IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA
BISMARCK DIVISION

| | | |
|---|---|---|
| STATE OF IOWA, | ) | |
| STATE OF NORTH DAKOTA, | ) | |
| STATE OF ALASKA, | ) | |
| STATE OF ARKANSAS, | ) | |
| STATE OF FLORIDA, | ) | |
| STATE OF GEORGIA, | ) | |
| STATE OF IDAHO, | ) | Case No.: _____ |
| STATE OF KANSAS | ) | |
| COMMONWEALTH OF KENTUCKY | ) | |
| STATE OF LOUISIANA, | ) | |
| STATE OF MISSOURI, | ) | |
| STATE OF MONTANA, | ) | |
| STATE OF NEBRASKA, | ) | |
| STATE OF SOUTH CAROLINA, | ) | |
| STATE OF SOUTH DAKOTA, | ) | |
| STATE OF TENNESSEE, | ) | |
| STATE OF TEXAS | ) | |
| STATE OF UTAH, | ) | |
| STATE OF WEST VIRGINIA, and | ) | |
| STATE OF WYOMING | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| COUNCIL ON ENVIRONMENTAL | ) | |
| QUALITY, and | ) | |
| BRENDA MALLORY, | ) | |
| in her official capacity as Chair, | ) | |
| | ) | |
| Defendants. | ) | |

---

**COMPLAINT**

---

Plaintiffs STATE OF IOWA, STATE OF NORTH DAKOTA, STATE OF

ALASKA, STATE OF ARKANSAS, STATE OF FLORIDA, STATE OF GEORGIA,

STATE OF IDAHO, STATE OF KANSAS, COMMONWEALTH OF KENTUCKY, STATE OF LOUISIANA, STATE OF MISSOURI, STATE OF MONTANA, STATE OF NEBRASKA, STATE OF SOUTH CAROLINA, STATE OF SOUTH DAKOTA, STATE OF TENNESSEE, STATE OF TEXAS, STATE OF UTAH, STATE OF WEST VIRGINIA and STATE OF WYOMING ("Plaintiff States"), allege as follows:

## NATURE OF THE ACTION

1.     The Council on Environmental Quality is a division within the Executive Office of the President tasked with coordinating federal environmental policy. Unfortunately, the Council has recently embarked on a campaign of imposing substantive, stringent, unworkable regulations with the effect—if not the deliberate goal—of stymying development of certain projects and resources within Plaintiff States and across the country. The Council's most recent salvo in this war on common-sense development and governance is the Rule challenged in this action, National Environmental Policy Act Implementing Regulations Revisions Phase 2, 89 Fed. Reg. 35442 (May 1, 2024) ("Final Rule"). The Final Rule becomes effective on July 1, 2024, and may retroactively apply to NEPA reviews commenced before that date as well.

2.     As courts have uniformly held since its enactment more than fifty years ago, NEPA is a purely procedural statute, requiring agencies to take a "hard look" at environmental consequences of proposed "major Federal actions significantly affecting the quality of the human environment," and to disseminate relevant environmental information to the public. NEPA does not mandate substantive

results, including the adoption or rejection of proposed actions based on their anticipated environmental impacts.

3.      Nevertheless, the Final Rule illegally seeks to transform NEPA's well-developed and carefully delineated procedures for environmental reviews of proposed federal agency actions into a substantive set of requirements to achieve broad and vague policy goals. The Final Rule's problematic changes include but are not limited to: (1) new limitations on the use of categorical exclusions for NEPA review, (2) elevation of atextual environmental justice and climate change considerations, (3) politically motivated fast-tracking favored projects, (4) creation of new mitigation obligations, and (5) the removal of clarity for public involvement.

4.      While the Council nominally claims that the Final Rule is intended to streamline and improve environmental permitting requirements, it inserts many arbitrary mandates into the environmental review system with the foreseeable effect of delaying and foreclosing disfavored types of projects. In part, that is due to the Final Rule's reliance on the Biden Administration's adoption of an unrealistic and unlawful "government-wide approach to advancing environmental justice" untethered to any federal statutory basis. *See id.* at 35445 (citing E.O. 14096, Revitalizing Our Nation's Commitment to Environmental Justice for All, 88 Fed. Reg. 2521 (Apr. 26, 2023)).

5.      Another unlawful component of the Final Rule can be found in the express introduction into NEPA of race-based environmental justice and other environmental considerations requiring that an agency identify and analyze

alternatives to any proposed agency actions to arrive at "the environmentally preferable alternative" that results in "maximizing environmental benefits"— including considering alternatives outside the agency's jurisdiction. *E.g.*, *id.* at 35565. That open-ended obligation and impossible-to-meet standard guarantee regulatory and schedule uncertainty and predictable litigation surrounding any controversial or disfavored project.

6.      Exemplifying the arbitrariness and uncertainty injected into the NEPA process by the Final Rule is its move to redefine the sources of "high quality information" that agencies must consider in their decision making—by stating that "high quality information" does not mean "best available science" but now must include "Indigenous Knowledge." *E.g.*, *id.* at 35525; *see also id.* at 35571 ("In preparing environmental documents, agencies shall use high-quality information, including reliable data and resources, models, and Indigenous Knowledge."). Such "Indigenous Knowledge" must be given equal weight to "other sources of scientific expertise." *Id.* The Final Rule offers no meaningful explanation for what is or is not included in "Indigenous Knowledge," and there is no reason given in the Final Rule as to why placing "Indigenous Knowledge" on an equal footing with "reliable data," "models," and "scientific expertise" fulfills NEPA or improves decisionmaking.

7.      Instead, NEPA requires federal agencies to engage in an informed, transparent, and public decision-making process to comprehensively analyze and evaluate the effects of their proposed actions. Plaintiff States have a vested interest in NEPA retaining its proper role and function. NEPA's focus on government

transparency and public participation ensures that States, territories, tribes, local governments, businesses, organizations, and individuals have a role in shaping federal agency actions. States, local governments, and the public have long relied on the NEPA process to identify the anticipated effects of proposed federal actions, including on the States' air, water, public lands, wildlife, cultural, and socioeconomic resources.

8.     In 2020, the Council undertook a much-needed comprehensive update of its more than 40-year-old NEPA regulations to modernize and consolidate NEPA implementation across the federal government. Those regulations have guided NEPA reviews since 2021.

9.     Congress stepped in with even further improvements to NEPA via the Fiscal Responsibility Act of 2023 ("FRA").

10.     Yet, through this Final Rule, the Council seeks to turn back the clock and transform NEPA's foundational purposes by undoing the modernizations and consolidation achieved in the 2020 regulations. The Final Rule violates the plain language and purpose of NEPA, its legislative history, and binding precedent. The Final Rule also lacks reasoned basis in the record and is otherwise arbitrary and capricious under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701 *et seq*.

11.     The Final Rule will add complexities and significantly exacerbate delays in the NEPA process and work against NEPA's goal of encouraging balanced public engagement. Also, it will create increased costs that further impede or even preclude critically needed projects of importance to Plaintiff States with any federal nexus. In

doing so, the Final Rule countermands, rather than implements, improvements to the NEPA process that Congress enacted less than a year ago in the 2023 FRA. It also frustrates recent federal laws like the 2021 Bipartisan Infrastructure Law, the 2022 Inflation Reduction Act, and the 2023 FRA, all aimed at timely delivery of needed infrastructure. The Final Rule's injection of ambiguity, new requirements, and unbounded agency discretion will also needlessly foster more development-crippling litigation by opportunistic project opponents using NEPA as a convenient tool to challenge federal agency approvals. The result undue federal interference with the States' sovereign and economic interests in the stewardship and development of critical projects and their respective natural resources.

12.     Accordingly, Plaintiff States respectfully ask this Court to vacate the Final Rule, remand it to the Council, enjoin the Council from enforcing the Final Rule, and resultingly reinstate the 2020 rule.

## JURISDICTION AND VENUE

13.     This action arises under the APA, 5 U.S.C. §§ 701–706. This Court has federal question jurisdiction over this action under 28 U.S.C. § 1331. An actual controversy exists between the Parties within the meaning of 28 U.S.C. § 2201(a). This Court may grant declaratory, injunctive, and other relief under 28 U.S.C. §§ 2201–2202 and 5 U.S.C. §§ 705–706.

14.     The APA allows for judicial review of final agency action. 5 U.S.C. §§ 702, 704. Courts reviewing agency action "shall" hold unlawful and set aside final agency actions, findings, and conclusions that are arbitrary and capricious, an abuse

of discretion, or otherwise not in accordance with law. 5 U.S.C. § 706(2)(A). The Final Rule is a final agency action and subject to judicial review under the APA.

15.     Many Plaintiff States submitted timely and detailed comments opposing the Council's proposed version of the Final Rule and have therefore exhausted all administrative remedies for the Final Rule. Plaintiff States have suffered legal injury due to the Council's actions and are adversely affected or aggrieved by the Council's actions within the meaning of the APA. 5 U.S.C. § 702.

16.     Venue is proper in this Court under 28 U.S.C. § 1391(e)(1) because (a) Defendants are U.S. agencies or officers acting in their official capacities; (b) the claims do not involve real property; and (c) this is the judicial district in which Plaintiff State of North Dakota resides.

## PARTIES

17.     Plaintiff States, appearing by and through their Attorneys General, are sovereign States that regulate the natural resources within their borders through duly enacted state laws administered by State officials and constituent agencies.

18.     Plaintiff Iowa is a sovereign State of the United States of America. Iowa sues to vindicate its sovereign, quasi-sovereign, financial, and proprietary interests. Iowa brings this suit through its attorney general, Brenna Bird. She is authorized by Iowa law to sue on the State's behalf under Iowa Code § 13.2.

19.     Plaintiff North Dakota is a sovereign State of the United States of America. North Dakota sues to vindicate its sovereign, quasi-sovereign, financial, and proprietary interests. Drew Wrigley is the Attorney General of North Dakota and is

authorized to "[i]nstitute and prosecute all actions and proceedings in favor or for the use of the state." N.D.C.C. § 54-12-01(2).

20. Plaintiff State of Alaska is a sovereign State of the United States of America. Alaska sues to vindicate its sovereign, quasi-sovereign, financial, and proprietary interests. Treg Taylor is the Attorney General of Alaska. Attorney General Taylor is authorized to bring legal actions on behalf of the State of Alaska and its citizens.

21. Plaintiff State of Arkansas is a sovereign State of the United States of America. Arkansas sues to vindicate its sovereign, quasi-sovereign, financial, and proprietary interests. Tim Griffin is the Attorney General of Arkansas. Attorney General Griffin is authorized to bring legal actions on behalf of the State of Arkansas and its citizens.

22. Plaintiff State of Florida is a sovereign State of the United States of America. Florida sues to vindicate its sovereign, quasi-sovereign, financial, and proprietary interests. Ashley Moody is the Attorney General of Florida. Attorney General Moody is authorized to bring legal actions on behalf of the State of Florida and its citizens.

23. Plaintiff State of Georgia is a sovereign State of the United States of America. Georgia sues to vindicate its sovereign, quasi-sovereign, financial, and proprietary interests. Christopher M. Carr is the Attorney General of Georgia. Attorney General Carr is authorized to bring legal actions on behalf of the State of Georgia and its citizens.

24.     Plaintiff State of Kansas is a sovereign State of the United States of America. Kansas sues to vindicate its sovereign, quasi-sovereign, financial, and proprietary interests. Kris W. Kobach is the Attorney General of Kansas. Attorney General Kobach is authorized to bring legal actions on behalf of the State of Kansas and its citizens.

25.     Plaintiff Commonwealth of Kentucky is a sovereign State of the United States of America. Kentucky sues to vindicate its sovereign, quasi-sovereign, financial, and proprietary interests. Russell Coleman is the Attorney General of Kentucky. Attorney General Coleman is authorized to bring legal actions on behalf of the Commonwealth of Kentucky and its citizens.

26.     Plaintiff State of Idaho is a sovereign State of the United States of America. Idaho sues to vindicate its sovereign, quasi-sovereign, financial, and proprietary interests. Raúl R. Labrador is the Attorney General of Idaho. Attorney General Labrador is authorized to bring legal actions on behalf of the State of Idaho and its citizens.

27.     Plaintiff State of Louisiana is a sovereign State of the United States of America. Louisiana sues to vindicate its sovereign, quasi-sovereign, financial, and proprietary interests. Liz B. Murrill is the Attorney General of Louisiana. Attorney General Murrill is authorized to bring legal actions on behalf of the State of Louisiana and its citizens.

28.     Plaintiff State of Missouri is a sovereign State of the United States of America. Missouri sues to vindicate its sovereign, quasi-sovereign, financial, and

proprietary interests. Andrew Bailey is the Attorney General of Missouri. Attorney General Bailey is authorized to bring legal actions on behalf of the State of Missouri and its citizens.

29.    Plaintiff State of Montana is a sovereign State of the United States of America. Montana sues to vindicate its sovereign, quasi-sovereign, financial, and proprietary interests. Austin Knudsen is the Attorney General of Montana. Attorney General Knudsen is authorized to bring legal actions on behalf of the State of Montana and its citizens.

30.    Plaintiff State of South Carolina is a sovereign State of the United States of America. South Carolina sues to vindicate its sovereign, quasi-sovereign, financial, and proprietary interests. Alan Wilson is the Attorney General of South Carolina. Attorney General Wilson is authorized to bring legal actions on behalf of the State of South Carolina and its citizens.

31.    Plaintiff State of South Dakota is a sovereign State of the United States of America. South Dakota sues to vindicate its sovereign, quasi-sovereign, financial, and proprietary interests. Marty J. Jackley is the Attorney General of South Dakota. Attorney General Jackley is authorized to bring legal actions on behalf of the State of South Dakota and its citizens.

32.    Plaintiff State of Tennessee is a sovereign State of the United States of America. Tennessee sues to vindicate its sovereign, quasi-sovereign, financial, and proprietary interests. Jonathan T. Skrmetti is the Attorney General of Tennessee. Attorney General Skrmetti is authorized to bring legal actions on behalf of the State

of Tennessee and its citizens.

33.    Plaintiff State of Texas is a sovereign State of the United States of America. Texas sues to vindicate its sovereign, quasi-sovereign, financial, and proprietary interests. Ken Paxton is the Attorney General of Texas. Attorney General Paxton is authorized to bring legal actions on behalf of the State of Texas and its citizens.

34.    Plaintiff State of Utah is a sovereign State of the United States of America. Utah sues to vindicate its sovereign, quasi-sovereign, financial, and proprietary interests. Sean D. Reyes is the Attorney General of Tennessee. Attorney General Reyes is authorized to bring legal actions on behalf of the State of Utah and its citizens.

35.    Plaintiff State of West Virginia is a sovereign State of the United States of America. West Virginia sues to vindicate its sovereign, quasi-sovereign, financial, and proprietary interests. Patrick Morrissey is the Attorney General of West Virginia. Attorney General Morrissey is authorized to bring legal actions on behalf of the State of West Virginia and its citizens.

36.    Plaintiff State of Wyoming is a sovereign State of the United States of America. Wyoming sues to vindicate its sovereign, quasi-sovereign, financial, and proprietary interests. Bridget Hill is the Attorney General of Wyoming. Attorney General Hill is authorized to bring legal actions on behalf of the State of Wyoming and its citizens.

37.    Defendant Council on Environmental Quality is a federal agency established by NEPA in the Executive Office of the President. the Council is mainly responsible for implementation of NEPA across the federal government.

38.    Defendant Brenda Mallory is the Chair of the Council and is sued in her official capacity. Ms. Mallory is the official responsible for implementing and fulfilling the Council's duties. Ms. Mallory signed the Final Rule.

## STATUTORY BACKGROUND

### The National Environmental Policy Act.

39.    NEPA was enacted in 1969 to ensure that "unquantified environmental amenities and values" are given "appropriate consideration in decisionmaking." 42 U.S.C. § 4332(2)(B).

40.    NEPA establishes transparent procedures that require federal decisionmakers to consider and account for the environmental impacts of federal projects. NEPA is meant to ensure that States and other public stakeholders are informed about the environmental impacts of projects and alternative solutions so that they may keep government accountable and weigh in on the decision-making process. Even while NEPA sets forth the procedural requirements for agency consideration and public engagement, it has long been "well settled that NEPA itself does not mandate particular results, but simply prescribes the necessary process." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989)

**The Administrative Procedure Act.**

41.    The APA establishes the procedural requirements for federal agency decision-making, including the agency rulemaking process. The APA requires the reviewing court to "hold unlawful and set aside agency action, findings, and conclusions found to be – (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "(B) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2).

42.    An agency action is arbitrary and capricious under the APA where "the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins.,* 463 U.S. 29, 43 (1983). An agency lacks authority to adopt a regulation that is "manifestly contrary to the statute." *Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 844 (1984); *see also* 5 U.S.C. § 706(2)(C).

43.    An agency amending its regulations must "provide a more detailed justification than what would suffice for a new policy created on a blank slate" when "its new policy rests upon factual findings that contradict those which underlay its prior policy," "or when its prior policy has engendered serious reliance interests that must be taken into account." *FCC v. Fox Television Stations,* 556 U.S. 502, 515 (2009). Any "[u]nexplained inconsistency" in agency policy is "a reason for holding an

13

interpretation to be an arbitrary and capricious change from agency practice." *National Cable & Telecomms. Ass'n v. Brand X Internet S*, 545 U.S. 967, 981 (2005).

## REGULATORY BACKGROUND AND FACTUAL ALLEGATIONS

44.   In 1978, in response to the NEPA statute and an Executive Order issued by President Carter, E.O. 11991, *Relating to Protection and Enhancement of Environmental Quality*, 42 Fed. Reg. 26967 (May 25, 1977), the Council promulgated regulations providing federal agencies with efficient and uniform procedures for implementing the NEPA process. Implementation of Procedural Provisions, 43 Fed. Reg. 55,978 (Nov. 29, 1978) ("1978 regulations").

45.   The Council made minor amendments to the 1978 regulations in 1979 and amended one section in 1986, but otherwise left the regulations largely unchanged for almost forty years.

46.   In the interim, NEPA reviews became longer, NEPA documents grew massively in size, and use of NEPA multiplied as a litigation tool to oppose disfavored agency policy decisions. Moreover, the Council regulations failed to keep pace with technological advances and best practices for timely and efficiently completing NEPA reviews.

### The 2020 Regulations

47.   On August 15, 2017, President Trump issued an Executive Order directing the Council to establish an interagency working group to propose changes to NEPA regulations. E.O. 13807, Establishing Discipline and Accountability in the Environmental Review and Permitting Process for Infrastructure Projects, 82 Fed.

Reg. 40463 (Aug. 24, 2017). In response, the Council published a final rule on July

15, 2020. Update to the Regulations Implementing the Procedural Provisions of the

National Environmental Policy Act, 85 Fed. Reg. 43304 (July 16, 2020) ("2020 rule").

48.    Among other changes, the 2020 rule simplified the regulatory definition

of "effects" or "impacts" of the proposed action and alternatives to eliminate separate

terms for "direct," "indirect," and "cumulative" effects, and to clarify which effects are

"reasonably foreseeable." That change did not exclude cumulative impacts or climate

change, which agencies and courts have consistently required in NEPA reviews.

Indeed, the 2020 rule incorporated such considerations as part of the baseline for the

"no action" alternative.

49.    The 2020 rule also codified decades of CEQ guidance and case law

implementing NEPA, enabling consolidated and consistent standards across the

federal government, and reducing uncertainty that otherwise engenders widespread

NEPA litigation.

### The 2022 Phase 1 NEPA Regulations.

50.    In 2021, President Biden issued Executive Order 13990, Protecting

Public Health and the Environment and Restoring Science to Tackle the Climate

Crisis, announcing his administration's intention to abandon most of the 2020 rule.

86 Fed. Reg. 7037 (Jan. 20, 2021).

51.    Executive Order 13990 directed the heads of all agencies to

"immediately review all existing regulations, orders, guidance documents, policies,

and any other similar agency actions promulgated, issued, or adopted" by the Trump

Administration that were or could deviate from the Biden Administration's policies as stated in the order and to consider suspending, revising, or rescinding such actions.

52.    In October 2021, the Council proposed a "Phase 1" rollback of the 2020 rule, which it then finalized with few changes in April 2022. National Environmental Policy Act Implementing Regulations Revisions, 86 Fed. Reg. 55757 (Oct. 7, 2021); National Environmental Policy Act Implementing Regulations Revisions, 87 Fed. Reg. 23453 (Apr. 20. 2022) (collectively, "Phase 1 Regulations").

53.    The 2022 Phase 1 Regulations reverted to language in the 1978 regulations regarding a NEPA document's purpose and need statement and alternatives, the definition of "effects," and individual agency NEPA regulations. The Council's Phase 1 Regulations stated that more substantial changes were forthcoming in a Phase 2 rulemaking.

### The Final Rule.

54.    On July 31, 2023, the Council issued its proposed version of the Phase 2 rulemaking to again revise the implementing regulations for NEPA across the federal government. National Environmental Policy Act Implementing Regulations Phase 2, 88 Fed. Reg. 49,924 (July 31, 2023).

55.    After notice and public comment on the proposed rules, the Council published the Final Rule on May 1, 2024. 89 Fed. Reg. 35442. The Final Rule becomes effective July 1, 2024. Because the Final Rule at 40 C.F.R. § 1506.12 also enables its application to "ongoing activities and environmental documents begun before" the Final Rule's effective date, its scope of impacts is even broader.

56.     Despite widespread critical comments, the Council largely finalized the most problematic provisions of the proposed version of the Rule. 89 Fed. Reg. 35442. In the few places where the Council changed its Final Rule, those changes were primarily cosmetic, intended to avoid unwanted scrutiny, and inconsequential to the Final Rule's operation.

57.     Emblematic of the Council's unauthorized transformation of NEPA from procedural to substantive, the Final Rule deletes text in 40 C.F.R. § 1500.1(a) describing NEPA as "a procedural statute," and substitutes language in 40 C.F.R. § 1502.1, which states that "[t]he primary purpose of an environmental impact statement prepared pursuant to [] NEPA is to serve as an action-forcing device by ensuring agencies consider the environmental effects of their action in decision making, so that the policies and goals defined in the Act are infused into the ongoing programs and actions of the Federal Government." 89 Fed. Reg. 35562–63. But contrary to that new language, the only actions that NEPA itself requires are the preparation of NEPA documents and public involvement, with the decision on any proposed agency action left to the lead agency and other agencies or entities with whom it is working in conjunction.

58.     Other parts of the Final Rule also are substantive rather than procedural, such as the emphasis on "the environmentally preferable alternative" and associated new list of regulatory criteria that are not mentioned in the statute, and imposition of new mitigation burdens, even where unnecessary to reduce a proposed

action's effects to insignificant and thereby obviate preparation of an environmental impact statement. *E.g.*, *id.* at 35565, 35569.

59.    Plaintiff States have a concrete interest in the Council's continuing adherence to NEPA and its role in ensuring environmentally informed decision-making and public participation. This interest of sovereign States is afforded special solicitude. Ensuring compliance with NEPA, along with analogous state environmental review laws which commonly are integrated with the NEPA process, is a part of many State agencies' operations. State energy and minerals development, transportation projects, utility construction and maintenance, forest and stormwater management, and other key infrastructure operations commonly have a federal nexus and thus must comply with NEPA. Plaintiff States' agencies regularly engage in the federal NEPA process, often via their agencies with special expertise relevant to the potential impacts to the States' natural resources.

60.    The new requirements immediately add new delays to the NEPA process and further frustrate the goals of the 2023 FRA's amendments to NEPA, and other recent federal laws including the 2021 Bipartisan Infrastructure Law and the 2022 Inflation Reduction Act, all aimed at timely delivery of needed infrastructure. The Final Rule's elevation of certain voices over others, even where not backed by scientific evidence, works against NEPA's goal of encouraging balanced public engagement. Also, the Final Rule will create increased costs that further impede or even preclude critically needed projects. The Final Rule's injection of ambiguity, new requirements, and unbounded agency discretion will also needlessly foster more

litigation by opportunistic project opponents using NEPA as a convenient tool to challenge federal agency approvals. Examples of such projects in various States with a federal nexus are compiled at https://www.whitehouse.gov/build/resources/state-fact-sheets/.

61. Plaintiff States have sovereign and proprietary interests in their natural resources, such as the States' fish and wildlife resources, which are State property held in trust by the States for the benefit of their people.

62. Iowa State agencies, including the Department of Natural Resources and the Department of Transportation, engage in the federal NEPA process to protect the state's interest in public safety, environmental quality, and state natural resources, and Iowa agencies have commented repeatedly on NEPA documents.

63. Examples of key ongoing or upcoming projects in Iowa that will be directly affected by the Final Rule include, but are not limited to, improvements to the Eastern Iowa Airport, construction of the Lewis & Clark Regional Water System, and modernization of the Upper Mississippi River System.

64. Iowa is planning to replace the Iowa 12 Gordon Drive Viaduct in Sioux City and that will be subject to NEPA evaluation. The new regulations will require additional evaluation beyond what is currently required.

65. Iowa is planning to reconstruct US 75 in the city of Hinton and that will be subject to NEPA evaluation. The new regulations will require additional evaluation beyond what is currently required.

66. The State of Iowa is planning to replace the US 67 Centennial Bridge

over the Mississippi River in Davenport and that will be subject to NEPA evaluation. The new regulations will require additional evaluation beyond what is currently required. This project will be done jointly with the state of Illinois.

67.    North Dakota has more than a million acres of federal lands, including five national parks, six national forests, and seven national historic landmarks. It also contains areas rich in oil and gas resources, as to which both surface and subsurface ownership is largely "checkerboarded," with federally managed lands adjacent to state, tribal, and privately owned lands. Moreover, a significant portion of the State consists of split estate lands, with different surface and subsurface owners. Although the surface and mineral estates in North Dakota were once more than 97 percent private- and State-owned, during the Depression in the 1930s, the federal government foreclosed on many farms in North Dakota and took ownership of both the mineral and surface estates. Many mineral estates were retained by the federal government, which has resulted in a large number of small federally owned mineral estate tracts scattered throughout western North Dakota. As a result of this intertwined land ownership, North Dakota is often necessarily a partner with the federal government for development of oil and gas resources. North Dakota has been forced to sue, and has prevailed, against other federal regulatory actions that, like the Final Rule, encroach on State energy resources.

68.    North Dakota State agencies, including the Department of Environmental Quality, and the Department of Trust Lands, frequently participate in the federal NEPA process as cooperating and commenting agencies.

69.     Examples of key ongoing or upcoming projects in North Dakota that will be directly affected by the Final Rule include, but are not limited to, the Fargo-Morehead Area Diversion and Inland Flood Risk Management Projects addressing flooding risks, highway projects on Tribal lands, and expansion of high-speed internet access.

70.     South Dakota State agencies including the Department of Agriculture and Natural Resources, Department of Game, Fish and Parks and the Department of Transportation, frequently participate in the federal NEPA process.

71.     South Dakota has more than two million acres of federal lands, including two national forests, three national grasslands, two national parks, and three national monuments. Other federal lands include lands owned and managed by the US Fish and South Dakota has nine federally recognized Indian tribes and their associated Indian country. State projects, such as highway projects, on tribal lands are subject to the NEPA process. Other key on-going or upcoming projects affected by the final rule includes, but is not limited to, construction of the Lewis & Clark Regional Water System Wildlife Service, Bureau of Land Management and Department of Defense. The new regulations will require additional evaluation beyond what is currently required for each of those projects.

72.     West Virginia State agencies, including the Department of Transportation, engage in the federal NEPA process to protect the state's interest in public safety, environmental quality, and state natural resources, and West Virginia agencies have commented repeatedly on NEPA documents.

21

73.     Examples of key ongoing or upcoming projects in West Virginia that will be directly affected by the Final Rule include, but are not limited to: the Coalfields Expressway project from Pineville to Mullens and West Virginia 16 to Pineville; the King Coal Highway Segment, which is beginning the NEPA process; and the Corridor H Highway Project in Tucker County—in which the Department of Transportation announced a notice of intent to prepare a supplemental environmental impact statement under NEPA to finish Corridor H. The new regulations will require additional evaluation beyond what is currently required for each of those projects.

74.     Tennessee State agencies and departments engage in the federal NEPA process through all three levels of environmental review. Among other things, Tennessee State departments compile a substantial number of documents relating to the Categorial Exclusion level of review, and also compile Environmental Assessments and Environmental Impact Statements. At present, Tennessee state agencies and departments have at least three Environmental Assessments underway, with at least five or six more anticipated to occur over the course of the next few years. The new regulations will require additional evaluation beyond what is currently required for each of those projects.

75.     Some States, including Alaska, Florida, and Utah, have been delegated NEPA responsibilities under the Surface Transportation Project Delivery Program. 23 U.S.C. § 327. Those States are obligated to implement the new Phase 2 regulations at the State level. The changes to NEPA will impose additional requirements on those States' Departments of Transportation under the terms of the operative memoranda

of understanding between those States and the federal government.

76.    Under the Final Rule, all agencies now expressly must take additional considerations and areas of expertise, including climate change-related effects, environmental justice communities, and Indigenous Knowledge into account as part of their NEPA review. And under new 40 C.F.R. § 1502.12, all agencies also must determine the environmentally preferable alternative for all proposed projects in an EIS before issuing a final determination under NEPA. Plaintiff States will incur harm due to the significant, unnecessary delays these requirements will impose on the completion of review and issuance of final determinations and permits for projects, including those that have already been thoroughly considered under NEPA prior to the Final Rule or under other required environmental reviews, and due to the resulting impediments to the development of critical natural resources and construction of much-needed infrastructure.

## CLAIMS FOR RELIEF
### COUNT ONE:
### The Final Rule Violates NEPA and the APA

77.    The States incorporate by reference the allegations of the preceding paragraphs.

78.    All regulations must be consistent with their authorizing statutes.

79.    NEPA is a procedural statute intended to ensure that federal agencies take a hard look at the environmental impacts of their proposed actions. The statute does not require or authorize an agency to take any substantive actions or to elevate the protection of environmental resources above other priorities.

80.    The Final Rule: (a) removes language in the prior regulations' describing NEPA as a procedural statute, and substitutes language suggesting that NEPA is, instead, an "action forcing" statute intended to preserve or even "enhance" the environment; (b) directs mitigation measures to address environmental justice and other perceived concerns, assigns mitigation types a "general order of priority," and requires a mitigation and compliance plan even after a federal agency has completed the NEPA process; and (c) emphasizes an "environmentally preferable alternative" based on new criteria that are not defined in NEPA's text. Those regulatory changes, among others in the Final Rule, improperly transform the process carefully delineated in NEPA into a substantive statute and a tool for achieving specific policy goals.

81.    The Final Rule also adds conditions to the use of categorical exclusions for NEPA review by redefining "extraordinary circumstances" in 40 C.F.R. § 1508.1 to include environmental justice concerns or risks from the effects of climate change. It also places conditions on an agency's adoption of another agency's categorical exclusion. NEPA imposes no such conditions. Because categorical exclusions are by far the most common level of NEPA review, these restrictions will result in widespread delays, and may even render certain projects infeasible to permit and construct.

82.    The Final Rule places outsized importance on climate change and environmental justice considerations in NEPA reviews, despite pointing to no statutory authority for either. The Final Rule even goes beyond the Council's

proposed version in 40 C.F.R. § 1502.6 by generally requiring an environmental impact statement to include "quantification of greenhouse gas emissions, from the proposed action and alternatives."

83.     The Final Rule also adds a new part to section 1501.8 to include "Indigenous Knowledge" as a new area of expertise for a cooperating agency, and language specifying "Indigenous Knowledge" as one type of "high-quality information" upon which an agency may base its determinations, but it does not define that term or provide any guidelines or parameters for its use or application. Thus, it is not consistent with other requirements in the final rule that an agency's determinations in its NEPA analysis should be informed by "relevant science" and must be "supported by credible scientific evidence."

84.     The Final Rule narrows the circumstances and scope of NEPA environmental documents that applicants or third-party contractors may prepare in the first instance. These limitations are arbitrary and not based in NEPA, including as amended by the FRA.

85.     The Final Rule is thus inconsistent with NEPA, the Council lacked the authority to issue it, and the Final Rule's revisions to existing regulations are *ultra vires* and unenforceable.

**COUNT TWO:**
**The Final Rule Is Arbitrary and Capricious and Violates the APA**

86.    The States incorporate by reference the allegations of the preceding paragraphs.

87.    Agency regulatory actions cannot be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). The Council must provide an internally consistent and satisfactory explanation for its actions. *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983); *Ala. Power Co. v. FCC*, 311 F.3d 1357, 1371 (11th Cir. 2002); *Gen. Chem. Corp. v. United States*, 817 F.2d 844, 846 (D.C. Cir. 1987).

88.    The Council has reversed course by promulgating the Final Rule only four years after it promulgated comprehensive updates to its 1978 NEPA regulations, without providing the requisite detailed explanation for the policy reversal.

89.    An agency must ensure that a new policy is itself supported by substantial record evidence, "based upon a consideration of the relevant factors," and supported with "rational connection[s] between the facts found and the choice made," *State Farm*, 463 U.S. at 43–44 (citations and quotations omitted).

90.    The Final Rule's deletions from the 2020 rule and newly added provisions will impose substantial burdens on States, project proponents, landowners, and others, without correspondingly advancing NEPA's purposes.

91.    The Final Rule in 40 C.F.R. § 1500.3(b) adds the following statement to its proposed rule: "It is the Council's intention that any allegation of noncompliance with NEPA and the regulations in this subchapter should be resolved as expeditiously

26

as appropriate." But that internally contradicts most of the Final Rule's changes to the 2020 rule and will have the effect of multiplying and prolonging disputes ostensibly raised under NEPA to delay or stop federal actions and approvals of other actions critical to the States.

92.    The Final Rule's unexplained departures from the council's prior policy in its regulations implementing NEPA are arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law.

93.    The Final Rule at 40 C.F.R. § 1507.3(b) affords all federal agencies "no more than 12 months" after the Final Rule's effective date to propose revisions to their own NEPA implementing procedures. That timeframe is unreasonably short, particularly given that CEQ took multiple years to complete its Final Rule, and in the interim CEQ directed (unlawfully) federal agencies to ignore the 2020 rule's directive for agencies to amend their regulations as necessary to comport with the 2020 rule. The States and other stakeholders also need sufficient time for meaningful review and commenting on each agency's proposed revisions to their respective NEPA implementing procedures; such meaningful participation cannot be accomplished across myriad agencies all at once. For this reason, too, the Final Rule is arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law.

## COUNT THREE:
## The Final Rule's NEPA Review Violates NEPA

94.    The States incorporate by reference the allegations of the preceding paragraphs.

95.    The Council prepared a "special" Environmental Assessment and Finding of No Significant Impact in conjunction with its Final Rule, which—ironically for a NEPA rule—failed to sufficiently consider the Final Rule's relevant impacts under NEPA.

96.    No authority recognizes such "special" environmental document or excuses the Council from a full NEPA analysis for its Final Rule. The Final Rule's new section at 40 C.F.R. § 1507.3(b)(3) that purports to create such an exception from NEPA review is likewise baseless, and in any event cannot apply to the Final Rule since it does not become effective until July 1, 2024, after completion of the Final Rule's NEPA review.

97.    The Council's NEPA documents for the Final Rule assert that it will result in "better" decisions and environmental outcomes, reflecting its substantive nature and real on-the-ground consequences not adequately assessed by the Council.

98.    The Final Rule's deletion of the proposed rule's provisions that would have exempted significant "beneficial" impacts from an environmental impact statement reflect that even if the Council views its Final Rule as beneficial, those significant impacts require more fulsome NEPA review.

## COUNT FOUR:
## The Final Rule Violates the Major Questions Doctrine

99.    The States incorporate by reference the allegations of the preceding paragraphs.

100.    The 2024 Rules lack "clear congressional authorization."

101.    the Council has not previously asserted the Final Rules' expansive reach under the more than 50-year-old NEPA statute.

102.    The Final Rule has major economic and political significance.

103.    Among other flaws, the Final Rule creates distinctions between favored and disfavored projects that are intended to reshape national policy (such as the Nation's mix of electric generation sources) and are not based on NEPA's text.

104.    The Final Rule therefore violates the "major questions" doctrine. *West Virginia v. EPA*, 142 S. Ct. 2587, 2607–08 (2022).

### PRAYER FOR RELIEF

WHEREFORE, the States respectfully ask this Court to:

a.    Declare that the Final Rule is *ultra vires* or otherwise not in accordance with NEPA;

b.    Declare that the Final Rule is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law under the APA;

c.    Vacate and set aside the Final Rule;

d.    Enjoin Defendants from implementing, enforcing, relying on, or otherwise proceeding on the basis of the Final Rule;

e.    Remand the Final Rule to the Council to issue rules consistent with NEPA;

f.    Resultingly reinstate the Council's 2020 rule implementing NEPA;

g.    Award the States their costs and attorneys' fees; and

h.    Grant the States such other relief as the Court deems just and proper.

Respectfully submitted,

May 21, 2024

BRENNA BIRD
Attorney General of Iowa

/s/ Eric Wessan
ERIC WESSAN
*Solicitor General*
Alexa Den Herder
*Assistant Solicitor General*
Hoover State Office Building
1305 East Walnut Street
Des Moines, Iowa 50319
(515) 823-9117
eric.wessan@ag.iowa.gov
alexa.denherder@ag.iowa.gov

*Counsel for the State of Iowa*

TREG TAYLOR
Alaska Attorney General

/s/ Wade M. Withington
WADE M. WITHINGTON*
*Assistant Attorney General, Civil Division*
Office of the Alaska Attorney General
Alaska Department of Law
1031 W. 4th Avenue, Suite 200
(907) 269-5232
wade.withington@alaska.gov

*Counsel for the State of Alaska*

TIM GRIFFIN
Arkansas Attorney General

/s/ Nicholas J. Bronni
NICHOLAS J. BRONNI
*Solicitor General*
DYLAN L. JACOBS
*Deputy Solicitor General*
Office of the Arkansas Attorney General

Respectfully submitted,

DREW H. WRIGLEY
North Dakota Attorney General

/s/ Philip Axt
PHILIP AXT
*Solicitor General*

Office of Attorney General
600 E. Boulevard Ave Dept. 125
Bismarck ND 58505
(701) 328-2210
pjaxt@nd.gov

*Counsel for the State of North Dakota*

323 Center Street, Suite 200
Little Rock, AR 72201
(501) 682-6302
Nicholas.Bronni@ArkansasAG.gov

*Counsel for the State of Arkansas*

ASHLEY MOODY
Florida Attorney General

/s/ Natalie P. Christmas
Natalie P. Christmas (Fla. Bar. No. 1019180)
SENIOR COUNSELOR
Office of the Attorney General
The Capitol, Pl-01
Tallahassee, Florida 32399-1050
(850) 414-3300
(850) 410-2672 (fax)
natalie.christmas@myfloridalegal.com

*Counsel for the State of Florida*

CHRISTOPHER M. CARR
Georgia Attorney General

/s/ *Justin T. Golart*
JUSTIN T. GOLART *
*Deputy Solicitor General*
Office of the Attorney General of
Georgia
40 Capitol Square, SW
Atlanta, GA 30334
(404) 458-3252
jgolart@law.ga.gov

*Counsel for the State of Georgia*

RAÚL R. LABRADOR
IDAHO ATTORNEY GENERAL

/s/ *Joshua N. Turner*
JOSHUA N. TURNER
*Chief of Constitutional Litigation and Policy*
ALAN M. HURST
*Solicitor General*
JOY M. VEGA
*Lead Deputy Attorney General*
Office of the Idaho Attorney General
P.O. Box 83720
Boise, Idaho 83720
(208) 334-2400
Josh.Turner@ag.idaho.gov
Alan.Hurst@ag.idaho.gov
Joy.Vega@ag.idaho.gov

*Counsel for State of Idaho*

KRIS W. KOBACH
Kansas Attorney General

*/s/Abhishek S. Kambli*
ABHISHEK S. KAMBLI
*Deputy Attorney General*
Office of the Kansas Attorney General
120 SW 10th Avenue, 2nd Floor

Topeka, Kansas 66612
Telephone: (785) 296-2215
Fax: (785) 296-3131
abhishek.kambli@ag.ks.gov

*Counsel for the State of Kansas*

RUSSELL COLEMAN
Kentucky Attorney General

/s/ *Victor B. Maddox*
VICTOR B. MADDOX*
AARON SILLETTO
Kentucky Office of the Attorney
General
700 Capital Avenue, Suite 118
Frankfort, Kentucky 40601
(502) 696-5300
victor.maddox@ky.gov
aaron.silletto@ky.gov

*Counsel for the Commonwealth of Kentucky*

LIZ B. MURRILL
Louisiana Attorney General

*/s/ J. Benjamin Aguiñaga*
J. BENJAMIN AGUIÑAGA
*Solicitor General*
AUTUMN HAMIT PATTERSON
*Special Assistant Solicitor General*
Office of the Louisiana Attorney
General
1885 North Third Street
Baton Rouge, LA 70804
(225) 326-6766
aguinagaj@ag.louisiana.gov

*Counsel for the State of Louisiana*

ANDREW T. BAILEY
Missouri Attorney General

/s/ *Joshua M. Divine*
Joshua M. Divine, 69875MO
*Solicitor General*
Office of the Attorney General
207 West High St.
Jefferson City, MO 65101
Phone: (573) 751-8870
Josh.Divine@ago.mo.gov

*Counsel for the State of Missouri*

AUSTIN KNUDSEN
Montana Attorney General

*/s/ Christian B. Corrigan*
Christian B. Corrigan
*Solicitor General*
Montana Department of Justice
215 North Sanders
P.O. Box 201401
Helena, Montana 59620-1401
(406) 444-2026
christian.corrigan@mt.gov

*Counsel for the State of Montana*

MICHAEL T. HILGERS
Nebraska Attorney General

*/s/ Grant D. Strobl*
GRANT D. STROBL
*Assistant Solicitor General*
Office of the Nebraska Attorney
General
2115 State Capitol
Lincoln, NE 68509
(402) 471-2683
grant.strobl@nebraska.gov

*Counsel for the State of Nebraska*

ALAN WILSON
South Carolina Attorney General

/s/ *Joseph D. Spate*
Joseph D. Spate
*Assistant Deputy Solicitor General*
Office of the South Carolina Attorney
General
1000 Assembly Street
Columbia, SC 29201
(803) 734-3371
josephspate@scag.gov

*Counsel for the State of South
Carolina*

MARTY J. JACKLEY
South Dakota Attorney General

*/s/ Charles McGuigan*
Charles McGuigan
*Deputy Attorney General*
1302 East Highway 14, Suite 1
Pierre, SD 57501-8501
605-773-3215
charles.mcguigan@state.sd.us

*Counsel for the State of South Dakota*

JONATHAN SKRMETTI
Tennessee Attorney General and
Reporter

*/s/ Whitney Hermandorfer*
Whitney Hermandorfer
*Director of Strategic Litigation*
Attorney General and Reporter of
Tennessee
Tennessee Attorney General's Office
P.O. Box 20207
Nashville, Tennessee 37202-0207
Phone: (615) 741-3491
Whitney.Hermandorfer@ag.tn.gov

*Counsel for the State of Tennessee*

KEN PAXTON
Texas Attorney General

BRENT WEBSTER
*First Assistant Attorney General of Texas*
RALPH MOLINA
*Deputy Attorney General for Legal Strategy*
RYAN D. WALTERS
*Chief, Special Litigation Division*

*/s/ Susanna Dokupil*
SUSANNA DOKUPIL
*Lead Attorney*
*Special Counsel*
Texas State Bar No. 24032801
JACOB E. PRZADA
*Special Counsel*
Texas State Bar No. 24125371
MUNERA AL-FUHAID
*Special Counsel*
Texas State Bar No. 24094501
Office of the Attorney General of Texas
P.O. Box 12548 (MC 009)
Austin, TX 78711-2548
Phone: (512) 936-3754
FAX: (512) 457-4410
Susanna.Dokupil@oag.texas.gov
Jacob.Przada@oag.texas.gov
Munera.Al-Fuhaid@oag.texas.gov

*Attorneys for the State of Texas*

SEAN D. REYES
Utah Attorney General

*/s/ Renee Spooner*
RENEE SPOONER
*Assistant Attorney General*
350 N. State Street, Suite 230

P.O. Box 142320
Salt Lake City, UT 84114-2320
Telephone: (385) 285-5740
rspooner@agutah.gov

*Counsel for the State of Utah*

PATRICK MORRISEY
West Virginia Attorney General

*/s/ Michael R. Williams*
LINDSAY S. SEE
*Solicitor General*
MICHAEL R. WILLIAMS
*Principal Deputy Solicitor General*
Office of the Attorney General of West Virginia
State Capitol Complex
Building 1, Room E-26
Charleston, WV 25301
(304) 558-2021
michael.r.williams@wvago.gov

*Counsel for State of West Virginia*

BRIDGET HILL
Wyoming Attorney General

*/s/ Ryan Schelhaas*
RYAN SCHELHAAS
*Chief Deputy*
Office of the Attorney General of Wyoming
109 State Capitol
Cheyenne, WY 82002
(307) 777-7895
ryan.schelhaas@wyo.gov

*Counsel for the State of Wyoming*

*Application for admission or pro hac vice forthcoming

33