# EXHIBIT B

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA
BISMARK DIVISION

| | |
|---|---|
| STATE OF IOWA, | ) |
| STATE OF NORTH DAKOTA, | ) |
| STATE OF ALASKA, | ) |
| STATE OF ARKANSAS, | ) |
| STATE OF FLORIDA, | ) |
| STATE OF GEORGIA, | ) |
| STATE OF IDAHO, | ) Case No. 1:24-cv-00089-CRH |
| STATE OF KANSAS, | ) |
| COMMONWEALTH OF KENTUCKY, | ) |
| STATE OF LOUISIANA, | ) |
| STATE OF MISSOURI, | ) |
| STATE OF MONTANA, | ) |
| STATE OF NEBRASKA, | ) |
| STATE OF SOUTH CAROLINA, | ) |
| STATE OF SOUTH DAKOTA, | ) |
| STATE OF TENNESSEE, | ) |
| STATE OF TEXAS, | ) |
| STATE OF UTHA, | ) |
| STATE OF VIRGINIA, | ) |
| STATE OF WEST VIRGINIA, and | ) |
| STATE OF WYOMING, | ) |
| | ) |
| Plaintiffs, | ) |
| v. | ) |
| | ) |
| COUNCIL ON ENVIRONMENTAL | ) |
| QUALITY, and BRENDA MALLORY, in | ) |
| her official capacity as Chair, | ) |
| | ) |
| Defendants. | ) |

---

**DECLARATION OF
JAN HASSELMAN**

---

DECLARATION OF JAN HASSELMAN

- 1 -

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA  98104-1711*
*(206) 343-7340*

I, Jan Erik Hasselman, declare as follows:

1.  I am an attorney in the Northwest Regional Office of Earthjustice, and I represent Alaska Community Action on Toxics, Center for Biological Diversity, Center for Environmental Health, Center for Food Safety, Environmental Law and Policy Center, Environment Protection Information Center, Food & Water Watch, Fort Berthold POWER, Friends of the Earth, Green Latinos, Labor Council on Latin American Advancement, Mālama Mākua, National Parks Conservation Association, National Wildlife Federation, Ocean Conservancy, People's Collective for Environmental Justice, Rio Grande International Study Center, Southern Utah Wilderness Alliance, The Wilderness Society, and Winter Wildlands Alliance (collectively, "Applicants").  I am also a member in good standing of the bar of the State of Washington and am admitted to practice in the United States District Court for the District of North Dakota.  I make this declaration based on my personal knowledge and, if called to testify, could and would testify as stated herein.

2.  Attached hereto as **Exhibit 1** is a true and correct copy of the First Amended Complaint for Declaratory and Injunctive Relief, dated October 6, 20202, filed in *Alaska Community Action on Toxics v. Council on Environmental Quality*, United States District Court for the Northern District of California, ECF No. 22, Case No. 3:20-cv-5199-RS.

3.  Attached hereto as **Exhibit 2** is a true and correct copy of a letter dated September 29, 2023, from Center for Biological Diversity, et al. to Council on Environmental Quality regarding Phase 2 regulations implementing National Environmental Policy Act, Docket No. 2023-0003.

DECLARATION OF JAN HASSELMAN

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA  98104-1711*
*(206) 343-7340*

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

DATED this 27th day of June, 2024.

*s/ Jan E. Hasselman*
JAN E. HASSELMAN

DECLARATION OF JAN HASSELMAN

- 3 -

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA  98104-1711*
*(206) 343-7340*

# EXHIBIT 1

KRISTEN L. BOYLES (CSBA #158450)
JAN E. HASSELMAN (WSBA # 29107)
*[Admitted Pro Hac Vice]*
EARTHJUSTICE
810 Third Avenue, Suite 610
Seattle, WA  98104
(206) 343-7340
kboyles@earthjustice.org
jhasselman@earthjustice.org

SUSAN JANE M. BROWN (OSBA #054607)
*[Admitted Pro Hac Vice]*
WESTERN ENVIRONMENTAL LAW CENTER
4107 NE Couch St.
Portland, OR.  97232
(503) 914-1323
brown@westernlaw.org

GREGORY C. LOARIE (CSBA #215859)
EARTHJUSTICE
50 California Street, Suite 500
San Francisco, CA  94111
(415) 217-2000
gloarie@earthjustice.org

*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | |
|---|---|
| ALASKA COMMUNITY ACTION ON TOXICS, AMERICAN ALPINE CLUB, CALIFORNIA WILDERNESS COALITION, CENTER FOR BIOLOGICAL DIVERSITY, CENTER FOR ENVIRONMENTAL HEALTH, CENTER FOR FOOD SAFETY, ENVIRONMENT AMERICA, ENVIRONMENTAL DEFENSE FUND, ENVIRONMENTAL PROTECTION INFORMATION CENTER, FOOD AND WATER WATCH, FORT BERTHOLD POWER, FRIENDS OF THE EARTH, NATIONAL PARKS CONSERVATION ASSOCIATION, NATIONAL WILDLIFE | Case No. 3:20-cv-5199-RS<br><br>Related Case: No. 3:20-cv-6057-RS<br><br>FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF<br><br>(National Environmental Policy Act, 42 U.S.C. § 4321 *et seq.*; Administrative Procedure Act, 5 U.S.C. § 551 *et seq.*; Endangered Species Act, 16 U.S.C. § 1531 *et seq.*) |

FIRST AMENDED COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 1 -

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA  98104-1711*
*(206) 343-7340*

1  | FEDERATION, OCEAN CONSERVANCY,
2  | RIO GRANDE INTERNATIONAL STUDY
   | CENTER, SOUTHERN UTAH
3  | WILDERNESS ALLIANCE, WE ACT FOR
   | ENVIRONMENTAL JUSTICE, WESTERN
4  | WATERSHEDS PROJECT, THE
   | WILDERNESS SOCIETY, and WINTER
5  | WILDLANDS ALLIANCE,

6  |                  Plaintiffs,

   | v.

7  | COUNCIL ON ENVIRONMENTAL
8  | QUALITY, and MARY NEUMAYR, in her
   | official capacity as Chair of the Council on
9  | Environmental Quality,

10 |                  Defendants.

## INTRODUCTION

1.      The National Environmental Policy Act of 1970 ("NEPA"), 42 U.S.C. § 4331 *et*

*seq*., often called the "Magna Carta" of American environmental law, embodies our Nation's

environmental conscience.  In enacting NEPA, Congress issued a sweeping declaration of values

and a call to action, centering the protection of human health and the environment in all federal

agency decisions.  The statute affirms the government's role to "fulfill the responsibilities of

each generation as trustee of the environment for succeeding generations."  *Id*. § 4331(b)(1).  To

implement these goals, NEPA institutes a national policy of "look before you leap" by requiring

all federal agencies to carefully analyze and disclose to the public the potential environmental

impacts of, and feasible alternatives to, federal agency actions.  *Id*. § 4332(c).  It is, in short, the

people's environmental law.

2.      Since 1978, regulations promulgated by the Council on Environmental Quality

("CEQ"), an agency created by NEPA within the executive office of the President, have guided

FIRST AMENDED COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 2 -

1    every federal agency's implementation of NEPA.  *See* 40 C.F.R. Part 1500 (1978).  CEQ's

2    regulations codified early judicial precedent interpreting the meaning and reach of NEPA's

3    obligations, and they provided the basis for a substantial body of judicial precedent spanning

4    over four decades.  CEQ's regulations also formed the foundation for more specific regulations

5    enacted by federal "action" agencies—from the U.S. Forest Service to the Federal Energy

6    Regulatory Commission—to implement their particular missions.  Over the decades, the 1978

7    CEQ regulations have stood the test of the time, with only minor amendments.

8            3.      That long history of continuity with respect to CEQ's interpretation of NEPA has

9    come to an abrupt halt under the current administration.  The current administration explicitly

10   admitted that it placed the interests of pipelines, fossil fuel energy production, and road building

11   over that of environmental and public health.  Over the vociferous objections of states, members

12   of Congress, myriad conservation, environmental justice, and public health organizations, and

13   the general public, on July 16, 2020 CEQ issued a final rule ("Final Rule") rewriting the entirety

14   of its 1978 regulations.  *Update to the Regulations Implementing the Procedural Provisions of*

15   *the National Environmental Policy Act; Final Rule*, 85 Fed. Reg. 43,304 (July 16, 2020) (to be

16   codified at 40 C.F.R. Part 1500).  More than an update, the Final Rule upends virtually every

17   aspect of NEPA and its longstanding practice, contradicts decades of court interpretations of

18   NEPA's mandates, and undercuts the reliance placed on NEPA by the public, decision-makers,

19   and project proponents.  The Final Rule limits the scope of actions to which NEPA applies,

20   eviscerates the thorough environmental analysis that lies at the heart of the statute, reduces the

21   ability of the public to participate in federal agency decision-making, and seeks to limit judicial

22   review of agency NEPA compliance.  All told, the Final Rule frustrates Congress's manifest

23   intent in enacting NEPA and threatens human health and the environment.

24

25   FIRST AMENDED COMPLAINT FOR DECLARATORY        *Earthjustice*
     AND INJUNCTIVE RELIEF - 3 -                    *810 Third Avenue, Suite 610*
26                                                  *Seattle, WA  98104-1711*
                                                    *(206) 343-7340*

4.      Plaintiffs in this action are a diverse coalition of national and regional environmental justice, outdoor recreation, public health, and conservation organizations that rely on NEPA to protect their varied interests in human health and the environment.  Plaintiffs challenge the Final Rule for four broad reasons.  First, CEQ failed to consider and disclose the significant environmental impacts from the Final Rule in an environmental assessment ("EA") or environmental impact statement ("EIS"), in violation of NEPA itself.  Second, the Final Rule is arbitrary and capricious in a number of ways, as CEQ failed to explain its decision in light of the evidence in the record, including public comments, failed to review the impacts of the rule on the advancement of environmental justice, failed to consider the relevant factors when altering longstanding practice, and changed longstanding agency interpretations and practice without adequate explanation or justification.  Third, in many ways, the Rule is inconsistent with the text, structure, and intent of NEPA itself and violates the Administrative Procedure Act ("APA").  Finally, CEQ failed to consult under Endangered Species Act ("ESA") Section 7 on the Final Rule, a rule that clearly may affect ESA-listed species and critical habitat.

5.      Plaintiffs seek an order declaring the Final Rule unlawful and vacating the Final Rule, reinstating the NEPA regulations previously in force.

JURISDICTION AND VENUE

6.      This Court has jurisdiction pursuant to 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 1346 (United States as defendant).  The Court may issue a declaratory judgment and further relief under 28 U.S.C. §§ 2201-02.  This action is brought pursuant to the APA, 5 U.S.C. § 551 *et seq.* and the ESA, 16 U.S.C. § 1540(g)(1).  A subset of Plaintiffs provided 60 days' notice of intent to sue on July 31, 2020 to federal defendants.  A copy of the notice is appended as Exhibit A.

FIRST AMENDED COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 4 -

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA  98104-1711*
*(206) 343-7340*

7.      Venue is properly vested in this Court under 28 U.S.C. § 1391(e), as a number of Plaintiffs reside in this district, Plaintiffs have members and offices in this District, and many of the consequences of the defendants' violations of the law giving rise to the claims occurred or will occur in this district.

INTRADISTRICT ASSIGNMENT

8.      This case is properly assigned to the San Francisco Division or the Oakland Division under Civil L.R. 3-2(c) because several of the Plaintiffs and/or their members are located in counties within those districts.

PARTIES

A.      Plaintiffs

1.      Descriptions, Interests, and Injury of Each Plaintiff Organization

9.      Plaintiff Alaska Community Action on Toxics ("ACAT") is a 501(c)(3) non-profit with its main office in Anchorage, Alaska.  ACAT also has staff and conducts community health research in Gambell and Savoonga, both located on Saint Lawrence Island, Alaska.  ACAT believes everyone has a right to clean air, clean water, and toxic-free food.  Driven by a core belief in environmental health and justice, ACAT empowers communities to eliminate exposure to toxics through collaborative research, shared science, education, organizing, and advocacy. ACAT employs a community-based approach guided by the following core values: community right-to-know, environmental justice, the precautionary principle, elimination of the production and release of toxics, rights and sovereignty of Indigenous peoples, and a culture of caring and wellness.  ACAT has approximately 300 donors, 50 volunteers, and several thousand people who have signed up as interested citizens and activists to receive communications and actions alerts about issues relevant to environmental contamination by toxic chemicals.

FIRST AMENDED COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 5 -

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA  98104-1711*
*(206) 343-7340*

10.     ACAT works primarily with Alaska Native communities who rely on the land and ocean for physical, spiritual, and cultural sustenance.  Those communities depend on healthy marine ecosystems, in particular, for hunting, fishing, and food security.  ACAT conducts public education programs to educate its constituent members about the environmental and public health risks, including risks and harms from oil development, chemical dispersants used in oil spill response, the proposed Pebble and Donlin Creek Mines, the proposed Ambler Mining District Industrial Access Road, and military training, testing, and bombing/artillery exercises in sensitive ecological areas, such as wetlands, stream and river corridors, and estuaries (e.g. bombing of Eagle River Flats) and other areas of high biological diversity (e.g. high impact training operations in the Gulf of Alaska).

11.     ACAT regularly uses NEPA and its public processes to advocate for issues on behalf of its supporters and communities in Alaska.  ACAT has most recently submitted scoping comments in response to the 2020 U.S. Department of Defense, Department of the Air Force Notice of Intent to prepare an Environmental Impact Statement under the National Environmental Policy Act for the proposed action of year-round mortar and artillery live fire training on Eagle River Flats, an ecologically and culturally important estuary north of Anchorage on the Joint Bases Elmendorf AFB-Fort Richardson.  ACAT also prepared comments for the scoping process and on the Draft Environmental Impact Statements for the proposed Donlin Creek Mine and Ambler Mining District Industrial Access Road.  In 2019, ACAT prepared and submitted comments on the Draft Environmental Impact Statement for the proposed Pebble Mine.

12.     As a science-based organization with over 20 years of experience working on toxic contamination, ACAT has worked with many Alaskan communities faced with and

FIRST AMENDED COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 6 -

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA  98104-1711*
*(206) 343-7340*

1    concerned about pollution from mines and oil exploitation and the effects on the environment,

2    traditional wild foods, and people's health.  ACAT staff, supporters, and the communities ACAT

3    works with are harmed by the Final Rule because they eliminate the vital protections that have

4    been in place for decades.  The environmental justice implications of the Final Rule are

5    profound, and preventing such injustices is at the core of ACAT's mission.

6          13.     Staff member Patti Saunders is ACAT's Development Director, having previously

7    worked as an attorney and commercial fisherman in Prince William Sound, Southeast Alaska,

8    and Bristol Bay.  Ms. Saunders has previously submitted public comments to government

9    agencies during NEPA review processes and will do so again in the future when proposed

10   projects threatened the environmental and public health of Alaska.  As a commercial fisherman

11   who fished in Bristol Bay for a season and who has friends who have (and in some cases

12   continue to) fish there, she is keenly aware of the Bristol Bay watershed's importance as a world-

13   class fishery that has both economic and cultural value for Alaskans.  It is a virtually pristine,

14   intact ecosystem that has supported Alaska Natives for thousands of years.  It also provides

15   recreational opportunities for Alaskans and non-Alaskans: fishing, birding, wildlife viewing,

16   nature photography, hiking, kayaking, and canoeing.  Ms. Saunders enjoys these types of

17   recreational opportunities, including birdwatching, in the Bristol Bay watershed.  She has

18   definite plans to return to the Bristol Bay region to enjoy all it has to offer an outdoor enthusiast

19   in the next two to four years.

20         14.     Pamela Miller has served as ACAT's Executive Director since 1997.  Ms. Miller

21   has more than 35 years of experience in research, policy, advocacy, and training programs

22   focused on environmental health, justice, human rights, and marine ecology.  Since 2005, she has

23   served as Principal Investigator for community-based environmental health research projects

24

25   FIRST AMENDED COMPLAINT FOR DECLARATORY          *Earthjustice*
     AND INJUNCTIVE RELIEF - 7 -                      *810 Third Avenue, Suite 610*
26                                                    *Seattle, WA  98104-1711*
                                                      *(206) 343-7340*

1  supported by the National Institute of Environmental Health Sciences and focused on the long-

2  term effects of endocrine-disrupting chemicals on the environment and human health.  In 2016,

3  Ms. Miller was elected to serve as the co-chair of the International Pollutants Elimination

4  Network, a global network of more than 500 environmental health and justice organizations

5  working in over 100 countries for a toxics-free future.  Ms. Miller has personally been involved

6  in writing NEPA comments, attending public hearings, and engaging in litigation when NEPA

7  has been violated.  Ms. Miller has been the primary person working on chemical dispersant

8  issues for ACAT since 2002.  The use of dispersant chemicals in the event of an offshore oil spill

9  would greatly impact the health and cultural well-being of ACAT's supporters, including its

10  Board Members.

11        15.      Harriet Penayah, a Yupik Elder from the Native Village of Savoonga on Saint

12  Lawrence Island in the Bering Sea, is an ACAT board member.  Ms. Penayah and her family rely

13  on the harvest of marine fish and marine mammals for spiritual, physical, and cultural

14  sustenance.  A significant part of the Penayah family diet comes from the ocean, including fish

15  like salmon, cod, and halibut, as well as marine mammals like ringed seal, bearded seal, walrus,

16  and bowhead whale.  St. Lawrence Island is located in the northern Bering Sea and within the

17  Norton Sound region on the Alaska Outer Continental Shelf.  The Norton Sound area

18  experienced oil and gas development in the 1980s.  It is also proposed for oil and gas leasing

19  under the federal Bureau of Ocean Energy Management's Draft Proposed Program for 2019-

20  2024.  Oil development in the Bering Sea and use of chemical dispersants in response to an oil

21  spill in the Norton Sound region would impact Ms. Penayah and her family's food security by

22  polluting the marine ecosystems on which they depend for food.  It would also disrupt the

23  migratory patterns of important marine mammals, such as the bowhead whale.  Marine animals

24

25  FIRST AMENDED COMPLAINT FOR DECLARATORY
    AND INJUNCTIVE RELIEF - 8 -
26

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA  98104-1711*
*(206) 343-7340*

1    form the basis of Harriet's diet and cultural traditions.  If chemical dispersants impacted the

2    safety of these food sources, Ms. Penayah and her family would not be able to replace these

3    sources with food purchased from a grocery store, due to the deep cultural importance that these

4    animals hold for Ms. Penayah and her family.  ACAT engages in the NEPA process, including

5    preparation of public comments and participation in hearings concerning oil and gas

6    development in the Bering, Chukchi, and Beaufort Seas, in order to protect the health of marine

7    ecosystems and Alaska Native communities that rely on traditional foods from the sea.

8            16.     Plaintiff American Alpine Club ("AAC") is a 501(c)(3) non-profit organization

9    based in Golden, Colorado with over 25,000 members nationally and 3,491 members in

10   California.  Founded in 1902 to support the research and exploration of mountainous regions, the

11   AAC remains committed to supporting the climbing and human-powered outdoor recreation

12   communities over a century later.  At the core of AAC's policy efforts are critical issues facing

13   climbers and outdoor recreationists nationally, such as keeping public lands pristine, wild, and

14   open to human-powered recreation.  One of the key tools that enable the AAC to effectively

15   advocate for these issues on behalf of its membership and the climbing community broadly is the

16   public process afforded by NEPA.  NEPA mandates informed decision-making, based on sound

17   science, and requires that, to the fullest extent possible, all agencies of the federal government

18   take a hard look at environmental consequences prior to issuing a decision.  NEPA declares a

19   broad national commitment to protecting and promoting environmental quality under the CEQ

20   regulations, which are influential in shaping agency implementation of the statute.

21           17.     The Final Rule is extremely detrimental to the outdoor community's interests and

22   adversely affects the AAC and its membership.  The changes will hamstring AAC's members'

23   ability to effectively participate in public comment periods, maintain accountability and

24

25   FIRST AMENDED COMPLAINT FOR DECLARATORY
     AND INJUNCTIVE RELIEF - 9 -

26

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA  98104-1711*
*(206) 343-7340*

transparency in public lands decision-making, and advocate for solutions to climate change, among other issues.  For these reasons, the AAC has promoted the disbandment of this proposal at every stage of the CEQ rulemaking process, from having provided public testimony at the CEQ hearing in Denver, Colorado to submitting technical comments on the proposed rulemaking alongside their partners at the Outdoor Alliance, a coalition dedicated to protecting public lands and waters for human powered recreation.

18.     A key concern among AAC members are the effects of a changing climate on its communities, climbing areas, and ecosystems.  Mountain regions are warming at roughly twice the pace of the global average, and AAC members are bearing witness to these changes directly. As climbers, skiers, and mountaineers, AAC members are intimately familiar with the mountain landscapes of the United States.  Many of AAC's members also rely on a predictable climate to sustain their livelihoods.  Whether as a mountain guide, a gear shop owner, or a retail employee, a reliable climate in many United States mountain towns equates to a reliable tourism and outdoor recreation economy.  In 2018, the annual climbing industry contribution to the United States Gross Domestic Product ("GDP") was $12.5 billion, where the outdoor recreation economy as a whole generated 7.6 million jobs and accounted for more than 2.2% of the country's GDP, according to the Bureau of Economic Analysis.

19.     AAC membership has historically engaged in federal agency land use planning, such as in U.S. Forest Service forest planning or Bureau of Land Management ("BLM") resource management plan development, where members could influence the outcome of energy development, mining, or logging projects through extensive public engagement, expert testimony and scientifically informed environmental reviews.  In addition, NEPA's cumulative and indirect effects analysis has benefited AAC members by requiring that the federal government consider

FIRST AMENDED COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 10 -

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA  98104-1711*
*(206) 343-7340*

1   the impact of their decision-making on the climate and factor this into the creation of reasonable

2   plan alternatives.

3          20.     This is particularly troubling in areas with complex management issues such as

4   Bears Ears National Monument, where following a Presidential Proclamation which reduced the

5   original monument designation in size by 85%, thousands of acres of land in southeastern Utah

6   including many important rock-climbing areas as well as Native American sacred and cultural

7   sites, were opened to oil and gas development.  The AAC and its partners relied on NEPA to

8   inform the BLM resource management planning process for the Indian Creek and Shash Jaa units

9   on issues of recreation and natural resource management.

10         21.     Dr. Len Necefer, a member of the AAC since 2017, resides in Tucson, Arizona

11   where he is a Professor of American Indian Studies at the Udall Center for Public Policy at the

12   University of Arizona as well as the CEO of Colorado based company, Natives Outdoors.  Dr.

13   Necefer is a member of the Navajo Nation and his research focuses on the intersection of

14   indigenous peoples and natural resource management.  An avid climber and backcountry skier,

15   Dr. Necefer currently serves as a board member for the AAC and volunteers his time on the

16   AAC Policy Committee, which advises AAC staff on recreation management and natural

17   resource policy issues.  Dr. Necefer has relied heavily on the NEPA process to voice concern

18   over impacts caused by energy development on climbing and cultural resources in resource

19   management planning.  Dr. Necefer worked with the Bears Ears Inter-Tribal Coalition to

20   orchestrate collaborative comments for the BLM during their resource planning process for the

21   Indian Creek and Shash Jaa units in Bears Ears National Monument.  Not only does Dr. Necefer

22   visit Bears Ears National Monument to enjoy the world-renowned rock climbing in Indian Creek,

23   an area with hundreds of documented climbing routes, but also the area is a sacred site for the

24

25   FIRST AMENDED COMPLAINT FOR DECLARATORY
     AND INJUNCTIVE RELIEF - 11 -

26

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA  98104-1711*
*(206) 343-7340*

Navajo Nation and contains numerous cultural resources.  Dr. Necefer has firm and definite plans to visit and climb in these areas in the future.  Dr. Necefer utilizes NEPA to provide management guidance on several areas like Bears Ears, where sacred ancestral lands overlap with well-documented recreation areas.

22.     Dr. Necefer has also worked extensively on the Oak Flat land exchange in the Coconino National Forest where Resolution Copper plans to open a large-scale copper mine. The proposed mine will span two miles wide and over 1,000 feet deep, destroying hundreds of rock climbs as well as vast stands of Emory oak, medicinal plants, and ceremonial sites important to the San Carlos Apache tribe.  This mine, if approved in the pending EIS, will mark the biggest loss of climbing area access in history.

23.     Dr. Necefer's ability to enjoy the future of Oak Flat, and Bears Ears National Monument has hinged in part on his ability to voice concern for their management throughout the NEPA process.  Dr. Necefer's interest in protecting climbing areas and important cultural sites will be harmed by the CEQ's narrowing of NEPA's scope of review, as well as the reduced public participation and allowing a private corporation, like Resolution Copper, who has a vested interest in its project, to draft its own EIS.  Dr. Necefer has concrete plans to return to Bears Ears National Monument as well as areas closer to home, such as the Coronado National Forest, and hopes to continue participating in the management of the climbing resources of these areas.  As a professor and small business owner, the CEQ's shortened timeline for submitting comments will make it near impossible for him to provide adequately substantive comments, resulting in his important opinions being overlooked.  Finally, as a member of the Navajo Nation, Dr. Necefer fears that his community will be overlooked in future energy development projects by the

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF - 12 -

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA  98104-1711*
*(206) 343-7340*

1   abbreviated NEPA process and that adequate consultation with tribes and the appropriate

2   fulfillment of the government's trust responsibility agreement will not be met.

3       24.     Byron Harvison is an attorney who resides in Park City, Utah, who has been a

4   member of the AAC for more than 15 years.  Mr. Harvison is a long-time volunteer for the AAC,

5   serving as the AAC Salt Lake Chapter Chair, and also volunteers with the Salt Lake Climbers

6   Alliance.  An avid rock and ice climber, Mr. Harvison has worked extensively on recreation and

7   public lands policy issues through the NEPA process in Utah.  Throughout his long climbing

8   career, Mr. Harvison has climbed all over the Western United States, and frequents federally

9   managed public lands often to recreate.  Mr. Harvison has concrete plans to continue to climb in

10  Utah and elsewhere in the west in the future.  Currently, Mr. Harvison and other climbers in the

11  Salt Lake region are volunteering their time to work on the Uinta-Wasatch Cache National Forest

12  Plan revision, with the intent of influencing a specific climbing management plan through public

13  comment afforded by NEPA.

14      25.     Additionally, Mr. Harvison and a team of other AAC members, staff, and local

15  Salt Lake climbers, have been working to challenge the Little Cottonwood Canyon ("LCC") EIS

16  alternatives.  Mr. Harvison has climbed here in the past and has definite plans to return to the

17  area in the future to climb here again.  A proposed gondola and road widening project would

18  have several direct and indirect impacts on the climbing resources of the LCC, an area that is a

19  critically important resource to the climbers of Salt Lake.  Mr. Harvison and other climbers who

20  visit LCC to recreate in the future will be greatly impacted by several of the proposed

21  alternatives which could severely alter the state of climbing in the canyon.  LCC is a highly

22  congested roadway that generates large amounts of air pollution, especially during the winter

23  months.  If climate change and air quality implications are not thoroughly considered in the

24

25  FIRST AMENDED COMPLAINT FOR DECLARATORY
    AND INJUNCTIVE RELIEF - 13 -
26

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA  98104-1711*
*(206) 343-7340*

NEPA process, Mr. Harvison, other Utah residents, and climbers everywhere will be negatively affected.  The Final Rule's removal of the indirect and cumulative effects analysis requirement will result in a failure to account for the visual and auditory effects of projects such as this and limited comment periods will make it increasingly difficult for volunteers like Mr. Harvison to offer informed public comment.  Additional restrictions on Mr. Harvison's ability to provide comment on federal land management decisions will result in negative consequences to his recreational experience in the Wasatch-Cache National Forest and on other National Forest units across the country.

26.     Plaintiff California Wilderness Coalition ("CalWild") is a non-profit organization incorporated under the laws of the State of California with its central office in Oakland, California, and field offices in Sacramento, Redding, Fresno, and Los Angeles, California.  CalWild, on behalf of its 632 members, works in a variety of ways to protect and restore the state's wildest natural landscapes and watersheds on federal public lands.  These important wild places provide clean air and water, refuges for wildlife, mitigation against the effects of climate change, and outstanding opportunities for recreation and spiritual renewal for people.  CalWild is the only statewide organization dedicated solely to protecting and restoring the wild places and native biodiversity of California's public lands.  CalWild is dedicated to achieving Congressionally-designated protections (e.g., wilderness, national monument), as well as administrative protections by state or federal agencies, for California's wild public lands.  CalWild pursues these objectives through legislative campaigns, grass-roots organizing, and public education (such as publishing monthly news journals, blogs, and white papers) concerning conservation issues, and, when necessary, legal action.  CalWild regularly send action alerts to members and subscribers to inform them about when and how to comment on specific proposed

FIRST AMENDED COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 14 -

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA  98104-1711*
*(206) 343-7340*

1   projects and plans, such as BLM planning or National Monument review.  In addition, CalWild

2   regularly participates in and submits comments itself on proposed federal agency land and/or

3   resource management plans and site-specific project proposals (e.g., logging, mining,

4   geothermal, renewable energy), primarily related to public lands managed by BLM and United

5   States Forest Service.

6          27.     For decades, CalWild has relied on NEPA to effectively advocate for these issues

7   on behalf of its membership.  Beyond NEPA's public information and participation

8   requirements, NEPA requires informed decision-making, based on sound science, and requires

9   that, to the fullest extent possible, all agencies of the federal government take a hard look at

10  environmental consequences prior to issuing a decision.  NEPA declares a broad national

11  commitment to protecting and promoting environmental quality, a goal CalWild embraces.

12  CalWild joined a comment letter of conservation, health, and justice organizations and

13  businesses opposing the proposed NEPA rules.

14         28.     CalWild members, including Pamela Nelson of Warner Springs, California, have

15  long-standing, particularized interests in public lands and wildlife that NEPA helps to protect.

16  Ms. Nelson has been a CalWild member for at least 15 years, and she has used NEPA to keep

17  informed about and comment on projects and planning near her home and in areas where she

18  regularly recreates and has definite plans to continue visiting into the future, in particular the San

19  Bernardino and Cleveland National Forests, where Ms. Nelson regularly enjoys hiking,

20  exploring, and bird and wildlife watching.  In the last seven years, Ms. Nelson has participated in

21  NEPA planning and commenting processes for forest plan amendments to the Inyo, Sequoia, and

22  Sierra National Forest Plans.  She has also submitted NEPA comments on the California Desert

23  Conservation Plan and San Gabriel Mountains National Monument Land Management Plan.

24

25  FIRST AMENDED COMPLAINT FOR DECLARATORY
    AND INJUNCTIVE RELIEF - 15 -
26

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA  98104-1711*
*(206) 343-7340*

29.     CalWild member Maureen Forney, a resident of both San Leandro, California, in Alameda County, and Bear Valley, California in Alpine County, frequently visits national forests, national parks, and lands managed by the BLM, where she engages in and will continue to engage in many activities including hiking, running, mountain biking, snowshoeing, cross-country skiing, bouldering, kayaking, swimming, camping, animal tracking, sightseeing, and wildlife watching, particularly in the Stanislaus National Forest where one of her homes is located.  Ms. Forney has also submitted written and oral NEPA comments to federal agencies about how she wants to see public lands managed, and she will be harmed if her ability to continue to do so is limited.

30.     Plaintiff Center for Biological Diversity ("the Center") is a nonprofit organization dedicated to the preservation and restoration of biodiversity, native species, and ecosystems. Founded in Tucson, Arizona with offices throughout the country, including in Oakland and Los Angeles, California, the Center works through science, law, and creative media to secure a future for all species, great or small, hovering on the brink of extinction.  The Center has more than 1.6 million supporters, including more than 74,000 members from all across the United States, with approximately 17,214 in California.  The Center and its members have longstanding recreational, aesthetic, scientific, professional, and other concrete interests in conserving native species throughout the country and routinely advocate for native species conservation and protection. Center attorneys, scientists, organizers, and advocates routinely participate in commenting at all phases of NEPA processes before numerous federal agencies, including the U.S. Forest Service, BLM, the Bureau of Reclamation, the U.S. Army Corps of Engineers, the U.S. Fish and Wildlife Service, and many others.  The Center also employs numerous media and outreach staff to

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF - 16 -

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA  98104-1711*
*(206) 343-7340*

inform the Center's members about, and encourage and assist members in participating in, NEPA reviews.  The Center submitted detailed comments on the proposed NEPA rule.

31.     For example, the Center is currently challenging a BLM decision to approve rights-of-way for powerlines, natural gas, water, and petroleum product in Utah that will facilitate the construction of the first commercial scale facility to process a rock known as "oil shale" into a petroleum product.  The oil shale plant will produce 50,000 barrels of shale oil per day, produce significant amounts of air and climate pollution, and will require up to 10,000 acre-feet of water per year for thirty years from the Green River, home to four endangered fish.  The Center and other groups have challenged BLM's rights-of-way because the agency's NEPA analysis failed to consider the cumulative and indirect impacts of the federal rights-of-way, including the air and climate pollution and water depletion impacts of the oil shale production facility.  Because the Final Rule eliminates the consideration of cumulative effects and does not even mandate the consideration of indirect effects, it will make it difficult if not impossible for the Center to engage in this kind of advocacy in the future, resulting in an imminent increase in harm to wildlife, public lands and waters, and the shared climate.

32.     The Center communicates extensively with its members and supporters, as well as the general public, about threats to imperiled species, the protection of public lands, and the ongoing and future damage from the global climate crisis by issuing press releases and statements, publishing online news through its publication "The Revelator," holding webinars, and sending emails and action alerts.  The Center's members participate in and rely on the NEPA review processes, and will be harmed by the Final Rule.  For example, the Final Rule's explicit elimination of cumulative impacts review will significantly impede the ability of the Center and its members to obtain and disseminate adequate information about, and ensure government

FIRST AMENDED COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 17 -

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA  98104-1711*
*(206) 343-7340*

1  consideration of, the climate change impacts of projects such as oil and gas development plans,

2  rights-of-way for oil shale development, federal coal leasing, and federal auto fleet standards that

3  will contribute to cumulatively significant and devastating greenhouse gas emissions.  In

4  addition to impeding the Center's ability to obtain such essential information as part of the

5  NEPA process, the Final Rule also necessitates that the Center expend its limited organizational

6  resources in an effort to obtain and compile such information from other sources.

7      33.    The Center has individual members, including but not limited to Ileene Anderson

8  of California and Taylor McKinnon of Arizona, who regularly visit, study, work, photograph, or

9  recreate on lands where NEPA has been and will be used in reviewing federal projects.  Each of

10 the members has specific intentions to continue to interact with these areas frequently and on an

11 ongoing basis.  Center members and staff derive recreational, spiritual, professional, scientific,

12 educational, and aesthetic benefits from their interactions with these parts of the natural world.

13     34.    Ileene Anderson is a botanist, a Center member since 1998, and a staff member at

14 the Center since 2005.  Ms. Anderson is also a frequent user of the federal lands in the California

15 Desert, where she hikes, photographs, searches for rare plants, watches birds and other wildlife,

16 and enjoys the solace that wildlands can provide.  Among the places she has visited on numerous

17 occasions are federal lands on and adjacent to Conglomerate Mesa (on the doorstep of Death

18 Valley National Park).  There, she has camped, hiked, and botanized the area at least three times

19 in the last five years including her most recent visit to the area earlier in 2020.  This area near

20 Owens Lake, California, is renowned for its dense western Joshua tree forests, rare plants, unique

21 cultural resources and pristine landscape, positioned between wilderness areas on BLM, Forest

22 Service, and National Park Service managed lands (Malpais Mesa, Inyo Mountains, and Death

23 Valley).  Ms. Anderson plans to return to Conglomerate Mesa in 2020 and beyond once the

24

25  FIRST AMENDED COMPLAINT FOR DECLARATORY
    AND INJUNCTIVE RELIEF - 18 -

26

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA  98104-1711*
*(206) 343-7340*

1   Covid-19 restrictions are relaxed to enjoy the outstanding scenic beauty of this area and look for

2   plants and wildlife.

3          35.     Over the past 25 years, Ms. Anderson has participated in many NEPA processes

4   evaluating mining, off-road vehicles, grazing, energy projects, land use management plans,

5   habitat conservation plans, railroads, pipelines, highways, land exchanges, and many others.  Ms.

6   Anderson also wrote sections of NEPA documents for federal agencies when she was employed

7   as a consulting biologist.  She has found NEPA's procedural safeguards to be crucial to

8   improving projects and reducing the unnecessary impacts, because in her experience, NEPA

9   review typically reveals diverse perspectives and impact-reduction solutions that otherwise

10  would not be identified by the agency acting alone.

11         36.     The Final Rule harms Ms. Anderson, including by impairing her ability to

12  evaluate and comment on the indirect and cumulative impacts of projects like a pending proposal

13  to undertake exploratory drilling for gold on the Conglomerate Mesa, and the harms the project

14  poses to off-site resources, including the landscapes and visitor experiences from and within

15  Death Valley National Park and the adjacent wilderness areas, the damage from indirect impacts

16  of off-road vehicle use, cumulative impacts of this proposal together with the 2018 approved

17  exploration plan, and the reasonably foreseeable construction of a large gold mine.

18         37.     Taylor McKinnon is a former owner of a Utah river rafting business, amateur

19  photographer, a Center member since 2007, and is now employed as the Center's Senior Public

20  Lands Campaigner.  Mr. McKinnon grew up and still lives in Flagstaff, Arizona, amidst national

21  forests and parks that he continues to visit.  As he has since he was young, Mr. McKinnon now

22  regularly uses and enjoys federal and other public lands for hiking, cycling, camping, fishing,

23  photography, snowboarding, birding, nature and wildlife observation and vehicle touring.

24

25  FIRST AMENDED COMPLAINT FOR DECLARATORY
    AND INJUNCTIVE RELIEF - 19 -
26

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA  98104-1711*
*(206) 343-7340*

Among the lands that he has regularly visited for some of these activities in the last several years (most recently in 2018) is the sage brush and sandstone high desert of the remote Book Cliffs along the Utah-Colorado border, where BLM approved rights-of-way for the nation's first commercial scale oil shale plant. Mr. McKinnon has also regularly participated in NEPA processes on numerous federal agency proposals over the last decade involving lands where he recreates, including lands at issue in the Utah oil shale plant.

38.     As part of his enjoyment of public lands, Mr. McKinnon regularly visits (and plans to return this year to) Grand Canyon National Park and the Forest Service lands near the town of Tusayan, Arizona. He visits the South Rim area several times each year to hike, sight see, and take photographs of the Grand Canyon and wildlife in the area. The Forest Service last year received applications from an Italian development corporation named Stilo for rights-of-way across National Forest lands near the Grand Canyon's South Rim for water and natural gas pipelines, electricity, and a paved road to facilitate a massive commercial and residential development on private land. Stilo's proposed development, located within two miles of the southern boundary of Grand Canyon National Park, would increase Tusayan's population ten-fold, likely cause depletion of aquifers that are the only source of water for natural springs along Grand Canyon's South Rim, worsen air, noise and light pollution within the Park, and fragment habitat for wildlife that use the Park. When Stilo submitted a prior version of this application to the Forest Service in 2014, Mr. McKinnon on the Center's behalf submitted comments and helped lead a major public campaign opposing Stilo's proposal as part of the agency's NEPA scoping process. The Forest Service ultimately rejected Stilo's application based largely on the indirect and cumulative impacts to the National Park that Mr. McKinnon and others had raised. The Final Rule's complete elimination of cumulative impacts as a consideration in NEPA

FIRST AMENDED COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 20 -

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA  98104-1711*
*(206) 343-7340*

1   analyses and its elimination of the mandate that agencies consider and disclose indirect effects

2   would mean NEPA reviews of Stilo's 2019 application – which the Forest Service is likely to

3   initiate this year – need not address impacts to Grand Canyon National Park at all, increasing the

4   likelihood that Stilo's development will impair the Park resources that Mr. McKinnon enjoys.

5          39.     Plaintiff Center for Environmental Health ("CEH") is a California non-profit

6   organization founded in 1996 with its principal place of business in Oakland, California.  CEH

7   has approximately 22 staff members, and an email list of 25,000 supporters who regularly

8   receive information and action alerts.  CEH works on the regional and national level.

9          40.     CEH protects people from toxic chemicals by working with communities,

10  consumers, workers, government, and the private sector to demand and support business

11  practices that are safe for public health and the environment.  For CEH, people and their health

12  and well-being are the ultimate concern.  Air, water, food, and consumer products should be free

13  of dangerous and untested chemicals.

14         41.     CEH works collaboratively with environmental justice organizations and low-

15  income communities to address the disproportionate toll that toxic chemicals take on their

16  neighborhoods.  Historically, CEH's legal action has spurred hundreds of major retailers to

17  remove lead and other toxic chemicals from child and adult jewelry, fashion accessories

18  including those marketed toward low income buyers, candies, toys, lunchboxes, personal care

19  products, and more.  CEH has also taken legal action (primarily using California's Safe Drinking

20  Water and Toxic Enforcement Act, Proposition 65) to force polluting industries to reduce, or

21  otherwise mitigate, hazardous air emissions from low-income communities and communities of

22  color.

23

24

25  FIRST AMENDED COMPLAINT FOR DECLARATORY
    AND INJUNCTIVE RELIEF - 21 -
26

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA  98104-1711*
*(206) 343-7340*

42.     One of CEH's core values is that people need information in order to both protect themselves and their families and also to advocate for businesses and the government to enact health protective policies.  This is the type of public information and public participation that NEPA requires.

43.     CEH submitted comments on the Proposed Rule in March 2020 in coordination with other environmental justice and public health organizations.  Those comments were critical of the proposed rule because CEH felt it would hurt the ability of communities to know what projects were planned and it would harm the ability of the public to meaningfully explain to decision-makers how their communities would be impacted.

44.     CEH supporters and staff members have used NEPA's standards and requirements to bring about on-the-ground protections.  For example, CEH Senior Scientist Caroline Cox's work has been focused on toxics for decades.  In the 1980s, Ms. Cox was part of a group that used NEPA litigation to force dramatic changes in the use of herbicides for growing timber in the Pacific Northwest.  Forcing the U.S. Forest Service and BLM to fully comply with NEPA resulted in changed Forest Service practices, as NEPA's requirements to review alternatives and fully engage the public brought the agency new information and perspectives. The net result was that herbicide use decreased dramatically because the NEPA process was so successful in addressing issues that people on the ground cared about.

45.     CEH is harmed by the changes in the NEPA regulations that create less public transparency, fail to foster full public participation, curtail review of alternatives, and fail to review the indirect and cumulative impacts of proposed projects.

46.     Plaintiff Center for Food Safety ("CFS") is a national public interest nonprofit organization dedicated to empowering people, supporting farmers, and protecting the planet from

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF - 22 -

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA  98104-1711*
*(206) 343-7340*

1  the harms of industrial agriculture.  CFS's program areas encompass all aspects of food and

2  agriculture production, from pesticides and commodity crops to livestock production to ocean

3  and coastal aquaculture to the climate impacts of agriculture.  In each area CFS strives to ensure

4  responsible government oversight and advocates for a more sustainable, regenerative food future.

5  CFS has over 970,000 members across the country, and offices in San Francisco, CA; Portland,

6  OR; and Washington, D.C.  CFS and its members are being, and will be, adversely affected by

7  the Final Rule.

8          47.     Since its inception in 1997, CFS has incorporated NEPA review in all its program

9  areas, and acts as a watchdog to ensure agencies fulfill NEPA's requirements to allow for

10  reasoned decision-making and informed public participation.  CFS has multiple full-time staff

11  members (policy, scientific, outreach, and legal) devoted to overseeing federal agencies' NEPA

12  review regarding the regulation of food and agriculture.

13          48.     To fulfill its mission, CFS disseminates to government agencies, members of

14  Congress, and the general public a wide array of educational and informational program

15  materials often addressing major federal actions requiring NEPA review.  CFS also sends out

16  action alerts to its True Food Network.  These alerts generate public involvement, education, and

17  engagement with governmental officials, including during NEPA public comment periods on

18  federal projects affecting the sustainable food systems CFS promotes.  Collectively, the

19  dissemination of this material has made CFS an information clearinghouse for public

20  involvement in NEPA processes in the realm of sustainable food and agriculture.

21          49.     In addition to information and public education, when necessary, CFS engages in

22  public interest litigation challenging industrial food production and agricultural practices that

23  harm public health and the environment and/or impact farmers, its members, and the public

24

25  FIRST AMENDED COMPLAINT FOR DECLARATORY
    AND INJUNCTIVE RELIEF - 23 -

26

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA  98104-1711*
*(206) 343-7340*

interest.  CFS has a long history of watchdogging federal agencies' NEPA compliance, in order to ensure agencies responsibly and rigorously analyze, among other things, the reasonably foreseeable impacts of their actions, consider a full range of reasonable alternatives, and thoroughly analyze cumulative and intertwined socioeconomic impacts.

50.     In March 2020, CFS submitted public comments on the Proposed Rule and was a signatory to three additional joint comment letters.  The Final Rule injures CFS as an organization and its members individually.  CFS and thousands of its members frequently participate in NEPA public comment periods.  Through shortening comment periods, significantly reducing available information on cumulative and indirect impacts, and exempting more federal projects, CFS and its members will struggle to meaningfully participate in the NEPA process or will be prevented from doing so.  Without access to information on cumulative and indirect impacts, CFS will be forced to divert organizational resources to look into these impacts and fully inform members on federal projects, resources that otherwise would be used on CFS mission central activities.  The Final Rule's weakening of agency NEPA reviews will divert resources from CFS's other work, including advocating for organic production and other sustainable, regenerative food systems.  Overall, CEQ's unlawful rollbacks of NEPA regulations frustrates CFS's organizational mission to inform the public on the harmful impacts of industrial agriculture and promote sustainable food systems.

51.     The Final Rule also injures CFS's members directly by restricting their ability to participate in agency decision-making, as well to assure that agencies take a hard look at their actions, actions that injure the members' health, environmental, aesthetic, recreational, and intertwined socioeconomic interests.  Many of CFS's members rely on healthy and safe methods

FIRST AMENDED COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 24 -

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA  98104-1711*
*(206) 343-7340*

1  of food production to keep safe themselves, their families, their livelihoods, and the environment

2  on which they rely.

3       52.    For example, CFS members who live and recreate and own businesses in

4  Washington's Willapa Bay and Puget Sound are adversely impacted by industrial commercial

5  shellfish aquaculture and relied on the Army Corps of Engineers to thoroughly assess the

6  impacts, including cumulative, of allowing tens of thousands of acres of aquaculture in these

7  aquatic ecosystems.  CFS member Ross Barkhurst, a U.S. Naval Academy graduate, lives on 270

8  acres on Willapa Bay, including two shellfish beds totaling 60 acres, where he has for years

9  harvested shellfish and used to sell them commercially, and where he recreates as an avid hunter,

10  fisher, and bird-watcher.  He has watched as the health of his tidelands and those around the Bay

11  he loves are degraded from industrial shellfish aquaculture and especially the pesticide use

12  associated with it, and has recorded the waning numbers of various fish and waterfowl species.

13  The Corps' past failure to adequately assess the impacts from the aquaculture it permits under

14  NEPA have adversely affected Mr. Barkhurst, as well as other CFS members who live or

15  recreate in these tidal areas, eat oysters, and enjoy watching the large variety of wildlife there,

16  including threatened and endangered species.

17       53.    Mr. Fritzi Cohen, another CFS member, owns a historic bed and breakfast on

18  Willapa Bay but has been unable to harvest the oysters it was once famous for from the tide bed,

19  due to the impacts of industrial shellfish aquaculture permitted by the Corps, but not properly

20  analyzed under NEPA.

21       54.    These members, and others who live and recreate on Washington shorelines, have

22  been participating in the regulatory processes for years and will continue to do so, especially now

23  that a federal court has found that the Corps' NEPA analysis was deficient and sent the agency

24

25  FIRST AMENDED COMPLAINT FOR DECLARATORY
   AND INJUNCTIVE RELIEF - 25 -

26

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA  98104-1711*
*(206) 343-7340*

back to fully assess the impacts, especially cumulative impacts, of commercial shellfish aquaculture.  CFS members' interest in the information required under NEPA as well as their own participation in the NEPA process, is directly harmed by the Final Rule, especially insofar as it removes the obligation for agencies to perform cumulative impact analyses.

55.     CFS members in the Gulf of Mexico are also adversely impacted by the lack of NEPA analysis for offshore aquaculture.  CFS member Barbara Findley, a resident of Bonita Springs, Florida, is an avid boater and beachgoer who relies on the NEPA process to protect her aesthetic and recreational interests in Gulf marine life, as well as use of the bodies of waters surrounding her home state.  Ms. Findley regularly utilizes Florida's Gulf and Atlantic coasts, and takes pleasure in viewing the variety of marine species in the Gulf and surrounding waters, including loggerhead, green, and leatherback turtles; cobia, grouper, red snapper, tarpon, and snook; Key West stingrays, cassiopeas, and moon jellyfish; and bottlenose dolphins.  As a result, Ms. Findley is concerned with the development of offshore projects such as offshore aquaculture farms.  Ms. Findley's ability to enjoy the future of waters surrounding her home state is hinged in part on her ability to voice concerns for their management throughout the NEPA process.  Ms. Findley's interest in the protection of marine species in the Gulf from offshore aquaculture facilities (which are permitted by federal agencies) will be harmed by the CEQ's narrowing of NEPA scope of review.

56.     Plaintiff <u>Environment America</u> is a non-profit corporation organized under the laws of Colorado.  It has hundreds of thousands of members nationwide, with approximately 434 active members in California.  Its mission is to transform the power of our imaginations and our ideas into change that makes our world a greener and healthier place for all.  Environment America's staff works for clean air, clean water, clean energy, wildlife and open spaces, and a

FIRST AMENDED COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 26 -

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA  98104-1711*
*(206) 343-7340*

livable climate.  Its members put grassroots support behind Environment America's research, advocacy, and litigation.

57.    Environment America has worked to ensure that the goals of NEPA are achieved and that it remains a powerful tool to protect our health and environment and safeguard our natural treasures for posterity.  Environment America opposed the regulations at issue in this litigation when they were first proposed and provided testimony in opposition, as well as submitted written comments.  In addition, Environment America produced a blog post explaining the dangers of the proposal and a factsheet to educate the public as to NEPA's importance.

58.    Environment America has individual members, including but not limited to Joseph Sandri of Maryland and Peter Skopec of Wisconsin, who regularly visit, study, work, photograph, or recreate on lands where NEPA has been and will be used in reviewing federal projects.  Each of the members has specific intentions to continue to interact with these areas frequently and on an ongoing basis.  Environment America members and staff derive recreational, spiritual, professional, scientific, educational, and aesthetic benefits from their interactions with these parts of the natural world.

59.    Joseph Sandri has been a member of Environment America since 2009 and lives in Maryland.  Mr. Sandri has participated in NEPA processes in the past.  He is a member of the board of directors of the Archangel Ancient Tree Archive, which is a non-profit organization that locates and propagates the world's largest and most iconic trees.  In his role as a member of the board of directors, Mr. Sandri wrote and submitted a comment opposing U.S. Forest Service's proposal to exempt the Tongass National Forest from the 2001 Roadless Area Conservation Rule.

FIRST AMENDED COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 27 -

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA  98104-1711*
*(206) 343-7340*

60.     Peter Skopec has been a member of Environment America since 2020 and lives in Wisconsin.  Mr. Skopec has participated in NEPA processes in the past, and he plans to participate in NEPA processes in the future.  For example, in his role as the director of the Wisconsin Public Interest Research Group, a non-profit public interest advocacy organization, Mr. Skopec was involved in the NEPA review process for the proposed expansion of highway I-94 in Milwaukee.  Mr. Skopec provided in-person testimony on December 4, 2014, and he submitted written comments on January 27, 2015, April 15, 2016, and May 5, 2016.  On July 8, 2020, it was announced that the I-94 expansion project will be revived, and Mr. Skopec plans to participate in any public engagement opportunities provided by NEPA in the future.

61.     Plaintiff Environmental Defense Fund ("EDF") is a national nonprofit organization representing over 384,000 members nationwide, including over 62,000 in California.  Since 1967, EDF has linked science, economics, and law to create innovative, equitable, and cost-effective solutions to urgent environmental problems.  EDF employs over a hundred scientists, economists, engineers, business school graduates, and lawyers to help solve challenging environmental problems in a scientifically sound and cost-effective way.  EDF pursues initiatives at the state and national levels designed to protect human health and the environment.  EDF frequently participates in NEPA review processes for federal actions, including by submitting comments and bringing litigation to ensure agencies adequately evaluate the impacts of their actions under NEPA, including climate impacts.  EDF and its individual members will be adversely affected by the Final Rule.

62.     Francis Don Schreiber is a member of EDF and a rancher and landowner in Rio Arriba County, New Mexico in the San Juan Basin, one of the most active areas in the country for oil and gas production.  Mr. Schreiber has a split estate—he owns the surface rights to his

FIRST AMENDED COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 28 -

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA  98104-1711*
*(206) 343-7340*

1   land, and the mineral rights on his property are owned by the federal government and managed

2   by the BLM.  Mr. Schreiber also holds a federal permit to graze cattle, sheep and horses for

3   approximately 2,700 acres of land managed by the BLM.  There are over a hundred oil and gas

4   wells managed by BLM on and immediately adjacent to Mr. Schreiber's ranch.  Mr. Schreiber

5   has advocated for BLM to consider the health, environmental, and climate impacts of the oil and

6   gas development that BLM manages, and implement measures to reduce venting, flaring, and

7   leaking of natural gas on his land.  Rigorous NEPA review has been, and will continue to be,

8   critical for reducing the harm that this federally-managed oil and gas development causes Mr.

9   Schreiber, his family, and his community.  For example, a BLM regulation, opposed by Mr.

10  Schreiber, that allowed increased waste of natural gas and increased methane and local air

11  pollution from federally-managed oil and gas development, including the wells on Mr.

12  Schreiber's ranch, was recently vacated by a court in this district because BLM failed to comply

13  with NEPA.  The court specifically held that BLM had failed to adequately assess cumulative

14  impacts, including climate impacts, under NEPA.  Currently, a Draft Resource Management Plan

15  Amendment and Environmental Impact Statement for expanding oil and gas development in the

16  San Juan Basin is under consideration at the BLM Farmington Field Office.  The Final Rule

17  removes required consideration of cumulative impacts under NEPA, among other damaging

18  changes, harming Mr. Schreiber, who must live with the cumulative impacts of BLM's decisions

19  for oil and gas development on his land.

20      63.     Jonathan Goldstein is Director of Legislative and Regulatory Affairs at EDF and

21  an EDF member.  Mr. Goldstein frequently submits comments on behalf of EDF on federal

22  agency NEPA documents.  For example, Mr. Goldstein submitted comments in 2018 on BLM's

23  draft resource management plan and environmental impact statement for Carlsbad that

24

25  FIRST AMENDED COMPLAINT FOR DECLARATORY
    AND INJUNCTIVE RELIEF - 29 -

26

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA  98104-1711*
*(206) 343-7340*

highlighted how BLM failed to conduct adequate NEPA analysis of the impacts, including

cumulative impacts, from existing and future oil and gas development in the planning area.  Mr.

Goldstein plans to continue to submit comments in the future on NEPA documents, including

during the currently-open comment period on BLM's draft resource management plan

amendment and environmental impact statement for Farmington.  Mr. Goldstein is also a

frequent user of federal public lands that will be impacted by the changes to NEPA regulations,

including by limiting consideration of climate change effects.  Mr. Goldstein regularly hikes and

mountain bikes in the Roosevelt National Forest near his home in Lyons, Colorado and plans to

continue to do in the future.

64.    Plaintiff Environmental Protection Information Center ("EPIC") is a nonprofit

organization based in Arcata, California.  EPIC advocates for the protection and restoration of

Northwest California's forests, using an integrated, science-based approach, combining public

education, citizen advocacy, and strategic litigation.

65.    EPIC was founded in 1977 as a membership organization and its members shape

the priorities of the organization through electing its board of directors.  EPIC has approximately

700 members and over 12,000 supporters.  EPIC members also contribute to the work of the

organization through volunteering to review projects.  NEPA is critical to EPIC's work.  In the

past year, EPIC has commented on over 30 NEPA projects and has four ongoing federal cases

alleging violations of the act.

66.    EPIC members have an interest in areas and activities that will be impacted by the

revised regulations.  For example, Felice Pace is a member of EPIC and volunteers his time to

help EPIC monitor cattle grazing on public land.  Mr. Pace currently resides in Klamath Glen,

California.  Mr. Pace has participated over a hundred projects on the Klamath National Forest,

FIRST AMENDED COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 30 -

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA  98104-1711*
*(206) 343-7340*

Six Rivers National Forest and Shasta-Trinity National Forest and NEPA is critical to Mr. Pace's work to voice his concerns.  Mr. Pace runs the Project to Reform Public Land Grazing in Northern California.  Through the Project, Mr. Pace spends numerous days in the field documenting the effects of grazing on the environment.  As part of this, Mr. Pace is particularly careful to document how grazing near and in streams can impact salmonids listed under the Endangered Species Act.  Because he has spent considerable personal resources developing long-term data about the impacts of grazing on salmonids, Mr. Pace has a unique interest in areas that will be harmed by the challenged rule.

67.     Joseph and Susan Bower are also members of EPIC and devote considerable time and effort into commenting on Forest Service projects.  Mr. and Ms. Bower moved to Peanut, California in May 1973 and have lived on their homestead since that time.  Their land backs up against the Shasta-Trinity National Forest, which serves as their backyard and source of domestic drinking water.  Mr. and Ms. Bower first became engaged in Forest Service projects in 1975 because of concerns over herbicide use and have remained engaged since that time.  Because they are reliant on the National Forest for their water and because land management decisions, such as fire break projects, on the National Forest affect their homestead, they actively use NEPA to comment on proposed projects, commenting on over a hundred proposed projects primarily on the Shasta-Trinity National Forest.  Mr. and Ms. Bower are particularly concerned with the fate of the northern spotted owl, a species listed as "threatened" under the Endangered Species Act, because the spotted owl is a designated indicator species for forest health.  In their experience, examining the cumulative effects of a project is particularly important for the "checkerboard" lands of Northern California, where private and public lands are arranged in neat squares like on a checkerboard.  Under the challenged rules, it appears that much if not all of the

FIRST AMENDED COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 31 -

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA  98104-1711*
*(206) 343-7340*

cumulative effects analysis that they have relied upon would no longer be required.  Their

interest in knowledge about cumulative effects, and their ability to advocate for changes to a

project because of potential cumulative effects, is harmed by the challenged rule.

68.     Trisha Lotus also exemplifies how EPIC works to satisfy the interests of its

members and how the challenged rule would injure its members.  Ms. Lotus is a member of

EPIC and a resident of Humboldt County, California.  Ms. Lotus has been instrumental in a

federal challenge brought by EPIC to the Richardson Grove Project, a proposed highway

widening project through Richardson Grove State Park.  The proposed highway widening would

critically affect old-growth redwoods in the park, whose root system would be cut and paved

over as part of the project.  Ms. Lotus was moved to do something about the project because for

her, this project was personal.  In 1922 Ms. Lotus's great-grandfather, Henry Devoy, entrusted

the 120 acres of land to the State of California which came to be known as Richardson Grove

State Park.  As an EPIC member, Ms. Lotus and others encouraged EPIC to intercede in the

project, beginning a decade-long engagement with this project that has resulted in numerous

federal cases that have stopped the project from moving forward.  The challenged rule would

likely have caused this project to fall outside of NEPA's bounds, as federal financing of a project

is no longer deemed to cause a project to be a "major federal action" under NEPA.  Since being

an involved plaintiff in the Richardson Grove State Park lawsuit, Ms. Lotus continues to monitor

highway projects in her area.  Many of these highway projects receive significant funding from

the Federal Highway Administration, and would possibly be exempt from NEPA in the future.

Trisha's ability to influence state highway projects would be diminished under the challenged

rule and she would be injured by this loss of her ability to participate.

FIRST AMENDED COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 32 -

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA  98104-1711*
*(206) 343-7340*

69.     Plaintiff <u>Food and Water Watch</u> ("FWW") is a national, non-profit, membership organization that mobilizes people to build political power to move bold and uncompromised solutions to the most pressing food, water, and climate problems of our time.  FWW uses grassroots organizing, media outreach, public education, research, policy analysis, and litigation to protect people's health, communities, and democracy from the growing destructive power of the most powerful economic interests.  FWW's priority campaigns include fighting for a just and rapid transition to 100% clean, renewable energy and away from fossil fuels, and fighting for a ban on factory farms, also known as concentrated animal feeding operations ("CAFOs").  Central to its mission, FWW has advocated against new fossil fuel infrastructure, government support for factory farms, and other harmful federal projects since its founding in 2005.  This work regularly involves engaging in the NEPA review process and communicating with FWW members about opportunities to participate in NEPA reviews.  FWW has more than 180,000 members nationwide, including 7,767 in California, and maintains offices across the country including an office in Oxnard and Los Angeles, with its headquarters in Washington, D.C.  FWW submitted comments on the proposed NEPA rule.

70.     FWW is currently challenging a Federal Energy Regulatory Commission NEPA review for failure to consider cumulative and indirect effects of a project.  FWW is also currently challenging a Farm Service Agency NEPA review for a Maryland chicken factory farm because it fails to adequately consider the cumulative impacts of agency financing of the project.  It brings these challenges on behalf of members whose interests are harmed by these projects.  However, by eliminating the requirement that agencies consider cumulative and indirect effects, and declaring that Farm Service Agency financing is not subject to NEPA review, the Final Rule

FIRST AMENDED COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 33 -

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA  98104-1711*
*(206) 343-7340*

will make it difficult if not impossible for FWW to engage in this kind of advocacy work in the future, resulting in increased environmental and public health harm.

71.     FWW communicates extensively with its members and supporters, as well as the general public, about climate change, water pollution, and other harmful impacts of fossil fuel infrastructure proposals and other federally permitted or funded actions by releasing reports and fact sheets, issuing press releases and statements, publishing online news pieces, and sending emails and action alerts.  FWW members participate in and rely on the NEPA review processes, and will be harmed by the Final Rule.  For example, the Rule's elimination of cumulative impacts review will make it difficult or impossible for FWW and its members to obtain adequate information about and ensure government consideration of the climate change impacts of projects such as fracked gas pipelines that will contribute to cumulatively significant and devastating greenhouse gas emissions.  The Final Rule's exclusions will make it impossible for FWW and its members to comment in opposition to proposed factory farms that receive federal financing, because there will no longer be a NEPA public comment process to notify citizens of projects proposed in their communities associated with the receipt of federal funds: the prior CEQ regulations required this public disclosure and analysis, but the Final Rule eliminates this requirement.

72.     FWW has individual members, including but not limited to Dane Schumacher of Arkansas and Carol Kuehn of New Jersey, who regularly visit, study, work, photograph, or recreate on lands or marine areas where NEPA has been and will be used in reviewing federal projects.  Each of the members has specific intentions to continue to interact with these areas frequently and on an ongoing basis.  FWW members and staff derive recreational, spiritual,

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF - 34 -

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA  98104-1711*
*(206) 343-7340*

1   professional, scientific, educational, and aesthetic benefits from their interactions with these parts

2   of the natural world.

3       73.    FWW member Dane Schumacher resides on a small, sustainable farm in Carroll

4   County, Arkansas and generates a portion of his income selling produce from the farm.  Mr.

5   Schumacher irrigates his farm from the waters of adjacent Dry Fork Creek, a tributary of the

6   Kings River, which is part of the White River watershed.  He also swims, kayaks, and recreates

7   in these waters, and plans to continue to do so in the future.  However, Mr. Schumacher's use

8   and enjoyment of these waters is diminished by the operation of factory farms upstream that

9   discharge pollution into them: he can smell factory farm waste (i.e., animal waste) and is

10  concerned about farm pollution in the places he swims and recreates.  Mr. Schumacher relies on

11  NEPA processes to learn of new projects that are federally permitted or funded, and seeks to

12  participate in such processes to ensure that her concerns about downstream pollution are

13  addressed.  Farm Service Agency funding is often the sole federal trigger for NEPA for these

14  kinds of projects.  On one occasion, Mr. Schumacher participated in a NEPA process considering

15  funding of a factory farm near his home: his comments helped persuade the agency that the site

16  was ill-suited for such a project and the project was abandoned, thereby preventing a likely

17  additional source of pollution in the waters near his home.  Elimination of NEPA reviews for

18  such agency funding would mean future NEPA reviews that adversely affect Mr. Schumacher

19  would not occur at all, resulting in additional pollution in his watershed and further undermining

20  his use and enjoyment of these waters.

21      74.    Carol Kuehn, another FWW member, is a homeowner living in South Brunswick,

22  New Jersey, whose property abuts the proposed NorthEast Supply Enhancement Project's

23  Compression Station 206.  She has been involved in the NEPA process opposing the

24

25  FIRST AMENDED COMPLAINT FOR DECLARATORY
    AND INJUNCTIVE RELIEF - 35 -

26

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA  98104-1711*
*(206) 343-7340*

1   construction of the pipeline and compressor station that would result in noxious petrochemical

2   emissions near her property.  Ms. Kuehn would be adversely affected by the narrowed scope of

3   NEPA review proposed by the Final Rule, because the Final Rule would not require the Federal

4   Energy Regulatory Commission – the federal agency responsible for permitting the pipeline and

5   compressor station – to analyze the cumulative and indirect impacts of the project that could

6   result in serious damage to her property and respiratory health.  Moreover, reduced public

7   participation opportunities would result in the diminished capability of Ms. Kuehn to be involved

8   in the decision-making process related to the fate of her property.

9        75.    Plaintiff <u>Fort Berthold Protectors of Water and Earth Rights</u> ("Fort Berthold

10  POWER") is a grassroots, member-led, Fort Berthold Indian Reservation community group that

11  works to affect beneficial change in the multi-jurisdictional government decision-making

12  processes that affect the individual Mandan, Hidatsa, and Arikara tribal members' pre-treaty

13  lands held in trust since treaty times.  Fort Berthold POWER is an affiliate member of Dakota

14  Resource Council, a non-profit organization incorporated in North Dakota with a mission to

15  promote sustainable use of North Dakota's natural resources and family-owned and operated

16  agriculture by building member-led local groups that empower people to influence the decision-

17  making processes that affect their lives and communities.  Fort Berthold POWER is committed

18  to working toward a sustainable society guided by cultural and spiritual beliefs in their lands and

19  their world view.  The mission of Fort Berthold POWER is to conserve and protect the land,

20  water, and air on which all life depends.  Fort Berthold POWER works to engage citizens in

21  activities that protect the environment, facilitates learning for members to disseminate

22  information on environmental issues that affect all people, and expands members' ability to take

23  effective action to address issues that affect land, air, and water.

24

25  FIRST AMENDED COMPLAINT FOR DECLARATORY
    AND INJUNCTIVE RELIEF - 36 -

26

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA  98104-1711*
*(206) 343-7340*

76.     Fort Berthold POWER was formed in 2015 to counteract the devastating environmental effects of the implementation of federal hydraulic fracturing projects on the trust lands of allottees and the tribal government.  The federal project oil and gas wells are primarily in the Mandaree, Four Bears, and Shell Creek communities and underneath the Missouri River which transverses the reservation and is the only available source of drinking water for all communities on the reservation and many off-reservation communities.  Fort Berthold Reservation is currently experiencing both the environmental and social impacts and the financial benefits of the Bakken oil expansion.  Over the past decade, members of Fort Berthold POWER have witnessed environmental degradation, a rise in crime, and deconstruction of social fabric of once small town communities.

77.     Fort Berthold POWER members live, work, and recreate in and around, and otherwise use and enjoy, lands where oil and gas development is occurring or has been proposed on federal and tribal leases and are likely to be affected by the associated air and water pollution and other impacts from such development.  For example, some members live on or near split-estate lands (where the federal government owns the minerals underlying their property) that are already subject to oil and gas development or are likely to be developed in the future.  Other members use public lands in and around federal and tribal leases for recreation, wildlife viewing, solitude, and scientific study.

78.     Fort Berthold POWER understands and supports the requirements of the original NEPA regulations to provide for informed consent of tribal land and mineral owners in federal proposed projects.  Fort Berthold POWER has relied on NEPA to inform its community about federal oil and gas fracking actions.  Federal extractive projects are often proposed and targeted on trust lands held by tribal members or adjacent to tribal members lands, but just as often

FIRST AMENDED COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 37 -

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA  98104-1711*
*(206) 343-7340*

1   federal lead agencies fail to inform tribal members of the anticipated environmental impacts of

2   these projects and fail to provide public participation for tribal members.  NEPA's public

3   information and participation requirements are vital to the community.  In 2018, Fort Berthold

4   POWER held a NEPA conference for members of their community.

5           79.     NEPA is critical to the tribal members and their communities that live among

6   federal proposed extractive mineral projects such as the federal Bureau of Indian Affairs ("BIA")

7   Oil and Gas Hydraulic Fracturing Drilling Project.  In this federal project, the BIA did not

8   comply with NEPA and did not undertake a science-based Environmental Impact Statement;

9   now, resident tribal members and families are experiencing the environmental, medical, social,

10  and cultural impacts that outweigh the financial benefits of the rapid onset of massive industrial

11  extraction.

12          80.     Ms. Joletta Bird Bear is a Mandan Hidatsa grandmother of the Three Affiliated

13  Tribes and the current President of Fort Berthold POWER.  After seeing the rapid degradation of

14  the lands and environment, Ms. Bird Bear called concerned tribal members together to organize

15  and form an action-oriented group to counter the rapid destruction caused by multiple oil waste

16  spills and the unregulated extractive actions in the densely populated federal project that was

17  undermining the respect and spirituality of lands of herself and her ancestors held.  Ms. Bird

18  Bear is an allottee and sole owner of her lands and minerals located on the Fort Berthold Indian

19  Reservation in western North Dakota.  She is a retired U.S. Postal Service Postmaster of 23

20  years, former school board member and president of the Mandaree Public School, co founder of

21  Mandaree Inc. which served as the local community government board, and an avid caretaker of

22  her big yard that contains hundreds of tree species that she planted for wildlife habitat, wind

23  break, shade from the growing heat, and aesthetics.  All current and future federal agency

24

25  FIRST AMENDED COMPLAINT FOR DECLARATORY
    AND INJUNCTIVE RELIEF - 38 -

26

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA  98104-1711*
*(206) 343-7340*

1  proposed projects planned for Fort Berthold will directly affect her allottee interests, all tribal

2  residents, tribal communities, and her tribal government.

3      81.     As an allottee and tribal member, Ms. Bird Bear is harmed by NEPA short-cuts

4  that fast track oil and mining extraction and the laying of oil pipelines on federal lands.  Ms. Bird

5  Bear has testified at many public hearings and written many letters asking federal agencies to

6  adhere to NEPA and thoroughly consider the environmental impacts of oil and gas development.

7  As spokeswoman for Fort Berthold POWER, Ms. Bird Bear has presented draft tribal resolutions

8  before her Three Affiliated Tribes tribal government decision makers and acquired tribal

9  government committee-level support to respond to the NEPA proposed changes.

10     82.     Fort Berthold POWER member Theodora Bird Bear is an enrolled tribal member

11  of the Three Affiliated Tribes in western North Dakota.  Ms. Bird Bear has been taking action on

12  her concerns about the externalized and adverse impacts from intensive oil and gas extraction

13  around her home since 2007.  She is a former chairperson for the state-wide Dakota Resource

14  Council's oil and gas task force and a member of the Western Organization of Resource

15  Council's six state regional board.  As a tribal member, she has testified for more health-

16  protective regulations before multiple jurisdictions in regards to oil and gas extraction.  Over the

17  years, Ms. Bird Bear has testified in North Dakota state legislative committee hearings, in a

18  number of federal agency public hearings, and in the Three Affiliated Tribes Tribal Council

19  meetings on the adverse impacts from the intensive oil and gas extraction within, and outside of,

20  Fort Berthold Indian Reservation boundaries.  Ms. Bird Bear submitted comments on the CEQ

21  Final Rule, urging CEQ to maintain and strengthen the existing NEPA regulations, instead of

22  undermining the federally-protected public right to comment and participate in order to inform

23

24

25  FIRST AMENDED COMPLAINT FOR DECLARATORY
    AND INJUNCTIVE RELIEF - 39 -

26

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA  98104-1711*
*(206) 343-7340*

1    agencies of the potential adverse impacts to human health and the environment, land, air, and

2    water.

3            83.    There currently are 1,831 active, fracking and drilling wells on just the trust lands

4    within the Fort Berthold Indian Reservation boundaries, and thousands more expected, according

5    to the September 2020 North Dakota Oil & Gas Division Director's Report.  Most of these target

6    the rural area of Mandaree where Ms. Bird Bear lives.  Although there have been hundreds of

7    flaring wells on Fort Berthold and a major pipeline spill of about one-million gallons, the federal

8    Department of the Interior only formally approved the intensive oil and gas extraction in 2017—

9    a full decade after the intensive oil and gas extraction started.  Because significant, direct, and

10   indirect cumulative impacts from the intensive oil and gas fracking, drilling, and flaring has, and

11   will continue to occur on lands which are the last historic tribal lands, Theodora Bird Bear and

12   her family are harmed by the final CEQ NEPA Rule.

13           84.    As a rural Medicare-eligible tribal elder, Ms. Bird Bear was harmed by the final

14   CEQ NEPA Rule process.  She tried to get one of the very limited slots available to testify in the

15   Denver Colorado public hearing on the proposed NEPA changes.  But the limited slots filled

16   within minutes after the website opened, denying many elders and tribal members, like Ms. Bird

17   Bear, from speaking in the public hearing on the critical importance of NEPA on the last of their

18   historic tribal lands.

19           85.    Ms. Lisa Deville is an enrolled member of the Mandan Hidatsa Arikara Nation,

20   also known as the Three Affiliated Tribes; Ms. Deville, her husband, five children, and three

21   grandchildren have lived their whole lives in Mandaree, North Dakota; her family and ancestors

22   are buried along the shores of Lake Sakakawea.

23

24

25   FIRST AMENDED COMPLAINT FOR DECLARATORY
     AND INJUNCTIVE RELIEF - 40 -
26

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA  98104-1711*
*(206) 343-7340*

86.     Ms. Deville is the Vice President of Fort Berthold POWER, which is a member organization of Dakota Resource Council, which in turn is a member organization of Western Organization of Resource Councils.  Ms. Deville is also on the Board of the Western Organization of Resource Councils, and she currently serves on EPA's National Environmental Justice Advisory Committee ("NEJAC").  The NEJAC is a Federal Advisory Committee formed in 1993 to provide advice and recommendations to the EPA Administrator and her or his staff about broad, cross-cutting issues related to environmental justice, from all stakeholders involved in the environmental justice dialogue.  The impacts of the oil and gas development on Fort Berthold Reservation are environmental justice impacts, as they disproportionately harm indigenous people, many of whom are low-income.

87.     Ms. Deville has relied heavily on the NEPA process to voice her concern over impacts caused by energy development on the land where she lives.  For example, the Final Rule's removal of the indirect and cumulative effects analysis requirement will result in a failure to account for the full impacts of oil and gas development, and limited comment periods will make it increasingly difficult for tribal members like Ms. Deville to offer informed public comment.  NEPA is the main law which gives citizens on the Fort Berthold Indian Reservation protection from the widespread negative impacts of energy development, because NEPA gives communities like Fort Berthold a voice in the decision-making process surrounding energy development and helps the community protect indigenous significant historical and cultural sites, burial sites, endangered species, and water.

88.     Plaintiff Friends of the Earth ("FoE") is a tax-exempt, 501(c)(3) organization and a not-for-profit corporation existing under the laws of the District of Columbia with offices in Washington D.C. and Berkeley, California and staff located across the country.  FoE is a

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF - 41 -

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA  98104-1711*
*(206) 343-7340*

1  membership organization consisting of more than 170,000 members and more than 1.7 million

2  activists nationwide.  FoE is also a member of Friends of the Earth-International, which is a

3  network of grassroots groups in 74 countries worldwide.  FoE's mission is to protect our natural

4  environment, including air, water, and land, to create a more healthy and just world. FoE utilizes

5  public education, advocacy, legislative processes, and litigation to achieve its organizational

6  goals.

7           89.     FoE has five core campaign programs: Climate & Energy, Democracy, Economic

8  Policy, Food & Agriculture, and Oceans & Vessels.  All of these programs utilize the processes

9  afforded by NEPA to engage in major federal project decision-making.  FoE's Climate program

10  promotes energy conservation and clean energy sources, including wind, solar, and geothermal

11  power, to end dependence on fossil fuels, reduce greenhouse gas emissions, and mitigate climate

12  change.  FoE's Economic Policy program works to redirect tax policies and public spending to

13  make polluters pay for the costs of their pollution, and to drive the transition to a cleaner, low-

14  carbon economy.  FoE's Democracy program works to create stronger and more effective

15  environmental policies by fostering representative and responsive democratic institutions across

16  the United States.  FoE's Food program seeks a fundamental shift in our food system: from toxic

17  and chemical intensive to healthy and ecologically regenerative; from corporate controlled to

18  democratically governed; and from a system that embodies the deepest inequities in our society

19  to one that advances justice and fulfills the needs of all eaters now and in the future.  FoE's

20  Oceans program works to protect our oceans, the tens of millions of people who live near, and

21  the marine creatures who reside in from the threats from oil spills, air pollution, sewage releases,

22  industrial ocean fish farming, and unnatural ocean noise.

23

24

25  FIRST AMENDED COMPLAINT FOR DECLARATORY
    AND INJUNCTIVE RELIEF - 42 -

26

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA  98104-1711*
*(206) 343-7340*

90.     The Final Rule is extremely detrimental to and adversely affects the FoE's interests and those of FoE's members and activists.  The changes will restrict FoE's members' ability to effectively participate in public comment periods, maintain accountability and transparency in major federal project decision-making, and advocate for solutions to climate change, air and water pollution and fight against environmentally damaging projects.  In addition to restrictions on the scope of NEPA, the Final Rule impedes FoE and its members' ability to provide important experience-based and culturally significant comments through newly enforced restrictions on the specificity of a substantive comment.  Many FoE members live on the frontlines of various proposed major federal projects or existing projects that are being modified which trigger existing NEPA requirements.  However, the shortened time limits for EA/EIS documents—as well as the overly strict specificity requirements for public comments that demand a level of technical training that many FoE members do not possess or have the time to provide—will result in agencies disregarding many of FoE's member perspectives.

91.     In particular, FoE member and senior oceans campaigner Verner Wilson will be harmed by the implementation of the Final Rule.  Mr. Wilson is a member of the Curyung Tribe in Bristol Bay, Alaska.  Pebble Mine, a proposed metals mine in Bristol Bay, threatens one of the largest and last remaining wild salmon populations in the world.  The project is moving forward in a NEPA process with the final EIS published on July 24, 2020.  The mine could generate more than 10 billion tons of dangerous waste, wipe out 90 miles of salmon streams and pollute more than 5,000 acres of wetlands, ponds and lakes.  It would likely plummet the salmon population—catastrophically impacting local communities and earth's last great wild sockeye salmon fishery.  Mr. Wilson and his family would be significantly impacted by the project as they are subsistence fishers who rely on the wild salmon runs every year.  If NEPA is curtailed even further, Mr.

FIRST AMENDED COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 43 -

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA  98104-1711*
*(206) 343-7340*

1  Wilson will be significantly impacted in his ability to participate in and object to the Pebble

2  Mine and any other major federal projects that are proposed for the region.

3          92.     Plaintiff National Parks Conservation Association ("NPCA") is a non-profit

4  organization whose mission is to enhance and protect the National Park System.  NPCA was

5  formed in 1919 and today has 1.4 million members and supporters, with approximately 40,629

6  members in California and offices in Oakland, Joshua Tree, Los Angeles, and Fresno.  NPCA is

7  headquartered in Washington, D.C., and has 27 regional and field offices throughout the country.

8  A robust NEPA process is essential to NPCA's mission of protecting national parks, which is

9  why NPCA provided oral testimony and detailed written comments on the proposed revisions to

10  CEQ's NEPA regulations.

11          93.     NPCA is regularly involved in NEPA processes and submits comments on

12  proposed projects and activities on and near national park lands.  For instance, the Midwest

13  regional office recently submitted comments to the National Park Service on its environmental

14  assessment associated with Independence Day fireworks at Mount Rushmore National

15  Memorial, and several regional offices have submitted NEPA comments to the BLM on recent

16  oil and gas lease sales.  NPCA is also currently asserting NEPA claims in several lawsuits,

17  including in the challenge to the Alton Coal Mine expansion near Bryce Canyon National Park

18  and the challenge to three BLM leasing decisions for oil and gas development covering

19  approximately 117,000 acres near Dinosaur National Monument.

20          94.     NPCA has individual members and staff who regularly visit, study, work,

21  photograph, or recreate on lands or marine areas where NEPA has been and will be used in

22  reviewing federal projects.  Each of these members and staff have specific intentions to continue

23  to interact with these areas frequently and on an ongoing basis.  NPCA members and staff derive

24

25  FIRST AMENDED COMPLAINT FOR DECLARATORY
    AND INJUNCTIVE RELIEF - 44 -
26

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA  98104-1711*
*(206) 343-7340*

recreational, spiritual, professional, scientific, educational, and aesthetic benefits from their interactions with these parts of the natural world.

95.     Joy Oakes, of Arlington, Virginia, is Senior Director of the Mid-Atlantic regional office for NPCA and long-time NPCA member, has frequently utilized the NEPA process to advocate for the protection of natural, cultural, and historical places.  Most recently, in her role as Senior Director, Ms. Oakes has been participating in the NEPA permit application review process for the Surry-Skiffes Creek transmission line project in the scenic James River area. This project is close to the Colonial National Historical Park, an area that Ms. Oakes has visited many times throughout her lifetime and plans to continue visiting in the future for both professional and personal reasons.  Ms. Oakes expects to be involved in other NEPA processes in the future, including assisting with comments on the Federal Highway Administration's I-495 & I-270 Managed Lanes Study Draft EIS, which was released in July 2020.

96.     The Final Rule reduces Ms. Oakes' ability to participate in these and other future NEPA processes by limiting the alternatives considered (e.g., in the case of the transmission line across the James River, potentially not identifying alternatives that would meet electricity needs while also protecting the region's historic character and resources), eliminating the consideration of cumulative impacts (e.g., the impacts the transmission line would have on climate change), and shortening the amount of time given to review draft EISs and provide comments.

97.     Plaintiff National Wildlife Federation ("NWF") is the nation's largest member-supported non-profit conservation advocacy and education organization, with more than six million members and supporters, including more than 583,000 members and supporters in California.  NWF has affiliate organizations in fifty-two states and territories, including California.  NWF has regional offices and staff located throughout the United States, including a

FIRST AMENDED COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 45 -

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA  98104-1711*
*(206) 343-7340*

California Regional Office headquartered in Midpines, California and additional staff in San

Anselmo, California.  NWF is organized under the laws of the District of Columbia and is

headquartered in Reston, Virginia.

98.     NWF works to unite all Americans to ensure wildlife thrive in a rapidly changing

world.  NWF advances this mission through numerous programs that, among other things, work

to protect, restore, and connect wildlife habitat; confront climate change; defend the public's

interest in ownership and management of public lands; address the threat of invasive species and

other systemic threats to wildlife; advance modern approaches to wildlife management; and

connect Americans with wildlife through education and advocacy engagement.

99.     A robust NEPA process is essential to NWF's mission, which is why NWF

actively engaged in both the entire process leading up to the promulgation of the Final Rule.

Among other things, NWF provided extensive and detailed written comments at all stages;

provided oral testimony at both the Denver, CO and Washington D.C. public hearings on the

Proposed Rule; met twice with representatives from the Office of Management and Budget and

other federal agencies to discuss our concerns during the Office of Information and Regulatory

Affairs review process; mobilized comments on the Proposed Rule from more than 350

organizations; and collectively generated almost 50,000 individual comments on the from our

members and supporters through our Action Alert system.

100.    NWF attorneys, policy advocates, scientists, and organizers routinely participate

in commenting at all phases of NEPA processes before numerous federal agencies, including the

U.S. Forest Service, BLM, the U.S. Army Corps of Engineers, the U.S. Fish and Wildlife

Service, Bureau of Ocean Energy Management, and others.  NWF engages in litigation to ensure

full compliance with NEPA.  NWF takes an active role in educating members of Congress about

FIRST AMENDED COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 46 -

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA  98104-1711*
*(206) 343-7340*

1   the importance of maintaining the integrity of NEPA and the NEPA implementing regulations,

2   and about the importance of strong Congressional oversight to ensure that federal agencies

3   properly apply NEPA when making major federal decisions that affect the quality of the

4   environment.  NWF also employs numerous media and outreach staff to inform NWF's members

5   about, and encourage and assist members in participating in, NEPA reviews.

6        101.   For example, NWF is currently litigating the U.S. Army Corps of Engineers'

7   failure to properly comply with NEPA in connection with its navigation maintenance activities

8   on a 195-mile portion of the Mississippi River.  Key issues in this litigation include the indirect

9   and cumulative impacts of in-stream navigation structures, which have significantly increased

10  flood levels in the Mississippi River by up to 15 feet in some locations and 6 to 10 feet over

11  broad stretches where these structures are prevalent.  Prior to filing this challenge, NWF had

12  engaged in all aspects of the NEPA processes providing detailed scoping comments, detailed

13  comments on the draft EISs, and detailed comments on the final EISs.  NWF routinely monitors

14  upcoming NEPA review processes and engages in those reviews as appropriate, including the

15  NEPA processes for oil and gas lease sales and for U.S. Army Corps of Engineers' projects and

16  permits, among others.  By eliminating consideration of indirect and cumulative effects, the Final

17  Rule will make it difficult if not impossible for NWF to engage in this kind of advocacy in the

18  future, resulting in increased harm to wildlife, public lands and waters, and our shared climate.

19       102.   NWF communicates extensively with its members and supporters, as well as the

20  general public, about threats to wildlife, the protection of public lands, the ongoing and future

21  damage from the global climate crisis, and the importance of retaining the long-standing

22  protections provided by NEPA and the nation's other environmental laws, by issuing press

23  releases and statements, blogs, newsletters, magazines, and sending emails and action alerts.

24

25  FIRST AMENDED COMPLAINT FOR DECLARATORY
    AND INJUNCTIVE RELIEF - 47 -

26

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA  98104-1711*
*(206) 343-7340*

1   NWFs members participate in and rely on the NEPA review processes, and will be harmed by

2   the Final Rule.  For example, the Final Rule's elimination of references to indirect impacts

3   strikes at the heart of the ability of NWF and its members to obtain information on the indirect

4   effects of levees, navigation structures, reservoir operating plans, pumping plants and other

5   major infrastructure on increased flooding, losses of wetlands and other vital wildlife habitat, and

6   reductions in critical river flows.  The Final Rule's elimination of cumulative impacts review

7   will make it difficult or impossible for NWF and its members to obtain adequate information

8   about, and ensure government consideration of, the cumulative impacts of climate change on:

9   (a) the effectiveness, sustainability, and impacts of flood and storm damage reduction and other

10  projects in both riverine and coastal areas; and (b) the climate change impacts of projects such as

11  oil and gas development or mining operations.  The Final Rule's provision allowing federal

12  agencies to waive NEPA if other review processes are associated with, or required for, a project

13  will eliminate the ability of NWF and its members to obtain adequate information about, or

14  provide their views and comments on, many types of projects.

15          103.    NWF has individual members, including but not limited to Michael Bartlett of

16  New Hampshire and Melissa Samet of California who regularly visit, study, work, photograph,

17  or recreate on lands, waters, or coastal areas where NEPA has been and will be used in reviewing

18  federal projects and permitting decisions.  Each of these members has specific intentions to

19  continue to interact with these areas frequently and on an ongoing basis.

20          104.    Michael Bartlett is a member of the Board of Directors of NWF and has been a

21  member of NWF since 2012.  Mr. Bartlett has both a deep personal and a professional interest in

22  migratory birds.  Mr. Bartlett is an avid birder and amateur ornithologist with a particular affinity

23  for migratory bird species such as the Peregrine Falcon, which is one of his favorite species, and

24

25  FIRST AMENDED COMPLAINT FOR DECLARATORY
    AND INJUNCTIVE RELIEF - 48 -

26

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA  98104-1711*
*(206) 343-7340*

the Screech Owl.  Mr. Bartlett spends considerable time observing birds in his home state of

New Hampshire and has installed bird houses and bird feeders on his property to attract both

migratory and "overwintering" species, and species endemic to New Hampshire like Chickadees,

Nuthatches, Downy Woodpeckers, American Goldfinches, and Northern Cardinals.  Mr. Bartlett

likewise seeks out opportunities to study and observe bird populations when he is traveling in the

United States and abroad.

105.    Earlier in his life, Mr. Bartlett worked for the U.S. Fish and Wildlife Service for

more than thirty-seven years, including many years as Supervisor of the Service's New England

Field Office, working on matters related to the preservation of avian wildlife resources—

including the protection of migratory bird species like loons, terns, and waterfowl.  While the

director of the New England Field Office, Mr. Bartlett supervised the office's Endangered

Species Program, which included work protecting migratory birds like the Piping Plover.

106.    On February 3, 2020, the U.S. Department of Interior Fish and Wildlife Service

issued a proposed rule that followed up on a legal memorandum issued in December of 2017 to

remove long-standing protections of about 1,000 species of migratory birds, including many that

are present in New Hampshire like the common loon, black-capped chickadee, and the above

mentioned species, among others, from the impacts of incidental takes under the Migratory Bird

Treaty Act.  Incidental takes – like deaths from oil pits, oil spills, large buildings, power lines,

and wind turbines – comprise the largest number of takes of migratory birds.  On June 5, 2020,

the U.S. Fish and Wildlife Service issued a draft EIS on the proposed rule (the MBTA DEIS).

Applying the new NEPA rule to the MBTA DEIS would greatly deprive Mr. Bartlett's ability as

a member of the public concerned with birds to assess and obtain information about how the

proposed MBTA take rule might impact the birds he watches and cares about.  For instance,

FIRST AMENDED COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 49 -

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA  98104-1711*
*(206) 343-7340*

1   impacts like climate change and habitat loss are causing many bird species to decline.  Without a

2   consideration of cumulative impacts, the impacts of the proposed MBTA take rule in

3   combination with these other reasonably foreseeable impacts may not be assessed or disclosed to

4   members of the public like Mr. Bartlett.

5          107.    Melissa Samet, the Senior Water Resources Counsel for NWF and an NWF

6   member, has frequently utilized the NEPA process in a professional and personal capacity to

7   advocate for the protection of rivers, wetlands, and coastal areas.  Ms. Samet has worked for

8   NWF since 2010 where she directs water resources campaigns and provides policy and legal

9   direction on issues related to water resources planning and projects, with a particular focus on

10   improving the planning practices of the U.S. Army Corps of Engineers and improving floodplain

11   management.  Ms. Samet has engaged in NEPA litigation; and has educated Congress about the

12   importance of maintaining the full suite of protections provided by NEPA and the CEQ NEPA

13   regulations and of the importance of effective Congressional oversight of federal agency

14   compliance with NEPA, including through Congressional testimony.  She has found NEPA's

15   procedural safeguards to be crucial to improving projects and reducing and preventing

16   unnecessary impacts, because in her experience, NEPA review typically reveals diverse

17   perspectives, key scientific information, likely impacts, and impact-reduction solutions that

18   otherwise would not be identified by the agency acting alone.  Ms. Samet believes that the Final

19   Rule will severely undercut her ability to evaluate and comment on the indirect and cumulative

20   impacts of major federal actions, including U.S. Army Corps of Engineers' flood and storm

21   damage reduction projects, navigation projects, reservoir operating plans, and permitting

22   decisions that typically have far reaching indirect and cumulative impacts.

23

24

25   FIRST AMENDED COMPLAINT FOR DECLARATORY
     AND INJUNCTIVE RELIEF - 50 -
26

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA  98104-1711*
*(206) 343-7340*

108.    Ms. Samet is a frequent user of federal, state, and other protected lands in California, where she hikes, watches birds and other wildlife, photographs, and seeks out the solace that wildlands can provide.  Among the places she has visited on many occasions are Point Reyes National Seashore in Marin County, Mount Tamalpais in Marin County, Yosemite National Park in Mariposa County, Humboldt Redwoods State Park in Humboldt County, Sequoia National Park in Tulare County, Monterey Bay in Monterey County, and Point Lobos State Natural Reserve in Monterey County.  Ms. Samet visits Point Reyes National Seashore on a regular basis, where she has hiked and watched hawks, owls, pelicans, shorebirds, waterfowl, seals, whales, Tule Elk and many other mammals at least 6 times each year for more than two decades.  Her most recent visit to Point Reyes was in July 2020, and she plans to continue to visit Point Reyes on at least a bi-monthly basis for the foreseeable future.  In addition to relying on NEPA in her professional capacity, Ms. Samet has engaged in the NEPA process in her personal capacity, most recently providing detailed comments on the National Park Services' Draft Environmental Impact Statement for a General Management Plan Amendment for Point Reyes National Seashore.  Those comments highlighted significant indirect and cumulative impacts of the proposed management plan, including the cumulative impacts of climate change and the indirect impacts of the proposed plan on the Seashore's rich array of predator species.

109.    Plaintiff Ocean Conservancy is a nonprofit, science-based conservation organization working to protect the ocean from today's greatest global challenges.  Together with its partners, Ocean Conservancy creates science-based solutions for a healthy ocean and the wildlife and communities that depend on it.  Since 1972, Ocean Conservancy has sought to improve the health of our nation's marine wildlife and fish, and to face threats such as ocean trash, shipping, overfishing, and ocean acidification.  Ocean Conservancy has over 150,000

FIRST AMENDED COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 51 -

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA  98104-1711*
*(206) 343-7340*

1    members and supporters worldwide, with approximately 20,591 in California.  Ocean

2    Conservancy is headquartered in Washington, D.C. and has offices in Alaska, Washington,

3    Florida, Oregon, Texas, and Santa Cruz and Santa Barbara, California.

4          110.    Ocean Conservancy communicates extensively with its members, its supporters,

5    and the general public about threats to ocean health, climate change, ocean acidification, ocean

6    plastics, and fishery management, and comments on numerous federally permitted or funded

7    actions.  The organization regularly releases reports and fact sheets, issues press releases and

8    statements, publishes online blog and news pieces, and sends emails and action alerts to its

9    members and supporters.  Ocean Conservancy's members participate in and rely on NEPA's

10    review processes, and will be harmed by the Final Rule.  For example, the Final Rule's

11    elimination of cumulative impacts review will make it difficult or impossible for Ocean

12    Conservancy and its members to obtain adequate information about, and ensure government

13    consideration of, the impacts of greenhouse gases on the ocean, such as ocean acidification and

14    warming waters, which leads to shifting fish stocks that harm Ocean Conservancy's members

15    and interests.  Nor will Ocean Conservancy and its members be able to obtain adequate

16    information about shipping and new shipping routes in the Arctic region, which are of interest to

17    Ocean Conservancy and its members.

18          111.    In the context of fishery management, NEPA procedures constitute an important

19    means of ensuring that fishery managers consider important issues that the Magnuson-Stevens

20    Act does not address: in this way, the Magnuson-Stevens Act is not a "functional equivalent" of

21    the NEPA process. NEPA plays an integral role in the fishery management process and Ocean

22    Conservancy and its members will be harmed by the Final Rule because they will be unable to

23    fully engage in the fishery management process.  At a time when we understand better than ever

24

25    FIRST AMENDED COMPLAINT FOR DECLARATORY

26    AND INJUNCTIVE RELIEF - 52 -

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA  98104-1711*
*(206) 343-7340*

that a healthy ocean ecosystem is necessary to support thriving fisheries, NEPA interjects larger environmental issues into a process proscribed by the Magnuson-Stevens Act that otherwise focuses on maximizing how many fish can be caught.

112.    Further, many Ocean Conservancy members are fishermen who spend substantial amounts of time at sea or operate fish transport or packing activities.  These members will be harmed by shortened NEPA analysis and public comment timelines envisioned by the Final Rule.

113.    Ocean Conservancy has individual members, including but not limited to Captain Dave Monti of Rhode Island, who regularly visit, study, work, photograph, or recreate on lands or marine areas where NEPA has been and will be used in reviewing federal projects.  Each of the members has specific intentions to continue to interact with these areas frequently and on an ongoing basis.  Ocean Conservancy members and staff derive recreational, spiritual, professional, scientific, educational, and aesthetic benefits from their interactions with these parts of the natural world.

114.    Captain Dave Monti is an Ocean Conservancy member who resides in Warwick, Rhode Island and keeps his charter boat, the *Virginia Joan*, in North Kingstown, Rhode Island. He generates a portion of his income as a charter boat captain and guide.  Captain Monti has been fishing for over 45 years and expects to do so for the foreseeable future.  He helps his clients target Rhode Island fish species such as striped bass, bluefish, summer flounder (fluke), scup, tautog, black sea bass, cod, and bonito in the Narragansett Bay, Block Island, and Newport areas.  Captain Monti relies on NEPA reviews and public processes to be informed and involved in federal decisions affecting the areas he fishes in and the habitat that his target fish need to stay productive, including permitting decisions regarding the Block Island Wind Farm.  Elimination

FIRST AMENDED COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 53 -

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA  98104-1711*
*(206) 343-7340*

1   or curtailment of NEPA reviews for the siting of wind farms or for fishery management actions

2   would result in additional threats in the waters he fishes in and the fish species he targets for his

3   clients.  The proposed rule would undermine his use and enjoyment of these waters and public

4   fishery resources.

5        115.     Plaintiff Rio Grande International Study Center ("RGISC") is a public interest,

6   501(c)(3) advocacy organization located in Laredo, Texas.  It has a staff of two full-time

7   employees and three part-time employees.  RGISC's mission is "to preserve and protect the Rio

8   Grande-Rio Bravo, its watershed and environment, through awareness, advocacy, research,

9   education, stewardship and bi-national collaboration for the benefit of present and future

10  generations."  Nearly 95% of the population in Laredo is Hispanic and more than one-third of the

11  city's population lives in poverty, more than twice the state average.  RGISC staff and board

12  members live, work, and recreate in and along the Rio Grande and will continue to do so into the

13  future.

14       116.     RGISC's workload includes monthly river sampling and water quality testing at

15  multiple locations in Webb County through the Texas Clean Rivers Program to monitor the

16  health of the river.  RGISC helped establish this program through local and state entities and has

17  done monthly monitoring for more than 25 years.  The City of Laredo has asked RGISC to

18  operate an educational center (the "South Laredo Nature and Birding Center" or "SoLa Center")

19  to promote appreciation of the flora, fauna and wildlife of the region, and in particular within the

20  Rio Grande ecosystem.  Every year in early February, RGISC hosts a four-day Laredo Birding

21  Festival, and RGISC staff and volunteers take visitors from across the United States and different

22  countries to observe birds along the Rio Grande in Webb and Zapata counties.  RGISC also leads

23  community outings called Loving Laredo Paddles and Loving Laredo Hikes along the river

24

25  FIRST AMENDED COMPLAINT FOR DECLARATORY
    AND INJUNCTIVE RELIEF - 54 -
26

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA  98104-1711*
*(206) 343-7340*

1  several times a year to raise awareness of the beauty and ecological importance of the Rio

2  Grande.  The Laredo Birding Festival and Community Paddles generate revenue for RGISC.

3  117.    RGISC uses NEPA and its requirements for public transparency, information-

4  sharing, and participation in its work to protect the Rio Grande.  For example, in 2009-2010, led

5  by then Executive Director Jay Johnson Castro and Board members Dr. Tom Vaughan & Dr.

6  James Earhart, RGISC informed and educated the families living in Barrio de Colores of the

7  potential adverse environmental impacts of a U.S. Customs and Border Protection project to

8  remove Carrizo cane vegetation along the U.S.-Mexico border through herbicide spraying along

9  the river banks.

10  118.    RGISC board member, Israel Reyna, an attorney with the Texas Rio Grande

11  Legal Aid, advised the families of their rights and protections under NEPA, including the right to

12  know all of the potential harms to their human environment, to ensure alternatives were

13  considered, a bilingual notice of the proposed project, and of their right to sue if NEPA was

14  violated.

15  119.    In ensuing federal litigation, Dr. Earhart, a biologist and scientist on the RGISC

16  board, wrote an affidavit that supported the suit's allegations of the potential harmful effects to

17  families in Barrio de Colores from exposure to herbicides used to remove the Carrizo cane,

18  particularly because of aerial spray drift.  Through a court-approved settlement, Customs and

19  Border Protection agreed to use a combination of principally non-chemical methods to remove

20  Carrizo cane, using herbicide in one area only after a 5 day warning period and public

21  information provided in both English and Spanish.  The federal agency also agreed to hire a

22  certain number of workers from the local labor pool, and to convene a public information

23  meeting to fully explain the cane removal and control activities to the local community, again in

24

25  FIRST AMENDED COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 55 -

26

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA  98104-1711*
*(206) 343-7340*

both English and Spanish.  Finally, the federal agency agreed to implement future NEPA analysis regarding Carrizo cane removal with at least one public scoping meeting, a 45-day comment period, and summaries and documents translated into Spanish and distributed at the local public library.  *Barrio de Colores v. U.S. Customs and Border Protection, Dep't of Homeland Security*, No. 09-0035 (S.D. Tex.).

120.    RGISC is currently deep in the throes of a battle against the federal government's plans to build a border wall, approximately 121 river miles along the Rio Grande in the Laredo Sector.  NEPA, in addition to dozens of other federal laws, has been waived to expedite construction of the Border Wall.  Waiver of NEPA for the Border Wall has meant that the federal government can undertake projects or issue permits without consulting local communities and local experts.  Waiver of NEPA has taken away the community's voice and input into projects that would harm the environment, public health, cultural heritage, and way of life.

121.    Like waiver of NEPA, RGISC believes that the Final Rule will undercut its ability and the ability of the community that RGISC serves to evaluate and comment on the full impacts of projects like the border vegetation control project.  The Final Rule also harms RGISC's ability to push federal agencies to fully provide local communities timely, accessible, Spanish-language information about proposed actions and meaningful opportunities to participate in federal decisions that affect them.

122.    Plaintiff Southern Utah Wilderness Alliance ("SUWA") is a nonprofit environmental membership organization dedicated to the preservation of outstanding wilderness found throughout Utah, and the management of wilderness-quality lands in their natural state for the benefit of all Americans.  SUWA promotes local and national recognition of the region's unique character through research and public education, and supports administrative and

FIRST AMENDED COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 56 -

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA  98104-1711*
*(206) 343-7340*

1   legislative initiatives to permanently protect Utah's wild places.  SUWA has more than 14,000

2   members in all fifty states, with 2,155 members in California, and maintains offices in Utah and

3   Washington D.C.  SUWA members use and enjoy federal public lands throughout Utah for a

4   variety of purposes, including scientific study, recreation, wildlife viewing, aesthetic

5   appreciation, viewing cultural and historic artifacts, and financial livelihood.

6          123.    SUWA staff are well versed in CEQ's NEPA regulations and regularly review

7   and analyze NEPA documents and submit detailed, technical comments on proposed actions that

8   may impact areas proposed for wilderness designation or other federal public lands in Utah.

9   These comments often address federal agencies' discounting of greenhouse gas emissions and

10  impacts to climate change from proposed actions like federal oil and gas lease sales and

11  applications for oil and gas drilling permits and the clearcutting native vegetation.  SUWA staff

12  and members work to safeguard remarkable federal public lands in Utah will be harmed by the

13  Final Rule.  SUWA submitted comments on CEQ's draft rule.  SUWA has individual members,

14  including Neal Clark and Landon Newell, who establish SUWA's significant interest in the

15  rulemaking and standing to bring this facial challenge.

16         124.    Mr. Clark has been a full-time employee of SUWA since 2011 and serves as the

17  organization's Wildlands Program Director, and also serves as House Counsel.  In this capacity,

18  Mr. Clark oversees the drafting and filing of dozens of SUWA comments annually on various

19  federal agency NEPA documents.  For example, in 2018 SUWA submitted comments on BLM's

20  draft resource management plans and environmental impact statements for the Shash Jaa and

21  Indian Creek units of the reduced Bears Ears national monument and highlighted numerous

22  instances where the Bureau had failed to comply with the letter and spirit and NEPA's

23  implementing regulations.

24

25  FIRST AMENDED COMPLAINT FOR DECLARATORY
    AND INJUNCTIVE RELIEF - 57 -

26

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA  98104-1711*
*(206) 343-7340*

125.    Mr. Clark is also an active member of SUWA.  Mr. Clark lives in Moab, Utah and spends much of his free time exploring BLM, Forest Service, and National Park Service public lands in southern Utah, including hiking and camping in Bears Ears National Monument, rafting in Labyrinth Canyon, and mountain biking on Bureau-managed lands surrounding Moab.  He engages in these activities on a daily basis, year-round, and intends on continuing to do so for years to come.  Mr. Clark's interest in the protection and preservation of these federal public lands will be harmed by the Final Rule because by eliminating the requirement that federal agencies fully consider and disclose the cumulative impacts of climate change these agencies will make fundamentally uninformed decisions that will result in short and long term degradation that threaten the places he recreates in and enjoys.

126.    Mr. Newell has been a full-time employee of SUWA since 2012 and serves as one of the organization's staff attorneys.  In this capacity Mr. Newell focuses his work on reviewing BLM proposals to hold quarterly oil and gas lease sales across Utah, as well as the Bureau's management of those leases and applications by private companies to drill wells and exploit subsurface resources.  Mr. Newell submits detailed comments on these proposals, as well as files administrative appeals and federal court litigation regarding the Bureau's failure to comply with NEPA's hard look mandate.

127.    Mr. Newell is also an active member of SUWA.  Mr. Newell lives in Salt Lake City and frequently camps, sightsees, hikes, fishes, and visits Native American cultural sites on BLM lands in Utah.  For example, in the spring of 2020 Mr. Newell traveled to Utah's San Rafael Swell (managed by BLM) and Capitol Reef National Park to hike, camp, and sightsee. He already has plans to return to these places in the fall and winter of 2020.  These public lands are part of the Colorado Plateau in Utah and one of the areas expected to get hotter and drier over

FIRST AMENDED COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 58 -

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA 98104-1711*
*(206) 343-7340*

the coming years due to climate change.  Mr. Newell's interest in the protection of these places is threatened by the environmental degradation brought on by climate change, including drought, aridification of soils, and loss of native vegetation, and decision by agencies like BLM to approve oil and gas leases and wells that will be made without considering and disclosing their impacts to the climate.

128.    Plaintiff, <u>WE ACT for Environmental Justice</u> ("WE ACT") is a non-profit organization founded in 1988 in the West Harlem neighborhood of New York City.  WE ACT's mission is to build healthy communities by ensuring that people of color and/or low income residents participate meaningfully in the creation of sound and fair environmental health and protection policies and practices.  WE ACT envisions a community that has informed and engaged residents who participate fully in decision-making on key issues that impact their health and community; strong and equal environmental protections; increased environmental health through community-based participatory research and evidence-based campaigns.  WE ACT has grown to 16 staff members, offices in New York City and Washington D.C., and over 800 members throughout New York City.

129.    WE ACT is a leading group in the Environmental Justice Movement, which began in order to call attention to and organize against systemic environmental racism, which is often left out of mainstream, largely white, environmental advocacy agendas.  In 1991, a multinational group, including WE ACT, attended The First People of Color Environmental Leadership Summit in Washington D.C.  At the event, "The Principles of Environmental Justice" were created and agreed upon, and still stand as a guiding set of principles for the Environmental Justice Movement today.

FIRST AMENDED COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 59 -

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA  98104-1711*
*(206) 343-7340*

130.    Throughout the 32 years of its existence, WE ACT has provided effective leadership in the development of New York City and northeast region environmental justice alliances to network, collaborate, and impact environmental policy-making.  WE ACT is also the administrative arm of the Environmental Justice Leadership Forum, which is a coalition of nearly 60 environmental justice advocates and experts working to eliminate environmental injustices through technical assistance, capacity building, and policy solutions.

131.    WE ACT's founders, Peggy Shepard, Chuck Sutton, and Vernice Miller-Travis started as community activists.  They have long viewed NEPA as an important tool for advocacy. They used the procedures and requirements of the National Environmental Policy Act in their attempt to address the noxious emissions and pollution from the North River Sewage Treatment Plant, which lines the banks of the Hudson River along Manhattan Island in the West Harlem community for almost half a mile.  They conducted significant research into the land use and siting history of this largely federally funded facility and uncovered that EPA Region 2 had twice declared a Finding of No Significant Impact under NEPA for the North River plant.  As a result, the public was never informed about how a facility designed to treat 180 million gallons a day of raw sewage and wastewater, constructed without any odor- control features at all, might impact the tens of thousands of people who live near the plant.

132.    Peggy Shepard is the co-founder and executive director of WE ACT for Environmental Justice.  She has lived in New York City for over 30 years.  In both her role as a community advocate and executive director of WE ACT, she and WE ACT staff have worked to effectively educate WE ACT membership on the importance of public engagement, and how to effectively organize at the local level.  Ms. Shepard has a long history of organizing and engaging Northern Manhattan residents in community-based planning and campaigns to address

FIRST AMENDED COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 60 -

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA  98104-1711*
*(206) 343-7340*

1   environmental protection and environmental health policy locally and nationally.  She has

2   successfully combined grassroots organizing, environmental advocacy, and environmental health

3   community-based participatory research to become a national leader in advancing environmental

4   policy and the perspective of environmental justice in urban communities to ensure that the right

5   to a clean, healthy and sustainable environment extends to all.

6        133.    With NEPA as the foundation for many state and city level regulations, WE ACT

7   has utilized similar regulations to engage locally to voice concerns about projects that impact

8   their community.  In 2017, WE ACT community members concerned about New York City's

9   plan to rezone the Inwood neighborhood utilized the public participation provisions to voice their

10   apprehension about this project.  The nine residents submitted in depth written comments on the

11   environmental impact statement because they believed the proposed rezoning would lead to an

12   increase in density and serious environmental and socioeconomic risks that, if it is enacted as

13   proposed, would cause irreparable harm to their neighborhood.  They also believed that the

14   redevelopment project would jeopardize the special character of their neighborhood.  Their

15   comment particularly identified that the redevelopment plan for Inwood increased the likelihood

16   of tenant displacement, would negatively impact minority- and women-owned businesses in the

17   area, and the community would experience the social impact of the loss of the community's

18   library.  The New York Supreme Court judge sided with these local residents, contending the

19   prior environmental review of the project ignored concerns they had raised.

20        134.    WE ACT submitted comments on the Proposed Rule in March 2020 in

21   coordination with Yale University's Environmental Justice Law Clinic.  WE ACT's comments

22   reflected their grave concern about how these proposed changes would drastically diminish the

23   ability of communities to know what projects were planned and also be able to meaningfully

24

25   FIRST AMENDED COMPLAINT FOR DECLARATORY
     AND INJUNCTIVE RELIEF - 61 -

26

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA  98104-1711*
*(206) 343-7340*

1  provide their expertise to articulate how their respective communities would be impacted.  NEPA

2  is one of the key tools WE ACT uses to effectively advocate on behalf of its membership.  The

3  NEPA mandates of public participation and informed decision-making, based on sound science

4  and requiring all agencies of the federal government to take a hard look at environmental

5  consequences prior to issuing a decision, are vital protections.

6       135.  WE ACT serves a very diverse membership who live in neighborhoods like

7  Washington Heights and Inwood.  According to the 2018 New York City's Community Health

8  Profile, 47% of residents in WE ACT's service area are born outside of the United States and

9  37% have limited proficiency in English.  Spanish translation is a costly but necessary service

10  WE ACT provides for all materials for membership.  The changes to the Final Rule cut the

11  public comment period on major federal projects from 45 days to just 30.  That's not enough

12  time for WE ACT community members to organize and respond to long technical documents

13  that are often only provided in English.  These changes to rule would also limit the way agencies

14  distribute information.  Without in-person meetings, and a requirement that agencies physically

15  distribute documents, WE ACT community members are in danger of being silenced and left in

16  the dark.

17       136.  WE ACT community members without access to the internet or those with slower

18  access will be disadvantaged.  Communities with lower socio-economic statuses are often the

19  ones impacted the most by projects.  By moving documents online, these communities will not

20  have a chance to meaningfully participate and voice their concerns.

21       137.  WE ACT like many environmental justice communities are disproportionately

22  impacted by pollution.  Race, even more than class, is the number one indicator for the

23  placement of toxic facilities in this country.  Exposure to elevated levels of air pollution are

24

25  FIRST AMENDED COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 62 -

26

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA  98104-1711*
*(206) 343-7340*

1   linked to or exacerbate cardiovascular and respiratory diseases, often leading to emergency

2   department visits, hospitalizations and premature death, as well as reduced birth weight and

3   cancer.  The result is that Black, Asian, and Latino/a communities have some of the highest rates

4   of asthma nationwide, and African Americans are three times more likely to die from asthma-

5   related causes than the white population.

6        138.    Communities of color and low income communities are often the hardest hit by

7   climate change.  While air quality in New York City has improved over the past few decades due

8   to actions taken to reduce pollution emissions, not all neighborhoods are experiencing that

9   improvement equally.  NYC neighborhoods with higher rates of poverty also have higher rates of

10  nearby emissions and pre-existing illnesses that are more sensitive to air quality issues.  In

11  Northern Manhattan, residents continue to suffer disproportionately from the impacts of air

12  pollution, particularly those living in East Harlem.  East Harlem children wind up hospitalized

13  for asthma at more than three times the New York City rate.  The changes to NEPA eliminate

14  that requirement for agencies to look not just at the incremental impacts of their actions, but also

15  the cumulative effects.  While one project might not emit much pollution by itself, but combined

16  with the emissions of other facilities or projects in the area, the cumulative effects might pose an

17  unacceptable health risk.  Cumulative impacts are life-or-death impacts for already vulnerable

18  communities.

19       139.    Plaintiff Western Watersheds Project ("WWP") is a 501(c)(3) non-profit

20  conservation organization based in Hailey, Idaho with over 12,000 members and supporters

21  nationwide, 74 current dues-paying members in California, and one member of the Board of

22  Directors who resides in Berkeley, California.  Founded in 1993 to protect and restore western

23  watersheds and wildlife through education, public policy initiatives, and legal advocacy.  WWP

24

25  FIRST AMENDED COMPLAINT FOR DECLARATORY
    AND INJUNCTIVE RELIEF - 63 -
26

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA  98104-1711*
*(206) 343-7340*

1   has offices in Idaho, Montana, Wyoming, Arizona, Utah, Washington, Oregon, and Nevada, and

2   focuses its efforts on minimizing environmental impacts to federal public lands, with a particular

3   focus on public lands livestock grazing.

4          140.    WWP works to influence and improve public lands management throughout the

5   West with a primary focus on the negative impacts of livestock grazing on 250 million acres of

6   western public lands, including harm to ecological, biological, cultural, historic, archeological,

7   scenic resources, wilderness values, roadless areas, Wilderness Study Areas and designated

8   Wilderness.  WWP works to ensure that commercial projects on public lands are compatible with

9   maintaining healthy and fully functioning native ecosystems that support diverse and abundant

10   wildlife, clean water and native fish habitats, and outstanding opportunities for public recreation

11   and enjoyment.

12          141.    NEPA is critical to WWP's work because it: first, ensures that WWP is notified of

13   major federal actions with potential to significantly impact the environment; second, allows

14   WWP to participate in those actions through submitting detailed comments based in science and

15   law; and third, encourages better outcomes by requiring federal agencies to "look before they

16   leap" and consider WWP's input in their decision-making.  WWP commonly recommends

17   alternative conservation measures for federal plans or projects, and its alternatives are at times

18   included within the range that federal decision-makers ultimately consider in detail.  NEPA also

19   helps WWP engage its base of members and supporters by encouraging them to participate in

20   opportunities to share their perspectives with federal agencies through the NEPA process.

21          142.    Addressing the environmental impacts of livestock grazing on federal public

22   lands, including those managed by the Bureau of Land Management, the Forest Service, and the

23   National Park Service, is at the heart of WWP's conservation advocacy, and NEPA provides the

24

25   FIRST AMENDED COMPLAINT FOR DECLARATORY
     AND INJUNCTIVE RELIEF - 64 -

26

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA  98104-1711*
*(206) 343-7340*

framework for federal grazing leases, large-scale land-use plans, federal programs impacting

wildlife such as USDA Wildlife Services, and federal projects including energy development,

and sagebrush and juniper vegetation destruction projects.  Domestic livestock are the most

widespread – and often the most important – human impact on federal public lands and

waterways.  Poorly managed livestock grazing degrades land health and vegetation communities,

spreads invasive weeds like cheatgrass that destroys wildlife habitat function and increases fire

risk, causes erosion and sedimentation that harms the spawning habitats of native fishes, and

inputs levels of fecal coliform and other biological contaminants that can violate Clean Water

Act standards.

143.    Many of WWP's members use federal public lands throughout the West as a

primary source for recreation, engaging in activities ranging from hiking and camping to

birdwatching, rockhounding, cross-country skiing, angling, hunting, wildlife viewing, and nature

study.  The recreational experience of WWP members is harmed by improper livestock grazing,

and WWP commonly receives and investigates complaints from our members of livestock

trespassing on public lands closed to grazing, or heavily impacting their recreational experiences

in areas of high recreation value like federal campgrounds.  NEPA is often the sole way that the

public can have a voice to achieve the proper management of the federal public lands and call

attention to inappropriate or environmentally harmful practices approved by federal agencies,

and seek corrective actions through NEPA processes.

144.    Erik Molvar is Executive Director of Western Watersheds Project, and also has

been a member of the organization since 2016.  Mr. Molvar has been intimately involved in

researching the science and law applicable to Point Reyes National Seashore, located in Marin

County, California, and in drafting comment letters on behalf of Western Watersheds Project and

FIRST AMENDED COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 65 -

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA  98104-1711*
*(206) 343-7340*

1    its members that have been submitted to the National Park Service as part of the NEPA process

2    for the park's General Management Plan (GMP).  Mr. Molvar has personally visited Point Reyes

3    National Seashore and Golden Gate National Recreation Area (NRA, also governed under GMP)

4    five separate times since 2015, most recently in May of 2020, for the purposes of camping,

5    hiking, wildlife viewing, wildlife photography, landscape photography, and nature study, and he

6    intends to return to this area as soon as health concerns due to the global pandemic subside.  Mr.

7    Molvar's enjoyment of these lands was impaired by federally permitted livestock grazing and

8    other agricultural activities, including spraying of liquified manure from dairy operations,

9    invasive weed proliferation, and hazing of elk away from areas of the National Seashore where

10   livestock are permitted, and the Park Service may remedy these harms by imposing restrictions

11   on livestock use currently under study in the GMP planning process.  His future enjoyment of the

12   National Seashore and Golden Gate NRA may be impaired as a result of the Final Rule's

13   elimination of indirect and cumulative impacts analysis requirements, imposition of new

14   exhaustion requirements on issues raised by other commenters, and potential imposition of bond

15   or other financial security requirements.  He has definite plans to return to Point Reyes, and a

16   refunded airplane ticket to use, as soon as COVID-19 pandemic makes travel to California

17   advisable.

18          145.    Dr. Jason A. Lillegraven, a member of WWP since 2017, is a

19   paleontologist/geologist and retired Professor of Geology and Zoology at the University of

20   Wyoming.  He has camped and recreated extensively on federal public lands throughout

21   Wyoming, usually in conjunction with his geological and paleontological research.  Indeed, he

22   completely restored a sheep wagon to support his extended geological mapping program in

23   Wyoming's Hanna/Carbon Basin.  Dr. Lillegraven has worked in conjunction with WWP in

24

25   FIRST AMENDED COMPLAINT FOR DECLARATORY
     AND INJUNCTIVE RELIEF - 66 -
26

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA  98104-1711*
*(206) 343-7340*

1   submitting detailed, science-based comments during federal agency NEPA processes, advocating

2   for conservation and protections for public lands and wildlife.  He also has submitted

3   independent comments on federal NEPA processes, most recently including for the U.S. Forest

4   Service's ongoing Landscape Vegetation Analysis project, originally proposed to permit over

5   300,000 acres of logging on the Medicine Bow National Forest near his home in Laramie.  Dr.

6   Lillegraven also submitted comments on the Thunder Basin National Grassland plan amendment

7   referenced above.  In 2005, he submitted an expert declaration for an U.S. Interior Board of Land

8   Appeals challenge against a NEPA-based decision on the Cherokee West 3D vibroseis

9   exploration project on BLM lands in the southern Red Desert, a project stayed in part on the

10  strength of his expert testimony.  Dr. Lillegraven has keen interests in water diversion projects,

11  and he submitted comments in opposition to the Corp of Engineers-supported Million

12  Conservation Resource Group's proposal to establish trans-basin water diversion from the Green

13  River in Wyoming to Pueblo, in southern Colorado.  Similarly, he recently wrote in opposition to

14  the Lake Powell Pipeline Project in southern Utah.  Dr. Lillegraven also served as a leader in

15  opposition to development of the Dunlap Wind Energy Project that eventually was built north of

16  Medicine Bow, Wyoming.  More successfully, Dr. Lillegraven was largely responsible for

17  opposition to approval and any future plans for development of the DKRW coal gasification

18  project in Wyoming's Carbon Basin.

19      146.    Plaintiff The Wilderness Society ("TWS") is a national non-profit organization

20  working to unite people to protect America's wild places.  Founded in 1935 and with more than

21  one million members and supporters, with approximately 27,000 members and over 12,000

22  supporters in California and an office in Oakland, California, TWS has led the effort to

23  permanently protect 111 million acres of wilderness and to ensure sound management of our

24

25  FIRST AMENDED COMPLAINT FOR DECLARATORY
    AND INJUNCTIVE RELIEF - 67 -

26

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA  98104-1711*
*(206) 343-7340*

shared national lands.  The Wilderness Society sees a future where people and wild nature

flourish together, meeting the challenges of a rapidly changing planet.  To accomplish that

vision, TWS works to ensure that public lands are a solution to the climate and extinction crises

and that all people benefit equitably from public lands.  Of all our bedrock conservation laws,

NEPA perhaps best speaks to the vision The Wilderness Society seeks to accomplish by

enshrining democratic principles of transparency, public participation, science-based

environmental review, and accountability into government decision-making.

147.    TWS, its members, supporters, and partners have relied on NEPA and CEQ's

implementing regulations to drive the organization's engagement in countless agency decision-

making processes over the last fifty years – everything from small local decisions on a particular

national forest ranger district to sweeping national regulatory changes.  The environmental

review and public process requirements in CEQ's 1978 NEPA regulations have facilitated

decades of productive and informed dialogue between TWS and federal land managers, local

communities, tribes, and other stakeholders that paved the way for decisions to protect roadless

and wilderness-quality lands, policies to reduce climate pollution from fossil fuel development

on public lands, and management plans for newly established national monuments and other

crown-jewels of our federal public lands system.

148.    The Final Rule will harm the ability of TWS and its members to protect wild and

sensitive landscapes threatened by mining, drilling, logging, and other extractive uses, make

public lands part of the climate solution, and ensure that all people in the U.S. benefit equitably

from public lands.  TWS submitted comments and provided public testimony at every

opportunity during the rulemaking process, detailing how the proposed regulatory changes would

harm TWS's ability achieve its mission.

FIRST AMENDED COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 68 -

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA  98104-1711*
*(206) 343-7340*

149.     TWS has individual members, including but not limited to Rebecca Rom of Minnesota and Brad Meiklejohn of Alaska, who regularly visit, study, work, photograph, or recreate on lands or marine areas where NEPA has been and will be used in reviewing federal projects.  Each of the members has specific intentions to continue to interact with these areas frequently and on an ongoing basis.  TWS members and staff derive recreational, spiritual, professional, scientific, educational, and aesthetic benefits from their interactions with these parts of the natural world.

150.     Rebecca Rom has been a member of TWS since the 1970s.  Ms. Rom is a life-long citizen advocate for the protection and preservation of the world's greatest canoe country wilderness: the Boundary Waters Canoe Area Wilderness and Voyageurs National Park.  She lives within the Superior National Forest near Ely, Minnesota and in close proximity to the Boundary Waters.  Ms. Rom has definite plans to continue to explore the Boundary Waters and Voyageurs in 2020 and beyond.  For her entire adult life, Ms. Rom has been heavily engaged in NEPA processes involving activities affecting these areas, as well as NEPA processes affecting federal public lands throughout the nation, including proposals to develop sulfide-ore copper mining in the Superior National Forest in the headwaters of the Boundary Waters and downstream of Voyageurs.

151.     Brad Meiklejohn has been a TWS member since 2019.  Throughout his decades-long career as a conservation advocate and in his personal capacity as an avid wilderness explorer, Mr. Meiklejohn has engaged in dozens of NEPA processes to protect federal public lands in his home state of Alaska and across the country.  He has an especially deep and long involvement in utilizing NEPA to protect the Arctic National Wildlife Refuge – one of the

FIRST AMENDED COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 69 -

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA  98104-1711*
*(206) 343-7340*

1  wildest undisturbed landscapes remaining on the planet and a place that he has visited nearly

2  every year since 1989 – and intends to continue his annual sojourns there into the future.

3        152.    Plaintiff Winter Wildlands Alliance ("WWA") is a national non-profit

4  organization dedicated to preserving winter wildlands and quality human-powered snowsports

5  experiences on public lands.  Founded in 2000, WWA represents a growing community of

6  human-powered winter adventurers from across the country.  WWA's 15,080 members and

7  supporters – 398 of whom reside in California, and the members of their 33 grassroots groups,

8  deeply value natural winter soundscapes and the opportunity for refuge and respite afforded by

9  the last remaining places across the United States where solitude, fundamental wildness, and

10  non-motorized experiences are preserved.  From its headquarters in Boise, Idaho and field

11  offices in Mammoth Lakes, California and Bozeman, Montant, WWA works with land

12  managers, elected officials, grassroots groups and other partners to pursue a balanced, adaptive,

13  and collaborative approach to public lands management for the long-term protection of the

14  places where their members recreate and seek adventure.  WWA's priority campaigns include

15  over-snow vehicle travel management planning on Forest Service lands, Forest Service land

16  management planning, and defense of non-motorized backcountry recreation opportunities on

17  public lands – all of these campaigns rely upon the public process afforded by NEPA and guided

18  by CEQ's NEPA regulations.

19        153.    Central to its mission, WWA is currently engaged in over a dozen different Forest

20  Service land or travel management planning processes; three projects involving the expansion of

21  ski resorts on public land; and several additional projects involving federal land management.

22  This work regularly involves engaging in the NEPA process and communicating with WWA

23  members about opportunities to participate in comment periods and other opportunities for

24

25  FIRST AMENDED COMPLAINT FOR DECLARATORY       *Earthjustice*
   AND INJUNCTIVE RELIEF - 70 -                  *810 Third Avenue, Suite 610*
26                                               *Seattle, WA  98104-1711*
                                                 *(206) 343-7340*

1   engagement allowed for by NEPA.  WWA submitted comments on the proposed rule, and prior

2   to the publication of the final regulations, met with the Office of Information and Regulatory

3   Affairs to discuss their comments.

4          154.    WWA has individual members, including but not limited to Gus Bekker of

5   Washington and Darrel Jury of California, who regularly visit, study, work, photograph, or

6   recreate on lands where NEPA has been and will be used in reviewing federal projects.  Each of

7   the members has specific intentions to continue to interact with these areas frequently and on an

8   ongoing basis.  WWA members and staff derive recreational, spiritual, professional, scientific,

9   educational, and aesthetic benefits from their interactions with these parts of the natural world.

10          155.    Gus Bekker, a WWA member since 2002 and board member of one of WWA's

11   grassroots groups, El Sendero Backcountry Ski and Snowshoe Club, lives in Wenatchee,

12   Washington.  An avid backcountry skier, Mr. Bekker has worked for years to advocate for

13   backcountry skiing and preservation of winter wildlands on the Okanogan-Wenatchee National

14   Forest, where he regularly skis during the winter months.  Mr. Bekker skied several areas on the

15   Forest this past winter, and has definite plans to do so again this year as soon as there is

16   sufficient snow.  He has engaged extensively in many Forest Service projects in order to preserve

17   opportunities for backcountry winter recreation on Forest Service lands near Wenatchee.

18   Currently, Mr. Bekker is advocating for backcountry skier interests as the Forest Service

19   considers whether to grant a road right-of way to Mission Ridge Ski and Snowboard Resort near

20   Wenatchee.  Mr. Bekker relies on the NEPA process to learn of new projects that may be

21   federally authorized and participates in these processes to advocate for his and his organization's

22   interests.  As the road right-of-way proposal shows, these projects are not always directly related

23   to backcountry recreation yet can have significant consequences to Mr. Bekker's interests.

24

25   FIRST AMENDED COMPLAINT FOR DECLARATORY
     AND INJUNCTIVE RELIEF - 71 -

26

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA  98104-1711*
*(206) 343-7340*

1   Elimination of the mandate that agencies consider indirect and cumulative effects and barriers to

2   public participation would mean that either Mr. Bekker would be unable to participate in

3   decisions affecting backcountry skiing on the Okanogan-Wenatchee National Forest, his

4   concerns would be dismissed as unrelated to the project at hand, or his participation may not

5   "count" if the responsible official deems his comments lacking in technicality or specificity.  In

6   all cases, it is likely that the Forest Service would make decisions that reduce or negatively

7   impact the use and enjoyment of National Forest lands for Mr. Bekker and his fellow

8   backcountry skiers.

9          156.    Darrel Jury, a WWA member since 2015 and president of the WWA grassroots

10  group Friends of Plumas Wilderness, relies on the NEPA process to engage in public land

11  management near his home in Quincy, California.  Specifically, Mr. Jury advocates for

12  Wilderness, Wild & Scenic Rivers, and non-motorized areas for winter recreation on the Plumas,

13  Lassen, and Tahoe National Forests, where he often recreates.  Mr. Jury visits these national

14  forest lands near his home on a weekly basis and is looking forward to skiing Thompson Peak on

15  the Plumas National Forest as soon as there is sufficient snow to do so.  He is extensively

16  involved in over-snow vehicle planning on the Plumas, Lassen, and Tahoe National Forests and

17  has submitted NEPA comments on these planning processes at multiple stages in the process.

18  Mr. Jury's deep interest in Wilderness preservation and preserving refuges for quiet winter

19  recreation opportunities will be harmed by the narrowed scope of NEPA review in the Final

20  Rule.

21              2.      Interests and Injuries Common to All Plaintiffs

22         157.    As detailed above, Plaintiff groups and their members reside near, visit, or

23  otherwise use and enjoy areas where NEPA analysis has occurred and will be undertaken in the

24  future.  Plaintiffs have concrete interests in CEQ's lawful implementation of NEPA and its vital

25  FIRST AMENDED COMPLAINT FOR DECLARATORY
    AND INJUNCTIVE RELIEF - 72 -
26

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA  98104-1711*
*(206) 343-7340*

role in preventing harm to people and the environment, and the regulatory revisions challenged in this lawsuit fundamentally undermine and contradict the requirements of NEPA.  Plaintiffs have members who reside, work, travel, and recreate in places where federal agency actions and decisions occur, where threatened and endangered plants and animals are found, and where non-federal projects that require federal involvement, approval, and/or funding have been and will be proposed.  Plaintiffs' concrete interests are also injured by CEQ's violation of procedural duties under NEPA, the ESA, and the APA.  *Citizens for Better Forestry v. U.S. Dep't of Agric.*, 341 F.3d 961 (9th Cir. 2003); *W. Watershed Project v. Kraayenbrink*, 632 F.3d 472 (9th Cir. 2011). The past, present, and future enjoyment of the scientific, recreational, aesthetic, economic, and conservation benefits to Plaintiffs' members has been, is being, and will continue to be irreparably harmed by CEQ's disregard of its statutory duties.  The "presence of one party with standing is sufficient to satisfy Article III's case-or-controversy requirement."  *Rumsfeld v. Forum For Academics and Inst. Rights, Inc.*, 547 U.S. 47, 52 n.2 (2006); *see Brown v. City of Los Angeles*, 521 F.3d 1238, 1240 n.1 (9th Cir. 2008) ("[T]he presence in a suit of even one party with standing suffices to make a claim justiciable").

158.    The Final Rule will impede all of the Plaintiff organizations' ability to obtain information vital to their central conservation missions, and will also require Plaintiffs to divert scarce organizational resources from other programs to support their engagement in ongoing and upcoming NEPA processes.  For instance, with shorter timelines and higher standards for comment "specificity," Plaintiffs will need to devote new staff time and resources to effectively engage and support their members, supporters, and partners during important public comment periods.  For those Plaintiffs that have them, Plaintiffs' legal and technical staff will also need to spend additional time and resources preparing detailed information to demonstrate, among other

FIRST AMENDED COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 73 -

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA  98104-1711*
*(206) 343-7340*

things, that the host of significant environmental impacts associated with proposals to mine, drill, log, or conduct other activities on public lands have "a reasonably close causal relationship to the proposed action" and are not "remote in time, geographically remote, or the product of a lengthy causal chain."  This in turn will require Plaintiffs to recruit and retain experts who will need to work on compressed timelines.  For those organizations that do not have legal and technical staff, Plaintiffs' ability to participate in the new NEPA procedures will be dramatically compromised, and in some instances, impossible.  Additionally, by purporting to authorize federal agencies to require the posting of a bond in order to obtain a stay of agency action while NEPA issues remain under review, the Final Rule significantly increases the risk that Plaintiffs will be required to pay for a bond or other security to participate in the NEPA process.  Such expenses would, at minimum, divert funds away from other crucial conservation activities and may deter Plaintiffs and others with whom they associate from fully participating in NEPA processes.  In the absence of the Final Rule, Plaintiffs would dedicate financial and staff capacity towards other organizational programs such as outreach to urban and communities of color, expanding recreational opportunities for youth, building a socially diverse conservation community, developing clean energy and just transition policy platforms, and advocating for congressional protection of wild places.

159.    NEPA expressly commands the federal government to "fulfill the responsibilities of each generation as trustee of the environment for succeeding generations."  42 U.S.C. § 4331(b)(1).  The aesthetic, conservation, organizational, recreational, professional, spiritual, and scientific interests of Plaintiffs and their members in ensuring that CEQ's regulations maintain the requirement to fully analyze and disclose to the public the potential environmental impacts of, and feasible alternatives to, federal agency actions, 42 U.S.C. § 4332(c), have been, are being,

FIRST AMENDED COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 74 -

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA  98104-1711*
*(206) 343-7340*

1  and, unless the relief prayed for is granted, will continue to be directly and adversely affected by

2  the failure of Federal Defendants to comply with the law.

3       160.    Vacatur of the Final Rule would redress the injuries to Plaintiffs and their

4  members and supporters by requiring federal agencies to continue conducting meaningful review

5  of their actions' environmental impacts and providing opportunities for public participation in

6  that process.

7       B.    <u>Defendants</u>

8       161.    Defendant <u>Council on Environmental Quality</u> is an agency within the Executive

9  Office of the President.  CEQ oversees Federal agency NEPA implementation and develops and

10  recommends national policies to the President that promote the improvement of environmental

11  quality.

12       162.    Defendant <u>Mary Neumayr</u> is the Chair of the Council on Environmental Quality.

13  Ms. Neumayr is sued in her professional capacity.  Ms. Neumayr was confirmed by the United

14  States Senate on January 2, 2019, and sworn in on January 10, 2019.  CEQ issued the Final Rule

15  under the direction of Ms. Neumayr.

16  BACKGROUND

17  I.    THROUGH NEPA, CONGRESS INFUSED ENVIRONMENTAL AND PUBLIC
      HEALTH VALUES INTO ALL FEDERAL AGENCY ACTIONS AND DECISIONS.

18
     A.    <u>Congress Enacted NEPA To Address Overwhelming National Concern about
19          Protection of the Environment and Public Health.</u>

20       163.    The 1960s epitomized a period of rapid economic and social change and heralded

21  the rise of the environmental movement.  Members of both political parties, urban and rural

22  residents, and developers and preservationists all espoused the burgeoning conservation ethic in

23  America.

24

25  FIRST AMENDED COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 75 -

26

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA  98104-1711*
*(206) 343-7340*

164.     Seizing the moment of profound political change, the United States Congress hosted a joint House-Senate Colloquium on a "National Policy for the Environment" in July 1968.  Invited to participate in the Colloquium were interested members of the public, executive branch heads, and leaders of industrial, commercial, academic, and scientific organizations, with the purpose of "focusing on the evolving task the Congress faces in finding more adequate means to manage the quality of the American environment."

165.     The outcome of the day-long discussion was a Congressional White Paper on a National Policy for the Environment, published in October 1968.  Noting the near-consensus views expressed by those participating in the Colloquium, the Congressional White Paper explained that "in the recent past, a good deal of public interest in the environment has shifted from its preoccupation with the extraction of natural resources to the more compelling problems of deterioration in natural systems of air, land, and water.  The essential policy issue of conflicting demands has become well recognized."

166.     The Congressional White Paper explained that "If America is to create a carefully designed, healthful, and balanced environment, we must (1) find equitable ways of charging for environmental abuses within the traditional free-market economy; (2) obtain adequate ecological guidance on the character and impact of environmental change; (3) where corporate resource development does not preserve environmental values, then consider the extension of governmental controls in the larger public interest; (4) coordinate the Government agency activities, which share with industry the dominant influence in shaping our environment; and (5) establish judicial procedures so that the individual rights to a productive and high quality environment can be assured."

FIRST AMENDED COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 76 -

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA  98104-1711*
*(206) 343-7340*

167.     The Congressional White Paper highlighted a number of additional issues that stakeholders agreed were essential and ripe for Congressional consideration in its development of a national environmental policy.  For example, Dr. Walter Orr Roberts, an atmospheric physicist and founder of the National Center for Atmospheric Research, explained the importance of considering climate change due to "[s]ubtle alterations of the chemical constitution of the atmosphere, through pollutants added in the form of trace gases, liquids, or solids, result from industrial activity or urbanization.  This is an area of biometeorology that has significance in every living person and yet we have not yet seen even the first beginnings of an adequately sustained research effort in this area."

168.     Russell Train, who would become the first Chair of the Council on Environmental Quality, testified that "[t]he urgent necessity of taking into account major environmental influences of foreign economic assistance and other international developments" in American environmental policy.  This was an urgent issue because "to speak about environmental quality without at least referring to the fact of the international components and consequences of even our activity as Americans and considering our own acreage and our own problems with the environment, appears to ... be somewhat shortsighted," according to Dr. Dillon Ripley, the Secretary of the Smithsonian Institution.  In that way, America's national environmental policy needed to consider domestic as well as international environmental quality.

169.     Given the exigency facing the environment and Americans, Senator Henry Jackson "argued that new approaches to environmental management are now required, and urged the Colloquium to provide thoughts on the possible 'action-forcing' processes that could be put into operation" through congressional action.

FIRST AMENDED COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 77 -

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA  98104-1711*
*(206) 343-7340*

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

B.     NEPA Requires All Agencies To Prioritize Protection of the Environment and Human Health.

170.    Congress enacted the National Environmental Policy Act in 1969, adopting nearly all of the Congressional White Paper's elements of a national policy for the environment and public health and heralding a new era of environmental awareness in America.

171.    Section 101 of NEPA sets forth a national policy "to use all practicable means and measures, including financial and technical assistance, in a manner calculated to foster and promote the general welfare, to create and maintain conditions under which man and nature can exist in productive harmony, and fulfill the social, economic, and other requirements of present and future generations of Americans."  42 U.S.C. § 4331(a).

172.    Section 101 also gives federal agencies "continuing responsibility" to fulfill their role as a "trustee of the environment for succeeding generations"; assure all Americans have "safe, healthful, productive, and aesthetically and culturally pleasing surroundings"; "attain the widest range of beneficial uses of the environment" without degradation or risk; preserve "natural aspects of our national heritage"; "achieve a balance between population and resource use"; and enhance renewable resources and "maximum attainable recycling of depletable resources."  42 U.S.C. § 4331(b).

173.    Finally, Congress recognizes in Section 101 the right and responsibility of each person to "enjoy a healthful environment and … to contribute to the preservation and enhancement of the environment."  42 U.S.C. § 4331(c).

174.    Section 102 of NEPA applies the national policy set forth in Section 101 to "proposals for … major Federal actions significantly affecting the quality of the human environment."  42 U.S.C. § 4332(2)(C).  Specifically, Section 102 requires Federal agencies to prepare a "detailed statement," which would soon become known as an environmental impact

FIRST AMENDED COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 78 -

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA  98104-1711*
*(206) 343-7340*

statement or EIS, analyzing: (1) the environmental impact of the proposed action; (2) any

adverse effects that cannot be avoided; (3) alternatives to the proposed action; (4) the

relationship between local short-term uses of man's environment and the maintenance and

enhancement of long-term productivity; and (5) any irreversible and irretrievable commitments

of resources that would be involved in the proposed action.  42 U.S.C. § 4332(2)(C).

175.    The congressional mandates set forth in Section 102 are to be implemented "to

the fullest extent possible." 42 U.S.C. § 4332(2)(C).  NEPA demands a "systematic,

interdisciplinary approach" to "insure the integrated use of the natural and social sciences."  42

U.S.C. § 4322(2)(A).  The statute also recognizes the need to ensure "unquantified

environmental amenities and values" are considered in agency decision-making.  42 U.S.C. §

4322(2)(B).

176.    NEPA also requires federal agencies to study and develop alternatives to

proposed actions, 42 U.S.C. § 4322(2)(E); to recognize the "worldwide and long-range character

of environmental problems" and "maximize international cooperation in anticipating and

preventing a decline in the quality of mankind's world environment," 42 U.S.C. § 4322(2)(F);

and make advice and information available to states, municipalities, and the public to be used in

"restoring, maintaining, and enhancing the quality of the environment."  42 U.S.C. § 4322(2)(G).

177.    Section 202 of NEPA establishes CEQ within the office of the President.  42

U.S.C. § 4342.  Among other things, the statute directs CEQ to "to develop and recommend to

the President national policies to foster and promote the improvement of environmental quality

to meet the conservation, social, economic, health, and other requirements and goals of the

Nation." 42 U.S.C. § 4344(4).

FIRST AMENDED COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 79 -

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA  98104-1711*
*(206) 343-7340*

1      178.    Roughly half of U.S. states have modeled state laws based on NEPA, and its

2   example has been adopted by scores of nations around the world.

3   II.    COURTS INTERPRETING NEPA'S PLAIN LANGUAGE HELD THE STATUTE
          DEMANDS FULL DISCLOSURE OF THE ENVIRONMENTAL IMPACTS OF
4          MAJOR FEDERAL ACTIONS AND PUBLIC COMMENT ON SUCH ACTIONS.

5      179.    As federal agencies began to implement NEPA in the absence of regulatory

6   direction in the first years after the law's enactment, courts stressed the broad requirements

7   Congress instilled in the statute.  In an early opinion, the D.C. Circuit confirmed "[t]he sweep of

8   NEPA is extraordinarily broad, compelling consideration of any and all types of environmental

9   impact of federal action."  *Calvert Cliffs' Coordinating Comm., Inc. v. U. S. Atomic Energy*

10  *Comm'n*, 449 F.2d 1109, 1122 (D.C. Cir. 1971); *see also id.* at 1114-15 (stressing "as forcefully

11  as possible" that the language "to the fullest extent possible ... does not provide an escape hatch

12  for foot-dragging agencies; it does not make NEPA's procedural requirements somehow

13  "discretionary"").

14      180.    Early circuit court opinions also addressed the purposes of an environmental

15  impact statement, *Silva v. Lynn*, 482 F.2d 1282, 1284–85 (1st Cir. 1973); the standards for

16  determining whether a project will have a "significant" impact and necessitate an environmental

17  impact statement, including the need to consider potential direct, indirect, and cumulative

18  environmental effects, *Hanly v. Kleindienst*, 471 F.2d 823, 830–31 (2d Cir. 1972); and the

19  importance of agency consideration of a robust range of alternatives, *Nat. Res. Def. Council, Inc.*

20  *v. Morton*, 458 F.2d 827 (D.C. Cir. 1972).

21      181.    The Ninth Circuit in 1975 further outlined the statutory obligation to consider the

22  indirect effects of agency action.  "[C]onsideration of secondary impacts may often be more

23  important than consideration of primary impacts. … A new highway located in a rural area may

24  directly cause increased air pollution as a primary effect.  But the highway may also induce

25  FIRST AMENDED COMPLAINT FOR DECLARATORY                    *Earthjustice*
    AND INJUNCTIVE RELIEF - 80 -                              *810 Third Avenue, Suite 610*
26                                                            *Seattle, WA  98104-1711*
                                                             *(206) 343-7340*

residential and industrial growth, which may in turn create substantial pressures on available

water supplies, sewage treatment facilities, and so forth." *City of Davis v. Coleman,* 521 F.2d

661, 676–77 (9th Cir. 1975) (*quoting Scientists' Institute for Public Information v. A. E. C.*, 481

F.2d 1079, 1092 (D.C. Cir. 1973) and Fifth Annual Report of the Council on Environmental

Quality, 410-11 (December 1974)).

182.    In 1976, again before CEQ adopted any regulations, the U.S. Supreme Court

confirmed that comprehensive environmental review under NEPA required consideration of

long-term and cumulative effects.  The Court explained:

> Section 102(2)(C) [of NEPA] is one of the "action-forcing" provisions intended
> as a directive to all agencies to assure consideration of the environmental impact
> of their actions in decisionmaking.  By requiring an [environmental] impact
> statement Congress intended to assure such consideration during the development
> of a proposal or as in this case during the formulation of a position on a proposal
> submitted by private parties.  A comprehensive impact statement may be
> necessary in some cases for an agency to meet this duty.  Thus, when several
> proposals for coal-related actions that will have cumulative or synergistic
> environmental impact upon a region are pending concurrently before an agency,
> their environmental consequences must be considered together.  Only through
> comprehensive consideration of pending proposals can the agency evaluate
> different courses of action.

*Kleppe v. Sierra Club*, 427 U.S. 390, 409–10 (1976) (citing Congressional Conference Report on

NEPA, 115 Cong. Rec. 40,416 (1969)).

III.    CEQ ENGAGED IN EXTENSIVE OUTREACH TO DEVELOP THE 1978 NEPA
        REGULATIONS.

183.    Prompted by the early case law interpreting NEPA, President Carter issued

Executive Order 11991 on May 24, 1977, directing CEQ to issue regulations that would guide all

agencies in implementing NEPA.  *Relating to Protection and Enhancement of Environmental*

*Quality*, Exec. Order No. 11991, 42 Fed. Reg. 26, 967 (May 24, 1977).  The Executive Order

was based on the President's Constitutional and statutory authority, including NEPA, the

Environmental Quality Improvement Act, and Section 309 of the Clean Air Act.  In signing

FIRST AMENDED COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 81 -

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA  98104-1711*
*(206) 343-7340*

1  Executive Order 11991, the President delegated this authority to the agency created by NEPA,

2  the Council on Environmental Quality.  *Implementation of Procedural Provisions, Final*

3  *Regulations*, 43 Fed. Reg. 55,978 (Nov. 29, 1978) (codified at 40 C.F.R. Part 1500).

4       184.    Following President Carter's Executive Order, CEQ announced three days of

5  public hearings regarding how to best reform NEPA implementation and invited testimony from

6  a "broad array of public officials, organizations and private citizens, affirmatively involving

7  NEPA's critics as well as its friends."  43 Fed. Reg. at 55,980.

8       185.    After the hearings, CEQ "culled the record to organize both the problems and the

9  solutions proposed by witnesses into a 38-page "NEPA Hearing Questionnaire," which it then

10 sent "to all witnesses, every State governor, all Federal agencies, and everyone who responded to

11 an invitation in the Federal Register."  43 Fed. Reg. at 55,980.  CEQ collated the responses to the

12 questionnaire for use in drafting its anticipated regulations.

13      186.    CEQ also met with every agency of the executive branch to discuss what should

14 be in the regulations, and it circulated an early draft of proposed regulations to all federal

15 agencies in December 1977.  Further one-on-one consultation with agencies ensued, culminating

16 with a fourth draft of the proposed NEPA regulations sent to interested parties for comment.

17 Meanwhile:

18         At the same time that Federal agencies were reviewing the early draft, [CEQ]
           continued to meet with, listen to, and brief members of the public, including
19         representatives of business, labor, State and local governments, environmental
           groups, and others.  Their views were considered during this early stage of the
20         rulemaking.  [CEQ] also considered seriously and proposed in our regulation
           virtually every major recommendation made by the Commission on Federal
21         Paperwork and the General Accounting Office in their recent studies on the EIS
           process.
22
23 43 Fed. Reg. at 55,980.

24

25 FIRST AMENDED COMPLAINT FOR DECLARATORY          *Earthjustice*
   AND INJUNCTIVE RELIEF - 82 -                     *810 Third Avenue, Suite 610*
26                                                  *Seattle, WA  98104-1711*
                                                    *(206) 343-7340*

1    187.    Following these extensive hearings and intergovernmental consultations, CEQ

2   published proposed regulations to implement NEPA in June 1978, with a 60-day public comment

3   period.  *National Environmental Policy Act Regulations; Proposed Implementation of*

4   *Procedural Provisions*, 43 Fed. Reg. 24,230 (June 9, 1978).  CEQ prepared a "special

5   environmental assessment" to accompany the rulemaking.  CEQ promulgated final regulations

6   on November 29, 1978 and the regulations became effective July 30, 1979.  43 Fed. Reg. at

7   55,978.

8    188.    Prior to the Final Rule at issue in this case, CEQ made only two modifications to

9   the 1978 regulations.  First, in 1986, CEQ revised a regulation regarding a "worst case analysis."

10   *National Environmental Policy Act Regulations; Incomplete or Unavailable Information*, 51 Fed.

11   Reg. 15,625 (April 26, 1986).  Second, in 2005, CEQ changed the address for filing copies of

12   EISs.  *Other Requirements of NEPA; Final Rule*, 70 Fed. Reg. 41,148 (July 18, 2005).

13   IV.    CEQ HAS ISSUED NEPA GUIDANCE AND REVIEWS FOR OVER 40 YEARS,
          NONE FINDING A NEED FOR MAJOR AMENDMENTS TO ITS REGULATIONS.
14
     189.    Over the years, CEQ has issued additional guidance regarding the implementation
15
    of NEPA and the 1978 regulations (as amended in 1986).  In particular, CEQ published its "40
16
    Most Asked Questions Concerning CEQ's National Environmental Policy Act Regulations" in
17
    the Federal Register in 1981.  *Forty Most Asked Questions Concerning CEQ's National*
18
    *Environmental Policy Act Regulations*, 46 Fed. Reg. 18,026 (March 23, 1981) (*Forty Questions*).
19
     190.    Several congressional and presidential reviews of the regulations have occurred;
20
    but none have previously resulted in changes to the 1978 regulations.
21
     191.    In 1981 during the Reagan Administration, CEQ requested public responses to 11
22
    questions, ranging from the specific ("Is the scoping process used at an appropriate stage in the
23
    development of agency proposals?") to the general ("What day-to-day practices could be
24

25   FIRST AMENDED COMPLAINT FOR DECLARATORY                    *Earthjustice*
     AND INJUNCTIVE RELIEF - 83 -                               *810 Third Avenue, Suite 610*
26                                                              *Seattle, WA  98104-1711*
                                                                *(206) 343-7340*

1   improved to assure better compliance with NEPA?").  *Agency Implementation of CEQ's NEPA*

2   *Regulations; Request for Public Comment*, 46 Fed. Reg. 41,131 (Aug. 14, 1981).  The comment

3   period remained open for 60 days.  After release of a summary of the comments in July 1982, a

4   public meeting was held to solicit any additional comments or suggestions.  The process resulted

5   in guidance published in 1983 on five particular topics, but no changes to the regulations

6   themselves.  *Guidance Regarding NEPA Regulations*, 48 Fed. Reg. 34,263 (July 28, 1983).

7         192.    In 1997, CEQ published the study *The National Environmental Policy Act: A*

8   *Study of Its Effectiveness After Twenty-Five Years* (Jan. 1997).  The study built on input from

9   some of the original framers of NEPA, members of Congress, state and local agencies, and

10  federal agencies along with a major effort to include the public.  Eleven separate groups of

11  partners were established to provide input into this study: businesses, decision-makers, state and

12  local governments, agencies, academicians, Congress, framers of NEPA, drafters of CEQ

13  regulations, Native American tribes, lawyers and public interest/citizen groups.  In coordination

14  with CEQ, the Environmental Protection Agency ("EPA") conducted a survey of states regarding

15  NEPA implementation.  CEQ, EPA, and the North Carolina Department of Environment, Health

16  and Natural Resources held a regional conference to investigate the effectiveness of state-federal

17  interaction in NEPA implementation.  The study concluded that "[o]verall, what we found is that

18  NEPA is a success — it has made agencies take a hard look at the potential environmental

19  consequences of their actions, and it has brought the public into the agency decision-making

20  process like no other statute."  The 1997 report emphasized the importance of several factors in

21  ensuring that the congressional intent of NEPA was met, including adequate agency training to

22  implement the 1978 regulations, consideration of a robust range of alternatives, engaging the

23

24

25  FIRST AMENDED COMPLAINT FOR DECLARATORY
    AND INJUNCTIVE RELIEF - 84 -

26

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA  98104-1711*
*(206) 343-7340*

1   public early and often in the NEPA process, and the need to develop concise NEPA documents

2   rather than lengthy reviews.

3        193.    At the same time, CEQ published its guidance on *Considering Cumulative Effects*

4   *Under the National Environmental Policy Act* (Jan. 1997).  This guidance stated that "[e]vidence

5   is increasing that the most devastating environmental effects may result not from the direct

6   effects of a particular action, but from the combination of individually minor effects of multiple

7   actions over time," highlighting the importance of this aspect of NEPA review.  The 1997

8   guidance explained how federal agencies may analyze their actions for cumulative effects;

9   provided advice regarding inviting public scoping of and comment on cumulative effects; and

10  included methods, tools, and techniques (including examples) for analyzing cumulative effects.

11  Nothing in the 1997 guidance suggested that consideration of cumulative effects was difficult,

12  costly, or otherwise resulted in delays in project implementation.

13       194.    Most recently, the George W. Bush Administration's CEQ published

14  "Modernizing NEPA Implementation" in December 2003.  The NEPA Task Force, *The NEPA*

15  *Task Force Report to the Council on Environmental Quality: Modernizing NEPA*

16  *Implementation* (September 2003).  The report was based on the work of a task force composed

17  of federal agency employees with diverse skills, expertise, and perspectives.  The Task Force

18  engaged with state, tribal, and local governments and public interest organizations in completing

19  its report.  CEQ took comments from the public at large for 75 days on the 2003 report.  The

20  report provided a number of recommendations for action by CEQ, but did not commence

21  rulemaking to change the 1978 regulations.

22  V.       NEPA PROMOTES ENVIRONMENTAL JUSTICE.

23       195.    Guided by CEQ's 1978 regulations, NEPA became a crucial tool for public

24  engagement and better governmental decision-making in the fight against environmental racism.

25  FIRST AMENDED COMPLAINT FOR DECLARATORY
    AND INJUNCTIVE RELIEF - 85 -

26

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA  98104-1711*
*(206) 343-7340*

NEPA and the 1978 regulations promote environmental justice by requiring federal agencies to include a proposed project's potential environmental, economic, and public-health impacts on low-income communities, communities of color, and rural communities.  One of the visionary elements of NEPA was its creation of broad opportunities for public participation in government decisions that affect communities and their environment.

196.    In 1994, President Clinton issued Executive Order 12898, *Federal Actions to Address Environmental Justice in Minority Populations and Low-Income Populations*, Exec. Order No. 12898, *codified at* 3 C.F.R. § 859 (1995), *reprinted as amended in* 42 U.S.C. § 4321 (1998).  Executive Order 12898 directs federal agencies to make environmental justice part of their mission, and to identify and address the disproportionate environmental and health effects of their activities on communities of color and low-income populations.  The Executive Order also requires agencies to ensure effective public participation and access to information.

197.    The Presidential Memorandum accompanying the Executive Order directs all agencies to utilize NEPA to analyze environmental, health, economic, and social effects of federal actions, including effects on communities of color and low-income communities; develop mitigation measures that address significant effects of actions on communities of color and low-income communities; and to provide opportunities for public input in decision-making.  Most importantly, agencies must provide opportunities for effective community participation in the NEPA process.

198.    Executive Order 12898 recognized the importance of gathering data and conducting research to identify and address disproportionately high and adverse health, environmental, social, and economic effects of federal agency programs and policies on communities of color and low-income communities.  Public participation is an integral part of

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF - 86 -

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA  98104-1711*
*(206) 343-7340*

1   addressing environmental justice concerns.  The Presidential Memorandum also makes clear that

2   any NEPA document should "address significant and adverse environmental effects of proposed

3   federal actions on minority populations, low-income populations, and Indian Tribes."

4   Furthermore, each federal agency must provide opportunities for effective community

5   participation in the NEPA process through consultation with affected communities and

6   improving the accessibility of public meetings, crucial documents, and notices.

7       199.    CEQ has repeatedly published guidance documents on how to include

8   environmental justice in NEPA analyses.  In 1997, in consultation with EPA and other agencies,

9   CEQ developed guidance to "further assist Federal agencies with their NEPA procedures so that

10  environmental justice concerns are effectively identified and addressed."  *Environmental Justice*

11  *– Guidance Under the National Environmental Policy Act* (1997).  CEQ recognized that

12  environmental justice issues may arise during federal decision-making and should be considered

13  at any step in the NEPA process, and courts have noted that "[e]nvironmental justice is not

14  merely a box to be checked."  *Friends of Buckingham v. State Air Pollution Control Bd.*, 947

15  F.3d 68, 92 (4th Cir. 2020).

16      200.    In 2016, a Federal Interagency Working Group issued a report on how better to

17  implement environmental justice in the NEPA process: *Promising Practices for EJ*

18  *Methodologies in NEPA Reviews*.  CEQ and other agencies recognized that engaging community

19  members early and often informs an agency's decision-making process, benefitting agencies by

20  communicating their objectives for the proposed activity.  The interagency report recognized that

21  communities have varying levels of access to information, and instructed agencies to "consider

22  providing notice to the public (as appropriate) of the meeting date(s) and time(s) well in advance

23  and through methods of communication suitable for minority and low income populations."

24

25  FIRST AMENDED COMPLAINT FOR DECLARATORY
    AND INJUNCTIVE RELIEF - 87 -

26

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA  98104-1711*
*(206) 343-7340*

1   Furthermore, when addressing impacts on environmental justice communities, the report stressed

2   that NEPA requires agencies to consider three types of effects or impacts: direct, indirect, and

3   cumulative impacts, and that agencies should be mindful that environmental justice communities

4   may be differently affected by past, present, or reasonably foreseeable future impacts—that is,

5   cumulative effects—than the general population.

6   VI.   THE PRESIDENT'S 2017 INFRASTRUCTURE DIRECTIVE AND CEQ'S 2018
        ADVANCE NOTICE OF PROPOSED RULEMAKING.
7
          201.   On August 15, 2017, the President issued Executive Order 13807, entitled
8
    "Establishing Discipline and Accountability in the Environmental Review and Permitting
9
    Process for Infrastructure Projects." *Establishing Discipline and Accountability in the*
10
    *Environmental Review and Permitting Process for Infrastructure Projects*, 82 Fed. Reg. 40,463
11
    (Aug. 24, 2017).  The Executive Order emphasized an alleged need for greater efficiency in
12
    environmental reviews of infrastructure projects, defined to include "pipelines," "energy
13
    production and generation," and "electricity transmission."  For example, the Order noted the
14
    importance of "using CEQ's authority to interpret NEPA to simplify and accelerate the NEPA
15
    review process" and sought "expedited environmental review for the development of energy
16
    infrastructure projects."  *Id*. at 40,468.
17
          202.   In response to the Executive Order, CEQ announced its intention to review
18
    existing NEPA regulations to "identify changes needed to update and clarify those regulations"
19
    in September 2017.  *Initial List of Actions To Enhance and Modernize the Federal*
20
    *Environmental Review and Authorization Process*, 82 Fed. Reg. 43,226 (Sept. 14, 2017).
21
          203.   On June 18, 2018, CEQ issued an "advance notice of proposed rulemaking
22
    ("ANPRM") indicating that CEQ was proposing to amend the longstanding CEQ regulations
23
    governing NEPA.  *Update to the Regulations for Implementing the Procedural Provisions of the*
24

25   FIRST AMENDED COMPLAINT FOR DECLARATORY
     AND INJUNCTIVE RELIEF - 88 -
26

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA  98104-1711*
*(206) 343-7340*

1   *National Environmental Policy Act; Advanced Notice of Proposed Rulemaking*, 83 Fed. Reg.

2   28,591 (June 20, 2018).

3          204.    The ANPRM gave little or no indication of what revisions CEQ was considering.

4   Instead, it asked a series of twenty open-ended questions about whether various features of the

5   existing regulations should be amended, and if so, how.

6          205.    Plaintiffs and others responded with detailed comments explaining why the CEQ

7   regulations should not be amended.  Instead, the vast majority of the public comments explained

8   how NEPA was successful in meeting its goals, and offered suggestions as to how

9   implementation of NEPA could be improved to increase efficiency without undermining those

10  goals.  The purported problems that CEQ sought to address, Plaintiffs and others explained, were

11  a product of external factors such as inadequate training, funding, and implementation of the

12  existing regulations and would not be solved by amending and weakening the CEQ regulations

13  themselves.

14  VII.   CEQ PROPOSED SIGNIFICANT CHANGES TO THE 1978 REGULATIONS THAT
        CONFLICT WITH CONGRESSIONAL INTENT IN ENACTING NEPA.

15

16         206.    On January 10, 2020, CEQ issued its proposed revision to its implementing

    regulations in a Notice of Proposed Rulemaking in the Federal Register ("Proposed Rule").

17
    *Update to the Regulations Implementing the Procedural Provisions of the National*

18
    *Environmental Policy Act; Notice of Proposed Rulemaking*, 85 Fed. Reg. 1,684 (Jan. 10, 2020).

19
    The Proposed Rule aimed to "comprehensively update and substantially revise" the longstanding

20
    1978 CEQ regulations, touching virtually every aspect of them.  Taken as a whole, the Proposed

21
    Rule sought to transform NEPA from a sweeping infusion of environmental values and

22
    environmental justice into federal decision-making to an expedited paperwork exercise designed

23
    primarily to limit NEPA's reach, reduce public involvement, and narrow the scope of what

24

25  FIRST AMENDED COMPLAINT FOR DECLARATORY          *Earthjustice*
    AND INJUNCTIVE RELIEF - 89 -                      *810 Third Avenue, Suite 610*
26                                                    *Seattle, WA  98104-1711*
                                                      *(206) 343-7340*

environmental consequences of federal agency actions are considered by federal agencies in direct contravention to the statutory command to implement NEPA "to the fullest extent possible."

207.    In virtually every instance where CEQ proposed changes, the effect was to undermine NEPA or create ambiguity about the applicability and scope of NEPA review.  The Proposed Rule contained changes that undermined NEPA's policies, including by deleting prior regulatory language focused on the policy-driving, action-forcing congressional mandate.  In other places, the Proposed Rule replaced the word "possible" with the word "practicable."

208.    The Proposed Rule also advanced changes to reduce the scope of NEPA's applicability, limiting the number and types of federal actions that are subject to NEPA.  For example, the Proposed Rule ignored longstanding regulatory and judicial precedent that the adjective "major" in front of "federal action" reinforces but does not have independent meaning from the qualifier "significantly."  In other words, the Proposed Rule refocused on the extent of federal "control" rather than the extent and nature of the impacts of federal actions to the environment.  The Proposed Rule compounded this mistake by asserting that federal financial assistance does not qualify as a "major federal action" if the agency did not retain an undefined level of "control and responsibility" over the effects of the action.

209.    Additionally, the Proposed Rule proposed to add a new "functional equivalency" test, allowing NEPA to be waived if there was some other environmental review process associated with the project.  Nothing in the Proposed Rule set any meaningful boundaries on such use, meaning that alternative reviews with lower environmental standards and less robust public processes could be used to avoid the application of NEPA.  Even the example offered by CEQ—a Regulatory Impact Analysis ("RIA") required by an Executive Order—proved the

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF - 90 -

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA  98104-1711*
*(206) 343-7340*

point: an RIA focuses on economic cost-benefit analysis, rather than review of environmental impacts and potential alternatives.

210.    The Proposed Rule announced a new definition of "significance" that would reduce the number of actions deemed substantial enough to trigger the preparation of an environmental impact statement.  The Proposed Rule similarly eliminated language prohibiting "piecemealing" or segmentation of agency actions by breaking them into individually less significant or relatively minor component parts, and it expanded the scope and application of "categorical exclusions," a mechanism to simplify NEPA compliance for actions that did not individually or cumulatively have a significant effect on the environment.

211.    In addition to narrowing the type of actions to which NEPA applied in the first instance, the Proposed Rule also significantly limited the scope of environmental review for those actions that still triggered NEPA compliance.  Of particular concern, the Proposed Rule categorically eliminated the requirement to consider cumulative effects and eliminated any obligation to consider indirect effects.  Under the 1978 CEQ regulations and longstanding judicial interpretation, cumulative effects constitute an "impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions," regardless of what agency (Federal or non-Federal) or person undertakes such other actions, while indirect effects are those effects that are "caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable." Indirect and cumulative effects are critical components of environmental impacts that must be considered under NEPA.  In many cases, they are the most important issues of concern to the public and other stakeholders.

FIRST AMENDED COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 91 -

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA  98104-1711*
*(206) 343-7340*

1      212.   While there are many reasons why the consideration of indirect and cumulative

2   effects is essential to sound decision-making, the failure to consider such effects is especially

3   harmful with regard to the issue of climate change, both in terms of a proposed action's

4   greenhouse gas emissions that contribute to it, as well as how a changing climate could affect a

5   proposed action or the location where the action takes place.  As many agencies and courts have

6   recognized, climate change is the ultimate "cumulative effect," because it arises from the

7   aggregate of countless actions over time and around the world.  CEQ in the past has issued

8   guidance on how to include climate change in NEPA analyses, and courts have been repeatedly

9   called on to interpret agencies' duties in this regard.  By eliminating the review of cumulative

10   and indirect effects, the Proposed Rule attempted to relieve agencies of the duty to consider

11   climate change related impacts in their NEPA analyses.

12      213.   The Proposed Rule also undermined the analysis of environmental justice impacts

13   without explanation.  Environmental justice addresses the disproportionate impact of pollution

14   and environmental degradation on people of color and low-income communities.  Cumulative

15   impact analysis is essential to identifying whether and how low income and frontline

16   communities of color may be overburdened by the additive environmental impacts of a proposed

17   federal action, particularly actions that contribute air, land, and water pollution to the

18   environment.  By eliminating cumulative impact review, the Proposed Rule allowed agencies to

19   sidestep considering environmental justice impacts.  CEQ also failed to conduct an

20   environmental justice analysis of the Proposed Rule under Executive Order 12898, *Federal*

21   *Actions To Address Environmental Justice in Minority Populations and Low-Income*

22   *Populations*, 59 Fed. Reg. 7,629 (Feb. 11, 1994).

23

24

25   FIRST AMENDED COMPLAINT FOR DECLARATORY

26   AND INJUNCTIVE RELIEF - 92 -

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA  98104-1711*
*(206) 343-7340*

1    214.   The Proposed Rule limited the discussion of alternatives, the "heart" of the EIS

2    process. *Forty Questions; Answer to Question 7*, 46 Fed. Reg. at 18,026.  Indeed, the Proposed

3    Rule explicitly struck regulatory language declaring as much.  Instead, the Proposed Rule sought

4    to constrain the range of alternatives considered in an EIS, providing that federal agencies did

5    not need to consider alternatives not within the jurisdiction of the lead agency—in contravention

6    of precedent and governing caselaw. *NRDC v. Morton*, 458 F.2d 827, 834 (D.C. Cir. 1972)

7    (noting that the reasonableness requirement does not limit the agency to evaluate only measures

8    within its jurisdiction); *see EDF v. U.S. Army Corps of Engineers*, 492 F.2d 1123, 1135 (5th Cir.

9    1974) (agreeing with the D.C. Circuit that there is no statutory restriction that limits "an agency

10    to consideration of only those alternatives that it could adopt or put into effect").

11    215.   The Proposed Rule included a series of provisions that would raise barriers to

12    public participation, limit the requirements for agencies to engage with the public and respond to

13    comments, and eliminate protections against conflicts of interest.  The Proposed Rule eliminated

14    restrictions on project proponents writing their own environmental reviews, stripped references

15    to public participation from regulations, eliminated the requirement for public comments at the

16    scoping stage for EAs.

17    216.   The Proposed Rule also included provisions intended to raise the bar on public

18    comment, effectively allowing agencies to ignore comments that do not meet an arbitrary

19    technical standard of precision.  Many commenters, especially members of the public, may have

20    useful environmental, cultural, social, or other knowledge that should be brought to bear in

21    agency decision-making, but lack the technical knowledge to express that information consistent

22    with the Proposed Rule.  Simultaneously, the Proposed Rule reduced requirements that the

23    agency respond to comments with detailed explanation and citation to authorities.  In other

24

25    FIRST AMENDED COMPLAINT FOR DECLARATORY
    AND INJUNCTIVE RELIEF - 93 -

26

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA  98104-1711*
*(206) 343-7340*

1    words, the Proposed Rule raised the bar for the public in commenting during the NEPA process

2    while it lowered the bar for agencies to respond to comments.

3         217.    Finally, the Proposed Rule contained several elements which were directed at

4    limiting judicial review of agency compliance with NEPA, for example, redefining "final agency

5    action" for purposes of APA review to exclude an agency's failure to act and stating that "it is

6    the Council's intention that the regulations ... create no presumption that violation of NEPA is a

7    basis for injunctive relief or for a finding of irreparable harm."

8         218.    In sum, the Proposed Rule fundamentally mischaracterized, and attempted to

9    fundamentally rewrite, the statutory purpose and goals of NEPA.  It proposed to substantially

10   reduce both the breadth and depth of NEPA analysis, and to eviscerate available remedies for

11   inadequate agency compliance.  Instead of centering environmental values and sound decision-

12   making at the heart of the environmental and public health review process, the Proposed Rule

13   elevated private interests and resource exploitation.  The Proposed Rule proposed to reverse

14   longstanding positions accepted by CEQ, other agencies, and the courts for decades without

15   explanation or a basis in fact or law.

16   VIII.   DESPITE OVERWHELMING OPPOSITION TO THE PROPOSED RULE, CEQ
            RUSHED TO ISSUE A FINAL RULE THAT EVISCERATED NEPA.

17
18        219.    The Proposed Rule ran for nearly 50 pages in the Federal Register and touched on

     virtually every aspect of the longstanding prior regulations, yet CEQ only offered 60 days for
19
     public comment.  Hundreds of states, Tribes, organizations, and others—including 167 members
20
     of the United States Congress—formally requested additional time to comment; CEQ denied all
21
     extension requests.
22
          220.    CEQ only held two public hearings on the Proposed Rule, one in Denver,
23
     Colorado and one in Washington, D.C.  Speaking slots were made available during a 90-minute
24

25   FIRST AMENDED COMPLAINT FOR DECLARATORY           *Earthjustice*
     AND INJUNCTIVE RELIEF - 94 -                       *810 Third Avenue, Suite 610*
26                                                      *Seattle, WA  98104-1711*
                                                        *(206) 343-7340*

window, in advance, through a web-based registration system.  After the online registration system opened, all available speaking slots filled within a few minutes.  The vast majority of people who wished to provide oral comment were not able to do so.  Again, many members of the public requested additional hearings in vain.

221.    Despite the truncated process and the impacts of the global COVID-19 pandemic on every aspect of people's lives, CEQ received over one million public comments, a significant number of them containing detailed and comprehensive analyses explaining the significant harm that would arise from the proposal.  Opposition came from states and state agencies, Tribes, and a broad swath of public interests such as environmental protection, environmental justice, human health, public lands, and outdoor recreation groups, as well as former Chairs and staff of CEQ under both Republican and Democratic administrations.  Plaintiffs submitted detailed comments on the proposal.

222.    CEQ closed the comment period for the Proposed Rule on March 10, 2020.  CEQ released a pre-publication version of the Final Rule on July 15, 2020.  The Final Rule was published in the Federal Register on July 16, 2020.  85 Fed. Reg. 43,304.  Despite CEQ's prior statement that the Proposed Rule was only an update to the 1978 regulations, in announcing the Final Rule, President Trump declared that the new regulations were a "top to bottom overhaul" intended to bolster America "as a nation of builders."

IX.    CEQ'S FINAL RULE MADE ONLY MINOR CHANGES TO THE PROPOSED RULE.

223.    Aside from small changes such as altering verb tense and other technical corrections, the Final Rule closely mirrors the content of the Proposed Rule.

224.    The Final Rule only requires agencies to consider environmental information and "inform" the public regarding an agency decision.  40 C.F.R. §§ 1500.1(a), 1503.1(2)(v),

FIRST AMENDED COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 95 -

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA  98104-1711*
*(206) 343-7340*

1   1507.3(f)(3) (2020).  The Final Rule deleted language that NEPA should be implemented "to the

2   fullest extent possible."  42 U.S.C. § 4332(2)(C); 40 C.F.R. § 1502.2 (1978).[1]

3   225.    The Final Rule prohibits agencies from imposing any more stringent procedures

4   or requirements beyond that required by the Final Rule.  40 C.F.R. 1507.3(b) (2020).  It deleted

5   language stating that an EIS is an "action forcing" document intended to ensure NEPA's goals

6   are "infused" into programs and activities of the Federal government.  40 C.F.R. 1502.1 (2020).

7   226.    The Final Rule replaces the word "possible" in the 1978 regulations with the word

8   "practicable," weakening existing requirements and providing agencies with open-ended

9   discretion to refuse to comply with requirements if they are inconvenient or cumbersome.  *See,*

10  *e.g.,* 40 C.F.R. §§ § 1500.2, 1501.2(b)(2), 1501.5(d), 1501.7(g), (g)(1), (g)(2), (i), (j),

11  1501.8(b)(1), (b)(6), (b)(8), 1501.9(a), (b), 1502.5(b), 1502.9(b), 1502.11(g), 1505.2(g)(3),

12  1506.2(b), (c), 1506.4, 1506.2(b), (c) (2020).

13  227.    The Final Rule limits the number and nature of federal actions that are subject to

14  NEPA.  For example, the Final Rule departs from longstanding regulatory and judicial precedent

15  that the adjective "major" in front of "federal action" reinforces but does not have independent

16  meaning from the qualifier "significantly."  40 C.F.R. § 1508.1(q) (2020).

17  228.    The Final Rule asserts that federal financial assistance does not qualify as a

18  "major federal action" if the agency does not retain an undefined level of "control and

19  responsibility" over the effects of the action, in a manner that is inconsistent with judicial

20  precedent, creates confusion, and invites abuse by applicants. 40 C.F.R. § 1508.1(q) (2020).

21

22

23  _____

    [1] The following citations to the 1978 regulations include changes made to 40 C.F.R. § 1502.22 in

24  1986.

25  FIRST AMENDED COMPLAINT FOR DECLARATORY        *Earthjustice*
    AND INJUNCTIVE RELIEF - 96 -                    *810 Third Avenue, Suite 610*
26                                                  *Seattle, WA  98104-1711*
                                                    *(206) 343-7340*

229.    The Final Rule narrowed the definition of "major federal action" even further by deleting language that defines "action" to include circumstances where an agency "fails to act" and that failure is reviewable under the APA.  40 C.F.R. § 1508.1(q)(1)(iii) (2020).

230.    The Final Rule allows federal agencies to waive NEPA if other review processes are either associated with or required for the project.  40 C.F.R. §§ 1501.1(a)(6) (2020), 1506.2, 1506.4, 1506.5, 1506.9, 1506.11(e), 1507.3(c)(5), (d)(6).

231.    The Final Rule allows federal agencies to circumvent NEPA by authorizing agencies, in their discretion, to determine that other statutes or directives conflict with NEPA.  40 C.F.R. §§ 1501.1(a)(2), (a)(3), § 1507.3(d)(2) (2020).  However, Congress did not delegate federal agencies authority to interpret "whether compliance with NEPA would clearly and fundamentally conflict with the requirements of another statute," or "whether compliance with NEPA would be inconsistent with Congressional intent expressed in another statute."  This is also inconsistent with NEPA's statutory directive to apply the law to "the fullest extent possible," as well as judicial precedent prohibiting such a narrow reading of NEPA.

232.    The Final Rule exempts certain categories of federal actions from the definition of "major federal action," including actions that have long been understood to trigger NEPA review, such as "loans, loan guarantees and other forms of financial assistance."  40 C.F.R. § 1508.1(q)(1)(vii) (2020).  Similarly, the Final Rule characterizes the "action" for treaties and international conventions such that NEPA compliance would only be required for implementation of treaties and international conventions or agreements, 40 C.F.R. § 1508.1(q)(3)(i) (2020); the Final Rule eliminated the ratification of treaties from the definition of "proposals for legislation."  40 C.F.R. § 1508.17 (1978).

FIRST AMENDED COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 97 -

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA  98104-1711*
*(206) 343-7340*

233.    The Final Rule eliminates language from the 1978 regulations that programmatic EISs are sometimes required and language that they are specifically required under certain circumstances.  40 C.F.R. § 1502.4(b) (2020).

234.    The Final Rule eviscerates the regulatory definition of "significance," which will reduce the number of actions deemed significant enough to trigger the preparation of an environmental impact statement.  *Compare* 40 C.F.R. §§ 1501.3(a)(2) (2020), (b)(1), 1501.5(a), 1502.16(a)(1) *with* 40 C.F.R. §§ 1508.27 (1978), 1508.8.  Specifically, the Final Rule eliminates the consideration of critical concerns like context, cumulative effects, scientific controversy, and effects to listed species from the evaluation of a federal action's significance.  *Id.*

235.    The Final Rule no longer prohibits the "piecemealing" or segmentation of agency actions by breaking them into individually less significant or relatively minor component parts.  *Compare* 40 C.F.R. § 1501.3(b) (2020), 1501.9(e)(1) *with* 40 C.F.R. §§ 1508.25(a)(1) (1978), (a)(2), (a)(3).

236.    The Final Rule substantially expands the scope and application of "categorical exclusions," normally a mechanism to simplify NEPA compliance for actions that do not individually or cumulatively have a significant effect on the environment.  *Compare* 40 C.F.R. § 1508.1(d) (2020) *with* 40 C.F.R. § 1508.4 (1978).  Instead, the Final Rule eliminates key factors that previously prevented the use of categorical exclusions for actions that "individually or cumulatively" may have impacts to the environment.  *Id.*  Regardless of whether extraordinary circumstances exist, the Final Rule allows federal agencies, in their sole discretion, to use a categorical exclusion if there are "circumstances that lessen the impacts or other conditions sufficient to avoid significant effects;" but does not require the utilization of these other "circumstances" or "conditions."  40 C.F.R. § 1501.4(b)(1) (2020).  The Final Rule allows

FIRST AMENDED COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 98 -

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA  98104-1711*
*(206) 343-7340*

1   agencies to apply a different agency's categorical exclusion, a sweeping expansion of what

2   should be a narrow exception tailored to a specific federal agency and its mission-specific

3   undertakings. *Id.* at §§ 1506.3(d) (2020), 1507.3(f)(5).

4        237.    The Final Rule authorizes multiple exceptions to the general rule that action may

5   not be taken to advance a proposal pending finalization of the NEPA process, thereby allowing

6   agencies and private applicants to commit resources before a decision is made (including without

7   public comment), and "steamroll" decisions before environmental analysis is complete and the

8   information shared with the public.

9        238.    The Final Rule eliminates the requirement that agencies consider both

10  "cumulative" and "indirect" effects from NEPA analysis.  *Compare* 40 C.F.R. § 1508.1(g)(3)

11  (2020) *with* 40 C.F.R. §§ 1502.16(b) (1978), 1508.25(c), 1508.4, 1508.7, 1508.8, 1508.27(b)(7).

12  Indirect and cumulative effects are critical components of environmental impacts and in many

13  cases, they are the most important issues of concern to the public and other stakeholders.  For

14  example, allowing agencies to forgo consideration of cumulative and indirect effects will have

15  profound adverse effects on the environment, particularly on the global climate, which is the

16  ultimate example of indirect effects aggregated into cumulative effects.  A robust indirect and

17  cumulative effects analysis is essential to preventing the disproportionate impact of pollution and

18  environmental degradation on people of color and low-income communities.

19       239.    The Final Rule only requires NEPA to consider effects that have a "reasonably

20  close causal relationship" with the proposed action, ruling out effects that are "remote in time

21  and space" or "the product of a lengthy causal chain."  40 C.F.R. § 1508.1(g) (2020).  Terms

22  such as "reasonably close" and "lengthy" were not defined, inviting agencies to ignore decades

23  of judicial and regulatory precedent interpreting the scope of review by claiming that foreseeable

24

25  FIRST AMENDED COMPLAINT FOR DECLARATORY
    AND INJUNCTIVE RELIEF - 99 -

26

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA  98104-1711*
*(206) 343-7340*

impacts do not have a "reasonably" close causal relationship to the proposed action. Without any standard against which to gauge these determinations, public and judicial accountability will be undermined, and efficiency in agency decision-making will not occur.

240.    The Final Rule adopts a new definition of "reasonably foreseeable" that imports tort law concepts by linking impacts to what a "person of ordinary prudence" would consider "likely." 40 C.F.R. §§ 1508.1(g), (aa) (2020).  But federal agencies using NEPA to evaluate risks and impacts are not "ordinary people:" they purport to be expert agencies applying technical analysis under standards developed over decades of experience.  The new regulation will allow agencies to ignore impacts that are truly "foreseeable," simply because they may beyond the ken of an "ordinary" person.

241.    The Final Rule limits the scope of NEPA's application to domestic federal agency actions, regardless of whether those actions have extraterritorial effects.  40 C.F.R. § 1508.1(q)(1)(i) (2020).  This regulation is inconsistent with NEPA's statutory directive to "recognize the worldwide and long-range character of environmental problems."

242.    The Final Rule does not require federal agencies to seek out and include information regarding the adverse impacts of federal agency actions, an important departure from the 1978 regulations.  40 C.F.R. § 1502.21 (2020).  Instead, the duty to obtain information is waived if the cost of doing so is "unreasonable," an undefined term that invites abuse and provides no standards against which to evaluate compliance.  *Id.*  The Final Rule further asserts that agencies do not need to undertake "new scientific and technical research" to inform an EIS, *id.* at § 1502.23 (2020), in contravention to decades of precedent identifying the importance of new research when needed to accomplish NEPA's goals.  Without this information, the

FIRST AMENDED COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 100 -

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA  98104-1711*
*(206) 343-7340*

1    environmental consequences of many federal actions will be unknown, in contravention to the

2    congressional intent of NEPA.

3        243.    The Final Rule also limits the discussion of alternatives, which has always

4    represented the "heart" of the EIS process: indeed, the Final Rule strikes this keystone language

5    from the 1978 regulations.  40 C.F.R. § 1502.14 (2020).  The Final Rule constrains the range of

6    alternatives considered in an EIS, providing that federal agencies need not consider alternatives

7    not within the jurisdiction of the lead agency, *compare* 40 C.F.R. § 1502.14 (2020) *with* 40

8    C.F.R. § 1502.14(e) (1978), in contravention of precedent and governing caselaw.

9        244.    The Final Rule revises the definition of "purposes and need" to highlight the

10    applicant's preferred project purpose, 40 C.F.R. § 1502.13 (2020), diminishes the role of

11    alternatives, *id.* at § 1502.14 (2020), and redefines "reasonable alternatives" such that

12    alternatives focus on the needs of the applicant rather than the public and federal agency

13    involved, *id.* at § 1508.1(z) (2020).

14        245.    The Proposed Rule required contractors to execute a disclosure statement

15    specifying that they have no financial or other interest in the outcome of the project.  In one of

16    the only substantive changes to the Proposed Rule, the Final Rule instead requires contractors to

17    submit a disclosure statement to the lead agency that specifies any financial or other interest in

18    the outcome of the action.  40 C.F.R. § 1506.5(b)(4) (2020).  Thus, the Final Rule authorizes

19    conflicts of interest, so long as they are disclosed to the federal agency; but there is no

20    requirement that the public be informed of a contractor's conflict of interest.  *Id.*

21        246.    The Final Rule undermines public participation in the NEPA process, even though

22    public involvement is one of NEPA's "twin aims."  For example, the Final Rule eliminates a

23    requirement to circulate draft EISs that satisfy NEPA standards, meaning that agencies could

24

25    FIRST AMENDED COMPLAINT FOR DECLARATORY
26    AND INJUNCTIVE RELIEF - 101 -

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA  98104-1711*
*(206) 343-7340*

1    circulate incomplete or misleading draft EISs that undercut the public's ability to comment.  40

2    C.F.R. § 1502.9 (2020).  The Final Rule eliminates the scoping process for EAs, an important

3    step that allows the public to provide comment to federal agencies regarding developing

4    alternatives for further review.  *Id*. at § 1501.9(a).  The Final Rule imposes a 30-day timeline for

5    comment on Final EISs, even in instances where there are changes in the project considered in a

6    draft EIS, with no discretion for extensions, *id.* at § 1506.11, and eliminates a requirement in the

7    1978 regulations that EISs be available for 15 days before a public hearing, allowing agencies to

8    schedule hearings without allowing the public meaningful time to review EISs prior to such a

9    hearing.  40 C.F.R. § 1506.6(c)(2) (1978).

10        247.    The Final Rule imposes obligations on the public to provide technically specific

11   and detailed comments on an agency action, but many commenters, including Plaintiffs, have

12   useful environmental, cultural, social, or other knowledge that should be brought to bear in

13   agency decision-making, but lack the technical knowledge to express that information consistent

14   with the undefined requirements of the Final Rule.  40 C.F.R. § 1503.3 (2020).  Commenters

15   must not only provide "data sources and methodologies supporting the proposed changes" to a

16   proposed agency action, but also comment on the "economic and employment impacts" of that

17   change, issues that they may or may not have anything to say, or the expertise and resources to

18   bring to bear.  *Id*. at § 1503.3(a).

19        248.    The Final Rule allows agencies to respond to public comments without detailed

20   explanation and citation to authorities, 40 C.F.R. § 1503.4 (a)(5) (2020), makes responding to

21   comments permissive rather than obligatory by changing "shall" to "may," *id.* at § 1503.4 (a),

22   and broadens the agency's discretion to respond to substantive public comments generically

23   rather than specifically, *id.* at §§ 1503.4 (a), (a)(5).  The Final Rule eliminates the requirement

24

25   FIRST AMENDED COMPLAINT FOR DECLARATORY
     AND INJUNCTIVE RELIEF - 102 -

26

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA  98104-1711*
*(206) 343-7340*

that a federal agency "assess and consider" public comments and instead allows a brief summary of comments, *id*. at §§ 1503.4(a), § 1502.17, replaces the requirement to assess and consider comments with a statement "certifying" that the agency "considered" the comments, *id.* at § 1505.2, and in an effort to shift the burden for judicial review, imposes a "conclusive presumption" that an agency has considered all comments and other information during the comment process, *id.* at § 1505.2(b). Coupled with the changes to the public's comment obligations, these changes raise the bar for the public in commenting during the NEPA process while lowering the bar for agencies to respond to those comments.

249.     The Final Rule imposes arbitrary and unworkable page and time limits, which will undermine the NEPA process and increase conflict and litigation around NEPA reviews rather than promoting efficiency. 40 C.F.R. §§ 1501.5(f) (2020), § 1501.10, § 1502.7, § 1508.1(v).

250.     The Final Rule redefines "final agency action" for purposes of APA review to limit reviews of NEPA compliance where no "record of decision" or formal decision document is created, for example, where an agency fails to undertake an otherwise required environmental analysis (e.g., a failure to act). 40 C.F.R. § 1508.1(q)(1)(iii) (2020). The effort is contrary to settled precedent and serves only to unlawfully constrain judicial review.

251.     Contrary to judicial precedent disfavoring the practice, the Final Rule allows agencies to impose "bond and security" requirements on plaintiffs seeking administrative and judicial review of agency decisions. 40 C.F.R. § 1500.3(c) (2020). Plaintiffs will be required to divert organizational assets in order to participate in a public review process guaranteed by statute.

FIRST AMENDED COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 103 -

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA  98104-1711*
*(206) 343-7340*

252.   The Final Rule states that "it is the Council's intention that the regulations ... create no presumption that violation of NEPA is a basis for injunctive relief or for a finding of irreparable harm" and that "it is also the Council's intention that minor, nonsubstantive errors that have no effect on agency decision-making shall be considered harmless and shall not invalidate an agency action." 40 C.F.R. § 1500.3(d). The Final Rule misstates current law, and impinges upon the role of the judiciary to assess whether a party has demonstrated irreparable harm and whether a legal violation is "harmless error."

253.   The Final Rule is a sweeping alteration of the legal framework for environmental review and public engagement.

254.   The effective date of the Final Rule is September 14, 2020.

255.   The Final Rule states that "No more than 12 months after September 14, 2020 ... each agency shall develop or revise, as necessary, proposed procedures to implement the regulations in this subchapter, including to eliminate any inconsistencies with the regulations in this subchapter ... Except for agency efficiency (see paragraph (c) of this section) or as otherwise required by law, agency NEPA procedures shall not impose additional procedures or requirements beyond those set forth in the regulations in this subchapter."  40 C.F.R. § 1507.3(b).

CLAIMS FOR RELIEF

FIRST CLAIM FOR RELIEF

Violation of the National Environmental Policy Act and the Administrative Procedure Act: Failure to Prepare an EA or EIS

256.   Plaintiffs re-allege, as if fully set forth herein, every allegation contained in the preceding paragraphs.

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF - 104 -

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA  98104-1711*
*(206) 343-7340*

257.    NEPA is America's "basic national charter for protection of the environment."  40 C.F.R. § 1500.1 (1978).  NEPA requires all agencies of the federal government to prepare a "detailed statement" analyzing the environmental effects of, and reasonable alternatives to, all "major Federal actions significantly affecting the quality of the human environment."  42 U.S.C. § 4332(2)(C).  This statement is commonly known as an environmental impact statement.

258.    Under the CEQ regulations in effect while CEQ considered, proposed, and promulgated the Final Rule, a "major federal action" upon which an EIS may be required included "new or revised agency rules [and] regulations."  40 C.F.R. § 1508.18(a) (1978).  The environmental effects that must be considered in an EIS include "indirect effects, which are caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable," as well as direct effects.  40 C.F.R. § 1508.8 (1978).  An EIS must also consider the cumulative impacts of the proposed action, that is, the environmental impacts that result "from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions."  40 C.F.R. § 1508.7 (1978); *see also* 40 C.F.R. § 1508.27(b)(7) (1978).

259.    The purpose of an EIS is to inform federal agency decision-makers as well as the public of the significant environmental impacts of the proposed action, means to mitigate those impacts, and reasonable alternatives that may have reduced environmental effects.

260.    CEQ is a federal agency subject to NEPA.

261.    CEQ's issuance of the Final Rule is a "major federal action significantly affecting the quality of the human environment."  42 U.S.C. § 4332(2)(C).

262.    In issuing the Final Rule, CEQ did not prepare an EA, EIS, or any NEPA documentation at all.  Responding to the fact that CEQ prepared "special environmental

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF - 105 -

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA  98104-1711*
*(206) 343-7340*

1   assessments" for the original 1978 regulations and 1986 amendment, CEQ noted that "long-prior

2   voluntary decisions do not forever establish that CEQ has an obligation to apply the CEQ's

3   regulations to changes to those regulations." 85 Fed. Reg. at 43,353.  Instead, CEQ insisted that

4   because the Final Rule "would not authorize any activity or commit resources to a project that

5   may affect the environment," preparation of an EA or EIS was not required.  *Id.* at 43,354.  CEQ

6   also stated that preparing an EA for the Final Rule "would not meaningfully inform CEQ or the

7   public," and that there was no precedent for applying the 1978 regulations "to a rule that revises

8   those same regulations." *Id.*

9        263.   Because the Final Rule is a major federal action significantly affecting the quality

10   of the human environment within the meaning of 42 U.S.C. § 4332(2)(C), CEQ violated NEPA

11   by failing to prepare and circulate either an EA or an EIS for public comment prior to the

12   publication of the Final Rule.  Public comments on the Proposed Rule, including comments

13   submitted by Plaintiffs, highlighted the significant environmental impact that will result from

14   CEQ's decision to adopt the Final Rule.  For example, the Final Rule will have a significant

15   environmental impact because it substantially reduces the scope and applicability of NEPA to

16   meet the explicit goal of expediting development and resource extraction projects as directed by

17   EO 13807.  Indeed, CEQ promulgated the Final Rule to achieve EO 13807's mandate to

18   streamline federal approvals for consequential, high-impact projects like pipelines and energy

19   generation, production, and transmission projects.  Assuming that the premise of the Final Rule

20   is correct—that the Final Rule will expedite the approval and construction of many such projects

21   with potential significant environmental impacts—then it unavoidably follows that the Final

22   Rule itself will have significant environmental impacts that CEQ must consider in an EIS or, at

23   the very least, an EA.

24

25   FIRST AMENDED COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 106 -

26

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA  98104-1711*
*(206) 343-7340*

264.     Consistent with NEPA, an EIS, or at least an EA, on the Final Rule should have considered the adverse environmental and health impacts of replacing the 1978 regulations with the Final Rule and identified alternative approaches that could meet the objectives of the rulemaking without significant environmental impacts.

265.     To satisfy NEPA, an EA or EIS on the Final Rule should also have analyzed the environmental justice impacts of abandoning the 1978 regulation's robust standards for environmental analysis.  Environmental justice communities are disproportionately affected by pollution and other environmental and health hazards.  These communities have the most to lose from the truncated NEPA process set forth in the Final Rule that narrows NEPA's applicability, ignores cumulative and indirect impacts, reduces the range of alternatives, and raises the bar for both public participation and judicial review.

266.     Consideration of the environmental justice implications of the Final Rule is required both by NEPA and EO 12898.

267.     An EA or EIS on the Final Rule should have been prepared that would also have assessed the impact of the Final Rule on efforts to limit greenhouse gas emissions that contribute to global climate change, as well as efforts to evaluate how a changing climate affects proposed projects that are under review.  As noted above, the Final Rule limits the requirement that federal agencies consider the climate-related effects of their actions.  This is a significant impact that NEPA required CEQ to assess in an EA or EIS.

268.     An EA or EIS on the Final Rule should have been prepared that considered the extent to which the Final Rule's changes will affect agencies' ability to take other cumulative effects into consideration in their decision-making.  Agencies such as the U.S. Army Corps of Engineers, U.S. Forest Service, BLM, and others make decisions that individually may not have

FIRST AMENDED COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 107 -

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA  98104-1711*
*(206) 343-7340*

significant impacts but that cumulatively have such impacts in conjunction with other federal, state, local, and private actions.  By precluding these agencies from considering such impacts in their NEPA decision-making, the Final Rule will have a significant adverse environmental impact that should have been considered in an EA or EIS.

269.   CEQ's promulgation of the Final Rule without preparing an EA or EIS that: (a) examines a reasonable range of alternatives; (b) has a statement of purpose and need that corresponds to the agencies' proposed action; (c) identifies the correct no action alternative baseline for comparing and assessing direct, indirect, and cumulative environmental effects; (d) uses high quality scientific information; and (e) examines the overarching direct, indirect, and cumulative environmental effects of the Final Rule is arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law, in violation of NEPA and the APA, 5 U.S.C. § 706(2).

SECOND CLAIM FOR RELIEF

<u>Violation of the National Environmental Policy Act and Administrative Procedure Act:
Failure to Review Environmental Justice Impacts</u>

270.   Plaintiffs re-allege, as if fully set forth herein, every allegation contained in the preceding paragraphs.

271.   In adopting NEPA, Congress placed environmental justice concerns at the core of the statute by recognizing that each person "should enjoy a healthful environment" and by premising the entire requirement for an environmental impact statement on "major Federal actions significantly affecting the quality of the <u>human</u> environment."  42 U.S.C. § 4332(C) (emphasis added).

272.   Beginning with Executive Order 12898 in 1994 and continuing with CEQ's 1997 "Environmental Justice Guidance under the National Environmental Policy Act" Guidance and

FIRST AMENDED COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 108 -

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA  98104-1711*
*(206) 343-7340*

1    the 2016 Federal Interagency Working Group report "Promising Practices for EJ Methodologies

2    in NEPA Reviews," CEQ has developed longstanding policies and practices that rely on

3    advancing environmental justice through NEPA.

4          273.    In the Final Rule, CEQ acknowledged that it was required to analyze the effect of

5    its proposal on Executive Order 12898, and asserted that it "analyzed this final rule and

6    determined that it would not cause disproportionately high and adverse human health or

7    environmental effects on minority populations and low-income populations."  85 Fed. Reg. at

8    43,356.  CEQ failed to provide factual support for this assertion.

9          274.    Nothing in the Final Rule provides rational reasons for departing from CEQ's

10    longstanding policy and practice of fully analyzing the environmental justice impacts of its

11    actions through a NEPA review.  Many provisions in the Final Rule will have a disparate and

12    adverse impact on communities of color and low-income communities.  These provisions include

13    but are not limited to imposing arbitrary page limits, redefining "major federal action," striking

14    required cumulative impact analysis, authorizing the imposition of a bond requirement to

15    participate in the NEPA process, and allowing collective responses to public comments.

16          275.    CEQ claimed that environmental justice effects should be analyzed only at the

17    point of action agency project implementation, 85 Fed. Reg. at 43,356.  To the contrary, CEQ

18    has an obligation under NEPA and the 1978 implementing regulations to assess environmental

19    justice impacts in its rulemaking, especially when considering changes to longstanding

20    regulations that, among other changes that will disproportionately affect environmental justice

21    communities, eliminate requirements to consider indirect and cumulative impacts on

22    overburdened communities that already bear disproportionate impacts of past harmful actions.

23

24

25    FIRST AMENDED COMPLAINT FOR DECLARATORY

26    AND INJUNCTIVE RELIEF - 109 -

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA  98104-1711*
*(206) 343-7340*

276.     NEPA has been an essential mechanism for ensuring that disenfranchised and underrepresented communities have voice in major federal actions.  The sweeping changes in the Final Rule will fundamentally alter nearly every step of the NEPA review process, and yet because CEQ did not engage in a NEPA analysis of the Final Rule, there is no explanation or analysis of how the development and implementation of the Final Rule will affect implementation of Executive Order 12898; if the Final Rule is consistent with CEQ's 1997 environmental justice guidance; or how the Final Rule will affect environmental justice communities themselves.  CEQ acknowledged that commenters raised these issues, 85 Fed. Reg. at 43,356, but insisted that the Final Rule would not result in any adverse environmental impacts. *Final Rule Response to Comments* (June 30, 2020) at 34.

277.     CEQ's decision to adopt the Final Rule without analyzing how the Rule and its implementation would affect the environmental justice mandates in Executive Order 12898, how the Final Rule affects with CEQ's 1997 environmental justice guidance, or how the Final Rule will affect environmental justice communities themselves is arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law, in violation of NEPA and the APA, 5 U.S.C. § 706(2).

THIRD CLAIM FOR RELIEF

Violation of the National Environmental Policy Act and Administrative Procedure Act:
CEQ's Arbitrary and Capricious Decision-Making

278.     Plaintiffs re-allege, as if fully set forth herein, every allegation contained in the preceding paragraphs.

279.     CEQ's issuance of the Final Rule is a "final agency action" subject to judicial review under the APA.  5 U.S.C. § 704.

FIRST AMENDED COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 110 -

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA  98104-1711*
*(206) 343-7340*

280.     The APA provides that courts must "hold unlawful and set aside agency action, findings, and conclusions found to be … arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

281.     The Supreme Court has clarified that an agency action is arbitrary and capricious for purposes of the APA "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicles Mfrs v. State Farm*, 463 U.S. 29, 43 (1983).  The agency "must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Id*.  Moreover, "an agency changing course" is "obligated to supply a reasoned analysis for the change" beyond what would be required if the agency were operating on a clean slate. *Id*. at 42; *see also Organized Vill. of Kake v. U.S. Dep't of Agriculture*, 795 F.3d 956, 968 (9th Cir. 2015) ("[E]ven when reversing a policy after an election, an agency may not simply discard prior factual findings without a reasoned explanation.").

282.     When an agency issues a regulation changing or amending a prior regulation, it faces an even higher burden.  The agency must demonstrate that: (1) a new rule is permissible under the statute; (2) there are good reasons for the change; (3) the agency believes it to be better; and (4) the agency displays awareness that it is changing its position. *F.C.C. v. Fox Television Stations, Inc,*, 556 U.S. 502, 514-16 (2009) (*Fox*).  When a new regulation rests upon a factual finding contrary to prior policy, an agency must provide a more detailed justification than what would suffice if the new policy were created on a blank slate.  An unexplained

FIRST AMENDED COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 111 -

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA  98104-1711*
*(206) 343-7340*

1    inconsistency between the prior rule and its replacement is a basis for finding the agency's

2    interpretation arbitrary and capricious.  *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet

3    Servs.*, 545 U.S. 967, 981 (2005).  Furthermore, when an agency reverses course and chooses a

4    new policy direction, it must address how the new policy affects other parties who have relied

5    upon the old policy to meet their legal obligations; and failing to take account of legitimate

6    reliance interests is arbitrary and capricious.  *Fox*, 556 U.S. at 515-16; *Smiley v. Citibank (South

7    Dakota), N.A*., 517 U.S. 735, 742, (1996); *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117,

8    2125-26 (2016).

9        283.    In issuing the Final Rule, CEQ violated these fundamental standards.  CEQ failed

10   to make a rational connection between the facts in the record, including comments submitted by

11   Plaintiffs, and the conclusions it made in the text of the Final Rule, and/or failed to consider an

12   important aspect of the problem, and/or relied on factors that it should not have considered.

13       284.    Promulgation of the Final Rule is also unlawful because CEQ failed to provide a

14   rational explanation for changes in its longstanding agency practice.  For example, the Final Rule

15   glossed over the significance of the many changes to longstanding statutory and judicial

16   interpretation and packages the Final Rule as "streamlining" and "efficiency" without providing

17   support in the record for these changes.  In fact, the Final Rule will achieve the exact opposite of

18   its goals, by creating conflict with governing case law, agency regulations and guidance, and

19   longstanding practices that the public, decision-makers, and the courts have relied upon for the

20   past four decades.  Conflicts like these will slow NEPA implementation, sow public and agency

21   confusion, and increase litigation, undermining the very goals of efficiency that the Final Rule

22   claimed to seek to implement.

23

24

25   FIRST AMENDED COMPLAINT FOR DECLARATORY
     AND INJUNCTIVE RELIEF - 112 -

26

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA  98104-1711*
*(206) 343-7340*

285.    The Final Rule is arbitrary, capricious, and not in accordance with law, in violation of the APA, 5 U.S.C. § 706(2).

FOURTH CLAIM FOR RELIEF

<u>Violation of National Environmental Policy Act and Administrative Procedure Act:
CEQ Exceeded Its Delegated Authority</u>

286.    Plaintiffs re-allege, as if fully set forth herein, every allegation contained in the preceding paragraphs.

287.    CEQ is a federal agency delegated authority to implement NEPA, including by promulgating interpretive regulations.

288.    As part of this authority, CEQ may define terms found in NEPA, provided it is consistent with congressional intent and the purposes of the Act.  CEQ may also develop procedures to guide implementation of NEPA.

289.    CEQ cannot adopt regulations that are manifestly contrary to the text and purpose of NEPA.

290.    Both individually and collectively, provisions in the Final Rule are contrary to law and the plain language and purpose of NEPA.

291.    For example, the Final Rule exceeds CEQ's delegated authority by purporting to determine whether a party has standing to go to court and challenge violations of NEPA, the presumptions courts apply in such cases, and other matters that are the province of the judiciary.

292.    Similarly, the Final Rule exceeds CEQ's delegated authority and violates NEPA by authorizing agencies to create bonding and other security requirements as a condition for public participation in the NEPA process.  In enacting NEPA, Congress sought to increase public participation and input into agencies' analysis of environmental impacts.  The Final Rule's bonding requirements impede congressional intent and the purposes of NEPA.

FIRST AMENDED COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 113 -

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA  98104-1711*
*(206) 343-7340*

293.     The Final Rule also dramatically alters the parameters regarding exhaustion of administrative remedies, stating that "comments or objections of any kind not submitted, including those based on submitted alternatives, information, and analyses, shall be forfeited as unexhausted." While the principles of administrative exhaustion are well known, exceptions to the principle exist within the case law, such as when an issue arises after the administrative process about which a party was unaware and therefore could not have commented; the Final Rule impermissibly purports to preclude this well-known exception.

294.     Likewise, the Final Rule states that "it is the Council's intention that the regulations ... create no presumption that violation of NEPA is a basis for injunctive relief or for a finding of irreparable harm" and that "it is also the Council's intention that minor, non-substantive errors that have no effect on agency decision-making shall be considered harmless and shall not invalidate an agency action." The Final Rule is based on an erroneous and incomplete reading of case law, and impinges upon the role of the judiciary to assess whether a party has demonstrated irreparable harm and whether a legal violation is "harmless error."

295.     Moreover, while CEQ has been delegated an interpretive and implementation role under NEPA, other agencies have been given no such role. NEPA is a "good government" statute that regulates, constrains, and imposes obligations on such federal agencies. The Final Rule purports to authorize federal agencies to self-certify their NEPA compliance that will be given a conclusive presumption of compliance by federal courts. This provision exceeds CEQ's authority under NEPA and intrudes into the province of the judiciary.

296.     These and other provisions of the Final Rule are inconsistent with the plain language of NEPA as interpreted by longstanding judicial precedent.

FIRST AMENDED COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 114 -

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA  98104-1711*
*(206) 343-7340*

297.     The Final Rule is arbitrary, capricious, and not in accordance with law, in violation of the APA, 5 U.S.C. § 706(2).

FIFTH CLAIM FOR RELIEF

Violation of the Administrative Procedure Act:
CEQ Invalidly Attempted To Amend Thresholds for Judicial Review

298.     Plaintiffs re-allege, as if fully set forth herein, every allegation contained in the preceding paragraphs.

299.     Congress enacted the APA to establish procedures agencies must follow in promulgating rules.  The APA is applicable to all federal agencies.

300.     CEQ does not have unique authority or expertise in interpreting the applicability of the APA, and CEQ cannot amend the APA's statutory thresholds for judicial review through a rulemaking.

301.     The Final Rule attempts to eliminate the APA's failure to act cause of action by narrowing the definition of "major federal action" such that the NEPA process would not apply to where a responsible agency official fails to act.

302.     In the APA, Congress provided a cause of action for an agency's failure to act.  5 U.S.C. § 551(13).  The APA causes of action apply when there is no other adequate remedy at law.  The Final Rule unlawfully purports to eliminate this cause of action.

303.     The Final Rule states that it "create[s] no presumption that violation of NEPA is a basis for injunctive relief or for a finding of irreparable harm," yet in the APA Congress provided that courts shall hold unlawful and set aside agency actions, findings, and conclusions that are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law or in excess of statutory jurisdiction, authority, or limitations.  5 U.S.C. § 706(2)(A) & (C).

FIRST AMENDED COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 115 -

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA  98104-1711*
*(206) 343-7340*

304.     The Final Rule is arbitrary, capricious, not in accordance with law and in excess of statutory jurisdiction and authority, in violation of the APA, 5 U.S.C. § 706(2).

SIXTH CLAIM FOR RELIEF

Violation of the Endangered Species Act and the Administrative Procedure Act:
Failure to Consult Under ESA Section 7 on the Final Rule

305.     Plaintiffs re-allege, as if fully set forth herein, every allegation contained in the preceding paragraphs.

306.     Section 7(a)(2) of the ESA requires that each federal agency, in consultation with the U.S Fish and Wildlife Service ("FWS") and/or the National Marine Fisheries Service ("NMFS"), ensure that any action authorized, funded, or carried out by the agency is not likely to jeopardize the continued existence of any threatened or endangered species or result in the destruction or adverse modification of critical habitat of such species.  16 U.S.C. § 1536(a)(2). "Action is defined to include the promulgation of regulations; actions that may directly or indirectly cause modifications to the land, water, or air; and actions that are intended to conserve listed species or their habitat."  50 C.F.R. § 402.02.

307.     If a federal agency, including CEQ, determines that its proposed action "may affect" listed species or critical habitat, the agency must engage in "formal consultation" with FWS and/or NMFS, depending on the species involved.  50 C.F.R. § 402.14.  Courts have recognized that the "may affect" hurdle is extremely low, encompassing any possible effect, whether beneficial, benign, adverse, or of an undetermined character.

308.     Formal consultation concludes with the preparation of a biological opinion by FWS and/or NFMS addressing whether the proposed action will jeopardize threatened or endangered species or result in the destruction or adverse modification of critical habitat and setting forth any necessary measures for avoiding, minimizing, and mitigating any adverse

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA  98104-1711*
*(206) 343-7340*

1    impacts.  16 U.S.C. § 1536(b).  An action agency may avoid formal consultation by engaging in

2    "informal consultation" with FWS and/or NMFS and obtaining a written concurrence that the

3    project is not likely to adversely affect threatened or endangered species or critical habitat.  50

4    C.F.R. § 402.13(a).

5        309.    CEQ's issuance of the Final Rule required consultation under the ESA.  The Final

6    Rule substantially weakened the environmental review process in many ways that affect listed

7    species and their habitat, including by allowing federal agencies to: (1) disregard and/or

8    inadequately analyze direct, indirect, and cumulative impacts of proposed projects; (2) establish

9    arbitrary time limits on the completion of EAs and EISs, truncating and reducing the quality of

10    those reviews; (3) gather no new data when preparing completing environmental reviews; (4)

11    undercut the importance of analyzing a range of reasonable alternatives; and (5) significantly

12    expand the use of categorical exclusions when in fact adverse environmental impacts are likely.

13        310.    CEQ did not consult on the Final Rule under the ESA.  Instead, CEQ concluded

14    that the Final Rule had "no effect" on threatened and endangered species and critical habitat.

15        311.    The lack of cumulative and indirect effects analysis particularly harms threatened

16    and endangered species that depend on rivers and whose habitat quality is linked to climate

17    change.  Over 50 listed species may be adversely affected by the Final Rule as a result of the lack

18    of an analysis of the cumulative and/or indirect climate and water quality effects on these species

19    including, but not limited to, California red-legged frogs, Southern resident killer whales, polar

20    bears, Northern California steelhead, and Southern Oregon/Northern California coast coho

21    salmon.

22        312.    The elimination of cumulative impacts analysis under NEPA is especially harmful

23    to these species because the cumulative impacts analysis under the prior CEQ regulations was

24

25    FIRST AMENDED COMPLAINT FOR DECLARATORY
     AND INJUNCTIVE RELIEF - 117 -

26

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA  98104-1711*
*(206) 343-7340*

broader than that conducted pursuant to the ESA itself.  NEPA review under the prior CEQ regulations was not the "substantial equivalent" of the analysis of listed species impacts required by the ESA, and its elimination will hinder the ability of federal agencies to take cumulative effects on species into consideration when making decisions regarding particular activities and projects.

313.    The Final Rule may affect listed species and critical habitat in other ways as well, including by eliminating the consideration of species and critical habitat impacts as a specific significance criterion (for purpose of analyzing whether an EIS is necessary), and by eliminating the requirement that additional surveys and studies be undertaken and additional information be obtained when necessary to adequately analyze an action's impacts.

314.    ESA Section 7(d) provides that after federal agencies initiate consultation on an action under Section 7(a)(2), but prior to completion of consultation, the agencies "shall not make any irreversible or irretrievable commitment of resources with respect to the agency action which has the effect of foreclosing the formulation or implementation of any reasonable and prudent alternative measures which would not violate subsection (a)(2) of this section."  16 U.S.C. § 1536(d).  The purpose of Section 7(d) is to maintain the environmental status quo pending the completion of consultation.  By failing to consult with the Services, CEQ has guaranteed that some land, water, and air will be degraded or destroyed without the possibility that a reasonable and prudent measure could ever be implemented to protect a listed species or its critical habitat because CEQ has improperly foreclosed the possibility of consultations in the rule.

315.    The failure of CEQ to consult on the Final Rule that clearly "may affect" ESA-listed species and critical habitat, is arbitrary, capricious, contrary to the ESA, and in violation of the APA, 5 U.S.C. § 706(2)(A).

PRAYER FOR RELIEF

Plaintiffs respectfully request that the Court:

FIRST AMENDED COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 118 -

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA  98104-1711*
*(206) 343-7340*

1     (1)    Declare that federal defendants acted arbitrarily, capriciously, and contrary to

2   NEPA, in violation of the APA, 5 U.S.C. § 706(2), by failing to prepare an EA or EIS on the

3   Final Rule, and by failing to evaluate alternatives to, and the full direct, indirect, and cumulative

4   impacts of, the Final Rule;

5     (2)    Declare that federal defendants acted arbitrarily, capriciously, and contrary to law

6   by failing to analyze how the Final Rule and its implementation would affect the directive of

7   Executive Order 12898 and CEQ's longstanding policy and practice of fully analyzing the

8   environmental justice impacts of its actions;

9     (3)    Declare that federal defendants violated NEPA and the APA by issuing

10   regulations that are inconsistent with the statutory purpose and language of NEPA;

11     (4)    Declare that federal defendants acted in excess of statutory authority by issuing

12   the Final Rule;

13     (5)    Declare that federal defendants violated Section 7 of the ESA by issuing the Final

14   Rule without first consulting with FWS and NMFS on the Rule's effects on listed species and

15   their critical habitat;

16     (6)    Hold unlawful and vacate the Final Rule, reinstating the 1978 regulations, as

17   amended, in place prior to the enactment of the Final Rule;

18     (7)    Enjoin federal defendants from implementing, enforcing, or relying upon the

19   Final Rule;

20     (8)    Award Plaintiffs their reasonable fees, costs, and expenses, including attorneys'

21   fees; and

22     (9)    Grant Plaintiffs such further and additional relief as the Court may deem just and

23   proper.

24

25   FIRST AMENDED COMPLAINT FOR DECLARATORY
     AND INJUNCTIVE RELIEF - 119 -

26

1    DATED this 6th day of October, 2020.

2                                          Respectfully submitted,

3                                          s/ Kristen L. Boyles
                                           KRISTEN L. BOYLES (CSBA # 158450)
4                                          JAN E. HASSELMAN (WSBA # 29017)
                                           [Admitted Pro Hac Vice]
5                                          EARTHJUSTICE
                                           810 Third Avenue, Suite 610
6                                          Seattle, WA  98104
                                           (206) 343-7340
7                                          kboyles@earthjustice.org
                                           jhasselman@earthjustice.org
8
                                           SUSAN JANE M. BROWN (OSBA # 054607)
9                                          [Admitted Pro Hac Vice]
                                           WESTERN ENVIRONMENTAL LAW CENTER
10                                         4107 N.E. Couch St.
                                           Portland, OR 97232
11                                         (503) 914-1323
                                           brown@westernlaw.org
12
                                           Attorneys for Plaintiffs
13
                                           GREGORY C. LOARIE (CSBA # 215859)
14                                         EARTHJUSTICE
                                           50 California Street, Suite 500
15                                         San Francisco, CA 94111
                                           (415) 217-2000
16                                         gloarie@earthjustice.org

17                                         Local Counsel for Plaintiffs

18

19

20

21

22

23

24

25   FIRST AMENDED COMPLAINT FOR DECLARATORY                    Earthjustice
                                                                810 Third Avenue, Suite 610
     AND INJUNCTIVE RELIEF - 120 -                              Seattle, WA  98104-1711
26                                                             (206) 343-7340

CERTIFICATE OF SERVICE

I hereby certify that on October 6, 2020, I electronically filed the foregoing document

with the Clerk of the Court using the CM/ECF system, which will send notification of this filing

to the attorneys of record and all registered participants.

Dated: October 6, 2020          *s/ Kristen L. Boyles*
                            KRISTEN L. BOYLES (CSBA # 158450)

FIRST AMENDED COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 121 -

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA  98104-1711*
*(206) 343-7340*

# EXHIBIT 2

September 29, 2023

The Honorable Brenda Mallory
Chair, Council on Environmental Quality
730 Jackson Place, N.W.
Washington, D.C.  20503

Re: Docket Number 2023-0003

Dear Chair Mallory:

This letter represents the collective comments of 83 organizations representing millions of members and supporters regarding the proposed Phase 2 regulations implementing the National Environmental Policy Act (NEPA).  Our members care deeply about and participate in the environmental impact assessment process mandated by NEPA.  Some of our organizations will also be submitting additional comments.

We are pleased to see the restatement of many core principles of NEPA compliance that had been deleted or diminished in the 2020 regulatory revisions.  We applaud many of the new provisions, such as those related to climate change, environmental justice and tribal governments, alternatives, and mitigation.  We recognize that certain provisions included in the proposed regulations are required by the Fiscal Responsibility Act of 2023 (FRA).  We also have concerns about some of the proposed provisions and recommendations for improvements.[1]

## I.    REGULATORY PROPOSALS THAT RECOGNIZE NEPA'S STATUTORY PURPOSE AND DIRECTION.

The Council on Environmental Quality's (CEQ) proposal to reinstate many of NEPA's core concepts throughout the implementing regulations is appropriate and welcome.  Many of the changes made in the 2020 regulations reflected an erroneous view that the NEPA process is merely a paperwork exercise with minimal connection to substantive environmental protection.  That flawed premise ignores the fundamental purpose of NEPA as clearly stated in the Act:

> To declare a national policy which will encourage productive and enjoyable harmony between man and his environment; to promote efforts which will prevent or eliminate damage to the environment and biosphere and stimulate the health and welfare of man; to enrich the understanding of the ecological systems and natural resources important to the Nation; and to establish a Council on Environmental Quality.[2]

---

[1] As our comments reference three sets of CEQ's NEPA regulations, we have identified them using the following format:  proposed regulations: "Proposed Section 40 C.F.R. 1500.1;" existing regulations: "40 C.F.R. § 1500.1 (2020);" and original regulations: "40 C.F.R. § 1500.1 (1979)."

[2] 42 U.S.C. § 4321.

We commend CEQ for reinvigorating the regulations in a manner that educates both implementing agencies and the public about this bedrock law that articulates this country's national environmental policies and provides a process for achieving them.  While the national goals that NEPA establishes are a long way from being realized, the proposed regulations generally do a good job of setting the stage for improved agency decisionmaking in a way that comports with the law's purpose.

In that regard, we support the proposed revisions to Part 1500, "Purpose and Policy."  The proposed revisions make clear the linkages between our national environmental policies and the NEPA process,[3] emphasize federal agencies' responsibilities to interpret and administer their policies and regulations and authorizing legislation in accordance with NEPA's policies and the CEQ regulations,[4] and restore the mandate to comply with the Act "to the fullest extent possible."[5]  The linkage between NEPA's policies and process is further strengthened by proposed Section 1502.14(f) which would require agencies to identify the environmentally preferable alternative or alternatives in an EIS and by defining the environmentally preferable alternative(s) as the one that would best promote the national environmental policies set forth in Title 101 of NEPA.[6]

We also support the proposed repeal of several current provisions in that section, such as current § 1500.1, which states that the purpose and function of NEPA is satisfied if the agencies consider information that is presented through the environmental impact assessment process and if the public is informed of the process.  In fact, the purpose of NEPA is not just to consider information – even good quality information – but to act on it.  And the public wishes to participate in the process, not just be informed.  Further, we support the proposed rescission of current § 1500.3 and the provisions throughout the current regulations that, in our collective view, inappropriately attempt to give direction to federal courts regarding causes of action and defenses, bonds, ripeness, and other issues associated with litigation.

## II.    CLIMATE CHANGE EFFECTS.

Climate change is the overarching environmental issue of our time.  It has been clear for many years that federal agencies have an obligation to assess climate impacts under NEPA.[7]  Proposed Section 1500.2(e)'s direction to identify and analyze reasonable alternatives that would reduce climate change-related effects provides a much-needed linkage between the NEPA process and the statute's purpose.  Similarly, the proposed revision to Section 1502.14(f), explaining that the

---

[3] National Environmental Policy Act Implementing Regulations Revisions Phase 2, 88 Fed. Reg. 49924, 49967-49968 (July 31, 2023).

[4] *Id*.

[5] *Id*. at 49968.

[6] *Id*. at 49977.

[7] *See, e.g.*, *Sierra Club v. FERC*, 867 F.3d 1357 (D.C. Cir. 2017); *Wild Earth Guardians v. Bureau of Land Mgmt.*, 870 F.3d 1222 (10th Cir. 2017); *Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin.*, 538 F.3d 1172 (9th Cir. 2008); *Mid-States Coal. for Progress v. Surface Transp. Bd.*, 345 F.3d 520 (8th Cir. 2003); *City of Los Angeles v. Nat'l Highway Traffic Safety Admin.*, 912 F.2d 478 (D.C. Cir. 1990).

environmentally preferable alternative or alternatives are those that would best promote NEPA's policies by, for example, addressing climate change is an important step in the right direction.

We also strongly support the proposed revision to the requirements for the description of the "affected environment" in Section 1502.15, identifying the requirement to include anticipated climate-related changes to the environment and steps to take when that information is not readily available.  Analysis of proposed actions without including such information can no longer be considered adequate (or in NEPA parlance, a "hard look") given our rapidly changing environment and improved scientific capacity.[8]  Proposed Section 1502.16(a)(7)'s charge to agencies to analyze reasonably foreseeable climate change-related effects of both the proposed action and alternatives and on the proposed action and alternatives reflects long-standing law.[9]  We also support the references to climate change-related effects in the definition of "effects" and "extraordinary circumstances" in proposed Sections 1508.1(g), (m).

Finally, CEQ invited comment on whether it should codify any, or all, of its 2023 *National Environmental Policy Act Guidance on Consideration of Greenhouse Gas Emissions and Climate Change*, issued in interim final form earlier this year.[10]  We urge CEQ to issue that guidance in final form as soon as feasible.  We especially underscore the need to provide the recommended additional guidance on two climate issues and consider including relevant direction in the regulations themselves.  Those two issues are perfect substitution analysis and comparisons to national and global greenhouse gas emissions (GHG).

In regard to perfect substitution analysis, despite CEQ's strong warning in its 2023 interim final guidance,[11] we continue to see agencies rely on this highly flawed theory to justify lack of an adequate analysis of climate effects. For a very current example, please consider the August 2023 Bureau of Land Management's draft supplemental EIS (DSEIS) for a draft Resource Management Plan in the Colorado River Valley planning area.  In the DSEIS, the Bureau of Land Management (BLM) has proffered a "perfect substitution analysis" in the context of oil and gas demand, contending that supply will be met somewhere anyway (hence perfect substitution), so why not concentrate that supply in the United States and in this case, Colorado, because it has a stricter regulatory scheme than many other possible locations.[12]

---

[8] For example, *see* Steven Amstrup and Cecila Blitz, *Unlock the Endangered Species Act to Address GHG Emissions*, 381 *Science* 949 (2023) for discussion of casual connection between current (as opposed to atmospheric) greenhouse gas emissions and polar bear recruitment.
[9] *Supra* note 7.
[10] National Environmental Policy Act Guidance on Consideration of Greenhouse Gas Emissions and Climate Change, 88 Fed. Reg. 1196 (Jan. 9, 2023) [hereinafter *Interim Final Guidance*]; Letter from Ctr. for Biological Diversity et al to The Honorable Brenda Mallory (April 10, 2023) (**Attachment 1**).
[11] Interim Final Guidance, *supra* note 10, at 1205.
[12] *See* Bureau of Land Mgmt., Draft Resource Mgmt. Plan: Supplemental Environmental Impact Statement: Colorado River Valley Field Office and Grand Junction Field Office at 3-20, 3-21 (Aug. 2023), available at https://eplanning.blm.gov/public_projects/2016085/200525292/20083156/250089338/CRVFO_GJFO_Draft_SEIS_2023_Aug.pdf

4

To address this continuing problem, we suggest that CEQ consider integrating the warning in the interim final guidance against "perfect substitution analysis" and the recommendation to "use models that accurately account for reasonable and available energy substitute resources, including renewable energy,… [to] compare the proposed action's and reasonable alternatives' energy use against scenarios or energy use trends that are consistent with achieving science-based GHG reduction goals, such as those pursued in the Long-Term Strategy of the United States"[13] into the Phase II regulations and/or the preamble, as appropriate.

We also urge CEQ to incorporate into the regulations CEQ's admonition in the 2016[14] and 2023[15] climate guidance that agencies should not compare a proposed action's GHG emissions to national and global climate GHG emissions as that is not a useful comparison. Though CEQ's guidance on this point has also been available for several years, we also continue to see agencies ignore that guidance.  For example, the Forest Service approved a 1,700-acre clearcutting project in 2022, after CEQ effectively restored the 2016 guidance, that relied on just the type of conclusory statement that CEQ cautioned against, alleging that the project would have an "infinitesimal" impact on global carbon stores and emissions.   Predictably, a federal court rejected this approach just last month stating that:

> With all in agreement that climate change as a result of carbon emissions is an increasingly serious national and global problem, the USFS has the responsibility to give the public an accurate picture of what impacts a project may have, no matter how 'infinitesimal' they believe they may be.  They did not do so here. Accordingly, the agency failed to take a 'hard look' at the Project's carbon emissions, violating NEPA.[16]

Third, consistent with the administration's recent announcement regarding actions to address climate change,[17] we urge CEQ to include a regulation addressing the appropriate

---

[13] Dept. of State and the U.S. Executive Office of the President, *The Long-Term Strategy of the United States:  Pathways to Net-Zero Greenhouse Gas Emission by 2050* (Nov. 2021)*.*

[14] Council on Env't Quality, *Final Guidance for Federal Departments and Agencies on Consideration of Greenhouse Gas Emissions and the Effects of Climate Change in National Environmental Policy Act Reviews*, 11 (Aug. 1, 2016),available at https://ceq.doe.gov/docs/ceq-regulations-and-guidance/nepa_final_ghg_guidance.pdf.

[15] Interim Final Guidance, *supra* note 10, at 1205.

[16] *Ctr. For Biological Diversity v. U.S. Forest Serv.*, 2023 U.S. Dist. LEXIS 144726, 31-37 (D. Mont. Aug. 17, 2023); *see also*, *350 Montana v. Haaland*, 50 F.4th 154, 1259 (9th Cir. 2022) (setting aside agency's determination that proposed coal mine expansion would not have significant impacts in part because the determination relied "on the arbitrary and conclusory determination that the . . . project's emissions will be 'minor' compared to global and domestic emissions.)

[17] *See* Press Release, President Joe Biden, The White House, Biden-Harris Administration Announces New Actions to Reduce Greenhouse Gas Emissions and Combat the Climate Crisis (Sept. 21, 2023), https://www.whitehouse.gov/briefing-room/statements-

use of Social Cost of Greenhouse Gases (SC-GHG).  Agencies' utilization of SC-GHG should be placed in the context of relevant climate goals and commitments.  An important part of that context would be analysis of the magnitude and severity of GHG emissions as compared to the remaining global carbon budget.

### III.    TRIBAL GOVERNMENTS AND INDIGENOUS COMMUNITIES.

We support the retention of the 2020 provisions that removed the original restrictions on Tribal governments' participation in the NEPA process and require the inclusion of Tribal governments and Indigenous communities in all stages of the NEPA process. Tribal governments' roles in scoping,[18] as potential cooperating agencies,[19] and as joint lead agencies[20] are properly affirmed throughout the proposed regulations.  Consistent with the federal government's trust responsibilities to Tribal Nations, we urge CEQ to authorize Tribes to appeal a denial of a request to become a cooperating agency or joint lead agency to CEQ.[21]  We also recommend that CEQ include a definition of "Tribal Nations" in the regulations.

The preamble's acknowledgment that Tribal involvement in the NEPA process is separate from and is *in addition* to required government to government consultation is appropriate and welcome.[22]  But as President Biden's Memorandum on Uniform Standards for Tribal Consultation states, "[c]onsultation requires that information from Tribes be given meaningful consideration, and agencies should strive for consensus with Tribes or a mutually desired outcome."[23]  We urge CEQ to explicitly reference this responsibility in the final regulations.

We support several proposed additions to the NEPA regulations that incorporate long overdue measures to address Tribal interests and concerns.  Importantly, Tribal interests would be incorporated into the various factors that agencies must consider in determining whether a proposed action has a significant effect.[24]

We urge CEQ to further address and incorporate requirements to recognize the interests of Indigenous communities and peoples.  In particular, we recommend the following changes to ensure more complete identification of Indigenous interests in the context of determining the significance of a proposed action and alternatives and thus the level of appropriate NEPA compliance:

---

releases/2023/09/21/fact-sheet-biden-harris-administration-announces-new-actions-to-reduce-greenhouse-gas-emissions-and-combat-the-climate-crisis/.

[18] Proposed Section 1502.4(c).

[19] Proposed Section 1501.8.

[20] Proposed Sections 1501.7(d) 1501.8(a).

[21] Proposed Section 1501.8(a).

[22] Phase 2 Proposed Revisions, *supra* note 3, at 49930-49931.

[23]  President Joe Biden, Memorandum on Uniform Standards for Tribal Consultation, Sec. 2. (Nov. 30, 2022), https://www.whitehouse.gov/briefing-room/presidential-actions/2022/11/30/memorandum-on-uniform-standards-for-tribal-consultation/.

[24] Proposed Sections 1501.3(d)(iv)(ix).

*Use broader language concerning culturally significant sites.* Proposed Section 1501.3(d)(2)(iii) directs agencies to consider the degree to which a proposed action may adversely affect unique characteristics of the affected geographic area, including Tribal sacred sites.  We recommend broadening this language to include sacred and culturally significant sites of Native Hawaiians, Alaska Natives and Indigenous peoples in the U.S. and U.S. territories.  Concomitantly, agencies should be directed to consult organizations that serve and represent the interests of Native Hawaiians, Indigenous peoples of the U.S. territories in the Pacific (American Samoa, Guam, and the Commonwealth of the Northern Mariana Islands), Alaska Natives, and members of non-federally recognized Native American tribes.

*Use ACHP criteria to identify appropriate organizations representing Indigenous peoples and non-federally recognized Tribes.* The need to effectively integrate consultation with and analysis of effects of proposed federal actions and alternatives on both Tribal Nations and Indigenous peoples is underscored by the close relationship between implementation of NEPA and the National Historic Preservation Act (NHPA). CEQ regulations mandate the preparation and integration of NEPA analyses with other applicable laws and executive orders.[25] CEQ and the Advisory Council on Historic Preservation (ACHP) have provided specific agency guidance implementing the integration of compliance with the two statutes in their jointly published handbook.[26]  The NHPA defines Native Hawaiian organizations as any organization that serves and represents Native Hawaiian interests, has as a primary and stated purpose the provision of service to Native Hawaiians, and has demonstrated expertise in aspects of historic preservation that are culturally significant to Native Hawaiians.[27]  Those criteria should be applied to other Indigenous peoples and non-federally recognized Tribes in the context of the NEPA process.

*Use broader references when speaking of "rights".*  Proposed Section 1501.3(x) identifies adverse effects on the rights of Tribal Nations that have been reserved through treaties, statutes or Executive Orders as another factor that should be considered in the determination of significance.  Some Indigenous peoples and Indigenous communities that are not denominated as "Tribes" have been

---

[25] 40 C.F.R. § 1502.4(a).

[26] *See* Council on Env't Quality and Advisory Council on Hist. Pres., *NEPA and NHPA: A Handbook for Integrating NEPA and Section 106* (March 2013), available at https://www.achp.gov/sites/default/files/2017-02/NEPA_NHPA_Section_106_Handbook_Mar2013_0.pdf.

[27] 54 U.S.C. § 300314(a); 36 C.F.R. § 800.16 (s)(1).

recognized and granted certain rights through treaties, statutes and Executive Orders and those rights should also be included in significance determinations.[28]

We also note a proposed exclusion from the definition of "major federal action" that is specific to Tribal interests. Specifically, "[a]ctivities or decisions for projects approved by a Tribal Nation that occur on or involve land held in trust or restricted status by U.S. for the benefit of that Tribal Nation or by the Tribal Nation when such activities or decisions involve no Federal funding or other Federal involvement" would be excluded from the definition of "major federal action."[29] We assume the phrase "other federal involvement" in the latter provision dealing with actions on Tribal lands includes any proposed federal permits or other federal approvals but we recommend that the final regulation clarify what the phrase "other federal involvement" refers to in this context.

Finally, we note the incorporation of Indigenous Knowledge into the definition of "special expertise."[30] CEQ noted that the joint guidance document issued last year on Indigenous Knowledge does not define Indigenous Knowledge.[31] CEQ now invites comment on whether it should include such a definition in the context of these NEPA regulations.[32]

With deference to Indigenous peoples and communities and with appreciation for the work of the Kawerak organization, an Alaska Native Tribal Consortium for the Bering Strait region of Alaska, we suggest consideration of this definition:

> Traditional Knowledge (TK) is a living body of knowledge which pertains to explaining and understanding the universe, and living and acting within it. It is acquired and utilized by indigenous communities and individuals in and through long-term sociocultural, spiritual and environmental engagement. TK is an integral part of the broader knowledge system of indigenous communities, is transmitted intergenerationally, is practically and widely applicable, and integrates personal experience with oral traditions. It provides perspectives applicable to an array of human and non-human phenomena. It is deeply rooted in history, time, and place, while also being rich, adaptable, and dynamic, all of which keep it relevant and useful in contemporary life. This knowledge is part of, and used in, everyday life, and is inextricably intertwined with peoples' identity, cosmology, values, and way

---

[28] *See, e.g.*, 42 U.S.C. § 11701 (setting forth numerous findings affirming the trust relationship between the United States and Native Hawaiians and identifying numerous statutes that recognize particular rights accorded to Alaska Native, Eskimo, and Aleut communities as well as Native Hawaiians).

[29] Proposed Section 1508.1(u)(2)(x).

[30] Proposed Section 1501.8(a).

[31] Council on Env'tl Quality and Off. of Sci. and Tech. Policy, Memorandum on Guidance for Federal Departments and Agencies on Indigenous Knowledge (Nov. 30, 2022), available at https://www.whitehouse.gov/wp-content/uploads/2022/12/OSTP-CEQ-IK-Guidance.pdf.

[32] Phase 2 Proposed Revisions, *supra* note 3, at 49941.

of life. Tradition – and TK – does not preclude change, nor does it equal only 'the past'; in fact, it inherently entails change.[33]

Indigenous Knowledge is a cornerstone of our global intellectual legacy and is integral to understanding the complex dynamics within our ecosystems. Born out of centuries of intimate interaction with the land, it encompasses valuable insights that have the potential to significantly impact justice, sustainability, and cultural preservation. Through the lens of rigorous investigation, it becomes imperative to appreciate the inherent value of our unique knowledge systems and their role in shaping sustainable futures.

## IV.    ENVIRONMENTAL JUSTICE.

We applaud the long overdue proposed integration of environmental justice issues into essential components of the NEPA process.  The draft regulations make it clear that the NEPA process should be appropriately utilized to identify and assess reasonable alternatives that will avoid and minimize adverse effects that disproportionately affect communities with environmental justice concerns.[34]  Further, the proposed regulation on alternatives incorporates environmental justice concerns into the identification of the environmentally preferable alternative or alternatives.[35] The proposed regulations would also require agencies to factor in the degree to which a proposed action and alternatives may have "disproportionate and adverse effects on communities with environmental justice concerns,"[36] analyze the potential for disproportionate, adverse human health, and environmental effects on communities with environmental justice concerns,[37] include disproportionate and adverse effects on communities with environmental justice concerns, whether direct, indirect, or cumulative in the definition of effects,[38] and in the definition of "extraordinary circumstances" that may indicate that a normally categorically excluded proposed action subject to NEPA may have a significant effect.[39]

We are incorporating by reference the comments from GreenLatinos and WE ACT for Environmental Justice addressing environmental justice issues in the proposed regulations.[40]  We also recommend that CEQ specifically identify the incorporation of multi-language models in the NEPA process is one of the responsibilities of agencies Chief Public Engagement Officers.[41]

---

[33] Julie Raymond-Yakoubian, et al.,, *The Incorporation of Traditional Knowledge into Alaska Fisheries Management*, 78 *Marine Policy* 132, 133 (April 2017), https://doi.org/10.1016/j.marpol.2016.12.024.
[34] Proposed Section 1500.2(e).
[35] Proposed Section 1502.14(f).
[36] Proposed Section 1501.3(d)(ix).
[37] Proposed Section 1502.16(a)(14)
[38] Proposed Section 1508.1(g)(4)
[39] Proposed Section 1508.1(m).
[40] Comments from GreenLatinos and WE ACT for Environmental Justice on Docket ID No. CEQ-2023-0003 National Environmental Policy Act Implementing Regulations Revisions Phase II (Sept. 29, 2023) (**Attachment 2**).
[41] Proposed Section 1507.2(a).

**V.    MITIGATION (Proposed Sections 1505.2, 1505.3, 1508.1(w)).**

We commend CEQ for several excellent additions to the current regulations regarding monitoring and mitigation.  While regrettably, NEPA as currently interpreted does not require agencies to mitigate adverse effects, most agencies adopt some mitigation measures for actions requiring environmental impact statements (EIS) and often for actions subject to environmental assessments (EA).  However, once the decision has been made, agencies seldom disclose to the public whether those measures actually occur and, if they do, whether they have been effective.  Mitigation and especially monitoring have long been weak points in the NEPA process.

The proposed provision requiring agencies that rely on mitigation measures in their analysis of reasonably foreseeable effects to ensure that such mitigation measures are enforceable is particularly critical.  While the proposed formulation should cover most mitigation measures in NEPA analyses, we urge CEQ to consider broadening this requirement to all mitigation measures identified in the final decision document.

We are pleased to see the inclusion of a requirement that agencies prepare a monitoring and compliance plan when an EA or EIS relies on mitigation.  Monitoring is a key piece of an adaptive management cycle.  Given that the NEPA process predicts environmental consequences, agencies should be required to monitor the implementation of projects to assess the actual consequences of project implementation to better predict similar or other effects in the future, and to mitigate actual consequences in real time if they prove to extend beyond those predicted (or, alternatively, to prepare new or supplemental NEPA analysis if such impacts cannot be mitigated and there is continuing federal action).

While we are cognizant of the definition of "mitigation" in Proposed Section 1508.1(w), we point out that some agencies, particularly the Forest Service and BLM, routinely rely on EA "project design criteria," "project design features," and other formulations to escape the obligation to enforce such measures during project implementation. Although these measures are described as "part of" the project and therefore not "mitigation," they can still serve to limit the extent or duration of adverse effects and thus to support a finding of no significant impact. However, the agencies frequently waive many of these measures in project implementation (for example, a provision to replace failing culverts to offset sediment input to streams from upland vegetation removal is waived if receipts from timber harvest are inadequate to fund culvert upgrades).

We recommend that in the final rule, CEQ either define "relies on" as utilized in Proposed Section 1501.6(c), 1505.3(c) or revise the definition of "mitigation" to include any measure that reduce the effects of an action to below the level of significance.  We also recommend that CEQ include a requirement in the final rule that agencies make monitoring data publicly available on an agency website and through other mechanisms to increase the transparency around the effects of agency actions.

Finally, we support the proposed change to the definition of mitigation in proposed Section 1508.1(w) to clarify that the various types of mitigation are listed in general order of priority.

### VI.   PROGRAMMATIC ANALYSIS AND TIERING (Proposed Section 1501.11(a) and Preamble).

We recognize that programmatic analysis and tiering have potential for improving the efficiency of the environmental review process.  Improved efficiency and effectiveness is important across the board and highlighted by the need to expeditiously transition into new types of energy production and usage.  We agree that a good programmatic analysis that remains timely and accurate can avoid duplicative analysis at a later stage. However, agencies often struggle with appropriate compliance at the right levels of analyses.  We have three recommendations regarding programmatic analysis.

1.  We recommend that CEQ provide additional clarity and guidance, in the preamble and text as appropriate, regarding the proper implementation of programmatic analysis.  The history of agency NEPA compliance demonstrates a tendency for agencies to overestimate how much they can rely on an earlier programmatic analysis to the detriment of adequate site-specific analysis. Unfortunately, despite the fact that it is at the programmatic level of analysis where cumulative effects may be most effectively and usefully analyzed, we continue to see agencies defer that analysis to a tiered down level and then, at times, not do the analysis even at that point. As one court pointed out:

> NEPA is not designed to postpone analysis of an environmental consequence to the last possible moment.  Rather, it is designed to require such analysis as soon as it can reasonably be done.  [cites omitted] If it is reasonably possible to analyze the environmental consequences in an EIS for an RMP, the agency is required to perform that analysis.  The EIS analysis may be more general than a subsequent EA analysis, and it may turn out that a particular environmental consequence must be analyzed in both the EIS and the EA.  But an earlier EIS analysis will not have been wasted effort, for it will guide the EA analysis and, to the extent appropriate, permit "tiering" by the EA to the EIS in order to avoid wasteful duplication.[42]

Commonly referred to as a "shell game", this practice is often observed in federal agency compliance for oil and gas leasing and development.[43]

Given our experience with this problem, we are concerned about the statement in the preamble in relationship to proposed Section 1501.11(a) that says that, "[a] sufficiently detailed programmatic analysis with such project descriptions can allow agencies to rely upon programmatic environmental documents for further actions *with no or little additional environmental review necessary.*"[44]  This statement will sound encouraging to many agency personnel and project proponents, but in practice, it is very hard to achieve, especially in the context of public land management.  A programmatic EIS would have to be so detailed that it would be quite voluminous not to mention so far-sighted as to anticipate proposed site-specific actions 10-15 years in the future.  Forest Service attempts to do this in the late 1970's and early

---

[42] *Kern v. U.S. Bureau of Land Mgt.*, 284 F.3d 1062, 1072-73 (9th Cir. 2002).
[43] *See, e.g., N. Mex. ex rel Richardson v. Bureau of Land Mgt.*, 565 F. 683 (10th Cir. 2009).
[44] Phase 2 Proposed Revisions, *supra* note 3, at 4994 (emphasis added).

1980's failed.[45]  While programmatic EISs can be very useful for addressing cumulative effects, developing programmatic or policy guidance for future actions and in fact eliminating the need to repeat some analysis, this CEQ language seriously overpromises the possibilities inherent in programmatic NEPA analyses and if it remains, is highly likely to lead to flawed process and disappointment.

Instead, we recommend that CEQ direct agencies in the final regulations to take the following steps:

> a) Where a category or type of site-specific impacts or particular site-specific actions are reasonably foreseeable as a result of the proposed programmatic action(s) covered by a PEIS, agencies should include that analysis in the PEIS rather than deferring the analysis to a later stage.

> b) Agencies should be clear that the effects of site-specific actions not analyzed in a PEIS must be analyzed in a subsequent NEPA analysis.

> c) Agencies should be reminded that mitigation measures included in a Record of Decision for a PEIS comply with the mitigation provisions established by the final regulations.

Each of these points reflects current law and CEQ's guidance "Effective Use of Programmatic NEPA Reviews."[46]  However, agencies would benefit from specific direction in the regulations.

2.  We urge CEQ to restore CEQ's original regulatory language stating that EIS are sometimes required for proposed decisions regarding new agency programs or regulations.[47]  This important direction was removed from the 2020 regulations "to focus the provision on the discretionary use of programmatic EISs in support of clearly defined decisionmaking purposes."[48]  Yet the proposed Phase 2 regulations include the adoption of official policy, such as rules, regulations and interpretations under the Administrative Procedure Act, as well as adoption of formal plans and programs as "major federal actions" under NEPA.[49]  Clearly, not every proposed plan, program or policy interpretation requires preparation of an EIS, but just as clearly, some do, and EISs on plans, programs and policy interpretations and are most commonly programmatic.  CEQ could better serve the implementing agencies and the public by acknowledging that programmatic EISs "are sometimes required."

---

[45] *See, California v. Block*, 690 F.2d 753 (1982).

[46] Council of Env't Quality,  Memorandum on Effective Use of Programmatic NEPA Reviews (Dec. 18, 2014), available at  https://ceq.doe.gov/docs/ceq-regulations-and-guidance/Effective_Use_of_Programmatic_NEPA_Reviews_Final_Dec2014_searchable.pdf

[47] 40 C.F.R.  §  1502.4(b) (2019).

[48] Update to the Regulations Implementing the Procedural Provisions of the National Environmental Policy Act, 85 Fed. Reg. 43304, 43328 (July 16, 2020).

[49] Proposed Section 1508.1(u)(ii)-(iv).

3.  Finally, in regards to the reevaluation of programmatic analysis required in proposed Section 1501.11(c)(2) for analysis that is more than five years old, CEQ should require that agencies make that analysis publicly available.  We are aware that the Forest Service, for example, often prepares "supplemental information reports" (SIRs) to evaluate whether supplemental NEPA analysis is required.[50]  If a SIR concludes that no NEPA supplementation is required, the agency simply files the report away, and affected tribes, communities and the public at large are left uninformed of the fact of the agency's evaluation or the basis for its conclusions.  The CEQ regulations should ensure that such reports are made available to the public in the same manner as EAs.

## VII.   PROPOSED REPEAL OF FUNCTIONAL EQUIVALENCE PROVISION (Proposed Section 1501.1(a)(6)).

We strongly support the repeal of this provision that attempted to codify the "functional equivalence" doctrine in the current regulations.  There was never a sufficient policy rationale nor a legal basis for this abandonment of NEPA in CEQ's regulations.  Further, its implementation would have led to serious inefficiencies if multiple federal agencies implemented a variety of pathways to purported NEPA compliance.

 Congress, in passing the FRA, had before it a provision that would have codified functional equivalence, exempting from NEPA analysis proposed actions "for which [an] agency's compliance with another statute's requirements serve[s] the same or similar function as the requirements of [NEPA] with respect to such action."[51]  However, in the FRA as signed into law, that provision was not included.  Rather, the law now makes clear that agencies are excused from preparation of a NEPA document only "where compliance would ***clearly and fundamentally conflict with the requirements of another provision of law.***"[52]  Congress clearly rejected codification of the functional equivalence doctrine and it should be abandoned all together.[53]  Thus, we ask that CEQ's final preamble it make it clear that no agency – whether an independent regulatory agency or the Environmental Protection Agency – can utilize the functional equivalence doctrine to avoid compliance with NEPA.

## VIII.   PROPOSED RESTORATION OF CONTEXT AND INTENSITY FACTORS FOR DETERMINATIONS OF SIGNIFICANCE (Proposed Section 1501.3(d)).

---

[50] *See* U.S. Forest Serv.,  National Environmental Policy Act Handbook FSH 1909.15, Ch. 18.1 (March 3, 2023), available at
https://www.fs.usda.gov/im/directives/fsh/1909.15/wo_1909.15_10-Amend%202023-1.docx.
[51] Bldg. U.S. Infrastructure through Ltd Delays and Efficient Rev. Act of 2023, H.R. 1577, 118th Cong. § 2(b) (2023) (proposed section 106(a)(6)).
[52] 42 U.S.C. § 4336(a)(3) (emphasis added).
[53] *U.S. v. Johnson*, 529 U.S. 53, 58 (2000) ("When Congress provides exceptions in a statute, it does not follow that courts have authority to create others.  The proper inference, and the one we adopt here, is that Congress considered the issue of exceptions, and, in the end, limited the statute to the ones set forth.").

We support the proposed reinsertion of several important factors that agencies should consider in the course of making their determinations about the significance of a proposed action and alternatives. These proposed provisions provide critical guidance to agencies and the public as consideration is being given to the appropriate level of NEPA compliance.  As noted above, we commend the inclusion of factors relating to the interests of Tribal Nations and recommend broadening those provisions to other Indigenous communities.[54]  We also support the inclusion of environmental justice concerns as an important factor.[55]

We suggest that CEQ include the degree to which a proposed action and alternatives may adversely affect wildlife corridors (or alternatively, connectivity) as an addition to this section, perhaps as a specific example of ecologically critical areas in Proposed Section 1501.3(2)(iii). CEQ's recent guidance on ecological connectivity and wildlife corridors provides considerable support for the inclusion of these factors.[56]

## IX.   PROPOSED CHANGE TO THRESHOLD REQUIREMENT FOR PREPARATION OF AN ENVIRONMENTAL IMPACT STATEMENT (Proposed Section 1501.3(d).

We oppose the proposed change to the long-standing statutory mandate that agencies prepare a detailed statement, now known as an EIS, for recommendations or reports on proposals for "legislation and other major Federal actions significantly affecting the quality of the human environment . . ."  Proposed Section 1501.3(d)(2)(i), directing that, "only actions with significant adverse effects require an environmental impact statement" as well as the related proposed modifications to the "context and intensity" factors that lead to a determination of "significance," also in Proposed Section 1501.3(d), would amend this standard so that proposed actions that an agency maintains would have only significant beneficial effects would not trigger the requirement to prepare an EIS .

We agree with the statement that agencies should consider both short-term adverse effects and long-term beneficial effects[57] and that both beneficial and adverse effects should be analyzed under NEPA.[58]  To be clear, our concern is rooted in our collective years of experience in seeing federal agencies characterize proposed actions, and especially their preferred alternative, as beneficial when they are often not beneficial or at the least have serious harmful effects.  We offer some examples below.

Further, the preamble is devoid of any explanation of why CEQ believes its proposed change to the most well-known statutory phrase in NEPA is either permissible or desirable.  Rather, in

---

[54] *Supra* Sec. III.

[55] Proposed Section 1501.3(d)(ix).

[56] Council on Env't Quality, Memorandum on Guidance for Federal Departments and Agencies on Ecological Connectivity and Wildlife Corridors (March 21, 2023), available at https://www.whitehouse.gov/wp-content/uploads/2023/03/230318-Corridors-connectivity-guidance-memo-final-draft-formatted.pdf.

[57] Proposed Section 1501.3(d)(2)(i).

[58] *Id*.

circular fashion, the preamble language states that the modification is being made consistent with the proposed addition of the term "adverse" in Proposed Section 1501.3(d), in various factors that must be considered in an agency's determination of significance.  Justifying a change in the standard by pointing to the same change in the criteria does not provide a rationale for the underlying proposal.  It simply points out that this change is being made consistently in two parts of the same regulation.  Nor is this proposed change a "clarifying addition," as CEQ suggests in the preamble;[59] rather, it is a significant change.

While not frequently litigated, a few courts have considered the issue of whether beneficial environmental effects trigger NEPA's statutory language in Section 102(2)(C) requiring an EIS. The majority of courts have noted that the statute's plain language is inclusive of all significant environmental impact and, accordingly, concluded that significant beneficial impacts do trigger preparation of an EIS.  The earliest such case, *Hiram Clarke Civil Club v. Lynn*, observed that, "[a] close reading of Section 102(2)(C) in its entirety discloses that Congress was not only concerned with just adverse effects but with *all* potential environmental effects that affect the quality of the human environment."[60]

Other courts that have considered the argument have reached similar conclusions.  In *Environmental Defense Fund v. Marsh*, the issue was whether the Army Corps was required to prepare a supplemental EIS (SEIS) in light of major project design changes for the proposed construction of the Tennessee-Tombigbee Waterway.[61]  The Corps' argument was that "every change made in the waterway's design and functioning after completion of the original 1971 project EIS would produce no significant *adverse* environmental effects, but would produce significant environmental and aesthetic *benefits*."[62]  The Court observed that it found "no solid evidence that the Corps has ever asked the right question, much less answered it reasonably."[63] In justifying 18 volumes of "Supplemental Environmental Reports" proffered in lieu of preparing a SEIS, the Corps noted that the standard that was the basis for the decision not to prepare a SEIS was that, "no significant deviations have been discovered or actions taken which were not in the best interest of the natural environment in the project area."[64]  But, as the Court stated, "that is simply the wrong standard.  NEPA requires the discussion of all *significant* environmental impacts, not just adverse ones."[65]  Importantly, the Court explained that:

> The proper question is not the intent behind the actions, but the significance of the
> environmental impacts.  And even if the Corps was correct in deciding that the new

---

[59] Phase 2 Proposed Revisions, *supra* note 3, at 49936.

[60] *Hiram Clarke Civil Club v. Lynn*, 476 F.2d 421, 427 (5th Cir. 1973). The appellate court ultimately held that the proposed low- and moderate-income housing development did not trigger the requirement to prepare an EIS, deferring to the lower court's holding after a full evidentiary hearing that plaintiffs had not shown the effects were significant.

[61] *Env't Defense Fund v. Marsh*, 651 F.2d 983 (5th Cir. 1981).

[62] Lance D. Wood, *Proposed Revisions to Improve and Modernize CEQ's NEPA Regulations*, 49 Env't Law Rep. 10529, 10531 (June 6, 2019).

[63] 651 F.2d at 996.

[64] *Id*. at 997 996-997.

[65] 651 F.2d at 997.

land use will be beneficial in impact, a beneficial impact must nevertheless be discussed in an EIS, so long as it is significant.  NEPA is concerned with all significant environmental effects, not merely adverse one.[66]

The Corps' theory was also rejected by the Eleventh Circuit in *National Wildlife Federation v. Marsh*.  This case involved federal funding for a controversial proposed man-made 1,400-acre lake and specifically the issue of whether a SEIS was required for a proposed mitigation plan for the proposed lake.[67]

There are also sound policy reasons for not reversing CEQ's fifty-three-year interpretation that either significant adverse or beneficial effects can trigger the requirement to prepare an EIS.  Frequently, agency officials sincerely believe that a proposed action will benefit the environment, as did apparently the Corps' representatives in the cases involving the changes in the Tennessee Tombigbee Waterway and Lake Alma.  But, as was noted by the Fifth Circuit, "[i]n any event, the congressional mandate to develop alternatives would be thwarted by ending the search for other possibilities at the first proposal which establishes an ecological plus, even if such a positive value could be demonstrated with some certainty."[68]  Adequate opportunities for the public (including outside experts) to provide input are vital to ensure that potentially significant impacts are not ignored in the agency decision-making process.  Otherwise, agency officials may truly believe that their proposal would confer environmental benefits when, in fact, it would be an ecological disaster.  History is littered with such examples.[69]

That point is quite well illustrated by the important decision in *Center for Biological Diversity v. NHTSA*.[70]  The case dealt with the National Highway Traffic Safety Administration's (NHTSA) NEPA compliance for proposed Corporate Average Fuel Economy standards (CAFE standards) for light trucks.  NHTSA's original EA concluded that the proposed CAFE standard would result

---

[66] *Id*. at 993.

[67] *Nat'l Wildlife Fed'n v. Marsh*, 721 F.2d 767 (11th Cir. 1983).  The Sixth Circuit Court of Appeals reached a different conclusion in *Friends of Fiery Gizzard v. Farmers Home Admin.*, 61 F.3d 501 (6th Cir. 1995).  The case involved proposed funding from the Farmers Home Administration for a proposed water impoundment and treatment project for the small town of Tracey City, Tennessee, following pollution, water shortages, a possible imminent collapse of a mine and a consent decree requiring the town to develop a solution to its water supply problem, with penalties attached if it did not do so.  The Court, clearly sensing the urgency of the situation, reasoned that the statutory language had to be "read in the light of the implementing regulations" (which seems backwards as regulations as typically interpreted in the light of the statue) and discussed what it perceived as the advantages of an environmental assessment over an EIS.  *Id*. at 504.  In hindsight, it seems as though the situation could have been appropriately handled through alternative arrangements under CEQ's provision for emergencies.

[68] *Env't Defense Fund v. Marsh*, 492 F.2d 1123, 1135 (5th Cir. 1974).

[69] One of the most dramatic examples was the Atomic Energy Commission's "Project Chariot," which involved using nuclear blasts to construct a port near Port Hope, Alaska.  *See Look before detonating nukes*, Univ. of Alaska Fairbanks, https://www.uaf.edu/centennial/uaf100/ideas/project-chariot.php (last accessed Sept. 28, 2023).

[70] Ctr. For Biological Diversity v. NHTSA, *supra* note 7.

in a small decrease in carbon emissions and thus, there would be no significant effect.  But as the Ninth Circuit Court of Appeal's opinion pointed out, the EA's very narrow range of alternatives was unreasonable in light of NHTSA's discretion to consider a broader range of alternatives, including an alternative submitted during the relevant comment period that would have a considerably more significant effect on lowering carbon emissions.[71]  In other words, even though NHTSA's preferred option was beneficial in the context of climate change, the NEPA process revealed a reasonable alternative that was significantly superior in terms of its benefits.  The holding underscores perhaps the most significant purpose of the NEPA process and, in particular, alternatives analysis:  not just to avoid or avoid adverse environmental effects, but to develop information and ideas that can lead to better results even for a proposed action intended to benefit the human environment.

As another example, the Army Corps of Engineers believed that its proposed ecosystem restoration project for the ecologically rich Bolinas Lagoon in northern California would have beneficial effects.[72]  Bolinas Lagoon is a designated Wetland of International Importance under the Ramsar Convention and one of the most pristine tidal lagoons in California.  However, the DEIS prepared by the Corps and the public comments on that draft made it clear that the Army Corps' proposed plan would cause significant harm to this incredible resource.  The DEIS acknowledged that the so-called restoration project was not the environmentally preferable alternative—and in fact was the most ecologically damaging alternative evaluated.[73]

"As a consequence of public concern related to the impacts of dredging and the need for intervention, [the project's non-federal sponsor] coordinated a rigorous scientific review of the ACOE plan and a study of the lagoon's ecological and hydrological evolution."  That review concluded that the Army Corps' proposal was based on a fundamental misunderstanding of the Lagoon's ecological processes and that the large-scale dredging proposed by the Corps "not justified" because there was "an absence of ecological problems that would be mitigated by such apparently unnecessary preventive actions."[74]  As a direct result of NEPA's important review

---

[71] *Id.*, at 1217-1219.

[72] U.S. Army Corps of Engineers, Draft Environmental Impact Statement/Report and Draft Feasibility Study, Bolinas Lagoon Ecosystem Restoration Project (2002), available at https://babel.hathitrust.org/cgi/pt?id=uc1.31210025039817&seq=1.

[73] *Id.*, at 2-27 and ES-6 (the "No Action Alternative would be environmentally superior" and the Corps' proposed "National Ecosystem Restoration Plan" was the most damaging plan evaluated).

[74] Marin County Open Space District, Bolinas Lagoon Ecosystem Restoration Feasibility Project (February 2006) at Peer Review Comments on Administrative Draft Reports I & II with Responses by Consultants at 2, 3, 11 ("The data from both reports indicate that two major conclusions can be drawn: the lagoon mouth is unlikely to close and the overall ecology of the lagoon is unlikely to change in significant ways during the foreseeable future . . . We find quite reasonable the consultants' conclusion that, since the lagoon is unlikely to close in the foreseeable future, no intercession in the evolution of the lagoon to prevent its closure is warranted . . . The greatest strength of the study is that all of its reports support the conclusion, to a greater or lesser degree, that the lagoon is unlikely to close and that dredging or any other action to prevent closure is not justified at this time.  There is an absence of ecological problems that would be mitigated by such apparently unnecessary preventive actions.")

process, the Army Corps' plan was abandoned and a locally-driven restoration initiative was developed for the Bolinas Lagoon ecosystem.

## X.   DETERMINING THE APPROPRIATE LEVEL OF REVIEW (Proposed Sections 1501.3(a)(2), (3)).

These provisions state that as a threshold matter, agencies "shall assess whether NEPA applies to the proposed activity or decision" by, among other factors, determining:

> *(2) Whether compliance with NEPA would clearly and fundamentally conflict with the requirements of another provision of law;*
> *(3)  Whether statutory provisions applicable to the agency's proposed activity or decision make compliance with NEPA impossible;*

These two provisions appear highly duplicative.  The first of these two provisions – whether "the preparation of such document would clearly and fundamentally conflict with the requirements of another provision of law" – reflects the language in Section 106(a)(3) of the FRA.

Subsection 1501.3(a)(3) is new.  The preamble states that:

> Third, CEQ proposes a new factor in paragraph (a)(3) to address circumstances other than those in which Congress or case law have exempted an activity from NEPA, to clarify that there must be an irreconcilable and fundamental conflict between complying with a statutory provision and complying with NEPA i.e., the other statutory provision must make NEPA compliance impossible.  This factor would be consistent with case law and longstanding principles of statutory construction that requires statutes to be read in harmony when it is possible to do so.  This approach also reflects the statutory requirement of section 102 of NEPA that agencies interpret and administer "the policies, regulations and public laws of the United States" in accordance with NEPA's policies and is consistent with CEQ's proposed revisions to § 1500.6, 'Agency Authority.' 42 U.S.C. 4332; see section II.B.5.[75]

One of the problems with the preamble discussion is that the Supreme Court's sole ruling on conflicts between NEPA and other statutes is perfectly captured in the first of these two provisions.  In *Flint Ridge Dev. Co. v. Scenic Rivers Association,* the Court stated that:

> Section 102 recognizes, however, that, where a clear and unavoidable conflict in statutory authority exists, NEPA must give way. As we noted in United States v. SCRAP, 412 U. S. 669, 412 U. S. 694 (1973), 'NEPA was not intended to repeal by implication any other statute.' And so the question we must resolve is whether, assuming an environmental impact statement would otherwise be required in this case, requiring the Secretary to prepare such a statement would create an

---

[75] Phase 2 Proposed Revisions, *supra* note 3, at 49934.

irreconcilable and fundamental conflict with the Secretary's duties under the Disclosure Act.[76]

And the Court concluded by holding that:

> In sum, even if the Secretary's action in this case constituted major federal action significantly affecting the quality of the human environment, so that an environmental impact statement would ordinarily be required, there would be a clear and fundamental conflict of statutory duty. The Secretary cannot comply with the statutory duty to allow statements of record to go into effect within 30 days of filing, absent inaccurate or incomplete disclosure, and simultaneously prepare impact statements on proposed developments. In these circumstances, we find that NEPA's impact statement requirement is inapplicable.[77]

In short, subsection (2) perfectly reflects the law on this point.  While the wording in subsection (3) similarly reflects the law, having two basically identical provisions is confusing and is apt to lead to attempts to parse differences between the two.  If complying with NEPA and another law in any given situation is indeed impossible, that situation clearly and fundamentally conflicts with the provision of the other law.  Having duplicative provisions here makes little sense and is likely to cause confusion as agencies try to distinguish between the two provisions.  We recommend dropping subsection (3) and staying with the language that reflects the provision in the FRA.

## XI.   CATEGORICAL EXCLUSIONS.

We understand that a well-crafted categorical exclusion (CE) can serve the purpose of conserving agencies' resources to focus on proposed actions that involve unresolved conflicts concerning alternative uses of available resources[78] and/or have the potential for significant environmental effects.[79]  That said, many of the undersigned organizations have experienced abuses of the use of CE under the 1979 regulations and are very concerned that the proliferation of many pathways to promulgating new CEs will multiply these problems.  Further, we are concerned with the proposed language concerning "extraordinary circumstances."  In regard to adoption of CEs, we acknowledge the need to incorporate the adoption provision passed in the FRA but question the need for additional adoption measures and some of the provisions in those proposed measures.  In short, we believe the proposed effort to significantly expand the use of CEs is extremely troubling.  We believe that CEQ's emphasis needs to be on better analysis and improved processes for proposed federal actions that require EAs or EISs, not on enabling multiple pathways for proposed CEs.

Importantly, we would like to see CEQ require agencies to notify the public of the proposed use of a CE and to keep documentation of its use of a CE for specific proposed actions so that the

---

[76] 426 U.S. 776, 788 (1976).

[77] *Id.* at 791.

[78] 42 U.S.C. § 4332 (H).

[79] 42 U.S.C. § 4332 (C).

public can access that information.  When the public, other agencies, tribes and communities doesn't know that an agency is proposing to take an action under a CE, there is no one outside of the agency using the CE that can raise the existence of extraordinary circumstances for a particular action at a particular site.  Some agencies – notably, the Forest Service and the Department of Energy – do make their use of CEs public, but most other agencies do not reveal their use of a CE unless and until there is litigation alleging a lack of compliance with NEPA.

        a.   Extraordinary Circumstances (Proposed Section 1501.4 (b)(1)).

The proposed regulation would authorize an agency to use a CE even if extraordinary circumstances exist if the agency conducts an analysis and determines that the proposed action does not have the potential to result in significant effects or if the agency modifies the action to address the extraordinary circumstances.  We would agree that if an agency modifies an action such that the extraordinary circumstance originally identified simply no longer exists in relationship to the reconfigured proposed action, an applicable CE could be utilized.  However, if the presence of one or more extraordinary circumstances remains relevant to the proposed action, such that the agency needs to conduct an analysis to determine the potential significance of the effects, the agency should prepare an EA.  As the U.S. Court of Appeals for the Seventh Circuit held, "[i]t is not enough that the Forest Service has conducted an internal review to determine whether the extraordinary circumstance will cause the proposed action to have a significant impact on the environment.  An [EA] is the process required to make that determination."[80]  In many circumstances, such an EA might be quite brief, but it should be done, and any such analysis must be made publicly available.

Additionally, the proposed language in this section currently states that an agency "should" publish analysis of extraordinary circumstances on its website or otherwise make it publicly available. We ask that "should" be changed to "shall."

        b.   Promulgation of CEs in Planning or Programmatic Contexts (Proposed Section 1501.4(c)).

Purportedly as a way to increase flexibility and potentially the speed with which a new CE can be established, CEQ is proposing a new process by which agencies could establish a CE in the context of a land use plan or other equivalent planning or programmatic decision.  Despite what CEQ no doubt sees as measures to allow for transparency and public involvement, we oppose this proposal. When we examine the proposal closely, we are puzzled about its purported benefits.  The process CEQ proposes for this new pathway to CEs actually appears to be the same as the process for approval of CEs under the current regulations.[81]  Agencies frequently consult with CEQ about additional proposed CEs (without proposing revisions in the rest of their NEPA procedures).  In such cases, as we understand the process, CEQ reviews and advises the agency, which subsequently provides for public notice and comment, substantiates its determination that the proposed category normally does not have significant effects individually

---

[80] *Rhodes v. Johnson*, 153 F.3d 785, 790 (7th Cir. 1998).  *See also*, *Citizens for Better Forestry v. U.S. Dep't of Agric.*, 481 F. Supp. 2nd 1059, 1090 (N.D. Cal. 2007).
[81] 40 C.F.R. § 1507.3.

or cumulatively, provides for extraordinary circumstances and, after considering comments received on the proposal and making any needed modifications, publishes the CE in final form. This is the same process proposed in this section. We fail to see the procedural advantage in this "plan by plan" approach.

What we do see is that the proliferation of these multiple pathways to CE development through the regular process, this programmatic approach, and the various adoption provisions, including the provision passed by Congress and additional provisions added by CEQ in the draft regulations, will - despite CEQ's intentions - result in considerably more confusion about the status of normal NEPA compliance for proposed actions. Bundling programmatic NEPA analyses with the promulgation of new CEs could easily cause new CEs to escape the public's attention, frustrating public participation, and encouraging the proliferation of CEs on an ad hoc basis without adequate forethought and review. The agencies appear to have no difficulty in going through this same process under the current regulations. We believe CEQ's emphasis needs to be on better analysis and improved processes for proposed federal actions that require EAs or EISs, not on managing multiple pathways for proposed actions that meet the requirements for a CE. We therefore request that this provision be removed from the final regulations.

      c.   <u>Adoption of Other Agency Categorical Exclusions as a Class or for a Particular Actions (Proposed Sections 1501.4(e), and 1506.3(d)).</u>

Proposed Section 1501.4(d) essentially incorporates new Section 109 of NEPA into the regulations. Though CEQ proposes to use the term "apply" rather than "adopt," it appears to be a distinction without a real difference in that one agency would essentially be adopting another agency's CE for use either for a particular category of actions or for a particular proposed action.

Proposed Section 1506.3(d) authorizes an agency to adopt another agency's determination that a particular proposed action falls within a CE and the adopting agency's proposed action is "substantially the same." We recommend that Section 1506.3(d)(2) be modified to require an agency to both publish such a determination on its website *and* make it publicly available in other ways, as opposed to one or the other option.

The final regulation should also make it clear that federal agencies may only adopt other federal agencies' CEs, whether the adoption is for a particular class of actions or a single proposed action.

      d.   <u>Codification of Current Agency CEs (Proposed Section 1507.3(a)).</u>

This proposed section would codify CEQ's approval of all CE provisions as of the date of the final regulations' publication. We recommend either deleting this provision or, alternatively, including the identification of actions normally requiring EISs and EAs in agency NEPA procedures. No rationale is provided in the preamble for giving CE categories preferential approval over EIS and EA provisions in agency regulations.
Further, not all CEs that are currently used are consistent with CEQ's regulations. For example, the Federal Communications Commission current NEPA procedures, issued in 1986, use a CE as

the "default provision" for all agency actions that are not identified as requiring either an EIS or an EA.[82]  This was contrary to CEQ regulations at the time the CE went into effect,[83] under the current CEQ regulations,[84] and CEQ's proposed regulations.[85]  Further, several agencies NEPA procedures, like the FCC's 1986 regulations, are badly outdated and do not address current mission activities well or at all.

e.   Required Ten Year Review (Proposed Section 1507.3(c)(9)).

We recommend clarifying the requirement for each agency to review its CEs at least every 10 years by specifying that the 10 years begin with the date of a CE's promulgation, not with the issuance of these final regulations.  We also suggest that the results of each such review be filed with CEQ and be made public.

## XII.   ENVIRONMENTAL ASSESSMENTS.

a.   Proposed Section 1501.5(e).

This proposed section states that an agency shall solicit public comments on an EA *if* it publishes a draft EA and consider those comments in preparation of a final EA.  If this provision is finalized as drafted, agencies may be incentivized to avoid publishing a draft EA.  We urge CEQ to simply require a 30-day review period for all EAs, even if an agency does not intend to publish a separate final EA following a comment period.

b.   Proposed Section 1501.5 (h).

This proposed regulation states that agencies "may" supplement an EA and "may" reevaluate an EA to determine whether there is a duty to do so.  CEQ should change the permissive voice of this regulatory language to make mandatory the duty to supplement EAs.  CEQ provides no rationale for why EAs should not be supplemented when new information relevant to the effects of the action becomes available, just as EISs must be supplemented.  Indeed, federal courts have held the supplementation requirement applies to EAs as well as EISs.[86]  Of course, agencies are always free to prepare a completely new EA and, in some cases, that might be the wisest course of action.  But absent preparation of a new EA, the same standard for supplementation applies.

Additionally, CEQ should consider giving additional guidance on the process that agencies should undertake when engaging in a reevaluation of a NEPA document, including directions to make such reevaluations public.

## XIII.   PRE-APPLICATION SCOPING (Proposed Section 1502.4(a)).

---

[82] 47 C.F.R. § 1.1306(a) (1986).
[83] 40 C.F.R. § 1501.4(b) (1979).
[84] 40 C.F.R. § 1501.4(b)(2).
[85] Proposed Section 1501.4(b)(2).
[86] *See, e.g., Cascadia Wildlands v. U.S. Forest Serv.*, 791 F. Supp. 2d 979 (D. Or. 2011).

CEQ proposes a number of changes to the regulation on scoping that would appear to be sensible steps to improve the efficiency of the process, such as identifying precisely who agencies should contact during the scoping process (along with the general public) as well as including additional detail on information and actions that agencies should take during the process.  However, we are concerned that CEQ is retaining from the 2020 regulation the provision that states that, "[s]coping may include appropriate pre-application procedures or work conducted prior to publication of the notice of intent" and urge that this language be eliminate in the final regulation.

The 2020 regulation on this point was a reversal of CEQ's prior position that scoping begins with publication of the Notice of Intent (NOI). The term "pre-application procedures" generally refers to what an applicant needs to do to submit a complete application to a federal agency.  Pre-application processes serve an important purpose for the applicant and the agency, but they do not serve the same purposes as scoping.

By retaining this 2020 pre-application scoping language, CEQ opens the door to agencies relying on communications that may not be available to the public (as confidential business information may be involved) and that do not serve the purposes as scoping comments to drive the scope of an EA or EIS.  CEQ has previously stated that scoping can be a useful tool prior to publication of an NOI, "so long as there is appropriate public notice and enough information available on the proposal so that the public and relevant agencies can participate effectively." Further, CEQ stated that

> scoping that is done before the assessment, and in aid of its preparation, cannot substitute for the normal scoping process after publication of the NOI, unless the earlier public notice stated clearly that this possibility was under consideration, and the NOI expressly provides that written comments on the scope of alternatives and impacts will still be considered.[87]

CEQ should not allow agencies to count communications between it and an applicant to be constitute scoping unless the public has notice and opportunity to also participate in scoping at the same stage.

## XIV.  ALTERNATIVES INCLUDING THE PROPOSED ACTION (Proposed 1502.14)

We strongly support the reinsertion of the statement that the alternatives section is the "heart of the environmental impact statement," and the other proposed modifications to the current alternatives regulation.  Without an objective exploration of reasonable alternatives, the NEPA process loses its potential to truly inform better decisionmaking.  We also support the identification of the environmentally preferable alternative at an earlier stage, realizing, of course, that nothing in the proposed regulation requires a decisionmaker to select that alternative.

---

[87] Forty Most Asked Questions Concerning CEQ's National Environmental Policy Act Regulations, 46 Fed. Reg. 18026, 10830 (Mar. 23, 1981).

We have one recommendation related to alternative analysis.  Based on Congress' recent amendment to NEPA in the FRA to add to the phrase "technically and economically feasible" to the requirement that agencies analyze reasonable alternatives to a proposed action, CEQ has followed with proposed amendments including "technically and economically feasible" in the proposed section on alternatives in EAs[88]  and in the proposed definition of "reasonable alternative."[89] Consistent with its affirmation that alternatives are the "heart" of the environmental impact statement, CEQ should provide direction on interpretation of the phrase "technically and economically feasible." Without such safeguards, the phrase could be subject to inappropriately narrow interpretation.  This is particularly important given the FRA's amendment to NEPA and CEQ's proposed conforming regulation to allow project sponsors to prepare EAs and EISs.[90]  We urge that CEQ incorporate the following two principles into the final regulations.

First, CEQ should explain that before an agency can dismiss otherwise reasonable alternatives on the basis of not being "technically or economically feasible," it must include a discussion of these terms, including any definition it is using for those terms, in the draft EA or draft EIS to allow the public to understand the terms and comment on them as they apply to that particular project.

Second, CEQ should draw on language from its long-standing Forty Most Asked Questions memorandum to federal agencies that makes it clear that technical and economic feasibility shall be judged based on common sense, rather than the project proponent's preferences: "*Reasonable alternatives include those that are practical or feasible from the technical and economic standpoint and using common sense, rather than simply desirable from the standpoint of the applicant.*"[91]

A rather recent judicial decision aptly demonstrates why this direction is necessary to ensure that alternatives remain the "heart" of the NEPA process. In 2019, a coalition of conservation organizations challenged an Office of Surface Mining (OSM)'s NEPA review of a proposed mine plan for the West Elk coal mine in Colorado.[92] Among other deficiencies, conservation groups argued that OSM violated NEPA by failing to consider an alternative that would have required the mine to flare its methane emissions instead of venting methane directly into the atmosphere.  The agency and the project proponent had utilized a definition of "economically feasible" that the coal company negotiated into its federal coal lease with a different agency (BLM) years earlier outside of the NEPA process with no public involvement.  BLM's EIS, evaluating the environmental impacts of the lease, did not disclose or seek public input on the lease's one-sided definition of the term. Instead, the lease defined "economically feasible" in a way that constrained consideration of reasonable alternatives by requiring any methane flaring aspect of the mine to earn a specified internal rate of return on any flaring-related investments, before it could be required as a condition of mining publicly owned coal. Thus, in this instance,

---

[88] Proposed Section 40 C.F.R. 1502.7(g).
[89] Proposed Section 40 C.F.R. 1508.1(gg).
[90] Fiscal Responsibility Act of 2023, Pub. Law 118-5, §107(f), 137 Stat. 10, 42 (2023).
[91] *Supra* note 88.
[92] *WildEarth Guardians v. Bernhardt*, 423 F.Supp.3d 1083, 1094-1100 (D. Colo. 2019).

the coal company attempted to constrain OSM's review of an otherwise reasonable alternative under NEPA based on a one-sided definition of economic feasibility that was negotiated and adopted by a federal agency outside the NEPA process, which applied economic feasibility not to the project as a whole but to one specific design aspect.  The Court found that OSM's reliance on this interpretation of "technically or economically feasible" was not supported by the record.[93]  CEQ can steer agencies away from such errors by including the aforementioned recommendations in the final regulations.

## XV.   INCOMPLETE OR UNAVAILABLE INFORMATION (Proposed Section 1502.21).

The proposed text retains the change in the 2020 regulations that removed the word "always" from the first statement in the 1986 regulation that read:

> When an agency is evaluating reasonably foreseeable significant adverse effects on the human environment in an environmental impact statement and there is incomplete or unavailable information, the agency shall **always** make clear that such information is lacking.[94]

The sole reason that CEQ gave in the preamble to the final 2020 regulations for this proposed deletion was that the word "always" was "unnecessarily limiting."[95]  Indeed, the word "always" is supposed to be prescriptive and that is precisely why it should stay in the regulation.  As the Court of Appeals for the D.C. Circuit made clear early in its consideration of NEPA's requirements, "one of the functions of a NEPA statement is to indicate the extent to which environmental effects are essentially unknown."[96]  CEQ did not provide an adequate justification in the preamble as to why "always" should be deleted nor is there was any indication of what criteria an agency should use to determine in what instances incomplete or unavailable information about reasonably foreseeable significant adverse effects need not be identified.  This change runs counter to CEQ's avowed goal of efficiency by creating uncertainty over when an agency has to make clear that such information is lacking.  The word "always" should be reinserted in the final regulation.

The proposed regulation also retains, as it now must because of a provision in the FRA, CEQ's 2020 replacement of the term "exorbitant" with "unreasonable" in the portion of the regulation that excuses an agency from obtaining complete information relevant to reasonably foreseeable significant adverse impacts. Under the 1986 regulation, an agency has to obtain such information if that is possible unless the overall costs of obtaining it are "exorbitant"; the 2020 amendment changed the criteria to "unreasonable costs" and the unfortunate FRA provision states that agencies are only required to undertake new scientific or technical research if such work "is essential to a reasoned choice among alternatives, and the overall costs and time frame of

---

[93] *Id*., at 1099.

[94] 40 C.F.R. § 1502.22 (1986) (emphasis added).

[95] Update to the Regulations Implementing the Procedural Provisions of the National Environmental Policy Act, 85 Fed. Reg. 1684, 1703 (January 10, 2020).

[96] *Scientists' Inst. for Pub. Info., Inc. v. Atomic Energy Comm'n*, 481 F.2d 1079, 1092 (D.C. Cir. 1973).

obtaining it are not unreasonable."[97]  To our knowledge, neither CEQ nor any other entity has provided an interpretation of "unreasonable costs" and we encourage CEQ to do so in the final regulation.

## XVI.   PUBLIC INVOLVEMENT ISSUES.

Again, we commend CEQ for removing many of the barriers to robust public involvement in the NEPA process and for the significant inclusion of environmental justice communities, Tribes and Indigenous populations.  However, there are three provisions from CEQ's original regulations that were removed in the 2020 regulations that should be restored in the final regulations.  Those provisions are:

a.  Availability of NEPA Documents (Proposed Section 1501.9(d)(3)).

CEQ's original NEPA regulations included a provision at Section 1506.6(f) requiring agencies to "make EISs, comments received and any underlying documents available to the public pursuant to the provisions of the Freedom of Information Act (5 U.S.C. 552), without regard to the exclusion for interagency memoranda where such memoranda transmit comments of Federal agencies on the environmental impact of the proposed action."  Further, that provision required such materials to be made available to the public without charge to the extent practicable or at least at no more than the actual costs of reproducing copies required to be sent to other Federal agencies.  These two provisions were dropped in the 2020 NEPA regulations, with no explanation provided regarding their deletion.  The referenced FOIA amendments in the regulation do not appear to address the concerns regarding availability of agency comments or the costs of reproduction.  While we appreciate the fact that most agency comments on EISs are included in an appendix to the final EIS, we suggest that it is best to codify that requirement so that agencies clearly understand their responsibilities.  We also understand that most documents are now sent via electronic form.  However, there are still individuals or organizations that lack the capacity to receive documents online and consistent with proposed Section 1501.9(c)(3) that directs agencies to "consider the ability of affected persons and agencies to access electronic media," the original provision should be reinstated.[98]

In addition, we recommend that agencies be directed to inform communities, Tribal governments, Indigenous peoples, and other affected parties about what information related to their interests will be kept confidential and what information will be published or available through FOIA.

Finally, while we appreciate the fact that there are (and should be) multiple pathways to making NEPA documents available to the public, at this point, it would seem that regular posting of all NEPA documents on agency websites should be a basic, common practice.  We urge CEQ to

---

[97] FRA, *supra* note 91, at § 106(b)(3)(B), 137 Stat. at 40; 42 U.S.C. § 4336a (f).
[98] *See*, Michelle Cao and Rafi Goldberg, *Switched Off: Why Are One in Five U.S. Households Not Online?*, Nat'l Telecomm. and Info. Admin., Dep't of Com. (Oct. 5, 2022), https://www.ntia.gov/blog/2022/switched-why-are-one-five-us-households-not-online.

include such a requirement in this section of the regulations to ensure consistency and transparency in all agencies.

b. Time Between Availability of Draft EIS and Public Hearing (Proposed Section 1501.9(e)).

In the original regulations, Section 1506.l6(c) required that if an agency held a public hearing on a DEIS (which was not required but was an option and remains an option in proposed Section 1501.9(e), the DEIS had to be available to the public at least 15 days in advance of the hearing. The proposed regulations do not restore this provision. The rationale for requiring this minimal period of time prior to a public hearing has not changed simply because DEISs are typically now found online. Indeed, for some members of the public and especially those in environmental justice communities and in remote, rural locations, the switch from paper documents to online documents makes it more challenging than ever to access EISs and review them in a timely manner. Even for those having access to an electronic version, it is extremely difficult to review a DEIS and technical appendices and develop meaningful comments to share within 15 days. This is particularly true for people who have to juggle this review and commenting with jobs, family responsibilities and other claims on their time. At the very least, the 15-day mandate should be restored and perhaps expanded to 30 days.

c. Lack of Public Involvement Provisions in the Referral Process (Proposed Part 1504).

Some of us have had experience with CEQ's referral process as it was conceived under the 1979 regulations and found it to be a useful means of achieving better results. At times, the process can resolve problems that might otherwise be the subject of litigation in federal court. That process was enhanced by the involvement of non-federal entities and individuals interested in the proposed action (including an applicant, if relevant to the proposed action). Such involvement was explicitly provided for in two stages of the process: 1) CEQ's deliberations as to whether to accept a particular referral,[99] and 2) CEQ's recommendations for referrals that it accepted.[100]

The 2020 NEPA regulations omit a specific role for any entity or individual outside of federal agencies other than a provision that permits an applicant for the proposed action to provide written views to CEQ no later than the lead agency's response to the referral.[101]

It is disappointing to see that CEQ has, in its proposed Section 1504, failed to restore a specific role for the public, Tribes, affected communities, states and local governments in this important process. We urge that at a minimum, the original provisions for such participation be restored to Section 1504.

**XVII.   LIMITATION ON ACTIONS DURING THE NEPA PROCESS (Proposed Section 1506.1).**

---

[99] Proposed Section 1504.3(e).
[100] Proposed Section 1504.3(f)(3).
[101] 40 C.F.R. § 1504.3(e).

We appreciate the proposed addition that would reinsert direction to agencies to not allow predecisional activities that would limit the choice of reasonable alternatives and would clarify an agency's responsibility for notifying the applicant that the agency retains discretion to select any reasonable alternative or the no action alternative regardless of any work completed by the applicant prior to the conclusion of the NEPA process.  However, we oppose, and continue to be very concerned about the expansion of the types of actions that can be taken before completion of the NEPA process. The original CEQ regulation on this point was drafted both to minimize the possibility of biasing the decisionmaking process, including the possibility of foreclosing alternatives, and to address concerns that the limitations on pre-decisional action "would impair the ability of those outside the Federal government to develop proposals for agency review and approval."[102]

The 2020 regulation loosened these protections by allowing agencies to engage in "such activities, including, but not limited to "acquisition of interests in land" while the NEPA process is still underway.[103] This addition is of deep concern. Even with the best of intentions, advance acquisition of land will almost certainly bias the analytical and decisionmaking process. The preamble to the draft 2020 regulations presented no justification for this dangerous addition other than a vague reference to making the process "more efficient and flexible . . . . ."[104] We question how an applicant expending resources prior to the conclusion of the NEPA process achieves either efficiency or flexibility.  In fact, it makes the process more efficient only if one assumes that the outcome is predetermined. The flexibility it affords runs only to the applicant, not to the public's interest in a fair and unbiased process.

Courts have made it clear, often in the context of deliberating on injunctive relief, that allowing action to proceed before the completion of an adequate NEPA process undermines the purposes of the law. As the Court of Appeals for the First Circuit has said, "[t]he way that harm arises may well have to do with the psychology of decision makers, and perhaps a more deeply rooted human psychological instinct not to tear down projects once they are built."[105] As the Court noted, there is great "difficulty in stopping a bureaucratic steam roller, once started . . ."[106]

We believe that the CEQ regulations should explicitly limit project proponents to activities necessary to support applications for federal approval or assistance prior to completion of the NEPA process.

## XVIII.    ADOPTION OF EISs AND EAs (Proposed Section 1506.3(e)).

Proposed Section 1506.3(e) would require agencies to identify the adoption of another agency's EIS or EA that is not final, is the subject of a referral to CEQ, or is the subject of litigation.  The

---

[102] Implementation of Procedural Provisions of the National Environmental Policy Act, 43 Fed. Reg. 55978, 55986 (Nov. 29, 1978).
[103] 40 C.F.R. § 1506.1(b).
[104] Updated Regulations (Jan. 2020), *supra* note 96, at 1704.
[105] *Sierra Club v. Marsh*, 872 F.2d 497, 504 (1st Cir. 1989).
[106] *Id.*

proposed requirements imply that it is acceptable for an agency to adopt another agency's EIS or EA for a particular proposed action under those three sets of circumstances. We urge CEQ to bar adoption of documents in these categories in the first place.  To the extent there is useful analysis in such a document, that work could still be incorporated by reference into another NEPA document under the provisions of proposed Section 1501.12.  However, documents that are still in draft form or the subject of formal dispute resolution or litigation should not be available for adoption."

## XIX.    AGENCY RESPONSIBILITY FOR ENVIRONMENTAL DOCUMENTS (Proposed Section 1506.5).

a. <u>Sponsor Preparation of EISs (Proposed Section 1506.5).</u>

We believe new Section 107(f) of NEPA requiring agencies to allow project sponsors to prepare EAs and EISs is deplorable.  However, we urge CEQ to include the agencies' proposed provisions implementing this mandate in its review of agency NEPA procedures to ensure adequate guidance and oversight.  We commend CEQ for retaining the requirement for contactors to disclosure financial or other conflicts of interest and for the addition of the requirement for agencies to include in an EA or EIS the names and qualifications of persons conducting the essential independent evaluation of any information submitted by or environmental documents prepared by a contractor.  We urge CEQ to work with agencies to require a similar disclosure of reviewers of information and documents prepared directly by an applicant.

b. <u>Allowing Contractors to Prepare Findings of No Significant Impact and Records of Decision (Proposed Section 1506.5(b).</u>

This proposed provision would allow an agency to authorize a contractor to prepare not only an EA or EIS under the supervision of the agency but would go further by authorizing a contractor to draft a finding of no significant impact or record of decision.
We oppose this proposal.

Determining whether the environmental effects identified in an EA and deciding what alternative should ultimately be chosen by an agency are quintessential government functions and should never be outsourced to a contractor.  Giving these tasks to a contractor further separates the NEPA process from actual agency decisionmaking, no matter how much review takes place. Agency personnel *should* be wrestling with Findings and RODs.

## XX.    INNOVATIVE APPROACHES TO NEPA REVIEWS (Proposed Section 1506.12)

We have multiple concerns with the entirety of this provision. While we agree that climate change and other ecological stressors such as increasing wildfire risk are existential crises that urgently need comprehensive solutions, we do not support the open-ended invitation to federal agencies to "get creative" with their NEPA compliance. Not only does this cut the public, Tribes, and others out of that "creative process" in terms of assessing what is and is not acceptable NEPA compliance, but also the agencies have already proven themselves adept at using existing

authorities to expedite their NEPA compliance. For example, the Forest Service has already deployed a number of emergency NEPA authorities to combat what it calls "the Wildfire Crisis," including limiting the consideration of a robust range of alternatives, eliminating the administrative review process for projects it defines as wildfire risk reduction activities, utilizing alternative arrangements to undertake ground-disturbing activities prior to completing NEPA analysis, exempting CE projects from documentation with a decision memorandum, and other emergency authorities.[107] It remains to be seen – if any monitoring of these projects occurs – whether this approach in fact achieves the agency's desired outcomes, or if it in fact exacerbates the underlying causes for concern of climate change-driven ecological collapse.  What is clear is that the Forest Service's efforts described here limit the ability of interested groups, environmental justice communities, Tribes, and other members of the public to meaningfully participate in the NEPA process and deprive the agency of important information in making its decision.

While it is reasonable to encourage constructive innovation in NEPA compliance, we are dismayed that CEQ would essentially give federal agencies a blank check without any public accountability. We strongly urge that CEQ abandon this provision in the final rule.

### XXI.  DEFINITION OF "REASONABLY FORESEEABLE" (Proposed Section 1508.1(gg).

CEQ should amend the 2020 regulation's definition of "reasonably foreseeable."  We preface our explanation by noting that generally, like CEQ, we oppose the integration of tort law into the NEPA process.[108]  However, "reasonably foreseeable" is a term long enshrined in NEPA law and practice.

The 2020 Rule defined "reasonably foreseeable" to mean "sufficiently likely to occur such that a person of ordinary prudence would take it into account in reaching a decision."[109] The preamble to the 2020 Rule,[110] stated that this was "consistent with the ordinary person standard—that is what a person of ordinary prudence in the position of the agency decision maker would consider

---

[107] Decision Memorandum on Proposed Emergency Response, R5 Giant Sequoia Groves Fuels Reduction and Restoration Projects – Sequoia and Sierra National Forests (July 22, 2022), available at https://www.fs.usda.gov/Internet/FSE_DOCUMENTS/fseprd1078189.pdf; Letter from Randy Moore, Chief, Nat'l Forest System, to Regional Foresters, Station Directors, IITF Director, Deputy Chiefs, and WO Directors (July 19, 2023) (copy available at https://www.dropbox.com/scl/fi/f6zl41fn19w1qpl3ki313/USDA-FS-Emergency-Authorities-Memo-July-2023.pdf?rlkey=fwvkal9wk67t5qf243x3cdo0l&dl=0).

[108] As CEQ stated in its Phase 1 rulemaking, "CEQ no longer deems it necessary to import principles of tort law into the NEPA regulations.  Environmental review under NEPA serves different purposes, such as guiding sound agency decision making and future planning, that may reasonably entail a different scope of effects analysis than the district tort law context." Implementing Regulations Revisions on National Environmental Policy Act, 87 Fed. Reg. 23453, 23465 (May 20, 2022).

[109] 40 C.F.R. 1508.1(aa); Updated Regulations (July 2020), *supra* note 48, at 43376.

[110] *Id.* at 43351

in reaching a decision." CEQ provided no additional justification in the 2020 Notice of Proposed Rulemaking.[111]

The definition adopted in 2020, without further explanation, leaves unnecessary ambiguity as to who this "person of ordinary prudence" is. An agency decisionmaker has access to knowledge and skills, and an agency's resources and responsibilities, that an ordinary person on the street would not. And it would not be prudent, or consistent with general principles of law, to hold an agency decisionmaker to a standard that ignores these specialized knowledge, skills, and resources.

The First Circuit case that the 2020 Rule preamble cited for the "person of ordinary prudence" standard, *Sierra Club v. Marsh*, appears to have recognized this, noting that the point of reference for the "person of ordinary prudence" standard is not an ordinary person on the street, but a "person of ordinary prudence *in the position of the decisionmaker at the time the decision is made*."[112] A person of ordinary prudence in that position has access to all the agency's specialized knowledge, skills, and resources, and is subject to the agency's particular responsibilities. A portion of *Marsh*'s language is referenced in the preamble to the 2020 Rule, but not repeated in the regulatory definition. And that preamble language is insufficiently explicit to eliminate unnecessary ambiguity

But background principles of law can inform this standard. *Marsh* explicitly drew its "person of ordinary prudence in the position of the decisionmaker" standard from the law of torts, *id.*, and the law of torts makes clear that "[i]f an actor has skills or knowledge that exceed those possessed by most others, these skills or knowledge are circumstances to be taken into account in determining whether the actor has behaved as a reasonably careful person."[113]

The 2020 Rule's definition of "reasonably foreseeable" also neglects to state explicitly—and thus arguably leaves ambiguous—the obligation that agencies preparing NEPA documentation engage in a degree of reasonable forecasting—something not every "person of ordinary prudence" on the street would necessarily do, but that agencies, with their expertise and modeling resources, are expected to do.[114]  We believe that defining "reasonable foreseeability" from the perspective of a prudent agency decisionmaker would better reflect the principles underlying *Scientists' Institute for Public Information*.

 For these reasons, we urge CEQ to amend and clarify the definition of "reasonably foreseeable." One important goal of the Phase 2 rule should be to reduce ambiguity and eliminate uncertainty where possible. Here that's possible. The 2020 Rule's "person of ordinary prudence" standard could be misinterpreted as referring to a person of ordinary prudence who lacks the specialized knowledge, skills, and resources of a federal agency. That would be inconsistent with

---

[111] Updated Regulations (Jan. 2020), *supra* note 96, at 1710.

[112] *Sierra Club v. Marsh¸* 976 F.2d 763, 767 (1st Cir. 1992) (emphasis added).

[113] *Restatement (Third) of Torts: Liability for Physical and Emotional Harm* § 12 (2010).

[114] *See Scientists' Inst. for Pub. Info., Inc.*, *supra* note 96, at 1092; *Wildearth Guardians v. Zinke*, 368 F.Supp.3d 41, 67-68 (D.D.C. 2019); *High County Conservation Advocs. v. U.S. Forest Serv.*, 52 F. Supp. 3d 1174, 1196 (D. Colo. 2014).

background principles of law and appellate precedent. To help eliminate that possibility, we urge CEQ to more clearly define "reasonably foreseeable" to mean "sufficiently likely to occur such that a prudent agency decisionmaker would take it into account in reaching a decision."

### XXII.    "MAJOR FEDERAL ACTIONS" (Proposed Section 1508.1(u)).

The FRA defined a major Federal action as one that is subject to "substantial Federal control and responsibility," as determined by the action agency.[115] The FRA excluded certain types of financial assistance, including loans and loan guarantees, from that definition only where the agency "does not exercise sufficient control and responsibility over the subsequent use of such financial assistance or the effect of the action."[116]

In the Proposed Rule, CEQ includes the FRA's definition of a major Federal action verbatim, including the exemption for financial assistance where the agency does not exercise the requisite level of control and responsibility.[117] Although Congress did not further define "sufficient control and responsibility" in the FRA, CEQ interprets the phrase to at least include circumstances where the agency "has authority and discretion over the financial assistance in a manner that could address environmental effects from the activities receiving the financial assistance."[118] The Proposed Rule reflects this interpretation, as CEQ provides that major Federal actions generally include financial assistance such as loans or loan guarantees in the following circumstances:

> where the agency has the authority to deny in whole or in part the assistance due to environmental effects, impose conditions on the receipt of financial assistance to address environmental effects, or otherwise has sufficient control and responsibility over the subsequent use of the financial assistance or the effects of the activity for which the agency is providing the financial assistance.[119]

Given the potential for federally assisted programs to cause significant environmental effects, CEQ should provide additional guidance to agencies to aid in their determinations as to whether an action is "subject to substantial Federal control and responsibility." Additional guidance would clarify the statutory and regulatory language, promote consistency in agency determinations, and discourage agencies from skirting their NEPA obligations. In providing additional guidance, CEQ should use examples to further expand on the concept of substantial control and responsibility. Both Department of Energy (DOE) Title XVII loan guarantees and Department of Agriculture Farm Service Agency (FSA) financial assistance for factory farms are apt choices for this purpose because it is well-established that these programs already are, and should continue to be, subject to NEPA.  Indeed, the presence of required ongoing monitoring, reporting and auditing requirements would also indicate substantial Federal control and responsibility.

---

[115] 42 U.S.C. § 4336e(10)(A).

[116] 42 U.S.C. § 4336e(10)(B)(iii).

[117]  Phase 2 Proposed Revisions, *supra* note 3, at 49987 (proposed 1508.1(u)).

[118] Phase 2 Proposed Revisions, *supra* note 3, at 49962.

[119] Phase 2 Proposed Revisions, *supra* note 3, at 49987 (proposed § 1508.1(u)(1)(vi)).

Federal financial assistance is a powerful driver of many polluting industries and as such, additional guidance regarding the level of control and responsibility necessary to trigger NEPA is critical. The purported benefits and many potential adverse environmental effects associated with federally assisted projects deserve continued scrutiny. For example, applicants for DOE Title XVII loan guarantees may include entities constructing carbon capture, utilization, and storage (CCUS) projects, carbon dioxide transportation infrastructure, mine processing facilities, and hydrogen infrastructure,[120] which have adverse environmental effects that must be considered and evaluated alongside any purported benefits.

Applications for FSA financial assistance are also properly subject to scrutiny for environmental impacts because applicants may include heavily polluting factory farms.[121] Concentrated Animal Feeding Operations (CAFOs) and other factory farms that are otherwise eligible for FSA assistance contribute to climate change and generate enormous amounts of waste that contaminate local air, water, and soil.[122] CAFOs are particularly harmful to frontline communities that are disproportionately comprised of Black, Latino, Indigenous, and low-income people.[123] These communities deserve to understand the impacts of projects funded by their tax dollars and their voices should be heard during the decision-making process. Accordingly, FSA-assisted CAFO projects are properly subject to NEPA review.

It is well-established that DOE Title XVII loan guarantees and FSA financial assistance for CAFOs are major federal actions. DOE already subjects loan guarantees to NEPA, as expressly

---

[120] Loan Guarantees for Clean Energy Projects, 88 Fed. Reg. 34,421 (May 30, 2023).

[121] *See, e.g.*, *Dakota Rural Action v. U.S. Dep't of Agric.*, No. 18-2852, 2023 LEXIS 59678 (D.D.C. April 4, 2023) at *5 (confirming that FSA provides loan services to CAFOs).

[122] *See generally* Nat'l Risk Mgmt. Research Lab'y, *Risk Assessment Evaluation for Concentrated Animal Feeding Operations* EPA/600/R-04/042, U.S. Env't Prot. Agency (May 2004) [hereinafter *EPA CAFO Risk Assessment*), available at https://nepis.epa.gov/Exe/ZyPDF.cgi/901V0100.PDF?Dockey=901V0100.PDF (describing the various risks of environmental harms from CAFOs). *See also* National Pollutant Discharge Elimination System Permit Regulation and Effluent Limitation Guidelines and Standards for Concentrated Animal Feeding Operations, 68 Fed. Reg. 7,176, 7,181 (Feb. 12, 2003) ("[p]ollutants in animal waste and manure can enter the environment through a number of pathways."); JoAnn Burkholder et al., *Impacts of Waste from Concentrated Animal Feeding Operations on Water Quality*, 115 Env't Health Persp. 308 (Feb. 2007), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC1817674/; Matthew N Hayek & Scot M Miller, *Underestimates of Methane from Intensively Raised Animals Could Undermine Goals of Sustainable Development*, 16 Env't. Res. Lett. 1 (2021), https://iopscience.iop.org/article/10.1088/1748-9326/ac02ef/pdf ("[a]nimal agriculture has been reported to represent 15.6% of total annual greenhouse gas (GHG) emissions globally.").

[123] *See generally, e.g.*, Wendee Nicole, *CAFOs and Environmental Justice: The Case of North Carolina*, 121 Env't Health Persp. A182 (2013), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3672924/pdf/ehp.121-a182.pdf.

stated in the agency's regulations,[124] which were clarified through DOE's recent Interim Final Rule on Loan Guarantees for Clean Energy Projects.[125] DOE further discusses how loan guarantees are subject to NEPA in its program guidance,[126] its current loan guarantee solicitation announcement,[127] and its website.[128] Nothing in the FRA or the Proposed Rule affects this determination. Similarly, FSA regulations have long required the agency to prepare an environmental assessment prior to acting on an application for financial assistance for CAFOs.[129] DOE Title XVII loan guarantees and FSA financial assistance are both instructive, not only because they are already subject to NEPA, but because they are squarely within the circumstances that CEQ generally recognizes as major federal actions as well. Both DOE and FSA have the authority to deny applications for their respective financial assistance programs due to environmental effects, and both agencies otherwise exercise control and responsibility

---

[124] 10 C.F.R. § 609.7(b)(5) (stating that prior to closing, DOE will ensure that it has "completed all necessary reviews under [NEPA].").

[125] Loan Guarantees for Clean Energy Projects, 88 Fed. Reg. 34419 (May 30, 2023) (codified at 10 C.F.R. Part 609) (revising DOE's regulations to clarify that NEPA review is required for loan guarantees prior to closing).

[126] Loan Programs Office, *Program Guidance for Title 17 Clean Energy Program* OMB No. 1910-5134,U.S. Dep't of Energy, 47-48 (May 19, 2023),  available at https://www.energy.gov/lpo/articles/program-guidance-title-17-clean-energy-program (stating that "[p]rior to financial close of a Title 17 loan guarantee, projects must complete the appropriate environmental review subject to NEPA.").

[127] Loan Programs Office, Loan Guarantee Solicitation Announcement: Federal Loan Guarantees for Innovative Clean Energy DE-SOL-0007154, U.S. Dep't of Energy, 8 (Apr. 18, 2022), available at https://www.energy.gov/lpo/articles/innovative-clean-energy-loan-guarantee-solicitation-current (stating that "DOE must complete a NEPA review before it makes a decision to provide a loan guarantee. Compliance is integrated into LPO's decision-making procedures to ensure that a Project's environmental impacts are properly considered."); *id*., at 36-38 (Attachment D – National Environmental Policy Act Compliance).

[128] Loan Programs Office, Environmental Compliance, U.S. Dep't of Energy, https://www.energy.gov/lpo/environmental-compliance (last accessed Sept. 28, 2023) (stating that "[l]oans and loan guarantees issued under LPO's program are considered major Federal actions and are subject to [NEPA] review. NEPA compliance is integrated into LPO's decision-making procedures to ensure that environmental impacts are considered throughout the loan guarantee process. The NEPA review must be completed before a loan or loan guarantee can be issued.").

[129] *See Buffalo River Watershed All. v. U.S. Dep't of Agric.*, No. 4:13-cv-450-DPM, 2014 LEXIS 168750 (E.D. Ark. Dec. 2, 2014) (describing FSA's pre-2016 NEPA regulations and their treatment of CAFO loan guarantees). *See also* 7 C.F.R. §§ 799.31(b)(1)(vii) (noting that loans for livestock are not categorically excluded from NEPA); 799.32(d)(1)(ii) (explaining that extraordinary circumstances may exist that make loans for livestock subject to NEPA); 799.32(e) (requiring "additional environmental review and consultation" for loans to projects that include construction or ground disturbance); 799.33(a)(1) (describing extraordinary circumstances—such as harm to wildlife, waterways, aquifers, and important landscapes—that require heightened environmental review); 799.41(a) (mandating an EA for CAFO construction, refinancing of new CAFOs, and activities like land clearing and irrigation development that are typical to CAFOs).

over the activities undertaken using Federal dollars. Eligible projects for Title XVII loan guarantees must "avoid, reduce, utilize, or sequester air pollutants or anthropogenic emissions of greenhouse gases," or have controls or technologies to do so.[130] Applicants must describe how their projects meet those eligibility requirements[131] and DOE denies applications for ineligible projects.[132] Even if a project is eligible, DOE still considers environmental factors—namely, "[e]nvironmental impacts, review and compliance"—in the application process.[133] DOE exercises subsequent control and responsibility over loan guarantees through its authority to, *inter alia*, monitor the performance of the borrower and the eligible project,[134] access records related to the project and perform audits,[135] and authorize deviations from program requirements.[136]

Likewise, FSA farm ownership loan guarantees are only authorized for projects that "promote soil and water conservation and protection."[137] No FSA loans can be made to any project that "contributes to excessive erosion of highly erodible land or to the conversion of wetlands."[138] Further, FSA exercises ongoing control over and responsibility for financed projects because the agency must "seek to mitigate potential adverse environmental impacts resulting from Agency actions" like loan guarantees and other forms of financial assistance to CAFOs and other factory farm operations.[139] FSA must include any environmental mitigation measures the agency relies upon in reaching their decision in the agency's commitment documents, plans, construction contracts, and anywhere else necessary to make the mitigation legally binding.[140] Crucially, FSA retains this control and responsibility beyond the decision to issue the financial assistance. The agency must monitor implementation of mitigation measures throughout the design, construction, and future servicing of the project.[141] Moreover, if the applicant fails to comply with the agreed upon mitigation, FSA must suspend all advancements and reimbursements, and the agency is broadly authorized to take other measures to redress the failed mitigation.[142] All of these factors indicate sufficient agency control over a financially assisted project and could inform additions to proposed section 1508.1(u)(1)(vi) in the final rule.

---

[130] 42 U.S.C. §§ 16513, 16517; 10 CFR § 609.3.

[131] Loan Guarantee Solicitation Announcement, *supra* note 128, at 22-23.

[132] 10 C.F.R. § 609.5(b)(1)

[133] Loan Guarantee Solicitation Announcement, *supra* note, at 9 (breaking down the weight of various criteria in the application process, including environmental factors which account for 20%).

[134] 10 C.F.R. § 609.8(b)(13).

[135] *Id.*, at § 609.17.

[136] *Id.*, at § 609.18.

[137] 7 C.F.R. § 762.121(b)(3).

[138] *Id.*, at § 762.121(d).

[139] 7 C.F.R. § 1970.16(a).

[140] *Id.*, at §1970.16(a)-(b).

[141] *Id.*, at §1970.16(c).

[142] *Id.*

In short, CEQ must provide guidance to agencies to inform determinations regarding financial assistance. Such guidance is necessary to ensure clarity and consistency across agencies and to ensure that federally-assisted projects receive the appropriate level of NEPA review.

In conclusion, we appreciate the opportunity to comment on these proposed revisions to CEQ's NEPA regulations.  If you have you any questions about these comments, please contact Stephen Schima, Senior Legislative Council, Earthjustice, at sschima@earthjustice.org or (503) 830-5753.

Sincerely,

Animal Welfare Institute
Black Hills Clean Water Alliance
Black Millennials 4 Flint
Center for Biological Diversity
Chaco Alliance
Citizens Caring for the Future
Clean Water Action
Clean+Healthy
Climate Hawks Vote
Coalition to Protect America's National Parks
Connected Conservation Foundation
CURE
Defenders of Wildlife
Earth Action, Inc.
Earthjustice
Earthworks
Endangered Species Coalition
Environmental Health Trust
Environmental Justice Health Alliance for Chemical Policy Reform (EJHA)
Environmental Law & Policy Center
Environmental Protection Information Center - EPIC
Food & Water Watch
Footloose Montana
FracTracker Alliance
Friends of the Earth
Great Old Broads for Wilderness
GreenLatinos
Idaho Conservation League
Information Network for Responsible Mining
Interfaith Power & Light
Just Solutions Collective
Klamath Forest Alliance
Living Rivers
League of Conservation Voters
Los Jardines Institute

Los Padres ForestWatch
Maryland Pesticide Education Network
Montana Environmental Information Center
Naeva
National Trust for Historic Preservation
National Wildlife Federation
Native Movement
Native Organizers Alliance
Natural Resources Defense Council
New Hampshire Audubon
New Mexico Climate Justice
New Mexico Sportsmen
New Mexico Wild
Norbeck Society
Northeastern Minnesotans for Wilderness
Northern Plains Resource Council
NPCA
Nuclear Watch New Mexico
Oceana
Ocean Conservation Research
Ocean Defense Initiative
Operation HomeCare, Inc.
Oxfam America
Powder River Basin Resource Council
Prairie Hills Audubon Society
Predator Defense
Progressive Democrats of America - Central New Mexico
Project Eleven Hundred
Public Employees for Environmental Responsibility (PEER)
Rio Grande Indivisible, NM
Santa Fe Forest Coalition
(SciCAN) Science and Community Action Network_EJ
Seven Circles Foundation
Sheep Mountain Alliance
Sierra Club
Silvix Resources
Southern Environmental Law Center
Southern Utah Wilderness Alliance
Tanka Fu
The Wilderness Society
Waterkeeper Alliance
Western Colorado Alliance
Western Environmental Law Center
Western Organization of Resource Councils
WildEarth Guardians
Wilderness Workshop

Winter Wildlands Alliance
Wyoming Wilderness Association

# ATTACHMENT 1

April 10, 2023

The Honorable Brenda Mallory
Chair, Council on Environmental Quality
730 Jackson Place, N.W.
Washington, D.C.  20503

> RE:  *National Environmental Policy Act Guidance on Consideration of*
> *Greenhouse Gas Emissions and Climate Change*
> CEQ-2022-0005

Dear Chair Mallory:

Thank you for the opportunity to comment on the Council on Environmental Quality (CEQ)'s interim National Environmental Policy Act Guidance on Consideration of Greenhouse Gas Emissions and Climate Change (hereinafter "Interim Guidance) on analyzing greenhouse gas (GHG) emissions and climate change effects in the course of agency implementation of the National Environmental Policy Act (NEPA).  The Interim Guidance is an important step forward in CEQ's direction on this most critical issue. Since issuance of CEQ's 2016 guidance on climate change in the NEPA context, our understanding and experience with climate change and how to assess its effects has evolved.  We appreciate the substantial work that has gone into incorporating some of this new understanding. That said, we offer a number of recommendations below for improving the guidance. These suggested changes will make the final guidance a more useful tool for complying with NEPA, will provide a more accurate assessment of how projects will impact climate mitigation efforts, and will better ensure that potential climate-related impacts to communities and natural resources from projects are appropriately considered.

**GENERAL ISSUES**

<u>CEQ's Final Guidance Should Direct Agencies to Quantify Methane Emissions Using both 100-Year and 20-Year Methane Global Warming Potential.</u>

Our organizations urge CEQ to bolster its recommendations around the disclosure of methane's global warming potential (GWP) by instructing agencies to affirmatively disclose <u>both</u> the 100-year and 20-year methane GWP. Adding this requirement will ensure compliance with recent case law regarding such disclosures and ensure alignment with NEPA regulations that require agencies to consider "[b]oth short-term and long-term effects" of their actions.[1] Adding this requirement would not put undue burdens on the NEPA review process as GWPs for non-carbon dioxide greenhouse gasses are commonly used in NEPA documents to allow the agency to provide a total GHG calculation that factors in carbon dioxide, methane, nitrous oxides, and other relevant GHGs and converts

---

[1] 40 C.F.R. § 1501.3(b)(2)(i).

2

them all to carbon dioxide equivalent ($CO_{2e}$) (with carbon dioxide assigned a GWP of 1). The Interim Guidance instructs agencies to quantify a project's direct and indirect GHG emissions "individually by GHG, as well as aggregated in terms of total $CO_2$ equivalence by factoring in each pollutant's global warming potential (GWP), using the best available science and data."[2]

Methane has substantially different GWPs depending on whether one considers its short-term or long-term warming influence.  As CEQ explains, "over a 100-year period, the emissions of a ton of methane contribute 28 to 36 times as much to global warming as a ton of carbon dioxide. Over a 20-year timeframe, methane is about 84 times as potent as carbon dioxide."[3]  That is accurate, useful information.  But when guiding agencies on how to use methane's GWPs in their NEPA analyses, the Interim Guidance falls short of what the relevant case law requires.  The Interim Guidance states "[t]o avoid potential ambiguity, CEQ encourages agencies to use the 100-year GWP [of methane] when disclosing the GHG emissions impact from an action in their NEPA documents."[4] Following that guidance would frequently omit a substantial amount of GHGs from a project's total $CO_{2e}$ calculation, particularly where methane makes up a meaningful portion of the project's GHG emissions, thus underrepresenting both the short-term disproportionate impact of such emissions on climate change and the near-term benefits of methane emission reductions if such projects were not approved.

As explained by the United States District Court for the District of Montana, which invalidated BLM's NEPA review for two resource management plans where BLM relied exclusively on the 100-year GWP for methane, "BLM's unexplained decision to use the 100-year time horizon, when other more appropriate time horizons remained available, qualifies as arbitrary and capricious under these circumstances."[5] At a minimum, agency NEPA analyses must disclose both the 100-year and 20-year GWP for methane.[6] In the final guidance, CEQ should update its recommendations on methane GWPs to better reflect the mandates in NEPA's regulations and the relevant case law.

In the final guidance, CEQ should strengthen this direction by instructing agencies to use both the 100-year and 20-year GWP of methane. Agencies can avoid any "ambiguity" by explaining why they use both GWPs to calculate a project's total GHG emissions. Doing so would add very minimally to an agency's workload, improve the disclosure of GHG emissions "using the best available science and data,"[7] and align with

---

[2] CEQ, NEPA Guidance on Consideration of Greenhouse Gas Emissions and Climate Change, 88 Fed. Reg. at 1201.
[3] 88 Fed. Reg. at 1199.
[4] 88 Fed. Reg. at 1199.
[5] *W. Org. of Res. Councils v. BLM*, 2018 WL 1475470 at *15 (D. Mont. 2018).
[6] The Tenth Circuit Court of Appeals recently upheld a NEPA analysis that disclosed both the 100- and 20-year methane GWP. *See Dine Citizens Against Ruining Our Env't v. Haaland,* 59 F.4th 1016 (10th Cir. 2023) (holding that "because BLM discussed both the one hundred-year and twenty-year time horizons … BLM did consider the short-and long-term effects of the GHG emissions.").
[7] 88 Fed. Reg. at 1201.

NEPA regulations that require agencies to consider "[b]oth short- and long-term effects" of their actions.[8]

<u>The Final Guidance Should Include Additional Ocean and Coastal Issues and Examples.</u>

We urge CEQ to include additional ocean-related concerns and examples throughout the final guidance. Rapidly accelerating climate change and ocean acidification driven by greenhouse gas emissions are some of the most imminent threats to functional marine ecosystems and healthy coastal communities, with clearly foreseeable and enormously significant environmental consequences for the American public. Approximately 42% of the United States population (over 133 million people) lives near the coast.[9] Coastal communities and the marine ecosystems on which they depend are experiencing extreme weather events, sea level rise, ocean acidification, and changing abundance and distribution of fish stocks. Extreme events associated with the ocean are projected to become more common and severe as these conditions intensify and intersect.[10]

It is critically important that oceans are explicitly included in the final guidance. NEPA applies to a wide range of ocean-related activities under federal management jurisdiction including management of fisheries, offshore energy production, vessel traffic, ocean dumping, military activities, and other actions. Climate change and federal actions resulting in GHG reductions have a significant impact on ocean-related federal proposals and actions that otherwise would be single resource-driven decisions. CEQ's GHG NEPA guidance plays a vital role in ensuring that climate change impacts are part of these analyses.

As a start, the background section should include an additional section (Section C) on ocean acidification. Just as methane, as a particularly potent GHG, is called out for the specific attention necessary to reducing emissions and concentrations, carbon dioxide concentrations are uniquely responsible for ocean acidification. Ocean acidification acts together with other climate-driven ocean changes like warming temperatures and oxygen loss to place variable, and sometimes difficult to predict, pressures on marine life that can affect species' survival, reproduction, geographic range, and interactions with other species.[11]

Additionally, we ask that the reference to "land and resource management" in the background section be modified to read "land, <u>ocean and coastal </u>resource management actions under NEPA."[12] This change should be made throughout the guidance where similar language appears including in the discussions of "Special Considerations for

---

[8] 40 C.F.R. § 1502.3(b)(2)(i).
[9] U.S. Global Change Research Program, Fourth National Climate Assessment (NCA4), Chapter 8: Coastal Effects (2018), *available at* https://nca2018.globalchange.gov/chapter/8/.
[10] IPCC, 2022, pp. 420–433, *Climate Change 2022: Impacts, Adaptation and Vulnerability*, https://www.ipcc.ch/report/ar6/wg2/.
[11] IPCC, 2022, pp. 379-550, *Climate Change 2022: Impacts, Adaptation and Vulnerability,* https://www.ipcc.ch/report/ar6/wg2/,
[12] 88 Fed. Reg. 1196, 1198.

Biological GHG Sources and Sinks,"[13] and "Programmatic or Broad-Based Studies and NEPA Reviews."[14] We also recommend adding marine heat waves to the list of real world effects in the examples of issues that agencies should address, citing available scientific literature, to help explain effects, including local effects.[15]

## DIRECT AND INDIRECT EFFECTS

<u>CEQ's Final Guidance Should Provide Considerably More Assistance, Including Additional Limits on and Clarity Around, Agencies' Use of Substitution Analysis.</u>

CEQ's Interim Guidance provides a useful starting point in addressing substitution analysis as it pertains to the climate impacts of federal projects undergoing NEPA review. Substitution analysis refers to the practice of assessing the impacts of a particular project on energy markets as a whole.  In the context of major fossil fuel infrastructure or development projects, substitution analysis seeks to compare project emissions with those that might occur if the project is not developed. Agencies often conclude that some other source of fossil fuel will perfectly substitute for the project in question, or that the fuel will be transported through other means, leading to the counter-intuitive result that the project will have net zero or even negative GHG emissions. For example, in its NEPA review for the Wright Area coal mines, BLM assumed "that there was no real world difference between issuing the Wright area leases and declining to issue them" because, it asserted, even if BLM denied the leases, "third party sources of coal would <u>perfectly substitute</u> for any volume lost on the open market."[16]  The result of BLM's arbitrary perfect substitution assumption -- which the Tenth Circuit rejected as illogical -- was that there would be no difference between the action and no action alternatives in terms of coal mined, coal burned, or greenhouse gasses emitted. Given the centrality of these findings to the NEPA process and substantive decisions around fossil development, we urge CEQ to provide more specific guidance to agencies in order to promote greater certainty, consistency, and accuracy in NEPA analyses across federal agencies.

NEPA requires agencies to provide a clear basis for choice among considered alternatives,[17] and CEQ's Interim Guidance correctly notes that substitution analysis related to fossil fuel proposals has proven particularly challenging for agencies. Given the wide disparity among federal agencies with regard to whether and how to analyze substitution effects, and the variety of economic models available to assist with this analysis,[18] CEQ should provide additional clear direction and clear sidebars to the agencies regarding the use of substitution analysis in NEPA analyses.

---

[13] *Id*. at 1207.

[14] *Id*. at 1210.

[15] *Id*. at 2203.

[16] *WildEarth Guardians v. United States Bureau of Land Management*, 870 F.3d 1222, 1233 (10th Cir. 2017) (emphasis added).

[17] 42 U.S.C. §§ 4332(C)-(E), 40 C.F.R. 1502.14.

[18] For example, EIA uses the National Energy Modeling System in its Annual Energy Outlook; EPA uses ICF's Integrated Planning Model; BOEM developed and uses its own model known as MarketSIM; BLM has no standard analytic method for evaluating substitution effects.  As

As CEQ notes, agencies tasked with providing the public and decisionmakers with a useful comparison between the climate impacts of action and no action alternatives understandably seek to identify not just direct and indirect emissions from a project, but also net changes in GHG emissions. This, in turn, frequently entails forecasting changes in energy markets based on whether a particular proposal is approved (as it is in action alternatives) or rejected (as it typically is the no action alternative). However, evaluating changes in energy markets across alternatives – specifically the mix of coal, oil, gas, wind, and solar, etc. used to generate electricity – and the extent to which changes to this mix increase or decrease GHG emissions is often not within the scope of many agencies' traditional expertise. The results of these efforts have been consistently flawed, with many comparisons concluding that major fossil fuel investments would have no or even negative GHG emissions. Perhaps in part because of federal agencies' lack of familiarity with the subject, federal courts have overturned NEPA reviews based on arbitrary climate analyses stemming from flawed consideration of substitution effects from the Bureau of Land Management,[19] Office of Surface Mining Control Reclamation and Enforcement,[20] Bureau of Ocean Energy Management,[21] U.S. Forest Service,[22] Federal Energy Regulatory Commission,[23] and Surface Transportation Board.[24] Plainly, there is a need for greater clarity from CEQ on this subject.

In short, substitution analysis as practiced by most agencies today is fraught with error, undermines the central goal of NEPA to present a clear picture of GHG emissions, and is an obvious litigation risk for agencies. While CEQ's Interim Guidance provides a useful starting point for agencies analyzing climate and market substitution effects, it is critical that the final guidance provide additional specificity and limits to agencies in order to provide the most useful, instructive guidance for future NEPA reviews. We ask CEQ to incorporate the following principles and examples in its final guidance.

>    *1. Substitution modeling should never assume fixed market demand for fossil fuels.*

CEQ's final guidance should instruct agencies that market analyses in NEPA reviews must acknowledge: (a) that energy proposals and policies may affect levels of consumption and (b) that agencies must not treat demand for commodities such as coal, oil, and gas as fixed. In 2003 the Eighth Circuit rejected the notion of fixed coal demand

---

discussed further below, some of the models have deep flaws—for example, by assuming constant demand for fossil fuels for many decades, in contravention to both U.S. and global policies as well as the facts on the ground.

[19] *WildEarth Guardians v. BLM*, 870 F.3d 1222, 1236 (10th Cir. 2017).

[20] *Montana Environmental Information Center v. OSM*, 274 F.Supp.3d 1074, 1098 (D. Mont. 2017).

[21] *Center for Biological Diversity v. Bernhardt*, 982 F.3d 723, 736 (9th Cir. 2020).

[22] *High Country Conservation Advocs. v. U.S. Forest Serv.*, 52 F. Supp. 3d 1174, 1197–98 (D. Colo. 2014).

[23] *Sierra Club v. Fed. Energy Regulatory Comm'n*, 867 F.3d 1357, 1375 (D.C. Cir. 2017).

[24] *Mid-States Coalition for Progress v. Surface Transp. Bd.*, 345 F.3d 520, 549 (8th Cir. 2003).

in analyzing a Surface Transportation Board's analysis of a proposed coal rail line, concluding that "the proposition that the demand for coal will be unaffected by an increase in the availability … is illogical at best."[25] Even where agencies do not fully rely on perfect substitution, their analyses have implausibly assumed that economic demand for a specific commodity, such as coal, oil, or gas, will remain unchanged in the face of new supply.[26] More than one commentator has noted that BOEM's MarketSim model "assumes near constant oil and gas demand domestically for up to 70 years into the future."[27] These assumptions are squarely at odds with the facts and with our climate goals: plainly, both the nation and the world need to be – and are – moving aggressively away from fossil fuels in the years ahead and agencies cannot simply project today's fuels uses over decades to make useful predictions. Indeed, it is the comparison of project emissions to this unrealistic future that lays at the heart of misleading conclusions that major fossil fuel projects will have no climate impacts.

Analyzing substitution effects is a complicated exercise that is particularly challenging when fossil fuel projects impact both domestic and international markets. CEQ's final guidance should follow instructive D.C. Circuit case law rejecting agency attempts to dodge meaningful analysis based on vague statements related to market substitution. In its NEPA review for the Sabal Trail gas pipeline, the Federal Energy Regulatory Commission ("FERC")'s assessment of market impacts was that the project's GHG emissions "might be partially offset" by the market replacing the project's gas with either coal or other gas supply.[28] The D.C. Circuit rejected FERC's failure to study this issue, stating, "[a]n agency decision maker reviewing this EIS would thus have no way of knowing whether total emissions, on net, will be reduced or increased by this project, or what the degree of reduction or increase will be. In this respect, then, the EIS fails to fulfill its primary purpose."[29] *Id.* CEQ's final guidance should make clear that similarly vague assertions of market effects are insufficient where modeling tools would allow the agency to provide the public and decisionmakers with a more informed understanding of a project's climate impact.

Moreover, this principle applies to both domestic and international consumption of fossil fuels that agencies should account for in their market and climate analyses. As the Ninth Circuit has made clear, despite modeling uncertainties, agencies must attempt to account for all reasonably foreseeable market changes, including changes internationally. CEQ's final guidance should make this obligation clear to agencies. In analyzing the effects of the Liberty oil and gas drilling project, the Bureau of Ocean Energy Management ("BOEM") concluded initially that the no action alternative – rejecting the Liberty project

---

[25] *Mid-States Coalition for Progress v. Surface Transp. Bd.*, 345 F.3d 520, 549 (8th Cir. 2003).

[26] Peter Howard and Max Sarinsky, *Best Practices for Energy Substitution Analysis*, Institute for Policy Integrity, at 3 (Dec. 2022).

[27] Jan Hasselman and Peter Erickson, *NEPA Review of Fossil Fuel Projects – Principles for Applying a "Climate Test" for New Production and Infrastructure* (2022); Howard & Sarinsky, supra note 23, at 5 (noting EIA's reference case baseline "assumes near-constant demand for oil and gas for the next 70 years.").

[28] *Sierra Club v. Fed. Energy Regulatory Comm'n*, 867 F.3d 1357, 1375 (D.C. Cir. 2017).

[29] *Id.*

– would, counterintuitively, increase greenhouse gas emissions by shifting production to foreign sources with comparatively weaker environmental protections.[30] But BOEM's model assumed "foreign consumption of oil will remain static" were the Liberty project approved; crucially, this assumption ignored "basic economic principles" that are key to understanding climate impacts. As the Ninth Circuit explained, increasing the supply of fossil fuels such as oil (*i.e.*, approving the Liberty project) reduces prices; as price drops, foreign consumers will buy and consume more oil. *Id.* Thus, the Court concluded, emissions from predictable market responses, whether domestic or foreign, "are surely a 'reasonably foreseeable' indirect effect" that must be analyzed and disclosed under NEPA.[31] *Id.*

Finally, as CEQ notes, some agencies have engaged in substitution analysis and modeling for many years. Others, like the Bureau of Land Management ("BLM"), spent years relying on the myth of perfect substitution in its NEPA reviews for coal mines and other fossil fuel related projects. While courts have roundly rejected perfect substitution assumptions[32] and CEQ appropriately instructs agencies not to rely on perfect substitution, additional instruction would assist agency analyses that need to quit utilizing their flawed approaches to market and climate analysis. Specifically, when agencies that formerly relied on perfect substitution to discount the climate impacts of their choices now engage in substitution modeling, they must acknowledge the change in agency practice and explain why the prior approach was wrong.[33] This is particularly important where project proponents in the fossil fuel industry still cling to perfect substitution while advancing their proposals. Unless agencies that formerly relied on perfect substitution acknowledge and address the issue head on in their NEPA reviews, those reviews may be vulnerable to industry challenges under the Administrative Procedure Act. In the final guidance, CEQ should include a reminder to federal agencies that they must explain departures from prior agency positions, including misguided assertions of perfect substitution.

CEQ should provide additional instruction to agencies on these points, as set out below. Doing so will improve agency analyses, foster more informed decisions, and reduce the likelihood of litigation. CEQ's final guidance should instruct agencies not to treat demand for fossil fuels as a fixed commodity, to take foreign consumption into account

---

[30] *Center for Biological Diversity v. Bernhardt*, 982 F.3d 723, 736 (9th Cir. 2020).
[31] *Id.*
[32] *E.g.*, *WildEarth Guardians v. BLM*, 870 F.3d 1222, 1236 (10th Cir. 2017); *Montana Environmental Information Center v. OSM*, 274 F.Supp.3d 1074, 1098 (D. Mont. 2017); *High Country Conservation Advocs. v. U.S. Forest Serv.*, 52 F. Supp. 3d 1174, 1197–98 (D. Colo. 2014).
[33] *W. Deptford Energy, LLC v. FERC*, 766 F.3d 10, 17 (D.C. Cir. 2014) (agencies "cannot depart from [prior] rulings without provid[ing] a reasoned analysis indicating that prior policies and standards are being deliberately changed, not casually ignored"); *Wis. Valley Improvement v. FERC*, 236 F.3d 738, 748 (D.C. Cir. 2001) ("an agency acts arbitrarily and capriciously when it abruptly departs from a position it previously held without satisfactorily explaining its reason for doing so").

8

where applicable, and to acknowledge where the agency's substitution analysis departs from past reliance on perfect substitution.

> *2. No action / baseline comparisons should align with international climate commitments and state and national climate policies rather than presume continued reliance on fossil fuels decades into the future.*

In addition to directing agencies to analyze changes to market demand as a result of agency decisions that open up additional supply of fossil fuels, the final guidance should amplify the importance of the requirement for agencies to consider long-term changes to fossil fuel consumption anticipated to be occasioned by state, federal, and international policies as part of their substitution analysis. Assuming a future reliant on fossil fuels— often done as part of a no action alternative in NEPA reviews—can lead to skewed climate analysis by making it appear that a proposed fossil fuel project will primarily displace other fossil fuel sources over the coming decades and thus have an insignificant climate impact.  By contrast, in a future energy market comprised primarily of renewable resources, a proposed fossil fuel project would be more likely to compete for market-share against wind, solar, or geothermal projects with far fewer GHG emissions.  Thus, an agency's projections about the future energy market in which a project would operate years or decades into the future can affect its assessment of the difference in GHG emissions between the action and no action alternatives under consideration.

CEQ's final guidance should more clearly instruct agencies to adopt an approach to future energy markets that more clearly reflects an anticipated trajectory toward meeting climate goals when comparing action and no action alternatives, consistent with other aspects of the Interim Guidance. Elsewhere, the Interim Guidance instructs agencies to "discuss whether and to what extent the proposal's reasonably foreseeable GHG emissions are consistent with GHG reduction goals, such as those reflected in the U.S. nationally determined contribution under the Paris Agreement."[34] Toward the end of the Interim Guidance's discussion of substitution effects, CEQ notes that "analysis generally should be complemented with evaluation that compares the proposed action's and reasonable alternatives' energy use against scenarios or energy use trends that are consistent with achieving science-based GHG reduction goals, such as those pursued in the *Long-Term Strategy of the United States.*"[35] If followed, this recommendation would significantly improve GHG accounting analysis, but risks being overlooked without a fuller description and more specific instruction from CEQ.

---

[34] 88 Fed. Reg. at 1203.
[35] *Id.* at 1205.

Current U.S. climate policy commits the U.S. to reduce GHGs by 50-52% below 2005 levels by 2030.[36] President Biden further set national goals to "achieve a carbon pollution-free electricity sector by 2035 and net-zero emissions economy-wide by no later than 2050."[37] As it does regarding contextualizing climate impacts, CEQ should similarly instruct agencies to incorporate U.S. climate commitments as part of comparing climate impacts across alternatives. Specifically, CEQ should direct agencies to incorporate U.S. climate commitments and decarbonization pathways as part of the <u>no action alternative baselines</u> instead of assuming long-term reliance on fossil fuels. Unless CEQ instructs agencies to correct this approach in future NEPA reviews, many agencies will continue to provide decisionmakers and the public with a misleading comparison of the climate impacts of action and no action alternatives. When assuming fossil fuel reliance decades into the future, the frequent agency conclusion is that a proposed fossil fuel project will primarily substitute for other fossil fuels instead of renewables, thus minimizing a project's climate impact, when a comparison to a Paris-compliant future would reveal significantly larger net GHG emissions.

The recent Final EIS for the Department of Interior leases sales in the Gulf of Mexico[38] reveals how critical this step would be useful NEPA analysis. In that EIS, Interior estimated that the lease sale will generate 1.13 billion barrels of oil over several decades, generating truly massive amounts of GHG emissions over its full lifecycle. The agency then concluded that the net impact of the sale to GHG emissions was minimal by concluding that other sources of oil—some of which would have slightly higher emissions—would be used, enabling the agency to conclude that the net impact is marginal. That analysis does not incorporate the U.S. Paris Agreement commitment, or any other policy commitment, to reduce oil use. Instead, it implicitly assumes that the U.S. and every other nation will ignore those commitments and continue to produce and consume oil at the same rate it does today. If the analysis was done correctly—by comparing project emissions to a baseline that is in line with policy commitments and the science that motivated them—it would reveal the project to be a massive source of GHG emissions. The NEPA process should provide such clarity, so that decisionmakers and the public can make substantive decisions in light of the facts.

The same is true in the context of state and local policies calling for rapid phaseouts of fossil fuel uses and deep reductions in GHG emissions. Again, an example may be

---

[36] White House, "FACT SHEET: President Biden Sets 2030 Greenhouse Gas Pollution Reduction Target Aimed at Creating Good-Paying Union Jobs and Securing U.S. Leadership on Clean Energy Technologies," (April 22, 2001), available at https://www.whitehouse.gov/briefing-room/statements-releases/2021/04/22/fact-sheet-president-biden-sets-2030-greenhouse-gas-pollution-reduction-target-aimed-at-creating-good-paying-union-jobs-and-securing-u-s-leadership-on-clean-energy-technologies/.

[37] Executive Order 14057, "Catalyzing Clean Energy Industries and Jobs Through Federal Sustainability" (Dec. 8, 2021), available at https://www.federalregister.gov/documents/2021/12/13/2021-27114/catalyzing-clean-energy-industries-and-jobs-through-federal-sustainability.

[38] Available at https://www.boem.gov/oil-gas-energy/gulf-mexico-lease-sales-259-and-261-supplemental-environmental-impact-statement.

instructive.  FERC is currently considering a proposal to significantly expand the capacity of a fossil gas pipeline (GTN Express) that carries gas from British Columbia to Washington, Oregon, and California. All three states have adopted aggressive decarbonization targets that will require drastically reducing if not eliminating the use of fossil gas. Even so, and over the heated opposition of the states themselves, FERC's Final EIS for the expansion assumes gas demand is fixed in these states, failing to even mention the conflict between the proposal and the states' climate policies or those of the federal government. Again, the result is an EIS that concludes that emissions will be inconsequential. Such an outcome undermines a key purpose of NEPA—to fully analyze and disclose a project's consistency with existing laws, international commitments, and treaty obligations.

The U.S. has made international commitments to reduce GHG emissions in line with the recommendations from the world's leading scientific bodies. CEQ rightfully instructs agencies to evaluate whether their proposed fossil fuel projects are inconsistent with national climate targets. CEQ should go further in its final guidance to clearly instruct agencies that when using a substitution analysis, the agencies should compare emissions across alternatives by using modeling that reflects the U.S. commitments to reduce GHG emissions.  The final guidance should direct agencies not to base this comparison on an assumption that that historical uses will continue into the future.

### 3. *Modeling assumptions and uncertainties must be clearly disclosed.*

Substitution analysis is a complex undertaking fraught with uncertainty and marginal changes in assumptions used for such analysis can have consequential impacts on the outcome. It is not that complicated for agencies to identify reasonably foreseeable direct and indirect GHG emissions associated with the extraction, transportation, and combustion of fossil fuels. By contrast, there is far more uncertainty when agencies model market effects under a "no action" scenario, both domestic and international, years or decades into the future.

To address this situation, we urge CEQ to adopt two clear standards. First, agencies should fully disclose the uncertainties inherent in their substitution analyses. These analyses cannot compare the relatively straightforward calculation of project GHGs to a speculative guess of hypothetical emissions under the no action alternative. Yet this is what currently happens today in most cases:  the comparison of project emissions and no action alternatives are presented as equivalent, leading to overly confident predictions of net impacts that are often marginal or negative.

Second, to avoid a "black box" scenario, where the public has no ability to test an agency's analysis based on proprietary models, agencies should make assumptions, inputs, and modeling codes publicly available no later than when the NEPA document is released to the public. Agencies should disclose any uncertainty in those modeling runs, including by discussing the extent to which the model outputs are susceptible to manipulation based on different inputs and assumptions. Where modeling results point to a range of potential outcomes, agencies should disclose those ranges and discuss their assessments of the likelihood of potential outcomes.

CEQ makes this clear in discussing other aspects of climate analysis, stating, "[q]uantification should include the reasonably foreseeable direct and indirect GHG emissions …. Agencies also should disclose the information and any assumptions used in the analysis and explain any uncertainty."[39] While that is certainly true for the relatively straight-forward exercise of quantifying GHG emissions, it is also true for the more complicated market substitution analysis. Agencies should not present their reasonably certain estimates of GHG emissions on an equal footing with long-term, less certain, market forecasting that essentially discounts those emissions to the public and decisionmakers.[40]

> ### 4. Substitution analysis must be applied to project benefits in the same manner it is applied to climate impacts.

Agencies frequently use substitution to discount GHG emissions when discussing the environmental impacts of a proposal, but almost never to discount purported project benefits using the same logic. This asymmetry inflates project benefits (such as taxes, state and federal royalties, jobs, indirect employment, etc.) while lessening the perception of costs by asserting that if coal, oil, or gas doesn't come out of the ground in this project, the same or nearly the same amount will come from another source. But there's typically no logical distinction that would justify such dissimilar approaches to impacts and benefits for fossil fuel proposals. As BLM explained in its 2017 federal coal program PEIS scoping report, "[t]he environmental (including climate change) *and economic impacts* of reform alternatives depend, in large part, on the estimated substitution effects."[41]

Courts have long recognized that agencies may not provide misleading analysis by inflating benefits and obscuring or minimizing costs.[42] In providing agencies with guidance on effective substitution analysis, CEQ should specifically instruct agencies to ensure substitution is applied equally to climate harms and purported economic benefits.

> ### 5. Explicitly call out and discuss infrastructure "lock-in" of new fossil projects.

While a GHG analysis that looks at fossil fuel emissions from fossil infrastructure projects is an important component of a NEPA analysis, it does not tell the whole story.

---

[39] NEPA Guidance on Consideration of Greenhouse Gas Emissions and Climate Change, 88 Fed. Reg. at 1204.

[40] Hasselman and Erickson, *supra*, note 25 at 4.

[41] BLM, PEIS Coal Scoping Report at 6-48 (Jan. 2017) (emphasis added).

[42] *E.g.*, *Ctr. for Biological Diversity v. NHTSA*, 538 F.3d 1172, 1198 (9th Cir. 2008) (finding analysis arbitrary and capricious where agency "put a thumb on the scale" through inconsistent treatment of costs and benefits). *Accord Utah Physicians for a Healthy Env't v. BLM*, 528 F.Supp.3d 1222, 1232 (D. Utah 2021) ("The socioeconomics section may not lay out the economic benefits from the proposal without analyzing the socioeconomic costs of GHGs together with climate change.")

Agencies must also consider the extent to which construction of new fossil fuel infrastructure "locks in" long-term emissions and creates an affirmative barrier to decarbonization efforts.[43] Privately financed infrastructure projects costing hundreds of millions if not billions of dollars will result in extraordinary pressure to continue using that infrastructure for many decades—well past the time when fossil fuel uses must be all but eliminated to ensure warming remains below thresholds set in international agreements—and beyond which catastrophic consequences are likely to accelerate and become irreversible. And other private actors make their own investment decisions based on the existence of such infrastructure, much like the construction of a new crude oil pipeline both spurs new development projects as well as other feeder pipelines relying on that new infrastructure.

Moreover, a project that "locks in" fossil fuels also "locks out" low carbon alternatives, "either because it uses up finite capital or to the extent that it contributes to social or political norms, building in redundancy of supply that helps to increase investor confidence in the long-term prospects of that fuel, or contributes to economies of scale for fossil fuel processing technologies."[44] Other useful questions for the agency to ask may include whether the project could be repurposed at some point for low-GHG alternatives, and at what cost. These are crucial considerations that must be disclosed in a NEPA analysis.

In short, a useful climate analysis for major infrastructure projects must go further than just disclosing lifecycle emissions. Instead, agencies should assess the extent to which the project will create pressures to continue operations for decades and/or generate other investments that promote fossil fuel use, or risk becoming a stranded asset. In its final guidance CEQ should instruct agencies to disclose the risk of "locking in" GHG emissions and investments associated with fossil fuel infrastructure projects as part of their NEPA analyses.

## CUMULATIVE EFFECTS

### CEQ's Final Guidance Should Provide Information About Appropriate Methodology to Address Cumulative Effects Requirements.

The very short discussion of cumulative impacts in the interim guidance falls short of what the science and the law require, and falls short of providing useful guidance to implementing agencies. Cumulative effects analysis that reflects reality is essential to useful NEPA analyses. Climate change is the quintessential impact that must be evaluated in an agency's cumulative impacts analysis:

> The large-scale nature of environmental issues like climate change show why cumulative impacts analysis proves vital to the overall NEPA

---

[43] Hasselman & Erickson, *supra*, note 25 at 13.
[44] Peter Erickson, Assessing the Greenhouse Gas Emissions Impact of New Fossil Fuel Infrastructure, Stockholm Env't Inst. (2013).

analysis. The cumulative impacts analysis was designed precisely to determine whether a small amount here, a small amount there, and still more at another point could add up to something with a much greater impact . . . . Thus, if BLM ever hopes to determine the true impact of its projects on climate change, it can do so only by looking at projects in combination with each other, not simply in the context of state and nation-wide emissions. Without doing so, the relevant decisionmaker cannot determine whether, or how, to alter the program to lessen cumulative impacts on climate change.[45]

CEQ explains in the Interim Guidance that:

the analysis and public disclosure of cumulative effects can be accomplished by quantifying GHG emissions and providing context for understanding their effects as discussed above, including by monetizing climate damages using estimates of the SC-GHG, placing those damages in the context of relevant climate action goals and commitments, and summarizing and citing to available scientific literature to help explain real world effects.[46]

While this guidance is a good starting point, practically it suggests to the reader that a cumulative impacts analysis is essentially fulfilled by putting the analyses of indirect and direct effects in context and requires nothing more.[47] The position that a robust cumulative effects analysis of the incremental impacts resulting from additional GHG emissions is not required because climate change is inherently a cumulative phenomenon is circular and falls short of NEPA's hard look requirement.[48] The final guidance should provide additional information to assist agencies in developing the appropriate level of cumulative effects analysis, especially more robust guidance on the methods by which to contextualize impacts to determine the significance of GHG emissions from a proposed action.[49]

---

[45] *Wildearth Guardians v. U.S. Bureau of Land Mgt.*, 457 F. Supp. 3d 880, 894 (D. Mont. 2020) (internal quotations and citations omitted).

[46] 88 Fed. Reg. 1206.

[47] While the cumulative effects language in the 2023 Interim Guidance is more in line with relevant climate science and case law than the 2016 Interim Guidance (*see* section A.5), essentially the two say the same thing: that a robust cumulative emissions and climate impacts analysis is not required by NEPA, "[g]iven that climate change is the result of the increased global accumulation of GHGs climate effects analysis is inherently cumulative in nature." 88 Fed. Reg. 1206.

[48] *See, e.g.*, *Ctr. for Biological Diversity v. Nat'l Hwy. Safety Admin.*, 538 F.3d 1172, 1217 (9th Cir. 2008)("[T]he fact that climate change is largely a global phenomenon that includes actions that are outside of the agency's control does not release the agency from the duty of assessing the effects of its actions on global warming within the context of other actions that also affect global warming.")

[49] *See*, *Diné Citizens Against Ruining Our Env. v. Haaland*, 59 F.4th 1016, 1042 (10th Cir. 2023) ("if an accurate method exists to determine the effect of the proposed action, BLM must perform that analysis or explain why it has not.") (citing *WildEarth Guardians v. Bernhardt*, 502 F. Supp.

14

Mere quantification of emissions "does not evaluate the incremental impact that these emissions will have on climate change or on the environment."[50] "Indeed, all agency actions causing an increase in GHG emissions will appear de minimis when compared to the regional, national, and global numbers."[51]

For actions "with *relatively large* GHG emissions or reductions or that will perpetuate reliance on GHG-emitting energy sources," CEQ advises agencies to explain how the proposed action and alternatives would "help meet or detract from achieving relevant climate action goals and commitments."[52] However, the Interim Guidance provides no basis on which to judge whether GHG emissions are relatively large or small, and no justification for this distinction in light of the fact that climate change is quintessentially a problem of cumulative additions, even the largest of which appears small on a global scale. On the one hand, CEQ acknowledges, as it must, that "diverse individual sources of emissions each make a relatively small addition to the global atmospheric GHG concentration that *collectively have a large effe*ct" which is "the nature of climate change itself."[53] On the other hand, CEQ advises that "actions *with only small* GHG emissions may be able to rely on less detailed emissions estimates."[54] Agencies could better reconcile these statements with useful analysis if CEQ provided more guidance on how to evaluate the level of analysis needed for projects with differing levels of GHG emissions. The final guidance should direct agencies to prevent segmentation of cumulatively large impacts and should provide additional information to assist agencies in developing the appropriate level of cumulative effects analysis, especially more robust guidance on the methods by which to contextualize impacts, in order to determine the significance of GHG emissions from a proposed action. We recommend that some specific examples interpreting the "rule of reason" be included in the final guidance.

As one example to illustrate why more is needed in the Interim Guidance to address cumulative effects analysis and significance evaluation, we point out that in recent U.S. Bureau of Land Management onshore oil and gas lease sales, the agency regularly and arbitrarily, and contrary to NEPA, fails to consider the effects – including those related to climate and GHG emissions as well other impacts, such as those to wildlife habitat, water pollution, impacts to recreation, socioeconomic impacts, public health impacts, and environmental justice impacts – of the lease sales when added to the effects of other lease sales, despite the lease sales being part of a national oil and gas leasing program across

---

3d 237, 255 (D.D.C. 2020) ("BLM either had to explain why using a carbon budget analysis would not contribute to informed decisionmaking, in response to WildEarth's comments, or conduct an 'accurate scientific analysis' of the carbon budget.") (quoting 40 C.F.R. § 1500.1(b)); *350 Montana v. Haaland*, 50 F.4th 1254, 1273 (9th Cir. 2022) (recognizing the requirement of using "science-based criteria" for determining "significance [of GHG emissions] in terms of contribution to global warming that is grounded in the record and available scientific evidence.")
[50] *Ctr. For Biological Diversity v. Nat'l Highway Traffic Safety Admin.*, 538 F.3d. 1172, 1216 (9th Cir. 2008).
[51] 88 Fed. Reg. 1201, *Diné CARE,* 59 F.4th at 1043.
[52] 88 Fed. Reg. 1203 (emphasis added).
[53] *Id*. (emphasis added).
[54] *Id*. at 1202 (emphasis added).

multiple states. The failure to properly evaluate cumulative effects results in the agency finding no significant effects, thereby masking the severity of the adverse effects.

**ENVIRONMENTAL JUSTICE**

<u>Our Organizations Urge that the Final Guidance Include More Detailed Direction Regarding the Need for Agencies to Significantly Improve the Analysis of Alternatives, Effects and Decisionmaking on Environmental Justice Communities and their Involvement in the Process.</u>

The federal government's efforts to address current and historic environmental injustice through decisionmaking that addresses these historic and current severe impacts are crucial and integral to NEPA. NEPA should be seen as a bridge, not a barrier, to ensuring that: (1) we build out the clean energy infrastructure of the future in a just, equitable, sustainable, and timely way; and (2) we increase, not decrease, community resilience to climate change.  As such, cumulative impacts and efforts to address them must include a broad range of strategic, scientific, technological, regulatory, community engagement, and economic issues related to environmental justice.  The final guidance should redirect agencies to comply with existing CEQ Guidance on Environmental Justice Under NEPA[55] by a) considering the composition of the affected area to identify potentially affected tribal, minority or low-income communities; b) analyzing relevant public health and other available credible scientific information concerning the potential for cumulative exposure to affected communities health; c) recognizing the past and present interrelated cultural, social, occupational, historical and economic factors that may amplify the reasonably foreseeable future cumulative effects on the community and the surrounding environment; d) implement effective participation strategies in concert with the affected communities, including appropriate tribal representation and government to government consultation with tribal nations.[56]

Agencies should also be reminded of the requirement to respond to comments regarding environmental justice concerns by either modifying alternatives or analysis to respond to the comment or explaining why the comments do not warrant agency response.[57]  The final guidance should also direct agencies to explain how the agency considered and incorporated environmental justice concerns into its final decision on the proposed action.[58]

> *1. The requirement to assess health effects should be emphasized in the final guidance.*

In particular, in the climate context, we emphasize that agencies should be explicitly directed to include health effects in the NEPA analysis, as long

---

[55] https://ceq.doe.gov/docs/ceq-regulations-and-guidance/regs/ej/justice.pdf
[56] https://www.whitehouse.gov/briefing-room/presidential-actions/2022/11/30/memorandum-on-uniform-standards-for-tribal-consultation/
[57] 40 CFR § 1503.4
[58] 40 CFR § 1505.2(a).

required.[59] As the National Research Council Report notes, agencies "often lack public health expertise, and the lack of guidance may be a disincentive to a more robust, systematic approach to health."[60]  As the Pan American Health Organization has stated, "Climate change is the biggest global health threat of the 21st century. Health is and will be affected by the changing climate through direct impacts (heat waves, droughts, heavy storms, and sea-level rise), and indirect impacts (vector-borne and airways diseases, food and water insecurity, undernutrition, and forced displacements)."[61]  As numerous studies, including government studies, have shown, it is the environmental justice communities in the U.S. that are the most significantly affected by climate-related health effects.[62] Focusing increased attention on these communities is critically important for many reasons; indeed, as the IPCC's latest report states, "Adaptation and mitigation actions that prioritize equity, social justice, climate justice, rights-based approaches, and inclusivity, lead to more sustainable outcomes, reduce trade-offs, support transformative change and advance climate resilient development."[63]

Health impact assessment, a methodology modeled after environmental impact assessment, has been broadly accepted by institutions such as the National Research Council[64] and the Center for Disease Control.[65]  In the NEPA context, agencies need to:

      i.      Determine when to conduct a systematic analysis of health effects in an EIS <u>or</u> an EA;

      ii.     Determine what populations or communities are affected and describe baseline conditions in them;

      iii.    Determine the appropriate scope of health problems in close consultation with the affected communities and public health experts;

      iv.    Provide analysis of health effects in a scientifically and legally defensible manner; and

---

[59] 40 CFR  §1508.1(g).

[60] *Id.*

[61] PAHO, Climate Change and Health, https://www.paho.org/en/topics/climate-change-and-health.

[62] EPA. 2021. Climate Change and Social Vulnerability in the United States: A Focus on Six Impacts. U.S. Environmental Protection Agency, EPA 430-R-21-003; *Climate Changes Health: Ensuring Environmental Justice Underlies Public Health's Climate Change Work, A Summit's Proceeding Report*, August, 2018, available at https://graham.umich.edu/media/files/APHA-Climate-Justice-Summit-Proceedings-2018.pdf

[63] IPCC Synthesis Report, Summary for Policymakers, C.5.2. (March 2023).

[64] National Research Council. 2011. *Improving Health in the United States: The Role of Health Impact Assessment*. Washington, DC: The National Academies Press. https://doi.org/10.17226/13229.

[65] https://www.cdc.gov/healthyplaces/hia.htm

17

> v.     Identify appropriate mitigation measures for any identified
> effects on public health.[66]

> *2. The concerns of and impacts on environmental justice communities must be at
> the forefront of cumulative effects analysis of proposed climate mitigation
> measures, including carbon capture proposals.*

Environmental justice analysis integrated into the NEPA process must cover the broad
spectrum of effects potentially realized by these communities in all contexts, including
proposed climate mitigation measures.  Importantly, existing and proposed carbon
capture, utilization and sequestration activities (CCUS) disproportionately occur in
proximity to vulnerable communities since that is where many fossil fuel extraction,
transportation and processing facilities were constructed.  Our organizations urge CEQ to
direct agencies to incorporate co-pollutant modeling into cumulative effects analysis for
all such proposed actions.

## EVALUATING SIGNIFICANCE

While Retaining the Direction on the Social Cost of Carbon, the Final Guidance Should
Include Additional Direction Regarding the Evaluation of the Magnitude and Severity of
Climate Impacts of the Proposed Action and Alternatives.

> *1. The guidance properly recognizes the importance of providing monetized
> estimates for climate impacts using the social cost of greenhouse gases.*

CEQ appropriately recommends that agencies should apply the best available SC-GHG
estimates to emissions, even when other costs and benefits are not monetized.[67]  The SC-
GHG provides critical context for the significance of climate impacts.  Furthermore, while
NEPA does not require an analysis that fully monetizes costs and benefits associated with
an action, in instances where an agency has monetized the benefits associated with an
action and can reasonably quantify GHG emissions increases, courts have determined
that the agency must include a monetized estimate of the climate impacts of an action
using the best available SC-GHG.[68]

---

[66] *Improving Health in the United States*, Appendix F, "Analysis of Health Effects under the
National Environmental Policy Act."
[67] 88 Fed. Reg. 1202.
[68] *See, e.g.*, *California v. Bernhardt*, 472 F. Supp. 3d 573, 623 (N.D. Cal. 2020) ("It is arbitrary
for an agency to quantify an action's benefits while ignoring its costs where tools exist to
calculate those costs."), *High Country Conservation Advocates v. United States Forest Serv.*, 52
F. Supp. 3d 1174, 1191 (D. Colo. 2014) ("arbitrary and capricious to quantify the *benefits* of
[agency action] and then explain that a similar analysis of the *costs* was impossible when such an
analysis was in fact possible"),
*Mont. Envtl. Info. Ctr. v. United States Office of Surface Mining*, 274 F. Supp. 3d 1074, 1098 (D.
Mont. 2017) (similar), *Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin.*, 538
F.3d 1172, 1200, 1214 (9th Cir. 2008) (holding that NEPA requires an agency to analyze the
effects of its actions on global climate change and cannot assign a cost of zero to emissions).

We strongly support the Interim Guidance's recommendations on the monetization of climate damages through the use of the SC-GHG, placing those costs in the context of relevant climate goals and commitments, and summarizing available scientific literature to document real-world effects from GHG emissions. Yet, while these steps are all useful in contextualizing a project's GHG emissions, in most respects, applying these tools in isolation with no standard or threshold by which to measure their significance does not "properly evaluate the severity of the adverse effects" from the quantified GHG emissions in order to fully inform the decisionmaker and the public about the climate impacts of a proposed project.[69]

   *2. The final guidance should include direction on utilizing the carbon budget tool to evaluate the magnitude and severity of GHG emissions and resulting climate impacts.*

In addition to recommendations on monetizing climate impacts using the SC-GHG estimates, we request that the final guidance include an additional accepted methodology available for analyzing the magnitude and severity of GHG emissions: the application of those emissions to the remaining global carbon budget. The carbon budget represents a cap on the remaining stock of GHGs that can be emitted while still keeping global average temperature rise below scientifically-established warming thresholds—beyond which climate change impacts may result in catastrophic and irreparable harm to the biosphere and humanity. The use of a carbon budget is essential for evaluating whether a given project would help meet or detract from achieving climate goals, and for analyzing the scope of such help or hindrance.

The Tenth Circuit Court of Appeals recently described the carbon budget as an accepted methodology "deriv[ing] from science suggesting the total amount of GHGs that are emitted is the key factor to determine how much global warming occurs. The carbon budget is a finite amount of total GHGs that may be emitted worldwide, without exceeding acceptable levels of global warming."[70] The court held that BLM violated the law by failing to consider the impacts of projected GHG emissions from new oil and gas well drilling approvals because it "neither applied the carbon budget method nor explained why it did not."[71]

The 2023 Interim Guidance recommends that agencies should place GHG emissions "in the context of relevant climate action goals and commitments including Federal goals, international agreements, state or regional goals, Tribal goals, agency-specific goals, or others as appropriate."[72] Perhaps the most relevant climate action commitment for

---

[69] *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 352 (1989)

[70] *Diné CARE.*, 59 F.4th at 1043.

[71] *Id.* ("NEPA does not give BLM the discretion to ignore the impacts to the environment when there are methods for analyzing those impacts. So, while it is correct that BLM need not use any specific methodology, it is not free to omit the analysis of environmental effects entirely when an accepted methodology exists to quantify the impact of GHG emissions from the approved APDs.")

[72] 88 Fed. Reg. at 1203.

purposes of CEQ's guidance is the United States' commitment to the climate change target of holding the long-term global average temperature "to well below 2 degrees Celsius above pre-industrial levels and to pursue efforts to limit the temperature increase to 1.5 $CO_2$ above pre-industrial levels" under the Paris Agreement.[73] The Paris Agreement established the $CO_2$ climate target given the evidence that two degrees of warming would lead to catastrophic climate harms.[74] Scientific research has estimated the global carbon budget—the remaining amount of carbon dioxide that can be emitted—for maintaining a likely chance of meeting the Paris climate targets, providing clear benchmarks for the United States and global climate action.[75]  It should also be noted that the U.S. is a signatory to the Global Methane Pledge, which is "a collective effort to reduce global methane emissions at least 30 percent from 2020 levels by 2030," and the Global Methane Pledge Energy Pathway, which aims to capture the maximum potential of cost-effective methane mitigation in the oil and gas sector and eliminate routine flaring as soon as possible, and no later than 2030.[76]

Immediate and aggressive greenhouse gas emissions reductions are necessary to keep warming well below a 2 degree Celsius rise above pre-industrial levels. The IPCC Fifth Assessment Report and other expert assessments have established global carbon budgets, or the total amount of carbon that can be burned while maintaining some probability of staying below a given temperature target.[77] Most recently, the IPCC Sixth Assessment Report estimated the carbon budget for a 67 percent probability of limiting temperature rise to 1.5°C at just 400 $GtCO_2$ from the beginning of 2020 and at 500 $GtCO_2$ for a 50

---

[73] United Nations Framework Convention on Climate Change, Conference of the Parties (Nov. 30-Dec. 11, 2015), Adoption of the Paris Agreement Art. 2, U.N. Doc. FCCC/CP/2015/L.9 (Dec. 12, 2015), available at: http://unfccc.int/resource/docs/2015/cop21/eng/l09.pdf ("Paris Agreement"). The United States signed the Paris Agreement on April 22, 2016 as a legally binding instrument through executive agreement, and the treaty entered into force on November 4, 2016.

[74] IPCC, Global Warming of 1.5°C, an IPCC special report on the impacts of global warming of 1.5°C above pre-industrial levels and related global greenhouse gas emission pathways, in the context of strengthening the global response to the threat of climate change, sustainable development, and efforts to eradicate poverty (Oct. 6, 2018), available at: http://www.ipcc.ch/report/sr15/.

[75] Id.

[76] https://www.globalmethanepledge.org/  https://www.state.gov/u-s-eu-joint-press-release-on-the-global-methane-pledge-energy-pathway/

[77] For example, the 2013 IPCC Fifth Assessment Report estimated that total cumulative anthropogenic emissions of $CO_2$ must remain below about 1,000 $GtCO_2$ from 2011 onward for a 66 percent probability of limiting warming to 2°C above pre-industrial levels, and to 400 $GtCO_2$ from 2011 onward for a 66 percent probability of limiting warming to 1.5°C. See IPCC [Intergovernmental Panel on Climate Change], 2013: Summary for Policymakers. In: *Climate Change 2013: The Physical Science Basis, Contribution of Working Group I to the Fifth Assessment Report of the Intergovernmental Panel on Climate Change* [Stocker, T.F. et al. (eds.), Cambridge University Press (2013) at 25; IPCC [Intergovernmental Panel on Climate Change], *Climate Change 2014: Synthesis Report. Contribution of Working Groups I, II and III to the Fifth Assessment Report of the Intergovernmental Panel on Climate Change*, [Core Writing Team, R.K. Pachauri and L.A. Meyer (eds.)], IPCC, Geneva, Switzerland, 151 pp. (2014) at 63-64 & Table 2.2.

percent probability of 1.5°C.[78] A 2022 study has an even more harrowing estimate of just 300 GtCO$_2$ remaining from the start of 2022 for a 50 percent chance of limiting warming to 1.5°C.[79] A third study found that, at current emissions rates, the world will exhaust the carbon budget for a 50 percent chance for 1.5°C in 10 years and the carbon budget for a 67 percent chance in seven years.[80]Published scientific studies have also estimated the United States' portion of the global carbon budget by allocating the remaining global budget across countries based on factors including equity principles and economics. Estimates of the remaining U.S. carbon budget consistent with meeting a 1.5°Ctarget are negative or near zero.[81] Therefore, whatever remaining carbon budget the U.S. has left, if any, is very small and rapidly being consumed. We ask that the final guidance specifically include the well-accepted carbon budget tool for agencies to use to evaluate whether a given project would help meet or detract from achieving climate goals.

<u>The Final Guidance Should Continue to Give Special Attention to Biological GHG Sources and Sinks and Add Additional Direction Regarding Certain Features.</u>

> *1. The final guidance should direct agencies to evaluate the GHG sequestration benefits of wetlands and other natural systems affected by a federal action.*

The Final Guidance should direct agencies to evaluate the GHG sequestration benefits of wetland and other natural systems that will be affected by a federal action as part of the baseline for assessing climate change impacts.  A growing body of science demonstrates the importance of healthy wetlands as vital carbon sinks, as summarized in a May 2022 study published in Science.  That study found that while wetlands cover just 1% percent of the Earth's surface, they "store 20% of ecosystem organic carbon. This disproportional share is fueled by high carbon sequestration rates and effective storage in peatlands, mangroves, salt marshes, and seagrass meadows, which greatly exceed those of oceanic and forest ecosystems."  This study reviews the process that underlines these carbon sink qualities and documents:

---

[78] Intergovernmental Panel on Climate Change, Summary for Policymakers In: Climate Change 2021: The Physical Science Basis. Contribution of Working Group I to the Sixth Assessment Report of the Intergovernmental Panel on Climate Change (2021), https://www.ipcc.ch/report/sixth-assessment-report-working-group-i/ at SPM-38.
[79] CONSTRAIN, Zero In On: The Critical Decade: Insights from the Latest IPCC Reports on the Paris Agreement, 1.5°C, and Climate Impacts (2022).
[80] Calverley and Anderson, Phaseout Pathways for Fossil Fuel Production Within Paris-compliant Carbon Budgets (2022), https://www.research.manchester.ac.uk/portal/en/publications/phaseout-pathways-for-fossil-fuel-production-within-pariscompliant-carbon-budgets(c7235a8e-e3b1-4f44-99de-c27958c03758).html
[81] Van den Berg, Nicole et al., Implications of various effort-sharing approaches for national carbon budgets and emission pathways, Climatic Change 162: 1805-1822 (2020), https://link.springer.com/article/10.1007%2Fs10584-019-02368-y; Dooley, Kate et al., Ethical choices behind quantifications of fair contributions under the Paris Agreement, Nature Climate Change 11: 300-305 (2021), https://www.nature.com/articles/s41558-021-01015-8.

"how feedback disruption can switch wetlands from carbon sinks into sources. Currently, human activities are driving rapid declines in the area of major carbon-storing wetlands (1% annually).  Our findings highlight the urgency to stop through conservation ongoing losses and to reestablish landscape-forming feedbacks innovations that recover the role of biogeomorphic wetlands as the world's biotic carbon hotspots."[82]

> *2. The final guidance should direct agencies to evaluate the GHG emissions from reservoirs and from other areas where water flow is reduced (such as behind navigation locks and dams).*

Dams and reservoirs emit a significant amount of methane to the atmosphere.  The Guidance should direct agencies to evaluate the GHG emissions from reservoirs, and from other areas where water flow is reduced such as the areas behind navigation locks and dams (e.g., the Upper Mississippi River Navigation System), hydropower and other dams, low head dams, and weirs.[83]  This analysis should be required as a fundamental component of NEPA reviews, and of supplemental NEPA reviews, carried out in connection with new projects, including the development of new operating plans (including such things as water control manuals, and operation and maintenance plans for navigation systems and individual locks and dams); and when updating existing operating plans. These analyses are critical for planning and operating projects in a way that avoids, minimizes, and mitigates the release of GHGs from reservoirs and other permanently flooded lands.

As discussed above, methane is a GHG that is 28 to 36 times more warming than carbon dioxide over a 100-year period and approximately 84 times as potent over a 20-year period, and thus has a disproportionate impact on short-term warming relative to $CO_2$.[84] Globally, dams and reservoirs (with and without hydropower) are estimated to emit approximately 13.4 million metric tons of methane per year, with nearly half of that coming from hydroelectric reservoirs.[85]  Some individual hydropower facilities emit on par with fossil fuel sources like coal and natural gas when considered on an emission-per-unit-of-energy basis.[86]  In 2020 reservoir emissions rivaled the international shipping

---

[82] Ralph J. M. Temmink, L.P.M. Lamers, C. Angelini et al, *Recovering wetland biogeomorphic feedbacks to restore the world's biotic carbon hotspots,* Cite this article as R. J. M. Temmink et al., Science 376, eabn1479 (2022). DOI: 10.1126/science.abn1479.

[83] The Environmental Protection Agency has noted, "[s]ince reservoirs are not natural systems, greenhouse gasses emanating from reservoirs are considered to have an anthropogenic, or human-made, origin."  United States EPA, "Research on Emissions from U.S. Reservoirs", https://www.epa.gov/air-research/research-emissions-us-reservoirs (last visited Oct. 20, 2022).

[84] Henriette I. Jager et al., *Getting Lost Tracking the Carbon Footprint of Hydropower*, 162 RENEWABLE AND SUSTAINABLE ENERGY REV. 2 (2022).

[85] Bridget R. Deemer et al., *Greenhouse Gas Emissions from Reservoir Water Surfaces: A New Global Synthesis*, 66 BIOSCIENCE 494 (2016) (Deemer 2016).

[86] For example, the validated G-res Tool modeling results of Weiss dam on the Coosa River in Alabama shows a net carbon footprint of 118,437 metric tons of carbon dioxide equivalent being

sector in terms of carbon dioxide equivalence.[87]  Methane emissions have been observed at all reservoirs where measurements have been taken, including in at least 11 US states and Puerto Rico (AL, CA, CO, GA, ID, NC, OR, SC, TN, WA, WI, PR) according to a detailed 2016 study (and its underlying data set).[88]  A 2020 report by the Environmental Protection Agency (EPA) estimates that reservoirs and other artificially flooded lands produced 797 kilotons of methane, annually.[89]

Methane is produced through the decomposition of organic matter (e.g., leaves, trees, algae) under the anoxic (i.e., no oxygen) conditions that are common in reservoir sediments.  Methane is emitted from anthropogenic reservoirs through several pathways including:  (1) continuous diffusion across the surface of the reservoir; (2) bubbling ("ebullition") from sediments; and (3) transport through plants growing within the reservoir.[90]  Ebullition is generally understood to be the primary mechanism for methane emissions from reservoirs,[91] particularly in the first 10 to 20 years after dam construction, though emissions persist for the life of the reservoir.[92]

The energy generation technology used at hydropower dams can increase the net methane emissions of the reservoir through turbine gassing, spill changes, and drawdowns.[93]  When the water in a reservoir is passed through energy-generating turbines and the spillway (which deposits the water back into the river or channel), the water is "degassed," meaning that the dissolved gases naturally present in the water are separated from the water and released into the atmosphere.[94]  Additional GHGs are released from

emitted per year, with methane composing over 60% of the emissions. Validated G-res modeling results for Weiss dam and reservoir and R.L. Harris dam and reservoir are available at https://alabamarivers.org/reservoir_emissions.

[87] Cynthia Soued et al, "Reservoir Carbon Dioxide and Methane Emissions and Their Climate Impact Over the Period 1900-2060", *Nature Geoscience*, (Sept. 2022), Vol 15, 700-705, https://www.nature. com/articles/s41561-022-01004-2.

[88] Deemer 2016.

[89] EPA (2022) Inventory of U.S. Greenhouse Gas Emissions and Sinks: 1990-2020. U.S. Environmental Protection Agency, EPA 430-R-22-003, at 6-5. https://www.epa.gov/ghgemissions/draft-inventory-us-greenhouse-gas-emissionsand-sinks-1990-2020.

[90] *See* Jake J. Beaulieu et al., *High Methane Emissions from a Midlatitude Reservoir Draining an Agricultural Watershed*, 48 ENV'T SCI. AND TECH. (2014). *See also* Deemer 2016; John A. Harrison et al., Reservoir Water-Level Drawdowns Accelerate and Amplify Methane Emission, 51 ENV'T SCI. AND TECH. 1267.

[91] Jake J. Beaulieu et al., *Methane and Carbon Dioxide Emissions from Reservoirs: Controls and Upscaling*, 125 J. OF GEOPHYSICAL RSCH. 1, 11 (2020). Sjohi D. Thottathil & Yves T. Prairie, *Coupling of Stable Carbon Isotopic Signature of Methane and Ebullitive Fluxes in Northern Temperate Lakes*, 777 SCI. OF THE TOTAL ENV'T 146117 (2021).

[92] Nathan Barros et al., *Carbon Emission From Hydroelectric Reservoirs Linked To Reservoir Age and Latitude*, 4 NAT. GEOSCIENCE 593 (2011).

[93] Henriette I. Jager et al., *Getting Lost Tracking the Carbon Footprint of Hydropower*, 162 RENEWABLE AND SUSTAINABLE ENERGY REV. 2 (2022).

[94] A. Levasseur et al., *Improving the Accuracy of Electricity Carbon Footprint: Estimation of Hydroelectric Reservoir Greenhouse Gas Emissions*, 136 RENEWABLE AND SUSTAINABLE ENERGY REV. 110433 (2021).

large drawdowns, which cause increased bubbling of methane and periodic exposure of flooded, methane-producing sediments to the atmosphere.[95]  River segments downstream of hydropower dams are also associated with increased methane emissions, especially if anoxic, methane-rich water from the bottom of the reservoir flows through the turbines.[96]

>    *3. The final guidance should be expanded to explicitly cover ocean and coastal resource management planning.*

The discussion regarding NEPA analyses for management planning[97] should be expanded to include the, "land, ocean, coastal and resource management context" and a reference or mention should be added that addresses the difference between land-based sources and sinks and those that are ocean and coastal-based, including the different levels of certainty in modeling and quantification of sources and sinks. Additionally in this section, the reference to "Federal land and resource management agencies" should be expanded to "Federal land, ocean, coastal, and resource management agencies" to include NOAA and BOEM in the statement. It is critical that the, "specific principles and guidance for considering biological carbon in management and planning decisions," capture principles and guidance for 'blue carbon' and therefore included agencies responsible for ocean and coastal based ecosystems is critical.

**CONSIDERING THE EFFECTS OF CLIMATE CHANGE ON A PROPOSED ACTION**

The Final Guidance Should Provide Additional Guidance on a Number of Issues Related to the Effects of Climate Change on a Proposed Action and the Affect Environment

The Interim Guidance properly recognizes that a NEPA analysis must consider how the impacts of climate change could affect a proposed action and its environmental outcomes, a requirement that has been confirmed by multiple court decisions.[98]  This analysis is essential in light of the pervasive and escalating impacts of climate change on the natural and built environment.[99]

---

[95] Bridget R. Deemer et al., *Greenhouse Gas Emissions from Reservoir Water Surfaces: A New Global Synthesis*, 66 BIOSCIENCE 494 (2016). *See also* John A. Harrison et al., Reservoir Water-Level Drawdowns Accelerate and Amplify Methane Emission, 51 ENV'T SCI. AND TECH. 1267.
[96] Bridget R. Deemer et al., *Greenhouse Gas Emissions from Reservoir Water Surfaces: A New Global Synthesis*, 66 BIOSCIENCE 494 (2016).
[97] 88 Fed. Reg. 1207.
[98] *See, e.g.*, *AquAlliance, et al., v. U.S. Bureau of Reclamation*, 287 F. Supp. 3d 969 (E.D. Cal. 2018); *National Wildlife Federation v. National Marine Fisheries Service*, 184 F. Supp. 3d 861, 875 (D. Or. 2016); F*riends of Wild Swan v. Jewell*, No. CV 13-61-M-DWM, 2014 U.S. Dist. LEXIS 116788, at *31 (D. Mont. Aug. 21, 2014); *Southern Utah Wilderness Alliance v. Burke*, 981 F. Supp. 2d 1099, 1110–1111 (D. Utah 2013).
[99] ROMANY M. WEBB ET AL., EVALUATING CLIMATE RISK IN NEPA REVIEWS: CURRENT PRACTICES AND RECOMMENDATIONS FOR REFORM 23 (2022), https://scholarship.law.columbia.edu/sabin_climate_change/185/ ("Without first considering the how climate impacts will affect a project and the surrounding environment, agencies cannot possibly hope to make a decision that reflects the most 'beneficial uses of the environment

As CEQ's Interim Guidance affirms, agencies should incorporate climate impact considerations throughout their NEPA analyses, including in assessments of: the baseline current and projected future state of the affected environment; reasonably foreseeable environmental effects of the proposed action and alternatives; resilience, adaptation, and mitigation measures; and disproportionate effects on environmental justice communities.[100] The analysis should consider all types of climate impacts that could affect the proposed action and its environmental outcomes, should be appropriately tailored to the characteristics of the proposed action, and should be sufficiently concrete and comprehensive to meaningfully inform the agency's decision-making.[101]

> *1. The final guidance should provide additional direction regarding the best available science and available tools and resources.*

In addition to relying on available national climate assessments or reports, as the guidance encourages,[102] CEQ should also advise agencies to incorporate and utilize the best available scientific information on climate impacts on specific resources that may be impacted by the proposed action and its alternatives. To provide a concrete example, best available science shows that climate change is predicted to affect individual species such as caribou in Alaska's Arctic through increased wildfire, summer insect harassment, and icing events, as well as changes to forage quality and quantity, spring phenology, and distribution and migratory behavior.[103] Thus, when considering an oil and gas development proposal, the Bureau of Land Management must analyze how disturbance, fragmentation, and other impacts from development will affect climate-stressed caribou over the life of the project. Simply acknowledging that climate change will make caribou – or any other resource – more vulnerable to potential impacts from a proposed action is insufficient. This sort of qualitative, resource-specific analysis is necessary to fully disclose the impacts of climate change on a proposed action and its reasonably foreseeable direct, indirect, and cumulative impacts on the affected environment, as well as determine the significance of those impacts and consider through alternatives and effects analysis how best to mitigate them in the context of a climate-stressed environment.

CEQ rightly notes that agencies "should use the most up-to-date scientific projections available, identify any methodologies and sources used, and where relevant, disclose any relevant limitations of studies, climate models, or projections they rely on."[104] While the

---

without degradation, risk to health or safety, or other undesirable and intended consequences,' and are thus at risk of violating their statutory responsibilities.") (quoting 42 U.S.C. § 4331(b)(3)).

[100] 88 Fed. Reg. 1208-1209.

[101] WEBB ET AL., *supra* note 92 at 27 (explaining that effective climate impact analysis should be holistic, specific, and actionable).

[102] CEQ Interim Guidance at 1208.

[103] *E.g.*, Mallory, Conor D., and Mark S. Boyce. "Observed and predicted effects of climate change on Arctic caribou and reindeer." *Environmental Reviews* 26.1 (2018): 13–25.

[104] 88 Fed. Reg. at 1,208.

Interim Guidance already notes that "the best available climate change reports . . . often project at least two possible future emissions scenarios" and instructs agencies to "identify and use information on future projected GHG emissions scenarios to evaluate potential future impacts," we recommend that CEQ expressly specify that agencies should consider climate impacts under multiple possible GHG emissions scenarios, including a high GHG emissions scenario.[105] Agencies should take into account the range of potential climate change trajectories to ensure their assessments are realistic and resilient.

To assist agencies in implementing this guidance, we recommend that CEQ build upon the list of GHG-focused tools and resources that it maintains with additional tools and resources that agencies can use to rigorously assess effects of climate change on a proposed action and its outcomes.[106] As with the GHG-focused list, the climate impact-focused list should include notes that contextualize and recommend specific uses for the resources. This would ensure that agencies and the public alike are aware of, can easily access, and understand how to use the many relevant resources and tools available to conduct such analyses.[107]

> 2. *The final guidance should direct agencies to evaluate the resilience benefits of the full array of natural systems affected by a federal action as part of the affected environment baseline.*

As discussed above, healthy natural systems play a significant role in sequestering GHG emissions. Healthy natural systems are also essential if the nation's human and wildlife communities are to remain resilient in the face of the many challenges resulting from climate change. As defined in the Interim Guidance, resilience is "the ability to prepare for and adapt to changing conditions and withstand and recover rapidly from disruption."

To ensure meaningful consideration of climate change impacts the final guidance should direct agencies to evaluate the resilience benefits of the full array of natural systems affected by a federal action as part of the affected environment baseline. The final guidance should also provide examples of the ways in which natural systems advance resilience, some of which are highlighted below.

For example, as CEQ is well aware, healthy wetlands, floodplains and rivers provide essential flood protection services that are critical to community resilience. Wetlands act

---

[105] WEBB ET AL., *supra* note 92, at 28.
[106] *GHG Tools and Resources*, NEPA.GOV, https://ceq.doe.gov/guidance/ghg-tools-and-resources.html (last visited Feb. 9, 2023); *see* WEBB ET AL., *supra* note 74 at Part 4.3 and Appendix 2 (listing relevant data sources, tools, and guidance documents).
[107] *See* WEBB ET AL., *supra* note 92, at 55-56 ("[W]hile many useful resources are already publicly available, some federal agencies appear to be unaware of or unwilling to use them. For example, FERC has argued that it is unable to perform detailed climate impact analysis for hydroelectric projects because it lacks access to localized climate projections, but useful projections have been published by other government agencies.") (citing analysis of recent FERC EISs).

as natural sponges, storing and slowly releasing floodwaters after peak flood flows have passed, and coastal wetlands buffer the onslaught of hurricanes and tropical storms.  A single acre of wetland can store one million gallons of floodwaters.[108]  Just a 1 percent loss of a watershed's wetlands can increase total flood volume by almost seven percent.[109]  Restoring a river's natural flow and meandering channel, and giving at least some floodplain back to the river, slows down floodwaters and gives the river room to spread out without harming homes and businesses.

As an example, wetlands prevented $625 million in flood damages in the 12 coastal states affected by Hurricane Sandy, and reduced damages by 20 to 30 percent in the four states with the greatest wetland coverage.[110]  The forest and other conservation lands that make up the 28,000 acre Meramec Greenway along the Meramec River in southern Missouri contribute about $6,000 per acre in avoided flood damages annually.[111]  Wetlands in the Eagle Creek watershed of central Indiana reduce peak flows from rainfall by up to 42 percent, flood area by 55 percent, and maximum stream velocities by 15 percent.[112]  Coastal wetlands reduced storm surge in some New Orleans neighborhoods by two to three feet during Hurricane Katrina, and levees with wetland buffers had a much greater chance of surviving Katrina's fury than levees without wetland buffers.[113]  These systems also have the significant added benefit of benefits of being self-sustaining and avoiding the risk of catastrophic structural failures.

Healthy rivers, floodplains, and wetlands are also essential for allowing people and wildlife to benefit from natural flood cycles.  In a healthy, functioning river system, precipitation events and other natural increases in water flow can deposit nutrients along floodplains creating fertile soil for bottomland hardwood forests.  Sediment transported by these increased flows form islands and back channels that are home to fish, birds, and other wildlife.  By scouring out river channels and riparian areas, these events prevent rivers from becoming overgrown with vegetation.  They also facilitate breeding and migration for a host of fish species, and provide vital connectivity between habitat areas.

---

[108] Environmental Protection Agency, *"Wetlands:  Protecting Life and Property from Flooding." EPA 843-F-06-001.* (2006) (factsheet).

[109] Demissie, M. and Abdul Khan. 1993. "Influence of Wetlands on Streamflow in Illinois." Illinois State Water Survey, Contract Report 561, Champaign, IL, Table 7, pp. 44-45.

[110] Narayan, S., Beck, M.B., Wilson, P., et al., The Value of Coastal Wetlands for Flood Damage Reduction in the Northeastern USA. Scientific Reports 7, Article number 9463 (2017), doi:10.1038/s41598-017-09269-z.

[111] Kousky, C., M. Walls, and Z. Chu. 2014. Measuring resilience to climate change: The benefits of forest conservation in the floodplain. p 345–360. In: V.A. Sample and R.P. Bixler, eds. Forest Conservation and Management in the Anthropocene: Conference Proceedings. Proceedings RMRS-P-71. Fort Collins, CO: U.S. Department of Agriculture, Forest Service, Rocky Mountain Research Station.

[112] Javaheri, A., and M. Babbar-Sebens. 2014. On comparison of peak flow reductions, flood inundation maps, and velocity maps in evaluating effects of restored wetlands on channel flooding. Ecological Engineering 73: 132–145.

[113] Bob Marshall, Studies abound on why the levees failed. But researchers point out that some levees held fast because wetlands worked as buffers during Katrina's storm surge, The New Orleans Times-Picayune (March 23, 2006).

In the deltas at the mouths of rivers, increased flows release freshwater and sediment, sustaining and renewing wetlands that protect coastal communities from storms and provide nurseries for multibillion dollar fisheries.

Wetlands are equally essential for ensuring thriving and resilient populations of fish and wildlife. Wetlands are some of the most biologically productive natural ecosystems in the world, and support an incredibly diverse and extensive array of fish and wildlife. America's wetlands support millions of migratory birds and waterfowl.  Up to one-half of all North American bird species rely on wetlands.  Although wetlands account for just about 5 percent of land area in the lower 48 states, those wetlands are the only habitat for more than one third of the nation's threatened and endangered species and support an additional 20 percent of the nation's threatened and endangered species at some time in their life.  These same wetlands are home to 31 percent of the nation's plant species.[114]

> 3. *The final guidance should direct agencies to evaluate the direct, indirect, and cumulative effects of a proposed action on the ability of affected natural systems to retain and/or increase resilience for communities and fish and wildlife in the face of climate change.*

To facilitate development of alternatives that advance resilience and adaptation, the final guidance should direct agencies to evaluate the direct, indirect, and cumulative effects of a proposed action on the ability of the natural systems affected by the proposed action to retain and/or increase resilience for communities and fish and wildlife in the face of climate change.

As discussed above, the critical importance of healthy natural systems for both human and wildlife communities is well known.  But the role that these systems play in ensuring resilience in the face of climate change is virtually never assessed or considered in the NEPA context.

For example, the Army Corps of Engineers did not evaluate the implications for ecosystem resilience in its September 2022 Draft Environmental Assessment and FONSI analyzing the Corps' plan to close a natural crevasse in the lowest reaches of the Mississippi River despite the well-recognized deltaic land-building that is occurring as a direct result of the crevasse and the EA's conclusion that closing the crevasse would result in the loss of 533 acres of wetlands from the loss of deltaic land building.[115]  As CEQ and the Army Corps are well aware, reestablishing Louisiana's coastal wetlands is critical to the long-term survival and resilience of this region.  The Army Corps did not assess the adverse implications to ecosystem resilience from a project that would damage many tens of thousands of acres of hemispherically significant wetlands in its 2020

---

[114] Environmental Protection Agency, Economic Benefits of Wetlands, EPA843-F-06-004 (May, 2006) (factsheet).
[115] U.S. Army Corps of Engineers, Draft Finding of No Significant Impact and Draft Environmental Assessment, Mississippi River, Baton Rouge To The Gulf Of Mexico, Louisiana Neptune Pass Rock Closure, Plaquemines Parish, Louisiana September 2022.

supplemental Environmental Impact Statement on the Yazoo Area Pump Project.[116]  The Army Corps did not assess the adverse implications to resilience for fish and wildlife that rely on a 195-mile stretch of the Mississippi River despite acknowledging extensive adverse impacts to fish and wildlife habitat in its supplemental EIS on the activities it carries out to maintain navigation on this reach of the river.[117]    Similarly, the Army Corps did not assess the adverse implications to resilience in its analysis of an operating plan for the Apalachicola-Chattahoochee-Flint river system, despite the enormous harm that the plan would cause to the vitally important Apalachicola River and its floodplain.[118]

The changing climate, combined with historic and ongoing destruction[119] and degradation[120] of vast swaths of habitat,[121] have pushed America's wildlife into crisis, helping to drive the planet's ongoing 6th Mass Extinction of species.[122]  As many as one-

---

[116] The Mississippi Delta wetlands that would be harmed by this devastating project are located in the heart of the Mississippi River Flyway.  U.S. Army Corps of Engineers, *Second Final Supplemental, USACE, MS,* Final Supplement No. 2 to the 1982 Yazoo Area Pump Project Final EIS (December 2020).

[117] Final Supplement to The Final Environmental Statement, Regulating Works on the Mississippi River Between The Ohio And Missouri Rivers (May 2017).

[118] U.S. Army Corps of Engineers, Final Environmental Impact Statement, Update of the Water Control Manual for the Apalachicola-Chattahoochee-Flint River Basin in Alabama, Florida, and Georgia and a Water Supply Storage Assessment (December 2016).

[119] For example, at least ten states have lost more than 70 percent of their wetlands, which provide essential fish and wildlife habitat, while 22 states have lost 50 percent or more of their original wetland acreage. T.E. Dahl and S.M. Stedman. 2013. Status and trends of wetlands in the coastal watersheds of the Conterminous United States 2004 to 2009. U.S. Department of the Interior, Fish and Wildlife Service and National Oceanic and Atmospheric Administration, National Marine Fisheries Service. (46 pp); Dahl, T.E. 2006. Status and trends of wetlands in the conterminous United States 1998 to 2004. U.S. Department of the Interior, Fish and Wildlife Service, Washington, D.C. (112 pp); Dahl, T.E. 2000. Status and trends of wetlands in the conterminous United States 1986 to 1997. U.S. Department of the Interior, Fish and Wildlife Service, Washington, D.C. (82 pp); Dahl, T.E., and Johnson, C.E., 1991, Status and trends of wetlands in the conterminous United States, mid-1970's to mid-1980's. U.S. Department of the Interior, Fish and Wildlife Service, Washington, D.C. (28 pp).

[120] Fish and wildlife have also been severely harmed through the pervasive alteration of natural stream flows, including from reservoirs and locks and dams, which have occurred in 86 percent of the almost 3,000 streams assessed by the U. S. Geological Survey.  U.S. Geological Survey, Ecological Health in the Nation's Streams, Fact Sheet 2013-3033 (July 2013); Carlisle, D.M., Meador, M.R., Short, T.M., Tate, C.M., Gurtz, M.E., Bryant, W.L., Falcone, J.A., and Woodside, M.D., 2013, The quality of our Nation's waters—Ecological health in the Nation's streams, 1993–2005: U.S. Geological Survey Circular 1391 (120 pp).

[121] For example, the construction of levees by the Army Corps and others to reduce the frequency and duration of flooding in the lower Mississippi River Valley is the single largest contributor to wetland losses in the country, according to the Department of the Interior. Report to Congress by the Secretary of the Interior, The Impact of Federal Programs on Wetlands, Volume II, at 145 (1994).  Approximately 80 percent of the bottomland hardwood wetlands in the lower Mississippi River basin have already been lost approximately.  Report to Congress by the Secretary of the Interior, The Impact of Federal Programs on Wetlands, Volume I at 39.

[122] Gerardo Ceballos, Ehrlich Paul, Raven Peter, Vertebrates on the brink as indicators of biological annihilation and the sixth mass extinction. Proceedings of the National Academy of

third of America's plant and wildlife species are vulnerable, with one in five imperiled and at high risk of extinction.[123]   A 2023 assessment found that an alarming 40% of all animal species in the United States are at risk of extinction and that 41% of all ecosystems "at risk of range-wide collapse."[124]  Approximately 40 percent of the nation's freshwater fish species are now rare or imperiled.[125]  Nearly 60 percent of the nation's globally significant freshwater mussel species are imperiled or vulnerable, and an additional 10 percent are already extinct.[126]

Our wildlife crisis extends well beyond rare and endangered species, and now affects many widespread and previously abundant creatures, such as the little brown bat, monarch butterfly, and many of our most beloved songbirds. State fish and wildlife agencies have identified more than 12,000 species nationwide in need of conservation action, and fully one-third of North America's bird species require urgent conservation attention.[127]

> 4. *The final guidance should direct agencies to evaluate the direct, indirect, and cumulative effects / risks of a proposed action transferring flood risks to other communities, increasing flooding upstream, and increasing flooding downstream.*

Structural projects, while necessary in some places including for flood risk reduction, can transfer flood risks to other communities.  For example, a recent study found that building one large seawall in a small portion of California's San Francisco Bay could

---

Sciences Jun 2020, 117 (24) 13596-13602; DOI: 10.1073/pnas.1922686117 ("The ongoing sixth mass extinction may be the most serious environmental threat to the persistence of civilization, because it is irreversible. . . . the sixth mass extinction is human caused and accelerating. . . . species are links in ecosystems, and, as they fall out, the species they interact with are likely to go also. . . . Our results reemphasize the extreme urgency of taking massive global actions to save humanity's crucial life-support systems.")

[18] U.S. Geological Survey, Ecological Health in the Nation's Streams, Fact Sheet 2013-3033 (July 2013); Carlisle, D.M., Meador, M.R., Short, T.M., Tate, C.M., Gurtz, M.E., Bryant, W.L., Falcone, J.A., and Woodside, M.D., 2013, The quality of our Nation's waters—Ecological health in the Nation's streams, 1993–2005: U.S. Geological Survey Circular 1391 (120 pp).

[123] Stein, B. A., L. S. Kutner, J. S. Adams eds. 2000. Precious Heritage: The Status of Biodiversity in the United States. New York: Oxford University Press.

[124] NatureServe. 2023. Biodiversity in Focus: United States Edition. NatureServe: Arlington, VA at 8, 11 (https://www.natureserve.org/sites/default/files/NatureServe_BiodiversityInFocusReport_medium.pdf).

[125] Jelks, H. L., S.J. Walsh, N.M. Burkhead, et al. 2008. Conservation status of imperiled North American freshwater and diadromous fishes. Fisheries. 33: 372-407.

[126] Williams, J. D., M. L. Warren, K. S. Cummings, J. L. Harris, and R. J. Neves. 1993. Conservation status of freshwater mussels of the United States and Canada. Fisheries 18: 6–22; Lydeard, C., R. H. Cowie, W. F. Ponder, et al. 2004. The global decline of nonmarine mollusks. BioScience 54 321-330.

[127] Stein, B. A., N. Edelson, L. Anderson, J. Kanter, and J. Stemler. 2018. Reversing America's Wildlife Crisis: Securing the Future of Our Fish and Wildlife. Washington, DC: National Wildlife Federation.

significantly increase flooding in other areas, causing up to $723 million of flood damages to those areas during each flood event[128]—an estimate that is highly conservative as it "doesn't account for potential damage to ecosystems and fisheries."[129] New levees, or levee raises, that may help one community can similarly push flood waters onto others, increasing risks for other communities including very often, communities of color and low-income communities that do not have the resources to construct or raise their own levees.

The impacts associated with transferring flood risks will be greatly exacerbated by the appreciable increases in both the intensity and number of extreme storms that the nation will suffer as our climate continues to warm.[130]  In some locations, future extreme events could be twice as intense as historical averages.[131]  By 2100, previously rare extreme rainstorms could happen every two years.[132]  By 2050, high tides could cause "sunny day" flooding in coastal communities 25 to 75 days a year.[133]  By the end of the century, homes and commercial properties currently worth more than $1 trillion could be at risk of chronic flood inundation.[134]

Storms and floods in the U. S. disproportionately harm Black, Latinx, Indigenous, low-income, and frontline communities.  For example, the neighborhood that suffered the worst flood damage during Hurricane Harvey was in an area of southwest Houston where 49 percent of the residents are people of color.  Damage from Hurricane Katrina was most extensive in the region's Black neighborhoods. In four of the seven ZIP codes that suffered the costliest flood damages from Hurricane Katrina at least 75 percent of

---

[128] Michelle Hummel, Griffin R., Arkema K., Guerry A., PNAS 2021 Vol. 118 No. 29 e2025961118, Economic evaluation of sea-level rise adaptation strongly influenced by hydrodynamic feedbacks https://doi.org/10.1073/pnas.2025961118 (July 2021) (documenting that the seawall would divert 36 million cubic meters of flood waters (9.5 billion gallons) onto other communities, and demonstrating the value of natural infrastructure for alleviating flooding and damages along other stretches of the coastline).

[129] Matt Simon, Be very careful where you build that seawall, WIRED (July 14, 2021).

[130] The nation has already suffered more billion-dollar inland flood disasters in the last decade than in the prior three decades combined.  We have also endured more billion-dollar hurricane disasters in the last five years than in the decade before. NOAA National Centers for Environmental Information (NCEI) U.S. Billion-Dollar Weather and Climate Disasters (2021) (https://www.ncdc.noaa.gov/billions/), DOI: 10.25921/stkw-7w73 (inland flooding "caused by billion-dollar hurricanes (i.e., Harvey, Florence, Matthew) has also increased").

[131] E&E News, Anne C. Mulkern, Climate drives rise in global damage from storms — study, July 12, 2021; Madakumbura, G.D., Thackeray, C.W., Norris, J. et al. Anthropogenic influence on extreme precipitation over global land areas seen in multiple observational datasets. Nat Commun 12, 3944 (2021). https://doi.org/10.1038/s41467-021-24262-x.

[132] Inside Climate News, New Study Shows Global Warming Intensifying Extreme Rainstorms Over North America, June 2, 2020; Megan C. Kirchmeier-Young, Xuebin Zhang, Human influence has intensified extreme precipitation in North America, Proceedings of the National Academy of Sciences Jun 2020, 117 (24) 13308-13313; DOI:10.1073/pnas.1921628117.

[133] NOAA High Tide Flooding Report, 2021 State of High Tide Flooding and Annual Outlook.

[134] Union of Concerned Scientists. Underwater: Rising Seas, Chronic Floods, and the Implications for US Coastal Real Estate (2018).

residents were Black.[135]  Over the next 30 years, the "risk of coastal floods damaging or destroying low-income homes will triple" resulting in the flooding of more than 25,000 affordable housing units each year.[136]

In addition, "while severe storms fall on the rich and poor alike, the capacity to respond to and recover from flooding is much lower in socially vulnerable populations that even in the best of times are struggling to function."[137]  Even low levels of flooding can wreak havoc on buildings and the residents who live in them, damaging belongings, disrupting electrical equipment, contaminating water sources and septic systems, and generating mold.  These impacts can "cause profound disruptions to families already struggling to make ends meet" and can be particularly challenging to remedy in affordable housing units, which are often in poor repair to begin with.[138]

It is critical that agencies evaluate whether a federal action will transfer flood risks onto other communities as our rapidly changing climate produces increasingly severe storms and floods and wildfires (that can lead to increased flooding due to the loss of vegetative cover) fueled by our rapidly changing climate.[139]

> 5.  *The final guidance should direct agencies to fully evaluate, as part of each NEPA review, locating the proposed project or activity at alternative sites that would avoid climate change risk (e.g., sea level rise, storm surge, floodplains) and avoid and reduce the adverse impacts to healthy natural systems.*

Many NEPA reviews examine projects in areas at high risk from climate change and/or projects that will adversely affect natural systems essential for the long-term resilience of communities and wildlife.  The final guidance should direct agencies to fully evaluate and consider, as part of each NEPA review, locating the proposed project or activity at a location that would:  (a) avoid or minimize climate change risks to the project; and (b) avoid and minimize adverse impacts to natural systems essential for resilience.

For example, when conducing a NEPA review of a facility that would be located in a coastal area subject to sea level rise, wave and storm-drive erosion, or subsidence,

---

[135] Thomas Frank, Flooding Disproportionately Harms Black Neighborhoods, Scientific American (June 2, 2020).

[136] Maya K Buchanan *et al,*  Sea level rise and coastal flooding threaten affordable housing, *Environ. Res. Lett.,* 15 124020/ (2020).

[137] National Academies of Sciences, Engineering, and Medicine 2019. Framing the Challenge of Urban Flooding in the United States. Washington, DC: The National Academies Press. https://doi.org/10.17226/25381.

[138] Buchanan *et al,* Sea level rise and coastal flooding threaten affordable housing (see footnote 8).

[139] For example, a recent study concludes that climate change-induced sea level rise accounted for 13% of the damage caused by Hurricane Sandy (approximately $8.1 billion of the $62.5 billion in total damages) and 54% of the people affected (71,000 people out of the total of 131,000 people affected).  Strauss, B.H., Orton, P.M., Bittermann, K. et al Economic damages from Hurricane Sandy attributable to sea level rise caused by anthropogenic climate change. Nat Commun 12, 2720 (2021). https://doi.org/10.1038/s41467-021-22838-1.

agencies should be required to assess options for alternate locations that would not be subject to those same risks. Similarly, agencies should be required to conduct a robust review of alternatives that would avoid adverse impacts to wetlands that provide essential flood assimilation and/or fish and wildlife habitat. Full examination of such alternatives should already be happening to achieve the fundamental goals of NEPA, but often is not. The final guidance should ensure that these critical assessments are in fact carried out.

>    6. *The final guidance should also recognize the important role that public lands play in resilience, GHG emissions reductions, and adaptation.*

Public lands – encompassing approximately one-third of the land mass of the U.S. – play an outsized role in reducing climate change emissions (both through carbon storage and opportunities to rapidly decrease fossil fuel emissions), supporting species adaptation, and building resilience for communities through providing clean air and water and access to nature. Healthy landscapes are natural and efficient carbon captors, while at the same time a significant portion of the nation's energy production – representing roughly 20-25% of U.S. GHG emissions – comes from federal lands and waters.[140] The Biden Administration's America The Beautiful and 30x30 commitment recognizes the importance of protecting and connecting U.S. lands and waters in the face of climate change. Proposed actions that could impact that commitment – through conservation gains or losses – need to be thoroughly analyzed under NEPA. This could be recognized in the guidance as another example of a climate-focused tool against which the impacts of a proposed action and alternatives should be measured (similar to tools discussed that would help agencies measure GHG emissions against various climate targets or emissions management frameworks).

**CONCLUSION**

Our organizations hope that you and your staff find these observations and recommendations useful. CEQ's Interim Guidance provides essential legal direction to federal agencies. Our recommendations highlight areas where more detailed guidance would help ensure that agencies are accurately accounting for communicating to the public the impacts of their decisionmaking. We look forward to seeing the final version of the guidance and, importantly, the proposals for CEQ's Phase 2 Rulemaking. We would be pleased to discuss any of these issues with you or your staff further if that would be helpful. Please contact Stephen Schima, Senior Legislative Counsel, Earthjustice, at sschima@earthjustice.org or (503) 830-5753.

Sincerely,

Center for Biological Diversity
Center for International Environmental Law (CIEL)
Defenders of Wildlife

---

[140] *See* Matthew D. Merrill et al., U.S. Geological Survey, Scientific Investigations Report 2018-5131: Federal Lands Greenhouse Gas Emissions and Sequestration in the United States: Estimates for 2005-14.

Earthjustice
Environmental Defense Fund
Environmental Law and Policy Center
Evergreen Action
Food and Water Watch
League of Conservation Voters
National Wildlife Federation
Natural Resources Defense Council
Ocean Conservancy
The Sierra Club
WE ACT for Environmental Justice
The Wilderness Society

# ATTACHMENT 2

 

**DATE:** September 29, 2023

**TO:** Council of Environmental Quality (CEQ)

**FROM:** GreenLatinos and WE ACT for Environmental Justice

**SUBJECT:** Docket ID No. CEQ-2023-0003 National Environmental Policy Act Implementing Regulations Revisions Phase II

GreenLatinos and WE ACT for Environmental Justice, along with the undersigned organizations, submit these comments to express our support and provide improvements to the Council on Environmental Quality ("CEQ") National Environmental Policy Act ("NEPA") Implementing Regulations Revisions Phase II (No. CEQ-2023-0003). The submitted comments are framed with the goal of centering and securing the safety, health, and resiliency of Black, Brown, and Indigenous communities that historically and currently experience undue burdens of environmental and climate injustice.

GreenLatinos is an active comunidad of over 14,000 Latines and allies across the U.S. and territories, united to ensure that environmental justice is embedded across all levels of governmental policies. We envision a healthy and equitable society where communities of color are liberated from disproportionate environmental burdens, free to breathe fresh air, drink pure water, access clean transportation, and enjoy our majestic public lands, ocean, and waters. GreenLatinos analysis of the proposed regulations are informed by the the Latino Climate Justice Framework ("LCJF")[1] The LCJF is a blueprint for decision makers and underserved communities alike to champion equitable policy solutions aimed at improving disproportionately impacted environmental justice communities, especially communities of color. The Framework was developed through extensive partner and community input over the course of 1.5 years and

---

[1]Green Latinos, *Latino Climate Justice Framework*, (hereafter cited to as "LCJF"), https://www.lcjf.greenlatinos.org/_files/ugd/352e47_e3bf44c2175e4867a171544cd4a72ac2.pdf.(October 2022).

was launched in October 2022 alongside 22 Latine-serving partner organizations. Currently, over 70 additional organizations have endorsed the Framework.

WE ACT for Environmental Justice ("WE ACT") is a Northern Manhattan-based member organization whose mission is to advocate for and build healthy communities by ensuring communities of color and low income communities lead in creating just and equitable environmental health laws, policies, and practices.[2] Since its founding in 1988, WE ACT has worked to serve environmental justice communities across the country which have been and continue to be adversely affected by harmful infrastructure, pollution, and the inequitable enforcement of environmental laws.[3] WE ACT consistently calls for strong environmental protections and actions that address and remediate historical burdens. WE ACT's Federal Policy Office in Washington, D.C. pursues national policy solutions that center the positions, interests, goals, and and voices of environmental justice organizations across the country. The Federal Policy Office addresses injustice and equity within the federal landscape and seeks to drive just and equitable solutions in the realms of clean air, clean water, climate, transportation, and energy justice, as well as the creation of healthy homes and other issue areas.

## I.   BACKGROUND

Since its establishment over 50 years ago, NEPA has been the nation's bedrock environmental law, requiring review and oversight for any major federal action. It is a tool used to integrate the voice of the people into federal decision making. Unfortunately, fossil fuel and special interests have weakened this critical law, which ultimately hampers communities' ability to provide input into projects being developed in their backyards, neighborhoods, and towns. CEQ has already begun the important work of restoring NEPA provisions, as was evidenced in the first phase of CEQ's regulations, which focused on reversing dangerous rollbacks made by the previous Administration. In Summer 2023, NEPA faced additional setbacks and carve-outs through the passage of the Fiscal Responsibility Act ("FRA"), where there were significant concessions to industry and conservative interests that effectively weakened NEPA and its application.[4] We commend the Biden-Harris Administration and Executive Order 14096 for

---

[2] WE ACT for Environmental Justice, *Who We Are,* https://www.weact.org/whoweare/ourstory/ (2023).
[3] *Id.*
[4] WE ACT for Environmental Justice, *WE ACT For Environmetnal Justice Decries Debt Ceiling Concessions and Calls for Amendments to Remove Harmful NEPA and MVP Provisions*, https://www.weact.org/2023/05/we-act-for-environmental-justice-decries-debt-ceiling-concessions-and-calls-for-amendments-to-remove-harmful-nepa-and-mvp-provisions/ (May 31, 2023).

furthering the interests and goals of environmental justice through this proposed rule. Further, the undersigned organizations reiterate that the Biden-Harris Administration must no longer use environmental justice communities as bargaining chips at the negotiation table.[5]

The scientific record and lived experience demonstrates that a strong NEPA process makes projects more resilient, less likely to face litigation, and ultimately allows them to move faster all while safeguarding affected communities.[6] It is always worth repeating - environmental justice communities historically and currently bear the burden of climate and environmental injustice. Historic permitting and siting practices have marginalized front and fenceline voices, created sacrificial zones, and excluded environmental justice communities from environmental benefits while burdening them with environmental harms.Discriminatory practices, such as segregation, redlining, and unjust industrial zoning policies cause Black, Brown, Indigenous, and/or low-income communities to house a disproportionate amount of pollution infrastructure.[7]

Indeed, Black and Hispanic communities respectively bear 56% and 63% excess air pollution exposure, relative to the exposure caused by their consumption.[8] Specifically, deaths from Particulate Matter 2.5, also known as soot, are disproportionately felt by Black and Brown communities. Black populations 65 years or older, experience three times as many PM2.5-attributable deaths per capita compared to all other races.[9] More than one million Black Americans face a cancer risk above "EPA's level of concern." Approximately, 13.4% of Black children suffer from asthma, as compared to 7.3% of white children. Latine children are more likely to be diagnosed with asthma and are twice as likely to die from an asthma attack compared to their white counterparts.[10] Lastly, Black Americans are 75% more likely to live in

---

[5] WE ACT for Environmental Justice, *Letter Regarding May 2023 Congressional Debt Ceiling Negotiations,*
https://www.weact.org/wp-content/uploads/2023/05/FINAL_EJ-Debt-Ceiling-Letter-to-President-Biden.pdf
(May 25, 2023)
[6] Roosevelt Institute, Climate and Community Project, *A Progressive Take on Permitting Reform*,
https://rooseveltinstitute.org/wp-content/uploads/2023/08/RI_Progressive_Permitting_Report_202308.pdf
(2023).
[7] Equitable & Just National Climate Platform, *Approaches to Defining Environmental Justice Community for Mandatory Emissions Reduction Polic*y [Insert Link] (September 2021) at 4.
[8] Christopher W. Tessum et al., *Inequity in consumption of goods and services adds to racial-ethnic disparities in air pollution exposure* (Mar. 11, 2019), https://www.pnas.org/doi/10.1073/pnas.1818859116.
[9]Industrial Economics, *Analysis of PM.25 - Related Health Burdens Under Current and Alternative NAAQS,*https://globalcleanair.org/wp-content/blogs.dir/95/files/2022/05/Analysis-of-PM2.5-Related-Health-Burdens-Under-Current-and-Alternative-NAAQS.pdf.
[10] GreenLatinos, *LCJF,*
https://www.lcjf.greenlatinos.org/_files/ugd/352e47_e3bf44c2175e4867a171544cd4a72ac2.pdf.(October 2022).

fence-line communities housing industrial facilities that produce a myriad of negative impacts, including emission exposure, traffic, odor, and noise.[11] In addition to the overwhelming data, communities have deeply woven experiences of impacts and generational harm that still exist today, as a result of systemic racism, economic inequality, and  injustice.

**This comment letter will discuss the proposed climate change and environmental justice provisions and call for the strengthening and preservation of pathways for equitable public participation and engagement. The undersigned organizations urge CEQ to adopt strong regulations that effectively and thoroughly center environmental justice communities. Embedding such protections in NEPA's implementation regulations would be a shared victory for communities and advocates across the country, all while advancing more durable and resilient infrastructure.**

## II.    DISCUSSION

### A.  Proposed §1508.1 Definitions

NEPA is often referred to as the "People's Environmental Law" and the  "Magna Carta" of  federal  environmental  laws.[12]  Accordingly,  the  implementing  regulations  must  boldly  and directly identify *who* the people are, with a heightened focus on those harmed and targeted by environmental injustice and inequity.

- **Proposed Definition of Environmental Justice (EJ) Communities:** Proposed section  1508.1(k)  proposes  to  define  "environmental  justice"  as  "the  just treatment and meaningful involvement of all people, regardless of income, race, color, national origin, Tribal affiliation, or disability, in agency decision making and other Federal activities that affect human health and the environment so that people: (1) Are fully protected from disproportionate and adverse human health

---

[11] Princeton University, *Racial Disparities and Climate Change*, https://psci.princeton.edu/tips/2020/8/15/racial-disparities-and-climate-change#:~:text=In%20total%2C%20African%20Americans%20are,health%20problems%20such%20as%20asthma. (August 15,2020).

[12] National Environmental Policy Act Website, *Welcome,* https://ceq.doe.gov/#:~:text=NEPA%20was%20the%20first%20major,actions%20prior%20to%20making%20decisions (undated); Also see Earthjustice, T*he People's Environmental Law: National Environmental Policy Act,*https://earthjustice.org/feature/national-environmental-policy-act#:~:text=January%209%2C%202023-,The%20People%27s%20Environmental%20Law%3A%20National%20Environmental%20Policy%20Act,or%20poorly%20planned%20federal%20projects (January 9, 2023).

and environmental effects (including risks) and hazards, including those related to climate change, the cumulative impacts of environmental and other burdens, and the legacy of racism or other structural or systemic barriers; and (2) Have equitable access to a healthy, sustainable, and resilient environment in which to live, play, work, learn, grow, worship, and engage in cultural and subsistence practices."[13]  The inclusion of this definition is welcome and long overdue. Since NEPA's enactment in 1970 and subsequent amendments and implementing regulations over the years, an explicit recognition of environmental justice communities has not existed, despite overwhelming science and data indicating the distinct experience, suffering, and interests of communities of color and/or low-income communities across the country.  Environmental justice advocates have historically called for a recognition of communities overburdened with pollution and environmental infrastructure noting "for federal policies, there is value in providing a baseline definition of EJ community that can serve as a floor and as a guardrail to ensure that the most affected geographic areas are covered under the definition."[14]

- **Proposed Definition of Cumulative Impacts:** The inclusion of "cumulative impacts" in the proposed definition is also significant, as CEQ rightfully acknowledges that the concept has "–meaning in the context of environmental justice relating to the aggregate effect of multiple stressors and exposures on a person,community, or population" and further, that "the evolving science on cumulative impacts is "sufficiently distinct from the general meaning of cumulative effects under the NEPA regulations that using a different term could be helpful to agencies and the public."[15] There has been significant advancement in cumulative impact assessments at the state level, as evidenced by the enactment of landmark environmental justice laws in New Jersey and New York State.[16] Federal agencies have also recognized cumulative impacts, such as

---

[13] Proposed § 1508.1(k).
[14] Equitable & Just National Climate Platform, *Approaches to Defining Environmental Justice Community for Mandatory Emissions Reduction Policy* [Insert Link] (September 2021) at 4.
[15] Federal Register, *National Environmental Policy Act Implementing Regulations Revisions Phase 2, "6. Environmental Justice* (§ 1508.1(k)"  https://www.federalregister.gov/d/2023-15405/p-430
[16] New Jersey Environmental Justice Law,  N.J.S.A.
13:1D,https://dep.nj.gov/wp-content/uploads/ej/docs/ej-law.pdf  *and*; New York Environmental Justice Law, Senate Bill 8830 and  Assembly Bill 2103D.

DOE and EPA.[17] Distinguishing cumulative impacts in the proposed rule is a just and promising step in advancing equity and justice in the federal permitting process.

### B.  Proposed §1500.2: Policy

The undersigned organizations support the inclusion of environmental justice and climate change considerations in the Policy section of the proposed rule. Proposed §1500.2(d) directs federal agencies to "Encourage and facilitate public engagement in decisions that affect the quality of the human environment, including meaningful engagement with communities with environmental justice concerns, which often include communities of color, low-income communities, indigenous communities, and Tribal communities."[18] Proposed §1500.2(3)(e) directs federal agencies to "Use the NEPA process to identify and assess the reasonable alternatives to proposed actions that will avoid or minimize adverse effects of these actions upon the quality of the human environment, such as alternatives that will reduce climate change-related effects or address adverse health and environmental effects that disproportionately affect communities with environmental justice concerns."[19]

Both provisions rightfully amplify the importance of environmental and climate justice in regulatory processes. As outlined in the above, environmental justice communities are overburdened with polluting infrastructure and often facing additional barriers, exacerbating public health, quality of life, and safety implications. The direct mention of climate-change, in the context of environmental justice, is also significant. Since NEPA was passed in 1970, anthropogenic climate change has accelerated at an unprecedented pace, with far-reaching and potentially irreversible consequences.[20] And Black, Brown, Indigenous and/or low-income communities are at the forefront of the climate crisis and they are the least able to prepare for, and recover from, the impacts which include heat waves, poor air quality, and flooding.[21] Indeed, Black and African American individuals are 40% more likely to currently live in areas with the

---

[17] Environmental Protection Agency, *Cumulative Impacts Research,* https://www.epa.gov/healthresearch/cumulative-impacts-research (last updated May 17, 2023).
[18] Proposed Rule §1500.2(d).
[19] Proposed Rule §1500.2(e).
[20] Environmental Protection Agency, *Climate Change Indicators: U.S. and Global Temperatures,* https://www.epa.gov/climate-indicators/climate-change-indicators-us-and-global-temperature#:~:text=Since%201901%2C%20the%20average%20surface,F%20per%20decade%20since%201979).
[21] Environmental Protection Agency, *Climate Change and Social Vulnerability in the United States: A Focus on Six Impacts,*https://www.epa.gov/system/files/documents/2021-09/climate-vulnerability_september-2021_508.pdf  (September 2021) at 4 - 8.

highest projected increases in extreme temperature related deaths.[22] Hispanic and Latin American individuals are 43% more likely to currently live in areas with the highest projected reductions in labor hours due to extreme temperatures.[23]

### C. Proposed §1501.3: Determine the appropriate level of NEPA review

Proposed Section §1501.3 provides a consolidated description of the process agencies should use to determine the appropriate level of NEPA review for a federal action. The undersigned organizations support the addition of paragraph (d)(2)(ix) in Section §1501.3, requiring agencies to analyze the degree to which an "action may have disproportionate and adverse effects on communities with environmental justice concerns" when determining the appropriate level of NEPA review.[24]

- **Environmental Justice Concerns should be distinctly considered when determining the level of NEPA review:** As outlined above, environmental justice communities bear an unjust amount of environmental historically rooted inequities and accordingly, should receive a heightened level of review. Countless communities live in dangerous proximity to multiple exposure sites such as highways, gas plants, pipelines, waste management infrastructure, oil extraction sites, petrochemical facilities, and others. Further, Black and Brown communities are also particularly hit hard by the effects of the climate crisis.[25]

- **The final rule must further define the "degree" to which an action may have a disproportionate impact:** The undersigned organizations ask that under paragraph (d)(2)(ix), CEQ be more specific about how an agency will include the "degree" to which an action may have disproportionate impacts that is aligned with our comments under *§1502.16 Environmental Consequences*, including how an agency considers not only

---

[22] Environmental Protection Agency, *Climate Change and Social Vulnerability in the United States: A Focus on Six Impacts,*https://www.epa.gov/system/files/documents/2021-09/climate-vulnerability_september-2021_508.pdf  (September 2021) at 4 - 8.
[23]  *Id.* at 6.
[24] Proposed §1501.3.
[25] GreenLatinos, *LCJF,* https://www.lcjf.greenlatinos.org/_files/ugd/352e47_e3bf44c2175e4867a171544cd4a72ac2.pdf. (October 2022) at 4.

the potential for adverse impacts but also the need for mitigation measures and equitable solutions.

### D. Proposed §1501.9: Public and governmental engagement

Proposed section §1501.9 addresses how agencies should conduct public engagement to inform the public of an agency's proposed action and how agencies should allow for meaningful engagement during the NEPA process, which ensures decision makers are informed by the views of the public. This section is an integral component of NEPA as it guides federal agencies on effective, two-way public engagement. Drawing upon the language access and justice principles in the LCJF, we offer the following considerations regarding language justice[26]:

- **Language Access in Public Outreach:** Proposed §1501.9(c)(3) outlines how to identify appropriate outreach methods, including "the ability of affected persons and agencies to access electronic media and the primary language of affected persons."[27] Language access in every structure of government and broad outreach to non-English speaking communities, or those with limited English proficiency (LEP), regardless of citizenship status, is vital to the meaningful engagement of marginalized communities in NEPA's democratic process. To this end, we urge CEQ to require translation and interpretation at every step of the outreach and notification in the NEPA process. CEQ must go beyond the "primary language of affected persons" and use U.S. Census data on the most widely spoken languages in an affected community to guide translation priorities into multiple languages. In §1501.9(d), we recommend requiring that public notices are published in English and any other required alternative languages in all available avenues, including email announcements, public notices physically posted in places of interest to the community, websites, social media, and other media forms.

- **Culturally Competent Community Engagement:** CEQ must provide guidance regarding how agencies hold engagement sessions with local partners to ensure that sessions are conducted in culturally sensitive ways. We also recommend that CEQ itself, as its own entity, conduct engagement sessions with local partners in culturally sensitive

---

[26] GreenLatinos, *LCJF*,
https://www.lcjf.greenlatinos.org/_files/ugd/352e47_e3bf44c2175e4867a171544cd4a72ac2.pdf.(October 2022) at 26.
[27] Proposed §1501.9(c)(3).

ways so that communities have built-in trust and buy-in i.e. partnering with a local validator or trusted community leader. CEQ must also recognize that not every U.S. resident has citizenship; therefore, public forums should not be held in venues requiring state-issued ID to enter, which restricts participation based on age and citizenship status. The undersigned organizations urge CEQ to incorporate language that would advise against the presence of uniformed officers, including Customs and Border Protection or Immigration and Customs Enforcement officers, at public forums that could deter undocumented persons or mixed-status families from attending and participating in public processes. In §1501.9(d)(C), we recommend coordination with local ethnic media outlets to ensure public notice announcements are disseminated directly into multilingual and multiethnic communities and shared broadly with community organizations, leads, and public service entities.

- **Translation of EISs and EAs:** Environmental Impact Statements (EIS) and Environmental Assessments (EA) must be translated and disseminated in culturally relevant, sensitive and competent ways.

In addition to these proposed changes for the Phase II Regulations, we express the importance of inclusive language in CEQ's Citizen's Guide to NEPA:

- **Inclusive Language in CEQ's *A Citizen's Guide to NEPA*:** Even in 2023, language is still too often a barrier to access and equity. CEQ's *A Citizen's Guide to NEPA* has only been translated into one other language: Spanish. This is problematic given the U.S. Census Bureau reports[28] that nearly 68 million people in the United States speak a language other than English as their primary language. This number is only projected to increase in the coming decade, with waves of migration increasing the presence of Asian languages such as Chinese, Vietnamese, Korean and Arabic in the United States. Further, the Spanish version of the Guide is outdated, as it reflects the 2007 edition and not the current edition issued in January 2021.
  - The undersigned organizations urge CEQ to remove the term "citizen" from the title and replace the term within the guide as well, as this language is exclusionary of permanent or temporary residents, as well as immigrants who do

---

[28] Sandy Dietrich, Erik Hernandez, *Nearly 68 Million People Spoke a Language Other Than English at Home in 2019*, https://www.census.gov/library/stories/2022/12/languages-we-speak-in-united-states.html. (December 6, 2022).

not have citizenship but who are affected by a federal project in their community and have a right to share their voice. Words such as "community" or "people" (as in "The People's Guide to NEPA" or "The Community's Guide to NEPA") are suggested as more inclusive replacements for the word "citizen."

In addition to the language justice provisions, we offer the following considerations to increase accessibility and engagement in NEPA processes:

- **Accessibility of EISs and EAs:** Environmental Impact Statements (EIS) and Environmental Assessments (EA) must be made available in formats that are reader-friendly and easy to understand for community members who may not have specialized expertise.

- **Community Driven Solutions:** CEQ should clearly define its plan to include community-driven solutions throughout the NEPA process. Importantly, CEQ must ensure mechanisms that invite affected communities to propose mitigation measures and alternatives that are not unduly difficult to engage with.

- **Addressing Inequitable Broadband Access:** We urge CEQ to require an equitable balance of internet-based outreach and physical outreach to accommodate communities with limited internet access, including rural communities with poor bandwidth infrastructure challenges and low-income communities.

By incorporating these recommendations, CEQ can enhance language justice and community access to the often daunting and tedious government public input processes. These recommendations further the spirit and intent of NEPA and restore its place as a critical tool in advancing public engagement, transparency, and participation for communities impacted by environmental and climate injustice. [29]

### E. Proposed §1501.10: Deadlines and Schedule for the NEPA Process

---

[29] GreenLatinos, *LCJF*, https://www.lcjf.greenlatinos.org/_files/ugd/352e47_e3bf44c2175e4867a171544cd4a72ac2.pdf.(October 2022) at 26 - 36.

Proposed §Section 1501.10 titled "Deadlines and Schedule for the NEPA Process" sets timelines for environmental assessments and environmental impact statements. Amendments to proposed Section §1502.7 sets page limits for environmental impact statements at 150 pages or 300 pages for proposals of "extraordinary complexity."[30]

- **Preserving complete and thoroughly analyzed assessments:** It is critical that withstanding these stringent page limitations, environmental impact statements and assessments are thorough, fulsome, analyses that do not sacrifice completeness or accuracy. Importantly, assessments must deliver upon the climate and environmental justice provisions that will be included in the final rule, despite politicalized attempts to shorten or dilute their consideration. The undersigned organizations encourage CEQ to include language in the final rule that emphasizes this.

### F. Proposed § 1501.3(d)(2): Determination of Significance

Proposed §Section 1501.3(d)(2) proposes to add new "intensity" factors when determining whether the effects of a proposed major federal action are significant.  Specifically, Proposed §1501.3(d)(2)(ix) proposes an intensity factor that measures "the degree to which the action may have disproportionate and adverse effects on communities with environmental justice concerns."[31] Communities impacted by environmental and climate injustice face particularized harms and vulnerabilities. Those experiences should be weighed, on their own merits, in the significance determination.

### G. Proposed §1502.16: Environmental Consequences

Proposed §1502.16 forms the scientific and analytical basis for comparisons in the "alternatives" section of EISs.[32] The following provisions are of note:

- **Proposed §1502.16 (10):** Proposes the identification of "Any relevant risk reduction, resiliency, or adaptation measures incorporated into the proposed action or alternatives, informed by relevant science and data on the affected environment and expected future conditions";

---

[30] Proposed §1502.7.
[31] Proposed  § 1501.3(d)(2)(ix).
[32] Proposed  § 1502.16(14).

- **Proposed §1502.16 (14):** Proposes the identification of "The potential for disproportionate and adverse human health and environmental effects on communities with environmental justice concerns."[33]

Importantly, the section proposes to require an explicit discussion of disproportionate harms imposed on environmental justice communities in the environmental consequences section. The inclusion of this consideration is long overdue, given the centuries of environmental dangers, toxins, public health implications, quality of life impacts, and unjust practices that perpetuate environmental violence on communities across the country. CEQ must ensure that this provision remains in the final version of the rule as a significant and long awaited step towards codifying environmental justice in the NEPA processes.

The undersigned organizations encourage the CEQ to further strengthen the language in this section to more effectively address these critical issues. Climate change is one of the most pressing challenges facing our planet, with far-reaching and potentially irreversible consequences. Given the urgency of the climate crisis, it is essential that NEPA provides clear guidance on how federal agencies should assess and mitigate climate-related impacts comprehensively. This includes not only the direct impacts of proposed actions but also the broader consequences of a changing climate on these actions and alternatives. Notwithstanding the "reasonably foreseeable" standard, we recommend the following enhancements for this section:

- **Comprehensive Climate Risk Assessment:** There should be a requirement for agencies to conduct a thorough climate risk assessment, including an evaluation of how climate change may affect the feasibility, viability and effectiveness of proposed actions themselves over their entire lifecycle.
- **Public Engagement on Climate:** Ensure that public engagement processes for NEPA reviews explicitly include opportunities for stakeholders to provide input and feedback on climate change considerations.

By strengthening the language in this section in the above ways, CEQ can demonstrate leadership in addressing the climate crisis and promote responsible federal decision-making

---

[33] Proposed §1502.16 (14).

that is attuned with the existential moment we are living and prioritizes climate change mitigation and resilience.

## III.   CONCLUSION

GreenLatinos, WE ACT for Environmental Justice, and the allied environmental justice and environmental organizations below thank the Council on Environmental Quality for an opportunity to comment on CEQ's National Environmental Policy Act Implementing Regulations Revisions Phase II (No. CEQ-2023-0003). Historically and currently, environmental justice communities have been marginalized and sacrificed in the buildout of environmental infrastructure in this nation. CEQ's efforts to directly advance equity and justice through these implementing regulations are welcomed and supported. As mentioned above, "The People's Environmental Law" must include *and* center the most impacted among those that face historic and present suffering, and are in need of timely, effective, change to combat climate change and harms caused by overburdening and pollution.

Respectfully submitted,

GreenLatinos
WE ACT for Environmental Justice

**Allied Environmental Justice Organizations:**

**Allied Organizations:**

13