# EXHIBIT K

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA
BISMARK DIVISION

| | |
|---|---|
| STATE OF IOWA, | ) |
| STATE OF NORTH DAKOTA, | ) |
| STATE OF ALASKA, | ) |
| STATE OF ARKANSAS, | ) |
| STATE OF FLORIDA, | ) |
| STATE OF GEORGIA, | ) |
| STATE OF IDAHO, | ) Case No. 1:24-cv-00089-DMT-CRH |
| STATE OF KANSAS, | ) |
| COMMONWEALTH OF KENTUCKY, | ) |
| STATE OF LOUISIANA, | ) |
| STATE OF MISSOURI, | ) |
| STATE OF MONTANA, | ) |
| STATE OF NEBRASKA, | ) |
| STATE OF SOUTH CAROLINA, | ) |
| STATE OF SOUTH DAKOTA, | ) |
| STATE OF TENNESSEE, | ) |
| STATE OF TEXAS, | ) |
| STATE OF UTHA, | ) |
| STATE OF VIRGINIA, | ) |
| STATE OF WEST VIRGINIA, and | ) |
| STATE OF WYOMING, | ) |
| | ) |
| Plaintiffs, | ) |
| v. | ) |
| | ) |
| COUNCIL ON ENVIRONMENTAL | ) |
| QUALITY, and BRENDA MALLORY, in | ) |
| her official capacity as Chair, | ) |
| | ) |
| Defendants. | ) |

_____

**DECLARATION OF VINCE KANA'I DODGE**

_____

1

I, VINCE KANAʻI DODGE, declare under penalty of perjury that:

1.    I am a long-time resident of Waiʻanae on the island of Oʻahu and a member of the Board of Directors of Mālama Mākua. Mālama Mākua is a Hawaiʻi nonprofit corporation, whose members consist primarily of residents of the Waiʻanae District of Oʻahu. The organization's goals include restoration of the land, return of the land to appropriate traditional and cultural uses, and protection of the public from adverse impacts associated with military training-related activities at the Mākua Military Reservation ("MMR"), a U.S. military base on Oʻahu. Members of Mālama Mākua include native Hawaiian practitioners, community leaders, and educators who are actively involved in the land-use issues associated with MMR.

2.    The U.S. military occupation in Mākua Valley began in 1929. In 1942, after the bombing of Pearl Harbor, the entire Valley was seized so that it could be used for training. The ranch, the farmers, and the homesteaders were all evicted, some of them at gunpoint. People were promised that the Valley would be returned to them within six months of the end of World War II. That is not what happened. From 1942 to 1998, the Valley was heavily bombarded with bombs, napalm, white phosphorus, and every type of projectile and mortar. There was a "dud rate" of about 10%, which resulted in the tens of thousands of unexploded ordinance littered all over the Valley. Ships in Mākua Bay fired into the Valley. Planes dropped all kinds of bombs. There were Beach assaults. Heavy artillery pounded the Valley and helicopters blasted targets. Training took place both day and night and the tracer weapons that the helicopters used at night were responsible for hundreds of fires in the Valley. It was not uncommon in the hot summers for the entire Valley to burn. These fires not only destroyed native flora and fauna in the Valley, but climbed out of the Valley and burnt and destroyed protected areas.

3.      The military also used the Valley as a disposal site for outdated munitions and dangerous waste, including radioactive waste and things like mustard gas. Many times, the heavy rains came after the burning of the Valley and this resulted in a tremendous amount of soil being washed downstream into Mākua Bay.

4.      Mākua Bay has been the site of a fishing village from time immemorial. Our coastline is one of the richest fishing areas on the island of Oʻahu. Families and community have been living on the beach for much of the time that the military has been training in the Valley. In the Waiʻanae community, Mākua Beach is a dearly loved beach and I like many others have raised my children and my grandchildren on that beach. The connection between the health of the Valley and the near shore waters is unmistakable. Those waters feed us. And after nearly 6 decades of intense bombardment of the Valley, our community was very concerned about how the contamination from those six decades of bombardment would be affecting us, and especially the most innocent of us, our pregnant mothers and infants.

5.      Mālama Mākua was originally organized in 1992 to oppose the Army's permit application to the Environmental Protection Agency to burn and detonate hazardous waste at MMR. Since then, Mālama Mākua and its members have continued actively to monitor the impacts of military activities at MMR. Mālama Mākua and its members are committed to the preservation and perpetuation of native Hawaiian culture, traditional and customary Hawaiian practices, cultural sites and resources in the Mākua region, including at MMR. Mālama Mākua has long been concerned about the destruction of cultural sites at MMR associated with defendants' military training and associated activities.

6.      My father, Dr. Fred Dodge, and my mother, Aiko Tanaka, met and married in Tokyo, Japan, where I was born. We moved to the island of Oʻahu in 1961 when I was four years

old, and I have lived here ever since. I moved to Waiʻanae in 1979. Between 1980 and 1990, I supported my family as a subsistence fisherman in and around the Mākua area. I have been diving in and around Mākua Bay regularly ever since, both to fish and to gather edible limu (seaweed). With forty years of experience fishing and diving for food, I am very familiar with the marine resources that are found here, especially those that are edible.

7.      Since I frequently eat fish, limu, shellfish and other marine resources gathered from Mākua and share those foods with my family and friends, I am concerned about possible contamination of Mākua's marine resources from military activities at MMR. Accordingly, I have participated actively in review of the United States Army's study of marine resources at Mākua, often through NEPA processes, doing my best to ensure that the study provides accurate information regarding the health risks of consuming the food I regularly gather there. Among other things, I have provided comments to the Army during opportunities for public input to provide information about marine species that I and other Waiʻanae Coast residents commonly gather at Mākua, so that the Army would know on which species it should focus for collection and testing for contaminants.

8.      As part of the NEPA process, we consulted with community members and gave the Army an extensive list of the most commonly caught and eaten fish, including octopus, shellfish, and limu. Some limu can be gathered on the shore after a high tide, some found on the reefs and gathered at low tide, and some you go diving in the water for. Many limu have a harvest season. We gave this information to the Army during the NEPA process, and also offered to help their contractors gather the identified limu. This knowledge comes from community members who have lived in this area for generations and is not commonly known by outsiders.

9.      You can imagine our surprise when the study was released and they could not even identify the type of limu that they had gathered and studied. They had gone down to the shoreline and picked up whatever was there and then they justified this by making the statement that this was a traditional gathering practice. It's as if you went to a grocery store, walked in the door and just grabbed the first few things you saw, and called it going shopping. That is not traditional gathering practice. When we gather, we know what we're looking for. We know where and when we are going to look for it. If for some reason, it is not available, we will gratefully take what is available, but we never go to the ocean and just take whatever. We had to take the Army back to federal court to get them to do a decent limu study as part of the NEPA process. The fish, shellfish, and octopus part of the study was woefully inadequate as well. It turned out that the contractors were not allowed to go into the ocean.

10.     The federal judge agreed with us, and decreed that they needed to do a better study. As far as I can remember, the final study did include some of the fish and limu that are commonly eaten. In the larger picture, I believe that because of NEPA, we were able to protect other living members of our community, i.e., native fauna and flora, from near total annihilation, by suing the Department of Defense. The result of the lawsuit and the eventual settlement was the protection and propagation of native fauna and flora, reconnection of our people with our `Aina (land), suspension of live fire training for nearly 20 years in Mākua Valley, and the declaration in federal court in November 2023 that the Department of Defense would not now or in the future use Mākua Valley for live fire training. This shift in the last 25 years from intensive bombing and destruction of sacred `Aina to the total cessation of live fire training, will now and in the future have tremendous positive impacts on our community, our island nation, and the world beyond.

11.     In 2024, the Biden White House updated the NEPA regulations. The updated regulations explicitly called for greater consideration of environmental justice in the NEPA process. This provision is important to me, my community, and my organization. The Wai`anae community is the site of the two largest landfills on the island of O'ahu, the only major power plant in the US with the exemption to burn high content sulfur fuel, the four thousand acre Naval Ammunition Depot, the four thousand acre Mākua Military Reservation training range, and Space Force tracking facilities. The community is also home to the largest concentration of native Hawaiians in the world. Would any of these destructive health-risking entities be near the affluent neighborhoods of Honolulu? Or in the proximity of downtown Honolulu or Waikiki? Of course not. These communities have the money and expertise to fight these types of developments. And so they are relegated to communities like ours. The population of Wai`anae is over 60,000. The continual exposure to environmental degradation has and will continue to hurt our people. Greater consideration of environmental justice in the NEPA process is critical in shifting the "business as usual" dynamic.

12.     Removing the environmental justice language would make it more difficult for communities like mine to be heard in the NEPA process, undermining the goals of NEPA to fully consider the environmental impacts of government decisions.

13.     This lawsuit also challenges provisions in the regulations that call for agencies to consider "indigenous knowledge" in NEPA reviews. In my view, consideration of indigenous knowledge is crucial to serving NEPA's goals. Place-based knowledge carried by the people who have lived in a particular place for many generations is critical to understanding how to best take care of people and all living beings. The world has become small and it is crystal clear that we humans and all other living beings share just one home, Mother Earth or Mama `Aina. We are

6

and have always been in a reciprocal relationship with Mother Earth and it is crucial that we do our best to take care of our common home.

14.     It is my understanding that the 2020 version of the NEPA rules, issued under the Trump administration, limit public participation in the NEPA process and limit the scope and extent of NEPA reviews as compared to long-standing NEPA procedures in place since the 1970s. Reverting to these rules would harm our families and community by limiting our ability to participate meaningfully in NEPA processes that impact our lives and well-being.


Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.


Executed on this _14_ day of June, 2024 at Waiʻanae, Hawaiʻi.

_____
Vince KanaʻI Dodge

7