# EXHIBIT L

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA
BISMARK DIVISION

| | |
|---|---|
| STATE OF IOWA, | ) |
| STATE OF NORTH DAKOTA, | ) |
| STATE OF ALASKA, | ) |
| STATE OF ARKANSAS, | ) |
| STATE OF FLORIDA, | ) |
| STATE OF GEORGIA, | ) |
| STATE OF IDAHO, | ) Case No. 1:24-cv-00089-DMT-CRH |
| STATE OF KANSAS, | ) |
| COMMONWEALTH OF KENTUCKY, | ) |
| STATE OF LOUISIANA, | ) |
| STATE OF MISSOURI, | ) |
| STATE OF MONTANA, | ) |
| STATE OF NEBRASKA, | ) |
| STATE OF SOUTH CAROLINA, | ) |
| STATE OF SOUTH DAKOTA, | ) |
| STATE OF TENNESSEE, | ) |
| STATE OF TEXAS, | ) |
| STATE OF UTHA, | ) |
| STATE OF VIRGINIA, | ) |
| STATE OF WEST VIRGINIA, and | ) |
| STATE OF WYOMING, | ) |
| | ) |
| Plaintiffs, | ) |
| v. | ) |
| | ) |
| COUNCIL ON ENVIRONMENTAL | ) |
| QUALITY, and BRENDA MALLORY, in | ) |
| her official capacity as Chair, | ) |
| | ) |
| Defendants. | ) |

## DECLARATION OF WILLIAM HOUSTON

I, **William Houston**, make the following declaration under penalty of perjury pursuant to 28 U.S.C. § 1746. This declaration is based on my personal knowledge, information, and belief.

1

1. I am a current member of the National Wildlife Federation (NWF) Board of Directors, and am a past chair of the Board. I currently live in Kingfield, Maine, and have for the last 35 years.

2. I have both a personal and a professional interest in ensuring that the environmental impacts of federal projects are thoroughly and appropriately examined and that the public, including myself and organizations that I am member of, have ample and meaningful opportunity to participate in the process of evaluating those impacts.

3. I have worked as a Master Maine Guide with thousands of river miles guiding raft, canoe, and kayak trips throughout North American and Europe, and have taught outdoor leadership and skills at Somerset Career and Technical Center, in Skowhegan, Maine for over 25 years. As part of that work, I developed a pioneering two-year course to prepare high-school-age students to work in the natural resources and outdoor recreation industries while instilling in them an appreciation of nature and a conservation ethic.

4. I served as chair of the State of Maine's Whitewater Guides Advisory Board for many years, and I am a life member of the Maine Wilderness Guides Organization.

5. From 1999 to 2001 I worked with the Natural Resources Council of Maine (NRCM), NWF's affiliate and an organization dedicated to protecting the natural resources of Maine, to organize a Guide's Rendezvous—a conference designed to empower guides to take actions to protect Maine's environment. I served on the Board of Directors for NRCM for seven years in the early 2000's , with two years as Board President. In 2002, NRCM recognized my efforts to protect Maine's wild and scenic places by honoring me with an Environmental Achievement Award. NRCM is a nonprofit membership organization protecting, restoring, and conserving Maine's environment and is NWF's affiliate organization in Maine. NRCM has

existed for more than 60 years and works to protect the health of Maine's rivers, lakes, streams, and coastal waters; promote sustainable communities through initiatives that reduce toxic pollution and waste; decrease air and climate-changing pollution through energy efficiency and renewable sources; conserve Maine lands and wildlife habitat, including our treasured North Woods; and defend the federal environmental policies and programs that help protect Maine. It has more than 30,000 supporters statewide and beyond

6. I have taken a great deal of satisfaction in my work over the years protecting the many lakes, rivers, streams, and other water resources that I canoe, raft, fish, and otherwise use and enjoy. I often have engaged as a member of the public in commenting or testifying on federal licenses and permits that impact these resources such as the operation of dams and developments that could alter the flow of or pollute waters or other natural resources, potentially diminishing my enjoyment of the use of these resources.

7. I also own a cabin on Chesuncook Lake, a Maine gem lake near Baxter State Park that is level controlled by the Ripogenus Dam. The Ripogenus Dam on the West Branch of the Penobscot River has been operating since 1916. Chesuncook Lake is the third largest lake in Maine, known for its beauty, wildlife, recreational opportunities, and the chance for solitude and the enjoyment of nature.

8. I spend a great deal of time at my cabin, where I enjoy the recreation and natural beauty the lake and area provide, including the nearby West Branch that exists downstream of the Ripogenus Dam. In particular, I enjoy fishing for landlocked salmon, and watching wildlife, such as loons. There is nothing that connects me to the wilds of Maine like hearing the hauntingly beautiful calls of loons echo through the night. I also spend a lot of time canoeing and

rafting on the lake and river. I intend to continue these activities for the foreseeable future as we plan to spend ample time at our cabin for many years to come.

9. The operation of the Ripogenus Dam has an immense impact on my ability to enjoy and use Chesuncook Lake and the West Branch of the Penobscot River. The dam was historically operated to support paper mills, which resulted in relatively consistent water releases that maintained stable lake levels. These consistent flows provided flow for rafting, and water stability for fisheries and wildlife such as loons, ensuring that loon nesting areas, which are near the shore, have predictable and constant access to the lake and the water.

10. However, since the closure of the last paper mill approximately a decade ago, the dam has been operated to supply power to the grid. As such, the operation of the dam has changed substantially in recent years, with large flow fluctuations and larger and longer water releases. This has resulted in large drawdowns of water from the lake that have resulted in extremely low lake levels and much less consistent flow in the river.

11. These changes in operation have impacted my use of both the river and the lake. Flows in the river are much less consistent, impacting fish habitat and survival. The major drawdowns and extremely low lake levels make access to the lake difficult with boat launches becoming unusable and large expanses of exposed lake bottom, and can expose hazards on the lake. Additionally, low lake levels can effectively destroy loon nesting habitat by causing nesting areas to be too far from the water the loons need to have nearby. These negative impacts reduce the amount and the health of salmon and the populations of loon, making it harder for me to enjoy fishing for salmon and to observe and listen to the loons I love. The major drawdowns are currently allowed under the existing Federal Energy Regulatory Commission's (FERC) license

4

which has no effective drawdown limit, placing no real drawdown limit on the dam's operator, Great Lakes Hydro America, LLC (GLHA), a subsidiary of Brookfield Renewable.

12. The Ripogenus Dam operating license is scheduled to be renewed in 2026. As part of the re-licensing process, FERC is planning to issue an environmental document under the National Environmental Policy Act (NEPA) which will be used by FERC to help determine whether, and under what conditions, to issue a new license for the dam. This process will be influential in determining how the dam will operate for the next thirty to fifty years. Because the result of this overall licensing process that will be greatly informed by the NEPA process will have significant impact on how the lake and the river are managed, it will directly affect my use of the lake and river. My wife and I have been directly involved in this licensing process for three years and intend to continue to the engage the process, including submitting comments at every opportunity such as during the preparation of NEPA documents, to weigh in how we believe the dam should be operated to protect our interests in rafting, wildlife observation and enjoyment including impacts on loons, and impacts on fisheries such as salmon which I frequently fish for and enjoy and continue to do so. The NEPA process will also inform our understanding of how the dam will operate under its renewed license – if that license is issued – and what the impacts of that operation will be.

13. As such and from my long history of involvement in protecting the places I love in Maine and elsewhere, I am familiar with NEPA and the Act's requirement that agencies take a "hard look" at many of their actions and that they solicit and consider public comment during the process of taking a hard look. This hard look often results in an environmental impact statement as well as a detailed examination of the impacts of a major federal action and a consideration of reasonable alternatives to the action.

14. I am aware that on May 1, 2024, the U.S. Council of Environmental Quality issued a final rule that helps restore provisions that were rolled back in 2020 to ensure that NEPA fulfills its role as a statute to inform the public about major federal actions and take a look at serious impacts of a project like climate impacts, impacts to environmental justice communities, and reasonable alternatives including alternatives that might result in a more environmentally beneficial alternative than the proposed alternative.

15. These rules will help ensure that my concerns about the dam are heard and help ensure that important considerations are evaluated when FERC considers the reissuance of the license. For example, by considering climate impacts, the 2024 NEPA regulations will help make it more likely that considerations such as increased drought and flooding events will be evaluated and explained, as will their impact on species like loons and salmon and on recreational and other uses. The influence of climate change on the operation of the dam needs to be considered so that conditions such as increased drought and flooding that will greatly affect lake levels and potentially exacerbate the impact of drawdowns on recreational users and species like salmon and loons are examined as part of the decision-making process on the license renewal. Consideration of these impacts will increase my understanding of any conditions that are imposed as part of the relicensing and also help ensure that my concerns about how climate change impacts in the operation of the dam affect my use and enjoyment of the lake and river will be heard by FERC.

16. If the court overturns the 2024 rules, I will be harmed because it will be unlikely that these important considerations will be evaluated. This will diminish my understanding of the relicensing and not inform me about potential impacts that are very important to my use and

enjoyment of the lake. It will also make it less likely that conditions will be made part of any license that will protect my interests in the use and enjoyment of the lake and river.

17. By contrast, if a court declares the NEPA regulations are valid, I will feel more confident that my voice will be heard in the NEPA process regarding the dam re-licensing, that all important impacts on salmons, loons, recreation, and other wildlife will be evaluated, and that the important impacts of climate change on the relicensing will be considered. I will additionally be more confident that I will have the information needed to understand the impacts of the relicensing and the alternatives considered, and that a consideration of these impacts and alternatives are likely to result in a new license that will be protective of my interests in the lake and the river.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed on this 22nd day of June, 2024 at Kingfield, Maine.

William Houston