# EXHIBIT N

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA
BISMARK DIVISION

| | | |
|---|---|---|
| STATE OF IOWA, | ) | |
| STATE OF NORTH DAKOTA, | ) | |
| STATE OF ALASKA, | ) | |
| STATE OF ARKANSAS, | ) | |
| STATE OF FLORIDA, | ) | |
| STATE OF GEORGIA, | ) | |
| STATE OF IDAHO, | ) | Case No. 1:24-cv-00089-DMT-CRH |
| STATE OF KANSAS, | ) | |
| COMMONWEALTH OF KENTUCKY, | ) | |
| STATE OF LOUISIANA, | ) | |
| STATE OF MISSOURI, | ) | |
| STATE OF MONTANA, | ) | |
| STATE OF NEBRASKA, | ) | |
| STATE OF SOUTH CAROLINA, | ) | |
| STATE OF SOUTH DAKOTA, | ) | |
| STATE OF TENNESSEE, | ) | |
| STATE OF TEXAS, | ) | |
| STATE OF UTHA, | ) | |
| STATE OF VIRGINIA, | ) | |
| STATE OF WEST VIRGINIA, and | ) | |
| STATE OF WYOMING, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| v. | ) | |
| | ) | |
| COUNCIL ON ENVIRONMENTAL | ) | |
| QUALITY, and BRENDA MALLORY, in | ) | |
| her official capacity as Chair, | ) | |
| | ) | |
| Defendants. | ) | |

**DECLARATION OF DAVID LAMFROM**

I, David Lamfrom, declare as follows:

1.      The facts set forth in this declaration are based upon my personal knowledge. As to those matters that reflect an opinion, they reflect my personal and professional opinion on the matter. If called upon to testify, I could and would do so competently.

2.      I have worked for the National Parks Conservation Association ("NPCA") since 2008. I first became a member of NPCA in 2010. I last renewed my membership on January 1, 2024. I reside in Knoxville, Tennessee.

3.      I am currently the Vice President of Regional Programs for NPCA. In this capacity, I lead a staff of 70 other professionals all over the country who work to protect the resources, stories, and legacy of our national parks. I am a part of NPCA's Executive Team which supports our organization's prioritization of work and decision-making functions. I also lead the Diversity, Equity, and Inclusion work for NPCA. This work starts internally but also involves creating authentic long-term partnerships with communities that have deep relationships with places that are now national parks and ensuring equitable access to national park sites. I have previously held several other positions at NPCA, including Southeast Regional Director and Director of the California Desert and Wildlife Program.

4.      As a longtime NPCA staff member, I have personal knowledge of NPCA's mission and activities. NPCA is a nonpartisan, non-profit organization headquartered in Washington, D.C., whose mission is to provide an independent voice for protecting and enhancing America's National Park System for present and future generations. For over a hundred years, NPCA has worked to protect places of unparalleled natural wonder, historical significance, and cultural value. NPCA has more than 1.6 million members and supporters nationwide.

5.     I have traveled many times to the national park units for both personal and professional reasons. I enjoy hiking, photography, watching wildlife, and learning about ecology, and natural and cultural history in park units throughout the country, including Mojave National Preserve, Everglades National Park, Great Smoky Mountains National Park, Yellowstone National Park, National Park of American Samoa, and Katmai National Park and Preserve, to name a few. I have visited well over 100 national park units in my life and career. I have organized many dozens of park visits for members, allies, and decision-makers to educate them about the values the park was established to preserve, the threats to those values, and how people can help protect a particular park and its natural and historic setting for future generations.

6.     NPCA's regional teams tackle many park-related issues. We regularly advocate for protecting natural, cultural, and historic places from proposed and existing harmful and/or incompatible uses and impacts that would degrade, or already degrade, their visual, ecological, historical, and cultural values. For instance, we contest ill-considered developments in and near park sites, work to clear the air and water of pollution that harms parks and people, advocate for wildlife corridors between protected spaces, and fight for the protection of parks against consumptive and damaging uses. Our regional staff also work closely with communities that intersect with national park units due to being gateway communities, having interest in being involved in park planning issues, advocating for their protection, or having cultural affinity or connection to the national park units themselves. NPCA's regional team works on campaigns by communicating with decision-makers at the local, regional, state, and national levels, building community around specific key issues national park units face, and working to raise awareness of key issues to make sure communities and decision-makers are involved in these important and

timely issues. Many of the issues we engage on go through the National Environmental Policy Act ("NEPA") process.

7.     I am familiar with NEPA and the regulations to implement that law. NPCA staff regularly review and analyze NEPA documents and submit detailed, technical comments on proposed actions that may impact national park sites across the country. These federal proposals include, but are not limited to, permit applications to construct pipelines, electric transmission lines, highways, and industrial facilities, and general management plans that guide National Park Service ("NPS") management. Many of these proposals undergo NEPA processes and that constitutes one of our primary venues for participation and for the participation of our members, allies, coalitions, and communities we work with. We seek to participate in such processes to ensure that our concerns about impacts on federal lands are considered. I have been involved in hundreds of NEPA process components, whether it be drafting comments, supervising the commenting process, reviewing and editing our regional teams' comments, attending public meetings, delivering public comment, consulting with community members, educating the community about NEPA and how to best participate, or educating agency leadership. NPCA has hosted several NEPA workshops to help educate community members on how the process works and how to be effective in their participation.

8.     NEPA is integral to the work of NPCA because it ensures we are aware of proposed projects that may impact park sites and allows us to express concerns about the potential negative impacts of a proposal or our support for an important proposal. It is imperative that agencies fully analyze all the effects of their proposed actions so that the public understands the risks beforehand and the agency can make a well-informed decision. Not including certain types of impacts in a NEPA analysis, would result in additional threats to the areas that I regularly visit for recreational

and professional purposes. It would also discourage the American public from being involved in important decisions regarding national parks and public lands for whom they are stakeholders.

9.      NPCA communicates extensively with its members and supporters, as well as the general public, about threats to park sites and positive opportunities by issuing press releases, publishing its quarterly magazine, hosting its regular podcast "The Secret Life of Parks," and sending email and action alerts. NPCA frequently encourages its members to submit public comments on NEPA documents that will impact national park sites. These comments often address federal agencies not properly analyzing the impacts of proposed actions including both climate change and/or how the proposal would disproportionately affect marginalized communities.

10.     NPCA as an organization is focused on how climate change is and will continue to threaten national park sites. It has and will continue to cause harm to irreplaceable wildlife habitat, increase flooding and drought conditions, escalate sea level rise, and increase the severity and quantity of natural disasters, like fires and hurricanes. These natural disasters and increasing temperatures will also make visitation harder in many circumstances. For instance, wildfires burned through Yosemite's sequoia groves and floods in Yellowstone left communities and visitors without power and drinking water. Given the broad impacts of climate change, it is essential that the government consider both the reasonably foreseeable effects of proposed projects on climate change and the effects of climate change on the proposed action and their alternatives. NPCA also cares greatly about how NPS will manage its resources effectively amid the changes caused by climate change. I regularly advise regional staff members to consider climate impacts when analyzing a proposal by the government.

11.     When analyzing a proposal that may impact a national park site, we also strive to always consider the potential environmental justice impacts. NPCA as an organization recognizes

that the modern environmental movement and public lands system were built on a foundation of the harmful displacement of Indigenous people. NPCA's work with national parks also is directly related to stories of the Civil Rights Era and movement as well as many other significant stories of social justice that are fundamental to our national identity and which have been identified as worthy of being held and interpreted by NPS. We always strive to acknowledge past injustices, listen to underrepresented and marginalized voices, and work toward reconciliation. I always stress to my regional staff members to consider how a proposal may impact marginalized groups and to include, when relevant, that in our comments to government agencies. National park units are sited throughout the country and are closely connected to adjacent communities as well as communities that have cultural connections to the lands NPS currently manages. It is imperative that we hear from those communities when we consider actions that would propose significant impacts so that we can carefully analyze them and make decisions that represent the public interest.

12.    Throughout my years in conservation and preservation advocacy, my staff and I have been involved in countless NEPA processes. Below I describe just a few of them.

13.    Under my supervision, NPCA's Alaska regional office has been working for years to oppose the Ambler Mining District Industrial Access Road. The organization opposes this 211-mile industrial mining access road because it would have devastated a vast wilderness landscape that is home to 66 Alaska Native communities, and disrupted caribou migration, the subsistence lifestyles of rural Alaskans, and the integrity of Gates of the Arctic National Park and Preserve. In 2023, along with our coalition partners, NPCA commented on the supplemental draft environmental impact statement ("SEIS") for the proposed Ambler Mining District Industrial Access Road. The comments discuss in detail how Bureau of Land Management (BLM) failed to fully consider the direct and cumulative climate impacts, as well as the impacts of climate change

on the road and connected mines. The comments also stress that BLM must do a better job of analyzing how the project may lead to additional significant adverse effects on environmental justice communities. Specifically, our comments discuss how "large-scale mining projects located in remote, isolated communities are correlated with impacts such as high poverty and unemployment rates, poorer health, lower education attainment, and long-term out-migration. As minority and low-income status is the norm in the region proposed for the Ambler Road, such adverse environmental justice impacts are likely to be severe and to reverberate throughout the region." We advocated for a detailed analysis of the likelihood, magnitude, and duration of all such likely environmental justice impacts. In addition to the organizational comments, NPCA encouraged our members to submit comments that outlined how the road would negatively impact over 20 million acres of national parklands and 66 Alaska Native Tribes. On April 19, 2024, the Department of the Interior ("DOI") issued the Final Supplemental Environmental Impact Statement for the Ambler Road proposal, identifying the No Action Alternative as its preferred alternative and rejecting the project. In doing so, DOI acknowledged that any of the action alternatives "would significantly and irrevocably impact resources, including those supporting important subsistence uses, in ways that cannot be adequately mitigated."[1] I was thrilled that DOI truly considered the impact the proposal would have on tribal and other local communities and, in part, rejected the proposal due to those negative impacts.

14.    I have drafted comments that address renewable energy projects and the development of overarching frameworks that create public land policies governing renewable

---

[1] Press Release, Dep't of Interior, Biden-Harris Administration Takes Critical Action to Protect Alaska Native Subsistence, Lands and Wildlife (Apr. 19, 2015), https://www.doi.gov/pressreleases/biden-harris-administration-takes-critical-action-protect-alaska-native-subsistence.

energy. One primary intention of these renewable energy projects and frameworks is to promote clean energy development that reduces climate change by limiting fossil-fuel generated electricity. It is imperative that climate change be analyzed when industrial-scale projects are being contemplated, particularly when they have the stated purpose of supporting a clean-energy transition. It is also important that the climate and social justice impacts of industrial scale projects occur even when projects propose benefits that include climate. Examples of these NEPA processes include the development of BLM's Desert Renewable Energy Conservation Plan, BLM's Western Solar Programmatic Plan, the Caithness Soda Mountain Solar Project, the Silurian Valley Solar and Wind Project, the Desert Sunlight Solar Project, the Ivanpah Solar Project, the Stateline Solar Project, the Eagle Crest Pumped Energy Project, and the Crescent Peak Wind Energy Project.

15.    Under my supervision, NPCA's Sun Coast Office has been working to lessen the impacts of off-road vehicle usage in Big Cypress National Preserve. In 2020, NPCA submitted comments on the DEIS for the Preserve Backcountry Access Plan ("BAP"), which strongly urged NPS to rescind the DEIS and re-issue a new and more comprehensive DEIS. Our comments explained how NPS failed to include climate change and sea-level rise in its baseline and impact analyses of the BAP. This analysis is necessary because sea-level rise is an increasing concern in South Florida and needs to be evaluated in all planning decisions in the region.

16.    Overall, NEPA has given NPCA the opportunity to participate in decision-making impacting federal lands and park resources. In the years to come, NPCA plans to continue to regularly gain information on federal projects and permits in and around national park sites and share our knowledge of the potential impacts. The recent revisions to the NEPA regulations properly affirm that federal agencies should be doing full analyses of all the reasonably foreseeable

risks and harmful impacts of proposed projects. NPCA has a clear interest in ensuring that agencies continue to evaluate and consider the climate and environmental justice impacts of a proposal before deciding whether to go forward with it. First, it helps us organizationally understand the potential risks, which can help us decide our position on a given proposal. Second, it ensures that the federal government is making fully informed decisions about proposals that may impact park sites that NPCA has been working to protect for over a century. Without the opportunity to voice particular concerns and advocate for these interests through the NEPA process, I will experience professional, environmental, aesthetic, and recreational harms.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed on this _17th_ day of June, 2024.

David Lamfrom

9