# EXHIBIT O

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA
BISMARK DIVISION

| | |
|---|---|
| STATE OF IOWA,<br>STATE OF NORTH DAKOTA,<br>STATE OF ALASKA,<br>STATE OF ARKANSAS,<br>STATE OF FLORIDA,<br>STATE OF GEORGIA,<br>STATE OF IDAHO,<br>STATE OF KANSAS,<br>COMMONWEALTH OF KENTUCKY,<br>STATE OF LOUISIANA,<br>STATE OF MISSOURI,<br>STATE OF MONTANA,<br>STATE OF NEBRASKA,<br>STATE OF SOUTH CAROLINA,<br>STATE OF SOUTH DAKOTA,<br>STATE OF TENNESSEE,<br>STATE OF TEXAS,<br>STATE OF UTHA,<br>STATE OF VIRGINIA,<br>STATE OF WEST VIRGINIA, and<br>STATE OF WYOMING,<br><br>            Plaintiffs,<br>   v.<br><br>COUNCIL ON ENVIRONMENTAL<br>QUALITY, and BRENDA MALLORY, in<br>her official capacity as Chair,<br><br>            Defendants. | Case No. 1:24-cv-00089-DMT-CRH |

## DECLARATION OF TAYLOR MCKINNON

DECLARATION OF TAYLOR MCKINNON

I, Taylor McKinnon, declare as follows:

1. I make this declaration of my own personal knowledge. If called to testify as a witness, I could and would testify competently regarding its contents.

2. I have been a member of and have worked for the Center for Biological Diversity since 2007, where I am the Southwest director. The Center for Biological Diversity ("the Center") is a national membership organization founded in 1989 and dedicated to the protection and recovery of endangered species and their habitats, including river ecosystems and imperiled fish and other species throughout North America. The Center is headquartered in Tucson, Arizona and has 1.7 million members and online activists as of June 2024.

3. Before working for the Center, I worked at Grand Canyon Trust ("the Trust"), beginning in 1999. The Trust is a regional membership organization that is dedicated to protecting and restoring the Colorado Plateau—its spectacular landscapes, flowing rivers, clean air, diversity of plants and animals, and areas of beauty and solitude.

4. I regularly use and enjoy public lands; and I have since I was a child. I grew up and still live in Flagstaff amidst national forests and parks that I regularly visit. Activities that I regularly engage in on public lands include hiking, cycling, camping, fishing, photographing, snowboarding, birding, nature and wildlife observation and vehicle touring. My love of the natural world and public lands inspired me to own and operate a river rafting business in southern Utah earlier in my career. My use and enjoyment of public lands brings joy to my life.

5. Since a child, I have engaged a practice of natural history, which is the intentional, focused attentiveness and receptivity to the more-than-human world. This practice has yielded a deep appreciation for the natural world, including its biological diversity and

aesthetics; it was the focus of my college studies in environmental studies, field ecology, and natural history; it is the primary focus of my hobby, photography; and it led me to a career working to protect and preserve nature.

6.      As Southwest director for the Center, in my earlier capacities at Grand Canyon Trust, and as a result of my deep personal interests in the natural world, for more than two decades I have worked to protect public lands and waters. This includes regularly participating in processes set forth under the National Environmental Policy Act (NEPA) for federal proposed actions to harm federal public lands and species and ecosystems therein. I am familiar with NEPA, the 1978 regulations to implement that law, and the regulations adopted in July 2020 that fundamentally revise the 1978 rules. I have participated in dozens of NEPA processes evaluating uranium mining, recreational projects, logging, off-road vehicles, fire management, livestock grazing, fossil fuel development, land use management plans, pipelines, rights-of-way, and many other proposed actions.

7.      I have found NEPA's procedural safeguards embodied the 1978 regulations to be crucial to improving projects and reducing the unnecessary environmental impacts, because in my experience NEPA review typically reveals diverse perspectives and impact-reduction solutions that otherwise would not be identified by the action agency. NEPA review often reveals issues and direct, indirect, cumulative, and synergistic effects of proposed federal actions. Good NEPA review reveals inconsistencies between federal projects and governing plans, laws, and regulations that would otherwise go undetected, avoiding resulting environmental harm by disclosing harm ahead of implementation and devising mitigation measure to address those harms. The 2024 regulations will restore some of the important provisions of the 1978 regulations that CEQ's 2020 amendments weakened, and strengthen them in some regards too.

8.     The Center has engaged thousands of NEPA processes, and at any given time is engaged in dozens of NEPA processes for federal actions whose potential effects are relevant to our mission. The public participation, analysis and disclosure requirements of NEPA are critical to ensuring that federal agency decisions factor the public's interests, including mine and those of the Center; that they that are consistent with other laws and policies; and that they rationally rely on the best scientific and technical information available.

9.     For example, NEPA was critical to securing the Northern Arizona Mineral Withdrawal, protections that preclude new uranium mining on one million acres of public lands surrounding Grand Canyon National Park. I helped to spearhead the campaign to secure those protections because I have a deep lifelong connection to the lands and waters threatened by new mining. The Department of the Interior's Environmental Impact Statement afforded me, the Center, the Trust, Tribes, other organizations and hundreds of thousands of members of the public to voice support for protections and to provide information elucidating threats to public values that in turn drove a robust analysis of impacts and alternatives. The Department's decision to withdraw these lands and ban new mining claims was supported by NEPA and its procedures. The EIS weighed facts provided by the public and sister agencies; it considered concerns raised by the public; it weighed scientific uncertainty and risk against potential harms. As a result, the Interior Department concluded, rationally, based on facts, that a withdrawal was warranted to avoid irreplaceable harm, including indirect and cumulative impacts, to public values like aquifers, springs, wildlife, cultural sites, and unindustrialized landscapes. That decision, facilitated by NEPA's public participation and procedures for analyzing direct, indirect, and cumulative impacts, and evaluating a range of reasonable alternatives safeguarded my personal

and professional interests in protecting and preserving nature in and around Grand Canyon National Park.

10. In another example, NEPA has been critical to informing motorized vehicle use on the Apache-Sitgreaves National Forest in eastern Arizona. The Apache-Sitgreaves National Forest includes vast tracts of high-value habitats for threatened and endangered species including Mexican spotted owl, Apache trout, New Mexico jumping mouse, and Mexican grey wolf. The Center has a long history of working to protect these species on the Forest, and I frequently visit the Forest with my friends and family to camp, fish, photograph, hike, and to observe flora and fauna.

11. The Forest Service's Public Motorized Travel Management Plan Environmental Impact Statement analyzed motorized vehicle use impacts to natural resources such as soils, streams, and threatened and endangered species, to propose a range of open road networks for the Forest. The Center participated in scoping and provided extensive comments on the Draft Environmental Impact Statement. Recognizing impacts to resource values from status-quo motorized use management, the Final Environmental Impact Statement's preferred alternative, and each of its action alternatives, would limit most motorized travel to designated open routes, and would sharply reduce the number of those routes that remain open. While the Center continues to engage this NEPA process in advance of a forthcoming decision, NEPA's public participation and procedures for analyzing direct, indirect, and cumulative impacts, have resulted in the Apache-Sitgreaves National Forest considering, for the first time, Forest-wide motorized vehicle use in the context of impacts to the values that I and the Center care about, such as the survival and recovery of threatened and endangered species. Here, by yielding a range of action alternatives for motorized vehicle use that improve conditions over status quo for most

threatened and endangered species, NEPA's public participation and procedures for analyzing effects are safeguarding my personal and professional interests in protecting and preserving nature in eastern Arizona's high country.

12.     As part of my enjoyment of public lands, I regularly visit Grand Canyon National Park's South Rim and lands of the Kaibab National Forest near the town of Tusayan, Arizona that directly abut the Park. I visit the South Rim area several times each year to hike, sightsee, and take photographs of the Grand Canyon and wildlife in the area. I relish my time within the Park and National Forest lands because of the awesome scenery and wild forests there. I visited the South Rim area most recently in March 2024 and plan to return to photograph storms upon onset of the summer monsoon.

13.     I am aware that the Forest Service has received applications from an Italian development corporation named Stilo for rights-of-way for water and natural gas pipelines, electricity, and a paved road to facilitate a massive commercial and residential development on private land surrounded by the Kaibab National Forest less than two miles from the southern boundary of Grand Canyon National Park. Stilo's proposed development would include a rash of indirect and cumulative impacts that include increasing Tusayan's population ten-fold, likely causing depletion of aquifers that are the only source of water for natural springs along Grand Canyon's South Rim, worsening air, noise and light pollution within the Park, and fragmenting habitat for wildlife that use the Park. The project will also likely worsen climate pollution, by inducing tens of thousands of additional motor vehicle trips and an increase in air travel to Tusayan and Flagstaff airports, and inducing an increase in fossil-fuel-generated energy use for the homes and businesses built there. Climate change will also likely impact the project, by, over

5

time, requiring more water for landscaping, more energy for air conditioning, and the project's development will interact synergistically with stresses on wildlife caused by increased heat.

14.     When Stilo submitted a prior version of this application to the Forest Service in 2014, I contributed to analysis and comments opposing Stilo's proposal in response to the Forest Service NEPA scoping process conducted under the 1978 regulations. The Forest Service ultimately rejected Stilo's application based largely on the project's potential indirect and cumulative impacts to the National Park that had been raised by the Center and other members of the public.

15.     In September 2020, the Forest Service announced that it had accepted Stilo's application. The Forest Service states that the application will next be "carried forward into an administrative review process to evaluate the application in further detail. The administrative review includes an environmental analysis, as prescribed by the National Environmental Policy Act, with ample opportunity for public engagement and comment." *See* Kaibab National Forest webpage, https://www.fs.usda.gov/detail/kaibab/home/?cid=FSEPRD660672 (last viewed June 12, 2020).  As of June 12, 2024, the Forest Service had not begun scoping this forthcoming analysis.

16.     I am aware that the 2020 NEPA regulations eliminated the requirement that federal agencies consider the indirect and cumulative effects of their actions. I am also aware that the 2024 CEQ NEPA regulations explicitly require agencies to disclose the project's "climate change-related effects, including the contribution of a proposed action and its alternatives to climate change, and the reasonably foreseeable effects of climate change on the proposed action and its alternatives," something the 2020 NEPA regulations do not. The 2024 NEPA regulations also direct that agencies disclose "[w]here applicable, climate change-related effects, including,

6

where feasible, quantification of greenhouse gas emissions, from the proposed action and alternatives and the effects of climate change on the proposed action and alternatives."

17.     If plaintiffs prevail in this litigation, these provisions will be vacated, and it is less likely that the Forest Service will address the project's climate impacts, or that the agency will quantify the greenhouse gas emissions by alternative. This will leave me and the Center in the dark as to the nature and scale of the project's climate impacts. Further, if the Forest Service is no longer required by the 2024 NEPA regulations to disclose these climate impacts, a result plaintiffs' complaint seeks, there is a far greater likelihood that any NEPA document the Forest Service prepares will ignore these impacts, and that the rights-of-way will be approved, Stilo's mega-development will be built, and that that project will destroy the natural quiet, dark skies, pure springs, and scenery that I enjoy. Such an outcome will make it less likely that I will want to return to the area, and harming me when I do.

18.     I am also aware that the 2024 NEPA regulations require agencies to "use high quality information, including … Indigenous Knowledge." From my years of work and recreation around the Grand Canyon, including building alliances with Tribal governments, and Indigenous-led non-governmental advocacy groups, I know that Indigenous people, including the Havasupai Tribe, Hopi Tribe, and Navajo have hunted, farmed, lived and/or visited for centuries in the area where Stilo plans its massive resort and shopping complex. By requiring the Forest Service to use Indigenous Knowledge, if available and provided by the Tribes that maintain sovereignty over this information, in any NEPA review of Stilo's proposed right-of-way, the 2024 NEPA regulations are likely to result in a richer understanding of the resources and values at stake. This will further NEPA's purposes with a more informed analysis, benefit my and the Center's understanding of the harms the project will cause, make it less likely that the Forest

7

Service will choose to degrade those values, and make it more likely that the Forest Service will mitigate any such harm.

19.  But if the Forest Service is no longer required by the 2024 NEPA regulations to use Indigenous Knowledge in the agency's analysis, a result plaintiffs' complaint seeks, there is a greater likelihood that the any NEPA document the Forest Service prepares will ignore the history, values, and knowledge that the Havasupai, Hopi, and Navajo have accumulated over millennia, and that the rights-of-way will be approved, Stilo's mega-development will be built in ignorance of this Indigenous Knowledge, and that that project will destroy these and other values that I, too, enjoy. Such an outcome will make it less likely that I will want to return to the area, and harming me when I do so.

Dated: June 18th, 2024

_____

Taylor McKinnon