# EXHIBIT R

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA
BISMARK DIVISION

| | |
|---|---|
| STATE OF IOWA, <br> STATE OF NORTH DAKOTA, <br> STATE OF ALASKA, <br> STATE OF ARKANSAS, <br> STATE OF FLORIDA, <br> STATE OF GEORGIA, <br> STATE OF IDAHO, <br> STATE OF KANSAS, <br> COMMONWEALTH OF KENTUCKY, <br> STATE OF LOUISIANA, <br> STATE OF MISSOURI, <br> STATE OF MONTANA, <br> STATE OF NEBRASKA, <br> STATE OF SOUTH CAROLINA, <br> STATE OF SOUTH DAKOTA, <br> STATE OF TENNESSEE, <br> STATE OF TEXAS, <br> STATE OF UTHA, <br> STATE OF VIRGINIA, <br> STATE OF WEST VIRGINIA, and <br> STATE OF WYOMING, <br><br>     Plaintiffs, <br>  v. <br><br> COUNCIL ON ENVIRONMENTAL QUALITY, and BRENDA MALLORY, in her official capacity as Chair, <br><br>     Defendants. | Case No. 1:24-cv-00089-DMT-CRH |

## DECLARATION OF DAVID MONTI

1

I, David Monti, state as follows:

1. I make this declaration of my own personal knowledge. If called to testify as a witness, I could and would testify competently regarding its contents.

2. I, Captain Dave Monti, am a member of Ocean Conservancy. I reside in Warwick, Rhode Island, and keep my charter boat, the *Virginia Joan*, in Warwick, Rhode Island.

3. I generate a portion of my income as a charter boat captain and guide. I have been fishing for over 50 years and I expect to do so for the foreseeable future. I help my clients target Rhode Island fish species such as striped bass, bluefish, summer flounder (fluke), scup, tautog, black sea bass, cod, and bonito in the Narragansett Bay, Block Island, and Newport areas.

4. I rely on NEPA reviews and public processes to be informed and involved in federal decisions affecting the areas I take my clients fishing in and the habitat that my target fish species need to stay productive. These federal decisions include but are not limited to fishery management actions and permitting decisions regarding offshore wind farms. Elimination or curtailment of NEPA reviews for the siting of offshore wind operations or for fishery management actions would result in additional threats in the waters I take my clients fishing in and the fish species I target for my clients.

5. In 2015, I used NEPA's public engagement and analysis process to engage in siting and permitting decisions regarding the Block Island Wind Farm, the first offshore commercial wind farm in the U.S. NEPA allowed me and my fellow captains to voice our opinions on the wind farm and engage in studies about the farm's impact on fisheries. Similarly, in 2020 and 2021, I used the NEPA process to engage in decisions about the South Fork Wind Farm. The farm is located on Cox Ledge, which consists of rich recreational and commercial

2

fishing grounds 19 to 24 miles southeast of Point Judith, Rhode Island. The power generated there is sold and brought to Long Island, New York (35 miles away) via submarine cable.

6. Bureau of Ocean Energy Management (BOEM) permitting is the federal trigger for NEPA for these kinds of projects. Because work on the NEPA process for the Block Island and South Fork offshore wind projects began before September 14, 2020, BOEM followed the 1978 CEQ NEPA regulations.

7. Thus far, the wind farms have had no remarkable adverse effects on the environment, fish, mammals, birds, and people. Recreational fishing at the farms has been good, even though fishing pressure by recreational anglers has greatly increased in these areas. Offshore wind farms are now a destination for me and other captains. For example, at the Block Island Wind Farm, there are gillnets set right up to the turbines, commercial fishermen trawl along the side of the wind farm, and recreational anglers fish right up to the pylons. The NEPA analysis and public involvement process allowed federal agencies, the wind farm company, and fishermen like me to work together. The results have been positive. Last year, a seven-year fish abundance trawl survey was completed inside the Block Island Wind Farm compared to two control areas south and east of the Wind Farm. The study identified a greater abundance of Atlantic cod and black sea bass in the wind farm area compared to control areas. Other species were even; if squid, scup or summer flounder were up or down in control areas they were up or down by a corresponding amount in the wind farm area.

8. I and other fishermen worked with Ørsted, the wind farm company, on the South Fork Wind Farm research monitoring plan which includes numerous studies about the farm's effect on fish species that fishermen and the surrounding coastal communities depend on. The aim of the studies was to measure the impacts offshore wind farms could have on fish and

invertebrate species before, during, and after construction.  The study was completed in 2020 and was refined and expanded through an iterative process that considered feedback from agencies and stakeholder groups.

9. So far, offshore wind farms have had a positive impact on the abundance of finfish within their boundaries compared to control areas outside the wind farms.  Research occurring in the South Fork Wind Farm and surrounding area is a good example of fishermen, government, scientists, and developers working together to safeguard fishing while providing the nation with the renewable energy opportunity it needs.

10. NEPA is the glue that has tied this coordination together.  While fishermen were wary of offshore wind farms in the past, we have learned of their benefits via the NEPA process. NEPA has allowed cooperative and inclusive engagement in federal decisions affecting our important fishery resources.  The 2024 NEPA rule retains or strengthens the public processes that have benefitted me in the past.

11. In contrast, elimination or scaling down of NEPA reviews for agency actions, as set forth in the 2020 NEPA regulations, would adversely affect my ability to participate in these important studies and resulting decisions that affect my business.  Plaintiffs are asking for the 2024 regulations to be struck down, which would mean the 2020 regulations would take their place and my ability to take part in wind farm siting and fishery impacts would be limited.  For example, had the NEPA review for these wind farms that have affected my business taken place under the 2020 regulations, fishermen may not have had opportunities to comment on projects, or would have received less information if projects had undergone environmental assessments instead of comprehensive environmental impact statements.  Even worse, the permitting agency might have employed the "functional equivalence" option in the 2020 regulations, meaning that

the NEPA process might not have even existed for wind projects.  If fishermen were shut out of these processes in the future, I would personally suffer, as would the wind industry and the fishing industry as a whole. A full NEPA process under the new 2024 regulations is especially critical as offshore wind development is expected to increase in the years ahead.

12. Similarly, a full and robust NEPA process as set forth in the 2024 regulations is critically important to my use and enjoyment of our nation's marine fisheries and my engagement in fishery management decisions.  The fish I target for my clients are managed by the National Marine Fisheries Service (NMFS), which must ensure that fishery management complies with NEPA. Via the NEPA process as described in the 2024 rulemaking process, I am informed of the direct and indirect environmental effects of fishery management actions, and a reasonable range of alternatives that can accomplish the purpose and need of the proposed action.  Elimination or curtailment of rigorous NEPA reviews for the siting of wind farms or for fishery management actions—which could happen if plaintiffs in this case succeed in overturning the 2024 regulations—would result in additional threats to the waters I fish in and the fish species my clients catch, and would likely result in less information about the environmental consequences of management decisions being made publicly available.

13. In the context of federal fishery management, the NEPA process set out by the 2024 regulations provides an important means of ensuring fishery managers consider essential issues that the Magnuson-Stevens Fishery Conservation and Management Act (MSA) does not address.  Under the 2024 NEPA regulations, federal fishery managers must consider possible adverse effects of proposed management actions, identify reasonable alternatives, and consider ways to avoid or minimize any adverse effects.  The 2024 NEPA rules, like the original 1978 rules, also ensures everyone involved in fisheries—including recreational and commercial

5

fishermen, charter captains (like myself), seafood processors, restaurant owners, public interest organizations, tribes, local governments, and the public—can weigh in on decisions about management of our shared fishery resources.  Finally, NEPA review under the 2024 rules is an important avenue for regional fishery management councils to provide input on non-fishing actions that directly impact fisheries and fish habitat, such as oil and gas development, aquaculture, hydropower and offshore wind.

14. The MSA review process is limited in scope and is designed to maximize the amount of fish that can be sustainably caught.  This process is focused on fishery participants but is not focused on the full complement of environmental impacts. The NEPA process (that is, via the 1978 regulations and the new 2024 regulations), by contrast, is comprehensive in scope, interdisciplinary in approach, and designed to facilitate informed agency actions that minimize adverse impacts on the environment, all while also informing the public about the effects of fishery management decisions.  These two distinct processes are not functionally equivalent. Attempting to collapse the distinct review requirements of the MSA and NEPA through the functional equivalency provisions of the 2020 rule would severely undermine our national progress in achieving sustainable fishery management.

15. Any scaling back of NEPA processes for fishery management could result in a decline of fishery abundance in the waters where my clients pay me to take them. A decline in fish abundance would directly affect my livelihood as a charter boat captain who relies on the assumption that fish (a publicly owned resource) will be robustly present in the ocean for my clients to catch and enjoy. The outcome sought by the plaintiffs would cause harm to me, my interests, and the environment upon which I depend for my livelihood.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed on June 14, 2024, in Warwick, Rhode Island.

_____
Captain David Monti