# EXHIBIT T

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA
BISMARK DIVISION

| | |
|---|---|
| STATE OF IOWA, <br> STATE OF NORTH DAKOTA, <br> STATE OF ALASKA, <br> STATE OF ARKANSAS, <br> STATE OF FLORIDA, <br> STATE OF GEORGIA, <br> STATE OF IDAHO, <br> STATE OF KANSAS, <br> COMMONWEALTH OF KENTUCKY, <br> STATE OF LOUISIANA, <br> STATE OF MISSOURI, <br> STATE OF MONTANA, <br> STATE OF NEBRASKA, <br> STATE OF SOUTH CAROLINA, <br> STATE OF SOUTH DAKOTA, <br> STATE OF TENNESSEE, <br> STATE OF TEXAS, <br> STATE OF UTHA, <br> STATE OF VIRGINIA, <br> STATE OF WEST VIRGINIA, and <br> STATE OF WYOMING, <br><br>             Plaintiffs, <br> v. <br><br> COUNCIL ON ENVIRONMENTAL QUALITY, and BRENDA MALLORY, in her official capacity as Chair, <br><br>             Defendants. | Case No. 1:24-cv-00089-DMT-CRH |

**DECLARATION OF DANE SCHUMACHER**

1

I, Dane Schumacher, declare that if called as a witness in this action I would competently testify of my own personal knowledge, as follows:

1. I am a resident of Omega township in southwest Carroll County, Arkansas, about one mile from the border of Madison County, Arkansas.

2. I am a member of Food & Water Watch (FWW). I joined FWW because water is an extremely important part of my life, and for a time, has been essential to my livelihood. The health of the White River watershed and its sub-watersheds is particularly important to me, and I value organizations like FWW that work to protect water quality—especially because of the karst geology in the region that makes the White River particularly susceptible to degradation.

3. I know that FWW is also an organization dedicated to holding industrial factory farms accountable for their water pollution and other harmful impacts in rural communities, and that FWW works to strengthen government oversight of these operations. I know that FWW has expertise in this area of work, and I rely on FWW and its website for research and other materials related to factory farming and water pollution.

4. I moved to Arkansas in 1996. After pursuing a career as a legal and research assistant and volunteering with the Peace Corps, I became interested in sustainable agriculture and decided to buy land to farm. The property on which my home sits is 90 acres, about 2 acres of which is devoted to a small farm/garden where we grow crops like garlic and blueberries and raise chickens. From 1998 until several years ago selling produce at farmers' markets was my primary livelihood; I only do it part-time now.

5. My property sits on Dry Fork Creek in the Kings River watershed, which is a sub-watershed of the White River. In early 2000, I learned from an instream biologist for the Kings River Watershed Partnership that Dry Fork Creek was one of the cleanest waterways in

Arkansas. I irrigate my land from the creek, including the produce that I grow for myself and my family. I also use the creek and Kings River for swimming and kayaking.

6. Protecting water quality and quantity in my regional watersheds is important to me because we live downstream from various activities that could adversely affect our water quality, and we are directly impacted by how the water is used, protected, or contaminated upstream from us. What happens upstream is also important because of the karst geology and drainage tiles in our region; the tile drains bring contaminants as well as water directly into the stream, and anything upstream will come downstream.

7. The valley where my farm is located is home to several small-scale sustainable farms. My property is located across the creek from one of the oldest organic farms in the state of Arkansas. I care about these farms because of what they bring to our state and community, and because they care for the land and water that we all rely on. I understand that all of us in the same watershed are connected. For this reason, I strongly believe in protecting and monitoring the health of streams, creeks, and all surface waters.

8. I know there are chicken concentrated animal feeding operations (CAFOs) upstream from me. It's very important to me to be able to know what these operations are doing so I can take action to protect myself from pollution coming downstream and downwind. It is also important to me that they know that I'm downstream from them and their actions are impacting me. For example, I sometimes smell the CAFO waste even though I do not always know which facilities are applying CAFO waste or exactly where.

9. In addition, although I continue to kayak and swim in several waterways near me, my enjoyment of these activities is diminished by my concern over the possibility of pollution from the CAFOs in the watershed. I find that I am on alert when I am on the water, and am

3

sometimes uneasy because I do not always know exactly what the state of the water quality is. Concern over CAFO pollution has also led me to change where I recreate; there are some waterways that I will no longer kayak on because I am concerned about water pollution from CAFOs in the area.

10. Because there are several large poultry processing plants in the area, Carroll County and our surrounding area is ground zero for expansion of the vertically integrated poultry CAFO industry, meaning CAFOs that operate under contract with the nearby processing companies. Because integrator companies gain efficiencies by having their CAFO producers near their slaughterhouses and other infrastructure, we are truly inundated with chicken houses in my county, and cannot even keep track of how many chicken houses there are in the areas upstream that could affect me and the waterways I rely on. I do know that within the past couple of years, yet another CAFO constructed about 2 miles upstream from me as the crow flies.

11. I am aware of the U.S. Department of Agriculture's Farm Service Agency's (FSA) role in financing CAFOs, because I followed the lawsuit over FSA's inadequate environmental review of the C&H hog CAFO in Arkansas' Buffalo River watershed. One of the main issues in that case was the FSA's failure to provide public notice and comment of its National Environmental Policy Act (NEPA) environmental review of the CAFO.

12. If there were public notice of a NEPA review of a new CAFO in my watershed, I would absolutely comment on it and share it with others in my community and watershed. I am very engaged in government actions and public processes related to water quality, and have participated in state public comment periods for impaired waterway designations for creeks and a proposed rulemaking to lower the dissolved oxygen standard for Arkansas waterways. In the past, my NEPA comments and those of others have resulted in better projects with more

environmental mitigation and pollution controls, although CAFOs remain highly polluting and noxious.

13. I was very concerned when the 2020 Council on Environmental Quality (CEQ) NEPA regulations exempted CAFO financing actions from NEPA, and provided a declaration for FWW in its legal challenge to that regulatory rollback. I worried, and continue to worry, that lack of environmental review and public comment would result in unmitigated CAFO construction and operation, and thus degrade the water quality upon which I depend for my livelihood and personal use and enjoyment.

14. When there is no NEPA review, I generally only learn of new CAFOs when I happen to see one being constructed. Most chicken operations in the area are considered "dry waste" operations, which are not required to get the permit that liquid waste operations must follow, and therefore do not go through a public notice and comment process. It is hard to find out when one of these dry waste operations is being proposed, and it is very difficult to publicly oppose new and expanded CAFOs as a result.

15. I have previously relied on NEPA processes to learn of new projects that are federally permitted or funded, and seek to participate in such processes to ensure that my concerns about downstream and nearby pollution are addressed. FSA financing is often the sole federal trigger for NEPA for these kinds of projects. Several years ago, I participated in a NEPA process considering FSA funding for land purchase and construction of a large turkey CAFO[1] near my home; my comments helped persuade the agency that the site was ill-suited for such a

---

[1] *See* https://www.fsa.usda.gov/Assets/USDA-FSA-Public/usdafiles/State-Offices/Arkansas/env-docs/draft_ea_davidson_madisonco_20191121.pdf.

project, and the project applicant withdrew the application for the site, thereby preventing a likely additional source of pollution in the waters near my home.

16. Due to NEPA's importance in informing me and my community about proposed CAFOs, its public participation opportunities, and its role in mitigating some of the worst CAFO environmental impacts on my local waterways and environment, I am very supportive of CEQ's new Phase 2 NEPA rule because it removes the CAFO financing exemption from the 2020 rule. This means that FSA can continue to conduct NEPA reviews when it finances CAFOs, which helps ensure that I will be aware of these projects and have an opportunity to comment on them in an effort to protect my and my community's health.

17. I am supportive of FWW's intervention in this challenge to the Phase 2 rule, because if the Phase 2 rule is struck down and the 2020 rule goes back into effect, CEQ will deem FSA CAFO financing actions not subject to NEPA. This would leave me and my community members in the dark about proposed CAFOs and eliminate a critical opportunity to influence CAFO financing actions and environmental mitigation measures.

18. I do not think it makes sense for FSA to use my tax dollars to finance new and expanded CAFOs, particularly in areas like Carroll and Madison Counties that are already inundated with them. FSA should be using public financing to finance organic and sustainable farms that do not harm waterways or communities like mine, rather than integrated contract CAFOs that concentrate in certain communities and watersheds simply to serve the financial goals of the integrator corporations.

19. But I have every reason to believe that FSA is going to continue financing CAFOs in my area, including through loan guarantees. A requirement that the agency conduct an Environmental Assessment and a public notice and comment process when it does so has at least

provided me and my community members with the opportunity to weigh in on ways that the proposal could have a lesser environmental impact, or to propose alternatives to the CAFO altogether. I will be significantly harmed if the court in this case vacates the Phase 2 rule and reinstates the 2020 rule that did not require FSA to conduct NEPA reviews for its CAFO financing actions. If the court upholds the Phase 2 rule, ensuring NEPA review for CAFO financing actions, I will take advantage of these opportunities to provide comment in the hopes that it would inform and positively influence the agency's decision making process.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed this _13_ day of June, 2024 in Omega Township, Arkansas.

*Dane Schumacher*
Dane Schumacher