# EXHIBIT X

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA
BISMARK DIVISION

| | |
|---|---|
| STATE OF IOWA, | ) |
| STATE OF NORTH DAKOTA, | ) |
| STATE OF ALASKA, | ) |
| STATE OF ARKANSAS, | ) |
| STATE OF FLORIDA, | ) |
| STATE OF GEORGIA, | ) |
| STATE OF IDAHO, | ) Case No. 1:24-cv-00089-DMT-CRH |
| STATE OF KANSAS, | ) |
| COMMONWEALTH OF KENTUCKY, | ) |
| STATE OF LOUISIANA, | ) |
| STATE OF MISSOURI, | ) |
| STATE OF MONTANA, | ) |
| STATE OF NEBRASKA, | ) |
| STATE OF SOUTH CAROLINA, | ) |
| STATE OF SOUTH DAKOTA, | ) |
| STATE OF TENNESSEE, | ) |
| STATE OF TEXAS, | ) |
| STATE OF UTHA, | ) |
| STATE OF VIRGINIA, | ) |
| STATE OF WEST VIRGINIA, and | ) |
| STATE OF WYOMING, | ) |
| | ) |
| Plaintiffs, | ) |
| v. | ) |
| | ) |
| COUNCIL ON ENVIRONMENTAL | ) |
| QUALITY, and BRENDA MALLORY, in | ) |
| her official capacity as Chair, | ) |
| | ) |
| Defendants. | ) |

**DECLARATION OF DONALD M. WALLER**

I, Donald M. Waller, declare as follows:

1. My name is Dr. Don Waller. I am providing this declaration in support of the standing of the Environmental Law and Policy Center (ELPC). I am over the age of eighteen

1

(18) and suffer from no legal incapacity. The following is true to the best of my knowledge, information, and belief. I make this declaration of my own personal knowledge. If called to testify as a witness, I could and would testify competently regarding its contents.

2. Until my retirement in 2019, I was the John T. Curtis Professor of Botany and Environmental Studies at the University of Wisconsin-Madison, where I spent my entire academic career. During my more than forty years at UW-Madison, I served as Chair of the Department of Botany, Chair of Wisconsin Ecology, and Chair of the Conservation Biology Major. I received my Ph.D. in Population Biology from Princeton University in 1978, after which I served as a Post-Doctoral Fellow at Harvard University.

3. Although I have retired from academic teaching, I continue to conduct research and publish scientific studies and papers. My research in conservation biology, ecology, and genetics and evolution has focused on long-term ecological trends, biodiversity, forest management, species declines, and the effects of inbreeding, habitat fragmentation, and climate change, among other issues. I co-authored *Wild Forests: Conservation Biology and Public Policy* (Island Press 1994), and co-edited *The Vanishing Present: Wisconsin's Changing Lands, Waters, and Wildlife* (University of Chicago Press 2008). In addition, over the course of my career I have authored or co-authored more than 200 journal articles, book chapters, and other publications.

4. I am a member of the Environmental Law and Policy Center. I also continue to serve on ELPC's Science Advisory Board and previously served as Chair of this group for several years.

5. I am familiar with and knowledgeable about the National Environmental Policy Act (NEPA). My co-authors and I wrote about how NEPA is implemented to influence natural resource management in our book, "*Wild Forests: Conservation Biology and Public Policy,*" and

I taught this topic in my Conservation Biology course. These activities stemmed from my experience where, as a private citizen working with environmental non-profit organizations, I regularly engaged in discussions, negotiations, and lawsuits involving NEPA. NEPA has direct and important impacts on how ecological communities and natural areas are managed on public lands, including those where I conduct research. Some of these areas have been either preserved or seriously degraded as the result of outcomes from NEPA processes.

6. Over the past several decades, I have utilized the rights and procedures afforded under NEPA to participate in public proceedings for assessing and evaluating the environmental impacts of certain proposed projects. I have submitted comments, testified at public hearings, and participated in civil actions to ensure proper implementation of NEPA's requirements for proposed projects affecting communities, locations, and resources in which I have a professional or personal interest.

7. National forests, for example, have played a central role in my career and my life. I know from decades of experience that a robust NEPA process is critical to sustainably managing these forests. I have relied on these forests for professional activities (teaching and research), career advancement (consulting and lecturing on these topics), and personal fulfillment (via a variety of recreational activities that have improved my health, emotional, and spiritual well-being). I, local communities, and society as a whole also rely on the key roles these temperate forests play in providing habitats for native plant and animal species (supporting biodiversity), in fixing and sequestering carbon (the greenhouse gases that contribute to regional and global climate change), in improving water quality (by reducing soil erosion and runoff), and in providing moist, shaded environments that ameliorate the climatic extremes that have become more common and dangerous with recent changes in climate (including droughts and extreme

heat). While I have participated in NEPA proceedings across many contexts, I have particularly focused on the Chequamegon-Nicolet National Forest (CNNF) in northern Wisconsin. I continue to rely on the CNNF for my scientific studies including an on-going project that uses experimental fenced exclosures to evaluate the effects of white-tailed deer on the regeneration of eastern hemlock, Canada yew, northern white cedar, and other woody and herbaceous species. I am also considering engaging in another extensive round of resurveys of dozens of sites in the CNNF and surrounding areas to further assess long-term ecological changes in these forests by comparing the results to similar surveys in the 1950s and early 2000s. These habitats and ecosystems provide a unique laboratory for examining long-term ecological change and conducting natural experiments. It would not be an exaggeration to say that these unique baselines and detailed dissections of the forces driving ecological change in this region, and the CNNF in particular, gives these habitats global significance.

8.     Beyond relying on the Chequamegon-Nicolet, Ottawa, and Hiawatha National Forests for scientific research, I also derive great personal joy and meaning from my involvement with the continued health and management of these National Forests. I enjoy hiking and camping in the natural beauty of the forest with my family and wish to see it well-managed far into the future. To that end, over the years, utilizing NEPA, I have submitted comments on the scoping phases and draft Environmental Impact Statements for numerous proposed timber sale projects within Chequamegon, including the Fishel, Fishbone, and Medford Aspen timber sale projects. I have also submitted comments on the Cayuga, McCaslin, Northwest Howell, Hoffman Sailor, Sunken Moose, Long Rail Boulder, and Twentymile timber sales.

9.     I was particularly involved in challenging what I believed to be inadequate NEPA determinations made in connection with the Northwest Howell Timber Project from 2003

4

to 2008, and the Fourmile Vegetation Project in Chequamegon-Nicolet National Forest in 2020. Both projects would have crucial climate impacts that demanded attention and careful analysis. For Northwest Howell, the U.S. Forest Service failed to meaningfully analyze the impact of its logging project on climate change, as well as the impact of a changing climate on the sensitivity and vulnerability of ecosystems subject to habitat fragmentation due to logging and road construction, topics close to my research that concern me almost every day. Similarly, for Fourmile, despite further important advances in climate science over the ensuing decade, the U.S. Forest Service again failed adequately to address climate impacts during the NEPA review process of the project.

10. I am aware that the recently adopted Phase 2 NEPA Rules contain new requirements to specifically analyze the effects of climate change. I have witnessed first-hand a lack of climate analysis for multiple forestry projects subject to NEPA review and how this, in turn, has led to detrimental decisions by governmental authorities. I know that forest management will benefit directly and substantially from the climate-analysis requirements contained in the Phase 2 NEPA Rules. These new rules address something for which I have long advocated: analyzing a proposed project's impacts on climate change as well as the potentially complex and deleterious effects of those climate impacts on increasingly vulnerable ecosystems.

11. I understand that in this lawsuit, certain parties challenge the new climate analysis requirements contained in the Phase 2 NEPA Rules, as well as other elements of those rules. Removing those requirements would dismiss and disregard the broad scientific consensus that exists regarding climate change's growing destructive impacts on forest ecosystems – impacts that I have personally experienced over my lifetime and documented in some detail in my professional career. Removing these requirements from NEPA would directly, concretely, and

significantly harm the forests and ecosystems that I rely on professionally and personally. This would materially and concretely harm me, both as a scientist who studies these ecosystems and as someone who recreates in and enjoys these forests.

12. I understand that the Phase 2 NEPA Rules also introduce several new requirements. One of these requires agencies to identify one or more environmentally preferable alternatives rather than leaving this to (sometimes imperfect) agency discretion. Another stipulates that agencies use high-quality and reliable data to assess anticipated climate-related changes to the environment. A third adds explicit requirements that agencies objectively and rigorously analyze these data. These requirements, not present in the preceding 2020 version of the rule, add key important and beneficial elements to NEPA that were heretofore regularly missed in being implicit rather than explicit. These omissions harmed me as a scientist, as a concerned and informed citizen, and recreational user of national forests.

13. More specifically, as someone who has devoted decades to studying the ecology of this region, I am exceptionally well-positioned to assess the quality of the scientific data and arguments that government agencies have relied on in managing the Chequamegon-Nicolet National Forest. I have worked frequently with local, state, and federal agencies to provide expertise based on research by my team and others to improve management activities and outcomes in the forest. I raised serious issues concerning the reliability of the data and projections used in the Northwest Howell and the Fourmile projects. I have also worked to develop more reliable data, monitoring tools, and other resources to improve management of national forests. Requiring agencies to explicitly identify an environmentally preferable alternative is a major step forward to ensure that agencies consider less ecologically damaging project designs in their forest projects.

14. Finally, I also understand that the Phase 2 NEPA Rules require agencies to consider and analyze adverse effects on communities with environmental justice concerns, including impacts on the rights of Tribal Nations. These new provisions are important to me. In my experience, unfortunately, state and federal forest and wildlife managers in this region often have not heeded, or solicited, meaningful input on management activities from indigenous Native American individuals and tribes, minimizing their influence. Tribal peoples in this region have accumulated a vast store of traditional ecological knowledge ('TEK') by living within and on these lands and waters and managing their natural resources carefully for millenniums. This knowledge is woven into their traditions, culture, and stories as well as their practices (for example, how elders decide when and how to harvest key resources like deer and wild rice). I believe it is appropriate and overdue for agencies to consult with tribal leadership and experts regarding how these lands (on which they retain considerable usufructuary rights under treaties since the 1830s) are managed. Indeed, it is my opinion that asking agencies to consult and collaborate with tribal resource experts regarding land management would not only allow them to better serve these important communities but could also considerably enhance the quality and outcomes of federal forest and wildlife management. This is not an opinion based on readings, impressions, or conjecture. Rather, it is based on decades of personal experience, working on reservations and with tribal partners and other natural resource experts with the Great Lakes Indian and Fisheries and Wildlife Commission. In particular, we present convincing evidence, based on several criteria, that the quality and sustainability of ecological conditions present on the larger reservations in northern Wisconsin exceed those on adjacent state and federal public forestlands, often to a considerable degree. Waller, D. M., and N. J. Reo. 2018. First stewards: ecological outcomes of forest and wildlife stewardship by indigenous peoples of Wisconsin,

7

USA. *Ecology and Society* 23(1):45. This conclusion led to our recommendation that public forestland managers seek out opportunities to study, and in some cases emulate, management on tribal lands.

15.    In sum, I continue to pursue both professional activities, including active research, and personal activities in the Chequamegon-Nicolet National Forest and nearby national forests in the upper Midwest. The management of these national forests remains important to my work and my life, meaning I retain a keen interest in NEPA, including the Phase 2 Rules. I plan to continue to exercise rights afforded to me under NEPA and participate in NEPA proceedings into the future. The improvements introduced by the Phase 2 Rules will be essential to my ongoing and future participation in planning and management of the Chequamegon-Nicolet National Forest.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 25th day of June, 2024, at _Madison, WI_.

_Donald M. Waller_
Donald M. Waller