**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NORTH DAKOTA**
**WESTERN DIVISION**

| | |
|---|---|
| STATE OF IOWA, STATE OF NORTH DAKOTA, et al., | |
| Plaintiffs, | |
| v. | |
| COUNCIL ON ENVIRONMENTAL QUALITY, and BRENDA MALLORY, in her official capacity as Chair, | Case No. 1:24-cv-00089-DMT-CRH |
| Defendants, | |
| and | |
| ALASKA COMMUNITY ACTION ON TOXICS, et al., | |
| Intervenor-Defendants. | |

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF**
**MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

TABLE OF CONTENTS ...................................................................................................... ii

TABLE OF EXHIBITS ...................................................................................................... iii

TABLE OF AUTHORITIES ............................................................................................... iv

INTRODUCTION ............................................................................................................... 1

STATEMENT OF UNCONTESTED MATERIAL FACTS ................................................ 4

STANDARD OF REVIEW ................................................................................................. 9

ARGUMENT ..................................................................................................................... 10

I.      This Action Is Justiciable. ..................................................................................... 10

II.     The Final Rule Unlawfully Transforms the NEPA Process to Achieve Substantive  Policy
        Goals of the Current Administration. ..................................................................... 19

        A.      The Final Rule Is Explicit in Forcing Substantive Outcomes .................................. 20

        B.      The Final Rule Elevates the Current Administration's Substantive Policy Priorities
                Absent Any Statutory Foundation. .............................................................. 21

        C.      The Final Rule Drives Agencies to an "Environmentally Preferable Alternative." 25

        D.      The Final Rule Now Compels Mitigation of Environmental Impacts. .................... 27

        E.      The Final Rule Imposes Policy-Based Restrictions on the Use of Categorical
                Exclusions During NEPA Reviews. .......................................................... 29

III.    The Final Rule Is Arbitrary and Capricious. ......................................................... 32

IV.     The Final Rule's NEPA Review Itself Violates NEPA. ........................................ 37

V.      The Final Rule Violates the Major Questions Doctrine. ....................................... 39

CONCLUSION ................................................................................................................... 41

**TABLE OF EXHIBITS**

| Exhibit | Declarant Name | Title/State Agency |
|---------|----------------|---------------------|
| A | Doug Goehring | Commissioner, North Dakota Department of Agriculture |
| B | Andrea Travnicek | Director, North Dakota Department of Water Resources |
| C | Ronald Henke | Director, North Dakota Department of Transportation |
| D | Stuart Anderson | Transportation Development Division Director, Iowa Department of Transportation |
| E | Travis Parsons | Deputy Director for Office of Abandoned Mine Lands and Reclamation, West Virginia Department of Environmental Protection |
| F | Travis E. Long | Director of Technical Support Division, West Virginia Division of Highways |
| G | Hunter Roberts | Cabinet Secretary, South Dakota Department of Agriculture and Natural Resources |
| H | Joel Jundt | Secretary, South Dakota Department of Transportation |
| I | Kyle Keller | Project Development Division Engineer, Nebraska Department of Transportation |
| J | Michael Johnson | Division Administrator of Engineering Services and State Bridge Engineer, Idaho Transportation Department |
| K | Angel Deem | Chief of Policy, Virginia Department of Transportation |
| L | John Boyle | Commissioner, Alaska Department of Natural Resources |
| M | Brandon Weston | Environmental Director, Utah Department of Transportation |
| N | William Watts | Assistant Secretary of Engineering and Operations, Florida Department of Transportation |
| O | Doug Booher | Director of Environmental Affairs Division, Texas Department of Transportation |
| P | Todd Parfitt | Director of the Wyoming Department of Environmental Quality |

# TABLE OF AUTHORITIES

**Cases**                                                                                                     **Page**

*Andrus v. Sierra Club*,
    442 U.S. 347 (1979) ......................................................................................... 20

*Assn. of U.S., Inc. v. State Farm Mut. Auto. Ins.*, 463 U.S. 29 (1983) ...................................... 9, 34

*Balt. Gas and Elec. Co. v. Nat. Res. Def. Council, Inc.*,
    462 U.S. 87 (1983) ......................................................................................... 4, 5

*Bienestar de la Comunidad Costera v. FERC*,
    6 F.4th 1321 (D.C. Cir. 2021) ......................................................................... 23

*Christoffersen v. Yellow Book USA*,
    536 F.3d 947 (8th Cir. 2008) ............................................................................ 9

*City of Kennett, Mo. v. EPA*,
    887 F.3d 424 (8th Cir. 2018) .......................................................................... 12

*Dept. of Transp. v. Pub. Citizen*,
    541 U.S. 752 (2004) ............................................................................... 3, 12, , 25

*EDF v. Thomas*,
    627 F. Supp. 566 (D.D.C. 1986) ..................................................................... 22

*Encino Motorcars, LLC v. Navarro*,
    579 U.S. 211 (2016) ........................................................................................ 32

*Env't Def. Fund, Inc. v. Corps of Engineers of U.S. Army*,
    470 F.2d 289 (8th Cir. 1972) .......................................................................... 26

*FCC v. Fox Television Stations*,
    556 U.S. 502 (2009) ........................................................................................ 32

*Food & Water Watch v. USDA*,
    1 F.4th 1112 (D.C. Cir. 2021) ......................................................................... 40

*Heartwood, Inc. v. U.S. Forest Serv.*,
    230 F.3d 947 (7th Cir. 2000) .......................................................................... 38

*Iowa League of Cities v. EPA*,
    711 F.3d 844 (8th Cir. 2013) ...........................................................10, 11, 12, 20

*Kentucky v. Federal Highway Admin.*,
    No. 5:23-cv-162, 2024 WL 1402443 (W.D. Ky. Apr. 1, 2024) ................................. 2

*Key Med. Supply, Inc. v. Burwell*,
    764 F.3d 955 (8th Cir. 2014) .......................................................................... 10

*Kisor v. Willkie*,
    588 U.S. 558 (2019) ........................................................................................ 33

*Lakes and Parks All. v. Fed. Transit Admin.*,
    928 F.3d 759 (8th Cir. 2019) ............................................................................ 5

*Lakes Region Legal Def. Fund, Inc. v. Slater*,
    986 F. Supp. 1169 (N.D. Iowa 1997) ................................................. 10

*Loper Bright Enter. v. Raimondo*,
    144 S.Ct. 2244 (2024) ................................................................. 10

*Louisiana v. Biden*,
    No. 2:24-cv-00406, 2024 WL 3253103 (W.D. La. Jul. 1, 2024)........................ 2, 22

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992) ..................................................................... 11

*Mandan, Hidatsa Arikara Nation v. Dep't of Interior*,
    95 F.4th 573 (8th Cir. 2024) ........................................................... 9

*Michigan v. EPA*,
    576 U.S. 743 (2015) ...................................................................... 9

*Mid States Coal. for Progress v. Surface Transp. Bd.*,
    345 F.3d 520 (8th Cir. 2003) .......................................................... 25

*N. States Power Co. v. United States*,
    73 F.3d 767 (8th Cir. 1996) ........................................................... 10

*Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*,
    545 U.S. 967 (2005) ..................................................................... 33

*North Dakota v. Dep't of Interior*,
    No. 1:21-cv-00148, Dkt. 98 (D.N.D. Mar. 27, 2023).................................. 2

*Perez v. Mortg. Bankers Ass'n*,
    575 U.S. 92 (2015) ...................................................................... 32

*Portland Cement Ass'n v. EPA*,
    665 F.3d 177 (D.C. Cir. 2011) ........................................................ 36

*Robertson v. Methow Valley Citizens Council*,
    490 U.S. 332 (1989) ............................................................. passim

*Seven Cnty. Infrastructure Coal. v. Eagle Cnty.*,
    No. 23-975, 2024 WL 3089539 (U.S.) (Jun. 24, 2024) ........................... 3

*Sierra Club N. Star Chapter v. LaHood*,
    693 F.Supp.2d 958 (D. Minn. 2010) .................................................. 34

*Sierra Club v. U.S. Army Corp of Eng'rs*,
    645 F.3d 978 (8th Cir. 2011) ........................................................... 11

*Skidmore v. Swift & Co.*,
    323 U.S. 134 (1944) ..................................................................... 10

*Thomas v. Anchorage Equal Rts. Comm'n*,
    220 F.3d 1134 (9th Cir. 1999) ......................................................... 11

*U.S. Sugar Corp. v. EPA*,
    830 F.3d 579 (D.C. Cir. 2016) ........................................................ 35

*United Food and Com. Workers Union, Loc. No. 663 v. USDA,*
    451 F. Supp. 3d 1040 (D. Minn. Apr. 1, 2020) ........................................................ 35

*Utility Air Regulatory Grp. v. EPA,*
    573 U.S. 302 (2014) ....................................................................................... 2, 39, 41

*Vecinos para el Bienestar de la Comunidad Costera* v. *FERC,*
    6 F.4th 1321 (D.C. Cir. 2021) ..................................................................................... 24

*Vermont Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.,*
    435 U.S. 519 (1978) ..................................................................................................... 40

*Voyageurs Nat. Park Ass'n v. Norton,*
    381 F.3d 759 (8th Cir. 2004) ........................................................................................ 9

*Warm Springs Dam Task Force v. Gribble,*
    565 F.2d 549 (9th Cir. 1977) ...................................................................................... 40

*West Virginia v. EPA,*
    597 U.S. 697 (2022) ............................................................................... 2, 39, 40, 41

*West Virginia v. EPA,*
    696 F. Supp. 3d 781 (D.N.D. 2023) ........................................................................... 37

*Wild Virginia v. Council on Env't Quality,*
    56 F.4th 281 (4th Cir. 2022) ........................................................................ 18, 19, 20

*WildEarth Guardians v. BLM,*
    870 F.3d 1222 (10th Cir. 2017) .................................................................................. 23

*WildEarth Guardians v. Zinke,*
    368 F. Supp. 3d 41 (D.D.C. 2019) ............................................................................. 23

*Wise v. Dep't of Transp.,*
    943 F.3d 1161 (8th Cir. 2019) .................................................................................... 29

*Young Am. Corp. v. Affiliated Comput. Servs. (ACS), Inc.,*
    424 F.3d 840 (8th Cir. 2005) ...................................................................................... 11

*Youngstown Sheet & Tube Co. v. Sawyer,*
    343 U.S. 579 (1952) ..................................................................................................... 22

## Statutory Authorities                 Page

5 U.S.C. §706 ....................................................................................................................... 9

5 U.S.C. §706(2)(A) ............................................................................................................. 9

5 U.S.C. §706(2)(C) ........................................................................................................... 10

16 U.S.C. § 3162(4) ........................................................................................................... 16

16 U.S.C. §6592b(b)–(c) .................................................................................................... 30

23 U.S.C. §327 ............................................................................................................. 11, 16

23 U.S.C. §327(a) .............................................................................................................. 16

42 U.S.C. § 4331(a) ........................................................................................................... 25

42 U.S.C. § 4332 ............................................................................................. 8, 37, 40

42 U.S.C. § 4332(2)(B) ............................................................................................ 4

42 U.S.C. § 4332(2)(C) ............................................................................................ 4

42 U.S.C. § 4332(2)(E) .......................................................................................... 24

42 U.S.C. § 4336 ...................................................................................................... 8

42 U.S.C. § 4336(a)–(b) .......................................................................................... 5

42 U.S.C. § 4336a(f) ........................................................................................... 6, 11

42 U.S.C. § 4336(b)(3) .......................................................................................... 24

42 U.S.C. § 4336c .................................................................................................. 31

42 U.S.C. § 4336e(10) ....................................................................................... 5, 39

42 U.S.C. § 4342 ...................................................................................................... 5

42 U.S.C. § 4344 ...................................................................................................... 5

42 U.S.C. § 15942 .................................................................................................... 3

43 U.S.C. § 1752(h) .............................................................................................. 30

Pub. L. No. 118-5, 137 Stat. 10 (2023) .................................................................. 7

Pub. L. No. 118-5, §321 (2023) ........................................................................... 24

**Rules and Regulations**                                                          **Page**

40 C.F.R. § 1500.1(a) ................................................................................... 1, 20, 33

40 C.F.R. § 1500.1(f) ............................................................................................ 22

40 C.F.R. § 1500.2(f) ............................................................................................ 28

40 C.F.R. § 1500.3(d) ........................................................................................... 33

40 C.F.R. § 1501.3(d) ........................................................................................... 25

40 C.F.R. § 1501.6(c) ........................................................................................... 28

40 C.F.R. § 1502.14(f) ........................................................................... 22, 23, 25, 26

40 C.F.R. § 1502.15(b) ......................................................................................... 23

40 C.F.R. § 1502.16(a)(6) ..................................................................................... 23

40 C.F.R. § 1503.3 ................................................................................................ 35

40 C.F.R. § 1503.3(b) ........................................................................................... 35

40 C.F.R. § 1503.3(d)(1) ....................................................................................... 23

40 C.F.R. § 1503.3(d)(2)(vi) ................................................................................. 23

40 C.F.R. § 1505.3(a)(2) ....................................................................................... 28

40 C.F.R. § 1506.3(d) ........................................................................................... 31

40 C.F.R. § 1506.5 ............................................................................................ 34

40 C.F.R. § 1506.5(a) ....................................................................................... 24

40 C.F.R. § 1507.3 ............................................................................................ 31

40 C.F.R. § 1507.3(b)(3) ................................................................................... 38

40 C.F.R. § 1507.3(c)(12) ................................................................................. 34

40 C.F.R. § 1508.1(f)) ....................................................................................... 21

40 C.F.R. § 1508.1(n) ........................................................................................ 25

40 C.F.R. § 1508.1(o) .................................................................................. 23, 30

40 C.F.R. § 1508.1(s) ........................................................................................ 28

50 C.F.R. §402.02 ............................................................................................. 29

50 C.F.R. § 402.14(i)(2) .................................................................................... 29

Fed. R. Civ. P. 56 ................................................................................................ 9

## Federal Register                                                                    Page

85 Fed.Reg. 43304 (July 16, 2020) ..................................................................... 6

86 Fed.Reg. 7037 (Jan. 25, 2021) ....................................................................... 1

86 Fed.Reg. 7619 (Feb. 1, 2021) ......................................................................... 1

87 Fed.Reg. 23453 (Apr. 20, 2022) ..................................................................... 7

88 Fed.Reg. 2521 (Apr. 21, 2023) ....................................................................... 3

88 Fed.Reg. 49924 (July 31, 2023) ...................................................................... 8

89 Fed.Reg. 24268 (Apr. 5, 2024) ..................................................................... 29

89 Fed.Reg. 35442 (May 1, 2024) ............................................................... passim

## Dockets                                                                             Page

*Iowa v. Sec. and Exch. Comm'n,*
    No. 24-1522 (8th Cir.) ................................................................................... 2

*North Dakota v. Dep't of Interior*,
    No. 1:24-cv-00066 (D.N.D.) ......................................................................... 2

*North Dakota v. Dep't of Interior*,
    No. 1:24-cv-00124 (D.N.D.) ......................................................................... 3

## Additional Authorities                                                             Page

3 Admin. L. & Prac. § 7:33 (3d ed.) (Mar. 2024 update) ................................... 22

*Aidan Mackenzie and Santi Ruiz, No, NEPA Really Is a Problem for Clean Energy,
Institute for Progress,* https://perma.cc/C9LD-QABW. (Aug. 17, 2023) .................................. 6

CC Vassar, *NRDC v. Winter: Is NEPA Impeding National Security Interests?*,

24 J. Land Use & Envtl. L. 279, 284 (2009) ........................................................... 40

CEQ, *Fact Sheet: Modernizing CEQ's NEPA Regulations*, https://perma.cc/N5U8-SJNF.
(Jul. 15, 2020) ........................................................................................................... 7

Daniel R. Mandelker, *NEPA Law & Litigation*, 7:10 (2d ed. 2003) ............................ 29

Dep't of Energy, *NEPA Lessons Learned*, Issue No. 75, Second Quarter FY 2013,
https://www.energy.gov/sites/default/files/2013/06/f1/LLQR-2013-Q2_0.pdf.
(June 2013) ............................................................................................................... 40

Diane Katz, *National Environmental Policy Act Is a Half-Century Old—And Long
Outlived Its Usefulness,* The Heritage Foundation,
https://www.heritage.org/environment/commentary/national-environmental-policy-
act-half-century-old-and-long-outlived-its (Mar. 28, 2018) ...................................... 39

Kristin Hite, Congressional Research Service, *National Environmental Protection Act:
An Overview* (Dec. 28, 2023) ................................................................................... 29

Mark C. Rutzick, *A Long and Winding Road: How the National Environmental Policy
Act Has Become the Most Expensive and Least Effective Environmental Law in the
History of the United States, and How to Fix It*, Regulatory Transparency Project,
Federalist Society (Oct. 16, 2018), https://perma.cc/XV7W-JHN3 ............................ 6

CEQ, National Environmental Policy Act Categorical Exclusions,
https://ceq.doe.gov/nepa-practice/categorical-exclusions.html ................................ 30

The White House, *State Fact Sheets*, https://perma.cc/DW8Q-SUA4. ........................ 12

U.S. Gov't Accountability Office, *National Environmental Policy Act: Little
Information Exists on NEPA Analyses* (Apr. 15, 2014),
https://www.gao.gov/products/gao-14-370 .............................................................. 40

## INTRODUCTION

The National Environmental Policy Act of 1969 (NEPA) is designed to be a procedural statute that does not prejudge outcomes. It requires federal agencies to examine their planned actions' environmental impacts, but it does not put a thumb on the scale of preferring environmental activism over other benefits. But the Council on Environmental Quality's (CEQ) latest update to the NEPA implementing regulations—the National Environmental Policy Act Implementing Regulations Revisions Phase 2, 89 Fed.Reg. 35442 (May 1, 2024) (Final Rule)— brazenly flouts Congress's statutory design and intent.

The Final Rule affirmatively removes the language enacting Congressional intent that NEPA is "a procedural statute intended to ensure Federal agencies consider the environmental impacts" of their actions. 89 Fed.Reg. 35554 (formerly at 40 C.F.R. § 1500.1(a)); Administrative Record (A.R.) 43436. In its place, the Final Rule purports to transform NEPA into an "action-forcing" process that pushes controversial initiatives like climate change and environmental justice and mandates that agencies devise alternatives based on such initiatives. There is no statutory authority for such a dramatic overhauling of the NEPA process. And by compelling the current Administration's politically charged preferences, the Final Rule violates NEPA's procedural design and transforms how NEPA has operated since its inception over 50 years ago.

The Final Rule cannot and should not be viewed in isolation. The current Administration has directed federal agencies to repurpose any and every statutory authority they can find to implement the Administration's climate agenda. *See, e.g.*, Executive Order 13990, *Protecting Public Health and the Environment and Restoring Science To Tackle the Climate Crisis*, 86 Fed.Reg. 7037 (Jan. 25, 2021), A.R. 33672–78 (directing "all executive departments and agencies . . . to immediately commence work to confront the climate crisis"); Executive Order 14008, *Tackling the Climate Crisis at Home and Abroad*, 86 Fed.Reg. 7619, 7622 (Feb. 1, 2021), A.R.

33679–93 ("It is the policy of my Administration to organize and deploy the full capacity of its agencies to combat the climate crisis to implement a Government-wide approach.").

Early in the current Administration, the Supreme Court made clear that it was improper for federal agencies to force fundamental changes to our nation's economy through bureaucratic rulemaking unless the agency could point to "clear congressional authorization" for regulating in such a manner. *West Virginia v. EPA*, 597 U.S. 697, 732 (2022) (quoting *Utility Air Regulatory Grp. v. EPA*, 573 U.S. 302, 324 (2014)); *see also id.* at 735 (holding "it is not plausible that Congress gave EPA the authority" to "force a nationwide transition away from the use of coal to generate electricity" for putative climate change reasons).

But the Supreme Court's direction has barely fazed agencies under the current Administration, and recent months have seen federal agency after federal agency contorting their rulemaking authorities to promulgate climate-related rules without any statutory mooring, forcing the States to challenge such rules over and over. Examples abound. *See, e.g., Kentucky v. Fed. Highway Admin.*, 2024 WL 1402443 (W.D. Ky. Apr. 1, 2024) (invalidating Department of Transportation climate rule purporting to mandate States set declining on-road $CO_2$ emission targets for lacking any statutory basis and being arbitrary and capricious) (appeal filed); *Iowa v. Sec. and Exch. Comm'n*, No. 24-1522, (8th Cir.) (challenging SEC rule requiring public companies to make climate-related disclosures as lacking any statutory basis); *Louisiana v. Biden*, 2024 WL 3253103 (W.D. La. Jul. 1, 2024) (enjoining Department of Energy's unilateral "pause" on liquified natural gas exports for climate-related reasons as clearly contrary to statute); *North Dakota v. Dep't of Interior*, No. 1:21-cv-00148, Dkt. 98 (D.N.D. Mar. 27, 2023) (enjoining BLM's refusal to hold statutorily mandated oil and gas lease sales for climate-related reasons); *North Dakota v. Dep't of Interior*, No. 1:24-cv-00066 (D.N.D.) (challenging BLM's use of statutory authority designed for

preventing the waste of federal resources to enact climate change policies); *North Dakota v. Dep't of Interior*, No. 1:24-cv-00124 (D.N.D.) (challenging BLM's repurposing of statutory authority for using federal lands by making non-use of the land a "use" for climate change reasons).

This Final Rule is more of the same. 89 Fed.Reg. 35447 (issuing Final Rule "[c]onsistent with E.O. 13990 and E.O. 14008"). To make it even worse, CEQ is also using this Final Rule to impose the Administration's "government-wide approach to advancing environmental justice," also untethered to any statute. *See* 89 Fed.Reg. 35445 (citing E.O. 14096, *Revitalizing Our Nation's Commitment to Environmental Justice for All*, 88 Fed.Reg. 2521 (Apr. 21, 2023)).

The Final Rule was promulgated to compel all federal agencies to prioritize global climate change and "environmental justice" for every major project that requires NEPA review, notwithstanding Supreme Court precedent that "where an agency [conducting a NEPA review] has no ability to prevent a certain effect due to its limited statutory authority over the relevant actions . . . the agency need not consider these effects." *Dept. of Transp. v. Pub. Citizen*, 541 U.S. 752, 770 (2004). And notably, the Supreme Court recently granted certiorari to address whether NEPA requires an agency evaluating the permitting of a new rail line to consider the alleged impacts caused by use of the fossil fuel commodities to be shipped across it. *See Seven Cnty. Infrastructure Coal. v. Eagle Cnty.*, No. 23-975, 2024 WL 3089539 (U.S.) (Jun. 24, 2024) ("Question presented . . . Whether [NEPA] requires an agency to study environmental impacts beyond the proximate effects of the action over which the agency has regulatory authority.").

Moreover, beyond exceeding NEPA's statutory grant of authority by imposing the current Administration's policy agendas, CEQ also acted arbitrarily and capriciously by issuing a Final Rule that does the opposite of what it claims: "concentrate on the issues that are truly relevant to the action in question" and "improve the efficiency and effectiveness of the NEPA process . . . by

providing a clear process for evaluating alternatives and effects . . . and reducing litigation." 89 Fed.Reg. 35551, 35554. The Final Rule imposing open-ended and blanket requirements, including forcing climate change and environmental justice priorities into all NEPA analyses, will almost certainly—and foreseeably—create more NEPA litigation by infrastructure and development projects' opponents. That is good only for the special interests that will continue abusing the NEPA review process to delay and prevent developments that require federal approval or involve federal funding, thereby depriving the States and their citizens of much-needed infrastructure and development.

The Final Rule should be vacated and remanded.

## STATEMENT OF UNCONTESTED MATERIAL FACTS

1. Congress enacted NEPA to ensure that "unquantified environmental amenities and values" are given "appropriate consideration in decisionmaking." 42 U.S.C. § 4332(2)(B). NEPA requires that federal agencies prepare a "detailed statement" on proposed "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C).

2. "NEPA has twin aims:" first, it requires federal agencies to consider the significant environmental impacts of their proposed actions; and second, it requires those federal agencies to inform the public how it has considered those environmental concerns in its decision-making process. *Balt. Gas and Elec. Co. v. Nat. Res. Def. Council, Inc.*, 462 U.S. 87, 97 (1983).

"In enacting NEPA, however, [Congress] did not require agencies to elevate environmental concerns over other appropriate considerations." *Id*. "Rather, it required only that the agency take a 'hard look' at the environmental consequences before taking a major action." *Id.* Put differently, "NEPA itself does not mandate particular results, but simply prescribes the necessary process . . . merely prohibit[ing] uninformed—rather than unwise—agency action." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350–51 (1989). Or, as the Eighth Circuit has summarized,

4

"NEPA provides procedural rather than substantive protection." *Lakes and Parks All. v. Fed. Transit Admin.*, 928 F.3d 759, 762 (8th Cir. 2019) (citation and quotations omitted).

3. The "major federal actions" implicated by NEPA are broad and can include federal agencies' adoption of rules and regulations, their issuance of permits, the provision of financial assistance, and other actions "subject to substantial Federal control and responsibility." 42 U.S.C. § 4336e(10). For Plaintiff States, energy and minerals development, transportation projects, utility construction and maintenance, forest and water resource management, and other key infrastructure operations commonly have a federal nexus and must comply with NEPA.

4. NEPA also created the CEQ as a division within the Executive Office of the President, responsible for establishing the process by which federal agencies must comply with NEPA's requirements. *See* 42 U.S.C. §§ 4342, 4344. CEQ's NEPA implementing regulations have always provided for different levels of NEPA review based on whether the proposed action will "significantly" affect the human environment. Those different levels of NEPA review are an environmental impact statement (EIS) for clearly significant effects, an environmental assessment (EA) for unknown effects, and a categorical exclusion (CE) for clearly insignificant effects. *See* 42 U.S.C. § 4336(a)–(b). The EA process for unknown environmental effects concludes with either a Finding of No Significant Impact (FONSI) or determination that an EIS is needed. *See id.*

The Final Rule retains that framework for levels of NEPA review. *See* 89 Fed.Reg. 35557–58. And while the responsibility for conducting NEPA reviews ultimately lies with the federal agency considering a proposed action, States and other project proponents are often delegated the task of preparing NEPA documents for review by the federal agencies, and for funding the studies and external activities necessary to complete the NEPA review. *See* 42 U.S.C. § 4336a(f).

5. CEQ published its original NEPA implementing regulations in 1978. *See* 43 Fed.Reg. 55978 (Nov. 29, 1978). But over the following decades, NEPA implementation ballooned far beyond Congress' twin aims. Indeed, NEPA reviews morphed into a vehicle for encyclopedic, lengthy, copious, repetitive documents that are nearly unintelligible to both the public and decision-makers. *See, e.g.,* Mark C. Rutzick, *A Long and Winding Road: How the National Environmental Policy Act Has Become the Most Expensive and Least Effective Environmental Law in the History of the United States, and How to Fix It*, Regulatory Transparency Project, Federalist Society, at 12–15 (Oct. 16, 2018), https://perma.cc/XV7W-JHN3.

And the excessive analysis for NEPA reviews often resulted in development paralysis, with States and federal agencies engaged in an endless task of trying to build NEPA documents capable of withstanding frequent legal challenges from opponents of disfavored agency policy decisions who would be able to delay or prevent development projects based on any number of procedural minutiae. *Id*. at 10–11. Meanwhile, a patchwork of CEQ and individual agency "guidance" documents arose creating inconsistency and confusion, and the NEPA implementing regulations failed to keep pace with technological advances and best practices. *See, e.g.*, Aidan Mackenzie and Santi Ruiz, *No, NEPA Really Is a Problem for Clean Energy*, Institute for Progress (Aug. 17, 2023), https://perma.cc/C9LD-QABW.

6. In 2020, CEQ promulgated a generational update of the NEPA implementing regulations to modernize and consolidate NEPA processes across the federal government. 85 Fed.Reg. 43304 (July 16, 2020) (2020 Rule), A.R. 29042–114. The 2020 Rule essentially codified in one location decades of agency guidance, best practices, and case law. The 2020 Rule was designed to ensure NEPA documents would inform, rather than confuse, their readers, rely on the best available information, and guard against speculation. The 2020 Rule also created efficiencies in the timing

and length of NEPA documents and facilitated assistance by external preparers, interagency coordination, and public commenting. *See* Council on Environmental Quality, *Fact Sheet: Modernizing CEQ's NEPA Regulations* (Jul. 15, 2020), https://perma.cc/N5U8-SJNF.

7. In 2021, the current Administration identified the NEPA implementing regulations as a vehicle for imposing the Administration's environmental and social policy priorities nationwide. According to the Final Rule, "CEQ is leading the President's efforts to secure environmental justice" and "leading the efforts with its agency partners to . . . reduc[e] Federal agency GHG emissions by 65 percent." 89 Fed.Reg. 35445.

To achieve that end, CEQ undertook a multi-phased approach to rewriting the NEPA implementing regulations to undo many changes from the 2020 Rule and impose the current Administration's environmental and social policy preferences. First, CEQ issued a "Phase 1" final rule that undid much of the 2020 Rule and removed language that required consistency in the NEPA regulations promulgated by agencies. *See* 87 Fed.Reg. 23453 (Apr. 20, 2022), A.R. 43863–80. During its Phase 1 rulemaking, CEQ previewed that "Phase 2" would be an even more substantial overhaul. 87 Fed.Reg. 23456, A.R. 43866.

8. In June 2023—between the Phase 1 and Phase 2 rulemakings—Congress enacted the Fiscal Responsibility Act (FRA), which included the first statutory amendments to NEPA in more than 50 years. Pub. L. No. 118-5, 137 Stat. 10 (2023). Congress codified several of the 2020 Rule's reforms. *See id.* § 321 (Builder Act) (codified at 42 U.S.C. §§ 4332, 4336). Congress also added backstops against gamesmanship of the NEPA process, including, but not limited to, clearer definitions, firm time and page limits for NEPA documents, the ability to sue agencies for delays, and clarity regarding the adoption of other agencies' CEs. *Id.*

7

9. CEQ published its "Phase 2" notice of proposed rulemaking on July 31, 2023. 88 Fed.Reg. 49924 (July 31, 2023), A.R. 1-66. Despite Congress' efforts in the FRA to clarify the NEPA review process, CEQ proposed expansive new requirements. Though the proposed rule nominally purported to implement the FRA, Plaintiff States allege that it did not adhere to the FRA's letter or spirit. For example, while the proposal touted "timely and unified" federal reviews, 88 Fed.Reg. 49925, A.R. 2, it introduced several stumbling blocks certain to cause delay and discord; most of these flaws in the proposal persisted to the Final Rule, as discussed below.

10. Plaintiff States and other key stakeholders in the NEPA process submitted voluminous comments on the proposed rule. Those comments expressed concern that the proposed rule would transform NEPA into a substantive statute, and that it impermissibly elevated policy priorities found nowhere in the statute. *See, e.g.*, A.R. 27339–356 (comments of Iowa and 23 other States); A.R. 27234–27241 (comments of North Dakota); A.R. 27703–706 (comments of 17 State governors). Commenters also warned that the proposed rule would exacerbate the already severe problems with NEPA's implementation, resulting in delayed and canceled projects, economic damage, and invasions of States' sovereignty and their ability to provide their citizens with functioning infrastructure. A.R. 27339–56; A.R. 27234–41; A.R. 27703–06.

CEQ promulgated the Final Rule on May 1, 2024. 89 Fed.Reg. 35442. Dismissing many suggested changes raised in comments from Plaintiff States and other stakeholders, CEQ largely adopted the proposed rule. The Final Rule not only drastically departs from the 2020 Rule's improvements, but also drastically departs from how NEPA has operated for the last five decades. The Final Rule's changes directly reflect the substantive policy priorities of the current Administration to make NEPA an "action-forcing" device requiring substantive outcomes. While CEQ set the Final Rule to be effective on July 1, 2024, 89 Fed.Reg. 35442, it also directs that it

may have retroactive application for "ongoing activities and environmental documents begun before" the Final Rule's effective date. 89 Fed.Reg. 35573 (§ 1506.12.).

11. Plaintiff States sued on May 21, 2024, and filed a First Amended Complaint on June 4, 2024 (*see* Dkts. 1, 39). The parties agreed to an expedited schedule for briefing the merits of this dispute, which the Court entered (*see* Dkt. 56). Twenty self-proclaimed environmental justice, labor, and conservation groups moved unopposed to intervene in defense of the Rule on June 27, 2024, which the Court granted on July 31, 2024 (*see* Dkts. 51-1, 60).

## STANDARD OF REVIEW

"Summary judgment is proper if, after viewing the evidence and drawing all reasonable inferences in the light most favorable to the nonmovant, no genuine issue of material fact exists and the movant is entitled to judgment as a matter of law." *Christoffersen v. Yellow Book USA*, 536 F.3d 947, 949 (8th Cir. 2008) (citing Fed. R. Civ. P. 56).

"Judicial review of administrative decisions is governed by the Administrative Procedure[] Act ('APA')." *Voyageurs Nat. Park Ass'n v. Norton*, 381 F.3d 759, 763 (8th Cir. 2004) (citing 5 U.S.C. § 706). Under the APA, a court "shall . . . hold unlawful and set aside agency action that is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. § 706(2)(A). "Federal administrative agencies are required to engage in reasoned decisionmaking." *Mandan, Hidatsa Arikara Nation v. Dep't of Interior*, 95 F.4th 573, 579 (8th Cir. 2024) (quoting *Michigan v. EPA*, 576 U.S. 743, 750 (2015)) (internal quotations omitted). "Not only must an agency's decreed result be within the scope of its lawful authority, but the process by which it reaches that result must be logical and rational." *Id.* at 579–80 (quoting same and *Assn. of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)) (internal quotations omitted). An agency's action is unlawful if it fails to consider relevant factors, which "are generally determined

by Congress." *Id.* at 580 (citing *N. States Power Co. v. United States*, 73 F.3d 767, 766 (8th Cir. 1996)).

Courts also must set aside *ultra vires* agency actions. 5 U.S.C. § 706(2)(C); *Key Med. Supply, Inc. v. Burwell*, 764 F.3d 955, 962–63 (8th Cir. 2014). An agency rule is *ultra vires* when "promulgated without valid statutory authority." *Iowa League of Cities v. EPA*, 711 F.3d 844, 876 (8th Cir. 2013). "Courts must exercise their independent judgment in deciding whether an agency has acted within its statutory authority, as the APA requires." *Loper Bright Enter. v. Raimondo*, 144 S.Ct. 2244, 2273 (2024). And "the role of the reviewing court under the APA is, as always, to independently interpret the statute and effectuate the will of Congress subject to constitutional limits." *Id*. at 2263. An agency's interpretation of its own statutory authority is relevant only to the extent it has the "power to persuade," *id*. at 2267 (quoting *Skidmore v. Swift & Co*., 323 U.S. 134, 140 (1944)) (quotations omitted), which in turn depends "upon the thoroughness evident in its consideration, the validity of its reasoning, [and] its consistency with earlier and later pronouncements," *id*. at 2259 (quoting *Skidmore*, 323 U.S. at 140).

## ARGUMENT

### I.   This Action Is Justiciable.

Plaintiff States have a vested interest in NEPA retaining its proper role and function. States play a unique role in NEPA reviews with respect to projects that occur in their State or for which the State is a project proponent, which often involves responsibility to prepare the NEPA documents delegated to a State agency in the first instance. *E.g.*, 42 U.S.C. § 4336a(f); *Lakes Region Legal Def. Fund, Inc. v. Slater*, 986 F. Supp. 1169, 1176 n.4 (N.D. Iowa 1997) (citing example of agency NEPA implementing regulations authorizing that delegation). And several

Plaintiff States (including Florida, Texas, and Utah) directly administer NEPA for certain projects under approved NEPA "assignment" pursuant to 23 U.S.C. § 327. Am. Compl. ¶ 76, Dkt. 39.

Plaintiff States have sovereign and proprietary interests in developing their natural resources, which are held in trust by the States to benefit their people. So Plaintiff States are often proponents of critical infrastructure projects. That includes development projects that have a federal component (either with a federal agency lead or requiring federal permitting or involving federal funding) and that are thus subject to NEPA review. They are initial *preparers* of NEPA documents. They also are designated as *cooperating* or *participating agencies* in NEPA reviews.

That means Plaintiff States are affected directly and broadly, as the nature of their involvement in the NEPA process is much more than just providing information during a public comment period. They are directly involved in undertaking NEPA reviews alongside federal agencies within their respective States and will bear the costs of complying with the Final Rule.

Those costs make Plaintiff States' challenge to the Final Rule justiciable and establish that they have standing to challenge it. Article III standing requires that "a plaintiff must demonstrate (1) injury in fact." *Young Am. Corp. v. Affiliated Comput. Servs. (ACS), Inc.*, 424 F.3d 840, 843 (8th Cir. 2005) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992)). Ripeness and standing often, as here, go hand in hand. *Iowa League of Cities*, 711 F.3d 844 at 867 ("[I]n many cases, ripeness coincides squarely with standing's injury in fact prong.") (quoting *Thomas v. Anchorage Equal Rts. Comm'n*, 220 F.3d 1134, 1138–39 (9th Cir. 1999)). "[O]nly one plaintiff need show standing" to establish the Court's jurisdiction. *Sierra Club v. U.S. Army Corp of Eng'rs*, 645 F.3d 978, 986 (8th Cir. 2011).

The Eighth Circuit "[does] not require parties to operate beneath the sword of Damocles until the threatened harm actually befalls them, but the injury must be 'certainly impending.'" *Iowa*

*League of Cities*, 711 F.3d at 867 (quoting *Pub. Water Supply*, 345 F.3d at 573); *see also City of Kennett, Mo. v. EPA*, 887 F.3d 424, 431 (8th Cir. 2018) ("In future injury cases, the plaintiff must demonstrate that the threatened injury is certainly impending, or there is a substantial risk that the harm will occur." (citation and quotations omitted)). The imminency of harm to Plaintiff States is present here, where the Final Rule is poised to inflict profound injury on Plaintiff States as project proponents, cooperating agencies, holders of delegated authority, and landowners in the lands where many projects subject to NEPA reviews occur.

The States are now engaged in many federal or federally funded infrastructure programs that require NEPA review. *See generally,* The White House, *State Fact Sheets*, https://perma.cc/DW8Q-SUA4.

For example, in North Dakota, there are major infrastructure projects, changes to water and irrigation, and energy development projects all currently underway and impacted by the Final Rule's revisions to the NEPA process. Declaration of Doug Goehring (Goehring Decl.) at ¶¶ 13–14 (**Exhibit A**). That includes $1.3 billion awarded to North Dakota for the construction of roads, bridges, roadway safety, and other major projects that facilitate the transport of agricultural goods in the State. Goehring Decl. at ¶ 13(a)(i). It also includes $437 million awarded by the Army Corps of Engineers for the Fargo-Moorhead Area Diversion project, mitigating flooding that causes nearly $240 million in flood damage annually. Goehring Decl. at ¶ 13(b); Declaration of Andrea Travnicek (Travnicek Decl.) at ¶ 12 (**Exhibit B**). And it includes development of the Heartland Hydrogen Hub, which leverages North Dakota's natural resources to help decarbonize the State and decrease energy prices. Goehring Decl. at ¶ 13(c). These and other current and future projects are critical to North Dakota's infrastructure, agricultural success, and, ultimately, the U.S.'s food security. Goehring Decl. at ¶¶ 12, 16–17.

The Final Rule is also likely to impair development of North Dakota's water infrastructure. Travnicek Decl. at ¶¶ 13, 19. North Dakota has four major water supply projects underway to protect and ensure the water supply for 75% of its residents. Travnicek Decl. at ¶ 7. For example, the Northwest Area Water Supply will deliver water from the Missouri River to 81,000 residents, but NEPA-related litigation has delayed its construction for more than 17 years. Travnicek Decl. at ¶ 8. The Final Rule will affect, at a minimum, any additional funding and permitting for this project. Travnicek Decl. at ¶ 8. The same is true for North Dakota's other major water supply projects and flood protection efforts with a federal agency nexus. Travnicek Decl. at ¶¶ 9-12. The Final Rule also jeopardizes the use of CEs by agencies like the U.S. Forest Service, which are necessary for critical projects like North Dakota's Southwest Pipeline Project. Travnicek Decl. at ¶ 9. The Final Rule's new requirements also multiply litigation risk for North Dakota water resources projects already long delayed by NEPA litigation. Travnicek Decl. at ¶¶ 8, 10, 14. And they demand substantially more staff and financial resources that otherwise would be dedicated to meeting the needs of the people of North Dakota. Travnicek Decl. at ¶ 20.

The Final Rule is also likely to adversely affect North Dakota's highway infrastructure. The North Dakota Department of Transportation (NDDOT) participates in the NEPA process for around fifty highway or transportation developments per year, and NDDOT is involved in or planning around one hundred projects that are undergoing or pending NEPA review. Declaration of Ronald Henke (Henke Decl.) at ¶¶ 5, 6 (**Exhibit C**). NDDOT already invests millions of dollars and thousands of personnel hours each year in implementing NEPA, and the Final Rule will increase those costs and associated litigation delays. Henke Decl. at ¶ 11.

The State of Iowa also suffers from the Final Rule. For example, projects that use federal funding and are subject to NEPA review include replacement of the Iowa 12 Gordon Drive Viaduct,

reconstruction of US 75, and replacement of the US 67 Centennial Bridge over the Mississippi River. Declaration of Stuart Anderson (Anderson Decl.) at ¶¶ 3, 4 (**Exhibit D**). The Final rule will require evaluations far beyond what is required under NEPA, costing Iowa money and time. Anderson Decl. at ¶ 6.

West Virginia presents similar instances of programs subject to the Final Rule. For example, West Virginia's Office of Abandoned Mine Lands Reclamation (AML) administers federal funding for economic development projects subject to NEPA review on abandoned mine lands. Declaration of Travis Parsons (Parsons Decl.) at ¶ 8 (**Exhibit E**). In site reclamation, AML must prepare an EA in consultation with the West Virginia Division of Natural Resources, U.S. Fish and Wildlife Service, and other offices for every project. Parsons Decl. at ¶ 8. AML invests millions of dollars and thousands of personnel hours in NEPA compliance. Parsons Decl. at ¶ 12. AML oversees Mtn View Portals, a reclamation project containing environmental hazards that AML must address. Parsons Decl. at ¶ 13(a). This project is still undergoing NEPA review and will be harmed by midstream changes due to the Final Rule. Parsons Decl. at ¶ 13(a). A similar scenario presents for AML's Staten Run Drainage and Refuse project. Parsons Decl. at ¶ 13(b). For AML-related projects alone, West Virginia estimates that it will have to spend an additional $1.3 million due to implementation of the Final Rule. Parsons Decl. at ¶ 14. West Virginia also has the ongoing Coalfields Expressway project, King Coal Highway Segment, and Corridor H Highway Project, all of which may require revised NEPA analysis under the Final Rule which would foreseeably cause project delays that may result in health, safety and environmental issues for the public. Declaration of Travis Long (Long Decl.) at ¶ 13 (**Exhibit F**). For its transportation projects subject to NEPA review, West Virginia estimates that the Final Rule will require additional staffing and additional expenditure of $6 million annually. Long Decl. at ¶ 15.

14

South Dakota faces similar burdens from the Final Rule. For instance, the Final Rule's new and costly requirements will delay expansion and development of regional water systems needed to ensure access to safe and reliable drinking water and enable economic growth. Declaration of Hunter Roberts (Roberts Decl.) at ¶¶ 7, 9 (**Exhibit G**). Such current projects likely to seek federal funding and thus trigger NEPA review include the Dakota Mainstem Regional Water System, the Lewis and Clark Regional Water System, the Water Investment in Northern South Dakota, and the Western Dakota Regional Water System. Roberts Decl. at ¶ 8. The Final Rule also impairs South Dakota's administration of highway, railroad, and transit projects worth hundreds of millions of dollars and comprising tens of thousands of miles. Declaration of Joel Jundt (Jundt Decl.) ¶¶ 5–6, 8, 10–11 (**Exhibit H**). Resulting delays in project delivery will adversely affect not only South Dakota, but also local agencies, landowners, developers, and private interests benefitting from those projects.

The Final Rule imposes similar burdens on other Plaintiff States. For example, the Final Rule's added requirements will thwart Nebraska's timely advancement and realization of key transportation projects, such as the Central City Viaduct, Minatare to US-385 expressway expansion, Bridgeport Viaduct, Decatur Bridge (into Iowa), York-Columbus expressway expansion, and Norfolk-Wisner US-275. Declaration of Kyle Keller (Keller Decl.) at ¶¶ 4, 6, 7 (**Exhibit I**). In Idaho, the Final Rule will impede realization of about 45 currently programmed transportation projects and multiple planning efforts entailing environmental reviews. Declaration of Michael Johnson (Johnson Decl.) at ¶¶ 5, 8, 9 (**Exhibit J**). Similarly, the Final Rule will add time and money to complete important ongoing and new projects in Virginia. Declaration of Angel Deem at ¶ 7 (**Exhibit K**). The Final Rule will frustrate Alaska's management of its vast forests, parks, recreational areas, agricultural, soil conservation, and surface and subsurface minerals,

including petroleum and natural gas, as well as its realization of specific statutory deadlines to complete NEPA reviews for certain transportation and utility projects in Alaska. Declaration of John Boyle at ¶¶ 1, 4, 8 (**Exhibit L**); 16 U.S.C. § 3162(4).

North Dakota and other Plaintiff States will also see immediate effects from the Final Rule on the millions of acres of federal lands within their States, including, but not limited to, national forests, national grasslands, national parks, and national monuments, as well as Tribal lands. *E.g.*, Goehring Decl. at ¶ 6 (nearly 1 million acres of federally managed lands in North Dakota); Johnson Decl. at ¶ 3 (federal government manages nearly two-thirds of Idaho's land mass).

And several Plaintiff States—including Florida, Texas, and Utah—are also directly affected by the Final Rule in a different way. Those States have directly assumed NEPA responsibilities from the U.S. Department of Transportation (USDOT) for certain transportation projects. *See* 23 U.S.C. § 327. That statute provides that "with the written agreement of the Secretary and a State . . . the Secretary may assign, and the State may assume, the responsibilities of the Secretary in respect to one or more highway projects within the State under [NEPA]." 23 U.S.C. § 327(a). Florida, Texas, and Utah, among other States, have each assumed direct NEPA review responsibilities pursuant to this statute, and consequently are directly injured by the Final Rule's unlawful revisions to the NEPA review process. *See*, *e.g.,* Declaration of Brandon Weston (Weston Decl.) at ¶ 3, (**Exhibit M**); Declaration of William Watts (Watts Decl.) at ¶¶ 11–12 (**Exhibit N**). For example, Texas exercises NEPA assignment for its more than 80,700 centerline miles of highway, 55,000 bridges, and 500 million daily vehicle miles of travel; its state transportation system is the most extensive and heavily used in the nation. Declaration of Doug Booher (Booher Decl.) at ¶ 2 (**Exhibit O**). Texas has several upcoming projects that the Final Rule will affect including the Regional Parkway-North Padre Island Project and the 36A South Project,

16

each of which is essential to improve Texas' infrastructure. Booher Decl. at ¶¶ 7, 9. The Final Rule's added requirements and complexity will cause delay to these projects and resulting economic harm to Texas. Booher Decl. at ¶¶ 8, 9. Similarly, Florida exercises NEPA assignment for 123,652 centerline miles of public roads, 12,121 centerline miles of State Highways, and 4,351 centerline miles of Strategic Intermodal System, as well as almost 7,500 miles of bicycle facilities and over 3,500 miles of pedestrian facilities, the majority of which have a federal nexus. Watts Decl. ¶¶ 7, 9. Florida's five-year work program is $65.5 billion for affected highway capacity congestion relief projects, critical bridge repair and replacement projects, regional trail and safety projects, and multiple wildlife crossing projects. Watts Decl. ¶ 7, 13. And States with NEPA assignment must regularly certify to USDOT their full compliance with the Final Rule, and will be the named defendants in inevitably increased lawsuits challenging compliance with the Final Rule. Weston Decl. ¶¶ 13, 17, 21.

The Final Rule also uniquely effects Wyoming. Indeed, the federal government delegated Wyoming's Department of Environmental Quality primacy over multiple environmental and natural resource programs, including water, air, solid and hazardous waste, abandoned mine land reclamation, coal mining, and underground injection control (UIC) wells. Declaration of Todd Parfitt (Parfitt Decl.) at ¶ 3 (**Exhibit P**). The Final Rule ignores the Department's primacy over those various regulatory programs and will require the Department to consider how the Final Rule's new provisions, which exceed the scope of the pertinent agency's authority under NEPA and governing state law, affect a particular project and impact Department resources. *Id*. ¶ 5.

The Final Rule transforms NEPA into an "action-forcing" statute that improperly advances substantive policy goals, such as those related to climate change and environmental justice. Those changes impede farming or ranching activities declared environmentally adverse and create new

obligations to "mitigate" longstanding practices. Goehring Decl. at ¶ 12(a). Those changes also limit the use of CEs for NEPA review by redefining "extraordinary circumstances," including CEs duly promulgated by the United States Department of Agriculture's Agricultural Research Services, Animal and Plant Health Inspection Service, Farm Service Agency, United States Forest Service, Natural Resources Conservation Service, and rural development agencies. Goehring Decl. at ¶ 12(b), n.3. Those concrete harms to Plaintiff States stem from the unlawfulness of the Final Rule, and Plaintiff States have the right to have this Court adjudicate the validity of the Final Rule itself. CEQ's NEPA implementing regulations are no more insulated from review than other agency actions with adverse effects on those subject to the regulation.

States' role in the NEPA process distinguishes this case from the Fourth Circuit's dismissal of a group of project opponent activists who challenged the 2020 Rule. *Cf. Wild Virginia v. Council on Env't Quality*, 56 F.4th 281 (4th Cir. 2022). If Federal Defendants attempt to argue for the same disposition as the out-of-circuit *Wild Virginia* decision, such a result would be misplaced here. The activist groups in *Wild Virginia* lacked direct interests in CEQ's regulations. Those development opponents generally wield NEPA as a sword to block projects; none have duties, fiscal responsibilities, or delegated authorities to move NEPA reviews through completion. Not only does such groups' misuse of NEPA lead to time-consuming, unnecessary, and expensive project delays due to litigation, but it also brings into sharp focus what those project opponents must claim injury from: NEPA regulations as applied to specific future projects. For them, it is unclear how, or even if, revisions to CEQ's revisions to NEPA implementing will affect a specific project, in part because additional agency-specific implementing regulations are needed. That is not the case for Plaintiff States who prepare NEPA documents and serve as coordinating agencies in the NEPA

review process. Indeed, even *Wild Virginia* "emphasize[d] the limited nature of [its] holding," and did not disqualify all future facial challenges to CEQ's NEPA implementing regulations. *Id.* at 302.

The justiciability of Plaintiff States' challenge to the Final Rule is further shown by the claims made by the Intervenor-Defendants in this case. Those twenty self-proclaimed environmental justice, labor, and conservation groups recognize the real-world impacts of the Final Rule (though their defenses of the Rule are misplaced). *See* Mem. Supp. of Mot. Intervene at 4, 12–16, Dkt. 51-1. They allege that the Final Rule affects their missions of "protect[ing] the health and welfare of their communities, preserv[ing] the nation's parks, wildlife, and wilderness, and advocat[ing] for clean energy." *Id.* at 4–5. They also claim "significant conservation-based interests in the preservation of the areas where they live, work, recreate, worship, and subsist" and that the "Final Rule has direct implications on [Intervenor Defendants'] ability to access and enjoy these areas." *Id.* at 10. They assert that the Final Rule directs agencies to give greater consideration to climate change and environmental justice, and that vacatur of the Final Rule would "compound historic harms to already overburdened communities." *Id.* at 11. The Court accepted those impacted interests in granting intervention. Order Granting Mot. to Intervene at 6, Dkt. 60. Consequently, while Plaintiff States in no way endorse these assertions—or agree that any of them are germane to NEPA's actual procedural requirements—their allegations at a minimum highlight the existence of converse harms and justiciability for adjudicating the Final Rule's validity.

## II.     The Final Rule Unlawfully Transforms the NEPA Process to Achieve Substantive Policy Goals of the Current Administration.

NEPA is—and has always been—a purely procedural statute that requires a hard look at the environmental consequences of proposed agency actions. *Public Citizen*, 541 U.S. at 756 ("NEPA imposes only procedural requirements…"). "Other statutes may impose substantive

environmental obligations on federal agencies, but NEPA merely prohibits uninformed—rather than unwise—agency action." *Robertson*, 490 U.S. at 351.

CEQ's Final Rule departs from this decades-long understanding of NEPA, transforming it into an "action-forcing" mechanism that compels policy-driven outcomes. It does so "without valid statutory authority." *See Iowa League of Cities*, 711 F.3d at 876. And it does so contrary to NEPA's purpose and longstanding interpretation by the courts. *E.g.*, *Robertson*, 490 U.S. at 333. The Final Rule's invalid attempt to transform NEPA into a substantive tool for achieving the controversial policy goals of the current Administration is manifest in multiple ways.

### A.    The Final Rule Is Explicit in Forcing Substantive Outcomes.

From the start, the Final Rule removes regulatory language stating that NEPA's purpose is "a procedural statute intended to ensure Federal agencies consider the environmental impacts [of] their actions." 89 Fed.Reg. 35449–50, 35554 (formerly at 40 C.F.R. § 1500.1(a)); A.R. 43436. CEQ tries to justify re-writing NEPA's entire purpose by making the unsupported assertion that the former language, in place for decades, "minimizes Congress's broader goals in enacting the statute." 89 Fed.Reg. at 35450. CEQ also tries to defend its re-write by citing *Andrus v. Sierra Club*, which does not justify removing this language. *Id.* (citing *Andrus*, 442 U.S. 347, 350–51 (1979)). *Andrus* answered a simple question, and in the *negative*—does NEPA require federal agencies to prepare an EIS to accompany appropriation requests? *Andrus*, 442 U.S. at 348–49. The decision only generally describes the longstanding proposition that agencies *consider* environmental concerns in their planning. *Andrus*, 442 U.S. at 350–51.

With that "procedural" language taken out of the way, the Final Rule then goes on to claims that NEPA instead "contains 'action-forcing' procedural provisions to ensure Federal agencies implement the letter and spirit of the Act." 89 Fed.Reg. 35450, 35554 (§ 1500.1(a)(2)); A.R. 43437. The Final Rule also states that the primary purpose of an EIS is to "serve as an action-forcing

device" so that "the policies and goals defined in the Act are infused into the ongoing programs and actions of the Federal Government." 89 Fed.Reg. 35494–95, 35562–63 (§ 1502.1(a)); A.R. 43466. But such language is not found in the statutory text. Indeed, NEPA only requires preparing NEPA documents and involving the public; the decision on a proposed major federal action is up to the federal agency, working in conjunction with other cooperating federal and State agencies and the applicant. *See Robertson*, 490 U.S. at 350–51.

CEQ thus purposefully and without legal authority provides in the Final Rule that the effect of the regulations is not to examine environmental effects, but to force outcomes. This interpretation is contrary to NEPA, as it has long been explained by the Supreme Court. *E.g.*, *Robertson*, 490 U.S. at 333. These linguistic changes set the table for the many other substantive changes that the Final Rule attempts to inject into the NEPA process.

**B.     The Final Rule Elevates the Current Administration's Substantive Policy Priorities Absent Any Statutory Foundation.**

During the last five decades, NEPA's implementing regulations have not emphasized specific types of effects over others—something that CEQ itself has expressly acknowledged is inappropriate in other contexts, including economic effects. *See* 88 Fed.Reg. 49952, A.R. 29 (rejecting express regulatory listing of economic factors because "it is inappropriate to single out these considerations for special treatment"). Yet here, the Final Rule is rife with mandated policy priorities. Most notably, the Final Rule newly mandates special treatment for the current Administration's policy concerns relating to "environmental justice," "climate change," "Indigenous Knowledge," and "global" effects.

Starting with "environmental justice." The Final Rule adds capacious definitions of "environmental justice" and "communities with environmental justice concerns," *see* 89 Fed.Reg. 35575 (§§ 1508.1(f), 1508.1(m)); A.R. 43506–08, and it weaves mandatory consideration of those

concepts throughout its requirements. For example, the Final Rule now requires that agencies identify alternatives that will "address adverse health and environmental effects that disproportionately affect communities with environmental justice concerns." 89 Fed.Reg. 35554–55 (§ 1500.2(e)); A.R. 43438. "Environmental justice" is also a consideration in the newly-created "environmentally preferable alternative." *See* 89 Fed.Reg. 35565 (§ 1502.14(f)); A.R. 43474. Indeed, analysis of the concept is now required in determining whether an action's effect is "significant" to begin with. 89 Fed.Reg. 35556–57 (§ 1501.3(d)(1)); A.R. 43446–47. And agencies must now treat "environmental justice" concerns as an "extraordinary circumstance" that can entirely prevent use of CEs. *See* 89 Fed.Reg. 35575 (§ 1508.1(o)); A.R. 43507.

Nowhere does NEPA mention "environmental justice." Indeed, there are no federal laws on the topic at all. Instead, CEQ relies only on Executive Orders 12898, 14008, and 14096 to now mandate "environmental justice" considerations during the NEPA review process. *See* 89 Fed.Reg. 35444–45, 35452–53, 35557 (§§ 1501.3(d)(1), 1501.3(d)(2)(vi)). But "[i]n issuing directives to govern the Executive Branch, the President may not . . . permit agencies to transgress boundaries set by Congress." *EDF v. Thomas*, 627 F. Supp. 566, 570 (D.D.C. 1986) (quotation omitted); *see also, e.g.*, 3 Admin. L. & Prac. § 7:33 (3d ed.) (Mar. 2024 update) ("the President may not, as a general proposition, require or permit agencies to transgress boundaries set by Congress") (citing *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952)); *accord Louisiana et al. v. Biden et al.*, 622 F.Supp.3d 267, 294–95 (W.D. La. Aug. 18, 2022) ("A command in an Executive Order does not exempt an agency from the APA's reasoned decision-making requirement.").

Similarly problematic are the Final Rule's provisions on "climate change." Like environmental justice, NEPA lacks any mention of climate change, even as amended by the FRA in 2023. And the Final Rule does not even define "climate change." Yet the Final Rule states that

agencies must identify "alternatives that will reduce climate-change related effects." 89 Fed.Reg. 35554 (§ 1500.2(e)); A.R. 43438. This focus on climate change is also incorporated in the "environmentally preferable alternative" and the new CE "extraordinary circumstances" requirements. *See* 89 Fed.Reg. 35565 (§1502.14(f)), 35575 (§ 1508.1(o)). Though perhaps most substantive, the Final Rule mandates that environmental impact statements must now consider climate change, including "where feasible, *quantification* of greenhouse gas emissions, from the proposed action and alternatives and the effects of climate change on the proposed action and alternatives." 89 Fed.Reg. 35566 (§ 1502.16(a)(6)) (emphasis added). But because many actions subject to NEPA review do not affect climate change—which is a global phenomenon—this new directive is simply a requirement to drive agency decisions towards whatever minimizes greenhouse gas emissions around the globe. That is not NEPA's statutory mandate.

The Final Rule relies on cases that have cited an agency's failure to consider climate change to justify its inclusion. *See* 89 Fed.Reg. 35508 (citing *Vecinos para el Bienestar de la Comunidad Costera* v. *FERC*, 6 F.4th 1321 (D.C. Cir. 2021); *WildEarth Guardians* v. *Zinke*, 368 F. Supp. 3d 41 (D.D.C. 2019) [miscited in the Final Rule as a D.C. Circuit case]; and *WildEarth Guardians* v. *BLM*, 870 F.3d 1222 (10th Cir. 2017)). But none of these cases hold that climate change is inexorably part of NEPA, nor do they prescribe the level of climate analysis that is required. Rather, these are case-by-case analyses of the adequacy of NEPA review. Such analyses are within the purview of the courts, while reading climate change into the text of NEPA is not within the purview of CEQ.

Next, the Final Rule adds "Indigenous Knowledge" as a form of "high-quality information" that agencies "shall" use when making NEPA determinations. *See* 89 Fed.Reg. 35565 (§ 1502.15(b)). Nothing in NEPA's statutory text contemplates including "Indigenous Knowledge"

among the "reliable data" that is supposed to underlie NEPA decision-making. *See* 42 U.S.C. § 4332(2)(E); *cf. Reliable*, Merriam-Webster (last updated July 17, 2024) ("suitable or fit to be relied on: dependable; giving the same result on successive trials"). When Congress amended NEPA in 2023 through the FRA, it added the requirement to use "reliable" data and resources and disclaimed any requirement to undertake "new" scientific or technical research unless doing so was "essential." *See* FRA, Pub. L. No. 118-5, § 321 (2023) (codified at 42 U.S.C. §§ 4332(2)(E), 4336(b)(3)). When revising the statutory language regarding the types of data to use during NEPA reviews, Congress did not include the concept of "Indigenous Knowledge."

The Final Rule's inclusion of "Indigenous Knowledge" as a source of "high-quality" information in NEPA reviews also elevates it to special status, as the Final Rule contains no similar recognition of the unique knowledge of other stakeholders, such as by requiring consideration of "State Knowledge." Presumably, the Final Rule intends for "Indigenous Knowledge" to refer to knowledge held by Native Americans, *see* 89 Fed.Reg. 35481, but whether that means knowledge held by a particular individual, a group, an entire Tribal Nation, or among multiple Tribal nations, the Final Rule does not say. Whether that means written knowledge or oral histories, the Final Rule does not say. And how such knowledge "shall ensure the . . . scientific integrity" of environmental analysis, *see* 89 Fed.Reg. 35571 (§ 1506.5(a)), the Final Rule again does not say. Such vagueness causes the Final Rule to be insurmountably ambiguous. Even so, if an agency does not adequately consider that undefined concept when proposing a development or project, that project may now be delayed in litigation for years. Nowhere does the statutory text of NEPA suggest a purpose to inject such uncertainty into the NEPA review process.

Finally, the Final Rule contradicts NEPA's statutory text by requiring the assessment of worldwide affects. For example, the Final Rule categorically tells agencies to consider their actions

in "global" contexts and explains that global effects may be significant to warrant an EIS even if the project has minuscule effects locally or even nationally. 89 Fed.Reg. 35557 (§ 1501.3(d)). There is no basis for this in the statutory text of NEPA. Instead, and to the contrary, NEPA's statutory text calls for environmental considerations to be made while serving the needs of "Americans"—*not* while serving "global" interests. 42 U.S.C. § 4331(a); *see also Public Citizen*, 541 U.S. at 770 ("where an agency has no ability to prevent a certain effect due to its limited statutory authority over the relevant actions . . . [it] need not consider these effects").

The Final Rule's newly mandated special treatments to further the current Administration's substantive policy priorities are impermissible under NEPA's plain language. For this reason, the Final Rule exceeds statutory authority and is *ultra vires*.

### C.    The Final Rule Drives Agencies to an "Environmentally Preferable Alternative."

The Final Rule creates a regime in which the "no action" alternative will often have a thumb pressed on the scale for NEPA reviews. "Under NEPA, an agency 'is required to consider only reasonable, feasible alternatives.'" *Mid States Coal. for Progress v. Surface Transp. Bd.*, 345 F.3d 520, 546 (8th Cir. 2003) (citation omitted). Yet under NEPA, the statutory requirement to consider alternatives does not drive an agency towards selecting any one alternative. *Robertson*, 490 U.S. at 350–51. The Final Rule unlawfully changes that maxim.

With this Final Rule, CEQ transforms this alternatives analysis by introducing a requirement to identify the "environmentally preferable alternative" during NEPA review. 89 Fed.Reg. 35503–05, 35565 (§§ 1502.12, 1502.14(f)). CEQ defines "environmentally preferable alternative" as "the alternative or alternatives that will best promote the national environmental policy as expressed in section 101 of NEPA." 89 Fed.Reg. 35575 (§ 1508.1(n)). That means agencies must now "[i]dentify the environmentally preferable alternative or alternatives" that will

"maximiz[e] environmental benefits, such as addressing climate change-related effects or disproportionate and adverse effects on communities with environmental justice concerns; protecting, preserving, or enhancing historic, cultural, Tribal, and natural resources, including rights of Tribal Nations . . .; or causing the least damage to the biological and physical environment." 89 Fed.Reg. 35565 (§ 1502.14(f)). This concept then appears throughout the Final Rule. *E.g.*, 89 Fed.Reg. 35568–69 (§§ 1504.3(a)(6), 1505.2(b)).

But nowhere in its statutory text does NEPA permit CEQ to force agencies to consider what CEQ sees as the "environmentally preferable" policy. Nor does the NEPA statute prescribe criteria for such an inquiry. This entirely new concept introduces subjective, open-ended theorizing into what is supposed to be an objective analytical process. *Cf. Env't Def. Fund, Inc. v. Corps of Engineers of U.S. Army*, 470 F.2d 289, 296 (8th Cir. 1972) (under NEPA, "[a] rigorous exploration and *objective* evaluation of alternative actions . . . is essential.") (emphasis added) (internal citations omitted). Concerns raised by adding the "environmentally preferable alternative" into NEPA documents are buttressed by the failure of the Final Rule's regulatory text to disavow the need to create new alternatives (outside of its non-operative preamble). *Compare* 89 Fed.Reg. 35504 (preamble) *with* 89 Fed.Reg. 35565 (§ 1502.14(f)).

Equally significant is what the Final Rule does not say. CEQ ostensibly does not mandate agencies to define such an alternative pointlessly; CEQ expects agencies to adopt the "environmentally preferable alternative," or face a heavier burden for not doing so. The Final Rule also does not meaningfully define, or enable agencies to define, such an alternative. The Final Rule thus gives project opponents a ready-made means for challenging NEPA assessments for traditional development projects—like energy, mining, and highways. Indeed, by expressly identifying the "no action alternative" as a possible environmentally preferable alternative, 89

Fed.Reg. 35565 (§ 1502.14(f)), the Final Rule creates a greater burden for justifying any development, even when doing nothing in the face of pressing public needs is not a reasonable option because it would harm a State's public health or economic well-being.

The Final Rule states that "CEQ does not view this shift as materially affecting litigation risk, since claims alleging a violation of NEPA must be brought after an agency issues a [Record of Decision]." 89 Fed.Reg. at 35504. But this reasoning is inaccurate. Introducing the assignment of an "environmentally preferable alternative" in a NEPA document will foreseeably make it more difficult for agencies to depart from that alternative and cultivates other means for project opponents to challenge any project that is not the "environmentally preferable" one.

These revisions thus create a presumption against development that will beget further paralysis for politically disfavored projects, and which contradict NEPA's procedural nature.

### D.    The Final Rule Now Compels Mitigation of Environmental Impacts.

Nothing in the statutory text of NEPA mandates mitigating or monitoring environmental impacts as part of the NEPA review. Those concepts are absent from the statute, which requires only the *consideration* of *potential* mitigation. *Robertson*, 490 U.S. at 352–53.

Yet the Final Rule transforms *consideration* of potential mitigation into *mandated* mitigation. In the Final Rule's "Mitigation" definition, CEQ tellingly removed the following text, which has been part of the NEPA implementing regulations for decades: "while NEPA requires consideration of mitigation, it does not mandate the form or adoption of any mitigation." 89 Fed.Reg. 35548–49; A.R. 43512. CEQ justified removing that text by stating it "was unnecessary and could mislead readers because it does not acknowledge that agencies may use other authorities to require mitigation or may incorporate mitigation in mitigated FONSIs. . . and [Records of Decision]." 89 Fed.Reg. 35548–49. Of course, that explanation makes little sense, because the Final Rule is a NEPA implementing rule and cannot alter any other legal authority.

More importantly, CEQ contradicts itself with express, affirmative mitigation requirements in the Final Rule. For example, Section 1505.3(a)(2) states that agencies "shall . . . Condition funding of actions on mitigation." 89 Fed.Reg. 35569. Also contradictory is Section 1505.3(b), which expressly calls for mitigation of environmental justice concerns: "The lead or cooperating agency should, where relevant and appropriate, incorporate into its decision mitigation measures that address or ameliorate significant human health and environmental effects of proposed Federal actions that disproportionately and adversely affect communities with environmental justice concerns." 89 Fed.Reg. 35569. Moreover, Section 1500.2(f) directs that federal agencies "shall to the fullest extent possible . . . Use all practicable means, consistent with the requirements of the Act and other essential considerations of national policy, to restore and enhance the quality of the human environment and avoid or minimize any possible adverse effects of their actions upon the quality of the human environment." 89 Fed.Reg. 35554–55. These new provisions are substantive and are thus invalid under NEPA.

The Final Rule also now requires a "monitoring and compliance plan" for mitigation when an analysis of reasonably foreseeable effects in an EA or EIS is based on implementation of mitigation, or an agency incorporates mitigation into a NEPA decision document. 89 Fed.Reg. 35518–19, 35569 (§ 1505.3(c)). That goes far beyond currently required monitoring of mitigation *only* when used in the context of a mitigated EA or FONSI to *avoid* significant impacts that would otherwise require preparation of an EIS. *See* 85 Fed.Reg. 43361, 43375–76 (formerly at 40 C.F.R. § 1501.6(c), 1508.1(s)). In other words, once an agency prepares an EIS, it hasn't had any obligation under NEPA to mitigate the significant impacts analyzed thereunder. But the Final Rule changes that. And the Final Rule's mandate that each EIS must now incorporate mitigation and associated monitoring plans exceeds CEQ's statutory authority under NEPA.

The Final Rule also does not specify the consequence of unsuccessful mitigation. Inevitably, project opponents will rely on the Final Rule's new mitigation provisions to demand re-opening of any completed NEPA review after-the-fact based on inadequately realized mitigation. That would impermissibly transform NEPA from the look-before-you-leap process that Congress intended into a process used to stall any project that lacked perfect foresight. These concerns are only magnified by the cumulative effect of other contemporaneous regulatory changes by the current Administration inventing new extra-statutory mitigation obligations under other laws, including under the Endangered Species Act. *See, e.g.*, Endangered and Threatened Wildlife and Plants; Regulations for Interagency Cooperation, 89 Fed.Reg. 24268, 24297–98 (Apr. 5, 2024) (codified at 50 C.F.R. §§ 402.02, 402.14(i)(2)) (newly allowing for "offsets" as reasonable and prudent measures to mitigate the effect of incidental taking on listed species). But CEQ cannot create substantive mitigation requirements for the NEPA process through rulemaking.

### E.    The Final Rule Imposes Policy-Based Restrictions on the Use of Categorical Exclusions During NEPA Reviews.

Categorical exclusions are by far the most common level of NEPA review. *See, e.g.*, Goehring Decl. at ¶ 12(b)(i); Travnicek Decl. at ¶ 16; Henke Decl. at ¶ 8; Kristin Hite, Congressional Research Service, *National Environmental Protection Act: An Overview* (Dec. 28, 2023) ("Categorical exclusions apply to the vast majority of agency actions that require NEPA compliance."), https://crsreports.congress.gov/product/pdf/IF/IF12560. They create a streamlined means of satisfying NEPA requirements for categories of projects where agencies have already undergone the proper analysis to establish that those types of projects do not involve significant environmental impacts. *See* Goehring Decl. at ¶¶ 12(b), n.3; *Wise v. Dep't of Transp.*, 943 F.3d 1161, 1163–64 (8th Cir. 2019); Daniel R. Mandelker, *NEPA Law & Litigation* 7:10 (2d ed. 2003) ("Consultation with CEQ on the adoption of categorical exclusions is required, but a categorical

exclusion adoption does not require an environmental assessment or an impact statement."). Federal agencies maintain lists of such CEs, all of which CEQ has approved. *See* CEQ, *National Environmental Policy Act Categorical Exclusions*, https://ceq.doe.gov/nepa-practice/categorical-exclusions.html. (accessed Jul. 20, 2024). Congress also has repeatedly issued statutory CEs, expressly endorsing CEs as a means of NEPA compliance. *See, e.g.,* Energy Policy Act of 2005 (codified at 42 U.S.C. § 15942) (statutory CEs for activities such as drilling oil or gas wells at prior well sites, drilling an oil or gas well within a developed field in an approved land use plan, placing a pipeline in a right of way corridor, and minor maintenance); 43 U.S.C. § 1752(h) (statutory CEs for Bureau of Land Management issuance of a grazing permit or lease and for trailing and crossing of livestock across federal land); 16 U.S.C. §6592b(b)–(c) (statutory CEs for certain forest management activities, including to reduce wildlife risk).

In short, CEs are essential for streamlining and approving projects that will not have significant environmental impacts. CEs can be completed in just days or weeks unlike EAs or EISs which may take months or years. Yet despite articulating no problem with how CEs have traditionally operated as part of the NEPA review process, the Final Rule now impermissibly injects several substantive, policy-based limits on their adoption and use.

*First*, Section 1508.1(o) has been modified to add several vague policy considerations into the "extraordinary circumstances" that prevent use of a CE for a given project. 89 Fed.Reg. 35575. Specifically, "extraordinary circumstances" now purportedly include "potential substantial disproportionate and adverse effects on communities with environmental justice concerns" or "potential substantial effects associated with climate change." 89 Fed.Reg. 35575. Given the amorphous and ever-changing nature of "environmental justice concerns" and "climate change" concerns, directing that such concepts are now "extraordinary circumstances" that may preclude

the use of a CE will effectively kill the use of CEs for all projects and developments that are disfavored by special interest groups. That risk exists even where those projects have been understood for decades to not have significant environmental impacts requiring a more full-fledged EA or EIS. And without CEs enabling prompt actions, such projects may no longer be viable.

*Second*, the Final Rule places conditions on an agency's adoption of another agency's CE, even though the NEPA statute imposes no such restriction. 89 Fed.Reg. 35570 (§ 1506.3(d)). That change is particularly notable because it is expressly contrary to the statutory amendments made in 2023 as part of the FRA, which amended NEPA expressly to facilitate interagency adoption of existing CEs. *See* 42 U.S.C. § 4336c. Under NEPA, as modified by the FRA, the decision-making for such inter-agency CE adoption resides with the adopting agency, including consulting with the other agency to ensure the adoption is appropriate. *Id.* Yet, Section 1501.4(e) of the Final Rule handcuffs inter-agency CE adoption by superimposing conditions absent from the statutory text, including verification that no extraordinary circumstances exist and publication of the adoption determination. 89 Fed.Reg. 35558. Indeed, the Final Rule asserts that "this provision does not allow an agency to unilaterally use another agency's CE for an independent proposed action." 89 Fed.Reg. 35522. Adding an EA or EIS requirement onto a CE and curbing a tool that Congress adopted mere months earlier is *ultra vires*.

*Third*, Section 1507.3 of the Final Rule subjects existing and well-functioning CEs to constant re-reviews at least every 10 years. 89 Fed.Reg. 35574. There is no statutory basis for this new requirement, and it violates NEPA's spirit, as amended by the FRA, which expressly encourages CEs' use. *E.g.*, 42 U.S.C. § 4336c. Consistent with Congress' intent, CEQ should be facilitating more CEs, rather than restricting their use.

The practical effect of these considerations is hamstringing the use of CEs for projects and development that will not have any significant environmental impact, and precluding their use for any project or development that implicates "environmental justice" or "climate change" concerns. Not only is that effect unsupported by statutory text, but it also strays from the statute's spirit, as expressed in the 2023 FRA amendments to the NEPA statute.

* * * *

In sum, CEQ's injection of substantive policy preferences into the Final Rule impermissibly imparts the current Administration's policy priorities into the NEPA regulations, placing these policy priorities above other relevant considerations. Yet, NEPA's statutory text cannot bear that reading—and it does not permit forcing agency adoption of alternatives perceived to enhance those policies. Accordingly, this Court should vacate and remand the Final Rule.

## III.    The Final Rule Is Arbitrary and Capricious.

The Final Rule is also arbitrary and capricious in violation of the APA. An agency changing its regulations must "provide a more detailed justification than what would suffice for a new policy created on a blank slate," especially when "its new policy rests upon factual findings that contradict those which underlay its prior policy," or "when its prior policy has engendered serious reliance interests that must be taken into account." *FCC v. Fox Television Stations*, 556 U.S. 502, 515 (2009); *see also, e.g.*, *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 106 (2015) ("As we . . . underscore again today, the APA requires an agency to provide more substantial justification when its new policy rests upon factual findings that contradict those which underlay its prior policy … It would be arbitrary and capricious to ignore such matters.") (citations and quotations omitted); *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 222 (2016) (in cases of policy reversals, "a reasoned explanation is needed for disregarding facts and circumstances that underlay or were

engendered by the prior policy"); *Kisor v. Willkie*, 588 U.S. 558, 579 (2019) ("[A] court may not defer to a new interpretation . . . that creates 'unfair surprise' to regulated parties.").

An "[u]nexplained inconsistency" in agency policy is "a reason for holding an interpretation to be an arbitrary and capricious change from agency practice." *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 981 (2005). And for this Final Rule, "unexplained inconsistencies" from prior rulemakings abound.

*First*, the Final Rule arbitrarily and capriciously reverses most of the significant changes enacted by the 2020 Rule less than four years earlier. The NEPA implementing regulations—given their broad applicability and profound importance to long-term development projects around the nation—cannot become the target of frequent seriatim changes with every change in presidential administration. Nor should NEPA's implementing regulations be used, like this Final Rule does, to achieve preferred policy outcomes that are at odds with NEPA's procedural nature.

Here, CEQ abruptly reversed course with the Final Rule, and provided no meaningful analysis to justify reversing the 2020 Rule beyond expressing policy preferences. For example, when explaining why it removed language in Section 1500.1(a) reiterating that NEPA is a procedural statute, CEQ summarily—and incorrectly—states that the language is "an inappropriately narrow view of NEPA's purpose and ignores the fact that Congress established the NEPA process for the purpose of promoting informed decision making and improved environmental outcomes." 89 Fed.Reg. 35449. So too with CEQ's revisions to former 40 C.F.R. § 1503.3 to remove required specificity for public comments that was intended to enable the NEPA process to proceed more effectively and avoid gamesmanship by potential litigants. Now, CEQ simply states that it did not want to place "unnecessary burden on public commenters." 89 Fed.Reg. 35512. Likewise, the Final Rule deleted former 40 C.F.R. § 1500.3(d), which had expressed CEQ's

intention of proportionate judicial remedies for NEPA violations, because the Final Rule questioned CEQ's "authority to direct courts." 89 Fed.Reg. 35455. But that purported reason is belied by the Final Rule's several other stated "intentions" about when and how courts should review NEPA compliance. *E.g.*, 89 Fed.Reg. 35555 (§ 1500.3(b)).

Unfortunately, CEQ's reversals from the 2020 Rule do not reflect "reasoned analysis" as much as they reflect political discourse. *Sierra Club N. Star Chapter v. LaHood*, 693 F.Supp.2d 958, 973 (D. Minn. 2010) (citing *State Farm*, 463 U.S. at 42). CEQ's failure to provide that reasoned analysis when reversing its changes from the 2020 Rule is arbitrary and capricious agency decision-making that violates the APA.

*Second*, the Final Rule arbitrarily and capriciously modifies many of NEPA's implementing regulations' fundamental aspects that Plaintiff States have relied on for more than five decades. For example, Plaintiff States and other project proponents have long relied on the sufficiency of NEPA analyses without added blanket requirements to adopt mitigation measures, quantify greenhouse gas emissions, or elevate environmental justice considerations. And given limited federal agency resources, Plaintiff States have long relied on the ability to prepare or retain third parties to prepare draft NEPA documents to ensure the NEPA process can be completed promptly. Yet the Final Rule arbitrarily restricts such project proponent and third-party preparation of NEPA documents. 89 Fed.Reg. 35571, 35574 (§§ 1506.5, 1507.3(c)(12)).

*Third*, the Final Rule is arbitrary and capricious because it adds substantial levels of uncertainty to the NEPA review process that will foreseeably result in a dramatic expansion of development-stalling litigation, contrary to its claim that it is "intended" to: "concentrate on the issues that are truly relevant to the action in question" and "improve the efficiency and

effectiveness of the NEPA process . . . by providing a clear process for evaluating alternatives and effects . . . and reducing litigation." 89 Fed.Reg. 35551, 35554.

For example, the Final Rule removed the 2020 Rule's requirements that objections to a project be made with specificity during the NEPA decision-making process or otherwise be waived, thereby facilitating dispute resolution during NEPA reviews and limiting potential litigation. 89 Fed.Reg. 35512. CEQ justified its deletion of the requirement that project objections be made with specificity by claiming the requirement "could be read to require a commenter to provide a detailed explanation of a moral objection to a proposed action or a personal interest in it," or "could imply that commenters must either be an expert on the subject matter or hire an expert to provide the necessary detail . . . ." 89 Fed.Reg. 35512. Such a reading is not a reasonable interpretation of the regulatory text that the Final Rule deleted.

Couple the removal of that procedural safeguard with the Final Rule's introduction of vague and mandatory new considerations for the NEPA review process, such as "environmental justice," "climate change," and "Indigenous Knowledge," and it is foreseeable that the Final Rule's effect—if not its deliberate goal—will be exposing traditional infrastructure projects to staggering amounts of NEPA-related litigation designed to delay or prevent the projects. Such unexplained inconsistencies in the Final Rule render it arbitrary and capricious. *U.S. Sugar Corp. v. EPA*, 830 F.3d 579, 650 (D.C. Cir. 2016); *United Food and Com. Workers Union, Loc. No. 663 v. USDA*, 451 F. Supp. 3d 1040, 1055 (D. Minn. Apr. 1, 2020).

*Fourth*, the Final Rule arbitrarily and capriciously adds "Indigenous Knowledge" as a form of "high-quality information" that agencies "shall" use when making NEPA determinations. 89 Fed.Reg. 35565. What that term means, and what it requires agencies to consider, the Final Rule does not say. Indeed, CEQ expressly refused to define "Indigenous Knowledge"—the

information that CEQ is now mandating that all agencies must consider whenever undertaking any major federal action—because it found that it did not have "an adequate basis . . . to determine that providing a definition in the regulations would be workable across contexts and Tribal Nations." 89 Fed.Reg. 35481. That is a remarkable statement when the Final Rule mandates its consideration for every major federal development project in the nation. The Final Rule's imposition of a mandatory and plainly ambiguous consideration that it refuses to define—because it knows *there is no workable definition*—is arbitrary and capricious. *See West Virginia v. EPA*, 669 F. Supp. 3d 781, 803 (D.N.D. 2023) ("These murky definitions are unintelligible and provide little guidance to parties impacted by the regulations.").

Finally, the Final Rule is arbitrary because the timeline it sets for agencies to promulgate follow-on regulations is unrealistic. The Final Rule gives agencies "no more than 12 months" after the Final Rule's effective date to propose revisions to their NEPA implementing procedures. 89 Fed.Reg. 35532. Yet CEQ's Final Rule itself took years to draft and adopt. And even if every agency in the federal government can promulgate follow-on regulations in 12 months, it is not reasonable to expect that the States, let alone the public, will be able to meaningfully participate in the rulemaking process when there is a deluge of all federal agencies implementing the Final Rules' drastic changes on an abridged timeframe. *Cf. Portland Cement Ass'n v. EPA*, 665 F.3d 177, 187 (D.C. Cir. 2011) (holding that a rule is arbitrary and capricious when it fails to "account for" the impacts of "contemporaneous and closely related rule[s]"). Relatedly, the Final Rule purports to apply to ongoing NEPA reviews but does not account for any corresponding delays necessary to redo prior assessments or to redevelop new approaches, data, and schedules.

In short, the Final Rule is arbitrary and capricious for several reasons, beyond conflicting with statute and being *ultra vires*.

IV.    **The Final Rule's NEPA Review Itself Violates NEPA.**

NEPA requires "all agencies of the Federal Government" to consider the environmental effects of their proposed rulemaking, disclose those impacts, and involve the public in the NEPA process. 42 U.S.C. § 4332. There is no exception to this statutory NEPA requirement, even for CEQ's NEPA-implementing regulations.

But CEQ ignored those requirements in promulgating the Final Rule's changes to CEQ's NEPA implementing regulations. CEQ has not issued an EIS or an EA for the Final Rule, nor has CEQ established a CE for it. Rather, CEQ prepared an atextual and cursory "special EA" to accompany its rulemaking, and then it promulgated a purported exception to NEPA within the Final Rule as an after-the-fact attempt to exclude itself from its own requirements. *See* AR 27752–27760 (special EA); 89 Fed.Reg. 35552, 35573 (after-the-fact exclusion).

Lest there be any doubt, there is no basis for a "special EA" in either the NEPA statute or the NEPA-implementing regulations in effect when the Final Rule was promulgated; CEQ appears to have invented the term "special EA" for the sole purpose of promulgating this Final Rule after commenters made CEQ aware that the Final Rule too was subject to NEPA.

In any event, the Special EA is a scant nine-page document filled with conclusory statements, including that "[t]he changes to the CEQ regulations would, in themselves, have no environmental effect. The regulations do not dictate that Federal agencies reach any particular outcome or take any specific action." A.R. 27754. But beyond being markedly incorrect, this statement and the lack of analysis about the Final Rule's environmental effects fail to pass NEPA muster. Indeed, such a statement runs counter to CEQ's recognition in the Special EA that the Final Rule makes "Changes to Promote Better Environmental Outcomes." A.R. 27755. Moreover, CEQ's recognition that the Final Rule purposefully makes "Changes to Promote Better

Environmental Outcomes" would appear to be a tacit admission the Final Rule exceeds NEPA's procedural nature. *Contra*, *e.g., Robertson*, 490 U.S. at 333.

CEQ continues on in the Special EA to delineate the Final Rule into five sections: "Changes to Improve NEPA Efficiency and Add Flexibility," "Changes to Promote Better Environmental Outcomes," "Changes to Prioritize Meaningful Public Engagement, Including Advancing Environmental Justice and Respecting Tribal Sovereignty," "Changes to Update Structure and Consistency of NEPA Regulations," and "Changes to Enhance Clarity in NEPA Regulations." A.R. 27754–759. CEQ then cursorily concludes each of these sections by stating: "CEQ does not anticipate that there would be any reasonably foreseeable environmental effects from these changes, but to the extent there are, such effects would be beneficial." A.R. 27754–59. That is the full extent of CEQ's assessment of the Final Rule's environmental impacts. This empty exercise by CEQ cannot meet NEPA's requirements.

Nor can CEQ's newly drafted exception to its own statutory responsibility unbridle it from NEPA's requirements. As part of the Final Rule itself, CEQ promulgated a new Section 1507.3(b)(3) to bootstrap its failure to adhere to NEPA and "make[] it explicit that a NEPA analysis is not required for establishing or updating NEPA procedures." 89 Fed.Reg. 35552, 35573. But even if that bootstrapping were permissible, the new section did not take effect on its own terms until July 1, 2024—which was *after* promulgation of the Final Rule. 89 Fed.Reg. 35442.

Also unavailing is the Final Rule's citation of *Heartwood, Inc. v. U.S. Forest Serv.*, 230 F.3d 947, 954–55 (7th Cir. 2000). 89 Fed.Reg. 35552. *Heartwood* concluded that adoption of CEs for timber harvest on Forest Service land was not a major federal action for NEPA review purposes. *See* 230 F.3d at 954. But that is hardly the same magnitude as this Final Rule overhauling and

introducing substantive elements to the entirety of the NEPA regulations that apply across the entire federal government for all pending and forthcoming projects and developments.

Consequently, CEQ's failure to adhere to NEPA and meaningfully consider the environmental impacts of its proposed action before promulgating the Final Rule is an independent, and perhaps ironic, basis for vacating it.

**V.     The Final Rule Violates the Major Questions Doctrine.**

In "certain extraordinary cases, both separation of powers principles and a practical understanding of legislative intent make [courts] 'reluctant to read into ambiguous statutory text' the delegation claimed to be lurking there." *West Virginia*, 597 U.S. at 723 (quoting *Utility Air,* 573 U.S. at 324). If Congress "wishes to assign to an agency decisions of vast economic and political significance," courts require "something more than a merely plausible textual basis for the agency action is necessary. The agency instead must point to 'clear congressional authorization' for the power it claims." *Id.* at 716, 723 (quoting *Utility Air*, 573 U.S. at 324). Unsurprisingly, CEQ did not point to any such clear delegation of authority when promulgating the Final Rule's sweeping revisions to NEPA—as there is none.

NEPA's economic significance to our nation is enormous. NEPA reviews encompass almost every major development or project with a federal nexus that occurs nationwide. 42 U.S.C. § 4336e(10). That includes any major State-run developments or infrastructure projects that involve or require federal financing or permitting.

NEPA's profound effect on development cannot be overstated. *See, e.g.*, Diane Katz, *National Environmental Policy Act Is a Half-Century Old—And Long Outlived Its Usefulness*, The Heritage Foundation (Mar. 28, 2018), https://www.heritage.org/environment/commentary/national-environmental-policy-act-half-century-old-and-long-outlived-its. And even setting aside the economic impacts of affected projects, the actual process of conducting NEPA reviews has

tremendous economic costs all on its own. For example, in 2013 the Department of Energy reported spending $135 million over a four-year period on a mere 13 EISs, with an average cost exceeding $10 million. *See* U.S. Dep't of Energy, *NEPA Lessons Learned,* Issue No. 75, Second Quarter FY 2013, 5 (June 2013), https://www.energy.gov/sites/default/files/2013/06/f1/LLQR-2013-Q2_0.pdf. And the latest government-wide data available regarding the number of EISs estimated that, between 2008 and 2012, federal agencies annually prepared about 1,100–1,150 EISs for federal agency decisions. U.S. Gov't Accountability Office, *National Environmental Policy Act: Little Information Exists on NEPA Analyses*, 9–11 (Apr. 15, 2014), https://www.gao.gov/products/gao-14-370, A.R. 43535–37.

For over five decades, Congress, courts, and CEQ itself have consistently interpreted NEPA as imposing procedural, not substantive, requirements. *E.g., Vermont Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*, 435 U.S. 519, 558 (1978) ("NEPA does not set forth significant substantive goals for the Nation, . . . its mandate to the agencies is essentially procedural") (citing 42 U.S.C. § 4332). Further, CEQ's role has always been that of an information-gathering, advisory agency, not one that forces environmental outcomes. *See Warm Springs Dam Task Force v. Gribble*, 565 F.2d 549, 554 (9th Cir. 1977); *Food & Water Watch v. USDA*, 1 F.4th 1112, 1119 (D.C. Cir. 2021) (Randolph, J. concurring); CC Vassar, *NRDC v. Winter: Is NEPA Impeding National Security Interests?*, 24 J. Land Use & Envtl. L. 279, 284 (2009) ("CEQ mainly exerts influence through informal discussion and criticism." (cleaned up)). CEQ's unprecedented effort to insert substantive and action-forcing requirements into NEPA's implementing regulations is a red flag that CEQ is "asserting highly consequential power beyond what Congress could reasonably be understood to have granted." *West Virginia*, 597 U.S. at 723.

By transforming NEPA reviews into a substantive directive tailored to achieve the current Administration's policy agenda, this Final Rule will affect an astonishing array of projects that have widespread social and economic implications for every single Plaintiff State, as well as the whole nation. *E.g.*, Goehring Decl. at ¶¶ 9, 12–14, 16–17; Travnicek Decl. at ¶¶ 7–13, 20; Henke Decl. at ¶ 5; Parsons Decl. at ¶¶ 11–16; Long Decl. at ¶ 13; Anderson Decl. at ¶¶ 3, 4, 6; Booher Decl. at ¶¶ 8, 9; Weston Decl. at ¶ 7; Roberts Decl. at ¶ 8; Jundt Decl. at ¶¶ 5–6; Watts Decl. at ¶¶ 7, 13, 18; Johnson Decl. at ¶¶ 8–9.; Parfitt Decl. at ¶ 7. If left in place, the Final Rule will have profound effects across our country in the years and decades to come. Yet those effects will be driven by rulemaking that relies on statutory text which is, in most relevant parts, over fifty years old, and which contains no clear statement of Congressional intent for CEQ to reshape American society in such a way. Courts should rightly be skeptical when an agency "claim[s] to discover in a long-extant statute an unheralded power" representing a "transformative expansion in [its] regulatory authority." *West Virginia*, 597 U.S. at 724 (quoting *Utility Air*, 573 U.S. at 324). So too here.

CEQ's attempt to fundamentally transform NEPA's operation absent any clear statutory authorization should be rejected as violating the major questions doctrine.

## CONCLUSION

For the above reasons, Plaintiff States respectfully request that the Court declare unlawful, vacate, and remand the Final Rule.

Dated: August 2, 2024

Respectfully Submitted,

BRENNA BIRD                        DREW H. WRIGLEY
Iowa Attorney General              North Dakota Attorney General

41

*/s/ Eric Wessan*
ERIC WESSAN
*Solicitor General*
ALEXA DEN HERDER
*Assistant Solicitor General*
Hoover State Office Building
1305 East Walnut Street
Des Moines, Iowa 50319
Phone: (515) 823-9117
eric.wessan@ag.iowa.gov
alexa.denherder@ag.iowa.gov

*Counsel for the State of Iowa*

*/s/ Philip Axt*
PHILIP AXT
*Solicitor General*
JAMES M. AUSLANDER
NESSA HOREWITCH COPPINGER*
*Special Assistant Attorneys General*
Office of Attorney General
600 E. Boulevard Ave Dept. 125
Bismarck, ND 58505
Phone: (701) 328-2210
pjaxt@nd.gov
jauslander@bdlaw.com
ncoppinger@bdlaw.com

*Counsel for the State of North Dakota*

TREG TAYLOR
Alaska Attorney General

*/s/ Wade M. Withington*
WADE M. WITHINGTON
*Assistant Attorney General, Civil Division*
Office of the Alaska Attorney General
Alaska Department of Law
1031 W. 4th Avenue, Suite 200
Phone: (907) 269-5232
wade.withington@alaska.gov

*Counsel for the State of Alaska*

TIM GRIFFIN
Arkansas Attorney General

*/s/ Nicholas J. Bronni*
NICHOLAS J. BRONNI
*Solicitor General*
DYLAN L. JACOBS
*Deputy Solicitor General*
Office of the Arkansas Attorney General
323 Center Street, Suite 200
Little Rock, AR 72201
Phone: (501) 682-6302
Nicholas.Bronni@ArkansasAG.gov

*Counsel for the State of Arkansas*

ASHLEY MOODY
Florida Attorney General

*/s/ Natalie P. Christmas*
NATALIE P. CHRISTMAS (Fla. 1019180)
*Senior Counselor*
Office of the Attorney General
The Capitol, Pl-01
Tallahassee, Florida 32399-1050
Phone: (850) 414-3300
natalie.christmas@myfloridalegal.com

*Counsel for the State of Florida*

CHRISTOPHER M. CARR
Georgia Attorney General

*/s/ Justin T. Golart*
JUSTIN T. GOLART
*Deputy Solicitor General*
Office of the Attorney General of Georgia
40 Capitol Square, SW
Atlanta, GA 30334
Phone: (404) 458-3252
jgolart@law.ga.gov

*Counsel for the State of Georgia*

RAÚL R. LABRADOR
Idaho Attorney General

/s/ Joshua N. Turner
JOSHUA N. TURNER
*Chief of Constitutional Litigation and Policy*
ALAN M. HURST
*Solicitor General*
JOY M. VEGA
*Lead Deputy Attorney General*
Office of the Idaho Attorney General
P.O. Box 83720
Boise, Idaho 83720
Phone: (208) 334-2400
Josh.Turner@ag.idaho.gov
Alan.Hurst@ag.idaho.gov
Joy.Vega@ag.idaho.gov

*Counsel for the State of Idaho*

KRIS W. KOBACH
Kansas Attorney General

/s/Abhishek S. Kambli
ABHISHEK S. KAMBLI
*Deputy Attorney General*
Office of the Kansas Attorney General
120 SW 10th Avenue, 2nd Floor
Topeka, Kansas 66612
Telephone: (785) 296-2215
Fax: (785) 296-3131
abhishek.kambli@ag.ks.gov

*Counsel for the State of Kansas*

RUSSELL COLEMAN
Kentucky Attorney General

/s/ Victor B. Maddox
VICTOR B. MADDOX
AARON SILLETTO
Kentucky Office of the Attorney General
700 Capital Avenue, Suite 118
Frankfort, Kentucky 40601
Phone: (502) 696-5300
victor.maddox@ky.gov
aaron.silletto@ky.gov

*Counsel for the Commonwealth of Kentucky*

LIZ B. MURRILL
Louisiana Attorney General

J. BENJAMIN AGUIÑAGA
Solicitor General

/s/ Kelsey L. Smith
Kelsey L. Smith
Deputy Solicitor General
Office of the Louisiana Attorney General
1885 North Third Street
Baton Rouge, LA 70804
Phone: (225) 428-7432
smithkel@ag.louisiana.gov

*Counsel for the State of Louisiana*

ANDREW T. BAILEY
Missouri Attorney General

/s/ Joshua M. Divine
JOSHUA M. DIVINE, 69875MO
*Solicitor General*
Office of the Attorney General
207 West High St.
Jefferson City, MO 65101
Phone: (573) 751-8870

AUSTIN KNUDSEN
Montana Attorney General

/s/ Christian B. Corrigan
CHRISTIAN B. CORRIGAN
*Solicitor General*
Montana Department of Justice
215 North Sanders
P.O. Box 201401
Helena, Montana 59620-1401

Josh.Divine@ago.mo.gov

*Counsel for the State of Missouri*


MICHAEL T. HILGERS
Nebraska Attorney General

*/s/ Grant D. Strobl*
GRANT D. STROBL
*Assistant Solicitor General*
Office of the Nebraska Attorney General
2115 State Capitol
Lincoln, NE 68509
Phone: (402) 471-2683
grant.strobl@nebraska.gov

*Counsel for the State of Nebraska*


MARTY J. JACKLEY
South Dakota Attorney General

*/s/ Charles McGuigan*
CHARLES MCGUIGAN
*Deputy Attorney General*
1302 East Highway 14, Suite 1
Pierre, SD 57501-8501
Phone: 605-773-3215
charles.mcguigan@state.sd.us

*Counsel for the State of South Dakota*


KEN PAXTON
Texas Attorney General

BRENT WEBSTER
*First Assistant Attorney General of Texas*
RALPH MOLINA
*Deputy Attorney General for Legal Strategy*
RYAN D. WALTERS
*Chief, Special Litigation Division*

*/s/ Susanna Dokupil*
SUSANNA DOKUPIL
*Lead Attorney*
*Special Counsel*
Texas State Bar No. 24032801

Phone: (406) 444-2026
christian.corrigan@mt.gov

*Counsel for the State of Montana*


ALAN WILSON
South Carolina Attorney General

*/s/ Joseph D. Spate*
JOSEPH D. SPATE
*Assistant Deputy Solicitor General*
Office of the South Carolina Attorney General
1000 Assembly Street
Columbia, SC 29201
Phone: (803) 734-3371
josephspate@scag.gov

*Counsel for the State of South Carolina*


JONATHAN SKRMETTI
Tennessee Attorney General and Reporter

*/s/ Whitney Hermandorfer*
WHITNEY HERMANDORFER
*Director of Strategic Litigation*
Attorney General and Reporter of Tennessee
Tennessee Attorney General's Office
P.O. Box 20207
Nashville, Tennessee 37202-0207
Phone : (615) 741-3491
Whitney.Hermandorfer@ag.tn.gov

*Counsel for the State of Tennessee*


SEAN D. REYES
Utah Attorney General

*/s/ Renee Spooner*
RENEE SPOONER
*Assistant Attorney General*
350 N. State Street, Suite 230
P.O. Box 142320
Salt Lake City, UT 84114-2320
Telephone: (385) 285-5740
rspooner@agutah.gov

*Counsel for the State of Utah*

44

JACOB E. PRZADA
*Special Counsel*
Texas State Bar No. 24125371
MUNERA AL-FUHAID
*Special Counsel*
Texas State Bar No. 24094501
Office of the Attorney General of Texas
P.O. Box 12548 (MC 009)
Austin, TX 78711-2548
Phone: (512) 936-3754
Fax: (512) 457-4410
Susanna.Dokupil@oag.texas.gov
Jacob.Przada@oag.texas.gov
Munera.Al-Fuhaid@oag.texas.gov

*Counsel for the State of Texas*

JASON MIYARES
Virginia Attorney General

/s/ *Kevin M. Gallagher*
KEVIN M. GALLAGHER
*Principal Deputy Solicitor General*
Virginia Attorney General's Office
202 North 9th Street
Richmond, Virginia 23219
Phone: (804) 786-2071
kgallagher@oag.state.va.us

*Counsel for the Commonwealth of Virginia*

PATRICK MORRISEY
West Virginia Attorney General

/s/ *Michael R. Williams*
MICHAEL R. WILLIAMS
*Solicitor General*
Office of the Attorney General of West
Virginia
State Capitol Complex
Building 1, Room E-26
Charleston, WV 25301
Phone: (304) 558-2021
michael.r.williams@wvago.gov

*Counsel for the State of West Virginia*

BRIDGET HILL
Wyoming Attorney General

/s/ *Ryan Schelhaas*
RYAN SCHELHAAS
*Chief Deputy*
Office of the Attorney General of Wyoming
109 State Capitol
Cheyenne, WY 82002
Phone: (307) 777-7895
ryan.schelhaas@wyo.gov

*Counsel for the State of Wyoming*

*\*Application for admission pending*