# Exhibit A
# Declaration of D. Goehring

UNITED STATES DISTRICT COURT
DISTRICT OF NORTH DAKOTA
WESTERN DIVISION

| | |
|---|---|
| STATE OF IOWA,<br>STATE OF NORTH DAKOTA,<br>STATE OF ALASKA,<br>STATE OF ARKANSAS,<br>STATE OF FLORIDA,<br>STATE OF GEORGIA,<br>STATE OF IDAHO,<br>STATE OF KANSAS<br>COMMONWEALTH OF KENTUCKY<br>STATE OF LOUISIANA,<br>STATE OF MISSOURI,<br>STATE OF MONTANA,<br>STATE OF NEBRASKA,<br>STATE OF SOUTH CAROLINA,<br>STATE OF SOUTH DAKOTA,<br>STATE OF TENNESSEE,<br>STATE OF TEXAS,<br>STATE OF UTAH,<br>STATE OF VIRGINIA<br>STATE OF WEST VIRGINIA, and<br>STATE OF WYOMING<br><br>                Plaintiffs,<br><br>  vs.<br><br>COUNCIL ON ENVIRONMENTAL QUALITY, and<br>BRENDA MALLORY, in her official capacity as Chair.<br><br>                Defendants. | Case No. 1:24-cv-00089-DMT |

**DECLARATION OF DOUG GOEHRING
NORTH DAKOTA AGRICULTURE COMMISSIONER**

I, Doug Goehring, declare that:

1. I am over 21 years of age and am fully competent and duly authorized to make this Declaration and could testify to its content if called upon to do so. The statements contained in this declaration are based on my personal and professional knowledge or information available to me in the performance of my professional duties.

2. I have served as the Agriculture Commissioner of North Dakota since 2009. As Agriculture Commissioner, I serve the people of North Dakota. Beyond my responsibilities to North Dakota's agriculture industry, my public duties as Agriculture Commissioner include oil and gas, other State energy and mineral resources, water, trade, business development, tax equalization, and infrastructure. I am a statutorily designated and permanent member of the North Dakota Industrial Commission.[1] I am also a statutorily designated and permanent member of the North Dakota State Water Commission that, in significant part, oversees flood control and water management.[2]

3. I am the head of the North Dakota Department of Agriculture (Department). The Department's mission is to "[s]erve, advocate, protect and promote agriculture to benefit everyone." The Department furthers this mission by promoting agriculture to protect the value and use of agricultural lands, protect agriculture capacity and output, and promote rural economic development and agricultural industries.

---

[1] North Dakota Century Code ch. 54-17. The North Dakota Industrial Commission (NDIC) consists of the Governor, Attorney General, and Agriculture Commissioner. Each is a state-wide elected official. The North Dakota Legislature established the NDIC in 1919 to manage, on behalf of the State, certain utilities, industries, enterprises, and business projects.
[2] North Dakota Century Code § 61-02-04 ("The state water commission consists of the governor, agriculture commissioner, and eight other members appointed by the governor . . .").

4. I am a third-generation farmer. My son and I operate a 2,800-acre farm near Menoken, North Dakota in southcentral North Dakota. We raise crops including corn, soybeans, spring wheat, sunflowers, and barley. In the past, we have also produced winter wheat, durum, canola, mustard, millet, safflower, alfalfa, lentils, and field peas, and have had a feeder cattle operation.

5. I am the past president of the National Association of State Departments of Agriculture (NASDA), a nonpartisan, nonprofit association that represents all the elected and appointed commissioners, secretaries, and directors of the departments of agriculture in all fifty states and four U.S. territories. Moreover, I am president for the 2024-2025 term (and, during the 2012-2013 term, previously also served as president) of the Midwestern Association of State Departments of Agriculture (MASDA) comprised of the Commissioners, Secretaries, and Directors of Agriculture from the midwestern states of Illinois, Indiana, Iowa, Kansas, Michigan, Minnesota, Missouri, Nebraska, North Dakota, Ohio, Oklahoma, South Dakota, and Wisconsin.

6. North Dakota contains over a million acres of federal lands, including five national parks, six national forests, and seven national historic landmarks. These federal lands are rich in energy, mineral, and other natural resources, with mixed surface and subsurface ownership. Most, if not all, federal lands within the borders of North Dakota are adjacent to either State, tribal, and privately owned lands, many of which contain similar natural resources.

7. I am very familiar with the agricultural industry, that is quintessential North Dakota and has defined North Dakota since statehood in 1889. North Dakota is rich in agriculture, being home to nearly 40 million acres devoted to farming and ranching, comprising approximately 90 percent of the total land area in the State. North Dakota is the 11th largest agricultural exporting

state in the U.S.  As a prime exporter of agricultural products, North Dakota is often cited as the "breadbasket of the world."

8. Agriculture remains North Dakota's leading industry, and the State produces over 50 different commodities.  The top commodities by cash receipt are soybeans, wheat, corn, cattle & calves, and canola.  North Dakota leads the nation in the production of more than a dozen other commodities, including spring and durum wheat, rye, food grains, assorted beans, flaxseed, canola, oats, honey, and sunflowers.  North Dakota is also a hotbed for emerging crops like industrial hemp, hops, fava beans, and carinata.

9. North Dakota has nearly 25,000 farms and ranches.  Of North Dakota's approximately 780,000 residents, only about 2% are farmers and ranchers.  Nonetheless, agriculture broadly supports nearly 25% of the State's workforce.  Moreover, North Dakota's agricultural significance extends well beyond traditional crops and livestock.  Agribusiness and food processing, agriculture equipment manufacturing and dealerships, innovative technology, local food and farmers markets, agritourism, and agricultural education all are part of the State's thriving and most predominant industry.  North Dakota agriculture contributes approximately $40 billion in economic activity annually to the State.

10. I am familiar with the Council on Environmental Quality (CEQ) Phase 2 National Environmental Policy Act (NEPA) rulemaking published on May 1, 2024 (Final Rule).  Based upon my personal and professional knowledge and experience, the Final Rule will detrimentally affect North Dakota critical infrastructure, agriculture, and the Department.  In my personal and professional opinion, the Final Rule will significantly, unnecessarily, and irreparably harm North Dakota.

11. This Final Rule radically modifies and unreasonably expands the applicability and level of NEPA reviews, the NEPA processes, the scope of analysis within NEPA documents, and the scope of "alternatives" required to be analyzed. It also requires that NEPA-related regulatory reviews consider vague and confusing new criteria that will consequently encourage and result in dramatic increases in NEPA-related litigation.

12. The Final Rule transforms NEPA from its intended and previously well-established role in creating transparency in environmental reviews into an action-forcing statute to advance certain provincial environmental policy objectives. The Final Rule changes NEPA from a workable procedural statute – that does not dictate a specific substantive result and that simply lays out a practical process for federal agencies to assess environmental actions before taking actions on a project – to one that unreasonably imposes numerous layers of overly burdensome bureaucratic red tape requirements that inevitably will unnecessarily delay critical infrastructure projects, hinder economic development, and ultimately act to threaten and undermine our nation's food, economic, and energy security.

13. Below are some examples how the Final Rule improperly modifies NEPA that will consequently result in unnecessary and irreparable harm to North Dakota:

   a. The Final Rule emphasizes an "environmentally preferable alternative" based on new criteria not defined in NEPA's text or in the Final Rule. These changes shift the technical review focus of a NEPA review to one that instead seeks to advance specific partisan intangible policy goals. Those changes will greatly affect the timing and viability of current and ongoing projects reviewed under NEPA. In the agricultural context, these NEPA regulatory changes could consequently serve to

   impede legitimate farming or ranching practices whenever the practices may simply be perceived by some as potentially environmentally adverse.

   b. Of additional note, the Final Rule limits the use of categorical exclusions[3] for NEPA review by redefining "extraordinary circumstances" to include professed "environmental justice" concerns or perceived theoretical risks from the effects of climate change.

      i. In this vein, the Final Rule also places new conditions on an agency's adoption of another agency's categorical exclusion, notwithstanding that NEPA itself imposes no such conditions.

      ii. These specified categorical exclusions are by far the most common level of NEPA review, including in North Dakota, so limiting them will result in widespread delays and may render certain projects no longer feasible to permit and timely construct – many times *de facto* killing the projects and consequently negatively impacting North Dakota.

   c. For yet another example, the Final Rule directs ancillary mitigation measures to ostensibly address perceived "environmental justice" and other professed exceedingly subjective concerns – and then assigns these tasks mandated to mitigate "environmental justice" a "general order of priority," such as potentially

---

[3] Categorical exclusions are agency actions, generally reoccurring, that the agency has already determined have no significant adverse impact on the environment, for example routine park trail maintenance, land surveys, and routine restoration projects. Narrowly drawn categorical exclusions relating to agriculture include those of the United States Department of Agriculture's Agriculture Research Services, Animal and Plant Health Inspection Service, Farm Service Agency, United States Forest Service, Natural Resources Conservation Service, and rural development agencies.

      requiring a consequent compliance plan be implemented indefinitely after the NEPA process and associated project has been fully completed.

    d. Additionally, the Final Rule overemphasizes concepts of climate change and "environmental justice", for example arbitrarily requiring "quantifications of greenhouse gas emissions, from the proposed action and alternatives." This overly excessive emphasis placed on certain highly subjective, indeterminate, and inherently controversial factors will unnecessarily burden and improperly bias the review process, significantly departing from NEPA's primary goal of solidly science-based and fact-based objective project transparency.

    e. Along these lines, the Final Rule also directs that "indigenous knowledge" is a type of "high-quality information" that must be considered in conducting NEPA reviews, without plainly defining the term or even providing any material guidance for effectively garnering this rather uncertain data or implementing the new requirement. This new, unclear, and ill-defined requirement improperly subordinates legitimate scientific data, compromises the factual basis for NEPA reviews, increases confusion, causes the unnecessary expenditure of limited time and resources, and will undoubtedly lead to a dramatic expansion of litigation brought and specifically designed to gratuitously stall or outright prevent infrastructure development.

14. The Final Rule will have, at minimum, the following immediate, significant, unnecessary, and irreparable negative repercussions on the State of North Dakota, North Dakota residents, the State's critical agriculture industry, and the Department. Below are several pertinent

examples of pending critical infrastructure projects in North Dakota that will be negatively and irreparably impacted by the Final Rule:

    a. <u>Roads, bridges, roadway safety, and other transportation projects</u>. North Dakota's agriculture industry and agricultural community rely on the proper regular maintenance and continued improvement of the State's roadways and transportation critical infrastructure.

        i. The great distances in the State between farming or ranching properties and corresponding markets render North Dakota agriculture particularly dependent on such transportation infrastructure projects. According to the current Biden administration, North Dakota currently has 449 bridges and over 827 miles of highway in poor condition. Consequently, North Dakota has, in total, received $1.3 billion dollars from the federal Bipartisan Infrastructure Law for the construction of roads, bridges, roadway safety, and other major projects. These associated pending critical infrastructure projects will likely be negatively impacted by the Final Rule.

        ii. As another example, North Dakota received $55 million from the federal Rural Surface Transportation Grant Program for the Theodore Roosevelt Expressway Freight Safety Project. That project addresses motorist safety and convenience by upgrading a 2-lane rural road to a 4-lane road, which will significantly improve access to emergency services and medical transportation needs in a remote area and facilitate the transport of commodities and goods in one of North Dakota's critical agricultural

regions. This pending transportation critical infrastructure project will likely be negatively impacted by the Final Rule.

    iii. For another example, the North Dakota Department of Transportation also received up to $30 million in federal funding to support final design and the construction of a rail grade separation near the University of North Dakota, which will reduce delays caused by the nearby Grand Forks Yard-associated train transfers and improve capabilities for transporting agricultural goods. This pending rail grade separation critical infrastructure project will similarly likely be negatively impacted by the Final Rule.

b. <u>Water and irrigation infrastructure</u>. Flood mitigation is critical to prevent damage to critical infrastructure used by the public as well as by agriculture and energy industries. The U.S. Army Corps of Engineers recently awarded $437 million for the Fargo-Moorhead Area Diversion project. That project will mitigate flooding in the Red River of the North that causes nearly $240 million in flood damage annually and will construct a 30-mile diversion channel in North Dakota to better manage flows and benefit North Dakota agriculture. This diversion channel critical infrastructure project will similarly likely be negatively impacted by the Final Rule.

c. <u>Heartland Hydrogen Hub</u>. The U.S. Department of Energy awarded North Dakota and surrounding states up to $925 million for the Heartland Hydrogen Hub. The hub leverages North Dakota's abundant resources to help decarbonize the agricultural sector's production of fertilizer and decrease the regional cost of clean hydrogen. The hub offers equity ownership with the Mandan, Hidatsa, and Arikara Nation and to local farmers and farmer co-ops through a private sector partnership.

>This hub will permit farmers access to competitively priced domestically produced fertilizer instead of relying on costly overseas imports. This hydrogen hub critical infrastructure project will similarly likely be negatively impacted by the Final Rule.

15. The above-mentioned projects are merely a few of the many examples of the wide range of federally permitted and funded projects directly implicating NEPA across North Dakota that would likely be negatively affected by the Final Rule. The resulting impediments to critical infrastructure project approvals caused by implementation of the Final Rule will foreseeably negatively affect a significant portion of North Dakota's agricultural community, causing substantial harm to the State's economy, rural communities, and to North Dakota's farmers and ranchers.

16. By imposing burdensome, undefined, and inherently subjective requirements into NEPA reviews (for example, by potentially requiring NEPA reviews to consider highly subjective concepts of "environmental justice" and "indigenous knowledge" when conducting environmental impact analyses), the Final Rule will foreseeably require the Department to expend more time, personnel resources, and financial resources in providing material input to agriculture-related NEPA reviews. The Department has limited resources. And each hour of staff time devoted to trying to decipher and satisfy the Final Rule's new unnecessary, vague, and burdensome new requirements is an hour that cannot be spent much more productively and constructively fulfilling the Department's mission to serve the people of North Dakota.

17. North Dakota's agricultural industry relies on effective, timely, and efficient environmental reviews of federally permitted and funded projects. Those projects properly maintain the roads and transportation critical infrastructure that transport agricultural commodities produced in North Dakota within North Dakota and to the rest the country. These projects

steadfastly maintain the critical infrastructure that protects farms and ranches from flooding and destruction. Finally, these projects stalwartly maintain the systems of irrigation that allow North Dakota crops to grow.

18. The Final Rule unreasonably and needlessly risks the timely construction and completion of all these and many other critical infrastructure projects in the State by making NEPA regulatory environmental reviews far less certain for the both the State and builders. More to the point, the Final Rule will unnecessarily complicate and lengthen NEPA technical reviews, make them less science-based and less grounded upon verifiable data and sound engineering principles, and simply provide detractors to the development of critical infrastructure numerous various legal vehicles to subsequently illegitimately engage in abuse of process and lawfare with the ultimate objective simply to stall or stop project construction – all of which will consequently unnecessarily and significantly impose negative impacts and irreparable harms upon North Dakota, North Dakota agriculture, North Dakota farmers and ranchers, and the Department. These many adverse impacts from the gratuitous delay or stopping of construction of critical infrastructure will, in turn, collectively result in substantial harm to the nation's economic security and food security.

19. Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed in Bismarck, North Dakota, on August 1, 2024.

Doug Goehring
Agriculture Commissioner