# Exhibit P
# Declaration of T. Parfitt

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA
BISMARCK DIVISION

STATE OF IOWA,                                    )
STATE OF NORTH DAKOTA,                            )
STATE OF ALASKA,                                  )
STATE OF ARKANSAS,                                )
STATE OF FLORIDA,                                 )
STATE OF GEORGIA,                                 )    Case No. 24-CV-00089-DMT-CRH
STATE OF IDAHO,                                   )
STATE OF KANSAS,                                  )
COMMONWEALTH OF KENTUCKY,                         )
STATE OF LOUISIANA,                               )
STATE OF MISSOURI,                                )
STATE OF MONTANA,                                 )
STATE OF NEBRASKA,                                )
STATE OF SOUTH CAROLINA,                          )
STATE OF SOUTH DAKOTA,                            )
STATE OF TENNESSEE,                               )
STATE OF TEXAS,                                   )
STATE OF UTAH,                                    )
STATE OF WEST VIRGINIA, and                       )
STATE OF WYOMING,                                 )
                                                  )
Plaintiffs,                                       )
                                                  )
        v.                                        )
                                                  )
COUNCIL ON ENVIRONMENTAL                          )
QUALITY, and BRENDA MALLORY,                      )
In her official capacity as Chair,                )
                                                  )
Defendants.                                       )

---

**DECLARATION OF TODD PARFITT**

---

Plaintiff State of Wyoming submits the following declaration:

I, Todd Parfitt, declare as follows:

1.      I am the Director of the Wyoming Department of Environmental Quality

(Department). I received a Bachelor of Science degree in Natural Resources and a Master of Public

1

Administration with an emphasis in environmental policy from the Ohio State University. As part of my duties as Director I am responsible for overseeing the Department's regulatory programs for each of the various divisions of the Department.

2.      I have been employed by the Department for more than thirty years. During that time, I have been involved in numerous facets of the Department's different regulatory programs. I have served as the Director for twelve years, as Deputy Director for seven years, as Administrator of the Department's Industrial Siting Division for seven years, as Interim Administrator of Abandoned Mine Lands Division on two different occasions, and as manager of the Department's Clean Water Act pollution discharge permitting program for seven years. Additionally, I served four years working in the Department's Resource Conservation and Recovery Act program related to hazardous and solid waste and underground storage tanks. In all of my various positions, I regularly reviewed federal and state regulatory program requirements. I have also worked with the Wyoming Legislature on many occasions related to the Department's regulatory programs. I have also served as President of the Environmental Council of States from 2017-18. Because of my education and experience I am well-versed in state implementation of environmental regulatory programs.

3.      It is important to note that the Department has been delegated primacy over multiple environmental and natural resource programs by the federal government – water, air, solid and hazardous waste, abandoned mine land reclamation, coal mining, and underground injection control (UIC) wells, including class VI, for the geologic sequestration of carbon dioxide.  In addition, the Department permits and regulates all minerals mined in the state such as gravel and bentonite. The Department has also received an agreement state status with the Nuclear Regulatory Commission for uranium mining and processing in the State of Wyoming.  Wyoming received

primacy delegations and agreement status as a result of federal agencies determining that Wyoming and the Department have the environmental, permitting and regulatory structure in place to ensure that any activity within the agency's authority is handled in a manner that protects human health and the environment. In addition to the delegated primacy, the State of Wyoming also established the Industrial Development Information and Siting Act as a state program. This program is administered by the Department. Large industrial projects such as solar and wind farms that meet the jurisdictional threshold or definition, are required to submit a permit application to the Department. Permit applications must address the environmental, wildlife and socio-economic aspects of the project.

4.    The Department is responsible for enforcing various state and federal environmental laws in Wyoming to protect air quality, water quality, and land quality, among other attributes. As the Department's Director, I am responsible for overseeing the Department's work regarding the federal National Environmental Policy Act ("NEPA"). The Department's programs and general regulatory affairs are often influenced by NEPA processes carried out by federal agencies, including but not limited to the Department and/or one of its Divisions having cooperating agency status with a federal agency that is carrying out a NEPA process. Accordingly, and to serve the principles of cooperative federalism, it is imperative that the Department be able to both fully participate in such federal processes, as well as implementing NEPA decisions through its various Divisions. In order to adequately participate in NEPA processes it is critical that the Department have the ability to interpret, take account of, and implement NEPA statutory requirements, as well as NEPA regulations.

5.    Relying on my professional experience and education, I reviewed the *National Environmental Policy Act Implementing Regulations Revisions Phase 2* rule published by the

federal Council on Environmental Quality, 89 Fed. Reg. 35442 (May 1, 2024) (the "Final Rule"). Based on my experience and training I have the personal knowledge to understand what steps the Wyoming Department of Environmental Quality must undertake to implement the Final Rule, and in consultation with other Department employees I have determined the impacts the Final Rule will have on the Department. The Final Rule will require the Department to deploy scarce resources to attempt to properly consider and analyze the new issues and mandates set forth in the Final Rule, to carry out analyses of issues not embodied in the statutory requisites of NEPA, and to attempt to implement and/or take account of the federal administration-specific policies contained in the Final Rule. Most importantly, the Final Rule ignores the Department's primacy over various regulatory programs and will require the Department to consider how implementation of the Final Rule's new provisions that exceed the scope of the pertinent agency's authority under NEPA and governing state and/or federal law affect a particular project and impact Department resources.

6.     One problematic provision of the Final Rule pertains to its specification that in carrying out a NEPA process a federal agency (agency) "may include reasonable alternatives not within the jurisdiction of the lead agency." 40 C.F.R. § 1502.14(a). While this part of the Final Rule does not necessarily expressly require *the Department* to recommend such non-jurisdictional alternatives, it nonetheless improperly subjects the Department to significant needless additional work by having to consider such alternatives and to potentially analyze or justify why such alternatives were not considered, given the requirement under the Final Rule that agencies "rigorously explore and objectively evaluate reasonable alternatives" and consider a "reasonable range of alternatives." Id. It would be a waste of scarce resources for the Department to have to review and consider alternatives that are not within the scope of an agency's regulatory authority.

Moreover, this part of the Final Rule could be interpreted by an outside agency having jurisdiction as justification for taking over a proposed project, based on the need for regulatory jurisdiction. Such a result would subvert the earlier-defined purpose and need of the project, which forms the very basis for a NEPA review in the first place.

7.    Another problematic provision of the Final Rule is the requirement that an agency identify "the environmentally preferable alternative or alternatives amongst the alternatives considered . . . ." 40 C.F.R. § 1502.14. This requirement necessarily would require the Department to make a *subjective* recommendation to the agency as to which policy or policies reflected in an alternative are supposedly preferable, which is the exact opposite of the Department's long-standing practice of using *objective* criteria to evaluate the impacts of an alternative and selection or recommendation of an alternative when there are potentially conflicting goals and objectives. One such example might be consideration of an alternative that would result in mining of low-sulfur Wyoming coal from a surface coal mine in the Powder River Basin for use for electrical energy production, as compared to an alternative to generate electricity from a wind energy project. The wind energy project could be more aesthetically visually intrusive. Thus, the wind energy project may have its own adverse impacts. The Department would be forced to consider whether it is "preferable" to recommend an alternative that will negatively impact aesthetics and view sheds compared to an alternative that will result in generation of some so-called greenhouse gas. Further, the environmental preferable alternative may have significant adverse socio-economic impacts that must be fully addressed.

8.    The Department has always engaged in the NEPA process by providing unbiased and objective information on environmental impacts; it is not appropriate for the NEPA process to reach an outcome-based result arising from policy decisions imposed by an existing national

political administration. Yet, the Final Rule would result in such an unprecedented outcome (even if the political administration changes or reaches new policy decisions).

9.      The Final Rule, for the first time, would require the Department to: (i) analyze or consider how a proposed project might impact climate change, even perhaps on a global basis, (ii) analyze or consider alternatives that avoid or minimize supposed adverse environmental impacts, (iii) analyze or consider appropriate mitigation requirements, and (iv) analyze or consider appropriate monitoring and compliance measures. None of these requirements match the Department's long-standing NEPA practice. Moreover, each of these new requirements will impose substantial additional expense on the Department in each NEPA process in which it becomes involved, and will require devotion of scarce resources and/or shifting of such resources from other projects and programs. Moreover, the Department would be forced to consider potential global impacts when the Department does not have the resources to carry out such an analysis.

10.      Another troubling provision in the Final Rule relates to environmental justice. The Final Rule adds requirements concerning consideration of "environmental justice." Environmental justice at the federal level is not based on any statutory authority. However, the Department is committed to ensuring that no person is excluded from participation in, denied the benefits of, or subjected to discrimination under any program, activity or service that it provides on the basis of race, color, national origin, sex, disability or age, in violation of Title VI of the Civil Rights Act of 1964. Accordingly, the Department has its own policy concerning similar issues, Department Policy No. 32. This Department policy focuses on "Small and Special Focus Communities," which have a precise definition under the policy. This definition differs dramatically from the definition of environmental justice set forth in the Final Rule. This conflict subverts Wyoming's primacy,

6

and imposes a whole new set of requirements for analysis by the Department that are not based in federal statute.

11.    By removing the "Exhaustion" section in 40 C.F.R. § 1500.3(b), the Final Rule could be construed as giving (or requiring) an agency the authority to accept comments after the close of a NEPA process comment period. This is problematic and inappropriate and harms the Department. Apparent discretion to accept comments after the close of a comment period may create a scenario where parties are required to wait for a comment period to close, then wait again for an arbitrary time period to allow comment on submitted comments and issues raised by other commenters. Moreover, accepting comments after the close of a comment period may also significantly disadvantage cooperating agencies (such as the Department) and other commenters who commit resources to provide timely input. Any unannounced deadline to accept more comments after the comment period may be considered arbitrary and capricious. Therefore, if the agency receives public comment after the close of the comment period, the only option it should consider, in the interest of fairness and equality, is to reject the comments. This is especially true given that more often than not, federal agencies deny state requests for extension of comment periods. Moreover, the elimination of 40 C.F.R. § 1500.3(b)'s "exhaustion" provisions could potentially be construed as eliminating the long-standing requirement imposed under administrative law that generally precludes challenges to a NEPA process by a person or organization that did not comment during the NEPA process. As such, the elimination could potentially subject agency action to more numerous after-the-fact challenges by persons or organizations who failed to give input during the NEPA comment period.

12.    A significant change—and a concern for proper administration of the NEPA process—is that the Final Rule improperly converts the NEPA process from an information-

gathering and procedural process to a substantive process meant to implement the policy goals of one political administration. The Department objects to the NEPA process (and will be harmed by) being used to dictate the outcome of a planning or decision-making process; the Final Rule would now require the Department to make substantive decisions or recommendations, rather than to generate information that would allow for a fully-informed decision on the substance of the matter that was subjected to the NEPA process. This significant change is likely to result in numerous challenges to NEPA decisions by persons or organizations that oppose the policy decisions imposed by the Final Rule.

13.    Overall, the Final Rule will adversely impact the Department's obligations to serve the citizens of Wyoming and its primacy over various federal environmental programs. The Final Rule will require the Department to significantly expand its NEPA review process, and will cause the unnecessary expenditure of significant additional financial resources and personnel. The Final Rule will require the Department to consider alternatives that are outside of regulatory jurisdiction and to determine the supposed most environmentally-beneficial alternative, even if doing so would alter the purpose and need of the NEPA process. The Final Rule will force the Department to consider climate change issues, even potentially on a global basis (for which the Department has neither the resources nor authority), and the Final Rule's environmental justice provisions conflict with existing Department policy to serve disadvantaged communities in Wyoming. Finally, the Final Rule will put the Department in the impossible position of having to determine whether to anticipate late-filed comments, which likely will promote even more litigation to challenge NEPA decisions by persons who did not engage in the NEPA comment process.

14.    Both individually and collectively the above-described adverse impacts will result in significant and irreparable harm to the Department, the state of Wyoming and to the citizens of

Wyoming. The harm that the Department, the state, and the citizens will suffer will be direct and immediate, and be of a high-magnitude financial, political, and substantive nature, which would be unwarranted and unprecedented after multiple decades of NEPA implementation. Additionally, the Final Rule will defeat the required principles of cooperative federalism.

I declare under the penalty of perjury that the foregoing is correct to the best of my knowledge, information, and belief.

Executed on this first day of August, 2024.

Todd Parfitt
Director
Wyoming Department of Environmental Quality