IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA

| | |
|---|---|
| STATE OF IOWA, *et al.*, | |
| Plaintiffs, | |
| v. | No. 1:24-cv-00089-DMT-CRH |
| COUNCIL ON ENVIRONMENTAL QUALITY, and BRENDA MALLORY, in her official capacity as Chair, | |
| Defendants, | |
| ALASKA COMMUNITY ACTION ON TOXICS, et al., | |
| Intervenor-Defendants, | |

**STATE INTERVENOR DEFENDANTS' MEMORANDUM IN SUPPORT OF CROSS MOTION FOR PARTIAL SUMMARY JUDGMENT AND OPPOSITION TO PLAINTIFF STATES' MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

**Page**

Introduction.................................................................................................................................1

Background and Statement of Facts ............................................................................................3

Response to Plaintiff States' Statement of Material Facts.............................................................6

Standard of Review.....................................................................................................................8

Argument ...................................................................................................................................9

    I.    Defendant States Have Standing to Defend the Final Rule. ................................9

        A.    Defendant States Satisfy the Injury Requirement for Standing Because Their Interests Would Be Harmed If the Final Rule Were Vacated.......10

        B.    Defendant States Satisfy the Traceability Requirement for Standing Because Plaintiff States' Remedy Would Vacate the Final Rule. ..........15

        C.    Defendant States Satisfy the Redressability Requirement for Standing Because Denial of Plaintiff States' Remedy Would Prevent Injury to Defendant States Caused by Vacating the Final Rule. ........................16

    II.    The Final Rule is Consistent With NEPA and does not exceed ceq's authority under the statute. ................................................................................................16

        A.    Congress Delegated CEQ Broad Authority to Implement NEPA's Comprehensive System for Reviewing Environmental Impacts. ...........17

        B.    The Final Rule Properly Recognizes the "Action-Forcing" Nature of NEPA Without Adding Substantive Requirements. ...............................18

        C.    The Final Rule Properly Emphasizes That Climate Change and Environmental Justice Are Parts of Environmental Review. .................20

        D.    Indigenous Knowledge Has a Proper Role in Federal Agencies' NEPA Analyses..............................................................................................27

        E.    Worldwide Impacts Are Relevant Under NEPA and Properly Included in the Final Rule........................................................................................30

        F.    The Final Rule Does Not "Drive" Agencies to Choose the Environmentally Preferable Alternative. .................................................31

        G.    The Final Rule Does Not Compel Mitigation of Environmental Impacts. ...................................................................................................33

H.      The Final Rule Does Not Impose Policy-Based Restrictions on the Use
        of Categorical Exclusions Under NEPA..................................................35

III.    The Final Rule is Rationally Supported and CEQ Complied with the APA in
        Adopting the Final Rule...................................................................................38

        A.      CEQ Adequately Justifies the Changes it Adopts in the Final Rule.......38

        B.      The Final Rule Does Not Add Substantial Levels of Uncertainty and Is
                Reasonably Explained.............................................................................43

IV.     The Final Rule does not Implicate the Major Questions Doctrine. ...................45

V.      Plaintiff States' Requested Remedy is Inappropriate. ........................................49

Conclusion .........................................................................................................................50

**TABLE OF EXHIBITS**

| Exhibit | Declarant Name | Title/State Agency |
|---|---|---|
| A | Declaration of Sarah Reif | Habitat Division Administrator with the Oregon Department of Fish and Wildlife |
| B | Declaration of Joenne McGerr | Manager of Shorelands and Environmental Assistance Program at the Washington State Department of Ecology |
| C | Declaration of Tori T. Kim | Assistant Secretary of Massachusetts Executive Office of Energy and Environmental Affairs and Director of Massachusetts Environmental Policy Act Office |
| D | Declaration of Lawrence H. Weintraub | Assistant Counsel in Office of General Counsel for New York State Department of Environmental Conservation |
| E | Declaration of Geneva E.B. Thompson | Deputy Secretary of Tribal Affairs at the California Natural Resources Agency |

# TABLE OF AUTHORITIES

**Page**

CASES

*Allied-Signal, Inc. v. U.S. Nuclear Regul. Comm'n*
    988 F.2d 146 (D.C. Cir. 1993)...............................................49

*Am. Civil Liberties Union of Minn. v. Tarek*
    *ign Ziyad Acad.*, 643 F.3d 1088, 1092-93 (8th Cir. 2011)...............................10, 15

*Andrus v. Sierra Club*
    442 U.S. 347 (1979)...............................................4, 19, 46

*Baltimore Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*
    462 U.S. 87 (1983)...............................................4

*Biden v. Missouri*
    595 U.S. 87 (2022) (per curiam)...............................................47

*Breaker v. United States*
    977 F. Supp. 2d 921 (D. Minn. 2013)...............................................50

*California et al., v. Council on Environmental Quality*
    Case No. 3:20-cv-06057 (N.D. Cal. Aug. 28, 2020) ...............................................5

*Christoffersen v. Yellow Book USA*
    536 F.3d 947 (8th Cir. 2008) ...............................................9

*City of Council Bluffs v. U.S. Dep't of the Interior*
    No. 117CV00033SMRCFB, 2019 WL 10854533 (S.D. Iowa Aug. 12, 2019) ...............................................50

*Ctr. for Biological Diversity v. Nat'l Highway Transportation Safety Admin.*
    538 F.3d 1172 (9th Cir. 2008)...............................................23

*el Bienestar de la Comunidad Costera v. Fed. Energy Regulatory Comm.*
    6 F.4th 1321 (D.C. Cir. 2021)...............................................26

*Encino Motorcars, LLC v. Navarro*
    579 U.S. 211 (2016)...............................................38, 42

*Envtl. Decade, Inc. v. Dep't of Nat. Res.*
    271 N.W.2d 69 (Wis. 1978)...............................................11

*Found. v. Kaler*
    14 F.4th 879 (8th Cir. 2021) ...............................................9

*Glass v. Goeckel*
    703 N.W.2d 58 (Mich. 2005)................................................................14

*Horne v. Flores*
    557 U.S. 433 (2009)...........................................................................9

*Kleppe v. Sierra Club*
    427 U.S. 390 (1976)..........................................................................18

*Loper Bright Enter. v. Raimondo*
    144 S. Ct. 2244 (2024).......................................................................8

*Mid States Coalition for Progress v. Surface Transp. Bd.*
    345 F.3d. 520 (8th Cir. 2003) ...........................................................26

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*
    463 U.S. 29 (1983).............................................................................8

*Nat'l Parks Conservation Ass'n v. U.S. Env't. Prot. Agency*
    759 F.3d 969 (8th Cir. 2014) .............................................................9

*Navajo Nation v. U.S. Forest Serv.*
    479 F.3d 1024 (9th Cir. 2007) ..........................................................32

*Robertson v. Methow Valley Citizens Council*
    490 U.S. 332 (1989)..............................................................4, 19, 46

*Sierra Club v. Fed. Energy Regulatory Comm.*
    867 F.3d 1357 (D.C. Cir. 2017) ........................................................26

*Sierra Club v. U.S. Army Corps of Engineers*
    446 F.3d 808 (8th Cir. 2006) ...........................................................19

*South Dakota v. Ubbeholde*
    330 F.3d 1014 (8th Cir. 2003) ..........................................................10

*Voyageurs Nat. Park Ass'n v. Norton*
    381 F.3d 759 (8th Cir. 2004) ..........................................................3, 8

*WaterLegacy v. U.S. Env't Prot. Agency*
    300 F.R.D. 332 (D. Minn. 2014) .......................................................50

*West Virginia v. EPA*
    597 U.S. 697 (2022)...............................................................45, 47, 48

*WildEarth Guardians v. U.S. Bureau of Land Mgmt.*
    870 F.3d 1222 (10th Circ. 2017).................................................................23, 32

**STATUTES**

5 U.S.C. § 706...............................................................................................8

5 U.S.C. § 706(2)(A) .....................................................................................8

42 U.S.C. § 4321.....................................................................................1, 17, 23

42 U.S.C. §§ 4321 *et seq.* .........................................................................1, 17

42 U.S.C. § 4331.....................................................................................4, 23, 35

42 U.S.C. § 4331(a) .............................................................................1, 17, 20, 35

42 U.S.C. § 4331(a)-(c) .................................................................................1

42 U.S.C. § 4331(b) .................................................................................22, 47

42 U.S.C. § 4331(b)(1) .................................................................................20

42 U.S.C. § 4331(b)(2) .........................................................................17, 20, 25

42 U.S.C. § 4331(b)(4) .................................................................................17

42 U.S.C. § 4331(c) .................................................................................17, 25

42 U.S.C. § 4332(I) .................................................................................22, 30

42 U.S.C. § 4332(2) .....................................................................................17

42 U.S.C. § 4332(2)(B).........................................................................3, 19, 21, 32

42 U.S.C. § 4332(2)(c)(iv) .............................................................................23

42 U.S.C. § 4332(c) .........................................................................20, 25, 36

42 U.S.C. § 4332(C)(i) .................................................................................22

42 U.S.C. § 4335.........................................................................................2

42 U.S.C.§ 4336(b) .......................................................................................36

42 U.S.C. § 4342.....................................................................................4, 17, 21

42 U.S.C. § 4344 ............................................................................................17, 21

California Public Resources Code
    § 4512 ......................................................................................................11
    § 4513 ......................................................................................................11

California Water Code
    § 102 ........................................................................................................11
    § 105 ........................................................................................................11

D.C. Code
    § 8-151.09d .............................................................................................13

Me. Stat., Title 38
    §§ 576-A to 578 .....................................................................................13
    § 631 ........................................................................................................11
    § 633 ........................................................................................................11
    § 636 ........................................................................................................11

Mich. Comp. Laws
    §§ 460.1001-.1211 .................................................................................13

N.J. Stat. Ann.
    § 26:2C-38 ..............................................................................................13

Waterfront Development Act and the Coastal Wetlands Act. N.J. Stat. Ann.
    §§ 12:5-3, 13:0A-1 ................................................................................14

## COURT RULES

Local Rule 7.1 (A)(2-3) ..........................................................................................3

## OTHER AUTHORITIES

40 C.F.R. § (7)-(12) ................................................................................................6

40 C.F.R. § 1500.1(a) ......................................................................................18, 40

40 C.F.R. § 1500.2(d) .............................................................................................47

40 C.F.R. § 1500.2(e) ..............................................................................22, 24, 46

40 C.F.R. § 1500.2(f) ..............................................................................33, 34, 35

40 C.F.R. § 1500.3(b) ..............................................................................40, 41, 42

40 C.F.R. § 1500.3 (c) ...................................................................................................40

40 C.F.R. § 1500.3 (c) ...................................................................................................41

40 C.F.R. § 1500.3(d) ..............................................................................................41, 42

40 C.F.R. § 1500.6 ........................................................................................................37

40 C.F.R. § 1501(b) ......................................................................................................39

40 C.F.R. § 1501.1(a) ...................................................................................................10

40 C.F.R. § 1501.3(a) ...................................................................................................10

40 C.F.R. § 1501.3(b) ...................................................................................................10

40 C.F.R. § 1501.3(b)(1) ..............................................................................................21

40 C.F.R. § 1501.3(d) .............................................................................................10, 30

40 C.F.R. § 1501.3(d)(1) ...............................................................................25, 30, 46

40 C.F.R. § 1501.4(b)(1) ..............................................................................................37

40 C.F.R. § 1501.4(e) ...................................................................................................37

40 C.F.R. § 1502.12 ......................................................................................................31

40 C.F.R. § 1502.14 ...............................................................................................13, 32

40 C.F.R. § 1502.14 (b) ................................................................................................32

40 C.F.R. § 1502.14(f) .............................................................................................*passim*

40 C.F.R. § 1502.16(a)(1)-(2) ........................................................................................6

40 C.F.R. § 1502.16(a)(6) .......................................................................................13, 46

40 C.F.R. § 1503.3 ........................................................................................................41

40 C.F.R. § 1503.3(a) ...................................................................................................33

40 C.F.R. § 1505.2 ........................................................................................................31

40 C.F.R. § 1505.2(a)(2) ...............................................................................................47

40 C.F.R. § 1505.2(b) ...................................................................................................47

40 C.F.R. § 1505.2(c) ...............................................................................................33, 34

40 C.F.R. § 1505.3(a) .....................................................................................................33

40 C.F.R. § 1505.3(a)(2) .................................................................................................33

40 C.F.R. § 1505.3(b) ...............................................................................................34, 47

40 C.F.R. § 1505.3(c) .....................................................................................................35

40 C.F.R. § 1506.3(e) .....................................................................................................37

40 C.F.R. § 1506.6(a) .....................................................................................................29

40 C.F.R. § 1506.6(b) ...............................................................................................27, 29

40 C.F.R. § 1506.16(a)(6) .........................................................................................23, 24

40 C.F.R. § 1507.3(c)(8) .................................................................................................36

40 C.F.R. § 1508.1(i)(4) ..................................................................................................29

40 C.F.R. § 1508.1(g) .................................................................................................6, 23

40 C.F.R. § 1508.1(g)(1) .................................................................................................29

40 C.F.R. § 1508.1(*l*) .....................................................................................................31

40 C.F.R. § 1508.1(n) .....................................................................................................31

40 C.F.R. § 1508.1(o) ..........................................................................................36, 37, 46

40 C.F.R. § 1508.27 ........................................................................................................21

43 Fed. Reg. 55978 (Nov. 29, 1978) ................................................................................4

76 Fed. Reg. 3843, 3847 (Jan. 21, 2011) ........................................................................47

85 Fed. Reg. 1684-01, 1696 (Jan. 10, 2020).................................................................35

85 Fed. Reg. 43304 (July 16, 2020)...........................................................................*passim*

85 Fed. Reg. 43316 (July 16, 2020)................................................................................18

86 Fed. Reg. 34154 (July 29, 2021)..................................................................................5

86 Fed. Reg. 55757 (Oct. 7, 2021)....................................................................................5

87 Fed. Reg. 23453 (April 20, 2022) ...........................................................................5

88 Fed. Reg. 49,924 (July 31, 2023) ...........................................................................38

88 Fed. Reg. 49,967 (July 31, 2023) ...........................................................................39

88 Fed. Reg. 49924 (July 31, 2023) ...........................................................................5

89 Fed. Reg. 3689 (Jan. 19, 2024) ...........................................................................12

89 Fed. Reg. 35442 (May 1, 2024) .............................................................1, 5, 19, 46

89 Fed. Reg. 35444-45 (May 1, 2024) .......................................................................26

89 Fed. Reg. 35445 (May 1, 2024) .............................................................................7

89 Fed. Reg. 35446-47 (May 1, 2024) .......................................................................7

89 Fed. Reg. 35447 (May 1, 2024) .............................................................................7

89 Fed. Reg. 35448 (May 1, 2024) .............................................................................39

89 Fed. Reg. 35449 (May 1, 2024) .............................................................................40

89 Fed. Reg. 35449-50 (May 1, 2024) .......................................................................18

89 Fed. Reg. 35450 (May 1, 2024) .............................................................................19

89 Fed. Reg. 35450-51 (May 1, 2024) .......................................................................18

89 Fed. Reg. 35451 (May 1, 2024) .............................................................................39

89 Fed. Reg. 35452 n.58 (May 1, 2024) .....................................................................23

89 Fed. Reg. 35455 (May 1, 2024) .......................................................................40, 41

89 Fed. Reg. 35463 (May 1, 2024) .............................................................................42

89 Fed. Reg. 35465 (May 1, 2024) .............................................................................30

89 Fed. Reg. 35481 (May 1, 2024) .............................................................................43

89 Fed. Reg. 35495 (May 1, 2024) .............................................................................19

89 Fed. Reg. 35501 (May 1, 2024) .............................................................................32

89 Fed. Reg. 35503-05 (May 1, 2024) .......................................................................31

89 Fed. Reg. 35504 (May 1, 2024) .......................................................................31, 32, 33

89 Fed. Reg. 35508 (May 1, 2024) ...................................................................................23

89 Fed. Reg. 35510 (May 1, 2024) ...................................................................................42

89 Fed. Reg. 35512-14 (May 1, 2024) ..............................................................................41

89 Fed. Reg. 35517 (May 1, 2024) ...................................................................................34

89 Fed. Reg. 35517-19 (May 1, 2024) ..............................................................................34

89 Fed. Reg. 35524 (May 1, 2024) ...................................................................................42

89 Fed. Reg. 35525 (May 1, 2024) ...................................................................................29

89 Fed. Reg. 35530 (May 1, 2024) ...................................................................................45

89 Fed. Reg. 35532 (May 1, 2024) ...................................................................................44

89 Fed. Reg. 35548-49 (May 1, 2024) ..............................................................................35

89 Fed. Reg. 35553 (May 1, 2024) ...................................................................................26

89 Fed. Reg. 35554 (May 1, 2024) ...........................................................................18, 22

89 Fed. Reg. 35554-55 (May 1, 2024) ..............................................................................24

89 Fed. Reg. 35556-57 (May 1, 2024) ..............................................................................25

89 Fed. Reg. 35557 (May 1, 2024) ...................................................................................30

89 Fed. Reg. 35558 (May 1, 2024) ...................................................................................37

89 Fed. Reg. 35565 (May 1, 2024) ............................................................................ *passim*

89 Fed. Reg. 35566 (May 1, 2024) ...................................................................................22

89 Fed. Reg. 35569 (May 1, 2024) ...................................................................................34

89 Fed. Reg. 35575 (May 1, 2024) ...........................................................................22, 24, 36

*Active Licenses*, FERC.gov, https://www.ferc.gov/licensing (last visited Aug. 22, 2024) .............................................................................................................11

Agric., *National Forests in California: Nature's Benefits-Water* 1 (2023), https://www.fs.usda.gov/Internet/FSE_DOCUMENTS/fseprd543954.pdf.........................11

Climate Ready DC, *The District of Columbia's Plan to Adapt to a Changing Climate* 3 (2016), https://doee.dc.gov/sites/default/files/dc/sites/ddoe/ .............................13

Colorado. Cong. Research Serv., *Federal Land Ownership: Overview and Data* 7 (2020), https://crsreports.congress.gov/product/pdf/R/R42346.........................................11

Comments of Attorneys General of California, et al., on Advance Notice of Proposed Rulemaking, 83 Fed. Reg. 28591 (August 20, 2018) ...........................................5

Comments of Attorneys General of Washington, et al., on Notice of Proposed Rulemaking, 85 Fed. Reg. 1684 (March 10, 2020) ..................................................5

Comments of Attorneys General of Washington, et al., on Notice of Proposed Rulemaking 86 Fed. Reg. 55757 (Nov. 22, 2021)...................................................5

Comments of Attorneys General of Washington, et al., on Notice of Proposed Rulemaking, 85 Fed. Reg. 1684 (March 10, 2020) at 35 ......................................36

Envtl. Prot. Agency, *What Climate Change Means for Michigan* 1-2 (2016), https://19january2017snapshot.epa.gov/sites/production/files/2016-09/documents/climate-change-mi.pdf........................................................................14

Executive Order 12898, Executive Order 14008, and Executive Order 14096.........................26

H.R. Rep. No. 91-378 (1969), *reprinted in* 1969 U.S.C.C.A.N. 2751 .......................................3

N.J. Dep't of Envtl. Prot., Scientific Report on Climate Change 42-43 (2020), https://dspace.njstatelib.org/bitstreams/ebcee53e-0050-4896-8f2b-b84f0721f470/download ..........................................................................................14

N.M. State Land Office, https://www.nmstatelands.org/about/ (last visited Aug. 24, 2024) ..........................................................................................................14

N.M. State Land Office, Revenues by Source: 1989-2023 (2023), https://www.nmstatelands.org/wp-content/uploads/2023/12/SLO-Revenue-1989-2023_FINAL.pdf ..........................................................................................14

NOAA Nat'l Ctr. For Envtl. Info., State Climate Summaries 2022: New Mexico, https://statesummaries.ncics.org/chapter/nm/...........................................15

## INTRODUCTION

In enacting the National Environmental Policy Act, 42 U.S.C. §§ 4321 *et seq.* ("NEPA"), Congress declared it is "a national environmental policy" of the Federal Government "to use all practicable means and measures…to foster and promote the general welfare, to create and maintain conditions under which man and nature can exist in productive harmony," and to fulfill the needs of "present and future generations." 42 U.S.C. § 4331(a). To advance this national policy, NEPA mandates that all federal agencies consider the environmental impacts of proposed projects receiving federal funding or requiring federal permits. To further these ends, NEPA explicitly requires a transparent process with robust opportunities for public engagement. The Council on Environmental Quality ("CEQ") is charged with implementing NEPA; it has a responsibility to ensure that federal agencies "use all practicable means and measures" to comply with NEPA's directives to protect and enhance the human environment. 42 U.S.C. §§ 4321, 4331(a)-(c).

Plaintiff States[1] challenge CEQ's 2024 National Environmental Policy Act Implementing Regulations Revisions Phase 2, 89 Fed. Reg. 35442 (May 1, 2024) ("Final Rule") because they disagree with CEQ's changes as a matter of policy and wish to reinstate a 2020 CEQ Rule revising NEPA. *See* 85 Fed. Reg. 43304 (July 16, 2020) ("2020 Rule"). Plaintiff States contend that the Final Rule exceeds CEQ's authority by imbuing NEPA with substantive requirements that illegally transform the procedural statute into a tool to achieve its policy priorities, including by emphasizing consideration of environmental justice and climate

---

[1] Plaintiff States include Iowa, North Dakota, Alaska, Arkansas, Florida, Georgia, Idaho, Kansa, Commonwealth of Kentucky, Louisiana, Missouri, Montana, Nebraska, South Carolina, South Dakota, Tennessee, Texas, Utah, Virginia, West Virginia, and Wyoming.

change. Plaintiff States also contend the Final Rule violates the Administrative Procedure Act ("APA") and the major questions doctrine. These contentions are meritless.

CEQ's delegated authority under NEPA is broad, and the changes it adopts in the Final Rule are consistent with the purpose of the statute and with NEPA's focus on procedure, required analysis, and public input. The Final Rule requires analysis that will aid federal agencies' decision-making, but it does not mandate outcomes or dictate the direction of those decisions. The Final Rule directs federal agencies to consider the effects of climate change and environmental justice in the NEPA review process—not because they are "politically charged preferences," as Plaintiff States suggest—but because they are critical environmental issues facing our nation. Plaintiff States' arguments to the contrary are not supported by the administrative record, NEPA's plain language, Congressional intent, or case law.

CEQ acted in compliance with the APA when it adopted the Final Rule, reincorporating longstanding provisions abruptly removed by the 2020 Rule despite more than four decades of successful implementation. CEQ also updated the Final Rule to address judicial precedent and incorporate amendments made by the Fiscal Responsibility Act of 2023, 42 U.S.C. § 4335, that streamlined environmental review. CEQ carefully responded to comments and explained its reason for addressing or incorporating some changes urged by various commenting stakeholders and declining to incorporate others. Thus, its decision to adopt the Final Rule was not "arbitrary and capricious."

The States of California, Washington, Colorado, Illinois, Maine, Maryland, New Jersey, New Mexico, New York, Oregon, Wisconsin, the Commonwealth of Massachusetts, the People of Michigan, the District of Columbia, and the City of New York (collectively

"Defendant States")[2] request that the Court deny Plaintiff States' motion for summary

judgment in part. Plaintiff States' arguments have no merit and, accordingly, the

Court should grant Defendant States' cross-motion for partial summary judgment upholding

the Final Rule.

## BACKGROUND AND STATEMENT OF FACTS[3]

NEPA, often referred to as the "Magna Carta" of environmental laws, was enacted in

1970 to protect the human environment by ensuring that "unquantified environmental

amenities and values" are given "appropriate consideration in decision making." 42 U.S.C. §

4332(2)(B). In enacting NEPA, Congress recognized that widespread environmental

degradation affected every aspect of American life and determined to gather, assess, and

provide information on such impacts before they occur. The 1969 House of Representatives

Committee Report on NEPA explains: environmental problems are "deep, and [] touch[] on

practically every aspect of everyday life: economic, scientific, technological, legal, and even

interpersonal. . . [W]e do not know the consequences of our actions until it is too late." H.R.

Rep. No. 91-378, at 3 & 6 (1969), *reprinted in* 1969 U.S.C.C.A.N. 2751, 2753, 2756. The

Senate Committee Report on NEPA echoes the same opinion: "It is the unanimous view of the

---

[2] On August 2, 2024, Defendant States moved to intervene as defendants in this action. On the date of this filing, August 30, 2024, Defendant States' motion to intervene was granted by the Court. ECF 82.

[3] While North Dakota Local Rule 7.1 (A)(2-3) requires that memorandums in support of motions for summary judgment and responses to motions for summary judgment include a statement of uncontested facts, cases brought pursuant to the Administrative Procedure Act are judged on the basis of the administrative record. *See Voyageurs Nat. Park Ass'n v. Norton*, 381 F.3d 759, 765 (8th Cir. 2004) (citing 5 U.S.C. § 706). The facts that are material to this case are contained within the administrative record of CEQ's decision making for the Final Rule. Therefore, Defendant States refer to and incorporate the administrative record as their recitation of undisputed material facts.

members . . . that our Nation's present state of knowledge, our established public policies, and our existing governmental institutions are not adequate to deal with the growing environmental problems and crises the Nation faces." *See* S. Rep. No. 91-296, at 4 (1969). These sentiments are included within NEPA's text and purpose. 42 U.S.C. § 4331.

The law has "twin aims": it establishes transparent procedures that require federal decisionmakers to consider and analyze the environmental impacts of federal projects, and it ensures that the public is informed about those impacts and any alternatives. AR 27904; *Baltimore Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*, 462 U.S. 87, 97 (1983). While NEPA does not "mandate particular results," *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989), Congress intended NEPA's "action-forcing procedures" to "insure that the policies [of NEPA] are implemented," *Andrus v. Sierra Club*, 442 U.S. 347, 350 (1979).

NEPA also created CEQ to administer the statute. 42 U.S.C. § 4342. In 1978, in compliance with NEPA and Executive Order 11991 (42 Fed. Reg. 26967), CEQ promulgated regulations implementing NEPA ("1978 Regulations"). *See* Final Regulations, Implementation of Procedural Provisions, 43 Fed. Reg. 55978 (Nov. 29, 1978). CEQ issued the 1978 Regulations in response to the "inconsistent agency practices and interpretations of the law" that had sprung up given the "lack of a uniform, government-wide approach to implementing NEPA." *Id.*

The 1978 Regulations stayed in place for more than forty years with little change until CEQ made far-reaching revisions to the NEPA regulations in its 2020 Rule. With the 2020 Rule, CEQ unlawfully narrowed the scope of NEPA review, made environmental review less

rigorous, reduced public participation in federal agency decision making, and made other revisions that unlawfully thwarted proper implementation of the statute's purpose and requirements. In response, a coalition of States, including the Defendant States, and others filed suit to challenge the 2020 Rule. *See California et al., v. Council on Environmental Quality*, Case No. 3:20-cv-06057 (N.D. Cal. Aug. 28, 2020); AR 25996-26088. That case is presently stayed while the parties assess the impact of the Final Rule on the litigation.

CEQ subsequently issued several rulemakings to address and reverse the harmful and unlawful provisions in the 2020 Rule, including the National Environmental Policy Act Implementing Regulation Revisions, 86 Fed. Reg. 55757 (Oct. 7, 2021) ("Proposed Phase 1 Regulations") and the National Environmental Policy Act Implementing Regulations Revisions, 87 Fed. Reg. 23453 (April 20, 2022) (collectively, "Phase 1 Regulations"). On July 31, 2023, CEQ issued a proposed version of its Phase 2 rulemaking. *See* National Environmental Policy Act Implementing Regulations Phase 2, 88 Fed. Reg. 49924 (July 31, 2023). After notice and comment, CEQ published the Final Rule on May 1, 2024. 89 Fed. Reg. 35442.[4]

---

[4] Defendant States participated in each of these rulemaking processes, including by filing comments on the proposed Final Rule. AR 25618-25655 (Comments of Attorneys General of Washington, et al. on the Proposed Phase 2 Rule, 88 Fed. Reg. 49924 (July 31, 2023)); *see also* AR 25657-25732 (Comments of Attorneys General of California, et al., on Advance Notice of Proposed Rulemaking, 83 Fed. Reg. 28591 (August 20, 2018)); AR 25734-25980 (Comments of Attorneys General of Washington, et al., on Notice of Proposed Rulemaking, 85 Fed. Reg. 1684 (March 10, 2020)); AR 25982-25994 (Comments of Attorneys General of Washington, et al., on the Interim Final Rule, 86 Fed. Reg. 34154 (July 29, 2021); AR 26090-26529 (Comments of Attorneys General of Washington, et al., on Notice of Proposed Rulemaking 86 Fed. Reg. 55757 (Nov. 22, 2021)); AR 26625-26662 (Comments of the Attorneys General of New York, et al. on Council on Environmental Quality's Interim "National Environmental Policy Act Guidance on Consideration of Greenhouse Gas Emissions and Climate Change" at 4-5 (Apr. 10, 2023)).

In addition to removing illegal provisions of the 2020 Rule, the Final Rule modernizes and updates the 1978 Regulations to streamline environmental review and increase public participation and address current environmental issues. The Final Rule recognizes federal agencies' obligation under NEPA to identify, analyze, and consider alternatives and mitigation measures for the reasonably foreseeable direct, indirect, and cumulative effects, including "climate change related effects," and impacts to environmental justice communities for all major federal actions. *See* 40 C.F.R. §§ 1508.1(g), 1502.16(a)(1)-(2), (7)-(12).

On May 21, 2024, Plaintiff States filed this action seeking to set aside the Final Rule and reinstate the 2020 Rule, including the provisions that improperly weakened NEPA review. *See* ECF No. 1, 39. On August 2, 2024, Defendant States moved to intervene to protect their sovereign and proprietary interests in ensuring that federal agencies conduct environmental review in accordance with NEPA's language, purpose, and intent. ECF 63.

**RESPONSE TO PLAINTIFF STATES' STATEMENT OF MATERIAL FACTS**

Defendant States do not believe a response to Plaintiff States' Statement of Uncontested Facts is necessary because the decision in this case will be based on the administrative record. However, Defendant States provide the following response to Plaintiff States' Statement of Uncontested Facts to advise the Court of the many instances where Plaintiff States have improperly labeled unsupported allegations and arguments as "uncontested" and "material" "facts."

At page 6, paragraph 5, Plaintiff States assert that, in the decades since 1978, NEPA implementation has "ballooned far beyond Congress' twin aims" of requiring agencies to: (1) consider significant environmental impacts of proposed actions, and (2) inform the public that

it has considered environmental concerns in its decision-making process. Plaintiff States complain of purported "lengthy . . . nearly unintelligible" NEPA reviews, "development paralysis," and outdated regulations that have not kept "pace with technological advances and best practices." These assertions are not material, and they are not supported by citations to the administrative record. Plaintiff States instead improperly cite to partisan think tank position papers.

At pages 6-7, paragraph 6, Plaintiff States purport to describe the 2020 Rule and cite to a fact sheet without referencing the administrative record. The 2020 Rule is described in the Final Rule, which also discusses litigation over the 2020 Rule and CEQ's review of the 2020 Rule. *See* 89 Fed. Reg. at 35446-47; AR 28766- 28767.

At page 7, paragraph 7, Plaintiff States improperly misconstrue and attack the current Administration's rationale for implementing the Final Rule. The Final Rule describes the role of CEQ generally at 89 Fed. Reg. at 35445, AR 28765. The rationale for the Final Rule is summarized at 89 Fed. Reg. at 35447, AR 28767.

At page 7, paragraph 8, Plaintiff States improperly, and without reference to the administrative record or any legislative history to confirm congressional intent, describe CEQ's changes in the Final Rule as being responsive to "gamesmanship of the NEPA process."

Finally, at page 8, paragraphs 9 and 10, Plaintiff States make unsupported arguments about the purported effects of and "flaws in" CEQ's Final Rule. At paragraph 10, Plaintiff States make arguments about the rationale for the Final Rule and ways in which it changes how NEPA operates. Neither set of arguments is grounded in the administrative record.

**STANDARD OF REVIEW**

NEPA claims are reviewed pursuant to the APA, 5 U.S.C. § 706; *Voyageurs Nat. Park Ass'n v. Norton*, 381 F.3d 759, 763 (8th Cir. 2004) (citing 5 U.S.C. § 706) ("Judicial review of administrative decisions is governed by the Administrative Procedure[] Act ('APA')."). Under the APA, a court may "set aside agency action only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. § 706(2)(A).

Agency action is arbitrary and capricious "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co*., 463 U.S. 29, 43 (1983). "If an agency's determination is supportable on any rational basis, [a court] must uphold it," particularly "when an agency is acting within its own sphere of expertise." *Voyageurs Nat'l Park Ass'n*, 381 F.3d at 763.

Plaintiff States claim CEQ's changes in the Final Rule exceed its statutory authority. The U.S. Supreme Court recently clarified that agency interpretations of statutes are subject to "respect." *Loper Bright Enter. v. Raimondo*, 144 S. Ct. 2244, 2267 (2024). Because CEQ is operating within clearly delegated authority under NEPA, Defendant States' defense of the Final Rule is not based on deference to the agency. *Loper Bright*, 144 S.Ct. at 2257.

All parties move for summary judgment as a matter of law. "Summary judgment is proper if, after viewing the evidence and drawing all reasonable inferences in the light most favorable to the nonmovant, no genuine issue of material fact exists and the movant is entitled

to judgment as a matter of law." *Christoffersen v. Yellow Book USA*, 536 F.3d 947, 949 (8th Cir. 2008) (citing Fed. R. Civ. P. 56).

## ARGUMENT

Defendant States have standing to defend the Final Rule, the Final Rule does not violate NEPA, the APA, or the Major Questions Doctrine, and therefore the Court should grant Defendant States' partial motion for summary judgment upholding the Final Rule.[5] Additionally, Plaintiff States' arguments have no merit in law and, accordingly, their motion for summary judgment should be denied.

## I.    DEFENDANT STATES HAVE STANDING TO DEFEND THE FINAL RULE.

Defendant States meet the requirements for Article III standing. "The requirements for Article III standing are: (1) injury, (2) causation, and (3) redressability." *Nat'l Parks Conservation Ass'n v. U.S. Env't. Prot. Agency*, 759 F.3d 969, 974 (8th Cir. 2014). At the summary judgment stage, standing must be supported by reference to specific facts. *Young Am.'s Found. v. Kaler*, 14 F.4th 879, 888 (8th Cir. 2021). Furthermore, where multiple parties seek the same relief, the standing of one party satisfies the standing requirements for all parties seeking that relief. *Horne v. Flores*, 557 U.S. 433, 446 (2009) (citing *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 263-64, 265 n.9 (1977) (because individual plaintiff had standing to challenge discriminatory zoning ordinance, housing development authority also had standing to challenge ordinance)).

---

[5] Defendant States move for summary judgment on count one, two and four of the claims in Plaintiff States' Complaint. ECF 39.

**A.    Defendant States Satisfy the Injury Requirement for Standing Because Their Interests Would Be Harmed If the Final Rule Were Vacated.**

Defendant States satisfy the injury prong of Article III standing.  An intervenor-defendant satisfies the injury requirement if granting plaintiff's remedy would cause or threaten imminent injury to the intervenor-defendant. *South Dakota v. Ubbeholde*, 330 F.3d 1014, 1024 (8th Cir. 2003); *Am. Civil Liberties Union of Minn. v. Tarek ign Ziyad Acad.*, 643 F.3d 1088, 1092-93 (8th Cir. 2011).

**1.    The Final Rule Protects Defendant States' Interests in Natural Resources, and Loss of These Protections If the Final Rule Were Vacated Would Harm These Interests.**

Defendant States possess sovereign and proprietary interests in—and concomitant obligations to protect—natural resources that would be injured if the Court grants Plaintiff States the relief requested in this action.[6] Specifically, if the Court grants Plaintiff States' prayer for relief, vacating the Final Rule, provisions of the 2020 Rule may be reinstated. Defendant States could not depend on the Final Rule's requirements for rigorous environmental review to ensure that federal agencies fully consider and disclose the adverse environmental effects of federal actions on the interests of Defendant States.[7]

For one example, hydroelectric projects licensed by the Federal Energy Regulatory

---

[6] In their amended complaint, Plaintiff States ask that the 2020 Rule be reinstated. ECF No. 39 at 29.  As Defendant States note in Part V of this motion, reinstatement of the 2020 Rule would be improper, given superseding statutory amendments to NEPA and the Phase 1 Rule, which Plaintiff States did not challenge.

[7] These requirements include: (1) repeal of "thresholds" promulgated by the 2020 Rule that excused NEPA review of actions based on vague standards of "functional" NEPA compliance via review under another statute and "inconsistency" of NEPA with congressional intent of another statute, *compare* 40 C.F.R. § 1501.3(a) (2024), *with* 40 C.F.R. § 1501.1(a) (2020), and (2) the reinstatement from 1978 regulations of the context and intensity framework for analyzing significance, including consideration of effects on historic or cultural resources, park lands, Tribal sacred sites, prime farmlands, wetlands, wild and scenic rivers, or ecologically critical areas, *compare* 40 C.F.R. § 1501.3(d) (2024), *with* 40 C.F.R. § 1501.3(b) (2020).

Commission ("FERC") affect Defendant States' interests in rivers. Vacating the Final Rule would mean a less comprehensive environmental review of FERC relicensing proceedings, harming these interests. Maine's Waterway Development and Conservation Act requires hydroelectric projects to mitigate environmental harms. Me. Stat. tit. 38, §§ 631, 633, 636. Maine therefore has an interest in preventing harms from the 65 FERC-licensed hydroelectric projects licensed in the state. *Complete List of Active Licenses*, FERC.gov, https://www.ferc.gov/licensing (last visited Aug. 22, 2024). Wisconsin holds navigable waters in public trust for fishing, hunting, recreation, and scenic beauty. *Wis.'s Envtl. Decade, Inc. v. Dep't of Nat. Res.*, 271 N.W.2d 69, 72 (Wis. 1978). Wisconsin's ability to enforce its public trust obligations is affected by the 72 FERC-licensed hydroelectric projects in the state. FERC.gov, *supra*.

Western Defendant States with a large federal public domain have a particular interest in the effects of federal land management plans on their natural resources. For instance, California is comprised of approximately 48 percent public lands and activities on federal lands affect California's interests. AR 25624. California owns waters in the state for the public benefit. Cal. Water Code §§ 102, 105. The reliability and quality of California's water supply depends on protection of its forest watersheds. California protects watersheds on non-federal lands through its Forest Practice Act. *See* Cal. Pub. Res. Code §§ 4512, 4513. However, approximately 60% of California's water supply originates in national forests. U.S. Dep't of Agric., *National Forests in California: Nature's Benefits-Water* 1 (2023), https://www.fs.usda.gov/Internet/FSE_DOCUMENTS/fseprd543954.pdf. Plans for national forest management therefore have a profound impact on California's water supply. Federal

lands comprise over a third of Colorado. Cong. Research Serv., *Federal Land Ownership: Overview and Data* 7 (2020), https://crsreports.congress.gov/product/pdf/R/R42346. Colorado relies on the NEPA process to provide input on range management plans that affect its water resources and fish and wildlife habitat. *See, e.g.*, Notice of Availability of the Record of Decision for the Approved Eastern Colorado Resource Management Plan, 89 Fed. Reg. 3689 (Jan. 19, 2024). Oregon's Department of Fish and Wildlife manages the state's fish and wildlife resources and their habitat for the benefit of residents; these resources are affected by land use management plans governing the 53 percent of lands in Oregon owned by the federal government. Declaration of Sarah Reif ¶ 4 (**Exhibit A**).

Reduced environmental review under a vacated Final Rule would harm Washington's natural resources which generate more than $200 million in annual financial benefits to state public schools, institutions, and county services. Vacatur of the Final Rule would leave federal agencies with less information about climate change impacts and a reduced ability to implement meaningful mitigation measures, worsening and accelerating the impacts of climate change in Washington. Declaration of Joenne McGerr ¶ 12 (**Exhibit B**). The resulting mismatch between NEPA and the Washington State Environmental Policy Act process would place an additional burden on Washington State agencies and add additional costs to the environmental review process. Declaration of Joenne McGerr ¶ 14.

> **2.    Defendant States' Natural Resource Interests Are Impacted by Climate Change, and Vacatur of the Final Rule's Requirements to Analyze Climate Effects Would Impair Defendant States' Ability to Evaluate and Comment on Climate Impacts Affecting Their Interests.**

It is particularly important that federal agencies make fully informed decisions regarding climate effects, which impact Defendant States' interests in natural resources—

including coastal resources—and their economies. As a result, many Defendant States have adopted commitments to curbing greenhouse gas emissions. *See, e.g.*, D.C. Code § 8-151.09d; 20 Ill. Comp. Stat. 3855/1-5; Me. Stat., tit. 38, §§ 576-A to 578; Mich. Comp. Laws §§ 460.1001-.1211; N.J. Stat. Ann. § 26:2C-38; N.M. Exec. Order 2019-003; Wis. Exec. Order. 38. The Final Rule requires appropriate analysis of the climate effects of a proposed federal action and reasonable alternatives. 40 C.F.R. §§ 1502.14, 1502.16(a)(6). Elimination of these requirements would reduce protections for Defendant States' sovereign and proprietary interests in natural resources, hindering the ability to evaluate and comment on the environmental impacts of proposed federal actions and frustrating their ability to meet emissions reductions commitments.

For example, the District of Columbia has already experienced a 300 percent increase in nuisance flooding along the Potomac and Anacostia Rivers due to sea-level rise and subsidence; climate change is predicted to raise water levels another 3.4 feet by 2080 and increase extreme rain events, worsening flood damage. Climate Ready DC, *The District of Columbia's Plan to Adapt to a Changing Climate* 3 (2016), https://doee.dc.gov/sites/default/files/dc/sites/ddoe/ service_content/attachments/CRDC-Report-FINAL-Web.pdf.

Massachusetts' state environmental review statute requires consideration of reasonably foreseeable climate impacts of proposed projects. Declaration of Tori T. Kim ¶ 8 (**Exhibit C**). Projects reviewed under this statute include many also subject to NEPA review, and Massachusetts often coordinates joint environmental review with federal agencies or provides input on NEPA review. *Id*. ¶¶ 13-14, 17. Vacating the Final Rule would deprive Massachusetts

of valuable data on climate impacts of proposed actions, harming its natural resources impairing its ability to meet climate reduction targets. *Id.* ¶¶ 18-19.

Michigan's public trust doctrine obligates it to protect public rights in the Great Lakes, including fishing and recreation. *Glass v. Goeckel*, 703 N.W.2d 58, 74-75 (Mich. 2005). Climate change will warm the Great Lakes, and the resulting loss of winter ice cover—which has already shrunk by 63 percent since the 1970s—will reduce opportunities for ice fishing and snowmobiling, harming local economies. Envtl. Prot. Agency, *What Climate Change Means for Michigan* 1-2 (2016), https://19january2017snapshot.epa.gov/sites/production/files/2016-09/documents/climate-change-mi.pdf.

New Jersey has enacted a number of statutes to protect its coast, including the Waterfront Development Act and the Coastal Wetlands Act. N.J. Stat. Ann. §§ 12:5-3, 13:0A-1. Yet New Jersey's coastline is expected to rise 1.4 feet by 2050, and climate-change driven increases in precipitation are expected to worsen flooding, degrading water quality and increasing harmful algal blooms. N.J. Dep't of Envtl. Prot., Scientific Report on Climate Change 42-43 (2020), https://dspace.njstatelib.org/bitstreams/ebcee53e-0050-4896-8f2b-b84f0721f470/download.

New Mexico holds 9 million acres of surface estate in trust for the benefit of public schools, hospitals, colleges, and other public institutions. *About*, N.M. State Land Office, https://www.nmstatelands.org/about/ (last visited Aug. 24, 2024). Fees and leases for purposes such as grazing, water, and recreation generated a significant portion of the $2.7 billion in revenues state trust lands generated in 2023. *Id.*; N.M. State Land Office, Revenues by Source: 1989-2023 (2023), https://www.nmstatelands.org/wp-content/uploads/2023/12/SLO-Revenue-

1989-2023_FINAL.pdf. Climate change threatens to intensify drought, degrading these resources and reduce the revenue they generate. *See* NOAA Nat'l Ctr. For Envtl. Info., State Climate Summaries 2022: New Mexico, https://statesummaries.ncics.org/chapter/nm/.

New York owns the wildlife, numerous water bodies, and millions of acres of park and forest lands within its borders. Declaration of Lawrence H. Weintraub ¶ 9 (**Exhibit D**). Climate change will negatively impact these resources and the public health benefits they provide, such as clean drinking water. *Id*. ¶ 13. Climate-change caused sea-level rise along New York's 1,850 miles of tidal coastline—which includes critical infrastructure—and will exacerbate flooding and damage from events like 2012's Superstorm Sandy, which killed 53 New Yorkers and saddled the state with $30 billion in recovery costs. *Id*. ¶ 14.

Washington's marine shellfish and salmon populations are predicted to decline steeply due to climate change, costing its fishing industry billions of dollars in lost revenues. Declaration of Joenne McGerr ¶¶ 7-8. Sea-level rise will damage coastal infrastructure and erode coastline, damaging wildlife habitat and tribal lands. *Id.* ¶ 6. Inland, drier climate is predicted to increase by 300 percent the area burned by fire, putting homes and residents at risk and potentially decreasing revenue from state-owned lands. *Id.* ¶ 9.

### B.    Defendant States Satisfy the Traceability Requirement for Standing Because Plaintiff States' Remedy Would Vacate the Final Rule.

An intervenor-defendant satisfies the causation—or traceability—requirement if the defendant's conduct resulting from granting plaintiff's remedy would cause the prospective injury to intervenor-defendant. *See Am. Civil Liberties Union of Minn.*, 643 F.3d at 1093. If Plaintiff States' suit is successful, CEQ would be compelled to implement the requested remedy—vacatur of the Final Rule and reinstatement of provisions of the 2020 Rule. As

described above, vacatur of the Final Rule would harm Defendant States' interests, and

therefore Defendant States meet the traceability requirement. *See id.* ("[W]hen the defendant

will be compelled to cause the alleged injury to the intervenor if the plaintiff prevails, the

intervenor satisfies the traceability requirement.").

      C.    **Defendant States Satisfy the Redressability Requirement for Standing Because Denial of Plaintiff States' Remedy Would Prevent Injury to Defendant States Caused by Vacating the Final Rule.**

An intervenor-defendant satisfies the redressability requirement if denial of plaintiff's

remedy would prevent prospective injury. *Id*. Defendant States satisfy the redressability

requirement because denial of Plaintiff States' claims would preserve the rigorous

environmental review requirements of the Final Rule and prevent prospective injuries to

Defendant States' interests described above. *See id.* (redressability satisfied if court denies

relief that would compel defendant to cause injury to intervenor).

In sum, Defendant States meet the injury, traceability, and redressability requirements

of Article III standing.

**II.    THE FINAL RULE IS CONSISTENT WITH NEPA AND DOES NOT EXCEED CEQ'S AUTHORITY UNDER THE STATUTE.**

Plaintiff States contend CEQ exceeded its authority in the Final Rule by improperly

creating substantive obligations that exceed the scope of NEPA. ECF 39 at 24-26; Iowa Br.

(ECF 65) at 21-25. Plaintiff States identify the following provisions of the Final Rule which

purportedly violate NEPA: (a) addressing climate change, global impacts, and environmental

justice; (b) adding conditions that restrict the use of categorical exclusions; (c) incorporating

indigenous knowledge as reliable evidence in NEPA reviews; (d) requiring identification of an

"environmentally preferred alternative"; and (e) compelling the adoption of mitigation

measures. Iowa Br. at 19-20; ECF 39 at 25. These arguments fail because the Final Rule does not compel substantive outcomes and is consistent with and supported by NEPA's text and purpose, case law, CEQ guidance, and historical agency practice.

### A.    Congress Delegated CEQ Broad Authority to Implement NEPA's Comprehensive System for Reviewing Environmental Impacts.

Plaintiff States' claim that the Final Rule exceeds CEQ's authority is simply meritless. The plain language of NEPA promotes an unequivocal policy of environmental protection. This policy is achieved through transparent analysis, public engagement, and robust considerations of the environmental consequences and alternatives to federal projects, all of which foster better federal agency decision making and promote enhancement of the environment. *See generally* 42 U.S.C. § 4321 *et seq*. NEPA declares that it is "a national environmental policy" of the Federal Government "to use all practicable means and measures . . . to foster and promote the general welfare," to create "productive harmony," and to "fulfill the needs of 'present and future generations." 42 U.S.C. § 4331(a). Congress "authorize[d] and direct[ed] that, to the fullest extent possible," policies, regulations and "shall" be "interpreted and administered" in accordance with NEPA's goals. 42 U.S.C. § 4332(2).

NEPA established CEQ and directed the agency to promulgate regulations providing methods and procedures to ensure that "environmental amenities and values may be given appropriate consideration in decision making along with economic and technical considerations." 42 U.S.C. §§ 4321 (establishing CEQ), 4332(2)(B); *see also* §§ 4342, 4344. Plaintiff States' challenge fails because NEPA broadly grants CEQ the authority to determine the environmental values to be considered in decision making and the Final Rule is a valid exercise of CEQ's authority aimed at achieving the purpose and need of the statute. 42 U.S.C.

§§ 4321, 4331(a), (b)(2), (b)(4), (c).

    **B.**    **The Final Rule Properly Recognizes the "Action-Forcing" Nature of NEPA Without Adding Substantive Requirements.**

Plaintiff States argue that CEQ's removal of language from the 2020 Rule referencing NEPA's procedural nature (formerly at 40 C.F.R. § 1500.1(a); AR 43436) and addition of the term "action-forcing" into the rule's text "sets the table" for further *ultra vires* substantive changes. Iowa Br. at 21-22; 89 Fed. Reg. at 35449-50, 35554. Without offering any evidence to support this theory, Plaintiff States contend this change transforms the NEPA process by making its goal "not to examine effects" but to "force outcomes." Iowa Br. at 21-22.

On the contrary, this change merely restores language that existed for over forty years and that was removed by the 2020 Rule. 85 Fed. Reg. at 43316; *compare* AR 42708 (1978 regulations) ("Section 102(2) contains action-forcing provisions to make sure that federal agencies act according to the letter and spirit of the Act"), *with* 89 Fed. Reg. at 35554 ("Section 102(2) of NEPA establishes procedural requirements to carry out the policy and responsibilities established in section 101 of NEPA and contains 'action-forcing' procedural provisions to ensure Federal agencies implement the letter and spirit of the Act.") As CEQ points out in the Final Rule, the change is entirely consistent with statutory text and with case law interpreting it. 89 Fed. Reg. 35450-51; AR 28770071.

Reverting to the 1978 language reflects CEQ's long held understanding that, while NEPA is "procedural," those procedures are inherently "action-forcing" because they "assure consideration of the environmental impact of [federal agency actions] in decisionmaking." *Kleppe v. Sierra Club*, 427 U.S. 390, 409 (1976) (citing Conference Report on NEPA, 115 Cong.Rec. 40416 (1969)). As the Supreme Court noted, complying with NEPA's procedures

"[is] almost certain to affect the agency's substantive decision" even if "NEPA itself does not mandate particular results, but simply prescribes the necessary process." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989). This "action-forcing" component ensures that environmental concerns are "integrated into the very process of agency decision-making." *Andrus v. Sierra Club*, 442 U.S. at 349-50 (1979); *see also Sierra Club v. U.S. Army Corps of Engineers*, 446 F.3d 808, 815 (8th Cir. 2006); S. Rep. No. 91-296, at 9 (1969) ("[I]f goals and principles are to be effective, they must be capable of being applied in action. [The proposed NEPA bill] thus incorporates certain "action-forcing" provisions and procedures which are designed to assure that all Federal agencies plan and work toward meeting the challenge of a better environment.").

Finally, CEQ explained that, in making this change, it intended to update the regulations to implement the "procedural provisions" of NEPA to "ensure that agencies use the information gathered and analyzed in an environmental impact statement ("EIS") in their decision-making processes" with the goal of facilitating better "environmental outcomes." *See* 89 Fed. Reg. at 35495, 35450, 35442; AR 28762. CEQ stated that it "does not consider it necessary to repeatedly emphasize the procedural nature of NEPA which may suggest that NEPA mandates a rote paperwork exercise and de-emphasizes the Act's larger goals and purposes" AR 27942. As explained below, Plaintiff States fail to identify any specific provision of the Final Rule that does more than compel "consideration" of impacts on the environment, which is exactly what Congress intended and the statute requires. 42 U.S.C. § 4332(2)(B).

**C.    The Final Rule Properly Emphasizes That Climate Change and Environmental Justice Are Parts of Environmental Review.**

Plaintiff States challenge the Final Rule's provisions related to "environmental justice" and "climate change" on the sole basis that those terms are not explicitly mentioned in the statute. Iowa Br. at 21-22. Plaintiff State's simplistic textual argument is meritless. *Id.* Plaintiff States argue that climate change and environmental justice are not within "NEPA's statutory mandate," but do not explain how requiring agencies to gather information on and analyze these impacts on the "human environment," steps which can only facilitate better agency decision-making, violates the statute. Iowa Br. at 23; 42 U.S.C. § 4332(c). Further, none of the specific provisions cited by Plaintiff States actually do what Plaintiff States claim—i.e., compel substantive outcomes in violation of NEPA.

NEPA champions broad policy goals aimed at environmental protection by requiring thorough evaluation of environmental impacts. Again, its focus on the health and welfare of people to ensure that humans and nature can exist in productive harmony is meant to fulfill the social, economic, and other requirements of present and future generations. 42 U.S.C. § 4331(a). Given NEPA's purpose, it is entirely consistent that impacts from climate change and potentially disparate impacts on vulnerable communities are encompassed within the scope of environmental impacts that agencies must consider under NEPA.

Given the risks posed to the "human environment," 42 U.S.C. § 4332(c), by climate change and the enduring, historical legacy affecting environmental justice communities, it naturally follows that CEQ would formalize these concerns in environmental reviews and safeguard the environment for "future generations," 42 U.S.C. §§ 4331(b)(1), (b)(2) ("[Federal government is to] assure for all Americans, safe, healthful, . . . and culturally pleasing

surroundings"). Plaintiff States' argument that "reading [climate change and environmental justice] into the text of NEPA (Iowa Br. at 23) is not within the purview of CEQ" is meritless.

The statute left the determination of what direction to provide agencies to CEQ. AR 27880 (CEQ has long identified the types of environmental impacts agencies should consider). Through NEPA's implementing regulations, CEQ has long advised agencies regarding a broad range of environmental effects that they should analyze. 40 C.F.R. § 1509.8 (1978) (directing agencies to consider growth inducing effects and other effects related to induced changes in the pattern of land use, population density or growth rate, and related effects on air and water and other natural systems . . ."); 40 C.F.R. § 1508.27 (1978) (factors to assess significance, including "public health and safety," cumulative impacts, and protected wildlife); 40 C.F.R. § 1501.3(b)(1) (directing agencies to consider impacts to listed species and designated habitat). Adding climate change and environmental justice to this list aligns with CEQ's responsibility to ensure that federal agencies comply with NEPA and fulfill its stated objectives. 42 U.S.C. § 4332(2)(B); *see also* 42 U.S.C. §§ 4342, 4344. This is nothing new. CEQ's 1978 Regulations identified effects that it believed would frustrate achievement of those goals, and CEQ's 2024 regulations do the same.

Moreover, it is nothing new for CEQ to require analysis of both the effects of greenhouse gas emissions and the distributional inequities of environmental impacts in environmental reviews. CEQ has provided guidance to agencies on how to evaluate the effects of greenhouse gas emissions since 2016 and environmental justice has been recognized as a concern by the federal government for even longer. AR 1739, 2916, 25619, 27873-77, 33077.

    *i.*     *Climate Change*

The following provisions in the Final Rule pertain to climate change: AR 43438 (agencies should identify "alternatives that will reduce climate-change related effects"); 40 C.F.R. §§ 1500.2(e), 1502.14(f) (environmentally preferable alternative), 1502.16(a)(6) ("where feasible", quantification of greenhouse gas emissions), and 1508.1(o) (consider climate in extraordinary circumstances in deciding whether to use a categorical exclusion). *See* 89 Fed. Reg. at 35554, 35565, 35566, 35575. Plaintiff States do not show that CEQ has acted improperly in adopting these provisions. Iowa Br. at 22-23. Their argument consists of a summary list of the specific changes and the assertion that climate change "is not inexorably part of NEPA" and that such analysis should be determined on a case-by-case basis and not predetermined by CEQ. Iowa Br. at 23. This argument is not persuasive.

As NEPA declares, it is the federal government's responsibility to avoid environmental degradation; preserve historic, cultural, and natural resources; and "attain the widest range of beneficial uses of the environment without degradation, risk to health or safety, or other undesirable and unintended consequences." 42 U.S.C. § 4331(b). NEPA also explicitly recognizes the "worldwide and long-range character of environmental problems." 42 U.S.C. § 4332(I). NEPA specifically requires that EISs include information on impacts that are "reasonably foreseeable." 42 U.S.C. § 4332(C)(i).

Given the statute's directive and the evidence in the administrative record demonstrating the climate change is a pervasive, long-range environmental challenge (AR 27856-27857 ("tackling the climate crisis"), CEQ was well-within its authority to advise agencies how to conceptualize such impacts in its implementing regulations. "Climate change has implications for numerous categories of effects from species to water to air quality" and it

is therefore "a particularly important environmental trend for agencies to consider in addressing the affected environment." AR 28825; 42 U.S.C. § 4321, 4331, 4332(2)(c)(iv). Plaintiff States have not shown or attempted to show how CEQ exceeds its authority by issuing a regulation requiring agencies to consider and address these threats as part of their NEPA review. Suggesting that "such analysis should be conducted on a case-by-case basis" (Iowa Br. at 23) is not evidence that CEQ has exceeded its authority.

Agencies have for some time already been analyzing and assessing climate impacts with NEPA review when climate change related impacts are "reasonably foreseeable." 40 C.F.R. § 1508.1(g). Courts have set aside agency actions, based upon the plain language of NEPA and the 1978 regulations, because the agency failed to evaluate a project's impacts to climate change during a NEPA review, where such impacts were "reasonably foreseeable." 89 Fed. Reg. at 35508; AR 28828. This is because various courts recognize that "[t]he impact of GHG emissions on climate change is precisely the kind of cumulative impacts analysis that NEPA requires agencies to conduct." *See Ctr. for Biological Diversity v. Nat'l Highway Transportation Safety Admin.*, 538 F.3d 1172, 1217 (9th Cir. 2008); 89 Fed. Reg. at 35452 n.58; AR 28772; *WildEarth Guardians v. U.S. Bureau of Land Mgmt.*, 870 F.3d 1222 (10th Circ. 2017) (invalidating an EIS and Record of Decision for coal leases for failing to consider climate change); AR 27881.

CEQ received comments on its proposal to codify the 2023 GHG guidance in its Final Rule, but it opted not to do so, with one exception concerning the quantification of GHG emissions. AR 28814. Plaintiff States claim that this requirement in 40 C.F.R. § 1506.16(a)(6) to quantify emissions when *feasible* will necessarily "drive agency decisions towards whatever

minimizes greenhouse gas emissions around the globe." Iowa Br. at 23. However, all the Final

Rule does is require *analysis* of climate change effects. In this way, the Final Rule is

admittedly "action-forcing," by directing agencies to plan and work towards producing a better

outcome for the environment, but it is not, as Plaintiff States contend, "action-driving." The

Final Rule requires analysis. It does not mandate a substantive outcome. CEQ expressly

limited its request to quantify emissions to instances where it is "feasible," 40 C.F.R. §

1506.16(a)(6), and did not dictate how federal agencies balance climate change impacts

amongst potentially competing concerns to make decisions on projects, AR 35452 (CEQ

affirms that "NEPA does not dictate a particular outcome.")

    *ii.*    *Environmental Justice*

      CEQ defines environmental justice as "the just treatment and meaningful involvement

of *all people* . . . in agency decision making and other Federal activities that affect human

health and the environment so that people . . . are fully protected from disproportionate and

adverse environmental effects." 89 Fed. Reg. at 35575 (emphasis added).

      The Final Rule refers to "environmental justice" in the following provisions: it adds

definitions of "environmental justice" and "communities with environmental justice concerns,"

*see* 89 Fed. Reg. at 35575 (40 C.F.R. §§ 1508.1(f), 1508.1(m)); AR 43506-98; it directs

agencies to identify alternatives that "address adverse health and environmental effects that

disproportionately affect communities with environmental justice concerns," 89 Fed. Reg. at

35554-55 (40 C.F.R. § 1500.2(e)); AR 43438; and it directs agencies to consider

"environmental justice" when identifying an "environmentally preferable alternative," *see* 89

Fed. Reg. at 35565 (40 C.F.R. § 1502.14(f)); AR 43,474. Impacts to environmental justice

communities can also be considered environmental effects that are "significant" under the statute. 89 Fed. Reg. at 35556-57 (40 C.F.R. § 1501.3(d)(1)); AR 43446-47.

Plaintiff States argue that CEQ has exceeded its authority in adopting these changes, again, because NEPA does not explicitly mention "environmental justice." Iowa Br. at 22. Plaintiff States offer no evidence or analysis to demonstrate that these changes actually violate NEPA. In addition to the unsubstantiated textual argument, Plaintiff States argue CEQ violates NEPA because "there are no federal laws on the topic [of environmental justice] at all" and therefore that CEQ is not authorized to make the changes it adopts. Iowa Br. at 22.

The concept of environmental justice is clearly encompassed within the scope of NEPA, and the basis for addressing it in the Final Rule, is found in the statute. 42 U.S.C. §§ 4331(b)(2), 4331(c), 4332(c). While NEPA itself does not include the term "environmental justice" (*see* AR 13480–81 (the term "environmental justice" was coined after NEPA's passage)), NEPA makes it the federal government's responsibility to "assure for *all* Americans safe, healthful, productive, and esthetically and culturally pleasing surroundings," 42 U.S.C. § 4331(b)(2) (emphasis added), and states "that *each person* should enjoy a healthful environment," 42 U.S.C. § 4331(c) (emphasis added). Consideration of how a proposed federal action might disproportionately affect *some* Americans more than others is thus a highly relevant consideration under the statute. NEPA's focus on "the quality of the *human* environment" (42 U.S.C. § 4332(c) (emphasis added)), is also a concern advanced by analyzing the distribution of environmental burdens in the human environment. These requirements support evaluating environmental justice concerns during NEPA review.

The legislative history of NEPA also supports consideration of environmental justice in

environmental reviews. Congress indicated that provisions in NEPA require agencies to confront any and all environmental effects that interfere with public health and the quality of the human environment. AR 13480-81. This would necessarily include considering environmental impacts on communities that already bear a disproportionate share of the burden of pollution.

Plaintiff States' contention that there are no federal laws on environmental justice is misleading. Executive Orders by multiple presidential administrations directed its consideration in environmental analysis. AR 33077 (discussing Executive Orders 12898, 14008, and 14096). Indeed, Executive Order 12898 by President Clinton in 1994 and Executive Order 14096 by President Biden in 2023 specifically required federal agencies to consider environmental justice impacts during NEPA review. 89 Fed. Reg. at 35444-45, 35553; AR 28764-65, 28873, 33572-82, 33727-31. CEQ refers to the Executive Orders not to rely on them as a legal basis for its changes, but to demonstrate that consideration of environmental justice impacts has already been required in NEPA reviews. AR 33077. Courts interpret the Executive Orders as "requiring agencies to assess the environmental effects of their actions on environmental justice communities," even if they do not create a private right to judicial review, when analyzing the sufficiency of an agency's environmental justice analysis. *See, e.g.*, *Vecinos para el Bienestar de la Comunidad Costera v. Fed. Energy Regulatory Comm.*, 6 F.4th 1321, 1330 (D.C. Cir. 2021).

Courts have also reviewed NEPA analyses to determine if they appropriately considered environmental justice impacts. *See, e.g.*, *Mid States Coalition for Progress v. Surface Transp. Bd.*, 345 F.3d. 520, 541 (8th Cir. 2003); *Sierra Club v. Fed. Energy*

*Regulatory Comm.*, 867 F.3d 1357, 1370 (D.C. Cir. 2017).

The Final Rule does not mandate substantive results or require federal agencies to select the course of action that best ameliorates an environmental justice concern. Instead, it only requires federal agencies to take a "hard look" at environmental justice effects of the agencies' proposed actions. Further, CEQ adequately explained its reasons for adopting these provisions, rejecting the claim that it was impermissibly elevating certain environmental effects, including environmental justice, over others. AR 27837. CEQ explained that it revised provisions of the 2020 Rule, because it "may have the effect of limiting the scope of NEPA analysis, with negative repercussions for environmental protection and environmental quality, including in critical areas such as climate change and environmental justice." AR 27835-36. In other words, to combat the residual effects of the unlawful 2020 Rule, CEQ found it necessary to explicitly direct that climate and environmental justice impacts should be included in environmental reviews, even though agencies have long been required to analyze those effects where "reasonably foreseeable."

### D.    Indigenous Knowledge Has a Proper Role in Federal Agencies' NEPA Analyses.

Plaintiff States claim CEQ exceeded its authority by incorporating "Indigenous Knowledge" as one form of "high-quality information" to be used in NEPA determinations. 89 Fed. Reg. at 35565 (40 C.F.R. § 1502.15(b)); AR 28885; 40 C.F.R. § 1506.6(b). Pursuant to the Final Rule, "High-quality information" includes "reliable data and resources, models, and Indigenous Knowledge." 89 Fed. Reg. at 35565; AR 28885.

Plaintiff States contend that this change exceeds CEQ's authority because Indigenous Knowledge is not mentioned within the text of NEPA, is allegedly not a source of "high

quality" information, is vague, and should not be given "special status" over other forms of information. Iowa Br. at 24. The argument misconstrues the Final Rule, the administrative record and NEPA itself. And, as discussed in Section III.B, CEQ has amply demonstrated that Indigenous Knowledge is a form of information that can contribute to more thorough analysis of environmental effects in proposed projects.

First, incorporating Indigenous Knowledge as a reliable and relevant source of information is consistent with actions across the federal government where such knowledge is valued in decision-making. AR 41633. Because Indigenous communities often have a deep understanding of their local ecosystems and natural resources as well as traditional practices for sustainable land management, including Indigenous Knowledge in the NEPA process benefits decision-makers to make more informed and culturally appropriate decisions. AR 29029-41 (Department of Interior Policies 2023); AR 41600-45; *see also* Declaration of Geneva E.B. Thompson ("Thompson Declaration") in Support of Intervenor-Defendants' Motion for Summary Judgment ¶¶ 4-6 (**Exhibit E**). For instance, Indigenous Knowledge is relevant to provide "evidence of baseline environmental conditions, including historic and current populations of fish, animal, and plant species, that were informed by daily observation, study, and care passed down by generations." *See* Thompson Declaration ¶ 4. CEQ's decision to seek include Indigenous Knowledge advances NEPA's purpose and does not violate NEPA. *Id*.

Second, Indigenous Knowledge is not a vague term. It has a clear meaning and understanding as defined in guidance from the U.S. Department of the Interior, the agency that oversees the Bureau of Indian Affairs. Indigenous Knowledge refers to bodies of observations,

oral and written knowledge, innovations, technologies, practices, or beliefs developed by

Indigenous peoples from their interactions with the environment. AR 29031-32, 1757

["Indigenous peoples are the best authority in conceptualization . . . of their own IK"].

Third, the Final Rule does not elevate Indigenous Knowledge to "special" status

treatment. Rather, the Final Rule requires agencies to rely on "high-quality information" of any

sort and does not value one source of such information over another. CEQ affirmed that

Indigenous Knowledge is a potential source of information and "do[es] not create a

preference" for one type of information over others. 89 Fed. Reg. at 35525; Iowa Br. at 24.

Whether or not Indigenous Knowledge is expressly mentioned by the statute is

irrelevant to whether it can be considered "reliable" information: other sources of data are not

identified within the text of NEPA—such as statistical models or remotely gathered

information—and yet Plaintiff States do not challenge these as potential sources of

information. 40 C.F.R. § 1506.6(a), (b). Nor are such sources of information uniformly

reliable, but instead their reliability must be assessed on a case-by-case basis.

Because NEPA regulations explicitly require analysis of effects on historical or cultural

resources, 40 C.F.R. §1508.1(i)(4), agency guidance documents pertaining to Indigenous

Knowledge are already in use, AR 41633. Even the 2020 Rule that Plaintiff States seek to

"reinstate," asked agencies to analyze effects on tribal cultural resources and to seek out

information from relevant tribal communities in a similar way. *Compare* 40 C.F.R.

1508.1(i)(4) (2024), *with* 40 C.F.R. 1508.1(g)(1) (2020) (2020 Rule); ECF 39 at Prayer (f).

Plaintiff States' arguments to the contrary are not persuasive.

### E.    Worldwide Impacts Are Relevant Under NEPA and Properly Included in the Final Rule.

Plaintiff States assert that the Final Rule violates NEPA by "categorically dictating" that agencies consider their actions in "global" contexts. *See* Iowa Br. at 24-25; 89 Fed. Reg. at 35557; 40 C.F.R. § 1501.3(d); AR 28877. The Final Rule directs federal agencies, where applicable, to "consider the potential global, national, regional and local contexts" of their actions. 40 C.F.R. § 1501.3(d)(1).

Adding "global" to the lists of "contexts" is consistent with and even mandated by NEPA, which states "to the fullest extent possible" federal agencies "shall . . . recognize the worldwide and long-range character of environmental problems." 42 U.S.C. § 4332(I). Courts have interpreted NEPA to require analysis of federal actions which will cause an extra-territorial impact. AR 2920 (listing applicable cases).

Plaintiff States argue inserting the word "global" creates a substantive obligation to analyze a project's global effects in instances when its local or national effects might be insignificant. Iowa Br. at 25. It defies common sense that a project could pose a global impact without also posing a national or local impact, and Plaintiff States do not offer any real-life example of this occurrence. Finally, CEQ adequately explained why it added "global" to the list of contexts to be considered, stating it is consistent with "decades of experience agencies had implementing the 1978 regulations" and that the provision "does not require agencies to evaluate all four contexts for every proposed action. Agencies should determine the appropriate contexts to consider based on the scope of the action and its anticipated reasonably foreseeable effects." 89 Fed. Reg. at 35465; AR 28054. Accordingly, Plaintiff States' arguments are unavailing.

**F.    The Final Rule Does Not "Drive" Agencies to Choose the Environmentally Preferable Alternative.**

Plaintiff States assert that the Final Rule's requirement to *identify* an "environmentally preferable alternative," 89 Fed. Reg. at 35503-05, 35565; 40 C.F.R. §§ 1502.12, 1502.14(f), exceeds CEQ's authority and "drive[s]" or puts a "thumb on the scale" of alternatives analysis and amounts to CEQ "expect[ing] agencies to adopt the 'environmentally preferable alternative,' or face a heavier burden for not doing so," Iowa Br. at 25-26. Plaintiff States' argument is without merit.

The Final Rule requires that agencies identify the "environmentally preferable alternative or alternatives" in the draft and final EIS. 40 C.F.R. § 1502.14(f); *see also id.* § 1508.1(*l*) (adding definition for "environmentally preferable alternative"). The Final Rule also requires that the EIS "identify the environmentally preferable alternative or alternatives" 40 C.F.R. § 1502.12.

Plaintiff States do not dispute that NEPA *already* mandates consideration of the reasonably foreseeable effects of potential alternatives and mandates comparison of these effects to support informed federal agency decision making. Iowa Br. at 25 ("under NEPA," there is a "statutory requirement to consider alternatives."); 40 C.F.R. §§ 1502.12, 1502.14(f), 1508.1(n). In addition, implementing regulations have always required agencies to identify the environmentally preferable alternative in a Record of Decision ("ROD") for an agency action. 40 C.F.R. § 1505.2 (2019) and 40 C.F.R. § 1505.2 (2020). The "new" and purportedly objectionable requirement in the Final Rule, according to Plaintiff States, is the identification of an "environmentally preferable alternative" in the EIS. Iowa Br. at 25-26. CEQ has merely moved the identification of the preferred alternative to earlier in the decision-making process

to facilitate transparency. 89 Fed. Reg. at 35504; AR 28824. CEQ adequately explained the basis for its decision to expedite the identification of the environmentally preferable alternative, noting that this addition will enhance the public and decision makers' understanding of the alternatives under consideration, and is consistent with a pre-existing provision, 40 C.F.R. § 1502.14 (b), which requires agencies to discuss alternatives in detail. 89 Fed. Reg. at 35501; AR 28821.

Plaintiff States assert, without evidence, that the new requirement will force agencies to choose the "environmentally preferable" policy. Iowa Br. at 26. That is incorrect. The Final Rule specifically allows agencies flexibility because it does not mandate that agencies select just one environmentally preferable alternative. Instead, it allows for multiple environmentally preferable alternatives, provides elements that the alternative(s) may generally include—with an "or" qualifier to both clarify that the alternative(s) need not maximize each possible environmental benefit listed—and acknowledges that there may be tradeoffs in selecting the alternative(s). 40 C.F.R. § 1502.14(f). CEQ acknowledges that agencies have discretion and should use their expertise to identify alternatives. 89 Fed. Reg. at 35504; AR 28824.

More fundamentally, the requirement that agencies merely *identify* an environmentally preferred alternative or alternatives cannot be said to "drive" an agency to choose that alternative. NEPA specifically provides that CEQ will help shape methods and procedures to guide environmental review processes. 42 U.S.C. § 4332(2)(B). Identifying alternatives during NEPA review is a core procedural requirement. Weighing the various costs and benefits of potential agency actions is not "subjective, open-ended theorizing" but rather the "heart" of NEPA. Iowa Br. at 26; 40 C.F.R. § 1502.14; *see also Wildearth Guardians v. U.S. Bureau of*

*Land Mgmt.*, 870 F.3d 1222, 1226 (10th Cir. 2017) (citing 40 C.F.R. § 1502.14); *Navajo*

*Nation v. U.S. Forest Serv.*, 479 F.3d 1024, 1054 (9th Cir. 2007) (same). However, the Final

Rule does not require a federal agency to adopt the environmentally preferred alternative or

take any substantive action based on this information.

Finally, Plaintiff States argue that, by identifying the "no action alternative" as a

possible environmentally preferable alternative, CEQ somehow increases the "burden" to

"justify[] any development." Iowa Br. at 26-27. However, the Final Rule merely clarifies that

the "environmentally preferable alternative" may be the proposed action, the no action

alternative, or another reasonable alternative. 40 C.F.R. § 1502.14(f). CEQ added this

clarification to address a misunderstanding that the "environmentally preferable alternative"

could not be the proposed action or no action alternatives. 89 Fed. Reg. at 35504; AR 28824.

In sum, Plaintiff States' arguments should be rejected.

### G.    The Final Rule Does Not Compel Mitigation of Environmental Impacts.

Plaintiff States misconstrue the Final Rule as requiring mitigation of environmental

impacts in violation of NEPA. Iowa Br. at 27. Although Plaintiff States acknowledge that

NEPA *presently* requires "the *consideration* of potential mitigation" (Iowa Br. at 27 (emphasis

added)), they allege wrongly, for the reasons discussed below, that the Final Rule requires an

agency to commit to mitigate the significant effects of proposed projects. Iowa Br. at 27. There

is no support for this argument.

According to Plaintiff States, 40 C.F.R. §§ 1505.3(a)(2), 1503.3(a), 1500.2(f),

1505.2(c) explicitly impose mitigation responsibilities. Iowa Br. at 28. That is simply not the

case: *none* of these provisions require agencies to adopt mitigation measures. Section

1505.3(a)(2) addresses funding for projects where an agency has already committed to implement mitigation as part of a reviewed project. 40 C.F.R. § 1505.3(a) ("Mitigation . . . established in the environmental impact statement or during its review and *committed* as part of the decision . . .") (emphasis added). CEQ has not mandated that agencies implement mitigation where the agency has not already independently committed itself to undertake the mitigation. 89 Fed. Reg. at 35517-19; AR 28837-39, 28494-95 (Response to Comments at 664-65). Section 1505.3(b) expresses a policy preference to mitigate for environmental justice concerns "where *relevant and appropriate* . . ." 89 Fed. Reg. at 35569 (emphasis added). Section 1500.2(f) directs agencies to "the fullest extent possible . . . use all practicable means . . . to restore and enhance the quality of the human environment." 89 Fed. Reg. at 35554-55. Section 1505.2(c) requires an agency to "state whether the agency has adopted all practical means to mitigate environmental harm . . . and if not, why not." 40 C.F.R. § 1505.2(c).

The administrative record contradicts Plaintiff States' contention. CEQ explains that agencies "*should*, where relevant and appropriate" incorporate mitigation measures into their decisions to address "significant human health and environmental effects" of their actions. 40 C.F.R. § 1505.3(b) (emphasis added). As CEQ advises, this provision "encourages"—but does not require—agencies to incorporate the referenced mitigation. 89 Fed. Reg. at 35517; AR 28837. Utilizing the term "should" rather than "must" also reflects CEQ's understanding and recognition that its mitigation recommendations in the Final Rule do not bind an agency to undertake specific mitigation measures. AR 24558; 89 Fed. Reg. at 35517; 40 C.F.R. § 1505.3(b). CEQ has not exceeded its statutory authority by including provisions in the Final Rule encouraging mitigation to meet NEPA's goals. 89 Fed. Reg. at 35517; AR 28837.

Plaintiff States incorrectly assert that the Final Rule requires a "monitoring and compliance plan" for mitigation. Iowa Br. at 28 (citing 89 Fed. Reg. at 35518-19, 35569 (40 C.F.R. § 1503(c))). Section 1505.3(c) requires a compliance and monitoring plan only when an agency has based its environmental analysis and findings regarding a project's projected impacts on its commitment to perform mitigation. *Id*. The Final Rule does *not* require "that *each* EIS must now incorporate mitigation and associated monitoring plans." Iowa Br. at 28 (emphasis added).

Plaintiff States contend that CEQ's reintroduction of 40 C.F.R. § 1500.2(f)—a provision which encourages agencies to "use all practicable means and measures, . . . to foster and promote the general welfare, to create and maintain conditions under which man and nature can exist in productive harmony," also exceeds CEQ's authority. Iowa Br. at 28. This provision, which was included in the 1978 Regulations and was eliminated by the 2020 Rule, echoes text taken directly from the NEPA; it is, by definition, consistent with NEPA itself. *See* 1978 Regulations at 40 C.F.R. §1500.2(f); 42 U.S.C. §§ 4331, 4331(a); AR 43512; 89 Fed. Reg. at 35548-49. Again, Plaintiff States arguments should be rejected.

### H. The Final Rule Does Not Impose Policy-Based Restrictions on the Use of Categorical Exclusions Under NEPA.

Plaintiff States object to the Final Rule's revisions to the regulatory provisions regarding categorial exclusions ("CEs") contending that the changes exceed CEQ's authority. Iowa Br. at 30. CEs are the most common and expeditious mode of complying with NEPA. Iowa Br. at 29; Proposed Rule: Update to the Regulations Implementing the Procedural Provisions of the National Environmental Policy Act, 85 Fed. Reg. 1684-01, 1696 (Jan. 10, 2020); AR 29126-27 (noting that Federal agencies have developed and documented more than

2,000 categorical exclusions over the past 40 years and that federal agencies apply categorical exclusions to approximately 100,000 federal agency actions annually). CE's streamline approval for projects that do not have significant environmental effects.[8] Iowa Br. at 30. Plaintiff States contend that CEQ has not shown the need to revise CEs and that the Final Rule impermissibly injects substantive "policy-based" limits on their adoption and use. Iowa Br. at 30. Neither contention is true.

Plaintiff States object to CEQ's addition of climate change and environmental justice impacts to the consideration of whether a CE is appropriate. Iowa Br. at 30. CEQ added "potential substantial disproportionate and adverse effects on communities with environmental justice concerns," and "potential substantial effects associated with climate change" to its definition of "extraordinary circumstances" that limit the use of CEs. 40 C.F.R.§ 1508.1(o); 89 Fed. Reg. at 35575. Plaintiff States' objection is without merit.

CEQ does not develop CEs, agencies do. 40 C.F.R. § 1507.3(c)(8). CEQ simply offers "examples," acknowledging that federal agencies themselves, not CEQ, prepare their own sets of "extraordinary circumstances." AR 28682; 40 C.F.R. § 1507.3(c)(8). Providing these salient examples of potential extraordinary circumstances to guide federal agencies does not "kill the use of CE's for all projects and developments that are disfavored by special interest groups." Iowa Br. at 31. Second, even without mentioning "environmental justice" or "climate change" by name, a potential project that posed significant impacts to climate or to disadvantaged

---

[8] Frequency, however, does not mean use of CEs is without risk of harm. As the Defendant States noted in comments on the proposed 2020 Rule, the Deepwater Horizon offshore oil well project, which resulted in environmental disaster, was approved under a CE. AR 25767 (Comments of Attorneys General of Washington, et al., on Notice of Proposed Rulemaking, 85 Fed. Reg. 1684 (March 10, 2020) at 35).

communities would *already* ordinarily require further analysis regardless of whether CEQ lists them as examples. *See* 42 U.S.C.§§ 4332(C), 4336(b). CEQ amply supported this change to Section 1508.1(o). *See* Section III.A; AR 27885-86. These are not vague policy considerations that are unrelated to NEPA; these are environmental effects that fall squarely within NEPA's scope. AR 27821.

Plaintiff States also attack two other CE requirements in the Final Rule. First, they attack the requirement that inter-agency CE adoption includes verification that no extraordinary circumstances exist and publication of that determination. 89 Fed. Reg. at 35558; 40 C.F.R. §§ 1501.4(e), 1506.3(e). These provisions shine a light into agency decision-making that would otherwise avoid public scrutiny during the NEPA process. CEQ explained its reasoning that the change is consistent with NEPA's goal of increased transparency and its experience in overseeing agency development of CEs. AR 28120-22, 28132.

Plaintiff States similarly object to a second requirement that federal agencies review their CEs every decade. Iowa Br. at 31. This requirement is consistent with long-standing CEQ guidance on CEs. AR 28610-14; AR 6271-88 (2010 guidance requiring review of CEs). CEQ has consistently recognized that "assumptions underlying the nature and impact of activities encompassed by categorical exclusions have changed over time." 40 C.F.R. § 1500.6 (1978) (2020) (2024).

The Final Rule does not overstep CEQ's authority. It does not even preclude the use of CEs when extraordinary circumstances exist. 40 C.F.R. § 1501.4(b)(1) provides that "[i]f an extraordinary circumstance exists, the agency nevertheless may apply the categorical exclusion if the agency conducts an analysis and determines that the proposed action does not in fact

have the potential to result in significant effects notwithstanding the extraordinary circumstance, or the agency modifies the action to avoid the potential to result in significant effects." The Final Rule provides additional guidance, accountability, and transparency for the use of CEs under NEPA.

### III. THE FINAL RULE IS RATIONALLY SUPPORTED AND CEQ COMPLIED WITH THE APA IN ADOPTING THE FINAL RULE.

Despite CEQ's hundreds of pages of thorough explanation and analysis in its rulemaking on the Final Rule, Plaintiff States assert that CEQ failed to provide adequate justification for revising NEPA's regulations to restore key language that harmonizes NEPA's implementing regulations with the text and purpose of NEPA. Iowa Br. at 32-36. However, "[a]gencies are free to change their existing policies as long as they provide a reasonable explanation for the change." *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016). An agency must "at least display awareness that it is changing position and show that there are good reasons for the new policy." *Id.* Agencies "must also be cognizant that longstanding policies may have engendered serious reliance interests that must be taken into account." *Id.* at 221-22. The Final Rule clearly satisfies the requirement to provide a reasonable explanation.

### A. CEQ Adequately Justifies the Changes it Adopts in the Final Rule.

Plaintiff States' argument that the Final Rule is "arbitrary and capricious" in violation of the APA is premised on the faulty contention that CEQ reversed the changes enacted in the 2020 Rule without providing meaningful analysis "beyond expressing policy preferences." Iowa Br. at 33-34. This argument is contradicted by the record, which shows careful consideration, evaluation, and explanation of each change CEQ proposed to make to the 2020 Rule. Before CEQ adopted the Final Rule, it published a proposed draft rule for public

comment. Proposed Rule: National Environmental Policy Act Implementing Regulations Revisions Phase 2, 88 Fed. Reg. 49,924 (July 31, 2023); AR 1-065. CEQ included a lengthy preamble acknowledging every point of departure from the 2020 Rule and explaining in detail its justification for each change. After considering public comments, CEQ published the Final Rule in May 2024, and again provided detailed reasoning for each change from the 2020 Rule, explaining where CEQ agreed and disagreed with commenters. *See* AR 27821-28761 (Response to Comments).

Moreover, CEQ retained "many of the changes made in the 2020 [Rule], including changes that codified longstanding practice or guidance or enhanced the efficiency and effectiveness of the NEPA process." 89 Fed. Reg. at 35448; AR 28768. For example, despite commenter opposition, CEQ retained the term "normally" in the definition of categorical exclusion, which was added to that definition in the 2020 Rule. *Id.* at 35537; AR 28857. Additionally, CEQ did not finalize every proposed change from the 2020 Rule. For example, CEQ proposed to strike the first two sentences of 40 C.F.R. § 1501(b) (2020), which provided that "The regulations in this subchapter implement section 102(2) of NEPA," and restore language from the "1978 regulations emphasizing the importance of the early identification of high-quality information that is relevant to a decision." 88 Fed. Reg. at 49,967; AR 7, 44. Based on comments it received, CEQ determined that it would not finalize the proposed revisions. Specifically, CEQ retained the first sentence added in the 2020 Rule but replaced "section 102(2) of NEPA" with the "requirements of NEPA," because "the requirements of NEPA extend[s] to additional sections following the 2023 NEPA amendments." 89 Fed. Reg. at 35451; AR 28771. CEQ also did not restore the language from the 1978 Regulations that

was deleted by the 2020 Rule, explaining that "the text from the 1978 Regulations could be construed as a direction to agencies rather than a statement about the purpose of the CEQ regulations."[9] *Id.*

In selectively picking specific examples of the Final Rule's changes from the 2020 Rule, Plaintiff States overlook the full, detailed reasoning CEQ offered for these changes. Iowa Br. at 33-34. For example, when explaining why it removed language in 40 C.F.R. § 1500.1(a) reiterating that NEPA is a procedural statute, CEQ did not just explain that the language is "an inappropriately narrow view of NEPA's purpose and ignores the fact that Congress established the NEPA process for the purpose of promoting informed decision making and improved environmental outcomes," as Plaintiff States suggest. *See* 89 Fed. Reg. at 35449; AR 28769. Instead, CEQ further explained that "Congress did not establish NEPA to create procedure for procedure's sake, but rather, to provide for better informed Federal decision making and improved environmental outcomes." *Id.* at 35449-450; AR 28770. As CEQ noted, these "goals are not fulfilled if the NEPA analysis is treated merely as a check-the-box exercise." *Id.* As such, CEQ explained that it "does not consider it necessary to repeatedly emphasize in the regulations the procedural nature of the statutory mechanism Congress chose to advance the purposes of NEPA," and that "[d]oing so may suggest that NEPA mandates a rote paperwork exercise and de-emphasizes the Act's larger goals and purposes." *Id.*; *see also* AR 27943-44

---

[9] CEQ also initially proposed to delete the language of paragraph (c) of 40 C.F.R. § 1500.3 (2020), which provided that "t is the Council's intention that any allegation of noncompliance with NEPA and the regulations in this subchapter should be resolved as expeditiously as possible." 89 Fed. Reg. at 35455; AR 28775. One commenter opposed that deletion, explaining that "it is proper for CEQ to express its interest in agencies resolving NEPA compliance issues as soon as practicable." *Id.* After receiving that comment, CEQ determined that it would not finalize that proposal and retained that sentence as the third sentence of 40 C.F.R. § 1500.3(b). *Id.*

(Response to Comments at 112-113).

Similarly, when explaining why CEQ removed the specificity requirements for public comments in former 40 C.F.R. § 1503.3, CEQ did not just simply state that it did not want to place unnecessary burdens on public commenters, as Plaintiff States argue. Iowa Br. at 33 (citing 89 Fed. Reg. at 35512). Rather, CEQ offered a lengthy explanation and various reasons for removing the specificity requirements, while explaining *why* and *how* the former specificity requirements were overly burdensome on commenters. 89 Fed. Reg. at 35512-14; AR 28832-33. For example, CEQ explained that it was removing certain specificity requirements because, among other reasons, they were "unnecessary and duplicative," "vague," or "inappropriate," and to "enhance efficiency." *Id.*

Likewise, CEQ adequately explained that it was removing portions of former 40 C.F.R. § 1500.3(d) because CEQ considers courts to be in the best position to determine the appropriate remedy for successful challenges to an agency's NEPA compliance. 89 Fed. Reg. at 35455; AR 28775. And, contrary to Plaintiff States' suggestion, that explanation is consistent with CEQ's explanation for the revisions to 40 C.F.R. § 1500.3(b), which set forth CEQ's intentions for judicial review of NEPA compliance. For example, in explaining its basis for retaining the second sentence of paragraph (c) of 40 C.F.R. § 1500.3 (2020) in the Final Rule as the third sentence of 40 C.F.R. § 1500.3(b),[10] which sets forth CEQ's intention regarding the speed of NEPA compliance review, CEQ explained that it "cannot compel members of the public or courts to resolve disputes expeditiously," but that the revisions

---

[10] As discussed *supra* footnote 9, CEQ initially proposed to delete the language of paragraph (c) of 40 C.F.R. § 1500.3 (2020), which was added in the 2020 Rule.

appropriately expressed "CEQ's intention, rather than purporting to inappropriately bind those parties to litigation or dictate what timeline is appropriate for any particular case." 89 Fed. Reg. at 35455; AR 28775. Like CEQ's explanation for its changes to 40 C.F.R. § 1500.3(d), CEQ's explanation for its changes to 40 C.F.R. § 1500.3(b) consistently reflects CEQ's position that it cannot direct courts.

In addition, Plaintiff States contend that "the Final Rule arbitrarily and capriciously modifies many of the fundamental aspects of NEPA's implementing regulations" that Plaintiff States have relied on for more than five decades." Iowa Br. at 34. Plaintiff States' argument does not change the fact that CEQ can change its existing policies as long as it provides a reasonable explanation for the change. *See Encino Motorcars*, 579 U.S. at 221. And CEQ displayed an adequate awareness that it was changing its policy position in the Final Rule, and provided a well-reasoned explanation. *See, e.g.*, 89 Fed. Reg. at 35463 (acknowledging that a provision had been in the NEPA regulations since 1978 and explaining the basis for removal); AR 28783. Moreover, Plaintiff States mischaracterize various provisions in the Final Rule as modifications to fundamental aspects of the NEPA regulations that Plaintiff States have relied on for more than five decades. Iowa Br. at 34. For example, Plaintiff States claim that the Final Rule includes a blanket requirement to adopt mitigation measures and prohibits a project proponent or a third-party preparing NEPA documents. *Id.* However, as discussed above, the Final Rule does not compel mitigation of environmental impacts. And, the Final Rule does not prohibit project sponsors or third-party preparation of NEPA documents. *See, e.g.*, 89 Fed. Reg. at 35524; AR 28844. Similarly, Plaintiff States also object to the requirement to quantify greenhouse gas emissions and consider environmental justice considerations. Iowa Br. at 34.

However, as discussed above and as CEQ explained, those additions are "consistent with the text of NEPA, longstanding practice, and case law." 89 Fed. Reg. at 35510; AR 28830.

**B.    The Final Rule Does Not Add Substantial Levels of Uncertainty and Is Reasonably Explained.**

Plaintiff States also argue that the Final Rule is arbitrary and capricious because it allegedly includes uncertain terms that "will foreseeably result in a dramatic expansion of development-stalling litigation," which is inconsistent with the Final Rule's intent to ensure consideration of issues that are relevant to the action in question, improve efficiency and effectiveness of the NEPA process, provide a clear process for evaluating alternatives and effects, and reduce litigation. Iowa Br. at 34-35. As discussed above, environmental justice, climate change, and "Indigenous Knowledge" are not uncertain terms. Moreover, Plaintiff States fail to explain how CEQ's justification for including those terms is internally inconsistent with the Final Rule's intent.

Similarly, Plaintiff States argue that CEQ's decision to add "Indigenous Knowledge" as a form of "high-quality information" that agencies shall use when making NEPA determinations is arbitrary because it is unclear what that term means and CEQ did not define it. For the reasons discussed above, the term "Indigenous Knowledge" is not uncertain. Moreover, CEQ offered a well-reasoned justification for not defining that term in the Final Rule. As CEQ explained in the Proposed Phase 2 Rule, CEQ invited comments on whether it should include a definition of "Indigenous Knowledge" in the regulation. 89 Fed. Reg. at 35481; AR 28801. CEQ received comments for and against including a definition of that term, as well as a comment suggesting that CEQ should engage in tribal consultation on the definition. *Id.* In response to those comments, CEQ held two tribal consultations, "but a

consensus view on a definition did not emerge." *Id.* In the Final Rule, CEQ determined not to define "Indigenous Knowledge" because the "comments CEQ received did not provide an adequate basis for CEQ to determine that providing a definition in the regulations would be workable across contexts and Tribal Nations." *Id.* CEQ further explained that "it considers it appropriate for agencies to have flexibility to approach Indigenous Knowledge in a fashion that makes sense for their programs and the Tribal Nations with which they work." *Id.* As such, CEQ provided a well-reasoned explanation of the general contours of the meaning of "Indigenous Knowledge" and its basis for not defining the term.

Finally, Plaintiff States contend that the Final Rule is arbitrary because the timeline CEQ established for federal agencies to promulgate follow-on regulations is unrealistic, and because CEQ made the Final Rule applicable to ongoing NEPA reviews. Iowa Br. at 36. However, both arguments mischaracterize the Final Rule. With respect to the deadline for follow-on regulations, Plaintiff States claim that CEQ's Final Rule took years to adopt, so it is unrealistic to expect agencies to promulgate follow-on regulations within twelve months and for the public to meaningfully participate in those follow-on rulemaking proceedings. However, as CEQ explained, the Final Rule merely requires agencies to *propose* revisions to their follow-on regulations within twelve months. 89 Fed. Reg. at 35532; AR 28852. An agency does not have to take public comment and finalize its regulations within twelve months. *Id.* With respect to the Final Rule's applicability to ongoing NEPA reviews, Plaintiff States also mischaracterize the Final Rule as applying to ongoing NEPA reviews. Iowa Br. at 36. As CEQ clearly explained, the Final Rule "does not apply to ongoing reviews unless the agency elects to do so and otherwise applies to any NEPA process begun after the effective

date of the final rule." AR 28576 (Response to Comments at 746). Therefore, "agencies do not

have to and should not rewrite NEPA documents."[11] *Id.*; *see also* 89 Fed. Reg. at 35530; AR

28850.

**IV.   THE FINAL RULE DOES NOT IMPLICATE THE MAJOR QUESTIONS DOCTRINE.**

      Plaintiff States argue that "insert[ing] substantive and action-forcing requirements into

NEPA's implementing regulations" and "transforming NEPA reviews into a substantive

directive to achieve the current Administration's policy agenda" are inconsistent with NEPA

under the major questions doctrine. Iowa Br. at 40-41. However, the doctrine's clear-

authorization requirement is triggered only in "extraordinary" cases where the "history and the

breadth of the authority that the agency has asserted," coupled with "the economic and political

significance of that assertion," prompt enhanced skepticism. *West Virginia v. EPA*, 597 U.S.

697, 721 (2022). Here, neither the Final Rule nor its purported impacts raise major questions

that implicate the doctrine.

      Plaintiff States do not identify specific provisions of the Final Rule they claim

impermissibly insert substantive requirements into the regulations implementing NEPA in

violation of the major questions doctrine. Instead, Defendant States infer that Plaintiff States

are referencing provisions described at Section II ("The Final Rule Unlawfully Transforms the

NEPA Process to Achieve Substantive Policy Goals of the Current Administration") of State

Plaintiffs' Brief. That Section argues that CEQ removes language that NEPA is a "procedural

statute" and claims NEPA is "action-forcing" (Section II.A), elevates priorities of

---

[11] An agency's discretion to apply new NEPA regulations to ongoing reviews existed in the
NEPA regulations before this Final Rule and was present in the 2020 Rule. AR 28578
(Response to Comments at 748).

"environmental justice" and "climate change" (Section II.B), requires agencies to choose an "environmentally preferable alternative" (Section II.C), compels mitigation (Section II.D), and restricts categorical exclusions (Section II.E).

First, in describing the Final Rule, State Plaintiffs mistakenly argue that NEPA is exclusively "procedural" and therefore cannot also be "action-forcing." *See* Iowa Br. at 40 (asserting CEQ undertook an "unprecedented effort to insert substantive and action-forcing requirements into NEPA's implementing regulations."). The administrative record demonstrates that CEQ is updating the regulations to implement the "procedural provisions" of NEPA. 89 Fed. Reg. at 35442; AR 28762. While it is true that NEPA does not mandate specific substantive outcomes, the procedural provisions serve NEPA's "action-forcing" purpose. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 348 (1989). The requirement that federal agencies consider and publicly disclose the environmental consequences of a proposed action as well as the alternatives has practical significance, and results in decisions that better protect environmental resources. Congress intended that the procedures required under the Act result in more informed decisions and facilitate better environmental outcomes. *See, e.g.*, *Andrus v. Sierra Club*, 442 U.S. 347, 350–51 (1979) ("If environmental concerns are not interwoven into the fabric of agency planning, the action-forcing characteristics of [NEPA] would be lost.")

Second, to support their major questions doctrine argument, Plaintiff States may be relying on their claim that certain provisions of the Final Rule, including 40 C.F.R. §§ 1500.2(e), 1502.14(f), 1502.16(a)(6), 1508.1(o), 1501.3(d)(1), unlawfully "transform NEPA." Iowa Br. at 20. However, as described in Section II, these provisions are consistent with

NEPA's text and purpose, case law, guidance, and historical agency practice and therefore do not represent a fundamental revision of the statute. *See Biden v. Missouri*, 595 U.S. 87, 94 (2022) (per curiam) (noting agency's "longstanding practice" of imposing the kind of condition in dispute and not applying major questions doctrine despite challengers' request). For example, CEQ's regulations have long required agencies to identify the environmentally preferable alternative or alternatives in the ROD, *see* 40 C.F.R. § 1505.2(b) (2019); 40 C.F.R. § 1505.2(a)(2) (2020), and the Final Rule merely accelerates the timing of such identification earlier in the process. References to climate change and communities with environmental justice concerns in Section 1500.2(d) fit squarely within NEPA's text, including avoiding environmental degradation; preserving historic, cultural, and natural resources; and "attain[ing] the widest range of beneficial uses of the environment without degradation, risk to health or safety, or other undesirable and unintended consequences." 42 U.S.C. § 4331(b). In another example, the Final Rule's addition of Section 1505.3(b) reflects a return to CEQ's longstanding view that agencies should, when appropriate, "commit to mitigation to achieve environmentally preferred outcomes, particularly when addressing unavoidable adverse environmental impacts." *See* 2011 Mitigation Guidance, 76 Fed. Reg. 3843, 3847 (Jan. 21, 2011); AR 41376. In sum, the Final Rule in no way "effect[s] a fundamental revision of the statute," and therefore does not implicate the major questions doctrine. *West Virginia*, 597 U.S. at 728.

      Plaintiff States are not only wrong about how "sweeping" CEQ's changes in the Final Rule are, Iowa Br. at 39, and about the alleged lack of support in NEPA's text and historical agency practice for those changes. They are also wrong about their political and economic

effect. Plaintiff States' argument that Congress could not have meant to give CEQ the authority to revise NEPA's regulations of such "vast economic and political significance" unravels because Plaintiff States point to the "economic significance" of NEPA overall without clearly explaining the significance of the Final Rule. Iowa Br. at 39.

Nearly all of Plaintiff States' claims regarding the costs of NEPA compliance are unrelated to the Final Rule and instead decry the average annual costs of complying with NEPA under *previous* versions of the regulations implementing NEPA. Iowa Br. at 39-40 (citing commentary from 2018 and government data from 2013 and 2014). These costs reflect a choice that Congress already made and are not the result of any alleged "transformative expansion in [CEQ's] regulatory authority" that CEQ claimed to make the revisions in the Final Rule. *West Virginia*, 597 U.S. at 724.

Plaintiff States' argument that the Final Rule will have a significant economic impact also collapses because Plaintiff States fail to do more than generally allege that the Final Rule will require additional evaluation and therefore demand more time and money from state agencies. *See, e.g.*, Anderson Decl. ¶ 6, Booher ¶¶ 8, 9, Roberts ¶ 8, Travnicek Decl. ¶¶ 13, 20. The administrative record does not support these allegations. To the contrary, CEQ's Regulatory Impact Analysis determined that the changes in the Final Rule are likely "to benefit Federal agencies, applicants, environmental stakeholders, and members of communities affected by Federal actions." AR 27762 (Regulatory Impact Analysis at 2). Noting that the Final Rule's new requirements "may result in agencies conducting more public engagement and preparing more thorough analyses, which could result in additional costs," CEQ also found "other aspects and consequences of the final rule, such as more streamlined processes,

enhanced interagency and intergovernmental coordination, reduced delays and duplication, greater predictability in the decision-making process, better supported decisions, and potentially reduced litigation risk, are likely to lead to long-term cost savings, and these savings are anticipated to exceed additional costs." AR 27763 (Regulatory Impact Analysis at 3). CEQ determined that the incremental benefits of the Final Rule are expected to exceed incremental costs for applicants, and several changes are aimed at reducing litigation risks and saving time. AR 27777-79, 27786 (Regulatory Impact Analysis at 17-19, 26).

In promulgating the Final Rule, CEQ did not attempt to fundamentally transform NEPA, and it has clear statutory authorization for the changes made by the Final Rule. Moreover, there is no evidence that CEQ's changes will have widespread social and economic implications. This Court should reject Plaintiff States' major questions doctrine arguments.

## V. PLAINTIFF STATES' REQUESTED REMEDY IS INAPPROPRIATE.

Plaintiff States ask this Court to vacate the Final Rule and to "reinstate" the 2020 Rule. ECF 39, prayer. The requested relief is inappropriate for several reasons, including: Plaintiff States challenge specific provisions of the Final Rule and not the entire Final Rule, CEQ has amended the 2020 Rule in an earlier rulemaking not challenged here (the Phase 1 rulemaking), portions of the 2020 Rule have also been subsequently amended and superseded by the Fiscal Responsibility Act (AR 43863), and the 2020 Rule is subject to multiple pending lawsuits regarding its legality.

In addition, should this Court find that the Final Rule or provisions of the Final Rule are invalid, the Final Rule need not be vacated. Case law acknowledges the disruptive consequences of vacating an inadequately supported rule. *Allied-Signal, Inc. v. U.S. Nuclear*

*Regul. Comm'n*, 988 F.2d 146, 150–51 (D.C. Cir. 1993)(noting the decision whether to vacate depends on the seriousness of the deficiencies and the disruptive consequences of interim changes); *see also, e.g., City of Council Bluffs v. U.S. Dep't of the Interior*, No. 117CV00033SMRCFB, 2019 WL 10854533, at *3 (S.D. Iowa Aug. 12, 2019); *WaterLegacy v. U.S. Env't Prot. Agency*, 300 F.R.D. 332, 345 (D. Minn. 2014); *Breaker v. United States*, 977 F. Supp. 2d 921, 941-42 (D. Minn. 2013). If this Court finds that all or part of the Final Rule is improper, Defendant States respectfully request additional briefing to inform the Court of the factual and legal complexities inherent in remedy selection.

## CONCLUSION

For the reasons set forth above, the Court should grant Defendant States Cross-Motion for Partial Summary Judgment and deny Plaintiff States' Motion for Summary Judgment.

DATED this 30th day of August, 2024.

FOR THE STATE OF CALIFORNIA

ROB BONTA

Attorney General of California

*/s/ Jamie Jefferson*
SARAH E. MORRISON, SBN 143459
Supervising Deputy Attorney General
JAMIE JEFFERSON, SBN 197142 (admitted in D.N.D.)
Deputy Attorney General
1515 Clay Street, 20th Floor
Oakland, CA 94602
(510) 879-3298
Jamie.jefferson@doj.ca.gov

FOR THE STATE OF WASHINGTON

ROBERT W. FERGUSON
Attorney General of Washington

*/s/ Elizabeth Harris*
ELIZABETH HARRIS (admitted in D.N.D.)
WSBA #53135)
Assistant Attorney General
Washington State Attorney General's Office
Environmental Protection Division
800 5th Avenue, Suite 2000
Seattle, WA 98104
(206) 521-3213
Elizabeth.Harris@atg.wa.gov
Attorneys for State of Washington

FOR THE STATE OF ILLINOIS

KWAME RAOUL
Attorney General

*/s/ Jason E. James*
JASON E. JAMES, admitted *pro hac vice*
Assistant Attorney General
MATTHEW J. DUNN
Chief, Environmental Enforcement/ Asbestos
Litigation Division
Office of the Attorney General
201 W. Pointe Drive, Suite 7
Belleville, IL 62226
Ph: (872) 276-3583
Email: jason.james@ilag.gov

FOR THE STATE OF MARYLAND
Anthony G. Brown
Attorney General
*/s/ Steven Goldstein*
STEVEN J. GOLDSTEIN*
Special Assistant Attorney General
Office of the Attorney General of Maryland
200 Saint Paul Place
Baltimore, MD 21202
410-576-6414
sgoldstein@oag.state.md.us

FOR THE STATE OF COLORADO

PHILLIP J. WEISER
Attorney General

*/s/ Carrie Noteboom*
CARRIE NOTEBOOM*
Assistant Deputy Attorney General
Natural Resources and Environment
Section
1300 Broadway, 7th Floor
Denver, CO 80203
720.508.6285
carrie.noteboom@coag.gov

FOR THE STATE OF MAINE

AARON M. FREY
Attorney General

*/s/ Caleb Elwell*
CALEB ELWELL*
Assistant Attorney General
Office of the Maine Attorney General
6 State House Station
Augusta, ME 04333
(207) 626-8545
Caleb.elwell@maine.gov

FOR THE COMMONWEALTH OF
MASSACHUSETTS
ANDREA JOY CAMPBELL
Attorney General

TURNER SMITH
Deputy Chief and Assistant Attorney General

*/s/ Matthew Ireland*
MATTHEW IRELAND *
Assistant Attorney General
Energy and Environment Bureau
Office of the Attorney General
One Ashburton Place, 18th Fl.
Boston, MA 02108
matthew.ireland@mass.gov

FOR THE STATE OF NEW JERSEY

MATTHEW J. PLATKIN
Attorney General of New Jersey

*/s/ Dianna Shinn*
DIANNA SHINN, admitted *pro hac vice*
(N.J. Bar No. 242372017)
Deputy Attorney General
Environmental Enforcement & Enforcement
Justice Section
New Jersey Division of Law
25 Market Street
P.O. Box 093
Trenton, NJ 08625-093
(609) 376-2789
Dianna.Shinn@law.njoag.gov

FOR THE PEOPLE OF THE STATE
OF MICHIGAN

*/s/ Benjamin C. Houston*
BENJAMIN C. HOUSTON*
Assistant Attorney General
Environment, Natural Resources, and
Agriculture Division
6th Floor G. Mennen Williams Building
525 W. Ottawa Street
P.O. Box 30755
Lansing, MI 48909
Tel: (517) 582-3746
Email: HoustonB1@michigan.gov

FOR THE STATE OF NEW MEXICO

RAÚL TORREZ
Attorney General

*/s/ J. Spenser Lotz*
J. Spenser Lotz*
Assistant Attorney General
201 3rd St. NW
Suite 300
Albuquerque, NM 87102
Tel. (505) 616-7560
SLotz@nmdoj.gov

FOR THE STATE OF NEW YORK

LETITIA JAMES
Attorney General of New York

*/s/ Claiborne E. Walthall*
CLAIBORNE E. WALTHALL, admitted *pro hac vice*
Assistant Attorney General
New York State Office of
the Attorney General
State Capitol
Albany, NY 12224
(518) 776-2380
claiborne.walthall@ag.ny.gov


FOR THE STATE OF WISCONSIN

JOSHUA L. KAUL
Attorney General of Wisconsin

*/s/ Tressie K. Kamp*
TRESSIE K. KAMP *
Assistant Attorney General
Wisconsin Department of Justice
17 W. Main Street
Madison, WI 53707-7857
(608) 266-9595
kamptk@doj.state.wi.us



FOR THE DISTRICT OF COLUMBIA
BRIAN L. SCHWALB
Attorney General for the District of Columbia

*/s/ Wesley Rosenfeld*
WESLEY ROSENFELD*
Housing and Environmental Justice Section
Assistant Attorney General
400 6th Street NW
Washington, D.C. 20001
(202) 368-2569
wesley.rosenfeld1@dc.gov


*PHV application forthcoming

FOR THE STATE OF OREGON

ELLEN F. ROSENBLUM
ATTORNEY GENERAL

*/s/ Paul Garrahan*
PAUL GARRAHAN, admitted *pro hac vice*
Attorney-in-Charge
STEVE NOVICK
Special Assistant Attorney General
Natural Resources Section
Oregon Department of Justice
1162 Court Street NE
Salem, Oregon 97301-4096
(503) 947-4540
Paul.Garrahan@doj.oregon.gov
Steve.Novick@doj.oregon.gov


FOR THE CITY OF NEW YORK

MURIEL GOODE-TRUFANT
Acting Corporation Counsel of the
City of New York

*/s/ Nathan Taylor*
NATHAN TAYLOR*
New York City Law Department
100 Church Street, Rm 6-144
New York, NY 10007
(646) 940-0736 (m)
(212) 356-2315
NTaylor@law.nyc.gov

# CERTIFICATE OF SERVICE

Case Name:   *State of Iowa et al v. Council on*          No.   **1:24-cv-00089-DMT-CRH**
             *Environmental Quality et al*

I hereby certify that on <u>August 30, 2024</u>, I electronically filed the following documents with the Clerk of the Court by using the CM/ECF system:

    1.) Motion for Partial Summary Judgment;

    2.) Memorandum in Support of Cross Motion for Partial Summary Judgment and Opposition to Plaintiff States' Motion for Summary Judgment;

    3.) Declaration of Geneva E.B. Thompson;

    4.) Declaration of Sarah Reif;

    5.) Declaration of Lawrence Weintraub;

    6.) Declaration of Tori T. Kim; and

    7.) Declaration of Joenne McGerr.

I certify that **all** participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

I declare under penalty of perjury under the laws of the State of California and the United States of America the foregoing is true and correct and that this declaration was executed on <u>August 30, 2024</u>, at Oakland, California.

       Chanvie Nailon                         /s/ Chanvie Nailon
          Declarant                               Signature

SA2024303394
91885388.docx