# EXHIBIT D

*Declaration of Lawrence H. Weintraub*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA
BISMARCK DIVISION

| | |
|---|---|
| STATE OF IOWA, *et al.*,<br><br>          Plaintiffs,<br><br>  v.<br><br>COUNCIL ON ENVIRONMENTAL QUALITY, and BRENDA MALLORY, in her official capacity as Chair,<br><br>          Defendants,<br><br>and<br><br>ALASKA COMMUNITY ACTION ON TOXICS, et al.,<br><br>          Intervenor-Defendants. | NO. 1:24-cv-00089-DMT-CRH |

**DECLARATION OF LAWRENCE H. WEINTRAUB IN SUPPORT OF INTERVENOR-DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

I, Lawrence H. Weintraub, hereby declare as follows:

1.      I submit this declaration in support of Intervenor-Defendants' Motion for Summary Judgment and Opposition to Plaintiffs' Motion for Summary Judgment. I make this declaration on personal knowledge and information and belief.

2.      I understand that Plaintiffs' complaint seeks to vacate the Council on Environmental Quality's final rule entitled "National Environmental Policy Act Implementing Regulations Revisions Phase 2," 89 Fed. Reg. 35,442 (May 1, 2024) (Final Rule) and reinstate prior revisions to the implementing regulations for the National Environmental Policy Act (NEPA)

1

promulgated in a 2020 rulemaking entitled "Update to the Regulations Implementing the Procedural Provisions of the National Environmental Policy Act," published at 85 Fed. Reg. 43,304 (July 16, 2020) ("2020 Rule").

3. I am an Assistant Counsel within the Office of General Counsel for the New York State Department of Environmental Conservation (NYSDEC), a position I have held since September 2007. NYSDEC serves as New York State's natural resource protection and permitting agency, among its other responsibilities.

4. My main role within NYSDEC is to provide legal support to the Division of Environmental Permits (DEP).

5. DEP coordinates environmental permitting for the regulatory divisions within NYSDEC. My work involves, among other things, the application of state implementing laws for (or analogues to) most of the federal environmental laws including the Clean Air Act and the Clean Water Act.

6. Importantly, NYSDEC also administers the state version of the National Environmental Policy Act of 1969, namely the State Environmental Quality Review Act (SEQR), N.Y. Envtl. Conserv. L. Article 8. My day-to-day work includes advising NYSDEC staff on legal questions that are often related to SEQR and NEPA. DEP permitting staff process thousands of permits per year — some involving NEPA reviews of mostly large-scale projects proposed to be constructed in New York State. DEP also coordinates the issuance of "water quality certifications" under the Clean Water Act for federally permitted projects that do not require a state permit — which may also be subject to NEPA review.

7. SEQR, which became law in 1975, was modelled on NEPA. Where NEPA applies, and a federal agency has required the preparation of an environmental impact statement (EIS),

New York state agencies may rely on the NEPA statement to make findings under SEQR, provided the NEPA statement is sufficiently comprehensive to support SEQR findings. N.Y. Envtl. Conserv. L. § 8-0111(1) and section 617.15(a) of Title 6 of the Official Compilation of Codes, Rules, and Regulations of the State of New York (6 NYCRR). For projects that do not require the preparation of an EIS under NEPA or where that a federal agency has yet to determine whether to require an EIS, DEP may submit comments to the federal agency and thereby participate in the development of the NEPA record.

8. If an EIS prepared under NEPA is insufficient to make findings under SEQR, the NEPA statement cannot under SEQR be relied on, as discussed further below. *See infra* ¶¶17-20. Notably, SEQR includes the consideration of cumulative impacts, climate change, and environmental justice. These are subjects fully restored to the NEPA regulations in recent Council on Environmental Quality rulemakings, with analysis of climate change and environmental justice effects and alternatives greatly strengthened in the Final Rule. A federal environmental impact statement that did not address these topics where they were relevant to the project and significant could result in NYSDEC or another state agency determining that the federal environmental impact statement was deficient and needed state supplementation.

9. The State of New York has numerous sovereign and proprietary interests that are impacted by projects and agency actions requiring environmental review under NEPA. These interests include ownership of all wildlife in the state, N.Y. Envtl. Conserv. L. § 11-0105, and numerous waterbodies, including without limitation: the land under the "marginal sea" to a line three miles from the coast, the Great Lakes within the state's territorial jurisdiction, Lake Champlain and the St. Lawrence and Niagara Rivers, as well as the Hudson and Mohawk Rivers, Lake George, Cayuga Lake, Canandaigua Lake, Oneida Lake, and Keuka Lake. *See Town of N.*

3

*Elba v. Grimditch*, 98 A.D.3d 183, 188-89 (N.Y. App. Div. 3d Dep't 2012). The state also owns approximately 4.8 million acres of park and forest lands (administered by NYSDEC), including more than 2.8 million acres of "forever wild" forest preserve. N.Y. Const. art. XIV.

10. There are many federal assets and installations in the State of New York, and actions at or concerning these locations are subject to NEPA review. For example, New York is home to primary and auxiliary interstate highways, international airports, and several federal military installations, including Fort Drum, the United States Military Academy at West Point, and the Watervliet Arsenal.

11. NYSDEC is a NEPA cooperating agency for offshore wind projects, including Beacon Wind, Vineyard Wind Northeast, and Atlantic Shores North Empire Wind/SBMT.

12. The Final Rule, among other things, specifically addresses two areas that impact the sovereign and proprietary interests of the State of New York: climate change and environmental justice. *See* 89 Fed. Reg. at 35452-53, 35464, 35469, 35504; *see* 40 C.F.R. § 1500.2(e) (2024) (requiring consideration of reasonable alternatives, such as those that will "reduce climate change-related effects or address adverse health and environmental effects that disproportionately affect communities with environmental justice concerns"); *see* 40 C.F.R. § 1502.14(f) (requiring agencies to identify the environmentally preferable alternative such as the alternative "addressing climate-change related effects or disproportionate and adverse effects on communities with environmental justice concerns"); *id.* §§ 1501.3(d)(1), (2)(vii) (in making significance determination, agencies should consider proximity to "communities with environmental justice concerns" and "degree to which the action may adversely affect [such communities]"); *id.* § 1508.1(f) (defining "communities with environmental justice concerns"); *id.* § 1508.1(m) (defining "environmental justice").

4

13. New York has a strong interest in robust NEPA review of greenhouse gas emissions and alternatives because the State's resources and residents are threatened by climate change, as documented in numerous reports and assessments. Extreme heat events are increasing, and intense storms are occurring with greater frequency. These changes are harming, and will continue to harm, New York State's environment, including shorelines, drinking water sources, agriculture, forests, and wildlife diversity.[1] Demand for health services in New York will increase as the climate continues to change, with projected increases in heat-related illness and death. Increased coastal and riverine flooding resulting from intense precipitation increases the risk that such flooding could release contaminants or even toxic substances from wastewater treatment facilities, industrial facilities, and superfund sites with multiple attendant adverse health effects as well impaired ability to deliver public health and medical services. Diseases spread by insects, and contaminated water and food are likely to increase without mitigation and adaptation intervention.[2]

14. Sea level in the coastal waters of New York State and up the Hudson River has been steadily rising over the 20th century.[3] New York State has 1,850 miles of tidal coastline,[4] and the State and its agencies and entities it funds own dozens of state parks and critical infrastructure within New York State's coastal boundary.[5] Tidal shoreline property in the State held by private

---

[1] N.Y. State Energy Research and Dev. Auth., Responding to Climate Change in New York State: The ClimAID Integrated Assessment for Effective Climate Change Adaptation (2011) (Cynthia Rosenzweig, et al., eds.) (hereinafter the "ClimAID Report"), https://www.nyserda.ny.gov/-/media/Project/Nyserda/Files/Publications/Research/Environmental/EMEP/climaid/ClimAID-Report.pdf; see N.Y. State Energy Research and Dev. Auth., *Climate Change in New York State: Updating the 2011 ClimAID Climate Risk Information* (2014) (Cynthia Rosenzweig, et al., eds.) (hereinafter the "ClimAID Update"), https://www.nyserda.ny.gov/climaid
[2] ClimAID Report at 403-04, 421-22.
[3] ClimAID Report at 19, 127, 135.
[4] U.S. Bureau of the Census, *Statistical Abstract of the United States 1987* at 187 (107th Ed.).
[5] *See, e.g.*, See MTA, *2017 Adopted Budget: February Financial Plan, 2017-2020*, Section V, *available at*

5

landowners is similarly at risk. According to NOAA's National Coastal Population Report, over 15.5 million people live within coastal counties in New York, the second highest population within the United States.[6] NOAA's Office for Coastal Management has found that New York has experienced 26 billion-dollar disasters since 2018.[7] In July 2023, New York was impacted by severe storms that caused billions of dollars in damage across the Northeast, including more than $100 million of flood damage in West Point, New York.[8] Sea-level rise increases the extent and magnitude of coastal flooding. For example, a New York City report found that the twelve inches of sea level rise the New York City area has experienced in the past century exacerbated the flooding caused by Superstorm Sandy by about twenty-five square miles, damaging the homes of an additional 80,000 people in the New York City area alone.[9] That flooding devastated several areas of New York City, including the Brooklyn-Queens Waterfront, the East and South Shores of Staten Island, Southern Queens, Southern Manhattan, and Southern Brooklyn. Overall, a bipartisan report from the New York State Senate found that Superstorm Sandy caused 53 deaths and the estimated costs of response and recovery in New York State exceeded $30 billion.[10]

---

http://web.mta.info/mta/budget/pdf/MTA%202017%20Adopted%20Budget%20February%20Financial%20Plan%202017-2020.pdf

[6] Nat'l Oceanic and Atmospheric Admin., *National Coastal Population Report: Population Trends from 1970 to 2010* (Mar. 2013), available at: https://aambpublicoceanservice.blob.core.windows.net/oceanserviceprod/facts/coastal-population-report.pdf

[7] Nat'l Oceanic and Atmospheric Admin, Office for Coastal Mgmt., "Coastal Management: Fast Facts," https://coast.noaa.gov/states/new-york.html

[8] Nat'l Oceanic and Atmospheric Admin, Office for Coastal Mgmt., "Fast Facts: Hurricane Costs," https://coast.noaa.gov/states/fast-facts/hurricane-costs.html

[9] New York City Panel on Climate Change 2015 Report, Chapter 2: Sea Level Rise and Coastal Storms. Ann. N.Y. Acad. Sci. ISSN 0077-8923, *available at* http://onlinelibrary.wiley.com/doi/10.1111/nyas.12593/full

[10] N.Y. Senate Bipartisan Task Force on Sandy Recovery, *Preliminary Response & Recovery Report* at 1, 26 (Feb. 2013), https://www.nysenate.gov/sites/default/files/articles/attachments/Senate%20Bipartisan%20Task%20Force%20on%20Hurricane%20Sandy%20Report%20FINAL%202-5.pdf

15. Climate change also threatens New York's natural resources, including wildlife, and the ecosystems and economic activities that rely on those resources. According to a report by the New York State Energy and Research Development Authority, the State is likely to see widespread shifts in species composition in the State's forests and other natural landscapes within the next several decades. Lakes, streams, inland wetlands and associated aquatic species will be highly vulnerable to changes in the timing, supply, and intensity of rainfall and snowmelt, groundwater recharge and duration of ice cover. Increasing water temperatures will negatively affect brook trout and other native cold-water fish.[11] New York State's forests and the economy that depends on them will be hurt by climate change, which will affect the forest mix.[12] As forest species change, the resulting decrease in the vibrant display of New York State fall foliage could have a negative impact on regional tourism. New York State's Adirondack Park is the largest forested area east of the Mississippi and consists of six million acres, including 2.6 million acres of state-owned forest preserve,[13] is likely to be threatened by these changes.[14] These changes will also further impact plant and wildlife species in the Adirondack Park and throughout the state, as the forest composition changes.

16. For these reasons, reduced greenhouse gas emissions, including from alternatives identified during NEPA review under the Final Rule, are crucial to reducing the severity of climate change impacts for New York, particularly in areas already overburdened with environmental justice concerns.

---

[11] ClimAID Report 172, 183-84, 196, 203-08.
[12] ClimAID Report 177.
[13] N.Y. State Adirondack Park Agency, "About the Adirondack Park," https://apa.ny.gov/about_park/index.html
[14] ClimAID Report 178-79, III-47.

17. If the Final Rule were vacated, and the 2020 Rule reinstated, NEPA reviews would most likely be conducted without adequately considering (i) climate change and environmental justice effects, (ii) less-impactful alternatives, or (iii) mitigation measures. Such inadequate consideration would allow federal agencies to approve and implement projects without fully evaluating environmental harms that would impact New York's resources and residents.

18. Moreover, as discussed above, *see supra* ¶ 7, state and local (municipal) agencies in New York, including NYSDEC, are subject to SEQR. New York state agencies and authorities, including the NYSDEC, engage in the federal NEPA process for major federal actions occurring in New York. Federal agency activities and actions requiring federal permits that affect New York's coastal zone, water quality, wildlife, and cultural resources are subject to NEPA, and NEPA analysis is used to support state decision making where, as discussed above, a federal agency is preparing an EIS.

19. For example, I already mentioned that where federal and state environmental reviews of a project are undertaken, the NYSDEC may rely on a NEPA EIS where it is sufficient for the agency to make findings under state law. 6 NYCRR § 617.15. Where no EIS is prepared under NEPA, the NEPA record developed to support a Finding of No Significant Impact may inform the record for analysis under state law. And where state environmental review may be preempted, New York agencies such as NYSDEC may use, and often rely on, NEPA analysis to support their decisions, such as water quality certifications.

20. However, vacatur of the Final Rule and revival of parts of the 2020 Rule could produce NEPA analyses and federal agency documents that may no longer meet state law standards. In such cases, it would undermine the ability of state agencies to rely on NEPA analysis in making their own required environmental findings under state law. That would require New

York state agencies to expend additional time and resources undertaking additional environmental review to comply with SEQR.

21. In addition to undermining federal-state coordination, vacatur of the Final Rule and reinstatement of the 2020 Rule would also impact New York's ability to meet greenhouse gas emission reduction and environmental justice requirements under state law. Under New York's Climate Leadership and Community Protection Act (Climate Law), New York must reduce economy-wide greenhouse gas emissions 85% below 1990 levels by 2050 and offset the remaining 15%. N.Y. Envtl. Conserv. L. § 75-0107.

22. The Climate Law also prohibits disproportionately burdening disadvantaged communities in considering and issuing permits, licenses, and other approvals (including grants, loans, and contracts), and directs state agencies to prioritize reductions of greenhouse gases and co-pollutants in disadvantaged communities. 2019 N.Y. Sess. Laws c.106, §§ 1(7), 7(3); *see also* N.Y. Envtl. Conserv. L. § 75-0111.

23. To implement climate and associated environmental justice related requirements, NYSDEC has issued guidance documents for analysis of climate change impacts under state law.[15] Identification and assessment of the reasonably foreseeable greenhouse gas emissions from proposed federal actions, and alternatives that would reduce such emissions particularly in communities with environmental justice concerns, are important to achievement of these binding emissions reduction requirements.

---

[15] *See, e.g.*, N.Y. St. Dep't of Envtl. Conserv., CP-49, Climate Change and DEC Action (Dec. 14, 2022); N.Y. St. Dep't of Envtl. Conserv., DAR 21, The Climate Leadership and Community Protection Act (Dec. 14, 2022); N.Y. St. Dep't of Envtl. Conserv., DEP 24-1, Permitting and Disadvantaged Communities under the Climate Leadership and Community Protection Act (May 8, 2024).

24. The Final Rule requires more careful consideration of the significance of these emissions, consideration of lower-emission alternatives, and identification of communities with environmental justice concerns. Vacatur of that rule, and reinstatement of the 2020 Rule could undermine these protections.

25. Failure to reduce greenhouse gas emissions both inside and outside New York's borders will worsen the effects of climate change, which, as discussed above, will damage New Yorkers' public health, state industries and ecosystems, and the state's public lands, natural resources, and critical infrastructure.

26. In summary, vacating the Final Rule would weaken protections for New York's natural resources and communities with environmental justice concerns, interfere with coordination in environmental review between State and federal agencies (likely increasing expenditure of State resources to make up for deficient federal environmental reviews), and undermine New York's achievement of required greenhouse gas emission reductions, endangering our residents, public health, environment, and economy.

I state under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge and belief.

Executed on August 29, 2024 in Albany, New York.

 */s/ Lawrence H. Weintraub*
Lawrence H. Weintraub