# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NORTH DAKOTA

| | |
|---|---|
| STATE OF IOWA, *et al.*, | ) |
| | ) |
| *Plaintiffs*, | ) |
| | ) |
| v. | ) |
| | ) |
| COUNCIL ON ENVIRONMENTAL | ) No. 24-89 (DMT-CRH) |
| QUALITY and BRENDA MALLORY, in her | ) |
| official capacity as Chair of the Council on | ) |
| Environmental Quality, | ) |
| | ) |
| *Defendants*, | ) |
| | ) |
| and | ) |
| | ) |
| ALASKA COMMUNITY ACTION ON | ) |
| TOXICS, *et al*., | ) |
| | ) |
| *Defendant-Intervenors*. | ) |
| | ) |

## MEMORANDUM IN SUPPORT OF DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

## TABLE OF CONTENTS

INTRODUCTION .................................................................................................... 1

BACKGROUND .................................................................................................... 3

    I.      NEPA ................................................................................................ 3

    II.     The 1978 Regulations .................................................................... 5

    III.    The 2020 Rule ................................................................................ 6

    IV.    CEQ's Revisions to the 2020 Rule and the Fiscal Responsibility Act's
           Amendments to NEPA .................................................................. 7

           A.     The Phase 1 Rule ............................................................... 7

           B.     The Fiscal Responsibility Act ............................................ 8

           C.     The 2024 "Phase 2" Rule .................................................. 9

STANDARD OF REVIEW ................................................................................... 13

ARGUMENT ........................................................................................................ 14

    I.      This Court Lacks Jurisdiction in the Absence of Specific Projects Applying
          the 2024 Rule in a Manner That Harms the States ............................... 14

           A.     The States Lack Standing .................................................... 14

                    1.     Whether Viewed Through the Lens of Injury-in-Fact or
                            Causation, the States' Claimed Injuries as Project Proponents
                            are Too Speculative ........................................... 15

                    2.     The State's Self-Inflicted Injuries Do Not Suffice ...... 21

           B.     For Many of the Same Reasons, Plaintiffs' Claims Also Are Unripe ...... 22

    II.     The 2024 Rule is Consistent With NEPA's Text and Purpose ............................. 25

           A.     CEQ's Objectives in Issuing the 2024 Rule Mirror NEPA's
                 Statutory Objectives ......................................................... 25

            B.     CEQ Has Broad Discretion to Set Procedures Implementing NEPA ....... 28

            C.     The 2024 Rule Accords with NEPA ................................... 30

                    1.     The 2024 Rule Does Not "Elevate" Certain Effects Over
                            Others ............................................................... 30

2.    The Rule Does Not Require Agencies to Favor Substantive Outcomes ................................................................................ 35

3.    The 2024 Rule's Mitigation Provisions Ensure the Reliability and Integrity of Agencies Predictive Judgments ........................ 36

4.    The 2024 Rule Does Not Inhibit Use of Categorical Exclusions ................................................................................ 42

III.    CEQ Appropriately Detailed its Departure From the 2020 Rule ........................ 45

A.    CEQ Adequately Explained Changes in Policy Reflected in the 2024 Rule ................................................................................ 45

B.    The 2024 Rule Does Not Implicate "Serious Reliance Interests ............. 49

IV.    CEQ Properly Prepared a Special Environmental Assessment ........................... 50

A.    Plaintiffs' Claims Lie Outside NEPA's Zone of Interests ....................... 50

B.    The Special Environmental Assessment Complied with NEPA ............... 52

V.    The 2024 Rule Does Not Implicate the Major Questions Doctrine ..................... 53

VI.    The States' Requested Remedies are Improper ................................................... 54

CONCLUSION .......................................................................................................... 55

# TABLE OF AUTHORITIES

**Cases**

*Abbott Labs. v. Gardner*,
    387 U.S. 136 (1967).......................................................................................................... 23

*Alabama v. Cardona*,
    No. 24-533, 2024 WL 3607492 (D. Ala. July 30, 2024)...................................................... 34

*Allen v. Wright*,
    468 U.S. 737 (1984).......................................................................................................... 14

*Allied-Signal, Inc. v. United States Nuclear Regul. Comm'n.*,
    988 F.2d 146 (D.C. Cir. 1983)........................................................................................... 55

*Am. Freedom Law Ctr. v. Obama*,
    821 F.3d 44 (D.C. Cir. 2016)............................................................................................. 18

*Am. Petroleum Inst. v. U.S. Dep't of Interior*,
    81 F.4th 1048 (10th Cir. 2023).......................................................................................... 49

*Andrus v. Sierra Club*,
    442 U.S. 347 (1979).......................................................................................... 27, 28, 29

*AquaAlliance v. U.S. Bureau of Reclamation*,
    287 F. Supp. 3d 969 (E.D. Cal. 2018) ............................................................................... 41

*Arc of Iowa v. Reynolds*,
    94 F.4th 707 (8th Cir. 2024) ............................................................................................. 17

*Arizona v. Env't Prot. Agency*,
    77 F.4th 1126 (D.C. Cir. 2023).......................................................................................... 22

*Arkansas v. U.S. Dep't of Educ.*,
    — F. Supp. 3d. —, 2024 WL 3518588 (E.D. Mo. July 24, 2024)........................................... 55

*Ashley Creek Phosphate Co. v. Norton*,
    420 F.3d 934 (9th Cir. 2005) ............................................................................................ 27

*Audubon Soc'y of Cent. Ark. v. Dailey*,
    977 F.2d 428 (8th Cir. 1992) ............................................................................................ 40

*Bennett v. Spear*,
    520 U.S. 154 (1997)..................................................................................................... 51, 52

*Birckhead v. Fed. Energy Reg. Comm'n*,
    925 F.3d 510 (D.C. Cir. 2019)........................................................................................... 33

*Braidwood Mgmt., Inc. v. Becerra*,
    104 F.4th 930 (5th Cir. 2024)............................................................................................ 55

*Cal. Trucking Ass'n v. South Coast Air Quality Mgmt. Dist.*,
    No. 21-6341, 2023 WL 9622548 (C.D. Cal. Dec. 14, 2023).................................................. 54

iii

*Carlson v. U.S. Postal Regul.Comm'n*,
 938 F.3d 337 (D.C. Cir. 2019) ........................................................... 55

*Cent. S.D. Coop. Grazing Dist.v. Sec'y of the U.S. Dep't of Agriculture*,
 266 F.3d 889 (8th Cir. 2001) ......................................................... 51, 52

*Churchill Truck Lines, Inc. v. United States*,
 533 F.2d 411 (8th Cir. 1976) ............................................................. 51

*Citizens for Clean Air & Clean Water in Brazoria Cnty. v. U.S. Dep't of Transp.*,
 98 F.4th 178 (5th Cir. 2024) .............................................................. 25

*City of Dallas v. Hall*,
 562 F.3d 712 (5th Cir. 2009) ............................................................. 36

*City of Port Isabel v. Fed. Energy Reg. Comm'n*,
 — F. 4th —, 2024 WL 3659344 (D.C. Cir. Aug. 6, 2024) ........................ 31

*Clapper v. Amnesty Int'l USA*,
 568 U.S. 398 (2013) ................................................................... 13, 21

*Comprehensive Med. Ctr., Inc. v. State Farm Mut. Auto. Ins.*,
 690 F. Supp. 3d 1104 (C.D. Cal. 2023) ................................................ 20

*Corner Post v. Bd. of Governors of the Fed. Reserve Sys*,
 144 S. Ct. 2440 (2024) .................................................................... 55

*Crosby v. Young*,
 512 F. Supp. 1363 (E.D. Mich. 1981) ................................................. 29

*Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin.*,
 538 F.3d 1172 (9th Cir. 2008) ........................................................... 33

*DACO Invest., LLC v. U.S. Small Bus. Admin.*,
 No. 22-1444, 2024 WL 750594 (W.D. La. Feb. 22, 2024) ........................ 53

*Dep't of Com. v. New York*,
 588 U.S. 752 (2019) ....................................................................... 48

*Dep't of Transp. v. Pub. Citizen*,
 541 U.S. 752 (2004) ................................................................... 28, 53

*Ecosystem Inv., Partners v. Crosby Dredging, L.L.C.*,
 729 F. App'x 287 (5th Cir. 2018) ....................................................... 50

*Encino Motorcars, LLC v. Navarro*,
 579 U.S. 211 (2016) ................................................................... 45, 49

*Env't Def. Fund, Inc. v. Corps of Eng'rs of U.S. Army*,
 470 F.2d 289 (8th Cir. 1972) ............................................................ 26

*FAA v. Cooper*,
 566 U.S. 284 (2012) ....................................................................... 44

*FCC v. Fox Television Stations*, Inc.,
556 U.S. 502 (2009) ............................................................................................ 45, 46, 49

*Fla. Power & Light Co. v. EPA*,
145 F.3d 1414 (D.C. Cir. 1998) ...................................................................................... 24

*Fla. Power & Light Co. v. Lorion*,
470 U.S. 729 (1985) ......................................................................................................... 3

*Food & Drug Admin. v. All. for Hippocratic Med.*,
602 U.S. 367 (2024)............................................................................... 14, 15, 17, 20

*Friends of Boundary Waters Wilderness v. Dombeck*,
164 F.3d 1115 (8th Cir. 1999) .............................................................................. 46, 47, 51

*Friends of Del Norte v. California Dep't of Transp.*,
No. 18-129, 2020 WL 1812175 (N.D. Cal. Apr. 9, 2020)..................................... 22

*Friends of Richards-Gebaur Airport v. FAA*,
251 F.3d 1178 (8th Cir. 2001) ....................................................................................... 42

*Friends of the Norbeck v. U.S. Forest Serv.*,
661 F.3d 969 (8th Cir. 2011) ......................................................................................... 31

*Heartwood, Inc. v. U.S. Forest Serv.*,
230 F.3d 947 (7th Cir. 2000) .......................................................................................... 52

*Heckler v. Chaney*,
470 U.S. 821 (1985).......................................................................................................... 50

*Hillsdale Env't Loss Prevention, Inc. v. U.S. Army Corps of Eng'rs*,
702 F.3d 1156 (10th Cir. 2012) ...................................................................................... 41

*Immigration & Naturalization Serv. v. Nat'l Ctr. for Immigrants' Rights*, 502 U.S. 183, 188
(1991)...................................................................................................................................... 23

*Kleppe v. Sierra Club*,
427 U.S. 390 (1976)......................................................................................... 3, 4, 5, 28

*Loper Bright Enters. v. Raimondo*,
144 S. Ct. 2244 (2024)............................................................................................... 29, 30

*Louisiana v. Biden*,
64 F.4th 674 (5th Cir. 2023) .................................................................................... 18, 21

*Lujan v. Defs. of Wildlife*,
504 U.S. 555 (1992)..................................................................................................... 13, 14

*Lujan v. Nat'l Wildlife Fed'n*,
497 U.S. 871 (1990)........................................................................................................... 23

*Marsh v. Oregon Nat. Res. Council*,
490 U.S. 360 (1989).......................................................................................................... 30

v

*Massachusetts v. EPA,*
  549 U.S. 497 (2007) ................................................................................................ 33

*Mississippi v. Becerra,*
  — F. Supp. 3d —, 2024 WL 1335084 n.18 (S.D. Miss. Mar. 28, 2024) ................................ 20

*Missouri v. Biden,*
  52 F.4th 362 (8th Cir. 2022) ....................................................................... 17, 18, 20

*Missouri v. Yellen,*
  39 F.4th 1063 (8th Cir. 2022) ................................................................................ 15

*Morris Cnty. Tr. for Hist. Pres. v. Pierce,*
  714 F.2d 271 (3d Cir. 1983) ................................................................................. 26

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co.,*
  463 U.S. 29 (1983) ................................................................................................ 48

*Mulgrew v. U.S. Dep't of Transp.,*
  No. 24-1644, 2024 WL 3251732 ........................................................................... 47

*Nat'l Audubon Soc'y v. Hoffman,*
  132 F.3d 7 (2d Cir. 1997) .......................................................................... 39, 40, 41

*Nat'l Park Hospitality Ass'n v. Dep't of the Interior,*
  538 U.S. 803 (2003) ................................................................................................ 23

*Native Ecosystems Council v. Dombeck,*
  304 F.3d 886 (9th Cir. 2002) .................................................................................. 47

*Netflix, Inc. v. Babin,*
  88 F.4th 1080 (5th Cir. 2023) ................................................................................ 21

*O'Reilly v. U.S. Army Corps of Eng'rs,*
  477 F.3d 225 (5th Cir. 2007) ............................................................................ 38, 39

*Oak Ridge Env't Peace All. v. Perry,*
  412 F. Supp. 3d 786 (E.D. Tenn. 2019) ................................................................. 36

*Ohio Forestry Ass'n v. Sierra Club,*
  523 U.S. 726 (1998) ................................................................................................ 24

*Ohio Valley Env't Coal. v. Hurst,*
  604 F. Supp. 2d 860 (S.D. W.Va. 2009) ................................................................. 39

*Organized Vill. of Kake v. U.S. Dep't of Agric.,*
  795 F.3d 956 (9th Cir. 2015) .................................................................................. 48

*Perez v. Owl, Inc.,*
  — F.4th —, 2024 WL 3665313 (11th Cir. 2024) ................................................... 52

*Pfeil v. Rogers,*
  757 F.2d 850 (7th Cir. 1985) ................................................................................. 18

*Pharm. Research & Mfrs. of Am. v. Dep't of Health & Human Servs.*,
    656 F. Supp. 3d 137 (D.D.C. 2023) ........................................................... 19

*Robertson v. Methow Valley Citizens Council*,
    490 U.S. 332 (1989) ............................................................... 27, 37, 51

*Robinson v. Knebel*,
    550 F.2d 422 (8th Cir. 1997) .................................................................. 51

*Rosebud Sioux Tribe v. McDivitt*,
    286 F.3d 1031 (8th Cir. 2002) ........................................................... 26, 52

*Sch. of the Ozarks, Inc. v. Biden*,
    41 F.4th 992 (8th Cir. 2022) ........................................................ 14, 15, 24

*Sherley v. Sebelius*,
    644 F.3d 388 (D.C. Cir. 2011) ................................................................. 23

*Sierra Club North Star Chapter v. LaHood*,
    693 F. Supp. 2d 958 (D. Minn. 2010) ....................................................... 48

*Sierra Club v. Kimbell*,
    623 F.3d 549 (8th Cir. 2010) .................................................................. 13

*Sierra Club v. Sigler*,
    695 F.2d 957 (5th Cir. 1983) .................................................................. 29

*Skidmore v. Swift*,
    323 U.S. 134 (1944) .............................................................................. 30

*South Dakota v. U.S. Dep't of Interior*,
    423 F.3d 790 (8th Cir. 2005) .................................................................. 14

*Stahl v. U.S. Dep't of Agric.*,
    327 F.3d 697 (8th Cir. 2003) .................................................................. 16

*Summers v. Earth Island Inst.*,
    555 U.S. 488 (2009) ...................................................................... 15, 16, 17

*Texas v. SEC*,
    No. 23-60079, 2024 WL 2106183 (5th Cir. May 10, 2024) .................... 14, 20

*Texas v. United States*,
    50 F.4th 498 (5th Cir. 2022) ................................................................... 21

*United Food & Comm. Workers Union, Local No. 663 v. U.S. Dep't of Agric.*,
    532 F. Supp. 3d 741 (D. Minn. 2021) ...................................................... 55

*United States v. Metro. St. Louis Sewer Dist.*,
    569 F.3d 829 (8th Cir. 2009) .................................................................. 19

*United States v. Salerno*,
    481 U.S. 739 (1987) .............................................................................. 23

*United States v. Texas*,
   599 U.S. 670 (2023) .................................................................................. 55

*Voyageurs Nat'l Park Ass'n v. Norton*,
   381 F.3d 759 (8th Cir. 2004) .................................................................... 47

*Warm Springs Dam Task Force v. Gribble*,
   417 U.S. 1301 (1974) ........................................................................... 28, 29

*Washington v. U.S. Dep't of Health and Human Servs.*,
   482 F. Supp. 3d 1104 (W.D. Wash. 2020) ................................................ 20

*West Virginia v. EPA*,
   597 U.S. 697 (2022) ............................................................................. 53, 54

*Wild Virginia v. Council on Env't Quality*,
   56 F.4th 281 (4th Cir. 2022) .......................................................... 6, 22, 23, 24

**Statutes**

23 U.S.C § 327(a)(1) ..................................................................................... 22

42 U.S.C. § 4231 ............................................................................................ 12

42 U.S.C. § 4321 ...................................................................................... 26, 42

42 U.S.C. § 4331 ............................................................................................ 26

42 U.S.C. § 4331(a) .................................................................................... 3, 25

42 U.S.C. § 4331(b) ................................................................................... 4, 11

42 U.S.C. § 4331(b)(2) ................................................................................... 31

42 U.S.C. § 4331(b)(3) ....................................................................... 25, 32, 42

42 U.S.C. § 4331(b)(5) ................................................................................... 31

42 U.S.C. § 4332 ............................................................................................ 14

42 U.S.C. § 4332(2)(B) .................................................................................. 26

42 U.S.C. § 4332(2)(C) .................................................................................. 36

42 U.S.C. § 4332(2)(C)(i) .............................................................................. 11

42 U.S.C. § 4332(2)(D) ...................................................................... 12, 38, 40

42 U.S.C. § 4332(2)(E) .................................................................................. 40

42 U.S.C. § 4332(B) .................................................................................. 30, 32

42 U.S.C. § 4332(C) ......................................................................................... 4

42 U.S.C. § 4332(E) ....................................................................................... 34

42 U.S.C. § 4334(4) ....................................................................................... 53

42 U.S.C. § 4336 ............................................................................................. 8

42 U.S.C. § 4336(2)(C) .................................................................................. 42

42 U.S.C. § 4336(b)(1) ............................................................................ 36, 37

42 U.S.C. § 4336(b)(3) ................................................................................. 34

42 U.S.C. § 4336a(e) ................................................................................ 8, 50

42 U.S.C. § 4336a(f) .................................................................................... 50

42 U.S.C. § 4336a(g) ................................................................................... 20

42 U.S.C. § 4336b(1) ..................................................................................... 8

42 U.S.C. § 4336c ................................................................................ 8, 10, 43

42 U.S.C. § 4336c(3) .................................................................................... 44

42 U.S.C. § 4336e(1) .................................................................................... 42

42 U.S.C. § 4336e(10)(A) ............................................................................... 9

42 U.S.C. § 4342 ........................................................................................... 5

42 U.S.C. § 4344(3) ..................................................................................... 28

42 U.S.C. § 4344(3), (4) ................................................................................. 5

42 U.S.C. § 4344(4) ..................................................................................... 28

42 U.S.C. §§ 4321-4370m-11 ..................................................................... 1, 32

5 U.S.C. § 706(2)(A) ..................................................................................... 13

Pub. L. No. 118-5, 137 Stat. 10 (2023) ........................................................... 8

Pub. L. No. 91-190, 83 Stat. 852 (Jan. 1, 1970) ............................................... 3

**Regulations**

40 C.F.R. § 1500.1(a)(2) ............................................................................... 27

40 C.F.R. § 1501.4(e)(3) ............................................................................... 43

40 C.F.R. § 1501.6(a)(2) ............................................................................... 37

40 C.F.R. § 1501.6(d) ................................................................................... 38

40 C.F.R. § 1502.16(a)(6) (2024) ................................................................... 33

40 C.F.R. § 1502.16(b)(2) ............................................................................. 36

40 C.F.R. § 1502.22 ....................................................................................... 6

40 C.F.R. § 1505.2 ....................................................................................... 35

40 C.F.R. § 1505.2(c) ................................................................................... 38

ix

40 C.F.R. § 1506.6(b) .................................................................................... 34

40 C.F.R. § 1507.3(c)(9) ................................................................................ 44

40 C.F.R. § 1508.1(m) ............................................................................ 11, 31

**Other Authorities**

42 Fed. Reg. 26,967 (May 24, 1977) ............................................................... 5

43 Fed. Reg. 25,232 (June 9, 1978) ............................................................... 52

43 Fed. Reg. 55,978 (Nov. 29, 1978) ............................................. 5, 6, 39, 44

44 Fed. Reg. 873 (Jan. 3, 1979) ...................................................................... 6

51 Fed. Reg. 15,618 (Apr. 25, 1986) ......................................................... 6, 52

76 Fed. Reg. 3843 (Jan. 21, 2011) ................................................................. 12

82 Fed. Reg. 40,463 (Aug. 24, 2017) .............................................................. 6

85 Fed. Reg. 43,304 (July 16, 2020) ............................................ 6, 39, 50, 52

86 Fed. Reg. 34,154 (June 29, 2021) ............................................................... 7

87 Fed. Reg. 23,453 (April 20, 2022) .............................................................. 7

88 Fed. Reg. 1196 (Jan. 9, 2023) ................................................... 11, 12, 33

88 Fed. Reg. 49,924 (July 31, 2023) ............................................................... 9

89 Fed. Reg.  35,442 (May 1, 2024) .................................................... passim

H.R. Rep. No. 91-765 (Dec. 17, 1969) ........................................................... 4

S. Rep. No. 91-296 (July 9, 1969) ......................................................... passim

# INTRODUCTION

In 1969, Congress passed the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321-4370m-11, with the aim of improving environmental protection by requiring Federal agencies to assess the environmental effects of their actions.  In addition, NEPA created the Council on Environmental Quality ("CEQ") to oversee the Federal Government's implementation of the statute's requirements.  Accordingly, over the past 50 years, CEQ has exercised its delegated authority to effectuate NEPA's goals by issuing a range of rules and guidance.  Most recently, in 2024 it promulgated comprehensive updates to its regulations implementing NEPA.  *See Nat'l Env't Policy Act Implementing Regulations Revisions Phase 2*, 89 Fed. Reg. 35,442 (May 1, 2024) ("2024 Rule").  The 2024 Rule makes federal agencies' application of NEPA more efficient and effective, encourages better environmental outcomes by ensuring agencies rely on high-quality information to make well-informed decisions, accounts for pressing environmental issues, ensures full public engagement, and harmonizes CEQ's regulations with Congress's 2023 amendments to NEPA.

The Plaintiff States' facial challenge to the 2024 Rule should be rejected.  As an initial matter, this Court lacks jurisdiction to even hear the States' claims because the harms they assert are based on speculation; they do not demonstrate the type of concrete and imminent injury cognizable under Article III.  Whether viewed through the lens of standing or ripeness, the States' claims improperly hinge on guesswork about how Federal agencies will apply the 2024 Rule in the future.

Even if the States could overcome that hurdle, the 2024 Rule is wholly consistent with the best reading of NEPA's text, history, and purpose, and thus well within the bounds of CEQ's delegated authority to implement procedures operationalizing NEPA.  The 2024 Rule

1

appropriately implements NEPA's twin purposes of providing agencies and the public with reliable information about environmental effects to facilitate better decisions, while also improving the efficiency of agency procedures and accounting for the environmental concerns currently facing the Nation. Relatedly, CEQ provided well-reasoned explanations for those instances where it changed course from prior versions of its regulations. Those explanations fully satisfy the Administrative Procedure Act's ("APA") deferential standard of review.

The States' claim that CEQ should have performed additional NEPA analysis before issuing the 2024 Rule also fails. First, the States are outside NEPA's zone of interests because they do not allege any environmental harm. Second, CEQ fully complied with NEPA by preparing a special environmental assessment consistent with the agency's historical practice with respect to its promulgation of NEPA-implementing regulations.

Finally, the 2024 Rule does not implicate the major questions doctrine. The Supreme Court has long recognized CEQ's authority to implement NEPA, and the 2024 Rule does just that. While the procedures in the 2024 Rule may diverge in some instances from prior versions of CEQ's regulations, any differences do not amount to matters of "vast economic significance" that might implicate the doctrine. This makes sense given the Rule regulates federal agencies' procedural conduct, rather than broader economic activity. To the extent the Rule affects the substance of agencies' actions by improving their decision making, what the States truly object to are *the statute's* scope and reach, but that disagreement is not cognizable as a challenge to CEQ's rulemaking.

In sum, CEQ issued a well-reasoned rule that this Court should uphold.

2

# BACKGROUND[1]

## I.   <u>NEPA</u>

Enacted in 1969 and signed into law in 1970, NEPA is considered the first major environmental law in the United States.  *See* Pub. L. No. 91-190, 83 Stat. 852 (Jan. 1, 1970) (AR_43565).[2]  Congress "declare[d] a national policy" of "encourag[ing] productive and enjoyable harmony between man and his environment," and sought "to promote efforts which will prevent or eliminate damage to the environment," "stimulate the health and welfare of man," and "enrich the understanding of the ecological systems and natural resources important to the Nation."  83 Stat. 852 § 2, 42 U.S.C. § 4321; *see also* 42 U.S.C. § 4331(a) ("recognizing [ ] the critical importance of restoring and maintaining environmental quality to the overall welfare and development of man . . ."); *Kleppe v. Sierra Club*, 427 U.S. 390, 409 (1976) ("NEPA announced a national policy of environmental protection and placed a responsibility upon the Federal Government to further specific environmental goals.").  Congress also directed that the Federal Government "use all practicable means" to, among other things, "assure for all Americans safe, healthful, productive, and esthetically and culturally pleasing surroundings," "attain the widest range of beneficial uses of the environment without degradation, risk to health or safety, or other undesirable and unintended consequences," and "preserve important historic, cultural, and

---

[1]   Local Civil Rule 7.1(a)(3) requires that a motion for summary judgment "state the facts upon which the party . . . relies."  However, in cases like this one arising under the APA, the Court's task is to review the administrative record and determine whether, as a matter of law, the agency's decision is arbitrary, capricious, or otherwise contrary to law.  *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729 (1985).  Nonetheless, to the extent required by Local Rule, Defendants submit the "Background" section of this brief as their statement of facts.

[2]   For clarity, this brief cites to publicly available documents via their official citation, but also provides citations to the Administrative Record the first time each document is cited.

natural aspects of our national heritage, and maintain, wherever possible, an environment which supports diversity and variety of individual choice." 42 U.S.C. § 4331(b).

In enacting this bedrock environmental statute, Congress was animated by the realization that, in 1969, the country lacked the ability "to deal with [its] growing environmental problems." *National Envtl. Policy Act of 1969*, S. Rep. No. 91-296 at 4 (July 9, 1969).[3] Those problems included: (1) "critical air and water pollution"; (2) "the loss of valuable open spaces"; (3) "continuing soil erosion"; (4) "the degradation of unique ecosystems"; (5) "needless deforestation"; (6) "faltering and poorly designed transportation systems"; (7) "thermal pollution"; and (8) "haphazard urban and suburban growth." *Id*.; *see also id*. at 8 (referring to the "Santa Barbara oil well blowout," "proliferation of pesticides," and "the loss of publicly owned seashores, open spaces, and other irreplaceable natural assets to industry, commercial users, and developers" as some of the many "Federal policies and activities [that] have contributed to environmental decay and degradation").

To address these "critical problems of domestic policy," *id*., NEPA requires that Federal agencies assess the effects of proposed major federal actions on the human environment through preparation of a "detailed statement." *See* 42 U.S.C. § 4332(C).[4] As originally enacted, that statement must assess the environmental impact of the proposed action, including any unavoidable adverse environmental effects should the proposed action be implemented, as well

---

[3]    The text that became NEPA largely stems from the proposed bill considered by the Senate Committee on Interior and Insular Affairs. *See* S. Rep. No. 91-296. The Conference Report on the bill, H.R. Rep. No. 91-765 (Dec. 17, 1969), explains that the final bill adopted the "national goals of environmental policy specified in the Senate bill . . . ." *Id*. at 8.

[4]    This provision of NEPA is often referred to as "Section 102(2)(C)" based on its location in the original statutory text, 83 Stat. 852. That provision too originated with the Senate version of the bill. *See Kleppe*, 427 U.S. at 401 n.12.

as alternatives to the proposed action.  83 Stat. 853, § 102(2)(C).  As the Supreme Court

explained, "Section 102(2)(C) is one of the 'action-forcing' provisions intended as a directive to

'all agencies to assure consideration of the environmental impact of their actions in

decisionmaking.'"  *Kleppe*, 427 U.S. at 409 n.18.

NEPA also established CEQ.  42 U.S.C. § 4342.  CEQ was authorized to "appraise the

various programs and activities of the Federal Government . . . for the purpose of determining

the extent to which such programs and activities are contributing to the achievement of [NEPA's

goals]" and "to develop and recommend to the President national policies to foster and promote

the improvement of environmental quality to meet the conservation, social, economic, health,

and other requirements and goals of the Nation."  42 U.S.C. § 4344(3), (4).  In 1977, President

Carter directed CEQ to issue regulations implementing NEPA.  Exec. Order No. 11,991, 42 Fed.

Reg. 26,967 (May 24, 1977) (AR_33243).

## II.    The 1978 Regulations

Consistent with that direction, in 1978, CEQ issued its first set of regulations.  *See*

43 Fed. Reg. 55,978 (Nov. 29, 1978) ("1978 Regulations") (AR_42696).  The 1978 Regulations

were intended "[t]o reduce paperwork, to reduce delays, and at the same time to produce better

decisions which further the national policy to protect and enhance the quality of the human

environment."  *Id.*   To that end, the 1978 Regulations defined terms such as "cumulative

impact," "effects," "major Federal action," and "significantly"; and provided provisions for

public comment and agency planning.  *See id.*

Particularly relevant, in the 1978 Regulations CEQ first implemented a scaled review

approach to meet NEPA's requirements.  First, for actions where an agency does not anticipate

significant environmental effects, an agency may use what is known as a categorical exclusion

("CE").  43 Fed. Reg. 55,992.  Second, where the environmental impact of a proposed action is

uncertain or unlikely to have significant effects, an agency may prepare an environmental

assessment ("EA"), which "[b]riefly provides sufficient evidence and analysis for determining"

whether the agency must prepare a more detailed analysis or may instead issue a finding of no

significant impact ("FONSI").  *Id*. at 56,004.  Third, an agency must prepare an Environmental

Impact Statement ("EIS") where it is likely that the effects are significant.  *Id*. at 55,994.

### III.    The 2020 Rule

The 1978 Regulations remained largely unchanged for over 40 years.[5]  Then, in 2017,

President Trump issued Executive Order 13,807, which directed CEQ establish and lead an

interagency working group to propose changes to the 1978 Regulations.  82 Fed. Reg. 40,463 §

5(e)(iii) (Aug. 24, 2017) (AR_33656).  In response, on July 16, 2020, CEQ promulgated

regulations making significant revisions.  85 Fed. Reg. 43,305 (July 16, 2020) ("2020 Rule")

(AR_29042).  The 2020 Rule was challenged in five separate lawsuits, although none has yet

resulted in a decision on the merits.[6]

---

[5]     CEQ made technical amendments to the 1978 regulations in 1979, 44 Fed. Reg. 873 (Jan.
3, 1979) (AR_42691), and amended one requirement regarding "incomplete" or "unavailable"
information in 1986, 51 Fed. Reg. 15,618 (Apr. 25, 1986) (amending 40 C.F.R. § 1502.22)
(AR_43514).

[6]     One, *Wild Virginia v. Council on Env't Quality*, was dismissed on jurisdictional grounds.
56 F.4th 281 (4th Cir. 2022).  Two have been voluntarily dismissed.  *See Env't Justice Health
All. v. Council on Env't Quality*, No. 20-6143 (S.D.N.Y. 2020); *Iowa Citizens for Cmty.
Improvement v. Council on Env't Quality*, No. 20-2715 (D.D.C. 2020).  The remaining two are
stayed until September 2024, pending those plaintiffs determining whether they wish to proceed
with the litigation.  *See Alaska Cmty. Action on Toxics v. Council on Env't Quality*, No. 20-5199
(N.D. Cal. 2020); *California v. Council on Env't Quality*, No. 20-6057 (N.D. Cal. 2020).

IV.    **CEQ's Revisions to the 2020 Rule and the Fiscal Responsibility Act's Amendments to NEPA**

In 2021, CEQ commenced a comprehensive reconsideration of the 2020 Rule to evaluate its legal basis and "to ensure that the NEPA implementing regulations provide for sound and efficient environmental review of Federal actions, including those actions integral to tackling the climate crisis, in a manner that enables meaningful public participation, provides for an expeditious process, discloses climate change-related effects, advances environmental justice, respects Tribal sovereignty, protects our Nation's resources, and promotes better and more equitable environmental and community outcomes." 89 Fed. Reg. 35,447.  As a result of that review, CEQ undertook a phased approach to amending the 2020 Rule.

A.  **The Phase 1 Rule**

On April 20, 2022, CEQ published the *National Environmental Policy Act Implementing Regulations Revisions*, 87 Fed. Reg. 23,453 (April 20, 2022) ("Phase 1 Rule") (AR_43863).[7] Addressing some of the changes made by the 2020 Rule to the regime in place since 1978, the Phase 1 rule: (1) "clarif[ied]" that agencies have discretion to consider a variety of factors when developing the purpose and need for a proposed action; (2) "remov[ed] language that could be construed to limit agencies' flexibility to develop or revise procedures to implement NEPA specific to their programs and functions that may go beyond the CEQ regulatory requirements"; and (3) clarified that the definition of "effects" "include[s] direct, indirect, and cumulative effects." *Id*.

---

[7]    Prior to issuing the Phase 1 Rule, CEQ published an interim final rule that extended the time for agencies to develop or revise procedures implementing the 2020 Rule.  *Deadline for Agencies to Propose Updates to Nat'l Envtl. Policy Act Procedures*, 86 Fed. Reg. 34,154 (June 29, 2021) (AR_32897).  That rule was intended to "allow Federal agencies to avoid wasting resources developing procedures based upon regulations that CEQ may repeal or substantially amend."  86 Fed. Reg. at 34,155-56.

### B.  The Fiscal Responsibility Act

While CEQ was developing the "Phase 2" proposed rule, Congress enacted the Fiscal Responsibility Act of 2023 ("FRA"), which made several amendments to NEPA.  Pub. L. No. 118-5, 137 Stat. 10 (Jan. 3, 2023).  First, Congress amended the part of the statute detailing the required elements of EISs, *id*. § 321(a)(3).[8]  Second, the FRA reiterated that agencies should "ensure the professional integrity, including scientific integrity, of the discussion and analysis in an environmental document" and "make use of reliable data and resources," *id*. § 321(a)(6).  Third, it added six new provisions to the statute.  FRA § 321(b), 137 Stat. 39-46.

New Section 4336 provides procedures for determining the appropriate level of NEPA review, including detail on: (1) the difference between EISs and EAs; (2) threshold considerations for when NEPA review using an EA or EIS is not required; (3) the applicability of CEs; and (4) the type of information an agency should consider in assessing the threshold question of whether an EA or EIS is required.  42 U.S.C. § 4336.  Section 4336a encourages more efficient NEPA reviews by prescribing page limits for EISs and EAs and imposing time limits for completing NEPA reviews.  42 U.S.C. § 4336a(e), (g).[9]  Section 4336b affirmatively permits the use of programmatic NEPA documents.  42 U.S.C. § 4336b(1).  Section 4336c allows agencies to adopt and use CEs established by other agencies.  42 U.S.C. § 4336c.  And

---

[8]    The FRA amended Section 102(2)(C) to require that an EIS must assess the "(i) reasonably foreseeable environmental effects of the proposed agency action; (ii) any reasonably foreseeable adverse environmental effects which cannot be avoided should the proposal be implemented; (iii) a reasonable range of alternatives to the proposed agency action . . . that are technically and economically feasible, and meet the purpose and need of the proposal; [and] (iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity . . . ."  *Id*.

[9]    Section 4336a(g) also allows project sponsors to petition for judicial intervention in the case of unduly delayed NEPA reviews.

Section 4336e provides statutory definitions for various terms relevant to NEPA analyses.  *See, e.g.*, 42 U.S.C. § 4336e(10)(A) (defining "major Federal action").

### C.  The 2024 "Phase 2" Rule

On July 31, 2023, CEQ published for public comment the Notice of Proposed Rulemaking for the "Phase 2" rule.  *Nat'l Env' Policy Act Implementing Regulations Revisions Phase 2*, 88 Fed. Reg. 49,924 (July 31, 2023) ("Proposed Phase 2 Rule") (AR_0001); *see also* AR_117 (redline of changes in proposed rule).  The public comment period on the proposed rule closed on September 29, 2023.  *Id*.  CEQ received approximately 148,089 comments on the proposed rule, with about 540 being unique substantive comments.  89 Fed. Reg. 35,447.  Most of the unique comments were supportive of the proposed rule.  *Id*.

On May 1, 2024, CEQ published the final 2024 Rule, 89 Fed. Reg. 35,442.  CEQ revised NEPA's implementing regulations to "provide for an effective environmental review process; ensure full and fair public engagement; enhance efficiency and regulatory certainty; and promote sound Federal agency decision making that is grounded in science, including consideration of relevant environmental, climate change, and environmental justice effects."  *Id*.  As CEQ explained, "[t]hese changes are grounded in NEPA's statutory text and purpose, including making decisions informed by science; CEQ's extensive experience implementing NEPA; CEQ's perspective on how NEPA can best inform agency decision making; longstanding Federal agency experience and practice; and case law interpreting NEPA's requirements."  *Id*.  Accordingly, the 2024 Rule will "help agencies more successfully implement NEPA and facilitate a more efficient and effective environmental review process."  *Id*.

CEQ acted "to ensure that agencies consider resiliency to the risks associated with a changing climate, including wildfires, extreme heat and other extreme weather events, drought,

flood risk, loss of historic and cultural resources, and food scarcity." *Id*. at 35,507.  Indeed,
commenters detailed the ways in which climate change has impacted their communities, safety,
and economies.  *See, e.g.*, AR_1105 (noting "[t]hawing permafrost [ ] creates an increasingly
unstable and dangerous landscape for Alaskan communities"); AR_27692 (Tribal "community
surveys indicate that 68% of the population is already seeing the impacts of climate change . . .
which include worsening seasonal flooding . . . and seasonal water shortages").  Accordingly, the
2024 Rule provides additional direction to ensure federal agencies consider these modern
manifestations of the concerns that motivated Congress to enact NEPA over 50 years ago.  *See*
89 Fed. Reg. 35,452.

The specific changes made in the 2024 Rule fall into "five general categories."  *Id*. at
35,447-48.  First, the Rule "makes revisions to the regulations to implement the amendments to
NEPA made by the [FRA]."  *Id*. at 35,447.  For example, consistent with new 42 U.S.C. § 4336c,
the Rule provides for a process for agencies to adopt and apply other agencies' CEs.  *Id*. at
35,474.  Second, and similarly, the 2024 Rule "amends the regulations to enhance consistency
and clarity," *id*. at 35,447, such as by modifying use of the term "significant" to avoid confusion
about what the term means.  *Id*. at 35,448.

Third, the Rule makes revisions "based on decades of CEQ and agency experience
implementing and complying with NEPA to improve the efficiency and effectiveness of the
environmental review process, foster science-based decision making, better effectuate NEPA's
statutory purposes, and reflect developments in case law."  *Id*. at 35,447-48.  Grounded in the
text of 42 U.S.C. § 4332(2)(C)(i) and consistent with §§ 4331(b) and (c), the 2024 Rule codifies
various longstanding requirements that agencies consider the reasonably foreseeable effects of

proposed actions to ensure a healthy, safe, and productive environment, without requiring that agencies change their substantive decisions after so considering.

For example, consistent with 42 U.S.C. § 4331(b), CEQ has long encouraged agencies to consider the effects of their programs on community health and welfare.  *See* AR_ 33077; *see also* AR_33089.  The 2024 Rule recognizes some communities may not experience environmental justice,[10] and reiterates that in preparing environmental reviews, agencies must consider reasonably foreseeable effects on community health, welfare, and safety, and should consider whether particular communities are overburdened.  89 Fed. Reg. 35,452-53; *see also id.* at 35,468 recognizing that "communities with environmental justice concerns often experience disproportionate environmental burdens such as pollution or urban heat stress, and often experience disproportionate health and other socio-economic burdens that make them more susceptible to adverse effects").

Further, since 2010 CEQ has provided guidance to agencies on how they can consider climate change and greenhouse gas ("GHG") emissions under NEPA.  *Id.* at 35,444 n.10.  More recently, in 2023 CEQ issued its interim final *National Environmental Policy Act Guidance on Considerations of Greenhouse Gas Emissions and Climate Change*, 88 Fed. Reg. 1196 (Jan. 9, 2023) (AR_43046).  In that guidance, CEQ explained that "[c]limate change is a fundamental environmental issue, and its effects on the human environment fall squarely within NEPA's purview."  *Id.* at 1197 (citing 42 U.S.C. § 4231, *et seq.*).  CEQ recommended that "NEPA reviews [ ] quantify proposed actions' GHG emissions, place GHG emissions in appropriate

---

[10]    The Rule defines "environmental justice" as "the just treatment and meaningful involvement of all people, regardless of income, race, color, national origin, Tribal affiliation, or disability, in agency decision making and other Federal activities that affect human health and the environment."  40 C.F.R. § 1508.1(m).

context and disclose relevant GHG emissions and relevant climate impacts, and identify alternatives and mitigation measures to avoid or reduce GHG emissions." *Id.* Consistent with this guidance, the 2024 Rule continues to recognize that NEPA's direction is consistent with encouraging agencies to consider, "where applicable," "climate change-related effects, including, where feasible, quantification of [GHG] emissions, from the proposed action and alternatives and the effects of climate change on the proposed action and alternatives." 89 Fed. Reg. 35,507-09; *id.* at 35,566.

So too, in 2011 CEQ issued guidance on agencies' use of mitigation. *Final Guidance for Fed. Dep'ts and Agencies on the Appropriate Use of Mitigation and Monitoring and Clarifying the Appropriate Use of Mitigated* [*FONSIs*], 76 Fed. Reg. 3,843 (Jan. 21, 2011) (AR_41372). That guidance stated that "[a]gencies should not commit to mitigation measures considered in an EIS or EA absent the authority or expectation of resources to ensure that the mitigation is performed." *Id.* at 3,847. Consistent with that understanding and 42 U.S.C. § 4332(2)(D), (E) (regarding the integrity and reliability of NEPA reviews), the 2024 Rule "reinforce[s] the integrity of environmental reviews by ensuring that if an agency assumes as part of its analysis that mitigation will occur and be effective, the agency takes steps to ensure that this assumption is correct . . . ." 89 Fed. Reg. 35,516.

Fourth, the 2024 Rule "reverts to and revises for clarity certain language from the 1978 Regulations . . . where CEQ determined [that] language provides clearer and more effective and predictable direction or guidance to implement NEPA." *Id.* at 35,448.

Fifth, the 2024 Rule "removes certain provisions added by the 2020 [R]ule that CEQ considers imprudent or legally unsettled, or that create uncertainty or ambiguity that could reduce efficiency or increase the risk of litigation." *Id.* at 35,447-48. Among other things, CEQ

deleted language from the 2020 Rule encouraging agencies to impose bonding requirements on NEPA litigants given that "it is unsettled whether NEPA provides agencies with authority to promulgate procedures that require plaintiffs to post bonds in litigation brought under the APA . . . . " *Id*. at 35,455.  CEQ noted, however, that "[it] retain[ed] many of the changes made in the [2020 Rule], including changes that . . . enhanced the efficiency and effectiveness of the NEPA process." *Id*. at 35,448.

The 2024 Rule is effective for "any NEPA process begun after July 1, 2024," although an agency "may" apply the Rule to ongoing environmental reviews.  89 Fed. Reg. 35,573.  It also directs that by July 1, 2025, agencies submit to CEQ for review "proposed" procedures to implement the Rule.  *Id*.

## STANDARD OF REVIEW

A plaintiff bears the burden of proving standing "with the manner and degree of evidence required at the successive stages of the litigation."  *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992).  Thus, at summary judgment, the States "bear the burden of . . . *proving* concrete facts showing that [CEQ's] actual action has caused the substantial risk of harm" and "cannot rely on speculation about 'the unfettered choices made by independent actors not before the court.'" *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414 n.5 (2013) (emphasis added) (citation omitted).

Further, "[u]nder the APA, a reviewing court will not set aside agency action unless it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'"  *Sierra Club v. Kimbell*, 623 F.3d 549, 559 (8th Cir. 2010) (citing 5 U.S.C. § 706(2)(A)).  "The burden is on the plaintiff to prove that the agency's action was arbitrary and capricious."  *South Dakota v. U.S. Dep't of Interior*, 423 F.3d 790, 800 (8th Cir. 2005).

**ARGUMENT**

I.   **This Court Lacks Jurisdiction in the Absence of Specific Projects Applying the 2024 Rule in a Manner That Harms the States.**

   **A. The States Lack Standing.**

   "To establish Article III standing, a party invoking federal jurisdiction must show (1) that the plaintiff suffered an injury in fact, (2) a causal relationship between the injury and the challenged conduct, and (3) that a favorable decision will likely redress the injury." *Sch. of the Ozarks, Inc. v. Biden*, 41 F.4th 992, 997 (8th Cir. 2022); *see also Lujan*, 504 U.S. at 560-61. Because the States challenge a rule that governs the actions of *Federal* agencies, rather than state conduct, 42 U.S.C. § 4332, they face an uphill battle to establish standing. *See Lujan*, 504 U.S. at 562 ("[W]hen the plaintiff is not [it]self the object of the government action or inaction [it] challenges, standing is not precluded, but it is ordinarily 'substantially more difficult' to establish." (quoting *Allen v. Wright*, 468 U.S. 737, 758 (1984)); *see also Food and Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 383 (2024) ("unregulated parties may have more difficulty establishing causation—that is, linking their asserted injuries to the government's regulation . . . of someone else.").

   The States press two theories of standing. First, they claim that, for States that are "proponents" of projects subject to NEPA review, the 2024 Rule will increase costs for States or cause delays in project implementation. Pls.' Mem. Supp. Mot. Sum. J. ("Pls.' Mem.") at 11, 15 (ECF No. 65). But those allegations rest on improper conjecture about prospective application of the Rule. *See Texas v. Sec. and Exch. Comm'n*, No. 23-60079, 2024 WL 2106183, at *2 (5th Cir. May 10, 2024) ("[E]vidence" that "new regulatory burdens" "*may* increase costs . . . is too hypothetical to support a claim of standing"). Second, they allege that certain States have

"directly assumed NEPA responsibilities" and are "directly injured" by the 2024 Rule.  Pls.'
Mem. at 16-17.  But self-inflicted injury does not confer standing under Article III.

      1.      <u>Whether Viewed Through the Lens of Injury-in-Fact or Causation, the States'
      Claimed Injuries as Project Proponents are Too Speculative.</u>

Because NEPA only applies to federal agencies, the States challenge a rule that "neither
require[s] nor forbid[s] any action" on their part.  *Summers v. Earth Island Inst.*, 555 U.S. 488,
493 (2009).  Thus, the States "can demonstrate standing only if application of the [2024 Rule] by
the Government will affect" them in a way that threatens to impose an "'injury in fact' that is
concrete and particularized."  *Id*. at 493-494.  Said differently, "[i]n cases of alleged future
injuries to unregulated parties from government regulation, the causation requirement and the
imminence element of the injury in fact requirement . . . target the same issue: Is it likely that the
government's regulation or lack of regulation of someone else will cause a concrete and
particularized injury in fact to the unregulated plaintiff?"  *All. Hippocratic Med.*, 602 U.S. at 385
n.2.

The States' primary standing theory fails to satisfy that standard because it rests on a
speculative chain of events.  *See Sch. of the Ozarks*, 41 F.4th at 1000 (finding no standing where
plaintiff asked court to "assume that [a] . . . series of events is imminent").  Specifically, the
States posit that: (1) the 2024 Rule will require additional NEPA review for all projects; and (2)
such additional review will, irrespective of the project, (a) impose additional costs that will be
borne by state project sponsors, or (b) cause agencies to take longer to complete NEPA reviews
(thus allegedly delaying needed project benefits).  Pls.' Mem. at 11-16.  But the States do not
adequately support those assertions.  *See Missouri v. Yellen*, 39 F.4th 1063, 1070 (8th Cir. 2022)
(rejecting request to enjoin "hypothetical" application of statute).

As an initial matter, the States frequently reference projects for which NEPA reviews began and were completed before the 2024 Rule was effective, 89 Fed. Reg. 35,573, and thus the Rule could not have been the cause of any injury.  For example, North Dakota identifies the Theodore Roosevelt Expressway Freight Safety Project, Goehring Decl. ¶ 14(a)(ii) (ECF No. 65-1), but the final EIS for that project was completed, and a ROD issued, in March 2019.[11]  The State also relies on the Red River Valley Water Supply project, Travnicek Decl. ¶ 10 (ECF No. 65-2), but there the supplemental EA was completed, and a FONSI issued, in May 2024.[12]  Similarly, Nebraska identifies the Norfolk-Wisner US-275 project, Keller Decl. ¶ 6 (ECF No. 65-9), but the EA process for that project also concluded in May 2024.[13]  And some States reference ongoing NEPA processes but do not provide any evidence the relevant agency intends to apply the 2024 rule to those reviews.  *See* Long Decl. ¶ 13(a) (ECF No. 65-6); Parsons Decl. ¶ 13(a)-(b) (referencing projects "submitted" to the reviewing agency prior to 2024) (ECF No. 65-5).[14]  The States' reliance on projects unaffected by the Rule illustrates the lack of rigor in their standing arguments.

---

[11]    *See* Final Environmental Impact Statement & Record of Decision (Feb. 2019), *available at* https://www.dot.nd.gov/sites/www/files/documents/construction-projects/US85-I94/FEIS-ROD/FEIS-ROD-US-Highway-85-030619_20046.pdf.  The court may take judicial notice of public records.  *See Stahl v. U.S. Dep't of Agric.*, 327 F.3d 697, 700 (8th Cir. 2003).

[12]    *See* Final Environmental Assessment #3 (May 2024), *available at* https://fmdiversion.gov/wp-content/uploads/2024/08/USACE-Supplemental-EA-3.pdf.

[13]    *See* Federal Permitting Dashboard, Environmental Assessment, *available at* https://www.permits.performance.gov/proj/sr-275-norfolk-wisner/environmental-assessment-ea.

[14]    On the flip side, many declarants identify purely tentative projects.  For example, South Dakota references projects for which the State is only "likely to seek federal funding."  Roberts Decl. ¶ 8 (ECF No. 65-7); *see also* Johnson Decl. ¶ 9 (noting only "anticipated" projects) (ECF No. 65-10).  Such speculative assertions of future harm cannot support standing.  *See Summers*, 555 U.S. at 497-500 (rejecting the possibility that standing may be based on a "statistical

Those inapposite projects aside, the States' declarants largely offer purely hypothetical concerns about future applications of the 2024 Rule.  *See, e.g.,* Goehring Decl. ¶ 13 (claiming the 2024 rule "*could* consequently serve to impede" farming practices and "*may* render certain projects" infeasible); Travnicek Decl. ¶ 7 (the 2024 Rule "*may*" affect certain ongoing projects); Henke Decl. ¶ 6 (explaining projects "*may* require additional evaluation") (ECF No. 65-3); Jundt Decl. ¶ 11 (stating agencies "*may* also need to expand their analysis and review of pending projects") (ECF No. 65-8); Johnson Decl. ¶ 13 (arguing changes in 2024 Rule "*will potentially* increase the time and expense" incurred by agency in NEPA reviews) (emphasis added to all).

But standing requires a showing of "imminent harm," not simply "a realistic threat that . . . the challenged activity would cause [the plaintiff] harm in the reasonably near future." *Summers*, 555 U.S. at 499-500 (internal citation omitted); *see also All. of Hippocratic Med.*, 602 U.S. at 381 ("when a plaintiff seeks prospective relief such as an injunction, the plaintiff must establish a sufficient likelihood of future injury").  Here, the States' bald speculation about the possibility that Federal agencies *may* apply the 2024 Rule in a manner that *may* increase future costs is not enough.[15]  *See Missouri v. Biden*, 52 F.4th 362, 368-69 (8th Cir. 2022) (rejecting standing based on the theory that the application of GHG guidance would increase costs to states in the form of "more heavily regulated economic activity" and holding that the issuance of the guidance, "alone, do[es] not injure [p]laintiffs"; instead, "'[t]he injury that [p]laintiffs fear is from hypothetical future regulation possibly derived from' [the guidance]"); *Louisiana v. Biden*,

---

probability" of harm); *see also Arc of Iowa v. Reynolds*, 94 F.4th 707, 711 (8th Cir. 2024) ("If the risk is too speculative, Article III standing is lacking.").

[15]    Several declarants also speculate the 2024 Rule may lead to increased litigation, *see* Travnicek Decl. ¶ 14; Parfitt Decl. ¶ 13 (ECF No. 65-16), but those claims are doubly speculative given they also rely on possible legal actions brought by third parties not before the Court.

64 F.4th 674, 681-82 (5th Cir. 2023) (rejecting contention that guidance conferred standing based on allegations it would increase the costs of NEPA compliance).

Moreover, even where the States identify a project that will both require a NEPA review and proceed after the Rule's July 1, 2024, effective date, they provide no factual basis for assuming application of the Rule will result in an injury sufficient to support standing.[16]  For example, Iowa alleges "additional evaluation" will be needed for certain transportation projects. Anderson Decl. ¶¶ 4, 6-7 (referencing reconstruction of U.S. 75 in Hinton, IA, and replacement of the U.S. 67 Centennial Bridge in Davenport, IA) (ECF No. 65-4).  Similarly, Nebraska references the Decatur Bridge project, Keller Decl. ¶ 6, but relies only on opaque references to "additional evaluations."  But the States do not make clear *why* the 2024 Rule will "require additional resources."  For example, Federal Highway Administration guidance predating the 2024 Rule already implements consideration of the effects of projects on environmental justice and to quantify certain emissions.  *See also* Response to Comments ("RTC") at 50-51 (April 2024) (AR_27880-81).  In sum, the States ignore the myriad project-specific factors that influence the scope of any specific project review, and fail to establish the 2024 Rule, as opposed to NEPA itself, requires additional analysis.  *See Missouri*, 52 F.4th at 370 ("alleged future increased regulatory costs are not traceable to the [guidance] estimates 'because agencies consider a great number of other factors in determining when, what, and how to regulate or take agency action'" (citation omitted)); *Louisiana*, 64 F.4th at 682 & n.48; *Am. Freedom Law Ctr. v. Obama*, 821 F.3d 44, 51 (D.C. Cir. 2016) (finding no standing where "[c]hanges in any of these

---

[16]     To that end, the Court should ignore statements in the States' declarations that are legal arguments masquerading as factual allegations.  *See Pfeil v. Rogers*, 757 F.2d 850, 862 (7th Cir. 1985) ("legal argument in an affidavit may be disregarded").  For example, South Dakota's declarant baldly claims the 2024 Rule violates the major questions doctrine.  Roberts Decl. ¶ 5.

factors could cause costs to increase or decrease, and it is difficult to separate out which factors actually cause any specific price adjustment").[17]

Even assuming the States can identify projects that will apply the 2024 Rule and demonstrate that application of the Rule will cause NEPA reviews to differ from those conducted under the 2020 Rule, the States provide no detail regarding why those changes will cause their costs to increase. *See United States v. Metro. St. Louis Sewer Dist.*, 569 F.3d 829, 836 (8th Cir. 2009) (rejecting standing theory premised on downstream rate increases where intervenor "would not unavoidably be harmed economically"). Several declarants contend, without any support, that they may need to hire additional staff to comply with the Rule, while others suggest a need for further spending. *See, e.g.*, Goehring Decl. ¶ 16 (claiming Rule will require diversion of staff resources); Travnicek Decl. ¶ 20 (claiming Rule will require additional resources to conduct NEPA reviews); Parsons Decl. ¶ 14 (claiming additional expenditures of $1.3 million caused by the 2024 Rule); Long Decl. ¶ 15 (claiming Rule will force state to "double [ ] current staffing levels"). While increased compliance costs may support standing in some cases, such costs cannot be incurred purely in anticipation of potential future action; "[i]f it were otherwise, anyone with reasonable fears of future harm could buy standing via self-inflicted expenditures, irrespective of whether a risk is constitutionally substantial." *Pharm. Research & Mfrs. of Am. v. Dep't of Health and Human Servs.*, 656 F. Supp. 3d 137, 156 (D.D.C. 2023). Because no State declarant has offered specific evidence regarding how agencies have actually applied the 2024 Rule in a manner that increases costs, their expectations as to future expenditures are too

---

[17]    Some States—Tennessee, Arkansas, Georgia, Kansas, Kentucky, Louisiana, Missouri, Montana, and South Carolina—provide no evidence of affected projects at all. And the projects identified for those States in the Amended Complaint are inapt. *See, e.g.*, Am. Compl. ¶ 75 (referencing Tennessee projects where NEPA review began before July 1, 2024) (ECF No. 39).

speculative to show injury.[18]  *See Comprehensive Med. Ctr., Inc. v. State Farm Mut. Auto. Ins.*, 690 F. Supp. 3d 1104, 1114 (C.D. Cal. 2023) ("conclusory, speculative testimony in declarations or other evidentiary materials is insufficient to raise genuine issues of material fact and defeat summary judgment"); *Sec. & Exchange Comm'n*, 2024 WL 2106183, at *2 ("Evidence couched in hypothetical language cannot support [a pecuniary] injury.").

The States' "delay" theory is similarly inapt.  Congress, through the recent FRA amendments, set deadlines for the completion of NEPA reviews.  *See* 42 U.S.C. § 4336a(g).  If the States complain of those deadlines, their injury was not caused by CEQ's 2024 Rule.  If the States are instead alleging the 2024 Rule will cause agencies to fail to meet those deadlines, that claim is presently unsupported.  *See All. for Hippocratic Med.*, 602 U.S. at 383 ("The causation requirement precludes speculative links—that is, where it is not sufficiently predictable how third parties would react to government action or cause downstream injury to plaintiffs.").[19]

Finally, while the States suggest their "sovereign" interests lessen the standing burden, *see* Am. Compl. ¶¶ 60, 62, the Eighth Circuit has made plain that "even if the States as sovereigns are entitled to some undefined 'special solicitude' in the standing analysis, they still must satisfy the basic requirements of Article III standing."  *Missouri*, 52 F.4th at 369; *see also Mississippi v. Becerra*, — F. Supp. 3d —, 2024 WL 1335084, at *14 n.18 (S.D. Miss. Mar. 28, 2024) ("the Fifth Circuit has noted that 'the special solicitude' once afforded to states . . . with

---

[18]    Some States also reference a desire to conform state policies to the 2024 Rule, but a state cannot "manufacture standing any time it want[s] to challenge an agency regulation by expressing a desire to incur administrative costs as a result of the changed regulations." *Washington v. U.S. Dep't of Health and Human Servs.*, 482 F. Supp. 3d 1104, 1118 (W.D. Wash. 2020).

[19]    Alaska alleges that the 2024 Rule ignores certain Alaska-specific statutory requirements. *See* Boyle Decl. ¶ 4-5 (ECF No. 65-12).  But, as the 2024 Rule explains, agencies are not expected to apply the Rule inconsistent with existing statutory authority.  89 Fed. Reg. 35,556.

respect to justiciability doctrines like standing, seems to also be falling out of favor with the Supreme Court." (citing *Netflix, Inc. v. Babin*, 88 F.4th 1080, 1090 n.12 (5th Cir. 2023)).  And if the doctrine even remains valid, the economic interests pressed by the States in development of their "natural resources" are not the type of quasi-sovereign interests afforded consideration under such an inquiry.  *See Texas v. United States*, 50 F.4th 498, 514 (5th Cir. 2022) ("Quasi-sovereign interests are 'not sovereign interests, proprietary interests, or private interests pursued by the State as a nominal party.'  Rather, they 'consist of a set of interests that the State has in the well-being of its populace.'" (citation omitted)).[20]

In sum, the States "cannot do away with their alleged parade of horribles in a single swipe" based only on "harms that are several steps removed from—and are not guaranteed by—the challenged" regulations.  *Louisiana*, 64 F.4th at 684.

2.    The State's Self-Inflicted Injuries Do Not Suffice.

The States identify another potential injury: certain States, including Florida, Texas, and Utah, have voluntarily assumed the responsibility of complying with NEPA for certain transportation projects and assert the 2024 Rule will directly increase their compliance costs.  Pls.' Mem. at 16-17.  But that alleged injury is entirely self-inflicted, and thus insufficient.  *See Clapper*, 568 U.S. at 416 ("respondents cannot manufacture standing merely by inflicting harm on themselves").

---

[20]    The States also argue that their claims of standing are buttressed by the fact the Court granted Alaska Communities for Alternatives to Toxics leave to intervene.  Pls.' Mem. at 19 (citing ECF No. 60 at 6).  Among other things, that argument overlooks that in evaluating Intervenors' request the Court assumed the truth of their factual assertions, ECF No. 60 at 5-6, whereas here, at summary judgment, the States must prove their allegations.

Specifically, 23 U.S.C § 327(a)(1) directs the Secretary of Transportation to "carry out a surface transportation project delivery program." Under that authority:

> [W]ith the written agreement of the Secretary and a State . . . the Secretary may assign, and the State may assume, the responsibilities of the Secretary with respect to one or more highway projects within the State under [NEPA].

*Id.* § 327(a)(2)(A), (B)(i). Thus, in enacting Section 327, "Congress made an explicit choice to *allow* states . . . to *assume responsibility* for environmental assessments that would otherwise be required of the FHWA." *Friends of Del Norte v. California Dep't of Transp.*, No. 18-129, 2020 WL 1812175, at *3 (N.D. Cal. Apr. 9, 2020) (emphasis added).

States (including Texas, Florida, and Utah here) voluntarily choose to take on delegated authority and the attendant risk that any change to NEPA or CEQ's regulations could potentially increase the cost of exercising that assumed authority. This sort of self-inflicted injury is insufficient to confer standing. *See Arizona v. Envtl. Prot. Agency*, 77 F.4th 1126, 1130 (D.C. Cir. 2023) ("a complainant cannot fairly trace its injuries to a regulation that merely allows, but does not require, the riskier choice that allegedly causes its injury"). If those States truly believe that their voluntary participation in the program will result in harm, their recourse is to revisit their agreements assuming responsibility under Section 327, not pursue litigation against CEQ.

**B. For Many of the Same Reasons, Plaintiffs' Claims Also Are Unripe.**

Crucially, the only court to have considered a similar facial challenge to CEQ's NEPA regulations determined that without specific applications of that rule the challenge was unripe. *See Wild Virginia*, 56 F.4th 281. This Court should follow suit if it does not dismiss for lack of standing.

To determine whether administrative action is ripe for judicial review under the APA, courts evaluate (1) the fitness of the issues for judicial decision and (2) the hardship to the parties

of withholding review. *Abbott Labs. v. Gardner*, 387 U.S. 136, 149 (1967). Where—as here—the challenged agency action is a regulation, courts presume the facial challenge is not ripe. As the Supreme Court explained:

> Absent such a [pre-enforcement review] provision, however, a regulation is not ordinarily considered the type of agency action "ripe" for judicial review under the APA until the scope of the controversy has been reduced to more manageable proportions, and its factual components fleshed out, by some concrete action applying the regulation to the claimant's situation in a fashion that harms or threatens to harm him.

*Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 891 (1990). Indeed, the Supreme Court has questioned whether facial challenges to regulations under the APA can ever be ripe absent "a concrete dispute." *Nat'l Park Hospitality Ass'n v. Dep't of the Interior*, 538 U.S. 803, 812 (2003); *see also United States v. Salerno*, 481 U.S. 739, 745 (1987) (a facial challenge is "the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the [rule] would be valid").[21]

Applying those precedents, the Fourth Circuit in *Wild Virginia* considered a challenge to the 2020 Rule brought by various environmental groups. The court explained that "CEQ's regulations provide rules for other agencies, but it is those other agencies that will actually take actions subject to NEPA reviews. So, to the extent Plaintiffs express fears related to how other agencies will conduct their NEPA reviews of potential future actions after the 2020 Rule, those fears have not yet ripened into actionable injuries." 52 F.4th at 296; *see also id.* (claims that "are 'contingent upon a decision to be made by a third party that has not yet acted' are not ripe."

---

[21]    *See also Immigration & Naturalization Serv. v. Nat'l Ctr. for Immigrants' Rights*, 502 U.S. 183, 188 (1991) ("That the regulation may be invalid as applied in [some] cases, however, does not mean that the regulation is facially invalid because it is without statutory authority."); *Sherley v. Sebelius*, 644 F.3d 388, 397 (D.C. Cir. 2011) (applying the "no set of circumstances" test to a facial challenge to agency regulation).

(citing *Ohio Forestry Ass'n v. Sierra Club,* 523 U.S. 726, 743 (1998)).  As the Fourth Circuit

noted, "[p]laintiffs are ultimately concerned with the environmental effects of decisions that

other agencies might make in conducting their NEPA analyses under CEQ's 2020 Rule.  But

there are many steps to occur . . . including, most importantly, that other agencies will need to

actually engage in NEPA reviews (or decline to do so) as to particular projects."  *Wild Virginia*,

56 F.4th at 297.

So too here.  The States are concerned about the economic ramifications of agencies'

future applications of the 2024 Rule.  But the Rule does not directly govern the States' conduct:

it does not "command anyone to do anything or to refrain from doing anything"; "grant,

withhold, or modify any formal legal license, power, or authority"; "subject anyone to any civil

or criminal liability"; or create "legal rights or obligations."  *Ohio Forestry*, 523 U.S. at 733; *see*

*Fla. Power & Light Co. v. EPA*, 145 F.3d 1414, 1421 (D.C. Cir. 1998) (facial challenge to

regulation unripe where claims were based on plaintiff's "own interpretations of the preamble

statements and what could happen if those statements—as interpreted by [plaintiff]—are

applied" by the agency); *Sch. of the Ozarks*, 41 F.4th at 998-99.

The States will "have ample opportunity later to bring [their] legal challenge at a time

when harm [is] more imminent and more certain."  *Ohio Forestry*, 523 U.S. at 734; *see Wild*

*Virginia*, 56 F.4th at 297 ("Plaintiffs can bring a challenge to later agency actions—and, if

relevant, to the underlying 2020 Rule" when it has been applied in a concrete project).  Judicial

review now "would have to take place without benefit of the focus that a particular [ ] proposal

could provide"; on the other hand, delaying review until the "factual components" of application

of the 2024 Rule have been "fleshed out, by some concrete action" will aid resolution of the

States' claims.  *Ohio Forestry*, 523 U.S. at 736-37.

Absent identification of a specific instance where the 2024 Rule has been applied to a specific project, the States' claims are unripe.

**II.**    **The 2024 Rule is Consistent With NEPA's Text and Purpose.**

The States press various challenges to provisions of the 2024 Rule that are, at base, expressions of their disagreement with CEQ's policy determinations.  In each instance, however, CEQ acted consistent with NEPA's directives and within its statutory discretion.  In particular, the States are incorrect that NEPA's procedural nature means the statute is bereft of policy goals; instead, Congress intended that the process required by NEPA would lead agencies to make more environmentally beneficial decisions, and the 2024 Rule furthers that intent.  Each of the provisions challenged by the States seeks to further elucidate the types of high-quality information agencies should consider prior to acting, a goal fully consistent with NEPA.

**A. CEQ's Objectives in Issuing the 2024 Rule Mirror NEPA's Statutory Objectives**.

As an initial matter, the States are incorrect that NEPA is agnostic as to policy outcomes. Instead, in enacting NEPA, Congress set "ambitious goals" of environmental protection. *Citizens for Clean Air & Clean Water in Brazoria Cnty. v. U.S. Dep't of Transp.*, 98 F.4th 178, 189 (5th Cir. 2024).  To that end, NEPA's text and legislative history, as well as the caselaw interpreting NEPA, *all* show that NEPA was enacted to encourage agencies to integrate environmental concerns into their decision-making to facilitate better outcomes, and to provide the public with information about those concerns.

Congress recognized "the critical importance of restoring and maintaining environmental quality," 42 U.S.C. § 4331(a), and enacted NEPA to "attain the widest range of beneficial uses of the environment without degradation, risk to health or safety, or other undesirable and unintended consequences."  *Id*. § 4331(b)(3).  All agencies must accordingly "give[] appropriate

consideration" to "presently unquantified environmental amenities and values."  42 U.S.C. § 4332(2)(B).  Thus, while NEPA does not mandate particular results, its plain language shows that it was enacted to encourage agencies to further environmental protection and public health and welfare.  42 U.S.C. §§ 4321, 4331.

NEPA's legislative history buttresses this understanding of statutory intent.  For example, Congress explained that NEPA was intended to address "inadequacy" in the nation's ability to "deal with [ ] growing environmental problems and crises."  S. Rep. No. 91-296 at 4; *see also id.* at 4-5 (noting the lack of a "comprehensive national policy on environmental management and the need for "procedures to preserve environmental values in the larger public interest").  As such, NEPA was designed to address the way "Federal policies and activities have contributed to environmental decay and degradation."  *Id.* at 8.

Courts have also recognized this broad purpose.  *See Rosebud Sioux Tribe v. McDivitt*, 286 F.3d 1031, 1038 (8th Cir. 2002) ("The overriding purpose of NEPA is to prevent or eliminate damage to the environment."); *Morris Cnty. Tr. for Hist. Pres. v. Pierce*, 714 F.2d 271, 276 (3d Cir. 1983) ("[b]y requiring Federal agencies to consider the environmental consequences of action for which they are responsible, Congress' ultimate goal was to prevent environmental damage which is not justified by a countervailing federal interest"); *Envtl. Def. Fund, Inc. v. Corps of Eng'rs of U.S. Army*, 470 F.2d 289, 298 (8th Cir. 1972) ("The unequivocal intent of NEPA is to require agencies to consider and give effect to the environmental goals set forth in the Act, not just to file detailed impact studies which will fill governmental archives.").

The States therefore misconstrue NEPA's "procedural" nature and press an interpretation of that term shorn of necessary context.  While the States correctly note that NEPA does not ultimately constrain the substantive actions agencies may pursue, Pls.' Mem. at 19-20, NEPA's

procedures are designed to ensure "that environmental concerns [are] integrated into the very process of agency decisionmaking." *Andrus v. Sierra Club*, 442 U.S. 347, 350 (1979).

Indeed, the Supreme Court has explained that NEPA's "procedures are almost certain to affect the agency's substantive decision." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989). This is because NEPA:

> [E]nsures that the agency, in reaching its decision, will have available, and will carefully consider, detailed information concerning significant environmental impacts; it also guarantees that the relevant information will be made available to the larger audience that may also play a role in both the decisionmaking process and the implementation of that decision.

*Id*. at 349. In other words, NEPA's "strong precatory language . . . and the requirement that agencies prepare detailed impact statements inevitably bring pressure to bear on agencies 'to respond to the needs of environmental quality.'" *Id*. (citation omitted); *see also Ashley Creek Phosphate Co. v. Norton*, 420 F.3d 934, 945 (9th Cir. 2005) (recognizing that Section "102 of NEPA cannot be separated from the statute's overarching purpose of environmental protection because it is designed to further that purpose").[22]

Although the States repeatedly object to the 2024 Rule's characterization of NEPA as "action-forcing," Pls.' Mem. at 20-21, that terminology was imported directly from the statute's legislative history and has been endorsed by the Supreme Court. *See* S. Rep. No. 91-296 at 9 ("[I]f [NEPA's] goals and principles are to be effective, they must be capable of being applied in action. [NEPA] thus incorporates certain 'action-forcing' provisions and procedures which are designed to assure that all Federal agencies plan and work toward meeting the challenge of a

---

[22]    Despite the States' concerns about removal of language highlighting NEPA's "procedural" nature, Pls.' Mem. at 20, 40 C.F.R. § 1500.1(a)(2) explains that the 2024 Rule implements "procedural provisions to ensure Federal agencies implement the letter and spirit of the Act." 89 Fed. Reg. 35,554.

27

better environment.”); *Kleppe*, 427 U.S. at 409 & n.18 (recognizing that the term “action

forcing” “was applied to the provisions of what became [Section 102(2)(C)] . . . by the Senate.”).

CEQ’s explanation of that term is therefore consistent with its historical understanding.  *See* 89

Fed. Reg. at 35,450 (“While NEPA does not mandate particular results in specific decision-

making processes, Congress intended that the procedures required under the Act result in more

informed decisions, with the goal that information about the environmental effects of those

decision[s] would facilitate better environmental outcomes.”).

In sum, while the States contend the 2024 Rule represents a “re-write” of NEPA’s “entire

purpose,” Pls.’ Mem. at 20, CEQ’s rationale accords with the statute’s text and history.

**B.  CEQ Has Broad Discretion to Set Procedures Implementing NEPA.**

The Supreme Court has long afforded CEQ’s interpretation of NEPA what it has

variously termed “substantial deference,” *Andrus*, 442 U.S. at 358, or “great weight.”  *Warm*

*Springs Dam Task Force v. Gribble*, 417 U.S. 1301, 1310 (1974).  Those holdings flow from

Congress’s explicit delegation to CEQ of the authority to “make recommendations to the

President with respect” to the Federal Government’s compliance with NEPA’s statutory purpose,

and to “develop and recommend to the President national policies to foster and promote the

improvement of environmental quality to meet the conservation, social, economic, health, and

other requirements and goals of the Nation.”  42 U.S.C. §§ 4344(3), (4).  That language has been

interpreted as conferring on CEQ the authority to interpret NEPA and the discretion to determine

the specific procedures an agency must follow to satisfy the statute.  *See Dep’t of Transp. v. Pub.*

*Citizen*, 541 U.S. 752, 757 (2004) (“[CEQ], established by NEPA *with authority to issue*

*regulations interpreting it*, has promulgated regulations to guide federal agencies . . . .”

(emphasis added)); *see also Crosby v. Young*, 512 F. Supp. 1363, 1386 (E.D. Mich. 1981)

(Executive Order 11991 delegated CEQ "the responsibility for interpretation of . . . NEPA.").

 Contrary to the States' argument, Pls.' Mem. at 10, the Supreme Court's recent decision

in *Loper Bright Enterprises v. Raimondo* is consistent with how courts have historically

approached Congress's delegation of authority to CEQ.  The Supreme Court has found that

Congress "charged" CEQ "with the responsibility" to implement NEPA's requirements.  *Andrus*,

442 U.S. at 358; *see also Warm Springs*, 417 U.S. at 1310 (noting CEQ is "ultimately

responsible for administration of the NEPA and most familiar with its requirements for [EISs]").

Within that broad delegation, courts have assessed CEQ's regulations by determining the bounds

of NEPA's grant of authority to the agency.  For example, applying *Andrus*, the Fifth Circuit

examined whether a provision of the 1978 Regulations lay within the "statutory minima" of

NEPA by looking to whether the regulation was "in accord with" NEPA's "language and

legislative history" and "case law."  *Sierra Club v. Sigler*, 695 F.2d 957, 971 (5th Cir. 1983).

This accords with the approach detailed in *Loper,* where the Court emphasized that "the best

reading of a statute" may be that "it delegates discretionary authority to an agency," in which

case, "the role of the reviewing court under the APA is . . . recognizing constitutional

delegations, 'fix[ing] the boundaries of [the] delegated authority,' . . . and ensuring the agency

has engaged in 'reasoned decisionmaking' within those boundaries."  144 S. Ct. 2244, 2263

(2024) (citation omitted).  Here, NEPA details to CEQ the responsibility to "fill up the details of

[the] statutory scheme such that the "agency is authorized to exercise a degree of discretion."  *Id*.

*Loper* thus does not displace *Andrus*.

Finally, and apart from binding precedent requiring deference to CEQ's exercise of discretion,[23] the agency's interpretation is also a source of persuasive authority. *See id.* at 2273 ("whether an agency has acted within its statutory authority, as the APA requires" may be informed by "[c]areful attention to the judgment of the Executive Branch"); *Skidmore v. Swift*, 323 U.S. 134, 140 (1944) (court may find agency's interpretation persuasive based on the "thoroughness evident in its consideration"). And regardless, for the reasons discussed below, the 2024 Rule represents the best construction of what NEPA requires, so this Court need not even decide what deference CEQ's interpretations warrant to resolve this case in CEQ's favor.

### C. The 2024 Rule Accords with NEPA.

1.      The 2024 Rule Does Not "Elevate" Certain Effects Over Others.

The States argue that the 2024 Rule's references to environmental justice concerns, climate change effects (including GHG emissions), Indigenous Knowledge, and global effects each gives improper "special treatment" to certain "policy priorities." Pls.' Mem. at 21. But measures—such as those discussed below—that ensure agencies and the public have access to high-quality information about important environmental effects are fully consistent with NEPA's text and purpose of ensuring agencies analyze the reasonably foreseeable effects of proposed actions on communities, health and welfare, and cumulative and worsening environmental problems. *See* 42 U.S.C. § 4332(B); *Marsh v. Oregon Nat. Res. Council*, 490 U.S. 360, 371 (1989) (NEPA's "broad dissemination of information" "ensures that the agency will not act on incomplete information, only to regret its decision after it is too late to correct"); *Friends of the*

---

[23]      This is particularly so because *Andrus* did not rely on (and indeed predated) *Chevron*. Moreover, *Loper Bright* made clear that it did not intend to disturb "statutory *stare decisis*," even for those cases that rely on *Chevron*, 144 S. Ct. at 2273, making it all the more clear that *Loper Bright* did not disturb *Andrus*'s holding.

*Norbeck v. U.S. Forest Serv.*, 661 F.3d 969, 973 (8th Cir. 2011) ("NEPA's purpose is to ensure a fully informed and well considered decision"); *see also* S. Rep. No. 91-296 at 20 (NEPA was intended to further the "development of adequate methodology for evaluating the full environmental impacts and the full costs of Federal actions," and the identification of "adverse environmental effects" that "cannot be avoided.").[24]

First, the States assert that the concept of environmental justice is outside of NEPA's ambit. Pls.' Mem. at 22. But NEPA's text explicitly refers to the need to "assure for *all* Americans safe, healthful, productive, and esthetically and culturally pleasing surroundings," and to "permit high standards of living and a wide sharing of life's amenities," 42 U.S.C. §§ 4331(b)(2), (5) (emphasis added)—requirements that align with the definition of environmental justice in the 2024 Rule. *See* 40 C.F.R. § 1508.1(m); *see also* S. Rep. No. 91-296 at 18 ("Each individual should be assured of safe, healthful, and productive surroundings in which to live and work . . . ."). Indeed, in guidance now almost 30 years old, CEQ explained that consideration of environmental justice follows from NEPA's statutory text. AR_33089. And courts have agreed that principles of environmental justice are embedded in the statute. *See, e.g.*, *City of Port Isabel v. Fed. Energy Reg. Comm'n*, — F. 4th —, 2024 WL 3659344, at *7 (D.C. Cir. Aug. 6, 2024) ("effects on environmental justice communities can be independently significant").

Further, the States overread how the 2024 Rule invites consideration of environmental justice. For example: (1) new Section 1500.2, which addresses NEPA's policies, requires agencies to "assess reasonable alternatives," and provides as an example those that will "address

---

[24]    As an initial matter, while the States allege CEQ's regulations have traditionally avoided identifying "specific types of effects," Pls.' Mem. at 21, that position is inaccurate. *See* RTC at 50 (AR_27880) (noting "CEQ's regulations, including the 1978 regulations and the 2020 rule, have long identified specific types of environmental effects as examples of the types of effects that agencies should consider").

adverse health and environmental effects that disproportionately affect communities with environmental justice concerns"; (2) Section 1502.14(f), which requires agencies to identify the environmentally preferable alternative, identifies considerations about communities with environmental justice concerns as one potential element for identifying that alternative; and (3) Section 1501.3(d) identifies considerations about the degree to which an action may adversely affect communities with environmental justice concerns as one of many factors that agencies may use in assessing the intensity of a proposed action's effects.  None of the above is outcome-determinative.[25]  Instead, the 2024 Rule appropriately encourages agencies to consider information about environmental justice consistent with typical agency discretion.

Second, NEPA's text and purpose encompass agency consideration of climate change-related effects as another way of ensuring decision makers are presented with complete, reliable, high-quality information.  NEPA was intended to provide procedures that "prevent or eliminate damage to the environment."  42 U.S.C. § 4321.  NEPA also instructs the Federal Government to avoid "undesirable or unintended consequences," 42 U.S.C. § 4331(b)(3), and to give "*presently unquantified* environmental amenities and values . . . appropriate consideration . . . ."  *Id.* § 4332(2)(B) (emphasis added); S. Rep. No. 91-296 at 18 ("[T]he Federal Government must take care to avoid . . . other undesirable and unintended consequences.").  The 2024 Rule's provisions encouraging agencies to consider climate change and GHG effects appropriately update CEQ's regulations given current science and the FRA's direction for agencies to analyze reasonably

---

[25]    For example, Section 1501.3(d) notes agencies "should" consider environmental justice in assessing the significance of an effect.  Here, as elsewhere, the States overlook that CEQ uses the words "shall," "should," and "may" to mean different things.  *See* RTC at 14-15 ("the regulations consistently use the word 'shall' to indicate that a provision is mandatory, and the word 'should' to encourage agencies to take certain actions without mandating those actions") (AR_27844-45).

foreseeable effects. *See Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin.*, 538 F.3d 1172, 1217 (9th Cir. 2008) ("The impact of greenhouse gas emissions on climate change is precisely the kind of cumulative impacts analysis that NEPA requires agencies to conduct."); *see also Massachusetts v. EPA*, 549 U.S. 497, 507 (2007) (describing the development of the "study of climate change" and the Federal Government's response to it). And while the States allege references to climate change are too vague, the Rule's references to CEQ's 2023 GHG guidance make clear that the Rule is referring to "rising global [ ] GHG concentrations [that] are substantially affecting the Earth's climate." 88 Fed. Reg. 1,199.

The States' central complaint is the 2024 Rule's direction that "*where applicable*" agencies consider "climate change-related effects, including, *where feasible*, quantification of greenhouse gas emissions . . . ." 40 C.F.R. § 1502.16(a)(6) (emphasis added).[26] The States argue this provision "drive[s] agency decisions towards whatever minimizes greenhouse gas emissions around the globe." Pls.' Mem. at 23. But that reading ignores the plain language of the provision, which explains that agencies should attempt—but need not always—quantify such emissions. In any event, encouraging agencies to engage in quantification, where feasible, is entirely in line with NEPA's goals of informing the decisionmaker and the public. *See Birckhead v. Fed. Energy Reg. Comm'n*, 925 F.3d 510, 520 (D.C. Cir. 2019) (explaining, in the context of quantifying GHG emissions, that "NEPA also requires the [agency] to at least attempt to obtain the information necessary to fulfill its statutory responsibilities").

Similarly, though the States maintain the Rule "elevates" Indigenous Knowledge to "special status," Pls.' Mem. at 24, the Rule simply identifies Indigenous Knowledge as an

---

[26]    Although the States also object to Section 1500.2 and references to climate change in Sections 1502.14(f) and 1508.1(o), each is explanatory, rather than prescriptive.

example of "high-quality" information an agency *may* employ, where appropriate, consistent with 42 U.S.C. § 4336(b)(3). *See* 40 C.F.R. § 1506.6(b). As such, the Rule does not contravene the FRA, given 42 U.S.C. § 4332(E) requires that an agency "make use of reliable data and resources," but does not define those terms more fully. Moreover, CEQ does not intend that agencies "weigh this knowledge more heavily than other sources" or "preference [ ] one kind of high-quality information over others." 89 Fed. Reg. 35,525. Instead, the Rule cross-references CEQ guidance that explains, specific to NEPA, that "[a]gencies should recognize that Tribes and Indigenous Peoples hold relevant information and perspectives regarding the environment, and Indigenous Knowledge can inform Agencies' environmental analysis." *Guidance for Federal Departments and Agencies on Indigenous Knowledge* at 6 (Nov. 30, 2022) (AR_41600).[27] In sum, the 2024 Rule again seeks to clarify the information agencies may potentially consider.

Finally, the States allege the 2024 Rule "categorically" expands the scope of effects an agency must consider. Pls.' Mem. at 24-25. Yet the States read out of context the direction in Section 1501.3(d)(1) that, "[d]epending on the scope of the action, agencies should consider the potential global, national, regional, and local contexts . . . ." As CEQ explained, "agencies should determine the appropriate contexts to consider based on the scope of the action and its anticipated reasonably foreseeable effects." 89 Fed. Reg. 35,465. CEQ explicitly noted that the

---

[27]    Although the States also assert that the Rule is arbitrary and capricious because it allegedly does not define "Indigenous Knowledge," Pls.' Mem. at 35, CEQ both explained why providing such a definition was not practicable in the context of the Rule, 89 Fed. Reg. 35,481-82, and directed commenters to a broader discussion of the term. *Id*. (citing AR_41600 (defining "Indigenous Knowledge" as "a body of observations, oral and written knowledge, innovations, practices, and beliefs developed by Tribes and Indigenous Peoples through interaction and experience with the environment.")). That approach is hardly arbitrary. *See Alabama v. Cardona*, No. 24-533, 2024 WL 3607492, at *22 (D. Ala. July 30, 2024) (affirming agency's decision not to define term where it reasonably considered the issue). Indeed, CEQ noted that "Indigenous Knowledge is inherently heterogenous because of the cultural, geographic, and socioeconomic differences from which it is derived." AR_41600.

context for an action is project-specific.  Nothing requires an agency to make a substantive

decision to authorize a project based on "global interests."  Pls.' Mem. at 25.  Instead, agencies

are limited to considering the "reasonably foreseeable" effects of their actions, and actions with

wholly extraterritorial effects are not subject to NEPA.  42 U.S.C. § 4336e(10)(B)(vi).

      2.    <u>The Rule Does Not Require Agencies to Favor Substantive Outcomes.</u>

The States argue that, by requiring agencies to identify the "environmentally preferable

alternative" in draft and final EISs, the 2024 Rule "unlawfully changes [the] maxim" that NEPA

not "drive an agency towards selecting any one alternative."  Pls.' Mem. at 25.  As an initial

matter, the States' challenge ignores that CEQ's "regulations have *always* required agencies to

identify the environmentally preferable alternative in a [record of decision ("ROD")]."  89 Fed.

Reg. 35,504 (citing prior 40 C.F.R. § 1505.2)(2020) (emphasis added)).  Thus, rather than

introducing an "entirely new concept," Pls.' Mem. at 26, the 2024 Rule simply directs agencies

to identify the environmental preferable alternative at an earlier stage of the NEPA process.  The

change is therefore one of timing, not substance: "the regulations do not require agencies to

select the environmentally preferable alternative, just as the long-standing requirement for

agencies to identify the environmentally preferable alternative in a ROD did not."  89 Fed. Reg.

35,504.[28]  That earlier identification, in service of increased "transparency," tracks NEPA's

statutory purpose of "develop[ing] appropriate alternatives to recommended courses of action

involving unresolved environmental conflicts."  S. Rep. No. 91-296 at 7.

The States' subtextual arguments (*i.e.*, what "the Final Rule does not say," Pls.' Mem. at

26) are equally unavailing.  For example, CEQ has explained an agency need not select the

---

[28]    Nor does the Rule require creation of another alternative; instead, "the agency must
identify the environmentally preferable alternative from amongst the alternatives considered in
the EIS."  *Id.*

environmentally preferable alternative.  *See* 89 Fed. Reg. 35,516 (noting that "longstanding practice" holds that "agencies balance" "myriad factors" and are accordingly not required to specifically explain non-selection of the environmentally preferable alternative); *see also Oak Ridge Env't Peace All. v. Perry*, 412 F. Supp. 3d 786, 858 (E.D. Tenn. 2019) ("practical considerations may often prevent an agency from choosing the environmentally preferable alternative").  So too, while the States speculate the Rule will "create a presumption against development," Pls.' Mem. at 27, the Rule is consistent with the position that "NEPA does not require federal agencies to favor an environmentally preferable course of action."  *City of Dallas v. Hall*, 562 F.3d 712, 717 (5th Cir. 2009).  Indeed, the Rule also requires that agencies consider the adverse effects of taking *no* action.  40 C.F.R. § 1502.16(b)(2).

      3.    <u>The 2024 Rule's Mitigation Provisions Ensure the Reliability and Integrity of Agencies Predictive Judgments.</u>

Although the States claim the 2024 Rule improperly includes "express, affirmative mitigation requirements," Pls.' Mem. at 28, the Rule does not require mitigation of adverse environmental effects, only that agencies make well-supported assumptions about those effects.  Consistent with NEPA's text and caselaw, the Rule ensures that when an analysis of an action's effects relies on the implementation of mitigation, that reliance is based on a reasonable expectation that the mitigation will in fact be implemented.

As amended by the FRA in 2023, 42 U.S.C. § 4332(2)(C) requires an agency to identify the "reasonably foreseeable environmental effects of the proposed agency action" and "any reasonably foreseeable adverse environmental effects which cannot be avoided should the proposal be implemented."  An EIS is therefore required where an action "has a reasonably foreseeable significant effect on the quality of the human environment."  42 U.S.C. § 4336(b)(1);

*see also id.* § 4336(b)(2) (an EA is required for actions that "[do] not have a reasonably foreseeable significant effect on the quality of the human environment.").

The Supreme Court has found that "[i]mplicit in NEPA's demand that an agency prepare a detailed statement on 'any adverse environmental effects which cannot be avoided should the proposal be implemented' . . . is an understanding that the EIS will discuss the extent to which adverse effects can be avoided." *Robertson*, 490 U.S. at 352; *see also* 89 Fed. Reg. 35,518 ("to the extent that identification" of reasonably foreseeable effects "assumes the implementation of mitigation measures to avoid adverse effects, it follows, in turn, that implementation of mitigation must also be reasonably foreseeable"). "More generally, omission of a reasonably complete discussion of possible mitigation measures would undermine the 'action-forcing' function of NEPA." *Robertson*, 490 U.S. at 352. On the other hand, NEPA has never contained "a substantive requirement that a complete mitigation plan be actually formulated and adopted." *Id.*[29] The 2024 Rule respects that distinction.

The Rule incorporates mitigation at two decision points. First, after preparing an EA, an agency may prepare "[a] mitigated [FONSI] if the agency determines, based on the [EA], that NEPA does not require preparation of an [EIS] because the proposed action will not have significant effects due to mitigation." 40 C.F.R. § 1501.6(a)(2). In turn, "the mitigated [FONSI] shall state the enforceable mitigation requirements or commitments that will be undertaken and

---

[29]    The factual background of *Robertson* is relevant here. There, the U.S. Forest Service prepared an EIS related to a permit for ski development in the North Cascades National Park. *Id.* at 337-38. But the Forest Service did not rely on mitigation to avoid identifying adverse effects, instead explaining, for example, that "development . . . will result in violations of state air-quality standards unless effective mitigation measures are put in place by the local governments and the private developer." *Id.* at 347. Thus, the case did not present a situation where tentatively supported assumptions about mitigation prevented decision makers and the public from "properly evaluat[ing] the severity of the adverse effects." *Id.* at 352.

the authority to enforce them . . . and the agency shall prepare a monitoring and compliance plan for that mitigation . . . ."  *Id*. § 1501.6(d).  In this scenario, the enforceable mitigation is an element of the agency's FONSI, rather than an independent requirement.

Second, if an agency prepares an EIS, it must prepare a ROD stating the decision, alternatives considered, and "whether the agency has adopted all practicable means to mitigate environmental harm."  40 C.F.R. § 1505.2(c) (a requirement that has been in CEQ's regulations since 1978).  If the agency chooses assume that mitigation will occur (*i.e.*, "when the record of decision incorporates mitigation *and* the analysis of the reasonably foreseeable effects of the proposed action is based on implementation of that mitigation" (emphasis added)), the agency must identify the authority for the mitigation and prepare a monitoring and compliance plan.  *Id.* § 1505.2(c).  Here too, the choice to rely on mitigation comes from the agency's determination, not the 2024 Rule.

Thus, in either event, the 2024 Rule:

[D]oes not require agencies to include enforceable mitigation measures in every decision subject to NEPA or require them to adopt mitigation in any circumstance; rather, the provision reinforces the integrity of environmental reviews by ensuring that if an agency assumes as part of its analysis that mitigation will occur and will be effective, the agency takes steps to ensure that this assumption is correct, including by making the mitigation measures enforceable.

89 Fed. Reg. 35,516.  As such, it ensures the integrity and reliability of information in NEPA reviews.  *See* 42 U.S.C. §§ 4332(2)(D), (E).

Those provisions are consistent with judicial interpretations of NEPA's mitigation principles.  It is well-established that "reliance on mitigation measures may reduce a project's impacts below the level of significance."  *O'Reilly v. U.S. Army Corps of Eng'rs*, 477 F.3d 225, 231 (5th Cir. 2007).  But such an analysis must "sufficiently demonstrate that the mitigation measures adequately address and remediate the adverse impacts so that they will not

significantly affect the environment."  *Id.* at 234; *see also Nat'l Audubon Soc'y v. Hoffman*, 132

F.3d 7, 17 (2d Cir. 1997) ("When the adequacy of proposed mitigation measures is supported by

substantial evidence, the agency may use those measures as a mechanism to reduce

environmental impacts below the level of significance that would require an EIS."); *Ohio Valley*

*Env't Coal. v. Hurst*, 604 F. Supp. 2d 860, 888-89 (S.D. W.Va. 2009) (mitigation must be "more

than a possibility" and "there must be some assurance that the proposed mitigation measures will

be successful." (citations omitted)).

Despite that background, the States allege that three provisions of Section 1505.3 are

"substantive," and thus "invalid."  Pls.' Mem. at 28.  Specifically, the States challenge: (1)

Section 1505.3(a)(1)-(2) (which requires agencies to ensure mitigation "committed as part of the

decision" is "implemented," including by "appropriate conditions in grants, permits, or other

approvals" or "[c]ondition[ing] funding of actions on mitigation"); (2) Section 1505.3(b)

(encouraging agencies, "where relevant and appropriate" to incorporate mitigation for actions

that adversely affect environmental justice communities); and (3) Section 1505.3(c) (requiring a

monitoring and compliance plan for mitigation incorporated into FONSIs, RODs, or other

decision documents).

First, as to Section 1505.3(a), the Rule ensures that when an agency "commit[s]" to

mitigation "as part of the decision," the mitigation will be implemented.  But this provision does

not require an agency to commit to mitigation.  Moreover, the provision was substantively

identical in the 2020 Rule and 1978 Regulations.  *See* 85 Fed. Reg. 43,369; 43 Fed. Reg. 56,000.

Thus, the States are wrong the 2024 Rule imposes new obligations.  Moreover, this requirement

accords with caselaw finding that "mitigating measures must be 'more than mere vague

statements of good intentions.'" *Audubon Soc'y of Cent. Ark. v. Dailey*, 977 F.2d 428, 436 (8th Cir. 1992) (citation omitted)).

Second, Section 1505.3(b) encourages agencies to consider mitigation that furthers NEPA's goal of public health protection. As CEQ explained, this provision is intended to "highlight the importance of considering environmental justice and addressing disproportionate effects through the NEPA process and the associated decision." 89 Fed. Reg. 35,517. But it "does not impose any binding requirements on agencies, [and] rather codifies a portion of CEQ's longstanding position that agencies should, as a policy matter, mitigate significant adverse effects where relevant and appropriate . . . ." *Id.* Thus, the States are once again incorrect that the Rule imposes a substantive requirement.

Third, the States argue that Section 1505.3(c) improperly expands the requirement for agencies to monitor mitigation measures. But the provision is only a codification of the logical notion that when an agency bases its effects analysis on mitigation *and* incorporates that mitigation into the decision, the agency and the public should have some certainty that the mitigation will be implemented as predicted. *See Hoffman*, 132 F.3d at 17 ("Absent substantial evidence to support the efficacy of [the mitigation measure], we . . . are left with the firm conviction that the [agency] could not have adequately considered the significance of its proposed action's impact on the environment."). Were it otherwise, the agency's analysis would lack the integrity and reliability required by statute. *See* 42 U.S.C. § 4332(2)(D), (E). As CEQ detailed, the provision "would not require a monitoring and compliance plan where an agency analyzes and discloses the effects of the action without the mitigation measure because, in that circumstance, the agency would not base its identification of reasonably foreseeable effects on the mitigation measure." 89 Fed. Reg. 35,518; *see also id.* at 35,516 ("This provision does not

prohibit agencies from approving proposals with unmitigated adverse environmental effects"). But, to the extent "identification [of effects] assumes the implementation of mitigation measures . . . [t]he preparation of a monitoring and compliance plan [ ] provides the agency with reasonable certainty that the mitigation measures upon which it has based its effects analysis will be implemented."  *Id*. at 35,518; *see also Hillsdale Env't Loss Prevention, Inc. v. U.S. Army Corps of Eng'rs*, 702 F.3d 1156, 1174 (10th Cir. 2012) (mitigation plan was sufficient because the "plan's mandatory monitoring provisions are designed to ensure [the project sponsor] adopts effective mitigation measures"); *Hoffman*, 132 F.3d at 17 (explaining substantial evidence mitigation would be successful could mean that mitigation was "based on studies conducted by the agency" or "likely to be adequately policed").

And contrary to the States' assertions that the Rule imposes "consequence[s] [for] unsuccessful mitigation," Pls.' Mem. at 29, CEQ clarified it did not intend to "address effectiveness of the mitigation" after-the-fact.  89 Fed. Reg. 35,519; *see AquaAlliance v. U.S. Bureau of Reclamation*, 287 F. Supp. 3d 969, 1054 n.49 (E.D. Cal. 2018) (noting a difference between "impos[ing] a substantive mitigation requirement" and "enforc[ing] 'NEPA's procedural requirement that an agency evaluate the effectiveness of the mitigation it proposes.'" (citation omitted)).  Although the States hypothesize that a project opponent might challenge the implementation of mitigation years after an agency action is finalized, CEQ clarified that Section 1505.3(c) does not create a "new obligation for ongoing NEPA analysis after a decision is made."  89 Fed. Reg. 35,519.  In sum, the 2024 Rule safeguards the accuracy of an agency's conclusions but does not create post-decisional remedies.  *See id*.

Finally, the States object to language in Section 1500.2(f) that encourages agencies to "avoid or minimize any possible adverse effects of their actions upon the quality of the human

environment."  Pls.' Mem. at 28.  But that hortatory language mirrors 42 U.S.C. § 4321, and in

any event, follows from the statute's purpose.  *See, e.g.*, *id*. § 4331(b) (agencies should act to

"permit high standards of living" and avoid "risk to health or safety").

     4.    <u>The 2024 Rule Does Not Inhibit Use of Categorical Exclusions.</u>

The States also allege the 2024 Rule improperly imposes limitations on the use of CEs by

"inject[ing] several substantive, policy-based limits on their adoption and use."  Pls.' Mem. at

30.  However, each of their allegations is incorrect, as the Rule instead merely takes steps to

ensure that agencies' use of CEs will be consistent with NEPA.

First, the States claim the definition of "extraordinary circumstances" in Section 1508.1

adds restrictions on use of CEs.  But the States misunderstand that the definition of

"extraordinary circumstances" does not impose restrictions, but rather identifies situations where

an agency should conduct further analysis to determine whether application of a CE to a

particular action is proper.  In other words, the extraordinary-circumstances inquiry simply

restates, in the specific context of CEs, NEPA's overarching statutory requirement that an

agency must determine whether an action "significantly affects the quality of the human

environment," requiring preparation of an EIS.  42 U.S.C. § 4332(2)(C); *see also id*. § 4336e(1).

Moreover, "the 1978 [R]egulations explained the meaning of extraordinary circumstances

as part of the definition of 'categorical exclusion' . . . ," and the 2024 Rule added "several

examples of extraordinary circumstances to help agencies and the public understand common

situations that agencies may consider . . . ."  89 Fed. Reg. 35,541-42; *see, e.g.*, *Friends of*

*Richards-Gebaur Airport v. FAA*, 251 F.3d 1178, 1185 (8th Cir. 2001).  And in any event, the

"list of examples is not exclusive, and agencies continue to have the discretion to identify

extraordinary circumstances in their NEPA implementing procedures . . . ."  89 Fed. Reg. at 35,542.

Second, the States allege Section 1501.4(e) conflicts with the FRA by improperly constraining agencies from adopting other agencies' CEs.  Pls.' Mem. at 31.  New 42 U.S.C. § 4336c requires the agency to: (1) "identify to the public the [CE] that the agency plans to use for its proposed actions"; (2) "consult with the agency that established the [CE] to ensure that the proposed adoption of the [CE] to a category of action is appropriate"; (3) identify to the public the [CE] that the agency plans to use"; and (4) "document adoption of the [CE]."

CEQ reasonably expounded on Congress's directive by laying out five steps an agency must take to adopt an apply another agency's CE.  40 C.F.R. § 1501.4(e)(3).  An agency must: (1) identify an appropriate CE listed in another agency's NEPA procedures; (2) consult with the agency that established the CE to ensure the CE is appropriate; (3) notify the public of the adoption; (4) when applying the CE, evaluate its action-specific use for extraordinary circumstances; and (5) publish documentation of how it applied the adopted CE.  *Id*.; *see also* 89 Fed. Reg. 35,475.  Neither the extraordinary-circumstances inquiry (step 4), nor the publication requirement (step 5) "superimpos[es]" any extra-textual obligations.  Pls.' Mem. at 31.

Instead, the extraordinary-circumstances inquiry enables the adopting agency "to determine whether a particular action normally covered by a CE requires preparation of an EA or EIS," just as the agency would do if it were applying its own CE.  89 Fed. Reg. 35,474.  Whether an agency is applying its own CE or one that it adopted from another agency, NEPA requires an agency to ensure that the action will not have significant effects (which would require preparation of an EIS), and the extraordinary-circumstances inquiry simply operationalizes that inquiry.  Moreover, "it is a 'cardinal rule of statutory construction' that, when Congress employs

43

a term of art, 'it presumably knows and adopts the cluster of ideas that were attached to each borrowed word in the body of learning from which it was taken.'" *FAA v. Cooper*, 566 U.S. 284, 292 (2012) (citation omitted).  Because CEQ's regulations have always required consideration of extraordinary circumstances when applying CEs to proposed actions, *see* 43 Fed. Reg. 56,003-04, it is reasonable to assume, in the absence of text to the contrary, that Congress wished to apply that established principle to adopted CEs.  It would be strange to assume Congress exempted agencies using adopted CEs from conducting extraordinary-circumstances inquiries, while agencies using those same CEs would still need to do so.

Likewise, 42 U.S.C. § 4336c(3) requires agencies to "identify to the public the categorical exclusion that the agency plans to use for its proposed actions," while Section 4336(4) requires an agency to "document adoption of the categorical exclusion."  Section 1501.4(e) of the 2024 Rule implements those provisions by requiring notice that: (1) the agency has adopted a CE from another agency; and (2) the agency has actually applied the adopted CE to a proposed action.  Thus, this provision too is firmly grounded in the statutory text.

Third, the States challenges the 2024 Rule's requirement that agency procedures provide a process for reviewing that agency's CEs at least every 10 years.  40 C.F.R. § 1507.3(c)(9).  However, CEQ explained that it has "encouraged agencies to review CEs since the 2010 guidance," and "[s]uch reviews are animated by . . .  ensur[ing] the underlying analysis and conclusions remain valid."  89 Fed. Reg. 35,534.  In other words, review every decade ensures that an agency's determination that an action "normally does not significantly affect the quality of the human environment" remains accurate such that continued use of a CE is consistent with NEPA's statutory mandate, helping to protect the future use of the CE from legal challenge.  Nothing in the FRA's text contradicts CEQ's effort to ensure agencies' CEs are kept current;

44

instead, efforts to ensure CEs remain valid are consistent with the spirit of the FRA's amendments encouraging use of CEs.

### III.   CEQ Appropriately Detailed its Departure From the 2020 Rule.

The States also fall far short in establishing that CEQ's promulgation of the 2024 Rule was arbitrary and capricious.  Pls.' Mem. at 32-36.  Instead, CEQ's changes and clarifications in the 2024 Rule are well-reasoned and more than adequately explained, and represent valid exercises of the agency's expertise in implementing NEPA.

### A.  CEQ Adequately Explained Changes in Policy Reflected in the 2024 Rule.

In urging that the Court invalidate the 2024 Rule, the States assert that the Final Rule "reverses most of the significant changes enacted by the 2020 Rule less than four years earlier." Pls.' Mem. at 33.  But CEQ retained many of the changes made in the 2020 Rule, "including changes that codified longstanding practice or guidance or enhanced the efficiency and effectiveness of the NEPA process," and removed only those provisions added in the 2020 rulemaking "that CEQ considers imprudent or legally unsettled, or that create uncertainty or ambiguity that could reduce efficiency or increase the risk of litigation."  89 Fed. Reg. 35,448.

"Agencies are free to change their existing policies as long as they provide a reasoned explanation for the change."  *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 222 (2016). And "agency action representing a policy change [need not] be justified by reasons more substantial than those required to adopt a policy in the first instance."  *FCC v. Fox Television Stations*, Inc., 556 U.S. 502, 514 (2009).  A "policy change" complies with the APA if: (1) the agency "display[s] awareness that it *is* changing position"; (2) "the new policy is permissible under the statute"; (3) "there are good reasons for" the new policy; and (4) "the agency *believes*

45

[the new policy] to be better." *Id*. at 515-16 (emphasis in original). CEQ satisfied each of these factors when it removed the three provisions that the States challenge.

First, CEQ removed language added by the 2020 rulemaking in Section 1500.1(a) that described NEPA as a purely procedural statute. CEQ described how, in its view, that language took "an inappropriately narrow view of NEPA's purpose" because "Congress established the NEPA process for the purpose of promoting informed decision making and improved environmental outcomes." 89 Fed. Reg. 35,449. The States assert that CEQ's explanation is too cursory and disagree with the agency's legal interpretation. Pls.' Mem. at 33. As discussed above, however, this change is consistent with NEPA's text and history, as well as decades of case law. And CEQ's explanation for this change fully satisfies the *Fox* test by acknowledging the change and explaining why, in the agency's view, the change better comports with NEPA's statutory purposes. Moreover, CEQ's rationale mirrors Eighth Circuit precedent recognizing that NEPA is not value-neutral but instead "foster[s] both informed decision making and informed public participation." *Friends of Boundary Waters Wilderness v. Dombeck*, 164 F.3d 1115, 1131 (8th Cir. 1999) (internal quotations omitted).

Second, CEQ removed a provision added by the 2020 Rule in Section 1503.3 that required specificity in public comments. CEQ explained that requiring such specificity could "inappropriately restrict public comments and place unnecessary burden on public commenters" because "the text could be read to require a commenter to provide a detailed examination of a moral objection to a proposed action or a personal interest in it if those inform the commenter's position on the project." 89 Fed. Reg. 35,512. Further, "[t]he text also could imply that commenters must either be an expert on the subject matter or hire an expert to provide the necessary detail." *Id*. And "the text could be read to imply that commenters are under an

obligation to collect or produce information necessary for agencies to fully evaluate issues raised in comments even if the commenters do not possess that information or the skills necessary to produce it." *Id.* The States maintain that this change, too, is arbitrary and capricious. But CEQ appropriately explained why its approach would foster (rather than potentially inhibit) public participation, a well-settled goal of NEPA. *See Friends of Boundary Waters Wilderness*, 164 F.3d at 1131.

The States argue that CEQ's reading of NEPA as to the need for specificity in public comments is "not a reasonable interpretation." Pls.' Mem. at 35. But courts have recognized that requiring members of the public to raise specific legal challenges in proceedings before agencies "might unduly burden those who . . . may frame their claims in non-legal terms rather than precise legal formulations." *Native Ecosystems Council v. Dombeck*, 304 F.3d 886, 900 (9th Cir. 2002). In any event, CEQ's change passes muster under the APA's deferential standard of review. *Voyageurs Nat'l Park Ass'n v. Norton*, 381 F.3d 759, 763 (8th Cir. 2004) ("If an agency's determination is supportable on any rational basis, [the court] must uphold it.").

Third, the 2024 Rule removed a provision in the 2020 Rule that purported to limit the judicial remedies available for findings of NEPA violations. CEQ explained that courts, not agencies, are in the best position to determine the appropriate remedy based on standards of equity. 89 Fed. Reg. 35,455.[30] The States contend that the rationale provided is "belied by the Final Rule's several other stated 'intentions' about when and how courts should review NEPA

---

[30]   Indeed, supporting CEQ's rationale here, at least one court has questioned whether CEQ in the 2020 Rule could "curtail the scope of judicial review without a clear grant of that authority from Congress . . . ." *Mulgrew v. U.S. Dep't of Transp.*, No. 24-1644, 2024 WL 3251732, at *21 (S.D.N.Y. June 20, 2024.

compliance."  Pls.' Mem. at 34 (citing 89 Fed. Reg. 35,555 (§ 1500.3(b)).  But the provision

cited by the States is inapposite, and they otherwise provide no support for their argument.

In addition to their specific challenges, the States more broadly assert the 2024 Rule is

invalid simply because the prior administration issued the 2020 Rule.  *See* Pls.' Mem. at 33

(asserting that NEPA regulations "cannot become the target of frequent seriatim changes with

every change in presidential administration").  That argument, too, is without merit because,

under the APA, "[a] change in administration brought about by the people casting their votes is a

perfectly reasonable basis for any executive agency's reappraisal of the costs and benefits of its

programs and regulations."  *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co*., 463

U.S. 29, 59 (1983) (Rehnquist, C.J., concurring in part and dissenting in part); *Dep't of Com. v.

New York*, 588 U.S. 752, 781 (2019) ("A court may not set aside an agency's policymaking

decision solely because it might have been influenced by political considerations or prompted by

an Administration's priorities."); *Organized Vill. of Kake v. U.S. Dep't of Agric*., 795 F.3d 956,

968 (9th Cir. 2015) (recognizing that *Fox* permits agencies to change policy and noting that

"elections have policy consequences").

Last, the States assert that CEQ's change in position rests on factual findings that

contradict those underlying the 2020 Rule and so require greater explanation.  *See* Pls.' Mem. at

32.  But none of the three changes identified above were based on factual findings, let alone

those that contradict the 2020 Rule.  Instead, each was made because CEQ determined that the

provisions were "imprudent or legally unsettled, or that . . . could reduce efficiency or increase

the risk of litigation."  89 Fed. Reg. 35,448.[31]

---

[31]      This is also not a case, as in *Sierra Club North Star Chapter v. LaHood*, which the States
cite, where the agency failed to "explain why [its] change is justified."  693 F. Supp. 2d 958, 973
(D. Minn. 2010).  As discussed above, CEQ explained each of the changes the States challenge.

**B.  The 2024 Rule Does Not Implicate "Serious Reliance Interests."**

The Court should likewise reject the States' argument that their "serious reliance interests" require "a more detailed justification" of the changes in the 2024 Rule.  Pls.' Mem. at 32, 34 (citing *Fox*, 556 U.S. at 515).  The States' "general assertions of reliance simply do not rise to the level of ongoing and serious reliance interests necessary to trigger a duty . . . to provide a more detailed explanation" under *Fox*.  *Am. Petroleum Inst. v. U.S. Dep't of Interior*, 81 F.4th 1048, 1061 (10th Cir. 2023).  For example, the States fail to point to any concrete investment or other financial interest that the rule upends.  *See Am. Hosp. Ass'n v. Azar*, 983 F.4d 528, 540 (D.C. Cir. 2020) (recognizing that plaintiffs must point to individualized harm, such as investment or other individualized harm, that is impacted by a regulation).

Reliance interests, moreover, are only created by "longstanding [agency] policies." *Encino*, 579 U.S. at 222.  While the States assert that they "and other project proponents have long relied on the sufficiency of NEPA analyses without added blanket requirements to adopt mitigation measures, quantify greenhouse gas emissions, or elevate environmental justice considerations," Pls.' Mem. at 34, CEQ guidance has (consistent with NEPA) long directed agencies to consider GHG emissions, environmental justice, and mitigation.  *See* pages 11-12, above.  Thus, they are wrong that the 2024 Rule represents a sea change in CEQ policy.

The States also assert that "they have long relied" on the ability to prepare NEPA documents as project proponents, or to retain third parties to prepare draft documents, and claim that "the Final Rule arbitrarily restricts such project proponent and third-party preparation of NEPA documents."  Pls.' Mem. at 34 (citing 89 Fed. Reg. 35,571, 35,574).  But, even if the States are correct, this purported "long reliance" totals all of four years given the 2020 Rule first permitted a project proponent to prepare an EIS on behalf of the agency.  85 Fed. Reg. 43,371.

In any event, the 2024 Rule implements amendments to NEPA in the FRA that require agencies to establish procedures to allow project sponsors to prepare EAs and EISs under the supervision of the agency.  *See* 42 U.S.C. § 4336a(f); 89 Fed. Reg. 35,522-24, 35,571, 35,574 (discussing FRA amendments and changes).  To the extent the States complain of those changes, Pls.' Mem. at 34, their claim is not cognizable under the APA.  *See Heckler v. Chaney*, 470 U.S. 821, 830 (1985) (claims under 5 U.S.C. § 706(2) are meant to allow a court to "judge the agency's exercise of discretion," not duties imposed by statute).

Finally, the States' claims that the 2024 Rule will lead to delays and uncertainty are entirely speculative*, see* pages 18-20, above, and belied by the Rule's incorporation of the FRA's time and page limits.  *Compare* 42 U.S.C. § 4336a(e), (g) *with* 89 Fed. Reg. 35,560 (implementing FRA deadlines).  Similarly, the States' argument that the "Final Rule is arbitrary and capricious because the timeline it sets for agencies to promulgate follow-on regulations is unrealistic," Pls.' Mem. at 36, rings hollow given that the 2020 Rule (which the States wish CEQ to return to) imposed the same 12-month deadline on agencies.  85 Fed. Reg. 43,473.

## IV.    CEQ Properly Prepared a Special Environmental Assessment.

The States further argue that in issuing the 2024 Rule, CEQ violated NEPA by preparing a "special environmental assessment."  Pls.' Mem. at 37-39.  But because the States do not assert any environmental harm, their claim falls outside NEPA's "zone of interests" and they consequently lack prudential standing.  Their claim also fails on the merits, given CEQ appropriately determined no further analysis was necessary in light of historical practice.

### A.  Plaintiffs' Claims Lie Outside NEPA's Zone of Interests.

To bring a NEPA claim, a plaintiff must demonstrate both constitutional and statutory standing.  *See Ecosystem Inv., Partners v. Crosby Dredging, L.L.C.*, 729 F. App'x 287, 291 (5th

Cir. 2018).  To demonstrate statutory standing, the States must assert an interest that falls within

the "zone of interests protected or regulated by the statutory provision." *Bennett v. Spear*, 520

U.S. 154, 162 (1997).  In other words, to pursue a NEPA claim the States must allege harm

within the scope of NEPA's purpose.  As discussed above, NEPA's purpose is to establish "a

broad national commitment to protecting and promot[ing] environmental quality." *Robertson*,

490 U.S. at 348.  Accordingly, NEPA's procedures are not implicated unless a plaintiff has an

environmental injury at stake.  *Cent. S.D. Coop. Grazing Dist.v. Sec'y of the U.S. Dep't of*

*Agric.*, 266 F.3d 889, 895-896 (8th Cir. 2001).  While the Eighth Circuit has recognized a wide

variety of allegations may satisfy NEPA's zone of interests, a plaintiff's environmental concerns

must not be so insignificant "that they ought to be disregarded altogether." *Robinson v. Knebel*,

550 F.2d 422, 425 (8th Cir. 1997) (allegations of impact to recreational hunting fell within zone

of interests); *see also Friends of Boundary Waters Wilderness*, 164 F.3d at 1126 (claims of

impaired use of a wilderness area were within NEPA's zone of interests even though most

substantive complaints were based on the economic impact of the action).

Here, though, the States have alleged *no* environmental harm.  Instead, they claim that the

2024 Rule "elevate[s] the protection of environmental resources above other priorities."  Am.

Compl. ¶ 80.  Similarly, the States point to potential "delays to the NEPA process" and the

"frustration" of "timely delivery of needed infrastructure" as the basis for their claims.  *See id*. at

¶ 61.  But the States cannot establish prudential standing under NEPA based on claims that the

2024 Rule will result in delayed completion of infrastructure or cause economic harm.  *See, e.g.,*

*Churchill Truck Lines, Inc. v. United States*, 533 F.2d 411, 416 (8th Cir. 1976) (plaintiffs failed

to establish prudential standing because their "sole motivation . . . was their own economic self-

interest and welfare"); *Cent. S.D. Coop. Grazing Dist.*, 266 F.3d at 895 (economic interests alone

are not within NEPA's zone of interests); *Rosebud Sioux*, 286 F.3d at 1038 (economic injury insufficient to establish prudential standing).[32]

### B.  The Special Environmental Assessment Complied with NEPA.

Even if the States have prudential standing, their claim fails on the merits.  The States assert that CEQ "invented the term 'special EA' for the sole purpose of promulgating" the 2024 Rule.  Pls.' Mem. at 37.  Instead, however, CEQ's issuance of a special environmental assessment to accompany its NEPA regulations is supported by consistent historical practice. *See* 43 Fed. Reg. 25,232 (determining that a special environmental assessment was appropriate to accompany the 1978 Regulations because "the impacts of procedural regulations of this kind are not susceptible to detailed analysis beyond that set out in the assessment"); 51 Fed. Reg. 15,618 (issuing a special environmental assessment to accompany the 1986 regulations).  Indeed, the 2020 Rule was not accompanied by any NEPA analysis at all, as CEQ explained that it used "a baseline of the statutory requirements of NEPA and Supreme Court case law" to determine no NEPA review was needed.  85 Fed. Reg. 43,352.  CEQ's determination here that a special environmental assessment was appropriate is therefore reasonable considering this past practice. *See* 89 Fed. Reg. 35,552; *see also Perez v. Owl, Inc.*, — F.4th —, 2024 WL 3665313 at *22-23 (11th Cir. 2024) (finding persuasive agency's "consistent position").

Finally, and as CEQ explained, procedural rulemakings of this kind are not major federal actions for purposes of triggering NEPA's requirements.  *See Heartwood, Inc. v. U.S. Forest*

---

[32]    The States also fail to comply with Eighth Circuit precedent that requires a plaintiff to reference particular statutory provisions to establish prudential standing.  *See Cent. S.D. Coop. Grazing Dist.*, 266 F.3d at 896.  Thus, even if the States had made some colorable claim of environmental harm, which they did not, their cursory reference to a single provision of NEPA is insufficient.  *See Bennett*, 520 U.S. at 175-76.

*Serv.*, 230 F.3d 947, 954-955 (7th Cir. 2000).[33]  CEQ's issuance of a special environmental

assessment was more than sufficient.  And in any event, CEQ appropriately determined the Rule

would have no significant environmental impact.  89 Fed. Reg. 35,552.

## V.    The 2024 Rule Does Not Implicate the Major Questions Doctrine.

The States' argument that the Final Rule violates the "major questions" doctrine fares no

better.  Pls.' Mem. at 39-41.  In *West Virginia v. EPA*, the Supreme Court recognized a small

category of "'extraordinary cases' in which the 'history and the breadth of the authority that the

agency has asserted,' and the 'economic and political significance' of that assertion [of

authority], provide a 'reason to hesitate before concluding that Congress' meant to confer such

authority."  597 U.S. 697, 721-23 (2022) (quotation omitted)).  None of those considerations

apply here.

Rather than regulating economic activity, the 2024 Rule governs the procedures agencies

must follow in conducting reviews under NEPA.  And the Supreme Court has recognized a clear

authorization for CEQ to promulgate regulations implementing NEPA.  *See Pub. Citizen*, 541

U.S. at 757.  Thus, CEQ is exercising the same authority that the agency used when issuing the

2020 Rule, and the States' arguments to the contrary are internally inconsistent.  Further, in *West*

*Virginia* and the other cases referenced by the Court that triggered the "major questions"

doctrine, agencies acted on never used, or rarely used, statutory authority. 597 U.S. at 724-25.

Here, however, CEQ has acted under the same authority, 42 U.S.C. § 4334(4), for over 40 years.

*See, e.g.*, *DACO Invest.*, *LLC v. U.S. Small Bus. Admin.*, No. 22-1444, 2024 WL 750594, at *17

(W.D. La. Feb. 22, 2024) (doctrine not implicated where agency was "following Congress'

---

[33]     The States attempt to distinguish *Heartwood* by arguing that the 2024 Rule is improperly substantive.  But, as explained throughout this memorandum, this claim is meritless.

directive . . . under the umbrella of [a] pre-existing [statutory] program.").

Nor does the 2024 Rule represent the sort of "transformative expansion in [CEQ's] regulatory authority" that implicates the major questions doctrine.  *West Virginia*, 597 U.S. at 724.  Though the States argue that the doctrine is triggered because the Final Rule seeks to insert "action-forcing requirements," Pls.' Mem. at 39, that claim is belied by the fact that Congress used precisely that language in enacting NEPA.  *See* S. Rep. No. 91-296 at 9.  Thus, Congress "could reasonably be understood" to delegate such rulemaking to CEQ.  *West Virginia*, 597 U.S. at 724.

Finally, the States improperly direct arguments toward *NEPA's* alleged effects on economic development.  Pls.' Mem. at 39.  But the major questions doctrine does not function as a substitute for challenges to Congress's power to regulate.  *See Cal. Trucking Ass'n v. South Coast Air Quality Mgmt. Dist.*, No. 21-6341, 2023 WL 9622548, at *30 (C.D. Cal. Dec. 14, 2023) (the "doctrine . . . applies to the balance of power between Congress and federal agencies, not the balance of power between the federal government and the states.").

## VI.  The States' Requested Remedies are Improper.

Last, the States request that the Court "[v]acate and set aside the Final Rule" and reimpose the 2020 Rule.  Am. Compl., Prayer for Relief, ¶¶ c, f.  But, for the reasons sketched out briefly below, such categorical and wholesale relief is inappropriate, and Federal Defendants respectfully request that the Court order supplemental briefing on remedy in the event it grants summary judgment to the States on any of their claims, since the proper remedy will be contingent on which claims the Court finds meritorious, if any.

First, the 2024 Rule incorporates a severability clause, 89 Fed. Reg. 35,555, and the Court should consequently determine the appropriate remedy on a provision-by-provision basis.

*See United Food and Comm. Workers Union, Local No. 663 v. U.S. Dep't of Agric.*, 532 F. Supp. 3d 741 (D. Minn. 2021) (citing *Carlson v. U.S. Postal Regul. Comm'n*, 938 F.3d 337, 351 (D.C. Cir. 2019)).  Second, the remedy of vacatur is not found in the APA's text and contravenes the principles that should guide the selection of remedy.  *See United States v. Texas*, 599 U.S. 670, 693-704 (2023) (Gorsuch, J, concurring); *but see Corner Post v. Bd. of Governors of the Fed. Reserve Sys*, 144 S. Ct. 2440, 2461-65 (2024) (Kavanaugh, J., concurring).  Third, even if vacatur is available under the APA, it is an equitable remedy that should only be imposed after weighing the "seriousness" of the agency's error against the "disruptive consequences of vacatur."  *See, e.g*., *United Food & Commercial Workers Union*, 532 F. Supp. 3d at 778 (citing *Allied-Signal, Inc. v. United States Nuclear Regul. Comm'n*. 988 F.2d 146, 150-51 (D.C. Cir. 1983)).  Fourth, and similarly, wholesale injunctive relief requires a careful balancing of the equities and should be no broader than needed to give relief to those States that have shown imminent injury.  Here, not only do some of the plaintiff States fail to even allege specific harms from the 2024 Rule, but judicial reimposition of the 2020 Rule would conflict with the FRA's intervening change in law.  *See Braidwood Mgmt., Inc. v. Becerra*, 104 F.4th 930, 954 & n.17 (5th Cir. 2024) (universal "injunctions are not 'required or even the norm,' and several justices on the Supreme Court have viewed them with conspicuous skepticism."); *see also Arkansas v. U.S. Dep't of Educ.*, — F. Supp. 3d. —, 2024 WL 3518588, at *20 (E.D. Mo. July 24, 2024) (explaining that "issuing a nationwide injunction in this case would prevent the Final Rule from taking effect for those States not requesting such relief").

## CONCLUSION

For the foregoing reasons, Federal Defendants request that the Court deny Plaintiffs' request for summary judgement and grant summary judgment to Defendants on all counts.

Respectfully submitted this 30th day of August, 2024,

> TODD KIM
> Assistant Attorney General
> United States Department of Justice
> Environment & Natural Resources Division
>
> */s/ DRAFT*
> GREGORY M. CUMMING
> PAUL G. FREEBORNE
> SAMANTHA G. PELTZ
> Environment & Natural Resources Division
> 150 M St., N.E.
> Washington, D.C. 20002
> (202) 305-0457 (phone)
> (202) 598-0414 (cell)
> gregory.cumming@usdoj.gov
> paul.freeborne@usdoj.gov
> samantha.peltz@usdoj.gov

56