IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA
BISMARK DIVISION

| | |
|---|---|
| STATE OF IOWA, et al.,<br><br>    Plaintiffs,<br><br> v.<br><br>COUNCIL ON ENVIRONMENTAL QUALITY, and BRENDA MALLORY, in her official capacity as Chair,<br><br>    Defendants,<br><br>ALASKA COMMUNITY ACTION ON TOXICS; CENTER FOR BIOLOGICAL DIVERSITY; CENTER FOR ENVIRONMENTAL HEALTH; CENTER FOR FOOD SAFETY; ENVIRONMENTAL LAW AND POLICY CENTER; ENVIRONMENTAL PROTECTION INFORMATION CENTER; FOOD & WATER WATCH; FORT BERTHOLD POWER; FRIENDS OF THE EARTH; GREEN LATINOS; LABOR COUNCIL ON LATIN AMERICAN ADVANCEMENT; MĀLAMA MĀKUA; NATIONAL PARKS CONSERVATION ASSOCIATION; NATIONAL WILDLIFE FEDERATION; OCEAN CONSERVANCY; PEOPLE'S COLLECTIVE FOR ENVIRONMENTAL JUSTICE; RIO GRANDE INTERNATIONAL STUDY CENTER; SOUTHERN UTAH WILDERNESS ALLIANCE; WE ACT FOR ENVIRONMENTAL JUSTICE; THE WILDERNESS SOCIETY, and WINTER WILDLANDS ALLIANCE,<br><br>    Intervenor-Defendants. | Case No. 1:24-cv-00089-DMT-CRH |

**INTERVENOR-DEFENDANTS' MEMORANDUM OF LAW
IN SUPPORT OF OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY
JUDGMENT AND CROSS-MOTION FOR SUMMARY JUDGMENT**

**TABLE OF CONTENTS**

INTRODUCTION ...............................................................................................................1

STATEMENT OF UNCONTESTED MATERIAL FACTS ...........................................2

STANDARD OF REVIEW .............................................................................................5

ARGUMENT ...................................................................................................................6

I.  THE FINAL RULE DOES NOT "TRANSFORM" NEPA INTO A
    SUBSTANTIVE DIRECTIVE. ...............................................................................6

    A.  NEPA Imposes Procedural Requirements to Improve Agency Decision-
        Making. .......................................................................................................6

    B.  The Final Rule Properly Identifies Climate and Environmental Justice
        Issues Consistent with NEPA, Case Law, and Other Authority. .............9

        1.  Environmental justice ................................................................10

        2.  Climate change............................................................................14

        3.  Indigenous Knowledge ...............................................................16

        4.  Worldwide effects........................................................................20

    C.  The Final's Rule's Reference to an "Environmentally Preferable
        Alternative" Is Consistent with NEPA. ....................................................21

    D.  The Final Rule Does Not Create Substantive Mitigation Requirements. ..............23

    E.  The Final Rule Lawfully Addresses the Use of Categorical Exclusions. ..............26

II.  PLAINTIFFS FAIL TO MEET THEIR BURDEN TO SHOW THAT THE RULE
     IS ARBITRARY AND CAPRICIOUS. ...............................................................29

III. PLAINTIFFS FAIL TO SHOW THAT THE FINAL RULE VIOLATES NEPA...........32

IV.  THE FINAL RULE DOES NOT VIOLATE THE "MAJOR QUESTIONS
     DOCTRINE."........................................................................................................34

V.   IF THIS COURT FINDS A LEGAL VIOLATION IN SOME ASPECT OF THE
     FINAL RULE, IT SHOULD ORDER ADDITIONAL BRIEFING ON REMEDY........35

CONCLUSION................................................................................................................36

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*350 Mont. v. Haaland*,
    50 F.4th 1254 (9th Cir. 2022) ...................................................................................14

*Alaska Survival v. Surface Transp. Bd.*,
    705 F.3d 1073 (9th Cir. 2013) .................................................................................21

*Allied-Signal, Inc. v. U.S. Nuclear Regul. Comm'n*,
    988 F.2d 146 (D.C. Cir. 1993) ...........................................................................35, 36

*Andrus v. Sierra Club*,
    442 U.S. 347 (1979) ...................................................................................................8

*Missouri ex rel. Bailey v. U.S. Dep't of Interior*,
    73 F.4th 570 (8th Cir. 2023) ......................................................................................7

*Bayou Liberty Ass'n v. U.S. Army Corps of Eng'rs*,
    217 F.3d 393 (5th Cir. 2000) ...................................................................................25

*Calvert Cliffs Coordinating Comm., Inc. v. U. S. Atomic Energy Comm'n*,
    449 F.2d 1109 (D.C. Cir. 1971) .................................................................................7

*City of Port Isabel v. FERC*,
    No. 23-1174, 2024 WL 3659344 (D.C. Cir. Aug. 6, 2024) ....................................12

*Coliseum Square Ass'n, Inc. v. Jackson*,
    465 F.3d 215 (5th Cir. 2006) ...................................................................................12

*Dep't of Transp. v. Pub. Citizen*,
    541 U.S. 752 (2004) ...................................................................................................8

*Env't Def. Fund v. Massey*,
    986 F.2d 528 (D.C. Cir. 1993) .................................................................................20

*FCC v. Fox Television Studios*,
    556 U.S. 502 (2009)......................................................................................29, 30, 32

*Heartwood v. U.S. Forest Serv.*,
    380 F.3d 428 (8th Cir. 2004) ...................................................................................33

*Kentucky v. Fed. Highway Admin.*,
    No. 5:23-cv-162-BJB, 2024 WL 1402443 (W.D. Ky. Apr. 1, 2024) ......................36

*Kleppe v. Sierra Club*,
    427 U.S. 390 (1976)....................................................................................................8

*Lands Council v. Powell*,
  395 F.3d 1019 (9th Cir. 2005) ..........................................................................30

*Lilliputian Sys., Inc. v. Pipeline and Hazardous Materials Safety Admin.*,
  741 F.3d 1309 (D.C. Cir. 2014) .......................................................................19

*Loper Bright Enters. v. Raimondo*,
  144 S. Ct. 2244 (2024) ..................................................................................5, 8

*Marsh v. Or. Nat. Res. Coun*cil,
  490 U.S. 360 (1989) ........................................................................................25

*Massachusetts v. EPA*,
  549 U.S. 497 (2007) ........................................................................................14

*Mid States Coal. for Progress v. Surface Transp. Bd.*,
  345 F.3d 520 (8th Cir. 2003) .......................................................12, 15, 21, 22

*Minn. Pub. Int. Rsch. Grp. v. Butz*,
  498 F.2d 1314 (8th Cir. 1974) ...........................................................................9

*Missouri v. Biden*,
  Nos. 24-2332 & 24-2351, 2024 WL 3738157 (8th Cir. Aug. 9, 2024) ...........35

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
  463 U.S. 29 (1983) .............................................................................................5

*Myersville Citizens for a Rural Cmty. v. FERC*,
  783 F.3d 1301 (D.C. Cir. 2015) .......................................................................21

*Robertson v. Methow Valley Citizens Council*,
  490 U.S. 332 (1989) ...........................................................................2, 7, 8, 30

*Seven Cnty. Infrastructure Coal. v. Eagle Cnty.*,
  No. 23-975, 2024 WL 3089539 (U.S. June 24, 2024) .....................................16

*Sierra Club v. EPA*,
  252 F.3d 943 (8th Cir. 2001) .........................................................................6, 15

*Sierra Club v. FERC*,
  867 F.3d 1357 (D.C. Cir. 2017) .......................................................................12

*Sierra Club v. U.S. Army Corps of Eng'rs*,
  446 F.3d 808 (8th Cir. 2006) .............................................................................8

*Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*,
  255 F. Supp. 3d 101 (D.D.C. 2017) .............................................................13, 36

*State v. Biden*,
    52 F.4th 362 (8th Cir. 2022) ..................................................................14

*Trenton Threatened Skies, Inc., v. Fed. Aviation Admin.*,
    90 F.4th 122 (3rd Cir. 2024) ..................................................................12

*Vecinos para el Bienestar de la Comunidad Costera v. FERC*,
    6 F.4th 1321 (D.C. Cir. 2021) ..........................................................12, 14

*Vermonters for a Clean Env't v. Madrid*,
    73 F. Supp.3d 417 (D. Vt. 2014) ............................................................22

*Voyageurs Nat'l Park Ass'n v. Norton*,
    381 F.3d 759 (8th Cir. 2004) .................................................................2, 6

*Weissich v. United States*,
    4 F.3d 810 (9th Cir. 1993) .....................................................................23

*West Virginia v. EPA*,
    597 U.S. 697 (2022) ...............................................................................34

*WildEarth Guardians v. U.S. Bureau of Land Mgmt.*,
    870 F.3d 1222 (10th Cir. 2017) ..............................................................14

**Statutes**

5 U.S.C. § 706 ...............................................................................................5

5 U.S.C. § 706(2)(A) .....................................................................................5

42 U.S.C. § 4223(C) ......................................................................................2

42 U.S.C. § 4321 ......................................................................................2, 11

42 U.S.C. § 4331 ..........................................................................................24

42 U.S.C. § 4331(a) ..................................................................................2, 11

42 U.S.C. § 4331(b)(1) ................................................................................14

42 U.S.C. § 4331(b)(2) ................................................................................11

42 U.S.C. § 4331(b)(4) ................................................................................11

42 U.S.C. § 4331(c) .....................................................................................11

42 U.S.C. § 4332 ............................................................................................2

42 U.S.C. § 4332(2)(I) .................................................................................20

42 U.S.C. § 4332(2)(C)(iii) ................................................................................21

42 U.S.C. § 4336(a)(2) ......................................................................................33

42 U.S.C. § 4336(b)(1) ......................................................................................32

42 U.S.C. § 4336(b)(2) ......................................................................................33

42 U.S.C. § 4336a ........................................................................................4, 33

42 U.S.C. § 4336a(f) ....................................................................................30, 31

42 U.S.C. § 4336c .............................................................................................28

42 U.S.C. § 4342 ................................................................................................3

42 U.S.C. § 4346b .............................................................................................20

Pub. L. No. 118-5, 137 Stat. 38 (June 3, 2023) .................................................4

## Rules and Regulations

36 C.F.R. § 219.19 ............................................................................................17

36 C.F.R. § 220.6(b)(2) .....................................................................................27

40 C.F.R. § 1500.1(b) ........................................................................................15

40 C.F.R. § 1500.2(f) .........................................................................................24

40 C.F.R. § 1500.6 (1978) (2020) (2024) ..........................................................29

40 C.F.R. § 1501.3(d)(1) ...................................................................................20

40 C.F.R. § 1501.4(b)(1) ...................................................................................27

40 C.F.R. § 1502.12 ..........................................................................................21

40 C.F.R. § 1502.14(f) ....................................................................10, 21, 22, 23

40 C.F.R. § 1502.16 .....................................................................................10, 16

40 C.F.R. § 1502.16(e)–(h) ...............................................................................23

40 C.F.R. § 1502.24 (1978) ...............................................................................15

40 C.F.R. § 1503.3 .............................................................................................30

40 C.F.R. § 1503.3(d) ........................................................................................23

40 C.F.R. § 1504.2 ................................................................................................21

40 C.F.R. § 1504.3(c)(2)(vi) ..................................................................................23

40 C.F.R. § 1505.2 (1978) .....................................................................................21

40 C.F.R. § 1505.2(c) .......................................................................................23, 24

40 C.F.R. § 1505.3 .................................................................................................23

40 C.F.R. § 1505.3(a) .............................................................................................24

40 C.F.R. § 1505.3(b) .............................................................................................23

40 C.F.R. § 1506.3(d) .............................................................................................28

40 C.F.R. § 1506.5 .................................................................................................31

40 C.F.R. § 1506.5(a) .............................................................................................31

40 C.F.R. § 1506.6 .................................................................................................18

40 C.F.R. § 1506.6(a) .............................................................................................18

40 C.F.R. § 1506.6(b) .............................................................................................16

40 C.F.R. § 1507.3 (1978) .....................................................................................32

40 C.F.R. § 1507.3(c)(8) .........................................................................................27

40 C.F.R. § 1508(n) ................................................................................................21

40 C.F.R. § 1508.1(i)(4) ..........................................................................................16

40 C.F.R. § 1508.1(o) ..................................................................................10, 26, 27

40 C.F.R. § 1508.1(y) .............................................................................................23

40 C.F.R. § 1508.4 (1978) .....................................................................................27

40 C.F.R. § 1508.8 (1978) .....................................................................................10

40 C.F.R. § 1508.14 ...............................................................................................10

40 C.F.R. § 1508.27 ...............................................................................................10

**Federal Register**

44 Fed. Reg. 1,957 (Jan. 9, 1979) .........................................................................20

74 Fed. Reg. 66,496 (Dec. 15, 2009) ...............................................................14

76 Fed. Reg. 3,843 (Jan. 21, 2011) .................................................................23

85 Fed. Reg. 43,304 (July 16, 2020) ..................................................3, 8, 33, 34

88 Fed. Reg. 1,196 (Jan. 9, 2023) ...................................................................15

89 Fed. Reg. 35,442 (May 1, 2024) ........................................................ *passim*

INTRODUCTION

The National Environmental Policy Act ("NEPA") includes both a sweeping declaration of national priorities and a process requiring federal agencies to consider the consequences of their actions. By requiring transparency and public input about the environmental and health impacts of agency actions, NEPA aims to drive better decisions. For decades, courts and agencies have recognized that while the statute's requirements are procedural, NEPA seeks to ensure that the values of environmental preservation are integrated into agency decisions. Congress reaffirmed these important legislative purposes as recently as 2023, when it amended NEPA as part of the Fiscal Responsibility Act to streamline certain processes and clarify key terms, but otherwise left NEPA's fundamental purpose and structure untouched.

Plaintiffs' attack on the Council on Environmental Quality's ("CEQ's") 2024 NEPA implementing regulations ignores both NEPA's core principles and Congress's recent amendments to the statute. The central premise of Plaintiffs' challenge is that the Final Rule somehow transforms NEPA from a procedural statute into one mandating particular substantive outcomes. The Final Rule does nothing of the sort. The Final Rule primarily restores regulatory language that had been in place for decades but was rewritten in a controversial 2020 overhaul of NEPA's implementing rules that was challenged in five separate court cases. The Final Rule also implements the changes enacted by Congress in the Fiscal Responsibility Act, and updates the regulations to reflect judicial precedent and guidance. CEQ finalized the Final Rule only after conducting a lengthy administrative process, considering extensive public and Tribal input, and carefully explaining its decision.

Intervenors Alaska Communities for Alternatives to Toxics *et al.* ("ACAT") are a diverse coalition of conservation, labor, Indigenous, and environmental justice advocates who support and rely on NEPA's fundamental premise: that transparency around environmental impacts and

1

consideration of public input result in better and more durable decisions. ACAT respectfully requests that this Court deny Plaintiffs' motion for summary judgment.

STATEMENT OF UNCONTESTED MATERIAL FACTS[1]

Responding to a growing awareness of environmental degradation, Congress enacted NEPA in 1969. 89 Fed. Reg. 35,442 (May 1, 2024). The enacted purpose of NEPA is to "encourage productive and enjoyable harmony" between people and the environment, to "prevent or eliminate damage to the environment and biosphere and stimulate the health and welfare" of people; and "to enrich the understanding of the ecological systems and natural resources…." 42 U.S.C. § 4321. It declared a "national environmental policy" to use "all practicable means and measures … to foster and promote the general welfare," to create "productive harmony" between people and the environment, "and to fulfill the needs of "present and future generations" of all Americans. *Id*. § 4331(a).

NEPA directs that all agencies "to the fullest extent possible" are to implement their policies, regulations, and laws in accordance with NEPA's goals. 42 U.S.C. § 4332. More concretely, NEPA directs agencies to prepare "a detailed statement" on major federal actions that significantly affect the human environment. *Id*. § 4223(C). Such statements should evaluate the reasonably foreseeable effects of the action and a "a reasonable range of alternatives" to the action. *Id.*; *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 348 (1989) ("NEPA declares a broad national commitment to protecting and promoting environmental quality. To ensure that this commitment is 'infused into the ongoing programs and actions of the Federal Government, the act also establishes some important 'action-forcing' procedures.'").

---

[1] While North Dakota's local rules require a statement of uncontested facts, cases brought under the Administrative Procedure Act are resolved on summary judgment on the basis of an administrative record. *Voyageurs Nat'l Park Ass'n v. Norton*, 381 F.3d 759, 763 (8th Cir. 2004).

NEPA also created CEQ to administer the statute. 42 U.S.C. § 4342. Eight years after NEPA's enactment, CEQ promulgated detailed implementing regulations based on its experience and court precedent during the statute's early years. 89 Fed. Reg. at 35,446; AR 42696. The 1978 regulations laid out in detail the policy and purposes of NEPA; what events triggered what level of environmental review; public and agency comment and review procedures; and definitions of key terms. *Id*. The regulations also formed the foundation for more specific rules enacted by the federal action agencies—from the U.S. Forest Service to the Federal Energy Regulatory Commission—to implement NEPA's environmental protection goals within the context of their specific missions. The 1978 regulations proved remarkably durable, with only minor changes adopted on a handful of occasions over the next 42 years.

That history of continuity ended in 2020. On July 16, 2020, CEQ issued the final 2020 Rule, a significant and controversial overhaul of the 1978 regulations. 85 Fed. Reg. 43,304 (July 16, 2020). The 2020 Rule limited the scope of actions to which NEPA applied, lessened environmental analysis requirements, reduced the ability of the public to participate in federal agency decision-making, and sought to limit judicial review of agency NEPA compliance. AR 6542. The 2020 Rule was subject to no fewer than five federal lawsuits from various entities, including many of the intervenors here. 89 Fed. Reg. at 35,446.

In January 2021, the incoming administration signaled a return to the status quo. AR 33672. The executive order prompted CEQ to review the 2020 NEPA rule and to undertake a multi-phase rulemaking process to restore and, as appropriate, update the NEPA regulations. CEQ began the rulemaking process by issuing an interim final rule that gave action agencies two more years to amend their agency-specific NEPA procedures. AR 32897. In April of 2022, CEQ issued a "Phase I" final rule that restored three key elements of the 1978 regulations. AR 43863

(making changes to "purpose and need" of proposed action, agency procedures for implementing CEQ's regulations, and definition of effects).

CEQ then initiated a process to review the NEPA rules more comprehensively. AR 001. CEQ engaged agency experts, conducted Tribal consultations, held public hearings, and oversaw an extensive public comment period on the proposed rule, ultimately receiving almost 150,000 comments from agencies, states, Tribes, experts, and members of the public. 89 Fed. Reg. at 35,447. Unsurprisingly, the comments reflected a wide variety of positions. Some entities urged CEQ to promulgate regulations that streamlined NEPA's processes or limited public participation and judicial oversight. Other entities urged CEQ to restore more of the 1978 regulations and modernize the rules in light of new environmental challenges that have emerged since the 1970s. *See, e.g.*, AR 24550; AR 3029; AR 23594; AR 25118.

During the rulemaking process, Congress enacted the first statutory changes to NEPA in fifty years. *See* Pub. L. No. 118-5, 137 Stat. 38 (June 3, 2023). That legislation, the Fiscal Responsibility Act, was a bipartisan compromise primarily addressing the federal debt ceiling, and did not alter NEPA's core purpose, goals, or basic structure. Instead, the amendments clarified certain procedural aspects of NEPA's implementation to ensure "timely and unified" federal reviews, such as page limits, deadlines, and streamlined judicial review. 42 U.S.C. § 4336a; AR 23664 (Act was the result of "extensive negotiations" between White House and Congress).

CEQ published the "Phase II" Final Rule on May 1, 2024. 89 Fed. Reg. 35,442 (May 1, 2024) ("Final Rule"). The Final Rule reinstated several longstanding provisions from the 1978 regulations that had been altered in the 2020 Rule. *Id*. at 35,465–68. It also updated the 1978 regulations to account for the Fiscal Responsibility Act amendments, and to address intervening

case law and public comments. For example, the Final Rule includes provisions implementing

the page and time limits enacted in the Fiscal Responsibility Act. It also contains provisions

confirming that agencies must weigh relevant climate and environmental justice considerations

in their environmental reviews, consistent with existing practices and governing case law. The

Final Rule was supported by nearly 140 pages of Federal Register text explaining the decision, a

nearly 1,000-page response to public comments, an environmental assessment considering the

Rule's effects, and a regulatory impact analysis evaluating costs and benefits. AR 66; AR 27821;

AR 27761. This lawsuit followed.

## STANDARD OF REVIEW

The Administrative Procedure Act ("APA"), 5 U.S.C. § 706, governs Plaintiffs' claims.

Under the APA, review of an agency decision is limited, and courts only set aside agency action

that is "arbitrary, capricious, and an abuse of discretion, or otherwise not in accordance with

law." *Id*. § 706(2)(A). As to claims that an agency has not acted in accordance with law, though

agencies' interpretations of their governing statutes do not receive deference, longstanding

agency interpretations do receive meaningful "respect" from courts interpreting the same

statutory provisions. *Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244, 2267 (2024). Agency

action is arbitrary and capricious "if the agency has relied on factors which Congress has not

intended it to consider, entirely failed to consider an important aspect of the problem, offered an

explanation for its decision that runs counter to the evidence before the agency, or is so

implausible that it could not be ascribed to a difference in view or the product of agency

expertise." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S.

29, 43 (1983). When evaluating such claims, this Circuit directs courts to give "agency decisions

a high degree of deference." *Sierra Club v. EPA*, 252 F.3d 943, 947 (8th Cir. 2001).

"It is well-established that judicial review under the APA is limited to the administrative record that was before the agency when it made its decision." *Voyageurs*, 381 F.3d at 765.[2] Exceptions to this rule are "very narrow," and consideration of extra-record materials allowed only in "extraordinary circumstances." *Id*. at 766. Plaintiffs' summary judgment motion does not adhere to this standard, rarely supporting its arguments with references to the record or the governing standard of review. Nor do Plaintiffs offer any explanation as to what "extraordinary circumstances" warrant consideration of its cited extra-record evidence, which mostly consists of disputed political commentary. *Id.*

ARGUMENT

I.     THE FINAL RULE DOES NOT "TRANSFORM" NEPA INTO A SUBSTANTIVE DIRECTIVE.

The core premise of Plaintiffs' motion is that the Final Rule transforms NEPA from a purely procedural statute into one mandating specific substantive outcomes. That premise ignores decades of governing case law and the text of the Final Rule itself. Contrary to Plaintiffs' argument, the Final Rule serves the important legislative purposes that Congress intended by clarifying the procedures through which agencies must consider public input and environmental effects before making final decisions, without requiring specific outcomes.

A.     NEPA Imposes Procedural Requirements to Improve Agency Decision-Making.

Congress enacted NEPA to require that agencies transparently analyze environmental impacts, consider different alternatives, and solicit public input in order to drive better agency decisions. As the Supreme Court has reiterated on numerous occasions, "the sweeping policy

---

[2] This rule applies to the Court's consideration of the merits. ACAT does not object to consideration of extra-record evidence for purposes of addressing non-merits factors like jurisdiction or remedy.

goals announced in § 101 of NEPA are thus realized through a set of 'action-forcing' procedures that require that agencies take a 'hard look' at environmental consequences,' and that provide for broad dissemination of relevant environmental information." *Robertson*, 490 U.S. at 350. While its requirements are procedural in nature, "these procedures are almost certain to affect the agency's substantive decision." *Id.*; *Missouri ex rel. Bailey v. U.S. Dep't of Interior*, 73 F.4th 570, 579 (8th Cir. 2023) (NEPA "is not about preventing 'unwise' agency action—just 'uninformed' action); *Calvert Cliffs Coordinating Comm., Inc. v. U. S. Atomic Energy Comm'n*, 449 F.2d 1109, 1111 (D.C. Cir. 1971) (NEPA "takes the major step of requiring all federal agencies to consider values of environmental preservation in their spheres of activity, and it prescribes certain procedural measures to ensure that those values are in fact fully respected").

Plaintiffs argue that the Final Rule transforms NEPA from a procedural law into a substantive one by adding the term "action forcing" into the rule's text. Br. at 20–21. This is not a serious argument. The challenged provision restores language that appeared in the NEPA regulations in 1978 but was controversially removed in the 2020 overhaul. Indeed, CEQ added additional clarifying language to this long-standing provision that confirms that NEPA's requirements remain fundamentally procedural. *Compare* AR 42708 (1978 regulations) ("Section 102(2) contains action-forcing provisions to make sure that federal agencies act according to the letter and spirit of the Act"); *with* 89 Fed. Reg. at 35,554 ("Section 102(2) of NEPA establishes procedural requirements to carry out the policy and responsibilities established in section 101 of NEPA and contains 'action-forcing' procedural provisions to ensure Federal agencies implement the letter and spirit of the Act."); *see also Loper Bright*, 144 S. Ct. 2262

("interpretations issued contemporaneously with the statute at issue, and which have remained consistent over time, may be especially useful in determining the statute's meaning").[3]

The description of NEPA's procedures as "action forcing" originated with the U.S. Supreme Court before CEQ issued the first set of regulations. "Section 102(2)(C) is one of the 'action-forcing' provisions intended as a directive to 'all agencies to assure consideration of the environmental impact of their actions in decisionmaking.'" *Kleppe v. Sierra Club*, 427 U.S. 390, 409 (1976) ("The term 'action-forcing' was applied to the provisions of what became § 102(2) throughout their consideration by the Senate," *citing* S. Rep. No. 91-296, p. 9 (1969); 115 Cong. Rec. 40416, 40419 (1969)). The Court has consistently emphasized that characterization of NEPA in the decades since. *See, e.g.*, *Robertson*, 490 U.S. at 347 ("To ensure that this commitment is infused into the ongoing programs and actions of the Federal Government, the act also establishes some important 'action-forcing' procedures."); *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 769 (2004) ("[t]he primary purpose of an environmental impact statement is to serve as an action-forcing device"); *Andrus* v. *Sierra Club,* 442 U.S. 347, 350–51 (1979) ("If environmental concerns are not interwoven into the fabric of agency planning, the action-forcing characteristics of [NEPA] would be lost."). So has this Circuit. *Sierra Club v. U.S. Army Corps of Eng'rs*, 446 F.3d 808, 815 (8th Cir. 2006) ("NEPA prescribes a set of 'action-forcing' measures that require federal agencies to take a 'hard look' at the environmental consequences of major federal actions before they are taken.").

---

[3] Plaintiffs also incorrectly state that the Final Rule removed a phrase describing NEPA as a "procedural statute" that had been "in place for decades." Br. at 20. The challenged phrase was added for the first time in the 2020 Final Rule. 85 Fed. Reg. 43,316; *see also* AR 27946 (explaining why CEQ removed language from 2020 Final Rule).

During the recent rulemaking process, a few commenters complained that restoration of the "action forcing" language would transform NEPA's procedures into a substantive mandate. CEQ considered these comments and explained why it disagreed. "While NEPA does not mandate particular results in specific decision-making processes, Congress intended the procedures required under the Act to result in more informed decisions, with the goal that information about the environmental effects of those decision would facilitate better environmental outcomes." 89 Fed. Reg. at 35,450; *see also id*. at 35,495 ("CEQ considers it appropriate to restore this [action forcing] text from the 1978 regulations to ensure that agencies use the information gathered and analyzed in an EIS in their decision-making processes."). CEQ's explanation is consistent with long-standing interpretations of NEPA and settled law. Plaintiffs ignore that explanation, the extensive administrative record supporting it, and decades of governing law.

B.    The Final Rule Properly Identifies Climate and Environmental Justice Issues Consistent with NEPA, Case Law, and Other Authority.

Next, Plaintiffs attack provisions in the Final Rule that highlight specific concerns to be considered in NEPA reviews where applicable, for example, climate change and environmental justice. Br. at 21. Plaintiffs' primary argument appears to be that because NEPA itself does not explicitly mention these issues, CEQ exceeded its authority by including them in the Final Rule. But NEPA speaks broadly to the overarching goals of engaging the public and fostering better federal agency decision-making to protect environmental values. Failure to consider a particular impact, even if it is not specifically called out in NEPA itself, is a violation of the statute. *See, e.g.*, *Minn. Pub. Int. Rsch. Grp. v. Butz*, 498 F.2d 1314, 1322 (8th Cir. 1974) (interpreting statute, prior to promulgation of CEQ regulations, to find agency needed to consider impacts of logging).

NEPA's implementing regulations have always provided direction as to the kinds of specific effects agencies should consider during the NEPA process. *See, e.g.*, 40 C.F.R. § 1508.8 (1978) (directing agencies to consider "growth inducing effects and other effects related to induced changes in the pattern of land use, population density or growth rate, and related effects on air and water and other natural systems…"); § 1508.27 (1978) (listing factors to weigh in assessing project significance, including "public health and safety," "proximity to historic or cultural resources," cumulative impacts, and protected wildlife); § 1508.14 (1978) (defining "human environment"). There is nothing novel about identifying specific kinds of effects that should be considered in NEPA's regulations, especially where courts have been clear that agencies violate NEPA by ignoring them, as courts have done with respect to climate change and environmental justice. AR 27880 ("CEQ's regulations, including the 1978 regulations and the 2020 rule, have long identified specific types of environmental effects as examples of the types of effects that agencies should consider."). Moreover, contrary to Plaintiffs' assertions, the Final Rule does not grant these considerations more weight than other effects an agency must consider. *See, e.g.*, AR 27891 ("The rule does not, however, direct agencies to prioritize environmental justice to the exclusion of all other considerations in the review process.")

       1.   *Environmental justice*

Environmental justice has played a key role in NEPA reviews for decades. 89 Fed. Reg. at 35,540 ("Agencies have decades of experience integrating consideration of environmental justice in their NEPA reviews"). However, prior to the Final Rule, there was no specific direction in NEPA's regulations on how agencies should consider the issue. The Final Rule resolves that absence by providing a definition of the term and giving direction to agencies on how to weigh environmental justice considerations during the NEPA process where they arise. 40 C.F.R. §§ 1502.16, 1502.14(f), 1508.1(o).

Plaintiffs primarily assert that these provisions reach beyond the purview of NEPA because "environmental justice" is not explicitly stated in the statute. This argument is baseless because NEPA plainly speaks to the issue of environmental justice even if it doesn't use the term itself. While the term "environmental justice" only came into common use after NEPA's passage, AR 13480–81 (outlining history), its core principles are embedded in NEPA. The statute strives "to promote efforts which will prevent or eliminate damage to the environment and biosphere and stimulate the health and welfare" of people; establishes "the continuing policy of the Federal Government" to "assure for *all Americans* safe, healthful, productive, and esthetically and culturally pleasing surroundings" and to "preserve important historic, cultural, and natural aspects of our national heritage;" and "recognizes that *each person* should enjoy a healthful environment." 42 U.S.C. §§ 4321, 4331(a), (b)(2), (b)(4), (c) (emphasis added). CEQ specifically agreed. AR 27885 ("CEQ agrees that the environmental justice-related provisions of the rulemaking advance NEPA's statutory policies, which include avoiding environmental degradation; preserving historic, cultural, and natural resources; and attaining the widest range of beneficial uses of the environment without degradation, risk to health or safety, or other undesirable and unintended consequences.")

The purposes of NEPA align closely with the goals of ensuring greater consideration of environmental justice concerns:

> Environmental justice means the just treatment and meaningful involvement of *all people* . . . in agency decision making and other Federal activities that affect human health and the environment so that people are fully protected from disproportionate and adverse environmental effects (including risks) and hazards . . . have equitable access to healthy, sustainable, and resilient environment in which to live, play, work, learn, grow, worship, and engage in cultural and subsistence practices.

89 Fed. Reg. at 35,576 (emphasis added); AR 25121 (environmental justice is "core to NEPA's promise"); AR 27888 ("references to environmental justice reflect and advance NEPA's

statutory objectives, text, and policy statements"). Because NEPA itself requires agencies to consider environmental justice concerns, Plaintiffs never explain why its inclusion in the Final Rule goes beyond CEQ's authority.

Addressing environmental justice in NEPA reviews is also consistent with longstanding CEQ policy and agency practice. CEQ issued guidance on how to integrate environmental justice concerns into NEPA reviews nearly 27 years ago. AR 33077. The guidance reiterates that "attainment of environmental justice is wholly consistent with the purposes and policies of NEPA," and that "[e]nvironmental justice issues encompass a broad range of impacts covered by NEPA." AR 33089–90. The Guidance directs agencies how to address and consider environmental justice considerations at every stage of the NEPA review process. AR 33092–99.

Courts have repeatedly recognized that agencies must consider environmental justice impacts under NEPA. *Mid States Coal. for Progress v. Surface Transp. Bd.*, 345 F.3d 520, 541 (8th Cir. 2003); *see also Sierra Club v. FERC*, 867 F.3d 1357, 13368 (D.C. Cir. 2017) (acknowledging that federal agencies are required to include environmental justice analysis in NEPA reviews); *Coliseum Square Ass'n, Inc. v. Jackson,* 465 F.3d 215, 232 (5th Cir. 2006) (same); *Trenton Threatened Skies, Inc., v. Fed. Aviation Admin.*, 90 F.4th 122, 138 (3rd Cir. 2024) (stating agencies "must consider designs or alternatives that will avoid or minimize disproportionately high and adverse impacts on low-income communities or communities of color"). Courts have not hesitated to find NEPA reviews deficient where agencies did not properly assess the environmental justice implications of their actions. *See, e.g.*, *City of Port Isabel v. FERC*, No. 23-1174, 2024 WL 3659344, at *7 (D.C. Cir. Aug. 6, 2024) (holding the agency should have issued a supplemental EIS to address its new environmental justice analysis and conclusions); *Vecinos para el Bienestar de la Comunidad Costera v. FERC*, 6 F.4th 1321,

1330–32 (D.C. Cir. 2021) (remanding environmental impact statement because the agency's environmental justice analysis was deficient); *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 255 F. Supp. 3d 101, 140 (D.D.C. 2017) (remanding an environmental assessment for providing inadequate analysis of environmental justice implications of crude oil pipeline).

CEQ received many comments during the public comment period expressing support for more specific provisions to address environmental justice concerns. Inclusion of specific provisions on how to consider the issue was "long overdue, given the centuries of environmental dangers, toxins, public health implications, quality of life impacts, and unjust practices that perpetuate environmental violence on communities across the country." AR 25370; AR 24242 (NAACP) ("Black communities are often sacrifice zones for decisions that undergo a NEPA process"); AR 2904–06 (expressing support for the inclusion of environmental justice and proposing that CEQ go farther in requiring agencies conduct Health Impact Assessments); AR 24622–24 (documenting disproportionate impacts to Black and Hispanic communities from pollution). Conversely, other commenters expressed concern that agencies might elevate environmental justice concerns over other issues; while some worried that agencies could interpret the regulations to require them to consider effects that were not reasonably foreseeable. 89 Fed. Reg. at 35,510. CEQ considered these comments and modified its proposal in response, for example, adding the qualifier, "[w]here applicable," and removing the term "potential" to make clear that not every action will have environmental justice impacts and that such impacts must be reasonably foreseeable for the agencies to give such impacts consideration. *Id.*

Plaintiffs may disagree as a policy matter that addressing environmental justice concerns is important. But their argument ignores decades of history of evaluating environmental justice in NEPA reviews and the well-established judicial precedent requiring it. CEQ received extensive

public comment on the issue, considered it carefully, and explained its decision in the Final Rule. Plaintiffs cannot show how CEQ exceeded its authority or acted arbitrarily or capriciously. *See also State v. Biden*, 52 F.4th 362, 371 (8th Cir. 2022) (even where state Plaintiffs "disagree with the President's policies … it is not our role to "exercise general legal oversight of the Legislative and Executive Branches").

>           2.      *Climate change*

NEPA calls on agencies to "fulfill the responsibilities of each generation as trustee of the environment for succeeding generations." 42 U.S.C. § 4331(b)(1). No issue invokes this intergenerational responsibility more than climate change, AR 25126, which is widely acknowledged as a critical environmental issue. *See, e.g.*, 74 Fed. Reg. 66,496, 66,523 (Dec. 15, 2009) (finding that elevated concentrations of greenhouse gasses were likely to "endanger the public health and welfare of current and future generations"); *Massachusetts v. EPA*, 549 U.S. 497, 521 (2007) ("The harms associated with climate change are serious and well recognized."). Climate change touches on countless other areas of traditional environmental concern, from air pollution to water quality to human health to wildlife, 74 Fed. Reg. at 66,497–500, and compounds historic environmental injustices. AR 25126; AR 24243 ("There is no doubt that environmental justice and climate change analysis are inextricably intertwined.").

Agencies have struggled with assessing the climate-related impacts of federal actions in the NEPA process. Numerous courts have set aside agency actions for not adequately grappling with an action's contribution to climate change in the NEPA process. *See, e.g.*, *Vecinos para el Bienestar*, 6 F.4th at 1329–30 (setting aside EIS for failing to consider greenhouse gas emissions from liquified natural gas terminal); *350 Mont. v. Haaland*, 50 F.4th 1254, 1266–70 (9th Cir. 2022) (finding greenhouse gas disclosures for coal mine invalid where agency failed to cite "scientific evidence" to support conclusions); *WildEarth Guardians v. U.S. Bureau of Land*

*Mgmt.*, 870 F.3d 1222, 1236–38 (10th Cir. 2017) (rejecting NEPA analysis of greenhouse gas emissions for coal mine); *Sierra Club*, 867 F.3d at 1371–75 (invalidating EIS for gas pipeline because it failed to consider impacts of burning transported gas). The Eighth Circuit first did so over twenty years ago. *Mid States Coal. for Progress*, 345 F.3d at 550 (setting aside rail project EIS because it did not evaluate "effects that may occur as a result of the reasonably foreseeable increase in coal consumption").

Starting in 2010, CEQ issued various iterations of guidance to assist agencies in carrying out this task, in each case confirming that climate-related impacts must be analyzed under NEPA. 88 Fed. Reg. 1,196, 1,198 (Jan. 9, 2023) ("[c]limate change analysis is a critical component of environmental reviews and integral to Federal agencies managing and addressing climate change"); AR 193 (2023 climate guidance). Clarifying these duties was a top priority in the Final Rule, and commenters from diverse perspectives urged CEQ to address the issue. *See, e.g.*, AR 2916; AR 1739; AR 25619; AR 23663. As it did with many issues, CEQ did not go as far as some parties urged, for example, by codifying its 2023 guidance into the regulations. 89 Fed. Reg. at 35,494; AR 2928 (urging CEQ to "go further" in applying climate analysis at appropriate scales); AR 25640; AR 1742 (urging requirements to consider climate in environmental assessments); AR 28399. But CEQ also rejected suggestions that it leave climate out of the rule altogether. 89 Fed. Reg. at 35,494. It carefully explained its reasoning behind all of instances where climate is referenced. *Id.*; AR 28392–413.

Plaintiffs do not present a coherent argument that these commonsense provisions are outside of CEQ's authority. They do nothing more than direct agencies to consider the best available science and data—already a long-standing NEPA requirement. *See, e.g.*, 40 C.F.R. §§ 1500.1(b), 1502.24 (1978) (information in NEPA documentation must be of "high quality"

and represent "accurate scientific analysis"). The Final Rule directs agencies to consider climate change, including "where feasible" quantification of greenhouse gas emissions, in assessing the environmental impact of major federal actions. 40 C.F.R. § 1502.16; § 1508.1(i)(4). As noted, the failure to do so, when the record indicates that it is a relevant consideration to an agency's decision, is already arbitrary and capricious. Actions that "do not affect climate change," Br. at 23, would obviously not have to provide such an analysis.[4] AR 28397 ("not all actions will have climate-related effects that require analysis in the EIS"). Nor does the Final Rule impose any substantive standard related to climate. AR 28409 ("the final rule does not establish climate policy or require climate-related outcomes, rather, it requires agencies to consider how actions may affect climate and how climate may affect alternatives"). CEQ was within its authority to address climate change in the Final Rule and did not act arbitrarily.

### 3.    *Indigenous Knowledge*

In the Final Rule, CEQ includes Indigenous Knowledge as one of the many sources of "high quality information" that can be used during NEPA reviews, along with other reliable data, resources, and models. 40 C.F.R. § 1506.6(b). Plaintiffs argue that inclusion of Indigenous Knowledge as a source of "high quality information" is arbitrary and capricious and outside what was contemplated in the statute. Br. at 23–24. The argument is not grounded in the Final Rule, the administrative record supporting it, or NEPA itself.

Indigenous people have managed the lands and waters of this nation since "time immemorial." AR 1771. "Indigenous Knowledge" refers to bodies of observations, oral and

---

[4] Contrary to Plaintiffs' suggestion, the Final Rule's changes have nothing to do with the U.S. Supreme Court's grant of certiorari in *Seven Cnty. Infrastructure Coal. v. Eagle Cnty.*, No. 23-975, 2024 WL 3089539 (U.S. June 24, 2024), a case that concerns whether agencies must study indirect impacts that are not proximately caused by the action over which they have authority.

written knowledge, innovations, technologies, practices, or beliefs developed by Indigenous

peoples from their interactions with the environment. AR 29031–32 (U.S. Department of the

Interior guidance). As federal guidance confirms, "Indigenous Knowledge is a valid form of self-

supporting evidence that should be included in federal policy, research, and decision-making."

AR 42912.

> Indigenous Knowledge has much in common with scientific methodologies. Both,
> for example: Seek systemic ways of understanding and explaining ways of
> knowing; use empirical approaches to conduct practical, curiosity-driven
> investigations; use standard practices, such as systematic observation, innovation,
> and verification; derive from directly engaging with the environment; and evolve
> and adapt to new observations.

*Id.;* AR 24234 ("Indigenous knowledge is a cornerstone of our global intellectual heritage and is

integral to understanding the complex dynamics of our ecosystems."); 36 C.F.R. § 219.19 (U.S.

Forest Service definition).

Integrating such knowledge into how federal agencies manage federal resources is not

new. Several agencies have already published applicable guidance. AR 41633–34 (noting nine

different agency guidance documents on Indigenous Knowledge). Many agencies have worked

alongside Tribes to successfully integrate Indigenous Knowledge into resource management

work. AR 41621–32. For example, the National Oceanic and Atmospheric Administration and

the Cowlitz Indian Tribe applied the Tribe's traditional fishing expertise to assess historic

distribution of eulachon and identify key spawning habitat and timing. AR 41627 "The project

facilitated joint efforts to identify and protect critical habitat, increase abundance of the species,

and promote species recovery." *Id*. Similarly, the National Park Service worked alongside

citizens of Wabanaki Tribes in Acadia National Park on restoring sweetgrass that the Tribes have

harvested for generations. AR 41623. This federal agency work, guided by Indigenous

17

methodologies, confirmed that harvesting sweetgrass through Wabanaki traditional methods enhances sweetgrass abundance. *Id.*

Plaintiffs' arguments about inclusion of Indigenous Knowledge as a source of "high quality information" do not withstand scrutiny. First, Plaintiffs argue that because "Indigenous Knowledge" is not specifically mentioned in the statute as a "reliable data" source, CEQ cannot direct agencies to use it. Br. at 24. The argument implies that in calling on agencies to use applicable Indigenous Knowledge, CEQ is inviting them to use information that is not "reliable." The accusation is baseless. The Final Rule directs agencies to use *reliable* Indigenous Knowledge. 40 C.F.R. § 1506.6(a). Including Indigenous Knowledge among the many sources of information that can be used does not absolve agencies from ensuring the professional and scientific integrity of their analyses. *Id.* And the argument that Indigenous Knowledge is not specifically identified in the statute overlooks that other sources of data that are discussed in § 1506.6—such as remotely gathered information or statistical models—are also not mentioned in the statute.

Second, Plaintiffs complain that the inclusion of Indigenous Knowledge as a potential source of information in NEPA reviews elevates it to special status. Br. at 24. This too is untrue. CEQ explained in the Final Rule that "[t]he regulations require agencies to rely on high-quality information and provide several examples, one of which is Indigenous Knowledge, and do not create a preference for one kind of high-quality information over others." 89 Fed. Reg. at 35,525. The Final Rule provided several other examples of information that agencies should consider if available. Indigenous Knowledge is just one of the many tools that agencies can use in their environmental reviews, if available and if reliable. *Id.*

18

Third, Plaintiffs attack the "vagueness" of including Indigenous Knowledge in the Final Rule, complaining that the term is not defined in the regulations. Br. at 24. The argument ignores the record and CEQ's explanation. CEQ received "a large number" of comments on this issue. AR 27901. Some commenters objected to the idea of providing a single regulatory definition given the variety of what could be considered Indigenous Knowledge. *See e.g.*, AR 26930. CEQ also conducted two Tribal consultations that examined the issue. 89 Fed. Reg. at 35,481. In the Final Rule, CEQ explained that it could not arrive at a single definition that would be workable across the diverse contexts and different Tribal Nations that federal agencies work in. *Id.* "CEQ, therefore, considers it appropriate for agencies to have flexibility to approach Indigenous Knowledge in a fashion that makes sense for their programs and the Tribal Nations with which they work." While CEQ left the agencies with flexibility, it did not leave the agencies without guidance regarding how to integrate Indigenous Knowledge into their decision-making. *See, e.g.*, AR 27902; AR 29029–41; AR 41600–45.

Responding to public and Tribal input, and explaining a decision, is the opposite of arbitrary or capricious decision-making. *Lilliputian Sys., Inc. v. Pipeline and Hazardous Materials Safety Admin.*, 741 F.3d 1309, 1312 (D.C. Cir. 2014) (agencies must "respond to relevant and significant public comments"). CEQ received widespread comments supporting the inclusion of Indigenous Knowledge in NEPA reviews, and varying comments regarding how to and whether to define it. *See e.g.*, AR 26674 ("[t]he use of Indigenous Knowledge will allow for better and more accurate analysis of effects"). CEQ considered the comments and responded by including Indigenous Knowledge as one type of "high quality" information that should be considered and gave agencies flexibility on a definition. Plaintiffs' attack on the Final Rule should be rejected.

4.    *Worldwide effects*

Last, Plaintiffs turn their sights to language in the rule that directs agencies to evaluate "the potential global, national, regional, and local contexts" of impacts to determine the appropriate level of NEPA review. Br. at 24–25, *citing* 40 C.F.R. § 1501.3(d)(1). This argument—focused on the word "global" in this provision—is particularly puzzling. NEPA itself calls for consideration of such impacts, commanding that "to the fullest extent possible…all agencies of the Federal Government shall:"

> recognize the *worldwide* and long-range character of environmental problems and, where consistent with the foreign policy of the United States, lend appropriate support to initiatives, resolutions, and programs designed to *maximize international cooperation* in anticipating and preventing a decline in the quality of mankind's *world* environment.

42 U.S.C. § 4332(2)(I) (emphasis added); *id*. § 4346b (authorizing "expenditures in support of international activities"); *see also* 44 Fed. Reg. 1,957 (Jan. 9, 1979) (executive order instructing agencies to consider effects of action on "the global commons" and the "environment of a foreign nation"); AR 32805 (1997 guidance on transboundary impacts). NEPA's application to federal actions that result in environmental impacts outside U.S. borders has long been settled. *See, e.g.*, *Env't Def. Fund v. Massey*, 986 F.2d 528, 533 (D.C. Cir. 1993); AR 2920 (listing cases). The rule does nothing more than affirm Congressional intent and long-standing practice. CEQ explained its decision to include the word "global" in this section, observing that the Final Rule's description of context was "consistent with the decades of experience agencies had implementing the 1978 regulations." 89 Fed. Reg. at 35,465.[5]

---

[5] CEQ dismissed concerns that the statute would cause more expansive consideration of impacts, noting that "§ 1501.3(d)(1) does not require agencies to evaluate all four contexts—global, national, regional, and local—for every proposed action. Rather, agencies should determine the appropriate contexts to consider based on the scope of the action and its anticipated reasonably foreseeable effects." *Id.* Agencies have been following this direction for decades.

C.    The Final's Rule's Reference to an "Environmentally Preferable Alternative" Is Consistent with NEPA.

Next, Plaintiffs challenge revisions to the Final Rule that call on agencies to identify an "environmentally preferable alternative" in an EIS. Br. at 25–26, *citing* 40 C.F.R. § 1502.12 (summary of EIS); § 1502.14(f) (alternatives); *see also* § 1508(n) (defining environmentally preferable alternative). Plaintiffs describe this as "an entirely new practice" that invites confusion and abuse. Br. at 26. But identification of an environmentally preferable alternative has been a required element of the NEPA process since 1978. *See* 40 C.F.R. § 1505.2 (1978) (agencies must identify "environmentally preferable alternative" in record of decision); § 1504.2 (criteria for CEQ referral). These provisions were also features of the 2020 Rule that were unchanged in the Final Rule. Far from being "entirely new," inclusion of an "environmentally preferable alternative" in an EIS is a longstanding and uncontroversial agency practice. *See, e.g.*, *Myersville Citizens for a Rural Cmty. v. FERC*, 783 F.3d 1301, 1323–24 (D.C. Cir. 2015); *Mid States Coal.*, 345 F.3d at 533–34; *Alaska Survival v. Surface Transp. Bd.*, 705 F.3d 1073, 1077 (9th Cir. 2013) (involving EISs that identified environmentally preferable alternatives); 89 Fed. Reg. at 35,504 ("Agencies…have decades of experience with identifying the environmentally preferable alternative."). And for good reason: having decisionmakers apprised of which alternative is "environmentally preferable" promotes NEPA's policy goals of fostering better environmental outcomes for the human environment. Plaintiffs' accusation that this is a novel concept reveals a lack of understanding of both the history and purpose of NEPA.

Plaintiffs do not explain why they think that the identification of such an alternative in an EIS, as directed by 40 C.F.R. §§ 1502.12 and 1502.14(f), is outside the scope of NEPA. It does not change NEPA's explicit directive that the EIS is limited to "reasonable" alternatives. 42 U.S.C. § 4332(2)(C)(iii) (statutorily limiting range of alternatives to those that are "technically

and economically feasible" and that "meet the purpose and need of the proposal"). Moreover, Plaintiffs' accusation that agencies must adopt the environmentally preferable alternative, or "face a heavier burden for not doing so" is unmoored from the explicit text of the rule or any record document. Br. at 26; 89 Fed. Reg. at 35,541 ("Agencies are not required to adopt the environmentally preferred alternative as its final decision."); *Vermonters for a Clean Env't v. Madrid*, 73 F. Supp.3d 417, 427–28 (D. Vt. 2014) ("NEPA does not require the environmentally preferred alternative be chosen."); AR 27843–44.

Nor does the Final Rule create a "thumb on the scale" for the "no action" alternative. Br. at 25. Again, the Final Rule says the opposite. *See* § 1502.14(f) ("The environmentally preferable alternative may be the proposed action, the no action alternative, or a reasonable alternative"). Instead, the Final Rule reinforces the longstanding expectation that decisionmakers fully consider reasonable alternatives to agency actions, just as it always has done. *Mid States Coal. for Progress*, 345 F.3d at 556 (Heany, J., concurring) ("Fully analyzing alternatives is the 'heart of the environmental impact statement,' and the agency is required to '[r]igorously explore and objectively evaluate all reasonable alternatives.") (internal citations omitted). Plaintiffs' concerns are not well-founded.

As it did with other issues, CEQ invited comment on these provisions and explained the reasoning behind its decision. 89 Fed. Reg. at 35,503–04; AR 28356. Unsurprisingly, "[m]ultiple commenters supported proposed § 1502.14(f), while other commenters opposed it." 89 Fed. Reg. at 35,503–04. CEQ's discussion confirms that the rule should be applied flexibly, recognizing that there may be "tradeoffs" among environmental effects. *Id*. ("the rule provides agencies flexibility to rely on their discretion and expertise to strike an appropriate balance in identifying the environmentally preferable alternative"). CEQ made changes to the Final Rule to confirm

22

that agencies only need to select an alternative "amongst the proposed action, no action, and reasonable alternatives." *Id*. at 35,504. And it specifically addressed each concern—for example, the concern that selection of such alternative was "subjective" or would increase litigation risk— and explained why it disagreed. *Id*. As the Final Rule observes, "identifying the environmentally preferable alternative provides information to decisionmakers and the public, and is a longstanding part of the NEPA process." *Id*. at 35,541. Plaintiffs' arguments to the contrary are unpersuasive.

D.    The Final Rule Does Not Create Substantive Mitigation Requirements.

Plaintiffs' effort to argue that the Final Rule establishes a new, affirmative duty to mitigate adverse effects fares no better. *See* 40 C.F.R. § 1508.1(y) (defining mitigation). Consideration and disclosure of measures to mitigate adverse impacts have always been a key part of the NEPA process. *See, e.g.*, 40 C.F.R. § 1502.14(f) (1978) (requirements for discussing alternatives); § 1502.16(e)–(h) (1978) (requirements for discussing environmental effects); § 1503.3(d) (1978) (requirements for comments); § 1504.3(c)(2)(vi) (1978) (criteria for referrals); § 1505.3 (1978) (implementation standards). It is also the subject of extensive agency guidance and practice going back decades. 76 Fed. Reg. 3,843 (Jan. 21, 2011); AR 41372–82; AR 29199–230; AR 42596–673; AR 44664–716.

Plaintiffs' argument that the Final Rule now requires actual mitigation—rather than merely considering and disclosing it—is contradicted by the rule itself. For example, the Final Rule states that agencies "*should*, where relevant and appropriate" incorporate measures to address "significant human health and environmental effects" of their actions. 40 C.F.R. § 1505.3(b). Of course, the directive that an agency "should" do something does not create a mandatory duty. *Weissich v. United States*, 4 F.3d 810, 814 (9th Cir. 1993) ("language is suggestive, not mandatory"). Similarly, 40 C.F.R. § 1505.2(c) requires an agency to "state

23

whether the agency has adopted all practical means to mitigate environmental harm . . . and if not, why not." This obviously does not require agencies to adopt mitigation, but rather simply explain their decision. *Id*. And the statement in § 1500.2(f) that agencies "shall" use practicable means to avoid adverse effects is a policy statement that simply mirrors NEPA itself. *See* 42 U.S.C. § 4331.

In the Final Rule, CEQ explicitly addressed concerns around these provisions, observing that it understood that it could not impose substantive mitigation requirements. 89 Fed. Reg. at 35,517 ("this provision *does not impose any binding requirements on agencies*, but rather codifies a portion of CEQ's longstanding position that agencies should, as a policy matter, mitigate significant adverse effects where relevant and appropriate.") (emphasis added); AR 28723 ("CEQ continues to acknowledge that as a legal matter, NEPA does not require agencies to adopt mitigation measures"). CEQ encourages mitigation of adverse effects to meet NEPA policy goals—it does not mandate it. 89 Fed. Reg. at 35,517–18; *see also id*. at 35,548–9 ("NEPA requires agencies to consider mitigation, not implement it."). Plaintiffs' argument that these provisions create new substantive duties is wrong.

Plaintiffs also point to 40 C.F.R. § 1505.3(a), which directs that mitigation "shall" be implemented (for example, through conditions in permits or funding) where mitigation is established in a NEPA document "and committed as part of the decision." Br. at 28. This provision has existed since 1978 and was part of the 2020 regulations that Plaintiffs seek to restore. In any event, this provision does not require agencies to mitigate environmental impacts. Rather, when agencies *choose* to rely on mitigation—for example, to reduce adverse impacts to an acceptable level or to avoid preparation of an EIS—then the Rule directs them to follow through on that commitment. That is already a long-standing requirement of law. AR 41372

(2011 CEQ guidance) (use of mitigation acceptable where applicant "commits to carry out the mitigation and establishes a mechanism for ensuring the mitigation is carried out"). More importantly, it is consistent with NEPA itself, as CEQ explained. 89 Fed. Reg. at 35,518; AR 24558. Because NEPA requires agencies to identify the "reasonably foreseeable environmental effects" of an action, "to the extent that identification assumes the implementation of mitigation measures to avoid adverse effects, it follows, in turn, that implementation of mitigation must also be reasonably foreseeable." 89 Fed. Reg. at 35,518. There is no tension between this provision and the statute.

Plaintiffs' final argument—that project opponents will exploit these provisions "to demand re-opening of any completed NEPA review after-the-fact"—is difficult to understand. Br. at 29. ACAT is unaware of any mechanism by which NEPA reviews for completed projects can be "re-opened." *See, e.g.*, *Bayou Liberty Ass'n v. U.S. Army Corps of Eng'rs*, 217 F.3d 393, 399 (5th Cir. 2000) (dismissing NEPA challenge as moot because construction of the project was completed). Courts sometimes find a supplemental EIS is required where there remains major federal action to occur and where new information shows significant adverse impacts that have not already been considered. *Marsh v. Or. Nat. Res. Coun*cil, 490 U.S. 360, 374 (1989). But if a project has been "completed," and there is no major action remaining to occur, there is nothing to trigger such a duty. Nor do Plaintiffs explain how "after-the-fact" challenges to a completed project would "stall" it. Br. at 29.

In short, the challenged mitigation provisions are consistent with NEPA and decades of settled law and agency practice. They do not mandate any substantive outcome, nor do they open the floodgates for frivolous litigation. Plaintiffs' arguments should be rejected.

E.    The Final Rule Lawfully Addresses the Use of Categorical Exclusions.

Plaintiffs raise three points to suggest that CEQ acted unlawfully in promulgating provisions regarding categorical exclusions ("CEs"), the most common type of NEPA compliance tool. Br. at 29–31. While it is clear that Plaintiffs have policy disagreements with the Final Rule's revisions to handling of the CE provisions, Plaintiffs do not show that these provisions are outside CEQ's authority or arbitrary. Indeed, it is difficult to discern what the nature of their claim is.

Plaintiffs argue that the Final Rule "imposes policy-based restrictions on the use of CEs," primarily those involving consideration of climate change and environmental justice. Br. at 29. As previously discussed, there was abundant record support for including environmental justice and climate change considerations more specifically in the Final Rule. *See supra* § I.B; *see also* AR 27885–86 (statutory, executive, and case law requirements to consider environmental justice and climate change issues); AR 27893–97 (same); AR 6132–171 (1997 CEQ guidance on considering environmental justice issues in agency NEPA analysis); AR 8011–92 (2015 Federal Highway Administration guidance), AR 9630–85 (2016 EPA guidance); AR 29231–83. Plaintiffs' attack on the Final Rule's CE provisions fares no better than their attack on those other provisions.

Plaintiffs argue that the Final Rule imposes "vague policy considerations into the 'extraordinary circumstances' that prevent use of a CE for a given project," again targeting the issues of climate change and environmental justice. Br. at 30. "Extraordinary circumstances" are "factors or circumstances that indicate a normally categorically excluded action may have a significant effect" and render a project not appropriate for exclusion from detailed NEPA review. 40 C.F.R. § 1508.1(o). But as ACAT has demonstrated, environmental justice and climate change concerns are not "vague factors" but issues that federal agencies and CEQ have been

26

integrating into their NEPA procedures for decades and must do so in order to fulfill Congress' commands. *See supra*; AR 27875–77, 83–91.

Plaintiffs also misunderstand the way in which federal agencies evaluate whether extraordinary circumstances are present when considering a CE is the appropriate NEPA tool. As an initial matter, individual federal agencies—not CEQ—develop extraordinary circumstances, 40 C.F.R. § 1507.3(c)(8), a requirement that has existed for decades. 40 C.F.R. § 1508.4 (1978) (agency specific NEPA rules "shall provide for extraordinary circumstances in which a normally excluded action may have a significant environmental effect"); AR 27885–97. While the Final Rule provides *examples* of conditions that *could* constitute extraordinary circumstances, 40 C.F.R. § 1508.1(o), it is up to the individual federal agencies, not CEQ, to determine which extraordinary circumstances are present when determining if a CE is appropriate. AR 28682 ("The list of examples in the definition [of extraordinary circumstances] is not exclusive, and agencies have discretion to determine whether inclusion of these examples in their NEPA procedures is appropriate for their particular programs and authorities").

Moreover, the use of CEs is not precluded even when extraordinary circumstances exist: instead, "if an extraordinary circumstance exists, the agency nevertheless may apply the categorical exclusion if the agency conducts an analysis and determines that the proposed action does not in fact have the potential to result in significant effects notwithstanding the extraordinary circumstance, or the agency modifies the action to avoid the potential to result in significant effects." 40 C.F.R. § 1501.4(b)(1); *see also* 36 C.F.R. § 220.6(b)(2) (Forest Service regulation allowing for the use of a CE even when extraordinary circumstances are present). Plaintiffs are wrong that the existence of extraordinary circumstances prevents the use of CEs.

Plaintiffs also complain that the Final Rule "places conditions on an agency's adoption of another agency's CE." Br. at 31. But the Final Rule mostly mirrors the statute as updated in the Fiscal Responsibility Act. *Compare* 40 C.F.R. § 1506.3(d)) *with* 42 U.S.C. § 4336c. As CEQ explained, publication of an agency's adoption of another agency's CE is consistent with the statute's goal of increasing transparency in agency decision-making and reflects CEQ's experience with implementing § 4336(c). AR 28120–22, 28132 ("Agencies have long been required to prepare [CE substantiation] materials to justify CEs, and providing them as part of the public notice is good agency practice that should not delay the development of CEs ... This provision simply adds transparency"). Indeed, federal agencies have already begun publicly adopting other agencies' CEs without incident, belying Plaintiffs' claim that the Final Rule prevents the practice. *See, e.g.*, AR 28123 (citing National Institute of Standards and Technology and Department of Transportation notices of CE adoption); AR 28524; AR 26749 (State of Mississippi comment letter praising ability to adopt other agencies' CEs).[6]

Finally, Plaintiffs claim that the Final Rule's requirement that federal agencies review their CEs every decade "violates NEPA's spirit." Br. at 31. Yet CEQ has long encouraged agencies to regularly review their CEs for continued validity and improvement. AR 28610–14; AR 6271–88 (2010 CEQ guidance regarding review of existing CEs). In fact, the mandate for agencies to periodically "review their policies and procedures, in consultation with the Council,

---

[6] Here, too, Plaintiffs misunderstand the Rule's reference to extraordinary circumstances. Br. 31 (arguing that the Final Rule impermissibly includes "a verification that no extraordinary circumstances exist"). As explained above, federal agencies have always been required to identify in their NEPA procedures extraordinary circumstances that would preclude the use of a CE unless otherwise mitigated. Revised § 1506.3(d) merely requires that when a federal agency adopts another agency's CE for its own use, the adopting agency must similarly identify extraordinary circumstances that could preclude the use of the adopted CE. CEQ has declined to specify whether the adopting agency should apply its own extraordinary circumstances or those of the originating agency to provide additional agency flexibility in CE use. AR 28115–18.

and revise them as necessary to ensure full compliance with the purposes and provisions of the Act" is a longstanding feature of the NEPA regulations that has existed since their inception. *See* 40 C.F.R. § 1500.6 (1978) (2020) (2024). The Final Rule does nothing new here either.

II.   PLAINTIFFS FAIL TO MEET THEIR BURDEN TO SHOW THAT THE RULE IS ARBITRARY AND CAPRICIOUS.

In *FCC v. Fox Television Studios*, 556 U.S. 502, 514–15 (2009), the U.S. Supreme Court laid out a review standard for situations where an agency changes position. The Court rejected the argument that reversals are subject to "heightened" review, or that they "must be justified by reasons more substantial than those required to adopt a policy in the first instance." *Id*. Rather, when an agency reverses a prior policy, the APA is satisfied if the agency "display[s] awareness that it is changing position," and "show[s] that there are good reasons for the new policy." *Id*. These reasons need not be better than the reasons for the old policy, as it is sufficient "that the new policy is permissible under the statute, that there are good reasons for it, and that the agency believes it to be better, which the conscious change of course adequately indicates." *Id*.

Plaintiffs make no effort to ground their challenge to the Final Rule in this standard. As a threshold matter, it was the 2020 Rule that sharply departed from CEQ's settled interpretations of NEPA, while the Final Rule mostly restores the original. In any event, Plaintiffs' complaints derive from their policy preferences. Clearly, Plaintiffs do not believe that issues like climate change, environmental justice, and Indigenous Knowledge should play a role in NEPA reviews. Br. at 33–35. But the question for this Court is whether CEQ adequately explained its decision to adopt these provisions, especially insofar as they depart from previous findings. The answer to that question is yes. *See supra* § I.B.(1)–(3): AR 27881 ("the preambles to both the Phase 2 proposed rule and final rule articulate the agency's reasons for the change"). In fact, CEQ

repeatedly discussed the *Fox Television* standard and why the Final Rule satisfied it. *Id.*; AR 27890.

Take the issue of CEQ's clarification of rule language regarding the "specificity" of public comments during NEPA reviews. Br. at 33, *citing* 40 C.F.R. § 1503.3. NEPA regulations have always required comments to be "as specific as possible." 40 C.F.R. § 1503.3 (1978). The 2020 Rule imposed for the first time a higher bar, demanding that commenters propose specific changes and include "data, sources, or methodologies" supporting those changes. 40 C.F.R. § 1503.3 (2020). CEQ heard from many commenters that this stricter standard marginalized voices that may not have access to such information, *see, e.g.*, AR 25121 (2020 regulation harms those who cannot "hire and deploy squads of technical consultants"), and that the rule required commenters to "demonstrate a level of sophistication and technical expertise not required historically." 89 Fed. Reg. at 35,513. Inviting public input is a core purpose of NEPA. *Robertson*, 490 U.S. at 349; *Lands Council v. Powell*, 395 F.3d 1019, 1027 (9th Cir. 2005). Accordingly, in the Final Rule CEQ adopted modest changes to the commenting standard, for example, by adding the qualifier that data, sources, and methodologies should be identified "where possible," and fully explained its reasoning for doing so. 89 Fed. Reg. at 35,513. This modest clarification easily passes APA review under *Fox Television*.

Similarly, Plaintiffs' claim that the Final Rule "arbitrarily restricts" agencies' ability to rely on outside contractors is wrong. Br. at 34. The ability of agencies to rely on outside entities is enshrined in the Fiscal Responsibility Act amendments. 42 U.S.C. § 4336a(f). The Final Rule does not restrict the ability of agencies to rely on outside parties to prepare EISs and environmental assessments, even though many commenters urged CEQ to do just that. 89 Fed. Reg. at 35,522–23. Instead, the Final Rule clarifies that agencies should ensure that

environmental reviews are prepared with "professional and scientific integrity," and should "exercise independent judgment" that such contracted work meets NEPA standards. 40 C.F.R. § 1506.5(a). This language affirms longstanding NEPA interpretations that agencies "take responsibility" for the contents of contractor-provided NEPA documents, *id.* § 1506.5 (1978), as affirmed in the Fiscal Responsibility Act. 42 U.S.C. § 4336a(f). CEQ modified the Final Rule in light of public comments and discussed its reasons for these changes at length. 89 Fed. Reg. at 35,522–23. The APA requires nothing more.

Plaintiffs' speculation that the Final Rule will result in "substantial levels of uncertainty" and "staggering amounts" of litigation is unmoored from the record. It was the 2020 Rule's departure from decades of settled understanding and governing precedent that created uncertainty and litigation risk. 89 Fed. Reg. at 35,448 ("CEQ removes certain provisions added by the 2020 rule that CEQ considers imprudent or legally unsettled, or that create uncertainty or ambiguity that could reduce efficiency or increase the risk of litigation"). By affirming core principles and restoring settled regulatory language, the Final Rule reduces rather than aggravates uncertainty. And when it comes to integrating issues like climate change and environmental justice, the record explains how it was the *absence* of regulatory direction from CEQ that caused uncertainty and litigation risk, as agencies struggled to successfully address these issues. *See supra* § I.B. The intent of the Final Rule was to provide greater clarity to reduce such risks and uncertainties. *See, e.g.*, 89 Fed. Reg. at 35,532 (explaining why proposal would not increase litigation risks and uncertainty); *id.* at 35,550 (rejecting proposal because "[c]hanging the regulatory text could create uncertainty..."). Plaintiffs' hyperbole to the contrary is not supported by the record.

Finally, Plaintiffs complain that a year is insufficient time for agencies to "develop or revise" their own agency-specific NEPA rules. Br. at 26, *citing* 40 C.F.R. § 1507.3(a). The original NEPA regulations gave agencies eight months to issue their own regulations. 40 C.F.R. § 1507.3 (1978). The 2020 Rule also gave agencies a 12-month deadline. 40 C.F.R. § 1507.3 (2020). CEQ considered the various perspectives and explained its decision. 89 Fed. Reg. at 35,532 (agencies need only share proposals with CEQ within 12 months, not finalize them).

In sum, Plaintiffs' charge that CEQ provides "no meaningful analysis" of the changes adopted in the Final Rule, Br. at 33, is belied by the extensive discussion in the Final Rule and the administrative record. Plaintiffs never cite to the record and ignore most of CEQ's discussion. Their *Fox Television* argument should be rejected too.

III.    PLAINTIFFS FAIL TO SHOW THAT THE FINAL RULE VIOLATES NEPA.

Plaintiffs next argue that CEQ must comply with NEPA when revising its NEPA regulations by considering and disclosing potential environmental impacts. Br. at 37. ACAT agrees in principle, and its legal challenge to the 2020 Rule asserted that CEQ violated NEPA because CEQ performed no analysis of its impacts. 89 Fed. Reg. at 35,446. However, in contrast with the 2020 Rule, when CEQ promulgated the Final Rule in 2024, it did in fact issue an environmental assessment ("EA") confirming that the impacts of the rule did not meet the standard of "significance" that would trigger an environmental impact statement under NEPA. CEQ also provided an opportunity for comment on that EA. AR 66. Plaintiffs make no effort to explain what impacts were arbitrarily ignored or minimized in the EA. Accordingly, this argument fails too.

NEPA describes the three different levels of review attendant to federal actions. For actions with a "reasonably foreseeable significant effect," a full environmental impact statement is required. 42 U.S.C. § 4336(b)(1). On the other end of the spectrum, no NEPA review is

required if an action is covered by a CE or meets other criteria not salient here. *Id*. § 4336(a)(2). And where an action either "does not have a reasonably foreseeable significant effect on the quality of the human environment," or "if the significance of such effect is unknown," the agency must prepare an "environmental assessment, which is "a concise public document prepared by a Federal agency to set forth the basis of such agency's finding of no significant impact" *Id*. § 4336(b)(2); *Heartwood v. U.S. Forest Serv.*, 380 F.3d 428, 430 (8th Cir. 2004). An environmental assessment cannot exceed 75 pages. *Id*. § 4336a. Environmental assessments are far more common than full EISs. AR 25627; 85 Fed. Reg. at 43,305 n.5 (agencies prepare on average 176 EISs and 10,000 environmental assessments per year).

As the statute requires, CEQ's environmental assessment for the Final Rule is a "concise" document that explains why there are no "reasonably foreseeable environmental effects" that would be significant enough to warrant an EIS. AR 68. The fact that CEQ labeled the document a "*special* environmental assessment" rather than simply an "environmental assessment" is immaterial. Br. at 37; 89 Fed. Reg. at 35,552 (explaining how CEQ has previously used "special" environmental assessments during previous rulemakings). Nor do Plaintiffs point to any record evidence that CEQ failed to grapple with in reaching its conclusion that an EIS was not required. Plaintiffs cannot challenge CEQ's NEPA compliance without citation to the administrative record and without argument.[7]

---

[7] As noted, in promulgating the 2020 rule, CEQ did not issue *any* environmental assessment, special or otherwise. Instead, CEQ insisted that the rules were exempt from NEPA altogether. 85 Fed. Reg. at 43,354. If the Court were to find a technical NEPA violation in CEQ's reliance on the special environmental assessment, it should not grant restoration of the 2020 Rule that suffers from a more substantial deficiency.

IV.    THE FINAL RULE DOES NOT VIOLATE THE "MAJOR QUESTIONS DOCTRINE."

Plaintiffs' effort to challenge the Final Rule as a violation of the "major questions doctrine" fares no better than any of its other arguments. The U.S. Supreme Court has recognized that in certain "extraordinary" cases, courts should be skeptical of "agencies asserting highly consequential power beyond what Congress could reasonably be understood to have granted." *West Virginia v. EPA*, 597 U.S. 697, 724 (2022). In *West Virginia*, this doctrine was applied to strike down a federal regulation that would "substantially restructure the American energy market" based on a previously unused "gap filler" statutory provision. In that situation, the agency's "discovery" of a sweeping new power "allowed it to adopt a regulatory program that Congress had conspicuously and repeatedly declined to enact itself." *Id.*; *see also id.* at 723 ("Extraordinary grants of regulatory authority are rarely accomplished through modest words, vague terms, or subtle devices.") (cleaned up).

Plaintiffs' attempt to impose this rarely invoked doctrine is unpersuasive. The argument is another gloss on its mistaken belief that the Final Rule imposes substantive outcomes rather than procedural standards, an argument that ACAT has already addressed at length. *See supra* § I.(A)–(E). The argument also relies on political commentary from outside the record without making any attempt to explain why the Court should consider it. Br. at 39–41.[8] Plaintiffs complain about the costs of NEPA compliance but do not mention CEQ's cost-benefit analysis of the Final Rule. That analysis found that while it might impose modest regulatory costs, the resulting benefits would outweigh them. AR 77. Plaintiffs never made any effort to contest those

---

[8] Plaintiffs also get key facts wrong. *Compare* Br. at 40 (citing out-of-date extra-record data that agencies complete 1,100 EISs annually) *with* 85 Fed. Reg. at 43,305 (CEQ estimated in 2020 that agencies annually complete 176 EISs).

findings during the administrative process. 89 Fed. Reg. at 35,551 (noting that CEQ only received two comments on regulatory impact analysis).

Plaintiffs try to make up for the deficiencies in their legal argument with embellishment: they assert that the Final Rule will "fundamentally transform" NEPA, and that its implications are "enormous," "tremendous," "unprecedented," and "astonishing." Br. at 39–41. This hyperbole is untethered to the record. ACAT agrees that NEPA is important and that CEQ's implementing regulations play a key role in the statute's implementation. But the Final Rule does nothing more than provide direction for what agencies should disclose and consider in their NEPA reviews, in the service of advancing Congress's explicit goals of infusing environmental information and public input into agency decisions. Those core goals were affirmed just within the last year as part of the Fiscal Responsibility Act—which was enacted in the middle of CEQ's overhaul of NEPA's implementing rules. Like its predecessor rules, the Final Rule does not require agencies to choose any particular outcome. The notion that the Final Rule constitutes the "extraordinary" case where CEQ seeks to substantively regulate far beyond Congressional intent should be rejected. *Compare Missouri v. Biden*, Nos. 24-2332 & 24-2351, 2024 WL 3738157, at *3 (8th Cir. Aug. 9, 2024) (finding major questions arose in "light of [a] vast assertion of newfound power" justifying $475 billion in administrative expenditures).

V.   IF THIS COURT FINDS A LEGAL VIOLATION IN SOME ASPECT OF THE FINAL RULE, IT SHOULD ORDER ADDITIONAL BRIEFING ON REMEDY.

Plaintiffs do not say much about remedy except to demand that this Court vacate the Final Rule in its entirety and restore the 2020 Rule. Again, Plaintiffs overreach. *Allied-Signal, Inc. v. U.S. Nuclear Regul. Comm'n*, 988 F.2d 146, 150–51 (D.C. Cir. 1993) ("The decision whether to vacate depends on 'the seriousness of the order's deficiencies (and thus the extent of doubt whether the agency chose correctly) and the disruptive consequences of an interim change

that may itself be changed.'"). Should the Court find that any of Plaintiffs' arguments have merit, which it should not, ACAT asks that the Court direct the parties to submit additional briefing on remedy in light of the Court's specific findings. This is a common outcome in NEPA litigation, as a court's assessment of vacatur under *Allied-Signal* and other remedies should be shaped by its findings on the merits. S*ee, e.g., Standing Rock Sioux Tribe*, 255 F. Supp.3d at 147 (ordering additional briefing on remedy after finding violation of NEPA); *Kentucky v. Fed. Highway Admin.*, No. 5:23-cv-162-BJB, 2024 WL 1402443, at *18 (W.D. Ky. Apr. 1, 2024) (same).

In any event, vacatur of the entire Final Rule would not be a feasible remedy. Plaintiffs do not challenge the vast majority of the Final Rule nor explain why its many non-controversial elements should be vacated. And the 2020 Rule has already been superseded in important ways by other CEQ rules that have not been challenged in this lawsuit. *See, e.g.*, AR 32897; AR 43863. Moreover, the 2020 Rule predates the statutory amendments to NEPA in the Fiscal Responsibility Act. This Court should not resurrect regulations that predate these Congressional amendments. Finally, the record is rich in detail about how the 2020 Rule itself undermines NEPA, ignores critical issues, and violates various procedural standards. *See, e.g.*, AR 6542; AR 25622; AR 25141–57, 25170–79. A remedy that substitutes one putatively unlawful agency action for another would create administrative and judicial chaos. Accordingly, the Court should hold open the issue of remedy, if necessary, pending additional briefing.

CONCLUSION

For the foregoing reasons, Plaintiffs' motion for summary judgment should be denied.

DATED this 30th day of August, 2024.

s/ Jan E. Hasselman<br>JAN E. HASSELMAN (Admitted in D.N.D.)<br>(WSBA #29017)

KRISTEN L. BOYLES (Admitted in D.N.D.)
(CSBA #158450)
LYDIA HEYE (Admitted in D.N.D.)
(ABA #2211101)
EARTHJUSTICE
810 Third Avenue, Suite 610
Seattle, WA 98104
(206) 343-7340
jhasselman@earthjustice.org
kboyles@earthjustice.org
lheye@earthjustice.org

SUSAN JANE M. BROWN
*[Admitted Pro Hac Vice]*
(OSBA #054607)
SILVIX RESOURCES
4107 NE Couch St.
Portland, OR 97232
(503) 680-5513
sjb@silvex.org

*Attorneys for Intervenor-Defendants Alaska
Community Action on Toxics, et al.*

CERTIFICATE OF SERVICE

I hereby certify that on August 30, 2024, I electronically filed the foregoing document

with the Clerk of the Court using the CM/ECF system, which will send notification of this filing

to the attorneys of record and all registered participants.

Dated: August 30, 2024.

*s/ Jan E. Hasselman*
Jan E. Hasselman