**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA
WESTERN DIVISION**

| | |
|---|---|
| STATE OF IOWA, STATE OF NORTH DAKOTA, et al., | |
| Plaintiffs, | |
| v. | |
| COUNCIL ON ENVIRONMENTAL QUALITY, and BRENDA MALLORY, in her official capacity as Chair, | |
| Defendants, | Case No. 1:24-cv-00089-DMT-CRH |
| and | |
| ALASKA COMMUNITY ACTION ON TOXICS, et al., and STATE OF WASHINGTON, et al., | |
| Intervenor-Defendants. | |

**PLAINTIFFS' REPLY IN SUPPORT OF SUMMARY JUDGMENT
AND
OPPOSITION TO DEFENDANTS' CROSS-MOTIONS FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES................................................................................................. iii

INTRODUCTION ................................................................................................................ 1

ARGUMENT ....................................................................................................................... 3

I.    This Action Is Justiciable. ....................................................................................... 3

   A.    Plaintiff States have standing. .............................................................................. 3

   B.    The Final Rule is ripe for adjudication.................................................................. 8

II.   The Final Rule Unlawfully Grafts Substantive Requirements onto NEPA...................... 10

   A.    The Final Rule's re-interpretation of NEPA does not merit deference. ................ 10

   B.    NEPA's statutory mandates are purely procedural, not substantive. .................... 12

   C.    The Final Rule adds new requirements based on the current Administration's substantive policy preferences............................................................................... 15

      1.    The Final Rule places the concepts of "environmental justice" and climate change on a pedestal. ............................................................................................... 15

      2.    The Final Rule's mitigation provisions impermissibly convert NEPA from a predictive "hard look" into a backcheck. .................................................................... 18

      3.    The Final Rule constrains the use of categorical exclusions........................... 21

      4.    The Final Rule improperly propels an "environmentally preferable alternative.".......... 22

      5.    The Final Rule elevates the vague and undefined concept of "Indigenous Knowledge" in the NEPA process. ................................................................................ 24

      6.    NEPA's scope is not global............................................................................ 25

III.  The Final Rule Is Arbitrary and Capricious. ....................................................... 26

IV.   The Final Rule's Own NEPA Review Is Deficient............................................... 28

V.    The Final Rule Violates the Major Questions Doctrine. ...................................... 30

VI.   Vacatur of the Final Rule Is the Appropriate Remedy........................................311

CONCLUSION................................................................................................................. 344

# TABLE OF AUTHORITIES

**Cases**

*ACA Int'l v. FCC,*
    885 F.3d 687 (D.C. Cir. 2018) ................................................................ 33

*Action on Smoking & Health v. Civil Aeronautics Bd.,*
    713 F.2d 795 (D.C. Cir. 1983) ................................................................ 32

*Alabama Ass'n of Realtors v. Dept. of Health and Hum. Services,*
    594 U.S. 758 (2021) ................................................................................. 31

*Andrus v. Sierra Club,*
    442 U.S. 347 (1979) ................................................................................. 11

*Arkansas v. Dep't. of Educ.,*
    No. 4:24-cv-636 RWS, 2024 WL 3518588 (E.D. Mo. July 24, 2024) ............. 8

*Balt. Gas and Elec. Co. v. Nat. Res. Def. Council, Inc.,*
    462 U.S. 87 (1983) ................................................................................... 19

*Birckhead v. Fed. Energy Reg. Comm'n,*
    925 F.3d 510 (D.C. Cir. 2019) ................................................................ 17

*Carlson v. Postal Regul. Comm'n,*
    938 F.3d 337 (D.C. Cir. 2019) ................................................................ 33

*Clapper v. Amnesty Int'l USA,*
    568 U.S. 398 (2013) ................................................................................... 7

*Corner Post, Inc. v. Bd. of Governors of the Fed. Rsrv. Sys.,*
    144 S.Ct. 2440 (2024) ................................................................................ 9

*Dep't of Commerce v. New York,*
    139 S. Ct. 2551 (2019) ............................................................................. 16

*Dep't of Educ. v. Louisiana,*
    144 S.Ct. 2507 (2024) .............................................................................. 33

*Dep't of Transp. v. Public Citizen,*
    541 U.S. 752 (2004) ..................................................................... 12, 13, 25

*Envtl. Def. Fund, Inc. v. Corps of Eng'rs of U.S. Army,*
    470 F.2d 289 (8th Cir. 1972) .................................................................. 14

*Food & Water Watch, Inc. v. Vilsack,*
    808 F.3d 905 (D.C. Cir. 2015) .................................................................. 7

*Friends of Boundary Waters Wilderness v. Dombeck,*
    164 F.3d 115 (8th Cir. 1999) ............................................................ 14, 29

*Indep. Meat Packers Ass'n v. Butz,*
    526 F.2d 228 (8th Cir. 1975) .................................................................. 18

*Iowa League of Cities v. EPA,*
    711 F.3d 844 (8th Cir. 2013) ............................................................. 11, 31

*K Mart Corp. v. Cartier, Inc.*,
   486 U.S. 281 (1988) ................................................................................................................ 33

*Loper Bright Enterprises v. Raimondo*,
   144 S.Ct. 2244 (2024) ...................................................................................9, 10, 11, 12

*Louisiana v. Biden*,
   64 F.4th 674 (5th Cir. 2023) ................................................................................... 6, 7

*Lujan v. Defenders of Wildlife*,
   504 U.S. 555 (1992) ...................................................................................................... 4

*Marinello v. United States*,
   584 U.S. 1 (2018) ....................................................................................................... 20

*Massachusetts v. EPA*,
   549 U.S. 497, 520 (2007) ............................................................................................. 4

*Metro. Edison Co. v. People Against Nuclear Energy*,
   460 U.S. 766 (1983) ................................................................................................... 13

*Mississippi v. Becerra*,
   No. 1:22cv113-HSO-RPM, 2024 WL 1335084 (S.D. Miss. Mar. 28, 2024)........................... 4

*Missouri v. Biden*,
   112 F.4th 531 (8th Cir. 2024) ................................................................................... 31

*Missouri v. Biden*,
   52 F.4th 362 (8th Cir. 2022) ...................................................................................... 6

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
   463 U.S. 29 (1983) ..................................................................................................... 20

*Murthy v. Missouri*,
   144 S. Ct. 1972 (2024) ................................................................................................ 7

*NAACP v. Trump*,
   298 F. Supp. 3d 209 (D.C. Cir. 2018)......................................................................... 28

*Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*,
   545 U.S. 967 (2005) ................................................................................................... 27

*Native Ecosystems Council v. Dombeck*,
   304 F.3d 886 (9th Cir. 2002) ..................................................................................... 28

*Ohio Forestry Ass'n, Inc. v. Sierra Club*,
   523 U.S. 726 (1998) ............................................................................................... 9, 10

*Paulsen v. Daniels*,
   413 F.3d 999 (9th Cir. 2005) ..................................................................................... 32

*Robertson v. Methow Valley Citizens Council*,
   490 U.S. 332 (1989) .............................................................................................. 14, 20

*Rosebud Sioux Tribe v. McDivitt*,
   286 F.3d 1031 (8th Cir. 2002) ................................................................................... 14

*Rumsfeld v. Forum for Acad. & Inst. Rights, Inc.*,
    547 U.S. 47 (2006) ................................................................................. 5

*State Oil Co. v. Kahn*,
    522 U.S. 3 (1997) ................................................................................... 4

*Tennessee v. Dep't of Educ.*,
    104 F.4th 577 (6th Cir. 2024) ............................................................... 8

*Texas v. United States*,
    40 F.4th 205 (5th Cir. 2022) ............................................................... 32

*Texas v. United States*,
    50 F.4th 498 (5th Cir. 2022) ................................................................. 4

*United Food and Com. Workers Union v. U.S. Dep't of Agric.*,
    532 F.Supp.3d 741 (D. Minn. 2021) .................................................. 31

*United Steel v. Mine Safety & Health Admin.*,
    925 F.3d 1279 (D.C. Cir. 2019) .......................................................... 31

*Vermont Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*,
    435 U.S. 519 (1978) ...................................................................... 13, 14

*Voyageurs Nat. Park Ass'n v. Norton*,
    381 F.3d 759 (8th Cir. 2004) ................................................................ 4

*West Virginia v. EPA*,
    669 F. Supp. 3d 781 (D.N.D. 2023) .................................................. 26

*West Virginia v. EPA*,
    597 U.S. 697 (2022) ........................................................................... 30

*Wild Virginia v. Council on Env't Quality*,
    56 F.4th 281 (4th Cir. 2022) ............................................................. 8, 9

*Young Conservatives of Texas Found. v. Smatresk*,
    73 F.4th 304 (5th Cir. 2023) ................................................................ 8

**Statutory Authorities**

5 U.S.C. § 553 .............................................................................................11

5 U.S.C. § 706 ........................................................................................ 4, 31

23 U.S.C. § 327 ............................................................................................ 7

42 U.S.C. § 4331 ........................................................................ 2, 12, 13, 25

42 U.S.C. § 4332 ............................................................................. 2, 19, 28

42 U.S.C. § 4336c ...................................................................................... 21

42 U.S.C. § 4344 ........................................................................................ 10

**Rules and Regulations**

40 C.F.R. § 230.10(a) ................................................................................ 19

40 C.F.R. § 1500.3(d) ........................................................................................................... 28

40 C.F.R. § 1501.4(c) ........................................................................................................... 21

40 C.F.R. § 1501.5(h) ........................................................................................................... 20

40 C.F.R. § 1502.16(a)(6) .................................................................................................... 17

40 C.F.R. § 1502.22 .............................................................................................................. 24

40 C.F.R. § 1503.3 ................................................................................................................ 27

40 C.F.R. § 1506.5 ................................................................................................................ 27

40 C.F.R. § 1507.3(c)(8) ....................................................................................................... 21

40 C.F.R. § 1508.1(y) ........................................................................................................... 19

**Federal Register**

84 Fed.Reg. 30097 (June 26, 2019) ..................................................................................... 12

85 Fed.Reg. 43304 (July 16, 2020) ...................................................................................... 27

86 Fed.Reg. 7037 (Jan. 25, 2021) ........................................................................................ 16

86 Fed.Reg. 7619 (Feb. 1, 2021) .......................................................................................... 16

88 Fed.Reg. 1196 (Jan. 9, 2023) .......................................................................................... 12

89 Fed.Reg. 35442 (May 1, 2024) ................................................................................. *passim*

**Additional Authorities**

Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure*, § 3531.5
    (3d ed. 2008) ...................................................................................................................... 8

## INTRODUCTION

Defendants acknowledge that NEPA's legal mandates are only procedural, and so they downplay the Final Rule's new directives as merely suggestive or optional. *E.g.*, Dkt. 86 (CEQ Br.) at 26 ("NEPA does not mandate particular results"); *id.* ("the States correctly note that NEPA does not ultimately constrain the substantive actions agencies may pursue"); Dkt. 85 (Intervenor States Br.) at 46 ("it is true that NEPA does not mandate specific substantive outcomes"); Dkt. 88 (Intervenor NGO Br.) at 1 ("the statute's requirements are procedural"). But at the same time, Defendants tout substantive "policies" and "objectives," and insist the Final Rule is critical to achieving those outcomes. *E.g.*, CEQ Br. at 25; Intervenor States Br. at 18, Exs. A-E; Intervenor NGO Br. at 9. Defendants cannot have it both ways. And they rely on immaterial semantics in their efforts to keep their arguments straight. *E.g.*, Intervenor States Br. at 24 ("In this way [via its climate change provisions], the Final Rule is admittedly 'action-forcing,' by directing agencies to plan and work towards producing a better outcome for the environment, but it is not, as Plaintiff States contend, 'action-driving.'").

The easiest answer for cutting through Defendants' semantic haze is also the simplest one: CEQ is misusing NEPA—departing from the statute's procedural directives to foster informed agency action and public participation—to put a thumb on the scale and achieve the current Administration's substantive policy ends. For that and the many other reasons explained by Plaintiff States, the Court should vacate and remand the Final Rule.

To avoid adjudicating the merits, CEQ tries to evade judicial review on jurisdictional grounds, contending that the Final Rule cannot be challenged because it imposes no consequences. CEQ Br. at 14-25. But no other party takes such a position, and for good reason. The Final Rule binds every agency's implementation of NEPA and governs every NEPA review begun after July 1, 2024, as well as many that began even earlier. And despite CEQ's quibbling with a couple of

identified projects, Plaintiff States' declarations extensively describe many significant injuries and costs to be imposed by the Final Rule. CEQ is mistaken that Plaintiff States must sit back and wait to challenge the Final Rule as applied to individual proposed actions, as by that time the Final Rule's delays and other harms will have already occurred.

Similarly misguided is CEQ's claim of blanket discretion to (re)interpret NEPA however it sees fit. CEQ Br. at 28-30. Congress has not imbued CEQ with such power. Rather, as the Supreme Court has made plain, legal interpretation of NEPA is the role of the courts, not the agency.

The Final Rule levies new across-the-board requirements that are nowhere expressed in NEPA's text, and Defendants' attempts to latch onto hortatory "policy" snippets from NEPA Section 101 (42 U.S.C. § 4331) fundamentally misconstrue the statute. Only NEPA Section 102 (42 U.S.C. § 4332) imposes legal obligations—*i.e.*, the procedural requirements to prepare NEPA documents and involve the public. NEPA's only "action-forcing" commands are its procedures. And as Plaintiffs have shown, at a minimum, the Final Rule's elevation of climate change, environmental justice, "Indigenous Knowledge," and extraterritorial effects; its imposition of mitigation requirements; its curtailment of categorical exclusions (CEs); and its requirement for an "environmentally preferable alternative" all exceed CEQ's authority for crafting NEPA procedures. Assurances in Defendants' litigation filings that attempt to limit the Final Rule's import and impact cannot replace the Final Rule's operative text. Indeed, if the Final Rule were as inconsequential as CEQ contends, and if those conducting NEPA reviews are largely free to ignore it, it raises the question why it is necessary at all, or why Defendants so stridently defend it.

Defendants' criticisms of Plaintiffs' arguments also often help reflect the Final Rule's arbitrary and capricious nature. As just one example, CEQ's statement that there remains "guesswork about how Federal agencies will apply the 2024 Rule in the future" (CEQ Br. at 1)

reflects how the Final Rule transforms the NEPA process by injecting vague and undefined requirements. Additionally, assertions by some Defendants that the Final Rule's new terms are clear and well-understood (*e.g.*, Intervenor States Br. at 28) are not persuasive when the Final Rule itself disclaims the ability to define such terms. And Defendants' claims that the Final Rule will serve its stated purposes of reducing NEPA delays and litigation is divorced from reality, considering the Final Rule's deliberate deletion of regulatory provisions that provided some modicum of certainty and predictability to the NEPA process.

Defendants' remaining arguments fare no better. Their defenses of CEQ's NEPA analysis for this Final Rule are as meager as was the analysis itself. And given the profound economic and environmental impacts that the Final Rule will have across the nation, Defendants cannot remove the Final Rule from the ambit of the major questions doctrine and its concomitant requirement that CEQ must point to clear statutory language to justify its actions.

Finally, to try to cut their potential losses, Defendants urge this Court to defer any remedy or to not vacate the Final Rule in its entirety. But vacatur is the presumptive and appropriate remedy for the unlawful Final Rule, especially given that its unlawful provisions are intractably woven throughout the fabric of the entire rule and granting vacatur would merely reinstate the status quo that immediately preceded the Final Rule.

## ARGUMENT

### I.    This Action Is Justiciable.

#### A.    Plaintiff States have standing.

The Final Rule causes immediate and substantial injury to Plaintiff States. *See* Dkt. 65 (Pls. Opening Br.) at 10-19, Exs. A-P. Those injuries confer Plaintiff States with standing, and CEQ's arguments to the contrary (CEQ Br. at 14-25) should be rejected.

To begin, Plaintiff States have "special solicitude" for invoking this Court's jurisdiction

and can establish standing "without meeting all the normal standards for … immediacy." *Massachusetts v. EPA*, 549 U.S. 497, 517-18, 520 (2007) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 572 n.7 (1992)) (quotation marks omitted); *contra* CEQ Br. at 20-21. Plaintiff States have standing "if there is some possibility that the requested relief will prompt the injury-causing party to reconsider the decision that allegedly harmed the litigant." *Massachusetts*, 549 U.S. at 518. CEQ's suggestion that this Court should reject the special solicitude afforded to States because the Fifth Circuit has opined that the doctrine might be "falling out of favor with the Supreme Court" (CEQ Br. at 20-21) (quoting *Mississippi v. Becerra*, No. 1:22cv113-HSO-RPM, 2024 WL 1335084, at *14 n.18 (S.D. Miss. Mar. 28, 2024)), should itself be rejected. Unless the Supreme Court overrules *Massachusetts. v. EPA*, its holding remains binding on this Court. *See State Oil Co. v. Kahn*, 522 U.S. 3, 20 (1997) ("it is [the Supreme] Court's prerogative alone to overrule one if its precedents"); *Texas v. United States*, 50 F.4th 498, 519 (5th Cir. 2022) (citing *Massachusetts v. EPA* as still being good law).

Plaintiff States fall squarely within that "special solicitude" because: (1) they have a procedural right to challenge the Final Rule; and (2) the challenged Final Rule affects Plaintiff States' quasi-sovereign interests. *See Texas*, 50 F.4th at 514. The Administrative Procedure Act provides Plaintiff States the procedural right to challenge the Final Rule. *See Voyageurs Nat. Park Ass'n v. Norton*, 381 F.3d 759, 763 (8th Cir. 2004) (citing 5 U.S.C. § 706). And quasi-sovereign interests "consist of a set of interests that the State has in the well-being of its populace." *Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592, 602 (1982). Such interests include "the health and well-being—both physical and economic—of its residents in general." *Alfred*, 458 U.S. at 607. And the Final Rule greatly affects the well-being of Plaintiff States' populaces by

impacting myriad NEPA-affected projects, not just the "development of their 'natural resources.'" *Contra* CEQ Br. at 21.

But this action is justiciable even without Plaintiff States' "special solicitude." Plaintiff States have provided extensive declaration support from sixteen state officials with direct and longstanding NEPA experience. *See* Pls. Opening Br., Exs. A-P. CEQ attempts to nitpick a couple statements within a couple of these declarations (CEQ Br. at 16, 18), but that nitpicking cannot refute the significant number of current and planned projects affected by the Final Rule. Plaintiff States have detailed ongoing projects including in North Dakota, such as critical transportation projects, the Heartland Hydrogen Hub, the Fargo-Moorhead Area Diversion Project, and many other infrastructure projects. *See* Pls. Opening Br. at 12-18. And that is just for North Dakota. *See also* Pls. Opening Br. at 10-19 (discussing other States). CEQ does not, and cannot, dispel the Final Rule's effects on each project with a federal nexus in each Plaintiff State. And the presence of one party with standing suffices for this Court's jurisdiction over Plaintiffs' lawsuit. *Rumsfeld v. Forum for Acad. & Inst. Rights, Inc.*, 547 U.S. 47, 52 n.2 (2006).

Intervenors likewise agree that the Final Rule has immediate and broad effects, and offer their own examples highlighting the Final Rule's substantive import. For example, the Intervenor States recognize that states have "sovereign and proprietary interests in . . . natural resources" that are affected by the Final Rule. Intervenor States Br. at 10. And Intervenor States provide several declarations attesting that the Final Rule has climate or environmental impacts on their States. *E.g.*, Dkt. 85-2 ¶¶ 6-9; Dkt. 85-3 ¶¶ 18-19; Dkt. 85-4 ¶¶ 16, 21, 25-26 (Intervenor States Br. Exs. B-D). Likewise, Intervenor NGOs recognize that the Final Rule will have significant, real-world impacts. *See* Intervenor NGO Br. at 20. And while Plaintiff States do not endorse Intervenors' assertions

about the Final Rule's purported benefits or legality, they all agree that the Final Rule will have imminent and substantial effects—and is thus justiciable.

The impacts from the Final Rule are not too "speculative" to establish standing. *Contra* CEQ Br. at 15. CEQ concedes that the Final Rule applies to *every* NEPA review begun after July 1, 2024, and that agencies may apply the Final Rule even to ongoing environmental reviews. CEQ Br. at 13. And the Final Rule binds *all* federal agencies even absent implementing regulations from individual agencies. A.R. 28875 (89 Fed.Reg. 35442, 35555 (§ 1500.3(a))); ("This subchapter is applicable to and binding on all Federal agencies for implementing the procedural provisions of [NEPA]."). That means that it is not the enactment of follow-on regulations from individual agencies that will cause of Plaintiff States' injuries; it is the requirements of the Final Rule itself.

Plaintiff States also do not assert "bald speculation" of injury, *contra* CEQ Br. at 17, and the cases cited by CEQ for this point are of limited relevance. *Cf.* CEQ Br. at 17-18 (citing *Missouri v. Biden*, 52 F.4th 362, 368-69 (8th Cir. 2022); *Louisiana v. Biden*, 64 F.4th 674, 681-82 (5th Cir. 2023)). In *Missouri*, the Eighth Circuit concluded that the claimed injuries from the Office of Management and Budget's interim estimates of the social cost of greenhouse gases (GHG)—which agencies might not use in future rulemakings—were "concrete only if [the court] assume[d] at some point in the future, one or more agencies will inevitably issue one or more regulations that rely in some way upon the [i]nterim [e]stimates; that such agency will inevitably disregard any objections to the methodology …; and that this yet-to-be-identified regulation will then harm Plaintiffs in a concrete and particularized way. *Missouri*, 52 F.4th at 368 (quotation marks and citation omitted). So too in *Louisiana*, which addressed a "parallel" challenge to the same interim estimates as in *Missouri* and found "no reason to depart from the Eighth Circuit's [] ruling," given that "the core of" the Fifth Circuit's standing determination was that the interim estimates do "not

*require* any action from federal agencies." 64 F.4th at 681, 683 (emphasis original). Those facts greatly diverge from the circumstances presented here.

By contrast, the Final Rule at issue here expressly adopts regulations applicable across the federal government and requires federal agencies to propose conforming revisions to their own implementing procedures within "no more than 12 months." A.R. 28893 (89 Fed.Reg. 35573 (§ 1507.3 (b))). No speculation is needed to discern that agencies *will* alter their NEPA reviews due to the Final Rule, agencies *will* adopt conforming regulatory revisions based on the Final Rule, and that those revisions *will* affect all actions subject to NEPA—including the myriad projects and developments specifically identified by Plaintiff States. CEQ's argument also ignores States' often principal role in preparing NEPA documents and corresponding need to understand and apply CEQ's regulations implementing NEPA. *See* Pls. Opening Br. at 10-19.

And certain Plaintiff States' NEPA assignments under the Surface Transportation Project Delivery Program, 23 U.S.C. § 327, underscores their standing because of their direct administration of NEPA for covered projects. *See* Pls. Opening Br. at 16-17.

CEQ's assertion that those NEPA assignments amount to "self-inflicted injury" that cannot confer standing is mistaken. *Cf.* CEQ Br. at 21-22. An alleged self-inflicted injury generally cannot support standing only when it comes about after a party voluntarily assumes an obligation *in response* to a perceived injury. *See, e.g.*, *Clapper v. Amnesty Int'l USA,* 568 U.S. 398, 415–18 (2013); *Murthy v. Missouri*, 144 S. Ct. 1972, 1995 (2024); *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 918 (D.C. Cir. 2015). That is not the case here, because the impacted Plaintiff States were assigned NEPA responsibilities under 23 U.S.C. § 327 well before this Final Rule went into effect, and well before any injury from this Final Rule was even in sight.

Moreover, CEQ cites no authority holding that when a State incurs obligations under a federal statutory program, the State lacks standing to challenge a subsequent act of rulemaking that alters those obligations, and that the State's only option is to withdraw its participation from the program. *Cf.* CEQ Br. at 22. Rather, courts have repeatedly held that States have standing to challenge agency rulemaking which unlawfully modifies federal statutory programs, even where the States' participation in that statutory program is voluntary. *E.g.*, *Arkansas v. Dep't of Educ.*, No. 4:24-cv-636 RWS, 2024 WL 3518588, at *3 (E.D. Mo. July 24, 2024) (States with education programs receiving federal Title IX funding have standing to challenge new federal regulatory requirements for such funding); *Tennessee v. Dep't of Educ.*, 104 F.4th 577, 586-91 (6th Cir. 2024) (same). And even if the Court found such an injury to be partially self-inflicted, a plaintiff's partial contribution to the injury does not defeat standing. *See, e.g., Young Conservatives of Texas Found. v. Smatresk*, 73 F.4th 304, 309-10 (5th Cir. 2023) ("Standing is not defeated merely because the plaintiff has in some sense contributed to his own injury … Standing is defeated only if … the injury is so completely due to the plaintiff's own fault as to break the causal chain." (quoting 13A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 3531.5 (3d ed. 2008 & Supp. 2022) (emphasis and quotation marks omitted)).

### B.    The Final Rule is ripe for adjudication.

Plaintiff States' claims are also ripe. In arguing otherwise, CEQ relies heavily on the out-of-circuit decision in *Wild Virginia v. Council on Env't Quality*, 56 F.4th 281 (4th Cir. 2022), which is factually and legally dissimilar to the case here. *Cf.* CEQ Br. at 22-24.

Unlike here, the special interest group plaintiffs in *Wild Virginia* did not have unique State interests, simply alleging that the NEPA rule at issue there would "(1) create problems with NEPA analysis, (2) pose obstacles for them to comment on NEPA analyses or otherwise participate in agency decisionmaking, (3) make it more difficult for them to obtain information about proposed

federal actions, and (4) eliminate some categories of actions from NEPA review altogether." *Wild Virginia*, 56 F.4th at 295. But all those purported injuries were in anticipation of those plaintiffs using NEPA to slow or halt projects that had yet to be identified. Here, by contrast, Plaintiff States directly prepare NEPA documents, have quasi-sovereign interests at stake, and have identified a host of specific projects and project categories that already are and will be affected by the Final Rule. *See* Pls. Opening Br. at 10-19.

CEQ's statement that "[w]here—as here—the challenged agency action is a regulation, courts presume the facial challenge is not ripe" is incorrect. *Cf.* CEQ Br. at 23. Courts regularly accept facial challenges to regulations, and CEQ ignores the citation of many such cases facially challenging unlawful agency regulations that are being driven by the same policy ends that the current Administration is pursuing with this Final Rule. *See* Pls. Opening Br. at 2-3 (citations omitted). Indeed, the Supreme Court very recently reaffirmed the propriety of bringing "facial challenges" to agency regulations. *See Corner Post, Inc. v. Bd. of Governors of the Fed. Rsrv. Sys.*, 144 S.Ct. 2440, 2458-60 (2024) (recognizing "the APA's 'basic presumption' that anyone injured by agency action should have access to judicial review" and the "deep-rooted historic tradition that everyone should have his own day in court") (citation and quotation marks omitted).

Finally, this case is not one where the challenged regulation does not "command anyone to do anything or to refrain from doing anything." CEQ Br. at 24 (quoting *Ohio Forestry Ass'n, Inc. v. Sierra Club*, 523 U.S. 726, 733 (1998)). Indeed, the Final Rule commands all preparers of NEPA documents and cooperating agencies to immediately adhere to its new requirements and commands the promulgation of other conforming regulations. These commands, and their resulting impacts on development projects that are critically needed by the public, directly affect Plaintiff States and their citizens.

CEQ's argument that Plaintiff "States will 'have ample opportunity later to bring [their] legal challenge at a time when harm [is] more imminent and more certain'" ignores reality. *Cf.* CEQ Br. at 24 (quoting *Ohio Forestry*, 523 U.S. at 734). Delay will not aid resolution of Plaintiff States' claims, which are based on the Final Rule's failures as a matter of law. And CEQ offers no explanation how Plaintiff States will challenge the unlawful overapplication of NEPA requirements to a given project (rather than underapplication), as there is no readily available cause of action for an agency being compelled to perform too much NEPA review. Even worse, after the unlawful delay has occurred, the harm will have already been done and the unlawful impositions of the Final Rule will effectively evade review. Plaintiff States' challenge is ripe for review now.

## II.    The Final Rule Unlawfully Grafts Substantive Requirements onto NEPA.

### A.    The Final Rule's re-interpretation of NEPA deserves no deference.

Despite its suggestion otherwise (CEQ Br. at 28-30), CEQ does not possess a blank check to infer new requirements into the NEPA statute fifty years after its enactment—and the 2023 Fiscal Responsibility Act (FRA) emphasizes that point as it was enacted to address many of the very types of uncertainty and delays the Final Rule creates. That is further complemented by *Loper Bright Enterprises v. Raimondo*, 144 S.Ct. 2244 (2024). "[W]hen the best reading of a statute is that it delegates discretionary authority to an agency, the role of the reviewing court under the APA is, as always, to independently interpret the statute and effectuate the will of Congress subject to constitutional limits." *Loper Bright*, 144 S.Ct. at 2263. The Court does so by "recognizing constitutional delegations, [and] fixing the boundaries of the delegated authority." *Id.* (quotation marks and citation omitted).

That it is the courts, not the agency, charged with finding the agency's outer bounds of statutory authority rings especially true for CEQ, which is not a traditional agency and whose role has always been inherently advisory. *See* 42 U.S.C. § 4344 ("assist and advise" and "recommend"

to the President). Yet CEQ cites the single case of *Andrus v. Sierra Club*, 442 U.S. 347 (1979), as "binding precedent requiring deference to CEQ's exercise of discretion" in interpreting NEPA. CEQ Br. at 29-30. But *Andrus* stands for no such proposition and, regardless, is readily distinguishable. *Andrus* was limited to whether an agency proposal for legislation—requested modification to Congressional appropriations—required an environmental impact statement (EIS). *Andrus*, 442 U.S. at 364; *see also* Pls. Opening Br. at 20.

In other words, the question in *Andrus* for which the view of CEQ—not even a defendant in that case—was afforded "substantial deference" was whether a given fact pattern required an EIS. *Id.* at 358. That is not this case. *Andrus* did not involve rulemaking, much less one that overhauled the NEPA processes and pushed the boundaries of CEQ's statutory authority. And to the extent CEQ attempts to derive a generally applicable deference mandate into that solitary statement in *Andrus*, it was abrogated by *Loper Bright*, 144 S.Ct. at 2263.

Nor can CEQ demand deference on questions of statutory interpretation by directing the Court to agency guidance documents that did not establish binding nationwide standards. *E.g.*, CEQ Br. at 49 ("CEQ guidance has (consistent with NEPA) long directed agencies to consider GHG emissions, environmental justice, and mitigation."). A binding regulation like the Final Rule is inherently different than guidance documents which have not followed the proper safeguards of the APA, including undergoing public notice and comment and OMB review. *See* 5 U.S.C. § 553; *Iowa League of Cities v. EPA*, 711 F.3d 844, 855 (8th Cir. 2013). As one example, Intervenor States suggest that "CEQ has provided guidance to agencies on how to evaluate the effects of greenhouse gas emissions since 2016." Intervenor States Br. at 21. But CEQ's GHG "guidance" documents have gone through dramatically different iterations in only a few years' time, and even today's

version holds only an "interim" label. *Compare* 84 Fed.Reg. 30097 (June 26, 2019) *with* A.R. 193 (88 Fed.Reg. 1196 (Jan. 9, 2023)).

In short, "legal interpretation [] has been, emphatically, the province and duty of the judicial department for at least 221 years." *Loper Bright*, 144 S.Ct. at 2273 (citation omitted). And "the APA [] bars judges from disregarding that responsibility just because an Executive Branch agency views a statute differently." *Id.* The same rules govern CEQ and its re-interpretation of NEPA.

> **B.    NEPA's statutory mandates are purely procedural, not substantive.**

To begin, CEQ attempts to reframe NEPA's procedural nature by reading the Section 101 "policy" provisions to imbue the statute with substantive requirements and policy objectives. *See* CEQ Br. at 25-28 (citing 42 U.S.C. § 4331). Based on that section, CEQ asserts that "Congress intended that the process required by NEPA would lead agencies to make more environmentally beneficial decisions, and the [Final Rule] furthers that intent," and that "[c]ourts have also recognized this broad purpose." CEQ Br. at 25-26.

But NEPA's operative terms are in Section 102, not Section 101. *See Dep't of Transp. v. Public Citizen*, 541 U.S. 752, 756-57 (2004). Even the Final Rule recognizes as much. *See* A.R. 28875 (89 Fed.Reg. 35555 (§ 1500.3(a)) ("NEPA compliance … The regulations in this subchapter apply to the whole of *section 102(2)* of NEPA.") (emphasis added). To Plaintiff States' knowledge, no court (nor agency) has ever ascribed legal consequences or found a violation of Section 101. And courts have explained that introductory, hortatory "policy" paragraphs like those in NEPA Section 101 are not binding in other statutory contexts. *See*, *e.g.*, *Pub. Lands for the People, Inc. v. U.S. Dep't of Agric.*, No. CIV. S–09–1750 LKK/JFM, 2010 WL 5200944, at *11 (E.D. Cal. Dec. 15, 2010) (addressing arguments based on the policy provision of the Federal Land Policy Management Act, and stating: "By relying on section 1701, a 'Congressional declaration of policy,'

plaintiffs are once again attempting to transform a statement of policy into a command regarding the [agency's] authority to regulate" its jurisdictional lands), *aff'd*, 697 F.3d 1192 (9th Cir. 2012).

Nor does the NEPA statute "provide procedures that prevent or eliminate damage to the environment" and "instruct[] the Federal Government to avoid undesirable or unintended consequences." *Contra* CEQ Br. at 32 (quotation marks and citations omitted). As Defendants repeatedly concede elsewhere, the legally operative provisions of NEPA prescribe procedures to be followed, not outcomes. *E.g.*, CEQ Br. at 26.

Moreover, even on those policy statements' own terms, CEQ's argument fails, and Defendants only selectively quote from those policy provisions. For example, Intervenor States misstate that "[t]he plain language of NEPA promotes an unequivocal policy of environmental protection." Intervenor States Br. at 17. But NEPA's policy provisions do not place environmental benefits above all other aims and indicia of the public welfare. *See, e.g.*, 42 U.S.C. § 4331(a) ("foster and promote the general welfare" and "fulfill the social, economic, and other requirements of present and future generations of Americans"); *id.* § 4331(b) (NEPA is to be implemented "consistent with other essential considerations of national policy"); *id.* § 4331(b)(5) ("achieve a balance between population and resource use which will permit high standards of living and a wide sharing of life's amenities").

The Supreme Court has emphasized NEPA's procedural nature for decades. *See Vermont Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*, 435 U.S. 519, 558 (1978) ("NEPA does set forth significant substantive goals for the Nation, but its mandate to the agencies is essentially procedural.... It is to insure a fully informed and well considered decision."); *Metro. Edison Co. v. People Against Nuclear Energy*, 460 U.S. 766, 772 (1983) (discussing NEPA's procedural direction to federal agencies); *Public Citizen*, 541 U.S. at 756-57 ("NEPA itself does

not mandate particular results …. Rather, NEPA imposes on procedural requirements on federal agencies with particular focus on requiring agencies to undertake analyses of the environmental impact of their proposed actions.") (quotation marks and citation omitted).

And the other cases cited by CEQ do not support holding otherwise. *Cf.* CEQ Br. at 26, 36, 46. *Envtl. Def. Fund, Inc. v. Corps of Eng'rs of U.S. Army,* 470 F.2d 289 (8th Cir. 1972), was decided shortly after NEPA's passage and *before* the Supreme Court's holdings that the statute's legal requirements are only procedural (*e.g.*, *Yankee Nuclear Power*, 435 U.S. at 558). CEQ's quote from *Rosebud Sioux Tribe v. McDivitt*, 286 F.3d 1031, 1038 (8th Cir. 2002), speaks only to NEPA's purpose as it relates to standing. *Cf.* CEQ Br. at 26. And *Friends of Boundary Waters Wilderness v. Dombeck*, 164 F.3d 115 (8th Cir. 1999), does not stand for CEQ's proposition that "NEPA is not value-neutral." *Contra* CEQ Br. at 46. CEQ's presentation of that statement, pulled from the end of the opinion and out of context, ignores the court's explanation of NEPA's procedural requirements. *Dombeck*, 164 F.3d at 1128.

And the Supreme Court's prior reference to NEPA being "action-forcing" referred to preparing NEPA documents, not to substantive outcomes. *See Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989). The use of that phrase does not support Defendants' assertion that NEPA can "action-force" substantive outcomes. *Cf.* CEQ Br. at 26-28.

For more than fifty years, the Supreme Court has understood NEPA as only imposing procedural, not substantive, requirements. To avoid that precedent, Intervenor States contend that "the Final Rule is admittedly 'action-forcing,' by directing agencies to plan and work towards producing a better outcome for the environment, but it is not, as Plaintiff States contend, 'action-driving.'" Intervenor States Br. at 24. Similarly, they assert that "in describing the Final Rule, State Plaintiffs mistakenly argue that NEPA is exclusively 'procedural' and therefore cannot also be

'action-forcing.'…. The requirement that federal agencies consider and publicly disclose the environmental consequences of a proposed action as well as the alternatives has practical significance, and results in decisions that better protect environmental resources." Intervenor States Br. at 46. But as discussed above, NEPA has been understood as purely procedural for decades. There has been no relevant statutory modification that would change that, and Defendants' attempts to recast NEPA's long-understood operative mandate should be rejected.

### C.   The Final Rule adds new requirements based on the current Administration's substantive policy preferences.

In its brief, CEQ contends that Plaintiff States "press various challenges to provisions of the 2024 Rule that are, at base, expressions of their disagreement with CEQ's policy determinations." CEQ Br. at 25. CEQ's statement is not entirely wrong—but that defense only goes to the heart of the issue, which is that CEQ has no statutory authority to be inserting substantive policy preferences into the NEPA process to begin with.

The Final Rule adds requirements that appear nowhere in NEPA's statutory text nor in the NEPA-implementing regulations which existed before the Final Rule. Despite *post hoc* attempts by Defendants' counsel to downplay the effects of the Final Rule's operative text (*e.g.*, CEQ Br. at 30-36), the Final Rule says what it says. And that operative text is loaded with substantive policy requirements that depart from what the statute requires. *See* Pls. Opening Br. at 19-32.

### 1.   The Final Rule places the concepts of "environmental justice" and climate change on a pedestal.

CEQ asserts that the Final Rule does not "elevate" climate change and "environmental justice" considerations over others. *See* CEQ Br. at 30. But that statement is fighting reality, given that the Final Rule makes both concepts the centerpieces of the regulation, even though NEPA's statutory text mentions neither concept.

Under the Final Rule, failure to consider climate change and environmental justice effects (*e.g.*, §§ 1502.14(f); 1502.16(a)(5), (6) & (13); 1503.3(b); 1506.6(d)) becomes a violation of CEQ's NEPA regulations. In a footnote CEQ describes these required considerations as voluntary by pointing to the word "should" (CEQ Br. at 32 n.25). But the Final Rule's operative text doesn't contain that limitation. And any suggestion that entities conducting NEPA reviews may ignore what CEQ instructs they "should" do is fanciful, and agencies will face challenges and litigation for failing to consider such effects.

Similarly, CEQ's contention that the Final Rule adds climate change and environmental justice requirements into the NEPA process merely to "ensure agencies and the public have access to high-quality information about important environmental effects" asks this Court to pretend that it is a coincidence that such "high-quality information" is in exact alignment with current Administration's policy pushes. CEQ Br. at 30; Exec. Order 13990, *Protecting Public Health and the Environment and Restoring Science To Tackle the Climate Crisis*, 86 Fed.Reg. 7037 (Jan. 25, 2021), A.R. 33672–78 (directing "all executive departments and agencies … to immediately commence work to confront the climate crisis"); Exec. Order 14008, *Tackling the Climate Crisis at Home and Abroad*, 86 Fed.Reg. 7619, 7622 (Feb. 1, 2021), A.R. 33679–93 ("It is the policy of my Administration to organize and deploy the full capacity of its agencies to combat the climate crisis to implement a Government-wide approach."). Courts are "'not required to exhibit a naiveté from which ordinary citizens are free.'" *Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2575 (2019) (citation omitted).

Another new substantive requirement imposed by the Final Rule is the explicit mandate that NEPA reviews quantify GHG emissions. Even if that requirement is nominally caveated with the terms "where applicable" and "where feasible" (CEQ Br. at 33) (citing 40 C.F.R.

§ 1502.16(a)(6) (emphasis omitted), those terms are inherently vague and consequently prime targets for litigation if a NEPA review were to determine that quantifying GHG emissions was not applicable or feasible. Plaintiff States are not ignoring the Final Rule's text when noting that is deliberately driving agency decisions towards outcomes that minimize global GHG emissions. *Contra* CEQ Br. at 33. CEQ then pivots to defending its elevation of considering GHG emissions by citing *Birckhead v. Fed. Energy Reg. Comm'n*, 925 F.3d 510, 520 (D.C. Cir. 2019). *See* CEQ Br. at 33. But *Birckhead* concerned a decision to ignore the environmental effects of increased production at a natural gas compression facility, and the court determined that it had "no basis for concluding that the Commission acted unreasonably in declining to evaluate downstream combustion impacts. 925 F.3d at 519-21. That decision cannot be read to force agencies to universally consider GHG effects for every development in the country with a federal nexus, as the Final Rule effectively does notwithstanding any "where applicable" proviso.

"Environmental justice" is another new express requirement for NEPA reviews under the Final Rule. Defendants point to nowhere in NEPA mentioning the term, and despite it being a well-publicized concept, Congress notably did not include the term when it amended NEPA in 2023 as part of the FRA. CEQ cannot get around that problem by invoking NEPA Section 101's "all Americans" term, as that statutory text expresses no policy of elevating some people or populations over others, nor does it supply the demarcation lines that the Final Rule enacts. *Cf.* CEQ Br. at 31. Moreover, CEQ's reliance on that phrase is particularly suspect since CEQ then moves beyond "all Americans" for purposes of requiring global effects analysis. *See* Pls. Opening Br. at 25.

Nor can CEQ summon an environmental justice requirement from out of its own non-binding guidance. *Cf.* CEQ Br. at 31. And while Intervenor States cite executive orders as "federal laws on environmental justice" (Intervenor States Br. at 26), executive orders are not statutes and

Defendants cannot rely on them to defend regulatory requirements that have no statutory basis. *See Indep. Meat Packers Ass'n v. Butz*, 526 F.2d 228, 234-35 (8th Cir. 1975).

Declarations from the Intervenor States also point to certain State laws with substantive climate change and environmental justice requirements as somehow buttressing those aspects of the Final Rule. State laws with such substantive aspects include the California Environmental Quality Act, Washington State Environmental Policy Act, and Massachusetts Environmental Policy Act. *See* Intervenor States Br. Ex. B at 2, Ex. C at 2. But such State laws are distinct from NEPA, which is purely procedural. And Intervenor States would have no basis for any contention that entities complying with federal NEPA obligations must also fulfill State law obligations that Intervenor States have elected to impose on their own agencies.

Finally, Defendants urge the policy importance of climate change and environmental justice. CEQ Br. at 30-35; Intervenor States Br. at 20-27; Intervenor NGO Br. at 9-16. But to be clear, this case is not about the wisdom of such policies. Those are questions of national policy over which Congress can legislate. Instead, this case is about whether CEQ can act where Congress has not allowed it to act, using bureaucratic rulemaking to implement substantive policy provisions that contravene NEPA's procedural nature. And it cannot.

### 2.    The Final Rule's mitigation provisions impermissibly convert NEPA from a predictive "hard look" into a backcheck.

It is undisputed that NEPA's statutory text contains no substantive mitigation requirements. Yet the Final Rule creates them anyway. *See* Pls. Opening Br. at 27-29.

CEQ's brief offers no defense for removing the longtime regulatory provision that: "While NEPA requires consideration of mitigation, it does not mandate the form or adoption of any mitigation." 89 Fed.Reg. 35548–49; *see also* Pls. Opening Br. at 27. In its place, the Final Rule imposes new requirements to monitor and enforce mitigation, even where an EIS has already been

18

prepared, and where no significant effects exist. *See* A.R. 28874-75, 28889 (89 Fed.Reg. 35554–55 (§ 1500.2(f)), 35569 (§§ 1505.3(a)(2), 1505.3(b), 1505.3(c))).

Defendants understate the Final Rule's new mitigation requirements by seeking to deflect mitigation decisions from CEQ to individual agencies. *See* CEQ Br. at 36-42; Intervenor States Br. at 33-35; Intervenor NGO Br. at 23-26. But it is the Final Rule that mandates mitigation. Indeed, federally funded or permitted projects often have some impact reduction measures baked in as matters of substantive law or accepted best management practices, not due to NEPA review. *E.g.*, 40 C.F.R. § 230.10(a) (requiring least environmentally damaging practicable alternative for Clean Water Act Section 404 dredged or fill material discharge permits). But the Final Rule's new mitigation requirements as part of the NEPA review process are different. For example, the Final Rule's redefinition of mitigation to include an "order of priority," headlined by measures to "avoid" or "minimize" effects, will create widespread "mitigation" measures subject to new mandatory monitoring plans under the Final Rule. *See* 40 C.F.R. § 1508.1(y).

Similarly, the Final Rule's broad mandate requiring monitoring plans for any measures deemed to be "mitigation" is *ultra vires*. CEQ claims the Final Rule's far-reaching mitigation requirements will "ensure the reliability and integrity of agencies['] predictive judgments." CEQ Br. at 36. But that purported justification misapprehends NEPA's basic nature of as a forward-looking rather than backward-looking statute. NEPA requires only a "hard look" at reasonably foreseeable effects of a proposed agency action. *Balt. Gas and Elec. Co. v. Nat. Res. Def. Council, Inc.*, 462 U.S. 87, 97 (1983). That hard look is based on reliable information available at the time of the relevant agency decision. 42 U.S.C. § 4332(2)(E). NEPA nowhere requires looking back later to verify whether the agency's predictions proved correct. As CEQ admits, "NEPA has never

contained 'a substantive requirement that a complete mitigation plan be actually formulated and adopted.'" CEQ Br. at 37 (quoting *Robertson*, 490 U.S. at 352).

As such, CEQ's suggestion that mandating monitoring mitigation efforts is a "logical notion" under NEPA is wrong. *Cf.* CEQ Br. at 40. The Final Rule's required mitigation monitoring crosses the line between "prohibit[ing] uninformed—rather than unwise—agency action." *Robertson,* 490 U.S. at 350-51. Whether agencies decide to require mitigation conditions as a term of issuing permits or allocating funds is a function of substantive law; NEPA imposes no such monitoring requirement, and neither can an administrative rule purporting to implement NEPA.

Those new mitigation requirements will have real-world consequences and will multiply project challenges. Ineffectiveness of any such mitigation measures, regardless of intervening circumstances, will elicit calls for renewed scrutiny and supplemental NEPA review. *See* 40 C.F.R. § 1501.5(h). Assurances from Defendants for purposes of this litigation that CEQ "did not intend" to create after-the-fact NEPA liabilities (*e.g.*, CEQ Br. at 41) do not establish otherwise. *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 50 (1983) ("courts may not accept appellate counsel's *post hoc* rationalizations for agency action"); *cf. Marinello v. United States*, 584 U.S. 1, 11 (2018) (courts may not rely on "the assumption that the Government will use [prosecutorial power] responsibly") (citation omitted). Moreover, Intervenor NGOs' suggestion that they are "unaware of any mechanism by which NEPA reviews for completed projects can be 're-opened,'" neither specifies what "completed" means nor acknowledges project opponents' creativity in bringing novel NEPA arguments to derail projects they dislike. Intervenor NGO Br. at 25. And it is not "difficult to understand" how the Final Rule's imposition of mitigation requirements for a project will foreseeably result in litigation over the project's adherence to those requirements. *Contra* Intervenor NGO Br. at 25.

### 3.    The Final Rule constrains the use of categorical exclusions.

One area of agreement among the Parties is that CEs are the most common form of NEPA compliance. *E.g.*, Intervenor NGO Br. at 26. And CEQ acknowledges "the FRA's amendments encouraging use of CEs." CEQ Br. at 45. Yet that agreement highlights the scope of problems generated by the Final Rule's new restrictions on the use of CEs.

CEQ asserts that the Final Rule does not "inhibit" the use of CEs and "merely takes steps to ensure that agencies' use of CEs will be consistent with NEPA." CEQ Br. at 42. But in so proclaiming, CEQ ignores the central role it already plays in approving CEs before an agency may use them. Even without the Final Rule, CEQ must find that a CE aligns with NEPA—because a CE cannot issue without CEQ's express approval. 40 C.F.R. §§ 1501.4(c), 1507.3(c)(8). Consequently, CEQ's stated justification for its revisions to the CE process is a paper tiger. And contrary to CEQ's suggestion otherwise, the Final Rule does "inhibit" the utilization of CEs by adding new, substance-based restrictions on their use. *See* Pls. Opening Br. at 29-31.

CEQ's addition of extra-statutory conditions for the adoption of other agencies' CEs is not "consistent with the spirit of the FRA's amendments encouraging [the] use of CEs," much less the controlling letter of the FRA. *Contra* CEQ Br. at 44-45. When Congress enacted that statute in 2023, it included no requirement to consider extraordinary circumstances for this purpose. 42 U.S.C. § 4336c. Nor did it include a requirement for re-reviews "at least every 10 years" as the Final Rule does. *Id.*; A.R. 28894 (89 Fed.Reg. 35574 (§ 1507.3(c)(9))).

Relatedly, Defendants cannot pass the buck to individual agencies for the Final Rule's expansion of extraordinary circumstances to deter the use of CEs. For example, Intervenor NGOs assert that "[a]s an initial matter, individual federal agencies—not CEQ—develop extraordinary circumstances." Intervenor NGO Br. at 27. But that is not quite right. Instead, the Final Rule, for the first time, dictates new extraordinary circumstances that all federal agencies must assess,

including any climate change and environmental justice concerns raised for a given proposed action. *See* Pls. Opening Br. at 21-25 (discussing, *e.g.*, A.R. 28874-77, 28885-86, 28895 (89 Fed.Reg. 35554-57, 35565-66, 35575 (§§ 1500.2(e), 1501.3(d)(1), 1502.14(f), 1502.16(a)(6) 1508.1(f), (m) & (o))). Defendants attempt to downplay those new requirements as optional examples, but the Final Rule's operative text presents no optionality. *E.g.*, A.R. 28895 (89 Fed.Reg. 35575 (§ 1508.1(o))) ("Examples of extraordinary circumstances include … potential substantial disproportionate and adverse effects on communities with environmental justice concerns; potential substantial effects associated with climate change …."); *id.* (§ 1508.1) ("Federal agencies shall use these terms uniformly throughout the Federal Government."); *contra* CEQ Br. at 42-43; Intervenor States Br. at 36-37; Intervenor NGO Br. at 27.

CEQ both overstates and understates the import of extraordinary circumstances where applicable and present. *See* CEQ Br. at 42. Requiring a similar level of analysis of extraordinary circumstances for a CE as for an EA or EIS defeats the very nature of CEs. Meanwhile, as a practical matter, even if not legally prohibitive of a CE, the alleged existence of extraordinary circumstances will disincentivize agencies from using their duly promulgated CEs.

The foreseeable result of the Final Rule is that agencies and project proponents will face more assertions of extraordinary circumstances that create a higher bar to use established CEs for the types of projects that the current Administration disfavors—*i.e.*, projects alleged to have the "potential" for "environmental justice" or "climate change" effects.

### 4.    The Final Rule improperly propels an "environmentally preferable alternative."

Defendants also try to minimize the Final Rule's *ultra vires* preference for an "environmentally preferable alternative." *See* CEQ Br. at 35-36. But those provisions are a

microcosm of the Final Rule's broader imposition of impermissible substantive ends. *See* Pls. Opening Br. at 25-27.

CEQ contends that the Final Rule's revisions to the "environmentally preferable alternative" process are of little regard because the change is "one of timing, not substance." CEQ Br. at 35. But contrary to CEQ's suggestions, the "timing" of an environmentally preferable alternative designation is highly relevant to shaping the process's outcome. Mandating that agencies must now identify such an alternative early in the NEPA process—including in a draft NEPA document before public comment, rather than in the Record of Decision for the final agency action—creates decision points for the rest of the NEPA analysis, including on which alternatives to dismiss from further consideration. This new and accelerated requirement increases the vulnerability to challenges that an agency did not properly consider the alternative with the fewest perceived net environmental impacts—which often will be the no action alternative, as doing nothing is generally going to be less impactful than doing something. CEQ's summary disavowal of the Final Rule's presumption against development (CEQ Br. at 36) should be rejected, because the no action alternative will often have the fewest environmentally adverse impacts, and thus agencies will be under increased pressure to not select it.

Moreover, despite Defendants' claim that these changes are only of timing and not of substance (*e.g.*, CEQ Br. at 35), there was never a definition nor criteria for this designation before the Final Rule's creation of them out of whole cloth. *See* A.R. 28885, 28894 (89 Fed.Reg. 35565, 35574 (§§ 1502.14(f), 1508.1(n))). And despite *post hoc* assurances by Defendants, the Final Rule itself nowhere countermands requiring creating a new alternative for the environmentally preferable alternative—which would be one of the "alternatives" within the NEPA document described in § 1502.14(f) of the Final Rule.

Finally, Intervenor States' characterization of the environmentally preferable alternative determination as "[w]eighing the various costs and benefits of potential agency actions" overlooks that the Final Rule preserves the regulatory direction that cost-benefit analysis is unnecessary under NEPA. *Compare* Intervenor States Br. at 32 *with* 40 C.F.R. § 1502.22. And Intervenor NGOs cannot simultaneously maintain that the environmentally preferable alternative "promotes NEPA's policy goals of fostering better environmental outcomes for the human environment," while disclaiming that the Final Rule's creation of a heavier burden to reject that alternative is "unmoored from the explicit text of the rule." *Cf.* Intervenor NGO Br. at 21-22.

### 5.    The Final Rule elevates the vague and undefined concept of "Indigenous Knowledge" in the NEPA process.

Plaintiff States explained that the Final Rule's inclusion of undefined "Indigenous Knowledge" as a source of "high-quality" information to be considered during NEPA reviews elevates it to special status, as the Final Rule contains no similar recognition of the unique knowledge of other stakeholders—such as by requiring consideration of "State Knowledge," as just one example. *See* Pls. Opening Br. at 23-24.

CEQ acknowledges that it could not come up with a cogent definition of "Indigenous Knowledge" for purposes of the Final Rule. CEQ Br. at 34 n.27. Yet the Final Rule categorically declares "Indigenous Knowledge" to be "high-quality" information for agencies to use alongside scientific data. CEQ Br. at 34. The Final Rule does not identify other stakeholders as being sources of "reliable" information to be considered during the NEPA review process. As noted above, CEQ's semantic arguments about using the verb "may" cannot defeat the reality that the CEQ chose to adopt that provision as a binding regulation, and agencies will be compelled to follow it to avoid greater litigation exposure under the Final Rule.

24

And Intervenor States cannot defend this new requirement by claiming that it has a "clear meaning." Intervenor States Br. at 28-29 (quoting the Department of Interior as stating "Indigenous peoples are the best authority in conceptualization … of their own IK"). "Indigenous Knowledge" cannot have a clear meaning for purposes of the Final Rule where CEQ expressly disclaimed the ability to formulate one for the Final Rule. A.R. 28801-02 (89 Fed.Reg. 35481-82). If the term is to be given any meaning in the absence of CEQ defining it, "Indigenous Knowledge" will become a function of whatever a tribal or other project opponent (or a reviewing court) says that it is, and then any entity conducting a NEPA review must give that claimed knowledge equal or elevated importance to scientific data, or risk consequences for not doing so. Such a result does not "clarify the information agencies may potentially consider." *Contra* CEQ Br. at 34.

### 6.    NEPA's scope is not global.

NEPA's statutory text calls for environmental considerations to be made while serving the needs of "Americans"—*not* while serving "global" interests. 42 U.S.C. § 4331(a); *Public Citizen*, 541 U.S. at 770 ("where an agency has no ability to prevent a certain effect due to its limited statutory authority over the relevant actions … [it] need not consider these effects"); *see* Pls. Opening Br. at 23-25. Even if agencies need only need consider global effects when "reasonably foreseeable," that does not correct for projects wherein a global scope may trigger an EIS even when more localized effects would not. *Cf.* CEQ Br. at 34-35. Climate change often fits into that box. CEQ also cannot wave away this Final Rule shortcoming by basing global impacts on "context." *Cf.* CEQ Br. at 34-35. That is particularly true since the Final Rule's new climate change requirements relate to an inherently global phenomenon, thus resulting in inherently global considerations across all NEPA analyses. Such worldwide considerations are outside of NEPA's statutory text, and the Final Rule's geographically overbroad scope cannot stand.

### III.    The Final Rule Is Arbitrary and Capricious.

Defendants exhibit a disconnect by both asserting that the Final Rule only does what NEPA already requires, yet is also defensible as a change in policy. For example, Intervenor States acknowledge that the Final Rule effectuates a policy change, asserting that "Plaintiff States' argument does not change the fact that CEQ can change its existing policies as long as it provides a reasonable explanation for the change." Intervenor States Br. at 42. Yet Defendants do not explain how this change is possible if the Final Rule simply does what NEPA already requires. *See id.* at 18-20. That disconnect in defending the Final Rule is illustrative of the many ways in which it is arbitrary and capricious. *See* Pls. Opening Br. at 32-36.

For starters, CEQ disparages Plaintiff States' claims as "guesswork." CEQ Br. at 1. But that label more accurately describes many of the Final Rule's new requirements, which will turn NEPA reviews into speculation that is contrary to NEPA's purpose for ensuring informed agency decisions. By injecting vaguely defined and politically charged concepts into the NEPA review process, the Final Rule creates guesswork for mitigated outcomes, climate impacts, and environmental justice effects. Defendants also assert that "the term 'Indigenous Knowledge' is not uncertain." *E.g.,* Intervenor States Br. at 43. Again, that seems a difficult statement to make when CEQ itself expressly stated that for purposes of the Final Rule it did not have "an adequate basis … to determine that providing a definition [for Indigenous Knowledge] in the regulations would be workable across contexts and Tribal Nations." A.R. 28801 (89 Fed.Reg. 35481). *Cf. West Virginia v. EPA*, 669 F. Supp. 3d 781, 803 (D.N.D. 2023) ("These murky definitions are unintelligible and provide little guidance to parties impacted by the regulations.").

CEQ's attempt to dispel Plaintiff States' reliance interests on a properly functioning NEPA regime are unavailing. *Cf.* CEQ Br. at 49-50. Plaintiff States reasonably relied on decades of NEPA implementing regulations that did not contain the arbitrary and unworkable requirements imposed

by the Final Rule. CEQ's response is simply to fall back on its mistaken arguments that the Final Rule causes no injury. But as Plaintiff States have explained, the Final Rule causes injury in spades.

CEQ's responses on the arbitrariness of specific Final Rule provisions are also misplaced. For example, CEQ is wrong that third parties have prepared draft NEPA documents for "all of four years" (CEQ Br. at 49); in reality, CEQ and individual agencies have long allowed third-party preparation of NEPA documents, and CEQ provides no reasonable basis for reinstituting document preparation responsibilities on already overburdened federal agency resources. *See* A.R. 42719 (40 C.F.R. § 1506.5 (2019)) ("applicant" or "contractor" could prepare NEPA documents even before the 2020 Rule). Nor can CEQ credibly deny that the Final Rule will create delays by hiding behind the Final Rule's time and page limits, which contemplate many exceptions and enlargements. *Cf.* CEQ Br. at 50. And Defendants provide no response on infeasibility of a timeline that requires the public to comment provide comment on countless individual agency follow-on implementing regulations with 30-to-60-day public comment periods running concurrently. *See* Pls. Opening Br. at 36. CEQ's only response to that point is that the 2020 Rule did so too. *See* CEQ Br. at 50. But even if two wrongs made a right, CEQ fails to harmonize that defense with its earlier concession that, for the 2020 Rule, CEQ unilaterally stayed agencies' obligation to issue conforming regulations for more than two years after the initial 12-month window. CEQ Br. at 7 n.7.

The Final Rule's changes are also arbitrary and capricious given their "unexplained inconsistency" with the same agency's recent views reflected in the 2020 updates to the same regulations. *See Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 981 (2005); 85 Fed.Reg. 43304 (July 16, 2020) (2020 Rule); Pls. Opening Br. at 33-35. For example, CEQ fails to meaningfully justify removing the language in former 40 C.F.R. § 1503.3 for greater specificity of public comments during the NEPA process to ensure their usefulness for NEPA

reviews and decision-making. *See* A.R. 28832-34. That did not express the *post hoc* and cramped reading that CEQ now espouses to it. *See* CEQ Br. at 46-47. Nor does CEQ explain how that now-deleted provision was inconsistent with its only cited case, which nowhere addressed the subject regulatory provision and instead found that a commenter had exhausted administrative remedies. CEQ Br. at 47 (citing *Native Ecosystems Council v. Dombeck*, 304 F.3d 886, 900 (9th Cir. 2002)). Also, CEQ fails to explain why the Final Rule removed its stated "intention" in former 40 C.F.R. § 1500.3(d) that NEPA remedies be proportional to the extent of found NEPA violations, yet included several other "intentions" regarding "judicial review" in § 1500.3(b). *See* A.R. 28832-34; *cf.* CEQ Br. at 47-48 (summarily stating that the removed provision is "inapposite").

Finally, in response to the problems that the Final Rule creates, CEQ offers conclusory statements such as that "the [Final Rule] makes federal agencies' application of NEPA more efficient and effective." CEQ Br. at 1. CEQ also asserts that the Final Rule "enhance[s] efficiency and regulatory certainty," and "will help agencies more successfully implement NEPA and facilitate a more efficient and environmental review process." CEQ Br. at 9 (quotation marks and citation omitted). But given that the foreseeable result of the Final Rule will be a significant expansion in development-stalling litigation, Defendants' inconsistent and conclusory statements to the contrary are insufficient justification. *See NAACP v. Trump*, 298 F. Supp. 3d 209, 243 (D.C. Cir. 2018) ("conclusory statements were insufficient to explain" agency's changed views).

## IV.    The Final Rule's Own NEPA Review Is Deficient.

NEPA requires "all agencies of the Federal Government" to consider the environmental effects of their proposed rulemaking, disclose those impacts, and involve the public in the NEPA process. 42 U.S.C. § 4332. That includes CEQ. *See* Pls. Opening Br. at 37-39.

Even so, rather than adhering to the rigorous NEPA requirements that it imposes on every other federal agency, CEQ prepared merely a back-of-the-envelope "Special EA" for this Final

Rule. *See* A.R. 27752–27760 (Special EA). In their brief, Intervenor States do not attempt to defend CEQ's use of a pro forma "Special EA." For their part, Intervenor NGOs, "agree[] in principle" that CEQ is subject to NEPA requirements when promulgating NEPA-implementing regulations, but they contend that the 2024 Rule they are defending (unlike the 2020 Rule they challenged) satisfied those requirements. NGO Intervenor Br. at 32.

CEQ attempts to evade judicial review of their failure to conduct a proper NEPA review by claiming that Plaintiff States are not within NEPA's "zone of interests" for "prudential standing" and asserting that Plaintiff States do not "allege any environmental harm." CEQ Br. at 50. But that is incorrect. Prudential standing is satisfied where a plaintiff alleges that an agency's NEPA review failed to properly consider all relevant considerations, not merely environmental ones. *E.g.*, *Dombeck*, 164 F.3d at 1125-28 (prudential standing to ensure that an agency's NEPA review adequately addresses all relevant concerns, including economic ones). And in any event, Plaintiff States do allege environmental harm, including through the Final Rule's frustration of projects that are needed for the public welfare and the de-prioritization of environmental effects other than climate change and environmental justice. *See* Pls. Opening Br. at 12-14, 16-17; *see also id.* Ex. B at ¶¶ 7-13, 20 (describing foreseeable harms to North Dakota's water environment); *id.* Ex. E at ¶¶ 11-16 (describing foreseeable harms to West Virginia's mine reclamation efforts). Those interests easily fall within NEPA's zone of interests, even if prudential standing was, as CEQ alleges, limited to only "environmental harm."

Nor can Defendants save the Special EA by relying on its "historical practice," CEQ Br. at 52 (pointing to "special EA[s]" issued by CEQ in 1978 and 1986), especially where that purported practice has neither been challenged or adjudicated. As CEQ acknowledges, it has rarely undertaken regulatory actions to categorically overhaul and redefine the NEPA-implementing,

much less established a "practice" for doing so. *See* CEQ Br. at 6 & n.5 (noting that prior to 2020 the NEPA regulations "remained largely unchanged for over 40 years" since 1978). Nor has CEQ produced or included in its administrative record for this case any prior "special EA." Likewise, CEQ's mention of, and Intervenor NGOs' purported concern with, the 2020 Rule's NEPA analysis is extraneous, since the validity of that earlier Rule is not before this Court here challenging the 2024 Final Rule. *See* CEQ Br. at 52; Intervenor NGO Br. at 32-33.

## V.      The Final Rule Violates the Major Questions Doctrine.

When an agency wishes to execute decisions of vast economic and political significance, it "must point to clear congressional authorization for the power it claims." *West Virginia v. EPA*, 597 U.S. 697, 723 (2022) (citation omitted). CEQ's effort to overhaul the NEPA process and insert non-statutory substantive requirements into the regulations implementing a statute with enormous economic significance for the entire country is such an instance. *See* Pls. Opening Br. at 39-41.

Defendants try in vain to exempt the Final Rule from the major questions doctrine. But the assertion that the Final Rule is not a "transformative expansion" of existing NEPA-implementing regulations (CEQ Br. at 54) both disregards the Final Rule's plain terms and Defendants' repeated insistence that the Final Rule is critical to achieving environmental outcomes.

CEQ also fails to explain how Plaintiff States' major questions doctrine claim is "internally inconsistent." CEQ Br. at 53. The Final Rule is fundamentally different from the 2020 Rule, and only the Final Rule's legality is before this Court. Just because CEQ issued prior NEPA-implementing regulations under its statutory authority does not automatically mean that the Final Rule which CEQ now purports to issue under the "same authority" is presumptively valid.

Intervenor States are also mistaken in their argument that the Final Rule cannot implicate the major questions doctrine because the economic significance of the Final Rule is merely the cost of compliance with NEPA itself. *Cf.* Intervenor States Br. at 48. The Supreme Court has time

and again recognized that when complying with an agency's assertion of newfound regulatory powers imposes massive costs on the nation, the major questions doctrine is implicated. *E.g., Alabama Ass'n of Realtors v. Dept. of Health and Hum. Services*, 594 U.S. 758, 764 (2021) (requiring an agency to point to clear statutory authority when imposing an eviction moratorium estimated to impose $50 billion in economic impact).

Just last month, the Eighth Circuit invoked the major questions doctrine in preliminarily enjoining a federal agency rulemaking involving student loan repayment, as "something more than a merely plausible textual basis for the agency action is necessary." *Missouri v. Biden*, 112 F.4th 531, 537 (8th Cir. 2024) (citation omitted). The agency in that case, like CEQ here, had issued prior regulations on the same topic. *Id.* at 534. Yet, like the regulation in that case, the Final Rule "is an order of magnitude broader than anything that has come before," and violates the major questions doctrine. *Id.*

## VI.    Vacatur of the Final Rule Is the Appropriate Remedy.

The proper remedy here is clear and straightforward: vacatur of the Final Rule. Under both the APA and caselaw, vacatur is the standard remedy for unlawful agency action. *See* 5 U.S.C. § 706(2)(A) & (C) ("The reviewing court *shall* … hold unlawful and *set aside* agency action, findings, and conclusions found to be ... arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law … [or] in excess of statutory jurisdiction, authority, or limitations, or short of statutory right ….") (emphasis added); *Iowa League of Cities v. EPA*, 711 F.3d 844, 875-76 (8th Cir. 2013) (8th Cir. 2013) (vacating agency rules under 5 U.S.C. § 706(2)); *United Steel v. Mine Safety & Health Admin.*, 925 F.3d 1279, 1287 (D.C. Cir. 2019) ("The ordinary practice is to vacate unlawful agency action."); *United Food and Com. Workers Union v. U.S. Dep't of Agric.*, 532 F.Supp.3d 741, 781 (D. Minn. 2021) (adhering to "the normal APA remedy of vacatur"). Defendants fail to establish why vacatur would not be appropriate here, nor is additional post-

merits briefing necessary. For several reasons, Defendants' efforts to forestall imposing a remedy and to perpetuate an unlawful regulation should be rejected.

First, Defendants misrepresent the scope of Plaintiff States' Complaint and requested remedy. *See* CEQ Br. at 54; Intervenor States Br. at 49-50; Intervenor NGO Br. at 35-36. This case challenges the entire Final Rule, and no other agency action. As such, Plaintiff States request only to vacate the Final Rule, which would result in reinstatement of the CEQ regulations that the Final Rule amends. Dkt. 39 (Am. Complaint) ¶ 12 ("Accordingly, Plaintiff States respectfully ask this Court to vacate the Final Rule, remand it to the Council, enjoin the Council from enforcing the Final Rule, and resultingly reinstate the 2020 rule."); *id.* at 29 (prayer for same relief). That is because the natural "effect of invalidating an agency rule is to reinstate the rule previously in force." *Paulsen v. Daniels*, 413 F.3d 999, 1008 (9th Cir. 2005) (citing *Action on Smoking & Health v. Civil Aeronautics Bd.*, 713 F.2d 795, 797 (D.C. Cir. 1983)); *see also Texas v. United States*, 40 F.4th 205, 220 (5th Cir. 2022) ("[A] vacatur does nothing but re-establish the status quo absent the unlawful agency action. Apart from the constitutional or statutory basis on which the court invalidated an agency action, vacatur neither compels nor restrains further agency decision-making."). Defendants' contention that this lawsuit seeks to alter any other regulations through a mechanism other than vacatur of the Final Rule—such as by reinstating regulatory terms that were amended by CEQ's 2022 "Phase 1" rulemaking—is mistaken. *See* Intervenor States Br. at 49; Intervenor NGO Br. at 36.

Second, Congress' passage of the FRA does not defeat vacatur of the Final Rule. *See* CEQ Br. at 55; Intervenor States Br. at 49-50; Intervenor NGO Br. at 35-36. As Plaintiffs have explained, the 2023 FRA codified aspects of CEQ's 2020 Rule and foreclosed other aspects that CEQ is nonetheless attempting to push through with this Final Rule. *See* Pls. Opening Br. at 7-8. The FRA

is already binding law. It thus does not matter when CEQ amends its implementing regulations in a manner that adheres to the FRA and that is not *ultra vires* or arbitrary and capricious. Moreover, if the Final Rule is vacated, CEQ could readily issue an interim final rule that mirrors corresponding FRA provisions—just as CEQ acknowledges it did to delay revisions of agency regulations to conform to CEQ's 2020 Rule. CEQ Br. at 7 n.7.

Third, there is no reasonable basis for the Court to engage in a line-iteming exercise to determine which parts of the Final Rule are severable from the others (comprising 136 pages in the Federal Register). The "severability" clause in the Final Rule on which CEQ relies is boilerplate and not determinative. CEQ Br. at 54 (citing A.R. 28875 (89 Fed.Reg. 35555 (§ 1500.3(c)))). Severance requires the Court to determine which provisions do "not impair the function of the statute as a whole," and there must be "no indication that the regulation would not have been passed but for its inclusion." *K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 294 (1988). "First, the court must find that 'the agency would have adopted the same disposition regarding the unchallenged portion of the regulation if the challenged portion were subtracted,'" and "[s]econd, the parts of the regulation that remain must be able to 'function sensibly without the stricken provision.'" *Carlson v. Postal Regul. Comm'n*, 938 F.3d 337, 351 (D.C. Cir. 2019) (citations omitted). But this case does not present a single offending provision, easily severable from the rest. Instead, CEQ's insertion of substantive policy into NEPA reviews permeates throughout the Final Rule, rendering severability improper. *See Dep't of Educ. v. Louisiana*, 144 S.Ct. 2507, 2510 (2024); *ACA Int'l v. FCC*, 885 F.3d 687, 708 (D.C. Cir. 2018) ("When we invalidate a specific aspect of an agency's action, we leave related components of the agency's action standing only if we can say *without any substantial doubt* that the agency would have adopted the severed portion on its own.") (quotation marks and citation omitted, emphasis added). Thus, the proper remedy

here is to vacate and remand the Final Rule for CEQ to determine in the first instance which, if any, lawful provisions it can revise and readopt.

Finally, vacating the Final Rule would not have substantially disruptive consequences—and would have less disruptive consequences than its retention. *Contra* Intervenor States Br. at 49-50, NGO Intervenor Br. at 35-36. Defendants are also mistaken that vacatur of the Final Rule's substantive mandates would prevent appropriate NEPA consideration of relevant impacts for any given proposed action. *Cf.* CEQ Br. at 54-55. Intervenor States and NGOs participated in NEPA reviews before the Final Rule and will continue doing so following its vacatur. Similarly, Intervenor States' ability to coordinate their own State law analogs with NEPA—just as Plaintiff States routinely do—would continue to occur just as it did before the Final Rule.

## CONCLUSION

For the reasons above and in Plaintiffs States' opening brief, Plaintiff States respectfully request that the Court grant their motion for summary judgment in its entirety and declare unlawful, vacate, and remand the Final Rule. Plaintiffs States also request that the Court deny Defendants' cross-motions for summary judgment in their entirety.

Dated: September 20, 2024                    Respectfully submitted,

BRENNA BIRD                                  DREW H. WRIGLEY
Attorney General of Iowa                     North Dakota Attorney General

*/s/ Eric Wessan*                            /s/ *Philip Axt*
ERIC WESSAN                                  PHILIP AXT
*Solicitor General*                          *Solicitor General*
Hoover State Office Building                 JAMES M. AUSLANDER
1305 East Walnut Street                      NESSA HOREWITCH COPPINGER
Des Moines, Iowa 50319                       *Special Assistant Attorneys General*
(515) 823-9117                               Office of Attorney General
eric.wessan@ag.iowa.gov                      600 E. Boulevard Ave Dept. 125
                                             Bismarck ND 58505
*Counsel for the State of Iowa*              (701) 328-2210

pjaxt@nd.gov
jauslander@bdlaw.com
ncoppinger@bdlaw.com

*Counsel for the State of North Dakota*

TREG TAYLOR
Alaska Attorney General

/s/ *Wade M. Withington*
WADE M. WITHINGTON
*Assistant Attorney General, Civil Division*
Office of the Alaska Attorney General
Alaska Department of Law
1031 W. 4th Avenue, Suite 200
(907) 269-5232
wade.withington@alaska.gov

*Counsel for the State of Alaska*

TIM GRIFFIN
Arkansas Attorney General

/s/ *Nicholas J. Bronni*
NICHOLAS J. BRONNI
*Solicitor General*
DYLAN L. JACOBS
*Deputy Solicitor General*
Office of the Arkansas Attorney General
323 Center Street, Suite 200
Little Rock, AR 72201
(501) 682-6302
Nicholas.Bronni@ArkansasAG.gov

*Counsel for the State of Arkansas*

ASHLEY MOODY
Florida Attorney General

/s/ *Natalie P. Christmas*
NATALIE P. CHRISTMAS (Fla. 1019180)
*Senior Counselor*
Office of the Attorney General
The Capitol, Pl-01
Tallahassee, Florida 32399-1050
(850) 414-3300
natalie.christmas@myfloridalegal.com

*Counsel for the State of Florida*

CHRISTOPHER M. CARR
Georgia Attorney General

/s/ *Justin T. Golart*
JUSTIN T. GOLART
*Deputy Solicitor General*
Office of the Attorney General of Georgia
40 Capitol Square, SW
Atlanta, GA 30334
(404) 458-3252
jgolart@law.ga.gov

*Counsel for the State of Georgia*

RAÚL R. LABRADOR
Idaho Attorney General

/s/ *Joy M. Vega*
ALAN M. HURST
*Solicitor General*
JOY M. VEGA
*Lead Deputy Attorney General*
Office of the Idaho Attorney General
P.O. Box 83720
Boise, Idaho 83720
(208) 334-2400
Alan.Hurst@ag.idaho.gov

KRIS W. KOBACH
Kansas Attorney General

/s/Abhishek S. Kambli
ABHISHEK S. KAMBLI
*Deputy Attorney General*
Office of the Kansas Attorney General
120 SW 10th Avenue, 2nd Floor
Topeka, Kansas 66612
Telephone: (785) 296-2215
Fax: (785) 296-3131
abhishek.kambli@ag.ks.gov

*Counsel for the State of Kansas*

Joy.Vega@ag.idaho.gov

*Counsel for State of Idaho*

RUSSELL COLEMAN
Kentucky Attorney General

/s/ *Victor B. Maddox*
VICTOR B. MADDOX
AARON SILLETTO
Kentucky Office of the Attorney General
700 Capital Avenue, Suite 118
Frankfort, Kentucky 40601
(502) 696-5300
victor.maddox@ky.gov
aaron.silletto@ky.gov

*Counsel for the Commonwealth of Kentucky*

LIZ B. MURRILL
Louisiana Attorney General

J. BENJAMIN AGUIÑAGA
Solicitor General

/s/ *Kelsey L. Smith*
Kelsey L. Smith
Deputy Solicitor General
Office of the Louisiana Attorney General
1885 North Third Street
Baton Rouge, LA 70804
(225) 428-7432
smithkel@ag.louisiana.gov

*Counsel for the State of Louisiana*

ANDREW T. BAILEY
Missouri Attorney General

/s/ *Joshua M. Divine*
JOSHUA M. DIVINE, 69875MO
*Solicitor General*
Office of the Attorney General
207 West High St.
Jefferson City, MO 65101
Phone: (573) 751-8870
Josh.Divine@ago.mo.gov

*Counsel for the State of Missouri*

AUSTIN KNUDSEN
Montana Attorney General

/s/ *Christian B. Corrigan*
CHRISTIAN B. CORRIGAN
*Solicitor General*
Montana Department of Justice
215 North Sanders
P.O. Box 201401
Helena, Montana 59620-1401
(406) 444-2026
christian.corrigan@mt.gov

*Counsel for the State of Montana*

MICHAEL T. HILGERS
Nebraska Attorney General

/s/ *Grant D. Strobl*
GRANT D. STROBL
*Assistant Solicitor General*
Office of the Nebraska Attorney General
2115 State Capitol
Lincoln, NE 68509
(402) 471-2683
grant.strobl@nebraska.gov

*Counsel for the State of Nebraska*

ALAN WILSON
South Carolina Attorney General

/s/ *Joseph D. Spate*
JOSEPH D. SPATE
*Assistant Deputy Solicitor General*
Office of the South Carolina Attorney
General
1000 Assembly Street
Columbia, SC 29201
(803) 734-3371
josephspate@scag.gov

*Counsel for the State of South Carolina*

MARTY J. JACKLEY
South Dakota Attorney General

*/s/ Charles McGuigan*
CHARLES MCGUIGAN
*Deputy Attorney General*
1302 East Highway 14, Suite 1
Pierre, SD 57501-8501
605-773-3215
charles.mcguigan@state.sd.us

*Counsel for the State of South Dakota*


KEN PAXTON
Texas Attorney General

BRENT WEBSTER
*First Assistant Attorney General of Texas*
RALPH MOLINA
*Deputy Attorney General for Legal Strategy*
RYAN D. WALTERS
*Chief, Special Litigation Division*

*/s/ Susanna Dokupil*
SUSANNA DOKUPIL
*Lead Attorney*
*Special Counsel*
Texas State Bar No. 24032801
JACOB E. PRZADA
*Special Counsel*
Texas State Bar No. 24125371
MUNERA AL-FUHAID
*Special Counsel*
Texas State Bar No. 24094501
Office of the Attorney General of Texas
P.O. Box 12548 (MC 009)
Austin, TX 78711-2548
Phone: (512) 936-3754
FAX: (512) 457-4410
Susanna.Dokupil@oag.texas.gov
Jacob.Przada@oag.texas.gov
Munera.Al-Fuhaid@oag.texas.gov

*Counsel for the State of Texas*


JONATHAN SKRMETTI
Tennessee Attorney General and Reporter

*/s/ Whitney Hermandorfer*
WHITNEY HERMANDORFER
*Director of Strategic Litigation*
Attorney General and Reporter of Tennessee
Tennessee Attorney General's Office
P.O. Box 20207
Nashville, Tennessee 37202-0207
Phone: (615) 741-3491
Whitney.Hermandorfer@ag.tn.gov

*Counsel for the State of Tennessee*


SEAN D. REYES
Utah Attorney General

*/s/ Renee Spooner*
RENEE SPOONER
*Assistant Attorney General*
350 N. State Street, Suite 230
P.O. Box 142320
Salt Lake City, UT 84114-2320
Telephone: (385) 285-5740
rspooner@agutah.gov

*Counsel for the State of Utah*

JASON MIYARES
Virginia Attorney General

/s/ *Kevin M. Gallagher*
KEVIN M. GALLAGHER
*Principal Deputy Solicitor General*
Virginia Attorney General's Office
202 North 9th Street
Richmond, Virginia 23219
(804) 786-2071
kgallagher@oag.state.va.us

*Counsel for the Commonwealth of Virginia*

PATRICK MORRISEY
West Virginia Attorney General

*/s/ Michael R. Williams*
MICHAEL R. WILLIAMS
*Solicitor General*
Office of the Attorney General of West
Virginia
State Capitol Complex
Building 1, Room E-26
Charleston, WV 25301
(304) 558-2021
michael.r.williams@wvago.gov

*Counsel for the State of West Virginia*

BRIDGET HILL
Wyoming Attorney General

/s/ *Ryan Schelhaas*
RYAN SCHELHAAS
*Chief Deputy*
Office of the Attorney General of Wyoming
109 State Capitol
Cheyenne, WY 82002
(307) 777-7895
ryan.schelhaas@wyo.gov

*Counsel for the State of Wyoming*