IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA
BISMARK DIVISION

STATE OF IOWA, et al.,

      Plaintiffs,

   v.

COUNCIL ON ENVIRONMENTAL
QUALITY, and BRENDA MALLORY, in her
official capacity as Chair,

      Defendants,

ALASKA COMMUNITY ACTION ON
TOXICS, et al.,

      Intervenor-Defendants,

   and

WASHINGTON, CALIFORNIA, COLORADO,
ILLINOIS, MAINE, MARYLAND, NEW
JERSEY, NEW MEXICO, NEW YORK,
OREGON, WISCONSIN, THE
COMMONWEALTH OF MASSACHUSETTS,
THE PEOPLE OF MICHIGAN, THE
DISTRICT OF COLUMBIA, and THE CITY
OF NEW YORK,

      Intervenor-Defendants.

Case No. 1:24-cv-00089-DMT-CRH

**INTERVENOR-DEFENDANTS ALASKA COMMUNITY ACTION ON TOXICS
ET AL.'S REPLY IN SUPPORT OF CROSS-MOTION FOR SUMMARY
JUDGMENT**

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................1

ARGUMENT ......................................................................................................................2

I.      THE FINAL RULE DOES NOT IMPOSE SUBSTANTIVE REQUIREMENTS. ............2

      A.    NEPA Is a Procedural Statute That Promotes Environmental Goals. ....................2

      B.    NEPA Already Requires Agencies to Consider Factors Like Climate Change and Environmental Justice. .........................................................................4

            1.    Environmental Justice .................................................................................5

            2.    Climate ........................................................................................................6

            3.    Indigenous Knowledge ...............................................................................8

            4.    Worldwide Effects ......................................................................................9

      C.    Selection of an "Environmentally Preferable Alternative" Is a Long-Standing Feature of NEPA Regulations That Promotes NEPA's Goals. ...............9

      D.    The Final Rule Does Not Impose Substantive Mitigation Obligations. ................11

      E.    Categorical Exclusions..........................................................................................12

II.     PLAINTIFFS MAKE NO EFFORT TO SHOW THAT THE FINAL RULE IS ARBITRARY AND CAPRICIOUS UNDER THE *FOX TELEVISION* STANDARD................................................................................................................14

III.    PLAINTIFFS DO NOT MEET THEIR BURDEN OF SHOWING THAT ISSUANCE OF THE "SPECIAL EA" WAS A VIOLATION OF NEPA.......................16

IV.   PLAINTIFFS' "MAJOR QUESTION DOCTRINE" CLAIM SHOULD BE REJECTED.................................................................................................................18

V.    PLAINTIFFS ARE NOT ENTITLED TO ANY REMEDY, LET ALONE VACATUR OF THE ENTIRE FINAL RULE.................................................................19

CONCLUSION.................................................................................................................21

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*350 Mont. v. Haaland*,
  50 F.4th 1254 (9th Cir. 2022) ...........................................................................6

*Alaska Wilderness Recreation & Tourism Ass'n v. Morrison*,
  67 F.3d 723 (9th Cir. 1995) ............................................................................10

*Allied-Signal, Inc. v. U.S. Nuclear Regul. Comm'n*,
  988 F.2d 146 (D.C. Cir. 1993) ........................................................................20

*California v. Bernhardt*,
  472 F. Supp. 3d 573 (N.D. Cal. 2020) ..............................................................5

*Citizens Telecomms. Co. of Minn. v. FCC*,
  901 F.3d 991 (8th Cir. 2018) ..........................................................................20

*Ctr. for Biological Diversity v. U.S. Dep't of the Interior*,
  72 F.4th 1166 (10th Cir. 2023) .......................................................................10

*EarthReports, Inc. v. FERC*,
  828 F.3d 949 (D.C. Cir. 2016) ..........................................................................7

*Encino Motorcars, LLC v. Navarro*,
  579 U.S. 211 (2016) .........................................................................................15

*FCC v. Fox Television Studios*,
  556 U.S. 502 (2009) ....................................................................................14, 16

*High Country Conservation Advocs. v. U.S. Forest Serv.*,
  951 F.3d 1217 (10th Cir. 2020) .......................................................................20

*Kleppe v. Sierra Club*,
  427 U.S. 390 (1976) ...........................................................................................3

*Lilliputian Sys., Inc. v. Pipeline & Hazardous Materials Safety Admin.*,
  741 F.3d 1309 (D.C. Cir. 2014) ........................................................................8

*Minn. Pub. Int. Rsch. Grp. v. Butz*,
  498 F.2d 1314 (8th Cir. 1974) ..........................................................................2

*Missouri v. Biden*,
  112 F.4th 531 (8th Cir. 2024) .........................................................................18

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983)................................................................................17

*Parker Drilling Management Services, Ltd. v. Newton*,
    587 U.S. 601 (2019)................................................................................7

*Robertson v. Methow Valley Citizens Council*,
    490 U.S. 332 (1989)..............................................................................2, 3

*Rosebud Sioux Tribe v. McDivitt*,
    286 F.3d 1031 (8th Cir. 2002) ................................................................2

*Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*,
    255 F. Supp. 3d 101 (D.D.C. 2017) .......................................................5

*United Food & Com. Workers Union, Local No. 663 v. U.S. Dep't of Agric.*,
    532 F. Supp. 3d 741 (D. Minn. 2021) ...................................................20

*Vecinos para el Bienestar de la Comunidad Costera v. FERC*,
    6 F.4th 1321 (D.C. Cir. 2021) .............................................................5, 6

*Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council*,
    435 U.S. 519 (1978)................................................................................2

*W. Watersheds Project v. Zinke*,
    441 F. Supp. 3d 1042 (D. Idaho 2020) .................................................20

*West Virginia v. EPA*,
    597 U.S. 697 (2022)..............................................................................18

*WildEarth Guardians v. U.S. Bureau of Land Mgmt.*,
    870 F.3d 1222 (10th Cir. 2017) .............................................................6

**Statutes**

42 U.S.C. § 4332(2)(C)(iii)......................................................................10

42 U.S.C. § 4331(a) ................................................................................2, 3

42 U.S.C. § 4331(c) ...................................................................................5

42 U.S.C. § 4332(I)....................................................................................9

42 U.S.C. § 4332(2)(C)............................................................................11

42 U.S.C. § 4336(3)(10)(B)(vi) .................................................................9

42 U.S.C. § 4336a(f) ...............................................................................15

42 U.S.C. § 4336c ..................................................................................................13

42 U.S.C. § 4336e(10) ............................................................................................7

42 U.S.C. § 4344 ....................................................................................................4

**Other Authorities**

40 C.F.R. § 1500.1(a) (2020) ................................................................................3

40 C.F.R. § 1500.1(c) .............................................................................................3

40 C.F.R. § 1500.3(c) ...........................................................................................20

40 C.F.R. § 1500.6 (1978) (2020) (2024) ............................................................14

40 C.F.R. § 1501.3(d)(1) ........................................................................................9

40 C.F.R. § 1501.9 ................................................................................................10

40 C.F.R. § 1502.14 ..............................................................................................10

40 C.F.R. § 1503.3 ................................................................................................16

40 C.F.R. § 1505.3(a) ...........................................................................................11

40 C.F.R. § 1505.3(c) ...........................................................................................11

40 C.F.R. § 1506.3 ................................................................................................13

40 C.F.R. § 1506.3(d) ...........................................................................................13

40 C.F.R. § 1506.5 (1979) .....................................................................................15

40 C.F.R. § 1506.6(b) .............................................................................................8

40 C.F.R. § 1508.1(o) ...........................................................................................13

40 C.F.R. § 1605.3 ................................................................................................13

43 Fed. Reg. 55,978 (Nov. 29, 1978) .....................................................................4

89 Fed. Reg. 35,442 (May 1, 2024) ................................................................ *passim*

INTRODUCTION

Plaintiffs fail to make a case under the Administrative Procedure Act ("APA") that the Council on Environmental Quality ("CEQ") either exceeded its authority or acted in an arbitrary and capricious manner in promulgating the Final Rule. Overheated rhetoric, baseless speculation, and conclusory assertions aside, Plaintiffs offer no substance for the Court to grapple with. Their struggle to identify any cognizable legal claim is unsurprising, as CEQ acted within the lines of its authority and provided a reasoned explanation for each of its decisions. Ultimately, Plaintiffs' case boils down to a policy disagreement as to whether specific concerns like climate change and environmental justice should be addressed in NEPA documents. But judicial review under the APA is not for policy-making, and this Court is the wrong forum for such grievances. Moreover, their concern that specific provisions of the Final Rule could result in "development-stalling litigation" is entirely speculative and ignores the record evidence that the Final Rule was specifically designed to increase certainty and transparency and reduce litigation risk.

The opening brief filed by intervenors Alaska Communities for Alternatives to Toxics et al. ("ACAT") explained why Plaintiffs failed to meet their burden for each of their various theories attacking the Final Rule. For the most part, Plaintiffs' reply brief (hereinafter, "Iowa Reply") fails to respond to ACAT's arguments at all. Indeed, Plaintiffs continue to fundamentally misunderstand NEPA, misinterpret its governing precedent, and misconstrue the scope of judicial review under the APA. Because Plaintiffs have failed to meet their burden under the APA, their summary judgment motion must be denied.

ARGUMENT

I.    THE FINAL RULE DOES NOT IMPOSE SUBSTANTIVE REQUIREMENTS.

A.    NEPA Is a Procedural Statute That Promotes Environmental Goals.

According to Plaintiffs, the procedural requirements of NEPA are entirely disconnected from the statute's policy goals. Iowa Reply at 12.[1] In fact, they assert that no court has ever found that the statute's policy goals have "legal consequences." *Id.* Their support for this claim is a single unpublished 2010 district court decision, from a different circuit, concerning a different statute.

Plaintiffs are wrong. Countless courts, including the U.S. Supreme Court and the Eighth Circuit, have found that the purpose of NEPA's procedures is to advance the statute's broad policy goals. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989) ("The sweeping policy goals announced in § 101 of NEPA are thus realized through a set of action-forcing procedures that require that agencies take a hard look at environmental consequences, and that provide for broad dissemination of relevant environmental information.") (cleaned up); *Minn. Pub. Int. Rsch. Grp. v. Butz*, 498 F.2d 1314, 1321 (8th Cir. 1974) (citing NEPA § 101 and "the purposes of the Act" to find NEPA violation). This Circuit has long recognized that "[t]he overriding purpose of NEPA is to prevent or eliminate damage to the environment." *Rosebud Sioux Tribe v. McDivitt*, 286 F.3d 1031, 1038 (8th Cir. 2002) (citation omitted). There is no dispute that NEPA does not *require* agencies to select the most environmentally beneficial alternative for any given action: in that sense it is "procedural." *Vt. Yankee Nuclear Power Corp.*

---

[1] Plaintiffs are incorrect that NEPA's policy goals are only contained in Section 101 of the statute, as Section 102(a)—which even Plaintiffs agree contains NEPA's "operative terms"—also includes policy objectives. 42 U.S.C. § 4331(a) (directing all federal agencies to use their authorities "to create and maintain conditions under which man and nature can exist in productive harmony").

*v. Nat. Res. Def. Council*, 435 U.S. 519, 558 (1978). But NEPA's procedures "are almost certain to affect the agency's substantive decision" by shining a spotlight on environmental impacts and alternatives. *Robertson*, 490 U.S. at 350. Indeed, that was Congress's explicit intent in enacting NEPA: to establish procedures "in order to carry out the policy set forth in this Act" that recognizes "the critical importance of restoring and maintaining environmental quality to the overall welfare . . . of present and future generations of Americans." 42 U.S.C. § 4331(a).

Plaintiffs' arguments turn this simple and long-settled concept on its head. They argue that the Supreme Court's consistent references to NEPA's "action-forcing" nature refers only to the "action" of preparing documents. Iowa Reply at 14. This argument collides with the plain language and purpose of the Act and decades of precedent. NEPA was not enacted for the purpose of generating paperwork for its own sake. 40 C.F.R. § 1500.1(c) ("NEPA's purpose is not to generate paperwork—even excellent paperwork—but to foster excellent action.")[2] It was enacted to promote better environmental outcomes. *Robertson*, 490 U.S. at 350; *Kleppe v. Sierra Club*, 427 U.S. 390, 409 (1976) (NEPA embodies "a national policy of environmental protection").

In their opening brief, Plaintiffs challenged a provision in the Final Rule describing NEPA's procedures as "action-forcing," despite the fact that this language has been a feature of CEQ regulations since 1978. As ACAT has shown, the "action-forcing" description arises not from the challenged Final Rule but from the Act's legislative history and governing U.S. Supreme Court precedent. ACAT Br. at 6–9. In reply, Plaintiffs tellingly ignore this detailed

---

[2] An identical provision appears in the 1978 Rules and a nearly identical one appears in the 2020 Rule supported by Plaintiffs. 40 C.F.R. § 1500.1(a) (2020) ("NEPA's purpose is not to generate paperwork or litigation, but to provide for informed decision making and foster excellent action.")

explanation that their claim is gravely misplaced. This Court should reject Plaintiffs' attempt to revise the statute's settled purpose and structure and upend fifty years of precedent.

      B.    <u>NEPA Already Requires Agencies to Consider Factors Like Climate Change and Environmental Justice.</u>

Plaintiffs' case relies primarily on the argument that the Final Rule includes provisions addressing environmental justice, climate, Indigenous Knowledge, and worldwide effects "that appear nowhere in NEPA's statutory text" or in previous iterations of CEQ's rules. Iowa Reply at 15. But, as ACAT has shown, CEQ's rules have always provided the specifics as to what kinds of impacts should be considered in the NEPA process—a point that Plaintiffs do not contest. ACAT Br. at 9–10. NEPA is a statute that speaks in general terms, and CEQ's role is to help agencies develop the specifics through regulations and guidance. *Id*.; 42 U.S.C. § 4344; National Environmental Policy Act—Regulations, Implementation of Procedural Provisions, 43 Fed. Reg. 55,978 (Nov. 29, 1978) (1978 CEQ regulations defining key statutory terms). Consistent with these principles, the Final Rule updates the 1970s-era regulations to account for these considerations. Specific terms not appearing in NEPA simply reflects Congress's enactment of a general statute. Moreover, Plaintiffs stubborn insistence that the Final Rule "elevates" these considerations to a higher priority conflict with the text of the rule saying exactly the opposite. These provisions are not just within CEQ's authority: it would have been arbitrary and capricious to *omit* them in light of the extensive administrative record revealing a deep need for direction on these issues. *See e.g.*, AR 25359; AR 2904–06; AR 2916; AR 1739; AR 25619; AR 23663. Plaintiffs have failed to meet their burden of showing these provisions are outside of CEQ's authority.

*1.    Environmental Justice*

Plaintiffs disregard ACAT's arguments justifying the inclusion of environmental justice provisions in the Final Rule, mischaracterize the regulations, and even distort the notion of environmental justice itself.

First, Plaintiffs do not respond to the fact that environmental justice has been part of NEPA reviews for years. ACAT Br. at 12. Prior to the promulgation of the Final Rule, courts found that a failure to consider environmental justice issues where they arise violates NEPA. *See e.g.*, *Vecinos para el Bienestar de la Comunidad Costera v. FERC*, 6 F.4th 1321, 1330–32 (D.C. Cir. 2021); *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 255 F. Supp. 3d 101, 140 (D.D.C. 2017). The Final Rule only codifies a court's established interpretation of NEPA and longstanding agency practice, holding that agencies must consider environmental justice concerns as appropriate. This does not make environmental justice a "centerpiece" of the regulations, it merely clarifies how agencies should consider a factor that they already must make part of the NEPA review process.

Nor do Plaintiffs respond to ACAT's argument that NEPA's statutory text already reflects the environmental justice principles spelled out in the Final Rule. ACAT Br. at 11. Instead, Plaintiffs distort the very concept of environmental justice, incorrectly saying that environmental justice "elevates some people or populations over others." Iowa Reply at 17. The Final Rule does nothing of the sort. Rather, environmental justice ensures equity among "all people" in access to a healthy environment. National Environmental Policy Act Implementing Regulations Revisions Phase 2, 89 Fed. Reg. 35,442, 35,576 (May 1, 2024). This definition aligns with Congress's declaration in NEPA that "each person should enjoy a healthful environment." 42 U.S.C. § 4331(c). Moreover, NEPA's statutory text makes clear that one of NEPA's core purposes is to protect and promote public health. *Id.*, *see California v. Bernhardt*,

472 F. Supp. 3d 573, 622 (N.D. Cal. 2020). Requiring agencies to analyze disparate health impacts supports the purposes of the statute. In short, CEQ's inclusion of environmental justice in the Final Rule is not *ultra vires.* Instead, it flows from the statute itself and codifies governing caselaw and established agency practice. Plaintiffs offer no coherent argument to the contrary.

       2.    *Climate*

      Nor can Plaintiffs explain why it is outside of CEQ's authority to direct agencies to consider relevant climate change impacts. Again, as ACAT explained at length, this has been a requirement of NEPA for years—the Final Rule does little more than codify existing caselaw. *See, e.g.*, *Vecinos para el Bienestar*, 6 F.4th at 1329–30; *350 Mont. v. Haaland*, 50 F.4th 1254, 1266–70 (9th Cir. 2022); *WildEarth Guardians v. U.S. Bureau of Land Mgmt.*, 870 F.3d 1222, 1236–38 (10th Cir. 2017); ACAT Br. at 14–16. In other words, the "failure to consider climate change," where the record documents climate concerns, violated NEPA long before the Final Rule. Iowa Reply at 16. If anything, the Final Rule *benefits* project proponents, as the absence of clear direction from CEQ on how to integrate climate into NEPA reviews had been an ongoing source of uncertainty and litigation risk. *See, e.g.*, AR 2916; AR 1739; AR 25619; AR 23663 (commenters discussing need for clarity on climate in NEPA reviews). Plaintiffs' failure to respond to this argument speaks volumes.

      Plaintiffs also complain about the Final Rule's direction to quantify greenhouse gas emissions, one of over a dozen specific factors that the Rule identifies as potential "environmental consequences" that an EIS should address as appropriate. Iowa Reply at 16–17, *citing* 40 C.F.R. § 1502.16(a)(6). As Plaintiffs concede, the Final Rule explains that this analysis should only be done "where applicable" and where quantification is "feasible." *Id*. Plaintiffs

wave off these qualifiers as "immaterial semantics," *id*. at 1, but words in a statute or regulation have meaning.[3]

Next, Plaintiffs assert that Congress "has not allowed [CEQ] to act" on climate. Iowa Reply at 18. Congress has done no such thing. Instead, Congress "legislates against the backdrop of existing law," including regulations and court precedent. *Parker Drilling Management Services, Ltd. v. Newton*, 587 U.S. 601, 611 (2019). Just last year, Congress enacted the most significant amendments to NEPA in decades. Congress could have imposed limits on considering climate change in NEPA reviews, as it did with a whole host of federal actions, from financial assistance to enforcement actions to non-discretionary actions. 42 U.S.C. § 4336e(10). It chose not to, even though this Administration's policies, longstanding guidance, and existing court precedent with respect to climate were well known.

Plaintiffs worry that the Rules may "driv[e] agency decisions towards outcomes that minimize" greenhouse gas emissions. Iowa Reply at 17. That is, of course, a possibility: NEPA requires analysis and disclosure of environmental impacts, and by requiring agencies to consider and disclose climate-harming emissions, agencies may shape their decisions to reduce such emissions. But it is no violation of NEPA to fail to do so as long as impacts are considered and disclosed. In NEPA, Congress sought to promote more environmentally informed decisions, but did not dictate any particular result. Plaintiffs' strident opposition to a rule that promotes informed decisionmaking on a key environmental issue is difficult to understand. But ultimately it is a policy disagreement with NEPA itself, not a sound legal argument that CEQ has exceeded its authority.

---

[3] Courts routinely upheld NEPA analyses that fail to quantify greenhouse gas emissions where an agency has an explanation for why it is not "feasible" to do so. *See, e.g.*, *EarthReports, Inc. v. FERC*, 828 F.3d 949, 956 (D.C. Cir. 2016).

### 3.    *Indigenous Knowledge*

Plaintiffs offer no coherent argument against the Final Rule's inclusion of Indigenous Knowledge as a source of high-quality information agencies must consider in NEPA reviews, where it is available. Plaintiffs' arguments do not even mention, much less discuss, the record evidence documenting CEQ's decision-making process that was informed by extensive public comment and Tribal consultation, nor CEQ's explanation for including these provisions.

As ACAT has already explained, including Indigenous Knowledge among the other sources of high-quality information that agencies can consider in NEPA reviews does not elevate it to "special status." ACAT Br. at 18. Instead, the regulations direct agencies to consider all kinds of information, including Indigenous Knowledge, where applicable. 40 C.F.R. § 1506.6(b); 89 Fed. Reg. at 35,525 ("The regulations require agencies to rely on high-quality information and provide several examples, one of which is Indigenous Knowledge, and do not create a preference for one kind of high-quality information over others"). Plaintiffs ignore this plain language and do not offer any response to ACAT's arguments.

Similarly, CEQ's decision to not formally define Indigenous Knowledge in the regulations was informed by public comment and Tribal outreach and was reasonable. ACAT Br. at 19. CEQ considered several comments regarding the definition of Indigenous Knowledge and concluded that there was no consensus over whether or how to define it. *See* AR 27901–02; AR 26930. Accordingly, it reasonably decided that there was no universal definition that would be workable across the various contexts where agencies would consider Indigenous Knowledge, so gave implementing agencies discretion. 89 Fed. Reg. at 35,481. It fully explained this decision and pointed to record support as well as detailed guidance. CEQ's decision was a proper response to the public comment and Tribal consultation process under NEPA. *Lilliputian Sys., Inc. v. Pipeline & Hazardous Materials Safety Admin.*, 741 F.3d 1309, 1312 (D.C. Cir. 2014)

(agencies must "respond to relevant and significant public comments"). Plaintiffs cite no record evidence supporting their argument and fail to meet their burden to establish that CEQ acted *ultra vires* or arbitrarily and capriciously.

4.    *Worldwide Effects*

Plaintiffs' insistence that NEPA is "not global" continues to ignore specific statutory language indicating the opposite. Iowa Reply at 25; 42 U.S.C. § 4332(I) (directing agencies to "recognize the worldwide and long-range character of environmental problems and, where consistent with the foreign policy of the United States, lend appropriate support to initiatives, resolutions, and programs designed to maximize international cooperation in anticipating and preventing a decline in the quality of mankind's world environment"). The statute explicitly exempts federal agency actions with *only* extraterritorial impacts from NEPA reviews, which appears to alleviate whatever concern Plaintiffs may have about an EIS being triggered by such impacts. *Id*. § 4336(3)(10)(B)(vi). Consistent with this statutory text, the Final Rule merely urges that "agencies *should* consider the potential global, national, regional, and local contexts" when determining the scope of a NEPA document, 40 C.F.R. § 1501.3(d)(1) (emphasis added). Plaintiffs' objection to this provision is groundless.

C.    <u>Selection of an "Environmentally Preferable Alternative" Is a Long-Standing Feature of NEPA Regulations That Promotes NEPA's Goals.</u>

Plaintiffs challenge CEQ's adoption of rule language directing that agencies describe an "environmentally preferable alternative" in an EIS, even though this requirement has been a feature of the NEPA process since its inception. ACAT Br. at 21–23. In reply, Plaintiffs struggle to offer an explanation as to why the placement of that long-standing requirement slightly earlier in the process violates NEPA. Iowa Reply at 22–23. Plaintiffs make no effort to explain which provision of NEPA would allow a rule requiring the inclusion of such an alternative in a record

of decision but prohibit one requiring its inclusion in an EIS. Nor do they clarify how a requirement that potentially "creates decision points for the rest of the analysis," *id.* at 23, collides with any specific language in NEPA. Simply put, there is no conflict between NEPA's broad language and this modest change in a long-standing standard that serves NEPA's goals.

Plaintiffs' claim that agencies will be "under increased pressure" to select the "no action" alternative is particularly puzzling. The requirement to consider the "no action" alternative is a separate requirement of NEPA, one that Plaintiffs have not challenged. It is specifically identified in the statute itself and is a core part of the alternatives analysis at the heart of the EIS. 42 U.S.C. § 4332(2)(C)(iii); 40 C.F.R. § 1502.14 (agencies "shall…[d]iscuss each alternative considered in detail" and must "include the no action alternative"); 40 C.F.R. § 1501.9 (to determine scope of EIS, agencies "shall" consider "[a]lternatives, which include the no action alternative . . ."). The no action alternative serves a purpose distinct from other alternatives, as it provides a "baseline against which the proposed action and its alternatives may be measured." *Ctr. for Biological Diversity v. U.S. Dep't of the Interior*, 72 F.4th 1166, 1185–86 (10th Cir. 2023); *Alaska Wilderness Recreation & Tourism Ass'n v. Morrison*, 67 F.3d 723, 730 (9th Cir. 1995) (no action alternative "serves as the benchmark by which effects of all action alternatives are measured"). And the notion that the "no action" will have the fewest environmental harms may be true sometimes, but certainly not always. Many projects subject to NEPA involve tradeoffs between different environmental benefits and impacts, for example, in energy projects and land management plans. Sometimes the no action alternative will be the "environmentally preferable" one, and sometimes not. The statute itself recognizes this, requiring that agencies address "any negative environmental impacts of not implementing the proposed agency action in the case of a no action alternative." 42 U.S.C. 4332(2)(C)(iii).

NEPA is a procedural statute that seeks to promote more environmentally conscious decisions through public disclosure and consideration of environmental impacts. Plaintiffs admit that the Final Rule does not *require* agencies to adopt the environmentally preferred alternative. Their speculation that agencies might feel some generalized "increased pressure" to select such an alternative does not amount to a cognizable legal claim that the regulation is *ultra vires* under NEPA.

D.    The Final Rule Does Not Impose Substantive Mitigation Obligations.

In their opposition briefs, both ACAT and CEQ explained in detail why the Final Rule's provisions relating to mitigation do not require agencies to adopt specific measure to mitigate adverse impacts, but instead requires that they consider and disclose mitigation options, precisely as Congress required. 42 U.S.C. § 4332(2)(C) (requiring disclosure of any adverse effects "which cannot be avoided"); ACAT Br. at 23–26; CEQ Br. at 36–42. ACAT also explained how some of the mitigation provisions that Plaintiffs seek to challenge are in fact long-standing features of the CEQ regulations, including the 2020 Rule that Plaintiffs seek to restore. ACAT Br. at 23. Plaintiffs fail to respond to any of this. Iowa Reply at 19.

Plaintiffs' primary grievance appears to be with the 40 C.F.R. § 1505.3(a), which states that mitigation conditions "established in the environmental impact statement or during its review and committed as part of the decision shall be implemented by the lead agency or other appropriate consenting agency." But that section has been in place since 1978. There is no evidence in the record that this longstanding provision enables after the fact project challenges as Plaintiffs allege. Plaintiffs do not even appear to have raised this issue in their comments on the Final Rule.

Plaintiffs also object to the monitoring and compliance plan recommended or required in certain instances pursuant to 40 C.F.R. § 1505.3(c). Their complaint seems to be that the

11

monitoring plan could reveal information that "will elicit calls for renewed scrutiny" of projects after the fact. Iowa Reply at 20. Yet, again, Plaintiffs fail to explain what specific provision of NEPA prohibits such a possibility. Nor do Plaintiffs have an answer for CEQ's detailed explanation as to why Plaintiffs fears are baseless. CEQ Br. at 41. Plaintiffs denigrate these explanations as *post hoc* rationalizations of counsel, but they appear in the rule itself. *Id*. (citing record support).

Moreover, in response to ACAT's common-sense observation that one cannot "stall" projects that have already been completed, Plaintiffs only counter with the "creativity" of project opponents in "bringing novel NEPA arguments." Iowa Reply at 20. The response highlights the overall lack of merit to their case, a federal court challenge to a national rule implementing the nation's cornerstone environmental law. Plaintiffs bear the burden of explaining why specific rule provisions are *ultra vires* in light of specific statutory language. Plaintiffs have not met that burden. Instead, they have submitted a brief that ignores the detailed arguments of the other parties, continues to repeat allegations that are demonstrably wrong, and relies on baseless speculation about things that might happen in the future. More is required to prevail in a facial challenge to a federal regulation.

    E.    <u>Categorical Exclusions</u>

Plaintiffs similarly fail to carry their burden to show that the Final Rule's treatment of categorical exclusions ("CEs") is unlawful. First, Plaintiffs argue that CEQ impermissibly added "extra-statutory conditions for the adoption of other agencies' CEs," presumably referring to climate change and environmental justice considerations, and to the role of "extraordinary circumstances" in action agencies' use of CEs. Iowa Reply at 21. Plaintiffs' response gravely misunderstands when extraordinary circumstances come into play under NEPA and ignores the plain text of the Final Rule.

Nothing in 40 C.F.R. § 1605.3 requires consideration of extraordinary circumstances when one action agency adopts a CE promulgated by another agency.[4] Iowa Reply at 21–22. Instead, it is only when the adopting agency decides to apply the adopted CE to a project that the requirement to consider the adopting agency's own extraordinary circumstances attaches. 40 C.F.R. § 1506.3. The Final Rule's text clearly states that climate change and environmental justice are *examples* of conditions that could constitute extraordinary circumstances that action agencies could identify in their NEPA procedures: there is no requirement that action agencies adopt any of these illustrative extraordinary circumstances. 40 C.F.R. § 1508.1(o) (defining "extraordinary circumstances" as "factors or circumstances that indicate a normally categorically excluded action may have a significant effect" and listing several "*examples* of extraordinary circumstances") (emphasis added). Additionally, Plaintiffs have failed to rebut ACAT's explanation that action agencies, not CEQ, determine which extraordinary circumstances are present when determining if a CE is appropriate, a fact that undermines Plaintiffs' argument. AR 28682 ("The list of examples in the definition [of extraordinary circumstances] is not exclusive, and agencies have discretion to determine whether inclusion of these examples in their NEPA procedures is appropriate for their particular programs and authorities").

Second, Plaintiffs argue that "requiring a similar level of analysis of extraordinary circumstances for a CE as for an EA or EIS defeats the very nature of CEs." Iowa Reply at 22. This fear is misplaced too. Extraordinary circumstances only come into play when considering whether a CE is appropriate; they are not used to determine whether to prepare an EA or EIS and do not require a commensurate level of analysis. 40 C.F.R. § 1508.1(o). Plaintiffs' argument

---

[4] Plaintiffs take issue with ACAT's characterization, ACAT Br. at 28, of the adoption regulation mirroring the FRA's statutory language, Iowa Reply at 21, but do not illustrate how the regulation and statute are inconsistent. *Compare* 40 C.F.R. § 1506.3(d)) *with* 42 U.S.C. § 4336c.

belies their misunderstanding of the levels of NEPA review and should be rejected, as should

their baseless claim that the Final Rule will disincentivize the use of CEs. Iowa Reply at 22.

Finally, Plaintiffs reiterate their opposition to the Final Rule's requirement that agencies

periodically review their CEs for continued validity and improvement. Iowa Reply at 21.

Plaintiffs ignore the fact that this has been a regulatory requirement since 1978 and fail to

provide any authority explaining why such a requirement is legally impermissible or causes them

harm now. *See* 40 C.F.R. § 1500.6 (1978) (2020) (2024).

II.    PLAINTIFFS MAKE NO EFFORT TO SHOW THAT THE FINAL RULE IS
       ARBITRARY AND CAPRICIOUS UNDER THE *FOX TELEVISION* STANDARD.

ACAT's opening brief explained in detail the governing standard for challenging an

agency's change in position. ACAT Br. at 29, *citing FCC v. Fox Television Studios*, 556 U.S.

502, 514–15 (2009). ACAT further explained how, for each challenged change, CEQ laid out the

various points of view and explained its reasoning for its decision, satisfying their legal

obligations. *Id*. Plaintiffs have no response to this analysis. They do not mention *Fox Television*

and are silent regarding CEQ's explanations in the record. Instead, Plaintiffs offer only

conclusory assertions and overheated rhetoric reflecting their disdain for the Final Rule. This

cannot satisfy their burden under the APA.

First, Plaintiffs proclaim that the Final Rule cannot both represent a "change" from prior

positions and still be within the ambit of NEPA, as if they have trapped defendants in some

logical inconsistency. Iowa Reply at 26. But there is no inconsistency. For example, the Final

Rule makes a minor change in the level of technical detail that is required for comments,

eliminating provisions enacted in 2020 that established excessive hurdles for some commenters

and stifled public input. 89 Fed. Reg. at 35,513. This modest clarification—which represented a

change from the previous rule—is surely within the scope of NEPA, which provides few detailed

specifications regarding public comments, instead leaving that task up to CEQ. There is no "disconnect" in defendants' arguments.

Next, Plaintiffs complain about their unsettled "reliance interests" on a "properly functioning NEPA regime." Iowa Reply at 26. But "agencies are free to change their existing policies as long as they provide a reasoned explanation for the change." *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016). Moreover, insofar as the Plaintiffs' grievances focus on rule provisions for climate change, environmental justice, and Indigenous Knowledge, Plaintiffs never had a "reliance interest" in ignoring these matters in the first place. They certainly make no effort to document one in or out of the record. As ACAT has already demonstrated, NEPA required agencies to consider these factors and explain their reasoning in light of them even prior to adoption of the Final Rule. The Final Rule simply confirms the status quo and provides greater direction to agencies so that they can meet their obligations.

Plaintiffs also complain about provisions in the Final Rule that govern agency use of NEPA materials prepared by third parties. Yet this has long been a feature of NEPA's implementing rules. *See* 40 C.F.R. § 1506.5 (1979). The 2020 Rule relaxed long-standing rules to eliminate conflict of interest provisions. *See* 40 C.F.R. § 1506.5 (2020). The Final Rule did not restore the original 1978 language but clarified this provision to require that agencies "ensure [third-party NEPA documents] are prepared with professional and scientific integrity," and to harmonize the language with statutory amendments in the Fiscal Responsibility Act. 42 U.S.C. § 4336a(f); 40 C.F.R. § 1506.5 (2024). It thoroughly explained its reasoning for these modest clarifications. 89 Fed. Reg. at 35,522–23. The notion that the Final Rule places "document preparation responsibilities" of third parties back on agencies is false. In any event, CEQ plainly

15

satisfied the *Fox Television* standard by recognizing that it was making this change and explaining its reasoning for doing so.

The same is true with respect to Plaintiffs' grievance with CEQ's modest amendments to the rule specificity provisions at 40 C.F.R. § 1503.3. The 2020 Rule imposed hurdles to public participation by requiring an unreasonable level of detail and technical specificity; the Final Rule modestly amended these provisions to give agencies more flexibility to accept comments. Leaving aside the question of why Plaintiffs are aggrieved by this minor change, they fail to explain why CEQ's explanation for making it fails the *Fox Television* test. CEQ described the change it was making, pointed to evidence in the administrative record to support it, and explained its reasoning. Nothing more is required.

Finally, Plaintiffs fall back on speculation that the outcome of the Final Rule will be "significant expansion of development-stalling litigation." Iowa Reply at 28. But Plaintiffs offer no support for their view that the Final Rule would increase, rather than ameliorate, uncertainty and conflict. Certainly, the record does not support their perspective. 89 Fed. Reg. at 35,532 (explaining why proposal would not increase litigation risks and uncertainty); *id*. at 35,550 (rejecting proposal because "[c]hanging the regulatory text could create uncertainty . . ."). Regardless, the claim gets to the wisdom of the Final Rule, which is not before the Court. What is before the Court is whether Plaintiffs have met their burden under the APA and *Fox Television* to show that that CEQ's changes were arbitrary and capricious. On that question, Plaintiffs unquestionably fail.

III.    PLAINTIFFS DO NOT MEET THEIR BURDEN OF SHOWING THAT ISSUANCE OF THE "SPECIAL EA" WAS A VIOLATION OF NEPA.

Plaintiffs' challenge to CEQ's Special Environmental Assessment ("Special EA") is particularly difficult to address because Plaintiffs never identify, let alone support, any claim of a

legal violation. Plaintiffs never explain what record evidence CEQ arbitrarily ignored in issuing the Special EA. They never identify any specific procedure that CEQ omitted. And they never point out where they lacked an opportunity to comment and share their views. ACAT's opening brief invited Plaintiffs to fill in these critical missing pieces. ACAT Br. at 32. ("Plaintiffs make no effort to explain what impacts were arbitrarily ignored or minimized in the EA.") In reply, Plaintiffs revealingly decline that invitation.

Plaintiffs' grievance appears to boil down to an objection that the document was called a "Special EA" rather than just an "EA," and that the document was shorter than they believe it should have been. Iowa Reply 28–29. More is needed to prove a NEPA violation pursuant to the APA. Plaintiffs bear the burden of demonstrating that CEQ "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). CEQ conducted an assessment and found that the Final Rules would not have a "significant" enough of an impact to warrant preparation of a full EIS. 89 Fed. Reg. at 35,552. Plaintiffs do not point to a single record citation, governing regulation, or comparable precedent suggesting that this conclusion was arbitrary and capricious. Its NEPA claim should be rejected.[5]

---

[5] As ACAT previously explained, the Special EA produced for the Final Rule stands in marked contrast with CEQ's position when enacting the 2020 Rule—for which it disclaimed any NEPA obligations at all. ACAT Br. at 33 n.7. Plaintiffs wave off this factor as "extraneous," Iowa Reply at 30, but it is hardly extraneous given that Plaintiffs have asked this Court to restore the 2020 Rule in full. Plaintiffs do not explain why this Court should vacate a federal rule and replace it with another one that suffers from a more flagrant version of the same alleged problem.

IV.    PLAINTIFFS' "MAJOR QUESTION DOCTRINE" CLAIM SHOULD BE REJECTED.

Plaintiffs make only a half-hearted effort to defend their argument that the Final Rule implicates the major questions doctrine. Iowa Reply at 30. And with good reason: applying this rarely invoked doctrine, reserved for "extraordinary" agency actions with vast economic and political implications, is a grave overreach.

Plaintiffs fail to point the Court to any actual evidence—a single administrative record citation or witness declaration—supporting their claim that the economic impacts of the Final Rule are "vast." Iowa Reply at 30. Nor do they respond to evidence in the administrative record assessing the economic impacts of the Final Rule and finding them minor. ACAT Br. at 34–35. In fact, it appears that Plaintiffs never submitted any evidence at all on this issue during the rulemaking process. Each of these shortcomings is fatal to their argument. *Compare Missouri v. Biden,* 112 F.4th 531, 537 (8th Cir. 2024) (striking down administrative action with nearly half a trillion dollars in federal spending impacts).

In any event, Plaintiffs' concerns about the practical impacts of conducting environmental reviews arise from the statute itself, not the Final Rule. If Plaintiffs have a concern about the impact of NEPA, those concerns result from Congress' decision to adopt the statute—not CEQ's regulations implementing that directive. The major questions doctrine addresses executive actions not clearly authorized by statute, with major economic and political implications. It is not a limit on Congressional action itself. *West Virginia v. EPA*, 597 U.S. 697, 716 (2022).

Finally, the premise that the Final Rule is "an order of magnitude broader" than CEQ's previous implementing regulations—in place for decades—is not a serious argument. Iowa Reply at 31. As ACAT has demonstrated, and as Plaintiffs make no effort to refute, the Final Rule in many places restores language that had been part of the 1978 Rule but was removed in

the 2020 Rule. The handful of places where CEQ has adopted new regulatory language—for example, provisions relating to climate and environmental justice—are consistent with longstanding agency practice, judicial precedent, and the statute itself. *See supra* § I.B. Simply put, the major questions doctrine is not implicated here.

## V.    PLAINTIFFS ARE NOT ENTITLED TO ANY REMEDY, LET ALONE VACATUR OF THE ENTIRE FINAL RULE.

Plaintiffs have not shown any violation of NEPA or the APA and accordingly are not entitled to any remedy at all. Should this Court find otherwise, it should request additional briefing as to remedy, as is commonplace in these situations. ACAT Br. at 35–36, *citing Allied-Signal, Inc. v. U.S. Nuclear Regul. Comm'n*, 988 F.2d 146, 150–51 (D.C. Cir. 1993). Plaintiffs oppose further briefing, asserting without any support that vacatur would not have "disruptive consequences." Iowa Reply at 34. But the remedy analysis requires more.

Plaintiffs retreat from their original request to reinstate the 2020 Rule in total. Iowa Reply at 32–33. They now concede that they cannot ask the Court to reinstate those portions of the 2020 Rule that have been modified by other agency actions, like CEQ's Phase I rule. They also appear to acknowledge that it would be problematic to vacate Final Rule provisions that implement the Fiscal Responsibility Act. *Id*. But their suggestion that this Court vacate the Final Rule in its entirety, reinstate a separate rule that predates that statute, and then direct CEQ to promulgate a new "interim final" rule that codifies those provisions highlights the unworkability of Plaintiffs' proposed relief. The appropriate response to the Rule's many unchallenged provisions is to not vacate them in the first place.

Plaintiffs also argue against selective vacatur of only those provisions that the Court might find violate the law, complaining that the Final Rule does not "present a single offending provision" that can be easily severed from the rest. Iowa Reply at 33. This argument proves

ACAT's point. Until this Court rules on the merits, no one knows what provisions may be found to be "offending," and how easily severable they are. If, for example, this Court ruled for Plaintiffs on one narrow issue and rejected the rest of their arguments, vacatur of the entire Final Rule would be highly inappropriate. Until the Court has ruled, it is not possible to determine how likely it is that CEQ will be able to resolve any concerns the Court has, and how "disruptive" partial or total vacatur would be. *Allied-Signal*, 988 F.2d at 150–51. That is why this Court should invite further briefing on remedy if it finds for Plaintiffs on any issue.

In any event, Plaintiffs' severability argument is undercut by the very case on which it relies. *United Food & Com. Workers Union, Local No. 663 v. U.S. Dep't of Agric.*, 532 F. Supp. 3d 741, 778 (D. Minn. 2021) (addressing vacatur analysis only to specific portion of the rule deemed invalid.). The Final Rule contains a severability clause that speaks to the situation where a provision in the rule is deemed invalid. 40 C.F.R. § 1500.3(c). This case focuses on a handful of provisions in a comprehensive rule. Should the Court find that any of these specific provisions are unlawful—which it should not—they are easily severable without undermining the entire Final Rule, the vast majority of which Plaintiffs have not challenged. CEQ explicitly found as much. 89 Fed. Reg. at 35,455 ("As a result, if a court were to invalidate any particular provision of this final rule, allowing the remainder of the rule to remain in effect would still result in a functional NEPA review process.") Courts often follow this approach. *See, e.g.*, *Citizens Telecomms. Co. of Minn. v. FCC*, 901 F.3d 991, 1006 (8th Cir. 2018) ("vacating solely the portions of the final rule" deemed invalid); *High Country Conservation Advocs. v. U.S. Forest Serv.*, 951 F.3d 1217, 1228–29 (10th Cir. 2020) (court "may partially set aside a regulation if the invalid portion is severable"); *W. Watersheds Project v. Zinke*, 441 F. Supp. 3d 1042, 1085 (D. Idaho 2020) (vacatur "will be narrowly and specifically tailored to fit the dispute").

Plaintiffs' final argument—that vacatur of the Final Rule would not prevent NEPA consideration "of relevant impacts for any given proposed action"—undercuts the entire premise for their lawsuit. Iowa Reply at 34. If vacatur of the Final Rule would not prevent agencies from considering things like climate change and environmental justice where they are "relevant" to a proposed action, it is difficult to understand why Plaintiffs brought this case at all, or how vacatur of the Final Rule would redress their concerns. Vacatur would have serious, real-world consequences, and the Court should explore those further with additional briefing, if needed, once it has issued a ruling on the merits.

CONCLUSION

For the foregoing reasons, Plaintiffs' motion for summary judgment should be denied and ACAT's cross motion for summary judgment should be granted.


DATED this 11th day of October 2024.

s/ Jan E. Hasselman
JAN E. HASSELMAN (Admitted in D.N.D.)
(WSBA #29017)
KRISTEN L. BOYLES (Admitted in D.N.D.)
(CSBA #158450)
LYDIA HEYE (Admitted in D.N.D.)
(ABA #2211101)
EARTHJUSTICE
810 Third Avenue, Suite 610
Seattle, WA  98104
(206) 343-7340
jhasselman@earthjustice.org
kboyles@earthjustice.org
lheye@earthjustice.org

SUSAN JANE M. BROWN
[Admitted Pro Hac Vice]
(OSBA #054607)
SILVIX RESOURCES
4107 NE Couch St.
Portland, OR 97232

21

(503) 680-5513
sjb@silvex.org

*Attorneys for Intervenor-Defendants Alaska*
*Community Action on Toxics, et al.*

CERTIFICATE OF SERVICE

I hereby certify that on October 11, 2024, I electronically filed the foregoing document

with the Clerk of the Court using the CM/ECF system, which will send notification of this filing

to the attorneys of record and all registered participants.

Dated: October 11, 2024.

*s/ Jan E. Hasselman*
Jan E. Hasselman