**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NORTH DAKOTA**

| | |
|---|---|
| STATE OF IOWA, *et al.*, | ) |
| | ) |
| *Plaintiffs*, | ) |
| | ) |
| v. | ) |
| | ) |
| COUNCIL ON ENVIRONMENTAL | ) No. 24-89 (DMT-CRH) |
| QUALITY and BRENDA MALLORY, in her | ) |
| official capacity as Chair of the Council on | ) |
| Environmental Quality, | ) |
| | ) |
| *Defendants*, | ) |
| | ) |
| and | ) |
| | ) |
| ALASKA COMMUNITY ACTION ON | ) |
| TOXICS, *et al*., | ) |
| | ) |
| *Defendant-Intervenors*. | ) |
| | ) |

**DEFENDANTS' REPLY IN SUPPORT OF**
**CROSS-MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 1

ARGUMENT ...................................................................................................................... 2

I.    The States' Speculation Over Future Injury is Insufficient to Establish this Court's Jurisdiction. ................................................................................................ 2

    A.    The States Cannot Demonstrate Standing Based Only on Speculation Regarding the Future Effects of the 2024 Rule ...................... 3

    B.    The States Are Not Entitled to a Lesser Standing Burden. ........................ 8

    C.    This Matter is Unripe Absent Evidence of How the 2024 Rule Has Been Applied in Practice. ........................................................................ 10

II.    CEQ Acted Within its Statutory Authority to Implement NEPA in Issuing the 2024 Rule. ..................................................................................................... 11

    A.    The Best Reading of NEPA is Informed by Statutory Purpose and Structure. .................................................................................................. 12

        1.    The States Cannot Divorce NEPA's Text from its Purposes. ........ 12

        2.    CEQ's Ability to Promulgate Rules Implementing NEPA is Not Limited to the Plain Text of Section 102. ............................. 15

    B.    The Provisions of the 2024 Rule Challenged by the States are Consistent with NEPA. ............................................................................ 18

        1.    Consideration of Climate Change is Consistent with NEPA. ........ 18

        2.    NEPA's Text Encompasses Consideration of Environmental Justice ............................................................................................. 19

        3.    The Rule Does Not Require Consideration of Indigenous Knowledge. ..................................................................................... 20

        4.    CEQ Could Modify the Timing for Identification of an Alternative ....................................................................................... 20

        5.    CEQ's Existing Regulations on CEs Inform the FRA Amendments. ................................................................................... 20

        6.    The 2024 Rule's Mitigation Provisions Do Not Require Substantive Action……………………………………………………22

    C.    The States Mischaracterize the Plain Meaning of the 2024 Rule. ............ 24

i

D.      The Supreme Court Has Held that CEQ Has Broad Statutory
Authority to Implement NEPA. ............................................................... 26

III.    The States Continue to Press Unsupported Arguments About the
Sufficiency of CEQ's 2024 Rulemaking. ............................................. 28

IV.     The 2024 Rule Did Not Require Further NEPA Analysis. .................................. 31

V.      The 2024 Rule Does Not Present a "Major Question." ........................................ 33

VI.     The States Fail to Show that *Vacatur* of the Rule is Appropriate......................... 34

CONCLUSION ..................................................................................................................... 34

# TABLE OF AUTHORITIES

## Cases

*Am. Petroleum Inst. v. U.S. Dep't of Interior*,
  81 F.4th 1048 (10th Cir. 2023) ................................................. 30

*Andrus v. Sierra Club*,
  442 U.S. 347 (1979)................................................. 15, 26

*Arizona v. Biden*,
  40 F.4th 375 (6th Cir. 2022) ................................................. 3, 7, 8, 9

*Ashley Creek Phosphate Co. v. Norton*,
  420 F.3d 934 (9th Cir. 2005) ................................................. 13

*Bradford v. U.S. Dep't of Lab.*,
  101 F.4th 707 (10th Cir. 2024) ................................................. 33

*California v. Trump*,
  613 F. Supp. 3d. 231 (D.D.C. 2020) ................................................. 9

*Cement Kiln Recycling Coal. v. EPA*,
  493 F.3d 207 (D.C. Cir. 2007) ................................................. 20

*Cent. S.D. Coop. Grazing Dist. v. Sec'y of the U.S. Dep't. of Agric.*,
  266 F.3d 889 (8th Cir. 2001) ................................................. 31

*Chamber of Comm. of U.S. v. EPA*,
  642 F.3d 192 (D.C. Cir. 2011)................................................. 4, 5

*Chavero-Linares v. Smith*,
  782 F.3d 1038 (8th Cir. 2015) ................................................. 22

*Chevron, U.S.A., Inc. v. NRDC, Inc.*,
  467 U.S. 837 (1984)................................................. 27

*Crane v. Johnson*,
  783 F.3d 244 (5th Cir. 2015) ................................................. 5

*Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin.*,
  538 F.3d 1172 (9th Cir. 2008) ................................................. 19

*Cuozzo Speed Tech. v. Comm. for Intell. Prop.*,
  579 U.S. 261 (2016)................................................. 16

*Dep't of Educ. v. Brown*,
  600 U.S. 551 (2023)................................................. 9

*Dep't of Transp. v. Pub. Citizen*,
  541 U.S. 752 (2004)................................................. 11, 32, 33

*Designworks Homes, Inc. v. Columbia House of Brokers Realty, Inc.*,
  9 F.4th 803 (8th Cir. 2021) ................................................. 12

iii

*Double R Ranch Trust v. Need*,
 284 F. Supp. 3d 21 (D.D.C. 2018) .......................................................... 4, 26, 28, 30

*Encino Motorcars, LLC v. Navarro*,
 579 U.S. 211 (2016) ........................................................................................... 28

*FCC v. Fox Television Stations, Inc.*,
 556 U.S. 502 (2009) ........................................................................................... 29

*Fed. Forest Res. Coal. v. Vilsack*,
 100 F. Supp. 3d 21 (D.D.C. 2015) ....................................................................... 4

*First Comm. Corp. v. United States*,
 63 Fed. Cl. 627 (2005) ......................................................................................... 7

*Frank's Landing Indian Community v. Nat'l Indian Gaming Comm'n*,
 918 F.3d 610 (9th Cir. 2019) .............................................................................. 22

*Friend of the Boundary Water Wilderness v. Dombeck*,
 164 F.3d 1115 (8th Cir. 1999) ............................................................................ 31

*Goodyear Atomic Corp. v. Miller*,
 486 U.S. 174 (1988) ........................................................................................... 21

*Gundy v. United States*,
 588 U.S. 128 (2019) ..................................................................................... 12, 13

*Gunpowder Riverkeeper v. FERC*,
 807 F.3d 267 (D.C. Cir. 2015) ........................................................................... 31

*Habitat Educ. Ctr., Inc. v. U.S. Forest Serv.*,
 673 F.3d 518 (7th Cir. 2012) .............................................................................. 28

*Haggar Co. v. Helvering*,
 308 U.S. 389 (1940) ........................................................................................... 14

*Henderson v. Springfield R-12 Sch. Dist.*,
 — F.4th —, 2024 WL 4179208 (8th Cir. Sept. 13, 2024) ..................................... 3

*Iowa League of Cities v. EPA*,
 711 F.3d 844 (8th Cir. 2013) ................................................................................ 8

*Japanese Vill., LLC v. Fed. Transit Admin.*,
 843 F.3d 445 (9th Cir. 2016) .............................................................................. 23

*King v. Burwell*,
 576 U.S. 473 (2015) ........................................................................................... 13

*Kisor v. Wilkie*,
 588 U.S. 558 (2019) ........................................................................................... 25

*Kleppe v. Sierra Club*,
 427 U.S. 390 (1976) ........................................................................................... 16

*La. Forestry Ass'n, v. Solis,*
   889 F. Supp. 2d 711 (E.D. Pa. 2012) ................................................................... 17

*Loper Bright Enterp. v. Raimondo,*
   144 S. Ct. 2244 (2024) .............................................................. 12, 14, 21, 27

*Louisiana v. Biden,*
   64 F.4th 674 (5th Cir. 2023) .................................................................. 7, 8

*Louisiana v. Nat'l Oceanic & Atmospheric Admin.,*
   70 F.4th 872 (5th Cir. 2023) .............................................................. 4, 5, 6, 8

*Lujan v. Defs. of Wildlife,*
   504 U.S. 555 (1992) .......................................................................... 2

*Marsh v. Oregon Nat. Res. Council,*
   490 U.S. 360 (1989) ......................................................................... 27

*Martin v. Occupational Safety and Health Rev. Comm'n,*
   499 U.S. 144 (1991) ......................................................................... 14

*Massachusetts v. EPA,*
   549 U.S. 497 (2007) .......................................................................... 8

*Mayfield v. U.S. Dep't of Lab.,*
   — F.4th —, 2024 WL 4142760 (5th Cir. Sept. 11, 2024) .................................... 18, 20

*McNaught v. Nolen,*
   76 F.4th 764 (8th Cir. 2023) .................................................................. 5

*Mid States Coal. for Progress v. Surface Transp. Bd.,*
   345 F.3d 520 (8th Cir. 2003) ................................................................. 19

*Minn. Pub. Interest Research Grp. v. Butz,*
   541 F.2d 1292 (8th Cir. 1976) ................................................................ 26

*Missouri v. Biden,*
   52 F.4th 362 (8th Cir. 2022) .................................................................. 8

*NASA v. Nelson,*
   562 U.S. 134 (2011) ......................................................................... 33

*Nat'l Ass'n of Home Builders v. E.P.A.,*
   667 F.3d 6 (D.C. Cir. 2011) ........................................................ 4, 10, 14, 22, 25, 32

*Nat'l Cable & Telecomms. Assn'n v. Brand X Internet Servs.,*
   545 U.S. 967 (2005) ......................................................................... 28

*Nat'l Infusion Ctr. Ass'n. v. Becerra,*
   — F.4th —, 2024 WL 4247856 (5th Cir. Sept. 20, 2024) .................................... 7, 18

*New Mexico ex rel. Richardson v. Bureau of Land Mgmt.,*
   565 F.3d 683 (10th Cir. 2009) ................................................................ 28

*New York v. U.S. Dep't of Health and Human Servs.*,
 414 F. Supp. 3d 475 (S.D.N.Y. 2019) ................................................................. 34

*Norton v. S. Utah Wilderness*,
 *All.*, 542 U.S. 55 (2004) ..................................................................................... 24

*Ohio Forestry Ass'n, v. Sierra Club*,
 523 U.S. 726 (1998) ............................................................................................ 11

*Ohio Valley Env'tl Coal. v. Hurst*,
 604 F. Supp. 2d 860 (S.D. W. Va. 2009) ............................................................ 24

*Perez v. Owl, Inc.*,
 110 F.4th 1296 (11th Cir. 2024) ........................................................................ 19

*Protect Our Cmtys. Found. v. Jewell*,
 825 F.3d 571 (9th Cir. 2016) ............................................................................. 23

*Robertson v. Methow Valley Citizens Council*,
 490 U.S. 332 (1989) .............................................................................. 13, 14, 27

*Rodriguez de Quijas v. Shearson/Am. Express, Inc.*,
 490 U.S. 477 (1989) ............................................................................................ 27

*Rosebud Sioux Tribe v. McDivitt*,
 286 F.3d 1031 (8th Cir. 2002) ........................................................................... 14

*Rubin v. Islamic Rep. of Iran*,
 830 F. 470 (7th Cir. 2016) ................................................................................. 13

*Salt Lake City Corp. v. Shepherd*,
 No. 23-893, 2024 WL 2158128 (D. Utah May 14, 2024) ..................................... 7

*Scalia v. Wynnewood Ref. Co., LLC*,
 978 F.3d 1175 (10th Cir. 2020) ......................................................................... 25

*Sierra Club v. Sigler*,
 695 F.2d 957 (5th Cir. 1983) ....................................................................... 18, 27

*Steel Co. v. Citizens for a Better Env't*,
 523 U.S. 83 (1998) ............................................................................................... 9

*Summers v. Earth Island Inst.*,
 555 U.S. 488 (2009) .......................................................................................... 8, 9

*Tenn. Conf. of the N.A.A.C.P. v. Lee*,
 105 F.4th 888 (6th Cir. 2024) .............................................................................. 4

*Tennessee v. Becerra*,
 — F.4th —, 2024 WL 3934560 (6th Cir. Aug. 26, 2024) .................................... 27

*Tennessee v. Equal Emp. Opportunity Comm'n*,
 — F. Supp. 3d. —, 2024 WL 3012823 (E.D. Ark. June 14, 2024) ......................... 5

*Tex. Med. Ass'n v. U.S. Dep't of Health and Human Servs.*,
  110 F.4th 762 (5th Cir. 2024) ......................................................... 14

*Theodore Roosevelt Conservation P'ship v. Salazar*,
  616 F.3d 497 (D.C. Cir. 2010) ........................................................ 23

*Twp. of Bordentown v. Fed. Energy Reg. Comm'n*,
  903 F.3d 234 (3d. Cir. 2018) .......................................................... 28

*U.S. Sugar Corp. v. Env't Prot. Agency*,
  113 F.4th 984 (D.C. Cir. 2024) ....................................................... 15

*United States v. White*,
  97 F.4th 532 (7th Cir. 2024) .......................................................... 33

*Valley Forge Christian Coll. v. Am. United for Separation of Church and State, Inc.*,
  454 U.S. 464 (1984) ......................................................................... 9

*Voyageurs Nat'l Park Ass'n v. Norton*,
  381 F.3d 759 (8th Cir. 2004) .......................................................... 29

*Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council*,
  435 U.S. 519 (1978) ................................................................. 15, 32

*Warms Springs Dam Task Force v. Gribble*,
  417 U.S. 1301 (1974) ...................................................................... 27

*West Virginia v. EPA*,
  597 U.S. 697 (2022) ........................................................................ 33

*Whitman v. Am. Trucking Ass'n*,
  531 U.S. 457 (2001) ........................................................................ 16

*Wild Va. v. Council on Env't Quality*,
  56 F.4th 281 (4th Cir. 2022) ............................................... 10, 11, 16

**Statutes**

5 U.S.C. § 704 ..................................................................................... 30

23 U.S.C. § 327 ..................................................................................... 6

42 U.S.C. § 4331 ........................................................... 12, 14, 18, 20

42 U.S.C. § 4332 ........................................................... 12, 13, 16, 20

42 U.S.C. § 4334 ................................................................... 15, 33

42 U.S.C. § 4336a ................................................................. 11, 30

42 U.S.C. § 4336e ................................................................. 16, 21

Pub. L. 114-94 § 41001 ..................................................................... 17

Pub. L. No. 118-5 ................................................................................. 6

Pub. L. No. 91-190.................................................................................................................. 1

**Regulations**

43 Fed. Reg. 56,003 ............................................................................................................ 21

58 Fed. Reg. 51,735 ............................................................................................................ 34

85 Fed. Reg. 43,360. .................................................................................................... 17, 31

89 Fed. Reg. 35,541. ................................................................................................... passim

**Other Authorities**

Executive Order 12866 ....................................................................................................... 34

## INTRODUCTION

The Plaintiff States' arguments are fundamentally deficient because they try to elevate policy differences with the Council on Environmental Quality ("CEQ") into legal disputes. This flaw permeates each of their arguments. Thus, as to standing, because the States' claims are grounded in disagreement with the 2024 Rule[1] rather than specific outcomes, they fail to identify how the Rule will cause them non-speculative harm. And on the merits, the States do not contend with either the overarching Congressional directives in the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321-4347,[2] or the statutory structure and context, and instead press a reading of NEPA that would negate the agency's ability to implement the statute in the manner Congress intended.

Specifically, as to standing, the States argue that because the 2024 Rule modifies federal agencies' NEPA analyses, and the States participate in projects subject to NEPA, they have established standing. But that approach is too simplistic and has been rejected by numerous courts considering similar challenges to agency regulations. Instead, at summary judgment, a plaintiff must produce evidence of specific, non-speculative harm. The States fail to do so here, instead falling back on conclusory declarations and advocating for an improperly lenient standing test that would obviate Article III's requirements in cases challenging agency action.

As for the merits, the States do not recognize or grapple with NEPA's clear text and purposes, the scope of CEQ's interpretive authority, or the weight afforded the agency's interpretation of NEPA by well-established case law. Instead, they press an improperly

---

[1]     *Nat'l Env't Pol'y Act Implementing Regulations Revisions Phase 2*, 89 Fed. Reg. 35,442 (May 1, 2024) ("2024 Rule") (AR_28762).

[2]     Pub. L. No. 91-190, 83 Stat. 852 (Jan. 1, 1970) (AR_43565).

subjective reading of the statute that is shorn of history, structure, and context.  An appropriately rigorous analysis, however, demonstrates that the 2024 Rule is the very type of CEQ action contemplated by NEPA.  Were it otherwise, CEQ's ability to interpret NEPA—an authority repeatedly recognized by the Supreme Court—would be nullified.

Nor do the States present a compelling challenge to the sufficiency of CEQ's reasoning underlying changes made in the 2024 Rule, particularly given they hardly engage with the governing standard and the agency's reasoning.  The States' challenge to the NEPA analysis supporting the Rule also falls flat because they are attempting to vindicate asserted economic— rather than environmental—concerns that are not within NEPA's zone of interests.  And that flaw aside, the States have not advanced this claim in a manner that reflects an appropriately articulated disagreement with CEQ's analysis.  Finally, the States' major questions doctrine argument is based on a mischaracterization of the history of CEQ's interpretive authority and the scope of the 2024 Rule, neither of which show the Rule relies on an expansion of agency authority that could implicate the doctrine.

In sum, the Court should reject each of the States' claims.

## ARGUMENT

### I.    The States' Speculation Over Future Injury is Insufficient to Establish this Court's Jurisdiction.

The States bear the burden of proving standing "with the manner and degree of evidence required at the successive stages of the litigation."  *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992).  Here, at summary judgment, they have failed to meet that burden.  Their response instead crystallizes that their standing arguments are not supported by the kinds of evidence that would place their allegations above speculation.  Perhaps in recognition of this fact, the States press a theory of "special solicitude," which they characterize as allowing them to "establish

standing without meeting all the normal standards. . . ."  States' Resp. to Defs.' Mot. Summ. J.

("Pls.' Resp.") at 4 (ECF No. 98).  But even if "special solicitude" were not a virtual dead letter,

the doctrine does not permit the States' to bypass the requirement of establishing proof of harm.

*See Arizona v. Biden*, 40 F.4th 375, 385-86 (6th Cir. 2022).  Because the States cannot establish

standing, the Court lacks jurisdiction over this matter.  So too, the States' claims are unripe.

### A.  The States Cannot Demonstrate Standing Based Only on Speculation Regarding the Future Effects of the 2024 Rule.

In response to CEQ's arguments that they failed to demonstrate standing, *see* Defs.'

Mem. Supp. Mot. Sum. J. ("CEQ Mem.") at 14-22 (ECF No. 86-1), the States merely offer that

they have identified a "significant number of current and planned projects affected" by the Rule,

Pls.' Resp. at 5, and argue, without support, that they "do not assert 'bald speculation' of injury."

*Id*. at 6.  Indeed, their rebuttal on this point totals all of one sentence and seems to rest simply on

the identification of projects to which the 2024 Rule will apply.  But that misses the point: even

if the States can identify relevant projects, they must still show that they will not only be *affected*

by, but *harmed* by the Rule.  That showing requires more than reliance on supporting

declarations that offer only self-serving speculation regarding how Federal agencies might apply

the 2024 Rule.[3]  *See* CEQ Mem. at 18-19.

Courts have rejected similar attempts to evade Article III requirements by plaintiffs

asserting an interest alone, rather than a concrete and particularized harm.  *See, e.g.*, *Henderson

v. Springfield R-12 Sch. Dist.*, — F.4th —, 2024 WL 4179208, at *3-4 (8th Cir. Sept. 13, 2024)

(finding plaintiffs had not shown sufficient injury stemming from participation in school

---

[3]    Though the States characterize CEQ's opposition as a mere "quibble," CEQ instead
demonstrated how many of the States' declarants offered inaccurate testimony.  *See* CEQ Mem.
at 16-17 (identifying at least 5 projects as involving NEPA reviews that do not implicate the
2024 Rule).  The Court should accordingly view the States' allegations skeptically.

training); *Nat'l Ass'n of Home Builders v. EPA*, 667 F.3d 6, 13 (D.C. Cir. 2011) (finding lack of standing where "[plaintiff] does not explain . . . how the [agency action] adversely affects [ ] the 'manner' of regulation"). That is because standing requires more than just being potentially affected by a regulation. Were it otherwise, the constraints of Article III would be nullified in cases challenging government action. *See, e.g.*, *Fed. Forest Res. Coal. v. Vilsack*, 100 F. Supp. 3d 21, 44 (D.D.C. 2015) ("It is simply not enough for Plaintiffs to say that, by virtue of their size and membership, their constituent organizations use all of the national forests, and therefore are affected by any regulation pertaining to those forests").

Even if the States can identify specific projects to which the 2024 Rule will apply, they do not offer concrete facts substantiating how the Rule will cause harm. *See* CEQ Mem. at 17-20. Instead, their declarants offer the type of speculative assertions that courts have consistently rejected. *See Tenn. Conf. of the N.A.A.C.P. v. Lee*, 105 F.4th 888, 906 (6th Cir. 2024) (explaining a "generic declaration" could not support standing and contrasting with cases in which plaintiffs "have identified their precise harms from the defendant's conduct down to the penny"); *Louisiana v. Nat'l Oceanic & Atmospheric Admin.* ("*NOAA*"), 70 F.4th 872, 881 (5th Cir. 2023) ("the declaration does not 'connect the dots' so as to create a genuine issue of material fact as to the State's ostensible sovereign injury" where the "testimony is couched in speculative, general language (the rule 'could' burden [the state])"); *Chamber of Comm. of U.S. v. EPA*, 642 F.3d 192, 202-03 (D.C. Cir. 2011) (noting "equivocal" statements in declarations are "just the kind . . . that we have previously rejected as insufficient to establish standing"); *Double R Ranch Trust v. Need*, 284 F. Supp. 3d 21, 30 (D.D.C. 2018) (Plaintiffs' general contentions that the rule will make "the regulatory process more complicated and less certain," "unmoored from specific, concrete facts are insufficient to establish an injury.").

Comparing the declarations here to those in *NOAA* is particularly instructive. There, Louisiana sought to challenge a rule requiring turtle-excluding devices on shrimping vessels, and supported their claims with a declaration from a state official who claimed the rule would increase the state's costs. 70 F.4th at 881. The Fifth Circuit found that declaration insufficient because it was "couched in speculative, general language (the rule 'could' burden [the state])." *Id.*; *see also McNaught v. Nolen*, 76 F.4th 764, 772 (8th Cir. 2023) ("vague, blanket statements of [ ] harm" are insufficient). Here, the States' declarations similarly refer to what "might" happen, *see* CEQ Mem. at 17-18, but provide no facts—and no non-testimonial evidence— supporting their suppositions of future harms. *See NOAA*, 70 F.4th at 883 ("merely describing what 'could' happen" is "insufficient by itself to forestall summary judgment"); *see also Crane v. Johnson*, 783 F.3d 244, 252 (5th Cir. 2015) ("Mississippi was required to demonstrate that the state *will* incur costs because of the [federal] program" (emphasis added)).

The insufficiency of the States' declarations is heightened by the fact that when the States filed suit a version of CEQ's NEPA regulations was already operative. Thus, to establish standing, the States must prove that the specific *changes* made in the 2024 Rule will cause burdens beyond any imposed by the preexisting regulatory scheme. *See Tennessee v. Equal Emp. Opportunity Comm'n*, — F. Supp. 3d. —, 2024 WL 3012823, at *6 (E.D. Ark. June 14, 2024) (finding lack of standing where plaintiffs had not "offered particulars about how the challenged slice imposes additional compliance costs beyond those required by the unchallenged parts of the regulation, or even the Act itself"). Establishing causation related to the 2024 Rule itself is particularly crucial given how, even in its absence, Federal agencies would undertake many of the so-called additional reviews the States challenge here because of judicial findings on the scope of NEPA. *See* CEQ Mem. at 18; *see also Chamber of Comm.*, 642 F.3d at 205

(plaintiffs must show events "would proceed on a different course more favorable to" them). The inadequacy of the States' showing is further compounded by their declarants' failures to address how the 2024 Rule affects them in light of the statutory amendments to NEPA in the Fiscal Responsibility Act ("FRA"), Pub. L. No. 118-5, 137 Stat. 10 (Jan. 3, 2023), which generally accelerate NEPA reviews and thus could ameliorate their claims of delay.

Aside from any alleged project-specific harms, the States claim they have standing because certain states (Texas, Florida, and Utah) assumed NEPA responsibilities from the Federal Highway Administration ("FHWA") under 23 U.S.C. § 327 before the 2024 Rule went into effect. But those states' assumptions of responsibilities could generate, at most, self-inflicted harms that cannot support standing, and the States' contentions to the contrary suffer from several flaws. First, and most fundamentally, it is undisputed that participation in the Section 327 program is voluntary, and that the States could withdraw to avoid any injury. CEQ Mem. at 22. Second, there is no merit to the States' response that they were "assigned" responsibilities "before any injury from this Final Rule was even in sight." Pls.' Resp. at 7. The relevant declarations instead indicate that those states *chose to renew* their assumptions of authority in the spring of 2022, well after CEQ had announced its intention to revisit its NEPA-implementing regulations. *See* Decl. of Brandon Weston. at 30 (ECF No. 65-13); Decl. of William Watts, Jr. at 30 (ECF No. 65-14) (Florida and Utah memorandums of understanding ("MOUs"), executed May 26, 2022); AR_43863. Thus, if their "enforcement of the rule is discretionary, any increased enforcement costs would be self-inflicted and therefore insufficient to confer standing." *NOAA*, 74 F.4th at 883. Third, the MOUs provide that the states are responsible for implementing "new or revised Federal policies and guidance" that are "applicable

to FHWA's responsibilities under NEPA." Weston Decl. at 17; Watts Decl. at 17.[4]  As such, the MOUs "allocated the risk of regulatory change" to those states. *See, e.g.*, *First Comm. Corp. v. United States*, 63 Fed. Cl. 627, 630 (2005).  And fourth, it would be wrong to permit states to sue the Federal government on the basis of alleged harms from their voluntary participation in a program that affords the United States sovereign immunity. *See Salt Lake City Corp. v. Shepherd*, No. 23-893, 2024 WL 2158128, at *2 (D. Utah May 14, 2024).

At base, the States are left to contend with the fact that "[c]ontingent injuries, especially those arising from the impact of regulations on third parties not before the Court [here Federal agencies], rarely create cognizable cases or controversies." *Arizona*, 40 F.4th at 383.  Although the States analogize their claims to those challenging changes to the administration of Federal grant funding, *see* Pls.' Resp. at 8, the potential loss of funding and harms to state university systems is a far more direct injury than those alleged here, which necessarily depend on how agencies assess specific projects under NEPA. *See Nat'l Infusion Ctr. Ass'n. v. Becerra*, —— F.4th ——, 2024 WL 4247856, at *5 (5th Cir. Sept. 20, 2024) ("Predicting those decisions was necessarily speculative because they were discretionary and involved the weighing of a variety of unidentified values and goals.").

Finally, the States miss the point in attempting to distinguish recent precedent from the Eighth and Fifth Circuits.  *See* Pls.' Resp. at 6.  As in those cases, the 2024 Rule does not require a particular outcome; instead, it prescribes a process by which agencies should assess a project's effects. *See, e.g.*, *Louisiana v. Biden*, 64 F.4th 674,  684 (5th Cir. 2023) (when agency guidance "does not itself mandate any particular regulatory action by a federal agency," any "harms are traceable to possible agency actions, not to" the guidance); *Missouri v. Biden*, 52 F.4th 362, 369-

---

[4]        Texas does not provide its MOU, but it likely includes the same standard language.

70 (8th Cir. 2022) ("prefer[ring] that [ ] federal agency partners not use these estimates in future program planning or decision-making" "is not concrete harm to the States").

### B.  The States Are Not Entitled to a Lesser Standing Burden.

Perhaps in a tacit recognition of the weakness of their standing allegations, the States press that under *Massachusetts v. EPA* they are entitled to "special solicitude" to vindicate certain "quasi-sovereign" interests, which in turn lowers the bar for their standing.  Pls.' Resp. at 4 (citing 549 U.S. 497 (2007)).  But "special solicitude," if it is even a live doctrine, *see* CEQ Mem. at 21, does not obviate a state's obligation to meet the requirements of Article III.  *See Louisiana*, 64 F.4th at 684 ("Regardless of the applicability of the special solicitude, Plaintiffs must still satisfy the basic requirements of standing."); *NOAA*, 70 F.4th at 882 ("Special solicitude merely changes 'the normal standards for redressability and immediacy'. . . it is not a standing shortcut when standing is otherwise lacking.  In other words, it [just] countenances some uncertainty as to both the efficacy of a judicial remedy and the timing of the injury alleged by a State.").  As the Sixth Circuit explained, "*Massachusetts v. EPA* . . . does not remove Article III's imperative of a cognizable case or controversy or the requirements of injury, causation, and redressability."  *Arizona*, 40 F.4th at 385.  That principle applies here.

If the "special solicitude" doctrine even applies, it has limited relevance.  First, although the States argue they have a "procedural right" to bring their claims, only Counts II and III arguably assert procedural claims.  *Cf. Iowa League of Cities v. EPA*, 711 F.3d 844, 870-71 (8th Cir. 2013) (applying "procedural rights" theory to claim alleging lack of notice-and-comment rulemaking).  And even with respect to those claims, "the requirement of injury in fact is a hard floor of Article III jurisdiction" that cannot be relaxed.  *Summers v. Earth Island Inst.*, 555 U.S.

488, 497 (2009).[5]  Thus, for example, "[t]here is no doubt . . . that a plaintiff that is able to establish that an agency failed to comply with the notice and comment procedures of the APA would, nonetheless, have no recourse in an Article III court absent a showing that it suffered or will suffer a concrete injury as a result of policy produced through the allegedly flawed process." *California v. Trump*, 613 F. Supp. 3d. 231, 243 (D.D.C. 2020).  Second, the States' economic interests in projects and natural resources development do not constitute quasi-sovereign interests.  Instead, the States' "main objection is to indirect fiscal burdens allegedly flowing from the [Rule].  But why would that humdrum feature of a regulation count as a uniquely sovereign harm?  Most regulations have costs.  A State has no more, and no less, reason to fear harms to its bottom line from federal regulations than a person or a business does." *Arizona*, 40 F.4th at 386.

Finally, though the States argue that CEQ's challenge to their standing to bring this suit is an effort to "evade judicial review," Pls.' Resp. at 1, the Supreme Court has made clear that "Article III . . . is not merely a troublesome hurdle to be overcome if possible so as to reach the 'merits' of a lawsuit which a party desires to have adjudicated; it is a part of the basic charter promulgated by the Framers of the Constitution . . . ." *Valley Forge Christian Coll. v. Am. United for Separation of Church and State, Inc.*, 454 U.S. 464, 476 (1984).  Thus, the Court should reject out-of-hand the States' efforts to circumvent their burden by characterizing CEQ's arguments as a procedural tactic.  *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 101

---

[5]    Even if a footnote in *Lujan* could be read to relax the injury-in-fact requirement for procedural-rights plaintiffs, *see* Pls.' Resp. at 4, the Court in *Summers* expressly rejected that approach, clarifying that the "hard floor" for injury-in-fact requires that the alleged injury be concrete, imminent, and not conjectural or hypothetical, regardless of the claim.  555 U.S. at 496-97.  Indeed, the Supreme Court has clarified that "we have never held a litigant who asserts such a [procedural] right is excused from demonstrating that it has a "concrete interest that is affected by the deprivation" of the claimed right."  *Dep't of Educ. v. Brown*, 600 U.S. 551, 562 (2023) (citation omitted).

(1998) (jurisdictional questions involve "[m]uch more than legal niceties" and instead "are an essential ingredient of separation and equilibration of powers, restraining the courts from acting at certain times").  To that end, the States are not prevented from ever challenging the Rule; they "just will need to bring such a challenge under circumstances where they can present evidence sufficient to support federal-court jurisdiction."  *Wild Va. v. Council on Env't Quality*, 56 F.4th 281, 303 (4th Cir. 2022).

In sum, the States fail to remedy the fundamental flaw with their assertions of standing: they ask this Court to find jurisdiction when they offer only speculation about the effects of a Rule that does not directly regulate them.  Given the lack of evidence establishing standing, the Court should follow the weight of authority and dismiss this matter for lack of jurisdiction.

### C.  This Matter is Unripe Absent Evidence of How the 2024 Rule Has Been Applied in Practice.

The States' arguments on ripeness similarly ring hollow.  They attempt to distinguish *Wild Virginia* by arguing that states' roles as project proponents renders their claims more concrete than those brought by the environmental organizations in that matter.  Pls.' Resp. at 8-9.  But that comparison overlooks the import of the Fourth Circuit's explanation.

The States argue that the *Wild Virginia* plaintiffs' allegations of harm are distinguishable because they allegedly sought to use "NEPA to slow or halt projects," while here, the States are project sponsors.  *Id.* at 9.  But they ignore that the common issue is not the *type* of harm but the lack of *imminence* of any harm.  There, the court found the plaintiffs had failed to demonstrate imminent harm given reliance on declarations that "were filed *before* the 2020 Rule took effect."  *Wild Va.*, 56 F.4th at 295.  Here, the States' declarants similarly do not identify any project for which the 2024 Rule has caused harm; instead, the States likewise offer speculation about

potential harms caused by the Rule. *See id.* (noting insufficiency of "numerous concerns with how NEPA analyses will be conducted under the 2020 Rule").[6]

Finally, the States question how they could "challenge the unlawful overapplication of NEPA requirements to a given project" if not through this vehicle. Pls.' Resp. at 10. But as the Supreme Court explained, a plaintiff may "include a challenge to the lawfulness of the [Rule] if (but only if) the [Rule] then matters, *i.e.*, if the [Rule] plays a causal role with respect to the future, then-imminent," agency action. *Ohio Forestry Ass'n, v. Sierra Club*, 523 U.S. 726, 734 (1998). Further, the States overlook that the FRA contains a cause of action for delay in preparation of NEPA documents. *See* 42 U.S.C. § 4336a(g)(3)(A). Thus, the States have recourse for any undue delay.

## II.    CEQ Acted Within its Statutory Authority to Implement NEPA in Issuing the 2024 Rule.

Even if this Court finds it has jurisdiction, the 2024 Rule is lawful because it is consistent with NEPA's text and purposes. *See* CEQ Mem. at 25-45. The States argue that certain provisions of the Rule—principally those addressing climate change and environmental justice—exceed CEQ's authority because they go beyond the express text of the statute. Pls.' Resp. at 10-25. But, the States' policy objections notwithstanding, the 2024 Rule is a permissible exercise of CEQ's authority to establish procedures to implement NEPA's goals.

To that end, binding precedent holds that NEPA delegates to CEQ the "authority to issue regulations interpreting" the statute. *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 757 (2004). Thus, contrary to the States' assertions, this Court need not define the statute in the first instance

---

[6]    The States' other arguments are similarly unavailing. Whether facial challenges are appropriate in other contexts ignores that one is a misfit here, where the 2024 Rule has not yet been applied in a manner that permits for effective review. And the Rule only applies to Federal agencies; it issues no "commands" to the States that warrant immediate judicial intervention.

but should instead "respect th[at] delegation" while "polic[ing] the outer statutory boundaries" of Congress's grant of interpretive authority. *See Loper Bright Enterp. v. Raimondo*, 144 S. Ct. 2244, 2273 (2024); *see also id*. at 2263 (a "statute's meaning may well be that the agency is authorized to exercise a degree of discretion"). Within that framework, NEPA's purposes, structure, and text all indicate that the challenged provisions of the 2024 Rule are well within CEQ's delegated authority to implement NEPA's broad directives. And even if the import of NEPA's terms were not clear, CEQ's interpretation is nonetheless entitled to deference.

**A.  The Best Reading of NEPA is Informed by Statutory Purpose and Structure.**

As an initial matter, the Court should reject the States' arguments that NEPA's statutory purposes cannot inform a proper reading of the legality of the 2024 Rule, or that CEQ's regulatory authority is limited to merely parroting the statutory text.

1.  <u>The States Cannot Divorce NEPA's Text from its Purposes.</u>

As the Eighth Circuit has explained, "[w]hen interpreting a statute, [a court] must also consider the statutory context in which the words in question appear . . . including both 'the specific context in which th[e] language is used, and the broader context of the statute as a whole.'" *Designworks Homes, Inc. v. Columbia House of Brokers Realty, Inc.*, 9 F.4th 803, 807 (8th Cir. 2021) (citation omitted); *see also Gundy v. United States*, 588 U.S. 128, 141 (2019) ("To define the scope of delegated authority, [courts look] to the text in 'context' and in light of the statutory 'purpose'" (citations omitted)).

The States' arguments contradict those established principles by asking the Court to ignore NEPA's statutory purposes and the degree to which the 2024 Rule furthers those purposes. *See* CEQ Mem. at 25-28. In particular, the States argue that Section 101 of NEPA (42 U.S.C. § 4331) cannot serve as a guide to interpretation of Section 102 (42 U.S.C. § 4332). Pls.'

Resp. at 12.  That argument is wrong; instead, NEPA's goals necessarily inform a proper reading

of its action-forcing procedures.  *See King v. Burwell*, 576 U.S. 473, 486 (2015) ("Our duty, after

all, is 'to construe statutes, not isolated provisions.'" (citation omitted)).

The Supreme Court faced a similar argument in *Gundy*.  There, the Court was urged to

"ignore [the statute's] statement of purpose because it is 'located in the Act's preface' rather that

'tied' specifically to [the provision at issue]."  588 U.S. at 142.  But, as the Court explained, "the

placement of such a statement within a statute makes no difference.  *See* A. Scalia & B. Garner,

Reading Law: The Interpretation of Legal Texts 220 (2012).  Wherever it resides, it is 'an

appropriate guide' to the 'meaning of the [statute's] operative provisions' . . . ."  *Id*.  Other courts

have found the same.  *See, e.g.*, *Rubin v. Islamic Rep. of Iran*, 830 F. 470, 480 (7th Cir. 2016)

("None of the standard objections to judicial reliance on legislative history inhibit our resort to a

statutory declaration of purpose for help in interpreting a part of the statute to which it applies").

The States cannot divorce the procedures established in Section 102(2)(C) (42 U.S.C.

§ 4332(C)) from NEPA's larger purposes and intent.  *See Ashley Creek Phosphate Co. v. Norton*,

420 F.3d 934, 945 (9th Cir. 2005) (recognizing that Section "102 of NEPA cannot be separated

from the statute's overarching purpose of environmental protection because it is designed to

further that purpose").  To the contrary, the Supreme Court has long interpreted NEPA's

purposes as informing its action-forcing provisions.  *See Robertson v. Methow Valley Citizens

Council*, 490 U.S. 332, 349 (1989) (explaining that NEPA's "strong precatory language [*i.e.*,

Section 101] . . . and the requirement that agencies prepare detailed impact statements [*i.e.*,

Section 102] inevitably bring pressure to bear on agencies 'to respond to the needs of environmental quality'" (citation omitted)).[7]

Thus, rather than merely prescribing only "procedures to be followed," Pls.' Resp. at 13, or requiring the "prepar[ation] [of] documents," *id*. at 14, Congress intended NEPA to further explicit goals of environmental protection. *See Rosebud Sioux Tribe v. McDivitt*, 286 F.3d 1031,1038 (8th Cir. 2002) ("The overriding purpose of NEPA is to prevent or eliminate damage to the environment."); *see also Robertson*, 490 U.S. at 350 (explaining that NEPA's "procedures are almost certain to affect the agency's substantive decision"). The Rule therefore furthers Congress's explicit intent by providing a procedural mechanism for "restoring and maintaining environmental quality." *See* 42 U.S.C. § 4331; *see also Haggar Co. v. Helvering*, 308 U.S. 389, 394 (1940) ("All statutes must be construed in the light of their purpose"). Moreover, even if this intent was not clear from NEPA's plain text (and it is), it is evident from NEPA's legislative history, which shows Congress intended for NEPA's procedural requirements to further a variety of environmentally protective efforts. *See* CEQ Mem. at 4 (citing *Nat'l Env't Pol'y Act of 1969*, S. Rep. No. 91-296 at 4 (July 9, 1969)); *see also Loper Bright*, 144 S. Ct. at 2266 (noting "courts use every tool at their disposal to determine the best reading of the statute and resolve the ambiguity"); *Tex. Med. Ass'n v. U.S. Dep't of Health and Human Servs.*, 110 F.4th 762, 781 (5th Cir. 2024) (King, J., concurring in part) (using "legislative history for guidance" under *Loper*).

In sum, NEPA's purposes and intent—both those explicitly set forth in the statute and those derived from legislative history—inform the best reading of the statute, which is that

---

[7]      On this argument, as with others, the States refer to CEQ's argument, but then respond to a citation from one of the Intervenors' briefs. Pls.' Resp. at 13. Those inapt citations aside, CEQ's interpretation controls over contrary readings from Intervenors given it is the agency Congress chose to "invest [with] interpretive power." *See Martin v. Occupational Safety and Health Rev. Comm'n*, 499 U.S. 144, 153 (1991).

Congress intended to establish procedures to improve the environmental outcomes of Federal actions.

>    2.  <u>CEQ's Ability to Promulgate Rules Implementing NEPA is Not Limited to the Plain Text of Section 102.</u>

Along with asking the Court to ignore NEPA's statutory purposes, the States also press that CEQ has no authority to add provisions to its regulations beyond those that expressly "appear . . . in NEPA's statutory text."  Pls.' Resp. at 15.  But that argument would render NEPA unworkable, and the Court should accordingly reject such a narrow reading.  *See U.S. Sugar Corp. v. Env't Prot. Agency*, 113 F.4th 984, 999-1000 (D.C. Cir. 2024) (rejecting reading that would "substantially hamper [the agency's] ability to effectively promulgate standards" when courts had "generally acknowledged that [the agency] may exercise discretion and utilize its expertise").  Indeed, interpreting CEQ's statutory authority to be limited by NEPA's exact statutory text would frustrate Congressional intent and render CEQ's role a virtual nullity. Instead, the best reading of the statute is that CEQ's delegated authority extends to establishing the specific procedures needed to effect the broad goals of Section 101 and to operationalize the procedural provisions of Section 102.

In enacting NEPA, Congress authorized CEQ to "review and appraise the various programs and activities of the Federal Government in light of" those policy goals and "charged" CEQ "with the responsibility" to implement NEPA's requirements.  *Andrus v. Sierra Club*, 442 U.S. 347, 358 (1979); *see also* 42 U.S.C. § 4334(3)-(4).  Thus, the statute itself reflects that CEQ may enact provisions implementing NEPA that go beyond the text of Section 102.

To that end, when NEPA was enacted in 1969, its operative terms were intentionally left open for CEQ to further interpret.  *See, e.g., Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council*, 435 U.S. 519, 551 (1978) (noting the term "alternatives" in 42 U.S.C. § 4332(C) is "not

self-defining"). Congress itself recognized that NEPA included "an expression of broad national goals rather than narrow and specific procedures for implementation." S. Rep. No. 91-296, 91st Cong., 1st Sess. at 9 (1969). So too, even following the FRA's 2023 amendments to the statute, NEPA leaves for CEQ to define what agency actions "significantly affect the quality of the human environment," 42 U.S.C. § 4332(C), and how to define many relevant terms. *See, e.g.*, 42 U.S.C. § 4332(2)(E) (which does not define what "reliable data and resources" are).[8] Particularly relevant here, NEPA requires agencies to evaluate the "reasonably foreseeable environmental effects of the proposed agency action," *id*. § 4332(C)(i), but does not define what effects should be considered, or how agencies should assess significance.[9] In other words, explication by CEQ is necessary to "give meaning to that language if there is to be anything in NEPA to enforce at all." *Kleppe v. Sierra Club*, 427 U.S. 390, 420-21 (1976) (Marshall, J., concurring in part and dissenting in part).

Congress therefore left to CEQ the development of "measures to improve the quality of the environment." S. Rep. 91-296 at 10; *see also Wild Va.*, 56 F.4th at 288 (Congress established CEQ to "further [the statute's] goals"). Such structure is indicative of a broad delegation of authority. *See Cuozzo Speed Tech. v. Comm. for Intell. Prop.*, 579 U.S. 261, 280 (2016) (finding

---

[8] And even where Congress *did* offer definitions in the FRA, those terms are often at a high-level and necessarily require further explanation. *See* 42 U.S.C. § 4336e(10)(A) (defining major federal action as one subject to "substantial Federal control and responsibility" without explaining what level of control rises to "substantial" or defining "responsibility").

[9] The Court should reject the States' insinuation that passage of the FRA altered the scope of CEQ's delegated authority. Pls.' Resp. at 10. The FRA is silent on that matter, and the Supreme Court has held that "Congress . . . does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions—it does not, one might say, hide elephants in mouseholes." *Whitman v. Am. Trucking Ass'n*, 531 U.S. 457, 468 (2001).

a delegation of authority where "neither the statutory language, its purpose, or its history suggest that Congress considered what standard the agency should apply").

The States' contrary theory—that CEQ only has authority to promulgate regulations that transpose NEPA's open-ended text—is at odds with that precedent and common sense. Taken to its logical endpoint, their argument would invalidate not only the 2024 Rule they challenge here, but fundamentally frustrate the statute's explicit purpose by limiting CEQ's ability to implement NEPA writ large.[10] That cannot be what Congress intended when it created CEQ and empowered the agency to establish procedures to create "a coordinated Federal response to the problems of environmental management." S. Rep. 91-296 at 15. Indeed, Congress has recognized and relied upon the procedural structure created by CEQ's regulations in enacting other legislation to improve infrastructure development. *See* Fixing America's Surface Transportation Act, Pub. L. 114-94 § 41001, 129 Stat. 1742 (Dec. 4, 2015). That reliance, too, is inconsistent with the States' interpretation of CEQ's authority. *See La. Forestry Ass'n, v. Solis*, 889 F. Supp. 2d 711, 729 (E.D. Pa. 2012) (Congressional acknowledgement of agency regulations was "endors[ment]" of interpretation that statute conferred rulemaking authority) (subsequent history omitted).

Further, in applying NEPA, one court explained that whether the statute's "literal language" permitted a provision of CEQ's regulations did not end the inquiry; instead, the regulation was a permissible exercise of CEQ's authority when the statute "endorse[d] generally

---

[10]    The States' theory would also invalidate many provisions of the 2020 Rule they seek to reimpose. *See* 85 Fed. Reg. 43,305 (July 16, 2020) ("2020 Rule") (AR_29042). For example, the 2020 Rule contains provisions on bond requirements, (Section 1500.3(c) (AR_29096)), a presumption of adequate consideration (Section 1505.2(b) (AR_29107)), and time limits for agency review (Section 1501.10 (AR_29100)) that are not found in Section 102 and thus would fall outside the States' view of CEQ's authority.

the concept," and the provision was supported by "the language and legislative history of NEPA and closely tracks NEPA case law." *Sierra Club v. Sigler*, 695 F.2d 957, 969-71 (5th Cir. 1983). Similarly, in applying *Loper*, the Fifth Circuit rejected an argument that an agency's delegated authority extended only to the specific term identified in the statute. *See Mayfield v. U.S. Dep't of Lab.*, — F.4th —, 2024 WL 4142760, at *4 (5th Cir. Sept. 11, 2024). Instead, the court found that the agency could "add[] an additional characteristic" where the rule had a "textual foundation" and was "consistent with the [statute's] broader structure. . . ." *Id*. at *5; *see also id.* (looking to whether the "rule has rational relationship to the text and structure of the statute").

In sum, CEQ's authority to implement NEPA extends further than simply repeating NEPA's statutory terms; instead, NEPA's structure and purpose indicate Congress intended to provide CEQ with the latitude to develop procedures to effectuate the statute's goals.

### B. The Provisions of the 2024 Rule Challenged by the States are Consistent with NEPA.

Setting aside the States' overarching arguments that NEPA's purposes are irrelevant or that CEQ may do no more than repeat the exact terms of the statute, the specific provisions challenged by the States—regarding climate change, environmental justice, the environmentally preferable alternative, Indigenous Knowledge, categorial exclusions, and mitigation—each have a firm basis in the statutory text, as well as NEPA's purposes, structure, and legislative history, and are thus consistent with the best reading of the statute. *See* CEQ Mem. at 30-36.

### 1. Consideration of Climate Change is Consistent with NEPA.

As to climate change, Congress intended NEPA to provide procedures that "prevent or eliminate damage to the environment," 42 U.S.C. § 4321, and instructed the Federal Government to avoid "undesirable and unintended consequences," 42 U.S.C. § 4331(b)(3). Consideration of climate change and quantification of greenhouse gas emissions falls well within those goals. *See*

*Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin.*, 538 F.3d 1172, 1217 (9th Cir. 2008) ("The impact of greenhouse gas emissions on climate change is precisely the kind of cumulative impacts analysis that NEPA requires agencies to conduct.").  Indeed, contemporaneous with NEPA's enactment in 1970, CEQ issued its first annual report, which recognized that human activity was "alter[ing] the chemical composition of the earth's atmosphere and chang[ing] its heat balance" and recommended "monitoring" to "establish pollution baselines."[11]  Thus, the States' categorical claim that NEPA was not intended to encompass climate change is erroneous, since an understanding of that term predated even issuance of CEQ's 1978 Regulations.  Further, the States ignore that the 2024 Rule simply operationalizes what courts across the country already require.  *See, e.g.*, *Mid States Coal. for Progress v. Surface Transp. Bd.*, 345 F.3d 520, 549 (8th Cir. 2003) ("degradation in air quality, is indeed something that must be addressed . . . if it is 'reasonably foreseeable'"); *see also* CEQ Mem. at 33.  Thus, rather than creating delay, the 2024 rule avoids it by encouraging agencies to consider in the first instance what they are already judicially required to do.  *See Perez v. Owl, Inc.*, 110 F.4th 1296, 1307-08 (11th Cir. 2024) (applying *Loper* and adopting agency reading supported by "the views of other circuits" and "common sense").

     2.     <u>NEPA's Text Encompasses Consideration of Environmental Justice.</u>

As to environmental justice, the States misread the term, which does not speak of "elevating some people or populations," Pls.' Resp. at 17, but ensuring adverse environmental effects are not disproportionately borne by any community, a goal entirely consonant with Congressional "recogn[ition] that each person should enjoy a healthful environment" and "assure

---

[11]    *See* CEQ, Environmental Quality: The First Annual Report, at 93, 104 (Aug. 1970), *available at* https://ceq.doe.gov/ceq-reports/annual_environmental_quality_reports.html.

for all Americans safe, healthful, productive, and esthetically and culturally pleasing surroundings." 42 U.S.C. § 4331(b)(2), (c). Again, there is no basis for reading NEPA to categorically exclude consideration of this matter, where relevant. And the States' references to the FRA are a red herring, as Congress did not modify the underlying statutory purposes from which the 2024 Rule's provisions on environmental justice flow.

3. <u>The Rule Does Not Require Consideration of Indigenous Knowledge.</u>

So too, the States claim CEQ has no ability to define the high-quality information agencies may consider as including Indigenous Knowledge. Pls.' Resp. at 24. But the FRA did not define "reliable data and resources," *see* 42 U.S.C. § 4332(2)(E), and providing examples of the types of information agencies may consider is within CEQ's delegated authority. *See Mayfield*, 2024 WL 4142760, at *5. Nor was CEQ obligated to specifically define the term. Pls.' Resp. at 26, 28. When "Congress has 'not specified the level of specificity expected . . . the agency is entitled to broad deference in picking the suitable level'" of explanation. *Cement Kiln Recycling Coal. v. EPA*, 493 F.3d 207, 217 (D.C. Cir. 2007) (quotation omitted).

4. <u>CEQ Could Modify the Timing for Identification of an Alternative.</u>

With respect to the environmentally preferable alternative, the States' argument appears to be that NEPA's text prohibits CEQ from modifying its regulations addressing when agencies must identify that alternative. Pls.' Resp. at 23. But the statutory text only requires identification of "a reasonable range of alternatives," not timing. 42 U.S.C. § 4332(C)(iii). CEQ's further definition is therefore a reasonable exercise of the agency's delegated authority.

5. <u>CEQ's Existing Regulations on CEs Inform the FRA Amendments.</u>

As CEQ previously explained, the 2024 Rule does not contradict the FRA's provisions regarding categorical exclusions ("CE"). CEQ Mem. at 42-44. The States ignore the regulatory

20

scheme in place at the time Congress enacted the FRA and assume contrary legislative intent where no indicia of such purpose exist.

By way of background, both the 1978 Regulations and the 2020 Rule required agencies to assess the application of a CE for a specific project to ensure there were not "extraordinary circumstances" precluding use of the CE.  *See* 43 Fed. Reg. 56,003-04; 85 Fed. Reg. 43,360; *see also* 89 Fed. Reg. 35,541-42.  Thus, while the States argue that the FRA included "no requirement to consider extraordinary circumstances" when an agency adopts another agency's CE, Pls.' Resp. at 21, that requirement long existed for agencies' use of their own CEs.  *See Loper*, 144 S. Ct. at 2262 ("interpretations issued contemporaneously with the statute at issue, and which have remained consistent over time, may be especially useful in determining the statute's meaning").

The States read the FRA to absolve agencies from having to conduct an extraordinary circumstances inquiry when using adopted CEs even while the agency from which the CE was adopted would still have to conduct that inquiry when using the very same CE.  Such a reading is nonsensical.  And it is also contrary to the statutory definition of a CE as "a category of actions that a Federal agency has determined *normally* does not" have a significant effect.  42 U.S.C. § 4336e(1) (emphasis added).  The extraordinary-circumstances inquiry permits an agency to determine when an action is not normal because of its potential for significant effects; the State's reading would remove that backstop for adopted CEs.

Moreover, courts "generally presume that Congress is knowledgeable about existing law pertinent to the legislation it enacts."  *Goodyear Atomic Corp. v. Miller*, 486 U.S. 174, 184-85 (1988); *see Frank's Landing Indian Community v. Nat'l Indian Gaming Comm'n*, 918 F.3d 610, 616 (9th Cir. 2019) ("We assume Congress is knowledgeable about existing law pertinent to the

legislation it enacts.").  Because CEQ's regulations have always required agency consideration of extraordinary circumstances when applying CEs to proposed actions, it is reasonable and appropriate for the Court to assume, in the absence of text to the contrary, that Congress wished to apply those established requirements to adopted CEs.  *See Franks's Landing*, 918 F.3d at 619 ("Assuming, as we must, that Congress was knowledgeable about [the agency's] longstanding [ ] regulations . . . it is conspicuous that Congress did not take the opportunity when it amended the . . . Act to specifically authorize the" action plaintiffs requested).

Finally, while the States argue without support that "the alleged existence of extraordinary circumstances will disincentivize" use of adopted CEs, Pls.' Resp. at 22, they ignore that the agencies that promulgated the CEs have been successfully using them (and applying the extraordinary circumstances inquiry) for decades to expedite NEPA analysis, and there is no reason to assume those CEs will be less useful to the adopting agencies.

6.  The 2024 Rule's Mitigation Provisions Do Not Require Substantive Action.

Contrary to the States' arguments, the 2024 Rule does not require agencies to conduct retroactive analysis of the effects of a project, but simply ensures that agencies make well-supported assumptions about the effectiveness of mitigation.  While the States claim the Rule requires "monitoring plans for any measures deemed to be 'mitigation,'" *id*. at 19,[12]  they misapprehend that a monitoring and compliance plan, if any, is intended to function as an element of an agency's determination that mitigation measures are sufficiently likely to be effective such that the agency's prediction of no significant impact is accurate.  *See Protect Our*

---

[12]      The Court should ignore the States' new challenge to Section 1508.1(y), contending that an "order of priority" for mitigation will subject agencies to new obligations, *id*., given arguments not raised in a party's initial motion are considered waived.  *See Chavero-Linares v. Smith*, 782 F.3d 1038, 1040 (8th Cir. 2015).

*Cmtys. Found. v. Jewell*, 825 F.3d 571, 582 (9th Cir. 2016) ("mitigation measures are projections").  In other words, monitoring does not require *post hoc* "verif[ication]," Pls.' Resp. at 19, but is instead part of an agency's advance assessment that it can reasonably rely on the effectiveness of mitigation.

    To that end, courts have repeatedly upheld agency reliance on less developed mitigation plans when those plans included monitoring.  *See Japanese Vill., LLC v. Fed. Transit Admin.*, 843 F.3d 445, 460-61 (9th Cir. 2016) ("While, at first glance, the[] mitigation measures seem to lack detail," "the use of such a continuous monitoring system" was sufficient "to allow for an evaluation of effectiveness" (citation omitted)); *Theodore Roosevelt Conservation P'ship v. Salazar*, 616 F.3d 497, 517 (D.C. Cir. 2010) ("Through the adaptive management plan, the Bureau plans to monitor the real effects of the development it authorizes, and adapt its mitigation measures to specific drilling proposals in response to trends observed.  Allowing adaptable mitigation measures is a responsible decision in light of the inherent uncertainty of environmental impacts, not a violation of NEPA").

    Though the States argue monitoring is now required when an agency prepares an environmental impact statement ("EIS"), Pls.' Resp. at 18, Section 1505.3 makes clear that a monitoring and compliance plan is required only when those measures are "committed [to] as part of the decision."  *See also* 89 Fed. Reg. 35,569 (Sec. 1505.3(c)) (explaining a plan is required only when the analysis of effects is based on implementing mitigation).  Nor does the Rule require monitoring in all situations.  Instead, Section 1505.3(d) explains that "[t]he agency should tailor the contents of a monitoring and compliance plan . . . to the complexity of the mitigation committed to. . . ."  *Id*.  The plan therefore functions as a tool for ensuring the agency's predictions are accurate, not a retroactive reanalysis of the project.  *See, e.g.*, *Ohio*

*Valley Env'tl Coal. v. Hurst*, 604 F. Supp. 2d 860, 888 (S.D. W. Va. 2009) ("An agency's reliance on mitigation . . . must be justified . . . there must be some assurance that the mitigation measures 'constitute an adequate buffer against the negative impacts that result from the authorized activity to render such impacts so minor as to not warrant an EIS.'" (citation omitted)).

Finally, the States' speculation that the 2024 Rule's mitigation provisions will increase litigation is meritless. The Rule explicitly provides in Section 1505.3(e) that: (1) "an agency does not need to supplement" its environmental analysis or "revise" its decision document "based solely on new information developed through a monitoring" plan; and (2) "[t]he ongoing implementation of a monitoring and compliance plan shall not be considered an incomplete or ongoing Federal action." 89 Fed. Reg. 35,569.[13] In any event, the States' argument conflicts with the established principle that an agency's NEPA obligations are complete when the federal action is complete. *See Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 73 (2004) (only an "ongoing 'major Federal action' [ ] could require supplementation").

### C. The States Mischaracterize the Plain Meaning of the 2024 Rule.

Alternatively, the States claim that, even if nominally permissible, CEQ inserted various mandatory provisions into the 2024 Rule that improperly force agencies to conduct substantive analysis. Pls.' Resp. at 15. But their arguments rest on fundamental mischaracterizations of the relevant provisions.

As with statutory interpretation, proper regulatory interpretation starts with the plain meaning of the regulation, because if a regulation "just means what it means—[ ] the court must

---

[13]    The States are wrong to characterize this as CEQ's litigation position—it is explicitly part of the Rule.

give it effect, as the court would any law." *Kisor v. Wilkie*, 588 U.S. 558, 575 (2019); *see also*

*Scalia v. Wynnewood Ref. Co., LLC*, 978 F.3d 1175, 1181 (10th Cir. 2020) ("nothing in *Kisor*

changes our longstanding approach to regulatory interpretation: begin with the text of the

regulation, and, if the meaning is clear, look no further").

The States' arguments violate those settled principles by asking the Court to ignore plain

regulatory language. *See, e.g.*, Pls.' Resp. at 17 (asking the Court to read Section 1502.16(a)(6)

"notwithstanding any 'where applicable' proviso"); *id*. at 16 (arguing the Rule's text lacks any

indication that consideration of climate change is voluntary). The particular provisions cited by

the States read as follows (emphasis added to all):

- Section 1502.14(f): explaining that the environmentally preferable alternative will "maximiz[e] environmental benefits, *such as* addressing climate change-related effects or disproportionate and adverse effects on communities with environmental justice concerns");

- Section 1502.16(a)(5): identifying, "*[w]here applicable*," potential conflicts between the action and "the objectives of Federal, regional, State, Tribal, and local plans, policies, and controls for the area concerned, *including* those [that] address climate change";

- Section 1502.16(a)(6): environmental consequences include, "*[w]here applicable*, climate change-related effects, including, *where feasible*, quantification of greenhouse gas emissions, from the proposed action and alternatives and the effects of climate change on the proposed action and alternatives";

- Section 1502.16(a)(13): environmental consequences include, "*[w]here applicable*, disproportionate and adverse human health and environmental effects on communities with environmental justice concerns";

- Section 1505.3(b): encouraging agencies, "*where relevant and appropriate*," to incorporate mitigation measures addressing effects that "disproportionately and adversely affect communities with environmental justice concerns";

- Section 1506.6(d): explaining that, "*[w]here appropriate*, agencies shall use projections when evaluating the reasonably foreseeable effects, including climate change-related effects."

But none requires, for all agencies and all projects, the analysis the States claim. Instead, each provides agencies discretion. The States cannot read out the text of those provisions by claiming CEQ's reading is "fanciful" or "nominally caveated." Pls.' Resp. at 16. Instead, the regulations must be interpreted as written, not as selectively interpreted by a litigating party.

The States' argument on Indigenous Knowledge is particularly spurious. The States argue the Rule will require agencies to consider Indigenous Knowledge in all circumstances, ignoring that Section 1506.6(b) makes clear agencies "may" do so, as appropriate. Similarly, with respect to the environmentally preferable alternative, the States argue that the Rule does not make clear that alternative should be identified from those already under consideration. *Id*. at 23. But that is exactly what the 2024 Rule says. 89 Fed. Reg. 35,504.

Finally, the States challenge CEQ's explanation regarding when agencies may need to consider global effects and argue some projects may require more NEPA review based only on global effects. Pls.' Resp. at 25. But this speculation is contradicted by the plain text of Section 1501.3(d)(1), which provides that "[d]epending on the scope of the action, agencies should consider the potential global, national, regional, and local contexts . . . ." Nothing in the text requires that an agency find an effect significant based solely on global impact.

### D. The Supreme Court Has Held that CEQ Has Broad Statutory Authority to Implement NEPA.

Finally, even if the Court were to find that NEPA's statutory text is ambiguous, CEQ's interpretation is entitled to deference. *See Andrus*, 442 U.S. at 358 (entitling CEQ's interpretation to "substantial deference"); *see also Minn. Pub. Interest Research Grp. v. Butz*, 541 F.2d 1292, 1299 n. 15 ("Congress directed the CEQ to perform a wide range of environmental duties and functions" meriting giving "substantial weight" to CEQ's directives).

The States are incorrect that *Loper* overruled *Andrus*. Instead, *Loper* overruled the deference framework of *Chevron, U.S.A., Inc. v. NRDC, Inc.*, 467 U.S. 837 (1984). But *Andrus* predates *Chevron* and remains binding on this Court. *See Loper*, 144 S. Ct. at 2273 (noting that prior decisions are subject to "statutory *stare decisis*").[14]

And even if the Court were to credit the States' argument that *Loper* cast doubt on the reasoning in *Andrus*, that does not constitute a basis for the Court to disregard *Andrus*. *See Rodriguez de Quijas v. Shearson/Am. Express, Inc.*, 490 U.S. 477, 484 (1989) ("If a precedent of this Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the Court of Appeals should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions."); *see also Tennessee v. Becerra*, — F.4th —, 2024 WL 3934560, at *8 (6th Cir. Aug. 26, 2024) (explaining *Loper* did not disturb holdings that relied on *Chevron* deference).

Moreover, the States' attempt to limit *Andrus* to its facts should be flatly rejected. *See* Pls.' Resp. at 11. Instead, the Supreme Court has consistently deferred to CEQ's interpretation of NEPA. *See Marsh v. Oregon Nat. Res. Council*, 490 U.S. 360, 372 (1989); *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 355-56 (1989) (same); *Warms Springs Dam Task Force v. Gribble*, 417 U.S. 1301, 1310 (1974) (affording CEQ's interpretation "great weight").

---

[14]    This makes sense because the deference the Court applied in *Andrus* differs from that later adopted in *Chevron*. *Compare Sigler*, 695 F.2d at 971 (applying *Andrus* and examining whether a provision of the 1978 Regulations[14] lay within the "statutory minima" of NEPA (and was entitled to deference) by looking to whether the regulation was "in accord with" NEPA's "language and legislative history" and "case law"), *with Chevron*, 467 U.S. at 843 (asking only "whether the agency's answer is based on a permissible construction of the statute").

The rationale in those cases has been adopted by many courts, none of which limited *Andrus* to the issue of the type of review needed for a particular project.[15]

The Supreme Court's direction that courts defer to CEQ's interpretation of NEPA therefore remains binding on this Court.

### III.    The States Continue to Press Unsupported Arguments About the Sufficiency of CEQ's 2024 Rulemaking.

CEQ also acted consistent with its statutory authority and the APA in removing certain provisions that were included in the 2020 Rule but that it determined were "imprudent or legally unsettled, or that create uncertainty or ambiguity that could reduce efficiency or increase the risk of litigation." 89 Fed. Reg. 35, 448; *see* CEQ Mem. at 45-50. As described below, the States' continued arguments to the contrary fail to confront the applicable standard, record, and their burden. *See* Pls.' Resp. at 26-28.

As an initial matter, if the States are arguing that CEQ could not change position from the 2020 Rule, *id*. at 26, they ignore that "[a]gencies are free to change their existing policies as long as they provide a reasoned explanation for the change." *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016). Thus, absent arguing that the 2020 Rule was the only permissible reading of NEPA (which the States do not do), CEQ had a right to remove certain provisions in the 2020 Rule based on its reconsidered interpretation of NEPA.

If the States are instead arguing that CEQ could not change its interpretation, that too is incorrect. An agency is permitted to "consider varying interpretations and the wisdom of its policy on a continuing basis," so long as it is explained. *Nat'l Cable & Telecomms. Assn'n v.*

---

[15]     *See, e.g.*, *Twp. of Bordentown v. Fed. Energy Reg. Comm'n*, 903 F.3d 234, 248 (3d. Cir. 2018); *Habitat Educ. Ctr., Inc. v. U.S. Forest Serv.*, 673 F.3d 518, 527 (7th Cir. 2012); *New Mexico ex rel. Richardson v. Bureau of Land Mgmt.*, 565 F.3d 683, 703 (10th Cir. 2009.

*Brand X Internet Servs*., 545 U.S. 967, 981 (2005).  And an agency's explanation complies with the APA if: (1) the agency "display[s] awareness that it *is* changing position"; (2) "the new policy is permissible under the statute"; (3) "there are good reasons for" the new policy; and (4) "the agency *believes* [the new policy] to be better." *FCC v. Fox Television Stations, Inc*., 556 U.S. 502, 515-16 (2009) (emphasis in original).

CEQ satisfied that test in explaining why it revised Section 1503.3(a)–(b) of the 2020 Rule, which had stated that a litigant waived arguments not made with specificity in public comments.  Pls.' Reply at 27-28.  CEQ explained that requiring undue specificity from commenters during the administrative process could inhibit public participation by "imply[ing] that commenters must either be an expert on the subject matter or hire an expert to provide the necessary level of detail."  89 Fed. Reg. 35,512; *see also id*. ("the text [in Section 1503.3 of the 2020 Rule] could be read to imply that commenters are under an obligation to collect or produce information necessary for agencies to fully evaluate issues raised in comments even if the commenters do not possess that information or the skills necessary to produce it").  That the States disagree with that policy outcome is irrelevant.  CEQ need only show that its determination was reasonable.  *See Voyageurs Nat'l Park Ass'n v. Norton*, 381 F.3d 759, 763 (8th Cir. 2004) ("If an agency's determination is supportable on any rational basis, [the court] must uphold it" under the APA).

CEQ also adequately explained why it deleted former Section 1500.3(d), which had previously expressed CEQ's views about proportionate judicial remedies.  Pls.' Resp. at 28.  The States contend that the agency's rationale conflicts with Section 1500.3(b) of the 2024 Rule, which also states "intentions" about how and when courts should review NEPA compliance.  *Id*. But Section 1500.3(b) merely recites the APA's threshold requirements.  89 Fed. Reg. 35,555;

*see* 5 U.S.C. § 704 (only "final agency action for which there is no other adequate remedy in a court are subject to judicial review"); *id*. § 706 ("due account shall be taken of the rule of prejudicial error.")).  That is markedly different from directing courts on how they should exercise remedial discretion, as former Section 1500.3(d) purported to do.

Last, the States assert that their purported reliance interests are sufficient to obligate CEQ to provide additional explanation of the Rule's changes even absent any showing of "injury." Pls.' Resp. at 26-27.  As explained in CEQ's opening brief, CEQ Mem. at 49, but ignored in the States' response, a plaintiff must provide more than "general assertions of reliance."  *Am. Petroleum Inst. v. U.S. Dep't of Interior*, 81 F.4th 1048, 1061 (10th Cir. 2023).  Baldly asserting the 2024 Rule "causes injury in spades," Pls.' Resp. at 27, is not enough.

In any event, the States are incorrect that the rule interferes with their purportedly longstanding ability to prepare NEPA documents.  *Id*.[16]  Both the 2020 and 2024 Rules allow an applicant (or its contractor) to prepare an environmental assessment ("EA") or an EIS.  The only substantive difference is that under the 2024 Rule an applicant (or its contractor) cannot prepare a Notice of Intent to issue an EA or EIS or a Finding of No Significant Impact.  89 Fed. Reg. 35,574 (Section 1507.3(c)(12)(iii)).  That change implements the FRA, which provides that project sponsors are permitted to prepare only EAs and EISs.  42 U.S.C. § 4336a(f).

The States are similarly wrong that the Rule will result in delayed projects, Pls.' Resp. at 27, given the Rule implements the FRA's deadlines for completion of NEPA analysis.  And though the States argue the Rule fails to provide enough time for agencies to develop their own implementing procedures, *id*. at 27, Section 1507.3(b) both the 2020 and 2024 Rules provide the

---

[16]    If the States are arguing the Rule prevents them from preparing documents as joint lead agencies, that claim is belied by the text of the Rule.  *See* 89 Fed. Reg. 35,574 (Section 1507.3(c)(12)).

same 12-month timeframe for agencies to propose implementing procedures, 85 Fed. Reg.

43,373, and the States do not elaborate on why that standard is now arbitrary.  Nor are agencies

required to finalize their regulations within that timeframe.  Instead, they need only develop

proposed procedures for CEQ review.  Because most agencies will only need to update their

existing procedures, 12 months is sufficient.  *See* AR_26801-02.

### IV.    The 2024 Rule Did Not Require Further NEPA Analysis.

Though they argue otherwise, the States' claims of economic injury do not put them

within NEPA's zone of interests, and they consequently cannot establish prudential standing to

challenge the Special EA prepared by CEQ.  *See* CEQ Mem. at 50-51.  The States contend that

prudential standing is satisfied simply by allegations of "all relevant considerations."  Pls.' Resp.

at 29.[17]  Not so.  To pursue a NEPA claim, the States must allege harm within the scope of

*NEPA's* purposes.  And courts, including the Eighth Circuit, have made clear economic interests

alone are not within the scope of NEPA.  *See Cent. S.D. Coop. Grazing Dist. v. Sec'y of the U.S.*

*Dep't. of Agric.*, 266 F.3d 889, 895 (8th Cir. 2001) ("Economic interests alone are 'clearly not

within the zone of interests to be protected by [NEPA].'" (citation omitted)); *see also*

*Gunpowder Riverkeeper v. FERC*, 807 F.3d 267, 274 (D.C. Cir. 2015) ("[t]he zone of interests

protected by the NEPA is, as its name implies, environmental; economic interests simply do not

fall within that zone.").  Thus, the States must assert an environmental harm to come within the

relevant zone of interests.  *See Cent. S.D. Coop.*, 266 F.3d at 895-96 ("NEPA's procedures are

not implicated unless a plaintiff has an environmental injury at stake").

---

[17]    The States cite *Friend of the Boundary Water Wilderness v. Dombeck*, 164 F.3d 1115
(8th Cir. 1999), to support this proposition.  But that case acknowledges that economic and social
effects may be considered together with environmental ones, not as a basis for standing by
themselves.  *Id*. at 1125-26.  Further, the court explicitly noted that the plaintiffs there had
alleged an environmental harm.  *Id*. at 1126.

Though the States assert to the contrary, Pls.' Resp. at 29, the harms they allege are plainly economic. For example, they claim that the Final Rule "will affect . . . any additional *funding* and permitting for" the Northwest Area Water Supply project, as well as pose "litigation risk" and strain "financial resources" for North Dakota's Southwest Pipeline Project. *See id*. at 13 (emphasis added). They also claim that transportation projects in West Virginia will "require additional staffing" and additional financial expenditures, *see id*. at 14, that the 2024 Rule will subject Texas, Florida, and Utah to "increased lawsuits," and that the "Final Rule's added requirements and complexity will . . . result [in] *economic* harm to Texas." *Id*. at 16-17 (emphasis added). Yet those allegations facially center on economic harm alone—lawsuits, funding, and additional staffing—rather than any environmental harm.

Finally, the States do nothing to dispel the notion that this claim was an afterthought, at best. Notably, their prayer for relief does not even include a request with respect to this claim. *See* Am. Compl. at 29 (ECF No. 39). And the States failed to raise any concerns with CEQ's NEPA review during the public comment period. The draft Special EA was available for comment from July 31, 2023 until September 29, 2023. *See* 89 Fed. Reg. 35,447; *see also* AR_66-74 (draft Special EA). But the States raised no concerns in their comments. *See* AR_27339-356 (comment letter by the Attorneys General of Iowa and 23 other states); AR_27234-241 (comment letter by North Dakota). If the States objected to the sufficiency of the Special EA, they should have "structure[d] their participation so that it . . . alert[ed] [CEQ]" to their positions." *Pub. Citizen*, 541 U.S. at 764 (quoting *Vt. Yankee*, 435 U.S. at 553). Instead, the States have never articulated any specific deficiencies in the Special EA, and the Court should disregard their bald and late-arriving argument now.

**V.     The 2024 Rule Does Not Present a "Major Question."**

The States also fail to show that the 2024 Rule falls within the "small category of 'extraordinary cases' in which the 'history and the breadth of the authority that the agency has asserted,' and the 'economic and political significance' of that assertion [of authority], provide a reason to hesitate before concluding that Congress meant to confer such authority."  CEQ Mem. at 53-54 (quoting *West Virginia v. EPA*, 597 U.S. 697, 721-23 (2022) (quotation omitted)).

This is not a case in which the agency is "claim[ing] to discover in a long-extant statute an unheralded [regulatory] power" or undertaking a "transformative expansion in [its] regulatory authority."  *See West Virginia*, 597 U.S. at 724 (quotation omitted).  Instead, CEQ issued the Rule under the same well-established statutory authority that it has acted under for 40 years, 42 U.S.C. § 4334, authority the Supreme Court has recognized provides CEQ with the "authority to issue regulations interpreting" NEPA's mandates.  *Pub. Citizen*, 541 U.S. at 757; *see also United States v. White*, 97 F.4th 532, 540 (7th Cir. 2024) (court's recognition of agency's "broad statutory power" to regulate foreclosed "major questions" claim).

The States' colorful descriptions of the Rule do not change these essential facts.  *See* Pls.' Resp. at 30 (mischaracterizing regulations as "transformative" attempt to dictate "environmental outcomes").  Nor, for the same reason, can the States now assert that CEQ is somehow seeking to regulate economic activity.  *Id*. at 30-31.  The 2024 Rule, like the 2020 Rule before it, governs the procedures Federal agencies must follow in conducting environmental reviews.  *See, e.g.*, *Bradford v. U.S. Dep't of Lab.*, 101 F.4th 707, 726 (10th Cir. 2024) (rejecting "major questions" doctrine challenge and explaining that "when the government acts 'in its capacity as . . . manager of its internal operation,' it 'has a much freer hand' than when it 'exercise[s] its sovereign power to regulate.'" (citing *NASA v. Nelson*, 562 U.S. 134, 148 (2011)).

The Court should thus decline to apply the "major questions" doctrine.

**VI.    The States Fail to Show that _Vacatur_ of the Rule is Appropriate.**

Finally, the States' response on remedy is telling for what it avoids: (1) a discussion of whether vacatur is appropriate under the APA, *see* CEQ Mem. at 54-55; or (2) whether application of the *Allied-Signal* factors warrants vacatur, *see* CEQ Mem. at 55.

In addition, the States' contradictory response demonstrates why additional briefing on remedy would be necessary if the Court disagrees with CEQ's positions.  For example, the States now claim that they do not seek to re-install the 2020 Rule wholesale, but just those portions of that Rule that were not modified by CEQ's 2022 Phase 1 rulemaking.  Pls.' Resp. at 32.  Further, the States continue to overlook that portions of the 2024 Rule integrate provisions of the current NEPA statute (as amended by the FRA) and are not amenable to vacatur.[18]  Thus any vacatur would need to be carefully tailored.

Finally, the States argue without support that the 2024 Rule's severability clause is "not determinative."  Pls.' Resp. at 33.  But cases assessing the appropriateness of severability demonstrate the efficacy of further briefing on remedy, given severability involves a detailed review of the agency's rationale for adopting the provisions at issue.  *See, e.g.*, *New York v. U.S. Dep't of Health and Human Servs.*, 414 F. Supp. 3d 475, 577 (S.D.N.Y. 2019).

Thus, even if the Court finds it has jurisdiction and grants summary judgment to the States, Federal Defendants request that the Court exercise its discretion and order supplemental briefing so that proper remedy can be appropriately tailored to the facts of the case.

---

[18]    The States' contention that CEQ could "readily" issue a subsequent rulemaking to ensure consistency with the FRA ignores the complexities inherent in any substantive rulemaking endeavor.  *See, e.g.*, Executive Order 12866, 58 Fed. Reg. 51, 735 (Sept. 30, 1993).

## CONCLUSION

For the foregoing reasons, Federal Defendants request that the Court deny Plaintiffs'

request for summary judgement and grant summary judgment to Defendants on all counts.

Respectfully submitted this 11th day of October, 2024,

TODD KIM
Assistant Attorney General
United States Department of Justice
Environment & Natural Resources Division

*/s/ Gregory M. Cumming*
GREGORY M. CUMMING
PAUL G. FREEBORNE
SAMANTHA G. PELTZ
Environment & Natural Resources Division
Natural Resources Section
150 M St., N.E.
Washington, D.C. 20002
(202) 305-0457 (phone)
(202) 598-0414 (cell)
gregory.cumming@usdoj.gov
paul.freeborne@usdoj.gov
samantha.peltz@usdoj.gov