IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA
BISMARK DIVISION

| | |
|---|---|
| STATE OF IOWA, et al.,<br><br>     Plaintiffs,<br><br>  v.<br><br>COUNCIL ON ENVIRONMENTAL QUALITY, and BRENDA MALLORY, in her official capacity as Chair,<br><br>     Defendants,<br><br>ALASKA COMMUNITY ACTION ON TOXICS, et al., and STATE OF WASHINGTON, et al.<br><br>     Intervenor-Defendants. | NO. 1:24-cv-00089-DMT-CRH |

**REPLY MEMORANDUM IN SUPPORT OF CROSS-MOTION FOR
SUMMARY JUDGMENT**

**TABLE OF CONTENTS**

I.    INTRODUCTION.................................................................................................. 1

II.   ARGUMENT ...................................................................................................... 1

    A.   The Final Rule Is Consistent with NEPA's Procedural Mandate............................ 1

    B.   The Final Rule Does Not Add Substantive Policy Mandates Exceeding
         NEPA's Scope ........................................................................................ 6

         1.   The Final Rule does not elevate consideration of environmental justice
             and climate change concerns.................................................................... 6

         2.   The Final Rule's mitigation provisions support the appropriate level of
             review for a Federal agency action .................................................. 9

         3.   The Final Rule appropriately guides the use of categorical exclusions ........... 10

         4.   Requiring identification of the environmentally preferable alternative in
             an Environmental Impact Statement does not violate NEPA ......................... 12

         5.   The Final Rule does not unlawfully require consideration of Indigenous
             Knowledge or elevate it above other considerations......................... 14

         6.   The Final Rule is consistent with NEPA in recognizing the global nature
             of some environmental effects ......................................................... 15

    C.   The Final Rule is Rationally Supported and Explained........................................... 16

         1.   CEQ Adequately Explains the Changes It Made in the Final Rule ................. 17

         2.   CEQ Provided Adequate Justifications for the Changes Adopted in the
             Final Rule .................................................................................. 21

         3.   The Final Rule Does Not Add Uncertainty and Is Reasonably Explained ...... 22

         4.   Plaintiff States Have Not Shown Any "Reliance Interests" Upset by the
             Final Rule .................................................................................. 25

    D.   The Final Rule Does Not Violate the Major Questions Doctrine............................ 26

    E.   Simple Vacatur Is Not the Appropriate Remedy .................................................... 29

    F.   Plaintiff States Mischaracterize Defendant States' Standing Arguments................ 31

III.  CONCLUSION .................................................................................................. 32

# TABLE OF AUTHORITIES

## Cases

*Akeyo v. O'Hanlon,*
  75 F.3d 370 (8th Cir.1996) ................................................................ 12

*Allied-Signal, Inc. v. U.S. Nuclear Regul. Comm'n,*
  988 F.2d 146 (D.C. Cir. 1993) ........................................................ 29, 30

*Am. Petroleum Inst. v. U.S. Dep't of Interior,*
  81 F.4th 1048 (10th Cir. 2023) .......................................................... 25

*Andrus v. Sierra Club,*
  442 U.S. 347 (1979) ............................................................................ 5

*Ctr. For Biological Diversity v. Nat'l Highway Transportation Safety Admin.,*
  538 F. 3d 1172 (9th Cir. 2008) ............................................................ 7

*Encino Motorcars, LLC v. Navarro,*
  579 U.S. 211 (2016) .......................................................................... 17

*FCC v. Fox Television Stations, Inc.,*
  556 U.S. 502 (2009) ............................................................ 17, 18, 19, 23

*Kleppe v. Sierra Club,*
  427 U.S. 390 (1976) ............................................................................ 5

*Mid States Coalition for Progress v. Surface Transp. Bd.,*
  345 F.3d 520 (8th Cir. 2003) ............................................................... 7

*Missouri v. Biden,*
  112 F.4th 531 (8th Cir. 2024) ................................................... 26, 27, 28

*Nat'l Audubon Soc'y v. Hoffman,*
  132 F.3d 7 (2d Cir. 1997) .................................................................... 9

*Nat'l Cable & Telecomms Ass'n v. Brand X Internet Servs.,*
  545 U.S. 967 (2005) .......................................................................... 17

*Public Lands for the People, Inc. v. U.S. Dept. of Agric.,*
  No. CIV. S-09-1750 LKK/JFM, 2010 WL 5200944 (E.D. Cal. Dec. 15, 2010), *aff'd,*
  697 F.3d 1192 (9th Cir. 2012) ............................................................. 5

*Robertson v. Methow Valley Citizens Council,*
  490 U.S. 332 (1989) ......................................................................... 3, 4

*Sierra Club v. Fed. Energy Regulatory Comm.,*
  867 F.3d 1357 (D.C. Cir. 2017) ........................................................... 7

ii

*Voyageurs Nat. Park Ass'n v. Norton*,
   381 F.3d 759 (8th Cir. 2004) ................................................................ 28

*West Virginia v. Env't Prot. Agency*,
   597 U.S. 697 (2022) ................................................................ 26, 27, 28

*WildEarth Guardians v. U.S. Bureau of Land Mgmt.*,
   870 F.3d 1222 (10th Cir. 2017) ........................................................ 7, 8

## Statutes

42 U.S.C. § 4321 ........................................................................... 4, 6

42 U.S.C. § 4322 ............................................................................. 6

42 U.S.C. § 4331(b)(2) ...................................................................... 7

42 U.S.C. § 4331(c) .......................................................................... 7

42 U.S.C. § 4332 ............................................................................. 2

42 U.S.C. § 4332 (2)(c)(i) .................................................................. 14

42 U.S.C. § 4332(2)(C)-(i) ................................................................... 6

42 U.S.C. § 4332(2)(C)(ii) .................................................................. 16

42 U.S.C. § 4332(2)(C)(v) ................................................................... 15

42 U.S.C. § 4332(2)(E) ...................................................................... 14

42 U.S.C. § 4332(2)(F) ...................................................................... 16

42 U.S.C. § 4332-4332(B) .................................................................... 14

42 U.S.C. § 4336 a(f) ....................................................................... 21

42 U.S.C. § 4336a(e) ........................................................................ 22

42 U.S.C. § 4336a(g) ........................................................................ 22

42 U.S.C. § 4336c ........................................................................... 11

42 U.S.C. § 4332(1) ....................................................................... 3, 4

## Other Authorities

76 Fed. Reg. 35512 (June 17, 2011) ...................................................... 9, 10

86 Fed. Reg. 34154 (July 29, 2021) ......................................................... 29

86 Fed. Reg. 55757 (Nov. 22, 2021) ...................................................................... 29

87 Fed. Reg. 23453 (April 20, 2022) ...................................................................... 29

88 Fed. Reg. 1196 (January 9, 2023) ...................................................................... 23

89 Fed. Reg. 35442 (May 1, 2024) .................................................................. passim

115 Cong. Rec. 40416 ............................................................................................ 4

Exec. Order No. 12898 ........................................................................................... 8

Exec. Order No. 14008 ........................................................................................... 8

Exec. Order No. 14096 ........................................................................................... 8

Fiscal Responsibility Act,
   P.L. 118-5 (June 3, 2023) ................................................................................. 11

## Regulations

2024 National Environmental Policy Act Implementing Regulations Revisions Phase 2,
   89 Fed. Reg. 35442 (May 1, 2024) ..................................................................... 1

40 C.F.R. § 1500.3(b) (2020) .............................................................................. 19

40 C.F.R. § 1500.3(d) ................................................................................. 17, 18, 19

40 C.F.R. § 1500.3(d) (2020) .............................................................................. 19

40 C.F.R. § 1501.4 .............................................................................................. 10

40 C.F.R. § 1501.4(b) .......................................................................................... 11

40 C.F.R. § 1502.16 ............................................................................................ 24

40 C.F.R. § 1502.22 ............................................................................................ 14

40 C.F.R. § 1502.5 .............................................................................................. 21

40 C.F.R. § 1502.7 .............................................................................................. 21

40 C.F.R. § 1503.3 .............................................................................................. 17

40 C.F.R. § 1503.3 (2020) .............................................................................. 18, 20

40 C.F.R. § 1505.2(c) ........................................................................................ 9, 10

40 C.F.R. § 1505.2(c) (1978) ................................................................................. 9

40 C.F.R. § 1505.3 (1978) ..................................................................................... 9

40 C.F.R. § 1505.3(a) ............................................................................................. 9

40 C.F.R. § 1505.3(e) ............................................................................................. 10

40 C.F.R. § 1506.5 ................................................................................................. 21

40 C.F.R. § 1506.5(a)-(d) ...................................................................................... 21

40 C.F.R. § 1506.6(b) ............................................................................................ 15

40 C.F.R. § 1507.3(b) ............................................................................................ 22

40 C.F.R. § 1508.1(e) ............................................................................................ 10

40 C.F.R. § 1508.1(f) ............................................................................................. 23

40 C.F.R. § 1508.1(m) ........................................................................................... 23

40 C.F.R. § 1508.1(o) ............................................................................................ 11

40 C.F.R. § 1508.4 (1978) ..................................................................................... 11

40 C.F.R. § 1508.7 (1978) ..................................................................................... 7

40 C.F.R. §1502.14(f) ........................................................................................... 12

40 C.F.R. §1502.16 (a)(5) ..................................................................................... 24

40 C.F.R. § 1505.2(b) (1978) ................................................................................ 13

# I.    INTRODUCTION

The Council on Environmental Quality ("CEQ") 2024 regulatory updates to the

National Environmental Policy Act's ("NEPA") implementing regulations lawfully support

meaningful environmental review of federal agency actions and ensure informed federal

decision making in accordance with the text and purpose of the statute. CEQ supported each

change with thorough analysis and operated within its statutory authority. Plaintiff States'

Motion for Summary Judgment incorrectly alleged CEQ's 2024 rulemaking exceeded CEQ's

authority and violated the law based largely on policy disagreements with the rulemaking. On

Reply, Plaintiff States fail to salvage any of their arguments. Plaintiff States' challenge is

wholly without merit and should be rejected.

# II.    ARGUMENT

CEQ's changes to the NEPA regulations implemented in the 2024 National

Environmental Policy Act Implementing Regulations Revisions Phase 2, 89 Fed. Reg. 35442

(May 1, 2024) ("Final Rule") do not introduce substantive policy mandates, are rationally

supported by the record before the agency, and do not implicate the major questions doctrine.

## A.    The Final Rule Is Consistent with NEPA's Procedural Mandate

The Final Rule's regulatory changes recognize NEPA's procedural nature and support

meaningful environmental review of federal agency actions. Despite Plaintiff States'

arguments on Reply, they still fail to identify any specific provision in the Final Rule that

mandates a substantive outcome or does more than compel "consideration" by federal agencies

of impacts on the environment as required by NEPA. *See* Iowa Reply in Support of Summary

Judgment ("Iowa Reply") at 12-15, Dkt. 98. And, contrary to Plaintiff States' assertions, CEQ

did not "imbue the statute with substantive requirements and policy objectives" by referencing the policy provisions of NEPA. *See* Iowa Reply at 12.

In their motion for summary judgment, Plaintiff States point to the removal of language that was in the Update to the Regulations Implementing the Procedural Provisions of the National Environmental Policy Act, 85 Fed. Reg. 43304 (July 16, 2020) (formerly at 40 C.F.R. § 1500.1(a); AR43436) ("2020 Rule") concerning NEPA's procedural nature and the Final Rule's inclusion of "action-forcing" language as evidence of a substantive requirement. *See* Plaintiff States Memorandum in Support of Summary Judgment ("Iowa Br.") at 20-21, Dkt. 65 (citing 89 Fed. Reg. 35450, 35554 (§ 1500.1(a)(2)); AR43437). Plaintiff States' Reply does not provide a better explanation than their motion for how these regulatory provisions impose a substantive mandate. Iowa Reply at 12-15; 42 U.S.C. § 4332(2)(B). Plaintiff States read meaning into those changes that simply does not exist in the plain language of the regulations.

First, the Final Rule's removal of language stating that NEPA is "a procedural statute" does not change the meaning of any provision in NEPA or its implementing regulations. NEPA's plain language and years of case law interpreting it, as cited by Plaintiff States, make clear that NEPA is and will remain a procedural statute. *See generally* 42 U.S.C. § 4332, Defendant States Opposition to Motion for Summary Judgment ("Def. States Op.") at 18, Dkt. 85, Iowa Reply at 13-14.

Second, in pointing out that the Final Rule supports the purposes of NEPA by "forcing" agencies to consider impacts on the environment during agency decision making, Defendant States are not admitting that the Final Rule imposes novel substantive requirements or alters "[NEPA's procedural] precedent." Iowa Reply at 14. Plaintiff States mischaracterize

2

Defendant States' arguments and the statutory commands of NEPA. Rather, Defendant States simply state the unremarkable fact that the regulations implement the text and purpose of NEPA by requiring agencies to *consider* environmental issues in their decision making. *See, e.g.* 42 U.S.C. § 4332(1) (directing agencies to act "in accordance with the policies set forth in this [Act].") The Supreme Court long ago approved NEPA's "action forcing" elements when it explained that such analysis is "almost certainly likely to affect the agency's substantive decision" even if "NEPA itself does not mandate particular results, but simply prescribes the necessary process." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989) ("Robertson").[1]  In short, the Final Rule "forces" agencies to do only what the statute demands: consider environmental impacts when they make important decisions.

Most importantly, under the Final Rule, as under the 2020 Rule, so long as an agency examines the environmental consequences of its proposed action, it remains free to choose any appropriate course of action, even one that will have significant effects. *Robertson*, 490 U.S. at 350 ("If the adverse environmental effects of the proposed action are adequately identified and evaluated, the agency is not constrained by NEPA from deciding that other values outweigh the environmental costs.") The Final Rule requires transparent analysis, public engagement, and robust considerations of the environmental consequences and alternatives to federal projects consistent with the text of NEPA, all of which foster better federal agency decision

---

[1] Plaintiff States argue that *Robertson*'s reference to NEPA being "action-forcing" only referred to NEPA documents themselves and not to substantive outcomes. Iowa Reply at 14, citing *Robertson,* 490 U.S. at 349. Forcing the production of environmental review documents is precisely the point of the mandate to conduct environmental review of impacts. This assessment of potential effects is presented to the decisionmakers and the public in environmental impact statements and does not require substantive outcomes and Plaintiff States fail to prove otherwise.

making; but the Final Rule does not dictate a particular outcome. Def. State Opp. at 17; 42 U.S.C. § 4321-4347. As CEQ explained in the Final Rule, engaging in NEPA analysis often facilitates better "environmental outcomes." 89 Fed. Reg. 35495, 35450, 35442; AR28762. But NEPA does not require them. Plaintiff States distort Defendant States' words to claim otherwise. Rather than claim that "NEPA's policy provisions place environmental benefits above all other aims and indicia of the public welfare," Iowa Reply at 13, Defendant States acknowledged that NEPA clearly and unambiguously promotes a policy of environmental protection. Def. State Opp. at 17; *see* 42 U.S.C. § 4321 ("The purposes of this [Act] are: … to promote effects which will prevent or eliminate damage to the environment and biosphere and stimulate the health and welfare of man.").

Finally, CEQ does not attempt to import a substantive mandate into NEPA by referring to the policy language in Section 101. Iowa Reply at 12. NEPA itself mandates in Section 102 that federal agencies act in accordance with Section 101. 42 U.S.C. § 4332(1). Section 101's policy provisions do not imbue the statute with "substantive requirements," Iowa Reply at 12, but rather, as the Supreme Court recognized, they provide policy objectives consistent with Congress' intent to ensure environmental policy was "infused into the ongoing programs and actions of the Federal Government." *Robertson*, 490 U.S. at 348 (citing 115 Cong. Rec. 40416). NEPA's legislative history indicates that Congress intended Section 101 to "establish[] priorities and gives expression to our national goals and aspirations" and "provide[] a statutory foundation to which administrators may refer to [] for guidance in making decisions." Conference Report on NEPA, 115 Cong. Rec. 40416. So, while Section 101 of the Act does not specify the contents of an environmental review or the outcome an agency should choose,

its provisions guide agency decision making under Section 102, which is precisely how CEQ (and Defendant States) employ it here. *Contra* Iowa Reply at 12.

Plaintiff States' citation to *Public Lands for the People, Inc. v. U.S. Dept. of Agric.,* No. CIV. S-09-1750 LKK/JFM, 2010 WL 5200944 (E.D. Cal. Dec. 15, 2010), *aff'd*, 697 F.3d 1192 (9th Cir. 2012) for the proposition that introductory paragraphs in statutes are not binding is unavailing. Iowa Reply at 12. That case discusses the policy provisions of a different statute and in a very different context. *Id*. There, the Court found that a policy section of the Federal Land Policy Management Act did not confer an "undisputed right" for miners to access their mining claims "without interference." *Id*. at *8. In this case, no one claims that Section 101 of NEPA grants an "undisputed right" to a substantive outcome under NEPA. Rather, consistent with case law, the policy provisions in Section 101, as implemented through the process set forth in Section 102, "assure consideration of the environmental impact of [federal agency actions] in decisionmaking." *Kleppe v. Sierra Club*, 427 U.S. 390, 409 (1976) (citing Conference Report on NEPA, 115 Cong. Rec. 40416 (1969)); *see also* Def. State Op. at 18-19. Where the Supreme Court has specifically considered Section 101, it recognized Congress' intent to include in NEPA "action-forcing procedures which will help to insure that the policies [of the Act] are implemented." *Andrus v. Sierra Club*, 442 U.S. 347, 350 (1979) (citing S.Rep.No.91–296, p. 19 (1969)). Thus, while Section 101 does not mandate specific substantive outcomes, it does provide a guiding national environmental policy to be implemented by federal agencies through NEPA, including Section 102.

**B.    The Final Rule Does Not Add Substantive Policy Mandates Exceeding NEPA's Scope**

NEPA itself embodies a policy preference – the policy preference expressed by Congress in enacting NEPA and enumerated in the statute. *See* 42 U.S.C. §§ 4321, 4322. Contrary to Plaintiff States' arguments, CEQ adhered to these directives in the Final Rule by ensuring proper consideration of environmental effects, as contemplated by Congress, without mandating substantive results.

**1.    The Final Rule does not elevate consideration of environmental justice and climate change concerns**

CEQ's actions to ensure consideration of climate change and environmental justice environmental effects through the Final Rule align with the text of NEPA and federal policy as well as existing case law interpreting NEPA. Plaintiff States incorrectly claim that CEQ focuses on its policy priorities (making climate change and environmental justice "centerpieces of the regulation") to the exclusion of other environmental impacts. Iowa Reply at 15-16. First, they complain that the Final Rule "adds requirements that appear nowhere in NEPA's statutory text nor in the NEPA implementing regulations which existed before the Final Rule." *Id.* Next, they contend that CEQ creates substantive requirements by mandating that both climate change and environmental justice be considered in NEPA reviews as an environmental effect, and that greenhouse gas emissions be quantified, where feasible. Iowa Reply at 16. Finally, they claim that CEQ has wrongly asserted its own policy preferences into NEPA reviews without authority. Iowa Reply at 15. Each of these arguments rings hollow.

NEPA and its implementing regulations require federal agencies to assess the "reasonably foreseeable environmental effects" of a federal agency action "significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C)-(i). Further, NEPA

6

plainly says that the federal government has a responsibility to assure "*all* Americans safe, healthful, productive, and esthetically and culturally pleasing surroundings," 42 U.S.C. § 4331(b)(2) (emphasis added), and states "that *each person* should enjoy a healthful environment" 42 U.S.C. § 4331(c) (emphasis added). This broadly drafted text supports analysis of climate change and environmental justice, which are elements of the human environment. *Id*. Additionally, cumulative impacts analysis—which focuses in part on each affected community and has been specified in implementing regulations since 1978—is tied to disparate impacts on people. *See, e.g.* 40 C.F.R. § 1508.7 (1978). NEPA's mandate to analyze environmental effects does not specify which kinds of environmental effects an agency should or should not analyze beyond those that are reasonably foreseeable, but rather requires analysis of reasonably foreseeable effects, including reasonably foreseeable effects that may have disparate impacts or relate to climate change.

Numerous courts have acknowledged that both climate change and environmental justice can be important aspects of an action's environmental impacts. *Ctr. For Biological Diversity v. Nat'l Highway Transportation Safety Admin.*, 538 F. 3d 1172, 1217 (9th Cir. 2008); *WildEarth Guardians v. U.S. Bureau of Land Mgmt.*, 870 F.3d 1222 (10th Cir. 2017); *Mid States Coalition for Progress v. Surface Transp. Bd.,* 345 F.3d 520, 541 (8th Cir. 2003); *Sierra Club v. Fed. Energy Regulatory Comm.*, 867 F.3d 1357, 1370 (D.C. Cir. 2017). Therefore, the Final Rule's explicit inclusion of climate change and environmental justice does not constitute a change in policy under NEPA. Plaintiff States fail to explain how these types of effects can or should be exempted from NEPA review. Where reasonably foreseeable

environmental effects involve climate change or impacts to overburdened communities, NEPA does not allow agencies to turn a blind eye.

Whether the issue of climate change is part of any federal administration's policy agenda is not relevant here. *Contra* Iowa Reply at 15-16. As Defendant States previously pointed out, climate change analysis under NEPA is not a new concept, as reflected in decades of CEQ guidance to agencies. Def. State Opp. at 23. In addition, federal courts have repeatedly recognized that analysis of climate change impacts is required under NEPA. *Id.*, citing to *Ctr. for Biological Diversity v. Nat'l Highway Transportation Safety Admin.*, 538 F.3d 1172, 1217 (9th Cir. 2008) ("[t]he impact of [greenhouse gas] emissions on climate change is precisely the kind of cumulative impacts analysis that NEPA requires."); 89 Fed. Reg. at 35452 n.58; AR28772; *WildEarth Guardians v. U.S. Bureau of Land Mgmt.*, 870 F.3d 1222 (10th Cir. 2017); AR27881.

Similarly, consideration of environmental justice impacts as part of NEPA analysis is not a new concept. Contrary to Plaintiff States' protestations, Iowa Reply at 17, this is an issue that has been addressed by presidential administrations for over thirty years. *See, e.g.* Exec. Order Nos. 12898, 14008, and 14096; AR 33077.

Finally, contrary to Plaintiff States' assertion, Defendant States do not attempt to use the State environmental laws discussed in their standing declarations to "buttress" the climate change and environmental justice aspects of the Final Rule. *See* Iowa Reply at 18.  Defendant States' declarations support a different argument: that Defendant States have important sovereign interests in the environment within their geographic borders, and that those interests will be injured if the Final Rule is vacated and the 2020 Rule is reinstated. *See, e.g.* Decl. S.

Reif (Dkt. 85-1), Decl. J. McGerr (Dkt. 85-2), Decl T. Kim (Dkt. 85-3), Decl. L. Weintraub (Dkt. 85-4), Decl G. Thompson (Dkt. 85-5).

> **2.    The Final Rule's mitigation provisions support the appropriate level of review for a Federal agency action**

Contrary to Plaintiff States' repeated assertions, the Final Rule does not create new substantive obligations to implement and monitor mitigation measures. The Final Rule only requires mitigation when an agency *chooses* to rely on mitigation measures identified in its environmental review as part of its decision on a proposed action. 40 C.F.R. § 1505.3(a). This requirement is found in previous versions of the regulations and is consistent with the NEPA statute. *See, e.g.* 40 C.F.R. §§ 1505.2(c), 1505.3 (1978). As CEQ explained in promulgating the Final Rule, it follows from the statutory requirement to identify "reasonably foreseeable environmental effects" that mitigation must be reasonably assured if the agency identifies reasonably foreseeable effects based on there being mitigation; if mitigation is not reasonably assured, the mitigated effects are not reasonably foreseeable. 76 Fed. Reg. at 35519; AR28839. Otherwise, an agency could evade the more searching review of an EIS simply by identifying potential mitigation measures that could reduce effects to less than significant levels, even if those measures have no real prospect of happening. *See, e.g., Nat'l Audubon Soc'y v. Hoffman*, 132 F.3d 7, 17 (2d Cir. 1997).

Similarly, the Final Rule does not create ongoing NEPA liability for failure to implement mitigation; it simply requires that an agency decision that assumes mitigation of effects enforces such mitigation through a monitoring and compliance plan. 40 C.F.R. § 1505.2(c). As CEQ explained in promulgating the Final Rule, monitoring and compliance plans ensure that mitigation will be carried out and bolster the integrity of the environmental

analysis. 76 Fed. Reg. at 35518-19; AR 28838-39. The plan requirement does not create

liability under NEPA for failure to adhere to the plan. Instead, the Final Rule provides that

plans may be enforced via "permit conditions, agreements, or other measures," 40 C.F.R. §

1505.2(c), such as permitting requirements under substantive laws like the Clean Water Act.

Nor does the plan requirement create liability or any ongoing obligation under NEPA

where implementation is ineffective. The Final Rule states an agency need not supplement its

environmental analysis or decision "based solely on new information developed through a

monitoring and compliance plan . . .  The ongoing implementation of a monitoring and

compliance plan shall not be considered an incomplete or ongoing Federal action." 40 C.F.R. §

1505.3(e). While Plaintiff States claim that project opponents and litigants will ignore the law

and seize on the plan requirement to "re-open" decisions made under NEPA, Iowa Reply at 20,

this is belied by the text of the Final Rule.

3.      **The Final Rule appropriately guides the use of categorical exclusions**

The Final Rule's revisions to the application of categorical exclusions ("CEs") do not

amount to substantive mandates, but rather revisions to ensure the use of CEs is in line with the

text and purposes of NEPA. CEs are a streamlined process designed for an action that

"normally does not have a significant effect on the human environment," but not a

determination that a particular action will *never* have such an effect. 40 C.F.R. § 1508.1(e).

While CEQ must approve a federal agency's new CEs, CEQ does not oversee implementation

of CEs each time they are used by a federal agency. *See* 40 C.F.R. § 1501.4. By design, the

application of CEs to agency actions occurs with limited oversight, highlighting the importance

of getting it right initially, when CEs are developed. Plaintiff States incorrectly argue that the

Final Rule inhibits the use of CEs by placing substantive restrictions on their use through the extraordinary circumstances review and structure for one agency adopting another's CEs. Iowa Reply at 21.

Under the Final Rule a federal agency must proceed with NEPA review of a categorically excluded action if there are extraordinary circumstances that mean the usually categorically excluded action may, in that instance, have significant environmental effects. 40 C.F.R. §§ 1501.4(b), 1508.1(o). The Final Rule notes as an example that extraordinary circumstances may include potential environmental justice concerns and potential climate change effects. 40 C.F.R. § 1508.1(o). Plaintiff States argue that reviewing extraordinary circumstances in this way defeats the purpose of CEs. Iowa Reply at 21. Plaintiff States do not and cannot explain why federal agencies, faced with potential significant effects from an otherwise categorically excluded action, should ignore them because they are climate change related or are felt by a community with environmental justice concerns. Nowhere does NEPA or the Fiscal Responsibility Act, P.L. 118-5 (June 3, 2023) ("FRA"), limit CEs in such a manner. *See, generally* 42 U.S.C. § 4336c. It can be true both that Congress encouraged the use of CEs and that CEQ is allowed to guide the use of CEs to ensure they are applied in accordance with NEPA.

Congress did not need to include text in the FRA dictating that federal agencies "consider extraordinary circumstances" when applying a CE, because this requirement was already in the NEPA regulations and had been since 1978. Iowa Reply at 21, 40 C.F.R. § 1508.4 (1978) ("Any procedures under this section shall provide for extraordinary circumstances in which a normally excluded action may have a significant environmental

effect."). As discussed above, the consideration of climate change and environmental justice is consistent with the text of NEPA and supported by case law. *See* Section II.B.1, supra.

The Final Rule's revisions regarding CEs thus do not amount to substantive mandates but rather revisions to ensure CE use is consistent with the text and purposes of NEPA.

### 4. Requiring identification of the environmentally preferable alternative in an Environmental Impact Statement does not violate NEPA

Plaintiff States improperly assert a new argument in their Reply that the timing of the identification of the environmentally preferable alternative in the Final Rule, 40 C.F.R. §1502.14(f) is *ultra vires*. Iowa Reply at 23. However, Plaintiff States do not articulate how earlier identification of an environmentally preferable alternative, which is also required in the 2020 Rule, is a substantive mandate that exceeds NEPA's scope.

As an initial matter, Plaintiff States improperly raise a new argument on Reply. The argument that it is the timing of the identification of the environmentally preferable alternative that is *ultra vires* was not mentioned in Plaintiff States' Motion and they have thus waived it on Reply. *Compare* Iowa Br. at 25-27 *with* Iowa Reply at 22-24; *See Akeyo v. O'Hanlon,* 75 F.3d 370, 374 n. 2 (8th Cir.1996) ("we do not address arguments raised for the first time in a reply brief.")

Even if the court considers this argument, it fails. Plaintiff States argue that moving the identification of an environmentally preferable alternative from the Record of Decision ("ROD") to the Environmental Impact Statement ("EIS") stage "increases the vulnerability to challenges that an agency did not properly consider the alternative with the fewest perceived net environmental impacts" and adds pressure on the federal agency to dismiss alternatives from further analysis that have greater perceived environmental impacts from the final EIS.

Iowa Reply at 23. However, Plaintiff States fail to explain how labeling an alternative the "environmentally preferable alternative" at the EIS stage rather than the ROD stage would lead to the agency to dismiss alternatives from further analysis or will place increased pressures on agencies "to not select" alternatives favoring development. Iowa Reply at 23. The federal agency would face the same "decision point" of which alternatives to analyze, whether it has identified the environmentally preferable alternative at the EIS or at the ROD stage. This requirement is not "new," as Plaintiff States note. Iowa Reply at 23. *See* 40 CFR § 1505.2(b) (1978) (providing that a Record of Decision must "[i]dentify all alternatives considered by the agency in reaching its decision, specifying the alternative or alternatives which were considered to be environmentally preferable.").

Finally, Plaintiff States assert that "the Final Rule itself nowhere countermands requiring creating a new alternative for the environmentally preferable alternative." Iowa Reply at 23. Their argument seems to be that because the Final Rule does not specifically state that it does not require creating an additional alternative for analysis in the EIS, it in fact *does* require an additional alternative for analysis in the EIS. *See* Iowa Reply at 23. This journey into the double negative fails to support Plaintiff States' point. The Final Rule does not explicitly require creation of an additional alternative, and Plaintiff States fail to show how it constructively requires such a creation.

Finally, contrary to Plaintiff States' arguments, Iowa Reply at 24, in characterizing the selection of the environmentally preferable alternative as a weighing of the costs and benefit of potential agency action, Defendant States do not call for a monetary cost-benefit analysis. Def. State. Opp. at 32.  Plaintiff States are correct that neither NEPA nor NEPA's implementing

regulations require a cost-benefit analysis. Iowa Reply at 24, 40 C.F.R. § 1502.22. However, NEPA does state that federal agencies "shall … use a systematic and interdisciplinary approach … [and] identify and develop methods and procedures, …, which will ensure the previously unquantified environmental amenities and values may be given appropriate consideration in decision making along with economic and technical considerations." 42 U.S.C. §§ 4332-4332(B). This consideration is akin to a weighing of costs and benefits, but it is not a full monetary cost-benefit analysis. Neither the Final Rule nor Defendant States' motion suggests the regulations have created a requirement for monetary cost-benefit analysis under NEPA.

Moving the selection of an environmentally preferable alternative from the ROD to the EIS is consistent with NEPA and not *ultra vires*.

### 5.    The Final Rule does not unlawfully require consideration of Indigenous Knowledge or elevate it above other considerations

The Final Rule's inclusion of Indigenous Knowledge is consistent with NEPA's mandate to use reliable data. 42 U.S.C. § 4332(2)(E). The recognition of Indigenous Knowledge as a high-quality information source for NEPA reviews recognizes the value of information held by tribes across the nation and is consistent with NEPA's mandate to analyze all reasonably foreseeable environmental effects. 42 U.S.C. § 4332 (2)(c)(i). Plaintiff States' arguments that CEQ improperly elevates Indigenous Knowledge to "special status" and that not providing a definition of Indigenous Knowledge increases litigation risk both fail. Iowa Reply at 24. Plaintiffs States mischaracterize the role of Indigenous Knowledge in the NEPA process and ignore CEQ's well-reasoned explanation (*see* Section II.C) for continuing to rely on existing definitions and processes for determining how to utilize Indigenous Knowledge in

NEPA reviews. Clarifying for federal agencies that they can and should use Indigenous

Knowledge to fulfill their obligations under NEPA does not somehow elevate Indigenous

Knowledge above other forms of information.

First, Plaintiff States' contention that CEQ improperly elevates Indigenous Knowledge

to "special status" by recognizing it as a source of high-quality information ignores the myriad

sources of information incorporated into the NEPA process. 40 C.F.R. § 1506.6(b), Iowa Reply

at 24-45. Plaintiff States argue that the Final Rule does not identify other stakeholders as being

sources of "reliable" information to be considered during the NEPA review process." Iowa

Reply at 24. However, the text of the NEPA statute explicitly incorporates the solicitation of

information from other stakeholders, including States. 42 U.S.C. § 4332(2)(C)(v) ("the

comments and views of the appropriate Federal, State, and local agencies, which are authorized

to develop and enforce environmental standards, shall … accompany the proposal through the

existing agency review processes."). While these State actors are not listed in the definition of

"reliable" information, their participation and the information they provide is already woven

throughout the NEPA process.

Secondly, Plaintiff States' attack the notion of Indigenous Knowledge as vague ignores

existing guidance. Iowa Reply Br. at 24. As explained below, CEQ adequately explained that

guidance already exists on the use of Indigenous Knowledge and agencies can use their

discretion in utilizing Indigenous Knowledge. *See* Section II.C.3, *infra*.

### 6. The Final Rule is consistent with NEPA in recognizing the global nature of some environmental effects

Plaintiff States wrongly contend that the Final Rule's consideration of global impacts is

not supported by the text of NEPA by claiming that NEPA's scope is not global. Iowa Reply at

25. However, Section 102 of NEPA requires that agencies disclose "any adverse environmental effects which cannot be avoided" if the agency action goes forward and to consider the larger context, directing them to "recognize the *worldwide* and long-range character of environmental problems." 42 U.S.C. § 4332(2)(C)(ii)*,* 4332(2)(F) (emphasis added). Thus, it is entirely consistent with NEPA and even explicitly mandated to consider potential global impacts of a federal agency action, including potential impacts due to climate change.

Each of these changes is consistent with the text of NEPA and supports meaningful environmental review.

## C.    The Final Rule is Rationally Supported and Explained

The Final Rule was supported by CEQ's thorough explanation, was consistent with the statute's purpose, and uses identifiable and intelligible terms. Consequently, Plaintiff States' complaints that CEQ did not sufficiently justify, explain, or clarify the rule changes are unavailing, and cannot support a Motion for Summary Judgment.

Plaintiff States' arguments fail for four reasons: First, the Final Rule is adequately explained by CEQ, consistent with NEPA's purpose, and not arbitrary and capricious. Second, the Final Rule is rationally supported by reasoned analysis and thousands of pages of analysis with more than nine-hundred pages spent responding to public comments. *See* AR 27821-AR 28762. And the record refutes Plaintiff States' specific claims. Third, Plaintiff States fail to support their argument that the Final Rule's use of the terms environmental justice, climate change and "Indigenous Knowledge" adds substantial uncertainty to environmental review under NEPA. Finally, Plaintiff States do not demonstrate they possess reliance interests which are adversely affected by the Final Rule.

1.    **CEQ Adequately Explains the Changes It Made in the Final Rule**

Plaintiff States contend that the Final Rule's changes are arbitrary and capricious given

their "unexplained inconsistency" with CEQ's recent views in the 2020 Rule. Iowa Reply at 27

(citing *Nat'l Cable & Telecomms Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 981 (2005)).

Plaintiff States identify two provisions in the Final Rule that supposedly illustrate this

"unexplained inconsistency": (1) removing language from former 40 C.F.R. § 1503.3 requiring

greater specificity in public comments to ensure their usefulness for NEPA analysis (AR

28832-34); and (2) removing CEQ's stated "intention" in former 40 C.F.R. § 1500.3(d) that

NEPA remedies must be proportional to the extent of NEPA violations. Iowa Reply Br. at 27.

Under the Administrative Procedure Act ("APA"), "[a]gencies are free to change their

existing policies as long as they provide a reasoned explanation for the change." *Encino*

*Motorcars, LLC v. Navarro*, 579 U.S. 211, 222 (2016). A "policy change" complies with the

APA if: (1) the agency "display[s] awareness that it is changing position"; (2) "the new policy

is permissible under the statute"; (3) "there are good reasons for" the new policy; and (4) "the

agency believes [the new policy] to be better." *FCC v. Fox Television Stations, Inc.,* 556 U.S.

502, 515-16 (2009) *("Fox")*. In adopting the changes referenced by Plaintiff States, CEQ

explained its reasons for changing its position and why it believes the new policy is better and

furthers the goals of NEPA. CEQ easily satisfies the standard established by *Fox. Id.* at 515-16.

Plaintiff States contend that CEQ failed to explain why it removed a requirement for

more specificity and detail in public comments that was added by the 2020 Rule. Iowa Reply

Br. at 27-28. In the 2020 Rule, CEQ revised former Section 1503.3 to require any commenters

to provide as much detail as necessary and describe their data, sources or methodologies. *See*

17

40 C.F.R. § 1503.3 (2020).  CEQ eliminated this language in the Final Rule, offering a lengthy

explanation and several reasons for electing to do so, including an explanation of why and how

the former requirements were overly burdensome on commenters and would impede public

participation. 89 Fed. Reg. 35512-14; AR 28832-33. CEQ explained that requiring such

specificity could "inappropriately restrict public comments and place unnecessary burden on

public commenters" who may have valuable information and perspective on a proposed action.

89 Fed. Reg. 35512. CEQ noted that the "text could be read to imply that commenters are

under an obligation to collect or produce information necessary for agencies to fully evaluate

issues raised in comments even if the commenters do not possess that information or the skills

necessary to produce it." *Id.* CEQ also commented that significant public support for

eliminating the specificity requirement exists and explained that it does not want commenters

who lack access to technical experts or consultants to face a barrier in commenting on projects.

*Id*.  CEQ adequately explained its reasoning and provided an appropriate basis for its change

— a basis that directly furthers a goal of NEPA by fostering public participation and informed

decision making. *Fox, supra,* at 515-16. Plaintiff States may disagree with CEQ's conclusion,

but that disagreement does not render the rulemaking or CEQ's decision to remove the

provision arbitrary and capricious.

     Likewise, CEQ adequately explained its revision to 40 C.F.R. § 1500.3(d) to remove

language added by the 2020 Rule concerning remedies and restore language from the 1978

regulations.  89 Fed. Reg. 35455; AR 28775.  In 2020, CEQ added language in 40 C.F.R. §

1500.3(d) stating CEQ's intention that the "regulations… create no presumption that violation

of NEPA is a basis for injunctive relief or for a finding of irreparable harm." 40 C.F.R. §

1500.3(d) (2020). In the rulemaking on the Final Rule, CEQ explained it considered the 2020

Rule's addition of language restricting judicial review to be "inappropriate" because the courts,

not CEQ, are best suited to determine the appropriate remedy for successful challenges to an

agency's NEPA compliance. 89 Fed. Reg. at 35455; AR 28775. Also, contrary to Plaintiff

States' suggestion, CEQ's explanation for rejecting a restriction on judicial review in Section

1500.3(d) is not in tension with CEQ's explanation for removing language in a different

provision, 40 C.F.R. § 1500.3(b) (2020), that established exhaustion requirements as a

precursor for judicial review of NEPA compliance. Unlike imposing restrictions on judicial

review, which is the province of the judicial branch itself to determine, CEQ's elimination of

language containing onerous exhaustion requirements is within the purview of the agency to

determine. CEQ states it "cannot compel members of the public or courts to resolve disputes

expeditiously," but that the revisions were made based on CEQ's recognition that it cannot

"dictate what timeline is appropriate for any particular case." 89 Fed. Reg. 35455; AR 28775.

Additionally, responding to comments on this issue, CEQ opted to retain some language from

40 C.F.R. § 1500.3(b) (2020) stating that "any allegation of noncompliance with NEPA and the

regulations… should be resolved as expeditiously as appropriate." 40 C.F.R. § 1500.3(b); 89

Fed. Reg. 35454; AR 28774.

Finally, Plaintiff States point to CEQ's arguments in this litigation as evidence that it

lacks awareness that the Final Rule contains policy changes in violation of the *Fox* standard.

Iowa Reply Br. at 26; *Fox, supra,* 556 U.S. at 515-16.  Plaintiff States contend that CEQ failed

to demonstrate awareness that it changed its position alleging that at times CEQ acknowledges

certain provisions of the Final Rule change policy, such as removing the specificity

requirement, in 40 C.F.R. § 1503.3 (2020), but at other times, CEQ argues that certain provisions of the Final Rule such as adding references to climate change, environmental justice, and Indigenous Knowledge do not alter CEQ's policy, and are instead consistent with NEPA and CEQ's long-standing policy. Iowa Reply Br. at 26.

However, CEQ's positions are not contradictory. The administrative record shows that CEQ clearly acknowledged when it adopted changes in the Final Rule that evince a change in policy from the 2020 Rule such as removing specificity requirements in public comments. *See* 89 Fed. Reg. 35512-14; AR 28832-34. Where CEQ revised any portion of the 2020 Rule, CEQ provided a reasonable explanation for doing so. Plaintiff States attack the inclusion of climate change and environmental justice as policy changes which CEQ defended as codifying long-standing existing NEPA practice. 89 Fed. Reg. 35452 at n. 58 (CEQ noted "consistent with section 102(2)(c) of NEPA, considerations of environmental justice and climate change-related effects have long been part of NEPA analysis."); AR 28772; 89 Fed. Reg. 35464; AR 28784. Even to the extent expressly adding climate change to the list "represent[s] a change in position from the 2020 Rule," CEQ adequately articulated "the agency's reasons for the change" in the preambles to the Phase 2 proposed rule and the Final Rule. AR 27881. CEQ also explained that adding climate change as an environmental effect to be considered addresses case law invalidating NEPA analyses that failed to consider reasonably foreseeable effects related to climate change. AR 27881 (listing cases).

As Plaintiff States do not cite to any specific provision or place where CEQ failed to explain its decision regarding a change in policy, their APA argument is not supported by evidence and should be rejected.

2.    **CEQ Provided Adequate Justifications for the Changes Adopted in the Final Rule**

Plaintiff States' arguments that CEQ failed to adequately justify changes in the Final Rule focus on only three provisions, but each of those arguments evaporates immediately upon examination. First, Plaintiff States incorrectly claim that 40 C.F.R. § 1506.5(a)-(d) restricts project sponsors or third-party preparation of NEPA documents without CEQ providing a "basis for reinstituting document preparation responsibilities on already overburdened federal agency resources." *See* Iowa Reply at 27 (citing 89 Fed. Reg. 35524); AR 28844. But this assertion is simply wrong. The Final Rule does not prohibit project sponsor or third-party preparation of NEPA documents. *See* 40 C.F.R. § 1506.5(a)-(d). As CEQ thoroughly explained, it does precisely the opposite. *See* 89 Fed. Reg. 35524 ("agency may allow applicants to prepare EAs or EISs consistent with agency procedures"); AR 28844. Section 1506.5 of the Final Rule provides instructions for third parties to prepare NEPA documents, and CEQ provided justification for this change, stating that "regardless of whether they are prepared by the agency or a contractor under the supervision and direction of the agency…" the agency is responsible for their accuracy and professional integrity. 89 Fed. Reg. 35571. In addition, CEQ noted that the changes it made to section 1506.5 of the Final Rule are based on the FRA's requirement that agencies establish procedures to allow project sponsors to prepare EAs and EISs under the supervision of the agency. *See* 42 U.S.C. § 4336 a(f); 89 Fed. Reg. 35522-24, 35571, 35574. CEQ thus adequately justified the changes to 40 C.F.R. § 1506.5.

Plaintiffs' other arguments fare no better. Plaintiff States contend that CEQ's changes to page and time limits in the Final Rule promote delay and are not adequately justified. Iowa Reply at 27; *See* 40 C.F.R. § 1502.7 (page limits); 40 C.F.R. § 1502.5 (timing).  But CEQ

reasonably explained that its changes related to page and time limits incorporate the FRA's time and page limits. *Compare* 42 U.S.C. § 4336a(e)  and (g) *with* 89 Fed. Reg. 35560. CEQ's justification for the changes are reasonable and supported by the administrative record.

Finally, Plaintiff States contend that the Final Rule is arbitrary because the 12-month timeline in 40 C.F.R. § 1507.3(b) for agencies to promulgate their own internal regulations to comply with NEPA is unrealistic and arbitrary. Iowa Reply at 27. Plaintiff States claim CEQ fails to address their concern with this timing. During the rulemaking for the Final Rule, commenters raised the concern that the timing for agencies to promulgate consistent regulations was not feasible. *See* 89 Fed. Reg. 35532. CEQ responded that since agencies need only provide *proposed* revisions within a twelve-month period, it declined to revise the timing requirement in proposed 40 C.F.R. § 1507.3(b), because it considers "12 months sufficient for agencies to propose procedures." 89 Fed. Reg. 35532; AR 28852.

In sum, CEQ's rulemaking includes hundreds of pages of explanation substantially justifying each change. Plaintiff States only quibble with a handful of obscure and picayune examples where they contend, without merit, that CEQ failed to adequately explain its changes. Therefore, Plaintiff States' strained APA argument should be rejected.

### 3.    The Final Rule Does Not Add Uncertainty and Is Reasonably Explained

Without record support, Plaintiff States claim the Final Rule's provisions pertaining to climate change related impacts, environmental justice and mitigated outcomes infuse "guesswork" into NEPA analysis that is contrary to NEPA's purpose of ensuring informed agency decisions. *See* Iowa Reply at 26. But, environmental justice, climate change and Indigenous Knowledge are not uncertain terms. In addition, Plaintiff States do not explain how

CEQ's use of these terms or any of the provisions which pertain to them add uncertainty or are inconsistent with NEPA's purpose. *See Fox, supra,* 556 U.S. at 515-16.

First, the Final Rules' provisions pertaining to climate change related impacts and environmental justice are not vague. Environmental justice is a term that is defined in the Final Rule and is not uncertain. 40 C.F.R. § 1508.1(m). Responding to comments that providing a definition of environmental justice would help provide clarity, CEQ defined environmental justice in 40 C.F.R. § 1508.1(m), as: "the just treatment and meaningful involvement of all people, regardless of income, race, color, national origin, tribal affiliation, or disability, in agency decision making" with the intention of protecting people from disproportionate and adverse human health and environmental effects. *See Id.*; *see also* 89 Fed. Reg. 35540; AR 28860; 40 C.F.R. § 1508.1(f) (communities with environmental justice concerns); AR 28860 (CEQ's explanation for defining the term "environmental justice" in Section 1508.1(k)). Nor do Plaintiff States attack climate change as lacking definition, but they do contend that any changes referring to climate change as an environmental effect create ambiguity. In any event, as the record shows, CEQ has issued guidance on how to account for climate change related impacts and greenhouse gas emission in NEPA reviews. AR 28763 (citing National Environmental Policy Act Guidance on Consideration of Greenhouse Gas Emissions and Climate Change 88 Fed. Reg. 1196 (2023)).

Second, the Final Rule does not demand consideration of climate and environmental justice impacts where they are not applicable. Plaintiff States argue that including consideration of environmental justice and climate change related impacts "inject[s] vaguely defined and politically charged concepts into NEPA review." Iowa Reply at 26. Responding to

comments during the rulemaking stating that requiring consideration of environmental justice and climate change related impacts in 40 C.F.R. § 1502.16 will elevate "remote" and "speculative" concerns into NEPA analysis (89 Fed. Reg. 35510; AR 28830), CEQ added the phrase "[w]here applicable" — a qualifier— to 40 C.F.R. § 1502.16 (environmental consequences), to address comments that not every project will have "climate change-related effects" or "environmental justice concerns." 89 Fed. Reg. 35510; AR 28830; *see also* 40 C.F.R. §1502.16 (a)(5) ("where applicable, climate change-related effects") and 40 C.F.R. §1502.16(a)(13) ("where applicable, disproportionate and adverse impacts to environmental justice concerns"). CEQ acknowledged "not all proposed actions will have such effects." 89 Fed. Reg. 35510; AR 28830. CEQ also noted that by adding these terms to the environmental consequences that may be considered by agencies, it was not changing longstanding NEPA practice that "agencies must determine on a case-by-case basis which effects are relevant to address in an EIS." *Id.*

Plaintiff States contend, without merit, that CEQ's decision not to define the term Indigenous Knowledge in the Final Rule is arbitrary and capricious. Iowa Reply at 26. CEQ chose not to define Indigenous Knowledge because of the difficulty in settling on a definition that would "be workable across contexts and Tribal Nations."[2] 89 Fed. Reg. 35481; AR 28801. In justifying its decision not to include a definition, CEQ explained that "[it] considers it appropriate for agencies to have flexibility to approach Indigenous Knowledge in a fashion that

---

[2] CEQ received comments for and against including a definition of that term, as well as a comment suggesting that CEQ should engage in tribal consultation on the definition.89 Fed. Reg. 35481; AR 28801. In response to those comments, CEQ held two tribal consultations, "but a consensus view on a definition did not emerge." *Id*.

makes sense for their programs and the Tribal Nations with which they work." *Id.*
Additionally, CEQ stated that "[a]gencies' implementation of this provision may be informed
by the existing approaches that some agencies have developed to Indigenous Knowledge and
[other Federal Guidance]." 89 Fed. Reg. 35481-82. CEQ also noted that it would consider
whether specific guidance was needed in the future. *Id*. In short, CEQ provided a reasonable
explanation for this decision and a manner for agencies to refine the definition in accordance
with their existing approaches. CEQ's decision was not arbitrary and capricious in violation of
the APA.

### 4.    Plaintiff States Have Not Shown Any "Reliance Interests" Upset by the Final Rule

Plaintiff States contend that they relied on the 2020 Rule and that the Final Rule is
unworkable and will cause them great injury. Iowa Reply at 26-27. But they offer no concrete
example of how the Final Rule harms even that vaguely identified interest. *Id.* Generic
assertions of reliance "do not rise to the level of ongoing and serious reliance interests
necessary to trigger a duty… to provide a more detailed explanation" for the proposed change.
*See Am. Petroleum Inst. v. U.S. Dep't of Interior*, 81 F.4th 1048, 1061 (10th Cir. 2023).
Plaintiff States do not show they have any specific and concrete reliance interests harmed by
the Final Rule.

To the extent that Plaintiff States focus on reliance interests in a "properly functioning
NEPA regime" which does not contain "unworkable requirements," Plaintiff States have not

shown specific evidence that the Final Rule will result in a dysfunctional NEPA process.[3] Iowa Reply at 26.

In sum, none of Plaintiff States' arguments has merit or is supported by the evidence in the administrative record. Plaintiff States thus do not satisfy their burden on summary judgment to show entitlement to judgment as a matter of law on their APA claim.

**D.      The Final Rule Does Not Violate the Major Questions Doctrine**

Plaintiff States contend the Final Rule violates the major questions doctrine because, they claim, the Final Rule has "vast economic and political significance" and CEQ lacks clear congressional authorization to promulgate such as sweeping rule. Iowa Reply at 30-31, citing *West Virginia v. Env't Prot. Agency*, 597 U.S. 697, 764 (2022). As explained above in Section II.B, the Final Rule does not present an "extraordinary case," *West Virginia*, 597 U.S. at 721, where CEQ is exercising an "unheralded power," *Missouri v. Biden*, 112 F.4th 531, 537 (8th Cir. 2024). There is nothing novel or transformative about the Final Rule because it comports with the statute and historical agency practice. Therefore, there is no basis to apply the major questions doctrine to this case. However, even if the Court examines the economic and political significance of this action, Plaintiff States do not, and cannot, show that the Final Rule will impose additional costs beyond those that NEPA compliance already requires. Whatever costs implementation of the Final Rule will entail, they are a far cry from the "enormous" or "massive costs" necessary to implicate the major questions doctrine. Iowa Reply at 30-31.

---

[3] Further, as discussed in Section II.B.1, to the extent Plaintiff States contend that addressing climate change, environmental justice or mitigation represents a dramatic sea change, which upsets their reliance interests, the administrative record shows that case law has long required agencies to consider these impacts in NEPA reviews, where applicable.

As Defendant States have already shown above in Section II.B.1, and therefore do not restate here, the Final Rule does not fundamentally transform NEPA or claim "unheralded" or "newfound" power that would implicate the major questions doctrine. *West Virginia*, 597 U.S. at 722, 724. Under the major questions doctrine, this Court should not consider the economic costs that Plaintiff States complain of (but do not substantiate) because Congress meant for CEQ to administer NEPA just as it has done here in the Final Rule.

Although Plaintiff States contend that "complying with" the Final Rule will "impose[] massive costs on the nation," they fail to identify any evidence in the record that shows the Final Rule has "vast economic or political significance." Iowa Reply at 31; *West Virginia,* 597 U.S. at 721. First, Plaintiff States point to the annual costs of compliance with NEPA under the previous (1978) version of NEPA's implementing regulations as evidence of the Final Rule's stark economic consequences. Iowa Br. at 39-40 (citing commentary from 2018 and government data from 2013 and 2014.) By citing to previous, long accepted costs of compliance with the 1978 regulations, Plaintiff States undermine their own contention that the Final Rule's compliance costs are excessive compared to compliance costs under the 2020 Rule or represent an expansion in CEQ's authority. This conclusion is supported by *Missouri v. Biden*, where a court found that a loan forgiveness program violated the major questions doctrine even though the Secretary of Education had "issued prior regulations on the same topic." Iowa Reply at 31 (citing *Missouri v. Biden*,112 F.4th at 537).  In *Missouri v. Biden,* the record showed the loan forgiveness regulation would forgive 3,000 percent more student loans from baseline than had ever been forgiven under any other federal program. *Id.* at 537. *Missouri v. Biden* does not stand for the proposition that the major questions doctrine prohibits

expensive rules; instead, a significant *expansion* of costs beyond those of prior regulations—in *Missouri v. Biden*, an estimated increase from "roughly $15 billion to $475 billion," 112 F.4th 531, 537 (8th Cir. 2024)—can indicate the agency is claiming more authority than it was historically understood to have.  Here, in contrast, the very costs Plaintiff States complain of are the same costs of compliance inherent in performing environmental analysis pursuant to NEPA for over forty years—representing, in effect, a return to baseline and not, as in *Missouri*, a 3,000 percent increase *over* baseline. *Id*. Plaintiff States do not provide evidence to show that the Final Rule substantially increase economic costs from implementation of the 2020 Rule in a way that represents a transformative expansion of CEQ's regulatory authority.[4] *West Virginia*, 597 U.S. at 724.

Second, Plaintiff States' declarations state that the Final Rule will require additional environmental analysis under NEPA, which will drive-up costs of compliance, but these claims are unsubstantiated.[5] *See* Anderson Decl. ¶6; Booher Decl. ¶¶ 8, 9, Roberts Decl. ¶ 8, Travnicek Decl. ¶¶ 13, 20.

Therefore, Plaintiff States have not shown that the Final Rule is an exercise of "vast economic and political significance" that warrants special skepticism under the major questions doctrine.

---

[4] Plaintiff States do not point to any reduction in NEPA costs attributable to the 2020 Rule as a basis for comparison. Iowa Br. at 39-40; State Defendants Br. at 46.

[5] Such extra-record evidence is not admissible in an administrative record case where it could easily have been submitted during public comment. *Voyageurs Nat. Park Ass'n v. Norton*, 381 F.3d 759, 766 (8th Cir. 2004) ("It is well-established that judicial review under the APA is limited to the administrative record that was before the agency when it made its decision.")

**E.      Simple Vacatur Is Not the Appropriate Remedy**

Although Plaintiff States' motion lacks merit, if the Court grants any part of that motion, Defendant States request that the Court order further briefing on remedy given the complexity involved in invalidating any part of the Final Rule.

Plaintiff States' incorrectly contend that vacatur of the Final Rule is not only appropriate but is "clear and straightforward". Iowa Reply at 31. It is important to note that certain aspects of the 2020 Rule were repealed in CEQ's two earlier rulemakings that preceded the Final Rule, which Plaintiff States do not challenge. *See, e.g.* Interim Final Rule, , 86 Fed. Reg. 34154 (July 29, 2021), Phase I Rule Notice of Proposed Rulemaking, 86 Fed. Reg. 55757 (Nov. 22, 2021). These earlier rulemakings, not the Final Rule, made substantive changes to the NEPA regulations, including the repeal of the 2020 Rule's unlawful definition of "effects." *See* 87 Fed. Reg. at 23466. Therefore, Plaintiff States cannot obtain complete reinstatement of the 2020 Rule through this current litigation, which only challenges the Final Rule. Similarly, the Final Rule also implemented changes to conform NEPA regulations with the text of NEPA as revised by the FRA. AR43863. Repealing the Final Rule would return many—but even then, not all—provisions of the NEPA regulations to language promulgated prior to passage of the FRA which could be inconsistent with the text of NEPA as revised by the FRA. Vacating the Final Rule and returning to a version of NEPA regulations that cannot stand on their own would have serious disruptive consequences to NEPA compliance. *Allied-Signal, Inc. v. U.S. Nuclear Regul. Comm'n*, 988 F.2d 146, 151 (D.C. Cir. 1993).

In addition, Plaintiff States contradict their own request to reinstate the 2020 Rule by claiming in their Reply that CEQ could issue an interim final rule to address the issues

discussed above. Iowa Reply at 33, *see* Complaint, Dkt. 39 ¶ 12 ("Accordingly, Plaintiff States respectfully ask this Court to vacate the Final Rule, remand it to the Council, enjoin the Council from enforcing the Final Rule, and resultingly reinstate the 2020 rule"), Iowa Reply at 32 (quoting same). By pointing out that CEQ would need to issue an interim final rule to address these complexities, Plaintiff States admit that reinstatement of the 2020 Rule, as they request, is unworkable. Even an interim final rule would take time for CEQ to promulgate necessitating a delay in implementation of a vacatur order. The exact mechanics of implementing such an order are best addressed through further briefing.

Second, Plaintiff States misstate the Defendant States' position regarding the FRA. Defendant States do not claim that the FRA alone is a dispositive factor that would prevent this Court from ordering the vacatur of the Final Rule. *Contra* Iowa Reply at 32. It is merely one factor that this Court should consider in an *Allied-Signal* analysis of whether vacatur of the Final Rule would have disruptive consequences to the implementation of NEPA. Depending on the particular provisions affected by a ruling from this Court, there may or may not be conflicts with the NEPA text as revised by the FRA. Other factors include but are not limited to other CEQ rules that have not been challenged in this lawsuit. *See, e.g.,* AR 32897; AR 43863.

The Final Rule is rationally supported and consistent with NEPA and should stay in place to guide federal agencies in informed decision making. Even if this court rules for Plaintiff States, complete vacatur of the Final Rule is not the appropriate remedy. Additional briefing is necessary to determine the contours of an appropriate remedy in that case.

**F.      Plaintiff States Mischaracterize Defendant States' Standing Arguments**

Defendant States reject Plaintiff States' mischaracterization of Defendant States' standing arguments. While Defendant States take no position on Plaintiff States' standing to bring this challenge, Plaintiff States claim Defendant States "agree" the Final Rule is justiciable because it "has immediate and broad effects" citing to Defendant States' "own examples highlighting the Final Rule's substantive import . . . attesting that the Final Rule has climate or environmental impacts on their States." *See* Iowa Reply at 5. Contrary to this assertion, Defendant States' standing is based on the injuries that would occur to their interests if the Final Rule challenged by Plaintiff States were invalidated and the 2020 Rule reinstated. *See* Def. State Opp. at 10. Defendant States' standing argument cites the beneficial effects of the Final Rule, including environmental review that considers climate change-related impacts, to show that invalidation of the Final Rule would cause such harm. *See* Def. State Opp. at 10; Dkt. 85-1 ¶7, Dkt. 85-2 ¶11. Plaintiff States' misplaced attempt to piggyback on Defendant States' factual showing of harm under a reinstated 2020 Rule does not support an argument about harm from the Final Rule. Defendant States did not argue that there is harm from implementation of the Final Rule.

/ / /

/ / /

/ / /

### III.    CONCLUSION

For the reasons set forth above, the Court should deny Plaintiff States' Motion for Summary Judgment and grant Defendant States' Motion for Summary Judgment in full. However, should this Court rule all or part of the Final Rule is improper, the Court should order additional briefing on the extent and nature of the remedy.

DATED this 11th day of October, 2024.

FOR THE STATE OF WASHINGTON

ROBERT W. FERGUSON
Attorney General of Washington

*s/ Elizabeth Harris*
ELIZABETH HARRIS (Admitted in D.N.D.)
(WSBA #53135)
Assistant Attorney General
Washington State Attorney General's Office
Environmental Protection Division
800 5th Avenue, Suite 2000
Seattle, WA 98104
(206) 521-3213
Elizabeth.Harris@atg.wa.gov

*Attorneys for Intervenor-Defendant*
*State of Washington*

FOR THE STATE OF CALIFORNIA

ROB BONTA
Attorney General of California

*/s/ Jamie Jefferson*
SARAH E. MORRISON, SBN 143459
Supervising Deputy Attorney General
JAMIE JEFFERSON, SBN 197142 (admitted in D.N.D.)
THOMAS SCHUMANN, SBN 324559
Deputy Attorneys General
1515 Clay Street, 20th Floor
Oakland, CA 94602
(510) 879-3298
Jamie.jefferson@doj.ca.gov

FOR THE STATE OF COLORADO

PHILLIP J. WEISER
Attorney General

*s/ Carrie Noteboom*
CARRIE NOTEBOOM*
Assistant Deputy Attorney General
Natural Resources and Environment
Section
1300 Broadway, 7th Floor
Denver, CO 80203
720.508.6285
carrie.noteboom@coag.gov

FOR THE STATE OF ILLINOIS

KWAME RAOUL
Attorney General

/s/ Jason E. James
JASON E. JAMES, admitted *pro hac vice*
Assistant Attorney General
MATTHEW J. DUNN
Chief, Environmental Enforcement/ Asbestos
Litigation Division
Office of the Attorney General
201 W. Pointe Drive, Suite 7
Belleville, IL 62226
Ph: (217) 843-0322
Email: jason.james@ilag.gov

FOR THE STATE OF MAINE

AARON M. FREY
Attorney General

/s/ Caleb Elwell
CALEB ELWELL*
Assistant Attorney General
Office of the Maine Attorney General
6 State House Station
Augusta, ME 04333
(207) 626-8545
Caleb.elwell@maine.gov

FOR THE STATE OF MARYLAND
Anthony G. Brown
Attorney General
*/s Steven Goldstein*
STEVEN J. GOLDSTEIN*
Special Assistant Attorney General
Office of the Attorney General of Maryland
200 Saint Paul Place
Baltimore, MD 21202
410-576-6414
sgoldstein@oag.state.md.us

33

FOR THE COMMONWEALTH OF
MASSACHUSETTS
ANDREA JOY CAMPBELL
Attorney General

TURNER SMITH
Deputy Chief and Assistant Attorney General

*s/ Matthew Ireland*
MATTHEW IRELAND *
Assistant Attorney General
Energy and Environment Bureau
Office of the Attorney General
One Ashburton Place, 18th Fl.
Boston, MA 02108
matthew.ireland@mass.gov

FOR THE PEOPLE OF THE STATE
OF MICHIGAN

*/s/Benjamin C. Houston*
BENJAMIN C. HOUSTON (admitted in
D.N.D.)
Assistant Attorney General
Environment, Natural Resources, and
Agriculture Division
6th Floor G. Mennen Williams Building
525 W. Ottawa Street
P.O. Box 30755
Lansing, MI 48909
Tel: (517) 582-3746
Email: HoustonB1@michigan.gov

FOR THE STATE OF NEW JERSEY

MATTHEW J. PLATKIN
Attorney General of New Jersey

*/s/ Dianna Shinn*
DIANNA SHINN, admitted *pro hac vice*
(N.J. Bar No. 242372017)
Deputy Attorney General
Environmental Enforcement & Enforcement
Justice Section
New Jersey Division of Law
25 Market Street
P.O. Box 093
Trenton, NJ 08625-093
(609) 376-2789
Dianna.Shinn@law.njoag.gov

FOR THE STATE OF NEW MEXICO

RAÚL TORREZ
Attorney General

*/s/ J. Spenser Lotz*
J. Spenser Lotz (admitted in D.N.D.)
Assistant Attorney General
201 3rd St. NW
Suite 300
Albuquerque, NM 87102
Tel. (505) 616-7560
SLotz@nmdoj.gov

FOR THE STATE OF NEW YORK

LETITIA JAMES
Attorney General of New York

*/s/ Claiborne E. Walthall*
CLAIBORNE E. WALTHALL, admitted pro
hac vice
Assistant Attorney General
New York State Office of
the Attorney General
State Capitol
Albany, NY 12224
(518) 776-2380
claiborne.walthall@ag.ny.gov

FOR THE STATE OF WISCONSIN

JOSHUA L. KAUL
Attorney General of Wisconsin

*/s/ Tressie K. Kamp*
TRESSIE K. KAMP, admitted pro hac vice
Assistant Attorney General
Wisconsin Department of Justice
17 W. Main Street
Madison, WI 53707-7857
(608) 266-9595
kamptk@doj.state.wi.us

FOR THE DISTRICT OF COLUMBIA

BRIAN L. SCHWALB
Attorney General for the District of Columbia

*/s/ Wesley Rosenfeld*
WESLEY ROSENFELD*
Housing and Environmental Justice Section
Assistant Attorney General
400 6th Street NW
Washington, D.C. 20001
(202) 368-2569
wesley.rosenfeld1@dc.gov

FOR THE STATE OF OREGON

ELLEN F. ROSENBLUM
ATTORNEY GENERAL

*/s/ Paul Garrahan*
PAUL GARRAHAN, admitted pro hac
vice
Attorney-in-Charge
STEVE NOVICK
Special Assistant Attorney General
Natural Resources Section
Oregon Department of Justice
1162 Court Street NE
Salem, Oregon 97301-4096
(503) 947-4540
Paul.Garrahan@doj.oregon.gov
Steve.Novick@doj.oregon.gov

FOR THE CITY OF NEW YORK

MURIEL GOODE-TRUFANT
Acting Corporation Counsel of the
City of New York

*/s/ Nathan Taylor*
NATHAN TAYLOR*
New York City Law Department
100 Church Street, Rm 6-144
New York, NY 10007
(646) 940-0736 (m)
(212) 356-2315
NTaylor@law.nyc.gov

35

*PHV application forthcoming