## COUNCIL ON ENVIRONMENTAL QUALITY

**40 CFR Parts 1500, 1501, 1502, 1503, 1504, 1505, 1506, 1507, and 1508**

**[CEQ–2023–0003]**

**RIN 0331–AA07**

## National Environmental Policy Act Implementing Regulations Revisions Phase 2

**AGENCY:** Council on Environmental Quality.

**ACTION:** Notice of proposed rulemaking.

**SUMMARY:** The Council on Environmental Quality (CEQ) is proposing this "Bipartisan Permitting Reform Implementation Rule" to revise its regulations for implementing the procedural provisions of the National Environmental Policy Act (NEPA), including to implement the Fiscal Responsibility Act's amendments to NEPA. CEQ proposes the revisions to provide for an effective environmental review process that promotes better decision making; ensure full and fair public involvement; provide for an efficient process and regulatory certainty; and provide for sound decision making grounded in science, including consideration of relevant environmental, climate change, and environmental justice effects. CEQ proposes these changes to better align the provisions with CEQ's extensive experience implementing NEPA; CEQ's perspective on how NEPA can best inform agency decision making; longstanding Federal agency experience and practice; NEPA's statutory text and purpose, including making decisions informed by science; and case law interpreting NEPA's requirements. CEQ invites comments on the proposed revisions.

**DATES:**

*Comments:* CEQ must receive comments by September 29, 2023.

*Public meetings:* CEQ will conduct four virtual public meetings for the proposed rule on Saturday, August 26, 2023, from 1 p.m. to 4 p.m. EDT; Wednesday, August 30, 2023, from 5 p.m. to 8 p.m. EDT; Monday, September 11, 2023, from 1 p.m. to 4 p.m. EDT; and Thursday, September 21, 2023, from 2 p.m. to 5 p.m. EDT. For additional information and to register for the meetings, please visit CEQ's website at *www.nepa.gov.*

**ADDRESSES:** You may submit comments, identified by docket number CEQ–2023–0003, by any of the following methods:

• *Federal eRulemaking Portal: https://www.regulations.gov.* Follow the instructions for submitting comments.

• *Fax:* 202–456–6546.

• *Mail:* Council on Environmental Quality, 730 Jackson Place NW, Washington, DC 20503.

*Instructions:* All submissions received must include the agency name, "Council on Environmental Quality," and docket number, CEQ–2023–0003, for this rulemaking. All comments received will be posted without change to *https://www.regulations.gov,* including any personal information provided. Please do not submit electronically any information you consider private, Confidential Business Information (CBI), or other information, the disclosure of which is restricted by statute.

*Docket:* For access to the docket to read background documents or comments received, go to *https://www.regulations.gov.*

**FOR FURTHER INFORMATION CONTACT:** Amy B. Coyle, Deputy General Counsel, 202–395–5750, *Amy.B.Coyle@ceq.eop.gov.*

**SUPPLEMENTARY INFORMATION:**

## I. Background

### A. NEPA Statute

Congress enacted NEPA in 1969 by a unanimous vote in the Senate and a nearly unanimous vote in the House to declare an ambitious and visionary national policy to promote environmental protection for present and future generations.[1] President Nixon signed NEPA into law on January 1, 1970. NEPA seeks to "encourage productive and enjoyable harmony" between humans and the environment, recognizing the "profound impact" of human activity and the "critical importance of restoring and maintaining environmental quality" to the overall welfare of humankind. 42 U.S.C. 4321, 4331.

Furthermore, NEPA seeks to promote efforts that will prevent or eliminate damage to the environment and biosphere and stimulate the health and welfare of people, making it the continuing policy of the Federal Government to use all practicable means and measures to create and maintain conditions under which humans and nature can exist in productive harmony and fulfill the social, economic, and other requirements of present and future

generations of Americans. 42 U.S.C. 4331(a). It also recognizes that each person should have the opportunity to enjoy a healthy environment and has a responsibility to contribute to the preservation and enhancement of the environment. 42 U.S.C. 4331(c).

NEPA requires Federal agencies to interpret and administer Federal policies, regulations, and laws in accordance with NEPA's policies and to consider environmental values in their decision making. 42 U.S.C. 4332. To that end, section 102(2)(C) of NEPA requires Federal agencies to prepare "detailed statements," referred to as environmental impact statements (EISs), for "every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment" and, in doing so, provide opportunities for public participation to help inform agency decision making. 42 U.S.C. 4332(2)(C). The EIS process embodies the understanding that informed decisions are better decisions and lead to better environmental outcomes when decision makers understand, consider, and publicly disclose environmental effects of their decisions. The EIS process also enriches understanding of the ecological systems and natural resources important to the Nation and helps guide sound decision making, such as decisions on infrastructure and energy development, in line with high-quality information, including the best available science, information and data, as well as the environmental design arts.

In many respects, NEPA was a statute ahead of its time and remains relevant and vital today. It codifies the common-sense idea of "look before you leap" to guide agency decision making, particularly in complex and consequential areas, because conducting sound environmental analysis before agencies take actions reduces conflict and waste in the long run by avoiding unnecessary harm and uninformed decisions. *See, e.g.,* 42 U.S.C. 4332. It establishes a framework for agencies to ground decisions in sound science and recognizes that the public may have important ideas and information on how Federal actions can occur in a manner that reduces potential harms and enhances ecological, social, and economic well-being. *See, e.g., id.*

On June 3, 2023, President Biden signed the Fiscal Responsibility Act of 2023 (FRA) into law, which included amendments to NEPA. Specifically, the FRA amended section 102(2)(C) and added sections 102(2)(D) through (F) and sections 106 through 111. The amendments in section 102(2)(C) largely codify longstanding principles that EISs

---

[1] *See* Linda Luther, Cong. Rsch. Serv., RL33152, The National Environmental Policy Act: Background and Implementation, 4 (2008), *https://crsreports.congress.gov/product/details?prodcode=RL33152.*

should include discussion of reasonably foreseeable environmental effects of the proposed action, reasonably foreseeable adverse environmental effects that cannot be avoided, and a reasonable range of alternatives to the proposed action. Section 102(2)(D) requires Federal agencies to ensure the professional integrity of the discussion and analysis in an environmental document; section 102(2)(E) requires use of reliable data and resources when carrying out NEPA; and section 102(2)(F) requires agencies to study, develop, and describe technically and economically feasible alternatives.

Section 106 adds provisions for determining the appropriate level of NEPA review. It clarifies that an agency is only required to prepare an environmental document when proposing to take an action that would constitute a final agency action and codifies existing regulations and caselaw that an agency is not required to prepare an environmental document when doing so would clearly and fundamentally conflict with the requirements of another law or a proposed action is non-discretionary. Section 106 also largely codifies the current CEQ regulations and longstanding practice with respect to the use of categorical exclusions (CEs), environmental assessments (EAs), and EISs, as modified by the new provision expressly permitting agencies to adopt CEs from other agencies established in section 109 of NEPA.

Section 107 addresses timely and unified Federal reviews, codifying existing practice with a few minor adjustments, including provisions clarifying lead, joint-lead, and cooperating agency designation, generally requiring development of a single environmental document, directing agencies to develop procedures for project sponsors to prepare EAs and EISs, and prescribing page limits and deadlines similar to current requirements. Section 108 codifies time lengths and circumstances for when agencies can rely on programmatic environmental documents without additional review, and section 109 allows a Federal agency to use another agency's CE. Section 111 adds a variety of definitions. This proposed rule would update the regulations to address how agencies should implement NEPA consistent with the amendments made by the FRA.

*B. The Council on Environmental Quality*

NEPA established the Council on Environmental Quality (CEQ) in the Executive Office of the President. 42

U.S.C. 4342. For more than 50 years, CEQ has advised presidents on national environmental policy, assisted Federal agencies in their implementation of NEPA, and overseen implementation of a variety of other environmental initiatives from the expeditious and thorough environmental review of infrastructure projects [2] to the sustainability of Federal operations.[3]

NEPA charges CEQ with overseeing and guiding NEPA implementation across the Federal Government. In addition to issuing the regulations for implementing NEPA, 40 CFR parts 1500 through 1508 (referred to throughout as "the CEQ regulations"), CEQ has issued guidance on numerous topics related to NEPA review. In 1981, CEQ issued the "Forty Most Asked Questions Concerning CEQ's National Environmental Policy Act Regulations," [4] which CEQ has routinely

identified as an invaluable tool for Federal, Tribal, State, and local governments and officials, and members of the public, who have questions about NEPA implementation.

CEQ also has issued guidance on a variety of other topics, from scoping to cooperating agencies to consideration of effects.[5] For example, in 1997, CEQ issued guidance documents on the consideration of environmental justice in the NEPA context[6] under Executive Order (E.O.) 12898, *Federal Actions to Address Environmental Justice in Minority Populations and Low-Income Populations*,[7] and on analysis of cumulative effects in NEPA reviews,[8] two documents that agencies continue to use today. From 2010 to the present, CEQ developed additional guidance on CEs, mitigation, programmatic reviews, and consideration of greenhouse gas (GHG) emissions in NEPA.[9] To ensure

[2] *See, e.g.*, E.O. 14008, *Tackling the Climate Crisis at Home and Abroad*, 86 FR 7619 (Feb. 1, 2021); E.O. 13604, *Improving Performance of Federal Permitting and Review of Infrastructure Projects*, 77 FR 18885 (Mar. 28, 2012); E.O. 13274, *Environmental Stewardship and Transportation Infrastructure Project Reviews*, 67 FR 59449 (Sept. 23, 2002); *see also* Modernizing Federal Infrastructure Review and Permitting Regulations, Policies, and Procedures, 78 FR 30733 (May 22, 2013).

[3] *See, e.g.*, E.O. 14057, *Catalyzing Clean Energy Industries and Jobs Through Federal Sustainability*, 86 FR 70935 (Dec. 13, 2021); E.O. 13834, *Efficient Federal Operations*, 83 FR 23771 (May 22, 2018); E.O. 13693, *Planning for Federal Sustainability in the Next Decade*, 80 FR 15869 (Mar. 25, 2015); E.O. 13514, *Federal Leadership in Environmental, Energy, and Economic Performance*, 74 FR 52117 (Oct. 8, 2009); E.O. 13423, *Strengthening Federal Environmental, Energy, and Transportation Management*, 72 FR 3919 (Jan. 26, 2007); E.O. 13101, *Greening the Government Through Waste Prevention, Recycling, and Federal Acquisition*, 63 FR 49643 (Sept. 16, 1998). For Presidential directives pertaining to other environmental initiatives, see E.O. 13432, *Cooperation Among Agencies in Protecting the Environment With Respect to Greenhouse Gas Emissions From Motor Vehicles, Nonroad Vehicles, and Nonroad Engines*, 72 FR 27717 (May 16, 2007) (requiring CEQ and OMB to implement the E.O. and facilitate Federal agency cooperation to reduce greenhouse gas emissions); E.O. 13141, *Environmental Review of Trade Agreements*, 64 FR 63169 (Nov. 18, 1999) (requiring CEQ and the U.S. Trade Representative to implement the E.O., which has the purpose of promoting Trade agreements that contribute to sustainable development); E.O. 13061, *Federal Support of Community Efforts Along American Heritage Rivers*, 62 FR 48445 (Sept. 15, 1997) (charging CEQ with implementing the American Heritage Rivers initiative); E.O. 13547, *Stewardship of the Ocean, Our Coasts, and the Great Lakes*, 75 FR 43023 (Jul. 22, 2010) (directing CEQ to lead the National Ocean Council); E.O. 13112, *Invasive Species*, 64 FR 6183 (Feb. 8, 1999) (requiring the Invasive Species Council to consult with CEQ to develop guidance to Federal agencies under NEPA on prevention and control of invasive species).

[4] CEQ, Forty Most Asked Questions Concerning CEQ's National Environmental Policy Act Regulations, 46 FR 18026 (Mar. 23, 1981) ("Forty Questions"), *https://www.energy.gov/nepa/downloads/forty-most-asked-questions-concerning-ceqs-national-environmental-policy-act.*

[5] *See, e.g.*, CEQ, Memorandum for General Counsels, NEPA Liaisons and Participants in Scoping (Apr. 30, 1981), *https://www.energy.gov/nepa/downloads/scoping-guidance-memorandum-general-counsels-nepa-liaisons-and-participants-scoping*; CEQ, Incorporating Biodiversity Considerations Into Environmental Impact Analysis Under the National Environmental Policy Act (Jan. 1993), *https://ceq.doe.gov/publications/incorporating_biodiversity.html*; CEQ, Council on Environmental Quality Guidance on NEPA Analyses for Transboundary Impacts (July 1, 1997), *https://ceq.doe.gov/docs/ceq-regulations-and-guidance/memorandum-transboundary-impacts-070197.pdf*; CEQ, Designation of Non-Federal Agencies to be Cooperating Agencies in Implementing the Procedural Requirements of the National Environmental Policy Act (July 28, 1999), *https://ceq.doe.gov/docs/ceq-regulations-and-guidance/regs/ceqcoop.pdf*; CEQ, Identifying Non-Federal Cooperating Agencies in Implementing the Procedural Requirements of the National Environmental Policy Act (Sept. 25, 2000), *https://ceq.doe.gov/docs/ceq-regulations-and-guidance/memo-non-federal-cooperating-agencies-09252000.pdf*; CEQ & DOT Letters on Lead and Cooperating Agency Purpose and Need (May 12, 2003), *https://ceq.doe.gov/docs/ceq-regulations-and-guidance/CEQ-DOT_PurposeNeed_May-2013.pdf.*

[6] CEQ, Environmental Justice: Guidance under the National Environmental Policy Act (Dec. 10, 1997) ("Environmental Justice Guidance"), *https://ceq.doe.gov/docs/ceq-regulations-and-guidance/regs/ej/justice.pdf.*

[7] E.O. 12898, *Federal Actions To Address Environmental Justice in Minority Populations and Low-Income Populations*, 59 FR 7629 (Feb. 16, 1994).

[8] CEQ, Considering Cumulative Effects Under the National Environmental Policy Act (Jan. 1997), *https://ceq.doe.gov/publications/cumulative_effects.html*; *see also* CEQ, Guidance on the Consideration of Past Actions in Cumulative Effects Analysis (June 24, 2005), *https://www.energy.gov/sites/default/files/nepapub/nepa_documents/RedDont/G-CEQ-PastActsCumulEffects.pdf.*

[9] CEQ, Establishing, Applying, and Revising Categorical Exclusions Under the National Environmental Policy Act (Nov. 23, 2010) ("CE Guidance"), *https://ceq.doe.gov/docs/ceq-regulations-and-guidance/NEPA_CE_Guidance_Nov232010.pdf*; CEQ, Appropriate Use of Mitigation and Monitoring and Clarifying the Appropriate Use

Continued

coordinated environmental review, CEQ has issued guidance to integrate NEPA reviews with other environmental review requirements such as the National Historic Preservation Act, E.O. 11988, *Floodplain Management,* and E.O. 11990, *Protection of Wetlands.*[10] Finally, CEQ has provided guidance to ensure efficient and effective environmental reviews, particularly for infrastructure projects.[11]

In addition to guidance, CEQ engages frequently with Federal agencies on their implementation of NEPA. First, CEQ is responsible for consulting with all agencies on the development of their NEPA implementing procedures and determining that those procedures conform with NEPA and the CEQ regulations. Through this process, CEQ engages with agencies to understand their specific authorities and programs to ensure agencies integrate consideration of environmental effects into their decision-making processes. Additionally, CEQ provides feedback and recommendations on how agencies may effectively implement NEPA through their procedures.

Second, CEQ consults with agencies on the efficacy and effectiveness of NEPA implementation. Where necessary or appropriate, CEQ engages with agencies on NEPA reviews for specific projects or project types to provide advice and identify any emerging or cross-cutting issues that would benefit from CEQ issuing formal guidance or assisting with coordination. This includes establishing alternative arrangements for compliance with NEPA when agencies encounter emergency situations where they need to act swiftly while also ensuring they meet their NEPA obligations. CEQ also advises on NEPA compliance when agencies are establishing new programs or implementing new statutory authorities. Finally, CEQ helps advance the environmental review process for projects or initiatives deemed important to an administration such as nationally and regionally significant projects, major infrastructure projects, and consideration of climate change-related effects and effects on communities with environmental justice concerns.[12]

Third, CEQ meets regularly with external stakeholders to understand their perspectives on the NEPA process. These meetings can help inform CEQ's development of guidance or other initiatives and engagement with Federal agencies. Finally, CEQ coordinates with other Federal agencies and components of the White House on a wide array of environmental issues and reviews that intersect with the NEPA process, such as Endangered Species Act consultation or effects to Federal lands and waters from federally authorized activities.

In addition to its NEPA responsibilities, CEQ is currently charged with implementing several of the administration's key environmental priorities. On January 27, 2021, the President signed E.O. 14008, *Tackling the Climate Crisis at Home and Abroad,* to establish a government-wide approach to the climate crisis by reducing GHG emissions across the economy; increasing resilience to climate change-related effects; conserving land, water, and biodiversity; transitioning to a clean-energy economy; advancing environmental justice; and investing in disadvantaged communities.[13] CEQ is leading the President's efforts to secure environmental justice consistent with sections 219 through 223 of the E.O.[14] For example, CEQ has developed the Climate and Economic Justice Screening Tool[15] and collaborates with the Office of Management and Budget (OMB) and the National Climate Advisor on implementing the Justice40 initiative, which sets a goal that 40 percent of the overall benefits of certain Federal investments flow to disadvantaged communities.[16]

Section 205 of the E.O. also charged CEQ with developing the Federal Sustainability Plan, a directive that was augmented by E.O. 14057, *Catalyzing Clean Energy Industries and Jobs Through Federal Sustainability,*[17] to achieve a carbon pollution-free electricity sector and clean and zero-emission vehicle fleets. CEQ also is collaborating with the Departments of the Interior, Agriculture, and Commerce on the implementation of the America the Beautiful Initiative.[18] Additionally, E.O. 14008 requires the Chair of CEQ and the Director of OMB to ensure that Federal permitting decisions consider the effects of GHG emissions and climate change.[19]

CEQ is also instrumental to the President's efforts to institute a government-wide approach to advancing environmental justice. On April 21, 2023, the President signed E.O. 14096, *Revitalizing Our Nation's Commitment to Environmental Justice for All,* to further embed environmental justice into the work of Federal agencies and ensure that all people can benefit from the vital safeguards enshrined in the Nation's foundational environmental and civil rights laws.[20]

of Mitigated Findings of No Significant Impact (Jan. 14, 2011), *https://ceq.gov/docs/ceq-regulations-and-guidance/Mitigation_and_Monitoring_Guidance_14Jan2011.pdf;* CEQ, National Environmental Policy Act Guidance on Consideration of Greenhouse Gas Emissions and Climate Change, 88 FR 1196 (Jan. 9, 2023) ("2023 GHG Guidance"), *https://ceq.doe.gov/guidance/ceq_guidance_nepa-ghg.html.*

[10] CEQ, Implementation of Executive Order 11988 on Floodplain Management and Executive Order 11990 on Protection of Wetlands (Mar. 21, 1978), *https://ceq.doe.gov/docs/ceq-regulations-and-guidance/Memorandum-Implementation-of-EO-11988-and-EO-11990-032178.pdf;* CEQ & Advisory Council on Historic Preservation, NEPA and NHPA: A Handbook for Integrating NEPA and Section 106 (Mar. 2013), *https://ceq.doe.gov/docs/ceq-publications/NEPA_NHPA_Section_106_Handbook_Mar2013.pdf.*

[11] *See, e.g.,* CEQ, Improving the Process for Preparing Efficient and Timely Environmental Reviews Under the National Environmental Policy Act (Mar. 6, 2012), *https://ceq.doe.gov/docs/ceq-regulations-and-guidance/Improving_NEPA_Efficiencies_06Mar2012.pdf;* CEQ, Effective Use of Programmatic NEPA Reviews (Dec. 18, 2014) ("Programmatic Guidance"), *https://www.energy.gov/sites/default/files/2016/05/f31/effective_use_of_programmatic_nepa_reviews_18dec2014.pdf;* OMB & CEQ, M–15–20, Guidance Establishing Metrics for the Permitting and Environmental Review of Infrastructure Projects (Sept. 22, 2015), *https://www.whitehouse.gov/wp-content/uploads/legacy_drupal_files/omb/memoranda/2015/m-15-20.pdf;* OMB & CEQ, M–17–14, Guidance to Federal Agencies Regarding the Environmental Review and Authorization Process for Infrastructure Projects (Jan. 13, 2017), *https://www.whitehouse.gov/wp-content/uploads/legacy_drupal_files/omb/memoranda/2017/m-17-14.pdf.*

[12] *See, e.g.,* Memorandum from President Barack Obama to the Heads of Executive Departments and Agencies, *Speeding Infrastructure Development through More Efficient and Effective Permitting and Environmental Review* (Aug. 31, 2011), *https://obamawhitehouse.archives.gov/the-press-office/2011/08/31/presidential-memorandum-speeding-infrastructure-development-through-more;* E.O. 13807, *Establishing Discipline and Accountability in the Environmental Review and Permitting Process for Infrastructure Projects,* 82 FR 40463 (Aug. 24, 2017).

[13] E.O. 14008, *supra* note 2.

[14] E.O. 14008's direction to advance environmental justice reinforces and reflects longstanding policy established in E.O. 12898 and advances the related though distinct policy defined more broadly in E.O. 13985, *Advancing Racial Equity and Support for Underserved Communities Through the Federal Government,* that the Federal Government "pursue a comprehensive approach to advancing equity for all, including people of color and others who have been historically underserved, marginalized, and adversely affected by persistent poverty and inequality." 86 FR 7009 (Jan. 25, 2021), sec. 1.

[15] CEQ, *Explore the Map,* Climate and Economic Justice Screening Tool, *https://screeningtool.geoplatform.gov/.*

[16] E.O. 14008, *supra* note 2, sec. 223.

[17] E.O. 14057, *supra* note 3.

[18] E.O. 14008, *supra* note 2.

[19] *Id.* at sec. 213(a); *see also id.,* sec. 219 (directing agencies to "make achieving environmental justice part of their missions by developing programs, policies, and activities to address the disproportionately high and adverse human health, environmental, climate-related and other cumulative impacts on disadvantaged communities").

[20] E.O. 14096, *Revitalizing Our Nation's Commitment to Environmental Justice for All,* 88 FR 25251 (Apr. 26, 2023). E.O. 14096 builds upon efforts to advance environmental justice and equity

AR_0000003

The E.O. charges each agency with making achieving environmental justice part of its mission consistent with statutory authority,[21] and requires each agency to submit to the Chair of CEQ and make publicly available an Environmental Strategic Plan setting forth the agency's goals and plans for advancing environmental justice.[22] Further, section 8 of the E.O. establishes a White House Office of Environmental Justice within CEQ.

Finally, CEQ is staffed with experts with decades of NEPA experience. CEQ's diverse array of responsibilities and expertise has long influenced the implementation of NEPA, and CEQ relied extensively on this experience in developing this rulemaking.

*C. NEPA Implementation 1970–2019*

Following shortly after the enactment of NEPA, President Nixon issued E.O. 11514, *Protection and Enhancement of Environmental Quality,* directing CEQ to issue guidelines for implementation of section 102(2)(C) of NEPA.[23] In response, CEQ in April 1970 issued interim guidelines, which addressed the provisions of section 102(2)(C) of the Act regarding EIS requirements.[24] CEQ revised the guidelines in 1971 and 1973 to address public involvement and introduce the concepts of EAs and draft and final EISs.[25]

In 1977, President Carter issued E.O. 11991, *Relating to Protection and Enhancement of Environmental Quality,* amending E.O. 11514 and directing CEQ to issue regulations for implementation of section 102(2)(C) of NEPA and requiring that Federal agencies comply with those regulations.[26] CEQ promulgated its NEPA regulations in 1978.[27] Issued 8 years after NEPA's enactment, the NEPA regulations reflected CEQ's interpretation of the statutory text and Congressional intent,

expertise developed through issuing and revising the CEQ guidelines and advising Federal agencies on their implementation of NEPA, initial interpretations of the courts, and Federal agency experience implementing NEPA. The 1978 regulations reflected the fundamental principles of informed and science-based decision making, transparency, and public engagement Congress established in NEPA. The regulations further required agency-level implementation, directing Federal agencies to issue and update periodically agency-specific implementing procedures to supplement CEQ's procedures and integrate the NEPA process into the agencies' specific programs and processes. Consistent with 42 U.S.C. 4332(2)(B), the regulations also required agencies to consult with CEQ in the development or update of these agency-specific procedures to ensure consistency with CEQ's regulations.

CEQ made typographical amendments to the 1978 implementing regulations in 1979[28] and amended one provision in 1986 (CEQ refers to these regulations, as amended, as the ''1978 regulations'' in this preamble).[29] Otherwise, CEQ left the regulations unchanged for over 40 years. As a result, CEQ and Federal agencies developed extensive experience implementing the 1978 regulations, and a large body of agency practice and case law developed based on them.

*D. 2020 Amendments to the CEQ Regulations*

On August 15, 2017, President Trump issued E.O. 13807, *Establishing Discipline and Accountability in the Environmental Review and Permitting Process for Infrastructure Projects,*[30] which directed CEQ to establish and lead an interagency working group to identify and propose changes to the NEPA regulations.[31] In response, CEQ issued an advance notice of proposed rulemaking (ANPRM) on June 20, 2018,[32] and a notice of proposed rulemaking (NPRM) on January 10, 2020, proposing broad revisions to the

1978 regulations.[33] A wide range of stakeholders submitted more than 12,500 comments on the ANPRM[34] and 1.1 million comments on the proposed rule,[35] including from state and local governments, Tribes, environmental advocacy organizations, professional and industry associations, other advocacy or non-profit organizations, businesses, and private citizens. Many commenters provided detailed feedback on the legality, policy wisdom, and potential consequences of the proposed amendments. In keeping with the proposed rule, the final rule, promulgated on July 16, 2020 (''2020 regulations'' or ''2020 rule''), made wholesale revisions to the regulations; it took effect on September 14, 2020.[36]

In the months that followed the issuance of the 2020 regulations, five lawsuits were filed challenging the 2020 rule.[37] These cases challenge the 2020 rule on a variety of grounds, including under the Administrative Procedure Act (APA), NEPA, and the Endangered Species Act, contending that the rule exceeded CEQ's authority and that the related rulemaking process was procedurally and substantively defective. In response to CEQ's motions and joint motions, the district courts issued temporary stays in each of these cases, except for *Wild Virginia v. Council on Environmental Quality,* which the district court dismissed without prejudice on June 21, 2021.[38] The Fourth Circuit affirmed that dismissal on December 22, 2022.[39]

---

consistent with the policy advanced in documents including E.O. 13985, E.O. 14008, and E.O. 12898. *See, e.g.,* note 14, *supra.*

[21] E.O. 14096, *supra* note 20, sec. 3.

[22] *Id.* at sec. 4.

[23] E.O. 11514, *Protection and Enhancement of Environmental Quality,* 35 FR 4247 (Mar. 7, 1970), sec. 3(h).

[24] *See* Statements on Proposed Federal Actions Affecting the Environment, 35 FR 7390 (May 12, 1970) (interim guidelines).

[25] Statements on Proposed Federal Actions Affecting the Environment, 36 FR 7724 (Apr. 23, 1971) (final guidelines); Preparation of Environmental Impact Statements, 38 FR 10856 (May 2, 1973) (proposed revisions to the guidelines); Preparation of Environmental Impact Statements: Guidelines, 38 FR 20550 (Aug. 1, 1973) (revised guidelines).

[26] E.O. 11991, *Relating to Protection and Enhancement of Environmental Quality.* 42 FR 26967 (May 25, 1977).

[27] Implementation of Procedural Provisions, 43 FR 55978 (Nov. 29, 1978).

[28] Implementation of Procedural Provisions; Corrections, 44 FR 873 (Jan. 3, 1979).

[29] National Environmental Policy Act Regulations; Incomplete or Unavailable Information, 51 FR 15618 (Apr. 25, 1986) (amending 40 CFR 1502.22).

[30] E.O. 13807, *supra* note 12.

[31] *Id.,* sec. 5(e)(iii).

[32] Update to the Regulations for Implementing the Procedural Provisions of the National Environmental Policy Act, 83 FR 28591 (June 20, 2018).

[33] Update to the Regulations Implementing the Procedural Provisions of the National Environmental Policy Act, 85 FR 1684 (Jan. 10, 2020).

[34] *See* Docket No. CEQ–2018–0001, *https://www.regulations.gov/document/CEQ-2018-0001-0001.*

[35] *See* Docket No. CEQ–2019–0003, *https://www.regulations.gov/document/CEQ-2019-0003-0001.*

[36] Update to the Regulations Implementing the Procedural Provisions of the National Environmental Policy Act, 85 FR 43304 (July 16, 2020) (''2020 Final Rule'').

[37] *Wild Va.* v. *Council on Env't Quality,* No. 3:20cv45 (W.D. Va. 2020); *Env't Justice Health All.* v. *Council on Env't Quality,* No. 1:20cv06143 (S.D.N.Y. 2020); *Alaska Cmty. Action on Toxics* v. *Council on Env't Quality,* No. 3:20cv5199 (N.D. Cal. 2020); *California* v. *Council on Env't Quality,* No. 3:20cv06057 (N.D. Cal. 2020); *Iowa Citizens for Cmty. Improvement* v. *Council on Env't Quality,* No. 1:20cv02715 (D.D.C. 2020). Additionally, in *The Clinch Coalition* v. *U.S. Forest Serv.,* No. 2:21cv00003 (W.D. Va. 2020), plaintiffs challenged the U.S. Forest Service's NEPA implementing procedures, which established new categorical exclusions, and, relatedly, the 2020 rule's provisions on categorical exclusions.

[38] *Wild Va.* v. *Council on Env't Quality,* 544 F. Supp. 3d 620 (W.D. Va. 2021).

[39] *Wild Va.* v. *Council on Env't Quality,* 56 F.4th 281 (4th Cir. 2022).

*E. CEQ's Review of the 2020 Regulations*

On January 20, 2021, President Biden issued E.O. 13990, *Protecting Public Health and the Environment and Restoring Science to Tackle the Climate Crisis*,[40] to establish an administration policy to listen to the science; improve public health and protect our environment; ensure access to clean air and water; limit exposure to dangerous chemicals and pesticides; hold polluters accountable, including those who disproportionately harm communities of color and low-income communities; reduce GHG emissions; bolster resilience to the impacts of climate change; restore and expand the Nation's treasures and monuments; and prioritize both environmental justice and the creation of well-paying union jobs necessary to achieve these goals.[41] The Executive Order calls for Federal agencies to review existing regulations issued between January 20, 2017, and January 20, 2021, for consistency with the policy it articulates and to take appropriate action.[42] The Executive Order also revokes E.O. 13807 and directs agencies to take steps to rescind any rules or regulations implementing it.[43] An accompanying White House fact sheet, published on January 20, 2021, specifically identified the 2020 regulations for CEQ's review for consistency with E.O. 13990's policy.[44]

Consistent with E.O. 13990 and E.O. 14008, CEQ has reviewed the 2020 regulations and engaged in a multi-phase rulemaking process to ensure that the NEPA implementing regulations provide for sound and efficient environmental review of Federal actions, including those actions integral to tackling the climate crisis, in a manner that enables meaningful public participation, provides for an expeditious process, discloses climate change-related effects, advances environmental justice, respects Tribal sovereignty, protects our Nation's resources, and promotes better and more equitable environmental and community outcomes.

First, CEQ issued an interim final rule on June 29, 2021, amending the requirement in 40 CFR 1507.3(b) for agencies to propose changes to existing agency-specific NEPA procedures by September 14, 2021, to make those procedures consistent with the 2020

regulations.[45] CEQ extended the date by 2 years to avoid agencies proposing changes to agency-specific implementing procedures on a tight deadline to conform to regulations that are undergoing extensive review and would likely change in the near future.

Next, on October 7, 2021, CEQ issued a "Phase 1" proposed rule to focus on a discrete set of provisions designed to restore three elements of the 1978 regulations.[46] CEQ proposed changes to the provisions it considered most critical to address, revise, and clarify while completing the comprehensive review. First, CEQ proposed to revise 40 CFR 1502.13 to clarify that agencies have discretion to consider a variety of factors when assessing an application for authorization by removing a requirement that an agency base the purpose and need on the goals of an applicant and the agency's statutory authority. CEQ also proposed a conforming edit to the definition of "reasonable alternatives" in 40 CFR 1508.1(z). Second, CEQ proposed to remove language in 40 CFR 1507.3 that could be construed to limit agencies' flexibility to develop or revise procedures to implement NEPA specific to their programs and functions that may go beyond CEQ's regulatory requirements. Finally, CEQ proposed to revise the definition of "effects" in 40 CFR 1508.1(g) to restore the substance of the definitions of "effects" and "cumulative impacts" contained in the 1978 regulations. CEQ received 94,458 written comments in response to the proposed rule. CEQ issued a Phase 1 final rule on April 20, 2022,[47] which finalized the proposed revisions.

CEQ received a variety of comments on the Phase 1 proposed rule suggesting additional provisions or changes that CEQ should consider as part of the Phase 2 rulemaking.[48] For example, commenters requested that CEQ strengthen public participation requirements and encourage more robust public engagement; better incorporate environmental justice and climate change considerations into the regulations; further address the climate

and biodiversity crises; modernize environmental review of renewable energy projects; and further refine definitions, including human environment, major Federal action, and effects. In addition, commenters suggested that CEQ address page and time limits; mitigation; tiering; CEs; and improved coordination among Federal, Tribal, State, and local agencies and governments. Additionally, many of the comments on the Phase 1 proposed rule's changes to 40 CFR 1502.13 on purpose and need also included suggestions for changes to 40 CFR 1502.14 and the discussion of alternatives. Where appropriate, CEQ summarizes these Phase 1 comments as they relate to specific subsections of Section II of the preamble.

Here, in this Phase 2 notice of proposed rulemaking (NPRM), CEQ initiates a broader rulemaking to revise, update, and modernize the NEPA implementing regulations. Informed by CEQ's extensive experience implementing NEPA, CEQ proposes further revisions to ensure the NEPA process provides for efficient and effective environmental reviews that are guided by science and are consistent with the statute's text and purpose; enhance clarity and certainty for Federal agencies, project proponents, and the public; inform the public about the potential environmental effects of Federal Government actions and enable full and fair public participation; and ultimately promote better informed Federal decisions that protect and enhance the quality of the human environment, including by ensuring climate change, environmental justice, and other environmental issues are fully accounted for in agencies' decision-making processes.

As part of CEQ's review, CEQ engaged in extensive outreach with a wide variety of interested and experienced parties to solicit their feedback and recommendations on what new elements CEQ should consider adding; what elements from the 1978 regulations CEQ should consider restoring; what existing elements of the NEPA regulations CEQ should consider clarifying, revising, or removing; and what existing elements CEQ should retain in their current form. CEQ convened a Federal interagency working group made up of NEPA practitioners, attorneys, and other experts to hear and discuss their recommendations on a wide variety of issues in the NEPA regulations and more generally with the environmental review process. The Federal agency participants represented the broad array of NEPA practice and environmental expertise across the

---

[40] 86 FR 7037 (Jan. 25, 2021).

[41] *Id.* at sec. 1.

[42] *Id.*

[43] *Id.* at sec. 7.

[44] The White House, Fact Sheet: List of Agency Actions for Review (Jan. 20, 2021), *https://www.whitehouse.gov/briefing-room/statements-releases/2021/01/20/fact-sheet-list-of-agency-actions-for-review/*.

[45] Deadline for Agencies to Propose Updates to National Environmental Policy Act Procedures, 86 FR 34154 (June 29, 2021).

[46] National Environmental Policy Act Implementing Regulations Provisions, 86 FR 55757 (Oct. 7, 2021).

[47] National Environmental Policy Act Implementing Regulations Revisions, 87 FR 23453 (Apr. 20, 2022) ("Phase 1 Final Rule").

[48] *See* CEQ, National Environmental Policy Act Implementing Regulations Revision Phase 1 Response to Comments (Apr. 2022) ("Phase 1 Response to Comments"), *https://www.regulations.gov/document/CEQ-2021-0002-39427*.

AR_0000005

Federal Government, including land management, infrastructure, resource conservation, climate, and environmental justice experts.

CEQ also hosted or participated in over 60 meetings with external parties, such as environmental organizations, business and industry organizations (including timber, energy, air, grazing, mining, and transportation organizations), Tribal Nations, State governments, environmental justice organizations, academics, and labor organizations. Additionally, CEQ held a Tribal consultation specifically on the Phase 2 regulations and the updates to CEQ's GHG guidance on November 12, 2021. CEQ considered the feedback received during these engagements in the development of this proposed rule and has included summaries of the external engagements in the docket.

Finally, as discussed in Section I.B, CEQ relies on its extensive experience overseeing and implementing NEPA in the development of this rule. CEQ has over 50 years of experience advising Federal agencies on the implementation of NEPA. CEQ collaborates daily with Federal agencies on specific NEPA reviews, provides government-wide guidance on NEPA implementation, consults with agencies on the development of agency-specific NEPA implementing procedures and determines they conform with NEPA and the CEQ regulations, and advises the President on a vast array of environmental issues. This experience also enables CEQ to clarify the patchwork of fact-specific judicial decisions that have evolved under NEPA. This rulemaking seeks to bring clarity and predictability to Federal agencies and outside parties whose activities require Federal action and therefore trigger NEPA review, while also facilitating better environmental and social outcomes due to informed decision making.

## II. Summary of Proposed Rule

This section summarizes CEQ's proposed revisions to its NEPA implementing regulations and the rationale for the changes. CEQ's proposed changes fall into five general categories. First, CEQ proposes revisions to implement the amendments to NEPA made by the FRA. Second, where CEQ determined it made sense to do so, CEQ proposes to amend provisions, which the 2020 regulations revised, to revert to the language from the 1978 regulations that was in effect for more than 40 years, subject to minor revisions for clarity. Third, CEQ proposes to remove certain provisions added by the 2020 rule that CEQ considers imprudent or legally

unsettled. Fourth, CEQ proposes to amend certain provisions to enhance consistency and provide clarity to improve the efficiency and effectiveness of the environmental review process. Fifth, CEQ proposes revisions to the regulations to implement decades of CEQ and agency experience implementing and complying with NEPA, foster science-based decision making—including decisions that account for climate change and environmental justice—improve the efficiency and effectiveness of the environmental review process, and better effectuate NEPA's statutory purposes. CEQ is retaining many of the changes made in the 2020 rulemaking particularly where those changes codified longstanding practice or guidance or enhanced the efficiency and effectiveness of the NEPA process.

In response to the Phase 1 proposed rule, CEQ received many comments on provisions not addressed in Phase 1. CEQ indicated in the Phase 1 final rule that it would consider such comments during the development of this Phase 2 rulemaking. CEQ has done so, and where applicable, this NPRM provides a high-level summary of the important issues raised in those public comments.

While some comments have advocated for a straight return to the 1978 regulations, CEQ does not consider this to be the appropriate approach. As part of its review, CEQ evaluated the provisions of the 2020 regulations and sought feedback from NEPA experts and interested stakeholders to identify provisions that, as written, add value to the NEPA process or that require amendments to enhance clarity or improve efficiency and effectiveness. For example, CEQ identified for retention the inclusion of Tribal interests throughout the regulations, the integration of mechanisms to facilitate better interagency cooperation, and the reorganization and modernization of provisions addressing certain elements of the process to make the regulations easier to understand and follow. CEQ considers it important that the regulations meet current goals and objectives, including to promote the development of NEPA documents that are concise but also include the information needed to inform decision makers and reflect public input. CEQ's proposed revisions to the regulations emphasize the importance of transparency and public engagement, reflecting modern practices and changing needs, while also recognizing the discretion and flexibility that Federal agencies need to respond and move efficiently and effectively through the NEPA process.

### A. Proposed Changes Throughout Parts 1500–1508 [49]

CEQ proposes several revisions throughout parts 1500–1508 to provide consistency, improve clarity, and correct grammatical errors. Improved clarity reduces confusion and results in more consistent implementation, thereby improving the efficiency of the NEPA process and reducing the risk of litigation.

For greater consistency and clarity, CEQ proposes to change the word "impact" to "effect" where this term is used as a noun because these two words are synonymous. Throughout the regulations, to improve clarity, CEQ proposes to use the word "significant" only to modify the term "effects." Accordingly, throughout the regulations, where "significant" modifies a word other than "effects," CEQ proposes to replace "significant" with another more accurate adjective, typically "important" or "substantial," which have been used throughout the CEQ regulations since 1978. In doing so, CEQ seeks to avoid confusion about what "significant" means in these other contexts by limiting its use to describing "significant effects." The one exception to this change would be that CEQ proposes for the regulations to continue to refer to a finding of no significant impact (FONSI), which CEQ would leave intact because the concept of a FONSI is entrenched in practice and case law. CEQ heard from public comments and agency feedback on the Phase 1 rulemaking that use of the word "significant" in phrases such as "significant issues" or "significant actions" creates confusion on what the word "significant" means.[50] The proposed change also aligns with the proposed definition of "significant effects" in § 1508.1(jj),[51] as discussed in section II.J.13. CEQ does not intend these proposed changes to substantively change the meaning of the provisions.

For clarity, CEQ proposes to change "statement" to "environmental impact statement" and "assessment" to "environmental assessment" where the regulations only use the short form in the paragraph. See, e.g., §§ 1502.3 and 1506.3(e)(1) through (e)(3).

---

[49] CEQ prepared a redline of this proposed rule's changes to the current CEQ regulations and provided it in the docket as a tool to facilitate public review of this NPRM.

[50] Phase 1 Response to Comments, *supra* note 48, at 120–21.

[51] In the preamble, CEQ uses the section symbol (§) to refer to the proposed regulations as set forth in this NPRM and 40 CFR to refer to the current CEQ regulations as set forth in 40 CFR parts 1500–1508. When referencing specific regulatory sections in place prior to the 2020 final rule, CEQ uses 40 CFR but adds "(2019)."

AR_0000006

CEQ also proposes to make grammatical corrections or other edits throughout the regulations where CEQ considers the changes necessary for the reader to understand fully the meaning of the sentences. Finally, CEQ proposes to update the authorities for each part, update the references to NEPA as amended by the FRA, and fix internal cross references to other sections of the regulations throughout to follow the correct **Federal Register** format.

*B. Proposed Revisions To Update Part 1500, Purpose and Policy*

1. Purpose (§ 1500.1) and Policy (§ 1500.2)

Consistent with the approach taken in the 1978 regulations, CEQ proposes to address the purpose of the CEQ regulations in § 1500.1, "Purpose," and reinstate § 1500.2, "Policy." In § 1500.1, CEQ proposes to restore much of the language from the 1978 regulations and further incorporate the policies Congress established in the NEPA statute. CEQ is proposing these changes to restore text regarding NEPA's purpose and goals, placing the regulations into their broader context. CEQ also finds value in restating the policies of the Act within the regulations, which would improve readability by avoiding the need for cross references to material outside the four corners of the regulations.

Specifically, CEQ proposes to revise 40 CFR 1500.1(a) by subdividing it into § 1500.1(a), (a)(1), and (a)(2), and restoring language from the 1978 regulations that states the principles and policies Congress established in sections 101 and 102 of NEPA. CEQ is proposing to remove the language that describes NEPA as a purely procedural statute because, while correct, CEQ considers that language to be an inappropriately narrow view of NEPA's purpose that minimizes some of the broader goals of NEPA described in section I.A. While CEQ agrees that a NEPA analysis does not dictate a particular outcome by the decision maker, Congress established the NEPA process to provide for better informed Federal decision making and improve environmental outcomes, and those goals are not fulfilled if the NEPA analysis is treated merely as a check-the-box exercise. In short, CEQ does not consider it necessary to repeatedly emphasize the procedural nature of NEPA, which may suggest that NEPA mandates a rote paperwork exercise and de-emphasizes the Act's larger goals and purposes. Instead, CEQ remains cognizant of the goals Congress intended to achieve through the NEPA process in developing its implementing

regulations, and agencies should carry out NEPA's procedural requirements in a manner faithful to the purposes of the statute.

In § 1500.1(a)(1), CEQ proposes to retain the sentence summarizing section 101(a) of NEPA and add a second sentence summarizing section 101(b) to clarify that agencies also should accomplish the purposes described in section 101(b) through NEPA reviews. Including this language in § 1500.1(a)(1) would help agencies understand what the regulations refer to when the regulations direct or encourage agencies to act in a manner consistent with the purposes or policies of the Act. *See, e.g.,* §§ 1500.2(a), 1500.6, 1501.1(a), 1502.1(a), and 1507.3(b).

In § 1500.1(a)(2), CEQ proposes to restore generally the language of the 1978 regulations stating that the purpose of the regulations is to convey what agencies should and must do to comply with NEPA to achieve its purpose. CEQ proposes to strike the language added by the 2020 rule that NEPA requires Federal agencies to provide a detailed statement for major Federal actions, that the purpose and function of NEPA is satisfied if agencies have considered environmental information and informed the public, and that NEPA does not mandate particular results. While it is true that NEPA does not mandate particular results in specific decision-making processes, this language unduly minimizes Congress's understanding that procedures ensuring that agencies analyze, consider, and disclose environmental effects will lead to better substantive outcomes, and is inconsistent with Congress's statements of policy in the NEPA statute.

In § 1500.1(b), CEQ proposes to strike the first two sentences added by the 2020 rule and restore language from the 1978 regulations emphasizing the importance of the early identification of high-quality information that is relevant to a decision. Early identification and consideration of issues using high-quality information have long been fundamental to the NEPA process, particularly because this facilitates comprehensive analysis of alternatives and timely and efficient decision making, and CEQ considers it important to emphasize these considerations in this section. The proposed changes also emphasize that the environmental information that agencies use in the NEPA process should be high-quality, science-based, and accessible. CEQ proposes to strike the first two sentences of this paragraph, which the 2020 rule added, because they also provide an unnecessarily narrow view of the

purposes of NEPA and its implementing regulations.

Finally, CEQ proposes in a new § 1500.1(c) to restore text from the 1978 regulations, most of which the 2020 rule deleted, emphasizing the importance of NEPA reviews for informed decision making. The proposed changes to § 1500.1 recognize that the procedural provisions of NEPA are intended to further the purpose and goals of the Act. One of those goals is to make improved and sound government decisions.

The 2020 rule struck 40 CFR 1500.2 (2019) and integrated policy language into 40 CFR 1500.1 (2020).[52] CEQ is proposing to once again provide for two sections, renaming § 1500.1 to "Purpose" and restoring § 1500.2 as "Policy." CEQ is proposing to restore with some updates the language of the 1978 regulations to § 1500.2.

In § 1500.2(a), CEQ proposes to restore the 1978 language directing agencies to interpret their authorities consistent with the policies of NEPA and the CEQ regulations to the fullest extent possible. Paragraph (b) would restore with clarifying edits the 1978 language directing agencies to implement procedures that facilitate a meaningful NEPA process to the fullest extent possible and emphasize that environmental documents should be concise and clear. Paragraph (c) would direct agencies to integrate NEPA with other planning and environmental review requirements to the fullest extent possible, which promotes efficient processes. CEQ proposes to modernize language from the 1978 regulations in paragraph (d) to emphasize public engagement, including with communities with environmental justice concerns, which often include communities of color, low-income communities, and indigenous communities, and Tribal communities. CEQ views an emphasis on engagement with such communities to be important because agencies have not always meaningfully engaged with them and such communities have been disproportionately and adversely affected by certain Federal activities.

In proposing to make this change to emphasize public engagement, CEQ notes that the obligation to consult with Tribal Nations on a nation-to-nation basis is distinct from the public engagement requirements of NEPA.[53] CEQ invites comment on whether

---

[52] 2020 Final Rule, *supra* note 36, at 43316–17.

[53] *See* E.O. 13175, *Consultation and Coordination with Indian Tribal Governments,* 65 FR 67249 (Nov. 9, 2000); Presidential Memorandum, Tribal Consultation and Strengthening Nation-to-Nation Relationships, 86 FR 7491 (Jan. 29, 2021), *https://www.federalregister.gov/d/2021-02075.*

additional changes to the NEPA regulations would be appropriate in light of the obligation for Tribal consultation.

In paragraph (e), CEQ proposes to restore language from the 1978 regulations regarding the identification of alternatives that avoid or minimize adverse effects. CEQ is proposing to add examples of such alternatives, including those that will reduce climate change-related effects or address effects that disproportionately affect communities with environmental justice concerns consistent with E.O. 12898 and E.O. 14096, to highlight the importance of considering such effects in environmental documents, consistent with NEPA's requirements, including the consideration of high-quality information, such as best available science and data.[54]

Finally, in paragraph (f), CEQ proposes to restore the direction from the 1978 regulations to use all practicable means to restore and enhance the environment, consistent with the policies of NEPA. These proposed restorations and additions to § 1500.2(d), (e), and (f) reflect longstanding practice among Federal agencies and align with NEPA's statutory policies, including to avoid environmental degradation, preserve historic, cultural, and natural resources, and "attain the widest range of beneficial uses of the environment without degradation, risk to health or safety, or other undesirable and unintended consequences." 42 U.S.C. 4331(b).

The 2020 rule removed the Policy section stating that it was duplicative of other sections.[55] However, CEQ proposes to restore and update this section because a robust articulation of the Act's policy principles is fundamental to the NEPA process. CEQ also considers it helpful to agency practitioners and the public to have a consolidated listing of policy objectives regardless of whether other sections of the regulations address those objectives.

### 2. NEPA Compliance (§ 1500.3)

CEQ proposes to remove from § 1500.3 provisions added by the 2020 rule regarding exhaustion and remedies, restore some language from the 1978 regulations removed by the 2020 rule, and make other conforming edits. Specifically, in § 1500.3(a), CEQ proposes to remove the phrase "except where compliance would be inconsistent with other statutory requirements" because this is addressed by § 1500.6. CEQ also proposes to remove the reference to E.O. 13807, which E.O. 13990 revoked, as well as the reference to section 309 of the Clean Air Act because this provision is implemented by EPA.

CEQ proposes to delete 40 CFR 1500.3(b), including its paragraphs. The process established by the 2020 rule provides that first, an agency must request in its notice of intent (NOI) comments on all relevant information, studies, and analyses on potential alternatives and effects. 40 CFR 1500.3(b)(1). Second, the agency must summarize all the information it receives in the draft EIS and specifically seek comment on it. 40 CFR 1500.3(b)(2), 1502.17, 1503.1(a)(3). Third, decision makers must certify in the record of decision (ROD) that they considered all the alternatives, information, and analyses submitted by public commenters. 40 CFR 1500.3(b)(4), 1505.2(b). Fourth, any comments not submitted within the comment period are considered forfeited as unexhausted. 40 CFR 1500.3(b)(3), 1505.2(b). By adding this exhaustion process, the 2020 rule aimed to limit legal challenges and judicial remedies.[56]

CEQ proposes to remove this process because it establishes an inappropriately stringent exhaustion requirement for public commenters and agencies. It is unsettled whether CEQ has the authority under NEPA to set out an exhaustion requirement that bars parties from bringing claims on the grounds that an agency's compliance with NEPA violated the APA, pursuant to 5 U.S.C. 702. While the 2020 rule correctly identifies instances in which courts have ruled that parties may not raise legal claims based on issues that they themselves did not raise during the comment period,[57] other courts have

sometimes ruled that a plaintiff can bring claims where another party raised an issue in comments or where the agency should have identified an issue on its own. *Pac. Coast Fed'n of Fishermen's Ass'ns* v. *U.S. Dep't of Interior,* 929 F. Supp. 2d 1039, 1045–46 (E.D. Cal. 2013); *Wyo. Lodging and Rest. Ass'n* v. *U.S. Dep't of Interior,* 398 F. Supp. 2d 1197, 1210 (D. Wyo. 2005); *see Pub. Citizen,* 541 U.S. at 765 (noting that "[T]he agency bears the primary responsibility to ensure that it complies with NEPA . . . and an EA's or an EIS' flaws might be so obvious that there is no need for a commentator to point them out specifically in order to preserve its ability to challenge a proposed action"). Because the fundamental question raised by these cases is the availability of a cause of action under the APA, and not a question of interpreting NEPA, CEQ considers this question more appropriate for the courts to determine. Further, nothing in this revision would limit the positions the Federal Government may take regarding whether, based on the facts of a particular case, a particular issue has been forfeited by a party's failure to raise it before the agency, and removing this provision does not suggest that a party should not be held to have forfeited an issue by failing to raise it. By deleting the exhaustion requirements, CEQ does not take the position that plaintiffs may raise new and previously unraised issues in litigation. Rather, CEQ considers this to be a question of general administrative law and therefore the courts to be the proper venue to determine whether any particular claim can proceed.

Moreover, the exhaustion requirement established in the 2020 rule is at odds with longstanding agency practice. While courts have ruled that agencies are not required to do so, *see, e.g., Pub. Citizen,* 541 U.S. at 764–65 (finding that where a party does not raise an objection in their comments on an EA, the party forfeits any objection to the EA on that ground), agencies have discretion to consider and respond to comments submitted after a comment period ends. The exhaustion requirement established in the 2020 regulations could encourage agencies to disregard important information presented to the agency shortly after a comment period closes, and such a formalistic approach would not advance NEPA's goal of informed decision making.

To be clear, this change does not relieve parties interested in participating in, commenting on, or ultimately challenging a NEPA analysis

---

[54] Consideration of environmental justice and climate change-related effects has long been part of NEPA analysis. *See, e.g.,* Environmental Justice Guidance, *supra* note 6, and *Ctr. For Biological Diversity* v. *Nat'l Highway Traffic Safety Admin.,* 538 F.3d 1172 (9th Cir. 2008). See also 42 U.S.C. 4331(b) ("[I]t is the continuing responsibility of the Federal Government to . . . assure for *all* Americans safe, healthful, productive, and esthetically and culturally pleasing surroundings . . . [and to] maintain, wherever possible, an environment which supports diversity and variety of individual choice" (emphasis added); 42 U.S.C. 4332(2)(F) ("all agencies of the Federal Government shall . . . recognize the worldwide and long-range character of environmental problems").

[55] 2020 Final Rule, *supra* note 36 at 43317.

[56] 2020 Final Rule, *supra* note 36, at 43317–18.

[57] *Id.* (citing *Dep't of Transp.* v. *Pub. Citizen,* 541 U.S. 752 (2004); *Karst Env't. Educ. & Prot., Inc.* v. *Fed. Highway Admin.,* 559 F. App'x 421 (6th Cir. 2014); *Friends of the Norbeck* v. *U.S. Forest Serv.,* 661 F.3d 969 (8th Cir. 2011); *Exxon Mobil Corp.* v. *U.S. EPA,* 217 F.3d 1246 (9th Cir. 2000); *Nat'l Ass'n of Mfrs.* v. *U.S. Dep't of the Interior,* 134 F.3d 1095 (D.C. Cir. 1998)).

of the obligation to "structure their participation so that it is meaningful." *Vt. Yankee Nuclear Power Corp.* v. *Nat. Res. Def. Council, Inc.,* 435 U.S. 519, 553 (1978). As CEQ's regulations have made clear since 1978, parties must provide comments that are as specific as possible to enable agencies to consider and address information during the decision-making processes. *See* 40 CFR 1503.3(a). While commenters should follow the appropriate procedures and time limits, the revisions would provide agencies flexibility to address unusual circumstances.

CEQ proposes to redesignate 40 CFR 1500.3(c), "Review of NEPA compliance," as paragraph (b) and move to paragraph (b) the sentence from 40 CFR 1500.3(d) regarding harmless error for minor, non-substantive errors, which is a concept that has been in place since the 1978 regulations. CEQ proposes to delete the remaining text of 40 CFR 1500.3(c), removing language that noncompliance with NEPA and the CEQ regulations should be resolved as expeditiously as possible. While CEQ agrees with expeditious resolution of issues, CEQ considers this inappropriate for regulatory text as these regulations cannot compel members of the public or courts to resolve NEPA disputes. Rather, the regulations promote public engagement, appropriate analysis, and informed decision making to facilitate NEPA compliance and avoid such disputes from the outset. CEQ also proposes to strike the last sentence in this paragraph regarding bonding and other security requirements, which relates to litigation over an agency action and not the NEPA process itself. It is unsettled whether NEPA provides agencies with authority to promulgate procedures that require plaintiffs to post bonds in litigation brought under the APA. In any case, CEQ does not consider it appropriate to address this issue in the NEPA implementing regulations.

With the exception of the last sentence in 40 CFR 1500.3(d) regarding remedies, which CEQ proposes to move, as discussed earlier in this section, CEQ proposes to delete the remainder of the paragraph. It is questionable whether CEQ has the authority to direct courts about what remedies are available in litigation brought under the APA to challenge NEPA compliance and, in any case, CEQ considers the 2020 rule's addition of this paragraph to be inappropriate. CEQ considers courts to be in the best position to determine the appropriate remedies when a plaintiff successfully challenges an agency's NEPA compliance.

Finally, CEQ proposes to redesignate 40 CFR 1500.3(e), "Severability," as paragraph (c), without change. CEQ intends these regulations to be severable. The proposed rule would amend existing regulations and the NEPA regulations could be functionally implemented if each revision proposed in this rule occurred on its own or in combination with any other subset of proposed revisions. As a result, if a court were to invalidate any particular provision of this rule, allowing the remainder of the rule to remain in effect would still result in a functional NEPA review process. This approach to severability is the same as the approach that CEQ took when it promulgated the 2020 regulations, because those amendments similarly could be layered onto the 1978 regulations individually without disrupting the overarching NEPA review process.

### 3. Concise and Informative Environmental Documents (§ 1500.4)

CEQ proposes to revise § 1500.4 to emphasize the important values served by concise and informative NEPA documents beyond merely reducing paperwork, such as promoting informed and efficient decision making and facilitating meaningful public participation. Section 1500.4 lists examples of provisions in the CEQ regulations that provide mechanisms by which agencies may prepare concise and informative environmental documents. Each paragraph listed in § 1500.4 includes cross references to regulatory provisions that further the goal of preparing concise and informative documents.

To that end, CEQ proposes to retitle § 1500.4 from "Reducing paperwork" to "Concise and informative environmental documents" and revise the introductory text to clarify that the paragraphs in this section provide examples of the mechanisms in the regulations that agencies can use to prepare concise and informative environmental documents. CEQ proposes to remove paragraphs (a) and (b) from 40 CFR 1500.4 because they are redundant with § 1500.5(a) and (b) and are more appropriately addressed in the section on reducing delay, as well as paragraph (d) because it is addressed in the revised introductory text. CEQ proposes to redesignate 40 CFR 1500.4(c) and (e) through (q) as § 1500.4 (a) and (b) through (n), respectively.

CEQ proposes to add "*e.g.,*" to the cross references listed in § 1500.4(b), (c), and (e) to clarify that they are non-exclusive examples of how agencies can briefly discuss unimportant issues, write in plain language, and reduce

emphasis on background material. CEQ would update the cross references to other sections of the subchapter to reflect proposed changes elsewhere in the regulations. In paragraphs (c) and (e), CEQ proposes to expand the reference from EISs to all environmental documents, as the concepts discussed are more broadly applicable. Additionally, in paragraph (e), CEQ proposes to insert "most" before "useful" to clarify that the environmental documents should not contain portions that are useless.

In § 1500.4(f), CEQ proposes to replace "significant" with "important" and insert "unimportant" to modify "issues" consistent with our proposal to only use "significant" to modify "effects." CEQ also proposes to clarify in paragraph (f) that scoping may apply to EAs. Finally, CEQ proposes to expand paragraph (h), regarding programmatic review and tiering, to include EAs to align with the proposed changes to § 1501.11. Finally, in paragraph (m), CEQ proposes to insert "Federal" before "agency" consistent with § 1506.3, which allows adoption of NEPA documents prepared by other Federal agencies.

Concise and informational documents make the NEPA process more accessible and transparent to the public, allowing the public an opportunity to contribute to the NEPA process. The changes proposed in § 1500.4 align the regulations with the intent of NEPA to allow the public to provide input, as well as CEQ's stated goal of increasing transparency, while providing agencies flexibility on how to achieve concise and informative documents. These proposed changes aim to encourage the preparation of documents that can be easily read and understood, which in turn promote informed and efficient decision making.

### 4. Efficient Process (§ 1500.5)

CEQ proposes minor changes to § 1500.5 to provide clarity and flexibility regarding mechanisms by which agencies can apply the CEQ regulations to improve efficiency in the environmental review process. CEQ proposes these changes to acknowledge that unanticipated events and circumstances beyond agency control may delay the environmental review process, and to recognize that, while these approaches may improve efficiency for many NEPA reviews, they could be inefficient for others. To that end, CEQ proposes to retitle § 1500.5 from "Reducing delay" to "Efficient process" and revise the introductory text to reflect the new title. The other proposed changes include adding EAs

to paragraph (a) to make the provision consistent with the definition of "categorical exclusion;" changing "real issues" to "important issues that required detailed analysis" in paragraph (f) for consistency with § 1502.4; and expanding the scope of paragraph (h) from EISs to environmental documents to make clear that, regardless of the level of NEPA review, agencies should prepare environmental documents early in the process. Proposed § 1500.5 recognizes the importance of timely information for decision making and encourages agencies to implement the 12 listed mechanisms to achieve timely and efficient NEPA processes.

5. Agency Authority (§ 1500.6)

In § 1500.6, CEQ proposes to revise the second sentence to remove the qualification added in the 2020 rule that agencies must ensure full compliance with the Act "as interpreted by" these regulations and instead state that agencies must review and revise their procedures to ensure compliance with NEPA and the CEQ regulations. The phrase added in 2020 could be read to indicate that agencies have no freestanding requirement to comply with NEPA itself, which would be untrue. CEQ also considers the proposed change necessary for consistency with § 1507.3(b), which CEQ revised in the Phase 1 rulemaking to make clear that, while agency procedures must be consistent with the CEQ regulations, agencies have discretion and flexibility to develop procedures beyond the CEQ regulatory requirements, enabling agencies to address their specific programs, statutory mandates, and the contexts in which they operate. CEQ proposes to make conforming edits in §§ 1502.2(d) and 1502.9(b) to remove this phrase.

In the third sentence, CEQ proposes to remove the cross-reference to § 1501.1 for consistency with the proposed modifications to § 1501.1 and restore the intent of language from the 1978 regulations, with modification, explaining that the phrase "to the fullest extent possible" means that each agency must comply with section 102 of NEPA unless an agency activity, decision, or action is exempted by law or compliance with NEPA is impossible. Finally, CEQ proposes to strike the last sentence stating that the CEQ regulations do not limit an agency's other authorities or legal responsibilities, which the 2020 rule added to acknowledge the possibility of different statutory authorities with different requirements. While the 2020 regulations contended that this sentence was added for consistency with E.O.

11514, as amended by section 2(g) of E.O. 11991, CEQ considers the sentence superfluous and unnecessarily vague. As stated in the new proposed text, agencies must comply with NEPA in carrying out an activity, decision, or action unless exempted by law or compliance with NEPA is impossible. That description would reflect accurately the directive that Federal agencies comply with the CEQ regulations "except where such compliance would be inconsistent with statutory requirements." [58]

CEQ's proposed revisions to § 1500.6 would clarify that agencies have an independent responsibility to ensure compliance with NEPA and a duty to harmonize NEPA with their other statutory requirements and authorities to the maximum extent possible. This is true as a general matter of statutory construction as well as under the specific statutory mandate of section 102 of NEPA, which requires that "the policies, regulations, and public laws of the United States shall be interpreted and administered in accordance with the policies set forth in this [Act]." 42 U.S.C. 4332(1).

Therefore, compliance with NEPA is only impossible within the meaning of this subsection when the conflict between another statute and the requirements of NEPA are clear, unavoidable, and irreconcilable. Absent exemption by Congress or a court, an irreconcilable conflict exists only if the agency's authorizing statute grants it no discretion to comply with NEPA while also satisfying the statutory mandate.

*C. Proposed Revisions To Update Part 1501, NEPA and Agency Planning*

CEQ is proposing substantive revisions to all sections in part 1501 except § 1501.2, "Apply NEPA early in the process," to which CEQ proposes minor edits for readability that CEQ considers clarifying and non-substantive. CEQ invites comment on whether it should make any substantive changes to that section or other changes to part 1501.

1. Purpose (§ 1501.1)

CEQ proposes to revert and retitle § 1501.1 to "Purpose," to emphasize the goals of part 1501 consistent with the approach in the 1978 regulations. As discussed further below, CEQ proposes to move some of the NEPA thresholds language in 40 CFR 1501.1 to § 1503.1(a), strike the remaining text, and replace it with new provisions similar to those in the 1978 regulations.

In § 1501.1(a), CEQ proposes to highlight the importance of integrating NEPA early in agency planning processes by generally restoring the language from the 1978 regulations, while also emphasizing that this promotes an efficient process and reduces delay. Restoring this language is consistent with section 102(2)(C) of NEPA and the objective to build into agency decision making, beginning at the earliest point, an appropriate consideration of the environmental aspects of a proposed action. 42 U.S.C. 4332(2)(C). CEQ proposes in paragraph (b) to emphasize early engagement in the environmental review process consistent with other changes proposed throughout the regulations to elevate the importance of early coordination and engagement throughout the NEPA process to identify and address potential issues early in a decision-making process, thereby helping to reduce the overall time required to approve a project and improving outcomes. In new paragraph (c), CEQ proposes to restore text from the 1978 regulations regarding expeditious resolution of interagency disputes as promoted in §§ 1501.7 and 1501.8. Paragraph (d) also would restore the direction to identify the scope of the proposed action and important environmental issues consistent with § 1501.3, thereby enhancing efficiency. Finally, paragraph (e) would highlight the importance of schedules consistent with § 1501.10, which includes provisions requiring agencies to develop a schedule for all environmental reviews and authorizations, as well as §§ 1501.7 and 1501.8, which promote interagency coordination including with respect to schedules.

As discussed further in section II.C.2, CEQ proposes to combine the threshold considerations provision with the process to determine the appropriate level of NEPA review in § 1501.3 by moving 40 CFR 1501.1(a)(1), (2), (4), and (5) to proposed § 1503.3(a)(1), (2), (4), and (4)(ii), respectively, and striking the remaining paragraphs. The 2020 regulations replaced the purpose section in 40 CFR 1501.1 with a list of factors agencies should consider in assessing whether NEPA applies or is otherwise fulfilled for a proposed activity or decision, and allows agencies to make these threshold considerations pursuant to their agency NEPA procedures or on an individual basis.

CEQ proposes to delete two of the threshold factors currently in 40 CFR 1501.1(a). First, CEQ proposes to delete the factor currently listed in 40 CFR 1501.1(a)(3), inconsistency with Congressional intent expressed in another statute. Upon further

---

[58] 2020 Final Rule, *supra* note 36, at 43319.

consideration, this factor may inadequately account for agencies' responsibility to harmonize NEPA with other statutes, as discussed further in section II.C.2. As discussed in section II.B.5, the regulations provide that an agency should determine if a statute or court exempts an action from NEPA or if compliance with NEPA and another statute would be impossible; if not, the agency must comply with NEPA. To the extent the factor suggests that Congress's intent regarding NEPA compliance involves considerations other than those two determinations, the factor is incorrect.

Second, CEQ proposes to strike the factor in 40 CFR 1501.1(a)(6) regarding functional equivalence. While certain Environmental Protection Agency (EPA) actions are explicitly exempted from NEPA's environmental review requirements, and courts have found other EPA-administered statutes to be functionally equivalent or otherwise exempt, CEQ considers this language added to the 2020 rule to go beyond the scope of the NEPA statute and case law because the language can be construed to expand functional equivalence beyond the narrow contexts in which it has been recognized. *See, e.g.,* 15 U.S.C. 793(c)(1) (exempting EPA actions under the Clean Air Act); 33 U.S.C. 1371(c)(1) (exempting most EPA actions under the Clean Water Act); *Env't Def. Fund, Inc.* v. *EPA,* 489 F.2d 1247, 1256–57 (D.C. Cir. 1973) (exempting agency actions under FIFRA); *W. Neb. Res. Council* v. *U.S. Env't Prot. Agency,* 943 F.2d 867, 871–72 (8th Cir. 1991) (noting exemptions under the Safe Drinking Water Act). CEQ considers the more appropriate and prudent approach is for agencies to establish mechanisms in their agency NEPA procedures to align processes and requirements from other environmental laws with the NEPA process.

CEQ proposes to eliminate the current language in 40 CFR 1501.1(b) allowing agencies to make threshold determinations individually or in their NEPA procedures because CEQ proposes to move the consideration of thresholds into § 1501.3 to consolidate the steps agencies should take to determine whether NEPA applies and, if so, what level of NEPA review is appropriate. The language in 40 CFR 1501.1(b) is also redundant to language in § 1507.3(d)(1), which would provide that agency NEPA procedures may identify activities or decisions that are not subject to NEPA. CEQ proposes to remove as unnecessary 40 CFR 1501.1(b)(1) because agencies have discretion to consult with CEQ and have done so for decades on a wide variety

of matters, including on determining NEPA applicability, without such specific language in the CEQ regulations. Finally, CEQ proposes to eliminate 40 CFR 1501.1(b)(2) directing agencies to consult with another agency when they jointly administer a statute if they are making a threshold applicability determination. While CEQ agrees that consultation is a good practice in such circumstances, it does not consider such a requirement necessary for these regulations because consultation is best determined by the agencies involved.

### 2. Determine the Appropriate Level of NEPA Review (§ 1501.3)

CEQ proposes substantive revisions to § 1501.3 to provide a more robust and consolidated description of the process agencies should use to determine the appropriate level of NEPA review, including addressing the threshold question of whether NEPA applies. CEQ also proposes clarifying edits, including adding paragraph headings to paragraphs (a) through (d). This revised provision would clarify the steps for assessing the appropriate level of NEPA review, facilitating a more efficient and predictable review process.

First, as noted in section II.C.1, CEQ proposes to move 40 CFR 1501.1(a)(1) to a new § 1501.3(a), "Applicability," and add a sentence requiring agencies to determine whether NEPA applies to a proposed activity or decision as a threshold matter. CEQ proposes this move because the inquiry into whether NEPA applies is central to determining the level of NEPA review and consolidating the steps in this process in one regulatory section would improve the clarity of the regulations. It is also consistent with the approach in section 106 of NEPA, which addresses threshold considerations. CEQ proposes to strike "or is otherwise fulfilled" in the moved text because, as discussed in section II.C.1, CEQ is proposing to remove the functional equivalence factor from the regulation.

Second, CEQ proposes to move the threshold determination factors agencies should consider when determining whether NEPA applies, currently at 40 CFR 1501.1(a)(1) and (2), to § 1501.3(a)(1) and (2) respectively. CEQ proposes to align the text in paragraph (a)(1) with the language in § 1500.6, "exempted from NEPA by law," and align the text in paragraph (a)(2) with the language in section 106(a)(3) of NEPA, changing "another statute" to "another provision of law" for consistency with the statutory text. Third, CEQ proposes a new factor in paragraph (a)(3) to address

circumstances other than those in which Congress or case law have exempted an activity from NEPA, to clarify that there must be an irreconcilable and fundamental conflict between complying with a statutory provision and complying with NEPA—*i.e.,* the other statutory provision must make NEPA compliance impossible. This factor would be consistent with case law and longstanding principles of statutory construction that require statutes to be read in harmony when it is possible to do so. This approach also reflects the statutory requirement of section 102 of NEPA that agencies interpret and administer "the policies, regulations, and public laws of the United States" in accordance with NEPA's policies and is consistent with CEQ's proposed revisions to § 1500.6, "Agency Authority." 42 U.S.C. 4332; *see* section II.B.5.

Fourth, consistent with section 106(a)(1) and (4) of NEPA, CEQ proposes to move the threshold determination factors regarding whether the activity or decision is a major Federal action from 40 CFR 1501.1(a)(4) and (5), to § 1501.3(a)(4) and (a)(4)(ii), respectively. Consistent with section 106(a)(1) and (4) of NEPA, CEQ proposes to include whether an activity or decision is a final agency action or non-discretionary as subfactors of whether an activity or decision is a major Federal action in § 1501.3(a)(4) because these are also exclusions from the definition of a major Federal action. When agencies assess whether an activity or decision meets the definition of a major Federal action, agencies determine whether they have discretion to consider environmental effects consistent with § 1508.1(u). CEQ invites comment on whether it should make additional changes to § 1501.3(a) in light of the recently enacted provisions in section 106(a) regarding threshold determinations.

Fifth, CEQ proposes to move, with clarifying edits, 40 CFR 1501.9(e), "Determination of scope," to a new proposed § 1501.3(b), "Scope of action and analysis," to provide the next step in determining the appropriate level of NEPA review—the scope of the proposed action and its potential effects. In addition, CEQ proposes moving into § 1501.3(b) one sentence from 40 CFR 1502.4(a) directing agencies to evaluate in a single NEPA review proposals sufficiently closely related to be considered a single action, as well as text from 40 CFR 1501.9(e)(1) regarding connected actions, which are closely related Federal activities or decisions that agencies should consider in a single NEPA document. CEQ proposes to move

**Federal Register** / Vol. 88, No. 145 / Monday, July 31, 2023 / Proposed Rules

**49935**

40 CFR 1501.9(e)(1)(i) through (e)(1)(iii) providing the types of connected actions into § 1501.3(b)(1)(i) through (b)(1)(iii), respectively. This longstanding principle from the 1978 regulations that agencies should not improperly segment their actions is relevant not only when agencies are preparing EISs; rather, it is critical for agencies to consider this as part of the determination whether to prepare an EA or apply a CE. CEQ proposes to consolidate this text into § 1501.3(b) because the determination of the scope of the action, including any connected actions, necessarily informs the appropriate level of NEPA review. While 40 CFR 1501.9(e) currently applies to the scope of EISs, CEQ's proposed consolidation would clarify that this analysis is applicable not only to the scope of the environmental document itself but also to the determination of the level of NEPA document the agency must prepare. Because including this provision in § 1501.3 would make it applicable to environmental reviews other than EISs, CEQ proposes to strike the sentence that accompanied the text in 40 CFR 1502.4(a) directing the lead agency to determine the scope and significant issues for analysis in the EIS as part of the scoping process. CEQ would retain in § 1502.4(a), "Scoping," the requirement that agencies determine the scope and significant issues for analysis in an EIS using an early and open process. CEQ proposes in § 1501.3(b)(1)(i) to likewise change "environmental impact statements" to "NEPA review."

In bringing the text from 40 CFR 1501.9(e) to § 1501.3(b), CEQ is proposing to strike 40 CFR 1501.9(e)(2) and (3) relating to alternatives and impacts, respectively. The current CEQ regulations and the proposed revisions in this NPRM address the analyses of alternatives and effects regarding both EISs (§§ 1502.14, 1502.15) and EAs (§ 1501.5(c)(2)(ii) and (c)(2)(iii)). It would be premature in the process, unnecessary, and unhelpful to address alternatives as part of determining the level of NEPA review.

Sixth, CEQ proposes to redesignate 40 CFR 1501.3(a) as paragraph (c), title it "Levels of NEPA review," and retain the existing paragraphs (1) through (3) without change. In paragraph (c), CEQ proposes to incorporate section 106(b)(3) of NEPA addressing the sources of information agencies may rely on when determining the appropriate level of NEPA review. While section 106(b)(3) only directly applies to an agency's determination whether to prepare an EA or an EIS, CEQ views the approach to reliable data

and producing new research as consistent with longstanding practice and caselaw and appropriate to apply broadly to an agency's determination of the appropriate level of NEPA review, including a determination that no review is required. This approach avoids creating an implication that an agency could be required to conduct new research in a broader range of circumstances when making threshold determinations outside of whether to prepare an EA or EIS, for example in considering whether a CE applies. CEQ invites comment on this approach.

Seventh, CEQ proposes to redesignate 40 CFR 1501.3(b) as § 1501.3(d), title it "Significance determination—context and intensity," and address factors agencies must consider in determining significance by restoring with some modifications the consideration of "context" and "intensity" from the 1978 regulations, which appeared in the definition of "significantly." *See* 40 CFR 1508.27 (2019). Because this text provides direction on how agencies determine the significance of an effect, rather than a definition, this is a more appropriate location for this provision than § 1508.1.

CEQ proposes to modify the introductory language in § 1501.3(d) by requiring agencies to consider the context of an action and the intensity of the effects when considering whether the proposed action's effects are significant. CEQ proposes to strike the sentence requiring agencies to consider connected actions because this concept would be included in proposed paragraph (c).

Paragraph (d)(1) would restore the consideration of the context of the proposed action as a standalone consideration. Specifically, CEQ proposes to restore language from the 1978 regulations requiring agencies to analyze the significance of an action in several contexts. The proposed provision also provides some examples of contexts for consideration. First, the provision proposes agencies should consider the characteristics of the relevant geographic area such as proximity to unique or sensitive resources or vulnerable communities. Such resources may include historic or cultural resources, Tribal sacred sites, and various types of ecologically sensitive areas. This proposal relates to the intensity factor proposed in (d)(2)(iii), which CEQ is proposing to restore from the 1978 regulations. CEQ is proposing to include it as a context factor as well since it relates to the setting of the proposed action. It also would encourage agencies to consider

proximity to communities with environmental justice concerns.

Second, CEQ proposes that agencies should consider the potential global, national, regional, and local contexts, which may be relevant depending on the scope of the action, consistent with the current regulations as well as the 1978 regulations. Third, agencies should consider the duration of the potential effects and whether they are anticipated to be short- or long-term. To that end, CEQ proposes to move and revise text providing that the consideration of short- and long-term effects is relevant to the context of a proposed action from current 40 CFR 1501.3(b)(2)(i) to paragraph (d)(1).

The 2020 rule narrowed the "context" consideration to the potentially affected environment in determining significance, stating that this reframing relates more closely to physical, ecological, and socio-economic aspects of the environment.[59] CEQ has reconsidered this approach and now finds it to be overly limiting. Agencies have decades of experience analyzing their actions within this broader framing of "context." Moreover, this use of "context" is consistent with CEQ's 2022 reinstatement of the concepts of indirect and cumulative effects. Additionally, the 2020 rule's tying of significance to the affected environment, "usually" only in the local area,[60] could be read as deemphasizing reasonably foreseeable effects beyond the immediate area of the action. The appropriate environment is the one that the agency has identified as the affected environment in § 1502.15, which can include the global, national, regional, and local environment. For example, leases for oil and gas extraction or natural gas pipelines have local effects, but also have reasonably foreseeable global indirect and cumulative effects related to GHG emissions.

CEQ also proposes to reinstate "intensity" as a consideration in determining significance, which CEQ reframed in the 2020 rule as the "degree" of the action's effects. In § 1501.3(d)(2), CEQ proposes to require agencies to assess the intensity of effects from an action and to provide a list of factors, some or all of which may apply to any given action, for agencies to consider in relation to one another, returning to the approach from 1978. In 2020, CEQ justified the removal of intensity as a consideration in part

---

[59] 2020 Final Rule, *supra* note 36, at 43322.

[60] 40 CFR 1501.3(b)(1) ("For instance, in the case of a site-specific action, significance would *usually* depend only upon the effects in the local area.") (emphasis added).

based on the proposition that effects are not required to be intense or severe to be considered significant.[61] However, the intensity factors that CEQ proposes to reinstate with modifications have long provided agencies with guidance in how the intensity of an action's effects may inform the significance determination. CEQ does not consider "intense" to be a synonym for "significant;" rather, it points to factors to inform the determination of significance that are part of longstanding agency practice. CEQ also proposes to clarify that agencies should focus on adverse impacts in determinations of significance. This is consistent with NEPA's policies and goals as set forth in section 101 of the statute. 42 U.S.C. 4331.

Paragraph (d)(2)(i) would mirror the 1978 rule's reference to beneficial effects with clarifying additions. CEQ proposes to state that only actions with significant adverse effects require an EIS. This is distinct from weighing beneficial effects against adverse effects to determine that an action's effects on the whole are not significant. Rather, this statement reflects the fact that an action with only beneficial effects and no significant adverse effects does not require an EIS, consistent with CEQ's proposed revisions to § 1501.3(d)(2), regarding the meaning of intensity.

CEQ proposes to add to paragraph (d)(2)(i) clarification that agencies should consider the duration of effects and provide an example of an action with short-term adverse effects but long-term beneficial effects. While significant adverse effects may exist even if the agency considers that on balance the effects of the action will be beneficial, the agency should consider any related short- and long-term effects in the same effect category together in evaluating intensity. For example, an agency should consider short-term construction-related GHG emissions from a renewable energy project in light of long-term reductions in GHG emissions when determining the overall intensity of effects. In this situation, the agency could reasonably determine that the climate effects of the proposed action would not be significantly adverse, and therefore an EIS would not be required. As another example, a forest restoration project may have a short-term adverse effect to a species by displacing it from the area while the project is carried out but have long-term beneficial effects to the species by reducing the risk that a severe wildfire will destroy the habitat altogether. An agency should consider both of these

effects in assessing whether the action significantly affects the species, and may determine that the overall effects on the species would not be significantly adverse and therefore would not require an EIS.

In paragraph (d)(2)(ii), CEQ proposes to make a clarifying edit to the factor relating to the action's effects on health and safety by adding language indicating that the relevant consideration is "the degree to which" the proposed action may "adversely" affect public health and safety.

CEQ proposes to add in paragraph (d)(2)(iii) a factor to consider the degree to which the proposed action may adversely affect unique characteristics of the geographic area such as historic or cultural resources, Tribal sacred sites, parkland, and various types of ecologically sensitive areas. This would reinstate a factor from the 1978 regulations, with clarifying edits, which agencies have considered for decades. As noted earlier in this section, CEQ proposes to use the wording from the 1978 factor on unique characteristics because it is a context consideration. Consideration of this factor is consistent with both the definition of effects (§ 1508.1(g)) and the policies and goals of NEPA. 42 U.S.C. 4331.

In paragraph (d)(2)(iv), CEQ proposes to make a clarifying edit to the factor in 40 CFR 1501.3(b)(2)(iv) relating to actions that may violate Federal, State, Tribal, or local law by adding reference to "other requirements." CEQ also proposes to include inconsistencies with policies designed for protection of the environment because agencies should not necessarily limit their inquiry to statutory requirements. Of course, it may be appropriate to give relatively more weight to whether the action threatens a law imposed for environmental protection as opposed to a policy, but policies imposed for the protection of clean air, clean water, or species conservation, for example, may nonetheless be relevant in evaluating intensity. CEQ invites comment on the inclusion of policies in this provision and whether the regulations should reference specific categories of policies.

Next, CEQ proposes to add paragraph (d)(2)(v) to consider the degree to which effects are highly uncertain. The 1978 regulations included factors for "controversial" effects and those that are "highly uncertain or involve unique or unknown risks." CEQ proposes to restore a modified version of this concept that makes clear that the uncertainty of an effect is the appropriate consideration, and not whether an action is controversial. While a legitimate disagreement on

technical grounds may relate to uncertainty, this approach would make clear that public controversy over an activity or effect is not a factor for determining significance.

CEQ proposes to add a factor to paragraph (d)(2)(vi) regarding the action's relationship with other actions. This would reinstate a factor from the 1978 regulations and reinforce the consideration of the scope of the action that agencies should consider in a NEPA document—that an agency cannot avoid significance by terming an action temporary when it is in fact a part of a repeating or ongoing action or segmenting it into smaller parts. This longstanding NEPA principle is consistent with decades of case law prohibiting the segmentation of actions. *See, e.g., Sierra Club* v. *Marsh,* 769 F.2d 868 (1st Cir. 1985); *Kern* v. *U.S. Bureau of Land Mgmt.,* 284 F.3d 1062 (9th Cir. 2002).

CEQ proposes to add a factor to paragraph (d)(2)(vii) relating to actions that would affect historic resources listed or eligible for listing in the National Register of Historic Places. This would generally reinstate a factor from the 1978 regulations, which agencies have decades of experience considering. Consideration of this factor furthers the policies and goals of NEPA, including to "preserve important historic, cultural, and natural aspects of our national heritage . . . ." 42 U.S.C. 4331.

CEQ proposes to add paragraph (d)(2)(viii) to include effects on an endangered or threatened species or its habitat, including critical habitat under the Endangered Species Act. 16 U.S.C. 1532(5). This would be an expansion of an intensity factor from the 1978 regulations, which only addressed critical habitat. CEQ's proposed revision would clarify that agencies should consider effects to the habitat of endangered or threatened species even if it has not been designated as critical habitat.

CEQ proposes to add paragraph (d)(2)(ix) to include consideration of the degree to which the action may have disproportionate and adverse effects on communities with environmental justice concerns. Evidence continues to accumulate that communities with environmental justice concerns often experience disproportionate environmental burdens such as pollution or urban heat stress, and often experience disproportionate health and other socio-economic burdens that make them more susceptible to adverse effects.

Finally, CEQ proposes to add paragraph (d)(2)(x) to include effects

[61] 2020 Final Rule, *supra* note 36, at 43322.

AR_0000013

upon the rights of Tribal Nations reserved through treaties, statutes, or Executive Orders. This proposed addition would clarify that agencies should consider how an action may impact the reserved rights of Tribal Nations. Tribes' ability to exercise these rights often depends on protection of the resources that support the rights, and agencies should consider impacts to such resources. CEQ specifically seeks comments from Tribes on this proposed addition.

CEQ invites comments on whether there are other considerations that should be added to the regulations to guide agency evaluation of the context and intensity of an effect as part of a determination of significance.

3. Categorical Exclusions (§ 1501.4)

CEQ proposes revisions to § 1501.4 to clarify this provision, which the 2020 rule added, and provide agencies new flexibility to establish CEs using additional mechanisms and flexibilities outside of their NEPA procedures to promote more efficient and transparent development of CEs that may be tailored to specific environmental contexts or project types.

First, CEQ proposes to edit § 1501.4(a) for consistency with and add a cross reference to § 1507.3(c)(8), which currently requires agencies to establish CEs in their NEPA procedures. This revision would more fully and accurately reflect the purposes of and requirements for CEs. As is reflected in the regulations, CEQ views CEs to be an important mechanism to promote efficiency in the NEPA process where agencies have long exercised their expertise to identify and substantiate categories of actions that normally do not have a significant effect on the human environment.

CEQ also proposes to add the clause "individually or in the aggregate" to § 1501.4(a)'s description of CEs. This proposal would clarify that when establishing a CE in its procedures, an agency must determine that the application of the CE to a single action and the repeated collective application to multiple actions would not have significant effects on the human environment. This clarification recognizes that agencies often use CEs multiple times over many years. This change is consistent with the definition of "categorical exclusion" provided by section 111(1) as a "category of actions," which highlights the manner in which CEs consider an aggregation of individual actions. This change is similar to the 1978 regulations' definition of CEs as categories of actions that do not "individually or

cumulatively" have significant effects, which the 2020 rule removed consistent with its removal of the term "cumulative impacts" from the regulations. The Phase 1 rulemaking reinstated cumulative effects to the definition of "effects," [62] so the 2020 rule's justification for removing the phrase no longer has a basis. However, CEQ proposes to use the phrase "in the aggregate" rather than "cumulatively" to avoid potential confusion. Cumulative effects refer to the incremental effects of an agency action added to the effects of other past, present, and reasonably foreseeable actions. In the context of establishing CEs, agencies must consider both the effects of a single action as well as the aggregation of effects from anticipated multiple actions covered by the CE such that the aggregate sum of actions covered by the CE does not normally have a significant effect on the human environment. As part of this analysis, agencies consider the effects—direct, indirect, and cumulative—of the individual and aggregated actions. Because the definition of effects includes cumulative effects, CEQ considers the phrase "in the aggregate" to more clearly define what agencies must consider in establishing a CE—the full scope of direct, indirect, and cumulative effects of the category of action covered by the CE. Agencies have flexibility on how to evaluate whether the "aggregate" of actions covered by a CE will not ordinarily have significant effects and may consider the manner in which the agency's extraordinary circumstances may avoid multiple potential actions having reasonably foreseeable significant effects in the aggregate. As discussed further in section II.I.2 CEQ notes that agencies do not need to evaluate the environmental effects of establishing the CE itself, but rather define the category of action and demonstrate in its substantiation that the CE does not normally have significant effects in the absence of extraordinary circumstances. CEQ proposes to add a qualifying clause at the end of the sentence to reference extraordinary circumstances consistent with § 1501.4(b), and add a definition of "extraordinary circumstances" at § 1508.1(m). These provisions are consistent with longstanding practice and recognize that, as the definition provided by section 111(1) indicates, CEs are a mechanism to identify categories of actions that normally do not have significant environmental effects. Extraordinary circumstances serve to identify actions within a

category of actions the effects of which exceed those normally associated with that category of action and therefore, do not fall within the bounds of the CE.

Finally, CEQ also proposes to add at the end of paragraph (a) language clarifying that agencies may establish CEs individually or jointly with other agencies. In such cases, agencies may use a shared substantiation document and list the CEs in both agencies' NEPA procedures or identify them through another joint document as provided for by proposed § 1501.4(c). CEQ proposes this addition to provide an additional mechanism for establishing CEs transparently and with appropriate public process. Agencies may find value in establishing a CE jointly for activities that they routinely work on together where having a CE would create efficiency in project implementation. Agencies also may save administrative time by establishing CEs jointly.

CEQ proposes edits to § 1501.4(b)(1) to clarify the standard for applying a CE to a proposed action where extraordinary circumstances exist: an agency may apply a CE if the agency determines that a proposed action does not have the potential to result in significant effects, or the agency modifies the proposed action to address the extraordinary circumstance. This standard is consistent with agency practice and has been upheld in case law. As currently drafted, 40 CFR 1501.4(b)(1) could be construed to mean that agencies may mitigate extraordinary circumstances that would otherwise have the potential for significant effects and thereby apply a CE with no opportunity for public review or engagement on such actions. While the 2020 Response to Comments sought to distinguish "circumstances that lessen the impacts" from required mitigation to address significant effects,[63] based on CEQ's discussions with agency representatives and stakeholders, the potential for confusion remains. CEQ's proposed standard makes clear that if an extraordinary circumstance exists, an agency must make an affirmative determination that there is no potential for significant effects in order to apply a CE. If it finds such potential it must either: (1) modify its proposed action in a way that will address the extraordinary circumstance, or (2) prepare an EA or EIS.

CEQ also proposes to add a documentation requirement in these

---

[62] Phase 1 Final Rule, *supra* note 47, at 23469.

[63] CEQ, Update to the Regulations Implementing the Procedural Provisions of the National Environmental Policy Act Final Rule Response to Comments 130 (June 30, 2020) ("2020 Response to Comments"), *https://www.regulations.gov/document/CEQ-2019-0003-720629.*

instances where an agency is applying a CE notwithstanding extraordinary circumstances. CEQ also proposes to add language encouraging agencies to publish such documentation. While not required, CEQ encourages agencies to publish documentation of instances where an agency is applying a CE notwithstanding extraordinary circumstances to provide transparency to the public of an agency determination that there is no potential for significant effects. The proposed language responds to feedback from the public requesting such transparency. CEQ invites comment on whether it should require agencies to publish such documentation.

In addition, CEQ proposes to add a new § 1501.4(c) to provide agencies more flexibility to establish CEs outside of their NEPA procedures. This provision would allow agencies to establish CEs through a land use plan, a decision document supported by a programmatic EIS or EA, or other equivalent planning or programmatic decisions. Once established, agencies could apply CEs to future actions addressed in the program or plan, including site-specific or project-level actions. CEQ anticipates that expanding the mechanisms through which agencies may establish CEs will encourage agencies to conduct programmatic and planning reviews, increase the speed with which agencies can establish CEs while ensuring public participation and adequate substantiation, promote the development of CEs that are tailored to specific contexts, geographies, or project-types, and allow decision makers to consider the cumulative effects of related actions on a geographic area over a longer time frame than agencies generally consider in a review of a single action. This provision would not require agencies to establish CEs through the mechanism added in § 1501.4(c) but rather would provide new options for agencies to consider. CEQ also notes that this mechanism does not preclude agencies from conducting and relying on programmatic analyses in making project-level decisions consistent with § 1501.11. Additionally, it does not require agencies to conduct a NEPA analysis to establish CEs generally, consistent with § 1507.3(c)(8).

Establishing a CE through this alternative approach could be beneficial by providing agencies with more flexibility on how to identify categories of actions that normally will not have significant effects and establishing a CE for them. A programmatic EIS supporting a program decision or land use plan could, for example, provide the

analysis necessary to substantiate a new CE established by the associated decision document that makes sense in the context of the overall program decision or land use plan. For example, a land management agency could consider establishing a CE for zero or minimal impact resilience-related activities. Enabling an agency to establish a CE through this mechanism would reduce duplication of effort by obviating the need for the agency to revise their NEPA procedures consistent with § 1507.3 after completing the programmatic EIS. Agencies also may find it efficient to establish a CE through a land use planning process rather than undertaking a separate process to establish the CE via agency procedures after completion of the land use planning process.

Paragraphs (c)(1) through (c)(6) would set forth the requirements for the establishment of CEs through mechanisms other than an agency's NEPA procedures. Paragraphs (c)(1) and (c)(2) would require agencies to provide CEQ an opportunity to review and comment and provide opportunities for public comment. Agencies may satisfy the requirement for notification and comment under paragraph (c)(2) by incorporating the proposed CEs into any interagency and public review process that involves notice and comment opportunities applicable to the relevant programmatic or planning process.

Proposed paragraphs (c)(3) and (c)(4) would include the same requirements for agencies to substantiate CEs and provide for extraordinary circumstances when they establish CEs under this section as when they establish CEs through their agency NEPA procedures pursuant to § 1507.3. Specifically, first, agencies would have to substantiate their determinations that the category of actions covered by a CE normally will not result in significant effects, individually or in the aggregate. Second, agencies would need to identify extraordinary circumstances. This could be the same list set forth in the agency's NEPA procedures, a list specific to this set of CEs, or a combination of both. While agencies would need to satisfy these requirements in a manner consistent with the establishment of CEs under § 1507.3, agencies could document their compliance with these requirements in the relevant programmatic or planning documents.

Proposed paragraph (c)(5) would direct agencies to establish a process for determining that a CE applies to a specific action in the absence of extraordinary circumstance, or determine the CE still applies notwithstanding the presence of

extraordinary circumstances. Finally, paragraph (c)(6) would direct agencies to maintain a list of all such CEs on their websites, similar to the requirement for agencies to publish CEs established in their agency NEPA procedures consistent with §§ 1507.3(b)(2) and 1507.4(a). Agency websites should clearly link the CEs to their underlying programmatic or planning documents. Additionally, agencies may want to incorporate CEs established through these mechanisms into their agency NEPA procedures during a subsequent revision. CEQ encourages agencies to list all agency CEs in one location, regardless of how the agency established the CE, so that the public can easily access the full list of an agency's CEs.

Proposed § 1501.4(d) would identify a list of examples of features agencies may want to consider including when establishing CEs, regardless of what mechanism they use to do so. Paragraph (d)(1) would note that CEs may cover specific geographic areas or areas that share common characteristics, such as a specific habitat type for a given species.

To promote experimentation and evaluation, paragraph (d)(2) would indicate that agencies may establish CEs for a limited duration. Doing so would enable agencies to narrow the scope of analysis necessary to substantiate that a class of activities normally will not have a significant environmental effect where uncertainty exists about changes to the environment that may occur later in time that could affect the analysis. As with all CEs, agencies should review their continued validity periodically, consistent with CEQ's proposed review timeframe in § 1507.3(c)(9). Once the limited duration threshold is met, agencies could either consider the CE expired, conduct additional analysis to create a permanent CE, or reissue the CE for a new period.

Paragraph (d)(3) provides that a CE may include mitigation measures to address potential significant effects. A CE that includes mitigation is different than an agency modifying an action to avoid an extraordinary circumstance that would otherwise require preparation of an EA or EIS. Paragraph (d)(3) makes clear that an agency may establish a CE for a class of activities that include mitigation requirements as part of the CE application. Agencies would implement the activities covered by the CE as well as the mitigation incorporated into those activities as part of the CE. As an illustrative example, an agency could conclude that, as a category, a type of activity that degrades five acres of habitat will not ordinarily have significant effects where five acres

of equivalent habitat are effectively restored or conserved elsewhere. As another example, a CE could allow for vegetation management activities but require specific mitigation if a certain habitat type is disturbed, such as implementing vegetation activities on 10 acres of sage grouse habitat and requiring restoration or compensatory mitigation for an equivalent 10 acres of sage grouse habitat. Where an agency establishes a CE with a mitigation requirement, the agency would need to include such mitigation in their proposed actions in order for the CE to apply.

Paragraph (d)(4) would provide that agencies can include criteria for when a CE might expire, such that, if such criteria were present, the agency could no longer apply that CE. For example, an agency could establish a CE for certain activities up to a threshold, such as a specified number of acres or occurrences. Once the agency applied that CE up to the threshold number of proposed actions, the agency could no longer use the CE. An agency might set an expiration date or threshold where their record indicates a potential for significant effects after a certain number of applications of the CE to proposed actions; where there is uncertainty beyond that threshold; or where it is unclear how widely the agency would apply the CE. In other situations, an agency may want to make a CE time limited because its authority over the actions is likewise time limited.

Finally, CEQ proposes to strike the provision that would allow an agency to establish a process in its agency NEPA procedures to apply a CE listed in another agency's NEPA procedures in 40 CFR 1507.3(f)(5) and replace it with a provision in § 1501.4(e) that is consistent with the process for adoption established by section 109 of NEPA. While section 109 uses the term "adopt" CEQ is proposing to "apply" to distinguish this provision from the longstanding use of "adoption" in the CEQ regulations to refer to an agency's reliance on another agency's previously completed analysis, including the determination that a CE applies to a proposed action.

First, paragraph (e)(1) would require the borrowing agency to identify the proposed action or category of proposed actions that falls within the CE. In instances where an agency would like to use the CE on a long-term basis, CEQ encourages agencies to establish the CE either in their own procedures or through the process set forth in § 1501.4(c). However, this provision would serve as an important bridge when agencies are implementing new

programs where they have not yet established relevant CEs or when existing programs begin to undertake new categories of actions but where other agencies have experience with similar actions and have established a CE for those actions. In these circumstances, the agency could immediately begin to implement the new programs and new activities based on another agencies CE for similar actions without the need to first develop a CE to cover them. CEQ also notes that, consistent with the requirement of section 109(2) that an agency consult with "the agency that established the categorical exclusion," this provision would only apply to CEs established administratively by the agency, including those that Congress directs agencies to establish administratively, but not those CEs created by statute. While CEQ encourages agencies to include legislative CEs established by statute in their NEPA procedures to provide transparency, they are not "established" by the agency, but rather by Congress. CEQ invites comment on this approach.

Second, under paragraph (e)(2), the borrowing agency would consult with the agency that has the listed CE to ensure application of the CE is appropriate. Third, under paragraph (e)(3), the borrowing agency would evaluate for extraordinary circumstances, consistent with § 1501.3(b) to incorporate the process for documenting use of the CE when extraordinary circumstances are present, but application of the CE is still appropriate. Finally, under paragraphs (e)(4) and (e)(5), the borrowing agency would document application of the CE, provide public notice of the CE that the agency plans to use, and publish the documentation of the application of the CE. Neither the statute nor the proposed regulation requires the agency to accept comment on the public notice of the CE that the agency plans to use. In cases where an agency is applying CEs to a category of actions, the agency could conduct a single consultation and publish a consolidated notice, for example. CEQ invites comment on its proposed process. CEQ invites comment on whether the regulations implementing section 109 should include additional provisions to facilitate the use of CEs while ensuring CEs are not used improperly to authorize actions that have reasonably foreseeable significant effect.

CEQ notes that there has been some confusion regarding the difference between the use or borrowing of another agency's CE proposed in § 1501.4(e), which section 109 of NEPA refers to as

adoption and is currently provided by 40 CFR 1507.3(f)(5) and adoption of a CE determination under § 1506.3(d). In the latter case of adoption of a CE determination, an agency with a CE has applied the CE to its own proposed action. A second agency then adopts that determination for the second agency's action that is substantially the same. Under § 1501.4(e), an agency may use a CE from another agency that has not itself determined that the CE applies to an action. In such circumstances, an agency would be borrowing the CE of another agency and applying it to a new, separate action, rather than adopting a CE determination for an action that is substantially the same.

### 4. Environmental Assessments (§ 1501.5)

CEQ proposes to revise § 1501.5 for consistency with sections 106(b)(2) and 107(e)(2) of NEPA, and to provide greater clarity to agencies on the requirements that apply to the preparation of EAs and to codify agency practice. CEQ proposes edits to address what agencies must discuss in an EA, how agencies should consider public comments they receive on draft EAs, what page limits apply to EAs, and what other requirements in the CEQ regulations agencies should apply to EAs.

Regarding the contents of an EA, CEQ proposes to split 40 CFR 1501.5(c)(2), which requires an EA to briefly discuss the purpose and need for the proposed action, alternatives, and effects, into paragraphs (c)(2)(i) through (iii) to improve readability and provide a clearly defined list of requirements. This formatting change would make it easier for the public and the agencies to ascertain whether an EA includes the necessary contents. For example, when an agency develops an EA for a proposal involving unresolved conflicts concerning alternative uses of available resources, section 102(2)(H) requires an analysis of alternatives, which will generally require analysis of one or more reasonable alternatives, in addition to a proposed action and no action alternative. 42 U.S.C. 4332(2)(H).

CEQ proposes to move from 40 CFR 1501.5(c)(2) into its own paragraph at § 1501.5(c)(3) the requirement for EAs to list the agencies and persons consulted in the development of the EA. CEQ also proposes to clarify in this paragraph that agencies include Federal agencies as well as State, Tribal, and local governments and agencies. CEQ also proposes to add in paragraph (c)(4) a requirement that the EA include a unique identification number that can be used for tracking purposes that

**49940**    **Federal Register**/Vol. 88, No. 145/Monday, July 31, 2023/Proposed Rules

would then be carried forward to all other documents related to the environmental review of the action, including the EIS. Identification numbers can help the public and agencies track the progress of an EA for a specific action as it moves through the NEPA process and may allow for more efficient and effective use of technology such as databases. CEQ also is proposing a similar requirement for EISs in § 1502.4(e)(9).

To reflect current agency practice and provide the public with a clearer understanding about potential public participation opportunities with respect to EAs, CEQ proposes to add a new paragraph (e) that provides that if an agency chooses to publish a draft EA, it must invite public comment on the draft and consider those comments when preparing a final EA. This provision reflects the fact that one of the primary purposes for which agencies choose to prepare draft EAs is to enable public participation. Codifying this practice will enhance the public's understanding of the NEPA process and meaningful public engagement and does not restrict agency discretion over whether to choose to prepare a draft EA for public comment. CEQ would redesignate the current 40 CFR 1501.5(e) and (f) to § 1501.5(f) and (g) respectively.

CEQ also proposes to revise § 1501.5(g) to dispense with the requirement for senior agency official approval to exceed 75 pages, not including any citations or appendices, for consistency with section 107(e)(2) of NEPA.

CEQ proposes to add paragraph (h) to clarify that agencies may reevaluate or supplement an EA if a major Federal action remains to occur and the agency considers it appropriate to do so. Paragraph (h) also would provide that agencies may reevaluate an environmental assessment or otherwise document a finding that changes to the proposed action or new circumstances or information relevant to environmental concerns are not substantial, or the underlying assumptions of the analysis remain valid. CEQ adds this to clarify that an agency may apply the provisions at § 1502.9 regarding supplemental EISs to a supplemental EA to improve efficiency and effectiveness.

Finally, CEQ proposes to clarify the provisions that agencies should or may apply to EAs. In a new paragraph (i), CEQ proposes to clarify that agencies generally should apply the provisions of § 1502.21 regarding incomplete or unavailable information and § 1502.23 regarding scientific accuracy. The 2020 regulations added these as provisions

agencies "may apply;" however, on reflection, CEQ considers it important to disclose where information is incomplete or unavailable, and ensure scientific accuracy for all levels of NEPA review, not just EISs. Then, CEQ proposes to provide in paragraph (j) that agencies may apply the other provisions of parts 1502 and 1503 where they consider it appropriate to improve efficiency and effectiveness of EAs. This provision includes a list of example provisions where this might be the case—scoping (§ 1502.4), cost-benefit analysis (§ 1502.22), environmental review and consultation requirements (§ 1502.24), and response to comments (§ 1503.4).

### 5. Findings of No Significant Impact (§ 1501.6)

CEQ proposes two revisions to § 1501.6 on findings of no significant impact (FONSIs) to clarify the 2020 rule's codification of the longstanding agency practice of relying on mitigated FONSIs in circumstances where the agency incorporates mitigation into the proposed action to reduce its effects below significance. This is an important efficiency tool for NEPA compliance because it expands the circumstances in which an agency may prepare an EA and reach a FONSI, rather than preparing an EIS, consistent with the requirements of NEPA.

Paragraph (a) currently describes that an agency prepares a FONSI when it determines, as a result of an EA, not to prepare an EIS because the proposed action will not have significant effects. At the end of paragraph (a), CEQ proposes to clarify that agencies can prepare a mitigated FONSI if the action will include mitigation to avoid the significant effects that would otherwise occur or minimize or compensate for them to the point that the effects are not significant. So long as the agency can conclude that effects will be insignificant in light of mitigation, the agency can issue a mitigated FONSI. CEQ considers this an important clarification for consistency with the language in § 1501.6(c). Codification of these best practices also aligns with guidance CEQ has issued on appropriate use of mitigation, monitoring, and mitigated FONSIs.[64]

Paragraph (c) currently addresses what an agency must include in a FONSI regarding mitigation. The text provides that when an agency relies on

mitigation to reach a FONSI, the mitigated FONSI must state the enforceable mitigation requirements or commitments that avoid the potentially significant effects. CEQ proposes to clarify in the second sentence that the FONSI must state the enforceable mitigation requirements or commitments, as well as the authorities for them, since they must be enforceable for agencies to reach a mitigated FONSI. CEQ proposes this change because, where a proposed action evaluated in an EA may have significant effects, and an agency is not preparing an EIS, the FONSI must include mitigation of the significant effects. At the end of paragraph (c), CEQ proposes additional language to provide additional details on what is needed to demonstrate that mitigation requirements or commitments are enforceable. Specifically, the proposed language would direct agencies to identify the authority that is being exercised to make the mitigation enforceable.

Finally, as discussed in section II.G.2, CEQ proposes to add a new sentence at the end of paragraph (c) to require a monitoring and compliance plan when the EA relies on mitigation as a component of the proposed action and incorporates the mitigation into the FONSI, consistent with proposed § 1505.3(c). These changes will help effectuate NEPA's purpose as articulated in section 101, including to "attain the widest range of beneficial uses of the environment without degradation, risk to health or safety, or other undesirable and unintended consequences" and to "preserve important historic, cultural, and natural aspects of our national heritage . . . ." 42 U.S.C. 4331(b).

### 6. Lead Agency; Cooperating Agencies (§§ 1501.7 and 1501.8)

CEQ proposes to eliminate the reference to "complex" environmental assessments. The 2020 rule added this term without definition. CEQ invites comment on whether it should retain a complex EA in the regulations, and if so, how CEQ should define a complex EA.

CEQ proposes to retitle § 1501.7 "Lead Agency" to align with section 107(a) of NEPA. CEQ proposes to revise paragraph (b) regarding joint lead agencies for consistency with section 107(a)(1)(B) of NEPA to clarify that the participating Federal agencies may designate a Federal, State, Tribal, or local agency as a joint lead agency upon invitation to and acceptance by such agency. CEQ includes Federal agencies in the list of potential joint lead agencies because there are circumstances in which having another

---

[64] CEQ, Appropriate Use of Mitigation and Monitoring and Clarifying the Appropriate Use of Mitigated Findings of No Significant Impact (Jan. 14, 2011), *https://ceq.doe.gov/docs/ceq-regulations-and-guidance/Mitigation_and_Monitoring_Guidance_14Jan2011.pdf.*

agency serving as a joint lead agency will enhance efficiency. CEQ does not read the text in section 107(a)(1)(B) of NEPA as precluding this approach, but rather Congress specified that State, Tribal, and local agencies may serve as joint lead agencies because they are ineligible to serve as the lead agency. CEQ invites comment on whether it should make additional changes to this paragraph.

CEQ proposes to revise paragraph (c) for consistency with section 107(a)(1) of NEPA to clarify that the participating Federal agencies determine the agency that will be lead and any joint lead agencies, and that the lead agency determines any cooperating agencies. This change also would make this paragraph consistent with the text in § 1506.2(c) on joint EISs. In § 1501.7(e), CEQ proposes to revise the text for consistency with section 107(a)(5)(B) of NEPA and make a non-substantive change to replace the phrase "private person" with the word "individual" for consistency with this term's use in other sections of the regulations. In paragraph (e), CEQ proposes to revise the text for consistency with section 107(a)(4) of NEPA, clarify that the 45 days is calculated from the date of the written request to the senior agency officials as set forth in § 1501.7(d), and replace "persons" with "individuals" for consistency with the rest of regulations.

In paragraph (f), CEQ proposes to revise the text for consistency with section 107(a)(5)(D) of NEPA, to change "within 20 days" to "no later than 20 days" in the first sentence, and "20 days" to "40 days" and "determine" to "designate" in the second sentence.

Currently, 40 CFR 1501.7(g), addressing combined documents, is consistent with the text of section 107(b) of NEPA with respect to EISs, EAs, and FONSIs. The statute does not address joint RODs. CEQ proposes to revise § 1501.7 to add a caveat that agencies must issue joint RODs except where it is inappropriate or inefficient to do so, such as when an agency has a separate statutory directive, or it would take significantly longer to issue a joint ROD than separate ones. CEQ recognizes that, in some cases, requiring a joint ROD could inadvertently slow the NEPA process down because, for example, agencies may have different procedures for issuing authorizations under their applicable legal authorities or may need to consider different factors. But in other cases, it could improve efficiency by avoiding duplication of effort or analysis. Additionally, for consistency with § 1501.5, CEQ proposes to add that agencies can jointly determine to

prepare an EIS if a FONSI is inappropriate.

In § 1501.7(h)(2), CEQ proposes to add a clause consistent with section 107(a)(2)(C) of NEPA requiring the lead agency to give consideration to a cooperating agency's analyses and proposals. In the existing clause, CEQ proposes to move the qualifier, "to the extent practicable" to clarify that it only modifies the second clause, and change "proposals" to "information" to make the text consistent with § 1501.8(b)(3). Further, the use of "proposal" here is inconsistent with the definition of "proposal" provided in § 1508.1(cc). CEQ also proposes to remove the reference to jurisdiction by law or special expertise as unnecessarily redundant given that the definition of "cooperating agencies" in § 1508.1(e) incorporates those phrases.

As discussed further in section II.C.8, CEQ proposes to move the requirements for schedules and milestones currently in 40 CFR 1501.7(i) and (j) to proposed § 1501.10(c) in order to consolidate provisions related to deadlines, schedules, and milestones in one section.

CEQ proposes an addition to § 1501.8 to clarify the meaning of the phrase "special expertise." Paragraph (a) provides that a lead agency may request an agency with special expertise to serve as a cooperating agency. CEQ proposes to clarify in paragraph (a) that special expertise can include Indigenous Knowledge. This proposed change helps ensure that Federal agencies respect and benefit from unique knowledge that Tribal governments may bring to the environmental review process. CEQ notes that the Office of Science and Technology Policy and CEQ have issued a Guidance Memorandum for Federal Departments and Agencies on Indigenous Knowledge,[65] but does not define Indigenous Knowledge. CEQ invites comment on whether it should include such a definition in the regulations. Finally, CEQ notes that even where a federally recognized Tribe participates as a cooperating agency, the agency also may have an obligation to engage in government-to-government consultation on the proposed action consistent with the agency's obligations under E.O. 13175, *Consultation and Coordination with Indian Tribal Governments*.[66]

---

[65] Office of Science and Technology Policy and CEQ, Guidance for Federal Departments and Agencies on Indigenous Knowledge (Nov. 30, 2022), *https://www.whitehouse.gov/wp-content/uploads/2022/12/OSTP-CEQ-IK-Guidance.pdf*.

[66] E.O. 13175, *supra* note 53.

In paragraph (b)(7), CEQ proposes to strike the second clause requiring cooperating agencies to limit their comments to align this paragraph with section 107(a)(3) of NEPA. Finally, CEQ invites comment on whether it should make any additional changes to these sections to promote or improve lead and cooperating agency engagement on the preparation of NEPA documents or increase the efficiency of the preparation process.

7. Public and Governmental Engagement (§ 1501.9)

CEQ proposes to address public and governmental engagement in a revised § 1501.9 by moving and updating 40 CFR 1506.6, "Public involvement," to § 1501.9, and moving provisions specific to the EIS scoping process to § 1502.4. CEQ proposes these updates to continue to provide agencies with flexibility to tailor their engagement specific to their programs and actions while also maintaining the requirements to engage the public and affected parties in the NEPA process. CEQ proposes revisions to § 1501.9 to emphasize the importance of creating an accessible and transparent NEPA process. CEQ also proposes many of these changes in response to feedback on the Phase 1 proposed rule, the 2020 proposed rule, and input received from stakeholders and agencies during development of this proposed rule. Much of that feedback requested increased opportunities for public engagement and increased transparency about agency decision making, along with general requests that CEQ elevate the importance of public engagement in the NEPA process. Finally, CEQ proposes to move the requirements related to public engagement to part 1501 to emphasize that it is a core component of the NEPA process and agency planning, regardless of the level of NEPA analysis being undertaken.

To accomplish this goal, CEQ is proposing changes to multiple sections of the regulations. First, CEQ is proposing to move the existing provisions of 40 CFR 1501.9 on scoping, specifically paragraphs (a), (b), (c), (d), (d)(1) through (8), (f), and (f)(1) through (5) to proposed § 1502.4, "Scoping." As discussed in sections II.C.2 and II.C.9, CEQ proposes to move the existing provisions in 40 CFR 1502.4 on "Major Federal actions requiring the preparation of environmental impact statements" to §§ 1501.3 and 1501.11. Also, as discussed in section II.C.2, CEQ proposes to move the remaining text of existing 40 CFR 1501.9(e) and (e)(1) through (3) on the determination of scope to proposed § 1501.3 because

**49942**     **Federal Register** / Vol. 88, No. 145 / Monday, July 31, 2023 / Proposed Rules

determining the scope of actions applies to all levels of NEPA review.

CEQ proposes to retitle § 1501.9 to "Public and governmental engagement" and accordingly update references to "public involvement" within this section and throughout the CEQ regulations to "public engagement." CEQ is proposing this change because the word "engagement" better reflects how Federal agencies should be interacting with the public. The word "engagement" reflects a process that is more interactive and collaborative compared to simply including or notifying the public of an action. Engagement is also a common term for Federal agencies with experience developing public engagement strategies or that work with public engagement specialists. CEQ proposes to add "governmental" to the title to better reflect the description of the provisions proposed to be included in the section, which relate to both public and governmental entities.

Next, CEQ proposes to add paragraphs (a) and (b) to articulate the purposes of public and governmental engagement and to identify the responsibility of agencies to determine the appropriate methods of public and governmental engagement and conduct scoping consistent with § 1502.4 for EISs. CEQ proposes to use the phrase "meaningful" engagement to better describe the purpose of this process because public and governmental engagement should not be a mere check-the-box exercise, and agencies should conduct engagement with appropriate planning and active dialogue or other interaction with stakeholders in which all parties can contribute. For example, such engagement can inform the potential for significant effects or identify alternatives that avoid or reduce effects. Agencies should determine the appropriate level of outreach needed to engage meaningfully and effectively with affected communities.

Paragraph (c) would list what actions the lead agency should take when conducting outreach for public and governmental engagement. Proposed paragraph (c)(1) would recommend agencies invite likely affected agencies and governments, and paragraph (c)(2) would recommend agencies conduct early engagement with likely affected or interested members of the public. CEQ modeled these provisions on the existing approaches in 40 CFR 1501.7(a)(1) (2019) and 40 CFR 1501.9(b) (2020) to invite early participation of likely affected parties. Paragraph (c)(3) would provide flexibility to agencies to tailor

engagement strategies, considering the scope, scale, and complexity of the proposed action and alternatives, the degree of public interest, and other relevant factors. CEQ proposes to move from 40 CFR 1506.6(c) to § 1501.9(c)(3) the requirement that agencies consider the ability of affected parties to access electronic media when selecting the appropriate methods of notification. CEQ also proposes to add a clause to the end of paragraph (c)(3) to require agencies to consider the primary language of affected persons when determining the appropriate notification methods to use.

CEQ then proposes to move and modify the rest of 40 CFR 1506.6 to proposed §§ 1501.9(d), (e), and (f). Specifically, CEQ proposes to move the introductory clause of 40 CFR 1506.6 and 40 CFR 1506.6(b), including its paragraphs, to § 1501.9(d) and (d)(2), respectively, and make minor revisions to improve readability and consistency with the rest of § 1501.9, including adding the paragraph heading "notification." CEQ also proposes in (d)(2) to clarify that agencies should make environmental documents available, as appropriate, to help inform the public engagement process. CEQ proposes here and throughout the CEQ regulations to replace the word "notice" with "Notification," except where "notice" is used in reference to a **Federal Register** notice. This proposed change is intended to clearly differentiate between those requirements to publish a notice in the **Federal Register** and other requirements to provide notification of an activity, which may include a notice in the **Federal Register** or use of other mechanisms.

CEQ proposes a new paragraph (d)(1) to require agencies to publish notification of proposed actions they are analyzing through an EIS. CEQ proposes this requirement in response to feedback from multiple stakeholders and members of the public requesting more transparency about agency proposed actions. Agencies may publish notification through websites, email notifications, or other mechanisms such as the Permitting Dashboard,[67] so long as the notification method or methods are designed to adequately inform the persons and agencies who may be interested or affected, consistent with the definition of "publish" in § 1508.1(ee). A notice of intent in the **Federal Register**, consistent with

§ 1502.4(e), can fulfill the notification requirement, but agencies also may elect to use additional notification methods. CEQ proposes to combine the provisions from 40 CFR 1506.6(b)(3)(i) and (ii) on notice to State, Tribal, and local governments and agencies in proposed § 1501.9(d)(2)(iii)(A) to consolidate similar provisions. CEQ also proposes to recommend in paragraph (d)(2)(iii)(I) that agencies establish email notification lists or similar methods for the public to easily request electronic notifications for proposed actions.

As discussed in section II.I.3, CEQ proposes to move the requirement for agencies to explain in their NEPA procedures where interested persons can get information on EISs and the NEPA process from 40 CFR 1506.6(e) to § 1507.3(c)(11) since this is a requirement for NEPA procedures, not public engagement. CEQ proposes to move the requirements to make EISs available under FOIA from 40 CFR 1506.6(f) to § 1501.9(d)(3).

CEQ proposes to delete 40 CFR 1506.6(d) on soliciting information from the public because CEQ proposes to include that concept in the purpose and language of § 1501.9. CEQ proposes to move 40 CFR 1506.6(c) on public meetings and hearings to § 1501.9(e), with modification, including adding the heading "Public meetings and hearings" to the paragraph, making minor revisions for clarity, consistency, and readability, and adding a phrase to clarify that when an agency accepts comments for electronic or virtual meetings, agencies must allow the public to submit them electronically or via regular mail. CEQ also proposes to add in paragraph (e) a sentence encouraging agencies to consider the needs of affected communities when determining what format to use for a public hearing or public meeting because the best option for the communities involved may vary.

Finally, CEQ proposes to move 40 CFR 1506.6(a) on public involvement for NEPA procedures to new paragraph § 1501.9(f), adding a paragraph heading "Agency procedures" and changing the word "involve" to "engage." CEQ is proposing to move this provision to its own paragraph because engagement in the development of agency NEPA procedures does not align with the new title added for paragraph (d) and its paragraphs on notification requirements.

CEQ invites comment on whether and how it can make any additional changes to this or other provisions in the regulations to enhance community engagement. This could include adding provisions to the NEPA regulations to

---

[67] *See* Fed. Permitting Improvement Steering Council, Permitting Dashboard for Federal Infrastructure Projects, *https://www.permits.performance.gov/*.

**Federal Register** / Vol. 88, No. 145 / Monday, July 31, 2023 / Proposed Rules **49943**

further address the responsibilities of the Chief Public Engagement Officers proposed in § 1507.2(a) to facilitate community engagement across the agency and technical assistance to communities. CEQ welcomes other ideas.

### 8. Deadlines and Schedule for the NEPA Process (§ 1501.10)

CEQ proposes to retitle § 1501.10 to "Deadlines and schedule for the NEPA process" and revise the section to direct agencies to set deadlines and schedules for NEPA reviews to achieve efficient and informed NEPA analyses consistent with section 107 of NEPA. The proposed changes in this section would improve transparency and predictability for stakeholders and the public regarding NEPA reviews.

In paragraph (a), CEQ proposes edits to emphasize that while NEPA reviews should be efficient and expeditious, they also must include sound analysis. The proposal would direct agencies to set deadlines and schedules tailored to individual or types of proposed actions to facilitate meeting the deadlines proposed in § 1501.10(b). Consistent with section 107(a)(2)(D) of NEPA, CEQ also proposes in this paragraph to require, where applicable, the lead agency to consult with and seek concurrence of joint lead, cooperating, and participating agencies and consult with project sponsors and applicants when establishing and updating schedules.

CEQ proposes to update paragraph (b) for consistency with section 107(h) of NEPA. Paragraph (b)(1) would require agencies to complete an EA within one year and paragraph (b)(2) would require EIS completion in two years unless the lead agency extends the deadline in consultation with any applicant or project sponsor and sets a new deadline. In circumstances where there is no applicant or project sponsor, the consultation requirement is inapplicable to extension of deadlines. Paragraph (b)(3) would identify the starting points from which the deadline is measured and require agencies to measure from the soonest of the three dates identified in section 107(g) of NEPA, as applicable. CEQ notes that section 107(g)(3) of NEPA provides a mechanism for project sponsors to petition the courts for relief if an agency fails to meet the deadlines. Finally, paragraph (b)(4) would require agencies to submit the report to Congress on any missed deadlines required by section 107(h) of NEPA.

To enhance predictability, CEQ proposes to add a new paragraph (c), which would contain text moved from 40 CFR 1501.7(i) and modified for consistency with section 107(a)(2)(D) and (E) of NEPA requiring the lead agency to develop schedules for EISs and EAs. The schedule would include key milestones for the environmental review process, including reviews, permits, and authorizations, and the lead agency would develop it in consultation with the applicant or project sponsor and in consultation with and seek the concurrence of any joint lead, cooperating, and participating agencies. CEQ proposes to allow schedules to be tailored to proposed actions and to highlight factors that may help agencies set specific schedules to meet the deadlines. Finally, CEQ proposes to move to the end of this paragraph text from 40 CFR 1501.7(j) with modifications, including for consistency with section 107(a)(2)(E) of NEPA, and provide clarification to enhance interagency communication and issue resolution. The proposed changes would require that, when the lead agency or any participating agency anticipates a missed milestone, that agency notifies the responsible agency (and the lead agency if identified by another agency) and request that they take action to comply with the schedule. To emphasize the importance of informed and efficient decision making, CEQ proposes to require agencies to elevate any unresolved disputes contributing to the missed milestone to the appropriate officials for resolution within the deadlines for the individual action.

CEQ proposes to redesignate 40 CFR 1501.10(c) as paragraph (d), which addresses factors in setting deadlines, and make changes to the text for consistency with the proposed changes to paragraph (b). Specifically, CEQ proposes to change the reference to "deadlines" to add a reference to "the schedule" and add a reference to the "lead agency," to consider the listed factors in setting schedules. CEQ proposes to add an additional factor to (d)(7), redesignating 40 CFR 1501.10(c)(7) to be paragraph (d)(8), to add the degree to which a substantial dispute exists on the proposed action and its effects. This would restore and clarify a factor included in the 1978 regulations at 40 CFR 1501.8(a)(vii) (2019) regarding the degree to which the action is controversial. While the 2020 regulations removed this factor because it overlapped with other factors, CEQ is proposing to restore and clarify it in the list of factors, focusing on substantial disputes over the size, location, nature, or consequences of the proposed action and its effects. CEQ considers this an important factor that could have

implications for establishing schedules and milestones. In such instances, agencies should seek ways to resolve disputes early in the process, including using conflict resolution and other tools, to achieve efficient outcomes and avoid costly and time-consuming litigation later in the process.

CEQ proposes to redesignate 40 CFR 1501.10(d) as paragraph (e) and require a schedule to include a list of specific milestones. Proposed paragraphs (e)(1) through (e)(5) would require EIS schedules to include proposed dates for publication of the NOI, issuance of the draft EIS, the public comment period, issuance of the final EIS, and issuance of the ROD. CEQ proposes to remove paragraphs 40 CFR 1501.10(d)(2), (d)(6), and (d)(7) because they are either covered by proposed (e)(1) through (e)(3) or unnecessary. CEQ proposes in paragraph (f) and (f)(1) through (f)(4) to identify the milestones that agencies must include in schedules for EAs.

CEQ proposes to redesignate 40 CFR 1501.10(e) as paragraph (g). Finally, to increase predictability and enhance agency accountability, CEQ proposes to strike 40 CFR 1501.10(f) and add a new paragraph (h) to require agencies to make schedules for EISs publicly available and to publish revisions to the schedule. It also would require agencies to publish revisions to the schedule and include an explanation for substantial revisions to increase transparency and public understanding of decision making and to encourage agencies to avoid unnecessary delays.

### 9. Programmatic Environmental Document and Tiering (§ 1501.11)

CEQ proposes to revise and retitle § 1501.11, "Programmatic environmental document and tiering," for consistency with section 108 of NEPA, to consolidate relevant provisions, and to add new language to codify best practices for developing programmatic NEPA reviews and tiering, which are important tools to facilitate more efficient environmental reviews and project approvals. The revisions to this section propose to move portions of 40 CFR 1502.4 on EISs for broad Federal actions to proposed § 1501.11 because agencies can review actions at a programmatic level in both EAs and EISs. CEQ has encouraged agencies to engage in environmental reviews for broad Federal actions through the NEPA process since CEQ's initial guidelines. This continues to be a best practice for addressing broad actions, such as programs, policies, rulemakings, series of projects, and larger or multi-phase projects. CEQ developed guidance in 2014 on Effective

**49944**     **Federal Register** / Vol. 88, No. 145 / Monday, July 31, 2023 / Proposed Rules

Use of Programmatic NEPA Reviews,[68] compiling best practices across the Federal Government on the development of programmatic environmental reviews. In this proposed rule, CEQ would codify some of these principles.

CEQ proposes to first address programmatic environmental documents and then tiering in § 1501.11. Accordingly, CEQ proposes to redesignate existing 40 CFR 1501.11(a), (b), and (c), which address tiering, to be proposed paragraphs (b), (b)(1), and (b)(2), respectively, with some modifications. CEQ proposes to add a new paragraph (a) to address programmatic environmental documents. Proposed paragraph (a) would encourage the use of programmatic environmental documents through an EIS or EA that evaluates the environmental effects of policies, programs, plans, or groups of related activities. CEQ proposes to move text from 40 CFR 1502.4(b) to § 1501.11(a) and revise it to include EAs, providing that programmatic environmental documents should be relevant to the agency decisions and timed to coincide with meaningful points in agency planning and decision making. Finally, paragraph (a) would clarify that agencies can use programmatic environmental documents in a variety of ways, highlighting some examples for agencies to consider to facilitate better and more efficient environmental reviews.

CEQ proposes to move the list of ways agencies may find it useful to evaluate a proposal when preparing programmatic documents from 40 CFR 1502.4(b)(1) and (b)(1)(i) through (b)(1)(iii) to § 1501.11(a)(1) and (a)(1)(i) through (a)(1)(iii), respectively, and expand the list to apply to environmental documents rather than just EISs to encompass EAs. CEQ proposes to modify paragraph (a)(1)(ii) to clarify "[g]enerically" to mean "[t]hematically or by sector," and add technology as an example action type.

CEQ proposes to add paragraph (a)(2) to provide examples of the types of agency actions that may be appropriate for programmatic environmental documents, including programs, policies, or plans; national or regional actions; or actions with multiple stages and are part of an overall plan or program. CEQ proposes to move 40 CFR 1502.4(b)(2) to § 1501.11(a)(3) and recommend that agencies employ scoping and other tools to describe the relationship between programmatic environmental document

and related actions to reduce duplication. CEQ proposes to strike the last sentence of 40 CFR 1502.4(b)(2) stating that agencies may tier their analyses because tiering and programmatic environmental documents would now be addressed together in this section rendering the language unnecessary.

As referenced earlier in this section, CEQ proposes to redesignate the existing paragraphs on tiering to paragraphs (b), (b)(1) and (b)(2). CEQ proposes to title paragraph (b) "Tiering" and add new language to describe when agencies may employ tiering. CEQ proposes to strike as redundant the reference to issues not yet ripe for decision as well as the last sentence on applying tiering to different stages of actions.

In § 1501.11(b)(1) CEQ proposes to add programmatic environmental document to the list of documents from which agencies may tier. This paragraph also would clarify that agencies need to discuss the relationship between the tiered analysis and the previous review; evaluate site-, phase-, or stage-specific conditions and effects; and allow for public engagement opportunities that are appropriate for the location, phase, or stage.

Programmatic documents can most effectively address later activities when they provide a description of planned activities that would implement the program and consider the effects of the program as specifically and comprehensively as possible. A sufficiently detailed programmatic analysis with such project descriptions can allow agencies to rely upon programmatic environmental documents for further actions with no or little additional environmental review necessary. When conducting programmatic analyses, agencies should engage the public throughout the NEPA process and consider when it is appropriate to re-engage the public prior to implementation of the action.

In paragraph (c), CEQ proposes to include the provisions in section 108 of NEPA, which address when an agency may rely on a programmatic document in subsequent environmental documents. CEQ notes that it interprets the reference to "judicial review" in paragraph (c)(1) to mean an opportunity for a party to challenge the programmatic document, including an administrative proceeding or challenge under the Administrative Procedure Act. CEQ invites comment on whether to provide additional information in the regulations to clarify this provision. CEQ proposes in paragraph (c)(2) to require agencies to briefly document

their reevaluations when relying on programmatic environmental documents older than 5 years. CEQ invites comment on whether and how to more closely align this provision with the reevaluation and supplementation provisions in §§ 1501.5(h) and 1502.9(d).

CEQ invites comment on any additional changes that would promote effective use of programmatic environmental reviews to facilitate efficient and non-duplicative subsequent review of project-specific actions, including through tiering.

### 10. Incorporation by Reference Into Environmental Documents (§ 1501.12)

CEQ proposes minor modifications to § 1501.12 to emphasize the importance of transparency and accessibility of material that agencies incorporate by reference. CEQ proposes to add a specific requirement for agencies to briefly explain the relevance of any material incorporated into the environmental document to clarify that agencies must do this. CEQ proposes this addition because explaining the relevance of incorporated material in addition to summarizing it will better inform the decision maker and the public. CEQ encourages agencies to integrate the description of relevance into the summary of the material. CEQ also proposes to change "may not" to "shall not" to eliminate a potential ambiguity over whether agencies must make material they incorporate by reference reasonably available for public inspection. CEQ also proposes to add a reference to "publicly accessible website" as an example of a mechanism for making material incorporated by reference available to the public, and clarify that an agency may meet this obligation by posting documents on a website. Finally, CEQ proposes to add language encouraging agencies to provide digital references, such as hyperlinks, to incorporated material or otherwise indicate how the public can access the material for inspection.

### D. Proposed Revisions To Update Part 1502, Environmental Impact Statements

CEQ is proposing revisions to many sections of part 1502. CEQ is not proposing any substantive changes to § 1502.3, but is revising the section title to read "Statutory requirements for environmental impact statements." CEQ is not proposing substantive changes to § 1502.6, Interdisciplinary preparation; § 1502.13, Purpose and need; § 1502.18, List of preparers; § 1502.19, Appendix; § 1502.20, Publication of the environmental impact statement; § 1502.22, Cost-benefit analysis; or

---

[68] Programmatic Guidance, *supra* note 11.

§ 1502.24, Environmental review and consultation requirements. CEQ invites comment on whether it should make any changes to these sections or other changes to part 1502.

CEQ particularly invites comment on whether it should codify any or all of its 2023 GHG guidance, and, if so, which provisions of part 1502 or other provisions of the regulations CEQ should amend. CEQ proposes to incorporate some or all of the 2023 GHG guidance, which would require making additional changes in the final rule to codify the guidance in whole or part, as is or with changes, based on the comments CEQ receives on this proposed rule.[69]

## 1. Purpose (§ 1502.1)

CEQ proposes to divide § 1502.1 into paragraphs (a), (b), and (c) to enhance readability and amend the text in the section to restore the approach taken in the 1978 regulations regarding the purpose of EISs as they relate to NEPA.

In paragraph (a), CEQ proposes to restore language from the 1978 regulations clarifying that one purpose of an EIS is to serve as an action-forcing device for implementing the policies set out in section 101 of NEPA by ensuring agencies consider the environmental effects of their action in decision making. Congress did not enact NEPA to create procedure for procedure's sake; NEPA's procedures serve the substantive policies and goals Congress established and restoring the action-forcing language would clarify how EISs serve this broader function. This proposed change is consistent with the proposed edits in § 1500.1. *See* section II.B.1.

In paragraph (b), CEQ proposes minor edits for clarity and consistency with other changes proposed throughout the regulations. CEQ proposes to change "It" to "Environmental impact statements" to improve readability in light of the proposal to add paragraphs to the section. CEQ also proposes to change "significant" to "important" before "environmental issues" and insert "reasonable" before "alternatives" for consistency with similar phrasing throughout the regulations. In paragraph (c), CEQ proposes to restore the 1978 language clarifying that an EIS is more than a disclosure document and that agencies must use EISs concurrently with other relevant information to make informed decisions. CEQ considers this language to provide important direction to agencies to ensure that EISs inform planning and decision making and do

not serve as a perfunctory check-the-box exercise.

## 2. Implementation (§ 1502.2)

CEQ proposes minor modifications in § 1502.2. First, CEQ proposes to restore from the 1978 regulations the introductory paragraph directing agencies to prepare EISs to meet the purpose established in § 1502.1. Upon reconsideration, CEQ is proposing to restore this language that was removed as unnecessary by the 2020 rule to provide clarity on the purpose of this section and improve readability.

Next, in paragraph (b) CEQ proposes to replace the word "significant" with "important" and add reference to an environmental assessment for clarity and consistency. In paragraph (c), CEQ proposes to change "analytic" to "analytical," and "project size" to "the scope and complexity of the action" since this provision is applicable to more than projects, and the length of an EIS should be proportional to the scope and complexity of the action analyzed in the document.

CEQ proposes to delete "as interpreted in" before "the regulations in this subchapter" in paragraph (d), for the reasons discussed above for making a similar change in section II.B.5. CEQ is concerned that this phrase may inappropriately constrain agencies whose agency NEPA procedures go beyond the CEQ regulations. Under the proposal, EISs must state how alternatives and decisions will or will not achieve the requirements of NEPA, the CEQ regulations, and other environmental laws and policies. Finally, CEQ proposes to delete the word "final" in paragraph (f) because there is no distinction between a decision and final decision and for consistency with use of "decision" elsewhere in the regulations.

## 3. Scoping (§ 1502.4)

As discussed in section II.C.7 on § 1501.9, "Public and governmental engagement," and § 1501.11, "Programmatic review and tiering," CEQ proposes to revise § 1502.4 by retitling it "Scoping" and moving provisions from the current 40 CFR 1501.9 to this section. This proposal would move the requirements of scoping for EISs to part 1502, which addresses the requirements of EISs, while moving requirements for determining the appropriate level of NEPA review applicable to all environmental reviews to § 1501.3(b). CEQ also proposes to revise the provisions moved from the current 40 CFR 1501.9 to align scoping with related changes made on public engagement in

§ 1501.9 and to add requirements focused on increasing efficiency in the EIS scoping process.

CEQ has heard from multiple Federal agencies that there is uncertainty over the differences between the scoping process required for EISs and other public involvement or engagement requirements for NEPA reviews more generally. By proposing the revised§ 1501.9 on public and governmental engagement and moving the scoping provisions to § 1502.4, CEQ is emphasizing the importance of public engagement in the NEPA process generally, clarifying what requirements are unique to EISs, and clarifying what requirements and best practices agencies should consider regardless of the level of NEPA review.

As noted in sections II.C.2 and II.C.9, with the revision of this section to address scoping, CEQ proposes to move the existing provisions of 40 CFR 1502.4, "Major Federal actions requiring the preparation of environmental impact statements" to §§ 1501.3 and 1501.11.

CEQ proposes to move 40 CFR 1501.9(a), outlining the general purpose of scoping, to § 1502.4(a) and proposes to change the words "significant" and "non-significant" to "important" and "unimportant," respectively, to align with CEQ's proposed change to only use the word "significant" when describing effects. CEQ intends this to be a clarifying, non-substantive change. CEQ proposes to move 40 CFR 1501.9(c) on scoping outreach to paragraph (b) and add a sentence requiring agencies to facilitate notification to persons and agencies who may be interested or affected by an agency's proposed action, consistent with the public engagement requirements in proposed § 1501.9. CEQ proposes to move 40 CFR 1501.9(b) on cooperating and participating agencies to paragraph (c) and retitle it "Inviting participation" to better reflect that the paragraph covers cooperating and participating agencies as well as proponents of the action and other likely affected or interested persons. CEQ notes that agencies invited to serve as cooperating or participating agencies should respond in a timely manner to facilitate the inclusion in the NOI any information that these agencies may need as part of the scoping process.

CEQ proposes to move 40 CFR 1501.9(f) and (f)(1) through (f)(5) on additional scoping responsibilities to paragraph (d) and (d)(1) though (d)(5), respectively. Within this list, CEQ proposes modifications to paragraph (d)(1) to change "significant" to "important" to align with changes in paragraph (a) and the use of "significant" throughout the

regulations, which CEQ intends to be a clarifying, non-substantive change.

CEQ proposes to move the requirements for an NOI from 40 CFR 1501.9(d) and (d)(1) through (d)(8) to § 1502.4(e) and (e)(1) through (e)(8), respectively. CEQ proposes to delete the reference to 40 CFR 1507.3(f)(3) because CEQ is proposing to remove that provision from the regulations, as discussed in section II.I.2. CEQ proposes to revise the language in paragraph (e)(7) for consistency with section 107(c) requiring the NOI to include a request for public comment on alternatives or impacts and on relevant information, studies, or analyses, delete the cross reference to § 1502.17 because CEQ proposes to broaden the language in § 1502.17. Further, this cross reference would no longer be necessary since CEQ proposes to remove the exhaustion process in 40 CFR 1500.3, which relies, in part, on this provision as the first step in that process. Additionally, the purpose of scoping is to receive input from the public on the proposed action and alternatives as well as other information relevant to consideration of the proposed action. CEQ considers the language in this paragraph to be redundant to the other required information in paragraph (e).

To this list of NOI requirements, CEQ proposes to add paragraph (e)(9) to require the lead agency to list any cooperating and participating agencies that have been identified at the time of the NOI, as well as any information those agencies require to facilitate their decisions or authorizations related to the EIS. CEQ proposes to add this requirement to ensure that lead and cooperating agencies are communicating about any unique statutory or regulatory requirements of each agency so that the necessary information is included in the initial NOI and does not require re-issuance of a second NOI by the cooperating or participating agency. For example, the U.S. Forest Service's regulations regarding administrative review require the responsible official to disclose during the NEPA scoping process that a proposed project or activity or proposed plan, plan amendment, or plan revision is subject to one of its administrative review regulations. 36 CFR 218.7(a), 219.52(a). When the Forest Service acts as a cooperating agency and the lead agency does not include the necessary information in the NOI, the Forest Service then must issue its own NOI, which can add additional time in the NEPA process.

CEQ also proposes to add paragraph (e)(10) to require that the NOI include a unique identification number for tracking purposes that would be carried forward to all other documents related to the action such as the draft and final EISs and ROD. Identification numbers can help both the public and agencies track the progress of an EIS for a specific action as it moves through the NEPA process. CEQ has similarly proposed to require agencies to use tracking numbers for environmental assessments in § 1501.5. *See* section II.C.4.

CEQ proposes to move and edit the second sentence regarding supplemental notices in 40 CFR 1507.3(f)(3) to paragraph (f), "Notices of withdrawal or cancellation," to require that an agency publish in the **Federal Register** a notice of withdrawal of the NOI or a supplemental notice to inform the public that it is no longer considering a proposed action and, therefore, discontinuing preparation of an EIS. Agencies should publish such notices if they withdraw, cancel, or otherwise cease the consideration of a proposed action before completing a final EIS. CEQ proposes this requirement to codify common agency practice and to increase transparency to the public. Such a notice does not need to be lengthy, but should clearly reference the original NOI, name of the project in the original notice, unique identification number, and who to contact for additional information.[70] Finally, CEQ proposes to move 40 CFR 1501.9(g) on NOI revisions to § 1502.4(g), updating the paragraph references and changing "significant" to "important" and "impacts" to "effects," which CEQ intends to be a clarifying, non-substantive edit. These edits would align the text with the proposed changes to § 1502.9(d)(1)(ii).

### 4. Timing (§ 1502.5)

CEQ proposes to make three clarifying amendments to § 1502.5. First, in paragraph (a), CEQ proposes to add "*e.g.,*" in the parenthetical "(go/no-go)." CEQ proposes this amendment in response to agency feedback during the development of the proposed rule to clarify that the feasibility analysis and the "go/no-go" stage may not occur at the same point in time and may differ depending on what is included in the feasibility analysis and how the agency has structured that analysis. This change would be consistent with the longstanding practice that agencies have

---

[70] Examples of NOI Withdrawals: Powell Ranger District; Utah; Powell Travel Management Project; Withdrawal of Notice of Intent to Prepare an Environmental Impact Statement, 87 FR 1109 (Jan. 10, 2022); Withdrawal of the Notice of Intent to Prepare an Environmental Impact Statement for the Carpinteria Shoreline, a Feasibility Study in the City of Carpinteria, Santa Barbara County, CA, 86 FR 41028 (July 30, 2021).

---

discretion to decide the appropriate time to begin the NEPA analysis, but also that agencies should integrate the NEPA process and other planning or authorization processes early. *See* § 1501.2(a).

Second, CEQ proposes to add "complete" in the first sentence of paragraph (b) to clarify that agencies must begin preparing an EIS after receiving a complete application, though agencies can elect to begin the process earlier if they choose to do so. CEQ also proposes to add "together and" in the second sentence of paragraph (b) to clarify further that agencies should work "together and with" potential applicants and other entities before receiving the application. Based on CEQ's experience, early conversations and coordination among Federal agencies, the applicant, and other interested entities can improve efficiencies in the NEPA process and ultimately lead to better environmental outcomes. Additionally, similar to the proposed change to paragraph (a), this proposed change is consistent with other directions in the regulations to integrate the NEPA process and other processes early. *See* §§ 1500.5(h), (i), 1501.2(a).

### 5. Page Limits (§ 1502.7)

CEQ proposes to amend § 1502.7 to align the text with section 107(e) of NEPA, which sets page limits for EISs at 150 pages or 300 pages for proposals of extraordinary complexity, not including citations or appendices. CEQ proposes to remove the requirement for the senior agency official of the lead agency to approve longer documents for consistency with the statute, which does not provide a mechanism to approve longer documents.

CEQ strongly encourages agencies to prepare concise EISs that are both comprehensive and understandable to the decision maker and the public. Agencies should consider establishing within their procedures mechanisms to do so that will be most effective for their programs and activities. Such mechanisms might include placing technical analyses in appendices and summarizing them in plain language in the EIS; making use of visual aids, which are excluded from the definition of "page," including sample images, maps, drawings, charts, graphs, and tables; and using insets, colors, and highlights to create visually interesting ways to draw attention to key information and conclusions. Agencies should consider making EISs and technical appendices machine readable, where possible and feasible, to facilitate data sharing and reuse in future

analyses. CEQ invites comment on whether CEQ should modify the regulations to appropriately encourage agencies to do so.

### 6. Writing; and Draft, Final, and Supplemental Statements (§§ 1502.8 and 1502.9)

CEQ proposes minor edits to § 1502.8 to make the text consistent with modifications proposed in § 1502.12 regarding visual aids or charts.

CEQ proposes to delete "as interpreted" before "in the regulations in this subchapter" in § 1502.9(b), as section II.B.5 explains. CEQ also proposes to clarify that it is the agency preparing a draft EIS that determines a draft statement requires supplementation to inform its decision-making process.

In § 1502.9(c), CEQ proposes to clarify that a final EIS should "consider and respond" to comments rather than just "address" them, restoring language from the 1978 regulations and aligning the language with text at § 1503.4(a) regarding consideration of comments. The 2020 rule did not explain the change to "address," [71] and CEQ is concerned that it could be read as weakening the standard for responding to comments within § 1502.9 and in § 1503.4. In paragraphs (d)(1)(ii) and (d)(4), CEQ proposes to replace the word "significant" with "important" and "impacts" with "effects" (except where "impact" is used as part of the term FONSI) for consistency, as discussed in section II.A. In paragraph (d)(1)(ii), CEQ also proposes to add "substantial or" before "important new circumstances or information," for consistency with its use section 108(1) of NEPA, which confirms that an agency may rely on the analysis in an existing programmatic environmental document for five years without having to supplement or reevaluate the analysis, provided no substantial new circumstances or information exist. CEQ invites comment on whether it should revise the language in paragraphs (d)(1)(i) and (d)(1)(ii) to more specifically identify situations where supplementation is required.

CEQ proposes to redesignate 40 CFR 1502.9(d)(4) as § 1502.9(e), title it "Reevaluation," making this a standalone paragraph rather than a paragraph of supplemental EISs to clarify that reevaluation is a separate tool to document when supplementation is not required. CEQ proposes to add in paragraph (e) that agencies may "reevaluate" an EIS in part to determine "that the underlying assumptions of the analysis remains

valid." That language is generally consistent with section 108(2) of NEPA's rule that an agency may rely on programmatic documents that are more than five years old if it reevaluates the underlying analysis. However, while section 108(2) requires reevaluation for programmatic documents more than five years old, CEQ proposes to leave agencies discretion over whether and when to reevaluate non-programmatic documents.

### 7. Recommended Format and Cover (§§ 1502.10 and 1502.11)

CEQ proposes to revise the recommended format of an EIS. CEQ proposes to include the summary of scoping information required by § 1502.17 and the list of preparers required by § 1502.18 in appendices, rather than the main body of the EIS. Therefore, CEQ proposes to remove 40 CFR 1502.10(a)(7) through (9), and add a new paragraph (a)(7) requiring appendices including the scoping summary and list of preparers.

CEQ proposes to clarify in § 1502.11(a) that the list of "responsible agencies" on an EIS cover are the lead, joint lead, and any cooperating agencies. Consistent with the proposed change in § 1502.4(e)(10), CEQ proposes to amend paragraph (g) to require the cover to include the identification number identified in the NOI to make clear the relationships of documents to one another and help the public and decision makers easily track the progress of the EIS as it moves through the NEPA process and to facilitate digitization and analysis.

CEQ proposes to strike the existing requirement in 40 CFR 1502.11(g) to include on the cover of the final EIS the estimated preparation cost, a change that multiple Federal agencies requested during development of this proposed rule. The 2020 rule stated that including estimated total costs would be helpful for tracking such costs, and that agencies could develop their own methodologies for tracking EIS preparation costs in their agency NEPA procedures.[72] However, Federal agency commenters stated that agencies typically do not estimate total costs, that they are difficult to monitor especially when project sponsors and contractors are bearing some of the cost, that the methodology for estimating costs is inconsistent across agencies, and that providing these estimates would be burdensome. At least one agency commenter noted that agencies inconsistently implemented a similar requirement in E.O. 13807, which

undermined the utility of the estimates, that tracking costs added a significant new burden on staff, and that it was not clear whether tracking such costs provided useful information for agencies or the public.

CEQ does not consider EIS costs to be germane to the purpose of an EIS. Requiring that they be included on the cover could incorrectly lead the public and decision makers to believe that those costs relate to the proposed action addressed in the EIS. In general, the purpose of the cover is to indicate the subject matter of the document and provide the public with an agency point of contact, provide a short abstract of the EIS, and indicate the date by which the public must submit comments. Further, CEQ is concerned that requiring agencies to calculate the costs may unnecessarily add time to the EIS preparation process, particularly where aspects of an environmental review serve multiple purposes and allocating costs to NEPA compliance and other obligations may be complicated.

CEQ recognizes the value in gathering information on overall costs, trends in costs, and approaches that can reduce costs, as this can provide a full picture of how and whether agencies are effectively using their resources, including to conduct environmental reviews. Each agency should track and monitor these costs through their own procedures and mechanisms and consult with CEQ about any lessons learned to inform CEQ's ongoing evaluation of the efficiency and effectiveness of the NEPA process. CEQ does not consider requiring in the NEPA regulations that agencies publish costs on the cover of EISs to be the appropriate mechanism to develop that information.

### 8. Summary (§ 1502.12)

CEQ proposes modifications to § 1502.12 to clarify the purpose of the summary and update what elements agencies should include in the summary with a goal of creating summaries that are more useful to the public and agencies. The summary serves to provide the public and decision makers with a clear, high-level overview of the proposed action and alternatives, the significant effects, and other critical information in the EIS.

CEQ proposes a few changes to the second sentence in § 1502.12. First, CEQ proposes to replace the word "stress" with "include" in describing the contents of the summary to clarify that an adequate and accurate summary may include more than what is listed in § 1502.12. Next, CEQ proposes to clarify that the summary should summarize

---

[71] *See* 2020 Final Rule, *supra* note 36.

[72] *Id.*

disputed issues, any issues to be resolved, and key differences among alternatives. CEQ proposes this change to provide the public and decision makers with a more complete picture of the disputed issues rather than focusing on "areas of" disputed issues and to facilitate informed decision making and transparency. These edits are also consistent with § 1502.14(b), which requires agencies to discuss alternatives in detail. Summarizing the key differences of alternatives could enhance the public's and decision makers' understandings of the relative trade-offs of the alternatives considered in detail.

CEQ also proposes to add language to the second sentence to require that the summary identify the environmentally preferable alternative or alternatives. Adding the environmentally preferable alternative to the summary would enhance the public's and decision makers' understandings of the alternative or alternatives that will best promote the national environmental policy as expressed in section 101 of NEPA by providing a summary of that alternative early on in the document.

CEQ proposes to add a fourth sentence to § 1502.12 to make summaries easier to read and understand by requiring agencies to write the summary in plain language and encouraging use of visual aids and charts. Existing regulatory text already requires agencies to write environmental documents in plain language as a means to preparing readable, concise, and informative documents. *See, e.g.,* §§ 1500.4 and 1502.8. Agencies commonly use visual aids, such as graphics, maps, and pictures, throughout their environmental documents.

Finally, similar to other changes proposed regarding page limits, CEQ proposes to allow agencies flexibility in the length of a summary. In the existing text, summaries are limited to 15 pages. CEQ proposes instead to encourage summaries to not exceed 15 pages. Although summaries should be brief, CEQ acknowledges with this proposed change that some proposed actions are more complex and may require additional pages.

### 9. Purpose and Need; Alternatives Including the Proposed Action (§§ 1502.13 and 1502.14)

CEQ proposes to revise § 1502.13 to align the language with the text of section 107(d) of NEPA requiring an EIS to include statement that briefly summarizes the underlying purpose and need for the proposed agency action.

CEQ proposes revisions to § 1502.14 to promote the rigorous analysis and consideration of alternatives, consistent with the longstanding principle that agencies take a "hard look" at their actions. To that end, CEQ proposes to reintroduce much of the 1978 text to § 1502.14 that the 2020 rule removed and modernize it to ensure agency decision makers are well-informed. Many commenters on the Phase 1 rule requested CEQ revise this provision to revert to the 1978 language or revise it to ensure agencies fully explore the reasonable alternatives to their proposed actions.[73]

CEQ proposes to revise the introductory paragraph of § 1502.14 to reinstate the language from the 1978 regulations that the alternatives analysis "is the heart of the environmental impact statement." While the 2020 rule described this clause as "colloquial language" to justify its removal,[74] CEQ now considers this to be an integral policy statement necessary to emphasize the importance of the alternatives analyses to allow decision makers to assess a reasonable range of possible approaches to the matters before them and notes that numerous court decisions quoted this language from the 1978 regulations in stressing the importance of the alternatives analysis. *See, e.g., Wyoming* v. *U.S. Dep't of Agric.,* 661 F.3d 1209, 1243 (10th Cir. 2011). Numerous commenters on the 2020 rule and the 2022 Phase 1 rule supported inclusion of this language.[75]

CEQ proposes a clarifying edit in the introductory paragraph, replacing "present" the environmental effects with "identify" the "reasonably foreseeable" environmental effects consistent with § 1500.2(e) and section 102(2)(C)(i) of NEPA. Finally, in the introductory paragraph, CEQ proposes to state that the alternatives analysis should sharply define issues for the decision maker and the public and provide a clear basis for choice in the options. CEQ proposes reintroducing this language from the 1978 regulations because it provides an important policy statement, concisely explaining the end goals for the alternatives analysis.

CEQ proposes in paragraph (a) to restore the clause that agencies must "rigorously explore and objectively" evaluate reasonable alternatives at the beginning of the first sentence. CEQ proposes to reinsert this language because it provides a standard for how

agencies should analyze alternatives. CEQ proposes to add two additional sentences to paragraph (a). One statement would clarify that agencies need not consider every conceivable alternative to a proposed action but rather must consider a reasonable range of alternatives that fosters informed decision making. CEQ proposes to add this sentence to replace the statement in the current 40 CFR 1502.14(f) requiring agencies to limit their consideration to a reasonable number of alternatives, which CEQ proposes to strike. This proposed language is consistent with longstanding CEQ guidance[76] and would reinforce that the alternative analysis is not boundless; the key is to provide the decision maker with reasonable options to ensure informed decision making. To that end, CEQ also proposes in paragraph (a) to clarify that agencies have the discretion to consider reasonable alternatives not within their jurisdiction, but NEPA and the CEQ regulations generally do not require them to do so. Such alternatives may be relevant, for instance, when agencies are considering program-level decisions[77] or anticipate funding for a project not yet authorized by Congress.[78] CEQ anticipates that such consideration would be a relatively infrequent occurrence and notes that such alternatives would still need to be technically and economically feasible and meet the purpose and need for the proposed action, consistent with the definition of "reasonable alternatives." CEQ considers adding this language to paragraph (a) to improve the consistency of the regulations with the "hard look" principle of NEPA.

Some commenters—both on the 2020 rule and the Phase 1 rule—supported the removal of the 1978 regulations' requirement to consider alternatives outside the jurisdiction of the lead agency, contending that such alternatives are inherently infeasible.[79] However, many commenters on the

[73] *See* Phase 1 Response to Comments, *supra* note 48, at 162.

[74] 2020 Final Rule, *supra* note 36, at 43330.

[75] *See, e.g.,* 2020 Response to Comments, *supra* note 63, at 274; Phase 1 Response to Comments, *supra* note 48, at 55.

[76] Forty Questions, *supra* note 4.

[77] *See, e.g.,* Fed. R.R. Admin., Final Program Environmental Impact Report/Final Environmental Impact Statement (EIR/EIS) for the proposed California High-Speed Train System (2005), *https://hsr.ca.gov/programs/environmental-planning/program-eir-eis-documents-for-the-statewide-high-speed-rail-system-tier-1/final-program-environmental-impact-report-environmental-impact-statement-eir-eis-for-the-proposed-california-high-speed-train-system-2005/.*

[78] *See, e.g.,* U.S. Army Corps of Eng'rs, *Final Environmental Impact Statement for Savannah Harbor Expansion Project* (rev. July 2012), *https://www.sas.usace.army.mil/Missions/Civil-Works/Savannah-Harbor-Expansion/Final-Environmental-Impact-Statement/.*

[79] 2020 Final Rule, *supra* note 36, at 43330–31; 2020 Response to Comments, *supra* note 63, at 45, 57.

Phase 1 rule supported the reintroduction of this language.[80] CEQ's proposal is intended to strike a balance; the proposal would not require agencies to consider alternatives outside their jurisdiction or preclude agencies from doing so. Further, it would retain the direction that the agency need only consider reasonable alternatives.

CEQ proposes to replace paragraph (f) with a requirement to identify the environmentally preferable alternative. In addition to the proposed definition of environmentally preferable alternative in § 1508.1(*l*), this provision would describe elements that the environmentally preferable alternative may generally include. The list uses "or" to make clear that the environmentally preferable alternative need not include each delineated element and recognizes that identifying the environmentally preferable alternative may entail making tradeoffs in some cases. This approach would provide agencies flexibility to rely on their discretion and expertise to strike an appropriate balance in identifying the environmentally preferable alternative. Finally, paragraph (f) would clarify that the environmentally preferable alternative may be the proposed action, no action alternative, or a reasonable alternative. Agencies may identify more than one environmentally preferable alternative as they deem appropriate.

The CEQ regulations, at 40 CFR 1505.2, always have required agencies to identify the environmentally preferable alternative in a ROD. CEQ's proposal would provide more context for what this alternative entails, improving consistency and furthering NEPA's goal of ensuring that agencies make informed decisions regarding actions that impact the environment. Additionally, requiring that the draft and final EIS identify the environmentally preferable alternative would provide more transparency to the public as to the agency's decision-making process at an earlier stage, as well as an opportunity to comment on it before the agency makes its decision.

### 10. Affected Environment (§ 1502.15)

CEQ proposes revisions to § 1502.15 to emphasize the use of high-quality information, including best available science and data; clarify considerations of reasonably foreseeable environmental trends; and emphasize efficiency and concise documents. CEQ also proposes to divide § 1502.15 into paragraphs (a), (b), and (c) to improve readability.

CEQ proposes to discuss data in a new paragraph (b), which would encourage agencies to use high-quality information, including best available science and data, in recognition that these should inform all agency decisions. This paragraph would articulate clearly NEPA's statutory mandate that science inform agencies' decisions as part of a systematic, interdisciplinary approach. *See* 42 U.S.C. 4332(2)(A). In addition, the paragraph would clarify that this information should inform agencies' consideration of "reasonably foreseeable environmental trends," noting explicitly that this includes anticipated climate-related changes to the environment.

CEQ proposes this language to clarify that agencies should consider reasonably foreseeable future climate conditions on affected areas rather than merely describing general climate change trends at the global or national level. In line with scientific projections, accurate baseline assessment of the affected environment over an action's lifetime should incorporate forward-looking climate projections rather than relying on historical data alone. CEQ also proposes language in paragraph (b) to connect the description of baseline environmental conditions and reasonably foreseeable trends to an agency's analysis of environmental consequences and mitigation measures.

CEQ proposes to move the second and third through fifth sentences of 40 CFR 1502.15 to new paragraph (c). CEQ also proposes minor revisions to the relocated language and a new sentence to provide that agencies may combine the affected environment and environmental consequences sections in an EIS, which should be no longer than necessary to understand the relevant affected environment and the effects of the alternatives.

### 11. Environmental Consequences (§ 1502.16)

CEQ proposes several changes to § 1502.16 to clarify priorities and methods of analysis and make updates to ensure that agencies integrate climate change and environmental justice considerations into the analysis of environmental effects.

CEQ proposes in paragraph (a)(1) to modify the sentence requiring agencies to base the comparison of the proposed action and reasonable alternatives on the discussion of effects to add "reasonably foreseeable" before "environmental effects" for consistency with the text of section 102(2)(C)(i) of NEPA and to focus the comparison of the proposed action and reasonable alternatives on the "significant or

important effects" to emphasize that agencies' analyses of effects should be proportional to the significance of the effects. The FRA's amendments to NEPA codified the longstanding principle from the 1978 regulations and long recognized by the courts that effects must be reasonably foreseeable. Consistent with this provision, agencies should identify the effects they deem significant whenever possible to inform the public and decision makers. Finally, CEQ proposes adding a new sentence to the end of paragraph (a)(1) clarifying the proper role of the no action alternative to ensure that the comparative analysis is not distorted by selecting a different alternative (for example, the preferred alternative) as the baseline against which all other alternatives are measured. In formulating the no action alternative, agencies should make reasonable assumptions. CEQ invites comment on whether it should include additional direction or guidance regarding the no action alternative in the final rule.

Next, CEQ proposes to add "reasonably foreseeable" in paragraph (a)(1) before "environmental effects" for consistency with section 102(2)(C)(i) of NEPA and in paragraph (a)(2) before "adverse environmental effects" for consistency with section 102(2)(C)(ii) of NEPA. CEQ proposes to add a new paragraph (a)(3) requiring an analysis of effects of the no action alternative, including any adverse environmental effects consistent with section 102(2)(C)(iii) of NEPA, which requires an analysis of any negative environmental impacts of not implementing the proposed action in the case of a no action alternative. CEQ interprets "negative" to have the same meaning as the term "adverse." For example, an environmental restoration project that helps mitigate the effects of climate change and restores habitat could have adverse effects if it were not implemented or the construction of a commuter transit line could have adverse effects from persistent traffic congestion, air pollution, and related effects to environmental justice communities if it were not implemented. To accommodate this additional paragraph, CEQ proposes to redesignate 40 CFR 1502.15(a)(3) through (a)(5) as paragraphs (a)(4) through (a)(6) accordingly. In paragraph (a)(5), CEQ proposes to insert "Federal" before "resources" for consistency with section 102(2)(C)(v) of NEPA.

Then, CEQ proposes to add reference to two specific elements and revise the reference to an existing element that agencies must include in the analysis of environmental consequences, all related

---

[80] *Phase 1 Response to Comments, supra* note 48, at 162.

to climate change. First, CEQ proposes to revise paragraph (a)(6) to broaden it from land use plans to plans generally and clarify that this element includes plans and policies addressing climate change. Second, CEQ proposes to add a new paragraph (a)(7) to clarify that the discussion of environmental consequences in an EIS must include any reasonably foreseeable climate change-related effects, including effects of climate change on the proposed action and alternatives (which may in turn alter the effects of the proposed action and alternatives). CEQ would then redesignate the paragraphs at 40 CFR 1502.16(a)(6) and(a)(7) as paragraphs (a)(8) and (a)(9), respectively. Third, CEQ proposes to add a new paragraph (a)(10), which would require agencies to address any risk reduction, resiliency, or adaptation measures included in the proposed action and alternatives. This would ensure agencies consider resiliency to the risks associated with a changing climate, including wildfire risk, extreme heat and other extreme weather events, drought, flood risk, loss of historic and cultural resources, and food scarcity. This analysis would further NEPA's mandate that agencies use "the environmental design arts" in decision making and consider the relationship between the "uses" of the environment "and the maintenance and enhancement of long-term productivity." 42 U.S.C. 4332(2)(A) and (2)(C)(iv). It also would help achieve NEPA's goals of protecting the environment across generations, preserving important cultural and other resources, and attaining "the widest range of beneficial uses of the environment without degradation, risk to health or safety, or other undesirable and unintended consequences." 42 U.S.C. 4331(b)(3).

These proposed revisions would clarify that agencies must address both effects of the proposed action and alternatives on climate change, and the resiliency of the proposed action and alternatives in light of climate change.[81] These proposed revisions are consistent with what NEPA has long required: using science to make informed decisions. This proposal is also consistent with NEPA's specific requirement to study the effects of the

Federal action because effects on the Federal action due to climate change may in turn alter the effects that the project has on its environment. These proposed revisions also align well with the definition of effects to encompass reasonably foreseeable indirect and cumulative effects, which are integral to NEPA analyses.

To accommodate the new paragraph (a)(10), CEQ proposes to redesignate 40 CFR 1502.16(a)(8) through (a)(10) as paragraphs (a)(11) through (a)(13), respectively. Finally, CEQ proposes to add paragraph (a)(14) to provide that agencies must discuss the potential for disproportionate and adverse health and environmental effects on communities with environmental justice concerns. The addition of this paragraph would clarify that EISs generally must include an environmental justice analysis to ensure that agency actions do not unintentionally impose disproportionate and adverse effects on these communities.

Finally, CEQ proposes to strike "and give appropriate consideration to" from paragraph (b). CEQ proposes this revision to remove unnecessary language that could be read to require the decision maker to make consideration of such effects a higher priority than other effects listed in this section.

### 12. Summary of Scoping Information (§ 1502.17)

CEQ proposes to revise § 1502.17 and retitle it "Summary of scoping information" to more accurately reflect the proposed content of this section and align it with the common practice of what many agencies produce via scoping reports. CEQ proposes other changes in this section to simplify and remove unnecessary or redundant text and clarify requirements.

CEQ proposes to revise paragraph (a) to require agencies to include a summary of the information they receive from commenters during the scoping process in draft EISs consistent with the proposed revisions to §§ 1500.3, 1501.9, and 1502.4. CEQ proposes to replace "State, Tribal, and local governments and other public commenters" with "commenters" because this phrase is all encompassing. CEQ also proposes to clarify that a draft EIS should include a summary of information, including alternative and analyses, that commenters submitted during scoping. This change provides agencies flexibility to develop a broader summary of information received during scoping. While agencies should still summarize alternatives and analyses, this provision would not require them

to provide a specific summary of every individual alternative, piece of information, or analysis commenters submit during scoping.

CEQ proposes to redesignate paragraph (a)(1) as paragraph (b) and modify it to clarify that agencies can either append to the draft EIS or otherwise make publicly available comments received during scoping. This modification clarifies that the requirements of this paragraph can be met through means other than an appendix, such as a scoping report, which is common practice for some Federal agencies. CEQ proposes a conforming edit in paragraph (b) of § 1502.19, "Appendix," for consistency with this language.

Finally, CEQ proposes to delete the current 40 CFR 1502.17(a)(2) and (b) because the requirements of these paragraphs are redundant to the requirements in part 1503 for Federal agencies to invite comment on draft EISs in their entirety and review and respond to public comments.

### 13. Incomplete or Unavailable Information (§ 1502.21)

CEQ proposes one revision to paragraph (b) of § 1502.21 to strike "but available," which addresses situations where an agency encounters incomplete or unavailable information during its evaluation of a proposed action's reasonably foreseeable significant adverse effects. CEQ proposes to strike "but available," a phrase added by the 2020 rule, to clarify that agencies must obtain information relevant to reasonably foreseeable significant adverse effects that is essential to a reasoned choice between alternatives where the overall costs of doing so are not unreasonable, and the means of obtaining that information are known. This qualifier, which CEQ proposes to remove, could be read to significantly narrow agencies' obligations to obtain additional information even when it is easily attainable and the costs are reasonable. CEQ has reconsidered this change and now considers it vital to the NEPA process for agencies to undertake studies and analyses where necessary rather than relying solely on available information where the costs of obtaining the relevant information are not unreasonable.

Agency feedback received during the development of this proposed rule supports this change. Agency NEPA experts indicated that this qualifier could be read to say that agencies do not need to collect additional information that could and should otherwise inform the public and decision makers. Removing this phrase also would be

---

[81] Such analysis is not new and CEQ has issued guidance consistent with these proposed provisions for nearly a decade. *See generally* CEQ, Final Guidance for Federal Departments and Agencies on Consideration of Greenhouse Gas Emissions and the Effects of Climate Change in National Environmental Policy Act Reviews, 81 FR 51866 (Aug. 8, 2016), *https://ceq.doe.gov/docs/ceq-regulations-and-guidance/nepa_final_ghg_guidance.pdf*, and 2023 GHG Guidance, *supra* note 9.

consistent with other provisions in the regulations emphasizing the importance of relying on high-quality and accurate information in implementing NEPA. *See, e.g.,* § 1500.1(b).

14. Methodology and Scientific Accuracy (§ 1502.23)

CEQ proposes changes to § 1502.23 to promote use of high-quality information, such as best available science and data; require agencies to explain assumptions; and, where appropriate, incorporate projections, including climate change-related projections, in the evaluation of reasonably foreseeable effects. CEQ proposes to separate existing 40 CFR 1502.23 into paragraphs (a) and (b), with some modification, and add a new paragraph (c). The proposed changes to this section would provide additional guidance on how Federal agencies can meet NEPA's statutory requirement to "study, develop, and describe appropriate alternatives to recommended courses of action in any proposal" as set forth in section 102(2)(H) of NEPA.

In paragraph (a), CEQ proposes to reinstate the term high-quality information, as used in the 1978 regulations, and clarify that such information includes best available science and reliable data, models, and resources. Also, CEQ proposes clarifying edits, including moving the word "existing" in the second sentence of paragraph (a) to the end of the sentence and adding reference to sources and materials. CEQ proposes these changes to clarify that while agencies must use reliable data and resources, which can include existing data and resources, they are not limited to use of existing materials. Public commenters on the 2020 rule and Federal agency experts who provided input on this proposed rule raised concerns that the 2020 language could limit agencies to "existing" resources and preclude agencies from undertaking site surveys, conducting investigation, and performing other forms of data collection, which have long been standard practice when analyzing an action's potential environmental effects and may be necessary for agencies to understand particular effects.

For example, in the context of analyzing historical, cultural, or biological effects, survey work is often revisited and reassessed periodically, and an agency should not be required to rely on outdated data. While there are numerous reliable data sources for a variety of resources analyzed in NEPA documents, and the CEQ regulations encourage the use of existing

information wherever possible, *see* § 1501.12, agencies should be permitted to exercise their good judgment in determining when new data and analyses are necessary. Indigenous Knowledge also can be a source of high-quality information.

CEQ proposes to add a new sentence at the end of paragraph (a) encouraging agencies to explain their assumptions and any limitations of their models and methods. CEQ proposes this addition to support this section's overall purpose of ensuring the integrity of the discussions and analyses in environmental documents. Additionally, this would codify typical agency practice to explain relevant assumptions or limitations of the information in environmental documents.

CEQ proposes to strike the statement that agencies are not required to undertake new research to inform their analyses consistent with the changes to paragraph (a). As noted in this section, it is common practice for agencies, when necessary or appropriate, to engage in additional research and create new data based on an action's particular circumstances (such as the affected environment) when analyzing proposed actions under NEPA. Further, by simply striking the sentence added in 2020, CEQ is not proposing to add an across-the-board requirement that agencies must undertake new research in all cases.

Finally, CEQ proposes to add a new paragraph (c), which would require agencies to use projections when evaluating reasonably foreseeable effects, including climate change-related effects, where appropriate. CEQ also proposes to clarify that such projections may employ mathematical or other models that project a range of possible future outcomes, so long as agencies disclose the relevant assumptions or limitations. This addition is consistent with the amendments proposed in paragraphs (a) and (b). Based on existing agency practice and academic literature on climate science, agencies can and do use reliable projections to analyze reasonably foreseeable climate change-related effects. Where available and appropriate, agencies also can use or rely on projections that are scaled to a more targeted and localized geographic scope, such as land use projections, air emissions, and modeling, or to evaluate climate effects experienced locally in relation to the proposed action. When doing so, agencies should explain the basis for relying on those projections and their underlying assumptions. Climate projections can vary based on different factors and assumptions such as geography, location, and existing and

future GHG emissions. For that reason, agencies can use models that analyze a range of possible future outcomes, but agencies must disclose the underlying relevant assumptions or limitations of those models.

CEQ expects that modeling techniques will continue to improve in the future, resulting in more precise climate projections. To be consistent with proposed changes with paragraph (a) in this section, as climate modeling techniques advance, agencies should rely on high-quality information when evaluating reasonably foreseeable climate change-related effects.

*E. Proposed Revisions To Update Part 1503, Commenting on Environmental Impact Statements*

CEQ is proposing substantive revisions to all sections of part 1503, except § 1503.2, Duty to comment. CEQ invites comments on whether it should make changes to this section or other changes to part 1503.

1. Inviting Comments and Requesting Information and Analyses (§ 1503.1)

CEQ proposes to delete 40 CFR 1503.1(a)(3) requiring agencies to invite comment specifically on the submitted alternatives, information, and analyses and the summary thereof for consistency with proposed changes to §§ 1500.3 and 1502.17. This requirement would be unnecessary with the removal of the exhaustion provision. It also is redundant as Federal agencies invite comment on all sections of draft EISs and therefore need not invite comment on one specific section of an EIS.

2. Specificity of Comments and Information (§ 1503.3)

CEQ proposes edits to § 1503.3 to clarify the expected level of detail in comments submitted by the public and other agencies to facilitate their consideration by agencies in the decision-making process. The proposal would remove or otherwise modify provisions that could inappropriately restrict public comments and place unnecessary burden on public commenters.

CEQ proposes to remove language from § 1503.3(a) added in the 2020 rule that requires comments to be as detailed as necessary to meaningfully participate and fully inform the agency of the commenter's position because this requirement could lead commenters to provide unnecessarily long comments that will impede efficiency. Paragraph (a) already requires comments to be "as specific as possible," and the language CEQ proposes to remove could be read

to require commenters to provide detailed information that is not pertinent to the NEPA analysis about the commenter's position on the proposed action, the project proponent, the Federal agency, or other issues. For example, the text could be read to require a commenter to provide a detailed explanation of a moral objection to a proposed action or a personal interest in it if those inform the commenter's position on the project. The text also could imply that commenters must either be an expert on the subject matter or hire an expert to provide the necessary level of detail. The current text could be read to imply that commenters are under an obligation to collect or produce information necessary for agencies to fully evaluate issues raised in comments even if the commenters do not possess that information or the skills necessary to produce it. Some commenters on the 2020 rule raised this issue, expressing concerns that this language could be read to require the general public to demonstrate a level of sophistication and technical expertise not required historically under the CEQ regulations or consistent with the NEPA statute.[82] Commenters also expressed concern that the requirement would discourage or preclude laypersons or communities with environmental justice concerns from commenting.[83] Other commenters on the 2020 rule expressed concern that the changes would shift the responsibility of analysis from the agencies to the general public.[84] Finally, CEQ proposes to remove this language because the requirements that comments provide as much detail as necessary to "meaningfully" participate and "fully inform" the agency are vague and put the burden on the commenter to anticipate the appropriate level of detail to meet those standards.

CEQ also proposes to delete from paragraph (a) language describing the types of impacts that a comment should cover, including the reference to economic and employment impacts. CEQ proposes this deletion because this language imposes an inappropriate burden on commenters by indicating that comments need to explain why an issue matters for economic and employment purposes. NEPA requires agencies to analyze the potential effects on the human environment and does not require that these effects be specified in economic terms or related specifically to employment

considerations. Therefore, it is inappropriate to single out these considerations for special treatment and unduly burdensome to expect commenters to address economic and employment impacts. The proposed revision would not have the effect of limiting commenters from addressing these issues but would avoid the implication that members of the public are welcome to comment only if they address those issues. CEQ proposes to delete the reference to "other impacts affecting the quality of the human environment" because it is unnecessary and duplicative of "consideration of potential effects and alternatives."

Finally, in paragraph (a), CEQ proposes changes to the last sentence to clarify that, only where possible, the public should include citations or proposed changes to the EIS or describe the data, sources, or methodologies that support the proposed changes in their comments. While such information is helpful to the agency whenever it is readily available, CEQ has concerns that this could be construed to place an unreasonable burden on commenters.

CEQ proposes to strike 40 CFR 1503.3(b) and redesignate 40 CFR 1503.3(c) through (d) as § 1503.3(b) and (c). CEQ proposes the deletion of paragraph (b) for consistency with proposed changes to § 1500.3's exhaustion requirement and corresponding changes to § 1502.17. The paragraph also is unrelated to the subject addressed in § 1503.3, which addresses the specificity of comments, rather than when commenters should file their comments. Further, agencies have long had the discretion to consider special or unique circumstances that may warrant consideration of comments outside those time periods. CEQ proposes to strike "site-specific" in paragraph (c) to clarify that cooperating agencies must identify additional information needed to address significant effects generally. This proposed change would enhance efficiency because it would ensure that cooperating agencies have the information they need to fully comment on EISs averting potential delay in the environmental review process.

Finally, CEQ proposes in paragraph (d) to strike the requirement for cooperating agencies to cite their statutory authority for recommending mitigation. This requirement is unnecessary since, at this stage, those agencies with jurisdiction by law have already established their legal authority to participate as cooperating agencies. CEQ also proposes in paragraph (d) to replace the reference to "permit, license, or related requirements" with

"authorizations" because the definition of "authorization" in § 1508.1(c) is inclusive of those terms.

### 3. Response to Comments (§ 1503.4)

CEQ proposes to revise paragraph (a) to clarify that agencies must respond to comments but may do so either individually, in groups, or in some combination thereof. The current use of "may," which the 2020 regulations changed from "shall," creates ambiguity that could be read to mean that agencies have discretion in whether to respond to comments at all, not just the way they respond, *i.e.*, individually or in groups. Some comments on the 2020 proposed rule construed the change to "may" as weakening the longstanding requirement to respond to comments. The proposed change removes any ambiguity created by revisions to the paragraph in the 2020 regulations and is consistent with the longstanding requirement and expectation for agencies to respond to comments received on an EIS while also clarifying that agencies have discretion on how to respond to comments to promote the efficiency of the NEPA process.

In paragraph (c), CEQ proposes changes to clarify that when an agency uses an errata sheet, the agency must publish the entire final EIS, which would include the errata sheet, the draft EIS, and the comments with their responses. CEQ proposes these edits to reflect the typical Federal agency practice and to reflect the current requirement for electronic submission of EISs rather than the old practice of printing EISs for distribution.

### F. Proposed Revisions To Update Part 1504, Pre-Decisional Referrals to the Council of Proposed Federal Actions Determined To Be Environmentally Unsatisfactory

#### 1. Purpose (§ 1504.1)

CEQ proposes in § 1504.1(a) to add language encouraging agencies to engage early with each other to resolve interagency disagreements concerning proposed major Federal actions before such disputes are referred to CEQ. CEQ also proposes to add language clarifying that part 1504 establishes procedures for agencies to submit requests to CEQ for informal dispute resolution, expanding the purpose to reflect changes proposed in §§ 1504.2 and described in section II.F.2. This proposal is consistent with CEQ's ongoing role in promoting the use of environmental collaboration and conflict resolution,[85] and serving as a

---

[82] 2020 Response to Comments, *supra* note 63, at 326–27.

[83] *Id.* at 327.

[84] *Id.* at 328.

[85] *See* OMB & CEQ, Memorandum on Environmental Collaboration and Conflict Resolution (Sept. 7, 2012), *https://www.energy.gov/*

convener and informal mediator for interagency disputes. CEQ strongly encourages agencies to resolve disputes informally and as early as possible so that referrals under part 1504 are used only as a last resort. Early resolution of disputes is essential to ensuring an efficient and effective environmental review process.

In paragraph (b), which addresses EPA's role pursuant to section 309 of the Clean Air Act, CEQ proposes to strike the parenthetical providing the term "environmental referrals," as this term is not used elsewhere in part 1504. Further, CEQ notes that EPA's section 309 authority is distinct from the ability of an agency to make a referral pursuant to this part. Finally, CEQ proposes to revise the second sentence in paragraph (c) to eliminate the passive voice to improve clarity.

2. Early Dispute Resolution (§ 1504.2)

As discussed further in section II.F.3, CEQ proposes to move the provisions in existing 40 CFR 1504.2 to § 1504.3(a) to repurpose § 1504.2 for a new section on early dispute resolution. CEQ proposes to add this section to codify the current practice of agencies to engage with one another and enlist CEQ to help resolve interagency disputes. The added text would codify CEQ's role in convening discussions, mediating issues, and recommending resolutions. While the proposed provisions in § 1504.2 are non-binding, they would serve to encourage agencies to use this informal process to resolve interagency disputes early in the process and provide transparency to the public that this process occurs.

Proposed paragraph (a) would encourage agencies to engage in interagency coordination and collaboration within planning and decision-making processes and to identify and resolve interagency disputes. Further, paragraph (a) would encourage agencies to elevate issues to appropriate agency officials or to CEQ in a timely manner that is consistent with the schedules for the proposed action established under § 1501.10.

Paragraph (b) would allow a Federal agency to request that CEQ engage in informal dispute resolution. When making such a request to CEQ, the agency must provide CEQ with a summary of the proposed action, information on the disputed issues, and agency points of contact. CEQ proposes

*sites/default/files/OMB_CEQ_Env_Collab_Conflict_ Resolution_20120907-2012.pdf;* OMB & CEQ, Memorandum on Environmental Conflict Resolution (Nov. 28, 2005), *https://ceq.doe.gov/ docs/ceq-regulations-and-guidance/regs/OMB_ CEQ_Joint_Statement.pdf.*

this provision to codify the longstanding practice of CEQ helping to mediate and resolve interagency disputes outside of and well before the formal referral process (§ 1504.3) and to provide additional direction to agencies on what information CEQ needs to effectively mediate.

Paragraph (b) would provide CEQ with several options to respond to a request for informal dispute resolution, including requesting additional information, convening discussions, and making recommendations, as well as the option to decline the request.

3. Criteria and Procedure for Referrals and Response (§ 1504.3)

As noted in section II.F.2, CEQ proposes to move the criteria for referral currently set forth in 40 CFR 1504.2 to a new § 1504.3(a) and redesignate 40 CFR 1504.3(a) through (h) as § 1504.5(b) through (i), respectively. As a result of this consolidation, CEQ would revise the title of § 1504.3 to "Criteria and procedure for referrals and response." The criteria and procedures for agencies to make a referral apply to agencies that make a referral under the NEPA regulations and do not apply to EPA when exercising its referral authority under section 309 of the Clean Air Act (42 U.S.C. 7609).

*G. Proposed Revisions to NEPA and Agency Decision Making (Part 1505)*

1. Record of Decision in Cases Requiring Environmental Impact Statements (§ 1505.2)

CEQ proposes modifications in § 1505.2 to align this section with other proposed changes to the regulations and clarify the alternatives agencies must identify in RODs. CEQ also proposes to modify the provision on mitigation.

As discussed further in this section, CEQ proposes to strike 40 CFR 1505.2(b), make 40 CFR 1505.2(a) an undesignated introductory paragraph in § 1505.2, and redesignate 40 CFR 1505.2(a)(1) through (3) as § 1505.2(a) through (c), respectively. In § 1505.2(b), CEQ proposes to restructure the first two sentences to improve readability and clarify that agencies must identify one or more environmentally preferable alternatives in the ROD, consistent with proposed changes to § 1502.14(f) requiring agencies to identify them in the EIS and § 1508.1(*l*), defining "environmentally preferable alternative." Further, in the second sentence of paragraph (b), CEQ proposes to add "environmental" to the list of relevant factors upon which an agency may base discussion of preferences among alternatives. In paragraph (c),

CEQ proposes to change "avoid or minimize" to "mitigate" in the first sentence for consistency with the remainder of the paragraph. CEQ also proposes to clarify that any mitigation must be enforceable, such as through permit conditions or grant agreements, if an agency includes it as a component of a proposed action and relies on its implementation to analyze the action's reasonably foreseeable environmental effects. Additionally, CEQ proposes to require agencies to identify the authority for enforceable mitigation, and adopt a mitigation and compliance plan consistent with § 1505.3(c).

CEQ proposes to strike 40 CFR 1505.2(b), which requires a decision maker to certify in the ROD that the agency has considered all of the alternatives, information, and analyses submitted under 40 CFR 1502.17(b) and states that such certification is entitled to a presumption that the agency has considered such information in the EIS. CEQ proposes to strike 40 CFR 1505.2(b) because it is redundant—the discussion in the ROD and the decision maker's signature on such document has long served to verify the agency has considered the EIS's analysis of the proposed action, alternatives, and effects, as well as the public comments received. Additionally, while CEQ agrees that agencies are entitled to a presumption of regularity under the tenets of generally applicable administrative law, this presumption does not arise from NEPA, and therefore, CEQ considers it inappropriate to address in the NEPA regulations.

Finally, CEQ proposes to strike 40 CFR 1505.2(b) consistent with the proposal to remove the exhaustion provision in 40 CFR 1500.3, as discussed in section II.B.2. As CEQ discussed in that section, CEQ now considers it more appropriately the purview of the courts to make determinations regarding exhaustion. The certification requirement would no longer be necessary since it was intended to trigger the exhaustion provision in judicial review.

2. Implementing the Decision (§ 1505.3)

CEQ proposes revisions to § 1505.3 to add provisions for mitigation and related monitoring and compliance plans. To accommodate the proposed changes, CEQ proposes to designate the undesignated introductory paragraph of 40 CFR 1505.3 as paragraph (a) and redesignate 40 CFR 1505.3(a) and (b) as § 1505.3(a)(1) and (a)(2), respectively.

CEQ proposes to add new § 1505.3(b) to encourage lead and cooperating agencies to incorporate, where

appropriate, mitigation measures addressing a proposed action's significant adverse human health and environmental effects that disproportionately and adversely affect communities with environmental justice concerns. This addition would highlight the importance of considering environmental justice and addressing disproportionate effects through the NEPA process and the associated decision. CEQ proposes this addition based on public and agency feedback received during development of this proposed rule requesting that the regulations address mitigation of disproportionate effects. Additionally, this proposed change would encourage agencies to incorporate mitigation measures to address disproportionate burdens on communities with environmental justice concerns.

CEQ proposes to strike the text in paragraph (c) regarding mitigation and strike existing 40 CFR 1505.3(d) regarding publication of monitoring, replacing them with the new language in § 1505.3(c) regarding the contents of a monitoring and compliance plan. A revised paragraph (c) would require agencies to prepare a monitoring and compliance plan when the agency relies on and commits to mitigation in a ROD, FONSI, or separate document, which could be issued after the decision. This provision would require a plan for any mitigation relied upon and adopted as the basis for analyzing the reasonably foreseeable effects of a proposed action, not just mitigation to address significant effects. CEQ views this plan as necessary for an agency to conclude that it is reasonably foreseeable that a mitigation measure will be implemented. Further, the plan is necessary for the agency to conclude that the effects of the action without the mitigation measure are not reasonably foreseeable and, therefore, do not need to be analyzed and disclosed. CEQ does not propose to require a monitoring and compliance plan where an agency analyzes and discloses the effects of the action without the mitigation measure. In that circumstance, the agency would not rely on the mitigation measure as the basis for identifying reasonably foreseeable effects.

New paragraphs (c)(1) and (c)(1)(i) through (c)(1)(vi) would describe the contents of a monitoring and compliance plan and provide agencies flexibility to tailor plans to the complexity of the mitigation that the agency has incorporated into a ROD, FONSI, or other documents. Contents would include a description of the mitigation measures; the parties responsible for monitoring and

implementation; how the information will be made publicly available, as appropriate; the timeframe for the mitigation; the standards for compliance; and how the mitigation will be funded. Agencies may tailor monitoring and compliance plans to the particular action, but they should contain sufficient detail to inform the participating and cooperating agencies and the public about relevant considerations, such as the magnitude of the environmental effects that would be subject to mitigation, the degree to which the mitigation represents an innovative approach, the degree of uncertainty about the efficacy of the mitigation, and other relevant facts that support a determination that the mitigation will be effective. Where a proposed action involves more than one agency, the lead and cooperating agencies should collaboratively develop a monitoring and compliance plan that clearly defines agency roles and avoids duplication of effort.

Requiring agencies to prepare a monitoring and compliance plan for mitigation relied upon in a decision is intended to address concerns that mitigation measures included in agency decisions are not always carried out or monitored for effectiveness. If it is reasonably foreseeable that a mitigation measure will not be effective, then the agency could not appropriately rely on the mitigation measure in determining that an effect is not significant. A monitoring and compliance plan would address this concern and support an agency relying on mitigation for purposes of accurately assessing the environmental effects of a proposed action, and, in some circumstances, concluding that a FONSI is appropriate.

A new paragraph (c)(2) would state that any new information developed through the monitoring and compliance plan would not require an agency to supplement its environmental documents solely because of this new information. This provision is intended to clarify that the existence of a monitoring and compliance plan by itself would not mean that the action to which it relates is an ongoing action if it would otherwise be considered completed; however, if an action remains to occur notwithstanding the monitoring and compliance plan, the agency may need to supplement its analysis in light of new information if the criteria for supplementation in § 1502.9(d) are met.

The proposed changes to § 1505.3 would be consistent with proposed revisions to 40 CFR 1505.2(c), which direct agencies to adopt and summarize a monitoring and enforcement program

for any enforceable mitigation requirements or commitments for a ROD, and changes to § 1501.6(a) to clarify the use of mitigated FONSIs. The changes also would provide more consistency in the content of monitoring and compliance plans, increase transparency in the disclosure of mitigation measures, and provide the public and decision makers with relevant information about mitigation measures and the process to comply with them.

*H. Proposed Revisions to Other Requirements of NEPA (Part 1506)*

CEQ proposes multiple revisions to part 1506, as described in this section. As noted in section II.C.7, CEQ proposes to move 40 CFR 1506.6, "Public involvement," to proposed § 1501.9, "Public and governmental engagement." CEQ is not proposing changes to § 1506.2, Elimination of duplication with State, Tribal, and local procedures; § 1506.4, Combining documents; or § 1506.8, Proposals for legislation. CEQ invites comment on whether it should make changes to these sections or other changes to part 1506.

1. Limitations on Actions During NEPA Process (§ 1506.1)

CEQ proposes to edit § 1506.1(b) to provide further clarity on the limitations on actions during the NEPA process to ensure that agencies and applicants do not take actions that will adversely affect the environment or limit the choice of reasonable alternatives until an agency concludes the NEPA process.

CEQ is proposing to amend the last sentence in paragraph (b), which provides that agencies may authorize certain activities by applicants for Federal funding while the NEPA process is ongoing. To better align this provision with NEPA's requirements, CEQ proposes to add a clause to the sentence clarifying that such activities cannot limit the choice of reasonable alternatives, and the Federal agency must notify the applicant that the agency retains discretion to select any reasonable alternative or the no action alternative regardless of any potential prior activity taken by the applicant prior to the conclusion of the NEPA process. This proposal would provide additional clarity consistent with 40 CFR 1506.1(a) and the 2020 Response to Comments, which state that this provision allows certain activities to proceed, prior to a ROD or FONSI, so long as they do not have an adverse environmental impact or limit the

AR_0000031

choice of reasonable alternatives.[86] It also is responsive to comments received on the 2020 rule expressing concern that the proposed language could allow predecisional activities to proceed that would inappropriately narrow the range of alternatives considered by an agency. To address this concern, these commenters requested that the CEQ clarify in the regulations that these predecisional activities cannot limit the range of alternatives an agency considers under NEPA.[87] CEQ's proposed amendments to this paragraph would provide clarity on this issue within the regulatory text.

CEQ also proposes to strike "required" in paragraph (c). This edit is consistent with § 1506.11, which encourages, but does not require, the use of programmatic environmental reviews.

### 2. Adoption (§ 1506.3)

The CEQ regulations have always allowed agencies to adopt all or part of an EIS. The 2020 regulations expanded the adoption provisions to codify longstanding agency practice of adopting EAs and explicitly allowed for adoption of other agencies' prior CE determinations. CEQ has heard from multiple stakeholders, including clean energy and other stakeholders, that CEQ should retain these provisions because they create efficiencies in the NEPA process. Conversely, other stakeholders, including environmental organizations, have raised concerns about potential abuse of the adoption process, especially for CE determinations. CEQ proposes changes to this provision to facilitate use of these efficiency mechanisms in an appropriate and transparent manner. CEQ proposes modifications to § 1506.3 to improve clarity, reduce redundancy, and ensure that when a Federal agency adopts an EIS, EA, or CE determination, the agency conducts an independent review to determine that the EIS, EA, or CE determination meets certain basic standards. CEQ also proposes to add new requirements regarding the adoption of another agency's CE determination to increase public transparency.

In paragraph (a), CEQ proposes to strike the language requiring an EIS, EA, or CE determination to meet relevant standards and instead capture the standards in paragraphs (b) through (d) addressing adoption of EISs, EAs, and CE determinations, respectively. CEQ proposes to replace this clause with a

statement that requires adoption to be done "consistent with this section." CEQ proposes to remove "Federal" as unnecessary and to make clear that agencies can adopt NEPA documents prepared by non-Federal entities that are doing so pursuant to delegated authority from a Federal agency. *See, e.g.,* 23 U.S.C. 327.

Accordingly, in paragraph (b), CEQ proposes to add introductory text clarifying the standard for adopting an EIS. The language would provide that an agency may adopt a draft or final EIS, or a portion of a draft or final EIS, if the adopting agency independently reviews the statement and concludes it meets the standards for an adequate statement pursuant to the CEQ regulations and the agency's NEPA procedures. In paragraph (b)(1), which addresses adoption of an EIS for actions that are substantially the same, CEQ proposes to insert "and file" after "republish" to improve consistency with § 1506.9 and because agencies must both publish the EIS and file it with EPA. Further in paragraph (b)(1), CEQ proposes to add text to clarify that agencies should supplement or reevaluate an EIS if the agency determines that the EIS requires additional analysis. For example, this may be necessary if an agency is adopting an EIS for an action that was evaluated 5 years earlier, and there is more recent data or updated information available on one of the categories of effects. In such instances, the agency would adopt the EIS, prepare a supplemental analysis reevaluating the particular category of effects for which updated information is available, and issue both for public comment. Similarly, if an action is not substantially the same and the adopting agency determines that the EIS requires supplemental analysis, the agency would treat the EIS as a draft, prepare the additional analysis, and publish the new draft EIS for notice and comment. Where a proposed action is not substantially the same, an agency must, at minimum, supplement the adopted EIS to ensure it covers its proposed action.

Additionally, in paragraph (b)(2), which addresses adoption of an EIS by a cooperating agency, CEQ proposes to clarify that this provision is triggered when a cooperating agency does not issue a joint or concurrent ROD consistent with § 1505.2. For example, this provision covers instances when a cooperating agency adopts an EIS for an action the cooperating agency did not anticipate at the time the EIS was issued, such as a funding action for a project that was not contemplated at the time of the EIS. In such instances, the

cooperating agency may issue a ROD adopting the EIS of the lead agency without republication. CEQ proposes to strike the text at the end of paragraph (b)(2) regarding independent review because that standard would be captured in paragraph (b).

In paragraph (c), CEQ proposes to add introductory language to clarify the standard for adopting an EA, which mirrors the standard for adoption of an EIS. CEQ similarly proposes edits to align the process with EISs by clarifying that the adopting agency may adopt the EA, and supplement or reevaluate it as necessary, in its FONSI.

For additional clarity, CEQ proposes to add "determinations" to the title of paragraph (d). CEQ also proposes to revise this paragraph to improve readability and clarify that the adopting agency is adopting another agency's already made determination that a CE applies to a particular proposed action where the adopting agency's proposed action is substantially the same. This provision does not allow an agency to unilaterally use another agency's CE for an independent proposed action; rather, that process is addressed in § 1501.4(e).

To ensure that there is public transparency for adoption of CE determinations, like adoption of EAs and EISs, CEQ proposes to require agencies to document and publish their adoption of CE determinations, such as on their website. Proposed changes to paragraph (d)(1) would specify that agencies must document a determination that the proposed action is substantially the same as the action covered by the original CE determination, and there are no extraordinary circumstances present requiring preparation of an EA or EIS. Because agencies typically already make such determinations in the course of adopting CE determinations for actions that are substantially the same, CEQ does not view this documentation requirement as onerous or time consuming.

Finally, CEQ proposes to add paragraph (d)(2) requiring agencies to publicly disclose when they are adopting a CE determination. This proposed change is intended to increase transparency on use of CEs in response to feedback from stakeholders that they often do not know when an agency is proceeding with a CE. This adds a standard to adoption of CE determinations that is similar to the practice for adoption of EAs and EISs. Agencies, however, would have flexibility to determine how to make this information publicly available, including through posting on an agency's website.

---

[86] 2020 Response to Comments, *supra* note 63, at 356.

[87] *Id.* at 355.

**49956**    **Federal Register** / Vol. 88, No. 145 / Monday, July 31, 2023 / Proposed Rules

### 3. Agency Responsibility for Environmental Documents (§ 1506.5)

CEQ proposes modification and additions to § 1506.5 to clarify the requirements related to a Federal agency's role in preparing environmental documents and for consistency with section 107(f) of NEPA, which requires agencies to prescribe procedures to allow project sponsors to prepare EAs and EISs under the agencies' supervision and to independently evaluate and take responsibility for such documents. The 2020 rule amended this provision to allow an applicant to prepare EISs on behalf of the agency; however, the 2023 amendments to NEPA make clear that agencies must establish procedures for project sponsors to prepare environmental documents, not the CEQ regulations. CEQ understands the 2023 amendments to NEPA to use the terms applicant and project sponsor interchangeably and, therefore, CEQ proposes to remove references to applicants from this section other than to cross-reference the requirement that agencies establish procedures in their agency NEPA procedures for project sponsors to prepare environmental documents. See section II.I.2. However, CEQ notes that applicants and project sponsors may still provide information to agencies so that they or their contractors may prepare environmental documents consistent with § 1506.5(b).

In paragraph (a), CEQ proposes to clarify that, regardless of who prepares an environmental document, the agency must ensure they are prepared with professional and scientific integrity using reliable data and resources, consistent with sections 102(2)(D) and (2)(E) of NEPA, and exercise its independent judgment to review, take responsibility for, and briefly document its determination that the document meets all necessary requirements and standards related to NEPA, the CEQ regulations, and the agency's NEPA procedures. Agencies do not need to document this determination separately and, for example, could include a certification statement in the environmental document.

Paragraph (b) would provide that agencies can authorize a contractor to draft a FONSI or ROD, but the agency is responsible for its accuracy, scope, and contents. Because a FONSI or ROD represents an agency's conclusions regarding potential environmental impacts and other aspects of a proposed action, CEQ proposes these changes to exclude applicants from directly preparing these documents and to clarify the role of contractors. A lead agency must prescribe procedures to allow a project sponsor to prepare an environmental assessment or an environmental impact statement, consistent with section 107(f) of NEPA, and CEQ proposes to require agencies to include these procedures as part of their agency NEPA procedures in § 1507.3(c)(12). Finalizing and verifying the contents of these decision documents is appropriately the responsibility of the Federal agency and is consistent with longstanding agency practice.

CEQ proposes to revise paragraph (b)(4) to clarify that the Federal agency is responsible for preparing a disclosure statement for the contractor to execute, specifying that the contractor does not have any financial or other interest in the outcome of the proposed action. The proposed language is generally consistent with the approach in the 1978 regulations.

Finally, CEQ proposes to remove the paragraph headings because they do not accurately or helpfully describe the contents of the paragraphs.

### 4. Further Guidance (§ 1506.7)

CEQ proposes to simplify § 1506.7(a) by deleting references to Executive Orders that have been revoked. CEQ will continue to provide guidance concerning NEPA and its implementation on an as-needed basis. Any such guidance will be consistent with NEPA, the CEQ regulations, and any other applicable requirements. Future guidance could include updates to existing CEQ guidance [88] or new guidance. CEQ also proposes to update paragraph (b) to reflect the date upon which a final rule is effective. If there is a conflict between existing guidance and an issued final rule, the final rule would prevail after the date upon which it becomes effective.

### 5. Proposals for Regulations (40 CFR 1506.9)

CEQ proposes to strike 40 CFR 1506.9, "Proposals for regulations." The 2020 rule added this provision to allow agencies to substitute processes and documentation as part of the rulemaking process for corresponding requirements in these regulations.[89] Since 1978, the CEQ regulations have encouraged agencies to combine environmental documents with any other agency document to reduce duplication and paperwork (40 CFR 1506.4), and agencies also may combine procedural steps, for example, to satisfy the public comment requirements of a rulemaking process and NEPA. See § 1507.3(c)(5). As such, CEQ expects that the provision at 40 CFR 1506.9 is unnecessary to achieve the desired effect of improved efficiency. Removing this section would avoid confusion and controversy over whether the procedures of a separate process meet the requirements of CEQ's regulations. Further, courts have questioned whether separate regulatory processes can be a substitute for NEPA in some cases. See e.g., *Sierra Club* v. *Fed. Energy Regul. Comm'n*, 867 F.3d 1357, 1375 (D.C. Cir. 2017) ("[T]he existence of permit requirements overseen by another [F]ederal agency or [S]tate permitting authority cannot substitute for a proper NEPA analysis."). Additionally, CEQ does not consider it appropriate to single out one particular type of action—rulemaking—for aligning or combining procedural steps. Indeed, one of the key objectives of agency NEPA procedures is to integrate the NEPA process into other agency processes. Therefore, CEQ suggests the more prudent approach is for agencies to combine NEPA reviews with other reviews for rulemaking, similar to longstanding agency practice to combine NEPA documents with other review processes, such as compliance with section 106 of the National Historic Preservation Act or section 7 of the Endangered Species Act, or set out processes in their NEPA procedures to comply concurrently with multiple legal requirements.

### 6. Filing Requirements (§ 1506.9)

CEQ proposes to redesignate 40 CFR 1506.10 as § 1506.9, which would restore the same numbering for this and subsequent sections used in the 1978 regulations. CEQ proposes to replace the acronym for EPA with the full name "Environmental Protection Agency" here and in § 1506.10, consistent with the format in the rest of the CEQ regulations. CEQ also proposes to clarify that agencies must notify EPA when they adopt an EIS consistent with § 1506.3(b). CEQ proposes this change to codify common practice and guidance from EPA.[90] EPA notification ensures initiation of the appropriate comment or review period. Such notification, even where a cooperating agency is adopting without public comment consistent

---

[88] See CEQ, *CEQ Guidance Documents, https://ceq.doe.gov/guidance/guidance.html.*

[89] 2020 Final Rule, *supra* note 36, at 43338–39.

[90] See EPA, *Environmental Impact Statement Filing Guidance, https://www.epa.gov/nepa/environmental-impact-statement-filing-guidance.* EPA must be notified when a Federal agency adopts an EIS to commence the appropriate comment or review period. If a Federal agency chooses to adopt an EIS written by another agency, and it was not a cooperating agency in the preparation of the original EIS, the EIS must be republished and filed with EPA.

with § 1506.3(b)(1), improves transparency to the public regarding the status of an EIS and also helps track the status of EISs across the Federal Government.

### 7. Timing of Agency Action (§ 1506.10)

To accommodate the change in numbering described in section II.H.6, CEQ proposes to renumber 40 CFR 1506.11 "Timing of agency action" to § 1506.10. CEQ proposes in paragraph (b) to change "may not" to "shall not" to eliminate a potential ambiguity. CEQ proposes changes to paragraph (c)(1) to update this provision to reflect current practices within Federal agencies. Specifically, CEQ proposes to change references to "appeal processes" and add examples, which can include processes such as appeals, objections, and protests. CEQ further proposes updates to align the text to provide flexibility in timing to agencies that use these administrative review processes and clarify that such a process may be initiated either prior to or after the filing and publication of a final EIS with EPA depending on the specifics of the agency's authorities. Depending on the agency involved and their associated authorities, administrative review processes generally allow other agencies or the public to raise issues about a decision and make their views known. CEQ proposes to clarify that the period for administrative review of the decision and the 30-day review period prescribed in paragraph (b)(2) for when a ROD can be issued may run concurrently. CEQ proposes these changes to reflect changes in Federal agency regulations and procedures since this text was promulgated in 1978 and to allow for greater efficiency.

For example, the U.S. Department of Agriculture's Forest Service has an objections process outlined in 36 CFR part 218 where the public can object to a draft decision; these regulations replaced the prior appeal process formerly used by the agency. To initiate the objections process, Forest Service regulations require that the final EIS and a draft ROD be made available to the public, but the Forest Service does not have to publish the final EIS with EPA until the conclusion of the objections process. *See* 36 CFR 218.7(b). The objections process can take 120 to 160 days, during which the agency makes the final EIS widely available to the public. Allowing the agency to file the final EIS with EPA and issue a ROD at the same time as the conclusion of the objections process rather than waiting an additional 30 days following the official filing will add efficiency to the

process. These proposed changes also would accommodate similar administrative review procedures. *See e.g.,* 43 CFR 1610.5–2 (outlining the Bureau of Land Management (BLM) protest procedures).

CEQ also proposes minor edits in paragraphs (d) and (e) for clarity and readability.

### 8. Emergencies (§ 1506.11)

Consistent with changes in the preceding sections, CEQ proposes to renumber 40 CFR 1506.12 "Emergencies" to § 1506.11. CEQ proposes to strike the last sentence stating other actions remain subject to NEPA review. This erroneously implies that actions covered by § 1506.11 are not subject to NEPA review. Instead, CEQ proposes to replace the sentence with language clarifying that alternative arrangements are not a waiver of NEPA; rather, they establish an alternative means for NEPA compliance.

This longstanding provision on emergencies has generated some confusion [91] as to whether, during emergencies, agency actions are exempted from NEPA review. CEQ proposes these changes to clarify that the regulations do not create a NEPA exemption; rather, they provide a pathway for compliance with NEPA where the exigencies of emergency situations do not provide sufficient time for an agency to complete an EIS for an action with significant environmental effects. As has been the long-standing practice, agencies may continue to determine how to proceed with actions to respond to emergencies that do not have significant environmental effects and that would ordinarily be analyzed through an EA. As discussed in section II.I.2, some agencies include procedures for addressing such situations in their agency NEPA procedures.

CEQ does not have the authority to exempt agency actions from NEPA, regardless of whether an emergency exists. The proposed changes to § 1506.11 clarify that CEQ does not offer "alternative arrangements" to circumvent appropriate NEPA analysis but rather allows Federal agencies to establish alternative means for NEPA compliance to ensure that agencies can act swiftly to address emergencies while also meeting their statutory obligations under NEPA. CEQ's proposal would clarify that when emergencies arise, § 1506.11 allows agencies to adjust the means by which they achieve NEPA compliance. This approach is also consistent with CEQ's guidance on

NEPA and emergencies, updated in 2020.[92]

### 9. Innovative Approaches to NEPA Reviews (§ 1506.12)

CEQ proposes to add a new section to the regulations in § 1506.12 to allow CEQ to grant a request for modification to authorize Federal agencies to pursue innovative approaches to comply with NEPA and the regulations in order to address extreme environmental challenges. CEQ's intent is for this section to maximize agency flexibility, creativity, and efficiency while still meeting the requirements of NEPA and providing for sound environmental review. This is a new concept, distinct from the emergency provisions in § 1506.11, and different considerations apply for determining the existence of an extreme environmental challenge sufficient to trigger the proposed § 1506.12 than those for determining the existence of an emergency requiring alternative arrangements pursuant to § 1506.11. For example, an extreme environmental challenge might have a longer time horizon than is typical for an emergency action. As another example, it might be appropriate for an agency to determine that a forest ecosystem presenting a high risk of severe wildfire that could threaten water supplies presents extreme environmental challenges, even though restoration activities would take many years to complete. The intent of this approach is to allow for agencies to take innovative approaches when exploring how to address extreme environmental challenges, which could include, for instance, sea level rise or increased wildfire risk, or bolstering the resilience of infrastructure to increased disaster risk from the effects of climate change; water scarcity; degraded water or air quality; species loss; disproportionate and adverse effects on communities with environmental justice concerns; imminent or reasonably foreseeable loss of historic, cultural, or Tribal resources; and impaired ecosystem health.

Paragraph (a) would provide that the purpose of this section is to allow agencies to comply with NEPA using procedures modified from the requirements of these regulations to address extreme environmental challenges.

Paragraph (b) would require CEQ approval for any innovative approaches and make clear that approval does not waive the requirement to comply with

---

[91] 2020 Response to Comments, *supra* note 63, at 417–19.

[92] CEQ, Emergencies and the National Environmental Policy Act Guidance (Sept. 14, 2020), *https://ceq.doe.gov/docs/nepa-practice/emergencies-and-nepa-guidance-2020.pdf.*

the statute. Rather, this section establishes an alternative means for NEPA compliance to address extreme environmental challenges.

Paragraph (c) would outline what an agency must include in its request for approval of an innovative approach. Agencies would have to identify each provision of the regulations for which they are requesting modification and explain how the innovative approach they propose to ensure NEPA compliance. Agencies also must explain the extreme environmental challenge they are trying to address, why the alternative means are needed to address the challenge, and how the innovative approach would facilitate sound and efficient environmental review. Finally, agencies would need to consult with any potential cooperating agencies and include a summary of their comments with the request.

Paragraph (d) would provide CEQ's process for reviewing and approving such requests. Under this provision, CEQ would evaluate requests within 60 days and may choose whether to approve the approach, approve it with revision, or deny the request. Further, as is stipulated in paragraph (e), CEQ would post on its website all modification requests it has approved or denied.

Examples of innovative approaches that could be the basis for a request include new ways to use information technology; cooperative agreements or work with local communities; methods more fully incorporating, while protecting, Indigenous Knowledge; new ways to work with project proponents and communities to advance proposals; and innovative tools for engaging the public and providing public comment opportunities, which could enhance participation from communities with environmental justice concerns. CEQ acknowledges that the proposed regulations would not include explicit limits in any of these areas. The intent of proposed § 1506.12 is to help ensure that the regulations have the maximum ability to accommodate ideas not yet put forward to improve NEPA implementation. The proposed regulation would encourage innovation where needed to address extreme environmental challenges, consistent with the purposes and policies expressed in the NEPA statute including to "promote efforts which will prevent or eliminate damage to the environment and biosphere and stimulate the health and welfare of [humans]," 42 U.S.C. 4321, and "attain the widest range of beneficial uses of the environment without degradation, risk to health or safety, or other undesirable and

unintended consequences," 42 U.S.C. 4331(b)(3). CEQ invites public comment on this proposed provision to determine if it is necessary. Specifically, CEQ would like input on whether such a provision is needed to address extreme environmental challenges and what Federal agencies would be able to carry out under this proposed provision that they cannot currently accomplish in the current regulations. CEQ also invites public comment on whether CEQ should add additional procedures or limitations to ensure that innovative approaches are used appropriately.

### 10. Effective Date (§ 1506.13)

CEQ proposes to remove the 2020 effective date and replace it with the date upon which a final rule is effective. CEQ notes that Federal agencies would not need to redo or supplement a completed NEPA review (*e.g.*, where a CE determination, FONSI, or ROD has been issued) as a result of the issuance of this rulemaking.

### I. Proposed Revisions to Agency Compliance (Part 1507)

CEQ proposes substantive revisions to all sections in part 1507. CEQ invites comment on whether it should make other changes to this section.

### 1. Compliance (§ 1507.1)

CEQ proposes to add a second sentence to § 1507.1, restoring language from the 1978 regulations, to state that agencies have flexibility to adapt their implementing procedures to the requirements of other applicable laws. Restoring this language is consistent with the changes CEQ made to 40 CFR 1507.3 in its Phase 1 rulemaking to restore the agency discretion to tailor their NEPA procedures to their unique missions and contexts, creating opportunity for agencies to innovate and improve efficiency.

### 2. Agency Capability To Comply (§ 1507.2)

CEQ proposes edits to § 1507.2 to emphasize agencies' responsibilities under NEPA, including to incorporate the requirements added to section 102(2) of NEPA by the FRA, and require agencies to designate a Chief Public Engagement Officer. First, CEQ proposes to move the first sentence of 40 CFR 1507.2(a) to a new § 1507.2(b) and require agencies to identify a Chief Public Engagement Officer who would be responsible for facilitating community engagement across the agency and, where appropriate, the provision of technical assistance to communities. Next, CEQ proposes to redesignate 40 CFR 1507.2(b) and (c) as

§ 1507.2(c) and (d), respectively. Then, CEQ proposes to redesignate the existing 40 CFR 1507.2(d) through (f) as § 1507.2(h) through (j) and add a new paragraph (e) to require agencies to prepare environmental document with professional integrity consistent with section 102(2)(D) of NEPA. In a new paragraph (f), CEQ proposes to require agencies to make use of reliable data and resources, consistent with section 102(2)(E) of NEPA. And in a new paragraph (g), CEQ proposes to require agencies to study, develop, and describe technically and economically feasible alternatives, consistent with section 102(2)(F) of NEPA. Finally, in redesignated paragraph (j), CEQ proposes to delete the reference to E.O. 13807 because E.O. 13990 revoked E.O. 13807.

### 3. Agency NEPA Procedures (§ 1507.3)

CEQ proposes several updates to § 1507.3 to reorganize paragraphs to improve readability, consolidate provisions, restore text from the 1978 regulations, and codify CEQ guidance on CEs.

In paragraphs (a) and (b), CEQ would update the effective date to reflect the effective date of a final rule. In paragraph (b), CEQ proposes to give agencies 12 months after the effective date to develop proposed procedures and initiate consultation with CEQ to implement the CEQ regulations. CEQ also proposes moving, with some modification, language from paragraph (c) to paragraph (b) for clarity and to improve organization since the language is generally applicable to all agency NEPA procedures. CEQ would clarify that proposed procedures should facilitate efficient decision making and ensure that agencies make decisions in accordance with the policies and requirements of NEPA.

In paragraph (b)(2), CEQ proposes to change "adopting" to "issuing" to avoid confusion with adoption under § 1506.3. CEQ also proposes to restore text from the 1978 regulations requiring agencies to continue to review their policies and procedures and revise them as necessary to be in full compliance with NEPA. The 2020 rule deleted this language as redundant to language added to 40 CFR 1507.3(b) requiring agencies to update their procedures to implement the final rule.[93] CEQ is proposing to restore this language because CEQ views the requirement for an agency to continue to review their policies and procedures as different than the requirement in paragraph (b) to initially update procedures consistent with a final rule.

---

[93] 2020 Final Rule, *supra* note 36, at 43340.

**Federal Register**/Vol. 88, No. 145/Monday, July 31, 2023/Proposed Rules    **49959**

Further, restoring this requirement is consistent with the proposal in paragraph (c)(9) for agencies to review CEs at least every 10 years. CEQ proposes a new paragraph (b)(3) to explicitly clarify that, consistent with longstanding practice, the issuance of new agency procedures or an update to existing agency procedures is not subject to NEPA review. To align with these changes with paragraph (b) and its paragraphs, CEQ proposes to strike the first clause in 40 CFR 1507.3(e) because it is unnecessary and could create confusion and move the other text in 40 CFR 1507.3(e) into § 1507.3(c) as discussed below. This provision does not provide any additional direction given the regulations' longstanding existing requirements that agencies develop agency NEPA procedures, and CEQ determinations that they conform to the NEPA regulations. Further, its requirement that agency procedures "comply" with the CEQ regulations could be read to suggest that agencies must complete a NEPA review when establishing their procedures.

Paragraphs (c) and (c)(1) through (c)(10) would list the items that all agency NEPA procedures must include. CEQ proposes minor revisions to paragraphs (c)(1) through (c)(4) to improve clarity and conciseness. CEQ proposes to modify paragraph (c)(3) to clarify that procedures should integrate environmental review into agency decision-making processes so decision makers can make use of them in making the decision. CEQ proposes to modify paragraph (c)(5) to emphasize that combining environmental documents should be done to facilitate sound and efficient decision making and avoid duplication. CEQ proposes to strike the language from this paragraph allowing agencies to designate and rely on other procedures or documents to satisfy NEPA compliance. As discussed further in sections II.C.1 and II.C.2, CEQ has concerns about this language added by the 2020 rule to substitute other reviews as functionally equivalent for NEPA compliance, and therefore proposes to remove it.

To consolidate into one paragraph the required aspects of agency NEPA procedures, CEQ proposes to move 40 CFR 1507.3(e)(1), (e)(2), (e)(2)(i), and (e)(2)(iii) to paragraphs (c)(6), (c)(7), (c)(7)(i) and (c)(7)(ii), respectively, with minor wording modification for readability. CEQ proposes to move with modification 40 CFR 1507.3(e)(2)(ii), requiring agencies to establish CEs and identify extraordinary circumstances to paragraph (c)(8). CEQ proposes in paragraphs (c)(8)(i) through (c)(8)(iii) to include more specificity about the

process for establishing new or revising existing CEs consistent with CEQ's 2010 CE guidance and agency practice. Paragraph (c)(8)(i) would include the existing requirement from 40 CFR 1507.3(e)(2)(i) that agencies identify when documentation is required for a determination that a CE applies to a proposed action. Paragraph (c)(8)(ii) would require agencies to substantiate new or revised CEs and make the documentation publicly available. This is consistent with the 2010 guidance and CEQ's longstanding practice requiring agencies to demonstrate that agency activities are eligible for CEs.[94] CEQ proposes to add paragraph (c)(8)(iii) to require agencies to describe how agencies will consider extraordinary circumstances; this requirement is currently addressed in existing 40 CFR 1507.3(c)(2)(ii).

CEQ proposes to add paragraph (c)(9) to require agencies to include in their NEPA procedures a process for reviewing their CEs every 10 years. This would codify recommendations in CEQ's guidance on establishing CEs,[95] which encourages agencies to review CEs periodically. While the guidance recommends every 7 years,[96] CEQ is proposing for review to occur at least every 10 years. In CEQ's experience, it can take an agency a year or more to conduct such a review and revision given the steps involved, including conducting the review, developing a proposal to update procedures to reflect the review, consulting with CEQ, soliciting public comment, developing final procedures, and receiving a CEQ conformity determination. Federal agencies should review their CEs for multiple reasons, including to determine if CEs remain useful, whether they should modify them, and to determine if circumstances have changed resulting in an existing category raising the potential for significant effects.

CEQ proposes to move 40 CFR 1507.3(e)(3) to paragraph (c)(10) without substantive change. Finally, CEQ proposes to move the requirement for agencies to explain in their NEPA procedures where interested persons can get information on EISs and the NEPA process from 40 CFR 1506.6(e) to § 1507.3(c)(11) and add a reference to EAs as well.

CEQ proposes to codify section 107(f) of NEPA in a new paragraph (c)(12) requiring agencies to include procedures, where applicable, to allow a project sponsor to prepare EAs and

EISs consistent with § 1506.5. Since not all agency actions involve project sponsors, CEQ proposes to include "where applicable" to qualify this requirement. CEQ includes "consistent with § 1506.5" so that such procedures would ensure environmental documents prepared by project sponsors (or a contractor on the project sponsor's behalf) are prepared with professional and scientific integrity, and ensure that the agency independently evaluates and takes responsibility for the contents of such documents. It also would ensure agencies require project sponsors to execute a disclosure statement to address financial or other interests. In addition to procedures, agencies may provide project sponsors with guidance and assist in the preparation of the documents consistent with § 1506.5(b)(1). CEQ invites comment on whether it should include additional provisions that agencies should consider or address in establishing such procedures.

CEQ proposes to delete the provisions in 40 CFR 1507.3(d) and its paragraphs, which recommend agency procedures identify different classes of activities or decisions that may not be subject to NEPA. CEQ proposes to revise § 1507.3(d) to provide a list of items that agencies may include in their procedures, as appropriate, which would include, at paragraph (d)(1), identifying activities or decisions that are not subject to NEPA. Proposing to delete the specific categories of such activities or decisions is consistent with the proposed changes to § 1501.1. *See* section II.C.1 and II.C.2. Paragraph (d)(2) would allow agencies to include processes for emergency actions that would not result in significant environmental effects. This provision is similar to CEQ's own emergency process for EISs provided in § 1506.11 but relates to activities that would not require preparation of an EIS. Some agencies have programs that focus on these types of emergency actions and may need to consider special arrangements for their environmental assessments in these circumstances. These special arrangements could focus on the format of the documents, special distribution and public involvement procedures, and timing considerations. Some agencies have already established such processes in their procedures to ensure efficient NEPA compliance in an emergency. *See, e.g.,* 36 CFR 220.4(b); Dept of Homeland Sec., Instruction Manual #023–01–001–01, Section VI.[97]

---

[94] CE Guidance, *supra* note 9.

[95] *Id.*

[96] *Id.* at 16.

[97] *https://www.dhs.gov/sites/default/files/publications/DHS_Instruction%20Manual%20023-*
Continued

**49960**    **Federal Register** / Vol. 88, No. 145 / Monday, July 31, 2023 / Proposed Rules

CEQ proposes to move, without modification, 40 CFR 1507.3(f)(1) and (f)(2) to paragraphs (d)(3) and (d)(4), respectively. CEQ proposes to remove 40 CFR 1507.3(f)(4) regarding combining the agency's EA process with its scoping process as unnecessary. Section 1501.5(j) clarifies that agencies can employ scoping at their discretion when it will improve the efficiency and effectiveness of EAs, including combining scoping with a comment period on a draft EA. In addition, CEQ proposes to remove, as superfluous, the first sentence of 40 CFR 1507.3(f)(3) regarding lengthy periods between an agency's decision to prepare an EIS and actual preparation, as the regulations do not prescribe specific timelines for preparation of environmental documents. As discussed in section II.D.3, CEQ proposes to move the second sentence of 40 CFR 1507.3(f)(3) regarding supplemental notices when an agency withdraws, cancels, or otherwise ceases the consideration of a proposed action before completing an EIS to § 1502.4(f) with modifications.

Finally, as discussed in section II.C.3, CEQ is proposing to strike 40 CFR 1507.3(f)(5) and replace it with a provision in § 1501.4(e) that is consistent with the process established by section 109 of NEPA for adoption or use of another agency's CE.

### 4. Agency NEPA Program Information (§ 1507.4)

CEQ proposes revisions to § 1507.4, which describes the use of agency websites and other information technology to promote transparency and efficiency in the NEPA process. In paragraph (a), CEQ proposes revisions to remove "environmental" before "documents" because "environmental documents" is a defined term, and the intent of the sentence is to refer to NEPA-related information and documents more broadly; CEQ proposes the same edit in paragraph (a)(1). CEQ also proposes to require agencies to provide on their websites or other information technology tools (to account for new technologies) their agency NEPA procedures and a list of EAs and EISs that are in development and complete. CEQ proposes to revise paragraph (a)(2) to encourage agencies to post their environmental documents to their websites. CEQ proposes to encourage rather than simply allow agencies to include the information listed in paragraphs (a)(1) through (a)(4). Finally, CEQ proposes edits to paragraph (b), which promotes

interagency coordination of environmental program websites and shared databases, to provide agencies with additional flexibility and clarify that the section is not limited to the listed technology.

### J. Proposed Revisions to Definitions (Part 1508)

Within part 1508, CEQ proposes revisions to the definitions of "cooperating agency," "effects" or "impacts," "environmental assessment," "environmental document," "environmental impact statement," "finding of no significant impact," "human environment," "lead agency," "major Federal action," "mitigation," "notice of intent," "page," "scope," and "tiering." CEQ proposes to add definitions for "environmental justice," "environmentally preferable alternative," "extraordinary circumstances," "joint lead agency," "participating Federal agency," "programmatic environmental document," and "significant effects."

CEQ does not propose substantive edits to any other definitions, but would redesignate the paragraphs to keep the list of terms in alphabetical order. CEQ invites comment on whether CEQ should modify other definitions or add new definitions. In particular, CEQ invites comment on whether it should define any additional terms used in NEPA, as amended by the FRA, including "applicant" or "project sponsor." CEQ is not proposing to separately define the phrase "communities with environmental justice concerns," but intends that phrase would mean communities that do not experience environmental justice as defined in § 1508.1(k). CEQ is particularly interested in comment on whether to provide a separate definition of "communities with environmental justice concerns," and if so, how the regulations should define that term.

#### 1. Cooperating Agency (§ 1508.1(e))

CEQ proposes to revise the definition of "cooperating agency" in § 1508.1(e) for clarity and consistency with the definition of "cooperating agency" in section 111(2) of NEPA defining this term to mean "any Federal, State, Tribal, or local agency with jurisdiction by law or special expertise that has been designated as a cooperating agency by the lead agency . . . ."

#### 2. Effects or Impacts (§ 1508.1(g))

In § 1508.1(g), CEQ proposes to make clarifying edits and to add and modernize examples. Paragraph (g)(4) lists common types of effects that may arise during NEPA review. CEQ

proposes to update the list to add disproportionate and adverse effects to communities with environmental justice concerns and climate change-related effects. For climate change effects, CEQ proposes to clarify that this can include both the contributions to climate change from a proposed action and its alternatives as well as the potential effects of climate change on the proposed action and its alternatives. These changes would update the definition to include effects that have been an important part of NEPA analysis for more than a decade and will continue to be relevant, consistent with best available science and NEPA's requirements. Also, CEQ proposes these changes in response to comments received during the Phase 1 rulemaking that the definition of "effects" or "impacts" should explicitly address environmental justice and climate change.[98]

#### 3. Environmental Assessment (§ 1508.1(h))

CEQ proposes to update the definition of "environmental assessment" in § 1508.1(h) for consistency with sections 106(b)(2) and 111(4) of NEPA, 40 CFR 1501.5, and longstanding agency practice. CEQ proposes to strike "prepared by" and change it to "for which a Federal agency is responsible" for consistency with section 107(f) of NEPA and § 1506.5, which allow a contractor or project sponsor (following agency issuance of procedures) to prepare an EA but requires that the agency take responsibility for the accuracy of its contents irrespective of who prepares it. This change would be consistent with longstanding agency practice to allow applicants and contractors to prepare EAs, so long as the agency is ultimately responsible for the contents.

To improve readability, CEQ proposes edits to add text from § 1501.5 clarifying that an agency prepares an EA when a proposed action is not likely to have a significant effect or the significance of the effects is unknown. CEQ also proposes to simplify language in the rest of the paragraph by deleting superfluous text. These proposed changes do not alter the intention that an EA is used to support an agency's determination whether to prepare an EIS (part 1502) or issue a FONSI (§ 1501.6).

#### 4. Environmental Document (§ 1508.1(i))

CEQ proposes to add "record of decision" to the definition of "environmental document" in

---

01–001–01%20Rev%2001_
508%20Admin%20Rev.pdf.

[98] Phase 1 Response to Comments, supra note 48, at 87, 99.

**49961**

§ 1508.1(i) for clarity. CEQ also proposes to add a documented CE determination to the definition to reflect the longstanding agency practice of documenting some CE determinations. This change also is consistent with the change CEQ proposes to §§ 1501.4 and 1507.3 to add references to CE determinations. Therefore, for clarity and efficiency, CEQ is proposing to incorporate documented CE determinations into the definition of "environmental document." CEQ notes that section 111(5) of NEPA defines "environmental document" more narrowly to only include EISs, EAs, and FONSIs. However, CEQ is proposing to retain and expand the regulatory definition since the term is used more broadly in the CEQ regulations.

### 5. Environmental Impact Statement (§ 1508.1(j))

CEQ proposes to change "as required" to "that is required" in the definition of EIS in § 1508.1(j) for consistency with the definition of "environmental impact statement" in section 111(6) of NEPA.

### 6. Environmental Justice (§ 1508.1(k))

CEQ proposes to add a new definition of "environmental justice" at § 1508.1(k). This definition would align with the definition set forth in section 2(b) of E.O. 14096.[99] This provision would define "environmental justice" as the just treatment and meaningful involvement of all people so that they are fully protected from disproportionate and adverse human health and environmental effects and hazards, and have equitable access to a healthy, sustainable, and resilient environment. The proposed definition of environmental justice uses the phrase "cumulative impacts," rather than the phrase "cumulative effects," which are used elsewhere in the proposed regulations. That is because the phrase "cumulative impacts" has a meaning in the context of environmental justice relating to the aggregate effect of multiple stressors and exposures on a person, community, or population. *See, e.g.,* Environmental Protection Agency, Cumulative Impacts Research: Recommendations for EPA's Office of Research and Development (2022). CEQ views the evolving science on cumulative impacts as sufficiently distinct from the general meaning of cumulative effects under the NEPA regulations that using a different term could be helpful to agencies and the public. CEQ invites comment on this approach.

### 7. Environmentally Preferable Alternative (§ 1508.1(l))

CEQ proposes to add a new definition of "environmentally preferable alternative" at § 1508.1(l). Since 1978, the CEQ regulations have required agencies to identify the environmentally preferable alternative or alternatives in the ROD (§ 1505.2(b)). While the regulations did not define the term, CEQ's Forty Questions document provided an explanation, upon which CEQ has based the proposed definition.[100] The environmentally preferable alternative is the alternative that will best promote the national environmental policy as expressed in section 101 of NEPA. 42 U.S.C. 4331. Application of the term "environmentally preferable alternative" is also described in § 1502.14(f) and discussed in section II.D.9.

### 8. Extraordinary Circumstances (§ 1508.1(m))

CEQ proposes to add a definition of "extraordinary circumstances" at § 1508.1(m). The 1978 regulations included the meaning of extraordinary circumstances in the definition of "categorical exclusion" at 40 CFR 1508.4 (2019), which the 2020 rule moved to 40 CFR 1501.4(b) (describing how to apply extraordinary circumstances when considering use of a CE) and 40 CFR 1507.3(e)(2)(ii) (requiring agencies to establish extraordinary circumstances for CEs in their procedures).[101] CEQ proposes to create a standalone definition of "extraordinary circumstances" to improve clarity when this term is used throughout the rule.

CEQ also proposes to add several examples of extraordinary circumstances to help agencies and the public understand common situations that agencies may consider in determining whether application of a CE is appropriate. The examples would include impacts on sensitive environmental resources, disproportionate and adverse effects on communities with environmental justice concerns, effects associated with climate change, and effects on historic properties or cultural resources. This list of examples would not be exclusive, and agencies would continue to have the discretion to identify extraordinary circumstances in their NEPA implementing procedures that are specific and appropriate to their

particular actions and CEs consistent with § 1507.3.

### 9. Finding of No Significant Impact (§ 1508.1(o))

In the definition of FONSI in § 1508.1(o), CEQ proposes to insert "agency's determination that and" after "presenting the" for consistency with the definition of FONSI in section 111(7) of NEPA, which defines the term to mean "a determination by a Federal agency that a proposed agency action does not require the issuance of an environmental impact statement."

### 10. Human Environment or Environment (§ 1508.1(p))

CEQ proposes to clarify that "human environment" and "environment" are synonymous in the regulations given that the latter is the more commonly used term. CEQ proposes a minor edit to "human environment" in § 1508.1(p) to remove "of Americans" after "present and future generations." This minor edit improves consistency with NEPA in section 101(a), which speaks more generally about the impact of people's "activity on the interrelations of all components of the natural environment" and the need "to create and maintain conditions under which [humans] and nature can exist in productive harmony." 42 U.S.C. 4331(a).

In the 2020 rule, CEQ changed "people" to "of Americans," explaining that it was done to be consistent with section 101(a) of NEPA.[102] However, CEQ now considers this explanation to overlook the context in which the phrase "present and future generations of Americans" is used in section 101(a). That paragraph of the Act refers to Americans at the end of the last sentence after using the broader term "man" three times. A reasonable interpretation is that human environment refers broadly to the interrelationship between people and the environment. The phrase "present and future generations of Americans" is used in a narrower context to "fulfill the social, economic, and other requirements of present and future generations of Americans." 42 U.S.C. 4331(a).

### 11. Joint Lead Agency (§ 1508.1(q))

CEQ proposes to add a definition for "joint lead agency" consistent with the usage of that term in section 107(a)(1)(B) of NEPA and § 1501.7(b) and (c).

---

[99] E.O. 14096, *supra* note 20, at 25253.

[100] Forty Questions, *supra* note 4.

[101] 2020 Final Rule, *supra* note 36, at 43322, 43342–43.

[102] *Id.* at 43344–45.

12. Lead Agency (§ 1508.1(s))

CEQ proposes to revise the definition of "lead agency" for consistency with the definition of "lead agency" in section 111(9) of NEPA and to expand the definition of "lead agency" in § 1508.1(s) to also include EAs, consistent with longstanding practice.

13. Major Federal Action (§ 1508.1(u))

CEQ proposes to move the definition of "major Federal action" currently provided in 40 CFR 1508.1(q) to § 1508.1(u), revise it to clarify the list of example activities or decisions that meet the definition, and revise the list of exclusions from the definition consistent with section 111(10) of NEPA. CEQ notes that the determination of whether an activity or decision is a major Federal action is a fact-specific analysis that agencies have long engaged in to determine where they have substantial control and responsibility to consider environmental effects in their decision making.

CEQ proposes to reorder and revise the definition to list the examples of activities or decisions that may be included in the definition of "major Federal action" in paragraph (u)(1), redesignating current 40 CFR 1508.1(q)(3)(i) through (q)(3)(iv) as paragraphs (u)(1)(ii) through (u)(1)(v). To paragraph (u)(1), CEQ proposes to revise the current example in 40 CFR 1508.1(q)(2) in paragraph (u)(1)(i) and add one example of potential major Federal actions.

First, CEQ proposes to strike 40 CFR 1508.1(q)(2) and replace it with paragraph (u)(1)(i) to include the granting of authorizations such as permits, licenses, and rights-of way. CEQ proposes to strike the existing examples since regulated activities would be addressed in this revised example, and the others are redundant to the other examples listed in paragraphs (u)(1)(ii) through (u)(1)(vi).

Second, CEQ proposes to revise the phrase "connected agency decisions" to "related agency decisions" in paragraph (u)(1)(iv) to clarify that the concept in this paragraph is not meant to refer to "connected actions" as defined in § 1501.3. CEQ considers this a non-substantive, clarifying change to avoid any confusion with connected actions.

Third, CEQ proposes to revise paragraph (u)(1)(v) to change "approval of" to "carrying out" specific projects to address projects carried out directly by a Federal agency. CEQ proposes to strike "located in a defined geographic area" from the example of management activities; while this is merely an example, CEQ is concerned it could be

read as limiting. CEQ also proposes to strike the sentence regarding permits and regulatory decisions as this would be addressed by the example in paragraph (u)(1)(i).

Fourth, CEQ proposes to add a new example at § 1508.1(u)(1)(vi) to explain when Federal financial assistance is a major Federal action. Generally, Federal financial assistance, other than minimal Federal funding, is a major Federal action where the Federal agency has authority and discretion over the financial assistance in a manner that could address environmental effects from the activities receiving the financial assistance. In such circumstances, the agency has sufficient control and responsibility over the use of the funds or the effects of the action for the decision to provide financial assistance to constitute a major Federal action consistent with the definition in section 111(10) of NEPA. This includes circumstances where the agency could deny the financial assistance, in whole or in part, due to environmental effects from the activity receiving the financial assistance, or could impose conditions on the financial assistance that could address the effects of such activity.

To improve clarity and ensure appropriate application of NEPA, CEQ proposes this example of what a major Federal action may include. CEQ considers that, other than for minimal Federal Funding, where an agency has substantial control and responsibility over a recipient's environmental effects or sufficient discretion to consider the environmental effects when making decisions, the appropriate approach is for agencies to identify the corresponding scope of analysis rather than excluding an activity or decision from NEPA review altogether. For example, if a Federal agency operates a loan guarantee program, the agency may have discretion in the types of activities to which it might issue a loan guarantee. A NEPA review that analyzes the environmental effects of potential project types could help inform how the agency designs the program. Depending on the terms of the loan guarantee program, the agency may have substantial control and responsibility over the use of the funds such that an environmental analysis can inform the decision making. As noted in section II.C.2 and earlier in this section, this is a fact-specific analysis agencies undertake based on the specifics of their authority for a particular action.

In § 1508.1(u)(2), CEQ proposes to replace the exclusions currently in 40 CFR 1508.1(q)(1)(i) through (vi) with the exclusions from the definition of major Federal action codified in the definition

in section 111(10)(B) of NEPA. Paragraph (u)(2)(i)(A) and (B) would include the exclusion of non-Federal actions with no or minimal funding; or with no or minimal Federal involvement where the agency cannot control the outcome of the project consistent with section 111(10)(B)(i) of NEPA. These exclusions would replace the current exclusion in 40 CFR 1508.1(q)(1)(vi), which CEQ proposes to strike. CEQ invites comment on whether it should add additional provisions to the regulations to implement the "minimal Federal funding" exclusion in § 1508.1(u)(2)(i)(A). Agencies currently evaluate the provision of minimal Federal funding based on specific factual contexts. CEQ is interested in whether additional procedures, including thresholds for the amount or proportion of Federal funding necessary for an agency action to constitute major Federal action, could increase predictability while ensuring that Federal agencies do not overlook effects to vital components of the human environment, including the health of children and vulnerable populations, drinking water, communities with environmental justice concerns, and similar considerations.

Paragraph (u)(2)(ii) would include the exclusion of funding assistance solely in the form of general revenue sharing funds consistent with section 111(10)(B)(ii) of NEPA. This exclusion would replace the current, similar exclusion in 40 CFR 1508.1(q)(1)(v), which CEQ proposes to strike.

Paragraph (u)(2)(iii) would include the exclusion of loans, loan guarantees, or other forms of financial assistance where a Federal agency does not exercise sufficient control and responsibility over the subsequent use of such financial assistance or the effects of the action, consistent with section 111(10)(B)(iii) of NEPA.

Paragraph (u)(2)(iv) would include the exclusion of certain business loan guarantees provided by the Small Business Administration, consistent with section 111(10)(B)(iv) of NEPA. These exclusions would replace the current, similar exclusion in 40 CFR 1508.1(q)(1)(vii), which CEQ proposes to strike. In particular, CEQ proposes to strike the example currently in 40 CFR 1508.1(q)(1)(vii) for farm ownership and operating loan guarantees by the Farm Service Agency pursuant to 7 U.S.C. 1925 and 1941 through 1949. CEQ considers it best left to agencies to identify exclusions from the definition of major Federal action absent specific statutory authority like those for the Small Business Administration loan guarantees.

Next, CEQ proposes to move the existing exclusions, currently in 40 CFR 1508.1(q)(1)(iv), (q)(1)(i), and (q)(1)(ii) to paragraphs (u)(2)(v) through (u)(2)(vii), respectively. Section 111(10)(B)(v) through (vii) of NEPA codified these exclusions. Paragraph (u)(2)(v) would exclude bringing judicial or administrative civil or criminal enforcement actions. Paragraph (u)(2)(vi) would exclude extraterritorial activities or decisions.[103] Paragraph (u)(2)(vii) would exclude activities or decisions that are non-discretionary. CEQ notes that there may be activities or decisions that are partially non-discretionary. In such circumstances, an agency may conclude that the non-discretionary components of an activity or decision are not major Federal actions and exclude the non-discretionary components from analysis. In such circumstances, the agency would consider the discretionary components of the activity or decision. For example, if a statute mandated an agency to make an affirmative decision once a set of criteria are met, but the agency has flexibility in how to meet those criteria, the agency still has some discretion to consider alternatives and effects. Similarly, if a statute directs an agency to take an action, but the agency has discretion in how it takes that action, the agency can still comply with NEPA while carrying out its statutory mandate.

CEQ proposes to move the exclusion regarding final agency actions from 40 CFR 1508.1(q)(1)(iii) to § 1508.1(u)(2)(viii) and make changes for consistency with section 106(a)(1). While section 106(a)(1) of NEPA includes this as a threshold factor for not requiring an EIS or EA, it is consistent with longstanding caselaw to exclude non-final agency actions from the definition of major Federal action. Therefore, CEQ proposes to include this as a threshold consideration as well as an exclusion from the definition of major Federal action.

Finally, CEQ proposes a new exclusion in § 1508.1(u)(2)(ix) for activities or decisions for projects approved by a Tribal Nation that occur on or involve land held in trust or restricted status when the activities involve no Federal funding or other Federal involvement. Recognizing the unique circumstances facing Tribal Nations due to the United States holding land in trust for them or the Tribal Nation holding land in restricted status, CEQ proposes this exclusion to clarify that activities or decisions for projects approved by a Tribal Nation on trust lands are not major Federal actions where such activities do not involve Federal funding or other Federal involvement. Tribal leaders raised this issue during consultations that CEQ held on its NEPA regulations and voiced concerns that the NEPA process placed Tribal Nations in a disadvantageous position relative to State and local governments because of the United States' ownership interest in Tribal lands. Categories of activities on trust lands that typically will not constitute major Federal actions include transfer of existing operation and maintenance activities of Federal facilities to Tribal groups, water user organizations, or other entities; human resources programs such as social services, education services, employment assistance, Tribal operations, law enforcement, and credit and financing activities not related to development; self-governance compacts for Bureau of Indian Affairs programs; service line agreements for an individual residence, building, or well from an existing facility where installation will involve no clearance of vegetation from the right-of-way other than for placement of poles, signs (including highway signs), or buried power/cable lines; and approvals of Tribal regulations or other documents promulgated in exercise of Tribal sovereignty, such as Tribal Energy Resource Agreements, certification of a Tribal Energy Development Organization, Helping Expedite and Advance Responsible Tribal Homeownership Act Tribal regulations, Indian Trust Asset Reform Act Tribal regulations and trust asset management plans, and Tribal liquor control ordinances.

### 14. Mitigation (§ 1508.1(w))

CEQ proposes three edits to the definition of "mitigation" in § 1508.1(w). First, CEQ proposes to change "nexus" to the more commonly used word "connection" to describe the relationship between a proposed action or alternatives and any associated environmental effects. Second, CEQ proposes to delete the sentence that NEPA "does not mandate the form or adoption of any mitigation" because this sentence is unnecessary and could mislead readers by not acknowledging that agencies may use other authorities to require mitigation or may incorporate mitigation in mitigated FONSIs (§ 1501.6) and RODs (§ 1505.2). Third, CEQ proposes to add the clause "in general order of priority" to the sentence, "Mitigation includes" which introduces the list of mitigation types. This change would clarify that the types of mitigation provided in paragraphs (u)(1) though (u)(5) are listed in general order of priority, consistent with the familiar "mitigation hierarchy."[104] This list was prioritized in the 1978 regulations with avoidance coming before other types of mitigation and this proposed addition highlights that intent, which is consistent with longstanding agency practice.[105]

### 15. Notice of Intent (§ 1508.1(y))

CEQ proposes to modify the definition of notice of intent to include environmental assessments, as applicable. CEQ proposes this change for consistency with § 1501.5(j), which provides that agencies may issue an NOI for an EA where it is appropriate to improve efficiency and effectiveness, and § 1501.10(b)(3)(iii), which sets forth one of the three potential starting points from which deadlines are measured for environmental assessments consistent with 107(g)(1)(B)(iii).

---

[103] CEQ notes that the statutory exclusion of these activities from the definition of major Federal action and therefore NEPA review does not change the scope of environmental effects that agencies should assess for actions that are subject to NEPA review.

[104] *See e.g.,* U.S. Dep't of the Interior, A Strategy for Improving the Mitigation Policies and Practices of the Department of the Interior 2–3 (Apr. 2014), *https://www.doi.gov/sites/doi.gov/files/migrated/news/upload/Mitigation-Report-to-the-Secretary_FINAL_04_08_14.pdf* (discussing the development of a "mitigation hierarchy"—which starts with avoidance—in the implementation of NEPA and the Clean Water Act); Bureau of Land Mgmt., H–1794–1, Mitigation Handbook (P) 2–1 (Sept. 22, 2021), *https://www.blm.gov/sites/default/files/docs/2021-10/IM2021-046_att2.pdf* (citing CEQ regulations and noting that the "five aspects of mitigation (avoid, minimize, rectify, reduce/eliminate, compensate) are referred to as the mitigation hierarchy because they are generally applied in a hierarchical manner"); U.S. Env't Prot. Agency & U.S. Dep't of Def., Memorandums of Agreement (MOA); Clean Water Act Section 404(b)(1) Guidelines; Correction, 55 FR 9210, 9211 (Mar. 12, 1990) (noting that under section 404 of the Clean Water Act, the Army Corps of Engineers evaluates potential mitigation efforts sequentially, starting with avoidance, minimization, and then compensation).

[105] *See, e.g.,* 10 CFR 900.3 (defining a regional mitigation approach under NEPA as "an approach that applies the mitigation hierarchy (first seeking to avoid, then minimize impacts, then, when necessary, compensate for residual impacts)"); Presidential Memorandum, Mitigating Impacts on Natural Resources From Development and Encouraging Related Private Investment, 80 FR 68743, 68745 (Nov. 6, 2015) (addressing five agencies and noting that, "[a]s a practical matter, [mitigation is] captured in the terms avoidance, minimization, and compensation. These three actions are generally applied sequentially . . . ."); Fed. Highway Admin., *NEPA and Transportation Decisionmaking: Questions and Answers Regarding the Consideration of Indirect and Cumulative Impacts in the NEPA Process* Question 9, *https://www.environment.fhwa.dot.gov/nepa/QAimpact.aspx* (describing the importance of "sequencing," which refers to the process of prioritizing avoidance and minimization of effects over replacement or compensation for NEPA mitigation efforts).

16. Page (§ 1508.1(z))

CEQ proposes to modify the definition of "page" consistent with section 107(e) of NEPA to exclude citations from the page limits for EISs and EAs. CEQ proposes to retain the exclusions for maps, diagrams, graphs, tables, and other means of graphically displaying quantitative or geospatial information from the definition of "page" to facilitate better NEPA documents. While agencies could move these visual representations of information to appendices, which could come at the end of an EIS or the end of EIS chapters, CEQ is concerned that this will make the documents less functional to decision makers and the public. Further, such graphical displays themselves could be considered appendices consistent with the ordinary definition of appendix—supplementary material usually attached at the end of a piece of writing.[106] CEQ invites comment on its proposed definition of "page."

17. Participating Federal Agency (§ 1508.1(bb))

CEQ proposes to add a definition of "participating Federal agency" to § 1508.1(bb) and define it consistent with the definition of the same term in section 111(8) of NEPA.

18. Programmatic Environmental Document (§ 1508.1(cc))

CEQ proposes to add a definition of "programmatic environmental document" to § 1508.1(cc) and define it consistent with the definition of the same term in section 111(11) of NEPA.

19. Scope (§ 1508.1(ii))

CEQ proposes to expand the definition of "scope" to include EAs and revise the definition to include both the range and breadth of the actions, alternatives, and effects to be considered in an EIS or EA, consistent with CEQ's proposed relocation of the discussion of scope in § 1501.3(b). As discussed further in section II.C.2, agencies have long examined the scope of their actions to determine what alternatives and effects they must analyze. This is a fact-specific analysis that agencies undertake informed by their statutory authority and control and responsibility over the activity. CEQ also proposes to strike the last sentence regarding tiering because it is not definitional language and is unnecessary because this concept is more fully addressed in § 1501.11.

20. Significant Effects (§ 1508.1(kk))

CEQ proposes to add a definition for "significant effects" to provide a definition for those effects that are of vital importance in the NEPA process in determining the appropriate level of review. The proposed definition would align with the restoration of the context and intensity factors for determining significance in § 1501.3(d). CEQ proposes to define "significant effects" as adverse effects identified by an agency as significant based on the criteria set forth in § 1501.3(d). This would clarify that beneficial effects are not significant effects as the phrase is used in NEPA and, therefore, do not require an agency to prepare an EIS. CEQ proposes this as an alternative approach to the proposal in § 1501.3(d)(2)(i) where an action "does not" require an EIS when it would result only in significant beneficial effects. If CEQ includes this definition in the final rule, this approach would mean that an agency would not need to prepare an EIS if a proposed action's effects are exclusively beneficial. However, irrespective of the level of NEPA review, agencies would still need to analyze both adverse and beneficial effects in NEPA documents if they are reasonably foreseeable. CEQ invites comment on the definition, specifically on the inclusion of "adverse" in the definition, and comments on whether the approach in § 1501.3(d)(2)(i) or § 1508.1(kk) is preferred and the reasons why. Finally, CEQ invites the public to submit any examples of EAs or EISs where there were significant effects that were purely beneficial.

21. Tiering (§ 1508.1(mm))

CEQ proposes to revise the definition of tiering to cross reference the process as set forth in § 1501.11. CEQ is proposing this revision to avoid any potential inconsistencies between the definition and the provisions of § 1501.11.

**III. Rulemaking Analyses and Notices**

*A. Executive Order 12866, Regulatory Planning and Review*

E.O. 12866 provides that the Office of Information and Regulatory Affairs will review all significant rules.[107] E.O. 13563 reaffirms the principles of E.O. 12866, calling for improvements in the Federal Government's regulatory system to promote predictability, reduce uncertainty, and use the best, most innovative, and least burdensome tools for achieving regulatory objectives.[108] This proposed rule is a significant regulatory action under section 3(f)(1) of E.O. 12866 that CEQ submitted to OMB for review. The proposed changes would improve the CEQ regulations to benefit agencies and the public. Furthermore, an effective NEPA process can save time and reduce overall project costs by providing a clear process for evaluating alternatives and effects, coordinating agencies and relevant stakeholders including the public, and identifying and avoiding problems— including significant significant effects— that may occur in later stages of project development.[109] Additionally, if agencies choose to consider additional alternatives and conduct clearer or more robust analyses, such analyses should improve societal outcomes by improving agency decision making. Because individual cases will vary, the magnitude of potential costs and benefits resulting from these proposed changes are difficult to anticipate, but CEQ has prepared a qualitative analysis in the accompanying regulatory impact analysis.

*B. Regulatory Flexibility Act and Executive Order 13272, Proper Consideration of Small Entities in Agency Rulemaking*

The Regulatory Flexibility Act (RFA), as amended, 5 U.S.C. 601 *et seq.*, and E.O. 13272, *Proper Consideration of Small Entities in Agency Rulemaking*,[110] require agencies to assess the impacts of proposed and final rules on small entities. Under the RFA, small entities include small businesses, small organizations, and small governmental jurisdictions. An agency must prepare an Initial Regulatory Flexibility Analysis unless it determines and certifies that a proposed rule, if promulgated, would not have a significant economic impact on a substantial number of small entities. 5 U.S.C. 605(b). The proposed rule would not directly regulate small entities. Rather, the proposed rule would apply to Federal agencies and set forth the process for their compliance with NEPA. Accordingly, CEQ hereby certifies that the proposed rule, if promulgated, would not have a significant economic impact on a substantial number of small entities.

---

[106] Merriam-Webster, *https://www.merriam-webster.com/dictionary/appendix.*

[107] *Regulatory Planning and Review,* 58 FR 51735 (Oct. 4, 1993).

[108] E.O. 13563, *Improving Regulation and Regulatory Review,* 76 FR 3821 (Jan. 21, 2011).

[109] *See generally* Linda Luther, Cong. Rsch. Serv. R42479, The Role of the Environmental Review Process in Federally Funded Highway Projects: Background and Issues for Congress (2012), *https://crsreports.congress.gov/product/pdf/R/R42479.*

[110] 67 FR 53461 (Aug. 16, 2002).

## C. National Environmental Policy Act

Under the CEQ regulations, major Federal actions may include regulations. When CEQ issued regulations in 1978, it prepared a "special environmental assessment" for illustrative purposes pursuant to E.O. 11991.[111] The NPRM for the 1978 rule stated "the impacts of procedural regulations of this kind are not susceptible to detailed analysis beyond that set out in the assessment." [112] Similarly, in 1986, while CEQ stated in the final rule that there were "substantial legal questions as to whether entities within the Executive Office of the President are required to prepare environmental assessments," it also prepared a special EA.[113] The special EA issued in 1986 supported a FONSI, and there was no finding made for the assessment of the 1978 final rule. CEQ also prepared a special EA and reached a FONSI for the Phase 1 rulemaking.

CEQ continues to take the position that a NEPA analysis is not required for establishing or updating NEPA procedures. See Heartwood v. U.S. Forest Serv., 230 F.3d 947, 954–55 (7th Cir. 2000) (finding that neither NEPA or the CEQ regulations required the Forest Service to conduct an EA or an EIS prior to the promulgation of its procedures creating a CE). Nevertheless, based on past practice, CEQ has developed a special EA and has posted it in the docket. CEQ invites comments on the special EA.

## D. Executive Order 13132, Federalism

E.O. 13132 requires agencies to develop an accountable process to ensure meaningful and timely input by state and local officials in the development of regulatory policies that have federalism implications.[114] Policies that have federalism implications include regulations that have substantial direct effects on the States, on the relationship between the national government and the States, or on the distribution of power and responsibilities among the various levels of government.[115] CEQ does not anticipate that this proposed rule has

federalism implications because it applies to Federal agencies, not States.

## E. Executive Order 13175, Consultation and Coordination With Indian Tribal Governments

E.O. 13175 requires agencies to have a process to ensure meaningful and timely input by Tribal officials in the development of policies that have Tribal implications.[116] Such policies include regulations that have substantial direct effects on one or more Indian Tribes, on the relationship between the Federal Government and Indian Tribes, or on the distribution of power and responsibilities between the Federal Government and Indian Tribes.[117] CEQ has assessed the impact of this proposed rule on Indian Tribal governments and has determined preliminarily that the proposed rule does significantly or uniquely affect these communities and seeks comment on this preliminary determination. CEQ engaged in government-to-government consultation with federally recognized Tribes on the Phase 2 rulemaking. As required by E.O. 13175, CEQ held a Tribal consultation on this rulemaking on November 12, 2021, and will be holding additional consultations during the public comment period.

## F. Executive Order 12898, Federal Actions To Address Environmental Justice in Minority Populations and Low-Income Populations and Executive Order 14096, Revitalizing Our Nation's Commitment to Environmental Justice for All

E.O. 12898 requires agencies to make achieving environmental justice part of their missions by identifying and addressing, as appropriate, disproportionately high and adverse human health or environmental effects of their programs, policies, and activities on communities of color and low-income communities.[118] E.O. 14096 charges agencies to make achieving environmental justice part of its mission consistent with statutory authority by identifying, analyzing, and addressing disproportionate and adverse human health and environmental effects and hazards of Federal activities, including those related to climate change and cumulative impacts of environmental and other burdens on communities with environmental justice concerns.

CEQ has analyzed this proposed rule and preliminarily determined that it would not cause disproportionate and adverse human health or environmental

effects on communities with environmental justice concerns. This rule would set forth implementing regulations for NEPA; it is in the agency implementation of NEPA when conducting reviews of proposed agency actions where consideration of environmental justice effects typically occurs. CEQ invites comment on this preliminary determination.

## G. Executive Order 13211, Actions Concerning Regulations That Significantly Affect Energy Supply, Distribution, or Use

Agencies must prepare a Statement of Energy Effects for significant energy actions under E.O. 13211.[119] CEQ has preliminarily determined that this rulemaking is not a "significant energy action" because it is not likely to have a significant adverse effect on the supply, distribution, or use of energy.

## H. Executive Order 12988, Civil Justice Reform

Under section 3(a) of E.O. 12988, agencies must review their proposed regulations to eliminate drafting errors and ambiguities, draft them to minimize litigation, and provide a clear legal standard for affected conduct.[120] Section 3(b) provides a list of specific issues for review to conduct the reviews required by section 3(a).[121] CEQ has conducted this review and determined that this proposed rule complies with the requirements of E.O. 12988.

## I. Unfunded Mandate Reform Act

Section 201 of the Unfunded Mandates Reform Act of 1995, 2 U.S.C. 1531, requires Federal agencies to assess the effects of their regulatory actions on Tribal, State, and local governments, and the private sector to the extent that such regulations incorporate requirements specifically set forth in law. Before promulgating a rule that may result in the expenditure by a Tribal, State, or local government, in the aggregate, or by the private sector of $100 million, adjusted annually for inflation, in any 1 year, an agency must prepare a written statement that assesses the effects on Tribal, State, and local governments and the private sector. 2 U.S.C. 1532. This proposed rule would apply to Federal agencies and would not result in expenditures of $100 million or more for Tribal, State, and local governments, in the aggregate, or the private sector in any 1 year. This

[111] National Environmental Policy Act—Regulations: Proposed Implementation of Procedural Provisions, 43 FR 25230, 25232 (June 9, 1978); see E.O. 11991, supra note 26.

[112] National Environmental Policy Act—Regulations: Proposed Implementation of Procedural Provisions, supra note 111, at 25232.

[113] National Environmental Policy Act Regulations; Incomplete or Unavailable Information, supra note 29, at 15619.

[114] E.O. 13132, Federalism, 64 FR 43255 (Aug. 10, 1999).

[115] Id.

[116] E.O. 13175, supra note 53.

[117] Id.

[118] E.O. 12898, supra note 7.

[119] E.O. 13211, Actions Concerning Regulations That Significantly Affect Energy Supply, Distribution, or Use, 66 FR 28355 (May 22, 2001).

[120] E.O. 12988, Civil Justice Reform, 61 FR 4729, 4731 (Feb. 7, 1996).

[121] Id.

proposed action also would not impose any enforceable duty, contain any unfunded mandate, or otherwise have any effect on small governments subject to the requirements of 2 U.S.C. 1531–1538.

### J. Paperwork Reduction Act

This proposed rule would not impose any new information collection burden that would require additional review or approval by OMB under the Paperwork Reduction Act, 44 U.S.C. 3501 *et seq.*

### List of Subjects in 40 CFR Parts 1500, 1501, 1502, 1503, 1504, 1505, 1506, 1507, and 1508

Administrative practice and procedure; Environmental impact statements; Environmental protection; Natural resources.

**Brenda Mallory,**
*Chair.*

For the reasons discussed in the preamble, the Council on Environmental Quality proposes to amend 40 CFR chapter V by revising subchapter A to read as follows:

■ 1. Revise subchapter A to read as follows:

### PART 1500—PURPOSE AND POLICY

Sec.
1500.1   Purpose.
1500.2   Policy.
1500.3   NEPA compliance.
1500.4   Concise and informative environmental documents.
1500.5   Efficient process.
1500.6   Agency authority.

**Authority:** 42 U.S.C. 4321–4347; 42 U.S.C. 4371–4375; 42 U.S.C. 7609; and E.O. 11514, 35 FR 4247, 3 CFR, 1966–1970, Comp., p. 902, as amended by E.O. 11991, 42 FR 26967, 3 CFR, 1977 Comp., p. 123.

### PART 1501—NEPA AND AGENCY PLANNING

Sec.
1501.1   Purpose.
1501.2   Apply NEPA early in the process.
1501.3   Determine the appropriate level of NEPA review.
1501.4   Categorical exclusions.
1501.5   Environmental assessments.
1501.6   Findings of no significant impact.
1501.7   Lead agency.
1501.8   Cooperating agencies.
1501.9   Public and governmental engagement.
1501.10   Deadlines and schedule for the NEPA process.
1501.11   Programmatic environmental documents and tiering.
1501.12   Incorporation by reference into environmental documents.

**Authority:** 42 U.S.C. 4321–4347; 42 U.S.C. 4371–4375; 42 U.S.C. 7609; and E.O. 11514, 35 FR 4247, 3 CFR, 1966–1970, Comp., p.

902, as amended by E.O. 11991, 42 FR 26967, 3 CFR, 1977 Comp., p. 123.

### PART 1502—ENVIRONMENTAL IMPACT STATEMENT

Sec.
1502.1   Purpose of environmental impact statement.
1502.2   Implementation.
1502.3   Statutory requirements for environmental impact statements.
1502.4   Scoping.
1502.5   Timing.
1502.6   Interdisciplinary preparation.
1502.7   Page limits.
1502.8   Writing.
1502.9   Draft, final, and supplemental statements.
1502.10   Recommended format.
1502.11   Cover.
1502.12   Summary.
1502.13   Purpose and need.
1502.14   Alternatives including the proposed action.
1502.15   Affected environment.
1502.16   Environmental consequences.
1502.17   Summary of scoping information.
1502.18   List of preparers.
1502.19   Appendix.
1502.20   Publication of the environmental impact statement.
1502.21   Incomplete or unavailable information.
1502.22   Cost-benefit analysis.
1502.23   Methodology and scientific accuracy.
1502.24   Environmental review and consultation requirements.

**Authority:** 42 U.S.C. 4321–4347; 42 U.S.C. 4371–4375; 42 U.S.C. 7609; and E.O. 11514, 35 FR 4247, 3 CFR, 1966–1970, Comp., p. 902, as amended by E.O. 11991, 42 FR 26967, 3 CFR, 1977 Comp., p. 123.

### PART 1503—COMMENTING ON ENVIRONMENTAL IMPACT STATEMENTS

Sec.
1503.1   Inviting comments and requesting information and analyses.
1503.2   Duty to comment.
1503.3   Specificity of comments and information.
1503.4   Response to comments.

**Authority:** 42 U.S.C. 4321–4347; 42 U.S.C. 4371–4375; 42 U.S.C. 7609; and E.O. 11514, 35 FR 4247, 3 CFR, 1966–1970, Comp., p. 902, as amended by E.O. 11991, 42 FR 26967, 3 CFR, 1977 Comp., p. 123.

### PART 1504—PRE-DECISIONAL REFERRALS TO THE COUNCIL OF PROPOSED FEDERAL ACTIONS DETERMINED TO BE ENVIRONMENTALLY UNSATISFACTORY

Sec.
1504.1   Purpose.
1504.2   Early dispute resolution.
1504.3   Criteria and procedure for referrals and response.

### PART 1505—NEPA AND AGENCY DECISION MAKING

Sec.
1505.1   [Reserved]
1505.2   Record of decision in cases requiring environmental impact statements.
1505.3   Implementing the decision.

**Authority:** 42 U.S.C. 4321–4347; 42 U.S.C. 4371–4375; 42 U.S.C. 7609; and E.O. 11514, 35 FR 4247, 3 CFR, 1966–1970, Comp., p. 902, as amended by E.O. 11991, 42 FR 26967, 3 CFR, 1977 Comp., p. 123.

### PART 1506—OTHER REQUIREMENTS OF NEPA

Sec.
1506.1   Limitations on actions during NEPA process.
1506.2   Elimination of duplication with State, Tribal, and local procedures.
1506.3   Adoption.
1506.4   Combining documents.
1506.5   Agency responsibility for environmental documents.
1506.6   [Reserved]
1506.7   Further guidance.
1506.8   Proposals for legislation.
1506.9   Filing requirements.
1506.10   Timing of agency action.
1506.11   Emergencies.
1506.12   Innovative approaches to NEPA reviews.
1506.13   Effective date.

**Authority:** 42 U.S.C. 4321–4347; 42 U.S.C. 4371–4375; 42 U.S.C. 7609; and E.O. 11514, 35 FR 4247, 3 CFR, 1966–1970, Comp., p. 902, as amended by E.O. 11991, 42 FR 26967, 3 CFR, 1977 Comp., p. 123.

### PART 1507—AGENCY COMPLIANCE

Sec.
1507.1   Compliance.
1507.2   Agency capability to comply.
1507.3   Agency NEPA procedures.
1507.4   Agency NEPA program information.

**Authority:** 42 U.S.C. 4321–4347; 42 U.S.C. 4371–4375; 42 U.S.C. 7609; and E.O. 11514, 35 FR 4247, 3 CFR, 1966–1970, Comp., p. 902, as amended by E.O. 11991, 42 FR 26967, 3 CFR, 1977 Comp., p. 123.

### PART 1508—DEFINITIONS

Sec.
1508.1   Definitions.
1508.2   [Reserved]

**Authority:** 42 U.S.C. 4321–4347; 42 U.S.C. 4371–4375; 42 U.S.C. 7609; and E.O. 11514, 35 FR 4247, 3 CFR, 1966–1970, Comp., p. 902, as amended by E.O. 11991, 42 FR 26967, 3 CFR, 1977 Comp., p. 123.

### PART 1500—PURPOSE AND POLICY

§ 1500.1   Purpose.

(a) The National Environmental Policy Act (NEPA) is the basic national charter for protection of the environment. It establishes policy, sets goals (section 101), and provides direction (section 102) for carrying out the policy.

(1) Section 101(a) of NEPA establishes the national environmental policy of the Federal Government to use all practicable means and measures to foster and promote the general welfare, create and maintain conditions under which people and nature can exist in productive harmony, and fulfill the social, economic, and other requirements of present and future generations. Section 101(b) of NEPA establishes the continuing responsibility of the Federal Government to use all practicable means, consistent with other essential considerations of national policy, to help each generation serve as a trustee of the environment for succeeding generations; assure for all people safe, healthful, productive, and aesthetically and culturally pleasing surroundings; attain the widest range of beneficial uses of the environment without degradation, risk to health or safety, or other undesirable and unintended consequences; preserve important historic, cultural, and natural aspects of our national heritage, and maintain, wherever possible, an environment which supports diversity and variety of individual choice; achieve a balance between population and resource use which will permit high standards of living and a wide sharing of life's amenities; and enhance the quality of renewable resources and approach the maximum attainable recycling of depletable resources.

(2) Section 102(2) of NEPA establishes procedural requirements to carry out the policy and responsibilities established in section 101 of NEPA and contains "action-forcing" procedural provisions to ensure Federal agencies implement the letter and spirit of the Act. The purpose of the regulations in this subchapter is to set forth what Federal agencies must and should do to comply with the procedures and achieve the goals of the Act. The President, the Federal agencies, and the courts share responsibility for enforcing the Act so as to achieve the policy goals of section 101.

(b) Federal agency NEPA procedures must ensure that agencies identify, consider, and disclose to the public relevant environmental information early in the process before decisions are made and before actions are taken. The information should be of high quality, science-based, and accessible. Accurate scientific analysis, expert agency comments, and public scrutiny are essential to implementing NEPA. Most important, environmental documents must concentrate on the issues that are truly relevant to the action in question, rather than amassing needless detail. The regulations in this subchapter also

are intended to ensure that Federal agencies conduct environmental reviews in a coordinated, consistent, predictable, and timely manner, and to reduce unnecessary burdens and delays. Finally, the regulations in this subchapter promote concurrent environmental reviews to ensure timely and efficient decision making.

(c) Ultimately, of course, it is not better documents but better decisions that count. NEPA's purpose is not to generate paperwork—even excellent paperwork—but to foster excellent action. The NEPA process is intended to help public officials make decisions that are based on an understanding of environmental consequences and take actions that protect, restore, and enhance the environment. The regulations in this subchapter provide the direction to achieve this purpose.

**§ 1500.2   Policy.**

Federal agencies shall to the fullest extent possible:

(a) Interpret and administer the policies, regulations, and public laws of the United States in accordance with the policies set forth in the Act and in these regulations.

(b) Implement procedures to make the NEPA process more useful to decision makers and the public; to reduce paperwork and the accumulation of extraneous background data; and to emphasize important environmental issues and alternatives. Environmental documents shall be concise, clear, and supported by evidence that agencies have conducted the necessary environmental analyses.

(c) Integrate the requirements of NEPA with other planning and environmental review procedures required by law or by agency practice so that all such procedures run concurrently rather than consecutively.

(d) Encourage and facilitate public engagement in decisions that affect the quality of the human environment, including meaningful engagement with communities with environmental justice concerns, which often include communities of color, low-income communities, indigenous communities, and Tribal communities.

(e) Use the NEPA process to identify and assess the reasonable alternatives to proposed actions that will avoid or minimize adverse effects of these actions upon the quality of the human environment, such as alternatives that will reduce climate change-related effects or address adverse health and environmental effects that disproportionately affect communities with environmental justice concerns.

(f) Use all practicable means, consistent with the requirements of the Act and other essential considerations of national policy, to restore and enhance the quality of the human environment and avoid or minimize any possible adverse effects of their actions upon the quality of the human environment.

**§ 1500.3   NEPA compliance.**

(a) *Mandate.* This subchapter is applicable to and binding on all Federal agencies for implementing the procedural provisions of the National Environmental Policy Act of 1969, as amended (Pub. L. 91–190, 42 U.S.C. 4321 *et seq.*) (NEPA or the Act). The regulations in this subchapter are issued pursuant to NEPA; the Environmental Quality Improvement Act of 1970, as amended (Pub. L. 91–224, 42 U.S.C. 4371 *et seq.*); and Executive Order 11514, Protection and Enhancement of Environmental Quality (March 5, 1970), as amended by Executive Order 11991, Relating to the Protection and Enhancement of Environmental Quality (May 24, 1977). The regulations in this subchapter apply to the whole of section 102(2) of NEPA. The provisions of the Act and the regulations in this subchapter must be read together as a whole to comply with the Act.

(b) *Review of NEPA compliance.* It is the Council's intention that judicial review of agency compliance with the regulations in this subchapter not occur before an agency has issued the record of decision or taken other final agency action, except with respect to claims brought by project sponsors related to deadlines under section 107(g)(3) of NEPA. It is also the Council's intention that minor, non-substantive errors that have no effect on agency decision making shall be considered harmless and shall not invalidate an agency action.

(c) *Severability.* The sections of this subchapter are separate and severable from one another. If any section or portion therein is stayed or determined to be invalid, or the applicability of any section to any person or entity is held invalid, it is the Council's intention that the validity of the remainder of those parts shall not be affected, with the remaining sections to continue in effect.

**§ 1500.4   Concise and informative environmental documents.**

Agencies shall prepare analytical, concise, and informative environmental documents by:

(a) Meeting appropriate page limits (§§ 1501.5(g) and 1502.7 of this subchapter).

(b) Discussing only briefly issues other than important ones (*e.g.*, § 1502.2(b) of this subchapter).

(c) Writing environmental documents in plain language (*e.g.*, § 1502.8 of this subchapter).

(d) Following a clear format for environmental impact statements (§ 1502.10 of this subchapter).

(e) Emphasizing the portions of the environmental document that are most useful to decision makers and the public (*e.g.*, §§ 1502.14, 1502.15, and 1502.16 of this subchapter) and reducing emphasis on background material (*e.g.*, § 1502.1 of this subchapter).

(f) Using the scoping process to identify important environmental issues deserving of study and to deemphasize unimportant issues, narrowing the scope of the environmental impact statement process (or, where an agency elects to do so, the environmental assessment process) accordingly (§§ 1501.9 and 1502.4 of this subchapter).

(g) Summarizing the environmental impact statement (§ 1502.12 of this subchapter).

(h) Using programmatic environmental documents and tiering from documents of broad scope to those of narrower scope, to eliminate repetitive discussions of the same issues (§ 1501.11 of this subchapter).

(i) Incorporating by reference (§ 1501.12 of this subchapter).

(j) Integrating NEPA requirements with other environmental review and consultation requirements (§ 1502.24 of this subchapter).

(k) Requiring that comments be as specific as possible (§ 1503.3 of this subchapter).

(*l*) Attaching and publishing only changes to the draft environmental impact statement, rather than rewriting and publishing the entire statement, when changes are minor (§ 1503.4(c) of this subchapter).

(m) Eliminating duplication with State, Tribal, and local procedures, by providing for joint preparation of environmental documents where practicable (§ 1506.2 of this subchapter), and with other Federal procedures, by providing that an agency may adopt appropriate environmental documents prepared by another Federal agency (§ 1506.3 of this subchapter).

(n) Combining environmental documents with other documents (§ 1506.4 of this subchapter).

### § 1500.5    Efficient process.

Agencies shall improve efficiency of their NEPA processes by:

(a) Using categorical exclusions to define categories of actions that normally do not have a significant effect on the human environment (§ 1501.4 of this subchapter) and therefore do not require preparation of an environmental assessment or environmental impact statement.

(b) Using a finding of no significant impact when an action not otherwise excluded will not have a significant effect on the human environment (§ 1501.6 of this subchapter) and therefore does not require preparation of an environmental impact statement.

(c) Integrating the NEPA process into early planning (§ 1501.2 of this subchapter).

(d) Engaging in interagency cooperation before or during the preparation of an environmental assessment or environmental impact statement, rather than waiting to submit comments on a completed document (§§ 1501.7 and 1501.8 of this subchapter).

(e) Ensuring the swift and fair resolution of lead agency disputes (§ 1501.7 of this subchapter).

(f) Using the scoping process for early identification of the important issues that require detailed analysis (§ 1502.4 of this subchapter).

(g) Meeting appropriate deadlines for the environmental assessment and environmental impact statement processes (§ 1501.10 of this subchapter).

(h) Preparing environmental documents early in the process (§ 1502.5 and § 1501.5(d) of this subchapter).

(i) Integrating NEPA requirements with other environmental review and consultation requirements (§ 1502.24 of this subchapter).

(j) Eliminating duplication with State, Tribal, and local procedures by providing for joint preparation of environmental documents where practicable (§ 1506.2 of this subchapter) and with other Federal procedures by providing that agencies may jointly prepare or adopt appropriate environmental documents prepared by another agency (§ 1506.3 of this subchapter).

(k) Combining environmental documents with other documents (§ 1506.4 of this subchapter).

(*l*) Using accelerated procedures for proposals for legislation (§ 1506.8 of this subchapter).

### § 1500.6    Agency authority.

Each agency shall interpret the provisions of the Act as a supplement to its existing authority and as a mandate to view policies and missions in the light of the Act's national environmental objectives, to the extent consistent with its existing authority. Agencies shall review their policies, procedures, and regulations accordingly and revise them as necessary to ensure full compliance with the purposes and provisions of the Act and the regulations in this subchapter. The phrase ''to the fullest extent possible'' in section 102 of NEPA means that each agency of the Federal Government shall comply with that section unless an agency activity, decision, or action is exempted from NEPA by law or compliance with NEPA is impossible.

## PART 1501—NEPA AND AGENCY PLANNING

### § 1501.1    Purpose.

The purposes of this part include:

(a) Integrating the NEPA process into agency planning at an early stage to facilitate appropriate consideration of NEPA's policies, promote an efficient process, and reduce delay.

(b) Providing for early engagement in the environmental review process with other agencies, State, Tribal, and local governments, and affected or interested persons, entities, and communities before a decision is made.

(c) Providing for the swift and fair resolution of interagency disputes.

(d) Identifying at an early stage the important environmental issues deserving of study, and deemphasizing unimportant issues, narrowing the scope of the environmental review and enhancing efficiency accordingly.

(e) Promoting accountability by establishing appropriate deadlines and requiring schedules.

### § 1501.2    Apply NEPA early in the process.

(a) Agencies should integrate the NEPA process with other planning and authorization processes at the earliest reasonable time to ensure that agencies consider environmental impacts in their planning and decisions, to avoid delays later in the process, and to head off potential conflicts.

(b) Each agency shall:

(1) Comply with the mandate of section 102(2)(A) of NEPA to utilize a systematic, interdisciplinary approach, which will ensure the integrated use of the natural and social sciences and the environmental design arts in planning and in decision making that may have an impact on the human environment, as specified by § 1507.2(a) of this subchapter.

(2) Identify environmental effects and values in adequate detail so the decision maker can appropriately consider such effects and values alongside economic and technical analyses. Whenever practicable, agencies shall review and publish environmental documents and appropriate analyses at the same time as other planning documents.

(3) Study, develop, and describe appropriate alternatives to recommended courses of action in any proposal that involves unresolved conflicts concerning alternative uses of available resources, as provided by section 102(2)(H) of NEPA.

(4) Provide for actions subject to NEPA that are planned by applicants or other non-Federal entities before Federal involvement so that:

(i) Policies or designated staff are available to advise potential applicants of studies or other information foreseeably required for later Federal action.

(ii) The Federal agency consults early with appropriate State, Tribal, and local governments and with interested individuals and organizations when their involvement is reasonably foreseeable.

(iii) The Federal agency commences its NEPA process at the earliest reasonable time (§§ 1501.5(d) and 1502.5(b) of this subchapter).

### § 1501.3   Determine the appropriate level of NEPA review.

(a) *Applicability.* As a threshold determination, an agency shall assess whether NEPA applies to the proposed activity or decision. In assessing whether NEPA applies, Federal agencies should determine:

(1) Whether the proposed activity or decision is exempted from NEPA by law;

(2) Whether compliance with NEPA would clearly and fundamentally conflict with the requirements of another provision of law;

(3) Whether statutory provisions applicable to the agency's proposed activity or decision make compliance with NEPA impossible; and

(4) Whether the proposed activity or decision is a major Federal action, including whether:

(i) The proposed activity or decision is a final agency action within the meaning of such term in chapter 5 of title 5, United States Code (§ 1508.1(u)(2)(viii)); or

(ii) The proposed activity or decision is a non-discretionary action with respect to which such agency does not have authority to take environmental factors into consideration in determining whether to take the proposed action (§ 1508.1(u)(2)(vi)).

(b) *Scope of action and analysis.* If the agency determines that NEPA applies, the agency shall consider the scope of the proposed action and its potential effects to inform the agency's determination of the appropriate level of NEPA review. The agency shall evaluate, in a single review, proposals or parts of proposals that are related closely enough to be, in effect, a single course of action. The agency also shall consider whether there are connected actions, which are closely related Federal activities or decisions that should be considered in the same NEPA review that:

(1) Automatically trigger other actions that may require NEPA review;

(2) Cannot or will not proceed unless other actions are taken previously or simultaneously; or

(3) Are interdependent parts of a larger action and depend on the larger action for their justification.

(c) *Levels of NEPA review.* In assessing the appropriate level of NEPA review, agencies may make use of any reliable data source and are not required to undertake new scientific or technical research unless it is essential to a reasoned choice among alternatives, and the overall costs and timeframe of obtaining it are not unreasonable. Agencies should determine whether the proposed action:

(1) Normally does not have significant effects and is categorically excluded (§ 1501.4);

(2) Is not likely to have significant effects or the significance of the effects is unknown and is therefore appropriate for an environmental assessment (§ 1501.5); or

(3) Is likely to have significant effects and is therefore appropriate for an environmental impact statement (part 1502 of this subchapter).

(d) *Significance determination— context and intensity.* In considering whether the effects of the proposed action are significant, agencies shall examine both the context of an action and the intensity of the effects.

(1) Agencies shall analyze the significance of an action in several contexts. Agencies should consider the characteristics of the relevant geographic area, such as proximity to unique or sensitive resources or vulnerable communities. Depending on the scope of the action, agencies should consider the potential global, national, regional, and local contexts as well as the duration, including short-and long-term effects.

(2) Agencies shall analyze the intensity of effects considering the following factors, as applicable and in relationship to one another:

(i) Effects may be beneficial or adverse. However, only actions with significant adverse effects require an environmental impact statement. A significant adverse effect may exist even if the agency considers that on balance the effects of the action will be beneficial. Agencies should consider the duration of effects; for instance, a proposed action may have short-term adverse effects but long-term beneficial effects.

(ii) The degree to which the proposed action may adversely affect public health and safety.

(iii) The degree to which the proposed action may adversely affect unique characteristics of the geographic area such as historic or cultural resources, park lands, Tribal sacred sites, prime farmlands, wetlands, wild and scenic rivers, or ecologically critical areas.

(iv) Whether the action may violate relevant Federal, State, Tribal, or local laws or other requirements or be inconsistent with Federal, State, Tribal, or local policies designed for the protection of the environment.

(v) The degree to which the potential effects on the human environment are highly uncertain.

(vi) The degree to which the action may relate to other actions with adverse environmental effects, including actions that are individually insignificant but significant in the aggregate. Significance cannot be avoided by terming an action temporary that is not temporary in fact or by segmenting it into small component parts.

(vii) The degree to which the action may adversely affect resources listed or eligible for listing in the National Register of Historic Places.

(viii) The degree to which the action may adversely affect an endangered or threatened species or its habitat, including habitat that has been determined to be critical under the Endangered Species Act of 1973.

(ix) The degree to which the action may have disproportionate and adverse effects on communities with environmental justice concerns.

(x) The degree to which the action may adversely affect rights of Tribal Nations that have been reserved through treaties, statutes, or Executive Orders.

### § 1501.4   Categorical exclusions.

(a) For efficiency and consistent with § 1507.3(c)(8)(ii) of this subchapter, agencies shall establish categorical exclusions for categories of actions that normally do not have a significant effect on the human environment, individually or in the aggregate, and therefore do not require preparation of an environmental assessment or environmental impact statement unless extraordinary circumstances exist that make application of the categorical exclusion inappropriate, consistent with paragraph (b) of this section. Agencies may establish categorical exclusions individually or jointly with other agencies.

(b) If an agency determines that a categorical exclusion identified in its agency NEPA procedures covers a proposed action, the agency shall evaluate the action for extraordinary circumstances in which a normally excluded action may have a significant effect.

(1) If an extraordinary circumstance exists, the agency nevertheless may apply the categorical exclusion if the agency conducts an analysis and determines that the proposed action does not in fact have the potential to result in significant effects notwithstanding the extraordinary circumstance or the agency modifies the action to address the extraordinary circumstance. In such cases, the agency shall document such determination and should publish it on the agency's website or otherwise make it publicly available.

(2) If the agency cannot categorically exclude the proposed action, the agency shall prepare an environmental assessment or environmental impact statement, as appropriate.

(c) In addition to the process for establishing categorical exclusions under § 1507.3(c)(8) of this subchapter, agencies may establish categorical exclusions through a land use plan, a decision document supported by a programmatic environmental impact statement or programmatic environmental assessment, or other equivalent planning or programmatic decision, so long as the agency:

(1) Provides the Council an opportunity to review and comment prior to public comment;

(2) Provides notification and an opportunity for public comment;

(3) Substantiates its determination that the category of actions normally does not have significant effects, individually or in the aggregate;

(4) Identifies extraordinary circumstances;

(5) Establishes a process for determining that a categorical exclusion applies to a specific action or actions in the absence of extraordinary circumstances, or, where extraordinary circumstances are present, for determining the agency may apply the categorical exclusion consistent with (b)(1) of this section; and

(6) Publishes a list of all categorical exclusions established through these mechanisms on its website.

(d) Categorical exclusions established consistent with paragraph (c) of this section or § 1507.3(c)(8) may:

(1) Cover specific geographic areas or areas that share common characteristics, *e.g.*, habitat type;

(2) Have a limited duration;

(3) Include mitigation measures that, in the absence of extraordinary circumstances, will ensure that any environmental effects are not significant, so long as a process is established for monitoring and enforcing any required mitigation measures, including through the suspension or revocation of the relevant agency action; or

(4) Provide criteria that would cause the categorical exclusion to expire because the agency's determination that the category of action does not have significant effects, individually or in the aggregate, is no longer applicable, including, as appropriate, because:

(i) The number of individual actions covered by the categorical exclusion exceeds a specific threshold;

(ii) Individual actions covered by the categorical exclusion are too close to one another in proximity or time; or

(iii) Environmental conditions or information upon which the agency's determination was based have changed.

(e) An agency may apply a categorical exclusion listed in another agency's NEPA procedures to a proposed action or a category of proposed actions consistent with this paragraph. The agency shall:

(1) Identify the categorical exclusion listed in another agency's NEPA procedures that covers its proposed action or a category of proposed actions;

(2) Consult with the agency that established the categorical exclusion to ensure that the proposed application of the categorical exclusion is appropriate;

(3) Evaluate the proposed action or category of proposed actions for extraordinary circumstances, consistent with paragraph (b) of this section;

(4) Provide public notice of the categorical exclusion that the agency plans to use for the proposed action or category of proposed actions; and

(5) Publish the documentation of the application of the categorical exclusion.

### § 1501.5 Environmental assessments.

(a) An agency shall prepare an environmental assessment for a proposed action that is not likely to have significant effects or when the significance of the effects is unknown unless the agency finds that a categorical exclusion (§ 1501.4) is applicable or has decided to prepare an environmental impact statement.

(b) An agency may prepare an environmental assessment on any action to assist agency planning and decision making.

(c) An environmental assessment shall:

(1) Briefly provide sufficient evidence and analysis for determining whether to prepare an environmental impact statement or a finding of no significant impact;

(2) Briefly discuss the:

(i) Purpose and need for the proposed agency action;

(ii) Alternatives as required by section 102(2)(H) of NEPA; and

(iii) Environmental effects of the proposed action and alternatives;

(3) List the Federal agencies; State, Tribal, and local governments and agencies; or persons consulted; and

(4) Provide a unique identification number for tracking purposes, which the agency shall reference on all associated environmental review documents prepared for the proposed action.

(d) For applications to the agency requiring an environmental assessment, the agency shall commence the environmental assessment as soon as practicable after receiving the application.

(e) If an agency publishes a draft environmental assessment, the agency shall invite public comment and consider those comments in preparing the final environmental assessment.

(f) Agencies shall involve the public, State, Tribal, and local governments, relevant agencies, and any applicants, to the extent practicable in preparing environmental assessments (*see* § 1501.9).

(g) The text of an environmental assessment shall not exceed 75 pages, not including any citations or appendices.

(h) Agencies may supplement environmental assessments if a major Federal action remains to occur, and the agency determines supplementation is appropriate. Agencies may reevaluate an environmental assessment or otherwise document a finding that changes to the proposed action or new circumstances or information relevant to environmental concerns are not substantial, or the underlying assumptions of the analysis remain valid.

(i) Agencies generally should apply the provisions of §§ 1502.21 and 1502.23 to environmental assessments.

(j) As appropriate to improve efficiency and effectiveness of environmental assessments, agencies may apply the other provisions of part 1502 and 1503 of this subchapter, including §§ 1502.4, 1502.22, 1502.24, and 1503.4, to environmental assessments.

### § 1501.6 Findings of no significant impact.

(a) An agency shall prepare a finding of no significant impact if the agency determines, based on the environmental

assessment, not to prepare an environmental impact statement because the proposed action will not have significant effects, or a mitigated finding of no significant impact because the proposed action will not have significant effects due to mitigation.

(1) The agency shall make the finding of no significant impact available to the affected public as specified in § 1501.9(d)(2) of this subchapter.

(2) In the following circumstances, the agency shall make the finding of no significant impact available for public review for 30 days before the agency makes its final determination whether to prepare an environmental impact statement and before the action may begin:

(i) The proposed action is or is closely similar to one that normally requires the preparation of an environmental impact statement under the procedures adopted by the agency pursuant to § 1507.3 of this subchapter; or

(ii) The nature of the proposed action is one without precedent.

(b) The finding of no significant impact shall include the environmental assessment or incorporate it by reference and shall note any other environmental documents related to it (§ 1502.4(d)(3)). If the environmental assessment is included, the finding need not repeat any of the discussion in the assessment but may incorporate it by reference.

(c) The finding of no significant impact shall state the authority for any mitigation that the agency has adopted and any applicable monitoring or enforcement provisions. If the agency finds no significant effects based on mitigation, the mitigated finding of no significant impact shall state the enforceable mitigation requirements or commitments that will be undertaken and the authority to enforce them, such as permit conditions, agreements, or other measures. In addition, the agency shall prepare a monitoring and compliance plan for any mitigation the agency relies on as a component of the proposed action consistent with § 1505.3(c) of this subchapter.

### § 1501.7 Lead agency.

(a) A lead agency shall supervise the preparation of an environmental impact statement or environmental assessment if more than one Federal agency either:

(1) Proposes or is involved in the same action; or

(2) Is involved in a group of actions directly related to each other because of their functional interdependence or geographical proximity.

(b) Federal, State, Tribal, or local agencies may serve as a joint lead

agency to prepare an environmental impact statement or environmental assessment (§ 1506.2 of this subchapter). A joint lead agency shall jointly fulfill the role of a lead agency.

(c) If an action falls within the provisions of paragraph (a) of this section, the participating Federal agencies shall determine, by letter or memorandum, which agencies will be lead or joint lead agencies, and the lead agency shall determine which agencies will be cooperating agencies. The agencies shall resolve the lead agency question so as not to cause delay. If there is disagreement among the agencies, the following factors (which are listed in order of descending importance) shall determine lead agency designation:

(1) Magnitude of agency's involvement;

(2) Project approval or disapproval authority;

(3) Expertise concerning the action's environmental effects;

(4) Duration of agency's involvement; and

(5) Sequence of agency's involvement.

(d) Any Federal, State, Tribal, or local agency or individual substantially affected by the absence of a lead agency designation, may make a written request to the senior agency officials of the potential lead agencies that a lead agency be designated. An agency that receives a request under this paragraph shall transmit such request to each participating Federal agency and to the Council.

(e) If Federal agencies are unable to agree on which agency will be the lead agency or if the procedure described in paragraph (c) of this section has not resulted in a lead agency designation within 45 days of the written request to the senior agency officials, any of the agencies or individuals concerned may file a request with the Council asking it to determine which Federal agency shall be the lead agency. The Council shall transmit a copy of the request to each potential lead agency. The request shall consist of:

(1) A precise description of the nature and extent of the proposed action; and

(2) A detailed statement of why each potential lead agency should or should not be the lead agency under the criteria specified in paragraph (c) of this section.

(f) Any potential lead agency may file a response no later than 20 days after a request is filed with the Council. As soon as possible, but not later than 40 days after receiving the request and all responses to it, the Council shall designate which Federal agency will be

the lead agency and which other Federal agencies will be cooperating agencies.

(g) To the extent practicable, if a proposal will require action by more than one Federal agency and the lead agency determines that it requires preparation of an environmental impact statement, the lead and cooperating agencies shall evaluate the proposal in a single environmental impact statement and shall issue, except where inappropriate or inefficient, a joint record of decision. To the extent practicable, if a proposal will require action by more than one Federal agency and the lead agency determines that it requires preparation of an environmental assessment, the lead and cooperating agencies shall evaluate the proposal in a single environmental assessment and issue a joint finding of no significant impact or jointly determine to prepare an environmental impact statement.

(h) With respect to cooperating agencies, the lead agency shall:

(1) Request the participation of each cooperating agency in the NEPA process at the earliest practicable time;

(2) Consider any analysis or proposal created by a cooperating agency and, to the maximum extent practicable, use the environmental analysis and information provided by cooperating agencies;

(3) Meet with a cooperating agency at the latter's request; and

(4) Determine the purpose and need, and alternatives in consultation with any cooperating agency.

### § 1501.8 Cooperating agencies.

(a) The purpose of this section is to emphasize agency cooperation early in the NEPA process. Upon request of the lead agency, any Federal agency with jurisdiction by law shall be a cooperating agency. In addition, upon request of the lead agency, any other Federal agency with special expertise with respect to any environmental issue may be a cooperating agency. A State, Tribal, or local agency of similar qualifications may become a cooperating agency by agreement with the lead agency. Relevant special expertise may include Indigenous Knowledge. An agency may request that the lead agency designate it a cooperating agency, and a Federal agency may appeal a denial of its request to the Council, in accordance with § 1501.7(e).

(b) Each cooperating agency shall:

(1) Participate in the NEPA process at the earliest practicable time.

(2) Participate in the scoping process (described in § 1502.4).

(3) On request of the lead agency, assume responsibility for developing

information and preparing environmental analyses, including portions of the environmental impact statement or environmental assessment concerning which the cooperating agency has special expertise.

(4) On request of the lead agency, make available staff support to enhance the lead agency's interdisciplinary capability.

(5) Normally use its own funds. To the extent available funds permit, the lead agency shall fund those major activities or analyses it requests from cooperating agencies. Potential lead agencies shall include such funding requirements in their budget requests.

(6) Consult with the lead agency in developing the schedule (§ 1501.10), meet the schedule, and elevate, as soon as practicable, to the senior agency official of the lead agency any issues relating to purpose and need, alternatives, or other issues that may affect any agencies' ability to meet the schedule.

(7) Meet the lead agency's schedule for providing comments.

(8) To the maximum extent practicable, jointly issue environmental documents with the lead agency.

(c) In response to a lead agency's request for assistance in preparing the environmental documents (described in paragraph (b)(3), (4), or (5) of this section), a cooperating agency may reply that other program commitments preclude any involvement or the degree of involvement requested in the action that is the subject of the environmental impact statement or environmental assessment. The cooperating agency shall submit a copy of this reply to the Council and the senior agency official of the lead agency.

### § 1501.9  Public and governmental engagement.

(a) *Purpose.* Agencies conduct public engagement to inform the public of an agency's proposed action, allow for meaningful engagement during the NEPA process, and ensure decision makers are informed by the views of the public. Agencies conduct governmental engagement to identify the potentially affected Federal, State, Tribal, and local governments, invite them to serve as cooperating agencies, as appropriate, and ensure that participating agencies have opportunities to engage in the environmental review process, as appropriate.

(b) *Responsibility.* Agencies shall determine the appropriate methods of public and governmental engagement. For environmental impact statements, in addition to the requirements of this section, agencies also shall comply with

the requirements for scoping set forth in § 1502.4 of this subchapter.

(c) *Outreach.* The lead agency should:

(1) Invite the participation of likely affected Federal, State, Tribal, and local agencies and governments, as early as practicable, including, as appropriate, as cooperating agencies under § 1501.8 of this subchapter;

(2) Conduct early engagement with likely affected or interested members of the public (including those who might not be in accord with the action), unless there is a limited exception under § 1507.3(d)(3) of this subchapter; and

(3) Consider what methods of outreach and notification are necessary and appropriate based on the likely affected entities; the scope, scale, and complexity of the proposed action and alternatives; the degree of public interest; and other relevant factors. When selecting appropriate methods for providing public notification, agencies shall consider the ability of affected persons and agencies to access electronic media and the primary language of affected persons.

(d) *Notification.* Agencies shall:

(1) Publish notification of proposed actions they are analyzing through an environmental impact statement.

(2) Provide public notification of NEPA-related hearings, public meetings, and other opportunities for public engagement, and, as appropriate, the availability of environmental documents to inform those persons and agencies who may be interested or affected by their proposed actions.

(i) In all cases, the agency shall notify those who have requested notification on an individual action.

(ii) In the case of an action with effects of national concern, notice shall include publication in the **Federal Register.** An agency also may notify entities and persons who have requested regular notification.

(iii) In the case of an action with effects primarily of local concern, the notification may include distribution to or through:

(A) State, Tribal, and local governments and agencies that may be interested or affected by the proposed action.

(B) Following the affected State or Tribe's public notification procedures for comparable actions.

(C) Publication in local newspapers having general circulation.

(D) Other local media.

(E) Potentially interested community organizations including small business associations.

(F) Publication in newsletters that may be expected to reach potentially interested persons.

(G) Direct mailing to owners and occupants of nearby or affected property.

(H) Posting of notification on- and off-site in the area where the action is to be located.

(I) Electronic media (*e.g.*, a project or agency website, dashboard, email list, or social media). Agencies should establish email notification lists or similar methods for the public to easily request electronic notifications for a proposed action.

(3) Make environmental impact statements, the comments received, and any underlying documents available to the public pursuant to the provisions of the Freedom of Information Act, as amended (5 U.S.C. 552).

(e) *Public meetings and hearings.* Agencies may hold or sponsor public hearings, public meetings, or other opportunities for public engagement whenever appropriate or in accordance with statutory or regulatory requirements or applicable agency NEPA procedures. Agencies may conduct public hearings and public meetings by means of electronic communication except where another format is required by law. When determining the format for a public hearing or public meeting, agencies should consider the needs of affected communities. When accepting comments for electronic or virtual public hearings or meetings, agencies shall allow the public to submit comments electronically, by regular mail, or by other appropriate methods.

(f) *Agency procedures.* Agencies shall make diligent efforts to engage the public in preparing and implementing their NEPA procedures (§ 1507.3 of this subchapter).

### § 1501.10  Deadlines and schedule for the NEPA process.

(a) To ensure that agencies conduct sound NEPA reviews as efficiently and expeditiously as practicable, Federal agencies shall set deadlines and schedules appropriate to individual actions or types of actions consistent with this section and the time intervals required by § 1506.10 of this subchapter. Where applicable, the lead agency shall establish the schedule and make any necessary updates to the schedule in consultation with and seek the concurrence of joint lead, cooperating, and participating agencies, and in consultation with project sponsors or applicants.

(b) To ensure timely decision making, agencies shall complete:

(1) Environmental assessments within 1 year, unless the lead agency extends the deadline in writing and in

consultation with any applicant or project sponsor, and establishes a new deadline that provides only so much additional time as is necessary to complete the environmental assessment.

(2) Environmental impact statements within 2 years, unless the lead agency extends the deadline in writing and in consultation with any applicant or project sponsor and establishes a new deadline that provides only so much additional time as is necessary to complete the environmental impact statement.

(3) The deadlines in paragraphs (b)(1) and (b)(2) of this section are measured from the sooner of, as applicable:

(i) the date on which the agency determines that NEPA requires an environmental impact statement or environmental assessment for the proposed action;

(ii) the date on which the agency notifies an applicant that the application to establish a right-of-way for the proposed action is complete; and

(iii) the date on which the agency issues a notice of intent for the proposed action.

(4) The lead agency shall annually submit the report to Congress on missed deadlines for environmental assessments and environmental impact statements required by section 107(h) of NEPA.

(c) To facilitate predictability, the lead agency shall develop a schedule for completion of environmental impact statements and environmental assessments as well as any authorizations required to carry out the action. The lead agency shall set milestones for all environmental reviews, permits, and authorizations required for implementation of the action, in consultation with any project sponsor or applicant and in consultation with and seek the concurrence of all joint lead, cooperating, and participating agencies, as soon as practicable. Schedules may vary depending on the type of action and in consideration of other factors in paragraph (d). The lead agency should develop a schedule that is based on its expertise reviewing similar types of actions under NEPA. If the lead agency or any participating agency anticipates that a milestone, including those for a review, permit, or authorization, will not be completed, it shall notify the agency responsible for the milestone or issuance of the review, permit, or authorization and the lead agency, as applicable, and request that they take appropriate measures to comply with the schedule. As soon as practicable, the lead and any other agency affected by a potentially missed milestone shall

elevate any unresolved disputes contributing to the missed milestone to the appropriate officials of the agencies responsible for the missed milestone, to ensure timely resolution within the deadlines for the individual action.

(d) The lead agency may consider the following factors in determining the schedule and deadlines:

(1) Potential for environmental harm.

(2) Size of the proposed action.

(3) State of the art of analytic techniques.

(4) Degree of public need for the proposed action, including the consequences of delay.

(5) Number of persons and agencies affected.

(6) Availability of relevant information.

(7) Degree to which a substantial dispute exists as to the size, location, nature, or consequences of the proposed action and its effects.

(8) Time limits imposed on the agency by law, regulation, or Executive Order.

(e) The schedule for environmental impact statements shall include the following milestones:

(1) The publication of the notice of intent;

(2) The issuance of the draft environmental impact statement;

(3) The public comment period on the draft environmental impact statement, consistent with § 1506.10 of this subchapter;

(4) The issuance of the final environmental impact statement; and

(5) The issuance of the record of decision.

(f) The schedule for environmental assessments shall include the following milestones:

(1) Decision to prepare an environmental assessment;

(2) Issuance of the draft environmental assessment, where applicable;

(3) The public comment period on the draft environmental assessment, consistent with § 1501.5 of this subchapter, where applicable; and

(4) Issuance of the final environmental assessment and decision on whether to issue a finding of no significant impact or issue a notice of intent to prepare an environmental impact statement.

(g) An agency may designate a person (such as the project manager or a person in the agency's office with NEPA responsibilities) to expedite the NEPA process.

(h) For environmental impact statements, agencies shall make schedules for completing the NEPA process publicly available, such as on their website or another publicly

accessible platform. If agencies make subsequent changes to the schedule, agencies shall publish revisions to the schedule and explain the basis for substantial changes.

### § 1501.11  Programmatic environmental documents and tiering.

(a) *Programmatic environmental document.* Agencies may prepare programmatic environmental documents, which may be either environmental impact statements or environmental assessments, to evaluate the environmental effects of policies, programs, plans, or groups of related activities. When agencies prepare such documents, they should be relevant to the agency decisions and timed to coincide with meaningful points in agency planning and decision making. Agencies may use programmatic environmental documents to conduct a broad or holistic evaluation of effects or policy alternatives; evaluate widely applicable measures; or avoid duplicative analysis for individual actions by first considering relevant issues at a broad or programmatic level.

(1) When preparing programmatic environmental documents (including proposals by more than one agency), agencies may find it useful to evaluate the proposal(s) in one of the following ways:

(i) Geographically, including actions occurring in the same general location, such as body of water, region, or metropolitan area.

(ii) Thematically or by sector, including actions that have relevant similarities, such as common timing, impacts, alternatives, methods of implementation, technology, media, or subject matter.

(iii) By stage of technological development, including Federal or federally assisted research, development, or demonstration programs for new technologies that, if applied, could significantly affect the quality of the human environment. Documents on such programs should be completed before the program has reached a stage of investment or commitment to implementation likely to determine subsequent development or restrict later alternatives.

(2) Agency actions that may be appropriate for programmatic documents include:

(i) Programs, policies, or plans, including land use or resource management plans;

(ii) Regulations;

(iii) National or regional actions;

(iv) Actions that have multiple stages or phases, and are part of an overall plan or program; or

(v) A group of projects or related types of projects.

(3) Agencies should, as appropriate, employ scoping (§ 1502.4 of this subchapter), tiering (paragraph (b) of this section), and other methods listed in §§ 1500.4 and 1500.5 of this subchapter, to describe the relationship between the programmatic document and related individual actions and to avoid duplication and delay.

(b) *Tiering.* Where an existing environmental impact statement, environmental assessment, or programmatic environmental document is relevant to a later proposed action, agencies may employ tiering. Tiering allows subsequent tiered environmental analysis to avoid duplication and focus on issues, effects, or alternatives not fully addressed in a programmatic document, environmental impact statement, or environmental assessment prepared at an earlier phase or stage. Agencies generally should tier their environmental impact statements and environmental assessments when it would eliminate repetitive discussions of the same issues, focus on the actual issues ripe for decision, and exclude from consideration issues already decided.

(1) When an agency has prepared a programmatic environmental review or other environmental impact statement or environmental assessment for a program or policy and then prepares a subsequent statement or assessment on an action included within the program or policy (such as a project- or site-specific action), the tiered document shall discuss the relationship between the tiered document and the previous review, and summarize and incorporate by reference the issues discussed in the broader document. The tiered document shall concentrate on the issues specific to the subsequent action, analyzing site-, phase-, or stage-specific conditions and reasonably foreseeable effects. The agency shall provide for public engagement opportunities consistent with the type of environmental document prepared and appropriate for the location, phase, or stage. The tiered document shall state where the earlier document is publicly available.

(2) Tiering is appropriate when the sequence from an environmental impact statement or environmental assessment is:

(i) From a programmatic, plan, or policy environmental impact statement or environmental assessment to a program, plan, or policy statement or assessment of lesser or narrower scope or to a site-specific statement or assessment.

(ii) From an environmental impact statement or environmental assessment on a specific action at an early stage (such as need and site selection) to a supplement (which is preferred) or a subsequent statement or assessment at a later stage (such as environmental mitigation). Tiering in such cases is appropriate when it helps the agency to focus on the issues that are ripe for decision and exclude from consideration issues already decided or not yet ripe.

(c) When an agency prepares a programmatic environmental document for which judicial review was available, the agency may rely on the analysis included in the programmatic environmental document in a subsequent environmental document for related actions as follows:

(1) Within 5 years and without additional review of the analysis in the programmatic environmental document, unless there are substantial new circumstances or information about the significance of adverse effects that bear on the analysis; or

(2) After 5 years, so long as the agency reevaluates the analysis in the programmatic environmental document and any underlying assumption to ensure reliance on the analysis remains valid. The agency shall briefly document its reevaluation and explain why the analysis remains valid considering any new and substantial information or circumstances.

### § 1501.12  Incorporation by reference into environmental documents.

Agencies shall incorporate material, such as planning studies, analyses, or other relevant information, into environmental documents by reference when the effect will be to cut down on bulk without impeding agency and public review of the action. Agencies shall cite the incorporated material in the document, briefly describe its content, and briefly explain the relevance of the incorporated material to the environmental document. Agencies shall not incorporate material by reference unless it is reasonably available for inspection, such as on a publicly accessible website, by potentially interested persons within the time allowed for comment. Agencies should provide digital references, such as hyperlinks, to the incorporated material or otherwise indicate how the public can access the material for inspection. Agencies shall not incorporate by reference material based on proprietary data that is not available for review and comment.

## PART 1502—ENVIRONMENTAL IMPACT STATEMENT

### § 1502.1  Purpose of environmental impact statement.

(a) The primary purpose of an environmental impact statement prepared pursuant to section 102(2)(C) of NEPA is to serve as an action-forcing device by ensuring agencies consider the environmental effects of their action in decision making, so that the policies and goals defined in the Act are infused into the ongoing programs and actions of the Federal Government.

(b) Environmental impact statements shall provide full and fair discussion of significant effects and shall inform decision makers and the public of reasonable alternatives that would avoid or minimize adverse effects or enhance the quality of the human environment. Agencies shall focus on important environmental issues and reasonable alternatives and shall reduce paperwork and the accumulation of extraneous background data.

(c) Environmental impact statements shall be concise, clear, and to the point, and shall be supported by evidence that the agency has made the necessary environmental analyses. An environmental impact statement is more than a disclosure document. Federal agencies shall use environmental impact statements in conjunction with other relevant material to plan actions and make decisions.

### § 1502.2  Implementation.

To achieve the purposes set forth in § 1502.1 agencies shall prepare environmental impact statements in the following manner:

(a) Environmental impact statements shall not be encyclopedic.

(b) Environmental impact statements shall discuss effects in proportion to their significance. There shall be only brief discussion of other than important issues. As in an environmental assessment and finding of no significant impact, there should be only enough discussion to show why more study is not warranted.

(c) Environmental impact statements shall be analytical, concise, and no longer than necessary to comply with NEPA and with the regulations in this subchapter. Length should be proportional to potential environmental effects and the scope and complexity of the action.

(d) Environmental impact statements shall state how alternatives considered in them and decisions based on them will or will not achieve the requirements of sections 101 and 102(1) of NEPA, the regulations in this

subchapter, and other environmental laws and policies.

(e) The range of alternatives discussed in environmental impact statements shall encompass those to be considered by the decision maker.

(f) Agencies shall not commit resources prejudicing the selection of alternatives before making a decision (*see also* § 1506.1 of this subchapter).

(g) Environmental impact statements shall serve as the means of assessing the environmental impact of proposed agency actions, rather than justifying decisions already made.

### § 1502.3  Statutory requirements for environmental impact statements.

As required by section 102(2)(C) of NEPA, environmental impact statements are to be included in every Federal agency recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment.

### § 1502.4  Scoping.

(a) *Generally.* Agencies shall use an early and open process, consistent with § 1501.9 of this subchapter, to determine the scope of issues for analysis in an environmental impact statement, including identifying the important issues and eliminating from further study unimportant issues. Scoping may begin as soon as practicable after the proposal for action is sufficiently developed for agency consideration. Scoping may include appropriate pre-application procedures or work conducted prior to publication of the notice of intent (see §§ 1501.3 and 1501.9 of this subchapter).

(b) *Scoping outreach.* When preparing an environmental impact statement, agencies shall facilitate notification to persons and agencies who may be interested or affected by an agency's proposed action, consistent with § 1501.9 of this subchapter. As part of the scoping process, the lead agency may hold a scoping meeting or meetings, publish scoping information, or use other means to communicate with those persons or agencies who may be interested or affected, which the agency may integrate with any other early planning meeting.

(c) *Inviting participation.* As part of the scoping process, and consistent with § 1501.9 of this subchapter, the lead agency shall invite the participation of likely affected Federal, State, Tribal, and local agencies and governments, the proponent of the action, and other likely affected or interested persons (including those who might not be in accord with the action), unless there is a limited

exception under § 1507.3(d)(3) of this subchapter.

(d) *Additional scoping responsibilities.* As part of the scoping process, the lead agency shall:

(1) Identify and eliminate from detailed study the issues that are not important or have been covered by prior environmental review(s) (§§ 1501.12 and 1506.3 of this subchapter), narrowing the discussion of these issues in the environmental impact statement to a brief presentation of why they will not be important or providing a reference to their coverage elsewhere.

(2) Allocate assignments for preparation of the environmental impact statement among the lead and cooperating agencies, with the lead agency retaining responsibility for the statement.

(3) Indicate any public environmental assessments and other environmental impact statements that are being or will be prepared and are related to but are not part of the scope of the environmental impact statement under consideration.

(4) Identify other environmental review, authorization, and consultation requirements so the lead and cooperating agencies may prepare other required analyses and studies concurrently and integrated with the environmental impact statement, as provided in § 1502.24 of this subchapter.

(5) Indicate the relationship between the timing of the preparation of environmental analyses and the agencies' tentative planning and decision-making schedule.

(e) *Notice of intent.* As soon as practicable after determining that a proposal is sufficiently developed to allow for meaningful public comment and requires an environmental impact statement, the lead agency shall publish a notice of intent to prepare an environmental impact statement in the **Federal Register**. In addition to the **Federal Register** notice, an agency also may publish notification in accordance with § 1501.9 of this subchapter. The notice shall include, as appropriate:

(1) The purpose and need for the proposed action;

(2) A preliminary description of the proposed action and alternatives the environmental impact statement will consider;

(3) A brief summary of expected effects;

(4) Anticipated permits and other authorizations;

(5) A schedule for the decision-making process;

(6) A description of the public scoping process, including any scoping meeting(s);

(7) A request for comment on alternatives and effects, as well as on relevant information, studies, or analyses with respect to the proposed action;

(8) Contact information for a person within the agency who can answer questions about the proposed action and the environmental impact statement;

(9) Identification of any cooperating and participating agencies, and any information that such agencies require in the notice to facilitate their decisions or authorizations that will rely upon the resulting environmental impact statement; and

(10) A unique identification number for tracking purposes, which the agency shall reference on all environmental documents prepared for the proposed action.

(f) *Notices of withdrawal or cancellation.* If an agency withdraws, cancels, or otherwise ceases the consideration of a proposed action before completing a final environmental impact statement, the agency shall publish a notice in the **Federal Register**.

(g) *Revisions.* An agency shall revise the determinations made under paragraphs (b), (c), and (d) of this section if substantial changes are made later in the proposed action, or if important new circumstances or information arise that bear on the proposal or its effects.

### § 1502.5  Timing.

An agency should commence preparation of an environmental impact statement as close as practicable to the time the agency is developing or receives a proposal so that preparation can be completed in time for the final statement to be included in any recommendation or report on the proposal. The statement shall be prepared early enough so that it can serve as an important practical contribution to the decision-making process and will not be used to rationalize or justify decisions already made (§§ 1501.2 of this subchapter and 1502.2). For instance:

(a) For projects directly undertaken by Federal agencies, the agency shall prepare the environmental impact statement at the feasibility analysis (*e.g.,* go/no-go) stage and may supplement it at a later stage, if necessary.

(b) For applications to the agency requiring an environmental impact statement, the agency shall commence the statement as soon as practicable after receiving the complete application. Federal agencies should work together

and with potential applicants and applicable State, Tribal, and local agencies and governments prior to receipt of the application.

(c) For adjudication, the final environmental impact statement shall normally precede the final staff recommendation and that portion of the public hearing related to the impact study. In appropriate circumstances, the statement may follow preliminary hearings designed to gather information for use in the statement.

(d) For informal rulemaking, the draft environmental impact statement shall normally accompany the proposed rule.

### § 1502.6   Interdisciplinary preparation.

Agencies shall prepare environmental impact statements using an interdisciplinary approach that will ensure the integrated use of the natural and social sciences and the environmental design arts (section 102(2)(A) of NEPA). The disciplines of the preparers shall be appropriate to the scope and issues identified in the scoping process (§ 1502.4 of this subchapter).

### § 1502.7   Page limits.

The text of final environmental impact statements, not including citations or appendices, shall not exceed 150 pages except for proposals of extraordinary complexity, which shall not exceed 300 pages.

### § 1502.8   Writing.

Agencies shall write environmental impact statements in plain language and should use, as relevant, appropriate visual aids or charts so that decision makers and the public can readily understand such statements. Agencies should employ writers of clear prose or editors to write, review, or edit statements, which shall be based upon the analysis and supporting data from the natural and social sciences and the environmental design arts.

### § 1502.9   Draft, final, and supplemental statements.

(a) *Generally*. Except for proposals for legislation as provided in § 1506.8 of this subchapter, agencies shall prepare environmental impact statements in two stages and, where necessary, supplement them as provided in paragraph (d)(1) of this section.

(b) *Draft environmental impact statements*. Agencies shall prepare draft environmental impact statements in accordance with the scope decided upon in the scoping process (§ 1502.4 of this subchapter). The lead agency shall work with the cooperating agencies and shall obtain comments as required in part 1503 of this subchapter. To the

fullest extent practicable, the draft statement must meet the requirements established for final statements in section 102(2)(C) of NEPA and in the regulations in this subchapter. If the agency determines that a draft statement is so inadequate as to preclude meaningful analysis, the agency shall prepare and publish a supplemental draft of the appropriate portion. At appropriate points in the draft statement, the agency shall discuss all major points of view on the environmental effects of the alternatives, including the proposed action.

(c) *Final environmental impact statements*. Final environmental impact statements shall consider and respond to comments as required in part 1503 of this subchapter. At appropriate points in the final statement, the agency shall discuss any responsible opposing view that was not adequately discussed in the draft statement and shall indicate the agency's response to the issues raised.

(d) *Supplemental environmental impact statements*. Agencies:

(1) Shall prepare supplements to either draft or final environmental impact statements if a major Federal action remains to occur, and:

(i) The agency makes substantial changes to the proposed action that are relevant to environmental concerns; or

(ii) There are substantial or important new circumstances or information relevant to environmental concerns and bearing on the proposed action or its effects.

(2) May also prepare supplements when the agency determines that the purposes of the Act will be furthered by doing so.

(3) Shall prepare, publish, and file a supplement to a statement (exclusive of scoping (§ 1502.4 of this subchapter)) as a draft and final statement, as is appropriate to the stage of the statement involved, unless the Council approves alternative procedures (§ 1506.12 of this subchapter).

(e) *Reevaluation*. An agency may reevaluate an environmental impact statement and find that changes to the proposed action or new circumstances or information relevant to environmental concerns are not substantial or that the underlying assumptions of the analysis remains valid, and therefore do not require a supplement under paragraph (d) of this section. The agency should document the finding consistent with its agency NEPA procedures (§ 1507.3 of this subchapter), or, if necessary, in a finding of no significant impact supported by an environmental assessment.

### § 1502.10   Recommended format.

(a) Agencies shall use a format for environmental impact statements that will encourage good analysis and clear presentation of the alternatives, including the proposed action. Agencies should use the following standard format for environmental impact statements unless the agency determines that there is a more effective format for communication:

(1) Cover (§ 1501.11);
(2) Summary (§ 1502.12);
(3) Table of contents;
(4) Purpose of and need for action (§ 1502.13);
(5) Alternatives including the proposed action (sections 102(2)(C)(iii) and 102(2)(H) of NEPA) (§ 1502.14);
(6) Affected environment and environmental consequences (especially sections 102(2)(C)(i), (ii), (iv), and (v) of NEPA) (§§ 1502.15 and 1502.16); and
(7) Appendices (§ 1502.19), including the summary of scoping information (§ 1502.17) and the list of preparers (§ 1502.18).

(b) If an agency uses a different format, it shall include paragraph (a) of this section, as further described in §§ 1502.11 through 1502.19, in any appropriate format.

### § 1502.11   Cover.

The environmental impact statement cover shall not exceed one page and shall include:

(a) A list of the lead, joint lead and any cooperating agencies;
(b) The title of the proposed action that is the subject of the statement (and, if appropriate, the titles of related cooperating agency actions), together with the State(s) and county(ies) (or other jurisdiction(s), if applicable) where the action is located;
(c) The name, address, and telephone number of the person at the agency who can supply further information;
(d) A designation of the statement as a draft, final, or draft or final supplement;
(e) A one-paragraph abstract of the statement;
(f) The date by which the agency must receive comments (computed in cooperation with the Environmental Protection Agency under § 1506.10 of this subchapter); and
(g) The identification number included in the notice of intent (§ 1502.4(e)(10)).

### § 1502.12   Summary.

Each environmental impact statement shall contain a summary that adequately and accurately summarizes the statement. The summary shall include the major conclusions and summarize

any disputed issues raised by agencies and the public, any issues to be resolved, and key differences among alternatives, and identify the environmentally preferable alternative or alternatives. Agencies shall write the summary in plain language and should use, as relevant, appropriate visual aids and charts. The summary normally should not exceed 15 pages.

### § 1502.13   Purpose and need.

The environmental impact statement shall include a statement that briefly summarizes the underlying purpose and need for the proposed agency action.

### § 1502.14   Alternatives including the proposed action.

The alternatives section is the heart of the environmental impact statement. The alternatives section should identify the reasonably foreseeable environmental effects of the proposed action and the alternatives in comparative form based on the information and analysis presented in the sections on the affected environment (§ 1502.15) and the environmental consequences (§ 1502.16). In doing so, the analysis should sharply define the issues for the decision maker and the public and provide a clear basis for choice among options. In this section, agencies shall:

(a) Rigorously explore and objectively evaluate reasonable alternatives to the proposed action, and, for alternatives that the agency eliminated from detailed study, briefly discuss the reasons for their elimination. The agency need not consider every conceivable alternative to a proposed action; rather, it shall consider a reasonable range of alternatives that will foster informed decision making. Agencies also may include reasonable alternatives not within the jurisdiction of the lead agency.

(b) Discuss each alternative considered in detail, including the proposed action, so that reviewers may evaluate their comparative merits.

(c) Include the no action alternative.

(d) Identify the agency's preferred alternative or alternatives, if one or more exists, in the draft statement and identify such alternative in the final statement unless another law prohibits the expression of such a preference.

(e) Include appropriate mitigation measures not already included in the proposed action or alternatives.

(f) Identify the environmentally preferable alternative or alternatives. The environmentally preferable alternative will best promote the national environmental policy expressed in section 101 of NEPA by

maximizing environmental benefits, such as addressing climate change-related effects or disproportionate and adverse effects on communities with environmental justice concerns; protecting, preserving, or enhancing historic, cultural, Tribal, and natural resources, including rights of Tribal Nations that have been reserved through treaties, statutes, or Executive Orders; or causing the least damage to the biological and physical environment. The environmentally preferable alternative may be the proposed action, the no action alternative, or a reasonable alternative.

### § 1502.15   Affected environment.

(a) The environmental impact statement shall succinctly describe the environment of the area(s) to be affected or created by the alternatives under consideration, including the reasonably foreseeable environmental trends and planned actions in the area(s).

(b) Agencies should use high-quality information, including the best available science and data, to describe reasonably foreseeable environmental trends, including anticipated climate-related changes to the environment, and when such information is lacking, provide relevant information consistent with § 1502.21. This description of baseline environmental conditions and reasonably foreseeable trends should inform the agency's analysis of environmental consequences and mitigation measures (§ 1502.16).

(c) The environmental impact statement may combine the description of the affected environment with evaluation of the environmental consequences (§ 1502.16). The description should be no longer than necessary to understand the relevant affected environment and the effects of the alternatives. Data and analyses in a statement shall be commensurate with the importance of the effect, with less important material summarized, consolidated, or simply referenced. Agencies shall avoid useless bulk in statements and shall concentrate effort and attention on important issues. Verbose descriptions of the affected environment are themselves no measure of the adequacy of an environmental impact statement.

### § 1502.16   Environmental consequences.

(a) The environmental consequences section forms the scientific and analytic basis for the comparisons under § 1502.14. It shall consolidate the discussions of those elements required by sections 102(2)(C)(i), (ii), (iv), and (v) of NEPA that are within the scope of the environmental impact statement and as

much of section 102(2)(C)(iii) of NEPA as is necessary to support the comparisons. This section should not duplicate discussions in § 1502.14. The discussion shall include:

(1) The reasonably foreseeable environmental effects of the proposed action and reasonable alternatives to the proposed action and the significance of those effects (§ 1501.3 of this subchapter). The comparison of the proposed action and reasonable alternatives shall be based on the discussion of the effects, focusing on the significant or important effects. The no action alternative should serve as the baseline against which the proposed action and other alternatives are compared.

(2) Any reasonably foreseeable adverse environmental effects that cannot be avoided should the proposal be implemented.

(3) An analysis of the effects of the no action alternative, including any adverse environmental effects.

(4) The relationship between short-term uses of the human environment and the maintenance and enhancement of long-term productivity.

(5) Any irreversible or irretrievable commitments of Federal resources that would be involved in the proposal should it be implemented.

(6) Possible conflicts between the proposed action and the objectives of Federal, regional, State, Tribal, and local plans, policies, and controls for the area concerned, including those addressing climate change (§ 1506.2(d) of this subchapter).

(7) Any reasonably foreseeable climate change-related effects, including the effects of climate change on the proposed action and alternatives.

(8) Energy requirements and conservation potential of various alternatives and mitigation measures.

(9) Natural or depletable resource requirements and conservation potential of various alternatives and mitigation measures.

(10) Any relevant risk reduction, resiliency, or adaptation measures incorporated into the proposed action or alternatives, informed by relevant science and data on the affected environment and expected future conditions.

(11) Urban quality, historic and cultural resources, and the design of the built environment, including the reuse and conservation potential of various alternatives and mitigation measures.

(12) Means to mitigate adverse environmental impacts (if not fully covered under § 1502.14(e)).

(13) Where applicable, economic and technical considerations, including the

economic benefits of the proposed action.

(14) The potential for disproportionate and adverse human health and environmental effects on communities with environmental justice concerns.

(b) Economic or social effects by themselves do not require preparation of an environmental impact statement. However, when the agency determines that economic or social and natural or physical environmental effects are interrelated, the environmental impact statement shall discuss these effects on the human environment.

### § 1502.17  Summary of scoping information.

(a) The draft environmental impact statement shall include a summary of information, including alternatives and analyses, submitted by commenters during the scoping process for consideration by the lead and cooperating agencies in their development of the draft environmental impact statement.

(b) The agency shall append to the draft environmental impact statement or otherwise make publicly available all comments (or summaries thereof where the response has been exceptionally voluminous) received during the scoping process.

### § 1502.18  List of preparers.

The environmental impact statement shall list the names, together with their qualifications (expertise, experience, professional disciplines), of the persons who were primarily responsible for preparing the environmental impact statement or important background papers, including basic components of the statement. Where possible, the environmental impact statement shall identify the persons who are responsible for a particular analysis, including analyses in background papers. Normally the list will not exceed two pages.

### § 1502.19  Appendix.

If an agency prepares an appendix, the agency shall publish it with the environmental impact statement, and it shall consist of, as appropriate:

(a) Material prepared in connection with an environmental impact statement (as distinct from material that is not so prepared and is incorporated by reference (§ 1501.12 of this subchapter)).

(b) Material substantiating any analysis fundamental to the impact statement.

(c) Material relevant to the decision to be made.

(d) For draft environmental impact statements, all comments (or summaries

thereof where the response has been exceptionally voluminous) received during the scoping process that identified information for the agency's consideration.

(e) For final environmental impact statements, the comment summaries and responses consistent with § 1503.4 of this chapter.

### § 1502.20  Publication of the environmental impact statement.

Agencies shall publish the entire draft and final environmental impact statements and unchanged statements as provided in § 1503.4(c) of this subchapter. The agency shall transmit the entire statement electronically (or in paper copy, if requested due to economic or other hardship) to:

(a) Any Federal agency that has jurisdiction by law or special expertise with respect to any environmental impact involved and any appropriate Federal, State, Tribal, or local agency authorized to develop and enforce environmental standards.

(b) The applicant, if any.

(c) Any person, organization, or agency requesting the entire environmental impact statement.

(d) In the case of a final environmental impact statement, any person, organization, or agency that submitted substantive comments on the draft.

### § 1502.21  Incomplete or unavailable information.

(a) When an agency is evaluating reasonably foreseeable significant adverse effects on the human environment in an environmental impact statement, and there is incomplete or unavailable information, the agency shall make clear that such information is lacking.

(b) If the incomplete information relevant to reasonably foreseeable significant adverse effects is essential to a reasoned choice among alternatives, and the overall costs of obtaining it are not unreasonable, the agency shall include the information in the environmental impact statement.

(c) If the information relevant to reasonably foreseeable significant adverse effects cannot be obtained because the overall costs of obtaining it are unreasonable or the means to obtain it are not known, the agency shall include within the environmental impact statement:

(1) A statement that such information is incomplete or unavailable;

(2) A statement of the relevance of the incomplete or unavailable information to evaluating reasonably foreseeable significant adverse effects on the human environment;

(3) A summary of existing credible scientific evidence that is relevant to evaluating the reasonably foreseeable significant adverse effects on the human environment; and

(4) The agency's evaluation of such effects based upon theoretical approaches or research methods generally accepted in the scientific community.

(d) For the purposes of this section, "reasonably foreseeable" includes effects that have catastrophic consequences, even if their probability of occurrence is low, provided that the analysis of the effects is supported by credible scientific evidence, is not based on pure conjecture, and is within the rule of reason.

### § 1502.22  Cost-benefit analysis.

If an agency is considering a cost-benefit analysis for the proposed action relevant to the choice among alternatives with different environmental effects, the agency shall incorporate the cost-benefit analysis by reference or append it to the statement as an aid in evaluating the environmental consequences. In such cases, to assess the adequacy of compliance with section 102(2)(B) of NEPA (ensuring appropriate consideration of unquantified environmental amenities and values in decision making, along with economical and technical considerations), the statement shall discuss the relationship between that analysis and any analyses of unquantified environmental impacts, values, and amenities. For purposes of complying with the Act, agencies need not display the weighing of the merits and drawbacks of the various alternatives in a monetary cost-benefit analysis and should not do so when there are important qualitative considerations. However, an environmental impact statement should at least indicate those considerations, including factors not related to environmental quality, that are likely to be relevant and important to a decision.

### § 1502.23  Methodology and scientific accuracy.

(a) Agencies shall ensure the professional integrity, including scientific integrity, of the discussions and analyses in environmental documents. Agencies shall use high-quality information, such as best available science and reliable data, models, and resources, including existing sources and materials, to analyze effects resulting from a proposed action and alternatives. Agencies may use any reliable data sources, such as remotely gathered

information or statistical models. Agencies should explain any relevant assumptions or limitations of the information or the particular model or methodology selected for use.

(b) Agencies shall identify any methodologies used and shall make explicit reference to the scientific and other sources relied upon for conclusions in the statement. Agencies may place discussion of methodology in an appendix. Nothing in this section is intended to prohibit agencies from compliance with the requirements of other statutes pertaining to scientific and technical research.

(c) Where appropriate, agencies shall use projections when evaluating the reasonably foreseeable effects, including climate change-related effects. Such projections may employ mathematical or other models that project a range of possible future outcomes, so long as agencies disclose the relevant assumptions or limitations.

### § 1502.24 Environmental review and consultation requirements.

(a) To the fullest extent possible, agencies shall prepare draft environmental impact statements concurrent and integrated with environmental impact analyses and related surveys and studies required by all other Federal environmental review laws and Executive orders applicable to the proposed action, including the Fish and Wildlife Coordination Act (16 U.S.C. 661 *et seq.*), the National Historic Preservation Act of 1966 (54 U.S.C. 300101 *et seq.*), and the Endangered Species Act of 1973 (16 U.S.C. 1531 *et seq.*).

(b) The draft environmental impact statement shall list all Federal permits, licenses, and other authorizations that must be obtained in implementing the proposal. If it is uncertain whether a Federal permit, license, or other authorization is necessary, the draft environmental impact statement shall so indicate.

## PART 1503—COMMENTING ON ENVIRONMENTAL IMPACT STATEMENTS

### § 1503.1 Inviting comments and requesting information and analyses.

(a) After preparing a draft environmental impact statement and before preparing a final environmental impact statement the agency shall:

(1) Obtain the comments of any Federal agency that has jurisdiction by law or special expertise with respect to any environmental impact involved or is authorized to develop and enforce environmental standards; and

(2) Request the comments of:

(i) Appropriate State, Tribal, and local agencies that are authorized to develop and enforce environmental standards;

(ii) State, Tribal, or local governments that may be affected by the proposed action;

(iii) Any agency that has requested it receive statements on actions of the kind proposed;

(iv) The applicant, if any; and

(v) The public, affirmatively soliciting comments in a manner designed to inform those persons or organizations who may be interested in or affected by the proposed action.

(b) An agency may request comments on a final environmental impact statement before the final decision and set a deadline for providing such comments. Other agencies or persons may make comments consistent with the time periods under § 1506.10 of this subchapter.

(c) An agency shall provide for electronic submission of public comments, with reasonable measures to ensure the comment process is accessible to affected persons.

### § 1503.2 Duty to comment.

Cooperating agencies and agencies that are authorized to develop and enforce environmental standards shall comment on environmental impact statements within their jurisdiction, expertise, or authority within the time period specified for comment in § 1506.10 of this subchapter. A Federal agency may reply that it has no comment. If a cooperating agency is satisfied that the environmental impact statement adequately reflects its views, it should reply that it has no comment.

### § 1503.3 Specificity of comments and information.

(a) To promote informed decision making, comments on an environmental impact statement or on a proposed action shall be as specific as possible, and may address either the adequacy of the statement or the merits of the alternatives discussed or both. Comments should explain why the issues raised are important to the consideration of potential environmental effects and alternatives to the proposed action. Where possible, comments should reference the corresponding section or page number of the draft environmental impact statement, propose specific changes to those parts of the statement, and describe any data, sources, or methodologies that support the proposed changes.

(b) When a participating agency criticizes a lead agency's predictive

methodology, the participating agency should describe the alternative methodology that it prefers and why.

(c) A cooperating agency shall specify in its comments whether it needs additional information to fulfill other applicable environmental review or consultation requirements and what information it needs. In particular, it shall specify any additional information it needs to comment adequately on the draft statement's analysis of significant effects associated with the granting or approving by that cooperating agency of necessary Federal permits, licenses, or authorizations.

(d) A cooperating agency with jurisdiction by law shall specify mitigation measures it considers necessary to allow the agency to grant or approve applicable authorizations or concurrences.

### § 1503.4 Response to comments.

(a) An agency preparing a final environmental impact statement shall consider substantive comments timely submitted during the public comment period. The agency shall respond to individual comments or groups of comments. In the final environmental impact statement, the agency may respond by:

(1) Modifying alternatives including the proposed action;

(2) Developing and evaluating alternatives not previously given serious consideration by the agency;

(3) Supplementing, improving, or modifying its analyses;

(4) Making factual corrections; or

(5) Explaining why the comments do not warrant further agency response, recognizing that agencies are not required to respond to each comment.

(b) An agency shall append or otherwise publish all substantive comments received on the draft statement (or summaries thereof where the response has been exceptionally voluminous).

(c) If changes in response to comments are minor and are confined to the responses described in paragraphs (a)(4) and (5) of this section, an agency may write any changes on errata sheets and attach the responses to the statement instead of rewriting the draft statement. In such cases, the agency shall publish the final statement (§ 1502.20 of this subchapter), which includes the draft statement, the comments, responses to those comments, and errata sheets. The agency shall file the final statement with the Environmental Protection Agency (§ 1506.10 of this subchapter).

## PART 1504—PRE–DECISIONAL REFERRALS TO THE COUNCIL OF PROPOSED FEDERAL ACTIONS DETERMINED TO BE ENVIRONMENTALLY UNSATISFACTORY

### §1504.1  Purpose.

(a) This part establishes procedures for referring to the Council Federal interagency disagreements concerning proposed major Federal actions that might cause unsatisfactory environmental effects. It provides means for early resolution of such disagreements, and encourages Federal agencies to engage with each other as early as practicable to resolve interagency disagreements concerning proposed major Federal actions before referring disputes to the Council. This part also establishes procedures for Federal agencies to submit a request to the Council to provide informal dispute resolution on NEPA issues before formally referring disputes to the Council.

(b) Section 309 of the Clean Air Act (42 U.S.C. 7609) directs the Administrator of the Environmental Protection Agency to review and comment publicly on the environmental impacts of Federal activities, including actions for which agencies prepare environmental impact statements. If, after this review, the Administrator determines that the matter is "unsatisfactory from the standpoint of public health or welfare or environmental quality," section 309 directs that the matter be referred to the Council.

(c) Under section 102(2)(C) of NEPA (42 U.S.C. 4332(2)(C)), other Federal agencies may prepare similar reviews of environmental impact statements, including judgments on the acceptability of anticipated environmental impacts. These agencies must make these reviews available to the President, the Council, and the public.

### §1504.2  Early dispute resolution.

(a) Federal agencies should engage in interagency coordination and collaboration in their planning and decision-making processes and should identify and resolve disputes concerning proposed major Federal actions early in the NEPA process. To the extent practicable, agencies should elevate issues to appropriate agency officials or the Council in a timely manner that will accommodate schedules consistent with § 1501.10 of this subchapter.

(b) A Federal agency may request that the Council engage in informal dispute resolution to provide recommendations on how to resolve an interagency dispute concerning an environmental review. In making the request, the agency shall provide the Council with a summary of the proposed action, information on the disputed issues, and agency points of contact.

(c) In response to a request for informal dispute resolution, the Council may request additional information, provide non-binding recommendations, convene meetings of those agency decision makers necessary to resolve disputes, or determine that informal dispute resolution is unhelpful or inappropriate.

### §1504.3  Criteria and procedure for referrals and response.

(a) Federal agencies should make environmental referrals to the Council only after concerted, timely (as early as practicable in the process), but unsuccessful attempts to resolve differences with the lead agency. In determining what environmental objections to the matter are appropriate to refer to the Council, an agency should weigh potential adverse environmental effects, considering:

(1) Possible violation of national environmental standards or policies;

(2) Severity;

(3) Geographical scope;

(4) Duration;

(5) Importance as precedents;

(6) Availability of environmentally preferable alternatives; and

(7) Economic and technical considerations, including the economic costs of delaying or impeding the decision making of the agencies involved in the action.

(b) A Federal agency making the referral to the Council shall:

(1) Notify the lead agency at the earliest possible time that it intends to refer a matter to the Council unless a satisfactory agreement is reached;

(2) Include such a notification whenever practicable in the referring agency's comments on the environmental assessment or draft environmental impact statement;

(3) Identify any essential information that is lacking and request that the lead agency make it available at the earliest possible time; and

(4) Send copies of the referring agency's views to the Council.

(c) The referring agency shall deliver its referral to the Council no later than 25 days after the lead agency has made the final environmental impact statement available to the Environmental Protection Agency, participating agencies, and the public, and in the case of an environmental assessment, no later than 25 days after the lead agency makes it available. Except when the lead agency grants an extension of this period, the Council will not accept a referral after that date.

(d) The referral shall consist of:

(1) A copy of the letter signed by the head of the referring agency and delivered to the lead agency informing the lead agency of the referral and the reasons for it; and

(2) A statement supported by factual evidence leading to the conclusion that the matter is unsatisfactory from the standpoint of public health or welfare or environmental quality. The statement shall:

(i) Identify any disputed material facts and incorporate (by reference if appropriate) agreed upon facts;

(ii) Identify any existing environmental requirements or policies that would be violated by the matter;

(iii) Present the reasons for the referral;

(iv) Contain a finding by the agency whether the issue raised is of national importance because of the threat to national environmental resources or policies or for some other reason;

(v) Review the steps taken by the referring agency to bring its concerns to the attention of the lead agency at the earliest possible time; and

(vi) Give the referring agency's recommendations as to what mitigation alternative, further study, or other course of action (including abandonment of the matter) are necessary to remedy the situation.

(e) No later than 25 days after the referral to the Council, the lead agency may deliver a response to the Council and the referring agency. If the lead agency requests more time and gives assurance that the matter will not go forward in the interim, the Council may grant an extension. The response shall:

(1) Address fully the issues raised in the referral;

(2) Be supported by evidence and explanations, as appropriate; and

(3) Give the lead agency's response to the referring agency's recommendations.

(f) Applicants may provide views in writing to the Council no later than the response.

(g) No later than 25 days after receipt of both the referral and any response or upon being informed that there will be no response (unless the lead agency agrees to a longer time), the Council may take one or more of the following actions:

(1) Conclude that the process of referral and response has successfully resolved the problem.

(2) Initiate discussions with the agencies with the objective of mediation with referring and lead agencies.

AR_0000057

(3) Obtain additional views and information.

(4) Determine that the issue is not one of national importance and request the referring and lead agencies to pursue their decision process.

(5) Determine that the referring and lead agencies should further negotiate the issue, and the issue is not appropriate for Council consideration until one or more heads of agencies report to the Council that the agencies' disagreements are irreconcilable.

(6) Publish its findings and recommendations (including, where appropriate, a finding that the submitted evidence does not support the position of an agency).

(7) When appropriate, submit the referral and the response together with the Council's recommendation to the President for action.

(h) The Council shall take no longer than 60 days to complete the actions specified in paragraph (g)(2), (3), or (5) of this section.

(i) The referral process is not intended to create any private rights of action or to be judicially reviewable because any voluntary resolutions by the agency parties do not represent final agency action and instead are only provisional and dependent on later consistent action by the action agencies.

## PART 1505—NEPA AND AGENCY DECISION MAKING

### § 1505.1   [Reserved]

### § 1505.2   Record of decision in cases requiring environmental impact statements.

At the time of its decision (§ 1506.10 of this subchapter) or, if appropriate, its recommendation to Congress, each agency shall prepare and timely publish a concise public record of decision or joint record of decision. The record, which each agency may integrate into any other record it prepares, shall:

(a) State the decision.

(b) Identify alternatives considered by the agency in reaching its decision. The agency also shall specify the environmentally preferable alternative or alternatives (§ 1502.14(f) of this subchapter). The agency may discuss preferences among alternatives based on relevant factors, including environmental, economic, and technical considerations and agency statutory missions. The agency shall identify and discuss all such factors, including any essential considerations of national policy, that the agency balanced in making its decision and state how those considerations entered into its decision.

(c) State whether the agency has adopted all practicable means to mitigate environmental harm from the alternative selected, and if not, why the agency did not. When an agency includes mitigation as a component of the proposed action and relies on implementation of that mitigation to analyze the reasonably foreseeable environmental effects, the mitigation shall be enforceable, such as through permit conditions, agreements, or other measures. The agency shall identify the authority for enforceable mitigation, and adopt a monitoring and compliance plan consistent with § 1505.3(c).

### § 1505.3   Implementing the decision.

(a) Agencies may provide for monitoring to assure that their decisions are carried out and should do so in important cases. Mitigation (§ 1505.2(c)) and other conditions established in the environmental impact statement or during its review and committed as part of the decision shall be implemented by the lead agency or other appropriate consenting agency. The lead agency shall:

(1) Include appropriate conditions in grants, permits, or other approvals; and

(2) Condition funding of actions on mitigation.

(b) The lead or cooperating agency should, where relevant and appropriate, incorporate mitigation measures that address or ameliorate significant adverse human health and environmental effects of proposed Federal actions that disproportionately and adversely affect communities with environmental justice concerns.

(c) The lead or cooperating agency shall prepare a monitoring and compliance plan when the environmental assessment or environmental impact statement relies on mitigation as a component of the proposed action to analyze the reasonably foreseeable environmental effects, including to determine the significance of those effects, and the agency incorporates the mitigation into a record of decision, finding of no significant impact, or separate document, consistent with the following:

(1) *Contents.* The agency should tailor the plan to the complexity of the mitigation committed to and include:

(i) A basic description of the mitigation measure or measures;

(ii) The parties responsible for monitoring and implementing the mitigation;

(iii) If appropriate, how monitoring information will be made publicly available;

(iv) The anticipated timeframe for implementing and completing mitigation;

(v) The standards for determining compliance with the mitigation and the consequences of non-compliance; and

(vi) How the mitigation will be funded.

(2) *No ongoing Federal action.* An agency does not need to supplement its environmental impact statement or environmental assessment or revise its record of decision or finding of no significant impact or separate decision document based solely on new information developed through the monitoring and compliance plan.

## PART 1506—OTHER REQUIREMENTS OF NEPA

### § 1506.1   Limitations on actions during NEPA process.

(a) Except as provided in paragraphs (b) and (c) of this section, until an agency issues a finding of no significant impact, as provided in § 1501.6 of this subchapter, or record of decision, as provided in § 1505.2 of this subchapter, no action concerning the proposal may be taken that would:

(1) Have an adverse environmental effect; or

(2) Limit the choice of reasonable alternatives.

(b) If an agency is considering an application from a non-Federal entity and is aware that the applicant is about to take an action within the agency's jurisdiction that would meet either of the criteria in paragraph (a) of this section, then the agency shall promptly notify the applicant that the agency will take appropriate action to ensure that the objectives and procedures of NEPA are achieved. This section does not preclude development by applicants of plans or designs or performance of other activities necessary to support an application for Federal, State, Tribal, or local permits or assistance. An agency considering a proposed action for Federal funding may authorize such activities, including, but not limited to, acquisition of interests in land (*e.g.,* fee simple, rights-of-way, and conservation easements), purchase of long lead-time equipment, and purchase options made by applicants, if the agency determines that such activities would not limit the choice of reasonable alternatives and notifies the applicant that the agency retains discretion to select any reasonable alternative or the no action alternative regardless of any potential prior activity taken by the applicant prior to the conclusion of the NEPA process.

(c) While work on a programmatic environmental review is in progress and the action is not covered by an existing programmatic review, agencies shall not

undertake in the interim any major Federal action covered by the program that may significantly affect the quality of the human environment unless such action:

(1) Is justified independently of the program;

(2) Is itself accompanied by an adequate environmental review; and

(3) Will not prejudice the ultimate decision on the program. Interim action prejudices the ultimate decision on the program when it tends to determine subsequent development or limit alternatives.

**§ 1506.2  Elimination of duplication with State, Tribal, and local procedures.**

(a) Federal agencies are authorized to cooperate with State, Tribal, and local agencies that are responsible for preparing environmental documents, including those prepared pursuant to section 102(2)(G) of NEPA.

(b) To the fullest extent practicable unless specifically prohibited by law, agencies shall cooperate with State, Tribal, and local agencies to reduce duplication between NEPA and State, Tribal, and local requirements, including through use of studies, analysis, and decisions developed by State, Tribal, or local agencies. Except for cases covered by paragraph (a) of this section, such cooperation shall include, to the fullest extent practicable:

(1) Joint planning processes.

(2) Joint environmental research and studies.

(3) Joint public hearings (except where otherwise provided by statute).

(4) Joint environmental assessments.

(c) To the fullest extent practicable unless specifically prohibited by law, agencies shall cooperate with State, Tribal, and local agencies to reduce duplication between NEPA and comparable State, Tribal, and local requirements. Such cooperation shall include, to the fullest extent practicable, joint environmental impact statements. In such cases, one or more Federal agencies and one or more State, Tribal, or local agencies shall be joint lead agencies. Where State or Tribal laws or local ordinances have environmental impact statement or similar requirements in addition to but not in conflict with those in NEPA, Federal agencies may cooperate in fulfilling these requirements, as well as those of Federal laws, so that one document will comply with all applicable laws.

(d) To better integrate environmental impact statements into State, Tribal, or local planning processes, environmental impact statements shall discuss any inconsistency of a proposed action with any approved State, Tribal, or local plan or law (whether or not federally sanctioned). Where an inconsistency exists, the statement should describe the extent to which the agency would reconcile its proposed action with the plan or law. While the statement should discuss any inconsistencies, NEPA does not require reconciliation.

**§ 1506.3  Adoption.**

(a) *Generally.* An agency may adopt a draft or final environmental impact statement, environmental assessment, or portion thereof, or categorical exclusion determination, consistent with this section.

(b) *Environmental impact statements.* An agency may adopt a draft or final environmental impact statement, or portion thereof, provided that the adopting agency conducts an independent review of the statement and concludes that it meets the standards for an adequate statement, pursuant to the regulations in this subchapter and the adopting agency's NEPA procedures.

(1) If the actions covered by the original environmental impact statement and the proposed action are substantially the same, the adopting agency shall republish and file it as a final statement consistent with § 1506.9 of this subchapter. If the actions are not substantially the same or the adopting agency determines that the statement requires supplementation, the adopting agency shall treat the statement as a draft, supplement or reevaluate it as necessary, and republish and file it, consistent with § 1506.9 of this subchapter.

(2) Notwithstanding paragraph (b)(1) of this section, if a cooperating agency does not issue a record of decision jointly or concurrently consistent with § 1505.2 of this subchapter, a cooperating agency may issue a record of decision adopting the environmental impact statement of a lead agency without republication.

(c) *Environmental assessments.* An agency may adopt an environmental assessment, or portion thereof, if the actions covered by the original environmental assessment and the proposed action are substantially the same, and the assessment meets the standards for an adequate environmental assessment under the regulations in this subchapter and the adopting agency's NEPA procedures. If the actions are not substantially the same or the adopting agency determines that the environmental assessment requires supplementation, the adopting agency may adopt the environmental assessment, and supplement or reevaluate it as necessary, in its finding of no significant impact and provide notice consistent with § 1501.6 of this subchapter.

(d) *Categorical exclusion determinations.* An agency may adopt another agency's determination that a categorical exclusion applies to a particular proposed action if the action covered by that determination and the adopting agency's proposed action are substantially the same.

(1) The adopting agency shall document its adoption, including the determination that its proposed action is substantially the same as the action covered by the original categorical exclusion determination and that there are no extraordinary circumstances present that require the preparation of an environmental assessment or environmental impact statement.

(2) The adopting agency shall publish its adoption determination on an agency website or otherwise make it publicly available.

(e) *Identification of certain circumstances.* The adopting agency shall specify if one of the following circumstances is present:

(1) The agency is adopting an environmental assessment or environmental impact statement that is not final within the agency that prepared it.

(2) The action assessed in the environmental assessment or environmental impact statement is the subject of a referral under part 1504 of this subchapter.

(3) The environmental assessment or environmental impact statement's adequacy is the subject of a judicial action that is not final.

**§ 1506.4  Combining documents.**

Agencies should combine, to the fullest extent practicable, any environmental document with any other agency document to reduce duplication and paperwork.

**§ 1506.5  Agency responsibility for environmental documents.**

(a) The agency is responsible for the accuracy, scope (§ 1501.3(b) of this subchapter), and content of environmental documents and shall ensure they are prepared with professional and scientific integrity, using reliable data and resources, regardless of whether they are prepared by the agency or a contractor under the supervision of the agency or by the applicant or project sponsor under procedures the agency adopts pursuant to section 107(f) of NEPA and § 1507.3(c)(1) of this subchapter. The agency shall exercise its independent judgment and briefly document its

determination that an environmental document meets the standards under NEPA, the regulations in this subchapter, and the agency's NEPA procedures.

(b) An agency may require an applicant to submit environmental information for possible use by the agency in preparing an environmental document. An agency also may authorize a contractor to prepare an environmental assessment or environmental impact statement under the supervision of the agency and may authorize a contractor to draft a finding of no significant impact or record of decision, but the agency is responsible for its accuracy, scope, and contents.

(1) The agency should assist the applicant by outlining the types of information required for the preparation of environmental documents. The agency shall provide guidance to the contractor and participate in and supervise the document's preparation.

(2) The agency shall independently evaluate the information submitted and the environmental document and shall be responsible for their accuracy, scope, and contents, and document its evaluation in the environmental document.

(3) The agency shall include in the environmental document the names and qualifications of the persons preparing environmental documents, and conducting the independent evaluation of any information submitted or environmental documents prepared by a contractor, such as in the list of preparers for environmental impact statements (§ 1502.18 of this subchapter). It is the intent of this paragraph (b)(3) that acceptable work not be redone, but that it be verified by the agency.

(4) The lead agency or cooperating agency, where appropriate, shall prepare a disclosure statement for the contractor's execution specifying that the contractor has no financial or other interest in the outcome of the action. Such statement need not include privileged or confidential trade secrets or other confidential business information.

(5) Nothing in this section is intended to prohibit an agency from requesting any person, including the applicant, to submit information to it or to prohibit any person from submitting information to an agency for use in preparing environmental documents.

## § 1506.6 [Reserved]

## § 1506.7 Further guidance.

(a) The Council may provide further guidance concerning NEPA and its procedures.

(b) To the extent that Council guidance issued prior to [EFFECTIVE DATE OF THE FINAL RULE] is in conflict with this subchapter, the provisions of this subchapter apply.

## § 1506.8 Proposals for legislation.

(a) When developing legislation, agencies shall integrate the NEPA process for proposals for legislation significantly affecting the quality of the human environment with the legislative process of the Congress. Technical drafting assistance does not by itself constitute a legislative proposal. Only the agency that has primary responsibility for the subject matter involved will prepare a legislative environmental impact statement.

(b) A legislative environmental impact statement is the detailed statement required by law to be included in an agency's recommendation or report on a legislative proposal to Congress. A legislative environmental impact statement shall be considered part of the formal transmittal of a legislative proposal to Congress; however, it may be transmitted to Congress up to 30 days later to allow time for completion of an accurate statement that can serve as the basis for public and Congressional debate. The statement must be available in time for Congressional hearings and deliberations.

(c) Preparation of a legislative environmental impact statement shall conform to the requirements of the regulations in this subchapter, except as follows:

(1) There need not be a scoping process.

(2) Agencies shall prepare the legislative statement in the same manner as a draft environmental impact statement and need not prepare a final statement unless any of the following conditions exist. In such cases, the agency shall prepare and publish the statements consistent with §§ 1503.1 of this subchapter and 1506.11:

(i) A Congressional committee with jurisdiction over the proposal has a rule requiring both draft and final environmental impact statements.

(ii) The proposal results from a study process required by statute (such as those required by the Wild and Scenic Rivers Act (16 U.S.C. 1271 *et seq.*)).

(iii) Legislative approval is sought for Federal or federally assisted construction or other projects that the agency recommends be located at specific geographic locations. For proposals requiring an environmental impact statement for the acquisition of space by the General Services Administration, a draft statement shall accompany the Prospectus or the 11(b) Report of Building Project Surveys to the Congress, and a final statement shall be completed before site acquisition.

(iv) The agency decides to prepare draft and final statements.

(d) Comments on the legislative statement shall be given to the lead agency, which shall forward them along with its own responses to the Congressional committees with jurisdiction.

## § 1506.9 Filing requirements.

(a) Agencies shall file environmental impact statements together with comments and responses with the Environmental Protection Agency, Office of Federal Activities, consistent with the Environmental Protection Agency's procedures.

(b) Agencies shall file statements with the Environmental Protection Agency no earlier than they are also transmitted to participating agencies and made available to the public. The Environmental Protection Agency may issue guidelines to agencies to implement its responsibilities under this section and § 1506.10.

(c) Agencies shall notify the Environmental Protection Agency when they adopt an environmental impact statement consistent with § 1506.3(b).

## § 1506.10 Timing of agency action.

(a) The Environmental Protection Agency shall publish a notice in the **Federal Register** each week of the environmental impact statements filed since its prior notice. The minimum time periods set forth in this section are calculated from the date of publication of this notice.

(b) Unless otherwise provided by law, including statutory provisions for combining a final environmental impact statement and record of decision, Federal agencies shall not make or issue a record of decision under § 1505.2 of this subchapter for the proposed action until the later of the following dates:

(1) 90 days after publication of the notice described in paragraph (a) of this section for a draft environmental impact statement.

(2) 30 days after publication of the notice described in paragraph (a) of this section for a final environmental impact statement.

(c) An agency may make an exception to the rule on timing set forth in paragraph (b) of this section for a

proposed action in the following circumstances:

(1) Some agencies have formally established administrative review processes (*e.g.*, appeals, objections, protests), which may be initiated prior to or after filing and publication of the final environmental impact statement with the Environmental Protection Agency, that allow other agencies or the public to raise issues about a decision and make their views known. In such cases where a real opportunity exists to alter the decision, the agency may make and record the decision at the same time it publishes the environmental impact statement. This means that the period for administrative review of the decision and the 30-day period set forth in paragraph (b)(2) of this section may run concurrently. In such cases, the environmental impact statement shall explain the timing and the public's right of administrative review and provide notification consistent with § 1506.9; or

(2) An agency engaged in rulemaking under the Administrative Procedure Act or other statute for the purpose of protecting the public health or safety may waive the time period in paragraph (b)(2) of this section, publish a decision on the final rule simultaneously with publication of the notice of the availability of the final environmental impact statement, and provide notification consistent with § 1506.10, as described in paragraph (a) of this section.

(d) If an agency files the final environmental impact statement within 90 days of the filing of the draft environmental impact statement with the Environmental Protection Agency, the minimum 30-day and 90-day periods may run concurrently. However, subject to paragraph (e) of this section, agencies shall allow at least 45 days for comments on draft statements.

(e) The lead agency may extend the minimum periods in paragraph (b) of this section and provide notification consistent with § 1506.10. Upon a showing by the lead agency of compelling reasons of national policy, the Environmental Protection Agency may reduce the minimum periods and, upon a showing by any other Federal agency of compelling reasons of national policy, also may extend the minimum periods, but only after consultation with the lead agency. The lead agency may modify the minimum periods when necessary to comply with other specific statutory requirements (§ 1507.3(d)(4) of this subchapter). Failure to file timely comments shall not be a sufficient reason for extending a period. If the lead agency does not concur with the extension of time, the

Environmental Protection Agency may not extend it for more than 30 days. When the Environmental Protection Agency reduces or extends any period it shall notify the Council.

### § 1506.11   Emergencies.

Where emergency circumstances make it necessary to take an action with significant effects without observing the provisions of the regulations in this subchapter, the Federal agency taking the action should consult with the Council about alternative arrangements for compliance with section 102(2)(C) of NEPA. Agencies and the Council will limit such arrangements to actions necessary to control the immediate impacts of the emergency. Alternative arrangements do not waive the requirement to comply with the statute, but establish an alternative means for NEPA compliance.

### § 1506.12   Innovative approaches to NEPA reviews.

(a) The Council may authorize an innovative approach to NEPA compliance that allows an agency to comply with the Act following procedures modified from the requirements of the regulations in this subchapter, to facilitate sound and efficient environmental review for actions to address extreme environmental challenges consistent with section 101 of NEPA. Examples of extreme environmental challenges may relate to sea level rise, increased wildfire risk, or bolstering the resilience of infrastructure to increased disaster risk due to climate change; water scarcity; degraded water or air quality; disproportionate and adverse effects on communities with environmental justice concerns; imminent or reasonably foreseeable loss of historic, cultural, or Tribal resources; species loss; and impaired ecosystem health.

(b) The Council may approve an innovative approach if it is consistent with this section, and such approval does not waive the requirement to comply with the statute, but establishes an alternative means for NEPA compliance.

(c) An agency request for an innovative approach shall:

(1) Identify each provision of this subchapter from which the agency seeks a modification and how the innovative approach the agency proposes to ensure compliance with NEPA;

(2) Explain the extreme environmental challenge the approach would address, why the alternative means are needed to address the challenge, and how the alternative

means would facilitate the sound and efficient environmental review; and

(3) Consult with any potential cooperating agencies and include a summary of their comments.

(d) The Council shall evaluate the agency's request within 60 days to determine if it meets the requirements in this section. The Council may:

(1) Approve the request for modification;

(2) Approve the request for modification with revisions; or

(3) Deny the request for modification.

(e) The Council shall publish on its website any request for modification that it has approved, approved with revisions, or denied.

### § 1506.13   Effective date.

The regulations in this subchapter apply to any NEPA process begun after [EFFECTIVE DATE OF THE FINAL RULE]. An agency may apply the regulations in this subchapter to ongoing activities and environmental documents begun before [EFFECTIVE DATE OF THE FINAL RULE].

## PART 1507—AGENCY COMPLIANCE

### § 1507.1   Compliance.

All agencies of the Federal Government shall comply with the regulations in this subchapter. It is the intent of these regulations to allow each agency flexibility in adapting its implementing procedures authorized by § 1507.3 to the requirements of other applicable laws.

### § 1507.2   Agency capability to comply.

Each agency shall be capable (in terms of personnel and other resources) of complying with the requirements of NEPA and the regulations in this subchapter. Such compliance may include use of the resources of other agencies, applicants, and other participants in the NEPA process, but the agency using the resources shall itself have sufficient capability to evaluate what others do for it and account for the contributions of others. Agencies shall:

(a) Agencies shall designate a senior agency official to be responsible for overall review of agency NEPA compliance, including resolving implementation issues, and a Chief Public Engagement Officer to be responsible for facilitating community engagement across the agency and, where appropriate, the provision of technical assistance to communities.

(b) Fulfill the requirements of section 102(2)(A) of NEPA to utilize a systematic, interdisciplinary approach that will ensure the integrated use of the

AR_0000061

natural and social sciences and the environmental design arts in planning and in decision making that may have an impact on the human environment.

(c) Identify methods and procedures required by section 102(2)(B) of NEPA to ensure that presently unquantified environmental amenities and values may be given appropriate consideration.

(d) Prepare adequate environmental impact statements pursuant to section 102(2)(C) of NEPA and cooperate on the development of statements in the areas where the agency has jurisdiction by law or special expertise or is authorized to develop and enforce environmental standards.

(e) Ensure environmental documents are prepared with professional integrity, including scientific integrity, consistent with section 102(2)(D) of NEPA.

(f) Make use of reliable data and resources in carrying out their responsibilities under NEPA, consistent with section 102(2)(E) of NEPA.

(g) Study, develop, and describe technically and economically feasible alternatives, consistent with section 102(2)(F) of NEPA.

(h) Study, develop, and describe alternatives to recommended courses of action in any proposal that involves unresolved conflicts concerning alternative uses of available resources, consistent with section 102(2)(H) of NEPA.

(i) Comply with the requirement of section 102(2)(K) of NEPA that the agency initiate and utilize ecological information in the planning and development of resource-oriented projects.

(j) Fulfill the requirements of sections 102(2)(I), 102(2)(J), and 102(2)(L), of NEPA, and Executive Order 11514, Protection and Enhancement of Environmental Quality, section 2, as amended by Executive Order 11991, Relating to Protection and Enhancement of Environmental Quality.

### § 1507.3   Agency NEPA procedures.

(a) The Council has determined that the categorical exclusions contained in agency NEPA procedures as of [EFFECTIVE DATE OF THE FINAL RULE] are consistent with this subchapter.

(b) No more than 12 months after [EFFECTIVE DATE OF THE FINAL RULE], or 9 months after the establishment of an agency, whichever comes later, each agency shall develop or revise, as necessary, proposed procedures to implement the regulations in this subchapter, facilitate efficient decision making, and ensure that agencies make decisions in accordance with the policies and requirements of

the Act. When the agency is a department, it may be efficient for major subunits (with the consent of the department) to adopt their own procedures.

(1) Each agency shall consult with the Council while developing or revising its proposed procedures and before publishing them in the **Federal Register** for comment. Agencies with similar programs should consult with each other and the Council to coordinate their procedures, especially for programs requesting similar information from applicants.

(2) Agencies shall provide an opportunity for public review and review by the Council for conformity with the Act and the regulations in this subchapter before issuing their final procedures. The Council shall complete its review within 30 days of the receipt of the proposed final procedures. Once in effect, agencies shall publish their NEPA procedures and ensure that they are readily available to the public. Agencies shall continue to review their policies and procedures, in consultation with the Council, to revise them as necessary to ensure full compliance with the purposes and provisions of the Act.

(3) The issuance or update of agency procedures is not subject to NEPA review under this subchapter.

(c) Agency procedures shall:

(1) Designate the major decision points for the agency's programs and actions subject to NEPA, ensuring that the NEPA process begins at the earliest reasonable time, consistent with § 1501.2 of this subchapter, and aligns with the corresponding decision points;

(2) Require that relevant environmental documents, comments, and responses be part of the record in rulemaking and adjudicatory proceedings;

(3) Integrate the environmental review into the decision-making process by requiring that relevant environmental documents, comments, and responses accompany the proposal through existing agency review processes so that decision makers use them in making decisions;

(4) Require that the alternatives considered by the decision maker are encompassed by the range of alternatives discussed in the relevant environmental documents and that the decision maker consider the alternatives described in the environmental documents. If another decision document accompanies the relevant environmental documents to the decision maker, agencies are encouraged to make available to the public before the decision is made any part of that

document that relates to the comparison of alternatives.

(5) Require the combination of environmental documents with other agency documents to facilitate sound and efficient decision making and avoid duplication, where consistent with applicable statutory requirements;

(6) Include those procedures required by §§ 1501.2(b)(4) (assistance to applicants);

(7) Include specific criteria for and identification of those typical classes of action that normally:

(i) Require environmental impact statements; and

(ii) Require environmental assessments but not necessarily environmental impact statements;

(8) Establish categorical exclusions and identify extraordinary circumstances. When establishing new or revising existing categorical exclusions, agencies shall:

(i) Identify when documentation of a determination that a categorical exclusion applies to a proposed action is required;

(ii) Substantiate the proposed new or revised categorical exclusion with sufficient information to conclude that the category of actions does not have a significant effect, individually or in the aggregate, on the human environment and provide this substantiation in a written record that is made publicly available as part of the notice and comment process (§ 1507.3(b)(1) and (2)); and

(iii) Describe how the agency will consider extraordinary circumstances in determining whether additional analysis in an environmental assessment or environmental impact statement is required;

(9) Include a process for reviewing the agency's categorical exclusions at least every 10 years;

(10) Include a process for introducing a supplement to an environmental assessment or environmental impact statement into its formal administrative record, if such a record exists;

(11) Explain where interested persons can get information or status reports on environmental impact statements, environmental assessments, and other elements of the NEPA process; and

(12) Where applicable, include procedures to allow a project sponsor to prepare environmental assessments and environmental impact statements under the agency's supervision consistent with § 1506.5 of this subchapter.

(d) Agency procedures also may:

(1) Identify activities or decisions that are not subject to NEPA;

(2) Include processes for consideration of emergency actions that would not result in significant effects;

(3) Include specific criteria for providing limited exceptions to the provisions of the regulations in this subchapter for classified proposals. These are proposed actions that are specifically authorized under criteria established by an Executive order or statute to be kept secret in the interest of national defense or foreign policy and are in fact properly classified pursuant to such Executive order or statute. Agencies may safeguard and restrict from public dissemination environmental assessments and environmental impact statements that address classified proposals in accordance with agencies' own regulations applicable to classified information. Agencies should organize these documents so that classified portions are included as annexes, so that the agencies can make the unclassified portions available to the public; and

(4) Provide for periods of time other than those presented in § 1506.10 of this subchapter when necessary to comply with other specific statutory requirements, including requirements of lead or cooperating agencies.

### § 1507.4   Agency NEPA program information.

(a) To allow agencies and the public to efficiently and effectively access information about NEPA reviews, agencies shall provide for agency websites or other information technology tools to make available documents, relevant notices, and other relevant information for use by agencies, applicants, and interested persons. The website or other such means of publication shall include the agency's NEPA procedures, including those of subunits, and a list of environmental assessments and environmental impact statements that are in development and complete. As appropriate, agencies also should include:

(1) Agency planning and other documents that guide agency management and provide for public involvement in agency planning processes;

(2) Environmental documents;

(3) Agency policy documents, orders, terminology, and explanatory materials regarding agency decision-making processes;

(4) Agency planning program information, plans, and planning tools; and

(5) A database searchable by geographic information, document status, document type, and project type.

(b) Agencies shall provide for efficient and effective interagency coordination of their environmental program websites

and other information technology tools, such as use of shared databases or application programming interfaces, in their implementation of NEPA and related authorities.

## PART 1508—DEFINITIONS

### § 1508.1   Definitions.

The following definitions apply to the regulations in this subchapter. Federal agencies shall use these terms uniformly throughout the Federal Government.

(a) *Act* or *NEPA* means the National Environmental Policy Act, as amended (42 U.S.C. 4321, *et seq.*).

(b) *Affecting* means will or may have an effect on.

(c) *Authorization* means any license, permit, approval, finding, determination, or other administrative decision issued by an agency that is required or authorized under Federal law in order to implement a proposed action.

(d) *Categorical exclusion* means a category of actions that an agency has determined, in its agency NEPA procedures (§ 1507.3 of this subchapter) or pursuant to § 1501.4(c) of this subchapter, normally does not have a significant effect on the human environment.

(e) *Cooperating agency* means any Federal, State, Tribal, or local agency with jurisdiction by law or special expertise with respect to any environmental impact involved in a proposal that has been designated by the lead agency.

(f) *Council* means the Council on Environmental Quality established by title II of the Act.

(g) *Effects* or *impacts* means changes to the human environment from the proposed action or alternatives that are reasonably foreseeable and include the following:

(1) Direct effects, which are caused by the action and occur at the same time and place.

(2) Indirect effects, which are caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable. Indirect effects may include growth-inducing effects and other effects related to induced changes in the pattern of land use, population density or growth rate, and related effects on air and water and other natural systems, including ecosystems.

(3) Cumulative effects, which are effects on the environment that result from the incremental effects of the action when added to the effects of other past, present, and reasonably foreseeable actions regardless of what agency (Federal or non-Federal) or

person undertakes such other actions. Cumulative effects can result from actions with individually minor but collectively significant effects taking place over a period of time.

(4) Effects include ecological (such as the effects on natural resources and on the components, structures, and functioning of affected ecosystems), aesthetic, historic, cultural, economic, social, or health, such as disproportionate and adverse effects on communities with environmental justice concerns, whether direct, indirect, or cumulative. Effects also include climate change-related effects, including the contribution of a proposed action and its alternatives to climate change, and the reasonably foreseeable effects of climate change on the proposed action and its alternatives. Effects may also include those resulting from actions which may have both beneficial and detrimental effects, even if on balance the agency believes that the effects will be beneficial.

(h) *Environmental assessment* means a concise public document, for which a Federal agency is responsible, for an action that is not likely to have a significant effect or for which the significance of the effects is unknown (§ 1501.5 of this subchapter), that is used to support an agency's determination of whether to prepare an environmental impact statement (part 1502 of this subchapter) or a finding of no significant impact (§ 1501.6 of this subchapter).

(i) *Environmental document* means an environmental assessment, environmental impact statement, documented categorical exclusion determination, finding of no significant impact, record of decision, or notice of intent.

(j) *Environmental impact statement* means a detailed written statement that is required by section 102(2)(C) of NEPA.

(k) *Environmental justice* means the just treatment and meaningful involvement of all people, regardless of income, race, color, national origin, Tribal affiliation, or disability, in agency decision making and other Federal activities that affect human health and the environment so that people:

(1) Are fully protected from disproportionate and adverse human health and environmental effects (including risks) and hazards, including those related to climate change, the cumulative impacts of environmental and other burdens, and the legacy of racism or other structural or systemic barriers; and

(2) Have equitable access to a healthy, sustainable, and resilient environment

in which to live, play, work, learn, grow, worship, and engage in cultural and subsistence practices.

(*l*) *Environmentally preferable alternative* means the alternative or alternatives that will best promote the national environmental policy as expressed in section 101 of NEPA.

(m) *Extraordinary circumstances* are factors or circumstances that indicate a normally categorically excluded action may have a significant environmental effect. Examples of extraordinary circumstances include potential substantial effects on sensitive environmental resources, potential disproportionate and adverse effects on communities with environmental justice concerns, potential substantial effects associated with climate change, and potential adverse effects on historic properties or cultural resources.

(n) *Federal agency* means all agencies of the Federal Government. It does not mean the Congress, the Judiciary, or the President, including the performance of staff functions for the President in his Executive Office. For the purposes of the regulations in this subchapter, Federal agency also includes States, units of general local government, and Tribal governments assuming NEPA responsibilities from a Federal agency pursuant to statute.

(o) *Finding of no significant impact* means a document by a Federal agency briefly presenting the agency's determination that and reasons why an action, not otherwise categorically excluded (§ 1501.4 of this subchapter), will not have a significant effect on the human environment and for which an environmental impact statement therefore will not be prepared.

(p) *Human environment* or *environment* means comprehensively the natural and physical environment and the relationship of present and future generations with that environment. (*See also* the definition of "effects" in paragraph (g) of this section.)

(q) *Joint lead agency* means a Federal, State, Tribal, or local agency designated pursuant to § 1501.7(c) that shares the responsibilities of the lead agency for preparing the environmental impact statement or environmental assessment.

(r) *Jurisdiction by law* means agency authority to approve, veto, or finance all or part of the proposal.

(s) *Lead agency* means the Federal agency that proposes the agency action or is designated pursuant to § 1501.7(c) for preparing or having primary responsibility for preparing the environmental impact statement or environmental assessment.

(t) *Legislation* means a bill or legislative proposal to Congress developed by a Federal agency, but does not include requests for appropriations or legislation recommended by the President.

(u) *Major Federal action* or *action* means an action that the agency carrying out such action determines is subject to substantial Federal control and responsibility.

(1) Major Federal actions generally include:

(i) Granting authorizations, including permits, licenses, rights-of-way, or other authorizations.

(ii) Adoption of official policy, such as rules, regulations, and interpretations adopted under the Administrative Procedure Act, 5 U.S.C. 551 *et seq.*, or other statutes; implementation of treaties and international conventions or agreements, including those implemented pursuant to statute or regulation; formal documents establishing an agency's policies that will result in or substantially alter agency programs.

(iii) Adoption of formal plans, such as official documents prepared or approved by Federal agencies, which prescribe alternative uses of Federal resources, upon which future agency actions will be based.

(iv) Adoption of programs, such as a group of concerted actions to implement a specific policy or plan; systematic and related agency decisions allocating agency resources to implement a specific statutory program or executive directive.

(v) Carrying out specific projects, such as construction or management activities.

(vi) Providing financial assistance, including through grants, cooperative agreements, loans, loan guarantees, or other forms of financial assistance, where the agency has the authority to deny in whole or in part the assistance due environmental effects, impose conditions on the receipt of the financial assistance to address environmental effects, or otherwise has sufficient control and responsibility over the subsequent use of the financial assistance or the effects of the activity for which the agency is providing the financial assistance.

(2) Major Federal actions do not include the following:

(i) Non-Federal actions:

(A) With no or minimal Federal funding; or

(B) With no or minimal Federal involvement where the Federal agency cannot control the outcome of the project;

(ii) Funding assistance solely in the form of general revenue sharing funds that do not provide Federal agency compliance or enforcement responsibility over the subsequent use of such funds;

(iii) Loans, loan guarantees, or other forms of financial assistance where a Federal agency does not exercise sufficient control and responsibility over the subsequent use of such financial assistance or the effects of the action;

(iv) Business loan guarantees provided by the Small Business Administration pursuant to section 7(a) or (b) and of the Small Business Act (15 U.S.C. 636(a) and (b)), or title V of the Small Business Investment Act of 1958 (15 U.S.C. 695 through 697g);

(v) Judicial or administrative civil or criminal enforcement actions;

(vi) Extraterritorial activities or decisions, which means agency activities or decisions with effects located entirely outside of the jurisdiction of the United States;

(vii) Activities or decisions that are non-discretionary and made in accordance with the agency's statutory authority;

(viii) Activities or decisions that are not a final agency action within the meaning of such term under the Administrative Procedure Act; and

(ix) Activities or decisions for projects approved by a Tribal Nation that occur on or involve land held in trust or restricted status by the United States for the benefit of that Tribal Nation or by the Tribal Nation when such activities or decisions involve no Federal funding or other Federal involvement.

(v) *Matter* includes for purposes of part 1504 of this subchapter:

(1) With respect to the Environmental Protection Agency, any proposed legislation, project, action, or regulation as those terms are used in section 309(a) of the Clean Air Act (42 U.S.C. 7609).

(2) With respect to all other agencies, any proposed major Federal action to which section 102(2)(C) of NEPA applies.

(w) *Mitigation* means measures that avoid, minimize, or compensate for effects caused by a proposed action or alternatives as described in an environmental document or record of decision and that have a connection to those effects. Mitigation includes, in general order of priority:

(1) Avoiding the effect altogether by not taking a certain action or parts of an action.

(2) Minimizing effects by limiting the degree or magnitude of the action and its implementation.

(3) Rectifying the effect by repairing, rehabilitating, or restoring the affected environment.

(4) Reducing or eliminating the effect over time by preservation and maintenance operations during the life of the action.

(5) Compensating for the effect by replacing or providing substitute resources or environments.

(x) *NEPA process* means all measures necessary for compliance with the requirements of section 2 and title I of NEPA.

(y) *Notice of intent* means a public notice that an agency will prepare and consider an environmental impact statement or environmental assessment, as applicable.

(z) *Page* means 500 words and does not include citations, explanatory maps, diagrams, graphs, tables, and other means of graphically displaying quantitative or geospatial information.

(aa) *Participating agency* means a Federal, State, Tribal, or local agency participating in an environmental review or authorization of an action.

(bb) *Participating Federal agency* means a Federal agency participating in an environmental review or authorization of an action.

(cc) *Programmatic environmental document* means an environmental impact statement or environmental assessment analyzing all or some of the environmental effects of a policy, program, plan, or group of related actions.

(dd) *Proposal* means a proposed action at a stage when an agency has a goal, is actively preparing to make a decision on one or more alternative means of accomplishing that goal, and can meaningfully evaluate its effects. A proposal may exist in fact as well as by agency declaration that one exists.

(ee) *Publish* and *publication* mean methods found by the agency to efficiently and effectively make environmental documents and information available for review by interested persons, including electronic publication, and adopted by agency NEPA procedures pursuant to § 1507.3 of this subchapter.

(ff) *Reasonable alternatives* means a reasonable range of alternatives that are technically and economically feasible, and meet the purpose and need for the proposed action.

(gg) *Reasonably foreseeable* means sufficiently likely to occur such that a person of ordinary prudence would take it into account in reaching a decision.

(hh) *Referring agency* means the Federal agency that has referred any matter to the Council after a determination that the matter is unsatisfactory from the standpoint of public health or welfare or environmental quality.

(ii) *Scope* consists of the range and breadth of actions, alternatives, and effects to be considered in an environmental impact statement or environmental assessment.

(jj) *Senior agency official* means an official of assistant secretary rank or higher (or equivalent) that is designated for overall agency NEPA compliance, including resolving implementation issues.

(kk) *Significant effects* means adverse effects that an agency has identified as significant based on the criteria in § 1501.3(d) of this subchapter.

(ll) *Special expertise* means statutory responsibility, agency mission, or related program experience.

(mm) *Tiering* refers to the process described in § 1501.11 of this subchapter.

### § 1508.2    [Reserved]

[FR Doc. 2023–15405 Filed 7–28–23; 8:45 am]

**BILLING CODE 3325–F3–P**

AR_0000065

# Council on Environmental Quality

## National Environmental Policy Act Implementing Regulations Revisions Phase 2

## Special Environmental Assessment

## July 2023

### I.     Background

Section 102(2) of the National Environmental Policy Act of 1969 (NEPA), 42 U.S.C. 4321 *et seq.*, requires Federal agencies to consider in their decision-making processes the environmental effects of their proposed actions, disclose those impacts, and involve the public in the NEPA process. 42 U.S.C. 4332(2). The Council on Environmental Quality (CEQ) oversees the implementation of NEPA. 42 U.S.C. 4342, 4344. In 1978, CEQ issued NEPA implementing regulations at 40 CFR parts 1500 through 1508 (NEPA regulations), which set forth the procedures for agencies to comply with section 102(2) of NEPA. 43 FR 55978 (Nov. 29, 1978). CEQ subsequently made technical amendments in 1979, 44 FR 873 (Jan. 3, 1979), and amended one provision in 1986, 51 FR 15618 (Apr. 25, 1986). The NEPA regulations, as amended through April 25, 1986, are referred to collectively as the 1978 regulations. In 2020, CEQ made significant changes throughout the NEPA regulations. 85 FR 43304 (July 16, 2020) (2020 regulations).

CEQ has since engaged in a review of the 2020 regulations and is revising them using a phased rulemaking approach. First, CEQ issued an interim final rule that amended the 2020 regulations to extend the deadline for Federal agencies to make their agency NEPA procedures consistent with the 2020 regulations. 86 FR 34154 (June 29, 2021). Next, CEQ issued a final rule that made three targeted changes to the NEPA regulations, clarifying the 2020 regulation's definition of "effects;" the requirements for addressing the purpose and need of an action in an environmental impact statement; and agencies' authority to develop NEPA implementing procedures that go beyond the minimum requirements set forth in the NEPA regulations. 87 FR 23453 (April 20, 2022).

On June 3, 2023, President Biden signed the Fiscal Responsibility Act of 2023 (FRA) into law, which included a range of amendments to NEPA. These amendments modified section 102(2)(C), added sections 102(2)(D) through (F), and added sections 106 through 111 to NEPA. Sec. 321, Pub. L. 118-5, 137 Stat. 10.

CEQ is now proposing additional changes to better align the regulations with CEQ's extensive experience implementing NEPA; CEQ's perspective on how NEPA can most effectively inform agency decision-making; longstanding Federal agency experience and practice with environmental review processes; NEPA's purpose and statutory text, including making decisions informed by the best available science and information; and case law interpreting NEPA's requirements. The proposed changes also implement the amendments made to NEPA by the

1

FRA. CEQ has detailed these proposed changes in a notice of proposed rulemaking (NPRM). The amendments to NEPA from the FRA are also further explained in the NPRM.

The NEPA regulations provide for three levels of NEPA review for major Federal actions. When a Federal agency is considering an action that is likely to have significant environmental effects, it must prepare an environmental impact statement (EIS). *See* 40 CFR part 1502.[1] Agencies also must identify categories of actions that normally do not have significant environmental effects in their agency NEPA procedures, and then apply these categorical exclusions (CEs) to individual actions after considering whether there are extraordinary circumstances present that preclude the application of the CE. *See* 40 CFR 1501.4, 1507.3(e)(2)(ii). Finally, for actions where the significance of the effects is unknown or for those actions that are not likely to have significant environmental effects and where the agency does not have an established CE, agencies prepare an environmental assessment (EA) to comply with NEPA. *See* 40 CFR 1501.5. EAs briefly provide sufficient evidence and analysis to determine whether to prepare an EIS or to make a finding of no significant impact (FONSI). 40 CFR 1501.5(c)(1). Agencies may prepare EAs on any action to assist agency planning and decision making. 40 CFR 1501.5(b).

CEQ has not adopted agency-specific NEPA procedures and has not established CEs for its own actions. Consistent with the majority of CEQ's past practice, it has prepared this special EA to accompany and inform its proposed rulemaking to amend the NEPA regulations.

## II.     Purpose and Need

The purpose and need for this rulemaking is to implement the FRA's amendments to NEPA; provide for an effective environmental review process that promotes better decision making; ensure full and fair public involvement; provide for an efficient process and regulatory certainty; and provide for sound decision making grounded in science, including consideration of relevant environmental, climate change, and environmental justice effects. CEQ's action to address those elements will help to better execute NEPA's statutory requirements and purposes, including to clearly communicate requirements for Federal agencies, to ensure that Federal decisions are guided by the best available information, to better protect and enhance the quality of the human environment, and to provide timely and meaningful processes that inform and engage the public before decisions are made.

## III.     Proposed Action and Alternatives

The proposed action would include revisions throughout the NEPA regulations, as described in the NPRM. CEQ incorporates the NPRM herein and refers readers to that document for a more detailed description of CEQ's proposed changes. In this special EA, CEQ groups the proposed changes into the following five categories: improvements to provide efficiency and flexibility in the NEPA process, promoting better environmental outcomes, prioritizing meaningful public engagement, structural updates, and clarifying amendments.

---

[1] In this document, CEQ uses the section symbol (§) to refer to the proposed regulations as set forth in the NPRM and "40 CFR" to refer to the current CEQ NEPA regulations, as set forth in 40 CFR parts 1500–1508.

- **Proposed changes to improve NEPA efficiency and add flexibility** would update requirements for agency collaboration and expand agency flexibility to allow agencies to adapt environmental reviews to their unique operational needs and statutory obligations.
- **Proposed changes would promote better environmental outcomes** by codifying the need to evaluate climate change impacts in environmental analyses; by encouraging the use of the best available information; and by directing agencies to engage with impacted stakeholders, including communities with environmental justice concerns, such as communities of color, low-income communities, and Tribal Nations, earlier in the process.
- **Proposed changes would prioritize meaningful public engagement** by improving agency notice requirements, encouraging robust and meaningful comments from stakeholders, and ensuring agencies advance environmental justice and respect Tribal sovereignty.
- **Proposed structural updates** to the CEQ regulations would ensure internal consistency and enhance the readability of the regulations.
- **Proposed clarifying amendments** would provide clear direction to agencies in implementing NEPA by more closely aligning the regulations with the requirements and policy objectives of NEPA, codifying agency best practices, and identifying appropriate agency roles and responsibilities.

CEQ has determined that this action does not involve unresolved conflicts concerning the alternative uses of available resources that would warrant consideration of other alternatives required by 42 U.S.C. 4332(2)(E).

## IV.    Environmental Effects

The proposed changes to the CEQ regulations would, in themselves, have no environmental effect. The regulations do not dictate that Federal agencies reach any particular outcome or take any specific action. Rather, the CEQ regulations establish a process that Federal agencies must follow consistent with the national environmental policy set forth in section 101 of NEPA and the procedural requirements set forth in section 102 of NEPA. The proposed changes would improve this process, which is expected to result in Federal agencies making better and timely decisions that take into account potential environmental effects of their actions.

### A.    *Proposed Changes to Improve NEPA Efficiency and Add Flexibility*

CEQ proposes to make substantive changes to agency obligations within the NEPA regulations. In some instances, these changes reflect a return to the long-standing requirements under the 1978 regulations. In other places, CEQ proposes changes that are intended to implement the FRA's amendments to NEPA, improve the efficiency of agency processes, facilitate collaboration, and provide agencies with greater flexibility to prepare environmental analyses in the context of their unique operational needs and statutory obligations. These changes include, among others:

- Amending language in § 1500.6 regarding agency implementation of NEPA "as interpreted by the regulations" and confirms agencies have an independent obligation to ensure full compliance with NEPA, conforming this section with the update to § 1507.3

AR_0000068

in the 2022 final rule that eliminated the concept that the CEQ regulations are a ceiling for NEPA compliance;

- Moving and consolidating the threshold NEPA applicability factors and adding factors from section 106 of NEPA in proposed §§ 1501.3(a)(1)–(4), as well as restoring and updating the context and intensity factors for determining significance that were removed in the 2020 regulations;
- Updating the process for establishing CEs in §§ 1501.4 and 1507.3, including confirming that agencies can jointly develop CEs, allowing agencies to establish CEs through programmatic environmental reviews and other planning processes, clarifying that CEs may incorporate mitigation measures, and enabling agencies to apply another agency's CE to a proposed action or category of actions set forth in section 109 of NEPA;
- Clarifying the roles and responsibilities of lead and cooperating agencies in §§ 1501.7 and 1501.8;
- Improving flexibility for interagency coordination and early interagency collaboration and dispute resolution in §§ 1504.1 and 1504.2;
- Requiring agencies to set schedules in § 1501.10 to meet the one- and two-year deadlines for an EA and EIS, respectively;
- Directing agencies to establish EIS and EA schedules in § 1501.10 in consultation and concurrence with cooperating and participating agencies and in consultation with project sponsors or applicants, where applicable;
- Codifying best practices for programmatic environmental documents and tiering in § 1501.11;
- Providing clearer direction on agency adoption of EAs, EISs, and CE determinations in § 1506.3;
- Adding a new section in § 1506.12 that would allow Federal agencies to pursue innovative approaches to NEPA implementation when addressing extreme environmental challenges; and
- Adding additional clarification on requirements for developing agency NEPA procedures in § 1507.3, including for establishing CEs, identifying extraordinary circumstances, and emergency actions.

CEQ does not anticipate that there would be any reasonably foreseeable environmental effects from these changes, but to the extent there are, such effects would be beneficial. CEQ expects these changes will increase the efficiency of environmental reviews, lead to a more predictable and transparent NEPA process, and result in better environmental documents.

     B.    *Proposed Changes to Promote Better Environmental Outcomes*

In order to promote better environmental outcomes, CEQ proposes to ensure that NEPA documents appropriately consider all reasonably foreseeable environmental effects, including climate change and the impacts of greenhouse gas emissions, using high-quality information. CEQ proposes to improve the use of scientific analyses by reverting some provisions back to the original 1978 language, modernizing some of those 1978 provisions, and adding new requirements to reflect the current consensus of the scientific community. CEQ also proposes to add language to implement the FRA's amendments to NEPA. These changes include, among others:

- Clarifying the expectations for the use of incomplete or unavailable information, ensuring evaluation of high-quality and accurate information, and ensuring the professional integrity, including scientific integrity of the discussions and analyses in environmental documents in §§ 1500.1(b), 1501.5(i), 1502.21, and 1502.23;
- Highlighting climate change and disproportionate adverse health and environmental effects on communities with environmental justice concerns as important considerations when evaluating project alternatives in § 1500.2 and requiring the inclusion of reasonably foreseeable climate change effects of the proposed action and reasonable alternatives, as well as a discussion of the effects of climate change on the proposed action and reasonable alternatives, in § 1502.16;
- Requiring discussion of the potential for disproportionate and adverse human health and environmental effects on communities with environmental justice concerns (§ 1502.16);
- Requiring analysis of any adverse environmental effects of the no action alternative (§ 1502.16);
- Restoring and updating agency evaluation of context and intensity factors and encouraging a balanced consideration of beneficial effects when making a determination of significance in §§ 1501.3(b) and (d);
- Amplifying the use of Indigenous Knowledge as a source of relevant expertise for cooperating agencies in § 1501.8(a);
- Requiring identification of the environmentally preferable alternative in EISs (§ 1502.14);
- Encouraging the use of high-quality information for reasonably foreseeable trends, including the effects of climate change, in § 1502.15;
- Expanding the use of reliable high-quality information, including the flexibility for agencies to utilize newly gathered data in § 1502.23;
- Requiring agencies to develop a monitoring and compliance plan when an EA or EIS relies on mitigation to analyze the reasonably foreseeable environmental effects of a proposed action (§§ 1501.6, 1505.2, and 1505.3); and
- Modernizing definitions in § 1508.1 to incorporate climate change, including "effects," and "extraordinary circumstances."

CEQ does not anticipate that there would be any reasonably foreseeable environmental effects from these changes, but to the extent there are, such effects would be beneficial. CEQ expects the proposed changes would result in the use of high-quality information, including best-available science and reliable data, and encourage a systems-based approach to analyze potential effects. These proposed changes would result in more informative environmental documents, more scientifically accurate analyses, and better-informed government decision making. The proposed changes also will increase the predictability of the NEPA process and, as a result, may reduce litigation risks. Taken together, CEQ expects the proposed changes to have no or net-positive effects on the environment.

     C.     *Proposed Changes to Prioritize Meaningful Public Engagement, Including Advancing Environmental Justice and Respecting Tribal Sovereignty*

Consulting with and responding to affected stakeholders is critical to achieving the requirements and policy objectives of NEPA and the goals of transparent and informed decision-making. In

AR_0000070

particular, ensuring agencies listen to and incorporate feedback from communities with environmental justice concerns, which often include low-income communities, communities of color, areas within the boundaries of Tribal Nations, and other historically under-represented communities, is critical to considering and addressing the disproportionately adverse health and environmental effects on these groups. CEQ proposes to clarify or strike certain provisions in the 2020 regulations that may be misinterpreted to limit public engagement and community involvement in Federal decision making. CEQ also proposes to provide procedures to facilitate evaluation of local and cumulative impacts to vulnerable communities and achieve better environmental and community outcomes. CEQ further proposes procedures to ensure that public engagement occurs early in the NEPA process because early identification of issues and conflicts can lead to more efficient and effective decision making. These changes include, among others:

- Restoring and modifying the policy provision of § 1500.2 from the 1978 regulations by updating subsections (a) and (e) to promote meaningful engagement, specifically including engaging with communities with environmental justice concerns as well as clarifying in § 1501.5(c)(3) that agencies should list the Federal agencies, as well as the State, Tribal, and local governments with which they consulted;
- Improving transparency by encouraging publication of an agency determination where the agency determines to apply a CE when an extraordinary circumstance exists in § 1501.4(b)(1), and requiring notice and public comment in § 1501.4(c)(2) when an agency establishes a CE through a programmatic review;
- Adding consideration of disproportionate and adverse effects on communities with environmental justice concerns and adverse effects on rights of Tribal nations that have been reserved through treaties, statutes, or Executive Orders to the list of intensity factors in § 1501.3(d);
- Clarifying that if an agency publishes a draft EA, they must invite public comment on the draft EA (§ 1501.5(e));
- Determining the appropriate methods of public and government engagement, including the right mechanisms for notification, publication, and public meetings and hearings in § 1501.9;
- Conforming the scoping requirements in § 1502.4 with provisions on public engagement in § 1501.9;
- Clarifying that agencies should "work together and with" potential applicants and relevant agencies in § 1502.5(b) to encourage early coordination, process efficiencies, and better environmental outcomes;
- Increasing accessibility of conclusions for public review; for instance, requiring that the executive summary of the EIS identify the environmentally preferable alternative (§ 1502.12);
- Removing some of the commenting burdens added by the 2020 regulations in § 1503.3, including removing language encouraging commenters to discuss economic and employment impacts, and removing ambiguity around requirements for agencies to respond to public comments in § 1503.4(a);
- Promoting the incorporation of mitigation measures that address or ameliorate significant adverse human health and environmental effects of proposed Federal actions that disproportionately and adversely affect communities with environmental justice concerns in § 1505.3(b); and

- Modernizing definitions in § 1508.1 to incorporate communities with environmental justice concerns, such as within the definitions of "effects" and "extraordinary circumstances" and adding a definition of "environmental justice."

CEQ does not anticipate that there would be any reasonably foreseeable environmental effects from these changes, but to the extent there are, such effects would be beneficial. The proposed changes would facilitate public engagement to ensure that agencies incorporate perspectives from communities regarding direct, indirect, and cumulative effects, including effects that may otherwise not be analyzed. In addition, these changes would result in better community outcomes by amplifying the voices of those who may be most impacted by the proposed Federal action and, because the proposed changes prioritize early public engagement, they may result in more efficient and effective decision making and reduce potential litigation risks.

D. *Proposed Changes to Update Structure and Consistency of NEPA Regulations*

CEQ proposes to improve the logical structure of the NEPA regulations, to ensure consistency among internal cross-references, and to make additional non-substantive changes. These changes would improve the readability and clarity of the regulations, which is likely to improve the efficiency of agency compliance with NEPA. These proposed changes include, among others:

- Restoring the purpose and policy sections in §§ 1500.1 and 1500.2 to reflect a structure similar to the long-standing purpose and policy sections in the 1978 regulations, and updating sections to be consistent with other regulatory changes, such as the inclusion of climate change and consideration of effects on communities with environmental justice concerns, throughout the regulations;
- Removing the comment exhaustion requirement in § 1500.3(b) to reduce burden on public commenters and making substantive changes to §§ 1503.1 and 1503.3 to conform with this change;
- Emphasizing the importance of public engagement in the NEPA process, including adding early engagement language in § 1501.1(b), moving the requirements for public engagement to part 1501 to highlight it as a core component of the NEPA process and agency planning, and updating and moving requirements for scoping in § 1502.4;
- Consolidating provisions on applicability of NEPA, consideration of scope, and determination of the level of NEPA review in one section in § 1501.3, along with restoring and updating of context and intensity factors for evaluating significant effects; and
- Consolidating provisions on programmatic environmental documents and tiering in § 1501.11.

CEQ does not anticipate that there would be any reasonably foreseeable environmental effects from changes that improve the structure of the regulations and provide for internal consistency. CEQ expects that organizing the regulations logically, consolidating related provisions, and ensuring internal conformity would improve efficiency in the NEPA process, in part by reducing agency and public confusion regarding regulatory provisions. This generally would lead to improved NEPA compliance and better-informed agency decision making.

7

E.    *Proposed Changes to Enhance Clarity in NEPA Regulations*

CEQ proposes to enhance the clarity of the NEPA regulations by more clearly articulating the intent of NEPA, identifying agency best practices, and providing certainty for agency roles and responsibilities. These changes would provide agencies and the public with a clear understanding of how to implement NEPA in a way that encourages the consideration of high-quality information, supports robust public engagement, and results in fully-informed and transparent federal decision-making. CEQ also proposes changes that would implement the FRA's amendments to NEPA. These changes include, among others:

- Clarifying that the purpose of the NEPA regulations is to advance the "letter and spirit" of NEPA and achieve the environmental and community benefits envisioned by Congress (§§ 1500.1 and 1500.3(a)) and removing the misleading emphasis that NEPA is simply a procedural statue (§ 1500.1);
- Ensuring that consideration of climate change and environmental justice are appropriately included throughout the regulations (e.g., §§ 1500.2(e), 1502.14(f), 1502.16(a), 1502.23, and 1508.1(g));
- Clearly describing and cross-referencing agency requirements for creating concise and informative environmental documents (§ 1500.4), including amending potentially confusing provisions from the 2020 regulations, and clarifying the limited conditions in which it may be impossible for agencies to comply with NEPA requirements (§ 1500.6);
- Highlighting the importance of early stakeholder engagement in describing the overarching purpose of the regulations (§ 1501.1);
- Striking the "functional equivalence" provision in § 1501.1(a)(6), consistent with the NEPA statute and case law;
- Clarifying the determination of scope and closely related activities or decisions in § 1501.3(b) as well as the appropriate level of NEPA review that must be prepared by an agency;
- Codifying best practices, such as for mitigated findings of no significant impact (§ 1501.6), programmatic environmental documents (§ 1501.11), and early interagency dispute resolution (§ 1504.2); and
- Adding language regarding flexibility and agency obligations when establishing CEs in § 1501.4, including traditional CEs consistent with § 1507.3, allowing agencies to establish CEs through programmatic or planning NEPA documents, and setting forth the process through which an agency can use another agency's CE.

CEQ does not anticipate that there would be any reasonably foreseeable environmental effects from these changes, but to the extent there are, such effects would be beneficial. CEQ expects that updating the regulatory language to reflect more accurately the requirements and policy objectives of NEPA will help agencies more effectively and efficiently carry out their obligations consistent with NEPA and has the potential to reduce litigation risk. These proposed changes would result in transparent agency decision making, concise and informative environmental documents, and better environmental outcomes.

AR_0000073

**V.    List of Agencies and Persons Consulted**

CEQ provided this special EA to Federal agencies as part of the Office of Management and Budget's Office of Information and Regulatory Affairs (OMB OIRA) interagency review process for significant rules under E.O. 12866, *Regulatory Planning and Review*, 58 FR 51735 (Oct. 4, 1993). CEQ is making this special EA available to the public and seeking comments through the NPRM process.

AR_0000074

distribution of environmental benefits and costs by encouraging agencies to prioritize public engagement and to consider environmental justice.

The proposed changes provide that agencies should prepare informative yet concise environmental documents, including to address climate risk and provide for better public engagement. These provisions may result in agencies conducting more public engagement and preparing more thorough analyses, which could result in additional costs. However, the long-term cost savings from sounder decisions, greater predictability in the decision-making process, and potentially avoided litigation may exceed these upfront costs. CEQ invites comment on the analyses it presents in this document and on this conclusion about the likely net benefits of finalizing the proposed changes.

CEQ considered several alternatives to the current proposed rule, including reverting back to the pre-2020 version of the regulations in their entirety and keeping the 2020 regulations. CEQ has considered these alternatives and concluded that the preferred alternative—making targeted changes to the 2020 regulations, including changes to reflect the FRA's amendments to NEPA—has the highest net benefits of the options considered.

## I.    Background

NEPA was signed into law in 1970 as a visionary national policy to promote environmental protection for present and future generations. NEPA requires Federal agencies to interpret and administer Federal policies, regulations, and laws in accordance with NEPA's policies and to appropriately consider environmental values in their decision making. Furthermore, NEPA seeks to promote efforts that will prevent or eliminate damage to the environment and stimulate the health and welfare of people, making it the continuing policy of the Federal Government to use all practicable means and measures to create and maintain conditions that reduce potential harms and enhance ecological, social, and economic well-being. As discussed above, the FRA amended NEPA on June 3, 2023, by modifying section 102 and adding new sections 106 through 111.

CEQ has issued numerous guidance documents over the past 50 years to assist Federal agencies in their implementation of NEPA and ensure efficiency and effectiveness in implementation. In 2020, CEQ undertook a wholesale revision of the regulations following the issuance of E.O. 13807, *Establishing Discipline and Accountability in the Environmental Review and Permitting Process for Infrastructure Projects*.[8] On January 20, 2021, President Biden issued E.O. 13990, which directed Federal agencies to review existing regulations issued between January 20, 2017, and January 20, 2021, for consistency with the policies set forth in the E.O. and to take appropriate action to remedy any inconsistencies.[9] E.O. 13990 also revoked E.O. 13807 and directed agencies to promptly take steps to rescind any rules or regulations implementing it. An accompanying White House fact sheet, published on January 20, 2021,

---

[8] E.O. 13807, *Establishing Discipline and Accountability in the Environmental Review and Permitting Process for Infrastructure Projects*, 82 FR 40463 (Aug. 24, 2017).
[9] E.O. 13990, *supra* note 1, sec. 2(a).

AR_0000077

period, and successive reports shall be due annually on the same date thereafter. Without limitation, Peloton acknowledges and agrees that failure to make such timely and accurate reports as required by this Agreement and Order may constitute a violation of Section 19(a)(3) of the CPSA and may subject the Firm to enforcement under section 22 of the CPSA.

36. Notwithstanding and in addition to the above, Peloton shall promptly provide written documentation of any changes or modifications to its compliance program or internal controls and procedures, including the effective dates of the changes or modifications thereto. Peloton shall cooperate fully and truthfully with staff and shall make available all non-privileged information and materials and personnel deemed necessary by staff to evaluate Peloton's compliance with the terms of the Agreement.

37. The parties acknowledge and agree that the Commission may publicize the terms of the Agreement and the Order.

38. Peloton represents that the Agreement:

   (i) is entered into freely and voluntarily, without any degree of duress or compulsion whatsoever;

   (ii) has been duly authorized; and

   (iii) constitutes the valid and binding obligation of Peloton, enforceable against Peloton in accordance with its terms. The individuals signing the Agreement on behalf of Peloton represent and warrant that they are duly authorized by Peloton to execute the Agreement.

39. The signatories represent that they are authorized to execute this Agreement.

40. The Agreement is governed by the laws of the United States.

41. The Agreement and the Order shall apply to, and be binding upon, Peloton and each of its parents, successors, transferees, and assigns; and a violation of the Agreement or Order may subject Peloton, and each of its parents, successors, transferees, and assigns, to appropriate legal action.

42. The Agreement, any attachments, and the Order constitute the complete agreement between the parties on the subject matter contained therein.

43. The Agreement may be used in interpreting the Order. Understandings, agreements, representations, or interpretations apart from those contained in the Agreement and the Order may not be used to vary or contradict their terms. For purposes of construction, the Agreement shall be deemed to have been drafted by both of the parties and shall not, therefore, be construed against any party, for that reason, in any subsequent dispute.

44. The Agreement may not be waived, amended, modified, or otherwise altered, except as in accordance with the provisions of 16 CFR 1118.20(h). The Agreement may be executed in counterparts.

45. If any provision of the Agreement or the Order is held to be illegal, invalid, or unenforceable under present or future laws effective during the terms of the Agreement and the Order, such provision shall be fully severable. The balance of the Agreement and the Order shall remain in full force and effect, unless the Commission and Peloton agree in writing that severing the provision materially affects the purpose of the Agreement and the Order.

(Signatures on next page)
PELOTON INTERACTIVE, INC.
Dated: 12/8/22
By: /s/Barry McCarthy
Barry McCarthy, Peloton Interactive, Inc., CEO & President

Dated: 12/9/2022
By: /s/Erin M. Bosman
Erin M. Bosman, Morrison Foerster LLP, Counsel to Peloton Interactive, Inc.

U.S. CONSUMER PRODUCT SAFETY COMMISSION
Mary B. Murphy, Director
Leah Ippolito, Supervisory Attorney
Michael J. Rogal, Trial Attorney

Dated: 12/14/22
By: /s/Michael J. Rogal
Michael J. Rogal, Trial Attorney, Division of Enforcement and Litigation, Office of Compliance and Field Operations

**United States of America Consumer Product Safety Commission**

*In the Matter of:* PELOTON INTERACTIVE, INC.

CPSC Docket No.: 23–C0001

**Order**

Upon consideration of the Settlement Agreement entered into between Peloton Interactive, Inc. ("Peloton"), and the U.S. Consumer Product Safety Commission ("Commission" or "CPSC"), and the Commission having jurisdiction over the subject matter and over Peloton, and it appearing that the Settlement Agreement and the Order are in the public interest, the Settlement Agreement is incorporated by reference and it is:

Provisionally accepted and provisional Order issued on the 28th day of December, 2022.

By Order of the Commission.
/s/Alberta Mills
Alberta E. Mills,

*Secretary, U.S. Consumer Product Safety Commission.*

[FR Doc. 2023–00146 Filed 1–6–23; 8:45 am]

**BILLING CODE 6355–01–P**

---

**COUNCIL ON ENVIRONMENTAL QUALITY**

**[CEQ–2022–0005]**

**RIN 0331–AA06**

**National Environmental Policy Act Guidance on Consideration of Greenhouse Gas Emissions and Climate Change**

**AGENCY:** Council on Environmental Quality.

**ACTION:** Notice of interim guidance; request for comments.

**SUMMARY:** The Council on Environmental Quality (CEQ) is issuing this interim guidance to assist agencies in analyzing greenhouse gas (GHG) and climate change effects of their proposed actions under the National Environmental Policy Act (NEPA). CEQ is issuing this guidance as interim guidance so that agencies may make use of it immediately while CEQ seeks public comment on the guidance. CEQ intends to either revise the guidance in response to public comments or finalize the interim guidance.

**DATES:** This interim guidance is effective immediately. CEQ invites interested persons to submit comments on or before March 10, 2023.

**ADDRESSES:** You may submit comments, identified by docket number CEQ–2022–0005, by any of the following methods:

• *Federal eRulemaking Portal: https://www.regulations.gov.* Follow the instructions for submitting comments.

• *Fax:* 202–456–6546.

• *Mail:* Council on Environmental Quality, 730 Jackson Place NW, Washington, DC 20503.

All submissions received must include the agency name, "Council on Environmental Quality," and the docket number, CEQ–2022–0005. All comments received will be posted without change to *https:// www.regulations.gov,* including any personal information provided. Do not submit electronically any information you consider to be private, Confidential Business Information (CBI), or other information, the disclosure of which is restricted by statute.

**FOR FURTHER INFORMATION CONTACT:** Jomar Maldonado, Director for NEPA, 202–395–5750 or *Jomar.MaldonadoVazquez@ceq.eop.gov.*

**PERMAFROST
PATHWAYS**

Connecting Science,
People, and Policy for Arctic
Justice and Global Climate

Woodwell Climate Research Center • Arctic Initiative at Harvard Kennedy School • Alaska Institute for Justice

*"Innovative Approaches" to address extreme challenges of "permafrost thaw" and "Usteq"*

Permafrost Pathways strongly welcomes the proposed inclusion of a new section on "innovative approaches" to maximize agency flexibility, creativity, and efficiency without losing the spirit or intent of NEPA. The need for this new section is widely apparent in Alaska, where current approaches to NEPA reviews fail to meaningfully consider the permafrost-carbon cycle and permafrost thaw—processes that drive global climate change and the displacement of Alaskan communities.

Permafrost (a layer of soil that has been continuously frozen for up to thousands of years) underlies roughly 38% of Alaska's land area.[5] As global temperatures rise, this once-frozen ground is thawing, releasing carbon and methane emissions at rates on par with the highest emitting countries.[6] Thawing permafrost also creates an increasingly unstable and dangerous landscape for Alaskan communities – contributing to the collapse of homes, schools, runways, roads, and public utilities. Studies report that permafrost thaw and other climate impacts may cause up to $5.5 billion in damage to critical infrastructure in Alaska by 2100.[7]

NEPA reviews for the most headline-grabbing "major federal actions" in Alaska, such as the construction of pipelines and authorization of mining operations, have included permafrost in hydrological assessments, but such NEPA analyses are narrowly drawn and do not recognize the complex interactions of permafrost thaw with other ecological processes.[8] Wildfires, flooding, and extreme weather events (such as typhoons) in areas underlain by permafrost further catalyze irreversible landscape changes, such as lake drainage and ground subsidence, that threaten local communities.

Innovative approaches will give agencies the flexibility to consider the impacts on whole ecosystems and interrelated processes, like "Usteq," the Yupik word for catastrophic ground collapse caused by thawing permafrost, flooding, and erosion).[9] Permafrost thaw and "Usteq" are extreme environmental challenges recognized at the state level but are underrepresented in existing federal frameworks, including those that delegate disaster response authority to FEMA under the Stafford Act.[10]

Accordingly, the list of extreme environmental challenges to which innovative approaches are available should explicitly include "permafrost thaw" and "Usteq" (in addition to "sea level rise; increased wildfire risk; bolstering the resilience of infrastructure to increased disaster risk from the effects of climate change; water scarcity; degraded water or air quality; species loss; disproportionate and adverse effects on communities with environmental justice concerns; imminent or reasonably foreseeable loss of historic, cultural, or tribal resources; and impaired ecosystem health.") (proposed at 40 C.F.R. § 1506.12).

[5] Neal J. Pastik et al., *Distribution of near-surface permafrost in Alaska: Estimates of present and future conditions* 168 Remote Sensing of Environ. 301, 301-315 (2015), https://doi.org/10.1016/j.rse.2015.07.019.
[6] *Mitigation Policy,* Permafrost Pathways, https://permafrost.woodwellclimate.org/mitigation-policy/
[7] April Melvin et al., *Climate change damages to Alaska public infrastructure and the economics of proactive adaptation* PNAS (2016),https://www.pnas.org/doi/10.1073/pnas.1611056113
[8] *See also* Statement of Michael D. Nedd Deputy Director, Operations Bureau of Land Management U.S. Department of the Interior to the House Committee on Natural Resources, Subcommittee on Energy and Mineral Resources ""Examining the Biden Administration's Mismanagement of the Federal Onshore Oil and Gas Program" (Sept. 19, 2023)(critiquing the sufficiency of NEPA analyses conducted in the Arctic region)
[9] Statewide Threat Assessment: Identification of Threats from Erosion, Flooding, Thawing Permafrost, and Usteq in Remote Alaska Communities (2019).
[10] *See Alaska Institute for Justice Letter to FEMA (July 25, 2023), https://downloads.regulations.gov/FEMA-2023-0009-0059/attachment_1.pdf*

2

# ♔ Columbia **Law School** | COLUMBIA CLIMATE SCHOOL
## SABIN CENTER FOR CLIMATE CHANGE LAW

September 28, 2023

Council on Environmental Quality
730 Jackson Place NW
Washington, DC 20503

Submitted Via *Regulations.gov*

Re: National Environmental Policy Act Implementing Regulations Revisions Phase 2
    (Docket Number CEQ-2023-0003)

To whom it may concern:

The Sabin Center for Climate Change Law (Sabin Center) at Columbia Law School submits these comments in response to the Notice of Proposed Rulemaking for the Phase 2 Revisions to the National Environmental Policy Act (NEPA) implementing regulations (Proposed Rule).[1]

The Sabin Center strongly supports adoption of the Proposed Rule, which contains numerous provisions aimed at enhancing the quality and transparency of federal environmental reviews. We commend the Council on Environmental Quality (CEQ) for including provisions that will help federal agencies comply with their legal obligations to account for climate change and greenhouse gas (GHG) emissions when conducting NEPA reviews. While the Proposed Rule contains many important and much needed reforms, we wish to highlight four key changes that are essential for sound decision-making in the context of climate change:

- **Consideration of global context:** The Proposed Rule directs agencies to consider the global context, in addition to national, regional, and local contexts, when evaluating environmental impacts.[2]  CEQ explicitly refers to fossil fuel extraction leases and pipeline approvals as

---

[1] National Environmental Policy Act Implementing Regulations Revisions Phase 2, 88 Fed. Reg. 49924 (July 31, 2023) [hereinafter "Proposed Rule"].
[2] *Id.* at 49965 (amending § 1501.3).

1

### E. Explicit Recognition of Indigenous Knowledge as High-Quality Information and Parity for Indigenous Knowledge-Holders

NCAI applauds CEQ's recognition of Indigenous Knowledge (IK). NCAI supports Tribal Nations engaging in "a co-production of knowledge approach for research conducted on, near, or about tribal lands, waters, air, and communities." NCAI also "encourages federal agencies and researchers to meaningfully partner with tribal nations on research, create opportunities for tribal nations to be funded for research, to ensure tribal nations benefit from the research, and support community driven research initiatives, including sharing funding and resources in partnerships with non-tribal researchers."[24]

We emphasize that NEPA, as amended by the FRA, supports IK in its statutory directive to "make use of reliable data and resources" and "initiate and utilize ecological information in the planning and development of resource-oriented projects."[25] The administration's IK Guidance plainly states that IK "is a valid form of evidence for inclusion in Federal policy, research and decision making" and that "Tribes and Indigenous Peoples hold relevant information and perspectives regarding the environment, and Indigenous Knowledge can inform Agencies' environmental analysis."[26] Indeed, we recommend even more robust inclusion in the final regulations, as follows.

*First*, CEQ inquired whether to include a definition of IK. This is a nuanced issue. We understand federal agencies, and the public they serve, benefit when complex concepts are explained in plain terms. But many definitions of IK and its permutations (such as Traditional Ecological Knowledge) exist in science, law, policy, and philosophy, formulated by Indigenous and non-Indigenous scholars alike.[27] There are some common themes involving knowledge accumulated over generations as an ongoing process, cultural context, and a multidimensional and relational nature. However, each Tribal Nation has its own IK; IK is not a single "school" advocating a certain methodological approach, nor is it a unitary archive of information. We are hesitant to recommend any definition supporting an artificial dichotomy or competition between "Western" and "Indigenous." Neither do we wish to promote faulty assumptions that "Western Science" is objective, neutral, and quantitative in comparison to IK, and that the two are fundamentally different. We therefore suggest CEQ undertake a thorough and sensitive process of consulting with Tribal

---

[24] NCAI Resolution No. PDX-20-044 (November 2020), https://ncai.org/resources/resolutions/supporting-tribal-communities-that-utilize-a-co-production-of-knowledge-approach-in-research-engagement.

[25] Fiscal Responsibility Act, 137 Stat. 39 §(a)(6)(E), amending National Environmental Policy Act of 1969, 42 U.S.C. §4332(E), https://www.congress.gov/118/plaws/publ5/PLAW-118publ5.pdf *and* National Environmental Policy Act, 42 U.S.C. §4332(K), https://www.govinfo.gov/content/pkg/COMPS-10352/pdf/COMPS-10352.pdf.

[26] White House IK Guidance, *supra* note 22, at 4, 6. Other nations already statutorily require consideration of Indigenous Knowledge as part of environmental review. *See, e.g.*, Impact Assessment Act (S.C. 2019, c. 28, s. 1) §§ 22 (1)(g), 28(3.1), https://laws.justice.gc.ca/eng/acts/i-2.75/index.html, *and* IMPACT ASSESSMENT AGENCY OF CANADA, GUIDANCE: INDIGENOUS KNOWLEDGE UNDER THE *IMPACT ASSESSMENT ACT*, CANADA 3.2.3 https://www.canada.ca/en/impact-assessment-agency/services/policy-guidance/practitioners-guide-impact-assessment-act/indigenous-knowledge-under-the-impact-assessment-act.html (last visited Sept. 21, 2023). *See also*, Sara Souther, et al., *Integrating traditional ecological knowledge into US Public land management: Knowledge gaps and research priorities*, 11 FRONT. ECOL. EVOL., 6, 7-8 (2023), https://www.frontiersin.org/articles/10.3389/fevo.2023.988126/full.

[27] *See, e.g.*, Seafha C. Ramos, *Understanding Yurok traditional ecological knowledge and wildlife management*, 86 J. WILDLIFE MGMNT. 1 (2021, https://par.nsf.gov/biblio/10316649-understanding-yurok-traditional-ecological-knowledge-wildlife-management ("The term TEK was coined in Western academia, not from Indigenous communities, and even within academia it has no universally accepted definition") (*internal citations removed*).

AR_0001757

NCAI Comments on the National Environmental Policy Act Implementing Regulations Revisions Phase 2

## Conclusion

NCAI sets out above several recommendations for modifying the proposed regulations. We make these suggestions not out of criticism. Rather, we make them from a place of optimism and appreciation for **CEQ's expressed commitment to realizing its and lead agencies' federal trust responsibility and advancing** a respectful and productive nation-to-nation relationship between the federal government and the sovereign Tribal Nations who have called Turtle Island home since time immemorial.

Respectfully,



Larry Wright, Jr. (Sep 28, 2023 22:24 CDT)

Larry Wright, Jr.
Executive Director
National Congress of American Indians

20

AR_0001771

populations with a greater proportion of minority groups and/or groups that present socioeconomic vulnerabilities.[6]

It is reasonable to believe that this term will continue to be used in the NEPA context. For example, this proposed rule, if finalized, would require agencies to consider whether a proposed project's disproportionate and adverse effects on communities with environmental justice concerns constitutes an "extraordinary circumstance" in which application of a categorical exclusion would be inappropriate[7], or consider alternatives and incorporate mitigation measures that address disproportionate burdens on these communities[8], among other uses.[9] CEQ, other federal agencies, and the public would benefit from having a shared understanding of characteristics of "communities with environmental justice concerns" to undertake these tasks.

We recommend a definition of "communities with environmental justice concerns" that acknowledges the legacy of racial discrimination, segregation, redlining, exclusionary zoning, and other discriminatory governmental decisions and practices which have resulted in the placement of polluting industries, hazardous waste sites, and environmental issues. These practices and patterns cause individual and cumulative impacts on the health of communities. Additionally, the definition should include aspects of community vulnerability especially as it relates to climate change, such as exposure to severe storms and heat waves without sufficient public and private resources to provide equal protection from impacts or equal opportunity for recovery. We urge CEQ to describe that "communities with environmental justice concerns" encompass significant proportions of people who have low incomes, adversely affected by persistent poverty, in geographic areas with low economic opportunity, underinvestment, or under-resourced. Finally, these communities could be self-identified places and people, not necessarily limited to jurisdictions or census definitions, that include significant proportions of Black, Indigenous, People of Color and could also include geographically dispersed and mobile populations, such as migrant farmworkers.[10]

III.     Environmental Justice Analysis (Proposed Section 1502.16(a)(14))

We support the clarification that future NEPA reviews should include an EJ analysis so that agencies discuss the potential for disproportionate and adverse health and environmental effects on communities with EJ concerns. Most NEPA reviews do not include a comprehensive EJ analysis and those that do provide one often do so as a checklist exercise.[11] Therefore, we urge CEQ to further address and incorporate requirements about the specific sub-topics the EJ analysis should cover.

We highlight two recommendations previously requested by the National Environmental Justice Advisory Council (NEJAC) on ways to improve EJ analysis in NEPA: (1) through the incorporation of

---

[6] Ana Isabel Baptista et al., *Defining Environmental Justice Communities for Environmental Justice Policies*, TISHMAN ENVIRONMENT AND DESIGN CENTER (Apr. 2021), https://ejstatebystate.org/wp-content/uploads/2023/06/ejsbs-ej-definitions-exec-summary.pdf.
[7] 88 Fed. Reg. 49924, 49961 (July 21, 2023).
[8] *Id.* at 49931 and 49954.
[9] *Id.* at 49972 (Public and governmental engagement requirements).
[10] *See, e.g.*, Exec. Order No. 14096, 88 Fed. Reg. 25,251 at 25,2551-52 (April 26, 2023).
[11] EPA National Environmental Justice Advisory Council, Letter to Administrator Wheeler regarding National Environmental Policy Act (NEPA) and Environmental Justice (Aug. 14, 2019), https://www.epa.gov/sites/default/files/2019-10/documents/nejac_letter_nepa.pdf.

3

Health Impact Assessments; and (2) by directly addressing concerns regarding compliance with Title VI of the Civil Rights Act of 1964 (Title VI).[12]

We urge CEQ to require Health Impact Assessments (HIAs) as part of the development of a thorough EJ analysis. Given that the NEPA process predicts various environmental impacts, the use of HIAs could strengthen analysis of these environmental impacts on human health. HIAs could also complement the cumulative impacts analysis, reinstated in Phase 1 rulemaking, and inform whether other alternatives or mitigation measures should be implemented to reduce the health burdens a project may impose on a community. CEQ should also recommend the inclusion of community health and public health experts on NEPA study teams.

As part of the EJ analysis, we further recommend that CEQ require agencies to specifically address Title VI concerns. Title VI prohibits recipients of federal financial assistance from discriminating based on race, color, or national origin.[13] Discrimination on the basis of national origin includes a lack of meaningful access for people with limited English proficiency.[14] As such, a holistic EJ analysis should describe any disparate impacts a proposed project could have on communities with environmental justice concerns and people with limited English proficiency.

In addition to the recommendations offered by the NEJAC, we also urge CEQ to include recommendations from the *Environmental Justice Guidance Under the National Environmental Policy Act*[15] in the proposed Phase II regulations themselves. We ask that CEQ specifically include the following recommendations: (1) Agencies should identify the composition of minority populations, low-income populations, and Tribal communities present in the area affected by the proposed action; (2) agencies should present "relevant public health data [] concerning the potential for multiple or cumulative exposure to human health or environmental hazards…"; and (3) agencies should factor the "…interrelated cultural, social, occupational, historical, or economic factors that many amplify the natural or physical environmental effects of the proposed agency action."[16]

We further ask that CEQ include additional recommendations from *Promising Practices for EJ Methodologies in NEPA Reviews* (2016).[17] We urge CEQ to issue guidance on how agencies should identify the study area of a proposed project, to prevent improperly limiting or obstructing the identification of communities with environmental justice concerns or other potential major federal projects or existing sources of pollution exposure. In particular, we note two specific actions for agencies to undertake in any future EJ analysis:

> 1. *"In order to provide a useful comparative context for the consideration of impacts to minority populations and low-income populations, when developing the baseline characterization of the affected environment agencies can be informed by considering for*

---

[12] *Id.* at 3.
[13] 42 U.S.C. § 2000d.
[14] *Lau v. Nichols*, 414 U.S. 563, 569 (1974).
[15] Council on Environmental Quality, *Environmental Justice Guidance Under the National Environmental Policy Act,* (Dec. 10, 1997), https://ceq.doe.gov/docs/ceq-regulations-and-guidance/regs/ej/justice.pdf.
[16] *Id*. at 9.
[17] EPA Federal Interagency Working Group on Environmental Justice & NEPA Committee, *Promising Practices for EJ Methodologies in NEPA Reviews*, (March 2016), https://www.epa.gov/sites/default/files/2016-08/documents/nepa_promising_practices_document_2016.pdf.

4

AR_0002905

       *each resource topic in the NEPA document: 1) exposure pathways; 2)*
       *direct, indirect, and cumulative ecological, aesthetic, historical,*
       *cultural, economic, social or health impacts; and 3) distribution of*
       *any potential beneficial or adverse impacts. Agencies may also be*
       *informed by consideration of multiple exposures."*[18]

2.   *"Agencies may wish to consider data and information from a variety*
       *of sources, including, but not limited to" 1) community residents and*
       *other interested individuals and organizations; 2) data sets from*
       *federal, state, local, and tribal governments; 3) peer-reviewed and*
       *other scientific literature; and 4) articles in industry and*
       *professional journals, popular press, websites, etc.."*[19]

With these specific recommendations in mind, we urge CEQ to further address and incorporate requirements to ensure that future EJ analyses provide a complete picture and reflect the on-the-ground experiences of EJ communities so agencies are better able to define, shape, and/or mitigate the impacts of proposed projects.

IV.    Economic or Social Effects Analysis (Proposed Section 1502.16(b))

We commend proposed revisions that clarify a requirement to analyze economic and social effects when an agency determines that these impacts interrelate with natural or physical environmental effects.[20] We urge CEQ to include language for specific analyses of housing affordability, availability, and quality. While NEPA documents usually provide data on the number of housing units, the distribution of housing units in the study area, and vacancy rates, there is no requirement for agencies to analyze the impacts of housing loss or displacement. Such analysis falls within the intended purpose and functions declared in the Act, including to "attain the widest range of beneficial uses of the environment without degradation, *risk to health and safety*, or other *undesirable and unintended consequences*."[21] (*emphasis added*) This analysis should also discuss an agency's compliance with the Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970 to ensure that project displacees do not suffer disproportionate injury as a result of projects.[22]

One scenario where such housing analysis is critical is in the construction and expansion of highways, which often result in direct mass displacement and/or housing safety and quality issues.[23]  For example, homes in Elba, Alabama's historic Black community have seen major flooding and sewage overflow ever since the Alabama Department of Transportation completed a lane widening project of Highway 84 in 2018.[24] The flooding has caused a house's foundation to slowly sink in, leading to concerns that it could

---

[18] *Id.* at 16.

[19] *Id.*

[20] 88 Fed. Reg. at 49,950.

[21] National Environmental Policy Act of 1969 §101(b)(3), 42 U.S.C. § 4321.

[22] Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970, 42 U.S.C. §§4601-4655 *et seq.*

[23] Liam Dillon and Ben Poston, *Freeways Force Out Residents in Communities of Color—Again,* LOS ANGELES TIMES (Nov. 11, 2021),
https://www.latimes.com/projects/us-freeway-highway-expansion-black-latino-communities/.

[24] Kristoffer Tigue, *Plagued by Floods and Kept in the Dark, a Black Alabama Community Turns to a Hometown Hero for Help*, INSIDE CLIMATE NEWS (July 28, 2023),
https://insideclimatenews.org/news/28072023/elba-alabama-flooding-environmental-justice-robert-bullard/.

AR_0002906



Institute *for*
## Policy Integrity
NEW YORK UNIVERSITY SCHOOL OF LAW

September 29, 2023

**To:**             Council on Environmental Quality

**Subject:**       National Environmental Policy Act Implementing Regulations Revisions
                   Phase 2, 88 Fed. Reg. 49924 (CEQ–2023–0003) (proposed July 31, 2023)

The Institute for Policy Integrity at New York University School of Law (Policy Integrity)[1]
respectfully submits the following comments to the Council on Environmental Quality (CEQ)
regarding the proposed National Environmental Policy Act implementing regulations (Proposed
Rule).[2] Policy Integrity is a non-partisan think tank dedicated to improving the quality of
government decisionmaking through advocacy and scholarship in the fields of administrative
law, economics, and public policy.

The Proposed Rule reflects a more holistic approach to informing agency decisions with a robust
and balanced analysis of environmental impacts. Notably, this approach includes impacts on
climate change and environmental justice, which are both frequently and unjustifiably
overlooked in federal permitting decisions. CEQ can and should improve upon its proposal in
several key ways that will help ensure the robust and balanced treatment of environmental
impacts in reviews conducted under the National Environmental Policy Act (NEPA).
Specifically, this comment offers the following insights and recommendations:

- **The Proposed Rule's treatment of climate change, environmental justice,
  transboundary impacts, and alternatives is consistent with judicial and
  regulatory precedent** and represents a sensible approach to ensuring that agencies
  robustly assess key environmental impacts under NEPA.

- **CEQ should incorporate certain general principles from its recent greenhouse
  gas guidance[3] into the NEPA implementing regulations**—namely, the importance
  of quantifying and contextualizing environmental effects.

- CEQ should amend § 1502.22 of the NEPA implementing regulations to recognize
  that **cost-benefit analysis can be useful and appropriate even when some benefits
  or costs are unmonetized**.

- CEQ should amend §§ 1502.21 and 1502.23 to **more clearly specify that the
  standards for scientific accuracy and incomplete information apply to
  environmental assessments.**

---

[1] This document does not purport to present the views, if any, of New York University School of Law.
[2] National Environmental Policy Act Implementing Regulations Revisions Phase 2, 88 Fed. Reg. 49,924 (CEQ–
2023–0003) (proposed July 31, 2023) (hereinafter Proposed Rule).
[3] National Environmental Policy Act Guidance on Consideration of Greenhouse Gas Emissions and Climate
Change, 88 Fed. Reg. 1196 (Jan. 9, 2023) (hereinafter Interim Guidance).

jurisdiction of any nation," "the environment of a foreign nation," and "natural or ecological resources of global importance."[21] And in 1997, CEQ issued guidance recognizing that "NEPA requires agencies to include analysis of reasonably foreseeable transboundary effects."[22]

Some court decisions affirm that NEPA does not permit agencies to ignore the environmental impacts of covered actions that occur outside domestic borders. Most notably, in *Massey v. Environmental Defense Fund*, the D.C. Circuit held that NEPA required the National Science Foundation to consider environmental impacts before proceeding with plans to incinerate food waste in Antarctica, rejecting the agency's argument that such effects fall outside NEPA's purview due to the presumption against extraterritoriality.[23] The court found that "Congress, when enacting NEPA, was concerned with worldwide as well as domestic problems facing the environment."[24] Numerous other courts have followed the D.C. Circuit's lead in concluding that NEPA requires analysis of transboundary effects.[25]

To be sure, some courts have suggested that the question merits a case-by-case inquiry,[26] and case law on the issue is not entirely consistent.[27] Nonetheless, in light of the precedents above, it is widely established that, at a minimum, NEPA permits (if not requires) agencies to consider reasonably foreseeable transboundary effects.

### C. Environmental Justice

There is also extensive precedent dating back nearly thirty years for considering environmental justice impacts under NEPA. Once again, it is clearly established that agencies may consider environmental justice under NEPA—and a strong argument that, in at least many circumstances, they must do so.

Executive Order 12,898, issued in 1994, calls on "each federal agency" to "make achieving environmental justice part of its mission by identifying and addressing, as appropriate, disproportionately high and adverse human health or environmental effects of its programs, policies, and activities on minority populations and low-income populations."[28] A concurrent presidential memorandum specifically called upon each agency to analyze impacts on environmental justice under NEPA "whenever feasible."[29] Since 1997, CEQ guidance has "further assist[ed] Federal agencies with their NEPA procedures so that environmental justice concerns are effectively identified and addressed."[30]

---

[21] Exec. Order No 12,114 § 2-3, 44 Fed. Reg. 1957, 1957–58 (Jan. 9, 1979).

[22] Council on Env't Quality, Guidance on NEPA Analyses for Transboundary Impacts (July 1, 1997).

[23] Env't Def. Fund, Inc. v. Massey, 986 F.2d 528, 533 (D.C. Cir. 1993).

[24] *Id.* at 536.

[25] *E.g.*, Gov't of Man. v. Salazar, 691 F. Supp. 2d 37, 51 (D.D.C. 2010); Backcountry Against Dumps v. U. S. Dep't of Energy, No. 3:12-cv-03062-L-JLB, 2017 WL 3712487, at *3 (S.D. Cal. Aug. 29, 2017).

[26] *E.g.*, Greenpeace USA v. Stone, 748 F. Supp. 749, 759 (D. Haw. 1990) ("Congress intended to encourage federal agencies to consider the global impact of domestic actions and may have intended under certain circumstances for NEPA to apply extraterritorially.").

[27] *See* Mayaguezanos por la Salud y el Ambiente v. United States, 198 F.3d 297, 301 n.8 (1st Cir. 1999) (collecting case law going both directions); Hirt v. Richardson, 127 F. Supp. 2d 833, 844 (W.D. Mich. 1999) (same); Jeffrey E. Gonzalez-Perez & Douglas A. Klein, The International Reach of the Environmental Impact Statement Requirement of the National Environmental Policy Act, 62 Geo. Wash. L. Rev. 757, 760 (1994) ("There is no consensus about whether NEPA applies extraterritorially.").

[28] Exec. Order No. 12,898 § 1-101, 59 Fed. Reg. 7629, 7629 (Feb. 16, 1994).

[29] Memorandum on Environmental Justice, 30 Weekly Comp. Pres. Doc. 279, 280 (Feb. 11, 1994).

[30] CEQ, Environmental Justice Guidance Under the National Environmental Policy Act 1 (Dec. 10, 1997).

AR_0002920

**LCLAA**
LABOR COUNCIL FOR LATIN AMERICAN ADVANCEMENT

815 Black Lives Matter Plaza NW, 2nd. floor Washington DC 20006

**NATIONAL EXECUTIVE OFFICERS**

**Evelyn Dejesus, AFT**
National President

**Xochitl Cobarruvias, USW**
Executive Vice-President

**Sergio Rascon, LiUNA**
Secretary-Treasurer

**VICE PRESIDENTS**
Gary Allen, IAM
Victor Bonilla, AFT
Robert Martinez, IAM
Luciano Padilla, BAC
Johnny Rodriguez, UFCW
Jorge Rodriguez, UAW

**EXECUTIVE BOARD MEMBERS**
Gisela Alvarez, TWU
Benjamin Borges, AFSCME
Vanessa Caballero, AFSCME
Noel Candelaria, NEA
Laura Castillo, NEA
Raymond Carlos Carrillo, UMWA
Dora Cervantes, IAM
Kathy Chavez, AFT
Oscar de la Torre, LIUNA
Angel Del Rivero, IUOE
Juan Fernandez, AFSCME
Mark Gallegos, UA
Sabrina Hernandez, IBEW
Rocio Inclan, NEA
Desiree Lopez, UAW
Jose Lopez, IUPAT
Gabriel Medina, APWU
Jose Melara, UAW
Cesar Moreno Perez, AFT
Jose Luis Pavon, SEIU
Rosalba Perez, UFCW
Juan Ramirez, AFT
Jessica Rios Viner, USW
Ismael Rivera, ATU
Victor Rivera, SEIU
Martin Rosas, UFCW
Monica Lee Silbas, IAM
Valerie Soto, UAW
Jose Torres Cruz, TWU
Lupe Valles, OPEIU
Sonia Vasquez-Luna, LIUNA
Esteban Vera, LIUNA

**REGIONAL REPRESENTATIVES**
Carlos Pelayo, Western Region
Francisco Martinez, Central Region
Anthony Garcia, Eastern Region
Vacant, Mountain Region

September 29, 2023

The President
The White House
1600 Pennsylvania Avenue, NW
Washington D.C. 20500

Dear Mr. President:

On behalf of the Labor Council for Latin American Advancement (LCLAA), home of the Latino labor movement, we write to strongly support the White House Council on Environmental Quality's (CEQ) effort to update the National Environmental Policy Act's (NEPA) implementing regulations. NEPA provides Latino communities a voice in some of the most consequential government decisions, impacting where we work, how we work, the rights and safeguards we have on the job, and even the health and well-being of our families. As Latino workers, we play a major role in building and maintaining our nation's transportation and energy infrastructure, the same infrastructure that allows our country to prosper. In many instances, Latino workers and working families bear the brunt of federal projects, making our communities most vulnerable to rushed or ill planned decisions.

We represent the interests of over 2 million labor unionists, with 50 chapters across the United States. Our members include some of the most prominent unions in the country, including the United Automobile Workers (UAW), the United Steel Workers (USW), the Amalgamated Transit Union (ATU), the ServicesEmployees International Union (SEIU), and the Office and Professional Employees International Union (OPEIU) amongst many others. We recognize that our country is in dire need of job-creating infrastructure investment. As the Biden Administration begins the largest infrastructure build-out since the New Deal to transition our economy to clean energy, these investments must be structured in ways that create good-paying union jobs while adhering to strong environmental and health standards. c. This
can only happen through a robust and thorough NEPA process.



AR_0003029

# Environmental Justice

## Guidance Under the
## National Environmental Policy Act



**Council on Environmental Quality**

AR_0006132

Front cover photograph of John Heinz National Wildlife Refuge at Tinicum by John and Karen Hollingsworth

Front cover photograph of school bus and children by Sam Kittner.

AR_0006133

# *ENVIRONMENTAL JUSTICE*
## *Guidance Under the*
## *National Environmental Policy Act*



**Council on Environmental Quality**
**Executive Office of the President**
**Old Executive Office Building, Room 360**
**Washington, D.C. 20502**
**(202)395-5750**
**http://www.whitehouse.gov/CEQ/**
**December 10, 1997**

AR_0006135

# Table of Contents

I. Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II. Executive Order 12898 and the Presidential Memorandum . . . . . . . . . 3

III. Executive Order 12898 and NEPA . . . . . . . . . . . . . . . . . . . . . . . 7

   A. *NEPA Generally* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

   B. *Principles for Considering Environmental Justice under NEPA* . . . . . . . . . . 8
     1. General Principles . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
     2. Additional Considerations . . . . . . . . . . . . . . . . . . . . . . . . . 9

   C. *Considering Environmental Justice in Specific Phases of the NEPA Process* 10
     1. Scoping . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
     2. Public Participation . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
     3. Determining the Affected Environment . . . . . . . . . . . . . . . . . . 14
     4. Analysis . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
     5. Alternatives . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
     6. Record of Decision . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
     7. Mitigation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

   D. *Where No EIS or EA is Prepared* . . . . . . . . . . . . . . . . . . . . . . .16

IV. Regulatory Changes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

V. Effect of this Guidance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

Appendix: *Guidance for Agencies on Key Terms in Executive Order 12898* . 23

AR_0006137

# I.

# Introduction

Executive Order 12898, "Federal Actions to Address Environmental Justice in Minority Populations and Low-Income Populations,"[1] provides that "each Federal agency shall make achieving environmental justice part of its mission by identifying and addressing, as appropriate, disproportionately high and adverse human health or environmental effects of its programs, policies, and activities on minority populations and low-income populations." The Executive Order makes clear that its provisions apply fully to programs involving Native Americans.

In the memorandum to heads of departments and agencies that accompanied Executive Order 12898, the President specifically recognized the importance of procedures under the National Environmental Policy Act (NEPA)[2] for identifying and addressing environmental justice concerns. The memorandum states that "each Federal agency shall analyze the environmental effects, including human health, economic and social effects, of Federal actions, including effects on minority communities and low-income communities, when such analysis is required by [NEPA]." The memorandum particularly emphasizes the importance of NEPA's public participation process, directing that "each Federal agency shall provide opportunities for community input in the NEPA process." Agencies are further directed to "identify potential effects and mitigation measures in consultation with affected communities, and improve the accessibility of meetings, crucial documents, and notices."

The Council on Environmental Quality (CEQ) has oversight of the Federal government's compliance with Executive Order 12898 and NEPA.[3] CEQ, in consultation with EPA and other affected agencies, has developed this guidance to further assist Federal agencies with their NEPA procedures so that environmental justice concerns are effectively identified and addressed. To the extent practicable and permitted by law, agencies may supplement this guidance with more specific procedures tailored to particular programs or activities of an individual department, agency, or office.

---

[1]  59 Fed. Reg. 7629 (1994).

[2]  42 U.S.C. §4321 et seq.

[3]  Certain oversight functions in the Executive Order are delegated to the Deputy Assistant to the President for Environmental Policy. Following the merger of the White House Office on Environmental Policy with CEQ, the Chair of CEQ assumed those functions. The Environmental Protection Agency (EPA) has lead responsibility for implementation of the Executive Order as Chair of the Interagency Working Group (IWG) on Environmental Justice.

1

# II.

## Executive Order 12898 and the Presidential Memorandum

In addition to the general directive in Executive Order 12898 that each agency identify and address, as appropriate, "disproportionately high and adverse human health or environmental effects of its programs, policies, and activities on minority populations and low-income populations,"[4] there are several provisions of the Executive Order and a number of supporting documents to which agencies should refer when identifying and addressing environmental justice concerns in the NEPA process.

First, the Executive Order itself contains particular emphasis on four issues that are pertinent to the NEPA process:

● The Executive Order requires the development of agency-specific environmental justice strategies.[5] Thus, agencies have developed and should periodically revise their strategies providing guidance concerning the types of programs, policies, and activities that may, or historically have, raised environmental justice concerns at the particular agency. These guidances may suggest possible approaches to addressing such concerns in the agency's NEPA analyses, as appropriate.

● The Executive Order recognizes the importance of research, data collection, and analysis, particularly with respect to multiple and cumulative exposures to environmental hazards for low-income populations, minority populations, and Indian tribes.[6] Thus, data on these exposure issues should be incorporated into NEPA analyses as appropriate.[7]

● The Executive Order provides for agencies to collect, maintain, and analyze information on patterns of subsistence consumption of fish, vegetation, or wildlife.[8] Where an agency action may affect fish, vegetation, or wildlife, that agency action may

---

[4] Executive Order No. 12898, 59 Fed. Reg. at 7630 (Section 1-101).

[5] *Id.* at 7630 (Section 1-103).

[6] *Id.* at 7631 (Section 3-3).

[7] For further information on considering cumulative effects, see Considering Cumulative Effects Under The National Environmental Policy Act (Council on Environmental Quality, Executive Office of the President, Jan. 1997)

[8] *Id.* at 7631 (Section 4-401).

AR_0006140

also affect subsistence patterns of consumption and indicate the potential for disproportionately high and adverse human health or environmental effects on low-income populations, minority populations, and Indian tribes.

- The Executive Order requires agencies to work to ensure effective public participation and access to information.[9] Thus, within its NEPA process and through other appropriate mechanisms, each Federal agency shall, "wherever practicable and appropriate, translate crucial public documents, notices and hearings, relating to human health or the environment for limited English speaking populations." In addition, each agency should work to "ensure that public documents, notices, and hearings relating to human health or the environment are concise, understandable, and readily accessible to the public."[10]

Second, the memorandum accompanying the Executive Order identifies four important ways to consider environmental justice under NEPA.

- Each Federal agency should analyze the environmental effects, including human health, economic, and social effects of Federal actions, including effects on minority populations, low-income populations, and Indian tribes, when such analysis is required by NEPA.[11]

- Mitigation measures identified as part of an environmental assessment (EA), a finding of no significant impact (FONSI), an environmental impact statement (EIS), or a record of decision (ROD), should, whenever feasible, address significant and adverse environmental effects of proposed federal actions on minority populations, low-income populations, and Indian tribes.[12]

- Each Federal agency must provide opportunities for effective community participation in the NEPA process, including identifying potential effects and mitigation measures in consultation with affected communities and improving the accessibility of public meetings, crucial documents, and notices.[13]

- Review of NEPA compliance (such as EPA's review under § 309 of the Clean Air Act)

---

[9] *Id.* at 7632 (Section 5-5).

[10] *Id.* at 7632 (Section 5-5).

[11] Memorandum from the President to the Heads of Departments and Agencies. Comprehensive Presidential Documents No. 279. (Feb. 11, 1994).

[12] *Id.*

[13] *Id.*

4

must ensure that the lead agency preparing NEPA analyses and documentation has appropriately analyzed environmental effects on minority populations, low-income populations, or Indian tribes, including human health, social, and economic effects.[14]

Third, the Interagency Working Group (IWG), established by the Executive Order to implement the order's requirements, has developed guidance on key terms in the Executive Order. The guidance, reproduced as Appendix A, reflects a general consensus based on Federal agencies' experience and understanding of the issues presented. Agencies should apply the guidance with flexibility, and may consider its terms a point of departure rather than conclusive direction in applying the terms of the Executive Order.

---

[14] *Id.*

**5**

AR_0006143

# III.

## Executive Order 12898 and NEPA

### A. *NEPA Generally*

NEPA's fundamental policy is to "encourage productive and enjoyable harmony between man and his environment."[15] In the statute, Congress "recognizes that each person should enjoy a healthful environment and that each person has a responsibility to contribute to the preservation and enhancement of the environment."[16] The following goals, set forth in NEPA, make clear that attainment of environmental justice is wholly consistent with the purposes and policies of NEPA[17]:

- to "assure for all Americans safe, healthful, productive, and aesthetically and culturally pleasing surroundings"[18];

- to "attain the widest range of beneficial uses of the environment without degradation, risk to health or safety, or other undesirable and unintended consequences";[19]

- to "preserve important historic, cultural, and natural aspects of our natural heritage, and maintain, wherever possible, an environment which supports diversity and variety of individual choice"[20]; and

- to "achieve a balance between population and resource use which will permit high standards of living and a wide sharing of life's amenities."[21]

These goals are promoted through the requirement that all agencies of the Federal government shall include in every recommendation or report on proposals for legislation and other

---

[15]  42 U.S.C. § 4321.

[16]  42 U.S.C. § 4331(c).

[17]  42 U.S.C. § 4331(b).

[18]  42 U.S.C. § 4331(b)(2).

[19]  42 U.S.C. § 4331(b)(3).

[20]  42 U.S.C. § 4331(b)(4).

[21]  42 U.S.C. § 4331(b)(5).

AR_0006144

major Federal actions significantly affecting the quality of the human environment, a "detailed statement by the responsible official" on: the environmental impacts of the proposed action; adverse environmental effects that cannot be avoided should the proposal be implemented; alternatives to the proposed action; the relationship between local, short-term uses of man's environment and long-term productivity; and any irreversible or irretrievable commitments of resources involved in the proposed action itself.[22]

Preparation of an EA may precede preparation of an EIS, to determine whether a proposed action may "significantly affect" the quality of the human environment. The EA either will support a finding of no significant impact (FONSI), or will document the need for an EIS. Agency procedure at each step of this process should be guided by the agency's own NEPA regulations and by the CEQ regulations found at 40 C.F.R. Parts 1500-1508.

## B. Principles for Considering Environmental Justice under NEPA

Environmental justice issues may arise at any step of the NEPA process and agencies should consider these issues at each and every step of the process, as appropriate. Environmental justice issues encompass a broad range of impacts covered by NEPA, including impacts on the natural or physical environment and interrelated social, cultural and economic effects.[23] In preparing an EIS or an EA, agencies must consider both impacts on the natural or physical environment and related social, cultural, and economic impacts.[24] Environmental justice concerns may arise from impacts on the natural and physical environment, such as human health or ecological impacts on minority populations, low-income populations, and Indian tribes, or from related social or economic impacts.

### 1. General Principles

Agencies should recognize that the question of whether agency action raises environmental justice issues is highly sensitive to the history or circumstances of a particular community or population, the particular type of environmental or human health impact, and the nature of the proposed action itself. There is not a standard formula for how environmental justice issues should be identified or addressed. However, the following six principles provide general guidance.

---

[22]    42 U.S.C. § 4332(c).

[23]    The CEQ implementing regulations define "effects" or "impacts" to include "ecological...aesthetic, historic, cultural, economic, social or health, whether direct, indirect or cumulative." 40 C.F.R. 1508.8.

[24] 40 C.F.R. 1508.14.

**8**

- Agencies should consider the composition of the affected area, to determine whether minority populations, low-income populations, or Indian tribes are present in the area affected by the proposed action, and if so whether there may be disproportionately high and adverse human health or environmental effects on minority populations, low-income populations, or Indian tribes.

- Agencies should consider relevant public health data and industry data concerning the potential for multiple or cumulative exposure to human health or environmental hazards in the affected population and historical patterns of exposure to environmental hazards, to the extent such information is reasonably available. For example, data may suggest there are disproportionately high and adverse human health or environmental effects on a minority population, low-income population, or Indian tribe from the agency action. Agencies should consider these multiple, or cumulative effects, even if certain effects are not within the control or subject to the discretion of the agency proposing the action.

- Agencies should recognize the interrelated cultural, social, occupational, historical, or economic factors that may amplify the natural and physical environmental effects of the proposed agency action. These factors should include the physical sensitivity of the community or population to particular impacts; the effect of any disruption on the community structure  associated with the proposed action; and the nature and degree of impact on the physical and social structure of the community.

- Agencies should develop effective public participation strategies. Agencies should, as appropriate, acknowledge and seek to overcome linguistic, cultural, institutional, geographic, and other barriers to meaningful participation, and should incorporate active outreach to affected groups.

- Agencies should assure meaningful community representation in the process. Agencies should be aware of the diverse constituencies within any particular community when they seek community representation and should endeavor to have complete representation of the community as a whole. Agencies also should be aware that community participation must occur as early as possible if it is to be meaningful.

- Agencies should seek tribal representation in the process in a manner that is consistent with the government-to-government relationship between the United States and tribal governments, the federal government's trust responsibility to federally-recognized tribes, and any treaty rights.

## 2. Additional Considerations

The preceding principles must be applied in light of these further considerations that are

9

pertinent to any analysis of environmental justice under NEPA.

● The Executive Order does not change the prevailing legal thresholds and statutory interpretations under NEPA and existing case law.  For example, for an EIS to be required, there must be a sufficient impact on the physical or natural environment to be "significant" within the meaning of NEPA.  Agency consideration of impacts on low-income populations,  minority populations, or Indian tribes  may lead to the identification of disproportionately high and adverse human health or environmental effects that are significant and that otherwise would be overlooked.[25]

● Under NEPA, the identification of a disproportionately high  and adverse human health or environmental effect on a low-income population,  minority population, or Indian tribe does not preclude a proposed agency action from going forward, nor does it necessarily compel a conclusion that a proposed action is environmentally unsatisfactory.  Rather, the identification of such an effect should heighten agency attention to alternatives (including alternative sites), mitigation strategies, monitoring needs, and preferences expressed by the affected community or population.

● Neither the Executive Order nor this guidance prescribes any specific format for examining environmental justice, such as designating a specific chapter or section in an EIS or EA on environmental justice issues.   Agencies should integrate analyses of environmental justice concerns in an appropriate manner so as to be clear, concise, and comprehensible within the general format suggested by 40 C.F.R. § 1502.10.

## C.  *Considering Environmental Justice in Specific Phases of the NEPA Process*

While appropriate consideration of environmental justice issues is highly dependent upon the particular facts and circumstances of the proposed action, the affected environment, and the affected populations, there are opportunities and strategies that are useful at particular stages of the NEPA process.

### 1.  Scoping

During the scoping process, an agency should preliminarily determine whether

---

[25]  Title VI of the Civil Rights Act of 1964, U.S.C. 2000d *et seq.*, and agency implementing regulations, prohibit recipients of federal financial assistance from taking actions that discriminate on the basis of race, sex, color, national origin, or religion.  If an agency is aware that a recipient of federal funds may be taking action that is causing a racially discriminatory impact, the agency should consider using Title VI as a means to prevent or eliminate that discrimination.

an area potentially affected by a proposed agency action may include low-income populations, minority populations, or Indian tribes, and seek input accordingly. When the scoping process is used to develop an EIS or EA, an agency should seek input from low income populations, minority populations, or Indian tribes as early in the process as information becomes available.[26] Any such determination, as well as the basis for the determination, should be more substantively addressed in the appropriate NEPA documents and communicated as appropriate during the NEPA process.

If an agency identifies any potentially affected minority populations, low-income populations, or Indian tribes, the agency should develop a strategy for effective public involvement in the agency's determination of the scope of the NEPA analysis. Customary agency practices for notifying the public of a proposed action and subsequent scoping and public events may be enhanced through better use of local resources, community and other nongovernmental organizations, and locally targeted media.

---

**Agencies should consider enhancing their outreach through the following means:**

- Religious organizations (e.g., churches, temples, ministerial associations);

- Newspapers, radio and other media, particularly media targeted to low-income populations, minority populations, or Indian tribes;

- Civic associations;

- Minority business associations;

- Environmental and environmental justice organizations;

- Legal aid providers;

- Homeowners', tenants', and neighborhood watch groups;

- Federal, state, local, and tribal governments;

- Rural cooperatives;

- Business and trade organizations;

- Community and social service organizations;

- Universities, colleges, vocational and other schools;

- Labor organizations;

- Civil rights organizations;

- Local schools and libraries;

- Senior citizens' groups;

- Public health agencies and clinics; and

- The Internet and other electronic media.

---

[26] For more information on scoping, see Memorandum from Nicolas C. Yost, Scoping Guidance (Council on Environmental Quality, Executive Office of the President, April 30, 1981).

**11**

AR_0006148

The participation of diverse groups in the scoping process is necessary for full consideration of the potential environmental impacts of a proposed agency action and any alternatives. By discussing and informing the public of the emerging issues related to the proposed action, agencies may reduce misunderstandings, build cooperative working relationships, educate the public and decisionmakers, and avoid potential conflicts. Agencies should recognize that the identity of the relevant "public" may evolve during the process and may include different constituencies or groups of individuals at different stages of the NEPA process. This may also be the appropriate juncture to begin government-to-government consultation with affected Indian tribes and to seek their participation as cooperating agencies. For this participation to be meaningful, the public should have access to enough information so that it is well informed and can provide constructive input.

---

**The following information may help inform the public during the scoping process:**

- A description of the proposed action;

- An outline of the anticipated schedule for completing the NEPA process, with key milestones;

- An initial list of alternatives (including alternative sites, if possible) and potential impacts;

- An initial list of other existing or proposed actions, Federal and non-Federal, that may have cumulative impacts;

- Maps, drawings, and any other appropriate material or references;

- An agency point of contact;

- Timely notice of locations where comments will be received or public meetings held;

- Any telephone number or locations where further information can be obtained;

- Examples of past public comments on similar agency actions.

---

Thorough scoping is the foundation for the analytical process and provides an early opportunity for the public to participate in the design of alternatives for achieving the goals and objectives of the proposed agency action.

**12**

## 2. Public Participation

Early and meaningful public participation in the federal agency decision making process is a paramount goal of NEPA. CEQ's regulations require agencies to make diligent efforts to involve the public throughout the NEPA process. Participation of low-income populations, minority populations, or tribal populations may require adaptive or innovative approaches to overcome linguistic, institutional, cultural, economic, historical, or other potential barriers to effective participation in the decision-making processes of Federal agencies under customary NEPA procedures. These barriers may range from agency failure to provide translation of documents to the scheduling of meetings at times and in places that are not convenient to working families.

---

**The following steps may be considered, as appropriate, in developing an innovative strategy for effective public participation:**

- Coordination with individuals, institutions, or organizations in the affected community to educate the public about potential health and environmental impacts and enhance public involvement;

- Translation of major documents (or summaries thereof), provision of translators at meetings, or other efforts as appropriate to ensure that limited-English speakers potentially affected by a proposed action have an understanding of the proposed action and its potential impacts;

- Provision of opportunities for limited-English speaking members of the affected public to provide comments throughout the NEPA process;

- Provision of opportunities for public participation through means other than written communication, such as personal interviews or use of audio or video recording devices to capture oral comments;

- Use of periodic newsletters or summaries to provide updates on the NEPA process to keep the public informed;

- Use of different meeting sizes or formats, or variation on the type and number of media used, so that communications are tailored to the particular community or population;

- Circulation or creation of specialized materials that reflect the concerns and sensitivities of particular populations such as information about risks specific to subsistence consumers of fish, vegetation, or wildlife;

- Use of locations and facilities that are local, convenient, and accessible to the disabled, low-income and minority communities, and Indian tribes; and

- Assistance to hearing-impaired or sight-impaired individuals.

---

13

AR_0006150

### 3. Determining the Affected Environment

In order to determine whether a proposed action is likely to have disproportionately high and adverse human health or environmental effects on low-income populations, minority populations, or Indian tribes, agencies should identify a geographic scale for which they will obtain demographic information on the potential impact area. Agencies may use demographic data available from the Bureau of the Census (BOC) to identify the composition of the potentially affected population. Geographic distribution by race, ethnicity, and income, as well as a delineation of tribal lands and resources, should be examined. Census data are available in published formats, and on CD-ROM available through the BOC. This data also is available from a number of local, college, and university libraries, and the World Wide Web. Agencies may also find that Federal, tribal, state and local health, environmental, and economic agencies have useful demographic information and studies, such as the Landview II system, which is used by the BOC to assist in utilizing data from a geographic information system (GIS). Landview II has proven to be a low-cost, readily available means of graphically accessing environmental justice data. These approaches already should be incorporated into current NEPA compliance.

Agencies should recognize that the impacts within minority populations, low-income populations, or Indian tribes may be different from impacts on the general population due to a community's distinct cultural practices. For example, data on different patterns of living, such as subsistence fish, vegetation, or wildlife consumption and the use of well water in rural communities may be relevant to the analysis. Where a proposed agency action would not cause any adverse environmental impacts, and therefore would not cause any disproportionately high and adverse human health or environmental impacts, specific demographic analysis may not be warranted. Where environments of Indian tribes may be affected, agencies must consider pertinent treaty, statutory, or executive order rights and consult with tribal governments in a manner consistent with the government-to-government relationship.

### 4. Analysis

When a disproportionately high and adverse human health or environmental effect on a low-income population, minority population, or Indian tribe has been identified, agencies should analyze how environmental and health effects are distributed within the affected community. Displaying available data spatially, through a GIS, can provide the agency and the public with an effective visualization of the distribution of health and environmental impacts among demographic populations. This type of data should be analyzed in light of any additional qualitative or quantitative information gathered through the public participation process.

**14**

Where a potential environmental justice issue has been identified by an agency, the agency should state clearly in the EIS or EA whether, in light of all of the facts and circumstances, a disproportionately high and adverse human health or environmental impact on minority populations, low-income populations, or Indian tribe is likely to result from the proposed action and any alternatives. This statement should be supported by sufficient information for the public to understand the rationale for the conclusion. The underlying analysis should be presented as concisely as possible, using language that is understandable to the public and that minimizes use of acronyms or jargon.

## 5. Alternatives

Agencies should encourage the members of the communities that may suffer a disproportionately high and adverse human health or environmental effect from a proposed agency action to help develop and comment on possible alternatives to the proposed agency action as early as possible in the process.

Where an EIS is prepared, CEQ regulations require agencies to identify an environmentally preferable alternative in the record of decision (ROD).[27] When the agency has identified a disproportionately high and adverse human health or environmental effect on low-income populations, minority populations, or Indian tribes from either the proposed action or alternatives, the distribution as well as the magnitude of the disproportionate impacts in these communities should be a factor in determining the environmentally preferable alternative. In weighing this factor, the agency should consider the views it has received from the affected communities, and the magnitude of environmental impacts associated with alternatives that have a less disproportionate and adverse effect on low-income populations, minority populations, or Indian tribes.

## 6. Record of Decision

When an agency reaches a decision on an action for which an EIS was prepared, a public record of decision (ROD) must be prepared that provides information on the alternatives considered and the factors weighed in the decision-making process. Disproportionately high and adverse human health or environmental effects on a low-income population, minority population, or Indian tribe should be among those factors explicitly discussed in the ROD, and should also be addressed in any discussion of whether all practicable means to avoid or minimize environmental and other interrelated effects were adopted. Where relevant, the agency should discuss how these issues are addressed

---

[27]  40 C.F.R. § 1505.2(b)

AR_0006152

in any monitoring and enforcement program summarized in the ROD.[28]

Dissemination of the information in the ROD may provide an effective means to inform the public of the extent to which environmental justice concerns were considered in the decision-making process, and where appropriate, whether the agency intends to mitigate any disproportionately high and adverse human health or environmental effects within the constraints of NEPA and other existing laws. In addition to translating crucial portions of the EIS where appropriate, agencies should provide translation, where practicable and appropriate, of the ROD in non-technical, plain language for limited-English speakers. Agencies should also consider translating documents into languages other than English where appropriate and practical.

### 7. Mitigation

Mitigation measures include steps to avoid, mitigate, minimize, rectify, reduce, or eliminate the impact associated with a proposed agency action.[29] Throughout the process of public participation, agencies should elicit the views of the affected populations on measures to mitigate a disproportionately high and adverse human health or environmental effect on a low-income population, minority population, or Indian tribe and should carefully consider community views in developing and implementing mitigation strategies. Mitigation measures identified in an EIS or developed as part of a FONSI should reflect the needs and preferences of affected low-income populations, minority populations, or Indian tribes to the extent practicable.

### D. Where no EIS or EA is prepared

There are certain circumstances in which the policies of NEPA apply, and a disproportionately high and adverse human health or environmental impact on low-income populations, minority populations, or Indian tribes may exist, but where the specific statutory requirement to prepare an EIS or EA does not apply. These circumstances may arise because of an exemption from the requirement, a categorical exclusion of specific activities by regulation, or a claim by an agency that another environmental statute establishes the "functional equivalent" of an EIS or EA. For example, neither an EIS nor an EA is prepared for certain hazardous waste facility permits.

In circumstances in which an EIS or EA will not be prepared and a disproportionately high and adverse human health or environmental impact on low-income

---

[28] See 40 C.F.R. § 1505.2(c).

[29] See 40 C.F.R. § 1508.20.

**16**

populations, minority populations, or Indian tribes may exist, agencies should augment their procedures as appropriate to ensure that the otherwise applicable process or procedure for a federal action addresses environmental justice concerns. Agencies should ensure that the goals for public participation outlined in this guidance are satisfied to the fullest extent possible. Agencies also should fully develop and consider alternatives to the proposed action whenever possible, as would be required by NEPA.

AR_0006154

AR_0006155

# IV.

## Regulatory Changes

Consistent with the obligation of all agencies to promote consideration of environmental justice under NEPA and in all of their programs and activities, agencies that promulgate or revise regulations, policies, and guidances under NEPA or under any other statutory scheme should consult with CEQ and EPA to ensure that the principles and approaches presented in this guidance are fully incorporated into any new or revised regulations, policies, and guidances.

19

AR_0006156

AR_0006157

# V.

## Effect of this Guidance

Agencies should apply, and comply with, this guidance prospectively. If an agency has made substantial investments in NEPA compliance, or public participation with respect to a particular agency action, prior to issuance of this guidance, the agency should ensure that application of this guidance does not result in additional delays or costs of compliance.

This guidance is intended to improve the internal management of the Executive Branch with respect to environmental justice under NEPA. The guidance interprets NEPA as implemented through the CEQ regulations in light of Executive Order 12898. It does not create any rights, benefits, or trust obligations, either substantive or procedural, enforceable by any person, or entity in any court against the United States, its agencies, its officers, or any other person.

AR_0006158

AR_0006159

# APPENDIX A

## *GUIDANCE*
## *FOR FEDERAL AGENCIES ON KEY TERMS IN*
## *EXECUTIVE ORDER 12898*

### INTRODUCTION

Pursuant to Executive Order 12898 on Environmental Justice, Federal agencies are to make the achievement of environmental justice part of their mission by identifying and addressing, as appropriate, disproportionately high and adverse human health or environmental effects of their programs, policies, and activities on minority populations, low-income populations, and Indian tribes and allowing all portions of the population a meaningful opportunity to participate in the development of, compliance with, and enforcement of Federal laws, regulations, and policies affecting human health or the environment regardless of race, color, national origin, or income. To that end, set forth below is guidance for Federal agencies on key terms contained in Executive Order 12898.

This guidance is intended only to improve the internal management of the Executive Branch. It shall not be deemed to create any right, benefit, or trust obligation, either substantive or procedural, enforceable by any person, or entity in any court against the United States, its agencies, its officers, or any other person. Consequently, neither this Guidance nor the deliberative processes or products resulting from the implementation of this Guidance shall be treated as establishing standards or criteria that constitute any basis for review of the actions of the Executive Branch. Compliance with this Guidance shall not be justiciable in any proceeding for judicial review of Agency action.

AR_0006160

AR_0006161

TEXT OF EXECUTIVE ORDER 12898,
"FEDERAL ACTIONS TO ADDRESS ENVIRONMENTAL JUSTICE IN
MINORITY POPULATIONS AND LOW-INCOME POPULATIONS,"
ANNOTATED
WITH PROPOSED GUIDANCE ON TERMS IN THE EXECUTIVE ORDER[30]

Section 1-1.  IMPLEMENTATION.

1-101.  *Agency Responsibilities*.  To the greatest extent practicable and permitted by law, and consistent with the principles set forth in the report on the National Performance Review, each Federal agency shall make achieving environmental justice part of its mission by identifying and addressing, as appropriate, disproportionately high and adverse human health or environmental effects of its programs, policies, and activities on minority populations and low-income populations in the United States and its territories and possessions, the District of Columbia, the Commonwealth of Puerto Rico, and the Commonwealth of the Marianas Islands.

**Low-income population: Low-income populations in an affected area should be identified with the annual statistical poverty thresholds from the Bureau of the Census' Current Population Reports, Series P-60 on Income and Poverty.  In identifying low-income populations, agencies may consider as a community either a group of individuals living in geographic proximity to one another, or a set of individuals (such as migrant workers or Native Americans), where either type of group experiences common conditions of environmental exposure or effect.**

**Minority:  Individual(s) who are members of the following population groups: American Indian or Alaskan Native; Asian or Pacific Islander; Black, not of Hispanic origin; or Hispanic.**

**Minority population:  Minority populations should be identified where either: (a) the minority population of the affected area exceeds 50 percent or (b) the minority population percentage of the affected area is meaningfully greater than the minority population percentage in the general population or other appropriate unit of geographic analysis.  In identifying minority communities, agencies may consider as a community either a group of individuals living in**

---

[30] Executive Order provisions are in standard font. Guidance is in **bold** font.

AR_0006162

geographic proximity to one another, or a geographically dispersed/transient set of individuals (such as migrant workers or Native American ), where either type of group experiences common conditions of environmental exposure or effect.  The selection of the appropriate unit of geographic analysis may be a governing body's jurisdiction, a neighborhood, census tract, or other similar unit that is to be chosen so as to not artificially dilute or inflate the affected minority population.  A minority population also exists if there is more than one minority group present and the minority percentage, as calculated by aggregating all minority persons, meets one of the above-stated thresholds.

<u>Disproportionately high and adverse human health effects:</u>  When determining whether human health effects are disproportionately high and adverse, agencies are to consider the following three factors to the extent practicable:

> (a) Whether the health effects, which may be measured in risks and rates, are significant (as employed by NEPA), or above generally accepted norms.  Adverse health effects may include bodily impairment, infirmity, illness, or death; and

> (b)  Whether the risk or rate of hazard exposure by a minority population, low-income population, or Indian tribe to an environmental hazard is significant (as employed by NEPA) and appreciably exceeds or is likely to appreciably exceed the risk or rate to the general population or other appropriate comparison group; and

> (c)  Whether health effects occur in a minority population,  low-income population, or Indian tribe affected by cumulative or multiple adverse exposures from  environmental hazards.

<u>Disproportionately high and adverse environmental effects:</u> When determining whether environmental effects are disproportionately high and adverse, agencies are to consider the following three factors to the extent practicable:

> (a)  Whether there is or will be an impact on the natural or physical environment that significantly (as employed by NEPA) and adversely affects a minority population,  low-income population, or Indian tribe.  Such effects may include ecological, cultural, human health, economic, or social impacts on minority communities,  low-income communities, or Indian tribes when those impacts are interrelated to impacts on the natural or physical environment; and

26

**(b)  Whether environmental effects are significant (as employed by NEPA) and are or may be having an adverse impact on minority populations, low-income populations, or Indian tribes that appreciably exceeds or is likely to appreciably exceed those on the general population or other appropriate comparison group; and**

**(c)  Whether the environmental effects occur or would occur in a minority population, low-income population, or Indian tribe affected by cumulative or multiple adverse exposures from environmental hazards.**

*1-102.  Creation of an Interagency Working Group on Environmental Justice.* (a) Within 3 months of the date of this order, the Administrator of the Environmental Protection Agency ("Administrator") or the Administrator's designee shall convene an interagency Federal Working Group on Environmental Justice ("Working Group"). The Working Group shall comprise the heads of the following executive agencies and offices, or their designees: (a) Department of Defense; (b) Department of Health and Human Services; (c) Department of Housing and Urban Development; (d) Department of Labor; (e) Department of Agriculture; (f) Department of Transportation; (g) Department of Justice; (h) Department of the Interior; (I) Department of Commerce; (j) Department of Energy; (k) Environmental Protection Agency; (1) Office of Management and Budget; (m) Office of Science and Technology Policy; (n) Office of the Deputy Assistant to the President for Environmental Policy; (o) Office of the Assistant to the President for Domestic Policy; (p) National Economic Council; (q) Council of Economic Advisers; and (r) such other Government officials as the President may designate.  The Working Group shall report to the President through the Deputy Assistant to the President for Environmental Policy and the Assistant to the President for Domestic Policy.

(b)  The Working Group shall:

(1) provide guidance to Federal agencies on criteria for identifying disproportionately high and adverse human health or environmental effects on minority populations and low-income populations.

(2) coordinate with, provide guidance to, and serve as a clearinghouse for, each Federal agency as it develops an environmental justice strategy as required by section 1-103 of this order, in order to ensure that the administration, interpretation and enforcement of programs, activities and policies are undertaken in a consistent manner;

(3) assist in coordinating research by, and stimulating cooperation among, the Environmental Protection Agency, the Department of Health and Human Services, the

27

Department of Housing and Urban Development, and other agencies conducting research or other activities in accordance with section 3-3 of this order;

(4) assist in coordinating data collection, required by this order;

(5) examine existing data and studies on environmental justice;

(6) hold public meetings as required in section 5-502(d) of this order; and

(7) develop interagency model projects on environmental justice that evidence cooperation among Federal agencies.

1-103. *Development of Agency Strategies.*

(a) Except as provided in section 6-605 of this order, each Federal agency shall develop an agency-wide environmental justice strategy, as set forth in subsections (b)-(e) of this section that identifies and addresses disproportionately high and adverse human health or environmental effects of its programs, policies, and activities on minority populations and low-income populations. The environmental justice strategy shall list programs, policies, planning and public participation processes, enforcement, and/or rulemakings related to human health or the environment that should be revised to, at a minimum: (1) promote enforcement of all health and environmental statutes in areas with minority populations and low-income populations; (2) ensure greater public participation; (3) improve research and data collection relating to the health of and environment of minority populations and low-income populations; and (4) identify differential patterns of consumption of natural resources among minority populations and low-income populations. In addition, the environmental justice strategy shall include, where appropriate, a timetable for undertaking identified revisions and consideration of economic and social implications of the revisions.

**Differential patterns of consumption of natural resources: The term "differential patterns of consumption of natural resources" relates to subsistence and differential patterns of subsistence, and means differences in rates and/or patterns of fish, water, vegetation and/or wildlife consumption among minority populations, low-income populations, or Indian tribes, as compared to the general population.**

(b) Within 4 months of the date of this order, each Federal agency shall identify an internal administrative process for developing its environmental justice strategy, and shall inform this Working Group of the process.

28

(c) Within 6 months of the date of this order, each Federal agency shall provide the Working Group with an outline of its proposed environmental justice strategy.

(d) Within 10 months of the date of this order, each Federal agency shall provide the Working Group with its proposed environmental justice strategy.

(e) Within 12 months of the date of this order, each Federal agency shall finalize its environmental justice strategy and provide a copy and written description of its strategy to the Working Group. During the 12 month period from the date of this order, each Federal agency, as part of its environmental justice strategy, shall identify several specific projects that can be promptly undertaken to address particular concerns identified during the development of the proposed environmental justice strategy, and a schedule for implementing those projects.

(f) Within 24 months of the date of this order, each Federal agency shall report to the Working Group on its progress in implementing its agency-wide environmental justice strategy.

(g) Federal agencies shall provide additional periodic reports to the Working Group as requested by the Working Group.

1-104. *Reports to the President*. Within 14 months of the date of this order, the Working Group shall submit to the President, through the Office of the Deputy Assistant to the President for Environmental Policy and the Office of the Assistant to the President for Domestic Policy, a report that describes the implementation of this order, and includes the final environmental justice strategies described in section 1-103(e) of this order.

Sec. 2-2. FEDERAL AGENCY RESPONSIBILITIES FOR FEDERAL PROGRAMS.

Each Federal agency shall conduct its programs, policies, and activities that substantially affect human health or the environment, in a manner that ensures that such programs, policies, and activities do not have the effect of excluding persons (including populations) from participation in, denying persons (including populations) the benefits of, or subjecting persons (including populations) to discrimination under, such programs, policies, and activities, because of their race, color, or national origin.

AR_0006166

Sec. 3-3.  RESEARCH, DATA COLLECTION, AND ANALYSIS.

3-301.  *Human Health and Environmental Research and Analysis.*

(a) Environmental human health research, whenever practicable and appropriate, shall include diverse segments of the population in epidemiological and clinical studies, including segments at high risk from environmental hazards, such as minority populations, low-income populations and workers who may be exposed to substantial environmental hazards.

**Environmental hazard and substantial environmental hazard:  For purposes of research, data collection, and analysis under Section 3-3 of the Executive Order, the term "environmental hazard" means a chemical, biological, physical or radiological agent, situation or source that has the potential for deleterious effects to the environment and/or human health.  Among the factors that may be important in defining a substantial environmental hazard are:  the likelihood, seriousness, and magnitude of the impact.**

(b) Environmental human health analyses, whenever practical and appropriate, shall identify multiple and cumulative exposures.

**Environmental Exposure:  For purposes of research, data collection, and analysis under Section 3-3 of the Executive Order, the term "environmental exposure" means contact with a chemical (e.g., asbestos, radon), biological (e.g., Legionella),  physical (e.g., noise), or radiological agent.**

**Multiple Environmental Exposure:  For purposes of research, data collection, and analysis under Section 3-3 of the Executive Order, the term "multiple environmental exposure" means exposure to any combination of two or more chemical, biological, physical or radiological agents (or two or more agents from two or more of these categories) from single or multiple sources that have the potential for deleterious effects to the environment and/or human health.**

**Cumulative Environmental Exposure: For purposes of research, data collection, and analysis under Section 3-3 of the Executive Order, the term "cumulative environmental exposure" means exposure to one or more chemical, biological, physical, or radiological agents across environmental media (e.g., air, water, soil) from single or multiple sources, over time in one or more locations, that have the potential for deleterious effects to the environment and/or human health.**

**30**

(c) Federal agencies shall provide minority populations and low-income populations the opportunity to comment on the development and design of research strategies undertaken pursuant to this order.

3-302. *Human Health and Environmental Data Collection and Analysis.* To the extent permitted by existing law, including the Privacy Act, as amended (5 U.S.C. § 552a):

(a) each Federal agency, whenever practicable and appropriate, shall collect, maintain, and analyze information assessing and comparing environmental and human health risks borne by populations identified by race, national origin, or income. To the extent practical and appropriate, Federal agencies shall use this information to determine whether their programs, policies, and activities have disproportionately high and adverse human health or environmental effects on minority populations and low-income populations;

(b) In connection with the development and implementation of agency strategies in section 1-103 of this order, each Federal agency, whenever practicable and appropriate, shall collect, maintain and analyze information on the race, national origin, income level, and other readily accessible and appropriate information for areas surrounding facilities or sites expected to have a substantial environmental, human health, or economic effect on the surrounding populations, when such facilities or sites become the subject of a substantial Federal environmental administrative or judicial action. Such information shall be made available to the public unless prohibited by law; and

**<u>Federal environmental administrative or judicial action</u> includes any administrative enforcement action, civil enforcement action, or criminal enforcement action initiated by, or permitting or licensing determination undertaken by, a Federal agency to enforce or execute a Federal law intended, in whole or in part, to protect human health or the environment.**

(c) Each Federal agency, whenever practicable and appropriate, shall collect, maintain, and analyze information on the race, national origin, income level, and other readily accessible and appropriate information for areas surrounding Federal facilities that are: (1) subject to the reporting requirements under the Emergency Planning and Community Right-to-Know Act, 42 U.S.C. section 11001-11050 as mandated in Executive Order No. 12856; and (2) expected to have a substantial environmental, human health, or economic effect on surrounding populations. Such information shall be made available to the public, unless prohibited by law.

**31**

(d) In carrying out the responsibilities in this section, each Federal agency, whenever practicable and appropriate, shall share information and eliminate unnecessary duplication of efforts through the use of existing data systems and cooperative agreements among Federal agencies and with State, local, and tribal governments.

Sec. 4-4.  SUBSISTENCE CONSUMPTION OF FISH AND WILDLIFE.

4-401.  *Consumption Patterns*.  In order to assist in identifying the need for ensuring protection of populations with differential patterns of subsistence consumption of fish and wildlife, Federal agencies, whenever practicable and appropriate, shall collect, maintain, and analyze information on the consumption patterns of populations who principally rely on fish and/or wildlife for subsistence.  Federal agencies shall communicate to the public the risks of those consumption patterns.

**Subsistence consumption of fish and wildlife:  Dependence by a minority population,  low-income population, Indian tribe or subgroup of such populations on indigenous fish, vegetation and/or wildlife, as the principal portion of  their diet.**

**Differential patterns of subsistence consumption:  Differences in rates and/or patterns of subsistence consumption by minority populations,  low-income populations, and Indian tribes as compared to rates and patterns of consumption of the general population.**

4-402.  *Guidance*.  Federal agencies, whenever practicable and appropriate, shall work in a coordinated manner to publish guidance reflecting the latest scientific information available concerning methods for evaluating the human health risks associated with the consumption of pollutant-bearing fish or wildlife.  Agencies shall consider such guidance in developing their policies and rules.

Sec. 5-5.  PUBLIC PARTICIPATION AND ACCESS TO INFORMATION.

(a) The public may submit recommendations to Federal agencies relating to the incorporation of environmental justice principles into Federal agency programs or policies.  Each Federal agency shall convey such recommendations to the Working Group.

(b) Each Federal agency may, whenever practicable and appropriate, translate crucial public documents, notices, and hearings relating to human health or the environment for limited English speaking populations.

**32**

(c) Each Federal agency shall work to ensure that public documents, notices, and hearings relating to human health or the environment are concise, understandable, and readily accessible to the public.

(d) The Working Group shall hold public meetings, as appropriate, for the purpose of fact-finding, receiving public comments, and conducting inquiries concerning environmental justice. The Working Group shall prepare for public review a summary of the comments and recommendations discussed at the public meetings.

Sec. 6-6. GENERAL PROVISIONS.

6-601. *Responsibility for Agency Implementation.* The head of each Federal agency shall be responsible for ensuring compliance with this order. Each Federal agency shall conduct internal reviews and take such other steps as may be necessary to monitor compliance with this order.

6-602. *Executive Order No. 12250.* This Executive order is intended to supplement but not supersede Executive Order No. 12250, which requires consistent and effective implementation of various laws prohibiting discriminatory practices in programs receiving Federal financial assistance. Nothing herein shall limit the effect or mandate of Executive Order No. 12250.

6-603. *Executive Order No. 12875.* This Executive order is not intended to limit the effect or mandate of Executive Order No. 12875.

6-604. *Scope.* For purposes of this order, Federal agency means any agency on the Working Group, and such other agencies as may be designated by the President, that conducts any Federal program or activity that substantially affects human health or the environment. Independent agencies are requested to comply with the provisions of this order.

6-605. *Petitions for Exemptions.* The head of a Federal agency may petition the President for an exemption from the requirements of this order on the grounds that all or some of the petitioning agency's programs or activities should not be subject to the requirements of this order.

6-606. *Native American Programs.* Each Federal agency responsibility set forth under this order shall apply equally to Native American programs. In addition, the Department of the Interior, in coordination with the Working Group, and, after consultation with tribal leaders, shall coordinate steps to be taken pursuant to this order that address Federally-recognized Indian Tribes.

AR_0006170

**Native American programs: Native American programs include those Federal programs designed to serve Indian Tribes or individual Indians, recognizing that such programs are to be guided, as appropriate, by the government-to-government relationship, the Federal trust responsibility, and the role of tribes as governments within the Federal system.**

6-607. *Costs.* Unless otherwise provided by law, Federal agencies shall assume the financial costs of complying with this order.

6-608. *General.* Federal agencies shall implement this order consistent with, and to the extent permitted by, existing law.

6-609. *Judicial Review.* This order is intended only to improve the internal management of the executive branch and is not intended to, nor does it create any right, benefit, or trust responsibility, substantive or procedural, enforceable at law or equity by a party against the United States, its agencies, its officers, or any person. This order shall not be construed to create any right to judicial review involving the compliance or noncompliance of the United States, its agencies, its officers, or any other person with this order.

34



EXECUTIVE OFFICE OF THE PRESIDENT
COUNCIL ON ENVIRONMENTAL QUALITY
WASHINGTON, D.C. 20503

November 23, 2010

MEMORANDUM FOR HEADS OF FEDERAL DEPARTMENTS AND AGENCIES

FROM:     NANCY H. SUTLEY
          Chair

SUBJECT:  Establishing, Applying, and Revising Categorical Exclusions under the National
          Environmental Policy Act

     The Council on Environmental Quality (CEQ) is issuing this guidance for Federal departments and agencies on how to establish, apply, and revise categorical exclusions in accordance with section 102 of the National Environmental Policy Act (NEPA), 42 U.S.C. § 4332, and the CEQ Regulations for Implementing the Procedural Provisions of NEPA (CEQ Regulations), 40 CFR Parts 1500-1508.[1] This guidance explains the requirements of NEPA and the CEQ Regulations, describes CEQ policies, and recommends procedures for agencies to use to ensure that their use of categorical exclusions is consistent with applicable law and regulations.[2] The guidance is based on NEPA, the CEQ Regulations, legal precedent and agency NEPA experience and practice. It describes:

- How to establish or revise a categorical exclusion;

---

[1] The Council on Environmental Quality (CEQ) Regulations for Implementing the Procedural Provisions of NEPA (CEQ Regulations), *available on* www.nepa.gov *at* ceq.hss.doe.gov/ceq_regulations/regulations.html. This guidance applies only to categorical exclusions established by Federal agencies in accordance with section 1507.3 of the CEQ Regulations, 40 CFR § 1507.3. It does not address categorical exclusion established by statute, as their use is governed by the terms of the specific legislation and subsequent interpretation by the agencies charged with the implementation of that statute and NEPA requirements. CEQ encourages agencies to apply their extraordinary circumstances to categorical exclusions established by statute when the statue is silent as to the use and application of extraordinary circumstances.

[2] This guidance is not a rule or regulation, and the recommendations it contains may not apply to a particular situation based upon the individual facts and circumstances. This guidance does not change or substitute for any law, regulation, or any other legally binding requirement and is not legally enforceable. The use of non-mandatory language such as "guidance," "recommend," "may," "should," and "can," is intended to describe CEQ policies and recommendations. The use of mandatory terminology such as "must" and "required" is intended to describe controlling requirements under the terms of NEPA and the CEQ regulations, but this document does not establish legally binding requirements in and of itself.

- How to use public involvement and documentation to help define and substantiate a proposed categorical exclusion;
- How to apply an established categorical exclusion, and determine when to prepare documentation and involve the public;[3] and
- How to conduct periodic reviews of categorical exclusions to assure their continued appropriate use and usefulness.

This guidance is designed to afford Federal agencies flexibility in developing and implementing categorical exclusions, while ensuring that categorical exclusions are administered to further the purposes of NEPA and the CEQ Regulations.[4]

I. INTRODUCTION

The CEQ Regulations provide basic requirements for establishing and using categorical exclusions. Section 1508.4 of the CEQ Regulations defines a "categorical exclusion" as

a category of actions which do not individually or cumulatively have a significant effect on the human environment and which have been found to have no such effect in procedures adopted by a Federal agency in implementation of these regulations (§ 1507.3) and for which, therefore, neither an environmental assessment nor an environmental impact statement is required.[5]

Categories of actions for which exclusions are established can be limited by their terms. Furthermore, the application of a categorical exclusion can be limited by "extraordinary circumstances." Extraordinary circumstances are factors or circumstances in which a normally excluded action may have a significant environmental effect that then requires further analysis in an environmental assessment (EA) or an environmental impact statement (EIS).[6]

Categorical exclusions are not exemptions or waivers of NEPA review; they are simply one type of NEPA review. To establish a categorical exclusion, agencies determine whether a proposed activity is one that, on the basis of past experience, normally does not require further environmental review. Once established, categorical exclusions provide an efficient tool to complete the NEPA environmental review process for proposals that normally do not require more resource-intensive EAs or EISs. The use of categorical exclusions can reduce paperwork

---

[3] The term "public" in this guidance refers to any individuals, groups, entities or agencies external to the Federal agency analyzing the proposed categorical exclusion or proposed activity.

[4] 40 CFR § 1507.1 (noting that CEQ Regulations intend to allow each agency flexibility in adapting its NEPA implementing procedures to requirements of other applicable laws).

[5] *Id.* at § 1508.4.

[6] *Id.*

AR_0006272

and delay, so that EAs or EISs are targeted toward proposed actions that truly have the potential to cause significant environmental effects.[7]

When determining whether to use a categorical exclusion for a proposed activity, a Federal agency must carefully review the description of the proposed action to ensure that it fits within the category of actions described in the categorical exclusion. Next, the agency must consider the specific circumstances associated with the proposed activity, to rule out any extraordinary circumstances that might give rise to significant environmental effects requiring further analysis and documentation in an EA or an EIS.[8] In other words, when evaluating whether to apply a categorical exclusion to a proposed activity, an agency must consider the specific circumstances associated with the activity and may not end its review based solely on the determination that the activity fits within the description of the categorical exclusion; rather, the agency must also consider whether there are extraordinary circumstances that would warrant further NEPA review. Even if a proposed activity fits within the definition of a categorical exclusion and does not raise extraordinary circumstances, the CEQ Regulations make clear that an agency can, at its discretion, decide "to prepare an environmental assessment . . . in order to assist agency planning and decisionmaking."[9]

Since Federal agencies began using categorical exclusions in the late 1970s, the number and scope of categorically-excluded activities have expanded significantly. Today, categorical exclusions are the most frequently employed method of complying with NEPA, underscoring the need for this guidance on the promulgation and use of categorical exclusions.[10] Appropriate reliance on categorical exclusions provides a reasonable, proportionate, and effective analysis for many proposed actions, helping agencies reduce paperwork and delay. If used inappropriately, categorical exclusions can thwart NEPA's environmental stewardship goals, by compromising the quality and transparency of agency environmental review and decisionmaking, as well as compromising the opportunity for meaningful public participation and review.

## II. ESTABLISHING AND REVISING CATEGORICAL EXCLUSIONS

### A. Conditions Warranting New or Revised Categorical Exclusions

---

[7] *See id.* at §§ 1500.4(p) (recommending use of categorical exclusions as a tool to reduce paperwork), 1500.5(k) (recommending categorical exclusions as a tool to reduce delay).

[8] 40 CFR § 1508.4 (requiring Federal agencies to adopt procedures to ensure that categorical exclusions are not applied to proposed actions involving extraordinary circumstances that might have significant environmental effects).

[9] 40 CFR § 1501.3(b).

[10] *See* CEQ reports to Congress on the status and progress of NEPA reviews for Recovery Act funded projects and activities, *available on* www.nepa.gov *at* ceq.hss.doe.gov/ceq_reports/recovery_act_reports.html.

3

AR_0006273

Federal agencies may establish a new or revised categorical exclusion in a variety of circumstances. For example, an agency may determine that a class of actions—such as payroll processing, data collection, conducting surveys, or installing an electronic security system in a facility—can be categorically excluded because it is not expected to have significant individual or cumulative environmental effects. As discussed further in Section III.A.1, below, agencies may also identify potential new categorical exclusions after the agencies have performed NEPA reviews of a class of proposed actions and found that, when implemented, the actions resulted in no significant environmental impacts. Other categories of actions may become appropriate for categorical exclusions as a result of mission changes. When agencies acquire new responsibilities through legislation or administrative restructuring, they should propose new categorical exclusions after they, or other agencies, gain sufficient experience with the new activities to make a reasoned determination that any resulting environmental impacts are not significant.[11]

Agencies sometimes employ "tiering" to incorporate findings from NEPA environmental reviews that address broad programs or issues into reviews that subsequently deal with more specific and focused proposed actions.[12] Agencies may rely on tiering to make predicate findings about environmental impacts when establishing a categorical exclusion. To the extent that mitigation commitments developed during the broader review become an integral part of the basis for subsequently excluding a proposed category of actions, care must be taken to ensure that those commitments are clearly presented as required design elements in the description of the category of actions being considered for a categorical exclusion.

If actions in a proposed categorical exclusion are found to have potentially significant environmental effects, an agency can abandon the proposed categorical exclusion, or revise it to eliminate the potential for significant impacts. This can be done by: (1) limiting or removing activities included in the categorical exclusion; (2) placing additional constraints on the categorical exclusion's applicability; or (3) revising or identifying additional applicable extraordinary circumstances. When an agency revises an extraordinary circumstance, it should make sure that the revised version clearly identifies the circumstances when further environmental evaluation in an EA or an EIS is warranted.

B. The Text of the Categorical Exclusion

In prior guidance, CEQ has generally addressed the crafting of categorical exclusions, encouraging agencies to "consider broadly defined criteria which characterize types of actions that, based on the agency's experience, do not cause significant environmental effects," and to "offer several examples of activities frequently performed by that agency's personnel which

---

[11] When legislative or administrative action creates a new agency or restructures an existing agency, the agency should determine if its decisionmaking processes have changed and ensure that its NEPA implementing procedures align the NEPA review and other environmental planning processes with agency decisionmaking.

[12] 40 CFR §§ 1502.4(d), 1502.20, 1508.28.

AR_0006274

would normally fall in these categories."[13]  CEQ's prior guidance also urges agencies to consider whether the cumulative effects of multiple small actions "would cause sufficient environmental impact to take the actions out of the categorically-excluded class."[14]  This guidance expands on CEQ's earlier guidance, by advising agencies that the text of a proposed new or revised categorical exclusion should clearly define the eligible category of actions, as well as any physical, temporal, or environmental factors that would constrain its use.

Some activities may be variable in their environmental effects, such that they can only be categorically excluded in certain regions, at certain times of the year, or within a certain frequency.  For example, because the status and sensitivity of environmental resources varies across the nation or by time of year (e.g., in accordance with a protected species' breeding season), it may be appropriate to limit the geographic applicability of a categorical exclusion to a specific region or environmental setting.  Similarly, it may be appropriate to limit the frequency with which a categorical exclusion is used in a particular area.  Categorical exclusions for activities with variable impacts must be carefully described to limit their application to circumstances where the activity has been shown not to have significant individual or cumulative environmental effects.  Those limits may be spatial (restricting the extent of the proposed action by distance or area); temporal (restricting the proposed action during certain seasons or nesting periods in a particular setting); or numeric (limiting the number of proposed actions that can be categorically excluded in a given area or timeframe).  Federal agencies that identify these constraints can better ensure that a categorical exclusion is neither too broadly nor too narrowly defined.

When developing a new or revised categorical exclusion, Federal agencies must be sure the proposed category captures the entire proposed action.  Categorical exclusions should not be established or used for a segment or an interdependent part of a larger proposed action.  The actions included in the category of actions described in the categorical exclusion must be stand-alone actions that have independent utility.  Agencies are also encouraged to provide representative examples of the types of activities covered in the text of the categorical exclusion, especially for broad categorical exclusions.  These examples will provide further clarity and transparency regarding the types of actions covered by the categorical exclusion.

C. Extraordinary Circumstances

Extraordinary circumstances are appropriately understood as those factors or circumstances that help a Federal agency identify situations or environmental settings that may require an otherwise categorically-excludable action to be further analyzed in an EA or an EIS.  Often these factors are similar to those used to evaluate intensity for purposes of determining

---

[13]  Council on Environmental Quality, "Guidance Regarding NEPA Regulations," 48 Fed. Reg. 34,263, 34,265 (Jul. 28, 1983), *available on* www.nepa.gov *at* ceq.hss.doe.gov/nepa/regs/1983/1983guid.htm.

[14]  *Id.*

AR_0006275

significance pursuant to section 1508.27(b) of the CEQ Regulations.[15]  For example, several agencies list as extraordinary circumstances the potential effects on protected species or habitat, or on historic properties listed or eligible for listing in the National Register of Historic Places.

When proposing new or revised categorical exclusions, Federal agencies should consider the extraordinary circumstances described in their NEPA procedures to ensure that they adequately account for those situations and settings in which a proposed categorical exclusion should not be applied. An extraordinary circumstance requires the agency to determine how to proceed with the NEPA review.  For example, the presence of a factor, such as a threatened or endangered species or a historic resource, could be an extraordinary circumstance, which, depending on the structure of the agency's NEPA implementing procedures, could either cause the agency to prepare an EA or an EIS, or cause the agency to consider whether the proposed action's impacts on that factor require additional analysis in an EA or an EIS.  In other situations, the extraordinary circumstance could be defined to include both the presence of the factor and the impact on that factor.  Either way, agency NEPA implementing procedures should clearly describe the manner in which an agency applies extraordinary circumstances and the circumstances under which additional analysis in an EA or an EIS is warranted.

Agencies should review their existing extraordinary circumstances concurrently with the review of their categorical exclusions.  If an agency's existing extraordinary circumstances do not provide sufficient parameters to limit a proposed new or revised categorical exclusion to actions that do not have the potential for significant environmental effects, the agency should identify and propose additional extraordinary circumstances or revise those that will apply to the proposed categorical exclusion.  If extensive extraordinary circumstances are needed to limit a proposed categorical exclusion, the agency should also consider whether the proposed categorical exclusion itself is appropriate.  Any new or revised extraordinary circumstances must be issued together with the new or revised categorical exclusion in draft form and then in final form according to the procedures described in Section IV.

III. SUBSTANTIATING A NEW OR REVISED CATEGORICAL EXCLUSION

Substantiating a new or revised categorical exclusion is basic to good decisionmaking.  It serves as the agency's own administrative record of the underlying reasoning for the categorical exclusion.  A key issue confronting Federal agencies is how to substantiate a determination that a proposed new or revised categorical exclusion describes a category of actions that do not individually or cumulatively have a significant effect on the human environment.[16]  Provided below are methods agencies can use to gather and evaluate information to substantiate proposed new or revised categorical exclusions.

A. Gathering Information to Substantiate a Categorical Exclusion

---

[15]  *Id.* at § 1508.27(b).

[16]  *See id.* at §§ 1508.7, 1508.8, 1508.27.

6

The amount of information required to substantiate a categorical exclusion depends on the type of activities included in the proposed category of actions. Actions that are reasonably expected to have little impact (for example, conducting surveys or purchasing small amounts of office supplies consistent with applicable acquisition and environmental standards) should not require extensive supporting information.[17]  For actions that do not obviously lack significant environmental effects, agencies must gather sufficient information to support establishing a new or revised categorical exclusion. An agency can substantiate a categorical exclusion using the sources of information described below, either alone or in combination.[18]

1. Previously Implemented Actions

An agency's assessment of the environmental effects of previously implemented or ongoing actions is an important source of information to substantiate a categorical exclusion. Such assessment allows the agency's experience with implementation and operating procedures to be taken into account in developing the proposed categorical exclusion.

Agencies can obtain useful substantiating information by monitoring and/or otherwise evaluating the effects of implemented actions that were analyzed in EAs that consistently supported Findings of No Significant Impact. If the evaluation of the implemented action validates the environmental effects (or lack thereof) predicted in the EA, this provides strong support for a proposed categorical exclusion. Care must be taken to ensure that any mitigation measures developed during the EA process are an integral component of the actions considered for inclusion in a proposed categorical exclusion.

Implemented actions analyzed in an EIS can also be a useful source of substantiating information if the implemented action has independent utility to the agency, separate and apart from the broader action analyzed in the EIS. The EIS must specifically address the environmental effects of the independent proposed action and determine that those effects are not

---

[17]  Agencies should still consider the environmental effects of actions that are taken on a large scale. Agency-wide procurement and personnel actions could have cumulative impacts. For example, purchasing paper with higher recycled content uses less natural resources and will have lesser environmental impacts. *See* "Federal Leadership in Environmental, Energy, and Economic Performance," Exec. Order No. 13514, 74 Fed. Reg. 52,117 (Oct. 8, 2009).

[18]  Agencies should be mindful of their obligations under the Information Quality Act to ensure the quality, objectivity, utility, and integrity of the information they use or disseminate as the basis of an agency decision to establish a categorical exclusion. *See* Information Quality Act, Pub. L. No. 106-554, section 515 (2000), 114 Stat. §§ 2763, 2763A-153 (codified at 44 U.S.C. § 3516 (2001)); *see also* "Guidelines for Ensuring and Maximizing the Quality, Objectivity, Utility, and Integrity of Information Disseminated by Federal Agencies, Republication," 60 Fed. Reg. 8,452 (Feb. 22, 2002), *available at* www.whitehouse.gov/omb/inforeg/infopoltech.html. Additional laws and regulations that establish obligations that apply or may apply to the processes of establishing and applying categorical exclusions (such as the Federal Records Act) are beyond the scope of this guidance.

AR_0006277

significant. For example, when a discrete, independent action is analyzed in an EIS as part of a broad management action, an evaluation of the actual effects of that discrete action may support a proposed categorical exclusion for the discrete action. As with actions previously analyzed in EAs, predicted effects (or lack thereof) should be validated through monitoring or other corroborating evidence.

Agencies can also identify or substantiate new categorical exclusions and extraordinary circumstances by using auditing and implementation data gathered in accordance with an Environmental Management System or other systems that track environmental performance and the effects of particular actions taken to attain that performance.[19]

Agencies should also consider appropriate monitoring or other evaluation of the environmental effects of their categorically-excluded actions, to inform periodic reviews of existing categorical exclusions, as discussed in Section VI, below.

## 2. Impact Demonstration Projects

When Federal agencies lack experience with a particular category of actions that is being considered for a proposed categorical exclusion, they may undertake impact demonstration projects to assess the environmental effects of those actions. As part of a demonstration project, the Federal agency should monitor the actual environmental effects of the proposed action during and after implementation. The NEPA documentation prepared for impact demonstration projects should explain how the monitoring and analysis results will be used to evaluate the merits of a proposed categorical exclusion. When designing impact demonstration projects, an agency must ensure that the action being evaluated accurately represents the scope, the operational context, and the environmental context of the entire category of actions that will be described in the proposed categorical exclusion. For example, if the proposed categorical exclusion would be used in regions or areas of the country with different environmental settings, a series of impact demonstration projects may be needed in those areas where the categorical exclusion would be used.

## 3. Information from Professional Staff, Expert Opinions, and Scientific Analyses

A Federal agency may rely on the expertise, experience, and judgment of its professional staff as well as outside experts to assess the potential environmental effects of applying proposed categorical exclusions, provided that the experts have knowledge, training, and experience relevant to the implementation and environmental effects of the actions described in the proposed categorical exclusion. The administrative record for the proposed categorical exclusion should document the experts' credentials (e.g., education, training, certifications, years of related

---

[19] An EMS provides a systematic framework for a Federal agency to monitor and continually improve its environmental performance through audits, evaluation of legal and other requirements, and management reviews. The potential for EMS to support NEPA work is further described in CEQ's Guidebook, "Aligning National Environmental Policy Act Processes with Environmental Management Systems" (2007), *available on* www.nepa.gov *at* ceq.hss.doe.gov/publications/nepa_and_ems.html.

AR_0006278

experience) and describe how the experts arrived at their conclusions.

Scientific analyses are another good source of information to substantiate a new or revised categorical exclusion. Because the reliability of scientific information varies according to its source and the rigor with which it was developed, the Federal agency remains responsible for determining whether the information reflects accepted knowledge, accurate findings, and experience relevant to the environmental effects of the actions that would be included in the proposed categorical exclusion. Peer-reviewed findings may be especially useful to support an agency's scientific analysis, but agencies may also consult professional opinions, reports, and research findings that have not been formally peer-reviewed. Scientific information that has not been externally peer-reviewed may require additional scrutiny and evaluation by the agency. In all cases, findings must be based on high-quality, accurate technical and scientific information.[20]

4. Benchmarking Other Agencies' Experiences

A federal agency cannot rely on another agency's categorical exclusion to support a decision not to prepare an EA or an EIS for its own actions. An agency may, however, substantiate a categorical exclusion of its own based on another agency's experience with a comparable categorical exclusion and the administrative record developed when the other agency's categorical exclusion was established. Federal agencies can also substantiate categorical exclusions by benchmarking, or drawing support, from private and public entities that have experience with the actions covered in a proposed categorical exclusion, such as state and local agencies, Tribes, academic and professional institutions, and other Federal agencies.

When determining whether it is appropriate to rely on another entity's experience, an agency must demonstrate that the benchmarked actions are comparable to the actions in a proposed categorical exclusion. The agency can demonstrate this based on: (1) characteristics of the actions; (2) methods of implementing the actions; (3) frequency of the actions; (4) applicable standard operating procedures or implementing guidance (including extraordinary circumstances); and (5) timing and context, including the environmental settings in which the actions take place.

B. Evaluating the Information Supporting Categorical Exclusions

After gathering substantiating information and determining that the category of actions in the proposed categorical exclusion does not normally result in individually or cumulatively significant environmental effects, a Federal agency should develop findings that demonstrate how it made its determination. These findings should account for similarities and differences between the proposed categorical exclusion and the substantiating information. The findings should describe the method and criteria the agency used to assess the environmental effects of the proposed categorical exclusion. These findings, and the relevant substantiating information, should be maintained in an administrative record that will support: benchmarking by other agencies (as discussed in Section III.A.4, above); applying the categorical exclusions (as discussed in Section V.A, below); and periodically reviewing the continued viability of the

---

[20] *See* 40 CFR §§ 1500.1(b), 1502.24.

categorical exclusion (as discussed in Section VI, below). These finding should also be made available to the public, at least in preliminary form, as part of the process of seeking public input on the establishment of new or revised categorical exclusions, though the final findings may be revised based on new information received from the public and other sources.

## IV. PROCEDURES FOR ESTABLISHING A NEW OR REVISED CATEGORICAL EXCLUSION

Pursuant to section 1507.3(a) of the CEQ Regulations, Federal agencies are required to consult with the public and with CEQ whenever they amend their NEPA procedures, including when they establish new or revised categorical exclusions. An agency can only adopt new or revised NEPA implementing procedures after the public has had notice and an opportunity to comment, and after CEQ has issued a determination that the procedures are in conformity with NEPA and the CEQ regulations. Accordingly, an agency's process for establishing a new or revised categorical exclusion should include the following steps:

- Draft the proposed categorical exclusion based on the agency's experience and substantiating information;
- Consult with CEQ on the proposed categorical exclusion;
- Consult with other Federal agencies that conduct similar activities to coordinate with their current procedures, especially for programs requesting similar information from members of the public (e.g., applicants);
- Publish a notice of the proposed categorical exclusion in the *Federal Register* for public review and comment;
- Consider public comments;
- Consult with CEQ on the public comments received and the proposed final categorical exclusion to obtain CEQ's written determination of conformity with NEPA and the CEQ Regulations;
- Publish the final categorical exclusion in the *Federal Register*;
- File the categorical exclusion with CEQ; and
- Make the categorical exclusion readily available to the public through the agency's web site and/or other means.

### A. Consultation with CEQ

The CEQ Regulations require agencies to consult with CEQ prior to publishing their proposed NEPA procedures in the *Federal Register* for public comment. Agencies are encouraged to involve CEQ as early as possible in the process and to enlist CEQ's expertise and assistance with interagency coordination to make the process as efficient as possible.[21]

---

[21] 40 CFR § 1507.3(a) (requiring agencies with similar programs to consult with one another and with CEQ to coordinate their procedures).

AR_0006280

Following the public comment period, the Federal agency must consider the comments received and consult again with CEQ to discuss substantive comments and how they will be addressed. CEQ shall complete its review within thirty (30) days of receiving the final text of the agency's proposed categorical exclusion. For consultation to successfully conclude, CEQ must provide the agency with a written statement that the categorical exclusion was developed in conformity with NEPA and the CEQ Regulations. Finally, when the Federal agency publishes the final version of the categorical exclusion in the *Federal Register* and on its established agency website, the agency should notify CEQ of such publication so as to satisfy the requirements to file the final categorical exclusion with CEQ and to make the final categorical exclusion readily available to the public.[22]

## B. Seeking Public Involvement when Establishing or Revising A Categorical Exclusion

Engaging the public in the environmental aspects of Federal decisionmaking is a key aspect of NEPA and the CEQ Regulations.[23] At a minimum, the CEQ Regulations require Federal agencies to make any proposed amendments to their categorical exclusions available for public review and comment in the *Federal Register*,[24] regardless of whether the categorical exclusions are promulgated as regulations through rulemaking, or issued as departmental directives or orders.[25] To maximize the value of comments from interested parties, the agency's *Federal Register* notice should:

- Describe the proposed activities covered by the categorical exclusion and provide the proposed text of the categorical exclusion;

---

[22] *Id.*

[23] National Environmental Policy Act of 1969, § 2 *et seq.*, 42 U.S.C. § 4321 *et seq.*; *see, e.g.,* 40 CFR § 1506.6(a) (requiring agencies to make diligent efforts to involve the public in preparing and implementing their NEPA procedures); 40 CFR § 1507.3(a) (requiring each agency to consult with CEQ while developing its procedures and before publishing them in the *Federal Register* for comment; providing that an agency's NEPA procedures shall be adopted only after an opportunity for public review; and providing that, once in effect, the procedures must be made readily available to the public).

[24] *See* 40 CFR § 1507.3 (outlining procedural requirements for agencies to establish and revise their NEPA implementing regulations), 1506.6(a) (requiring agencies to involve the public in rulemaking, including public notice and an opportunity to comment).

[25] NEPA and the CEQ Regulations do not require agency NEPA implementing procedures, of which categorical exclusions are a key component, to be promulgated as regulations through rulemaking. Agencies should ensure they comply with all appropriate agency requirements for issuing and revising their NEPA implementing procedures.

AR_0006281

- Summarize the information in the agency's administrative record that was used to substantiate the categorical exclusion, including an evaluation of the information and related findings;[26]
- Define all applicable terms;
- Describe the extraordinary circumstances that may limit the use of the categorical exclusion; and
- Describe the available means for submitting questions and comments about the proposed categorical exclusion (for example, email addresses, mailing addresses, website addresses, and names and phone numbers of agency points of contact).

When establishing or revising a categorical exclusion, agencies should also pursue additional opportunities for public involvement beyond publication in the *Federal Register* in cases where there is likely to be significant public interest and additional outreach would facilitate public input. The extent of public involvement can be tailored to the nature of the proposed categorical exclusion and the degree of expected public interest.

CEQ encourages Federal agencies to engage interested parties such as public interest groups, Federal NEPA contacts at other agencies, Tribal governments and agencies, and state and local governments and agencies. The purpose of this engagement is to share relevant data, information, and concerns. Agencies can involve the public by using the methods noted in section 1506.6 of the CEQ Regulations, as well as other public involvement techniques such as focus groups, e-mail exchanges, conference calls, and web-based forums.

CEQ also strongly encourages Federal agencies to post updates on their official websites whenever they issue *Federal Register* notices for new or revised categorical exclusions. An agency website may serve as the primary location where the public learns about agency NEPA implementing procedures and their use, and obtains efficient access to updates and supporting information. Therefore, agencies should ensure that their NEPA implementing procedures and any final revisions or amendments are easily accessed through the agency's official website including when an agency is adding, deleting, or revising the categorical exclusions and/or the extraordinary circumstances in its NEPA implementing procedures.

## V. APPLYING AN ESTABLISHED CATEGORICAL EXCLUSION

---

[26] This step is particularly beneficial when the agency determines that the public will view a potential impact as significant, as it provides the agency the opportunity to explain why it believes that impact to be presumptively insignificant. Whenever practicable, the agency should include a link to a website containing all the supporting information, evaluations, and findings. Ready access to all supporting information will likely minimize the need for members of the public to depend on Freedom of Information Act requests and enhance the NEPA goals of outreach and disclosure. Agencies should consider using their regulatory development tools to assist in maintaining access to supporting information, such as establishing an online docket using www.regulations.gov.

AR_0006282

When applying a categorical exclusion to a proposed action, Federal agencies face two key decisions: (1) whether to prepare documentation supporting their determination to use a categorical exclusion for a proposed action; and (2) whether public engagement and disclosure may be useful to inform determinations about using categorical exclusions.

A. When to Document Categorical Exclusion Determinations

In prior guidance, CEQ has "strongly discourage[d] procedures that would require the preparation of additional paperwork to document that an activity has been categorically excluded," based on an expectation that "sufficient information will usually be available during the course of normal project development" to determine whether an EIS or an EA is needed.[27] Moreover, "the agency's administrative record (for the proposed action) will clearly document the basis for its decision."[28] This guidance modifies our prior guidance to the extent that it recognizes that each Federal agency should decide—and update its NEPA implementing procedures and guidance to indicate—whether any of its categorical exclusions warrant preparation of additional documentation.

Some activities, such as routine personnel actions or purchases of small amounts of supplies, may carry little risk of significant environmental effects, such that there is no practical need for, or benefit from, preparing additional documentation when applying a categorical exclusion to those activities. For those activities, the administrative record for establishing the categorical exclusion and any normal project development documentation may be considered sufficient.

For other activities, such as decisions to allow various stages of resource development after a programmatic environmental review, documentation may be appropriate to demonstrate that the proposed action comports with any limitations identified in prior NEPA analysis and that there are no potentially significant impacts expected as a result of extraordinary circumstances. In such cases, the documentation should address proposal-specific factors and show consideration of extraordinary circumstances with regard to the potential for localized impacts. It is up to agencies to decide whether to prepare separate NEPA documentation in such cases or to include this documentation in other project-specific documents that the agency is preparing.

In some cases, courts have required documentation to demonstrate that a Federal agency has considered the environmental effects associated with extraordinary circumstances.[29]

---

[27] "Guidance Regarding NEPA Regulations," 48 Fed. Reg. 34,263, 34,265 (Jul. 28, 1983), *available on* www.nepa.gov *at* ceq.hss.doe.gov/nepa/regs/1983/1983guid.htm.

[28] *Id.*

[29] *See, e.g.,* California v. Norton, 311 F.3d 1162, 1175-78 (9th Cir. 2002).

AR_0006283

Documenting the application of a categorical exclusion provides the agency the opportunity to demonstrate why its decision to use the categorical exclusion is entitled to deference.[30]

Documentation may be necessary to comply with the requirements of other laws, regulations, and policies, such as the Endangered Species Act or the National Historic Preservation Act. When that is the case, all resource analyses and the results of any consultations or coordination should be incorporated by reference in the administrative record developed for the proposed action. Moreover, the nature and severity of the effect on resources subject to additional laws or regulations may be a reason for limiting the use of a categorical exclusion and therefore should, where appropriate, also be addressed in documentation showing how potential extraordinary circumstances were considered and addressed in the decision to use the categorical exclusion.

For those categorical exclusions for which an agency determines that documentation is appropriate, the documentation should cite the categorical exclusion being used and show that the agency determined that: (1) the proposed action fits within the category of actions described in the categorical exclusion; and (2) there are no extraordinary circumstances that would preclude the proposed action from being categorically excluded. The extent of the documentation should be tailored to the type of action involved, the potential for extraordinary circumstances and environmental effects, and any applicable requirements of other laws, regulations, and policies. If lengthy documentation is needed to address these aspects, an agency should consider whether it is appropriate to apply the categorical exclusion in that particular situation. In all circumstances, any documentation prepared for a categorical exclusion should be concise.

B. When to Seek Public Engagement and Disclosure

Most Federal agencies do not routinely notify the public when they use a categorical exclusion to meet their NEPA responsibilities. There are some circumstances, however, where the public may be able to provide an agency with valuable information, such as whether a proposal involves extraordinary circumstances or potentially significant cumulative impacts that can help the agency decide whether to apply a categorical exclusion. CEQ therefore encourages Federal agencies to determine—and specify in their NEPA implementing procedures—those circumstances in which the public should be engaged or notified before a categorical exclusion is used.

Agencies should utilize information technology to provide the public with access to information about the agency's NEPA compliance. CEQ strongly recommends that agencies post key information about their NEPA procedures and implementation on a publicly available website. The website should include:

- The text of the categorical exclusions and applicable extraordinary circumstances;

---

[30]  The agency determination that an action is categorically excluded may itself be challenged under the Administrative Procedure Act, 5 U.S.C. § 501 *et seq.*

AR_0006284

- A synopsis of the administrative record supporting the establishment of each categorical exclusion with information on how the public can access the entire administrative record;
- Those categorical exclusions which the agency determines are and are not likely to be of interest to the public;[31] and
- Information on agencies' use of categorical exclusions for proposed actions, particularly in those situations where there is a high level of public interest in a proposed action.

Where an agency has documented a categorical exclusion, it should also consider posting that documentation online. For example, in 2009, the Department of Energy adopted a policy to post documented categorical exclusion determinations online.[32] By adopting a similar policy, other agencies can significantly increase the quality and transparency of their decisionmaking when using categorical exclusions.

## VI. PERIODIC REVIEW OF ESTABLISHED CATEGORICAL EXCLUSIONS

The CEQ Regulations direct Federal agencies to "continue to review their policies and procedures and in consultation with [CEQ] to revise them as necessary to ensure full compliance with the purposes and provisions of [NEPA]."[33] Many agencies have categorical exclusions that were established many years ago. Some Federal agencies have internal procedures for identifying and revising categorical exclusions that no longer reflect current environmental circumstances, or current agency policies, procedures, programs, or mission. Where an agency's categorical exclusions have not been regularly reviewed, they should be reviewed by the agency as soon as possible.

There are several reasons why Federal agencies should periodically review their categorical exclusions. For example, a Federal agency may find that an existing categorical exclusion is not being used because the category of actions is too narrowly defined. In such cases, the agency should consider amending its NEPA implementing procedures to expand the description of the category of actions included in the categorical exclusion. An agency could also find that an existing categorical exclusion includes actions that raise the potential for significant environmental effects with some regularity. In those cases, the agency should determine whether to delete the categorical exclusion, or revise it to either limit the category of actions or expand the extraordinary circumstances that limit when the categorical exclusion can be used. Periodic review can also help agencies identify additional factors that should be included in their extraordinary circumstances and consider whether certain categorical exclusions should be documented.

---

[31] Many agencies publish two lists of categorical exclusions: (1) those which typically do not raise public concerns due to the low risk of potential environmental effects, and (2) those more likely to raise public concerns.

[32] *See* Department of Energy, "Categorical Exclusion Determinations," *available at* www.gc.energy.gov/NEPA/categorical_exclusion_determinations.htm.

[33] 40 CFR § 1507.3.

AR_0006285

Agencies should exercise sound judgment about the appropriateness of categorically excluding activities in light of evolving or changing conditions that might present new or different environmental impacts or risks. The assumptions underlying the nature and impact of activities encompassed by a categorical exclusion may have changed over time. Different technological capacities of permitted activities may present very different risk or impact profiles. This issue was addressed in CEQ's August 16, 2010 report reviewing the Department of the Interior's Minerals Management Service's application of NEPA to the permitting of deepwater oil and gas drilling.[34]

Agencies should review their categorical exclusions on an established timeframe, beginning with the categorical exclusions that were established earliest and/or the categorical exclusions that may have the greatest potential for significant environmental impacts. This guidance recommends that agencies develop a process and timeline to periodically review their categorical exclusions (and extraordinary circumstances) to ensure that their categorical exclusions remain current and appropriate, and that those reviews should be conducted at least every seven years. A seven-year cycle allows the agencies to regularly review categorical exclusions to avoid the use of categorical exclusions that are outdated and no longer appropriate. If the agency believes that a different timeframe is appropriate, the agency should articulate a sound basis for that conclusion, explaining how the alternate timeframe will still allow the agency to avoid the use of categorical exclusions that are outdated and no longer appropriate. The agency should publish its process and time period, along with its articulation of a sound basis for periods over seven years, on the agency's website and notify CEQ where on the website the review procedures are posted. We recognize that due to competing priorities, resource constraints, or for other reasons, agencies may not always be able to meet these time periods. The fact that a categorical exclusion has not been evaluated within the time established does not invalidate its use for NEPA compliance, as long as such use is consistent with the defined scope of the exclusion and has properly considered any potential extraordinary circumstances.

In establishing this review process, agencies should take into account factors including changed circumstances, how frequently the categorical exclusions are used, the extent to which resources and geographic areas are potentially affected, and the expected duration of impacts. The level of scrutiny and evaluation during the review process should be commensurate with a categorically-excluded activity's potential to cause environmental impacts and the extent to which relevant circumstances have changed since it was issued or last reviewed. Some categorical exclusions, such as for routine purchases or contracting for office-related services,

---

[34] Council on Environmental Quality, "Report Regarding the Mineral Management Service's National Environmental Policy Act Policies, Practices, and Procedures as They Relate to Outer Continental Shelf Oil and Gas Exploration," *available at* ceq.hss.doe.gov/current_developments/docs/CEQ_Report_Reviewing_MMS_OCS_NEPA_Impl ementation.pdf (Aug. 2010) at 18-20 (explaining that MMS NEPA review for the Macondo Exploratory Well relied on categorical exclusions established in the 1980s, before deepwater drilling became widespread).

16

may require minimal review. Other categorical exclusions may require a more thorough reassessment of scope, environmental effects, and extraordinary circumstances, such as when they are tiered to programmatic EAs or EISs that analyzed activities whose underlying circumstances have since changed.

To facilitate reviews, the Federal agency offices charged with overseeing their agency's NEPA compliance should develop and maintain sufficient capacity to periodically review their existing categorical exclusions to ensure that the agency's prediction of no significant impacts is borne out in practice.[35] Agencies can efficiently assess changed circumstances by utilizing a variety of methods such as those recommended in Section III, above, for substantiating new or revised categorical exclusions. These methods include benchmarking, monitoring of previously implemented actions, and consultation with professional staff. The type and extent of monitoring and other information that should be considered in periodic reviews, as well as the particular entity or entities within the agency that would be responsible for gathering this information, will vary depending upon the nature of the actions and their anticipated effects. Consequently, agencies should utilize the expertise, experience, and judgment of agency professional staff when determining the appropriate type and extent of monitoring and other information to consider. This information will help the agency determine whether its categorical exclusions are used appropriately, or whether a categorical exclusion needs to be revised. Agencies can also use this information when they engage stakeholders in developing proposed revisions to categorical exclusions and extraordinary circumstances.

Agencies can also facilitate reviews by keeping records of their experiences with certain activities in a number of ways, including tracking information provided by agency field offices.[36] In such cases, a Federal agency could conduct its periodic review of an established categorical exclusion by soliciting information from field offices about the observed effects of implemented actions, both from agency personnel and the public. On-the-ground monitoring to evaluate environmental effects of an agency's categorically-excluded actions, where appropriate, can also be incorporated into an agency's procedures for conducting its oversight of ongoing projects and can be included as part of regular site visits to project areas.

Agencies can also conduct periodic review of existing categorical exclusions through broader program reviews. Program reviews can occur at various levels (for example, field office, division office, headquarters office) and on various scales (for example, geographic location, project type, or areas identified in an interagency agreement). While a Federal agency may choose to initiate a program review specifically focused on categorical exclusions, it is possible that program reviews with a broader focus may yield information relevant to categorical exclusions and may thus substitute for reviews specifically focused on categorical exclusions. However, the substantial flexibility that agencies have in how they structure their review

---

[35] 40 CFR § 1507.2.

[36] Council on Environmental Quality, "The NEPA Task Force Report to the Council on Environmental Quality – Modernizing NEPA Implementation," p. 63 (Sept. 2003), *available on* www.nepa.gov *at* ceq.hss.doe.gov/ntf/report/index.html.

17

procedures underscores the importance of ensuring that the review procedures are clear and transparent.

In working with agencies on reviewing their existing categorical exclusions, CEQ will look to the actual impacts from activities that have been subject to categorical exclusions, and will consider the extent and scope of agency monitoring and/or other substantiating evidence. As part of its oversight role and responsibilities under NEPA, CEQ will contact agencies following the release of this guidance to ascertain the status of their reviews of existing categorical exclusions. CEQ will make every effort to align its oversight with reviews being conducted by the agency and will begin with those agencies that are currently reassessing their categorical exclusions, as well as with agencies that are experiencing difficulties or facing challenges to their application of categorical exclusions.

Finally, it is important to note that the rationale and supporting information for establishing or documenting experience with using a categorical exclusion may be lost if an agency has inadequate procedures for recording, retrieving, and preserving documents and administrative records. Therefore, Federal agencies will benefit from a review of their current practices for maintaining and preserving such records. Measures to ensure future availability could include greater centralization of records, use of modern storage systems and improvements in the agency's electronic and hard copy filing systems.[37]

## VII. CONCLUSION

This guidance will help to guide CEQ and the agencies when an agency seeks to propose a new or revised categorical exclusion. It should also guide the agencies when categorical exclusions are used for proposed actions, when reviewing existing categorical exclusions, or when proposing new categorical exclusions. Questions regarding this guidance should be directed to the CEQ Associate Director for NEPA Oversight.

---

[37] Agencies should be mindful of their obligations to maintain and preserve agency records under the Federal Records Act for maintaining and preserving agency records. 44 U.S.C. § 3101 *et seq.*

AR_0006288

1  KRISTEN L. BOYLES (CSBA #158450)
   JAN E. HASSELMAN (WSBA # 29107)
2  *[Pro Hac Vice Application Pending]*
   EARTHJUSTICE
3  810 Third Avenue, Suite 610
   Seattle, WA  98104
4  (206) 343-7340
   kboyles@earthjustice.org
5  jhasselman@earthjustice.org

6  SUSAN JANE M. BROWN (OSBA #054607)
   *[Pro Hac Vice Application Pending]*
7  WESTERN ENVIRONMENTAL LAW CENTER
   4107 NE Couch St.
8  Portland, OR.  97232
   (503) 914-1323
9  brown@westernlaw.org

10 GREGORY C. LOARIE (CSBA #215859)
   EARTHJUSTICE
11 50 California Street, Suite 500
   San Francisco, CA  94111
12 (415) 217-2000
   gloarie@earthjustice.org
13
   *Attorneys for Plaintiffs*
14

15

16              UNITED STATES DISTRICT COURT
        FOR THE NORTHERN DISTRICT OF CALIFORNIA
17

| | |
|---|---|
| 18  ALASKA COMMUNITY ACTION ON TOXICS, AMERICAN ALPINE CLUB, CALIFORNIA WILDERNESS COALITION, CENTER FOR BIOLOGICAL DIVERSITY, CENTER FOR ENVIRONMENTAL HEALTH, CENTER FOR FOOD SAFETY, ENVIRONMENT AMERICA, ENVIRONMENTAL DEFENSE FUND, ENVIRONMENTAL PROTECTION INFORMATION CENTER, FOOD AND WATER WATCH, FRIENDS OF THE EARTH, NATIONAL PARKS CONSERVATION ASSOCIATION, NATIONAL WILDLIFE FEDERATION, | Case No. 3:20-cv-5199 <br><br> COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF <br><br> (National Environmental Policy Act, 42 U.S.C. § 4321 *et seq.*; Administrative Procedure Act, 5 U.S.C. § 551 *et seq.*) |

25 COMPLAINT FOR DECLARATORY
26 AND INJUNCTIVE RELIEF - 1 -

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA 98104-1711*
*(206) 343-7340*

AR_0006542

1  OCEAN CONSERVANCY, RIO GRANDE
   INTERNATIONAL STUDY CENTER,
2  SOUTHERN UTAH WILDERNESS
   ALLIANCE, WE ACT FOR
3  ENVIRONMENTAL JUSTICE, WESTERN
   WATERSHEDS PROJECT, THE
4  WILDERNESS SOCIETY, and WINTER
   WILDLANDS ALLIANCE,
5
                    Plaintiffs,
6  v.

7  COUNCIL ON ENVIRONMENTAL
   QUALITY, and MARY NEUMAYR, in her
8  official capacity as Chair of the Council on
   Environmental Quality,
9
                    Defendants.
10

11                    INTRODUCTION

12     1.      The National Environmental Policy Act of 1970 ("NEPA"), 42 U.S.C. § 4331 *et*

13  *seq.*, often called the "Magna Carta" of American environmental law, embodies our Nation's

14  environmental conscience.  In enacting NEPA, Congress issued a sweeping declaration of values

15  and a call to action, centering the protection of human health and the environment in all federal

16  agency decisions.  The statute affirms the government's role to "fulfill the responsibilities of

17  each generation as trustee of the environment for succeeding generations."  *Id*. § 4331(b)(1).  To

18  implement these goals, NEPA institutes a national policy of "look before you leap" by requiring

19  all federal agencies to carefully analyze and disclose to the public the potential environmental

20  impacts of, and feasible alternatives to, federal agency actions.  *Id*. § 4332(c).  It is, in short, the

21  people's environmental law.

22     2.      Since 1978, regulations promulgated by the Council on Environmental Quality

23  ("CEQ"), an agency created by NEPA within the executive office of the President, have guided

24

25  COMPLAINT FOR DECLARATORY
   AND INJUNCTIVE RELIEF - 2 -
26

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA 98104-1711*
*(206) 343-7340*

every federal agency's implementation of NEPA. *See* 40 C.F.R. Part 1500 (1978). CEQ's regulations codified early judicial precedent interpreting the meaning and reach of NEPA's obligations, and they provided the basis for a substantial body of judicial precedent spanning over four decades. CEQ's regulations also formed the foundation for more specific regulations enacted by federal "action" agencies—from the U.S. Forest Service to the Federal Energy Regulatory Commission—to implement their particular missions. Over the decades, the 1978 CEQ regulations have stood the test of the time, with only minor amendments.

3. That long history of continuity with respect to CEQ's interpretation of NEPA has come to an abrupt halt under the current administration. The current administration explicitly admitted that it placed the interests of pipelines, fossil fuel energy production, and road building over that of environmental and public health. Over the vociferous objections of states, members of Congress, myriad conservation, environmental justice, and public health organizations, and the general public, on July 16, 2020 CEQ issued a final rule ("Final Rule") rewriting the entirety of its 1978 regulations. *Update to the Regulations Implementing the Procedural Provisions of the National Environmental Policy Act; Final Rule*, 85 Fed. Reg. 43,304 (July 16, 2020) (to be codified at 40 C.F.R. Part 1500). More than an update, the Final Rule upends virtually every aspect of NEPA and its longstanding practice, contradicts decades of court interpretations of NEPA's mandates, and undercuts the reliance placed on NEPA by the public, decision-makers, and project proponents. The Final Rule limits the scope of actions to which NEPA applies, eviscerates the thorough environmental analysis that lies at the heart of the statute, reduces the ability of the public to participate in federal agency decision-making, and seeks to limit judicial review of agency NEPA compliance. All told, the Final Rule frustrates Congress's manifest intent in enacting NEPA and threatens human health and the environment.

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 3 -

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA 98104-1711*
*(206) 343-7340*

AR_0006544

4.     Plaintiffs in this action are a diverse coalition of national and regional environmental justice, outdoor recreation, public health, and conservation organizations that rely on NEPA to protect their varied interests in human health and the environment.  Plaintiffs challenge the Final Rule for three broad reasons.  First, CEQ failed to consider and disclose the significant environmental impacts from the Final Rule in an environmental assessment ("EA") or environmental impact statement ("EIS"), in violation of NEPA itself.  Second, the Final Rule is arbitrary and capricious in a number of ways, as CEQ failed to explain its decision in light of the evidence in the record, including public comments, failed to review the impacts of the rule on the advancement of environmental justice, failed to consider the relevant factors when altering longstanding practice, and changed longstanding agency interpretations and practice without adequate explanation or justification.  Finally, in many ways, the Rule is inconsistent with the text, structure, and intent of NEPA itself and violates the Administrative Procedure Act ("APA").

5.     Plaintiffs seek an order declaring the Final Rule unlawful and vacating the Final Rule, reinstating the NEPA regulations previously in force.

JURISDICTION AND VENUE

6.     This Court has jurisdiction pursuant to 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 1346 (United States as defendant).  The Court may issue a declaratory judgment and further relief under 28 U.S.C. §§ 2201-02.  This action is brought pursuant to the APA, 5 U.S.C. § 551 *et seq.*[1]

---

[1] Pursuant to 16 U.S.C. § 1540(g), a subset of Plaintiffs plan to provide 60 days' notice of legal violation to CEQ for failure to consult on the Final Rule in violation of Endangered Species Act Section 7.  If CEQ fails to provide a satisfactory response, Plaintiffs will take appropriate steps to amend this complaint to include these claims at the conclusion of the 60-day period.

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 4 -

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA  98104-1711*
*(206) 343-7340*

7.      Venue is properly vested in this Court under 28 U.S.C. § 1391(e), as a number of Plaintiffs reside in this district, Plaintiffs have members and offices in this District, and many of the consequences of the defendants' violations of the law giving rise to the claims occurred or will occur in this district.

INTRADISTRICT ASSIGNMENT

8.      This case is properly assigned to the San Francisco Division or the Oakland Division under Civil L.R. 3-2(c) because several of the Plaintiffs and/or their members are located in counties within those districts.

PARTIES

A.      <u>Plaintiffs</u>

1.      *Descriptions, Interests, and Injury of Each Plaintiff Organization*

9.      Plaintiff <u>Alaska Community Action on Toxics</u> ("ACAT") is a 501(c)(3) non-profit with its main office in Anchorage, Alaska.  ACAT also has staff and conducts community health research in Gambell and Savoonga, both located on Saint Lawrence Island, Alaska.  ACAT believes everyone has a right to clean air, clean water, and toxic-free food.  Driven by a core belief in environmental health and justice, ACAT empowers communities to eliminate exposure to toxics through collaborative research, shared science, education, organizing, and advocacy. ACAT employs a community-based approach guided by the following core values: community right-to-know, environmental justice, the precautionary principle, elimination of the production and release of toxics, rights and sovereignty of Indigenous peoples, and a culture of caring and wellness.  ACAT has approximately 300 donors, 50 volunteers, and several thousand people who have signed up as interested citizens and activists to receive communications and actions alerts about issues relevant to environmental contamination by toxic chemicals.

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 5 -

10.     ACAT works primarily with Alaska Native communities who rely on the land and ocean for physical, spiritual, and cultural sustenance.  Those communities depend on healthy marine ecosystems, in particular, for hunting, fishing, and food security.  ACAT conducts public education programs to educate its constituent members about the environmental and public health risks, including risks and harms from oil development, chemical dispersants used in oil spill response, the proposed Pebble and Donlin Creek Mines, the proposed Ambler Mining District Industrial Access Road, and military training, testing, and bombing/artillery exercises in sensitive ecological areas, such as wetlands, stream and river corridors, and estuaries (e.g. bombing of Eagle River Flats) and other areas of high biological diversity (e.g. high impact training operations in the Gulf of Alaska).

11.     ACAT regularly uses NEPA and its public processes to advocate for issues on behalf of its supporters and communities in Alaska.  ACAT has most recently submitted scoping comments in response to the 2020 U.S. Department of Defense, Department of the Air Force Notice of Intent to prepare an Environmental Impact Statement under the National Environmental Policy Act for the proposed action of year-round mortar and artillery live fire training on Eagle River Flats, an ecologically and culturally important estuary north of Anchorage on the Joint Bases Elmendorf AFB-Fort Richardson.  ACAT also prepared comments for the scoping process and on the Draft Environmental Impact Statements for the proposed Donlin Creek Mine and Ambler Mining District Industrial Access Road.  In 2019, ACAT prepared and submitted comments on the Draft Environmental Impact Statement for the proposed Pebble Mine.

12.     As a science-based organization with over 20 years of experience working on toxic contamination, ACAT has worked with many Alaskan communities faced with and

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 6 -

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA  98104-1711*
*(206) 343-7340*

AR_0006547

concerned about pollution from mines and oil exploitation and the effects on the environment,

traditional wild foods, and people's health.  ACAT staff, supporters, and the communities ACAT

works with are harmed by the Final Rule because they eliminate the vital protections that have

been in place for decades.  The environmental justice implications of the Final Rule are

profound, and preventing such injustices is at the core of ACAT's mission.

13.     Staff member Patti Saunders is ACAT's Development Director, having previously

worked as an attorney and commercial fisherman in Prince William Sound, Southeast Alaska,

and Bristol Bay.  Ms. Saunders has previously submitted public comments to government

agencies during NEPA review processes and will do so again in the future when proposed

projects threatened the environmental and public health of Alaska.  As a commercial fisherman

who fished in Bristol Bay for a season and who has friends who have (and in some cases

continue to) fish there, she is keenly aware of the Bristol Bay watershed's importance as a world-

class fishery that has both economic and cultural value for Alaskans.  It is a virtually pristine,

intact ecosystem that has supported Alaska Natives for thousands of years.  It also provides

recreational opportunities for Alaskans and non-Alaskans: fishing, birding, wildlife viewing,

nature photography, hiking, kayaking, and canoeing.  Ms. Saunders enjoys these types of

recreational opportunities, including birdwatching, in the Bristol Bay watershed.  She has

definite plans to return to the Bristol Bay region to enjoy all it has to offer an outdoor enthusiast

in the next two to four years.

14.     Pamela Miller has served as ACAT's Executive Director since 1997.  Ms. Miller

has more than 35 years of experience in research, policy, advocacy, and training programs

focused on environmental health, justice, human rights, and marine ecology.  Since 2005, she has

served as Principal Investigator for community-based environmental health research projects

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 7 -

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA 98104-1711*
*(206) 343-7340*

supported by the National Institute of Environmental Health Sciences and focused on the long-term effects of endocrine-disrupting chemicals on the environment and human health.  In 2016, Ms. Miller was elected to serve as the co-chair of the International Pollutants Elimination Network, a global network of more than 500 environmental health and justice organizations working in over 100 countries for a toxics-free future.  Ms. Miller has personally been involved in writing NEPA comments, attending public hearings, and engaging in litigation when NEPA has been violated.  Ms. Miller has been the primary person working on chemical dispersant issues for ACAT since 2002.  The use of dispersant chemicals in the event of an offshore oil spill would greatly impact the health and cultural well-being of ACAT's supporters, including its Board Members.

15.  Harriet Penayah, a Yupik Elder from the Native Village of Savoonga on Saint Lawrence Island in the Bering Sea, is an ACAT board member.  Ms. Penayah and her family rely on the harvest of marine fish and marine mammals for spiritual, physical, and cultural sustenance.  A significant part of the Penayah family diet comes from the ocean, including fish like salmon, cod, and halibut, as well as marine mammals like ringed seal, bearded seal, walrus, and bowhead whale.  St. Lawrence Island is located in the northern Bering Sea and within the Norton Sound region on the Alaska Outer Continental Shelf.  The Norton Sound area experienced oil and gas development in the 1980s.  It is also proposed for oil and gas leasing under the federal Bureau of Ocean Energy Management's Draft Proposed Program for 2019-2024.  Oil development in the Bering Sea and use of chemical dispersants in response to an oil spill in the Norton Sound region would impact Ms. Penayah and her family's food security by polluting the marine ecosystems on which they depend for food.  It would also disrupt the migratory patterns of important marine mammals, such as the bowhead whale.  Marine animals

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 8 -

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA 98104-1711*
*(206) 343-7340*

AR_0006549

form the basis of Harriet's diet and cultural traditions.  If chemical dispersants impacted the

safety of these food sources, Ms. Penayah and her family would not be able to replace these

sources with food purchased from a grocery store, due to the deep cultural importance that these

animals hold for Ms. Penayah and her family.  ACAT engages in the NEPA process, including

preparation of public comments and participation in hearings concerning oil and gas

development in the Bering, Chukchi, and Beaufort Seas, in order to protect the health of marine

ecosystems and Alaska Native communities that rely on traditional foods from the sea.

16.     Plaintiff American Alpine Club ("AAC") is a 501(c)(3) non-profit organization

based in Golden, Colorado with over 25,000 members nationally and 3,491 members in

California.  Founded in 1902 to support the research and exploration of mountainous regions, the

AAC remains committed to supporting the climbing and human-powered outdoor recreation

communities over a century later.  At the core of AAC's policy efforts are critical issues facing

climbers and outdoor recreationists nationally, such as keeping public lands pristine, wild, and

open to human-powered recreation.  One of the key tools that enable the AAC to effectively

advocate for these issues on behalf of its membership and the climbing community broadly is the

public process afforded by NEPA.  NEPA mandates informed decision-making, based on sound

science, and requires that, to the fullest extent possible, all agencies of the federal government

take a hard look at environmental consequences prior to issuing a decision.  NEPA declares a

broad national commitment to protecting and promoting environmental quality under the CEQ

regulations, which are influential in shaping agency implementation of the statute.

17.     The Final Rule is extremely detrimental to the outdoor community's interests and

adversely affects the AAC and its membership.  The changes will hamstring AAC's members'

ability to effectively participate in public comment periods, maintain accountability and

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 9 -

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA 98104-1711*
*(206) 343-7340*

transparency in public lands decision-making, and advocate for solutions to climate change, among other issues. For these reasons, the AAC has promoted the disbandment of this proposal at every stage of the CEQ rulemaking process, from having provided public testimony at the CEQ hearing in Denver, Colorado to submitting technical comments on the proposed rulemaking alongside their partners at the Outdoor Alliance, a coalition dedicated to protecting public lands and waters for human powered recreation.

18. A key concern among AAC members are the effects of a changing climate on its communities, climbing areas, and ecosystems. Mountain regions are warming at roughly twice the pace of the global average, and AAC members are bearing witness to these changes directly. As climbers, skiers, and mountaineers, AAC members are intimately familiar with the mountain landscapes of the United States. Many of AAC's members also rely on a predictable climate to sustain their livelihoods. Whether as a mountain guide, a gear shop owner, or a retail employee, a reliable climate in many United States mountain towns equates to a reliable tourism and outdoor recreation economy. In 2018, the annual climbing industry contribution to the United States Gross Domestic Product ("GDP") was $12.5 billion, where the outdoor recreation economy as a whole generated 7.6 million jobs and accounted for more than 2.2% of the country's GDP, according to the Bureau of Economic Analysis.

19. AAC membership has historically engaged in federal agency land use planning, such as in U.S. Forest Service forest planning or Bureau of Land Management ("BLM") resource management plan development, where members could influence the outcome of energy development, mining, or logging projects through extensive public engagement, expert testimony and scientifically informed environmental reviews. In addition, NEPA's cumulative and indirect effects analysis has benefited AAC members by requiring that the federal government consider

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 10 -

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA 98104-1711*
*(206) 343-7340*

AR_0006551

1   the impact of their decision-making on the climate and factor this into the creation of reasonable

2   plan alternatives.

3        20.      This is particularly troubling in areas with complex management issues such as

4   Bears Ears National Monument, where following a Presidential Proclamation which reduced the

5   original monument designation in size by 85%, thousands of acres of land in southeastern Utah

6   including many important rock-climbing areas as well as Native American sacred and cultural

7   sites, were opened to oil and gas development.  The AAC and its partners relied on NEPA to

8   inform the BLM resource management planning process for the Indian Creek and Shash Jaa units

9   on issues of recreation and natural resource management.

10       21.      Dr. Len Necefer, a member of the AAC since 2017, resides in Tucson, Arizona

11  where he is a Professor of American Indian Studies at the Udall Center for Public Policy at the

12  University of Arizona as well as the CEO of Colorado based company, Natives Outdoors.  Dr.

13  Necefer is a member of the Navajo Nation and his research focuses on the intersection of

14  indigenous peoples and natural resource management.  An avid climber and backcountry skier,

15  Dr. Necefer currently serves as a board member for the AAC and volunteers his time on the

16  AAC Policy Committee, which advises AAC staff on recreation management and natural

17  resource policy issues.  Dr. Necefer has relied heavily on the NEPA process to voice concern

18  over impacts caused by energy development on climbing and cultural resources in resource

19  management planning.  Dr. Necefer worked with the Bears Ears Inter-Tribal Coalition to

20  orchestrate collaborative comments for the BLM during their resource planning process for the

21  Indian Creek and Shash Jaa units in Bears Ears National Monument.  Not only does Dr. Necefer

22  visit Bears Ears National Monument to enjoy the world-renowned rock climbing in Indian Creek,

23  an area with hundreds of documented climbing routes, but also the area is a sacred site for the

24

25  COMPLAINT FOR DECLARATORY
    AND INJUNCTIVE RELIEF - 11 -

26

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA 98104-1711*
*(206) 343-7340*

AR_0006552

Navajo Nation and contains numerous cultural resources. Dr. Necefer has firm and definite plans to visit and climb in these areas in the future. Dr. Necefer utilizes NEPA to provide management guidance on several areas like Bears Ears, where sacred ancestral lands overlap with well-documented recreation areas.

22. Dr. Necefer has also worked extensively on the Oak Flat land exchange in the Coconino National Forest where Resolution Copper plans to open a large-scale copper mine. The proposed mine will span two miles wide and over 1,000 feet deep, destroying hundreds of rock climbs as well as vast stands of Emory oak, medicinal plants, and ceremonial sites important to the San Carlos Apache tribe. This mine, if approved in the pending EIS, will mark the biggest loss of climbing area access in history.

23. Dr. Necefer's ability to enjoy the future of Oak Flat, and Bears Ears National Monument has hinged in part on his ability to voice concern for their management throughout the NEPA process. Dr. Necefer's interest in protecting climbing areas and important cultural sites will be harmed by the CEQ's narrowing of NEPA's scope of review, as well as the reduced public participation and allowing a private corporation, like Resolution Copper, who has a vested interest in its project, to draft its own EIS. Dr. Necefer has concrete plans to return to Bears Ears National Monument as well as areas closer to home, such as the Coronado National Forest, and hopes to continue participating in the management of the climbing resources of these areas. As a professor and small business owner, the CEQ's shortened timeline for submitting comments will make it near impossible for him to provide adequately substantive comments, resulting in his important opinions being overlooked. Finally, as a member of the Navajo Nation, Dr. Necefer fears that his community will be overlooked in future energy development projects by the

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 12 -

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA 98104-1711*
*(206) 343-7340*

AR_0006553

1   abbreviated NEPA process and that adequate consultation with tribes and the appropriate

2   fulfillment of the government's trust responsibility agreement will not be met.

3   24.     Byron Harvison is an attorney who resides in Park City, Utah, who has been a

4   member of the AAC for more than 15 years.  Mr. Harvison is a long-time volunteer for the AAC,

5   serving as the AAC Salt Lake Chapter Chair, and also volunteers with the Salt Lake Climbers

6   Alliance.  An avid rock and ice climber, Mr. Harvison has worked extensively on recreation and

7   public lands policy issues through the NEPA process in Utah.  Throughout his long climbing

8   career, Mr. Harvison has climbed all over the Western United States, and frequents federally

9   managed public lands often to recreate.  Mr. Harvison has concrete plans to continue to climb in

10  Utah and elsewhere in the west in the future.  Currently, Mr. Harvison and other climbers in the

11  Salt Lake region are volunteering their time to work on the Uinta-Wasatch Cache National Forest

12  Plan revision, with the intent of influencing a specific climbing management plan through public

13  comment afforded by NEPA.

14  25.     Additionally, Mr. Harvison and a team of other AAC members, staff, and local

15  Salt Lake climbers, have been working to challenge the Little Cottonwood Canyon ("LCC") EIS

16  alternatives.  Mr. Harvison has climbed here in the past and has definite plans to return to the

17  area in the future to climb here again.  A proposed gondola and road widening project would

18  have several direct and indirect impacts on the climbing resources of the LCC, an area that is a

19  critically important resource to the climbers of Salt Lake.  Mr. Harvison and other climbers who

20  visit LCC to recreate in the future will be greatly impacted by several of the proposed

21  alternatives which could severely alter the state of climbing in the canyon.  LCC is a highly

22  congested roadway that generates large amounts of air pollution, especially during the winter

23  months.  If climate change and air quality implications are not thoroughly considered in the

24

25  COMPLAINT FOR DECLARATORY
    AND INJUNCTIVE RELIEF - 13 -

26

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA 98104-1711*
*(206) 343-7340*

AR_0006554

NEPA process, Mr. Harvison, other Utah residents, and climbers everywhere will be negatively affected. The Final Rule's removal of the indirect and cumulative effects analysis requirement will result in a failure to account for the visual and auditory effects of projects such as this and limited comment periods will make it increasingly difficult for volunteers like Mr. Harvison to offer informed public comment. Additional restrictions on Mr. Harvison's ability to provide comment on federal land management decisions will result in negative consequences to his recreational experience in the Wasatch-Cache National Forest and on other National Forest units across the country.

26. Plaintiff <u>California Wilderness Coalition</u> ("CalWild") is a non-profit organization incorporated under the laws of the State of California with its central office in Oakland, California, and field offices in Sacramento, Redding, Fresno, and Los Angeles, California. CalWild, on behalf of its 632 members, works in a variety of ways to protect and restore the state's wildest natural landscapes and watersheds on federal public lands. These important wild places provide clean air and water, refuges for wildlife, mitigation against the effects of climate change, and outstanding opportunities for recreation and spiritual renewal for people. CalWild is the only statewide organization dedicated solely to protecting and restoring the wild places and native biodiversity of California's public lands. CalWild is dedicated to achieving Congressionally-designated protections (e.g., wilderness, national monument), as well as administrative protections by state or federal agencies, for California's wild public lands. CalWild pursues these objectives through legislative campaigns, grass-roots organizing, and public education (such as publishing monthly news journals, blogs, and white papers) concerning conservation issues, and, when necessary, legal action. CalWild regularly send action alerts to members and subscribers to inform them about when and how to comment on specific proposed

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 14 -

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA 98104-1711*
*(206) 343-7340*

AR_0006555

projects and plans, such as BLM planning or National Monument review. In addition, CalWild

regularly participates in and submits comments itself on proposed federal agency land and/or

resource management plans and site-specific project proposals (e.g., logging, mining,

geothermal, renewable energy), primarily related to public lands managed by BLM and United

States Forest Service.

27.     For decades, CalWild has relied on NEPA to effectively advocate for these issues

on behalf of its membership. Beyond NEPA's public information and participation

requirements, NEPA requires informed decision-making, based on sound science, and requires

that, to the fullest extent possible, all agencies of the federal government take a hard look at

environmental consequences prior to issuing a decision. NEPA declares a broad national

commitment to protecting and promoting environmental quality, a goal CalWild embraces.

CalWild joined a comment letter of conservation, health, and justice organizations and

businesses opposing the proposed NEPA rules.

28.     CalWild members, including Pamela Nelson of Warner Springs, California, have

long-standing, particularized interests in public lands and wildlife that NEPA helps to protect.

Ms. Nelson has been a CalWild member for at least 15 years, and she has used NEPA to keep

informed about and comment on projects and planning near her home and in areas where she

regularly recreates and has definite plans to continue visiting into the future, in particular the San

Bernardino and Cleveland National Forests, where Ms. Nelson regularly enjoys hiking,

exploring, and bird and wildlife watching. In the last seven years, Ms. Nelson has participated in

NEPA planning and commenting processes for forest plan amendments to the Inyo, Sequoia, and

Sierra National Forest Plans. She has also submitted NEPA comments on the California Desert

Conservation Plan and San Gabriel Mountains National Monument Land Management Plan.

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 15 -

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA 98104-1711*
*(206) 343-7340*

AR_0006556

29.     CalWild member Maureen Forney, a resident of both San Leandro, California, in Alameda County, and Bear Valley, California in Alpine County, frequently visits national forests, national parks, and lands managed by the BLM, where she engages in and will continue to engage in many activities including hiking, running, mountain biking, snowshoeing, cross-country skiing, bouldering, kayaking, swimming, camping, animal tracking, sightseeing, and wildlife watching, particularly in the Stanislaus National Forest where one of her homes is located.  Ms. Forney has also submitted written and oral NEPA comments to federal agencies about how she wants to see public lands managed, and she will be harmed if her ability to continue to do so is limited.

30.     Plaintiff Center for Biological Diversity ("the Center") is a nonprofit organization dedicated to the preservation and restoration of biodiversity, native species, and ecosystems. Founded in Tucson, Arizona with offices throughout the country, including in Oakland and Los Angeles, California, the Center works through science, law, and creative media to secure a future for all species, great or small, hovering on the brink of extinction.  The Center has more than 1.6 million supporters, including more than 74,000 members from all across the United States, with approximately 17,214 in California.  The Center and its members have longstanding recreational, aesthetic, scientific, professional, and other concrete interests in conserving native species throughout the country and routinely advocate for native species conservation and protection. Center attorneys, scientists, organizers, and advocates routinely participate in commenting at all phases of NEPA processes before numerous federal agencies, including the U.S. Forest Service, BLM, the Bureau of Reclamation, the U.S. Army Corps of Engineers, the U.S. Fish and Wildlife Service, and many others.  The Center also employs numerous media and outreach staff to

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 16 -

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA 98104-1711*
*(206) 343-7340*

AR_0006557

inform the Center's members about, and encourage and assist members in participating in, NEPA reviews. The Center submitted detailed comments on the proposed NEPA rule.

31. For example, the Center is currently challenging a BLM decision to approve rights-of-way for powerlines, natural gas, water, and petroleum product in Utah that will facilitate the construction of the first commercial scale facility to process a rock known as "oil shale" into a petroleum product. The oil shale plant will produce 50,000 barrels of shale oil per day, produce significant amounts of air and climate pollution, and will require up to 10,000 acre-feet of water per year for thirty years from the Green River, home to four endangered fish. The Center and other groups have challenged BLM's rights-of-way because the agency's NEPA analysis failed to consider the cumulative and indirect impacts of the federal rights-of-way, including the air and climate pollution and water depletion impacts of the oil shale production facility. Because the Final Rule eliminates the consideration of cumulative effects and does not even mandate the consideration of indirect effects, it will make it difficult if not impossible for the Center to engage in this kind of advocacy in the future, resulting in an imminent increase in harm to wildlife, public lands and waters, and the shared climate.

32. The Center communicates extensively with its members and supporters, as well as the general public, about threats to imperiled species, the protection of public lands, and the ongoing and future damage from the global climate crisis by issuing press releases and statements, publishing online news through its publication "The Revelator," holding webinars, and sending emails and action alerts. The Center's members participate in and rely on the NEPA review processes, and will be harmed by the Final Rule. For example, the Final Rule's explicit elimination of cumulative impacts review will significantly impede the ability of the Center and its members to obtain and disseminate adequate information about, and ensure government

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 17 -

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA 98104-1711*
*(206) 343-7340*

AR_0006558

1    consideration of, the climate change impacts of projects such as oil and gas development plans,

2    rights-of-way for oil shale development, federal coal leasing, and federal auto fleet standards that

3    will contribute to cumulatively significant and devastating greenhouse gas emissions.  In

4    addition to impeding the Center's ability to obtain such essential information as part of the

5    NEPA process, the Final Rule also necessitates that the Center expend its limited organizational

6    resources in an effort to obtain and compile such information from other sources.

7        33.    The Center has individual members, including but not limited to Ileene Anderson

8    of California and Taylor McKinnon of Arizona, who regularly visit, study, work, photograph, or

9    recreate on lands where NEPA has been and will be used in reviewing federal projects.  Each of

10   the members has specific intentions to continue to interact with these areas frequently and on an

11   ongoing basis.  Center members and staff derive recreational, spiritual, professional, scientific,

12   educational, and aesthetic benefits from their interactions with these parts of the natural world.

13       34.    Ileene Anderson is a botanist, a Center member since 1998, and a staff member at

14   the Center since 2005.  Ms. Anderson is also a frequent user of the federal lands in the California

15   Desert, where she hikes, photographs, searches for rare plants, watches birds and other wildlife,

16   and enjoys the solace that wildlands can provide.  Among the places she has visited on numerous

17   occasions are federal lands on and adjacent to Conglomerate Mesa (on the doorstep of Death

18   Valley National Park).  There, she has camped, hiked, and botanized the area at least three times

19   in the last five years including her most recent visit to the area earlier in 2020.  This area near

20   Owens Lake, California, is renowned for its dense western Joshua tree forests, rare plants, unique

21   cultural resources and pristine landscape, positioned between wilderness areas on BLM, Forest

22   Service, and National Park Service managed lands (Malpais Mesa, Inyo Mountains, and Death

23   Valley).  Ms. Anderson plans to return to Conglomerate Mesa in 2020 and beyond once the

25   COMPLAINT FOR DECLARATORY
     AND INJUNCTIVE RELIEF - 18 -

26

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA 98104-1711*
*(206) 343-7340*

AR_0006559

Covid-19 restrictions are relaxed to enjoy the outstanding scenic beauty of this area and look for plants and wildlife.

35. Over the past 25 years, Ms. Anderson has participated in many NEPA processes evaluating mining, off-road vehicles, grazing, energy projects, land use management plans, habitat conservation plans, railroads, pipelines, highways, land exchanges, and many others. Ms. Anderson also wrote sections of NEPA documents for federal agencies when she was employed as a consulting biologist. She has found NEPA's procedural safeguards to be crucial to improving projects and reducing the unnecessary impacts, because in her experience, NEPA review typically reveals diverse perspectives and impact-reduction solutions that otherwise would not be identified by the agency acting alone.

36. The Final Rule harms Ms. Anderson, including by impairing her ability to evaluate and comment on the indirect and cumulative impacts of projects like a pending proposal to undertake exploratory drilling for gold on the Conglomerate Mesa, and the harms the project poses to off-site resources, including the landscapes and visitor experiences from and within Death Valley National Park and the adjacent wilderness areas, the damage from indirect impacts of off-road vehicle use, cumulative impacts of this proposal together with the 2018 approved exploration plan, and the reasonably foreseeable construction of a large gold mine.

37. Taylor McKinnon is a former owner of a Utah river rafting business, amateur photographer, a Center member since 2007, and is now employed as the Center's Senior Public Lands Campaigner. Mr. McKinnon grew up and still lives in Flagstaff, Arizona, amidst national forests and parks that he continues to visit. As he has since he was young, Mr. McKinnon now regularly uses and enjoys federal and other public lands for hiking, cycling, camping, fishing, photography, snowboarding, birding, nature and wildlife observation and vehicle touring.

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 19 -

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA 98104-1711*
*(206) 343-7340*

1  Among the lands that he has regularly visited for some of these activities in the last several years

2  (most recently in 2018) is the sage brush and sandstone high desert of the remote Book Cliffs

3  along the Utah-Colorado border, where BLM approved rights-of-way for the nation's first

4  commercial scale oil shale plant.  Mr. McKinnon has also regularly participated in NEPA

5  processes on numerous federal agency proposals over the last decade involving lands where he

6  recreates, including lands at issue in the Utah oil shale plant.

7  　　　　38.　　As part of his enjoyment of public lands, Mr. McKinnon regularly visits (and

8  plans to return this year to) Grand Canyon National Park and the Forest Service lands near the

9  town of Tusayan, Arizona.  He visits the South Rim area several times each year to hike, sight

10  see, and take photographs of the Grand Canyon and wildlife in the area.  The Forest Service last

11  year received applications from an Italian development corporation named Stilo for rights-of-

12  way across National Forest lands near the Grand Canyon's South Rim for water and natural gas

13  pipelines, electricity, and a paved road to facilitate a massive commercial and residential

14  development on private land.  Stilo's proposed development, located within two miles of the

15  southern boundary of Grand Canyon National Park, would increase Tusayan's population ten-

16  fold, likely cause depletion of aquifers that are the only source of water for natural springs along

17  Grand Canyon's South Rim, worsen air, noise and light pollution within the Park, and fragment

18  habitat for wildlife that use the Park.  When Stilo submitted a prior version of this application to

19  the Forest Service in 2014, Mr. McKinnon on the Center's behalf submitted comments and

20  helped lead a major public campaign opposing Stilo's proposal as part of the agency's NEPA

21  scoping process.  The Forest Service ultimately rejected Stilo's application based largely on the

22  indirect and cumulative impacts to the National Park that Mr. McKinnon and others had raised.

23  The Final Rule's complete elimination of cumulative impacts as a consideration in NEPA

24

25  COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 20 -

26

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA 98104-1711*
*(206) 343-7340*

AR_0006561

analyses and its elimination of the mandate that agencies consider and disclose indirect effects would mean NEPA reviews of Stilo's 2019 application – which the Forest Service is likely to initiate this year – need not address impacts to Grand Canyon National Park at all, increasing the likelihood that Stilo's development will impair the Park resources that Mr. McKinnon enjoys.

39.     Plaintiff Center for Environmental Health ("CEH") is a California non-profit organization founded in 1996 with its principal place of business in Oakland, California.  CEH has approximately 22 staff members, and an email list of 25,000 supporters who regularly receive information and action alerts.  CEH works on the regional and national level.

40.     CEH protects people from toxic chemicals by working with communities, consumers, workers, government, and the private sector to demand and support business practices that are safe for public health and the environment.  For CEH, people and their health and well-being are the ultimate concern.  Air, water, food, and consumer products should be free of dangerous and untested chemicals.

41.     CEH works collaboratively with environmental justice organizations and low-income communities to address the disproportionate toll that toxic chemicals take on their neighborhoods.  Historically, CEH's legal action has spurred hundreds of major retailers to remove lead and other toxic chemicals from child and adult jewelry, fashion accessories including those marketed toward low income buyers, candies, toys, lunchboxes, personal care products, and more.  CEH has also taken legal action (primarily using California's Safe Drinking Water and Toxic Enforcement Act, Proposition 65) to force polluting industries to reduce, or otherwise mitigate, hazardous air emissions from low-income communities and communities of color.

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 21 -

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA  98104-1711*
*(206) 343-7340*

AR_0006562

42.     One of CEH's core values is that people need information in order to both protect themselves and their families and also to advocate for businesses and the government to enact health protective policies.  This is the type of public information and public participation that NEPA requires.

43.     CEH submitted comments on the Proposed Rule in March 2020 in coordination with other environmental justice and public health organizations.  Those comments were critical of the proposed rule because CEH felt it would hurt the ability of communities to know what projects were planned and it would harm the ability of the public to meaningfully explain to decision-makers how their communities would be impacted.

44.     CEH supporters and staff members have used NEPA's standards and requirements to bring about on-the-ground protections.  For example, CEH Senior Scientist Caroline Cox's work has focused on toxics for decades.  In the 1980s, Ms. Cox was part of a group that used NEPA litigation to force dramatic changes in the use of herbicides for growing timber in the Pacific Northwest.  Forcing the U.S. Forest Service and BLM to fully comply with NEPA resulted in changed Forest Service practices, as NEPA's requirements to review alternatives and fully engage the public brought the agency new information and perspectives.  The net result was that herbicide use decreased dramatically because the NEPA process was so successful in addressing issues that people on the ground cared about.

45.     CEH is harmed by the changes in the NEPA regulations that create less public transparency, fail to foster full public participation, curtail review of alternatives, and fail to review the indirect and cumulative impacts of proposed projects.

46.     Plaintiff Center for Food Safety ("CFS") is a national public interest nonprofit organization dedicated to empowering people, supporting farmers, and protecting the planet from

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 22 -

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA 98104-1711*
*(206) 343-7340*

AR_0006563

the harms of industrial agriculture. CFS's program areas encompass all aspects of food and agriculture production, from pesticides and commodity crops to livestock production to ocean and coastal aquaculture to the climate impacts of agriculture. In each area CFS strives to ensure responsible government oversight and advocates for a more sustainable, regenerative food future. CFS has over 970,000 members across the country, and offices in San Francisco, CA; Portland, OR; and Washington, D.C. CFS and its members are being, and will be, adversely affected by the Final Rule.

47. Since its inception in 1997, CFS has incorporated NEPA review in all its program areas, and acts as a watchdog to ensure agencies fulfill NEPA's requirements to allow for reasoned decision-making and informed public participation. CFS has multiple full-time staff members (policy, scientific, outreach, and legal) devoted to overseeing federal agencies' NEPA review regarding the regulation of food and agriculture.

48. To fulfill its mission, CFS disseminates to government agencies, members of Congress, and the general public a wide array of educational and informational program materials often addressing major federal actions requiring NEPA review. CFS also sends out action alerts to its True Food Network. These alerts generate public involvement, education, and engagement with governmental officials, including during NEPA public comment periods on federal projects affecting the sustainable food systems CFS promotes. Collectively, the dissemination of this material has made CFS an information clearinghouse for public involvement in NEPA processes in the realm of sustainable food and agriculture.

49. In addition to information and public education, when necessary, CFS engages in public interest litigation challenging industrial food production and agricultural practices that harm public health and the environment and/or impact farmers, its members, and the public

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 23 -

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA 98104-1711*
*(206) 343-7340*

AR_0006564

1   interest.  CFS has a long history of watchdogging federal agencies' NEPA compliance, in order

2   to ensure agencies responsibly and rigorously analyze, among other things, the reasonably

3   foreseeable impacts of their actions, consider a full range of reasonable alternatives, and

4   thoroughly analyze cumulative and intertwined socioeconomic impacts.

5          50.     In March 2020, CFS submitted public comments on the Proposed Rule and was a

6   signatory to three additional joint comment letters.  The Final Rule injures CFS as an

7   organization and its members individually.  CFS and thousands of its members frequently

8   participate in NEPA public comment periods.  Through shortening comment periods,

9   significantly reducing available information on cumulative and indirect impacts, and exempting

10  more federal projects, CFS and its members will struggle to meaningfully participate in the

11  NEPA process or will be prevented from doing so.  Without access to information on cumulative

12  and indirect impacts, CFS will be forced to divert organizational resources to look into these

13  impacts and fully inform members on federal projects, resources that otherwise would be used on

14  CFS mission central activities.  The Final Rule's weakening of agency NEPA reviews will divert

15  resources from CFS's other work, including advocating for organic production and other

16  sustainable, regenerative food systems.  Overall, CEQ's unlawful rollbacks of NEPA regulations

17  frustrates CFS's organizational mission to inform the public on the harmful impacts of industrial

18  agriculture and promote sustainable food systems.

19         51.     The Final Rule also injures CFS's members directly by restricting their ability to

20  participate in agency decision-making, as well to assure that agencies take a hard look at their

21  actions, actions that injure the members' health, environmental, aesthetic, recreational, and

22  intertwined socioeconomic interests.  Many of CFS's members rely on healthy and safe methods

23

24

25  COMPLAINT FOR DECLARATORY
    AND INJUNCTIVE RELIEF - 24 -

26

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA 98104-1711*
*(206) 343-7340*

AR_0006565

1    of food production to keep safe themselves, their families, their livelihoods, and the environment

2    on which they rely.

3      52.  For example, CFS members who live and recreate and own businesses in

4    Washington's Willapa Bay and Puget Sound are adversely impacted by industrial commercial

5    shellfish aquaculture and relied on the Army Corps of Engineers to thoroughly assess the

6    impacts, including cumulative, of allowing tens of thousands of acres of aquaculture in these

7    aquatic ecosystems. CFS member Ross Barkhurst, a U.S. Naval Academy graduate, lives on 270

8    acres on Willapa Bay, including two shellfish beds totaling 60 acres, where he has for years

9    harvested shellfish and used to sell them commercially, and where he recreates as an avid hunter,

10   fisher, and bird-watcher. He has watched as the health of his tidelands and those around the Bay

11   he loves are degraded from industrial shellfish aquaculture and especially the pesticide use

12   associated with it, and has recorded the waning numbers of various fish and waterfowl species.

13   The Corps' past failure to adequately assess the impacts from the aquaculture it permits under

14   NEPA have adversely affected Mr. Barkhurst, as well as other CFS members who live or

15   recreate in these tidal areas, eat oysters, and enjoy watching the large variety of wildlife there,

16   including threatened and endangered species.

17     53.  Mr. Fritzi Cohen, another CFS member, owns a historic bed and breakfast on

18   Willapa Bay but has been unable to harvest the oysters it was once famous for from the tide bed,

19   due to the impacts of industrial shellfish aquaculture permitted by the Corps, but not properly

20   analyzed under NEPA.

21     54.  These members, and others who live and recreate on Washington shorelines, have

22   been participating in the regulatory processes for years and will continue to do so, especially now

23   that a federal court has found that the Corps' NEPA analysis was deficient and sent the agency

24

25   COMPLAINT FOR DECLARATORY
26   AND INJUNCTIVE RELIEF - 25 -

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA 98104-1711*
*(206) 343-7340*

back to fully assess the impacts, especially cumulative impacts, of commercial shellfish aquaculture. CFS members' interest in the information required under NEPA as well as their own participation in the NEPA process, is directly harmed by the Final Rule, especially insofar as it removes the obligation for agencies to perform cumulative impact analyses.

55.     CFS members in the Gulf of Mexico are also adversely impacted by the lack of NEPA analysis for offshore aquaculture. CFS member Barbara Findley, a resident of Bonita Springs, Florida, is an avid boater and beachgoer who relies on the NEPA process to protect her aesthetic and recreational interests in Gulf marine life, as well as use of the bodies of waters surrounding her home state. Ms. Findley regularly utilizes Florida's Gulf and Atlantic coasts, and takes pleasure in viewing the variety of marine species in the Gulf and surrounding waters, including loggerhead, green, and leatherback turtles; cobia, grouper, red snapper, tarpon, and snook; Key West stingrays, cassiopeas, and moon jellyfish; and bottlenose dolphins. As a result, Ms. Findley is concerned with the development of offshore projects such as offshore aquaculture farms. Ms. Findley's ability to enjoy the future of waters surrounding her home state is hinged in part on her ability to voice concerns for their management throughout the NEPA process. Ms. Findley's interest in the protection of marine species in the Gulf from offshore aquaculture facilities (which are permitted by federal agencies) will be harmed by the CEQ's narrowing of NEPA scope of review.

56.     Plaintiff Environment America is a non-profit corporation organized under the laws of Colorado. It has hundreds of thousands of members nationwide, with approximately 434 active members in California. Its mission is to transform the power of our imaginations and our ideas into change that makes our world a greener and healthier place for all. Environment America's staff works for clean air, clean water, clean energy, wildlife and open spaces, and a

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 26 -

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA 98104-1711*
*(206) 343-7340*

AR_0006567

1   livable climate.  Its members put grassroots support behind Environment America's research,

2   advocacy, and litigation.

3       57.     Environment America has worked to ensure that the goals of NEPA are achieved

4   and that it remains a powerful tool to protect our health and environment and safeguard our

5   natural treasures for posterity.  Environment America opposed the regulations at issue in this

6   litigation when they were first proposed and provided testimony in opposition, as well as

7   submitted written comments.  In addition, Environment America produced a blog post explaining

8   the dangers of the proposal and a factsheet to educate the public as to NEPA's importance.

9       58.     Environment America has individual members, including but not limited to

10  Joseph Sandri of Maryland and Peter Skopec of Wisconsin, who regularly visit, study, work,

11  photograph, or recreate on lands where NEPA has been and will be used in reviewing federal

12  projects.  Each of the members has specific intentions to continue to interact with these areas

13  frequently and on an ongoing basis.  Environment America members and staff derive

14  recreational, spiritual, professional, scientific, educational, and aesthetic benefits from their

15  interactions with these parts of the natural world.

16      59.     Joseph Sandri has been a member of Environment America since 2009 and lives

17  in Maryland.  Mr. Sandri has participated in NEPA processes in the past.  He is a member of the

18  board of directors of the Archangel Ancient Tree Archive, which is a non-profit organization that

19  locates and propagates the world's largest and most iconic trees.  In his role as a member of the

20  board of directors, Mr. Sandri wrote and submitted a comment opposing U.S. Forest Service's

21  proposal to exempt the Tongass National Forest from the 2001 Roadless Area Conservation

22  Rule.

23

24

25  COMPLAINT FOR DECLARATORY
    AND INJUNCTIVE RELIEF - 27 -

26

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA 98104-1711*
*(206) 343-7340*

AR_0006568

60.     Peter Skopec has been a member of Environment America since 2020 and lives in Wisconsin.  Mr. Skopec has participated in NEPA processes in the past, and he plans to participate in NEPA processes in the future.  For example, in his role as the director of the Wisconsin Public Interest Research Group, a non-profit public interest advocacy organization, Mr. Skopec was involved in the NEPA review process for the proposed expansion of highway I-94 in Milwaukee.  Mr. Skopec provided in-person testimony on December 4, 2014, and he submitted written comments on January 27, 2015, April 15, 2016, and May 5, 2016.  On July 8, 2020, it was announced that the I-94 expansion project will be revived, and Mr. Skopec plans to participate in any public engagement opportunities provided by NEPA in the future.

61.     Plaintiff Environmental Defense Fund ("EDF") is a national nonprofit organization representing over 384,000 members nationwide, including over 62,000 in California.  Since 1967, EDF has linked science, economics, and law to create innovative, equitable, and cost-effective solutions to urgent environmental problems.  EDF employs over a hundred scientists, economists, engineers, business school graduates, and lawyers to help solve challenging environmental problems in a scientifically sound and cost-effective way.  EDF pursues initiatives at the state and national levels designed to protect human health and the environment.  EDF frequently participates in NEPA review processes for federal actions, including by submitting comments and bringing litigation to ensure agencies adequately evaluate the impacts of their actions under NEPA, including climate impacts.  EDF and its individual members will be adversely affected by the Final Rule.

62.     Francis Don Schreiber is a member of EDF and a rancher and landowner in Rio Arriba County, New Mexico in the San Juan Basin, one of the most active areas in the country for oil and gas production.  Mr. Schreiber has a split estate—he owns the surface rights to his

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 28 -

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA 98104-1711*
*(206) 343-7340*

AR_0006569

1   land, and the mineral rights on his property are owned by the federal government and managed

2   by the BLM.  Mr. Schreiber also holds a federal permit to graze cattle, sheep and horses for

3   approximately 2,700 acres of land managed by the BLM.  There are over a hundred oil and gas

4   wells managed by BLM on and immediately adjacent to Mr. Schreiber's ranch.  Mr. Schreiber

5   has advocated for BLM to consider the health, environmental, and climate impacts of the oil and

6   gas development that BLM manages, and implement measures to reduce venting, flaring, and

7   leaking of natural gas on his land.  Rigorous NEPA review has been, and will continue to be,

8   critical for reducing the harm that this federally-managed oil and gas development causes Mr.

9   Schreiber, his family, and his community.  For example, a BLM regulation, opposed by Mr.

10  Schreiber, that allowed increased waste of natural gas and increased methane and local air

11  pollution from federally-managed oil and gas development, including the wells on Mr.

12  Schreiber's ranch, was recently vacated by a court in this district because BLM failed to comply

13  with NEPA.  The court specifically held that BLM had failed to adequately assess cumulative

14  impacts, including climate impacts, under NEPA.  Currently, a Draft Resource Management Plan

15  Amendment and Environmental Impact Statement for expanding oil and gas development in the

16  San Juan Basin is under consideration at the BLM Farmington Field Office.  The Final Rule

17  removes required consideration of cumulative impacts under NEPA, among other damaging

18  changes, harming Mr. Schreiber, who must live with the cumulative impacts of BLM's decisions

19  for oil and gas development on his land.

20       63.     Jonathan Goldstein is Director of Legislative and Regulatory Affairs at EDF and

21  an EDF member.  Mr. Goldstein frequently submits comments on behalf of EDF on federal

22  agency NEPA documents.  For example, Mr. Goldstein submitted comments in 2018 on BLM's

23  draft resource management plan and environmental impact statement for Carlsbad that

24

25  COMPLAINT FOR DECLARATORY
    AND INJUNCTIVE RELIEF - 29 -

26

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA 98104-1711*
*(206) 343-7340*

AR_0006570

highlighted how BLM failed to conduct adequate NEPA analysis of the impacts, including

cumulative impacts, from existing and future oil and gas development in the planning area. Mr.

Goldstein plans to continue to submit comments in the future on NEPA documents, including

during the currently-open comment period on BLM's draft resource management plan

amendment and environmental impact statement for Farmington. Mr. Goldstein is also a

frequent user of federal public lands that will be impacted by the changes to NEPA regulations,

including by limiting consideration of climate change effects. Mr. Goldstein regularly hikes and

mountain bikes in the Roosevelt National Forest near his home in Lyons, Colorado and plans to

continue to do in the future.

64. Plaintiff Environmental Protection Information Center ("EPIC") is a nonprofit

organization based in Arcata, California. EPIC advocates for the protection and restoration of

Northwest California's forests, using an integrated, science-based approach, combining public

education, citizen advocacy, and strategic litigation.

65. EPIC was founded in 1977 as a membership organization and its members shape

the priorities of the organization through electing its board of directors. EPIC has approximately

700 members and over 12,000 supporters. EPIC members also contribute to the work of the

organization through volunteering to review projects. NEPA is critical to EPIC's work. In the

past year, EPIC has commented on over 30 NEPA projects and has four ongoing federal cases

alleging violations of the act.

66. EPIC members have an interest in areas and activities that will be impacted by the

revised regulations. For example, Felice Pace is a member of EPIC and volunteers his time to

help EPIC monitor cattle grazing on public land. Mr. Pace currently resides in Klamath Glen,

California. Mr. Pace has participated over a hundred projects on the Klamath National Forest,

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 30 -

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA 98104-1711*
*(206) 343-7340*

AR_0006571

1    Six Rivers National Forest and Shasta-Trinity National Forest and NEPA is critical to Mr. Pace's

2    work to voice his concerns.  Mr. Pace runs the Project to Reform Public Land Grazing in

3    Northern California.  Through the Project, Mr. Pace spends numerous days in the field

4    documenting the effects of grazing on the environment.  As part of this, Mr. Pace is particularly

5    careful to document how grazing near and in streams can impact salmonids listed under the

6    Endangered Species Act.  Because he has spent considerable personal resources developing

7    long-term data about the impacts of grazing on salmonids, Mr. Pace has a unique interest in areas

8    that will be harmed by the challenged rule.

9         67.     Joseph and Susan Bower are also members of EPIC and devote considerable time

10   and effort into commenting on Forest Service projects.  Mr. and Ms. Bower moved to Peanut,

11   California in May 1973 and have lived on their homestead since that time.  Their land backs up

12   against the Shasta-Trinity National Forest, which serves as their backyard and source of domestic

13   drinking water.  Mr. and Ms. Bower first became engaged in Forest Service projects in 1975

14   because of concerns over herbicide use and have remained engaged since that time.  Because

15   they are reliant on the National Forest for their water and because land management decisions,

16   such as fire break projects, on the National Forest affect their homestead, they actively use

17   NEPA to comment on proposed projects, commenting on over a hundred proposed projects

18   primarily on the Shasta-Trinity National Forest.  Mr. and Ms. Bower are particularly concerned

19   with the fate of the northern spotted owl, a species listed as "threatened" under the Endangered

20   Species Act, because the spotted owl is a designated indicator species for forest health.  In their

21   experience, examining the cumulative effects of a project is particularly important for the

22   "checkerboard" lands of Northern California, where private and public lands are arranged in neat

23   squares like on a checkerboard.  Under the challenged rules, it appears that much if not all of the

24

25   COMPLAINT FOR DECLARATORY
     AND INJUNCTIVE RELIEF - 31 -
26

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA 98104-1711*
*(206) 343-7340*

1  cumulative effects analysis that they have relied upon would no longer be required. Their

2  interest in knowledge about cumulative effects, and their ability to advocate for changes to a

3  project because of potential cumulative effects, is harmed by the challenged rule.

4      68.    Trisha Lotus also exemplifies how EPIC works to satisfy the interests of its

5  members and how the challenged rule would injure its members. Ms. Lotus is a member of

6  EPIC and a resident of Humboldt County, California. Ms. Lotus has been instrumental in a

7  federal challenge brought by EPIC to the Richardson Grove Project, a proposed highway

8  widening project through Richardson Grove State Park. The proposed highway widening would

9  critically affect old-growth redwoods in the park, whose root system would be cut and paved

10  over as part of the project. Ms. Lotus was moved to do something about the project because for

11  her, this project was personal. In 1922 Ms. Lotus's great-grandfather, Henry Devoy, entrusted

12  the 120 acres of land to the State of California which came to be known as Richardson Grove

13  State Park. As an EPIC member, Ms. Lotus and others encouraged EPIC to intercede in the

14  project, beginning a decade-long engagement with this project that has resulted in numerous

15  federal cases that have stopped the project from moving forward. The challenged rule would

16  likely have caused this project to fall outside of NEPA's bounds, as federal financing of a project

17  is no longer deemed to cause a project to be a "major federal action" under NEPA. Since being

18  an involved plaintiff in the Richardson Grove State Park lawsuit, Ms. Lotus continues to monitor

19  highway projects in her area. Many of these highway projects receive significant funding from

20  the Federal Highway Administration, and would possibly be exempt from NEPA in the future.

21  Trisha's ability to influence state highway projects would be diminished under the challenged

22  rule and she would be injured by this loss of her ability to participate.

23

24

25  COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 32 -

26

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA 98104-1711*
*(206) 343-7340*

AR_0006573

69.     Plaintiff <u>Food and Water Watch</u> ("FWW") is a national, non-profit, membership organization that mobilizes people to build political power to move bold and uncompromised solutions to the most pressing food, water, and climate problems of our time. FWW uses grassroots organizing, media outreach, public education, research, policy analysis, and litigation to protect people's health, communities, and democracy from the growing destructive power of the most powerful economic interests. FWW's priority campaigns include fighting for a just and rapid transition to 100% clean, renewable energy and away from fossil fuels, and fighting for a ban on factory farms, also known as concentrated animal feeding operations ("CAFOs"). Central to its mission, FWW has advocated against new fossil fuel infrastructure, government support for factory farms, and other harmful federal projects since its founding in 2005. This work regularly involves engaging in the NEPA review process and communicating with FWW members about opportunities to participate in NEPA reviews. FWW has more than 180,000 members nationwide, including 7,767 in California, and maintains offices across the country including an office in Oxnard and Los Angeles, with its headquarters in Washington, D.C. FWW submitted comments on the proposed NEPA rule.

70.     FWW is currently challenging a Federal Energy Regulatory Commission NEPA review for failure to consider cumulative and indirect effects of a project. FWW is also currently challenging a Farm Service Agency NEPA review for a Maryland chicken factory farm because it fails to adequately consider the cumulative impacts of agency financing of the project. It brings these challenges on behalf of members whose interests are harmed by these projects. However, by eliminating the requirement that agencies consider cumulative and indirect effects, and declaring that Farm Service Agency financing is not subject to NEPA review, the Final Rule

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 33 -

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA 98104-1711*
*(206) 343-7340*

AR_0006574

1    will make it difficult if not impossible for FWW to engage in this kind of advocacy work in the

2    future, resulting in increased environmental and public health harm.

3    71.    FWW communicates extensively with its members and supporters, as well as the

4    general public, about climate change, water pollution, and other harmful impacts of fossil fuel

5    infrastructure proposals and other federally permitted or funded actions by releasing reports and

6    fact sheets, issuing press releases and statements, publishing online news pieces, and sending

7    emails and action alerts.  FWW members participate in and rely on the NEPA review processes,

8    and will be harmed by the Final Rule.  For example, the Rule's elimination of cumulative

9    impacts review will make it difficult or impossible for FWW and its members to obtain adequate

10   information about and ensure government consideration of the climate change impacts of

11   projects such as fracked gas pipelines that will contribute to cumulatively significant and

12   devastating greenhouse gas emissions.  The Final Rule's exclusions will make it impossible for

13   FWW and its members to comment in opposition to proposed factory farms that receive federal

14   financing, because there will no longer be a NEPA public comment process to notify citizens of

15   projects proposed in their communities associated with the receipt of federal funds: the prior

16   CEQ regulations required this public disclosure and analysis, but the Final Rule eliminates this

17   requirement.

18   72.    FWW has individual members, including but not limited to Dane Schumacher of

19   Arkansas and Carol Kuehn of New Jersey, who regularly visit, study, work, photograph, or

20   recreate on lands or marine areas where NEPA has been and will be used in reviewing federal

21   projects.  Each of the members has specific intentions to continue to interact with these areas

22   frequently and on an ongoing basis.  FWW members and staff derive recreational, spiritual,

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 34 -

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA  98104-1711*
*(206) 343-7340*

AR_0006575