professional, scientific, educational, and aesthetic benefits from their interactions with these parts of the natural world.

73.    FWW member Dane Schumacher resides on a small, sustainable farm in Carroll County, Arkansas and generates a portion of his income selling produce from the farm.  Mr. Schumacher irrigates his farm from the waters of adjacent Dry Fork Creek, a tributary of the Kings River, which is part of the White River watershed.  He also swims, kayaks, and recreates in these waters, and plans to continue to do so in the future.  However, Mr. Schumacher's use and enjoyment of these waters is diminished by the operation of factory farms upstream that discharge pollution into them: he can smell factory farm waste (i.e., animal waste) and is concerned about farm pollution in the places he swims and recreates.  Mr. Schumacher relies on NEPA processes to learn of new projects that are federally permitted or funded, and seeks to participate in such processes to ensure that her concerns about downstream pollution are addressed.  Farm Service Agency funding is often the sole federal trigger for NEPA for these kinds of projects.  On one occasion, Mr. Schumacher participated in a NEPA process considering funding of a factory farm near his home: his comments helped persuade the agency that the site was ill-suited for such a project and the project was abandoned, thereby preventing a likely additional source of pollution in the waters near his home.  Elimination of NEPA reviews for such agency funding would mean future NEPA reviews that adversely affect Mr. Schumacher would not occur at all, resulting in additional pollution in his watershed and further undermining his use and enjoyment of these waters.

74.    Carol Kuehn, another FWW member, is a homeowner living in South Brunswick, New Jersey, whose property abuts the proposed NorthEast Supply Enhancement Project's Compression Station 206.  She has been involved in the NEPA process opposing the

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 35 -

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA  98104-1711*
*(206) 343-7340*

1   construction of the pipeline and compressor station that would result in noxious petrochemical

2   emissions near her property. Ms. Kuehn would be adversely affected by the narrowed scope of

3   NEPA review proposed by the Final Rule, because the Final Rule would not require the Federal

4   Energy Regulatory Commission – the federal agency responsible for permitting the pipeline and

5   compressor station – to analyze the cumulative and indirect impacts of the project that could

6   result in serious damage to her property and respiratory health. Moreover, reduced public

7   participation opportunities would result in the diminished capability of Ms. Kuehn to be involved

8   in the decision-making process related to the fate of her property.

9        75.     Plaintiff <u>Friends of the Earth ("FoE")</u> is a tax-exempt, 501(c)(3) organization and

10  a not-for-profit corporation existing under the laws of the District of Columbia with offices in

11  Washington D.C. and Berkeley, California and staff located across the country. FoE is a

12  membership organization consisting of more than 170,000 members and more than 1.7 million

13  activists nationwide. FoE is also a member of Friends of the Earth-International, which is a

14  network of grassroots groups in 74 countries worldwide. FoE's mission is to protect our natural

15  environment, including air, water, and land, to create a more healthy and just world. FoE utilizes

16  public education, advocacy, legislative processes, and litigation to achieve its organizational

17  goals.

18       76.     FoE has five core campaign programs: Climate & Energy, Democracy, Economic

19  Policy, Food & Agriculture, and Oceans & Vessels. All of these programs utilize the processes

20  afforded by NEPA to engage in major federal project decision-making. FoE's Climate program

21  promotes energy conservation and clean energy sources, including wind, solar, and geothermal

22  power, to end dependence on fossil fuels, reduce greenhouse gas emissions, and mitigate climate

23  change. FoE's Economic Policy program works to redirect tax policies and public spending to

24

25  COMPLAINT FOR DECLARATORY
    AND INJUNCTIVE RELIEF - 36 -

26

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA 98104-1711*
*(206) 343-7340*

AR_0006577

make polluters pay for the costs of their pollution, and to drive the transition to a cleaner, low-carbon economy. FoE's Democracy program works to create stronger and more effective environmental policies by fostering representative and responsive democratic institutions across the United States. FoE's Food program seeks a fundamental shift in our food system: from toxic and chemical intensive to healthy and ecologically regenerative; from corporate controlled to democratically governed; and from a system that embodies the deepest inequities in our society to one that advances justice and fulfills the needs of all eaters now and in the future. FoE's Oceans program works to protect our oceans, the tens of millions of people who live near, and the marine creatures who reside in from the threats from oil spills, air pollution, sewage releases, industrial ocean fish farming, and unnatural ocean noise.

77. The Final Rule is extremely detrimental to and adversely affects the FoE's interests and those of FoE's members and activists. The changes will restrict FoE's members' ability to effectively participate in public comment periods, maintain accountability and transparency in major federal project decision-making, and advocate for solutions to climate change, air and water pollution and fight against environmentally damaging projects. In addition to restrictions on the scope of NEPA, the Final Rule impedes FoE and its members' ability to provide important experience-based and culturally significant comments through newly enforced restrictions on the specificity of a substantive comment. Many FoE members live on the frontlines of various proposed major federal projects or existing projects that are being modified which trigger existing NEPA requirements. However, the shortened time limits for EA/EIS documents—as well as the overly strict specificity requirements for public comments that demand a level of technical training that many FoE members do not possess or have the time to provide—will result in agencies disregarding many of FoE's member perspectives.

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 37 -

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA 98104-1711*
*(206) 343-7340*

AR_0006578

78.     In particular, FoE member and senior oceans campaigner Verner Wilson will be harmed by the implementation of the Final Rule.  Mr. Wilson is a member of the Curyung Tribe in Bristol Bay, Alaska.  Pebble Mine, a proposed metals mine in Bristol Bay, threatens one of the largest and last remaining wild salmon populations in the world.  The project is moving forward in a NEPA process with the final EIS published on July 24, 2020.  The mine could generate more than 10 billion tons of dangerous waste, wipe out 90 miles of salmon streams and pollute more than 5,000 acres of wetlands, ponds and lakes.  It would likely plummet the salmon population—catastrophically impacting local communities and earth's last great wild sockeye salmon fishery.  Mr. Wilson and his family would be significantly impacted by the project as they are subsistence fishers who rely on the wild salmon runs every year.  If NEPA is curtailed even further, Mr. Wilson will be significantly impacted in his ability to participate in and object to the Pebble Mine and any other major federal projects that are proposed for the region.

79.     Plaintiff National Parks Conservation Association ("NPCA") is a non-profit organization whose mission is to enhance and protect the National Park System.  NPCA was formed in 1919 and today has 1.4 million members and supporters, with approximately 40,629 members in California and offices in Oakland, Joshua Tree, Los Angeles, and Fresno.  NPCA is headquartered in Washington, D.C., and has 27 regional and field offices throughout the country.  A robust NEPA process is essential to NPCA's mission of protecting national parks, which is why NPCA provided oral testimony and detailed written comments on the proposed revisions to CEQ's NEPA regulations.

80.     NPCA is regularly involved in NEPA processes and submits comments on proposed projects and activities on and near national park lands.  For instance, the Midwest regional office recently submitted comments to the National Park Service on its environmental

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 38 -

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA 98104-1711*
*(206) 343-7340*

AR_0006579

assessment associated with Independence Day fireworks at Mount Rushmore National

Memorial, and several regional offices have submitted NEPA comments to the BLM on recent

oil and gas lease sales. NPCA is also currently asserting NEPA claims in several lawsuits,

including in the challenge to the Alton Coal Mine expansion near Bryce Canyon National Park

and the challenge to three BLM leasing decisions for oil and gas development covering

approximately 117,000 acres near Dinosaur National Monument.

81. NPCA has individual members and staff who regularly visit, study, work,

photograph, or recreate on lands or marine areas where NEPA has been and will be used in

reviewing federal projects. Each of these members and staff have specific intentions to continue

to interact with these areas frequently and on an ongoing basis. NPCA members and staff derive

recreational, spiritual, professional, scientific, educational, and aesthetic benefits from their

interactions with these parts of the natural world.

82. Joy Oakes, of Arlington, Virginia, is Senior Director of the Mid-Atlantic regional

office for NPCA and long-time NPCA member, has frequently utilized the NEPA process to

advocate for the protection of natural, cultural, and historical places. Most recently, in her role

as Senior Director, Ms. Oakes has been participating in the NEPA permit application review

process for the Surry-Skiffes Creek transmission line project in the scenic James River area.

This project is close to the Colonial National Historical Park, an area that Ms. Oakes has visited

many times throughout her lifetime and plans to continue visiting in the future for both

professional and personal reasons. Ms. Oakes expects to be involved in other NEPA processes

in the future, including assisting with comments on the Federal Highway Administration's I-495

& I-270 Managed Lanes Study Draft EIS, which was released in July 2020.

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 39 -

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA 98104-1711*
*(206) 343-7340*

AR_0006580

83. The Final Rule reduces Ms. Oakes' ability to participate in these and other future NEPA processes by limiting the alternatives considered (e.g., in the case of the transmission line across the James River, potentially not identifying alternatives that would meet electricity needs while also protecting the region's historic character and resources), eliminating the consideration of cumulative impacts (e.g., the impacts the transmission line would have on climate change), and shortening the amount of time given to review draft EISs and provide comments.

84. Plaintiff National Wildlife Federation ("NWF") is the nation's largest member-supported non-profit conservation advocacy and education organization, with more than six million members and supporters, including more than 583,000 members and supporters in California. NWF has affiliate organizations in fifty-two states and territories, including California. NWF has regional offices and staff located throughout the United States, including a California Regional Office headquartered in Midpines, California and additional staff in San Anselmo, California. NWF is organized under the laws of the District of Columbia and is headquartered in Reston, Virginia.

85. NWF works to unite all Americans to ensure wildlife thrive in a rapidly changing world. NWF advances this mission through numerous programs that, among other things, work to protect, restore, and connect wildlife habitat; confront climate change; defend the public's interest in ownership and management of public lands; address the threat of invasive species and other systemic threats to wildlife; advance modern approaches to wildlife management; and connect Americans with wildlife through education and advocacy engagement.

86. A robust NEPA process is essential to NWF's mission, which is why NWF actively engaged in both the entire process leading up to the promulgation of the Final Rule. Among other things, NWF provided extensive and detailed written comments at all stages;

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 40 -

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA 98104-1711*
*(206) 343-7340*

AR_0006581

1   provided oral testimony at both the Denver, CO and Washington D.C. public hearings on the

2   Proposed Rule; met twice with representatives from the Office of Management and Budget and

3   other federal agencies to discuss our concerns during the Office of Information and Regulatory

4   Affairs review process; mobilized comments on the Proposed Rule from more than 350

5   organizations; and collectively generated almost 50,000 individual comments on the from our

6   members and supporters through our Action Alert system.

7         87.    NWF attorneys, policy advocates, scientists, and organizers routinely participate

8   in commenting at all phases of NEPA processes before numerous federal agencies, including the

9   U.S. Forest Service, BLM, the U.S. Army Corps of Engineers, the U.S. Fish and Wildlife

10   Service, Bureau of Ocean Energy Management, and others.  NWF engages in litigation to ensure

11   full compliance with NEPA.  NWF takes an active role in educating members of Congress about

12   the importance of maintaining the integrity of NEPA and the NEPA implementing regulations,

13   and about the importance of strong Congressional oversight to ensure that federal agencies

14   properly apply NEPA when making major federal decisions that affect the quality of the

15   environment.  NWF also employs numerous media and outreach staff to inform NWF's members

16   about, and encourage and assist members in participating in, NEPA reviews.

17         88.    For example, NWF is currently litigating the U.S. Army Corps of Engineers'

18   failure to properly comply with NEPA in connection with its navigation maintenance activities

19   on a 195-mile portion of the Mississippi River.  Key issues in this litigation include the indirect

20   and cumulative impacts of in-stream navigation structures, which have significantly increased

21   flood levels in the Mississippi River by up to 15 feet in some locations and 6 to 10 feet over

22   broad stretches where these structures are prevalent.  Prior to filing this challenge, NWF had

23   engaged in all aspects of the NEPA processes providing detailed scoping comments, detailed

24

25   COMPLAINT FOR DECLARATORY
26   AND INJUNCTIVE RELIEF - 41 -

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA  98104-1711*
*(206) 343-7340*

AR_0006582

comments on the draft EISs, and detailed comments on the final EISs.  NWF routinely monitors

upcoming NEPA review processes and engages in those reviews as appropriate, including the

NEPA processes for oil and gas lease sales and for U.S. Army Corps of Engineers' projects and

permits, among others.  By eliminating consideration of indirect and cumulative effects, the Final

Rule will make it difficult if not impossible for NWF to engage in this kind of advocacy in the

future, resulting in increased harm to wildlife, public lands and waters, and our shared climate.

89.     NWF communicates extensively with its members and supporters, as well as the

general public, about threats to wildlife, the protection of public lands, the ongoing and future

damage from the global climate crisis, and the importance of retaining the long-standing

protections provided by NEPA and the nation's other environmental laws, by issuing press

releases and statements, blogs, newsletters, magazines, and sending emails and action alerts.

NWFs members participate in and rely on the NEPA review processes, and will be harmed by

the Final Rule.  For example, the Final Rule's elimination of references to indirect impacts

strikes at the heart of the ability of NWF and its members to obtain information on the indirect

effects of levees, navigation structures, reservoir operating plans, pumping plants and other

major infrastructure on increased flooding, losses of wetlands and other vital wildlife habitat, and

reductions in critical river flows.  The Final Rule's elimination of cumulative impacts review

will make it difficult or impossible for NWF and its members to obtain adequate information

about, and ensure government consideration of, the cumulative impacts of climate change on:

(a) the effectiveness, sustainability, and impacts of flood and storm damage reduction and other

projects in both riverine and coastal areas; and (b) the climate change impacts of projects such as

oil and gas development or mining operations.  The Final Rule's provision allowing federal

agencies to waive NEPA if other review processes are associated with, or required for, a project

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 42 -

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA 98104-1711*
*(206) 343-7340*

AR_0006583

1   will eliminate the ability of NWF and its members to obtain adequate information about, or

2   provide their views and comments on, many types of projects.

3       90.     NWF has individual members, including but not limited to Michael Bartlett of

4   New Hampshire and Melissa Samet of California who regularly visit, study, work, photograph,

5   or recreate on lands, waters, or coastal areas where NEPA has been and will be used in reviewing

6   federal projects and permitting decisions.  Each of these members has specific intentions to

7   continue to interact with these areas frequently and on an ongoing basis.

8       91.     Michael Bartlett is a member of the Board of Directors of NWF and has been a

9   member of NWF since 2012.  Mr. Bartlett has both a deep personal and a professional interest in

10  migratory birds.  Mr. Bartlett is an avid birder and amateur ornithologist with a particular affinity

11  for migratory bird species such as the Peregrine Falcon, which is one of his favorite species, and

12  the Screech Owl.  Mr. Bartlett spends considerable time observing birds in his home state of

13  New Hampshire and has installed bird houses and bird feeders on his property to attract both

14  migratory and "overwintering" species, and species endemic to New Hampshire like Chickadees,

15  Nuthatches, Downy Woodpeckers, American Goldfinches, and Northern Cardinals.  Mr. Bartlett

16  likewise seeks out opportunities to study and observe bird populations when he is traveling in the

17  United States and abroad.

18      92.     Earlier in his life, Mr. Bartlett worked for the U.S. Fish and Wildlife Service for

19  more than thirty-seven years, including many years as Supervisor of the Service's New England

20  Field Office, working on matters related to the preservation of avian wildlife resources—

21  including the protection of migratory bird species like loons, terns, and waterfowl.  While the

22  director of the New England Field Office, Mr. Bartlett supervised the office's Endangered

23  Species Program, which included work protecting migratory birds like the Piping Plover.

24

25  COMPLAINT FOR DECLARATORY
    AND INJUNCTIVE RELIEF - 43 -

26

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA 98104-1711*
*(206) 343-7340*

AR_0006584

93.     On February 3, 2020, the U.S. Department of Interior Fish and Wildlife Service issued a proposed rule that followed up on a legal memorandum issued in December of 2017 to remove long-standing protections of about 1,000 species of migratory birds, including many that are present in New Hampshire like the common loon, black-capped chickadee, and the above mentioned species, among others, from the impacts of incidental takes under the Migratory Bird Treaty Act.  Incidental takes – like deaths from oil pits, oil spills, large buildings, power lines, and wind turbines – comprise the largest number of takes of migratory birds.  On June 5, 2020, the U.S. Fish and Wildlife Service issued a draft EIS on the proposed rule (the MBTA DEIS).  Applying the new NEPA rule to the MBTA DEIS would greatly deprive Mr. Bartlett's ability as a member of the public concerned with birds to assess and obtain information about how the proposed MBTA take rule might impact the birds he watches and cares about.  For instance, impacts like climate change and habitat loss are causing many bird species to decline.  Without a consideration of cumulative impacts, the impacts of the proposed MBTA take rule in combination with these other reasonably foreseeable impacts may not be assessed or disclosed to members of the public like Mr. Bartlett.

94.     Melissa Samet, the Senior Water Resources Counsel for NWF and an NWF member, has frequently utilized the NEPA process in a professional and personal capacity to advocate for the protection of rivers, wetlands, and coastal areas.  Ms. Samet has worked for NWF since 2010 where she directs water resources campaigns and provides policy and legal direction on issues related to water resources planning and projects, with a particular focus on improving the planning practices of the U.S. Army Corps of Engineers and improving floodplain management.  Ms. Samet has engaged in NEPA litigation; and has educated Congress about the importance of maintaining the full suite of protections provided by NEPA and the CEQ NEPA

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 44 -

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA 98104-1711*
*(206) 343-7340*

AR_0006585

regulations and of the importance of effective Congressional oversight of federal agency

compliance with NEPA, including through Congressional testimony. She has found NEPA's

procedural safeguards to be crucial to improving projects and reducing and preventing

unnecessary impacts, because in her experience, NEPA review typically reveals diverse

perspectives, key scientific information, likely impacts, and impact-reduction solutions that

otherwise would not be identified by the agency acting alone. Ms. Samet believes that the Final

Rule will severely undercut her ability to evaluate and comment on the indirect and cumulative

impacts of major federal actions, including U.S. Army Corps of Engineers' flood and storm

damage reduction projects, navigation projects, reservoir operating plans, and permitting

decisions that typically have far reaching indirect and cumulative impacts.

95.     Ms. Samet is a frequent user of federal, state, and other protected lands in

California, where she hikes, watches birds and other wildlife, photographs, and seeks out the

solace that wildlands can provide. Among the places she has visited on many occasions are

Point Reyes National Seashore in Marin County, Mount Tamalpais in Marin County, Yosemite

National Park in Mariposa County, Humboldt Redwoods State Park in Humboldt County,

Sequoia National Park in Tulare County, Monterey Bay in Monterey County, and Point Lobos

State Natural Reserve in Monterey County. Ms. Samet visits Point Reyes National Seashore on

a regular basis, where she has hiked and watched hawks, owls, pelicans, shorebirds, waterfowl,

seals, whales, Tule Elk and many other mammals at least 6 times each year for more than two

decades. Her most recent visit to Point Reyes was in July 2020, and she plans to continue to visit

Point Reyes on at least a bi-monthly basis for the foreseeable future. In addition to relying on

NEPA in her professional capacity, Ms. Samet has engaged in the NEPA process in her personal

capacity, most recently providing detailed comments on the National Park Services' Draft

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 45 -

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA 98104-1711*
*(206) 343-7340*

AR_0006586

Environmental Impact Statement for a General Management Plan Amendment for Point Reyes National Seashore. Those comments highlighted significant indirect and cumulative impacts of the proposed management plan, including the cumulative impacts of climate change and the indirect impacts of the proposed plan on the Seashore's rich array of predator species.

96. Plaintiff Ocean Conservancy is a nonprofit, science-based conservation organization working to protect the ocean from today's greatest global challenges. Together with its partners, Ocean Conservancy creates science-based solutions for a healthy ocean and the wildlife and communities that depend on it. Since 1972, Ocean Conservancy has sought to improve the health of our nation's marine wildlife and fish, and to face threats such as ocean trash, shipping, overfishing, and ocean acidification. Ocean Conservancy has over 150,000 members and supporters worldwide, with approximately 20,591 in California. Ocean Conservancy is headquartered in Washington, D.C. and has offices in Alaska, Washington, Florida, Oregon, Texas, and Santa Cruz and Santa Barbara, California.

97. Ocean Conservancy communicates extensively with its members, its supporters, and the general public about threats to ocean health, climate change, ocean acidification, ocean plastics, and fishery management, and comments on numerous federally permitted or funded actions. The organization regularly releases reports and fact sheets, issues press releases and statements, publishes online blog and news pieces, and sends emails and action alerts to its members and supporters. Ocean Conservancy's members participate in and rely on NEPA's review processes, and will be harmed by the Final Rule. For example, the Final Rule's elimination of cumulative impacts review will make it difficult or impossible for Ocean Conservancy and its members to obtain adequate information about, and ensure government consideration of, the impacts of greenhouse gases on the ocean, such as ocean acidification and

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 46 -

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA 98104-1711*
*(206) 343-7340*

warming waters, which leads to shifting fish stocks that harm Ocean Conservancy's members and interests. Nor will Ocean Conservancy and its members be able to obtain adequate information about shipping and new shipping routes in the Arctic region, which are of interest to Ocean Conservancy and its members.

98.     In the context of fishery management, NEPA procedures constitute an important means of ensuring that fishery managers consider important issues that the Magnuson-Stevens Act does not address: in this way, the Magnuson-Stevens Act is not a "functional equivalent" of the NEPA process. NEPA plays an integral role in the fishery management process and Ocean Conservancy and its members will be harmed by the Final Rule because they will be unable to fully engage in the fishery management process. At a time when we understand better than ever that a healthy ocean ecosystem is necessary to support thriving fisheries, NEPA interjects larger environmental issues into a process proscribed by the Magnuson-Stevens Act that otherwise focuses on maximizing how many fish can be caught.

99.     Further, many Ocean Conservancy members are fishermen who spend substantial amounts of time at sea or operate fish transport or packing activities. These members will be harmed by shortened NEPA analysis and public comment timelines envisioned by the Final Rule.

100.     Ocean Conservancy has individual members, including but not limited to Captain Dave Monti of Rhode Island, who regularly visit, study, work, photograph, or recreate on lands or marine areas where NEPA has been and will be used in reviewing federal projects. Each of the members has specific intentions to continue to interact with these areas frequently and on an ongoing basis. Ocean Conservancy members and staff derive recreational, spiritual,

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 47 -

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA 98104-1711*
*(206) 343-7340*

professional, scientific, educational, and aesthetic benefits from their interactions with these parts of the natural world.

101.    Captain Dave Monti is an Ocean Conservancy member who resides in Warwick, Rhode Island and keeps his charter boat, the *Virginia Joan*, in North Kingstown, Rhode Island. He generates a portion of his income as a charter boat captain and guide. Captain Monti has been fishing for over 45 years and expects to do so for the foreseeable future. He helps his clients target Rhode Island fish species such as striped bass, bluefish, summer flounder (fluke), scup, tautog, black sea bass, cod, and bonito in the Narragansett Bay, Block Island, and Newport areas. Captain Monti relies on NEPA reviews and public processes to be informed and involved in federal decisions affecting the areas he fishes in and the habitat that his target fish need to stay productive, including permitting decisions regarding the Block Island Wind Farm. Elimination or curtailment of NEPA reviews for the siting of wind farms or for fishery management actions would result in additional threats in the waters he fishes in and the fish species he targets for his clients. The proposed rule would undermine his use and enjoyment of these waters and public fishery resources.

102.    Plaintiff Rio Grande International Study Center ("RGISC") is a public interest, 501(c)(3) advocacy organization located in Laredo, Texas. It has a staff of two full-time employees and three part-time employees. RGISC's mission is "to preserve and protect the Rio Grande-Rio Bravo, its watershed and environment, through awareness, advocacy, research, education, stewardship and bi-national collaboration for the benefit of present and future generations." Nearly 95% of the population in Laredo is Hispanic and more than one-third of the city's population lives in poverty, more than twice the state average. RGISC staff and board

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 48 -

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA 98104-1711*
*(206) 343-7340*

AR_0006589

1  members live, work, and recreate in and along the Rio Grande and will continue to do so into the

2  future.

3  103.  RGISC's workload includes monthly river sampling and water quality testing at

4  multiple locations in Webb County through the Texas Clean Rivers Program to monitor the

5  health of the river.  RGISC helped establish this program through local and state entities and has

6  done monthly monitoring for more than 25 years.  The City of Laredo has asked RGISC to

7  operate an educational center (the "South Laredo Nature and Birding Center" or "SoLa Center")

8  to promote appreciation of the flora, fauna and wildlife of the region, and in particular within the

9  Rio Grande ecosystem.  Every year in early February, RGISC hosts a four-day Laredo Birding

10  Festival, and RGISC staff and volunteers take visitors from across the United States and different

11  countries to observe birds along the Rio Grande in Webb and Zapata counties.  RGISC also leads

12  community outings called Loving Laredo Paddles and Loving Laredo Hikes along the river

13  several times a year to raise awareness of the beauty and ecological importance of the Rio

14  Grande.  The Laredo Birding Festival and Community Paddles generate revenue for RGISC.

15  104.  RGISC uses NEPA and its requirements for public transparency, information-

16  sharing, and participation in its work to protect the Rio Grande.  For example, in 2009-2010, led

17  by then Executive Director Jay Johnson Castro and Board members Dr. Tom Vaughan & Dr.

18  James Earhart, RGISC informed and educated the families living in Barrio de Colores of the

19  potential adverse environmental impacts of a U.S. Customs and Border Protection project to

20  remove Carrizo cane vegetation along the U.S.-Mexico border through herbicide spraying along

21  the river banks.

22  105.  RGISC board member, Israel Reyna, an attorney with the Texas Rio Grande

23  Legal Aid, advised the families of their rights and protections under NEPA, including the right to

24

25  COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 49 -

26

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA  98104-1711*
*(206) 343-7340*

AR_0006590

know all of the potential harms to their human environment, to ensure alternatives were considered, a bilingual notice of the proposed project, and of their right to sue if NEPA was violated.

106.    In ensuing federal litigation, Dr. Earhart, a biologist and scientist on the RGISC board, wrote an affidavit that supported the suit's allegations of the potential harmful effects to families in Barrio de Colores from exposure to herbicides used to remove the Carrizo cane, particularly because of aerial spray drift.  Through a court-approved settlement, Customs and Border Protection agreed to use a combination of principally non-chemical methods to remove Carrizo cane, using herbicide in one area only after a 5 day warning period and public information provided in both English and Spanish.  The federal agency also agreed to hire a certain number of workers from the local labor pool, and to convene a public information meeting to fully explain the cane removal and control activities to the local community, again in both English and Spanish.  Finally, the federal agency agreed to implement future NEPA analysis regarding Carrizo cane removal with at least one public scoping meeting, a 45-day comment period, and summaries and documents translated into Spanish and distributed at the local public library.  *Barrio de Colores v. U.S. Customs and Border Protection, Dep't of Homeland Security*, No. 09-0035 (S.D. Tex.).

107.    RGISC is currently deep in the throes of a battle against the federal government's plans to build a border wall, approximately 121 river miles along the Rio Grande in the Laredo Sector.  NEPA, in addition to dozens of other federal laws, has been waived to expedite construction of the Border Wall.  Waiver of NEPA for the Border Wall has meant that the federal government can undertake projects or issue permits without consulting local communities and

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 50 -

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA 98104-1711*
*(206) 343-7340*

AR_0006591

1  local experts.  Waiver of NEPA has taken away the community's voice and input into projects

2  that would harm the environment, public health, cultural heritage, and way of life.

3      108.  Like waiver of NEPA, RGISC believes that the Final Rule will undercut its ability

4  and the ability of the community that RGISC serves to evaluate and comment on the full impacts

5  of projects like the border vegetation control project.  The Final Rule also harms RGISC's ability

6  to push federal agencies to fully provide local communities timely, accessible, Spanish-language

7  information about proposed actions and meaningful opportunities to participate in federal

8  decisions that affect them.

9      109.  Plaintiff <u>Southern Utah Wilderness Alliance</u> ("SUWA") is a nonprofit

10  environmental membership organization dedicated to the preservation of outstanding wilderness

11  found throughout Utah, and the management of wilderness-quality lands in their natural state for

12  the benefit of all Americans.  SUWA promotes local and national recognition of the region's

13  unique character through research and public education, and supports administrative and

14  legislative initiatives to permanently protect Utah's wild places.  SUWA has more than 14,000

15  members in all fifty states, with 2,155 members in California, and maintains offices in Utah and

16  Washington D.C.  SUWA members use and enjoy federal public lands throughout Utah for a

17  variety of purposes, including scientific study, recreation, wildlife viewing, aesthetic

18  appreciation, viewing cultural and historic artifacts, and financial livelihood.

19      110.  SUWA staff are well versed in CEQ's NEPA regulations and regularly review

20  and analyze NEPA documents and submit detailed, technical comments on proposed actions that

21  may impact areas proposed for wilderness designation or other federal public lands in Utah.

22  These comments often address federal agencies' discounting of greenhouse gas emissions and

23  impacts to climate change from proposed actions like federal oil and gas lease sales and

24

25  COMPLAINT FOR DECLARATORY

26  AND INJUNCTIVE RELIEF - 51 -

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA 98104-1711*
*(206) 343-7340*

AR_0006592

1    applications for oil and gas drilling permits and the clearcutting native vegetation.  SUWA staff

2    and members work to safeguard remarkable federal public lands in Utah will be harmed by the

3    Final Rule.  SUWA submitted comments on CEQ's draft rule.  SUWA has individual members,

4    including Neal Clark and Landon Newell, who establish SUWA's significant interest in the

5    rulemaking and standing to bring this facial challenge.

6        111.    Mr. Clark has been a full-time employee of SUWA since 2011 and serves as the

7    organization's Wildlands Program Director, and also serves as House Counsel.  In this capacity,

8    Mr. Clark oversees the drafting and filing of dozens of SUWA comments annually on various

9    federal agency NEPA documents.  For example, in 2018 SUWA submitted comments on BLM's

10   draft resource management plans and environmental impact statements for the Shash Jaa and

11   Indian Creek units of the reduced Bears Ears national monument and highlighted numerous

12   instances where the Bureau had failed comply with the letter and spirit and NEPA's

13   implementing regulations.

14       112.    Mr. Clark is also an active member of SUWA.  Mr. Clark lives in Moab, Utah and

15   spends much of his free time exploring BLM, Forest Service, and National Park Service public

16   lands in southern Utah, including hiking and camping in Bears Ears National Monument, rafting

17   in Labyrinth Canyon, and mountain biking on Bureau-managed lands surrounding Moab.  He

18   engages in these activities on a daily basis, year-round, and intends on continuing to do so for

19   years to come.  Mr. Clark's interest in the protection and preservation of these federal public

20   lands will be harmed by the Final Rule because by eliminating the requirement that federal

21   agencies fully consider and disclose the cumulative impacts of climate change these agencies

22   will make fundamentally uninformed decisions that will result in short and long term degradation

23   that threaten the places he recreates in and enjoys.

24

25   COMPLAINT FOR DECLARATORY
     AND INJUNCTIVE RELIEF - 52 -

26

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA 98104-1711*
*(206) 343-7340*

AR_0006593

113.    Mr. Newell has been a full-time employee of SUWA since 2012 and serves as one of the organization's staff attorneys.  In this capacity Mr. Newell focuses his work on reviewing BLM proposals to hold quarterly oil and gas lease sales across Utah, as well as the Bureau's management of those leases and applications by private companies to drill wells and exploit subsurface resources.  Mr. Newell submits detailed comments on these proposals, as well as files administrative appeals and federal court litigation regarding the Bureau's failure to comply with NEPA's hard look mandate.

114.    Mr. Newell is also an active member of SUWA.  Mr. Newell lives in Salt Lake City and frequently camps, sightsees, hikes, fishes, and visits Native American cultural sites on BLM lands in Utah.  For example, in the spring of 2020 Mr. Newell traveled to Utah's San Rafael Swell (managed by BLM) and Capitol Reef National Park to hike, camp, and sightsee. He already has plans to return to these places in the fall and winter of 2020.  These public lands are part of the Colorado Plateau in Utah and one of the areas expected to get hotter and drier over the coming years due to climate change.  Mr. Newell's interest in the protection of these places is threatened by the environmental degradation brought on by climate change, including drought, aridification of soils, and loss of native vegetation, and decision by agencies like BLM to approve oil and gas leases and wells that will be made without considering and disclosing their impacts to the climate.

115.    Plaintiff, WE ACT for Environmental Justice ("WE ACT") is a non-profit organization founded in 1988 in the West Harlem neighborhood of New York City.  WE ACT's mission is to build healthy communities by ensuring that people of color and/or low income residents participate meaningfully in the creation of sound and fair environmental health and protection policies and practices.  WE ACT envisions a community that has informed and

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 53 -

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA 98104-1711*
*(206) 343-7340*

AR_0006594

engaged residents who participate fully in decision-making on key issues that impact their health

and community; strong and equal environmental protections; increased environmental health

through community-based participatory research and evidence-based campaigns.  WE ACT has

grown to 16 staff members, offices in New York City and Washington D.C., and over 800

members throughout New York City.

116.    WE ACT is a leading group in the Environmental Justice Movement, which

began in order to call attention to and organize against systemic environmental racism, which is

often left out of mainstream, largely white, environmental advocacy agendas.  In 1991, a

multinational group, including WE ACT, attended The First People of Color Environmental

Leadership Summit in Washington D.C.  At the event, "The Principles of Environmental Justice"

were created and agreed upon, and still stand as a guiding set of principles for the Environmental

Justice Movement today.

117.    Throughout the 32 years of its existence, WE ACT has provided effective

leadership in the development of New York City and northeast region environmental justice

alliances to network, collaborate, and impact environmental policy-making.  WE ACT is also the

administrative arm of the Environmental Justice Leadership Forum, which is a coalition of nearly

60 environmental justice advocates and experts working to eliminate environmental injustices

through technical assistance, capacity building, and policy solutions.

118.    WE ACT's founders, Peggy Shepard, Chuck Sutton, and Vernice Miller-Travis

started as community activists.  They have long viewed NEPA as an important tool for advocacy.

They used the procedures and requirements of the National Environmental Policy Act in their

attempt to address the noxious emissions and pollution from the North River Sewage Treatment

Plant, which lines the banks of the Hudson River along Manhattan Island in the West Harlem

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 54 -

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA  98104-1711*
*(206) 343-7340*

AR_0006595

community for almost half a mile. They conducted significant research into the land use and

siting history of this largely federally funded facility and uncovered that EPA Region 2 had twice

declared a Finding of No Significant Impact under NEPA for the North River plant. As a result,

the public was never informed about how a facility designed to treat 180 million gallons a day of

raw sewage and wastewater, constructed without any odor- control features at all, might impact

the tens of thousands of people who live near the plant.

119.    Peggy Shepard is the co-founder and executive director of WE ACT for

Environmental Justice. She has lived in New York City for over 30 years. In both her role as a

community advocate and executive director of WE ACT, she and WE ACT staff have worked to

effectively educate WE ACT membership on the importance of public engagement, and how to

effectively organize at the local level. Ms. Shepard has a long history of organizing and

engaging Northern Manhattan residents in community-based planning and campaigns to address

environmental protection and environmental health policy locally and nationally. She has

successfully combined grassroots organizing, environmental advocacy, and environmental health

community-based participatory research to become a national leader in advancing environmental

policy and the perspective of environmental justice in urban communities to ensure that the right

to a clean, healthy and sustainable environment extends to all.

120.    With NEPA as the foundation for many state and city level regulations, WE ACT

has utilized similar regulations to engage locally to voice concerns about projects that impact

their community. In 2017, WE ACT community members concerned about New York City's

plan to rezone the Inwood neighborhood utilized the public participation provisions to voice their

apprehension about this project. The nine residents submitted in depth written comments on the

environmental impact statement because they believed the proposed rezoning would lead to an

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 55 -

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA 98104-1711*
*(206) 343-7340*

AR_0006596

increase in density and serious environmental and socioeconomic risks that, if it is enacted as

proposed, would cause irreparable harm to their neighborhood.  They also believed that the

redevelopment project would jeopardize the special character of their neighborhood.  Their

comment particularly identified that the redevelopment plan for Inwood increased the likelihood

of tenant displacement, would negatively impact minority- and women-owned businesses in the

area, and the community would experience the social impact of the loss of the community's

library.  The New York Supreme Court judge sided with these local residents, contending the

prior environmental review of the project ignored concerns they had raised.

121.    WE ACT submitted comments on the Proposed Rule in March 2020 in

coordination with Yale University's Environmental Justice Law Clinic.  WE ACT's comments

reflected their grave concern about how these proposed changes would drastically diminish the

ability of communities to know what projects were planned and also be able to meaningfully

provide their expertise to articulate how their respective communities would be impacted.  NEPA

is one of the key tools WE ACT uses to effectively advocate on behalf of its membership.  The

NEPA mandates of public participation and informed decision-making, based on sound science

and requiring all agencies of the federal government to take a hard look at environmental

consequences prior to issuing a decision, are vital protections.

122.    WE ACT serves a very diverse membership who live in neighborhoods like

Washington Heights and Inwood.  According to the 2018 New York City's Community Health

Profile, 47% of residents in WE ACT's service area are born outside of the United States and

37% have limited proficiency in English.  Spanish translation is a costly but necessary service

WE ACT provides for all materials for membership.  The changes to the Final Rule cut the

public comment period on major federal projects from 45 days to just 30.  That's not enough

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 56 -

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA 98104-1711*
*(206) 343-7340*

AR_0006597

time for WE ACT community members to organize and respond to long technical documents that are often only provided in English. These changes to rule would also limit the way agencies distribute information. Without in-person meetings, and a requirement that agencies physically distribute documents, WE ACT community members are in danger of being silenced and left in the dark.

123. WE ACT community members without access to the internet or those with slower access will be disadvantaged. Communities with lower socio-economic statuses are often the ones impacted the most by projects. By moving documents online, these communities will not have a chance to meaningfully participate and voice their concerns.

124. WE ACT like many environmental justice communities are disproportionately impacted by pollution. Race, even more than class, is the number one indicator for the placement of toxic facilities in this country. Exposure to elevated levels of air pollution are linked to or exacerbate cardiovascular and respiratory diseases, often leading to emergency department visits, hospitalizations and premature death, as well as reduced birth weight and cancer. The result is that Black, Asian, and Latino/a communities have some of the highest rates of asthma nationwide, and African Americans are three times more likely to die from asthma-related causes than the white population.

125. Communities of color and low income communities are often the hardest hit by climate change. While air quality in New York City has improved over the past few decades due to actions taken to reduce pollution emissions, not all neighborhoods are experiencing that improvement equally. NYC neighborhoods with higher rates of poverty also have higher rates of nearby emissions and pre-existing illnesses that are more sensitive to air quality issues. In Northern Manhattan, residents continue to suffer disproportionately from the impacts of air

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 57 -

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA 98104-1711*
*(206) 343-7340*

AR_0006598

1   pollution, particularly those living in East Harlem.  East Harlem children wind up hospitalized

2   for asthma at more than three times the New York City rate.  The changes to NEPA eliminate

3   that requirement for agencies to look not just at the incremental impacts of their actions, but also

4   the cumulative effects.  While one project might not emit much pollution by itself, but combined

5   with the emissions of other facilities or projects in the area, the cumulative effects might pose an

6   unacceptable health risk.  Cumulative impacts are life-or-death impacts for already vulnerable

7   communities.

8       126.    Plaintiff Western Watersheds Project ("WWP") is a 501(c)(3) non-profit

9   conservation organization based in Hailey, Idaho with over 12,000 members and supporters

10  nationwide, 74 current dues-paying members in California, and one member of the Board of

11  Directors who resides in Berkeley, California.  Founded in 1993 to protect and restore western

12  watersheds and wildlife through education, public policy initiatives, and legal advocacy.  WWP

13  has offices in Idaho, Montana, Wyoming, Arizona, Utah, Washington, Oregon, and Nevada, and

14  focuses its efforts on minimizing environmental impacts to federal public lands, with a particular

15  focus on public lands livestock grazing.

16      127.    WWP works to influence and improve public lands management throughout the

17  West with a primary focus on the negative impacts of livestock grazing on 250 million acres of

18  western public lands, including harm to ecological, biological, cultural, historic, archeological,

19  scenic resources, wilderness values, roadless areas, Wilderness Study Areas and designated

20  Wilderness.  WWP works to ensure that commercial projects on public lands are compatible with

21  maintaining healthy and fully functioning native ecosystems that support diverse and abundant

22  wildlife, clean water and native fish habitats, and outstanding opportunities for public recreation

23  and enjoyment.

24

25  COMPLAINT FOR DECLARATORY
    AND INJUNCTIVE RELIEF - 58 -

26

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA 98104-1711*
*(206) 343-7340*

AR_0006599

128. NEPA is critical to WWP's work because it: first, ensures that WWP is notified of major federal actions with potential to significantly impact the environment; second, allows WWP to participate in those actions through submitting detailed comments based in science and law; and third, encourages better outcomes by requiring federal agencies to "look before they leap" and consider WWP's input in their decision-making. WWP commonly recommends alternative conservation measures for federal plans or projects, and its alternatives are at times included within the range that federal decision-makers ultimately consider in detail. NEPA also helps WWP engage its base of members and supporters by encouraging them to participate in opportunities to share their perspectives with federal agencies through the NEPA process.

129. Addressing the environmental impacts of livestock grazing on federal public lands, including those managed by the Bureau of Land Management, the Forest Service, and the National Park Service, is at the heart of WWP's conservation advocacy, and NEPA provides the framework for federal grazing leases, large-scale land-use plans, federal programs impacting wildlife such as USDA Wildlife Services, and federal projects including energy development, and sagebrush and juniper vegetation destruction projects. Domestic livestock are the most widespread – and often the most important – human impact on federal public lands and waterways. Poorly managed livestock grazing degrades land health and vegetation communities, spreads invasive weeds like cheatgrass that destroys wildlife habitat function and increases fire risk, causes erosion and sedimentation that harms the spawning habitats of native fishes, and inputs levels of fecal coliform and other biological contaminants that can violate Clean Water Act standards.

130. Many of WWP's members use federal public lands throughout the West as a primary source for recreation, engaging in activities ranging from hiking and camping to

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 59 -

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA 98104-1711*
*(206) 343-7340*

birdwatching, rockhounding, cross-country skiing, angling, hunting, wildlife viewing, and nature study. The recreational experience of WWP members is harmed by improper livestock grazing, and WWP commonly receives and investigates complaints from our members of livestock trespassing on public lands closed to grazing, or heavily impacting their recreational experiences in areas of high recreation value like federal campgrounds. NEPA is often the sole way that the public can have a voice to achieve the proper management of the federal public lands and call attention to inappropriate or environmentally harmful practices approved by federal agencies, and seek corrective actions through NEPA processes.

131. Erik Molvar is Executive Director of Western Watersheds Project, and also has been a member of the organization since 2016. Mr. Molvar has been intimately involved in researching the science and law applicable to Point Reyes National Seashore, located in Marin County, California, and in drafting comment letters on behalf of Western Watersheds Project and its members that have been submitted to the National Park Service as part of the NEPA process for the park's General Management Plan (GMP). Mr. Molvar has personally visited Point Reyes National Seashore and Golden Gate National Recreation Area (NRA, also governed under GMP) five separate times since 2015, most recently in May of 2020, for the purposes of camping, hiking, wildlife viewing, wildlife photography, landscape photography, and nature study, and he intends to return to this area as soon as health concerns due to the global pandemic subside. Mr. Molvar's enjoyment of these lands was impaired by federally permitted livestock grazing and other agricultural activities, including spraying of liquified manure from dairy operations, invasive weed proliferation, and hazing of elk away from areas of the National Seashore where livestock are permitted, and the Park Service may remedy these harms by imposing restrictions on livestock use currently under study in the GMP planning process. His future enjoyment of the

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 60 -

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA 98104-1711*
*(206) 343-7340*

National Seashore and Golden Gate NRA may be impaired as a result of the Final Rule's elimination of indirect and cumulative impacts analysis requirements, imposition of new exhaustion requirements on issues raised by other commenters, and potential imposition of bond or other financial security requirements. He has definite plans to return to Point Reyes, and a refunded airplane ticket to use, as soon as COVID-19 pandemic makes travel to California advisable.

132.   Dr. Jason A. Lillegraven, a member of WWP since 2017, is a paleontologist/geologist and retired Professor of Geology and Zoology at the University of Wyoming. He has camped and recreated extensively on federal public lands throughout Wyoming, usually in conjunction with his geological and paleontological research. Indeed, he completely restored a sheep wagon to support his extended geological mapping program in Wyoming's Hanna/Carbon Basin. Dr. Lillegraven has worked in conjunction with WWP in submitting detailed, science-based comments during federal agency NEPA processes, advocating for conservation and protections for public lands and wildlife. He also has submitted independent comments on federal NEPA processes, most recently including for the U.S. Forest Service's ongoing Landscape Vegetation Analysis project, originally proposed to permit over 300,000 acres of logging on the Medicine Bow National Forest near his home in Laramie. Dr. Lillegraven also submitted comments on the Thunder Basin National Grassland plan amendment referenced above. In 2005, he submitted an expert declaration for an U.S. Interior Board of Land Appeals challenge against a NEPA-based decision on the Cherokee West 3D vibroseis exploration project on BLM lands in the southern Red Desert, a project stayed in part on the strength of his expert testimony. Dr. Lillegraven has keen interests in water diversion projects, and he submitted comments in opposition to the Corp of Engineers-supported Million

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 61 -

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA 98104-1711*
*(206) 343-7340*

AR_0006602

1    Conservation Resource Group's proposal to establish trans-basin water diversion from the Green

2    River in Wyoming to Pueblo, in southern Colorado. Similarly, he recently wrote in opposition to

3    the Lake Powell Pipeline Project in southern Utah. Dr. Lillegraven also served as a leader in

4    opposition to development of the Dunlap Wind Energy Project that eventually was built north of

5    Medicine Bow, Wyoming. More successfully, Dr. Lillegraven was largely responsible for

6    opposition to approval and any future plans for development of the DKRW coal gasification

7    project in Wyoming's Carbon Basin.

8       133.    Plaintiff The Wilderness Society ("TWS") is a national non-profit organization

9    working to unite people to protect America's wild places. Founded in 1935 and with more than

10   one million members and supporters, with approximately 27,000 members and over 12,000

11   supporters in California and an office in Oakland, California, TWS has led the effort to

12   permanently protect 111 million acres of wilderness and to ensure sound management of our

13   shared national lands. The Wilderness Society sees a future where people and wild nature

14   flourish together, meeting the challenges of a rapidly changing planet. To accomplish that

15   vision, TWS works to ensure that public lands are a solution to the climate and extinction crises

16   and that all people benefit equitably from public lands. Of all our bedrock conservation laws,

17   NEPA perhaps best speaks to the vision The Wilderness Society seeks to accomplish by

18   enshrining democratic principles of transparency, public participation, science-based

19   environmental review, and accountability into government decision-making.

20      134.    TWS, its members, supporters, and partners have relied on NEPA and CEQ's

21   implementing regulations to drive the organization's engagement in countless agency decision-

22   making processes over the last fifty years – everything from small local decisions on a particular

23   national forest ranger district to sweeping national regulatory changes. The environmental

24

25   COMPLAINT FOR DECLARATORY
     AND INJUNCTIVE RELIEF - 62 -

26

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA 98104-1711*
*(206) 343-7340*

AR_0006603

review and public process requirements in CEQ's 1978 NEPA regulations have facilitated

decades of productive and informed dialogue between TWS and federal land managers, local

communities, tribes, and other stakeholders that paved the way for decisions to protect roadless

and wilderness-quality lands, policies to reduce climate pollution from fossil fuel development

on public lands, and management plans for newly established national monuments and other

crown-jewels of our federal public lands system.

135.    The Final Rule will harm the ability of TWS and its members to protect wild and

sensitive landscapes threatened by mining, drilling, logging, and other extractive uses, make

public lands part of the climate solution, and ensure that all people in the U.S. benefit equitably

from public lands.  TWS submitted comments and provided public testimony at every

opportunity during the rulemaking process, detailing how the proposed regulatory changes would

harm TWS's ability achieve its mission.

136.    TWS has individual members, including but not limited to Rebecca Rom of

Minnesota and Brad Meiklejohn of Alaska, who regularly visit, study, work, photograph, or

recreate on lands or marine areas where NEPA has been and will be used in reviewing federal

projects.  Each of the members has specific intentions to continue to interact with these areas

frequently and on an ongoing basis.  TWS members and staff derive recreational, spiritual,

professional, scientific, educational, and aesthetic benefits from their interactions with these parts

of the natural world.

137.    Rebecca Rom has been a member of TWS since the 1970s.  Ms. Rom is a life-

long citizen advocate for the protection and preservation of the world's greatest canoe country

wilderness: the Boundary Waters Canoe Area Wilderness and Voyageurs National Park.  She

lives within the Superior National Forest near Ely, Minnesota and in close proximity to the

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 63 -

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA 98104-1711*
*(206) 343-7340*

AR_0006604

Boundary Waters. Ms. Rom has definite plans to continue to explore the Boundary Waters and Voyageurs in 2020 and beyond. For her entire adult life, Ms. Rom has been heavily engaged in NEPA processes involving activities affecting these areas, as well as NEPA processes affecting federal public lands throughout the nation, including proposals to develop sulfide-ore copper mining in the Superior National Forest in the headwaters of the Boundary Waters and downstream of Voyageurs.

138.     Brad Meiklejohn has been a TWS member since 2019. Throughout his decades-long career as a conservation advocate and in his personal capacity as an avid wilderness explorer, Mr. Meiklejohn has engaged in dozens of NEPA processes to protect federal public lands in his home state of Alaska and across the country. He has an especially deep and long involvement in utilizing NEPA to protect the Arctic National Wildlife Refuge – one of the wildest undisturbed landscapes remaining on the planet and a place that he has visited nearly every year since 1989 – and intends to continue his annual sojourns there into the future.

139.     Plaintiff Winter Wildlands Alliance ("WWA") is a national non-profit organization dedicated to preserving winter wildlands and quality human-powered snowsports experiences on public lands. Founded in 2000, WWA represents a growing community of human-powered winter adventurers from across the country. WWA's 15,080 members and supporters – 398 of whom reside in California, and the members of their 33 grassroots groups, deeply value natural winter soundscapes and the opportunity for refuge and respite afforded by the last remaining places across the United States where solitude, fundamental wildness, and non-motorized experiences are preserved. From its headquarters in Boise, Idaho and field offices in Mammoth Lakes, California and Bozeman, Montant, WWA works with land managers, elected officials, grassroots groups and other partners to pursue a balanced, adaptive,

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 64 -

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA 98104-1711*
*(206) 343-7340*

AR_0006605

and collaborative approach to public lands management for the long-term protection of the

places where their members recreate and seek adventure. WWA's priority campaigns include

over-snow vehicle travel management planning on Forest Service lands, Forest Service land

management planning, and defense of non-motorized backcountry recreation opportunities on

public lands – all of these campaigns rely upon the public process afforded by NEPA and guided

by CEQ's NEPA regulations.

140.    Central to its mission, WWA is currently engaged in over a dozen different Forest

Service land or travel management planning processes; three projects involving the expansion of

ski resorts on public land; and several additional projects involving federal land management.

This work regularly involves engaging in the NEPA process and communicating with WWA

members about opportunities to participate in comment periods and other opportunities for

engagement allowed for by NEPA. WWA submitted comments on the proposed rule, and prior

to the publication of the final regulations, met with the Office of Information and Regulatory

Affairs to discuss their comments.

141.    WWA has individual members, including but not limited to Gus Bekker of

Washington and Darrel Jury of California, who regularly visit, study, work, photograph, or

recreate on lands where NEPA has been and will be used in reviewing federal projects. Each of

the members has specific intentions to continue to interact with these areas frequently and on an

ongoing basis. WWA members and staff derive recreational, spiritual, professional, scientific,

educational, and aesthetic benefits from their interactions with these parts of the natural world.

142.    Gus Bekker, a WWA member since 2002 and board member of one of WWA's

grassroots groups, El Sendero Backcountry Ski and Snowshoe Club, lives in Wenatchee,

Washington. An avid backcountry skier, Mr. Bekker has worked for years to advocate for

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 65 -

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA 98104-1711*
*(206) 343-7340*

backcountry skiing and preservation of winter wildlands on the Okanogan-Wenatchee National Forest, where he regularly skis during the winter months. Mr. Bekker skied several areas on the Forest this past winter, and has definite plans to do so again this year as soon as there is sufficient snow. He has engaged extensively in many Forest Service projects in order to preserve opportunities for backcountry winter recreation on Forest Service lands near Wenatchee. Currently, Mr. Bekker is advocating for backcountry skier interests as the Forest Service considers whether to grant a road right-of-way to Mission Ridge Ski and Snowboard Resort near Wenatchee. Mr. Bekker relies on the NEPA process to learn of new projects that may be federally authorized and participates in these processes to advocate for his and his organization's interests. As the road right-of-way proposal shows, these projects are not always directly related to backcountry recreation yet can have significant consequences to Mr. Bekker's interests. Elimination of the mandate that agencies consider indirect and cumulative effects and barriers to public participation would mean that either Mr. Bekker would be unable to participate in decisions affecting backcountry skiing on the Okanogan-Wenatchee National Forest, his concerns would be dismissed as unrelated to the project at hand, or his participation may not "count" if the responsible official deems his comments lacking in technicality or specificity. In all cases, it is likely that the Forest Service would make decisions that reduce or negatively impact the use and enjoyment of National Forest lands for Mr. Bekker and his fellow backcountry skiers.

143. Darrel Jury, a WWA member since 2015 and president of the WWA grassroots group Friends of Plumas Wilderness, relies on the NEPA process to engage in public land management near his home in Quincy, California. Specifically, Mr. Jury advocates for Wilderness, Wild & Scenic Rivers, and non-motorized areas for winter recreation on the Plumas,

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 66 -

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA 98104-1711*
*(206) 343-7340*

Lassen, and Tahoe National Forests, where he often recreates. Mr. Jury visits these national forest lands near his home on a weekly basis and is looking forward to skiing Thompson Peak on the Plumas National Forest as soon as there is sufficient snow to do so. He is extensively involved in over-snow vehicle planning on the Plumas, Lassen, and Tahoe National Forests and has submitted NEPA comments on these planning processes at multiple stages in the process. Mr. Jury's deep interest in Wilderness preservation and preserving refuges for quiet winter recreation opportunities will be harmed by the narrowed scope of NEPA review in the Final Rule.

### 2. Interests and Injuries Common to All Plaintiffs

144. As detailed above, Plaintiff groups and their members reside near, visit, or otherwise use and enjoy areas where NEPA analysis has occurred and will be undertaken in the future. Plaintiffs have concrete interests in CEQ's lawful implementation of NEPA and its vital role in preventing harm to people and the environment, and the regulatory revisions challenged in this lawsuit fundamentally undermine and contradict the requirements of NEPA. Plaintiffs have members who reside, work, travel, and recreate in places where federal agency actions and decisions occur, where threatened and endangered plants and animals are found, and where non-federal projects that require federal involvement, approval, and/or funding have been and will be proposed. Plaintiffs' concrete interests are also injured by CEQ's violation of procedural duties under NEPA and the APA. *Citizens for Better Forestry v. U.S. Dep't of Agric.*, 341 F.3d 961 (9th Cir. 2003); *W. Watershed Project v. Kraayenbrink*, 632 F.3d 472 (9th Cir. 2011). The past, present, and future enjoyment of the scientific, recreational, aesthetic, economic, and conservation benefits to Plaintiffs' members has been, is being, and will continue to be irreparably harmed by CEQ's disregard of its statutory duties. The "presence of one party with standing is sufficient to satisfy Article III's case-or-controversy requirement." *Rumsfeld v.*

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 67 -

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA 98104-1711*
*(206) 343-7340*

1  *Forum For Academics and Inst. Rights, Inc.*, 547 U.S. 47, 52 n.2 (2006); *see Brown v. City of*

2  *Los Angeles*, 521 F.3d 1238, 1240 n.1 (9th Cir. 2008) ("[T]he presence in a suit of even one

3  party with standing suffices to make a claim justiciable").

4  145.    The Final Rule will impede all of the Plaintiff organizations' ability to obtain

5  information vital to their central conservation missions, and will also require Plaintiffs to divert

6  scarce organizational resources from other programs to support their engagement in ongoing and

7  upcoming NEPA processes.  For instance, with shorter timelines and higher standards for

8  comment "specificity," Plaintiffs will need to devote new staff time and resources to effectively

9  engage and support their members, supporters, and partners during important public comment

10  periods.  For those Plaintiffs that have them, Plaintiffs' legal and technical staff will also need to

11  spend additional time and resources preparing detailed information to demonstrate, among other

12  things, that the host of significant environmental impacts associated with proposals to mine, drill,

13  log, or conduct other activities on public lands have "a reasonably close causal relationship to the

14  proposed action" and are not "remote in time, geographically remote, or the product of a lengthy

15  causal chain."  This in turn will require Plaintiffs to recruit and retain experts who will need to

16  work on compressed timelines.  For those organizations that do not have legal and technical

17  staff, Plaintiffs' ability to participate in the new NEPA procedures will be dramatically

18  compromised, and in some instances, impossible.  Additionally, by purporting to authorize

19  federal agencies to require the posting of a bond in order to obtain a stay of agency action while

20  NEPA issues remain under review, the Final Rule significantly increases the risk that Plaintiffs

21  will be required to pay for a bond or other security to participate in the NEPA process.  Such

22  expenses would, at minimum, divert funds away from other crucial conservation activities and

23  may deter Plaintiffs and others with whom they associate from fully participating in NEPA

24

25  COMPLAINT FOR DECLARATORY
26  AND INJUNCTIVE RELIEF - 68 -

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA 98104-1711*
*(206) 343-7340*

processes. In the absence of the Final Rule, Plaintiffs would dedicate financial and staff capacity towards other organizational programs such as outreach to urban and communities of color, expanding recreational opportunities for youth, building a socially diverse conservation community, developing clean energy and just transition policy platforms, and advocating for congressional protection of wild places.

146. NEPA expressly commands the federal government to "fulfill the responsibilities of each generation as trustee of the environment for succeeding generations." 42 U.S.C. § 4331(b)(1). The aesthetic, conservation, organizational, recreational, professional, spiritual, and scientific interests of Plaintiffs and their members in ensuring that CEQ's regulations maintain the requirement to fully analyze and disclose to the public the potential environmental impacts of, and feasible alternatives to, federal agency actions, 42 U.S.C. § 4332(c), have been, are being, and, unless the relief prayed for is granted, will continue to be directly and adversely affected by the failure of Federal Defendants to comply with the law.

147. Vacatur of the Final Rule would redress the injuries to Plaintiffs and their members and supporters by requiring federal agencies to continue conducting meaningful review of their actions' environmental impacts and providing opportunities for public participation in that process.

B. Defendants

148. Defendant Council on Environmental Quality is an agency within the Executive Office of the President. CEQ oversees Federal agency NEPA implementation and develops and recommends national policies to the President that promote the improvement of environmental quality.

149. Defendant Mary Neumayr is the Chair of the Council on Environmental Quality. Ms. Neumayr is sued in her professional capacity. Ms. Neumayr was confirmed by the United

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 69 -

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA 98104-1711*
*(206) 343-7340*

AR_0006610

States Senate on January 2, 2019, and sworn in on January 10, 2019. CEQ issued the Final Rule under the direction of Ms. Neumayr.

BACKGROUND

I.   THROUGH NEPA, CONGRESS INFUSED ENVIRONMENTAL AND PUBLIC HEALTH VALUES INTO ALL FEDERAL AGENCY ACTIONS AND DECISIONS.

   A.   Congress Enacted NEPA To Address Overwhelming National Concern about Protection of the Environment and Public Health.

150.   The 1960s epitomized a period of rapid economic and social change and heralded the rise of the environmental movement. Members of both political parties, urban and rural residents, and developers and preservationists all espoused the burgeoning conservation ethic in America.

151.   Seizing the moment of profound political change, the United States Congress hosted a joint House-Senate Colloquium on a "National Policy for the Environment" in July 1968. Invited to participate in the Colloquium were interested members of the public, executive branch heads, and leaders of industrial, commercial, academic, and scientific organizations, with the purpose of "focusing on the evolving task the Congress faces in finding more adequate means to manage the quality of the American environment."

152.   The outcome of the day-long discussion was a Congressional White Paper on a National Policy for the Environment, published in October 1968. Noting the near-consensus views expressed by those participating in the Colloquium, the Congressional White Paper explained that "in the recent past, a good deal of public interest in the environment has shifted from its preoccupation with the extraction of natural resources to the more compelling problems of deterioration in natural systems of air, land, and water. The essential policy issue of conflicting demands has become well recognized."

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 70 -

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA 98104-1711*
*(206) 343-7340*

AR_0006611

153. The Congressional White Paper explained that "If America is to create a carefully designed, healthful, and balanced environment, we must (1) find equitable ways of charging for environmental abuses within the traditional free-market economy; (2) obtain adequate ecological guidance on the character and impact of environmental change; (3) where corporate resource development does not preserve environmental values, then consider the extension of governmental controls in the larger public interest; (4) coordinate the Government agency activities, which share with industry the dominant influence in shaping our environment; and (5) establish judicial procedures so that the individual rights to a productive and high quality environment can be assured."

154. The Congressional White Paper highlighted a number of additional issues that stakeholders agreed were essential and ripe for Congressional consideration in its development of a national environmental policy. For example, Dr. Walter Orr Roberts, an atmospheric physicist and founder of the National Center for Atmospheric Research, explained the importance of considering climate change due to "[s]ubtle alterations of the chemical constitution of the atmosphere, through pollutants added in the form of trace gases, liquids, or solids, result from industrial activity or urbanization. This is an area of biometeorology that has significance in every living person and yet we have not yet seen even the first beginnings of an adequately sustained research effort in this area."

155. Russell Train, who would become the first Chair of the Council on Environmental Quality, testified that "[t]he urgent necessity of taking into account major environmental influences of foreign economic assistance and other international developments" in American environmental policy. This was an urgent issue because "to speak about environmental quality without at least referring to the fact of the international components and consequences of even

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 71 -

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA 98104-1711*
*(206) 343-7340*

AR_0006612

our activity as Americans and considering our own acreage and our own problems with the environment, appears to ... be somewhat shortsighted," according to Dr. Dillon Ripley, the Secretary of the Smithsonian Institution.  In that way, America's national environmental policy needed to consider domestic as well as international environmental quality.

156.    Given the exigency facing the environment and Americans, Senator Henry Jackson "argued that new approaches to environmental management are now required, and urged the Colloquium to provide thoughts on the possible 'action-forcing' processes that could be put into operation" through congressional action.

B.    <u>NEPA Requires All Agencies To Prioritize Protection of the Environment and Human Health.</u>

157.    Congress enacted the National Environmental Policy Act in 1969, adopting nearly all of the Congressional White Paper's elements of a national policy for the environment and public health and heralding a new era of environmental awareness in America.

158.    Section 101 of NEPA sets forth a national policy "to use all practicable means and measures, including financial and technical assistance, in a manner calculated to foster and promote the general welfare, to create and maintain conditions under which man and nature can exist in productive harmony, and fulfill the social, economic, and other requirements of present and future generations of Americans."  42 U.S.C. § 4331(a).

159.    Section 101 also gives federal agencies "continuing responsibility" to fulfill their role as a "trustee of the environment for succeeding generations"; assure all Americans have "safe, healthful, productive, and aesthetically and culturally pleasing surroundings"; "attain the widest range of beneficial uses of the environment" without degradation or risk; preserve "natural aspects of our national heritage"; "achieve a balance between population and resource

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 72 -

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA  98104-1711*
*(206) 343-7340*

AR_0006613

1  use"; and enhance renewable resources and "maximum attainable recycling of depletable

2  resources." 42 U.S.C. § 4331(b).

3      160.    Finally, Congress recognizes in Section 101 the right and responsibility of each

4  person to "enjoy a healthful environment and … to contribute to the preservation and

5  enhancement of the environment." 42 U.S.C. § 4331(c).

6      161.    Section 102 of NEPA applies the national policy set forth in Section 101 to

7  "proposals for … major Federal actions significantly affecting the quality of the human

8  environment." 42 U.S.C. § 4332(2)(C).  Specifically, Section 102 requires Federal agencies to

9  prepare a "detailed statement," which would soon become known as an environmental impact

10  statement or EIS, analyzing: (1) the environmental impact of the proposed action; (2) any

11  adverse effects that cannot be avoided; (3) alternatives to the proposed action; (4) the

12  relationship between local short-term uses of man's environment and the maintenance and

13  enhancement of long-term productivity; and (5) any irreversible and irretrievable commitments

14  of resources that would be involved in the proposed action.  42 U.S.C. § 4332(2)(C).

15      162.    The congressional mandates set forth in Section 102 are to be implemented "to

16  the fullest extent possible." 42 U.S.C. § 4332(2)(C).  NEPA demands a "systematic,

17  interdisciplinary approach" to "insure the integrated use of the natural and social sciences." 42

18  U.S.C. § 4322(2)(A).  The statute also recognizes the need to ensure "unquantified

19  environmental amenities and values" are considered in agency decision-making.  42 U.S.C. §

20  4322(2)(B).

21      163.    NEPA also requires federal agencies to study and develop alternatives to

22  proposed actions, 42 U.S.C. § 4322(2)(E); to recognize the "worldwide and long-range character

23  of environmental problems" and "maximize international cooperation in anticipating and

24

25  COMPLAINT FOR DECLARATORY
    AND INJUNCTIVE RELIEF - 73 -

26

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA 98104-1711*
*(206) 343-7340*

AR_0006614

1   preventing a decline in the quality of mankind's world environment," 42 U.S.C. § 4322(2)(F);

2   and make advice and information available to states, municipalities, and the public to be used in

3   "restoring, maintaining, and enhancing the quality of the environment." 42 U.S.C. § 4322(2)(G).

4         164.    Section 202 of NEPA establishes CEQ within the office of the President. 42

5   U.S.C. § 4342. Among other things, the statute directs CEQ to "to develop and recommend to

6   the President national policies to foster and promote the improvement of environmental quality

7   to meet the conservation, social, economic, health, and other requirements and goals of the

8   Nation." 42 U.S.C. § 4344(4).

9         165.    Roughly half of U.S. states have modeled state laws based on NEPA, and its

10   example has been adopted by scores of nations around the world.

11   II.    COURTS INTERPRETING NEPA'S PLAIN LANGUAGE HELD THE STATUTE
        DEMANDS FULL DISCLOSURE OF THE ENVIRONMENTAL IMPACTS OF
12       MAJOR FEDERAL ACTIONS AND PUBLIC COMMENT ON SUCH ACTIONS.

13         166.    As federal agencies began to implement NEPA in the absence of regulatory

14   direction in the first years after the law's enactment, courts stressed the broad requirements

15   Congress instilled in the statute. In an early opinion, the D.C. Circuit confirmed "[t]he sweep of

16   NEPA is extraordinarily broad, compelling consideration of any and all types of environmental

17   impact of federal action." *Calvert Cliffs' Coordinating Comm., Inc. v. U. S. Atomic Energy*

18   *Comm'n*, 449 F.2d 1109, 1122 (D.C. Cir. 1971); *see also id.* at 1114-15 (stressing "as forcefully

19   as possible" that the language "to the fullest extent possible ... does not provide an escape hatch

20   for foot-dragging agencies; it does not make NEPA's procedural requirements somehow

21   "discretionary"").

22         167.    Early circuit court opinions also addressed the purposes of an environmental

23   impact statement, *Silva v. Lynn*, 482 F.2d 1282, 1284–85 (1st Cir. 1973); the standards for

24   determining whether a project will have a "significant" impact and necessitate an environmental

25   COMPLAINT FOR DECLARATORY
    AND INJUNCTIVE RELIEF - 74 -
26

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA 98104-1711*
*(206) 343-7340*

AR_0006615

1  impact statement, including the need to consider potential direct, indirect, and cumulative

2  environmental effects, *Hanly v. Kleindienst*, 471 F.2d 823, 830–31 (2d Cir. 1972); and the

3  importance of agency consideration of a robust range of alternatives, *Nat. Res. Def. Council, Inc.*

4  *v. Morton*, 458 F.2d 827 (D.C. Cir. 1972).

5        168.    The Ninth Circuit in 1975 further outlined the statutory obligation to consider the

6  indirect effects of agency action.  "[C]onsideration of secondary impacts may often be more

7  important than consideration of primary impacts. … A new highway located in a rural area may

8  directly cause increased air pollution as a primary effect.  But the highway may also induce

9  residential and industrial growth, which may in turn create substantial pressures on available

10  water supplies, sewage treatment facilities, and so forth."  *City of Davis v. Coleman,* 521 F.2d

11  661, 676–77 (9th Cir. 1975) (*quoting Scientists' Institute for Public Information v. A. E. C.*, 481

12  F.2d 1079, 1092 (D.C. Cir. 1973) and Fifth Annual Report of the Council on Environmental

13  Quality, 410-11 (December 1974)).

14        169.    In 1976, again before CEQ adopted any regulations, the U.S. Supreme Court

15  confirmed that comprehensive environmental review under NEPA required consideration of

16  long-term and cumulative effects.  The Court explained:

17  > Section 102(2)(C) [of NEPA] is one of the "action-forcing" provisions intended
18  > as a directive to all agencies to assure consideration of the environmental impact
   > of their actions in decisionmaking.  By requiring an [environmental] impact
19  > statement Congress intended to assure such consideration during the development
   > of a proposal or as in this case during the formulation of a position on a proposal
20  > submitted by private parties.  A comprehensive impact statement may be
   > necessary in some cases for an agency to meet this duty.  Thus, when several
21  > proposals for coal-related actions that will have cumulative or synergistic
   > environmental impact upon a region are pending concurrently before an agency,
22  > their environmental consequences must be considered together.  Only through
   > comprehensive consideration of pending proposals can the agency evaluate
23  > different courses of action.

24

25  COMPLAINT FOR DECLARATORY
26  AND INJUNCTIVE RELIEF - 75 -

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA 98104-1711*
*(206) 343-7340*

AR_0006616

*Kleppe v. Sierra Club*, 427 U.S. 390, 409–10 (1976) (citing Congressional Conference Report on NEPA, 115 Cong. Rec. 40,416 (1969)).

III.   CEQ ENGAGED IN EXTENSIVE OUTREACH TO DEVELOP THE 1978 NEPA REGULATIONS.

170.   Prompted by the early case law interpreting NEPA, President Carter issued Executive Order 11991 on May 24, 1977, directing CEQ to issue regulations that would guide all agencies in implementing NEPA. *Relating to Protection and Enhancement of Environmental Quality*, Exec. Order No. 11991, 42 Fed. Reg. 26, 967 (May 24, 1977).  The Executive Order was based on the President's Constitutional and statutory authority, including NEPA, the Environmental Quality Improvement Act, and Section 309 of the Clean Air Act.  In signing Executive Order 11991, the President delegated this authority to the agency created by NEPA, the Council on Environmental Quality.  *Implementation of Procedural Provisions, Final Regulations*, 43 Fed. Reg. 55,978 (Nov. 29, 1978) (codified at 40 C.F.R. Part 1500).

171.   Following President Carter's Executive Order, CEQ announced three days of public hearings regarding how to best reform NEPA implementation and invited testimony from a "broad array of public officials, organizations and private citizens, affirmatively involving NEPA's critics as well as its friends."  43 Fed. Reg. at 55,980.

172.   After the hearings, CEQ "culled the record to organize both the problems and the solutions proposed by witnesses into a 38-page "NEPA Hearing Questionnaire," which it then sent "to all witnesses, every State governor, all Federal agencies, and everyone who responded to an invitation in the Federal Register."  43 Fed. Reg. at 55,980.  CEQ collated the responses to the questionnaire for use in drafting its anticipated regulations.

173.   CEQ also met with every agency of the executive branch to discuss what should be in the regulations, and it circulated an early draft of proposed regulations to all federal

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 76 -

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA 98104-1711*
*(206) 343-7340*

AR_0006617

agencies in December 1977. Further one-on-one consultation with agencies ensued, culminating

with a fourth draft of the proposed NEPA regulations sent to interested parties for comment.

Meanwhile:

> At the same time that Federal agencies were reviewing the early draft, [CEQ] continued to meet with, listen to, and brief members of the public, including representatives of business, labor, State and local governments, environmental groups, and others. Their views were considered during this early stage of the rulemaking. [CEQ] also considered seriously and proposed in our regulation virtually every major recommendation made by the Commission on Federal Paperwork and the General Accounting Office in their recent studies on the EIS process.

43 Fed. Reg. at 55,980.

174. Following these extensive hearings and intergovernmental consultations, CEQ

published proposed regulations to implement NEPA in June 1978, with a 60-day public comment

period. *National Environmental Policy Act Regulations; Proposed Implementation of*

*Procedural Provisions*, 43 Fed. Reg. 24,230 (June 9, 1978). CEQ prepared a "special

environmental assessment" to accompany the rulemaking. CEQ promulgated final regulations

on November 29, 1978 and the regulations became effective July 30, 1979. 43 Fed. Reg. at

55,978.

175. Prior to the Final Rule at issue in this case, CEQ made only two modifications to

the 1978 regulations. First, in 1986, CEQ revised a regulation regarding a "worst case analysis."

*National Environmental Policy Act Regulations; Incomplete or Unavailable Information*, 51 Fed.

Reg. 15,625 (April 26, 1986). Second, in 2005, CEQ changed the address for filing copies of

EISs. *Other Requirements of NEPA; Final Rule*, 70 Fed. Reg. 41,148 (July 18, 2005).

IV.    CEQ HAS ISSUED NEPA GUIDANCE AND REVIEWS FOR OVER 40 YEARS, NONE FINDING A NEED FOR MAJOR AMENDMENTS TO ITS REGULATIONS.

176. Over the years, CEQ has issued additional guidance regarding the implementation

of NEPA and the 1978 regulations (as amended in 1986). In particular, CEQ published its "40

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 77 -

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA 98104-1711*
*(206) 343-7340*

AR_0006618

Most Asked Questions Concerning CEQ's National Environmental Policy Act Regulations" in the Federal Register in 1981.  *Forty Most Asked Questions Concerning CEQ's National Environmental Policy Act Regulations*, 46 Fed. Reg. 18,026 (March 23, 1981) (*Forty Questions*).

177.    Several congressional and presidential reviews of the regulations have occurred; but none have previously resulted in changes to the 1978 regulations.

178.    In 1981 during the Reagan Administration, CEQ requested public responses to 11 questions, ranging from the specific ("Is the scoping process used at an appropriate stage in the development of agency proposals?") to the general ("What day-to-day practices could be improved to assure better compliance with NEPA?").  *Agency Implementation of CEQ's NEPA Regulations; Request for Public Comment*, 46 Fed. Reg. 41,131 (Aug. 14, 1981).  The comment period remained open for 60 days.  After release of a summary of the comments in July 1982, a public meeting was held to solicit any additional comments or suggestions.  The process resulted in guidance published in 1983 on five particular topics, but no changes to the regulations themselves.  *Guidance Regarding NEPA Regulations*, 48 Fed. Reg. 34,263 (July 28, 1983).

179.    In 1997, CEQ published the study *The National Environmental Policy Act: A Study of Its Effectiveness After Twenty-Five Years* (Jan. 1997).  The study built on input from some of the original framers of NEPA, members of Congress, state and local agencies, and federal agencies along with a major effort to include the public.  Eleven separate groups of partners were established to provide input into this study: businesses, decision-makers, state and local governments, agencies, academicians, Congress, framers of NEPA, drafters of CEQ regulations, Native American tribes, lawyers and public interest/citizen groups.  In coordination with CEQ, the Environmental Protection Agency ("EPA") conducted a survey of states regarding NEPA implementation.  CEQ, EPA, and the North Carolina Department of Environment, Health

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 78 -

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA 98104-1711*
*(206) 343-7340*

AR_0006619

and Natural Resources held a regional conference to investigate the effectiveness of state-federal interaction in NEPA implementation. The study concluded that "[o]verall, what we found is that NEPA is a success — it has made agencies take a hard look at the potential environmental consequences of their actions, and it has brought the public into the agency decision-making process like no other statute." The 1997 report emphasized the importance of several factors in ensuring that the congressional intent of NEPA was met, including adequate agency training to implement the 1978 regulations, consideration of a robust range of alternatives, engaging the public early and often in the NEPA process, and the need to develop concise NEPA documents rather than lengthy reviews.

180.    At the same time, CEQ published its guidance on *Considering Cumulative Effects Under the National Environmental Policy Act* (Jan. 1997). This guidance stated that "[e]vidence is increasing that the most devastating environmental effects may result not from the direct effects of a particular action, but from the combination of individually minor effects of multiple actions over time," highlighting the importance of this aspect of NEPA review. The 1997 guidance explained how federal agencies may analyze their actions for cumulative effects; provided advice regarding inviting public scoping of and comment on cumulative effects; and included methods, tools, and techniques (including examples) for analyzing cumulative effects. Nothing in the 1997 guidance suggested that consideration of cumulative effects was difficult, costly, or otherwise resulted in delays in project implementation.

181.    Most recently, the George W. Bush Administration's CEQ published "Modernizing NEPA Implementation" in December 2003. The NEPA Task Force, *The NEPA Task Force Report to the Council on Environmental Quality: Modernizing NEPA Implementation* (September 2003). The report was based on the work of a task force composed

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 79 -

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA 98104-1711*
*(206) 343-7340*

AR_0006620

of federal agency employees with diverse skills, expertise, and perspectives. The Task Force

engaged with state, tribal, and local governments and public interest organizations in completing

its report. CEQ took comments from the public at large for 75 days on the 2003 report. The

report provided a number of recommendations for action by CEQ, but did not commence

rulemaking to change the 1978 regulations.

V.    NEPA PROMOTES ENVIRONMENTAL JUSTICE.

182.    Guided by CEQ's 1978 regulations, NEPA became a crucial tool for public

engagement and better governmental decision-making in the fight against environmental racism.

NEPA and the 1978 regulations promote environmental justice by requiring federal agencies to

include a proposed project's potential environmental, economic, and public-health impacts on

low-income communities, communities of color, and rural communities. One of the visionary

elements of NEPA was its creation of broad opportunities for public participation in government

decisions that affect communities and their environment.

183.    In 1994, President Clinton issued Executive Order 12898, *Federal Actions to

Address Environmental Justice in Minority Populations and Low-Income Populations*, Exec.

Order No. 12898, *codified at* 3 C.F.R. § 859 (1995), *reprinted as amended in* 42 U.S.C. § 4321

(1998). Executive Order 12898 directs federal agencies to make environmental justice part of

their mission, and to identify and address the disproportionate environmental and health effects

of their activities on communities of color and low-income populations. The Executive Order

also requires agencies to ensure effective public participation and access to information.

184.    The Presidential Memorandum accompanying the Executive Order directs all

agencies to utilize NEPA to analyze environmental, health, economic, and social effects of

federal actions, including effects on communities of color and low-income communities; develop

mitigation measures that address significant effects of actions on communities of color and low-

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 80 -

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA 98104-1711*
*(206) 343-7340*

income communities; and to provide opportunities for public input in decision-making.  Most

importantly, agencies must provide opportunities for effective community participation in the

NEPA process.

185.    Executive Order 12898 recognized the importance of gathering data and

conducting research to identify and address disproportionately high and adverse health,

environmental, social, and economic effects of federal agency programs and policies on

communities of color and low-income communities.  Public participation is an integral part of

addressing environmental justice concerns.  The Presidential Memorandum also makes clear that

any NEPA document should "address significant and adverse environmental effects of proposed

federal actions on minority populations, low-income populations, and Indian Tribes."

Furthermore, each federal agency must provide opportunities for effective community

participation in the NEPA process through consultation with affected communities and

improving the accessibility of public meetings, crucial documents, and notices.

186.    CEQ has repeatedly published guidance documents on how to include

environmental justice in NEPA analyses.  In 1997, in consultation with EPA and other agencies,

CEQ developed guidance to "further assist Federal agencies with their NEPA procedures so that

environmental justice concerns are effectively identified and addressed." *Environmental Justice

– Guidance Under the National Environmental Policy Act* (1997).  CEQ recognized that

environmental justice issues may arise during federal decision-making and should be considered

at any step in the NEPA process, and courts have noted that "[e]nvironmental justice is not

merely a box to be checked." *Friends of Buckingham v. State Air Pollution Control Bd.*, 947

F.3d 68, 92 (4th Cir. 2020).

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 81 -

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA 98104-1711*
*(206) 343-7340*

187.    In 2016, a Federal Interagency Working Group issued a report on how better to implement environmental justice in the NEPA process: *Promising Practices for EJ Methodologies in NEPA Reviews*.  CEQ and other agencies recognized that engaging community members early and often informs an agency's decision-making process, benefitting agencies by communicating their objectives for the proposed activity.  The interagency report recognized that communities have varying levels of access to information, and instructed agencies to "consider providing notice to the public (as appropriate) of the meeting date(s) and time(s) well in advance and through methods of communication suitable for minority and low income populations."  Furthermore, when addressing impacts on environmental justice communities, the report stressed that NEPA requires agencies to consider three types of effects or impacts: direct, indirect, and cumulative impacts, and that agencies should be mindful that environmental justice communities may be differently affected by past, present, or reasonably foreseeable future impacts—that is, cumulative effects—than the general population.

VI.    THE PRESIDENT'S 2017 INFRASTRUCTURE DIRECTIVE AND CEQ'S 2018 ADVANCE NOTICE OF PROPOSED RULEMAKING.

188.    On August 15, 2017, the President issued Executive Order 13807, entitled "Establishing Discipline and Accountability in the Environmental Review and Permitting Process for Infrastructure Projects."  *Establishing Discipline and Accountability in the Environmental Review and Permitting Process for Infrastructure Projects*, 82 Fed. Reg. 40,463 (Aug. 24, 2017).  The Executive Order emphasized an alleged need for greater efficiency in environmental reviews of infrastructure projects, defined to include "pipelines," "energy production and generation," and "electricity transmission."  For example, the Order noted the importance of "using CEQ's authority to interpret NEPA to simplify and accelerate the NEPA

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 82 -

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA 98104-1711*
*(206) 343-7340*

AR_0006623

review process" and sought "expedited environmental review for the development of energy infrastructure projects." *Id*. at 40,468.

189.    In response to the Executive Order, CEQ announced its intention to review existing NEPA regulations to "identify changes needed to update and clarify those regulations" in September 2017. *Initial List of Actions To Enhance and Modernize the Federal Environmental Review and Authorization Process*, 82 Fed. Reg. 43,226 (Sept. 14, 2017).

190.    On June 18, 2018, CEQ issued an "advance notice of proposed rulemaking ("ANPRM") indicating that CEQ was proposing to amend the longstanding CEQ regulations governing NEPA. *Update to the Regulations for Implementing the Procedural Provisions of the National Environmental Policy Act; Advanced Notice of Proposed Rulemaking*, 83 Fed. Reg. 28,591 (June 20, 2018).

191.    The ANPRM gave little or no indication of what revisions CEQ was considering. Instead, it asked a series of twenty open-ended questions about whether various features of the existing regulations should be amended, and if so, how.

192.    Plaintiffs and others responded with detailed comments explaining why the CEQ regulations should not be amended.  Instead, the vast majority of the public comments explained how NEPA was successful in meeting its goals, and offered suggestions as to how implementation of NEPA could be improved to increase efficiency without undermining those goals.  The purported problems that CEQ sought to address, Plaintiffs and others explained, were a product of external factors such as inadequate training, funding, and implementation of the existing regulations and would not be solved by amending and weakening the CEQ regulations themselves.

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 83 -

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA 98104-1711*
*(206) 343-7340*

VII.     CEQ PROPOSED SIGNIFICANT CHANGES TO THE 1978 REGULATIONS THAT
CONFLICT WITH CONGRESSIONAL INTENT IN ENACTING NEPA.

193.     On January 10, 2020, CEQ issued its proposed revision to its implementing

regulations in a Notice of Proposed Rulemaking in the Federal Register ("Proposed Rule").

*Update to the Regulations Implementing the Procedural Provisions of the National*

*Environmental Policy Act; Notice of Proposed Rulemaking*, 85 Fed. Reg. 1,684 (Jan. 10, 2020).

The Proposed Rule aimed to "comprehensively update and substantially revise" the longstanding

1978 CEQ regulations, touching virtually every aspect of them.  Taken as a whole, the Proposed

Rule sought to transform NEPA from a sweeping infusion of environmental values and

environmental justice into federal decision-making to an expedited paperwork exercise designed

primarily to limit NEPA's reach, reduce public involvement, and narrow the scope of what

environmental consequences of federal agency actions are considered by federal agencies in

direct contravention to the statutory command to implement NEPA "to the fullest extent

possible."

194.     In virtually every instance where CEQ proposed changes, the effect was to

undermine NEPA or create ambiguity about the applicability and scope of NEPA review.  The

Proposed Rule contained changes that undermined NEPA's policies, including by deleting prior

regulatory language focused on the policy-driving, action-forcing congressional mandate.  In

other places, the Proposed Rule replaced the word "possible" with the word "practicable."

195.     The Proposed Rule also advanced changes to reduce the scope of NEPA's

applicability, limiting the number and types of federal actions that are subject to NEPA.  For

example, the Proposed Rule ignored longstanding regulatory and judicial precedent that the

adjective "major" in front of "federal action" reinforces but does not have independent meaning

from the qualifier "significantly."  In other words, the Proposed Rule refocused on the extent of

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 84 -

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA 98104-1711*
*(206) 343-7340*

AR_0006625

federal "control" rather than the extent and nature of the impacts of federal actions to the environment. The Proposed Rule compounded this mistake by asserting that federal financial assistance does not qualify as a "major federal action" if the agency did not retain an undefined level of "control and responsibility" over the effects of the action.

196. Additionally, the Proposed Rule proposed to add a new "functional equivalency" test, allowing NEPA to be waived if there was some other environmental review process associated with the project. Nothing in the Proposed Rule set any meaningful boundaries on such use, meaning that alternative reviews with lower environmental standards and less robust public processes could be used to avoid the application of NEPA. Even the example offered by CEQ—a Regulatory Impact Analysis ("RIA") required by an Executive Order—proved the point: an RIA focuses on economic cost-benefit analysis, rather than review of environmental impacts and potential alternatives.

197. The Proposed Rule announced a new definition of "significance" that would reduce the number of actions deemed substantial enough to trigger the preparation of an environmental impact statement. The Proposed Rule similarly eliminated language prohibiting "piecemealing" or segmentation of agency actions by breaking them into individually less significant or relatively minor component parts, and it expanded the scope and application of "categorical exclusions," a mechanism to simplify NEPA compliance for actions that did not individually or cumulatively have a significant effect on the environment.

198. In addition to narrowing the type of actions to which NEPA applied in the first instance, the Proposed Rule also significantly limited the scope of environmental review for those actions that still triggered NEPA compliance. Of particular concern, the Proposed Rule categorically eliminated the requirement to consider cumulative effects and eliminated any

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 85 -

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA 98104-1711*
*(206) 343-7340*

AR_0006626

1    obligation to consider indirect effects.  Under the 1978 CEQ regulations and longstanding

2    judicial interpretation, cumulative effects constitute an "impact on the environment which results

3    from the incremental impact of the action when added to other past, present, and reasonably

4    foreseeable future actions," regardless of what agency (Federal or non-Federal) or person

5    undertakes such other actions, while indirect effects are those effects that are "caused by the

6    action and are later in time or farther removed in distance, but are still reasonably foreseeable."

7    Indirect and cumulative effects are critical components of environmental impacts that must be

8    considered under NEPA.  In many cases, they are the most important issues of concern to the

9    public and other stakeholders.

10        199.    While there are many reasons why the consideration of indirect and cumulative

11   effects is essential to sound decision-making, the failure to consider such effects is especially

12   harmful with regard to the issue of climate change, both in terms of a proposed action's

13   greenhouse gas emissions that contribute to it, as well as how a changing climate could affect a

14   proposed action or the location where the action takes place.  As many agencies and courts have

15   recognized, climate change is the ultimate "cumulative effect," because it arises from the

16   aggregate of countless actions over time and around the world.  CEQ in the past has issued

17   guidance on how to include climate change in NEPA analyses, and courts have been repeatedly

18   called on to interpret agencies' duties in this regard.  By eliminating the review of cumulative

19   and indirect effects, the Proposed Rule attempted to relieve agencies of the duty to consider

20   climate change related impacts in their NEPA analyses.

21        200.    The Proposed Rule also undermined the analysis of environmental justice impacts

22   without explanation.  Environmental justice addresses the disproportionate impact of pollution

23   and environmental degradation on people of color and low-income communities.  Cumulative

24

25   COMPLAINT FOR DECLARATORY
     AND INJUNCTIVE RELIEF - 86 -

26

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA 98104-1711*
*(206) 343-7340*

AR_0006627

impact analysis is essential to identifying whether and how low income and frontline

communities of color may be overburdened by the additive environmental impacts of a proposed

federal action, particularly actions that contribute air, land, and water pollution to the

environment.  By eliminating cumulative impact review, the Proposed Rule allowed agencies to

sidestep considering environmental justice impacts.  CEQ also failed to conduct an

environmental justice analysis of the Proposed Rule under Executive Order 12898, *Federal

Actions To Address Environmental Justice in Minority Populations and Low-Income*

*Populations*, 59 Fed. Reg. 7,629 (Feb. 11, 1994).

201.    The Proposed Rule limited the discussion of alternatives, the "heart" of the EIS

process.  *Forty Questions; Answer to Question 7*, 46 Fed. Reg. at 18,026.  Indeed, the Proposed

Rule explicitly struck regulatory language declaring as much.  Instead, the Proposed Rule sought

to constrain the range of alternatives considered in an EIS, providing that federal agencies did

not need to consider alternatives not within the jurisdiction of the lead agency—in contravention

of precedent and governing caselaw.  *NRDC v. Morton*, 458 F.2d 827, 834 (D.C. Cir. 1972)

(noting that the reasonableness requirement does not limit the agency to evaluate only measures

within its jurisdiction); *see EDF v. U.S. Army Corps of Engineers*, 492 F.2d 1123, 1135 (5th Cir.

1974) (agreeing with the D.C. Circuit that there is no statutory restriction that limits "an agency

to consideration of only those alternatives that it could adopt or put into effect").

202.    The Proposed Rule included a series of provisions that would raise barriers to

public participation, limit the requirements for agencies to engage with the public and respond to

comments, and eliminate protections against conflicts of interest.  The Proposed Rule eliminated

restrictions on project proponents writing their own environmental reviews, stripped references

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 87 -

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA  98104-1711*
*(206) 343-7340*

to public participation from regulations, eliminated the requirement for public comments at the scoping stage for EAs.

203.    The Proposed Rule also included provisions intended to raise the bar on public comment, effectively allowing agencies to ignore comments that do not meet an arbitrary technical standard of precision.  Many commenters, especially members of the public, may have useful environmental, cultural, social, or other knowledge that should be brought to bear in agency decision-making, but lack the technical knowledge to express that information consistent with the Proposed Rule.  Simultaneously, the Proposed Rule reduced requirements that the agency respond to comments with detailed explanation and citation to authorities.  In other words, the Proposed Rule raised the bar for the public in commenting during the NEPA process while it lowered the bar for agencies to respond to comments.

204.    Finally, the Proposed Rule contained several elements which were directed at limiting judicial review of agency compliance with NEPA, for example, redefining "final agency action" for purposes of APA review to exclude an agency's failure to act and stating that "it is the Council's intention that the regulations ... create no presumption that violation of NEPA is a basis for injunctive relief or for a finding of irreparable harm."

205.    In sum, the Proposed Rule fundamentally mischaracterized, and attempted to fundamentally rewrite, the statutory purpose and goals of NEPA.  It proposed to substantially reduce both the breadth and depth of NEPA analysis, and to eviscerate available remedies for inadequate agency compliance.  Instead of centering environmental values and sound decision-making at the heart of the environmental and public health review process, the Proposed Rule elevated private interests and resource exploitation.  The Proposed Rule proposed to reverse

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 88 -

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA 98104-1711*
*(206) 343-7340*

longstanding positions accepted by CEQ, other agencies, and the courts for decades without explanation or a basis in fact or law.

## VIII. DESPITE OVERWHELMING OPPOSITION TO THE PROPOSED RULE, CEQ RUSHED TO ISSUE A FINAL RULE THAT EVISCERATED NEPA.

206.     The Proposed Rule ran for nearly 50 pages in the Federal Register and touched on virtually every aspect of the longstanding prior regulations, yet CEQ only offered 60 days for public comment.  Hundreds of states, Tribes, organizations, and others—including 167 members of the United States Congress—formally requested additional time to comment; CEQ denied all extension requests.

207.     CEQ only held two public hearings on the Proposed Rule, one in Denver, Colorado and one in Washington, D.C.  Speaking slots were made available during a 90-minute window, in advance, through a web-based registration system.  After the online registration system opened, all available speaking slots filled within a few minutes.  The vast majority of people who wished to provide oral comment were not able to do so.  Again, many members of the public requested additional hearings in vain.

208.     Despite the truncated process and the impacts of the global COVID-19 pandemic on every aspect of people's lives, CEQ received over one million public comments, a significant number of them containing detailed and comprehensive analyses explaining the significant harm that would arise from the proposal.  Opposition came from states and state agencies, Tribes, and a broad swath of public interests such as environmental protection, environmental justice, human health, public lands, and outdoor recreation groups, as well as former Chairs and staff of CEQ under both Republican and Democratic administrations.  Plaintiffs submitted detailed comments on the proposal.

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 89 -

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA 98104-1711*
*(206) 343-7340*

AR_0006630

209.     CEQ closed the comment period for the Proposed Rule on March 10, 2020.  CEQ released a pre-publication version of the Final Rule on July 15, 2020.  The Final Rule was published in the Federal Register on July 16, 2020.  85 Fed. Reg. 43,304.  Despite CEQ's prior statement that the Proposed Rule was only an update to the 1978 regulations, in announcing the Final Rule, President Trump declared that the new regulations were a "top to bottom overhaul" intended to bolster America "as a nation of builders."

IX.     CEQ'S FINAL RULE MADE ONLY MINOR CHANGES TO THE PROPOSED RULE.

210.     Aside from small changes such as altering verb tense and other technical corrections, the Final Rule closely mirrors the content of the Proposed Rule.

211.     The Final Rule only requires agencies to consider environmental information and "inform" the public regarding an agency decision.  40 C.F.R. §§ 1500.1(a), 1503.1(2)(v), 1507.3(f)(3) (2020).  The Final Rule deleted language that NEPA should be implemented "to the fullest extent possible."  42 U.S.C. § 4332(2)(C); 40 C.F.R. § 1502.2 (1978).[2]

212.     The Final Rule prohibits agencies from imposing any more stringent procedures or requirements beyond that required by the Final Rule.  40 C.F.R. 1507.3(b) (2020).  It deleted language stating that an EIS is an "action forcing" document intended to ensure NEPA's goals are "infused" into programs and activities of the Federal government.  40 C.F.R. 1502.1 (2020).

213.     The Final Rule replaces the word "possible" in the 1978 regulations with the word "practicable," weakening existing requirements and providing agencies with open-ended discretion to refuse to comply with requirements if they are inconvenient or cumbersome.  *See, e.g.,* 40 C.F.R. §§ § 1500.2, 1501.2(b)(2), 1501.5(d), 1501.7(g), (g)(1), (g)(2), (i), (j),

---

[2] The following citations to the 1978 regulations include changes made to 40 C.F.R. § 1502.22 in 1986.

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 90 -

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA 98104-1711*
*(206) 343-7340*

AR_0006631

1501.8(b)(1), (b)(6), (b)(8), 1501.9(a), (b), 1502.5(b), 1502.9(b), 1502.11(g), 1505.2(g)(3), 1506.2(b), (c), 1506.4, 1506.2(b), (c) (2020).

214.    The Final Rule limits the number and nature of federal actions that are subject to NEPA.  For example, the Final Rule departs from longstanding regulatory and judicial precedent that the adjective "major" in front of "federal action" reinforces but does not have independent meaning from the qualifier "significantly."  40 C.F.R. § 1508.1(q) (2020).

215.    The Final Rule asserts that federal financial assistance does not qualify as a "major federal action" if the agency does not retain an undefined level of "control and responsibility" over the effects of the action, in a manner that is inconsistent with judicial precedent, creates confusion, and invites abuse by applicants. 40 C.F.R. § 1508.1(q) (2020).

216.    The Final Rule narrowed the definition of "major federal action" even further by deleting language that defines "action" to include circumstances where an agency "fails to act" and that failure is reviewable under the APA.  40 C.F.R. § 1508.1(q)(1)(iii) (2020).

217.    The Final Rule allows federal agencies to waive NEPA if other review processes are either associated with or required for the project. 40 C.F.R. §§ 1501.1(a)(6) (2020), 1506.2, 1506.4, 1506.5, 1506.9, 1506.11(e), 1507.3(c)(5), (d)(6).

218.    The Final Rule allows federal agencies to circumvent NEPA by authorizing agencies, in their discretion, to determine that other statutes or directives conflict with NEPA.  40 C.F.R. §§ 1501.1(a)(2), (a)(3), § 1507.3(d)(2) (2020).  However, Congress did not delegate federal agencies authority to interpret "whether compliance with NEPA would clearly and fundamentally conflict with the requirements of another statute," or "whether compliance with NEPA would be inconsistent with Congressional intent expressed in another statute."  This is

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 91 -

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA 98104-1711*
*(206) 343-7340*

AR_0006632

1  also inconsistent with NEPA's statutory directive to apply the law to "the fullest extent

2  possible," as well as judicial precedent prohibiting such a narrow reading of NEPA.

3       219.    The Final Rule exempts certain categories of federal actions from the definition of

4  "major federal action," including actions that have long been understood to trigger NEPA

5  review, such as "loans, loan guarantees and other forms of financial assistance." 40 C.F.R. §

6  1508.1(q)(1)(vii) (2020). Similarly, the Final Rule characterizes the "action" for treaties and

7  international conventions such that NEPA compliance would only be required for

8  implementation of treaties and international conventions or agreements, 40 C.F.R. §

9  1508.1(q)(3)(i) (2020); the Final Rule eliminated the ratification of treaties from the definition of

10  "proposals for legislation." 40 C.F.R. § 1508.17 (1978).

11       220.    The Final Rule eliminates language from the 1978 regulations that programmatic

12  EISs are sometimes required and language that they are specifically required under certain

13  circumstances. 40 C.F.R. § 1502.4(b) (2020).

14       221.    The Final Rule eviscerates the regulatory definition of "significance," which will

15  reduce the number of actions deemed significant enough to trigger the preparation of an

16  environmental impact statement. *Compare* 40 C.F.R. §§ 1501.3(a)(2) (2020), (b)(1), 1501.5(a),

17  1502.16(a)(1) *with* 40 C.F.R. §§ 1508.27 (1978), 1508.8. Specifically, the Final Rule eliminates

18  the consideration of critical concerns like context, cumulative effects, scientific controversy, and

19  effects to listed species from the evaluation of a federal action's significance. *Id.*

20       222.    The Final Rule no longer prohibits the "piecemealing" or segmentation of agency

21  actions by breaking them into individually less significant or relatively minor component parts.

22  *Compare* 40 C.F.R. § 1501.3(b) (2020), 1501.9(e)(1) *with* 40 C.F.R. §§ 1508.25(a)(1) (1978),

23  (a)(2), (a)(3).

24

25  COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 92 -

26

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA 98104-1711*
*(206) 343-7340*

223. The Final Rule substantially expands the scope and application of "categorical exclusions," normally a mechanism to simplify NEPA compliance for actions that do not individually or cumulatively have a significant effect on the environment. *Compare* 40 C.F.R. § 1508.1(d) (2020) *with* 40 C.F.R. § 1508.4 (1978). Instead, the Final Rule eliminates key factors that previously prevented the use of categorical exclusions for actions that "individually or cumulatively" may have impacts to the environment. *Id.* Regardless of whether extraordinary circumstances exist, the Final Rule allows federal agencies, in their sole discretion, to use a categorical exclusion if there are "circumstances that lessen the impacts or other conditions sufficient to avoid significant effects;" but does not require the utilization of these other "circumstances" or "conditions." 40 C.F.R. § 1501.4(b)(1) (2020). The Final Rule allows agencies to apply a different agency's categorical exclusion, a sweeping expansion of what should be a narrow exception tailored to a specific federal agency and its mission-specific undertakings. *Id.* at §§ 1506.3(d) (2020), 1507.3(f)(5).

224. The Final Rule authorizes multiple exceptions to the general rule that action may not be taken to advance a proposal pending finalization of the NEPA process, thereby allowing agencies and private applicants to commit resources before a decision is made (including without public comment), and "steamroll" decisions before environmental analysis is complete and the information shared with the public.

225. The Final Rule eliminates the requirement that agencies consider both "cumulative" and "indirect" effects from NEPA analysis. *Compare* 40 C.F.R. § 1508.1(g)(3) (2020) *with* 40 C.F.R. §§ 1502.16(b) (1978), 1508.25(c), 1508.4, 1508.7, 1508.8, 1508.27(b)(7). Indirect and cumulative effects are critical components of environmental impacts and in many cases, they are the most important issues of concern to the public and other stakeholders. For

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 93 -

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA 98104-1711*
*(206) 343-7340*

AR_0006634

example, allowing agencies to forgo consideration of cumulative and indirect effects will have profound adverse effects on the environment, particularly on the global climate, which is the ultimate example of indirect effects aggregated into cumulative effects. A robust indirect and cumulative effects analysis is essential to preventing the disproportionate impact of pollution and environmental degradation on people of color and low-income communities.

226. The Final Rule only requires NEPA to consider effects that have a "reasonably close causal relationship" with the proposed action, ruling out effects that are "remote in time and space" or "the product of a lengthy causal chain." 40 C.F.R. § 1508.1(g) (2020). Terms such as "reasonably close" and "lengthy" were not defined, inviting agencies to ignore decades of judicial and regulatory precedent interpreting the scope of review by claiming that foreseeable impacts do not have a "reasonably" close causal relationship to the proposed action. Without any standard against which to gauge these determinations, public and judicial accountability will be undermined, and efficiency in agency decision-making will not occur.

227. The Final Rule adopts a new definition of "reasonably foreseeable" that imports tort law concepts by linking impacts to what a "person of ordinary prudence" would consider "likely." 40 C.F.R. §§ 1508.1(g), (aa) (2020). But federal agencies using NEPA to evaluate risks and impacts are not "ordinary people:" they purport to be expert agencies applying technical analysis under standards developed over decades of experience. The new regulation will allow agencies to ignore impacts that are truly "foreseeable," simply because they may beyond the ken of an "ordinary" person.

228. The Final Rule limits the scope of NEPA's application to domestic federal agency actions, regardless of whether those actions have extraterritorial effects. 40 C.F.R. §

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 94 -

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA 98104-1711*
*(206) 343-7340*

AR_0006635

1  1508.1(q)(1)(i) (2020).  This regulation is inconsistent with NEPA's statutory directive to

2  "recognize the worldwide and long-range character of environmental problems."

3       229.    The Final Rule does not require federal agencies to seek out and include

4  information regarding the adverse impacts of federal agency actions, an important departure

5  from the 1978 regulations.  40 C.F.R. § 1502.21 (2020).  Instead, the duty to obtain information

6  is waived if the cost of doing so is "unreasonable," an undefined term that invites abuse and

7  provides no standards against which to evaluate compliance.  *Id.*  The Final Rule further asserts

8  that agencies do not need to undertake "new scientific and technical research" to inform an EIS,

9  *id.* at § 1502.23 (2020), in contravention to decades of precedent identifying the importance of

10  new research when needed to accomplish NEPA's goals.  Without this information, the

11  environmental consequences of many federal actions will be unknown, in contravention to the

12  congressional intent of NEPA.

13       230.    The Final Rule also limits the discussion of alternatives, which has always

14  represented the "heart" of the EIS process: indeed, the Final Rule strikes this keystone language

15  from the 1978 regulations.  40 C.F.R. § 1502.14 (2020).  The Final Rule constrains the range of

16  alternatives considered in an EIS, providing that federal agencies need not consider alternatives

17  not within the jurisdiction of the lead agency, *compare* 40 C.F.R. § 1502.14 (2020) *with* 40

18  C.F.R. § 1502.14(e) (1978), in contravention of precedent and governing caselaw.

19       231.    The Final Rule revises the definition of "purposes and need" to highlight the

20  applicant's preferred project purpose, 40 C.F.R. § 1502.13 (2020), diminishes the role of

21  alternatives, *id.* at § 1502.14 (2020), and redefines "reasonable alternatives" such that

22  alternatives focus on the needs of the applicant rather than the public and federal agency

23  involved, *id.* at § 1508.1(z) (2020).

24

25  COMPLAINT FOR DECLARATORY
    AND INJUNCTIVE RELIEF - 95 -

26

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA 98104-1711*
*(206) 343-7340*

AR_0006636