minority populations and low-income populations in the affected environment might result in disproportionately high and adverse impacts.

5. Agencies may wish to integrate the analysis of the potential for disproportionately high and adverse impacts to minority populations and low-income populations into the NEPA process. The basic principles and practices of analysis applicable to all resource topics analyzed in the NEPA document (air emissions, water, biota, human health, noise, etc.) apply to the analysis of disproportionately high and adverse impacts as well.

6. Agencies may wish to consider factors that can amplify identified impacts (e.g., the unique exposure pathways, prior exposures, social determinants of health) to ensure a comprehensive review of potential disproportionately high and adverse impacts to minority populations and low-income populations.

7. Agencies may wish to recognize that in instances where an impact from the proposed action initially appears to be identical to both the affected general population and the affected minority populations and low-income populations, there may be inter-related ecological, aesthetic, historic, cultural, economic, social, or health factors that amplify the impact (e.g., unique exposure pathways, social determinants of health, community cohesion).  After consideration of factors that can amplify an impact to minority populations and low-income populations in the affected environment, an agency may determine the impact to be disproportionately high and adverse.

8. Agencies' approaches should not determine that a proposed action or alternative would not have a disproportionately high and adverse impact on minority populations and low-income populations solely because the potential impacts of the proposed action or alternative on the general population would be less than significant (as defined by NEPA).  Agencies may wish to consider unique vulnerabilities, special exposure pathways, and cultural practices associated with minority populations and low-income populations in the affected environment.

9. The disproportionately high and adverse impacts determination can help inform how an agency develops and/or selects alternative(s) and mitigation measures to avoid, minimize, rectify, reduce, or compensate for adverse impacts.

10. Agencies may wish to consider the distribution of beneficial and adverse impacts between minority populations and low-income populations in the

affected environment and the general population as a factor in the disproportionately high and adverse impacts determination. Scenarios in which minority populations and low-income populations receive an uneven distribution of benefits in the presence of adverse impacts, (e.g. a smaller proportion of beneficial impacts accrue to minority populations and low income populations than the general population) could indicate a potential disproportionately high and adverse impact.

11. Beneficial impacts from, and mitigation measures to, reduce the impacts associated with federal actions are distinct concepts.

12. Agencies' approaches to making a disproportionately high and adverse impact determination can be informed by the equitable distribution of beneficial impacts and how adverse impacts are mitigated. The end result is the same, as agencies consider mitigation for identified adverse impacts and address identified potentially disproportionately high and adverse impacts with additional mitigation measures informed by community involvement. Regardless of the approach that is selected, an agency may wish to explain its analysis and rationale.

13. While all approaches for identifying and addressing disproportionately high and adverse impacts consider the distribution of adverse and beneficial impacts to minority populations and low-income populations in the affected environment, the timing for considering mitigation varies for some approaches. Some agencies identify potentially disproportionately high and adverse impacts prior to developing mitigation measures for addressing the impact. Other agencies wait until all possible mitigation measures to address the impact have been developed before making the disproportionately high and adverse impact determination.

14. Agencies may wish to identify a relevant and appropriate comparison group when evaluating the impact of the proposed federal action on minority populations and low-income populations. The comparison group provides context (as appropriate) for the analysis of human health effects, environmental effects and the risk or rate of hazard exposure to minority populations and low-income populations in the affected environment. Comparison group is distinct from a reference community (See section 5, p.23 and section 6, p.28) which are used to identify the existence of minority populations and low-income populations.

15. In the disproportionately high and adverse impact analysis, agencies may wish

AR_0009671

to compare (as appropriate) impacts to minority populations and low-income populations in the affected environment with an appropriate comparison group within the affected environment. Relevant and appropriate comparison groups are selected based on the nature and scope of the proposed project. The types of calculations used for the comparison can include, but are not limited to, rates and risks. In addition, agencies may wish to (as appropriate) reference relevant national, state, and/or local data sets to inform the determination of a disproportionately high and adverse impact.

16. Agencies may wish to consider delineating parameters for selecting relevant comparison groups that can be applied on a case-by-case basis. Parameters may be different for a programmatic document versus a document that is either tiered to the initial programmatic document or is a stand-alone site-specific NEPA review.  More than one comparison group may be appropriate in some instances. When selecting relevant comparison groups, it is important to capture, as appropriate, relevant demographic, ecological, aesthetic, historic, cultural, economic, social, and health information.  Considerations include, but are not limited to the following parameters:

a.  Relevant jurisdictional boundaries based on the affected environment attributed to the specific impact being analyzed (county, state, or national level);

b.  Environmental stressor sources that may cause adverse health effects, such as the number of environmentally-regulated facilities within a community, proximity of regulated facilities, and quality of the air, water, and other environmental media;

c.  Existing health conditions such as percent of infant mortality, average birth weight, adult mortality, life expectancy at birth, and life span (e.g., age groups, healthy versus vulnerable populations);

d.  General demographics, e.g., percent of racial/ethnic population, population density, percent of the Native American population, distribution of languages spoken in population, and percent of the population that is literate in English or other languages; and

e.   Economic information, e.g., unemployment rate, income level and distribution, percent of homeowners and renters in a community, percent of residents relying on agriculture in the area, and percent relying on government resources.

16. Agencies may wish to document the selection process used to identify relevant

comparison groups in the NEPA review document.

17. Potential disproportionately high and adverse impacts should be described quantitatively whenever possible. At minimum, agencies may wish to provide a qualitative description. Agencies may want to pay particular attention to the description of human health impacts, which may be described in terms of risks or rates of exposure, if appropriate data are available.

## Specific Steps

As appropriate, agencies can consider the following actions:

**Specific Steps from Previous Sections to be Completed Prior to Disproportionately High and Adverse Impact Analysis:**

1. Consider determining the affected environment for the proposed federal action. The geographic scope of the affected environment may be different for each resource topic analyzed in the NEPA document (e.g., human health, air, water, socio-economics, wildlife, etc.) and analyzed alternative. The NEPA documents should contain a description of the environment of the areas to be affected by the alternatives under consideration. (See section 3, p.17)

2. Consider referencing available information on environmental, and related ecological, aesthetic, historic, cultural, economic, social, or health impacts from the proposed action within the affected environment. (See section 3, p.17)

3. Consider determining whether any minority populations and low-income populations are present within the affected environment for each of the alternatives carried forward for detailed analysis in the NEPA document (See section 5, p.23 and section 6 p.28). Generally, if minority populations and low-income populations are not identified, then the environmental justice analysis is complete.

4. Consider analyzing direct, indirect, and cumulative impacts to minority populations and low-income populations in the affected environment from resource topics analyzed in the NEPA document for each alternative carried forward for detailed analysis in the NEPA document. Look at impacts to: 1) human health; and 2) other environmental effects (See section 7, p. 31).

5. Consider determining whether any direct, indirect, or cumulative impacts to minority populations and low-income populations in the affected environment, for each alternative carried forward for detailed analysis in the NEPA document, are 'significant' (as employed by NEPA). (See section 7, p.31).

AR_0009673

**Specific Steps to Conduct the Disproportionately High and Adverse Impacts Analysis:**

1. When appropriate and as decided on a case-by-case basis, agencies may wish to select and explain the parameters used for identifying a relevant and appropriate comparison group within the affected environment.

2. Consider identifying the relevant and appropriate comparison group within the affected environment using the parameters selected in Step One, above.

3. Agencies may wish to consider the degree to which any of the following seven factors[15] could amplify identified impacts. Factors that can potentially amplify an impact to minority populations and low-income populations in the affected environment include, but are not limited to, the following:

    a. Proximity and exposure to chemical and other adverse stressors, e.g., impacts commonly experienced by fence-line communities;

    b. Vulnerable populations, e.g., minority and low-income children, pregnant women, elderly, or groups with high asthma rates;

    c. Unique exposure pathways, e.g., subsistence fishing, hunting, or gathering in minority and low-income populations;

    d. Multiple or cumulative impacts, e.g., exposure to several sources of pollutions or pollutants from single or multiple sources;

    e. Ability to participate in the decision-making process, e.g., lack of education or language barriers in minority and low-income populations;

    f. Physical infrastructure, e.g., inadequate housing, roads, or water supplies in communities;

    g. Non-chemical stressors, e.g., chronic stress related to environmental or socio-economic impacts.

    Agencies can be informed by considering additional factors that could amplify an impact to minority populations and low-income populations in the affected environment (as appropriate). Any identified factors that amplify the impacts to minority populations and low-income populations may (as appropriate) inform all subsequent analyses.

4. Consider summarizing adverse and beneficial impacts to both minority

---

[15] See US EPA, _Factors for Identifying and Addressing Disproportionate Environmental Health Impacts_ (2007); Supplement to American Journal of Public Health, Vol. 101, No. S1 (Dec 2011).

**44**

populations and low-income populations in the affected environment and, if applicable, appropriate comparison groups. Also, consider summarizing any mitigation measures that may have been developed prior to the commencement of the disproportionately high and adverse impact assessment that reduce adverse impacts to minority populations and low-income populations and, if applicable, comparison groups (see 40 CFR §1508.20). These summaries can (as appropriate) apply to the analysis of determining whether there is a disproportionately high and adverse impact from the proposed action for each alternative carried forward in the NEPA document.

5. Consider analyzing the distribution of adverse and beneficial impacts between the general population and minority populations and low-income populations in the affected environment as a factor when determining whether there is a disproportionately high and adverse impact. The distribution of adverse and beneficial impacts between the general population and minority populations and low-income populations is a factor that can be considered in the disproportionately high and adverse impacts determination.

6. There are various approaches to determine whether a proposed agency action will cause disproportionately high and adverse impacts to minority populations and low-income populations in the affected environment. For example:

   a) Impact Focus Approach:
      i. Beneficial impacts are considered in the analysis of the distribution of adverse and beneficial impacts between the general population and minority populations and low-income populations in the affected environment (see Step 5 above).

      ii. Consider (as appropriate) relevant mitigation measures (including avoidance and minimization) developed prior to the commencement of the disproportionately high and adverse impact assessment that reduce adverse impacts to minority populations and low-income populations.

      iii. If an adverse impact to minority populations and low-income populations remains after accounting for the mitigation measures developed prior to the commencement of the disproportionately high and adverse impact assessment, an agency should continue to consider whether the remaining adverse impact(s) is/are disproportionately high and adverse.

   b) Balancing Approach:
      i. Consider both mitigation measures developed prior to the commencement of the disproportionately high and adverse impact

AR_0009675

**45**

assessment that reduce adverse impacts to minority populations and low-income populations and any additional mitigation developed during the disproportionately high and adverse impacts assessment (see also Step iv. below).

ii.   After considering all appropriate mitigation measures, balance any remaining adverse impacts with beneficial impacts of the project to the community, as appropriate (see also Steps iv. and v. below).

iii.   If an adverse impact to minority populations and low-income populations remain after accounting for all appropriate mitigation measures and related project benefits, continue to consider whether the remaining adverse impact(s) is/are disproportionately high and adverse.

iv.   In determining the balance of beneficial and adverse impacts, the beneficial impacts and mitigation should be related to the type and location of the adverse impact.

v.   Agencies should not balance adverse impacts that directly affect human health at levels of concern, especially those that exceed health criteria, with project benefits.

7.   When appropriate, as decided on a case-by-case basis, after full consideration of **Specific Steps to Conduct the Disproportionately High and Adverse Impacts Analysis** (see Steps 1-6 above) consider comparing direct, indirect and cumulative adverse impacts to minority populations and low-income populations in the affected environment within the geographic unit of analysis to an appropriate comparison group. Measurable standards and evidence-based approaches can be used, if available and appropriate. This comparison may be considered for each alternative carried forward for detailed analysis in the NEPA document.

8.   Consider whether any of the following conditions are met, which may (as appropriate) be measured in risks and rates:

- **Exposure:**
  - exposure by minority populations and low-income populations to an environmental hazard that appreciably exceeds or is likely to appreciably exceed the risk or rate to the appropriate comparison group

- **Human health or environmental impact:**
  - to minority populations and low-income populations is above generally

AR_0009676

accepted norms[16]

- o to minority populations and low-income populations exceeds or is likely to appreciably exceed the impact to an appropriate comparison group
- o predominantly borne by minority populations or low-income populations
- o occurs in minority populations and low-income populations affected by cumulative or multiple adverse exposures from environmental hazards
- o to minority populations and low-income populations is significant and adverse.

9. Consider determining and stating in the NEPA document whether disproportionately high and adverse impacts exist for the proposed action and alternatives carried forward for detailed analysis in the NEPA document.

10. As appropriate, at this stage in the analysis, agencies may wish to reassess whether any disproportionately high and adverse impact is significant under NEPA through a review of context and intensity.

11. Consider communicating identified disproportionately high and adverse impacts to the affected minority populations and low-income populations and the public as early as appropriate to help identify potential mitigation measures.

12. As practicable, consider coordinating with minority populations and low-income populations in the affected environment as an agency develops and explores potential mitigation measures to address identified impacts to minority populations and low-income populations, including but not limited to those determined by an agency to be disproportionately high and adverse (See section 9, p.50).

---

[16]*Generally accepted norms* is a term used in "Appendix A, Text of Executive Order 12898, Federal Actions to Address Environmental Justice in Minority Populations and Low-Income Populations, Annotated with Proposed Guidance on Terms" which is attached to CEQ's *Environmental Justice Guidance Under the National Environmental Policy Act* (1997).

AR_0009677

# IX.  **MITIGATION AND MONITORING**

**47**

## Guiding Principles

Agencies can be informed by consideration of the following guiding principles:

1. Identifying mitigation is an important component of NEPA and Executive Order 12898. Generally, in NEPA documents, when an agency identifies potential adverse impacts it may wish to evaluate practicable mitigating measures, even if an agency determines the adverse impacts are not significant. The unique characteristics and conditions of minority populations and low-income populations in the affected environment may require adaptive and innovative mitigation measures to sufficiently address the specific circumstances and impacts presented by the proposed action. This includes mitigation of identified disproportionately high and adverse impacts, whenever feasible. Agencies may wish to evaluate mitigation measures even if the project will have some benefits to minority populations and low-income populations.

2. Throughout the NEPA process, agencies may wish to (as appropriate) involve potentially affected minority populations and low-income populations as agencies develop and implement mitigation measures and monitoring. Establishing groups made up of community members can be an effective method of engaging minority and low-income populations as an agency develops mitigation measures.

3. Agencies may wish to consider whether mitigation or monitoring measures can be included as conditions in its associated permits and licenses or in federal assistance grants and agreements, as appropriate.

4. Including monitoring requirements and sharing monitoring results with the public can often help to alleviate issues raised by minority populations and low-income populations.  Discussions with minority populations and low-income populations regarding the types of monitoring information that are of interest and how to best share monitoring results may improve the effectiveness of monitoring efforts. Feedback from minority populations and low-income populations can also be considered when developing monitoring measures.

5. Agencies may wish to consider, when preparing an Environmental Assessment[17], developing mitigation measures to avoid, minimize, rectify, reduce, or compensate for potentially significant adverse environmental

---

[17]CEQ, *Appropriate Use of Mitigation and Monitoring and Clarifying the Appropriate Use of Mitigated Findings of No Significant Impact* (Jan. 2011)

impacts that would otherwise require full review in an environmental impact statement.

6. When there are unavoidable adverse impacts to minority populations and low-income populations in the affected environment, agencies may wish to consider appropriate compensating mitigation and/or additional project benefits and provide express details in the NEPA document (see 40 CFR §1508.20(e)). These unavoidable adverse impacts can also be addressed separately in an environmental justice technical report.

7. Agencies may wish to make their mitigation and monitoring commitments clear and accessible in a format easily understandable by the public, including minority populations and low-income populations.

8. Agencies may wish to identify mitigation and monitoring measures designed specifically to address impacts to minority populations and low-income populations in the affected environment separately in the NEPA decision document and also separately in an environmental justice technical report.

9. If mitigation measures for impacts to minority populations and low-income populations in the affected environment have been identified in the NEPA document, agencies may wish to develop an adaptive management plan and conduct implementation and effectiveness monitoring. Monitoring implementation of mitigation measures can inform an agency and community whether the measures are on schedule and when they have been completed. Through the use of effectiveness monitoring, an agency and community can learn if the mitigation measures are providing the predicted outcomes. An adaptive management plan can provide agencies with a means for taking corrective action if mitigation implementation or effectiveness monitoring indicates the measures are not achieving the intended outcomes.

## Specific Steps

As appropriate, agencies can consider the following actions:

1. Agencies can be informed by data and information on the affected environment, adverse and beneficial impacts, (direct, indirect and cumulative effects) and public outreach and participation when developing potential mitigation measures.

2. When agencies are developing mitigation measures they should consider engaging minority populations and low-income populations early and throughout

AR_0009679

the process, as appropriate.

3. Consistent with applicable requirements, agencies should identify and analyze mitigation measures for impacts to minority populations and low-income populations in the affected environment (See 40 CFR §1502.14 and 1502.16). This includes appropriate mitigation measures not already included in the proposed action or alternatives (See 40 CFR §1502.14(f)) and any additional means to mitigate (if not fully covered under 40 CFR §1502.14(f)) for each identified disproportionately high and adverse impact to minority populations and low-income populations (See 40 CFR §1502.16(h).

4. If an agency determines there are disproportionately high and adverse impacts to minority populations and low income populations from its proposed project, the agency should consider and take action, as appropriate, to mitigate and monitor the impacts. When developing mitigation measures for adverse impacts, including for disproportionately high and adverse effects[18] to minority populations and low-income populations in the affected environment, consider the following five mitigation methods for each potential impact identified:

   a. Avoiding an impact by not taking a certain action or parts of an action.

   b. Minimizing an impact by limiting the degree or magnitude of the action and its implementation.

   c. Rectifying an impact by repairing, rehabilitating, or restoring the affected environment.

   d. Reducing or eliminating an impact's frequency over time, such as through preservation and maintenance operations during the life of the action.

   e. Compensating for an impact by replacing or providing substitute resources or environments.

5. Consistent with applicable requirements, agencies should state whether all practicable means to avoid or minimize environmental harm from the alternative selected have been adopted. (See 40 CFR §1502.2(c)). If disproportionately high and adverse impacts are unlikely to be fully mitigated, agencies may wish to explain in the analysis which measures to avoid or minimize environmental harm to minority populations and low-income populations from the selected alternative would be adopted, and describe any measures that were not adopted, and why they were not. An agency's analysis can disclose remaining disproportionately high and adverse impacts on

---

[18] See e.g. *Guidance for Incorporating Environmental Justice Concerns in EPA's NEPA Compliance Analyses*, (April 1998)

AR_0009680

minority populations and low-income populations in the affected environment, if any, and explain why further mitigation is not proposed.

6. Consider specifying mitigation or monitoring commitments in terms of timeframe, measurable performance standards or expected results (as appropriate) so as to establish clear performance expectations, and include appropriate language in the NEPA documents. The description of the mitigation measures should include (as appropriate) accountability measures (e.g., identify clear consequences) for failure to implement selected mitigation or monitoring measures. Agencies can be informed regarding feasibility of implementation by an explanation of how the mitigation and monitoring measures will be funded and who will implement the measures.

7. Consider developing an implementation and effectiveness monitoring plan to track performance and outcomes and reference the plan within the decision document (as appropriate).

8. Consider including an adaptive management process to adjust mitigation measures based on monitoring results.

9. Consider providing mitigation commitments and monitoring reports to the public including minority populations and low-income populations in appropriate formats (e.g., online, in print) whenever possible.

10. When conducting an Environmental Assessment, agencies may evaluate direct, indirect, and cumulative impacts to potentially affected minority populations and low-income populations for all of the relevant resource areas/impact topics. Regardless of whether an agency determines that a 'finding of no significant impact' (FONSI) or mitigated FONSI is appropriate for a proposed action analyzed in an environmental assessment, agencies may wish to explore in the environmental assessment mitigation measures for all potential adverse impacts. If issuing a FONSI, agencies may wish to clearly describe the specific mitigation for any identified impacts, including mitigation for impacts that are disproportionately high and adverse to minority populations and low-income populations.

AR_0009681

# NEPA AND EJ NATIONAL TRAINING PROJECT

**Overview**

The NEPA Committee seeks to improve the effective, efficient and consistent consideration of environmental justice issues in the NEPA process through the sharing of best practices, lessons learned, research, analysis, training, consultation, and other experiences of federal NEPA practitioners. To accomplish this purpose, the NEPA Committee produced a National Training Product (NTP) that serves as a companion to *Promising Practices for EJ Methodologies in NEPA Reviews (Promising Practices)*.

Several measures were taken to develop the foundation for the NTP. First, exemplary trainings on environmental justice from across the federal family were identified and reviewed for best practices. Second, training material from multiple federal agencies on environmental justice and NEPA including guidance, protocol and related documents, were assessed for best practices. Third, examples of NEPA reviews that addressed environmental justice were collected. Finally, draft PowerPoints were produced, reviewed and revised over the course of 36 months in order to produce the final NTP.

In addition, the NTP is aligned with *Promising Practices*. This alignment does not imply a line-by-line interpretation but that the key elements are captured. It is recommended that *Promising Practices* be read before taking the training and kept close by for reference so that the full nature and context of the NTP can be better understood. *Promising Practices* guiding principles and specific steps are referenced throughout the NTP. However, the NTP also includes more details and provides additional options, methods and examples.

The NTP consists of a Master PowerPoint Presentation that can be used in whole or in part to increase understanding of the intersection between NEPA and environmental justice. The target audience is federal NEPA and environmental justice practitioners. The NTP uses a variety of approaches (e.g. mapping tools, examples, and videos) to help explain elements of an effective environmental justice analysis in the NEPA process.

AR_0009682

**52**

## OUTLINES OF NATIONAL TRAINING PRODUCT

### Part One: Background on NEPA and environmental justice

- Learning Objectives
- Environmental j=Justice Defined
- Environmental Justice/NEPA Common Themes
- Core Principles of Environmental Justice

### Part Two: Integration of Environmental Justice Analysis in the NEPA Process

**I.  Meaningful Engagement**
- Outreach
- Other Options
- Public Participation
  Case Example [NY/NJ/Philadelphia Metropolitan Airspace Redesign (FAA)]

**II. Scoping Process**
- Early Planning, Case Example [New Pueblo, Colorado Freeway (FHWA)]

**III. Defining the Affected Environment**
- Demographic Data
- Base Line Characteristics
- Unique Conditions

**IV. Developing and Selecting Alternatives (Alternatives Analysis)**

**V.  Identifying Minority Populations**
- Guiding Principles
- Conduct Appropriate Analyses
- Test 1: The No-Threshold Analysis
- Test 2: Part 1- The 50% Criteria and Part 2 – The Meaningfully Greater Test
- Determining Appropriate Benchmarks
- Comparative Magnitude vs Absolute Threshold
  Case Example [Moganza to the Gulf Feasibility Study, Storm and Hurricane Risk-Reduction System (ACoE)]

AR_0009683

**53**

## VI. Identifying Low-Income Populations

- Guiding Principles
- Alternative Criteria Analysis
  Lo  -Income Threshold Criteria
- Case Example: Did They Do It Right - an Interactive Scenario

## VII. Impacts

## VIII. Disproportionately High and Adverse Impacts (DHAI)
- Disproportionate Impact Factors
- DHAI Determination
- Assessing Benefits and Burdens
  Case Example [Gasco Development – Oil and Gas Development on BLM lands, Utah; Klamath River Facilities Removal, OR and CA]

## IX. Mitigation and Monitoring
- Mitigation Methods
  Case Example [Central Corridor Light Rail Transit, Minneapolis-St. Paul, MN]
- Community Benefits Agreements
  Case Example Charleston Naval Base Expansion

AR_0009684



**A product of the
Federal Interagency Working Group
on Environmental Justice**

**MARCH 2016**

EPA 300B16001

AR_0009685

ResearchGate

See discussions, stats, and author profiles for this publication at: https://www.researchgate.net/publication/262787160

# The biodiversity of species and their rates of extinction, distribution, and protection

**Article** *in* Science · May 2014
DOI: 10.1126/science.1246752 · Source: PubMed

| CITATIONS | READS |
|---|---|
| 2,845 | 29,030 |

**9 authors**, including:



Stuart L Pimm
Duke University
**538** PUBLICATIONS  **43,642** CITATIONS

SEE PROFILE

Robin Abell
The Nature Conservancy
**41** PUBLICATIONS  **9,009** CITATIONS

SEE PROFILE

Clinton N. Jenkins
Florida International University
**150** PUBLICATIONS  **13,711** CITATIONS

SEE PROFILE

Thomas Brooks
International Union for Conservation of Nature
**319** PUBLICATIONS  **45,249** CITATIONS

SEE PROFILE

Some of the authors of this publication are also working on these related projects:

Research supporting the IUCN Red List of Ecosystems View project

Open data in Ecology View project

All content following this page was uploaded by Thomas Brooks on 23 January 2017.

The user has requested enhancement of the downloaded file.

RESEARCH

**REVIEW SUMMARY**

BIODIVERSITY STATUS

# The biodiversity of species and their rates of extinction, distribution, and protection

S. L. Pimm,* C. N. Jenkins, R. Abell, T. M. Brooks, J. L. Gittleman, L. N. Joppa,
P. H. Raven, C. M. Roberts, J. O. Sexton

**BACKGROUND:** A principal function of the Intergovernmental Science-Policy Platform on Biodiversity and Ecosystem Services (IPBES) is to "perform regular and timely assessments of knowledge on biodiversity." In December 2013, its second plenary session approved a program to begin a global assessment in 2015. The Convention on Biological Diversity (CBD) and five other biodiversity-related conventions have adopted IPBES as their science-policy interface, so these assessments will be important in evaluating progress towards the CBD's Aichi Targets of the Strategic Plan for Biodiversity 2011–2020. As a contribution toward such assessment, we review the biodiversity of eukaryote species and their extinction rates, distributions, and protection. We document what we know, how it likely differs from what we do not, and how these differences affect biodiversity statistics. Interestingly, several targets explicitly mention "known species"—a strong, if implicit, statement of incomplete knowledge. We start by asking how many species are known and how many remain undescribed. We then consider by how much human actions inflate extinction rates. Much depends on where species are, because different biomes contain different numbers of species of different susceptibilities. Biomes also suffer different levels of damage and have unequal levels of protection. How extinction rates will change depends on how and where threats expand and whether greater protection counters them.

**ADVANCES:** Recent studies have clarified where the most vulnerable species live, where and how humanity changes the planet, and how this drives extinctions. These data are increasingly accessible, bringing greater transparency to science and governance. Taxonomic catalogs of plants, terrestrial vertebrates, freshwater fish, and some marine taxa are sufficient to assess their status and the limitations of our knowledge. Most species are undescribed, however. The species we know best have large geographical ranges and are often common within them. Most known species have small ranges, however, and such species are typically newer discoveries. The numbers of known species with very small ranges are increasing quickly, even in well-known taxa. They are geographically concentrated and are disproportionately likely to be threatened or already extinct. We expect unknown species to share these characteristics. Current rates of extinction are about 1000 times the background rate of extinction. These are higher than previously estimated and likely still underestimated. Future rates will depend on many factors and are poised to increase. Finally, although there has been rapid progress in developing protected areas, such efforts are not ecologically representative, nor do they optimally protect biodiversity.

**OUTLOOK:** Progress on assessing biodiversity will emerge from continued expansion of the many recently created online databases, combining them with new global data sources on changing land and ocean use and with increasingly crowdsourced data on species' distributions. Examples of practical conservation that follow from using combined data in Colombia and Brazil can be found at www.savingspecies.org and www.youtube.com/watch?v=R3zjeJW2NVk.

**ON OUR WEBSITE**

Read the full article at http://dx.doi.org/10.1126/science.1246752



**Different visualizations of species biodiversity.** (**A**) The distributions of 9927 bird species. (**B**) The 4964 species with smaller than the median geographical range size. (**C**) The 1308 species assessed as threatened with a high risk of extinction by BirdLife International for the Red List of Threatened Species of the International Union for Conservation of Nature. (**D**) The 1080 threatened species with less than the median range size. (D) provides a strong geographical focus on where local conservation actions can have the greatest global impact. Additional biodiversity maps are available at www.biodiversitymapping.org.

The list of author affiliations is available in the full article online.
*Corresponding author. E-mail: stuartpimm@me.com
Cite this article as S. L. Pimm et al., Science 344, 1246752 (2014). DOI: 10.1126/science.1246752

Published by AAAS

AR_0013781

September 29, 2023

The Honorable Brenda Mallory
Chair, Council on Environmental Quality
730 Jackson Place, N.W.
Washington, D.C. 20503

*Via regulations.gov*

**RE:    National Environmental Policy Act Implementing Regulations Revisions Phase 2, 88 FR 49924 (Docket ID No. CEQ–2023–0003)**

Dear Chair Mallory:

The Center for Biological Diversity (the Center), through the undersigned, submits these comments in response to the Council on Environmental Quality's (CEQ's) proposed Phase 2 Revision to the National Environmental Policy Act's (NEPA's) Implementing Regulations. The Center's mission is to secure a future for all species, especially those hovering on the brink of extinction, and to preserve the invaluable diversity of nature by focusing on the land, water, and climate all creatures need to survive. The significance of NEPA and its approach to safeguarding informed agency decisionmaking and public engagement cannot be overstated. We write today to underline the importance of promulgating effective regulations for categorical exclusions (CEs) that will guarantee that all actions with significant effects on the environment will not be able to sidestep NEPA's mandates.

NEPA is the country's bedrock law concerning the environment. It exists to "promote efforts which will prevent or eliminate damage to the environment." 42 U.S.C. § 4321. NEPA does not mandate outcomes, but rather a way of thinking through important decisions before making them and notifying the public of the potential environmental impacts of such decisions. It is, as this administration has reaffirmed, an opportunity to "look before you leap."[1]

CEs exist to acknowledge the reality that not all government decisions risk significant impact of the environment. Some government activities are merely ministerial, and properly crafted and applied CEs can help ensure that time and resources are used effectively. But by their nature, they risk abuse, and without meaningful guardrails, CEs can easily become overbroad or outdated. This matters because, while use of CEs is not comprehensively tracked, estimates suggest that 95% of all NEPA analyses

---

[1] 87 Fed. Reg. 23453, 23454 (Apr. 20, 2022).

AR_0023594



September 29, 2023

Council on Environmental Quality
730 Jackson Place, NW
Washington, DC 20503

**Re: National Environmental Policy Act (NEPA) Implementing Regulations Revisions Phase 2: Bipartisan Permitting Reform Implementation Rule (Docket ID: CEQ-2023-0003)**

Environmental Defense Fund (EDF) respectfully submits these comments on the Council on Environmental Quality's (CEQ) proposed *National Environmental Policy Act Implementing Regulations Revisions Phase 2: Bipartisan Permitting Reform Implementation Rule*, 88 Fed. Reg. 49924 (July 31, 2023). Our comments are informed by the urgent need to address the crises of climate change and environmental injustice. Our comments focus on consideration of climate and environmental justice effects under NEPA analysis, as well as public participation in the NEPA process.

In 1970, Congress responded to another era of environmental crisis by enacting NEPA, explicitly explaining that "it is the continuing responsibility of the Federal Government *to use all practicable means*…[to carry out NEPA to] create and maintain conditions under which man and nature can exist in productive harmony, and fulfill the social, economic, and other requirements of present and future generations of Americans." 42 U.S.C. § 4331. As the Supreme Court has noted, the "sweeping policy goals" of NEPA are realized through a set of "action-forcing" environmental procedures that requires agencies to take a "hard look" at the environmental impacts of their actions by carefully considering consequences of a proposed action, alternatives and mitigation measures to ensure that (1) agencies fully consider the impacts of their decision-making, and (2) inform the public about the consequences of their actions. *See Robertson v. Methow Valley Citizens Council*, 490 U.S. 332,350 (1989), *see also Baltimore Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*, 462 U.S. 87, 97 (1983), *Marsh v. Oregon Nat. Res. Council*, 490 U.S. 360, 378 (1989).

The Fiscal Responsibility Act of 2023 (FRA) included provisions designed to streamline and accelerate consideration of projects undergoing environmental review at federal agencies. With the proposal, CEQ appropriately codifies and clarifies its interpretation of amendments to NEPA made in the FRA. EDF supports CEQ's incorporation and implementation of the relevant FRA provisions in its proposal, and we believe that they will provide both greater certainty and greater speed in decision-making for project sponsors and increased transparency for all interested and affected parties.

1

***Define "Indigenous Knowledge"—Proposed Section 1508.1:*** The National Wildlife Federation appreciates the incorporation of Indigenous Knowledge into the "special expertise" that warrants a Tribes' inclusion as a cooperating agency.[74] To ensure that this special expertise is properly accounted for, we recommend that CEQ define the term Indigenous Knowledge for the purposes of NEPA.[75]

With deference to Indigenous peoples and Tribal governments, and with appreciation for the work of the Kawerak organization, an Alaska Native Tribal Consortium for the Bering Straight region of Alaska, we suggest consideration of this definition:

> Traditional Knowledge (TK) is a living body of knowledge which pertains to explaining and understanding the universe, and living and acting within it. It is acquired and utilized by indigenous communities and individuals in and through long-term sociocultural, spiritual and environmental engagement.  TK is an integral part of the broader knowledge system of indigenous communities, is transmitted intergenerationally, is practically and widely applicable, and integrates personal experience with oral traditions. It provides perspectives applicable to an array of human and non-human phenomena.  It is deeply rooted in history, time, and place, while also being rich, adaptable, and dynamic, all of which keep it relevant and useful in contemporary life. This knowledge is part of, and used in, everyday life, and is inextricably intertwined with peoples' identity, cosmology, values, and way of life. Tradition – and TK – does not preclude change, nor does it equal only 'the past'; in fact, it inherently entails change.[76]

Indigenous knowledge is a cornerstone of our global intellectual legacy, and is integral to understanding the complex dynamics within our ecosystems.  Born out of centuries of intimate interaction with the land, it encompasses valuable insights that have the potential to significantly impact justice, sustainability and cultural preservation.  Through the lens of rigorous investigation, it becomes imperative to appreciate the inherent value of our unique knowledge systems and their role in shaping sustainable futures.

---

acknowledges as a federally recognized tribe pursuant to the Federally Recognized Indian Tribe list of 1994, 25 U.S.C. 15130, 5131."  We recommend CEQ broaden that definition for purpose of NEPA to state recognized Tribes and Indigenous organizations meeting the criteria in the National Historic Preservation Act.

[74] 88 Fed. Reg. 49971, Proposed Section 1501.8(a).

[75] As CEQ is aware, the term Indigenous Knowledge is not defined in the Council on Environmental Quality and Office of Science and Technology Policy, *Guidance for Federal Departments and Agencies on Indigenous Knowledge*, (Nov. 30, 2022), https://www.whitehouse.gov/wp-content/uploads/2022/12/OSTP-CEQ-IK-Guidance.pdf.

[76] Raymond-Yakoubian, Julie, Raymod-Yokoubian, Brenden, Moncrieff, Catherine, "The Incorporation of Traditional Knowledge into Alaska Fisheries Management", *Marine Policy*, Vol. 78, pp. 132-142 (April, 2017), https://www.sciencedirect.com/science/article/pii/S0308597X16307825?via%3Dihub.

AR_0024234

regulations should ensure that the public fully understands and can participate in actions that impact their community, and NEPA is one of the early underpinnings of a mechanism that should be utilized to build justice and equity into environmental decisions. Indeed, when Executive Order 12898 established a clear federal mandate for environmental justice, the accompanying memorandum decades ago outlined that environmental justice must be included in the analysis of environmental effects within the NEPA process. The Fiscal Responsibility Act of 2023 codified amendments to NEPA that are the bounds for these revisions. Now is the time to ensure that these revisions do not create additional barriers to public engagement and environmental justice.

The NAACP has long fought to ensure that agencies, elected officials, and interested parties center Black and frontline communities in environmental decisions that disproportionately impact our branch members, state conferences, and partners. Black communities are often sacrifice zones for decisions that undergo a NEPA process. When data shows that Black people over 65 are three times more likely to experience air quality deaths than all other races[3] and that Black mothers have the highest maternal health risk from overlapping exposure to air pollution and heat stress,[4] a process that ensures those communities are informed and valued in decision-making is necessary. Indeed, Black communities are exposed to more particulate matter compared to the overall U.S. population.[5] NEPA is an important and foundational place to ensure that happens.

## Environmental Justice and NEPA

We greatly value that CEQ utilizes these proposed revisions to ensure that environmental justice is no longer an afterthought in NEPA.[6] In fact, there are multiple proposed revisions where CEQ adds language to highlight that agencies must center environmental justice in NEPA analyses. Adding framing that includes consideration of the adverse effects on communities with environmental justice concerns is an important step to fully integrating environmental justice into decision-making accountability.[7] We also welcome CEQ taking these considerations a step further. The proposed

---

[3] Z. Schermele, "Black people over 65 far more likely to die from pollution-related disease than white seniors", NBCNews.com (2022), https://www.nbcnews.com/news/nbcblk/black-people-65-far-likely-die-pollution-related-disease-white-seniors-rcna33805 (last visited Sep 29, 2023).

[4] L. Emanuel, "Exposure to air pollutants and heat made worse by climate change impact black mothers the most", New Security Beat (2020), https://www.newsecuritybeat.org/2020/06/exposure-air-pollutants-heat-worse-climate-change-impact-black-mothers/ (last visited Sep 29, 2023):
"Black maternal health and the Climate Crisis: How Climate Change Affects Maternal Health and what congress can do about it", Moms Clean Air Force (2023), https://www.momscleanairforce.org/resources/black-maternal-health-and-the-climate-crisis-how-climate-change-affects-maternal-health-and-what-congress-can-do-about-it/ (last visited Sep 29, 2023):
F. Isaac, "Climate Change is Hurting Expectant black Mothers", American Bar Association (2021),
https://www.americanbar.org/groups/environment_energy_resources/publications/natural_resources_environment/2020-21/winter/climate-change-hurting-expectant-black-mothers/ (last visited Sep 29, 2023).

[5] "Pollution from fossil fuel combustion deadlier than previously thought", Harvard T.H. Chan School of Public Health, https://www.hsph.harvard.edu/news/hsph-in-the-news/pollution-from-fossil-fuel-combustion-deadlier-than-previously-thought/#:~:text=The%20study%2C%20which%20was%20conducted,350%2C000%20in%20the%20U.S.%20alone (last visited Sep 29, 2023).

[6] See e.g. Proposed 40 C.F.R. §§ 1500.2(e); 1502.14(f); 1508.1(g)(4).

[7] Proposed 40 C.F.R. §§ 1502.16(a), 1502.14(f)).

AR_0024242

September 29, 2023

The Honorable Brenda Mallory
Chair, Council on Environmental Quality
730 Jackson Place, N.W.
Washington, D.C. 20503

Re: Docket Number 2023-0003

Dear Chair Mallory:

This letter represents the collective comments of 88 organizations representing millions of members and supporters regarding the proposed Phase 2 regulations implementing the National Environmental Policy Act (NEPA). Our members care deeply about and participate in the environmental impact assessment process mandated by NEPA. Some of our organizations will also be submitting additional comments.

We are pleased to see the restatement of many core principles of NEPA compliance that had been deleted or diminished in the 2020 regulatory revisions. We applaud many of the new provisions, such as those related to climate change, environmental justice and tribal governments, alternatives, and mitigation. We recognize that certain provisions included in the proposed regulations are required by the Fiscal Responsibility Act of 2023 (FRA). We also have concerns about some of the proposed provisions and recommendations for improvements.[1]

## I. REGULATORY PROPOSALS THAT RECOGNIZE NEPA'S STATUTORY PURPOSE AND DIRECTION.

The Council on Environmental Quality's (CEQ) proposal to reinstate many of NEPA's core concepts throughout the implementing regulations is appropriate and welcome. Many of the changes made in the 2020 regulations reflected an erroneous view that the NEPA process is merely a paperwork exercise with minimal connection to substantive environmental protection. That flawed premise ignores the fundamental purpose of NEPA as clearly stated in the Act:

> To declare a national policy which will encourage productive and enjoyable harmony between man and his environment; to promote efforts which will prevent or eliminate damage to the environment and biosphere and stimulate the health and welfare of man; to enrich the understanding of the ecological systems and natural resources important to the Nation; and to establish a Council on Environmental Quality.[2]

---

[1] As our comments reference three sets of CEQ's NEPA regulations, we have identified them using the following format: proposed regulations: "Proposed Section 40 C.F.R. 1500.1;" existing regulations: "40 C.F.R. § 1500.1 (2020);" and original regulations: "40 C.F.R. § 1500.1 (1979)."

[2] 42 U.S.C. § 4321.

September 29, 2023

The Honorable Brenda Mallory, Chair
Council on Environmental Quality
730 Jackson Place NW
Washington, DC 20503.

Re: Docket Number CEQ-2023-0003

Dear Chair Mallory,

We write on behalf of the Environmental Justice Health Alliance for Chemical Policy Reform (EJHA), Center for Community Action and Environmental Justice, New Jersey Environmental Justice Alliance, Texas Environmental Justice Advocacy Services (TEJAS), Green Door Initiative, National Audubon Society, and the Natural Resources Defense Council to comment on the Council on Environmental Quality's proposed rulemaking, National Environmental Policy Act Regulation Revisions Phase 2. We appreciate your consideration of our views.

We welcome the Phase 2 rulemaking proposal's recognition and express incorporation of environmental justice and climate considerations, as well as other improvements to environmental decision making. When finalized, the proposal will also remove barriers to public participation, bolster the analysis of alternatives, and ensure that unenforceable promises of mitigation are not used to bypass environmental review. We support each of these important proposals.

There are, however, several areas in which we believe CEQ should make further changes. These further changes would reduce ambiguity and uncertainty, improve agency decision making, and facilitate meaningful public engagement.

## I.    Background

Since its enactment more than fifty years ago, the National Environmental Policy Act (NEPA) has served as a guardian of the national policy "to create and maintain conditions under which man and nature can exist in productive harmony, and fulfill the social, economic, and other requirements of present and future generations of Americans." 42 U.S.C. §

1

 

**DATE:** September 29, 2023

**TO:** Council of Environmental Quality (CEQ)

**FROM:** GreenLatinos and WE ACT for Environmental Justice

**SUBJECT:** Docket ID No. CEQ-2023-0003 National Environmental Policy Act Implementing Regulations Revisions Phase II

GreenLatinos and WE ACT for Environmental Justice, along with the undersigned organizations, submit these comments to express our support and provide improvements to the Council on Environmental Quality ("CEQ") National Environmental Policy Act ("NEPA") Implementing Regulations Revisions Phase II (No. CEQ-2023-0003). The submitted comments are framed with the goal of centering and securing the safety, health, and resiliency of Black, Brown, and Indigenous communities that historically and currently experience undue burdens of environmental and climate injustice.

GreenLatinos is an active comunidad of over 14,000 Latines and allies across the U.S. and territories, united to ensure that environmental justice is embedded across all levels of governmental policies. We envision a healthy and equitable society where communities of color are liberated from disproportionate environmental burdens, free to breathe fresh air, drink pure water, access clean transportation, and enjoy our majestic public lands, ocean, and waters. GreenLatinos analysis of the proposed regulations are informed by the the Latino Climate Justice Framework ("LCJF")[1] The LCJF is a blueprint for decision makers and underserved communities alike to champion equitable policy solutions aimed at improving disproportionately impacted environmental justice communities, especially communities of color. The Framework was developed through extensive partner and community input over the course of 1.5 years and

---

[1] Green Latinos, *Latino Climate Justice Framework*, (hereafter cited to as "LCJF"), https://www.lcjf.greenlatinos.org/_files/ugd/352e47_e3bf44c2175e4867a171544cd4a72ac2.pdf. (October 2022).

AR_0025359

# PUBLIC SUBMISSION

**As of:** May 20, 2024
**Received:** September 29, 2023
**Status:** Posted
**Posted:** October 03, 2023
**Tracking No.** ln5-7xyb-o4ga
**Comments Due:** September 29, 2023
**Submission Type:** Web

**Docket:** CEQ-2023-0003
National Environmental Policy Act Implementing Regulations Revisions Phase 2

**Comment On:** CEQ-2023-0003-0001
National Environmental Policy Act Implementing Regulations Revisions Phase 2

**Document:** CEQ-2023-0003-35189
Comment from Comments of State Attorneys General

## Submitter Information

**Email:** CEPSeaEF@ATG.WA.GOV
**Government Agency Type:** State
**Government Agency:** Comments of State Attorneys General

## General Comment

The Attorneys General of the States of Washington, California, New York, Colorado, District Of Columbia, Connecticut, Delaware, Illinois, Maine, Maryland, Massachusetts, New Jersey, North Carolina, Oregon, Pennsylvania, Rhode Island, Vermont, and Wisconsin, and the Harris County Attorney's Office, and The New York State Department Of Environmental Conservation (collectively, the States) respectfully submit the attached comments on the Council on Environmental Quality's (CEQ) notice of proposed rulemaking (Proposed Phase 2 Rule) revising the regulations implementing the National Environmental Policy Act (NEPA), 42 U.S.C. §§ 4321–4347.

## Attachments

FINAL_Phase2.Comments.9.29.23_WithExs

**COMMENTS OF ATTORNEYS GENERAL OF WASHINGTON, CALIFORNIA, NEW YORK, COLORADO, DISTRICT OF COLUMBIA, CONNECTICUT, DELAWARE, ILLINOIS, MAINE, MARYLAND, MASSACHUSETTS, NEW JERSEY, NORTH CAROLINA, OREGON, PENNSYLVANIA, RHODE ISLAND, VERMONT, WISCONSIN, AND THE HARRIS COUNTY ATTORNEY'S OFFICE, AND THE NEW YORK STATE DEPARTMENT OF ENVIRONMENTAL CONSERVATION**

September 29, 2023

VIA REGULATIONS.GOV
Amy B. Coyle, Deputy General Counsel
Council on Environmental Quality
730 Jackson Place NW
Washington, DC 20503

Re:    National Environmental Policy Act Implementing Regulations Revisions Phase 2
       88 Fed. Reg. 49924 (July 31, 2023)
       Docket No. CEQ-2023-0003

Deputy General Counsel Coyle:

The Attorneys General of the States of Washington, California, New York, Colorado, District Of Columbia, Connecticut, Delaware, Illinois, Maine, Maryland, Massachusetts, New Jersey, North Carolina, Oregon, Pennsylvania, Rhode Island, Vermont, and Wisconsin, and the Harris County Attorney's Office, and The New York State Department Of Environmental Conservation (collectively, the States) respectfully submit these comments on the Council on Environmental Quality's (CEQ) notice of proposed rulemaking (Proposed Phase 2 Rule) revising the regulations implementing the National Environmental Policy Act (NEPA), 42 U.S.C. §§ 4321–4347.[1]

## I.    INTRODUCTION

The States support CEQ's proposed changes to NEPA's implementing regulations that align with NEPA's text and goals, including those changes that advance informed decision-making through public participation, transparency, and thorough review of environmental impacts. As CEQ knows, in enacting NEPA, Congress advanced a national policy of environmental protection by requiring federal agencies to conduct thorough and careful review of their actions' environmental impacts.[2] As the Supreme Court explained, Congress intended

---

[1] National Environmental Policy Act Implementing Regulations Revisions Phase 2, 88 Fed. Reg. 49924 (July 31, 2023) Docket No. CEQ-2023-0003.

[2] 42 U.S.C. §§ 4331, 4332.

September 29, 2023

NEPA's "action-forcing procedures" to help "[e]nsure that the policies [of NEPA] are implemented."[3]

NEPA's implementing regulations, originally promulgated by CEQ in 1978 (the 1978 Regulations)[4], have long served the important function of guiding federal agencies through a thorough environmental review process to ensure transparent and informed agency decision-making. However, in 2020 CEQ promulgated unlawful regulations improperly narrowing NEPA, threatening meaningful public participation, and unlawfully seeking to restrict judicial review of agency actions (the 2020 Rule).[5] CEQ has since issued two rulemakings that partially address the revisions in the 2020 Rule which did not support the statutory purposes of NEPA.[6]

With this Proposed Phase 2 Rule, CEQ issues a broad rule to harmonize the NEPA implementing regulations with the statutory text and purposes of NEPA. Many of CEQ's proposed changes implement NEPA's goal of informed decision-making through better data collection and analysis, including collection of climate change data and data of disparate impacts of agency actions on communities with environmental justice concerns. CEQ's changes clarifying the important role that States play in the NEPA process and incorporating Tribal governments and indigenous knowledge in the NEPA process strengthen environmental review.[7] The States support these changes which improve federal agency implementation of NEPA. Finally, facing significant threats from climate change and corresponding state and local mandates to respond, the States strongly support CEQ's integration of climate change considerations throughout the Proposed Phase 2 Rule. We further support quantification and analysis of reasonably foreseeable greenhouse gas (GHG) emissions as part of the environmental assessment and environmental impact statement processes.

However, this Phase 2 Rulemaking does not resolve all of the harms introduced by the 2020 Rule. Where CEQ can go further to undo the unlawful elements of the 2020 Rule, the States urge CEQ to do so. Specifically, the States urge CEQ to bring the use of categorical exclusions in line with NEPA's statutory text, return to language requiring "substantial treatment" of alternatives in the alternatives analysis, and ensure draft Environmental Impact Statement (EIS) documents comply with NEPA to the "fullest extent possible." Additionally, the States urge CEQ to codify some of CEQ's existing guidance on the consideration of GHGs into

---

[3] *Andrus v. Sierra Club*, 442 U.S. 347, 350 (1979) (quoting S. Rep. No. 91-296, at 19 (1969)); *see also Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989) ("Simply by focusing the agency's attention on the environmental consequences of a proposed project, NEPA ensures that important effects will not be overlooked or underestimated only to be discovered after resources have been committed or the die otherwise cast.").

[4] Implementation of Procedural Provisions, 43 Fed. Reg. 55,978 (November 29, 1978).

[5] *See* Update to the Regulations Implementing the Procedural Provisions of the National Environmental Policy Act, 85 Fed. Reg. 43,304 (July 16, 2020).

[6] *See* Deadline for Agencies to Propose Updates to National Environmental Policy Act Procedures, 86 Fed. Reg. 34,154 (June 29, 2021) [hereinafter Interim Final Rule]; National Environmental Policy Act Implementing Regulations Revisions, 86 Fed. Reg. 55,757-01 (October 7, 2021) [hereinafter Phase 1 Rule].

[7] *See* 88 Fed. Reg. at 49,939, 49,970 (proposed § 1501.5(c)(3)) (clarifying that "agencies" includes state, Tribal and local governments); 88 Fed. Reg. at 49,940, 49,971 (proposed § 1501.7) (clarifying the role of States as joint lead agencies).

AR_0025620

September 29, 2023

the NEPA regulations to ensure agencies properly consider the potential impacts from GHG emissions associated with federal agency actions.

## II.        SUMMARY OF COMMENTS

Below is a summary of the States' comments supporting provisions in CEQ's Proposed Phase 2 Rule and recommendations for strengthening the final rule:

- The States support CEQ's proposed changes which would re-center NEPA's statutory purposes in the regulations and reinforce NEPA's informed decision-making mandate.

- The States support CEQ's proposed changes to increase public participation and increase transparency in agency decision-making. By increasing accessibility and transparency and reducing the undue burden on commenters, CEQ's proposed changes support more meaningful input from the public.

- The States appreciate CEQ's proposal for flexibility to use innovative approaches when addressing extreme environmental challenges. But, the States urge CEQ to provide further clarity and include public participation in this process.

- The States support CEQ's proposed changes to promote rigorous environmental review by reducing inappropriate segmentation, reinstating meaningful significance and alternatives analyses, and appropriately limiting the use of categorical exclusions. The States urge CEQ to further incorporate analysis of climate change into the significance analysis, clarify the role of beneficial effects in a significance analysis, and limit inappropriate categorical exclusions in the final rule.

- The States support CEQ's proposed revisions strengthening environmental review documents, including those regarding the approval process for exemptions from strict time and page limits and increasing public participation. The States urge CEQ to provide clarity regarding time and page limits by defining "extraordinary circumstances" under which such limits do not apply. The States also urge CEQ to reduce bias in the preparation of environmental review documents by providing agency oversight during the process.

- The States support CEQ's proposed definitional revisions promoting a more robust consideration of environmental justice concerns and climate change concerns in the review of federal agency actions. The States further support CEQ's proposed revisions to the definitions of major federal action and extraordinary circumstances, with some additional clarifications.

AR_0025621

September 29, 2023

- Finally, the States recommend incorporating some of CEQ's GHG Guidance into the regulations. However, the States recognize that some of the guidance requires greater flexibility for revision in the future, such as guidance based on changing data sets, and should remain as guidance to allow for future changes consistent with advancing scientific understanding.

Combined, CEQ's proposed changes take critical steps toward modernizing NEPA, improving the quality of agency analysis, and undoing harms caused by the 2020 Rule. However, CEQ should go further and introduce regulatory changes to address all the harms of the 2020 Rule and clarify regulations where necessary.

### III.    THE STATES HAVE AN ENDURING INTEREST IN NEPA

As described in each of the comment letters noted here[8] and in the States' complaint challenging the 2020 Rule[9], the States and territories have an enduring and unique role in implementing NEPA within their States and in participating in NEPA processes for actions with effects within their borders. Environmental review of federal agency action through the NEPA process is an important tool for States to understand these actions and to protect their interests by ensuring federal agencies make informed and transparent decisions. Accordingly, the States have actively participated in CEQ's rulemakings on the NEPA regulations since 2018.[10] The States fully incorporate here each of the prior comment letters.[11]

Based on significant concerns with the legality of CEQ's 2020 Rule, a coalition of States and territories challenged it in court.[12] As detailed in the lawsuit, the 2020 Rule is arbitrary, capricious, and contrary to law, exceeds CEQ's statutory authority, and was promulgated without observance of procedure required by law.[13] The States support CEQ's efforts to reverse the unlawful 2020 Rule, including CEQ's Phase 1 Rule that addresses some of the most problematic revisions of the 2020 Rule and this more comprehensive proposed Phase 2 Rule.

The States have a particularly strong interest in NEPA because it is a critical tool for understanding and mitigating the climate and environmental justice impacts of federal actions. NEPA requires agencies to consider climate change effects and the States have a strong interest

---

[8] *See* Comments of Attorneys General of California, et al., on Advance Notice of Proposed Rulemaking, 83 Fed. Reg. 28,591 (August 20, 2018) (attached as Exhibit 1); Comments of Attorneys General of Washington, et al., on Notice of Proposed Rulemaking, 85 Fed. Reg. 1684 (March 10, 2020) (attached as Exhibit 2) [hereinafter 2020 Comments]; Comments of Attorneys General of Washington, et al., on the Interim Final Rule, 86 Fed. Reg. 34154 (July 29, 2021) (attached as Exhibit 3); Comments of Attorneys General of Washington, et al., on Notice of Proposed Rulemaking 86 Fed. Reg. 55757 (Nov. 22, 2021) (attached as Exhibit 4).

[9] First Amended Compl. for Declaratory & Injunctive Relief, *State of California, et al. v. Council on Envtl. Quality, et al.*, Case No. 3:20-cv-06057-RS, Doc. 75 (filed Nov. 23, 2020) [hereinafter Complaint] (attached as Exhibit 5).

[10] Advance Notice of Proposed Rulemaking, 83 Fed. Reg. 28,591; Update to the Regulations Implementing the Procedural Provisions of the National Environmental Policy Act," 85 Fed. Reg. 1684 (Jan. 10, 2020), Docket ID No. CEQ-2019-0003; Interim Final Rule, 86 Fed. Reg. 34,154; Notice of Proposed Rulemaking 86 Fed. Reg. 55,757-01.

[11] *See* note 8, *supra*.

[12] *See* Complaint, *supra* note 9.

[13] *Id.*

AR_0025622

September 29, 2023

in robust analysis of these issues. The Proposed Phase 2 Rule correctly recognizes federal agencies' obligation to identify, analyze and consider alternatives and mitigation measures for the reasonably foreseeable direct, indirect, and cumulative effects, including "climate change-related effects," of all major federal actions.[14] Consideration of climate change is critical in analyzing an action's relationship between short-term uses and long-term productivity, and any irreversible and irretrievable commitment of resources.[15]

Agency NEPA analysis also must prioritize affected communities and thoroughly analyze and disclose the environmental justice concerns presented by an action's GHG emissions and climate impacts.[16] NEPA further directs agencies to "identify and develop methods and procedures" to ensure appropriate consideration of "presently unquantified environmental amenities."[17] As the Proposed Phase 2 Rule recognizes, NEPA requires federal agencies to consider climate change impacts both from and to a proposed action[18] as well as the "potential for disproportionate and adverse human health and environmental effects on communities with environmental justice concerns."[19] Agencies' consideration should include assessing reasonably foreseeable GHG emissions and climate change impacts, whether quantifiable or not.[20]

State and local governments also have strong interests in robust coordination and cooperation between federal agencies and state and local governments, particularly related to climate change and environmental justice. NEPA requires federal agencies to act, "in cooperation with States and local governments," to evaluate potential environmental impacts in fulfillment of NEPA's purposes.[21] The Proposed Phase 2 Rule continues to promote coordination and cooperation between federal, state, Tribal and local agencies[22] and to ensure that agencies consider inconsistency or "possible conflicts" "with any approved State, Tribal, or local plan or law," including those laws, plans, and controls addressing climate change.[23]

The States are critical stakeholders in NEPA reviews, particularly for proposed federal actions that may increase the emissions of GHGs and impacts of climate change in our

---

[14] 88 Fed. Reg. at 49,986 (proposed 40 C.F.R. § 1508.1(g)); *id.* at 49,977 (proposed 40 C.F.R. §§ 1502.16(a)(1)-(2), (7)-(12)).

[15] 42 U.S.C.§§ 4331(a), 4321; and 4332(2)(I) (NEPA intended to "recognize the worldwide and long-range character of environmental problems.").

[16] *See* 42 U.S.C. § 4331(a); 42 U.S.C. § 4332(2).

[17] 42 U.S.C. § 4332(2)(B).

[18] 88 Fed. Reg. 49,977 (proposed 40 C.F.R. §§ 1502.16(a)(7), (10)).

[19] 88 Fed. Reg. 49,978 (proposed 40 C.F.R. § 1502.16(a)(14)).

[20] *Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin.*, 538 F.3d 1172, 1217 (9th Cir. 2008) ("[t]he impact of [GHG] emissions on climate change is precisely the kind of cumulative impacts analysis that NEPA requires agencies to conduct."); *cf. Kleppe v. Sierra Club*, 427 U.S. 390, 410 (1976) ("Thus, when several proposals for coal-related actions that will have cumulative or synergistic environmental impact upon a region are pending concurrently before an agency, their environmental consequences must be considered together.").

[21] 42 U.S.C. § 4331(a).

[22] 88 Fed. Reg. at 49,982 (proposed 40 C.F.R. § 1506.2(a)-(c)).

[23] 88 Fed. Reg. at 49,977 (proposed 40 C.F.R. § 1502.16); 88 Fed. Reg. at 49,982 (proposed 40 C.F.R. § 1506.2(d));

AR_0025623

September 29, 2023

jurisdictions. Federal lands comprise a significant portion of many jurisdictions, and federal actions taken on those lands often affect the States' residents, natural resources, recreation and tourism.[24] Furthermore, the States are on the front lines of climate change and face numerous and unique threats to people and natural resources, including disproportionate impacts to communities with environmental justice concerns.[25] Cooperation with State, Tribal, and local governments and the public is thus an essential component of NEPA's informed decision-making process.

## IV.    THE PROPOSED PHASE 2 RULE MAKES MEANINGFUL PROGRESS TO ADVANCE NEPA'S PROTECTIONS AND SHOULD GO FURTHER

CEQ's Phase 2 Rule, if finalized, does significant work to modernize the practice of NEPA and ensure informed decision-making by harmonizing NEPA's implementing regulations with the text and purposes of NEPA. The States strongly support CEQ's proposed changes where they clarify and emphasize informed and transparent decision-making. The States urge CEQ to take further action where the revised regulations text does not fully implement the text and purpose of NEPA.

### A.    The States Support the Proposed Phase 2 Rule's Revisions Emphasizing the Importance of NEPA

The States support CEQ's proposed regulatory revisions which incorporate NEPA's statutory purposes into the NEPA regulations. These regulatory changes more directly tie the Purpose and Policy sections with the text of NEPA, emphasize the obligation of federal agencies to fully implement NEPA, and remove unnecessary thresholds to NEPA analysis.[26] In contrast to the unlawful 2020 Rule, these revisions appropriately frame the environmental review process to enact the statutory policy to "use all practicable means and measures … to create and maintain conditions under which man and nature can exist in productive harmony."[27]

#### 1.    CEQ's proposed revisions to the Purpose and Policy sections restore important framing language

CEQ's proposed revisions to the Purpose and Policy sections in §§ 1500.1 and 1500.2 serve a unique framing function as the very beginning of the regulations by placing the

---

[24] For example, federal lands comprise 80.1% of Nevada, more than half of Oregon, almost half of California, nearly one-third of New Mexico, nearly a quarter of the District of Columbia. *See* Congressional Research Service, "Federal Land Ownership: Overview and Data," Feb. 21, 2020, https://sgp.fas.org/crs/misc/R42346.pdf.

[25] *See* Comments of the Attorneys General of New York, *et al.* on Council on Environmental Quality's Interim "National Environmental Policy Act Guidance on Consideration of Greenhouse Gas Emissions and Climate Change" at 4-5 (Apr. 10, 2023), [hereinafter GHG Comment Letter] (attached as Exhibit 6).

[26] 88 Fed. Reg. at 49,966 (proposed 40 C.F.R. § 1500.1(a)); *Id*. at 49,946-67 (proposed 40 C.F.R. § 1500.1(a), (a)(2); *Id*. at 49,967 (proposed 1500.1(b))(emphasis added). *See also id*. at 49,968 (proposed 40 C.F.R. § 1501.1(a) "Integrating the NEPA process into agency planning at an early stage.").

[27] 42 U.S.C. § 4331(a).

6

September 29, 2023

regulations into the broader context of NEPA's mandate that agencies practice informed decision-making.[28]

CEQ's revisions restore key language stating that NEPA is the "basic national charter for protection of the environment" and an "action-forcing" statute which is not merely procedural.[29] These changes are consistent with not only NEPA, but also with Supreme Court precedent emphasizing that environmental review is "one of the 'action-forcing' provisions intended as a directive to 'all agencies to assure consideration of the environmental impact of their actions in decisionmaking.'"[30]

CEQ's proposed changes to § 1500.1(b) also correctly emphasize the need to "identify, consider, and disclose to the public" environmental impacts "*before* decisions are made and *before* actions are taken" which re-establishes the heart of NEPA's "look before you leap" ethos.[31] These changes support the collection of high quality information and the use of that information early in the agency decision-making process.

The States also fully support CEQ's proposed revision in § 1500.2 to restore statutory language that NEPA be applied "to the fullest extent possible" and to emphasize broad community outreach as part of that process.[32] For instance, CEQ's proposal to explicitly include language that directs agencies to "to the fullest extent possible: [e]ncourage and facilitate … engagement with communities with environmental justice concerns, which often include communities of color, low-income communities, indigenous communities, and Tribal communities" will strengthen the NEPA process and advance informed decision-making by ensuring meaningful community engagement and rigorous analysis of community impacts.[33] This update to NEPA's regulatory language further aligns with NEPA's statutory purpose to include public participation and transparency in the decision-making process[34] and addresses the reality that communities with environmental justice concerns have been disproportionately and adversely affected by certain Federal actions.[35]

CEQ proposes in § 1500.2(f) to reinstate the provision that agencies should use "all practicable means … to restore and enhance the quality of the human environment" consistent with NEPA's purpose.[36] The States support the reinstatement of the 1978 Regulations' language to return the regulations to their historic grounding in the fundamental principles of NEPA. The

---

[28] 88 Fed. Reg. at 49,930 (proposed 40 C.F.R. §§ 1500.1 and 1500.2).

[29] *Id.* at 49,966-67 (proposed 40 C.F.R. § 1500.1(a), (a)(2)).

[30] *Kleppe v. Sierra Club*, 427 U.S. 390, 409 (1976) (quoting Conference Report on NEPA, 115 Cong. Rec. 40416 (1969)).

[31] *Id.* at 49924, 49,967 (proposed 40 C.F.R. §1500.1(b))(emphasis added). *See also id.* at 49,968 (proposed 40 C.F.R. § 1501.1(a) "Integrating the NEPA process into agency planning at an early stage.").

[32] 88 Fed. Reg. at 49,930, 49,967 (proposed 40 C.F.R. § 1500.2); 42 U.S.C. § 4332.

[33] 88 Fed. Reg. at 49,930, 49,967 (proposed 40 C.F.R. § 1500.2(d)).

[34] 42 U.S.C. § 4331(a).

[35] 88 Fed. Reg. at 49,930.

[36] *Id.* at 49,931, 49,967 (proposed 40 C.F.R. § 1500.2(f)).

AR_0025625

September 29, 2023

States agree that including policy objectives such as "to avoid environmental degradation, preserve historic, cultural, and natural resources," and ''attain the widest range of beneficial uses of the environment without degradation, risk to health or safety, or other undesirable and unintended consequences" aligns with NEPA goals. [37]

### 2. The States support CEQ's proposed revisions reinforcing the obligation to implement NEPA

The States further support CEQ's proposal to restore language emphasizing each federal agency's independent obligation and ability to implement NEPA.  CEQ's proposal to remove language implemented by the 2020 Rule in § 1500.6 makes it clear that agencies have an obligation to comply with NEPA by following CEQ's regulations and also reviewing and revising, as necessary, their own agency policies, procedures, and activities.[38]  This independent obligation to comply with NEPA, combined with CEQ's previous revisions to § 1507.3 in the Phase 1 Rule,[39] provides federal agencies with flexibility to craft regulations tailored to their agency's work, even if they go beyond the requirements of CEQ's NEPA regulations.

### 3. CEQ's proposed changes determine the appropriate level of NEPA review

The States support CEQ's proposal to revise the threshold analysis introduced by the 2020 Rule to align it with NEPA's text and to better situate these threshold questions within the context of determining the appropriate level of NEPA review.[40] The States further support the Phase 2 Rule's revisions removing certain "thresholds" that improperly provided agencies a basis to avoid any environmental review of certain proposed projects.[41]

Specifically, the States support CEQ's edits to §§ 1501.1, 1506.9, and 1507.3 to limit federal agencies' reliance on another agency's procedures or another statutory process as a functional equivalent for their obligations under NEPA. For instance, CEQ's proposed deletion of language from § 1501.1(a)(6) exempting an agency from NEPA where "the proposed action is an action for which another statute's requirements serve the function of agency compliance with the Act," eliminates an exemption that is inconsistent with NEPA's text, purpose, and interpreting case law.[42] Although federal courts recognize functional equivalency, they tend to apply the concept narrowly in contrast to the broad exemption in the current regulations.[43] CEQ

---

[37] *Id.*

[38] *See id.* at 49,968 (proposed 40 C.F.R. § 1500.6).

[39] *See id.* at 49,933; 86 Fed. Reg. at 55,761.

[40] *See* 88 Fed. Reg. at 49,934, 49,969 (proposed 40 C.F.R. § 1501.3).

[41] *See* 2020 Comment letter, *supra* note 8, at 23-29.

[42] *Compare* 40 C.F.R. § 1501.1(a)(6) *with* proposed 40 C.F.R. § 1501.1.

[43] *See, e.g.*, *Portland Cement Ass'n v. Ruckelshaus*, 486 F.2d 375, 384-85, 387 (D.C. Cir. 1973) (concluding that "section 111 of the Clean Air Act, properly construed, requires the functional equivalent of a NEPA impact statement," and allowing a narrow exemption from NEPA); *Fund For Animals v. Hall*, 448 F. Supp. 2d 127, 134 (D.D.C. 2006) (rejecting Fish and Wildlife Service's argument that the Migratory Bird Hunting Frameworks or the Endangered Species Act's section 7 consultation process are the functional equivalent of NEPA's environmental review process). *See also* 2020 Comment Letter, *supra* note 8, at 26-27.

AR_0025626

September 29, 2023

proposes to eliminate similar language in §§ 1506.9 and 1507.3(c)(5).[44] These changes emphasize the unique role NEPA plays in agency decision-making and ensure NEPA is implemented in accordance with the statutory mandate that agencies apply NEPA to "the fullest extent possible."[45]

**B.    The States Support CEQ's Proposals to Improve Public Participation and Transparency in the NEPA Decision-making Process**

Public participation is critical for informed decision-making under NEPA. Among other things, the public can be an important partner in identifying alternatives that improve a proposed action or reduce its environmental impacts, identifying shortfalls in the agency's analyses, spotting missing issues, and providing additional information that the agency may have overlooked.[46] Public participation in the NEPA process can also advance environmental justice by ensuring that communities on the frontlines of environmental impacts have a voice in the process. The States support several revisions to the NEPA implementing regulations that ensure meaningful public participation.

**1.    The States support revisions enhancing accessibility and transparency**

The States support CEQ's revisions to increase public participation, accessibility, and transparency, including revisions to §§ 1501.5(c)(4), 1502.4(e)(9), § 1501.9, and § 1501.12.

First, the States support the revisions requiring a unique identification number that can be used for tracking environmental reviews for EAs in § 1501.5(c)(4) and EISs in § 1502.4(e)(9). NEPA review is often a multistep process with many procedures, multiple timelines, and voluminous records. A consistent reference point throughout the process can help the public and decision makers easily monitor the progress of the environmental review. The proposal thus increases transparency and accessibility of environmental reviews.

The States also support the changes in § 1501.9 that emphasize the importance of public engagement in the NEPA process at all levels of NEPA review.[47]   As CEQ knows, the vast majority of NEPA reviews do not result in an EIS, so this change protects public participation in EAs and other NEPA processes.[48]

---

[44] 88 Fed. Reg. at 49,956, 49,983 (proposed 40 C.F.R. § 1506.9); 88 Fed. Reg. at 49,958, 49,985 (proposed 40 C.F.R. § 1507.3(c)(5)).

[45] 42 USC § 4332.

[46] *See* 2020 Comment Letter, *supra* note 8, at 10.

[47] 88 Fed. Reg. at 49,945.

[48] *See* GAO, Nat'l Envtl. Policy Act, Little Information Exists on NEPA Analyses, GAO-14-370, at 1 (Apr. 2014) (discussing CEQ estimates that "95 percent of NEPA analyses are CEs, less than 5 percent are EAs, and less than 1 percent are EISs"). In a 2016 report, CEQ found that federal agencies started from 137 to 261 EISs each year between 2012 and 2015, while preparing from 11,308 to 13,205 EAs per year during the same time period, *see* CEQ, Fourth Report on Cooperating Agencies in Implementing the Procedural Requirements of the Nat'l Envtl. Policy Act 1 (Oct. 2016), https://ceq.doe.gov/docs/ceq-reports/Attachment-A-Fourth-Cooperating-Agency-Report_Oct2016.pdf . The 2020 Rule estimated that federal agencies annually complete 176 EISs and 10,000 EAs and apply approximately 100,000 CEs. 88 Fed. Reg. at 43,305 n.5.

September 29, 2023

The States agree the revisions to § 1501.12 requiring agencies to explain briefly the relevance of material incorporated into environmental review documents are important steps in increasing agency transparency and accessibility in the NEPA process. Clarifying that this requirement applies to agencies will help better inform the public and agency decision makers.[49]

The States further support CEQ's proposal to add references to "publicly accessible website[s]" and hyperlinks in § 1501.12 as an example of a way an agency can provide material incorporated by reference to the public in a more accessible way.[50] Modernizing the NEPA regulations to include these digital methods further increases transparency and facilitates public access to NEPA documents.

### 2.    The States support removing an undue burden on commenters

The States support CEQ's proposed edits to § 1503.3 clarifying the expected level of detail in public comments and removing or modifying provisions of the 2020 Rule that inappropriately restrict public comments and place an unnecessary burden on public commenters.[51]

The States support the removal of language in § 1503.3(a) that creates unnecessary barriers to public participation in the NEPA process such as requiring comments "[to be as detailed] as necessary to meaningfully participate and fully inform the agency of the commenter's position" and to describe any "economic and employment impacts."[52] Requiring such specificity can be a major hurdle to public commenters who are unfamiliar with the NEPA process and may preclude inclusion of important perspectives, such as the perspectives of community members experiencing disproportionate environmental justice impacts.

The States also support CEQ's decision to modify language in § 1503.3 (a) to clarify that the public should include citations or proposed changes to the EIS or describe the data, sources, or methodologies that support the proposed changes in the comments "only where possible."[53] This important change removes an unnecessary barrier to public comment.

Finally, the States support CEQ's proposal to remove language in § 1503.3(b) that places an undue burden on public participation through an onerous and unlawful exhaustion process that purportedly limited judicial review and remedies and a restrictive bonding requirement.[54] CEQ's proposed removal of the bond requirement and prescribed judicial remedies in § 1500.3(c) would address the inequity of bond requirements on under-resourced communities. These proposed amendments also recognize the role of courts in determining judicial remedies rather than attempting to proscribe them in regulations.[55] Similarly, the States support CEQ's

---

[49] 88 Fed. Reg. at 49,974 (proposed 40 C.F.R. § 1501.12).

[50] *Id.*

[51] *Id.* at 49,951.

[52] *Id.* at 49951-52 (proposed 40 C.F.R. § 1503.3(a)).

[53] *Id.* (proposed 40 C.F.R. § 1503.3(a)).

[54] *Id.* (proposed 40 C.F.R. § 1503.3(b)).

[55] 2020 Comment Letter, *supra* note 9, at 65-66.

AR_0025628

September 29, 2023

proposed revision to remove a presumption of adequate consideration of public comments in § 1505.2(b).[56] CEQ's proposed revision understands the role of courts in making this determination, rather than unlawfully suggesting that agencies could pre-determine exhaustion and limit the ability of affected communities to challenge a deficient environmental review process.

### 3.    The States support flexibility in the NEPA process but urge further clarity

CEQ proposes a new section in § 1506.12 to provide agencies flexibility by adopting "innovative approaches" to address extreme environmental challenges.[57] While the States support creative solutions to address climate change and advance environmental justice in the face of extreme environmental challenges, the States have questions about how CEQ would ensure that this provision is applied consistent with NEPA's text and purpose, what types of actions this approach would apply to, how often or broadly it would be used, and how it would complement CEQ's other Proposed Phase 2 Rule changes to address climate change and environmental justice and ensure transparency and public participation in the NEPA process.

The States agree that proposed § 1506.12 is not a waiver of the requirement of NEPA analysis and that its application must be "consistent with section 101 of NEPA."[58] To ensure that the use of "innovative approaches" is consistent with these limitations, CEQ should clarify the proposed regulatory language to explain how it will apply this new alternative process and what factors it will assess to ensure that the "innovative approaches" remain consistent with NEPA. CEQ should also further clarify how the "innovative approaches" provision interacts with its other proposed regulatory revisions, particularly those designed to address climate change, ensure robust review of reasonably foreseeable effects, and advance environmental justice.[59]

If CEQ maintains § 1506.12 in its final rulemaking, the States urge CEQ to define "extreme environmental challenges"[60] and to clarify the role of public participation and transparency in the innovative approaches process to ensure that agencies incorporate meaningful public participation throughout the process. First, the States believe that defining "extreme environmental challenges" in addition to the list of examples provided will clarify the scope of this alternative process and help ensure that the provision is not used so broadly as to undermine NEPA's text and purpose.[61] Second, CEQ should clarify the public disclosure and participation process for an agency's innovative approaches request and CEQ's review of that request. As currently drafted, the proposed regulations do not provide an explicit step that allows for public involvement in the request process. Since frontline communities will be some of the most impacted by extreme environmental challenges, it is important to get their perspective early and often in the NEPA process especially where the standard NEPA process may be modified.

---

[56] 88 Fed. Reg. at 49,953, 49,981 (*compare* 40 C.F.R. § 1505.2(b) (2020) with proposed 40 C.F.R. § 1505.2).

[57] *See* 88 Fed. Reg. at 49,957, 49,984 (proposed 40 C.F.R. § 1506.12).

[58] *Id.* at 49,957, 49,958 (proposed 40 C.F.R. § 1506.12(a)).

[59] *See* Proposed Rule 40 C.F.R. §§ 1500.2 (e), 1502.14(f) 1502.16 (a)(2), 1502.16 (a)(7), 1502.16 (a)(14), 1502.23 (c), 88 Fed. Reg. at 49931, 49961 (proposed §§ 1500.1(c), 1508.1(m)). *See also* Final Interim Rule; Phase 1 Rule.

[60] *See* 88 Fed. Reg. at 49,957, 49,984 (proposed 40 C.F.R. § 1506.12).

[61] *See* 88 Fed. Reg. at 49,957-49,958(proposed § 1506.12).

AR_0025629

September 29, 2023

### C. The States Support CEQ's Proposed Revisions Supporting Rigorous Environmental Review

#### 1. The States support CEQ's proposal to restore language prohibiting improper segmentation of environmental reviews

CEQ proposes to reinstate language in § 1501.3(b) that agencies should not unlawfully segment their actions and extend these principles to EISs, EAs, and Categorical Exclusions (CEs).[62] The States support reinstatement and expansion of this longstanding principle that requires federal agencies to consider whether there are connected actions that should be considered in the same NEPA review.[63] As the Ninth Circuit made clear in *Kern v. United States Bureau of Land Management*, NEPA requires federal agencies to analyze the combined environmental impacts of the proposed project and other projects, even if a project "individually has a significant environmental impact."[64] Ensuring agencies do not improperly segment their environmental reviews, regardless of the type of review, is especially beneficial to communities with environmental justice concerns facing localized negative environmental impacts because it can help to ensure agencies take a holistic view of the impacts of their connected actions.[65] Avoiding improper segmentation further ensures that agencies fully consider and inform the public of the environmental impacts of connected actions on those communities.[66]

#### 2. The States support CEQ's proposed reinstatement of a meaningful significance analysis

The States strongly support CEQ's revisions in § 1501.3(d)(2)(iii) to reinstate a meaningful analysis for determining the significance of an agency action's effects.[67] Restoring the "context" and "intensity" framework from the 1978 Regulations reduces confusion and adds clarity while ensuring agencies focus their analysis on meaningful factors to determine an action's significance.

The States applaud CEQ's decision to modernize this provision by adding several critical factors to both the context and intensity analyses to ensure that agencies engage in informed decision-making based on the reasonably foreseeable effects of proposed actions and do not ignore important aspects of the actions' potential impacts. Among other revisions, the States strongly support CEQ's decision to add consideration in the intensity analysis of State, Tribal, and local environmental protection laws, policies and efforts including those designed to address

---

[62] 88 Fed. Reg. at 49,935 (proposed 40 C.F.R. § 1501.3(b)).

[63] *See Kern v. Bureau of Land Mgmt.*, 284 Fed 1062, 1078 (9th Cir. 2002).

[64] 284 F.3d 1062, 1078 (9th Cir. 2002).

[65] 88 Fed. Reg. at 49,935.

[66] See 88 Fed. Reg. at 49,969 (proposed § 1501.3)

[67] 88 Fed. Reg. at 49,935 (proposed 40 C.F.R. § 1501.3(d)(2)(iii)).

AR_0025630

September 29, 2023

climate change, ensure clean air and water, advance environmental justice, and promote species health and biodiversity.[68]

The States recommend that CEQ strengthen § 1501.3(d) by identifying examples of relevant laws and policies that protect the environment. These examples could include state laws or policies to reduce State emissions by a date certain, to address air or water pollution, to mitigate the effects of climate harms, to improve resiliency in the face of climate change, to advance environmental justice, or to protect public health. Such examples would ensure that federal agencies do not overlook or ignore the critical actions of the undersigned States to respond to the climate crisis and to advance environmental justice. These revisions would align with the new intensity factor focused on assessing the degree of adverse impacts on communities with environmental justice concerns, the intensity factor focused on assessing impacts to public health and safety, and the general focus of these revisions to better address GHG emissions and climate impacts in the NEPA analysis.

The States further support CEQ's emphasis on the importance of assessing an agency action's full context at the local, regional, national, and global levels in § 1501.3(d)(1). Avoiding a myopic review ensures federal agencies will not overlook reasonably foreseeable impacts, such as an oil or gas project's local air quality impacts as well as its regional, national, and global impacts on climate change. Similarly, the States support CEQ's expansion of the intensity factor regarding endangered or threatened species to also include impacts to species habitat regardless of whether it has been designated as critical.[69]

The States also support CEQ's revisions in § 1501.3(d)(2) to ensure agencies assess the potential impacts of an action on Tribal Nations and vulnerable communities by refocusing the analysis on how a project will, both in context and intensity, impact vulnerable communities, address or exacerbate environmental justice, impact unique, sensitive, or cultural resources, including Tribal sacred sites, and adding an intensity factor specifically focused on adverse impacts to reserved rights of Tribal Nations.[70]

Further, the States support the stand-alone definition of significant effects in § 1508.1.[71] But, the States are concerned that defining "significant effects" to include only "adverse effects" could create confusion over how agencies assess which effects are truly beneficial and from whose/which perspective.[72] Different government entities, communities, and individuals may have divergent views as to the benefits or burdens of a particular effect. To avoid this confusion, CEQ should, at a minimum, provide agencies further direction on how they should apply the significance analysis to determine when a project "would result only in significant beneficial effects" and thus not require an EIS, including by directing that the benefits should be benefits to "the human environment" consistent with the definition of "effects" and providing further clarity

---

[68] 88 Fed. Reg. at 49,934, 49,969 (proposed 40 C.F.R. § 1501.3(d)(2)(iv)).

[69] *Id.* at 49,934, 49,969 (proposed 40 C.F.R. § 1501.3(d)(2(viii)).

[70] *See id.* at 49,935-36 (proposed 40 C.F.R. § 1501.3(d)(2)).

[71] *See id.* at 49,964 (proposed 40 C.F.R. § 1508.1(kk)).

[72] *See id.*

AR_0025631

September 29, 2023

on how agencies should ensure that their review of these effects properly evaluates impacts on environmental justice.[73]

Finally, the States recommend strengthening analysis of climate change effects at the determination of significance stage and in conducting NEPA reviews that do not involve an EIS. Most NEPA reviews do not result in an EIS, but instead are completed using a CE or EA.[74] If GHG emissions are primarily examined in EISs, actions not resulting in an EIS may escape consideration of their emissions potential and ways that to reduce those emissions. Collectively, that universe of actions could be significant in terms of emissions and effects and CEQ should require agencies to fully evaluate and consider mitigation for the potential GHG emissions of projects requiring EAs as well as EISs.  To this end, we recommend CEQ incorporate concepts from the 2023 CEQ guidance document on consideration of GHG emissions and climate change (2023 GHG Guidance)[75] into other provisions of the regulations to ensure agencies properly assess GHG and climate effects are properly assessed in determining significance and reviewing actions not covered by Part 1502. Specifically, in § 1501.3, we recommend adding provisions recognizing that, although there is no particular quantity of GHG emissions that triggers the requirement for an EIS, Federal agencies should quantify, where relevant, the reasonably foreseeable direct and indirect GHG emissions of their proposed actions and reasonable alternatives (as well as the no-action alternative) and the effects associated with those projected emissions in the determination of significance. Similarly, for actions where an agency prepares an EA, § 1501.5(i), which directs application of § 1502.23 methodology to EAs, could specify that such methodology should include evaluation of reasonably foreseeable climate change-related effects where appropriate as stated in § 1502.23(c).

3.    **The States support CEQ's proposed changes to ensure agencies conduct a meaningful alternatives analysis**

The States support CEQ's proposal to restore language to § 1502.4 stating that the alternatives analysis "is the heart of the environmental impact statement"; that the alternatives analysis "should sharply define issues for the decision maker and the public and provide a clear basis for choice in the options"; and that the EIS should "[r]igorously explore and objectively" evaluate alternatives.[76] Robust analysis of the relative environmental effects of a range of reasonable alternatives is necessary to ensure that the EIS serves the regulations' purpose of providing for meaningful public input and informed federal agency decision-making.[77]

---

[73] *Id.*

[74] *See* note 48, *supra.*

[75] 88 Fed. Reg. 1196-01 (Jan. 9, 2023).

[76] 88 Fed. Reg. 49,924-01, 49,948 (July 31, 2023).

[77] *See New Mexico ex rel. Richardson v. Bureau of Land Mngt.*, 565 F.3d 683, 708 (10th Cir. 2009) ("Without substantive, comparative environmental impact information regarding other possible courses of action, the ability of an EIS to inform agency deliberation and facilitate public involvement would be greatly degraded."); CEQ, Exec. Office of the President, A Citizen's Guide to the NEPA: Having Your Voice Heard, at 2 (Dec. 2007), *available at* https://ceq.doe.gov/docs/get-involved/Citizens_Guide_Dec07.pdf ("Two major purposes of the environmental review process are better informed decisions and citizen involvement, both of which should lead to implementation of NEPA's policies.").

AR_0025632

September 29, 2023

The States also support CEQ's proposal to restore the policy statement in § 1500.2(e) directing agencies to identify and analyze alternatives that would "avoid or minimize adverse effects" on the environment.[78] The States disagree with the 2020 Rule's rationale for deleting § 1500.2, which argued that the section unnecessarily repeated requirements stated elsewhere in the NEPA regulations.[79] As CEQ notes in the Proposed Phase 2 Rule, an introductory policy statement provides important context for the provisions that follow and improves readability.[80] The alternatives analysis, like NEPA as a whole, is not merely a procedural exercise. Rather, it forces agencies to take a "hard look" at the environmental consequences of proposed actions, for the purpose of "protecting and promoting environmental quality."[81] This necessarily entails contemplation of alternatives that would lessen harm to the environment. The States also support CEQ's proposal to revise subsection (e) to expressly include environmental justice and climate change as examples of environmental effects that agencies may consider in identifying less harmful alternatives.[82]

The States further support CEQ's proposal to add language to § 1502.14 providing that reasonable alternatives may include alternatives outside the lead agency's jurisdiction.[83] The States believe analysis of reasonable alternatives outside of the lead-agency jurisdiction represents a reasonable interpretation of NEPA's requirement to analyze such alternatives. As the States stated in their comment opposing the 2020 Rule, ignoring such alternatives may present the public and decision makers with a false and unlawfully narrowed picture of the choices available to accomplish an action's purpose, leading to selection of an inferior alternative.[84] By contrast, if the lead agency alerts the public and decision makers to superior alternatives within the authority of another agency, the public or agency officials could then advocate for the other agency to carry out those alternatives. Furthermore, other agencies at the federal, state, or local level with authority to carry out such alternatives could rely on the lead agency's NEPA review to meet their own environmental review obligations. Early interagency coordination and communication regarding potential alternatives would be important to ensure that analysis of these types of alternatives is robust and meaningful.[85]

The States also support CEQ's proposed revision to § 1506.1(b) clarifying that agencies may not take actions prior to making a final decision that limits alternatives. In particular, the States support the proposed language stating that any agency authorization of purchases by an applicant for federal funding prior to completion of NEPA review must not limit the agency's selection of alternatives.[86] The text of NEPA requires "that agencies complete environmental

---

[78] 88 Fed. Reg. at 49,931.

[79] 85 Fed. Reg. 43,304-01, 43,317.

[80] 88 Fed. Reg. at 49,930.

[81] *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 348-50 (1989).

[82] 88 Fed. Reg. at 49,931.

[83] *Id*. at 49,948.

[84] 2020 Comment Letter, *supra* note 8, at 38-42.

[85] *Id*. at 40.

[86] 88 Fed. Reg. at 49,954.

AR_0025633

September 29, 2023

review before any irreversible and irretrievable commitment of resources."[87] Whether such a commitment has been made "is necessarily contextual . . . requir[ing] a fact-specific inquiry."[88] CEQ's proposed revision to § 1506.1(b) would clarify that NEPA's requirement of informed decision-making limits actions that can be taken before a decision is made.

Finally, the States urge CEQ to restore language in § 1502.14 to ensure agencies "devote substantial treatment to each alternative considered in detail."[89] The 2020 Rule removed the "substantial treatment" language from § 1502.14 and replaced it with the mere requirement to "discuss" each alternative.[90] As described in the States' 2020 Comment letter, this change could potentially undermine the adequacy of the alternatives analysis.[91] CEQ should restore the "devote substantial treatment" which, along with the "[r]igorously explore and objectively" evaluate language, would ensure agencies take a "hard look" at their proposed action.[92]

### 4. The States recommend CEQ strengthen its proposed revisions to ensure agencies consider reasonably foreseeable projected GHG emissions in the alternatives analysis

The Proposed Phase 2 Rule also laudably recognizes in proposed § 1502.14(f) that identification of the environmentally preferable alternative or alternatives should consider which alternatives best address climate change-related effects.[93] We recommend strengthening this section to require specific consideration of reasonably foreseeable GHG emissions, in comparison of alternatives. This analysis will enable agencies and the public to see clearly the comparison among the projected emissions from a proposed action and its alternatives. In the context of proposed energy actions that are greenhouse gas-intensive, this analysis will assist agencies in identifying clean energy alternatives to proposed fossil fuel energy projects.

### 5. CEQ must ensure categorical exclusions are consistent with NEPA

The States recognize that CEs are a useful tool for streamlining the NEPA process. As CEQ has previously explained, however, "[i]f used inappropriately, categorical exclusions can thwart NEPA's environmental stewardship goals, by compromising the quality and transparency of agency environmental review and decision-making, as well as compromising the opportunity for meaningful public participation and review."[94] The States applaud CEQ's revisions to the CE provision at § 1501.4 to add the clause "individually or in the aggregate," which clarifies that agencies must consider both the individual application of a CE and also the aggregate impact of

---

[87] 2020 Comment Letter, *supra* note 8, at 37-38 (citing *Conner v. Burford*, 848 F.2d 1441, 1446 (9th Cir. 1988); 42 U.S.C. § 4332(C)(v)).

[88] *New Mexico ex rel. Richardson v. Bureau of Land Mgmt.*, 565 F.3d 683, 718 (10th Cir. 2009).

[89] *See* 40 C.F.R. 1502.14 (1978)

[90] *Compare* 40 C.F.R. § 1502.14 (2020) with 40 C.F.R. § 1502.14 (1978).

[91] *See* 2020 Comment Letter, *supra* note 8, at 40-41.

[92] 88 Fed. Reg. 49,924-01, 49,948 (July 31, 2023).

[93] 88 Fed. Reg. at 49,977 (proposed 40 C.F.R. § 1502.14(f)).

[95] 88 Fed. Reg. at 49,937.

AR_0025634

September 29, 2023

its repeated application over time in determining whether it has significant effects.[95] Combined with the Phase 1 rulemaking's reinstated cumulative effects language,[96] this proposed change will ensure agencies consider the actual anticipated impacts of applying a CE. Similarly, CEQ's proposed revision requiring agencies to consider "extraordinary circumstances" in promulgating CEs would ensure agencies consider the full range of possibilities when enacting CEs. The States further support CEQ's revisions for transparency in the use of CEs, including by requiring agencies to maintain a website with a list of all CEs regardless of the method of adoption.[97]

To further ensure the use of categorical exclusions aligns with NEPA's text and goals, the States recommend that CEQ's final rule include several additional revisions to the proposed CE provisions. First, CEQ should explain how § 1507.3(a), which presumes that CEs that exist as of the date of the final rule are consistent with the subchapter, ensures agency compliance with NEPA and CEQ's Proposed Phase 2 Rule.[98] CEQ initially adopted this provision in the final 2020 Rule,[99] and the States challenged it in their lawsuit over that Rule.[100] The States remain concerned about the legality of and justification for this provision and, at a minimum, seek clarity on how this presumption interacts with the requirements of § 1507.3(c)(8) and (9), CEQ's proposed changes to the significance analysis in § 1501.3(d)(2)(iii), and NEPA itself, including whether agencies are required to review those categorical exclusions for which CEQ presumes compliance within twelve months of CEQ's final Phase 2 Rule.

Second, CEQ should adopt measures to ensure transparency in the use of CEs by (a) requiring agencies to publish documentation for instances where agencies apply a CE notwithstanding extraordinary circumstances, (b) requiring (not just recommending) agencies to maintain a single list of CEs regardless of how they are established, and (c) directing agencies to ensure opportunities for public participation when agencies apply the CEs of other agencies or when they establish CEs through programmatic and planning decisions.[101]

Third, the States recommend that CEQ require agencies to review their CEs every seven years, consistent with CEQ's guidance on CEs, rather than the ten years proposed in the draft rule.[102] As CEQ previously observed, a seven-year cycle of review ensures agencies do not rely on CEs "that are outdated and no longer appropriate."[103] CEQ should also further clarify that the

---

[95] 88 Fed. Reg. at 49,937.

[96] 86 Fed. Reg. at 55,762-01.

[97] 88 Fed. Reg. at 49,937.

[98] *Id.* at 49,985 (proposed 40 C.F.R. § 1507.3(a)).

[99] *See* 85 Fed. Reg. at 43,340, 43,373 (§ 1507.3(a))

[100] *See* Complaint, *supra* note 9, ¶ 178(e).

[101] 88 Fed. Reg. at 49,938.

[102] *Compare* CEQ, MEMORANDUM FOR HEADS OF FEDERAL DEPARTMENTS AND AGENCIES: ESTABLISHING, APPLYING, AND REVISING CATEGORICAL EXCLUSIONS UNDER THE NATIONAL ENVIRONMENTAL POLICY ACT, at 16 (Nov. 23, 2010) (recommending that agencies review CEs at least every 7 years), https://ceq.doe.gov/docs/ceq-regulations-and-guidance/NEPA_CE_Guidance_Nov232010.pdf [hereinafter Categorical Exclusions Guidance], *with* 88 Fed. Reg. 49938 (§ 1507(c)(9)) (adopting a 10-year time frame for reviewing CEs).

[103] Categorical Exclusions Guidance at 16 (recommending that agencies review CEs at least every 7 years).

AR_0025635

September 29, 2023

requirement to more regularly review CEs applies to CEs adopted by any method, including the newly proposed provisions that would allow agencies to adopt CEs through a land use plan or "other equivalent planning or programmatic decisions."[104]

Fourth, the States remain concerned about the use of mitigated CEs where extraordinary circumstances exist for many of the same reasons stated in our comments on the 2020 regulatory changes.[105] The Proposed Phase 2 Rule states that agencies may still apply a CE where extraordinary circumstances exist "if the agency conducts an analysis and determines that the proposed action does not in fact have the potential to result in significant effects notwithstanding the extraordinary circumstance or the agency modifies the action to address the extraordinary circumstance.[106] The States are concerned that such mitigated CEs in the face of extraordinary circumstances could convert the utility of CEs into a tool to unlawfully thwart NEPA's mandates and goals of informed and transparent decision-making and urge CEQ in the final rule to either remove the use of mitigated CEs where extraordinary circumstances exist or adopt other protective measures.

## D.     The States Support CEQ's Proposed Changes Strengthening Environmental Review Documents

The States support CEQ's proposed revisions to provisions regarding the process to develop environmental review documents where they support informed and transparent decision-making. However, there are several additional changes CEQ can make to strengthen this process in line with the purposes of NEPA.

### 1.     The States support the removal of the requirements for senior agency official approvals

The States support CEQ's proposal providing for additional flexibility in preparing environmental review documents. For example, CEQ proposes to dispense with the requirement in current § 1501.5(g) that a senior agency official must approve in writing the exceedance of an EA's 75-page limit, and the requirement in current § 1502.7 for a senior agency official to approve the exceedance of an EIS's 150-page limit.[107] Similarly, the States support CEQ's proposal to allow the agency to extend the deadlines to complete an EA or EIS, without the need for approval by a senior agency official. CEQ's proposal gives agency staff, rather than a senior agency official, the ability to respond to factors beyond agency control affecting the review timeline such as "the potential for environmental harm; the size of the proposed action; other time limits imposed on the action by other statutes, regulations, or Executive Orders; the degree of public need for the proposed action and the consequences of delay; and the need for a

---

[104] 88 Fed. Reg. at 49,938, 49,970 (proposed 40 C.F.R. § 1501.4(c)).

[105] *See id.* at 49,937-38, 49,970 (proposed 40 C.F.R. § 1501.4(b)(1)); 2020 Comment Letter, *supra* note 8, at 35-36.

[106] 88 Fed. Reg. at 49,970 (proposed 40 C.F.R. § 1501.4(b)(1)).

[107] *See id.* at  49,972-73 (proposed 40 C.F.R. § 1501.10(b)(1) and (2)),

18

September 29, 2023

reasonable opportunity for public review."[108] These changes will provide agency officials flexibility to ensure they have time to meet the rigorous analysis requirements of NEPA.

### 2.     The States support CEQ's proposed revisions to encourage public disclosures and participation in the environmental assessment process

The States support CEQ's proposed revision of § 1501.5 to clarify public participation opportunities with respect to EAs, including the addition of a new paragraph requiring that lead agencies must invite public comments on a draft EA and must consider those comments when preparing a final EA.[109] This clarification is a recognition of one of NEPA's fundamental purposes—to facilitate meaningful public participation and informed decision-making.

The States support CEQ's proposal that agencies "should apply," rather than "may apply" existing regulatory provisions providing for the collection of all essential information and requiring scientific integrity in the EA process.[110] Section 1502.21 requires lead agencies to disclose incomplete or unavailable information and § 1502.23 requires lead agencies to identify and disclose any methodologies used, including scientific models and data sources. Collection of relevant information and scientific integrity are important to support informed agency decision-making. Because of this, the States encourage CEQ to go further by revising the regulations to state that "shall apply the provisions of §§ 1502.21 and 1502.23 to environmental assessments" to make this a mandate rather than a recommendation.

### 3.     The States support CEQ's proposed revisions regarding environmental review documents

The revision to § 1506.5(a) requiring agencies to use "reliable data and resources"[111] also encourages agencies to collect the information that will allow them to make informed decisions. However, the States urge CEQ to define the term "reliable" to ensure that agencies rely on the best available science and data in their environmental review processes.

Finally, the States support adding provisions to § 1505.3 to encourage lead agencies to incorporate mitigation measures addressing a proposed action's significant adverse human health and environmental effects that disproportionately and adversely affect communities with environmental justice concerns. This addition would emphasize that agencies should be considering environmental justice issues related to their actions, and addressing their disproportionate effects through the NEPA process—potentially through mitigation measures.

### 4.     The States support CEQ's proposed revisions to provisions governing environmental impact statements

The States support CEQ's proposal to restore action-forcing language in § 1502.1(a) (purpose) deleted by the 2020 Rule regarding the purpose of EISs as they relate to NEPA.

---

[108] CEQ, MEMORANDUM FOR HEADS OF FEDERAL DEPARTMENTS AND AGENCIES ON IMPROVING THE PROCESS FOR PREPARING EFFICIENT AND TIMELY ENVIRONMENTAL REVIEWS UNDER NEPA at 14 (Mar. 6, 2012).

[109] 88 Fed. Reg. at 49,970 (proposed 40 C.F.R. § 1501.5).

[110] *Compare* 40 C.F.R. § 1501.5(g) (2020) with 88 Fed. Reg. at 49970 (proposed 40 C.F.R. § 1501.5(i)).

[111] 88 Fed. Reg. at 49,982 (proposed 40 C.F.R. § 1506.5(a)).

AR_0025637

September 29, 2023

Specifically, the 2020 Rule removed language from § 1502. stating that the "primary purpose of an environmental impact statement is to serve as an action-forcing device to ensure that the policies and goals defined in [NEPA] are infused into the ongoing programs and actions of the Federal Government."[112] The restoration of this language reinforces NEPA's purpose as an action-forcing statute and emphasizes that NEPA is not just a procedural statute. Clarifying this purpose in the context of the EIS process further encourages lead agencies to prepare a thorough review of the significant environmental impacts of major federal actions consistent with NEPA.[113] The States also support CEQ's revision to § 1502.1(b) to restore the language clarifying the importance for lead agencies to make informed decisions and emphasizing that an EIS is more than just a disclosure document.[114]

The States support revisions to the language of § 1502.2 (implementation) to ensure that lead agencies explain in an EIS how alternatives and agency decisions will or will not achieve the requirements of NEPA, CEQ's implementing regulations, and other environmental policies.[115] Such revisions are necessary to facilitate NEPA's goals of transparency and public participation.

The States support CEQ's proposed revisions and reorganizations in § 1502.15 (affected environment) emphasizing the importance of high quality information, including the best available science and data, and clarifying considerations of reasonably foreseeable environmental trends such as climate change to establish an appropriate baseline that accounts for forward-looking climate projections.[116] These revisions would encourage agencies to use high quality information in recognition that such information should be the basis for informed agency decision-making and incorporated in the EIS.

Similarly, the States support revisions to § 1502.16 (environmental consequences) that require agencies to integrate climate change and environmental justice into the environmental consequences analysis, including by discussing risk reduction, saliency, or adaptation measures to reduce the climate impacts of the proposed action and alternatives.[117] In particular, the States applaud CEQ's decision to add a paragraph in this section providing that agencies must discuss the potential for disproportionate and adverse health and environmental effects on environmental justice communities.[118] The addition of this paragraph emphasizes the need for EISs to include environmental justice analyses to ensure that agency actions do not impose disproportionate adverse effects on these communities. CEQ's requirement that lead agencies discuss both climate

---

[112] *Compare* 40 C.F.R. § 1502.1 (1978), and 40 C.F.R. § 1502.1(a) (2020).

[113] 42 U.S.C. § 4332(C).

[114] 88 Fed. Reg. at 49,945, 49974 (proposed 40 C.F.R. § 1502.1(b)).

[115] *Id*. at 49974 (proposed 40 C.F.R. § 1502.2).

[116] *Id*. at 49,949, 77 (proposed 40 C.F.R. § 1502.15).

[117] *Id*. at 49,949-50, 77 (proposed 40 C.F.R. § 1502.16).

[118] *Id*. at 49,950, 78 (proposed 40 C.F.R. § 1502.16(14)).

AR_0025638

September 29, 2023

change and environmental justice impacts are consistent with NEPA because, as recognized by the courts, such effects are "reasonably foreseeable."[119]

The States support CEQ's proposed revision to remove "but available" from § 1502.21(b) (incomplete or unavailable information).[120] Striking "but available" from this provision would ensure agencies obtain necessary additional relevant information in cases where information is incomplete regarding reasonably foreseeable significant adverse effects that is essential to a reasoned choice among alternatives —especially in the climate and environmental justice contexts, rather than dismiss the information as unavailable and thereby refuse to take necessary actions to obtain more information that could fill in the gaps.[121]

The States further support CEQ's revisions to § 1502.23 (methodology and scientific accuracy), which would emphasize the importance of high-quality information, require agencies to offer explanations of assumptions in their analyses, and require them to incorporate projections, such as in the climate change context.[122] The States also support CEQ's proposed revisions adding language to this section explicitly including Indigenous Knowledge.[123]

The States also support proposed changes that integrate climate change considerations into the EIS process. Specifically, the States support the proposed change to § 1502.16(a)(7), which requires an EIS to include the effects of climate change from and to an action among the "environmental consequences" of an action, and proposed § 1502.16(a)(10), which requires consideration of relevant "risk reduction, resiliency, or adaptation measures."[124] Finally the States further support proposed § 1502.16(a)(6), which requires an EIS to discuss inconsistency of a proposed action with state, Tribal or local plans, policies and control, including those addressing climate change.[125] The States similarly urge CEQ to return to the requirement in the 1978 regulations that agencies must comply with NEPA to "fullest extent possible" for draft EISs, rather than the current language of "fullest extent practicable" in § 1502.9(b) (Draft, final, and supplemental statements).[126] The "fullest extent possible" language for draft EISs aligns

---

[119] *See, e.g., Eagle County, Co. v. Surface Transp. Bd.*, No. 22-1019, Slip Op. at 32-35, 2023 WL 5313815, at *14, 22, ___ F.4th ___ (D.C. Cir. Aug. 18, 2023) (finding climate effects and environmental justice impacts are reasonably foreseeable); *WildEarth Guardians v. Zinke*, 368 F. Supp. 3d 41, 67-68 (D.C. Cir. 2019) (finding climate change effects of GHG emission are reasonably foreseeable).

[120] *Compare* 88 Fed. Reg. at 49,978 (proposed § 1502.21(b)), *with* 40 C.F.R. § 1502.21(b).

[121] 88 Fed. Reg. at 49,950, 49,978 (proposed 40 C.F.R. § 1502.21(b)).

[122] *Id.* at 49,951, 78 (proposed 40 C.F.R. § 1502.23).

[123] The States understand "Indigenous Knowledge" to be defined by CEQ as: "a body of observations, oral and written knowledge, innovations, practices, and beliefs developed by Tribes and Indigenous Peoples through interaction and experience with the environment." OFFICE OF SCIENCE AND TECHNOLOGY POLICY AND CEQ, GUIDANCE FOR FEDERAL DEPARTMENTS AND AGENCIES ON INDIGENOUS KNOWLEDGE (Nov. 30, 2022), https://www.whitehouse.gov/wp-content/uploads/ 2022/12/OSTP-CEQ-IK-Guidance.pdf.

[124] *Id.* at 49,977 (proposed 40 C.F.R. § 1502.16(a)(7), (10)).

[125] *Id.* at 49,977 (proposed 40 C.F.R. § 1502.16(a)(6)).

[126] *Id.* at 49,947, 49,976 (proposed 40 C.F.R. § 1502.9(b)).

AR_0025639

September 29, 2023

NEPA's plain language,[127] its purposes of informed decision making and public participation,[128] and with CEQ's proposal to return to similar language in § 1500.2.[129]

> **5.    The States urge CEQ to include quantification of GHG emissions and future emissions scenarios to assess climate change effects in EISs**

The States recommend that proposed § 1502.16(a)(7) (environmental consequences) align with the 2023 GHG Guidance in emphasizing quantification of GHG emissions in determining foreseeable climate change-related effects.[130] Where relevant, a full lifecycle analysis of GHG emissions should be performed that includes an analysis of upstream and downstream emissions from an action for the foreseeable lifetime of that action.[131] This quantification may be particularly important for energy projects. Where information about these emissions is missing or otherwise unknown, we support incorporating into the regulations the 2023 GHG Guidance's explanation that such omitted information is not a basis to ignore and fail to analyze these impacts, which are still reasonably foreseeable.[132]

Similarly, in setting the context for a proposed action, proposed § 1502.15(b) requires an EIS to consider reasonably foreseeable climate-related changes to the environment,[133] a requirement echoed in § 1502.23(c).[134] These provisions should be strengthened by requiring consideration of projections based on varying emissions scenarios and related variations in climate change effects on the proposed action and alternatives. The 2023 GHG Guidance provides important information on quantifying and analyzing uncertainty in long-range projections of climate change, guiding agencies to use the most current reports on climate impacts such as national climate assessments,[135] and using the most current Social Cost of Greenhouse Gases (SC-GHG) estimates, where relevant. The States urge that CEQ strengthen the final rule by codifying the need to manage this uncertainty and analyze it; otherwise, agencies may unlawfully seek to minimize or avoid analysis of long-range projections of climate change altogether.

---

[127] 42 U.S.C. § 4332.

[128] *See Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989) (describing NEPA's purpose that agencies "will carefully consider, detailed information " and  provide "a springboard for public comment")

[129] 88 Fed. Reg. at 49,930, 49,967 (proposed 40 C.F.R. § 1500.2).

[130] 88 Fed. Reg. at 1,200.

[131] *See* 88 Fed. Reg. at 1,204; *Ctr. for Biological Diversity v. Bernhardt*, 982 F.3d 723, 735 (9th Cir. 2020); *Diné Citizens Against Ruining Our Env't v. Haaland*, 59 F.4th 1016, 1043 (10th Cir. 2023).

[132] 88 Fed. Reg. at 1,202.

[133] *Id*. at 49,977 (proposed 40 C.F.R. § 1502.15(b)).

[134] *Id*. at 49,979 (proposed 40 C.F.R. § 1502.23(c)).

[135] *Id*. at 1,208.

AR_0025640

September 29, 2023

6. **The States encourage CEQ to adopt further clarifications on provisions codified by the Fiscal Responsibility Act concerning preparation of environmental review documents**

The Fiscal Responsibility Act of 2023 codified various provisions of the 2020 Rule, including a 75-page limit for EAs[136] and a 150-page limit for EISs, unless the agency action is one of "extraordinary complexity", in which case a 300-page limit applies for the EIS excluding citations and appendices from the page limitation.[137]

The Fiscal Responsibility Act, however, does not define "extraordinary complexity."[138] To ensure consistency and transparency in the NEPA the States recommend that CEQ's final rule define "extraordinary complexity" or that CEQ otherwise issue guidelines on application of the term. What constitutes "extraordinary complexity" will likely vary among federal agencies. Therefore, the States propose that an action be classified as one of extraordinary complexity whenever agency staff determines that the 150-page limit is insufficient to disclose and analyze the potentially significant effects of a major federal agency action as required under NEPA. This additional clarification will help agencies align the page limit requirement with their obligation under NEPA to provide the public with a full environmental analysis.

The Fiscal Responsibility Act also requires lead agencies to prescribe procedures to allow project sponsors, rather than disinterested third parties, to prepare EAs and EISs under the supervision of the agency.[139] The Act also provides that the lead agency may provide a sponsor with guidance and assistance in preparation, and that the lead agency shall independently evaluate the environmental document and take responsibility for the contents.[140] The States encourage CEQ to guide lead agencies in preventing bias from project sponsors that undermines NEPA's promotion of informed agency decision-making. The States support CEQ's proposal to remove the ability of conflicted project proponents to prepare EIS's as it will strengthen environmental review by reducing conflicts of interest[141] and preventing the "self-serving assumptions" of a project proponent.[142]

The States further propose that CEQ develop guidance for lead agencies to mitigate the risk of conflicts. This guidance could include: (1) requiring assignment of project sponsor drafted environmental documents to an agency staff member to routinely check on the progress of the preparation and the accuracy of the analyses; (2) requiring project sponsors drafted environmental documents to be subject to review for accuracy by another agency staff member not assigned to supervise the progress; (3) requiring at least one public meeting in which the project sponsor preparing the environmental document is available to answer the public's

---

[136] 42 U.S.C. § 4336a(e)(2).

[137] 42 U.S.C. § 4336a(e)(1)(B).

[138] *Id.*

[139] 42 U.S.C. § 4336a(f).

[140] *Id.*

[141] 88 Fed. Reg. at 49,956, 49,983 (proposed 40 C.F.R. § 1506.5(b)(4))

[142] *See Greene Cnty. Planning Bd. v. Fed. Power Comm'n*, 455 F.2d 412, 420 (2nd Cir. 1972).

AR_0025641

September 29, 2023

questions, within one month after the draft document is released and before the public commenting deadline elapses; (4) requiring at least one public meeting in which the project sponsor preparing the environmental document is available to answer the public's questions within one month after the final document is published; and (5) any other procedures that CEQ deems appropriate to prescribe for lead agencies to reduce the risks of inadequately prepared environmental documents. Such procedures will support independent analysis and unbiased decision-making by the lead agencies and transparency and public participation in the process.

## E.    The States support CEQ's Proposed Definitions to Improve Environmental Review

The States support CEQ's efforts to add clarity to the NEPA process by adding new definitions to commonly used NEPA terms and updating or revising definitions of other important terms. In particular, the States support adding stand-alone definitions of environmental justice, extraordinary circumstances, and significant effects.

### 1.    The States support updating the definition of effects to include environmental justice and climate-change related effects

The States support the changes to § 1508.1(g) that add "disproportionate and adverse effects to communities with environmental justice concerns and climate change-related effects" to the list of common types of effects that may arise during NEPA review.[143] The States also support clarifying that climate change effects can include both the contributions to climate change from a proposed action and its alternatives as well as the potential effects of climate change on the proposed action and its alternatives.[144] This updated definition of climate change-related effects will help agencies adapt to ever-evolving climate threats while using the best available science and information on any disparate health effects (including risks) to help with the NEPA analysis. The States agree with CEQ that this update to the effects definition is consistent with important long-term NEPA analysis, the best use of available science, and to meet NEPA requirements.[145]

### 2.    The States support additional definitions related to environmental justice

The States applaud CEQ's decision to add two definitions related to environmental justice. Specifically, the States support adding a new definition of "environmental justice" in the Proposed Phase 2 Rule at § 1508.1(k)[146] consistent with Executive Order 14096.[147] The States support the updated definition since it is now inclusive of Tribal affiliation and disability as protected categories. The States agree with CEQ that adding a stand-alone definition for environmental justice will help agencies fully analyze environmental justice and climate change-related effects consistent with their obligations to evaluate all reasonably foreseeable effects

---

[143] 88 Fed. Reg. at 49986 (proposed 40 C.F.R. § 1508.1(g)).

[144] *Id.* at 49,960.

[145] *Id.*

[146] 88 Fed. Reg. at 49,961.

[147] Exec. Order No. 14096, 88 Fed. Reg. 25,251 (April 21, 2023). Executive Order 14096 updated the definition of environmental justice from Executive Order 12898 signed in 1994 by President Clinton.

AR_0025642

September 29, 2023

under NEPA and consistent with CEQ's existing guidance.[148]  The States recommend CEQ further center consideration of environmental justice impacts by providing direction to agencies, either through the final rule or guidance, on how to evaluate cumulative disproportionate adverse effects on environmental justice communities. While the definition of environmental justice addresses "the cumulative impacts of environmental and other burdens, and the legacy of racism or other structural or systemic barriers…,"[149] CEQ should elaborate further on how agencies should incorporate and assess those cumulative impacts in various NEPA review contexts. In addition, in response to CEQ's invitation for comment on whether and how communities with environmental justice concerns should be defined,[150] the States generally support the approach of defining "communities with environmental justice concerns" as communities that do not experience environmental justice as defined in § 1508.1(k).[151]

### 3.    The States support some changes to the extraordinary circumstances definition and urge further clarity

With respect to the definition of extraordinary circumstances, the States support highlighting impacts to environmental justice, historic properties and cultural resources, and sensitive environmental resources and impacts associated with climate change as types of circumstances that may warrant more detailed environmental review through an EA or EIS.[152] However, the States ask CEQ to clarify the meaning of "substantial effects" in this definition (which appears to be a new term used only in this definition) and to explain how it aligns with or differs from the definition of "effects" and "significant effects."[153] It also is not clear why the "substantial effects" language applies to certain impacts (i.e. impacts on sensitive environmental resources and impacts associated with climate effects) but not to other impacts (i.e. impacts to communities with environmental justice concerns and impacts on historic properties or cultural resources), which appear to create extraordinary circumstances when effects are "adverse."[154] In the final rule, CEQ should clarify these examples to ensure consistency and clarity and to avoid inappropriate use of CEs.

### 4.    The State support proposed changes to the definition of major Federal actions

Finally, the States support CEQ's changes to the definition of major Federal action to add clarity, eliminate language that could potentially limit agency review of agency actions under NEPA, and provide examples of major Federal actions where agencies have the requisite control

---

[148] *See, e.g.*, CEQ, ENVIRONMENTAL JUSTICE: GUIDANCE UNDER THE NATIONAL ENVIRONMENTAL POLICY ACT (Dec. 10, 1997) (''Environmental Justice Guidance''), https:// ceq.doe.gov/docs/ceq-regulations-and-guidance/ regs/ej/justice.pdf.

[149] *See* 88 Fed. Reg. at 49986 (proposed 40 C.F.R. § 1508.1(k)(1)).

[150] 88 Fed. Reg at 49,960.

[151] *Id., id.* at 49986 (proposed 40 C.F.R. § 1508.1(k)(1)).

[152] 88 Fed. Reg. at 49,961, 49,987 (§ 1508.1(m)). We caution, however, that many climate change-related effects that now seem extraordinary may become a "new normal," as climate change progresses.

[153] *Compare* 88 Fed Reg. at 49,987 (proposed 40 C.F.R. § 1508.1(m)), *with id.* at 49,988 (§ 1508.1(g), (kk)).

[154] *Id.* at 49,987 (proposed 40 C.F.R. § 1508.1(m)).

25

AR_0025643

September 29, 2023

and responsibility to trigger NEPA review.[155] The States further support eliminating exclusions from the definition of major Federal action that were not recently codified at 42 U.S.C. § 4336(e)(10). As CEQ notes, whether an action is a major Federal action is a fact-specific inquiry.[156] Given the fact-specific nature of this inquiry, the States are concerned that CEQ's suggestion to potentially set a threshold for the amount or proportion of federal funding necessary for agency action to trigger NEPA[157] would undermine the statute's emphasis that it apply to "the fullest extent possible,"[158] and potentially lead to perverse incentives for projects to take fewer federal funds to avoid NEPA review. The States believe that Congress's recent statutory changes, as clarified by CEQ's draft regulations, are sufficient to provide clarity on the scope of NEPA's application and do not think that a threshold amount is necessary or useful.

## V.    THE PROPOSED PHASE 2 RULE INTEGRATES ANALYSIS OF CLIMATE CHANGE EFFECTS INTO THE REGULATIONS, BUT SHOULD BE STRENGTHENED FOR ENVIRONMENTAL IMPACT STATEMENTS AND OTHER NEPA REVIEWS

The Proposed Phase 2 Rule requests comment on whether to codify any or all of CEQ's 2023 GHG Guidance ,[159] and if so, whether provisions of Part 1502 or other regulations should be amended.[160] The 2023 GHG Guidance recommends major areas for consideration of climate change effects in NEPA reviews, including that agencies: (1) quantify the projected lifetime emissions of GHGs from proposed actions and alternatives; (2) provide additional context for those emissions; (3) use best available information; (4) apply a "rule of reason" in determining how to consider effects; and (5) incorporate environmental justice considerations into analysis of climate-related effects.[161] The States support incorporating into the final rule many of the principles, definitions and provisions from or suggested by the 2023 GHG Guidance, integrating climate change and associated resiliency considerations into all NEPA reviews where applicable.

However, the States also expect the nature of and responses to the climate crisis will continue to evolve. We do not recommend full codification of the 2023 GHG Guidance, particularly specific technical or analytic techniques,[162] or concepts discussed in the guidance that need elaboration.[163] The Proposed Phase 2 Rule encourages innovation and use of the best

---

[155] *See id.* at 49,962 (discussing proposed 40 C.F.R. § 1508.1(u)); *see also* 42 U.S.C. § 4336(e)(10)(defining major Federal action).

[156] 88 Fed. Reg. 49,962.

[157] *See id.* at 49,987 (proposed 40 C.F.R. § 1508.1(u)(2)(i)(A)).

[158] 42 U.S.C. § 4332.

[159] 88 Fed. Reg. at 1,196.

[160] 88 Fed. Reg. at 49,945.

[161] GHG Comment Letter, *supra* note 28, at 23.

[162] For example, the 2023 GHG Guidance refers to a number of quantification and assessment tools available on CEQ's website, 88 Fed. Reg. at 1201 n.56. This and other similar provisions that will evolve and improve over time are better suited to a guidance document, not regulations.

[163] *See* GHG Comment Letter, *supra* note 28, at 153.

AR_0025644

September 29, 2023

and most current information for NEPA reviews.[164]  The 2023 GHG Guidance should continue to evolve while the regulations remain more stable. For that reason, revisions of the guidance that need additional explanation and examples should not be codified into the regulations.

This comment letter already discusses above several areas where the States support consideration of climate change issues in the Proposed Phase 2 Rule. In the following section, we discuss additional provisions the States support in the Proposed Phase 2 Rule and areas to improve the consideration of climate change effects in EISs and other NEPA reviews.

## A.    The States Recommend Strengthening the Consideration of Climate Effects and Communication of Those Effects and Alternatives to Affected Stakeholders

The Proposed Phase 2 Rule states CEQ's intention to return to the long-standing policy of the NEPA regulations being not just a "check-the-box exercise," but also "action-forcing."[165] Therefore, Part 1502, which governs EISs, should be strengthened with principles and requirements from the 2023 GHG Guidance as discussed in greater detail below to encourage more environmentally protective decisions.

### 1.    Strengthening accessibility of GHG emissions and climate change effects analyses

The States' 2023 GHG Comment Letter proposed several accessibility provisions to enhance public participation in review of proposed actions with a climate change-related component, and further recommended that CEQ consider their incorporation into the regulations.[166] The recommendations included holding early and frequent public meetings, translating key analyses into languages spoken in the affected community, and providing affected communities with information on technical issues in plain language. Proposed § 1500.4 emphasizes providing analytical and concise documents, including by use of plain language.[167] This section should be strengthened, however, by addition of specific requirements concerning technical or climate change-related analyses, encouraging plain language explanation of these analyses and by requiring translation into relevant languages. State and local governments may have resources to facilitate compliance with this type of requirement and other measures to promote full stakeholder and public participation.

### 2.    Strengthening analysis of cumulative effects on communities with environmental justice concerns

Proposed § 1502.16(a)(14) requires that EIS review discuss the potential for disproportionate and adverse human health and environmental effects on communities with environmental justice concerns.[168] The States strongly support this provision, which echoes recognition in the 2023 GHG Guidance that climate change will have disproportionate adverse

---

[164] 88 Fed. Reg. at 49,950, 51, and 57 (proposed 40 C.F.R. §§ 1502.21, 23 and 1506.12).

[165] 88 Fed. Reg. at 49,945 (discussing proposed 40 C.F.R. § 1502.1).

[166] GHG Guidance Letter, *supra* note 28, at 33.

[167] 88 Fed. Reg. 49,967-68 (proposed 40 C.F.R. § 1500.4(c)).

[168] 88 Fed. Reg. at 49,978.

AR_0025645

September 29, 2023

impacts in communities of color, low-income communities, and Tribal Nations and Indigenous communities.[169] However, we recommend CEQ's final rule expressly require that this environmental justice analysis include assessment of cumulative effects on communities, particularly in the context of climate change. NEPA requires agencies to consider the cumulative impacts of GHG emissions on climate change.[170] The 2023 GHG Guidance recognized that climate change "is inherently cumulative in nature," and these cumulative climate impacts frequently cause disproportionate impact on overburdened communities.[171] We therefore recommend that the discussion of environmental consequences include assessment of the ways affected communities are already overburdened with adverse environmental, socio-economic, and public health impacts, including the polluting effects of GHGs, such as air toxins and increased particulate matter. This analysis of cumulative impacts from co-pollutants should account for future projected climate conditions, including extreme heat and other changes such as sea level rise and flooding, and discuss how the increased levels of these emissions would affect overburdened communities in those contexts. To assess the full impact of a proposed action on a community, an agency must consider the existing levels of pollution and the cumulative impacts in the community of adding another pollution source.

Accordingly, CEQ should strengthen the final rule by instructing agencies to conduct analysis in a manner that ensures that federal NEPA reviews identify and disclose the full scope of potential impacts to communities, particularly already overburdened communities. The regulations could refer agencies to consideration of appropriate guidance and screening tools.[172]

---

[169] 88 Fed. Reg. at 1,197.

[170] *See Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin.*, 538 F.3d 1172, 1217 (9th Cir. 2008) ("The impact of greenhouse gas emissions on climate change is precisely the kind of cumulative impacts analysis that NEPA requires agencies to conduct."); *see also id.* ("The fact that climate change is largely a global phenomenon that includes actions that are outside of [the agency's] control ... does not release the agency from the duty of assessing the effects of its actions on global warming within the context of other actions that also affect global warming.") (cleaned up); *see also* Exec. Order 14,008, 86 Fed. Reg. 7,619 (Jan. 27, 2021) (directing federal agencies to "secure environmental justice and spur economic opportunity for disadvantaged communities that have been historically marginalized and overburdened by pollution and underinvestment"); Exec. Order 13,985, 86 Fed. Reg. 7,009 (Jan. 25, 2021) (directing all federal agencies to "work to redress inequities in their policies and programs that serve as barriers to equal opportunity"); Exec. Order 13,990, 86 Fed. Reg. 7,037 (Jan. 25, 2021) (directing all executive departments and agencies to address any actions that conflict with goal of prioritizing environmental justice, among other national objectives); Exec. Order 13,563, 76 Fed. Reg. 3,821 (Jan. 21, 2011) (directing agencies to select regulatory approaches that maximize net benefits including "distributive impacts[] and equity"); Exec. Order 12,898, 59 Fed. Reg. 7,629 (Feb. 16, 1994) (directing each federal agency to "make achieving environmental justice part of its mission by identifying and addressing, as appropriate, disproportionately high and adverse human health or environmental effects of its programs, policies, and activities on minority populations and low-income populations"); Exec. Order 12,866, 51 Fed. Reg. 51,735 (Oct. 4, 1993) (ordering agencies to consider "distributive impacts[] and equity" in designing regulations).

[171] 88 Fed Reg. at 1,206.

[172] *See, e.g.*, U.S. EPA, EJScreen: Environmental Justice Screening and Mapping Tool (last updated Sept. 9, 2023), *available at* https://www.epa.gov/ejscreen; Cal. Office of Environmental Health Hazard Assessment, CalEnviroScreen 4.0 (last updated May 1, 2023), *available at* https://oehha.ca.gov/calenviroscreen/report/calenviroscreen-40.

AR_0025646

September 29, 2023

## VI.    CONCLUSION

As stated above, the undersigned States largely support CEQ's Proposed Phase 2 Rule and urge CEQ to include more protective language to ensure NEPA's implementing regulations fully implement NEPA's statutory mandate.


        Sincerely,

FOR THE STATE OF WASHINGTON

ROBERT W. FERGUSON
Attorney General

By: /s/  Elizabeth Harris_____
ELIZABETH M. HARRIS
AURORA JANKE
JONATHAN MUNRO-HERNANDEZ
Assistant Attorneys General
Environmental Protection Division
800 5th Ave., Suite 2000, TB-14
Seattle, WA 98104-3188
(206) 233-3391
elizabeth.harris@atg.wa.gov
aurora.janke@atg.wa.gov
jonathan.munro-hernandez@atg.wa.gov

AR_0025647

September 29, 2023

FOR THE STATE OF CALIFORNIA

ROB BONTA
Attorney General

By: /s/ Sarah E. Morrison
SARAH E. MORRISON
Supervising Deputy Attorney General
THOMAS SCHUMANN
YUTING YVONNE CHI
Deputy Attorneys General
California Department of Justice
300 South Spring Street, Suite 1702
Los Angeles, CA 90013
(213) 269-6328
Sarah.Morrison@doj.ca.gov
Thomas.Schumann@doj.ca.gov
Yuting.Chi@doj.ca.gov

FOR THE STATE OF NEW YORK
AND THE NEW YORK STATE
DEPARTMENT OF ENVIRONMENTAL
CONSERVATION

LETITIA JAMES
Attorney General

By: /s/Claiborne E. Walthall
CLAIBORNE E. WALTHALL
Assistant Attorney General
MICHAEL J. MYERS
Senior Counsel
Environmental Protection Bureau
Office of the Attorney General
State Capitol
Albany, NY 12224
(518) 776-2380
claiborne.walthall@ag.ny.gov

30

AR_0025648

September 29, 2023

FOR THE STATE OF COLORADO

PHILIP J. WEISER
Attorney General, State of Colorado

By: /s/  Scott Steinbrecher
SCOTT STEINBRECHER
Colorado Department of Law
1300 Broadway, 10th Floor
Denver, CO 80203
(805) 975-2932
Scott.Steinbrecher@coag.gov


FOR THE STATE OF DISTRICT OF COLUMBIA

BRIAN L. SCHWALB
Attorney General for the District of Columbia

By: /s/ Wesley Rosenfeld
WESLEY ROSENFELD
Assistant Attorney General
Office of the Attorney General
for the District of Columbia
400 6th St. NW
Washington, D.C. 20001
(202) 368-2569
Email: wesley.rosenfeld1@dc.gov


FOR THE STATE OF CONNECTICUT

WILLIAM TONG
Attorney General for the State of Connecticut

By:  /s/ Robert Snook_____
ROBERT SNOOK
Assistant Attorney General
Office of the Attorney General
165 Capitol Avenue
Hartford, Connecticut 06106
(860) 808-5250
robert.snook@ct.gov

31

AR_0025649

September 29, 2023

FOR THE STATE OF DELAWARE

KATHLEEN JENNINGS
Attorney General

By: */s/ Kayli H. Spialter*
KAYLI H. SPIALTER
Deputy Attorney General
Delaware Department of Justice
820 N. French Street
Wilmington, DE 19801
(302) 577-8600


FOR THE OFFICE OF THE COUNTY ATTORNEY
HARRIS COUNTY, TEXAS

CHRISTIAN D. MENEFEE
Harris County Attorney

By: /s/ Sarah Jane Utley
SARAH JANE UTLEY
Environment Division Director
1019 Congress, 15th Floor
Houston, Texas 77002
(713) 274-5124
Sarah.Utley@cao.hctx.net


FOR THE STATE OF ILLINOIS

KWAME RAOUL
Attorney General of Illinois

By: /s/ Jason E. James
JASON E. JAMES
Assistant Attorney General
MATTHEW J. DUNN
Chief, Environmental Enforcement/
Asbestos Litigation Division
69 W. Washington St., 18th Floor
Chicago, IL 60602
(312) 814-0660
jason.james@ilag.gov

32

AR_0025650

September 29, 2023

FOR THE STATE OF MAINE

AARON M. FREY
Attorney General

By: _/s/ Margaret A. Bensinger_____
MARGARET A. BENSINGER
Assistant Attorney General
Office of the Attorney General
6 State House Station
Augusta, ME  04333-0006
207-626-8800
peggy.bensinger@maine.gov


FOR THE STATE OF MARYLAND

ANTHONY G. BROWN
Attorney General

By:/s/ Steven J. Goldstein_____
STEVEN J. GOLDSTEIN
Special Assistant Attorney General
Office of the Attorney General
200 Saint Paul Place, 20th Floor
Baltimore, MD 21202
(410) 576-6414
sgoldstein@oag.state.md.us

33

September 29, 2023

FOR THE COMMONWEALTH OF
MASSACHUSETTS

ANDREA JOY CAMPBELL
ATTORNEY GENERAL

By: /s/ Matthew Ireland
MATTHEW IRELAND
Assistant Attorney General
Environmental Protection Division
TURNER H. SMITH,
Assistant Attorney General and Deputy Chief
Energy and Environment Bureau
Office of the Attorney General
One Ashburton Place, 18th Floor
Boston, MA 02108-1598
(617) 727-2200
matthew.ireland@mass.gov

FOR THE STATE OF MINNESOTA

KEITH ELLISON
Attorney General of Minnesota

By: /s/ Peter N. Surdo
PETER N. SURDO
Special Assistant Attorney General
Minnesota Attorney General's Office
445 Minnesota Street
Town Square Tower Suite 1400
Saint Paul, Minnesota 55101
651.757.1061
Peter.Surdo@ag.state.mn.us

AR_0025652

September 29, 2023

FOR THE STATE OF NEVADA

AARON D. FORD
Attorney General of Nevada

By: /s/ Heidi Parry Stern
HEIDI PARRY STERN
Solicitor General
Daniel P. Nubel
Deputy Attorney General
Office of the Nevada Attorney General
100 N. Carson Street
Carson City, NV 89701
HStern@ag.nv.gov

FOR THE STATE OF NEW JERSEY

MATTHEW J. PLATKIN
Attorney General of New Jersey

By: /s/ Dianna Shinn
DIANNA SHINN
Deputy Attorney General
Environmental Permitting and Counseling
R.J. Hughes Justice Complex
P.O. Box 093
Trenton, NJ 08625
(609) 376-2789

FOR THE STATE OF NORTH CAROLINA

JOSHUA H. STEIN
Attorney General

By: /s/ Asher Spiller
ASHER SPILLER
Assistant Attorney General
North Carolina Department of Justice
114 W. Edenton Street Raleigh, NC 27603
(919) 716-6977
Aspiller@ncdoj.gov

AR_0025653

September 29, 2023

FOR THE STATE OF OREGON

ELLEN F. ROSENBLUM
Attorney General
By: /s/ Paul Garrahan
PAUL GARRAHAN
Attorney-in-Charge
STEVE NOVICK
Special Assistant Attorney General
Natural Resources Section
Oregon Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4593
Paul.garrahan@doj.state.or.us
Steve.Novick@doj.state.or.us


FOR THE COMMONWEALTH OF PENNSYLVANIA

JOSH SHAPIRO
Attorney General of Pennsylvania
MICHELLE A. HENRY
Attorney General

By: /s/ Ann Johnston
ANN JOHNSTON
Assistant Chief Deputy Attorney General
Civil Environmental Enforcement Unit
Office of Attorney General
Strawberry Square, 14th Floor
Harrisburg, Pennsylvania 17120
(717) 497-3678
ajohnston@attorneygeneral.gov

AR_0025654

September 29, 2023


FOR THE STATE OF RHODE ISLAND

PETER F. NERONHA
ATTORNEY GENERAL
By:

By: /s/ Randelle L. Boots
Randelle L. Boots
Special Assistant Attorney General
Rhode Island Office of the Attorney General
150 South Main Street
Providence, RI 02903
(401) 271-4400 ext. 2122
rboots@riag.ri.gov


FOR THE STATE OF VERMONT

CHARITY R. CLARK
Attorney General

By: /s/ Nicholas F. Persampieri
NICHOLAS F. PERSAMPIERI
Assistant Attorney General
Office of the Attorney General
109 State Street
Montpelier, VT 05609
(802) 828-3171
nick.persampieri@vermont.gov


FOR THE STATE OF WISCONSIN

JOSHUA L. KAUL
Attorney General
By: /s/ Tressie K. Kamp
TRESSIE K. Kamp
Assistant Attorney General
Wisconsin Department of Justice
17 W. Main Street
Madison, WI 53707-7857
(608) 266-9595
kamptk@doj.state.wi.us

37

**COMMENTS OF ATTORNEYS GENERAL OF CALIFORNIA, ILLINOIS,
MARYLAND, MASSACHUSETTS, NEW JERSEY, NEW YORK, OREGON,
VERMONT, AND WASHINGTON, AND THE SECRETARY OF THE
COMMONWEALTH OF PENNSYLVANIA DEPARTMENT OF
ENVIRONMENTAL PROTECTION**

August 20, 2018

VIA REGULATIONS.GOV
Edward A. Boling
Associate Director for the National Environmental Policy Act
Council on Environmental Quality
730 Jackson Place NW
Washington, DC 20503

Re:    Advance Notice of Proposed Rulemaking – Update to the Regulations
       for Implementing the Procedural Provisions of the National
       Environmental Policy Act, 83 Fed. Reg. 28,591 (June 20, 2018)
       Docket ID No. CEQ-2018-0001

Dear Associate Director Boling:

The undersigned State Attorneys General and state representatives, specifically, the Attorneys General of California, Illinois, Maryland, Massachusetts, New Jersey, New York, Oregon, Vermont, and Washington, and the Secretary of the Commonwealth of Pennsylvania Department of Environmental Protection ("States") respectfully submit these comments on the Council on Environmental Quality's ("CEQ") advance notice of proposed rulemaking ("Advance Notice") regarding potential revisions to the regulations implementing the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321, *et seq.*[1] The Advance Notice requests comments "on potential revisions to update and clarify" the process and scope of federal NEPA review by including questions on the following subjects: revising definitions of key NEPA terms, revising documents such as Notices of Intent and Categorical Exclusions, revising the timing of agency actions, revising agency and contractor responsibilities for document preparation, revising the public participation process, establishing mandatory time limits for preparation of documents and

---

[1] The advance notice of proposed rulemaking is entitled "Update to the Regulations for Implementing the Procedural Provisions of the National Environmental Policy Act," 83 Fed. Reg. 28,591 (June 20, 2018), Docket ID No. CEQ-2018-0001 [hereinafter Advance Notice].

1

completion of the NEPA process, narrowing the range of alternatives requiring analysis, seeking examples of purportedly "obsolete" regulations, seeking input on use of unspecified "new technologies," and combining NEPA analyses and other decision documents.[2] The breadth of the questions posed by the Advance Notice suggests that CEQ's existing NEPA regulations ("NEPA regulations") need major amendments or even a wholesale regulatory overhaul. The States submit, however, that no demonstrated need for such substantial revisions exists, and we oppose any revisions that would threaten or destroy the fundamental environmental protections in NEPA.

CEQ's NEPA regulations are the cornerstone of the federal government's implementation of NEPA, providing a durable and environmentally protective framework on which the States and the public have relied for 40 years. Through prior administrations, CEQ has shown remarkable restraint, revising its regulations only when absolutely necessary. This restraint should continue because existing data do not demonstrate a need for any significant changes to NEPA regulations implied by this Advance Notice. Instead, as described more fully in Sections II and III, NEPA and the NEPA regulations have successfully accomplished the goal of forcing federal agencies to take a "hard look" at how their actions impact the environment.[3] Therefore, the States urge CEQ to seriously consider whether it is appropriate to amend its NEPA regulations at all. If CEQ does decide to revise the NEPA regulations, it must first collect detailed data on NEPA's implementation and evaluate the effect any revisions would have on future federal actions, public health, and the environment. Any revisions to the regulations, if warranted and supported by substantial evidence, must continue to prioritize protection of public health and the environment, and to ensure public participation in accordance with NEPA, over mere administrative expedience.

## I.    NEPA Is the Foundation of Our Nation's Environmental Laws

Congress enacted NEPA in 1969 with the stated purpose to "declare a national policy which will encourage productive and enjoyable harmony between man and his environment; to promote efforts which will prevent or eliminate damage to the environment and biosphere and stimulate the health and welfare of man; to enrich the understanding of the ecological systems and natural resources important to the Nation; and to establish a Council on Environmental Quality."[4] NEPA was the first

---

[2] *See id.* at 28,591–92.

[3] *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989).

[4] 42 U.S.C. § 4321.

AR_0025658

major environmental law in the United States and is often called the "Magna Carta" of federal environmental laws. The NEPA regulations "tell federal agencies what they must do to comply with the procedures and achieve the goals of the Act."[5] Over the past 40 years, the NEPA regulations have guided NEPA's implementation across the nation and have become fundamental to the daily functioning and responsible decision-making of numerous federal and state agencies.

NEPA endorses a broad, deliberative approach, which focuses on public disclosure and requires all federal agencies to ensure that their decision-making takes public health and the environment into account. Nearly every major federal action, from the approval of significant energy and infrastructure projects to key decisions concerning the management of federal public lands, requires compliance with NEPA. Unlike many other subject-specific federal statutes such as the Clean Air Act,[6] NEPA has a uniquely broad scope requiring consideration of all potential environmental and social impacts of a federal action. At the heart of NEPA—and embodied in the NEPA regulations—are the principles that federal agencies must complete their environmental analysis of proposed projects and alternatives before they act, that the analysis must be accurate and rigorous, that the analysis should enable public and inter-agency participation,[7] and that the analysis should influence the decisions federal agencies ultimately make.[8] Although NEPA does not require a particular outcome, it compels agencies to think carefully and comprehensively about the environment before acting, and emphasizes the importance of fully assessing environmental impacts and alternative approaches through public participation and inter-agency consultation. NEPA requires agencies to consult with other agencies that have expertise on a particular resource impacted by a project, developing more robust alternatives and reducing delay in preparation of documents.[9] These principles must continue to underlie any potential changes to the NEPA regulations.

---

[5] 40 C.F.R. § 1500.1(a).

[6] 42 U.S.C. §§ 7401, *et seq.*

[7] 42 U.S.C. § 4332(2)(C).

[8] *See Am. Rivers v. Fed. Energy Regulatory Comm'n*, 895 F.3d 32, 49 (D.C. Cir. 2018) (NEPA ensures that agency decision-making is fully informed regarding environmental impacts); *Sierra Club v. U.S. Army Corps of Eng'rs*, 803 F.3d 31, 37 (D.C. Cir. 2015) (agencies must take a "hard look" at the environmental consequences of their actions before deciding whether and how to proceed).

[9] *See* 42 U.S.C. § 4332(2)(C); 40 C.F.R. §§ 1500.5, 1501.5, 1501.6.

AR_0025659

NEPA explicitly embraces democratic values by making the public important contributors to the environmental review process.[10] As CEQ's guidance states, "[t]wo major purposes of the environmental review process are better informed decisions and citizen involvement, both of which should lead to implementation of NEPA's policies."[11] Public comment in the NEPA process is critically important to, among other things, identify alternatives that improve a proposed action or reduce its environmental impacts, identify shortfalls in the agency's analyses, spot missing issues, and provide additional information that the agency may not have known existed. To the extent Question 6 of the Advance Notice suggests public comment can be more "efficient," CEQ should reject changes that weaken or shorten the public's opportunity for participation. Because of NEPA, the public has a legal right and a voice in the federal planning process,[12] and public involvement is beneficial to federal decision-making.[13] As CEQ itself has stated, "[s]ome of the most constructive and beneficial interaction between the public and an agency occurs when citizens identify or develop reasonable alternatives that the agency can evaluate in the EIS."[14]

In sum, the NEPA regulations in their current form embody NEPA's guiding principles, and any revisions to the NEPA regulations must adhere to these principles by ensuring the protection of public health and the environment through well-informed decision-making and robust and meaningful public involvement in the

---

[10] *See, e.g.*, 42 U.S.C. § 4332(2)(C); 40 C.F.R. §§ 1503.1(a)(4), 1506.6.

[11] CEQ, Exec. Office of the President, A Citizen's Guide to the NEPA: Having Your Voice Heard, at 2 (Dec. 2007) [hereinafter Citizen's Guide to the NEPA], *available at* https://ceq.doe.gov/docs/get-involved/Citizens_Guide_Dec07.pdf.

[12] 42 U.S.C. § 4332(2)(C); 40 C.F.R. §§ 1503.1(a)(4), 1506.6.

[13] *See* Letter from Russell E. Train, *et al.* to The Honorable Cathy McMorris, at 2 (Sept. 19, 2005) (former Chairs and General Counsels of CEQ stating that "the public plays an indispensable role in the NEPA process") [hereinafter Train Letter] (attached as Exhibit A); *see also* Envtl. Law Inst., NEPA Success Stories: Celebrating 40 Years of Transparency and Open Government, at 6 (Aug. 2010) [hereinafter NEPA Success Stories], *available at* https://ceq.doe.gov/docs/get-involved/NEPA_Success_Stories.pdf; CEQ, Examples of Benefits from the NEPA Process for ARRA 2–3 [American Recovery and Reinvestment Act] Funded Activities (May 2011) [hereinafter Examples of NEPA Benefits], *available at* https://ceq.doe.gov/docs/get-involved/ARRA_NEPA_Benefits_List_May122100.pdf; Citizen's Guide to the NEPA, *supra* note 11, at 24 ("Through NEPA, citizens were able to educate and assist the decision-makers in developing their alternatives.").

[14] Citizen's Guide to the NEPA, *supra* note 11, at 14.

4

NEPA process. Any revisions must continue to require that Federal agencies "use all practicable means" to fulfill the purpose of NEPA embodied in the statute.[15]

## II.    The States Have Unique Interests in Ensuring That the NEPA Regulations Demand Careful, Timely Review of Federal Actions.

The NEPA process affects the States' interests in several key ways, including their interests in protecting their residents and environmental resources by ensuring public participation and robust, informed decision-making processes for federal projects.

### A.    The States have an interest in ensuring that federal decisions do not harm their residents, property, or natural resources.

The States are injured in their *parens patriae* capacity when their residents suffer from the effects of environmental pollution or degradation, including cumulative impacts in environmental justice communities.[16] The States also have a quasi-sovereign interest in preventing harm to the health of their natural resources and ecosystems.[17] As federal courts have recognized, states are entitled to "special solicitude" in seeking redress for environmental harms within their borders, particularly where state property and quasi-sovereign interests are potentially injured.[18] Accordingly, the States have an interest in and are committed to preventing any harm to their residents, ecosystems, and property from revisions to NEPA's regulations that weaken environmental protections or undermine the policies and principles of NEPA—in particular, any revisions that would limit public participation or lead to less robust analysis and review.

The States have a fundamental interest in safeguarding their residents' involvement in the NEPA process for federal projects that could impact their communities. Relatedly, NEPA proceedings and resulting analyses provide an important opportunity for state and municipal agencies to help shape federal decisions that affect state or municipal resources. Public involvement is critical in identifying and evaluating public health and environmental issues of local or statewide concern that may result from federal actions. CEQ's current NEPA

---

[15] 42 U.S.C. § 4331(b)(1)-(6).

[16] *Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592, 607 (1982); *Maryland v. Louisiana*, 451 U.S. 725, 737–38 (1981).

[17] *Massachusetts v. EPA*, 549 U.S. 497, 519–22 (2007).

[18] *Id.* at 520.

AR_0025661

regulations provide that agencies shall "make diligent efforts to involve the public in preparing and implementing their NEPA procedures."[19] As discussed more fully in Point I, above, and Point III, below, any revisions to the NEPA regulations such as those suggested by Question 6 of the Advance Notice that may weaken public participation would violate NEPA and injure the States' interests.

The States are also required to undertake NEPA review in certain cases where federal funding is involved, such as for certain highway and other major infrastructure projects. Significant revisions to the NEPA regulations will impact the States' implementation of and compliance with NEPA, and may require revisions to the States' internal processes and significant investments of time and training resources to accommodate disruptive changes to long-settled processes.

The States also have a significant interest in ensuring that the environmental review process under NEPA is robust and detailed, particularly with respect to major infrastructure projects and projects affecting public lands and waterways that impact public health, environmental health, and the States' economies. For example, the siting of nuclear waste disposal sites receives environmental review only through a NEPA process conducted by the Nuclear Regulatory Commission ("NRC"). In New York, the West Valley nuclear waste disposal site is presently undergoing a NEPA Environmental Impact Statement ("EIS") process that is governed by the significant protections in the current NEPA regulations of both CEQ and the United States Department of Energy. The State of New York, along with numerous agencies and members of the public, is participating in this NEPA process. Any weakening of the procedural protections in NEPA, such as setting arbitrary and unreasonable timelines or page limits for NEPA review documents suggested by Questions 4 and 10 of the Advance Notice, or limiting the scope of issues as suggested by Question 5 or the range of alternatives considered as suggested by Question 13, could result in an environmental review process—in this case and many others—that is not compliant with the statutory requirements of NEPA, and that may injure the States' sovereign and proprietary interests.

Similarly, NEPA review is built into and improves the Federal Energy Regulatory Commission's ("FERC") analysis of whether a proposed interstate natural gas pipeline is in the public convenience and necessity.[20] The Natural Gas Act preserves the States' ability to issue substantive environmental permits under the

---

[19] 40 C.F.R. § 1506.6(a); *see also id.* § 1503.1(a)(4).

[20] *See* 15 U.S.C. § 717f; *see also* Certification of New Interstate Natural Gas Pipeline Facilities, 88 FERC 61,227, 61,745–46, 61,748, 61,749 (1999), *clarified*, 90 FERC 61,128, 61,397–98, *further clarified*, 92 FERC 61,094 (2000).

AR_0025662

Clean Air Act, the Clean Water Act, and the Coastal Zone Management Act for natural gas projects.[21] The States' jurisdiction in each of these substantive environmental regimes should therefore be absolute, subject to compliance with applicable timelines.[22] When reviewing a new pipeline application, FERC conducts its NEPA analysis at the same time as its review of the project's economic merits, reviewing both the environmental and socioeconomic impacts of the project.[23] At the conclusion of the NEPA process, FERC generally issues a Certificate of Public Convenience and Necessity ("CPCN") for the project. The CPCN not only authorizes the pipeline, but also includes numerous environmental conditions based largely on the NEPA analysis.

A robust and transparent NEPA analysis of proposed interstate natural gas pipeline projects is necessary to protect the States' interests because it requires careful consideration of the state and local laws that may apply or are relevant to the project and its impacts. However, the CPCNs that FERC issues—based on its NEPA process—often include language or conditions that may limit the States' substantive environmental jurisdiction. Therefore, the States have an interest in ensuring that the NEPA regulations retain their current strength to govern and shape FERC's NEPA analysis, as state environmental review processes may not be able to compensate in all cases for deficiencies in federal NEPA review in the course of decisions with significant and lasting environmental consequences for the States.

Finally, robust NEPA analyses provide important resources for the States in informing other important state programs and decisions affecting state resources. For example, robust EISs are critical to informing the States' "consistency determinations" under the federal Coastal Zone Management Act, 16 U.S.C. § 1456, by which states assess the impact of federal projects on the land or water uses or natural resources in a state's coastal zone.[24] If regulatory amendments result in fewer or less thorough EISs, the States would have to expend additional resources to comprehensively assess the impact of federal projects on state resources.

---

[21] 15 U.S.C § 717b(d).

[22] *Id.*

[23] *See* Comments of the Attorneys General of Massachusetts, Illinois, Maryland, New Jersey, Rhode Island, Washington, and the District of Columbia on the Federal Energy Regulatory Commission's April 19, 2018 Notice of Inquiry on its Certification of New Interstate Natural Gas Facilities, Docket No. PL18-1-000 (July 25, 2018) (attached as Exhibit B).

[24] *See, e.g.*, 15 C.F.R. § 930.31; 301 Code Mass. Regs. § 20.04.

7

AR_0025663

B. <u>Any Weakening of the NEPA Regulations Would Threaten the States' Abilities to Enforce Their Own State Environmental Laws to Protect Public Health and the Environment.</u>

NEPA also served as a model to the States, many of which enacted their own environmental review laws to protect public health and the environment.[25] Several examples include New York's State Environmental Quality Review Act ("SEQRA"),[26] the Massachusetts Environmental Policy Act ("MEPA"), the California Environmental Quality Act ("CEQA")[27], and Washington's State Environmental Policy Act ("SEPA").[28] These state laws are critically important to environmental review of state agency actions and are designed to complement NEPA review of federal actions within our States. The federal and state schemes most commonly interact when there are both federal agency and state agency components to a proposed action or project, such as a state highway project receiving federal funds. In such cases, a robust NEPA process remains vital to ensuring thorough and efficient review of numerous government actions that affect our residents' health and welfare and the environment. Revisions to the NEPA regulations should not negatively impact the States' abilities to implement and enforce their own environmental laws.

First, the States have an interest in the proper administration of their own environmental review laws, which could be adversely impacted by weakening the substance of NEPA reviews. The States' laws are often administered in conjunction with the NEPA regulations and either coordinate state and federal review, or allow project proponents to rely on NEPA review to satisfy State requirements. For example, in New York, the SEQRA regulations provide that, if a NEPA EIS has been prepared, generally no State EIS is required, provided the federal EIS is sufficient for the state to make its own findings.[29] Weaker federal review, less comprehensive federal EISs, or preparation of fewer EISs under NEPA may require that more EISs be prepared under a state process, likely leading to increased expenditures of State resources.

---

[25] *See* CEQ, States and Local Jurisdictions with NEPA-like Environmental Planning Requirements [hereinafter State and Local Laws], https://ceq.doe.gov/laws-regulations/states.html (last visited August 14, 2018).

[26] N.Y. Envtl. Conserv. L. art. 8; 6 N.Y.C.R.R. Part 617.

[27] Cal. Stats. ch. 1433 (1970), Cal. Pub. Res. Code §§ 21000–21189.57.

[28] RCW 43-21C-010–914; WAC 197-11-010–990.

[29] 6 N.Y.C.R.R. § 617.15(a); N.Y. Envtl. Conserv. L. § 8-0111(1) & (2); *see Hudson R. Sloop Clearwater v. Dep't of Navy*, 836 F.2d 760, 762 (2d Cir. 1988).

AR_0025664

In Massachusetts, if fewer projects qualify as major federal actions requiring an EIS under amended CEQ regulations, as suggested by Question 7, more project proponents, including state agencies receiving federal funds, will have to draft Environmental Impact Reports ("EIRs") under MEPA *ab initio* rather than substituting EISs for EIRs or building on EISs during coordinated review procedures.[30] Where Massachusetts projects still require both EISs and EIRs, if amended regulations relax the scoping as suggested by Question 5 of the Advance Notice, or cumulative effects and alternatives requirements for EISs as suggested by Question 13, EISs will prove a less helpful resource as project proponents prepare EIRs, requiring the expenditure of additional time and resources to comply with the comprehensive, environmentally protective State report requirements.

Likewise, Washington State law allows State agencies to adopt NEPA EISs that are adequate under CEQ's NEPA regulations.[31] However, if CEQ makes regulatory revisions that weaken NEPA and are not consistent with Washington's environmental policy act requirements, then compliance with the federal NEPA process may not be sufficient to satisfy State law. As a result, project proponents may be required to navigate divergent environmental review processes, potentially making the processes longer, more complicated, and more prone to legal challenges.

In California, CEQA[32] is designed to complement NEPA by eliciting public participation in protecting California's environment. Even though CEQA and NEPA do not have identical requirements (and, in certain aspects CEQA has more rigorous procedural requirements than NEPA), where a project requires both federal and State approvals (an EIS and an EIR), joint review under both statutes avoids redundancy, improves efficiency and interagency cooperation, and is easier for applicants and citizens to navigate.[33] Sharing documents and reducing paperwork results in efficient outcomes that benefit social welfare, environmental stewardship, and California's economy. If NEPA's regulations are revised in a manner that reduces protections for natural resources and public health, it will become more difficult for California state agencies to utilize NEPA documents by reference in CEQA reviews,

---

[30] *See, e.g.*, Mass. Gen. Laws c. 30, § 62; 310 Code Mass. Regs. § 11.09(c).

[31] WAC 197-11-610(3).

[32] Cal. Stats. ch. 1433 (1970); Cal. Pub. Res. Code §§ 21000–21189.57, 21001, 21100.

[33] *See* Exec. Office of the President & Governor of California's Office of Planning and Research, NEPA and CEQA: Integrating Federal and State Environmental Reviews, at 1 (2014) [hereinafter CEQA-NEPA Integration Guidance].

AR_0025665

precluding joint CEQA-NEPA review.[34] For example, if revised NEPA regulations curtail robust review of alternatives or cumulative impacts as suggested by Question 13 of the Advance Notice, coordinated CEQA-NEPA review of the proposed project would be impossible, resulting in greater inefficiency in projects requiring approvals under both statutes.

In addition, where projects require both federal and state-level environmental review, the NEPA regulations take account of many state partners' environmental review processes through state-specific memoranda designed to aid compliance with both federal and state schemes.[35] These carefully calibrated programs vary by state and represent significant work by CEQ and the States to harmonize these review programs. Any revisions to the CEQ regulations should account for the existing cooperative framework developed with the individual States to ensure compliance with each process—a framework that benefits the public and regulated community by providing an efficient linkage of state and federal requirements and facilitating coordinated compliance with both. CEQ should avoid amending the NEPA regulations in ways that will render such linked compliance more difficult or impossible. Furthermore, CEQ should evaluate the time and resources that will be needed if significant revisions to the CEQ regulations require substantial re-working of these memoranda to ensure continuing compliance with both federal and state programs.

The States have long relied on the NEPA regulations in implementing state environmental review statutes and regulations. For example, New York's SEQRA regulations drew from certain sections of the NEPA regulations in setting regulatory standards, such as when a supplemental EIS is required. New York SEQRA regulations also require review of potential catastrophic impacts from a proposed action[36] through provisions drawn and adapted from the NEPA regulations at 40 C.F.R. § 1502.22. NEPA regulations are also utilized by states courts in interpreting the obligations under equivalent state environmental review statutes. For example, courts in New York rely on NEPA in construing the scope of the SEQRA where appropriate, finding that certain decisions interpreting actions as exempt from NEPA

---

[34] *See* Exec. Order No. 13,807, 82 Fed. Reg. 40,463, 40,466–67 (Aug. 24, 2017); The White House, Legislative Outline for Rebuilding Infrastructure in America, 35–37, 48–50 (Feb. 28, 2018), *available at* https://www.whitehouse.gov/wp-content/uploads/2018/02/INFRASTRUCTURE-211.pdf.

[35] *See* State and Local Laws, *supra* note 25; *see also* 40 C.F.R. § 1500.5(h).

[36] 6 N.Y.C.R.R. § 617.9(b)(6).

10

review[37] are persuasive authority for determining whether such actions are required to undergo environmental review under the state statute.[38] In California, NEPA cases are considered persuasive authority in CEQA cases.[39] Courts in Washington State also look to NEPA decisions to interpret SEPA.[40] Some state courts have also adopted the federal "hard look" standard required by NEPA under their own States' environmental review statutes. If CEQ revises the definition of key terms, as suggested by the Advance Notice Questions 7, 8, and 9, it may create divergence between state and federal standards, undermine our States' ability to effectively implement our own environmental review laws, and impact the case law interpreting States' well-developed statutory and regulatory regimes. As CEQ considers any possible revisions, it should take that concern into account.

In summary, the States have strong interests in the continued implementation of NEPA regulations that provide for a robust, deliberative, and complete federal environmental review process. CEQ must avoid arbitrarily limiting the scope and timeframe allowed for preparation and consideration of NEPA documents or truncating the public participation process as suggested by the Advance Notice, which would harm the States' interests and violate the principles and provisions of NEPA.

### III.   CEQ Must Conduct a Thorough Review Process to Determine the Need, if Any, for NEPA Regulatory Revisions.

Consistent with NEPA's animating principles and fundamental requirements, any revisions to the NEPA regulations must be inclusive, deliberative, and transparent, and employ a public review process similar to the process CEQ used

---

[37] *See H.O.M.E.S. v. New York State Urban Dev. Corp.*, 69 A.D.2d 222, 231, 418 N.Y.S.2d 827, 832 (4th Dep't 1979).

[38] *See Villani v. Berle*, 91 Misc.2d 603, 608, 398 N.Y.S.2d 796, 801 (Sup. Ct. Suffolk County 1977); *Matter of Marino v. Platt*, 104 Misc.2d 386, 390, 428 N.Y.S.2d 433, 435–36 (Sup. Ct. Onondaga County 1980).

[39] *See, e.g., No Oil, Inc. v. City of Los Angeles*, 13 Cal.3d 68, 86, 529 P.2d 66, 78 (S.Ct. 1974) (California courts use NEPA as persuasive authority in CEQA); *accord Del Mar Terrace Conservancy, Inc. v. City Council of the City of San Diego*, 10 Cal.App.4th 712, 732, 12 Cal.Rptr.2d 785, 797 (1992).

[40] *See, e.g., Eastlake Cmty. Council v. Roanoke Assocs., Inc.*, 82 Wn.2d 475, 488, 513 P.3d 36, 44–45 (1983); *City of Des Moines v. Puget Sound Reg'l Council*, 98 Wn. App. 23, 37, 988 P.2d 27, 37 (1999); *Gebbers v. Okanogan Cty. Pub. Util. Dist. No. 1*, 144 Wn. App. 371, 381 & n.1, 183 P.3d 324, 328 & n.1 (2008) (looking to federal definition of cumulative impacts).

11

when it initially drafted its NEPA regulations,[41] and when it subsequently reviewed the effectiveness of NEPA regulations in 1997.[42] At a minimum, CEQ's review of whether to amend its NEPA regulations should include a detailed analysis of the effectiveness of current regulations and other tools in implementing NEPA, a demonstrated need for any revisions to the regulations to better support the purpose and structure of NEPA, and an analysis of whether changes to the regulations could increase litigation, delay, and confusion in the NEPA process.

A.    CEQ Should Adequately Evaluate the Effectiveness of the NEPA Regulations and Tools to Address Any Concerns about NEPA's Implementation.

As discussed in detail below, the NEPA regulations have successfully safeguarded public health and the environment for the past 40 years. In light of this history, CEQ should first consider whether existing tools available under the current NEPA regulations will address CEQ's apparent concerns about NEPA's implementation. If CEQ nevertheless decides to pursue revisions to its NEPA regulations, then CEQ must adequately demonstrate the need for any such changes.

1. *Current Regulations Have Been Largely Successful in Implementing NEPA.*

Before CEQ makes any changes to its NEPA regulations, CEQ should carefully evaluate the demonstrated effectiveness of its current regulations implementing NEPA, which have provided a consistent regulatory environment for several decades.[43] Under these regulations, federal agencies annually prepare hundreds of environmental impact statements, tens of thousands of environmental assessments, and hundreds of thousands of categorical exclusions.[44]

---

[41] *See* National Environmental Policy Act—Regulations, 43 Fed. Reg. 55,978, 55,980 (Nov. 29, 1978) [hereinafter NEPA—Regulations] (rulemaking process included public hearings; meetings with all federal agencies; meetings with representatives of business, labor, State and local governments, and environmental groups; and detailed consideration of federal studies on the environmental impact statement process).

[42] CEQ, Exec. Office of the President, National Environmental Policy Act: A Study of Its Effectiveness After Twenty-five Years, at 5 (Jan. 1997) [hereinafter NEPA Effectiveness Study] (CEQ solicited input from NEPA's original framers, members of Congress, State and local agencies, drafters of the CEQ regulations, federal agencies, and the public), *available at* https://ceq.doe.gov/docs/ceq-publications/nepa25fn.pdf.

[43] *See* Advance Notice, *supra* note 1, 83 Fed. Reg. at 28,591–92.

[44] *NEPA.gov*, https://ceq.doe.gov/ceq-reports/litigation.html; U.S. Gov't Accountability Office, GAO-14-369, National Environmental Policy Act: Little Information Exists on

AR_0025668

The vast majority of environmental review processes result in "taxpayer dollars and energy saved, resources better protected and the fostering of community agreements."[45] Indeed, when CEQ conducted a 25-year review of NEPA, it concluded "that NEPA is a success—it has made agencies take a hard look at the potential environmental consequences of their actions, and it has brought the public into the agency decision-making process like no other statute."[46] The 2014 U.S. Government Accountability ("GAO") Report on NEPA echoed this sentiment, stating that the NEPA process "ultimately saves time and reduces overall project costs by identifying and avoiding problems that may occur in later stages of project development."[47] In short, as U.S. Forest Service officials have observed, "NEPA leads to better decisions."[48]

In addition, the NEPA environmental review process has yielded significant community involvement and decisions sensitive to local interests. As NEPA itself recognizes, states and local governments are active and important partners in the effective implementation of NEPA in their communities.[49] Recognizing this partnership, the Federal Transit Administration has commended the effectiveness of collaborative NEPA processes across the country including the final EIS for the Federal Way Link Extension and the Mukilteo Multimodal Project in Washington State, the final EIS for the Purple Line and the alternative analysis and draft EIS for the Red Line Corridor Transit Study in Maryland, and the EIS for the Portland-Milwaukie Light Rail Project in Oregon.[50]

---

NEPA Analyses 7 (2014) [hereinafter GAO Report], *available at* https://www.gao.gov/assets/670/662546.pdf.

[45] Examples of NEPA Benefits, *supra* note 13, at 1.

[46] NEPA Effectiveness Study, *supra* note 42, at iii.

[47] GAO Report, *supra* note 44, at 16.

[48] *Id.*; *see also* NEPA Success Stories, *supra* note 13; Examples of NEPA Benefits, *supra* note 13; Citizen's Guide to the NEPA, *supra* note 11, at 24 ("Through NEPA, citizens were able to educate and assist the decision-makers in developing their alternatives.").

[49] 42 U.S.C. § 4331(a).

[50] Fed. Transit Admin., Outstanding Achievement Award for Excellence in Environmental Document Preparation, https://www.transit.dot.gov/regulations-and-guidance/environmental-programs/outstanding-achievement-award-excellence (last visited Aug. 14, 2018).

AR_0025669

The NEPA process benefits the States' residents and natural resources alike. For example, following extensive community involvement and collaboration between multiple state and federal agencies and the two impacted towns, the final joint EIS and state EIR for the Herring River Restoration on Cape Cod in Massachusetts recommended,[51] and the National Park Service adopted,[52] an alternative plan that will restore at least 346 acres of the tidal marsh, protect fish species harmed by current, impeded river conditions, and improve fishing and shell fishing yields, among other significant benefits to the community and the environment.

Contrary to assertions by critics of NEPA, the NEPA process does not foster significant litigation. The vast majority of NEPA reviews of proposed federal actions—over 99 percent by some estimates[53]—do not result in litigation.[54] Where projects are challenged, it is often by plaintiffs seeking to ensure that projects do not move forward without adequate review of environmental impacts. In such circumstances, the courts play a vital role in ensuring that federal agencies adhere to Congress's mandate to take a hard look at environmental consequences before taking

---

[51] *See* Nat'l Park Serv., Town of Wellfleet, Town of Truro, & Herring River Restoration Committee, Herring River Restoration Project Final Environmental Impact Statement and Environmental Impact Report (May 2016), *available at* https://parkplanning.nps.gov/document.cfm?parkID=217&projectID=18573&docum entID=73471.

[52] Nat'l Park Service, Record of Decision for Herring River Restoration Project, Final Environmental Impact Statement and Environmental Impact Report (Sept. 15, 2016), *available at* https://parkplanning.nps.gov/document.cfm?parkID=217&projectID=18573&docum entID=75340.

[53] Geo. U.L. Center, NEPA: Lessons Learned and Next Steps: Hearing Before the Task Force on Updating the National Environmental Policy Act of the H. Comm. on Resources, 109th Cong., Statement of Professor Robert G. Dreher, Nov. 17, 2005 ("[P]laintiffs bring around 100 NEPA lawsuits per year, representing only two-tenths of 1 percent of the 50,000 or so actions that Federal agencies document each year under NEPA.").

[54] *See* GAO Report, *supra* note 44, at 19–20; NEPA.gov, https://ceq.doe.gov/ceq-reports/litigation.html (stating that "the amount of litigation on these NEPA analyses is comparatively small"); The Weaponization of the National Environmental Policy Act and the Implications of Environmental Lawfare: Hearing Before the House Comm. on Natural Res., 115th Cong. 8–11 (2018) (statement of Horst Greczmiel, Former CEQ Associate Director of NEPA Oversight) [hereinafter Greczmiel Statement].

AR_0025670

major actions.[55] The opportunity for judicial review of agency actions is not a shortcoming of NEPA, but a fundamental part of the NEPA process that must be preserved.

### 2.  *Tools Already Exist to Address Any Concerns about the NEPA Process.*

Although NEPA critics and Questions 1, 2, 6, 13, 15, 17 and 19 of the Advance Notice suggest the environmental review process under NEPA is inefficient, the NEPA regulations already provide at least 12 specific strategies to reduce delay in agencies' NEPA reviews.[56] These strategies were designed to *reduce* inefficiencies while producing "better decisions which further the national policy to protect and enhance the quality of the human environment."[57] As a result, existing NEPA regulations—when properly implemented by well-resourced and well-trained federal agencies—already provide the tools to address many of CEQ's apparent efficiency concerns about the NEPA process.[58]

For example, section 1500.4 of CEQ's NEPA regulations identifies more than a dozen different methods for reducing excessive paperwork, such as reducing duplication by allowing for joint preparation with state and local processes and allowing federal agencies to adopt appropriate environmental documents prepared by other agencies.[59] Similarly, section 1500.5 directs agencies to take a dozen enumerated actions to reduce delay, including integrating the NEPA process into early stages of project planning.[60] Likewise, in certain appropriate circumstances, programmatic reviews, as referenced in Question 12, have been used as an effective tool when considering an action that will take place at multiple sites, and may provide a model for considering impacts of multiple similar projects.[61] Importantly, the NEPA

---

[55] *See* Greczmiel Statement, *supra* note 54, at 8–10.

[56] *See* 40 C.F.R. § 1500.5.

[57] *See* NEPA—Regulations, *supra* note 41, 43 Fed. Reg. at 55,978.

[58] *See generally*, CEQ, Memorandum for Heads of Federal Departments and Agencies on Improving the Process for Preparing Efficient and Timely Environmental Reviews under NEPA (Mar. 6, 2012), *available at* https://ceq.doe.gov/docs/ceq-regulations-and-guidance/Improving_NEPA_Efficiencies_06Mar2012.pdf.

[59] *See, e.g.*, 40 C.F.R. § 1500.4(n); *see also id.* §§ 1501.5 (discussing lead agencies), 1501.6 (discussing cooperating agencies); *see* NEPA Effectiveness Study, *supra* note 42, at 21.

[60] 40 C.F.R. § 1500.5.

[61] *See* CEQ, Effective Use of Programmatic NEPA Reviews 6-7 (Dec. 18, 2014), *available* *at* https://ceq.doe.gov/docs/ceq-regulations-and-

15

regulations provide agencies the flexibility to adjust the NEPA process to meet the needs of the agency and the project under review, which can vary widely depending on the size and nature of the agency and the project.[62]

As CEQ and others have identified, the effectiveness and efficiency of the NEPA process significantly increases when agencies:

    (a) integrate NEPA into their internal planning process as early as possible;[63]

    (b) ensure that the NEPA process is well-funded and led by experienced and well-trained staff and engaged senior management;[64]

    (c) engage in robust and inclusive public outreach;[65]

    (d) rely on accurate scientific data and rigorous environmental analysis;[66]

    (e) utilize NEPA regulations to facilitate interagency coordination to resolve or avoid conflicts, reduce duplication of effort, and improve the environmental permitting process;[67]

    (f) draft NEPA documents in plain, concise, and honest language;[68] and

---

guidance/Effective_Use_of_Programmatic_NEPA_Reviews_Final_Dec2014_searcha ble.pdf

[62] *See, e.g., id.* §§ 1501.7(b) (permitting lead agencies to set page and time limits), 1501.8(b) (providing factors to consider in setting time limits), 1501.8 (rejecting "prescribed universal time limits for the entire NEPA process" as "too inflexible").

[63] NEPA Effectiveness Study, *supra* note 42, at 11.

[64] *See id.*; Dep't of Energy, NEPA Lessons Learned Quarterly Report, September 2017, at 7 (Sept. 2017) (attributing shorter NEPA completion times to, among other things, agency senior management attention, the availability of data, and engagement of experienced staff), *available at* https://www.energy.gov/sites/prod/files/2017/09/f37/LLQR%20Sep_2017.pdf.

[65] NEPA Effectiveness Study, *supra* note 42, at 18; Train Letter, supra note 13, at 2, ("Meaningful efforts to improve [NEPA's] implementation should address the critical needs for better guidance and additional training for agency personnel and enhanced resources for NEPA implementation by federal agencies.").

[66] NEPA Effectiveness Study, *supra* note 42, at 27–29.

[67] *Id.* at 21.

[68] *Id.* at 29.

AR_0025672

(g) effectively partner with State and local governments.[69]

As these measures demonstrate, there is insufficient evidence that any revisions to the NEPA regulations for the purpose of increasing the efficiency of the environmental review process are needed. Instead, the existing efficiency measures should be implemented under current regulations by well-trained and well-funded federal agencies committed to NEPA's purpose and function.

Further, any concerns about the efficiency of the NEPA process for major infrastructure projects already have been addressed by Title 41 of the Fixing America's Surface Transportation Act of 2015 ("FAST Act").[70] Title 41 sought to streamline the environmental review of major infrastructure projects by, among other things, emphasizing the importance of early and frequent coordination between cooperating and participating agencies, creating a federal infrastructure-permitting dashboard to allow agencies and the public to track the progress of Title 41 covered projects, enhancing early stakeholder engagement, and requiring the newly created Federal Permitting Improvement Steering Council to publish an annual report of best practices.[71] Given that Title 41 targeted many of the concerns about the NEPA process raised by the current Administration and suggested by the Advance Notice,[72] CEQ should allow Title 41 to work in practice to better evaluate whether any changes to CEQ's NEPA regulations are warranted.

*3. CEQ Must Demonstrate the Need for and Purpose of Any Regulatory Revisions.*

To ensure informed decision-making consistent with NEPA's structure and purpose and the Administrative Procedure Act,[73] any revisions to the NEPA regulations must reflect reasoned decision-making based on accurate and reliable data demonstrating the need for the change and its consistency with the statute.[74]

---

[69] *See* Federal Permitting Improvement Steering Council, Recommended Best Practices for Environmental Reviews and Authorizations for Infrastructure Projects for Fiscal Year 2018, 8–9 (Dec. 2017), *available at* https://www.permits.performance.gov/sites/permits.performance.gov/files/docs/documentation/40856/fast-41fy-2018best-practices-report.pdf.

[70] Pub. L. No. 114-94 (2015).

[71] *See* 42 U.S.C. §§ 4370m-1–4370m-12.

[72] *See e.g.*, Exec. Order No. 13,807 (Aug. 15, 2017).

[73] 5 U.S.C. §§ 551–559.

[74] *See FCC v. Fox Television* Stations, 556 U.S. 502, 514–15 (2009) (changes in agency position must be based on reasoned explanation supported by the record and permissible under the statute); *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm*

AR_0025673

Insufficient data presently exist to support revisions to the NEPA regulations. According to the 2014 GAO Report, most federal agencies do not routinely track important information about their NEPA processes, including the number of environmental assessments and categorical exclusions conducted and the time frames for completing these reviews.[75] In addition, few agencies track the cost of completing NEPA analyses, leading to little quantitative data on the costs and benefits of the NEPA process.[76] The data that do exist, however, demonstrate that consistent with NEPA's intent and purpose, the present NEPA regulations encourage public participation, lead to projects that are "financially and environmentally improved," and seldom involve litigation.[77]

Given the lack of data demonstrating a need to revise NEPA's regulations—including the absence of meaningful discussion in the Advance Notice demonstrating a need to revise CEQ's NEPA regulations[78]—CEQ must engage in a careful and detailed review before proposing any regulatory revisions. The vague questions in the Advance Notice do not provide an adequate basis for stakeholder input. To ensure CEQ engages in an informed review process, the States reiterate that CEQ should hold several public hearings on the Advance Notice before proposing any regulatory revisions.[79] In addition, consistent with its past practices, CEQ should analyze existing studies and reports on the effectiveness of the current NEPA regulations and solicit input from federal agencies, State and local governments, the public, academics, scientists, and other stakeholders to determine whether changes are appropriate.[80] If, after this review, CEQ decides to revise the NEPA regulations, then

---

*Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) ("[T]he agency must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." (quotation and citation omitted)).

[75] GAO Report, *supra* note 44; *see also* NEPA Effectiveness Study, *supra* note 42, at 6, 13; *see also id.* at 13 (discussing the lack of information of the time frame for completing EAs and CEs).

[76] GAO Report, *supra* note 44, at 10.

[77] *Id.* at 15–18.

[78] *See* Advance Notice, *supra* note 1, 83 Fed. Reg. at 28,591–92.

[79] *See* Letter from Attorneys General of Washington, Maryland, Massachusetts, New Jersey, New York, and Oregon to Mary B. Neumayr re: Advance Notice of Proposed Rulemaking, Docket ID No. CEQ-2018-0001-0200, at 2 (July 3, 2018) (requesting several public hearings on the Advance Notice).

[80] *See* NEPA—Regulations, *supra* note 41, 43 Fed. Reg. at 55,980 (describing the process for drafting the current NEPA regulations as including public hearings,

AR_0025674

CEQ should again hold regional public hearings and provide sufficient time for stakeholders to scrutinize and comment on the proposed revisions as required by the Administrative Procedure Act.

In particular, CEQ should solicit information on the extent and causes of any delay in the NEPA process. The questions in the Advance Notice assume delay is caused by NEPA but reference no data to support that assumption. As noted above, existing data suggest that concerns over the extent of delay may be overblown given the number of NEPA analyses completed by federal agencies each year. Although NEPA critics assert that NEPA review results in delay, as previously noted, only a small percentage of NEPA actions result in litigation and potential delay.[81] Focusing on litigation as the sole or primary source of project delay also ignores a number of other factors that may cause delay and may be addressed without revisions to CEQ's NEPA regulations, including lack of funding to sufficiently implement the NEPA process, inadequate staff time and training to implement or supervise the NEPA process, local controversy over or opposition to a project that would exist regardless of NEPA, delays in non-NEPA permitting or approval processes, project sponsors' changes to project design that require substantial revisions, and uncertainties related to project funding.[82] Accordingly, before proposing any regulatory changes, CEQ should conduct a detailed review to first determine if delay is occurring, the extent of the delay, and the actual causes of delay, and then target those causes through training, guidance, or, if necessary, carefully tailored regulatory changes.

B. <u>Unnecessary Revisions to NEPA's Implementing Regulations Likely Will Increase Litigation, Delay, and Costs.</u>

Given the significance of the NEPA regulations to the implementation of NEPA and to the daily function of federal agencies, unnecessary revisions to these regulations likely will increase litigation, delay, and costs, and weaken the effectiveness of NEPA in protecting public health and the environment. As former CEQ leaders have made clear, "[m]easures to exempt certain agencies and programs from NEPA, to restrict or eliminate alternatives analysis, or to limit the public's right

---

meetings with all federal agencies implementing NEPA, meetings with representatives of business, labor, State and local governments, environmental and other interested groups, and the general public, and detailed consideration of existing federal studies on the NEPA process).

[81] *See* NEPA.gov, https://ceq.doe.gov/ceq-reports/litigation.html; GAO Report, *supra* note 44, at 19–20; Greczmiel Statement, *supra* note 54, at 8–11.

[82] *See* GAO Report, *supra* note 44, at 18; Greczmiel Statement, *supra* note 54, at 4–6.

AR_0025675

to participate in the NEPA process threaten NEPA's vital role in promoting responsible government decision-making."[83]

As an initial matter, unnecessary revisions likely will require federal agencies to revise their own NEPA regulations and guidance to ensure compliance with the NEPA regulations.[84] And, as already noted, the States may need to amend their environmental review programs to respond to such changes. These processes would waste taxpayer dollars, delay projects, and create uncertainty for project proponents and the public as agencies reconfigure their own NEPA regulations and procedures to conform to CEQ's regulatory changes.

Changes to CEQ's NEPA regulations are also likely to increase NEPA litigation. One of the current regulations' successes was a reduction in NEPA litigation, but changes to these regulations—particularly if CEQ does not engage in the robust and thoughtful review outlined above—threaten to undo that success.[85] Litigation is particularly likely if CEQ attempts to change the definition of key NEPA terms (such as those identified in Questions 7, 8, and 9 of the Advance Notice), or constrains the ability of agencies to identify a range of mitigation actions to help minimize project impacts on the environment. Further, as NEPA requires, CEQ's current regulations ensure that the adverse environmental effects of federal agency decision-making are fully considered and that any alternatives to the agency action are fully developed. Revising the regulations to limit full consideration of the effects and alternatives of a proposed action would contravene NEPA's mandate that agencies consider alternatives to the proposed action and would also make litigation likely.[86]

Moreover, because public involvement is so critical, CEQ should not revise the NEPA regulations in a manner suggested by Question 6 of the Advance Notice that would curtail public involvement, or by attempting to mandate completion of the environmental analysis on a predetermined timeframe, as suggested by Question 4 of the Advance Notice. For instance, Executive Order 13,807 envisions a two-year time frame for completing agency NEPA analyses. While such a time period may be adequate for some federal actions, others, such as the determination to issue permits

---

[83] Train Letter, *supra* note 13, at 2–3.

[84] *See* 40 C.F.R. § 1507.3.

[85] Bear, Dinah, *NEPA at 19: A Primer on an "Old" Law with Solutions to New Problems*, 19 Envtl. L. Rep. 10,060, 10,062 (1989) (noting that annual surveys showed a low of 71 NEPA cases in 1986 compared with 189 cases in 1974).

[86] 42 U.S.C. § 4332(2)(C).

AR_0025676

for complex proposed projects, require significant agency time and expertise to consider the materials submitted. Arbitrarily restricting the NEPA timeframe does not reduce the complexity of projects and the need for thorough evaluation of important considerations such as the public need and environmental impacts of proposed natural gas pipelines or the site of a new nuclear electricity facility. Instead, the shortened timeframes tend to reduce the public comment period and truncate the agency's consideration of public comments, which, as discussed above, often propose alternatives or mitigation measures that lead to better agency decisions and better outcomes for public health and the environment. Arbitrary limits on the length or format of NEPA documents also reduce transparency, diminish the effectiveness of the public review process, and, again, ultimately lead to litigation.

In addition, changes to increase the use of categorical exclusion provisions as suggested by Question 9 may lead to the inappropriate overuse of categorical exclusions that would undermine the principles of NEPA and likely increase litigation. As CEQ has previously explained, "[i]f used inappropriately, categorical exclusions can thwart NEPA's environmental stewardship goals, by compromising the quality and transparency of agency environmental review and decisionmaking, as well as compromising the opportunity for meaningful public participation and review."[87] CEQ must ensure that whether a project has the potential to significantly affect the environment remains the touchstone of the NEPA process. CEQ should not adopt new regulations that will undermine this basic principle of NEPA.

## IV. CEQ Should Limit Any Changes to Its Implementing Regulations to Codifying Its Environmentally Protective Guidance on Climate Change and Environmental Justice.

If CEQ decides to revise the NEPA regulations, the States urge CEQ to limit any regulatory revisions to codifying CEQ's previously issued guidance on climate change and environmental justice. Although not specifically referenced in the Advance Notice, such revisions would "provide greater clarity to ensure NEPA documents better focus on significant issues that are relevant and useful to decisionmakers and the public," as requested by Question 5.[88] By codifying established guidance regarding both climate change and environmental justice into

---

[87] *See Sierra Club v. Bosworth*, 510 F.3d 1016, 1027 (9th Cir. 2007) (to use categorical exclusions federal agencies "must document that the action to be undertaken is insignificant because the threshold question in a NEPA case is whether a proposed project will significantly affect the environment, thereby triggering the requirement for an EIS" quotation and citation omitted)); 42 U.S.C. § 4332(2)(C).

[88] Advance Notice, *supra* note 1, 83 Fed. Reg. at 28,591.

AR_0025677

the regulations, CEQ would ensure that these critical environmental impacts receive appropriate focus in NEPA analyses.

Climate change presents an enormous environmental problem that all federal agencies need to consider.[89] In 2010, CEQ issued draft guidance on incorporating climate change into NEPA analyses. It revised this guidance in 2014, and on August 5, 2016, CEQ finalized its NEPA Guidance on Climate Change ("Climate Change Guidance").[90] The Climate Change Guidance makes recommendations to federal agencies performing NEPA review of climate change related impacts.[91] These recommendations encourage agencies to consider both the "potential effects of a proposed action on climate change as indicated by assessing [greenhouse gas] emissions," and the "effects of climate change on a proposed action and its environmental impacts," and use these analyses to guide consideration of reasonable alternatives and potential mitigation.[92] Developed in part in response to requests from multiple federal agencies on how best to address climate change impacts, this guidance ensures that agencies adequately consider the effects of climate change in evaluating proposed projects. Indeed, because of the importance of addressing climate change, several of the States have codified similar requirements in their own environmental review processes.[93] However, on April 5, 2017, in response to President Trump's March 28, 2017 Presidential Executive Order on Promoting Energy Independence and Economic Growth, CEQ withdrew the Climate Change Guidance.[94]

We urge CEQ not only to readopt the Climate Change Guidance, but also to incorporate its substantive recommendations into any revised regulations CEQ may propose. In particular, CEQ should incorporate these recommendations into 40 C.F.R. § 1502.16, which directs agencies in evaluating the environmental consequences of proposed actions and alternatives. Courts give substantial deference to the NEPA

---

[89] *Massachusetts*, 549 U.S. at 497.

[90] CEQ, Final Guidance for Federal Departments and Agencies on Consideration of Greenhouse Gas Emissions and the Effects of Climate Change in National Environmental Policy Act Reviews, 81 Fed. Reg. 51,866 (Aug. 5, 2016) [hereinafter Climate Change Guidance].

[91] *Id.* at 4.

[92] *Id.*

[93] *See, e.g.,* Mass Gen. Laws c. 30, § 61; 310 Code Mass. Regs. § 11.12(5).

[94] Exec. Order No. 13783, 82 Fed. Reg. 16,576 (Apr. 5, 2017).

AR_0025678

regulations.[95] By codifying the Climate Change Guidance into its regulations, CEQ will ensure that agencies properly evaluate the climate impacts associated with projects. Codification could also improve interagency coordination, as each agency would follow a similar approach to addressing climate change in NEPA analyses, as opposed to the varying analyses presently occurring.[96]

CEQ also has issued guidance on how federal agencies should consider environmental justice under NEPA ("EJ Guidance").[97] CEQ published the EJ Guidance in 1997 in response to Executive Order 12,898, which directed agencies to identify and address "disproportionately high and adverse human health or environmental effects of its programs, policies, and activities on minority populations and low-income populations."[98] The EJ Guidance provides principles for considering environmental justice in NEPA analyses, including: ensuring sufficient opportunities for public input by minority, low-income, and Native American populations; considering relevant public health data concerning potential health and environmental hazards of an action; and recognizing the "interrelated cultural, social, occupational, historical, or economic factors that may amplify the natural and physical environmental effects of the proposed action."[99]

We urge CEQ to incorporate the EJ Guidance into its NEPA regulations to reinforce the responsibilities of federal agencies to consider environmental justice in NEPA review, particularly to ensure that environmental justice communities are not disproportionately burdened by cumulative adverse environmental impacts. Courts have long recognized the importance of environmental justice considerations in NEPA analyses.[100] Incorporating the EJ Guidance into regulations furthers the aims of Executive Order 12,898 by codifying the important role of assessing environmental

---

[95] *See Robertson*, 490 U.S. at 355.

[96] *See, e.g., In re Dominion Transmission*, 163 FERC ¶ 61,128 (Order Denying Rehearing) (Issued May 18, 2018).

[97] CEQ, Environmental Justice: Guidance Under the National Environmental Policy Act (Dec. 1997) [hereinafter EJ Guidance], *available at* https://ceq.doe.gov/docs/ceq-regulations-and-guidance/regs/ej/justice.pdf.

[98] Exec. Order No. 12,898, 59 Fed. Reg. 7,629 (Feb. 11, 1994).

[99] EJ Guidance, *supra* note 97, at 8–10.

[100] *See, e.g., Communities Against Runway Expansion, Inc. v. F.A.A.*, 355 F.3d 678, 689 (D.C. Cir. 2004) (permitting challenge to environmental justice analysis); *see also Senville v. Peters*, 327 F. Supp. 2d 335, 362–63 (D. Vt. 2004); *Coliseum Square Ass'n, Inc. v. Jackson*, 465 F.3d 215, 232-33 (5th Cir. 2006); *Saint Paul Branch of N.A.A.C.P. v. U.S. D.O.T.*, 764 F. Supp. 2d 1092, 1099, 1107–09, 1113, 1117 (D. Minn. 2011).

AR_0025679

justice implications in NEPA analyses. In turn, this will help agencies focus on alternatives, mitigation strategies, monitoring, and preferences of the disproportionately affected communities.

## V. <u>Conclusion</u>

In conclusion, the States submit that any revisions to CEQ's NEPA regulations must continue to protect the fundamental policies enshrined in the statute, including protection of the environment and public health and robust public participation. Any such revisions must fully respect the States' interests in a strong partnership to promote federal decision-making that protects these policies. We urge CEQ to fully examine the existing state of NEPA implementation and assess whether revisions to the NEPA regulations are even necessary. Then, only if changes are absolutely necessary and supported by a robust record, CEQ should engage in a careful, deliberative, and fully transparent process to propose limited and targeted regulatory changes consistent with the purpose and structure of NEPA.

24

Respectfully submitted,

FOR THE STATE OF CALIFORNIA

Dated: August _17_, 2018

XAVIER BECERRA
Attorney General

By: _____

SARAH MORRISON
Supervising Deputy Attorney General
JAMIE JEFFERSON
JULIA FORGIE
Deputy Attorneys General
California Department of Justice
300 South Spring Street, Suite 1702
Los Angeles, CA 90013
Tel. (213) 269-6328
Sarah.Morrison@doj.ca.gov
Jamie.Jefferson@doj.ca.gov
Julia.Forgie@doj.ca.gov

Dated: August 20, 2018      FOR THE STATE OF ILLINOIS

LISA MADIGAN
Attorney General

By:

MATTHEW J. DUNN
Chief, Environmental Enforcement/Asbestos
Litigation Division
DANIEL I. ROTTENBERG
Assistant Attorney General
Environmental Bureau
69 W. Washington St.
Suite 1800
Chicago, IL 60602
MDunn@atg.state.il.us
DRottenberg@atg.state.il.us

Dated: August 7, 2018     FOR THE STATE OF MARYLAND

BRIAN E. FROSH
Attorney General

By:

LEAH J. TULIN
Assistant Attorney General
200 Saint Paul Place
Baltimore, MD 21202
(410) 576-6962
ltulin@oag.state.md.us

AR_0025683

Dated:  August 17, 2018        FOR THE COMMONWEALTH OF
                               MASSACHUSETTS

                               MAURA HEALEY
                               Attorney General


                        By:    _____
                               CHRISTOPHE COURCHESNE
                               Assistant Attorney General and Chief
                               TURNER SMITH
                               Assistant Attorney General
                               Office of the Attorney General
                               Environmental Protection Div.
                               One Ashburton Place, 18th Floor
                               Boston, MA 02108
                               (617) 727-2200
                               christophe.courchesne@state.ma.us
                               turner.smith@state.ma.us

Dated: August 17, 2018          FOR THE STATE OF NEW JERSEY

                                GURBIR S. GREWAL
                                Attorney General

                    By:         _____
                                DAVID C. APY,
                                Assistant Attorney General
                                KRISTINA MILES
                                Deputy Attorney General
                                R.J. Hughes Justice Complex
                                25 Market Street
                                Trenton, NJ 08625-0093
                                (609) 376-2804
                                david.apy@law.njoag.gov
                                kristina.miles@law.njoag.gov

Dated: August **20**, 2018          FOR THE STATE OF NEW YORK

BARBARA D. UNDERWOOD
Attorney General

By:

MICHAEL J. MYERS
Senior Counsel
CLAIBORNE E. WALTHALL
Assistant Attorney General
Environmental Protection Bureau
New York State Attorney General
The Capitol
Albany, NY 12224
(518) 776-2380
Claiborne.Walthall@ag.ny.gov

Dated: August 12, 2018                     FOR THE STATE OF OREGON

                                           ELLEN F. ROSENBLUM
                                           Attorney General

                          By: _____
                                           PAUL GARRAHAN
                                           Attorney-in-Charge
                                           Natural Resources Section
                                           STEVE NOVICK
                                           Special Assistant Attorney General
                                           Oregon Department of Justice
                                           1162 Court Street NE
                                           Salem, OR 97301-4096
                                           (503) 947-4520
                                           paul.garrahan@doj.state.or.us
                                           steve.novick@doj.state.or.us

Dated: August 17, 2018

FOR THE COMMONWEALTH OF
PENNSYLVANIA DEPARTMENT OF
ENVIRONMENTAL PROTECTION

ALEXANDRA C. CHIARUTTINI
Chief Counsel

By:

MARGARET O. MURPHY
Department of Environmental Protection
Office of Chief Counsel
400 Market Street, 9th Floor
P.O. Box 8464
Harrisburg, PA 17105-8464
(717) 787-7060
mamurphy@pa.gov

AR_0025688

Dated: August /7, 2018          FOR THE STATE OF VERMONT

                                THOMAS J. DONOVAN, JR.
                                Attorney General

                        By:     _____
                                LAURA B. MURPHY
                                Assistant Attorney General
                                Office of the Attorney General
                                109 State Street
                                Montpelier, VT 05609
                                (802) 828-1059
                                laura.murphy@vermont.gov

AR_0025689

Dated: August 17, 2018          FOR THE STATE OF WASHINGTON

                                ROBERT W. FERGUSON
                                Attorney General

                          By:   _Aurora R. Janke_
                                WILLIAM R. SHERMAN
                                Assistant Attorney General
                                AURORA R. JANKE
                                Special Assistant Attorney General
                                Counsel for Environmental Protection
                                800 5th Ave Suite 2000, TB-14
                                Seattle, WA 98104-3188
                                (206) 442-4485
                                (206) 233-3391
                                bill.sherman@atg.wa.gov
                                auroraj@atg.wa.gov

# EXHIBIT A

AR_0025691

September 19, 2005

The Honorable Cathy McMorris
Chair, Task Force on Improving the
    National Environmental Policy Act
House Committee on Resources
United States House of Representatives
1324 Longworth House Office Building
Washington, D.C. 20515

Dear Congresswoman McMorris:

We, the undersigned former Chairs and General Counsels of the President's Council on Environmental Quality, are writing to you in your capacity as Chair of the Task Force on Improving the National Environmental Policy Act to state our support for NEPA, to articulate our understanding of the basic principles served by this landmark legislation, and to express our concerns about recent measures and pending proposals that threaten to undermine NEPA. Collectively, we have served Presidents of both parties since NEPA was signed into law on January 1, 1970.

We urge you and the other members of the Task Force to approach your work with an appreciation for the important role that NEPA plays in our government's decision-making with respect to the environment.. NEPA is, in the words of the CEQ regulations, "our basic national charter for protection of the environment." NEPA established, for the first time, a national policy favoring protection of the environment, and committed the Federal government to "create and maintain conditions under which man and nature can exist in productive harmony, and fulfill the social, economic, and other requirements of present and future generations of Americans." It also established farsighted procedural mechanisms, now emulated around the world, that require government agencies to consider and disclose to the public the environmental effects of proposed major government actions, and to provide an opportunity for the public to express concerns regarding the impacts of such actions.

Several principles embodied in NEPA are of overarching importance to achieving our nation's goal of "productive harmony" between man and nature.

Honorable Cathy McMorris
September 19, 2005
Page two

First, consideration of the impacts of proposed government actions on the quality of the human environment is essential to responsible government decision-making. Government projects and programs have effects on the environment with important consequences for every American, and those impacts should be carefully weighed by public officials before taking action. Environmental impact analysis is thus not an impediment to responsible government action; it is a prerequisite for it.

Second, analysis of alternatives to an agency's proposed course of action is the heart of meaningful environmental review. Review of reasonable alternatives allows agencies to evaluate systematically the potential effects of their decisions and to assess how they can better protect the environment while still fully implementing their primary missions.

Third, the public plays an indispensable role in the NEPA process. Public comments inform agencies of environmental impacts that they may have misunderstood or failed to recognize, and often provide valuable insights for reshaping proposed projects to minimize their adverse environmental effects. The public also serves as a watchdog, ensuring that Federal agencies fulfill their responsibilities under the law. Public participation under NEPA supports the democratic process by allowing citizens to communicate with and influence government actions that directly affect their health and well-being.

We recognize that environmental impact analysis should be efficient, timely and helpful to agencies and to the public. CEQ has always emphasized that the purpose of environmental review is "not to generate paperwork – even excellent paperwork – but to foster excellent action." The CEQ regulations direct Federal agencies to make the NEPA process more useful to decision-makers and the public, reduce paperwork, and emphasize real environmental issues and alternatives, and contain detailed guidance for integrating NEPA efficiently and effectively into agency planning processes. Unfortunately, not every Federal agency, and not every NEPA review, complies effectively with this mandate. Meaningful efforts to improve the Act's implementation should address the critical needs for better guidance and additional training for agency personnel and enhanced resources for NEPA implementation by federal agencies.

We are concerned that certain recent measures and pending proposals fail to reflect, and in some instances may undermine, the basic principles served by NEPA. Measures to exempt certain agencies and programs from NEPA, to restrict or eliminate alternatives analysis, or to limit the public's right to participate in the NEPA process

AR_0025693

Honorable Cathy McMorris
September 19, 2005
Page three

threaten NEPA's vital role in promoting responsible government decision-making. We
urge you and the other members of the Task Force to support the basic principles of
NEPA and reject proposals that would weaken or undermine NEPA.

Sincerely,

Russell E. Train
Chair, Council on Environmental Quality
(1970-1973)

Russell W. Peterson
Chair, Council on Environmental Quality
(1973-1976)

John Busterud
Chair, Council on Environmental Quality
(1976-1977)

Charles W. Warren
Chair, Council on Environmental Quality
(1977-1979)

J. Gustave Speth
Chair, Council on Environmental Quality
(1979-1981)

Honorable Cathy McMorris
September 19, 2005
Page four

_____

Michael R. Deland
Chair, Council on Environmental Quality
(1989-1993)

_____

Kathleen A. McGinty
Chair, Council on Environmental Quality
(1995-1998)

_____

George T. Frampton Jr.
Chair, Council on Environmental Quality
(1998-2001)

_____

Gary Widman
General Counsel, Council on Environmental
Quality (1974-1976)

_____

Nick Yost
General Counsel, Council on Environmental
Quality (1977-1981)

AR_0025695

# EXHIBIT B

AR_0025696

UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION

Certification of New Interstate Natural          )          Docket No. PL18-1-000
Gas Facilities                                   )

COMMENTS OF THE ATTORNEYS GENERAL OF MASSACHUSETTS, ILLINOIS, MARYLAND,
NEW JERSEY, RHODE ISLAND, WASHINGTON, AND THE DISTRICT OF COLUMBIA

The undersigned Attorneys General are pleased to submit these comments in response to the Federal Energy Regulatory Commission's ("Commission") Notice of Inquiry, dated April 19, 2018,[1] inviting comments on whether and how the Commission should revise its approach under its current policy statement on the certification of new natural gas transportation facilities ("Policy Statement") pursuant to the Natural Gas Act ("NGA").[2] As detailed herein, we have significant concerns about the Commission's approach to reviewing natural gas pipeline projects that are sited in and affect our states. We appreciate the opportunity to provide these comments, and respectfully urge the Commission to reexamine its Policy Statement, taking into account the following comments and recommendations.

## INTRODUCTION AND SUMMARY OF COMMENTS

Section 7 of the NGA, 15 U.S.C. § 717f (e), authorizes the Commission to grant a certificate of public convenience and necessity ("Certificate") for the construction or expansion of facilities for the transport of natural gas in interstate commerce. The NGA obligates the Commission to consider "all factors bearing on the public interest"[3] when making a Certificate decision, balancing the need for additional natural gas capacity from a proposed pipeline

---

[1] *Certification of New Interstate Natural Gas Facilities,* 163 FERC ¶ 61,042 (April 19, 2018) [hereinafter "Pipeline NOI"].

[2] Statement of Policy, Certification of New Interstate Natural Gas Pipeline Facilities, Docket No. PL99-3-000; 88 FERC ¶ 61,227 (September 15, 1999), Order Clarifying Statement of Policy, Docket No. PL99-3-001, 90 FERC ¶ 61,128 (February 9, 2000), Order Further Clarifying Statement of Policy, Docket No. PL99-3-002, 92 FERC ¶ 61,094 (July 28, 2000) [hereinafter "Policy Statement"].

[3] *Atl. Ref. Co. v. Pub. Serv. Comm'n,* 360 U.S. 378, 391 (1959); *see also* NGA §7 (c), (e), 15 U.S.C. § 717f (c), (e).

AR_0025697

project with the project's adverse effects, including economic and environmental impacts.[4] In addition, the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321 *et seq.*, requires the Commission to take a "hard look" at the full range of environmental impacts associated with proposed pipeline infrastructure.[5] For jurisdictional projects, the Commission holds ultimate land use siting authority—a role played by states and local governments for many other energy production and energy transportation facilities.

Between 1999 and 2017, the Commission approved interstate natural gas pipeline capacity additions of 180 billion cubic-feet per day nationwide, a significant number that exceeds current national peak demand.[6] While these additions may increase the availability of natural gas to customers, they also come with long-duration costs, many ultimately paid by residents and small businesses in our states, and significant environmental impacts. Meanwhile, new pipeline infrastructure projects are entering a rapidly changing energy market, which raises major questions about the business and environmental case for new capacity built using traditional financing approaches and assumptions. It is in this context that the undersigned Attorneys General believe that the Commission's review of proposed gas pipeline projects under the Policy Statement does not fully satisfy its vital obligations under the NGA and NEPA to protect the public interest.

Despite its broad statutory authority and duty to consider the full range and scope of relevant factors related to pipeline projects, the Commission's current process is unduly segmented and narrow in scope. In assessing project need, the Commission generally fails to account for the extent of regional need for new gas capacity or the evolving market for gas demand and relies too heavily on precedent agreements as proof of need for isolated projects.

---

[4] *See Sierra Club v. FERC*, 867 F.3d 1357, 1373 (D.C. Cir. 2017).

[5] *Kleppe v. Sierra Club*, 427 U.S. 390, 410 n.21 (1976) (citation omitted); *Coal. for Responsible Growth & Res. Conservation v. FERC*, 485 F. App'x 472, 474 (2d Cir. 2012).

[6] *See* SUSAN TIERNEY, ANALYSIS GROUP, NATURAL GAS PIPELINE CERTIFICATION: POLICY CONSIDERATIONS FOR A CHANGING INDUSTRY (2017), at 1–2, *available at* http://www.analysisgroup.com/uploadedfiles/content/insights/publishing/ag_ferc_natural_gas_pipeline_cer tification.pdf.

AR_0025698

This practice does not permit the Commission to understand the broader context for the alleged benefits of a proposed project and risks approving more infrastructure and capacity (on potentially inefficient terms) than the public need requires or prospective market conditions can or should support. The Commission's single-minded reliance on precedent agreements is also contrary to the existing Policy Statement which directs the Commission to "consider all relevant factors reflecting on the need for the project," including studies of projected demand, the market to be served, and potential cost savings to consumers.

The Commission's current practice also fails to meet its statutory obligations under NEPA to assess the environmental impacts of proposed pipeline projects in a comprehensive and robust manner. By generally focusing on single projects in isolation, the Commission does not appropriately consider reasonable alternatives or account for cumulative environmental impacts on a regional basis. The Commission also fails to adequately assess non-gas energy alternatives and other project alternatives such as energy storage, demand response, and energy efficiency, and routinely fails to appropriately consider state policies, such as state choices regarding our energy resource portfolios. And by not consistently and thoroughly assessing and quantifying upstream and downstream greenhouse gas emissions using the best available measures, the Commission's approach to assessing climate impacts does not satisfy NEPA requirements. Relatedly, the Commission's inadequate implementation of NEPA hobbles its broader statutory obligation under the NGA to evaluate the public interest in Certificate decisions by balancing project benefits against a full accounting of adverse environmental and socioeconomic impacts.

The undersigned Attorneys General strongly urge the Commission to revise the Policy Statement in accordance with the recommendations discussed in detail below. Implementing these recommendations will assist the Commission in addressing the issues raised by the Commission in its Notice of Inquiry, including growing stakeholder concerns and legal challenges related to the adverse impacts of pipeline projects.

3

## RECOMMENDATIONS

*First*, regarding project need, we recommend that the Commission assess need on a comprehensive, regional basis, and expand its analysis beyond the current dependence on precedent agreements, employing heightened scrutiny of precedent agreements with affiliates of project proponents.

*Second*, we urge the Commission to conduct a more thorough and robust NEPA analysis, comprehensively assessing on a regional basis the impacts of, and alternatives to, a proposed project, considering clean energy and other non-pipeline alternatives, thoroughly analyzing upstream and downstream greenhouse gas emissions, and considering state greenhouse gas emission-reduction policies.

*Third*, we recommend that the Commission consider environmental harm, including climate impacts quantified using the best available measure—the Social Cost of Carbon—and more heavily weigh the harm from use of eminent domain takings in its public interest assessment when balancing project benefits and harm in making a Certificate decision.

*Fourth*, we urge the Commission to better incorporate and consider state environmental and land use policies, no longer issue Certificates conditioned on later receipt of state certifications and permits under federal statutes, and to condition Certificates on obtaining and complying with state and local permits that do not unreasonably conflict with or delay approved projects.

*Finally*, we recommend that the Commission no longer issue partial notices to proceed with construction when Certificate rehearing requests are pending and limit the use and time of tolling periods for rehearing requests.

The Commission should seize the opportunity presented by the Notice of Inquiry to make these important reforms, to bring its review of proposed pipeline projects into full compliance with the NGA and NEPA, and to fulfill its statutory role in protecting the public interest. In contrast to the Commission's current process, such an approach would promote efficiency, reduce the risks of litigation delay in project development, and improve the Commission's ability to promote orderly competition and innovation in the gas market.

4

AR_0025700

## I.  THE COMMISSION SHOULD ENGAGE IN A SEARCHING ASSESSMENT OF PIPELINE PROJECT NEED.

Pursuant to the standard established in Section 7 of the NGA[7], an applicant must show that its proposed pipeline project is consistent with the public convenience and necessity by demonstrating that the public benefits the proposed pipeline project would achieve are proportional to its adverse impacts (the "Public Benefits Assessment").[8] Applicants must show that there is market demand in order to satisfy part of the public benefit requirement—that is, that the project is "needed" (the "Needs Assessment").[9] The current Needs Assessment fails to take into account the regional need for, and impacts of, building new pipelines, and relies too heavily on the existence of precedent agreements, and affiliate precedent agreements in particular. The Attorneys General recommend that the Commission assess market need and impacts on a comprehensive regional basis, expand the assessment to include factors beyond precedent agreements, and employ a rebuttable presumption that affiliate contracts do not demonstrate pipeline need.

### A.  Market need should be assessed on a comprehensive regional basis.

The Commission should broaden its Needs Assessment from assessing the need for each individual pipeline project to considering each pipeline project within the broader context of regional need. Regional designations should be based upon the Commission's natural gas market regions: Midwest, Northeast, Gulf, Southeast, and Western.[10] Changes in gas production, delivery, and consumption, as well as new sources of natural gas, have transformed the natural gas industry since the Policy Statement was issued, leading to a proliferation of natural gas pipelines and infrastructure whose impact on ratepayer and environmental interests necessitates a regional approach. Specifically, the Commission should develop a comprehensive

---

[7] 15 U.S.C. § 717f.

[8] Policy Statement, *supra* note 2, at 25.

[9] *See* Pipeline NOI, *supra* note 1, at 32, 47 n.91.

[10] *See Natural Gas Markets: National Overview*, FED. ENERGY REGULATORY COMM'N, https://www.ferc.gov/market-oversight/mkt-gas/overview.asp (July 3, 2018).

AR_0025701

analysis of each region's need for natural gas, taking into account existing pipelines and the integration of gas and electric systems, and evaluating available alternatives to pipeline infrastructure, as well as the impacts of pipeline infrastructure and alternatives.[11] Regional assessments would allow the Commission to systematically assess current and future need for additional natural gas capacity (including use by natural gas-fired power plants) in regional markets, accounting for projected growth in renewables and energy efficiency. In addition, the Commission's regional analyses would provide critical foundation for rational and regionally consistent project-specific Needs Assessments, which would build upon the regional assessments, incorporating more detailed analysis and information from project proponents.

The regional analyses should consider each region's existing infrastructure and natural gas pipeline capacity as well as state policy goals and projections of the future demand for natural gas, including the types of services that will be needed in a changing energy market. Other regional considerations should include whether the capacity is needed for new or existing generators, whether the additional capacity promotes competitive markets, whether anticipated markets will materialize, and whether there is a reliability benefit.[12,13]

### B. The current market needs assessment is too narrow and should be expanded to consider multiple factors.

Although the Policy Statement specifically rejected sole reliance on precedent agreements to demonstrate project benefits or need and recommends multiple factors the Commission should consider in the Needs Assessment, in practice, the Commission has relied heavily on proof of precedent agreements to find need.[14] This practice unduly restricts the

---

[11] *See infra* Section II A and B for further discussion of alternatives analysis.

[12] *National Fuel Gas Supply Corp.,* 158 FERC ¶ 61,145 (2017) (statement of Commissioner Bay).

[13] *See* SUSAN TIERNEY, NATURAL GAS PIPELINE CERTIFICATION: POLICY CONSIDERATIONS FOR A CHANGING INDUSTRY, *supra* note 6.

[14] Pipeline NOI, *supra* note 1, at 32, 47 n. 91. The Commission's decision to consider "all relevant factors" amended its previous policy which relied primarily on the "contract test"—the percentage of capacity under long-term contracts—to establish market need. The Commission further stated that the amount of capacity under contract "is not a sufficient indicator by itself of the need for a project." Policy Statement, *supra* note 2, at 5. However, the Commission has continued to find public need by relying solely upon long-term precedent agreements. *See, e.g.* Order on Rehearing, Mountain Valley Pipeline, LLC, Equitrans, L.P., 163 FERC ¶ 61,197

AR_0025702

Commission's inquiry and fails to account for the context of the alleged benefits of a proposed project and risks approving more infrastructure and capacity, on potentially inefficient terms, than the public need requires or prospective market conditions can support. Furthermore, the Policy Statement states that in evaluating market need, the Commission should "consider all relevant factors reflecting on the need for the project," and provide a range of factors in addition to evidence of precedent agreements, including studies of projected demand, the market to be served, and potential cost savings to consumers.[15] We recommend that the Commission make a renewed commitment to considering these factors and all others relevant to determining whether a pipeline project is needed, including accounting for the integration of gas and electric systems in the region and the projected growth in the use of renewables and energy efficiency measures. Where appropriate, the Commission should conduct evidentiary hearings or utilize other methods to create a more complete record and transparent process to provide greater confidence in the Commission's Public Benefits Assessments and Certificate decisions.

### C. The Commission should further scrutinize and limit the use of affiliate contracts in demonstrating pipeline project need.

The Policy Statement notes that "[u]sing contracts as the primary indicator of market support for the proposed pipeline project also raises additional issues when the contracts are held by pipeline affiliates."[16] Despite this recognition there are currently no restrictions on providing precedent agreements signed by affiliates to demonstrate project need. In practice, the Commission has stated repeatedly that it will not "look behind the precedent agreements to evaluate project need," even when affiliates constitute a majority of the precedent agreement capacity.[17]

---

at *35–44 (June 15, 2018) [hereinafter "Mountain Valley Rehearing Order"]; Order Issuing Certificates, PennEast Pipeline Company, LLC, 162 FERC ¶ 61,053 at *27–29, *33, *36 (January 19, 2018) [hereinafter "PennEast Order"].

[15] Policy Statement, *supra* note 2, at *23; PennEast Order, *supra* note 14 (Glick, C., dissenting, at *1–2).

[16] Policy Statement, *supra* note 2, at *16.

[17] *See, e.g.*, PennEast Order, *supra* note 14, at *33; Mountain Valley Rehearing Order, *supra* note 14, at *40.

AR_0025703

Relying too heavily on affiliate contracts risks mischaracterizing the need for the proposed pipeline project. In his dissent in *PennEast*, Commissioner Glick found that "precedent agreements that are in significant part between the pipeline developer and its affiliates [are] insufficient to carry the developer's burden to show that the pipeline is needed."[18] Indeed, where a utility holding company invests in a pipeline development project and an affiliate utility contracts for long-term firm service on that project, the utility holding company may pass the risk and the cost of the development of the pipeline to captive customers of the affiliate utility.[19] Without having to bear the risk or cost of development, the pipeline holding company has an economic incentive to construct new pipelines (and receive a return on its investment) regardless whether they are needed.[20] A pipeline project that is based on precedent agreements with multiple new customers tends to show a greater indication of need than a pipeline project supported by precedent agreements with affiliates.[21]

To protect ratepayers from undue costs and ensure projects truly reflect market need, the Commission should employ a rebuttable presumption that affiliate contracts do not demonstrate need wherever a pipeline project would not proceed absent affiliate contracts. In such instances, the Commission should require independent supporting evidence of need, such as third-party market analysis or state-approved resource plans, to overcome the presumption. Even where they make up only a relatively small portion of precedent agreements, the Commission should implement a more stringent standard of review for affiliate contracts. This standard should give the Commission the authority to look behind the contracts, including where needed an independent review of state regulatory filings and analyses regarding those contracts. Additional scrutiny of affiliate contracts will enable the Commission to better

---

[18] PennEast Order, *supra* note 14 (Glick, C., dissenting at *1).

[19] *Art of the Self-Deal,* Oilchange International (2017), at 20.

[20] *Id.*

[21] Policy Statement, *supra* note 2, at 26.

AR_0025704

evaluate the market need for the pipeline project and ensure that ratepayers are not burdened with unwarranted costs.

## II. THE COMMISSION SHOULD MORE ROBUSTLY AND COMPREHENSIVELY ASSESS THE IMPACTS OF, AND ALTERNATIVES TO, PROPOSED PIPELINE PROJECTS.

NEPA requires federal decision-makers, including the Commission, to prepare a "detailed statement" on the environmental impacts of certain actions prior to making decisions.[22] This environmental impact statement ("EIS") must take a "hard look" at the impacts of the proposed action,[23] including direct and cumulative impacts, as well as any "reasonably foreseeable" indirect impacts.[24] Consideration of environmental and economic impacts is also part of the Commission's Public Benefits Assessment under the NGA.[25] Yet, in practice, the Commission often fails to satisfy its duty to assess robustly and consistently the full range of impacts of, and alternatives to, proposed pipeline projects.[26] As discussed below, the Commission must take a more comprehensive approach to its impacts review—both to satisfy its legal obligations and to help forestall challenges to Commission decisions.

### A. The Commission should holistically evaluate the need for, the impacts of, and alternatives to new pipeline projects in each U.S. region.

As noted in Section I A above, the Commission's piecemeal review of natural gas infrastructure risks approval of more capacity than is in the public interest. Moreover, as underscored by recent federal court decisions vacating Commission orders, the Commission's

---

[22] 42 U.S.C. § 4332(2)(C).

[23] *Kleppe*, 427 U.S. at 410 (citation omitted); *see also Coal. for Responsible Growth & Res. Conservation v. FERC*, 485 F. App'x 472, 474 (2d Cir. 2012) and *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 249 (1989).

[24] 42 U.S.C. § 4332(2)(C)(i); 40 C.F.R. §§ 1502.16, 1508.8(a), (b); *see also* 40 C.F.R. § 1508.7 (a cumulative impact is "the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions"); *Sierra Club v. Marsh*, 976 F.2d 763, 767 (1st Cir. 1992) (a "reasonably foreseeable" impact or action is "sufficiently likely to occur that a person of ordinary prudence would take it into account in reaching a decision").

[25] *See* Order Denying Rehearing, Dominion Transmission, Inc., 163 FERC ¶ 61,128 (May 18, 2018) [hereinafter "Dominion Order"] (Glick, C., dissenting in part, at *1–2, *7).

[26] In recent years, federal courts have vacated orders based on deficiencies in the Commission's environmental impacts review process. *See Sierra Club*, 867 F.3d at 1373–75; *Del. Riverkeeper Network v. FERC*, 753 F.3d 1304, 1308–09 (D.C. Cir. 2014).

AR_0025705

segmented approach does not align with the requirements of NEPA and increases legal risks.[27] The Commission should instead undertake assessments of the impacts of and alternatives to new pipeline projects on a regional basis together with a regional assessment of need.[28] Regional analyses would offer an opportunity to standardize the Commission's impacts assessments approach across pipeline project review proceedings by setting forth data, metrics, projections, and other information that the Commission will use to evaluate pipeline projects in a particular region, including the cumulative and indirect impacts of pipeline projects, as discussed further below.[29]

### B. The Commission's alternatives assessment should include clean-energy and other non-pipeline alternatives.

The alternatives analysis required by NEPA is "the heart of the environmental impact statement."[30] Federal regulations require the Commission to explore all reasonable alternatives rigorously with an analysis that "present[s] the environmental impacts of the proposal and the alternatives in comparative form, thus sharply defining the issues and providing a clear basis

---

[27] *See, e.g., Sierra Club* 867 F.3d at 1373–75 (vacating a Commission decision due to the Commission's failure to properly consider the full range of pipeline project impacts under NEPA); *Del. Riverkeeper*, 753 F.3d at 1308–09, *supra* note 25 (holding that the Commission violated NEPA by failing to analyze the impacts of a project in conjunction with "three other connected, contemporaneous, closely related, and interdependent" pipeline certificate applications).

[28] Programmatic EISs ("PEISs") and combined EISs offer models for such regional assessments. They may even be mandated in certain circumstances. *See* 40 C.F.R. § 1508.25 (agencies "shall" consider "closely related," cumulative, and similar actions together in an EIS); *id.* § 1502.4(c)(1)–(2) (urging federal agencies to consider undertaking a PEIS when they are considering multiple projects in one region, or where projects share "relevant similarities, such as common timing, impacts, alternatives, [and] methods of implementation"); *Del. Riverkeeper*, 753 F.3d at 1308–09 (holding that the Commission must conduct a unified NEPA review of multiple connected gas pipeline segments); *Kleppe*, 427 U.S. at 409–10 ("A comprehensive impact statement may be necessary" where "several proposals for coal-related actions that will have cumulative or synergistic environmental impact upon a region are pending concurrently before an agency."); *Alpine Lakes Prot. Soc'y v. U.S. Forest Serv.*, 838 F. Supp. 478, 484 (W.D. Wash. 1993) (agency must consider seven access roads in the same region as "cumulative actions" under NEPA); *cf.* U.S. DEP'T OF INTERIOR, ORDER NO. 3338, DISCRETIONARY PROGRAMMATIC ENVIRONMENTAL STATEMENT TO MODERNIZE THE FEDERAL COAL PROGRAM (2016) (announcing the Department of Interior's then intent to conduct a programmatic EIS for the federal coal-leasing program).

[29] *Cf.* U.S. Envtl. Protection Agency, EPA Detailed Comments on FERC NOI for Policy Statement on New Natural Gas Transportation Facilities 1 (June 21, 2018) (recommending the Commission undertake regional analyses of the cumulative impacts associated with pipeline projects and mitigation opportunities).

[30] 40 C.F.R. § 1502.14; *see also Union Neighbors United, Inc. v. Jewell*, 831 F.3d 564 (D.C. Cir. 2016).

AR_0025706

for choice among options by the decisionmaker and the public."[31] In addition to exploring the effect of not building the proposed project,[32] the analysis must thoroughly address non-pipeline alternatives outside of the Commission's jurisdiction and the project applicant's preferences or capabilities.[33] Indeed, the Commission's own environmental review regulations and guidance require that the alternatives analysis address "the potential for accomplishing the proposed objectives through the use of other systems,"[34] including "non-gas energy alternatives, and/or energy conservation or efficiency, as applicable."[35] More explicitly, the Commission has said that the alternatives analysis should "[d]escribe the effect of any state or regional energy conservation, load-management, and demand-side management programs on the long-term and short-term demand for the energy to be supplied by the project."[36]

And yet, the Commission's NEPA alternatives analyses consistently give short shrift to or ignore non-gas energy alternatives or other measures such as energy storage, demand response, and energy efficiency to meet the need addressed by the proposed project. When such alternatives are addressed, they are typically considered in isolation and rejected in cursory fashion as unsuitable or insufficient to meet the demand evidenced by the precedent agreements the pipeline project applicant submits as demonstration of need.[37]

---

[31] *Id.*

[32] 40 C.F.R. § 1502.14 (d) (the analysis must "[i]nclude the alternative of no action").

[33] 40 C.F.R. § 1502.14 (c) (the analysis must "[i]nclude reasonable alternatives not within the jurisdiction of the lead agency"); *see also* Forty Most Asked Questions Concerning CEQ's National Environmental Policy Act Regulations, 46 Fed. Reg. 18,026, 18,033 (March 23, 1981) ("In determining the scope of alternatives to be considered, the emphasis is on what is 'reasonable' rather than on whether the proponent or applicant likes or is itself capable of carrying out a particular alternative.")

[34] Environmental reports for NGA applications, 18 C.F.R. § 380.12(l)(1) (the alternatives analysis must "[d]iscuss the "no action" alternative and the potential for accomplishing the proposed objectives through the use of other systems and/or energy conservation.").

[35] Fed. Energy Regulatory Comm'n, Guidance Manual for Environmental Report Preparation for Applications Filed Under the NGA, Vol. I, 4–136 (2017).

[36] Fed. Energy Regulatory Comm'n, Guidance Manual for Environmental Report Preparation, 3–6 (2002).

[37] *See, e.g.,* Order Issuing Certificates and Granting Abandonment Authority, Mountain Valley Pipeline, LLC, Equitrans, L.P., 161 FERC § 61,043 (October 13, 2017) [hereinafter "Mountain Valley Order"] (LaFleur dissenting at *2–3) (discussing "environmentally superior alternatives" limited to consideration of single, merged pipeline right of ways as alternatives to two separate pipeline project proposals).

AR_0025707

Natural gas is but one of many resources that can be utilized to meet customers' electric and thermal needs. Storage or electric system upgrades, for example, may be more cost-effective than pipeline expansion, particularly to satisfy peak demand. The Commission's alternatives analysis should analyze thoroughly and robustly all reasonable non-gas energy alternatives, including, where applicable, renewables and other clean-energy sources, the use of demand response and other market-based programs, and the impact of existing and projected increases in energy efficiency and energy conservation measures—accounting for state renewable portfolio standards and other programs and policies requiring or encouraging increased use of energy efficiency and conversation measures.

Not only should each individual alternative be thoroughly analyzed, but the combined effect of all non-gas pipeline alternatives also should be considered for its potential to meet the need to be addressed by the proposed project. NEPA requires no less.[38] Moreover, the public and states have significant interest in such analysis, particularly where state law and policy requires expansion of renewable and clean energy alternatives, increased energy efficiency measures, and reductions in greenhouse gas emissions, as discussed further below.

### C. The Commission must consistently analyze upstream and downstream greenhouse gas emissions associated with pipeline projects.

A robust comparative analysis of the climate impacts of pipeline infrastructure and reasonable alternatives is essential to inform the Commission's decisionmaking about proposed projects. As the D.C. Circuit Court of Appeals "clearly signaled" in its 2017 opinion in *Sierra Club v. FERC*,[39] which vacated a Commission decision due to the Commission's failure to properly analyze greenhouse gas impacts,[40] "the Commission should be doing more as part of

---

[38] *Cf. Davis v. Mineta*, 302 F.3d 1104, 1122 (10th Cir. 2002) ("Many [project] alternatives were improperly rejected because, standing alone, they did not meet the purpose and need of the Project. Cumulative options, however, were not given adequate study. Alternatives were dismissed in a cursory and perfunctory manner that do [*sic*] not support a conclusion that it was unreasonable to consider them as viable alternatives.").

[39] 867 F.3d 1357 (D.C. Cir. 2017).

[40] *Id.* at 1373–75.

AR_0025708

its environmental reviews" to analyze the climate impacts of pipeline projects.[41] In *Sierra Club*, the court found that downstream combustion of gas transported by a pipeline project "is not just 'reasonably foreseeable,' it is the project's entire purpose."[42] There is relative certainty about the likely fate of the natural gas resources that will be transported by pipeline projects: combustion.[43] Indeed, if a pipeline project is *not* needed to transport additional quantities of gas for combustion, the Commission would have no basis to approve the pipeline project.[44] As well, it is foreseeable that an expansion in natural gas transportation capacity would impact production of natural gas upstream in the supply chain.[45]

Yet, in recent orders, the Commission has maintained that it is not required to consider the full range of greenhouse gas emissions associated with pipeline projects because the impacts of such emissions are too speculative or not causally related to approval of a proposed pipeline project.[46] For instance, in its recent Order Denying Rehearing in *Dominion*

---

[41] Dominion Order, *supra* note 25 (LaFleur, C., dissenting in part, at *3).

[42] *Sierra Club*, 867 F.3d at 1372; *cf. High Country Conservation Advocates v. U.S. Forest Serv.*, 52 F. Supp. 3d 1174, 1196 (D. Colo. 2014) (finding that downstream greenhouse gas emissions related to constructing roads for coal mining are foreseeable).

[43] *See* Statement of Commissioner Cheryl A LaFleur on Tennessee Gas Pipeline Company, L.L.C., 2 n.3 (June 12, 2018), *available at* https://elibrary.ferc.gov/idmws/file_list.asp?accession_num=20180614-3074 [hereinafter "LaFleur June 12, 2018 Statement"] ("[I]t is reasonably foreseeable in the vast majority of cases that the gas being transported by a pipeline we authorize will be burned for electric generation or residential, commercial, or industrial end uses.... [T]here is a reasonably close causal relationship between the Commission's action to authorize a pipeline project ... and the downstream GHG emissions that result...."); *cf. Mid States Coalition for Progress v. Surface Transportation Board*, 345 F.3d 520, 549 (8th Cir. 2003) (agency unlawfully failed to consider downstream emissions from the burning of transported coal); *San Juan Citizens Alliance et al. v. U.S. Bureau of Land Mgmt.*, Slip Op. at *39 (D. N.M. 2018) (agency's "failure to estimate the amount of greenhouse gas emissions which will result from consumption of the oil and gas produced as a result of development of wells on the leased areas was arbitrary" and a violation of NEPA's requirement to analyze indirect and cumulative impacts).

[44] *Cf. N. Plains Res. Council, Inc. v. Surface Transp. Bd.*, 668 F.3d 1067, 1082 (9th Cir. 2011) (climate emissions were foreseeable where agency relied on mine development to justify investment in coal rail line proposal).

[45] *Cf. Barnes v. U.S. Dep't of Transp.*, 655 F.3d 1124, 1138–39 (9th Cir. 2011) (finding that "a new runway has a unique potential to spur demand," and agency therefore was required to analyze the impacts of such increased demand in EIS).

[46] *See, e.g.*, Order Denying Rehearing and Dismissing Stay Request, Algonquin Gas Transmission, LLC, 154 FERC ¶ 61,048, *44–46 (Jan. 28, 2016); Dominion Order, *supra* note 25, at *16–17; Columbia Gas Transmission, LLC, 153 FERC ¶ 61,064 at *6 (Oct. 14, 2015).

13

AR_0025709

*Transmission, Inc.* ("Dominion Order"),[47] the Commission stated that "where the Commission lacks meaningful information about potential future natural gas production" or "about future power plants, storage facilities, or distribution networks, within the geographic scope of a project-affected resource, then these impacts are not reasonably foreseeable."[48] Consequently, according to the Commission, neither NEPA nor the NGA requires the Commission to quantify or even consider those greenhouse gas emissions.[49]

This interpretation is a plain misreading of the Commission's legal authority and duties.[50] The NGA vests the Commission with broad authority to consider "all factors bearing on the public interest,"[51] which includes consideration of the full range of climate impacts[52] of proposed pipeline projects.[53] As Commissioner Glick noted in a recent dissenting opinion, a proposed project's "contribution to the harm caused by climate change[ is] critical to determining whether the Project[ is] in the public interest. Therefore, the Commission's failure to adequately address them is a sufficient basis for vacating [a] certificate."[54] Moreover, NEPA's requirement that the Commission take a "hard look" at the impacts of pipeline projects

---

[47] *See* Dominion Order, *supra* note 25.

[48] *Id.* at *14–15.

[49] *Id.* at *19 & n.96.

[50] Furthermore, we find it concerning that the Commission pronounced a new, broadly applicable policy in the context of a proceeding for an individual pipeline project, and while the Commission is simultaneously soliciting stakeholder feedback on the same set of issues in the instant docket. We urge the Commission to seize its review of the Policy Statement as an opportunity to reconsider the positions set forth in the recent Dominion Order and to revise its policy in line with our recommendations.

[51] *Atl. Ref. Co. v. Pub. Serv. Comm'n*, 360 U.S. 378, 391 (1959); *see also NAACP v. FPC*, 425 U.S. 662, 670 n.6 (1976) (explaining the Commission's broad authorities, including authority to consider "conservation" and "environmental" matters).

[52] *See* discussion *infra* in Section III.

[53] *Accord* Dominion Order, *supra* note 25 (LaFleur, C., dissenting in part, at *1); *id.* (Glick, C., dissenting in part, at *7); *see also* Mountain Valley Rehearing Order, *supra* note 14 (Glick, C., dissenting, at *1) ("In order to meet our obligations under both NEPA and the NGA, the Commission must adequately consider the environmental impact of greenhouse gas (GHG) emissions on climate change."); *see also Sierra Club*, 867 F.3d at 1373.

[54] Mountain Valley Rehearing Order, *supra* note 14 (Glick, C., dissenting, at *1–2); *accord Sierra Club*, 867 F.3d at 1373 (affirming that "FERC could deny a pipeline certificate on the ground that the pipeline would be too harmful to the environment"); Dominion Order, *supra* note 25 (Glick, C., dissenting, at *7) ("[T]he NGA's public interest standard requires the Commission to consider greenhouse gas emissions associated with the incremental production and consumption of natural gas caused by a new pipeline.").

AR_0025710

obligates the Commission to comprehensively and carefully consider the proposed project's

contribution to climate change—an urgent environmental and public health crisis.[55] Federal

caselaw makes clear that the Commission cannot evade this far-reaching requirement by

claiming that climate impacts are characterized by some uncertainty.[56]

NEPA does not require a perfect forecast. Where there is uncertainty about project

impacts, the Commission must provide a "summary of existing credible scientific evidence

which is relevant" to those impacts.[57] There are many analytical tools and data available to help

the Commission estimate upstream and downstream greenhouse gas emissions,[58] as

demonstrated in part by the Commission's past use of studies from the Department of Energy

and other entities to estimate "upper-bound" climate emissions.[59] Notably, the regional

assessments recommended above would address the Commission's claims in prior orders that

decision-analysis tools, lifecycle emissions estimates, and other available resources are too

general for the purposes of estimating certain project-level climate impacts.[60] Regional need

and impacts assessments would allow the Commission to assess the climate impacts of pipeline

projects at a broader level, based on the best available data and modeling relevant to the

impacted region.

---

[55] Cf. Baltimore Gas & Elec. Co. v. Nat. Res. Def. Council, Inc., 462 U.S. 87, 97 (1983) ("NEPA . . . places upon an agency the obligation to consider *every* significant aspect of the environmental impact of a proposed action.") (internal quotation marks and citations omitted) (emphasis added)).

[56] See, e.g., Scientists' Inst. For Pub. Info., Inc. v. U.S. Atomic Energy Comm'n, 481 F.2d 1079, 1092 (D.C. Cir. 1973) (courts must "reject any attempt by agencies to shirk their responsibility under NEPA by labeling any and all discussion of future environmental effects as 'crystal ball inquiry'"); Mid States Coal. For Progress v. Surface Transp. Bd., 345 F.3d 520, 549–50 (8th Cir. 2003) (finding that coal rail project would affect national long-term demand for coal and have upstream impacts by making coal a "more attractive option").

[57] 40 C.F.R. § 1502.22(b)(3).

[58] See, e.g., U.S. Envtl. Protection Agency, EPA Detailed Comments on FERC NOI for Policy Statement on New Natural Gas Transportation Facilities 2–4 (June 21, 2018) (listing existing tools and information available to the Commission to calculate the upstream and downstream climate emissions associated with pipeline infrastructure).

[59] See Dominion Order, *supra* note 25 (LaFleur, C., dissenting in part, at *2); LaFleur June 12, 2018 Statement, *supra* note 53, at 2 n.7 (citing studies used in past Commission orders); Pipeline NOI, *supra* note 1, at 43–44.

[60] See, e.g., Dominion Order, *supra* note 25, at *14–18; Mountain Valley Rehearing Order, *supra* note 14, at *150–53.

AR_0025711

And, in general, where essential information is lacking, NEPA requires the Commission to conduct independent research or otherwise compile missing information.[61] Thus, where the Commission finds that existing data and resources are inappropriate for estimating upstream or downstream emissions from a particular proposed pipeline project, the Commission should take advantage of available opportunities during the pre-filing and formal application process to seek more detailed information from proponents about the source and end use of the gas to be transported by the proposed project, and use that data to conduct its own analysis.[62]

Where more specific modeling is not feasible, NEPA requires the Commission to use or produce the best comparable information based on reasonable forecasts and estimates.[63] In such cases, the Commission should consider using the best available general modeling system and describe in its NEPA documents how it expects that project-related emissions might differ from available estimates.[64] For instance, the Commission could produce a "full-burn" estimate (i.e., an estimate of lifecycle greenhouse gas emissions from wellhead to point of consumption, taking into account leaks and losses in production, transmission, and distribution system, assuming total consumption of delivered gas) accompanied by a caveat that ultimately the pipeline project may result in fewer emissions.[65] We note that in past proceedings, the

---

[61] 40 C.F.R. § 1502.22(a).

[62] *Accord* Dominion Order, *supra* note 25 (Glick, C., dissenting in part, at *3).

[63] *Accord id.* (Glick, C., dissenting in part, at *3–4).

[64] Notably, while some consumption-related impacts are dependent upon details regarding when and where the associated emissions while occur (such as impacts to local air or water quality), the climate-warming effects of greenhouse gas emissions are globalized. Therefore, even without more specific details, the Commission can produce decision-relevant information about the climate impacts of pipeline projects based on an estimate of the quantity of natural gas that will be transported by the proposed infrastructure over its lifetime.

[65] Methane emissions from leaks and other system releases must be accounted for, particularly because methane is a potent greenhouse gas that is over thirty times more powerful than carbon dioxide in its ability to trap heat in the atmosphere over a 100-year time frame, and eighty-six times more potent over a twenty-year timeframe. According to the EPA, methane emissions from the oil and gas sector are the largest industrial source of methane emissions in the United States, accounting for about 30 percent of total U.S. methane emissions. *See* http://www3.epa.gov/climatechange/ghgemissions/gases/ch4.html. But a recent study found that methane emissions were sixty percent higher than the U.S. EPA inventory estimate, likely because existing inventory methods miss emissions released during abnormal operating conditions. *See* Ramón A. Alvarez, et al., *Assessment of Methane Emissions from the U.S. Oil and Gas Supply Chain*, Science, June 21, 2018.

AR_0025712

Commission has made gross, net, and "full-burn" estimations of upstream and downstream greenhouse gas emissions, evidencing the feasibility of this approach.[66] At the very least, the Commission should require project proponents to provide specific information on the indirect and cumulative impacts of the proposed pipeline project in the context of existing, under-development, and reasonably foreseeable energy projects and market trends in the region, as well as state energy and environmental policies. In no event, however, is the Commission permitted to abdicate its responsibility to consider climate impacts altogether.[67] Consistently analyzing upstream and downstream greenhouse gas emissions—even at some level of generality, if that is all that is feasible—would better inform Commission decisionmaking and the public than no information at all, while also increasing certainty for project proponents.

### D. The Commission should consider state policies and the Social Cost of Carbon in determining whether greenhouse gas emissions are significant.

The Commission has claimed that "no standard methodology exists to determine how a project's contribution to greenhouse gas emissions would translate into physical effects on the environment for the purposes of evaluating [a pipeline project's] impacts on climate change."[68] "Thus . . . any attempt by the Commission" to determine whether such emissions are significant for the purposes of NEPA review "would be arbitrary."[69] On the contrary, it is arbitrary and unlawful for the Commission to monetize and compare other benefits and impacts of pipeline projects without taking a similar approach to greenhouse gas emissions.[70]

---

[66] *See* Dominion Order, *supra* note 24 (LaFleur, C., dissenting in part, at *2).

[67] *Accord Mid States Coal. For Progress*, 345 F.3d at 549–50 (where the "*nature* of the effect is reasonably foreseeable but its *extent* is not," the "agency may not simply ignore the effect") (emphasis in original); LaFleur June 12, 2018 Statement, *supra* note 43, at 2; *see also* 40 C.F.R. § 1500.1(b) (requiring that agencies' NEPA analysis must be based on "high quality" information and "accurate scientific analysis").

[68] Dominion Order, *supra* note 25, *34; *accord* Pipeline NOI, *supra* note 1, at 41.

[69] Pipeline NOI, *supra* note 1, at 41; *see also* Dominion Order, *supra* note 25, at *28–29.

[70] *See Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin.*, 538 F.3d 1172, 1198 (9th Cir. 2008) (agency "cannot put a thumb on the scale by undervaluing the benefits and overvaluing the costs" in failing to analyze the benefits of reducing greenhouse gas emissions). As a general matter, there can be no doubt that greenhouse gas emissions related to natural gas extraction, transportation, and consumption in the United States as a whole are significant. *See, e.g.*, EPA, INVENTORY OF U.S. GREENHOUSE GAS EMISSIONS AND SINKS 3–6, 3–79 (2018), *available at* https://www.epa.gov/ghgemissions/inventory-us-greenhouse-gas-emissions-and-sinks-1990-2016 (reporting 2016 U.S. emissions associated with natural gas combustion (1,476.1 MMt CO2e) and

17

Despite the Commission's claims, there is a variety of relevant information to inform the Commission's determination of the significance of greenhouse gas emissions.[71] In particular, the Commission should use the best available data and methodologies to estimate the incremental societal impact of greenhouse emissions—also referred to as the Social Cost of Carbon.  Though Executive Order 13,783 § 5 (2017) withdrew the Interagency Working Group on the Social Cost of Greenhouse Gases ("IWG") technical support documents for a range of federal estimates of the social cost of carbon, the information and models underpinning these estimates remain credible and useful, and the IWG's estimates continue to represent the best available science.[72] The Commission has claimed that "it is not useful or appropriate" to use the Social Cost of Carbon in NEPA documents,[73] yet the Commission routinely monetizes other types of impacts in its NEPA documents. The Commission cannot evade its legal obligation to quantify the climate impacts of pipeline infrastructure projects where a scientifically based, peer-reviewed method to do so is available.[74]

In addition, the consistency of a proposed pipeline project's greenhouse gas emissions with relevant federal, regional, and state energy and climate policies and goals—which the

---

natural gas transmission and storage systems (32.8 MMt $CO_2e$ of methane)). The Commission plays a key role in approving actions that cause and contribute to these emissions. *Cf. Coal. on Sensible Transp. v. Dole*, 826 F.2d 60, 68 (D.C. Cir. 1987) (agency cannot avoid the requirements of NEPA by "artificially dividing" its combined contribution "into smaller components, each without a 'significant' impact").

[71] *See, e.g.,* Comments of Columbia Law School Sabin Ctr. for Climate Change Law on Southeast Market Pipelines Project, Draft Supplemental Environmental Impact Statement, Docket Nos. CP14-554-002; CP15-16-003; CPS15-17-002, at 2–3 (Nov. 17, 2017) (arguing that greenhouse gas emissions are significant where: 1) they exceed the reporting threshold of 25,000 tons per year of $CO_2e$ used previously by EPA and CEQ to identify major emitters; 2) the monetized social cost of the emissions is large; 3) the net increase in emissions constitutes a large percentage of the affected state's greenhouse gas emissions inventory; and 4) the emissions over the lifetime of the pipeline project would be viewed as significant in the context of state, local, and regional climate policies).

[72] Richard L. Revesz et al., *Best Cost Estimate of Greenhouse Gases,* 357 SCIENCE 6352 (2017).

[73] *See* Pipeline NOI, *supra* note 1, at 45 (citing *Fla. Se. Connection*, 162 FERC ¶ 61,233 at *37–38 (LaFleur and Glick, Comm'rs dissenting)).

[74] *See High Country Conservation Advocates v. U.S. Forest Serv.*, 52 F. Supp. 3d 1174, 1191 (D. Colo. 2014) (EIS was arbitrary and capricious where agency did not monetize climate impacts of coal mining activity "when such an analysis was in fact possible").

AR_0025714

Commission already analyzes in its NEPA documents[75]—can be used as a metric for evaluating whether emissions are "significant."[76] Many of our states have adopted ambitious greenhouse gas reduction goals and mandates, the achievement of which would be threatened by rapid buildout of natural gas infrastructure in our regions. Massachusetts has adopted a broad portfolio of laws and regulations to reduce economy-wide greenhouse gas emissions by 25 percent by 2020 and 80 percent by 2050 from 1990 levels, including the Global Warming Solutions Act (2008), the Green Communities Act (2008), the Act to Promote Energy Diversity (2016), the Regional Greenhouse Gas Initiative, and programs to promote low and zero-emission vehicles, among others. The clean energy industry is a powerful and growing economic engine for Massachusetts.[77] Similarly, Washington State has adopted greenhouse gas reduction goals to reduce overall state emissions of greenhouse gasses to 1990 levels by 2020 and fifty percent below 1990 levels by 2050.[78] In addition, Washington law requires large utilities to obtain fifteen percent of their electricity from new renewable resources by 2020[79]; imposes a greenhouse gas emission standard on electric power[80]; requires new power plants to mitigate at least 20 percent of their greenhouse gas emissions[81]; and sets minimum efficiency

---

[75] See Pipeline NOI, supra note 1, at 40.

[76] Cf. Ctr. For Biological Diversity v. Cal. Dep't of Fish & Wildlife, 62 Cal.4th 204, 225–27 (2015) (rejecting agency's approach to significance where agency failed to provide a reasoned explanation for how estimated project emissions compare to achieving statewide greenhouse gas reduction target).

[77] See Initial Comments of the Attorneys General of Massachusetts, California, Connecticut, Illinois, Maryland, North Carolina, Oregon, Rhode Island, Vermont, And Washington, Connecticut Department of Energy And Environmental Protection, Rhode Island Division Of Public Utilities And Carriers, and New Hampshire Office of The Consumer Advocate, Grid Reliability and Resiliency Pricing, FERC Docket No. RM18-1-000, October 23, 2017, available at https://www.mass.gov/files/documents/2017/10/23/Multistate%20Comments%20RM18-1%20-%2010-23-17%20%28FINAL%29.pdf. Furthermore, a study by the Analysis Group found that increasing natural gas capacity in Massachusetts and New England would result in a significant increase in greenhouse gas emissions and threaten compliance with Massachusetts's state law emission reduction mandate. See Hibbard, P. and Aubuchon, C., POWER SYSTEM RELIABILITY IN NEW ENGLAND: MEETING ELECTRIC RESOURCE NEEDS IN AN ERA OF GROWING DEPENDENCE ON NATURAL GAS, ANALYSIS GROUP, (2015), available at http://www.mass.gov/ago/doing-business-in-massachusetts/energy-and-utilities/regional-electric-reliability-options-study.html.

[78] Rev. Code of Wash. 70.235.020(1)(a).

[79] Rev. Code of Wash. 19.285.010.

[80] Rev. Code of Wash. 80.80.040

[81] Rev. Code of Wash. 80.70.020

AR_0025715

standards for appliances.[82] The District of Columbia's climate and energy plan, Clean Energy DC, proposes to reduce the District's greenhouse gas emissions by 50 percent below 2006 levels by 2032.[83] As part of its Public Benefits Analysis, the Commission should weigh the effect of project greenhouse gas emissions on our states' abilities to comply with our climate and clean energy laws and policies.

### III.    THE COMMISSION'S PUBLIC BENEFITS ASSESSMENT SHOULD BE INFORMED BY THE ECONOMIC HARM OF A PROJECT'S ENVIRONMENTAL IMPACTS AND MORE HEAVILY WEIGH HARM FROM EMINENT DOMAIN TAKINGS.

The Commission should wait until NEPA review is complete before conducting a Public Benefits Assessment—an assessment that should be made at the final stage of the process in conjunction with a Certificate decision and consider together adverse environmental and economic impacts, including the exercise of eminent domain. The Commission's current system of conducting the economic analyses first, followed by an assessment of environmental impacts which is wholly separate from the economic analyses, necessarily underestimates the value of avoiding the environmental impacts in the first place.

### A.    The Commission's Public Benefits Assessment should be informed by the economic harm of a project's environmental impacts quantified using the Social Cost of Carbon.

The Commission's Public Benefits Assessment and Certificate decisions should fully and robustly incorporate consideration of environmental impacts identified during NEPA review—including climate impacts. Currently, the Public Benefits Assessment tends to occur prior to NEPA review and only considers adverse economic impacts on the project proponent's customers, on other pipelines in the market, and on property owners affected by the proposed

---

[82] Rev. Code of Wash. 19.260.040

[83] *See Clean Energy DC: The District of Columbia Climate and Energy Plan*, October 2016 Draft, available at https://doee.dc.gov/sites/default/files/dc/sites/ddoe/publication/attachments/Clean_Energy_DC_2016_final_print_single_pages_102616_print.pdf.

AR_0025716

route.[84] This assessment does not consider adverse environmental impacts and comes before NEPA review is complete.[85]

By determining public benefit without regard to adverse environmental impacts and without consideration of the climate harm caused by a project, the Commission is failing to meet its obligations under both the NGA and NEPA. With the NGA, Congress broadly instructed the Commission to consider the public interest[86] by balancing a proposed project's public benefits against its adverse effects—*including environmental impacts*—when deciding if the public convenience and necessity requires granting a Certificate.[87] Indeed, "climate change bears on the public interest in terms of adverse effects" of a proposed pipeline, just as the need for system reliability bears on public benefit.[88] And, as discussed above, NEPA requires the

---

[84] *See* Policy Statement, *supra* note 2, at 18–19.

[85] *See id.*

[86] *See id.* at 23 ("In deciding whether a proposal is required by the public convenience and necessity, the Commission will consider the effects of the project on all the affected interests; this means more than the interests of the applicant, the potential new customers, and the general societal interests"); *see also, Atl. Ref. Co. v. Pub. Serv. Comm'n*, 360 U.S. 378, 391 (1959) (holding that § 7 of NGA requires the Commission to consider "all factors bearing on the public interest"); *FPC v. Transcontinental Gas Pipeline Co.*, 365 U.S. 1, 7 (1961) ("The Commission is the guardian of the public interest in determining whether certificates of convenience and necessity shall be granted. For the performance of that function, the Commission has been entrusted with a wide range of discretionary authority.").

[87] *See Sierra Club*, 867 F.3d at 1373 (citing *Minisink Residents for Envtl. Pres. & Safety v. FERC*, 762 F.3d 97, 101–02 (D.C. Cir. 2014) and *Myersville Citizens for a Rural Cmty. v. FERC*, 783 F.3d 1301, 1309 (D.C. Cir. 2015); *see also Pub. Utils. Comm'n of Cal. v. FERC*, 900 F.2d 269, 281 (D.C. Cir. 1990) (The public interest standard under the NGA includes factors such as the environment and conservation, particularly as decisions concerning the construction, operation, and transportation of natural gas in interstate commerce "necessarily and typically have dramatic natural resource impacts.").

[88] Order on Remand Reinstating Certificate and Abandonment Authorization, Florida Southeast Connection LLC, Transcontinental Gas Pipeline Co., LLC, Sabal Trail Transmission, LLC, 162 FERC 61,233 (March 14, 2018) [hereinafter "Sabal Trail Remand Order"] (Glick, C., dissenting at *3); *see also* Dominion Order, *supra* note 25 (LaFleur, C., dissenting in part, at *1) ("deciding whether a project is in the public interest requires a careful balancing of the economic need for a project and all of its environmental impacts. Climate change impacts of GHG emissions are environmental effects of a project and are part of [the] public interest determination."); Dominion Order, *supra* note 25 (Glick, C., dissenting in part, at *2) ("[c]limate change poses an existential threat to our security, economy, environment, and, ultimately, the health of individual citizens. [ . . . ] Accordingly, it is critical that the Commission carefully consider [projects'] contributions to climate change, both to fulfill NEPA's requirements *and to determine whether the Projects are in the public interest*") (emphasis added).

AR_0025717

Commission to quantify a project's climate-related and other reasonably ascertainable environmental costs.[89]

    The Commission therefore should expand its evaluation of economic impacts in its Public Benefits Assessment to consider the costs of environmental harms, including climate impacts monetized utilizing the Social Cost of Carbon, as required by NEPA and the NGA.

**B.**    **The Commission's Public Benefits Assessment should weigh more heavily the adverse effect of eminent domain takings.**

    In the Policy Statement, the Commission recognized that if the exercise of eminent domain will likely be required for a substantial portion of a pipeline right of way and other facility siting locations, the economic harm caused by the project may outweigh its public benefit.[90] And yet, the Commission has continued to issue Certificates without requiring a heightened showing of public benefit as disputes over pipeline siting and approvals have intensified in recent years and private property owners have increasingly resisted entering into voluntary easement agreements.[91] The Commission should require an enhanced showing of public benefit to offset the economic harm caused by the exercise of eminent domain where a pipeline project applicant fails to acquire voluntary easements for a significant portion of the project.

    The use of eminent domain should be a last resort.[92] Indeed, the NGA requires no less[93] and the Commission should require project applicants to negotiate in good faith with property

---

[89] *See* discussion *supra* in Section II C and D.

[90] *See* Policy Statement, *supra* note 2, at 27 ("The strength of the benefit showing will need to be proportional to the applicant's proposed exercise of eminent domain.").

[91] *See, e.g.,* Mountain Valley Order, *supra* note 37 (LaFleur, C. dissenting at *2–3 (concluding that because of the projects' environmental impacts and adverse impacts to property owners, the project, on balance is not in the public interest); Mountain Valley Rehearing Order, *supra* note 14 (LaFleur dissenting at *3) (noting the significant impact to landowners); *id.* (Glick dissenting at *2–3) (applicant failed to demonstrate sufficient need for the project to support a finding that the project's benefits outweigh its harms, especially where need was established solely through the existence of precedent agreements with the applicant's affiliates).

[92] *See generally* 42 U.S.C. § 4651 (requiring federal agencies undertaking condemnation in furtherance of federal programs "to encourage and expedite the acquisition of real property by agreements with owners, to avoid litigation and relieve congestion in the courts" by following federal condemnation policies).

[93] *See* 15 U.S.C. § 717f(h) (requiring as a precondition of condemnation litigation that the Certificate holder demonstrate that it "cannot acquire by contract" the real property rights needed); *see also USG Pipeline Co. v.*

AR_0025718

owners for voluntary easement agreements as a Certificate condition. Furthermore, as discussed below, the Commission should help facilitate increased use of voluntary easement agreements by making the currently voluntary pre-filing process mandatory, and by requiring that pipeline project proponents engage extensively with local property owners and state and local officials prior to filing an application with a preferred pipeline route and facility sites.

## IV.    THE COMMISION SHOULD BETTER COORDINATE ITS REVIEW WITH THAT OF STATE AND LOCAL PERMITTING AGENCIES.

The Commission seeks recommendations on how it may work more effectively with other agencies and on ways to change its review procedures to increase efficiency.[94] For the reasons discussed below, the Commission should make mandatory the current pre-filing process and require more thorough review and incorporation of state and local environmental and land use requirements during pre-filing and NEPA review. Pipeline project proponents should be required to promptly apply for required state certifications and approvals under the federal Clean Water Act[95] ("CWA"), Clean Air Act[96] ("CAA"), and the Coastal Zone Management Act[97] ("CZMA") upon filing an application with the Commission, to the extent consistent with the application process established by the relevant state agencies. The Commission should, strive to issue Certificates for pipeline projects only after completion of required state review under the CWA, CAA, and CZMA. The Commission should also expressly condition Certificates

---

*1.74 Acres in Marion Cty., Tenn.*, 1 F. Supp. 2d 816, 822 (E.D. Tenn. 1998) ("Courts also have imposed a requirement that the holder of the FERC Certificate negotiate in good faith with the owners to acquire the property."); *Transcon. Gas Pipe Line Corp. v. 118 Acres of Land*, 745 F. Supp. 366, 369 (E.D. La. 1990) ("In addition to satisfying the requirements of § 717f(h), federal law requires the condemnor to have conducted good faith negotiations with the landowners in order to acquire the property."). *But cf. Maritimes & Ne. Pipeline, L.L.C. v. Decoulos*, 146 F. App'x 495, 498 (1st Cir. 2005) (declining to find that the NGA requires that a pipeline project Certificate holder establish good faith negotiations with a property owner a requirement precedent to a condemnation action); *Mountain Valley Pipeline, LLC v. Simmons*, 307 F. Supp. 3d 506, 511 (N.D.W. Va. 2018) ("MVP is not required by the Natural Gas Act or Rule 71.1 to engage in good faith negotiations with the landowner.") (internal quotation marks and citations omitted).

[94] *See* Pipeline NOI, *supra* note 1, at 53–54.

[95] 33 U.S.C. §§ 1251–1388.

[96] 42 U.S.C. §§ 7401–7671q.

[97] 16 U.S.C. §§ 1451–1466.

AR_0025719

on compliance with state and local land use requirements and environmental permits (not required by federal law) when the Commission relies on them to minimize environmental impacts or when such permits do not unreasonably conflict with or delay Commission-approved pipeline projects. These reforms would increase efficiency, transparency, and predictability while reducing the likelihood of post-Certificate litigation.

A.  **Pre-filing should be mandatory and better incorporate state review.**

Now voluntary, the Commission's pre-filing process encourages pipeline project proponents to engage with property owners, stakeholders, and federal, state, and local agencies prior to filing an application with a preferred pipeline route and siting locations for compressor stations and other facilities. The pre-filing process thus provides stakeholders and agencies an opportunity become involved early in the project development process by providing information about the extent and nature of pipeline project impacts and environmental permitting and land use requirements. Through this process, applicants may alter pipeline project design, scale, and route to minimize impacts and siting controversies.

The Commission should not only make this pre-filing process mandatory but also require that pipeline project proponents engage with state and local officials and thoroughly examine all required state and local environmental permitting and land use requirements prior to filing an application with a preferred pipeline route and facility sites.[98] To help facilitate increased site access for ground surveys and encourage use of voluntary easement agreements to limit the exercise of eminent domain takings, the Commission should require that project proponents engage extensively with local property owners during pre-filing.[99] Pipeline project proponents should be required to prepare resource reports that comprehensively review

---

[98] This should require applicants to not merely meet with state and local officials, but listen, and to respect local requirements, then incorporate such requirements into the ultimate project siting and design as discussed *infra* in Section IV D.

[99] *See* discussion *supra* in Section III B, and *infra* in Section V. Property owner refusal to grant site access for ground surveys may hinder NEPA review as well as states' abilities to complete review of applications for state water quality certifications under CWA Section 401. Even when private property owners resist entering into voluntary easement agreements for pipeline construction right of ways, early landowner engagement may facilitate site access for performance of environmental and ground condition surveys.

AR_0025720

pipeline project impacts and all permitting requirements—including what must be submitted for state review under the CWA, CAA, and CZMA[100]—based on consultation with state and local agencies.

Immediately following the filing of an application, and concurrent with NEPA review, the Commission should require applicants to expeditiously file for all required state certifications and approvals under the federal CWA, CAA, and CZMA, seeking provisional approvals for the preferred route. The Commission should also encourage applicants to simultaneously work with state and local regulators to prepare for and begin filing all required permit applications.

### B. The Commission should not issue certificates before states have issued permits and certifications under federal statutes.

The NGA expressly preserves the rights of states under the CWA, CAA, and CZMA.[101] Under Section 401(a) of the CWA,[102] an applicant must present the Commission with state certification that pipeline project discharges will not violate state water quality standards and requirements, and any conditions imposed by a state water quality certification became conditions of the Commission's Certificate.[103] Pipeline project applicants must also present the Commission with state-issued permits under the CAA, and with certification that the pipeline project and its impacts are consistent with state Coastal Zone Management Plans approved under the CZMA.[104]

---

[100] *See* discussion *infra* in Section IV B.

[101] *See* 15 U.S.C. § 717b(d); *Meyersville Citizens for a Rural Cmty, Inc. v. FERC*, 783 F.3d 1301, 1315 (D.C. Cir. 2015) (the NGA "savings clause", 15 U.S.C. § 717b(d), saves from preemption the rights of states under the CWA, CAA, and CZMA); *see also Islander E. Pipeline Co., LLC v. Conn. Dep't of Envtl. Prot,* 482 F.3d 72, 89 (2d Cir. 2006) (*Islander I*); *Islander E. Pipeline Co., LLC v. Conn. Dep't of Envtl. Prot.,* 525 F.3d 141, 143 (2d Cir. 2008) (*Islander II*).

[102] In addition to CWA Section 401, where States have assumed federal authority over freshwater wetlands pursuant to CWA Section 404, the State's requirements become federal law and must be treated as a federal permit. *Delaware Riverkeeper v. Sec'y Pa. Dep't of Envtl. Prot.,* 833 F.3d 360 (3d Cir. 2016).

[103] 33 U.S.C. § 1341(a), (d).

[104] *See Islander I,* 482 F.3d at 84, 86; *Dominion Transmission v. Summers,* 723 F.3d 238, 240 (D.C. Cir. 2013).

AR_0025721

The Commission should end its practice of issuing Certificates conditioned on later receipt of state certifications, permits, and approvals under the CWA, CAA, and CZMA.[105] Following NEPA review, but prior to completion of required state review under the CWA, CAA, and CZMA, the Commission typically issues a Certificate approving a pipeline project conditioned on the applicant obtaining state-issued certifications and approvals under these federal statutes.[106] Requiring completion of state reviews prior to Certificate issuance would allow the Commission to better evaluate pipeline routing and facility siting alternatives informed by expert review by state agency regulators applying state standards that are applicable under federal law. This would also allow state regulators to review the preferred pipeline project route in the application, as well as alternative routes and facility siting locations, either denying or provisionally approving preferred and alternate routes and siting, pending the Commission's final review and siting approval in its Certificate. Additionally, it would prevent landowners' unnecessary loss of property via eminent domain for pipeline projects that may never be constructed.[107]

Notably, ending the routine issuance of Certificates conditioned on later receipt of state approvals under the CWA, CAA, and CZMA would most likely reduce post-Certificate litigation by precluding situations where the Commission approves a pipeline project only to have it blocked in whole or in part by one or more states denying federally-required permits.[108] Under

---

[105] The Commission typically issues conditional Certificates if state review will take more than six months. *See* Policy Statement, *supra* note 2, at 19. State CWA water quality certifications may take up to one year to complete. *See* 33 U.S.C. § 1341(a)(1) and discussion *infra* in note 98 (state waives its right to issue a CWA Section 401 water quality certification if it fails to act on a certification request within a reasonable time, not to exceed one year).

[106] *See, e.g.*, PennEast Pipeline Order, *supra* note 14 (issuing a Certificate conditioned upon the completion of unfinished surveys and documentation of unobtained permits).

[107] *See* discussion *infra* at note 108.

[108] *See, e.g.*, *Constitution Pipeline Co., LLC v. N.Y. State Dep't of Envtl. Conservation*, 868 F.3d 87, 90 (2d Cir. 2017), rehearing denied (2017), cert. denied (2018) (upholding the New York Department of Conservation's denial of Constitution's application for a CWA Section 401 water quality certification where the company failed to provide adequate information regarding a large number of stream crossings to demonstrate that project impacts would not violate state water quality standards); *Islander II*, 525 F.3d at 151–53 (upholding as supported by the record following remand the Connecticut Department of Environmental Protection's

AR_0025722

such circumstances, the Commission's conditional Certificate decision is subject to reconsideration and judicial review. After initiating such challenge, stakeholders or an applicant may subsequently file petitions in Circuit Courts of Appeals challenging state-issued certifications and permits under federal law.[109] Issuing Certificates after completion of all federally required state permitting would not only prevent staggered judicial review, but also provide a more complete record supporting the Commission's ultimate Certificate decision.

Waiting to issue a Certificate until all federally required state approvals have been obtained will also prevent irreparable harm that may result from the Commission's current practice of granting partial notices to proceed with construction for portions of a project. In the Constitution Pipeline project, the Commission's issuance of a partial notice to proceed with construction resulted in acres of mature trees being cut in Pennsylvania before the completion of the project was stopped by New York's denial of a CWA Section 401 water quality certification.[110]

As recommended above, the Commission should require that pipeline project applicants promptly file for state approvals under CWA, CAA, and CZMA after fully assessing state requirements and procedures under these federal statutes by working with state regulators during pre-filing. This will facilitate review by state regulators and reduce the instances of

---

denial of Islander's application for a CWA Section 401 water quality certification because of the project's adverse effects on shellfish habitat and other water quality impacts).

[109] Section 19(d)(1) of the NGA vests Circuit Courts of Appeals with original and exclusive jurisdiction over petitions seeking judicial review of state certifications and permits issued under the CWA, CAA, or CZMA. *See* 15 U.S.C. § 717r(d)(1). To be clear, we are not recommending that the Commission hold off issuing a Certificate during the pendency of judicial review following the filing of a petition under NGA Section 19(d)(1), although petitioners may seek a stay of the Commission's Certificate from the Court.

[110] *See Constitution Pipeline*, 868 F.3d at 90, 92–93 and discussion *supra*, note 108.

AR_0025723

project proponents filing incomplete applications that delay review by state regulators under these federal statutes.[111, 112]

### C. State water quality certification under the CWA should not be subject to new time limitations or otherwise constrained.

The Commission also seeks comments on whether there are "classes of projects that should appropriately be subject to a shortened [Certificate review] process."[113] Recent or contemplated federal legislative proposals would amend the CWA to shorten the time allowed states to review applications for CWA Section 401 water quality certifications.[114]

The undersigned state Attorneys General strongly oppose any legislative change or regulatory effort to limit the time allowed for state review of water quality applications under CWA Section 401. For projects with large numbers of discharges, state water quality review can be a complex and lengthy process. For instance, the Constitution Pipeline project proposal

---

[111] *See, e.g., N.Y. State Dep't of Envtl. Conservation v. FERC*, 884 F3d 450 (2d Cir. 2018) (*Millennium Pipeline*). In *Millennium Pipeline*, the company took more than nine months to complete its application for state water quality certification. The Court held that the "reasonable period of time (which shall not exceed one year)" for states to act on a request for CWA Section 401 water quality certification begins to run on the date the state receives the initial application, not when the applications is deemed complete. *Id.* at 455–56. The Court noted that states may assist applicants in completing applications and, if necessary, request that incomplete applications be withdrawn and resubmitted. *Id.* at 456. *But cf. Berkshire Envl. Action Team, Inc. v. Tenn. Gas Pipeline, LLC*, 851 F.3d 105 (1st Cir. 2017) (holding that Massachusetts' initial approval of a water quality certification made within one year of application was not final for purposes of NGA Section 19(d)(1) and that judicial review must wait for a final agency decision upon completion of a timely made administrative appeal).

[112] Section 19(d)(2) of the NGA provides a remedy for proponents faced with unreasonable delay or failure to act by a state agency on an application for a certification or permit under the CWA or CAA, in the form of seeking injunctive relief from the United States Court of Appeals for the D.C. Circuit. *See* 15 U.S.C. § 717r(d)(2), EPAct, 2005. Section 19(d)(2) of the NGA grants the United States Court of Appeals for the D.C. Circuit with exclusive jurisdiction over actions seeking declaratory and injunctive relief against state permitting agencies for undue delay or failure to act on federally-required permits. *See* discussion *infra* in Section III C.

[113] *See* Pipeline NOI, *supra* note 1, at 54.

[114] *See, e.g.,* H.R. 2910, Promoting Interagency Coordination for Review of Natural Gas Pipelines Act, 2017 (specifying limited timeframes and procedural requirements for the Commission and other agencies to follow in conducting environmental reviews related to proposed natural gas facility projects); *see also* Saqib Rahim and Nick Sobczk, "Legislative 'Reform' to Narrow States' Power," ENERGY AND ENVIRONMENTAL NEWS, February 2, 2018, https://eenew.net.energywire/stores/1060072719 (discussion contemplated amendments to the CWA that would allow states up to 90 days to determine if an application for a Section 401 water quality certification was complete, after which states would have 90 days to complete application review and issue or deny the requested water quality certification).

AR_0025724

involved discharges to 251 different streams and a variety of different water quality impacts, including habitat loss or degradations (87 impacted streams supported trout or trout spawning), changes in thermal conditions, increased erosion, and increases in stream instability and turbidity.[115] Any effort to shorten the one-year period Congress has deemed reasonable would be unlawful and arbitrary and capricious and, especially for large or complex projects, severely constrain states' rights to uphold and protect the quality of their waters under the cooperative federalism approach mandated by the CWA. Congress has already provided a remedy for pipeline project proponents faced with unreasonable delay or state agency obstruction on an application for certifications or permits under the CWA or CAA. [116]

It bears emphasizing that imposing arbitrary timeframes on CWA water quality certification review will not appreciably speed up pipeline project review. The Director of the Commission's Office of Energy Projects recently testified that, on average, eighty-eight percent of projects are issued Certificates within one year, and the single greatest factor slowing down review is the failure of the project applicant to provide the Commission and other agencies with "timely and complete information necessary to perform Congressionally-mandated project reviews."[117] Thus, the Commission should not entertain recommendations to curtail or expedite state review under CWA Section 401 (or other state approvals under federal statutes). Any such effort would contravene Congressional intent and do little to expedite state review.

**D. The Commission's Certificates should be conditioned on compliance with all state and local environmental permits and land use requirements that do not unreasonably conflict with or delay approved pipeline projects.**

Beyond federally required, state-issued certifications and approvals under the CWA, CAA, and CZMA, it is "the Commission['s] goal to include state and local authorities to the extent

---

[115] *See Constitution Pipeline*, 868 F.3d at 90, 92–93 and discussion *supra* note 108.

[116] *See supra* note 112, (referencing 15 U.S.C. § 717r(d)(2)) EPAct, 2005.

[117] House Committee on Energy and Commerce, Hearing on "Legislation Addressing Pipeline and Hydropower Infrastructure Modernization," Testimony of Terry Turpin, Director, Office of Energy Projects, Federal Energy Regulatory Commission, 115th Cong. (May 3, 2017).

AR_0025725

possible" in pipeline project planning and construction.[118] As FERC routinely asserts in Certificate decisions, a "rule of reason must govern both state and local authorities' exercise of their power and an applicant's bona fide attempts to comply with state and local requirements."[119] The mere fact that "a state or local authority requires something more or different than the Commission does not necessarily make it unreasonable for an applicant to comply with both the Commission's and state and local agency's requirements," even if state and local compliance would add additional cost and potentially threaten the facility's in-service date.[120]

Despite its goal to include state and municipal agencies in pipeline project planning and to strongly encourage compliance with their requirements, the Commission does not typically condition its Certificates on receipt of reasonable state and local permits.[121] This often leads to confusion about and litigation over whether an applicant has reasonably attempted to comply with state and local requirements that do not block or unduly delay a pipeline project. And rather than continue to work with state and local regulators as the Commission intends, applicants often assert preemption once armed with the Commission's Certificate.[122]

---

[118] *See, e.g.,* Order on Rehearing and Approving Agreements, Maritimes and Northeast Pipeline, L.L.C., 81 FERC ¶ 61,166, 17 (1997).

[119] *See* Pac. Connector Gas Pipeline LP, 134 FERC ¶ 61,102 at *1, *4, *11–12 (2011); Order Issuing Certificate, Tennessee Gas Pipeline Company, L.L.C., 154 FERC ¶ 61,191, at *30 (2016) (same).

[120] Order Issuing Certificate, Tennessee Gas Pipeline Company, L.L.C., 154 FERC ¶ 61,191, *30 (2016); *see also* Order on Rehearing and Approving Agreements, Maritimes and Northeast Pipeline, L.L.C., 81 FERC ¶ 61,166, 19–22 (1997) (ruling that several additional state conditions, including state review and approval requirements for pipeline route surveys and additional endangered species surveys, would not unreasonably delay the project where there was only a possibility that the conditions would conflict with the pipeline's in-service date).

[121] *See, e.g.,* Order Issuing Certificate, Tennessee Gas Pipeline Company, L.L.C., 154 FERC ¶ 61,191, *29–30 (2016) (noting and encouraging compliance with substantive land use restrictions and procedural requirements for allowing easement through conservation land protected by Article 97 of the Massachusetts Constitution, but declining to expressly condition Certificate on compliance with these requirements as requested by the Massachusetts Department of Conservation and Recreation and the Massachusetts Attorney General); *see also* discussion *infra* in note 122.

[122] *See, e.g., Millennium Pipeline Co., LLC v. Seggos,* 288 F. Supp. 3d 530 (N.D.N.Y. 2017) (granting preliminary injunction barring state from using state permitting requirements to delay construction of pipeline); Memorandum of Decision and Order on Plaintiff's Motion to Confirm Authority To Condemn Easements and Motion For Injunctive Relief Authorizing Immediate Entry, *Tennessee Gas Pipeline Co., LLC v. Commonwealth of Massachusetts,* Berkshire Superior Court, Civ. No. 16-0083, May 9, 2016 at *2–4, *11–16 (On motion for

AR_0025726

To avoid these disputes and unnecessary litigation, and to address jurisdictional public interest and environmental considerations identified under the NGA and NEPA, the Commission should, first, require that applicants consult with state and local permitting agencies during pre-filing. This step would help identify potentially applicable state and local permitting and other requirements that should be considered as potential Certificate conditions. Then, in lieu of the Commission's much vaguer conditions, the Commission should expressly condition its Certificates on applicants complying with state and local environmental permits and land use requirements the Commissions has identified during pre-filing and NEPA review and on which it relies for mitigation of environmental harm, or on permits that do not unreasonably conflict with or delay the approved pipeline project. This step would avoid confusion about the precise regulatory requirements applicable to a pipeline project and permit the Commission to utilize its federal authorities, in partnership with states and local governments, to responsibly manage the development of natural gas infrastructure in a manner more responsive to local requirements and concerns.

*        *        *

Because state practice varies, and coordinating federal, state, and local regulatory authority has presented challenges for the Commission, states, local governments, project developers, and other stakeholders alike, the Commission should consider convening a technical conference on procedural requirements, review timelines, and other practical coordination issues in this area, and how to best alter the Commission's process.

---

condemnation of easements asserting preemption of Massachusetts Constitution Article 97 (discussed *supra* in note 121), the Court noted that "[d]espite the preemption of Article 97, the Certificate does not give Tennessee unrestrained right to ignore the Commonwealth. Instead, the Certificate expressly requires Tennessee to make a good faith effort to cooperate with state and local authorities."); Request for Reconsideration and Clarification, *National Fuel Gas Supply Corp.*, Docket No. CP15-115 (March 3, 2017) (seeking "clarification" from FERC that all state and local environmental permits were preempted by the Natural Gas Act).

AR_0025727

## V.    PARTIAL NOTICES TO PROCEED WITH CONSTRUCTION SHOULD NOT BE ISSUED PRIOR TO REHEARING REQUEST DECISIONS, AND THE USE AND TIME OF TOLLING ORDERS SHOULD BE LIMITED.

The Commission's practice of allowing construction to proceed while delaying rehearing decisions through tolling orders inflicts irreparable harm while effectively foreclosing remedies on judicial review, denying injured parties due process. Though the NGA and the Commission's regulations require it to issue a decision within thirty days of a request for a Certificate rehearing,[123] the Commission routinely issues orders tolling this thirty-day period to allow it additional time to evaluate the merits of a rehearing request. These tolling orders routinely delay rehearing decisions for a year or more.[124]

Moreover, the Commission often grants requests for partial notices to proceed with construction after a Certificate issues—even when a tolled decision on a rehearing request is pending—so long as the Certificate holder has received all state-issued permits under the federal CWA, CAA, and CZMA (where construction activity could impact resources covered by those federally required permits). This practice results in significant and irreparable harm from project construction. For instance, as a rehearing request was tolled for more than thirteen months, the Commission granted the Transcontinental Gas Pipeline Company's Leidy Southeast Project a total of twenty partial notices to proceed resulting more than one hundred acres of tree clearing.[125] And while parties seeking rehearing of Commission Certificate Orders may request that FERC stay project construction during the pendency of the tolling period and

---

[123] *See* 15 U.S.C. § 717r(b); 18 C.F.R. § 157.20(a).

[124] While a few recent egregious tolling periods were attributable *in part* to an extended period in 2017 when the Commission lacked a quorum, tolling periods of a year or more are common even when there are no quorum issues. *See, e.g.,* Order Denying Rehearing, Transcontinental Gas Pipeline Company, LLC, 154 FERC ¶ 61,166 (March 3, 2016) (the Commission denied a rehearing request more than one year after timely rehearing requests made in January 2015 and a tolling order issued in February 2015).

[125] *See* Transcontinental Gas Pipeline, *supra* note 124. Similarly, a Commission tolling order delayed a rehearing decision regarding the Connecticut Expansion Project for over sixteen months, authorizing tree clearing and construction for the project, including through a two-mile stretch of conservation land protected under the Massachusetts Constitution in Otis State Forest. *See* Order on Rehearing, Tennessee Gas Pipeline Company, 160 FERC ¶ 61,027 (August 25, 2017) (denying timely rehearing requests made in April 2016).

AR_0025728

rehearing request, the Commission rarely, if ever, grants such stay requests, even when rehearing requests raise serious issues of merit.[126]

Because petitioners may not seek judicial review until the Commission rules on the merits of their request for rehearing,[127] the Commission's routine practice of delaying rehearing decisions raises serious due process concerns.[128] In addition to denying affected parties judicial review before construction begins, tolling orders deny landowners judicial review before their land is taken through eminent domain.[129] Because the power of eminent domain attaches regardless whether a rehearing has been requested, developers are free to take land while the Commission has not yet ruled on the rehearing request and while landowners have no judicial recourse.[130] To minimize the number of landowners whose land is taken without opportunity for judicial review, the Commission should end its practice of issuing tolling orders except in rare cases where the additional time is absolutely necessary, in which case tolling orders. should be for as brief a period as practicable.

---

[126] *See Del. Riverkeeper*, 753 F.3d at 1308–09 (Commission issued rehearing request tolling order, delaying judicial review, where the Court ultimately held that Commission's review violated NEPA).

[127] 15 U.S.C. § 717r(b); *see also Kokajko v. F.E.R.C.*, 837 F.2d 524, 525 (1st Cir. 1988) ("[B]ecause FERC has not yet issued a ruling on the merits of the petition, this court is without jurisdiction.").

[128] *See, e.g., MCI Telecommunications Corp. v. F.C.C.*, 627 F.2d 322, 341 (D.C. Cir. 1980) ("[D]elay in the resolution of administrative proceedings can . . . deprive regulated entities, their competitors or the public of rights and economic opportunities without the due process the Constitution requires."); *Kokajko*, 837 F.2d at 526 ("[A] claim which is virtually tied up in interminable successive rounds of administrative review may present due process concerns."); *cf. Pub. Citizen Health Research Grp. v. Comm'r, Food & Drug Admin.*, 740 F.2d 21, 34 (D.C. Cir. 1984) ("When the public health may be at stake, the agency must move expeditiously to consider and resolve the issues before it.").

[129] This is particularly true where, as is increasingly the practice, the pipeline seeks immediate entry onto and possession of the property rights it is condemning through the use of preliminary injunctions. *See, e.g. East Tennessee Natural Gas Company v. Sage*, 361 F.3d 808 (4th Cir. 2004) (granting a preliminary injunction to a pipeline company in a condemnation matter prior to the payment of just compensation); *Columbia Gas Transmission, LLC v. 1.01 Acres, More or Less, In Penn Twp*, 768 F.3d 300, 315–16 (3d Cir. 2014) (discussing *Sage* and granting a preliminary injunction to the pipeline company prior to the payment of just compensation). Since a District Court's reviewing role is limited, *see Columbia Gas Transmission* at 304, tolling orders issued by FERC can, when combined with preliminary injunctions granted by District Courts, deprive a property owner of any real judicial review until the pipeline has already taken full possession of the property.

[130] While the eminent domain proceeding occurs in a court, landowners cannot collaterally attack the Certificate, and therefore cannot challenge the developer's right to use eminent domain. *See, e.g., Williams Natural Gas Co. v. City of Oklahoma City*, 890 F.2d 255, 262, 264 (10th Cir. 1989).

AR_0025729

## CONCLUSION

The undersigned Attorneys General strongly urge the Commission to revise the Policy Statement in accordance with all the above recommendations. Thank you for your consideration of these comments.

Respectfully submitted,

MAURA HEALEY
ATTORNEY GENERAL OF MASSACHUSETTS

CHRISTOPHE COURCHESNE
CHIEF, ENVIRONMENTAL PROTECTION DIVISION
REBECCA TEPPER
CHIEF, ENERGY AND TELECOMMUNICATIONS DIVISION
MATTHEW IRELAND
SARAH BRESOLIN SILVER
ASSISTANT ATTORNEYS GENERAL
MEGAN HERZOG
SPECIAL ASSISTANT ATTORNEY GENERAL
OFFICE OF THE ATTORNEY GENERAL
One Ashburton Place, 18th Floor
Boston, MA 02108

34

LISA MADIGAN
ATTORNEY GENERAL OF ILLINOIS

PETER F. KILMARTIN
ATTORNEY GENERAL OF RHODE ISLAND

MATTHEW J. DUNN
CHIEF, ENVIRONMENTAL
ENFORCEMENT/ASBESTOS LITIGATION DIVISION
JANICE A. DALE
CHIEF, PUBLIC UTILITIES BUREAU
DANIEL I. ROTTENBERG
JACQUES ERFFMEYER
ASSISTANT ATTORNEYS GENERAL
ILLINOIS ATTORNEY GENERAL'S OFFICE
69 W. Washington St., 18th Floor
Chicago, IL 60602

LEO J. WOLD
ASSISTANT ATTORNEY GENERAL
RHODE ISLAND DEPARTMENT OF
ATTORNEY GENERAL
150 South Main Street
Providence, RI 02903

BRIAN E. FROSH
ATTORNEY GENERAL OF MARYLAND

BOB FERGUSON
ATTORNEY GENERAL OF WASHINGTON

JOSHUA M. SEGAL
ASSISTANT ATTORNEY GENERAL
OFFICE OF THE ATTORNEY GENERAL
200 St. Paul Place
Baltimore, MD  21202

WILLIAM R. SHERMAN
ASSISTANT ATTORNEY GENERAL
STACEY S. BERNSTEIN
ASSISTANT ATTORNEY GENERAL
AURORA R. JANKE
SPECIAL ASSISTANT ATTORNEY GENERAL
COUNSEL FOR ENVIRONMENTAL PROTECTION
800 5th Ave Suite 2000, TB-14
Seattle, WA 98104-3188

AR_0025731

GURBIR S. GREWAL
ATTORNEY GENERAL OF NEW JERSEY



DAVID C. APY
ASSISTANT ATTORNEY GENERAL
R.J. HUGHES JUSTICE COMPLEX
25 MARKET STREET, P.O. BOX 093
TRENTON, NJ 08625

KARL A. RACINE
ATTORNEY GENERAL
OF THE DISTRICT OF COLUMBIA

DAVID S. HOFFMANN
ASSISTANT ATTORNEY GENERAL
SARAH KOGEL-SMUCKER
SPECIAL ASSISTANT ATTORNEY GENERAL
PUBLIC ADVOCACY DIVISION
OFFICE OF THE ATTORNEY GENERAL FOR THE
DISTRICT OF COLUMBIA
441 Fourth Street, N.W., Suite 630 South
Washington, D.C. 20001

Dated: July 25, 2018

AR_0025732

**COMMENTS OF ATTORNEYS GENERAL OF WASHINGTON, CALIFORNIA, NEW YORK, DISTRICT OF COLUMBIA, CONNECTICUT, DELAWARE, GUAM, ILLINOIS, MAINE, MARYLAND, MASSACHUSETTS, MICHIGAN, MINNESOTA, NEVADA, NEW JERSEY, NEW MEXICO, OREGON, PENNSYLVANIA, RHODE ISLAND, AND VERMONT**

March 10, 2020

VIA E-MAIL and REGULATIONS.GOV
Edward A. Boling
Associate Director for the National Environmental Policy Act
Viktoria Z. Seale
Chief of Staff and General Counsel
Council on Environmental Quality
730 Jackson Place NW
Washington, DC 20503
NEPA-Update@ceq.eop.gov

Re:     Notice of Proposed Rulemaking – Update to the Regulations Implementing the Procedural Provisions of the National Environmental Policy Act, 85 Fed. Reg. 1684 (Jan. 10, 2020)
        Docket ID No. CEQ-2019-0003

Dear Associate Director Boling:

The undersigned state and territorial Attorneys General, specifically, the Attorneys General of the States of Washington, California, New York, Connecticut, Delaware, Illinois, Maine, Maryland, Michigan, Minnesota, Nevada, New Jersey, New Mexico, Oregon, Rhode Island, and Vermont; the District of Columbia; the Commonwealths of Massachusetts and Pennsylvania, and the Territory of Guam (collectively, "States") respectfully submit these comments on the Council on Environmental Quality's (CEQ) notice of proposed rulemaking (Proposed Rule) regarding proposed revisions to the regulations implementing the National Environmental Policy Act (NEPA), 42 U.S.C. §§ 4321–4347.[1] For the reasons stated below, the States strongly oppose the Proposed Rule and request that it be withdrawn in its entirety.

---

[1] The notice of proposed rulemaking is titled "Update to the Regulations Implementing the Procedural Provisions of the National Environmental Policy Act," 85 Fed. Reg. 1684 (Jan. 10, 2020), Docket ID No. CEQ-2019-0003.

## TABLE OF CONTENTS

I.    INTRODUCTION ................................................................................................6

II.   SUMMARY OF THE PROPOSED RULE ........................................................7

III.  NEPA IS A SUCCESS STORY ........................................................................8

    A.  NEPA Plays a Critical Role in Environmental Protection ...............................8

    B.  NEPA Has Protected Our Environment and Communities for Over 50 Years ..........10

IV.  CEQ'S PROPOSED RULE WOULD VIOLATE THE APA AND NEPA .......12

    A.  CEQ's Proposed Rule Is Not Rationally or Factually Supported ................13

        1.  CEQ's Proposed Rule Ignores NEPA's Successes and Environmental Protection Aims ................................................................13

        2.  CEQ Has Not Rationally Justified Its Proposed Rule ...........................14

        3.  The Proposed Rule Fails to Evaluate Whether Tools to Remedy Its Concerns Already Exist ................................................................17

    B.  CEQ's Public Process for This Rulemaking Is Deficient ...........................19

    C.  The Proposed Rule Would Undermine NEPA's Environmental Protection Goals in Violation of NEPA's Plain Language and Purpose .................................20

    D.  The Proposed Rule Would Improperly Limit NEPA's Application to Federal Actions ................................................................23

        1.  CEQ Proposes a New "Threshold Applicability Analysis" that Would Unlawfully Limit NEPA's Application ................................................23

            a.  CEQ's Proposed Redefinition of "Major Federal Action" is Unlawful .......24

            b.  CEQ's Expansion of Functional Equivalency Violates NEPA and the APA ................................................................26

            c.  CEQ's Other Threshold Applicability Analysis Factors Would Further Limit NEPA's Application and Lack Rational Support ...............................28

            d.  CEQ Should Not Adopt Other Limits on NEPA's Scope .............................30

        2.  CEQ's Proposed Definition of "Significance" Improperly Limits Environmental Review ................................................................31

2

3.   CEQ's Proposed Rule Would Improperly Expand the Use of Categorical Exclusions ...................................................................................33

     a.   CEQ's Proposed Rule Would Unlawfully Expand the Definition of Categorical Exclusions.............................................................34

     b.   CEQ's Proposed Revisions Would Expand Categorical Exclusions by Allowing Agencies to Mitigate Extraordinary Circumstances ...................35

     c.   CEQ's Expansion of Categorical Exclusions Would Impermissibly Limit Public Participation ...........................................................36

4.   The Proposed Rule Would Allow Actions to Proceed During NEPA Review ...................................................................................37

E.   The Proposed Rule Would Improperly Limit Discussion of Alternatives...................38

F.   The Proposed Rule Would Improperly Limit the Scope of Impacts Considered Under NEPA ...................................................................................42

1.   CEQ's Proposed Rule Would Improperly Limit Agencies' Responsibility to Consider "Indirect" and "Cumulative" Effects .................................................42

     a.   CEQ's Proposal to Limit Analysis of Effects Would Violate NEPA...........43

     b.   CEQ Has Not Provided a Reasoned Explanation for Its Proposal to Constrain the Analysis of Impacts .................................................46

         (1)   The Proposed Revisions to the Effects Definitions Would Not Provide Clarity or Avoid Litigation ...................................................46

         (2)   CEQ's Claim that Agencies Need to Focus on the Most Significant Effects Lacks Support and Conflicts with NEPA's Purpose ...................................................................................48

         (3)   CEQ Provides No Reasonable Explanation for "Reasonably Close Causal Relationship" Language .................................................48

         (4)   CEQ Has Not Provided a Rational Explanation for Exclusion of Cumulative Impacts or Indirect Impact Analysis...............................49

2.   CEQ's Proposed Revisions Improperly Curtail the Analysis of Federal Projects' Impacts of Greenhouse Gas Emissions and Climate Change ...............50

3.   CEQ's Proposed Revisions Would Improperly Limit the Analysis of Federal Projects' Impacts on Environmental Justice ...........................................52

AR_0025736

4.    CEQ's Proposed Revisions to Other Terms Such as "Affected Area" and "Mitigation" Illustrate and, in Some Instances, Exacerbate the Impropriety of CEQ's Proposed Revisions to the Definition of Effects ..................................53

5.    CEQ's Proposed Revisions Improperly Weaken the Standard for Requiring Agencies to Obtain Information on Adverse Effects ...........................................54

G.    The Proposed Rule Would Improperly Sideline the Public and Undercut NEPA's Purposes and Democratic Principles ............................................................56

1.    The Proposed Rule Would Increase Conflicts of Interest ....................................56

2.    The Proposed Rule Would Improperly Limit Public Participation .....................57

3.    The Proposed Rule Would Shift the Burden to the Public to Analyze Environmental Issues ........................................................................................59

4.    The Proposed Rule Would Impose Burdensome Exhaustion Requirements .......60

5.    The Proposed Rule Would Reduce an Agency's Obligation to Respond to Comments ...........................................................................................................61

6.    The Proposed Rule Would Impose Unreasonable and Unworkable Time and Page Limits that Could Undermine the Quality of NEPA Review ...............62

7.    CEQ Must Ensure Broad Public Participation ....................................................63

H.    CEQ's Proposed Rule Would Limit Appropriate Remedies for NEPA Violations and Block Access to the Courts....................................................................64

1.    CEQ Proposes Unlawful Limits on Judicial Remedies........................................64

2.    CEQ Proposes Unlawful Bond Requirements that Would Substantially Limit Judicial Review of Agency Actions ...........................................................65

3.    The Proposed Rule's Conclusive Presumption that an Agency Has Considered Public Comments is Contrary to Law ..............................................67

I.    The Proposed Rule Would Increase Uncertainty and Litigation ................................68

V.    THE PROPOSED RULE WILL ADVERSELY IMPACT THE UNIQUE INTERESTS OF STATES, TERRITORIES, AND LOCAL GOVERNMENTS IN ROBUST NEPA REGULATIONS .....................................................................................70

A.    The States Have an Interest in Ensuring that Federal Decisions Do Not Harm Their Residents, Property, or Natural Resources........................................................70

4

B.    Weakening the NEPA Regulations Would Disrupt Cooperation Between Federal and State Agencies and Burden States with Increased Environmental Review ...................................................................................................71

VI.    CEQ MUST CONDUCT NEPA REVIEW OF ITS REGULATIONS ............................73

A.    Overhauling the Nation's NEPA Regulations Is a Major Federal Action Affecting the Environment ........................................................................74

B.    CEQ Misstates and Ignores the Governing Law Requiring NEPA Review ...............75

VII.    CONCLUSION ................................................................................................77

5

# I.    INTRODUCTION

CEQ's Proposed Rule would trade reasoned and informed decision making for unjustified expedience in the NEPA process, upending longstanding NEPA practice by limiting federal agencies' ability to comprehensively evaluate the impacts of federal actions on the environment, public health, and our communities. Despite NEPA's "action-forcing" mandate,[2] the Proposed Rule repeatedly emphasizes NEPA's procedural nature and asserts that NEPA does not intend to elevate environmental concerns over other concerns[3] but is merely procedural.[4] CEQ claims the Proposed Rule will "modernize and clarify" its regulations,[5] but the regulatory changes in the Proposed Rule would undermine NEPA's plain language and purpose in violation of the Administrative Procedure Act (APA).

CEQ's Proposed Rule would discard decades of successful practice and precedent implementing NEPA by unlawfully narrowing the types of actions and scope of impacts and alternatives considered under environmental reviews and fundamentally weakening NEPA's clear direction that federal agencies consider the environmental impacts of their actions. These changes grant extraordinary discretion to Federal agencies and project proponents while limiting consideration of environmental and public health impacts from federal actions. Among other things, CEQ's Proposed Rule threatens to greatly diminish federal agency review of environmental impacts, including significant impacts from greenhouse gas emissions (GHG) and associated climate change. The Proposed Rule also seeks to limit public participation and judicial review of agency actions, undermining NEPA's core principles of informed decision making and government accountability and threatening to reduce consideration of environmental justice concerns in agency decision making. In addition, the Proposed Rule violates NEPA because CEQ has not conducted mandatory NEPA review for its own regulatory revisions.

In direct contravention of NEPA's objectives, CEQ's rulemaking process for this Proposed Rule has sidelined stakeholders—including states, tribes, and the public at large—from meaningful engagement on CEQ's unprecedented overhaul of its regulations. This approach has grave consequences for the evaluation of environmental justice concerns. CEQ's current NEPA regulations provide the foundation for NEPA's implementation—establishing a durable and environmentally protective framework on which federal agencies, states, territories, local governments, and the public have relied for 40 years. Through prior Republican and Democratic administrations, CEQ has promoted stability in environmental reviews by revising its regulations only when necessary to further the purposes of the statute and doing so after engaging in meaningful consultation with stakeholders. But in this rulemaking, CEQ discards this long history of stability and public review by providing the public *only 60 days and two geographically-limited public hearings* to review and comment on CEQ's unprecedented regulatory overhaul. As many undersigned states previously requested, CEQ should abandon its current timeline, reopen

---

[2] *Kleppe v. Sierra Club*, 427 U.S. 390, 409 (1976) (quoting Conference Report on NEPA, 115 Cong. Rec. 40416 (1969)).

[3] 85 Fed. Reg. at 1686 (citing *Balt. Gas & Elec. Co. v. Nat. Res. Def. Council*, 462 U.S. 87, 97 (1983)).

[4] *Id*. at 1685, 1686, 1688, 1693, 1698 n.62, & 1712.

[5] *Id*. at 1685.

AR_0025739

comments on the Proposed Rule for at least an additional 90 days, and provide additional public hearings.

Moreover, these unlawful and unreasonable changes will harm and burden the States. As an example of cooperative federalism, NEPA provides a robust framework for environmental review through coordination between federal agencies and the States. The States have a strong interest in protecting their residents, property, and natural resources from adverse environmental impacts. Contrary to these State interests, CEQ's Proposed Rule would increase uncertainty around implementation of NEPA and impose an additional burden on the States to fill the gaps left by inadequate NEPA environmental reviews.

CEQ's Proposed Rule is unlawful, unreasonable, and unjustified and must be withdrawn. For the past 40 years, existing NEPA regulations have successfully furthered the goal of ensuring that federal agencies take a "hard look" at how their actions impact the environment.[6] Rather than acknowledge this successful history, CEQ rushes to overhaul the regulations, pushing aside objections from stakeholders, including many of the undersigned States,[7] and ignoring requests that CEQ first collect detailed data on NEPA's implementation and evaluate the effect any revisions would have on future federal actions, public health, and the environment before proceeding with any regulatory changes. Without such evidence, CEQ cannot and has not satisfied its legal obligation to ensure that the regulations continue to prioritize protection of public health and the environment and to ensure public participation in accordance with NEPA.

These comments demonstrate how the Proposed Rule (1) ignores NEPA's successes; (2) fails to provide adequate public process; (3) would violate NEPA and the APA if adopted; and (4) fails to comply with NEPA itself. In sum, these comments demonstrate that the Proposed Rule is unlawful, arbitrary and capricious, and should be withdrawn.

## II.    SUMMARY OF THE PROPOSED RULE

CEQ's Proposed Rule introduces sweeping changes that narrow the environmental review process for federal projects. Among the proposed changes, CEQ proposes to:

- Shift the purpose of CEQ's NEPA regulations from ensuring detailed, "action-forcing" environmental review of agency actions to describing NEPA as a purely procedural statute;

- Limit NEPA's application to federal projects by (1) imposing a new "threshold applicability analysis"; (2) redefining "major federal action"; (3) expanding the use of functional equivalence; (4) allowing agencies to determine that NEPA review is not required because of direct statutory conflict or inconsistency with Congressional intent; (5)

---

[6] *See Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989).

[7] Comments of Attorneys General of California, Illinois, Maryland, Massachusetts, New Jersey, New York, Oregon, Vermont, and Washington, and the Secretary of the Commonwealth of Pennsylvania Department of Environmental Protections on Advance Notice of Proposed Rulemaking, 83 Fed. Reg. 28, 591 (August 20, 2018) [hereinafter Advance Notice Comments] (attached as Exhibit 1).

AR_0025740

redefining "significance"; (6) expanding agency authority to claim a categorical exclusion to avoid completing any NEPA analysis; and (7) allowing certain actions to proceed before NEPA review is completed;

- Limit the scope of alternatives considered in environmental reviews, including by (1) striking an agency's obligation to consider alternatives outside of its jurisdiction; (2) eliminating the direction to present alternatives in comparative form; (3) removing direction to "[r]igorously explore and objectively evaluate" all reasonable alternatives to the proposed action; (4) removing the requirement to "[d]evote substantial treatment to each alternative"; and (5) preventing federal agencies from adopting NEPA regulations that integrate with state review processes if they involve a broader scope or more detailed methodological standard than those in the revised CEQ regulations;

- Limit the scope of impacts considered by (1) attempting to limit agency responsibility to consider "indirect" and "cumulative" effects of federal actions; (2) redefining "effects"; (3) curtailing consideration of GHGs and climate change as well as environmental justice impacts in environmental reviews; and (4) weakening the standard for requiring agencies to obtain scientific information on environmental impacts;

- Limit public involvement by (1) increasing conflicts of interest in the drafting process; (2) generally constraining public participation; (3) shifting the responsibility from the agency to the public to perform the detailed analysis required by NEPA; (4) imposing burdensome exhaustion requirements; (5) reducing agency responsibility to respond to comments; (6) imposing time and page limits on environmental reviews; and (7) failing to ensure broad public access to the commenting process; and

- Limit access to courts by (1) seeking to limit judicial remedies; (2) proposing bond requirements for NEPA litigants; and (3) adopting a conclusive presumption for agency review of public comments.

Taken individually and together, these proposed changes substantially undermine NEPA's direction and purpose.

## III.    NEPA IS A SUCCESS STORY

### A.    NEPA Plays a Critical Role in Environmental Protection

Congress passed NEPA more than 50 years ago, establishing the nation's first comprehensive policy for ensuring detailed environmental review of federal actions.[8] In doing so, Congress recognized the "critical importance of restoring and maintaining environmental quality to the overall welfare and development of man" and emphasized a national policy of cooperation with State and local governments as well as concerned citizens and private organizations "to use

---

[8] *See* 42 U.S.C. § 4321; National Environmental Policy Act of 1969, Pub. L. No. 91-190, 83 Stat. 852 (1970).

AR_0025741

all practicable means … to create and maintain conditions under which man and nature can exist in productive harmony."[9]

Consistent with this overarching policy, NEPA seeks to ensure government accountability, requiring federal agencies to consider the impacts of their actions on the environment and public health. Specifically, NEPA requires agencies to prepare an environmental impact statement (EIS) for legislation or "other major Federal actions significantly affecting the quality of the human environment."[10] An EIS must consider and evaluate project alternatives, and assess environmental impacts of the action and alternatives.[11] NEPA's environmental review requirement is not merely procedural. Rather, the environmental review process compels agencies to fully assess environmental and public health impacts and alternative approaches by involving the public and consulting with other agencies to lessen environmental impacts. As an "umbrella" review process, NEPA review also frequently includes environmental justice impacts (Executive Order 12898), historic resource review (National Historic Preservation Act), and potential impacts to endangered species (Endangered Species Act).[12]

The courts have long recognized that NEPA requires integration of environmental values and concerns throughout agency decision making. As the Supreme Court stated more than 40 years ago, "[t]he thrust of § 102(2)(C) [of NEPA] is thus that environmental concerns be integrated into the very process of agency decision-making. The 'detailed statement' it requires is the outward sign that environmental values and consequences have been considered during the planning stage of agency actions."[13] Accordingly, the "action-forcing provisions [are] intended as a directive to all agencies to assure consideration of the environmental impact of their actions."[14] NEPA thus requires agencies to take a "hard look" at how their actions impact the environment,[15] and ensures that agency decision-making is fully informed regarding environmental impacts.[16]

NEPA also prioritizes democratic values by providing a central role for public participation in the environmental review process.[17] In particular, NEPA directs agencies to "utilize a systematic, interdisciplinary approach" in their decision making, and make their decision making process available to States, local governments, and the public, including through making available

---

[9] 42 U.S.C. § 4331(a).

[10] *Id.* § 4332(2)(C).

[11] *Id.*

[12] Exec. Order No. 12898, 59 Fed. Reg. 7629 (1994) (as amended); National Historic Preservation Act 54 U.S.C § 300101 et seq.; National Historic Preservation Act Section 106 Regulations, 36 C.F.R. 800; Endangered Species Act Section 7, 16 U.S.C. § 1536 (a)(1).

[13] *Andrus v. Sierra Club*, 442 U.S. 347, 350 (1979).

[14] *Kleppe*, 427 U.S. at 409 (quoting Conference Report on NEPA, 115 Cong. Rec. 40416 (1969)) (internal quotations omitted).

[15] *Robertson*, 490 U.S. at 350; *Sierra Club v. U.S. Army Corps v. Eng'rs*, 803 F.3d 31, 37 (D.C. Cir. 2015).

[16] *Am. Rivers v. FERC*, 895 F.3d 32, 49 (D.C. Cir. 2018).

[17] *See, e.g.*, 42 U.S.C. § 4332(2)(C); 40 C.F.R. §§ 1503.1(a)(4), 1506.6.

AR_0025742

"information useful in restoring, maintaining, and enhancing the quality of the environment."[18] NEPA thus envisions public participation in the federal planning process,[19] providing a benefit to federal decision making.[20]

CEQ's current NEPA regulations, largely adopted in 1978, "tell federal agencies what they must do to comply with the procedures and achieve the goals of the Act."[21] Over the past 40 years, CEQ's NEPA regulations have guided NEPA's implementation across the nation, including in the undersigned States, and have become fundamental to the daily functioning and responsible decision making of numerous federal and state agencies.

Importantly, CEQ's regulations and guidance have long prioritized public participation. CEQ has long emphasized that "[t]wo major purposes of the environmental review process are better informed decisions and citizen involvement, both of which should lead to implementation of NEPA's policies."[22] Public participation provides a critical tool for identifying alternatives that improve a proposed action or reduce its environmental impacts, identifying shortfalls in the agency's analyses, spotting missing issues, and providing additional information that the agency may not have known existed. Indeed, as CEQ has previously acknowledged, "[s]ome of the most constructive and beneficial interaction between the public and an agency occurs when citizens identify or develop reasonable alternatives that the agency can evaluate in the EIS."[23]

## B.    NEPA Has Protected Our Environment and Communities for Over 50 Years

In proposing an overhaul of NEPA's regulatory framework, CEQ ignores the many successes of the existing NEPA regulations and the critical importance of NEPA, as currently implemented, in ensuring that impacts on public health and the environment are identified and fully considered before agencies take action. Indeed, a 2014 Government Accountability Office Report (GAO Report) on NEPA stated that the NEPA process "ultimately saves time and reduces overall project costs by identifying and avoiding problems that may occur in later stages of project

---

[18] 42 U.S.C. § 4332(2)(A), (C), (G).

[19] *Id.* § 4332(2)(C); 40 C.F.R. §§ 1503.1(a)(4), 1506.6.

[20] *See* Letter from Russell E. Train, *et al.* To The Honorable Cathy McMorris, at 2 (Sept. 19, 2005) (former Chairs and General Counsels of CEQ stating that "the public plays an indispensable role in the NEPA process") [hereinafter Train Letter] (attached as Exhibit A to Advance Notice Comments). *See also* ENVTL. LAW INST., NEPA SUCCESS STORIES: CELEBRATING 40 YEARS OF TRANSPARENCY AND OPEN GOVERNMENT, at 6 (Aug. 2010) [hereinafter NEPA Success Stories], https://ceq.doe.gov/docs/get-involved/NEPA_Success_Stories.pdf (last visited Mar. 9, 2020); CEQ, EXAMPLES OF BENEFITS FROM THE NEPA PROCESS FOR ARRA FUNDED ACTIVITIES (May 2011) [hereinafter Examples of NEPA Benefits], https://ceq.doe.gov/docs/get-involved/ARRA_NEPA_Benefits_List_May122100.pdf (last visited Mar. 9, 2020); CEQ, A CITIZEN'S GUIDE TO THE NEPA: HAVING YOUR VOICE HEARD, at 24 (Dec. 2007) [hereinafter Citizen's Guide to the NEPA], https://ceq.doe.gov/docs/get-involved/Citizens_Guide_Dec07.pdf (last visited Mar. 9, 2020) (noting, in a specific example, that "[t]hrough NEPA, citizens were able to educate and assist the decision-makers in developing their alternatives.").

[21] 40 C.F.R. § 1500.1(a).

[22] Citizen's Guide to the NEPA, *supra* note 20, at 2.

[23] *Id.* at 14.

AR_0025743

development."[24] The GAO Report further explained that "[a]ccording to studies and agency officials, some of the qualitative benefits of NEPA include its role as a tool for encouraging transparency and public participation and in discovering and addressing the potential effects of a proposal in the early design stages to avoid problems that could end up taking more time and being more costly in the long run."[25] Similarly, U.S. Forest Service officials have observed that "NEPA leads to better decisions."[26]

As the States noted in our comments on the Advance Notice of Proposed Rulemaking (Advance Notice Comments) regarding potential revisions to the NEPA regulations,[27] NEPA and the existing CEQ regulations have produced numerous success stories in various states.[28] Examples of NEPA success stories abound beyond those provided in the earlier comments.

For example, New York's NEPA process for construction of the Governor Mario M. Cuomo Bridge (formerly Tappan Zee Bridge) achieved an efficient outcome through coordination with state and federal agencies. The bridge is a vital link in the transportation network in the northeast, serving approximately 138,000 vehicles a day. The project team of state and federal agencies worked together to meet an aggressive NEPA and permitting schedule. In fact, they completed the federal permitting and NEPA review in one and a half years. This shaved years off of the multi-billion-dollar project.[29] This example illustrates that, when adequate resources are available and agencies commit to early engagement with all stakeholders and other interested agencies, the NEPA process can proceed with efficiency and improve outcomes for all parties.[30]

In Washington State, the State Route 99 Alaskan Way Viaduct Replacement represents a NEPA success, due in large part to the extensive public, agency, and tribal engagement that went into the project. After the February 2001 Nisqually Earthquake, there was little doubt about the vulnerability of the Alaskan Way Viaduct in downtown Seattle and the need for its replacement. However, for ten years there was a very public debate over how to replace it, with 76 concepts originally considered and eight alternatives analyzed through the EIS process. The Washington

---

[24] U.S. GOV'T ACCOUNTABILITY OFFICE, GAO-14-369, NATIONAL ENVIRONMENTAL POLICY ACT: LITTLE INFORMATION EXISTS ON NEPA ANALYSES, at 16 (2014) [hereinafter GAO Report], https://www.gao.gov/products/gao-14-369 (last visited Feb. 21, 2020).

[25] *Id.* at 15.

[26] *Id.* at 16. *See also* NEPA Success Stories, *supra* note 20; Examples of NEPA Benefits, *supra* note 20; Citizen's Guide to the NEPA, *supra* note 20, at 24.

[27] "Update to the Regulations for Implementing the Procedural Provisions of the National Environmental Policy Act," 83 Fed. Reg. 28591 (June 20, 2018) [hereinafter Advance Notice].

[28] *See, e.g.,* Advance Notice Comments, *supra* note 7.

[29] *See generally,* Natural Res. Def. Council, Never Eliminate Public Advice: NEPA Success Stories (Feb. 1, 2015), https://www.nrdc.org/resources/never-eliminate-public-advice-nepa-success-stories (last visited Mar. 9, 2020).

[30] *See generally* Richard Lazarus, *The National Environmental Policy Act in the U.S. Supreme Court: A Reappraisal and a Peek Behind the Curtains*, 100 GEO. L.J. 1507, 1510 (2012), http://www.law.harvard.edu/faculty/rlazarus/docs/articles/Lazarus_APeekBehindtheCurtain_2012.pdf (NEPA's requirements have led to over 30,000 draft and final EISs "and successfully prevented at least hundreds, and likely thousands, of actions from causing unnecessary damage to the nation's environment.").

11

AR_0025744

State Department of Transportation's implementation of NEPA for this project won national awards. But, more importantly, it brought the public into the effort to find a solution that worked for the city, the nearby port, the region, and the State.

In Pennsylvania, the large Potters Mills Gap Transportation Project went through the NEPA process to address safety, congestion, and access concerns in along a state highway. This process included considerable public participation, examined alternatives, and implemented mitigation measures. Consideration of impacts on environmental features and wildlife and demands of the construction process led to an inclusive monitoring and mitigation plan. The project eventually received a Finding of No Significant Impact and was awarded the federal 2015 Environmental Excellence Award for Environmental Streamlining.

In short, CEQ's current NEPA regulations have helped lead to better, more-informed decisions that provide workable, long-lasting solutions for communities and protect public health and the environment.

## IV.    CEQ'S PROPOSED RULE WOULD VIOLATE THE APA AND NEPA

If finalized, CEQ's Proposed Rule would violate the procedures and standards established by the APA and fail to comply with NEPA's text and purpose. Under the APA, an agency action is unlawful if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law" or "without observance of procedure required by law."[31]

To comply with the APA, an agency "must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'"[32] An agency rule would be arbitrary and capricious "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."[33] Where an agency rule departs from longstanding policies, the agency must show that "there are good reasons" for the changes, and demonstrate that its new rule is "permissible under the statute."[34] Any unexplained inconsistency between longstanding agency practice and a proposed rule is a reason for holding the proposed rule to be arbitrary and

---

[31] 5 U.S.C. § 706(2)(A), (D).

[32] *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (quotation omitted).

[33] *Id.*

[34] *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). *See also Am. Wild Horse Pres. Campaign v. Perdue*, 873 F.3d 914, 927 (D.C. Cir. 2017) (agency reversing direction is not permitted "to whistle past [the] factual graveyard" and disregard previous policy and underlying record); *Lone Mountain Processing, Inc. v. Sec'y of Labor*, 709 F.3d 1161, 1164 (D.C. Cir. 2013) ("An agency changing its course must supply a reasoned analysis indicating that prior policies and standards are being deliberately changed, not casually ignored.") (quotation omitted).

AR_0025745

capricious.[35] This is particularly true where, as here, significant reliance interests are involved.[36] In addition, agency regulations are arbitrary and capricious if they conflict with or fail to accomplish their statutory objectives.[37]

As discussed in detail below, if finalized, CEQ's regulatory changes would be arbitrary and capricious and not in accordance with law, and would fail to observe procedures required by law. Overall, the Proposed Rule is inconsistent with NEPA and relevant case law and CEQ has not complied with the APA's procedural requirements.

Specifically, CEQ's Proposed Rule: (A) fails to provide an adequate justification for CEQ's departure from the agency's longstanding regulations and policies implementing NEPA; and (B) was not vetted through an adequate public process. If implemented the Proposed Rule would: (C) undermine NEPA's environmental protection goals; (D) unlawfully limit NEPA's application to federal projects; (E) unlawfully limit review of alternatives; (F) unlawfully limit review of environmental impacts; (G) unlawfully limit public participation; (H) unlawfully limit access to courts and judicial remedies; and (I) lead to increased uncertainty and litigation. For these reasons, CEQ's adoption of the Proposed Rule would violate the APA and NEPA.

## A.    CEQ's Proposed Rule Is Not Rationally or Factually Supported

In an attempt to justify this regulatory overhaul, CEQ ignores NEPA's successes and focuses instead on unsupported claims of shortcomings in NEPA's implementation. CEQ's Proposed Rule lacks sound rationale and factual support—a deficiency anticipated in the Advance Notice Comments and unaddressed in the Proposed Rule. Moreover, CEQ overlooks existing tools designed to enhance efficiency in the NEPA process, which is one of CEQ's purported reasons for developing this Proposed Rule.

### 1.    CEQ's Proposed Rule Ignores NEPA's Successes and Environmental Protection Aims

CEQ's proposed revisions that elevate supposed expediency over detailed environmental review are inconsistent with CEQ's longstanding recognition of NEPA's success and action-forcing goals. In its NEPA Effectiveness Study, a 25-year review of NEPA's implementation, CEQ emphasized that "NEPA is a success—it has made agencies take a hard look at the potential environmental consequences of their actions, and it has brought the public into the agency decision-making process like no other statute."[38] CEQ further recognized that NEPA includes a substantive mandate

---

[35] *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 981 (2005).

[36] *Encino Motorcars, LLC v. Navarro*, 136 S.Ct. 2117, 2126 (2016) ("the explanation fell short of the agency's duty to explain why it deemed it necessary to overrule its previous position" particularly because of "reliance on the Department's prior policy").

[37] *Chem. Mfrs. Ass'n v. EPA*, 217 F.3d 861, 867 (D.C. Cir. 2000.) (holding rule was arbitrary and capricious because it was inconsistent with the legislative intent of the Clean Air Act).

[38] CEQ, NATIONAL ENVIRONMENTAL POLICY ACT: A STUDY OF ITS EFFECTIVENESS AFTER TWENTY-FIVE YEARS, at iii (Jan. 1997), https://ceq.doe.gov/docs/ceq-publications/nepa25fn.pdf [hereinafter NEPA Effectiveness Study]; *id.*

AR_0025746

to "'act' to protect the environment" and an "[a]ffirmative mandate—not only to preserve existing environmental quality, but to make decisions that restore and enhance the environment."[39]

In the Proposed Rule, CEQ has not provided a reasoned explanation for departing from its prior recognition of NEPA's success and its substantive mandate. CEQ echoed this conclusion in a 2011 study, observing that numerous environmental reviews overwhelmingly have resulted in "taxpayer dollars and energy saved, resources better protected and the fostering of community agreements."[40] CEQ may not now ignore NEPA's plain language and legislative history, settled judicial precedent, and CEQ's own longstanding practice in its effort to adopt new regulations inconsistent with the statute itself.

### 2.    CEQ Has Not Rationally Justified Its Proposed Rule

CEQ fails to rationally justify its Proposed Rule. In particular, CEQ provides no comprehensive data or analysis to justify its comprehensive revision of the entire body of NEPA regulations "to reduce paperwork and delays and to promote better decisions."[41]

Notably, CEQ's Proposed Rule fails to acknowledge the Advance Notice Comments which urged CEQ to conduct a thorough review process to determine the need, if any, for NEPA regulatory revisions before launching such a major overhaul of NEPA's implementing regulations.[42]

In particular, the Advance Notice Comments explained that most federal agencies do not routinely track important information about their NEPA processes, including the number of environmental assessments (EAs) and categorical exclusions conducted and the timeframes for completing these reviews.[43] The Advance Notice Comments requested that CEQ analyze existing studies and reports concerning the effectiveness of the current NEPA regulations and solicit input from federal agencies, state and local governments, the public, academics, scientists, and other stakeholders to determine whether changes are appropriate, consistent with its approach to drafting the original NEPA regulations.[44] But, despite these requests, CEQ did not meaningfully engage

---

at 5 (CEQ solicited input from NEPA's original framers, members of Congress, State and local agencies, drafters of the CEQ regulations, federal agencies, and the public).

[39] *Id.*, at App'x A.

[40] Examples of NEPA Benefits, *supra* note 20, at 1.

[41] 85 Fed. Reg. at 1685.

[42] *See* Advance Notice Comments, *supra* note 7, at 11–21.

[43] *Id.* at 17–19.

[44] *See id.* at 18. *Compare* Final Regulations, Implementation of Procedural Provisions, 43 Fed. Reg. at 55,980 (Nov. 29, 1978) (describing the process for drafting the current NEPA regulations as including public hearings, meetings with all federal agencies implementing NEPA, meetings with representatives of business, labor, State and local governments, environmental and other interested groups, and the general public, and detailed consideration of existing federal studies on the NEPA process).

14

AR_0025747

with the States, other stakeholders, or the public to solicit input on these issues before issuing the Proposed Rule.

Moreover, in the Proposed Rule, CEQ does not indicate that it has gathered or assessed any such data. For example, CEQ did not first analyze the existence, extent, and causes of delays under NEPA, if any, and then target those causes through training, guidance, or, if necessary, carefully tailored regulatory changes.[45] Instead, CEQ assesses only the length of time for preparing EISs— a small fraction of the NEPA reviews conducted annually—and it expressly declines to assess the reasons for the length of time required for such reviews.[46] CEQ conducted no meaningful analysis of other NEPA reviews, such as EAs, a less rigorous environmental review process,[47] or categorical exclusions, for which NEPA review is not required.[48] This absence of data is particularly significant given that agencies prepare an EIS in relatively few cases and often utilize more streamlined NEPA processes including EAs and categorical exclusions.[49]

CEQ's failure to meaningfully evaluate current NEPA practice is particularly unreasonable because the Proposed Rule identifies agency guidance and numerous reports issued in the past several decades "intended to provide guidance and clarifications with respect to various aspects of the implementation of NEPA . . . and to increase the efficiency and effectiveness of the environmental review process."[50] For example, CEQ refers to its NEPA Effectiveness Study but glossed over that report's conclusion that "NEPA has ensured that agencies adequately analyze the potential environmental consequences of their actions and bring the public into the decision-making processes of Federal agencies."[51] CEQ instead focuses on the section of the NEPA Effectiveness Study that identified additional "matters of concern" from study participants, such as overly lengthy documents.[52]

CEQ incorrectly concludes that the NEPA Effectiveness Study supports the Proposed Rule's sweeping changes. In fact, the NEPA Effectiveness Study discussed with approval numerous examples of effective NEPA implementation and, as the Proposed Rule acknowledges, identified five elements of the existing NEPA process that were "critical to effective and efficient NEPA implementation:"[53] strategic planning, public information and input, interagency coordination, an interdisciplinary place-based approach to decision making, and science-based and

---

[45] Advance Notice Comments, *supra* note 7, at 19.

[46] CEQ, ENVIRONMENTAL IMPACT STATEMENT TIMELINES (2010-2017) at 2 (Dec. 14, 2018) [hereinafter, EIS Timelines Report] https://www.whitehouse.gov/wp-content/uploads/2017/11/CEQ-EIS-Timelines-Report.pdf.

[47] *See* 40 C.F.R. § 1508.9.

[48] EIS Timelines Report, *supra* note 46, at 2.

[49] Advance Notice Comments, *supra* note 7, at 18 (citing GAO Report, *supra* note 24); *see also* NEPA Effectiveness Study, *supra* note 38, at 19.

[50] 85 Fed. Reg. at 1686 (citing CEQ Guidance Documents, https://ceq.doe.gov/guidance/guidance.html).

[51] *Id.*

[52] *Id.*

[53] *Id.*

AR_0025748

flexible management approaches.[54] To the extent that the NEPA Effectiveness Study identified areas for improvement, CEQ has not examined whether changes in NEPA implementation through its own guidance and subsequent targeted statutory amendments have resulted in such improvements in the more than 23 years since this report was issued, ignoring an important aspect of the problem CEQ purports to address in the Proposed Rule. Nor has CEQ reasonably explained how the changes in the Proposed Rule will address any remaining "matters of concern" in light of that report's findings. Rather, as discussed in section III.G and V.B, *infra*, the Proposed Rule would weaken the NEPA process with respect to public information and input and disrupt coordination between federal and state agencies, two of the critical elements of NEPA identified in the report.[55]

In addition, CEQ identifies the work of a 2002 NEPA task force that examined NEPA implementation and issued a 2003 report,[56] which CEQ acknowledges led to "additional guidance documents and handbooks."[57] Similarly, CEQ describes a 2018 memorandum instituting the "One Federal Decision" framework for NEPA reviews involving multiple agencies, which resulted in associated guidance and a memorandum of understanding to implement the One Federal Decision framework for certain major infrastructure projects.[58] But CEQ provides no evidence in the Proposed Rule that these guidance documents or the One Federal Decision framework have been ineffective or that these reports otherwise support the sweeping regulatory changes in the Proposed Rule. Rather, CEQ simply states, without citation to specific supporting data, that "[d]espite CEQ guidance and regulations … the documentation and timelines for completing environmental reviews can be very lengthy, and the process can be complex and costly."[59] Thus, CEQ concludes that the Proposed Rule's significant revisions are necessary to "advance more timely reviews and reduce unnecessary paperwork."[60] But reasoned decision making requires more than CEQ's unsupported conclusions.

Similarly, CEQ includes sparse information on NEPA's long-term costs and benefits, with little comprehensive data about the number of NEPA analyses completed across the government since NEPA's inception.[61] As CEQ has acknowledged, factors such as changes in the proposed action, available project funding, and community concerns can significantly affect EIS development timeframes.[62] Yet, in the Proposed Rule, CEQ fails to acknowledge or review these

---

[54] NEPA Effectiveness Study, *supra* note 38, at ix.

[55] *Id.*, at x, 17–19, 21–23.

[56] 85 Fed. Reg. at 1686.

[57] *Id*. at 1687.

[58] *Id.*

[59] *Id.*

[60] 85 Fed. Reg. at 1688.

[61] Advance Notice Comments, *supra* note 7, at 18 (citing GAO Report)*, supra* note 24. *See also* NEPA Effectiveness Study*, supra* note 38, at 6, 13.

[62] EIS Timelines Report, *supra* note 46, at 2. CEQ cites the Forty Questions Guidance, which suggested a one-year completion timeframe for EISs, as evidence that the current average rate of four years is unreasonable. Yet, that guidance was issued in 1981, when CEQ had far less experience with the complexities that can be associated with comprehensive and meaningful reviews. *See* 85 Fed. Reg. at 1687. *See also* GAO Report, *supra* note 24, at 14 ("[A]

16

factors to justify its proposed changes. Except for the two cursory reports on EISs, all of the reports CEQ relies on in the Proposed Rule pre-date the Advance Notice. CEQ thus failed to address the Advance Notice Comments that highlighted the need for additional data and analysis of these factors. Moreover, a few scattered data points on EISs—and none on categorical exclusions or EAs—do not demonstrate that the time taken for environmental reviews unduly delays projects.

The Proposed Rule also attempts to justify its revisions by asserting, without supporting citations or examples, that in "some cases, the NEPA process and related litigation has slowed or prevented the development of new infrastructure and other projects that required Federal permits or approvals."[63] However, as the GAO Report noted in 2014, the NEPA data that does exist indicates that "most NEPA analyses do not result in litigation."[64] Thus, CEQ's justification is contradicted by evidence in the record. Moreover, CEQ's purpose is not to reduce litigation over NEPA, but to, among other things, develop policies that "foster and promote the improvement of environmental quality to meet the conservation, social, economic, health, and other requirements and goals of the Nation."[65]

Where projects are challenged, it is often by citizens seeking to ensure that projects do not move forward without adequate review of environmental impacts. In such circumstances, the courts play a vital role in ensuring that federal agencies adhere to NEPA's mandate to take a hard look at environmental consequences before taking major actions.[66] The opportunity for judicial review of agency actions is not a flaw of NEPA or an obstacle to achieving its purposes, but a fundamental part of the NEPA process. CEQ's assertion of litigation-related problems without support, data or analysis, and contrary to evidence in the record, is arbitrary and capricious.

In short, CEQ has not done its homework—and has thus produced a purported solution before determining the existence, scope, and causes of the problem.

3.    **The Proposed Rule Fails to Evaluate Whether Tools to Remedy Its Concerns Already Exist**

The Advance Notice Comments also argued that CEQ must adequately evaluate the ability of existing regulations as well as the available tools to address its purported concerns about NEPA's implementation.[67] By failing to address these prior comments and failing to consider the

---

10-year time frame to complete a project may have been associated with funding issues, engineering requirements, changes in agency priorities, delays in obtaining nonfederal approvals, or community opposition to the project, to name a few.").

[63] 85 Fed. Reg. at 1685.

[64] GAO Report, *supra* note 24, at 19.

[65] 42 U.S.C. § 4344.

[66] *See The Weaponization of the National Environmental Policy Act and the Implications of Environmental Lawfare: Hearing Before the House Comm. on Natural Res.*, 115th Cong. 8–11 (2018) at 8–10 (statement of Horst Greczmiel, Former CEQ Associate Director of NEPA Oversight) [hereinafter Greczmiel Statement].

[67] Advance Notice Comments, *supra* note 7, at 15–17.

AR_0025750

efficacy of existing tools, CEQ has ignored a significant aspect of the problem and failed to engage in reasoned decision making.[68]

Many, if not all, of the concerns CEQ identifies in the preamble to the Proposed Rule could be addressed by implementing existing CEQ guidance and regulations rather than a sweeping and unjustified rewrite of the regulations.[69] CEQ designed the current regulations to reduce inefficiencies while producing "better decisions which further the national policy to protect and enhance the quality of the human environment."[70] When properly implemented by well-resourced and well-trained federal agencies, CEQ's existing regulations already provide many of the tools to address CEQ's concerns about NEPA's perceived inefficiency.[71]

Indeed, several sections of the current regulations provide methods to reduce paperwork[72] and shorten delay.[73] Additionally, there are numerous ways to increase the effectiveness and efficiency of the NEPA process.[74] For instance, the Obama Administration employed guidance and other efforts to address inefficiencies in NEPA processes and facilitate increased interagency collaboration.[75] Many of these efforts continued under the Trump Administration, but CEQ has not engaged in a detailed review of these actions to determine whether an overhaul of the existing NEPA regulations is required to further facilitate efficient and meaningful NEPA review.

CEQ also failed to assess the effectiveness of the Fixing America's Surface Transportation Act of 2015 (FAST Act), particularly Title 41 (FAST-41), which seeks to facilitate environmental review and permitting of "covered projects," i.e., infrastructure projects in certain sectors where the project cost is expected to exceed $200 million.[76] In particular, the Advance Notice Comments stated that CEQ should assess whether FAST-41 increases efficiency while also continuing to serve NEPA's overriding environmental protection goals. Instead of assessing FAST-41's

---

[68] *State Farm*, 463 U.S. at 43.

[69] *See, e.g.,* 40 C.F.R. § 1500.5 (listing measures agencies must implement to reduce delay).

[70] *See* 43 Fed. Reg. at 55,978.

[71] *See generally*, CEQ, MEMORANDUM FOR HEADS OF FEDERAL DEPARTMENTS AND AGENCIES ON IMPROVING THE PROCESS FOR PREPARING EFFICIENT AND TIMELY ENVIRONMENTAL REVIEWS UNDER NEPA (Mar. 6, 2012) [hereinafter Timely Review Memorandum], https://ceq.doe.gov/docs/ceq-regulations-and-guidance/Improving_NEPA_Efficiencies_06Mar2012.pdf. *See also* Train Letter, *supra* note 20, at 2 ("Meaningful efforts to improve the Act's implementation should address the critical needs for better guidance and additional training for agency personnel and enhanced resources for NEPA implementation by federal agencies.").

[72] *See, e.g.,* 40 C.F.R. § 1500.4.

[73] *See, e.g., id.* at § 1500.5

[74] *See* Advance Notice Comments, *supra* note 7, at 15–16.

[75] *See, e.g.,* CEQ, MEMORANDUM FOR HEADS OF FEDERAL DEPARTMENTS AND AGENCIES, GUIDANCE TO FEDERAL AGENCIES REGARDING THE ENVIRONMENTAL REVIEW AND AUTHORIZATION PROCESS FOR INFRASTRUCTURE PROJECTS (Jan. 13, 2017), https://www.permits.performance.gov/sites/permits.performance.gov/files/docs/Official%20Signed%20FAST-41%20Guidance%20M-17-14%202017-01-13.pdf.

[76] Advance Notice Comments, *supra* note 7, at 17.

AR_0025751

implementation, CEQ's Proposed Rule appears to rely on the FAST Act and FAST-41 as expressing Congress's support for an overhaul of CEQ's NEPA regulations.[77] But, CEQ ignores that in enacting FAST-41, Congress did not otherwise alter NEPA or invalidate CEQ's existing NEPA regulations.[78] If CEQ finalizes its Proposed Rule, CEQ must address all comments submitted by the States, including the Advance Notice Comments, and critically assess the congressional intent of the FAST Act, including FAST-41, as well as its effectiveness.

Despite the lack of support for CEQ's claim that review under the current NEPA regulations causes undue delay and CEQ's failure to consider existing tools to address its concerns, CEQ asserts that its Proposed Rule will "advance the original goals of the CEQ regulations to reduce paperwork and delays and promote better decisions consistent with the national environmental policy set forth in section 101 of NEPA."[79] However, as discussed in more detail below, CEQ fails to demonstrate that the regulatory changes will in fact achieve these goals, particularly when CEQ proposes numerous changes in position without reasonable explanation on critical issues of NEPA interpretation and implementation.[80]

## B.    CEQ's Public Process for This Rulemaking Is Deficient

The APA seeks to ensure that agencies provide for meaningful public participation in the rulemaking process by requiring agencies to provide the public with adequate notice of a proposed rulemaking followed by a meaningful opportunity to comment on the rule's content.[81]

Despite this APA standard for meaningful public participation, CEQ's rulemaking process is woefully deficient. Although CEQ provided 60 days for comment on the Advance Notice of Proposed Rulemaking, the Advance Notice was extremely vague and did not provide the public sufficient notice and opportunity to comment, at an early stage, on CEQ's sweeping revisions.

CEQ also truncated the public review of this Proposed Rule by providing only 60 days to comment on its significant and complex proposed changes and providing only two public hearings. The public hearings were so limited that several of the undersigned State Attorneys General's offices were unable to obtain tickets to speak at the public hearings. Those that were able to speak were limited to just three minutes.

---

[77] *See, e.g.,* 85 Fed. Reg. at 16,889–90.

[78] *See* 42 U.S.C. §§ 4370m–4370m-12; 85 Fed. Reg. at 1689 (explaining that FAST-41 "imports the concepts of lead and cooperating agencies, and the different levels of NEPA analysis" from the NEPA regulations and codified several other requirements from the existing CEQ regulations).

[79] 85 Fed. Reg. at 1684.

[80] *See Fox Television* Stations, 556 U.S. at 514–15 (changes in agency position must be based on reasoned explanation supported by the record and permissible under the statute); *State Farm*, 463 U.S. at 43 (1983) ("[T]he agency must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." (quotation omitted)).

[81] 5 U.S.C. § 553(b)–(c).

AR_0025752

Given the breadth of CEQ's Proposed Rule and the longstanding nature of current regulations, CEQ should have provided the states, tribes, and the public more time to analyze and comment on CEQ's proposed changes, particularly when CEQ received requests from states, members of Congress, a myriad of organizations, and countless members of the public for more time to adequately review and comment on this immense undertaking. The undersigned States therefore reassert their request that CEQ extend the public comment period by at least 90 days and provide additional public hearings nationwide. Without additional opportunity for public review, CEQ's rulemaking process will run afoul of the APA's notice and comment requirements.[82]

## C.    The Proposed Rule Would Undermine NEPA's Environmental Protection Goals in Violation of NEPA's Plain Language and Purpose

The Proposed Rule unlawfully seeks to shift NEPA's focus from detailed, action-forcing consideration of environmental impacts to an ineffectual box-checking exercise. In the preamble to the Proposed Rule, CEQ repeatedly emphasizes NEPA's procedural nature[83] and states that NEPA was not intended to elevate environmental concerns over other concerns.[84] By deemphasizing NEPA's significance as a fundamental environmental law, CEQ makes clear its purpose in revising the NEPA regulations: to reduce the substance and depth of NEPA's environmental review requirements in exchange for purported efficiency. Although CEQ claims the Proposed Rule will "modernize and clarify" its regulations,[85] in effect, the regulatory changes in the Proposed Rule would undermine significantly NEPA's plain language and purpose, run counter to NEPA's legislative history and court precedent, and are unreasonable.[86]

Two regulatory changes in particular highlight the Proposed Rule's efforts to vitiate NEPA's purposes. First, CEQ proposes to retitle and revise the opening provision of its regulations to state that NEPA "is a procedural statute intended to ensure Federal agencies consider the environmental impacts of their actions in the decision-making process."[87] This new language replaces existing language stating that NEPA is "action-forcing" and ensures "that federal agencies act according to the letter and spirit of the Act" and "achieve the substantive requirements of section 101."[88] Second, CEQ's Proposed Rule adds a new section 1502.16(a)(10) that would require discussion of "economic and technical considerations" along with environmental

---

[82] *See e.g.*, *Gerber v. Norton*, 294 F.3d 173, 179 (D.C. Cir. 2002); *Home Box Office, Inc. v. FCC*, 567 F.2d 9, 35–36 (D.C. Cir. 1977).

[83] 85 Fed. Reg. at 1685, 1686, 1688, 1693, 1698 n.62, 1712.

[84] *Id*. at 1686 (citing *Balt. Gas & Elec. Co.*, 462 U.S. at 97).

[85] *Id*. at 1685.

[86] Although the States oppose the Proposed Rule and urge its withdrawal, the States support a separate, limited rulemaking adding "Tribal" to the phrase "State and local" throughout the NEPA regulations to ensure that Tribal interests are appropriately represented in NEPA processes. *See,* 85 Fed. Reg. at 1692.

[87] 85 Fed. Reg. at 1693, 1712 (proposed 40 C.F.R. § 1500.1(a)).

[88] 40 C.F.R. § 1500.1(a).

AR_0025753

impacts.[89] These new provisions appear aimed solely at diluting the environmental analysis required by NEPA in contravention of the statute's essential purpose of environmental protection.

NEPA demands more than the Proposed Rule suggests. The plain language of NEPA recognizes the "critical importance of restoring and maintaining environmental quality to the overall welfare and development of [humans]."[90] Although Congress also recognized the need to fulfill the "social, economic, and other requirements of present and future generations …,"[91] it intended for environmental impacts to be not merely considered, but also avoided or mitigated.[92] Thus, NEPA provides that the federal government should use "all practicable means" to "attain the widest range of beneficial uses of the environment *without degradation*, risk to health or safety, or other undesirable and unintended consequences."[93] While it is true that NEPA does not mandate specific substantive outcomes, its requirement that federal agencies consider and publicly disclose the environmental consequences of a proposed action (including actions that contribute to climate change) as well as alternatives to such action has practical and important significance and in fact yields decisions that better protect environmental resources.

NEPA's legislative history confirms Congress's intent to promote a policy of environmental protection. Congress developed NEPA at a time of heightened awareness and growing concern about the state of the environment, amid a series of high-profile environmental crises in the late 1960s.[94] Senator Henry Jackson (D-WA), then-Chairman of the Senate Committee on Interior and Insular Affairs, introduced the Act as a reaction to the "inadequacy of present knowledge, policies, and institutions" to the ecosystem damage resulting from human development and activities.[95] In Senate floor remarks, Senator Jackson pointed to a "new kind of revolutionary movement underway" that was "concerned with the integrity of man's life support system—the human environment" and involved, in particular, "the Nation's youth … taking up the banner of environmental awareness."[96] He saw the bill as Congress' response to this

---

[89] *See* 85 Fed. Reg. at 1702, 1720 (Proposed 40 C.F.R. § 1502.16(a)(10)).

[90] 42 U.S.C. § 4331(a).

[91] *Id.*

[92] S. Rep. No. 91-296, at 5 (1969) (Report from Committee on Interior & Insular Affairs on National Environmental Policy Act of 1969) (a national environmental policy needed to avoid growing environmental problems); *id* at 13 ("[I]t is necessary to move ahead to define the 'environmental' desires of the American people in operational terms that the President, Government agencies at all levels, the courts, private enterprise, and the public can consider and act upon.").

[93] 42 U.S.C. § 4331(b) (emphasis added).

[94] *See* RICHARD F. WEINGROFF, ADDRESSING THE QUIET CRISIS: ORIGINS OF THE NATIONAL ENVIRONMENTAL POLICY ACT OF 1969, at 16–17 [hereinafter NEPA Origins], https://www.fhwa.dot.gov/highwayhistory/nepa/nepa.pdf (describing controversies such as a proposed airport development near Florida wetlands, pipeline construction to the North Slope of Alaska, the Santa Barbara oil spill in early 1969, and Cuyahoga River's latest fire in the summer of 1969).

[95] *Id.* at 18. *See* S. Rep. No. 91-296, at 4 (1969) (noting the Report constituted the "unanimous view of the members of the [Committee]").

[96] 115 Cong. Rec. 40,417 (1969) (statement of Senator Jackson).

AR_0025754

movement, with NEPA intended to ensure that all federal agencies consider the environmental impacts of their actions and "to the fullest extent possible … administer their existing laws, regulations, and policies in conformance with the policies" set forth in NEPA.[97]

The unanimous Senate Committee Report described the urgent need for NEPA because, at the time, "[e]nvironmental problems are only dealt with when they reach crisis proportions. Public desires and aspirations are seldom consulted. Important decisions concerning the use and the shape of [humans'] future environment continue to be made in small but steady increments which perpetuate rather than avoid the recognized mistakes of previous decades."[98] The House of Representatives Managers' statement in the Conference Report similarly recognized the need for a national environmental policy and for cooperation with State and local governments and other concerned public and private agencies in achieving that policy.[99] Contrary to the focus of the Proposed Rule, Congress never intended NEPA to be a means to facilitate speedier infrastructure project reviews by cutting analytical corners in considering project impacts.

Courts, too, have long acknowledged that NEPA's purpose and procedural requirements reach beyond a set of steps for agencies to follow; NEPA is not simply a box-checking exercise.[100] Rather, the Supreme Court has stated that NEPA is an "action-forcing" statute, ensuring that environmental concerns are "integrated into the very process of agency decision-making."[101] That is, NEPA was designed to force agencies to stop, consider the environmental impacts of their decisions, and potentially alter their decisions in a manner that would minimize harm to the environment.[102] Indeed the Supreme Court has recognized that the central purpose of section 102 of NEPA is to ensure that "environmental enhancement opportunities" are not lost and to help prevent "unnecessary degradation."[103]

---

[97] *Id.*

[98] S. Rep. No. 91-296, at 5.

[99] H.R. Rep. No. 91-765, at 7-8 (1969).

[100] *See Kleppe*, 427 U.S. at 409 ("NEPA announced a national policy of environmental protection and placed a responsibility upon the Federal Government to further specific environmental goals by 'all practicable means, consistent with other essential considerations of national policy.'") (quoting 42 U.S.C. § 4331(b)).

[101] *Andrus*, 442 U.S. at 349–50. *See also* S. Rep. No. 91-296, at 9 ("[I]f goals and principles are to be effective, they must be capable of being applied in action. [The proposed NEPA bill] thus incorporates certain "action-forcing" provisions and procedures which are designed to assure that all Federal agencies plan and work toward meeting the challenge of a better environment.").

[102] *See Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin.*, 538 F.3d 1172, 1214–15 (9th Cir. 2008) ("The procedures included in [section] 102 of NEPA are not ends in themselves. They are intended to be 'action forcing.' The unequivocal intent of NEPA is to require agencies to consider and give effect to the environmental goals set forth in the Act, not just to file detailed impact studies which fill government archives.") (quoting *Envtl. Def. Fund, Inc. v. Corps of Eng'rs of the U.S. Army*, 470 F.2d 289, 298 (8th Cir. 1972). *See also Citizens Against Burlington, Inc. v. Busey*, 938 F.2d 190, 193–94 (D.C. Cir. 1991) ("NEPA commands agencies to imbue their decisionmaking, through the use of certain procedures, with our country's commitment to environmental salubrity.").

[103] *Andrus*, 442 U.S. at 351 (quoting S. Rep. No. 91-296).

AR_0025755

In the preamble, CEQ attempts to minimize NEPA's "action-forcing" purpose, focusing solely on NEPA as "a procedural statute."[104] While NEPA does not mandate "particular substantive results in particular problematic instances,"[105] it nevertheless encourages thoughtful and careful agency decision making that avoids environmental harms.[106] Although courts have emphasized the procedural nature of the statute, ample history suggests that Congress intended the Act to have substantive effect—once agencies reviewed impacts of a proposed action and evaluated alternatives, they would then follow the policy of acknowledging the importance of environmental protection as being as important as other values.[107] CEQ's proposed revision of paragraph (a) in section 1500.1 to excise "action-forcing"[108] is thus contrary to NEPA's purpose and long-settled judicial precedent.

## D.    The Proposed Rule Would Improperly Limit NEPA's Application to Federal Actions

CEQ's Proposed Rule seeks to unlawfully and unreasonably narrow NEPA's application and scope in four key ways. First, the Proposed Rule proposes a new "threshold applicability analysis" that would create a class of federal actions that evade NEPA review. Second, the Proposed Rule would improperly limit the use of detailed environmental reviews by redefining what qualifies as a "significant" effect on the environment. Third, the Proposed Rule would improperly expand the use of categorical exclusions, thwarting NEPA's environmental stewardship goals. Fourth, the Proposed Rule threatens to allow agencies to irreversibly commit resources prior to completion of NEPA review.

### 1.    CEQ Proposes a New "Threshold Applicability Analysis" that Would Unlawfully Limit NEPA's Application

NEPA's purposes can only be achieved through its rigorous application. CEQ's Proposed Rule, however, threatens to sideline NEPA by imposing a new "threshold applicability analysis" for determining whether NEPA applies to a particular project that employs a narrower definition of "major Federal action," significantly expands the "functional equivalency" concept, and invites federal agencies to avoid NEPA review by construing other statutory directives to conflict with

---

[104] 85 Fed. Reg. at 1693.

[105] Lazarus, *supra* note 30, at 1517 (quoting *Calvert Cliffs' Coordinating Comm., Inc. v. U.S. Atomic Energy Comm'n*, 449 F.2d 1109, 1112 (D.C. Cir. 1971)).

[106] *See* S. Rep. No. 91-296, at 8; *see Kleppe*, 427 U.S. at 409 & n.18 (noting the "action-forcing" intent of NEPA section 102(2)(C) as expressed throughout its legislative history).

[107] *See* S. Rep. No. 91-296, at 9 (NEPA intended to provide a "mandate" to guide federal agencies' actions and ensure federal agencies work toward better environment); *see id.* at 5 (NEPA intended to provide comprehensive policy on environmental management to respond to need to "reorder national goals and priorities" to deal with environmental degradation); *see also, e.g.,* Sam Kalen, *Ecology Comes of Age: NEPA's Lost Mandate*, 21 DUKE ENVT'L L. & POLICY F. 113 (2010), https://scholarship.law.duke.edu/cgi/viewcontent.cgi?article=1040&context=delpf (providing extensive review of events leading up the NEPA's passage and congressional intent at the time).

[108] 85 Fed. Reg. at 1693, 1712 (proposed 40 C.F.R. § 1500.1).

AR_0025756

NEPA.[109] Each of these proposed changes threatens to exclude certain federal actions from NEPA review in violation of the spirit and letter of NEPA. Moreover, CEQ has failed to provide a rational justification for these changes in violation of the APA.[110]

CEQ's proposed threshold applicability analysis would direct federal agencies to consider five factors to determine whether to apply NEPA. These factors would require agencies to consider whether a project is:

(1) a "major Federal action," under CEQ's new definition;[111]

(2) a "non-discretionary action for which the agency lacks authority to consider environmental effects as part of its decision-making process;"

(3) an "action for which compliance with NEPA would clearly and fundamentally conflict with the requirements of another statute;"

(4) an action for which compliance with NEPA "would be inconsistent with Congressional intent due to the requirements of another statute;" and

(5) "an action for which the agency has determined that the analyses or processes under other statutes serve the function of agency compliance with NEPA."[112]

This new threshold inquiry would provide several avenues for federal agencies to make an end run around environmental review in violation of NEPA.[113]

###### a.    CEQ's Proposed Redefinition of "Major Federal Action" Is Unlawful

As noted above, Congress specifically directed federal agencies to apply NEPA "to the fullest extent possible" by utilizing "a systematic, interdisciplinary approach" to integrate science in decision making that may have an impact on the human environment and to ensure that "environmental amenities and values" are given appropriate consideration in decision making.[114]

---

[109] *Id.* at 1695, 1714 (Proposed 40 C.F.R. § 1501.1).

[110] *State Farm*, 463 U.S. at 43.

[111] 85 Fed. Reg. at 1708–09, 1714, 1729 (proposed 40 C.F.R. 1501.1(a)(1); §§ 1508.1(q)).

[112] 85 Fed. Reg. at 1695, 1714 (proposed 40 C.F.R. § 1501.1). *See also id.* at 1728 (proposed 40 C.F.R. § 1507.3(c)); (indicating that agencies can develop agency-specific NEPA regulations that outline how they will apply the threshold applicability analysis).

[113] CEQ also should not adopt its proposed regulation at § 1507.3(b)(6), which directs agencies that they may include in their own NEPA regulations procedures for identifying actions not subject to NEPA. *See* 85 Fed. Reg. at 1727–28.

[114] 42 U.S.C. § 4332. S*ee also Flint Ridge Dev. Co. v. Scenic Rivers Ass'n of Okla.*, 426 U.S. 776, 787 (1976) (explaining that Congress's directive that NEPA apply "to the fullest extent possible" "is neither accidental nor

AR_0025757

Contrary to that clear instruction, CEQ proposes redefining "major federal action"[115] to exclude a number of federal actions from *any* NEPA review.

In particular, CEQ proposes to eliminate its longstanding interpretation that "[m]ajor reinforces but does not have a meaning independent of significantly,"[116] and to add new language that will limit "major Federal actions" to those "subject to Federal control and responsibility with effects that may be significant."[117] In effect, and as CEQ acknowledges, its proposed definition would direct federal agencies to consider the degree of federal control in determining whether an action is a "major Federal action" rather than to consider the environmental significance of a proposed federal action—a substantial shift from CEQ's current regulations.[118] By changing the focus from environmental impacts to the level of federal control exercised over an action, CEQ proposes to shift the emphasis away from environmental harms at the critical stage of determining whether NEPA applies at all.

Moreover, CEQ's proposed changes would inject vagueness and confusion into the inquiry of whether federal or state agencies must apply NEPA review to certain projects. For example, the Proposed Rule threatens to upend a robust body of case law interpreting when NEPA applies to federally funded projects[119] by directing that "major Federal actions" do not include projects receiving federal financial assistance "where the Federal agency does not exercise sufficient control and responsibility over the effects of the action."[120] Notably, CEQ does not define what constitutes "sufficient control and responsibility." So, agencies and courts would have to determine whether existing case law holding that NEPA applies even when there is only some "indicia of control over the private [or state] actors by the federal agency"[121] still stands under this new regulatory regime.

CEQ also fails to provide a rational explanation for changing its definition of major federal action, rendering the proposed changes unlawful.[122] CEQ claims that its prior approach failed to

---

hyperbolic" but is instead "a deliberate command that the duty NEPA imposes upon the agencies to consider environmental factors not be shunted aside in the bureaucratic shuffle").

[115] 40 C.F.R. § 1508.18 (Major federal action).

[116] 85 Fed. Reg. at 1708–09. *Compare id.* at 1729 (proposed 40 C.F.R. § 1508.1(q)), *with* 40 C.F.R. § 1508.18.

[117] 85 Fed. Reg. at 1729 (proposed 40 C.F.R. § 1508.1(q)).

[118] 85 Fed. Reg. at 1709.

[119] *See* DANIEL R. MANDELKER, NEPA LAW AND LITIGATION, § 8:19 (2d ed. 2016) (reviewing cases addressing NEPA's application to projects subject to federal permits, approvals, and control).

[120] 85 Fed. Reg. at 1729 (proposed 40 C.F.R. § 1508.1(q)(1)).

[121] *See Mayaguezanos por la Salud y el Ambiente v. United States*, 198 F.3d 297, 302 (1st Cir. 1999) (reviewing case law from different circuit courts of appeal on the issue of how to determine whether a situation constitutes a major federal action under NEPA).

[122] *State Farm*, 463 U.S. at 43.

AR_0025758

give meaning to all words in the statute.[123] But CEQ's proposed approach unreasonably conflates "major" and "federal" by unlawfully shifting the focus of NEPA's application from a project's environmental significance to "Federal control and responsibility."[124] This change would allow a purportedly minor federal action with a significant impact on the environment and potential environmental justice implications to go without NEPA review. Such an interpretation unlawfully separates "the consideration of the magnitude of federal action from its impact on the environment" and "does little to foster the purposes of [NEPA], i.e., to 'attain the widest range of beneficial uses of the environment without degradation, risk to health and safety, or other undesirable and unintended consequences.'"[125] Moreover, CEQ's reliance on the legislative history of NEPA ignores the statute's plain direction to apply NEPA expansively[126] and overlooks other parts of the same Senate Report indicating that, unlike "major" and "federal," the terms "major" and "significant" were indeed used interchangeably in the statute.[127]

### b.    CEQ's Expansion of Functional Equivalency Violates NEPA and the APA

CEQ's proposed threshold applicability analysis also would unlawfully and significantly expand the concept of "functional equivalency," providing another avenue for federal agencies to avoid NEPA review in contravention of the Congressional mandate to apply NEPA broadly.[128]

Specifically, CEQ's Proposed Rule would allow agencies to designate other "analyses or processes" to serve as the functional equivalent of NEPA review if those other analyses or procedures have (1) "substantive and procedural standards that ensure full and adequate consideration of environmental issues," (2) "public participation before a final alternative is selected," and (3) a purpose "to examine environmental issues."[129] For rulemakings, the Proposed Rule, if enacted, would provide that "analyses prepared pursuant to other statutory or Executive [O]rder requirements may serve as the functional equivalent of the EIS" if the above-listed factors are met.[130]

CEQ's proposed expansion of functional equivalency threatens to allow agencies to make an end run around the NEPA process by relying on analyses or procedures that do not require the

---

[123] 85 Fed. Reg. at 1709.

[124] *Id*. at 1708.

[125] *Minn. Pub. Interest Research Grp. v. Butz*, 498 F.2d 1314, 1322 (8th Cir. 1974) (quoting 42 U.S.C. § 4331(b)(3)).

[126] 42 U.S.C. § 4332.

[127] *See* S. Rep. No. 91-296, at 30 (1969) (deleting the term "significant" and adding the term "major" before Federal actions and "significantly" before "affecting the quality of the human environment").

[128] 42 U.S.C. § 4332; 85 Fed. Reg. at 1695, 1727–28 (proposed 40 C.F.R. §§ 1501.1, 1509.6(b), 1507.3(b)(6)).

[129] 85 Fed. Reg. at 1727–28 (proposed 40 C.F.R. § 1507.3(b)(6)).

[130] *Id*. at 1726 (proposed 40 C.F.R. § 1506.9).

AR_0025759

same degree of environmental analysis or public participation as NEPA. Although federal courts recognize functional equivalency, they tend to apply the concept narrowly[131] and have most often applied "functional equivalency" to the Environmental Protection Agency, an agency with a mission of protecting human and environmental health and numerous statutory charges to fully evaluate environmental harms.[132] In contrast to that narrow application of the functional equivalency exemption, CEQ's Proposed Rule would extend the concept of functional equivalency to all "other agencies,"[133] potentially allowing them to avoid NEPA review if they determine that they meet the vague and general factors in the Proposed Rule.[134] Such a broad application of functional equivalency would run afoul of NEPA's mandate that NEPA be applied "to the fullest extent possible"[135] and threatens to allow federal agencies to avoid reviewing a project's broad environmental impacts by finding functional equivalency in statutes that mandate a much more narrow scope of environmental review.

Seeking to extend functional equivalency even further, CEQ also proposes to add a regulatory provision indicating that "analyses prepared pursuant to other statutory or Executive [O]rder requirements may serve as the functional equivalent of the EIS and be sufficient to comply with NEPA."[136] As an example of a potentially "functionally equivalent" process, CEQ cites the regulatory impact analysis (RIA) required by Executive Order 12866, which directs federal agencies to prepare an economic assessment of the costs and benefits of a proposed action.[137] The example proves the problem. RIAs are a poor substitute for NEPA because they are designed to evaluate the economic costs and benefits of a proposed rulemaking and thus do not have a primary focus on detailed environmental review.[138] In addition, RIAs do not provide a sufficient opportunity for the public or states to review and weigh in on the environmental impacts associated

---

[131] *See, e.g., Portland Cement Ass'n v. Ruckelshaus*, 486 F.2d 375, 384-85, 387 (D.C. Cir. 1973) (concluding that "section 111 of the Clean Air Act, properly construed, requires the functional equivalent of a NEPA impact statement," and allowing a narrow exemption from NEPA); *Fund For Animals v. Hall*, 448 F. Supp. 2d 127, 134 (D.D.C. 2006) (rejecting Fish and Wildlife Service's argument that the Migratory Bird Hunting Frameworks or the Endangered Species Act's section 7 consultation process are the functional equivalent of NEPA's environmental review process).

[132] *See Merrell v. Thomas*, 807 F.2d 776, 781 (9th Cir. 1986) (reviewing cases applying functional equivalency to EPA procedures). *See also Tex. Comm. on Nat. Res. v. Bergland*, 573 F.2d 201, 208 (5th Cir. 1978) (refusing to apply functional equivalency to the Forest Service because its duties include balancing "environmental and economic needs in managing the nation's timber supply").

[133] 85 Fed. Reg. at 1707.

[134] *Id.* at 1727 (proposed 40 C.F.R. § 1507.3(b)(6)).

[135] 42 U.S.C. § 4332.

[136] 85 Fed. Reg. at 1726 (proposed 40 C.F.R. § 1506.9).

[137] *Id.* at 1705. *See also* Exec. Order No. 12866, 58 Fed. Reg. 51,735 (Sept. 30, 1993).

[138] *See generally*, Office of Mgmt. and Budget, Circular A-4 (Sept. 17, 2003), https://obamawhitehouse.archives.gov/omb/circulars_a004_a-4. *See also id.* at 44 (directing agencies to "complete NEPA documentation before issuing a final rule").

AR_0025760

with an action.[139] Agency use of RIAs, even when combined with other analyses, lacks the comprehensive review of an action's environmental impacts demanded by NEPA.[140] Other similar analyses which either fail to focus on environmental impacts or provide adequate public input will likely suffer from the same flaws.

CEQ did not and cannot rationally support expanding the use of functional equivalency to avoid NEPA review. CEQ does not cite any case law or provide any rationale to support its broad expansion of functional equivalency to all federal agencies.[141] CEQ also provides sparse direction on how the functional equivalency concept should be applied under the Proposed Rule, relying instead on vague terms that could potentially allow expansive application of this concept.[142] Moreover, although CEQ contends that its regulatory revisions will "promote efficiency and reduce duplication in the assessment of regulatory proposals,"[143] CEQ fails to explain how the revised regulations will promote such efficiency and also serve NEPA's fundamental purpose of ensuring careful review of environmental impacts.[144]

For the same reasons, CEQ should not add additional regulatory changes identifying specific agency analyses that CEQ claims are the functional equivalent of the NEPA process.[145]

### c.    CEQ's Other Threshold Applicability Analysis Factors Would Further Limit NEPA's Application and Lack Rational Support

CEQ's proposed threshold applicability analysis also would provide new avenues for federal agencies to escape NEPA review by determining that the proposed action: (a) "in whole or in part, is a non-discretionary action for which the agency lacks authority to consider environmental effects as part of its decision-making process"; (b) "is an action for which compliance with NEPA would clearly and fundamentally conflict with the requirements of another statute"; or (c) "is an action for which compliance with NEPA would be inconsistent with Congressional intent due to the requirements of another statute."[146]

These new threshold factors threaten to give federal agencies unwarranted discretion to avoid NEPA review, again in violation of NEPA's admonition that federal agencies must comply

---

[139] *See generally*, *id.*

[140] *See United States v. Coal. for Buzzards Bay*, 644 F.3d 26, 37-38 (1st Cir. 2011) (rejecting Coast Guard argument that a rulemaking process was the functional equivalent of a NEPA review, since the rulemaking process contained no "substantial environmental analysis.").

[141] 85 Fed. Reg. at 1695, 1706–07.

[142] *See id.* at 1695, 1705, 1706–07.

[143] *Id.* at 1705.

[144] 42 U.S.C. § 4332.

[145] 85 Fed. Reg. at 1705.

[146] *Id.* at 1714.

28

with NEPA "to the fullest extent possible."[147] As the Ninth Circuit has explained, Congress included that statutory language to prevent agencies from "attempt[ing] to avoid any compliance with NEPA by narrowly construing other statutory directives to create a conflict with NEPA."[148] Despite this clear statutory language, CEQ's proposed NEPA applicability factors seem designed for agencies to do just what Congress sought to prevent and indeed purport to authorize agencies to broadly construe Congressional intent and statutory language directly to avoid NEPA review.

Moreover, CEQ's proposed threshold factors conflict with the general rule of statutory interpretation that "repeals by implication are not favored."[149] By allowing agencies to determine whether an action conflicts with the requirements of another statute or with congressional intent, CEQ's Proposed Rule purports to allow agencies to infer congressional intent to repeal NEPA's application to specific projects. Just like the courts, agencies "are not at liberty to pick and choose among congressional enactments" but instead have the duty, "absent a clearly expressed congressional intention to the contrary, to regard each [statute] as effective."[150]

CEQ does not rationally support these new factors for determining whether NEPA applies to federal agency actions.[151] Notably, CEQ again provides no citations to support its contention that "courts have found that NEPA is inapplicable where an agency is carrying out a non-discretionary duty or obligation, where an agency's statutory obligation clearly or fundamentally conflict with NEPA compliance, [and] where Congress has established requirements under another statute that displaces NEPA compliance."[152] CEQ does not provide guidance on how to interpret or apply the scope of these factors consistent with the case law. CEQ's only justification for adding this new provision is to "assist agencies" in determining whether NEPA applies to a particular action.[153] Far from accomplishing that purpose, CEQ's vague threshold factors will create confusion and inject significant uncertainty into the NEPA process. This uncertainty threatens to limit NEPA's application to projects requiring environmental review, reduce transparency, and increase the potential for litigation.

---

[147] 42 U.S.C. § 4332.

[148] *Ctr. for Biological Diversity*, 538 F.3d at 1213 (quoting *Forelaws on Board v. Johnson*, 743 F.2d 677, 683 (9th Cir. 1985)).

[149] *Morton v. Mancari*, 417 U.S. 535, 549 (1974) (quoting *Posadas v. Nat'l City Bank*, 296 U.S. 497, 503 (1936)). *See also Nat'l Ass'n of Homebuilders v. Def. of Wildlife*, 551 U.S. 644, 662–64 (2007) (refusing to find later enacted statute implicitly revealed earlier enacted statute).

[150] *Morton*, 417 U.S. at 551.

[151] *State Farm*, 463 U.S. at 43.

[152] 85 Fed. Reg. at 1695.

[153] *Id.*

29

### d.    CEQ Should Not Adopt Other Limits on NEPA's Scope

CEQ also should not further amend "major federal action" or add regulatory changes that would exclude other categories of actions.[154] In particular, for the reasons stated above, CEQ should not make changes to the regulatory language to further limit NEPA's application to projects with federal funding or address what CEQ deems the "small handle problem," which refers to situations where federal action is only a part of a nonfederal project.[155] Nor should CEQ establish a threshold for minimal Federal funding or designate certain types of financial interests as excluded from NEPA review.[156] Any project with a federal nexus should require federal environmental review, even if that federal nexus is based on minimal federal funding or involvement. Failure to conduct NEPA review for such projects would result in less transparent and less informed decision making. For those states with their own environmental review processes, federal agencies' failure to conduct environmental review would shift the burden to states to perform that review. For those states without their own environmental review processes, no environmental review would occur prior to federal agency action affecting the human environment.

CEQ also should not adopt regulations addressing NEPA's application to extraterritorial environmental impacts.[157] CEQ's request for comment on whether regulations should clarify NEPA's extraterritorial application is vague and fails to address case law holding that the presumption against extraterritoriality does not apply to federal agency actions that have a significant environmental effect, regardless of whether that effect occurs within U.S. borders.[158] Nor is it clear whether CEQ's proposal would address transboundary impacts of major federal actions. As CEQ's current guidance on transboundary impacts notes, "the entire body of NEPA law directs federal agencies to analyze the effects of proposed actions to the extent they are reasonably foreseeable consequences of the proposed action, regardless of where those impacts might occur."[159] CEQ should not adopt any regulatory language inconsistent with this case law or its current guidance.

---

[154] *Id.* at 1709.

[155] *Id.*

[156] *Id.*

[157] *See id.*

[158] *See Envtl. Def. Fund v. Massey*, 986 F.2d 528, 536 (D.C. Cir. 1993). *See also Nat. Res. Def. Council Inc. v. U.S. Dep't of Navy*, No. CV-01-07781 CAS (RZX), 2002 WL 32095131, at *10–11 (C.D. Cal. Sept. 17, 2002) (declining to apply the presumption against extraterritoriality as a bar to the application of NEPA to Navy activities where NEPA's application would not be inconsistent with U.S. foreign policy).

[159] CEQ, MEMORANDUM TO THE HEADS OF AGENCIES ON THE APPLICATION OF NEPA TO PROPOSED FEDERAL ACTIONS IN THE UNITED STATES WITH TRANSBOUNDARY EFFECTS, at 2 (July 1, 1997), https://ceq.doe.gov/docs/ceq-regulations-and-guidance/memorandum-transboundary-impacts-070197.pdf.

AR_0025763

2.    **CEQ's Proposed Definition of "Significance" Improperly Limits Environmental Review**

CEQ's proposed changes to the definition of significance would create an unlawful mechanism for agencies to avoid detailed NEPA review by making fewer significance determinations.

In particular, the Proposed Rule would eliminate the existing definition of "significantly" and replaces it with a new, vague provision for determining the appropriate level of NEPA review.[160] Existing CEQ regulations require agencies to consider both an action's "context" and "intensity" to determine whether an action may "significantly" affect the environment.[161] The "context" component requires agencies to analyze the significance of an action "in several contexts such as society as a whole (human, national), the affected region, the affected interests, and the locality," which may vary depending on the setting of the proposed action.[162] The "intensity" component requires federal agencies to consider ten factors, including a project's beneficial and adverse effects, its impacts to public health or safety, whether the action "is related to other actions with individually insignificant but cumulatively significant impacts," and the degree to which the action may adversely affect endangered or threatened species or their habitat.[163]

In contrast, CEQ's new definition of "significantly" would direct agencies to assess the appropriate level of NEPA review by analyzing "the potentially affected environment," which replaces the current consideration of "context," and the "degree of the effects of the action," which replaces the current consideration of "intensity."[164] To determine "the potentially affected environment," the Proposed Rule would provide that agencies "*may* consider, as appropriate, the affected area" and may limit this review to the effects in the "locale."[165] To determine "the degree of the effects" of the action, the Proposed Rule would direct agencies to consider (i) that effects may be beneficial or adverse, (ii) effects to public health and safety, and (iii) whether there are effects that would violate Federal, State, Tribal, or local law protecting the environment.[166]

These changes would substantially and unlawfully diminish the scope of "significant" effects. CEQ's new regulations unlawfully exclude consideration of cumulative effects when determining a project's significance. Specifically, CEQ's Proposed Rule would eliminate consideration of whether the proposed action "is related to other actions with individually

---

[160] *See* 85 Fed. Reg. at 1714–15 (proposed 40 C.F.R. § 1501.3(b)).

[161] 40 C.F.R. § 1508.27; *Ctr. for Biological Diversity*, 538 F.3d at 1185–86.

[162] 40 C.F.R. § 1508.27(a).

[163] *Id.* § 1508.27(b).

[164] 85 Fed. Reg. at 1695, 1714 (proposed 40 C.F.R. § 1501.3(b)).

[165] *Id.* at 1714 (proposed 40 C.F.R. § 1501.3(b)(1)) (emphasis added).

[166] *Id.* at 1714–15 (proposed 40 C.F.R. § 1501.3(b)(2)).

AR_0025764

insignificant but cumulatively significant impacts."[167] As discussed in more detail below, section IV.F, *infra*, eliminating consideration of cumulative effects threatens to drastically undermine NEPA's purpose.

Moreover, the Proposed Rule would eliminate, without explanation, consideration of whether an action "may adversely affect" a species listed as threatened or endangered under the Endangered Species Act in determining the significance of an action.[168] Eliminating consideration of impacts to these species in the significance determination is inconsistent with NEPA's core aims of ensuring informed decision making and detailed consideration of environmental impacts. It is also inconsistent with NEPA's legislative history, which explains the need to counteract "the decline and extinction of fish and wildlife species" as a reason for passing NEPA.[169] Since the result will be contrary to CEQ's stated rationale and runs directly counter to both a long-standing agency interpretation and a well-developed body of case law, CEQ's proposed change is arbitrary and capricious.

The Proposed Rule also would remove language stating that "significance cannot be avoided by terming an action temporary or breaking it down into small component parts."[170] Courts have long held that agencies may not avoid meaningful NEPA review by improperly segmenting a project.[171] CEQ attempts to justify this change by stating that other provisions, namely proposed 40 C.F.R. §§ 1501.9(e) and 1502.4(a), "provide that agencies evaluate in a single EIS proposals or parts of proposals that are related closely enough to be, in effect, a single course of action."[172] But those provisions only govern what agencies should do *after* they have made the initial determination of what level of environmental review to conduct.[173] CEQ's Proposed Rule thus threatens to allow federal agencies to determine that a more limited environmental review

---

[167] *Compare* 85 Fed. Reg. at 1714 (proposed 40 C.F.R. § 1501.3), *with* 40 C.F.R. § 1508.27(b)(7).

[168] *Compare* 85 Fed. Reg. at 1714–15 (proposed 40 C.F.R. § 1501.3), *with* 40 C.F.R. § 1508.27(b)(9).

[169] S. Rep. No. 91-296, at 4.

[170] *Compare* 85 Fed. Reg. at 1695, 1714 (proposed 40 C.F.R. § 1501.3), *with* 40 C.F.R. § 1508.27(7).

[171] *See Pres. Endangered Areas of Cobb's History, Inc. v. U.S. Army Corps of Eng'rs*, 87 F.3d 1242, 1247 (11th Cir. 1996) (agency "cannot 'evade [its] responsibilities' under the National Environmental Policy Act by 'artificially dividing a major federal action into smaller components, each without a 'significant' impact.'" (quoting *Coal. on Sensible Transp., Inc. v. Dole*, 826 F.2d 60, 68 (D.C.Cir.1987)); *Ross v. Fed. Highway Admin.*, 162 F.3d 1046, 1052 (10th Cir. 1998) ("[S]tates may not avoid NEPA's requirements by withdrawing a segment of a project from federal funding.") (citing *San Antonio Conservation Society v. Texas Highway Dept.*, 446 F.2d 1013, 1027 (1971) (state cannot circumvent federal laws by constructing segment of federal highway project with state funding); *Scottsdale Mall v. State of Indiana*, 549 F.2d 484, 489 (7th Cir.1977) (withdrawal of federal funding from a segment of a "major federal action" does not relieve state of NEPA compliance; *Indian Lookout All. v. Volpe*, 484 F.2d 11, 18 (8th Cir. 1973) (collecting cases).

[172] 85 Fed. Reg. at 1695.

[173] *See id.* at 1716 (stating that 40 C.F.R. § 1501.9 applies "to determine the scope of issues for analysis in an environmental impact statement"); *id.* at 1718 (stating that 40 C.F.R. § 1502.4 governs review of major federal actions "requiring the preparation of environmental impact statements").

AR_0025765

process applies without ever reaching the critical question of whether the proposed action is being improperly segmented or defined as temporary at the initial stage. Such a determination could run afoul of NEPA's basic requirement that an EIS must be prepared for projects with significant environmental impacts and should not be improperly segmented to avoid detailed review.[174]

In violation of the APA, CEQ fails adequately to justify these proposed changes.[175] CEQ contends that the changes are needed because the revisions are necessary to provide direction and clarity.[176] Yet, instead of adding clarity to the decisional framework, CEQ's new definitions would inject vagueness and confusion into the NEPA process by removing key considerations from the analysis of whether a proposed action may significantly affect the environment. For example, the Proposed Rule would provide that agencies "*may*" consider the area affected by a project replacing previous direction that agencies "*must*" analyze the significance of an action in several contexts, including society as a whole, the affected region, the affected interests, and the locality.[177] It is thus unclear what affected area agencies would consider under the Proposed Rule. Moreover, to the extent CEQ's definition would permit assessment of only local effects, agencies would altogether miss any far-reaching, potentially serious environmental impacts, including environmental justice impacts, and thus run afoul of NEPA's core mandates. CEQ cannot adopt regulations that so dilute and obscure the significance framework, which CEQ acknowledges "is central to determining the appropriate level of review" under NEPA.[178]

### 3. CEQ's Proposed Rule Would Improperly Expand the Use of Categorical Exclusions

CEQ's Proposed Rule would substantially expand the application and scope of categorical exclusions, threatening to turn this useful tool for streamlining the NEPA process[179] into a mechanism for undermining NEPA's goals. As CEQ has previously explained, "[i]f used inappropriately, categorical exclusions can thwart NEPA's environmental stewardship goals, by compromising the quality and transparency of agency environmental review and decisionmaking, as well as compromising the opportunity for meaningful public participation and review."[180] CEQ's Proposed Rule violates NEPA and lacks rational support.

---

[174] 42 U.S.C. § 4332; *Pres. Endangered Areas of Cobb's History, Inc.*, 87 F.3d at 1247.

[175] *State Farm*, 463 U.S. at 43.

[176] 85 Fed. Reg. at 1695.

[177] *Compare* 40 C.F.R. § 1508.27(a) (emphasis added), *with* CEQ Proposed Rule, 85 Fed. Reg. at 1714 (emphasis added).

[178] 85 Fed. Reg. at 1695.

[179] *Id.* at 1695–96 (noting that Federal agencies have developed and documented more than 2,000 categorical exclusions over the past 40 years and that federal agencies apply categorical exclusions to approximately 100,000 federal agency actions annually).

[180] CEQ, MEMORANDUM FOR HEADS OF FEDERAL DEPARTMENTS AND AGENCIES: ESTABLISHING, APPLYING, AND REVISING CATEGORICAL EXCLUSIONS UNDER THE NATIONAL ENVIRONMENTAL POLICY ACT, at 3 (Nov. 23, 2010)

33

AR_0025766

a.    **CEQ's Proposed Rule Would Unlawfully Expand the Definition of Categorical Exclusions**

The Proposed Rule would unlawfully and unreasonably expand the definition of categorical exclusions. Specifically, the Proposed Rule would alter the existing requirement that agencies determine that categorically excluded actions "do not have an individually or cumulatively significant effect on the human environment" by inserting "normally" and eliminating "individually or cumulatively."[181]

As discussed in section IV.F, *infra*, CEQ's Proposed Rule would remove cumulative impacts from NEPA analysis in conflict with NEPA's text and purpose and decades of case law recognizing that cumulative impacts are a critical component of NEPA review. Removing consideration of cumulative impacts when determining whether to apply a categorical exclusion magnifies this legal deficiency by potentially directing agencies to unlawfully avoid environmental review despite the existence of cumulative significant environmental impacts.[182]

CEQ has not rationally justified this proposed change. Indeed, CEQ's sole justification for removing the phrase "individually or cumulatively" is to create "consistency with the proposed revision to the definition of 'effects.'"[183] But that flimsy rationale fails, because, as discussed in section IV.F, *infra*, CEQ's revisions to the "effects" definition are arbitrary and capricious and violate NEPA and the APA.

In addition, CEQ's proposed insertion of "normally" threatens to broaden the scope of categorical exclusions adopted by agencies and, given the vagueness of the term, add confusion.[184] CEQ states that it is adding "normally" "to clarify that there may be situations where an action may have significant effects on account of extraordinary circumstances."[185] But CEQ provides no guidance on how agencies should define "normally" or otherwise determine which actions "normally do not have a significant effect on the human environment."[186] Nor does CEQ provide a relevant time period for applying this new term, which is particularly concerning given that

---

[hereinafter Categorical Exclusions Memorandum], https://ceq.doe.gov/docs/ceq-regulations-and-guidance/NEPA_CE_Guidance_Nov232010.pdf. *See also* 42 U.S.C. § 4332(2)(C); *Sierra Club v. Bosworth*, 510 F.3d 1016, 1027 (9th Cir. 2007) (to use categorical exclusions federal agencies "must document that the action to be undertaken is insignificant because the threshold question in a NEPA case is whether a proposed project will significantly affect the environment, thereby triggering the requirement for an EIS" quotation and citation omitted)).

[181] *Compare* 40 C.F.R. § 1508.4 *with* 85 Fed. Reg. at 1713 (proposed 40 C.F.R. § 1500.4(a) and § 1500.5); 1715 (proposed 40 C.F.R. § 1501.4), 1728 (proposed 40 C.F.R. § 1508.1(d)).

[182] 42 U.S.C. § 4332(C).

[183] 85 Fed. Reg. at 1707.

[184] *State Farm*, 463 U.S. at 43.

[185] 85 Fed. Reg. at 1707.

[186] *Id.* at 1728 (proposed 40 C.F.R. § 1508.1(d)).

AR_0025767

CEQ's current guidance on categorical exclusions—which cites the *Deepwater Horizon* disaster as an example—advises that "assumptions underlying the nature and impact of activities encompassed by categorical exclusions have changed over time."[187] As CEQ previously noted in its report on the Deepwater Horizon explosion which killed 11 crew members and caused extensive environmental harm, the permitting agency had relied on categorical exclusions established in the 1980s to approve British Petroleum's initial and revised exploration plans for the Macondo well.[188] CEQ's proposed change thus threatens to greatly expand the scope of categorical exclusions adopted by agencies, potentially allowing categorical exclusions for actions with significant effects in violation of NEPA.[189]

### b.    CEQ's Proposed Revisions Would Expand Categorical Exclusions by Allowing Agencies to Mitigate Extraordinary Circumstances

CEQ's Proposed Rule would allow agencies to apply a categorical exclusion if an agency mitigates extraordinary circumstances.[190] This proposal would undermine NEPA's requirement that agencies review the environmental impacts of proposed actions with significant environmental impacts.[191] Extraordinary circumstances are circumstances in which "a normally excluded action may have a significant environmental effect," and have typically included factors similar to those used to evaluate "intensity" in the current significance determination, such as the potential for effects on protected species or habitat or on historic properties.[192] Under CEQ's proposal, the "mere presence of extraordinary circumstances" would no longer preclude application of a categorical exclusion.[193]

CEQ's proposal would inject uncertainty into the NEPA process. In the preamble, CEQ asserts that in making this determination "the agency may consider whether there is a close causal relationship between a proposed action and the potential effect on the conditions identified as extraordinary circumstances," and whether the action can be modified to avoid such circumstances.[194] As with its changes to the effects determination discussed *infra*, section IV.F,

---

[187] Categorical Exclusion Memorandum, *supra* note 180, at 16.

[188] CEQ, REPORT REGARDING THE MINERAL MANAGEMENT SERVICE'S NEPA POLICIES, PRACTICES, AND PROCEDURES AS THEY RELATE TO OUTER CONTINENTAL SHELF OIL AND GAS EXPLORATION, at 15, 18–20 (Aug. 16, 2010) https://www.doi.gov/sites/doi.gov/files/migrated/news/pressreleases/upload/CEQ-Report-Reviewing-MMS-OCS-NEPA-Implementation.pdf.

[189] *See* 42 U.S.C. § 4332(2)(C).

[190] 85 Fed. Reg. at 1715 (proposed 40 C.F.R. § 1501.4).

[191] 42 U.S.C. § 4332(2)(C).

[192] 40 C.F.R. § 1508.4, 1508.27(b).

[193] 85 Fed. Reg. at 1696.

[194] *Id.*

CEQ provides no reasonable explanation for its use of this "close causal relationship" to avoid meaningful NEPA review.

CEQ's proposal is also inconsistent with its current guidance, which counsels excluding actions with extraordinary circumstances from categorical exclusions. Specifically, CEQ's current guidance directs that where agencies find that a categorical exclusion "includes actions that raise the potential for significant environmental effects with some regularity …, the agency should determine whether to delete the categorical exclusion, or revise it to either limit the category of actions or *expand the extraordinary circumstances that limit when the categorical exclusion can be used*."[195] In contrast, CEQ's proposed change, particularly when taken with the insertion of "normally," would shift the focus to allowing more expansive use of categorical exclusions, increasing the possibility that agencies will apply a categorical exclusion where an EA or EIS may be necessary under NEPA.[196] This proposed change also impacts environmental justice as agencies should consider impacts to minority and low-income communities when considering a categorical exclusion to determine if an extraordinary circumstance exists that may result in further analysis of the project under an EA or EIS.[197] In violation of the APA, CEQ fails to acknowledge that its proposed change departs from its current guidance and also fails to provide a reasoned explanation for doing so.[198]

### c. CEQ's Expansion of Categorical Exclusions Would Impermissibly Limit Public Participation

The Proposed Rule's revisions to categorical exclusions also threaten to diminish public involvement. Given that agencies typically develop little to no documentation for specific applications of categorical exclusions,[199] agencies may avoid public review for their adoption of more expansive categorical exclusions, including mitigated categorical exclusions, and their adoption of other agencies' categorical exclusions, which CEQ seeks to allow under the Proposed Rule.[200]

The Proposed Rule's vague proposal to allow agencies to adopt another agency's categorical exclusions provides no meaningful detail about how an agency will adopt an existing categorical exclusion or whether the agency must provide any notice or documentation about the

---

[195] Categorical Exclusions Memorandum, *supra* note 180, at 15 (emphasis added).

[196] *See California v. Norton*, 311 F.3d 1162, 1175-1–78 (9th Cir. 2002) ("Generally, the agency is required to prepare an EIS or an EA before committing resources to an action.").

[197] *See* REPORT OF FEDERAL INTERAGENCY WORKING GROUP ON ENVIRONMENTAL JUSTICE & NEPA COMMITTEE: *PROMISING PRACTICES FOR EJ METHODOLOGIES IN NEPA REVIEWS* (March 2016) https://www.epa.gov/environmentaljustice/ej-iwg-promising-practices-ej-methodologies-nepa-reviews.

[198] *Fox Television Stations, Inc.*, 556 U.S. at 515.

[199] *See* 85 Fed. Reg. at 1696.

[200] *Id.* at 1728 (proposed 40 C.F.R. § 1507.3(e)(5)).

AR_0025769

decision to apply another agency's categorical exclusion. Rather, the Proposed Rule merely states that when an agency develops its own NEPA regulations, the agency "may" include a process of adopting another agency's categorical exclusions but appears to provide no parameters on the level of public review required in that process.[201] This vague provision may also lead to situations where significant impacts of an action are not considered because the agency adopting the initial categorical exclusion may not have considered impacts on resources within the jurisdiction of other resource agencies or analyzed other factors that could lead to a different level of environmental impacts.[202]

CEQ's Proposed Rule also conflicts with CEQ's current guidance on categorical exclusions, which encourages agencies to involve the public for certain categorical exclusion determinations, including "whether a proposal involves extraordinary circumstances"[203] and cautions against relying on another agency's categorical exclusions.[204] CEQ's plan to withdraw existing guidance only enhances the possibility that federal agencies will adopt categorical exclusions without public accountability. Such situations would create legal risks for agencies and thwart NEPA's mandate to consider fully the potential environmental impacts.[205]

### 4.    The Proposed Rule Would Allow Actions to Proceed During NEPA Review

CEQ also proposes to weaken well-established legal principles regarding whether and to what extent an agency can commit resources prior to making a final decision about a proposed action. Specifically, the current regulations state that until agencies issue a final decision on a proposal, "no action concerning the proposal *shall* be taken" that would have an adverse environmental impact or limit the choice of reasonable alternatives.[206] In the Proposed Rule, CEQ would specify a number of actions that applicants can take prior to a final decision, including "acquisition of interests in land (*e.g.*, fee simple, rights-of-way, and conservation easements), purchase of long lead-time equipment, and purchase options made by applicants."[207]

CEQ's Proposed Rule is flatly inconsistent with NEPA's requirement that agencies complete environmental review "before any irreversible and irretrievable commitment of

---

[201] *Id.*

[202] *See* Categorical Exclusions Memorandum, *supra* note 180, at 9 (providing criteria for agencies to use when adopting categorical exclusions by drawing support from other agency categorical exclusions).

[203] Categorical Exclusions Memorandum, *supra* note 180, at 14.

[204] *Id.* at 9.

[205] *See California*, 311 F.3d at 1175–78 (holding that federal agency failed to provide reasoned explanation for its application of a categorical exclusion to the suspension of offshore leases where there was ample evidence of extraordinary circumstances, such as controversy over the potential environmental effects of offshore oil and gas development and the presence of threatened species).

[206] 40 C.F.R. § 1506.1(a).

[207] 85 Fed. Reg. at 1724 (proposed 40 C.F.R. § 1506.1(b)).

AR_0025770

resources."[208] As the Ninth Circuit has explained, this irreversible and irretrievable commitment of resources criterion derives from section 102(C)(v) of NEPA, "which requires an EIS to include a statement of any irreversible and irretrievable commitment of resources which would be involved in the proposed action should it be implemented."[209] CEQ's proposal to allow certain actions prior to completion of environmental review is inconsistent with this case law to the extent that it allows agencies to bind themselves to a particular course of action before completing NEPA review.[210] Determining whether an irretrievable commitment of resources has in fact occurred "is necessarily contextual ... requir[ing] a fact-specific inquiry."[211] Moreover, CEQ should not adopt any regulations regarding "circumstances under which an agency may authorize irreversible and irretrievable commitments of resources" before completing environmental review because such regulations would violate NEPA.[212]

CEQ does not rationally justify its proposed changes. CEQ merely states that its proposed revisions seek to provide "additional clarity on what activities are allowable during the NEPA process."[213] CEQ cites no case law to support its revision and provides no additional explanation to support this significant change in the regulations. As a result, CEQ's proposed change lacks rational support and, if finalized, would be arbitrary and capricious.[214]

## E.    The Proposed Rule Would Improperly Limit Discussion of Alternatives

Courts often cite CEQ's NEPA regulation declaring that the required alternatives analysis is the "heart" of an EIS.[215] NEPA's alternatives analysis promotes informed and reasoned environmental decision making by "sharply defining the issues and providing a clear basis for

---

[208] *See Conner v. Burford*, 848 F.2d 1441, 1446 (9th Cir. 1988); *see also Ctr. for Envtl. Law & Policy v. U.S. Bureau of Reclamation*, 655 F.3d 1000, 1006 (9th Cir. 2011) ("The agency must complete an EA before the 'go-no go' stage of a project ... which is to say before 'making an irreversible and irretrievable commitment of resources.'") (quoting *Metcalf v. Daley*, 214 F.3d 1135, 1142 (9th Cir. 2000); *Sierra Club v. Peterson,* 717 F.2d 1409, 1414 (D. C. Cir. 1983) ("Therefore, the appropriate time for preparing an EIS is prior to a decision, when the decisionmaker retains a maximum range of options.").

[209] *Conner*, 848 F.2d at n.13 (internal quotations omitted).

[210] *See Ctr. for Envtl. Law and Policy*, 655 F.3d at 1007 (no irretrievable commitment of resources where agency retains the ability to forego a course of action, despite obtaining certain permits).

[211] *New Mexico ex rel. Richardson v. Bureau of Land Mgmt.*, 565 F.3d 683, 718 (10th Cir. 2009) (holding that issuance of an oil and gas lease without a no surface occupancy stipulation constitutes an irretrievable commitment of resources).

[212] *See* 85 Fed. Reg. at 1704.

[213] *Id.*

[214] *State Farm*, 463 U.S. at 43.

[215] 40 C.F.R. § 1502.14. *See, e.g., Wildearth Guardians v. U.S. Bureau of Land Mgmt.*, 870 F.3d 1222, 1226 (10th Cir. 2017) (citing 40 C.F.R. § 1502.14); *Navajo Nation v. U.S. Forest Serv.*, 479 F.3d 1024, 1054 (9th Cir. 2007) (same).

AR_0025771

choice among options by the decision maker and the public."[216] While NEPA does not dictate substantive outcomes, the current regulations declare that the alternatives analysis is essential to the federal government meeting its obligation to "use all practicable means" to "fulfill the responsibilities of each generation as trustee of the environment for succeeding generations."[217] The Proposed Rule would nonetheless strike this declaration regarding the "heart" of an EIS.[218] Additionally, the Proposed Rule would unlawfully and unreasonably curtail the required alternatives analyses by limiting consideration of alternatives outside an agency's jurisdiction and by striking key language regarding the required analysis. CEQ should withdraw this unlawful and unreasonable proposal.

The Proposed Rule would eliminate the requirement that an agency evaluate "reasonable alternatives not within the jurisdiction of the lead agency."[219] This new jurisdictional limitation would undercut the very purpose of an alternatives analysis. A decision maker cannot appropriately comprehend the environmental trade-offs among choices available to the project sponsor, to a community, or to the federal government as a whole if only considering options within the lead agency's jurisdiction. For example, if the U.S. Department of Veterans Affairs (VA) is considering expanding a hospital but the proposed parking lot expansion will require cutting a significant number of trees, it may be appropriate for the project's EIS to include an evaluation of expanding local bus service to the hospital to reduce the need to expand the parking lot even though the bus routes are beyond the jurisdiction of the VA. The EIS alternatives analysis can evaluate the feasibility of the local transit agency agreeing to bus service changes as part of its analysis. And, because some state "mini NEPAs" allow for coordinated environmental review,[220] should the local transit agency agree to those changes, it may be able to use the EIS to satisfy its own local environmental review obligations. Similarly, as described in the key guidance document, *40 Most Asked Questions Concerning CEQ's National Environmental Policy Act Regulations* (*Forty Questions Guidance*), alternatives beyond what Congress has authorized "must still be evaluated in the EIS if they are reasonable, because the EIS may serve as the basis for modifying the Congressional approval or funding in light of NEPA's goals and policies."[221] It makes no sense—and flies in the face of NEPA's core requirements—to cabin analyses to a particular

---

[216] 40 C.F.R. § 1502.14.

[217] 42 U.S.C. § 4331(b)(1).

[218] *Compare* 40 C.F.R. § 1502.14, *with* 85 Fed. Reg. at 1720 (proposed 40 C.F.R. § 1502.14).

[219] *Id.*

[220] *See, e.g.,* 6 N.Y. Comp. Codes R. & Regs. § 617.15 (New York State Environmental Quality Review Act regulations permitting an EIS prepared pursuant to NEPA to be used to satisfy state environmental review obligations); Mass Gen. Laws Ch. 30 § 32G (Draft and Final EISs under NEPA may be submitted in lieu of a required state Environmental Impact Report, provided that the NEPA documents comply with applicable state requirements and policies).

[221] CEQ, MEMORANDUM TO AGENCIES: 40 MOST ASKED QUESTIONS CONCERNING CEQ'S NATIONAL ENVIRONMENTAL POLICY ACT REGULATIONS, at Question 2b (1986) [hereinafter Forty Questions Guidance] https://www.energy.gov/sites/prod/files/2018/06/f53/G-CEQ-40Questions.pdf.

39

agency's limited jurisdiction and ignore creative, efficient, and beneficial alternatives to a proposed action.

CEQ does not adequately justify this misguided change in its NEPA regulations. In the preamble to the Proposed Rule, CEQ says that it is "not efficient or reasonable to require agencies to develop detailed analysis" for alternatives outside their jurisdiction.[222] CEQ also claims that an alternative outside an agency's jurisdiction would not be "technically feasible."[223] This explanation is unsupported—CEQ does not explain why it has come to the conclusion that such alternatives analysis is not efficient or reasonable, or that is it is infeasible to require such alternatives.

Indeed, CEQ does not explain why the changes are necessary now when existing regulations and case law already address the issue. An agency's alternatives analysis must adhere to a project specific "rule of reason."[224] Thus, if it is unreasonable for an agency to analyze a particular alternative due to a jurisdictional or feasibility issue, the agency need not conduct a full evaluation of that alternative. Instead, the agency must simply explain why it is unreasonable to fully consider that alternative.[225] What the agency may not do—though CEQ attempts to allow it now—is simply ignore alternatives on blanket grounds of jurisdiction or feasibility, when it would otherwise be reasonable for the agency to actually consider them. CEQ's utter lack of reasoned justification for this significant change is arbitrary and capricious.[226]

The Proposed Rule also would narrow the scope of the required alternatives analysis by: (1) striking the directive to present the alternatives in comparative form in order to "sharply" define the issues and provide a clear choice among options by the decision maker and the public; (2) removing the reference to the need for agencies to "[r]igorously explore and objectively evaluate" all reasonable alternatives to the proposed action; and (3) removing the requirement to "[d]evote substantial treatment" to each alternative.[227] CEQ also proposes to define "reasonable alternatives," as "a reasonable range of alternatives that are technically and economically feasible,

---

[222] 85 Fed. Reg. at 1702.

[223] *Id.*

[224] *Biodiversity Conservation All. v. Jiron*, 762 F.3d 1036, 1083-84 (10th Cir. 2014) (alternatives analysis reviewed subject to a "rule of reason"); *City of Carmel-by-the-Sea v. U.S. Dep't of Transp.*, 123 F.3d 1142, 1155 (9th Cir. 1997).

[225] *Am. Rivers v. FERC*, 201 F.3d 1186, 1200 (9th Cir. 1999) (alternatives eliminated from detailed study must only be briefly discussed); *Envtl. Def. Fund, Inc. v. Andrus*, 619 F.2d 1368, 1375 (10th Cir. 1980) (NEPA does not contemplate detailed discussion of remote or speculative alternatives);

[226] *See Fox Television Stations*, Inc., 556 U.S. at 515; *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 1001 (2005) (an agency must "adequately justif[y] the change" in course).

[227] *Compare* 40 CFR § 1502.14, *with* 85 Fed. Reg. at 1720 (proposed 40 C.F.R. § 1502.14).

AR_0025773

meet the purpose and need for the proposed action, and, where applicable, meet the goals of the applicant."[228]

Taken together, these proposed changes would undermine the alternatives analysis, ignoring the crucial role that identifying and evaluating all alternatives plays in helping decision makers and the public fully understand the scope of environmental impacts of a proposed action and how those impacts might be avoided. In this way, the Proposed Rule would controvert NEPA's statutory requirement to include a "detailed statement" on alternatives to the proposed action and fail to meet NEPA's "policy goals," contrary to CEQ's assertion that they do.[229] Moreover, CEQ selectively quotes its *Forty Questions Guidance* to support its cuts to the required alternatives analysis, but ignores the parts of that guidance that conflict with its proposed changes. Specifically, CEQ quotes Question 1b's explanation that "[w]hen there are potentially a very large number of alternatives, only a reasonable number of examples, covering the full spectrum of alternatives must be analyzed…" to support its proposed description of the required alternatives analysis.[230] However, Question 1a explains that a reasonable range of alternatives that NEPA requires must be "rigorously explored and objectively evaluated"—a phrase CEQ deletes in the Proposed Rule.[231] The *Forty Questions Guidance*, overall, does not support CEQ's proposed changes and therefore does not help justify the proposed changes.

CEQ also seeks comment on whether the regulations "should establish a presumptive maximum number of alternatives" for a proposed action or for certain categories of proposed actions.[232] Such a presumption is unnecessary and contrary to the policy goals of NEPA. Courts have long-affirmed that NEPA does not require that agencies review an endless array of alternatives. As the Supreme Court has stated: "[t]o make an impact statement something more than an exercise in frivolous boilerplate the concept of alternatives must be bounded by some notion of feasibility."[233] NEPA thus does not require evaluation of alternatives "deemed only remote and speculative possibilities."[234] Courts have likewise recognized that the number of appropriate alternatives that should be considered to satisfy NEPA will be directly related to the proposal at hand.[235] Such project-specific evaluation is the best way to ensure that agencies and

---

[228] 85 Fed. Reg. at 1730 (proposed 40 C.F.R. § 1508.1(z)).

[229] *See* 42 U.S.C. §§ 4331, 4332(2)(C)(iii).

[230] 85 Fed. Reg. at 1702.

[231] *See* Forty Questions Guidance, *supra* note 221, at Question 1a.

[232] 85 Fed. Reg. at 1702.

[233] *Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*, 435 U.S. 519, 551 (1978) (an EIS "cannot be found wanting simply because the agency failed to include every alternative device and thought conceivable by the mind of man.").

[234] *Id.*

[235] *See id.* at 552–53 (NEPA's concept of alternatives requires that agencies explore more or fewer alternatives as they become better known and understood); *City of Alexandria v. Slater*, 198 F.3d 862, 867 (D.C. Cir. 1999) (agency's choice of alternatives evaluated in light of its objectives).

41

the public are able to make informed and ideally environmentally beneficial decisions. A categorical limit on the number of alternatives agencies must consider is therefore inappropriate.

**F.    The Proposed Rule Would Improperly Limit the Scope of Impacts Considered Under NEPA**

For over 40 years, CEQ and the courts have interpreted NEPA to require consideration of direct, indirect, and cumulative effects.[236] This robust analysis of a project's environmental effects is critical for informing decision makers and the public, particularly where projects may contribute incrementally to larger environmental harms. However, CEQ now proposes to greatly curtail the scope of impacts considered under NEPA. By unlawfully and unreasonably limiting the scope of analyzed impacts, CEQ's Proposed Rule would undermine NEPA's primary purposes of fostering informed decision making and informed public participation. CEQ also has not adequately justified its proposed reversal from its longstanding prior position that a NEPA analysis must address direct, indirect, and cumulative effects. Accordingly, adoption of the Proposed Rule would be arbitrary and capricious.

**1.    CEQ's Proposed Rule Would Improperly Limit Agencies' Responsibility to Consider "Indirect" and "Cumulative" Effects**

CEQ's Proposed Rule would unlawfully seek to curtail analysis of environmental effects. CEQ's current NEPA regulations define the effects that federal agencies must consider in a NEPA analysis to include "direct effects," "indirect effects," and "cumulative effects."[237] Direct effects "are caused by the action and occur at the same time and place," while indirect effects:

> are caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable. Indirect effects may include growth inducing effects and other effects related to induced changes in the pattern of land use, population density or growth rate, and related effects on air and water and other natural systems, including ecosystems.[238]

A cumulative effect is:

> the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other

---

[236] 40 C.F.R. §§ 1508.7, 1508.8, 1508.25(c); *Kleppe*, 427 U.S. at 410.

[237] 40 C.F.R. § 1508.8.

[238] *Id.*

AR_0025775

actions. Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time.[239]

CEQ's Proposed Rule, however, would strike these definitions and "clarify" that agencies need to consider only environmental effects that "are reasonably foreseeable and have a reasonably close causal relationship to the proposed action or alternatives."[240] The Proposed Rule further would provide that "[e]ffects should not be considered significant if they are remote in time, geographically remote, or the product of a lengthy causal chain."[241] The Proposed Rule invites comment on "whether CEQ should affirmatively state that consideration of indirect effects is not required."[242] And, in an effort to severely constrain the impacts analysis, the Proposed Rule expressly would exclude cumulative effects from the scope of effects that agencies must analyze.[243]

The Proposed Rule's improper attempt to eliminate NEPA's requirement that agencies consider the "indirect effects" and "cumulative effects" of their actions is arbitrary and capricious. These changes are contrary to NEPA and would reverse, without rational justification, decades of agency practice, CEQ guidance and policy, and case law.[244]

### a.    CEQ's Proposal to Limit Analysis of Effects Would Violate NEPA

The Proposed Rule's definition of "effects" and exclusion of "cumulative effects" analysis is inconsistent with NEPA's purpose and language. NEPA's "primary function is information-forcing, … compelling federal agencies to take a hard and honest look at the environmental consequences of their decisions."[245] NEPA requires federal agencies to prepare a "detailed statement" on the impacts of certain actions prior to making decisions.[246] Specifically, Section 102 of NEPA requires that agencies disclose "*any* adverse environmental effects which cannot be avoided" if the agency action goes forward.[247] And NEPA requires agencies to consider the larger

---

[239] *Id. at* § 1508.7.

[240] 85 Fed. Reg. at 1708, 1728–29 (proposed 40 C.F.R. § 1508.1(g)).

[241] *Id.* at 1708.

[242] *Id.*

[243] *Id.* at 1729 (proposed 40 C.F.R. § 1508.1(g)) ("Analysis of cumulative effects is not required."); *id.* at 1707–08 (articulating decision to eliminate cumulative effects analysis requirement while acknowledging that this reflects a change from decades of CEQ guidance and agency action).

[244] *See, e.g.*, *Nat. Res. Def. Council, Inc. v. Hodel,* 865 F.2d 288, 299 (D.C. Cir. 1988) (EIS must analyze the combined effects of the actions in sufficient detail to be "useful to a decisionmaker in deciding whether, or how, to alter the program to lessen cumulative environmental impacts.").

[245] *Am. Rivers,* 895 F.3d at 49 (citations and internal quotation marks omitted).

[246] 42 U.S.C. § 4332(2)(C).

[247] *Id.* at § 4332(2)(C)(ii) (emphasis added).

AR_0025776

context, directing them to "recognize the worldwide and long-range character of environmental problems."[248]

To further both the language and purpose of NEPA, an agency must consider direct, indirect, and cumulative effects of a project. The legislative history makes clear that through NEPA, Congress sought to prevent agencies from making decisions without considering the larger context and incremental impact of projects on the environment. For instance, the Senate expressed concern that "[i]mportant decisions concerning the use and the shape of man's future environment continue to be made in small but steady increments which perpetuate rather than avoid the recognized mistakes of previous decades."[249]

For decades, courts have reinforced the critical role of impacts analysis in the "hard look" required by NEPA.[250] As the Supreme Court has explained, "[b]y so focusing agency attention [on the environmental effects of proposed agency action], NEPA ensures that the agency will not act on incomplete information, only to regret its decision after it is too late to correct."[251] Courts have repeatedly recognized that NEPA's "hard look" requires consideration of cumulative impacts.[252]

Because CEQ's Proposed Rule would eliminate the three categories of effects, replace them with an inappropriately narrow definition of effects, and exclude analysis of cumulative effects altogether, it is inconsistent with NEPA's statutory requirements. CEQ's proposal would undermine NEPA's purpose to ensure that agencies are fully equipped to make decisions concerning significant environmental impacts.[253] It also would unlawfully permit agencies to conduct NEPA analyses without taking the requisite "hard look" at a project's impacts. Indeed, CEQ asserts that the proposed revisions aim to focus agencies on the most significant effects. But NEPA requires that an agency assess *all* of the project's significant impacts, not merely the "most significant."[254]

---

[248] *Id.* at § 4332(2)(F).

[249] S. Rep. No. 91-296, at 5.

[250] *See e.g.*, *Kleppe*, 427 U.S. at 409 (explaining that Congress intended Section 102 of NEPA as a directive to "all agencies to assure consideration of the environmental impact of their actions in decisionmaking") (citing Conference Report on NEPA, 115 Cong. Rec. 40416 (1969)).

[251] *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 371 (1989). *See also Robertson*, 490 U.S. at 349 (NEPA's purpose is to "ensure[] that the agency, in reaching its decision, will have available, and will carefully consider, detailed information concerning significant environmental impacts").

[252] *Kleppe*, 427 U.S. at 410 (citing NEPA and specifying that agencies have an obligation to evaluate the "cumulative or synergistic" environmental impacts that may occur when there are several pending actions that may have similar effects); *Ecology Ctr. v. Castaneda*, 574 F.3d 652, 666 (9th Cir. 2009) ("NEPA requires the Forest Service to perform a cumulative impact analysis in approving projects.").

[253] *Robertson*, 490 U.S. at 349.

[254] 42 U.S.C. § 4332. Moreover, CEQ itself previously stated that "[p]erhaps that most significant environmental impacts results from the combination of existing stresses on the environment with the individually minor, but cumulatively major, effects of multiple actions of over time." NEPA Effectiveness Study, *supra* note 38, at 29. CEQ

44

If agencies omit relevant impacts from their analysis—as they may under the Proposed Rule if they assert that the impacts are not closely related to the agency proposal—then the agencies and the public will not be fully informed about the environmental implications of the agency decisions, as NEPA requires.

Moreover, to the extent that agencies ignore significant impacts under the Proposed Rule because they divide up projects into multiple actions or fail to consider the broader context for the action, then they will not have complied with NEPA's admonitions to "recognize the worldwide and long-range character of environmental problems,"[255] and to disclose "*any* adverse environmental effects which cannot be avoided."[256] CEQ's Proposed Rule would exclude impacts that are "remote in time" or "geographically remote," which unlawfully would take such "long-range" environmental impacts out of NEPA's purview.

The Proposed Rule also ignores the reality that some federal actions will have adverse effects that are remote in time but also reasonably foreseeable if not certain. Examples include the proposed geologic repository for the disposal of high-level radioactive wastes at Yucca Mountain, Nevada, identified in the Nuclear Waste Policy Act, as well as other interim storage options currently under development by the U.S. Department of Energy. Radioactive releases from the repository to the environment are not likely to occur for hundreds and possibly thousands of years, but after that, significant releases are certain to occur and must be evaluated.[257] The Proposed Rule suggests agencies should limit consideration of these critically important, inarguably significant impacts as too "remote in time."

CEQ's proposed revisions to the effects definitions thus would strike at the heart of NEPA's purpose and environmental review requirements. As CEQ recognized in NEPA guidance issued in 1973—less than four years after NEPA was enacted—indirect or "secondary" effects "may often be even more substantial than the primary effects of the original action itself."[258] And even before that, CEQ recognized that the effects of many decisions can be "individually limited but cumulatively considerable."[259] More recently, CEQ reaffirmed that "cumulative effects analysis is essential to effectively managing the consequences of human activities on the

---

provides no reasoned explanation for its change in position from previously recognizing cumulative impacts as often the "most significant."

[255] 42 U.S.C. § 4332(2)(F).

[256] 42 U.S.C. § 4332(2)(C)(ii) (emphasis added).

[257] In fact, the certainty of releases to the environment thousands of years into the future led both the U.S. EPA and the U.S. Nuclear Regulatory Commission to require the Department of Energy to estimate releases for one-million years. 40 C.F.R. § 197.20; 10 C.F.R. § 63.311; 40 C.F.R. § 197.12 (defining "period of geologic stability" as one million years following disposal).

[258] Preparation of Environmental Impact Statements: Guidelines, 38 Fed. Reg. 20,550, 20,553 (Aug. 1, 1973).

[259] NEPA Origins, *supra* note 94 (citing May 1970 Guidelines).

environment."[260] These findings hold true today. CEQ's proposal is an unlawful departure from the purpose and intent of NEPA and therefore arbitrary and capricious.

### b.    CEQ Has Not Provided a Reasoned Explanation for Its Proposal to Constrain the Analysis of Impacts

CEQ has also failed to provide a reasoned explanation for revising the "effects" definitions in the Proposed Rule. CEQ proposes to eliminate the definitions of direct, indirect, and cumulative impacts in favor of a single definition that, according to CEQ, would provide clarity and reduce unnecessary litigation by avoiding expansive interpretations "resulting in excessive documentation about speculative effects."[261] The changes to the effects definitions, CEQ claims, also would allow agencies to focus on "the most significant effects" and "effects that would occur as a result of the agency's decision."[262]

These purported justifications for the proposal are meritless and do not constitute the reasoned explanation that the APA requires. Federal agencies, the States, and the public have relied for decades on CEQ's existing regulations to direct their analysis of effects under NEPA. Courts have interpreted the NEPA regulations and established a large body of case law setting out the parameters of effects analyses. CEQ and other federal agencies have issued multiple guidance documents further expanding on effects analysis under the existing NEPA regulations.

CEQ's proposal makes sweeping changes to the regulations and will have enormous impacts on the scope of effects analyses. While CEQ acknowledges in certain places that it is changing course, it fails to provide a reasoned justification for this change of course, particularly with respect to the scope of effects. Indeed, only with respect to the exclusion of cumulative effects does CEQ concede that this reflects a change from CEQ's decades-old position.[263] CEQ's failure to provide a reasoned explanation for drastically departing from its existing regulations is arbitrary and capricious.[264]

### (1)    The Proposed Revisions to the Effects Definitions Would Not Provide Clarity or Avoid Litigation

Far from providing clarity and avoiding litigation as CEQ suggests, the proposal to strike definitions of types of effects and replace them with a single definition would sow confusion and

---

[260] CEQ, CONSIDERING CUMULATIVE EFFECTS UNDER THE NATIONAL ENVIRONMENTAL POLICY ACT (Jan. 1997) [hereinafter Considering Cumulative Effects], https://ceq.doe.gov/publications/cumulative_effects.html.

[261] 85 Fed. Reg. at 1707.

[262] *Id.* at 1708.

[263] *Id.*

[264] *See Lone Mountain Processing*, 709 F.3d at 1164.

AR_0025779

invite new, contentious litigation about the scope of NEPA's environmental disclosure requirements.

Since CEQ adopted the "indirect effects" and "cumulative impact" definitions in the 1978 NEPA regulations,[265] CEQ's guidance documents on the analysis of cumulative impacts have further clarified the scope of that inquiry.[266] Other federal agencies have also adopted regulations and guidance based on CEQ's NEPA regulations.[267] In addition, courts have developed a robust body of case law regarding the analysis of effects under NEPA, including indirect effects[268] and cumulative impacts.[269] CEQ's proposed revisions would wipe the slate clean and introduce new, vague language for "effects"—"reasonably close causal relationship"; "remote in time"; "geographically remote"—that agencies and members of the public would be required to construe without any guidance from CEQ or the courts. None of these terms is defined in the Proposed Rule. As a result, each term is subject to conflicting interpretations, first by each of the numerous federal agencies as the terms are applied, and later by the courts when the agencies' determinations are challenged.

CEQ also proposes to eliminate the definition of cumulative effects and to state that cumulative effects need not be analyzed.[270] How are agencies to know what effects constitute "cumulative effects" if CEQ strikes the definition of those effects and corresponding guidance? CEQ's Proposed Rule fails to achieve CEQ's asserted aim of increased clarity.

The proposed revisions to the effects definitions thus threaten to proliferate NEPA disputes and litigation and potentially grind the federal environmental review process to a halt—precisely the opposite of CEQ's stated intent.[271]

---

[265] *See* National Environmental Policy Act—Regulations, 43 Fed. Reg. 55,978 (Nov. 29, 1978).

[266] Considering Cumulative Effects, *supra* note 260.

[267] *See, e.g.*, 36 C.F.R. § 220.4(f) (U.S. Forest Service regulations regarding cumulative effects analysis); 32 C.F.R. § 651.16 (Department of the Army regulations regarding cumulative effects analysis); FED. HIGHWAY ADMIN., NEPA AND TRANSPORTATION DECISIONMAKING: QUESTIONS AND ANSWERS REGARDING CONSIDERATION OF INDIRECT AND CUMULATIVE IMPACTS IN THE NEPA PROCESS, https://www.environment.fhwa.dot.gov/nepa/QAimpact.aspx; U.S. EPA, Consideration of Cumulative Impacts in EPA Review of NEPA Documents (May 1999), https://www.epa.gov/sites/production/files/2014-08/documents/cumulative.pdf.

[268] *See, e.g.*, *Friends of Capital Crescent Trail v. Fed. Transit Admin.*, 877 F.3d 1051, 1064 (D.C. Cir. 2017); *EarthReports, Inc. v. Fed. Energy Regulatory Comm'n*, 828 F.3d 949, 956 (D.C. Cir. 2016); *Ctr. for Envtl. Law & Policy*, 655 F.3d at 1011; *City of Carmel-By-The-Sea*, 123 F.3d at 1162 (analyzing "growth-inducing effects").

[269] *See, e.g.*, *N. Plains Res. Council, Inc. v. Surface Transp. Bd.*, 668 F.3d 1067, 1076–83 (9th Cir. 2011); *Klamath-Siskiyou Wildlands Ctr. v. Bureau of Land Mgmt.*, 387 F.3d 989, 993−97 (9th Cir. 2004); *Kern v. U.S. Bureau of Land Mgmt.*, 284 F.3d 1062, 1075–79 (9th Cir. 2002).

[270] 85 Fed. Reg. at 1729 (proposed 40 C.F.R. § 1508.1(g)).

[271] *See Id.* at 1707–08.

AR_0025780

> (2)     **CEQ's Claim that Agencies Need to Focus on the Most Significant Effects Lacks Support and Conflicts with NEPA's Purpose**

CEQ has not provided concrete evidence or other data about the relative resources spent by agencies on their analyses of direct, indirect, and cumulative effects to support the claim that agencies need to redirect their focus to the causal relationship of the project to the effects and, specifically, the most significant effects. Without any support for these claims, the public cannot know whether or to what extent agencies actually divert resources from studying significant effects to categorizing and analyzing insignificant effects. CEQ cannot rely on this unsupported claim to justify its proposed revisions.

CEQ must explain how focusing agencies on only the "most significant effects" is a proper justification for its proposal.[272] As explained above, NEPA requires an agency to consider all significant effects of a project, not merely the "most" significant ones. To the extent that CEQ's rationale diverges from NEPA's requirements, it is arbitrary and capricious.[273]

> (3)     **CEQ Provides no Reasonable Explanation for "Reasonably Close Causal Relationship" Language**

CEQ also attempts to justify its new definition of effects by noting that "reasonably close causal relationship" as used in the revision "is analogous to proximate cause in tort law."[274] But that statement does not support CEQ's rationale for its revision. CEQ does not provide any evidence explaining the need to revise the definition of effects to add the term "reasonably close causal relationship."[275] Given NEPA's requirement that federal agencies must analyze a proposed project's effects on the human environment, CEQ has not adequately explained how the revised effects definition is necessary and consistent with NEPA.

Instead, the revised definition of "effects" exacerbates rather than diminishes the difficulty of effects analysis under NEPA. Commenters have noted that the proximate cause standard has been applied inconsistently in practice, resulting in significant uncertainty about the scope of that standard.[276] CEQ has not explained how agencies will avoid such inconsistency and uncertainty in the NEPA context.

---

[272] *Id.* at 1708.

[273] *See State Farm*, 463 U.S. at 43 (agency action is arbitrary where agency "has relied on factors which Congress has not intended it to consider").

[274] 85 Fed. Reg. at 1708.

[275] *Id.* at 768.

[276] Mark F. Grady, *Proximate Cause Decoded*, 50 UCLA L. REV. 293, 294 (2002) (attempting to clarify the proximate cause jurisprudence); Nicole Summers, *Setting the Standard for Proximate Cause in the Wake of Bank of America Corp. v. City of Miami*, 97 N.C. L. REV. 529, 532 (2019).

AR_0025781

The cases cited in the Proposed Rule do not support CEQ's proposal to import a "proximate cause" requirement into NEPA.[277] *Department of Transportation v. Public Citizen*, 541 U.S. 752 (2004), addressed a situation where an agency had "no ability categorically to prevent" the environmental impact in question, and thus, analyzing that impact "would have no effect on [the agency's] decisionmaking."[278] In *Metropolitan Edison Co. v. People Against Nuclear Energy*, 460 U.S. 766 (1983), the Court concluded that the Nuclear Regulatory Commission was not required to consider fear and anxiety associated with increased risk of a nuclear accident because "a *risk* of an accident is not an effect on the physical environment" for NEPA purposes.[279] Neither of these cases held that NEPA's environmental review requirement is or should be limited to effects that are "proximately caused" by the agency's action.[280]

The Proposed Rule also provides that "[e]ffects do not include effects that the agency has no ability to prevent due to its limited statutory authority or would occur regardless of the proposed action."[281] This proposed language would create confusion about agencies' NEPA obligations because the revised regulations would also require agencies to develop a single EIS and joint record of decision when "a proposal will require action by more than one Federal agency."[282] To comply with NEPA, such a joint EIS must assess the impacts of all of the agencies' actions and should include effects within the lead agency's and cooperating agencies' statutory authority.[283] CEQ should, at a minimum, clarify that agencies developing a joint EIS cannot rely on the Proposed Rule's new definition of "effects" to avoid addressing relevant impacts.

### (4)    CEQ Has Not Provided a Rational Explanation for Exclusion of Cumulative Impacts or Indirect Impact Analysis

Finally, CEQ has not provided a rational explanation for deleting the regulations' requirement that agencies consider cumulative and indirect impacts. CEQ argues that the exclusion of cumulative effects will ensure that agencies can focus on "the most significant effects" of their actions and "effects that would occur as a result of the agency's decision."[284] However, as discussed above, NEPA does not limit an agency's environmental analysis to the effects they consider "most significant"; instead, it requires them to evaluate all significant environmental

---

[277] *See* 85 Fed. Reg. at 1708.

[278] *Dep't of Transp. v. Public Citizen*, 541 U.S. 752, 768 (2004).

[279] *Metro. Edison Co. v. People Against Nuclear Energy*, 460 U.S. 766, 775 (1983).

[280] *See* 85 Fed. Reg. at 1708.

[281] *Id*. at 1729 (proposed 40 C.F.R. § 1508.1(g)).

[282] *Id*. at 1716 (proposed 40 C.F.R. § 1501.7(g)).

[283] *See* 42 U.S.C. § 4332(2)(C).

[284] 85 Fed. Reg. at 1708.

AR_0025782

impacts.[285] Further, CEQ has not explained how its implicit conclusion that cumulative impacts are inherently not significant is consistent with its earlier finding that a "cumulative effects analysis is essential to effectively managing the consequences of human activities on the environment."[286] CEQ also does not explain why cumulative impacts—which are, by definition, impacts that "*result*[] *from the incremental impact of the action* when added to other past, present, and reasonably foreseeable future actions"[287]—are not impacts that "occur as a result of the agency's decision."[288]

CEQ further attempts to justify its decision to not require cumulative effects analysis by explaining that agencies currently struggle to determine the geographic and temporal scope of such effects and therefore divert their focus from the most significant effects. CEQ provides no discussion of the validity and scope of the concerns, the types of actions where these alleged concerns occurred, or whether courts subsequently found that the documentation required to address indirect and cumulative effects was indeed "excessive."

CEQ also requests comment on whether it should "affirmatively state that consideration of indirect effects is not required."[289] It should not. This change to the regulations would create the same problem as the changes regarding "cumulative effects" because the regulations would refer to an undefined "indirect effects" term. In addition, for the reasons discussed, CEQ cannot lawfully eliminate NEPA's requirement that agencies consider "*any* adverse environmental effects which cannot be avoided,"[290] including effects that "are caused by the [agency] action and are later in time or farther removed in distance, but are still reasonably foreseeable."[291] CEQ has not provided a reasoned explanation for excluding cumulative impacts or indirect impacts from NEPA review.

## 2. CEQ's Proposed Revisions Would Improperly Curtail the Analysis of Federal Projects' Impacts of Greenhouse Gas Emissions and Climate Change

The impacts of greenhouse gas (GHG) emissions and climate change illustrates the absurdity of CEQ's proposal to redefine effects and eliminate cumulative effects analysis. For many federal proposals, the impacts of GHG emissions are among the most severe and most concerning for human health and the environment.[292] In NEPA reviews of federal oil and gas leasing or natural gas pipeline projects, for example, the upstream and downstream GHG emissions

---

[285] *See* 42 U.S.C. § 4332(2)(C)(ii) (agencies must disclose "any adverse environmental effects which cannot be avoided should the proposal be implemented").

[286] Considering Cumulative Effects, *supra* note 260, at 3. *See also* S. Rep. No. 91-296, at 5 (1969).

[287] 40 C.F.R. § 1508.7 (emphasis added).

[288] 85 Fed. Reg. at 1708.

[289] *Id.*

[290] 42 U.S.C. § 4332(2)(C)(ii) (emphasis added).

[291] 40 C.F.R. § 1508.8; *see also* 42 U.S.C. § 4332(2)(F).

[292] *See, e.g.,* U.S. Global Change Research Program, *Fourth National Climate Assessment* (2018).

AR_0025783

from these projects are typically considered "indirect" but no less important than the "direct" effects of actual project construction. And as courts have acknowledged, "[t]he impact of GHG emissions on climate change is precisely the kind of cumulative impacts analysis that NEPA requires agencies to conduct."[293] Taking a "hard look," thus, requires a recognition that climate change presents an extremely challenging cumulative emissions problem. This is true in part because a large percentage of the GHGs already in the atmosphere will remain there for decades, as will the GHG emissions resulting from a proposed project. It also requires agencies to consider how impacts from a proposed project could impact climate-related hazards in minority and low-income communities that are at risk and have fewer resources to recover from climate-related incidents.[294]

Given the critical importance of addressing the impacts of climate change, any regulations that attempt to exclude climate change and GHG emissions from the scope of effects cannot be consistent with NEPA's mandate to consider all significant effects on the environment. CEQ's proposed revisions seek to do just that. By eliminating the requirement to consider cumulative effects, the Proposed Rule would constrain severely the analysis of GHG emissions and climate change. CEQ's revisions, clearly designed to abrogate agencies' responsibility to consider GHG impacts, are inconsistent with NEPA's purpose to require a full analysis of environmental impacts, including those with a "worldwide and long-range character."[295] This is contrary to the statute and to NEPA's legislative history.[296]

CEQ should abandon these proposed NEPA regulations, as they are inconsistent with NEPA and unsupported by reasoned explanation. CEQ also has requested comment on whether it should codify any aspects of its draft GHG guidance in the NEPA regulations.[297] It should not. The States submitted comments on the draft GHG guidance, which are incorporated herein by

---

[293] *Ctr. for Biological Diversity*, 538 F.3d at 1216. *See also* CEQ, FINAL GUIDANCE FOR FEDERAL DEPARTMENTS AND AGENCIES ON CONSIDERATION OF GREENHOUSE GAS EMISSIONS AND THE EFFECTS OF CLIMATE CHANGE IN NATIONAL ENVIRONMENTAL POLICY ACT REVIEWS (Aug. 1, 2016), https://ceq.doe.gov/docs/ceq-regulations-and-guidance/nepa_final_ghg_guidance.pdf ("Climate change is a fundamental environmental issue, and its effects fall squarely within NEPA's purview.").

[294] *See* EPA, *Promising Practices for EJ Methodologies in NEPA Reviews* at 31 (Mar. 2016), https://www.epa.gov/environmentaljustice/ej-iwg-promising-practices-ej-methodologies-nepa-reviews; California Office of Envtl. Health Hazard Assessment, *Indicators of Climate Change in California: Environmental Justice Impacts* (Dec. 2010), https://oehha.ca.gov/media/downloads/climate-change/document/climatechangeej123110.pdf.

[295] 42 U.S.C. § 4332(F).

[296] *See* H.R. REP. NO. 91-378, at 121 (1969) ("It is an unfortunate fact that many and perhaps most forms of environmental pollution cross international boundaries as easily as they cross State lines. Contamination of the oceans, with insufficient attention paid to its long-term consequences, appears to be a major problem, to which far too little attention has been spent in the past. The international aspects are clearly a major part of the questions which the Council would have to confront, and your committee feels confident that these would receive early attention by the Council.")

[297] 85 Fed. Reg. at 1711 (requesting comment regarding the draft GHG Guidance, 84 Fed. Reg. 30,097 (June 26, 2019), Docket No. CEQ-2019-0002).

AR_0025784

reference[298] and attached as Exhibit 2. As explained in the comments, the draft guidance is inconsistent with the purpose and aims of NEPA, does not adequately address the nature of GHG emissions and the harms of climate change, and improperly limits the consideration of GHG emissions and climate change through analysis of indirect effects and cumulative effects, among many other shortcomings. Rather than codify the fundamentally flawed draft guidance, CEQ should replace it with an updated and strengthened version of the 2016 GHG Guidance[299] and incorporate this strengthened guidance into its regulations.

### 3.    CEQ's Proposed Revisions Would Improperly Limit the Analysis of Federal Projects' Impacts on Environmental Justice

Eliminating the cumulative effects analysis would also undermine analysis of impacts on environmental justice in contravention of Executive Order 12898 and of the intent of NEPA to examine all environmental impacts. Executive Order 12898 directs federal agencies to identify and address the disproportionately high and adverse human health or environmental effects of their actions on minority and low-income populations, to the greatest extent practicable and permitted by law.[300] In compliance with Executive Order 12898, CEQ's 1997 guidance directs agencies to incorporate an analysis of environmental justice into NEPA reviews (EJ Guidance).[301]

NEPA is an important tool in identifying and addressing environmental injustice because it requires agencies to examine salient information and gives communities a voice in the approval process. Cumulative impact analysis is essential to identifying whether and how low income and frontline communities of color may be overburdened by additional environmental impacts posed by an action because these communities may already be disproportionally burdened by existing sources of pollution.[302] For example, a community may have a disproportionately high amount of hazardous waste treatment facilities relative to its neighboring communities. These cumulative impacts likely would be obscured by the Proposed Rule's constrained effects analysis because it

---

[298] Comments of the Attorneys General of California, Colorado, Connecticut, Delaware, the District of Columbia, Illinois, Maine, Maryland, Massachusetts, Minnesota, New Mexico, New Jersey, New York, North Carolina, Oregon, Pennsylvania, Rhode Island, Vermont, and Washington, Aug. 26, 2019, Docket No. CEQ-2019-0002-6749.

[299] CEQ, Final Guidance for Federal Departments and Agencies on Consideration of Greenhouse Gas Emissions and the Effects of Climate Change in National Environmental Policy Act Reviews, 81 Fed. Reg. 51,866 (Aug. 5, 2016).

[300] Exec. Order No. 12898, 59 Fed. Reg. 7629 (1994) (as amended).

[301] CEQ, ENVIRONMENTAL JUSTICE GUIDANCE (1997) [hereinafter CEQ Environmental Justice Guidance] https://www.epa.gov/sites/production/files/2015-02/documents/ej_guidance_nepa_ceq1297.pdf.

[302] *See, e.g.,* Mercedes A. Bravo et al., *Racial isolation and exposure to airborne particulate matter and ozone in understudied US populations: Environmental justice applications of downscaled numerical model output*, 92–93 ENVT. INT'L 247 (2016) (finding that long-term exposure to particulate matter is associated with racial segregation, with more highly segregated areas suffering higher levels of exposure); INTERDISCIPLINARY ENVIRONMENTAL CLINIC AT WASHINGTON UNIVERSITY SCHOOL OF LAW, ENVIRONMENTAL RACISM IN ST. LOUIS, https://assets.documentcloud.org/documents/6367937/2097-STL-EnvirRacism-Report-04-Web.pdf (last visited March 2, 2020) (finding that most of St. Louis' air pollution sources are located in communities of color and that African American children in St. Louis make roughly 10 times more emergency room visits for asthma each year).

AR_0025785

no longer would require the cumulative analysis that would examine these inequities. Instead of undermining NEPA's analysis of environmental justice, as described in the Advanced Notice Comments, the CEQ EJ Guidance should be codified.[303]

The Proposed Rule's change in definition of "human environment" further exacerbates its conflict with Executive Order 12898. The Proposed Rule would eliminate the following from the definition of "human environment":

> This means that economic or social effects are not intended by themselves to require preparation of an environmental impact statement. When an environmental impact statement is prepared and economic or social and natural or physical environmental effects are interrelated, then the environmental impact statement will discuss all of these effects on the human environment.[304]

Environmental justice review requires examining how economic, social, and natural or physical environmental effects are interrelated, precisely as described in the text CEQ proposes to eliminate. By contrast, examined in a vacuum, as would occur under the Proposed Rule, an analysis of natural environmental effects does not promote decision making to ensure environmental justice, which EPA has defined as "the fair treatment and meaningful involvement of all people regardless of race, color, national origin, or income."[305] Accordingly, contrary to CEQ's unlawfully conclusory assertion that the Proposed Rule would not have environmental justice impacts, CEQ's proposed changes to the cumulative effects analysis and to the definition of "human environment" are inconsistent with both Executive Order 12898 and NEPA's intent.

## 4. CEQ's Proposed Revisions to Other Terms Such as "Affected Area" and "Mitigation" Illustrate and, in Some Instances, Exacerbate the Impropriety of CEQ's Proposed Revisions to the Definition of Effects

In addition to changing the definition of "effects" and excluding cumulative effects altogether, CEQ proposes other changes that could exacerbate the dangerous consequences of narrowing the scope of effects. As discussed above, CEQ's Proposed Rule unlawfully attempts to curtail the geographic scope of effects that may be considered. CEQ goes further, specifying that the "affected area" may be only national, regional, or local but not global or extraterritorial.[306] By focusing only on the national, regional, or local affected environments (and setting nationwide as the largest geographic scope for the affected area), the Proposed Rule would not only limit the geographic area but further constrain the types of effects that might be addressed under NEPA. These proposed changes reflect CEQ's unlawful efforts to minimize the assessment of GHG

---

[303] See Advance Notice Comments, supra note 7, at 23–24.

[304] Compare 40 C.F.R. § 1508.14, with 85 Fed. Reg. at 1729 (proposed 40 C.F.R. § 1508.1(m)).

[305] EPA, Environmental Justice, https://www.epa.gov/environmentaljustice (last visited March 2, 2020).

[306] 85 Fed. Reg. at 1714; see also id. (changing "in the world" to "in the Nation" to reflect that nationwide effects would be the geographically broadest effects considered under the proposed NEPA regulations).

AR_0025786

emissions and climate change impacts under NEPA. They are also inconsistent with NEPA's mandate to "recognize the worldwide and long-range character of environmental problems."[307] And by curtailing the extent to which agencies will consider and analyze broader-ranging environmental issues like climate change, CEQ undermines NEPA's purpose of informed decision making.

CEQ's proposed constraints on the scope of effects analyzed could reduce the information-sharing value of NEPA analyses in other ways as well. For instance, CEQ has proposed to define "mitigation" to specify that NEPA does not require adoption of any particular mitigation measure and to clarify that mitigation must have a nexus to the effects of the proposed action.[308] Specifically, the Proposed Rule would define mitigation as "measures that avoid, minimize, or compensate for reasonably foreseeable impacts to the human environment caused by a proposed action as described in an environmental document or record of decision and that have a nexus to the effects of a proposed action."[309] CEQ argues that this change "would make the NEPA process more effective by clarifying that mitigation measures must actually be designed to mitigate the effects of the proposed action."[310]

The proposed direct link between assessing mitigation measures and the effects of a project could compound the repercussions of the Proposed Rule's narrower effects analysis. The extent to which an agency identifies and assesses the effects of a project determines the degree to which the agency considers mitigation measures. By narrowing the scope of effects, then, CEQ is also limiting the assessment of (and consequent provision of information about) mitigation measures. Further, CEQ has not provided any evidence to support its claim that this change will "make the NEPA process more effective."[311] CEQ has thus failed to rationally justify its proposed changes to the definitions as required by the APA.[312] These proposed revisions are arbitrary and capricious.

5.  **CEQ's Proposed Rule Would Improperly Weaken the Standard for Requiring Agencies to Obtain Information on Adverse Effects**

CEQ also proposes to weaken the requirement for agencies to seek out and include additional information in an EIS regarding reasonably foreseeable significant adverse impacts.[313] Specifically, CEQ proposes to replace the term "exorbitant" in 40 C.F.R. § 1502.22 with the term "unreasonable," such that an agency will only be required to include information that is otherwise incomplete or unavailable if the agency determines that the overall cost of obtaining that

---

[307] 42 U.S.C. § 4332(2)(F).

[308] 85 Fed. Reg. at 1709, 1729 (proposed 40 C.F.R. § 1508.1(s)).

[309] *Id*. at 1729 (proposed 40 C.F.R. § 1508.1(s)).

[310] *Id.* at 1709.

[311] *Id.*

[312] *See Fox Television Stations, Inc.*, 556 U.S. at 515.

[313] 85 Fed. Reg. at 1703, 1721 (proposed 40 C.F.R. § 1502.22).

AR_0025787

information is not "unreasonable." By giving agencies more flexibility to decide when and whether to obtain more complete information, the proposed change may result in less information being sought and more holes in NEPA analyses, contrary to NEPA's purpose. This change thus risks undermining NEPA's aim to ensure that agencies fully consider the potential environmental impacts of their actions.[314]

CEQ attempts to justify this change on the grounds that "unreasonable" is "more consistent with CEQ's original description of 'overall cost' considerations, the common understanding of the term, and how the terminology has been interpreted in practice."[315] But CEQ does not elaborate or provide any citations to support its new position. CEQ does not explain what if anything is the "common understanding of the term." Moreover, CEQ's contention that "unreasonable" is more consistent with CEQ's original description of overall cost considerations is misleading, at best. In 1986, when 40 C.F.R. § 1502.22 was last amended, CEQ had proposed to remove language about "exorbitant costs" in favor of weaker language.[316] Nevertheless, CEQ retained the original "exorbitant costs" language. And in response to a comment expressing concern that the proposal essentially shifted the standard to "overall costs" rather than "exorbitant costs" and thereby weakened what was a "purposefully high standard, intended to counter agencies' demonstrated reluctance to seek out information," CEQ emphasized that the final regulation retained the original "exorbitant costs" standard.[317] This is hardly support for changing the language from "exorbitant" to "unreasonable" now. Without providing adequate support for its proposed change, CEQ's revision is arbitrary and capricious.

CEQ's proposed revisions to 40 C.F.R. § 1502.24 raise similar concerns about the quality and thoroughness of information considered by agencies conducting NEPA analyses. CEQ proposes to add language to section 1502.24 providing that "[a]gencies shall make use of reliable existing data and resources and are not required to undertake new scientific and technical research to inform their analyses. Agencies may make use of any reliable data sources, such as remotely gathered information or statistical models."[318] CEQ explains that this "clarification" aims to distinguish "separate and additional research that extends beyond existing scientific and technical information available in the public record or in publicly available academic or professional sources."[319] This change would give agencies discretion to refuse to consider certain scientific

---

[314] 42 U.S.C. § 4332(2)(C).

[315] 85 Fed. Reg. at 1703.

[316] 51 Fed. Reg. 15,618, 15,620 (Apr. 25, 1986) (quoting proposal).

[317] *Id.* at 15,621–22. CEQ also explained in the 1986 Federal Register notice that it concurred with the goals of the original regulation, including the acquisition of incomplete "information if reasonably possible." *Id.* at 15,620. That is distinct from reasonable costs. CEQ has not explained what it is relying on in its current proposal. But to the extent it is relying on this statement, it needs to explain why it is equating the statement in the 1986 notice with its proposed change from "exorbitant" to "unreasonable" costs.

[318] 85 Fed. Reg. at 1721 (proposed 40 C.F.R. § 1502.24).

[319] *Id.* at 1703.

evidence on the unfounded ground that it is not sufficiently "reliable."[320] In addition, the change could give agencies the discretion to use only easily accessible data, rather than ensuring review of the most in-depth data. This proposed revision thus undermines NEPA's purpose to promote rigorous and comprehensive assessment of the environmental effects of a project, including examination of all potentially relevant scientific information.

## G.    The Proposed Rule Would Improperly Sideline the Public and Undercut NEPA's Purposes and Democratic Principles

The proposed revisions to NEPA procedures and public participation mechanisms in the Proposed Rule would undercut NEPA's sound decision making and public participation goals by eliminating transparency and meaningful opportunities for participation by the public in the NEPA process. As discussed above in section III, public participation is not only a core tenet of NEPA but also can lead to substantively better outcomes. However, CEQ seeks to limit public participation throughout the Proposed Rule.

### 1.    The Proposed Rule Would Increase Conflicts of Interest

CEQ's Proposed Rule would eliminate key language from current regulations designed to prevent conflicts of interest in drafting EISs. Current regulations direct lead agencies to select contractors to prepare an EIS "to avoid any conflict of interest," and further state that contractors "shall execute a disclosure statement [prepared by the lead or cooperating agency] ... specifying that they have no financial or other interest in the outcome of the project."[321] The Proposed Rule, however, would eliminate this key language, potentially allowing a contractor or applicant to prepare an EIS without any disclosure statement or other process to avoid conflicts of interest.[322] These changes mark a clear departure from the requirements of NEPA and good government practice.

NEPA explicitly requires "a detailed statement *by the responsible official*," not by the project applicant.[323] Courts have interpreted this statutory requirement to mean that an agency cannot abdicate its responsibility under NEPA to a private applicant.[324] This requirement helps to prevent the "self-serving assumptions" that could be used by an applicant in an EIS.[325] While an applicant can submit environmental information or even assist in drafting, the agency must

---

[320] This proposed change echoes U.S. EPA's recent attempt to limit the scientific information it will consider for purposes of rulemaking. *See* EPA, Supplemental Notice of Proposed Rulemaking, Strengthening Transparency in Regulatory Science, https://www.epa.gov/osa/strengthening-transparency-regulatory-science.

[321] 40 C.F.R. § 1506.5(c).

[322] *Compare* 40 C.F.R. § 1506.5(c) *with* 85 Fed. Reg. at 1725 (proposed 40 C.F.R. § 1506.5(c)).

[323] 42 U.S.C. § 4332(c) (emphasis added).

[324] *See Greene Cnty. Planning Bd. v. Fed. Power Comm'n*, 455 F.2d 412, 420 (2nd Cir. 1972) (interpreting section 102(2) of NEPA to establish "primary and nondelegable responsibility" for agencies "to consider environmental values at every distinctive and comprehensive stage of the agency's process") (citations and alterations omitted).

[325] *Id.*

AR_0025739

"participate actively and significantly" in the EIS drafting process and independently review and analyze the information presented.[326] The Proposed Rule would fail to meet this "active and significant" participation standard by injecting vague requirements that the responsible federal official "provide guidance, participate in [the EIS's] preparation, independently evaluate [the EIS] prior to its approval, and take responsibility for [the EIS's] scope and content."[327]

CEQ's proposed changes would virtually guarantee conflicts of interest. Allowing a project applicant to draft an EA or EIS raises serious concerns about impartiality. Yet, CEQ provides no guidance to avoid such conflicts during NEPA drafting. While a project applicant may know the most about its own project, the applicant also has an incentive to secure approval for an action without properly considering all of the environmental impacts. The federal agency responsible for the action is in the best position to analyze the potential impacts from the project and weigh the various interests as required under NEPA and should maintain control over the drafting process consistent with existing case law, regulations, and NEPA's plain language. The Proposed Rule would thus increase bias in the environmental review process.

CEQ provides no justification for these changes beyond a desire to provide more "flexibility and "improved communication" between project proponents and agencies."[328] But "flexibility" and "improved communication" do not justify such a significant departure from CEQ's current regulations, particularly when it is at odds with NEPA's plain language and purpose of ensuring critical and transparent review of environmental impacts.

### 2.    The Proposed Rule Would Improperly Limit Public Participation

Although CEQ has recognized that "[s]ome of the most constructive and beneficial interaction between the public and an agency occurs when citizens identify or develop reasonable alternatives that the agency can evaluate in the EIS,"[329] the Proposed Rule includes many provisions that would improperly limit public participation to the detriment of NEPA and agency decision making.

CEQ's Proposed Rule would set a new tone for the federal implementation of NEPA by revising the Purpose and Policy section in which CEQ lays out the ideological framework for agency implementation of NEPA.[330] Alarmingly, CEQ's Proposed Rule would completely remove any reference to public participation and no longer highlight the need to provide environmental information to citizens "before decisions are made and before actions are taken." [331] In an effort to eliminate "redundancy," the Proposed Rule would also entirely strike the current regulation

---

[326] *Sierra Club v. Lynn*, 502 F.2d 43, 59 (5th Cir. 1974).

[327] 85 Fed. Reg. at 1725 (proposed 40 C.F.R. § 1506.5(c)).

[328] *Id*. at 1705.

[329] Citizen's Guide to the NEPA, *supra* note 20, at 14. *See also id*. at 2 (stating that citizen involvement is one of the environmental review process's major purposes).

[330] 85 Fed. Reg. at 1712.

[331] *Compare* 40 C.F.R. § 1500.1, *with* 85 Fed. Reg. at 1712 (proposed 40 C.F.R. § 1500.1).

AR_0025790

regarding the policy of CEQ's NEPA regulations, including the requirement for federal agencies to "[e]ncourage and facilitate public involvement in decisions which affect the quality of the human environment."

CEQ attempts to justify these revisions by stating that they "summarize Section 101 of the Act" and "simplify the regulations."[332] But section 101 of NEPA targets cooperation with concerned public and private organizations and is not limited merely to ensuring that the public has been informed. [333] As a result, CEQ's justification for eliminating key language from its regulations is irrational and arbitrary.

Indeed, courts have relied on the language CEQ seeks to remove as embodying the vital role of public participation in the NEPA process.[334] While the text of NEPA itself upholds the importance of the public in the environmental review process,[335] CEQ's attempt to eliminate this language may chill public participation. Should CEQ finalize the Proposed Rule and remove this language, it could jeopardize public participation in the NEPA process.

The Proposed Rule's revisions to draft EIS requirements further threaten to undermine public participation in the NEPA process. The Proposed Rule would provide that draft EISs circulated for public review must meet NEPA requirements only "to the fullest extent *practicable*."[336] The existing regulations, by contrast, require such compliance "to the fullest extent *possible*."[337] CEQ explains that, under this revision, agencies may decide that they are not able to circulate a fully-compliant draft EIS based on cost and time limitations or a lack of "economic feasibility."[338] The Proposed Rule would thus greatly expands agency discretion to circulate incomplete drafts for public review and comment. This revision would also be inconsistent with NEPA's purpose to ensure an opportunity for informed public participation in agency decision making.[339]

_____

[332] 85 Fed. Reg. at 1693.

[333] 42 U.S.C. § 4331(a). *See also Citizens for Better Forestry v. U.S. Dep't of Agric.*, 341 F.3d 961, 970–91 (9th Cir. 2003) (stating that failure to involve the public in the environmental review process "undermines the very purpose of NEPA").

[334] *See, e.g., Citizens for Better Forestry*, 341 F.3d at 970–91 (stating that 40 C.F.R. §§ 1501.4 and 1506.6 "mean something" and require public participation).

[335] *See, e.g.*, 42 U.S.C. § 4331(a) (stating that "it is the continuing policy of the Federal Government, in cooperation with … concerned public and private organizations, to use all practicable means and measures … in a manner calculated to foster and promote the general welfare, to create and maintain conditions under which man and nature can exist in productive harmony, and fulfill the social, economic, and other requirements of present and future generations of Americans.").

[336] 85 Fed. Reg. at 1719 (proposed 40 C.F.R. § 1502.9(b)) (emphasis added).

[337] 40 C.F.R. § 1502.9(a) (emphasis added).

[338] 85 Fed. Reg. at 1692.

[339] *Robertson*, 490 U.S. at 349.

58

AR_0025791

In addition, the Proposed Rule would impose a new rigid 30-day comment period on a final EIS.[340] For especially large and complex projects, 30 days may not be long enough for the public to review and comment on the final EIS. This is also true for a final EIS that makes significant changes from the draft EIS. CEQ should not finalize these regulations, but if it does, it should allow for extensions to the comment period as needed to ensure sufficient time for meaningful comment.

### 3.    The Proposed Rule Would Shift the Burden to the Public to Analyze Environmental Issues

CEQ's Proposed Rule would shift to the commenter the duty to perform a detailed analysis that agencies are legally obligated to perform. That is, CEQ seeks to simultaneously increase the burden on the public to provide scientific justification for comments and decrease the burden on a federal agency to respond to comments in a way that would not only prevent meaningful public participation through commenting but would also make agency decision making less clear. This burden shifting is unlawful under NEPA and the APA and also risks creating environmental injustice in agency decision making by restricting comments from those who may lack the resources to meet the new standards.

For example, proposed section 1503.3 would require comments to be "as specific as possible."[341] It also requires that the comments "shall provide as much detail as necessary to meaningfully participate and fully inform the agency of the commenters position," the "comment should explain why the issue raised is significant," "propose specific changes," and "include or describe the data sources and methodologies supporting the proposed changes."[342]

This change threatens to sideline members of the public impacted by the proposed action but unfamiliar with the NEPA process or unable to access technical expertise to comment on a proposed action. For example, an unsophisticated commenter from an area affected by a proposed action may have valuable knowledge about potential impacts or alternatives, but may be unable to describe the "data sources and methodologies supporting the proposed changes" required under the Proposed Rule.[343]

This change is especially troubling given CEQ's proposal in section 1503.4(a)(5) to remove language that strongly recommends the agency to cite "sources, authorities or reasons which support the agency's position" when declining to reply to comments.[344] Under this proposed change, agencies may interpret that they no longer need to cite sources or provide a detailed justification for their positions. This proposed change would limit the public's ability to determine

---

[340] 85 Fed. Reg. at 1722 (proposed 40 C.F.R. § 1503.1(b)).

[341] *Id.* at 1722 (proposed 40 C.F.R. § 1503.3).

[342] *Id.*

[343] *Id.*

[344] *Compare* 40 CFR § 1503.4(a)(5), *with* 85 Fed. Reg. at 1722 (proposed 40 C.F.R. §1503.4(a)(5)).

AR_0025792

if the agency has appropriately considered all comments received. CEQ fails to provide a rational justification for this change,[345] which is inconsistent with NEPA's public participation principles.

### 4.    The Proposed Rule Would Impose Burdensome Exhaustion Requirements

The Proposed Rule would provide that comments or objections not submitted in accordance with the Proposed Rule "shall be deemed unexhausted and forfeited."[346] Although this proposed change may appear to be consistent with current practice, when read with other regulatory revisions, it could significantly narrow both the NEPA comment process and access to judicial review for agency decisions, threatening to shield even the worst agency decisions from the courts.

The Proposed Rule would create a confusing set of steps for commenting: providing for comment at the scoping stage,[347] then requiring very particular comments on the summary of those comments received at the draft EIS stage,[348] providing only 30 days for a commenter to object to the summary in the final EIS,[349] and then imposing a strict exhaustion requirement.[350] Taken together, the various stages of commenting combined with the new specificity and exhaustion requirements could work to prevent a commenter, who has failed to meet all of these requirements, from accessing judicial review of the NEPA process. This process requires a level of knowledge and attention that an organization or individual unfamiliar with NEPA may well not have. The Proposed Rule thus threatens to exclude a broad swath of the public from meaningful participation in the NEPA process.

As noted above, the Proposed Rule also purports to increase the level of specificity for commenters beyond what is enumerated in the cases cited by CEQ in the Proposed Rule.[351] Under those cases, commenters must structure their participation "to alert[] the agency to the [commenter's] position and contentions" so that the agency can give the issue meaningful consideration.[352] But here, CEQ's Proposed Rule would go so far as to require commenters to provide "data sources and methodologies supporting" a proposed change and to explain the significance of the concern not only "to the consideration of environmental impacts and

---

[345] *See* 85 Fed. Reg. at 1704.

[346] *Id*. at 1693, 1713 (proposed 40 C.F.R. § 1500.3(b)(3)).

[347] *Id*. at 1716 (proposed 40 C.F.R. § 1501.9).

[348] *Id*. at 1721–22 (proposed 40 C.F.R. § 1503.1(a)); *id*. 1722 (proposed 40 C.F.R. § 1503.3).

[349] *Id*. at 1722 (proposed 40 C.F.R. § 1503.1(b)).

[350] *Id*. at 1713.

[351] *Id*. at 1703, 1704 (proposed 40 C.F.R. §1503.3(a)).

[352] *Public Citizen*, 541 U.S. at 764 (quoting *Vt. Yankee Nuclear Power Corp.*, 435 U.S. at 553–54) (alteration added).

AR_0025793

alternatives to the proposed action" but also to the consideration of "economic and employment impacts, and other impacts affecting the quality of the human environment."[353]

CEQ's Proposed Rule is unreasonable and unsupported. If read expansively, the Proposed Rule would require commenters to provide an exhaustive analysis of economic, employment, and other impacts even if their concern only pertains to certain environmental impacts[354] Requiring commenters to provide such detailed comments on environmental review documents goes beyond the case law and may unduly burden concerned parties, including those who may the lack experience or resources that such detailed comments demand.[355]

More fundamentally, these changes impermissibly shift the burden of sound environmental review from the federal agencies tasked with this responsibility to a public that often lacks the expertise and resources to conduct such an analysis, potentially narrowing consideration of public comments and limiting access to judicial review under NEPA.[356]

### 5.    The Proposed Rule Would Reduce an Agency's Obligation to Respond to Comments

CEQ's Proposed Rule would curtail agency response to submitted comments. Under the Proposed Rule, agencies would no longer need to "assess and consider comments both individually and collectively," though they "may" do so.[357] Additionally, the Proposed Rule creates a new section in an EIS where the agency must summarize "all the alternatives, information, and analyses submitted by public commenters."[358] The Proposed Rule then includes a provision that would allow agencies to summarize the comments received and "certify" that the agency considered those comments.[359] The lack of transparency with this proposed change will leave the public without sufficient knowledge that its concerns, including environmental justice concerns, were taken into consideration by the lead agency.

Consideration of opposing viewpoints and presenting that information in an EIS are central tenets of NEPA.[360] By weakening the agencies' responsibility to respond to comments and allowing them to prepare a single summary, the Proposed Rule would be inconsistent with the statutory obligation to provide "good faith, reasoned analysis in response" to comments and

---

[353] 85 Fed. Reg. at 1722 (proposed 40 C.F.R. § 1503.3(a)).

[354] *Native Ecosystems Council v. Dombeck*, 304 F.3d 886, 899 (9th Cir. 2002).

[355] *Id.*

[356] This concern has particular force when, under current case law, the plaintiff is excused from the usual requirement to exhaust administrative remedies when commenters could not review an issue before an EIS is finalized. *Friends of Pinto Creek v. EPA*, 504 F.3d 1007, 1017 (9th Cir. 2007).

[357] *Compare* 40 C.F.R. § 1503.4, *with* 85 Fed. Reg. at 1722 (proposed 40 C.F.R. § 1503.4).

[358] *Id.* at 1720 (proposed 40 C.F.R. § 1502.17).

[359] *Id.* (proposed 40 C.F.R. § 1502.18).

[360] *State of Cal. v. Block*, 690 F.2d 753, 770–71 (9th Cir. 1982).

AR_0025794

threatens to render the public comment process a meaningless exercise in violation of NEPA and the APA.[361]

### 6. The Proposed Rule Would Impose Unreasonable and Unworkable Time and Page Limits that Could Undermine the Quality of NEPA Review

CEQ proposes to impose arbitrary time and page limits on EAs[362] and EISs[363] to "advance more timely reviews and reduce unnecessary paperwork."[364] CEQ has neither assessed whether such blanket limits are practicable, nor examined the risk that they will result in inadequate and unlawful NEPA reviews, thus undermining CEQ's stated rationale to "advance more timely reviews and reduce unnecessary paperwork."[365]

CEQ has not supported these proposed limits. With respect to time limits, CEQ asserts that in "some cases, the NEPA process and related litigation has slowed or prevented the development of new infrastructure and other projects that required federal permits or approvals."[366] Yet, even if NEPA may lead to slower decision making in certain situations, CEQ's proposed time limits fail to recognize that process timelines can be affected by a range of factors—many outside of agency control—including "the potential for environmental harm; the size of the proposed action; other time limits imposed on the action by other statutes, regulations, or Executive Orders; the degree of public need for the proposed action and the consequences of delay; and the need for a reasonable opportunity for public review."[367] Indeed, CEQ's existing guidance on timelines explicitly recognized that "some projects will entail difficult long-term planning and/or the acquisition of certain data which of necessity will require more time for the preparation of the EIS" to ensure meeting NEPA's substantive goals.[368] However, CEQ's Proposed Rule does not address these complexities.

CEQ also fails to support its proposed page limits. CEQ cites data on the length of recent EISs in supporting its proposal to make the previously aspirational page limits mandatory, but provides no real justification for the proposal.[369] CEQ assumes without supporting data that shorter EISs than are currently the norm are consistent with the "core purpose of page limits from the

---

[361] *Id.* at 773 (quoting *Silva v. Lynn*, 482 F.2d 1282, 1285 (1st Cir. 1973).

[362] 85 Fed. Reg. at 1688, 1715 (proposed 40 C.F.R. § 1501.5), 1717 (proposed 40 C.F.R. § 1501.10).

[363] *Id.* at 1717 (proposed 40 C.F.R. § 1501.10), 1719 (proposed 40 C.F.R. § 1502.7).

[364] *Id.* at 1688.

[365] *Id.*

[366] *Id.* at 1685.

[367] Timely Review Memorandum, *supra* note 71, at 14.

[368] Forty Questions Guidance, *supra* note 221, at 26.

[369] 85 Fed. Reg. at 1687–88.

AR_0025795

original regulations."[370] But CEQ's approach ignores that the length of the document itself—as opposed to its contents—is at best a secondary consideration in determining whether the responsible official has met its obligation to "insure that presently unquantified environmental amenities and values may be given appropriate consideration"[371]

CEQ notes that "the length of an EIS will vary based on the complexity and significance of the proposed action environmental effects the EIS considers,"[372] but fails to analyze whether one-size-fits-all length limits are appropriate or practicable. Moreover, CEQ ignores that requiring agencies to create a page-limited EIS may in fact be more difficult and time consuming than allowing agencies to develop a longer document. Ignoring this critical aspect of the purported problem CEQ claims to be addressing is quintessentially arbitrary and capricious and unreasonable agency decision making.[373]

Additionally, CEQ provides no evidence to support its proposed presumptive time and length limitations for EAs. CEQ asserts that a 75-page limit for EAs "will promote more readable documents, but also provide agencies flexibility to prepare longer documents, where necessary to support the agency's analysis."[374] But without actually examining how EAs are currently being produced and used, or whether such limits would result in substantively deficient EAs, CEQ's page limit is unsupported and arbitrary and capricious.

### 7.    CEQ Must Ensure Broad Public Participation

The States support widening public access to the NEPA process by expanding tribal consultation and participation in the NEPA process and including electronic participation as one means of participation. But the States remain concerned that the Proposed Rule, as written, does not do enough to ensure inclusivity in the comment process.[375]

Specifically, the Proposed Rule would fail to provide for non-electronic notice and hearing access for communities adjacent to action areas, communities in urban areas, and tribal communities. Access to high-speed internet can be limited by location and income. The Federal Communications Commission estimates that as many as four million people in *urban* areas may not have access to broadband internet and further identifies a considerable gap in access for both tribal and rural areas.[376] The regulations should be revised to ensure agencies provide non-

---

[370] *Id.* at 1700.

[371] 42 U.S.C. § 4332(2)(B).

[372] 85 Fed. Reg. at 1700.

[373] *State Farm*, 463 U.S. at 43.

[374] *Id.*

[375] *See* 85 Fed. Reg. at 1705 (focusing only on rural communities), 1725 (proposed 40 C.F.R. § 1506.6(c)).

[376] FED. COMMC'NS COMM'N, 2019 BROADBAND DEPLOYMENT REPORT, at 16 (May 29, 2019) https://docs.fcc.gov/public/attachments/FCC-19-44A1.pdf (finding that an estimated 1.7% of the urban U.S. population of 257,446,000 people, equaling 4,376,582 people, did not have access to advanced broadband in 2017).

AR_0025796

electronic means of notice and commenting for all impacted communities or individuals without access to high-speed internet.

Such revisions would be more consistent with CEQ's current guidance on environmental justice in implementing NEPA.[377] That guidance specifically calls out the potential need for "adaptive or innovative approaches" to involve minority, low-income, and tribal populations in the NEPA process.[378] Establishing an electronic barrier to commenting or participation would only serve to magnify the disproportionate environmental harms in these communities. CEQ must ensure public meetings and public commenting are in fact public by providing means for all interested parties to attend and participate consistent with NEPA and the APA.

## H.    CEQ's Proposed Rule Would Limit Appropriate Remedies for NEPA Violations and Block Access to the Courts

Judicial review of agency actions under NEPA is necessary to ensure government accountability. Where projects are challenged, it is often by plaintiffs seeking to ensure that projects do not move forward without adequate review of environmental impacts. In such circumstances, the courts play a vital role in ensuring that federal agencies adhere to Congress's mandate to take a hard look at environmental consequences before taking major actions.[379] The opportunity for judicial review of agency actions is not a flaw of NEPA or an obstacle to achieving its purposes, but a fundamental part of the NEPA process. Indeed, judicial review of an executive agency action is an archetypical example of the separation of powers inherent in our government. However, CEQ's Proposed Rule threatens to obstruct judicial review.

### 1.    CEQ Proposes Unlawful Limits on Judicial Remedies

The Proposed Rule seeks to restrict the remedy a litigant can secure through litigation by stating that "[h]arm from failure to comply with NEPA can be remedied by compliance with NEPA's procedural requirements…"[380] The language of the Proposed Rule provides that the NEPA regulations "create no presumption that violation of NEPA is a basis for injunctive relief or for a finding of irreparable harm."[381] However, this change is irreconcilable with separation of powers principles and existing case law on NEPA remedies. CEQ has no authority to dictate or even suggest to the courts how they should process and decide NEPA cases.

Courts hold the power to enjoin unlawful agency actions.[382] Indeed, this is a necessary tool in NEPA litigation to prevent potential harm during litigation. A pronouncement from CEQ in a

---

[377] CEQ Environmental Justice Guidance, *supra* note 301, at 13.

[378] *Id.*

[379] *See* Greczmiel Statement, *supra* note 65, at 8–12.

[380] 85 Fed. Reg. at 1713 (proposed 40 C.F.R. § 1500.3(d)).

[381] *Id.*

[382] 5 U.S.C. § 705 (granting reviewing courts the authority to "issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review

AR_0025797

regulation that harm can be remedied by compliance with the statute, without any further intervention by the courts is inconsistent with the court's equity power and would be an unlawful attempt by the executive branch to severely limit the scope of the judicial branch's authority. This change, if upheld, would also lead to environmental harm in cases where the deficiencies in a NEPA review lead to implementation of an environmentally harmful project during litigation. This attempt to limit judicial remedies would unlawfully attempt to usurp the role of the courts in enforcing NEPA.

CEQ also attempts to define a final agency action for purposes of judicial review in newly proposed section 1500.3(c).[383] In doing so CEQ departs from its previous position that judicial review was appropriate after issuance of an EIS, a finding of no significant impact (FONSI), or irreparable injury[384] and focuses instead on the issuance of a Record of Decision or "other final agency action."[385] This proposal could create confusion as to which NEPA decisions constitute a final agency action subject to judicial review and is incongruent with case law holding that various agency decisions including issuance of a FONSI and final agency actions subject to judicial review. [386]

Proposed Section 1504.3(h), which proposes to refer federal disagreements over proposed actions to the CEQ, would remove the requirement to follow the process required under the APA.[387] The Proposed Rule also states that the referral process is not subject to judicial review.[388] CEQ states that it made this change to provide for "a more timely and efficient process" and "to simplify and modernize the process."[389] But CEQ provides no rationale or legal justification for this significant eradication of transparent procedures and judicial review of its decisions, which is inconsistent with NEPA's goals.

## 2.    CEQ Proposes Unlawful Bond Requirements that Would Substantially Limit Judicial Review of Agency Actions

The Proposed Rule also encourages agencies to impose "bond and security requirements or other conditions" on plaintiffs seeking to stay agency decisions pending administrative or judicial review of an agency decision.[390] This proposal would seek to constrain judicial review of

---

proceedings); *Winter v. Nat. Res. Defense Council*, 555 U.S. 7, 24 (2008) (discussing court's equity powers); *see also* Fed. R. Civ. P. 65.

[383] 85 Fed. Reg. at 1713.

[384] 40 C.F.R. § 1500.3.

[385] 85 Fed. Reg. at 1713 (proposed 40 C.F.R. § 1500.3).

[386] *Sierra Club v. U.S. Army Corps of Eng'rs*, 446 F.3d 808 (8th Cir. 2006).

[387] *Compare* 40 C.F.R. § 1504.3, *with* 85 Fed. Reg. at 1723 (proposed 40 CFR § 1504.3).

[388] 85 Fed. Reg. at 1723 (proposed 40 C.F.R. § 1504.3).

[389] *Id.* at 1704.

[390] 85 Fed. Reg. at 1694, 1713 (proposed 40 C.F.R. § 1500.3(c)).

AR_0025798

agency actions by limiting the field of plaintiffs able to raise concerns about NEPA compliance and lacks any rational explanation or statutory authority.

CEQ attempts to justify its unlawful proposal by claiming that "some courts have imposed substantial bond requirements in NEPA cases," but it fails to cite even one case doing so.[391] While courts have imposed bonds on NEPA plaintiffs, courts have done so with the explicit understanding that a court should "not set such a high bond that it serves to thwart citizen actions."[392] Where one court did set a bond of $4,500,000 for a NEPA plaintiff's preliminary injunction, the Ninth Circuit overturned the bond, stating that "such bonds would seriously undermine the mechanisms in NEPA for private enforcement" and, as a result, "plaintiffs in many NEPA cases would be precluded from effective and meaningful appellate review."[393] Indeed, high bond amounts could systematically keep out low-income, minority, and tribal plaintiffs, exacerbating existing under-representation of those groups. If courts were to impose a bond requirement plaintiffs cannot afford, then federal agencies would be able to go forward with major federal actions that were not compliant with NEPA. These arguments all apply equally to a federal agency requiring a bond to stay an agency decision in anticipation of litigation.

CEQ also attempts to justify this change under NEPA by stating that "appropriate conditions on such stays may further the purposes of NEPA, which provides that all Federal agencies shall identify and develop methods and procedures, in consultation with CEQ, to ensure that environmental amenities and values are given appropriate consideration in decision making along with economic and technical considerations."[394] However, NEPA explicitly declares that it is the policy of the federal government to cooperate with private organizations to "create and maintain conditions under which man and nature can exist in productive harmony."[395] Courts have found that a large bond in the judicial setting "would … stifle the intent of [NEPA], since … 'concerned private organizations' would be precluded from obtaining judicial review."[396] Excessive bonding requirements could thwart that vital role, and it should be the courts, not federal agencies, that have responsibility in ensuring appropriate bonding amounts.[397] CEQ's citation to NEPA's purposes therefore undermines rather than justifies its proposed bonding provision.

Furthermore, CEQ fails to provide authority to support this revision. CEQ merely states that "in appropriate circumstances, agencies may impose bond and security requirements or other conditions," while citing 5 U.S.C. § 301, which is a generalized grant of regulatory authority for

---

[391] 85 Fed. Reg. at 1694 n.55.

[392] *See Save Our Sonoran, Inc. v. Flowers*, 408 F.3d 1113, 1126 (9th Cir. 2005).

[393] *Friends of the Earth, Inc. v. Brinegar*, 518 F.2d 322, 323 (9th Cir. 1975).

[394] 85 Fed. Reg. at 1694 (citation omitted.)

[395] 42 U.S.C. § 4331(a).

[396] *Nat. Res. Def. Council, Inc. v. Morton*, 337 F. Supp. 167, 169 (D.D.C. 1971) (quotations in original). *See also Colorado Wild Inc. v. U.S. Forest Serv.*, 523 F. Supp. 2d 1213, 1230 (D. Colo. 2007) (declining to impose bond); *Morgan v. Walter*, 728 F. Supp. 1483, 1494 (D. Idaho 1989) (same).

[397] *See Flowers*, 408 F.3d at 1126 (affirming that nominal bonds in public interest cases can be appropriate, given that high bonds can "thwart citizen actions").

AR_0025799

federal agencies.[398] CEQ also apparently tries to rely on the authority of 5 U.S.C. § 705.[399] In fact, neither statutory provision mentions anything about bonds or sureties and to the extent section 705 discusses relief, it notes only the court's authority to award that relief.[400] Thus, CEQ has failed to provide any statutory authority for a federal agency to impose a bond requirement. Its proposal thus violates the APA and is *ultra vires*.

### 3.    The Proposed Rule's Conclusive Presumption that an Agency Has Considered Public Comments is Contrary to Law

CEQ's Proposed Rule seeks to impose a "conclusive presumption that the agency has considered the information included in the submitted alternatives, information, and analyses section"[401] in an EIS. CEQ's proposal to adopt a "conclusive presumption" of legality is both novel and inconsistent with separation of powers principles. CEQ has no authority to establish presumptions in judicial review, and in any event, a conclusive presumption is exceedingly rare in current federal regulations. Conclusive presumptions appear only four times in the entire Code of Federal Regulations and never are used to create a bar to judicial review of agency actions.[402] Yet, CEQ proposes to adopt this novel provision with little justification or legal analysis. CEQ's proposed provision represents an exceptional departure from previous CEQ policy and is inconsistent with NEPA's purpose that agencies foster meaningful public participation in agency decision making.

This purported conclusive presumption threatens to create an impossible bar for potential NEPA plaintiffs to challenge the deficiency of an agency's comment summary in an EIS. Even a patently deficient and factually incorrect summary could not be challenged under the proposed conclusive presumption standard.

CEQ's proposed presumption is also unnecessary. Courts currently apply a "rebuttable presumption" that a clear agency response to comments shows that the agency considered and answered the concerns.[403] This presumption can be rebutted by showing that the agency response was inadequate, an essential check against unreasonable or arbitrary agency decision making.[404]

---

[398] 85 Fed. Reg. at 1694 (citing 5 U.S.C. § 301).

[399] *See* 85 Fed. Reg. at 1694.

[400] *See* 5 U.S.C. §§ 301, 705.

[401] 85 Fed. Reg. at 1720 (proposed 40 C.F.R. § 1502.18).

[402] *See* 26 C.F.R. § 1.166-2(d)(3) (conclusive presumption used to define worthless debts under IRS regulations); 45 C.F.R. § 302.70(a)(5)(iv) (providing the states an option to create a conclusive presumption of paternity upon genetic testing); 15 C.F.R. § 930.83 (providing for conclusive presumption of state concurrence in certain situations); 38 C.F.R. § 3.250 (creating a presumption of dependency of a parent in specified circumstances). However, there are 180 references to a "rebuttable presumption" under the Code of Federal Regulations.

[403] *Great Old Broads for Wilderness v. Kimbell*, 709 F.3d 836, 849 (9th Cir. 2013)

[404] *Id.*

67

AR_0025800

A "conclusive presumption," in contrast, would give a commenter no chance to overcome the presumption.

In short, CEQ has no authority to adopt this purported "conclusive presumption," and has not rationally justified it.

## I.    The Proposed Rule Would Increase Uncertainty and Litigation

The Proposed Rule purports to "modernize and clarify" the NEPA regulations.[405] But many of its revisions would only work to increase uncertainty and litigation. This uncertainty would be exacerbated by CEQ's suggestions that the Proposed Rule, if adopted, "would supersede any previous CEQ NEPA guidance," and that CEQ "anticipates withdrawing all of the CEQ NEPA guidance that is currently in effect and issuing new guidance as consistent with Presidential directives."[406]

Over the years, in addition to issuing the current NEPA regulations, CEQ has developed and issued a robust body of guidance documents meant to help federal agencies and the public navigate the requirements of the statute.[407] For example, key CEQ guidance explains how to examine issues of environmental justice, coordinate historic preservation requirements with NEPA, and address emergencies.[408] Courts have also relied on the existing regulations and CEQ's guidance in interpreting NEPA.[409] Eliminating this guidance in one fell swoop, as proposed, would create substantial uncertainty for states, the public, agencies, and the courts and lead to extensive, costly, and time-consuming litigation.

Agencies have relied on CEQ guidance for decades. The principles outlined in those guidance documents and in CEQ's current NEPA regulations are infused throughout the agency-specific NEPA regulations.[410] The task of rewriting and rebuilding NEPA processes and programs

---

[405] 85 Fed. Reg. at 1684.

[406] *Id.* at 1710. Moreover, the preamble also notes that "[b]ased on comments received and CEQ's experience in implementing NEPA, the final rule may include amendments to any provisions in parts 1500 to 1508 of the CEQ regulation," suggesting that additional changes not articulated in the Proposed Rule be included in the final rule, if any. *See id.*

[407] *See* 85 Fed. Reg. at 1684–85 (over 30 guidance documents have been issued by CEQ since 1970).

[408] CEQ Environmental Justice Guidance *supra* note 301; CEQ AND ADVISORY COUNCIL ON HISTORIC PRESERVATION, NEPA AND NHPA: A HANDBOOK FOR INTEGRATING NEPA AND SECTION 106 (Mar. 2013), https://ceq.doe.gov/docs/ceq-publications/NEPA_NHPA_Section_106_Handbook_Mar2013.pdf; CEQ, Emergencies and the National Environmental Policy Act, https://ceq.doe.gov/docs/ceq-regulations-and-guidance/Emergencies_and_NEPA.pdf.

[409] *Davis v. Mineta*, 302 F. 3d 1104, 1125 n.17 (10thCir. 2002), *abrogated on other grounds by Dine Citizens Against Ruining Our Env't v. Jewell*, 839 .3d 1276 (10th Cir. 2016) (CEQ's "40 Questions" document is persuasive authority); *Citizens Against Burlington, Inc. v. Busey*, 938 F.2d 190, 202 (D.C. Cir. 1991) ) (citing with approval 40 Questions guidance); *Sierra Club v. Sigler*, 695 F.2d 957, 971 (5th Cir. 1983)(same). *But see State of La. v. Lee*, 758 F.2d 1081, 1083 (5th Cir. 1985) (finding that CEQ's "Forty Questions" document is not a controlling authority).

[410] *See, e.g.*, 85 Fed. Reg. at 1687 ("Over the past 4 decades, CEQ has issued over 30 documents to provide guidance and clarifications to assist Federal agencies to more efficiently and effectively implement NEPA. CEQ has issued

AR_0025801

within the agencies will be enormous. Confusion would result as agencies scramble to draft new NEPA procedures and policies to accommodate the new regulations. This confusion would be compounded by the fact that the regulations as proposed are often vague, and agencies would be operating without the existing guidance from CEQ. The Proposed Rule would also force states and applicants to guess which provisions would be litigated and which would be upheld. CEQ also directs agencies to develop and revise their own agency-specific NEPA procedures to be consistent with—but not more stringent than—the final rule within one year of the latter's publication. A one-year timeline to implement new regulations in the face of such great uncertainty would place an unreasonable burden on federal agencies. The Proposed Rule would thus disrupt NEPA reviews throughout the federal government and across the nation for years to come, increasing project delays and uncertainty.

This uncertainty would be compounded by CEQ's proposal to allow agencies to apply the Proposed Rule to "ongoing activities and environmental documents begun before" the effective date of a final rule.[411] If an agency chooses this disruptive option, it could upend any number of environmental reviews and cause additional confusion and delay.

CEQ's Proposed Rule, if finalized, would also significantly increase litigation. Currently, most NEPA analyses do not result in litigation.[412] According to CEQ data, "the number of NEPA lawsuits filed annually has consistently been just above or below 100, with the exception of a period in the early- and mid-2000s."[413] "Given that the number of federal actions potentially subject to NEPA is roughly 100,000 or so annually, litigation rates are exceedingly low."[414] Even for EISs, which represent a small fraction of NEPA review processes, on average 20% are challenged and just 13% are actually litigated."[415]

Under the Proposed Rule, however, federal actions would be subject to challenge based on an insufficient environmental review that may meet the standards in the Proposed Rule, but do not meet the substantive standards in NEPA itself.

---

guidance on such topics as [categorical exclusions], EAs, mitigation, and [FONSIs], emergencies, programmatic NEPA reviews, timely environmental reviews, collaboration and conflict resolution, purpose and need, effects, lead and cooperating agencies, environmental justice, and other topics.") (citations omitted).

[411] *Id.* at 1727.

[412] GAO Report, *supra* note 24, at 19.

[413] *Id.*

[414] David E. Adelman & Robert L. Glicksman, *Presidential and Judicial Politics in Environmental Litigation*, 50 ARIZ. ST. L.J. 4, 50 (2018).

[415] *Id.*; *see also* GAO Report, *supra* note 24, at 19; Lazarus, *supra* note 30 at 1510 (as of 2012, the Supreme Court had decided only 17 NEPA cases).

AR_0025802

V.    **THE PROPOSED RULE WOULD ADVERSELY IMPACT THE UNIQUE INTERESTS OF STATES, TERRITORIES, AND LOCAL GOVERNMENTS IN ROBUST NEPA REGULATIONS**

NEPA is an example of cooperative federalism, envisioning a strong role for states, territories, and local governments in NEPA reviews. Indeed, when enacting NEPA, Congress declared that the federal government must act, "in cooperation with States and local governments" to evaluate potential environmental impacts in fulfillment of NEPA's purposes.[416] The current NEPA regulations likewise direct federal agencies to "cooperate with State and local agencies to the fullest extent possible to reduce duplication between NEPA and State and local requirements…."[417] NEPA's success has led to the enactment of similar statutes in many states. NEPA plays a significant role in states across the nation by informing environmental reviews under both federal and state law. However, the proposed changes to CEQ's NEPA regulations would threaten the interests of the States in protecting our residents and environmental resources through public participation and robust, informed decision making processes for federal projects.

A.    **The States Have an Interest in Ensuring that Federal Decisions Do Not Harm Their Residents, Property, or Natural Resources**

The States have a strong interest in robust NEPA compliance with significant opportunities for public participation in order to protect their residents, property, and natural resources. The States are injured when our residents suffer from the effects of environmental degradation, including cumulative pollution impacts in environmental justice communities.[418] The States also have a quasi-sovereign interest in preventing harm to the health of our natural resources and ecosystems[419] and are entitled to "special solicitude" in seeking redress for environmental harms within their borders.[420] Moreover, public involvement by our agencies and residents is critical in identifying and evaluating public health and environmental issues of local or statewide concern that may result from federal actions.

NEPA reviews provide an important opportunity for state, territorial and municipal agencies to help shape federal decisions that affect our resources. For example, as detailed in the Advance Notice Comments, for critical issues such as siting of nuclear waste disposal facilities or interstate pipelines, where environmental review may take place primarily through a NEPA process, the Proposed Rule's narrowing of indirect and cumulative effects review and

---

[416] 42 U.S.C. § 4331(a).

[417] 40 C.F.R. § 1506.2.

[418] *Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Baez*, 458 U.S. 592, 607 (1982); *Maryland v. Louisiana*, 451 U.S. 725, 737–38 (1981).

[419] *Massachusetts v. EPA*, 549 U.S. 497, 519–22 (2007).

[420] *Id*. at 520.

AR_0025803

consideration of alternatives, would expose the States, and our resources, residents and environments to significant environmental impacts.[421]

NEPA analysis also provides important resources for states in informing other important programs and decisions affecting our resources. For example, robust EISs are critical to informing the states' "consistency determinations" under the federal Coastal Zone Management Act,[422] by which states assess the impact of federal projects on land, water uses, and natural resources in coastal zones.[423]

The Proposed Rule threatens these critical state interests by limiting both the substantive analysis under NEPA and the availability of public participation. For example, the threshold analysis added to the Regulations, the redefinition of "major Federal action" and "significance," and expansion of categorical exclusions would lead to weaker or no environmental analysis of some federal projects.[424] The expansion of the functional equivalency standard[425] and limitation of the alternatives analysis also would limit environmental review.[426] Limitations on the scope of impacts considered under NEPA could greatly reduce the information generated by an environmental review.[427] Without this type of analysis, states would lack information to understand the harm these projects could have within a state. They also would lack the information necessary to coordinate other state programs and resources impacted by these actions.

CEQ's revisions that restrict public participation and judicial review are also of great concern to the States because our residents would be unable to contribute effectively to, review, or challenge noncompliant NEPA reviews that affect their communities.[428]

## B.    Weakening the NEPA Regulations Would Disrupt Cooperation Between Federal and State Agencies and Burden States with Increased Environmental Review

Changes weakening NEPA would disrupt cooperative environmental reviews by federal and state agencies and increase the burden on states and applicants to conduct additional environmental review under state statutes.

---

[421] Advance Notice Comments, *supra* note 7, at 6–7.

[422] 16 U.S.C. § 1456.

[423] *See, e.g.*, 15 C.F.R. § 930.31; 301 Mass. Code Regs. § 20.04.

[424] *See supra* section IV.D.

[425] *Id.*

[426] *See supra* section IV.E.

[427] *See supra* section IV.F.

[428] *See supra* sections IV.G & IV.H.

AR_0025804

NEPA's enactment served as a model to the States, many of which enacted their own environmental review laws or "little NEPAs" to protect public health and the environment.[429] Examples include the California Environmental Quality Act,[430] the Massachusetts Environmental Policy Act,[431] New York's State Environmental Quality Review Act,[432] and Washington's State Environmental Policy Act.[433] Where an action has both federal and non-federal components, as is often the case, the NEPA regulations direct federal agencies to "cooperate with State and local agencies to the fullest extent possible to reduce duplication between NEPA and State and local requirements."[434] Accordingly, CEQ and several states have worked together to harmonize the environmental review processes under NEPA and little NEPAs through state-specific memoranda.[435] This collaboration allows state, local, and federal agencies to share documents, reduce paperwork, and efficiently allocate limited time and resources. However, the Proposed Rule would disrupt this collaboration to the extent it prohibits federal agencies from adopting NEPA regulations that integrate with state review processes with more stringent requirements and procedures than those set out in the Proposed Rule.[436] This change would impair federal agencies' coordination with states, creating greater complexity and uncertainty for applicants, and additional delays and paperwork.

Furthermore, the weakened, narrowed, and truncated NEPA process contemplated by the Proposed Rule would increase the burden on the States to rely more heavily on and prepare more documents under our own environmental laws.

As discussed more fully in the Advance Notice Comments,[437] the States' laws are often administered in conjunction with the NEPA regulations, either through coordinated state and federal review or by relying on NEPA review to satisfy state environmental review requirements. Those comments anticipated specific burdens and impacts from the proposed rulemaking that have been realized in the Proposed Rule. For instance, in situations where a federal agency's limited analysis of indirect and cumulative impacts and alternatives under the Proposed Rule would be less stringent than a state's little NEPA standards, a state agency would be unable to rely on the federal EIS to make its own environmental findings.[438] Thus, the burden would fall on the States to conduct additional analysis, such as preparing a separate state EIS. As a result, the proposed regulatory changes will not ultimately simplify or expedite the environmental review process, as

---

[429] *See* CEQ, STATES AND LOCAL JURISDICTIONS WITH NEPA-LIKE ENVIRONMENTAL PLANNING REQUIREMENTS [hereinafter State and Local Laws], https://ceq.doe.gov/laws-regulations/states.html (last visited Mar. 6, 2020).

[430] 1970 Cal. Stats. ch. 1433, Cal. Pub. Res. Code §§ 21000–21189.57.

[431] Mass. Gen. Laws ch. 30, §§ 61-62H (2020).

[432] N.Y. Envtl. Conserv. Law. art. 8; 6 N.Y. Comp. R. & Regs. § 617.

[433] Wash. Rev. Code 43-21C-010 to 914; Wash. Admin. Code § 197-11-010 to 990.

[434] 40 C.F.R. § 1506.2.

[435] *See* State and Local Laws, *supra* note 429. *See also* 40 C.F.R. § 1500.5(h).

[436] 85 Fed. Reg. at 1727 (proposed 40 CFR § 1507.3(a)).

[437] *See* Advance Notice Comments, *supra* note 7, at 5–11.

[438] *See, e.g.,* 6 N.Y. Comp. Codes R. & Regs. § 617.15(a).

72

posited by CEQ. Rather, by curtailing the scope of impacts analysis required under NEPA and reducing the level of cooperation with federal agencies, CEQ would merely shift the burdens of environmental review to state and local jurisdictions with robust little NEPAs. This additional analysis would require the States to expend additional time and resources on environmental review of a proposed action. CEQ's finding that the Proposed Rule would have no federalism implications under Executive Order 13132 is therefore wrong and unsupported.[439]

Moreover, where additional environmental review is not required under a little NEPA, CEQ's proposal to greatly limit the scope of impacts considered under NEPA would diminish the amount of information available to state and local agencies and the public with regard to the environmental impacts of proposed projects. In doing so, CEQ's Proposed Rule would undermine the major purposes of NEPA to foster informed decision making and informed public participation.

In addition to coordination with state environmental review laws, the States have also long relied on the NEPA regulations, guidance, and case law in interpreting and implementing their state environmental review statutes and regulations. The much weaker proposed NEPA regulations may no longer provide substantive and procedural guidance to states. CEQ's proposed revisions to the definition of key terms may create divergence between state and federal standards, undermining our States' ability to efficiently implement our own environmental review laws, and impacting the case law interpreting States' well-developed statutory and regulatory regimes. And, as discussed above, CEQ's proposal to withdraw all existing guidance will severely burden state agencies and programs relying on that guidance.

In summary, the States have strong interests in the continued implementation of NEPA regulations that provide for a robust, deliberative, and complete federal environmental review process. CEQ's arbitrary limits on the scope and timeframe allowed for preparation and consideration of NEPA documents, the public participation process, and judicial review would harm the States' interests and violate NEPA's purpose and text.

## VI.    CEQ MUST CONDUCT NEPA REVIEW OF ITS REGULATIONS

CEQ has acted arbitrarily and capriciously by failing to consider properly whether the proposed rule itself triggers NEPA, thus requiring the preparation of an EA or an EIS prior to the issuance of a final rule. Instead, CEQ summarily states it "has determined that the proposed rule would not have a significant effect on the environment because it would not authorize any activity or commit resources to a project that may affect the environment."[440] CEQ acknowledges that it prepared environmental assessments for its promulgation of NEPA regulations in 1978 and amendments in 1986.[441] But here, CEQ contends that it is not required to conduct NEPA analysis on its proposed rule because "CEQ does not require any Federal Agencies to conduct NEPA analysis for the development of agency procedures for the implementation of NEPA and the CEQ

---

[439] 85 Fed. Reg. at 1711.

[440] Id.

[441] Id.

AR_0025806

regulations."[442] This is not the relevant standard for determining whether environmental review is required.

Under NEPA, federal agencies, including CEQ, are required to prepare a detailed statement on the environmental impacts of a major federal action significantly affecting the quality of the human environment.[443] If there is a substantial question whether an action may have a significant effect on the environment, CEQ must prepare an EIS.[444] As a preliminary step, CEQ may prepare an EA to determine whether a proposed action may significantly affect the environment and whether an EIS is required.[445]

CEQ's decision to forgo NEPA review for this rulemaking is arbitrary and capricious because revising the NEPA regulations is a major federal action that will have a significant impact on the environment. Second, CEQ's justification conflicts with NEPA and the case law interpreting it. The absence of a regulation specifically requiring CEQ to conduct NEPA review on its regulations does not obviate the agency's obligations to comply with the statute and consider whether the Proposed Rule would have a major impact on the environment. Finally, CEQ's stated rationale is arbitrary and capricious because it ignores recent circuit court precedent.

## A.    Overhauling the Nation's NEPA Regulations Is a Major Federal Action Affecting the Environment

NEPA's current regulations identify agency rules as "major" federal actions which may require NEPA review.[446] Under NEPA, if an agency's rulemaking may significantly impact the environment, NEPA review is required. This includes CEQ's revisions to NEPA's implementing regulations in the Proposed Rule. As described in this comment letter, CEQ is proposing a sweeping re-write of NEPA's implementing regulations, which are relied upon by all federal agencies, and which have been in place—largely intact—since 1978. Accordingly, CEQ must undertake the necessary NEPA review of its rulemaking, and its failure to do so is arbitrary and capricious.[447]

CEQ's comprehensive overhaul of the NEPA regulations alters how and when federal agencies must consider the environmental effects of proposed projects across the nation. As discussed above, the proposed changes to CEQ's regulations will weaken the quality of

---

[442] *Id.*

[443] 42 U.S.C. § 4332(2)(C).

[444] *Ctr. for Biological Diversity*, 538 F.3d at 1185.

[445] *Id.*

[446] 40 C.F.R. § 1508.18(a) ("Actions include . . . new or revised agency rules, regulations, plans, policies, or procedures").

[447] *New York v. Nuclear Regulatory Comm'n*, 681 F.3d 471, 476–78 (2d Cir. 2012) (vacating agency's rulemaking, which the court considered to be a major federal action, because of deficient NEPA review).

AR_0025807

environmental analysis conducted by federal agencies by, among other things, expanding the use of categorical exclusions, reducing the meaning of "significance" for determining whether an EIS is required, restricting the types of effects considered in an EIS, weakening the alternatives analysis, and reducing public participation and agency accountability. A major purpose of NEPA is to ensure that an agency will have available, and will carefully consider, detailed information concerning significant environmental impacts, and guarantee that the relevant information will be made available to the larger public audience.[448] But CEQ's Proposed Rule, if adopted, would firmly undermine that purpose and is likely to have significant effects on the environment, thus warranting NEPA review. For example, by limiting the scope of effects that must be analyzed under NEPA, CEQ makes it more likely that projects with significant effects will be approved without mitigation. This is a reasonably foreseeable outcome where the analysis is truncated and the public and decision makers would be less aware of the environmental impacts of proposed projects and alternatives to those projects.

As another example, the proposed "threshold applicability analysis," which CEQ states will "provides a series of considerations to assist agencies … to determine whether NEPA applies,"[449] establishes in effect an early off-ramp for a wide category of actions that are presumed not to require any environmental review.[450] The "threshold applicability analysis," like other changes described in these comments, narrows the universe of actions subject to NEPA and creates the possibility that significant effects will be overlooked if certain projects are not subject to NEPA review. CEQ has not taken the "hard look" to determine whether the Proposed Rule, including the threshold applicability analysis, will significantly impact the environment.

## B.    CEQ Misstates and Ignores the Governing Law Requiring NEPA Review

CEQ contends that it is not required to conduct NEPA review of its implementing regulations because there is no regulation that specifically requires it. However, NEPA does not allow for such a conclusion. The language in section 102(2)(C) of NEPA "is intentionally broad to force the government to consider the environmental effects of its actions."[451] Existing CEQ regulations provide, and numerous courts have confirmed[452] that a "major federal action" includes

---

[448] *Ctr. for Biological Diversity*, 538 F.3d at 1185.

[449] 85 Fed. Reg. at 1695.

[450] *Id.*

[451] *Found. for Horses & Other Animals v. Babbitt*, 995 F. Supp. 1088, 1093 (C.D. Cal. 1998) (citing *Found. for N. Am. Wild Sheep v. U.S. Dep't of Agric.*, 681 F.2d 1172, 1177 (9th Cir. 1982)).

[452] *See, e.g., California ex rel. Lockyer v. U.S. Dep't of Agric.*, 575 F.3d 999, 1012–18 (9th Cir. 2009) (agency repeal of roadless rule and replacement with new regulations required NEPA review); *Humane Soc'y of the U.S. v. Johanns*, 520 F. Supp. 2d 8, 18–32 (D.D.C. 2007) (vacating federal rule requiring NEPA review); *Natural Res. Def. Council v. Duvall*, 777 F. Supp. 1533, 1542 (E.D. Cal. 1991) (setting aside federal rule due to failure to perform EIS)*American Pub. Transit Ass'n v. Goldschmidt*, 485 F. Supp. 811, 831–36 (D.D.C. 1980), *reversed on other grounds by Am. Pub. Transit Ass'n v. Lewis*, 655 F2d 1272 (D.C. Cir. 1981) (regulations requiring many individual

75

"new or revised agency *rules*, *regulations*, plans, policies, or *procedures*" where those actions may significantly affect the environment.[453] Regardless of whether the Proposed Rule is characterized as a rule, regulation, or procedure, it is still subject to NEPA review. NEPA regulations require that both the context and the intensity of an action be considered in determining whether an action may significantly affect the environment.[454] The presence of just "one of these factors may be sufficient to require the preparation of an EIS in appropriate circumstances."[455]

As with other agency actions, changes to NEPA's implementing regulations require their own NEPA review if they create the possibility of significant impacts on the environment.[456] In *Sierra Club v. Bosworth*, the Ninth Circuit held that the Forest Service's adoption of a new categorical exclusion for fuel reduction projects up to 1,000 acres and prescribed burns up to 4,500 acres on all national forest lands in the United States violated NEPA by failing to take the requisite "hard look" at the possibility of significant impacts of this rulemaking on the environment.[457] In particular, the Ninth Circuit found that the Forest Service failed to properly assess the scope of potential impacts and failed to adequately consider the NEPA significance factors, including cumulative impacts and the extent to which the categorical exclusion was highly controversial and the risks uncertain.[458] Consequently, the Ninth Circuit ordered the district court "to enter an injunction precluding the Forest Service from implementing the [categorical exclusion] pending its completion of an adequate assessment of the significance of the categorical exclusion from NEPA."[459]

Conversely, in *Heartwood*, the Seventh Circuit found the Forest Service could adopt a new categorical exclusion without additional NEPA review.[460] The court found that, "by definition," a categorical exclusion is unlikely to significantly impact the environment, and the Forest Service did evaluate whether the proposed activity subject to the categorical exclusion would affect the environment and whether it qualified for the categorical exclusion.[461] Unlike the situation in

---

actions, each significantly affecting the environment, must itself be regarded as significantly affecting the environment requiring NEPA analysis).

[453] 40 C.F.R. § 1508.18 (emphasis added). *See also* 40 C.F.R. § 1507.3 (requiring each federal agency to "adopt procedures to supplement these regulations").

[454] 40 C.F.R. § 1508.27.

[455] *Ocean Advocates v. U.S. Army Corps of Eng'rs*, 402 F.3d 846, 865 (9th Cir. 2005).

[456] *See Sierra Club v. Bosworth*, 510 F. 3d. 1016 (9th Cir. 2007).

[457] *Id.* at 1025–34.

[458] *Id.* at 1026–32.

[459] *Id.* at 1034.

[460] *Heartwood v. U.S. Forest Serv.*, 230 F.3d 947 (7th Cir. 2000).

[461] *See id.* at 954 (noting that "categorical exclusions, by definition, do not have a significant effect on the quality of the human environment").

AR_0025809

*Heartwood*, CEQ here has made no findings, or even considered, whether the proposed rule may significantly affect the quality of the human environment.

There is no rational basis for bypassing NEPA review of the Proposed Rule. First, the Proposed Rule will affect the approval of federal agency actions nationwide, making it more likely that actions with significant undisclosed effects are approved. CEQ's Proposed Rule goes well beyond simply adopting new categorical exclusions; it would change the manner in which federal agencies conduct EAs and EISs and curtail the quality and depth of review. Like in *Bosworth,* here CEQ fails to take the "hard look" at the likelihood of significant impacts resulting from this rulemaking and fails to provide "a reasonably thorough discussion of the significant aspects of the probable environmental consequences."[462] Unless and until CEQ properly considers whether the proposed rule may have a significant impact on the environment, it is in direct violation of the Ninth Circuit's holding in *Bosworth* and the requirements of NEPA. And it is also clear that CEQ should have done so already. The NEPA regulations make clear that "[a]gencies shall integrate the NEPA process with other planning *at the earliest possible time* to insure [sic] that planning and decisions reflect environmental values, to avoid delays later in the process, and to head off potential conflicts."[463]

Here, CEQ was required to request comments on the appropriate scope of environmental review of the Proposed Rule and then prepare, and notice for public comment, an EIS analyzing the Proposed Rule's potential impacts before, or in tandem with, its publication. The Proposed Rule thus violates NEPA and must be withdrawn. At the very least, CEQ should suspend rulemaking for the Proposed Rule, request NEPA scoping comments, and prepare an EIS.

## VII.    CONCLUSION

For all the reasons stated above, the undersigned States strongly urge CEQ to abandon its unlawful and unsupported Proposed Rule.[464]

---

[462] *Idaho Sporting Cong. v. Thomas*, 137 F.3d 1146, 1149 (9th Cir.1998), *overruled on other grounds by The Lands Council v. McNair*, 537 F.3d 981 (9th Cir. 2008) (en banc) (quoting *Or. Nat. Res. Council v. Lowe*, 109 F.3d 521, 526 (9th Cir. 1997)).

[463] 40 C.F.R § 1501.2 (emphasis added).

[464] The undersigned States also have submitted an appendix containing documents cited in these comments. The cover letter and index for that appendix are attached as Exhibit 3.

AR_0025810

FOR THE STATE OF WASHINGTON

ROBERT W. FERGUSON
Attorney General


By:    /s/ Aurora R. Janke
       AURORA R. JANKE
       ELIZABETH M. HARRIS
       Assistant Attorneys General
       Counsel for Environmental Protection
       800 5th Ave Suite 2000, TB-14
       Seattle, WA 98104-3188
       (206) 233-3391
       aurora.janke@atg.wa.gov
       elizabeth.harris@atg.wa.gov




FOR THE STATE OF CALIFORNIA

XAVIER BECERRA
Attorney General


By:    /s/ Sarah E. Morrison
       SARAH E. MORRISON
       Supervising Deputy Attorney General
       JAMIE JEFFERSON
       JULIA K. FORGIE
       JOSH PURTLE
       Deputy Attorneys General
       California Department of Justice
       300 South Spring Street, Suite 1702
       Los Angeles, CA 90013
       (213) 269-6328
       Sarah.Morrison@doj.ca.gov
       Jamie.jefferson@doj.ca.gov
       Julia.Forgie@doj.ca.gov
       Josh.Purlte@doj.ca.gov

AR_0025811

FOR THE STATE OF NEW YORK

LETITIA JAMES
Attorney General

By:      /s/ Claiborne E. Walthall
         MICHAEL J. MYERS
         Senior Counsel
         CLAIBORNE E. WALTHALL
         Assistant Attorney General
         Environmental Protection Bureau
         Office of the Attorney General
         State Capitol
         Albany, NY 12224
         (518) 776-2380
         claiborne.walthall@ag.ny.gov

FOR THE DISTRICT OF COLUMBIA

KARL A. RACINE
Attorney General

By:      /s/ Sarah Kogel-Smucker
         SARAH KOGEL-SMUCKER
         Special Assistant Attorney General
         Social Justice Section
         Office of the Attorney General
         441 4th Street, N.W., Suite 630 South
         Washington, D.C. 20001
         (202) 724-9727
         sarah.kogel-smucker@dc.gov

AR_0025812

FOR THE STATE OF CONNECTICUT

WILLIAM TONG
Attorney General

By:   /s/ Robert Snook
Robert Snook
Assistant Attorney General
Office of the Attorney General
165 Capitol Avenue
Hartford, Connecticut 06106
(860) 808-5250
robert.snook@ct.gov

FOR THE STATE OF DELAWARE

KATHLEEN JENNINGS
Attorney General

By:   /s/ Jameson A.L. Tweedie
Christian Douglas Wright
Director of Impact Litigation
Jameson A.L. Tweedie
Special Assistant Deputy Attorney General
Delaware Department of Justice
391 Lukens Drive
New Castle, DE  19720
Telephone: (302) 395-2521
Christian.Wright@delaware.gov
Jameson.Tweedie@delaware.gov

AR_0025813

FOR THE TERRITORY OF GUAM

LEEVIN T. CAMACHO
Attorney General


By:      /s/ Leevin T. Camacho_____
         LEEVIN T. CAMACHO
         Attorney General
         Office of the Attorney General of Guam
         590 S. Marine Corps Dr., Suite 901
         Tamuning, GU 96913
         (671) 475-3324
         lcamacho@oagguam.org




FOR THE STATE OF ILLINOIS

KWAME RAOUL
Attorney General


By:      /s/ Jason E. James_____
         JASON E. JAMES
         Assistant Attorney General
         MATTHEW J. DUNN
         Chief, Environmental Enf./Asbestos Litig. Div.
         Office of the Attorney General
         Environmental Bureau
         69 W. Washington St., 18th Floor
         Chicago, IL 60602
         (312) 814-0660
         jjames@atg.state.il.us

FOR THE STATE OF MAINE

AARON M. FREY
Attorney General


By:     /s/ Margaret A. Bensinger
        MARGARET A. BENSINGER, ME Bar #3003
        Assistant Attorney General
        Office of the Attorney General
        6 State House Station
        Augusta, Maine 04333
        (207) 626-8578
        Peggy.bensinger@maine.gov




FOR THE STATE OF MARYLAND

BRIAN E. FROSH
Attorney General


By:     /s/ Steven J. Goldstein
        STEVEN J. GOLDSTEIN
        Special Assistant Attorney General
        Office of the Attorney General
        200 Saint Paul Place, 20th Floor
        Baltimore, MD 21202
        (410) 576-6414
        sgoldstein@oag.state.md.us

AR_0025815

FOR THE COMMONWEALTH OF MASSACHUSETTS

MAURA HEALEY
Attorney General

By:    /s/ Turner Smith
            CHRISTOPHE COURCHESNE
            Assistant Attorney General and Chief
            TURNER SMITH
            MATTHEW IRELAND
            Assistant Attorneys General
            Office of the Attorney General
            Environmental Protection Division
            One Ashburton Place, 18th Floor
            Boston, MA 02108
            (617) 727-2200
            turner.smith@mass.gov

FOR THE PEOPLE OF THE STATE OF MICHIGAN

DANA NESSEL
Attorney General

By:     /s/ Elizabeth Morrisseau
            ELIZABETH MORRISSEAU
            Assistant Attorney General
            Environment, natural Resources, and Agriculture
            Division 6th Floor G. Mennen Williams Building
            525 W. Ottawa Street
            P.O. Box 30755
            Lansing, MI 48909
            (517) 335-7664
            MorrisseauE@michigan.gov

AR_0025816

FOR THE STATE OF MINNESOTA

KEITH ELLISON
Attorney General

By:     /s/ Peter N. Surdo
        PETER N. SURDO
        Special Assistant Attorney General
        445 Minnesota Street, Suite 900
        St. Paul, MN 55101
        (651) 757-1061
        peter.surdo@ag.state.mn.us

FOR THE STATE OF NEVADA

AARON D. FORD
Attorney General

By:     /s/ Dan P. Nubel
        DAN P. NUBEL
        Deputy Attorney General
        Government and Natural Resources Division
        Nevada Office of the Attorney General
        100 N. Carson Street
        Carson City, NV 89701
        (775) 684-1225
        dnubel@ag.nv.gov

AR_0025817

FOR THE STATE OF NEW JERSEY

GURBIR S. GREWAL
Attorney General

By:      /s/ Kristina Miles
         KRISTINA MILES
         *Deputy Attorney General*
         DIANNA SHINN
         *Deputy Attorney General*
         New Jersey Division of Law
         25 Market Street
         P.O. Box 093
         Trenton, NJ 08625-093
         (609) 376-2789
         Kristina.Miles@law.njoag.gov
         Dianna.Shinn@law.njoag.gov

FOR THE STATE OF NEW MEXICO

HECTOR BALDERAS
Attorney General

By:      /s/ William Grantham
         WILLIAM GRANTHAM
         Assistant Attorney General
         201 Third St. NW, Suite 300
         Albuquerque, NM 87102
         (505) 717-3520
         wgrantham@nmag.gov

85

FOR THE STATE OF OREGON

ELLEN F. ROSENBLUM
Attorney General


By:      /s/ Paul Garrahan
         PAUL GARRAHAN
         Attorney-in-Charge
         STEVE NOVICK
         Special Assistant Attorney General
         Natural resources Section
         Oregon Department of Justice
         1162 Court Street NE
         Salem, OR 97301-4096
         (503) 947-4593
         Paul.garrahan@doj.state.or.us
         Steve.Novick@doj.state.or.us




FOR THE COMMONWEALTH OF PENNSYLVANIA

JOSH SHAPIRO
Attorney General


By:      /s/ Ann R. Johnston
         ANN R. JOHNSTON
         Senior Deputy Attorney General
         Office of Attorney General
         Strawberry Square
         Harrisburg, PA 17120
         (717) 857-2091
         ajohnston@attorneygeneral.gov

86

FOR THE STATE OF RHODE ISLAND

PETER F. NERONHA
Attorney General

By:    /s/ Gregory S. Schultz_____
Gregory S. Schultz
Special Assistant Attorney General
Office of the Attorney General
150 south Main Street
Providence, RI 02903
(401) 274-4400
gschultz@riag.ri.gov

FOR THE STATE OF VERMONT

THOMAS J. DONOVAN, JR.
Attorney General

By:    /s/ Nicholas F. Persampieri_____
NICHOLAS F. PERSAMPIERI
Assistant Attorney General
Office of the Attorney General
109 State Street
Montpelier, VT 05609
(802) 828-6902
nick.persampieri@vermont.gov

AR_0025820

# EXHIBIT 1

AR_0025821

**COMMENTS OF ATTORNEYS GENERAL OF CALIFORNIA, ILLINOIS, MARYLAND, MASSACHUSETTS, NEW JERSEY, NEW YORK, OREGON, VERMONT, AND WASHINGTON, AND THE SECRETARY OF THE COMMONWEALTH OF PENNSYLVANIA DEPARTMENT OF ENVIRONMENTAL PROTECTION**

August 20, 2018

VIA REGULATIONS.GOV
Edward A. Boling
Associate Director for the National Environmental Policy Act
Council on Environmental Quality
730 Jackson Place NW
Washington, DC 20503

  Re: Advance Notice of Proposed Rulemaking – Update to the Regulations
    for Implementing the Procedural Provisions of the National
    Environmental Policy Act, 83 Fed. Reg. 28,591 (June 20, 2018)
    Docket ID No. CEQ-2018-0001

Dear Associate Director Boling:

  The undersigned State Attorneys General and state representatives, specifically, the Attorneys General of California, Illinois, Maryland, Massachusetts, New Jersey, New York, Oregon, Vermont, and Washington, and the Secretary of the Commonwealth of Pennsylvania Department of Environmental Protection ("States") respectfully submit these comments on the Council on Environmental Quality's ("CEQ") advance notice of proposed rulemaking ("Advance Notice") regarding potential revisions to the regulations implementing the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321, *et seq.*[1]  The Advance Notice requests comments "on potential revisions to update and clarify" the process and scope of federal NEPA review by including questions on the following subjects: revising definitions of key NEPA terms, revising documents such as Notices of Intent and Categorical Exclusions, revising the timing of agency actions, revising agency and contractor responsibilities for document preparation, revising the public participation process, establishing mandatory time limits for preparation of documents and

---

[1] The advance notice of proposed rulemaking is entitled "Update to the Regulations for Implementing the Procedural Provisions of the National Environmental Policy Act," 83 Fed. Reg. 28,591 (June 20, 2018), Docket ID No. CEQ-2018-0001 [hereinafter Advance Notice].

1

completion of the NEPA process, narrowing the range of alternatives requiring analysis, seeking examples of purportedly "obsolete" regulations, seeking input on use of unspecified "new technologies," and combining NEPA analyses and other decision documents.[2] The breadth of the questions posed by the Advance Notice suggests that CEQ's existing NEPA regulations ("NEPA regulations") need major amendments or even a wholesale regulatory overhaul. The States submit, however, that no demonstrated need for such substantial revisions exists, and we oppose any revisions that would threaten or destroy the fundamental environmental protections in NEPA.

CEQ's NEPA regulations are the cornerstone of the federal government's implementation of NEPA, providing a durable and environmentally protective framework on which the States and the public have relied for 40 years. Through prior administrations, CEQ has shown remarkable restraint, revising its regulations only when absolutely necessary. This restraint should continue because existing data do not demonstrate a need for any significant changes to NEPA regulations implied by this Advance Notice. Instead, as described more fully in Sections II and III, NEPA and the NEPA regulations have successfully accomplished the goal of forcing federal agencies to take a "hard look" at how their actions impact the environment.[3] Therefore, the States urge CEQ to seriously consider whether it is appropriate to amend its NEPA regulations at all. If CEQ does decide to revise the NEPA regulations, it must first collect detailed data on NEPA's implementation and evaluate the effect any revisions would have on future federal actions, public health, and the environment. Any revisions to the regulations, if warranted and supported by substantial evidence, must continue to prioritize protection of public health and the environment, and to ensure public participation in accordance with NEPA, over mere administrative expedience.

## I.    NEPA Is the Foundation of Our Nation's Environmental Laws

Congress enacted NEPA in 1969 with the stated purpose to "declare a national policy which will encourage productive and enjoyable harmony between man and his environment; to promote efforts which will prevent or eliminate damage to the environment and biosphere and stimulate the health and welfare of man; to enrich the understanding of the ecological systems and natural resources important to the Nation; and to establish a Council on Environmental Quality."[4] NEPA was the first

---

[2] *See id.* at 28,591–92.

[3] *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989).

[4] 42 U.S.C. § 4321.

AR_0025823

major environmental law in the United States and is often called the "Magna Carta" of federal environmental laws. The NEPA regulations "tell federal agencies what they must do to comply with the procedures and achieve the goals of the Act."[5] Over the past 40 years, the NEPA regulations have guided NEPA's implementation across the nation and have become fundamental to the daily functioning and responsible decision-making of numerous federal and state agencies.

NEPA endorses a broad, deliberative approach, which focuses on public disclosure and requires all federal agencies to ensure that their decision-making takes public health and the environment into account. Nearly every major federal action, from the approval of significant energy and infrastructure projects to key decisions concerning the management of federal public lands, requires compliance with NEPA. Unlike many other subject-specific federal statutes such as the Clean Air Act,[6] NEPA has a uniquely broad scope requiring consideration of all potential environmental and social impacts of a federal action. At the heart of NEPA—and embodied in the NEPA regulations—are the principles that federal agencies must complete their environmental analysis of proposed projects and alternatives before they act, that the analysis must be accurate and rigorous, that the analysis should enable public and inter-agency participation,[7] and that the analysis should influence the decisions federal agencies ultimately make.[8] Although NEPA does not require a particular outcome, it compels agencies to think carefully and comprehensively about the environment before acting, and emphasizes the importance of fully assessing environmental impacts and alternative approaches through public participation and inter-agency consultation. NEPA requires agencies to consult with other agencies that have expertise on a particular resource impacted by a project, developing more robust alternatives and reducing delay in preparation of documents.[9] These principles must continue to underlie any potential changes to the NEPA regulations.

---

[5] 40 C.F.R. § 1500.1(a).

[6] 42 U.S.C. §§ 7401, *et seq.*

[7] 42 U.S.C. § 4332(2)(C).

[8] *See Am. Rivers v. Fed. Energy Regulatory Comm'n*, 895 F.3d 32, 49 (D.C. Cir. 2018) (NEPA ensures that agency decision-making is fully informed regarding environmental impacts); *Sierra Club v. U.S. Army Corps of Eng'rs*, 803 F.3d 31, 37 (D.C. Cir. 2015) (agencies must take a "hard look" at the environmental consequences of their actions before deciding whether and how to proceed).

[9] *See* 42 U.S.C. § 4332(2)(C); 40 C.F.R. §§ 1500.5, 1501.5, 1501.6.

AR_0025824

NEPA explicitly embraces democratic values by making the public important contributors to the environmental review process.[10] As CEQ's guidance states, "[t]wo major purposes of the environmental review process are better informed decisions and citizen involvement, both of which should lead to implementation of NEPA's policies."[11] Public comment in the NEPA process is critically important to, among other things, identify alternatives that improve a proposed action or reduce its environmental impacts, identify shortfalls in the agency's analyses, spot missing issues, and provide additional information that the agency may not have known existed. To the extent Question 6 of the Advance Notice suggests public comment can be more "efficient," CEQ should reject changes that weaken or shorten the public's opportunity for participation. Because of NEPA, the public has a legal right and a voice in the federal planning process,[12] and public involvement is beneficial to federal decision-making.[13] As CEQ itself has stated, "[s]ome of the most constructive and beneficial interaction between the public and an agency occurs when citizens identify or develop reasonable alternatives that the agency can evaluate in the EIS."[14]

In sum, the NEPA regulations in their current form embody NEPA's guiding principles, and any revisions to the NEPA regulations must adhere to these principles by ensuring the protection of public health and the environment through well-informed decision-making and robust and meaningful public involvement in the

---

[10] *See, e.g.,* 42 U.S.C. § 4332(2)(C); 40 C.F.R. §§ 1503.1(a)(4), 1506.6.

[11] CEQ, Exec. Office of the President, A Citizen's Guide to the NEPA: Having Your Voice Heard, at 2 (Dec. 2007) [hereinafter Citizen's Guide to the NEPA], *available at* https://ceq.doe.gov/docs/get-involved/Citizens_Guide_Dec07.pdf.

[12] 42 U.S.C. § 4332(2)(C); 40 C.F.R. §§ 1503.1(a)(4), 1506.6.

[13] *See* Letter from Russell E. Train, *et al.* to The Honorable Cathy McMorris, at 2 (Sept. 19, 2005) (former Chairs and General Counsels of CEQ stating that "the public plays an indispensable role in the NEPA process") [hereinafter Train Letter] (attached as Exhibit A); *see also* Envtl. Law Inst., NEPA Success Stories: Celebrating 40 Years of Transparency and Open Government, at 6 (Aug. 2010) [hereinafter NEPA Success Stories], *available at* https://ceq.doe.gov/docs/get-involved/NEPA_Success_Stories.pdf; CEQ, Examples of Benefits from the NEPA Process for ARRA 2–3 [American Recovery and Reinvestment Act] Funded Activities (May 2011) [hereinafter Examples of NEPA Benefits], *available at* https://ceq.doe.gov/docs/get-involved/ARRA_NEPA_Benefits_List_May122100.pdf; Citizen's Guide to the NEPA, *supra* note 11, at 24 ("Through NEPA, citizens were able to educate and assist the decision-makers in developing their alternatives.").

[14] Citizen's Guide to the NEPA, *supra* note 11, at 14.

AR_0025825

NEPA process. Any revisions must continue to require that Federal agencies "use all practicable means" to fulfill the purpose of NEPA embodied in the statute.[15]

## II.    The States Have Unique Interests in Ensuring That the NEPA Regulations Demand Careful, Timely Review of Federal Actions.

The NEPA process affects the States' interests in several key ways, including their interests in protecting their residents and environmental resources by ensuring public participation and robust, informed decision-making processes for federal projects.

### A.    The States have an interest in ensuring that federal decisions do not harm their residents, property, or natural resources.

The States are injured in their *parens patriae* capacity when their residents suffer from the effects of environmental pollution or degradation, including cumulative impacts in environmental justice communities.[16] The States also have a quasi-sovereign interest in preventing harm to the health of their natural resources and ecosystems.[17] As federal courts have recognized, states are entitled to "special solicitude" in seeking redress for environmental harms within their borders, particularly where state property and quasi-sovereign interests are potentially injured.[18] Accordingly, the States have an interest in and are committed to preventing any harm to their residents, ecosystems, and property from revisions to NEPA's regulations that weaken environmental protections or undermine the policies and principles of NEPA—in particular, any revisions that would limit public participation or lead to less robust analysis and review.

The States have a fundamental interest in safeguarding their residents' involvement in the NEPA process for federal projects that could impact their communities. Relatedly, NEPA proceedings and resulting analyses provide an important opportunity for state and municipal agencies to help shape federal decisions that affect state or municipal resources. Public involvement is critical in identifying and evaluating public health and environmental issues of local or statewide concern that may result from federal actions. CEQ's current NEPA

---

[15] 42 U.S.C. § 4331(b)(1)-(6).

[16] *Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592, 607 (1982); *Maryland v. Louisiana*, 451 U.S. 725, 737–38 (1981).

[17] *Massachusetts v. EPA*, 549 U.S. 497, 519–22 (2007).

[18] *Id.* at 520.

AR_0025826

regulations provide that agencies shall "make diligent efforts to involve the public in preparing and implementing their NEPA procedures."[19] As discussed more fully in Point I, above, and Point III, below, any revisions to the NEPA regulations such as those suggested by Question 6 of the Advance Notice that may weaken public participation would violate NEPA and injure the States' interests.

The States are also required to undertake NEPA review in certain cases where federal funding is involved, such as for certain highway and other major infrastructure projects. Significant revisions to the NEPA regulations will impact the States' implementation of and compliance with NEPA, and may require revisions to the States' internal processes and significant investments of time and training resources to accommodate disruptive changes to long-settled processes.

The States also have a significant interest in ensuring that the environmental review process under NEPA is robust and detailed, particularly with respect to major infrastructure projects and projects affecting public lands and waterways that impact public health, environmental health, and the States' economies. For example, the siting of nuclear waste disposal sites receives environmental review only through a NEPA process conducted by the Nuclear Regulatory Commission ("NRC"). In New York, the West Valley nuclear waste disposal site is presently undergoing a NEPA Environmental Impact Statement ("EIS") process that is governed by the significant protections in the current NEPA regulations of both CEQ and the United States Department of Energy. The State of New York, along with numerous agencies and members of the public, is participating in this NEPA process. Any weakening of the procedural protections in NEPA, such as setting arbitrary and unreasonable timelines or page limits for NEPA review documents suggested by Questions 4 and 10 of the Advance Notice, or limiting the scope of issues as suggested by Question 5 or the range of alternatives considered as suggested by Question 13, could result in an environmental review process—in this case and many others—that is not compliant with the statutory requirements of NEPA, and that may injure the States' sovereign and proprietary interests.

Similarly, NEPA review is built into and improves the Federal Energy Regulatory Commission's ("FERC") analysis of whether a proposed interstate natural gas pipeline is in the public convenience and necessity.[20] The Natural Gas Act preserves the States' ability to issue substantive environmental permits under the

---

[19] 40 C.F.R. § 1506.6(a); *see also id.* § 1503.1(a)(4).

[20] *See* 15 U.S.C. § 717f; *see also* Certification of New Interstate Natural Gas Pipeline Facilities, 88 FERC 61,227, 61,745–46, 61,748, 61,749 (1999), *clarified,* 90 FERC 61,128, 61,397–98, *further clarified,* 92 FERC 61,094 (2000).

6

AR_0025827

Clean Air Act, the Clean Water Act, and the Coastal Zone Management Act for natural gas projects.[21] The States' jurisdiction in each of these substantive environmental regimes should therefore be absolute, subject to compliance with applicable timelines.[22] When reviewing a new pipeline application, FERC conducts its NEPA analysis at the same time as its review of the project's economic merits, reviewing both the environmental and socioeconomic impacts of the project.[23] At the conclusion of the NEPA process, FERC generally issues a Certificate of Public Convenience and Necessity ("CPCN") for the project. The CPCN not only authorizes the pipeline, but also includes numerous environmental conditions based largely on the NEPA analysis.

A robust and transparent NEPA analysis of proposed interstate natural gas pipeline projects is necessary to protect the States' interests because it requires careful consideration of the state and local laws that may apply or are relevant to the project and its impacts. However, the CPCNs that FERC issues—based on its NEPA process—often include language or conditions that may limit the States' substantive environmental jurisdiction. Therefore, the States have an interest in ensuring that the NEPA regulations retain their current strength to govern and shape FERC's NEPA analysis, as state environmental review processes may not be able to compensate in all cases for deficiencies in federal NEPA review in the course of decisions with significant and lasting environmental consequences for the States.

Finally, robust NEPA analyses provide important resources for the States in informing other important state programs and decisions affecting state resources. For example, robust EISs are critical to informing the States' "consistency determinations" under the federal Coastal Zone Management Act, 16 U.S.C. § 1456, by which states assess the impact of federal projects on the land or water uses or natural resources in a state's coastal zone.[24] If regulatory amendments result in fewer or less thorough EISs, the States would have to expend additional resources to comprehensively assess the impact of federal projects on state resources.

---

[21] 15 U.S.C § 717b(d).

[22] *Id.*

[23] *See* Comments of the Attorneys General of Massachusetts, Illinois, Maryland, New Jersey, Rhode Island, Washington, and the District of Columbia on the Federal Energy Regulatory Commission's April 19, 2018 Notice of Inquiry on its Certification of New Interstate Natural Gas Facilities, Docket No. PL18-1-000 (July 25, 2018) (attached as Exhibit B).

[24] *See, e.g.*, 15 C.F.R. § 930.31; 301 Code Mass. Regs. § 20.04.

AR_0025828

B. Any Weakening of the NEPA Regulations Would Threaten the States' Abilities to Enforce Their Own State Environmental Laws to Protect Public Health and the Environment.

NEPA also served as a model to the States, many of which enacted their own environmental review laws to protect public health and the environment.[25] Several examples include New York's State Environmental Quality Review Act ("SEQRA"),[26] the Massachusetts Environmental Policy Act ("MEPA"), the California Environmental Quality Act ("CEQA")[27], and Washington's State Environmental Policy Act ("SEPA").[28] These state laws are critically important to environmental review of state agency actions and are designed to complement NEPA review of federal actions within our States. The federal and state schemes most commonly interact when there are both federal agency and state agency components to a proposed action or project, such as a state highway project receiving federal funds. In such cases, a robust NEPA process remains vital to ensuring thorough and efficient review of numerous government actions that affect our residents' health and welfare and the environment. Revisions to the NEPA regulations should not negatively impact the States' abilities to implement and enforce their own environmental laws.

First, the States have an interest in the proper administration of their own environmental review laws, which could be adversely impacted by weakening the substance of NEPA reviews. The States' laws are often administered in conjunction with the NEPA regulations and either coordinate state and federal review, or allow project proponents to rely on NEPA review to satisfy State requirements. For example, in New York, the SEQRA regulations provide that, if a NEPA EIS has been prepared, generally no State EIS is required, provided the federal EIS is sufficient for the state to make its own findings.[29] Weaker federal review, less comprehensive federal EISs, or preparation of fewer EISs under NEPA may require that more EISs be prepared under a state process, likely leading to increased expenditures of State resources.

---

[25] See CEQ, States and Local Jurisdictions with NEPA-like Environmental Planning Requirements [hereinafter State and Local Laws], https://ceq.doe.gov/laws-regulations/states.html (last visited August 14, 2018).

[26] N.Y. Envtl. Conserv. L. art. 8; 6 N.Y.C.R.R. Part 617.

[27] Cal. Stats. ch. 1433 (1970), Cal. Pub. Res. Code §§ 21000–21189.57.

[28] RCW 43-21C-010–914; WAC 197-11-010–990.

[29] 6 N.Y.C.R.R. § 617.15(a); N.Y. Envtl. Conserv. L. § 8-0111(1) & (2); see Hudson R. Sloop Clearwater v. Dep't of Navy, 836 F.2d 760, 762 (2d Cir. 1988).

AR_0025829

In Massachusetts, if fewer projects qualify as major federal actions requiring an EIS under amended CEQ regulations, as suggested by Question 7, more project proponents, including state agencies receiving federal funds, will have to draft Environmental Impact Reports ("EIRs") under MEPA *ab initio* rather than substituting EISs for EIRs or building on EISs during coordinated review procedures.[30] Where Massachusetts projects still require both EISs and EIRs, if amended regulations relax the scoping as suggested by Question 5 of the Advance Notice, or cumulative effects and alternatives requirements for EISs as suggested by Question 13, EISs will prove a less helpful resource as project proponents prepare EIRs, requiring the expenditure of additional time and resources to comply with the comprehensive, environmentally protective State report requirements.

Likewise, Washington State law allows State agencies to adopt NEPA EISs that are adequate under CEQ's NEPA regulations.[31] However, if CEQ makes regulatory revisions that weaken NEPA and are not consistent with Washington's environmental policy act requirements, then compliance with the federal NEPA process may not be sufficient to satisfy State law. As a result, project proponents may be required to navigate divergent environmental review processes, potentially making the processes longer, more complicated, and more prone to legal challenges.

In California, CEQA[32] is designed to complement NEPA by eliciting public participation in protecting California's environment. Even though CEQA and NEPA do not have identical requirements (and, in certain aspects CEQA has more rigorous procedural requirements than NEPA), where a project requires both federal and State approvals (an EIS and an EIR), joint review under both statutes avoids redundancy, improves efficiency and interagency cooperation, and is easier for applicants and citizens to navigate.[33] Sharing documents and reducing paperwork results in efficient outcomes that benefit social welfare, environmental stewardship, and California's economy. If NEPA's regulations are revised in a manner that reduces protections for natural resources and public health, it will become more difficult for California state agencies to utilize NEPA documents by reference in CEQA reviews,

---

[30] *See, e.g.*, Mass. Gen. Laws c. 30, § 62; 310 Code Mass. Regs. § 11.09(c).

[31] WAC 197-11-610(3).

[32] Cal. Stats. ch. 1433 (1970); Cal. Pub. Res. Code §§ 21000–21189.57, 21001, 21100.

[33] *See* Exec. Office of the President & Governor of California's Office of Planning and Research, NEPA and CEQA: Integrating Federal and State Environmental Reviews, at 1 (2014) [hereinafter CEQA-NEPA Integration Guidance].

AR_0025830

precluding joint CEQA-NEPA review.[34] For example, if revised NEPA regulations curtail robust review of alternatives or cumulative impacts as suggested by Question 13 of the Advance Notice, coordinated CEQA-NEPA review of the proposed project would be impossible, resulting in greater inefficiency in projects requiring approvals under both statutes.

In addition, where projects require both federal and state-level environmental review, the NEPA regulations take account of many state partners' environmental review processes through state-specific memoranda designed to aid compliance with both federal and state schemes.[35] These carefully calibrated programs vary by state and represent significant work by CEQ and the States to harmonize these review programs. Any revisions to the CEQ regulations should account for the existing cooperative framework developed with the individual States to ensure compliance with each process—a framework that benefits the public and regulated community by providing an efficient linkage of state and federal requirements and facilitating coordinated compliance with both. CEQ should avoid amending the NEPA regulations in ways that will render such linked compliance more difficult or impossible. Furthermore, CEQ should evaluate the time and resources that will be needed if significant revisions to the CEQ regulations require substantial re-working of these memoranda to ensure continuing compliance with both federal and state programs.

The States have long relied on the NEPA regulations in implementing state environmental review statutes and regulations. For example, New York's SEQRA regulations drew from certain sections of the NEPA regulations in setting regulatory standards, such as when a supplemental EIS is required. New York SEQRA regulations also require review of potential catastrophic impacts from a proposed action[36] through provisions drawn and adapted from the NEPA regulations at 40 C.F.R. § 1502.22. NEPA regulations are also utilized by states courts in interpreting the obligations under equivalent state environmental review statutes. For example, courts in New York rely on NEPA in construing the scope of the SEQRA where appropriate, finding that certain decisions interpreting actions as exempt from NEPA

---

[34] *See* Exec. Order No. 13,807, 82 Fed. Reg. 40,463, 40,466–67 (Aug. 24, 2017); The White House, Legislative Outline for Rebuilding Infrastructure in America, 35–37, 48–50 (Feb. 28, 2018), *available at* https://www.whitehouse.gov/wp-content/uploads/2018/02/INFRASTRUCTURE-211.pdf.

[35] *See* State and Local Laws, *supra* note 25; *see also* 40 C.F.R. § 1500.5(h).

[36] 6 N.Y.C.R.R. § 617.9(b)(6).

10

review[37] are persuasive authority for determining whether such actions are required to undergo environmental review under the state statute.[38] In California, NEPA cases are considered persuasive authority in CEQA cases.[39] Courts in Washington State also look to NEPA decisions to interpret SEPA.[40] Some state courts have also adopted the federal "hard look" standard required by NEPA under their own States' environmental review statutes. If CEQ revises the definition of key terms, as suggested by the Advance Notice Questions 7, 8, and 9, it may create divergence between state and federal standards, undermine our States' ability to effectively implement our own environmental review laws, and impact the case law interpreting States' well-developed statutory and regulatory regimes. As CEQ considers any possible revisions, it should take that concern into account.

In summary, the States have strong interests in the continued implementation of NEPA regulations that provide for a robust, deliberative, and complete federal environmental review process. CEQ must avoid arbitrarily limiting the scope and timeframe allowed for preparation and consideration of NEPA documents or truncating the public participation process as suggested by the Advance Notice, which would harm the States' interests and violate the principles and provisions of NEPA.

### III.    CEQ Must Conduct a Thorough Review Process to Determine the Need, if Any, for NEPA Regulatory Revisions.

Consistent with NEPA's animating principles and fundamental requirements, any revisions to the NEPA regulations must be inclusive, deliberative, and transparent, and employ a public review process similar to the process CEQ used

---

[37] *See H.O.M.E.S. v. New York State Urban Dev. Corp.*, 69 A.D.2d 222, 231, 418 N.Y.S.2d 827, 832 (4th Dep't 1979).

[38] *See Villani v. Berle*, 91 Misc.2d 603, 608, 398 N.Y.S.2d 796, 801 (Sup. Ct. Suffolk County 1977); *Matter of Marino v. Platt*, 104 Misc.2d 386, 390, 428 N.Y.S.2d 433, 435–36 (Sup. Ct. Onondaga County 1980).

[39] *See, e.g., No Oil, Inc. v. City of Los Angeles*, 13 Cal.3d 68, 86, 529 P.2d 66, 78 (S.Ct. 1974) (California courts use NEPA as persuasive authority in CEQA); *accord Del Mar Terrace Conservancy, Inc. v. City Council of the City of San Diego*, 10 Cal.App.4th 712, 732, 12 Cal.Rptr.2d 785, 797 (1992).

[40] *See, e.g., Eastlake Cmty. Council v. Roanoke Assocs., Inc.*, 82 Wn.2d 475, 488, 513 P.3d 36, 44–45 (1983); *City of Des Moines v. Puget Sound Reg'l Council*, 98 Wn. App. 23, 37, 988 P.2d 27, 37 (1999); *Gebbers v. Okanogan Cty. Pub. Util. Dist. No. 1*, 144 Wn. App. 371, 381 & n.1, 183 P.3d 324, 328 & n.1 (2008) (looking to federal definition of cumulative impacts).

11

when it initially drafted its NEPA regulations,[41] and when it subsequently reviewed the effectiveness of NEPA regulations in 1997.[42] At a minimum, CEQ's review of whether to amend its NEPA regulations should include a detailed analysis of the effectiveness of current regulations and other tools in implementing NEPA, a demonstrated need for any revisions to the regulations to better support the purpose and structure of NEPA, and an analysis of whether changes to the regulations could increase litigation, delay, and confusion in the NEPA process.

A.    CEQ Should Adequately Evaluate the Effectiveness of the NEPA Regulations and Tools to Address Any Concerns about NEPA's Implementation.

As discussed in detail below, the NEPA regulations have successfully safeguarded public health and the environment for the past 40 years. In light of this history, CEQ should first consider whether existing tools available under the current NEPA regulations will address CEQ's apparent concerns about NEPA's implementation. If CEQ nevertheless decides to pursue revisions to its NEPA regulations, then CEQ must adequately demonstrate the need for any such changes.

1. *Current Regulations Have Been Largely Successful in Implementing NEPA.*

Before CEQ makes any changes to its NEPA regulations, CEQ should carefully evaluate the demonstrated effectiveness of its current regulations implementing NEPA, which have provided a consistent regulatory environment for several decades.[43] Under these regulations, federal agencies annually prepare hundreds of environmental impact statements, tens of thousands of environmental assessments, and hundreds of thousands of categorical exclusions.[44]

---

[41] *See* National Environmental Policy Act—Regulations, 43 Fed. Reg. 55,978, 55,980 (Nov. 29, 1978) [hereinafter NEPA—Regulations] (rulemaking process included public hearings; meetings with all federal agencies; meetings with representatives of business, labor, State and local governments, and environmental groups; and detailed consideration of federal studies on the environmental impact statement process).

[42] CEQ, Exec. Office of the President, National Environmental Policy Act: A Study of Its Effectiveness After Twenty-five Years, at 5 (Jan. 1997) [hereinafter NEPA Effectiveness Study] (CEQ solicited input from NEPA's original framers, members of Congress, State and local agencies, drafters of the CEQ regulations, federal agencies, and the public), *available at* https://ceq.doe.gov/docs/ceq-publications/nepa25fn.pdf.

[43] *See* Advance Notice, *supra* note 1, 83 Fed. Reg. at 28,591–92.

[44] *NEPA.gov*, https://ceq.doe.gov/ceq-reports/litigation.html; U.S. Gov't Accountability Office, GAO-14-369, National Environmental Policy Act: Little Information Exists on

12

The vast majority of environmental review processes result in "taxpayer dollars and energy saved, resources better protected and the fostering of community agreements."[45] Indeed, when CEQ conducted a 25-year review of NEPA, it concluded "that NEPA is a success—it has made agencies take a hard look at the potential environmental consequences of their actions, and it has brought the public into the agency decision-making process like no other statute."[46] The 2014 U.S. Government Accountability ("GAO") Report on NEPA echoed this sentiment, stating that the NEPA process "ultimately saves time and reduces overall project costs by identifying and avoiding problems that may occur in later stages of project development."[47] In short, as U.S. Forest Service officials have observed, "NEPA leads to better decisions."[48]

In addition, the NEPA environmental review process has yielded significant community involvement and decisions sensitive to local interests. As NEPA itself recognizes, states and local governments are active and important partners in the effective implementation of NEPA in their communities.[49] Recognizing this partnership, the Federal Transit Administration has commended the effectiveness of collaborative NEPA processes across the country including the final EIS for the Federal Way Link Extension and the Mukilteo Multimodal Project in Washington State, the final EIS for the Purple Line and the alternative analysis and draft EIS for the Red Line Corridor Transit Study in Maryland, and the EIS for the Portland-Milwaukie Light Rail Project in Oregon.[50]

---

NEPA Analyses7 (2014) [hereinafter GAO Report], *available at* https://www.gao.gov/assets/670/662546.pdf.

[45] Examples of NEPA Benefits, *supra* note 13, at 1.

[46] NEPA Effectiveness Study, *supra* note 42, at iii.

[47] GAO Report, *supra* note 44, at 16.

[48] *Id.*; *see also* NEPA Success Stories, *supra* note 13; Examples of NEPA Benefits, *supra* note 13; Citizen's Guide to the NEPA, *supra* note 11, at 24 ("Through NEPA, citizens were able to educate and assist the decision-makers in developing their alternatives.").

[49] 42 U.S.C. § 4331(a).

[50] Fed. Transit Admin., Outstanding Achievement Award for Excellence in Environmental Document Preparation, https://www.transit.dot.gov/regulations-and-guidance/environmental-programs/outstanding-achievement-award-excellence (last visited Aug. 14, 2018).

AR_0025834

The NEPA process benefits the States' residents and natural resources alike. For example, following extensive community involvement and collaboration between multiple state and federal agencies and the two impacted towns, the final joint EIS and state EIR for the Herring River Restoration on Cape Cod in Massachusetts recommended,[51] and the National Park Service adopted,[52] an alternative plan that will restore at least 346 acres of the tidal marsh, protect fish species harmed by current, impeded river conditions, and improve fishing and shell fishing yields, among other significant benefits to the community and the environment.

Contrary to assertions by critics of NEPA, the NEPA process does not foster significant litigation. The vast majority of NEPA reviews of proposed federal actions—over 99 percent by some estimates[53]—do not result in litigation.[54] Where projects are challenged, it is often by plaintiffs seeking to ensure that projects do not move forward without adequate review of environmental impacts. In such circumstances, the courts play a vital role in ensuring that federal agencies adhere to Congress's mandate to take a hard look at environmental consequences before taking

---

[51] *See* Nat'l Park Serv., Town of Wellfleet, Town of Truro, & Herring River Restoration Committee, Herring River Restoration Project Final Environmental Impact Statement and Environmental Impact Report (May 2016), *available at* https://parkplanning.nps.gov/document.cfm?parkID=217&projectID=18573&docum entID=73471.

[52] Nat'l Park Service, Record of Decision for Herring River Restoration Project, Final Environmental Impact Statement and Environmental Impact Report (Sept. 15, 2016), *available at* https://parkplanning.nps.gov/document.cfm?parkID=217&projectID=18573&docum entID=75340.

[53] Geo. U.L. Center, NEPA: Lessons Learned and Next Steps: Hearing Before the Task Force on Updating the National Environmental Policy Act of the H. Comm. on Resources, 109th Cong., Statement of Professor Robert G. Dreher, Nov. 17, 2005 ("[P]laintiffs bring around 100 NEPA lawsuits per year, representing only two-tenths of 1 percent of the 50,000 or so actions that Federal agencies document each year under NEPA.").

[54] *See* GAO Report, *supra* note 44, at 19–20; NEPA.gov, https://ceq.doe.gov/ceq-reports/litigation.html (stating that "the amount of litigation on these NEPA analyses is comparatively small"); The Weaponization of the National Environmental Policy Act and the Implications of Environmental Lawfare: Hearing Before the House Comm. on Natural Res., 115th Cong. 8–11 (2018) (statement of Horst Greczmiel, Former CEQ Associate Director of NEPA Oversight) [hereinafter Greczmiel Statement].

14

major actions.[55] The opportunity for judicial review of agency actions is not a shortcoming of NEPA, but a fundamental part of the NEPA process that must be preserved.

### 2. *Tools Already Exist to Address Any Concerns about the NEPA Process.*

Although NEPA critics and Questions 1, 2, 6, 13, 15, 17 and 19 of the Advance Notice suggest the environmental review process under NEPA is inefficient, the NEPA regulations already provide at least 12 specific strategies to reduce delay in agencies' NEPA reviews.[56] These strategies were designed to *reduce* inefficiencies while producing "better decisions which further the national policy to protect and enhance the quality of the human environment."[57] As a result, existing NEPA regulations—when properly implemented by well-resourced and well-trained federal agencies—already provide the tools to address many of CEQ's apparent efficiency concerns about the NEPA process.[58]

For example, section 1500.4 of CEQ's NEPA regulations identifies more than a dozen different methods for reducing excessive paperwork, such as reducing duplication by allowing for joint preparation with state and local processes and allowing federal agencies to adopt appropriate environmental documents prepared by other agencies.[59] Similarly, section 1500.5 directs agencies to take a dozen enumerated actions to reduce delay, including integrating the NEPA process into early stages of project planning.[60] Likewise, in certain appropriate circumstances, programmatic reviews, as referenced in Question 12, have been used as an effective tool when considering an action that will take place at multiple sites, and may provide a model for considering impacts of multiple similar projects.[61] Importantly, the NEPA

---

[55] *See* Greczmiel Statement, *supra* note 54, at 8–10.

[56] *See* 40 C.F.R. § 1500.5.

[57] *See* NEPA—Regulations, *supra* note 41, 43 Fed. Reg. at 55,978.

[58] *See generally*, CEQ, Memorandum for Heads of Federal Departments and Agencies on Improving the Process for Preparing Efficient and Timely Environmental Reviews under NEPA (Mar. 6, 2012), *available at* https://ceq.doe.gov/docs/ceq-regulations-and-guidance/Improving_NEPA_Efficiencies_06Mar2012.pdf.

[59] *See, e.g.*, 40 C.F.R. § 1500.4(n); *see also id.* §§ 1501.5 (discussing lead agencies), 1501.6 (discussing cooperating agencies); *see* NEPA Effectiveness Study, *supra* note 42, at 21.

[60] 40 C.F.R. § 1500.5.

[61] *See* CEQ, Effective Use of Programmatic NEPA Reviews 6-7 (Dec. 18, 2014), *available                    at                    https://ceq.doe.gov/docs/ceq-regulations-and-*

15

regulations provide agencies the flexibility to adjust the NEPA process to meet the needs of the agency and the project under review, which can vary widely depending on the size and nature of the agency and the project.[62]

As CEQ and others have identified, the effectiveness and efficiency of the NEPA process significantly increases when agencies:

(a) integrate NEPA into their internal planning process as early as possible;[63]

(b) ensure that the NEPA process is well-funded and led by experienced and well-trained staff and engaged senior management;[64]

(c) engage in robust and inclusive public outreach;[65]

(d) rely on accurate scientific data and rigorous environmental analysis;[66]

(e) utilize NEPA regulations to facilitate interagency coordination to resolve or avoid conflicts, reduce duplication of effort, and improve the environmental permitting process;[67]

(f) draft NEPA documents in plain, concise, and honest language;[68] and

---

guidance/Effective_Use_of_Programmatic_NEPA_Reviews_Final_Dec2014_searcha ble.pdf

[62] *See, e.g., id.* §§ 1501.7(b) (permitting lead agencies to set page and time limits), 1501.8(b) (providing factors to consider in setting time limits), 1501.8 (rejecting "prescribed universal time limits for the entire NEPA process" as "too inflexible").

[63] NEPA Effectiveness Study, *supra* note 42, at 11.

[64] *See id.*; Dep't of Energy, NEPA Lessons Learned Quarterly Report, September 2017, at 7 (Sept. 2017) (attributing shorter NEPA completion times to, among other things, agency senior management attention, the availability of data, and engagement of experienced staff), *available at* https://www.energy.gov/sites/prod/files/2017/09/f37/LLQR%20Sep_2017.pdf.

[65] NEPA Effectiveness Study, *supra* note 42, at 18; Train Letter, supra note 13, at 2, ("Meaningful efforts to improve [NEPA's] implementation should address the critical needs for better guidance and additional training for agency personnel and enhanced resources for NEPA implementation by federal agencies.").

[66] NEPA Effectiveness Study, *supra* note 42, at 27–29.

[67] *Id.* at 21.

[68] *Id.* at 29.

16

(g) effectively partner with State and local governments.[69]

As these measures demonstrate, there is insufficient evidence that any revisions to the NEPA regulations for the purpose of increasing the efficiency of the environmental review process are needed. Instead, the existing efficiency measures should be implemented under current regulations by well-trained and well-funded federal agencies committed to NEPA's purpose and function.

Further, any concerns about the efficiency of the NEPA process for major infrastructure projects already have been addressed by Title 41 of the Fixing America's Surface Transportation Act of 2015 ("FAST Act").[70] Title 41 sought to streamline the environmental review of major infrastructure projects by, among other things, emphasizing the importance of early and frequent coordination between cooperating and participating agencies, creating a federal infrastructure-permitting dashboard to allow agencies and the public to track the progress of Title 41 covered projects, enhancing early stakeholder engagement, and requiring the newly created Federal Permitting Improvement Steering Council to publish an annual report of best practices.[71] Given that Title 41 targeted many of the concerns about the NEPA process raised by the current Administration and suggested by the Advance Notice,[72] CEQ should allow Title 41 to work in practice to better evaluate whether any changes to CEQ's NEPA regulations are warranted.

### 3. CEQ Must Demonstrate the Need for and Purpose of Any Regulatory Revisions.

To ensure informed decision-making consistent with NEPA's structure and purpose and the Administrative Procedure Act,[73] any revisions to the NEPA regulations must reflect reasoned decision-making based on accurate and reliable data demonstrating the need for the change and its consistency with the statute.[74]

---

[69] *See* Federal Permitting Improvement Steering Council, Recommended Best Practices for Environmental Reviews and Authorizations for Infrastructure Projects for Fiscal Year 2018, 8–9 (Dec. 2017), *available at* https://www.permits.performance.gov/sites/permits.performance.gov/files/docs/documentation/40856/fast-41fy-2018best-practices-report.pdf.

[70] Pub. L. No. 114-94 (2015).

[71] *See* 42 U.S.C. §§ 4370m-1–4370m-12.

[72] *See e.g.*, Exec. Order No. 13,807 (Aug. 15, 2017).

[73] 5 U.S.C. §§ 551–559.

[74] *See FCC v. Fox Television* Stations, 556 U.S. 502, 514–15 (2009) (changes in agency position must be based on reasoned explanation supported by the record and permissible under the statute); *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm*

AR_0025838

Insufficient data presently exist to support revisions to the NEPA regulations. According to the 2014 GAO Report, most federal agencies do not routinely track important information about their NEPA processes, including the number of environmental assessments and categorical exclusions conducted and the time frames for completing these reviews.[75] In addition, few agencies track the cost of completing NEPA analyses, leading to little quantitative data on the costs and benefits of the NEPA process.[76] The data that do exist, however, demonstrate that consistent with NEPA's intent and purpose, the present NEPA regulations encourage public participation, lead to projects that are "financially and environmentally improved," and seldom involve litigation.[77]

Given the lack of data demonstrating a need to revise NEPA's regulations—including the absence of meaningful discussion in the Advance Notice demonstrating a need to revise CEQ's NEPA regulations[78]—CEQ must engage in a careful and detailed review before proposing any regulatory revisions. The vague questions in the Advance Notice do not provide an adequate basis for stakeholder input. To ensure CEQ engages in an informed review process, the States reiterate that CEQ should hold several public hearings on the Advance Notice before proposing any regulatory revisions.[79] In addition, consistent with its past practices, CEQ should analyze existing studies and reports on the effectiveness of the current NEPA regulations and solicit input from federal agencies, State and local governments, the public, academics, scientists, and other stakeholders to determine whether changes are appropriate.[80] If, after this review, CEQ decides to revise the NEPA regulations, then

---

*Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) ("[T]he agency must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." (quotation and citation omitted)).

[75] GAO Report, *supra* note 44; *see also* NEPA Effectiveness Study, *supra* note 42, at 6, 13; *see also id.* at 13 (discussing the lack of information of the time frame for completing EAs and CEs).

[76] GAO Report, *supra* note 44, at 10.

[77] *Id.* at 15–18.

[78] *See* Advance Notice, *supra* note 1, 83 Fed. Reg. at 28,591–92.

[79] *See* Letter from Attorneys General of Washington, Maryland, Massachusetts, New Jersey, New York, and Oregon to Mary B. Neumayr re: Advance Notice of Proposed Rulemaking, Docket ID No. CEQ-2018-0001-0200, at 2 (July 3, 2018) (requesting several public hearings on the Advance Notice).

[80] *See* NEPA—Regulations, *supra* note 41, 43 Fed. Reg. at 55,980 (describing the process for drafting the current NEPA regulations as including public hearings,

AR_0025839

CEQ should again hold regional public hearings and provide sufficient time for stakeholders to scrutinize and comment on the proposed revisions as required by the Administrative Procedure Act.

In particular, CEQ should solicit information on the extent and causes of any delay in the NEPA process. The questions in the Advance Notice assume delay is caused by NEPA but reference no data to support that assumption. As noted above, existing data suggest that concerns over the extent of delay may be overblown given the number of NEPA analyses completed by federal agencies each year. Although NEPA critics assert that NEPA review results in delay, as previously noted, only a small percentage of NEPA actions result in litigation and potential delay.[81] Focusing on litigation as the sole or primary source of project delay also ignores a number of other factors that may cause delay and may be addressed without revisions to CEQ's NEPA regulations, including lack of funding to sufficiently implement the NEPA process, inadequate staff time and training to implement or supervise the NEPA process, local controversy over or opposition to a project that would exist regardless of NEPA, delays in non-NEPA permitting or approval processes, project sponsors' changes to project design that require substantial revisions, and uncertainties related to project funding.[82] Accordingly, before proposing any regulatory changes, CEQ should conduct a detailed review to first determine if delay is occurring, the extent of the delay, and the actual causes of delay, and then target those causes through training, guidance, or, if necessary, carefully tailored regulatory changes.

B. <u>Unnecessary Revisions to NEPA's Implementing Regulations Likely Will Increase Litigation, Delay, and Costs.</u>

Given the significance of the NEPA regulations to the implementation of NEPA and to the daily function of federal agencies, unnecessary revisions to these regulations likely will increase litigation, delay, and costs, and weaken the effectiveness of NEPA in protecting public health and the environment. As former CEQ leaders have made clear, "[m]easures to exempt certain agencies and programs from NEPA, to restrict or eliminate alternatives analysis, or to limit the public's right

---

meetings with all federal agencies implementing NEPA, meetings with representatives of business, labor, State and local governments, environmental and other interested groups, and the general public, and detailed consideration of existing federal studies on the NEPA process).

[81] *See* NEPA.gov, https://ceq.doe.gov/ceq-reports/litigation.html; GAO Report, *supra* note 44, at 19–20; Greczmiel Statement, *supra* note 54, at 8–11.

[82] *See* GAO Report, *supra* note 44, at 18; Greczmiel Statement, *supra* note 54, at 4–6.

AR_0025840

to participate in the NEPA process threaten NEPA's vital role in promoting responsible government decision-making."[83]

As an initial matter, unnecessary revisions likely will require federal agencies to revise their own NEPA regulations and guidance to ensure compliance with the NEPA regulations.[84] And, as already noted, the States may need to amend their environmental review programs to respond to such changes. These processes would waste taxpayer dollars, delay projects, and create uncertainty for project proponents and the public as agencies reconfigure their own NEPA regulations and procedures to conform to CEQ's regulatory changes.

Changes to CEQ's NEPA regulations are also likely to increase NEPA litigation. One of the current regulations' successes was a reduction in NEPA litigation, but changes to these regulations—particularly if CEQ does not engage in the robust and thoughtful review outlined above—threaten to undo that success.[85] Litigation is particularly likely if CEQ attempts to change the definition of key NEPA terms (such as those identified in Questions 7, 8, and 9 of the Advance Notice), or constrains the ability of agencies to identify a range of mitigation actions to help minimize project impacts on the environment. Further, as NEPA requires, CEQ's current regulations ensure that the adverse environmental effects of federal agency decision-making are fully considered and that any alternatives to the agency action are fully developed. Revising the regulations to limit full consideration of the effects and alternatives of a proposed action would contravene NEPA's mandate that agencies consider alternatives to the proposed action and would also make litigation likely.[86]

Moreover, because public involvement is so critical, CEQ should not revise the NEPA regulations in a manner suggested by Question 6 of the Advance Notice that would curtail public involvement, or by attempting to mandate completion of the environmental analysis on a predetermined timeframe, as suggested by Question 4 of the Advance Notice. For instance, Executive Order 13,807 envisions a two-year time frame for completing agency NEPA analyses. While such a time period may be adequate for some federal actions, others, such as the determination to issue permits

---

[83] Train Letter, *supra* note 13, at 2–3.

[84] *See* 40 C.F.R. § 1507.3.

[85] Bear, Dinah, *NEPA at 19: A Primer on an "Old" Law with Solutions to New Problems*, 19 Envtl. L. Rep. 10,060, 10,062 (1989) (noting that annual surveys showed a low of 71 NEPA cases in 1986 compared with 189 cases in 1974).

[86] 42 U.S.C. § 4332(2)(C).

AR_0025841

for complex proposed projects, require significant agency time and expertise to consider the materials submitted. Arbitrarily restricting the NEPA timeframe does not reduce the complexity of projects and the need for thorough evaluation of important considerations such as the public need and environmental impacts of proposed natural gas pipelines or the site of a new nuclear electricity facility. Instead, the shortened timeframes tend to reduce the public comment period and truncate the agency's consideration of public comments, which, as discussed above, often propose alternatives or mitigation measures that lead to better agency decisions and better outcomes for public health and the environment. Arbitrary limits on the length or format of NEPA documents also reduce transparency, diminish the effectiveness of the public review process, and, again, ultimately lead to litigation.

In addition, changes to increase the use of categorical exclusion provisions as suggested by Question 9 may lead to the inappropriate overuse of categorical exclusions that would undermine the principles of NEPA and likely increase litigation. As CEQ has previously explained, "[i]f used inappropriately, categorical exclusions can thwart NEPA's environmental stewardship goals, by compromising the quality and transparency of agency environmental review and decisionmaking, as well as compromising the opportunity for meaningful public participation and review."[87] CEQ must ensure that whether a project has the potential to significantly affect the environment remains the touchstone of the NEPA process. CEQ should not adopt new regulations that will undermine this basic principle of NEPA.

## IV. CEQ Should Limit Any Changes to Its Implementing Regulations to Codifying Its Environmentally Protective Guidance on Climate Change and Environmental Justice.

If CEQ decides to revise the NEPA regulations, the States urge CEQ to limit any regulatory revisions to codifying CEQ's previously issued guidance on climate change and environmental justice. Although not specifically referenced in the Advance Notice, such revisions would "provide greater clarity to ensure NEPA documents better focus on significant issues that are relevant and useful to decisionmakers and the public," as requested by Question 5.[88] By codifying established guidance regarding both climate change and environmental justice into

---

[87] See Sierra Club v. Bosworth, 510 F.3d 1016, 1027 (9th Cir. 2007) (to use categorical exclusions federal agencies "must document that the action to be undertaken is insignificant because the threshold question in a NEPA case is whether a proposed project will significantly affect the environment, thereby triggering the requirement for an EIS" quotation and citation omitted)); 42 U.S.C. § 4332(2)(C).

[88] Advance Notice, supra note 1, 83 Fed. Reg. at 28,591.

the regulations, CEQ would ensure that these critical environmental impacts receive appropriate focus in NEPA analyses.

Climate change presents an enormous environmental problem that all federal agencies need to consider.[89] In 2010, CEQ issued draft guidance on incorporating climate change into NEPA analyses. It revised this guidance in 2014, and on August 5, 2016, CEQ finalized its NEPA Guidance on Climate Change ("Climate Change Guidance").[90] The Climate Change Guidance makes recommendations to federal agencies performing NEPA review of climate change related impacts.[91] These recommendations encourage agencies to consider both the "potential effects of a proposed action on climate change as indicated by assessing [greenhouse gas] emissions," and the "effects of climate change on a proposed action and its environmental impacts," and use these analyses to guide consideration of reasonable alternatives and potential mitigation.[92] Developed in part in response to requests from multiple federal agencies on how best to address climate change impacts, this guidance ensures that agencies adequately consider the effects of climate change in evaluating proposed projects. Indeed, because of the importance of addressing climate change, several of the States have codified similar requirements in their own environmental review processes.[93] However, on April 5, 2017, in response to President Trump's March 28, 2017 Presidential Executive Order on Promoting Energy Independence and Economic Growth, CEQ withdrew the Climate Change Guidance.[94]

We urge CEQ not only to readopt the Climate Change Guidance, but also to incorporate its substantive recommendations into any revised regulations CEQ may propose. In particular, CEQ should incorporate these recommendations into 40 C.F.R. § 1502.16, which directs agencies in evaluating the environmental consequences of proposed actions and alternatives. Courts give substantial deference to the NEPA

---

[89] *Massachusetts*, 549 U.S. at 497.

[90] CEQ, Final Guidance for Federal Departments and Agencies on Consideration of Greenhouse Gas Emissions and the Effects of Climate Change in National Environmental Policy Act Reviews, 81 Fed. Reg. 51,866 (Aug. 5, 2016) [hereinafter Climate Change Guidance].

[91] *Id.* at 4.

[92] *Id.*

[93] *See, e.g.,* Mass Gen. Laws c. 30, § 61; 310 Code Mass. Regs. § 11.12(5).

[94] Exec. Order No. 13783, 82 Fed. Reg. 16,576 (Apr. 5, 2017).

AR_0025843

regulations.[95] By codifying the Climate Change Guidance into its regulations, CEQ will ensure that agencies properly evaluate the climate impacts associated with projects. Codification could also improve interagency coordination, as each agency would follow a similar approach to addressing climate change in NEPA analyses, as opposed to the varying analyses presently occurring.[96]

CEQ also has issued guidance on how federal agencies should consider environmental justice under NEPA ("EJ Guidance").[97] CEQ published the EJ Guidance in 1997 in response to Executive Order 12,898, which directed agencies to identify and address "disproportionately high and adverse human health or environmental effects of its programs, policies, and activities on minority populations and low-income populations."[98] The EJ Guidance provides principles for considering environmental justice in NEPA analyses, including: ensuring sufficient opportunities for public input by minority, low-income, and Native American populations; considering relevant public health data concerning potential health and environmental hazards of an action; and recognizing the "interrelated cultural, social, occupational, historical, or economic factors that may amplify the natural and physical environmental effects of the proposed action."[99]

We urge CEQ to incorporate the EJ Guidance into its NEPA regulations to reinforce the responsibilities of federal agencies to consider environmental justice in NEPA review, particularly to ensure that environmental justice communities are not disproportionately burdened by cumulative adverse environmental impacts. Courts have long recognized the importance of environmental justice considerations in NEPA analyses.[100] Incorporating the EJ Guidance into regulations furthers the aims of Executive Order 12,898 by codifying the important role of assessing environmental

---

[95] *See Robertson*, 490 U.S. at 355.

[96] *See, e.g., In re Dominion Transmission*, 163 FERC ¶ 61,128 (Order Denying Rehearing) (Issued May 18, 2018).

[97] CEQ, Environmental Justice: Guidance Under the National Environmental Policy Act (Dec. 1997) [hereinafter EJ Guidance], *available at* https://ceq.doe.gov/docs/ceq-regulations-and-guidance/regs/ej/justice.pdf.

[98] Exec. Order No. 12,898, 59 Fed. Reg. 7,629 (Feb. 11, 1994).

[99] EJ Guidance, *supra* note 97, at 8–10.

[100] *See, e.g., Communities Against Runway Expansion, Inc. v. F.A.A.*, 355 F.3d 678, 689 (D.C. Cir. 2004) (permitting challenge to environmental justice analysis); *see also Senville v. Peters*, 327 F. Supp. 2d 335, 362–63 (D. Vt. 2004); *Coliseum Square Ass'n, Inc. v. Jackson*, 465 F.3d 215, 232-33 (5th Cir. 2006); *Saint Paul Branch of N.A.A.C.P. v. U.S. D.O.T.*, 764 F. Supp. 2d 1092, 1099, 1107–09, 1113, 1117 (D. Minn. 2011).

AR_0025844

justice implications in NEPA analyses. In turn, this will help agencies focus on alternatives, mitigation strategies, monitoring, and preferences of the disproportionately affected communities.

## V. <u>Conclusion</u>

In conclusion, the States submit that any revisions to CEQ's NEPA regulations must continue to protect the fundamental policies enshrined in the statute, including protection of the environment and public health and robust public participation. Any such revisions must fully respect the States' interests in a strong partnership to promote federal decision-making that protects these policies. We urge CEQ to fully examine the existing state of NEPA implementation and assess whether revisions to the NEPA regulations are even necessary. Then, only if changes are absolutely necessary and supported by a robust record, CEQ should engage in a careful, deliberative, and fully transparent process to propose limited and targeted regulatory changes consistent with the purpose and structure of NEPA.

AR_0025845

Respectfully submitted,

FOR THE STATE OF CALIFORNIA

Dated: August _17_, 2018

XAVIER BECERRA
Attorney General

By: _____

SARAH MORRISON
Supervising Deputy Attorney General
JAMIE JEFFERSON
JULIA FORGIE
Deputy Attorneys General
California Department of Justice
300 South Spring Street, Suite 1702
Los Angeles, CA 90013
Tel. (213) 269-6328
Sarah.Morrison@doj.ca.gov
Jamie.Jefferson@doj.ca.gov
Julia.Forgie@doj.ca.gov

Dated: August 20, 2018          FOR THE STATE OF ILLINOIS

LISA MADIGAN
Attorney General

By:

MATTHEW J. DUNN
Chief, Environmental Enforcement/Asbestos
Litigation Division
DANIEL I. ROTTENBERG
Assistant Attorney General
Environmental Bureau
69 W. Washington St.
Suite 1800
Chicago, IL 60602
MDunn@atg.state.il.us
DRottenberg@atg.state.il.us

Dated: August 7, 2018

FOR THE STATE OF MARYLAND

BRIAN E. FROSH
Attorney General

By:

LEAH J. TULIN
Assistant Attorney General
200 Saint Paul Place
Baltimore, MD 21202
(410) 576-6962
ltulin@oag.state.md.us

AR_0025848

Dated:  August 17, 2018          FOR THE COMMONWEALTH OF
                                 MASSACHUSETTS

                                 MAURA HEALEY
                                 Attorney General


                          By: _____
                                 CHRISTOPHE COURCHESNE
                                 Assistant Attorney General and Chief
                                 TURNER SMITH
                                 Assistant Attorney General
                                 Office of the Attorney General
                                 Environmental Protection Div.
                                 One Ashburton Place, 18th Floor
                                 Boston, MA 02108
                                 (617) 727-2200
                                 christophe.courchesne@state.ma.us
                                 turner.smith@state.ma.us

Dated: August 17, 2018      FOR THE STATE OF NEW JERSEY

GURBIR S. GREWAL
Attorney General

By:           _____

DAVID C. APY
Assistant Attorney General
KRISTINA MILES
Deputy Attorney General
R.J. Hughes Justice Complex
25 Market Street
Trenton, NJ 08625-0093
(609) 376-2804
david.apy@law.njoag.gov
kristina.miles@law.njoag.gov

Dated: August 20, 2018

FOR THE STATE OF NEW YORK

BARBARA D. UNDERWOOD
Attorney General

By:

MICHAEL J. MYERS
Senior Counsel
CLAIBORNE E. WALTHALL
Assistant Attorney General
Environmental Protection Bureau
New York State Attorney General
The Capitol
Albany, NY 12224
(518) 776-2380
Claiborne.Walthall@ag.ny.gov

Dated: August 12 2018          FOR THE STATE OF OREGON

                               ELLEN F. ROSENBLUM
                               Attorney General

          By:  _Steve Novick_

                               PAUL GARRAHAN
                               Attorney-in-Charge
                               Natural Resources Section
                               STEVE NOVICK
                               Special Assistant Attorney General
                               Oregon Department of Justice
                               1162 Court Street NE
                               Salem, OR 97301-4096
                               (503) 947-4520
                               paul.garrahan@doj.state.or.us
                               steve.novick@doj.state.or.us

Dated: August 17, 2018

FOR THE COMMONWEALTH OF
PENNSYLVANIA DEPARTMENT OF
ENVIRONMENTAL PROTECTION

ALEXANDRA C. CHIARUTTINI
Chief Counsel

By:

MARGARET O. MURPHY
Department of Environmental Protection
Office of Chief Counsel
400 Market Street, 9th Floor
P.O. Box 8464
Harrisburg, PA 17105-8464
(717) 787-7060
mamurphy@pa.gov

Dated: August / 7 2018

FOR THE STATE OF VERMONT

THOMAS J. DONOVAN, JR.
Attorney General

By:

LAURA B. MURPHY
Assistant Attorney General
Office of the Attorney General
109 State Street
Montpelier, VT 05609
(802) 828-1059
laura.murphy@vermont.gov

Dated: August 17, 2018          FOR THE STATE OF WASHINGTON

ROBERT W. FERGUSON
Attorney General

By: _____
WILLIAM R. SHERMAN
Assistant Attorney General
AURORA R. JANKE
Special Assistant Attorney General
Counsel for Environmental Protection
800 5th Ave Suite 2000, TB-14
Seattle, WA 98104-3188
(206) 442-4485
(206) 233-3391
bill.sherman@atg.wa.gov
auroraj@atg.wa.gov

# EXHIBIT A

AR_0025856

September 19, 2005

The Honorable Cathy McMorris
Chair, Task Force on Improving the
    National Environmental Policy Act
House Committee on Resources
United States House of Representatives
1324 Longworth House Office Building
Washington, D.C.  20515

Dear Congresswoman McMorris:

We, the undersigned former Chairs and General Counsels of the President's
Council on Environmental Quality, are writing to you in your capacity as Chair of the
Task Force on Improving the National Environmental Policy Act to state our support for
NEPA, to articulate our understanding of the basic principles served by this landmark
legislation, and to express our concerns about recent measures and pending proposals that
threaten to undermine NEPA.  Collectively, we have served Presidents of both parties
since NEPA was signed into law on January 1, 1970.

We urge you and the other members of the Task Force to approach your work
with an appreciation for the important role that NEPA plays in our government's
decision-making with respect to the environment..  NEPA is, in the words of the CEQ
regulations, "our basic national charter for protection of the environment."  NEPA
established, for the first time, a national policy favoring protection of the environment,
and committed the Federal government to "create and maintain conditions under which
man and nature can exist in productive harmony, and fulfill the social, economic, and
other requirements of present and future generations of Americans."  It also established
farsighted procedural mechanisms, now emulated around the world, that require
government agencies to consider and disclose to the public the environmental effects of
proposed major government actions, and to provide an opportunity for the public to
express concerns regarding the impacts of such actions.

Several principles embodied in NEPA are of overarching importance to achieving
our nation's goal of "productive harmony" between man and nature.

Honorable Cathy McMorris
September 19, 2005
Page two

First, consideration of the impacts of proposed government actions on the quality of the human environment is essential to responsible government decision-making. Government projects and programs have effects on the environment with important consequences for every American, and those impacts should be carefully weighed by public officials before taking action. Environmental impact analysis is thus not an impediment to responsible government action; it is a prerequisite for it.

Second, analysis of alternatives to an agency's proposed course of action is the heart of meaningful environmental review. Review of reasonable alternatives allows agencies to evaluate systematically the potential effects of their decisions and to assess how they can better protect the environment while still fully implementing their primary missions.

Third, the public plays an indispensable role in the NEPA process. Public comments inform agencies of environmental impacts that they may have misunderstood or failed to recognize, and often provide valuable insights for reshaping proposed projects to minimize their adverse environmental effects. The public also serves as a watchdog, ensuring that Federal agencies fulfill their responsibilities under the law. Public participation under NEPA supports the democratic process by allowing citizens to communicate with and influence government actions that directly affect their health and well-being.

We recognize that environmental impact analysis should be efficient, timely and helpful to agencies and to the public. CEQ has always emphasized that the purpose of environmental review is "not to generate paperwork – even excellent paperwork – but to foster excellent action." The CEQ regulations direct Federal agencies to make the NEPA process more useful to decision-makers and the public, reduce paperwork, and emphasize real environmental issues and alternatives, and contain detailed guidance for integrating NEPA efficiently and effectively into agency planning processes. Unfortunately, not every Federal agency, and not every NEPA review, complies effectively with this mandate. Meaningful efforts to improve the Act's implementation should address the critical needs for better guidance and additional training for agency personnel and enhanced resources for NEPA implementation by federal agencies.

We are concerned that certain recent measures and pending proposals fail to reflect, and in some instances may undermine, the basic principles served by NEPA. Measures to exempt certain agencies and programs from NEPA, to restrict or eliminate alternatives analysis, or to limit the public's right to participate in the NEPA process

AR_0025858

Honorable Cathy McMorris
September 19, 2005
Page three

threaten NEPA's vital role in promoting responsible government decision-making.  We
urge you and the other members of the Task Force to support the basic principles of
NEPA and reject proposals that would weaken or undermine NEPA.

Sincerely,

Russell E. Train
Chair, Council on Environmental Quality
(1970-1973)

Russell W. Peterson
Chair, Council on Environmental Quality
(1973-1976)

John Busterud
Chair, Council on Environmental Quality
(1976-1977)

Charles W. Warren
Chair, Council on Environmental Quality
(1977-1979)

J. Gustave Speth
Chair, Council on Environmental Quality
(1979-1981)

AR_0025859

Honorable Cathy McMorris
September 19, 2005
Page four

Michael R. Deland
Chair, Council on Environmental Quality
(1989-1993)

Kathleen A. McGinty
Chair, Council on Environmental Quality
(1995-1998)

George T. Frampton Jr.
Chair, Council on Environmental Quality
(1998-2001)

Gary Widman
General Counsel, Council on Environmental
Quality (1974-1976)

Nick Yost
General Counsel, Council on Environmental
Quality (1977-1981)

AR_0025860

# EXHIBIT B

AR_0025861

UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION

| | | |
|---|---|---|
| Certification of New Interstate Natural | ) | Docket No. PL18-1-000 |
| Gas Facilities | ) | |

## COMMENTS OF THE ATTORNEYS GENERAL OF MASSACHUSETTS, ILLINOIS, MARYLAND, NEW JERSEY, RHODE ISLAND, WASHINGTON, AND THE DISTRICT OF COLUMBIA

The undersigned Attorneys General are pleased to submit these comments in response to the Federal Energy Regulatory Commission's ("Commission") Notice of Inquiry, dated April 19, 2018,[1] inviting comments on whether and how the Commission should revise its approach under its current policy statement on the certification of new natural gas transportation facilities ("Policy Statement") pursuant to the Natural Gas Act ("NGA").[2] As detailed herein, we have significant concerns about the Commission's approach to reviewing natural gas pipeline projects that are sited in and affect our states. We appreciate the opportunity to provide these comments, and respectfully urge the Commission to reexamine its Policy Statement, taking into account the following comments and recommendations.

### INTRODUCTION AND SUMMARY OF COMMENTS

Section 7 of the NGA, 15 U.S.C. § 717f (e), authorizes the Commission to grant a certificate of public convenience and necessity ("Certificate") for the construction or expansion of facilities for the transport of natural gas in interstate commerce. The NGA obligates the Commission to consider "all factors bearing on the public interest"[3] when making a Certificate decision, balancing the need for additional natural gas capacity from a proposed pipeline

---

[1] *Certification of New Interstate Natural Gas Facilities,* 163 FERC ¶ 61,042 (April 19, 2018) [hereinafter "Pipeline NOI"].

[2] Statement of Policy, Certification of New Interstate Natural Gas Pipeline Facilities, Docket No. PL99-3-000; 88 FERC ¶ 61,227 (September 15, 1999), Order Clarifying Statement of Policy, Docket No. PL99-3-001, 90 FERC ¶ 61,128 (February 9, 2000), Order Further Clarifying Statement of Policy, Docket No. PL99-3-002, 92 FERC ¶ 61,094 (July 28, 2000) [hereinafter "Policy Statement"].

[3] *Atl. Ref. Co. v. Pub. Serv. Comm'n,* 360 U.S. 378, 391 (1959); *see also* NGA §7 (c), (e), 15 U.S.C. § 717f (c), (e).

AR_0025862

project with the project's adverse effects, including economic and environmental impacts.[4]  In addition, the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321 *et seq.*, requires the Commission to take a "hard look" at the full range of environmental impacts associated with proposed pipeline infrastructure.[5] For jurisdictional projects, the Commission holds ultimate land use siting authority—a role played by states and local governments for many other energy production and energy transportation facilities.

Between 1999 and 2017, the Commission approved interstate natural gas pipeline capacity additions of 180 billion cubic-feet per day nationwide, a significant number that exceeds current national peak demand.[6] While these additions may increase the availability of natural gas to customers, they also come with long-duration costs, many ultimately paid by residents and small businesses in our states, and significant environmental impacts. Meanwhile, new pipeline infrastructure projects are entering a rapidly changing energy market, which raises major questions about the business and environmental case for new capacity built using traditional financing approaches and assumptions. It is in this context that the undersigned Attorneys General believe that the Commission's review of proposed gas pipeline projects under the Policy Statement does not fully satisfy its vital obligations under the NGA and NEPA to protect the public interest.

Despite its broad statutory authority and duty to consider the full range and scope of relevant factors related to pipeline projects, the Commission's current process is unduly segmented and narrow in scope. In assessing project need, the Commission generally fails to account for the extent of regional need for new gas capacity or the evolving market for gas demand and relies too heavily on precedent agreements as proof of need for isolated projects.

---

[4] *See Sierra Club v. FERC*, 867 F.3d 1357, 1373 (D.C. Cir. 2017).

[5] *Kleppe v. Sierra Club*, 427 U.S. 390, 410 n.21 (1976) (citation omitted); *Coal. for Responsible Growth & Res. Conservation v. FERC*, 485 F. App'x 472, 474 (2d Cir. 2012).

[6] *See* Susan Tierney, Analysis Group, Natural Gas Pipeline Certification: Policy Considerations for a Changing Industry (2017), at 1–2, *available at* http://www.analysisgroup.com/uploadedfiles/content/insights/publishing/ag_ferc_natural_gas_pipeline_cer tification.pdf.

AR_0025863

This practice does not permit the Commission to understand the broader context for the alleged benefits of a proposed project and risks approving more infrastructure and capacity (on potentially inefficient terms) than the public need requires or prospective market conditions can or should support. The Commission's single-minded reliance on precedent agreements is also contrary to the existing Policy Statement which directs the Commission to "consider all relevant factors reflecting on the need for the project," including studies of projected demand, the market to be served, and potential cost savings to consumers.

The Commission's current practice also fails to meet its statutory obligations under NEPA to assess the environmental impacts of proposed pipeline projects in a comprehensive and robust manner. By generally focusing on single projects in isolation, the Commission does not appropriately consider reasonable alternatives or account for cumulative environmental impacts on a regional basis. The Commission also fails to adequately assess non-gas energy alternatives and other project alternatives such as energy storage, demand response, and energy efficiency, and routinely fails to appropriately consider state policies, such as state choices regarding our energy resource portfolios. And by not consistently and thoroughly assessing and quantifying upstream and downstream greenhouse gas emissions using the best available measures, the Commission's approach to assessing climate impacts does not satisfy NEPA requirements. Relatedly, the Commission's inadequate implementation of NEPA hobbles its broader statutory obligation under the NGA to evaluate the public interest in Certificate decisions by balancing project benefits against a full accounting of adverse environmental and socioeconomic impacts.

The undersigned Attorneys General strongly urge the Commission to revise the Policy Statement in accordance with the recommendations discussed in detail below. Implementing these recommendations will assist the Commission in addressing the issues raised by the Commission in its Notice of Inquiry, including growing stakeholder concerns and legal challenges related to the adverse impacts of pipeline projects.

AR_0025864

## RECOMMENDATIONS

*First*, regarding project need, we recommend that the Commission assess need on a comprehensive, regional basis, and expand its analysis beyond the current dependence on precedent agreements, employing heightened scrutiny of precedent agreements with affiliates of project proponents.

*Second*, we urge the Commission to conduct a more thorough and robust NEPA analysis, comprehensively assessing on a regional basis the impacts of, and alternatives to, a proposed project, considering clean energy and other non-pipeline alternatives, thoroughly analyzing upstream and downstream greenhouse gas emissions, and considering state greenhouse gas emission-reduction policies.

*Third*, we recommend that the Commission consider environmental harm, including climate impacts quantified using the best available measure—the Social Cost of Carbon—and more heavily weigh the harm from use of eminent domain takings in its public interest assessment when balancing project benefits and harm in making a Certificate decision.

*Fourth*, we urge the Commission to better incorporate and consider state environmental and land use policies, no longer issue Certificates conditioned on later receipt of state certifications and permits under federal statutes, and to condition Certificates on obtaining and complying with state and local permits that do not unreasonably conflict with or delay approved projects.

*Finally*, we recommend that the Commission no longer issue partial notices to proceed with construction when Certificate rehearing requests are pending and limit the use and time of tolling periods for rehearing requests.

The Commission should seize the opportunity presented by the Notice of Inquiry to make these important reforms, to bring its review of proposed pipeline projects into full compliance with the NGA and NEPA, and to fulfill its statutory role in protecting the public interest. In contrast to the Commission's current process, such an approach would promote efficiency, reduce the risks of litigation delay in project development, and improve the Commission's ability to promote orderly competition and innovation in the gas market.

AR_0025865

I.    **THE COMMISSION SHOULD ENGAGE IN A SEARCHING ASSESSMENT OF PIPELINE PROJECT NEED.**

Pursuant to the standard established in Section 7 of the NGA[7], an applicant must show that its proposed pipeline project is consistent with the public convenience and necessity by demonstrating that the public benefits the proposed pipeline project would achieve are proportional to its adverse impacts (the "Public Benefits Assessment").[8] Applicants must show that there is market demand in order to satisfy part of the public benefit requirement—that is, that the project is "needed" (the "Needs Assessment").[9] The current Needs Assessment fails to take into account the regional need for, and impacts of, building new pipelines, and relies too heavily on the existence of precedent agreements, and affiliate precedent agreements in particular. The Attorneys General recommend that the Commission assess market need and impacts on a comprehensive regional basis, expand the assessment to include factors beyond precedent agreements, and employ a rebuttable presumption that affiliate contracts do not demonstrate pipeline need.

A.    **Market need should be assessed on a comprehensive regional basis.**

The Commission should broaden its Needs Assessment from assessing the need for each individual pipeline project to considering each pipeline project within the broader context of regional need. Regional designations should be based upon the Commission's natural gas market regions: Midwest, Northeast, Gulf, Southeast, and Western.[10] Changes in gas production, delivery, and consumption, as well as new sources of natural gas, have transformed the natural gas industry since the Policy Statement was issued, leading to a proliferation of natural gas pipelines and infrastructure whose impact on ratepayer and environmental interests necessitates a regional approach. Specifically, the Commission should develop a comprehensive

---

[7] 15 U.S.C. § 717f.

[8] Policy Statement, *supra* note 2, at 25.

[9] *See* Pipeline NOI, *supra* note 1, at 32, 47 n.91.

[10] *See Natural Gas Markets: National Overview*, FED. ENERGY REGULATORY COMM'N, https://www.ferc.gov/market-oversight/mkt-gas/overview.asp (July 3, 2018).

AR_0025866

analysis of each region's need for natural gas, taking into account existing pipelines and the integration of gas and electric systems, and evaluating available alternatives to pipeline infrastructure, as well as the impacts of pipeline infrastructure and alternatives.[11] Regional assessments would allow the Commission to systematically assess current and future need for additional natural gas capacity (including use by natural gas-fired power plants) in regional markets, accounting for projected growth in renewables and energy efficiency. In addition, the Commission's regional analyses would provide critical foundation for rational and regionally consistent project-specific Needs Assessments, which would build upon the regional assessments, incorporating more detailed analysis and information from project proponents.

The regional analyses should consider each region's existing infrastructure and natural gas pipeline capacity as well as state policy goals and projections of the future demand for natural gas, including the types of services that will be needed in a changing energy market. Other regional considerations should include whether the capacity is needed for new or existing generators, whether the additional capacity promotes competitive markets, whether anticipated markets will materialize, and whether there is a reliability benefit.[12,13]

### B. The current market needs assessment is too narrow and should be expanded to consider multiple factors.

Although the Policy Statement specifically rejected sole reliance on precedent agreements to demonstrate project benefits or need and recommends multiple factors the Commission should consider in the Needs Assessment, in practice, the Commission has relied heavily on proof of precedent agreements to find need.[14] This practice unduly restricts the

---

[11] *See infra* Section II A and B for further discussion of alternatives analysis.

[12] *National Fuel Gas Supply Corp.*, 158 FERC ¶ 61,145 (2017) (statement of Commissioner Bay).

[13] *See* SUSAN TIERNEY, NATURAL GAS PIPELINE CERTIFICATION: POLICY CONSIDERATIONS FOR A CHANGING INDUSTRY, *supra* note 6.

[14] Pipeline NOI, *supra* note 1, at 32, 47 n. 91. The Commission's decision to consider "all relevant factors" amended its previous policy which relied primarily on the "contract test"—the percentage of capacity under long-term contracts—to establish market need. The Commission further stated that the amount of capacity under contract "is not a sufficient indicator by itself of the need for a project." Policy Statement, *supra* note 2, at 5. However, the Commission has continued to find public need by relying solely upon long-term precedent agreements. *See, e.g.* Order on Rehearing, Mountain Valley Pipeline, LLC, Equitrans, L.P., 163 FERC ¶ 61,197

AR_0025867

Commission's inquiry and fails to account for the context of the alleged benefits of a proposed project and risks approving more infrastructure and capacity, on potentially inefficient terms, than the public need requires or prospective market conditions can support. Furthermore, the Policy Statement states that in evaluating market need, the Commission should "consider all relevant factors reflecting on the need for the project," and provide a range of factors in addition to evidence of precedent agreements, including studies of projected demand, the market to be served, and potential cost savings to consumers.[15] We recommend that the Commission make a renewed commitment to considering these factors and all others relevant to determining whether a pipeline project is needed, including accounting for the integration of gas and electric systems in the region and the projected growth in the use of renewables and energy efficiency measures. Where appropriate, the Commission should conduct evidentiary hearings or utilize other methods to create a more complete record and transparent process to provide greater confidence in the Commission's Public Benefits Assessments and Certificate decisions.

### C. The Commission should further scrutinize and limit the use of affiliate contracts in demonstrating pipeline project need.

The Policy Statement notes that "[u]sing contracts as the primary indicator of market support for the proposed pipeline project also raises additional issues when the contracts are held by pipeline affiliates."[16] Despite this recognition there are currently no restrictions on providing precedent agreements signed by affiliates to demonstrate project need. In practice, the Commission has stated repeatedly that it will not "look behind the precedent agreements to evaluate project need," even when affiliates constitute a majority of the precedent agreement capacity.[17]

at *35–44 (June 15, 2018) [hereinafter "Mountain Valley Rehearing Order"]; Order Issuing Certificates, PennEast Pipeline Company, LLC, 162 FERC ¶ 61,053 at *27–29, *33, *36 (January 19, 2018) [hereinafter "PennEast Order"].

[15] Policy Statement, *supra* note 2, at *23; PennEast Order, *supra* note 14 (Glick, C., dissenting, at *1–2).

[16] Policy Statement, *supra* note 2, at *16.

[17] *See, e.g.,* PennEast Order, *supra* note 14, at *33; Mountain Valley Rehearing Order, *supra* note 14, at *40.

AR_0025868

Relying too heavily on affiliate contracts risks mischaracterizing the need for the proposed pipeline project. In his dissent in *PennEast*, Commissioner Glick found that "precedent agreements that are in significant part between the pipeline developer and its affiliates [are] insufficient to carry the developer's burden to show that the pipeline is needed."[18] Indeed, where a utility holding company invests in a pipeline development project and an affiliate utility contracts for long-term firm service on that project, the utility holding company may pass the risk and the cost of the development of the pipeline to captive customers of the affiliate utility.[19] Without having to bear the risk or cost of development, the pipeline holding company has an economic incentive to construct new pipelines (and receive a return on its investment) regardless whether they are needed.[20] A pipeline project that is based on precedent agreements with multiple new customers tends to show a greater indication of need than a pipeline project supported by precedent agreements with affiliates.[21]

To protect ratepayers from undue costs and ensure projects truly reflect market need, the Commission should employ a rebuttable presumption that affiliate contracts do not demonstrate need wherever a pipeline project would not proceed absent affiliate contracts. In such instances, the Commission should require independent supporting evidence of need, such as third-party market analysis or state-approved resource plans, to overcome the presumption. Even where they make up only a relatively small portion of precedent agreements, the Commission should implement a more stringent standard of review for affiliate contracts. This standard should give the Commission the authority to look behind the contracts, including where needed an independent review of state regulatory filings and analyses regarding those contracts. Additional scrutiny of affiliate contracts will enable the Commission to better

---

[18] PennEast Order, *supra* note 14 (Glick, C., dissenting at *1).

[19] *Art of the Self-Deal,* Oilchange International (2017), at 20.

[20] *Id.*

[21] Policy Statement, *supra* note 2, at 26.

AR_0025869

evaluate the market need for the pipeline project and ensure that ratepayers are not burdened with unwarranted costs.

## II. THE COMMISSION SHOULD MORE ROBUSTLY AND COMPREHENSIVELY ASSESS THE IMPACTS OF, AND ALTERNATIVES TO, PROPOSED PIPELINE PROJECTS.

NEPA requires federal decision-makers, including the Commission, to prepare a "detailed statement" on the environmental impacts of certain actions prior to making decisions.[22] This environmental impact statement ("EIS") must take a "hard look" at the impacts of the proposed action,[23] including direct and cumulative impacts, as well as any "reasonably foreseeable" indirect impacts.[24] Consideration of environmental and economic impacts is also part of the Commission's Public Benefits Assessment under the NGA.[25] Yet, in practice, the Commission often fails to satisfy its duty to assess robustly and consistently the full range of impacts of, and alternatives to, proposed pipeline projects.[26] As discussed below, the Commission must take a more comprehensive approach to its impacts review—both to satisfy its legal obligations and to help forestall challenges to Commission decisions.

### A. The Commission should holistically evaluate the need for, the impacts of, and alternatives to new pipeline projects in each U.S. region.

As noted in Section I A above, the Commission's piecemeal review of natural gas infrastructure risks approval of more capacity than is in the public interest. Moreover, as underscored by recent federal court decisions vacating Commission orders, the Commission's

---

[22] 42 U.S.C. § 4332(2)(C).

[23] *Kleppe*, 427 U.S. at 410 (citation omitted); *see also Coal. for Responsible Growth & Res. Conservation v. FERC*, 485 F. App'x 472, 474 (2d Cir. 2012) and *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 249 (1989).

[24] 42 U.S.C. § 4332(2)(C)(i); 40 C.F.R. §§ 1502.16, 1508.8(a), (b); *see also* 40 C.F.R. § 1508.7 (a cumulative impact is "the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions"); *Sierra Club v. Marsh*, 976 F.2d 763, 767 (1st Cir. 1992) (a "reasonably foreseeable" impact or action is "sufficiently likely to occur that a person of ordinary prudence would take it into account in reaching a decision").

[25] *See* Order Denying Rehearing, Dominion Transmission, Inc., 163 FERC ¶ 61,128 (May 18, 2018) [hereinafter "Dominion Order"] (Glick, C., dissenting in part, at *1–2, *7).

[26] In recent years, federal courts have vacated orders based on deficiencies in the Commission's environmental impacts review process. *See Sierra Club*, 867 F.3d at 1373–75; *Del. Riverkeeper Network v. FERC*, 753 F.3d 1304, 1308–09 (D.C. Cir. 2014).

AR_0025870

segmented approach does not align with the requirements of NEPA and increases legal risks.[27] The Commission should instead undertake assessments of the impacts of and alternatives to new pipeline projects on a regional basis together with a regional assessment of need.[28] Regional analyses would offer an opportunity to standardize the Commission's impacts assessments approach across pipeline project review proceedings by setting forth data, metrics, projections, and other information that the Commission will use to evaluate pipeline projects in a particular region, including the cumulative and indirect impacts of pipeline projects, as discussed further below.[29]

### B. The Commission's alternatives assessment should include clean-energy and other non-pipeline alternatives.

The alternatives analysis required by NEPA is "the heart of the environmental impact statement."[30] Federal regulations require the Commission to explore all reasonable alternatives rigorously with an analysis that "present[s] the environmental impacts of the proposal and the alternatives in comparative form, thus sharply defining the issues and providing a clear basis

---

[27] *See, e.g., Sierra Club* 867 F.3d at 1373–75 (vacating a Commission decision due to the Commission's failure to properly consider the full range of pipeline project impacts under NEPA); *Del. Riverkeeper*, 753 F.3d at 1308–09, *supra* note 25 (holding that the Commission violated NEPA by failing to analyze the impacts of a project in conjunction with "three other connected, contemporaneous, closely related, and interdependent" pipeline certificate applications).

[28] Programmatic EISs ("PEISs") and combined EISs offer models for such regional assessments. They may even be mandated in certain circumstances. *See* 40 C.F.R. § 1508.25 (agencies "shall" consider "closely related," cumulative, and similar actions together in an EIS); *id.* § 1502.4(c)(1)–(2) (urging federal agencies to consider undertaking a PEIS when they are considering multiple projects in one region, or where projects share "relevant similarities, such as common timing, impacts, alternatives, [and] methods of implementation"); *Del. Riverkeeper*, 753 F.3d at 1308–09 (holding that the Commission must conduct a unified NEPA review of multiple connected gas pipeline segments); *Kleppe*, 427 U.S. at 409–10 ("A comprehensive impact statement may be necessary" where "several proposals for coal-related actions that will have cumulative or synergistic environmental impact upon a region are pending concurrently before an agency."); *Alpine Lakes Prot. Soc'y v. U.S. Forest Serv.*, 838 F. Supp. 478, 484 (W.D. Wash. 1993) (agency must consider seven access roads in the same region as "cumulative actions" under NEPA); *cf.* U.S. DEP'T OF INTERIOR, ORDER NO. 3338, DISCRETIONARY PROGRAMMATIC ENVIRONMENTAL STATEMENT TO MODERNIZE THE FEDERAL COAL PROGRAM (2016) (announcing the Department of Interior's then intent to conduct a programmatic EIS for the federal coal-leasing program).

[29] *Cf.* U.S. Envtl. Protection Agency, EPA Detailed Comments on FERC NOI for Policy Statement on New Natural Gas Transportation Facilities 1 (June 21, 2018) (recommending the Commission undertake regional analyses of the cumulative impacts associated with pipeline projects and mitigation opportunities).

[30] 40 C.F.R. § 1502.14; *see also Union Neighbors United, Inc. v. Jewell*, 831 F.3d 564 (D.C. Cir. 2016).

AR_0025871

for choice among options by the decisionmaker and the public."[31] In addition to exploring the effect of not building the proposed project,[32] the analysis must thoroughly address non-pipeline alternatives outside of the Commission's jurisdiction and the project applicant's preferences or capabilities.[33] Indeed, the Commission's own environmental review regulations and guidance require that the alternatives analysis address "the potential for accomplishing the proposed objectives through the use of other systems,"[34] including "non-gas energy alternatives, and/or energy conservation or efficiency, as applicable."[35] More explicitly, the Commission has said that the alternatives analysis should "[d]escribe the effect of any state or regional energy conservation, load-management, and demand-side management programs on the long-term and short-term demand for the energy to be supplied by the project."[36]

And yet, the Commission's NEPA alternatives analyses consistently give short shrift to or ignore non-gas energy alternatives or other measures such as energy storage, demand response, and energy efficiency to meet the need addressed by the proposed project. When such alternatives are addressed, they are typically considered in isolation and rejected in cursory fashion as unsuitable or insufficient to meet the demand evidenced by the precedent agreements the pipeline project applicant submits as demonstration of need.[37]

---

[31] *Id.*

[32] 40 C.F.R. § 1502.14 (d) (the analysis must "[i]nclude the alternative of no action").

[33] 40 C.F.R. § 1502.14 (c) (the analysis must "[i]nclude reasonable alternatives not within the jurisdiction of the lead agency"); *see also* Forty Most Asked Questions Concerning CEQ's National Environmental Policy Act Regulations, 46 Fed. Reg. 18,026, 18,033 (March 23, 1981) ("In determining the scope of alternatives to be considered, the emphasis is on what is 'reasonable' rather than on whether the proponent or applicant likes or is itself capable of carrying out a particular alternative.")

[34] Environmental reports for NGA applications, 18 C.F.R. § 380.12(l)(1) (the alternatives analysis must "[d]iscuss the "no action" alternative and the potential for accomplishing the proposed objectives through the use of other systems and/or energy conservation.").

[35] Fed. Energy Regulatory Comm'n, Guidance Manual for Environmental Report Preparation for Applications Filed Under the NGA, Vol. I, 4–136 (2017).

[36] Fed. Energy Regulatory Comm'n, Guidance Manual for Environmental Report Preparation, 3–6 (2002).

[37] *See, e.g.*, Order Issuing Certificates and Granting Abandonment Authority, Mountain Valley Pipeline, LLC, Equitrans, L.P., 161 FERC § 61,043 (October 13, 2017) [hereinafter "Mountain Valley Order"] (LaFleur dissenting at *2–3) (discussing "environmentally superior alternatives" limited to consideration of single, merged pipeline right of ways as alternatives to two separate pipeline project proposals).

AR_0025872

Natural gas is but one of many resources that can be utilized to meet customers' electric and thermal needs. Storage or electric system upgrades, for example, may be more cost-effective than pipeline expansion, particularly to satisfy peak demand. The Commission's alternatives analysis should analyze thoroughly and robustly all reasonable non-gas energy alternatives, including, where applicable, renewables and other clean-energy sources, the use of demand response and other market-based programs, and the impact of existing and projected increases in energy efficiency and energy conservation measures—accounting for state renewable portfolio standards and other programs and policies requiring or encouraging increased use of energy efficiency and conversation measures.

Not only should each individual alternative be thoroughly analyzed, but the combined effect of all non-gas pipeline alternatives also should be considered for its potential to meet the need to be addressed by the proposed project. NEPA requires no less.[38] Moreover, the public and states have significant interest in such analysis, particularly where state law and policy requires expansion of renewable and clean energy alternatives, increased energy efficiency measures, and reductions in greenhouse gas emissions, as discussed further below.

### C. The Commission must consistently analyze upstream and downstream greenhouse gas emissions associated with pipeline projects.

A robust comparative analysis of the climate impacts of pipeline infrastructure and reasonable alternatives is essential to inform the Commission's decisionmaking about proposed projects. As the D.C. Circuit Court of Appeals "clearly signaled" in its 2017 opinion in *Sierra Club v. FERC*,[39] which vacated a Commission decision due to the Commission's failure to properly analyze greenhouse gas impacts,[40] "the Commission should be doing more as part of

---

[38] *Cf. Davis v. Mineta*, 302 F.3d 1104, 1122 (10th Cir. 2002) ("Many [project] alternatives were improperly rejected because, standing alone, they did not meet the purpose and need of the Project. Cumulative options, however, were not given adequate study. Alternatives were dismissed in a cursory and perfunctory manner that do [*sic*] not support a conclusion that it was unreasonable to consider them as viable alternatives.").

[39] 867 F.3d 1357 (D.C. Cir. 2017).

[40] *Id.* at 1373–75.

AR_0025873

its environmental reviews" to analyze the climate impacts of pipeline projects.[41]  In *Sierra Club*, the court found that downstream combustion of gas transported by a pipeline project "is not just 'reasonably foreseeable,' it is the project's entire purpose."[42] There is relative certainty about the likely fate of the natural gas resources that will be transported by pipeline projects: combustion.[43] Indeed, if a pipeline project is *not* needed to transport additional quantities of gas for combustion, the Commission would have no basis to approve the pipeline project.[44] As well, it is foreseeable that an expansion in natural gas transportation capacity would impact production of natural gas upstream in the supply chain.[45]

Yet, in recent orders, the Commission has maintained that it is not required to consider the full range of greenhouse gas emissions associated with pipeline projects because the impacts of such emissions are too speculative or not causally related to approval of a proposed pipeline project.[46]  For instance, in its recent Order Denying Rehearing in *Dominion*

---

[41] Dominion Order, *supra* note 25 (LaFleur, C., dissenting in part, at *3).

[42] *Sierra Club*, 867 F.3d at 1372; *cf. High Country Conservation Advocates v. U.S. Forest Serv.*, 52 F. Supp. 3d 1174, 1196 (D. Colo. 2014) (finding that downstream greenhouse gas emissions related to constructing roads for coal mining are foreseeable).

[43] *See* Statement of Commissioner Cheryl A LaFleur on Tennessee Gas Pipeline Company, L.L.C., 2 n.3 (June 12, 2018), *available at* https://elibrary.ferc.gov/idmws/file_list.asp?accession_num=20180614-3074 [hereinafter "LaFleur June 12, 2018 Statement"] ("[I]t is reasonably foreseeable in the vast majority of cases that the gas being transported by a pipeline we authorize will be burned for electric generation or residential, commercial, or industrial end uses. . . . [T]here is a reasonably close causal relationship between the Commission's action to authorize a pipeline project . . . and the downstream GHG emissions that result . . . ."); *cf. Mid States Coalition for Progress v. Surface Transportation Board*, 345 F.3d 520, 549 (8th Cir. 2003) (agency unlawfully failed to consider downstream emissions from the burning of transported coal); *San Juan Citizens Alliance et al. v. U.S. Bureau of Land Mgmt.*, Slip Op. at *39 (D. N.M. 2018) (agency's "failure to estimate the amount of greenhouse gas emissions which will result from consumption of the oil and gas produced as a result of development of wells on the leased areas was arbitrary" and a violation of NEPA's requirement to analyze indirect and cumulative impacts).

[44] *Cf. N. Plains Res. Council, Inc. v. Surface Transp. Bd.*, 668 F.3d 1067, 1082 (9th Cir. 2011) (climate emissions were foreseeable where agency relied on mine development to justify investment in coal rail line proposal).

[45] *Cf. Barnes v. U.S. Dep't of Transp.*, 655 F.3d 1124, 1138–39 (9th Cir. 2011) (finding that "a new runway has a unique potential to spur demand," and agency therefore was required to analyze the impacts of such increased demand in EIS).

[46] *See, e.g.*, Order Denying Rehearing and Dismissing Stay Request, Algonquin Gas Transmission, LLC, 154 FERC ¶ 61,048, *44–46 (Jan. 28, 2016); Dominion Order, *supra* note 25, at *16–17; Columbia Gas Transmission, LLC, 153 FERC ¶ 61,064 at *6 (Oct. 14, 2015).

AR_0025874

*Transmission, Inc.* ("Dominion Order"),[47] the Commission stated that "where the Commission lacks meaningful information about potential future natural gas production" or "about future power plants, storage facilities, or distribution networks, within the geographic scope of a project-affected resource, then these impacts are not reasonably foreseeable."[48] Consequently, according to the Commission, neither NEPA nor the NGA requires the Commission to quantify or even consider those greenhouse gas emissions.[49]

This interpretation is a plain misreading of the Commission's legal authority and duties.[50] The NGA vests the Commission with broad authority to consider "all factors bearing on the public interest,"[51] which includes consideration of the full range of climate impacts[52] of proposed pipeline projects.[53] As Commissioner Glick noted in a recent dissenting opinion, a proposed project's "contribution to the harm caused by climate change[ is] critical to determining whether the Project[ is] in the public interest. Therefore, the Commission's failure to adequately address them is a sufficient basis for vacating [a] certificate."[54] Moreover, NEPA's requirement that the Commission take a "hard look" at the impacts of pipeline projects

---

[47] *See* Dominion Order, *supra* note 25.

[48] *Id.* at *14–15.

[49] *Id.* at *19 & n.96.

[50] Furthermore, we find it concerning that the Commission pronounced a new, broadly applicable policy in the context of a proceeding for an individual pipeline project, and while the Commission is simultaneously soliciting stakeholder feedback on the same set of issues in the instant docket. We urge the Commission to seize its review of the Policy Statement as an opportunity to reconsider the positions set forth in the recent Dominion Order and to revise its policy in line with our recommendations.

[51] *Atl. Ref. Co. v. Pub. Serv. Comm'n*, 360 U.S. 378, 391 (1959); *see also NAACP v. FPC*, 425 U.S. 662, 670 n.6 (1976) (explaining the Commission's broad authorities, including authority to consider "conservation" and "environmental" matters).

[52] *See* discussion *infra* in Section III.

[53] *Accord* Dominion Order, *supra* note 25 (LaFleur, C., dissenting in part, at *1); *id.* (Glick, C., dissenting in part, at *7); *see also* Mountain Valley Rehearing Order, *supra* note 14 (Glick, C., dissenting, at *1) ("In order to meet our obligations under both NEPA and the NGA, the Commission must adequately consider the environmental impact of greenhouse gas (GHG) emissions on climate change."); *see also Sierra Club*, 867 F.3d at 1373.

[54] Mountain Valley Rehearing Order, *supra* note 14 (Glick, C., dissenting, at *1–2); *accord Sierra Club*, 867 F.3d at 1373 (affirming that "FERC could deny a pipeline certificate on the ground that the pipeline would be too harmful to the environment"); Dominion Order, *supra* note 25 (Glick, C., dissenting, at *7) ("[T]he NGA's public interest standard requires the Commission to consider greenhouse gas emissions associated with the incremental production and consumption of natural gas caused by a new pipeline.").

AR_0025875

obligates the Commission to comprehensively and carefully consider the proposed project's contribution to climate change—an urgent environmental and public health crisis.[55] Federal caselaw makes clear that the Commission cannot evade this far-reaching requirement by claiming that climate impacts are characterized by some uncertainty.[56]

NEPA does not require a perfect forecast. Where there is uncertainty about project impacts, the Commission must provide a "summary of existing credible scientific evidence which is relevant" to those impacts.[57] There are many analytical tools and data available to help the Commission estimate upstream and downstream greenhouse gas emissions,[58] as demonstrated in part by the Commission's past use of studies from the Department of Energy and other entities to estimate "upper-bound" climate emissions.[59] Notably, the regional assessments recommended above would address the Commission's claims in prior orders that decision-analysis tools, lifecycle emissions estimates, and other available resources are too general for the purposes of estimating certain project-level climate impacts.[60] Regional need and impacts assessments would allow the Commission to assess the climate impacts of pipeline projects at a broader level, based on the best available data and modeling relevant to the impacted region.

---

[55] Cf. Baltimore Gas & Elec. Co. v. Nat. Res. Def. Council, Inc., 462 U.S. 87, 97 (1983) ("NEPA . . . places upon an agency the obligation to consider every significant aspect of the environmental impact of a proposed action.") (internal quotation marks and citations omitted) (emphasis added)).

[56] See, e.g., Scientists' Inst. For Pub. Info., Inc. v. U.S. Atomic Energy Comm'n, 481 F.2d 1079, 1092 (D.C. Cir. 1973) (courts must "reject any attempt by agencies to shirk their responsibility under NEPA by labeling any and all discussion of future environmental effects as 'crystal ball inquiry'"); Mid States Coal. For Progress v. Surface Transp. Bd., 345 F.3d 520, 549–50 (8th Cir. 2003) (finding that coal rail project would affect national long-term demand for coal and have upstream impacts by making coal a "more attractive option").

[57] 40 C.F.R. § 1502.22(b)(3).

[58] See, e.g., U.S. Envtl. Protection Agency, EPA Detailed Comments on FERC NOI for Policy Statement on New Natural Gas Transportation Facilities 2–4 (June 21, 2018) (listing existing tools and information available to the Commission to calculate the upstream and downstream climate emissions associated with pipeline infrastructure).

[59] See Dominion Order, supra note 25 (LaFleur, C., dissenting in part, at *2); LaFleur June 12, 2018 Statement, supra note 53, at 2 n.7 (citing studies used in past Commission orders); Pipeline NOI, supra note 1, at 43–44.

[60] See, e.g., Dominion Order, supra note 25, at *14–18; Mountain Valley Rehearing Order, supra note 14, at *150–53.

AR_0025876

And, in general, where essential information is lacking, NEPA requires the Commission to conduct independent research or otherwise compile missing information.[61] Thus, where the Commission finds that existing data and resources are inappropriate for estimating upstream or downstream emissions from a particular proposed pipeline project, the Commission should take advantage of available opportunities during the pre-filing and formal application process to seek more detailed information from proponents about the source and end use of the gas to be transported by the proposed project, and use that data to conduct its own analysis.[62]

Where more specific modeling is not feasible, NEPA requires the Commission to use or produce the best comparable information based on reasonable forecasts and estimates.[63] In such cases, the Commission should consider using the best available general modeling system and describe in its NEPA documents how it expects that project-related emissions might differ from available estimates.[64] For instance, the Commission could produce a "full-burn" estimate (i.e., an estimate of lifecycle greenhouse gas emissions from wellhead to point of consumption, taking into account leaks and losses in production, transmission, and distribution system, assuming total consumption of delivered gas) accompanied by a caveat that ultimately the pipeline project may result in fewer emissions.[65] We note that in past proceedings, the

---

[61] 40 C.F.R. § 1502.22(a).

[62] *Accord* Dominion Order, *supra* note 25 (Glick, C., dissenting in part, at *3).

[63] *Accord id.* (Glick, C., dissenting in part, at *3–4).

[64] Notably, while some consumption-related impacts are dependent upon details regarding when and where the associated emissions while occur (such as impacts to local air or water quality), the climate-warming effects of greenhouse gas emissions are globalized. Therefore, even without more specific details, the Commission can produce decision-relevant information about the climate impacts of pipeline projects based on an estimate of the quantity of natural gas that will be transported by the proposed infrastructure over its lifetime.

[65] Methane emissions from leaks and other system releases must be accounted for, particularly because methane is a potent greenhouse gas that is over thirty times more powerful than carbon dioxide in its ability to trap heat in the atmosphere over a 100-year time frame, and eighty-six times more potent over a twenty-year timeframe. According to the EPA, methane emissions from the oil and gas sector are the largest industrial source of methane emissions in the United States, accounting for about 30 percent of total U.S. methane emissions. *See* http://www3.epa.gov/climatechange/ghgemissions/gases/ch4.html. But a recent study found that methane emissions were sixty percent higher than the U.S. EPA inventory estimate, likely because existing inventory methods miss emissions released during abnormal operating conditions. *See* Ramón A. Alvarez, et al., *Assessment of Methane Emissions from the U.S. Oil and Gas Supply Chain*, SCIENCE, June 21, 2018.

AR_0025877

Commission has made gross, net, and "full-burn" estimations of upstream and downstream greenhouse gas emissions, evidencing the feasibility of this approach.[66] At the very least, the Commission should require project proponents to provide specific information on the indirect and cumulative impacts of the proposed pipeline project in the context of existing, under-development, and reasonably foreseeable energy projects and market trends in the region, as well as state energy and environmental policies. In no event, however, is the Commission permitted to abdicate its responsibility to consider climate impacts altogether.[67] Consistently analyzing upstream and downstream greenhouse gas emissions—even at some level of generality, if that is all that is feasible—would better inform Commission decisionmaking and the public than no information at all, while also increasing certainty for project proponents.

### D. The Commission should consider state policies and the Social Cost of Carbon in determining whether greenhouse gas emissions are significant.

The Commission has claimed that "no standard methodology exists to determine how a project's contribution to greenhouse gas emissions would translate into physical effects on the environment for the purposes of evaluating [a pipeline project's] impacts on climate change."[68] "Thus . . . any attempt by the Commission" to determine whether such emissions are significant for the purposes of NEPA review "would be arbitrary."[69] On the contrary, it is arbitrary and unlawful for the Commission to monetize and compare other benefits and impacts of pipeline projects without taking a similar approach to greenhouse gas emissions.[70]

---

[66] *See* Dominion Order, *supra* note 24 (LaFleur, C., dissenting in part, at *2).

[67] *Accord Mid States Coal. For Progress*, 345 F.3d at 549–50 (where the "*nature* of the effect is reasonably foreseeable but its *extent* is not," the "agency may not simply ignore the effect") (emphasis in original); LaFleur June 12, 2018 Statement, *supra* note 43, at 2; *see also* 40 C.F.R. § 1500.1(b) (requiring that agencies' NEPA analysis must be based on "high quality" information and "accurate scientific analysis").

[68] Dominion Order, *supra* note 25, *34; *accord* Pipeline NOI, *supra* note 1, at 41.

[69] Pipeline NOI, *supra* note 1, at 41; *see also* Dominion Order, *supra* note 25, at *28–29.

[70] *See Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin.*, 538 F.3d 1172, 1198 (9th Cir. 2008) (agency "cannot put a thumb on the scale by undervaluing the benefits and overvaluing the costs" in failing to analyze the benefits of reducing greenhouse gas emissions). As a general matter, there can be no doubt that greenhouse gas emissions related to natural gas extraction, transportation, and consumption in the United States as a whole are significant. *See, e.g.*, EPA, INVENTORY OF U.S. GREENHOUSE GAS EMISSIONS AND SINKS 3–6, 3–79 (2018), *available at* https://www.epa.gov/ghgemissions/inventory-us-greenhouse-gas-emissions-and-sinks-1990-2016 (reporting 2016 U.S. emissions associated with natural gas combustion (1,476.1 MMt $CO_2$e) and

17

AR_0025878

Despite the Commission's claims, there is a variety of relevant information to inform the Commission's determination of the significance of greenhouse gas emissions.[71] In particular, the Commission should use the best available data and methodologies to estimate the incremental societal impact of greenhouse emissions—also referred to as the Social Cost of Carbon.  Though Executive Order 13,783 § 5 (2017) withdrew the Interagency Working Group on the Social Cost of Greenhouse Gases ("IWG") technical support documents for a range of federal estimates of the social cost of carbon, the information and models underpinning these estimates remain credible and useful, and the IWG's estimates continue to represent the best available science.[72] The Commission has claimed that "it is not useful or appropriate" to use the Social Cost of Carbon in NEPA documents,[73] yet the Commission routinely monetizes other types of impacts in its NEPA documents. The Commission cannot evade its legal obligation to quantify the climate impacts of pipeline infrastructure projects where a scientifically based, peer-reviewed method to do so is available.[74]

In addition, the consistency of a proposed pipeline project's greenhouse gas emissions with relevant federal, regional, and state energy and climate policies and goals—which the

---

natural gas transmission and storage systems (32.8 MMt $CO_2e$ of methane)). The Commission plays a key role in approving actions that cause and contribute to these emissions. *Cf. Coal. on Sensible Transp. v. Dole*, 826 F.2d 60, 68 (D.C. Cir. 1987) (agency cannot avoid the requirements of NEPA by "artificially dividing" its combined contribution "into smaller components, each without a 'significant' impact").

[71] *See, e.g.,* Comments of Columbia Law School Sabin Ctr. for Climate Change Law on Southeast Market Pipelines Project, Draft Supplemental Environmental Impact Statement, Docket Nos. CP14-554-002; CP15-16-003; CPS15-17-002, at 2–3 (Nov. 17, 2017) (arguing that greenhouse gas emissions are significant where: 1) they exceed the reporting threshold of 25,000 tons per year of $CO_2e$ used previously by EPA and CEQ to identify major emitters; 2) the monetized social cost of the emissions is large; 3) the net increase in emissions constitutes a large percentage of the affected state's greenhouse gas emissions inventory; and 4) the emissions over the lifetime of the pipeline project would be viewed as significant in the context of state, local, and regional climate policies).

[72] Richard L. Revesz et al., *Best Cost Estimate of Greenhouse Gases,* 357 SCIENCE 6352 (2017).

[73] *See* Pipeline NOI, *supra* note 1, at 45 (citing *Fla. Se. Connection,* 162 FERC ¶ 61,233 at *37–38 (LaFleur and Glick, Comm'rs dissenting)).

[74] *See High Country Conservation Advocates v. U.S. Forest Serv.,* 52 F. Supp. 3d 1174, 1191 (D. Colo. 2014) (EIS was arbitrary and capricious where agency did not monetize climate impacts of coal mining activity "when such an analysis was in fact possible").

AR_0025879

Commission already analyzes in its NEPA documents[75]—can be used as a metric for evaluating whether emissions are "significant."[76] Many of our states have adopted ambitious greenhouse gas reduction goals and mandates, the achievement of which would be threatened by rapid buildout of natural gas infrastructure in our regions. Massachusetts has adopted a broad portfolio of laws and regulations to reduce economy-wide greenhouse gas emissions by 25 percent by 2020 and 80 percent by 2050 from 1990 levels, including the Global Warming Solutions Act (2008), the Green Communities Act (2008), the Act to Promote Energy Diversity (2016), the Regional Greenhouse Gas Initiative, and programs to promote low and zero-emission vehicles, among others. The clean energy industry is a powerful and growing economic engine for Massachusetts.[77] Similarly, Washington State has adopted greenhouse gas reduction goals to reduce overall state emissions of greenhouse gasses to 1990 levels by 2020 and fifty percent below 1990 levels by 2050.[78] In addition, Washington law requires large utilities to obtain fifteen percent of their electricity from new renewable resources by 2020[79]; imposes a greenhouse gas emission standard on electric power[80]; requires new power plants to mitigate at least 20 percent of their greenhouse gas emissions[81]; and sets minimum efficiency

---

[75] *See* Pipeline NOI, *supra* note 1, at 40.

[76] *Cf. Ctr. For Biological Diversity v. Cal. Dep't of Fish & Wildlife*, 62 Cal.4th 204, 225–27 (2015) (rejecting agency's approach to significance where agency failed to provide a reasoned explanation for how estimated project emissions compare to achieving statewide greenhouse gas reduction target).

[77] *See* Initial Comments of the Attorneys General of Massachusetts, California, Connecticut, Illinois, Maryland, North Carolina, Oregon, Rhode Island, Vermont, And Washington, Connecticut Department of Energy And Environmental Protection, Rhode Island Division Of Public Utilities And Carriers, and New Hampshire Office of The Consumer Advocate, Grid Reliability and Resiliency Pricing, FERC Docket No. RM18-1-000, October 23, 2017, available at https://www.mass.gov/files/documents/2017/10/23/Multistate%20Comments%20RM18-1%20-%2010-23-17%20%28FINAL%29.pdf. Furthermore, a study by the Analysis Group found that increasing natural gas capacity in Massachusetts and New England would result in a significant increase in greenhouse gas emissions and threaten compliance with Massachusetts's state law emission reduction mandate. *See* Hibbard, P. and Aubuchon, C., Power System Reliability in New England: Meeting Electric Resource Needs in an Era of Growing Dependence on Natural Gas, Analysis Group, (2015), available at http://www.mass.gov/ago/doing-business-in-massachusetts/energy-and-utilities/regional-electric-reliability-options-study.html.

[78] Rev. Code of Wash. 70.235.020(1)(a).

[79] Rev. Code of Wash. 19.285.010.

[80] Rev. Code of Wash. 80.80.040

[81] Rev. Code of Wash. 80.70.020

AR_0025880

standards for appliances.[82] The District of Columbia's climate and energy plan, Clean Energy DC, proposes to reduce the District's greenhouse gas emissions by 50 percent below 2006 levels by 2032.[83] As part of its Public Benefits Analysis, the Commission should weigh the effect of project greenhouse gas emissions on our states' abilities to comply with our climate and clean energy laws and policies.

**III.    THE COMMISSION'S PUBLIC BENEFITS ASSESSMENT SHOULD BE INFORMED BY THE ECONOMIC HARM OF A PROJECT'S ENVIRONMENTAL IMPACTS AND MORE HEAVILY WEIGH HARM FROM EMINENT DOMAIN TAKINGS.**

The Commission should wait until NEPA review is complete before conducting a Public Benefits Assessment—an assessment that should be made at the final stage of the process in conjunction with a Certificate decision and consider together adverse environmental and economic impacts, including the exercise of eminent domain. The Commission's current system of conducting the economic analyses first, followed by an assessment of environmental impacts which is wholly separate from the economic analyses, necessarily underestimates the value of avoiding the environmental impacts in the first place.

**A.    The Commission's Public Benefits Assessment should be informed by the economic harm of a project's environmental impacts quantified using the Social Cost of Carbon.**

The Commission's Public Benefits Assessment and Certificate decisions should fully and robustly incorporate consideration of environmental impacts identified during NEPA review—including climate impacts. Currently, the Public Benefits Assessment tends to occur prior to NEPA review and only considers adverse economic impacts on the project proponent's customers, on other pipelines in the market, and on property owners affected by the proposed

---

[82] Rev. Code of Wash. 19.260.040

[83] *See Clean Energy DC: The District of Columbia Climate and Energy Plan*, October 2016 Draft, available at https://doee.dc.gov/sites/default/files/dc/sites/ddoe/publication/attachments/Clean_Energy_DC_2016_final_print_si ngle_pages_102616_print.pdf.

AR_0025881

route.[84] This assessment does not consider adverse environmental impacts and comes before NEPA review is complete.[85]

By determining public benefit without regard to adverse environmental impacts and without consideration of the climate harm caused by a project, the Commission is failing to meet its obligations under both the NGA and NEPA. With the NGA, Congress broadly instructed the Commission to consider the public interest[86] by balancing a proposed project's public benefits against its adverse effects—*including environmental impacts*—when deciding if the public convenience and necessity requires granting a Certificate.[87] Indeed, "climate change bears on the public interest in terms of adverse effects" of a proposed pipeline, just as the need for system reliability bears on public benefit.[88] And, as discussed above, NEPA requires the

---

[84] *See* Policy Statement, *supra* note 2, at 18–19.

[85] *See id.*

[86] *See id.* at 23 ("In deciding whether a proposal is required by the public convenience and necessity, the Commission will consider the effects of the project on all the affected interests; this means more than the interests of the applicant, the potential new customers, and the general societal interests"); *see also, Atl. Ref. Co. v. Pub. Serv. Comm'n*, 360 U.S. 378, 391 (1959) (holding that § 7 of NGA requires the Commission to consider "all factors bearing on the public interest"); *FPC v. Transcontinental Gas Pipeline Co.*, 365 U.S. 1, 7 (1961) ("The Commission is the guardian of the public interest in determining whether certificates of convenience and necessity shall be granted. For the performance of that function, the Commission has been entrusted with a wide range of discretionary authority.").

[87] *See Sierra Club*, 867 F.3d at 1373 (citing *Minisink Residents for Envtl. Pres. & Safety v. FERC*, 762 F.3d 97, 101–02 (D.C. Cir. 2014) and *Myersville Citizens for a Rural Cmty. v. FERC*, 783 F.3d 1301, 1309 (D.C. Cir. 2015); *see also Pub. Utils. Comm'n of Cal. v. FERC*, 900 F.2d 269, 281 (D.C. Cir. 1990) (The public interest standard under the NGA includes factors such as the environment and conservation, particularly as decisions concerning the construction, operation, and transportation of natural gas in interstate commerce "necessarily and typically have dramatic natural resource impacts.").

[88] Order on Remand Reinstating Certificate and Abandonment Authorization, Florida Southeast Connection LLC, Transcontinental Gas Pipeline Co., LLC, Sabal Trail Transmission, LLC, 162 FERC 61,233 (March 14, 2018) [hereinafter "Sabal Trail Remand Order"] (Glick, C., dissenting at *3); *see also* Dominion Order, *supra* note 25 (LaFleur, C., dissenting in part, at *1) ("deciding whether a project is in the public interest requires a careful balancing of the economic need for a project and all of its environmental impacts. Climate change impacts of GHG emissions are environmental effects of a project and are part of [the] public interest determination."); Dominion Order, *supra* note 25 (Glick, C., dissenting in part, at *2) ("[c]limate change poses an existential threat to our security, economy, environment, and, ultimately, the health of individual citizens. [ . . . ] Accordingly, it is critical that the Commission carefully consider [projects'] contributions to climate change, both to fulfill NEPA's requirements *and to determine whether the Projects are in the public interest*") (emphasis added).

AR_0025882

Commission to quantify a project's climate-related and other reasonably ascertainable environmental costs.[89]

The Commission therefore should expand its evaluation of economic impacts in its Public Benefits Assessment to consider the costs of environmental harms, including climate impacts monetized utilizing the Social Cost of Carbon, as required by NEPA and the NGA.

## B.    The Commission's Public Benefits Assessment should weigh more heavily the adverse effect of eminent domain takings.

In the Policy Statement, the Commission recognized that if the exercise of eminent domain will likely be required for a substantial portion of a pipeline right of way and other facility siting locations, the economic harm caused by the project may outweigh its public benefit.[90] And yet, the Commission has continued to issue Certificates without requiring a heightened showing of public benefit as disputes over pipeline siting and approvals have intensified in recent years and private property owners have increasingly resisted entering into voluntary easement agreements.[91] The Commission should require an enhanced showing of public benefit to offset the economic harm caused by the exercise of eminent domain where a pipeline project applicant fails to acquire voluntary easements for a significant portion of the project.

The use of eminent domain should be a last resort.[92] Indeed, the NGA requires no less[93] and the Commission should require project applicants to negotiate in good faith with property

---

[89] *See* discussion *supra* in Section II C and D.

[90] *See* Policy Statement, *supra* note 2, at 27 ("The strength of the benefit showing will need to be proportional to the applicant's proposed exercise of eminent domain.").

[91] *See, e.g.,* Mountain Valley Order, *supra* note 37 (LaFleur, C. dissenting at *2–3 (concluding that because of the projects' environmental impacts and adverse impacts to property owners, the project, on balance is not in the public interest); Mountain Valley Rehearing Order, *supra* note 14 (LaFleur dissenting at *3) (noting the significant impact to landowners); *id.* (Glick dissenting at *2–3) (applicant failed to demonstrate sufficient need for the project to support a finding that the project's benefits outweigh its harms, especially where need was established solely through the existence of precedent agreements with the applicant's affiliates).

[92] *See generally* 42 U.S.C. § 4651 (requiring federal agencies undertaking condemnation in furtherance of federal programs "to encourage and expedite the acquisition of real property by agreements with owners, to avoid litigation and relieve congestion in the courts" by following federal condemnation policies).

[93] *See* 15 U.S.C. § 717f(h) (requiring as a precondition of condemnation litigation that the Certificate holder demonstrate that it "cannot acquire by contract" the real property rights needed); *see also USG Pipeline Co. v.*

AR_0025883

owners for voluntary easement agreements as a Certificate condition. Furthermore, as discussed below, the Commission should help facilitate increased use of voluntary easement agreements by making the currently voluntary pre-filing process mandatory, and by requiring that pipeline project proponents engage extensively with local property owners and state and local officials prior to filing an application with a preferred pipeline route and facility sites.

## IV.    THE COMMISION SHOULD BETTER COORDINATE ITS REVIEW WITH THAT OF STATE AND LOCAL PERMITTING AGENCIES.

The Commission seeks recommendations on how it may work more effectively with other agencies and on ways to change its review procedures to increase efficiency.[94] For the reasons discussed below, the Commission should make mandatory the current pre-filing process and require more thorough review and incorporation of state and local environmental and land use requirements during pre-filing and NEPA review. Pipeline project proponents should be required to promptly apply for required state certifications and approvals under the federal Clean Water Act[95] ("CWA"), Clean Air Act[96] ("CAA"), and the Coastal Zone Management Act[97] ("CZMA") upon filing an application with the Commission, to the extent consistent with the application process established by the relevant state agencies. The Commission should, strive to issue Certificates for pipeline projects only after completion of required state review under the CWA, CAA, and CZMA. The Commission should also expressly condition Certificates

---

*1.74 Acres in Marion Cty., Tenn.*, 1 F. Supp. 2d 816, 822 (E.D. Tenn. 1998) ("Courts also have imposed a requirement that the holder of the FERC Certificate negotiate in good faith with the owners to acquire the property."); *Transcon. Gas Pipe Line Corp. v. 118 Acres of Land*, 745 F. Supp. 366, 369 (E.D. La. 1990) ("In addition to satisfying the requirements of § 717f(h), federal law requires the condemnor to have conducted good faith negotiations with the landowners in order to acquire the property."). *But cf. Maritimes & Ne. Pipeline, L.L.C. v. Decoulos*, 146 F. App'x 495, 498 (1st Cir. 2005) (declining to find that the NGA requires that a pipeline project Certificate holder establish good faith negotiations with a property owner a requirement precedent to a condemnation action); *Mountain Valley Pipeline, LLC v. Simmons*, 307 F. Supp. 3d 506, 511 (N.D.W. Va. 2018) ("MVP is not required by the Natural Gas Act or Rule 71.1 to engage in good faith negotiations with the landowner.") (internal quotation marks and citations omitted).

[94] *See* Pipeline NOI, *supra* note 1, at 53–54.

[95] 33 U.S.C. §§ 1251–1388.

[96] 42 U.S.C. §§ 7401–7671q.

[97] 16 U.S.C. §§ 1451–1466.

AR_0025884

on compliance with state and local land use requirements and environmental permits (not required by federal law) when the Commission relies on them to minimize environmental impacts or when such permits do not unreasonably conflict with or delay Commission-approved pipeline projects. These reforms would increase efficiency, transparency, and predictability while reducing the likelihood of post-Certificate litigation.

### A. Pre-filing should be mandatory and better incorporate state review.

Now voluntary, the Commission's pre-filing process encourages pipeline project proponents to engage with property owners, stakeholders, and federal, state, and local agencies prior to filing an application with a preferred pipeline route and siting locations for compressor stations and other facilities. The pre-filing process thus provides stakeholders and agencies an opportunity become involved early in the project development process by providing information about the extent and nature of pipeline project impacts and environmental permitting and land use requirements. Through this process, applicants may alter pipeline project design, scale, and route to minimize impacts and siting controversies.

The Commission should not only make this pre-filing process mandatory but also require that pipeline project proponents engage with state and local officials and thoroughly examine all required state and local environmental permitting and land use requirements prior to filing an application with a preferred pipeline route and facility sites.[98] To help facilitate increased site access for ground surveys and encourage use of voluntary easement agreements to limit the exercise of eminent domain takings, the Commission should require that project proponents engage extensively with local property owners during pre-filing.[99] Pipeline project proponents should be required to prepare resource reports that comprehensively review

---

[98] This should require applicants to not merely meet with state and local officials, but listen, and to respect local requirements, then incorporate such requirements into the ultimate project siting and design as discussed *infra* in Section IV D.

[99] *See* discussion *supra* in Section III B, and *infra* in Section V. Property owner refusal to grant site access for ground surveys may hinder NEPA review as well as states' abilities to complete review of applications for state water quality certifications under CWA Section 401. Even when private property owners resist entering into voluntary easement agreements for pipeline construction right of ways, early landowner engagement may facilitate site access for performance of environmental and ground condition surveys.

AR_0025885

pipeline project impacts and all permitting requirements—including what must be submitted for state review under the CWA, CAA, and CZMA[100]—based on consultation with state and local agencies.

Immediately following the filing of an application, and concurrent with NEPA review, the Commission should require applicants to expeditiously file for all required state certifications and approvals under the federal CWA, CAA, and CZMA, seeking provisional approvals for the preferred route. The Commission should also encourage applicants to simultaneously work with state and local regulators to prepare for and begin filing all required permit applications.

### B. The Commission should not issue certificates before states have issued permits and certifications under federal statutes.

The NGA expressly preserves the rights of states under the CWA, CAA, and CZMA.[101] Under Section 401(a) of the CWA[102], an applicant must present the Commission with state certification that pipeline project discharges will not violate state water quality standards and requirements, and any conditions imposed by a state water quality certification became conditions of the Commission's Certificate.[103] Pipeline project applicants must also present the Commission with state-issued permits under the CAA, and with certification that the pipeline project and its impacts are consistent with state Coastal Zone Management Plans approved under the CZMA.[104]

---

[100] *See* discussion *infra* in Section IV B.

[101] *See* 15 U.S.C. § 717b(d); *Meyersville Citizens for a Rural Cmty, Inc. v. FERC*, 783 F.3d 1301, 1315 (D.C. Cir. 2015) (the NGA "savings clause", 15 U.S.C. § 717b(d), saves from preemption the rights of states under the CWA, CAA, and CZMA); *see also Islander E. Pipeline Co., LLC v. Conn. Dep't of Envtl. Prot,* 482 F.3d 72, 89 (2d Cir. 2006) (*Islander I*); *Islander E. Pipeline Co., LLC v. Conn. Dep't of Envtl. Prot.,* 525 F.3d 141, 143 (2d Cir. 2008) (*Islander II*).

[102] In addition to CWA Section 401, where States have assumed federal authority over freshwater wetlands pursuant to CWA Section 404, the State's requirements become federal law and must be treated as a federal permit. *Delaware Riverkeeper v. Sec'y Pa. Dep't of Envtl. Prot.*, 833 F.3d 360 (3d Cir. 2016).

[103] 33 U.S.C. § 1341(a), (d).

[104] *See Islander I,* 482 F.3d at 84, 86; *Dominion Transmission v. Summers,* 723 F.3d 238, 240 (D.C. Cir. 2013).

AR_0025886

The Commission should end its practice of issuing Certificates conditioned on later receipt of state certifications, permits, and approvals under the CWA, CAA, and CZMA.[105] Following NEPA review, but prior to completion of required state review under the CWA, CAA, and CZMA, the Commission typically issues a Certificate approving a pipeline project conditioned on the applicant obtaining state-issued certifications and approvals under these federal statutes.[106] Requiring completion of state reviews prior to Certificate issuance would allow the Commission to better evaluate pipeline routing and facility siting alternatives informed by expert review by state agency regulators applying state standards that are applicable under federal law. This would also allow state regulators to review the preferred pipeline project route in the application, as well as alternative routes and facility siting locations, either denying or provisionally approving preferred and alternate routes and siting, pending the Commission's final review and siting approval in its Certificate. Additionally, it would prevent landowners' unnecessary loss of property via eminent domain for pipeline projects that may never be constructed.[107]

Notably, ending the routine issuance of Certificates conditioned on later receipt of state approvals under the CWA, CAA, and CZMA would most likely reduce post-Certificate litigation by precluding situations where the Commission approves a pipeline project only to have it blocked in whole or in part by one or more states denying federally-required permits.[108] Under

---

[105] The Commission typically issues conditional Certificates if state review will take more than six months. *See* Policy Statement, *supra* note 2, at 19. State CWA water quality certifications may take up to one year to complete. *See* 33 U.S.C. § 1341(a)(1) and discussion *infra* in note 98 (state waives its right to issue a CWA Section 401 water quality certification if it fails to act on a certification request within a reasonable time, not to exceed one year).

[106] *See, e.g.,* PennEast Pipeline Order, *supra* note 14 (issuing a Certificate conditioned upon the completion of unfinished surveys and documentation of unobtained permits).

[107] *See* discussion *infra* at note 108.

[108] *See, e.g., Constitution Pipeline Co., LLC v. N.Y. State Dep't of Envtl. Conservation*, 868 F.3d 87, 90 (2d Cir. 2017), rehearing denied (2017), cert. denied (2018) (upholding the New York Department of Conservation's denial of Constitution's application for a CWA Section 401 water quality certification where the company failed to provide adequate information regarding a large number of stream crossings to demonstrate that project impacts would not violate state water quality standards); *Islander II*, 525 F.3d at 151–53 (upholding as supported by the record following remand the Connecticut Department of Environmental Protection's

AR_0025887

such circumstances, the Commission's conditional Certificate decision is subject to reconsideration and judicial review. After initiating such challenge, stakeholders or an applicant may subsequently file petitions in Circuit Courts of Appeals challenging state-issued certifications and permits under federal law.[109] Issuing Certificates after completion of all federally required state permitting would not only prevent staggered judicial review, but also provide a more complete record supporting the Commission's ultimate Certificate decision.

Waiting to issue a Certificate until all federally required state approvals have been obtained will also prevent irreparable harm that may result from the Commission's current practice of granting partial notices to proceed with construction for portions of a project. In the Constitution Pipeline project, the Commission's issuance of a partial notice to proceed with construction resulted in acres of mature trees being cut in Pennsylvania before the completion of the project was stopped by New York's denial of a CWA Section 401 water quality certification.[110]

As recommended above, the Commission should require that pipeline project applicants promptly file for state approvals under CWA, CAA, and CZMA after fully assessing state requirements and procedures under these federal statutes by working with state regulators during pre-filing. This will facilitate review by state regulators and reduce the instances of

---

denial of Islander's application for a CWA Section 401 water quality certification because of the project's adverse effects on shellfish habitat and other water quality impacts).

[109] Section 19(d)(1) of the NGA vests Circuit Courts of Appeals with original and exclusive jurisdiction over petitions seeking judicial review of state certifications and permits issued under the CWA, CAA, or CZMA. *See* 15 U.S.C. § 717r(d)(1). To be clear, we are not recommending that the Commission hold off issuing a Certificate during the pendency of judicial review following the filing of a petition under NGA Section 19(d)(1), although petitioners may seek a stay of the Commission's Certificate from the Court.

[110] *See Constitution Pipeline*, 868 F.3d at 90, 92–93 and discussion *supra*, note 108.

27

project proponents filing incomplete applications that delay review by state regulators under these federal statutes.[111, 112]

### C. State water quality certification under the CWA should not be subject to new time limitations or otherwise constrained.

The Commission also seeks comments on whether there are "classes of projects that should appropriately be subject to a shortened [Certificate review] process."[113] Recent or contemplated federal legislative proposals would amend the CWA to shorten the time allowed states to review applications for CWA Section 401 water quality certifications.[114]

The undersigned state Attorneys General strongly oppose any legislative change or regulatory effort to limit the time allowed for state review of water quality applications under CWA Section 401. For projects with large numbers of discharges, state water quality review can be a complex and lengthy process. For instance, the Constitution Pipeline project proposal

---

[111] *See, e.g., N.Y. State Dep't of Envtl. Conservation v. FERC,* 884 F3d 450 (2d Cir. 2018) (*Millennium Pipeline*). In *Millennium Pipeline,* the company took more than nine months to complete its application for state water quality certification. The Court held that the "reasonable period of time (which shall not exceed one year)" for states to act on a request for CWA Section 401 water quality certification begins to run on the date the state receives the initial application, not when the applications is deemed complete. *Id.* at 455–56. The Court noted that states may assist applicants in completing applications and, if necessary, request that incomplete applications be withdrawn and resubmitted. *Id.* at 456. *But cf. Berkshire Envl. Action Team, Inc. v. Tenn. Gas Pipeline, LLC,* 851 F.3d 105 (1st Cir. 2017) (holding that Massachusetts' initial approval of a water quality certification made within one year of application was not final for purposes of NGA Section 19(d)(1) and that judicial review must wait for a final agency decision upon completion of a timely made administrative appeal).

[112] Section 19(d)(2) of the NGA provides a remedy for proponents faced with unreasonable delay or failure to act by a state agency on an application for a certification or permit under the CWA or CAA, in the form of seeking injunctive relief from the United States Court of Appeals for the D.C. Circuit. *See* 15 U.S.C. § 717r(d)(2), EPAct, 2005. Section 19(d)(2) of the NGA grants the United States Court of Appeals for the D.C. Circuit with exclusive jurisdiction over actions seeking declaratory and injunctive relief against state permitting agencies for undue delay or failure to act on federally-required permits. *See* discussion *infra* in Section III C.

[113] *See* Pipeline NOI, *supra* note 1, at 54.

[114] *See, e.g.,* H.R. 2910, Promoting Interagency Coordination for Review of Natural Gas Pipelines Act, 2017 (specifying limited timeframes and procedural requirements for the Commission and other agencies to follow in conducting environmental reviews related to proposed natural gas facility projects); *see also* Saqib Rahim and Nick Sobczk, "Legislative 'Reform' to Narrow States' Power," ENERGY AND ENVIRONMENTAL NEWS, February 2, 2018, https://eenew.net.energywire/stores/1060072719 (discussion contemplated amendments to the CWA that would allow states up to 90 days to determine if an application for a Section 401 water quality certification was complete, after which states would have 90 days to complete application review and issue or deny the requested water quality certification).

AR_0025889

involved discharges to 251 different streams and a variety of different water quality impacts, including habitat loss or degradations (87 impacted streams supported trout or trout spawning), changes in thermal conditions, increased erosion, and increases in stream instability and turbidity.[115] Any effort to shorten the one-year period Congress has deemed reasonable would be unlawful and arbitrary and capricious and, especially for large or complex projects, severely constrain states' rights to uphold and protect the quality of their waters under the cooperative federalism approach mandated by the CWA. Congress has already provided a remedy for pipeline project proponents faced with unreasonable delay or state agency obstruction on an application for certifications or permits under the CWA or CAA. [116]

It bears emphasizing that imposing arbitrary timeframes on CWA water quality certification review will not appreciably speed up pipeline project review. The Director of the Commission's Office of Energy Projects recently testified that, on average, eighty-eight percent of projects are issued Certificates within one year, and the single greatest factor slowing down review is the failure of the project applicant to provide the Commission and other agencies with "timely and complete information necessary to perform Congressionally-mandated project reviews."[117] Thus, the Commission should not entertain recommendations to curtail or expedite state review under CWA Section 401 (or other state approvals under federal statutes). Any such effort would contravene Congressional intent and do little to expedite state review.

**D. The Commission's Certificates should be conditioned on compliance with all state and local environmental permits and land use requirements that do not unreasonably conflict with or delay approved pipeline projects.**

Beyond federally required, state-issued certifications and approvals under the CWA, CAA, and CZMA, it is "the Commission['s] goal to include state and local authorities to the extent

---

[115] See *Constitution Pipeline*, 868 F.3d at 90, 92–93 and discussion *supra* note 108.

[116] See *supra* note 112, (referencing 15 U.S.C. § 717r(d)(2)) EPAct, 2005.

[117] House Committee on Energy and Commerce, Hearing on "Legislation Addressing Pipeline and Hydropower Infrastructure Modernization," Testimony of Terry Turpin, Director, Office of Energy Projects, Federal Energy Regulatory Commission, 115th Cong. (May 3, 2017).

AR_0025890

possible" in pipeline project planning and construction.[118] As FERC routinely asserts in Certificate decisions, a "rule of reason must govern both state and local authorities' exercise of their power and an applicant's bona fide attempts to comply with state and local requirements."[119] The mere fact that "a state or local authority requires something more or different than the Commission does not necessarily make it unreasonable for an applicant to comply with both the Commission's and state and local agency's requirements," even if state and local compliance would add additional cost and potentially threaten the facility's in-service date.[120]

Despite its goal to include state and municipal agencies in pipeline project planning and to strongly encourage compliance with their requirements, the Commission does not typically condition its Certificates on receipt of reasonable state and local permits.[121] This often leads to confusion about and litigation over whether an applicant has reasonably attempted to comply with state and local requirements that do not block or unduly delay a pipeline project. And rather than continue to work with state and local regulators as the Commission intends, applicants often assert preemption once armed with the Commission's Certificate.[122]

---

[118] *See, e.g.,* Order on Rehearing and Approving Agreements, Maritimes and Northeast Pipeline, L.L.C., 81 FERC ¶ 61,166, 17 (1997).

[119] *See* Pac. Connector Gas Pipeline LP, 134 FERC ¶ 61,102 at *1, *4, *11–12 (2011); Order Issuing Certificate, Tennessee Gas Pipeline Company, L.L.C., 154 FERC ¶ 61,191, at *30 (2016) (same).

[120] Order Issuing Certificate, Tennessee Gas Pipeline Company, L.L.C., 154 FERC ¶ 61,191, *30 (2016); *see also* Order on Rehearing and Approving Agreements, Maritimes and Northeast Pipeline, L.L.C., 81 FERC ¶ 61,166, 19–22 (1997) (ruling that several additional state conditions, including state review and approval requirements for pipeline route surveys and additional endangered species surveys, would not unreasonably delay the project where there was only a possibility that the conditions would conflict with the pipeline's in-service date).

[121] *See, e.g.,* Order Issuing Certificate, Tennessee Gas Pipeline Company, L.L.C., 154 FERC ¶ 61,191, *29–30 (2016) (noting and encouraging compliance with substantive land use restrictions and procedural requirements for allowing easement through conservation land protected by Article 97 of the Massachusetts Constitution, but declining to expressly condition Certificate on compliance with these requirements as requested by the Massachusetts Department of Conservation and Recreation and the Massachusetts Attorney General); *see also* discussion *infra* in note 122.

[122] *See, e.g., Millennium Pipeline Co., LLC v. Seggos,* 288 F. Supp. 3d 530 (N.D.N.Y. 2017) (granting preliminary injunction barring state from using state permitting requirements to delay construction of pipeline); Memorandum of Decision and Order on Plaintiff's Motion to Confirm Authority To Condemn Easements and Motion For Injunctive Relief Authorizing Immediate Entry, *Tennessee Gas Pipeline Co., LLC v. Commonwealth of Massachusetts,* Berkshire Superior Court, Civ. No. 16-0083, May 9, 2016 at *2–4, *11–16 (On motion for

AR_0025891

To avoid these disputes and unnecessary litigation, and to address jurisdictional public interest and environmental considerations identified under the NGA and NEPA, the Commission should, first, require that applicants consult with state and local permitting agencies during pre-filing. This step would help identify potentially applicable state and local permitting and other requirements that should be considered as potential Certificate conditions. Then, in lieu of the Commission's much vaguer conditions, the Commission should expressly condition its Certificates on applicants complying with state and local environmental permits and land use requirements the Commissions has identified during pre-filing and NEPA review and on which it relies for mitigation of environmental harm, or on permits that do not unreasonably conflict with or delay the approved pipeline project. This step would avoid confusion about the precise regulatory requirements applicable to a pipeline project and permit the Commission to utilize its federal authorities, in partnership with states and local governments, to responsibly manage the development of natural gas infrastructure in a manner more responsive to local requirements and concerns.

*      *      *

Because state practice varies, and coordinating federal, state, and local regulatory authority has presented challenges for the Commission, states, local governments, project developers, and other stakeholders alike, the Commission should consider convening a technical conference on procedural requirements, review timelines, and other practical coordination issues in this area, and how to best alter the Commission's process.

---

condemnation of easements asserting preemption of Massachusetts Constitution Article 97 (discussed *supra* in note 121), the Court noted that "[d]espite the preemption of Article 97, the Certificate does not give Tennessee unrestrained right to ignore the Commonwealth. Instead, the Certificate expressly requires Tennessee to make a good faith effort to cooperate with state and local authorities."); Request for Reconsideration and Clarification, *National Fuel Gas Supply Corp.*, Docket No. CP15-115 (March 3, 2017) (seeking "clarification" from FERC that all state and local environmental permits were preempted by the Natural Gas Act).

AR_0025892

V.     **PARTIAL NOTICES TO PROCEED WITH CONSTRUCTION SHOULD NOT BE ISSUED PRIOR TO REHEARING REQUEST DECISIONS, AND THE USE AND TIME OF TOLLING ORDERS SHOULD BE LIMITED.**

The Commission's practice of allowing construction to proceed while delaying rehearing decisions through tolling orders inflicts irreparable harm while effectively foreclosing remedies on judicial review, denying injured parties due process. Though the NGA and the Commission's regulations require it to issue a decision within thirty days of a request for a Certificate rehearing,[123] the Commission routinely issues orders tolling this thirty-day period to allow it additional time to evaluate the merits of a rehearing request. These tolling orders routinely delay rehearing decisions for a year or more.[124]

Moreover, the Commission often grants requests for partial notices to proceed with construction after a Certificate issues—even when a tolled decision on a rehearing request is pending—so long as the Certificate holder has received all state-issued permits under the federal CWA, CAA, and CZMA (where construction activity could impact resources covered by those federally required permits). This practice results in significant and irreparable harm from project construction. For instance, as a rehearing request was tolled for more than thirteen months, the Commission granted the Transcontinental Gas Pipeline Company's Leidy Southeast Project a total of twenty partial notices to proceed resulting more than one hundred acres of tree clearing.[125] And while parties seeking rehearing of Commission Certificate Orders may request that FERC stay project construction during the pendency of the tolling period and

---

[123] *See* 15 U.S.C. § 717r(b); 18 C.F.R. § 157.20(a).

[124] While a few recent egregious tolling periods were attributable *in part* to an extended period in 2017 when the Commission lacked a quorum, tolling periods of a year or more are common even when there are no quorum issues. *See, e.g.,* Order Denying Rehearing, Transcontinental Gas Pipeline Company, LLC, 154 FERC ¶ 61,166 (March 3, 2016) (the Commission denied a rehearing request more than one year after timely rehearing requests made in January 2015 and a tolling order issued in February 2015).

[125] *See* Transcontinental Gas Pipeline, *supra* note 124. Similarly, a Commission tolling order delayed a rehearing decision regarding the Connecticut Expansion Project for over sixteen months, authorizing tree clearing and construction for the project, including through a two-mile stretch of conservation land protected under the Massachusetts Constitution in Otis State Forest. *See* Order on Rehearing, Tennessee Gas Pipeline Company, 160 FERC ¶ 61,027 (August 25, 2017) (denying timely rehearing requests made in April 2016).

AR_0025893

rehearing request, the Commission rarely, if ever, grants such stay requests, even when rehearing requests raise serious issues of merit.[126]

Because petitioners may not seek judicial review until the Commission rules on the merits of their request for rehearing,[127] the Commission's routine practice of delaying rehearing decisions raises serious due process concerns.[128] In addition to denying affected parties judicial review before construction begins, tolling orders deny landowners judicial review before their land is taken through eminent domain.[129] Because the power of eminent domain attaches regardless whether a rehearing has been requested, developers are free to take land while the Commission has not yet ruled on the rehearing request and while landowners have no judicial recourse.[130] To minimize the number of landowners whose land is taken without opportunity for judicial review, the Commission should end its practice of issuing tolling orders except in rare cases where the additional time is absolutely necessary, in which case tolling orders should be for as brief a period as practicable.

---

[126] *See Del. Riverkeeper*, 753 F.3d at 1308–09 (Commission issued rehearing request tolling order, delaying judicial review, where the Court ultimately held that Commission's review violated NEPA).

[127] 15 U.S.C. § 717r(b); *see also Kokajko v. F.E.R.C.*, 837 F.2d 524, 525 (1st Cir. 1988) ("[B]ecause FERC has not yet issued a ruling on the merits of the petition, this court is without jurisdiction.").

[128] *See, e.g., MCI Telecommunications Corp. v. F.C.C.*, 627 F.2d 322, 341 (D.C. Cir. 1980) ("[D]elay in the resolution of administrative proceedings can . . . deprive regulated entities, their competitors or the public of rights and economic opportunities without the due process the Constitution requires."); *Kokajko*, 837 F.2d at 526 ("[A] claim which is virtually tied up in interminable successive rounds of administrative review may present due process concerns."); *cf. Pub. Citizen Health Research Grp. v. Comm'r, Food & Drug Admin.*, 740 F.2d 21, 34 (D.C. Cir. 1984) ("When the public health may be at stake, the agency must move expeditiously to consider and resolve the issues before it.").

[129] This is particularly true where, as is increasingly the practice, the pipeline seeks immediate entry onto and possession of the property rights it is condemning through the use of preliminary injunctions. *See, e.g. East Tennessee Natural Gas Company v. Sage*, 361 F.3d 808 (4th Cir. 2004) (granting a preliminary injunction to a pipeline company in a condemnation matter prior to the payment of just compensation); *Columbia Gas Transmission, LLC v. 1.01 Acres, More or Less, In Penn Twp*, 768 F.3d 300, 315–16 (3d Cir. 2014) (discussing *Sage* and granting a preliminary injunction to the pipeline company prior to the payment of just compensation). Since a District Court's reviewing role is limited, *see Columbia Gas Transmission* at 304, tolling orders issued by FERC can, when combined with preliminary injunctions granted by District Courts, deprive a property owner of any real judicial review until the pipeline has already taken full possession of the property.

[130] While the eminent domain proceeding occurs in a court, landowners cannot collaterally attack the Certificate, and therefore cannot challenge the developer's right to use eminent domain. *See, e.g., Williams Natural Gas Co. v. City of Oklahoma City*, 890 F.2d 255, 262, 264 (10th Cir. 1989).

AR_0025894

## CONCLUSION

The undersigned Attorneys General strongly urge the Commission to revise the Policy Statement in accordance with all the above recommendations.  Thank you for your consideration of these comments.

Respectfully submitted,

MAURA HEALEY
ATTORNEY GENERAL OF MASSACHUSETTS

CHRISTOPHE COURCHESNE
CHIEF, ENVIRONMENTAL PROTECTION DIVISION
REBECCA TEPPER
CHIEF, ENERGY AND TELECOMMUNICATIONS DIVISION
MATTHEW IRELAND
SARAH BRESOLIN SILVER
ASSISTANT ATTORNEYS GENERAL
MEGAN HERZOG
SPECIAL ASSISTANT ATTORNEY GENERAL
OFFICE OF THE ATTORNEY GENERAL
One Ashburton Place, 18th Floor
Boston, MA 02108

34

AR_0025895

LISA MADIGAN
ATTORNEY GENERAL OF ILLINOIS

PETER F. KILMARTIN
ATTORNEY GENERAL OF RHODE ISLAND

MATTHEW J. DUNN
CHIEF, ENVIRONMENTAL
ENFORCEMENT/ASBESTOS LITIGATION DIVISION
JANICE A. DALE
CHIEF, PUBLIC UTILITIES BUREAU
DANIEL I. ROTTENBERG
JACQUES ERFFMEYER
ASSISTANT ATTORNEYS GENERAL
ILLINOIS ATTORNEY GENERAL'S OFFICE
69 W. Washington St., 18th Floor
Chicago, IL 60602

LEO J. WOLD
ASSISTANT ATTORNEY GENERAL
RHODE ISLAND DEPARTMENT OF
ATTORNEY GENERAL
150 South Main Street
Providence, RI 02903

BRIAN E. FROSH
ATTORNEY GENERAL OF MARYLAND

BOB FERGUSON
ATTORNEY GENERAL OF WASHINGTON

JOSHUA M. SEGAL
ASSISTANT ATTORNEY GENERAL
OFFICE OF THE ATTORNEY GENERAL
200 St. Paul Place
Baltimore, MD 21202

WILLIAM R. SHERMAN
ASSISTANT ATTORNEY GENERAL
STACEY S. BERNSTEIN
ASSISTANT ATTORNEY GENERAL
AURORA R. JANKE
SPECIAL ASSISTANT ATTORNEY GENERAL
COUNSEL FOR ENVIRONMENTAL PROTECTION
800 5th Ave Suite 2000, TB-14
Seattle, WA 98104-3188

AR_0025896

GURBIR S. GREWAL
ATTORNEY GENERAL OF NEW JERSEY



DAVID C. APY
ASSISTANT ATTORNEY GENERAL
R.J. HUGHES JUSTICE COMPLEX
25 MARKET STREET, P.O. BOX 093
TRENTON, NJ 08625

KARL A. RACINE
ATTORNEY GENERAL
OF THE DISTRICT OF COLUMBIA

DAVID S. HOFFMANN
ASSISTANT ATTORNEY GENERAL
SARAH KOGEL-SMUCKER
SPECIAL ASSISTANT ATTORNEY GENERAL
PUBLIC ADVOCACY DIVISION
OFFICE OF THE ATTORNEY GENERAL FOR THE
DISTRICT OF COLUMBIA
441 Fourth Street, N.W., Suite 630 South
Washington, D.C. 20001

Dated: July 25, 2018

AR_0025897

# EXHIBIT 2

AR_0025898

**Comments of the Attorneys General of California, Colorado, Connecticut, Delaware, the
District of Columbia, Illinois, Maine, Maryland, Massachusetts, Minnesota, New Mexico,
New Jersey, New York, North Carolina, Oregon, Pennsylvania, Rhode Island, Vermont
and Washington**

August 26, 2019

*Via electronic submission to www.regulations.gov*
**ATTN: Docket ID No. CEQ-2019-0002**

Edward A. Boling
Associate Director for the National Environmental Policy Act
Council on Environmental Quality
730 Jackson Place, NW
Washington, DC 20503

Re:    **Draft National Environmental Policy Act Guidance on Consideration of
       Greenhouse Gas Emissions, 84 Fed. Reg. 30,097 (June 26, 2019)
       Docket No. CEQ-2019-0002**

Dear Associate Director Boling:

The undersigned State Attorneys General of California, Colorado, Connecticut,
Delaware, the District of Columbia, Illinois, Maine, Maryland, Massachusetts, Minnesota, New
Mexico, New Jersey, New York, North Carolina, Oregon, Pennsylvania, Rhode Island, Vermont
and Washington (hereinafter, "the States") respectfully submit these comments opposing the
Council on Environmental Quality's ("CEQ") "Draft National Environmental Policy Act
Guidance on Consideration of Greenhouse Gas Emissions" ("Draft Guidance").[1]

CEQ's Draft Guidance is inconsistent with the National Environmental Policy Act
("NEPA"), 42 U.S.C. § 4321 *et seq.*, and should be withdrawn for several reasons. First,
although the Draft Guidance focuses on greenhouse gas ("GHG") emissions, it fails to address
climate change and its impacts. NEPA does not permit, and CEQ may not direct, agencies to
ignore the well-documented impacts of climate change in their environmental impact analyses.
Second, the Draft Guidance undermines NEPA's full-disclosure purpose and conflicts with
NEPA's requirements in multiple ways, including: by failing to provide clarity on how agencies
should analyze indirect climate change impacts; by inadequately considering cumulative
impacts; by improperly minimizing the analytical value of monetizing climate impacts and
supporting an unbalanced approach to cost-benefit analysis; by discouraging analysis and
mitigation of a project's climate impacts; and by failing to direct federal agencies to consider
climate adaptation and resiliency when analyzing a project's environmental impacts and

---

[1] 84 Fed. Reg. 30,097 (June 26, 2019), Docket No. CEQ-2019-0002.

1

AR_0025899

mitigation for those impacts. In the States' experience, a robust assessment of climate impacts is not only possible but is also critical to adequate review of environmental impacts under NEPA and its state analogues.

Rather than providing clarity, CEQ rejects the positions taken its prior administrative guidance on the analysis of climate change impacts required under NEPA with an unsupported and outdated three-page document that does not take the threat of climate change seriously.[2] In so doing, CEQ is creating additional legal risk for both federal agencies and project applicants. For all of these reasons, detailed below, we urge CEQ to abandon this Draft Guidance. In addition, we request that CEQ revise and readopt the previous "Final Guidance for Federal Departments and Agencies on Consideration of Greenhouse Gas Emissions and the Effects of Climate Change in National Environmental Policy Act Reviews" ("2016 Guidance") issued in 2016 and withdrawn in 2017.[3] If readopted, the 2016 Guidance should be updated consistent with current case law interpreting NEPA and strengthened to reflect the severe and pervasive threats from climate change.

## I.   THE CRITICAL IMPORTANCE OF ADDRESSING CLIMATE CHANGE

It is well accepted that human-caused or "anthropogenic" GHG emissions are driving climate change that endangers the public health and welfare.[4] Global GHG emissions reached an all-time high in 2018, underscoring the need for more immediate and stronger action to address climate change.[5] And global annual average temperatures have "increased by more than 1.2°F (0.65°C) for the period 1986-2016 relative to 1901-1960."[6] Moreover, recent international assessments of climate change and its impacts demonstrate the urgency and enormity of the situation. In October 2018, the leading international body of climate scientists—the Nobel-prize-winning Intergovernmental Panel on Climate Change ("IPCC")—issued a report finding that, absent substantial GHG reductions by 2030 and net zero emissions by 2050, warming above

---

[2] Because existing NEPA regulations do not specifically address GHG impacts analysis, CEQ's Draft Guidance represents the *only* guidance on GHG analysis from the NEPA expert administrative agency.

[3] 81 Fed. Reg. 51,866 (Aug. 5, 2016). A copy of the 2016 Guidance is attached as Exhibit 1 to this letter. CEQ withdrew the 2016 Guidance pursuant to Executive Order 13783 on April 5, 2017. *See* 82 Fed. Reg. 16,576 (April 5, 2017).

[4] Endangerment and Cause or Contribute Findings for Greenhouse Gases Under Section 202(a) of the Clean Air Act, 74 Fed. Reg. 66,496 (Dec. 15, 2009).

[5] Le Quéré, C. et al., *Global Carbon Budget 2018*, 10 EARTH SYST. SCI. DATA 2141 (2018), https://doi.org/10.5194/essd-10-2141-2018; Chelsea Harvey, *More CO₂ Released in 2018 Than Ever Before*, E&E NEWS (Dec. 6, 2018), https://www.eenews.net/climatewire/stories/1060108875.

[6] U.S. Global Change Research Program, *Climate Science Special Report: Fourth National Climate Assessment, Volume I & II* (2017) [Wuebbles, D.J., D.W. Fahey, K.A. Hibbard, D.J. Dokken, B.C. Stewart, and T.K. Maycock eds.], https://www.globalchange.gov/browse/reports/climate-science-special-report-fourth-national-climate-assessment-nca4-volume-i.

AR_0025900

1.5°C (2.7°F) from pre-industrial levels is likely and would have wide-ranging and devastating consequences.[7]

The federal government has also previously recognized the severe and growing threats posed by climate change. In 2017, thirteen federal agencies released the first volume of the Fourth National Climate Assessment ("Assessment"), concluding that "[c]hanges in the characteristics of extreme events are particularly important for human safety, infrastructure, agriculture, water quality and quantity, and natural ecosystems. Heavy rainfall is increasing in intensity and frequency across the United States and globally and is expected to continue to increase."[8] On November 23, 2018, the same group of thirteen federal agencies released the second volume of the Assessment, which thoroughly evaluates the harmful impacts of climate change that different regions of the country are experiencing and the projected risks climate change poses to our health, environment, economy, and national security.[9] The Assessment reflects the work of more than 300 governmental and non-governmental experts, was externally peer-reviewed by a committee of the National Academies of Sciences, Engineering and Medicine, and underwent several rounds of technical and policy review by the federal agencies of the U.S. Global Change Research Program.[10] The two volumes of the Assessment represent the federal government's most up-to-date and comprehensive analysis of climate science and the impacts of climate change on the United States.[11]

The second volume of the Assessment cautions that "[i]n the absence of significant global mitigation action and regional adaptation efforts, rising temperatures, sea level rise, and changes in extreme events are expected to increasingly disrupt and damage critical infrastructure and property, labor productivity, and the vitality of our communities."[12] Further, "[w]hile mitigation and adaptation efforts have expanded substantially in the last four years, they do not yet approach the scale considered necessary to avoid substantial damages to the economy, environment, and human health over the coming decades."[13] Documenting many of the record-setting phenomena we have recently seen, including fires, floods, other extreme weather, and sea level rise, the second volume emphasizes the increasing vulnerability of our built environment as these phenomena become the new normal or even more extreme.[14] Additional studies support these disturbing findings. For instance, a modeling analysis of 22 recent hurricanes by U.S.

---

[7] *See* IPCC Press Release, Summary for Policymakers of IPCC Special Report on Global Warming of 1.5° C Approved by Governments (Oct. 8, 2018), https://www.ipcc.ch/site/assets/uploads/2018/11/pr_181008_P48_spm_en.pdf; IPCC Special Report, Global Warming of 1.5° C (IPCC Special Report), https://www.ipcc.ch/sr15/.

[8] *Assessment, Volume I*, *supra* note 6, at 10.

[9] U.S. Global Change Research Program, *Impacts, Risks, and Adaptation in the United States: Fourth National Climate Assessment*, *Volume II* (D.R. Reidmiller et al. eds., 2018), https://nca2018.globalchange.gov/.

[10] *Id.* at iii, 2.

[11] *Id.* at 1; *see also* Global Change Research Act of 1990, Pub. L. No. 101-606, 15 U.S.C. §§ 2921-2961.

[12] *Assessment, Volume II*, supra note 9, at 25-32 (Summary Findings).

[13] *Id.* at 26.

[14] *See, e.g.*, *id.* at 444, 669-1,308 (documenting regional impacts of climate change).

3

government scientists concluded that future hurricanes will have stronger maximum winds, move slower, and drop more precipitation.[15]

The States are already facing these severe impacts of climate change.[16]  In California, climate change is responsible for successive record-breaking fire seasons resulting in unprecedented loss of life and billions of dollars in damages and economic harm.  The 2017 wildfire season killed dozens of people, destroyed thousands of homes, forced hundreds of thousands to evacuate, and burned more than half a million acres.[17]  In August 2018, before the devastating Camp Fire that killed more than 80 people, California released a report suggesting that large wildfires (greater than 25,000 acres) could become 50% more frequent by the end of the century if GHG emissions are not reduced.[18]  Climate change is expected to make longer and more severe wildfire seasons the new normal for California.[19]  Besides the immediate threats they pose to life and property, wildfires significantly impair both air quality (via smoke and ash that can hospitalize residents) and water quality (via the erosion of hillsides stripped of their vegetation).  California also weathered a historic five-year drought and a variety of other unprecedented phenomena increasingly harming the health and prosperity of Californians from all parts of the state.[20]  Drought conditions beginning in 2012 left reservoirs across the state at record low levels, often no more than a quarter of their capacity.  By 2015, the Sierra snowpack—critical to California's water supply, tourism industry, and hydroelectric power— was the smallest in at least 500 years.[21]  In the Central Valley, the drought cost California agriculture about $2.7 billion and more than 20,000 jobs in 2015 alone.[22]

With over six-hundred miles of coastline and 2.2 million people living in shoreline towns and communities, Connecticut's residents are extremely vulnerable to the impacts of climate events.  Connecticut has already experienced significant damage to natural resources, homes, and

---

[15] Gutmann et al., *Changes in Hurricanes from a 13-Yr. Convection-Permitting Pseudo-Global Warming Simulation,* 31 J. CLIMATE 3,643 (Jan. 24, 2018) (abstract), https://doi.org/10.1175/JCLI-D-17-0391.1.

[16] A detailed summary of state-specific climate change impacts is set forth in the Comments of Attorneys General of New York, et al. on Proposed Rule: Emission Guidelines for Greenhouse Gas Emissions from Existing Electric Utility Generating Units: Emission Guideline Implementing Regulations; New Source Review Program, Appendix A: Climate Change Impacts, Docket Id. No. EPA-HQ-OAR-2017-0355-24817 (Oct. 31, 2018), https://www.regulations.gov/document?D=EPA-HQ-OAR-2017-0355-24817.

[17] Lauren Tierney, *The Grim Scope of 2017's California Wildfire Season Is Now Clear. The Danger's Not Over.*, WASH. POST (Jan. 4, 2018), https://www.washingtonpost.com/graphics/2017/national/california-wildfires-comparison/.

[18] Bedsworth, L. et al., *2018 Statewide Summary Report, California's Fourth Climate Change Assessment* at 9 (2018), www.climateassessment.ca.gov.

[19] California Department of Forestry and Fire Protection, *California's Forests and Rangelands: 2010 Assessment*, Ch. 3-7 (2010), https://frap.fire.ca.gov/media/3179/assessment2010.pdf.

[20] *See generally* California Air Resources Board, *California's 2017 Climate Change Scoping Plan Update: The Strategy for Achieving California's 2030 Greenhouse Gas Target*, (Nov. 2017), https://ww3.arb.ca.gov/cc/scopingplan/scoping_plan_2017.pdf.

[21] *See* NOAA, National Centers for Environmental Information, *Multi-Century Evaluation of Sierra Nevada Snowpack*, https://www.ncdc.noaa.gov/news/multi-century-evaluation-sierra-nevada-snowpack.

[22] California's 2017 Climate Change Scoping Plan Update, *supra* note 20, at 7.

4

infrastructure from more frequent and more intense storms, which is consistent with scientists' predictions of new weather patterns attributable to climate change.[23]  For example, in Connecticut alone, Hurricane Irene (2011) caused power outages affecting 754,000 citizens, and Superstorm Sandy (2012) forced a shutdown of Connecticut's transportation system, causing power outages to 600,000 people and inflicting almost $2 billion in statewide damages.[24]  Superstorm Sandy forced evacuations of thousands of Connecticut residents, damaged roads and infrastructure, and took nine days for the affected utilities to restore power.[25]

As one of the most low-lying states in the nation, Delaware is particularly at risk from the harms of climate change, including sea level rise.  For example, a 2012 Delaware Sea Level Rise Vulnerability Assessment found that sea level rise of only 0.5 meters would inundate 8% of the state's land area.[26]  Areas inundated would include "transportation and port infrastructure, historic fishing villages, resort towns, agricultural fields, wastewater treatment facilities and vast stretches of wetlands and wildlife habitat of hemispheric importance."[27]  The Assessment concluded that "every Delawarean is likely to be affected by sea level rise whether through increased costs of maintaining public infrastructure, decreased tax base, loss of recreational opportunities and wildlife habitat, or loss of community character."[28]

As a densely populated area located at the confluence of two tidal rivers, the District of Columbia is particularly vulnerable to the effects of climate change including dangerous heat waves, flooding caused by rising tides and heavy rains, and severe weather.  Nuisance flooding in riverfront areas has already increased by more than 300% according to the National Oceanic and Atmospheric Administration.[29]  The U.S. Army Corps of Engineers conservatively predicts up to 3.4 feet of additional sea level rise in the District by 2080.[30]  Heat emergencies are also projected to increase from 30 days per year (historic average) to 30-45 days by the 2050s, and to 40-75 days by the 2080s.[31]

---

[23] *Building a Low Carbon Future for Connecticut: Recommendations from the Governor's Council on Climate Change* (Dec. 18, 2018), https://www.ct.gov/deep/lib/deep/climatechange/publications/building_a_low_carbon_future_for_ct_gc3_recommendations.pdf.

[24] NOAA, National Centers for Environmental Information, *U.S. Billion-Dollar Weather and Climate Disasters: Overview*, https://www.ncdc.noaa.gov/billions/.

[25] John Burgeson, *Rising Above the Tide: 5 Years Since Sandy*, CTPOST, Oct. 28, 2017, https://www.ctpost.com/local/article/Rising-above-the-tide-5-years-since-Sandy-12313727.php.

[26] Delaware Department of Natural Resources and Environmental Control, *Preparing for Tomorrow's High Tide: Sea Level Rise Vulnerability Assessment for the State of Delaware* at ix (July 2012), http://www.dnrec.delaware.gov/coastal/Documents/SeaLevelRise/AssesmentForWeb.pdf.

[27] *Id.*

[28] *Id.*

[29] *Climate Ready DC, The District of Columbia's Plan to Adapt to a Changing Climate* at A3, https://doee.dc.gov/sites/default/files/dc/sites/ddoe/service_content/attachments/CRDC-Report-FINAL-Web.pdf.

[30] *Id.*

[31] *Id.* at A2.

5

In addition to threatening the lives of Illinois citizens, climate change is fundamentally altering the state's farming industry and greatest environmental asset, Lake Michigan. The farming sector is particularly vulnerable. In spring 2019, record flooding delayed crop planting across the state, causing the U.S. Department of Agriculture to declare an agricultural disaster for the entire state.[32] Climate disruption also contributes to whipsawing water levels on Lake Michigan. In January 2013, the Lake Michigan's water level fell to an all-time low. In 2015, the water level then climbed to its highest level since 1998.[33] These rapid changes harm commercial shipping, recreational boaters, wildlife, and beach-goers.

By 2100, Massachusetts is projected to experience between 4.0 and 7.6 feet of sea level rise relative to mean sea level from the year 2000, with up to 10.2 feet of sea level rise possible under a high emissions scenario.[34] Warmer temperatures, extended heat waves, increased frequency and extent of flooding, changing precipitation, and increasingly severe weather events are already significantly impacting public health, the environment, and agriculture in Massachusetts, causing significant property damage, and straining key infrastructure including transportation networks, wastewater treatment systems, drinking water sources, and energy infrastructure.[35]

New York is experiencing dramatic increases in the frequency and intensity of extreme rain storms.[36] For example, devastating rainfall from Hurricane Irene in 2011 dropped more than 11 inches of rain in just 24 hours, causing catastrophic flooding, power outages, displacement and loss of life, and estimated damage totaling $1.3 billion. New York's rate of sea level rise is much higher than the national average and could account for up to six feet of additional rise by 2100 if GHG emissions are not abated. Storm surge on top of high tide on top of sea level rise is a recipe for disaster for coastal New York. For example, the approximately 12 inches of sea level rise New York City has experienced since 1900 may have expanded Hurricane Sandy's flood area in 2012 by about 25 square miles, flooding the homes of an additional 80,000 people

---

[32] U.S. Dept. of Agriculture, *USDA Designates 102 Illinois Counties as Primary Natural Disaster Areas* (Aug. 14, 2019), https://www.fsa.usda.gov/news-room/emergency-designations/2019/ed_2019_0814_rel_0074.

[33] Tony Briscoe, *Lake Michigan Water Levels Rising at Near Record Rate*, Chicago Tribune (July 12, 2015), *available at* http://www.chicagotribune.com/news/local/breaking/ct-lake-michigan-water-levels-met-20150710-story.html.

[34] Northeast Climate Science Center, University of Massachusetts, *Massachusetts Climate Change Projections* (Mar. 2018), https://necsc.umass.edu/projects/massachusetts-climate-change-projections.

[35] *See, e.g.*, *id.* at 4-6; Massachusetts Dep't of Public Health, CAPACITY TO ADDRESS THE HEALTH IMPACTS OF CLIMATE CHANGE IN MASSACHUSETTS, 6 (Apr. 2014), *available at* http://www.mass.gov/eohhs/docs/dph/environmental/exposure/climate-change-report-2014.pdf; Runkle et al., *NOAA National Centers for Environmental Information, State Summaries 149-MA, Massachusetts*, 4 (2017), *available at* https://statesummaries.ncics.org/downloads/MA-screen-hi.pdf.

[36] *Current & Future Trends in Extreme Rainfall Across New York State, A Report from the Environmental Protection Bureau of New York State Attorney General Eric T. Schneiderman* (Sept. 2014), https://ag.ny.gov/pdfs/Extreme_Precipitation_Report%209%202%2014.pdf (based on data from the 2014 National Climate Assessment and the National Oceanographic and Atmospheric Administration's Northeast Regional Climate Center).

AR_0025904

in the New York City area alone.[37]  Air pollution in New York may also be worsening due to climate change.  According to the Third National Assessment on Climate Change, a scenario in which greenhouse gases continue to increase would lead to higher ground-level ozone concentrations in the New York metropolitan region, driving up the number of ozone-related emergency room visits for asthma in the area by 7.3%—more than 50 additional ozone-related emergency room visits per year in the 2020s, compared to the 1990s.[38]  The New York City metropolitan area experienced elevated ozone pollution levels in the years 2015-2017, a period that included the hottest years on record.[39]

In Pennsylvania, temperatures have already increased 1.8°F in the last century, and are projected to rise an additional 5.4°F by 2050.  Pennsylvania has seen a related rise in precipitation, causing increased flooding and landslides that cost the Commonwealth an additional $125.7 million for infrastructure replacement in 2018 alone. Climate change is also worsening air quality, damaging crops, and increasing the prevalence of invasive species and insect-transmitted diseases.[40]

Climate change will significantly adversely affect Washington's public health and its coasts, mountains, and forests.  The warming climate already is increasing ocean acidification,[41] decreasing Washington's snowpack,[42] and threatening Washington's forests and timber industry.[43]  With respect to public health, more frequent heat waves and more frequent and intense flooding may harm human health directly and may also exacerbate health risks from poor air quality and allergens.[44]  In addition, Washington is also experiencing decreasing winter mountain snowpack, and by the 2080s, snow pack is expected to decline 56-70%, impacting water availability for drinking, irrigation, hydropower, and salmon.[45]

For these reasons, the States are particularly concerned that federal agencies thoroughly consider GHG emissions and the consequences of climate change in their NEPA review and take

---

[37] Horton, et al., *New York City Panel on Climate Change 2015 Report, Chapter 2: Sea Level Rise and Coastal Storms*, 1336 ANN. N.Y. ACAD. SCI. 36 (2015), http://onlinelibrary.wiley.com/doi/10.1111/nyas.12593/full.

[38] U.S. National Climate Assessment, *Climate Change Impacts in the United States,* (2014) at 222 (citing P. E. Sheffield, et al., *Modeling of Regional Climate Change Effects on Ground Level Ozone and Childhood Asthma*, 41 AM. J. PREVENTIVE MEDICINE 251 (2011), http://download.journals.elsevierhealth.com/pdfs/journals/0749-3797/PIIS0749379711003461.pdf)

[39] Am. Lung Ass'n, *State of the Air 2019*, at 5-6, 21, 37, 127-128 (2019), https://www.lung.org/assets/documents/healthy-air/state-of-the-air/sota-2019-full.pdf.

[40] PENN. DEP'T OF ENVTL. PROTECTION, *Climate Change in PA*, https://www.depgis.state.pa.us/ClimateChange/index.html (last visited Aug. 22, 2019).

[41] Climate Impacts Group, University of Washington, *State of Knowledge Report, Climate Change Impacts and Adaptation in Washington State: Technical Summaries for Decision Makers*, at ES-1 (Dec. 2013), (hereinafter "State of Knowledge Report"), https://cig.uw.edu/resources/special-reports/wa-sok/.

[42] *Id.*

[43] *Id.* at ES-4.

[44] *Id*. at ES-4, ES-5.

[45] *Id.* at ES-4, 6-1, 6-6, 6-11, 6-12.

7

a hard look at the full environmental impacts, including climate-related impacts, of any proposed actions.

## II.    NEPA AND THE COUNCIL ON ENVIRONMENTAL QUALITY

Congress enacted NEPA in 1969 to establish a national policy for the environment and to create and maintain conditions under which man and nature can exist in productive harmony and fulfill the social, economic, and other requirements of present and future generations of Americans.[46]  NEPA is "our basic national charter for protection of the environment."[47]  NEPA's goals are to ensure agencies consider environmental consequences of their proposed actions and "inform the public about their decision-making process."[48]  Nearly every major federal action requires compliance with NEPA, which also requires consultation with other federal agencies possessing expertise on particular resources impacted by a project, with the aim to help develop more robust alternatives.

NEPA established CEQ within the Executive Office of the President to ensure that federal agencies meet their obligations under NEPA.[49]  CEQ reviews and approves federal agency NEPA procedures, approves alternative arrangements for compliance with NEPA in emergencies, and helps to resolve disputes between federal agencies and other governmental entities and members of the public.[50]  CEQ oversees NEPA implementation across the nation, principally through issuing regulations and guidance to implement NEPA's procedural requirements and provide direction to both federal agencies and private project proponents.

Over the past forty years, CEQ's regulations and guidance have shaped NEPA's implementation and have become integral to the daily functioning and responsible decision-making of numerous federal and state agencies.  CEQ's guidance also helps provide legal certainty to both federal agencies and private project applicants.  And circuit courts reviewing challenges to NEPA compliance often rely on CEQ's guidance documents as "persuasive authority offering interpretive guidance regarding the meaning of NEPA and the implementing regulations."[51]  Rather than implement or properly interpret the law, however, CEQ's Draft Guidance undermines NEPA's letter and spirit, sows confusion about consideration of climate change impacts under NEPA, increases uncertainty, and creates new legal risks for projects subject to NEPA.

---

[46] 42 U.S.C. § 4321.
[47] 40 C.F.R. § 1500.1 (2018).
[48] Draft Guidance, *supra* note 1, at 30,097.
[49] 42 U.S.C. § 4321.
[50] *See* https://ceq.doe.gov/index.html (last visited August 22, 2019).
[51] *See, e.g., Wyoming v. U.S. Dep't of Ag.*, 661 F.3d 1209, 1260 n.36 (10th Cir. 2011); *New Mexico ex rel. Richardson v. Bureau of Land Mgmt.*, 565 F.3d 683, 705 n.25 (10th Cir. 2009); *American Rivers v. F.E.R.C.*, 201 F.3d 1186, 1200-01 & n.21 (9th Cir. 1999).

8

## III.    CEQ Unlawfully and Arbitrarily Ignores the Effects of Climate Change in the Draft Guidance

CEQ's 2016 Guidance offered clarity and consistency in how federal agencies should address climate change—including how climate change may alter an action's environmental effects—in the environmental impact assessment process.  Central to the prior guidance was the goal of identifying important interactions between climate change and environmental impacts from a proposed action.  The 2016 Guidance appropriately focused on the environmental risks associated with climate change, recognizing the critical importance of climate change as a "fundamental environmental issue" whose effects "fall squarely within NEPA's purview."[52]  It also detailed the science on climate change, citing multiple international and federal government studies documenting the impacts of climate change.[53]  CEQ also emphasized the need to consider climate change and the evolving body of scientific information available to understand and identify a project's affected environment.[54]

The Draft Guidance unlawfully and arbitrarily ignores a growing body of scientific literature regarding climate change.  Notably absent from the three-page Draft Guidance is any discussion of climate change and its effects.  Proper assessment of the effects of GHG emissions requires a recognition—wholly absent in the Draft Guidance—that climate change presents an extremely challenging threat that must be addressed in NEPA analyses.  Instead, the Draft Guidance offers only a cursory overview of the assessment of a project's GHG emissions.  And despite its nominal focus on GHG emissions, the Draft Guidance only refers to climate effects in stating that GHG emissions "may be used as a proxy for assessing potential climate effects" and that an agency may qualitatively discuss the effects of GHG emissions based on literature.[55] These passing references do little to underscore the significance of GHG emissions in the context of climate change or to acknowledge the severe impacts that our States and cities are already facing today.

The Draft Guidance's disregard for climate change is the latest in a series of the Trump Administration's efforts to arbitrarily minimize or disregard the overwhelming scientific consensus that immediate and continual progress toward a near-zero GHG-emission economy by mid-century is necessary to avoid truly catastrophic climate change impacts.[56]  Indeed, CEQ's

---

[52] 2016 Guidance, *supra* note 3, at 2.

[53] *Id.* at 6-8.

[54] *Id.* at 21.

[55] Draft Guidance, *supra* note 1, at 30,098.

[56] *See* Intergovernmental Panel on Climate Change (IPCC), *Summary for Policymakers of IPCC Special Report on Global Warming of 1.5 C* at 15 (2018).  Multiple federal actions reflect the Trump administration's repeated disregard for the need to reduce GHG emissions, including, among others: the Affordable Clean Energy Rule, 84 Fed. Reg. 32,520 (July 8, 2019) (rolling back Clean Power Plan emissions controls on existing power plants); the Safer Affordable Fuel-Efficient (SAFE) Vehicles Proposed Rule for Model Years 2021-2026 Passenger Cars and Light Trucks, 83 Fed. Reg. 42,986 (Aug. 24, 2018); and *State of California v. EPA*, No. 4:18-03237-HSG (N.D. Cal. May 31, 2018) (challenging EPA's refusal to implement landfill methane emission regulations).

AR_0025907

refusal to address climate impacts in the Draft Guidance is all the more troubling in light of the federal government's *own* conclusions, detailed above, that climate change resulting from GHG emissions is already having a serious impact on communities throughout the country and that immediate action is necessary to avoid the most severe long-term consequences.[57] In the face of these severe and well-documented climate change impacts, CEQ's guidance should *highlight* rather than minimize the critical importance of addressing climate change and its impacts in NEPA analyses. The Draft Guidance unlawfully and arbitrarily ignores these impacts and encourages agencies to minimize the treatment of GHG emissions and climate effects during NEPA review of federal projects.

## IV.   CEQ's DRAFT GUIDANCE SUBVERTS THE PURPOSE AND REQUIREMENTS OF NEPA

CEQ's Draft Guidance undermines NEPA's purpose to promote informed decision-making by disregarding the most pressing environmental challenge of our time: climate change.[58] As the Supreme Court long ago emphasized, and as the Draft Guidance itself acknowledges, NEPA requires agencies to take a "hard look" at all environmental consequences—whether direct or indirect—of any proposed action on the environment.[59] And that "hard look" requirement obligates agencies to carefully consider every significant environmental impact of a project,[60] which must necessarily include examining a project's contribution to climate change through its GHG emissions.[61] NEPA's regulations, too, expressly require consideration of indirect effects on air, water, and other natural systems, like those resulting from climate change.[62] Inherent in NEPA and its implementing regulations is a "rule of

---

[57] *Assessment, Volume I, supra* note 6, at 16 ("[B]ased on extensive evidence, … it is extremely likely that human activities, especially emissions of GHGs, are the dominant cause of the observed warming since the mid-20th century[.]"); *see also* Assessment, Volume II, *supra* note 9 at 1453; Daniel R. Coats, *Statement for the Record: Worldwide Threat Assessment of the U.S. Intelligence Community* at 23 (Jan. 29, 2019), https://www.hsdl.org/?view&did=820727, ("Global environmental and ecological degradation, as well as climate change, are likely to fuel competition for resources, economic distress, and social discontent through 2019 and beyond. Climate hazards such as extreme weather, higher temperatures, droughts, floods, wildfires, storms, sea level rise, soil degradation, and acidifying oceans are intensifying, threatening infrastructure, health, and water and food security. Irreversible damage to ecosystems and habitats will undermine the economic benefits they provide, worsened by air, soil, water, and marine pollution.").

[58] *See Assessment, Volume II, supra* note 9, at 26, 73, 1347 (reaffirming that climate change is human-caused, that continued growth in emissions will produce economic losses across all sectors, and that mitigation measures do not "yet approach the scale considered necessary to avoid substantial damages to the economy, environment and human health over the coming decades").

[59] *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332 (1989); Draft Guidance, *supra* note 1, at 30,097.

[60] *See Baltimore Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*, 462 U.S. 87, 97 (1983) ("NEPA…places upon an agency the obligation to consider every significant aspect of the environmental impact of a proposed action.") (internal quotation marks and citations omitted).

[61] *See, e.g., WildEarth Guardians v. Jewell,* 738 F.3d 298, 301 (D.C. Cir. 2013) (holding that agency took the requisite hard look at the effect of its decision to authorize the lease of public lands for coal mining operations on global climate change).

[62] *See* 40 C.F.R. § 1508.8.

AR_0025908

reason," which ensures that agencies determine whether and how to prepare an Environmental Impact Statement ("EIS") based on the usefulness to the decision-making process of any new potential information regarding such impacts.[63]

While NEPA does not mandate substantive outcomes, the requirement that federal agencies consider and publicly disclose the environmental consequences of a proposed action, including actions that contribute to climate change, has practical significance.[64]  Although NEPA does not necessarily mandate that federal agencies reduce GHG emissions related to a proposed action, a full evaluation of a proposed action's GHG emissions and/or climate change impacts under NEPA affects agency activity by increasing awareness and allowing meaningful evaluation of alternative courses of action.  And disclosure of GHG impacts provides states and the public with useful information that increases their ability to lobby agencies and Congress to move toward greener and sustainable options in federal actions.

The Draft Guidance moves in the wrong direction, muddying the waters on the analysis of climate change impacts under NEPA and creating new legal risks for actions subject to NEPA. As discussed in more detail below, the Draft Guidance conflicts with NEPA's "hard look" mandate by: (1) failing to clarify how agencies analyze indirect climate change effects under NEPA; (2) improperly instructing agencies on cumulative impacts analysis; (3) encouraging agencies to forgo quantifying climate change impacts even though complex analysis and modeling of GHG impacts have been routinely performed by federal agencies since at least 2010; (4) discouraging a proper cost-benefit analysis; and (5) improperly indicating that evaluation of mitigation of GHG impacts is not required.  In short, rather than informing agencies how to meaningfully analyze a project's GHG emissions and climate change impacts,[65] the Draft Guidance encourages agencies *not* to analyze a project's likely climate change impacts and to avoid taking a "hard look" at climate-related impacts, in conflict with NEPA.  As noted below,[66] a growing body of case law demonstrates that, for many projects, CEQ's instructions in the Draft Guidance on how to address climate change impacts under NEPA encourage agencies to disregard relevant environmental information and are thus contrary to the law and arbitrary and capricious.[67]

---

[63] *Dep't of Transp. v. Public Citizen*, 541 U.S. 752, 754 (2004).

[64] 40 C.F.R. §§ 1501.5, 1501.6, 1500.5, 1508.7 (2019); *see Robertson*, 490 U.S. at 333 ("NEPA itself does not impose substantive duties mandating particular results, but simply prescribes the necessary process for preventing uninformed—rather than unwise—agency action").

[65] *Compare* 2016 Guidance, *supra* note 3, at 20-27.

[66] *See, e.g.*, *WildEarth Guardians v. Zinke*, 368 F. Supp. 3d 41, 68-71 (D.D.C. 2019); *Ctr. for Biological Diversity v. Nat'l Highway Transportation Safety Admin.*, 538 F.3d 1172, 1198-1203 (9th Cir. 2008); *see also Mid States Coal. for Progress v. Surface Transp. Bd.*, 345 F.3d 520, 532, 549-50 (8th Cir. 2003) (agencies must assess proposed action's indirect effect on climate change when nature of effect is reasonably foreseeable, even if extent of that effect is not).

[67] *See Motor Vehicle Mfrs. Ass'n of the United States v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) ("under the 'arbitrary and capricious' standard ... the agency must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made'").

11

AR_0025909

## A.    CEQ's Draft Guidance Does Not Clarify to What Extent Agencies Must Consider Indirect GHG Emissions

CEQ's disregard for indirect GHG emissions conflicts with NEPA, its regulations, and case law.  As noted above, an agency conducting review under NEPA must consider the project's direct and indirect environmental effects.[68]  Indirect effects are "caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable."[69]  Federal courts have held that upstream and downstream GHG emissions are an indirect effect of agencies authorizing projects such as pipelines and mining.[70]  Where an agency could deny a project on the ground that it would be too harmful to the environment, the agency is the "legally relevant cause" of both the direct and indirect effects of that project.[71]  Thus, federal agencies are required to analyze indirect GHG emissions under NEPA.[72]

The Draft Guidance, however, fails to clarify the extent to which agencies should consider GHG emissions from major federal actions.  Instead, it employs broad language and general terms to significantly reduce the scope of environmental impacts that agencies should analyze under NEPA.  Purporting to rely on the "rule of reason," the Draft Guidance suggests that agencies "should analyze reasonably foreseeable environmental consequences of major federal actions, but should not consider those that are remote or speculative."[73]  However, climate change harms are already occurring.  Although there may be uncertainties in terms of additional types of harms and the magnitude of impacts, CEQ seems to ignore the very predicate that harms are happening now.  And, rather than employ any "rule of reason," the Draft Guidance attempts to limit agencies' consideration of GHG emissions by not specifying the meaning of the terms or the analysis necessary for an agency to support such a determination.

Litigation challenging NEPA review by the Federal Energy Regulatory Commission ("FERC") provides a useful example of the proper analysis of GHG emissions as indirect effects under NEPA.  FERC, in particular, has struggled in its approach to analysis of climate effects of pipeline decisions under NEPA and the Natural Gas Act.[74]  Historically, FERC contended that

---

[68] 40 C.F.R. § 1502.16.

[69] 40 C.F.R. § 1508.8(b).

[70] *See, e.g.*, *Sierra Club*, 867 F.3d at 1374 ("greenhouse-gas emissions are an indirect effect of authorizing this [pipeline] project, which FERC could reasonably foresee"); *San Juan Citizens Alliance v. U.S. Bureau of Land Mgmt.*, 326 F. Supp. 3d at 1244 (finding that combustion emissions were indirect effect of agency's decision to extract those natural resources); *Montana Envtl. Info. Ctr. v. U.S. Office of Surface Mining*, No. CV 15-106-M-DWM, 2017 WL 5047901, *3 (stating that "effects of the estimated 23.16 million metric tons of greenhouse gas emissions the Mining Plan EA concluded would result from combustion of the coal that would be extracted from the Mine" are indirect effects from coal trains).

[71] *Sierra Club*, 867 F.3d at 1373.

[72] *Id.*

[73] Draft Guidance, *supra* note 1, at 30,098.

[74] In April 2018, FERC issued a Notice of Inquiry (NOI) aimed at reevaluating its previous approach to balancing the competing interests involved in pipeline projects, to which it invited comments (Certification of New Interstate Natural Gas Facilities Notice of Inquiry, 163 FERC ¶ 61,042 (2018)); *see also* Rich Glick & Matthew Christiansen, *FERC and Climate Change*, 40 ENERGY L. J. 1, 43 (2019)

12

upstream and downstream GHG emissions are not "reasonably foreseeable."[75]  Based on this reasoning, FERC has taken the position that it need not analyze such emissions pursuant to NEPA, or factor them into its public convenience and necessity determinations under the Natural Gas Act.[76]  The court in *Sierra Club v. FERC* disagreed, holding that under NEPA, FERC must consider GHG emissions as indirect effects of a project.[77]  CEQ should provide clarity on the process of evaluating GHG emissions by instructing agencies to consider upstream and downstream GHG emissions as indirect effects of a project, as *Sierra Club* requires.  Instead, the Draft Guidance directs agencies such as FERC to follow an approach inconsistent with NEPA and case law.

NEPA, CEQ's implementing regulations, and federal court decisions thus make clear that agencies cannot shirk their NEPA obligations by simply claiming that GHG emissions are too speculative.[78]  Any NEPA reviews conducted pursuant to the Draft Guidance—and thus in conflict with decisions such as *Sierra Club v. FERC*—will be unlawful and subject to increased litigation.  By failing to describe the factors triggering rigorous analysis of GHG impacts, the Draft Guidance fails to reduce uncertainty, invites speculation, and *reduces* clarity for agencies in assessing GHG emissions.  Rather than making agencies' NEPA reviews less robust and more vulnerable to challenge, CEQ should provide agencies with more meaningful guidance on how to analyze indirect GHG emissions.

---

(recommending that FERC should "meaningfully engage the issue and develop a framework for fully considering climate change in the section 7 process").

[75] *See, e.g.*, New Market Project Rehearing Order, 163 FERC ¶ 61,128 at P 34.

[76] *Id.* at P 43 ("We are not aware of any basis that indicates the Commission is required to consider environmental effects that are outside of our NEPA analysis of the proposed action in our determination of whether a project is in the public convenience and necessity under section 7(c).").

[77] *Sierra Club*, 867 F.3d at 1373-75.

[78] *See, e.g.*, *id*. at 1374 (holding that agency had not provided a satisfactory explanation for why quantification of indirect GHG emissions was not feasible and stating, "we understand that emission estimates would be largely influenced by assumptions rather than direct parameters about the project, but some educated assumptions are inevitable in the NEPA process" (internal quotation marks and citations omitted)); *San Juan Citizens Alliance*, 326 F. Supp.3d at 1241-44 (holding that BLM's failure to quantify and analyze the impacts of downstream GHG emissions was arbitrary, despite the agency's finding that impacts were "not feasible to predict with certainty"); *see Allegheny Defense Project v. FERC*, No. 17-1098, ___F.3d ___, 2019 WL 3518835 at *8, (D.C. Cir. Aug. 2, 2019) (holding "NEPA required the Commission to consider both the direct and indirect environmental effects of the Project, and that, despite what the Commission argues, the downstream greenhouse-gas emissions are just such an indirect effect," (citing *Sierra Club v. FERC* and 40 C.F.R. § 1502.16(b))); *see generally Scientists' Inst. For Pub. Info, Inc. v. U.S. Atomic Energy Comm'n*, 481 F.2d 1079, 1092 (D.C. Cir. 1973) ("Reasonable forecasting and speculation is thus implicit in NEPA, and we must reject any attempt by agencies to shirk their responsibilities under NEPA by labeling any and all discussion of future environmental effects as 'crystal ball inquiry.'").

AR_0025911

B.    **Vague and Undefined Terms in the Draft Guidance Add Legal Risk and Encourage Agencies to Unlawfully Avoid Quantification of GHG Emissions**

The Draft Guidance contains numerous ambiguous terms that, in effect, would encourage agencies to unlawfully cast aside their obligations under NEPA.  In particular, the Draft Guidance directs agencies to "attempt to quantify a proposed action's projected direct and reasonably foreseeable indirect GHG emissions when the amount of those emissions is *substantial* enough to warrant quantification, and when it is *practicable* to quantify them using available data and GHG quantification tools."[79]  But the Draft Guidance fails to explain what constitutes "substantial" emissions or what factors determine whether quantification would be "practicable."  CEQ's decision to add these ambiguous terms to the Draft Guidance conflicts directly with the more straightforward language of the 2016 Guidance, which directed agencies to "quantify…direct and indirect GHG emissions, taking into account available data and GHG quantification tools."[80]  The Draft Guidance provides agencies leeway to create their own technical definitions and, in some cases, to avoid analyzing a project's climate change impacts altogether.  What is more, if different agencies adopt their own interpretations of the terms set forth in the Draft Guidance, it is likely that major inconsistencies will arise in the processes by which different agencies assess GHG impacts under NEPA.

The Draft Guidance also states that agencies "are not required to quantify effects where information necessary . . . is unavailable, not of high quality, or the complexity of identifying emissions would make quantification overly-speculative."[81]  Here, too, the Draft Guidance fails to clarify what these terms mean or how they should be implemented, and the provision conflicts with both section 1502.22(b) of the NEPA implementing regulations regarding "Incomplete and Unavailable Information" and federal court decisions examining the scope of NEPA review.[82]  Specifically, section 1502.22(b) provides that where "the information relevant to reasonably foreseeable significant adverse impacts cannot be obtained because . . . the means to obtain it are not known," the agency must still include in its EIS, among other items, "a summary of existing credible scientific evidence which is relevant to evaluating the reasonably foreseeable significant adverse impacts on the human environment" and "the agency's evaluation of such impacts based upon theoretical approaches or research methods generally accepted in the scientific community."[83]  Similarly, although agencies need not have "perfect foresight when considering indirect effects,"[84] courts have rejected agency attempts to ignore an important aspect of a

---

[79] Draft Guidance, *supra* note 1, at 30,098 (emphases added).

[80] 2016 Guidance, *supra* note 3, at 4.

[81] Draft Guidance, *supra* note 1, at 30,098.

[82] 40 C.F.R. § 1502.22(b).

[83] *See id.*

[84] *See WildEarth Guardians v. United States Office of Surface Mining, Reclamation & Enf't*, 104 F. Supp. 3d 1208, 1230 (D. Colo. 2015), *order vacated as moot, appeal dismissed*, 652 F. App'x 717 (10th Cir. 2016).

14

AR_0025912