1  coordinated review under NEPA and the Massachusetts Environmental Policy Act (MEPA),

2  Mass. Gen. Laws, ch. 30, §§ 61–62I, the National Park Service adopted an alternative plan for

3  the Herring River Restoration on Cape Cod that will restore at least 346 acres of tidal marsh,

4  protect fish species harmed by existing impeded and degraded river conditions, and improve

5  fishing and shellfishing yields, among other significant benefits to the community and the

6  environment.  The pending coordinated NEPA and MEPA process for the I-90 Allston

7  highway project also has helped to convene a wide range of state and federal agencies and

8  stakeholder groups to explore and assess alternatives that minimize impacts to important

9  natural resources in and along the Charles River.

10  112.  Massachusetts state agencies also review federal agency actions subject to

11  NEPA, including permits, that affect Massachusetts's natural resources for consistency and

12  compliance with Massachusetts laws and policies.  *See, e.g.*, 301 Mass. Code Regs. § 20.04

13  (procedures for consistency determinations under Federal Coastal Zone Management Act,

14  16 U.S.C. § 1456).

15  113.  Plaintiff COMMONWEALTH OF PENNSYLVANIA brings this action by and

16  through Attorney General Josh Shapiro.  The Attorney General is the chief law officer of the

17  Commonwealth of Pennsylvania and has authority to represent the Commonwealth and all

18  Commonwealth agencies in any civil action brought by the Commonwealth. Pa. Const. art. IV,

19  § 4; *Cmwlth. Attorneys Act,* 71 P.S. § 732-204(c).  The Commonwealth brings this action on its

20  own behalf.

21  114.  This action is brought pursuant to the Commonwealth's sovereign interests and

22  its trustee obligations to protect Pennsylvania's public natural resources from degradation.  The

23  Commonwealth of Pennsylvania has a sovereign interest in its public natural resources, which

24  are the common property of all the people, including generations yet to come.  Pa. Const. art. I,

25  § 27. The Pennsylvania Constitution protects every Pennsylvanian's "right to clean air, pure

26  water, and to the preservation of the natural, scenic, historic and esthetic values of the

AR_0026034

1   environment." *Id.*, § 27.  The Commonwealth, as trustee, must conserve and maintain public

2   natural resources for the benefit of all the people.  *Robinson Twp. v. Pennsylvania*, 83 A.3d

3   901, 955–956 (Pa. 2013).

4         115.    Pennsylvania's public natural resources include 83,184 miles of streams and

5   rivers in the Ohio, Genesee, Potomac, Susquehanna, Lake Erie and Delaware River

6   watersheds, more than 4,000 lakes, reservoirs and ponds, 120 miles of coastal waters in the

7   Lake Erie and Delaware Estuary coastal zones and abundant groundwater resources.

8   Pennsylvania's state forest system comprises 2.2 million acres of forestland in forty-eight of

9   Pennsylvania's sixty-seven counties.  Pennsylvania has nineteen federally listed and protected

10   endangered or threatened species are known to occur in Pennsylvania, including the

11   endangered rusty patched bumble bee (*Bombus affinis*) and Piping plover (*Charadrius*

12   *melodus*) and the threatened northern long-eared bat (*Myotis septentrionalis*).

13         116.    Federal actions and activities that propose impacts to the Commonwealth's

14   public natural resources are subject to NEPA.  Commonwealth agencies review these actions to

15   ensure the Commonwealth's public natural resources are protected.  Pennsylvania agencies,

16   including without limit the Department of Environmental Protection, the Department of

17   Conservation and Natural Resources, and the Department of Transportation, engage in the

18   federal NEPA process.  Pennsylvania is home to large-scale pipeline projects subject to NEPA.

19   Commonwealth agencies closely review and comment on these NEPA analyses and utilize

20   these analyses to support state decision making.  Also, Pennsylvania is home to several federal

21   military installations, including those located at the Harrisburg International Airport, the U.S.

22   Army War College and Carlisle Barracks Army Base, New Cumberland Army Depot,

23   Letterkenny Army Depot, the Mechanicsburg Naval Depot, and the Willow Grove Naval Air

24   Station Joint Reserve Base.  Commonwealth agencies review the actions at these facilities to

25   ensure the Commonwealth's public natural resources are protected.

26

First Amended Compl. for Declaratory and
Inj. Relief             40
Case No. 3:20-cv-06057

AR_0026035

117. Plaintiff TERRITORY OF GUAM brings this action by and through Attorney General Leevin Taitano Camacho. The Attorney General is the chief legal officer of the Government of Guam. 48 U.S.C. § 1421g(d)(1). This challenge is brought pursuant to the Attorney General's statutory and common law authority to bring an action on behalf of Guam. 5 GCA § 30103.

118. Guam has a sovereign interest in its natural resources, which run two hundred nautical miles seaward from its low-water line. Guam is the sovereign and proprietary owner of all surface water and ground water within its territory, which it holds in trust for the people of Guam, 12 GCA § 14505, and has a statutory responsibility to conserve, enhance, and properly utilize its natural resources. 5 GCA § 63502.

119. Guam is home to numerous listed threatened and endangered species and their designated critical habitats. These species and habitats include the Mariana Fruit Bat (*Pteropus mariannus*), Hayun Lagu (*Serianthes nelsonii*), the largest native tree in the Mariana Islands, and the Guam Rail or the Ko'ko' bird (*Gallirallus owstoni*), which is native to Guam and found nowhere else in the world.

120. The United States Department of Defense has over fifty military installations in Guam and controls over twenty-five percent of the island. Federal agencies, including the United States Army, Air Force, Navy, Marine Corps, and the Coast Guard, routinely engage in military exercises in Guam. These exercises, along with other major Federal actions concerning Guam's land, water, and air, are subject to NEPA.

121. Over the last decade, there have been several federal actions proposed primarily by the Department of Defense in the Marianas, which have had significant environmental impacts on Guam, including the destruction of hundreds of acres of limestone forest that serve as a habitat for numerous endangered species and the planned construction and operation of a live-fire training range complex over Guam's aquifer. These projects include the Guam and CNMI Military Relocation Environmental Impact Statement and Supplemental EIS, the

AR_0026036

1    Marianas Islands Range Complex EIS, the Mariana Islands Training and Testing EIS, and the

2    Divert Activities and Exercises EIS.  Guam agencies, including the Guam Bureau of Statistics

3    and Plans, Guam Environmental Protection Agency, Guam Waterworks Authority, Guam

4    Department of Agriculture and Guam Department of Public Health and Social Services have

5    and continue to engage in the federal NEPA process to protect Guam's interest in public

6    health, environmental quality, and natural resources.

7        122.    Plaintiff DISTRICT OF COLUMBIA (the District) is a municipal corporation

8    and is the local government for the territory constituting the permanent seat of government of

9    the United States.  The District is represented by and through its chief legal officer the

10   Attorney General for the District of Columbia.  The Attorney General has general charge and

11   conduct of all legal business of the District and all suits initiated by and against the District and

12   is responsible for upholding the public interest.  D.C. Code § 1-301.81(a)(1).

13       123.    As the seat of the nation's capital, the District is uniquely impacted by

14   environmental review on federal actions and projects.  The federal government owns one-third

15   of the land in the District, eighty-five percent of the District's shoreline, and owns the riverbed

16   of the District's two major rivers, the Potomac and Anacostia.  Almost ninety percent of the

17   city's parkland—more than 6,900 acres including Rock Creek Park, the National Mall,

18   Anacostia Park and the Fort Circle Parks—is part of the National Park System.  With the

19   federal government owning or managing federal offices, land, and water resources in the

20   District of Columbia, federal government decisions relating to the environmental impact of

21   projects related to these buildings, land, and resources substantially impacts the District's

22   environment and the public health of its residents.

23       124.    The District is home to one federally listed species, the Hay's Spring Amphipod

24   (*Stygobromus hayi*), which is a small, shrimp-like freshwater crustacean that exists only in five

25   springs, all along Rock Creek Park.

26

AR_0026037

125.     Under the District's Environmental Policy Act and its implementing regulations, District agencies evaluate environmental impacts through review and analysis of environmental impact screening forms.  This review determines whether the District is to perform an environmental impact statement because a major action is likely to have substantial negative impact on the environment, if implemented.  However, this analysis is not required when an environmental analysis has been performed in accordance with NEPA.  Thus, when a federal agency does not perform an environmental review under NEPA, the District will perform the analysis to ensure that negative environmental and public health impacts are mitigated.

126.     Plaintiff HARRIS COUNTY, TEXAS is a local subdivision of the State of Texas.  Harris County brings this action to protect its citizens and governmental and proprietary interests, which include parks and greenway spaces.  Harris County is represented by the Harris County Attorney, an elected official and chief legal officer for Harris County.  Harris County is the third largest county in the United States, home to more than four million residents spread over 1,777 square miles, and is the energy capital of the world.

127.     Harris County is often impacted by federal actions subject to NEPA review and has submitted comments and participated in the NEPA process on a range of matters including the Keystone XL Pipeline and the Texas Coastal Study.

128.     Plaintiff CITY OF NEW YORK, a municipal subdivision of the State of New York, brings this action on its own behalf to protect its governmental and proprietary interests, which include more than 30,000 acres of parks and beaches, 2.6 million trees, 520 linear miles of waterfront property, and the nation's largest unfiltered water supply system with a watershed of over one million acres, which provides more than one billion gallons of drinking water daily from nineteen reservoirs to more than nine million residents of the City and State of New York.

AR_0026038

129.     Federally funded or permitted actions that affect New York City's environment are subject to the federal NEPA environmental review process.  New York City agencies and authorities regularly rely on NEPA analyses to support local decision making.  In particular, pursuant to the New York State Environmental Quality Review Act (SEQRA) and New York City Environmental Quality Review (CEQR) regulations, city agencies may rely on a federal EIS if it is sufficient for the City agency to make its findings under SEQRA/CEQR.  Similarly, a federal Environmental Assessment/Finding of No Significant Impact may serve as the basis for a city agency to issue a negative declaration under SEQRA/CEQR.  In addition, the New York City Department of Housing Preservation and New York City Mayor's Office of Management and Budget have assumed NEPA responsibilities from the U.S. Department of Housing and Urban Development (HUD) when utilizing HUD's housing grant programs and managing allocations of HUD's Community Development Block Grant Disaster Recovery and National Disaster Resilience programs, and are thus responsible for complying with HUD's NEPA regulations that will be revised under the Final Rule.

**B.     Defendants**

130.     Defendant CEQ is an agency of the federal government created by NEPA.  CEQ is responsible for guiding NEPA's implementation and bears responsibility, in whole or in part, for the acts complained of in this Complaint.

131.     Defendant Mary B. Neumayr is the Chairman of CEQ and is sued in her official capacity.  Ms. Neumayr is the official responsible for implementing and fulfilling CEQ's duties, including promulgating the Final Rule, and bears responsibility, in whole or in part, for the acts complained of in this Complaint.

## V.     STATUTORY AND REGULATORY BACKGROUND

**A.     Administrative Procedure Act**

132.     The APA, 5 U.S.C. §§ 551–559 and 701–706, governs the procedural requirements for federal agency decision making, including the agency rulemaking process.

AR_0026039

1   Under the APA, a "reviewing court shall ... hold unlawful and set aside" federal agency action

2   found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with

3   law," "without observance of procedure required by law," or "in excess of statutory

4   jurisdiction, authority, or limitations, or short of statutory right." *Id.* § 706(2).  An agency

5   action is arbitrary and capricious under the APA where "the agency has relied on factors which

6   Congress has not intended it to consider, entirely failed to consider an important aspect of the

7   problem, offered an explanation for its decision that runs counter to the evidence before the

8   agency, or is so implausible that it could not be ascribed to a difference in view or the product

9   of agency expertise." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins.*

10  *Co.*, 463 U.S. 29, 43 (1983) (*State Farm*).  An agency does not have authority to adopt a

11  regulation that is "plainly contrary to the statute." *United States v. Morton,* 467 U.S. 822, 833

12  (1984); *see also* 5 U.S.C. § 706(2)(C).

13          133.    "Agencies are free to change their existing policies," but they must "provide a

14  reasoned explanation for the change." *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117,

15  2125 (2016) (citing *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967,

16  981–82 (2005)); *see also Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*,

17  140 S. Ct. 1891, 1913 (2020) ("when an agency rescinds a prior policy its reasoned analysis

18  must consider the 'alterative[s]' that are within the ambit of the existing [policy]") (citations

19  omitted).  An agency must "provide a more detailed justification than what would suffice for a

20  new policy created on a blank slate" when "its new policy rests upon factual findings that

21  contradict those which underlay its prior policy," "or when its prior policy has engendered

22  serious reliance interests that must be taken into account." *FCC v. Fox Television Stations,*

23  *Inc.*, 556 U.S. 502, 515 (2009).

24          134.    Prior to promulgating a rule, agencies must engage in a public notice-and-

25  comment process.  5 U.S.C. §§ 551(5), 553.  Agencies must afford public notice of specific

26  regulatory changes and their reasoned basis to provide the public an opportunity for

AR_0026040

1   meaningful comment, *Home Box Office, Inc. v. FCC*, 567 F.2d 9, 35–36 (D.C. Cir. 1977),

2   including the "technical studies and data that [the agency] has employed in reaching the

3   decision[] to propose particular rules." *Kern Cty. Farm Bureau v. Allen*, 450 F.3d 1072, 1076

4   (9th Cir. 2006). The agency must consider and respond to all significant comments it receives.

5   *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 96 (2015).

6   **B.**    **National Environmental Policy Act**

7       135.    NEPA is often referred to as the "Magna Carta" of U.S. environmental law.

8   *See Citizens Against Burlington, Inc. v. Busey*, 938 F.2d 190, 193 (D.C. Cir. 1991).

9       136.    Congress developed NEPA at a time of heightened awareness and growing

10   concern about the environment, amid a series of high-profile environmental crises in the late

11   1960s. The national perspective was shifting from "preoccupation with the extraction of

12   natural resources to the more compelling problems of deterioration in natural systems of air,

13   land, and water." S. Comm. on Interior & Insular Affairs and H.R. Comm. on Science and

14   Astronautics, 90th Congress, *Congressional White Paper on a National Policy for the*

15   *Environment*, at 1 (Oct. 1968).

16       137.    Congress recognized that "[o]ur national resources—our air, water, and land—

17   are not unlimited," and as a country, "[w]e no longer have the margins for error that we once

18   enjoyed." S. Rep. No. 91-296, at 5 (1969). A comprehensive national environmental policy

19   would disrupt the current practice of establishing policy "by default and inaction" where

20   "[e]nvironmental problems are only dealt with when they reach crisis proportions. Public

21   desires and aspirations are seldom consulted. Important decisions concerning the use and the

22   shape of [humans'] future environment continue to be made in small but steady increments

23   which perpetuate rather than avoid the recognized mistakes of previous decades." *Id.*

24       138.    NEPA thus declares an overarching national policy to "use all practicable

25   means and measures … to foster and promote the general welfare, to create and maintain

26   conditions under which man and nature can exist in productive harmony, and fulfill the social,

First Amended Compl. for Declaratory and
Inj. Relief       46
Case No. 3:20-cv-06057

AR_0026041

economic and other requirements of present and future generations of Americans." 42 U.S.C.
§ 4331(a).

139.    Cooperation with states and local governments and other concerned public and
private organizations is an essential component of this policy. *Id.* §§ 4331(a), 4332(G).

140.    NEPA further emphasizes that in carrying out these policies, the federal
government has a continuing responsibility "to use all practicable means … to improve and
coordinate Federal plans, functions, programs, and resources to the end that the Nation may,"
among other things "fulfill the responsibilities of each generation as trustee of the environment
for succeeding generations," "assure for all Americans safe, healthful, productive, and
esthetically and culturally pleasing surroundings," and "attain the widest range of beneficial
uses of the environment without degradation, risk to health or safety, or other undesirable and
unintended consequences." *Id.* § 4331(b).

141.    To ensure that these policies are "integrated into the very process of agency
decision making," NEPA outlines "action-forcing" procedures, *Andrus*, 442 U.S. at 349–50,
that require federal agencies "to the fullest extent possible," to prepare a detailed
environmental review or EIS for legislation or other "major Federal actions significantly
affecting the quality of the human environment." *Id.* §§ 4332, 4332(2)(C).

142.    An EIS must evaluate, among other things, all of the environmental impacts of
the proposed federal action, any adverse and unavoidable environmental effects, alternatives to
the proposed action, the relationship between local short-term uses of the environment and the
maintenance and enhancement of long-term productivity, and any irreversible and irretrievable
commitment of resources involved in the proposed action. *Id.* § 4332(2)(C).

143.    For proposed actions involving unresolved conflicts about alternative uses of
available resources, NEPA further directs that federal agencies should "study, develop, and
describe appropriate alternatives" to the proposed action. *Id.* § 4332(E).

AR_0026042

1   144. NEPA also requires federal agencies to work in concert with states, local

2 governments, institutions, organizations, and individuals by making available "advice and

3 information useful in restoring, maintaining, and enhancing the quality of the environment."

4 42 U.S.C. § 4332(G).

5   145. In short, NEPA directs federal agencies to make well-informed and transparent

6 decisions based on a thorough review of environmental and public health impacts and

7 meaningful input from states, local governments, and the public.

8   146. In NEPA, Congress also created CEQ and directed it to appraise federal

9 programs and activities in light of NEPA's overarching policies: "to be conscious of and

10 responsive to the scientific, economic, social, esthetic, and cultural needs and interests of the

11 Nation; and to formulate and recommend national policies to promote the improvement of the

12 quality of the environment." *Id.* § 4342. CEQ has the statutory duty to take actions consistent

13 with NEPA's policies of environmental protection and informed decision making.

14   147. Many State Plaintiffs have adopted their own state environmental policy acts

15 modeled on NEPA. These include the California Environmental Quality Act, Cal. Pub. Res.

16 Code § 21000–21189.57, Washington's State Environmental Policy Act, Wash. Rev. Code.

17 ch. 43.21C, New York's State Environmental Quality Review Act, N.Y. Envtl. Conserv. L.

18 art. 8; 6 N.Y. Comp. Codes R. & Regs. Part 617; the Massachusetts Environmental Policy Act,

19 Mass. Gen. Laws, ch. 30, §§ 61-62I; and the District of Columbia's Environmental Policy Act,

20 D.C. Code § 8-109.01–109.12, and 20 D.C. Mun. Regs. § 7200–7299. These state statutes (or

21 little NEPAs) require detailed environmental review for certain state agency and local

22 government actions. Where an action subject to state environmental review also requires

23 NEPA review, state and local agencies can often comply with little NEPAs by adopting or

24 incorporating by reference certain environmental documents prepared under NEPA, but only if

25 those NEPA documents meet state statutory requirements. *See, e.g.*, 6 N.Y. Comp. Codes R. &

26 Regs. § 617.15; Mass. Gen. Laws, ch. 30, § 62G.

First Amended Compl. for Declaratory and
Inj. Relief   48
Case No. 3:20-cv-06057

AR_0026043

148.     CEQ and several states worked together to harmonize the environmental review processes under NEPA and little NEPAs through state-specific memoranda.  *See, e.g.*, CEQ, *States and Local Jurisdictions with NEPA-Like Environmental Planning Requirements*, https://ceq.doe.gov/laws-regulations/states.html.  This collaboration has long allowed state, local, and federal agencies to share documents, reduce paperwork, and efficiently allocate limited time and resources.  States rely on this collaboration and the effectiveness of federal NEPA documents under the 1978 regulations to allocate state resources and determine staffing needs.

## C.     Endangered Species Act

149.     In 1973, Congress enacted the ESA, 16 U.S.C. §§ 1531–44, "to halt and reverse the trend toward extinction, whatever the cost."  *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 174 (1978).  As such, the ESA sets forth "a program for the conservation of [] endangered species and threatened species" through, in part, conservation of the ecosystems upon which such species depend.  16 U.S.C. § 1531(b).  The Services are the agencies responsible for listing endangered and threatened species and designating those species' critical habitats.  *Id.* §§ 1532(15), 1533(a); 50 C.F.R. §§ 17.11(a), 17.12(a). The listing of a species under the ESA is a last resort to conserve endangered or threatened species and the ecosystems on which they depend.  The Services currently list over [insert number] species as endangered or threatened under the ESA.  50 C.F.R. §§ 17.11(a), 17.12(a).

150.     Section 7 of the ESA codifies "an explicit congressional decision to require agencies to afford first priority to the declared national policy of saving endangered species," elevating concern for the protection of such species "over the primary missions of federal agencies."  *Tenn. Valley Auth. v. Hill*, 437 U.S. at 185 (internal quotation marks omitted).  Pursuant to section 7, unless an exemption has been granted, each federal agency must, in consultation with one or both of the Services, "insure that any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of any

AR_0026044

endangered species or threatened species or result in the destruction or adverse modification of habitat of such species[.]"  16 U.S.C. § 1536(a)(2).  "The minimum threshold for an agency action to trigger consultation with FWS is low." *W. Watersheds Project v. Kraayenbrink*, 632 F.3d 472, 496 (9th Cir. 2011).  Consultation is required if a prospective agency action may affect a listed species or designated critical habitat.  *Id.*; 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.12(a).  Formal consultation is required if the prospective agency action is likely to adversely affect a listed species or designated critical habitat.  *Id.* § 1536(a)(2)–(3); 50 C.F.R. §§ 402.12(a), (k), 402.14(a)–(b).

151.    During formal consultation, the acting federal agency is prohibited from "mak[ing] any irreversible or irretrievable commitment of resources with respect to the agency action which has the effect of foreclosing the formulation or implementation of any reasonable and prudent alternative measures[.]"  16 U.S.C. § 1536(d).

152.    At the conclusion of the formal consultation period, the FWS or the NMFS provides the agency with a biological opinion including a determination as to whether the action is likely to "jeopardize the continued existence of a listed species or result in the destruction or adverse modification of critical habitat[.]"  16 U.S.C. § 1536(b)(1)(3)(A); 50 C.F.R. § 402.14(g)–(h).  If the FWS or the NMFS determines the proposed action is likely to result in jeopardy to a listed species or destruction or adverse modification of designated critical habitat, it will include "reasonable and prudent alternatives" to the agency action in the biological opinion.  50 C.F.R. § 402.14(h)(2).

153.    If the federal agency wishes to proceed with a proposed action that is deemed likely to result in jeopardy or adverse modification, it must generally implement the Services' recommended "reasonable and prudent alternatives" and adopt other "reasonable and prudent measures" to ensure that the action "is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of

AR_0026045

1  habitat of such species," and to minimize the impact of such action on listed species and

2  designated critical habitat.  16 U.S.C. §§ 1536(a)(2), 1536(b)(4); 50 C.F.R. § 402.15(a).

3      154.    Section 7 differs in important respects from NEPA.  As the Ninth Circuit has

4  explained, "[s]ection 7 of the ESA and NEPA involve different processes that measure

5  different kinds of environmental impacts."  *San Luis & Delta-Mendota Water Auth. v. Jewell*,

6  747 F.3d 581, 651 (9th Cir. 2014); *see also Fund for Animals v. Hall*, 448 F.Supp.2d 127, 136

7  (D.D.C. 2006).  Indeed, while NEPA review concerns a broad array of impacts, the ESA is

8  solely focused on impacts to listed species and designated critical habitat.

9  **D.    CEQ's 1978 NEPA Regulations**

10      155.    In 1977, President Carter issued Executive Order 11,991 directing CEQ to issue

11  regulations to guide federal agency implementation of NEPA.  *Relating to Protection and*

12  *Enhancement of Environmental Quality*, Exec. Order No. 11,991, 42 Fed. Reg. 26,967

13  (May 24, 1977) (amending in part Executive Order No. 11,514).

14      156.    Before proposing the implementing regulations, CEQ conducted extensive

15  outreach, soliciting "the views of almost 12,000 private organizations, individuals, state and

16  local agencies, and Federal agencies," held public hearings, and considered studies of the

17  environmental impact statement process.  NEPA—Regulations, Implementation of Procedural

18  Provisions, 43 Fed. Reg. 55,978, 55,980 (Nov. 29, 1978).

19      157.    CEQ also prepared an environmental assessment (EA) of its proposed

20  implementing regulations, in compliance with NEPA.  Proposed Implementation of Procedural

21  Provisions, 43 Fed. Reg. 25,230, 25,232 (May 31, 1978).

22      158.    In 1978, CEQ finalized a comprehensive set of regulations implementing the

23  "action-forcing" elements of NEPA "to tell federal agencies what they must do to comply with

24  the procedures and achieve the goals of" the statute.  40 C.F.R. § 1500.1(a) (1978).

25      159.    The 1978 regulations emphasize NEPA's role as "our basic national charter for

26  protection of the environment" and explained that "[t]he NEPA process is intended to help

First Amended Compl. for Declaratory and
Inj. Relief        51
Case No. 3:20-cv-06057

AR_0026046

1  public officials make decisions that are based on understanding of environmental

2  consequences, and take actions that protect, restore, and enhance the environment." *Id.*

3  § 1500.1(c) (1978).

4      160.    The 1978 regulations also emphasize transparency in government decision

5  making by ensuring agencies provide information to the public before "decisions are made and

6  before actions are taken." *Id.* § 1500.1(b) (1978).

7      161.    The 1978 regulations direct agencies to "[e]ncourage and facilitate public

8  involvement in decisions which affect the quality of the human environment," *id.* § 1500.2(d)

9  (1978), allowing states, private organizations, and individuals to inform and influence agency

10 decision making by commenting on proposed agency actions, *id*. § 1503.1(a)(4) (1978).

11     162.    Until the promulgation of the Final Rule, CEQ's 1978 regulations remained

12 largely unchanged with the exception of two minor amendments.  First, in 1986, CEQ removed

13 a requirement that agencies analyze the extent of environmental impacts in a hypothetical

14 "worst case scenario."  NEPA Regulations, Incomplete or Unavailable Information, 51 Fed.

15 Reg. 15,618 (May 27, 1986) (amending 40 C.F.R. § 1502.22).  CEQ prepared an EA for its

16 substantive change to the regulations in 1986 and concluded that the amendment would not

17 have a significant environmental impact.  *Id.* at 15,619.  Then in 2005, CEQ made a minor

18 amendment to the EIS filing requirements.  Other Requirements of NEPA, 70 Fed. Reg. 41,148

19 (July 18, 2005).

20     163.    CEQ has issued numerous guidance documents on NEPA and its 1978

21 regulations on which states and other stakeholders have relied.  *See e.g., Final Guidance for*

22 *Federal Departments and Agencies on Consideration of Greenhouse Gas Emissions and the*

23 *Effects of Climate Change in National Environmental Policy Act Reviews*, 81 Fed. Reg. 51,866

24 (Aug. 5, 2016), *withdrawn* 82 Fed. Reg. at 16,576 (Apr. 5, 2017); *Memorandum for Heads of*

25 *Federal Departments and Agencies: Establishing, Applying, and Revising Categorical*

26 *Exclusions under the National Environmental Policy Act* (Nov. 23, 2010); *A Citizen's Guide to*

AR_0026047

1  *the NEPA: Having Your Voice Heard* (Dec. 2007); *Forty Most Asked Questions Concerning*

2  *CEQ's National Environmental Policy Act Regulations*, 46 Fed. Reg. 18,026 (Mar. 23, 1982).

3       164.    Additionally, CEQ's Environmental Justice Guidance provides useful direction

4  for agency consideration of environmental justice impacts during the NEPA review process.

5  CEQ, *Environmental Justice: Guidance Under the National Environmental Policy Act*

6  (Dec. 10, 1997).  The Environmental Protection Agency (EPA) defines environmental justice

7  as "the fair treatment and meaningful involvement of all people regardless of race, color,

8  national origin, or income with respect to the development, implementation, and enforcement

9  of environmental laws, regulations, and policies."  EPA, Environmental Justice:

10  https://www.epa.gov/environmentaljustice.  CEQ's guidance builds on Executive Order

11  12,898, which directs federal agencies to identify and address the disproportionately high and

12  adverse human health or environmental effects of their actions on minority and low-income

13  populations, to the greatest extent practicable and permitted by law.  Exec. Order No. 12,898,

14  59 Fed. Reg. 7,629 (1994) (as amended).

15       165.    The Presidential Memorandum issued with Executive Order 12,898 further

16  directs federal agencies to analyze under NEPA "the environmental effects, including human

17  health, economic and social effects, of Federal actions, including effects on minority

18  communities and low income communities" and to provide opportunities for community input

19  in the NEPA process, including through "identifying potential effects and mitigation measures

20  in consultation with affected communities …."  White House, *Memorandum for the Heads of*

21  *All Departments and Agencies: Executive Order on Federal Action to Address Environmental*

22  *Justice in Minority Populations and Low-Income Populations* (Feb. 11, 1994).

23       166.    CEQ's Environmental Justice Guidance explains that agencies should consider

24  environmental justice impacts as part of their obligation to consider "both impacts on the

25  natural or physical environment and related social, cultural, and economic impacts."  CEQ,

26  *Environmental Justice*, at 8 (citing 40 C.F.R. § 1508.14).  Agencies should consider these

First Amended Compl. for Declaratory and
Inj. Relief             53
Case No. 3:20-cv-06057

AR_0026048

1  impacts while analyzing the affected area, considering cumulative effects, and developing

2  public participation strategies. *Id.* at 8–9.  CEQ further explained that identification of

3  disproportionately high and adverse human health or environmental effects on low-income,

4  minority, or Tribal populations "should heighten agency attention to alternatives …, mitigation

5  strategies, monitoring needs, and preferences expressed by the affected community." *Id.* at 10.

6       167.  CEQ has also issued a number of studies documenting NEPA's effectiveness.

7  *See, e.g.*, CEQ, *National Environmental Policy Act: A Study of Its Effectiveness After Twenty-*

8  *five Years* (Jan. 1997); NEPA Task Force, *Modernizing NEPA Implementation* (Sept. 2003);

9  CEQ, *Examples of Benefits from the NEPA Process for ARRA Funded Activities* (May 2011).

10  For example, in its NEPA Effectiveness Study, a twenty-five year review of NEPA's

11  implementation, CEQ emphasized that "NEPA is a success—it has made agencies take a hard

12  look at the potential environmental consequences of their actions, and it has brought the public

13  into the agency decision-making process like no other statute." CEQ, *National Environmental*

14  *Policy Act: A Study of Its Effectiveness After Twenty-five Years*, at iii (Jan. 1997).

15       168.  The courts, including the Ninth Circuit, have developed a robust body of case

16  law applying and interpreting NEPA and CEQ's 1978 regulations, providing direction to

17  agencies on how to comply with both CEQ's regulations and the statute.  *See, e.g.*, *Robertson*

18  *v. Methow Valley Citizens Council*, 490 U.S. 332, 351–52 (1989); *Kern v. Bureau of Land*

19  *Mgmt.*, 284 F.3d 1062, 1075 (9th Cir. 2002); *Klamath-Siskiyou Wildlands Ctr. v. Bureau of*

20  *Land Mgmt.*, 387 F.3d 989, 994 (9th Cir. 2004).

21       169.  NEPA, the 1978 regulations, and CEQ's subsequent guidance have promoted

22  more environmentally protective and transparent agency decisions, while not imposing overly

23  burdensome requirements.  In 2014, the Government Accountability Office concluded that the

24  NEPA process "ultimately saves time and reduces overall project costs by identifying and

25  avoiding problems that may occur in later stages of project development." U.S. Gov't

26  Account. Office, *National Environmental Policy Act: Little Information Exists on NEPA*

First Amended Compl. for Declaratory and
Inj. Relief         54
Case No. 3:20-cv-06057

AR_0026049

1  *Analyses*, 17 (Apr. 2014). Similarly, U.S. Forest Service officials have observed that "NEPA

2  leads to better decisions." *Id.*

3  **E.    The Proposed Rule**

4        170.    Despite the documented success of the 1978 regulations and reliance by states

5  and the public on NEPA's procedures to protect the environment and public health, CEQ

6  released an Advance Notice of Proposed Rulemaking on June 20, 2018, announcing CEQ's

7  plan to overhaul the 1978 regulations and including a vague list of topics that the rulemaking

8  might address. Update to the Regulations for Implementing the Procedural Provisions of the

9  National Environmental Policy Act, 83 Fed. Reg. 28,591 (June 20, 2018) (Advance Notice).

10  CEQ issued this proposal in response to President Trump's Executive Order 13,807, which

11  called for revisions to the NEPA regulations, purportedly to expedite infrastructure projects

12  and boost the economy. Establishing Discipline and Accountability in the Environmental

13  Review and Permitting Process, Exec. Order 13,807, 82 Fed. Reg. 40,463 (Aug. 15, 2017).

14        171.    CEQ allowed only sixty days for public comment on the Advance Notice. Most

15  State Plaintiffs submitted comments stating that CEQ had not demonstrated a need for

16  substantial revisions and opposing any revisions that would threaten NEPA's fundamental

17  values of environmental protection and informed decision making.

18        172.    On January 10, 2020, CEQ released its proposal to significantly revise the 1978

19  regulations. 85 Fed. Reg. 1,684 (Jan. 10, 2020).

20        173.    The Proposed Rule included numerous revisions to the 1978 regulations that

21  undermine NEPA's environmental and informed decision making purposes. For example, the

22  Proposed Rule included regulatory changes to remove numerous agency actions from NEPA's

23  reach, narrow the scope of environmental reviews that do occur, limit public participation, and

24  restrict judicial review for those harmed by agency failure to comply with NEPA.

25        174.    After publication of the Proposed Rule, CEQ again provided just sixty days for

26  the public to review, analyze, and submit comments on this far-reaching overhaul of its

AR_0026050

1 longstanding regulations, and hosted only two public hearings on the Proposed Rule.

2 Numerous commenters, including representatives from several State Plaintiffs, were not able to

3 reserve a spot to speak at the hearings due to a limited number of speaking slots.  Although

4 CEQ received requests from State Plaintiffs, members of Congress, and others for more time to

5 comment and for additional public hearings on the complex and wide-ranging Proposed Rule,

6 CEQ closed the comment period without providing additional hearings or extending the

7 comment period.

8      175.    Despite this short timeframe, interested parties submitted over 1.1 million

9 comments, the vast majority of which strongly opposed CEQ's Proposed Rule.  Most State

10 Plaintiffs submitted detailed comments stating that CEQ's Proposed Rule was unlawful,

11 unreasonable, and unjustified and should be withdrawn.  In addition to these comments, many

12 State Plaintiff elected officials and agencies submitted comments expressing concern about

13 CEQ's proposed changes and urging CEQ to withdraw the Proposed Rule.  *See, e.g.*, Letter

14 from Washington State Governor Jay Inslee to Mary Neumayr, re Proposed Rule (Mar. 10,

15 2020) (enclosing comments from seven state agencies and offices opposing the Proposed

16 Rule); Letter from California Governor Gavin Newsom to Edward A. Boling, re Proposed Rule

17 (Mar. 10, 2020).

18 **F.     The Final Rule**

19      176.    Just four months after the close of the comment period, President Trump

20 announced the release of the Final Rule on July 15, 2020.  The Final Rule was published in the

21 Federal Register the following day.  The Final Rule largely adopts the Proposed Rule's

22 unlawful, unjustified, and sweeping revisions to the 1978 Regulations.

23      177.    CEQ claimed that the Final Rule "advance[s] the original goals of the CEQ

24 regulations to reduce paperwork and delays and promote better decisions consistent with the

25 national environmental policy set forth in section 101 of NEPA," Final Rule, 85 Fed. Reg. at

26

First Amended Compl. for Declaratory and
Inj. Relief    56
Case No. 3:20-cv-06057

AR_0026051

1  43,306.  But the Final Rule will do just the opposite—leading to increased confusion and

2  litigation and decisions inconsistent with NEPA's text and purpose.

3      178.  The Final Rule makes substantial and unsupported revisions to the 1978

4  regulations, ignores reliance interests on those longstanding regulations, lacks a rational

5  justification, and undermines NEPA's goals of environmental protection, public participation,

6  and informed decision making.  Among other things, the Final Rule arbitrarily and unlawfully:

7          a.  Deletes language from the 1978 regulations directing federal agencies to

8  comply with "the letter and spirit" of NEPA's "action-forcing" provisions, *compare* 40 C.F.R.

9  § 1500.1(a) (1978), *with* Final Rule, 85 Fed. Reg. at 43,358 (to be codified at § 1500.1(a));

10          b.  Deletes language from the 1978 regulations stating that NEPA "is our

11  basic national charter for protection of the environment" and that "[t]he NEPA process is

12  intended to help public officials make decisions that are based on understanding of

13  environmental consequences, and take actions that protect, restore, and enhance the

14  environment," *compare* 40 C.F.R. § 1500.1(a), (c) (1978), *with* Final Rule, 85 Fed. Reg. at

15  43,357–58 (to be codified at § 1500.1);

16          c.  Deletes language from the 1978 regulations that federal agencies should

17  "to the fullest extent possible … [e]ncourage and facilitate public involvement in decisions

18  which affect the quality of the human environment" and "[u]se all practicable means … to

19  restore and enhance the quality of the human environment and avoid or minimize any possible

20  adverse effects of their action upon the quality of the human environment," *compare* 40 C.F.R.

21  § 1500.2 (1978), *with* Final Rule, 85 Fed. Reg. at 43,317, 43,358 (removing and reserving

22  § 1500.2);

23          d.  Prohibits federal agencies from adopting NEPA regulations that are

24  more stringent than CEQ's Final Rule, 85 Fed. Reg. at 43,373 (to be codified at § 1507.3(a),

25  (b));

26

AR_0026052

e.      Preemptively concludes that all categorical exclusions (*i.e.*, actions that federal agencies have determined will not have a significant environmental impact), effective by September 14, 2020, comply with the Final Rule, *id.* at 43,373 (to be codified at § 1507.3(a));

f.      Establishes six "NEPA Thresholds" that will allow federal agencies to avoid any environmental review of certain proposed actions, *id.* at 43,359 (to be codified at § 1501.1);

g.      Separates the definition of "major Federal action" from an action's significance and narrows the definition to exclude an agency's failure to act as well as actions that are not "subject to" an undefined amount of "Federal control and responsibility" and actions that are extraterritorial, non-discretionary, have minimal federal funding or minimal federal involvement, or receive certain federal loans, *id.* at 43,375 (to be codified at § 1508.1(q));

h.      Allows federal agencies to rely on unspecified procedures and documentation prepared under other statutory or Executive Order requirements to avoid conducting environmental review, *id.* at 43,359, 43,372–73 (to be codified at 40 C.F.R. §§ 1501.1, 1506.9, 1507.3);

i.      Authorizes federal agencies to determine that other statutes or directives conflict with NEPA and thus excuse agencies from NEPA review, *id.* at 43,359, 43,373, 43,374 (to be codified at §§ 1501.1(a)(2), (a)(3), 1507.3(d)(2));

j.      Revises the analysis of an agency action's "significance," to (i) diminish the scope of actions that will require more detailed environmental review, (ii) remove a prohibition on improperly segmenting a project to avoid analyzing its collective significant impacts, and (iii) eliminate review of important concerns like an action's public health impacts, cumulative effects, effects on threatened and endangered species and their habitat, and proximity to historic or cultural resources, park lands, farmlands, wetlands, wild and scenic

AR_0026053

1     rivers, or ecologically critical areas, 85 Fed. Reg. at 43,360 (to be codified at 40 C.F.R.

2     § 1501.3(b));

3             k.     Expands the use of categorical exclusions by adopting a new vague

4     definition that removes consideration of cumulative impacts and allows for use of categorical

5     exclusions in situations with extraordinary circumstances (*i.e.*, circumstances in which a

6     normally excluded action may have a significant effect and would formerly have required

7     preparation of an EA or EIS), *id*. at 43,360 (to be codified at § 1501.4);

8             l.     Allows certain actions to proceed during NEPA review, potentially

9     limiting the range of alternatives that could be considered during environmental review despite

10     NEPA's direction that environmental review occur before agencies take action, *id*. at 43,370

11     (to be codified at § 1506.1);

12             m.     Limits the number of alternatives to the proposed action analyzed in an

13     EA or EIS and the depth of that analysis by, among other things, removing the requirement that

14     agencies "[r]igorously explore and objectively evaluate" all reasonable alternatives to the

15     proposed action, eliminating consideration of alternatives outside the jurisdiction of the lead

16     agency, and removing the requirement that agencies "[d]evote substantial treatment to each

17     alternative," *id*. at 43,365 (to be codified at § 1502.14);

18             n.     Narrows the scope of effects agencies are required to evaluate, imposes

19     strict causation requirements for determining which environmental effects should be

20     considered, and directs agencies not to consider cumulative and indirect effects, all of which

21     will limit review of environmental justice and climate change impacts, impacts to species listed

22     and critical habitat designated under the ESA, and other impacts, *id*. at 43,360, 43,365–66,

23     43,375 (to be codified at §§ 1501.3(b), 1502.15, 1508.1(g), (m));

24             o.     Reduces agencies' obligations to obtain additional information about

25     environmental impacts when such information is not immediately available and further allows

26

First Amended Compl. for Declaratory and
Inj. Relief             59
Case No. 3:20-cv-06057

AR_0026054

1 agencies to refuse to consider certain scientific evidence if the agency determines it is not a

2 "reliable data source," *id.* at 43,366–67 (to be codified at §§ 1502.21, 1502.23);

3       p.    Allows project proponents with potential conflicts of interest to prepare

4 the EIS as long as conflicts are disclosed to the federal agency (but not the public), 85 Fed.

5 Reg. at 43,371 (to be codified at § 1506.5(b)(4));

6       q.    Imposes unreasonable and unworkable time and page limits for EAs and

7 EISs, *id.* at 43,360, 43,362–64 (to be codified at §§ 1501.5(f), 1501.10(b), 1502.7);

8       r.    Limits public participation in the NEPA process by striking key

9 provisions emphasizing the importance of public participation and eliminating the requirement

10 that a draft EIS circulated for public comment satisfy NEPA's standards to the fullest extent

11 possible, *id.* at 43,364–65 (to be codified at § 1502.9);

12       s.    Places an undue burden on the public to analyze environmental issues

13 and to meet a vague standard of specificity and detail and imposes burdensome exhaustion

14 requirements on commenters, *id.* at, 43,358, 43,367–68 (to be codified at §§ 1500.3(b)(3),

15 1503.3);

16       t.    Reduces agencies' obligation to consider and respond to public

17 comments, *id.* at 43,366, 43,368–69 (to be codified at §§ 1502.17, 1505.2(b), 1503.4);

18       u.    Permits agencies to claim a presumption that they have adequately

19 considered all public comments on an EIS, *id.* at 43,369 (to be codified at § 1505.2(b)); and

20       v.    Seeks to limit judicial review of agency NEPA compliance by

21 attempting to restrict remedies parties injured by deficient NEPA review can secure through

22 litigation and promoting unlawful bond requirements, 85 Fed. Reg. at 43,358 (to be codified at

23 § 1500.3(c), (d)).

24     179.   <u>NEPA Review</u>.  CEQ did not conduct any environmental review before issuing

25 the Proposed Rule or Final Rule.  Instead, CEQ asserted without adequate explanation that a

26 NEPA review was not required because the regulations are procedural and "apply generally to

First Amended Compl. for Declaratory and
Inj. Relief               60
Case No. 3:20-cv-06057

AR_0026055

1    Federal actions affecting the environment." *Id.* at 43,353–54.  CEQ then claimed that even if it

2    were to conduct an EA, it likely would result in a Finding of No Significant Impact, citing its

3    cursory analysis of environmental impacts in the Final Rule's Regulatory Impact Analysis

4    (RIA).  *Id.*  But the RIA analysis of environmental impacts, which consists of only two pages

5    and a short appendix, does not meet requirements for an EA or an EIS and summarily

6    concludes that the Final Rule will have no adverse environmental impacts.  RIA at 10–11;

7    App'x. A.  The RIA does not analyze alternative actions, and it ignores environmental impacts

8    of the Final Rule, including climate change and environmental justice impacts.  Moreover,

9    despite relying on the RIA to justify its conclusions of NEPA compliance in the Final Rule,

10   CEQ did not make the RIA available for public review and comment.

11       180.   <u>ESA Review.</u>  Although CEQ acknowledged in the Final Rule that the

12   promulgations of regulations "can be a discretionary action subject to section 7 of the ESA,"

13   CEQ failed to consult with the Services regarding the impacts that the Final Rule may have on

14   federally listed endangered and threatened species.  Final Rule, 85 Fed. Reg. at 43,354.

15   Instead, CEQ bypassed section 7's consultation process entirely without providing meaningful

16   analysis or supporting evidence for its conclusion that the Final Rule, which makes significant

17   changes to how federal agencies review the environmental impacts of their actions, will have

18   "no effect" on listed species or designated critical habitat.  Final Rule, 85 Fed. Reg. at 43,354-

19   55.  In the Final Rule, CEQ asserts that it "determined that updating its regulations

20   implementing the procedural provision of NEPA has 'no effect' on listed species or designated

21   critical habitat.  Therefore, section 7 consultation is not required."  *Id.* at 43,354.  CEQ's

22   decision to forego consultation with the Services under section 7 regarding the impacts that the

23   Final Rule may have on listed species or critical habitat violates the ESA because it is clear

24   that the proposed rule may affect, and is in fact likely to adversely affect, myriad listed species

25   and designated critical habitat.  In addition, CEQ's finding that no impact to listed species or

26

AR_0026056

1  critical habitat will result from the major changes to NEPA because the Final Rules are

2  "procedural in nature" is arbitrary and capricious and violates both the ESA and the APA.

3       181.   <u>Environmental Justice</u>.  CEQ also did not adequately review environmental

4  justice impacts from the Final Rule as required by Executive Order 12,898.  Instead, in the

5  Final Rule, CEQ concluded without rational explanation or support, and again relying on the

6  inadequate RIA, that the Final Rule will "not cause disproportionately high and adverse human

7  health or environmental effects on minority populations and low-income populations."  Final

8  Rule, 85 Fed. Reg. at 43,356–57.

9       182.   The Final Rule will become effective on September 14, 2020.  *Id*. at 43,372 (to

10  be codified at § 1506.13).  At that time, CEQ's existing guidance documents that are

11  inconsistent with the regulatory changes will effectively be withdrawn.  *Id*. at 43,371 (to be

12  codified at § 1506.7).

13       183.   Federal agencies may apply the Final Rule to ongoing activities and

14  environmental documents begun before the effective date.  *Id*. at 43,372-73 (to be codified at

15  § 1506.13).  As a result, federal agencies may apply the revised regulations to NEPA reviews

16  currently in progress, including reviews impacting State Plaintiffs.

17       184.   Federal agencies are also required to amend their NEPA regulations to conform

18  to the Final Rule.  *Id*. at 43,373 (to be codified at § 1507.3(b)).

19       185.   The Final Rule is unlawful and violates NEPA and the APA, because: (i) the

20  Final Rule is contrary to NEPA's text and purpose; (ii) CEQ failed to provide a rational

21  explanation for the Final Rule's numerous changes in policy and interpretation; (iii) CEQ

22  exceeded its statutory authority with certain revisions in the Final Rule; (iv) CEQ violated

23  notice-and-comment requirements; and (v) CEQ failed to analyze the Final Rule's significant

24  environmental impacts or consider reasonable alternatives to the Final Rule, as required by

25  NEPA.  CEQ also violated the ESA and the APA by failing to consult with the Services prior

26  to adopting the Final Rule, despite the fact that the Final Rule may impact federally listed

First Amended Compl. for Declaratory and
Inj. Relief          62
Case No. 3:20-cv-06057

AR_0026057

1   threatened and endangered species.  For these reasons, the Final Rule is arbitrary, capricious,

2   and contrary to law, was promulgated in excess of statutory authority and without observance

3   of procedure required by law, and should be vacated.

### VI.    THE FINAL RULE WILL HARM STATE PLAINTIFFS

5       186.    State Plaintiffs' unique, concrete, and particularized interests will be harmed by

6   CEQ's Final Rule, which undermines and weakens key NEPA requirements.  A judgment

7   vacating the Final Rule and reinstating the 1978 regulations and associated guidance would

8   redress these harms.

9       187.    As the Supreme Court has recognized, State Plaintiffs are entitled to "special

10  solicitude" in seeking to remedy environmental harms.  *Massachusetts v. EPA,* 549 U.S. 497

11  519–22 (2007).  State Plaintiffs have a concrete proprietary and sovereign interest in

12  preventing harm to their natural resources, including their state-owned and state-regulated

13  water, air, coastlines, public lands, and wildlife, as a result of fewer and less robust federal

14  environmental reviews and diminished public participation.

15      188.    Many federal actions, including those actions subject to NEPA, impact state-

16  owned and/or state-regulated resources.  Federal agencies routinely conduct major Federal

17  actions within and near our states and territories, including those related to federal land

18  management, infrastructure projects, energy projects, water management, national defense and

19  military training, and interstate transportation projects.  Federal lands often encompass large-

20  scale and important ecosystems that help to support biodiversity, including ESA listed species

21  and their critical habitat.

22      189.    Among other things, the Final Rule will increase the number of federal actions

23  that avoid environmental review and diminish the scope of NEPA reviews that do occur.  Both

24  of these changes will reduce federal agencies' understanding of proposed actions' potential

25  harms on the environment, including but not limited to, harms to listed species and critical

26  habitat.  These changes will also limit opportunities through the NEPA process to develop

First Amended Compl. for Declaratory and
Inj. Relief                          63
Case No. 3:20-cv-06057

AR_0026058

1    alternatives or other solutions that avoid or mitigate adverse impacts to state and territorial

2    natural resources (including water, air, coastlines, public lands, wildlife, and species listed and

3    critical habitat designated under the ESA) and public health.  As a result, the Final Rule will

4    cause unmitigated adverse impacts to public health and to state and territorial natural resources

5    (including water, air, coastlines, public lands, wildlife, and species listed and critical habitat

6    designated under the ESA).

7            190.    In particular, the Final Rule eliminates consideration of indirect and cumulative

8    impacts, including a project's reasonably foreseeable upstream and downstream GHG

9    emissions, the impact of those emissions on climate change, and methods for avoiding and

10   mitigating those impacts.  Climate change impacts have already harmed and are continuing to

11   harm state and territorial sovereign lands and coastal areas, state and territorial natural

12   resources (including ESA listed species and their critical habitat), state and territorial

13   infrastructure, and the health and safety of state and territorial residents resulting in economic

14   losses for State Plaintiffs.  State Plaintiffs are already committing significant resources to

15   reduce their own greenhouse gas (GHG) emissions and investing in infrastructure to protect

16   communities and state resources from the impacts of climate change.  Contrary to NEPA, the

17   Final Rule impedes these efforts.  Without detailed information about an action's GHG

18   emissions and climate impacts, federal agencies will not engage in efforts to avoid or mitigate

19   harms from those emissions and impacts, which will exacerbate climate change impacts in our

20   states and territories, diminish our states' understanding of the actions contributing to those

21   impacts, and cause states and territories economic harm.

22           191.    Eliminating consideration of climate impacts will also place an increased

23   burden on efforts by State Plaintiffs to study and abate harms from climate change.  For

24   example, the Final Rule's elimination of climate change considerations will make it more

25   challenging for New York to assess GHGs from projects subject to NEPA review where those

26   GHGs are generated outside New York but are associated with electricity generation or fossil

AR_0026059

1  fuel transportation in New York. Under New York's Climate Leadership and Community

2  Protection Act, Chapter 106 of the Laws of 2019 (Climate Act), which requires significant

3  statewide emission reductions by set dates, such out-of-state emissions contribute to statewide

4  GHG emissions. N.Y. Envtl. Conserv. L. § 75-0107(1). New York thus may need to

5  implement additional and potentially costly regulatory, policy, or other actions to ensure the

6  achievement of the requirements of the Climate Act. By decreasing the quality of analysis and

7  potential mitigation for GHG emissions from projects with impacts on Massachusetts residents,

8  the Final Rule may impose similar challenges and burdens on Massachusetts' ability to assess

9  and meet the GHG emission-reduction mandates of the Massachusetts Global Warming

10  Solutions Act. *See* Mass. Gen. Laws. ch. 21N, §§ 1–11.

11  192.    The scope of cumulative impact review required under the 1978 NEPA

12  regulations was broader than the cumulative impact review performed during an ESA

13  consultation process. The Final Rule, however, eliminates cumulative impact analysis during

14  the NEPA review process entirely, undermining CEQ's conclusion that the Final Rule will

15  have "no effect" on listed species or designated critical habitat. For example, the Final Rule's

16  instruction that federal agencies should not consider impacts that are "remote in time" and

17  "geographically remote" may result in inadequate analysis of and, consequently, potential

18  damage to the State Plaintiffs' fish and wildlife, including ESA listed species and designated

19  critical habitat. For ESA listed species and designated critical habitat, this harm will occur

20  even if federal agencies perform site-specific ESA consultation, due to the more limited scope

21  of cumulative impacts analysis required under the ESA's section 7 implementing regulations.

22  *See* 50 C.F.R. §§ 402.02, 402.14(g)(3)–(4). One example of such harm is apparent in the

23  context of federal dam operations, which have a major impact on several of Oregon's iconic

24  salmon populations, many of which are listed as threatened or endangered under the ESA.

25  Salmon travel hundreds of miles and juvenile salmon may be harmed by powerhouses in the

26  hydrosystem, only to succumb to their injuries after entering the ocean or on their migration

AR_0026060

1     upstream as adults. Due to the Final Rule's elimination of consideration of "geographically

2     remote" impacts and impacts that are "remote in time," NEPA analysis of federal hydrosystem

3     actions could disregard these impacts to State Plaintiffs' natural resources, including species

4     listed and critical habitat designated under the ESA.

5            193.   By decreasing opportunities for public comment and participation, the Final

6     Rule also limits State Plaintiffs' ability to influence federal projects affecting their natural

7     resources and residents. Through NEPA, state and territorial agencies regularly engage with

8     federal agencies and permit applicants to identify potential adverse impacts to their state and

9     territorial resources and propose alternatives or mitigation measures to avoid those harms. For

10     example, the Washington Department of Fish and Wildlife recently commented on the draft

11     EA for a proposed expansion of a ski area on federal lands within the state to highlight impacts

12     to state lands and wildlife and suggest the most effective mitigation of these impacts.

13     Washington state agencies also recently submitted comments on the Draft Supplemental EIS

14     for the Navy's proposed Northwest Training and Testing activities, which threatens harmful

15     impacts to critically endangered Southern Resident Killer Whales, a species that Washington

16     has dedicated significant resources to protect. Under the Final Rule, these opportunities to

17     comment on and help shape federal actions affecting state resources, including ESA listed

18     species and designated critical habitat, will be diminished in some situations and lost in others.

19     Where actions proceed with diminished public process under the Final Rule, states will lose the

20     opportunity to comment on or, if necessary, challenge the actions before harms occur.

21            194.   Fewer and less robust environmental reviews and diminished opportunities for

22     public participation will also increase the burden on State Plaintiffs to respond to public health

23     disparities flowing from uninformed federal decisions that adversely impact vulnerable

24     communities. For example, the Final Rule excludes consideration of cumulative impacts to

25     communities that face a historic and disproportionate pattern of exposure to environmental

26     hazards and are more likely to suffer future health disparities due to the elimination of

First Amended Compl. for Declaratory and
Inj. Relief           66
Case No. 3:20-cv-06057

AR_0026061

cumulative impact review from the NEPA process.  These communities also are more likely to

experience severe impacts of climate change, including flooding, extreme weather events such

as extreme heat, and degraded air and water quality.  Increased public health and community

harms from weakened NEPA reviews will require greater expenditures of state and territorial

funds to remedy increased public health disparities flowing from uninformed federal agency

action.

195.    These harms will also impair ongoing efforts by State Plaintiffs to reduce public

health disparities, which State Plaintiffs already devote significant resources to address.  For

example, the New York State Department of Environmental Conservation's Office of

Environmental Justice directs resources to disproportionately impacted communities and

enhances public participation through grant opportunities, enforcement of environmental laws

and programs, and consultation with local industries.  California's Community Air Protection

Program (CAPP) helps to reduce exposure in communities most impacted by air pollution.

CAPP works with communities throughout California to measure and reduce adverse health

impacts from air pollution, including through targeted incentive funding to deploy cleaner

technologies in communities experiencing localized air pollution.  In Washington, the

Department of Health and a statewide Environmental Justice Task Force are working to reduce

health disparities.  The Final Rule hinders these state efforts by adopting changes that allow

agencies to avoid thorough consideration of impacts on public health and environmental

justice.

196.    In addition, fewer and less robust NEPA reviews may increase the burden on

some State Plaintiffs to protect vulnerable species and the habitats upon which they depend

through the protections afforded under state environmental review laws and other state efforts

to protect biodiversity.

197.    State Plaintiffs have also relied on the 1978 regulations to review proposed

agency NEPA rules and to determine their potential impact on state and territorial natural

AR_0026062

1   resources.  For example, the Washington Department of Fish and Wildlife (WDFW) relied on

2   the requirement in the 1978 regulations that projects with extraordinary circumstances will not

3   be subject to a categorical exclusion in assessing potential wildlife impacts from the Forest

4   Service's proposed categorical exclusions.  *See* Letter from WDFW Director Kelly Susewind

5   to Amy Baker, U.S. Forest Service on proposed categorical exclusions, USFS-HQ-2019-12195

6   (Aug. 6, 2019).  The Final Rule, however, authorizes federal agencies to apply a categorical

7   exclusion even where extraordinary circumstances exist, diminishing the protections to state

8   natural resources on which WDFW relied.  Similarly, the Final Rule requires federal agencies

9   to amend their NEPA regulations to meet the lowered environmental review standards of the

10  Final Rule, which will increase the risk of adverse impacts to state and territorial natural

11  resources, including species listed and critical habitat designated under the ESA.

12          198.    Additionally, State Plaintiffs have institutional, proprietary, and economic

13  interests in federal agency compliance with NEPA's text and goals of environmental

14  protection, public participation, and informed decision making.  Fewer and weaker federal

15  environmental reviews mean that state agencies in Washington, California, New York, and

16  Massachusetts will no longer be able to adopt or incorporate most federal NEPA documents

17  into their own state NEPA review processes because the NEPA documents will no longer

18  satisfy state law, including, for example, requirements that state review include climate

19  impacts and greenhouse gas emissions.  *See, e.g.*, Wash. Rev. Code ch. 43.21; Cal. Pub. Res.

20  Code § 21083.5; 6 N.Y. Comp. Codes R. & Regs. § 617.15; Mass. Gen. Laws, ch. 30, §§ 61,

21  62G.  Similarly, state agencies in California will no longer be able to prepare joint documents

22  to satisfy both NEPA and California's little NEPA law, and this will increase the burden on

23  state agencies to prepare their own stand-alone environmental documents.  Cal. Code Regs., tit.

24  14, § 1517.  Similar problems may arise even in states that do not have so-called "little

25  NEPAs."  In Oregon, for example, the State Energy Facility Siting Council may need to

26  develop separate environmental reviews to meet the requirements of Oregon statutory law

AR_0026063

before approving energy facilities, rather than rely on federal NEPA documentation according to the Council's longstanding practice. As a result, State Plaintiff agencies will need to expend significant financial and administrative resources to conduct environmental analyses that would not have been necessary under the 1978 regulations.

199.    Robust NEPA review is critical for State Plaintiffs that lack environmental review processes or where state environmental review statutes may not apply. In these situations, state agencies will be unable to fill significant gaps in analysis through their own state environmental review and will thus need to rely on the federal NEPA process to understand a project's anticipated environmental impacts. Where the federal environmental review is insufficient, as it will be under the Final Rule, states and territories will lack valuable information to determine how federal projects will impact state and territorial natural resources.

200.    Moreover, while State Plaintiffs can act to protect natural resources within their borders, they cannot control decisions made by non-plaintiff states about resources that cross state boundaries, such as water, air, and wildlife. Thus, despite the State Plaintiffs' efforts, State Plaintiffs may not be able wholly to fill the regulatory gaps created by the Final Rule.

201.    Federal agencies will also be required to amend their NEPA regulations to conform to the Final Rule. 85 Fed. Reg. at 43,373 (to be codified at § 1507.3(b)). These regulatory changes will further burden State Plaintiff agencies that frequently participate in the NEPA process and will place a particular burden on State Plaintiff agencies, like Caltrans, that have been delegated NEPA authority.

202.    State Plaintiffs also suffered procedural harm from CEQ's failure to comply with the procedural requirements of the APA, NEPA, and the ESA in promulgating the Final Rule. CEQ's failure to promulgate a rationally supported and lawful rule, failure to prepare an EA or EIS for the Final Rule, and failure to consult with the Services regarding impacts to listed species and designated critical habitat harms State Plaintiffs' procedural interests in

AR_0026064

1   participating in a lawful rulemaking and environmental review process that adequately

2   considers and mitigates impacts on the State Plaintiffs' residents, natural resources, and ESA

3   listed species and designated critical habitat.

4        203.    State Plaintiffs have thus suffered concrete injury caused by CEQ's

5   promulgation of the Final Rule.  A court judgment vacating the entire Final Rule and

6   reinstating the 1978 regulations and associated guidance will redress the harms to State

7   Plaintiffs by requiring that federal agencies continue to review actions under the prior

8   regulations and guidance, consistent with NEPA.  Therefore, State Plaintiffs have standing to

9   bring this action.

10   **FIRST CAUSE OF ACTION**<br>**Violation of the APA and NEPA by Adopting Regulations Contrary to NEPA**<br>**5 U.S.C. § 706(2); 42 U.S.C. §§ 4321 *et seq.***

11

12        204.    State Plaintiffs incorporate all preceding paragraphs by reference.

13        205.    The APA provides that this Court shall "hold unlawful and set aside" agency

14   action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with

15   law" or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."

16   5 U.S.C. § 706(2).  An agency does not have authority to adopt a regulation that is "plainly

17   contrary to the statute." *Morton*, 467 U.S. at 834; *Babbitt v. Sweet Home Chapter of Cmtys.*

18   *for a Great Or.*, 515 U.S. 687, 703 (1995).

19        206.    The Final Rule is "not in accordance with law" because it conflicts with

20   NEPA's text, structure, and purpose and exceeds the scope of CEQ's jurisdiction, authority,

21   and discretion under NEPA.

22        207.    The Final Rule violates NEPA and the APA by adopting provisions that, both

23   individually and collectively, conflict with NEPA's overriding purposes of environmental

24   protection, public participation, and informed decision making and the statute's mandate that

25   agencies apply NEPA "to the fullest extent possible."  5 U.S.C. § 706(2)(A); 42 U.S.C.

26   §§ 4331, 4332.  The Final Rule is unlawful because, among other things, it:

First Amended Compl. for Declaratory and
Inj. Relief          70
Case No. 3:20-cv-06057

AR_0026065

1            a.     Restricts the number of projects subject to detailed environmental

2 review, including, among others things, through (i) a new "NEPA thresholds" provision that

3 establishes six broad and ill-defined circumstances in which NEPA does not apply, Final Rule,

4 85 Fed. Reg. at 43,359 (to be codified at § 1501.1); (ii) a narrow definition of "major Federal

5 action" that is inconsistent with NEPA's plain language, *id*. at 43,375 (to be codified at

6 § 1508.1(q)); and (iii) a revised analysis for determining what actions are likely to have

7 "significant effects" and thus require an EIS, *id*. at 43,360 (to be codified at § 1501.3). These

8 provisions are directly contrary to NEPA's text and purpose and its mandate that agencies

9 apply the statute "to the fullest extent possible." *See* 42 U.S.C. §§ 4331, 4332.

10            b.     Limits the scope of environmental effects agencies must consider when

11 conducting NEPA review. For example, the Final Rule allows agencies to avoid considering

12 cumulative and indirect impacts, as well as impacts that are "remote in time" or

13 "geographically remote." Final Rule, 85 Fed. Reg. at 43,375 (to be codified at § 1508.1(g));

14 *see also id*. at 43,360 (to be codified at § 1501.3(b)(1)) (limiting the "affected area" in the

15 significance analysis to "national, regional, or local"). Congress however, plainly intended

16 NEPA to address such impacts. NEPA directs agencies to consider "any adverse

17 environmental effects which cannot be avoided should the proposal be implemented,"

18 42 U.S.C. 4332(C)(ii), and "the relationship between local short-term uses of man's

19 environment and the maintenance and enhancement of long-term productivity," *id*.

20 § 4332(2)(C)(iv). NEPA further directs agencies to "recognize the worldwide and long-range

21 character of environmental problems," rather than examine the impacts of each federal

22 proposal in a silo, *id*. § 4332(2)(F). Indeed, the Senate Committee Report on NEPA stated that

23 the statute was necessary because "[i]mportant decisions concerning the use and the shape of

24 man's future environment continue to be made in small but steady increments which

25 perpetuate rather than avoid the recognized mistakes of previous decades." S. Rep. No. 91-

26 296, at 5. Avoiding this death by a thousand cuts demands that federal agencies carefully

First Amended Compl. for Declaratory and
Inj. Relief       71
Case No. 3:20-cv-06057

AR_0026066

1  consider the cumulative environmental impacts of their actions with other related and unrelated

2  actions—not, as the Final Rule would have it, ignore those impacts entirely.

3          c.     Limits the number of alternatives to the proposed action analyzed in an

4  EA or EIS and the depth of that analysis by, among other things, removing the requirement that

5  agencies "[r]igorously explore and objectively evaluate" all reasonable alternatives to the

6  proposed action, eliminating consideration of alternatives outside the jurisdiction of the lead

7  agency, and removing the requirement that agencies "[d]evote substantial treatment to each

8  alternative. Final Rule, 85 Fed. Reg. at 43,365 (to be codified at § 1502.14). The Final Rule

9  also unlawfully allows certain actions to proceed during NEPA review, constraining available

10  alternatives. *Id.* at 43,370 (to be codified at § 1506.1). Contrary to these provisions, NEPA's

11  plain language requires "to the fullest extent possible" consideration of "alternatives to the

12  proposed action" and limits action on proposals until after that comprehensive environmental

13  review occurs. 42 U.S.C. § 4332, 4332(2)(C)(iii); *Robertson*, 490 U.S. at 349 ("Simply by

14  focusing the agency's attention on the environmental consequences of a proposed project,

15  NEPA ensures that important effects will not be overlooked or underestimated only to be

16  discovered after resources have been committed or the die otherwise cast.").

17          d.     Diminishes agencies' obligation to obtain or develop information

18  regarding environmental impacts when such information is not already available. The 1978

19  regulations required agencies to obtain such information when the cost of obtaining it was "not

20  exorbitant." 40 C.F.R. § 1502.22(a) (1978). The Final Rule lowers the bar and permits

21  agencies to forgo additional investigation when the cost would be merely "unreasonable."

22  Final Rule, 85 Fed. Reg. at 43,366 (to be codified at 40 C.F.R. § 1502.21(b)). This vague and

23  lax standard is inconsistent with NEPA's statutory mandate that agencies consider all the

24  environmental impacts of their actions, not just those that are readily apparent. *See* 42 U.S.C.

25  § 4332(2)(C)(ii) (agencies must disclose "*any* adverse environmental effects which cannot be

26  avoided should the proposal be implemented" (emphasis added)).

First Amended Compl. for Declaratory and
Inj. Relief          72
Case No. 3:20-cv-06057

AR_0026067

e.    Undermines the ability of State Plaintiffs and the public to comment on federal proposals, in direct conflict with NEPA's informed decision making mandate and direction that federal agencies work "in cooperation with State and local governments, and other concerned public and private organizations." *Id.* § 4331(a); *see also id.* § 4332(2)(C) (directing that "the comments and views of the appropriate Federal, State, and local agencies … shall accompany the [agency] proposal through the existing agency review processes" and shall be made available to the public), *id.* § 4332(2)(G) ("make available to States, counties, municipalities, institutions, and individuals, advice and information useful in restoring, maintaining, and enhancing the quality of the environment").   The Final Rule allows federal agencies to claim a "presumption" that they have considered public comments (including comments by states and their agencies) by making a certification in the record of decision approving a proposed action.  Final Rule, 85 Fed. Reg. 43,369 (to be codified at 40 C.F.R. § 1505.2(b)).  This unjustified presumption invites federal agencies to overlook state and public input on federal proposals.  Indeed, the Final Rule adds a provision stating that agencies "are not required to respond to each comment."  *Id.* at 43,368 (to be codified at 40 C.F.R. § 1503.4(a)(5)).  Together, these changes, which excuse federal agencies from providing meaningful response to comments submitted by State Plaintiffs, local governments, and the public, unlawfully render NEPA's mandated public participation process an empty paperwork exercise.

208.    For these reasons, the Final Rule is arbitrary and capricious, an abuse of discretion, and contrary to the requirements of NEPA and the APA.  5 U.S.C. § 706(2); 42 U.S.C. §§ 4321 *et seq.*  The Final Rule should therefore be held unlawful and set aside.

### SECOND CAUSE OF ACTION
### Violation of the APA for Arbitrary and Capricious Rulemaking
### 5 U.S.C. § 706(2)

209.    State Plaintiffs incorporate all preceding paragraphs by reference.

AR_0026068

210.    The APA provides that this Court shall "hold unlawful and set aside" agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," "without observance of procedure required by law," or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."  5 U.S.C. § 706(2).

211.    Pursuant to the APA, in promulgating a regulation an "agency must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *State Farm*, 463 U.S. at 43.

212.    When the regulation represents a change in policy or interpretation, the agency must provide a rational explanation for that change.  *Fox Television, Inc.*, 556 U.S. at 515.  The agency must demonstrate that the new rule "is permissible under the statute, that there are good reasons for it, and that the agency *believes* it to be better, which the conscious change of course adequately indicates." *Id*.

213.    Moreover, in changing policy agencies are "required to assess whether there were reliance interests, determine whether they were significant, and weigh any such interests against competing policy concerns." *Dep't of Homeland Sec.*, 140 S. Ct. at 1915 (citations omitted).

214.    In promulgating the Final Rule, CEQ failed, both for the entire rule and for its individual changes, to provide the reasoned analysis required by the APA.  Specifically, CEQ failed to provide a rational explanation for its changes to its longstanding NEPA interpretations and policies, relied on factors Congress did not intend for CEQ to consider, offered explanations that run counter to the evidence before the agency, ignored substantial reliance interests (including reliance by State Plaintiffs on NEPA's procedures to help protect state and territorial natural resources and public health) in the 1978 regulations and associated guidance, and entirely overlooked important issues.

215.    CEQ provided no reasoned analysis to demonstrate that the revisions in the Final Rule, both individually and collectively, will achieve its purported objectives to reduce

AR_0026069

1    paperwork and delays while "at the same time to produce better decisions [that] further the

2    national policy to protect and enhance the quality of the human environment." Final Rule,

3    85 Fed. Reg. at 43,313; *see also id*. at 43,307.

4          216.    In particular, CEQ failed to demonstrate how the Final Rule will further

5    NEPA's policies of producing better decisions and furthering protection and enhancement of

6    the human environment when the Final Rule adopts provisions that conflict with NEPA's text,

7    purpose, legislative history, and CEQ's longstanding prior interpretations; that will produce

8    fewer and less robust environmental reviews and restrict public participation; and that will

9    limit judicial review.

10         217.    CEQ further failed to demonstrate how its revisions will reduce delay or add

11    clarity when CEQ's Final Rule injected new, undefined, and poorly explained language and

12    requirements into the NEPA process and swept away decades of agency regulations, guidance,

13    and case law that formerly provided extensive direction for federal agencies implementing

14    NEPA. If anything, the Final Rule will lead to more delay, confusion, and litigation over the

15    correct interpretation and application of the Final Rule.

16         218.    CEQ also failed to meaningfully examine evidence, including studies developed

17    by CEQ itself, demonstrating successful implementation of NEPA under the 1978 regulations

18    and indicating that delay in project implementation is often caused by factors other than CEQ's

19    implementing regulations. *See, e.g.*, U.S. Gov't Account. Office, *National Environmental*

20    *Policy Act: Little Information Exists on NEPA Analyses*, 16 (Apr. 2014).

21         219.    CEQ also failed to rationally consider environmental justice impacts from the

22    Final Rule or provide factual support for its conclusion that the Final Rule will "not cause

23    disproportionately high and adverse human health or environmental effects on minority

24    populations and low-income populations." Final Rule, 85 Fed. Reg. at 43,356–57. CEQ does

25    not justify its departure from its longstanding policy that environmental justice impacts should

26    be thoroughly analyzed through the NEPA process.

First Amended Compl. for Declaratory and
Inj. Relief          75
Case No. 3:20-cv-06057

AR_0026070

220.    CEQ also failed to consider important aspects of the Final Rule by, among other things, ignoring evidence of NEPA's successful implementation and sweeping away concerns about environmental justice impacts, natural resource impacts (including climate change impacts), and burdens imposed on State Plaintiffs resulting from the Final Rule.

221.    For these reasons, the Final Rule is arbitrary and capricious, an abuse of discretion, and contrary to the requirements of the APA.  5 U.S.C. § 706(2).  The Final Rule should therefore be held unlawful and set aside.

**THIRD CAUSE OF ACTION**
**Violation of the APA for Promulgating Regulations in Excess of Statutory Authority**
**5 U.S.C. § 706(2); 42 U.S.C. §§ 4321 *et seq.***

222.    State Plaintiffs incorporate all preceding paragraphs by reference.

223.    The APA provides that this Court shall "hold unlawful and set aside" agency action that is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."  5 U.S.C. § 706(2).

224.    Several of the Final Rule's provisions, individually and collectively, exceed CEQ's "statutory jurisdiction [and] authority."  *Id.* § 706(2)(C).

225.    These unlawful revisions include:

a.    Carving out new exceptions to NEPA's requirements.  As discussed above, the Final Rule would greatly expand the circumstances in which agencies can avoid complying with NEPA.  CEQ has no authority to excuse agencies from complying with NEPA's environmental review mandate.

b.    Redefining "major Federal action" to exclude an agency's failure to act, *compare* 40 C.F.R. § 1508.18 ("[a]ctions include the circumstance where the responsible agency officials fail to act and that failure to act is reviewable by courts or administrative tribunals"), *with* Final Rule, 85 Fed. Reg. at 43,375 (to be codified at § 1508.1(q) (removing failure to act language from the definition of "major Federal action")), effectively rewriting the

AR_0026071

1   definition of a reviewable agency action under the APA, 5 U.S.C. § 551(13).  CEQ has no

2   authority to limit the application of the APA.

3            c.       Placing a limit on the remedies available in a NEPA lawsuit, stating that

4   "[h]arm from the failure to comply with NEPA can be remedied by compliance with NEPA's

5   procedural requirements," suggesting that courts should decline to invalidate agency action

6   where agencies commit "minor, non-substantive errors that have no effect on agency decision

7   making," and stating that the Final Rule "create[s] no presumption that violation of NEPA is a

8   basis for injunctive relief or for a finding of irreparable harm."  Final Rule, 85 Fed. Reg. at

9   43,358 (to be codified at § 1500.3(d)).  CEQ has no authority, statutory or otherwise, to

10  instruct courts on the remedies they can order.  *See City of Los Angeles v. Barr*, 941 F.3d 931,

11  938 (9th Cir. 2019) ("An agency literally has no power to act ... unless and until Congress

12  confers power upon it.").

13      226.    For these reasons, the Final Rule is arbitrary, capricious, not in accordance with

14  law and in excess of CEQ's statutory authority.  5 U.S.C. § 706(2); 42 U.S.C. §§ 4321 *et seq.*

15  The Final Rule should therefore be held unlawful and set aside.

16                    **FOURTH CAUSE OF ACTION**
                **Violation of the APA's Notice-and-Comment Requirements**
17                            **5 U.S.C. § 706(2)**

18      227.    State Plaintiffs incorporate all preceding paragraphs by reference.

19      228.    The APA provides that this Court shall "hold unlawful and set aside" agency

20  action that is "without observance of procedure required by law."  5 U.S.C. § 706(2).

21      229.    Prior to promulgating, amending, or repealing a rule, agencies must engage in a

22  public notice-and-comment process.  *Id.* §§ 551(5), 553.  To satisfy the requirements of APA

23  section 553(b), agencies must afford public notice of specific regulatory changes and their

24  reasoned basis to provide the public an opportunity for meaningful comment.  *Home Box*

25  *Office v. FCC*, 567 F.2d at 35–36.  To allow for meaningful public comment, an agency must

26  "make available" during the public comment period "technical studies and data that it has

AR_0026072

1     employed in reaching the decision[] to propose particular rules." *Kern Cty. Farm Bureau*, 450

2     F.3d at 1076. The public may then submit comments on the proposed rule. 5 U.S.C. § 553(c).

3         230. "An agency must consider and respond to significant comments received during

4     the period for public comment." *Perez*, 575 U.S. at 96. "These procedures are 'designed to

5     assure due deliberation' of agency regulations and 'foster the fairness and deliberation that

6     should underlie a pronouncement of such force.'" *E. Bay Sanctuary Covenant v. Trump*, 932

7     F.3d 742, 775 (9th Cir. 2018) (quoting *United States v. Mead Corp.*, 533 U.S. 218, 230

8     (2001)). "In considering and responding to comments, 'the agency must examine the relevant

9     data and articulate a satisfactory explanation for its action including a "rational connection

10     between the facts found and the choice made."'" *Altera Corp. & Subsidiaries v. Comm'r of

11     Internal Revenue*, 926 F.3d 1061, 1080 (9th Cir. 2019) (quoting *State Farm*, 463 U.S. at 43),

12     *cert. denied sub nom. Altera Corp. & Subsidiaries v. CIR*, No. 19-1009, 2020 WL 3405861

13     (U.S. June 22, 2020).

14         231. CEQ failed to provide a meaningful opportunity to comment on data or

15     technical studies that it employed in reaching conclusions in the Final Rule. *Kern Cty. Farm

16     Bureau*, 450 F.3d at 1076.

17         232. In the Final Rule, CEQ relied repeatedly on its RIA to support its revised

18     regulations and to dismiss harms to the environment, public health, and vulnerable

19     communities, including to dismiss its obligation under NEPA to prepare an EA or EIS and its

20     obligation under Executive Order 12,898 to assess environmental justice impacts. *See, e.g.*,

21     Final Rule, 85 Fed. Reg. at 43,352, 43,354, 43,356. CEQ thus relied on the RIA in reaching its

22     decisions in the Final Rule.

23         233. CEQ did not provide an opportunity for the public to comment on the RIA prior

24     to promulgating the Final Rule.

25

26

First Amended Compl. for Declaratory and
Inj. Relief        78
Case No. 3:20-cv-06057

AR_0026073

234.     CEQ also failed to respond adequately to comments on the Proposed Rule.  For example, State Plaintiffs and others submitted significant comments on the Advance Notice and the Proposed Rule explaining that:

a.       CEQ has not presented sufficient evidence to demonstrate a need for the Proposed Rule, particularly given that studies, including studies developed by CEQ itself, and State Plaintiffs' own experience with NEPA demonstrate that NEPA leads to better decisions, that external factors contribute to delay in environmental reviews, and that existing tools could remedy CEQ's concerns about delay;

b.       CEQ's Proposed Rule, if finalized, would increase confusion, uncertainty, and litigation, causing the very delay CEQ claimed that it sought to avoid in promulgating the Final Rule;

c.       CEQ's Proposed Rule, if finalized, would adversely impact the unique interests of states, territories, and local governments including by harming state resources, limiting state access to information, disrupting coordination with federal agencies, undermining state reliance on the 1978 regulations and associated guidance, and burdening states with increased environmental review;

d.       CEQ's Proposed Rule, if finalized, would eliminate consideration of climate change impacts, contributing to adverse impacts to natural resources and public health in our states, territories, and communities; and

e.       CEQ's Proposed Rule, if finalized, would adversely impact vulnerable communities by limiting NEPA's application and scope, including by excluding certain federal actions from environmental review, eliminating consideration of cumulative impacts, and limiting opportunities for public comment.

235.     CEQ failed to provide a rational response to these significant comments.  To the extent CEQ addressed these issues, it provided only cursory responses that did not "examine

AR_0026074

1   the relevant data and articulate a satisfactory explanation for its action." *Altera Corp. &*

2   *Subsidiaries*, 926 F.3d at 1080.

3         236.   Because CEQ failed to provide an opportunity to comment on the RIA and CEQ

4   failed to rationally respond to significant comments, the Final Rule is arbitrary, capricious, an

5   abuse of discretion, and promulgated "without observance of procedure required by law."

6   5 U.S.C. § 706(2).  The Final Rule should therefore be held unlawful and set aside.

7   <b>FIFTH CAUSE OF ACTION</b>

<b>Violation of NEPA and the APA for Failure to Prepare an EA or EIS on the Final Rule</b>
8   <b>42 U.S.C. § 4332(2)(C); 5 U.S.C. § 706(2)</b>

9         237.   State Plaintiffs incorporate all preceding paragraphs by reference.

10         238.   NEPA requires federal agencies to take a "hard look" at the environmental

11   consequences of a proposal before acting on it.  *See* 42 U.S.C. § 4332.  That is, a federal

12   agency must prepare an EIS for all "major Federal actions significantly affecting the quality of

13   the human environment."  *Id.* § 4332(2)(C); 40 C.F.R. § 1502.3 (1978).

14         239.   An EIS must discuss, among other things: the environmental impact of the

15   proposed federal action, any adverse and unavoidable environmental effects, any alternatives

16   to the proposed action, and any irreversible and irretrievable commitment of resources

17   involved in the proposed action.  42 U.S.C. § 4332(2)(C).

18         240.   CEQ is a federal agency subject to NEPA.

19         241.   CEQ's 1978 regulations apply to CEQ's promulgation of the Final Rule.  Final

20   Rule, 85 Fed. Reg. 43,354 (stating that if CEQ were to prepare an EIS on the Final Rule, the

21   1978 regulations would apply).

22         242.   Under CEQ's 1978 regulations, a "major Federal action" included "new or

23   revised agency rules [and] regulations," like the Final Rule.  40 C.F.R. § 1508.18(a) (1978).

24         243.   CEQ's 1978 regulations specify that in an EIS, agencies must rigorously

25   explore and objectively evaluate all reasonable alternatives, including the alternative of taking

26

First Amended Compl. for Declaratory and
Inj. Relief          80
Case No. 3:20-cv-06057

AR_0026075

1   no action, and must discuss the reasons for eliminating any alternatives rejected from detailed

2   study. *Id*. § 1502.14.

3       244.    The 1978 regulations also require agencies to analyze both the direct impacts

4   that an action will have on the environment, as well as the action's "reasonably foreseeable"

5   indirect and cumulative impacts.  Indirect impacts are "caused by the action and are later in

6   time or farther removed in distance, but are still reasonably foreseeable." *Id*. § 1508.8(b)

7   (1978).  Cumulative impacts are those impacts that result "from the incremental impact of the

8   action when added to other past, present, and reasonably foreseeable future actions." *Id*.

9   § 1508.7 (1978).

10       245.    CEQ's analysis of alternatives and impacts should consider, among other things,

11   the disproportionately high and adverse human health or environmental effects of their actions

12   on minority and low-income populations.  42 U.S.C. § 4332(2)(C); Exec. Order No. 12,898,

13   59 Fed. Reg. 7,629 (1994) (as amended); CEQ, Environmental Justice (1997).

14       246.    As a preliminary step, an agency may first prepare an EA to determine whether

15   the effects of an action may be significant.  40 C.F.R. §§ 1501.4(b), 1508.9 (1978).  If an

16   agency decides not to prepare an EIS, it must supply a "convincing statement of reasons" to

17   explain why a project's impacts are not significant.  *Nat'l Parks Conservation Ass'n v. Babbitt*,

18   241 F.3d 722, 730 (9th Cir. 2001) (internal citations omitted); *see also Save the Yaak Comm. v.*

19   *Block*, 840 F.2d 714, 717 (9th Cir. 1988).

20       247.    An EIS must always be prepared if "substantial questions are raised as to

21   whether a project … *may* cause significant degradation of some human environmental factor."

22   *Idaho Sporting Cong. v. Thomas*, 137 F.3d 1146, 1149 (9th Cir. 1998) (quoting *Greenpeace*

23   *Action v. Franklin*, 14 F.3d 1324, 1332 (9th Cir. 1992)).

24       248.    CEQ's promulgation of the Final Rule is a "major Federal action" that

25   significantly affects the environment.  The Final Rule severely limits federal agencies'

26   obligation to review environmental impacts under NEPA both by excluding federal actions

First Amended Compl. for Declaratory and
Inj. Relief              81
Case No. 3:20-cv-06057

AR_0026076

from environmental review and by limiting the scope of environmental reviews that do occur. These changes will cause federal agencies to overlook—and thus fail to address, avoid, or mitigate—their actions' impacts, including significant impacts to State Plaintiffs' natural resources, climate change, public health, and environmental justice. Projects with significant unstudied and undisclosed impacts will move forward with no or insufficient environmental review in violation of NEPA. Moreover, excusing agencies from considering cumulative impacts will result in agencies taking actions without fully understanding the impacts of those actions on climate change, overburdened and underserved communities, water and air quality, and sensitive, threatened, and endangered wildlife.

249. Under NEPA, CEQ was required to address the Final Rule's significant environmental impacts and consider reasonable alternatives to the Final Rule in an EIS or, at a minimum, an EA. 42 U.S.C. § 4332(2)(C). CEQ did neither.

250. CEQ provided no legally sufficient justification—let alone a "convincing statement of reasons"—for failing to comply with NEPA in promulgating the Final Rule. *Babbitt*, 241 F.3d at 730; *see also Sierra Club v. Bosworth,* 510 F.3d. 1016 (9th Cir. 2007).

251. CEQ's failure to take a "hard look" at the environmental impacts of the Final Rule prior to its promulgation was arbitrary and capricious, an abuse of discretion, and contrary to the procedural requirements of NEPA and the APA. 5 U.S.C. § 706(2); 42 U.S.C. § 4332(2)(C). The Final Rule should therefore be held unlawful and set aside.

**SIXTH CAUSE OF ACTION**
**Violation of the ESA and APA for Failing to Consult**
**5 U.S.C. § 706(2)**

252. State Plaintiffs incorporate all preceding paragraphs by reference.

253. Section 7 of the ESA requires each federal agency to engage in consultation with the FWS or the NMFS when a proposed federal action "may affect a listed species or critical habitat." 16 U.S.C. § 1536(a)(2); 50 C.F.R. §§ 402.12(a), (k), 402.14(a)–(b). This "may affect" threshold is low; and "any possible effect, whether beneficial, benign, adverse, or

1   of an undetermined character, triggers the formal consultation requirement." *W. Watersheds*

2   *Project v. Kraayenbrink*, 632 F.3d 472, 496 (9th Cir. 2011) (citing 51 Fed. Reg. 19,926, 19,949

3   (June 3, 1986)) (brackets and internal quotation marks omitted).

4       254.    Once consultation has been initiated, the federal agency is prohibited from

5   "mak[ing] any irreversible or irretrievable commitment of resources with respect to the agency

6   action which has the effect of foreclosing the formulation or implementation of any reasonable

7   and prudent alternative measures[.]" 16 U.S.C § 1536(d). Where a federal agency is required

8   to initiate consultation, but fails to do so, the agency is prohibited from proceeding with any

9   activity that may affect a listed species or designated critical habitat until it complies with the

10  consultation requirement. *Pac. Rivers Council v. Thomas*, 30 F.3d 1050, 1056–57 (9th Cir.

11  1994).

12      255.    Each "department, agency, or instrumentality of the United States" is a federal

13  agency subject to the ESA. 16 U.S.C. § 1532(7).

14      256.    Actions subject to the ESA include "all activities or programs of any kind

15  authorized, funded, or carried out, in whole or in part, by Federal agencies in the United States

16  or upon the high seas." 50 C.F.R. § 402.02. Such actions include the promulgation of

17  regulations and all other actions directly or indirectly causing modifications to the land, water,

18  or air. *Id*.

19      257.    CEQ is a federal agency subject to the ESA.

20      258.    Promulgation of the Final Rule is an action subject to the ESA.

21      259.    Promulgation of the Final Rule "may affect" numerous listed species and the

22  designated critical habitats upon which they rely, including but not limited to, by revising

23  NEPA's implementing regulations to: exclude certain actions from NEPA review; separate the

24  definition of "major Federal action" from an action's significance; expand the use of

25  categorical exclusions; eliminate review of an agency action's effects on listed species and

26  designated critical habitat when analyzing the significance of an action; reduce the scope of

First Amended Compl. for Declaratory and
Inj. Relief          83
Case No. 3:20-cv-06057

AR_0026078

1   alternatives considered during environmental review; and direct agencies not to consider

2   cumulative and indirect effects, including climate change impacts.  Final Rule, 85 Fed. Reg. at

3   43,360, 43,365–66, 43,375 (to be codified at §§ 1501.3(b), 1501.4, 1502.14, 1502.15,

4   1508.1(g), (m), (q)).  As such, CEQ's rulemaking for the Final Rule triggered the consultation

5   requirement set forth in section 7(a)(2) of the ESA.  16 U.S.C. § 1536(a)(2).

6       260.    However, CEQ did not consult with the Services with regard to the Final Rule.

7   Rather, CEQ concluded, without any basis or explanation, that the Final Rule would have "no

8   effect" on listed species or designated critical habitat.

9       261.    Once published, the Final Rule can no longer be revised as needed to ensure

10  that it will not jeopardize the continued existence of any listed species or result in the

11  destruction or adverse modification of designated critical habitat of such species.  As such,

12  CEQ's promulgation of the Final Rule constitutes an irreversible and irretrievable commitment

13  of resources, which foreclosed the formulation or implementation of any reasonable and

14  prudent alternative measures[.]"  16 U.S.C. § 1536(d).  As a result of CEQ's failure to initiate

15  consultation, the ESA's prohibition on the irreversible or irretrievable commitment of

16  resources applies.

17      262.    CEQ's promulgation of the Final Rule without consulting with the Services,

18  based on its conclusion that the Final Rule would have "no effect" on listed species, is

19  arbitrary, capricious, and not in accordance with law, in violation of the ESA and the APA.  16

20  U.S.C. § 1536; 5 U.S.C. § 706(2)(A).

21                    **PRAYER FOR RELIEF**

22      WHEREFORE, State Plaintiffs respectfully request that this Court:

23      1.    Declare that CEQ violated NEPA and the APA by promulgating a Final Rule

24  that is contrary to NEPA's language and purpose and exceeds CEQ's statutory authority;

25

26

2.  Declare that CEQ violated the APA by promulgating a Final Rule that is arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law and fails to follow the procedures required by law;

3.  Declare that CEQ violated NEPA and the APA by promulgating a Final Rule without preparing an EA or an EIS evaluating the Final Rule's environmental and public health impacts;

4.  Declare that CEQ violated the ESA and the APA by promulgating the Final Rule without first consulting with the Services regarding the effects that the Final Rule may have on listed endangered and threatened species and designated critical habitat;

5.  Vacate the entire Final Rule so that the 1978 regulations as amended and associated guidance are immediately reinstated;

6.  Enjoin CEQ from implementing, enforcing, or relying upon the Final Rule;

7.  Award State Plaintiffs their costs, expenses, and reasonable attorneys' fees; and

8.  Award such other relief as the Court deems just and proper.

DATED this 23rd day of November, 2020.

XAVIER BECERRA
Attorney General of California

*/s/ Joshua R. Purtle*
SARAH E. MORRISON, SBN 143459
Supervising Deputy Attorney General
JAMIE B. JEFFERSON, SBN 197142
JOSHUA R. PURTLE, SBN 298215
JULIA K. FORGIE, SBN 304701
LANI M. MAHER, SBN 318637
Deputy Attorneys General
1515 Clay Street, 20th Floor
P.O. Box 70550
Oakland, CA 94612-0550
(510) 879-1002
Jamie.Jefferson@doj.ca.gov
Joshua.Purtle@doj.ca.gov

*Attorneys for Plaintiff State of California*


PHILIP J. WEISER
Attorney General of Colorado

*/s/ Scott Steinbrecher*
SCOTT STEINBRECHER
Assistant Deputy Attorney General
Ralph C. Carr Colorado Judicial Center
1300 Broadway, Seventh Floor
Denver, Colorado 80203
(720) 508-6287
Scott.Steinbrecher@coag.gov

*Attorneys for Plaintiff State Colorado*


ROBERT W. FERGUSON
Attorney General of Washington

*/s/ Aurora Janke*
AURORA JANKE
ELIZABETH HARRIS
Assistant Attorneys General
Washington Attorney General's Office
Environmental Protection Division
800 5th Ave Ste. 2000 TB-14
Seattle, Washington 98104-3188
(206) 233-3391
Aurora.Janke@atg.wa.gov
Elizabeth.Harris@atg.wa.gov

*Attorneys for Plaintiff State of Washington*


WILLIAM TONG
Attorney General of Connecticut

*/s/ Robert Snook*
ROBERT SNOOK
Assistant Attorney General
Attorney General's Office
165 Capitol Avenue
Hartford, Connecticut, 06106
(860) 808-5250
Robert.Snook@ct.gov

*Attorneys for Plaintiff State of Connecticut*

AR_0026081

KATHERINE S. DYKES
Commissioner Connecticut Department of
Energy and Environmental Protection

*/s/ Kirsten S. P. Rigney*
KIRSTEN S. P. RIGNEY
Director, Legal Office
Department of Energy and Environmental
Protection
10 Franklin Square
New Britain, CT 06051
(860) 827-2984

*/s/ Robert Snook*
ROBERT SNOOK
Assistant Attorney General
Attorney General's Office
165 Capitol Avenue
Hartford, Connecticut, 06106
(860) 808-5250
Robert.Snook@ct.gov

*Attorneys for Plaintiff Connecticut
Department of Energy and Environmental
Protection*

KATHLEEN JENNINGS
Attorney General of Delaware

*/s/ Kayli H. Spialter*
KAYLI H. SPIALTER
Deputy Attorney General
Delaware Department of Justice
820 N. French Street
Wilmington, DE 19801
(302) 577-8508
kayli.spialter@delaware.gov

*Attorneys for Plaintiff State of
Delaware*

AR_0026082

KWAME RAOUL
Attorney General of Illinois

/s/ Jason E. James
JASON E. JAMES
Assistant Attorney General
MATTHEW J. DUNN
Chief, Environmental Enforcement/Asbestos
Litigation Division
Office of the Attorney General
Environmental Bureau
69 West Washington St., 18th Floor
Chicago, IL 60602
(312) 814-0660
jjames@atg.state.il.us

*Attorneys for Plaintiff State of Illinois*

AARON FREY
Maine Attorney General

/s/ Jillian R. O'Brien
JILLIAN R. O'BRIEN, SBN 251311
Assistant Attorney General
Office of the Attorney General
6 State House Station
Augusta, ME 04333-0006
jill.obrien@maine.gov
(207) 626-8582

*Attorneys for Plaintiff State of Maine*

BRIAN E. FROSH
Attorney General of Maryland

/s/ Steven J. Goldstein
STEVEN J. GOLDSTEIN
Special Assistant Attorney General
200 Saint Paul Place, 20th Floor
Baltimore, Maryland 21202
(410) 576-6414
sgoldstein@oag.state.md.us

*Attorneys for Plaintiff State of Maryland*

FOR THE PEOPLE OF THE STATE
OF MICHIGAN

DANA NESSEL
Attorney General of Michigan

/s/ Elizabeth Morrisseau
ELIZABETH MORRISSEAU
Assistant Attorney General
Environment, Natural Resources, and
Agriculture Division
6th Floor G. Mennen Williams Building
525 W. Ottawa Street
P.O. Box 30755
Lansing, MI 48909
(517) 335-7664
MorrisseauE@michigan.gov

AR_0026083

KEITH ELLISON
Attorney General of Minnesota

/s/ Peter N. Surdo
PETER N. SURDO
Special Assistant Attorney General
445 Minnesota Street Suite 900
Saint Paul, MN 55101
(651) 757-1061
Peter.Surdo@ag.state.mn.us

*Attorneys for Plaintiff State
of Minnesota*

AARON D. FORD
Attorney General of Nevada

/s/ Tori N. Sundheim
TORI N. SUNDHEIM, SBN 294559
Deputy Attorney General
HEIDI PARRY STERN
Solicitor General
Office of the Nevada Attorney General
555 E. Washington Ave., Ste. 3900
Las Vegas, NV 89101
Tsundheim@ag.nv.gov
HStern@ag.nv.gov

*Attorneys for Plaintiff State of Nevada*

GURBIR S. GREWAL
Attorney General of New Jersey

/s/ Lisa Morelli
LISA MORELLI
Deputy Attorney General
Environmental Permitting and Counseling
R.J. Hughes Justice Complex
P.O. Box 093
Trenton, NJ 08625
(609) 376-2804
Lisa.Morelli@law.njoag.gov

*Attorneys for Plaintiff State of New
Jersey*

HECTOR BALDERAS
Attorney General of New Mexico

/s/ William Grantham
WILLIAM GRANTHAM
Assistant Attorney General
201 Third Street NW, Suite 300
Albuquerque, New Mexico 87102
(505) 717-3520
wgrantham@nmag.gov

*Attorneys for the State of New Mexico*

AR_0026084

LETITIA JAMES
Attorney General of New York

/s/ Claiborne E. Walthall
CLAIBORNE E. WALTHALL
Assistant Attorney General
New York State Office of
the Attorney General
State Capitol
Albany, NY 12224
(518) 776-2380
claiborne.walthall@ag.ny.gov

*Attorneys for Plaintiffs State of New York and New York State Department of Environmental Conservation*

JOSHUA H. STEIN
Attorney General of North Carolina

DANIEL S. HIRSCHMAN
Senior Deputy Attorney General

/s/ Asher P. Spiller
ASHER P. SPILLER
Assistant Attorney General
North Carolina Department of Justice
P.O. Box 629
Raleigh, NC 27602
(919) 716-6400
aspiller@ncdoj.gov

*Attorneys for Plaintiff State of North Carolina*

ELLEN ROSENBLUM
Attorney General of Oregon

/s/ Paul Garrahan
PAUL GARRAHAN
Attorney-in-Charge
STEVE NOVICK
Special Assistant Attorney General
Natural Resources Section
Oregon Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4593
Paul.Garrahan@doj.state.or.us
Steve.Novick@doj.state.or.us

*Attorneys for Plaintiff State of Oregon*

PETER F. NERONHA
Attorney General of Rhode Island

/s/ Gregory S. Schultz
GREGORY S. SCHULTZ
Special Assistant Attorney General
Rhode Island Office of Attorney General
150 South Main Street
Providence, RI 02903
(401) 274-4400
gschultz@riag.ri.gov

*Attorneys for Plaintiff State of Rhode Island*

AR_0026085

THOMAS J. DONOVAN, JR.
Attorney General of Vermont

*/s/ Nicholas F. Persampieri*
NICHOLAS F. PERSAMPIERI
Assistant Attorney General
Office of the Attorney General
109 State Street
Montpelier, VT 05609
(802) 828-3171
nick.persampieri@vermont.gov

*Attorneys for Plaintiff State of Vermont*


JOSHUA L. KAUL
Attorney General of Wisconsin

*/s/ Emily M. Ertel*
EMILY M. ERTEL
Assistant Attorney General
Wisconsin Department of Justice
Post Office Box 7857
Madison, Wisconsin 53707-7857
(608) 266-0432
ertelem@doj.state.wi.us

*Attorneys for Plaintiff State of Wisconsin*


MAURA HEALEY
Attorney General of Massachusetts

*/s/ Turner Smith*
TURNER SMITH
MATTHEW IRELAND
Assistant Attorneys General
Office of the Attorney General
Environmental Protection Division
One Ashburton Place, 18th Floor
Boston, MA 02108
(617) 727-2200
Turner.Smith@mass.gov
Matthew.Ireland@mass.gov

*Attorneys for Plaintiff Commonwealth of Massachusetts*


JOSH SHAPIRO
Attorney General of Pennsylvania

MICHAEL J. FISCHER
Chief Deputy Attorney General

*/s/ Ann R. Johnston*
ANN R. JOHNSTON
Senior Deputy Attorney General
Office of the Attorney General
Strawberry Square, 14th Floor
Harrisburg, PA 17120
(717) 705-6938
ajohnston@attorneygeneral.gov

*Attorneys for Plaintiff Commonwealth of Pennsylvania*

AR_0026086

LEEVIN TAITANO CAMACHO
Attorney General of Guam

*/s/ Joseph A. Perez*
JOSEPH A. PEREZ
Assistant Attorney General
Consumer Protection Division
590 South Marine Corps Drive,
Suite 901, ITC Building
Tamuning, Guam 96913
Telephone: (671) 475-3324
Facsimile: (671) 472-2493
jperez@oagguam.org

*Attorneys for Plaintiff Territory
of Guam*

KARL A. RACINE
Attorney General for the District of
Columbia

KATHLEEN KONOPKA
Deputy Attorney General
Public Advocacy Division

*/s/ Alacoque Hinga Nevitt*
ALACOQUE HINGA NEVITT, SBN
268768
WESLEY ROSENFELD
Assistant Attorneys General
District of Columbia Office of the
Attorney General
400 6th Street, NW
Washington, D.C. 20001
(202) 717-1368
alacoque.nevitt@dc.gov

*Attorneys for Plaintiff District of
Columbia*

VINCE RYAN
Harris County Attorney

*/s/ Sarah Jane Utley*
SARAH JANE UTLEY
Managing Attorney
Environmental Practice Group
Harris County Attorney's Office
1019 Congress, 15th Floor
Houston, Texas 77057
(713) 274-5124
Sarah.Utley@cao.hctx.net

*Attorneys for Plaintiff Harris County, Texas*

JAMES E. JOHNSON
Corporation Counsel of the
City of New York

*/s/ Nathan Taylor*
NATHAN TAYLOR
New York City Law Department
100 Church Street, Rm 6-144
New York, NY 10007
(646) 940-0736 (m)
(212) 356-2315
NTaylor@law.nyc.gov

*Attorneys for Plaintiff City of New York*

AR_0026087

# CERTIFICATE OF SERVICE

Case Name:     **State of California, et al. v.**          No.      **3:20-cv-06057**
                 **Council on Environmental**
                 **Quality, et al.**

I hereby certify that on <u>November 23, 2020</u>, I electronically filed the following documents with the Clerk of the Court by using the CM/ECF system:

**FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

I certify that **all** participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

I declare under penalty of perjury under the laws of the State of California and the United States of America the foregoing is true and correct and that this declaration was executed on <u>November 23, 2020</u>, at Oakland, California.

_____                    _____
      Maritza Padilla                                 Signature
        Declarant

OK2020303085
91319709.docx

**COMMENTS OF ATTORNEYS GENERAL OF WASHINGTON, CALIFORNIA, NEW YORK, COLORADO, DISTRICT OF COLUMBIA, DELAWARE, GUAM, HARRIS COUNTY, ILLINOIS, MAINE, MARYLAND, MASSACHUSETTS, NEW JERSEY, NEW MEXICO, CITY OF NEW YORK, NORTH CAROLINA, OREGON, PENNSYLVANIA, RHODE ISLAND, VERMONT, WISCONSIN, AND THE NEW YORK STATE DEPARTMENT OF ENVIRONMENTAL CONSERVATION**

November 22, 2021

VIA REGULATIONS.GOV
Amy B. Coyle, Deputy General Counsel
Council on Environmental Quality
730 Jackson Place NW
Washington, DC 20503

Re:    National Environmental Policy Act Implementing Regulations Revisions
       86 Fed. Reg. 55757 (Oct. 7, 2021)
       Docket No. CEQ-2021-0002

Dear Ms. Coyle:

       The Attorneys General of the States of Washington, California, New York, Colorado, District Of Columbia, Delaware, Guam, Illinois, Maine, Maryland, Massachusetts, New Jersey, New Mexico, North Carolina, Oregon, Pennsylvania, Rhode Island, Vermont, and Wisconsin, and the City of New York, Harris County, and The New York State Department Of Environmental Conservation (collectively, the States) respectfully submit these comments on the Council on Environmental Quality's (CEQ) notice of proposed rulemaking (Proposed Rule) revising the regulations implementing the National Environmental Policy Act (NEPA), 42 U.S.C. §§ 4321–4347.[1] While the Proposed Rule does not address all of the harms to the States from the current NEPA regulations, it takes important steps to undo this harm by requiring a more robust alternatives analysis, restoring the prior definition of effects, and making CEQ's regulations a floor and not a ceiling for other federal agencies' NEPA regulations. The States support these changes and urge CEQ to address all of the harms imposed by the current NEPA regulations as soon as possible through a further "Phase II" rulemaking.

## I.    THE 2020 RULE HARMS THE STATES' INTERESTS IN ROBUST NEPA REVIEWS AND DEPARTS FROM DECADES OF AGENCY PRACTICE

       For more than 50 years NEPA has supported informed and transparent agency decision-making and meaningful public participation in developing and reviewing the environmental and

---

[1] Nat'l Env'tl Policy Act Implementing Regulations Revisions, 86 Fed. Reg. 55757 (Oct. 7, 2021), Docket ID No. CEQ-2021-0002.

AR_0026090

public health impacts of proposed federal actions.[2] By requiring thorough environmental review before committing significant resources to such actions, NEPA has helped federal agencies for decades to develop projects that protect and enhance the human environment across the country, including in the States.[3]

The States have strong interests in deliberative and complete federal environmental reviews for major federal actions. States are injured in their *parens patriae* capacity when their residents suffer from environmental pollution.[4] Additionally, the States also have a quasi-sovereign interest in preventing harm to the health of their natural resources and ecosystems..[5] The NEPA process allows the States to safeguard these interests by identifying potential harms of federal actions prior to final approval. The States also rely on a robust NEPA process and the cooperative federalism approach woven into the first NEPA regulations promulgated by CEQ in 1978 (the 1978 Regulations). Indeed, the States coordinate closely with federal agencies by evaluating environmental impacts under NEPA and enforcing their own state environmental laws. Over time, many States have designed their own environmental review statutes, often referred to as "little NEPAs," to work in tandem with NEPA reviews.[6] The NEPA regulatory revisions finalized in 2020 (the 2020 Rule) harms all of these interests..[7]

Recognizing the importance of NEPA and in order to protect their interests, the States have actively participated in CEQ's rulemakings on the NEPA regulations. In 2018, a coalition of states and territories, including many of the signatories listed below, submitted comments on CEQ's Advanced Notice of Proposed Rulemaking seeking input on proposed revisions to CEQ's

---

[2] U.S. Gov't Accountability Office, GAO-14-369, National Environmental Policy Act: Little Information Exists on NEPA Analyses, at 16 (2014) [hereinafter GAO Report], https://www.gao.gov/products/gao-14-369 (last visited Nov. 22, 2021),("[a]ccording to studies and agency officials, some of the qualitative benefits of NEPA include its role as a tool for encouraging transparency and public participation and in discovering and addressing the potential effects of a proposal in the early design stages to avoid problems that could end up taking more time and being more costly in the long run.").

[3] *See, e.g.* Comments of Attorneys General of California, Illinois, Maryland, Massachusetts, New Jersey, New York, Oregon, Vermont, and Washington, and the Secretary of the Commonwealth of Pennsylvania Department of Environmental Protections on Advance Notice of Proposed Rulemaking, 83 Fed. Reg. 28, 591 at 12–15 (August 20, 2018) [hereinafter 2018 Comments] (attached as Ex. 1).

[4] *Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592, 607 (1982); *Maryland v. Louisiana*, 451 U.S. 725, 737–38 (1981).

[5] *Massachusetts v. EPA*, 549 U.S. 497, 51922 (2007).

[6] *See* Comments of Attorneys General of Washington, California , New York, Connecticut, Delaware, Illinois, Maine, Maryland, Michigan, Minnesota, Nevada, New Jersey, New Mexico, Oregon, Rhode Island, and Vermont; the District of Columbia; the Commonwealths of Massachusetts and Pennsylvania, and the Territory of Guam on Notice of Proposed Rulemaking, 85 Fed. Reg. 1684 (March 10, 2020), (Attached as Ex. 2) [hereinafter 2020 Comments] at 7173.

[7] *See* First Amended Complaint for Declaratory and Injunctive Relief, Nov. 23, 2020, (attached as Ex. 3) (Complaint) at 54–60. This litigation is stayed through the end of February, 2022. *See* Order Ext. Stay, Dkt. 96 (Oct. 2, 2021). These flaws have sparked other lawsuits around the country. *See Alaska Cmty. Action on Toxics v. CEQ*, No. 20-cv-05199 (N.D. Cal., filed July 29, 2020); *Wild Virginia v. CEQ*, No. 20-cv-0005 (W.D. Va., filed July 29, 2020); *Envtl. Justice Health All. v. CEQ*, No. 20-cv-6143 (S.D.N.Y., filed Aug. 6, 2020); *Iowa Citizens for Cmty. Improvement v. CEQ*, No. 20-cv-2715 (D.D.C., filed Sept. 23, 2020).

AR_0026091

NEPA regulations.[8] The coalition's comments explained the value of NEPA and the successful ways the 1978 Regulations implemented the statute's requirements and upheld its purposes.[9] When CEQ proposed the 2020 Rule, the States again provided comments detailing extensive legal, procedural and policy concerns.[10] The States fully incorporate into this letter those comments, which are attached as Exhibits 1 and 2.

When CEQ finalized the 2020 Rule, a coalition of States and territories challenged the 2020 Rule in court..[11] As detailed in the lawsuit, the 2020 Rule is arbitrary, capricious, and contrary to law, exceeds CEQ's statutory authority, and was promulgated without observance of procedure required by law..[12] The 2020 Rule undermines NEPA's plain language and purpose, discards decades of informed decision-making that protected the human environment, and results in myriad harms to the States. In particular, the 2020 Rule puts environmental justice communities, including low-income communities and communities of color, at increased risk of harm through a lack of consideration of cumulative and indirect effects..[13]

Additionally, due to the 2020 Rule's inconsistency with NEPA and decades of case law interpreting the statute and the 1978 Regulations, State and federal agencies have struggled to implement the 2020 Rule, as there is no guidance as to how to apply it or harmonize it with state-level reviews. The 2020 Rule has also caused additional confusion and inefficiency by forcing federal agencies to depart from decades of practice and by preventing them from tailoring their NEPA rules to their unique missions and context..[14] The 2020 Rule has also disrupted decades of coordination between state and federal agencies, particularly where states have their own rules for environmental reviews..[15] As a result of the 2020 Rule, States bear the burden of this disruption: they must spend additional resources on state-level reviews to compensate for the weakened federal process.

The States supported CEQ's first effort to triage the harms from the 2020 Rule through extending the deadline for federal agencies to update their own NEPA procedures to comply with the 2020 Rule..[16] Now, the States strongly support CEQ's return to the 1978 Regulations for

---

[8] Advanced Notice of Proposed Rulemaking – Update to the Regulations for implementing the procedural Provisions of the National Environmental Policy Act, 83 Fed. Reg. 28591 (June 20, 2018) Docket ID No. CEQ-2018-0001.

[9] *See* 2018 Comments.

[10] *See* 2020 Comments at 71–73.

[11] *See* First Amended Complaint for Declaratory & Injunctive Relief; *California v. Council on Envtl. Quality*, Case No. 3:20-cv-06057-RS, Doc. 75 (filed Nov. 23, 2020).

[12] *See* Complaint.

[13] *See* 2020 Comments at 42–50, Complaint at 57–58.

[14] Nat'l Env'tl Policy Act Implementing Regulations Revisions, 86 Fed. Reg. at 55759.

[15] *See* 2020 Rule Comments at 71–73.

[16] Deadline for Agencies to Propose Updates to National Environmental Policy Act Procedures, 86 Fed. Reg. 34154 (June 29, 2021) Docket ID No.CEQ-2021-0001; Comments of Attorneys General of Washington, California, New York, Colorado, Connecticut, Delaware, Illinois, Maine, Maryland, Minnesota, Nevada, New Jersey, New Mexico, North Carolina, Oregon, Rhode Island, Vermont, Wisconsin; the Commonwealths of Massachusetts and

AR_0026092

three harmful provisions of the 2020 Rule. These revisions will help restore decades of agency practice and judicial interpretations of the provisions, increase agency efficiency, promote state-federal cooperation, and result in more comprehensive environmental reviews. As such, the Proposed Rule will help to fulfill the federal government's duty to act "in cooperation with States and local governments" to evaluate environmental impacts..[17] The States urge CEQ to quickly address the remaining provisions of the 2020 Rule, which will continue to cause harm to the States until they are addressed through further rulemaking or through repeal of the 2020 Rule in its entirety.

## II.    THE PROPOSED RULE MAKES THREE IMPORTANT CHANGES TO SUPPORT MEANINGFUL ENVIRONMENTAL REVIEW

The States have consistently expressed the need to repeal the 2020 Rule as quickly and completely as possible, and the States support this rulemaking as meaningful progress toward that goal. While the Proposed Rule does not address all of the harms of the 2020 Rule, it takes important steps in the right direction by requiring more robust alternatives analysis, restoring the prior definition of "effects," and making CEQ's NEPA regulations a floor, rather than a ceiling, for other federal agencies' NEPA regulations.

### A.    The Proposed Rule's revisions to the "purpose and need" statement are a positive first step to ensure that federal agencies fully consider all reasonable alternatives

CEQ proposes removing language from the 2020 Rule that directs agencies to base the "purpose and need" for agency action on the goals of the applicant and restoring the definition of "purpose and need" from the 1978 NEPA regulations..[18] The States support this change. Federal agencies must evaluate a broad range of interests, not just those of project applicants, and should design and approve their actions based on factors such as the public interest, environmental outcomes, and local needs, in addition to the goals of a project applicant. By focusing the "purpose and need" analysis required under NEPA almost entirely on the goals of a project applicant, the 2020 Rule unlawfully limits the alternatives that may be considered to only those that meet an applicant's goals, in clear contravention of NEPA's statutory text and purpose. The Proposed Rule helps to address this conflict.

As the States previously commented, decision-makers and the public cannot evaluate the environmental impact of a decision without the disclosure and consideration of all reasonable alternatives.[19] Indeed, courts interpreting NEPA and its implementing regulations have long recognized that alternatives analysis is the "heart" of an Environmental Impact Statement

---

Pennsylvania; the Territory of Guam; the District of Columbia; Harris County, Texas; the City of New York; and the New York State Department of Environmental Conservation on the Interim Final Rule, 86 Fed. Reg. 34154 (July 29, 2021).

[17] 42 U.S.C. § 4331(a).

[18] *See* 40 C.F.R. § 1502.12; Phase One Proposed Rule at 55760.

[19] *See* 2020 Comments at 38–41.

AR_0026093

(EIS).[20] CEQ has also recognized the importance of considering appropriate alternatives to "meet the policies and responsibilities set forth in NEPA."[21] A NEPA review that fails to consider reasonable alternatives wastes taxpayer dollars, risks increased litigation and delays, and – most importantly – ignores creative, efficient, and beneficial alternatives to a proposed action.[22] The Proposed Rule makes important progress toward restoring this central part of the environmental review process.

While the States support the Proposed Rule's change to the definition of purpose and need, CEQ must also revise other provisions in the 2020 Rule that prevent agencies from adequately studying reasonable alternatives.[23] Specifically, CEQ should restore the directives for agencies to: (1) present alternatives in comparative form in order to "sharply" define the issues and provide a clear choice among options by the decision-maker and the public; (2) "[r]igorously explore and objectively evaluate" all reasonable alternatives to the proposed action; and (3) "[d]evote substantial treatment to each alternative."[24]

## B.  Removing the ceiling provision, while beneficial, may reduce, but will not eliminate, the harms of the 2020 Rule

CEQ also proposes to remove the "ceiling" provision that prevents federal agencies from "impos[ing] additional procedures or requirements beyond those set forth in [CEQ's] regulations."[25] The States support this proposed return to the regulatory structure of the 1978 Regulations, which would again allow federal agencies to tailor their NEPA procedures to their unique mandates. But, because some federal agencies lack their own regulations implementing NEPA and removal of the ceiling provision does not repeal the 2020 Rule, this change will not remediate all harms from the 2020 Rule. The provisions of the 2020 Rule not addressed in this Phase I Rulemaking will still apply to all major federal actions proposed after September 14, 2020.[26]

Moreover, while many federal agencies have their own detailed regulations for conducting environmental reviews under NEPA, these regulations were developed in reference to, and to coordinate with, CEQ's 1978 Regulations. Agency regulations and internal guidance may fill gaps for agency-specific practice, but they cannot supplant CEQ's regulations. State agencies also rely on CEQ's regulations for guidance when they are charged with administering NEPA or with implementing their little NEPAs.[27] As long as the 2020 Rule remains in effect,

---

[20] *See, e.g., Wildearth Guardians v. U.S. Bureau of Land Mgmt.*, 870 F.3d 1222, 1226 (10th Cir. 2017) (citing 40 C.F.R. § 1502.14); *Navajo Nation v. U.S. Forest Serv.*, 479 F.3d 1024, 1054 (9th Cir. 2007) (same).

[21] Nat'l Env'tl Policy Act Implementing Regulations Revisions, 86 Fed. Reg.at 55760.

[22] *See* 2020 Comments at 38–41.

[23] *See id.*

[24] *Compare* 40 C.F.R. § 1502.14, *with* former 40 C.F.R. § 1502.14 (1978).

[25] 40 C.F.R. § 1507.3(b).

[26] *See* 40 C.F.R. § 1506.13.

[27] *See* 2020 Comments at 71–73.

AR_0026094

even as a floor rather than a ceiling, agencies will need to rely on it to implement NEPA. CEQ should therefore expeditiously complete its Phase II rulemaking and, in that rulemaking, repeal the 2020 Rule in its entirety.

C.    **The States support CEQ's proposed definition of "effects" to ensure federal agencies evaluate direct, indirect, and cumulative effects of proposed agency actions**

The States strongly support CEQ's proposal to redefine "effects" analyzed during the NEPA environmental review process to include all reasonably foreseeable effects of a proposed action, explicitly including direct, indirect, and cumulative effects.[28] The 2020 Rule's deletion of indirect and cumulative impacts from the definition of "effects" blinds federal agencies to some of the most serious environmental consequences of their actions and obscures these impacts from public scrutiny. As CEQ previously recognized, these are often the most substantial effects of an agency action and "may often be even more substantial than the primary effects of the original action itself."[29]

NEPA requires consideration of indirect and cumulative effects and this analysis is integral to effective environmental review. The statute requires agencies to consider "*any* adverse environmental effects" of a proposed action.[30] Identifying and analyzing only direct effects that are close in time and geography to the proposed federal action ignores the true nature of most environmental problems, which Congress recognized as "worldwide and long-range" in character..[31]

Consideration of indirect and cumulative effects is also vital to addressing environmental injustice and climate change.[32] For example, studying cumulative impacts is essential to preventing further harm to low-income or minority communities already burdened with the effects of disproportionately high levels of pollution. Agencies simply cannot know the full impact of a project on a community without considering its existing levels of pollution and the cumulative impacts of adding another pollution source. Similarly, without considering existing burdens, agencies cannot identify meaningful alternatives or mitigation measures to reduce or avoid harms to impacted communities. By reinstating the prior definition of effects to include indirect and cumulative effects, it will help address and prevent disproportionate burdens.

---

[28] *See* Nat'l Env'tl Policy Act Implementing Regulations Revisions, 86 Fed. Reg. at 55762.

[29] Preparation of Environmental Impact Statements: Guidelines, 38 Fed. Reg. 20550, 20553 (Aug. 1, 1973).

[30] *See* 2020 Comments at 43–46; 42 U.S.C. § 4332(2)(C)(ii) (emphasis added).

[31] 42 U.S.C. § 4332(2)(F); *see also* S. Rep. No. 91-296, at 5 (Senate report stating "[i]mportant decisions concerning the use and the shape of man's future environment continue to be made in small but steady increments which perpetuate rather than avoid the recognized mistakes of previous decades.").

[32] *See* 2020 Comments at 50–53.

6

AR_0026095

Similarly, with regard to climate change, an agency cannot evaluate a project's future climate impacts without addressing the cumulative impact of greenhouse gas emissions.[33] Those impacts cannot be meaningfully assessed through a narrow analysis of direct effects from an individual proposed action. Considering the emissions from a federal agency action in addition to existing and future emissions from other projects are precisely the sort of information a NEPA analysis should robustly analyze. As such, the States support the proposed definition of effects to better protect the climate and redress environmental injustice. But, as discussed in the next section, the States urge CEQ to increase that protection by codifying the required analysis of environmental justice concerns and climate change impacts..[34]

### III.  CEQ SHOULD REPEAL THE 2020 RULE IN ITS ENTIRETY AND CODIFY SPECIFIC GUIDANCE ON ANALYZING THE EFFECTS FROM GREENHOUSE GAS EMISSIONS AND EFFECTS ON ENVIRONMENTAL JUSTICE COMMUNITIES

The Proposed Rule is an important step towards repealing the 2020 Rule, but further revisions to the 2020 Rule are necessary. CEQ should act swiftly to complete the work of reviewing and revising NEPA's implementing regulations in their entirety. As explained above, in the States' prior comments, and in several lawsuits, the 2020 Rule was adopted with numerous substantive and procedural flaws, most of which are not addressed in the Proposed Rule.[35] Until the 2020 Rule is fully repealed and new regulations that are consistent with NEPA are adopted, the harms from the 2020 Rule will remain, to the detriment of the States, their residents, their resources, and the environment. The States encourage CEQ to expeditiously promulgate the additional revisions to the 2020 Rule described below.

### A.  Repeal the 2020 Rule

CEQ should repeal each of the illegal provisions of the 2020 Rule identified in the 2020 Comments and the States' lawsuit.[36] These include, among many others, the improper expansion of categorical exclusions, imposition of additional NEPA threshold considerations, redefinition of "a major federal action," a weakened significance determination, a restricted alternatives analysis, constraints on meaningful public participation, and reduced judicial review.

---

[33] See CEQ, FINAL GUIDANCE FOR FEDERAL DEPARTMENTS AND AGENCIES ON CONSIDERATION OF GREENHOUSE GAS EMISSIONS AND THE EFFECTS OF CLIMATE CHANGE IN NATIONAL ENVIRONMENTAL POLICY ACT REVIEWS (Aug. 1, 2016), https://ceq.doe.gov/docs/ceq-regulations-and-guidance/nepa_final_ghg_guidance.pdf (GHG Guidance) ("Climate change results from the incremental addition of GHG emissions from millions of individual sources, which collectively have a large impact on a global scale").

[34] See Nat'l Env'tl Policy Act Implementing Regulations Revisions, 86 Fed. Reg. 55767 (requesting comment on whether the Council should provide specific rules for agencies to analyze certain categories of effects).

[35] See 2020 Comments at 12–70, Complaint at 60–73.

[36] See Complaint at 57–60.

AR_0026096

## B.    Public Participation

CEQ must take action to ensure robust and diverse participation in public hearings for the Phase II rulemaking. For example, CEQ should hold public hearings at a variety of times, including outside of normal business hours, to allow interested members of the public, including those with demanding work schedules, to provide input. CEQ should also adopt a system to ensure every participant has an opportunity to speak, including those who were unable to make a prior reservation to do so.

## C.    Climate Change

As CEQ has recognized, agencies would benefit from more "clarity and consistency" in how to address climate change in environmental review under NEPA.[37] CEQ's regulations should expressly require agencies to consider climate change in their NEPA analysis. Agencies must consider both a project's effects on climate change (including through emissions of greenhouse gases) and the effects of climate change on the project (such as future sea level rise or more severe weather events). CEQ can draw on state-level environmental review laws and regulations for examples in crafting appropriate regulations for federal environmental reviews.[38]

For example, California's little NEPA, the California Environmental Quality Act (CEQA),[39], requires public agencies to disclose and analyze impacts of greenhouse gas emissions from proposed projects and its implementing regulations provide agencies with guidance for determining the significance of such impacts.[40] Where a CEQA lead agency determines that a proposed project's impacts from greenhouse gas emissions are significant, the agency is required to adopt all feasible mitigation measures to substantially lessen those impacts prior to approving the project.[41] Under CEQA, California's Office of Planning and Research (OPR) and Natural Resources Agency has promulgated guidelines for the mitigation of greenhouse gas emissions and related impacts of said emissions.[42] OPR has also published a guidebook for state agencies looking to prepare for climate change and issued a draft advisory on CEQA and climate change.[43]

Moreover, when considering a project's climate change effects, the regulations should specify that the full lifecycle (upstream and downstream) of a project's greenhouse gas emissions

---

[37] See GHG Guidance at 2.

[38] See, e.g., 6 NYCRR § 617.9(b)(5)(iii)(i).

[39] Cal. Pub. Res. Code, § 21000 et seq.

[40] Cal. Code Regs., tit. 14, § 15064.4.

[41] Id. at § 15021(a)(3); Cal. Pub. Res. Code, § 21002.

[42] Cal. Pub. Res. Code, §§ 21083, 21083.05; Cal. Code Regs., tit. 14, § 15064.4.

[43] Planning and Investing for a Resilient California – A Guidebook for State Agencies (2018), https://opr.ca.gov/docs/20180313-Building_a_Resilient_CA.pdf; CEQA and Climate Change Advisory, Discussion Draft (2018), https://opr.ca.gov/docs/20181228-Discussion_Draft_Climate_Change_Adivsory.pdf.

AR_0026097

must be considered.[44] In addition, where agencies evaluate project alternatives with varying levels of associated greenhouse gas emissions, agencies should incorporate the Social Cost of Carbon to understand the full effects of increased emissions.[45] Agencies should also consider and, where appropriate, adopt mitigation measures to reduce climate impacts.

## D.    State and Tribal Climate Policies

Since CEQ issued its greenhouse gas guidance in 2016, many states have promulgated or strengthened laws and policies to reduce emissions. For example, New York's Climate Leadership and Community Protection Act (NY Climate Act) sets aggressive greenhouse gas reduction requirements and requires state agency actions to be consistent with achieving the emissions limits set for 2030 and 2050.[46] Under the NY Climate Act, New York agencies may use a state-specific social cost of carbon established by the Department of Environmental Conservation to determine the value of economic damages avoided through the reduction of greenhouse gas emissions, which ensures that less-emitting alternatives are adequately considered in the decision-making process.[47] In instances where a carbon-emitting option is justified, alternatives and greenhouse gas mitigation measures must be included, setting a clear path for ensuring the emissions reductions are achieved.[48] Other states have also adopted similar laws and policies.[49]

CEQ should ensure that NEPA reviews discuss the consistency of a proposed action with state or tribal climate laws, plans, and policies, including where state law requires consideration and mitigation of greenhouse gas emissions and climate change impacts. This important consideration is already built into California's little NEPA which directs state agencies to consider, among other factors, the extent to which a proposed project "complies with regulations or requirements adopted to implement a statewide, regional, or local plan for the reduction or

---

[44] *See, e.g., Ctr. for Biological Diversity v. Bernhardt*, 982 F.3d 723, 735 (9th Cir. 2020); *see also* N.Y. St. Dep't of Envtl. Conserv., *DEC Policy: Assessing Energy Use & Greenhouse Gas Emissions in Envtl. Impact Statements*, at 5-10 (Jul. 15, 2009), https://www.dec.ny.gov/docs/administration_pdf/eisghgpolicy.pdf (last visited Nov. 22, 2021).

[45] *See* GHG Guidance at 33, n.86.

[46] N.Y. Envtl. Conserv. L. § 75-0107, Ch. 106 of the Laws of 2019 (NY Climate Act) § 7(2).

[47] N.Y. Envtl. Conserv. L. § 75-0113; N.Y. Dep't of Envtl. Conserv.,Value of Carbon Guidance, https://www.dec.ny.gov/docs/administration_pdf/vocguidrev.pdf (last visited Nov. 22, 2021).

[48] NY Climate Act § 7(2).

[49] Hawaii: Food and Energy Security Act, 2010 Haw. Laws 73 (H.B. 2421) (codified in part at HRS § 196-10.5); Maine: Act To Promote Clean Energy Jobs and To Establish the Maine Climate Council, 2019 Me. Legis. Serv. Ch. 476 (S.P. 550) (L.D. 1679) (West) (codified in scattered sections of Me. Rev. Code tits. 5, 35-A, 38; Massachusetts: Act Creating a Next-Generation Roadmap for Massachusetts Climate Policy, 2021 Mass. Acts. Ch. 8, sec. 8 (codified in scattered sections of Mass. Rev. Code Chs. 21N, 23J, 25, 29, 30, 59, 62, 143, 164); Michigan: Executive Directive No. 2020-10 (Mich. 2020), https://www.michigan.gov/whitmer/0,9309,7-387-90499_90704-540278--,00.html; New Jersey: Global Warming Response Act, N.J. Stat. Ann. §§ 26:2C-37 to -68; Oregon: Executive Order No. 20-04 (Or. 2020), https://www.oregon.gov/gov/Documents/executive_orders/eo_20-04.pdf. Washington: Climate Commitment Act, Ch. 316, 2021 Wash. Sess. Laws 2606 (codified as amended in scattered sections of Wash. Rev. Code tits. 43, 70A).

AR_0026098

mitigation of greenhouse gas emissions.".[50] When considering alternatives, agencies should specifically discuss the impact different alternatives will have on achieving relevant adopted federal, state, or tribal greenhouse gas reduction goals and resiliency standards.

## E.    Environmental Justice

CEQ should also use this opportunity to explicitly incorporate consideration of environmental justice concerns into its NEPA rulemaking, as required by Executive Order 12898.[51] The States encourage CEQ to codify existing guidance on incorporating environmental justice issues into NEPA review.[52] These regulatory provisions should direct agencies to consider whether communities of color, low-income residents, or Native American tribes are affected by the proposed project and, if so, whether there are disproportionately adverse human health and environmental effects on those groups; whether unique characteristics of these populations may amplify the effects of the proposed action; and ways to ensure effective public participation and community representation.[53]

## F.    Environmental Review of Regulations

The States appreciate CEQ's efforts to assess the environmental impacts of the Proposed Rule through a Special Environmental Assessment.[54] The States urge CEQ to ensure it assesses these potential environmental impacts consistent with the mandate of NEPA and the Endangered Species Act, and in fulfillment of NEPA's broad purposes of informed, rational, and transparent agency decision-making. CEQ asserts that it is not subject to its own NEPA regulations when it promulgates regulations such as the Proposed Rule.[55] However, NEPA requires federal agencies, including CEQ, to evaluate the environmental impacts of major federal actions, such as the promulgation of regulations.[56] CEQ should perform an environmental assessment of the Proposed Rule in compliance with its own NEPA regulations and with the intent of NEPA itself and engage in consultation in compliance with the Endangered Species Act.

---

[50] *Id.* at § 15064.4(3).

[51] Exec. Order No. 12898, 59 Fed. Reg. 7629 (1994) (as amended).

[52] CEQ, ENVIRONMENTAL JUSTICE GUIDANCE (1997), https://www.epa.gov/sites/default/files/2015-02/documents/ej_guidance_nepa_ceq1297.pdf.

[53] *Id.* at 9.

[54] *See* CEQ Special Environmental Assessment Phase 1 NEPA Regulations Revision (Oct. 6, 2021), https://www.regulations.gov/document/CEQ-2021-0002-0003.

[55] See Nat'l Env'tl Policy Act Implementing Regulations Revisions, 86 Fed. Reg. 55757, at 55767.

[56] See 42 U.S.C. § 4332(2)(C).

AR_0026099

## IV.    CONCLUSION

For all the reasons stated above and the reasons stated in the States' previous comments, the undersigned states support CEQ's Proposed Rule. The States further urge CEQ to move forward as soon as possible with a comprehensive rulemaking to ensure NEPA's implementing regulations are consistent with the purpose and requirements of the statute through the full repeal or revision of the 2020 Rule.


Sincerely,

FOR THE STATE OF WASHINGTON

ROBERT W. FERGUSON
Attorney General

By: /s/ Megan Sallomi
MEGAN SALLOMI
ELIZABETH M. HARRIS
Assistant Attorneys General
Counsel for Environmental Protection
800 5th Ave., Suite 2000, TB-14
Seattle, WA 98104-3188
(206) 233-3391
megan.sallomi@atg.wa.gov
elizabeth.harris@atg.wa.gov

AR_0026100

FOR THE STATE OF CALIFORNIA

ROB BONTA
Attorney General

By:  /s/ Sarah Morrison
SARAH MORRISON
Supervising Deputy Attorney General
LANI M. MAHER
Deputy Attorney General
California Department of Justice
300 South Spring Street, Suite 1702
Los Angeles, CA 90013
(213) 269-6328
Sarah.Morrison@doj.ca.gov
Lani.Maher@doj.ca.gov

FOR THE STATE OF COLORADO

PHILIP J. WEISER
Attorney General, State of Colorado

By: /s/  Scott Steinbrecher
SCOTT STEINBRECHER
Colorado Department of Law
1300 Broadway, 10th Floor
Denver, CO 80203
(720) 508-628
Scott.Steinbrecher@coag.gov

12

AR_0026101

FOR THE STATE OF NEW YORK
AND THE NEW YORK STATE
DEPARTMENT OF ENVIRONMENTAL
CONSERVATION

LETITIA JAMES
Attorney General

By: /s/Claiborne E. Walthall
CLAIBORNE E. WALTHALL
Assistant Attorney General
MICHAEL J. MYERS
Senior Counsel
Environmental Protection Bureau
Office of the Attorney General
State Capitol
Albany, NY 12224
(518) 776-2380
claiborne.walthall@ag.ny.gov


FOR THE DISTRICT OF COLUMBIA

KARL A. RACINE
Attorney General for the District of Columbia

By: /s/ Wesley Rosenfeld
WESLEY ROSENFELD
Social Justice Section
Office of the Attorney General
for the District of Columbia
400 6th St. NW
Washington, D.C. 20001
(202) 774-0874
Email: Wesley.Rosenfeld1@dc.gov

AR_0026102

FOR THE STATE OF DELAWARE

KATHLEEN JENNINGS
Attorney General

By:/s/ Jameson A.L. Tweedie
JAMESON A.L. TWEEDIE
Deputy Attorney General
CHRISTIAN DOUGLAS WRIGHT
Director of Impact Litigation
Delaware Department of Justice
820 N. French Street
Wilmington, DE  19801
(302) 683-8899
Christian.Wright@delaware.gov
Jameson.Tweedie@delaware.gov

FOR THE TERRITORY OF GUAM

LEEVIN TAITANO CAMACHO
Attorney General

By: /s/ Joseph A. Perez
JOSEPH A. PEREZ
Assistant Attorney General
Consumer Protection Division
590 South Marine Corps Drive,
Suite 901, ITC Building
Tamuning, Guam 96913 ▪ USA
(671) 475-3324
jperez@oagguam.org

14

FOR HARRIS COUNTY, TEXAS

CHRISTIAN D. MENEFEE
Harris County Attorney

By: /s/ Sarah Jane Utley
SARAH JANE UTLEY
Environment Division Director
1019 Congress, 15th Floor
Houston, Texas 77002
(713) 274-5124
Sarah.Utley@cao.hctx.net

FOR THE STATE OF ILLINOIS

KWAME RAOUL
Attorney General of Illinois

By: /s/ Jason E. James
JASON E. JAMES
Assistant Attorney General
MATTHEW J. DUNN
Chief, Environmental Enforcement/
Asbestos Litigation Division
69 W. Washington St., 18th Floor
Chicago, IL 60602
(312) 814-0660
Jason.james@ilag.gov

AR_0026104

FOR THE STATE OF MAINE

AARON M. FREY
Attorney General

By: /s/ Margaret A.  Bensinger
MARGARET A. BENSINGER
Assistant Attorney General
Maine State Bar No. 3003
Office of the Attorney General
6 State House Station
Augusta, ME  04333-0006
207-626-8800
peggy.bensinger@maine.gov

FOR THE STATE OF MARYLAND

BRIAN E. FROSH
Attorney General

By: /s/ Steven J. Goldstein
STEVEN J. GOLDSTEIN
Special Assistant Attorney General
Office of the Attorney General
200 Saint Paul Place, 20th Floor
Baltimore, MD 21202
(410) 576-6414
sgoldstein@oag.state.md.us

AR_0026105

FOR THE COMMONWEALTH OF
MASSACHUSETTS

MAURA HEALEY
Attorney General

By: /s/ Matthew Ireland
MATTHEW IRELAND
Assistant Attorney General
TURNER H. SMITH,
Assistant Attorney General and Deputy Chief
Office of the Attorney General
Environmental Protection Division
One Ashburton Place, 18th Floor
Boston, MA 02108-1598
(617) 727-2200
matthew.ireland@mass.gov

FOR THE STATE OF NEW JERSEY

ANDREW J. BRUCK
Acting Attorney General of New Jersey

By: /s/ Matthew Novak
MATTHEW NOVAK
Deputy Attorneys General
Environmental Permitting and Counseling
R.J. Hughes Justice Complex
P.O. Box 093
Trenton, NJ 08625
(609) 376-2804

AR_0026106

FOR THE STATE OF NEW MEXICO

HECTOR BALDERAS
Attorney General of New Mexico

By: /s/ William Grantham
WILLIAM GRANTHAM
Assistant Attorney General
State of New Mexico Office of the Attorney General
Consumer & Environmental Protection Division
201 Third Street NW, Suite 300
Albuquerque, NM 87102
(505) 717-3520
wgrantham@nmag.gov


FOR THE CITY OF NEW YORK

GEORGIA M. PESTANA
Corporation Counsel of the City of New York

By: /s/ Hilary Meltzer
HILARY MELTZER
Chief, Environmental Law Division
New York City Law Department
100 Church Street
New York, NY 10007
212-356-2070
hmeltzer@law.nyc.gov

18

FOR THE STATE OF NORTH CAROLINA

JOSHUA H. STEIN
Attorney General

By: /s/ Asher P. Spiller
ASHER SPILLER
ELIZABETH S. YOUNG
Assistant Attorneys General
North Carolina Department of Justice
114 W. Edenton Street
Raleigh, NC 27603
(919) 716-6977
Aspiller@ncdoj.gov
Esyoung@ncdoj.gov


FOR THE STATE OF OREGON

ELLEN F. ROSENBLUM
Attorney General

By: /s/ Steve Novick_____
STEVE NOVICK
Special Assistant Attorney General
Natural resources Section
Oregon Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4593
Paul.garrahan@doj.state.or.us
Steve.Novick@doj.state.or.us

AR_0026108

FOR THE COMMONWEALTH OF PENNSYLVANIA

JOSH SHAPIRO
Attorney General of Pennsylvania
MICHAEL J. FISCHER
Chief Deputy Attorney General

By: /s/ Ann Johnston
ANN JOHNSTON
Senior Deputy Attorney General
Office of Attorney General
Strawberry Square, 14th Floor
Harrisburg, Pennsylvania 17120
(717) 705-6938
ajohnston@attorneygeneral.gov

FOR THE STATE OF RHODE ISLAND

PETER F. NERONHA
Attorney General

By: /s/ Alison B.  Hoffman
ALISON B. HOFFMAN
Special Assistant Attorney General
Rhode Island Office of the Attorney General
150 South Main Street
Providence, Rhode Island 02903
Telephone: (401) 274-4400 ext 2116
ahoffmanf@riag.ri.gov

AR_0026109

FOR THE STATE OF VERMONT

THOMAS J. DONOVAN, JR.
Attorney General

By: _/s/ Nicholas F. Persampieri____
NICHOLAS F. PERSAMPIERI
Assistant Attorney General
Office of the Attorney General
109 State Street
Montpelier, VT 05609
(802) 828-6902
nick.persampieri@vermont.gov


FOR THE STATE OF WISCONSIN

JOSHUA L. KAUL
Attorney General

By: _/s/ Tressie K. Kamp_____
TRESSIE K. KAMP
Assistant Attorney General
Wisconsin Department of Justice
17 W. Main Street
Madison, WI 53707-7857
(608) 266-9595
KampTK@doj.state.wi.us

AR_0026110

# EXHIBIT

# 1

AR_0026111

**COMMENTS OF ATTORNEYS GENERAL OF CALIFORNIA, ILLINOIS, MARYLAND, MASSACHUSETTS, NEW JERSEY, NEW YORK, OREGON, VERMONT, AND WASHINGTON, AND THE SECRETARY OF THE COMMONWEALTH OF PENNSYLVANIA DEPARTMENT OF ENVIRONMENTAL PROTECTION**

August 20, 2018

VIA REGULATIONS.GOV
Edward A. Boling
Associate Director for the National Environmental Policy Act
Council on Environmental Quality
730 Jackson Place NW
Washington, DC 20503

      Re:    Advance Notice of Proposed Rulemaking – Update to the Regulations for Implementing the Procedural Provisions of the National Environmental Policy Act, 83 Fed. Reg. 28,591 (June 20, 2018) Docket ID No. CEQ-2018-0001

Dear Associate Director Boling:

      The undersigned State Attorneys General and state representatives, specifically, the Attorneys General of California, Illinois, Maryland, Massachusetts, New Jersey, New York, Oregon, Vermont, and Washington, and the Secretary of the Commonwealth of Pennsylvania Department of Environmental Protection ("States") respectfully submit these comments on the Council on Environmental Quality's ("CEQ") advance notice of proposed rulemaking ("Advance Notice") regarding potential revisions to the regulations implementing the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321, *et seq.*[1] The Advance Notice requests comments "on potential revisions to update and clarify" the process and scope of federal NEPA review by including questions on the following subjects: revising definitions of key NEPA terms, revising documents such as Notices of Intent and Categorical Exclusions, revising the timing of agency actions, revising agency and contractor responsibilities for document preparation, revising the public participation process, establishing mandatory time limits for preparation of documents and

---

[1] The advance notice of proposed rulemaking is entitled "Update to the Regulations for Implementing the Procedural Provisions of the National Environmental Policy Act," 83 Fed. Reg. 28,591 (June 20, 2018), Docket ID No. CEQ-2018-0001 [hereinafter Advance Notice].

AR_0026112

completion of the NEPA process, narrowing the range of alternatives requiring analysis, seeking examples of purportedly "obsolete" regulations, seeking input on use of unspecified "new technologies," and combining NEPA analyses and other decision documents.[2] The breadth of the questions posed by the Advance Notice suggests that CEQ's existing NEPA regulations ("NEPA regulations") need major amendments or even a wholesale regulatory overhaul. The States submit, however, that no demonstrated need for such substantial revisions exists, and we oppose any revisions that would threaten or destroy the fundamental environmental protections in NEPA.

CEQ's NEPA regulations are the cornerstone of the federal government's implementation of NEPA, providing a durable and environmentally protective framework on which the States and the public have relied for 40 years. Through prior administrations, CEQ has shown remarkable restraint, revising its regulations only when absolutely necessary. This restraint should continue because existing data do not demonstrate a need for any significant changes to NEPA regulations implied by this Advance Notice. Instead, as described more fully in Sections II and III, NEPA and the NEPA regulations have successfully accomplished the goal of forcing federal agencies to take a "hard look" at how their actions impact the environment.[3] Therefore, the States urge CEQ to seriously consider whether it is appropriate to amend its NEPA regulations at all. If CEQ does decide to revise the NEPA regulations, it must first collect detailed data on NEPA's implementation and evaluate the effect any revisions would have on future federal actions, public health, and the environment. Any revisions to the regulations, if warranted and supported by substantial evidence, must continue to prioritize protection of public health and the environment, and to ensure public participation in accordance with NEPA, over mere administrative expedience.

## I.    NEPA Is the Foundation of Our Nation's Environmental Laws

Congress enacted NEPA in 1969 with the stated purpose to "declare a national policy which will encourage productive and enjoyable harmony between man and his environment; to promote efforts which will prevent or eliminate damage to the environment and biosphere and stimulate the health and welfare of man; to enrich the understanding of the ecological systems and natural resources important to the Nation; and to establish a Council on Environmental Quality."[4] NEPA was the first

---

[2] *See id.* at 28,591–92.

[3] *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989).

[4] 42 U.S.C. § 4321.

AR_0026113

major environmental law in the United States and is often called the "Magna Carta" of federal environmental laws. The NEPA regulations "tell federal agencies what they must do to comply with the procedures and achieve the goals of the Act."[5] Over the past 40 years, the NEPA regulations have guided NEPA's implementation across the nation and have become fundamental to the daily functioning and responsible decision-making of numerous federal and state agencies.

NEPA endorses a broad, deliberative approach, which focuses on public disclosure and requires all federal agencies to ensure that their decision-making takes public health and the environment into account. Nearly every major federal action, from the approval of significant energy and infrastructure projects to key decisions concerning the management of federal public lands, requires compliance with NEPA. Unlike many other subject-specific federal statutes such as the Clean Air Act,[6] NEPA has a uniquely broad scope requiring consideration of all potential environmental and social impacts of a federal action. At the heart of NEPA—and embodied in the NEPA regulations—are the principles that federal agencies must complete their environmental analysis of proposed projects and alternatives before they act, that the analysis must be accurate and rigorous, that the analysis should enable public and inter-agency participation,[7] and that the analysis should influence the decisions federal agencies ultimately make.[8] Although NEPA does not require a particular outcome, it compels agencies to think carefully and comprehensively about the environment before acting, and emphasizes the importance of fully assessing environmental impacts and alternative approaches through public participation and inter-agency consultation. NEPA requires agencies to consult with other agencies that have expertise on a particular resource impacted by a project, developing more robust alternatives and reducing delay in preparation of documents.[9] These principles must continue to underlie any potential changes to the NEPA regulations.

---

[5] 40 C.F.R. § 1500.1(a).

[6] 42 U.S.C. §§ 7401, et seq.

[7] 42 U.S.C. § 4332(2)(C).

[8] See Am. Rivers v. Fed. Energy Regulatory Comm'n, 895 F.3d 32, 49 (D.C. Cir. 2018) (NEPA ensures that agency decision-making is fully informed regarding environmental impacts); Sierra Club v. U.S. Army Corps of Eng'rs, 803 F.3d 31, 37 (D.C. Cir. 2015) (agencies must take a "hard look" at the environmental consequences of their actions before deciding whether and how to proceed).

[9] See 42 U.S.C. § 4332(2)(C); 40 C.F.R. §§ 1500.5, 1501.5, 1501.6.

AR_0026114

NEPA explicitly embraces democratic values by making the public important contributors to the environmental review process.[10] As CEQ's guidance states, "[t]wo major purposes of the environmental review process are better informed decisions and citizen involvement, both of which should lead to implementation of NEPA's policies."[11] Public comment in the NEPA process is critically important to, among other things, identify alternatives that improve a proposed action or reduce its environmental impacts, identify shortfalls in the agency's analyses, spot missing issues, and provide additional information that the agency may not have known existed. To the extent Question 6 of the Advance Notice suggests public comment can be more "efficient," CEQ should reject changes that weaken or shorten the public's opportunity for participation. Because of NEPA, the public has a legal right and a voice in the federal planning process,[12] and public involvement is beneficial to federal decision-making.[13] As CEQ itself has stated, "[s]ome of the most constructive and beneficial interaction between the public and an agency occurs when citizens identify or develop reasonable alternatives that the agency can evaluate in the EIS."[14]

In sum, the NEPA regulations in their current form embody NEPA's guiding principles, and any revisions to the NEPA regulations must adhere to these principles by ensuring the protection of public health and the environment through well-informed decision-making and robust and meaningful public involvement in the

---

[10] *See, e.g.*, 42 U.S.C. § 4332(2)(C); 40 C.F.R. §§ 1503.1(a)(4), 1506.6.

[11] CEQ, Exec. Office of the President, A Citizen's Guide to the NEPA: Having Your Voice Heard, at 2 (Dec. 2007) [hereinafter Citizen's Guide to the NEPA], *available at* https://ceq.doe.gov/docs/get-involved/Citizens_Guide_Dec07.pdf.

[12] 42 U.S.C. § 4332(2)(C); 40 C.F.R. §§ 1503.1(a)(4), 1506.6.

[13] *See* Letter from Russell E. Train, *et al.* to The Honorable Cathy McMorris, at 2 (Sept. 19, 2005) (former Chairs and General Counsels of CEQ stating that "the public plays an indispensable role in the NEPA process") [hereinafter Train Letter] (attached as Exhibit A); *see also* Envtl. Law Inst., NEPA Success Stories: Celebrating 40 Years of Transparency and Open Government, at 6 (Aug. 2010) [hereinafter NEPA Success Stories], *available at* https://ceq.doe.gov/docs/get-involved/NEPA_Success_Stories.pdf; CEQ, Examples of Benefits from the NEPA Process for ARRA 2–3 [American Recovery and Reinvestment Act] Funded Activities (May 2011) [hereinafter Examples of NEPA Benefits], *available at* https://ceq.doe.gov/docs/get-involved/ARRA_NEPA_Benefits_List_May122100.pdf; Citizen's Guide to the NEPA, *supra* note 11, at 24 ("Through NEPA, citizens were able to educate and assist the decision-makers in developing their alternatives.").

[14] Citizen's Guide to the NEPA, *supra* note 11, at 14.

4

NEPA process. Any revisions must continue to require that Federal agencies "use all practicable means" to fulfill the purpose of NEPA embodied in the statute.[15]

## II.    The States Have Unique Interests in Ensuring That the NEPA Regulations Demand Careful, Timely Review of Federal Actions.

The NEPA process affects the States' interests in several key ways, including their interests in protecting their residents and environmental resources by ensuring public participation and robust, informed decision-making processes for federal projects.

### A.    The States have an interest in ensuring that federal decisions do not harm their residents, property, or natural resources.

The States are injured in their *parens patriae* capacity when their residents suffer from the effects of environmental pollution or degradation, including cumulative impacts in environmental justice communities.[16] The States also have a quasi-sovereign interest in preventing harm to the health of their natural resources and ecosystems.[17] As federal courts have recognized, states are entitled to "special solicitude" in seeking redress for environmental harms within their borders, particularly where state property and quasi-sovereign interests are potentially injured.[18] Accordingly, the States have an interest in and are committed to preventing any harm to their residents, ecosystems, and property from revisions to NEPA's regulations that weaken environmental protections or undermine the policies and principles of NEPA—in particular, any revisions that would limit public participation or lead to less robust analysis and review.

The States have a fundamental interest in safeguarding their residents' involvement in the NEPA process for federal projects that could impact their communities. Relatedly, NEPA proceedings and resulting analyses provide an important opportunity for state and municipal agencies to help shape federal decisions that affect state or municipal resources. Public involvement is critical in identifying and evaluating public health and environmental issues of local or statewide concern that may result from federal actions. CEQ's current NEPA

---

[15] 42 U.S.C. § 4331(b)(1)-(6).

[16] *Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592, 607 (1982); *Maryland v. Louisiana*, 451 U.S. 725, 737–38 (1981).

[17] *Massachusetts v. EPA*, 549 U.S. 497, 519–22 (2007).

[18] *Id.* at 520.

AR_0026116

regulations provide that agencies shall "make diligent efforts to involve the public in preparing and implementing their NEPA procedures."[19] As discussed more fully in Point I, above, and Point III, below, any revisions to the NEPA regulations such as those suggested by Question 6 of the Advance Notice that may weaken public participation would violate NEPA and injure the States' interests.

The States are also required to undertake NEPA review in certain cases where federal funding is involved, such as for certain highway and other major infrastructure projects. Significant revisions to the NEPA regulations will impact the States' implementation of and compliance with NEPA, and may require revisions to the States' internal processes and significant investments of time and training resources to accommodate disruptive changes to long-settled processes.

The States also have a significant interest in ensuring that the environmental review process under NEPA is robust and detailed, particularly with respect to major infrastructure projects and projects affecting public lands and waterways that impact public health, environmental health, and the States' economies. For example, the siting of nuclear waste disposal sites receives environmental review only through a NEPA process conducted by the Nuclear Regulatory Commission ("NRC"). In New York, the West Valley nuclear waste disposal site is presently undergoing a NEPA Environmental Impact Statement ("EIS") process that is governed by the significant protections in the current NEPA regulations of both CEQ and the United States Department of Energy. The State of New York, along with numerous agencies and members of the public, is participating in this NEPA process. Any weakening of the procedural protections in NEPA, such as setting arbitrary and unreasonable timelines or page limits for NEPA review documents suggested by Questions 4 and 10 of the Advance Notice, or limiting the scope of issues as suggested by Question 5 or the range of alternatives considered as suggested by Question 13, could result in an environmental review process—in this case and many others—that is not compliant with the statutory requirements of NEPA, and that may injure the States' sovereign and proprietary interests.

Similarly, NEPA review is built into and improves the Federal Energy Regulatory Commission's ("FERC") analysis of whether a proposed interstate natural gas pipeline is in the public convenience and necessity.[20] The Natural Gas Act preserves the States' ability to issue substantive environmental permits under the

---

[19] 40 C.F.R. § 1506.6(a); *see also id.* § 1503.1(a)(4).

[20] *See* 15 U.S.C. § 717f; *see also* Certification of New Interstate Natural Gas Pipeline Facilities, 88 FERC 61,227, 61,745–46, 61,748, 61,749 (1999), *clarified,* 90 FERC 61,128, 61,397–98, *further clarified,* 92 FERC 61,094 (2000).

AR_0026117

Clean Air Act, the Clean Water Act, and the Coastal Zone Management Act for natural gas projects.[21] The States' jurisdiction in each of these substantive environmental regimes should therefore be absolute, subject to compliance with applicable timelines.[22] When reviewing a new pipeline application, FERC conducts its NEPA analysis at the same time as its review of the project's economic merits, reviewing both the environmental and socioeconomic impacts of the project.[23] At the conclusion of the NEPA process, FERC generally issues a Certificate of Public Convenience and Necessity ("CPCN") for the project. The CPCN not only authorizes the pipeline, but also includes numerous environmental conditions based largely on the NEPA analysis.

A robust and transparent NEPA analysis of proposed interstate natural gas pipeline projects is necessary to protect the States' interests because it requires careful consideration of the state and local laws that may apply or are relevant to the project and its impacts. However, the CPCNs that FERC issues—based on its NEPA process—often include language or conditions that may limit the States' substantive environmental jurisdiction. Therefore, the States have an interest in ensuring that the NEPA regulations retain their current strength to govern and shape FERC's NEPA analysis, as state environmental review processes may not be able to compensate in all cases for deficiencies in federal NEPA review in the course of decisions with significant and lasting environmental consequences for the States.

Finally, robust NEPA analyses provide important resources for the States in informing other important state programs and decisions affecting state resources. For example, robust EISs are critical to informing the States' "consistency determinations" under the federal Coastal Zone Management Act, 16 U.S.C. § 1456, by which states assess the impact of federal projects on the land or water uses or natural resources in a state's coastal zone.[24] If regulatory amendments result in fewer or less thorough EISs, the States would have to expend additional resources to comprehensively assess the impact of federal projects on state resources.

---

[21] 15 U.S.C § 717b(d).

[22] *Id.*

[23] *See* Comments of the Attorneys General of Massachusetts, Illinois, Maryland, New Jersey, Rhode Island, Washington, and the District of Columbia on the Federal Energy Regulatory Commission's April 19, 2018 Notice of Inquiry on its Certification of New Interstate Natural Gas Facilities, Docket No. PL18-1-000 (July 25, 2018) (attached as Exhibit B).

[24] *See, e.g.*, 15 C.F.R. § 930.31; 301 Code Mass. Regs. § 20.04.

AR_0026118

B. Any Weakening of the NEPA Regulations Would Threaten the States' Abilities to Enforce Their Own State Environmental Laws to Protect Public Health and the Environment.

NEPA also served as a model to the States, many of which enacted their own environmental review laws to protect public health and the environment.[25] Several examples include New York's State Environmental Quality Review Act ("SEQRA"),[26] the Massachusetts Environmental Policy Act ("MEPA"), the California Environmental Quality Act ("CEQA")[27], and Washington's State Environmental Policy Act ("SEPA").[28] These state laws are critically important to environmental review of state agency actions and are designed to complement NEPA review of federal actions within our States. The federal and state schemes most commonly interact when there are both federal agency and state agency components to a proposed action or project, such as a state highway project receiving federal funds. In such cases, a robust NEPA process remains vital to ensuring thorough and efficient review of numerous government actions that affect our residents' health and welfare and the environment. Revisions to the NEPA regulations should not negatively impact the States' abilities to implement and enforce their own environmental laws.

First, the States have an interest in the proper administration of their own environmental review laws, which could be adversely impacted by weakening the substance of NEPA reviews. The States' laws are often administered in conjunction with the NEPA regulations and either coordinate state and federal review, or allow project proponents to rely on NEPA review to satisfy State requirements. For example, in New York, the SEQRA regulations provide that, if a NEPA EIS has been prepared, generally no State EIS is required, provided the federal EIS is sufficient for the state to make its own findings.[29] Weaker federal review, less comprehensive federal EISs, or preparation of fewer EISs under NEPA may require that more EISs be prepared under a state process, likely leading to increased expenditures of State resources.

---

[25] *See* CEQ, States and Local Jurisdictions with NEPA-like Environmental Planning Requirements [hereinafter State and Local Laws], https://ceq.doe.gov/laws-regulations/states.html (last visited August 14, 2018).

[26] N.Y. Envtl. Conserv. L. art. 8; 6 N.Y.C.R.R. Part 617.

[27] Cal. Stats. ch. 1433 (1970), Cal. Pub. Res. Code §§ 21000–21189.57.

[28] RCW 43-21C-010–914; WAC 197-11-010–990.

[29] 6 N.Y.C.R.R. § 617.15(a); N.Y. Envtl. Conserv. L. § 8-0111(1) & (2); *see Hudson R. Sloop Clearwater v. Dep't of Navy*, 836 F.2d 760, 762 (2d Cir. 1988).

AR_0026119

In Massachusetts, if fewer projects qualify as major federal actions requiring an EIS under amended CEQ regulations, as suggested by Question 7, more project proponents, including state agencies receiving federal funds, will have to draft Environmental Impact Reports ("EIRs") under MEPA *ab initio* rather than substituting EISs for EIRs or building on EISs during coordinated review procedures.[30] Where Massachusetts projects still require both EISs and EIRs, if amended regulations relax the scoping as suggested by Question 5 of the Advance Notice, or cumulative effects and alternatives requirements for EISs as suggested by Question 13, EISs will prove a less helpful resource as project proponents prepare EIRs, requiring the expenditure of additional time and resources to comply with the comprehensive, environmentally protective State report requirements.

Likewise, Washington State law allows State agencies to adopt NEPA EISs that are adequate under CEQ's NEPA regulations.[31] However, if CEQ makes regulatory revisions that weaken NEPA and are not consistent with Washington's environmental policy act requirements, then compliance with the federal NEPA process may not be sufficient to satisfy State law. As a result, project proponents may be required to navigate divergent environmental review processes, potentially making the processes longer, more complicated, and more prone to legal challenges.

In California, CEQA[32] is designed to complement NEPA by eliciting public participation in protecting California's environment. Even though CEQA and NEPA do not have identical requirements (and, in certain aspects CEQA has more rigorous procedural requirements than NEPA), where a project requires both federal and State approvals (an EIS and an EIR), joint review under both statutes avoids redundancy, improves efficiency and interagency cooperation, and is easier for applicants and citizens to navigate.[33] Sharing documents and reducing paperwork results in efficient outcomes that benefit social welfare, environmental stewardship, and California's economy. If NEPA's regulations are revised in a manner that reduces protections for natural resources and public health, it will become more difficult for California state agencies to utilize NEPA documents by reference in CEQA reviews,

---

[30] *See, e.g.*, Mass. Gen. Laws c. 30, § 62; 310 Code Mass. Regs. § 11.09(c).

[31] WAC 197-11-610(3).

[32] Cal. Stats. ch. 1433 (1970); Cal. Pub. Res. Code §§ 21000–21189.57, 21001, 21100.

[33] *See* Exec. Office of the President & Governor of California's Office of Planning and Research, NEPA and CEQA: Integrating Federal and State Environmental Reviews, at 1 (2014) [hereinafter CEQA-NEPA Integration Guidance].

AR_0026120

precluding joint CEQA-NEPA review.[34] For example, if revised NEPA regulations curtail robust review of alternatives or cumulative impacts as suggested by Question 13 of the Advance Notice, coordinated CEQA-NEPA review of the proposed project would be impossible, resulting in greater inefficiency in projects requiring approvals under both statutes.

In addition, where projects require both federal and state-level environmental review, the NEPA regulations take account of many state partners' environmental review processes through state-specific memoranda designed to aid compliance with both federal and state schemes.[35] These carefully calibrated programs vary by state and represent significant work by CEQ and the States to harmonize these review programs. Any revisions to the CEQ regulations should account for the existing cooperative framework developed with the individual States to ensure compliance with each process—a framework that benefits the public and regulated community by providing an efficient linkage of state and federal requirements and facilitating coordinated compliance with both. CEQ should avoid amending the NEPA regulations in ways that will render such linked compliance more difficult or impossible. Furthermore, CEQ should evaluate the time and resources that will be needed if significant revisions to the CEQ regulations require substantial re-working of these memoranda to ensure continuing compliance with both federal and state programs.

The States have long relied on the NEPA regulations in implementing state environmental review statutes and regulations. For example, New York's SEQRA regulations drew from certain sections of the NEPA regulations in setting regulatory standards, such as when a supplemental EIS is required. New York SEQRA regulations also require review of potential catastrophic impacts from a proposed action[36] through provisions drawn and adapted from the NEPA regulations at 40 C.F.R. § 1502.22. NEPA regulations are also utilized by states courts in interpreting the obligations under equivalent state environmental review statutes. For example, courts in New York rely on NEPA in construing the scope of the SEQRA where appropriate, finding that certain decisions interpreting actions as exempt from NEPA

---

[34] *See* Exec. Order No. 13,807, 82 Fed. Reg. 40,463, 40,466–67 (Aug. 24, 2017); The White House, Legislative Outline for Rebuilding Infrastructure in America, 35–37, 48–50 (Feb. 28, 2018), *available at* https://www.whitehouse.gov/wp-content/uploads/2018/02/INFRASTRUCTURE-211.pdf.

[35] *See* State and Local Laws, *supra* note 25; *see also* 40 C.F.R. § 1500.5(h).

[36] 6 N.Y.C.R.R. § 617.9(b)(6).

AR_0026121

review[37] are persuasive authority for determining whether such actions are required to undergo environmental review under the state statute.[38] In California, NEPA cases are considered persuasive authority in CEQA cases.[39] Courts in Washington State also look to NEPA decisions to interpret SEPA.[40] Some state courts have also adopted the federal "hard look" standard required by NEPA under their own States' environmental review statutes. If CEQ revises the definition of key terms, as suggested by the Advance Notice Questions 7, 8, and 9, it may create divergence between state and federal standards, undermine our States' ability to effectively implement our own environmental review laws, and impact the case law interpreting States' well-developed statutory and regulatory regimes. As CEQ considers any possible revisions, it should take that concern into account.

In summary, the States have strong interests in the continued implementation of NEPA regulations that provide for a robust, deliberative, and complete federal environmental review process. CEQ must avoid arbitrarily limiting the scope and timeframe allowed for preparation and consideration of NEPA documents or truncating the public participation process as suggested by the Advance Notice, which would harm the States' interests and violate the principles and provisions of NEPA.

### III.    CEQ Must Conduct a Thorough Review Process to Determine the Need, if Any, for NEPA Regulatory Revisions.

Consistent with NEPA's animating principles and fundamental requirements, any revisions to the NEPA regulations must be inclusive, deliberative, and transparent, and employ a public review process similar to the process CEQ used

---

[37] *See H.O.M.E.S. v. New York State Urban Dev. Corp.*, 69 A.D.2d 222, 231, 418 N.Y.S.2d 827, 832 (4th Dep't 1979).

[38] *See Villani v. Berle*, 91 Misc.2d 603, 608, 398 N.Y.S.2d 796, 801 (Sup. Ct. Suffolk County 1977); *Matter of Marino v. Platt*, 104 Misc.2d 386, 390, 428 N.Y.S.2d 433, 435–36 (Sup. Ct. Onondaga County 1980).

[39] *See, e.g., No Oil, Inc. v. City of Los Angeles*, 13 Cal.3d 68, 86, 529 P.2d 66, 78 (S.Ct. 1974) (California courts use NEPA as persuasive authority in CEQA); *accord Del Mar Terrace Conservancy, Inc. v. City Council of the City of San Diego*, 10 Cal.App.4th 712, 732, 12 Cal.Rptr.2d 785, 797 (1992).

[40] *See, e.g., Eastlake Cmty. Council v. Roanoke Assocs., Inc.*, 82 Wn.2d 475, 488, 513 P.3d 36, 44–45 (1983); *City of Des Moines v. Puget Sound Reg'l Council*, 98 Wn. App. 23, 37, 988 P.2d 27, 37 (1999); *Gebbers v. Okanogan Cty. Pub. Util. Dist. No. 1*, 144 Wn. App. 371, 381 & n.1, 183 P.3d 324, 328 & n.1 (2008) (looking to federal definition of cumulative impacts).

AR_0026122

when it initially drafted its NEPA regulations,[41] and when it subsequently reviewed the effectiveness of NEPA regulations in 1997.[42] At a minimum, CEQ's review of whether to amend its NEPA regulations should include a detailed analysis of the effectiveness of current regulations and other tools in implementing NEPA, a demonstrated need for any revisions to the regulations to better support the purpose and structure of NEPA, and an analysis of whether changes to the regulations could increase litigation, delay, and confusion in the NEPA process.

A.    CEQ Should Adequately Evaluate the Effectiveness of the NEPA Regulations and Tools to Address Any Concerns about NEPA's Implementation.

As discussed in detail below, the NEPA regulations have successfully safeguarded public health and the environment for the past 40 years. In light of this history, CEQ should first consider whether existing tools available under the current NEPA regulations will address CEQ's apparent concerns about NEPA's implementation. If CEQ nevertheless decides to pursue revisions to its NEPA regulations, then CEQ must adequately demonstrate the need for any such changes.

1. *Current Regulations Have Been Largely Successful in Implementing NEPA.*

Before CEQ makes any changes to its NEPA regulations, CEQ should carefully evaluate the demonstrated effectiveness of its current regulations implementing NEPA, which have provided a consistent regulatory environment for several decades.[43] Under these regulations, federal agencies annually prepare hundreds of environmental impact statements, tens of thousands of environmental assessments, and hundreds of thousands of categorical exclusions.[44]

---

[41] *See* National Environmental Policy Act—Regulations, 43 Fed. Reg. 55,978, 55,980 (Nov. 29, 1978) [hereinafter NEPA—Regulations] (rulemaking process included public hearings; meetings with all federal agencies; meetings with representatives of business, labor, State and local governments, and environmental groups; and detailed consideration of federal studies on the environmental impact statement process).

[42] CEQ, Exec. Office of the President, National Environmental Policy Act: A Study of Its Effectiveness After Twenty-five Years, at 5 (Jan. 1997) [hereinafter NEPA Effectiveness Study] (CEQ solicited input from NEPA's original framers, members of Congress, State and local agencies, drafters of the CEQ regulations, federal agencies, and the public), *available at* https://ceq.doe.gov/docs/ceq-publications/nepa25fn.pdf.

[43] *See* Advance Notice, *supra* note 1, 83 Fed. Reg. at 28,591–92.

[44] *NEPA.gov*, https://ceq.doe.gov/ceq-reports/litigation.html; U.S. Gov't Accountability Office, GAO-14-369, National Environmental Policy Act: Little Information Exists on

AR_0026123

The vast majority of environmental review processes result in "taxpayer dollars and energy saved, resources better protected and the fostering of community agreements."[45] Indeed, when CEQ conducted a 25-year review of NEPA, it concluded "that NEPA is a success—it has made agencies take a hard look at the potential environmental consequences of their actions, and it has brought the public into the agency decision-making process like no other statute."[46] The 2014 U.S. Government Accountability ("GAO") Report on NEPA echoed this sentiment, stating that the NEPA process "ultimately saves time and reduces overall project costs by identifying and avoiding problems that may occur in later stages of project development."[47] In short, as U.S. Forest Service officials have observed, "NEPA leads to better decisions."[48]

In addition, the NEPA environmental review process has yielded significant community involvement and decisions sensitive to local interests. As NEPA itself recognizes, states and local governments are active and important partners in the effective implementation of NEPA in their communities.[49] Recognizing this partnership, the Federal Transit Administration has commended the effectiveness of collaborative NEPA processes across the country including the final EIS for the Federal Way Link Extension and the Mukilteo Multimodal Project in Washington State, the final EIS for the Purple Line and the alternative analysis and draft EIS for the Red Line Corridor Transit Study in Maryland, and the EIS for the Portland-Milwaukie Light Rail Project in Oregon.[50]

---

NEPA Analyses7 (2014) [hereinafter GAO Report], *available at* https://www.gao.gov/assets/670/662546.pdf.

[45] Examples of NEPA Benefits, *supra* note 13, at 1.

[46] NEPA Effectiveness Study, *supra* note 42, at iii.

[47] GAO Report, *supra* note 44, at 16.

[48] *Id.*; *see also* NEPA Success Stories, *supra* note 13; Examples of NEPA Benefits, *supra* note 13; Citizen's Guide to the NEPA, *supra* note 11, at 24 ("Through NEPA, citizens were able to educate and assist the decision-makers in developing their alternatives.").

[49] 42 U.S.C. § 4331(a).

[50] Fed. Transit Admin., Outstanding Achievement Award for Excellence in Environmental Document Preparation, https://www.transit.dot.gov/regulations-and-guidance/environmental-programs/outstanding-achievement-award-excellence (last visited Aug. 14, 2018).

13

The NEPA process benefits the States' residents and natural resources alike. For example, following extensive community involvement and collaboration between multiple state and federal agencies and the two impacted towns, the final joint EIS and state EIR for the Herring River Restoration on Cape Cod in Massachusetts recommended,[51] and the National Park Service adopted,[52] an alternative plan that will restore at least 346 acres of the tidal marsh, protect fish species harmed by current, impeded river conditions, and improve fishing and shell fishing yields, among other significant benefits to the community and the environment.

Contrary to assertions by critics of NEPA, the NEPA process does not foster significant litigation. The vast majority of NEPA reviews of proposed federal actions—over 99 percent by some estimates[53]—do not result in litigation.[54] Where projects are challenged, it is often by plaintiffs seeking to ensure that projects do not move forward without adequate review of environmental impacts. In such circumstances, the courts play a vital role in ensuring that federal agencies adhere to Congress's mandate to take a hard look at environmental consequences before taking

---

[51] *See* Nat'l Park Serv., Town of Wellfleet, Town of Truro, & Herring River Restoration Committee, Herring River Restoration Project Final Environmental Impact Statement and Environmental Impact Report (May 2016), *available at* https://parkplanning.nps.gov/document.cfm?parkID=217&projectID=18573&docum entID=73471.

[52] Nat'l Park Service, Record of Decision for Herring River Restoration Project, Final Environmental Impact Statement and Environmental Impact Report (Sept. 15, 2016), *available at* https://parkplanning.nps.gov/document.cfm?parkID=217&projectID=18573&docum entID=75340.

[53] Geo. U.L. Center, NEPA: Lessons Learned and Next Steps: Hearing Before the Task Force on Updating the National Environmental Policy Act of the H. Comm. on Resources, 109th Cong., Statement of Professor Robert G. Dreher, Nov. 17, 2005 ("[P]laintiffs bring around 100 NEPA lawsuits per year, representing only two-tenths of 1 percent of the 50,000 or so actions that Federal agencies document each year under NEPA.").

[54] *See* GAO Report, *supra* note 44, at 19–20; NEPA.gov, https://ceq.doe.gov/ceq-reports/litigation.html (stating that "the amount of litigation on these NEPA analyses is comparatively small"); The Weaponization of the National Environmental Policy Act and the Implications of Environmental Lawfare: Hearing Before the House Comm. on Natural Res., 115th Cong. 8–11 (2018) (statement of Horst Greczmiel, Former CEQ Associate Director of NEPA Oversight) [hereinafter Greczmiel Statement].

AR_0026125

major actions.[55] The opportunity for judicial review of agency actions is not a shortcoming of NEPA, but a fundamental part of the NEPA process that must be preserved.

2. *Tools Already Exist to Address Any Concerns about the NEPA Process.*

Although NEPA critics and Questions 1, 2, 6, 13, 15, 17 and 19 of the Advance Notice suggest the environmental review process under NEPA is inefficient, the NEPA regulations already provide at least 12 specific strategies to reduce delay in agencies' NEPA reviews.[56] These strategies were designed to *reduce* inefficiencies while producing "better decisions which further the national policy to protect and enhance the quality of the human environment."[57] As a result, existing NEPA regulations—when properly implemented by well-resourced and well-trained federal agencies—already provide the tools to address many of CEQ's apparent efficiency concerns about the NEPA process.[58]

For example, section 1500.4 of CEQ's NEPA regulations identifies more than a dozen different methods for reducing excessive paperwork, such as reducing duplication by allowing for joint preparation with state and local processes and allowing federal agencies to adopt appropriate environmental documents prepared by other agencies.[59] Similarly, section 1500.5 directs agencies to take a dozen enumerated actions to reduce delay, including integrating the NEPA process into early stages of project planning.[60] Likewise, in certain appropriate circumstances, programmatic reviews, as referenced in Question 12, have been used as an effective tool when considering an action that will take place at multiple sites, and may provide a model for considering impacts of multiple similar projects.[61] Importantly, the NEPA

---

[55] *See* Greczmiel Statement, *supra* note 54, at 8–10.

[56] *See* 40 C.F.R. § 1500.5.

[57] *See* NEPA—Regulations, *supra* note 41, 43 Fed. Reg. at 55,978.

[58] *See generally*, CEQ, Memorandum for Heads of Federal Departments and Agencies on Improving the Process for Preparing Efficient and Timely Environmental Reviews under NEPA (Mar. 6, 2012), *available at* https://ceq.doe.gov/docs/ceq-regulations-and-guidance/Improving_NEPA_Efficiencies_06Mar2012.pdf.

[59] *See, e.g.*, 40 C.F.R. § 1500.4(n); *see also id.* §§ 1501.5 (discussing lead agencies), 1501.6 (discussing cooperating agencies); *see* NEPA Effectiveness Study, *supra* note 42, at 21.

[60] 40 C.F.R. § 1500.5.

[61] *See* CEQ, Effective Use of Programmatic NEPA Reviews 6-7 (Dec. 18, 2014), *available*                    *at*                    https://ceq.doe.gov/docs/ceq-regulations-and-

15

regulations provide agencies the flexibility to adjust the NEPA process to meet the needs of the agency and the project under review, which can vary widely depending on the size and nature of the agency and the project.[62]

As CEQ and others have identified, the effectiveness and efficiency of the NEPA process significantly increases when agencies:

(a) integrate NEPA into their internal planning process as early as possible;[63]

(b) ensure that the NEPA process is well-funded and led by experienced and well-trained staff and engaged senior management;[64]

(c) engage in robust and inclusive public outreach;[65]

(d) rely on accurate scientific data and rigorous environmental analysis;[66]

(e) utilize NEPA regulations to facilitate interagency coordination to resolve or avoid conflicts, reduce duplication of effort, and improve the environmental permitting process;[67]

(f) draft NEPA documents in plain, concise, and honest language;[68] and

---

guidance/Effective_Use_of_Programmatic_NEPA_Reviews_Final_Dec2014_searcha ble.pdf

[62] *See, e.g., id.* §§ 1501.7(b) (permitting lead agencies to set page and time limits), 1501.8(b) (providing factors to consider in setting time limits), 1501.8 (rejecting "prescribed universal time limits for the entire NEPA process" as "too inflexible").

[63] NEPA Effectiveness Study, *supra* note 42, at 11.

[64] *See id.*; Dep't of Energy, NEPA Lessons Learned Quarterly Report, September 2017, at 7 (Sept. 2017) (attributing shorter NEPA completion times to, among other things, agency senior management attention, the availability of data, and engagement of experienced staff), *available at* https://www.energy.gov/sites/prod/files/2017/09/f37/LLQR%20Sep_2017.pdf.

[65] NEPA Effectiveness Study, *supra* note 42, at 18; Train Letter, supra note 13, at 2, ("Meaningful efforts to improve [NEPA's] implementation should address the critical needs for better guidance and additional training for agency personnel and enhanced resources for NEPA implementation by federal agencies.").

[66] NEPA Effectiveness Study, *supra* note 42, at 27–29.

[67] *Id.* at 21.

[68] *Id.* at 29.

AR_0026127

(g) effectively partner with State and local governments.[69]

As these measures demonstrate, there is insufficient evidence that any revisions to the NEPA regulations for the purpose of increasing the efficiency of the environmental review process are needed. Instead, the existing efficiency measures should be implemented under current regulations by well-trained and well-funded federal agencies committed to NEPA's purpose and function.

Further, any concerns about the efficiency of the NEPA process for major infrastructure projects already have been addressed by Title 41 of the Fixing America's Surface Transportation Act of 2015 ("FAST Act").[70] Title 41 sought to streamline the environmental review of major infrastructure projects by, among other things, emphasizing the importance of early and frequent coordination between cooperating and participating agencies, creating a federal infrastructure-permitting dashboard to allow agencies and the public to track the progress of Title 41 covered projects, enhancing early stakeholder engagement, and requiring the newly created Federal Permitting Improvement Steering Council to publish an annual report of best practices.[71] Given that Title 41 targeted many of the concerns about the NEPA process raised by the current Administration and suggested by the Advance Notice,[72] CEQ should allow Title 41 to work in practice to better evaluate whether any changes to CEQ's NEPA regulations are warranted.

### 3. CEQ Must Demonstrate the Need for and Purpose of Any Regulatory Revisions.

To ensure informed decision-making consistent with NEPA's structure and purpose and the Administrative Procedure Act,[73] any revisions to the NEPA regulations must reflect reasoned decision-making based on accurate and reliable data demonstrating the need for the change and its consistency with the statute.[74]

---

[69] See Federal Permitting Improvement Steering Council, Recommended Best Practices for Environmental Reviews and Authorizations for Infrastructure Projects for Fiscal Year 2018, 8–9 (Dec. 2017), available at https://www.permits.performance.gov/sites/permits.performance.gov/files/docs/docu mentation/40856/fast-41fy-2018best-practices-report.pdf.

[70] Pub. L. No. 114-94 (2015).

[71] See 42 U.S.C. §§ 4370m-1–4370m-12.

[72] See e.g., Exec. Order No. 13,807 (Aug. 15, 2017).

[73] 5 U.S.C. §§ 551–559.

[74] See FCC v. Fox Television Stations, 556 U.S. 502, 514–15 (2009) (changes in agency position must be based on reasoned explanation supported by the record and permissible under the statute); Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm

17

Insufficient data presently exist to support revisions to the NEPA regulations. According to the 2014 GAO Report, most federal agencies do not routinely track important information about their NEPA processes, including the number of environmental assessments and categorical exclusions conducted and the time frames for completing these reviews.[75] In addition, few agencies track the cost of completing NEPA analyses, leading to little quantitative data on the costs and benefits of the NEPA process.[76] The data that do exist, however, demonstrate that consistent with NEPA's intent and purpose, the present NEPA regulations encourage public participation, lead to projects that are "financially and environmentally improved," and seldom involve litigation.[77]

Given the lack of data demonstrating a need to revise NEPA's regulations— including the absence of meaningful discussion in the Advance Notice demonstrating a need to revise CEQ's NEPA regulations[78]—CEQ must engage in a careful and detailed review before proposing any regulatory revisions. The vague questions in the Advance Notice do not provide an adequate basis for stakeholder input. To ensure CEQ engages in an informed review process, the States reiterate that CEQ should hold several public hearings on the Advance Notice before proposing any regulatory revisions.[79] In addition, consistent with its past practices, CEQ should analyze existing studies and reports on the effectiveness of the current NEPA regulations and solicit input from federal agencies, State and local governments, the public, academics, scientists, and other stakeholders to determine whether changes are appropriate.[80] If, after this review, CEQ decides to revise the NEPA regulations, then

---

*Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) ("[T]he agency must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." (quotation and citation omitted)).

[75] GAO Report, *supra* note 44; *see also* NEPA Effectiveness Study, *supra* note 42, at 6, 13; *see also id.* at 13 (discussing the lack of information of the time frame for completing EAs and CEs).

[76] GAO Report, *supra* note 44, at 10.

[77] *Id.* at 15–18.

[78] *See* Advance Notice, *supra* note 1, 83 Fed. Reg. at 28,591–92.

[79] *See* Letter from Attorneys General of Washington, Maryland, Massachusetts, New Jersey, New York, and Oregon to Mary B. Neumayr re: Advance Notice of Proposed Rulemaking, Docket ID No. CEQ-2018-0001-0200, at 2 (July 3, 2018) (requesting several public hearings on the Advance Notice).

[80] *See* NEPA—Regulations, *supra* note 41, 43 Fed. Reg. at 55,980 (describing the process for drafting the current NEPA regulations as including public hearings,

AR_0026129

CEQ should again hold regional public hearings and provide sufficient time for stakeholders to scrutinize and comment on the proposed revisions as required by the Administrative Procedure Act.

In particular, CEQ should solicit information on the extent and causes of any delay in the NEPA process. The questions in the Advance Notice assume delay is caused by NEPA but reference no data to support that assumption. As noted above, existing data suggest that concerns over the extent of delay may be overblown given the number of NEPA analyses completed by federal agencies each year. Although NEPA critics assert that NEPA review results in delay, as previously noted, only a small percentage of NEPA actions result in litigation and potential delay.[81] Focusing on litigation as the sole or primary source of project delay also ignores a number of other factors that may cause delay and may be addressed without revisions to CEQ's NEPA regulations, including lack of funding to sufficiently implement the NEPA process, inadequate staff time and training to implement or supervise the NEPA process, local controversy over or opposition to a project that would exist regardless of NEPA, delays in non-NEPA permitting or approval processes, project sponsors' changes to project design that require substantial revisions, and uncertainties related to project funding.[82] Accordingly, before proposing any regulatory changes, CEQ should conduct a detailed review to first determine if delay is occurring, the extent of the delay, and the actual causes of delay, and then target those causes through training, guidance, or, if necessary, carefully tailored regulatory changes.

B. <u>Unnecessary Revisions to NEPA's Implementing Regulations Likely Will Increase Litigation, Delay, and Costs.</u>

Given the significance of the NEPA regulations to the implementation of NEPA and to the daily function of federal agencies, unnecessary revisions to these regulations likely will increase litigation, delay, and costs, and weaken the effectiveness of NEPA in protecting public health and the environment. As former CEQ leaders have made clear, "[m]easures to exempt certain agencies and programs from NEPA, to restrict or eliminate alternatives analysis, or to limit the public's right

---

meetings with all federal agencies implementing NEPA, meetings with representatives of business, labor, State and local governments, environmental and other interested groups, and the general public, and detailed consideration of existing federal studies on the NEPA process).

[81] *See* NEPA.gov, https://ceq.doe.gov/ceq-reports/litigation.html; GAO Report, *supra* note 44, at 19–20; Greczmiel Statement, *supra* note 54, at 8–11.

[82] *See* GAO Report, *supra* note 44, at 18; Greczmiel Statement, *supra* note 54, at 4–6.

AR_0026130

to participate in the NEPA process threaten NEPA's vital role in promoting responsible government decision-making."[83]

As an initial matter, unnecessary revisions likely will require federal agencies to revise their own NEPA regulations and guidance to ensure compliance with the NEPA regulations.[84] And, as already noted, the States may need to amend their environmental review programs to respond to such changes. These processes would waste taxpayer dollars, delay projects, and create uncertainty for project proponents and the public as agencies reconfigure their own NEPA regulations and procedures to conform to CEQ's regulatory changes.

Changes to CEQ's NEPA regulations are also likely to increase NEPA litigation. One of the current regulations' successes was a reduction in NEPA litigation, but changes to these regulations—particularly if CEQ does not engage in the robust and thoughtful review outlined above—threaten to undo that success.[85] Litigation is particularly likely if CEQ attempts to change the definition of key NEPA terms (such as those identified in Questions 7, 8, and 9 of the Advance Notice), or constrains the ability of agencies to identify a range of mitigation actions to help minimize project impacts on the environment. Further, as NEPA requires, CEQ's current regulations ensure that the adverse environmental effects of federal agency decision-making are fully considered and that any alternatives to the agency action are fully developed. Revising the regulations to limit full consideration of the effects and alternatives of a proposed action would contravene NEPA's mandate that agencies consider alternatives to the proposed action and would also make litigation likely.[86]

Moreover, because public involvement is so critical, CEQ should not revise the NEPA regulations in a manner suggested by Question 6 of the Advance Notice that would curtail public involvement, or by attempting to mandate completion of the environmental analysis on a predetermined timeframe, as suggested by Question 4 of the Advance Notice. For instance, Executive Order 13,807 envisions a two-year time frame for completing agency NEPA analyses. While such a time period may be adequate for some federal actions, others, such as the determination to issue permits

---

[83] Train Letter, *supra* note 13, at 2–3.

[84] *See* 40 C.F.R. § 1507.3.

[85] Bear, Dinah, *NEPA at 19: A Primer on an "Old" Law with Solutions to New Problems*, 19 Envtl. L. Rep. 10,060, 10,062 (1989) (noting that annual surveys showed a low of 71 NEPA cases in 1986 compared with 189 cases in 1974).

[86] 42 U.S.C. § 4332(2)(C).

AR_0026131

for complex proposed projects, require significant agency time and expertise to consider the materials submitted. Arbitrarily restricting the NEPA timeframe does not reduce the complexity of projects and the need for thorough evaluation of important considerations such as the public need and environmental impacts of proposed natural gas pipelines or the site of a new nuclear electricity facility. Instead, the shortened timeframes tend to reduce the public comment period and truncate the agency's consideration of public comments, which, as discussed above, often propose alternatives or mitigation measures that lead to better agency decisions and better outcomes for public health and the environment. Arbitrary limits on the length or format of NEPA documents also reduce transparency, diminish the effectiveness of the public review process, and, again, ultimately lead to litigation.

In addition, changes to increase the use of categorical exclusion provisions as suggested by Question 9 may lead to the inappropriate overuse of categorical exclusions that would undermine the principles of NEPA and likely increase litigation. As CEQ has previously explained, "[i]f used inappropriately, categorical exclusions can thwart NEPA's environmental stewardship goals, by compromising the quality and transparency of agency environmental review and decisionmaking, as well as compromising the opportunity for meaningful public participation and review."[87] CEQ must ensure that whether a project has the potential to significantly affect the environment remains the touchstone of the NEPA process. CEQ should not adopt new regulations that will undermine this basic principle of NEPA.

## IV.  CEQ Should Limit Any Changes to Its Implementing Regulations to Codifying Its Environmentally Protective Guidance on Climate Change and Environmental Justice.

If CEQ decides to revise the NEPA regulations, the States urge CEQ to limit any regulatory revisions to codifying CEQ's previously issued guidance on climate change and environmental justice. Although not specifically referenced in the Advance Notice, such revisions would "provide greater clarity to ensure NEPA documents better focus on significant issues that are relevant and useful to decisionmakers and the public," as requested by Question 5.[88] By codifying established guidance regarding both climate change and environmental justice into

---

[87] *See Sierra Club v. Bosworth*, 510 F.3d 1016, 1027 (9th Cir. 2007) (to use categorical exclusions federal agencies "must document that the action to be undertaken is insignificant because the threshold question in a NEPA case is whether a proposed project will significantly affect the environment, thereby triggering the requirement for an EIS" quotation and citation omitted)); 42 U.S.C. § 4332(2)(C).

[88] Advance Notice, *supra* note 1, 83 Fed. Reg. at 28,591.

AR_0026132

the regulations, CEQ would ensure that these critical environmental impacts receive appropriate focus in NEPA analyses.

Climate change presents an enormous environmental problem that all federal agencies need to consider.[89] In 2010, CEQ issued draft guidance on incorporating climate change into NEPA analyses. It revised this guidance in 2014, and on August 5, 2016, CEQ finalized its NEPA Guidance on Climate Change ("Climate Change Guidance").[90] The Climate Change Guidance makes recommendations to federal agencies performing NEPA review of climate change related impacts.[91] These recommendations encourage agencies to consider both the "potential effects of a proposed action on climate change as indicated by assessing [greenhouse gas] emissions," and the "effects of climate change on a proposed action and its environmental impacts," and use these analyses to guide consideration of reasonable alternatives and potential mitigation.[92] Developed in part in response to requests from multiple federal agencies on how best to address climate change impacts, this guidance ensures that agencies adequately consider the effects of climate change in evaluating proposed projects. Indeed, because of the importance of addressing climate change, several of the States have codified similar requirements in their own environmental review processes.[93] However, on April 5, 2017, in response to President Trump's March 28, 2017 Presidential Executive Order on Promoting Energy Independence and Economic Growth, CEQ withdrew the Climate Change Guidance.[94]

We urge CEQ not only to readopt the Climate Change Guidance, but also to incorporate its substantive recommendations into any revised regulations CEQ may propose. In particular, CEQ should incorporate these recommendations into 40 C.F.R. § 1502.16, which directs agencies in evaluating the environmental consequences of proposed actions and alternatives. Courts give substantial deference to the NEPA

---

[89] *Massachusetts*, 549 U.S. at 497.

[90] CEQ, Final Guidance for Federal Departments and Agencies on Consideration of Greenhouse Gas Emissions and the Effects of Climate Change in National Environmental Policy Act Reviews, 81 Fed. Reg. 51,866 (Aug. 5, 2016) [hereinafter Climate Change Guidance].

[91] *Id.* at 4.

[92] *Id.*

[93] *See, e.g.,* Mass Gen. Laws c. 30, § 61; 310 Code Mass. Regs. § 11.12(5).

[94] Exec. Order No. 13783, 82 Fed. Reg. 16,576 (Apr. 5, 2017).

AR_0026133

regulations.[95] By codifying the Climate Change Guidance into its regulations, CEQ will ensure that agencies properly evaluate the climate impacts associated with projects. Codification could also improve interagency coordination, as each agency would follow a similar approach to addressing climate change in NEPA analyses, as opposed to the varying analyses presently occurring.[96]

CEQ also has issued guidance on how federal agencies should consider environmental justice under NEPA ("EJ Guidance").[97] CEQ published the EJ Guidance in 1997 in response to Executive Order 12,898, which directed agencies to identify and address "disproportionately high and adverse human health or environmental effects of its programs, policies, and activities on minority populations and low-income populations."[98] The EJ Guidance provides principles for considering environmental justice in NEPA analyses, including: ensuring sufficient opportunities for public input by minority, low-income, and Native American populations; considering relevant public health data concerning potential health and environmental hazards of an action; and recognizing the "interrelated cultural, social, occupational, historical, or economic factors that may amplify the natural and physical environmental effects of the proposed action."[99]

We urge CEQ to incorporate the EJ Guidance into its NEPA regulations to reinforce the responsibilities of federal agencies to consider environmental justice in NEPA review, particularly to ensure that environmental justice communities are not disproportionately burdened by cumulative adverse environmental impacts. Courts have long recognized the importance of environmental justice considerations in NEPA analyses.[100] Incorporating the EJ Guidance into regulations furthers the aims of Executive Order 12,898 by codifying the important role of assessing environmental

---

[95] See Robertson, 490 U.S. at 355.

[96] See, e.g., In re Dominion Transmission, 163 FERC ¶ 61,128 (Order Denying Rehearing) (Issued May 18, 2018).

[97] CEQ, Environmental Justice: Guidance Under the National Environmental Policy Act (Dec. 1997) [hereinafter EJ Guidance], available at https://ceq.doe.gov/docs/ceq-regulations-and-guidance/regs/ej/justice.pdf.

[98] Exec. Order No. 12,898, 59 Fed. Reg. 7,629 (Feb. 11, 1994).

[99] EJ Guidance, supra note 97, at 8–10.

[100] See, e.g., Communities Against Runway Expansion, Inc. v. F.A.A., 355 F.3d 678, 689 (D.C. Cir. 2004) (permitting challenge to environmental justice analysis); see also Senville v. Peters, 327 F. Supp. 2d 335, 362–63 (D. Vt. 2004); Coliseum Square Ass'n, Inc. v. Jackson, 465 F.3d 215, 232-33 (5th Cir. 2006); Saint Paul Branch of N.A.A.C.P. v. U.S. D.O.T., 764 F. Supp. 2d 1092, 1099, 1107–09, 1113, 1117 (D. Minn. 2011).

AR_0026134

justice implications in NEPA analyses. In turn, this will help agencies focus on alternatives, mitigation strategies, monitoring, and preferences of the disproportionately affected communities.

## V. <u>Conclusion</u>

In conclusion, the States submit that any revisions to CEQ's NEPA regulations must continue to protect the fundamental policies enshrined in the statute, including protection of the environment and public health and robust public participation. Any such revisions must fully respect the States' interests in a strong partnership to promote federal decision-making that protects these policies. We urge CEQ to fully examine the existing state of NEPA implementation and assess whether revisions to the NEPA regulations are even necessary. Then, only if changes are absolutely necessary and supported by a robust record, CEQ should engage in a careful, deliberative, and fully transparent process to propose limited and targeted regulatory changes consistent with the purpose and structure of NEPA.

AR_0026135

Respectfully submitted,

FOR THE STATE OF CALIFORNIA

Dated: August _17_, 2018

XAVIER BECERRA
Attorney General

By: _____

SARAH MORRISON
Supervising Deputy Attorney General
JAMIE JEFFERSON
JULIA FORGIE
Deputy Attorneys General
California Department of Justice
300 South Spring Street, Suite 1702
Los Angeles, CA 90013
Tel. (213) 269-6328
Sarah.Morrison@doj.ca.gov
Jamie.Jefferson@doj.ca.gov
Julia.Forgie@doj.ca.gov

Dated: August 20, 2018   FOR THE STATE OF ILLINOIS

         LISA MADIGAN
         Attorney General

By:

         MATTHEW J. DUNN
         Chief, Environmental Enforcement/Asbestos
         Litigation Division
         DANIEL I. ROTTENBERG
         Assistant Attorney General
         Environmental Bureau
         69 W. Washington St.
         Suite 1800
         Chicago, IL 60602
         MDunn@atg.state.il.us
         DRottenberg@atg.state.il.us

Dated: August 7, 2018          FOR THE STATE OF MARYLAND

                               BRIAN E. FROSH
                               Attorney General

                    By:        _____

                               LEAH J. TULIN
                               Assistant Attorney General
                               200 Saint Paul Place
                               Baltimore, MD  21202
                               (410) 576-6962
                               ltulin@oag.state.md.us

Dated:  August 17, 2018          FOR THE COMMONWEALTH OF
                                 MASSACHUSETTS

                                 MAURA HEALEY
                                 Attorney General


                         By:     _____
                                 CHRISTOPHE COURCHESNE
                                 Assistant Attorney General and Chief
                                 TURNER SMITH
                                 Assistant Attorney General
                                 Office of the Attorney General
                                 Environmental Protection Div.
                                 One Ashburton Place, 18th Floor
                                 Boston, MA 02108
                                 (617) 727-2200
                                 christophe.courchesne@state.ma.us
                                 turner.smith@state.ma.us

Dated: August 17, 2018             FOR THE STATE OF NEW JERSEY

                                   GURBIR S. GREWAL
                                   Attorney General

                        By:       _____
                                   DAVID C. APY,
                                   Assistant Attorney General
                                   KRISTINA MILES
                                   Deputy Attorney General
                                   R.J. Hughes Justice Complex
                                   25 Market Street
                                   Trenton, NJ 08625-0093
                                   (609) 376-2804
                                   david.apy@law.njoag.gov
                                   kristina.miles@law.njoag.gov

Dated: August **20**, 2018        FOR THE STATE OF NEW YORK

BARBARA D. UNDERWOOD
Attorney General

By:

MICHAEL J. MYERS
Senior Counsel
CLAIBORNE E. WALTHALL
Assistant Attorney General
Environmental Protection Bureau
New York State Attorney General
The Capitol
Albany, NY 12224
(518) 776-2380
Claiborne.Walthall@ag.ny.gov

AR_0026141

Dated: August 17 2018          FOR THE STATE OF OREGON

                               ELLEN F. ROSENBLUM
                               Attorney General

By:          _Steve Novick_

                               PAUL GARRAHAN
                               Attorney-in-Charge
                               Natural Resources Section
                               STEVE NOVICK
                               Special Assistant Attorney General
                               Oregon Department of Justice
                               1162 Court Street NE
                               Salem, OR 97301-4096
                               (503) 947-4520
                               paul.garrahan@doj.state.or.us
                               steve.novick@doj.state.or.us

Dated: August 17, 2018

FOR THE COMMONWEALTH OF
PENNSYLVANIA DEPARTMENT OF
ENVIRONMENTAL PROTECTION

ALEXANDRA C. CHIARUTTINI
Chief Counsel

By:

MARGARET O. MURPHY
Department of Environmental Protection
Office of Chief Counsel
400 Market Street, 9th Floor
P.O. Box 8464
Harrisburg, PA 17105-8464
(717) 787-7060
mamurphy@pa.gov

Dated: August / 7 2018                FOR THE STATE OF VERMONT

                                      THOMAS J. DONOVAN, JR.
                                      Attorney General

                    By:               _____
                                      LAURA B. MURPHY
                                      Assistant Attorney General
                                      Office of the Attorney General
                                      109 State Street
                                      Montpelier, VT 05609
                                      (802) 828-1059
                                      laura.murphy@vermont.gov

Dated: August 17, 2018      FOR THE STATE OF WASHINGTON

ROBERT W. FERGUSON
Attorney General

By: _Aurora R. Janke_

WILLIAM R. SHERMAN
Assistant Attorney General
AURORA R. JANKE
Special Assistant Attorney General
Counsel for Environmental Protection
800 5th Ave Suite 2000, TB-14
Seattle, WA 98104-3188
(206) 442-4485
(206) 233-3391
bill.sherman@atg.wa.gov
auroraj@atg.wa.gov

# EXHIBIT A

AR_0026146

September 19, 2005

The Honorable Cathy McMorris
Chair, Task Force on Improving the
     National Environmental Policy Act
House Committee on Resources
United States House of Representatives
1324 Longworth House Office Building
Washington, D.C.  20515

Dear Congresswoman McMorris:

We, the undersigned former Chairs and General Counsels of the President's Council on Environmental Quality, are writing to you in your capacity as Chair of the Task Force on Improving the National Environmental Policy Act to state our support for NEPA, to articulate our understanding of the basic principles served by this landmark legislation, and to express our concerns about recent measures and pending proposals that threaten to undermine NEPA.  Collectively, we have served Presidents of both parties since NEPA was signed into law on January 1, 1970.

We urge you and the other members of the Task Force to approach your work with an appreciation for the important role that NEPA plays in our government's decision-making with respect to the environment..  NEPA is, in the words of the CEQ regulations, "our basic national charter for protection of the environment."  NEPA established, for the first time, a national policy favoring protection of the environment, and committed the Federal government to "create and maintain conditions under which man and nature can exist in productive harmony, and fulfill the social, economic, and other requirements of present and future generations of Americans."  It also established farsighted procedural mechanisms, now emulated around the world, that require government agencies to consider and disclose to the public the environmental effects of proposed major government actions, and to provide an opportunity for the public to express concerns regarding the impacts of such actions.

Several principles embodied in NEPA are of overarching importance to achieving our nation's goal of "productive harmony" between man and nature.

Honorable Cathy McMorris
September 19, 2005
Page two

First, consideration of the impacts of proposed government actions on the quality of the human environment is essential to responsible government decision-making. Government projects and programs have effects on the environment with important consequences for every American, and those impacts should be carefully weighed by public officials before taking action. Environmental impact analysis is thus not an impediment to responsible government action; it is a prerequisite for it.

Second, analysis of alternatives to an agency's proposed course of action is the heart of meaningful environmental review. Review of reasonable alternatives allows agencies to evaluate systematically the potential effects of their decisions and to assess how they can better protect the environment while still fully implementing their primary missions.

Third, the public plays an indispensable role in the NEPA process. Public comments inform agencies of environmental impacts that they may have misunderstood or failed to recognize, and often provide valuable insights for reshaping proposed projects to minimize their adverse environmental effects. The public also serves as a watchdog, ensuring that Federal agencies fulfill their responsibilities under the law. Public participation under NEPA supports the democratic process by allowing citizens to communicate with and influence government actions that directly affect their health and well-being.

We recognize that environmental impact analysis should be efficient, timely and helpful to agencies and to the public. CEQ has always emphasized that the purpose of environmental review is "not to generate paperwork – even excellent paperwork – but to foster excellent action." The CEQ regulations direct Federal agencies to make the NEPA process more useful to decision-makers and the public, reduce paperwork, and emphasize real environmental issues and alternatives, and contain detailed guidance for integrating NEPA efficiently and effectively into agency planning processes. Unfortunately, not every Federal agency, and not every NEPA review, complies effectively with this mandate. Meaningful efforts to improve the Act's implementation should address the critical needs for better guidance and additional training for agency personnel and enhanced resources for NEPA implementation by federal agencies.

We are concerned that certain recent measures and pending proposals fail to reflect, and in some instances may undermine, the basic principles served by NEPA. Measures to exempt certain agencies and programs from NEPA, to restrict or eliminate alternatives analysis, or to limit the public's right to participate in the NEPA process

Honorable Cathy McMorris
September 19, 2005
Page three

threaten NEPA's vital role in promoting responsible government decision-making.  We
urge you and the other members of the Task Force to support the basic principles of
NEPA and reject proposals that would weaken or undermine NEPA.

Sincerely,

Russell E. Train
Chair, Council on Environmental Quality
(1970-1973)

Russell W. Peterson
Chair, Council on Environmental Quality
(1973-1976)

John Busterud
Chair, Council on Environmental Quality
(1976-1977)

Charles W. Warren
Chair, Council on Environmental Quality
(1977-1979)

J. Gustave Speth
Chair, Council on Environmental Quality
(1979-1981)

AR_0026149

Honorable Cathy McMorris
September 19, 2005
Page four


Michael R. Deland
Chair, Council on Environmental Quality
(1989-1993)


Kathleen A. McGinty
Chair, Council on Environmental Quality
(1995-1998)


George T. Frampton Jr.
Chair, Council on Environmental Quality
(1998-2001)


Gary Widman
General Counsel, Council on Environmental
Quality (1974-1976)


Nick Yost
General Counsel, Council on Environmental
Quality (1977-1981)

# EXHIBIT B

AR_0026151

UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION

| | | |
|---|---|---|
| Certification of New Interstate Natural | ) | Docket No. PL18-1-000 |
| Gas Facilities | ) | |

## COMMENTS OF THE ATTORNEYS GENERAL OF MASSACHUSETTS, ILLINOIS, MARYLAND, NEW JERSEY, RHODE ISLAND, WASHINGTON, AND THE DISTRICT OF COLUMBIA

The undersigned Attorneys General are pleased to submit these comments in response to the Federal Energy Regulatory Commission's ("Commission") Notice of Inquiry, dated April 19, 2018,[1] inviting comments on whether and how the Commission should revise its approach under its current policy statement on the certification of new natural gas transportation facilities ("Policy Statement") pursuant to the Natural Gas Act ("NGA").[2] As detailed herein, we have significant concerns about the Commission's approach to reviewing natural gas pipeline projects that are sited in and affect our states. We appreciate the opportunity to provide these comments, and respectfully urge the Commission to reexamine its Policy Statement, taking into account the following comments and recommendations.

### INTRODUCTION AND SUMMARY OF COMMENTS

Section 7 of the NGA, 15 U.S.C. § 717f (e), authorizes the Commission to grant a certificate of public convenience and necessity ("Certificate") for the construction or expansion of facilities for the transport of natural gas in interstate commerce. The NGA obligates the Commission to consider "all factors bearing on the public interest"[3] when making a Certificate decision, balancing the need for additional natural gas capacity from a proposed pipeline

---

[1] *Certification of New Interstate Natural Gas Facilities*, 163 FERC ¶ 61,042 (April 19, 2018) [hereinafter "Pipeline NOI"].

[2] Statement of Policy, Certification of New Interstate Natural Gas Pipeline Facilities, Docket No. PL99-3-000; 88 FERC ¶ 61,227 (September 15, 1999), Order Clarifying Statement of Policy, Docket No. PL99-3-001, 90 FERC ¶ 61,128 (February 9, 2000), Order Further Clarifying Statement of Policy, Docket No. PL99-3-002, 92 FERC ¶ 61,094 (July 28, 2000) [hereinafter "Policy Statement"].

[3] *Atl. Ref. Co. v. Pub. Serv. Comm'n*, 360 U.S. 378, 391 (1959); *see also* NGA §7 (c), (e), 15 U.S.C. § 717f (c), (e).

AR_0026152

project with the project's adverse effects, including economic and environmental impacts.[4]  In addition, the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321 *et seq.*, requires the Commission to take a "hard look" at the full range of environmental impacts associated with proposed pipeline infrastructure.[5] For jurisdictional projects, the Commission holds ultimate land use siting authority—a role played by states and local governments for many other energy production and energy transportation facilities.

Between 1999 and 2017, the Commission approved interstate natural gas pipeline capacity additions of 180 billion cubic-feet per day nationwide, a significant number that exceeds current national peak demand.[6] While these additions may increase the availability of natural gas to customers, they also come with long-duration costs, many ultimately paid by residents and small businesses in our states, and significant environmental impacts. Meanwhile, new pipeline infrastructure projects are entering a rapidly changing energy market, which raises major questions about the business and environmental case for new capacity built using traditional financing approaches and assumptions. It is in this context that the undersigned Attorneys General believe that the Commission's review of proposed gas pipeline projects under the Policy Statement does not fully satisfy its vital obligations under the NGA and NEPA to protect the public interest.

Despite its broad statutory authority and duty to consider the full range and scope of relevant factors related to pipeline projects, the Commission's current process is unduly segmented and narrow in scope. In assessing project need, the Commission generally fails to account for the extent of regional need for new gas capacity or the evolving market for gas demand and relies too heavily on precedent agreements as proof of need for isolated projects.

---

[4] *See Sierra Club v. FERC*, 867 F.3d 1357, 1373 (D.C. Cir. 2017).

[5] *Kleppe v. Sierra Club*, 427 U.S. 390, 410 n.21 (1976) (citation omitted); *Coal. for Responsible Growth & Res. Conservation v. FERC*, 485 F. App'x 472, 474 (2d Cir. 2012).

[6] *See* SUSAN TIERNEY, ANALYSIS GROUP, NATURAL GAS PIPELINE CERTIFICATION: POLICY CONSIDERATIONS FOR A CHANGING INDUSTRY (2017), at 1–2, *available at* http://www.analysisgroup.com/uploadedfiles/content/insights/publishing/ag_ferc_natural_gas_pipeline_cer tification.pdf.

AR_0026153

This practice does not permit the Commission to understand the broader context for the alleged benefits of a proposed project and risks approving more infrastructure and capacity (on potentially inefficient terms) than the public need requires or prospective market conditions can or should support. The Commission's single-minded reliance on precedent agreements is also contrary to the existing Policy Statement which directs the Commission to "consider all relevant factors reflecting on the need for the project," including studies of projected demand, the market to be served, and potential cost savings to consumers.

The Commission's current practice also fails to meet its statutory obligations under NEPA to assess the environmental impacts of proposed pipeline projects in a comprehensive and robust manner. By generally focusing on single projects in isolation, the Commission does not appropriately consider reasonable alternatives or account for cumulative environmental impacts on a regional basis. The Commission also fails to adequately assess non-gas energy alternatives and other project alternatives such as energy storage, demand response, and energy efficiency, and routinely fails to appropriately consider state policies, such as state choices regarding our energy resource portfolios. And by not consistently and thoroughly assessing and quantifying upstream and downstream greenhouse gas emissions using the best available measures, the Commission's approach to assessing climate impacts does not satisfy NEPA requirements. Relatedly, the Commission's inadequate implementation of NEPA hobbles its broader statutory obligation under the NGA to evaluate the public interest in Certificate decisions by balancing project benefits against a full accounting of adverse environmental and socioeconomic impacts.

The undersigned Attorneys General strongly urge the Commission to revise the Policy Statement in accordance with the recommendations discussed in detail below. Implementing these recommendations will assist the Commission in addressing the issues raised by the Commission in its Notice of Inquiry, including growing stakeholder concerns and legal challenges related to the adverse impacts of pipeline projects.

AR_0026154

## RECOMMENDATIONS

*First*, regarding project need, we recommend that the Commission assess need on a comprehensive, regional basis, and expand its analysis beyond the current dependence on precedent agreements, employing heightened scrutiny of precedent agreements with affiliates of project proponents.

*Second*, we urge the Commission to conduct a more thorough and robust NEPA analysis, comprehensively assessing on a regional basis the impacts of, and alternatives to, a proposed project, considering clean energy and other non-pipeline alternatives, thoroughly analyzing upstream and downstream greenhouse gas emissions, and considering state greenhouse gas emission-reduction policies.

*Third*, we recommend that the Commission consider environmental harm, including climate impacts quantified using the best available measure—the Social Cost of Carbon—and more heavily weigh the harm from use of eminent domain takings in its public interest assessment when balancing project benefits and harm in making a Certificate decision.

*Fourth*, we urge the Commission to better incorporate and consider state environmental and land use policies, no longer issue Certificates conditioned on later receipt of state certifications and permits under federal statutes, and to condition Certificates on obtaining and complying with state and local permits that do not unreasonably conflict with or delay approved projects.

*Finally*, we recommend that the Commission no longer issue partial notices to proceed with construction when Certificate rehearing requests are pending and limit the use and time of tolling periods for rehearing requests.

The Commission should seize the opportunity presented by the Notice of Inquiry to make these important reforms, to bring its review of proposed pipeline projects into full compliance with the NGA and NEPA, and to fulfill its statutory role in protecting the public interest. In contrast to the Commission's current process, such an approach would promote efficiency, reduce the risks of litigation delay in project development, and improve the Commission's ability to promote orderly competition and innovation in the gas market.

4

## I.    THE COMMISSION SHOULD ENGAGE IN A SEARCHING ASSESSMENT OF PIPELINE PROJECT NEED.

Pursuant to the standard established in Section 7 of the NGA[7], an applicant must show that its proposed pipeline project is consistent with the public convenience and necessity by demonstrating that the public benefits the proposed pipeline project would achieve are proportional to its adverse impacts (the "Public Benefits Assessment").[8] Applicants must show that there is market demand in order to satisfy part of the public benefit requirement—that is, that the project is "needed" (the "Needs Assessment").[9] The current Needs Assessment fails to take into account the regional need for, and impacts of, building new pipelines, and relies too heavily on the existence of precedent agreements, and affiliate precedent agreements in particular. The Attorneys General recommend that the Commission assess market need and impacts on a comprehensive regional basis, expand the assessment to include factors beyond precedent agreements, and employ a rebuttable presumption that affiliate contracts do not demonstrate pipeline need.

### A.    Market need should be assessed on a comprehensive regional basis.

The Commission should broaden its Needs Assessment from assessing the need for each individual pipeline project to considering each pipeline project within the broader context of regional need. Regional designations should be based upon the Commission's natural gas market regions: Midwest, Northeast, Gulf, Southeast, and Western.[10] Changes in gas production, delivery, and consumption, as well as new sources of natural gas, have transformed the natural gas industry since the Policy Statement was issued, leading to a proliferation of natural gas pipelines and infrastructure whose impact on ratepayer and environmental interests necessitates a regional approach. Specifically, the Commission should develop a comprehensive

---

[7] 15 U.S.C. § 717f.

[8] Policy Statement, *supra* note 2, at 25.

[9] *See* Pipeline NOI, *supra* note 1, at 32, 47 n.91.

[10] *See Natural Gas Markets: National Overview*, FED. ENERGY REGULATORY COMM'N, https://www.ferc.gov/market-oversight/mkt-gas/overview.asp (July 3, 2018).

AR_0026156

analysis of each region's need for natural gas, taking into account existing pipelines and the integration of gas and electric systems, and evaluating available alternatives to pipeline infrastructure, as well as the impacts of pipeline infrastructure and alternatives.[11] Regional assessments would allow the Commission to systematically assess current and future need for additional natural gas capacity (including use by natural gas-fired power plants) in regional markets, accounting for projected growth in renewables and energy efficiency. In addition, the Commission's regional analyses would provide critical foundation for rational and regionally consistent project-specific Needs Assessments, which would build upon the regional assessments, incorporating more detailed analysis and information from project proponents.

The regional analyses should consider each region's existing infrastructure and natural gas pipeline capacity as well as state policy goals and projections of the future demand for natural gas, including the types of services that will be needed in a changing energy market. Other regional considerations should include whether the capacity is needed for new or existing generators, whether the additional capacity promotes competitive markets, whether anticipated markets will materialize, and whether there is a reliability benefit.[12,13]

**B. The current market needs assessment is too narrow and should be expanded to consider multiple factors.**

Although the Policy Statement specifically rejected sole reliance on precedent agreements to demonstrate project benefits or need and recommends multiple factors the Commission should consider in the Needs Assessment, in practice, the Commission has relied heavily on proof of precedent agreements to find need.[14] This practice unduly restricts the

---

[11] *See infra* Section II A and B for further discussion of alternatives analysis.

[12] *National Fuel Gas Supply Corp.,* 158 FERC ¶ 61,145 (2017) (statement of Commissioner Bay).

[13] *See* SUSAN TIERNEY, NATURAL GAS PIPELINE CERTIFICATION: POLICY CONSIDERATIONS FOR A CHANGING INDUSTRY, *supra* note 6.

[14] Pipeline NOI, *supra* note 1, at 32, 47 n. 91. The Commission's decision to consider "all relevant factors" amended its previous policy which relied primarily on the "contract test"—the percentage of capacity under long-term contracts—to establish market need. The Commission further stated that the amount of capacity under contract "is not a sufficient indicator by itself of the need for a project." Policy Statement, *supra* note 2, at 5. However, the Commission has continued to find public need by relying solely upon long-term precedent agreements. *See, e.g.* Order on Rehearing, Mountain Valley Pipeline, LLC, Equitrans, L.P., 163 FERC ¶ 61,197

AR_0026157

Commission's inquiry and fails to account for the context of the alleged benefits of a proposed project and risks approving more infrastructure and capacity, on potentially inefficient terms, than the public need requires or prospective market conditions can support. Furthermore, the Policy Statement states that in evaluating market need, the Commission should "consider all relevant factors reflecting on the need for the project," and provide a range of factors in addition to evidence of precedent agreements, including studies of projected demand, the market to be served, and potential cost savings to consumers.[15] We recommend that the Commission make a renewed commitment to considering these factors and all others relevant to determining whether a pipeline project is needed, including accounting for the integration of gas and electric systems in the region and the projected growth in the use of renewables and energy efficiency measures. Where appropriate, the Commission should conduct evidentiary hearings or utilize other methods to create a more complete record and transparent process to provide greater confidence in the Commission's Public Benefits Assessments and Certificate decisions.

C. **The Commission should further scrutinize and limit the use of affiliate contracts in demonstrating pipeline project need.**

The Policy Statement notes that "[u]sing contracts as the primary indicator of market support for the proposed pipeline project also raises additional issues when the contracts are held by pipeline affiliates."[16] Despite this recognition there are currently no restrictions on providing precedent agreements signed by affiliates to demonstrate project need. In practice, the Commission has stated repeatedly that it will not "look behind the precedent agreements to evaluate project need," even when affiliates constitute a majority of the precedent agreement capacity.[17]

---

at *35–44 (June 15, 2018) [hereinafter "Mountain Valley Rehearing Order"]; Order Issuing Certificates, PennEast Pipeline Company, LLC, 162 FERC ¶ 61,053 at *27–29, *33, *36 (January 19, 2018) [hereinafter "PennEast Order"].

[15] Policy Statement, *supra* note 2, at *23; PennEast Order, *supra* note 14 (Glick, C., dissenting, at *1–2).

[16] Policy Statement, *supra* note 2, at *16.

[17] *See, e.g.*, PennEast Order, *supra* note 14, at *33; Mountain Valley Rehearing Order, *supra* note 14, at *40.

AR_0026158

Relying too heavily on affiliate contracts risks mischaracterizing the need for the proposed pipeline project. In his dissent in *PennEast*, Commissioner Glick found that "precedent agreements that are in significant part between the pipeline developer and its affiliates [are] insufficient to carry the developer's burden to show that the pipeline is needed."[18] Indeed, where a utility holding company invests in a pipeline development project and an affiliate utility contracts for long-term firm service on that project, the utility holding company may pass the risk and the cost of the development of the pipeline to captive customers of the affiliate utility.[19] Without having to bear the risk or cost of development, the pipeline holding company has an economic incentive to construct new pipelines (and receive a return on its investment) regardless whether they are needed.[20] A pipeline project that is based on precedent agreements with multiple new customers tends to show a greater indication of need than a pipeline project supported by precedent agreements with affiliates.[21]

To protect ratepayers from undue costs and ensure projects truly reflect market need, the Commission should employ a rebuttable presumption that affiliate contracts do not demonstrate need wherever a pipeline project would not proceed absent affiliate contracts. In such instances, the Commission should require independent supporting evidence of need, such as third-party market analysis or state-approved resource plans, to overcome the presumption. Even where they make up only a relatively small portion of precedent agreements, the Commission should implement a more stringent standard of review for affiliate contracts. This standard should give the Commission the authority to look behind the contracts, including where needed an independent review of state regulatory filings and analyses regarding those contracts. Additional scrutiny of affiliate contracts will enable the Commission to better

---

[18] PennEast Order, *supra* note 14 (Glick, C., dissenting at *1).

[19] *Art of the Self-Deal,* Oilchange International (2017), at 20.

[20] *Id.*

[21] Policy Statement, *supra* note 2, at 26.

8

AR_0026159

evaluate the market need for the pipeline project and ensure that ratepayers are not burdened with unwarranted costs.

## II.   THE COMMISSION SHOULD MORE ROBUSTLY AND COMPREHENSIVELY ASSESS THE IMPACTS OF, AND ALTERNATIVES TO, PROPOSED PIPELINE PROJECTS.

NEPA requires federal decision-makers, including the Commission, to prepare a "detailed statement" on the environmental impacts of certain actions prior to making decisions.[22] This environmental impact statement ("EIS") must take a "hard look" at the impacts of the proposed action,[23] including direct and cumulative impacts, as well as any "reasonably foreseeable" indirect impacts.[24] Consideration of environmental and economic impacts is also part of the Commission's Public Benefits Assessment under the NGA.[25] Yet, in practice, the Commission often fails to satisfy its duty to assess robustly and consistently the full range of impacts of, and alternatives to, proposed pipeline projects.[26] As discussed below, the Commission must take a more comprehensive approach to its impacts review—both to satisfy its legal obligations and to help forestall challenges to Commission decisions.

### A.   The Commission should holistically evaluate the need for, the impacts of, and alternatives to new pipeline projects in each U.S. region.

As noted in Section I A above, the Commission's piecemeal review of natural gas infrastructure risks approval of more capacity than is in the public interest. Moreover, as underscored by recent federal court decisions vacating Commission orders, the Commission's

---

[22] 42 U.S.C. § 4332(2)(C).

[23] *Kleppe*, 427 U.S. at 410 (citation omitted); *see also Coal. for Responsible Growth & Res. Conservation v. FERC*, 485 F. App'x 472, 474 (2d Cir. 2012) and *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 249 (1989).

[24] 42 U.S.C. § 4332(2)(C)(i); 40 C.F.R. §§ 1502.16, 1508.8(a), (b); *see also* 40 C.F.R. § 1508.7 (a cumulative impact is "the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions"); *Sierra Club v. Marsh*, 976 F.2d 763, 767 (1st Cir. 1992) (a "reasonably foreseeable" impact or action is "sufficiently likely to occur that a person of ordinary prudence would take it into account in reaching a decision").

[25] *See* Order Denying Rehearing, Dominion Transmission, Inc., 163 FERC ¶ 61,128 (May 18, 2018) [hereinafter "Dominion Order"] (Glick, C., dissenting in part, at *1–2, *7).

[26] In recent years, federal courts have vacated orders based on deficiencies in the Commission's environmental impacts review process. *See Sierra Club*, 867 F.3d at 1373–75; *Del. Riverkeeper Network v. FERC*, 753 F.3d 1304, 1308–09 (D.C. Cir. 2014).

AR_0026160

segmented approach does not align with the requirements of NEPA and increases legal risks.[27]
The Commission should instead undertake assessments of the impacts of and alternatives to
new pipeline projects on a regional basis together with a regional assessment of need.[28]
Regional analyses would offer an opportunity to standardize the Commission's impacts
assessments approach across pipeline project review proceedings by setting forth data,
metrics, projections, and other information that the Commission will use to evaluate pipeline
projects in a particular region, including the cumulative and indirect impacts of pipeline
projects, as discussed further below.[29]

### B. The Commission's alternatives assessment should include clean-energy and other non-pipeline alternatives.

The alternatives analysis required by NEPA is "the heart of the environmental impact
statement."[30] Federal regulations require the Commission to explore all reasonable alternatives
rigorously with an analysis that "present[s] the environmental impacts of the proposal and the
alternatives in comparative form, thus sharply defining the issues and providing a clear basis

---

[27] *See, e.g., Sierra Club* 867 F.3d at 1373–75 (vacating a Commission decision due to the Commission's failure to properly consider the full range of pipeline project impacts under NEPA); *Del. Riverkeeper*, 753 F.3d at 1308–09, *supra* note 25 (holding that the Commission violated NEPA by failing to analyze the impacts of a project in conjunction with "three other connected, contemporaneous, closely related, and interdependent" pipeline certificate applications).

[28] Programmatic EISs ("PEISs") and combined EISs offer models for such regional assessments. They may even be mandated in certain circumstances. *See* 40 C.F.R. § 1508.25 (agencies "shall" consider "closely related," cumulative, and similar actions together in an EIS); *id.* § 1502.4(c)(1)–(2) (urging federal agencies to consider undertaking a PEIS when they are considering multiple projects in one region, or where projects share "relevant similarities, such as common timing, impacts, alternatives, [and] methods of implementation"); *Del. Riverkeeper*, 753 F.3d at 1308–09 (holding that the Commission must conduct a unified NEPA review of multiple connected gas pipeline segments); *Kleppe*, 427 U.S. at 409–10 ("A comprehensive impact statement may be necessary" where "several proposals for coal-related actions that will have cumulative or synergistic environmental impact upon a region are pending concurrently before an agency."); *Alpine Lakes Prot. Soc'y v. U.S. Forest Serv.*, 838 F. Supp. 478, 484 (W.D. Wash. 1993) (agency must consider seven access roads in the same region as "cumulative actions" under NEPA); *cf.* U.S. DEP'T OF INTERIOR, ORDER NO. 3338, DISCRETIONARY PROGRAMMATIC ENVIRONMENTAL STATEMENT TO MODERNIZE THE FEDERAL COAL PROGRAM (2016) (announcing the Department of Interior's then intent to conduct a programmatic EIS for the federal coal-leasing program).

[29] *Cf.* U.S. Envtl. Protection Agency, EPA Detailed Comments on FERC NOI for Policy Statement on New Natural Gas Transportation Facilities 1 (June 21, 2018) (recommending the Commission undertake regional analyses of the cumulative impacts associated with pipeline projects and mitigation opportunities).

[30] 40 C.F.R. § 1502.14; *see also Union Neighbors United, Inc. v. Jewell*, 831 F.3d 564 (D.C. Cir. 2016).

AR_0026161

for choice among options by the decisionmaker and the public."[31] In addition to exploring the effect of not building the proposed project,[32] the analysis must thoroughly address non-pipeline alternatives outside of the Commission's jurisdiction and the project applicant's preferences or capabilities.[33] Indeed, the Commission's own environmental review regulations and guidance require that the alternatives analysis address "the potential for accomplishing the proposed objectives through the use of other systems,"[34] including "non-gas energy alternatives, and/or energy conservation or efficiency, as applicable."[35] More explicitly, the Commission has said that the alternatives analysis should "[d]escribe the effect of any state or regional energy conservation, load-management, and demand-side management programs on the long-term and short-term demand for the energy to be supplied by the project."[36]

And yet, the Commission's NEPA alternatives analyses consistently give short shrift to or ignore non-gas energy alternatives or other measures such as energy storage, demand response, and energy efficiency to meet the need addressed by the proposed project. When such alternatives are addressed, they are typically considered in isolation and rejected in cursory fashion as unsuitable or insufficient to meet the demand evidenced by the precedent agreements the pipeline project applicant submits as demonstration of need.[37]

---

[31] *Id.*

[32] 40 C.F.R. § 1502.14 (d) (the analysis must "[i]nclude the alternative of no action").

[33] 40 C.F.R. § 1502.14 (c) (the analysis must "[i]nclude reasonable alternatives not within the jurisdiction of the lead agency"); *see also* Forty Most Asked Questions Concerning CEQ's National Environmental Policy Act Regulations, 46 Fed. Reg. 18,026, 18,033 (March 23, 1981) ("In determining the scope of alternatives to be considered, the emphasis is on what is 'reasonable' rather than on whether the proponent or applicant likes or is itself capable of carrying out a particular alternative.")

[34] Environmental reports for NGA applications, 18 C.F.R. § 380.12(l)(1) (the alternatives analysis must "[d]iscuss the "no action" alternative and the potential for accomplishing the proposed objectives through the use of other systems and/or energy conservation.").

[35] Fed. Energy Regulatory Comm'n, Guidance Manual for Environmental Report Preparation for Applications Filed Under the NGA, Vol. I, 4–136 (2017).

[36] Fed. Energy Regulatory Comm'n, Guidance Manual for Environmental Report Preparation, 3–6 (2002).

[37] *See, e.g.,* Order Issuing Certificates and Granting Abandonment Authority, Mountain Valley Pipeline, LLC, Equitrans, L.P., 161 FERC § 61,043 (October 13, 2017) [hereinafter "Mountain Valley Order"] (LaFleur dissenting at *2–3) (discussing "environmentally superior alternatives" limited to consideration of single, merged pipeline right of ways as alternatives to two separate pipeline project proposals).

AR_0026162

Natural gas is but one of many resources that can be utilized to meet customers' electric and thermal needs. Storage or electric system upgrades, for example, may be more cost-effective than pipeline expansion, particularly to satisfy peak demand. The Commission's alternatives analysis should analyze thoroughly and robustly all reasonable non-gas energy alternatives, including, where applicable, renewables and other clean-energy sources, the use of demand response and other market-based programs, and the impact of existing and projected increases in energy efficiency and energy conservation measures—accounting for state renewable portfolio standards and other programs and policies requiring or encouraging increased use of energy efficiency and conversation measures.

Not only should each individual alternative be thoroughly analyzed, but the combined effect of all non-gas pipeline alternatives also should be considered for its potential to meet the need to be addressed by the proposed project. NEPA requires no less.[38] Moreover, the public and states have significant interest in such analysis, particularly where state law and policy requires expansion of renewable and clean energy alternatives, increased energy efficiency measures, and reductions in greenhouse gas emissions, as discussed further below.

### C. The Commission must consistently analyze upstream and downstream greenhouse gas emissions associated with pipeline projects.

A robust comparative analysis of the climate impacts of pipeline infrastructure and reasonable alternatives is essential to inform the Commission's decisionmaking about proposed projects. As the D.C. Circuit Court of Appeals "clearly signaled" in its 2017 opinion in *Sierra Club v. FERC*,[39] which vacated a Commission decision due to the Commission's failure to properly analyze greenhouse gas impacts,[40] "the Commission should be doing more as part of

---

[38] *Cf. Davis v. Mineta*, 302 F.3d 1104, 1122 (10th Cir. 2002) ("Many [project] alternatives were improperly rejected because, standing alone, they did not meet the purpose and need of the Project. Cumulative options, however, were not given adequate study. Alternatives were dismissed in a cursory and perfunctory manner that do [*sic*] not support a conclusion that it was unreasonable to consider them as viable alternatives.").

[39] 867 F.3d 1357 (D.C. Cir. 2017).

[40] *Id.* at 1373–75.

AR_0026163

its environmental reviews" to analyze the climate impacts of pipeline projects.[41] In *Sierra Club*, the court found that downstream combustion of gas transported by a pipeline project "is not just 'reasonably foreseeable,' it is the project's entire purpose."[42] There is relative certainty about the likely fate of the natural gas resources that will be transported by pipeline projects: combustion.[43] Indeed, if a pipeline project is *not* needed to transport additional quantities of gas for combustion, the Commission would have no basis to approve the pipeline project.[44] As well, it is foreseeable that an expansion in natural gas transportation capacity would impact production of natural gas upstream in the supply chain.[45]

Yet, in recent orders, the Commission has maintained that it is not required to consider the full range of greenhouse gas emissions associated with pipeline projects because the impacts of such emissions are too speculative or not causally related to approval of a proposed pipeline project.[46] For instance, in its recent Order Denying Rehearing in *Dominion*

---

[41] Dominion Order, *supra* note 25 (LaFleur, C., dissenting in part, at *3).

[42] *Sierra Club*, 867 F.3d at 1372; *cf. High Country Conservation Advocates v. U.S. Forest Serv.*, 52 F. Supp. 3d 1174, 1196 (D. Colo. 2014) (finding that downstream greenhouse gas emissions related to constructing roads for coal mining are foreseeable).

[43] *See* Statement of Commissioner Cheryl A LaFleur on Tennessee Gas Pipeline Company, L.L.C., 2 n.3 (June 12, 2018), *available at* https://elibrary.ferc.gov/idmws/file_list.asp?accession_num=20180614-3074 [hereinafter "LaFleur June 12, 2018 Statement"] ("[I]t is reasonably foreseeable in the vast majority of cases that the gas being transported by a pipeline we authorize will be burned for electric generation or residential, commercial, or industrial end uses. . . . [T]here is a reasonably close causal relationship between the Commission's action to authorize a pipeline project . . . and the downstream GHG emissions that result . . . ."); *cf. Mid States Coalition for Progress v. Surface Transportation Board*, 345 F.3d 520, 549 (8th Cir. 2003) (agency unlawfully failed to consider downstream emissions from the burning of transported coal); *San Juan Citizens Alliance et al. v. U.S. Bureau of Land Mgmt.*, Slip Op. at *39 (D. N.M. 2018) (agency's "failure to estimate the amount of greenhouse gas emissions which will result from consumption of the oil and gas produced as a result of development of wells on the leased areas was arbitrary" and a violation of NEPA's requirement to analyze indirect and cumulative impacts).

[44] *Cf. N. Plains Res. Council, Inc. v. Surface Transp. Bd.*, 668 F.3d 1067, 1082 (9th Cir. 2011) (climate emissions were foreseeable where agency relied on mine development to justify investment in coal rail line proposal).

[45] *Cf. Barnes v. U.S. Dep't of Transp.*, 655 F.3d 1124, 1138–39 (9th Cir. 2011) (finding that "a new runway has a unique potential to spur demand," and agency therefore was required to analyze the impacts of such increased demand in EIS).

[46] *See, e.g.*, Order Denying Rehearing and Dismissing Stay Request, Algonquin Gas Transmission, LLC, 154 FERC ¶ 61,048, *44–46 (Jan. 28, 2016); Dominion Order, *supra* note 25, at *16–17; Columbia Gas Transmission, LLC, 153 FERC ¶ 61,064 at *6 (Oct. 14, 2015).

AR_0026164

*Transmission, Inc.* ("Dominion Order"),[47] the Commission stated that "where the Commission lacks meaningful information about potential future natural gas production" or "about future power plants, storage facilities, or distribution networks, within the geographic scope of a project-affected resource, then these impacts are not reasonably foreseeable."[48] Consequently, according to the Commission, neither NEPA nor the NGA requires the Commission to quantify or even consider those greenhouse gas emissions.[49]

This interpretation is a plain misreading of the Commission's legal authority and duties.[50] The NGA vests the Commission with broad authority to consider "all factors bearing on the public interest,"[51] which includes consideration of the full range of climate impacts[52] of proposed pipeline projects.[53] As Commissioner Glick noted in a recent dissenting opinion, a proposed project's "contribution to the harm caused by climate change[ is] critical to determining whether the Project[ is] in the public interest. Therefore, the Commission's failure to adequately address them is a sufficient basis for vacating [a] certificate."[54] Moreover, NEPA's requirement that the Commission take a "hard look" at the impacts of pipeline projects

---

[47] *See* Dominion Order, *supra* note 25.

[48] *Id.* at *14–15.

[49] *Id.* at *19 & n.96.

[50] Furthermore, we find it concerning that the Commission pronounced a new, broadly applicable policy in the context of a proceeding for an individual pipeline project, and while the Commission is simultaneously soliciting stakeholder feedback on the same set of issues in the instant docket. We urge the Commission to seize its review of the Policy Statement as an opportunity to reconsider the positions set forth in the recent Dominion Order and to revise its policy in line with our recommendations.

[51] *Atl. Ref. Co. v. Pub. Serv. Comm'n*, 360 U.S. 378, 391 (1959); *see also NAACP v. FPC*, 425 U.S. 662, 670 n.6 (1976) (explaining the Commission's broad authorities, including authority to consider "conservation" and "environmental" matters).

[52] *See* discussion *infra* in Section III.

[53] *Accord* Dominion Order, *supra* note 25 (LaFleur, C., dissenting in part, at *1); *id.* (Glick, C., dissenting in part, at *7); *see also* Mountain Valley Rehearing Order, *supra* note 14 (Glick, C., dissenting, at *1) ("In order to meet our obligations under both NEPA and the NGA, the Commission must adequately consider the environmental impact of greenhouse gas (GHG) emissions on climate change."); *see also Sierra Club*, 867 F.3d at 1373.

[54] Mountain Valley Rehearing Order, *supra* note 14 (Glick, C., dissenting, at *1–2); *accord Sierra Club*, 867 F.3d at 1373 (affirming that "FERC could deny a pipeline certificate on the ground that the pipeline would be too harmful to the environment"); Dominion Order, *supra* note 25 (Glick, C., dissenting, at *7) ("[T]he NGA's public interest standard requires the Commission to consider greenhouse gas emissions associated with the incremental production and consumption of natural gas caused by a new pipeline.").

AR_0026165

obligates the Commission to comprehensively and carefully consider the proposed project's contribution to climate change—an urgent environmental and public health crisis.[55] Federal caselaw makes clear that the Commission cannot evade this far-reaching requirement by claiming that climate impacts are characterized by some uncertainty.[56]

NEPA does not require a perfect forecast. Where there is uncertainty about project impacts, the Commission must provide a "summary of existing credible scientific evidence which is relevant" to those impacts.[57] There are many analytical tools and data available to help the Commission estimate upstream and downstream greenhouse gas emissions,[58] as demonstrated in part by the Commission's past use of studies from the Department of Energy and other entities to estimate "upper-bound" climate emissions.[59] Notably, the regional assessments recommended above would address the Commission's claims in prior orders that decision-analysis tools, lifecycle emissions estimates, and other available resources are too general for the purposes of estimating certain project-level climate impacts.[60] Regional need and impacts assessments would allow the Commission to assess the climate impacts of pipeline projects at a broader level, based on the best available data and modeling relevant to the impacted region.

---

[55] Cf. Baltimore Gas & Elec. Co. v. Nat. Res. Def. Council, Inc., 462 U.S. 87, 97 (1983) ("NEPA . . . places upon an agency the obligation to consider every significant aspect of the environmental impact of a proposed action.") (internal quotation marks and citations omitted) (emphasis added)).

[56] See, e.g., Scientists' Inst. For Pub. Info., Inc. v. U.S. Atomic Energy Comm'n, 481 F.2d 1079, 1092 (D.C. Cir. 1973) (courts must "reject any attempt by agencies to shirk their responsibility under NEPA by labeling any and all discussion of future environmental effects as 'crystal ball inquiry'"); Mid States Coal. For Progress v. Surface Transp. Bd., 345 F.3d 520, 549–50 (8th Cir. 2003) (finding that coal rail project would affect national long-term demand for coal and have upstream impacts by making coal a "more attractive option").

[57] 40 C.F.R. § 1502.22(b)(3).

[58] See, e.g., U.S. Envtl. Protection Agency, EPA Detailed Comments on FERC NOI for Policy Statement on New Natural Gas Transportation Facilities 2–4 (June 21, 2018) (listing existing tools and information available to the Commission to calculate the upstream and downstream climate emissions associated with pipeline infrastructure).

[59] See Dominion Order, supra note 25 (LaFleur, C., dissenting in part, at *2); LaFleur June 12, 2018 Statement, supra note 53, at 2 n.7 (citing studies used in past Commission orders); Pipeline NOI, supra note 1, at 43–44.

[60] See, e.g., Dominion Order, supra note 25, at *14–18; Mountain Valley Rehearing Order, supra note 14, at *150–53.

AR_0026166

And, in general, where essential information is lacking, NEPA requires the Commission to conduct independent research or otherwise compile missing information.[61] Thus, where the Commission finds that existing data and resources are inappropriate for estimating upstream or downstream emissions from a particular proposed pipeline project, the Commission should take advantage of available opportunities during the pre-filing and formal application process to seek more detailed information from proponents about the source and end use of the gas to be transported by the proposed project, and use that data to conduct its own analysis.[62]

Where more specific modeling is not feasible, NEPA requires the Commission to use or produce the best comparable information based on reasonable forecasts and estimates.[63] In such cases, the Commission should consider using the best available general modeling system and describe in its NEPA documents how it expects that project-related emissions might differ from available estimates.[64] For instance, the Commission could produce a "full-burn" estimate (i.e., an estimate of lifecycle greenhouse gas emissions from wellhead to point of consumption, taking into account leaks and losses in production, transmission, and distribution system, assuming total consumption of delivered gas) accompanied by a caveat that ultimately the pipeline project may result in fewer emissions.[65] We note that in past proceedings, the

---

[61] 40 C.F.R. § 1502.22(a).

[62] *Accord* Dominion Order, *supra* note 25 (Glick, C., dissenting in part, at *3).

[63] *Accord id.* (Glick, C., dissenting in part, at *3–4).

[64] Notably, while some consumption-related impacts are dependent upon details regarding when and where the associated emissions while occur (such as impacts to local air or water quality), the climate-warming effects of greenhouse gas emissions are globalized. Therefore, even without more specific details, the Commission can produce decision-relevant information about the climate impacts of pipeline projects based on an estimate of the quantity of natural gas that will be transported by the proposed infrastructure over its lifetime.

[65] Methane emissions from leaks and other system releases must be accounted for, particularly because methane is a potent greenhouse gas that is over thirty times more powerful than carbon dioxide in its ability to trap heat in the atmosphere over a 100-year time frame, and eighty-six times more potent over a twenty-year timeframe. According to the EPA, methane emissions from the oil and gas sector are the largest industrial source of methane emissions in the United States, accounting for about 30 percent of total U.S. methane emissions. *See* http://www3.epa.gov/climatechange/ghgemissions/gases/ch4.html. But a recent study found that methane emissions were sixty percent higher than the U.S. EPA inventory estimate, likely because existing inventory methods miss emissions released during abnormal operating conditions. *See* Ramón A. Alvarez, et al., *Assessment of Methane Emissions from the U.S. Oil and Gas Supply Chain*, SCIENCE, June 21, 2018.

AR_0026167

Commission has made gross, net, and "full-burn" estimations of upstream and downstream greenhouse gas emissions, evidencing the feasibility of this approach.[66] At the very least, the Commission should require project proponents to provide specific information on the indirect and cumulative impacts of the proposed pipeline project in the context of existing, under-development, and reasonably foreseeable energy projects and market trends in the region, as well as state energy and environmental policies. In no event, however, is the Commission permitted to abdicate its responsibility to consider climate impacts altogether.[67] Consistently analyzing upstream and downstream greenhouse gas emissions—even at some level of generality, if that is all that is feasible—would better inform Commission decisionmaking and the public than no information at all, while also increasing certainty for project proponents.

### D. The Commission should consider state policies and the Social Cost of Carbon in determining whether greenhouse gas emissions are significant.

The Commission has claimed that "no standard methodology exists to determine how a project's contribution to greenhouse gas emissions would translate into physical effects on the environment for the purposes of evaluating [a pipeline project's] impacts on climate change."[68] "Thus . . . any attempt by the Commission" to determine whether such emissions are significant for the purposes of NEPA review "would be arbitrary."[69] On the contrary, it is arbitrary and unlawful for the Commission to monetize and compare other benefits and impacts of pipeline projects without taking a similar approach to greenhouse gas emissions.[70]

---

[66] *See* Dominion Order, *supra* note 24 (LaFleur, C., dissenting in part, at *2).

[67] *Accord Mid States Coal. For Progress*, 345 F.3d at 549–50 (where the "*nature* of the effect is reasonably foreseeable but its *extent* is not," the "agency may not simply ignore the effect") (emphasis in original); LaFleur June 12, 2018 Statement, *supra* note 43, at 2; *see also* 40 C.F.R. § 1500.1(b) (requiring that agencies' NEPA analysis must be based on "high quality" information and "accurate scientific analysis").

[68] Dominion Order, *supra* note 25, *34; *accord* Pipeline NOI, *supra* note 1, at 41.

[69] Pipeline NOI, *supra* note 1, at 41; *see also* Dominion Order, *supra* note 25, at *28–29.

[70] *See Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin.*, 538 F.3d 1172, 1198 (9th Cir. 2008) (agency "cannot put a thumb on the scale by undervaluing the benefits and overvaluing the costs" in failing to analyze the benefits of reducing greenhouse gas emissions). As a general matter, there can be no doubt that greenhouse gas emissions related to natural gas extraction, transportation, and consumption in the United States as a whole are significant. *See, e.g.*, EPA, INVENTORY OF U.S. GREENHOUSE GAS EMISSIONS AND SINKS 3–6, 3–79 (2018), *available at* https://www.epa.gov/ghgemissions/inventory-us-greenhouse-gas-emissions-and-sinks-1990-2016 (reporting 2016 U.S. emissions associated with natural gas combustion (1,476.1 MMt $CO_2$e) and

AR_0026168

Despite the Commission's claims, there is a variety of relevant information to inform the Commission's determination of the significance of greenhouse gas emissions.[71] In particular, the Commission should use the best available data and methodologies to estimate the incremental societal impact of greenhouse emissions—also referred to as the Social Cost of Carbon.  Though Executive Order 13,783 § 5 (2017) withdrew the Interagency Working Group on the Social Cost of Greenhouse Gases ("IWG") technical support documents for a range of federal estimates of the social cost of carbon, the information and models underpinning these estimates remain credible and useful, and the IWG's estimates continue to represent the best available science.[72] The Commission has claimed that "it is not useful or appropriate" to use the Social Cost of Carbon in NEPA documents,[73] yet the Commission routinely monetizes other types of impacts in its NEPA documents. The Commission cannot evade its legal obligation to quantify the climate impacts of pipeline infrastructure projects where a scientifically based, peer-reviewed method to do so is available.[74]

In addition, the consistency of a proposed pipeline project's greenhouse gas emissions with relevant federal, regional, and state energy and climate policies and goals—which the

---

natural gas transmission and storage systems (32.8 MMt $CO_2e$ of methane)). The Commission plays a key role in approving actions that cause and contribute to these emissions. *Cf. Coal. on Sensible Transp. v. Dole*, 826 F.2d 60, 68 (D.C. Cir. 1987) (agency cannot avoid the requirements of NEPA by "artificially dividing" its combined contribution "into smaller components, each without a 'significant' impact").

[71] *See, e.g.*, Comments of Columbia Law School Sabin Ctr. for Climate Change Law on Southeast Market Pipelines Project, Draft Supplemental Environmental Impact Statement, Docket Nos. CP14-554-002; CP15-16-003; CPS15-17-002, at 2–3 (Nov. 17, 2017) (arguing that greenhouse gas emissions are significant where: 1) they exceed the reporting threshold of 25,000 tons per year of $CO_2e$ used previously by EPA and CEQ to identify major emitters; 2) the monetized social cost of the emissions is large; 3) the net increase in emissions constitutes a large percentage of the affected state's greenhouse gas emissions inventory; and 4) the emissions over the lifetime of the pipeline project would be viewed as significant in the context of state, local, and regional climate policies).

[72] Richard L. Revesz et al., *Best Cost Estimate of Greenhouse Gases,* 357 SCIENCE 6352 (2017).

[73] *See* Pipeline NOI, *supra* note 1, at 45 (citing *Fla. Se. Connection*, 162 FERC ¶ 61,233 at *37–38 (LaFleur and Glick, Comm'rs dissenting)).

[74] *See High Country Conservation Advocates v. U.S. Forest Serv.*, 52 F. Supp. 3d 1174, 1191 (D. Colo. 2014) (EIS was arbitrary and capricious where agency did not monetize climate impacts of coal mining activity "when such an analysis was in fact possible").

AR_0026169

Commission already analyzes in its NEPA documents[75]—can be used as a metric for evaluating whether emissions are "significant."[76] Many of our states have adopted ambitious greenhouse gas reduction goals and mandates, the achievement of which would be threatened by rapid buildout of natural gas infrastructure in our regions. Massachusetts has adopted a broad portfolio of laws and regulations to reduce economy-wide greenhouse gas emissions by 25 percent by 2020 and 80 percent by 2050 from 1990 levels, including the Global Warming Solutions Act (2008), the Green Communities Act (2008), the Act to Promote Energy Diversity (2016), the Regional Greenhouse Gas Initiative, and programs to promote low and zero-emission vehicles, among others. The clean energy industry is a powerful and growing economic engine for Massachusetts.[77] Similarly, Washington State has adopted greenhouse gas reduction goals to reduce overall state emissions of greenhouse gasses to 1990 levels by 2020 and fifty percent below 1990 levels by 2050.[78] In addition, Washington law requires large utilities to obtain fifteen percent of their electricity from new renewable resources by 2020[79]; imposes a greenhouse gas emission standard on electric power[80]; requires new power plants to mitigate at least 20 percent of their greenhouse gas emissions[81]; and sets minimum efficiency

---

[75] See Pipeline NOI, *supra* note 1, at 40.

[76] *Cf. Ctr. For Biological Diversity v. Cal. Dep't of Fish & Wildlife*, 62 Cal.4th 204, 225–27 (2015) (rejecting agency's approach to significance where agency failed to provide a reasoned explanation for how estimated project emissions compare to achieving statewide greenhouse gas reduction target).

[77] See Initial Comments of the Attorneys General of Massachusetts, California, Connecticut, Illinois, Maryland, North Carolina, Oregon, Rhode Island, Vermont, And Washington, Connecticut Department of Energy And Environmental Protection, Rhode Island Division Of Public Utilities And Carriers, and New Hampshire Office of The Consumer Advocate, Grid Reliability and Resiliency Pricing, FERC Docket No. RM18-1-000, October 23, 2017, available at https://www.mass.gov/files/documents/2017/10/23/Multistate%20Comments%20RM18-1%20-%2010-23-17%20%28FINAL%29.pdf. Furthermore, a study by the Analysis Group found that increasing natural gas capacity in Massachusetts and New England would result in a significant increase in greenhouse gas emissions and threaten compliance with Massachusetts's state law emission reduction mandate. *See* Hibbard, P. and Aubuchon, C., POWER SYSTEM RELIABILITY IN NEW ENGLAND: MEETING ELECTRIC RESOURCE NEEDS IN AN ERA OF GROWING DEPENDENCE ON NATURAL GAS, ANALYSIS GROUP, (2015), available at http://www.mass.gov/ago/doing-business-in-massachusetts/energy-and-utilities/regional-electric-reliability-options-study.html.

[78] Rev. Code of Wash. 70.235.020(1)(a).

[79] Rev. Code of Wash. 19.285.010.

[80] Rev. Code of Wash. 80.80.040

[81] Rev. Code of Wash. 80.70.020

AR_0026170

standards for appliances.[82] The District of Columbia's climate and energy plan, Clean Energy DC, proposes to reduce the District's greenhouse gas emissions by 50 percent below 2006 levels by 2032.[83] As part of its Public Benefits Analysis, the Commission should weigh the effect of project greenhouse gas emissions on our states' abilities to comply with our climate and clean energy laws and policies.

### III.    THE COMMISSION'S PUBLIC BENEFITS ASSESSMENT SHOULD BE INFORMED BY THE ECONOMIC HARM OF A PROJECT'S ENVIRONMENTAL IMPACTS AND MORE HEAVILY WEIGH HARM FROM EMINENT DOMAIN TAKINGS.

The Commission should wait until NEPA review is complete before conducting a Public Benefits Assessment—an assessment that should be made at the final stage of the process in conjunction with a Certificate decision and consider together adverse environmental and economic impacts, including the exercise of eminent domain. The Commission's current system of conducting the economic analyses first, followed by an assessment of environmental impacts which is wholly separate from the economic analyses, necessarily underestimates the value of avoiding the environmental impacts in the first place.

#### A.    The Commission's Public Benefits Assessment should be informed by the economic harm of a project's environmental impacts quantified using the Social Cost of Carbon.

The Commission's Public Benefits Assessment and Certificate decisions should fully and robustly incorporate consideration of environmental impacts identified during NEPA review— including climate impacts. Currently, the Public Benefits Assessment tends to occur prior to NEPA review and only considers adverse economic impacts on the project proponent's customers, on other pipelines in the market, and on property owners affected by the proposed

---

[82] Rev. Code of Wash. 19.260.040

[83] *See Clean Energy DC: The District of Columbia Climate and Energy Plan*, October 2016 Draft, available at https://doee.dc.gov/sites/default/files/dc/sites/ddoe/publication/attachments/Clean_Energy_DC_2016_final_print_si ngle_pages_102616_print.pdf.

AR_0026171

route.[84] This assessment does not consider adverse environmental impacts and comes before NEPA review is complete.[85]

By determining public benefit without regard to adverse environmental impacts and without consideration of the climate harm caused by a project, the Commission is failing to meet its obligations under both the NGA and NEPA. With the NGA, Congress broadly instructed the Commission to consider the public interest[86] by balancing a proposed project's public benefits against its adverse effects—*including environmental impacts*—when deciding if the public convenience and necessity requires granting a Certificate.[87] Indeed, "climate change bears on the public interest in terms of adverse effects" of a proposed pipeline, just as the need for system reliability bears on public benefit.[88] And, as discussed above, NEPA requires the

---

[84] *See* Policy Statement, *supra* note 2, at 18–19.

[85] *See id.*

[86] *See id.* at 23 ("In deciding whether a proposal is required by the public convenience and necessity, the Commission will consider the effects of the project on all the affected interests; this means more than the interests of the applicant, the potential new customers, and the general societal interests"); *see also, Atl. Ref. Co. v. Pub. Serv. Comm'n*, 360 U.S. 378, 391 (1959) (holding that § 7 of NGA requires the Commission to consider "all factors bearing on the public interest"); *FPC v. Transcontinental Gas Pipeline Co.*, 365 U.S. 1, 7 (1961) ("The Commission is the guardian of the public interest in determining whether certificates of convenience and necessity shall be granted. For the performance of that function, the Commission has been entrusted with a wide range of discretionary authority.").

[87] *See Sierra Club*, 867 F.3d at 1373 (citing *Minisink Residents for Envtl. Pres. & Safety v. FERC*, 762 F.3d 97, 101–02 (D.C. Cir. 2014) and *Myersville Citizens for a Rural Cmty. v. FERC*, 783 F.3d 1301, 1309 (D.C. Cir. 2015); *see also Pub. Utils. Comm'n of Cal. v. FERC*, 900 F.2d 269, 281 (D.C. Cir. 1990) (The public interest standard under the NGA includes factors such as the environment and conservation, particularly as decisions concerning the construction, operation, and transportation of natural gas in interstate commerce "necessarily and typically have dramatic natural resource impacts.").

[88] Order on Remand Reinstating Certificate and Abandonment Authorization, Florida Southeast Connection LLC, Transcontinental Gas Pipeline Co., LLC, Sabal Trail Transmission, LLC, 162 FERC 61,233 (March 14, 2018) [hereinafter "Sabal Trail Remand Order"] (Glick, C., dissenting at *3); *see also* Dominion Order, *supra* note 25 (LaFleur, C., dissenting in part, at *1) ("deciding whether a project is in the public interest requires a careful balancing of the economic need for a project and all of its environmental impacts. Climate change impacts of GHG emissions are environmental effects of a project and are part of [the] public interest determination."); Dominion Order, *supra* note 25 (Glick, C., dissenting in part, at *2) ("[c]limate change poses an existential threat to our security, economy, environment, and, ultimately, the health of individual citizens. [ . . . ] Accordingly, it is critical that the Commission carefully consider [projects'] contributions to climate change, both to fulfill NEPA's requirements *and to determine whether the Projects are in the public interest*") (emphasis added).

AR_0026172

Commission to quantify a project's climate-related and other reasonably ascertainable environmental costs.[89]

The Commission therefore should expand its evaluation of economic impacts in its Public Benefits Assessment to consider the costs of environmental harms, including climate impacts monetized utilizing the Social Cost of Carbon, as required by NEPA and the NGA.

**B.     The Commission's Public Benefits Assessment should weigh more heavily the adverse effect of eminent domain takings.**

In the Policy Statement, the Commission recognized that if the exercise of eminent domain will likely be required for a substantial portion of a pipeline right of way and other facility siting locations, the economic harm caused by the project may outweigh its public benefit.[90] And yet, the Commission has continued to issue Certificates without requiring a heightened showing of public benefit as disputes over pipeline siting and approvals have intensified in recent years and private property owners have increasingly resisted entering into voluntary easement agreements.[91] The Commission should require an enhanced showing of public benefit to offset the economic harm caused by the exercise of eminent domain where a pipeline project applicant fails to acquire voluntary easements for a significant portion of the project.

The use of eminent domain should be a last resort.[92] Indeed, the NGA requires no less[93] and the Commission should require project applicants to negotiate in good faith with property

---

[89] *See* discussion *supra* in Section II C and D.

[90] *See* Policy Statement, *supra* note 2, at 27 ("The strength of the benefit showing will need to be proportional to the applicant's proposed exercise of eminent domain.").

[91] *See, e.g.,* Mountain Valley Order, *supra* note 37 (LaFleur, C. dissenting at *2–3 (concluding that because of the projects' environmental impacts and adverse impacts to property owners, the project, on balance is not in the public interest); Mountain Valley Rehearing Order, *supra* note 14 (LaFleur dissenting at *3) (noting the significant impact to landowners); *id.* (Glick dissenting at *2–3) (applicant failed to demonstrate sufficient need for the project to support a finding that the project's benefits outweigh its harms, especially where need was established solely through the existence of precedent agreements with the applicant's affiliates).

[92] *See generally* 42 U.S.C. § 4651 (requiring federal agencies undertaking condemnation in furtherance of federal programs "to encourage and expedite the acquisition of real property by agreements with owners, to avoid litigation and relieve congestion in the courts" by following federal condemnation policies).

[93] *See* 15 U.S.C. § 717f(h) (requiring as a precondition of condemnation litigation that the Certificate holder demonstrate that it "cannot acquire by contract" the real property rights needed); *see also USG Pipeline Co. v.*

AR_0026173

owners for voluntary easement agreements as a Certificate condition. Furthermore, as discussed below, the Commission should help facilitate increased use of voluntary easement agreements by making the currently voluntary pre-filing process mandatory, and by requiring that pipeline project proponents engage extensively with local property owners and state and local officials prior to filing an application with a preferred pipeline route and facility sites.

## IV.    THE COMMISION SHOULD BETTER COORDINATE ITS REVIEW WITH THAT OF STATE AND LOCAL PERMITTING AGENCIES.

The Commission seeks recommendations on how it may work more effectively with other agencies and on ways to change its review procedures to increase efficiency.[94] For the reasons discussed below, the Commission should make mandatory the current pre-filing process and require more thorough review and incorporation of state and local environmental and land use requirements during pre-filing and NEPA review. Pipeline project proponents should be required to promptly apply for required state certifications and approvals under the federal Clean Water Act[95] ("CWA"), Clean Air Act[96] ("CAA"), and the Coastal Zone Management Act[97] ("CZMA") upon filing an application with the Commission, to the extent consistent with the application process established by the relevant state agencies. The Commission should, strive to issue Certificates for pipeline projects only after completion of required state review under the CWA, CAA, and CZMA. The Commission should also expressly condition Certificates

---

*1.74 Acres in Marion Cty., Tenn.*, 1 F. Supp. 2d 816, 822 (E.D. Tenn. 1998) ("Courts also have imposed a requirement that the holder of the FERC Certificate negotiate in good faith with the owners to acquire the property."); *Transcon. Gas Pipe Line Corp. v. 118 Acres of Land*, 745 F. Supp. 366, 369 (E.D. La. 1990) ("In addition to satisfying the requirements of § 717f(h), federal law requires the condemnor to have conducted good faith negotiations with the landowners in order to acquire the property."). *But cf. Maritimes & Ne. Pipeline, L.L.C. v. Decoulos*, 146 F. App'x 495, 498 (1st Cir. 2005) (declining to find that the NGA requires that a pipeline project Certificate holder establish good faith negotiations with a property owner a requirement precedent to a condemnation action); *Mountain Valley Pipeline, LLC v. Simmons*, 307 F. Supp. 3d 506, 511 (N.D.W. Va. 2018) ("MVP is not required by the Natural Gas Act or Rule 71.1 to engage in good faith negotiations with the landowner.") (internal quotation marks and citations omitted).

[94] *See* Pipeline NOI, *supra* note 1, at 53–54.

[95] 33 U.S.C. §§ 1251–1388.

[96] 42 U.S.C. §§ 7401–7671q.

[97] 16 U.S.C. §§ 1451–1466.

AR_0026174

on compliance with state and local land use requirements and environmental permits (not required by federal law) when the Commission relies on them to minimize environmental impacts or when such permits do not unreasonably conflict with or delay Commission-approved pipeline projects. These reforms would increase efficiency, transparency, and predictability while reducing the likelihood of post-Certificate litigation.

### A. Pre-filing should be mandatory and better incorporate state review.

Now voluntary, the Commission's pre-filing process encourages pipeline project proponents to engage with property owners, stakeholders, and federal, state, and local agencies prior to filing an application with a preferred pipeline route and siting locations for compressor stations and other facilities. The pre-filing process thus provides stakeholders and agencies an opportunity become involved early in the project development process by providing information about the extent and nature of pipeline project impacts and environmental permitting and land use requirements. Through this process, applicants may alter pipeline project design, scale, and route to minimize impacts and siting controversies.

The Commission should not only make this pre-filing process mandatory but also require that pipeline project proponents engage with state and local officials and thoroughly examine all required state and local environmental permitting and land use requirements prior to filing an application with a preferred pipeline route and facility sites.[98] To help facilitate increased site access for ground surveys and encourage use of voluntary easement agreements to limit the exercise of eminent domain takings, the Commission should require that project proponents engage extensively with local property owners during pre-filing.[99] Pipeline project proponents should be required to prepare resource reports that comprehensively review

---

[98] This should require applicants to not merely meet with state and local officials, but listen, and to respect local requirements, then incorporate such requirements into the ultimate project siting and design as discussed *infra* in Section IV D.

[99] *See* discussion *supra* in Section III B, and *infra* in Section V. Property owner refusal to grant site access for ground surveys may hinder NEPA review as well as states' abilities to complete review of applications for state water quality certifications under CWA Section 401. Even when private property owners resist entering into voluntary easement agreements for pipeline construction right of ways, early landowner engagement may facilitate site access for performance of environmental and ground condition surveys.

AR_0026175

pipeline project impacts and all permitting requirements—including what must be submitted for state review under the CWA, CAA, and CZMA[100]—based on consultation with state and local agencies.

Immediately following the filing of an application, and concurrent with NEPA review, the Commission should require applicants to expeditiously file for all required state certifications and approvals under the federal CWA, CAA, and CZMA, seeking provisional approvals for the preferred route. The Commission should also encourage applicants to simultaneously work with state and local regulators to prepare for and begin filing all required permit applications.

### B. The Commission should not issue certificates before states have issued permits and certifications under federal statutes.

The NGA expressly preserves the rights of states under the CWA, CAA, and CZMA.[101] Under Section 401(a) of the CWA[102], an applicant must present the Commission with state certification that pipeline project discharges will not violate state water quality standards and requirements, and any conditions imposed by a state water quality certification became conditions of the Commission's Certificate.[103] Pipeline project applicants must also present the Commission with state-issued permits under the CAA, and with certification that the pipeline project and its impacts are consistent with state Coastal Zone Management Plans approved under the CZMA.[104]

---

[100] *See* discussion *infra* in Section IV B.

[101] *See* 15 U.S.C. § 717b(d); *Meyersville Citizens for a Rural Cmty, Inc. v. FERC*, 783 F.3d 1301, 1315 (D.C. Cir. 2015) (the NGA "savings clause", 15 U.S.C. § 717b(d), saves from preemption the rights of states under the CWA, CAA, and CZMA); *see also Islander E. Pipeline Co., LLC v. Conn. Dep't of Envtl. Prot*, 482 F.3d 72, 89 (2d Cir. 2006) (*Islander I*); *Islander E. Pipeline Co., LLC v. Conn. Dep't of Envtl. Prot.*, 525 F.3d 141, 143 (2d Cir. 2008) (*Islander II*).

[102] In addition to CWA Section 401, where States have assumed federal authority over freshwater wetlands pursuant to CWA Section 404, the State's requirements become federal law and must be treated as a federal permit. *Delaware Riverkeeper v. Sec'y Pa. Dep't of Envtl. Prot.*, 833 F.3d 360 (3d Cir. 2016).

[103] 33 U.S.C. § 1341(a), (d).

[104] *See Islander I,* 482 F.3d at 84, 86; *Dominion Transmission v. Summers*, 723 F.3d 238, 240 (D.C. Cir. 2013).

AR_0026176

The Commission should end its practice of issuing Certificates conditioned on later receipt of state certifications, permits, and approvals under the CWA, CAA, and CZMA.[105] Following NEPA review, but prior to completion of required state review under the CWA, CAA, and CZMA, the Commission typically issues a Certificate approving a pipeline project conditioned on the applicant obtaining state-issued certifications and approvals under these federal statutes.[106] Requiring completion of state reviews prior to Certificate issuance would allow the Commission to better evaluate pipeline routing and facility siting alternatives informed by expert review by state agency regulators applying state standards that are applicable under federal law. This would also allow state regulators to review the preferred pipeline project route in the application, as well as alternative routes and facility siting locations, either denying or provisionally approving preferred and alternate routes and siting, pending the Commission's final review and siting approval in its Certificate. Additionally, it would prevent landowners' unnecessary loss of property via eminent domain for pipeline projects that may never be constructed.[107]

Notably, ending the routine issuance of Certificates conditioned on later receipt of state approvals under the CWA, CAA, and CZMA would most likely reduce post-Certificate litigation by precluding situations where the Commission approves a pipeline project only to have it blocked in whole or in part by one or more states denying federally-required permits.[108] Under

---

[105] The Commission typically issues conditional Certificates if state review will take more than six months. *See* Policy Statement, *supra* note 2, at 19. State CWA water quality certifications may take up to one year to complete. *See* 33 U.S.C. § 1341(a)(1) and discussion *infra* in note 98 (state waives its right to issue a CWA Section 401 water quality certification if it fails to act on a certification request within a reasonable time, not to exceed one year).

[106] *See, e.g.*, PennEast Pipeline Order, *supra* note 14 (issuing a Certificate conditioned upon the completion of unfinished surveys and documentation of unobtained permits).

[107] *See* discussion *infra* at note 108.

[108] *See, e.g.*, *Constitution Pipeline Co., LLC v. N.Y. State Dep't of Envtl. Conservation*, 868 F.3d 87, 90 (2d Cir. 2017), rehearing denied (2017), cert. denied (2018) (upholding the New York Department of Conservation's denial of Constitution's application for a CWA Section 401 water quality certification where the company failed to provide adequate information regarding a large number of stream crossings to demonstrate that project impacts would not violate state water quality standards); *Islander II*, 525 F.3d at 151–53 (upholding as supported by the record following remand the Connecticut Department of Environmental Protection's

AR_0026177

such circumstances, the Commission's conditional Certificate decision is subject to reconsideration and judicial review. After initiating such challenge, stakeholders or an applicant may subsequently file petitions in Circuit Courts of Appeals challenging state-issued certifications and permits under federal law.[109] Issuing Certificates after completion of all federally required state permitting would not only prevent staggered judicial review, but also provide a more complete record supporting the Commission's ultimate Certificate decision.

Waiting to issue a Certificate until all federally required state approvals have been obtained will also prevent irreparable harm that may result from the Commission's current practice of granting partial notices to proceed with construction for portions of a project. In the Constitution Pipeline project, the Commission's issuance of a partial notice to proceed with construction resulted in acres of mature trees being cut in Pennsylvania before the completion of the project was stopped by New York's denial of a CWA Section 401 water quality certification.[110]

As recommended above, the Commission should require that pipeline project applicants promptly file for state approvals under CWA, CAA, and CZMA after fully assessing state requirements and procedures under these federal statutes by working with state regulators during pre-filing. This will facilitate review by state regulators and reduce the instances of

---

denial of Islander's application for a CWA Section 401 water quality certification because of the project's adverse effects on shellfish habitat and other water quality impacts).

[109] Section 19(d)(1) of the NGA vests Circuit Courts of Appeals with original and exclusive jurisdiction over petitions seeking judicial review of state certifications and permits issued under the CWA, CAA, or CZMA. *See* 15 U.S.C. § 717r(d)(1). To be clear, we are not recommending that the Commission hold off issuing a Certificate during the pendency of judicial review following the filing of a petition under NGA Section 19(d)(1), although petitioners may seek a stay of the Commission's Certificate from the Court.

[110] *See Constitution Pipeline*, 868 F.3d at 90, 92–93 and discussion *supra*, note 108.

AR_0026178

project proponents filing incomplete applications that delay review by state regulators under these federal statutes.[111, 112]

### C. State water quality certification under the CWA should not be subject to new time limitations or otherwise constrained.

The Commission also seeks comments on whether there are "classes of projects that should appropriately be subject to a shortened [Certificate review] process."[113] Recent or contemplated federal legislative proposals would amend the CWA to shorten the time allowed states to review applications for CWA Section 401 water quality certifications.[114]

The undersigned state Attorneys General strongly oppose any legislative change or regulatory effort to limit the time allowed for state review of water quality applications under CWA Section 401. For projects with large numbers of discharges, state water quality review can be a complex and lengthy process. For instance, the Constitution Pipeline project proposal

---

[111] *See, e.g., N.Y. State Dep't of Envtl. Conservation v. FERC,* 884 F3d 450 (2d Cir. 2018) (*Millennium Pipeline*). In *Millennium Pipeline,* the company took more than nine months to complete its application for state water quality certification. The Court held that the "reasonable period of time (which shall not exceed one year)" for states to act on a request for CWA Section 401 water quality certification begins to run on the date the state receives the initial application, not when the applications is deemed complete. *Id.* at 455–56. The Court noted that states may assist applicants in completing applications and, if necessary, request that incomplete applications be withdrawn and resubmitted. *Id.* at 456. *But cf. Berkshire Envl. Action Team, Inc. v. Tenn. Gas Pipeline, LLC,* 851 F.3d 105 (1st Cir. 2017) (holding that Massachusetts' initial approval of a water quality certification made within one year of application was not final for purposes of NGA Section 19(d)(1) and that judicial review must wait for a final agency decision upon completion of a timely made administrative appeal).

[112] Section 19(d)(2) of the NGA provides a remedy for proponents faced with unreasonable delay or failure to act by a state agency on an application for a certification or permit under the CWA or CAA, in the form of seeking injunctive relief from the United States Court of Appeals for the D.C. Circuit. *See* 15 U.S.C. § 717r(d)(2), EPAct, 2005. Section 19(d)(2) of the NGA grants the United States Court of Appeals for the D.C. Circuit with exclusive jurisdiction over actions seeking declaratory and injunctive relief against state permitting agencies for undue delay or failure to act on federally-required permits. *See* discussion *infra* in Section III C.

[113] *See* Pipeline NOI, *supra* note 1, at 54.

[114] *See, e.g.,* H.R. 2910, Promoting Interagency Coordination for Review of Natural Gas Pipelines Act, 2017 (specifying limited timeframes and procedural requirements for the Commission and other agencies to follow in conducting environmental reviews related to proposed natural gas facility projects); *see also* Saqib Rahim and Nick Sobczk, "Legislative 'Reform' to Narrow States' Power," ENERGY AND ENVIRONMENTAL NEWS, February 2, 2018, https://eenew.net.energywire/stores/1060072719 (discussion contemplated amendments to the CWA that would allow states up to 90 days to determine if an application for a Section 401 water quality certification was complete, after which states would have 90 days to complete application review and issue or deny the requested water quality certification).

AR_0026179

involved discharges to 251 different streams and a variety of different water quality impacts, including habitat loss or degradations (87 impacted streams supported trout or trout spawning), changes in thermal conditions, increased erosion, and increases in stream instability and turbidity.[115] Any effort to shorten the one-year period Congress has deemed reasonable would be unlawful and arbitrary and capricious and, especially for large or complex projects, severely constrain states' rights to uphold and protect the quality of their waters under the cooperative federalism approach mandated by the CWA. Congress has already provided a remedy for pipeline project proponents faced with unreasonable delay or state agency obstruction on an application for certifications or permits under the CWA or CAA. [116]

It bears emphasizing that imposing arbitrary timeframes on CWA water quality certification review will not appreciably speed up pipeline project review. The Director of the Commission's Office of Energy Projects recently testified that, on average, eighty-eight percent of projects are issued Certificates within one year, and the single greatest factor slowing down review is the failure of the project applicant to provide the Commission and other agencies with "timely and complete information necessary to perform Congressionally-mandated project reviews."[117] Thus, the Commission should not entertain recommendations to curtail or expedite state review under CWA Section 401 (or other state approvals under federal statutes). Any such effort would contravene Congressional intent and do little to expedite state review.

**D. The Commission's Certificates should be conditioned on compliance with all state and local environmental permits and land use requirements that do not unreasonably conflict with or delay approved pipeline projects.**

Beyond federally required, state-issued certifications and approvals under the CWA, CAA, and CZMA, it is "the Commission['s] goal to include state and local authorities to the extent

---

[115] *See Constitution Pipeline*, 868 F.3d at 90, 92–93 and discussion *supra* note 108.

[116] *See supra* note 112, (referencing 15 U.S.C. § 717r(d)(2)) EPAct, 2005.

[117] House Committee on Energy and Commerce, Hearing on "Legislation Addressing Pipeline and Hydropower Infrastructure Modernization," Testimony of Terry Turpin, Director, Office of Energy Projects, Federal Energy Regulatory Commission, 115th Cong. (May 3, 2017).

AR_0026180

possible" in pipeline project planning and construction.[118] As FERC routinely asserts in Certificate decisions, a "rule of reason must govern both state and local authorities' exercise of their power and an applicant's bona fide attempts to comply with state and local requirements."[119] The mere fact that "a state or local authority requires something more or different than the Commission does not necessarily make it unreasonable for an applicant to comply with both the Commission's and state and local agency's requirements," even if state and local compliance would add additional cost and potentially threaten the facility's in-service date.[120]

Despite its goal to include state and municipal agencies in pipeline project planning and to strongly encourage compliance with their requirements, the Commission does not typically condition its Certificates on receipt of reasonable state and local permits.[121] This often leads to confusion about and litigation over whether an applicant has reasonably attempted to comply with state and local requirements that do not block or unduly delay a pipeline project. And rather than continue to work with state and local regulators as the Commission intends, applicants often assert preemption once armed with the Commission's Certificate.[122]

---

[118] *See, e.g.*, Order on Rehearing and Approving Agreements, Maritimes and Northeast Pipeline, L.L.C., 81 FERC ¶ 61,166, 17 (1997).

[119] *See* Pac. Connector Gas Pipeline LP, 134 FERC ¶ 61,102 at *1, *4, *11–12 (2011); Order Issuing Certificate, Tennessee Gas Pipeline Company, L.L.C., 154 FERC ¶ 61,191, at *30 (2016) (same).

[120] Order Issuing Certificate, Tennessee Gas Pipeline Company, L.L.C., 154 FERC ¶ 61,191, *30 (2016); *see also* Order on Rehearing and Approving Agreements, Maritimes and Northeast Pipeline, L.L.C., 81 FERC ¶ 61,166, 19–22 (1997) (ruling that several additional state conditions, including state review and approval requirements for pipeline route surveys and additional endangered species surveys, would not unreasonably delay the project where there was only a possibility that the conditions would conflict with the pipeline's in-service date).

[121] *See, e.g.*, Order Issuing Certificate, Tennessee Gas Pipeline Company, L.L.C., 154 FERC ¶ 61,191, *29–30 (2016) (noting and encouraging compliance with substantive land use restrictions and procedural requirements for allowing easement through conservation land protected by Article 97 of the Massachusetts Constitution, but declining to expressly condition Certificate on compliance with these requirements as requested by the Massachusetts Department of Conservation and Recreation and the Massachusetts Attorney General); *see also* discussion *infra* in note 122.

[122] *See, e.g.*, *Millennium Pipeline Co., LLC v. Seggos*, 288 F. Supp. 3d 530 (N.D.N.Y. 2017) (granting preliminary injunction barring state from using state permitting requirements to delay construction of pipeline); Memorandum of Decision and Order on Plaintiff's Motion to Confirm Authority To Condemn Easements and Motion For Injunctive Relief Authorizing Immediate Entry, *Tennessee Gas Pipeline Co., LLC v. Commonwealth of Massachusetts*, Berkshire Superior Court, Civ. No. 16-0083, May 9, 2016 at *2–4, *11–16 (On motion for

To avoid these disputes and unnecessary litigation, and to address jurisdictional public interest and environmental considerations identified under the NGA and NEPA, the Commission should, first, require that applicants consult with state and local permitting agencies during pre-filing. This step would help identify potentially applicable state and local permitting and other requirements that should be considered as potential Certificate conditions. Then, in lieu of the Commission's much vaguer conditions, the Commission should expressly condition its Certificates on applicants complying with state and local environmental permits and land use requirements the Commissions has identified during pre-filing and NEPA review and on which it relies for mitigation of environmental harm, or on permits that do not unreasonably conflict with or delay the approved pipeline project. This step would avoid confusion about the precise regulatory requirements applicable to a pipeline project and permit the Commission to utilize its federal authorities, in partnership with states and local governments, to responsibly manage the development of natural gas infrastructure in a manner more responsive to local requirements and concerns.

*       *       *

Because state practice varies, and coordinating federal, state, and local regulatory authority has presented challenges for the Commission, states, local governments, project developers, and other stakeholders alike, the Commission should consider convening a technical conference on procedural requirements, review timelines, and other practical coordination issues in this area, and how to best alter the Commission's process.

---

condemnation of easements asserting preemption of Massachusetts Constitution Article 97 (discussed *supra* in note 121), the Court noted that "[d]espite the preemption of Article 97, the Certificate does not give Tennessee unrestrained right to ignore the Commonwealth. Instead, the Certificate expressly requires Tennessee to make a good faith effort to cooperate with state and local authorities."); Request for Reconsideration and Clarification, *National Fuel Gas Supply Corp.*, Docket No. CP15-115 (March 3, 2017) (seeking "clarification" from FERC that all state and local environmental permits were preempted by the Natural Gas Act).

AR_0026182

V.    **PARTIAL NOTICES TO PROCEED WITH CONSTRUCTION SHOULD NOT BE ISSUED PRIOR TO REHEARING REQUEST DECISIONS, AND THE USE AND TIME OF TOLLING ORDERS SHOULD BE LIMITED.**

The Commission's practice of allowing construction to proceed while delaying rehearing decisions through tolling orders inflicts irreparable harm while effectively foreclosing remedies on judicial review, denying injured parties due process. Though the NGA and the Commission's regulations require it to issue a decision within thirty days of a request for a Certificate rehearing,[123] the Commission routinely issues orders tolling this thirty-day period to allow it additional time to evaluate the merits of a rehearing request. These tolling orders routinely delay rehearing decisions for a year or more.[124]

Moreover, the Commission often grants requests for partial notices to proceed with construction after a Certificate issues—even when a tolled decision on a rehearing request is pending—so long as the Certificate holder has received all state-issued permits under the federal CWA, CAA, and CZMA (where construction activity could impact resources covered by those federally required permits). This practice results in significant and irreparable harm from project construction. For instance, as a rehearing request was tolled for more than thirteen months, the Commission granted the Transcontinental Gas Pipeline Company's Leidy Southeast Project a total of twenty partial notices to proceed resulting more than one hundred acres of tree clearing.[125] And while parties seeking rehearing of Commission Certificate Orders may request that FERC stay project construction during the pendency of the tolling period and

---

[123] *See* 15 U.S.C. § 717r(b); 18 C.F.R. § 157.20(a).

[124] While a few recent egregious tolling periods were attributable *in part* to an extended period in 2017 when the Commission lacked a quorum, tolling periods of a year or more are common even when there are no quorum issues. *See, e.g.,* Order Denying Rehearing, Transcontinental Gas Pipeline Company, LLC, 154 FERC ¶ 61,166 (March 3, 2016) (the Commission denied a rehearing request more than one year after timely rehearing requests made in January 2015 and a tolling order issued in February 2015).

[125] *See* Transcontinental Gas Pipeline, *supra* note 124. Similarly, a Commission tolling order delayed a rehearing decision regarding the Connecticut Expansion Project for over sixteen months, authorizing tree clearing and construction for the project, including through a two-mile stretch of conservation land protected under the Massachusetts Constitution in Otis State Forest. *See* Order on Rehearing, Tennessee Gas Pipeline Company, 160 FERC ¶ 61,027 (August 25, 2017) (denying timely rehearing requests made in April 2016).

AR_0026183

rehearing request, the Commission rarely, if ever, grants such stay requests, even when rehearing requests raise serious issues of merit.[126]

Because petitioners may not seek judicial review until the Commission rules on the merits of their request for rehearing,[127] the Commission's routine practice of delaying rehearing decisions raises serious due process concerns.[128] In addition to denying affected parties judicial review before construction begins, tolling orders deny landowners judicial review before their land is taken through eminent domain.[129] Because the power of eminent domain attaches regardless whether a rehearing has been requested, developers are free to take land while the Commission has not yet ruled on the rehearing request and while landowners have no judicial recourse.[130] To minimize the number of landowners whose land is taken without opportunity for judicial review, the Commission should end its practice of issuing tolling orders except in rare cases where the additional time is absolutely necessary, in which case tolling orders should be for as brief a period as practicable.

---

[126] *See Del. Riverkeeper*, 753 F.3d at 1308–09 (Commission issued rehearing request tolling order, delaying judicial review, where the Court ultimately held that Commission's review violated NEPA).

[127] 15 U.S.C. § 717r(b); *see also Kokajko v. F.E.R.C.*, 837 F.2d 524, 525 (1st Cir. 1988) ("[B]ecause FERC has not yet issued a ruling on the merits of the petition, this court is without jurisdiction.").

[128] *See, e.g., MCI Telecommunications Corp. v. F.C.C.*, 627 F.2d 322, 341 (D.C. Cir. 1980) ("[D]elay in the resolution of administrative proceedings can . . . deprive regulated entities, their competitors or the public of rights and economic opportunities without the due process the Constitution requires."); *Kokajko*, 837 F.2d at 526 ("[A] claim which is virtually tied up in interminable successive rounds of administrative review may present due process concerns."); *cf. Pub. Citizen Health Research Grp. v. Comm'r, Food & Drug Admin.*, 740 F.2d 21, 34 (D.C. Cir. 1984) ("When the public health may be at stake, the agency must move expeditiously to consider and resolve the issues before it.").

[129] This is particularly true where, as is increasingly the practice, the pipeline seeks immediate entry onto and possession of the property rights it is condemning through the use of preliminary injunctions. *See, e.g. East Tennessee Natural Gas Company v. Sage*, 361 F.3d 808 (4th Cir. 2004) (granting a preliminary injunction to a pipeline company in a condemnation matter prior to the payment of just compensation); *Columbia Gas Transmission, LLC v. 1.01 Acres, More or Less, In Penn Twp*, 768 F.3d 300, 315–16 (3d Cir. 2014) (discussing *Sage* and granting a preliminary injunction to the pipeline company prior to the payment of just compensation). Since a District Court's reviewing role is limited, *see Columbia Gas Transmission* at 304, tolling orders issued by FERC can, when combined with preliminary injunctions granted by District Courts, deprive a property owner of any real judicial review until the pipeline has already taken full possession of the property.

[130] While the eminent domain proceeding occurs in a court, landowners cannot collaterally attack the Certificate, and therefore cannot challenge the developer's right to use eminent domain. *See, e.g., Williams Natural Gas Co. v. City of Oklahoma City*, 890 F.2d 255, 262, 264 (10th Cir. 1989).

AR_0026184

## CONCLUSION

The undersigned Attorneys General strongly urge the Commission to revise the Policy Statement in accordance with all the above recommendations.  Thank you for your consideration of these comments.

Respectfully submitted,

MAURA HEALEY
ATTORNEY GENERAL OF MASSACHUSETTS

CHRISTOPHE COURCHESNE
CHIEF, ENVIRONMENTAL PROTECTION DIVISION
REBECCA TEPPER
CHIEF, ENERGY AND TELECOMMUNICATIONS DIVISION
MATTHEW IRELAND
SARAH BRESOLIN SILVER
ASSISTANT ATTORNEYS GENERAL
MEGAN HERZOG
SPECIAL ASSISTANT ATTORNEY GENERAL
OFFICE OF THE ATTORNEY GENERAL
One Ashburton Place, 18th Floor
Boston, MA 02108

AR_0026185

LISA MADIGAN
ATTORNEY GENERAL OF ILLINOIS

MATTHEW J. DUNN
CHIEF, ENVIRONMENTAL
ENFORCEMENT/ASBESTOS LITIGATION DIVISION
JANICE A. DALE
CHIEF, PUBLIC UTILITIES BUREAU
DANIEL I. ROTTENBERG
JACQUES ERFFMEYER
ASSISTANT ATTORNEYS GENERAL
ILLINOIS ATTORNEY GENERAL'S OFFICE
69 W. Washington St., 18th Floor
Chicago, IL 60602

PETER F. KILMARTIN
ATTORNEY GENERAL OF RHODE ISLAND

LEO J. WOLD
ASSISTANT ATTORNEY GENERAL
RHODE ISLAND DEPARTMENT OF
ATTORNEY GENERAL
150 South Main Street
Providence, RI 02903

BRIAN E. FROSH
ATTORNEY GENERAL OF MARYLAND

JOSHUA M. SEGAL
ASSISTANT ATTORNEY GENERAL
OFFICE OF THE ATTORNEY GENERAL
200 St. Paul Place
Baltimore, MD 21202

BOB FERGUSON
ATTORNEY GENERAL OF WASHINGTON

WILLIAM R. SHERMAN
ASSISTANT ATTORNEY GENERAL
STACEY S. BERNSTEIN
ASSISTANT ATTORNEY GENERAL
AURORA R. JANKE
SPECIAL ASSISTANT ATTORNEY GENERAL
COUNSEL FOR ENVIRONMENTAL PROTECTION
800 5th Ave Suite 2000, TB-14
Seattle, WA 98104-3188

35

AR_0026186

GURBIR S. GREWAL
ATTORNEY GENERAL OF NEW JERSEY



DAVID C. APY
ASSISTANT ATTORNEY GENERAL
R.J. HUGHES JUSTICE COMPLEX
25 MARKET STREET, P.O. BOX 093
TRENTON, NJ 08625

KARL A. RACINE
ATTORNEY GENERAL
OF THE DISTRICT OF COLUMBIA

DAVID S. HOFFMANN
ASSISTANT ATTORNEY GENERAL
SARAH KOGEL-SMUCKER
SPECIAL ASSISTANT ATTORNEY GENERAL
PUBLIC ADVOCACY DIVISION
OFFICE OF THE ATTORNEY GENERAL FOR THE
DISTRICT OF COLUMBIA
441 Fourth Street, N.W., Suite 630 South
Washington, D.C. 20001

Dated: July 25, 2018

36

AR_0026187

# EXHIBIT

# 2

AR_0026188

**COMMENTS OF ATTORNEYS GENERAL OF WASHINGTON, CALIFORNIA, NEW YORK, DISTRICT OF COLUMBIA, CONNECTICUT, DELAWARE, GUAM, ILLINOIS, MAINE, MARYLAND, MASSACHUSETTS, MICHIGAN, MINNESOTA, NEVADA, NEW JERSEY, NEW MEXICO, OREGON, PENNSYLVANIA, RHODE ISLAND, AND VERMONT**

March 10, 2020

VIA E-MAIL and REGULATIONS.GOV
Edward A. Boling
Associate Director for the National Environmental Policy Act
Viktoria Z. Seale
Chief of Staff and General Counsel
Council on Environmental Quality
730 Jackson Place NW
Washington, DC 20503
NEPA-Update@ceq.eop.gov

> Re:    Notice of Proposed Rulemaking – Update to the Regulations Implementing the Procedural Provisions of the National Environmental Policy Act, 85 Fed. Reg. 1684 (Jan. 10, 2020)
> Docket ID No. CEQ-2019-0003

Dear Associate Director Boling:

The undersigned state and territorial Attorneys General, specifically, the Attorneys General of the States of Washington, California, New York, Connecticut, Delaware, Illinois, Maine, Maryland, Michigan, Minnesota, Nevada, New Jersey, New Mexico, Oregon, Rhode Island, and Vermont; the District of Columbia; the Commonwealths of Massachusetts and Pennsylvania, and the Territory of Guam (collectively, "States") respectfully submit these comments on the Council on Environmental Quality's (CEQ) notice of proposed rulemaking (Proposed Rule) regarding proposed revisions to the regulations implementing the National Environmental Policy Act (NEPA), 42 U.S.C. §§ 4321–4347.[1] For the reasons stated below, the States strongly oppose the Proposed Rule and request that it be withdrawn in its entirety.

---

[1] The notice of proposed rulemaking is titled "Update to the Regulations Implementing the Procedural Provisions of the National Environmental Policy Act," 85 Fed. Reg. 1684 (Jan. 10, 2020), Docket ID No. CEQ-2019-0003.

## TABLE OF CONTENTS

I.    INTRODUCTION ....................................................................................................6

II.   SUMMARY OF THE PROPOSED RULE ...........................................................7

III.  NEPA IS A SUCCESS STORY ............................................................................8

      A.   NEPA Plays a Critical Role in Environmental Protection ............................8

      B.   NEPA Has Protected Our Environment and Communities for Over 50 Years ..........10

IV.   CEQ'S PROPOSED RULE WOULD VIOLATE THE APA AND NEPA ......................12

      A.   CEQ's Proposed Rule Is Not Rationally or Factually Supported ................13

           1.   CEQ's Proposed Rule Ignores NEPA's Successes and Environmental Protection Aims ..........13

           2.   CEQ Has Not Rationally Justified Its Proposed Rule ..........14

           3.   The Proposed Rule Fails to Evaluate Whether Tools to Remedy Its Concerns Already Exist ..........17

      B.   CEQ's Public Process for This Rulemaking Is Deficient ..........19

      C.   The Proposed Rule Would Undermine NEPA's Environmental Protection Goals in Violation of NEPA's Plain Language and Purpose ..........20

      D.   The Proposed Rule Would Improperly Limit NEPA's Application to Federal Actions ..........23

           1.   CEQ Proposes a New "Threshold Applicability Analysis" that Would Unlawfully Limit NEPA's Application ..........23

                a.   CEQ's Proposed Redefinition of "Major Federal Action" is Unlawful ..........24

                b.   CEQ's Expansion of Functional Equivalency Violates NEPA and the APA ..........26

                c.   CEQ's Other Threshold Applicability Analysis Factors Would Further Limit NEPA's Application and Lack Rational Support ..........28

                d.   CEQ Should Not Adopt Other Limits on NEPA's Scope ..........30

           2.   CEQ's Proposed Definition of "Significance" Improperly Limits Environmental Review ..........31

2

3.   CEQ's Proposed Rule Would Improperly Expand the Use of Categorical Exclusions ........................................................................................33

    a.   CEQ's Proposed Rule Would Unlawfully Expand the Definition of Categorical Exclusions........................................................................34

    b.   CEQ's Proposed Revisions Would Expand Categorical Exclusions by Allowing Agencies to Mitigate Extraordinary Circumstances ....................35

    c.   CEQ's Expansion of Categorical Exclusions Would Impermissibly Limit Public Participation ...........................................................................36

4.   The Proposed Rule Would Allow Actions to Proceed During NEPA Review ......................................................................................................37

E.   The Proposed Rule Would Improperly Limit Discussion of Alternatives..................38

F.   The Proposed Rule Would Improperly Limit the Scope of Impacts Considered Under NEPA ....................................................................................................42

1.   CEQ's Proposed Rule Would Improperly Limit Agencies' Responsibility to Consider "Indirect" and "Cumulative" Effects .................................................42

    a.   CEQ's Proposal to Limit Analysis of Effects Would Violate NEPA...........43

    b.   CEQ Has Not Provided a Reasoned Explanation for Its Proposal to Constrain the Analysis of Impacts ..................................................................46

        (1)   The Proposed Revisions to the Effects Definitions Would Not Provide Clarity or Avoid Litigation ....................................................46

        (2)   CEQ's Claim that Agencies Need to Focus on the Most Significant Effects Lacks Support and Conflicts with NEPA's Purpose .....................................................................................................48

        (3)   CEQ Provides No Reasonable Explanation for "Reasonably Close Causal Relationship" Language ................................................48

        (4)   CEQ Has Not Provided a Rational Explanation for Exclusion of Cumulative Impacts or Indirect Impact Analysis..............................49

2.   CEQ's Proposed Revisions Improperly Curtail the Analysis of Federal Projects' Impacts of Greenhouse Gas Emissions and Climate Change ..............50

3.   CEQ's Proposed Revisions Would Improperly Limit the Analysis of Federal Projects' Impacts on Environmental Justice ...........................................52

3

4.  CEQ's Proposed Revisions to Other Terms Such as "Affected Area" and "Mitigation" Illustrate and, in Some Instances, Exacerbate the Impropriety of CEQ's Proposed Revisions to the Definition of Effects ....................................53

5.  CEQ's Proposed Revisions Improperly Weaken the Standard for Requiring Agencies to Obtain Information on Adverse Effects ............................................54

G.  The Proposed Rule Would Improperly Sideline the Public and Undercut NEPA's Purposes and Democratic Principles ............................................................56

1.  The Proposed Rule Would Increase Conflicts of Interest .....................................56

2.  The Proposed Rule Would Improperly Limit Public Participation ......................57

3.  The Proposed Rule Would Shift the Burden to the Public to Analyze Environmental Issues ............................................................................................59

4.  The Proposed Rule Would Impose Burdensome Exhaustion Requirements .......60

5.  The Proposed Rule Would Reduce an Agency's Obligation to Respond to Comments ................................................................................................................61

6.  The Proposed Rule Would Impose Unreasonable and Unworkable Time and Page Limits that Could Undermine the Quality of NEPA Review ...............62

7.  CEQ Must Ensure Broad Public Participation ......................................................63

H.  CEQ's Proposed Rule Would Limit Appropriate Remedies for NEPA Violations and Block Access to the Courts .................................................................64

1.  CEQ Proposes Unlawful Limits on Judicial Remedies ........................................64

2.  CEQ Proposes Unlawful Bond Requirements that Would Substantially Limit Judicial Review of Agency Actions ............................................................65

3.  The Proposed Rule's Conclusive Presumption that an Agency Has Considered Public Comments is Contrary to Law ...............................................67

I.  The Proposed Rule Would Increase Uncertainty and Litigation ................................68

V.  THE PROPOSED RULE WILL ADVERSELY IMPACT THE UNIQUE INTERESTS OF STATES, TERRITORIES, AND LOCAL GOVERNMENTS IN ROBUST NEPA REGULATIONS ......................................................................................70

A.  The States Have an Interest in Ensuring that Federal Decisions Do Not Harm Their Residents, Property, or Natural Resources .........................................................70

4

B.   Weakening the NEPA Regulations Would Disrupt Cooperation Between Federal and State Agencies and Burden States with Increased Environmental Review .................................................................................................................71

VI.   CEQ MUST CONDUCT NEPA REVIEW OF ITS REGULATIONS .............................73

A.   Overhauling the Nation's NEPA Regulations Is a Major Federal Action Affecting the Environment .........................................................................................74

B.   CEQ Misstates and Ignores the Governing Law Requiring NEPA Review ...............75

VII.   CONCLUSION ..................................................................................................77

AR_0026193

## I.    INTRODUCTION

CEQ's Proposed Rule would trade reasoned and informed decision making for unjustified expedience in the NEPA process, upending longstanding NEPA practice by limiting federal agencies' ability to comprehensively evaluate the impacts of federal actions on the environment, public health, and our communities. Despite NEPA's "action-forcing" mandate,[2] the Proposed Rule repeatedly emphasizes NEPA's procedural nature and asserts that NEPA does not intend to elevate environmental concerns over other concerns[3] but is merely procedural. [4] CEQ claims the Proposed Rule will "modernize and clarify" its regulations,[5] but the regulatory changes in the Proposed Rule would undermine NEPA's plain language and purpose in violation of the Administrative Procedure Act (APA).

CEQ's Proposed Rule would discard decades of successful practice and precedent implementing NEPA by unlawfully narrowing the types of actions and scope of impacts and alternatives considered under environmental reviews and fundamentally weakening NEPA's clear direction that federal agencies consider the environmental impacts of their actions. These changes grant extraordinary discretion to Federal agencies and project proponents while limiting consideration of environmental and public health impacts from federal actions. Among other things, CEQ's Proposed Rule threatens to greatly diminish federal agency review of environmental impacts, including significant impacts from greenhouse gas emissions (GHG) and associated climate change. The Proposed Rule also seeks to limit public participation and judicial review of agency actions, undermining NEPA's core principles of informed decision making and government accountability and threatening to reduce consideration of environmental justice concerns in agency decision making. In addition, the Proposed Rule violates NEPA because CEQ has not conducted mandatory NEPA review for its own regulatory revisions.

In direct contravention of NEPA's objectives, CEQ's rulemaking process for this Proposed Rule has sidelined stakeholders—including states, tribes, and the public at large—from meaningful engagement on CEQ's unprecedented overhaul of its regulations. This approach has grave consequences for the evaluation of environmental justice concerns. CEQ's current NEPA regulations provide the foundation for NEPA's implementation—establishing a durable and environmentally protective framework on which federal agencies, states, territories, local governments, and the public have relied for 40 years. Through prior Republican and Democratic administrations, CEQ has promoted stability in environmental reviews by revising its regulations only when necessary to further the purposes of the statute and doing so after engaging in meaningful consultation with stakeholders. But in this rulemaking, CEQ discards this long history of stability and public review by providing the public *only 60 days and two geographically-limited public hearings* to review and comment on CEQ's unprecedented regulatory overhaul. As many undersigned states previously requested, CEQ should abandon its current timeline, reopen

---

[2] *Kleppe v. Sierra Club*, 427 U.S. 390, 409 (1976) (quoting Conference Report on NEPA, 115 Cong. Rec. 40416 (1969)).

[3] 85 Fed. Reg. at 1686 (citing *Balt. Gas & Elec. Co. v. Nat. Res. Def. Council*, 462 U.S. 87, 97 (1983)).

[4] *Id*. at 1685, 1686, 1688, 1693, 1698 n.62, & 1712.

[5] *Id*. at 1685.

comments on the Proposed Rule for at least an additional 90 days, and provide additional public hearings.

Moreover, these unlawful and unreasonable changes will harm and burden the States. As an example of cooperative federalism, NEPA provides a robust framework for environmental review through coordination between federal agencies and the States. The States have a strong interest in protecting their residents, property, and natural resources from adverse environmental impacts. Contrary to these State interests, CEQ's Proposed Rule would increase uncertainty around implementation of NEPA and impose an additional burden on the States to fill the gaps left by inadequate NEPA environmental reviews.

CEQ's Proposed Rule is unlawful, unreasonable, and unjustified and must be withdrawn. For the past 40 years, existing NEPA regulations have successfully furthered the goal of ensuring that federal agencies take a "hard look" at how their actions impact the environment.[6] Rather than acknowledge this successful history, CEQ rushes to overhaul the regulations, pushing aside objections from stakeholders, including many of the undersigned States,[7] and ignoring requests that CEQ first collect detailed data on NEPA's implementation and evaluate the effect any revisions would have on future federal actions, public health, and the environment before proceeding with any regulatory changes. Without such evidence, CEQ cannot and has not satisfied its legal obligation to ensure that the regulations continue to prioritize protection of public health and the environment and to ensure public participation in accordance with NEPA.

These comments demonstrate how the Proposed Rule (1) ignores NEPA's successes; (2) fails to provide adequate public process; (3) would violate NEPA and the APA if adopted; and (4) fails to comply with NEPA itself. In sum, these comments demonstrate that the Proposed Rule is unlawful, arbitrary and capricious, and should be withdrawn.

## II.    SUMMARY OF THE PROPOSED RULE

CEQ's Proposed Rule introduces sweeping changes that narrow the environmental review process for federal projects. Among the proposed changes, CEQ proposes to:

- Shift the purpose of CEQ's NEPA regulations from ensuring detailed, "action-forcing" environmental review of agency actions to describing NEPA as a purely procedural statute;

- Limit NEPA's application to federal projects by (1) imposing a new "threshold applicability analysis"; (2) redefining "major federal action"; (3) expanding the use of functional equivalence; (4) allowing agencies to determine that NEPA review is not required because of direct statutory conflict or inconsistency with Congressional intent; (5)

---

[6] *See Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989).

[7] Comments of Attorneys General of California, Illinois, Maryland, Massachusetts, New Jersey, New York, Oregon, Vermont, and Washington, and the Secretary of the Commonwealth of Pennsylvania Department of Environmental Protections on Advance Notice of Proposed Rulemaking, 83 Fed. Reg. 28, 591 (August 20, 2018) [hereinafter Advance Notice Comments] (attached as Exhibit 1).

AR_0026195

redefining "significance"; (6) expanding agency authority to claim a categorical exclusion to avoid completing any NEPA analysis; and (7) allowing certain actions to proceed before NEPA review is completed;

- Limit the scope of alternatives considered in environmental reviews, including by (1) striking an agency's obligation to consider alternatives outside of its jurisdiction; (2) eliminating the direction to present alternatives in comparative form; (3) removing direction to "[r]igorously explore and objectively evaluate" all reasonable alternatives to the proposed action; (4) removing the requirement to "[d]evote substantial treatment to each alternative"; and (5) preventing federal agencies from adopting NEPA regulations that integrate with state review processes if they involve a broader scope or more detailed methodological standard than those in the revised CEQ regulations;

- Limit the scope of impacts considered by (1) attempting to limit agency responsibility to consider "indirect" and "cumulative" effects of federal actions; (2) redefining "effects"; (3) curtailing consideration of GHGs and climate change as well as environmental justice impacts in environmental reviews; and (4) weakening the standard for requiring agencies to obtain scientific information on environmental impacts;

- Limit public involvement by (1) increasing conflicts of interest in the drafting process; (2) generally constraining public participation; (3) shifting the responsibility from the agency to the public to perform the detailed analysis required by NEPA; (4) imposing burdensome exhaustion requirements; (5) reducing agency responsibility to respond to comments; (6) imposing time and page limits on environmental reviews; and (7) failing to ensure broad public access to the commenting process; and

- Limit access to courts by (1) seeking to limit judicial remedies; (2) proposing bond requirements for NEPA litigants; and (3) adopting a conclusive presumption for agency review of public comments.

Taken individually and together, these proposed changes substantially undermine NEPA's direction and purpose.

## III.    NEPA IS A SUCCESS STORY

### A.    NEPA Plays a Critical Role in Environmental Protection

Congress passed NEPA more than 50 years ago, establishing the nation's first comprehensive policy for ensuring detailed environmental review of federal actions.[8] In doing so, Congress recognized the "critical importance of restoring and maintaining environmental quality to the overall welfare and development of man" and emphasized a national policy of cooperation with State and local governments as well as concerned citizens and private organizations "to use

---

[8] *See* 42 U.S.C. § 4321; National Environmental Policy Act of 1969, Pub. L. No. 91-190, 83 Stat. 852 (1970).

AR_0026196

all practicable means … to create and maintain conditions under which man and nature can exist in productive harmony."[9]

Consistent with this overarching policy, NEPA seeks to ensure government accountability, requiring federal agencies to consider the impacts of their actions on the environment and public health. Specifically, NEPA requires agencies to prepare an environmental impact statement (EIS) for legislation or "other major Federal actions significantly affecting the quality of the human environment."[10] An EIS must consider and evaluate project alternatives, and assess environmental impacts of the action and alternatives.[11] NEPA's environmental review requirement is not merely procedural. Rather, the environmental review process compels agencies to fully assess environmental and public health impacts and alternative approaches by involving the public and consulting with other agencies to lessen environmental impacts. As an "umbrella" review process, NEPA review also frequently includes environmental justice impacts (Executive Order 12898), historic resource review (National Historic Preservation Act), and potential impacts to endangered species (Endangered Species Act).[12]

The courts have long recognized that NEPA requires integration of environmental values and concerns throughout agency decision making. As the Supreme Court stated more than 40 years ago, "[t]he thrust of § 102(2)(C) [of NEPA] is thus that environmental concerns be integrated into the very process of agency decision-making. The 'detailed statement' it requires is the outward sign that environmental values and consequences have been considered during the planning stage of agency actions."[13] Accordingly, the "action-forcing provisions [are] intended as a directive to all agencies to assure consideration of the environmental impact of their actions."[14] NEPA thus requires agencies to take a "hard look" at how their actions impact the environment,[15] and ensures that agency decision-making is fully informed regarding environmental impacts.[16]

NEPA also prioritizes democratic values by providing a central role for public participation in the environmental review process.[17] In particular, NEPA directs agencies to "utilize a systematic, interdisciplinary approach" in their decision making, and make their decision making process available to States, local governments, and the public, including through making available

---

[9] 42 U.S.C. § 4331(a).

[10] *Id.* § 4332(2)(C).

[11] *Id.*

[12] Exec. Order No. 12898, 59 Fed. Reg. 7629 (1994) (as amended); National Historic Preservation Act 54 U.S.C § 300101 et seq.; National Historic Preservation Act Section 106 Regulations, 36 C.F.R. 800; Endangered Species Act Section 7, 16 U.S.C. § 1536 (a)(1).

[13] *Andrus v. Sierra Club*, 442 U.S. 347, 350 (1979).

[14] *Kleppe*, 427 U.S. at 409 (quoting Conference Report on NEPA, 115 Cong. Rec. 40416 (1969)) (internal quotations omitted).

[15] *Robertson*, 490 U.S. at 350; *Sierra Club v. U.S. Army Corps v. Eng'rs*, 803 F.3d 31, 37 (D.C. Cir. 2015).

[16] *Am. Rivers v. FERC*, 895 F.3d 32, 49 (D.C. Cir. 2018).

[17] *See, e.g.*, 42 U.S.C. § 4332(2)(C); 40 C.F.R. §§ 1503.1(a)(4), 1506.6.

AR_0026197

"information useful in restoring, maintaining, and enhancing the quality of the environment."[18] NEPA thus envisions public participation in the federal planning process,[19] providing a benefit to federal decision making.[20]

CEQ's current NEPA regulations, largely adopted in 1978, "tell federal agencies what they must do to comply with the procedures and achieve the goals of the Act."[21] Over the past 40 years, CEQ's NEPA regulations have guided NEPA's implementation across the nation, including in the undersigned States, and have become fundamental to the daily functioning and responsible decision making of numerous federal and state agencies.

Importantly, CEQ's regulations and guidance have long prioritized public participation. CEQ has long emphasized that "[t]wo major purposes of the environmental review process are better informed decisions and citizen involvement, both of which should lead to implementation of NEPA's policies."[22] Public participation provides a critical tool for identifying alternatives that improve a proposed action or reduce its environmental impacts, identifying shortfalls in the agency's analyses, spotting missing issues, and providing additional information that the agency may not have known existed. Indeed, as CEQ has previously acknowledged, "[s]ome of the most constructive and beneficial interaction between the public and an agency occurs when citizens identify or develop reasonable alternatives that the agency can evaluate in the EIS."[23]

## B.    NEPA Has Protected Our Environment and Communities for Over 50 Years

In proposing an overhaul of NEPA's regulatory framework, CEQ ignores the many successes of the existing NEPA regulations and the critical importance of NEPA, as currently implemented, in ensuring that impacts on public health and the environment are identified and fully considered before agencies take action. Indeed, a 2014 Government Accountability Office Report (GAO Report) on NEPA stated that the NEPA process "ultimately saves time and reduces overall project costs by identifying and avoiding problems that may occur in later stages of project

---

[18] 42 U.S.C. § 4332(2)(A), (C), (G).

[19] *Id.* § 4332(2)(C); 40 C.F.R. §§ 1503.1(a)(4), 1506.6.

[20] *See* Letter from Russell E. Train, *et al.* To The Honorable Cathy McMorris, at 2 (Sept. 19, 2005) (former Chairs and General Counsels of CEQ stating that "the public plays an indispensable role in the NEPA process") [hereinafter Train Letter] (attached as Exhibit A to Advance Notice Comments). *See also* ENVTL. LAW INST., NEPA SUCCESS STORIES: CELEBRATING 40 YEARS OF TRANSPARENCY AND OPEN GOVERNMENT, at 6 (Aug. 2010) [hereinafter NEPA Success Stories], https://ceq.doe.gov/docs/get-involved/NEPA_Success_Stories.pdf (last visited Mar. 9, 2020); CEQ, EXAMPLES OF BENEFITS FROM THE NEPA PROCESS FOR ARRA FUNDED ACTIVITIES (May 2011) [hereinafter Examples of NEPA Benefits], https://ceq.doe.gov/docs/get-involved/ARRA_NEPA_Benefits_List_May122100.pdf (last visited Mar. 9, 2020); CEQ, A CITIZEN'S GUIDE TO THE NEPA: HAVING YOUR VOICE HEARD, at 24 (Dec. 2007) [hereinafter Citizen's Guide to the NEPA], https://ceq.doe.gov/docs/get-involved/Citizens_Guide_Dec07.pdf (last visited Mar. 9, 2020) (noting, in a specific example, that "[t]hrough NEPA, citizens were able to educate and assist the decision-makers in developing their alternatives.").

[21] 40 C.F.R. § 1500.1(a).

[22] Citizen's Guide to the NEPA, *supra* note 20, at 2.

[23] *Id.* at 14.

AR_0026198

development."[24] The GAO Report further explained that "[a]ccording to studies and agency officials, some of the qualitative benefits of NEPA include its role as a tool for encouraging transparency and public participation and in discovering and addressing the potential effects of a proposal in the early design stages to avoid problems that could end up taking more time and being more costly in the long run."[25] Similarly, U.S. Forest Service officials have observed that "NEPA leads to better decisions."[26]

As the States noted in our comments on the Advance Notice of Proposed Rulemaking (Advance Notice Comments) regarding potential revisions to the NEPA regulations,[27] NEPA and the existing CEQ regulations have produced numerous success stories in various states.[28] Examples of NEPA success stories abound beyond those provided in the earlier comments.

For example, New York's NEPA process for construction of the Governor Mario M. Cuomo Bridge (formerly Tappan Zee Bridge) achieved an efficient outcome through coordination with state and federal agencies. The bridge is a vital link in the transportation network in the northeast, serving approximately 138,000 vehicles a day. The project team of state and federal agencies worked together to meet an aggressive NEPA and permitting schedule. In fact, they completed the federal permitting and NEPA review in one and a half years. This shaved years off of the multi-billion-dollar project.[29] This example illustrates that, when adequate resources are available and agencies commit to early engagement with all stakeholders and other interested agencies, the NEPA process can proceed with efficiency and improve outcomes for all parties.[30]

In Washington State, the State Route 99 Alaskan Way Viaduct Replacement represents a NEPA success, due in large part to the extensive public, agency, and tribal engagement that went into the project. After the February 2001 Nisqually Earthquake, there was little doubt about the vulnerability of the Alaskan Way Viaduct in downtown Seattle and the need for its replacement. However, for ten years there was a very public debate over how to replace it, with 76 concepts originally considered and eight alternatives analyzed through the EIS process. The Washington

---

[24] U.S. GOV'T ACCOUNTABILITY OFFICE, GAO-14-369, NATIONAL ENVIRONMENTAL POLICY ACT: LITTLE INFORMATION EXISTS ON NEPA ANALYSES, at 16 (2014) [hereinafter GAO Report], https://www.gao.gov/products/gao-14-369 (last visited Feb. 21, 2020).

[25] *Id.* at 15.

[26] *Id.* at 16. *See also* NEPA Success Stories, *supra* note 20; Examples of NEPA Benefits, *supra* note 20; Citizen's Guide to the NEPA, *supra* note 20, at 24.

[27] "Update to the Regulations for Implementing the Procedural Provisions of the National Environmental Policy Act," 83 Fed. Reg. 28591 (June 20, 2018) [hereinafter Advance Notice].

[28] *See, e.g.,* Advance Notice Comments, *supra* note 7.

[29] *See generally*, Natural Res. Def. Council, Never Eliminate Public Advice: NEPA Success Stories (Feb. 1, 2015), https://www.nrdc.org/resources/never-eliminate-public-advice-nepa-success-stories (last visited Mar. 9, 2020).

[30] *See generally* Richard Lazarus, *The National Environmental Policy Act in the U.S. Supreme Court: A Reappraisal and a Peek Behind the Curtains*, 100 GEO. L.J. 1507, 1510 (2012), http://www.law.harvard.edu/faculty/rlazarus/docs/articles/Lazarus_APeekBehindtheCurtain_2012.pdf (NEPA's requirements have led to over 30,000 draft and final EISs "and successfully prevented at least hundreds, and likely thousands, of actions from causing unnecessary damage to the nation's environment.").

AR_0026199

State Department of Transportation's implementation of NEPA for this project won national awards. But, more importantly, it brought the public into the effort to find a solution that worked for the city, the nearby port, the region, and the State.

In Pennsylvania, the large Potters Mills Gap Transportation Project went through the NEPA process to address safety, congestion, and access concerns in along a state highway. This process included considerable public participation, examined alternatives, and implemented mitigation measures. Consideration of impacts on environmental features and wildlife and demands of the construction process led to an inclusive monitoring and mitigation plan. The project eventually received a Finding of No Significant Impact and was awarded the federal 2015 Environmental Excellence Award for Environmental Streamlining.

In short, CEQ's current NEPA regulations have helped lead to better, more-informed decisions that provide workable, long-lasting solutions for communities and protect public health and the environment.

## IV. CEQ'S PROPOSED RULE WOULD VIOLATE THE APA AND NEPA

If finalized, CEQ's Proposed Rule would violate the procedures and standards established by the APA and fail to comply with NEPA's text and purpose. Under the APA, an agency action is unlawful if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law" or "without observance of procedure required by law."[31]

To comply with the APA, an agency "must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'"[32] An agency rule would be arbitrary and capricious "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."[33] Where an agency rule departs from longstanding policies, the agency must show that "there are good reasons" for the changes, and demonstrate that its new rule is "permissible under the statute."[34] Any unexplained inconsistency between longstanding agency practice and a proposed rule is a reason for holding the proposed rule to be arbitrary and

---

[31] 5 U.S.C. § 706(2)(A), (D).

[32] *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (quotation omitted).

[33] *Id.*

[34] *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). *See also Am. Wild Horse Pres. Campaign v. Perdue*, 873 F.3d 914, 927 (D.C. Cir. 2017) (agency reversing direction is not permitted "to whistle past [the] factual graveyard" and disregard previous policy and underlying record); *Lone Mountain Processing, Inc. v. Sec'y of Labor*, 709 F.3d 1161, 1164 (D.C. Cir. 2013) ("An agency changing its course must supply a reasoned analysis indicating that prior policies and standards are being deliberately changed, not casually ignored.") (quotation omitted).

AR_0026200

capricious.[35] This is particularly true where, as here, significant reliance interests are involved.[36] In addition, agency regulations are arbitrary and capricious if they conflict with or fail to accomplish their statutory objectives.[37]

As discussed in detail below, if finalized, CEQ's regulatory changes would be arbitrary and capricious and not in accordance with law, and would fail to observe procedures required by law. Overall, the Proposed Rule is inconsistent with NEPA and relevant case law and CEQ has not complied with the APA's procedural requirements.

Specifically, CEQ's Proposed Rule: (A) fails to provide an adequate justification for CEQ's departure from the agency's longstanding regulations and policies implementing NEPA; and (B) was not vetted through an adequate public process. If implemented the Proposed Rule would: (C) undermine NEPA's environmental protection goals; (D) unlawfully limit NEPA's application to federal projects; (E) unlawfully limit review of alternatives; (F) unlawfully limit review of environmental impacts; (G) unlawfully limit public participation; (H) unlawfully limit access to courts and judicial remedies; and (I) lead to increased uncertainty and litigation. For these reasons, CEQ's adoption of the Proposed Rule would violate the APA and NEPA.

## A.    CEQ's Proposed Rule Is Not Rationally or Factually Supported

In an attempt to justify this regulatory overhaul, CEQ ignores NEPA's successes and focuses instead on unsupported claims of shortcomings in NEPA's implementation. CEQ's Proposed Rule lacks sound rationale and factual support—a deficiency anticipated in the Advance Notice Comments and unaddressed in the Proposed Rule. Moreover, CEQ overlooks existing tools designed to enhance efficiency in the NEPA process, which is one of CEQ's purported reasons for developing this Proposed Rule.

### 1.    CEQ's Proposed Rule Ignores NEPA's Successes and Environmental Protection Aims

CEQ's proposed revisions that elevate supposed expediency over detailed environmental review are inconsistent with CEQ's longstanding recognition of NEPA's success and action-forcing goals. In its NEPA Effectiveness Study, a 25-year review of NEPA's implementation, CEQ emphasized that "NEPA is a success—it has made agencies take a hard look at the potential environmental consequences of their actions, and it has brought the public into the agency decision-making process like no other statute."[38] CEQ further recognized that NEPA includes a substantive mandate

---

[35] *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 981 (2005).

[36] *Encino Motorcars, LLC v. Navarro*, 136 S.Ct. 2117, 2126 (2016) ("the explanation fell short of the agency's duty to explain why it deemed it necessary to overrule its previous position" particularly because of "reliance on the Department's prior policy").

[37] *Chem. Mfrs. Ass'n v. EPA*, 217 F.3d 861, 867 (D.C. Cir. 2000.) (holding rule was arbitrary and capricious because it was inconsistent with the legislative intent of the Clean Air Act).

[38] CEQ, NATIONAL ENVIRONMENTAL POLICY ACT: A STUDY OF ITS EFFECTIVENESS AFTER TWENTY-FIVE YEARS, at iii (Jan. 1997), https://ceq.doe.gov/docs/ceq-publications/nepa25fn.pdf [hereinafter NEPA Effectiveness Study]; *id.*

AR_0026201

to "'act' to protect the environment" and an "[a]ffirmative mandate—not only to preserve existing environmental quality, but to make decisions that restore and enhance the environment."[39]

In the Proposed Rule, CEQ has not provided a reasoned explanation for departing from its prior recognition of NEPA's success and its substantive mandate. CEQ echoed this conclusion in a 2011 study, observing that numerous environmental reviews overwhelmingly have resulted in "taxpayer dollars and energy saved, resources better protected and the fostering of community agreements."[40] CEQ may not now ignore NEPA's plain language and legislative history, settled judicial precedent, and CEQ's own longstanding practice in its effort to adopt new regulations inconsistent with the statute itself.

## 2.    CEQ Has Not Rationally Justified Its Proposed Rule

CEQ fails to rationally justify its Proposed Rule. In particular, CEQ provides no comprehensive data or analysis to justify its comprehensive revision of the entire body of NEPA regulations "to reduce paperwork and delays and to promote better decisions."[41]

Notably, CEQ's Proposed Rule fails to acknowledge the Advance Notice Comments which urged CEQ to conduct a thorough review process to determine the need, if any, for NEPA regulatory revisions before launching such a major overhaul of NEPA's implementing regulations.[42]

In particular, the Advance Notice Comments explained that most federal agencies do not routinely track important information about their NEPA processes, including the number of environmental assessments (EAs) and categorical exclusions conducted and the timeframes for completing these reviews.[43] The Advance Notice Comments requested that CEQ analyze existing studies and reports concerning the effectiveness of the current NEPA regulations and solicit input from federal agencies, state and local governments, the public, academics, scientists, and other stakeholders to determine whether changes are appropriate, consistent with its approach to drafting the original NEPA regulations.[44] But, despite these requests, CEQ did not meaningfully engage

---

at 5 (CEQ solicited input from NEPA's original framers, members of Congress, State and local agencies, drafters of the CEQ regulations, federal agencies, and the public).

[39] *Id.*, at App'x A.

[40] Examples of NEPA Benefits, *supra* note 20, at 1.

[41] 85 Fed. Reg. at 1685.

[42] *See* Advance Notice Comments, *supra* note 7, at 11–21.

[43] *Id.* at 17–19.

[44] *See id.* at 18. *Compare* Final Regulations, Implementation of Procedural Provisions, 43 Fed. Reg. at 55,980 (Nov. 29, 1978) (describing the process for drafting the current NEPA regulations as including public hearings, meetings with all federal agencies implementing NEPA, meetings with representatives of business, labor, State and local governments, environmental and other interested groups, and the general public, and detailed consideration of existing federal studies on the NEPA process).

AR_0026202

with the States, other stakeholders, or the public to solicit input on these issues before issuing the Proposed Rule.

Moreover, in the Proposed Rule, CEQ does not indicate that it has gathered or assessed any such data. For example, CEQ did not first analyze the existence, extent, and causes of delays under NEPA, if any, and then target those causes through training, guidance, or, if necessary, carefully tailored regulatory changes.[45] Instead, CEQ assesses only the length of time for preparing EISs— a small fraction of the NEPA reviews conducted annually—and it expressly declines to assess the reasons for the length of time required for such reviews.[46] CEQ conducted no meaningful analysis of other NEPA reviews, such as EAs, a less rigorous environmental review process,[47] or categorical exclusions, for which NEPA review is not required.[48] This absence of data is particularly significant given that agencies prepare an EIS in relatively few cases and often utilize more streamlined NEPA processes including EAs and categorical exclusions.[49]

CEQ's failure to meaningfully evaluate current NEPA practice is particularly unreasonable because the Proposed Rule identifies agency guidance and numerous reports issued in the past several decades "intended to provide guidance and clarifications with respect to various aspects of the implementation of NEPA . . . and to increase the efficiency and effectiveness of the environmental review process."[50] For example, CEQ refers to its NEPA Effectiveness Study but glossed over that report's conclusion that "NEPA has ensured that agencies adequately analyze the potential environmental consequences of their actions and bring the public into the decision-making processes of Federal agencies."[51] CEQ instead focuses on the section of the NEPA Effectiveness Study that identified additional "matters of concern" from study participants, such as overly lengthy documents.[52]

CEQ incorrectly concludes that the NEPA Effectiveness Study supports the Proposed Rule's sweeping changes. In fact, the NEPA Effectiveness Study discussed with approval numerous examples of effective NEPA implementation and, as the Proposed Rule acknowledges, identified five elements of the existing NEPA process that were "critical to effective and efficient NEPA implementation:"[53] strategic planning, public information and input, interagency coordination, an interdisciplinary place-based approach to decision making, and science-based and

---

[45] Advance Notice Comments, *supra* note 7, at 19.

[46] CEQ, ENVIRONMENTAL IMPACT STATEMENT TIMELINES (2010-2017) at 2 (Dec. 14, 2018) [hereinafter, EIS Timelines Report] https://www.whitehouse.gov/wp-content/uploads/2017/11/CEQ-EIS-Timelines-Report.pdf.

[47] *See* 40 C.F.R. § 1508.9.

[48] EIS Timelines Report, *supra* note 46, at 2.

[49] Advance Notice Comments, *supra* note 7, at 18 (citing GAO Report, *supra* note 24); *see also* NEPA Effectiveness Study, *supra* note 38, at 19.

[50] 85 Fed. Reg. at 1686 (citing CEQ Guidance Documents, https://ceq.doe.gov/guidance/guidance.html).

[51] *Id.*

[52] *Id.*

[53] *Id.*

AR_0026203

flexible management approaches.[54] To the extent that the NEPA Effectiveness Study identified areas for improvement, CEQ has not examined whether changes in NEPA implementation through its own guidance and subsequent targeted statutory amendments have resulted in such improvements in the more than 23 years since this report was issued, ignoring an important aspect of the problem CEQ purports to address in the Proposed Rule. Nor has CEQ reasonably explained how the changes in the Proposed Rule will address any remaining "matters of concern" in light of that report's findings. Rather, as discussed in section III.G and V.B, *infra*, the Proposed Rule would weaken the NEPA process with respect to public information and input and disrupt coordination between federal and state agencies, two of the critical elements of NEPA identified in the report.[55]

In addition, CEQ identifies the work of a 2002 NEPA task force that examined NEPA implementation and issued a 2003 report,[56] which CEQ acknowledges led to "additional guidance documents and handbooks."[57] Similarly, CEQ describes a 2018 memorandum instituting the "One Federal Decision" framework for NEPA reviews involving multiple agencies, which resulted in associated guidance and a memorandum of understanding to implement the One Federal Decision framework for certain major infrastructure projects.[58] But CEQ provides no evidence in the Proposed Rule that these guidance documents or the One Federal Decision framework have been ineffective or that these reports otherwise support the sweeping regulatory changes in the Proposed Rule. Rather, CEQ simply states, without citation to specific supporting data, that "[d]espite CEQ guidance and regulations … the documentation and timelines for completing environmental reviews can be very lengthy, and the process can be complex and costly."[59] Thus, CEQ concludes that the Proposed Rule's significant revisions are necessary to "advance more timely reviews and reduce unnecessary paperwork."[60] But reasoned decision making requires more than CEQ's unsupported conclusions.

Similarly, CEQ includes sparse information on NEPA's long-term costs and benefits, with little comprehensive data about the number of NEPA analyses completed across the government since NEPA's inception.[61] As CEQ has acknowledged, factors such as changes in the proposed action, available project funding, and community concerns can significantly affect EIS development timeframes.[62] Yet, in the Proposed Rule, CEQ fails to acknowledge or review these

---

[54] NEPA Effectiveness Study, *supra* note 38, at ix.

[55] *Id.*, at x, 17–19, 21–23.

[56] 85 Fed. Reg. at 1686.

[57] *Id.* at 1687.

[58] *Id.*

[59] *Id.*

[60] 85 Fed. Reg. at 1688.

[61] Advance Notice Comments, *supra* note 7, at 18 (citing GAO Report), *supra* note 24. *See also* NEPA Effectiveness Study, *supra* note 38, at 6, 13.

[62] EIS Timelines Report, *supra* note 46, at 2. CEQ cites the Forty Questions Guidance, which suggested a one-year completion timeframe for EISs, as evidence that the current average rate of four years is unreasonable. Yet, that guidance was issued in 1981, when CEQ had far less experience with the complexities that can be associated with comprehensive and meaningful reviews. *See* 85 Fed. Reg. at 1687. *See also* GAO Report, *supra* note 24, at 14 ("[A]

16

factors to justify its proposed changes. Except for the two cursory reports on EISs, all of the reports CEQ relies on in the Proposed Rule pre-date the Advance Notice. CEQ thus failed to address the Advance Notice Comments that highlighted the need for additional data and analysis of these factors. Moreover, a few scattered data points on EISs—and none on categorical exclusions or EAs—do not demonstrate that the time taken for environmental reviews unduly delays projects.

The Proposed Rule also attempts to justify its revisions by asserting, without supporting citations or examples, that in "some cases, the NEPA process and related litigation has slowed or prevented the development of new infrastructure and other projects that required Federal permits or approvals."[63] However, as the GAO Report noted in 2014, the NEPA data that does exist indicates that "most NEPA analyses do not result in litigation."[64] Thus, CEQ's justification is contradicted by evidence in the record. Moreover, CEQ's purpose is not to reduce litigation over NEPA, but to, among other things, develop policies that "foster and promote the improvement of environmental quality to meet the conservation, social, economic, health, and other requirements and goals of the Nation."[65]

Where projects are challenged, it is often by citizens seeking to ensure that projects do not move forward without adequate review of environmental impacts. In such circumstances, the courts play a vital role in ensuring that federal agencies adhere to NEPA's mandate to take a hard look at environmental consequences before taking major actions.[66] The opportunity for judicial review of agency actions is not a flaw of NEPA or an obstacle to achieving its purposes, but a fundamental part of the NEPA process. CEQ's assertion of litigation-related problems without support, data or analysis, and contrary to evidence in the record, is arbitrary and capricious.

In short, CEQ has not done its homework—and has thus produced a purported solution before determining the existence, scope, and causes of the problem.

### 3.    The Proposed Rule Fails to Evaluate Whether Tools to Remedy Its Concerns Already Exist

The Advance Notice Comments also argued that CEQ must adequately evaluate the ability of existing regulations as well as the available tools to address its purported concerns about NEPA's implementation.[67] By failing to address these prior comments and failing to consider the

---

10-year time frame to complete a project may have been associated with funding issues, engineering requirements, changes in agency priorities, delays in obtaining nonfederal approvals, or community opposition to the project, to name a few.").

[63] 85 Fed. Reg. at 1685.

[64] GAO Report, *supra* note 24, at 19.

[65] 42 U.S.C. § 4344.

[66] *See The Weaponization of the National Environmental Policy Act and the Implications of Environmental Lawfare: Hearing Before the House Comm. on Natural Res.*, 115th Cong. 8–11 (2018) at 8–10 (statement of Horst Greczmiel, Former CEQ Associate Director of NEPA Oversight) [hereinafter Greczmiel Statement].

[67] Advance Notice Comments, *supra* note 7, at 15–17.

AR_0026205

efficacy of existing tools, CEQ has ignored a significant aspect of the problem and failed to engage in reasoned decision making.[68]

Many, if not all, of the concerns CEQ identifies in the preamble to the Proposed Rule could be addressed by implementing existing CEQ guidance and regulations rather than a sweeping and unjustified rewrite of the regulations.[69] CEQ designed the current regulations to reduce inefficiencies while producing "better decisions which further the national policy to protect and enhance the quality of the human environment."[70] When properly implemented by well-resourced and well-trained federal agencies, CEQ's existing regulations already provide many of the tools to address CEQ's concerns about NEPA's perceived inefficiency.[71]

Indeed, several sections of the current regulations provide methods to reduce paperwork[72] and shorten delay.[73] Additionally, there are numerous ways to increase the effectiveness and efficiency of the NEPA process.[74] For instance, the Obama Administration employed guidance and other efforts to address inefficiencies in NEPA processes and facilitate increased interagency collaboration.[75] Many of these efforts continued under the Trump Administration, but CEQ has not engaged in a detailed review of these actions to determine whether an overhaul of the existing NEPA regulations is required to further facilitate efficient and meaningful NEPA review.

CEQ also failed to assess the effectiveness of the Fixing America's Surface Transportation Act of 2015 (FAST Act), particularly Title 41 (FAST-41), which seeks to facilitate environmental review and permitting of "covered projects," i.e., infrastructure projects in certain sectors where the project cost is expected to exceed $200 million.[76] In particular, the Advance Notice Comments stated that CEQ should assess whether FAST-41 increases efficiency while also continuing to serve NEPA's overriding environmental protection goals. Instead of assessing FAST-41's

---

[68] *State Farm*, 463 U.S. at 43.

[69] *See, e.g.,* 40 C.F.R. § 1500.5 (listing measures agencies must implement to reduce delay).

[70] *See* 43 Fed. Reg. at 55,978.

[71] *See generally*, CEQ, MEMORANDUM FOR HEADS OF FEDERAL DEPARTMENTS AND AGENCIES ON IMPROVING THE PROCESS FOR PREPARING EFFICIENT AND TIMELY ENVIRONMENTAL REVIEWS UNDER NEPA (Mar. 6, 2012) [hereinafter Timely Review Memorandum], https://ceq.doe.gov/docs/ceq-regulations-and-guidance/Improving_NEPA_Efficiencies_06Mar2012.pdf. *See also* Train Letter, *supra* note 20, at 2 ("Meaningful efforts to improve the Act's implementation should address the critical needs for better guidance and additional training for agency personnel and enhanced resources for NEPA implementation by federal agencies.").

[72] *See, e.g.,* 40 C.F.R. § 1500.4.

[73] *See, e.g., id.* at § 1500.5.

[74] *See* Advance Notice Comments, *supra* note 7, at 15–16.

[75] *See, e.g.,* CEQ, MEMORANDUM FOR HEADS OF FEDERAL DEPARTMENTS AND AGENCIES, GUIDANCE TO FEDERAL AGENCIES REGARDING THE ENVIRONMENTAL REVIEW AND AUTHORIZATION PROCESS FOR INFRASTRUCTURE PROJECTS (Jan. 13, 2017), https://www.permits.performance.gov/sites/permits.performance.gov/files/docs/Official%20Signed%20FAST-41%20Guidance%20M-17-14%202017-01-13.pdf.

[76] Advance Notice Comments, *supra* note 7, at 17.

AR_0026206

implementation, CEQ's Proposed Rule appears to rely on the FAST Act and FAST-41 as expressing Congress's support for an overhaul of CEQ's NEPA regulations.[77] But, CEQ ignores that in enacting FAST-41, Congress did not otherwise alter NEPA or invalidate CEQ's existing NEPA regulations.[78] If CEQ finalizes its Proposed Rule, CEQ must address all comments submitted by the States, including the Advance Notice Comments, and critically assess the congressional intent of the FAST Act, including FAST-41, as well as its effectiveness.

Despite the lack of support for CEQ's claim that review under the current NEPA regulations causes undue delay and CEQ's failure to consider existing tools to address its concerns, CEQ asserts that its Proposed Rule will "advance the original goals of the CEQ regulations to reduce paperwork and delays and promote better decisions consistent with the national environmental policy set forth in section 101 of NEPA."[79] However, as discussed in more detail below, CEQ fails to demonstrate that the regulatory changes will in fact achieve these goals, particularly when CEQ proposes numerous changes in position without reasonable explanation on critical issues of NEPA interpretation and implementation.[80]

## B.  CEQ's Public Process for This Rulemaking Is Deficient

The APA seeks to ensure that agencies provide for meaningful public participation in the rulemaking process by requiring agencies to provide the public with adequate notice of a proposed rulemaking followed by a meaningful opportunity to comment on the rule's content.[81]

Despite this APA standard for meaningful public participation, CEQ's rulemaking process is woefully deficient. Although CEQ provided 60 days for comment on the Advance Notice of Proposed Rulemaking, the Advance Notice was extremely vague and did not provide the public sufficient notice and opportunity to comment, at an early stage, on CEQ's sweeping revisions.

CEQ also truncated the public review of this Proposed Rule by providing only 60 days to comment on its significant and complex proposed changes and providing only two public hearings. The public hearings were so limited that several of the undersigned State Attorneys General's offices were unable to obtain tickets to speak at the public hearings. Those that were able to speak were limited to just three minutes.

---

[77] *See, e.g.,* 85 Fed. Reg. at 16,889–90.

[78] *See* 42 U.S.C. §§ 4370m–4370m-12; 85 Fed. Reg. at 1689 (explaining that FAST-41 "imports the concepts of lead and cooperating agencies, and the different levels of NEPA analysis" from the NEPA regulations and codified several other requirements from the existing CEQ regulations).

[79] 85 Fed. Reg. at 1684.

[80] *See Fox Television* Stations, 556 U.S. at 514–15 (changes in agency position must be based on reasoned explanation supported by the record and permissible under the statute); *State Farm*, 463 U.S. at 43 (1983) ("[T]he agency must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." (quotation omitted)).

[81] 5 U.S.C. § 553(b)–(c).

AR_0026207

Given the breadth of CEQ's Proposed Rule and the longstanding nature of current regulations, CEQ should have provided the states, tribes, and the public more time to analyze and comment on CEQ's proposed changes, particularly when CEQ received requests from states, members of Congress, a myriad of organizations, and countless members of the public for more time to adequately review and comment on this immense undertaking. The undersigned States therefore reassert their request that CEQ extend the public comment period by at least 90 days and provide additional public hearings nationwide. Without additional opportunity for public review, CEQ's rulemaking process will run afoul of the APA's notice and comment requirements.[82]

## C.    The Proposed Rule Would Undermine NEPA's Environmental Protection Goals in Violation of NEPA's Plain Language and Purpose

The Proposed Rule unlawfully seeks to shift NEPA's focus from detailed, action-forcing consideration of environmental impacts to an ineffectual box-checking exercise. In the preamble to the Proposed Rule, CEQ repeatedly emphasizes NEPA's procedural nature[83] and states that NEPA was not intended to elevate environmental concerns over other concerns.[84] By deemphasizing NEPA's significance as a fundamental environmental law, CEQ makes clear its purpose in revising the NEPA regulations: to reduce the substance and depth of NEPA's environmental review requirements in exchange for purported efficiency. Although CEQ claims the Proposed Rule will "modernize and clarify" its regulations,[85] in effect, the regulatory changes in the Proposed Rule would undermine significantly NEPA's plain language and purpose, run counter to NEPA's legislative history and court precedent, and are unreasonable.[86]

Two regulatory changes in particular highlight the Proposed Rule's efforts to vitiate NEPA's purposes. First, CEQ proposes to retitle and revise the opening provision of its regulations to state that NEPA "is a procedural statute intended to ensure Federal agencies consider the environmental impacts of their actions in the decision-making process."[87] This new language replaces existing language stating that NEPA is "action-forcing" and ensures "that federal agencies act according to the letter and spirit of the Act" and "achieve the substantive requirements of section 101."[88] Second, CEQ's Proposed Rule adds a new section 1502.16(a)(10) that would require discussion of "economic and technical considerations" along with environmental

---

[82] *See e.g.*, *Gerber v. Norton*, 294 F.3d 173, 179 (D.C. Cir. 2002); *Home Box Office, Inc. v. FCC*, 567 F.2d 9, 35–36 (D.C. Cir. 1977).

[83] 85 Fed. Reg. at 1685, 1686, 1688, 1693, 1698 n.62, 1712.

[84] *Id*. at 1686 (citing *Balt. Gas & Elec. Co.*, 462 U.S. at 97).

[85] *Id*. at 1685.

[86] Although the States oppose the Proposed Rule and urge its withdrawal, the States support a separate, limited rulemaking adding "Tribal" to the phrase "State and local" throughout the NEPA regulations to ensure that Tribal interests are appropriately represented in NEPA processes. *See,* 85 Fed. Reg. at 1692.

[87] 85 Fed. Reg. at 1693, 1712 (proposed 40 C.F.R. § 1500.1(a)).

[88] 40 C.F.R. § 1500.1(a).

AR_0026208

impacts.[89] These new provisions appear aimed solely at diluting the environmental analysis required by NEPA in contravention of the statute's essential purpose of environmental protection.

NEPA demands more than the Proposed Rule suggests. The plain language of NEPA recognizes the "critical importance of restoring and maintaining environmental quality to the overall welfare and development of [humans]."[90] Although Congress also recognized the need to fulfill the "social, economic, and other requirements of present and future generations ...,"[91] it intended for environmental impacts to be not merely considered, but also avoided or mitigated.[92] Thus, NEPA provides that the federal government should use "all practicable means" to "attain the widest range of beneficial uses of the environment *without degradation*, risk to health or safety, or other undesirable and unintended consequences."[93] While it is true that NEPA does not mandate specific substantive outcomes, its requirement that federal agencies consider and publicly disclose the environmental consequences of a proposed action (including actions that contribute to climate change) as well as alternatives to such action has practical and important significance and in fact yields decisions that better protect environmental resources.

NEPA's legislative history confirms Congress's intent to promote a policy of environmental protection. Congress developed NEPA at a time of heightened awareness and growing concern about the state of the environment, amid a series of high-profile environmental crises in the late 1960s.[94] Senator Henry Jackson (D-WA), then-Chairman of the Senate Committee on Interior and Insular Affairs, introduced the Act as a reaction to the "inadequacy of present knowledge, policies, and institutions" to the ecosystem damage resulting from human development and activities.[95] In Senate floor remarks, Senator Jackson pointed to a "new kind of revolutionary movement underway" that was "concerned with the integrity of man's life support system—the human environment" and involved, in particular, "the Nation's youth ... taking up the banner of environmental awareness."[96] He saw the bill as Congress' response to this

---

[89] *See* 85 Fed. Reg. at 1702, 1720 (Proposed 40 C.F.R. § 1502.16(a)(10)).

[90] 42 U.S.C. § 4331(a).

[91] *Id.*

[92] S. Rep. No. 91-296, at 5 (1969) (Report from Committee on Interior & Insular Affairs on National Environmental Policy Act of 1969) (a national environmental policy needed to avoid growing environmental problems); *id* at 13 ("[I]t is necessary to move ahead to define the 'environmental' desires of the American people in operational terms that the President, Government agencies at all levels, the courts, private enterprise, and the public can consider and act upon.").

[93] 42 U.S.C. § 4331(b) (emphasis added).

[94] *See* RICHARD F. WEINGROFF, ADDRESSING THE QUIET CRISIS: ORIGINS OF THE NATIONAL ENVIRONMENTAL POLICY ACT OF 1969, at 16–17 [hereinafter NEPA Origins], https://www.fhwa.dot.gov/highwayhistory/nepa/nepa.pdf (describing controversies such as a proposed airport development near Florida wetlands, pipeline construction to the North Slope of Alaska, the Santa Barbara oil spill in early 1969, and Cuyahoga River's latest fire in the summer of 1969).

[95] *Id.* at 18. *See* S. Rep. No. 91-296, at 4 (1969) (noting the Report constituted the "unanimous view of the members of the [Committee]").

[96] 115 Cong. Rec. 40,417 (1969) (statement of Senator Jackson).

AR_0026209

movement, with NEPA intended to ensure that all federal agencies consider the environmental impacts of their actions and "to the fullest extent possible … administer their existing laws, regulations, and policies in conformance with the policies" set forth in NEPA.[97]

The unanimous Senate Committee Report described the urgent need for NEPA because, at the time, "[e]nvironmental problems are only dealt with when they reach crisis proportions. Public desires and aspirations are seldom consulted. Important decisions concerning the use and the shape of [humans'] future environment continue to be made in small but steady increments which perpetuate rather than avoid the recognized mistakes of previous decades."[98] The House of Representatives Managers' statement in the Conference Report similarly recognized the need for a national environmental policy and for cooperation with State and local governments and other concerned public and private agencies in achieving that policy.[99] Contrary to the focus of the Proposed Rule, Congress never intended NEPA to be a means to facilitate speedier infrastructure project reviews by cutting analytical corners in considering project impacts.

Courts, too, have long acknowledged that NEPA's purpose and procedural requirements reach beyond a set of steps for agencies to follow; NEPA is not simply a box-checking exercise.[100] Rather, the Supreme Court has stated that NEPA is an "action-forcing" statute, ensuring that environmental concerns are "integrated into the very process of agency decision-making."[101] That is, NEPA was designed to force agencies to stop, consider the environmental impacts of their decisions, and potentially alter their decisions in a manner that would minimize harm to the environment.[102] Indeed the Supreme Court has recognized that the central purpose of section 102 of NEPA is to ensure that "environmental enhancement opportunities" are not lost and to help prevent "unnecessary degradation."[103]

_____

[97] *Id.*

[98] S. Rep. No. 91-296, at 5.

[99] H.R. Rep. No. 91-765, at 7-8 (1969).

[100] *See Kleppe*, 427 U.S. at 409 ("NEPA announced a national policy of environmental protection and placed a responsibility upon the Federal Government to further specific environmental goals by 'all practicable means, consistent with other essential considerations of national policy.'") (quoting 42 U.S.C. § 4331(b)).

[101] *Andrus*, 442 U.S. at 349–50. *See also* S. Rep. No. 91-296, at 9 ("[I]f goals and principles are to be effective, they must be capable of being applied in action. [The proposed NEPA bill] thus incorporates certain "action-forcing" provisions and procedures which are designed to assure that all Federal agencies plan and work toward meeting the challenge of a better environment.").

[102] *See Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin.*, 538 F.3d 1172, 1214–15 (9th Cir. 2008) ("The procedures included in [section] 102 of NEPA are not ends in themselves. They are intended to be 'action forcing.' The unequivocal intent of NEPA is to require agencies to consider and give effect to the environmental goals set forth in the Act, not just to file detailed impact studies which fill government archives.") (quoting *Envtl. Def. Fund, Inc. v. Corps of Eng'rs of the U.S. Army*, 470 F.2d 289, 298 (8th Cir. 1972). *See also Citizens Against Burlington, Inc. v. Busey*, 938 F.2d 190, 193–94 (D.C. Cir. 1991) ("NEPA commands agencies to imbue their decisionmaking, through the use of certain procedures, with our country's commitment to environmental salubrity.").

[103] *Andrus*, 442 U.S. at 351 (quoting S. Rep. No. 91-296).

AR_0026210

In the preamble, CEQ attempts to minimize NEPA's "action-forcing" purpose, focusing solely on NEPA as "a procedural statute."[104] While NEPA does not mandate "particular substantive results in particular problematic instances,"[105] it nevertheless encourages thoughtful and careful agency decision making that avoids environmental harms.[106] Although courts have emphasized the procedural nature of the statute, ample history suggests that Congress intended the Act to have substantive effect—once agencies reviewed impacts of a proposed action and evaluated alternatives, they would then follow the policy of acknowledging the importance of environmental protection as being as important as other values.[107] CEQ's proposed revision of paragraph (a) in section 1500.1 to excise "action-forcing"[108] is thus contrary to NEPA's purpose and long-settled judicial precedent.

## D.    The Proposed Rule Would Improperly Limit NEPA's Application to Federal Actions

CEQ's Proposed Rule seeks to unlawfully and unreasonably narrow NEPA's application and scope in four key ways. First, the Proposed Rule proposes a new "threshold applicability analysis" that would create a class of federal actions that evade NEPA review. Second, the Proposed Rule would improperly limit the use of detailed environmental reviews by redefining what qualifies as a "significant" effect on the environment. Third, the Proposed Rule would improperly expand the use of categorical exclusions, thwarting NEPA's environmental stewardship goals. Fourth, the Proposed Rule threatens to allow agencies to irreversibly commit resources prior to completion of NEPA review.

### 1.    CEQ Proposes a New "Threshold Applicability Analysis" that Would Unlawfully Limit NEPA's Application

NEPA's purposes can only be achieved through its rigorous application. CEQ's Proposed Rule, however, threatens to sideline NEPA by imposing a new "threshold applicability analysis" for determining whether NEPA applies to a particular project that employs a narrower definition of "major Federal action," significantly expands the "functional equivalency" concept, and invites federal agencies to avoid NEPA review by construing other statutory directives to conflict with

---

[104] 85 Fed. Reg. at 1693.

[105] Lazarus, *supra* note 30, at 1517 (quoting *Calvert Cliffs' Coordinating Comm., Inc. v. U.S. Atomic Energy Comm'n*, 449 F.2d 1109, 1112 (D.C. Cir. 1971)).

[106] *See* S. Rep. No. 91-296, at 8; *see Kleppe*, 427 U.S. at 409 & n.18 (noting the "action-forcing" intent of NEPA section 102(2)(C) as expressed throughout its legislative history).

[107] *See* S. Rep. No. 91-296, at 9 (NEPA intended to provide a "mandate" to guide federal agencies' actions and ensure federal agencies work toward better environment); *see id.* at 5 (NEPA intended to provide comprehensive policy on environmental management to respond to need to "reorder national goals and priorities" to deal with environmental degradation); *see also, e.g.,* Sam Kalen, *Ecology Comes of Age: NEPA's Lost Mandate*, 21 DUKE ENVT'L L. & POLICY F. 113 (2010), https://scholarship.law.duke.edu/cgi/viewcontent.cgi?article=1040&context=delpf (providing extensive review of events leading up the NEPA's passage and congressional intent at the time).

[108] 85 Fed. Reg. at 1693, 1712 (proposed 40 C.F.R. § 1500.1).

AR_0026211

NEPA.[109] Each of these proposed changes threatens to exclude certain federal actions from NEPA review in violation of the spirit and letter of NEPA. Moreover, CEQ has failed to provide a rational justification for these changes in violation of the APA.[110]

CEQ's proposed threshold applicability analysis would direct federal agencies to consider five factors to determine whether to apply NEPA. These factors would require agencies to consider whether a project is:

(1) a "major Federal action," under CEQ's new definition;[111]

(2) a "non-discretionary action for which the agency lacks authority to consider environmental effects as part of its decision-making process;"

(3) an "action for which compliance with NEPA would clearly and fundamentally conflict with the requirements of another statute;"

(4) an action for which compliance with NEPA "would be inconsistent with Congressional intent due to the requirements of another statute;" and

(5) "an action for which the agency has determined that the analyses or processes under other statutes serve the function of agency compliance with NEPA."[112]

This new threshold inquiry would provide several avenues for federal agencies to make an end run around environmental review in violation of NEPA.[113]

### a.    CEQ's Proposed Redefinition of "Major Federal Action" Is Unlawful

As noted above, Congress specifically directed federal agencies to apply NEPA "to the fullest extent possible" by utilizing "a systematic, interdisciplinary approach" to integrate science in decision making that may have an impact on the human environment and to ensure that "environmental amenities and values" are given appropriate consideration in decision making.[114]

---

[109] *Id.* at 1695, 1714 (Proposed 40 C.F.R. § 1501.1).

[110] *State Farm*, 463 U.S. at 43.

[111] 85 Fed. Reg. at 1708–09, 1714, 1729 (proposed 40 C.F.R. 1501.1(a)(1); §§ 1508.1(q)).

[112] 85 Fed. Reg. at 1695, 1714 (proposed 40 C.F.R. § 1501.1). *See also id.* at 1728 (proposed 40 C.F.R. § 1507.3(c)); (indicating that agencies can develop agency-specific NEPA regulations that outline how they will apply the threshold applicability analysis).

[113] CEQ also should not adopt its proposed regulation at § 1507.3(b)(6), which directs agencies that they may include in their own NEPA regulations procedures for identifying actions not subject to NEPA. *See* 85 Fed. Reg. at 1727–28.

[114] 42 U.S.C. § 4332. S*ee also Flint Ridge Dev. Co. v. Scenic Rivers Ass'n of Okla.*, 426 U.S. 776, 787 (1976) (explaining that Congress's directive that NEPA apply "to the fullest extent possible" "is neither accidental nor

24

Contrary to that clear instruction, CEQ proposes redefining "major federal action"[115] to exclude a number of federal actions from *any* NEPA review.

In particular, CEQ proposes to eliminate its longstanding interpretation that "[m]ajor reinforces but does not have a meaning independent of significantly,"[116] and to add new language that will limit "major Federal actions" to those "subject to Federal control and responsibility with effects that may be significant."[117] In effect, and as CEQ acknowledges, its proposed definition would direct federal agencies to consider the degree of federal control in determining whether an action is a "major Federal action" rather than to consider the environmental significance of a proposed federal action—a substantial shift from CEQ's current regulations.[118] By changing the focus from environmental impacts to the level of federal control exercised over an action, CEQ proposes to shift the emphasis away from environmental harms at the critical stage of determining whether NEPA applies at all.

Moreover, CEQ's proposed changes would inject vagueness and confusion into the inquiry of whether federal or state agencies must apply NEPA review to certain projects. For example, the Proposed Rule threatens to upend a robust body of case law interpreting when NEPA applies to federally funded projects[119] by directing that "major Federal actions" do not include projects receiving federal financial assistance "where the Federal agency does not exercise sufficient control and responsibility over the effects of the action."[120] Notably, CEQ does not define what constitutes "sufficient control and responsibility." So, agencies and courts would have to determine whether existing case law holding that NEPA applies even when there is only some "indicia of control over the private [or state] actors by the federal agency"[121] still stands under this new regulatory regime.

CEQ also fails to provide a rational explanation for changing its definition of major federal action, rendering the proposed changes unlawful.[122] CEQ claims that its prior approach failed to

---

hyperbolic" but is instead "a deliberate command that the duty NEPA imposes upon the agencies to consider environmental factors not be shunted aside in the bureaucratic shuffle").

[115] 40 C.F.R. § 1508.18 (Major federal action).

[116] 85 Fed. Reg. at 1708–09. *Compare id.* at 1729 (proposed 40 C.F.R. § 1508.1(q)), *with* 40 C.F.R. § 1508.18.

[117] 85 Fed. Reg. at 1729 (proposed 40 C.F.R. § 1508.1(q)).

[118] 85 Fed. Reg. at 1709.

[119] *See* DANIEL R. MANDELKER, NEPA LAW AND LITIGATION, § 8:19 (2d ed. 2016) (reviewing cases addressing NEPA's application to projects subject to federal permits, approvals, and control).

[120] 85 Fed. Reg. at 1729 (proposed 40 C.F.R. § 1508.1(q)(1)).

[121] *See Mayaguezanos por la Salud y el Ambiente v. United States*, 198 F.3d 297, 302 (1st Cir. 1999) (reviewing case law from different circuit courts of appeal on the issue of how to determine whether a situation constitutes a major federal action under NEPA).

[122] *State Farm*, 463 U.S. at 43.

AR_0026213

give meaning to all words in the statute.[123] But CEQ's proposed approach unreasonably conflates "major" and "federal" by unlawfully shifting the focus of NEPA's application from a project's environmental significance to "Federal control and responsibility."[124] This change would allow a purportedly minor federal action with a significant impact on the environment and potential environmental justice implications to go without NEPA review. Such an interpretation unlawfully separates "the consideration of the magnitude of federal action from its impact on the environment" and "does little to foster the purposes of [NEPA], i.e., to 'attain the widest range of beneficial uses of the environment without degradation, risk to health and safety, or other undesirable and unintended consequences.'"[125] Moreover, CEQ's reliance on the legislative history of NEPA ignores the statute's plain direction to apply NEPA expansively[126] and overlooks other parts of the same Senate Report indicating that, unlike "major" and "federal," the terms "major" and "significant" were indeed used interchangeably in the statute.[127]

> **b.**     **CEQ's Expansion of Functional Equivalency Violates NEPA and the APA**

CEQ's proposed threshold applicability analysis also would unlawfully and significantly expand the concept of "functional equivalency," providing another avenue for federal agencies to avoid NEPA review in contravention of the Congressional mandate to apply NEPA broadly.[128]

Specifically, CEQ's Proposed Rule would allow agencies to designate other "analyses or processes" to serve as the functional equivalent of NEPA review if those other analyses or procedures have (1) "substantive and procedural standards that ensure full and adequate consideration of environmental issues," (2) "public participation before a final alternative is selected," and (3) a purpose "to examine environmental issues."[129] For rulemakings, the Proposed Rule, if enacted, would provide that "analyses prepared pursuant to other statutory or Executive [O]rder requirements may serve as the functional equivalent of the EIS" if the above-listed factors are met.[130]

CEQ's proposed expansion of functional equivalency threatens to allow agencies to make an end run around the NEPA process by relying on analyses or procedures that do not require the

---

[123] 85 Fed. Reg. at 1709.

[124] *Id.* at 1708.

[125] *Minn. Pub. Interest Research Grp. v. Butz*, 498 F.2d 1314, 1322 (8th Cir. 1974) (quoting 42 U.S.C. § 4331(b)(3)).

[126] 42 U.S.C. § 4332.

[127] *See* S. Rep. No. 91-296, at 30 (1969) (deleting the term "significant" and adding the term "major" before Federal actions and "significantly" before "affecting the quality of the human environment").

[128] 42 U.S.C. § 4332; 85 Fed. Reg. at 1695, 1727–28 (proposed 40 C.F.R. §§ 1501.1, 1509.6(b), 1507.3(b)(6)).

[129] 85 Fed. Reg. at 1727–28 (proposed 40 C.F.R. § 1507.3(b)(6)).

[130] *Id.* at 1726 (proposed 40 C.F.R. § 1506.9).

AR_0026214

same degree of environmental analysis or public participation as NEPA. Although federal courts recognize functional equivalency, they tend to apply the concept narrowly[131] and have most often applied "functional equivalency" to the Environmental Protection Agency, an agency with a mission of protecting human and environmental health and numerous statutory charges to fully evaluate environmental harms.[132] In contrast to that narrow application of the functional equivalency exemption, CEQ's Proposed Rule would extend the concept of functional equivalency to all "other agencies,"[133] potentially allowing them to avoid NEPA review if they determine that they meet the vague and general factors in the Proposed Rule.[134] Such a broad application of functional equivalency would run afoul of NEPA's mandate that NEPA be applied "to the fullest extent possible"[135] and threatens to allow federal agencies to avoid reviewing a project's broad environmental impacts by finding functional equivalency in statutes that mandate a much more narrow scope of environmental review.

Seeking to extend functional equivalency even further, CEQ also proposes to add a regulatory provision indicating that "analyses prepared pursuant to other statutory or Executive [O]rder requirements may serve as the functional equivalent of the EIS and be sufficient to comply with NEPA."[136] As an example of a potentially "functionally equivalent" process, CEQ cites the regulatory impact analysis (RIA) required by Executive Order 12866, which directs federal agencies to prepare an economic assessment of the costs and benefits of a proposed action.[137] The example proves the problem. RIAs are a poor substitute for NEPA because they are designed to evaluate the economic costs and benefits of a proposed rulemaking and thus do not have a primary focus on detailed environmental review. [138] In addition, RIAs do not provide a sufficient opportunity for the public or states to review and weigh in on the environmental impacts associated

---

[131] *See, e.g.*, *Portland Cement Ass'n v. Ruckelshaus*, 486 F.2d 375, 384-85, 387 (D.C. Cir. 1973) (concluding that "section 111 of the Clean Air Act, properly construed, requires the functional equivalent of a NEPA impact statement," and allowing a narrow exemption from NEPA); *Fund For Animals v. Hall*, 448 F. Supp. 2d 127, 134 (D.D.C. 2006) (rejecting Fish and Wildlife Service's argument that the Migratory Bird Hunting Frameworks or the Endangered Species Act's section 7 consultation process are the functional equivalent of NEPA's environmental review process).

[132] *See Merrell v. Thomas*, 807 F.2d 776, 781 (9th Cir. 1986) (reviewing cases applying functional equivalency to EPA procedures). *See also Tex. Comm. on Nat. Res. v. Bergland*, 573 F.2d 201, 208 (5th Cir. 1978) (refusing to apply functional equivalency to the Forest Service because its duties include balancing "environmental and economic needs in managing the nation's timber supply").

[133] 85 Fed. Reg. at 1707.

[134] *Id.* at 1727 (proposed 40 C.F.R. § 1507.3(b)(6)).

[135] 42 U.S.C. § 4332.

[136] 85 Fed. Reg. at 1726 (proposed 40 C.F.R. § 1506.9).

[137] *Id.* at 1705. *See also* Exec. Order No. 12866, 58 Fed. Reg. 51,735 (Sept. 30, 1993).

[138] *See generally*, Office of Mgmt. and Budget, Circular A-4 (Sept. 17, 2003), https://obamawhitehouse.archives.gov/omb/circulars_a004_a-4. *See also id.* at 44 (directing agencies to "complete NEPA documentation before issuing a final rule").

AR_0026215

with an action.[139] Agency use of RIAs, even when combined with other analyses, lacks the comprehensive review of an action's environmental impacts demanded by NEPA.[140] Other similar analyses which either fail to focus on environmental impacts or provide adequate public input will likely suffer from the same flaws.

CEQ did not and cannot rationally support expanding the use of functional equivalency to avoid NEPA review. CEQ does not cite any case law or provide any rationale to support its broad expansion of functional equivalency to all federal agencies.[141] CEQ also provides sparse direction on how the functional equivalency concept should be applied under the Proposed Rule, relying instead on vague terms that could potentially allow expansive application of this concept.[142] Moreover, although CEQ contends that its regulatory revisions will "promote efficiency and reduce duplication in the assessment of regulatory proposals,"[143] CEQ fails to explain how the revised regulations will promote such efficiency and also serve NEPA's fundamental purpose of ensuring careful review of environmental impacts.[144]

For the same reasons, CEQ should not add additional regulatory changes identifying specific agency analyses that CEQ claims are the functional equivalent of the NEPA process.[145]

### c.  CEQ's Other Threshold Applicability Analysis Factors Would Further Limit NEPA's Application and Lack Rational Support

CEQ's proposed threshold applicability analysis also would provide new avenues for federal agencies to escape NEPA review by determining that the proposed action: (a) "in whole or in part, is a non-discretionary action for which the agency lacks authority to consider environmental effects as part of its decision-making process"; (b) "is an action for which compliance with NEPA would clearly and fundamentally conflict with the requirements of another statute"; or (c) "is an action for which compliance with NEPA would be inconsistent with Congressional intent due to the requirements of another statute."[146]

These new threshold factors threaten to give federal agencies unwarranted discretion to avoid NEPA review, again in violation of NEPA's admonition that federal agencies must comply

---

[139] *See generally*, *id.*

[140] *See United States v. Coal. for Buzzards Bay*, 644 F.3d 26, 37-38 (1st Cir. 2011) (rejecting Coast Guard argument that a rulemaking process was the functional equivalent of a NEPA review, since the rulemaking process contained no "substantial environmental analysis.").

[141] 85 Fed. Reg. at 1695, 1706–07.

[142] *See id.* at 1695, 1705, 1706–07.

[143] *Id.* at 1705.

[144] 42 U.S.C. § 4332.

[145] 85 Fed. Reg. at 1705.

[146] *Id.* at 1714.

AR_0026216

with NEPA "to the fullest extent possible."[147] As the Ninth Circuit has explained, Congress included that statutory language to prevent agencies from "attempt[ing] to avoid any compliance with NEPA by narrowly construing other statutory directives to create a conflict with NEPA."[148] Despite this clear statutory language, CEQ's proposed NEPA applicability factors seem designed for agencies to do just what Congress sought to prevent and indeed purport to authorize agencies to broadly construe Congressional intent and statutory language directly to avoid NEPA review.

Moreover, CEQ's proposed threshold factors conflict with the general rule of statutory interpretation that "repeals by implication are not favored."[149] By allowing agencies to determine whether an action conflicts with the requirements of another statute or with congressional intent, CEQ's Proposed Rule purports to allow agencies to infer congressional intent to repeal NEPA's application to specific projects. Just like the courts, agencies "are not at liberty to pick and choose among congressional enactments" but instead have the duty, "absent a clearly expressed congressional intention to the contrary, to regard each [statute] as effective."[150]

CEQ does not rationally support these new factors for determining whether NEPA applies to federal agency actions.[151] Notably, CEQ again provides no citations to support its contention that "courts have found that NEPA is inapplicable where an agency is carrying out a non-discretionary duty or obligation, where an agency's statutory obligation clearly or fundamentally conflict with NEPA compliance, [and] where Congress has established requirements under another statute that displaces NEPA compliance."[152] CEQ does not provide guidance on how to interpret or apply the scope of these factors consistent with the case law. CEQ's only justification for adding this new provision is to "assist agencies" in determining whether NEPA applies to a particular action.[153] Far from accomplishing that purpose, CEQ's vague threshold factors will create confusion and inject significant uncertainty into the NEPA process. This uncertainty threatens to limit NEPA's application to projects requiring environmental review, reduce transparency, and increase the potential for litigation.

---

[147] 42 U.S.C. § 4332.

[148] *Ctr. for Biological Diversity*, 538 F.3d at 1213 (quoting *Forelaws on Board v. Johnson*, 743 F.2d 677, 683 (9th Cir. 1985)).

[149] *Morton v. Mancari*, 417 U.S. 535, 549 (1974) (quoting *Posadas v. Nat'l City Bank*, 296 U.S. 497, 503 (1936)). *See also Nat'l Ass'n of Homebuilders v. Def. of Wildlife*, 551 U.S. 644, 662–64 (2007) (refusing to find later enacted statute implicitly revealed earlier enacted statute).

[150] *Morton*, 417 U.S. at 551.

[151] *State Farm*, 463 U.S. at 43.

[152] 85 Fed. Reg. at 1695.

[153] *Id.*

AR_0026217

#### d.    CEQ Should Not Adopt Other Limits on NEPA's Scope

CEQ also should not further amend "major federal action" or add regulatory changes that would exclude other categories of actions.[154] In particular, for the reasons stated above, CEQ should not make changes to the regulatory language to further limit NEPA's application to projects with federal funding or address what CEQ deems the "small handle problem," which refers to situations where federal action is only a part of a nonfederal project.[155] Nor should CEQ establish a threshold for minimal Federal funding or designate certain types of financial interests as excluded from NEPA review.[156] Any project with a federal nexus should require federal environmental review, even if that federal nexus is based on minimal federal funding or involvement. Failure to conduct NEPA review for such projects would result in less transparent and less informed decision making. For those states with their own environmental review processes, federal agencies' failure to conduct environmental review would shift the burden to states to perform that review. For those states without their own environmental review processes, no environmental review would occur prior to federal agency action affecting the human environment.

CEQ also should not adopt regulations addressing NEPA's application to extraterritorial environmental impacts.[157] CEQ's request for comment on whether regulations should clarify NEPA's extraterritorial application is vague and fails to address case law holding that the presumption against extraterritoriality does not apply to federal agency actions that have a significant environmental effect, regardless of whether that effect occurs within U.S. borders.[158] Nor is it clear whether CEQ's proposal would address transboundary impacts of major federal actions. As CEQ's current guidance on transboundary impacts notes, "the entire body of NEPA law directs federal agencies to analyze the effects of proposed actions to the extent they are reasonably foreseeable consequences of the proposed action, regardless of where those impacts might occur."[159] CEQ should not adopt any regulatory language inconsistent with this case law or its current guidance.

---

[154] *Id.* at 1709.

[155] *Id.*

[156] *Id.*

[157] *See id.*

[158] *See Envtl. Def. Fund v. Massey*, 986 F.2d 528, 536 (D.C. Cir. 1993). *See also Nat. Res. Def. Council Inc. v. U.S. Dep't of Navy*, No. CV-01-07781 CAS (RZX), 2002 WL 32095131, at *10–11 (C.D. Cal. Sept. 17, 2002) (declining to apply the presumption against extraterritoriality as a bar to the application of NEPA to Navy activities where NEPA's application would not be inconsistent with U.S. foreign policy).

[159] CEQ, MEMORANDUM TO THE HEADS OF AGENCIES ON THE APPLICATION OF NEPA TO PROPOSED FEDERAL ACTIONS IN THE UNITED STATES WITH TRANSBOUNDARY EFFECTS, at 2 (July 1, 1997), https://ceq.doe.gov/docs/ceq-regulations-and-guidance/memorandum-transboundary-impacts-070197.pdf.

AR_0026218

2.    **CEQ's Proposed Definition of "Significance" Improperly Limits Environmental Review**

CEQ's proposed changes to the definition of significance would create an unlawful mechanism for agencies to avoid detailed NEPA review by making fewer significance determinations.

In particular, the Proposed Rule would eliminate the existing definition of "significantly" and replaces it with a new, vague provision for determining the appropriate level of NEPA review.[160] Existing CEQ regulations require agencies to consider both an action's "context" and "intensity" to determine whether an action may "significantly" affect the environment.[161] The "context" component requires agencies to analyze the significance of an action "in several contexts such as society as a whole (human, national), the affected region, the affected interests, and the locality," which may vary depending on the setting of the proposed action.[162] The "intensity" component requires federal agencies to consider ten factors, including a project's beneficial and adverse effects, its impacts to public health or safety, whether the action "is related to other actions with individually insignificant but cumulatively significant impacts," and the degree to which the action may adversely affect endangered or threatened species or their habitat.[163]

In contrast, CEQ's new definition of "significantly" would direct agencies to assess the appropriate level of NEPA review by analyzing "the potentially affected environment," which replaces the current consideration of "context," and the "degree of the effects of the action," which replaces the current consideration of "intensity."[164] To determine "the potentially affected environment," the Proposed Rule would provide that agencies "*may* consider, as appropriate, the affected area" and may limit this review to the effects in the "locale."[165] To determine "the degree of the effects" of the action, the Proposed Rule would direct agencies to consider (i) that effects may be beneficial or adverse, (ii) effects to public health and safety, and (iii) whether there are effects that would violate Federal, State, Tribal, or local law protecting the environment.[166]

These changes would substantially and unlawfully diminish the scope of "significant" effects. CEQ's new regulations unlawfully exclude consideration of cumulative effects when determining a project's significance. Specifically, CEQ's Proposed Rule would eliminate consideration of whether the proposed action "is related to other actions with individually

---

[160] *See* 85 Fed. Reg. at 1714–15 (proposed 40 C.F.R. § 1501.3(b)).

[161] 40 C.F.R. § 1508.27; *Ctr. for Biological Diversity*, 538 F.3d at 1185–86.

[162] 40 C.F.R. § 1508.27(a).

[163] *Id*. § 1508.27(b).

[164] 85 Fed. Reg. at 1695, 1714 (proposed 40 C.F.R. § 1501.3(b)).

[165] *Id*. at 1714 (proposed 40 C.F.R. § 1501.3(b)(1)) (emphasis added).

[166] *Id*. at 1714–15 (proposed 40 C.F.R. § 1501.3(b)(2)).

AR_0026219

insignificant but cumulatively significant impacts."[167] As discussed in more detail below, section IV.F, *infra*, eliminating consideration of cumulative effects threatens to drastically undermine NEPA's purpose.

Moreover, the Proposed Rule would eliminate, without explanation, consideration of whether an action "may adversely affect" a species listed as threatened or endangered under the Endangered Species Act in determining the significance of an action.[168] Eliminating consideration of impacts to these species in the significance determination is inconsistent with NEPA's core aims of ensuring informed decision making and detailed consideration of environmental impacts. It is also inconsistent with NEPA's legislative history, which explains the need to counteract "the decline and extinction of fish and wildlife species" as a reason for passing NEPA.[169] Since the result will be contrary to CEQ's stated rationale and runs directly counter to both a long-standing agency interpretation and a well-developed body of case law, CEQ's proposed change is arbitrary and capricious.

The Proposed Rule also would remove language stating that "significance cannot be avoided by terming an action temporary or breaking it down into small component parts."[170] Courts have long held that agencies may not avoid meaningful NEPA review by improperly segmenting a project.[171] CEQ attempts to justify this change by stating that other provisions, namely proposed 40 C.F.R. §§ 1501.9(e) and 1502.4(a), "provide that agencies evaluate in a single EIS proposals or parts of proposals that are related closely enough to be, in effect, a single course of action."[172] But those provisions only govern what agencies should do *after* they have made the initial determination of what level of environmental review to conduct.[173] CEQ's Proposed Rule thus threatens to allow federal agencies to determine that a more limited environmental review

---

[167] *Compare* 85 Fed. Reg. at 1714 (proposed 40 C.F.R. § 1501.3), *with* 40 C.F.R. § 1508.27(b)(7).

[168] *Compare* 85 Fed. Reg. at 1714–15 (proposed 40 C.F.R. § 1501.3), *with* 40 C.F.R. § 1508.27(b)(9).

[169] S. Rep. No. 91-296, at 4.

[170] *Compare* 85 Fed. Reg. at 1695, 1714 (proposed 40 C.F.R. § 1501.3), *with* 40 C.F.R. § 1508.27(7).

[171] *See Pres. Endangered Areas of Cobb's History, Inc. v. U.S. Army Corps of Eng'rs*, 87 F.3d 1242, 1247 (11th Cir. 1996) (agency "cannot 'evade [its] responsibilities' under the National Environmental Policy Act by 'artificially dividing a major federal action into smaller components, each without a 'significant' impact.'" (quoting *Coal. on Sensible Transp., Inc. v. Dole*, 826 F.2d 60, 68 (D.C.Cir.1987)); *Ross v. Fed. Highway Admin.*, 162 F.3d 1046, 1052 (10th Cir. 1998) ("[S]tates may not avoid NEPA's requirements by withdrawing a segment of a project from federal funding.") (citing *San Antonio Conservation Society v. Texas Highway Dept.*, 446 F.2d 1013, 1027 (1971) (state cannot circumvent federal laws by constructing segment of federal highway project with state funding)); *Scottsdale Mall v. State of Indiana*, 549 F.2d 484, 489 (7th Cir.1977) (withdrawal of federal funding from a segment of a "major federal action" does not relieve state of NEPA compliance; *Indian Lookout All. v. Volpe*, 484 F.2d 11, 18 (8th Cir. 1973) (collecting cases).

[172] 85 Fed. Reg. at 1695.

[173] *See id.* at 1716 (stating that 40 C.F.R. § 1501.9 applies "to determine the scope of issues for analysis in an environmental impact statement"); *id.* at 1718 (stating that 40 C.F.R. § 1502.4 governs review of major federal actions "requiring the preparation of environmental impact statements").

AR_0026220

process applies without ever reaching the critical question of whether the proposed action is being improperly segmented or defined as temporary at the initial stage. Such a determination could run afoul of NEPA's basic requirement that an EIS must be prepared for projects with significant environmental impacts and should not be improperly segmented to avoid detailed review.[174]

In violation of the APA, CEQ fails adequately to justify these proposed changes.[175] CEQ contends that the changes are needed because the revisions are necessary to provide direction and clarity.[176] Yet, instead of adding clarity to the decisional framework, CEQ's new definitions would inject vagueness and confusion into the NEPA process by removing key considerations from the analysis of whether a proposed action may significantly affect the environment. For example, the Proposed Rule would provide that agencies "*may*" consider the area affected by a project replacing previous direction that agencies "*must*" analyze the significance of an action in several contexts, including society as a whole, the affected region, the affected interests, and the locality.[177] It is thus unclear what affected area agencies would consider under the Proposed Rule. Moreover, to the extent CEQ's definition would permit assessment of only local effects, agencies would altogether miss any far-reaching, potentially serious environmental impacts, including environmental justice impacts, and thus run afoul of NEPA's core mandates. CEQ cannot adopt regulations that so dilute and obscure the significance framework, which CEQ acknowledges "is central to determining the appropriate level of review" under NEPA.[178]

### 3.    CEQ's Proposed Rule Would Improperly Expand the Use of Categorical Exclusions

CEQ's Proposed Rule would substantially expand the application and scope of categorical exclusions, threatening to turn this useful tool for streamlining the NEPA process[179] into a mechanism for undermining NEPA's goals. As CEQ has previously explained, "[i]f used inappropriately, categorical exclusions can thwart NEPA's environmental stewardship goals, by compromising the quality and transparency of agency environmental review and decisionmaking, as well as compromising the opportunity for meaningful public participation and review."[180] CEQ's Proposed Rule violates NEPA and lacks rational support.

---

[174] 42 U.S.C. § 4332; *Pres. Endangered Areas of Cobb's History, Inc.*, 87 F.3d at 1247.

[175] *State Farm*, 463 U.S. at 43.

[176] 85 Fed. Reg. at 1695.

[177] *Compare* 40 C.F.R. § 1508.27(a) (emphasis added), *with* CEQ Proposed Rule, 85 Fed. Reg. at 1714 (emphasis added).

[178] 85 Fed. Reg. at 1695.

[179] *Id.* at 1695–96 (noting that Federal agencies have developed and documented more than 2,000 categorical exclusions over the past 40 years and that federal agencies apply categorical exclusions to approximately 100,000 federal agency actions annually).

[180] CEQ, MEMORANDUM FOR HEADS OF FEDERAL DEPARTMENTS AND AGENCIES: ESTABLISHING, APPLYING, AND REVISING CATEGORICAL EXCLUSIONS UNDER THE NATIONAL ENVIRONMENTAL POLICY ACT, at 3 (Nov. 23, 2010)

a.    **CEQ's Proposed Rule Would Unlawfully Expand the Definition of Categorical Exclusions**

The Proposed Rule would unlawfully and unreasonably expand the definition of categorical exclusions. Specifically, the Proposed Rule would alter the existing requirement that agencies determine that categorically excluded actions "do not have an individually or cumulatively significant effect on the human environment" by inserting "normally" and eliminating "individually or cumulatively." [181]

As discussed in section IV.F, *infra*, CEQ's Proposed Rule would remove cumulative impacts from NEPA analysis in conflict with NEPA's text and purpose and decades of case law recognizing that cumulative impacts are a critical component of NEPA review. Removing consideration of cumulative impacts when determining whether to apply a categorical exclusion magnifies this legal deficiency by potentially directing agencies to unlawfully avoid environmental review despite the existence of cumulative significant environmental impacts. [182]

CEQ has not rationally justified this proposed change. Indeed, CEQ's sole justification for removing the phrase "individually or cumulatively" is to create "consistency with the proposed revision to the definition of 'effects.'" [183] But that flimsy rationale fails, because, as discussed in section IV.F, *infra*, CEQ's revisions to the "effects" definition are arbitrary and capricious and violate NEPA and the APA.

In addition, CEQ's proposed insertion of "normally" threatens to broaden the scope of categorical exclusions adopted by agencies and, given the vagueness of the term, add confusion. [184] CEQ states that it is adding "normally" "to clarify that there may be situations where an action may have significant effects on account of extraordinary circumstances." [185] But CEQ provides no guidance on how agencies should define "normally" or otherwise determine which actions "normally do not have a significant effect on the human environment." [186] Nor does CEQ provide a relevant time period for applying this new term, which is particularly concerning given that

---

[hereinafter Categorical Exclusions Memorandum], https://ceq.doe.gov/docs/ceq-regulations-and-guidance/NEPA_CE_Guidance_Nov232010.pdf. *See also* 42 U.S.C. § 4332(2)(C); *Sierra Club v. Bosworth*, 510 F.3d 1016, 1027 (9th Cir. 2007) (to use categorical exclusions federal agencies "must document that the action to be undertaken is insignificant because the threshold question in a NEPA case is whether a proposed project will significantly affect the environment, thereby triggering the requirement for an EIS" quotation and citation omitted)).

[181] *Compare* 40 C.F.R. § 1508.4 *with* 85 Fed. Reg. at 1713 (proposed 40 C.F.R. § 1500.4(a) and § 1500.5); 1715 (proposed 40 C.F.R. § 1501.4), 1728 (proposed 40 C.F.R. § 1508.1(d)).

[182] 42 U.S.C. § 4332(C).

[183] 85 Fed. Reg. at 1707.

[184] *State Farm*, 463 U.S. at 43.

[185] 85 Fed. Reg. at 1707.

[186] *Id.* at 1728 (proposed 40 C.F.R. § 1508.1(d)).

34

CEQ's current guidance on categorical exclusions—which cites the *Deepwater Horizon* disaster as an example—advises that "assumptions underlying the nature and impact of activities encompassed by categorical exclusions have changed over time."[187] As CEQ previously noted in its report on the Deepwater Horizon explosion which killed 11 crew members and caused extensive environmental harm, the permitting agency had relied on categorical exclusions established in the 1980s to approve British Petroleum's initial and revised exploration plans for the Macondo well.[188] CEQ's proposed change thus threatens to greatly expand the scope of categorical exclusions adopted by agencies, potentially allowing categorical exclusions for actions with significant effects in violation of NEPA.[189]

### b.    CEQ's Proposed Revisions Would Expand Categorical Exclusions by Allowing Agencies to Mitigate Extraordinary Circumstances

CEQ's Proposed Rule would allow agencies to apply a categorical exclusion if an agency mitigates extraordinary circumstances.[190] This proposal would undermine NEPA's requirement that agencies review the environmental impacts of proposed actions with significant environmental impacts.[191] Extraordinary circumstances are circumstances in which "a normally excluded action may have a significant environmental effect," and have typically included factors similar to those used to evaluate "intensity" in the current significance determination, such as the potential for effects on protected species or habitat or on historic properties.[192] Under CEQ's proposal, the "mere presence of extraordinary circumstances" would no longer preclude application of a categorical exclusion.[193]

CEQ's proposal would inject uncertainty into the NEPA process. In the preamble, CEQ asserts that in making this determination "the agency may consider whether there is a close causal relationship between a proposed action and the potential effect on the conditions identified as extraordinary circumstances," and whether the action can be modified to avoid such circumstances.[194] As with its changes to the effects determination discussed *infra*, section IV.F,

---

[187] Categorical Exclusion Memorandum, *supra* note 180, at 16.

[188] CEQ, REPORT REGARDING THE MINERAL MANAGEMENT SERVICE'S NEPA POLICIES, PRACTICES, AND PROCEDURES AS THEY RELATE TO OUTER CONTINENTAL SHELF OIL AND GAS EXPLORATION, at 15, 18–20 (Aug. 16, 2010) https://www.doi.gov/sites/doi.gov/files/migrated/news/pressreleases/upload/CEQ-Report-Reviewing-MMS-OCS-NEPA-Implementation.pdf.

[189] *See* 42 U.S.C. § 4332(2)(C).

[190] 85 Fed. Reg. at 1715 (proposed 40 C.F.R. § 1501.4).

[191] 42 U.S.C. § 4332(2)(C).

[192] 40 C.F.R. § 1508.4, 1508.27(b).

[193] 85 Fed. Reg. at 1696.

[194] *Id.*

AR_0026223

CEQ provides no reasonable explanation for its use of this "close causal relationship" to avoid meaningful NEPA review.

CEQ's proposal is also inconsistent with its current guidance, which counsels excluding actions with extraordinary circumstances from categorical exclusions. Specifically, CEQ's current guidance directs that where agencies find that a categorical exclusion "includes actions that raise the potential for significant environmental effects with some regularity …, the agency should determine whether to delete the categorical exclusion, or revise it to either limit the category of actions or *expand the extraordinary circumstances that limit when the categorical exclusion can be used*."[195] In contrast, CEQ's proposed change, particularly when taken with the insertion of "normally," would shift the focus to allowing more expansive use of categorical exclusions, increasing the possibility that agencies will apply a categorical exclusion where an EA or EIS may be necessary under NEPA.[196] This proposed change also impacts environmental justice as agencies should consider impacts to minority and low-income communities when considering a categorical exclusion to determine if an extraordinary circumstance exists that may result in further analysis of the project under an EA or EIS.[197] In violation of the APA, CEQ fails to acknowledge that its proposed change departs from its current guidance and also fails to provide a reasoned explanation for doing so.[198]

### c.    CEQ's Expansion of Categorical Exclusions Would Impermissibly Limit Public Participation

The Proposed Rule's revisions to categorical exclusions also threaten to diminish public involvement. Given that agencies typically develop little to no documentation for specific applications of categorical exclusions,[199] agencies may avoid public review for their adoption of more expansive categorical exclusions, including mitigated categorical exclusions, and their adoption of other agencies' categorical exclusions, which CEQ seeks to allow under the Proposed Rule.[200]

The Proposed Rule's vague proposal to allow agencies to adopt another agency's categorical exclusions provides no meaningful detail about how an agency will adopt an existing categorical exclusion or whether the agency must provide any notice or documentation about the

---

[195] Categorical Exclusions Memorandum, *supra* note 180, at 15 (emphasis added).

[196] *See California v. Norton*, 311 F.3d 1162, 1175-1–78 (9th Cir. 2002) ("Generally, the agency is required to prepare an EIS or an EA before committing resources to an action.").

[197] *See* REPORT OF FEDERAL INTERAGENCY WORKING GROUP ON ENVIRONMENTAL JUSTICE & NEPA COMMITTEE: *PROMISING PRACTICES FOR EJ METHODOLOGIES IN NEPA REVIEWS* (March 2016) https://www.epa.gov/environmentaljustice/ej-iwg-promising-practices-ej-methodologies-nepa-reviews.

[198] *Fox Television Stations, Inc.*, 556 U.S. at 515.

[199] *See* 85 Fed. Reg. at 1696.

[200] *Id.* at 1728 (proposed 40 C.F.R. § 1507.3(e)(5)).

AR_0026224

decision to apply another agency's categorical exclusion. Rather, the Proposed Rule merely states that when an agency develops its own NEPA regulations, the agency "may" include a process of adopting another agency's categorical exclusions but appears to provide no parameters on the level of public review required in that process.[201] This vague provision may also lead to situations where significant impacts of an action are not considered because the agency adopting the initial categorical exclusion may not have considered impacts on resources within the jurisdiction of other resource agencies or analyzed other factors that could lead to a different level of environmental impacts.[202]

CEQ's Proposed Rule also conflicts with CEQ's current guidance on categorical exclusions, which encourages agencies to involve the public for certain categorical exclusion determinations, including "whether a proposal involves extraordinary circumstances"[203] and cautions against relying on another agency's categorical exclusions.[204] CEQ's plan to withdraw existing guidance only enhances the possibility that federal agencies will adopt categorical exclusions without public accountability. Such situations would create legal risks for agencies and thwart NEPA's mandate to consider fully the potential environmental impacts.[205]

### 4.    The Proposed Rule Would Allow Actions to Proceed During NEPA Review

CEQ also proposes to weaken well-established legal principles regarding whether and to what extent an agency can commit resources prior to making a final decision about a proposed action. Specifically, the current regulations state that until agencies issue a final decision on a proposal, "no action concerning the proposal *shall* be taken" that would have an adverse environmental impact or limit the choice of reasonable alternatives.[206] In the Proposed Rule, CEQ would specify a number of actions that applicants can take prior to a final decision, including "acquisition of interests in land (*e.g.*, fee simple, rights-of-way, and conservation easements), purchase of long lead-time equipment, and purchase options made by applicants."[207]

CEQ's Proposed Rule is flatly inconsistent with NEPA's requirement that agencies complete environmental review "before any irreversible and irretrievable commitment of

---

[201] *Id.*

[202] *See* Categorical Exclusions Memorandum, *supra* note 180, at 9 (providing criteria for agencies to use when adopting categorical exclusions by drawing support from other agency categorical exclusions).

[203] Categorical Exclusions Memorandum, *supra* note 180, at 14.

[204] *Id.* at 9.

[205] *See California*, 311 F.3d at 1175–78 (holding that federal agency failed to provide reasoned explanation for its application of a categorical exclusion to the suspension of offshore leases where there was ample evidence of extraordinary circumstances, such as controversy over the potential environmental effects of offshore oil and gas development and the presence of threatened species).

[206] 40 C.F.R. § 1506.1(a).

[207] 85 Fed. Reg. at 1724 (proposed 40 C.F.R. § 1506.1(b)).

AR_0026225

resources."[208] As the Ninth Circuit has explained, this irreversible and irretrievable commitment of resources criterion derives from section 102(C)(v) of NEPA, "which requires an EIS to include a statement of any irreversible and irretrievable commitment of resources which would be involved in the proposed action should it be implemented."[209] CEQ's proposal to allow certain actions prior to completion of environmental review is inconsistent with this case law to the extent that it allows agencies to bind themselves to a particular course of action before completing NEPA review.[210] Determining whether an irretrievable commitment of resources has in fact occurred "is necessarily contextual … requir[ing] a fact-specific inquiry."[211] Moreover, CEQ should not adopt any regulations regarding "circumstances under which an agency may authorize irreversible and irretrievable commitments of resources" before completing environmental review because such regulations would violate NEPA.[212]

CEQ does not rationally justify its proposed changes. CEQ merely states that its proposed revisions seek to provide "additional clarity on what activities are allowable during the NEPA process."[213] CEQ cites no case law to support its revision and provides no additional explanation to support this significant change in the regulations. As a result, CEQ's proposed change lacks rational support and, if finalized, would be arbitrary and capricious.[214]

## E.    The Proposed Rule Would Improperly Limit Discussion of Alternatives

Courts often cite CEQ's NEPA regulation declaring that the required alternatives analysis is the "heart" of an EIS.[215] NEPA's alternatives analysis promotes informed and reasoned environmental decision making by "sharply defining the issues and providing a clear basis for

---

[208] *See Conner v. Burford*, 848 F.2d 1441, 1446 (9th Cir. 1988); *see also Ctr. for Envtl. Law & Policy v. U.S. Bureau of Reclamation*, 655 F.3d 1000, 1006 (9th Cir. 2011) ("The agency must complete an EA before the 'go-no go' stage of a project … which is to say before 'making an irreversible and irretrievable commitment of resources.'") (quoting *Metcalf v. Daley*, 214 F.3d 1135, 1142 (9th Cir. 2000); *Sierra Club v. Peterson,* 717 F.2d 1409, 1414 (D. C. Cir. 1983) ("Therefore, the appropriate time for preparing an EIS is prior to a decision, when the decisionmaker retains a maximum range of options.").

[209] *Conner*, 848 F.2d at n.13 (internal quotations omitted).

[210] *See Ctr. for Envtl. Law and Policy*, 655 F.3d at 1007 (no irretrievable commitment of resources where agency retains the ability to forego a course of action, despite obtaining certain permits).

[211] *New Mexico ex rel. Richardson v. Bureau of Land Mgmt.*, 565 F.3d 683, 718 (10th Cir. 2009) (holding that issuance of an oil and gas lease without a no surface occupancy stipulation constitutes an irretrievable commitment of resources).

[212] *See* 85 Fed. Reg. at 1704.

[213] *Id.*

[214] *State Farm*, 463 U.S. at 43.

[215] 40 C.F.R. § 1502.14. *See, e.g., Wildearth Guardians v. U.S. Bureau of Land Mgmt.*, 870 F.3d 1222, 1226 (10th Cir. 2017) (citing 40 C.F.R. § 1502.14); *Navajo Nation v. U.S. Forest Serv.*, 479 F.3d 1024, 1054 (9th Cir. 2007) (same).

AR_0026226

choice among options by the decision maker and the public."[216] While NEPA does not dictate substantive outcomes, the current regulations declare that the alternatives analysis is essential to the federal government meeting its obligation to "use all practicable means" to "fulfill the responsibilities of each generation as trustee of the environment for succeeding generations."[217] The Proposed Rule would nonetheless strike this declaration regarding the "heart" of an EIS.[218] Additionally, the Proposed Rule would unlawfully and unreasonably curtail the required alternatives analyses by limiting consideration of alternatives outside an agency's jurisdiction and by striking key language regarding the required analysis. CEQ should withdraw this unlawful and unreasonable proposal.

The Proposed Rule would eliminate the requirement that an agency evaluate "reasonable alternatives not within the jurisdiction of the lead agency."[219] This new jurisdictional limitation would undercut the very purpose of an alternatives analysis. A decision maker cannot appropriately comprehend the environmental trade-offs among choices available to the project sponsor, to a community, or to the federal government as a whole if only considering options within the lead agency's jurisdiction. For example, if the U.S. Department of Veterans Affairs (VA) is considering expanding a hospital but the proposed parking lot expansion will require cutting a significant number of trees, it may be appropriate for the project's EIS to include an evaluation of expanding local bus service to the hospital to reduce the need to expand the parking lot even though the bus routes are beyond the jurisdiction of the VA. The EIS alternatives analysis can evaluate the feasibility of the local transit agency agreeing to bus service changes as part of its analysis. And, because some state "mini NEPAs" allow for coordinated environmental review,[220] should the local transit agency agree to those changes, it may be able to use the EIS to satisfy its own local environmental review obligations. Similarly, as described in the key guidance document, *40 Most Asked Questions Concerning CEQ's National Environmental Policy Act Regulations (Forty Questions Guidance)*, alternatives beyond what Congress has authorized "must still be evaluated in the EIS if they are reasonable, because the EIS may serve as the basis for modifying the Congressional approval or funding in light of NEPA's goals and policies."[221] It makes no sense—and flies in the face of NEPA's core requirements—to cabin analyses to a particular

---

[216] 40 C.F.R. § 1502.14.

[217] 42 U.S.C. § 4331(b)(1).

[218] *Compare* 40 C.F.R. § 1502.14, *with* 85 Fed. Reg. at 1720 (proposed 40 C.F.R. § 1502.14).

[219] *Id.*

[220] *See, e.g.,* 6 N.Y. Comp. Codes R. & Regs. § 617.15 (New York State Environmental Quality Review Act regulations permitting an EIS prepared pursuant to NEPA to be used to satisfy state environmental review obligations); Mass Gen. Laws Ch. 30 § 32G (Draft and Final EISs under NEPA may be submitted in lieu of a required state Environmental Impact Report, provided that the NEPA documents comply with applicable state requirements and policies).

[221] CEQ, MEMORANDUM TO AGENCIES: 40 MOST ASKED QUESTIONS CONCERNING CEQ'S NATIONAL ENVIRONMENTAL POLICY ACT REGULATIONS, at Question 2b (1986) [hereinafter Forty Questions Guidance] https://www.energy.gov/sites/prod/files/2018/06/f53/G-CEQ-40Questions.pdf.

39

AR_0026227

agency's limited jurisdiction and ignore creative, efficient, and beneficial alternatives to a proposed action.

CEQ does not adequately justify this misguided change in its NEPA regulations. In the preamble to the Proposed Rule, CEQ says that it is "not efficient or reasonable to require agencies to develop detailed analysis" for alternatives outside their jurisdiction.[222] CEQ also claims that an alternative outside an agency's jurisdiction would not be "technically feasible."[223] This explanation is unsupported—CEQ does not explain why it has come to the conclusion that such alternatives analysis is not efficient or reasonable, or that is it is infeasible to require such alternatives.

Indeed, CEQ does not explain why the changes are necessary now when existing regulations and case law already address the issue. An agency's alternatives analysis must adhere to a project specific "rule of reason."[224] Thus, if it is unreasonable for an agency to analyze a particular alternative due to a jurisdictional or feasibility issue, the agency need not conduct a full evaluation of that alternative. Instead, the agency must simply explain why it is unreasonable to fully consider that alternative.[225] What the agency may not do—though CEQ attempts to allow it now—is simply ignore alternatives on blanket grounds of jurisdiction or feasibility, when it would otherwise be reasonable for the agency to actually consider them. CEQ's utter lack of reasoned justification for this significant change is arbitrary and capricious.[226]

The Proposed Rule also would narrow the scope of the required alternatives analysis by: (1) striking the directive to present the alternatives in comparative form in order to "sharply" define the issues and provide a clear choice among options by the decision maker and the public; (2) removing the reference to the need for agencies to "[r]igorously explore and objectively evaluate" all reasonable alternatives to the proposed action; and (3) removing the requirement to "[d]evote substantial treatment" to each alternative.[227] CEQ also proposes to define "reasonable alternatives," as "a reasonable range of alternatives that are technically and economically feasible,

---

[222] 85 Fed. Reg. at 1702.

[223] *Id.*

[224] *Biodiversity Conservation All. v. Jiron*, 762 F.3d 1036, 1083-84 (10th Cir. 2014) (alternatives analysis reviewed subject to a "rule of reason"); *City of Carmel-by-the-Sea v. U.S. Dep't of Transp.*, 123 F.3d 1142, 1155 (9th Cir. 1997).

[225] *Am. Rivers v. FERC*, 201 F.3d 1186, 1200 (9th Cir. 1999) (alternatives eliminated from detailed study must only be briefly discussed); *Envtl. Def. Fund, Inc. v. Andrus*, 619 F.2d 1368, 1375 (10th Cir. 1980) (NEPA does not contemplate detailed discussion of remote or speculative alternatives);

[226] *See Fox Television Stations*, Inc., 556 U.S. at 515; *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 1001 (2005) (an agency must "adequately justif[y] the change" in course).

[227] *Compare* 40 CFR § 1502.14, *with* 85 Fed. Reg. at 1720 (proposed 40 C.F.R. § 1502.14).

AR_0026228

meet the purpose and need for the proposed action, and, where applicable, meet the goals of the applicant."[228]

Taken together, these proposed changes would undermine the alternatives analysis, ignoring the crucial role that identifying and evaluating all alternatives plays in helping decision makers and the public fully understand the scope of environmental impacts of a proposed action and how those impacts might be avoided. In this way, the Proposed Rule would controvert NEPA's statutory requirement to include a "detailed statement" on alternatives to the proposed action and fail to meet NEPA's "policy goals," contrary to CEQ's assertion that they do.[229] Moreover, CEQ selectively quotes its *Forty Questions Guidance* to support its cuts to the required alternatives analysis, but ignores the parts of that guidance that conflict with its proposed changes. Specifically, CEQ quotes Question 1b's explanation that "[w]hen there are potentially a very large number of alternatives, only a reasonable number of examples, covering the full spectrum of alternatives must be analyzed…" to support its proposed description of the required alternatives analysis.[230] However, Question 1a explains that a reasonable range of alternatives that NEPA requires must be "rigorously explored and objectively evaluated"—a phrase CEQ deletes in the Proposed Rule.[231] The *Forty Questions Guidance*, overall, does not support CEQ's proposed changes and therefore does not help justify the proposed changes.

CEQ also seeks comment on whether the regulations "should establish a presumptive maximum number of alternatives" for a proposed action or for certain categories of proposed actions.[232] Such a presumption is unnecessary and contrary to the policy goals of NEPA. Courts have long-affirmed that NEPA does not require that agencies review an endless array of alternatives. As the Supreme Court has stated: "[t]o make an impact statement something more than an exercise in frivolous boilerplate the concept of alternatives must be bounded by some notion of feasibility."[233] NEPA thus does not require evaluation of alternatives "deemed only remote and speculative possibilities."[234] Courts have likewise recognized that the number of appropriate alternatives that should be considered to satisfy NEPA will be directly related to the proposal at hand.[235] Such project-specific evaluation is the best way to ensure that agencies and

---

[228] 85 Fed. Reg. at 1730 (proposed 40 C.F.R. § 1508.1(z)).

[229] *See* 42 U.S.C. §§ 4331, 4332(2)(C)(iii).

[230] 85 Fed. Reg. at 1702.

[231] *See* Forty Questions Guidance, *supra* note 221, at Question 1a.

[232] 85 Fed. Reg. at 1702.

[233] *Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*, 435 U.S. 519, 551 (1978) (an EIS "cannot be found wanting simply because the agency failed to include every alternative device and thought conceivable by the mind of man.").

[234] *Id.*

[235] *See id.* at 552–53 (NEPA's concept of alternatives requires that agencies explore more or fewer alternatives as they become better known and understood); *City of Alexandria v. Slater*, 198 F.3d 862, 867 (D.C. Cir. 1999) (agency's choice of alternatives evaluated in light of its objectives).

AR_0026229

the public are able to make informed and ideally environmentally beneficial decisions. A categorical limit on the number of alternatives agencies must consider is therefore inappropriate.

## F.   The Proposed Rule Would Improperly Limit the Scope of Impacts Considered Under NEPA

For over 40 years, CEQ and the courts have interpreted NEPA to require consideration of direct, indirect, and cumulative effects.[236] This robust analysis of a project's environmental effects is critical for informing decision makers and the public, particularly where projects may contribute incrementally to larger environmental harms. However, CEQ now proposes to greatly curtail the scope of impacts considered under NEPA. By unlawfully and unreasonably limiting the scope of analyzed impacts, CEQ's Proposed Rule would undermine NEPA's primary purposes of fostering informed decision making and informed public participation. CEQ also has not adequately justified its proposed reversal from its longstanding prior position that a NEPA analysis must address direct, indirect, and cumulative effects. Accordingly, adoption of the Proposed Rule would be arbitrary and capricious.

### 1.   CEQ's Proposed Rule Would Improperly Limit Agencies' Responsibility to Consider "Indirect" and "Cumulative" Effects

CEQ's Proposed Rule would unlawfully seek to curtail analysis of environmental effects. CEQ's current NEPA regulations define the effects that federal agencies must consider in a NEPA analysis to include "direct effects," "indirect effects," and "cumulative effects."[237] Direct effects "are caused by the action and occur at the same time and place," while indirect effects:

> are caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable. Indirect effects may include growth inducing effects and other effects related to induced changes in the pattern of land use, population density or growth rate, and related effects on air and water and other natural systems, including ecosystems.[238]

A cumulative effect is:

> the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other

---

[236] 40 C.F.R. §§ 1508.7, 1508.8, 1508.25(c); *Kleppe*, 427 U.S. at 410.

[237] 40 C.F.R. § 1508.8.

[238] *Id.*

42

actions. Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time.[239]

CEQ's Proposed Rule, however, would strike these definitions and "clarify" that agencies need to consider only environmental effects that "are reasonably foreseeable and have a reasonably close causal relationship to the proposed action or alternatives."[240] The Proposed Rule further would provide that "[e]ffects should not be considered significant if they are remote in time, geographically remote, or the product of a lengthy causal chain."[241] The Proposed Rule invites comment on "whether CEQ should affirmatively state that consideration of indirect effects is not required."[242] And, in an effort to severely constrain the impacts analysis, the Proposed Rule expressly would exclude cumulative effects from the scope of effects that agencies must analyze.[243]

The Proposed Rule's improper attempt to eliminate NEPA's requirement that agencies consider the "indirect effects" and "cumulative effects" of their actions is arbitrary and capricious. These changes are contrary to NEPA and would reverse, without rational justification, decades of agency practice, CEQ guidance and policy, and case law.[244]

### a.    CEQ's Proposal to Limit Analysis of Effects Would Violate NEPA

The Proposed Rule's definition of "effects" and exclusion of "cumulative effects" analysis is inconsistent with NEPA's purpose and language. NEPA's "primary function is information-forcing, … compelling federal agencies to take a hard and honest look at the environmental consequences of their decisions."[245] NEPA requires federal agencies to prepare a "detailed statement" on the impacts of certain actions prior to making decisions.[246] Specifically, Section 102 of NEPA requires that agencies disclose "*any* adverse environmental effects which cannot be avoided" if the agency action goes forward.[247] And NEPA requires agencies to consider the larger

---

[239] *Id. at* § 1508.7.

[240] 85 Fed. Reg. at 1708, 1728–29 (proposed 40 C.F.R. § 1508.1(g)).

[241] *Id.* at 1708.

[242] *Id.*

[243] *Id.* at 1729 (proposed 40 C.F.R. § 1508.1(g)) ("Analysis of cumulative effects is not required."); *id.* at 1707–08 (articulating decision to eliminate cumulative effects analysis requirement while acknowledging that this reflects a change from decades of CEQ guidance and agency action).

[244] *See, e.g.*, *Nat. Res. Def. Council, Inc. v. Hodel*, 865 F.2d 288, 299 (D.C. Cir. 1988) (EIS must analyze the combined effects of the actions in sufficient detail to be "useful to a decisionmaker in deciding whether, or how, to alter the program to lessen cumulative environmental impacts.").

[245] *Am. Rivers*, 895 F.3d at 49 (citations and internal quotation marks omitted).

[246] 42 U.S.C. § 4332(2)(C).

[247] *Id.* at § 4332(2)(C)(ii) (emphasis added).

43

context, directing them to "recognize the worldwide and long-range character of environmental problems."[248]

To further both the language and purpose of NEPA, an agency must consider direct, indirect, and cumulative effects of a project. The legislative history makes clear that through NEPA, Congress sought to prevent agencies from making decisions without considering the larger context and incremental impact of projects on the environment. For instance, the Senate expressed concern that "[i]mportant decisions concerning the use and the shape of man's future environment continue to be made in small but steady increments which perpetuate rather than avoid the recognized mistakes of previous decades."[249]

For decades, courts have reinforced the critical role of impacts analysis in the "hard look" required by NEPA.[250] As the Supreme Court has explained, "[b]y so focusing agency attention [on the environmental effects of proposed agency action], NEPA ensures that the agency will not act on incomplete information, only to regret its decision after it is too late to correct."[251] Courts have repeatedly recognized that NEPA's "hard look" requires consideration of cumulative impacts.[252]

Because CEQ's Proposed Rule would eliminate the three categories of effects, replace them with an inappropriately narrow definition of effects, and exclude analysis of cumulative effects altogether, it is inconsistent with NEPA's statutory requirements. CEQ's proposal would undermine NEPA's purpose to ensure that agencies are fully equipped to make decisions concerning significant environmental impacts.[253] It also would unlawfully permit agencies to conduct NEPA analyses without taking the requisite "hard look" at a project's impacts. Indeed, CEQ asserts that the proposed revisions aim to focus agencies on the most significant effects. But NEPA requires that an agency assess *all* of the project's significant impacts, not merely the "most significant."[254]

---

[248] *Id*. at § 4332(2)(F).

[249] S. Rep. No. 91-296, at 5.

[250] *See e.g.*, *Kleppe*, 427 U.S. at 409 (explaining that Congress intended Section 102 of NEPA as a directive to "all agencies to assure consideration of the environmental impact of their actions in decisionmaking") (citing Conference Report on NEPA, 115 Cong. Rec. 40416 (1969)).

[251] *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 371 (1989). *See also Robertson*, 490 U.S. at 349 (NEPA's purpose is to "ensure[] that the agency, in reaching its decision, will have available, and will carefully consider, detailed information concerning significant environmental impacts").

[252] *Kleppe*, 427 U.S. at 410 (citing NEPA and specifying that agencies have an obligation to evaluate the "cumulative or synergistic" environmental impacts that may occur when there are several pending actions that may have similar effects); *Ecology Ctr. v. Castaneda*, 574 F.3d 652, 666 (9th Cir. 2009) ("NEPA requires the Forest Service to perform a cumulative impact analysis in approving projects.").

[253] *Robertson*, 490 U.S. at 349.

[254] 42 U.S.C. § 4332. Moreover, CEQ itself previously stated that "[p]erhaps that most significant environmental impacts results from the combination of existing stresses on the environment with the individually minor, but cumulatively major, effects of multiple actions of over time." NEPA Effectiveness Study, *supra* note 38, at 29. CEQ

44

If agencies omit relevant impacts from their analysis—as they may under the Proposed Rule if they assert that the impacts are not closely related to the agency proposal—then the agencies and the public will not be fully informed about the environmental implications of the agency decisions, as NEPA requires.

Moreover, to the extent that agencies ignore significant impacts under the Proposed Rule because they divide up projects into multiple actions or fail to consider the broader context for the action, then they will not have complied with NEPA's admonitions to "recognize the worldwide and long-range character of environmental problems,"[255] and to disclose "*any* adverse environmental effects which cannot be avoided."[256] CEQ's Proposed Rule would exclude impacts that are "remote in time" or "geographically remote," which unlawfully would take such "long-range" environmental impacts out of NEPA's purview.

The Proposed Rule also ignores the reality that some federal actions will have adverse effects that are remote in time but also reasonably foreseeable if not certain. Examples include the proposed geologic repository for the disposal of high-level radioactive wastes at Yucca Mountain, Nevada, identified in the Nuclear Waste Policy Act, as well as other interim storage options currently under development by the U.S. Department of Energy. Radioactive releases from the repository to the environment are not likely to occur for hundreds and possibly thousands of years, but after that, significant releases are certain to occur and must be evaluated.[257] The Proposed Rule suggests agencies should limit consideration of these critically important, inarguably significant impacts as too "remote in time."

CEQ's proposed revisions to the effects definitions thus would strike at the heart of NEPA's purpose and environmental review requirements. As CEQ recognized in NEPA guidance issued in 1973—less than four years after NEPA was enacted—indirect or "secondary" effects "may often be even more substantial than the primary effects of the original action itself."[258] And even before that, CEQ recognized that the effects of many decisions can be "individually limited but cumulatively considerable."[259] More recently, CEQ reaffirmed that "cumulative effects analysis is essential to effectively managing the consequences of human activities on the

---

provides no reasoned explanation for its change in position from previously recognizing cumulative impacts as often the "most significant."

[255] 42 U.S.C. § 4332(2)(F).

[256] 42 U.S.C. § 4332(2)(C)(ii) (emphasis added).

[257] In fact, the certainty of releases to the environment thousands of years into the future led both the U.S. EPA and the U.S. Nuclear Regulatory Commission to require the Department of Energy to estimate releases for one-million years. 40 C.F.R. § 197.20; 10 C.F.R. § 63.311; 40 C.F.R. § 197.12 (defining "period of geologic stability" as one million years following disposal).

[258] Preparation of Environmental Impact Statements: Guidelines, 38 Fed. Reg. 20,550, 20,553 (Aug. 1, 1973).

[259] NEPA Origins, *supra* note 94 (citing May 1970 Guidelines).

environment."[260] These findings hold true today. CEQ's proposal is an unlawful departure from the purpose and intent of NEPA and therefore arbitrary and capricious.

  **b.**    **CEQ Has Not Provided a Reasoned Explanation for Its Proposal to Constrain the Analysis of Impacts**

  CEQ has also failed to provide a reasoned explanation for revising the "effects" definitions in the Proposed Rule. CEQ proposes to eliminate the definitions of direct, indirect, and cumulative impacts in favor of a single definition that, according to CEQ, would provide clarity and reduce unnecessary litigation by avoiding expansive interpretations "resulting in excessive documentation about speculative effects."[261] The changes to the effects definitions, CEQ claims, also would allow agencies to focus on "the most significant effects" and "effects that would occur as a result of the agency's decision."[262]

  These purported justifications for the proposal are meritless and do not constitute the reasoned explanation that the APA requires. Federal agencies, the States, and the public have relied for decades on CEQ's existing regulations to direct their analysis of effects under NEPA. Courts have interpreted the NEPA regulations and established a large body of case law setting out the parameters of effects analyses. CEQ and other federal agencies have issued multiple guidance documents further expanding on effects analysis under the existing NEPA regulations.

  CEQ's proposal makes sweeping changes to the regulations and will have enormous impacts on the scope of effects analyses. While CEQ acknowledges in certain places that it is changing course, it fails to provide a reasoned justification for this change of course, particularly with respect to the scope of effects. Indeed, only with respect to the exclusion of cumulative effects does CEQ concede that this reflects a change from CEQ's decades-old position.[263] CEQ's failure to provide a reasoned explanation for drastically departing from its existing regulations is arbitrary and capricious.[264]

  **(1)**    **The Proposed Revisions to the Effects Definitions Would Not Provide Clarity or Avoid Litigation**

  Far from providing clarity and avoiding litigation as CEQ suggests, the proposal to strike definitions of types of effects and replace them with a single definition would sow confusion and

---

[260] CEQ, CONSIDERING CUMULATIVE EFFECTS UNDER THE NATIONAL ENVIRONMENTAL POLICY ACT (Jan. 1997) [hereinafter Considering Cumulative Effects], https://ceq.doe.gov/publications/cumulative_effects.html.

[261] 85 Fed. Reg. at 1707.

[262] *Id.* at 1708.

[263] *Id.*

[264] *See Lone Mountain Processing*, 709 F.3d at 1164.

AR_0026234

invite new, contentious litigation about the scope of NEPA's environmental disclosure requirements.

Since CEQ adopted the "indirect effects" and "cumulative impact" definitions in the 1978 NEPA regulations,[265] CEQ's guidance documents on the analysis of cumulative impacts have further clarified the scope of that inquiry.[266] Other federal agencies have also adopted regulations and guidance based on CEQ's NEPA regulations.[267] In addition, courts have developed a robust body of case law regarding the analysis of effects under NEPA, including indirect effects[268] and cumulative impacts.[269] CEQ's proposed revisions would wipe the slate clean and introduce new, vague language for "effects"—"reasonably close causal relationship"; "remote in time"; "geographically remote"—that agencies and members of the public would be required to construe without any guidance from CEQ or the courts. None of these terms is defined in the Proposed Rule. As a result, each term is subject to conflicting interpretations, first by each of the numerous federal agencies as the terms are applied, and later by the courts when the agencies' determinations are challenged.

CEQ also proposes to eliminate the definition of cumulative effects and to state that cumulative effects need not be analyzed.[270] How are agencies to know what effects constitute "cumulative effects" if CEQ strikes the definition of those effects and corresponding guidance? CEQ's Proposed Rule fails to achieve CEQ's asserted aim of increased clarity.

The proposed revisions to the effects definitions thus threaten to proliferate NEPA disputes and litigation and potentially grind the federal environmental review process to a halt—precisely the opposite of CEQ's stated intent.[271]

---

[265] *See* National Environmental Policy Act—Regulations, 43 Fed. Reg. 55,978 (Nov. 29, 1978).

[266] Considering Cumulative Effects, *supra* note 260.

[267] *See, e.g.*, 36 C.F.R. § 220.4(f) (U.S. Forest Service regulations regarding cumulative effects analysis); 32 C.F.R. § 651.16 (Department of the Army regulations regarding cumulative effects analysis); FED. HIGHWAY ADMIN., NEPA AND TRANSPORTATION DECISIONMAKING: QUESTIONS AND ANSWERS REGARDING CONSIDERATION OF INDIRECT AND CUMULATIVE IMPACTS IN THE NEPA PROCESS, https://www.environment.fhwa.dot.gov/nepa/QAimpact.aspx; U.S. EPA, Consideration of Cumulative Impacts in EPA Review of NEPA Documents (May 1999), https://www.epa.gov/sites/production/files/2014-08/documents/cumulative.pdf.

[268] *See, e.g.*, *Friends of Capital Crescent Trail v. Fed. Transit Admin.*, 877 F.3d 1051, 1064 (D.C. Cir. 2017); *EarthReports, Inc. v. Fed. Energy Regulatory Comm'n*, 828 F.3d 949, 956 (D.C. Cir. 2016); *Ctr. for Envtl. Law & Policy*, 655 F.3d at 1011; *City of Carmel-By-The-Sea*, 123 F.3d at 1162 (analyzing "growth-inducing effects").

[269] *See, e.g.*, *N. Plains Res. Council, Inc. v. Surface Transp. Bd.*, 668 F.3d 1067, 1076–83 (9th Cir. 2011); *Klamath-Siskiyou Wildlands Ctr. v. Bureau of Land Mgmt.*, 387 F.3d 989, 993−97 (9th Cir. 2004); *Kern v. U.S. Bureau of Land Mgmt.*, 284 F.3d 1062, 1075−79 (9th Cir. 2002).

[270] 85 Fed. Reg. at 1729 (proposed 40 C.F.R. § 1508.1(g)).

[271] *See Id.* at 1707–08.

AR_0026235

(2)     **CEQ's Claim that Agencies Need to Focus on the Most Significant Effects Lacks Support and Conflicts with NEPA's Purpose**

CEQ has not provided concrete evidence or other data about the relative resources spent by agencies on their analyses of direct, indirect, and cumulative effects to support the claim that agencies need to redirect their focus to the causal relationship of the project to the effects and, specifically, the most significant effects. Without any support for these claims, the public cannot know whether or to what extent agencies actually divert resources from studying significant effects to categorizing and analyzing insignificant effects. CEQ cannot rely on this unsupported claim to justify its proposed revisions.

CEQ must explain how focusing agencies on only the "most significant effects" is a proper justification for its proposal.[272] As explained above, NEPA requires an agency to consider all significant effects of a project, not merely the "most" significant ones. To the extent that CEQ's rationale diverges from NEPA's requirements, it is arbitrary and capricious.[273]

(3)     **CEQ Provides no Reasonable Explanation for "Reasonably Close Causal Relationship" Language**

CEQ also attempts to justify its new definition of effects by noting that "reasonably close causal relationship" as used in the revision "is analogous to proximate cause in tort law."[274] But that statement does not support CEQ's rationale for its revision. CEQ does not provide any evidence explaining the need to revise the definition of effects to add the term "reasonably close causal relationship."[275] Given NEPA's requirement that federal agencies must analyze a proposed project's effects on the human environment, CEQ has not adequately explained how the revised effects definition is necessary and consistent with NEPA.

Instead, the revised definition of "effects" exacerbates rather than diminishes the difficulty of effects analysis under NEPA. Commenters have noted that the proximate cause standard has been applied inconsistently in practice, resulting in significant uncertainty about the scope of that standard.[276] CEQ has not explained how agencies will avoid such inconsistency and uncertainty in the NEPA context.

---

[272] *Id.* at 1708.

[273] *See State Farm*, 463 U.S. at 43 (agency action is arbitrary where agency "has relied on factors which Congress has not intended it to consider").

[274] 85 Fed. Reg. at 1708.

[275] *Id.* at 768.

[276] Mark F. Grady, *Proximate Cause Decoded*, 50 UCLA L. REV. 293, 294 (2002) (attempting to clarify the proximate cause jurisprudence); Nicole Summers, *Setting the Standard for Proximate Cause in the Wake of Bank of America Corp. v. City of Miami*, 97 N.C. L. REV. 529, 532 (2019).

AR_0026236

The cases cited in the Proposed Rule do not support CEQ's proposal to import a "proximate cause" requirement into NEPA.[277] *Department of Transportation v. Public Citizen*, 541 U.S. 752 (2004), addressed a situation where an agency had "no ability categorically to prevent" the environmental impact in question, and thus, analyzing that impact "would have no effect on [the agency's] decisionmaking."[278] In *Metropolitan Edison Co. v. People Against Nuclear Energy*, 460 U.S. 766 (1983), the Court concluded that the Nuclear Regulatory Commission was not required to consider fear and anxiety associated with increased risk of a nuclear accident because "a *risk* of an accident is not an effect on the physical environment" for NEPA purposes.[279] Neither of these cases held that NEPA's environmental review requirement is or should be limited to effects that are "proximately caused" by the agency's action.[280]

The Proposed Rule also provides that "[e]ffects do not include effects that the agency has no ability to prevent due to its limited statutory authority or would occur regardless of the proposed action."[281] This proposed language would create confusion about agencies' NEPA obligations because the revised regulations would also require agencies to develop a single EIS and joint record of decision when "a proposal will require action by more than one Federal agency."[282] To comply with NEPA, such a joint EIS must assess the impacts of all of the agencies' actions and should include effects within the lead agency's and cooperating agencies' statutory authority.[283] CEQ should, at a minimum, clarify that agencies developing a joint EIS cannot rely on the Proposed Rule's new definition of "effects" to avoid addressing relevant impacts.

### (4)    CEQ Has Not Provided a Rational Explanation for Exclusion of Cumulative Impacts or Indirect Impact Analysis

Finally, CEQ has not provided a rational explanation for deleting the regulations' requirement that agencies consider cumulative and indirect impacts. CEQ argues that the exclusion of cumulative effects will ensure that agencies can focus on "the most significant effects" of their actions and "effects that would occur as a result of the agency's decision."[284] However, as discussed above, NEPA does not limit an agency's environmental analysis to the effects they consider "most significant"; instead, it requires them to evaluate all significant environmental

---

[277] *See* 85 Fed. Reg. at 1708.

[278] *Dep't of Transp. v. Public Citizen*, 541 U.S. 752, 768 (2004).

[279] *Metro. Edison Co. v. People Against Nuclear Energy*, 460 U.S. 766, 775 (1983).

[280] *See* 85 Fed. Reg. at 1708.

[281] *Id.* at 1729 (proposed 40 C.F.R. § 1508.1(g)).

[282] *Id.* at 1716 (proposed 40 C.F.R. § 1501.7(g)).

[283] *See* 42 U.S.C. § 4332(2)(C).

[284] 85 Fed. Reg. at 1708.

49

AR_0026237

impacts.[285] Further, CEQ has not explained how its implicit conclusion that cumulative impacts are inherently not significant is consistent with its earlier finding that a "cumulative effects analysis is essential to effectively managing the consequences of human activities on the environment."[286] CEQ also does not explain why cumulative impacts—which are, by definition, impacts that "*result*[] *from the incremental impact of the action* when added to other past, present, and reasonably foreseeable future actions"[287]—are not impacts that "occur as a result of the agency's decision."[288]

CEQ further attempts to justify its decision to not require cumulative effects analysis by explaining that agencies currently struggle to determine the geographic and temporal scope of such effects and therefore divert their focus from the most significant effects. CEQ provides no discussion of the validity and scope of the concerns, the types of actions where these alleged concerns occurred, or whether courts subsequently found that the documentation required to address indirect and cumulative effects was indeed "excessive."

CEQ also requests comment on whether it should "affirmatively state that consideration of indirect effects is not required."[289] It should not. This change to the regulations would create the same problem as the changes regarding "cumulative effects" because the regulations would refer to an undefined "indirect effects" term. In addition, for the reasons discussed, CEQ cannot lawfully eliminate NEPA's requirement that agencies consider "*any* adverse environmental effects which cannot be avoided,"[290] including effects that "are caused by the [agency] action and are later in time or farther removed in distance, but are still reasonably foreseeable."[291] CEQ has not provided a reasoned explanation for excluding cumulative impacts or indirect impacts from NEPA review.

## 2.     CEQ's Proposed Revisions Would Improperly Curtail the Analysis of Federal Projects' Impacts of Greenhouse Gas Emissions and Climate Change

The impacts of greenhouse gas (GHG) emissions and climate change illustrates the absurdity of CEQ's proposal to redefine effects and eliminate cumulative effects analysis. For many federal proposals, the impacts of GHG emissions are among the most severe and most concerning for human health and the environment.[292] In NEPA reviews of federal oil and gas leasing or natural gas pipeline projects, for example, the upstream and downstream GHG emissions

---

[285] *See* 42 U.S.C. § 4332(2)(C)(ii) (agencies must disclose "any adverse environmental effects which cannot be avoided should the proposal be implemented").

[286] Considering Cumulative Effects, *supra* note 260, at 3. *See also* S. Rep. No. 91-296, at 5 (1969).

[287] 40 C.F.R. § 1508.7 (emphasis added).

[288] 85 Fed. Reg. at 1708.

[289] *Id.*

[290] 42 U.S.C. § 4332(2)(C)(ii) (emphasis added).

[291] 40 C.F.R. § 1508.8; *see also* 42 U.S.C. § 4332(2)(F).

[292] *See, e.g.*, U.S. Global Change Research Program, *Fourth National Climate Assessment* (2018).

AR_0026238

from these projects are typically considered "indirect" but no less important than the "direct" effects of actual project construction. And as courts have acknowledged, "[t]he impact of GHG emissions on climate change is precisely the kind of cumulative impacts analysis that NEPA requires agencies to conduct."[293] Taking a "hard look," thus, requires a recognition that climate change presents an extremely challenging cumulative emissions problem. This is true in part because a large percentage of the GHGs already in the atmosphere will remain there for decades, as will the GHG emissions resulting from a proposed project. It also requires agencies to consider how impacts from a proposed project could impact climate-related hazards in minority and low-income communities that are at risk and have fewer resources to recover from climate-related incidents.[294]

Given the critical importance of addressing the impacts of climate change, any regulations that attempt to exclude climate change and GHG emissions from the scope of effects cannot be consistent with NEPA's mandate to consider all significant effects on the environment. CEQ's proposed revisions seek to do just that. By eliminating the requirement to consider cumulative effects, the Proposed Rule would constrain severely the analysis of GHG emissions and climate change. CEQ's revisions, clearly designed to abrogate agencies' responsibility to consider GHG impacts, are inconsistent with NEPA's purpose to require a full analysis of environmental impacts, including those with a "worldwide and long-range character."[295] This is contrary to the statute and to NEPA's legislative history.[296]

CEQ should abandon these proposed NEPA regulations, as they are inconsistent with NEPA and unsupported by reasoned explanation. CEQ also has requested comment on whether it should codify any aspects of its draft GHG guidance in the NEPA regulations.[297] It should not. The States submitted comments on the draft GHG guidance, which are incorporated herein by

---

[293] *Ctr. for Biological Diversity*, 538 F.3d at 1216. *See also* CEQ, FINAL GUIDANCE FOR FEDERAL DEPARTMENTS AND AGENCIES ON CONSIDERATION OF GREENHOUSE GAS EMISSIONS AND THE EFFECTS OF CLIMATE CHANGE IN NATIONAL ENVIRONMENTAL POLICY ACT REVIEWS (Aug. 1, 2016), https://ceq.doe.gov/docs/ceq-regulations-and-guidance/nepa_final_ghg_guidance.pdf ("Climate change is a fundamental environmental issue, and its effects fall squarely within NEPA's purview.").

[294] *See* EPA, *Promising Practices for EJ Methodologies in NEPA Reviews* at 31 (Mar. 2016), https://www.epa.gov/environmentaljustice/ej-iwg-promising-practices-ej-methodologies-nepa-reviews; California Office of Envtl. Health Hazard Assessment, *Indicators of Climate Change in California: Environmental Justice Impacts* (Dec. 2010), https://oehha.ca.gov/media/downloads/climate-change/document/climatechangeej123110.pdf.

[295] 42 U.S.C. § 4332(F).

[296] *See* H.R. REP. NO. 91-378, at 121 (1969) ("It is an unfortunate fact that many and perhaps most forms of environmental pollution cross international boundaries as easily as they cross State lines. Contamination of the oceans, with insufficient attention paid to its long-term consequences, appears to be a major problem, to which far too little attention has been spent in the past. The international aspects are clearly a major part of the questions which the Council would have to confront, and your committee feels confident that these would receive early attention by the Council.")

[297] 85 Fed. Reg. at 1711 (requesting comment regarding the draft GHG Guidance, 84 Fed. Reg. 30,097 (June 26, 2019), Docket No. CEQ-2019-0002).

AR_0026239

reference[298] and attached as Exhibit 2. As explained in the comments, the draft guidance is inconsistent with the purpose and aims of NEPA, does not adequately address the nature of GHG emissions and the harms of climate change, and improperly limits the consideration of GHG emissions and climate change through analysis of indirect effects and cumulative effects, among many other shortcomings. Rather than codify the fundamentally flawed draft guidance, CEQ should replace it with an updated and strengthened version of the 2016 GHG Guidance[299] and incorporate this strengthened guidance into its regulations.

### 3.  CEQ's Proposed Revisions Would Improperly Limit the Analysis of Federal Projects' Impacts on Environmental Justice

Eliminating the cumulative effects analysis would also undermine analysis of impacts on environmental justice in contravention of Executive Order 12898 and of the intent of NEPA to examine all environmental impacts. Executive Order 12898 directs federal agencies to identify and address the disproportionately high and adverse human health or environmental effects of their actions on minority and low-income populations, to the greatest extent practicable and permitted by law.[300] In compliance with Executive Order 12898, CEQ's 1997 guidance directs agencies to incorporate an analysis of environmental justice into NEPA reviews (EJ Guidance).[301]

NEPA is an important tool in identifying and addressing environmental injustice because it requires agencies to examine salient information and gives communities a voice in the approval process. Cumulative impact analysis is essential to identifying whether and how low income and frontline communities of color may be overburdened by additional environmental impacts posed by an action because these communities may already be disproportionally burdened by existing sources of pollution.[302] For example, a community may have a disproportionately high amount of hazardous waste treatment facilities relative to its neighboring communities. These cumulative impacts likely would be obscured by the Proposed Rule's constrained effects analysis because it

---

[298] Comments of the Attorneys General of California, Colorado, Connecticut, Delaware, the District of Columbia, Illinois, Maine, Maryland, Massachusetts, Minnesota, New Mexico, New Jersey, New York, North Carolina, Oregon, Pennsylvania, Rhode Island, Vermont, and Washington, Aug. 26, 2019, Docket No. CEQ-2019-0002-6749.

[299] CEQ, Final Guidance for Federal Departments and Agencies on Consideration of Greenhouse Gas Emissions and the Effects of Climate Change in National Environmental Policy Act Reviews, 81 Fed. Reg. 51,866 (Aug. 5, 2016).

[300] Exec. Order No. 12898, 59 Fed. Reg. 7629 (1994) (as amended).

[301] CEQ, ENVIRONMENTAL JUSTICE GUIDANCE (1997) [hereinafter CEQ Environmental Justice Guidance] https://www.epa.gov/sites/production/files/2015-02/documents/ej_guidance_nepa_ceq1297.pdf.

[302] See, e.g., Mercedes A. Bravo et al., *Racial isolation and exposure to airborne particulate matter and ozone in understudied US populations: Environmental justice applications of downscaled numerical model output*, 92–93 ENVT. INT'L 247 (2016) (finding that long-term exposure to particulate matter is associated with racial segregation, with more highly segregated areas suffering higher levels of exposure); INTERDISCIPLINARY ENVIRONMENTAL CLINIC AT WASHINGTON UNIVERSITY SCHOOL OF LAW, ENVIRONMENTAL RACISM IN ST. LOUIS, https://assets.documentcloud.org/documents/6367937/2097-STL-EnvirRacism-Report-04-Web.pdf (last visited March 2, 2020) (finding that most of St. Louis' air pollution sources are located in communities of color and that African American children in St. Louis make roughly 10 times more emergency room visits for asthma each year).

no longer would require the cumulative analysis that would examine these inequities. Instead of undermining NEPA's analysis of environmental justice, as described in the Advanced Notice Comments, the CEQ EJ Guidance should be codified.[303]

The Proposed Rule's change in definition of "human environment" further exacerbates its conflict with Executive Order 12898. The Proposed Rule would eliminate the following from the definition of "human environment":

> This means that economic or social effects are not intended by themselves to require preparation of an environmental impact statement. When an environmental impact statement is prepared and economic or social and natural or physical environmental effects are interrelated, then the environmental impact statement will discuss all of these effects on the human environment.[304]

Environmental justice review requires examining how economic, social, and natural or physical environmental effects are interrelated, precisely as described in the text CEQ proposes to eliminate. By contrast, examined in a vacuum, as would occur under the Proposed Rule, an analysis of natural environmental effects does not promote decision making to ensure environmental justice, which EPA has defined as "the fair treatment and meaningful involvement of all people regardless of race, color, national origin, or income."[305] Accordingly, contrary to CEQ's unlawfully conclusory assertion that the Proposed Rule would not have environmental justice impacts, CEQ's proposed changes to the cumulative effects analysis and to the definition of "human environment" are inconsistent with both Executive Order 12898 and NEPA's intent.

### 4.    CEQ's Proposed Revisions to Other Terms Such as "Affected Area" and "Mitigation" Illustrate and, in Some Instances, Exacerbate the Impropriety of CEQ's Proposed Revisions to the Definition of Effects

In addition to changing the definition of "effects" and excluding cumulative effects altogether, CEQ proposes other changes that could exacerbate the dangerous consequences of narrowing the scope of effects. As discussed above, CEQ's Proposed Rule unlawfully attempts to curtail the geographic scope of effects that may be considered. CEQ goes further, specifying that the "affected area" may be only national, regional, or local but not global or extraterritorial.[306] By focusing only on the national, regional, or local affected environments (and setting nationwide as the largest geographic scope for the affected area), the Proposed Rule would not only limit the geographic area but further constrain the types of effects that might be addressed under NEPA. These proposed changes reflect CEQ's unlawful efforts to minimize the assessment of GHG

---

[303] *See* Advance Notice Comments, *supra* note 7, at 23–24.

[304] *Compare* 40 C.F.R. § 1508.14, *with* 85 Fed. Reg. at 1729 (proposed 40 C.F.R. § 1508.1(m)).

[305] EPA, Environmental Justice, https://www.epa.gov/environmentaljustice (last visited March 2, 2020).

[306] 85 Fed. Reg. at 1714; *see also id.* (changing "in the world" to "in the Nation" to reflect that nationwide effects would be the geographically broadest effects considered under the proposed NEPA regulations).

AR_0026241

emissions and climate change impacts under NEPA. They are also inconsistent with NEPA's mandate to "recognize the worldwide and long-range character of environmental problems."[307] And by curtailing the extent to which agencies will consider and analyze broader-ranging environmental issues like climate change, CEQ undermines NEPA's purpose of informed decision making.

CEQ's proposed constraints on the scope of effects analyzed could reduce the information-sharing value of NEPA analyses in other ways as well. For instance, CEQ has proposed to define "mitigation" to specify that NEPA does not require adoption of any particular mitigation measure and to clarify that mitigation must have a nexus to the effects of the proposed action.[308] Specifically, the Proposed Rule would define mitigation as "measures that avoid, minimize, or compensate for reasonably foreseeable impacts to the human environment caused by a proposed action as described in an environmental document or record of decision and that have a nexus to the effects of a proposed action."[309] CEQ argues that this change "would make the NEPA process more effective by clarifying that mitigation measures must actually be designed to mitigate the effects of the proposed action."[310]

The proposed direct link between assessing mitigation measures and the effects of a project could compound the repercussions of the Proposed Rule's narrower effects analysis. The extent to which an agency identifies and assesses the effects of a project determines the degree to which the agency considers mitigation measures. By narrowing the scope of effects, then, CEQ is also limiting the assessment of (and consequent provision of information about) mitigation measures. Further, CEQ has not provided any evidence to support its claim that this change will "make the NEPA process more effective."[311] CEQ has thus failed to rationally justify its proposed changes to the definitions as required by the APA.[312] These proposed revisions are arbitrary and capricious.

5.    **CEQ's Proposed Rule Would Improperly Weaken the Standard for Requiring Agencies to Obtain Information on Adverse Effects**

CEQ also proposes to weaken the requirement for agencies to seek out and include additional information in an EIS regarding reasonably foreseeable significant adverse impacts.[313] Specifically, CEQ proposes to replace the term "exorbitant" in 40 C.F.R. § 1502.22 with the term "unreasonable," such that an agency will only be required to include information that is otherwise incomplete or unavailable if the agency determines that the overall cost of obtaining that

---

[307] 42 U.S.C. § 4332(2)(F).

[308] 85 Fed. Reg. at 1709, 1729 (proposed 40 C.F.R. § 1508.1(s)).

[309] *Id*. at 1729 (proposed 40 C.F.R. § 1508.1(s)).

[310] *Id.* at 1709.

[311] *Id.*

[312] *See Fox Television Stations, Inc.*, 556 U.S. at 515.

[313] 85 Fed. Reg. at 1703, 1721 (proposed 40 C.F.R. § 1502.22).

AR_0026242

information is not "unreasonable." By giving agencies more flexibility to decide when and whether to obtain more complete information, the proposed change may result in less information being sought and more holes in NEPA analyses, contrary to NEPA's purpose. This change thus risks undermining NEPA's aim to ensure that agencies fully consider the potential environmental impacts of their actions.[314]

CEQ attempts to justify this change on the grounds that "unreasonable" is "more consistent with CEQ's original description of 'overall cost' considerations, the common understanding of the term, and how the terminology has been interpreted in practice."[315] But CEQ does not elaborate or provide any citations to support its new position. CEQ does not explain what if anything is the "common understanding of the term." Moreover, CEQ's contention that "unreasonable" is more consistent with CEQ's original description of overall cost considerations is misleading, at best. In 1986, when 40 C.F.R. § 1502.22 was last amended, CEQ had proposed to remove language about "exorbitant costs" in favor of weaker language.[316] Nevertheless, CEQ retained the original "exorbitant costs" language. And in response to a comment expressing concern that the proposal essentially shifted the standard to "overall costs" rather than "exorbitant costs" and thereby weakened what was a "purposefully high standard, intended to counter agencies' demonstrated reluctance to seek out information," CEQ emphasized that the final regulation retained the original "exorbitant costs" standard.[317] This is hardly support for changing the language from "exorbitant" to "unreasonable" now. Without providing adequate support for its proposed change, CEQ's revision is arbitrary and capricious.

CEQ's proposed revisions to 40 C.F.R. § 1502.24 raise similar concerns about the quality and thoroughness of information considered by agencies conducting NEPA analyses. CEQ proposes to add language to section 1502.24 providing that "[a]gencies shall make use of reliable existing data and resources and are not required to undertake new scientific and technical research to inform their analyses. Agencies may make use of any reliable data sources, such as remotely gathered information or statistical models."[318] CEQ explains that this "clarification" aims to distinguish "separate and additional research that extends beyond existing scientific and technical information available in the public record or in publicly available academic or professional sources."[319] This change would give agencies discretion to refuse to consider certain scientific

---

[314] 42 U.S.C. § 4332(2)(C).

[315] 85 Fed. Reg. at 1703.

[316] 51 Fed. Reg. 15,618, 15,620 (Apr. 25, 1986) (quoting proposal).

[317] Id. at 15,621–22. CEQ also explained in the 1986 Federal Register notice that it concurred with the goals of the original regulation, including the acquisition of incomplete "information if reasonably possible." Id. at 15,620. That is distinct from reasonable costs. CEQ has not explained what it is relying on in its current proposal. But to the extent it is relying on this statement, it needs to explain why it is equating the statement in the 1986 notice with its proposed change from "exorbitant" to "unreasonable" costs.

[318] 85 Fed. Reg. at 1721 (proposed 40 C.F.R. § 1502.24).

[319] Id. at 1703.

AR_0026243

evidence on the unfounded ground that it is not sufficiently "reliable."[320] In addition, the change could give agencies the discretion to use only easily accessible data, rather than ensuring review of the most in-depth data. This proposed revision thus undermines NEPA's purpose to promote rigorous and comprehensive assessment of the environmental effects of a project, including examination of all potentially relevant scientific information.

## G.    The Proposed Rule Would Improperly Sideline the Public and Undercut NEPA's Purposes and Democratic Principles

The proposed revisions to NEPA procedures and public participation mechanisms in the Proposed Rule would undercut NEPA's sound decision making and public participation goals by eliminating transparency and meaningful opportunities for participation by the public in the NEPA process. As discussed above in section III, public participation is not only a core tenet of NEPA but also can lead to substantively better outcomes. However, CEQ seeks to limit public participation throughout the Proposed Rule.

### 1.    The Proposed Rule Would Increase Conflicts of Interest

CEQ's Proposed Rule would eliminate key language from current regulations designed to prevent conflicts of interest in drafting EISs. Current regulations direct lead agencies to select contractors to prepare an EIS "to avoid any conflict of interest," and further state that contractors "shall execute a disclosure statement [prepared by the lead or cooperating agency] … specifying that they have no financial or other interest in the outcome of the project."[321] The Proposed Rule, however, would eliminate this key language, potentially allowing a contractor or applicant to prepare an EIS without any disclosure statement or other process to avoid conflicts of interest.[322] These changes mark a clear departure from the requirements of NEPA and good government practice.

NEPA explicitly requires "a detailed statement *by the responsible official*," not by the project applicant.[323] Courts have interpreted this statutory requirement to mean that an agency cannot abdicate its responsibility under NEPA to a private applicant.[324] This requirement helps to prevent the "self-serving assumptions" that could be used by an applicant in an EIS.[325] While an applicant can submit environmental information or even assist in drafting, the agency must

---

[320] This proposed change echoes U.S. EPA's recent attempt to limit the scientific information it will consider for purposes of rulemaking. *See* EPA, Supplemental Notice of Proposed Rulemaking, Strengthening Transparency in Regulatory Science, https://www.epa.gov/osa/strengthening-transparency-regulatory-science.

[321] 40 C.F.R. § 1506.5(c).

[322] *Compare* 40 C.F.R. § 1506.5(c) *with* 85 Fed. Reg. at 1725 (proposed 40 C.F.R. § 1506.5(c)).

[323] 42 U.S.C. § 4332(c) (emphasis added).

[324] *See Greene Cnty. Planning Bd. v. Fed. Power Comm'n*, 455 F.2d 412, 420 (2nd Cir. 1972) (interpreting section 102(2) of NEPA to establish "primary and nondelegable responsibility" for agencies "to consider environmental values at every distinctive and comprehensive stage of the agency's process") (citations and alterations omitted).

[325] *Id.*

"participate actively and significantly" in the EIS drafting process and independently review and analyze the information presented.[326] The Proposed Rule would fail to meet this "active and significant" participation standard by injecting vague requirements that the responsible federal official "provide guidance, participate in [the EIS's] preparation, independently evaluate [the EIS] prior to its approval, and take responsibility for [the EIS's] scope and content."[327]

CEQ's proposed changes would virtually guarantee conflicts of interest. Allowing a project applicant to draft an EA or EIS raises serious concerns about impartiality. Yet, CEQ provides no guidance to avoid such conflicts during NEPA drafting. While a project applicant may know the most about its own project, the applicant also has an incentive to secure approval for an action without properly considering all of the environmental impacts. The federal agency responsible for the action is in the best position to analyze the potential impacts from the project and weigh the various interests as required under NEPA and should maintain control over the drafting process consistent with existing case law, regulations, and NEPA's plain language. The Proposed Rule would thus increase bias in the environmental review process.

CEQ provides no justification for these changes beyond a desire to provide more "flexibility and "improved communication" between project proponents and agencies."[328] But "flexibility" and "improved communication" do not justify such a significant departure from CEQ's current regulations, particularly when it is at odds with NEPA's plain language and purpose of ensuring critical and transparent review of environmental impacts.

### 2.    The Proposed Rule Would Improperly Limit Public Participation

Although CEQ has recognized that "[s]ome of the most constructive and beneficial interaction between the public and an agency occurs when citizens identify or develop reasonable alternatives that the agency can evaluate in the EIS,"[329] the Proposed Rule includes many provisions that would improperly limit public participation to the detriment of NEPA and agency decision making.

CEQ's Proposed Rule would set a new tone for the federal implementation of NEPA by revising the Purpose and Policy section in which CEQ lays out the ideological framework for agency implementation of NEPA.[330] Alarmingly, CEQ's Proposed Rule would completely remove any reference to public participation and no longer highlight the need to provide environmental information to citizens "before decisions are made and before actions are taken." [331] In an effort to eliminate "redundancy," the Proposed Rule would also entirely strike the current regulation

---

[326] *Sierra Club v. Lynn*, 502 F.2d 43, 59 (5th Cir. 1974).

[327] 85 Fed. Reg. at 1725 (proposed 40 C.F.R. § 1506.5(c)).

[328] *Id*. at 1705.

[329] Citizen's Guide to the NEPA, *supra* note 20, at 14. *See also id*. at 2 (stating that citizen involvement is one of the environmental review process's major purposes).

[330] 85 Fed. Reg. at 1712.

[331] *Compare* 40 C.F.R. § 1500.1, *with* 85 Fed. Reg. at 1712 (proposed 40 C.F.R. § 1500.1).

regarding the policy of CEQ's NEPA regulations, including the requirement for federal agencies to "[e]ncourage and facilitate public involvement in decisions which affect the quality of the human environment."

CEQ attempts to justify these revisions by stating that they "summarize Section 101 of the Act" and "simplify the regulations."[332] But section 101 of NEPA targets cooperation with concerned public and private organizations and is not limited merely to ensuring that the public has been informed. [333] As a result, CEQ's justification for eliminating key language from its regulations is irrational and arbitrary.

Indeed, courts have relied on the language CEQ seeks to remove as embodying the vital role of public participation in the NEPA process.[334] While the text of NEPA itself upholds the importance of the public in the environmental review process,[335] CEQ's attempt to eliminate this language may chill public participation. Should CEQ finalize the Proposed Rule and remove this language, it could jeopardize public participation in the NEPA process.

The Proposed Rule's revisions to draft EIS requirements further threaten to undermine public participation in the NEPA process. The Proposed Rule would provide that draft EISs circulated for public review must meet NEPA requirements only "to the fullest extent *practicable*."[336] The existing regulations, by contrast, require such compliance "to the fullest extent *possible*."[337] CEQ explains that, under this revision, agencies may decide that they are not able to circulate a fully-compliant draft EIS based on cost and time limitations or a lack of "economic feasibility."[338] The Proposed Rule would thus greatly expands agency discretion to circulate incomplete drafts for public review and comment. This revision would also be inconsistent with NEPA's purpose to ensure an opportunity for informed public participation in agency decision making.[339]

---

[332] 85 Fed. Reg. at 1693.

[333] 42 U.S.C. § 4331(a). *See also Citizens for Better Forestry v. U.S. Dep't of Agric.*, 341 F.3d 961, 970–91 (9th Cir. 2003) (stating that failure to involve the public in the environmental review process "undermines the very purpose of NEPA").

[334] *See, e.g.*, *Citizens for Better Forestry*, 341 F.3d at 970–91 (stating that 40 C.F.R. §§ 1501.4 and 1506.6 "mean something" and require public participation).

[335] *See, e.g.*, 42 U.S.C. § 4331(a) (stating that "it is the continuing policy of the Federal Government, in cooperation with … concerned public and private organizations, to use all practicable means and measures … in a manner calculated to foster and promote the general welfare, to create and maintain conditions under which man and nature can exist in productive harmony, and fulfill the social, economic, and other requirements of present and future generations of Americans.").

[336] 85 Fed. Reg. at 1719 (proposed 40 C.F.R. § 1502.9(b)) (emphasis added).

[337] 40 C.F.R. § 1502.9(a) (emphasis added).

[338] 85 Fed. Reg. at 1692.

[339] *Robertson*, 490 U.S. at 349.

AR_0026246

In addition, the Proposed Rule would impose a new rigid 30-day comment period on a final EIS.[340] For especially large and complex projects, 30 days may not be long enough for the public to review and comment on the final EIS. This is also true for a final EIS that makes significant changes from the draft EIS. CEQ should not finalize these regulations, but if it does, it should allow for extensions to the comment period as needed to ensure sufficient time for meaningful comment.

### 3.    The Proposed Rule Would Shift the Burden to the Public to Analyze Environmental Issues

CEQ's Proposed Rule would shift to the commenter the duty to perform a detailed analysis that agencies are legally obligated to perform. That is, CEQ seeks to simultaneously increase the burden on the public to provide scientific justification for comments and decrease the burden on a federal agency to respond to comments in a way that would not only prevent meaningful public participation through commenting but would also make agency decision making less clear. This burden shifting is unlawful under NEPA and the APA and also risks creating environmental injustice in agency decision making by restricting comments from those who may lack the resources to meet the new standards.

For example, proposed section 1503.3 would require comments to be "as specific as possible."[341] It also requires that the comments "shall provide as much detail as necessary to meaningfully participate and fully inform the agency of the commenters position," the "comment should explain why the issue raised is significant," "propose specific changes," and "include or describe the data sources and methodologies supporting the proposed changes."[342]

This change threatens to sideline members of the public impacted by the proposed action but unfamiliar with the NEPA process or unable to access technical expertise to comment on a proposed action. For example, an unsophisticated commenter from an area affected by a proposed action may have valuable knowledge about potential impacts or alternatives, but may be unable to describe the "data sources and methodologies supporting the proposed changes" required under the Proposed Rule.[343]

This change is especially troubling given CEQ's proposal in section 1503.4(a)(5) to remove language that strongly recommends the agency to cite "sources, authorities or reasons which support the agency's position" when declining to reply to comments.[344] Under this proposed change, agencies may interpret that they no longer need to cite sources or provide a detailed justification for their positions. This proposed change would limit the public's ability to determine

---

[340] 85 Fed. Reg. at 1722 (proposed 40 C.F.R. § 1503.1(b)).

[341] *Id.* at 1722 (proposed 40 C.F.R. § 1503.3).

[342] *Id.*

[343] *Id.*

[344] *Compare* 40 CFR § 1503.4(a)(5), *with* 85 Fed. Reg. at 1722 (proposed 40 C.F.R. §1503.4(a)(5)).

AR_0026247

if the agency has appropriately considered all comments received. CEQ fails to provide a rational justification for this change,[345] which is inconsistent with NEPA's public participation principles.

### 4.     The Proposed Rule Would Impose Burdensome Exhaustion Requirements

The Proposed Rule would provide that comments or objections not submitted in accordance with the Proposed Rule "shall be deemed unexhausted and forfeited."[346] Although this proposed change may appear to be consistent with current practice, when read with other regulatory revisions, it could significantly narrow both the NEPA comment process and access to judicial review for agency decisions, threatening to shield even the worst agency decisions from the courts.

The Proposed Rule would create a confusing set of steps for commenting: providing for comment at the scoping stage,[347] then requiring very particular comments on the summary of those comments received at the draft EIS stage,[348] providing only 30 days for a commenter to object to the summary in the final EIS,[349] and then imposing a strict exhaustion requirement.[350] Taken together, the various stages of commenting combined with the new specificity and exhaustion requirements could work to prevent a commenter, who has failed to meet all of these requirements, from accessing judicial review of the NEPA process. This process requires a level of knowledge and attention that an organization or individual unfamiliar with NEPA may well not have. The Proposed Rule thus threatens to exclude a broad swath of the public from meaningful participation in the NEPA process.

As noted above, the Proposed Rule also purports to increase the level of specificity for commenters beyond what is enumerated in the cases cited by CEQ in the Proposed Rule.[351] Under those cases, commenters must structure their participation "to alert[] the agency to the [commenter's] position and contentions" so that the agency can give the issue meaningful consideration.[352] But here, CEQ's Proposed Rule would go so far as to require commenters to provide "data sources and methodologies supporting" a proposed change and to explain the significance of the concern not only "to the consideration of environmental impacts and

---

[345] *See* 85 Fed. Reg. at 1704.

[346] *Id*. at 1693, 1713 (proposed 40 C.F.R. § 1500.3(b)(3)).

[347] *Id*. at 1716 (proposed 40 C.F.R. § 1501.9).

[348] *Id*. at 1721–22 (proposed 40 C.F.R. § 1503.1(a)); *id*. 1722 (proposed 40 C.F.R. § 1503.3).

[349] *Id*. at 1722 (proposed 40 C.F.R. § 1503.1(b)).

[350] *Id*. at 1713.

[351] *Id*. at 1703, 1704 (proposed 40 C.F.R. §1503.3(a)).

[352] *Public Citizen*, 541 U.S. at 764 (quoting *Vt. Yankee Nuclear Power Corp.*, 435 U.S. at 553–54) (alteration added).

AR_0026248

alternatives to the proposed action" but also to the consideration of "economic and employment impacts, and other impacts affecting the quality of the human environment."[353]

CEQ's Proposed Rule is unreasonable and unsupported. If read expansively, the Proposed Rule would require commenters to provide an exhaustive analysis of economic, employment, and other impacts even if their concern only pertains to certain environmental impacts[354] Requiring commenters to provide such detailed comments on environmental review documents goes beyond the case law and may unduly burden concerned parties, including those who may the lack experience or resources that such detailed comments demand.[355]

More fundamentally, these changes impermissibly shift the burden of sound environmental review from the federal agencies tasked with this responsibility to a public that often lacks the expertise and resources to conduct such an analysis, potentially narrowing consideration of public comments and limiting access to judicial review under NEPA.[356]

5.    The Proposed Rule Would Reduce an Agency's Obligation to Respond to Comments

CEQ's Proposed Rule would curtail agency response to submitted comments. Under the Proposed Rule, agencies would no longer need to "assess and consider comments both individually and collectively," though they "may" do so.[357] Additionally, the Proposed Rule creates a new section in an EIS where the agency must summarize "all the alternatives, information, and analyses submitted by public commenters."[358] The Proposed Rule then includes a provision that would allow agencies to summarize the comments received and "certify" that the agency considered those comments.[359] The lack of transparency with this proposed change will leave the public without sufficient knowledge that its concerns, including environmental justice concerns, were taken into consideration by the lead agency.

Consideration of opposing viewpoints and presenting that information in an EIS are central tenets of NEPA.[360] By weakening the agencies' responsibility to respond to comments and allowing them to prepare a single summary, the Proposed Rule would be inconsistent with the statutory obligation to provide "good faith, reasoned analysis in response" to comments and

---

[353] 85 Fed. Reg. at 1722 (proposed 40 C.F.R. § 1503.3(a)).

[354] *Native Ecosystems Council v. Dombeck*, 304 F.3d 886, 899 (9th Cir. 2002).

[355] *Id.*

[356] This concern has particular force when, under current case law, the plaintiff is excused from the usual requirement to exhaust administrative remedies when commenters could not review an issue before an EIS is finalized. *Friends of Pinto Creek v. EPA*, 504 F.3d 1007, 1017 (9th Cir. 2007).

[357] *Compare* 40 C.F.R. § 1503.4, *with* 85 Fed. Reg. at 1722 (proposed 40 C.F.R. § 1503.4).

[358] *Id.* at 1720 (proposed 40 C.F.R. § 1502.17).

[359] *Id.* (proposed 40 C.F.R. § 1502.18).

[360] *State of Cal. v. Block*, 690 F.2d 753, 770–71 (9th Cir. 1982).

AR_0026249

threatens to render the public comment process a meaningless exercise in violation of NEPA and the APA.[361]

### 6.    The Proposed Rule Would Impose Unreasonable and Unworkable Time and Page Limits that Could Undermine the Quality of NEPA Review

CEQ proposes to impose arbitrary time and page limits on EAs[362] and EISs[363] to "advance more timely reviews and reduce unnecessary paperwork."[364] CEQ has neither assessed whether such blanket limits are practicable, nor examined the risk that they will result in inadequate and unlawful NEPA reviews, thus undermining CEQ's stated rationale to "advance more timely reviews and reduce unnecessary paperwork."[365]

CEQ has not supported these proposed limits. With respect to time limits, CEQ asserts that in "some cases, the NEPA process and related litigation has slowed or prevented the development of new infrastructure and other projects that required federal permits or approvals."[366] Yet, even if NEPA may lead to slower decision making in certain situations, CEQ's proposed time limits fail to recognize that process timelines can be affected by a range of factors—many outside of agency control—including "the potential for environmental harm; the size of the proposed action; other time limits imposed on the action by other statutes, regulations, or Executive Orders; the degree of public need for the proposed action and the consequences of delay; and the need for a reasonable opportunity for public review."[367] Indeed, CEQ's existing guidance on timelines explicitly recognized that "some projects will entail difficult long-term planning and/or the acquisition of certain data which of necessity will require more time for the preparation of the EIS" to ensure meeting NEPA's substantive goals.[368] However, CEQ's Proposed Rule does not address these complexities.

CEQ also fails to support its proposed page limits. CEQ cites data on the length of recent EISs in supporting its proposal to make the previously aspirational page limits mandatory, but provides no real justification for the proposal.[369] CEQ assumes without supporting data that shorter EISs than are currently the norm are consistent with the "core purpose of page limits from the

---

[361] *Id.* at 773 (quoting *Silva v. Lynn*, 482 F.2d 1282, 1285 (1st Cir. 1973).

[362] 85 Fed. Reg. at 1688, 1715 (proposed 40 C.F.R. § 1501.5), 1717 (proposed 40 C.F.R. § 1501.10).

[363] *Id.* at 1717 (proposed 40 C.F.R. § 1501.10), 1719 (proposed 40 C.F.R. § 1502.7).

[364] *Id.* at 1688.

[365] *Id.*

[366] *Id.* at 1685.

[367] Timely Review Memorandum, *supra* note 71, at 14.

[368] Forty Questions Guidance, *supra* note 221, at 26.

[369] 85 Fed. Reg. at 1687–88.

AR_0026250

original regulations."[370] But CEQ's approach ignores that the length of the document itself—as opposed to its contents—is at best a secondary consideration in determining whether the responsible official has met its obligation to "insure that presently unquantified environmental amenities and values may be given appropriate consideration"[371]

CEQ notes that "the length of an EIS will vary based on the complexity and significance of the proposed action environmental effects the EIS considers,"[372] but fails to analyze whether one-size-fits-all length limits are appropriate or practicable. Moreover, CEQ ignores that requiring agencies to create a page-limited EIS may in fact be more difficult and time consuming than allowing agencies to develop a longer document. Ignoring this critical aspect of the purported problem CEQ claims to be addressing is quintessentially arbitrary and capricious and unreasonable agency decision making.[373]

Additionally, CEQ provides no evidence to support its proposed presumptive time and length limitations for EAs. CEQ asserts that a 75-page limit for EAs "will promote more readable documents, but also provide agencies flexibility to prepare longer documents, where necessary to support the agency's analysis."[374] But without actually examining how EAs are currently being produced and used, or whether such limits would result in substantively deficient EAs, CEQ's page limit is unsupported and arbitrary and capricious.

## 7.    CEQ Must Ensure Broad Public Participation

The States support widening public access to the NEPA process by expanding tribal consultation and participation in the NEPA process and including electronic participation as one means of participation. But the States remain concerned that the Proposed Rule, as written, does not do enough to ensure inclusivity in the comment process.[375]

Specifically, the Proposed Rule would fail to provide for non-electronic notice and hearing access for communities adjacent to action areas, communities in urban areas, and tribal communities. Access to high-speed internet can be limited by location and income. The Federal Communications Commission estimates that as many as four million people in *urban* areas may not have access to broadband internet and further identifies a considerable gap in access for both tribal and rural areas.[376] The regulations should be revised to ensure agencies provide non-

---

[370] *Id.* at 1700.

[371] 42 U.S.C. § 4332(2)(B).

[372] 85 Fed. Reg. at 1700.

[373] *State Farm*, 463 U.S. at 43.

[374] *Id.*

[375] *See* 85 Fed. Reg. at 1705 (focusing only on rural communities), 1725 (proposed 40 C.F.R. § 1506.6(c)).

[376] FED. COMMC'NS COMM'N, 2019 BROADBAND DEPLOYMENT REPORT, at 16 (May 29, 2019) https://docs.fcc.gov/public/attachments/FCC-19-44A1.pdf (finding that an estimated 1.7% of the urban U.S. population of 257,446,000 people, equaling 4,376,582 people, did not have access to advanced broadband in 2017).

AR_0026251

electronic means of notice and commenting for all impacted communities or individuals without access to high-speed internet.

Such revisions would be more consistent with CEQ's current guidance on environmental justice in implementing NEPA.[377] That guidance specifically calls out the potential need for "adaptive or innovative approaches" to involve minority, low-income, and tribal populations in the NEPA process.[378] Establishing an electronic barrier to commenting or participation would only serve to magnify the disproportionate environmental harms in these communities. CEQ must ensure public meetings and public commenting are in fact public by providing means for all interested parties to attend and participate consistent with NEPA and the APA.

## H.    CEQ's Proposed Rule Would Limit Appropriate Remedies for NEPA Violations and Block Access to the Courts

Judicial review of agency actions under NEPA is necessary to ensure government accountability. Where projects are challenged, it is often by plaintiffs seeking to ensure that projects do not move forward without adequate review of environmental impacts. In such circumstances, the courts play a vital role in ensuring that federal agencies adhere to Congress's mandate to take a hard look at environmental consequences before taking major actions.[379] The opportunity for judicial review of agency actions is not a flaw of NEPA or an obstacle to achieving its purposes, but a fundamental part of the NEPA process. Indeed, judicial review of an executive agency action is an archetypical example of the separation of powers inherent in our government. However, CEQ's Proposed Rule threatens to obstruct judicial review.

### 1.    CEQ Proposes Unlawful Limits on Judicial Remedies

The Proposed Rule seeks to restrict the remedy a litigant can secure through litigation by stating that "[h]arm from failure to comply with NEPA can be remedied by compliance with NEPA's procedural requirements…"[380] The language of the Proposed Rule provides that the NEPA regulations "create no presumption that violation of NEPA is a basis for injunctive relief or for a finding of irreparable harm."[381] However, this change is irreconcilable with separation of powers principles and existing case law on NEPA remedies. CEQ has no authority to dictate or even suggest to the courts how they should process and decide NEPA cases.

Courts hold the power to enjoin unlawful agency actions.[382] Indeed, this is a necessary tool in NEPA litigation to prevent potential harm during litigation. A pronouncement from CEQ in a

---

[377] CEQ Environmental Justice Guidance, *supra* note 301, at 13.

[378] *Id.*

[379] *See* Greczmiel Statement, *supra* note 65, at 8–12.

[380] 85 Fed. Reg. at 1713 (proposed 40 C.F.R. § 1500.3(d)).

[381] *Id.*

[382] 5 U.S.C. § 705 (granting reviewing courts the authority to "issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review

64

regulation that harm can be remedied by compliance with the statute, without any further intervention by the courts is inconsistent with the court's equity power and would be an unlawful attempt by the executive branch to severely limit the scope of the judicial branch's authority. This change, if upheld, would also lead to environmental harm in cases where the deficiencies in a NEPA review lead to implementation of an environmentally harmful project during litigation. This attempt to limit judicial remedies would unlawfully attempt to usurp the role of the courts in enforcing NEPA.

CEQ also attempts to define a final agency action for purposes of judicial review in newly proposed section 1500.3(c).[383] In doing so CEQ departs from its previous position that judicial review was appropriate after issuance of an EIS, a finding of no significant impact (FONSI), or irreparable injury[384] and focuses instead on the issuance of a Record of Decision or "other final agency action."[385] This proposal could create confusion as to which NEPA decisions constitute a final agency action subject to judicial review and is incongruent with case law holding that various agency decisions including issuance of a FONSI and final agency actions subject to judicial review. [386]

Proposed Section 1504.3(h), which proposes to refer federal disagreements over proposed actions to the CEQ, would remove the requirement to follow the process required under the APA.[387] The Proposed Rule also states that the referral process is not subject to judicial review.[388] CEQ states that it made this change to provide for "a more timely and efficient process" and "to simplify and modernize the process."[389] But CEQ provides no rationale or legal justification for this significant eradication of transparent procedures and judicial review of its decisions, which is inconsistent with NEPA's goals.

2.    **CEQ Proposes Unlawful Bond Requirements that Would Substantially Limit Judicial Review of Agency Actions**

The Proposed Rule also encourages agencies to impose "bond and security requirements or other conditions" on plaintiffs seeking to stay agency decisions pending administrative or judicial review of an agency decision.[390] This proposal would seek to constrain judicial review of

---

proceedings); *Winter v. Nat. Res. Defense Council*, 555 U.S. 7, 24 (2008) (discussing court's equity powers; *see also* Fed. R. Civ. P. 65.

[383] 85 Fed. Reg. at 1713.

[384] 40 C.F.R. § 1500.3.

[385] 85 Fed. Reg. at 1713 (proposed 40 C.F.R. § 1500.3).

[386] *Sierra Club v. U.S. Army Corps of Eng'rs*, 446 F.3d 808 (8th Cir. 2006).

[387] *Compare* 40 C.F.R. § 1504.3, *with* 85 Fed. Reg. at 1723 (proposed 40 CFR § 1504.3).

[388] 85 Fed. Reg. at 1723 (proposed 40 C.F.R. § 1504.3).

[389] *Id.* at 1704.

[390] 85 Fed. Reg. at 1694, 1713 (proposed 40 C.F.R. § 1500.3(c)).

AR_0026253

agency actions by limiting the field of plaintiffs able to raise concerns about NEPA compliance and lacks any rational explanation or statutory authority.

CEQ attempts to justify its unlawful proposal by claiming that "some courts have imposed substantial bond requirements in NEPA cases," but it fails to cite even one case doing so.[391] While courts have imposed bonds on NEPA plaintiffs, courts have done so with the explicit understanding that a court should "not set such a high bond that it serves to thwart citizen actions."[392] Where one court did set a bond of $4,500,000 for a NEPA plaintiff's preliminary injunction, the Ninth Circuit overturned the bond, stating that "such bonds would seriously undermine the mechanisms in NEPA for private enforcement" and, as a result, "plaintiffs in many NEPA cases would be precluded from effective and meaningful appellate review."[393] Indeed, high bond amounts could systematically keep out low-income, minority, and tribal plaintiffs, exacerbating existing under-representation of those groups. If courts were to impose a bond requirement plaintiffs cannot afford, then federal agencies would be able to go forward with major federal actions that were not compliant with NEPA. These arguments all apply equally to a federal agency requiring a bond to stay an agency decision in anticipation of litigation.

CEQ also attempts to justify this change under NEPA by stating that "appropriate conditions on such stays may further the purposes of NEPA, which provides that all Federal agencies shall identify and develop methods and procedures, in consultation with CEQ, to ensure that environmental amenities and values are given appropriate consideration in decision making along with economic and technical considerations."[394] However, NEPA explicitly declares that it is the policy of the federal government to cooperate with private organizations to "create and maintain conditions under which man and nature can exist in productive harmony."[395] Courts have found that a large bond in the judicial setting "would … stifle the intent of [NEPA], since … 'concerned private organizations' would be precluded from obtaining judicial review."[396] Excessive bonding requirements could thwart that vital role, and it should be the courts, not federal agencies, that have responsibility in ensuring appropriate bonding amounts.[397] CEQ's citation to NEPA's purposes therefore undermines rather than justifies its proposed bonding provision.

Furthermore, CEQ fails to provide authority to support this revision. CEQ merely states that "in appropriate circumstances, agencies may impose bond and security requirements or other conditions," while citing 5 U.S.C. § 301, which is a generalized grant of regulatory authority for

---

[391] 85 Fed. Reg. at 1694 n.55.

[392] *See Save Our Sonoran, Inc. v. Flowers*, 408 F.3d 1113, 1126 (9th Cir. 2005).

[393] *Friends of the Earth, Inc. v. Brinegar*, 518 F.2d 322, 323 (9th Cir. 1975).

[394] 85 Fed. Reg. at 1694 (citation omitted.)

[395] 42 U.S.C. § 4331(a).

[396] *Nat. Res. Def. Council, Inc. v. Morton*, 337 F. Supp. 167, 169 (D.D.C. 1971) (quotations in original). *See also Colorado Wild Inc. v. U.S. Forest Serv.*, 523 F. Supp. 2d 1213, 1230 (D. Colo. 2007) (declining to impose bond); *Morgan v. Walter*, 728 F. Supp. 1483, 1494 (D. Idaho 1989) (same).

[397] *See Flowers*, 408 F.3d at 1126 (affirming that nominal bonds in public interest cases can be appropriate, given that high bonds can "thwart citizen actions").

AR_0026254

federal agencies.[398] CEQ also apparently tries to rely on the authority of 5 U.S.C. § 705.[399] In fact, neither statutory provision mentions anything about bonds or sureties and to the extent section 705 discusses relief, it notes only the court's authority to award that relief.[400] Thus, CEQ has failed to provide any statutory authority for a federal agency to impose a bond requirement. Its proposal thus violates the APA and is *ultra vires*.

### 3.    The Proposed Rule's Conclusive Presumption that an Agency Has Considered Public Comments is Contrary to Law

CEQ's Proposed Rule seeks to impose a "conclusive presumption that the agency has considered the information included in the submitted alternatives, information, and analyses section"[401] in an EIS. CEQ's proposal to adopt a "conclusive presumption" of legality is both novel and inconsistent with separation of powers principles. CEQ has no authority to establish presumptions in judicial review, and in any event, a conclusive presumption is exceedingly rare in current federal regulations. Conclusive presumptions appear only four times in the entire Code of Federal Regulations and never are used to create a bar to judicial review of agency actions.[402] Yet, CEQ proposes to adopt this novel provision with little justification or legal analysis. CEQ's proposed provision represents an exceptional departure from previous CEQ policy and is inconsistent with NEPA's purpose that agencies foster meaningful public participation in agency decision making.

This purported conclusive presumption threatens to create an impossible bar for potential NEPA plaintiffs to challenge the deficiency of an agency's comment summary in an EIS. Even a patently deficient and factually incorrect summary could not be challenged under the proposed conclusive presumption standard.

CEQ's proposed presumption is also unnecessary. Courts currently apply a "rebuttable presumption" that a clear agency response to comments shows that the agency considered and answered the concerns.[403] This presumption can be rebutted by showing that the agency response was inadequate, an essential check against unreasonable or arbitrary agency decision making.[404]

---

[398] 85 Fed. Reg. at 1694 (citing 5 U.S.C. § 301).

[399] *See* 85 Fed. Reg. at 1694.

[400] *See* 5 U.S.C. §§ 301, 705.

[401] 85 Fed. Reg. at 1720 (proposed 40 C.F.R. § 1502.18).

[402] *See* 26 C.F.R. § 1.166-2(d)(3) (conclusive presumption used to define worthless debts under IRS regulations); 45 C.F.R. § 302.70(a)(5)(iv) (providing the states an option to create a conclusive presumption of paternity upon genetic testing); 15 C.F.R. § 930.83 (providing for conclusive presumption of state concurrence in certain situations); 38 C.F.R. § 3.250 (creating a presumption of dependency of a parent in specified circumstances). However, there are 180 references to a "rebuttable presumption" under the Code of Federal Regulations.

[403] *Great Old Broads for Wilderness v. Kimbell*, 709 F.3d 836, 849 (9th Cir. 2013)

[404] *Id.*

AR_0026255

A "conclusive presumption," in contrast, would give a commenter no chance to overcome the presumption.

In short, CEQ has no authority to adopt this purported "conclusive presumption," and has not rationally justified it.

## I.    The Proposed Rule Would Increase Uncertainty and Litigation

The Proposed Rule purports to "modernize and clarify" the NEPA regulations.[405] But many of its revisions would only work to increase uncertainty and litigation. This uncertainty would be exacerbated by CEQ's suggestions that the Proposed Rule, if adopted, "would supersede any previous CEQ NEPA guidance," and that CEQ "anticipates withdrawing all of the CEQ NEPA guidance that is currently in effect and issuing new guidance as consistent with Presidential directives."[406]

Over the years, in addition to issuing the current NEPA regulations, CEQ has developed and issued a robust body of guidance documents meant to help federal agencies and the public navigate the requirements of the statute.[407] For example, key CEQ guidance explains how to examine issues of environmental justice, coordinate historic preservation requirements with NEPA, and address emergencies.[408] Courts have also relied on the existing regulations and CEQ's guidance in interpreting NEPA.[409] Eliminating this guidance in one fell swoop, as proposed, would create substantial uncertainty for states, the public, agencies, and the courts and lead to extensive, costly, and time-consuming litigation.

Agencies have relied on CEQ guidance for decades. The principles outlined in those guidance documents and in CEQ's current NEPA regulations are infused throughout the agency-specific NEPA regulations.[410] The task of rewriting and rebuilding NEPA processes and programs

---

[405] 85 Fed. Reg. at 1684.

[406] *Id.* at 1710. Moreover, the preamble also notes that "[b]ased on comments received and CEQ's experience in implementing NEPA, the final rule may include amendments to any provisions in parts 1500 to 1508 of the CEQ regulation," suggesting that additional changes not articulated in the Proposed Rule be included in the final rule, if any. *See id.*

[407] *See* 85 Fed. Reg. at 1684–85 (over 30 guidance documents have been issued by CEQ since 1970).

[408] CEQ Environmental Justice Guidance *supra* note 301; CEQ AND ADVISORY COUNCIL ON HISTORIC PRESERVATION, NEPA AND NHPA: A HANDBOOK FOR INTEGRATING NEPA AND SECTION 106 (Mar. 2013), https://ceq.doe.gov/docs/ceq-publications/NEPA_NHPA_Section_106_Handbook_Mar2013.pdf; CEQ, Emergencies and the National Environmental Policy Act, https://ceq.doe.gov/docs/ceq-regulations-and-guidance/Emergencies_and_NEPA.pdf.

[409] *Davis v. Mineta*, 302 F. 3d 1104, 1125 n.17 (10thCir. 2002), *abrogated on other grounds by Dine Citizens Against Ruining Our Env't v. Jewell*, 839 .3d 1276 (10th Cir. 2016) (CEQ's "40 Questions" document is persuasive authority); *Citizens Against Burlington, Inc. v. Busey*, 938 F.2d 190, 202 (D.C. Cir. 1991) ) (citing with approval 40 Questions guidance); *Sierra Club v. Sigler*, 695 F.2d 957, 971 (5th Cir. 1983)(same). *But see State of La. v. Lee*, 758 F.2d 1081, 1083 (5th Cir. 1985) (finding that CEQ's "Forty Questions" document is not a controlling authority).

[410] *See, e.g.*, 85 Fed. Reg. at 1687 ("Over the past 4 decades, CEQ has issued over 30 documents to provide guidance and clarifications to assist Federal agencies to more efficiently and effectively implement NEPA. CEQ has issued

AR_0026256

within the agencies will be enormous. Confusion would result as agencies scramble to draft new NEPA procedures and policies to accommodate the new regulations. This confusion would be compounded by the fact that the regulations as proposed are often vague, and agencies would be operating without the existing guidance from CEQ. The Proposed Rule would also force states and applicants to guess which provisions would be litigated and which would be upheld. CEQ also directs agencies to develop and revise their own agency-specific NEPA procedures to be consistent with—but not more stringent than—the final rule within one year of the latter's publication. A one-year timeline to implement new regulations in the face of such great uncertainty would place an unreasonable burden on federal agencies. The Proposed Rule would thus disrupt NEPA reviews throughout the federal government and across the nation for years to come, increasing project delays and uncertainty.

This uncertainty would be compounded by CEQ's proposal to allow agencies to apply the Proposed Rule to "ongoing activities and environmental documents begun before" the effective date of a final rule.[411] If an agency chooses this disruptive option, it could upend any number of environmental reviews and cause additional confusion and delay.

CEQ's Proposed Rule, if finalized, would also significantly increase litigation. Currently, most NEPA analyses do not result in litigation.[412] According to CEQ data, "the number of NEPA lawsuits filed annually has consistently been just above or below 100, with the exception of a period in the early- and mid-2000s."[413] "Given that the number of federal actions potentially subject to NEPA is roughly 100,000 or so annually, litigation rates are exceedingly low."[414] Even for EISs, which represent a small fraction of NEPA review processes, on average 20% are challenged and just 13% are actually litigated."[415]

Under the Proposed Rule, however, federal actions would be subject to challenge based on an insufficient environmental review that may meet the standards in the Proposed Rule, but do not meet the substantive standards in NEPA itself.

---

guidance on such topics as [categorical exclusions], EAs, mitigation, and [FONSIs], emergencies, programmatic NEPA reviews, timely environmental reviews, collaboration and conflict resolution, purpose and need, effects, lead and cooperating agencies, environmental justice, and other topics.") (citations omitted).

[411] *Id.* at 1727.

[412] GAO Report, *supra* note 24, at 19.

[413] *Id.*

[414] David E. Adelman & Robert L. Glicksman, *Presidential and Judicial Politics in Environmental Litigation*, 50 ARIZ. ST. L.J. 4, 50 (2018).

[415] *Id.*; *see also* GAO Report, *supra* note 24, at 19; Lazarus, *supra* note 30 at 1510 (as of 2012, the Supreme Court had decided only 17 NEPA cases).

AR_0026257

## V.    THE PROPOSED RULE WOULD ADVERSELY IMPACT THE UNIQUE INTERESTS OF STATES, TERRITORIES, AND LOCAL GOVERNMENTS IN ROBUST NEPA REGULATIONS

NEPA is an example of cooperative federalism, envisioning a strong role for states, territories, and local governments in NEPA reviews. Indeed, when enacting NEPA, Congress declared that the federal government must act, "in cooperation with States and local governments" to evaluate potential environmental impacts in fulfillment of NEPA's purposes.[416] The current NEPA regulations likewise direct federal agencies to "cooperate with State and local agencies to the fullest extent possible to reduce duplication between NEPA and State and local requirements…."[417] NEPA's success has led to the enactment of similar statutes in many states. NEPA plays a significant role in states across the nation by informing environmental reviews under both federal and state law. However, the proposed changes to CEQ's NEPA regulations would threaten the interests of the States in protecting our residents and environmental resources through public participation and robust, informed decision making processes for federal projects.

## A.    The States Have an Interest in Ensuring that Federal Decisions Do Not Harm Their Residents, Property, or Natural Resources

The States have a strong interest in robust NEPA compliance with significant opportunities for public participation in order to protect their residents, property, and natural resources. The States are injured when our residents suffer from the effects of environmental degradation, including cumulative pollution impacts in environmental justice communities.[418] The States also have a quasi-sovereign interest in preventing harm to the health of our natural resources and ecosystems[419] and are entitled to "special solicitude" in seeking redress for environmental harms within their borders.[420] Moreover, public involvement by our agencies and residents is critical in identifying and evaluating public health and environmental issues of local or statewide concern that may result from federal actions.

NEPA reviews provide an important opportunity for state, territorial and municipal agencies to help shape federal decisions that affect our resources. For example, as detailed in the Advance Notice Comments, for critical issues such as siting of nuclear waste disposal facilities or interstate pipelines, where environmental review may take place primarily through a NEPA process, the Proposed Rule's narrowing of indirect and cumulative effects review and

---

[416] 42 U.S.C. § 4331(a).

[417] 40 C.F.R. § 1506.2.

[418] *Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Baez*, 458 U.S. 592, 607 (1982); *Maryland v. Louisiana*, 451 U.S. 725, 737–38 (1981).

[419] *Massachusetts v. EPA*, 549 U.S. 497, 519–22 (2007).

[420] *Id*. at 520.

AR_0026258

consideration of alternatives, would expose the States, and our resources, residents and environments to significant environmental impacts.[421]

NEPA analysis also provides important resources for states in informing other important programs and decisions affecting our resources. For example, robust EISs are critical to informing the states' "consistency determinations" under the federal Coastal Zone Management Act,[422] by which states assess the impact of federal projects on land, water uses, and natural resources in coastal zones.[423]

The Proposed Rule threatens these critical state interests by limiting both the substantive analysis under NEPA and the availability of public participation. For example, the threshold analysis added to the Regulations, the redefinition of "major Federal action" and "significance," and expansion of categorical exclusions would lead to weaker or no environmental analysis of some federal projects.[424] The expansion of the functional equivalency standard[425] and limitation of the alternatives analysis also would limit environmental review.[426] Limitations on the scope of impacts considered under NEPA could greatly reduce the information generated by an environmental review.[427] Without this type of analysis, states would lack information to understand the harm these projects could have within a state. They also would lack the information necessary to coordinate other state programs and resources impacted by these actions.

CEQ's revisions that restrict public participation and judicial review are also of great concern to the States because our residents would be unable to contribute effectively to, review, or challenge noncompliant NEPA reviews that affect their communities.[428]

## B.    Weakening the NEPA Regulations Would Disrupt Cooperation Between Federal and State Agencies and Burden States with Increased Environmental Review

Changes weakening NEPA would disrupt cooperative environmental reviews by federal and state agencies and increase the burden on states and applicants to conduct additional environmental review under state statutes.

---

[421] Advance Notice Comments, *supra* note 7, at 6–7.

[422] 16 U.S.C. § 1456.

[423] *See, e.g.*, 15 C.F.R. § 930.31; 301 Mass. Code Regs. § 20.04.

[424] *See supra* section IV.D.

[425] *Id.*

[426] *See supra* section IV.E.

[427] *See supra* section IV.F.

[428] *See supra* sections IV.G & IV.H.

AR_0026259

NEPA's enactment served as a model to the States, many of which enacted their own environmental review laws or "little NEPAs" to protect public health and the environment.[429] Examples include the California Environmental Quality Act,[430] the Massachusetts Environmental Policy Act,[431] New York's State Environmental Quality Review Act,[432] and Washington's State Environmental Policy Act.[433] Where an action has both federal and non-federal components, as is often the case, the NEPA regulations direct federal agencies to "cooperate with State and local agencies to the fullest extent possible to reduce duplication between NEPA and State and local requirements."[434] Accordingly, CEQ and several states have worked together to harmonize the environmental review processes under NEPA and little NEPAs through state-specific memoranda.[435] This collaboration allows state, local, and federal agencies to share documents, reduce paperwork, and efficiently allocate limited time and resources. However, the Proposed Rule would disrupt this collaboration to the extent it prohibits federal agencies from adopting NEPA regulations that integrate with state review processes with more stringent requirements and procedures than those set out in the Proposed Rule.[436] This change would impair federal agencies' coordination with states, creating greater complexity and uncertainty for applicants, and additional delays and paperwork.

Furthermore, the weakened, narrowed, and truncated NEPA process contemplated by the Proposed Rule would increase the burden on the States to rely more heavily on and prepare more documents under our own environmental laws.

As discussed more fully in the Advance Notice Comments,[437] the States' laws are often administered in conjunction with the NEPA regulations, either through coordinated state and federal review or by relying on NEPA review to satisfy state environmental review requirements. Those comments anticipated specific burdens and impacts from the proposed rulemaking that have been realized in the Proposed Rule. For instance, in situations where a federal agency's limited analysis of indirect and cumulative impacts and alternatives under the Proposed Rule would be less stringent than a state's little NEPA standards, a state agency would be unable to rely on the federal EIS to make its own environmental findings.[438] Thus, the burden would fall on the States to conduct additional analysis, such as preparing a separate state EIS. As a result, the proposed regulatory changes will not ultimately simplify or expedite the environmental review process, as

---

[429] *See* CEQ, STATES AND LOCAL JURISDICTIONS WITH NEPA-LIKE ENVIRONMENTAL PLANNING REQUIREMENTS [hereinafter State and Local Laws], https://ceq.doe.gov/laws-regulations/states.html (last visited Mar. 6, 2020).

[430] 1970 Cal. Stats. ch. 1433, Cal. Pub. Res. Code §§ 21000–21189.57.

[431] Mass. Gen. Laws ch. 30, §§ 61-62H (2020).

[432] N.Y. Envtl. Conserv. Law. art. 8; 6 N.Y. Comp. R. & Regs. § 617.

[433] Wash. Rev. Code 43-21C-010 to 914; Wash. Admin. Code § 197-11-010 to 990.

[434] 40 C.F.R. § 1506.2.

[435] *See* State and Local Laws, *supra* note 429. *See also* 40 C.F.R. § 1500.5(h).

[436] 85 Fed. Reg. at 1727 (proposed 40 CFR § 1507.3(a)).

[437] *See* Advance Notice Comments, *supra* note 7, at 5–11.

[438] *See, e.g.,* 6 N.Y. Comp. Codes R. & Regs. § 617.15(a).

AR_0026260

posited by CEQ. Rather, by curtailing the scope of impacts analysis required under NEPA and reducing the level of cooperation with federal agencies, CEQ would merely shift the burdens of environmental review to state and local jurisdictions with robust little NEPAs. This additional analysis would require the States to expend additional time and resources on environmental review of a proposed action. CEQ's finding that the Proposed Rule would have no federalism implications under Executive Order 13132 is therefore wrong and unsupported.[439]

Moreover, where additional environmental review is not required under a little NEPA, CEQ's proposal to greatly limit the scope of impacts considered under NEPA would diminish the amount of information available to state and local agencies and the public with regard to the environmental impacts of proposed projects. In doing so, CEQ's Proposed Rule would undermine the major purposes of NEPA to foster informed decision making and informed public participation.

In addition to coordination with state environmental review laws, the States have also long relied on the NEPA regulations, guidance, and case law in interpreting and implementing their state environmental review statutes and regulations. The much weaker proposed NEPA regulations may no longer provide substantive and procedural guidance to states. CEQ's proposed revisions to the definition of key terms may create divergence between state and federal standards, undermining our States' ability to efficiently implement our own environmental review laws, and impacting the case law interpreting States' well-developed statutory and regulatory regimes. And, as discussed above, CEQ's proposal to withdraw all existing guidance will severely burden state agencies and programs relying on that guidance.

In summary, the States have strong interests in the continued implementation of NEPA regulations that provide for a robust, deliberative, and complete federal environmental review process. CEQ's arbitrary limits on the scope and timeframe allowed for preparation and consideration of NEPA documents, the public participation process, and judicial review would harm the States' interests and violate NEPA's purpose and text.

## VI.   CEQ MUST CONDUCT NEPA REVIEW OF ITS REGULATIONS

CEQ has acted arbitrarily and capriciously by failing to consider properly whether the proposed rule itself triggers NEPA, thus requiring the preparation of an EA or an EIS prior to the issuance of a final rule. Instead, CEQ summarily states it "has determined that the proposed rule would not have a significant effect on the environment because it would not authorize any activity or commit resources to a project that may affect the environment."[440] CEQ acknowledges that it prepared environmental assessments for its promulgation of NEPA regulations in 1978 and amendments in 1986.[441] But here, CEQ contends that it is not required to conduct NEPA analysis on its proposed rule because "CEQ does not require any Federal Agencies to conduct NEPA analysis for the development of agency procedures for the implementation of NEPA and the CEQ

---

[439] 85 Fed. Reg. at 1711.

[440] Id.

[441] Id.

AR_0026261

regulations."[442] This is not the relevant standard for determining whether environmental review is required.

Under NEPA, federal agencies, including CEQ, are required to prepare a detailed statement on the environmental impacts of a major federal action significantly affecting the quality of the human environment.[443] If there is a substantial question whether an action may have a significant effect on the environment, CEQ must prepare an EIS.[444] As a preliminary step, CEQ may prepare an EA to determine whether a proposed action may significantly affect the environment and whether an EIS is required.[445]

CEQ's decision to forgo NEPA review for this rulemaking is arbitrary and capricious because revising the NEPA regulations is a major federal action that will have a significant impact on the environment. Second, CEQ's justification conflicts with NEPA and the case law interpreting it. The absence of a regulation specifically requiring CEQ to conduct NEPA review on its regulations does not obviate the agency's obligations to comply with the statute and consider whether the Proposed Rule would have a major impact on the environment. Finally, CEQ's stated rationale is arbitrary and capricious because it ignores recent circuit court precedent.

## A.  Overhauling the Nation's NEPA Regulations Is a Major Federal Action Affecting the Environment

NEPA's current regulations identify agency rules as "major" federal actions which may require NEPA review.[446] Under NEPA, if an agency's rulemaking may significantly impact the environment, NEPA review is required. This includes CEQ's revisions to NEPA's implementing regulations in the Proposed Rule. As described in this comment letter, CEQ is proposing a sweeping re-write of NEPA's implementing regulations, which are relied upon by all federal agencies, and which have been in place—largely intact—since 1978. Accordingly, CEQ must undertake the necessary NEPA review of its rulemaking, and its failure to do so is arbitrary and capricious.[447]

CEQ's comprehensive overhaul of the NEPA regulations alters how and when federal agencies must consider the environmental effects of proposed projects across the nation. As discussed above, the proposed changes to CEQ's regulations will weaken the quality of

---

[442] *Id.*

[443] 42 U.S.C. § 4332(2)(C).

[444] *Ctr. for Biological Diversity*, 538 F.3d at 1185.

[445] *Id.*

[446] 40 C.F.R. § 1508.18(a) ("Actions include . . . new or revised agency rules, regulations, plans, policies, or procedures").

[447] *New York v. Nuclear Regulatory Comm'n*, 681 F.3d 471, 476–78 (2d Cir. 2012) (vacating agency's rulemaking, which the court considered to be a major federal action, because of deficient NEPA review).

AR_0026262

environmental analysis conducted by federal agencies by, among other things, expanding the use of categorical exclusions, reducing the meaning of "significance" for determining whether an EIS is required, restricting the types of effects considered in an EIS, weakening the alternatives analysis, and reducing public participation and agency accountability. A major purpose of NEPA is to ensure that an agency will have available, and will carefully consider, detailed information concerning significant environmental impacts, and guarantee that the relevant information will be made available to the larger public audience.[448] But CEQ's Proposed Rule, if adopted, would firmly undermine that purpose and is likely to have significant effects on the environment, thus warranting NEPA review. For example, by limiting the scope of effects that must be analyzed under NEPA, CEQ makes it more likely that projects with significant effects will be approved without mitigation. This is a reasonably foreseeable outcome where the analysis is truncated and the public and decision makers would be less aware of the environmental impacts of proposed projects and alternatives to those projects.

As another example, the proposed "threshold applicability analysis," which CEQ states will "provides a series of considerations to assist agencies … to determine whether NEPA applies,"[449] establishes in effect an early off-ramp for a wide category of actions that are presumed not to require any environmental review.[450] The "threshold applicability analysis," like other changes described in these comments, narrows the universe of actions subject to NEPA and creates the possibility that significant effects will be overlooked if certain projects are not subject to NEPA review. CEQ has not taken the "hard look" to determine whether the Proposed Rule, including the threshold applicability analysis, will significantly impact the environment.

## B.    CEQ Misstates and Ignores the Governing Law Requiring NEPA Review

CEQ contends that it is not required to conduct NEPA review of its implementing regulations because there is no regulation that specifically requires it. However, NEPA does not allow for such a conclusion. The language in section 102(2)(C) of NEPA "is intentionally broad to force the government to consider the environmental effects of its actions."[451] Existing CEQ regulations provide, and numerous courts have confirmed[452] that a "major federal action" includes

---

[448] *Ctr. for Biological Diversity*, 538 F.3d at 1185.

[449] 85 Fed. Reg. at 1695.

[450] *Id.*

[451] *Found. for Horses & Other Animals v. Babbitt*, 995 F. Supp. 1088, 1093 (C.D. Cal. 1998) (citing *Found. for N. Am. Wild Sheep v. U.S. Dep't of Agric.*, 681 F.2d 1172, 1177 (9th Cir. 1982)).

[452] *See, e.g., California ex rel. Lockyer v. U.S. Dep't of Agric.*, 575 F.3d 999, 1012–18 (9th Cir. 2009) (agency repeal of roadless rule and replacement with new regulations required NEPA review); *Humane Soc'y of the U.S. v. Johanns*, 520 F. Supp. 2d 8, 18–32 (D.D.C. 2007) (vacating federal rule requiring NEPA review); *Natural Res. Def. Council v. Duvall*, 777 F. Supp. 1533, 1542 (E.D. Cal. 1991) (setting aside federal rule due to failure to perform EIS)*American Pub. Transit Ass'n v. Goldschmidt*, 485 F. Supp. 811, 831–36 (D.D.C. 1980), *reversed on other grounds by Am. Pub. Transit Ass'n v. Lewis*, 655 F2d 1272 (D.C. Cir. 1981) (regulations requiring many individual

AR_0026263

"new or revised agency *rules*, *regulations*, plans, policies, or *procedures*" where those actions may significantly affect the environment.[453] Regardless of whether the Proposed Rule is characterized as a rule, regulation, or procedure, it is still subject to NEPA review. NEPA regulations require that both the context and the intensity of an action be considered in determining whether an action may significantly affect the environment.[454] The presence of just "one of these factors may be sufficient to require the preparation of an EIS in appropriate circumstances."[455]

As with other agency actions, changes to NEPA's implementing regulations require their own NEPA review if they create the possibility of significant impacts on the environment.[456] In *Sierra Club v. Bosworth*, the Ninth Circuit held that the Forest Service's adoption of a new categorical exclusion for fuel reduction projects up to 1,000 acres and prescribed burns up to 4,500 acres on all national forest lands in the United States violated NEPA by failing to take the requisite "hard look" at the possibility of significant impacts of this rulemaking on the environment.[457] In particular, the Ninth Circuit found that the Forest Service failed to properly assess the scope of potential impacts and failed to adequately consider the NEPA significance factors, including cumulative impacts and the extent to which the categorical exclusion was highly controversial and the risks uncertain.[458] Consequently, the Ninth Circuit ordered the district court "to enter an injunction precluding the Forest Service from implementing the [categorical exclusion] pending its completion of an adequate assessment of the significance of the categorical exclusion from NEPA."[459]

Conversely, in *Heartwood*, the Seventh Circuit found the Forest Service could adopt a new categorical exclusion without additional NEPA review.[460] The court found that, "by definition," a categorical exclusion is unlikely to significantly impact the environment, and the Forest Service did evaluate whether the proposed activity subject to the categorical exclusion would affect the environment and whether it qualified for the categorical exclusion.[461] Unlike the situation in

---

actions, each significantly affecting the environment, must itself be regarded as significantly affecting the environment requiring NEPA analysis).

[453] 40 C.F.R. § 1508.18 (emphasis added). *See also* 40 C.F.R. § 1507.3 (requiring each federal agency to "adopt procedures to supplement these regulations").

[454] 40 C.F.R. § 1508.27.

[455] *Ocean Advocates v. U.S. Army Corps of Eng'rs*, 402 F.3d 846, 865 (9th Cir. 2005).

[456] *See Sierra Club v. Bosworth*, 510 F. 3d. 1016 (9th Cir. 2007).

[457] *Id.* at 1025–34.

[458] *Id.* at 1026–32.

[459] *Id.* at 1034.

[460] *Heartwood v. U.S. Forest Serv.*, 230 F.3d 947 (7th Cir. 2000).

[461] *See id.* at 954 (noting that "categorical exclusions, by definition, do not have a significant effect on the quality of the human environment").

AR_0026264

*Heartwood*, CEQ here has made no findings, or even considered, whether the proposed rule may significantly affect the quality of the human environment.

There is no rational basis for bypassing NEPA review of the Proposed Rule. First, the Proposed Rule will affect the approval of federal agency actions nationwide, making it more likely that actions with significant undisclosed effects are approved. CEQ's Proposed Rule goes well beyond simply adopting new categorical exclusions; it would change the manner in which federal agencies conduct EAs and EISs and curtail the quality and depth of review. Like in *Bosworth,* here CEQ fails to take the "hard look" at the likelihood of significant impacts resulting from this rulemaking and fails to provide "a reasonably thorough discussion of the significant aspects of the probable environmental consequences."[462] Unless and until CEQ properly considers whether the proposed rule may have a significant impact on the environment, it is in direct violation of the Ninth Circuit's holding in *Bosworth* and the requirements of NEPA. And it is also clear that CEQ should have done so already. The NEPA regulations make clear that "[a]gencies shall integrate the NEPA process with other planning *at the earliest possible time* to insure [sic] that planning and decisions reflect environmental values, to avoid delays later in the process, and to head off potential conflicts."[463]

Here, CEQ was required to request comments on the appropriate scope of environmental review of the Proposed Rule and then prepare, and notice for public comment, an EIS analyzing the Proposed Rule's potential impacts before, or in tandem with, its publication. The Proposed Rule thus violates NEPA and must be withdrawn. At the very least, CEQ should suspend rulemaking for the Proposed Rule, request NEPA scoping comments, and prepare an EIS.

## VII.    CONCLUSION

For all the reasons stated above, the undersigned States strongly urge CEQ to abandon its unlawful and unsupported Proposed Rule.[464]

---

[462] *Idaho Sporting Cong. v. Thomas*, 137 F.3d 1146, 1149 (9th Cir.1998), *overruled on other grounds by The Lands Council v. McNair*, 537 F.3d 981 (9th Cir. 2008) (en banc) (quoting *Or. Nat. Res. Council v. Lowe*, 109 F.3d 521, 526 (9th Cir. 1997)).

[463] 40 C.F.R § 1501.2 (emphasis added).

[464] The undersigned States also have submitted an appendix containing documents cited in these comments. The cover letter and index for that appendix are attached as Exhibit 3.

AR_0026265

FOR THE STATE OF WASHINGTON

ROBERT W. FERGUSON
Attorney General


By:    /s/ Aurora R. Janke
       AURORA R. JANKE
       ELIZABETH M. HARRIS
       Assistant Attorneys General
       Counsel for Environmental Protection
       800 5th Ave Suite 2000, TB-14
       Seattle, WA 98104-3188
       (206) 233-3391
       aurora.janke@atg.wa.gov
       elizabeth.harris@atg.wa.gov




FOR THE STATE OF CALIFORNIA

XAVIER BECERRA
Attorney General


By:    /s/ Sarah E. Morrison
       SARAH E. MORRISON
       Supervising Deputy Attorney General
       JAMIE JEFFERSON
       JULIA K. FORGIE
       JOSH PURTLE
       Deputy Attorneys General
       California Department of Justice
       300 South Spring Street, Suite 1702
       Los Angeles, CA 90013
       (213) 269-6328
       Sarah.Morrison@doj.ca.gov
       Jamie.jefferson@doj.ca.gov
       Julia.Forgie@doj.ca.gov
       Josh.Purlte@doj.ca.gov

AR_0026266

FOR THE STATE OF NEW YORK

LETITIA JAMES
Attorney General


By:     /s/ Claiborne E. Walthall
        MICHAEL J. MYERS
        Senior Counsel
        CLAIBORNE E. WALTHALL
        Assistant Attorney General
        Environmental Protection Bureau
        Office of the Attorney General
        State Capitol
        Albany, NY 12224
        (518) 776-2380
        claiborne.walthall@ag.ny.gov




FOR THE DISTRICT OF COLUMBIA

KARL A. RACINE
Attorney General

By:     /s/ Sarah Kogel-Smucker
        SARAH KOGEL-SMUCKER
        Special Assistant Attorney General
        Social Justice Section
        Office of the Attorney General
        441 4th Street, N.W., Suite 630 South
        Washington, D.C. 20001
        (202) 724-9727
        sarah.kogel-smucker@dc.gov

AR_0026267

FOR THE STATE OF CONNECTICUT

WILLIAM TONG
Attorney General

By:    /s/ Robert Snook
Robert Snook
Assistant Attorney General
Office of the Attorney General
165 Capitol Avenue
Hartford, Connecticut 06106
(860) 808-5250
robert.snook@ct.gov

FOR THE STATE OF DELAWARE

KATHLEEN JENNINGS
Attorney General

By:    /s/ Jameson A.L. Tweedie
Christian Douglas Wright
Director of Impact Litigation
Jameson A.L. Tweedie
Special Assistant Deputy Attorney General
Delaware Department of Justice
391 Lukens Drive
New Castle, DE  19720
Telephone: (302) 395-2521
Christian.Wright@delaware.gov
Jameson.Tweedie@delaware.gov

AR_0026268