FOR THE TERRITORY OF GUAM

LEEVIN T. CAMACHO
Attorney General


By:     _/s/ Leevin T. Camacho_____
LEEVIN T. CAMACHO
Attorney General
Office of the Attorney General of Guam
590 S. Marine Corps Dr., Suite 901
Tamuning, GU 96913
(671) 475-3324
lcamacho@oagguam.org




FOR THE STATE OF ILLINOIS

KWAME RAOUL
Attorney General


By:     _/s/ Jason E. James_____
JASON E. JAMES
Assistant Attorney General
MATTHEW J. DUNN
Chief, Environmental Enf./Asbestos Litig. Div.
Office of the Attorney General
Environmental Bureau
69 W. Washington St., 18th Floor
Chicago, IL 60602
(312) 814-0660
jjames@atg.state.il.us

AR_0026269

FOR THE STATE OF MAINE

AARON M. FREY
Attorney General


By:      /s/ Margaret A. Bensinger
         MARGARET A. BENSINGER, ME Bar #3003
         Assistant Attorney General
         Office of the Attorney General
         6 State House Station
         Augusta, Maine 04333
         (207) 626-8578
         Peggy.bensinger@maine.gov




FOR THE STATE OF MARYLAND

BRIAN E. FROSH
Attorney General


By:     /s/ Steven J. Goldstein
        STEVEN J. GOLDSTEIN
        Special Assistant Attorney General
        Office of the Attorney General
        200 Saint Paul Place, 20th Floor
        Baltimore, MD 21202
        (410) 576-6414
        sgoldstein@oag.state.md.us

82

AR_0026270

FOR THE COMMONWEALTH OF MASSACHUSETTS

MAURA HEALEY
Attorney General

By:    /s/ Turner Smith
       CHRISTOPHE COURCHESNE
       Assistant Attorney General and Chief
       TURNER SMITH
       MATTHEW IRELAND
       Assistant Attorneys General
       Office of the Attorney General
       Environmental Protection Division
       One Ashburton Place, 18th Floor
       Boston, MA 02108
       (617) 727-2200
       turner.smith@mass.gov

FOR THE PEOPLE OF THE STATE OF MICHIGAN

DANA NESSEL
Attorney General

By:    /s/ Elizabeth Morrisseau
       ELIZABETH MORRISSEAU
       Assistant Attorney General
       Environment, natural Resources, and Agriculture
       Division 6th Floor G. Mennen Williams Building
       525 W. Ottawa Street
       P.O. Box 30755
       Lansing, MI 48909
       (517) 335-7664
       MorrisseauE@michigan.gov

AR_0026271

FOR THE STATE OF MINNESOTA

KEITH ELLISON
Attorney General

By:    /s/ Peter N. Surdo
      PETER N. SURDO
      Special Assistant Attorney General
      445 Minnesota Street, Suite 900
      St. Paul, MN 55101
      (651) 757-1061
      peter.surdo@ag.state.mn.us

FOR THE STATE OF NEVADA

AARON D. FORD
Attorney General

By:    /s/ Dan P. Nubel
      DAN P. NUBEL
      Deputy Attorney General
      Government and Natural Resources Division
      Nevada Office of the Attorney General
      100 N. Carson Street
      Carson City, NV 89701
      (775) 684-1225
      dnubel@ag.nv.gov

AR_0026272

FOR THE STATE OF NEW JERSEY

GURBIR S. GREWAL
Attorney General


By:    /s/ Kristina Miles
        KRISTINA MILES
        *Deputy Attorney General*
        DIANNA SHINN
        *Deputy Attorney General*
        New Jersey Division of Law
        25 Market Street
        P.O. Box 093
        Trenton, NJ 08625-093
        (609) 376-2789
        Kristina.Miles@law.njoag.gov
        Dianna.Shinn@law.njoag.gov


FOR THE STATE OF NEW MEXICO

HECTOR BALDERAS
Attorney General


By:    /s/ William Grantham
        WILLIAM GRANTHAM
        Assistant Attorney General
        201 Third St. NW, Suite 300
        Albuquerque, NM 87102
        (505) 717-3520
        wgrantham@nmag.gov

AR_0026273

FOR THE STATE OF OREGON

ELLEN F. ROSENBLUM
Attorney General


By:    /s/ Paul Garrahan
       PAUL GARRAHAN
       Attorney-in-Charge
       STEVE NOVICK
       Special Assistant Attorney General
       Natural resources Section
       Oregon Department of Justice
       1162 Court Street NE
       Salem, OR 97301-4096
       (503) 947-4593
       Paul.garrahan@doj.state.or.us
       Steve.Novick@doj.state.or.us




FOR THE COMMONWEALTH OF PENNSYLVANIA

JOSH SHAPIRO
Attorney General


By:    /s/ Ann R. Johnston
       ANN R. JOHNSTON
       Senior Deputy Attorney General
       Office of Attorney General
       Strawberry Square
       Harrisburg, PA 17120
       (717) 857-2091
       ajohnston@attorneygeneral.gov

AR_0026274

FOR THE STATE OF RHODE ISLAND

PETER F. NERONHA
Attorney General

By:    /s/ Gregory S. Schultz_____
        Gregory S. Schultz
        Special Assistant Attorney General
        Office of the Attorney General
        150 south Main Street
        Providence, RI 02903
        (401) 274-4400
        gschultz@riag.ri.gov

FOR THE STATE OF VERMONT

THOMAS J. DONOVAN, JR.
Attorney General

By:    /s/ Nicholas F. Persampieri_____
        NICHOLAS F. PERSAMPIERI
        Assistant Attorney General
        Office of the Attorney General
        109 State Street
        Montpelier, VT 05609
        (802) 828-6902
        nick.persampieri@vermont.gov

AR_0026275

# EXHIBIT 1

AR_0026276

**COMMENTS OF ATTORNEYS GENERAL OF CALIFORNIA, ILLINOIS, MARYLAND, MASSACHUSETTS, NEW JERSEY, NEW YORK, OREGON, VERMONT, AND WASHINGTON, AND THE SECRETARY OF THE COMMONWEALTH OF PENNSYLVANIA DEPARTMENT OF ENVIRONMENTAL PROTECTION**

August 20, 2018

VIA REGULATIONS.GOV
Edward A. Boling
Associate Director for the National Environmental Policy Act
Council on Environmental Quality
730 Jackson Place NW
Washington, DC 20503

> Re:   Advance Notice of Proposed Rulemaking – Update to the Regulations for Implementing the Procedural Provisions of the National Environmental Policy Act, 83 Fed. Reg. 28,591 (June 20, 2018) Docket ID No. CEQ-2018-0001

Dear Associate Director Boling:

The undersigned State Attorneys General and state representatives, specifically, the Attorneys General of California, Illinois, Maryland, Massachusetts, New Jersey, New York, Oregon, Vermont, and Washington, and the Secretary of the Commonwealth of Pennsylvania Department of Environmental Protection ("States") respectfully submit these comments on the Council on Environmental Quality's ("CEQ") advance notice of proposed rulemaking ("Advance Notice") regarding potential revisions to the regulations implementing the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321, *et seq.*[1]  The Advance Notice requests comments "on potential revisions to update and clarify" the process and scope of federal NEPA review by including questions on the following subjects: revising definitions of key NEPA terms, revising documents such as Notices of Intent and Categorical Exclusions, revising the timing of agency actions, revising agency and contractor responsibilities for document preparation, revising the public participation process, establishing mandatory time limits for preparation of documents and

---

[1] The advance notice of proposed rulemaking is entitled "Update to the Regulations for Implementing the Procedural Provisions of the National Environmental Policy Act," 83 Fed. Reg. 28,591 (June 20, 2018), Docket ID No. CEQ-2018-0001 [hereinafter Advance Notice].

AR_0026277

completion of the NEPA process, narrowing the range of alternatives requiring analysis, seeking examples of purportedly "obsolete" regulations, seeking input on use of unspecified "new technologies," and combining NEPA analyses and other decision documents.[2] The breadth of the questions posed by the Advance Notice suggests that CEQ's existing NEPA regulations ("NEPA regulations") need major amendments or even a wholesale regulatory overhaul. The States submit, however, that no demonstrated need for such substantial revisions exists, and we oppose any revisions that would threaten or destroy the fundamental environmental protections in NEPA.

CEQ's NEPA regulations are the cornerstone of the federal government's implementation of NEPA, providing a durable and environmentally protective framework on which the States and the public have relied for 40 years. Through prior administrations, CEQ has shown remarkable restraint, revising its regulations only when absolutely necessary. This restraint should continue because existing data do not demonstrate a need for any significant changes to NEPA regulations implied by this Advance Notice. Instead, as described more fully in Sections II and III, NEPA and the NEPA regulations have successfully accomplished the goal of forcing federal agencies to take a "hard look" at how their actions impact the environment.[3] Therefore, the States urge CEQ to seriously consider whether it is appropriate to amend its NEPA regulations at all. If CEQ does decide to revise the NEPA regulations, it must first collect detailed data on NEPA's implementation and evaluate the effect any revisions would have on future federal actions, public health, and the environment. Any revisions to the regulations, if warranted and supported by substantial evidence, must continue to prioritize protection of public health and the environment, and to ensure public participation in accordance with NEPA, over mere administrative expedience.

## I.    <u>NEPA Is the Foundation of Our Nation's Environmental Laws</u>

Congress enacted NEPA in 1969 with the stated purpose to "declare a national policy which will encourage productive and enjoyable harmony between man and his environment; to promote efforts which will prevent or eliminate damage to the environment and biosphere and stimulate the health and welfare of man; to enrich the understanding of the ecological systems and natural resources important to the Nation; and to establish a Council on Environmental Quality."[4] NEPA was the first

---

[2] *See id.* at 28,591–92.

[3] *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989).

[4] 42 U.S.C. § 4321.

AR_0026278

major environmental law in the United States and is often called the "Magna Carta" of federal environmental laws. The NEPA regulations "tell federal agencies what they must do to comply with the procedures and achieve the goals of the Act."[5] Over the past 40 years, the NEPA regulations have guided NEPA's implementation across the nation and have become fundamental to the daily functioning and responsible decision-making of numerous federal and state agencies.

NEPA endorses a broad, deliberative approach, which focuses on public disclosure and requires all federal agencies to ensure that their decision-making takes public health and the environment into account. Nearly every major federal action, from the approval of significant energy and infrastructure projects to key decisions concerning the management of federal public lands, requires compliance with NEPA. Unlike many other subject-specific federal statutes such as the Clean Air Act,[6] NEPA has a uniquely broad scope requiring consideration of all potential environmental and social impacts of a federal action. At the heart of NEPA—and embodied in the NEPA regulations—are the principles that federal agencies must complete their environmental analysis of proposed projects and alternatives before they act, that the analysis must be accurate and rigorous, that the analysis should enable public and inter-agency participation,[7] and that the analysis should influence the decisions federal agencies ultimately make.[8] Although NEPA does not require a particular outcome, it compels agencies to think carefully and comprehensively about the environment before acting, and emphasizes the importance of fully assessing environmental impacts and alternative approaches through public participation and inter-agency consultation. NEPA requires agencies to consult with other agencies that have expertise on a particular resource impacted by a project, developing more robust alternatives and reducing delay in preparation of documents.[9] These principles must continue to underlie any potential changes to the NEPA regulations.

---

[5] 40 C.F.R. § 1500.1(a).

[6] 42 U.S.C. §§ 7401, et seq.

[7] 42 U.S.C. § 4332(2)(C).

[8] See Am. Rivers v. Fed. Energy Regulatory Comm'n, 895 F.3d 32, 49 (D.C. Cir. 2018) (NEPA ensures that agency decision-making is fully informed regarding environmental impacts); Sierra Club v. U.S. Army Corps of Eng'rs, 803 F.3d 31, 37 (D.C. Cir. 2015) (agencies must take a "hard look" at the environmental consequences of their actions before deciding whether and how to proceed).

[9] See 42 U.S.C. § 4332(2)(C); 40 C.F.R. §§ 1500.5, 1501.5, 1501.6.

AR_0026279

NEPA explicitly embraces democratic values by making the public important contributors to the environmental review process.[10] As CEQ's guidance states, "[t]wo major purposes of the environmental review process are better informed decisions and citizen involvement, both of which should lead to implementation of NEPA's policies."[11] Public comment in the NEPA process is critically important to, among other things, identify alternatives that improve a proposed action or reduce its environmental impacts, identify shortfalls in the agency's analyses, spot missing issues, and provide additional information that the agency may not have known existed. To the extent Question 6 of the Advance Notice suggests public comment can be more "efficient," CEQ should reject changes that weaken or shorten the public's opportunity for participation. Because of NEPA, the public has a legal right and a voice in the federal planning process,[12] and public involvement is beneficial to federal decision-making.[13] As CEQ itself has stated, "[s]ome of the most constructive and beneficial interaction between the public and an agency occurs when citizens identify or develop reasonable alternatives that the agency can evaluate in the EIS."[14]

In sum, the NEPA regulations in their current form embody NEPA's guiding principles, and any revisions to the NEPA regulations must adhere to these principles by ensuring the protection of public health and the environment through well-informed decision-making and robust and meaningful public involvement in the

---

[10] *See, e.g.*, 42 U.S.C. § 4332(2)(C); 40 C.F.R. §§ 1503.1(a)(4), 1506.6.

[11] CEQ, Exec. Office of the President, A Citizen's Guide to the NEPA: Having Your Voice Heard, at 2 (Dec. 2007) [hereinafter Citizen's Guide to the NEPA], *available at* https://ceq.doe.gov/docs/get-involved/Citizens_Guide_Dec07.pdf.

[12] 42 U.S.C. § 4332(2)(C); 40 C.F.R. §§ 1503.1(a)(4), 1506.6.

[13] *See* Letter from Russell E. Train, *et al.* to The Honorable Cathy McMorris, at 2 (Sept. 19, 2005) (former Chairs and General Counsels of CEQ stating that "the public plays an indispensable role in the NEPA process") [hereinafter Train Letter] (attached as Exhibit A); *see also* Envtl. Law Inst., NEPA Success Stories: Celebrating 40 Years of Transparency and Open Government, at 6 (Aug. 2010) [hereinafter NEPA Success Stories], *available at* https://ceq.doe.gov/docs/get-involved/NEPA_Success_Stories.pdf; CEQ, Examples of Benefits from the NEPA Process for ARRA 2–3 [American Recovery and Reinvestment Act] Funded Activities (May 2011) [hereinafter Examples of NEPA Benefits], *available at* https://ceq.doe.gov/docs/get-involved/ARRA_NEPA_Benefits_List_May122100.pdf; Citizen's Guide to the NEPA, *supra* note 11, at 24 ("Through NEPA, citizens were able to educate and assist the decision-makers in developing their alternatives.").

[14] Citizen's Guide to the NEPA, *supra* note 11, at 14.

AR_0026280

NEPA process. Any revisions must continue to require that Federal agencies "use all practicable means" to fulfill the purpose of NEPA embodied in the statute.[15]

## II. The States Have Unique Interests in Ensuring That the NEPA Regulations Demand Careful, Timely Review of Federal Actions.

The NEPA process affects the States' interests in several key ways, including their interests in protecting their residents and environmental resources by ensuring public participation and robust, informed decision-making processes for federal projects.

### A. The States have an interest in ensuring that federal decisions do not harm their residents, property, or natural resources.

The States are injured in their *parens patriae* capacity when their residents suffer from the effects of environmental pollution or degradation, including cumulative impacts in environmental justice communities.[16] The States also have a quasi-sovereign interest in preventing harm to the health of their natural resources and ecosystems.[17] As federal courts have recognized, states are entitled to "special solicitude" in seeking redress for environmental harms within their borders, particularly where state property and quasi-sovereign interests are potentially injured.[18] Accordingly, the States have an interest in and are committed to preventing any harm to their residents, ecosystems, and property from revisions to NEPA's regulations that weaken environmental protections or undermine the policies and principles of NEPA—in particular, any revisions that would limit public participation or lead to less robust analysis and review.

The States have a fundamental interest in safeguarding their residents' involvement in the NEPA process for federal projects that could impact their communities. Relatedly, NEPA proceedings and resulting analyses provide an important opportunity for state and municipal agencies to help shape federal decisions that affect state or municipal resources. Public involvement is critical in identifying and evaluating public health and environmental issues of local or statewide concern that may result from federal actions. CEQ's current NEPA

---

[15] 42 U.S.C. § 4331(b)(1)-(6).

[16] *Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592, 607 (1982); *Maryland v. Louisiana*, 451 U.S. 725, 737–38 (1981).

[17] *Massachusetts v. EPA*, 549 U.S. 497, 519–22 (2007).

[18] *Id.* at 520.

AR_0026281

regulations provide that agencies shall "make diligent efforts to involve the public in preparing and implementing their NEPA procedures."[19] As discussed more fully in Point I, above, and Point III, below, any revisions to the NEPA regulations such as those suggested by Question 6 of the Advance Notice that may weaken public participation would violate NEPA and injure the States' interests.

The States are also required to undertake NEPA review in certain cases where federal funding is involved, such as for certain highway and other major infrastructure projects. Significant revisions to the NEPA regulations will impact the States' implementation of and compliance with NEPA, and may require revisions to the States' internal processes and significant investments of time and training resources to accommodate disruptive changes to long-settled processes.

The States also have a significant interest in ensuring that the environmental review process under NEPA is robust and detailed, particularly with respect to major infrastructure projects and projects affecting public lands and waterways that impact public health, environmental health, and the States' economies. For example, the siting of nuclear waste disposal sites receives environmental review only through a NEPA process conducted by the Nuclear Regulatory Commission ("NRC"). In New York, the West Valley nuclear waste disposal site is presently undergoing a NEPA Environmental Impact Statement ("EIS") process that is governed by the significant protections in the current NEPA regulations of both CEQ and the United States Department of Energy. The State of New York, along with numerous agencies and members of the public, is participating in this NEPA process. Any weakening of the procedural protections in NEPA, such as setting arbitrary and unreasonable timelines or page limits for NEPA review documents suggested by Questions 4 and 10 of the Advance Notice, or limiting the scope of issues as suggested by Question 5 or the range of alternatives considered as suggested by Question 13, could result in an environmental review process—in this case and many others—that is not compliant with the statutory requirements of NEPA, and that may injure the States' sovereign and proprietary interests.

Similarly, NEPA review is built into and improves the Federal Energy Regulatory Commission's ("FERC") analysis of whether a proposed interstate natural gas pipeline is in the public convenience and necessity.[20] The Natural Gas Act preserves the States' ability to issue substantive environmental permits under the

---

[19] 40 C.F.R. § 1506.6(a); *see also id.* § 1503.1(a)(4).

[20] *See* 15 U.S.C. § 717f; *see also* Certification of New Interstate Natural Gas Pipeline Facilities, 88 FERC 61,227, 61,745–46, 61,748, 61,749 (1999), *clarified,* 90 FERC 61,128, 61,397–98, *further clarified,* 92 FERC 61,094 (2000).

AR_0026282

Clean Air Act, the Clean Water Act, and the Coastal Zone Management Act for natural gas projects.[21] The States' jurisdiction in each of these substantive environmental regimes should therefore be absolute, subject to compliance with applicable timelines.[22] When reviewing a new pipeline application, FERC conducts its NEPA analysis at the same time as its review of the project's economic merits, reviewing both the environmental and socioeconomic impacts of the project.[23] At the conclusion of the NEPA process, FERC generally issues a Certificate of Public Convenience and Necessity ("CPCN") for the project. The CPCN not only authorizes the pipeline, but also includes numerous environmental conditions based largely on the NEPA analysis.

A robust and transparent NEPA analysis of proposed interstate natural gas pipeline projects is necessary to protect the States' interests because it requires careful consideration of the state and local laws that may apply or are relevant to the project and its impacts. However, the CPCNs that FERC issues—based on its NEPA process—often include language or conditions that may limit the States' substantive environmental jurisdiction. Therefore, the States have an interest in ensuring that the NEPA regulations retain their current strength to govern and shape FERC's NEPA analysis, as state environmental review processes may not be able to compensate in all cases for deficiencies in federal NEPA review in the course of decisions with significant and lasting environmental consequences for the States.

Finally, robust NEPA analyses provide important resources for the States in informing other important state programs and decisions affecting state resources. For example, robust EISs are critical to informing the States' "consistency determinations" under the federal Coastal Zone Management Act, 16 U.S.C. § 1456, by which states assess the impact of federal projects on the land or water uses or natural resources in a state's coastal zone.[24] If regulatory amendments result in fewer or less thorough EISs, the States would have to expend additional resources to comprehensively assess the impact of federal projects on state resources.

---

[21] 15 U.S.C § 717b(d).

[22] *Id.*

[23] *See* Comments of the Attorneys General of Massachusetts, Illinois, Maryland, New Jersey, Rhode Island, Washington, and the District of Columbia on the Federal Energy Regulatory Commission's April 19, 2018 Notice of Inquiry on its Certification of New Interstate Natural Gas Facilities, Docket No. PL18-1-000 (July 25, 2018) (attached as Exhibit B).

[24] *See, e.g.*, 15 C.F.R. § 930.31; 301 Code Mass. Regs. § 20.04.

AR_0026283

B. Any Weakening of the NEPA Regulations Would Threaten the States' Abilities to Enforce Their Own State Environmental Laws to Protect Public Health and the Environment.

NEPA also served as a model to the States, many of which enacted their own environmental review laws to protect public health and the environment.[25] Several examples include New York's State Environmental Quality Review Act ("SEQRA"),[26] the Massachusetts Environmental Policy Act ("MEPA"), the California Environmental Quality Act ("CEQA")[27], and Washington's State Environmental Policy Act ("SEPA").[28] These state laws are critically important to environmental review of state agency actions and are designed to complement NEPA review of federal actions within our States. The federal and state schemes most commonly interact when there are both federal agency and state agency components to a proposed action or project, such as a state highway project receiving federal funds. In such cases, a robust NEPA process remains vital to ensuring thorough and efficient review of numerous government actions that affect our residents' health and welfare and the environment. Revisions to the NEPA regulations should not negatively impact the States' abilities to implement and enforce their own environmental laws.

First, the States have an interest in the proper administration of their own environmental review laws, which could be adversely impacted by weakening the substance of NEPA reviews. The States' laws are often administered in conjunction with the NEPA regulations and either coordinate state and federal review, or allow project proponents to rely on NEPA review to satisfy State requirements. For example, in New York, the SEQRA regulations provide that, if a NEPA EIS has been prepared, generally no State EIS is required, provided the federal EIS is sufficient for the state to make its own findings.[29] Weaker federal review, less comprehensive federal EISs, or preparation of fewer EISs under NEPA may require that more EISs be prepared under a state process, likely leading to increased expenditures of State resources.

---

[25] *See* CEQ, States and Local Jurisdictions with NEPA-like Environmental Planning Requirements [hereinafter State and Local Laws], https://ceq.doe.gov/laws-regulations/states.html (last visited August 14, 2018).

[26] N.Y. Envtl. Conserv. L. art. 8; 6 N.Y.C.R.R. Part 617.

[27] Cal. Stats. ch. 1433 (1970), Cal. Pub. Res. Code §§ 21000–21189.57.

[28] RCW 43-21C-010–914; WAC 197-11-010–990.

[29] 6 N.Y.C.R.R. § 617.15(a); N.Y. Envtl. Conserv. L. § 8-0111(1) & (2); *see Hudson R. Sloop Clearwater v. Dep't of Navy*, 836 F.2d 760, 762 (2d Cir. 1988).

8

AR_0026284

In Massachusetts, if fewer projects qualify as major federal actions requiring an EIS under amended CEQ regulations, as suggested by Question 7, more project proponents, including state agencies receiving federal funds, will have to draft Environmental Impact Reports ("EIRs") under MEPA *ab initio* rather than substituting EISs for EIRs or building on EISs during coordinated review procedures.[30] Where Massachusetts projects still require both EISs and EIRs, if amended regulations relax the scoping as suggested by Question 5 of the Advance Notice, or cumulative effects and alternatives requirements for EISs as suggested by Question 13, EISs will prove a less helpful resource as project proponents prepare EIRs, requiring the expenditure of additional time and resources to comply with the comprehensive, environmentally protective State report requirements.

Likewise, Washington State law allows State agencies to adopt NEPA EISs that are adequate under CEQ's NEPA regulations.[31] However, if CEQ makes regulatory revisions that weaken NEPA and are not consistent with Washington's environmental policy act requirements, then compliance with the federal NEPA process may not be sufficient to satisfy State law. As a result, project proponents may be required to navigate divergent environmental review processes, potentially making the processes longer, more complicated, and more prone to legal challenges.

In California, CEQA[32] is designed to complement NEPA by eliciting public participation in protecting California's environment. Even though CEQA and NEPA do not have identical requirements (and, in certain aspects CEQA has more rigorous procedural requirements than NEPA), where a project requires both federal and State approvals (an EIS and an EIR), joint review under both statutes avoids redundancy, improves efficiency and interagency cooperation, and is easier for applicants and citizens to navigate.[33] Sharing documents and reducing paperwork results in efficient outcomes that benefit social welfare, environmental stewardship, and California's economy. If NEPA's regulations are revised in a manner that reduces protections for natural resources and public health, it will become more difficult for California state agencies to utilize NEPA documents by reference in CEQA reviews,

---

[30] *See, e.g.*, Mass. Gen. Laws c. 30, § 62; 310 Code Mass. Regs. § 11.09(c).

[31] WAC 197-11-610(3).

[32] Cal. Stats. ch. 1433 (1970); Cal. Pub. Res. Code §§ 21000–21189.57, 21001, 21100.

[33] *See* Exec. Office of the President & Governor of California's Office of Planning and Research, NEPA and CEQA: Integrating Federal and State Environmental Reviews, at 1 (2014) [hereinafter CEQA-NEPA Integration Guidance].

AR_0026285

precluding joint CEQA-NEPA review.[34] For example, if revised NEPA regulations curtail robust review of alternatives or cumulative impacts as suggested by Question 13 of the Advance Notice, coordinated CEQA-NEPA review of the proposed project would be impossible, resulting in greater inefficiency in projects requiring approvals under both statutes.

In addition, where projects require both federal and state-level environmental review, the NEPA regulations take account of many state partners' environmental review processes through state-specific memoranda designed to aid compliance with both federal and state schemes.[35] These carefully calibrated programs vary by state and represent significant work by CEQ and the States to harmonize these review programs. Any revisions to the CEQ regulations should account for the existing cooperative framework developed with the individual States to ensure compliance with each process—a framework that benefits the public and regulated community by providing an efficient linkage of state and federal requirements and facilitating coordinated compliance with both. CEQ should avoid amending the NEPA regulations in ways that will render such linked compliance more difficult or impossible. Furthermore, CEQ should evaluate the time and resources that will be needed if significant revisions to the CEQ regulations require substantial re-working of these memoranda to ensure continuing compliance with both federal and state programs.

The States have long relied on the NEPA regulations in implementing state environmental review statutes and regulations. For example, New York's SEQRA regulations drew from certain sections of the NEPA regulations in setting regulatory standards, such as when a supplemental EIS is required. New York SEQRA regulations also require review of potential catastrophic impacts from a proposed action[36] through provisions drawn and adapted from the NEPA regulations at 40 C.F.R. § 1502.22. NEPA regulations are also utilized by states courts in interpreting the obligations under equivalent state environmental review statutes. For example, courts in New York rely on NEPA in construing the scope of the SEQRA where appropriate, finding that certain decisions interpreting actions as exempt from NEPA

---

[34] *See* Exec. Order No. 13,807, 82 Fed. Reg. 40,463, 40,466–67 (Aug. 24, 2017); The White House, Legislative Outline for Rebuilding Infrastructure in America, 35–37, 48–50 (Feb. 28, 2018), *available at* https://www.whitehouse.gov/wp-content/uploads/2018/02/INFRASTRUCTURE-211.pdf.

[35] *See* State and Local Laws, *supra* note 25; *see also* 40 C.F.R. § 1500.5(h).

[36] 6 N.Y.C.R.R. § 617.9(b)(6).

review[37] are persuasive authority for determining whether such actions are required to undergo environmental review under the state statute.[38] In California, NEPA cases are considered persuasive authority in CEQA cases.[39] Courts in Washington State also look to NEPA decisions to interpret SEPA.[40] Some state courts have also adopted the federal "hard look" standard required by NEPA under their own States' environmental review statutes. If CEQ revises the definition of key terms, as suggested by the Advance Notice Questions 7, 8, and 9, it may create divergence between state and federal standards, undermine our States' ability to effectively implement our own environmental review laws, and impact the case law interpreting States' well-developed statutory and regulatory regimes. As CEQ considers any possible revisions, it should take that concern into account.

In summary, the States have strong interests in the continued implementation of NEPA regulations that provide for a robust, deliberative, and complete federal environmental review process. CEQ must avoid arbitrarily limiting the scope and timeframe allowed for preparation and consideration of NEPA documents or truncating the public participation process as suggested by the Advance Notice, which would harm the States' interests and violate the principles and provisions of NEPA.

## III.    CEQ Must Conduct a Thorough Review Process to Determine the Need, if Any, for NEPA Regulatory Revisions.

Consistent with NEPA's animating principles and fundamental requirements, any revisions to the NEPA regulations must be inclusive, deliberative, and transparent, and employ a public review process similar to the process CEQ used

---

[37] *See H.O.M.E.S. v. New York State Urban Dev. Corp.*, 69 A.D.2d 222, 231, 418 N.Y.S.2d 827, 832 (4th Dep't 1979).

[38] *See Villani v. Berle*, 91 Misc.2d 603, 608, 398 N.Y.S.2d 796, 801 (Sup. Ct. Suffolk County 1977); *Matter of Marino v. Platt*, 104 Misc.2d 386, 390, 428 N.Y.S.2d 433, 435–36 (Sup. Ct. Onondaga County 1980).

[39] *See, e.g., No Oil, Inc. v. City of Los Angeles*, 13 Cal.3d 68, 86, 529 P.2d 66, 78 (S.Ct. 1974) (California courts use NEPA as persuasive authority in CEQA); *accord Del Mar Terrace Conservancy, Inc. v. City Council of the City of San Diego*, 10 Cal.App.4th 712, 732, 12 Cal.Rptr.2d 785, 797 (1992).

[40] *See, e.g., Eastlake Cmty. Council v. Roanoke Assocs., Inc.*, 82 Wn.2d 475, 488, 513 P.3d 36, 44–45 (1983); *City of Des Moines v. Puget Sound Reg'l Council*, 98 Wn. App. 23, 37, 988 P.2d 27, 37 (1999); *Gebbers v. Okanogan Cty. Pub. Util. Dist. No. 1*, 144 Wn. App. 371, 381 & n.1, 183 P.3d 324, 328 & n.1 (2008) (looking to federal definition of cumulative impacts).

AR_0026287

when it initially drafted its NEPA regulations,[41] and when it subsequently reviewed the effectiveness of NEPA regulations in 1997.[42] At a minimum, CEQ's review of whether to amend its NEPA regulations should include a detailed analysis of the effectiveness of current regulations and other tools in implementing NEPA, a demonstrated need for any revisions to the regulations to better support the purpose and structure of NEPA, and an analysis of whether changes to the regulations could increase litigation, delay, and confusion in the NEPA process.

A.    CEQ Should Adequately Evaluate the Effectiveness of the NEPA Regulations and Tools to Address Any Concerns about NEPA's Implementation.

As discussed in detail below, the NEPA regulations have successfully safeguarded public health and the environment for the past 40 years. In light of this history, CEQ should first consider whether existing tools available under the current NEPA regulations will address CEQ's apparent concerns about NEPA's implementation. If CEQ nevertheless decides to pursue revisions to its NEPA regulations, then CEQ must adequately demonstrate the need for any such changes.

1. *Current Regulations Have Been Largely Successful in Implementing NEPA.*

Before CEQ makes any changes to its NEPA regulations, CEQ should carefully evaluate the demonstrated effectiveness of its current regulations implementing NEPA, which have provided a consistent regulatory environment for several decades.[43] Under these regulations, federal agencies annually prepare hundreds of environmental impact statements, tens of thousands of environmental assessments, and hundreds of thousands of categorical exclusions.[44]

---

[41] *See* National Environmental Policy Act—Regulations, 43 Fed. Reg. 55,978, 55,980 (Nov. 29, 1978) [hereinafter NEPA—Regulations] (rulemaking process included public hearings; meetings with all federal agencies; meetings with representatives of business, labor, State and local governments, and environmental groups; and detailed consideration of federal studies on the environmental impact statement process).

[42] CEQ, Exec. Office of the President, National Environmental Policy Act: A Study of Its Effectiveness After Twenty-five Years, at 5 (Jan. 1997) [hereinafter NEPA Effectiveness Study] (CEQ solicited input from NEPA's original framers, members of Congress, State and local agencies, drafters of the CEQ regulations, federal agencies, and the public), *available at* https://ceq.doe.gov/docs/ceq-publications/nepa25fn.pdf.

[43] *See* Advance Notice, *supra* note 1, 83 Fed. Reg. at 28,591–92.

[44] *NEPA.gov*, https://ceq.doe.gov/ceq-reports/litigation.html; U.S. Gov't Accountability Office, GAO-14-369, National Environmental Policy Act: Little Information Exists on

AR_0026288

The vast majority of environmental review processes result in "taxpayer dollars and energy saved, resources better protected and the fostering of community agreements."[45] Indeed, when CEQ conducted a 25-year review of NEPA, it concluded "that NEPA is a success—it has made agencies take a hard look at the potential environmental consequences of their actions, and it has brought the public into the agency decision-making process like no other statute."[46] The 2014 U.S. Government Accountability ("GAO") Report on NEPA echoed this sentiment, stating that the NEPA process "ultimately saves time and reduces overall project costs by identifying and avoiding problems that may occur in later stages of project development."[47] In short, as U.S. Forest Service officials have observed, "NEPA leads to better decisions."[48]

In addition, the NEPA environmental review process has yielded significant community involvement and decisions sensitive to local interests. As NEPA itself recognizes, states and local governments are active and important partners in the effective implementation of NEPA in their communities.[49] Recognizing this partnership, the Federal Transit Administration has commended the effectiveness of collaborative NEPA processes across the country including the final EIS for the Federal Way Link Extension and the Mukilteo Multimodal Project in Washington State, the final EIS for the Purple Line and the alternative analysis and draft EIS for the Red Line Corridor Transit Study in Maryland, and the EIS for the Portland-Milwaukie Light Rail Project in Oregon.[50]

---

NEPA Analyses7 (2014) [hereinafter GAO Report], *available at* https://www.gao.gov/assets/670/662546.pdf.

[45] Examples of NEPA Benefits, *supra* note 13, at 1.

[46] NEPA Effectiveness Study, *supra* note 42, at iii.

[47] GAO Report, *supra* note 44, at 16.

[48] *Id.*; *see also* NEPA Success Stories, *supra* note 13; Examples of NEPA Benefits, *supra* note 13; Citizen's Guide to the NEPA, *supra* note 11, at 24 ("Through NEPA, citizens were able to educate and assist the decision-makers in developing their alternatives.").

[49] 42 U.S.C. § 4331(a).

[50] Fed. Transit Admin., Outstanding Achievement Award for Excellence in Environmental Document Preparation, https://www.transit.dot.gov/regulations-and-guidance/environmental-programs/outstanding-achievement-award-excellence (last visited Aug. 14, 2018).

13

The NEPA process benefits the States' residents and natural resources alike. For example, following extensive community involvement and collaboration between multiple state and federal agencies and the two impacted towns, the final joint EIS and state EIR for the Herring River Restoration on Cape Cod in Massachusetts recommended,[51] and the National Park Service adopted,[52] an alternative plan that will restore at least 346 acres of the tidal marsh, protect fish species harmed by current, impeded river conditions, and improve fishing and shell fishing yields, among other significant benefits to the community and the environment.

Contrary to assertions by critics of NEPA, the NEPA process does not foster significant litigation. The vast majority of NEPA reviews of proposed federal actions—over 99 percent by some estimates[53]—do not result in litigation.[54] Where projects are challenged, it is often by plaintiffs seeking to ensure that projects do not move forward without adequate review of environmental impacts. In such circumstances, the courts play a vital role in ensuring that federal agencies adhere to Congress's mandate to take a hard look at environmental consequences before taking

---

[51] *See* Nat'l Park Serv., Town of Wellfleet, Town of Truro, & Herring River Restoration Committee, Herring River Restoration Project Final Environmental Impact Statement and Environmental Impact Report (May 2016), *available at* https://parkplanning.nps.gov/document.cfm?parkID=217&projectID=18573&docum entID=73471.

[52] Nat'l Park Service, Record of Decision for Herring River Restoration Project, Final Environmental Impact Statement and Environmental Impact Report (Sept. 15, 2016), *available at* https://parkplanning.nps.gov/document.cfm?parkID=217&projectID=18573&docum entID=75340.

[53] Geo. U.L. Center, NEPA: Lessons Learned and Next Steps: Hearing Before the Task Force on Updating the National Environmental Policy Act of the H. Comm. on Resources, 109th Cong., Statement of Professor Robert G. Dreher, Nov. 17, 2005 ("[P]laintiffs bring around 100 NEPA lawsuits per year, representing only two-tenths of 1 percent of the 50,000 or so actions that Federal agencies document each year under NEPA.").

[54] *See* GAO Report, *supra* note 44, at 19–20; NEPA.gov, https://ceq.doe.gov/ceq-reports/litigation.html (stating that "the amount of litigation on these NEPA analyses is comparatively small"); The Weaponization of the National Environmental Policy Act and the Implications of Environmental Lawfare: Hearing Before the House Comm. on Natural Res., 115th Cong. 8–11 (2018) (statement of Horst Greczmiel, Former CEQ Associate Director of NEPA Oversight) [hereinafter Greczmiel Statement].

14

major actions.[55] The opportunity for judicial review of agency actions is not a shortcoming of NEPA, but a fundamental part of the NEPA process that must be preserved.

### 2. *Tools Already Exist to Address Any Concerns about the NEPA Process.*

Although NEPA critics and Questions 1, 2, 6, 13, 15, 17 and 19 of the Advance Notice suggest the environmental review process under NEPA is inefficient, the NEPA regulations already provide at least 12 specific strategies to reduce delay in agencies' NEPA reviews.[56] These strategies were designed to *reduce* inefficiencies while producing "better decisions which further the national policy to protect and enhance the quality of the human environment."[57] As a result, existing NEPA regulations—when properly implemented by well-resourced and well-trained federal agencies—already provide the tools to address many of CEQ's apparent efficiency concerns about the NEPA process.[58]

For example, section 1500.4 of CEQ's NEPA regulations identifies more than a dozen different methods for reducing excessive paperwork, such as reducing duplication by allowing for joint preparation with state and local processes and allowing federal agencies to adopt appropriate environmental documents prepared by other agencies.[59] Similarly, section 1500.5 directs agencies to take a dozen enumerated actions to reduce delay, including integrating the NEPA process into early stages of project planning.[60] Likewise, in certain appropriate circumstances, programmatic reviews, as referenced in Question 12, have been used as an effective tool when considering an action that will take place at multiple sites, and may provide a model for considering impacts of multiple similar projects.[61] Importantly, the NEPA

---

[55] *See* Greczmiel Statement, *supra* note 54, at 8–10.

[56] *See* 40 C.F.R. § 1500.5.

[57] *See* NEPA—Regulations, *supra* note 41, 43 Fed. Reg. at 55,978.

[58] *See generally*, CEQ, Memorandum for Heads of Federal Departments and Agencies on Improving the Process for Preparing Efficient and Timely Environmental Reviews under NEPA (Mar. 6, 2012), *available at* https://ceq.doe.gov/docs/ceq-regulations-and-guidance/Improving_NEPA_Efficiencies_06Mar2012.pdf.

[59] *See, e.g.*, 40 C.F.R. § 1500.4(n); *see also id.* §§ 1501.5 (discussing lead agencies), 1501.6 (discussing cooperating agencies); *see* NEPA Effectiveness Study, *supra* note 42, at 21.

[60] 40 C.F.R. § 1500.5.

[61] *See* CEQ, Effective Use of Programmatic NEPA Reviews 6-7 (Dec. 18, 2014), *available                                  at*                         https://ceq.doe.gov/docs/ceq-regulations-and-

15

regulations provide agencies the flexibility to adjust the NEPA process to meet the needs of the agency and the project under review, which can vary widely depending on the size and nature of the agency and the project.[62]

As CEQ and others have identified, the effectiveness and efficiency of the NEPA process significantly increases when agencies:

(a) integrate NEPA into their internal planning process as early as possible;[63]

(b) ensure that the NEPA process is well-funded and led by experienced and well-trained staff and engaged senior management;[64]

(c) engage in robust and inclusive public outreach;[65]

(d) rely on accurate scientific data and rigorous environmental analysis;[66]

(e) utilize NEPA regulations to facilitate interagency coordination to resolve or avoid conflicts, reduce duplication of effort, and improve the environmental permitting process;[67]

(f) draft NEPA documents in plain, concise, and honest language;[68] and

---

guidance/Effective_Use_of_Programmatic_NEPA_Reviews_Final_Dec2014_searchable.pdf

[62] *See, e.g., id.* §§ 1501.7(b) (permitting lead agencies to set page and time limits), 1501.8(b) (providing factors to consider in setting time limits), 1501.8 (rejecting "prescribed universal time limits for the entire NEPA process" as "too inflexible").

[63] NEPA Effectiveness Study, *supra* note 42, at 11.

[64] *See id.*; Dep't of Energy, NEPA Lessons Learned Quarterly Report, September 2017, at 7 (Sept. 2017) (attributing shorter NEPA completion times to, among other things, agency senior management attention, the availability of data, and engagement of experienced staff), *available at* https://www.energy.gov/sites/prod/files/2017/09/f37/LLQR%20Sep_2017.pdf.

[65] NEPA Effectiveness Study, *supra* note 42, at 18; Train Letter, supra note 13, at 2, ("Meaningful efforts to improve [NEPA's] implementation should address the critical needs for better guidance and additional training for agency personnel and enhanced resources for NEPA implementation by federal agencies.").

[66] NEPA Effectiveness Study, *supra* note 42, at 27–29.

[67] *Id.* at 21.

[68] *Id.* at 29.

16

(g) effectively partner with State and local governments.[69]

As these measures demonstrate, there is insufficient evidence that any revisions to the NEPA regulations for the purpose of increasing the efficiency of the environmental review process are needed. Instead, the existing efficiency measures should be implemented under current regulations by well-trained and well-funded federal agencies committed to NEPA's purpose and function.

Further, any concerns about the efficiency of the NEPA process for major infrastructure projects already have been addressed by Title 41 of the Fixing America's Surface Transportation Act of 2015 ("FAST Act").[70] Title 41 sought to streamline the environmental review of major infrastructure projects by, among other things, emphasizing the importance of early and frequent coordination between cooperating and participating agencies, creating a federal infrastructure-permitting dashboard to allow agencies and the public to track the progress of Title 41 covered projects, enhancing early stakeholder engagement, and requiring the newly created Federal Permitting Improvement Steering Council to publish an annual report of best practices.[71] Given that Title 41 targeted many of the concerns about the NEPA process raised by the current Administration and suggested by the Advance Notice,[72] CEQ should allow Title 41 to work in practice to better evaluate whether any changes to CEQ's NEPA regulations are warranted.

*3. CEQ Must Demonstrate the Need for and Purpose of Any Regulatory Revisions.*

To ensure informed decision-making consistent with NEPA's structure and purpose and the Administrative Procedure Act,[73] any revisions to the NEPA regulations must reflect reasoned decision-making based on accurate and reliable data demonstrating the need for the change and its consistency with the statute.[74]

---

[69] *See* Federal Permitting Improvement Steering Council, Recommended Best Practices for Environmental Reviews and Authorizations for Infrastructure Projects for Fiscal Year 2018, 8–9 (Dec. 2017), *available at* https://www.permits.performance.gov/sites/permits.performance.gov/files/docs/documentation/40856/fast-41fy-2018best-practices-report.pdf.

[70] Pub. L. No. 114-94 (2015).

[71] *See* 42 U.S.C. §§ 4370m-1–4370m-12.

[72] *See e.g.*, Exec. Order No. 13,807 (Aug. 15, 2017).

[73] 5 U.S.C. §§ 551–559.

[74] *See FCC v. Fox Television* Stations, 556 U.S. 502, 514–15 (2009) (changes in agency position must be based on reasoned explanation supported by the record and permissible under the statute); *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm*

AR_0026293

Insufficient data presently exist to support revisions to the NEPA regulations. According to the 2014 GAO Report, most federal agencies do not routinely track important information about their NEPA processes, including the number of environmental assessments and categorical exclusions conducted and the time frames for completing these reviews.[75] In addition, few agencies track the cost of completing NEPA analyses, leading to little quantitative data on the costs and benefits of the NEPA process.[76] The data that do exist, however, demonstrate that consistent with NEPA's intent and purpose, the present NEPA regulations encourage public participation, lead to projects that are "financially and environmentally improved," and seldom involve litigation.[77]

Given the lack of data demonstrating a need to revise NEPA's regulations—including the absence of meaningful discussion in the Advance Notice demonstrating a need to revise CEQ's NEPA regulations[78]—CEQ must engage in a careful and detailed review before proposing any regulatory revisions. The vague questions in the Advance Notice do not provide an adequate basis for stakeholder input. To ensure CEQ engages in an informed review process, the States reiterate that CEQ should hold several public hearings on the Advance Notice before proposing any regulatory revisions.[79] In addition, consistent with its past practices, CEQ should analyze existing studies and reports on the effectiveness of the current NEPA regulations and solicit input from federal agencies, State and local governments, the public, academics, scientists, and other stakeholders to determine whether changes are appropriate.[80] If, after this review, CEQ decides to revise the NEPA regulations, then

---

*Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) ("[T]he agency must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." (quotation and citation omitted)).

[75] GAO Report, *supra* note 44; *see also* NEPA Effectiveness Study, *supra* note 42, at 6, 13; *see also id.* at 13 (discussing the lack of information of the time frame for completing EAs and CEs).

[76] GAO Report, *supra* note 44, at 10.

[77] *Id.* at 15–18.

[78] *See* Advance Notice, *supra* note 1, 83 Fed. Reg. at 28,591–92.

[79] *See* Letter from Attorneys General of Washington, Maryland, Massachusetts, New Jersey, New York, and Oregon to Mary B. Neumayr re: Advance Notice of Proposed Rulemaking, Docket ID No. CEQ-2018-0001-0200, at 2 (July 3, 2018) (requesting several public hearings on the Advance Notice).

[80] *See* NEPA—Regulations, *supra* note 41, 43 Fed. Reg. at 55,980 (describing the process for drafting the current NEPA regulations as including public hearings,

AR_0026294

CEQ should again hold regional public hearings and provide sufficient time for stakeholders to scrutinize and comment on the proposed revisions as required by the Administrative Procedure Act.

In particular, CEQ should solicit information on the extent and causes of any delay in the NEPA process. The questions in the Advance Notice assume delay is caused by NEPA but reference no data to support that assumption. As noted above, existing data suggest that concerns over the extent of delay may be overblown given the number of NEPA analyses completed by federal agencies each year. Although NEPA critics assert that NEPA review results in delay, as previously noted, only a small percentage of NEPA actions result in litigation and potential delay.[81] Focusing on litigation as the sole or primary source of project delay also ignores a number of other factors that may cause delay and may be addressed without revisions to CEQ's NEPA regulations, including lack of funding to sufficiently implement the NEPA process, inadequate staff time and training to implement or supervise the NEPA process, local controversy over or opposition to a project that would exist regardless of NEPA, delays in non-NEPA permitting or approval processes, project sponsors' changes to project design that require substantial revisions, and uncertainties related to project funding.[82] Accordingly, before proposing any regulatory changes, CEQ should conduct a detailed review to first determine if delay is occurring, the extent of the delay, and the actual causes of delay, and then target those causes through training, guidance, or, if necessary, carefully tailored regulatory changes.

B. <u>Unnecessary Revisions to NEPA's Implementing Regulations Likely Will Increase Litigation, Delay, and Costs.</u>

Given the significance of the NEPA regulations to the implementation of NEPA and to the daily function of federal agencies, unnecessary revisions to these regulations likely will increase litigation, delay, and costs, and weaken the effectiveness of NEPA in protecting public health and the environment. As former CEQ leaders have made clear, "[m]easures to exempt certain agencies and programs from NEPA, to restrict or eliminate alternatives analysis, or to limit the public's right

---

meetings with all federal agencies implementing NEPA, meetings with representatives of business, labor, State and local governments, environmental and other interested groups, and the general public, and detailed consideration of existing federal studies on the NEPA process).

[81] *See* NEPA.gov, https://ceq.doe.gov/ceq-reports/litigation.html; GAO Report, *supra* note 44, at 19–20; Greczmiel Statement, *supra* note 54, at 8–11.

[82] *See* GAO Report, *supra* note 44, at 18; Greczmiel Statement, *supra* note 54, at 4–6.

19

to participate in the NEPA process threaten NEPA's vital role in promoting responsible government decision-making."[83]

As an initial matter, unnecessary revisions likely will require federal agencies to revise their own NEPA regulations and guidance to ensure compliance with the NEPA regulations.[84] And, as already noted, the States may need to amend their environmental review programs to respond to such changes. These processes would waste taxpayer dollars, delay projects, and create uncertainty for project proponents and the public as agencies reconfigure their own NEPA regulations and procedures to conform to CEQ's regulatory changes.

Changes to CEQ's NEPA regulations are also likely to increase NEPA litigation. One of the current regulations' successes was a reduction in NEPA litigation, but changes to these regulations—particularly if CEQ does not engage in the robust and thoughtful review outlined above—threaten to undo that success.[85] Litigation is particularly likely if CEQ attempts to change the definition of key NEPA terms (such as those identified in Questions 7, 8, and 9 of the Advance Notice), or constrains the ability of agencies to identify a range of mitigation actions to help minimize project impacts on the environment. Further, as NEPA requires, CEQ's current regulations ensure that the adverse environmental effects of federal agency decision-making are fully considered and that any alternatives to the agency action are fully developed. Revising the regulations to limit full consideration of the effects and alternatives of a proposed action would contravene NEPA's mandate that agencies consider alternatives to the proposed action and would also make litigation likely.[86]

Moreover, because public involvement is so critical, CEQ should not revise the NEPA regulations in a manner suggested by Question 6 of the Advance Notice that would curtail public involvement, or by attempting to mandate completion of the environmental analysis on a predetermined timeframe, as suggested by Question 4 of the Advance Notice. For instance, Executive Order 13,807 envisions a two-year time frame for completing agency NEPA analyses. While such a time period may be adequate for some federal actions, others, such as the determination to issue permits

---

[83] Train Letter, *supra* note 13, at 2–3.

[84] *See* 40 C.F.R. § 1507.3.

[85] Bear, Dinah, *NEPA at 19: A Primer on an "Old" Law with Solutions to New Problems*, 19 Envtl. L. Rep. 10,060, 10,062 (1989) (noting that annual surveys showed a low of 71 NEPA cases in 1986 compared with 189 cases in 1974).

[86] 42 U.S.C. § 4332(2)(C).

AR_0026296

for complex proposed projects, require significant agency time and expertise to consider the materials submitted. Arbitrarily restricting the NEPA timeframe does not reduce the complexity of projects and the need for thorough evaluation of important considerations such as the public need and environmental impacts of proposed natural gas pipelines or the site of a new nuclear electricity facility. Instead, the shortened timeframes tend to reduce the public comment period and truncate the agency's consideration of public comments, which, as discussed above, often propose alternatives or mitigation measures that lead to better agency decisions and better outcomes for public health and the environment. Arbitrary limits on the length or format of NEPA documents also reduce transparency, diminish the effectiveness of the public review process, and, again, ultimately lead to litigation.

In addition, changes to increase the use of categorical exclusion provisions as suggested by Question 9 may lead to the inappropriate overuse of categorical exclusions that would undermine the principles of NEPA and likely increase litigation. As CEQ has previously explained, "[i]f used inappropriately, categorical exclusions can thwart NEPA's environmental stewardship goals, by compromising the quality and transparency of agency environmental review and decisionmaking, as well as compromising the opportunity for meaningful public participation and review."[87] CEQ must ensure that whether a project has the potential to significantly affect the environment remains the touchstone of the NEPA process. CEQ should not adopt new regulations that will undermine this basic principle of NEPA.

## IV.    CEQ Should Limit Any Changes to Its Implementing Regulations to Codifying Its Environmentally Protective Guidance on Climate Change and Environmental Justice.

If CEQ decides to revise the NEPA regulations, the States urge CEQ to limit any regulatory revisions to codifying CEQ's previously issued guidance on climate change and environmental justice. Although not specifically referenced in the Advance Notice, such revisions would "provide greater clarity to ensure NEPA documents better focus on significant issues that are relevant and useful to decisionmakers and the public," as requested by Question 5.[88] By codifying established guidance regarding both climate change and environmental justice into

---

[87] *See Sierra Club v. Bosworth*, 510 F.3d 1016, 1027 (9th Cir. 2007) (to use categorical exclusions federal agencies "must document that the action to be undertaken is insignificant because the threshold question in a NEPA case is whether a proposed project will significantly affect the environment, thereby triggering the requirement for an EIS" quotation and citation omitted)); 42 U.S.C. § 4332(2)(C).

[88] Advance Notice, *supra* note 1, 83 Fed. Reg. at 28,591.

AR_0026297

the regulations, CEQ would ensure that these critical environmental impacts receive appropriate focus in NEPA analyses.

Climate change presents an enormous environmental problem that all federal agencies need to consider.[89] In 2010, CEQ issued draft guidance on incorporating climate change into NEPA analyses. It revised this guidance in 2014, and on August 5, 2016, CEQ finalized its NEPA Guidance on Climate Change ("Climate Change Guidance").[90] The Climate Change Guidance makes recommendations to federal agencies performing NEPA review of climate change related impacts.[91] These recommendations encourage agencies to consider both the "potential effects of a proposed action on climate change as indicated by assessing [greenhouse gas] emissions," and the "effects of climate change on a proposed action and its environmental impacts," and use these analyses to guide consideration of reasonable alternatives and potential mitigation.[92] Developed in part in response to requests from multiple federal agencies on how best to address climate change impacts, this guidance ensures that agencies adequately consider the effects of climate change in evaluating proposed projects. Indeed, because of the importance of addressing climate change, several of the States have codified similar requirements in their own environmental review processes.[93] However, on April 5, 2017, in response to President Trump's March 28, 2017 Presidential Executive Order on Promoting Energy Independence and Economic Growth, CEQ withdrew the Climate Change Guidance.[94]

We urge CEQ not only to readopt the Climate Change Guidance, but also to incorporate its substantive recommendations into any revised regulations CEQ may propose. In particular, CEQ should incorporate these recommendations into 40 C.F.R. § 1502.16, which directs agencies in evaluating the environmental consequences of proposed actions and alternatives. Courts give substantial deference to the NEPA

---

[89] *Massachusetts*, 549 U.S. at 497.

[90] CEQ, Final Guidance for Federal Departments and Agencies on Consideration of Greenhouse Gas Emissions and the Effects of Climate Change in National Environmental Policy Act Reviews, 81 Fed. Reg. 51,866 (Aug. 5, 2016) [hereinafter Climate Change Guidance].

[91] *Id.* at 4.

[92] *Id.*

[93] *See, e.g.*, Mass Gen. Laws c. 30, § 61; 310 Code Mass. Regs. § 11.12(5).

[94] Exec. Order No. 13783, 82 Fed. Reg. 16,576 (Apr. 5, 2017).

AR_0026298

regulations.[95] By codifying the Climate Change Guidance into its regulations, CEQ will ensure that agencies properly evaluate the climate impacts associated with projects. Codification could also improve interagency coordination, as each agency would follow a similar approach to addressing climate change in NEPA analyses, as opposed to the varying analyses presently occurring.[96]

CEQ also has issued guidance on how federal agencies should consider environmental justice under NEPA ("EJ Guidance").[97] CEQ published the EJ Guidance in 1997 in response to Executive Order 12,898, which directed agencies to identify and address "disproportionately high and adverse human health or environmental effects of its programs, policies, and activities on minority populations and low-income populations."[98] The EJ Guidance provides principles for considering environmental justice in NEPA analyses, including: ensuring sufficient opportunities for public input by minority, low-income, and Native American populations; considering relevant public health data concerning potential health and environmental hazards of an action; and recognizing the "interrelated cultural, social, occupational, historical, or economic factors that may amplify the natural and physical environmental effects of the proposed action."[99]

We urge CEQ to incorporate the EJ Guidance into its NEPA regulations to reinforce the responsibilities of federal agencies to consider environmental justice in NEPA review, particularly to ensure that environmental justice communities are not disproportionately burdened by cumulative adverse environmental impacts. Courts have long recognized the importance of environmental justice considerations in NEPA analyses.[100] Incorporating the EJ Guidance into regulations furthers the aims of Executive Order 12,898 by codifying the important role of assessing environmental

---

[95] *See Robertson*, 490 U.S. at 355.

[96] *See, e.g., In re Dominion Transmission*, 163 FERC ¶ 61,128 (Order Denying Rehearing) (Issued May 18, 2018).

[97] CEQ, Environmental Justice: Guidance Under the National Environmental Policy Act (Dec. 1997) [hereinafter EJ Guidance], *available at* https://ceq.doe.gov/docs/ceq-regulations-and-guidance/regs/ej/justice.pdf.

[98] Exec. Order No. 12,898, 59 Fed. Reg. 7,629 (Feb. 11, 1994).

[99] EJ Guidance, *supra* note 97, at 8–10.

[100] *See, e.g., Communities Against Runway Expansion, Inc. v. F.A.A.*, 355 F.3d 678, 689 (D.C. Cir. 2004) (permitting challenge to environmental justice analysis); *see also Senville v. Peters*, 327 F. Supp. 2d 335, 362–63 (D. Vt. 2004); *Coliseum Square Ass'n, Inc. v. Jackson*, 465 F.3d 215, 232-33 (5th Cir. 2006); *Saint Paul Branch of N.A.A.C.P. v. U.S. D.O.T.*, 764 F. Supp. 2d 1092, 1099, 1107–09, 1113, 1117 (D. Minn. 2011).

AR_0026299

justice implications in NEPA analyses. In turn, this will help agencies focus on alternatives, mitigation strategies, monitoring, and preferences of the disproportionately affected communities.

## V. <u>Conclusion</u>

In conclusion, the States submit that any revisions to CEQ's NEPA regulations must continue to protect the fundamental policies enshrined in the statute, including protection of the environment and public health and robust public participation. Any such revisions must fully respect the States' interests in a strong partnership to promote federal decision-making that protects these policies. We urge CEQ to fully examine the existing state of NEPA implementation and assess whether revisions to the NEPA regulations are even necessary. Then, only if changes are absolutely necessary and supported by a robust record, CEQ should engage in a careful, deliberative, and fully transparent process to propose limited and targeted regulatory changes consistent with the purpose and structure of NEPA.

24

Respectfully submitted,

FOR THE STATE OF CALIFORNIA

Dated: August _17_, 2018

XAVIER BECERRA
Attorney General

By: _____

SARAH MORRISON
Supervising Deputy Attorney General
JAMIE JEFFERSON
JULIA FORGIE
Deputy Attorneys General
California Department of Justice
300 South Spring Street, Suite 1702
Los Angeles, CA 90013
Tel. (213) 269-6328
Sarah.Morrison@doj.ca.gov
Jamie.Jefferson@doj.ca.gov
Julia.Forgie@doj.ca.gov

Dated: August 20, 2018          FOR THE STATE OF ILLINOIS

                                LISA MADIGAN
                                Attorney General

                    By:

                                MATTHEW J. DUNN
                                Chief, Environmental Enforcement/Asbestos
                                Litigation Division
                                DANIEL I. ROTTENBERG
                                Assistant Attorney General
                                Environmental Bureau
                                69 W. Washington St.
                                Suite 1800
                                Chicago, IL 60602
                                MDunn@atg.state.il.us
                                DRottenberg@atg.state.il.us

Dated: August 7, 2018          FOR THE STATE OF MARYLAND

BRIAN E. FROSH
Attorney General

By: _____

LEAH J. TULIN
Assistant Attorney General
200 Saint Paul Place
Baltimore, MD  21202
(410) 576-6962
ltulin@oag.state.md.us

Dated:  August 17, 2018          FOR THE COMMONWEALTH OF
                                 MASSACHUSETTS

                                 MAURA HEALEY
                                 Attorney General


                     By:   _____
                                 CHRISTOPHE COURCHESNE
                                 Assistant Attorney General and Chief
                                 TURNER SMITH
                                 Assistant Attorney General
                                 Office of the Attorney General
                                 Environmental Protection Div.
                                 One Ashburton Place, 18th Floor
                                 Boston, MA 02108
                                 (617) 727-2200
                                 christophe.courchesne@state.ma.us
                                 turner.smith@state.ma.us

Dated: August 17, 2018      FOR THE STATE OF NEW JERSEY

GURBIR S. GREWAL
Attorney General

By:                           

DAVID C. APY
Assistant Attorney General
KRISTINA MILES
Deputy Attorney General
R.J. Hughes Justice Complex
25 Market Street
Trenton, NJ 08625-0093
(609) 376-2804
david.apy@law.njoag.gov
kristina.miles@law.njoag.gov

AR_0026305

Dated: August **20**, 2018

FOR THE STATE OF NEW YORK

BARBARA D. UNDERWOOD
Attorney General

By:

MICHAEL J. MYERS
Senior Counsel
CLAIBORNE E. WALTHALL
Assistant Attorney General
Environmental Protection Bureau
New York State Attorney General
The Capitol
Albany, NY 12224
(518) 776-2380
Claiborne.Walthall@ag.ny.gov

Dated: August 13 2018      FOR THE STATE OF OREGON

ELLEN F. ROSENBLUM
Attorney General

By:    *Steve Novick*

PAUL GARRAHAN
Attorney-in-Charge
Natural Resources Section
STEVE NOVICK
Special Assistant Attorney General
Oregon Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4520
paul.garrahan@doj.state.or.us
steve.novick@doj.state.or.us

Dated: August 17, 2018

FOR THE COMMONWEALTH OF
PENNSYLVANIA DEPARTMENT OF
ENVIRONMENTAL PROTECTION

ALEXANDRA C. CHIARUTTINI
Chief Counsel

By:

MARGARET O. MURPHY
Department of Environmental Protection
Office of Chief Counsel
400 Market Street, 9th Floor
P.O. Box 8464
Harrisburg, PA 17105-8464
(717) 787-7060
mamurphy@pa.gov

AR_0026308

Dated: August / 7, 2018          FOR THE STATE OF VERMONT

                                 THOMAS J. DONOVAN, JR.
                                 Attorney General

                    By:          _____
                                 LAURA B. MURPHY
                                 Assistant Attorney General
                                 Office of the Attorney General
                                 109 State Street
                                 Montpelier, VT 05609
                                 (802) 828-1059
                                 laura.murphy@vermont.gov

Dated: August 17, 2018          FOR THE STATE OF WASHINGTON

ROBERT W. FERGUSON
Attorney General

By: _____
WILLIAM R. SHERMAN
Assistant Attorney General
AURORA R. JANKE
Special Assistant Attorney General
Counsel for Environmental Protection
800 5th Ave Suite 2000, TB-14
Seattle, WA 98104-3188
(206) 442-4485
(206) 233-3391
bill.sherman@atg.wa.gov
auroraj@atg.wa.gov

# EXHIBIT A

AR_0026311

September 19, 2005

The Honorable Cathy McMorris
Chair, Task Force on Improving the
   National Environmental Policy Act
House Committee on Resources
United States House of Representatives
1324 Longworth House Office Building
Washington, D.C.  20515

Dear Congresswoman McMorris:

We, the undersigned former Chairs and General Counsels of the President's Council on Environmental Quality, are writing to you in your capacity as Chair of the Task Force on Improving the National Environmental Policy Act to state our support for NEPA, to articulate our understanding of the basic principles served by this landmark legislation, and to express our concerns about recent measures and pending proposals that threaten to undermine NEPA.  Collectively, we have served Presidents of both parties since NEPA was signed into law on January 1, 1970.

We urge you and the other members of the Task Force to approach your work with an appreciation for the important role that NEPA plays in our government's decision-making with respect to the environment..  NEPA is, in the words of the CEQ regulations, "our basic national charter for protection of the environment."  NEPA established, for the first time, a national policy favoring protection of the environment, and committed the Federal government to "create and maintain conditions under which man and nature can exist in productive harmony, and fulfill the social, economic, and other requirements of present and future generations of Americans."  It also established farsighted procedural mechanisms, now emulated around the world, that require government agencies to consider and disclose to the public the environmental effects of proposed major government actions, and to provide an opportunity for the public to express concerns regarding the impacts of such actions.

Several principles embodied in NEPA are of overarching importance to achieving our nation's goal of "productive harmony" between man and nature.

Honorable Cathy McMorris
September 19, 2005
Page two

        First, consideration of the impacts of proposed government actions on the quality
of the human environment is essential to responsible government decision-making.
Government projects and programs have effects on the environment with important
consequences for every American, and those impacts should be carefully weighed by
public officials before taking action.  Environmental impact analysis is thus not an
impediment to responsible government action; it is a prerequisite for it.

        Second, analysis of alternatives to an agency's proposed course of action is the
heart of meaningful environmental review.  Review of reasonable alternatives allows
agencies to evaluate systematically the potential effects of their decisions and to assess
how they can better protect the environment while still fully implementing their primary
missions.

        Third, the public plays an indispensable role in the NEPA process.  Public
comments inform agencies of environmental impacts that they may have misunderstood
or failed to recognize, and often provide valuable insights for reshaping proposed projects
to minimize their adverse environmental effects.  The public also serves as a watchdog,
ensuring that Federal agencies fulfill their responsibilities under the law.  Public
participation under NEPA supports the democratic process by allowing citizens to
communicate with and influence government actions that directly affect their health and
well-being.

        We recognize that environmental impact analysis should be efficient, timely and
helpful to agencies and to the public.  CEQ has always emphasized that the purpose of
environmental review is "not to generate paperwork – even excellent paperwork – but to
foster excellent action."  The CEQ regulations direct Federal agencies to make the NEPA
process more useful to decision-makers and the public, reduce paperwork, and emphasize
real environmental issues and alternatives, and contain detailed guidance for integrating
NEPA efficiently and effectively into agency planning processes.  Unfortunately, not
every Federal agency, and not every NEPA review, complies effectively with this
mandate.  Meaningful efforts to improve the Act's implementation should address the
critical needs for better guidance and additional training for agency personnel and
enhanced resources for NEPA implementation by federal agencies.

        We are concerned that certain recent measures and pending proposals fail to
reflect, and in some instances may undermine, the basic principles served by NEPA.
Measures to exempt certain agencies and programs from NEPA, to restrict or eliminate
alternatives analysis, or to limit the public's right to participate in the NEPA process

AR_0026313

Honorable Cathy McMorris
September 19, 2005
Page three

threaten NEPA's vital role in promoting responsible government decision-making.  We
urge you and the other members of the Task Force to support the basic principles of
NEPA and reject proposals that would weaken or undermine NEPA.

Sincerely,

Russell E. Train
Chair, Council on Environmental Quality
(1970-1973)

Russell W. Peterson
Chair, Council on Environmental Quality
(1973-1976)

John Busterud
Chair, Council on Environmental Quality
(1976-1977)

Charles W. Warren
Chair, Council on Environmental Quality
(1977-1979)

J. Gustave Speth
Chair, Council on Environmental Quality
(1979-1981)

AR_0026314

Honorable Cathy McMorris
September 19, 2005
Page four

Michael R. Deland
Chair, Council on Environmental Quality
(1989-1993)

Kathleen A. McGinty
Chair, Council on Environmental Quality
(1995-1998)

George T. Frampton Jr.
Chair, Council on Environmental Quality
(1998-2001)

Gary Widman
General Counsel, Council on Environmental
Quality (1974-1976)

Nick Yost
General Counsel, Council on Environmental
Quality (1977-1981)

# EXHIBIT B

AR_0026316

UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION

Certification of New Interstate Natural )        Docket No. PL18-1-000
Gas Facilities                        )


COMMENTS OF THE ATTORNEYS GENERAL OF MASSACHUSETTS, ILLINOIS, MARYLAND,
NEW JERSEY, RHODE ISLAND, WASHINGTON, AND THE DISTRICT OF COLUMBIA

The undersigned Attorneys General are pleased to submit these comments in response
to the Federal Energy Regulatory Commission's ("Commission") Notice of Inquiry, dated April
19, 2018,[1] inviting comments on whether and how the Commission should revise its approach
under its current policy statement on the certification of new natural gas transportation
facilities ("Policy Statement") pursuant to the Natural Gas Act ("NGA").[2] As detailed herein, we
have significant concerns about the Commission's approach to reviewing natural gas pipeline
projects that are sited in and affect our states. We appreciate the opportunity to provide these
comments, and respectfully urge the Commission to reexamine its Policy Statement, taking into
account the following comments and recommendations.

### INTRODUCTION AND SUMMARY OF COMMENTS

Section 7 of the NGA, 15 U.S.C. § 717f (e), authorizes the Commission to grant a
certificate of public convenience and necessity ("Certificate") for the construction or expansion
of facilities for the transport of natural gas in interstate commerce. The NGA obligates the
Commission to consider "all factors bearing on the public interest"[3] when making a Certificate
decision, balancing the need for additional natural gas capacity from a proposed pipeline

---

[1] *Certification of New Interstate Natural Gas Facilities,* 163 FERC ¶ 61,042 (April 19, 2018) [hereinafter "Pipeline NOI"].

[2] Statement of Policy, Certification of New Interstate Natural Gas Pipeline Facilities, Docket No. PL99-3-000; 88 FERC ¶ 61,227 (September 15, 1999), Order Clarifying Statement of Policy, Docket No. PL99-3-001, 90 FERC ¶ 61,128 (February 9, 2000), Order Further Clarifying Statement of Policy, Docket No. PL99-3-002, 92 FERC ¶ 61,094 (July 28, 2000) [hereinafter "Policy Statement"].

[3] *Atl. Ref. Co. v. Pub. Serv. Comm'n,* 360 U.S. 378, 391 (1959); *see also* NGA §7 (c), (e), 15 U.S.C. § 717f (c), (e).

AR_0026317

project with the project's adverse effects, including economic and environmental impacts.[4] In addition, the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321 *et seq.*, requires the Commission to take a "hard look" at the full range of environmental impacts associated with proposed pipeline infrastructure.[5] For jurisdictional projects, the Commission holds ultimate land use siting authority—a role played by states and local governments for many other energy production and energy transportation facilities.

Between 1999 and 2017, the Commission approved interstate natural gas pipeline capacity additions of 180 billion cubic-feet per day nationwide, a significant number that exceeds current national peak demand.[6] While these additions may increase the availability of natural gas to customers, they also come with long-duration costs, many ultimately paid by residents and small businesses in our states, and significant environmental impacts. Meanwhile, new pipeline infrastructure projects are entering a rapidly changing energy market, which raises major questions about the business and environmental case for new capacity built using traditional financing approaches and assumptions. It is in this context that the undersigned Attorneys General believe that the Commission's review of proposed gas pipeline projects under the Policy Statement does not fully satisfy its vital obligations under the NGA and NEPA to protect the public interest.

Despite its broad statutory authority and duty to consider the full range and scope of relevant factors related to pipeline projects, the Commission's current process is unduly segmented and narrow in scope. In assessing project need, the Commission generally fails to account for the extent of regional need for new gas capacity or the evolving market for gas demand and relies too heavily on precedent agreements as proof of need for isolated projects.

---

[4] *See Sierra Club v. FERC*, 867 F.3d 1357, 1373 (D.C. Cir. 2017).

[5] *Kleppe v. Sierra Club*, 427 U.S. 390, 410 n.21 (1976) (citation omitted); *Coal. for Responsible Growth & Res. Conservation v. FERC*, 485 F. App'x 472, 474 (2d Cir. 2012).

[6] *See* SUSAN TIERNEY, ANALYSIS GROUP, NATURAL GAS PIPELINE CERTIFICATION: POLICY CONSIDERATIONS FOR A CHANGING INDUSTRY (2017), at 1–2, *available at* http://www.analysisgroup.com/uploadedfiles/content/insights/publishing/ag_ferc_natural_gas_pipeline_cer tification.pdf.

AR_0026318

This practice does not permit the Commission to understand the broader context for the alleged benefits of a proposed project and risks approving more infrastructure and capacity (on potentially inefficient terms) than the public need requires or prospective market conditions can or should support. The Commission's single-minded reliance on precedent agreements is also contrary to the existing Policy Statement which directs the Commission to "consider all relevant factors reflecting on the need for the project," including studies of projected demand, the market to be served, and potential cost savings to consumers.

The Commission's current practice also fails to meet its statutory obligations under NEPA to assess the environmental impacts of proposed pipeline projects in a comprehensive and robust manner. By generally focusing on single projects in isolation, the Commission does not appropriately consider reasonable alternatives or account for cumulative environmental impacts on a regional basis. The Commission also fails to adequately assess non-gas energy alternatives and other project alternatives such as energy storage, demand response, and energy efficiency, and routinely fails to appropriately consider state policies, such as state choices regarding our energy resource portfolios. And by not consistently and thoroughly assessing and quantifying upstream and downstream greenhouse gas emissions using the best available measures, the Commission's approach to assessing climate impacts does not satisfy NEPA requirements. Relatedly, the Commission's inadequate implementation of NEPA hobbles its broader statutory obligation under the NGA to evaluate the public interest in Certificate decisions by balancing project benefits against a full accounting of adverse environmental and socioeconomic impacts.

The undersigned Attorneys General strongly urge the Commission to revise the Policy Statement in accordance with the recommendations discussed in detail below. Implementing these recommendations will assist the Commission in addressing the issues raised by the Commission in its Notice of Inquiry, including growing stakeholder concerns and legal challenges related to the adverse impacts of pipeline projects.

AR_0026319

## RECOMMENDATIONS

*First*, regarding project need, we recommend that the Commission assess need on a comprehensive, regional basis, and expand its analysis beyond the current dependence on precedent agreements, employing heightened scrutiny of precedent agreements with affiliates of project proponents.

*Second*, we urge the Commission to conduct a more thorough and robust NEPA analysis, comprehensively assessing on a regional basis the impacts of, and alternatives to, a proposed project, considering clean energy and other non-pipeline alternatives, thoroughly analyzing upstream and downstream greenhouse gas emissions, and considering state greenhouse gas emission-reduction policies.

*Third*, we recommend that the Commission consider environmental harm, including climate impacts quantified using the best available measure—the Social Cost of Carbon—and more heavily weigh the harm from use of eminent domain takings in its public interest assessment when balancing project benefits and harm in making a Certificate decision.

*Fourth*, we urge the Commission to better incorporate and consider state environmental and land use policies, no longer issue Certificates conditioned on later receipt of state certifications and permits under federal statutes, and to condition Certificates on obtaining and complying with state and local permits that do not unreasonably conflict with or delay approved projects.

*Finally*, we recommend that the Commission no longer issue partial notices to proceed with construction when Certificate rehearing requests are pending and limit the use and time of tolling periods for rehearing requests.

The Commission should seize the opportunity presented by the Notice of Inquiry to make these important reforms, to bring its review of proposed pipeline projects into full compliance with the NGA and NEPA, and to fulfill its statutory role in protecting the public interest. In contrast to the Commission's current process, such an approach would promote efficiency, reduce the risks of litigation delay in project development, and improve the Commission's ability to promote orderly competition and innovation in the gas market.

AR_0026320

## I.   THE COMMISSION SHOULD ENGAGE IN A SEARCHING ASSESSMENT OF PIPELINE PROJECT NEED.

Pursuant to the standard established in Section 7 of the NGA[7], an applicant must show that its proposed pipeline project is consistent with the public convenience and necessity by demonstrating that the public benefits the proposed pipeline project would achieve are proportional to its adverse impacts (the "Public Benefits Assessment").[8] Applicants must show that there is market demand in order to satisfy part of the public benefit requirement—that is, that the project is "needed" (the "Needs Assessment").[9] The current Needs Assessment fails to take into account the regional need for, and impacts of, building new pipelines, and relies too heavily on the existence of precedent agreements, and affiliate precedent agreements in particular. The Attorneys General recommend that the Commission assess market need and impacts on a comprehensive regional basis, expand the assessment to include factors beyond precedent agreements, and employ a rebuttable presumption that affiliate contracts do not demonstrate pipeline need.

### A.   Market need should be assessed on a comprehensive regional basis.

The Commission should broaden its Needs Assessment from assessing the need for each individual pipeline project to considering each pipeline project within the broader context of regional need. Regional designations should be based upon the Commission's natural gas market regions: Midwest, Northeast, Gulf, Southeast, and Western.[10] Changes in gas production, delivery, and consumption, as well as new sources of natural gas, have transformed the natural gas industry since the Policy Statement was issued, leading to a proliferation of natural gas pipelines and infrastructure whose impact on ratepayer and environmental interests necessitates a regional approach. Specifically, the Commission should develop a comprehensive

---

[7] 15 U.S.C. § 717f.

[8] Policy Statement, *supra* note 2, at 25.

[9] *See* Pipeline NOI, *supra* note 1, at 32, 47 n.91.

[10] *See Natural Gas Markets: National Overview*, FED. ENERGY REGULATORY COMM'N, https://www.ferc.gov/market-oversight/mkt-gas/overview.asp (July 3, 2018).

AR_0026321

analysis of each region's need for natural gas, taking into account existing pipelines and the integration of gas and electric systems, and evaluating available alternatives to pipeline infrastructure, as well as the impacts of pipeline infrastructure and alternatives.[11] Regional assessments would allow the Commission to systematically assess current and future need for additional natural gas capacity (including use by natural gas-fired power plants) in regional markets, accounting for projected growth in renewables and energy efficiency. In addition, the Commission's regional analyses would provide critical foundation for rational and regionally consistent project-specific Needs Assessments, which would build upon the regional assessments, incorporating more detailed analysis and information from project proponents.

The regional analyses should consider each region's existing infrastructure and natural gas pipeline capacity as well as state policy goals and projections of the future demand for natural gas, including the types of services that will be needed in a changing energy market. Other regional considerations should include whether the capacity is needed for new or existing generators, whether the additional capacity promotes competitive markets, whether anticipated markets will materialize, and whether there is a reliability benefit.[12,13]

## B. The current market needs assessment is too narrow and should be expanded to consider multiple factors.

Although the Policy Statement specifically rejected sole reliance on precedent agreements to demonstrate project benefits or need and recommends multiple factors the Commission should consider in the Needs Assessment, in practice, the Commission has relied heavily on proof of precedent agreements to find need.[14] This practice unduly restricts the

---

[11] *See infra* Section II A and B for further discussion of alternatives analysis.

[12] *National Fuel Gas Supply Corp.,* 158 FERC ¶ 61,145 (2017) (statement of Commissioner Bay).

[13] *See* Susan Tierney, Natural Gas Pipeline Certification: Policy Considerations for a Changing Industry, *supra* note 6.

[14] Pipeline NOI, *supra* note 1, at 32, 47 n. 91. The Commission's decision to consider "all relevant factors" amended its previous policy which relied primarily on the "contract test"—the percentage of capacity under long-term contracts—to establish market need. The Commission further stated that the amount of capacity under contract "is not a sufficient indicator by itself of the need for a project." Policy Statement, *supra* note 2, at 5. However, the Commission has continued to find public need by relying solely upon long-term precedent agreements. *See, e.g.* Order on Rehearing, Mountain Valley Pipeline, LLC, Equitrans, L.P., 163 FERC ¶ 61,197

AR_0026322

Commission's inquiry and fails to account for the context of the alleged benefits of a proposed project and risks approving more infrastructure and capacity, on potentially inefficient terms, than the public need requires or prospective market conditions can support. Furthermore, the Policy Statement states that in evaluating market need, the Commission should "consider all relevant factors reflecting on the need for the project," and provide a range of factors in addition to evidence of precedent agreements, including studies of projected demand, the market to be served, and potential cost savings to consumers.[15] We recommend that the Commission make a renewed commitment to considering these factors and all others relevant to determining whether a pipeline project is needed, including accounting for the integration of gas and electric systems in the region and the projected growth in the use of renewables and energy efficiency measures. Where appropriate, the Commission should conduct evidentiary hearings or utilize other methods to create a more complete record and transparent process to provide greater confidence in the Commission's Public Benefits Assessments and Certificate decisions.

C. **The Commission should further scrutinize and limit the use of affiliate contracts in demonstrating pipeline project need.**

The Policy Statement notes that "[u]sing contracts as the primary indicator of market support for the proposed pipeline project also raises additional issues when the contracts are held by pipeline affiliates."[16] Despite this recognition there are currently no restrictions on providing precedent agreements signed by affiliates to demonstrate project need. In practice, the Commission has stated repeatedly that it will not "look behind the precedent agreements to evaluate project need," even when affiliates constitute a majority of the precedent agreement capacity.[17]

---

at *35–44 (June 15, 2018) [hereinafter "Mountain Valley Rehearing Order"]; Order Issuing Certificates, PennEast Pipeline Company, LLC, 162 FERC ¶ 61,053 at *27–29, *33, *36 (January 19, 2018) [hereinafter "PennEast Order"].

[15] Policy Statement, *supra* note 2, at *23; PennEast Order, *supra* note 14 (Glick, C., dissenting, at *1–2).

[16] Policy Statement, *supra* note 2, at *16.

[17] *See, e.g.,* PennEast Order, *supra* note 14, at *33; Mountain Valley Rehearing Order, *supra* note 14, at *40.

AR_0026323

Relying too heavily on affiliate contracts risks mischaracterizing the need for the proposed pipeline project. In his dissent in *PennEast*, Commissioner Glick found that "precedent agreements that are in significant part between the pipeline developer and its affiliates [are] insufficient to carry the developer's burden to show that the pipeline is needed."[18] Indeed, where a utility holding company invests in a pipeline development project and an affiliate utility contracts for long-term firm service on that project, the utility holding company may pass the risk and the cost of the development of the pipeline to captive customers of the affiliate utility.[19] Without having to bear the risk or cost of development, the pipeline holding company has an economic incentive to construct new pipelines (and receive a return on its investment) regardless whether they are needed.[20] A pipeline project that is based on precedent agreements with multiple new customers tends to show a greater indication of need than a pipeline project supported by precedent agreements with affiliates.[21]

To protect ratepayers from undue costs and ensure projects truly reflect market need, the Commission should employ a rebuttable presumption that affiliate contracts do not demonstrate need wherever a pipeline project would not proceed absent affiliate contracts. In such instances, the Commission should require independent supporting evidence of need, such as third-party market analysis or state-approved resource plans, to overcome the presumption. Even where they make up only a relatively small portion of precedent agreements, the Commission should implement a more stringent standard of review for affiliate contracts. This standard should give the Commission the authority to look behind the contracts, including where needed an independent review of state regulatory filings and analyses regarding those contracts. Additional scrutiny of affiliate contracts will enable the Commission to better

---

[18] PennEast Order, *supra* note 14 (Glick, C., dissenting at *1).

[19] *Art of the Self-Deal,* Oilchange International (2017), at 20.

[20] *Id.*

[21] Policy Statement, *supra* note 2, at 26.

8

evaluate the market need for the pipeline project and ensure that ratepayers are not burdened with unwarranted costs.

## II.    THE COMMISSION SHOULD MORE ROBUSTLY AND COMPREHENSIVELY ASSESS THE IMPACTS OF, AND ALTERNATIVES TO, PROPOSED PIPELINE PROJECTS.

NEPA requires federal decision-makers, including the Commission, to prepare a "detailed statement" on the environmental impacts of certain actions prior to making decisions.[22] This environmental impact statement ("EIS") must take a "hard look" at the impacts of the proposed action,[23] including direct and cumulative impacts, as well as any "reasonably foreseeable" indirect impacts.[24] Consideration of environmental and economic impacts is also part of the Commission's Public Benefits Assessment under the NGA.[25] Yet, in practice, the Commission often fails to satisfy its duty to assess robustly and consistently the full range of impacts of, and alternatives to, proposed pipeline projects.[26] As discussed below, the Commission must take a more comprehensive approach to its impacts review—both to satisfy its legal obligations and to help forestall challenges to Commission decisions.

### A.    The Commission should holistically evaluate the need for, the impacts of, and alternatives to new pipeline projects in each U.S. region.

As noted in Section I A above, the Commission's piecemeal review of natural gas infrastructure risks approval of more capacity than is in the public interest. Moreover, as underscored by recent federal court decisions vacating Commission orders, the Commission's

---

[22] 42 U.S.C. § 4332(2)(C).

[23] *Kleppe*, 427 U.S. at 410 (citation omitted); *see also Coal. for Responsible Growth & Res. Conservation v. FERC*, 485 F. App'x 472, 474 (2d Cir. 2012) and *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 249 (1989).

[24] 42 U.S.C. § 4332(2)(C)(i); 40 C.F.R. §§ 1502.16, 1508.8(a), (b); *see also* 40 C.F.R. § 1508.7 (a cumulative impact is "the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions"); *Sierra Club v. Marsh*, 976 F.2d 763, 767 (1st Cir. 1992) (a "reasonably foreseeable" impact or action is "sufficiently likely to occur that a person of ordinary prudence would take it into account in reaching a decision").

[25] *See* Order Denying Rehearing, Dominion Transmission, Inc., 163 FERC ¶ 61,128 (May 18, 2018) [hereinafter "Dominion Order"] (Glick, C., dissenting in part, at *1–2, *7).

[26] In recent years, federal courts have vacated orders based on deficiencies in the Commission's environmental impacts review process. *See Sierra Club*, 867 F.3d at 1373–75; *Del. Riverkeeper Network v. FERC*, 753 F.3d 1304, 1308–09 (D.C. Cir. 2014).

AR_0026325

segmented approach does not align with the requirements of NEPA and increases legal risks.[27] The Commission should instead undertake assessments of the impacts of and alternatives to new pipeline projects on a regional basis together with a regional assessment of need.[28] Regional analyses would offer an opportunity to standardize the Commission's impacts assessments approach across pipeline project review proceedings by setting forth data, metrics, projections, and other information that the Commission will use to evaluate pipeline projects in a particular region, including the cumulative and indirect impacts of pipeline projects, as discussed further below.[29]

### B. The Commission's alternatives assessment should include clean-energy and other non-pipeline alternatives.

The alternatives analysis required by NEPA is "the heart of the environmental impact statement."[30] Federal regulations require the Commission to explore all reasonable alternatives rigorously with an analysis that "present[s] the environmental impacts of the proposal and the alternatives in comparative form, thus sharply defining the issues and providing a clear basis

---

[27] *See, e.g., Sierra Club* 867 F.3d at 1373–75 (vacating a Commission decision due to the Commission's failure to properly consider the full range of pipeline project impacts under NEPA); *Del. Riverkeeper*, 753 F.3d at 1308–09, *supra* note 25 (holding that the Commission violated NEPA by failing to analyze the impacts of a project in conjunction with "three other connected, contemporaneous, closely related, and interdependent" pipeline certificate applications).

[28] Programmatic EISs ("PEISs") and combined EISs offer models for such regional assessments. They may even be mandated in certain circumstances. *See* 40 C.F.R. § 1508.25 (agencies "shall" consider "closely related," cumulative, and similar actions together in an EIS); *id.* § 1502.4(c)(1)–(2) (urging federal agencies to consider undertaking a PEIS when they are considering multiple projects in one region, or where projects share "relevant similarities, such as common timing, impacts, alternatives, [and] methods of implementation"); *Del. Riverkeeper*, 753 F.3d at 1308–09 (holding that the Commission must conduct a unified NEPA review of multiple connected gas pipeline segments); *Kleppe*, 427 U.S. at 409–10 ("A comprehensive impact statement may be necessary" where "several proposals for coal-related actions that will have cumulative or synergistic environmental impact upon a region are pending concurrently before an agency."); *Alpine Lakes Prot. Soc'y v. U.S. Forest Serv.*, 838 F. Supp. 478, 484 (W.D. Wash. 1993) (agency must consider seven access roads in the same region as "cumulative actions" under NEPA); *cf.* U.S. DEP'T OF INTERIOR, ORDER NO. 3338, DISCRETIONARY PROGRAMMATIC ENVIRONMENTAL STATEMENT TO MODERNIZE THE FEDERAL COAL PROGRAM (2016) (announcing the Department of Interior's then intent to conduct a programmatic EIS for the federal coal-leasing program).

[29] *Cf.* U.S. Envtl. Protection Agency, EPA Detailed Comments on FERC NOI for Policy Statement on New Natural Gas Transportation Facilities 1 (June 21, 2018) (recommending the Commission undertake regional analyses of the cumulative impacts associated with pipeline projects and mitigation opportunities).

[30] 40 C.F.R. § 1502.14; *see also Union Neighbors United, Inc. v. Jewell*, 831 F.3d 564 (D.C. Cir. 2016).

AR_0026326

for choice among options by the decisionmaker and the public."[31] In addition to exploring the effect of not building the proposed project,[32] the analysis must thoroughly address non-pipeline alternatives outside of the Commission's jurisdiction and the project applicant's preferences or capabilities.[33] Indeed, the Commission's own environmental review regulations and guidance require that the alternatives analysis address "the potential for accomplishing the proposed objectives through the use of other systems,"[34] including "non-gas energy alternatives, and/or energy conservation or efficiency, as applicable."[35] More explicitly, the Commission has said that the alternatives analysis should "[d]escribe the effect of any state or regional energy conservation, load-management, and demand-side management programs on the long-term and short-term demand for the energy to be supplied by the project."[36]

And yet, the Commission's NEPA alternatives analyses consistently give short shrift to or ignore non-gas energy alternatives or other measures such as energy storage, demand response, and energy efficiency to meet the need addressed by the proposed project. When such alternatives are addressed, they are typically considered in isolation and rejected in cursory fashion as unsuitable or insufficient to meet the demand evidenced by the precedent agreements the pipeline project applicant submits as demonstration of need.[37]

---

[31] Id.

[32] 40 C.F.R. § 1502.14 (d) (the analysis must "[i]nclude the alternative of no action").

[33] 40 C.F.R. § 1502.14 (c) (the analysis must "[i]nclude reasonable alternatives not within the jurisdiction of the lead agency"); see also Forty Most Asked Questions Concerning CEQ's National Environmental Policy Act Regulations, 46 Fed. Reg. 18,026, 18,033 (March 23, 1981) ("In determining the scope of alternatives to be considered, the emphasis is on what is 'reasonable' rather than on whether the proponent or applicant likes or is itself capable of carrying out a particular alternative.")

[34] Environmental reports for NGA applications, 18 C.F.R. § 380.12(l)(1) (the alternatives analysis must "[d]iscuss the "no action" alternative and the potential for accomplishing the proposed objectives through the use of other systems and/or energy conservation.").

[35] FED. ENERGY REGULATORY COMM'N, GUIDANCE MANUAL FOR ENVIRONMENTAL REPORT PREPARATION FOR APPLICATIONS FILED UNDER THE NGA, Vol. I, 4–136 (2017).

[36] FED. ENERGY REGULATORY COMM'N, GUIDANCE MANUAL FOR ENVIRONMENTAL REPORT PREPARATION, 3–6 (2002).

[37] See, e.g., Order Issuing Certificates and Granting Abandonment Authority, Mountain Valley Pipeline, LLC, Equitrans, L.P., 161 FERC § 61,043 (October 13, 2017) [hereinafter "Mountain Valley Order"] (LaFleur dissenting at *2–3) (discussing "environmentally superior alternatives" limited to consideration of single, merged pipeline right of ways as alternatives to two separate pipeline project proposals).

AR_0026327

Natural gas is but one of many resources that can be utilized to meet customers' electric and thermal needs. Storage or electric system upgrades, for example, may be more cost-effective than pipeline expansion, particularly to satisfy peak demand. The Commission's alternatives analysis should analyze thoroughly and robustly all reasonable non-gas energy alternatives, including, where applicable, renewables and other clean-energy sources, the use of demand response and other market-based programs, and the impact of existing and projected increases in energy efficiency and energy conservation measures—accounting for state renewable portfolio standards and other programs and policies requiring or encouraging increased use of energy efficiency and conversation measures.

Not only should each individual alternative be thoroughly analyzed, but the combined effect of all non-gas pipeline alternatives also should be considered for its potential to meet the need to be addressed by the proposed project. NEPA requires no less.[38] Moreover, the public and states have significant interest in such analysis, particularly where state law and policy requires expansion of renewable and clean energy alternatives, increased energy efficiency measures, and reductions in greenhouse gas emissions, as discussed further below.

### C. The Commission must consistently analyze upstream and downstream greenhouse gas emissions associated with pipeline projects.

A robust comparative analysis of the climate impacts of pipeline infrastructure and reasonable alternatives is essential to inform the Commission's decisionmaking about proposed projects. As the D.C. Circuit Court of Appeals "clearly signaled" in its 2017 opinion in *Sierra Club v. FERC*,[39] which vacated a Commission decision due to the Commission's failure to properly analyze greenhouse gas impacts,[40] "the Commission should be doing more as part of

---

[38] *Cf. Davis v. Mineta*, 302 F.3d 1104, 1122 (10th Cir. 2002) ("Many [project] alternatives were improperly rejected because, standing alone, they did not meet the purpose and need of the Project. Cumulative options, however, were not given adequate study. Alternatives were dismissed in a cursory and perfunctory manner that do [*sic*] not support a conclusion that it was unreasonable to consider them as viable alternatives.").

[39] 867 F.3d 1357 (D.C. Cir. 2017).

[40] *Id.* at 1373–75.

AR_0026328

its environmental reviews" to analyze the climate impacts of pipeline projects.[41]  In *Sierra Club*, the court found that downstream combustion of gas transported by a pipeline project "is not just 'reasonably foreseeable,' it is the project's entire purpose."[42] There is relative certainty about the likely fate of the natural gas resources that will be transported by pipeline projects: combustion.[43] Indeed, if a pipeline project is *not* needed to transport additional quantities of gas for combustion, the Commission would have no basis to approve the pipeline project.[44] As well, it is foreseeable that an expansion in natural gas transportation capacity would impact production of natural gas upstream in the supply chain.[45]

Yet, in recent orders, the Commission has maintained that it is not required to consider the full range of greenhouse gas emissions associated with pipeline projects because the impacts of such emissions are too speculative or not causally related to approval of a proposed pipeline project.[46]  For instance, in its recent Order Denying Rehearing in *Dominion*

---

[41] Dominion Order, *supra* note 25 (LaFleur, C., dissenting in part, at *3).

[42] *Sierra Club*, 867 F.3d at 1372; *cf. High Country Conservation Advocates v. U.S. Forest Serv.*, 52 F. Supp. 3d 1174, 1196 (D. Colo. 2014) (finding that downstream greenhouse gas emissions related to constructing roads for coal mining are foreseeable).

[43] *See* Statement of Commissioner Cheryl A LaFleur on Tennessee Gas Pipeline Company, L.L.C., 2 n.3 (June 12, 2018), *available at* https://elibrary.ferc.gov/idmws/file_list.asp?accession_num=20180614-3074 [hereinafter "LaFleur June 12, 2018 Statement"] ("[I]t is reasonably foreseeable in the vast majority of cases that the gas being transported by a pipeline we authorize will be burned for electric generation or residential, commercial, or industrial end uses. . . . [T]here is a reasonably close causal relationship between the Commission's action to authorize a pipeline project . . . and the downstream GHG emissions that result . . . ."); *cf. Mid States Coalition for Progress v. Surface Transportation Board*, 345 F.3d 520, 549 (8th Cir. 2003) (agency unlawfully failed to consider downstream emissions from the burning of transported coal); *San Juan Citizens Alliance et al. v. U.S. Bureau of Land Mgmt.*, Slip Op. at *39 (D. N.M. 2018) (agency's "failure to estimate the amount of greenhouse gas emissions which will result from consumption of the oil and gas produced as a result of development of wells on the leased areas was arbitrary" and a violation of NEPA's requirement to analyze indirect and cumulative impacts).

[44] *Cf. N. Plains Res. Council, Inc. v. Surface Transp. Bd.*, 668 F.3d 1067, 1082 (9th Cir. 2011) (climate emissions were foreseeable where agency relied on mine development to justify investment in coal rail line proposal).

[45] *Cf. Barnes v. U.S. Dep't of Transp.*, 655 F.3d 1124, 1138–39 (9th Cir. 2011) (finding that "a new runway has a unique potential to spur demand," and agency therefore was required to analyze the impacts of such increased demand in EIS).

[46] *See, e.g.*, Order Denying Rehearing and Dismissing Stay Request, Algonquin Gas Transmission, LLC, 154 FERC ¶ 61,048, *44–46 (Jan. 28, 2016); Dominion Order, *supra* note 25, at *16–17; Columbia Gas Transmission, LLC, 153 FERC ¶ 61,064 at *6 (Oct. 14, 2015).

13

AR_0026329

*Transmission, Inc.* ("Dominion Order"),[47] the Commission stated that "where the Commission lacks meaningful information about potential future natural gas production" or "about future power plants, storage facilities, or distribution networks, within the geographic scope of a project-affected resource, then these impacts are not reasonably foreseeable."[48] Consequently, according to the Commission, neither NEPA nor the NGA requires the Commission to quantify or even consider those greenhouse gas emissions.[49]

This interpretation is a plain misreading of the Commission's legal authority and duties.[50] The NGA vests the Commission with broad authority to consider "all factors bearing on the public interest,"[51] which includes consideration of the full range of climate impacts[52] of proposed pipeline projects.[53] As Commissioner Glick noted in a recent dissenting opinion, a proposed project's "contribution to the harm caused by climate change[ is] critical to determining whether the Project[ is] in the public interest. Therefore, the Commission's failure to adequately address them is a sufficient basis for vacating [a] certificate."[54] Moreover, NEPA's requirement that the Commission take a "hard look" at the impacts of pipeline projects

---

[47] *See* Dominion Order, *supra* note 25.

[48] *Id.* at *14–15.

[49] *Id.* at *19 & n.96.

[50] Furthermore, we find it concerning that the Commission pronounced a new, broadly applicable policy in the context of a proceeding for an individual pipeline project, and while the Commission is simultaneously soliciting stakeholder feedback on the same set of issues in the instant docket. We urge the Commission to seize its review of the Policy Statement as an opportunity to reconsider the positions set forth in the recent Dominion Order and to revise its policy in line with our recommendations.

[51] *Atl. Ref. Co. v. Pub. Serv. Comm'n*, 360 U.S. 378, 391 (1959); *see also NAACP v. FPC*, 425 U.S. 662, 670 n.6 (1976) (explaining the Commission's broad authorities, including authority to consider "conservation" and "environmental" matters).

[52] *See* discussion *infra* in Section III.

[53] *Accord* Dominion Order, *supra* note 25 (LaFleur, C., dissenting in part, at *1); *id.* (Glick, C., dissenting in part, at *7); *see also* Mountain Valley Rehearing Order, *supra* note 14 (Glick, C., dissenting, at *1) ("In order to meet our obligations under both NEPA and the NGA, the Commission must adequately consider the environmental impact of greenhouse gas (GHG) emissions on climate change."); *see also Sierra Club*, 867 F.3d at 1373.

[54] Mountain Valley Rehearing Order, *supra* note 14 (Glick, C., dissenting, at *1–2); *accord Sierra Club*, 867 F.3d at 1373 (affirming that "FERC could deny a pipeline certificate on the ground that the pipeline would be too harmful to the environment"); Dominion Order, *supra* note 25 (Glick, C., dissenting, at *7) ("[T]he NGA's public interest standard requires the Commission to consider greenhouse gas emissions associated with the incremental production and consumption of natural gas caused by a new pipeline.").

AR_0026330

obligates the Commission to comprehensively and carefully consider the proposed project's contribution to climate change—an urgent environmental and public health crisis.[55] Federal caselaw makes clear that the Commission cannot evade this far-reaching requirement by claiming that climate impacts are characterized by some uncertainty.[56]

NEPA does not require a perfect forecast. Where there is uncertainty about project impacts, the Commission must provide a "summary of existing credible scientific evidence which is relevant" to those impacts.[57] There are many analytical tools and data available to help the Commission estimate upstream and downstream greenhouse gas emissions,[58] as demonstrated in part by the Commission's past use of studies from the Department of Energy and other entities to estimate "upper-bound" climate emissions.[59] Notably, the regional assessments recommended above would address the Commission's claims in prior orders that decision-analysis tools, lifecycle emissions estimates, and other available resources are too general for the purposes of estimating certain project-level climate impacts.[60] Regional need and impacts assessments would allow the Commission to assess the climate impacts of pipeline projects at a broader level, based on the best available data and modeling relevant to the impacted region.

---

[55] *Cf. Baltimore Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*, 462 U.S. 87, 97 (1983) ("NEPA . . . places upon an agency the obligation to consider *every* significant aspect of the environmental impact of a proposed action.") (internal quotation marks and citations omitted) (emphasis added)).

[56] *See, e.g., Scientists' Inst. For Pub. Info., Inc. v. U.S. Atomic Energy Comm'n*, 481 F.2d 1079, 1092 (D.C. Cir. 1973) (courts must "reject any attempt by agencies to shirk their responsibility under NEPA by labeling any and all discussion of future environmental effects as 'crystal ball inquiry'"); *Mid States Coal. For Progress v. Surface Transp. Bd.*, 345 F.3d 520, 549–50 (8th Cir. 2003) (finding that coal rail project would affect national long-term demand for coal and have upstream impacts by making coal a "more attractive option").

[57] 40 C.F.R. § 1502.22(b)(3).

[58] *See, e.g.*, U.S. Envtl. Protection Agency, EPA Detailed Comments on FERC NOI for Policy Statement on New Natural Gas Transportation Facilities 2–4 (June 21, 2018) (listing existing tools and information available to the Commission to calculate the upstream and downstream climate emissions associated with pipeline infrastructure).

[59] *See* Dominion Order, *supra* note 25 (LaFleur, C., dissenting in part, at *2); LaFleur June 12, 2018 Statement, *supra* note 53, at 2 n.7 (citing studies used in past Commission orders); Pipeline NOI, *supra* note 1, at 43–44.

[60] *See, e.g.*, Dominion Order, *supra* note 25, at *14–18; Mountain Valley Rehearing Order, *supra* note 14, at *150–53.

15

AR_0026331

And, in general, where essential information is lacking, NEPA requires the Commission to conduct independent research or otherwise compile missing information.[61] Thus, where the Commission finds that existing data and resources are inappropriate for estimating upstream or downstream emissions from a particular proposed pipeline project, the Commission should take advantage of available opportunities during the pre-filing and formal application process to seek more detailed information from proponents about the source and end use of the gas to be transported by the proposed project, and use that data to conduct its own analysis.[62]

Where more specific modeling is not feasible, NEPA requires the Commission to use or produce the best comparable information based on reasonable forecasts and estimates.[63] In such cases, the Commission should consider using the best available general modeling system and describe in its NEPA documents how it expects that project-related emissions might differ from available estimates.[64] For instance, the Commission could produce a "full-burn" estimate (i.e., an estimate of lifecycle greenhouse gas emissions from wellhead to point of consumption, taking into account leaks and losses in production, transmission, and distribution system, assuming total consumption of delivered gas) accompanied by a caveat that ultimately the pipeline project may result in fewer emissions.[65] We note that in past proceedings, the

---

[61] 40 C.F.R. § 1502.22(a).

[62] *Accord* Dominion Order, *supra* note 25 (Glick, C., dissenting in part, at *3).

[63] *Accord id.* (Glick, C., dissenting in part, at *3–4).

[64] Notably, while some consumption-related impacts are dependent upon details regarding when and where the associated emissions while occur (such as impacts to local air or water quality), the climate-warming effects of greenhouse gas emissions are globalized. Therefore, even without more specific details, the Commission can produce decision-relevant information about the climate impacts of pipeline projects based on an estimate of the quantity of natural gas that will be transported by the proposed infrastructure over its lifetime.

[65] Methane emissions from leaks and other system releases must be accounted for, particularly because methane is a potent greenhouse gas that is over thirty times more powerful than carbon dioxide in its ability to trap heat in the atmosphere over a 100-year time frame, and eighty-six times more potent over a twenty-year timeframe. According to the EPA, methane emissions from the oil and gas sector are the largest industrial source of methane emissions in the United States, accounting for about 30 percent of total U.S. methane emissions. *See* http://www3.epa.gov/climatechange/ghgemissions/gases/ch4.html. But a recent study found that methane emissions were sixty percent higher than the U.S. EPA inventory estimate, likely because existing inventory methods miss emissions released during abnormal operating conditions. *See* Ramón A. Alvarez, et al., *Assessment of Methane Emissions from the U.S. Oil and Gas Supply Chain*, Science, June 21, 2018.

AR_0026332

Commission has made gross, net, and "full-burn" estimations of upstream and downstream greenhouse gas emissions, evidencing the feasibility of this approach.[66] At the very least, the Commission should require project proponents to provide specific information on the indirect and cumulative impacts of the proposed pipeline project in the context of existing, under-development, and reasonably foreseeable energy projects and market trends in the region, as well as state energy and environmental policies. In no event, however, is the Commission permitted to abdicate its responsibility to consider climate impacts altogether.[67] Consistently analyzing upstream and downstream greenhouse gas emissions—even at some level of generality, if that is all that is feasible—would better inform Commission decisionmaking and the public than no information at all, while also increasing certainty for project proponents.

### D. The Commission should consider state policies and the Social Cost of Carbon in determining whether greenhouse gas emissions are significant.

The Commission has claimed that "no standard methodology exists to determine how a project's contribution to greenhouse gas emissions would translate into physical effects on the environment for the purposes of evaluating [a pipeline project's] impacts on climate change."[68] "Thus . . . any attempt by the Commission" to determine whether such emissions are significant for the purposes of NEPA review "would be arbitrary."[69] On the contrary, it is arbitrary and unlawful for the Commission to monetize and compare other benefits and impacts of pipeline projects without taking a similar approach to greenhouse gas emissions.[70]

---

[66] *See* Dominion Order, *supra* note 24 (LaFleur, C., dissenting in part, at *2).

[67] *Accord Mid States Coal. For Progress*, 345 F.3d at 549–50 (where the "*nature* of the effect is reasonably foreseeable but its *extent* is not," the "agency may not simply ignore the effect") (emphasis in original); LaFleur June 12, 2018 Statement, *supra* note 43, at 2; *see also* 40 C.F.R. § 1500.1(b) (requiring that agencies' NEPA analysis must be based on "high quality" information and "accurate scientific analysis").

[68] Dominion Order, *supra* note 25, *34; *accord* Pipeline NOI, *supra* note 1, at 41.

[69] Pipeline NOI, *supra* note 1, at 41; *see also* Dominion Order, *supra* note 25, at *28–29.

[70] *See Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin.*, 538 F.3d 1172, 1198 (9th Cir. 2008) (agency "cannot put a thumb on the scale by undervaluing the benefits and overvaluing the costs" in failing to analyze the benefits of reducing greenhouse gas emissions). As a general matter, there can be no doubt that greenhouse gas emissions related to natural gas extraction, transportation, and consumption in the United States as a whole are significant. *See, e.g.*, EPA, INVENTORY OF U.S. GREENHOUSE GAS EMISSIONS AND SINKS 3–6, 3–79 (2018), *available at* https://www.epa.gov/ghgemissions/inventory-us-greenhouse-gas-emissions-and-sinks-1990-2016 (reporting 2016 U.S. emissions associated with natural gas combustion (1,476.1 MMt CO₂e) and

AR_0026333

Despite the Commission's claims, there is a variety of relevant information to inform the Commission's determination of the significance of greenhouse gas emissions.[71] In particular, the Commission should use the best available data and methodologies to estimate the incremental societal impact of greenhouse emissions—also referred to as the Social Cost of Carbon.  Though Executive Order 13,783 § 5 (2017) withdrew the Interagency Working Group on the Social Cost of Greenhouse Gases ("IWG") technical support documents for a range of federal estimates of the social cost of carbon, the information and models underpinning these estimates remain credible and useful, and the IWG's estimates continue to represent the best available science.[72] The Commission has claimed that "it is not useful or appropriate" to use the Social Cost of Carbon in NEPA documents,[73] yet the Commission routinely monetizes other types of impacts in its NEPA documents. The Commission cannot evade its legal obligation to quantify the climate impacts of pipeline infrastructure projects where a scientifically based, peer-reviewed method to do so is available.[74]

In addition, the consistency of a proposed pipeline project's greenhouse gas emissions with relevant federal, regional, and state energy and climate policies and goals—which the

---

natural gas transmission and storage systems (32.8 MMt $CO_2e$ of methane)). The Commission plays a key role in approving actions that cause and contribute to these emissions. *Cf. Coal. on Sensible Transp. v. Dole*, 826 F.2d 60, 68 (D.C. Cir. 1987) (agency cannot avoid the requirements of NEPA by "artificially dividing" its combined contribution "into smaller components, each without a 'significant' impact").

[71] *See, e.g.*, Comments of Columbia Law School Sabin Ctr. for Climate Change Law on Southeast Market Pipelines Project, Draft Supplemental Environmental Impact Statement, Docket Nos. CP14-554-002; CP15-16-003; CPS15-17-002, at 2–3 (Nov. 17, 2017) (arguing that greenhouse gas emissions are significant where: 1) they exceed the reporting threshold of 25,000 tons per year of $CO_2e$ used previously by EPA and CEQ to identify major emitters; 2) the monetized social cost of the emissions is large; 3) the net increase in emissions constitutes a large percentage of the affected state's greenhouse gas emissions inventory; and 4) the emissions over the lifetime of the pipeline project would be viewed as significant in the context of state, local, and regional climate policies).

[72] Richard L. Revesz et al., *Best Cost Estimate of Greenhouse Gases,* 357 SCIENCE 6352 (2017).

[73] *See* Pipeline NOI, *supra* note 1, at 45 (citing *Fla. Se. Connection*, 162 FERC ¶ 61,233 at *37–38 (LaFleur and Glick, Comm'rs dissenting)).

[74] *See High Country Conservation Advocates v. U.S. Forest Serv.*, 52 F. Supp. 3d 1174, 1191 (D. Colo. 2014) (EIS was arbitrary and capricious where agency did not monetize climate impacts of coal mining activity "when such an analysis was in fact possible").

AR_0026334

Commission already analyzes in its NEPA documents[75]—can be used as a metric for evaluating whether emissions are "significant."[76] Many of our states have adopted ambitious greenhouse gas reduction goals and mandates, the achievement of which would be threatened by rapid buildout of natural gas infrastructure in our regions. Massachusetts has adopted a broad portfolio of laws and regulations to reduce economy-wide greenhouse gas emissions by 25 percent by 2020 and 80 percent by 2050 from 1990 levels, including the Global Warming Solutions Act (2008), the Green Communities Act (2008), the Act to Promote Energy Diversity (2016), the Regional Greenhouse Gas Initiative, and programs to promote low and zero-emission vehicles, among others. The clean energy industry is a powerful and growing economic engine for Massachusetts.[77] Similarly, Washington State has adopted greenhouse gas reduction goals to reduce overall state emissions of greenhouse gasses to 1990 levels by 2020 and fifty percent below 1990 levels by 2050.[78] In addition, Washington law requires large utilities to obtain fifteen percent of their electricity from new renewable resources by 2020[79]; imposes a greenhouse gas emission standard on electric power[80]; requires new power plants to mitigate at least 20 percent of their greenhouse gas emissions[81]; and sets minimum efficiency

---

[75] *See* Pipeline NOI, *supra* note 1, at 40.

[76] *Cf. Ctr. For Biological Diversity v. Cal. Dep't of Fish & Wildlife*, 62 Cal.4th 204, 225–27 (2015) (rejecting agency's approach to significance where agency failed to provide a reasoned explanation for how estimated project emissions compare to achieving statewide greenhouse gas reduction target).

[77] *See* Initial Comments of the Attorneys General of Massachusetts, California, Connecticut, Illinois, Maryland, North Carolina, Oregon, Rhode Island, Vermont, And Washington, Connecticut Department of Energy And Environmental Protection, Rhode Island Division Of Public Utilities And Carriers, and New Hampshire Office of The Consumer Advocate, Grid Reliability and Resiliency Pricing, FERC Docket No. RM18-1-000, October 23, 2017, available at https://www.mass.gov/files/documents/2017/10/23/Multistate%20Comments%20RM18-1%20-%2010-23-17%20%28FINAL%29.pdf. Furthermore, a study by the Analysis Group found that increasing natural gas capacity in Massachusetts and New England would result in a significant increase in greenhouse gas emissions and threaten compliance with Massachusetts's state law emission reduction mandate. *See* Hibbard, P. and Aubuchon, C., POWER SYSTEM RELIABILITY IN NEW ENGLAND: MEETING ELECTRIC RESOURCE NEEDS IN AN ERA OF GROWING DEPENDENCE ON NATURAL GAS, ANALYSIS GROUP, (2015), available at http://www.mass.gov/ago/doing-business-in-massachusetts/energy-and-utilities/regional-electric-reliability-options-study.html.

[78] Rev. Code of Wash. 70.235.020(1)(a).

[79] Rev. Code of Wash. 19.285.010.

[80] Rev. Code of Wash. 80.80.040

[81] Rev. Code of Wash. 80.70.020

AR_0026335

standards for appliances.[82] The District of Columbia's climate and energy plan, Clean Energy DC, proposes to reduce the District's greenhouse gas emissions by 50 percent below 2006 levels by 2032.[83] As part of its Public Benefits Analysis, the Commission should weigh the effect of project greenhouse gas emissions on our states' abilities to comply with our climate and clean energy laws and policies.

III.    **THE COMMISSION'S PUBLIC BENEFITS ASSESSMENT SHOULD BE INFORMED BY THE ECONOMIC HARM OF A PROJECT'S ENVIRONMENTAL IMPACTS AND MORE HEAVILY WEIGH HARM FROM EMINENT DOMAIN TAKINGS.**

The Commission should wait until NEPA review is complete before conducting a Public Benefits Assessment—an assessment that should be made at the final stage of the process in conjunction with a Certificate decision and consider together adverse environmental and economic impacts, including the exercise of eminent domain. The Commission's current system of conducting the economic analyses first, followed by an assessment of environmental impacts which is wholly separate from the economic analyses, necessarily underestimates the value of avoiding the environmental impacts in the first place.

    A.  **The Commission's Public Benefits Assessment should be informed by the economic harm of a project's environmental impacts quantified using the Social Cost of Carbon.**

The Commission's Public Benefits Assessment and Certificate decisions should fully and robustly incorporate consideration of environmental impacts identified during NEPA review—including climate impacts. Currently, the Public Benefits Assessment tends to occur prior to NEPA review and only considers adverse economic impacts on the project proponent's customers, on other pipelines in the market, and on property owners affected by the proposed

---

[82] Rev. Code of Wash. 19.260.040

[83] *See Clean Energy DC: The District of Columbia Climate and Energy Plan*, October 2016 Draft, available at https://doee.dc.gov/sites/default/files/dc/sites/ddoe/publication/attachments/Clean_Energy_DC_2016_final_print_single_pages_102616_print.pdf.

AR_0026336

route.[84] This assessment does not consider adverse environmental impacts and comes before NEPA review is complete.[85]

By determining public benefit without regard to adverse environmental impacts and without consideration of the climate harm caused by a project, the Commission is failing to meet its obligations under both the NGA and NEPA. With the NGA, Congress broadly instructed the Commission to consider the public interest[86] by balancing a proposed project's public benefits against its adverse effects—*including environmental impacts*—when deciding if the public convenience and necessity requires granting a Certificate.[87] Indeed, "climate change bears on the public interest in terms of adverse effects" of a proposed pipeline, just as the need for system reliability bears on public benefit.[88] And, as discussed above, NEPA requires the

---

[84] *See* Policy Statement, *supra* note 2, at 18–19.

[85] *See id.*

[86] *See id.* at 23 ("In deciding whether a proposal is required by the public convenience and necessity, the Commission will consider the effects of the project on all the affected interests; this means more than the interests of the applicant, the potential new customers, and the general societal interests"); *see also, Atl. Ref. Co. v. Pub. Serv. Comm'n*, 360 U.S. 378, 391 (1959) (holding that § 7 of NGA requires the Commission to consider "all factors bearing on the public interest"); *FPC v. Transcontinental Gas Pipeline Co.*, 365 U.S. 1, 7 (1961) ("The Commission is the guardian of the public interest in determining whether certificates of convenience and necessity shall be granted. For the performance of that function, the Commission has been entrusted with a wide range of discretionary authority.").

[87] *See Sierra Club*, 867 F.3d at 1373 (citing *Minisink Residents for Envtl. Pres. & Safety v. FERC*, 762 F.3d 97, 101–02 (D.C. Cir. 2014) and *Myersville Citizens for a Rural Cmty. v. FERC*, 783 F.3d 1301, 1309 (D.C. Cir. 2015); *see also Pub. Utils. Comm'n of Cal. v. FERC*, 900 F.2d 269, 281 (D.C. Cir. 1990) (The public interest standard under the NGA includes factors such as the environment and conservation, particularly as decisions concerning the construction, operation, and transportation of natural gas in interstate commerce "necessarily and typically have dramatic natural resource impacts.").

[88] Order on Remand Reinstating Certificate and Abandonment Authorization, Florida Southeast Connection LLC, Transcontinental Gas Pipeline Co., LLC, Sabal Trail Transmission, LLC, 162 FERC 61,233 (March 14, 2018) [hereinafter "Sabal Trail Remand Order"] (Glick, C., dissenting at *3); *see also* Dominion Order, *supra* note 25 (LaFleur, C., dissenting in part, at *1) ("deciding whether a project is in the public interest requires a careful balancing of the economic need for a project and all of its environmental impacts. Climate change impacts of GHG emissions are environmental effects of a project and are part of [the] public interest determination."); Dominion Order, *supra* note 25 (Glick, C., dissenting in part, at *2) ("[c]limate change poses an existential threat to our security, economy, environment, and, ultimately, the health of individual citizens. [ . . . ] Accordingly, it is critical that the Commission carefully consider [projects'] contributions to climate change, both to fulfill NEPA's requirements *and to determine whether the Projects are in the public interest*") (emphasis added).

AR_0026337

Commission to quantify a project's climate-related and other reasonably ascertainable environmental costs.[89]

The Commission therefore should expand its evaluation of economic impacts in its Public Benefits Assessment to consider the costs of environmental harms, including climate impacts monetized utilizing the Social Cost of Carbon, as required by NEPA and the NGA.

**B.    The Commission's Public Benefits Assessment should weigh more heavily the adverse effect of eminent domain takings.**

In the Policy Statement, the Commission recognized that if the exercise of eminent domain will likely be required for a substantial portion of a pipeline right of way and other facility siting locations, the economic harm caused by the project may outweigh its public benefit.[90] And yet, the Commission has continued to issue Certificates without requiring a heightened showing of public benefit as disputes over pipeline siting and approvals have intensified in recent years and private property owners have increasingly resisted entering into voluntary easement agreements.[91] The Commission should require an enhanced showing of public benefit to offset the economic harm caused by the exercise of eminent domain where a pipeline project applicant fails to acquire voluntary easements for a significant portion of the project.

The use of eminent domain should be a last resort.[92] Indeed, the NGA requires no less[93] and the Commission should require project applicants to negotiate in good faith with property

---

[89] *See* discussion *supra* in Section II C and D.

[90] *See* Policy Statement, *supra* note 2, at 27 ("The strength of the benefit showing will need to be proportional to the applicant's proposed exercise of eminent domain.").

[91] *See, e.g.,* Mountain Valley Order, *supra* note 37 (LaFleur, C. dissenting at *2–3 (concluding that because of the projects' environmental impacts and adverse impacts to property owners, the project, on balance is not in the public interest); Mountain Valley Rehearing Order, *supra* note 14 (LaFleur dissenting at *3) (noting the significant impact to landowners); *id.* (Glick dissenting at *2–3) (applicant failed to demonstrate sufficient need for the project to support a finding that the project's benefits outweigh its harms, especially where need was established solely through the existence of precedent agreements with the applicant's affiliates).

[92] *See generally* 42 U.S.C. § 4651 (requiring federal agencies undertaking condemnation in furtherance of federal programs "to encourage and expedite the acquisition of real property by agreements with owners, to avoid litigation and relieve congestion in the courts" by following federal condemnation policies).

[93] *See* 15 U.S.C. § 717f(h) (requiring as a precondition of condemnation litigation that the Certificate holder demonstrate that it "cannot acquire by contract" the real property rights needed); *see also USG Pipeline Co. v.*

AR_0026338

owners for voluntary easement agreements as a Certificate condition. Furthermore, as discussed below, the Commission should help facilitate increased use of voluntary easement agreements by making the currently voluntary pre-filing process mandatory, and by requiring that pipeline project proponents engage extensively with local property owners and state and local officials prior to filing an application with a preferred pipeline route and facility sites.

## IV. THE COMMISION SHOULD BETTER COORDINATE ITS REVIEW WITH THAT OF STATE AND LOCAL PERMITTING AGENCIES.

The Commission seeks recommendations on how it may work more effectively with other agencies and on ways to change its review procedures to increase efficiency.[94] For the reasons discussed below, the Commission should make mandatory the current pre-filing process and require more thorough review and incorporation of state and local environmental and land use requirements during pre-filing and NEPA review. Pipeline project proponents should be required to promptly apply for required state certifications and approvals under the federal Clean Water Act[95] ("CWA"), Clean Air Act[96] ("CAA"), and the Coastal Zone Management Act[97] ("CZMA") upon filing an application with the Commission, to the extent consistent with the application process established by the relevant state agencies. The Commission should, strive to issue Certificates for pipeline projects only after completion of required state review under the CWA, CAA, and CZMA. The Commission should also expressly condition Certificates

---

*1.74 Acres in Marion Cty., Tenn.*, 1 F. Supp. 2d 816, 822 (E.D. Tenn. 1998) ("Courts also have imposed a requirement that the holder of the FERC Certificate negotiate in good faith with the owners to acquire the property."); *Transcon. Gas Pipe Line Corp. v. 118 Acres of Land*, 745 F. Supp. 366, 369 (E.D. La. 1990) ("In addition to satisfying the requirements of § 717f(h), federal law requires the condemnor to have conducted good faith negotiations with the landowners in order to acquire the property."). *But cf. Maritimes & Ne. Pipeline, L.L.C. v. Decoulos*, 146 F. App'x 495, 498 (1st Cir. 2005) (declining to find that the NGA requires that a pipeline project Certificate holder establish good faith negotiations with a property owner a requirement precedent to a condemnation action); *Mountain Valley Pipeline, LLC v. Simmons*, 307 F. Supp. 3d 506, 511 (N.D.W. Va. 2018) ("MVP is not required by the Natural Gas Act or Rule 71.1 to engage in good faith negotiations with the landowner.") (internal quotation marks and citations omitted).

[94] *See* Pipeline NOI, *supra* note 1, at 53–54.

[95] 33 U.S.C. §§ 1251–1388.

[96] 42 U.S.C. §§ 7401–7671q.

[97] 16 U.S.C. §§ 1451–1466.

AR_0026339

on compliance with state and local land use requirements and environmental permits (not required by federal law) when the Commission relies on them to minimize environmental impacts or when such permits do not unreasonably conflict with or delay Commission-approved pipeline projects. These reforms would increase efficiency, transparency, and predictability while reducing the likelihood of post-Certificate litigation.

A. **Pre-filing should be mandatory and better incorporate state review.**

Now voluntary, the Commission's pre-filing process encourages pipeline project proponents to engage with property owners, stakeholders, and federal, state, and local agencies prior to filing an application with a preferred pipeline route and siting locations for compressor stations and other facilities. The pre-filing process thus provides stakeholders and agencies an opportunity become involved early in the project development process by providing information about the extent and nature of pipeline project impacts and environmental permitting and land use requirements. Through this process, applicants may alter pipeline project design, scale, and route to minimize impacts and siting controversies.

The Commission should not only make this pre-filing process mandatory but also require that pipeline project proponents engage with state and local officials and thoroughly examine all required state and local environmental permitting and land use requirements prior to filing an application with a preferred pipeline route and facility sites.[98] To help facilitate increased site access for ground surveys and encourage use of voluntary easement agreements to limit the exercise of eminent domain takings, the Commission should require that project proponents engage extensively with local property owners during pre-filing.[99] Pipeline project proponents should be required to prepare resource reports that comprehensively review

---

[98] This should require applicants to not merely meet with state and local officials, but listen, and to respect local requirements, then incorporate such requirements into the ultimate project siting and design as discussed *infra* in Section IV D.

[99] *See* discussion *supra* in Section III B, and *infra* in Section V. Property owner refusal to grant site access for ground surveys may hinder NEPA review as well as states' abilities to complete review of applications for state water quality certifications under CWA Section 401. Even when private property owners resist entering into voluntary easement agreements for pipeline construction right of ways, early landowner engagement may facilitate site access for performance of environmental and ground condition surveys.

AR_0026340

pipeline project impacts and all permitting requirements—including what must be submitted for state review under the CWA, CAA, and CZMA[100]—based on consultation with state and local agencies.

Immediately following the filing of an application, and concurrent with NEPA review, the Commission should require applicants to expeditiously file for all required state certifications and approvals under the federal CWA, CAA, and CZMA, seeking provisional approvals for the preferred route. The Commission should also encourage applicants to simultaneously work with state and local regulators to prepare for and begin filing all required permit applications.

### B. The Commission should not issue certificates before states have issued permits and certifications under federal statutes.

The NGA expressly preserves the rights of states under the CWA, CAA, and CZMA.[101] Under Section 401(a) of the CWA[102], an applicant must present the Commission with state certification that pipeline project discharges will not violate state water quality standards and requirements, and any conditions imposed by a state water quality certification became conditions of the Commission's Certificate.[103] Pipeline project applicants must also present the Commission with state-issued permits under the CAA, and with certification that the pipeline project and its impacts are consistent with state Coastal Zone Management Plans approved under the CZMA.[104]

---

[100] *See* discussion *infra* in Section IV B.

[101] *See* 15 U.S.C. § 717b(d); *Meyersville Citizens for a Rural Cmty, Inc. v. FERC*, 783 F.3d 1301, 1315 (D.C. Cir. 2015) (the NGA "savings clause", 15 U.S.C. § 717b(d), saves from preemption the rights of states under the CWA, CAA, and CZMA); *see also Islander E. Pipeline Co., LLC v. Conn. Dep't of Envtl. Prot,* 482 F.3d 72, 89 (2d Cir. 2006) (*Islander I*); *Islander E. Pipeline Co., LLC v. Conn. Dep't of Envtl. Prot.,* 525 F.3d 141, 143 (2d Cir. 2008) (*Islander II*).

[102] In addition to CWA Section 401, where States have assumed federal authority over freshwater wetlands pursuant to CWA Section 404, the State's requirements become federal law and must be treated as a federal permit. *Delaware Riverkeeper v. Sec'y Pa. Dep't of Envtl. Prot.,* 833 F.3d 360 (3d Cir. 2016).

[103] 33 U.S.C. § 1341(a), (d).

[104] *See Islander I,* 482 F.3d at 84, 86; *Dominion Transmission v. Summers,* 723 F.3d 238, 240 (D.C. Cir. 2013).

AR_0026341

The Commission should end its practice of issuing Certificates conditioned on later receipt of state certifications, permits, and approvals under the CWA, CAA, and CZMA.[105] Following NEPA review, but prior to completion of required state review under the CWA, CAA, and CZMA, the Commission typically issues a Certificate approving a pipeline project conditioned on the applicant obtaining state-issued certifications and approvals under these federal statutes.[106] Requiring completion of state reviews prior to Certificate issuance would allow the Commission to better evaluate pipeline routing and facility siting alternatives informed by expert review by state agency regulators applying state standards that are applicable under federal law. This would also allow state regulators to review the preferred pipeline project route in the application, as well as alternative routes and facility siting locations, either denying or provisionally approving preferred and alternate routes and siting, pending the Commission's final review and siting approval in its Certificate. Additionally, it would prevent landowners' unnecessary loss of property via eminent domain for pipeline projects that may never be constructed.[107]

Notably, ending the routine issuance of Certificates conditioned on later receipt of state approvals under the CWA, CAA, and CZMA would most likely reduce post-Certificate litigation by precluding situations where the Commission approves a pipeline project only to have it blocked in whole or in part by one or more states denying federally-required permits.[108] Under

---

[105] The Commission typically issues conditional Certificates if state review will take more than six months. *See* Policy Statement, *supra* note 2, at 19. State CWA water quality certifications may take up to one year to complete. *See* 33 U.S.C. § 1341(a)(1) and discussion *infra* in note 98 (state waives its right to issue a CWA Section 401 water quality certification if it fails to act on a certification request within a reasonable time, not to exceed one year).

[106] *See, e.g.,* PennEast Pipeline Order, *supra* note 14 (issuing a Certificate conditioned upon the completion of unfinished surveys and documentation of unobtained permits).

[107] *See* discussion *infra* at note 108.

[108] *See, e.g., Constitution Pipeline Co., LLC v. N.Y. State Dep't of Envtl. Conservation,* 868 F.3d 87, 90 (2d Cir. 2017), rehearing denied (2017), cert. denied (2018) (upholding the New York Department of Conservation's denial of Constitution's application for a CWA Section 401 water quality certification where the company failed to provide adequate information regarding a large number of stream crossings to demonstrate that project impacts would not violate state water quality standards); *Islander II,* 525 F.3d at 151–53 (upholding as supported by the record following remand the Connecticut Department of Environmental Protection's

26

AR_0026342

such circumstances, the Commission's conditional Certificate decision is subject to reconsideration and judicial review. After initiating such challenge, stakeholders or an applicant may subsequently file petitions in Circuit Courts of Appeals challenging state-issued certifications and permits under federal law.[109] Issuing Certificates after completion of all federally required state permitting would not only prevent staggered judicial review, but also provide a more complete record supporting the Commission's ultimate Certificate decision.

Waiting to issue a Certificate until all federally required state approvals have been obtained will also prevent irreparable harm that may result from the Commission's current practice of granting partial notices to proceed with construction for portions of a project. In the Constitution Pipeline project, the Commission's issuance of a partial notice to proceed with construction resulted in acres of mature trees being cut in Pennsylvania before the completion of the project was stopped by New York's denial of a CWA Section 401 water quality certification.[110]

As recommended above, the Commission should require that pipeline project applicants promptly file for state approvals under CWA, CAA, and CZMA after fully assessing state requirements and procedures under these federal statutes by working with state regulators during pre-filing. This will facilitate review by state regulators and reduce the instances of

---

denial of Islander's application for a CWA Section 401 water quality certification because of the project's adverse effects on shellfish habitat and other water quality impacts).

[109] Section 19(d)(1) of the NGA vests Circuit Courts of Appeals with original and exclusive jurisdiction over petitions seeking judicial review of state certifications and permits issued under the CWA, CAA, or CZMA. *See* 15 U.S.C. § 717r(d)(1). To be clear, we are not recommending that the Commission hold off issuing a Certificate during the pendency of judicial review following the filing of a petition under NGA Section 19(d)(1), although petitioners may seek a stay of the Commission's Certificate from the Court.

[110] *See Constitution Pipeline*, 868 F.3d at 90, 92–93 and discussion *supra*, note 108.

AR_0026343

project proponents filing incomplete applications that delay review by state regulators under these federal statutes.[111, 112]

### C. State water quality certification under the CWA should not be subject to new time limitations or otherwise constrained.

The Commission also seeks comments on whether there are "classes of projects that should appropriately be subject to a shortened [Certificate review] process."[113] Recent or contemplated federal legislative proposals would amend the CWA to shorten the time allowed states to review applications for CWA Section 401 water quality certifications.[114]

The undersigned state Attorneys General strongly oppose any legislative change or regulatory effort to limit the time allowed for state review of water quality applications under CWA Section 401. For projects with large numbers of discharges, state water quality review can be a complex and lengthy process. For instance, the Constitution Pipeline project proposal

---

[111] *See, e.g., N.Y. State Dep't of Envtl. Conservation v. FERC,* 884 F3d 450 (2d Cir. 2018) (*Millennium Pipeline*). In *Millennium Pipeline,* the company took more than nine months to complete its application for state water quality certification. The Court held that the "reasonable period of time (which shall not exceed one year)" for states to act on a request for CWA Section 401 water quality certification begins to run on the date the state receives the initial application, not when the applications is deemed complete. *Id.* at 455–56. The Court noted that states may assist applicants in completing applications and, if necessary, request that incomplete applications be withdrawn and resubmitted. *Id.* at 456. *But cf. Berkshire Envl. Action Team, Inc. v. Tenn. Gas Pipeline, LLC,* 851 F.3d 105 (1st Cir. 2017) (holding that Massachusetts' initial approval of a water quality certification made within one year of application was not final for purposes of NGA Section 19(d)(1) and that judicial review must wait for a final agency decision upon completion of a timely made administrative appeal).

[112] Section 19(d)(2) of the NGA provides a remedy for proponents faced with unreasonable delay or failure to act by a state agency on an application for a certification or permit under the CWA or CAA, in the form of seeking injunctive relief from the United States Court of Appeals for the D.C. Circuit. *See* 15 U.S.C. § 717r(d)(2), EPAct, 2005. Section 19(d)(2) of the NGA grants the United States Court of Appeals for the D.C. Circuit with exclusive jurisdiction over actions seeking declaratory and injunctive relief against state permitting agencies for undue delay or failure to act on federally-required permits. *See* discussion *infra* in Section III C.

[113] *See* Pipeline NOI, *supra* note 1, at 54.

[114] *See, e.g.,* H.R. 2910, Promoting Interagency Coordination for Review of Natural Gas Pipelines Act, 2017 (specifying limited timeframes and procedural requirements for the Commission and other agencies to follow in conducting environmental reviews related to proposed natural gas facility projects); *see also* Saqib Rahim and Nick Sobczk, "Legislative 'Reform' to Narrow States' Power," ENERGY AND ENVIRONMENTAL NEWS, February 2, 2018, https://eenew.net.energywire/stores/1060072719 (discussion contemplated amendments to the CWA that would allow states up to 90 days to determine if an application for a Section 401 water quality certification was complete, after which states would have 90 days to complete application review and issue or deny the requested water quality certification).

AR_0026344

involved discharges to 251 different streams and a variety of different water quality impacts, including habitat loss or degradations (87 impacted streams supported trout or trout spawning), changes in thermal conditions, increased erosion, and increases in stream instability and turbidity.[115] Any effort to shorten the one-year period Congress has deemed reasonable would be unlawful and arbitrary and capricious and, especially for large or complex projects, severely constrain states' rights to uphold and protect the quality of their waters under the cooperative federalism approach mandated by the CWA. Congress has already provided a remedy for pipeline project proponents faced with unreasonable delay or state agency obstruction on an application for certifications or permits under the CWA or CAA. [116]

It bears emphasizing that imposing arbitrary timeframes on CWA water quality certification review will not appreciably speed up pipeline project review. The Director of the Commission's Office of Energy Projects recently testified that, on average, eighty-eight percent of projects are issued Certificates within one year, and the single greatest factor slowing down review is the failure of the project applicant to provide the Commission and other agencies with "timely and complete information necessary to perform Congressionally-mandated project reviews."[117] Thus, the Commission should not entertain recommendations to curtail or expedite state review under CWA Section 401 (or other state approvals under federal statutes). Any such effort would contravene Congressional intent and do little to expedite state review.

**D. The Commission's Certificates should be conditioned on compliance with all state and local environmental permits and land use requirements that do not unreasonably conflict with or delay approved pipeline projects.**

Beyond federally required, state-issued certifications and approvals under the CWA, CAA, and CZMA, it is "the Commission['s] goal to include state and local authorities to the extent

---

[115] *See Constitution Pipeline*, 868 F.3d at 90, 92–93 and discussion *supra* note 108.

[116] *See supra* note 112, (referencing 15 U.S.C. § 717r(d)(2)) EPAct, 2005.

[117] House Committee on Energy and Commerce, Hearing on "Legislation Addressing Pipeline and Hydropower Infrastructure Modernization," Testimony of Terry Turpin, Director, Office of Energy Projects, Federal Energy Regulatory Commission, 115th Cong. (May 3, 2017).

AR_0026345

possible" in pipeline project planning and construction.[118] As FERC routinely asserts in Certificate decisions, a "rule of reason must govern both state and local authorities' exercise of their power and an applicant's bona fide attempts to comply with state and local requirements."[119] The mere fact that "a state or local authority requires something more or different than the Commission does not necessarily make it unreasonable for an applicant to comply with both the Commission's and state and local agency's requirements," even if state and local compliance would add additional cost and potentially threaten the facility's in-service date.[120]

Despite its goal to include state and municipal agencies in pipeline project planning and to strongly encourage compliance with their requirements, the Commission does not typically condition its Certificates on receipt of reasonable state and local permits.[121] This often leads to confusion about and litigation over whether an applicant has reasonably attempted to comply with state and local requirements that do not block or unduly delay a pipeline project. And rather than continue to work with state and local regulators as the Commission intends, applicants often assert preemption once armed with the Commission's Certificate.[122]

---

[118] *See, e.g.,* Order on Rehearing and Approving Agreements, Maritimes and Northeast Pipeline, L.L.C., 81 FERC ¶ 61,166, 17 (1997).

[119] *See* Pac. Connector Gas Pipeline LP, 134 FERC ¶ 61,102 at *1, *4, *11–12 (2011); Order Issuing Certificate, Tennessee Gas Pipeline Company, L.L.C., 154 FERC ¶ 61,191, at *30 (2016) (same).

[120] Order Issuing Certificate, Tennessee Gas Pipeline Company, L.L.C., 154 FERC ¶ 61,191, *30 (2016); *see also* Order on Rehearing and Approving Agreements, Maritimes and Northeast Pipeline, L.L.C., 81 FERC ¶ 61,166, 19–22 (1997) (ruling that several additional state conditions, including state review and approval requirements for pipeline route surveys and additional endangered species surveys, would not unreasonably delay the project where there was only a possibility that the conditions would conflict with the pipeline's in-service date).

[121] *See, e.g.,* Order Issuing Certificate, Tennessee Gas Pipeline Company, L.L.C., 154 FERC ¶ 61,191, *29–30 (2016) (noting and encouraging compliance with substantive land use restrictions and procedural requirements for allowing easement through conservation land protected by Article 97 of the Massachusetts Constitution, but declining to expressly condition Certificate on compliance with these requirements as requested by the Massachusetts Department of Conservation and Recreation and the Massachusetts Attorney General); *see also* discussion *infra* in note 122.

[122] *See, e.g., Millennium Pipeline Co., LLC v. Seggos,* 288 F. Supp. 3d 530 (N.D.N.Y. 2017) (granting preliminary injunction barring state from using state permitting requirements to delay construction of pipeline); Memorandum of Decision and Order on Plaintiff's Motion to Confirm Authority To Condemn Easements and Motion For Injunctive Relief Authorizing Immediate Entry, *Tennessee Gas Pipeline Co., LLC v. Commonwealth of Massachusetts,* Berkshire Superior Court, Civ. No. 16-0083, May 9, 2016 at *2–4, *11–16 (On motion for

AR_0026346

To avoid these disputes and unnecessary litigation, and to address jurisdictional public interest and environmental considerations identified under the NGA and NEPA, the Commission should, first, require that applicants consult with state and local permitting agencies during pre-filing. This step would help identify potentially applicable state and local permitting and other requirements that should be considered as potential Certificate conditions. Then, in lieu of the Commission's much vaguer conditions, the Commission should expressly condition its Certificates on applicants complying with state and local environmental permits and land use requirements the Commissions has identified during pre-filing and NEPA review and on which it relies for mitigation of environmental harm, or on permits that do not unreasonably conflict with or delay the approved pipeline project. This step would avoid confusion about the precise regulatory requirements applicable to a pipeline project and permit the Commission to utilize its federal authorities, in partnership with states and local governments, to responsibly manage the development of natural gas infrastructure in a manner more responsive to local requirements and concerns.

*     *     *

Because state practice varies, and coordinating federal, state, and local regulatory authority has presented challenges for the Commission, states, local governments, project developers, and other stakeholders alike, the Commission should consider convening a technical conference on procedural requirements, review timelines, and other practical coordination issues in this area, and how to best alter the Commission's process.

---

condemnation of easements asserting preemption of Massachusetts Constitution Article 97 (discussed *supra* in note 121), the Court noted that "[d]espite the preemption of Article 97, the Certificate does not give Tennessee unrestrained right to ignore the Commonwealth. Instead, the Certificate expressly requires Tennessee to make a good faith effort to cooperate with state and local authorities."); Request for Reconsideration and Clarification, *National Fuel Gas Supply Corp.*, Docket No. CP15-115 (March 3, 2017) (seeking "clarification" from FERC that all state and local environmental permits were preempted by the Natural Gas Act).

31

AR_0026347

## V.    PARTIAL NOTICES TO PROCEED WITH CONSTRUCTION SHOULD NOT BE ISSUED PRIOR TO REHEARING REQUEST DECISIONS, AND THE USE AND TIME OF TOLLING ORDERS SHOULD BE LIMITED.

The Commission's practice of allowing construction to proceed while delaying rehearing decisions through tolling orders inflicts irreparable harm while effectively foreclosing remedies on judicial review, denying injured parties due process. Though the NGA and the Commission's regulations require it to issue a decision within thirty days of a request for a Certificate rehearing,[123] the Commission routinely issues orders tolling this thirty-day period to allow it additional time to evaluate the merits of a rehearing request. These tolling orders routinely delay rehearing decisions for a year or more.[124]

Moreover, the Commission often grants requests for partial notices to proceed with construction after a Certificate issues—even when a tolled decision on a rehearing request is pending—so long as the Certificate holder has received all state-issued permits under the federal CWA, CAA, and CZMA (where construction activity could impact resources covered by those federally required permits). This practice results in significant and irreparable harm from project construction. For instance, as a rehearing request was tolled for more than thirteen months, the Commission granted the Transcontinental Gas Pipeline Company's Leidy Southeast Project a total of twenty partial notices to proceed resulting more than one hundred acres of tree clearing.[125] And while parties seeking rehearing of Commission Certificate Orders may request that FERC stay project construction during the pendency of the tolling period and

---

[123] *See* 15 U.S.C. § 717r(b); 18 C.F.R. § 157.20(a).

[124] While a few recent egregious tolling periods were attributable *in part* to an extended period in 2017 when the Commission lacked a quorum, tolling periods of a year or more are common even when there are no quorum issues. *See, e.g.*, Order Denying Rehearing, Transcontinental Gas Pipeline Company, LLC, 154 FERC ¶ 61,166 (March 3, 2016) (the Commission denied a rehearing request more than one year after timely rehearing requests made in January 2015 and a tolling order issued in February 2015).

[125] *See* Transcontinental Gas Pipeline, *supra* note 124. Similarly, a Commission tolling order delayed a rehearing decision regarding the Connecticut Expansion Project for over sixteen months, authorizing tree clearing and construction for the project, including through a two-mile stretch of conservation land protected under the Massachusetts Constitution in Otis State Forest. *See* Order on Rehearing, Tennessee Gas Pipeline Company, 160 FERC ¶ 61,027 (August 25, 2017) (denying timely rehearing requests made in April 2016).

AR_0026348

rehearing request, the Commission rarely, if ever, grants such stay requests, even when rehearing requests raise serious issues of merit.[126]

Because petitioners may not seek judicial review until the Commission rules on the merits of their request for rehearing,[127] the Commission's routine practice of delaying rehearing decisions raises serious due process concerns.[128] In addition to denying affected parties judicial review before construction begins, tolling orders deny landowners judicial review before their land is taken through eminent domain.[129] Because the power of eminent domain attaches regardless whether a rehearing has been requested, developers are free to take land while the Commission has not yet ruled on the rehearing request and while landowners have no judicial recourse.[130] To minimize the number of landowners whose land is taken without opportunity for judicial review, the Commission should end its practice of issuing tolling orders except in rare cases where the additional time is absolutely necessary, in which case tolling orders. should be for as brief a period as practicable.

---

[126] *See Del. Riverkeeper*, 753 F.3d at 1308–09 (Commission issued rehearing request tolling order, delaying judicial review, where the Court ultimately held that Commission's review violated NEPA).

[127] 15 U.S.C. § 717r(b); *see also Kokajko v. F.E.R.C.*, 837 F.2d 524, 525 (1st Cir. 1988) ("[B]ecause FERC has not yet issued a ruling on the merits of the petition, this court is without jurisdiction.").

[128] *See, e.g.*, *MCI Telecommunications Corp. v. F.C.C.*, 627 F.2d 322, 341 (D.C. Cir. 1980) ("[D]elay in the resolution of administrative proceedings can . . . deprive regulated entities, their competitors or the public of rights and economic opportunities without the due process the Constitution requires."); *Kokajko*, 837 F.2d at 526 ("[A] claim which is virtually tied up in interminable successive rounds of administrative review may present due process concerns."); *cf. Pub. Citizen Health Research Grp. v. Comm'r, Food & Drug Admin.*, 740 F.2d 21, 34 (D.C. Cir. 1984) ("When the public health may be at stake, the agency must move expeditiously to consider and resolve the issues before it.").

[129] This is particularly true where, as is increasingly the practice, the pipeline seeks immediate entry onto and possession of the property rights it is condemning through the use of preliminary injunctions. *See, e.g. East Tennessee Natural Gas Company v. Sage*, 361 F.3d 808 (4th Cir. 2004) (granting a preliminary injunction to a pipeline company in a condemnation matter prior to the payment of just compensation); *Columbia Gas Transmission, LLC v. 1.01 Acres, More or Less, In Penn Twp*, 768 F.3d 300, 315–16 (3d Cir. 2014) (discussing *Sage* and granting a preliminary injunction to the pipeline company prior to the payment of just compensation).  Since a District Court's reviewing role is limited, *see Columbia Gas Transmission* at 304, tolling orders issued by FERC can, when combined with preliminary injunctions granted by District Courts, deprive a property owner of any real judicial review until the pipeline has already taken full possession of the property.

[130] While the eminent domain proceeding occurs in a court, landowners cannot collaterally attack the Certificate, and therefore cannot challenge the developer's right to use eminent domain. *See, e.g.*, *Williams Natural Gas Co. v. City of Oklahoma City*, 890 F.2d 255, 262, 264 (10th Cir. 1989).

AR_0026349

## CONCLUSION

The undersigned Attorneys General strongly urge the Commission to revise the Policy Statement in accordance with all the above recommendations. Thank you for your consideration of these comments.

Respectfully submitted,

MAURA HEALEY
ATTORNEY GENERAL OF MASSACHUSETTS

CHRISTOPHE COURCHESNE
CHIEF, ENVIRONMENTAL PROTECTION DIVISION
REBECCA TEPPER
CHIEF, ENERGY AND TELECOMMUNICATIONS DIVISION
MATTHEW IRELAND
SARAH BRESOLIN SILVER
ASSISTANT ATTORNEYS GENERAL
MEGAN HERZOG
SPECIAL ASSISTANT ATTORNEY GENERAL
OFFICE OF THE ATTORNEY GENERAL
One Ashburton Place, 18th Floor
Boston, MA 02108

34

LISA MADIGAN
ATTORNEY GENERAL OF ILLINOIS

*[signature]*

MATTHEW J. DUNN
CHIEF, ENVIRONMENTAL
ENFORCEMENT/ASBESTOS LITIGATION DIVISION
JANICE A. DALE
CHIEF, PUBLIC UTILITIES BUREAU
DANIEL I. ROTTENBERG
JACQUES ERFFMEYER
ASSISTANT ATTORNEYS GENERAL
ILLINOIS ATTORNEY GENERAL'S OFFICE
69 W. Washington St., 18th Floor
Chicago, IL 60602

PETER F. KILMARTIN
ATTORNEY GENERAL OF RHODE ISLAND

*[signature]*

LEO J. WOLD
ASSISTANT ATTORNEY GENERAL
RHODE ISLAND DEPARTMENT OF
ATTORNEY GENERAL
150 South Main Street
Providence, RI 02903

BRIAN E. FROSH
ATTORNEY GENERAL OF MARYLAND

*[signature]*

JOSHUA M. SEGAL
ASSISTANT ATTORNEY GENERAL
OFFICE OF THE ATTORNEY GENERAL
200 St. Paul Place
Baltimore, MD  21202

BOB FERGUSON
ATTORNEY GENERAL OF WASHINGTON

*[signature]*

WILLIAM R. SHERMAN
ASSISTANT ATTORNEY GENERAL
STACEY S. BERNSTEIN
ASSISTANT ATTORNEY GENERAL
AURORA R. JANKE
SPECIAL ASSISTANT ATTORNEY GENERAL
COUNSEL FOR ENVIRONMENTAL PROTECTION
800 5th Ave Suite 2000, TB-14
Seattle, WA 98104-3188

AR_0026351

GURBIR S. GREWAL
ATTORNEY GENERAL OF NEW JERSEY



DAVID C. APY
ASSISTANT ATTORNEY GENERAL
R.J. HUGHES JUSTICE COMPLEX
25 MARKET STREET, P.O. BOX 093
TRENTON, NJ 08625

KARL A. RACINE
ATTORNEY GENERAL
OF THE DISTRICT OF COLUMBIA

DAVID S. HOFFMANN
ASSISTANT ATTORNEY GENERAL
SARAH KOGEL-SMUCKER
SPECIAL ASSISTANT ATTORNEY GENERAL
PUBLIC ADVOCACY DIVISION
OFFICE OF THE ATTORNEY GENERAL FOR THE
DISTRICT OF COLUMBIA
441 Fourth Street, N.W., Suite 630 South
Washington, D.C. 20001

Dated: July 25, 2018

36

AR_0026352

# EXHIBIT 2

AR_0026353

**Comments of the Attorneys General of California, Colorado, Connecticut, Delaware, the District of Columbia, Illinois, Maine, Maryland, Massachusetts, Minnesota, New Mexico, New Jersey, New York, North Carolina, Oregon, Pennsylvania, Rhode Island, Vermont and Washington**

August 26, 2019

*Via electronic submission to www.regulations.gov*
**ATTN: Docket ID No. CEQ-2019-0002**

Edward A. Boling
Associate Director for the National Environmental Policy Act
Council on Environmental Quality
730 Jackson Place, NW
Washington, DC 20503

> **Re:    Draft National Environmental Policy Act Guidance on Consideration of Greenhouse Gas Emissions, 84 Fed. Reg. 30,097 (June 26, 2019) Docket No. CEQ-2019-0002**

Dear Associate Director Boling:

The undersigned State Attorneys General of California, Colorado, Connecticut, Delaware, the District of Columbia, Illinois, Maine, Maryland, Massachusetts, Minnesota, New Mexico, New Jersey, New York, North Carolina, Oregon, Pennsylvania, Rhode Island, Vermont and Washington (hereinafter, "the States") respectfully submit these comments opposing the Council on Environmental Quality's ("CEQ") "Draft National Environmental Policy Act Guidance on Consideration of Greenhouse Gas Emissions" ("Draft Guidance").[1]

CEQ's Draft Guidance is inconsistent with the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 *et seq.*, and should be withdrawn for several reasons. First, although the Draft Guidance focuses on greenhouse gas ("GHG") emissions, it fails to address climate change and its impacts. NEPA does not permit, and CEQ may not direct, agencies to ignore the well-documented impacts of climate change in their environmental impact analyses. Second, the Draft Guidance undermines NEPA's full-disclosure purpose and conflicts with NEPA's requirements in multiple ways, including: by failing to provide clarity on how agencies should analyze indirect climate change impacts; by inadequately considering cumulative impacts; by improperly minimizing the analytical value of monetizing climate impacts and supporting an unbalanced approach to cost-benefit analysis; by discouraging analysis and mitigation of a project's climate impacts; and by failing to direct federal agencies to consider climate adaptation and resiliency when analyzing a project's environmental impacts and

---

[1] 84 Fed. Reg. 30,097 (June 26, 2019), Docket No. CEQ-2019-0002.

AR_0026354

mitigation for those impacts. In the States' experience, a robust assessment of climate impacts is not only possible but is also critical to adequate review of environmental impacts under NEPA and its state analogues.

Rather than providing clarity, CEQ rejects the positions taken its prior administrative guidance on the analysis of climate change impacts required under NEPA with an unsupported and outdated three-page document that does not take the threat of climate change seriously.[2] In so doing, CEQ is creating additional legal risk for both federal agencies and project applicants. For all of these reasons, detailed below, we urge CEQ to abandon this Draft Guidance. In addition, we request that CEQ revise and readopt the previous "Final Guidance for Federal Departments and Agencies on Consideration of Greenhouse Gas Emissions and the Effects of Climate Change in National Environmental Policy Act Reviews" ("2016 Guidance") issued in 2016 and withdrawn in 2017.[3] If readopted, the 2016 Guidance should be updated consistent with current case law interpreting NEPA and strengthened to reflect the severe and pervasive threats from climate change.

## I.    THE CRITICAL IMPORTANCE OF ADDRESSING CLIMATE CHANGE

It is well accepted that human-caused or "anthropogenic" GHG emissions are driving climate change that endangers the public health and welfare.[4] Global GHG emissions reached an all-time high in 2018, underscoring the need for more immediate and stronger action to address climate change.[5] And global annual average temperatures have "increased by more than 1.2°F (0.65°C) for the period 1986-2016 relative to 1901-1960."[6] Moreover, recent international assessments of climate change and its impacts demonstrate the urgency and enormity of the situation. In October 2018, the leading international body of climate scientists—the Nobel-prize-winning Intergovernmental Panel on Climate Change ("IPCC")—issued a report finding that, absent substantial GHG reductions by 2030 and net zero emissions by 2050, warming above

---

[2] Because existing NEPA regulations do not specifically address GHG impacts analysis, CEQ's Draft Guidance represents the *only* guidance on GHG analysis from the NEPA expert administrative agency.

[3] 81 Fed. Reg. 51,866 (Aug. 5, 2016). A copy of the 2016 Guidance is attached as Exhibit 1 to this letter. CEQ withdrew the 2016 Guidance pursuant to Executive Order 13783 on April 5, 2017. *See* 82 Fed. Reg. 16,576 (April 5, 2017).

[4] Endangerment and Cause or Contribute Findings for Greenhouse Gases Under Section 202(a) of the Clean Air Act, 74 Fed. Reg. 66,496 (Dec. 15, 2009).

[5] Le Quéré, C. et al., *Global Carbon Budget 2018*, 10 EARTH SYST. SCI. DATA 2141 (2018), https://doi.org/10.5194/essd-10-2141-2018; Chelsea Harvey, *More CO$_2$ Released in 2018 Than Ever Before*, E&E NEWS (Dec. 6, 2018), https://www.eenews.net/climatewire/stories/1060108875.

[6] U.S. Global Change Research Program, *Climate Science Special Report: Fourth National Climate Assessment, Volume I & II* (2017) [Wuebbles, D.J., D.W. Fahey, K.A. Hibbard, D.J. Dokken, B.C. Stewart, and T.K. Maycock eds.], https://www.globalchange.gov/browse/reports/climate-science-special-report-fourth-national-climate-assessment-nca4-volume-i.

AR_0026355

1.5°C (2.7°F) from pre-industrial levels is likely and would have wide-ranging and devastating consequences.[7]

The federal government has also previously recognized the severe and growing threats posed by climate change. In 2017, thirteen federal agencies released the first volume of the Fourth National Climate Assessment ("Assessment"), concluding that "[c]hanges in the characteristics of extreme events are particularly important for human safety, infrastructure, agriculture, water quality and quantity, and natural ecosystems. Heavy rainfall is increasing in intensity and frequency across the United States and globally and is expected to continue to increase."[8] On November 23, 2018, the same group of thirteen federal agencies released the second volume of the Assessment, which thoroughly evaluates the harmful impacts of climate change that different regions of the country are experiencing and the projected risks climate change poses to our health, environment, economy, and national security.[9] The Assessment reflects the work of more than 300 governmental and non-governmental experts, was externally peer-reviewed by a committee of the National Academies of Sciences, Engineering and Medicine, and underwent several rounds of technical and policy review by the federal agencies of the U.S. Global Change Research Program.[10] The two volumes of the Assessment represent the federal government's most up-to-date and comprehensive analysis of climate science and the impacts of climate change on the United States.[11]

The second volume of the Assessment cautions that "[i]n the absence of significant global mitigation action and regional adaptation efforts, rising temperatures, sea level rise, and changes in extreme events are expected to increasingly disrupt and damage critical infrastructure and property, labor productivity, and the vitality of our communities."[12] Further, "[w]hile mitigation and adaptation efforts have expanded substantially in the last four years, they do not yet approach the scale considered necessary to avoid substantial damages to the economy, environment, and human health over the coming decades."[13] Documenting many of the record-setting phenomena we have recently seen, including fires, floods, other extreme weather, and sea level rise, the second volume emphasizes the increasing vulnerability of our built environment as these phenomena become the new normal or even more extreme.[14] Additional studies support these disturbing findings. For instance, a modeling analysis of 22 recent hurricanes by U.S.

---

[7] *See* IPCC Press Release, Summary for Policymakers of IPCC Special Report on Global Warming of 1.5° C Approved by Governments (Oct. 8, 2018), https://www.ipcc.ch/site/assets/uploads/2018/11/pr_181008_P48_spm_en.pdf; IPCC Special Report, Global Warming of 1.5° C (IPCC Special Report), https://www.ipcc.ch/sr15/.

[8] *Assessment, Volume I, supra* note 6, at 10.

[9] U.S. Global Change Research Program, *Impacts, Risks, and Adaptation in the United States: Fourth National Climate Assessment, Volume II* (D.R. Reidmiller et al. eds., 2018), https://nca2018.globalchange.gov/.

[10] *Id.* at iii, 2.

[11] *Id.* at 1; *see also* Global Change Research Act of 1990, Pub. L. No. 101-606, 15 U.S.C. §§ 2921-2961.

[12] *Assessment, Volume II*, supra note 9, at 25-32 (Summary Findings).

[13] *Id.* at 26.

[14] *See, e.g., id.* at 444, 669-1,308 (documenting regional impacts of climate change).

3

government scientists concluded that future hurricanes will have stronger maximum winds, move slower, and drop more precipitation.[15]

The States are already facing these severe impacts of climate change.[16]  In California, climate change is responsible for successive record-breaking fire seasons resulting in unprecedented loss of life and billions of dollars in damages and economic harm.  The 2017 wildfire season killed dozens of people, destroyed thousands of homes, forced hundreds of thousands to evacuate, and burned more than half a million acres.[17]  In August 2018, before the devastating Camp Fire that killed more than 80 people, California released a report suggesting that large wildfires (greater than 25,000 acres) could become 50% more frequent by the end of the century if GHG emissions are not reduced.[18]  Climate change is expected to make longer and more severe wildfire seasons the new normal for California.[19]  Besides the immediate threats they pose to life and property, wildfires significantly impair both air quality (via smoke and ash that can hospitalize residents) and water quality (via the erosion of hillsides stripped of their vegetation).  California also weathered a historic five-year drought and a variety of other unprecedented phenomena increasingly harming the health and prosperity of Californians from all parts of the state.[20]  Drought conditions beginning in 2012 left reservoirs across the state at record low levels, often no more than a quarter of their capacity.  By 2015, the Sierra snowpack—critical to California's water supply, tourism industry, and hydroelectric power— was the smallest in at least 500 years.[21]  In the Central Valley, the drought cost California agriculture about $2.7 billion and more than 20,000 jobs in 2015 alone.[22]

With over six-hundred miles of coastline and 2.2 million people living in shoreline towns and communities, Connecticut's residents are extremely vulnerable to the impacts of climate events.  Connecticut has already experienced significant damage to natural resources, homes, and

---

[15] Gutmann et al., *Changes in Hurricanes from a 13-Yr. Convection-Permitting Pseudo-Global Warming Simulation,* 31 J. CLIMATE 3,643 (Jan. 24, 2018) (abstract), https://doi.org/10.1175/JCLI-D-17-0391.1.

[16] A detailed summary of state-specific climate change impacts is set forth in the Comments of Attorneys General of New York, et al. on Proposed Rule: Emission Guidelines for Greenhouse Gas Emissions from Existing Electric Utility Generating Units: Emission Guideline Implementing Regulations; New Source Review Program, Appendix A: Climate Change Impacts, Docket Id. No. EPA-HQ-OAR-2017-0355-24817 (Oct. 31, 2018), https://www.regulations.gov/document?D=EPA-HQ-OAR-2017-0355-24817.

[17] Lauren Tierney, *The Grim Scope of 2017's California Wildfire Season Is Now Clear. The Danger's Not Over.,* WASH. POST (Jan. 4, 2018), https://www.washingtonpost.com/graphics/2017/national/california-wildfires-comparison/.

[18] Bedsworth, L. et al., *2018 Statewide Summary Report, California's Fourth Climate Change Assessment* at 9 (2018), www.climateassessment.ca.gov.

[19] California Department of Forestry and Fire Protection, *California's Forests and Rangelands: 2010 Assessment,* Ch. 3-7 (2010), https://frap.fire.ca.gov/media/3179/assessment2010.pdf.

[20] *See generally* California Air Resources Board, *California's 2017 Climate Change Scoping Plan Update: The Strategy for Achieving California's 2030 Greenhouse Gas Target,* (Nov. 2017), https://ww3.arb.ca.gov/cc/scopingplan/scoping_plan_2017.pdf.

[21] *See* NOAA, National Centers for Environmental Information, *Multi-Century Evaluation of Sierra Nevada Snowpack,* https://www.ncdc.noaa.gov/news/multi-century-evaluation-sierra-nevada-snowpack.

[22] California's 2017 Climate Change Scoping Plan Update, *supra* note 20, at 7.

4

infrastructure from more frequent and more intense storms, which is consistent with scientists' predictions of new weather patterns attributable to climate change.[23]  For example, in Connecticut alone, Hurricane Irene (2011) caused power outages affecting 754,000 citizens, and Superstorm Sandy (2012) forced a shutdown of Connecticut's transportation system, causing power outages to 600,000 people and inflicting almost $2 billion in statewide damages.[24]  Superstorm Sandy forced evacuations of thousands of Connecticut residents, damaged roads and infrastructure, and took nine days for the affected utilities to restore power.[25]

As one of the most low-lying states in the nation, Delaware is particularly at risk from the harms of climate change, including sea level rise.  For example, a 2012 Delaware Sea Level Rise Vulnerability Assessment found that sea level rise of only 0.5 meters would inundate 8% of the state's land area.[26]  Areas inundated would include "transportation and port infrastructure, historic fishing villages, resort towns, agricultural fields, wastewater treatment facilities and vast stretches of wetlands and wildlife habitat of hemispheric importance."[27]  The Assessment concluded that "every Delawarean is likely to be affected by sea level rise whether through increased costs of maintaining public infrastructure, decreased tax base, loss of recreational opportunities and wildlife habitat, or loss of community character."[28]

As a densely populated area located at the confluence of two tidal rivers, the District of Columbia is particularly vulnerable to the effects of climate change including dangerous heat waves, flooding caused by rising tides and heavy rains, and severe weather.  Nuisance flooding in riverfront areas has already increased by more than 300% according to the National Oceanic and Atmospheric Administration.[29]  The U.S. Army Corps of Engineers conservatively predicts up to 3.4 feet of additional sea level rise in the District by 2080.[30]  Heat emergencies are also projected to increase from 30 days per year (historic average) to 30-45 days by the 2050s, and to 40-75 days by the 2080s.[31]

---

[23] *Building a Low Carbon Future for Connecticut: Recommendations from the Governor's Council on Climate Change* (Dec. 18, 2018), https://www.ct.gov/deep/lib/deep/climatechange/publications/building_a_low_carbon_future_for_ct_gc3_recommendations.pdf.

[24] NOAA, National Centers for Environmental Information, *U.S. Billion-Dollar Weather and Climate Disasters: Overview*, https://www.ncdc.noaa.gov/billions/.

[25] John Burgeson, *Rising Above the Tide: 5 Years Since Sandy*, CTPOST, Oct. 28, 2017, https://www.ctpost.com/local/article/Rising-above-the-tide-5-years-since-Sandy-12313727.php.

[26] Delaware Department of Natural Resources and Environmental Control, *Preparing for Tomorrow's High Tide: Sea Level Rise Vulnerability Assessment for the State of Delaware* at ix (July 2012), http://www.dnrec.delaware.gov/coastal/Documents/SeaLevelRise/AssesmentForWeb.pdf.

[27] *Id.*

[28] *Id.*

[29] *Climate Ready DC, The District of Columbia's Plan to Adapt to a Changing Climate* at A3, https://doee.dc.gov/sites/default/files/dc/sites/ddoe/service_content/attachments/CRDC-Report-FINAL-Web.pdf.

[30] *Id.*

[31] *Id.* at A2.

AR_0026358

In addition to threatening the lives of Illinois citizens, climate change is fundamentally altering the state's farming industry and greatest environmental asset, Lake Michigan. The farming sector is particularly vulnerable. In spring 2019, record flooding delayed crop planting across the state, causing the U.S. Department of Agriculture to declare an agricultural disaster for the entire state.[32] Climate disruption also contributes to whipsawing water levels on Lake Michigan. In January 2013, the Lake Michigan's water level fell to an all-time low. In 2015, the water level then climbed to its highest level since 1998.[33] These rapid changes harm commercial shipping, recreational boaters, wildlife, and beach-goers.

By 2100, Massachusetts is projected to experience between 4.0 and 7.6 feet of sea level rise relative to mean sea level from the year 2000, with up to 10.2 feet of sea level rise possible under a high emissions scenario.[34] Warmer temperatures, extended heat waves, increased frequency and extent of flooding, changing precipitation, and increasingly severe weather events are already significantly impacting public health, the environment, and agriculture in Massachusetts, causing significant property damage, and straining key infrastructure including transportation networks, wastewater treatment systems, drinking water sources, and energy infrastructure.[35]

New York is experiencing dramatic increases in the frequency and intensity of extreme rain storms.[36] For example, devastating rainfall from Hurricane Irene in 2011 dropped more than 11 inches of rain in just 24 hours, causing catastrophic flooding, power outages, displacement and loss of life, and estimated damage totaling $1.3 billion. New York's rate of sea level rise is much higher than the national average and could account for up to six feet of additional rise by 2100 if GHG emissions are not abated. Storm surge on top of high tide on top of sea level rise is a recipe for disaster for coastal New York. For example, the approximately 12 inches of sea level rise New York City has experienced since 1900 may have expanded Hurricane Sandy's flood area in 2012 by about 25 square miles, flooding the homes of an additional 80,000 people

---

[32] U.S. Dept. of Agriculture, *USDA Designates 102 Illinois Counties as Primary Natural Disaster Areas* (Aug. 14, 2019), https://www.fsa.usda.gov/news-room/emergency-designations/2019/ed_2019_0814_rel_0074.

[33] Tony Briscoe, *Lake Michigan Water Levels Rising at Near Record Rate*, Chicago Tribune (July 12, 2015), *available at* http://www.chicagotribune.com/news/local/breaking/ct-lake-michigan-water-levels-met-20150710-story.html.

[34] Northeast Climate Science Center, University of Massachusetts, *Massachusetts Climate Change Projections* (Mar. 2018), https://necsc.umass.edu/projects/massachusetts-climate-change-projections.

[35] *See, e.g., id.* at 4-6; Massachusetts Dep't of Public Health, CAPACITY TO ADDRESS THE HEALTH IMPACTS OF CLIMATE CHANGE IN MASSACHUSETTS, 6 (Apr. 2014), *available at* http://www.mass.gov/eohhs/docs/dph/environmental/exposure/climate-change-report-2014.pdf; Runkle et al., *NOAA National Centers for Environmental Information, State Summaries 149-MA, Massachusetts*, 4 (2017), *available at* https://statesummaries.ncics.org/downloads/MA-screen-hi.pdf.

[36] *Current & Future Trends in Extreme Rainfall Across New York State, A Report from the Environmental Protection Bureau of New York State Attorney General Eric T. Schneiderman* (Sept. 2014), https://ag.ny.gov/pdfs/Extreme_Precipitation_Report%209%202%2014.pdf (based on data from the 2014 National Climate Assessment and the National Oceanographic and Atmospheric Administration's Northeast Regional Climate Center).

6

AR_0026359

in the New York City area alone.[37]  Air pollution in New York may also be worsening due to climate change.  According to the Third National Assessment on Climate Change, a scenario in which greenhouse gases continue to increase would lead to higher ground-level ozone concentrations in the New York metropolitan region, driving up the number of ozone-related emergency room visits for asthma in the area by 7.3%—more than 50 additional ozone-related emergency room visits per year in the 2020s, compared to the 1990s.[38]  The New York City metropolitan area experienced elevated ozone pollution levels in the years 2015-2017, a period that included the hottest years on record.[39]

In Pennsylvania, temperatures have already increased 1.8°F in the last century, and are projected to rise an additional 5.4°F by 2050.  Pennsylvania has seen a related rise in precipitation, causing increased flooding and landslides that cost the Commonwealth an additional $125.7 million for infrastructure replacement in 2018 alone. Climate change is also worsening air quality, damaging crops, and increasing the prevalence of invasive species and insect-transmitted diseases.[40]

Climate change will significantly adversely affect Washington's public health and its coasts, mountains, and forests.  The warming climate already is increasing ocean acidification,[41] decreasing Washington's snowpack,[42] and threatening Washington's forests and timber industry.[43]  With respect to public health, more frequent heat waves and more frequent and intense flooding may harm human health directly and may also exacerbate health risks from poor air quality and allergens.[44]  In addition, Washington is also experiencing decreasing winter mountain snowpack, and by the 2080s, snow pack is expected to decline 56-70%, impacting water availability for drinking, irrigation, hydropower, and salmon.[45]

For these reasons, the States are particularly concerned that federal agencies thoroughly consider GHG emissions and the consequences of climate change in their NEPA review and take

---

[37] Horton, et al., *New York City Panel on Climate Change 2015 Report, Chapter 2: Sea Level Rise and Coastal Storms*, 1336 ANN. N.Y. ACAD. SCI. 36 (2015), http://onlinelibrary.wiley.com/doi/10.1111/nyas.12593/full.
[38] U.S. National Climate Assessment, *Climate Change Impacts in the United States,* (2014) at 222 (citing P. E. Sheffield, et al., *Modeling of Regional Climate Change Effects on Ground Level Ozone and Childhood Asthma*, 41 AM. J. PREVENTIVE MEDICINE 251 (2011), http://download.journals.elsevierhealth.com/pdfs/journals/0749-3797/PIIS0749379711003461.pdf)
[39] Am. Lung Ass'n, *State of the Air 2019*, at 5-6, 21, 37, 127-128 (2019), https://www.lung.org/assets/documents/healthy-air/state-of-the-air/sota-2019-full.pdf.
[40] PENN. DEP'T OF ENVTL. PROTECTION, *Climate Change in PA*, https://www.depgis.state.pa.us/ClimateChange/index.html (last visited Aug. 22, 2019).
[41] Climate Impacts Group, University of Washington, *State of Knowledge Report, Climate Change Impacts and Adaptation in Washington State: Technical Summaries for Decision Makers*, at ES-1 (Dec. 2013), (hereinafter "State of Knowledge Report"), https://cig.uw.edu/resources/special-reports/wa-sok/.
[42] *Id.*
[43] *Id.* at ES-4.
[44] *Id*. at ES-4, ES-5.
[45] *Id.* at ES-4, 6-1, 6-6, 6-11, 6-12.

a hard look at the full environmental impacts, including climate-related impacts, of any proposed actions.

## II.    NEPA AND THE COUNCIL ON ENVIRONMENTAL QUALITY

Congress enacted NEPA in 1969 to establish a national policy for the environment and to create and maintain conditions under which man and nature can exist in productive harmony and fulfill the social, economic, and other requirements of present and future generations of Americans.[46]  NEPA is "our basic national charter for protection of the environment."[47]  NEPA's goals are to ensure agencies consider environmental consequences of their proposed actions and "inform the public about their decision-making process."[48]  Nearly every major federal action requires compliance with NEPA, which also requires consultation with other federal agencies possessing expertise on particular resources impacted by a project, with the aim to help develop more robust alternatives.

NEPA established CEQ within the Executive Office of the President to ensure that federal agencies meet their obligations under NEPA.[49]  CEQ reviews and approves federal agency NEPA procedures, approves alternative arrangements for compliance with NEPA in emergencies, and helps to resolve disputes between federal agencies and other governmental entities and members of the public.[50]  CEQ oversees NEPA implementation across the nation, principally through issuing regulations and guidance to implement NEPA's procedural requirements and provide direction to both federal agencies and private project proponents.

Over the past forty years, CEQ's regulations and guidance have shaped NEPA's implementation and have become integral to the daily functioning and responsible decision-making of numerous federal and state agencies.  CEQ's guidance also helps provide legal certainty to both federal agencies and private project applicants.  And circuit courts reviewing challenges to NEPA compliance often rely on CEQ's guidance documents as "persuasive authority offering interpretive guidance regarding the meaning of NEPA and the implementing regulations."[51]  Rather than implement or properly interpret the law, however, CEQ's Draft Guidance undermines NEPA's letter and spirit, sows confusion about consideration of climate change impacts under NEPA, increases uncertainty, and creates new legal risks for projects subject to NEPA.

---

[46] 42 U.S.C. § 4321.

[47] 40 C.F.R. § 1500.1 (2018).

[48] Draft Guidance, *supra* note 1, at 30,097.

[49] 42 U.S.C. § 4321.

[50] *See* https://ceq.doe.gov/index.html (last visited August 22, 2019).

[51] *See, e.g.*, *Wyoming v. U.S. Dep't of Ag.*, 661 F.3d 1209, 1260 n.36 (10th Cir. 2011); *New Mexico ex rel. Richardson v. Bureau of Land Mgmt.*, 565 F.3d 683, 705 n.25 (10th Cir. 2009); *American Rivers v. F.E.R.C.*, 201 F.3d 1186, 1200-01 & n.21 (9th Cir. 1999).

8

### III.  CEQ UNLAWFULLY AND ARBITRARILY IGNORES THE EFFECTS OF CLIMATE CHANGE IN THE DRAFT GUIDANCE

CEQ's 2016 Guidance offered clarity and consistency in how federal agencies should address climate change—including how climate change may alter an action's environmental effects—in the environmental impact assessment process.  Central to the prior guidance was the goal of identifying important interactions between climate change and environmental impacts from a proposed action.  The 2016 Guidance appropriately focused on the environmental risks associated with climate change, recognizing the critical importance of climate change as a "fundamental environmental issue" whose effects "fall squarely within NEPA's purview."[52]  It also detailed the science on climate change, citing multiple international and federal government studies documenting the impacts of climate change.[53]  CEQ also emphasized the need to consider climate change and the evolving body of scientific information available to understand and identify a project's affected environment.[54]

The Draft Guidance unlawfully and arbitrarily ignores a growing body of scientific literature regarding climate change.  Notably absent from the three-page Draft Guidance is any discussion of climate change and its effects.  Proper assessment of the effects of GHG emissions requires a recognition—wholly absent in the Draft Guidance—that climate change presents an extremely challenging threat that must be addressed in NEPA analyses.  Instead, the Draft Guidance offers only a cursory overview of the assessment of a project's GHG emissions.  And despite its nominal focus on GHG emissions, the Draft Guidance only refers to climate effects in stating that GHG emissions "may be used as a proxy for assessing potential climate effects" and that an agency may qualitatively discuss the effects of GHG emissions based on literature.[55]  These passing references do little to underscore the significance of GHG emissions in the context of climate change or to acknowledge the severe impacts that our States and cities are already facing today.

The Draft Guidance's disregard for climate change is the latest in a series of the Trump Administration's efforts to arbitrarily minimize or disregard the overwhelming scientific consensus that immediate and continual progress toward a near-zero GHG-emission economy by mid-century is necessary to avoid truly catastrophic climate change impacts.[56]  Indeed, CEQ's

---

[52] 2016 Guidance, *supra* note 3, at 2.

[53] *Id.* at 6-8.

[54] *Id.* at 21.

[55] Draft Guidance, *supra* note 1, at 30,098.

[56] *See* Intergovernmental Panel on Climate Change (IPCC), *Summary for Policymakers of IPCC Special Report on Global Warming of 1.5 C* at 15 (2018).  Multiple federal actions reflect the Trump administration's repeated disregard for the need to reduce GHG emissions, including, among others: the Affordable Clean Energy Rule, 84 Fed. Reg. 32,520 (July 8, 2019) (rolling back Clean Power Plan emissions controls on existing power plants); the Safer Affordable Fuel-Efficient (SAFE) Vehicles Proposed Rule for Model Years 2021-2026 Passenger Cars and Light Trucks, 83 Fed. Reg. 42,986 (Aug. 24, 2018); and *State of California v. EPA*, No. 4:18-03237-HSG (N.D. Cal. May 31, 2018) (challenging EPA's refusal to implement landfill methane emission regulations).

9

refusal to address climate impacts in the Draft Guidance is all the more troubling in light of the federal government's *own* conclusions, detailed above, that climate change resulting from GHG emissions is already having a serious impact on communities throughout the country and that immediate action is necessary to avoid the most severe long-term consequences.[57]  In the face of these severe and well-documented climate change impacts, CEQ's guidance should *highlight* rather than minimize the critical importance of addressing climate change and its impacts in NEPA analyses.  The Draft Guidance unlawfully and arbitrarily ignores these impacts and encourages agencies to minimize the treatment of GHG emissions and climate effects during NEPA review of federal projects.

## IV.    CEQ's Draft Guidance Subverts the Purpose and Requirements of NEPA

CEQ's Draft Guidance undermines NEPA's purpose to promote informed decision-making by disregarding the most pressing environmental challenge of our time: climate change.[58]  As the Supreme Court long ago emphasized, and as the Draft Guidance itself acknowledges, NEPA requires agencies to take a "hard look" at all environmental consequences—whether direct or indirect—of any proposed action on the environment.[59]  And that "hard look" requirement obligates agencies to carefully consider every significant environmental impact of a project,[60] which must necessarily include examining a project's contribution to climate change through its GHG emissions.[61]  NEPA's regulations, too, expressly require consideration of indirect effects on air, water, and other natural systems, like those resulting from climate change.[62]  Inherent in NEPA and its implementing regulations is a "rule of

---

[57] *Assessment, Volume I, supra* note 6, at 16 ("[B]ased on extensive evidence, … it is extremely likely that human activities, especially emissions of GHGs, are the dominant cause of the observed warming since the mid-20th century[.]"); *see also* Assessment, Volume II, *supra* note 9 at 1453; Daniel R. Coats, *Statement for the Record: Worldwide Threat Assessment of the U.S. Intelligence Community* at 23 (Jan. 29, 2019), https://www.hsdl.org/?view&did=820727, ("Global environmental and ecological degradation, as well as climate change, are likely to fuel competition for resources, economic distress, and social discontent through 2019 and beyond.  Climate hazards such as extreme weather, higher temperatures, droughts, floods, wildfires, storms, sea level rise, soil degradation, and acidifying oceans are intensifying, threatening infrastructure, health, and water and food security.  Irreversible damage to ecosystems and habitats will undermine the economic benefits they provide, worsened by air, soil, water, and marine pollution.").

[58] *See Assessment, Volume II, supra* note 9, at 26, 73, 1347 (reaffirming that climate change is human-caused, that continued growth in emissions will produce economic losses across all sectors, and that mitigation measures do not "yet approach the scale considered necessary to avoid substantial damages to the economy, environment and human health over the coming decades").

[59] *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332 (1989); Draft Guidance, *supra* note 1, at 30,097.

[60] *See Baltimore Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*, 462 U.S. 87, 97 (1983) ("NEPA…places upon an agency the obligation to consider every significant aspect of the environmental impact of a proposed action.") (internal quotation marks and citations omitted).

[61] *See, e.g.*, *WildEarth Guardians v. Jewell*, 738 F.3d 298, 301 (D.C. Cir. 2013) (holding that agency took the requisite hard look at the effect of its decision to authorize the lease of public lands for coal mining operations on global climate change).

[62] *See* 40 C.F.R. § 1508.8.

AR_0026363

reason," which ensures that agencies determine whether and how to prepare an Environmental Impact Statement ("EIS") based on the usefulness to the decision-making process of any new potential information regarding such impacts.[63]

While NEPA does not mandate substantive outcomes, the requirement that federal agencies consider and publicly disclose the environmental consequences of a proposed action, including actions that contribute to climate change, has practical significance.[64]  Although NEPA does not necessarily mandate that federal agencies reduce GHG emissions related to a proposed action, a full evaluation of a proposed action's GHG emissions and/or climate change impacts under NEPA affects agency activity by increasing awareness and allowing meaningful evaluation of alternative courses of action.  And disclosure of GHG impacts provides states and the public with useful information that increases their ability to lobby agencies and Congress to move toward greener and sustainable options in federal actions.

The Draft Guidance moves in the wrong direction, muddying the waters on the analysis of climate change impacts under NEPA and creating new legal risks for actions subject to NEPA. As discussed in more detail below, the Draft Guidance conflicts with NEPA's "hard look" mandate by: (1) failing to clarify how agencies analyze indirect climate change effects under NEPA; (2) improperly instructing agencies on cumulative impacts analysis; (3) encouraging agencies to forgo quantifying climate change impacts even though complex analysis and modeling of GHG impacts have been routinely performed by federal agencies since at least 2010; (4) discouraging a proper cost-benefit analysis; and (5) improperly indicating that evaluation of mitigation of GHG impacts is not required.  In short, rather than informing agencies how to meaningfully analyze a project's GHG emissions and climate change impacts,[65] the Draft Guidance encourages agencies *not* to analyze a project's likely climate change impacts and to avoid taking a "hard look" at climate-related impacts, in conflict with NEPA.  As noted below,[66] a growing body of case law demonstrates that, for many projects, CEQ's instructions in the Draft Guidance on how to address climate change impacts under NEPA encourage agencies to disregard relevant environmental information and are thus contrary to the law and arbitrary and capricious.[67]

---

[63] *Dep't of Transp. v. Public Citizen*, 541 U.S. 752, 754 (2004).

[64] 40 C.F.R. §§ 1501.5, 1501.6, 1500.5, 1508.7 (2019); *see Robertson*, 490 U.S. at 333 ("NEPA itself does not impose substantive duties mandating particular results, but simply prescribes the necessary process for preventing uninformed—rather than unwise—agency action").

[65] *Compare* 2016 Guidance, *supra* note 3, at 20-27.

[66] *See, e.g.*, *WildEarth Guardians v. Zinke*, 368 F. Supp. 3d 41, 68-71 (D.D.C. 2019); *Ctr. for Biological Diversity v. Nat'l Highway Transportation Safety Admin.*, 538 F.3d 1172, 1198-1203 (9th Cir. 2008); *see also Mid States Coal. for Progress v. Surface Transp. Bd.*, 345 F.3d 520, 532, 549-50 (8th Cir. 2003) (agencies must assess proposed action's indirect effect on climate change when nature of effect is reasonably foreseeable, even if extent of that effect is not).

[67] *See Motor Vehicle Mfrs. Ass'n of the United States v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) ("under the 'arbitrary and capricious' standard ... the agency must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made'").

AR_0026364

A.     CEQ's Draft Guidance Does Not Clarify to What Extent Agencies Must Consider Indirect GHG Emissions

CEQ's disregard for indirect GHG emissions conflicts with NEPA, its regulations, and case law.  As noted above, an agency conducting review under NEPA must consider the project's direct and indirect environmental effects.[68]  Indirect effects are "caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable."[69]  Federal courts have held that upstream and downstream GHG emissions are an indirect effect of agencies authorizing projects such as pipelines and mining.[70]  Where an agency could deny a project on the ground that it would be too harmful to the environment, the agency is the "legally relevant cause" of both the direct and indirect effects of that project.[71]  Thus, federal agencies are required to analyze indirect GHG emissions under NEPA.[72]

The Draft Guidance, however, fails to clarify the extent to which agencies should consider GHG emissions from major federal actions.  Instead, it employs broad language and general terms to significantly reduce the scope of environmental impacts that agencies should analyze under NEPA.  Purporting to rely on the "rule of reason," the Draft Guidance suggests that agencies "should analyze reasonably foreseeable environmental consequences of major federal actions, but should not consider those that are remote or speculative."[73]  However, climate change harms are already occurring.  Although there may be uncertainties in terms of additional types of harms and the magnitude of impacts, CEQ seems to ignore the very predicate that harms are happening now.  And, rather than employ any "rule of reason," the Draft Guidance attempts to limit agencies' consideration of GHG emissions by not specifying the meaning of the terms or the analysis necessary for an agency to support such a determination.

Litigation challenging NEPA review by the Federal Energy Regulatory Commission ("FERC") provides a useful example of the proper analysis of GHG emissions as indirect effects under NEPA.  FERC, in particular, has struggled in its approach to analysis of climate effects of pipeline decisions under NEPA and the Natural Gas Act.[74]  Historically, FERC contended that

---

[68] 40 C.F.R. § 1502.16.

[69] 40 C.F.R. § 1508.8(b).

[70] *See, e.g.*, *Sierra Club*, 867 F.3d at 1374 ("greenhouse-gas emissions are an indirect effect of authorizing this [pipeline] project, which FERC could reasonably foresee"); *San Juan Citizens Alliance v. U.S. Bureau of Land Mgmt*., 326 F. Supp. 3d at 1244 (finding that combustion emissions were indirect effect of agency's decision to extract those natural resources); *Montana Envtl. Info. Ctr. v. U.S. Office of Surface Mining*, No. CV 15-106-M-DWM, 2017 WL 5047901, *3 (stating that "effects of the estimated 23.16 million metric tons of greenhouse gas emissions the Mining Plan EA concluded would result from combustion of the coal that would be extracted from the Mine" are indirect effects from coal trains).

[71] *Sierra Club*, 867 F.3d at 1373.

[72] *Id*.

[73] Draft Guidance, *supra* note 1, at 30,098.

[74] In April 2018, FERC issued a Notice of Inquiry (NOI) aimed at reevaluating its previous approach to balancing the competing interests involved in pipeline projects, to which it invited comments (Certification of New Interstate Natural Gas Facilities Notice of Inquiry, 163 FERC ¶ 61,042 (2018)); *see also* Rich Glick & Matthew Christiansen, *FERC and Climate Change*, 40 ENERGY L. J. 1, 43 (2019)

12

AR_0026365

upstream and downstream GHG emissions are not "reasonably foreseeable."[75]  Based on this reasoning, FERC has taken the position that it need not analyze such emissions pursuant to NEPA, or factor them into its public convenience and necessity determinations under the Natural Gas Act.[76]  The court in *Sierra Club v. FERC* disagreed, holding that under NEPA, FERC must consider GHG emissions as indirect effects of a project.[77]  CEQ should provide clarity on the process of evaluating GHG emissions by instructing agencies to consider upstream and downstream GHG emissions as indirect effects of a project, as *Sierra Club* requires.  Instead, the Draft Guidance directs agencies such as FERC to follow an approach inconsistent with NEPA and case law.

NEPA, CEQ's implementing regulations, and federal court decisions thus make clear that agencies cannot shirk their NEPA obligations by simply claiming that GHG emissions are too speculative.[78]  Any NEPA reviews conducted pursuant to the Draft Guidance—and thus in conflict with decisions such as *Sierra Club v. FERC*—will be unlawful and subject to increased litigation.  By failing to describe the factors triggering rigorous analysis of GHG impacts, the Draft Guidance fails to reduce uncertainty, invites speculation, and *reduces* clarity for agencies in assessing GHG emissions.  Rather than making agencies' NEPA reviews less robust and more vulnerable to challenge, CEQ should provide agencies with more meaningful guidance on how to analyze indirect GHG emissions.

---

(recommending that FERC should "meaningfully engage the issue and develop a framework for fully considering climate change in the section 7 process").

[75] *See, e.g.*, New Market Project Rehearing Order, 163 FERC ¶ 61,128 at P 34.

[76] *Id.* at P 43 ("We are not aware of any basis that indicates the Commission is required to consider environmental effects that are outside of our NEPA analysis of the proposed action in our determination of whether a project is in the public convenience and necessity under section 7(c).").

[77] *Sierra Club*, 867 F.3d at 1373-75.

[78] *See, e.g.*, *id*. at 1374 (holding that agency had not provided a satisfactory explanation for why quantification of indirect GHG emissions was not feasible and stating, "we understand that emission estimates would be largely influenced by assumptions rather than direct parameters about the project, but some educated assumptions are inevitable in the NEPA process" (internal quotation marks and citations omitted)); *San Juan Citizens Alliance*, 326 F. Supp.3d at 1241-44 (holding that BLM's failure to quantify and analyze the impacts of downstream GHG emissions was arbitrary, despite the agency's finding that impacts were "not feasible to predict with certainty"); *see Allegheny Defense Project v. FERC*, No. 17-1098, ___F.3d ___, 2019 WL 3518835 at *8, (D.C. Cir. Aug. 2, 2019) (holding "NEPA required the Commission to consider both the direct and indirect environmental effects of the Project, and that, despite what the Commission argues, the downstream greenhouse-gas emissions are just such an indirect effect," (citing *Sierra Club v. FERC* and 40 C.F.R. § 1502.16(b))); *see generally Scientists' Inst. For Pub. Info, Inc. v. U.S. Atomic Energy Comm'n*, 481 F.2d 1079, 1092 (D.C. Cir. 1973) ("Reasonable forecasting and speculation is thus implicit in NEPA, and we must reject any attempt by agencies to shirk their responsibilities under NEPA by labeling any and all discussion of future environmental effects as 'crystal ball inquiry.'").

13

AR_0026366

**B.    Vague and Undefined Terms in the Draft Guidance Add Legal Risk and Encourage Agencies to Unlawfully Avoid Quantification of GHG Emissions**

The Draft Guidance contains numerous ambiguous terms that, in effect, would encourage agencies to unlawfully cast aside their obligations under NEPA.  In particular, the Draft Guidance directs agencies to "attempt to quantify a proposed action's projected direct and reasonably foreseeable indirect GHG emissions when the amount of those emissions is *substantial* enough to warrant quantification, and when it is *practicable* to quantify them using available data and GHG quantification tools."[79]  But the Draft Guidance fails to explain what constitutes "substantial" emissions or what factors determine whether quantification would be "practicable."  CEQ's decision to add these ambiguous terms to the Draft Guidance conflicts directly with the more straightforward language of the 2016 Guidance, which directed agencies to "quantify…direct and indirect GHG emissions, taking into account available data and GHG quantification tools."[80]  The Draft Guidance provides agencies leeway to create their own technical definitions and, in some cases, to avoid analyzing a project's climate change impacts altogether.  What is more, if different agencies adopt their own interpretations of the terms set forth in the Draft Guidance, it is likely that major inconsistencies will arise in the processes by which different agencies assess GHG impacts under NEPA.

The Draft Guidance also states that agencies "are not required to quantify effects where information necessary . . . is unavailable, not of high quality, or the complexity of identifying emissions would make quantification overly-speculative."[81]  Here, too, the Draft Guidance fails to clarify what these terms mean or how they should be implemented, and the provision conflicts with both section 1502.22(b) of the NEPA implementing regulations regarding "Incomplete and Unavailable Information" and federal court decisions examining the scope of NEPA review.[82]  Specifically, section 1502.22(b) provides that where "the information relevant to reasonably foreseeable significant adverse impacts cannot be obtained because . . . the means to obtain it are not known," the agency must still include in its EIS, among other items, "a summary of existing credible scientific evidence which is relevant to evaluating the reasonably foreseeable significant adverse impacts on the human environment" and "the agency's evaluation of such impacts based upon theoretical approaches or research methods generally accepted in the scientific community."[83]  Similarly, although agencies need not have "perfect foresight when considering indirect effects,"[84] courts have rejected agency attempts to ignore an important aspect of a

---

[79] Draft Guidance, *supra* note 1, at 30,098 (emphases added).

[80] 2016 Guidance, *supra* note 3, at 4.

[81] Draft Guidance, *supra* note 1, at 30,098.

[82] 40 C.F.R. § 1502.22(b).

[83] *See id.*

[84] *See WildEarth Guardians v. United States Office of Surface Mining, Reclamation & Enf't*, 104 F. Supp. 3d 1208, 1230 (D. Colo. 2015), *order vacated as moot, appeal dismissed*, 652 F. App'x 717 (10th Cir. 2016).

AR_0026367

problem by writing it off as too speculative[85] or acting on incomplete information or assumptions.[86]

The Draft Guidance also states that "when an agency determines that the tools, methods, or data inputs necessary to quantify a proposed action's GHG emissions are not *reasonably available*, or it otherwise would not be *practicable*, the agency should [alternatively] include a qualitative analysis. . . ."[87]  Again, CEQ has failed to explain what these terms mean.  This provision also presents an unlikely scenario because there are many tools available for quantification,[88] including CEQ's own compilation of GHG accounting tools, methodologies, and reports that it published for use by agencies engaged in emissions quantification.[89]  Moreover, federal agencies reviewing actions that are likely to have significant GHG emissions impacts such as pipelines, mining activities, and transportation projects have already implemented quantification at the environmental assessment and EIS stages of NEPA review and are thus familiar with the available data and methodologies.[90]  Absent clarification, CEQ's use of

---

[85] *See id.* at 1230-31; *Mid States Coal. for Progress v. Surface Transp. Bd.*, 345 F.3d at 548-50 (rejecting agency's argument that it need not consider air quality impacts of building national railroad to transport coal because the exact extent of impact was speculative).

[86] *WildEarth Guardians v. Bur. of Land Mgmt.*, 870 F.3d 1222, 1237-38 (10th Cir. 2017) (rejecting agency's analysis of impacts from coal leasing on carbon emissions and climate change that relied on faulty economic assumption); *see generally W. Watersheds Project v. Kraayenbrink*, 632 F.3d 472, 493 (9th Cir. 2011) (holding that agency violated NEPA when it failed to consider important aspect of problem by relying on data from only one-third of the rangeland in dispute and evaluating impacts without complete data); *Churchill County v. Norton*, 276 F.3d 1060, 1072-73 (9th Cir. 2001) (stating that NEPA "emphasizes the importance of coherent and comprehensive up-front environmental analysis to ensure…that the agency will not act on incomplete information" (internal quotation marks and citations omitted)).

[87] Draft Guidance, *supra* note 1, at 30,098 (emphases added).

[88] *See, e.g.*, U.S. Envtl. Protection Agency, *EPA Detailed Comments on FERC NOI for Policy Statement on New Natural Gas Transportation Facilities* 2-4 (June 21, 2018), https://elibrary.ferc.gov/idmws/file_list.asp?accession_num=20180621-5095 (listing numerous existing tools and information available to calculate upstream and downstream climate emissions associated with pipeline infrastructure).

[89] NEPA.GOV, *Greenhouse Gas (GHG) Accounting Tools*, https://ceq.doe.gov/guidance/ghg-accounting-tools.html (last visited August 23, 2019).

[90] *See, e.g.*, Surface Transp. Bd., *Draft Environmental Impact Statement for the Proposed Construction and Operation of the Tongue River Railroad Appendix F* (Apr. 2015), https://www.stb.gov/decisions/readingroom.nsf/UNID/E7DE39D1F6FD4A9A85257E2A0049104D/$file/AppF_Lifecycle+GHG.pdf (quantifying not only downstream combustion emissions of a coal-rail project, but also upstream emissions including the production of the steel and other materials for construction); Office of Surface Mining Reclamation and Enforcement, Environmental Assessment (DOI-BLM-CO-S010-2011-0074-EA), Federal Coal Lease (COC-62920) Modification and Federal Mine Permit (CO-0106A) Revision and Renewal 76-82, 173 (Oct. 12, 2017), https://eplanning.blm.gov/epl-front-office/projects/nepa/70895/127910/155610/King_II_Lease_Mod_Final_EA_2017-1012.pdf (quantifying direct carbon dioxide emissions from equipment to operate mine and construct improvements; indirect carbon dioxide emissions from mine workers' commutes; methane emissions from coal extraction process; indirect carbon dioxide emissions from transporting coal; and downstream carbon dioxide

15

ambiguous language encourages agencies to avoid quantification that can and should be done. The Draft Guidance is thereby inconsistent with NEPA and CEQ's obligation to ensure that agencies comply with the statute.[91]

As noted in the comments submitted in 2015 by the California Governor's Office of Planning and Research ("OPR") regarding the previous CEQ draft GHG guidance (referred to herein as the "2015 OPR Comments"), emissions from many projects are easily quantified using existing tools. The 2015 OPR Comments note that "[n]ational protocols for calculating greenhouse gas emissions are also readily available, such as the United States Community Protocol for Calculating Greenhouse Gas Emissions and the Local Government Operations Protocol."[92] California has long recognized that GHG quantification tools are widely available and reliable. Nearly a *decade* ago, during the process for amending the CEQA Guidelines to address GHG quantification, the California Natural Resources Agency noted that "quantification of GHG emissions is possible for a wide range of projects using currently available tools."[93] This is not unique to California; such tools are widely available to the federal government, in connection with federal projects, as well. For example, emission factors from construction equipment and other non-road engines have been readily available from EPA's NONROAD model since the late 1990s, while EPA's MOBILE6.1/6.2 model has included GHG emission factors since 2002. As OPR noted in its comments four years ago, the available tools have improved, and their use has become widespread.[94] That is even more true today.

### C. The Draft Guidance's Direction Regarding Cumulative Impacts Does Not Comply With NEPA

The Draft Guidance's instruction regarding cumulative impacts analysis also conflicts with NEPA. NEPA requires a lead agency to give a "hard look" at the cumulative impacts of a project, i.e., the "impact on the environment which results from the incremental impact of the

---

emissions from coal combustion; quantifying total direct and estimated indirect GHG emissions from maximum production at mine relative to total U.S. and global emissions).

[91] A survey conducted July 2012 through December 2014 found that of the 238 EISs surveyed, 214 (90%) contained some discussion of GHG emissions or climate change impacts, 172 (72%) discussed the GHG emissions associated with a proposed action, and 167 (70%) discussed how climate change may affect the proposed action. Jessica Wentz et al., Columbia Law School Sabin Ctr. For Climate Change Law, *Survey of Climate Change Considerations In Federal Environmental Impact Statements, 2012-2014*, at ii, 5, 11 (2016), http://columbiaclimatelaw.com/files/2016/06/Wentz-et-al.-2016-02-Climate-Change-Considerations-in-Federal-EIS-2012-14.pdf.

[92] *See* Comments from the Governor's Office of Planning and Research regarding the White House Council on Environmental Quality's "Revised Draft Guidance on Greenhouse Gases and Climate Change" at 3 (Mar. 24, 2015) A copy of the 5 OPR Comments is attached as Exhibit 2 to this letter. *See also* California Air Resources Board, Local Government Operations Protocol for Greenhouse Gas Assessments, https://ww3.arb.ca.gov/cc/protocols/localgov/localgov.htm (last visited Aug. 23, 2019).

[93] Cal. Natural Resources Agency, *Final Statement of Reasons for Regulatory Action: Amendments to the State CEQA Guidelines Addressing Analysis and Mitigation of Greenhouse Gas Emissions Pursuant to SB 97*, at 21 (Dec. 2009), http://resources.ca.gov/ceqa/docs/Final_Statement_of_Reasons.pdf.

[94] 2015 OPR Comments, *supra* note 92, at 4.

16

action when added to other past, present, and reasonably foreseeable future actions."[95]  A cumulative impact "can result from individually minor but collectively significant actions taking place over a period of time."[96]  The level of analysis required for NEPA's "hard look" is project-specific, and the analysis must be sufficient to provide a meaningful basis for an agency to compare amongst alternatives and decide whether to undertake the action in question.[97]

Several courts have upheld GHG cumulative impact analyses when they quantify both the project's GHG emissions and sector-related regional emissions, and have found cumulative impact analyses to be insufficient when they do not.[98]  For example, in *WildEarth Guardians v. Zinke*, the United States District Court for the District of Columbia held that the U. S. Department of the Interior, Bureau of Land Management's (BLM) environmental assessments for oil and gas leasing on federal land were insufficient because BLM failed to quantify the drilling-related GHG emissions from the leased parcels and failed to sufficiently compare them to regional and national emissions.[99]  The cumulative impacts analyses were insufficient because they did not provide "data-driven" comparisons of drilling-related GHG emissions resulting from the leases to regional and national GHG emissions.[100]  To satisfy NEPA, the court concluded that BLM should have quantified these comparisons and should have stated the cumulative effect of the decision with "reasonable specificity."[101]

In line with these requirements, the 2016 Guidance urged agencies to take an expansive view of cumulative impacts.  It admonished that a "statement that emissions from a proposed Federal action represent only a small fraction of global emissions is essentially a statement about the nature of the climate change challenge, and is not an appropriate basis for deciding whether or to what extent to consider climate change impacts under NEPA."[102]  And "[a]gencies should

---

[95] 40 C.F.R. § 1508.7 (2019); *Fritiofson v. Alexander*, 772 F.2d 1225, 1247 (5th Cir. 1985).

[96] 40 C.F.R. § 1508.7.

[97] *See Nat. Res. Defense Council, Inc. v. Hodel*, 865 F.2d 288, 299 (D.C. Cir. 1988) (EIS must analyze the combined effects of the actions in sufficient detail to be "useful to a decisionmaker in deciding whether, or how, to alter the program to lessen cumulative environmental impacts.").

[98] *See, e.g.*, *Citizens for a Healthy Cmty. v. Bur. of Land Mgmt.*, 49 ELR 20,044 (D. Colo. March 27, 2019) (upholding BLM's cumulative impact analysis of GHG emissions for master development plan for unit in Colorado basin because BLM looked at statewide emissions levels from coal-fired power plant for comparative assessment, performed regional cumulative impacts analysis of future mineral development in region, and quantified emissions expected from developments on land in question); *San Juan Citizens Alliance*, 326 F. Supp. 3d at 1240-41, 1248 (finding cumulative impacts analysis of GHG emissions from leasing of federal lands insufficient "facile conclusion" because it made qualitative comparison between "very small" increase in GHG emissions from leasing and regional and global emissions); *see also Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin.*, 538 F.3d 1172, 1180, 1216 (9th Cir. 2008); *Coal. for Healthy Ports v. U.S. Coast Guard*, 2015 U.S. Dist. LEXIS 159090 (S.D.N.Y. Nov. 24, 2015) (generally upholding cumulative impacts analysis of bridge project because it included "detailed, quantitative information").

[99] *WildEarth Guardians*, 368 F. Supp. 3d at 51, 63.

[100] *Id.* at 77.

[101] *Id.*

[102] 2016 Guidance, *supra* note 3, at 11.

17

not limit themselves to calculating a proposed action's emissions as a percentage of sector, nationwide, or global emissions in deciding whether or to what extent to consider climate change impacts under NEPA."[103] The 2016 Guidance also directed agencies to "discuss relevant approved federal, regional, state, tribal, or local plans, policies, or laws for GHG emissions reductions or climate adaption to make clear whether a proposed project's GHG emissions are consistent with such plans or laws."[104]

The Draft Guidance, by contrast, does not provide clarity on how agencies should perform cumulative impacts analyses for projects that implicate climate change, again inviting agencies to shirk their responsibilities to consider GHG effects. Instead, the Draft Guidance suggests that agencies may meet NEPA's cumulative impact analysis requirement by comparing a project's GHG emissions to local, regional, national, or sector-wide emissions estimates and providing a qualitative summary discussion of the effects of GHG emissions.[105] But this analysis of cumulative impacts would be insufficient for many projects, especially those involving fossil fuel leasing or transportation infrastructure, because NEPA's "hard look" requires a thorough analysis of cumulative GHG emissions and a more specific discussion of impacts and mitigation. The Draft Guidance thus ignores NEPA's requirement to analyze a project's cumulative effects when combined with other past, present, and reasonably foreseeable future federal actions.

As it did in the 2016 Guidance, CEQ should instruct agencies to thoroughly analyze a project's incremental impact on climate change. Specifically, CEQ should revise the Draft Guidance to instruct agencies to quantify cumulative impacts from GHG emissions, to consider a project's consistency with plans and policies to reduce GHG emissions, and to consider mitigation measures for cumulative impacts from GHG emissions.[106]

### D.    CEQ's Draft Guidance Improperly Supports an Unbalanced Approach to Cost-Benefit Analysis

CEQ's Draft Guidance also encourages improper assessment of climate costs of federal agency actions. Specifically, CEQ's Draft Guidance directs agencies that they do not need to monetize or quantify climate impacts even if they quantify employment or other socio-economic impacts of a project.[107] As courts have concluded, such a one-sided approach to monetizing project impacts lacks legal or rational support.[108]

---

[103] *Id.*

[104] *Id.* at 28-29.

[105] Draft Guidance, *supra* note 1, at 30,098.

[106] *See Sierra Club v. Clinton*, 689 F. Supp. 2d 1123, 1127, 1138-39 (D. Minn. 2010) (upholding cumulative impact analysis for GHG emissions from new 326-mile pipeline to transport crude oil, in part, because it discussed mitigation measures to offset emissions).

[107] Draft Guidance, *supra* note 3, at 30,099.

[108] *See Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin.*, 538 F.3d 1172, 1198 (9th Cir. 2008) (agency "cannot put a thumb on the scale by undervaluing the benefits and overvaluing the costs" in failing to analyze benefits of reducing GHG emissions); *High Country Conservation Advocates v. U.S.*

18

Although NEPA does not require a federal agency to conduct a cost-benefit analysis,[109] where an agency chooses to quantify the benefits of a proposed action, it must also quantify the costs of that action when a tool is available to do so.[110] For GHG emissions, the "social cost of carbon" provides such a tool. The former federal Interagency Working Group on Social Cost of Greenhouse Gases ("IWG") developed the social cost of carbon "through an interagency process committed to ensuring that the [social cost of carbon] estimates reflect the best available science and methodologies" for monetizing long-term damage caused by increased carbon dioxide emissions.[111] As CEQ noted in its 2016 Guidance, the social cost of carbon is a useful, available tool during NEPA review for agencies and the public to understand the potential climate impacts of a proposed federal action.[112]

In a reversal from the 2016 Guidance, the Draft Guidance now rejects the social cost of carbon or any other cost metric as a tool for monetizing climate impacts under NEPA.[113] It instructs agencies that they "need not weigh the effects of the various alternatives in NEPA in a monetary cost-benefit analysis using any monetized Social Cost of Carbon estimates."[114] CEQ then states that "[t]here may be some effects that are more capable of monetization or quantification, such as employment or other socio-economic impacts .... Monetization or quantification of some aspects of an agency's analysis does not require that all effects, including potential effects of GHG emissions, be quantified."[115] The message is clear: monetize benefits, such as employment, but do not monetize the climate costs. In other words, the Draft Guidance wrongly directs agencies that they may monetize some aspects of their analysis, such as employment or other socio-economic impacts, without quantifying the costs from climate impacts of the action.[116]

But courts have taken agencies to task for following the one-sided approach CEQ is suggesting here—monetizing the benefits of a project while failing to use the social cost of

---

*Forest Serv.*, 52 F. Supp. 3d 1174, 1195 (D. Colo. 2014) ("It is arbitrary to offer detailed projections of a project's upside while omitting a feasible projection of the project's costs.").

[109] 40 C.F.R. § 1502.23.

[110] *See Columbia Basin Land Prot. Ass'n v. Schlesinger*, 643 F.2d 585, 595 (9th Cir. 1981) (NEPA's "policy of full disclosure applies equally to the economic and technological benefits of a project as to its environmental costs. If full disclosure were applied only to the environmental costs, the purposes of mandating a balancing analysis would be defeated."); *Mont. Envtl. Info. Ctr v. U.S. Office of Surface Mining*, 274 F. Supp. 3d 1074, 1095–99 (D. Mont. 2017) (agency arbitrarily failed to consider costs of GHG emissions from coal combustion when agency quantified socioeconomic benefits of coal mining).

[111] 2016 Guidance, *supra* note 3, at 33 n.86; *see also* Interagency Working Group on Social Cost of Greenhouse Gases, *Technical Support Document: Technical Update of the Social Cost of Carbon for Regulatory Impact Analysis* – Under Executive Order 12866 (Aug. 2016).

[112] 2016 Guidance, *supra* note 3, at 33 n.86 (stating that social cost of carbon "provides a harmonized, interagency metric that can give decision makers and the public useful information for their NEPA review").

[113] Draft Guidance, *supra* note 1, at 30,098.

[114] *Id.*

[115] *Id.* at 30,099.

[116] *Id.*

19

carbon tool to monetize the climate costs—because it impairs an agency's ability to make an informed decision.[117]  In *High Country*, for example, the court faulted the U.S. Forest Service for refusing to use social cost of carbon estimates: "[e]ven though NEPA does not require a cost-benefit analysis, it was nonetheless arbitrary and capricious to quantify the *benefits* of the lease modifications and then explain that a similar analysis of the *costs* was impossible when such an analysis was in fact possible [using the social cost of carbon tool]."[118]

Nor can CEQ's proffered rationale save its unlawful approach.  In particular, CEQ dismisses the social cost of carbon on the basis that the IWG developed the tool for evaluation of regulatory actions and not for socio-economic analysis under NEPA.[119]  CEQ cannot reasonably dismiss this tool on the basis that it was not created for the precise purpose of aiding NEPA review.  Such reasoning is nonsensical: it would allow agencies to dismiss a whole host of reports, tools, and methods—including some of the GHG accounting tools identified on CEQ's own website—on the basis that they were not created specifically for the NEPA process,[120] in violation of NEPA's purpose of driving informed decision-making.  Indeed, in *High Country*, the court rejected this exact argument, observing that it did not "explain why these agencies believed the protocol was inaccurate or not useful in this instance."[121]  The court recognized that even if the IWG did not design the social cost of carbon specifically for the NEPA process, the tool could still provide useful information for the NEPA decision-making process, particularly where an agency decides to quantify benefits of a project.  Further, even if the social cost of carbon were not an appropriate tool for the NEPA process (it is), CEQ does not—because it cannot— explain why agencies could not use a different climate impact metric.

Consistent with NEPA, CEQ should revise the Draft Guidance to recommend a balanced approach that quantifies both the costs—including the social cost of carbon—and the benefits of proposed actions to ensure that federal agencies and the public have all necessary information about the potential environmental consequences of federal actions.[122]  In 2016, CEQ stated the social cost of carbon "provides a harmonized, interagency metric that can give decision makers and the public useful information for their NEPA review."[123]  Now, three years later, CEQ appears to have changed its mind, but fails to provide a reasoned basis for this change.[124]

---

[117] *See Ctr. for Biological Diversity*, 538 F.3d at 1198; *Columbia Basin Land Prot. Ass'n*, 643 F.2d at 595; *Mont. Envtl. Info. Ctr.*, 274 F. Supp. 3d at 1095–99.
[118] *High Country Conservation Advocates*, 52 F. Supp. 3d at 1191.
[119] Draft Guidance, *supra* note 1, at 30,099.
[120] *See* NEPA.GOV, *Greenhouse Gas (GHG) Accounting Tools*, https://ceq.doe.gov/guidance/ghg-accounting-tools.html.
[121] 52 F. Supp. 3d at 1192.
[122] 42 U.S.C. § 4331.
[123] 2016 Guidance, *supra* note 3, at 33 n.86.
[124] *Federal Commc'ns Comm'n v. Fox Television Stations*, 556 U.S. 502, 515 (2009) (agency must supply "good reasons" for departing from prior policy).

AR_0026373

### E.    CEQ's Draft Guidance Impermissibly Discourages Consideration of Required Mitigation Measures

The Draft Guidance also conflicts with NEPA by discouraging the mitigation and exploration of reasonable alternatives to reduce climate change impacts.  Regarding mitigation, the Draft Guidance flatly concludes: "NEPA does not require agencies to *adopt* mitigation measures."[125]  While it is true that NEPA does not require agencies to *adopt* mitigation measures, courts interpret NEPA's "hard look" requirement as requiring agencies to evaluate mitigation measures for a project that may impact the environment.[126]  The Draft Guidance fails to recognize that, while agencies are not required to adopt mitigation measures, they must include a discussion of "appropriate mitigation measures not already included in the proposed action or alternative" where a proposed action may impact the environment.[127]  Instead, CEQ's Draft Guidance steers federal agencies away from a thorough assessment of mitigation measures for a proposed project that may significantly impact climate change.

NEPA requires federal agencies to consider possible mitigation strategies for a federal action at multiple points throughout the NEPA analysis: in defining the scope of the EIS, in discussing alternatives to the proposed action and consequences of that action, and in explaining its ultimate decision.[128]  Courts have held that "mere lists of mitigation measures are insufficient" to satisfy NEPA.[129]  Instead, courts look at whether an agency has provided "an assessment of whether the proposed mitigation measures can be effective . . . [and] whether anticipated environmental impacts can be avoided."[130]  As the Supreme Court has explained, omission of a "reasonably complete discussion of possible mitigation measures" undermines the action-forcing purpose of NEPA because it would prevent agencies and the public from fully evaluating the severity of the proposed action.[131]

The Draft Guidance encourages federal agencies to forgo consideration of mitigation measures addressing climate change impacts of the action.  The resulting EIS may not present the agency, or the public, with a comprehensive understanding of the project's overall environmental impacts.  If an agency were to ignore mitigation measures to address GHG impacts, it likely would be unable to evaluate fully the impacts of a proposed action or an alternative, and thus would fail to fulfill the purpose of NEPA.  By steering agencies away from

---

[125] Draft Guidance, *supra* note 1, at 30,098 (emphasis added).

[126] *Neighbors of Cuddy Mountain v. U.S. Forest Service*, 137 F. 3d 1372, 1380 (9th Cir. 1998) (a mere listing of mitigation measures does not supply the reasoned analysis that NEPA requires).

[127] 40 C.F.R. § 1502.14(f) (emphasis added).

[128] *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 352 (1989); *see also* 40 C.F.R. §§ 1508.25(b), 1502.14(f), 1502.16(h), 1505.2(c).

[129] *Alaska Survival v. Surface Transp. Bd.*, 705 F.3d 1073, 1088 (9th Cir. 2013).

[130] *S. Fork Band Council of Western Shoshone of Nevada v. U.S. Dept. of Interior*, 588 F.3d 718, 727 (9th Cir. 2009); *High Sierra Hikers Ass'n v. Dept. of Interior*, 848 F. Supp. 2d 1036, 1054 (N.D. Cal. 2012) ("[a]n essential component of a reasonably complete mitigation discussion is an assessment of whether the proposed mitigation measures can be effective").

[131] *Robertson*, 490 U.S. at 352.

AR_0026374

a comprehensive discussion of mitigation measures for a proposed agency action, the Draft Guidance undermines the action-forcing function of NEPA and, consequently, conflicts with the general purpose and requirements of NEPA.

Moreover, the Draft Guidance's suggestion that an agency need not consider potential mitigation measures could undercut the efficacy of an agency's cost-benefit analysis regarding a particular action's GHG emissions. The Ninth Circuit, for instance, overturned an agency's NEPA analysis that failed to consider the monetary benefit of mitigating GHG emissions, stating that the mitigation of those emissions was "the most significant benefit" of the more stringent regulatory alternative to the agency's proposed action.[132]

The Draft Guidance's statement that NEPA does not require adoption of mitigation measures for climate change impacts is ill-advised and improper. Where a proposed project has climate change impacts, a robust analysis of mitigation measures from GHG emissions is required. CEQ should so instruct in any final guidance.

### F.    CEQ's Draft Guidance Should Direct Agencies to Consider Climate Adaptation and Resiliency

Increasing resiliency to a changing climate is a critically important challenge for many communities, yet the Draft Guidance does not even mention climate adaptation or resiliency. As discussed above, our States, cities, and localities are already experiencing climate change, and its effects will continue to worsen. To protect residents, infrastructure, and industries, states must adapt to address these impacts. Climate adaptation is a form of risk management that allows governments, utilities, businesses, and individuals to reduce the risk associated with a changing climate.[133] Climate resiliency improves a community's ability to weather the effects of climate change.[134] Because of the monumental costs associated with the effects of climate change, many climate adaptation measures are cost-effective. As the second volume of the Assessment found, "[p]roactive adaptation initiatives—including changes to policies, business operations, capital investments, and other steps—yield benefits in excess of their costs in the near term, as well as over the long term."[135] Since the effects of climate change are not felt evenly across society, proactive adaptation measures ensure that our most vulnerable residents—including low-income

---

[132] *Center for Biological Diversity,* 538 F.3d at 1199.

[133] *See Assessment, Volume II, supra* note 9, at 1314, *available at* https://nca2018.globalchange.gov/downloads/NCA4_Ch28_Adaptation_Full.pdf. The U.S. Climate Resilience Toolkit defines "adaptation" as: "The process of adjusting to new (climate) conditions in order to reduce risks to valued assets." U.S. Climate Resilience Toolkit, Glossary, https://toolkit.climate.gov/topics/built-environment/social-equity (last visited July 14, 2019).

[134] The U.S. Climate Resilience Toolkit defines "resilience" as: "The capacity of a community, business, or natural environment to prevent, withstand, respond to, and recover from a disruption." U.S. Climate Resilience Toolkit, Glossary, *supra* note 133.

[135] *Assessment, Volume II, supra* note 9, at 1322.

communities and communities of color—avoid bearing the brunt of the effects of climate change.[136]

Consideration of future adaptation and resiliency comports with NEPA's mandates. As discussed above, NEPA and its implementing regulations require consideration of a changing climate because when preparing an EIS, agencies must describe the affected environment, including by projecting into the future in order to analyze an action's environmental impacts and compare reasonable alternatives.[137] Because the climate is changing rapidly, the projections into the future (the future environment with the action, without the action, and reasonable alternatives) will often need to factor in the effects of climate change, including the ways a changing climate may alter the action. Accordingly, numerous courts have held that agencies acted arbitrarily and capriciously by failing to consider future conditions when analyzing the action's environmental impacts.[138]

The 2016 Guidance thus properly included a detailed discussion of how agencies must account for the impacts of climate change during NEPA reviews.[139] The 2016 Guidance directs agencies to consider "the ways in which a changing climate may impact the proposed action and any alternative actions . . . ."[140] Under the 2016 Guidance, agencies should describe the projected future state of the environment (i.e., the no action alternative) based on "authoritative climate change reports" and look at the expected life of the proposed action and its effects.[141] Agencies should consider how climate change makes a resource, ecosystem, or human community susceptible to environmental impacts. As the 2016 Guidance notes, such considerations fall "squarely within the scope of NEPA."[142] It directs that this analysis should "inform decisions on whether to proceed with, and how to design, the proposed action to

---

[136] *See* U.S. Climate Resilience Toolkit, Social Equity, https://toolkit.climate.gov/topics/built-environment/social-equity (last visited July 14, 2019).

[137] 40 C.F.R. § 1502.15 (2019) (defining affected environment as "the environment of the area(s) to be affected or created by the alternatives under consideration"); *see* Jessica Wentz, *Planning for the Effects of Climate Change on Natural Resources*, 47 ENVTL. L. REV. 10,220, 10,222-23 (2017) (describing how NEPA and regulations require incorporation of climate change into analysis of action's environmental impacts).

[138] *See, e.g.*, *California ex. Rel. Imperial Country Air Pollution Control Dist. v. U.S. Dep't of the Interior*, 767 F.3d 781 (9th Cir. 2014) (upholding EIS that analyzed effects of water transfer agreements on Salton Sea in southern California, in part, because it properly incorporated future conditions when establishing "no action" alternative); *American Canoe Ass'n v. White*, 277 F. Supp. 2d 1244 (N.D. Ala. 2003) (cumulative impact analysis for dam project was insufficient because it failed to consider future conditions of project); *AquAlliance v. U.S. Bureau of Reclamation*, 287 F. Supp. 3d 969, 1032 (E.D. Cal. 2018) (NEPA cumulative impact analysis in EIS analyzing water transfer program was insufficient because it failed to incorporate available information about likely change to future conditions due to climate change).

[139] 2016 Guidance, *supra* note 3, at 20-27.

[140] *Id.* at 9.

[141] *Id.* at 20-21.

[142] *Id.* at 21.

AR_0026376

eliminate or mitigate impacts . . . ."[143]  The 2016 Guidance provides useful direction on how, under NEPA, agencies should address the effects of climate change on the project and its impacts.

In sharp contrast to the 2016 Guidance, and despite the importance of climate adaptation and climate resiliency in project planning and environmental analysis, the Draft Guidance is virtually silent on the subject.  In terms of analyzing the effects of a changing climate on the proposed action and the action's impacts, the Draft Guidance only ambiguously advises that, "[w]hen relevant, agencies should consider whether the proposed action would be affected by foreseeable changes to the affected environment under a reasonable scenario"—again without defining those terms.[144]  The States thus urge CEQ to readopt the 2016 Guidance's discussion of climate impacts to account for adaptation and resiliency efforts.

Moreover, providing guidance directing federal agencies to address climate adaptation and resiliency in NEPA reviews would aid coordination among federal approval and planning processes and, as detailed below, with state and local agencies.  CEQ regulations encourage agencies to integrate the NEPA process with other processes at the earliest possible time.[145]  CEQ strongly encourages coordination of NEPA review with other federal approvals and planning processes, and with state and local agencies.[146]  Since many federal agencies, state agencies, and local partners have laws, regulations, and policies that require them to address climate risk during planning and project development, robust NEPA guidance directing similar considerations will encourage consistency and ease such coordination.  For example, U.S. Army Corps of Engineers policy requires it to integrate "climate change preparedness and resilience planning and actions in all activities," and the National Park Service's Coastal Adaptation Strategies Handbook provides policy and decision-making guidelines for addressing climate change impacts on vulnerable park resources.[147]  The States accordingly request that any final guidance that CEQ issues on consideration of GHG emissions in NEPA reviews robustly addresses climate adaptation and resiliency.

---

[143] *Id.*
[144] Draft Guidance, *supra* note 1, at 30,098.
[145] 40 C.F.R. § 1501.2.
[146] *See* Council on Environmental Quality, Collaboration in NEPA (2007), https://www.energy.gov/sites/prod/files/CEQ_Collaboration_in_NEPA_10-2007.pdf; Council on Environmental Quality, *A Citizen's Guide to the NEPA* (2007), https://ceq.doe.gov/docs/get-involved/Citizens_Guide_Dec07.pdf ("permitting and NEPA processes should be integrated or run concurrently in order to have an effective and efficient decision-making process").
[147] U.S. Army Corps of Engineers, *Adaptation Policy Statement* (2014), https://cdm16021.contentdm.oclc.org/utils/getfile/collection/p266001coll1/id/5255; National Park Service, Coastal Adaptation Handbook (2016), https://www.nps.gov/subjects/climatechange/upload/CASH_FINAL_Document_111016.pdf.

AR_0026377

## V.  CEQ's Draft Guidance Should Ensure Consistency Between NEPA and State Environmental Analyses

The States have a wealth of experience implementing state environmental review statutes and ensuring coordination between NEPA and its state analogues.  In developing the Draft Guidance, CEQ should consider ways to ensure that this coordination is as streamlined and smooth as possible.  Moreover, CEQ should look to our States for guidance on quantification of GHG emissions and assessment of climate impacts.

First, coordination between state and federal environmental reviews is a critical component of planning for major projects.  CEQ should revise the Draft Guidance to encourage agencies to coordinate analysis under NEPA with state environmental reviews that require analysis and mitigation of climate change impacts, such as the California Environmental Quality Act.  NEPA coordination with state environmental review laws would thus be improved by robust guidance encouraging federal agencies to likewise incorporate climate resiliency and adaptation in NEPA review.  Federal and state environmental review processes can be coordinated for projects requiring both federal and state action.[148]  The regulations implementing New York State's environmental review law require an environmental impact statement to identify and discuss measures to avoid or reduce both an action's impacts on climate change and associated impacts due to the effects of climate change such as sea level rise and flooding.[149]  The Washington State Department of Transportation ("WSDOT") requires all WSDOT projects subject to NEPA and state environmental review to follow its *Guidance - Project-Level Greenhouse Gas Evaluations under NEPA and SEPA* and directs projects to consider climate change impacts and ways to improve the resilience of transportation assets.[150]  Given these requirements, NEPA and state-level analysis can best be coordinated if NEPA reviews also address these important considerations.

Second, CEQ should look to states for guidance on quantitative GHG and climate change analyses under NEPA.  As discussed in Section IV.B above, California agencies have been quantifying GHG emissions and assessing climate change impacts associated with projects since at least 2006.  As noted in California's 2015 OPR Comments submitted regarding the previous CEQ draft GHG guidance, emissions from many projects are easily quantified using existing

---

[148] *See, e.g.*, 6 N.Y.C.R.R. § 617.15 (as long as NEPA EIS is sufficient for findings required, state and local agencies may rely on NEPA EIS to meet their requirements under New York State environmental review); Mass. Gen. Laws. c. 30, § 62G (allowing submission of NEPA EIS in lieu of state environmental impact report); 301 Code Mass. Regs. § 11.09(c) (authorizing special review procedures including coordination with other permitting agencies and consolidation of federal and state review processes).

[149] 6 N.Y.C.R.R. § 617.9(b)(5)(iii)(i).

[150] Washington State Dep't of Transportation, *WSDOT Guidance - Project-Level Greenhouse Gas Evaluations under NEPA and SEPA* (2018); *WSDOT, Guidance for NEPA and SEPA Project-Level Climate Change Evolutions* (Jan. 2017 update), https://www.wsdot.wa.gov/environment/technical/disciplines/air-quality-noise-energy/addressing-climate-change & https://www.wsdot.wa.gov/sites/default/files/2019/02/08/ENV-ANE-GHGGuidance.pdf.

AR_0026378

tools.  OPR noted that "quantification of GHG emissions is possible for a wide range of projects using currently available tools."[151]  This is not unique to California; such tools are widely available to the federal government, in connection with federal projects, as well.  Indeed, the available tools have improved, and their use has become widespread.[152]

States also provide useful guideposts in considering climate impacts generally.  For example, Massachusetts law requires that for all administrative approvals and decisions, the agency, department, board, commission, or authority "consider reasonably foreseeable climate change impacts, including additional GHG emissions, and effects, such as predicted sea level rise."[153]  In New York, state law requires consideration of future physical climate risk due to sea level rise, storm surge and flooding for a number of specified permitting and funding decisions.[154]  California's Sea Level Rise guidance provides methodology for state and local governments to analyze and assess the risks associated with sea level rise, and to incorporate sea level rise into their planning, permitting, and investment decisions.[155]

## VI.   CEQ SHOULD WITHDRAW THE DRAFT GUIDANCE AND ADOPT AN UPDATED VERSION OF THE 2016 GUIDANCE

For the reasons articulated above, CEQ's Draft Guidance inadequately advises federal agencies on the assessment of GHG emissions and the climate change impacts of projects during NEPA review.  The Draft Guidance avoids addressing climate change and its impacts, fails to clarify the proper analysis of indirect climate change effects, confuses and weakens GHG quantification requirements, minimizes the consideration of cumulative impacts and other components of a proper NEPA analysis, improperly supports an unbalanced approach to cost-benefit analysis, discourages consideration of mitigation and alternatives to reduce climate impacts, and fails even to mention consideration of measures to improve climate adaptation and resiliency.  The result is a document that conflicts with the statutory requirements of NEPA and does not further NEPA's purposes of promoting informed decision-making and identifying environmental impacts.  Instead, the Draft Guidance largely identifies opportunities for—and indeed appears to encourage—agencies to avoid adequately assessing GHG emissions and climate impacts of proposed projects.

Rather than pursue this inadequate and unlawful approach to analyzing GHG emissions and climate impacts, CEQ should withdraw its Draft Guidance.  The States urge CEQ instead to

---

[151] Cal. Natural Resources Agency, *Final Statement of Reasons for Regulatory Action: Amendments to the State CEQA Guidelines Addressing Analysis and Mitigation of Greenhouse Gas Emissions Pursuant to SB97*, at 21 (Dec. 2009).

[152] 2015 OPR Comments, *supra* note 92, at 4.

[153] State of Massachusetts, 2012: Mass. Gen. Laws c. 30, § 61.

[154] *See* New York State Department of Environmental Conservation, Community Risk and Resiliency Act (CRRA) Provisions, https://www.dec.ny.gov/energy/104113.html (last visited July 15, 2019).

[155] Cal. Natural Resources Agency, *State of California Sea Level Rise Guidance* (2018), http://www.opc.ca.gov/webmaster/ftp/pdf/agenda_items/20180314/Item3_Exhibit-A_OPC_SLR_Guidance-rd3.pdf.

AR_0026379

adopt an updated version of the 2016 Guidance that fully complies with NEPA and current caselaw and acknowledges and reflects the uniquely catastrophic threat of climate change. The 2016 Guidance reflects years of analysis as well as thoughtful recommendations offered by numerous stakeholders, and relies on longstanding NEPA principles.[156] Ensuring robust analysis of greenhouse gas emissions and climate impacts of federal projects is essential for informing decisionmakers and the public of the potential environmental impacts. NEPA demands this transparent and comprehensive process.

---

[156] 2016 Guidance, *supra* note 3, at 2 & n.4.

AR_0026380

If we can provide additional information that would be helpful in considering these comments, or if you wish to discuss with us any issue raised above, please do not hesitate to contact the undersigned.

Respectfully submitted,

Dated: August 26, 2019

FOR THE STATE OF CALIFORNIA

XAVIER BECERRA
Attorney General

By: /s/ Sarah E. Morrison_____

SARAH E. MORRISON
Supervising Deputy Attorney General
JAMIE JEFFERSON
JULIA K. FORGIE
Deputy Attorneys General
California Department of Justice
300 South Spring Street, Suite 1702
Los Angeles, CA 90013
Tel. (213) 269-6328
Sarah.Morrison@doj.ca.gov
Jamie.Jefferson@doj.ca.gov
Julia.Forgie@doj.ca.gov

FOR THE STATE OF COLORADO

PHILIP J. WEISER
Attorney General

By: /s/ Amy W. Beatie

AMY W. BEATIE
Deputy Attorney General
Natural Resources and Environment Section
Colorado Attorney General's Office
1300 Broadway, 7th Floor
Denver, Colorado 80203
720-508-6295
Amy.Beatie@coag.gov

28

AR_0026381

FOR THE STATE OF CONNECTICUT

WILLIAM TONG
Attorney General


By: /s/ Robert Snook_____

MATTHEW I. LEVINE
ROBERT SNOOK
Assistant Attorneys General
Office of the Attorney General
P.O. Box 120
55 Elm Street
Hartford, CT 06141-0120
Tel: (860) 808-5250
Robert.snook@ct.gov


FOR THE DISTRICT OF COLUMBIA

KARL A. RACINE
Attorney General


By: /s/ Sarah Kogel Smucker_____

SARAH KOGEL-SMUCKER
Special Assistant Attorney General
Office of the Attorney General
441 4th Street, N.W., Suite 630 South
Washington, D.C. 20001
(202) 724-9727
sarah.kogel-smucker@dc.gov


FOR THE STATE OF DELAWARE

KATHLEEN JENNINGS
Attorney General


By: /s/ Jameson Tweedie_____

DEVERA SCOTT
Deputy Attorney General
JAMESON TWEEDIE
Special Assistant Deputy Attorney General
Department of Justice
391 Lukens Drive
New Castle, DE 19720
Telephone: (302) 395-2521
devera.scott@state.de.us
jameson.tweedie@state.de.us


FOR THE STATE OF ILLINOIS

KWAME RAOUL
Attorney General


By: /s/ Jason E. James__

JASON E. JAMES
Assistant Attorney General
MATTHEW J. DUNN
Chief, Environmental Enf./Asbestos Litig.
Div.
Office of the Attorney General
Environmental Bureau
69 W. Washington St., 18th Floor
Chicago, IL 60602
(312) 814-0660
jjames@atg.state.il.us

29

FOR THE STATE OF MAINE

AARON M. FREY
Attorney General


By: /s/ Laura E. Jensen

LAURA E. JENSEN
Assistant Attorney General
Office of the Maine Attorney General
6 State House Station
Augusta, ME 04333
 (207) 626-8868
laura.jensen@maine.gov

FOR THE COMMONWEALTH OF
MASSACHUSETTS

MAURA HEALEY
Attorney General


By: /s/ Turner Smith

CHRISTOPHE COURCHESNE
Assistant Attorney General and Chief
TURNER SMITH
Assistant Attorney General
Office of the Attorney General
Environmental Protection Div.
One Ashburton Place, 18th Floor
Boston, MA 02108
(617) 727-2200
Turner.Smith@mass.gov

FOR THE STATE OF MARYLAND

BRIAN E. FROSH
Attorney General


By: /s/ Steven J. Goldstein

STEVEN J. GOLDSTEIN
Special Assistant Attorney General
Office of the Attorney General
200 Saint Paul Place, 20th Floor
Baltimore, Maryland 21202
(410) 576-6414
sgoldstein@oag.state.md.us

FOR THE STATE OF MINNESOTA

KEITH ELLISON
Attorney General


By: /s/ Christina Brown

CHRISTINA M. BROWN
Assistant Attorney General
445 Minnesota Street, Suite 900
St. Paul, MN 55105
(651) 757-1471
christina.brown@ag.state.mn.us

30

FOR THE STATE OF NEW JERSEY

GURBIR S. GREWAL
Attorney General


By: /s/ Aaron A. Love

AARON A. LOVE
Deputy Attorney General
New Jersey Division of Law
R.J. Hughes Justice Complex
25 Market Street, PO Box 093
Trenton, NJ 08625-0093
(609) 376-2762
Aaron.Love@law.njoag.gov


FOR THE STATE OF NEW YORK

LETITIA JAMES
Attorney General


By: /s/ Claiborne Walthall

MICHAEL J. MYERS
Senior Counsel
CLAIBORNE E. WALTHALL
Assistant Attorney General
Environmental Protection Bureau
New York State Attorney General
The Capitol
Albany, NY 12224
(518) 776-2380
Claiborne.Walthall@ag.ny.gov

FOR THE STATE OF NEW MEXICO

HECTOR H. BALDERAS
Attorney General


By: /s/ Anne E. Minard

ANNE MINARD
Special Assistant Attorney General
BILL GRANTHAM
Assistant Attorney General
State of New Mexico Office of the Attorney
General
Consumer & Environmental Protection
Division
408 Galisteo Street
Santa Fe, NM 87501
505-490-4045
505-717-3520
AMinard@nmag.gov
WGrantham@nmag.gov


FOR THE STATE OF NORTH CAROLINA

JOSHUA H. STEIN
Attorney General


By: /s/ Asher Spiller

ASHER SPILLER
Assistant Attorney General
North Carolina Department of Justice
114 W. Edenton Street
Raleigh, NC 27603
(919) 716-6977
Aspiller@ncdoj.gov

31

AR_0026384

FOR THE STATE OF OREGON

ELLEN F. ROSENBLUM
Attorney General


By: /s/ Paul Garrahan

PAUL GARRAHAN
Attorney-in-Charge
STEVE NOVICK
Special Assistant Attorney General
Natural Resources Section
Oregon Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4593
steve.novick@doj.state.or.us


FOR THE STATE OF PENNSYLVANIA

JOSH SHAPIRO
Attorney General


By: /s/ Aimee D. Thomson

AIMEE D. THOMSON
Deputy Attorney General
ANN R. JOHNSTON
Senior Deputy Attorney General
Pennsylvania Office of Attorney General
1600 Arch St., Suite 300
Philadelphia, PA 19103
Tel. (267) 940-6696
athomson@attorneygeneral.gov
ajohnston@attorneygeneral.gov


FOR THE STATE OF RHODE ISLAND

PETER F. NERONHA
Attorney General


By: /s/ Alison B. Hoffman

ALISON B. HOFFMAN
Special Assistant Attorney General
Office of the Attorney General
150 South Main Street
Providence, RI 02903
(401) 274-4400
AHoffman@riag.ri.gov


FOR THE STATE OF VERMONT

THOMAS J. DONOVAN, JR.
Attorney General


By: /s/ Nicholas F. Persampieri

NICHOLAS F. PERSAMPIERI
Assistant Attorney General
Office of the Attorney General
109 State Street
Montpelier, VT 05609
(802) 828-3186
nick.persampieri@vermont.gov


32

FOR THE STATE OF WASHINGTON

ROBERT W. FERGUSON
Attorney General


By: /s/ Aurora R. Janke

WILLIAM R. SHERMAN
Assistant Attorney General
AURORA R. JANKE
Special Assistant Attorney General
Counsel for Environmental Protection
800 5th Ave Suite 2000, TB-14
Seattle, WA 98104-3188
 (206) 442-4485
bill.sherman@atg.wa.gov
aurora.janke@atg.wa.gov

33

# ATTACHMENT 1

AR_0026387



EXECUTIVE OFFICE OF THE PRESIDENT
COUNCIL ON ENVIRONMENTAL QUALITY
WASHINGTON, D.C. 20503

August 1, 2016

MEMORANDUM FOR HEADS OF FEDERAL DEPARTMENTS AND AGENCIES

FROM:        CHRISTINA GOLDFUSS
             COUNCIL ON ENVIRONMENTAL QUALITY

SUBJECT:     Final Guidance for Federal Departments and Agencies on
             Consideration of Greenhouse Gas Emissions and the Effects of
             Climate Change in National Environmental Policy Act Reviews

## I.   INTRODUCTION

The Council on Environmental Quality (CEQ) issues this guidance to assist

Federal agencies in their consideration of the effects of greenhouse gas (GHG) emissions[1]

and climate change when evaluating proposed Federal actions in accordance with the

National Environmental Policy Act (NEPA) and the CEQ Regulations Implementing the

Procedural Provisions of NEPA (CEQ Regulations).[2]  This guidance will facilitate

compliance with existing NEPA requirements, thereby improving the efficiency and

consistency of reviews of proposed Federal actions for agencies, decision makers, project

proponents, and the public.[3]  The guidance provides Federal agencies a common

---

[1] For purposes of this guidance, CEQ defines GHGs in accordance with Section 19(m) of Exec. Order No. 13693, Planning for Federal Sustainability in the Next Decade, 80 Fed. Reg. 15869, 15882 (Mar. 25, 2015) (carbon dioxide, methane, nitrous oxide, hydrofluorocarbons, perfluorocarbons, nitrogen trifluoride, and sulfur hexafluoride).  Also for purposes of this guidance, "emissions" includes release of stored GHGs as a result of land management activities affecting terrestrial GHG pools such as, but not limited to, carbon stocks in forests and soils, as well as actions that affect the future changes in carbon stocks.  The common unit of measurement for GHGs is metric tons of $CO_2$ equivalent (mt $CO_2$-c).
[2] *See* 42 U.S.C. 4321 et seq.; 40 CFR Parts 1500–1508.
[3] This guidance is not a rule or regulation, and the recommendations it contains may not apply to a particular situation based upon the individual facts and circumstances.  This guidance does not change or substitute for any law, regulation, or other legally binding

approach for assessing their proposed actions, while recognizing each agency's unique circumstances and authorities.[4]

Climate change is a fundamental environmental issue, and its effects fall squarely within NEPA's purview.[5] Climate change is a particularly complex challenge given its global nature and the inherent interrelationships among its sources, causation, mechanisms of action, and impacts. Analyzing a proposed action's GHG emissions and the effects of climate change relevant to a proposed action—particularly how climate change may change an action's environmental effects—can provide useful information to decision makers and the public.

CEQ is issuing the guidance to provide for greater clarity and more consistency in how agencies address climate change in the environmental impact assessment process. This guidance uses longstanding NEPA principles because such an analysis should be similar to the analysis of other environmental impacts under NEPA. The guidance is intended to assist agencies in disclosing and considering the reasonably foreseeable effects of proposed actions that are relevant to their decision-making processes. It confirms that agencies should provide the public and decision makers with explanations of the basis for agency determinations.

---

requirement, and is not legally enforceable. The use of non-mandatory language such as "guidance," "recommend," "may," "should," and "can," is intended to describe CEQ policies and recommendations. The use of mandatory terminology such as "must" and "required" is intended to describe controlling requirements under the terms of NEPA and the CEQ regulations, but this document does not affect legally binding requirements.

[4] This guidance also addresses recommendations offered by a number of stakeholders. *See* President's State, Local, and Tribal Leaders Task Force on Climate Preparedness and Resilience, *Recommendations to the President* (November 2014), p. 20 (recommendation 2.7), *available at* www.whitehouse.gov/sites/default/files/docs/task_force_report_0.pdf; U.S. Government Accountability Office, *Future Federal Adaptation Efforts Could Better Support Local Infrastructure Decision Makers*, (Apr. 2013), *available at* http://www.gao.gov/assets/660/653741.pdf. Public comments on drafts of this guidance document are available at http://www.whitehouse.gov/administration/eop/ceq/initiatives/nepa/comments.

[5] NEPA recognizes "the profound impact of man's activity on the interrelations of all components of the natural environment." (42 U.S.C. 4331(a)). It was enacted to, *inter alia,* "promote efforts which will prevent or eliminate damage to the environment and biosphere and stimulate the health and welfare of man." (42 U.S.C. 4321).

AR_0026389

Focused and effective consideration of climate change in NEPA reviews[6] will allow agencies to improve the quality of their decisions.  Identifying important interactions between a changing climate and the environmental impacts from a proposed action can help Federal agencies and other decision makers identify practicable opportunities to reduce GHG emissions, improve environmental outcomes, and contribute to safeguarding communities and their infrastructure against the effects of extreme weather events and other climate-related impacts.

Agencies implement NEPA through one of three levels of NEPA analysis: a Categorical Exclusion (CE); an Environmental Assessment (EA); or an Environmental Impact Statement (EIS).  This guidance is intended to help Federal agencies ensure their analysis of potential GHG emissions and effects of climate change in an EA or EIS is commensurate with the extent of the effects of the proposed action.[7]  Agencies have discretion in how they tailor their individual NEPA reviews to accommodate the approach outlined in this guidance, consistent with the CEQ Regulations and their respective implementing procedures and policies.[8]  CEQ does not expect that implementation of this guidance will require agencies to develop new NEPA implementing procedures.  However, CEQ recommends that agencies review their NEPA procedures and propose any updates they deem necessary or appropriate to facilitate their consideration of GHG emissions and climate change.[9]  CEQ will review agency

---

[6] The term "NEPA review" is used to include the analysis, process, and documentation required under NEPA.  While this document focuses on NEPA reviews, agencies are encouraged to analyze GHG emissions and climate-resilient design issues early in the planning and development of proposed actions and projects under their substantive authorities.
[7] *See* 40 CFR 1502.2(b) (Impacts shall be discussed in proportion to their significance); 40 CFR 1502.15 (Data and analyses in a statement shall be commensurate with the importance of the impact…).
[8] *See* 40 CFR 1502.24 (Methodology and scientific accuracy).
[9] *See* 40 CFR 1507.3.  Agency NEPA implementing procedures can be, but are not required to be, in the form of regulation.  Section 1507.3 encourages agencies to publish explanatory guidance, and agencies also should consider whether any updates to explanatory guidance are necessary.  Agencies should review their policies and implementing procedures and revise them as necessary to ensure full compliance with NEPA.

AR_0026390

proposals for revising their NEPA procedures, including any revision of CEs, in light of this guidance.

As discussed in this guidance, when addressing climate change agencies should consider: (1) The potential effects of a proposed action on climate change as indicated by assessing GHG emissions (e.g., to include, where applicable, carbon sequestration);[10] and, (2) The effects of climate change on a proposed action and its environmental impacts.

This guidance explains the application of NEPA principles and practices to the analysis of GHG emissions and climate change, and

- Recommends that agencies quantify a proposed agency action's projected direct and indirect GHG emissions, taking into account available data and GHG quantification tools that are suitable for the proposed agency action;

- Recommends that agencies use projected GHG emissions (to include, where applicable, carbon sequestration implications associated with the proposed agency action) as a proxy for assessing potential climate change effects when preparing a NEPA analysis for a proposed agency action;

- Recommends that where agencies do not quantify a proposed agency action's projected GHG emissions because tools, methodologies, or data inputs are not reasonably available to support calculations for a quantitative analysis, agencies include a qualitative analysis in the NEPA document and explain the basis for determining that quantification is not reasonably available;

---

[10] Carbon sequestration is the long-term carbon storage in plants, soils, geologic formations, and oceans.

AR_0026391

- Discusses methods to appropriately analyze reasonably foreseeable direct, indirect, and cumulative GHG emissions and climate effects;

- Guides the consideration of reasonable alternatives and recommends agencies consider the short- and long-term effects and benefits in the alternatives and mitigation analysis;

- Advises agencies to use available information when assessing the potential future state of the affected environment in a NEPA analysis, instead of undertaking new research, and provides examples of existing sources of scientific information;

- Counsels agencies to use the information developed during the NEPA review to consider alternatives that would make the actions and affected communities more resilient to the effects of a changing climate;

- Outlines special considerations for agencies analyzing biogenic carbon dioxide sources and carbon stocks associated with land and resource management actions under NEPA;

- Recommends that agencies select the appropriate level of NEPA review to assess the broad-scale effects of GHG emissions and climate change, either to inform programmatic (e.g., landscape-scale) decisions, or at both the programmatic and tiered project- or site-specific level, and to set forth a reasoned explanation for the agency's approach; and

- Counsels agencies that the "rule of reason" inherent in NEPA and the CEQ Regulations allows agencies to determine, based on their expertise and

AR_0026392

experience, how to consider an environmental effect and prepare an analysis based on the available information.

## II.    BACKGROUND

### A. NEPA

NEPA is designed to promote consideration of potential effects on the human environment[11] that would result from proposed Federal agency actions, and to provide the public and decision makers with useful information regarding reasonable alternatives[12] and mitigation measures to improve the environmental outcomes of Federal agency actions.  NEPA ensures that the environmental effects of proposed actions are taken into account before decisions are made and informs the public of significant environmental effects of proposed Federal agency actions, promoting transparency and accountability concerning Federal actions that may significantly affect the quality of the human environment.  NEPA reviews should identify measures to avoid, minimize, or mitigate adverse effects of Federal agency actions.  Better analysis and decisions are the ultimate goal of the NEPA process.[13]

Inherent in NEPA and the CEQ Regulations is a "rule of reason" that allows agencies to determine, based on their expertise and experience, how to consider an environmental effect and prepare an analysis based on the available information.  The usefulness of that information to the decision-making process and the public, and the

---

[11] 40 CFR 1508.14 ("'Human environment' shall be interpreted comprehensively to include the natural and physical environment and the relationship of people with that environment.").
[12] 40 CFR 1508.25(b) ("Alternatives, which include:  (1) No action alternative. (2) Other reasonable courses of actions. (3) Mitigation measures (not in the proposed action).").
[13] 40 CFR 1500.1(c) ("Ultimately, of course, it is not better documents but better decisions that count.  NEPA's purpose is not to generate paperwork—even excellent paperwork—but to foster excellent action.  The NEPA process is intended to help public officials make decisions that are based on understanding of environmental consequences, and take actions that protect, restore, and enhance the environment.").

AR_0026393

extent of the anticipated environmental consequences are important factors to consider when applying that "rule of reason."

B.  Climate Change

Climate change science continues to expand and refine our understanding of the impacts of anthropogenic GHG emissions.  CEQ's first Annual Report in 1970 referenced climate change, indicating that "[m]an may be changing his weather."[14]  At that time, the mean level of atmospheric carbon dioxide ($CO_2$) had been measured as increasing to 325 parts per million (ppm) from an average of 280 ppm pre-Industrial levels.[15]  Since 1970, the concentration of atmospheric carbon dioxide has increased to approximately 400 ppm (2015 globally averaged value).[16]  Since the publication of CEQ's first Annual Report, it has been determined that human activities have caused the carbon dioxide content of the atmosphere of our planet to increase to its highest level in at least 800,000 years.[17]

It is now well established that rising global atmospheric GHG emission concentrations are significantly affecting the Earth's climate.  These conclusions are built upon a scientific record that has been created with substantial contributions from the

---

[14] See CEQ, Environmental Quality  The First Annual Report, p. 93 (August 1970); available at https://ceq.doe.gov/ceq_reports/annual_environmental_quality_reports.html.
[15] See USGCRP, Climate Change Impacts in the United States  The Third National Climate Assessment (Jerry M. Melillo, Terese (T.C.) Richmond, & Gary W. Yohe eds., 2014) [hereinafter "Third National Climate Assessment"], Appendix 3  Climate Science Supplement, p. 739; EPA, April 2015: Inventory of U.S. Greenhouse Emissions and Sinks  1990-2013, available at https://www3.epa.gov/climatechange/Downloads/ghgemissions/US-GHG-Inventory-2015-Main-Text.pdf.  See also Hartmann, D.L., A.M.G. Klein Tank, M. Rusticucci, et al., 2013  Observations  Atmosphere and Surface. In  Climate Change 2013  The Physical Science Basis. Contribution of Working Group I to the Fifth Assessment Report of the Intergovernmental Panel on Climate Change [Stocker, T.F., D. Qin, G.-K., et al. (eds)]. Cambridge University Press: Cambridge, United Kingdom and New York, NY, USA. Available at http://www.ipcc.ch/pdf/assessment-report/ar5/wg1/WG1AR5_Chapter02_FinAl.pdf.
[16] See Ed Dlugokencky & Pieter Tans, National Oceanic and Atmospheric Administration/Earth System Research Laboratory, http://www.esrl.noaa.gov/gmd/ccgg/trends/global.html.
[17] See http://earthobservatory.nasa.gov/Features/CarbonCycle; University of California Riverside, National Aeronautics and Space Administration (NASA), and Riverside Unified School District, Down to Earth Climate Change, http://globalclimate.ucr.edu/resources.html; USGCRP, Third National Climate Assessment, Appendix 3  Climate Science Supplement, p. 736 ("Although climate changes in the past have been caused by natural factors, human activities are now the dominant agents of change. Human activities are affecting climate through increasing atmospheric levels of heat-trapping gases and other substances, including particles.").

AR_0026394

United States Global Change Research Program (USGCRP), which informs the United

States' response to global climate change through coordinated Federal programs of

research, education, communication, and decision support.[18]  Studies have projected the

effects of increasing GHGs on many resources normally discussed in the NEPA process,

including water availability, ocean acidity, sea-level rise, ecosystem functions, energy

production, agriculture and food security, air quality and human health.[19]

      Based primarily on the scientific assessments of the USGCRP, the National

Research Council, and the Intergovernmental Panel on Climate Change, in 2009 the

Environmental Protection Agency (EPA) issued a finding that the changes in our climate

caused by elevated concentrations of greenhouse gases in the atmosphere are reasonably

anticipated to endanger the public health and public welfare of current and future

generations.[20]  In 2015, EPA acknowledged more recent scientific assessments that

"highlight the urgency of addressing the rising concentration of $CO_2$ in the atmosphere,"

finding that certain groups are especially vulnerable to climate-related effects.[21]  Broadly

---

[18] *See* Global Change Research Act of 1990, Pub. L. 101–606, Sec. 103 (November 16, 1990).  For additional information on the United States Global Change Research Program [hereinafter "USGCRP"], visit http://www.globalchange.gov.  The USGCRP, formerly the Climate Change Science Program, coordinates and integrates the activities of 13 Federal agencies that conduct research on changes in the global environment and their implications for society.  The USGCRP began as a Presidential initiative in 1989 and was codified in the Global Change Research Act of 1990 (Public Law 101–606).  USGCRP-participating agencies are the Departments of Agriculture, Commerce, Defense, Energy, Interior, Health and Human Services, State, and Transportation; the U.S. Agency for International Development, the Environmental Protection Agency, NASA, the National Science Foundation, and the Smithsonian Institution.

[19] *See* USGCRP, *Third National Climate Assessment, available at* http://nca2014.globalchange.gov/system/files_force/downloads/low/NCA3_Climate_Change_Impacts_in_the_United%20States_Low Res.pdf?download=1; IPCC, *Climate Change 2014  Synthesis Report.  Contribution of Working Groups I, II and III to the Fifth Assessment Report of the Intergovernmental Panel on Climate Change* (R.K. Pachauri, & L.A. Meyer eds., 2014), *available at* https://www.ipcc.ch/pdf/assessment-report/ar5/syr/SYR_AR5_FINAL_full.pdf; *see also* http://www.globalchange.gov; 40 CFR 1508.8 (effects include ecological, aesthetic, historic, cultural, economic, social, and health effects); USGCRP, *The Impacts of Climate Change on Human Health in the United States  A Scientific Assessment, available at* https://health2016.globalchange.gov/.

[20] *See generally Endangerment and Cause or Contribute Findings for Greenhouse Gases Under Section 202(a) of the Clean Air Act,* 74 Fed. Reg. 66496 (Dec. 15, 2009).  (For example, at 66497-98: "[t]he evidence concerning how human-induced climate change may alter extreme weather events also clearly supports a finding of endangerment, given the serious adverse impacts that can result from such events and the increase in risk, even if small, of the occurrence and intensity of events such as hurricanes and floods. Additionally, public health is expected to be adversely affected by an increase in the severity of coastal storm events due to rising sea levels").

[21] *See* EPA, *Final Rule for Carbon Pollution Emission Guidelines for Existing Stationary Sources  Electric Utility Generating Units,* 80 Fed. Reg. 64661, 64677 (Oct. 23, 2015) ("Certain groups, including children, the elderly, and the poor, are most vulnerable to climate-related effects. Recent studies also find that certain communities, including low-income communities and some communities of color … are disproportionately affected by certain climate change related impacts—including heat waves, degraded air quality, and

8

stated, the effects of climate change observed to date and projected to occur in the future include more frequent and intense heat waves, longer fire seasons and more severe wildfires, degraded air quality, more heavy downpours and flooding, increased drought, greater sea-level rise, more intense storms, harm to water resources, harm to agriculture, ocean acidification, and harm to wildlife and ecosystems.[22]

III.   <u>CONSIDERING THE EFFECTS OF GHG EMISSIONS AND CLIMATE CHANGE</u>

This guidance is applicable to all Federal actions subject to NEPA, including site-specific actions, certain funding of site-specific projects, rulemaking actions, permitting decisions, and land and resource management decisions.[23]  This guidance does not – and cannot – expand the range of Federal agency actions that are subject to NEPA. Consistent with NEPA, Federal agencies should consider the extent to which a proposed action and its reasonable alternatives would contribute to climate change, through GHG emissions, and take into account the ways in which a changing climate may impact the proposed action and any alternative actions, change the action's environmental effects over the lifetime of those effects, and alter the overall environmental implications of such actions.

This guidance is intended to assist agencies in disclosing and considering the effects of GHG emissions and climate change along with the other reasonably foreseeable environmental effects of their proposed actions.  This guidance does not establish any

---

extreme weather events—which are associated with increased deaths, illnesses, and economic challenges. Studies also find that climate change poses particular threats to the health, well-being, and ways of life of indigenous peoples in the U.S.").
[22] *See* http://www.globalchange.gov/climate-change/impacts-society and Third National Climate Assessment, Chapters 3-15 (Sectors) and Chapters 16-25 (Regions), *available at* http://nca2014.globalchange.gov/downloads.
[23] *See* 40 CFR 1508.18.

AR_0026396

particular quantity of GHG emissions as "significantly" affecting the quality of the human environment or give greater consideration to the effects of GHG emissions and climate change over other effects on the human environment.

A.  GHG Emissions as a Proxy for the Climate Change Impacts of a Proposed Action

In light of the global scope of the impacts of GHG emissions, and the incremental contribution of each single action to global concentrations, CEQ recommends agencies use the projected GHG emissions associated with proposed actions as a proxy for assessing proposed actions' potential effects on climate change in NEPA analysis.[24]  This approach, together with providing a qualitative summary discussion of the impacts of GHG emissions based on authoritative reports such as the USGCRP's National Climate Assessments and the Impacts of Climate Change on Human Health in the United States, a Scientific Assessment of the USGCRP, allows an agency to present the environmental and public health impacts of a proposed action in clear terms and with sufficient information to make a reasoned choice between no action and other alternatives and appropriate mitigation measures, and to ensure the professional and scientific integrity of the NEPA review.[25]

Climate change results from the incremental addition of GHG emissions from millions of individual sources,[26] which collectively have a large impact on a global scale.

---

[24] *See* 40 CFR 1502.16, 1508.9.

[25] *See* 40 CFR 1500.1, 1502.24 (requiring agencies to use high quality information and ensure the professional and scientific integrity of the discussions and analyses in environmental impact statements).

[26] Some sources emit GHGs in quantities that are orders of magnitude greater than others. *See* EPA, *Greenhouse Gas Reporting Program 2014 Reported Data*, Figure 2: Direct GHG Emissions Reported by Sector (2014), *available at* https://www.epa.gov/ghgreporting/ghgrp-2014-reported-data (amounts of GHG emissions by sector); *Final Rule for Carbon Pollution Emission Guidelines for Existing Stationary Sources Electric Utility Generating Units*, 80 Fed. Reg. 64661, 64663, 64689 (Oct. 23, 2015) (regulation of GHG emissions from fossil fuel-fired electricity generating power plants); *Oil and Natural Gas Sector Emission Standards for New, Reconstructed, and Modified Sources*, 81 Fed. Reg. 34824, 35830 (June 3, 2016 (regulation of GHG emissions from oil and gas sector).

AR_0026397

CEQ recognizes that the totality of climate change impacts is not attributable to any single action, but are exacerbated by a series of actions including actions taken pursuant to decisions of the Federal Government. Therefore, a statement that emissions from a proposed Federal action represent only a small fraction of global emissions is essentially a statement about the nature of the climate change challenge, and is not an appropriate basis for deciding whether or to what extent to consider climate change impacts under NEPA. Moreover, these comparisons are also not an appropriate method for characterizing the potential impacts associated with a proposed action and its alternatives and mitigations because this approach does not reveal anything beyond the nature of the climate change challenge itself: the fact that diverse individual sources of emissions each make a relatively small addition to global atmospheric GHG concentrations that collectively have a large impact. When considering GHG emissions and their significance, agencies should use appropriate tools and methodologies for quantifying GHG emissions and comparing GHG quantities across alternative scenarios. Agencies should not limit themselves to calculating a proposed action's emissions as a percentage of sector, nationwide, or global emissions in deciding whether or to what extent to consider climate change impacts under NEPA.

### 1. GHG Emissions Quantification and Relevant Tools

This guidance recommends that agencies quantify a proposed agency action's projected direct and indirect GHG emissions. Agencies should be guided by the principle that the extent of the analysis should be commensurate with the quantity of projected GHG emissions and take into account available data and GHG quantification tools that

AR_0026398

are suitable for and commensurate with the proposed agency action.[27]  The rule of reason

and the concept of proportionality caution against providing an in-depth analysis of

emissions regardless of the insignificance of the quantity of GHG emissions that would

be caused by the proposed agency action.

Quantification tools are widely available, and are already in broad use in the

Federal and private sectors, by state and local governments, and globally.[28]  Such

quantification tools and methodologies have been developed to assist institutions,

organizations, agencies, and companies with different levels of technical sophistication,

data availability, and GHG source profiles.  When data inputs are reasonably available to

support calculations, agencies should conduct GHG analysis and disclose quantitative

estimates of GHG emissions in their NEPA reviews.  These tools can provide estimates

of GHG emissions, including emissions from fossil fuel combustion and estimates of

GHG emissions and carbon sequestration for many of the sources and sinks potentially

affected by proposed resource management actions.[29]  When considering which tool(s) to

employ, it is important to consider the proposed action's temporal scale, and the

availability of input data.[30]  Examples of the kinds of methodologies agencies might

consider using are presented in CEQ's 2012 Guidance for Accounting and Reporting

GHG Emissions for a wide variety of activities associated with Federal agency

operations.[31]  When an agency determines that quantifying GHG emissions would not be

---

[27] *See* 40 CFR 1500.1(b) ("Most important, NEPA documents must concentrate on the issues that are truly significant to the action in question, rather than amassing needless detail."); 40 CFR 1502.2(b) (Impacts shall be discussed in proportion to their significance); 40 CFR 1502.15 (Data and analyses in a statement shall be commensurate with the importance of the impact…).
[28] *See* https://ceq.doe.gov/current_developments/GHG-accounting-tools.html.
[29] For example, USDA's COMET-Farm tool can be used to assess the carbon sequestration of existing agricultural activities along with the reduction in carbon sequestration (emissions) of project-level activities, http://cometfarm.nrel.colostate.edu/. Examples of other tools are available at https://ceq.doe.gov/current_developments/GHG-accounting-tools.html.
[30] *See* 40 CFR 1502.22.
[31] *See* https://www.whitehouse.gov/sites/default/files/microsites/ceq/revised_federal_greenhouse_gas_accounting_and_reporting_guidance_

AR_0026399

warranted because tools, methodologies, or data inputs are not reasonably available, the agency should provide a qualitative analysis and its rationale for determining that the quantitative analysis is not warranted. A qualitative analysis can rely on sector-specific descriptions of the GHG emissions of the category of Federal agency action that is the subject of the NEPA analysis.

When updating their NEPA procedures[32] and guidance, agencies should coordinate with CEQ to identify 1) the actions that normally warrant quantification of their GHG emissions, and consideration of the relative GHG emissions associated with alternative actions and 2) agency actions that normally do not warrant such quantification because tools, methodologies, or data inputs are not reasonably available. The determination of the potential significance of a proposed action remains subject to agency practice for the consideration of context and intensity, as set forth in the CEQ Regulations.[33]

## 2. The Scope of the Proposed Action

In order to assess effects, agencies should take account of the proposed action – including "connected" actions[34] – subject to reasonable limits based on feasibility and practicality. Activities that have a reasonably close causal relationship to the Federal action, such as those that may occur as a predicate for a proposed agency action or as a consequence of a proposed agency action, should be accounted for in the NEPA analysis.

---

060412.pdf. Federal agencies' Strategic Sustainability Performance Plans reflecting their annual GHG inventories and reports under Executive Order 13514 are available at https://www.performance.gov/node/3406/view?view=public#supporting-info.
[32] *See* 40 CFR 1507.3.
[33] 40 CFR 1508.27 ("'Significantly' as used in NEPA requires considerations of both context and intensity: (a) Context. This means that the significance of an action must be analyzed in several contexts such as society as a whole (human, national), the affected region, the affected interests, and the locality. . . . (b) Intensity. This refers to the severity of impact.").
[34] 40 CFR 1508.25(a) (Actions are connected if they: (i) Automatically trigger other actions which may require environmental impact statements; (ii) Cannot or will not proceed unless other actions are taken previously or simultaneously, or; (iii) Are interdependent parts of a larger action and depend on the larger action for their justification.).

AR_0026400

For example, NEPA reviews for proposed resource extraction and development projects typically include the reasonably foreseeable effects of various phases in the process, such as clearing land for the project, building access roads, extraction, transport, refining, processing, using the resource, disassembly, disposal, and reclamation. Depending on the relationship between any of the phases, as well as the authority under which they may be carried out, agencies should use the analytical scope that best informs their decision making.

The agency should focus on significant potential effects and conduct an analysis that is proportionate to the environmental consequences of the proposed action.[35] Agencies can rely on basic NEPA principles to determine and explain the reasonable parameters of their analyses in order to disclose the reasonably foreseeable effects that may result from their proposed actions.[36]

### 3. Alternatives

Considering alternatives, including alternatives that mitigate GHG emissions, is fundamental to the NEPA process and accords with NEPA Sections 102(2)(C) and 102(2)(E). [37] The CEQ regulations emphasize that the alternatives analysis is the heart of the EIS under NEPA Section 102(2)(C).[38] NEPA Section 102(2)(E) provides an independent requirement for the consideration of alternatives in environmental documents.[39] NEPA calls upon agencies to use the NEPA process to "identify and assess the reasonable alternatives to proposed actions that will avoid or minimize adverse effects of these actions upon the quality of the human environment."[40] The requirement to

---

[35] *See* 40 CFR 1501.7(a)(3), 1502.2(b), and 1502.15.
[36] *See* 40 CFR 1502.16.
[37] 42 U.S.C. 4332(2)(C), 4332(2)(E); 40 CFR 1502.14, 1508.9(b).
[38] 40 CFR 1502.14.
[39] *See* 40 CFR 1500.2, 1508.9(b).
[40] 40 CFR 1500.2(c).

14

consider alternatives ensures that agencies account for approaches with no, or less, adverse environmental effects for a particular resource.

Consideration of alternatives also provides each agency decision maker the information needed to examine other possible approaches to a particular proposed action (including the no action alternative) that could alter the environmental impact or the balance of factors considered in making the decision. Agency decisions are aided when there are reasonable alternatives that allow for comparing GHG emissions and carbon sequestration potential, trade-offs with other environmental values, and the risk from – and resilience to – climate change inherent in a proposed action and its design.

Agencies must consider a range of reasonable alternatives consistent with the level of NEPA review (e.g., EA or EIS) and the purpose and need for the proposed action, as well as reasonable mitigation measures if not already included in the proposed action or alternatives.[41] Accordingly, a comparison of these alternatives based on GHG emissions and any potential mitigation measures can be useful to advance a reasoned choice among alternatives and mitigation actions. When conducting the analysis, an agency should compare the anticipated levels of GHG emissions from each alternative – including the no-action alternative – and mitigation actions to provide information to the public and enable the decision maker to make an informed choice.

Agencies should consider reasonable alternatives and mitigation measures to reduce action-related GHG emissions or increase carbon sequestration in the same fashion as they consider alternatives and mitigation measures for any other environmental effects. NEPA, the CEQ Regulations, and this guidance do not require the decision

---

[41] *See* 42 U.S.C. 4332(2)(C), 4332(2)(E), and 40 CFR 1502.14(f), 1508.9(b). The purpose and need for action usually reflects both the extent of the agency's statutory authority and its policies.

15

AR_0026402

maker to select the alternative with the lowest net level of emissions. Rather, they allow for the careful consideration of emissions and mitigation measures along with all the other factors considered in making a final decision.

### 4. Direct and Indirect Effects

If the direct and indirect GHG emissions can be quantified based on available information, including reasonable projections and assumptions, agencies should consider and disclose the reasonably foreseeable direct and indirect emissions when analyzing the direct and indirect effects of the proposed action.[42]  Agencies should disclose the information and any assumptions used in the analysis and explain any uncertainties.

To compare a project's estimated direct and indirect emissions with GHG emissions from the no-action alternative, agencies should draw on existing, timely, objective, and authoritative analyses, such as those by the Energy Information Administration, the Federal Energy Management Program, or Office of Fossil Energy of the Department of Energy.[43]  In the absence of such analyses, agencies should use other available information.  When such analyses or information for quantification is unavailable, or the complexity of comparing emissions from various sources would make quantification overly speculative, then the agency should quantify emissions to the extent that this information is available and explain the extent to which quantified emissions information is unavailable while providing a qualitative analysis of those emissions.  As

---

[42] For example, where the proposed action involves fossil fuel extraction, direct emissions typically include GHGs emitted during the process of exploring for or extracting the fossil fuel.  The indirect effects of such an action that are reasonably foreseeable at the time would vary with the circumstances of the proposed action.  For actions such as a Federal lease sale of coal for energy production, the impacts associated with the end-use of the fossil fuel being extracted would be the reasonably foreseeable combustion of that coal.
[43] For a current example, see Office of Fossil Energy, Nat'l Energy Tech. Lab., U.S. Dep't of Energy, *Life Cycle Greenhouse Gas Perspective on Exporting Liquefied Natural Gas from the United States*, Pub. No. DOE/NETL-2014/1649 (2014), *available at* http://energy.gov/sites/prod/files/2014/05/f16/Life%20Cycle%20GHG%20Perspective%20Report.pdf.

AR_0026403

with any NEPA analysis, the level of effort should be proportionate to the scale of the emissions relevant to the NEPA review.

5.   Cumulative Effects

"Cumulative impact" is defined in the CEQ Regulations as the "impact on the environment that results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions."[44]  All GHG emissions contribute to cumulative climate change impacts.  However, for most Federal agency actions CEQ does not expect that an EIS would be required based *solely* on the global significance of cumulative impacts of GHG emissions, as it would not be consistent with the rule of reason to require the preparation of an EIS for every Federal action that may cause GHG emissions regardless of the magnitude of those emissions.

Based on the agency identification and analysis of the direct and indirect effects of its proposed action, NEPA requires an agency to consider the cumulative impacts of its proposed action and reasonable alternatives.[45]  As noted above, for the purposes of NEPA, the analysis of the effects of GHG emissions is essentially a cumulative effects analysis that is subsumed within the general analysis and discussion of climate change impacts.  Therefore, direct and indirect effects analysis for GHG emissions will adequately address the cumulative impacts for climate change from the proposed action and its alternatives and a separate cumulative effects analysis for GHG emissions is not needed.

6.   Short- and Long-Term Effects

---

[44] 40 CFR 1508.7.
[45] *See* 40 CFR 1502.16, 1508.7, 1508.8.  *See also* CEQ Memorandum to Heads of Federal Agencies, *Guidance on the Consideration of Past Actions in Cumulative Effects Analysis*, June 24, 2005, *available at* https://ceq.doe.gov/nepa/regs/Guidance_on_CE.pdf.

AR_0026404

When considering effects, agencies should take into account both the short- and long-term adverse and beneficial effects using a temporal scope that is grounded in the concept of reasonable foreseeability.  Some proposed actions will have to consider effects at different stages to ensure the direct effects and reasonably foreseeable indirect effects are appropriately assessed; for example, the effects of construction are different from the effects of the operations and maintenance of a facility.

Biogenic GHG emissions and carbon stocks from some land or resource management activities, such as a prescribed burn of a forest or grassland conducted to limit loss of ecosystem function through wildfires or insect infestations, may result in short-term GHG emissions and loss of stored carbon, while in the longer term a restored, healthy ecosystem may provide long-term carbon sequestration.  Therefore, the short- and long-term effects should be described in comparison to the no action alternative in the NEPA review.

### 7.  Mitigation

Mitigation is an important component of the NEPA process that Federal agencies can use to avoid, minimize, and compensate for the adverse environmental effects associated with their actions.  Mitigation, by definition, includes avoiding impacts, minimizing impacts by limiting them, rectifying the impact, reducing or eliminating the impacts over time, or compensating for them.[46]  Consequently, agencies should consider reasonable mitigation measures and alternatives as provided for under existing CEQ Regulations and take into account relevant agency statutory authorities and policies.  The NEPA process is also intended to provide useful advice and information to State, local

---

[46] *See* 40 CFR 1508.20, 1508.25 (Alternatives include mitigation measures not included in the proposed action).

18

and tribal governments and private parties so that the agencies can better coordinate with other agencies and organizations regarding the means to mitigate effects of their actions.[47]  The NEPA process considers the effects of mitigation commitments made by project proponents or others and mitigation required under other relevant permitting and environmental review regimes.[48]

As Federal agencies evaluate potential mitigation of GHG emissions and the interaction of a proposed action with climate change, the agencies should also carefully evaluate the quality of that mitigation to ensure it is additional, verifiable, durable, enforceable, and will be implemented.[49]  Agencies should consider the potential for mitigation measures to reduce or mitigate GHG emissions and climate change effects when those measures are reasonable and consistent with achieving the purpose and need for the proposed action.  Such mitigation measures could include enhanced energy efficiency, lower GHG-emitting technology, carbon capture, carbon sequestration (e.g., forest, agricultural soils, and coastal habitat restoration), sustainable land management practices, and capturing or beneficially using GHG emissions such as methane.

Finally, the CEQ Regulations and guidance recognize the value of monitoring to ensure that mitigation is carried out as provided in a record of decision or finding of no significant impact.[50]  The agency's final decision on the proposed action should identify those mitigation measures that the agency commits to take, recommends, or requires

---

[47] NEPA directs Federal agencies to make "advice and information useful in restoring, maintaining, and enhancing the quality of the environment" available to States, Tribes, counties, cities, institutions and individuals.  NEPA Sec. 102(2)(G).

[48] See CEQ Memorandum to Heads of Federal Agencies, *Appropriate Use of Mitigation and Monitoring and Clarifying the Appropriate Use of Mitigated Findings of No Significant Impact*, 76 FR 3843 (Jan. 21, 2011) *available at* https://ceq.doe.gov/current_developments/docs/Mitigation_and_Monitoring_Guidance_14Jan2011.pdf.

[49] See Presidential Memorandum: *Mitigating Impacts on Natural Resources from Development and Encouraging Related Private Investment* (https://www.whitehouse.gov/the-press-office/2015/11/03/mitigating-impacts-natural-resources-development-and-encouraging-related) defining "durability" and addressing additionality.

[50] See 40 CFR 1505.2(c), 1505.3.  *See also* CEQ Memorandum to Heads of Federal Agencies, *Appropriate Use of Mitigation and Monitoring and Clarifying the Appropriate Use of Mitigated Findings of No Significant Impact*, 76 FR 3843 (Jan. 21, 2011) *available at* https://ceq.doe.gov/current_developments/docs/Mitigation_and_Monitoring_Guidance_14Jan2011.pdf.

AR_0026406

others to take.  Monitoring is particularly appropriate to confirm the effectiveness of

mitigation when that mitigation is adopted to reduce the impacts of a proposed action on

affected resources already increasingly vulnerable due to climate change.

### B. CONSIDERING THE EFFECTS OF CLIMATE CHANGE ON A PROPOSED ACTION AND ITS ENVIRONMENTAL IMPACTS

According to the USGCRP and others, GHGs already in the atmosphere will

continue altering the climate system into the future, even with current or future emissions

control efforts.[51]  Therefore, a NEPA review should consider an action in the context of

the future state of the environment.  In addition, climate change adaptation and resilience

— defined as adjustments to natural or human systems in response to actual or expected

climate changes — are important considerations for agencies contemplating and planning

actions with effects that will occur both at the time of implementation and into the

future.[52]

### 1. Affected Environment

An agency should identify the affected environment to provide a basis for

comparing the current and the future state of the environment as affected by the proposed

action or its reasonable alternatives.[53]  The current and projected future state of the

environment without the proposed action (i.e., the no action alternative) represents the

reasonably foreseeable affected environment, and this should be described based on

---

[51] *See* Third National Climate Assessment, *Appendix 3  Climate Science Supplement* 753-754, *available at* http://s3.amazonaws.com/nca2014/low/NCA3_Full_Report_Appendix_3_Climate_Science_Supplement_LowRes.pdf?download=1.
[52] *See* Third National Climate Assessment, Chapter 28, "Adaptation" and Chapter 26, "Decision Support:  Connecting Science, Risk Perception, and Decisions," *available at* http://www.globalchange.gov/nca3-downloads-materials; see also, Exec. Order No. 13653, 78 Fed. Reg. 66817 (Nov. 6, 2013) and Exec. Order No.13693, *Planning for Federal Sustainability in the Next Decade*, 80 Fed. Reg. 15869 (Mach 25, 2015) (defining "climate-resilient design").
[53] *See* 40 CFR 1502.15 (providing that environmental impact statements shall succinctly describe the environmental impacts on the area(s) to be affected or created by the alternatives under consideration).

AR_0026407

authoritative climate change reports,[54] which often project at least two possible future scenarios.[55] The temporal bounds for the state of the environment are determined by the projected initiation of implementation and the expected life of the proposed action and its effects.[56] Agencies should remain aware of the evolving body of scientific information as more refined estimates of the impacts of climate change, both globally and at a localized level, become available.[57]

2. Impacts

The analysis of climate change impacts should focus on those aspects of the human environment that are impacted by both the proposed action and climate change. Climate change can make a resource, ecosystem, human community, or structure more susceptible to many types of impacts and lessen its resilience to other environmental impacts apart from climate change. This increase in vulnerability can exacerbate the effects of the proposed action. For example, a proposed action may require water from a stream that has diminishing quantities of available water because of decreased snow pack in the mountains, or add heat to a water body that is already warming due to increasing atmospheric temperatures. Such considerations are squarely within the scope of NEPA and can inform decisions on whether to proceed with, and how to design, the proposed action to eliminate or mitigate impacts exacerbated by climate change. They can also

---

[54] *See, e.g.,* Third National Climate Assessment (Regional impacts chapters) *available at* http://www.globalchange.gov/nca3-downloads-materials.
[55] *See, e.g.,* Third National Climate Assessment (Regional impacts chapters, considering a low future global emissions scenario, and a high emissions scenario) *available at* http://www.globalchange.gov/nca3-downloads-materials.
[56] CEQ, *Considering Cumulative Effects Under the National Environmental Policy Act* (1997), https://ceq.doe.gov/publications/cumulative_effects.html. Agencies should also consider their work under Exec. Order No. 13653, *Preparing the United States for the Impacts of Climate Change*, 78 Fed. Reg. 66817 (Nov. 6, 2013), that considers how capital investments will be affected by a changing climate over time.
[57] *See, e.g.,* http://nca2014.globalchange.gov/report/regions/coasts.

21

AR_0026408

inform possible adaptation measures to address the impacts of climate change, ultimately enabling the selection of smarter, more resilient actions.

### 3. Available Assessments and Scenarios

In accordance with NEPA's rule of reason and standards for obtaining information regarding reasonably foreseeable effects on the human environment, agencies need not undertake new research or analysis of potential climate change impacts in the proposed action area, but may instead summarize and incorporate by reference the relevant scientific literature.[58] For example, agencies may summarize and incorporate by reference the relevant chapters of the most recent national climate assessments or reports from the USGCRP.[59] Particularly relevant to some proposed actions are the most current reports on climate change impacts on water resources, ecosystems, agriculture and forestry, health, coastlines, and ocean and arctic regions in the United States.[60] Agencies may recognize that scenarios or climate modeling information (including seasonal, inter-annual, long-term, and regional-scale projections) are widely used, but when relying on a single study or projection, agencies should consider their limitations and discuss them.[61]

### 4. Opportunities for Resilience and Adaptation

As called for under NEPA, the CEQ Regulations, and CEQ guidance, the NEPA review process should be integrated with agency planning at the earliest possible time that would allow for a meaningful analysis.[62] Information developed during early

---

[58] *See* 40 CFR 1502.21 (material may be incorporated by reference if it is reasonably available for inspection by potentially interested persons during public review and comment).
[59] *See* http://www.globalchange.gov/browse/reports.
[60] *See* Third National Climate Assessment, *Our Changing Climate, available at* http://nca2014.globalchange.gov/report. Agencies should consider the latest final assessments and reports when they are updated.
[61] *See* 40 CFR 1502.22. Agencies can consult www.data.gov/climate/portals for model data archives, visualization tools, and downscaling results.
[62] *See* 42 U.S.C. 4332 ("agencies of the Federal Government shall … utilize a systematic, interdisciplinary approach which will insure the integrated use of the natural and social sciences and the environmental design arts in planning and in decision-making"); 40 CFR 1501.2 ("Agencies shall integrate the NEPA process with other planning at the earliest possible time…"); *See also* CEQ Memorandum

AR_0026409

planning processes that precede a NEPA review may be incorporated into the NEPA review. Decades of NEPA practice have shown that integrating environmental considerations with the planning process provides useful information that program and project planners can consider in the design of the proposed action, alternatives, and potential mitigation measures. For instance, agencies should take into account increased risks associated with development in floodplains, avoiding such development wherever there is a practicable alternative, as required by Executive Order 11988 and Executive Order 13690.[63] In addition, agencies should take into account their ongoing efforts to incorporate environmental justice principles into their programs, policies, and activities, including the environmental justice strategies required by Executive Order 12898, as amended, and consider whether the effects of climate change in association with the effects of the proposed action may result in a disproportionate effect on minority and low income communities.[64] Agencies also may consider co-benefits of the proposed action, alternatives, and potential mitigation measures for human health, economic and social stability, ecosystem services, or other benefit that increases climate change preparedness or resilience. Individual agency adaptation plans and interagency adaptation strategies, such as agency Climate Adaptation Plans, the National Fish, Wildlife and Plants Climate Adaptation Strategy, and the National Action Plan: Priorities for Managing Freshwater

---

for Heads of Federal Departments and Agencies, *Improving the Process for Preparing Efficient and Timely Environmental Reviews under the National Environmental Policy Act*, 77 Fed. Reg. 14473 (Mar. 12, 2012), *available at* https://ceq.doe.gov/current_developments/docs/Improving_NEPA_Efficiencies_06Mar2012.pdf.

[63] *See* Exec. Order No. 11988, "Floodplain Management," 42 Fed. Reg. 26951 (May 24, 1977), *available at* http://www.archives.gov/federal-register/codification/executive-order/11988.html; Exec. Order No. 13690, *Establishing a Federal Flood Risk Management Standard and a Process for Further Soliciting and Considering Stakeholder Input*, 80 Fed. Reg. 6425 (Jan. 30, 2015), *available at* https://www.gpo.gov/fdsys/pkg/FR-2015-02-04/pdf/2015-02379.pdf.

[64] *See* Exec. Order No. 12898, *Federal Actions to Address Environmental Justice in Minority and Low-Income Populations*, 59 Fed. Reg. 7629 (Feb. 16, 1994), *available at* https://ceq.doe.gov/nepa/regs/eos/ii-5.pdf; CEQ, *Environmental Justice Guidance Under the National Environmental Policy Act* (Dec. 1997), *available at* http://ceq.doe.gov/nepa/regs/ej/justice.pdf.

AR_0026410

Resources in a Changing Climate, provide other good examples of the type of relevant and useful information that can be considered.[65]

Climate change effects on the environment and on the proposed project should be considered in the analysis of a project considered vulnerable to the effects of climate change such as increasing sea level, drought, high intensity precipitation events, increased fire risk, or ecological change.  In such cases, a NEPA review will provide relevant information that agencies can use to consider in the initial project design, as well as alternatives with preferable overall environmental outcomes and improved resilience to climate impacts.  For example, an agency considering a proposed long-term development of transportation infrastructure on a coastal barrier island should take into account climate change effects on the environment and, as applicable, consequences of rebuilding where sea level rise and more intense storms will shorten the projected life of the project and change its effects on the environment.[66]  Given the length of time involved in present sea level projections, such considerations typically will not be relevant to short-term actions with short-term effects.

In addition, the particular impacts of climate change on vulnerable communities may be considered in the design of the action or the selection among alternatives to

---

[65] *See* http://sustainability.performance.gov for agency sustainability plans, which contain agency adaptation plans.  *See also* http://www.wildlifeadaptationstrategy.gov;
http://www.whitehouse.gov/sites/default/files/microsites/ceq/2011_national_action_plan.pdf; and
https://www.epa.gov/greeningepa/climate-change-adaptation-plans
[66] *See* U.S. Department of Transportation, Gulf Coast Study, Phase 2, *Assessing Transportation Vulnerability to Climate Change Synthesis of Lessons Learned and Methods Applied*, FHWA-HEP-15-007 (Oct. 2014) (focusing on the Mobile, Alabama region), *available at*
http://www.fhwa.dot.gov/environment/climate_change/adaptation/ongoing_and_current_research/gulf_coast_study/phase2_task6/fhwahep15007.pdf; U.S. Climate Change Science Program, Synthesis and Assessment Product 4.7, Impacts of Climate Change and Variability on Transportation Systems and Infrastructure: Gulf Coast Study, Phase I (Mar. 2008) (focusing on a regional scale in the central Gulf Coast), *available at* https://downloads.globalchange.gov/sap/sap4-7/sap4-7-final-all.pdf.  Information about the Gulf Coast Study is *available at*
http://www.fhwa.dot.gov/environment/climate_change/adaptation/ongoing_and_current_research/gulf_coast_study.  *See also* Third National Climate Assessment, Chapter 28, "Adaptation," at 675 (noting that Federal agencies in particular can facilitate climate adaptation by "ensuring the establishment of federal policies that allow for "flexible" adaptation efforts and take steps to avoid unintended consequences"), *available at* http://nca2014.globalchange.gov/report/response-strategies/adaptation#intro-section-2.

AR_0026411

assess the impact, and potential for disproportionate impacts, on those communities.[67] For example, chemical facilities located near the coastline could have increased risk of spills or leakages due to sea level rise or increased storm surges, putting local communities and environmental resources at greater risk. Increased resilience could minimize such potential future effects. Finally, considering climate change preparedness and resilience can help ensure that agencies evaluate the potential for generating additional GHGs if a project has to be replaced, repaired, or modified, and minimize the risk of expending additional time and funds in the future.

C. <u>Special Considerations for Biogenic Sources of Carbon</u>

With regard to biogenic GHG emissions from land management actions – such as prescribed burning, timber stand improvements, fuel load reductions, scheduled harvesting, and livestock grazing – it is important to recognize that these land management actions involve GHG emissions and carbon sequestration that operate within the global carbon and nitrogen cycle, which may be affected by those actions. Similarly, some water management practices have GHG emission consequences (e.g., reservoir management practices can reduce methane releases, wetlands management practices can enhance carbon sequestration, and water conservation can improve energy efficiency).

Notably, it is possible that the net effect of ecosystem restoration actions resulting in short-term biogenic emissions may lead to long-term reductions of atmospheric GHG concentrations through increases in carbon stocks or reduced risks of future emissions. In the land and resource management context, how a proposed action affects a net carbon sink or source will depend on multiple factors such as the climatic region, the distribution

---

[67] For an example, *see* https://www.blm.gov/epl-front-office/projects/nepa/5251/42462/45213/NPR-A_FINAL_ROD_2-21-13.pdf.

AR_0026412

of carbon across carbon pools in the project area, and the ongoing activities and trends. In addressing biogenic GHG emissions, resource management agencies should include a comparison of estimated net GHG emissions and carbon stock changes that are projected to occur with and without implementation of proposed land or resource management actions.[68] This analysis should take into account the GHG emissions, carbon sequestration potential, and the changes in carbon stocks that are relevant to decision making in light of the proposed actions and timeframes under consideration.

One example of agencies dealing with biogenic emissions and carbon sequestration arises when agencies consider proposed vegetation management practices that affect the risk of wildfire, insect and disease outbreak, or other disturbance. The public and the decision maker may benefit from consideration of the influence of a vegetation management action that affects the risk of wildfire on net GHG emissions and carbon stock changes. NEPA reviews should consider whether to include a comparison of net GHG emissions and carbon stock changes that are anticipated to occur, with and without implementation of the proposed vegetation management practice, to provide information that is useful to the decision maker and the public to distinguish between alternatives. The analysis would take into account the estimated GHG emissions (biogenic and fossil), carbon sequestration potential, and the net change in carbon stocks relevant in light of the proposed actions and timeframes under consideration. In such cases the agency should describe the basis for estimates used to project the probability or likelihood of occurrence or changes in the effects or severity of wildfire. Where such

---

[68] One example of a tool for such calculations is the Carbon On Line Estimator (COLE), which uses data based on USDA Forest Service Forest Inventory & Analysis and Resource Planning Assessment data and other ecological data. COLE began as a collaboration between the National Council for Air and Stream Improvement, Inc. (NCASI) and USDA Forest Service, Northern Research Station. It currently is maintained by NCASI. It is available at http://www.fs.usda.gov/ccrc/tools/cole.

AR_0026413

tools, methodologies, or data are not yet available, the agency should provide a qualitative analysis and its rationale for determining that the quantitative analysis is not warranted.  As with any other analysis, the rule of reason and proportionality should be applied to determine the extent of the analysis.

CEQ acknowledges that Federal land and resource management agencies are developing agency-specific principles and guidance for considering biological carbon in management and planning decisions.[69]  Such guidance is expected to address the importance of considering biogenic carbon fluxes and storage within the context of other management objectives and ecosystem service goals, and integrating carbon considerations as part of a balanced and comprehensive program of sustainable management, climate change mitigation, and climate change adaptation.

## IV.    TRADITIONAL NEPA TOOLS AND PRACTICES

### A.  Scoping and Framing the NEPA Review

To effectuate integrated decision making, avoid duplication, and focus the NEPA review, the CEQ Regulations provide for scoping.[70]  In scoping, the agency determines the issues that the NEPA review will address and identifies the impacts related to the proposed action that the analyses will consider.[71]  An agency can use the scoping process to help it determine whether analysis is relevant and, if so, the extent of analysis

---

[69] *See* Council on Climate Change Preparedness and Resilience, *Priority Agenda Enhancing the Climate Resilience of America's Natural Resources*, at 52 (Oct. 2014), *available at* http://www.whitehouse.gov/sites/default/files/docs/enhancing_climate_resilience_of_americas_natural_resources.pdf.
[70] *See* 40 CFR 1501.7 ("There shall be an early and open process for determining the scope of issues to be addressed and for identifying the significant issues related to a proposed action.  This process shall be termed scoping."); *see also* CEQ Memorandum for Heads of Federal Departments and Agencies, *Improving the Process for Preparing Efficient and Timely Environmental Reviews under the National Environmental Policy Act*, March 6, 2012, *available at* https://ceq.doe.gov/current_developments/docs/Improving_NEPA_Efficiencies_06Mar2012.pdf (the CEQ Regulations explicitly require scoping for preparing an EIS, however, agencies can also take advantage of scoping whenever preparing an EA).
[71] *See* 40 CFR 1500.4(b), 1500.4(g), 1501.7.

AR_0026414

appropriate for a proposed action.[72]  When scoping for the climate change issues associated with the proposed agency action, the nature, location, timeframe, and type of the proposed action and the extent of its effects will help determine the degree to which to consider climate projections, including whether climate change considerations warrant emphasis, detailed analysis, and disclosure.

Consistent with this guidance, agencies may develop their own agency-specific practices and guidance for framing the NEPA review.  Grounded on the principles of proportionality and the rule of reason, such aids can help an agency determine the extent to which an analysis of GHG emissions and climate change impacts should be explored in the decision-making process and will assist in the analysis of the no action and proposed alternatives and mitigation.[73]  The agency should explain such a framing process and its application to the proposed action to the decision makers and the public during the NEPA review and in the EA or EIS document.

B.  Frame of Reference

When discussing GHG emissions, as for all environmental impacts, it can be helpful to provide the decision maker and the public with a recognizable frame of reference for comparing alternatives and mitigation measures.  Agencies should discuss relevant approved federal, regional, state, tribal, or local plans, policies, or laws for GHG emission reductions or climate adaptation to make clear whether a proposed project's

---

[72] *See* 40 CFR 1501.7 (The agency preparing the NEPA analysis must use the scoping process to, among other things, determine the scope and identify the significant issues to be analyzed in depth) and CEQ, *Memorandum for General Counsels, NEPA Liaisons, and Participants in Scoping*, April 30, 1981, *available at* https://ceq.doe.gov/nepa/regs/scope/scoping.htm.

[73] *See, e.g.,* Matthew P. Thompson, Bruce G. Marcot, Frank R. Thompson, III, Steven McNulty, Larry A. Fisher, Michael C. Runge, David Cleaves, and Monica Tomosy, *The Science of Decisionmaking   Applications for Sustainable Forest and Grassland Management in the National Forest System* (2013), *available at* http://www.fs.fed.us/rm/pubs_other/rmrs_2013_thompson_m004.pdf; U.S. Forest Service Comparative Risk Assessment Framework And Tools, *available at* www.fs.fed.us/psw/topics/fire_science/craft/craft; and Julien Martin, Michael C. Runge, James D. Nichols, Bruce C. Lubow, and William L. Kendall, *Structured decision making as a conceptual framework to identify thresholds for conservation and management* (2009), Ecological Applications 19:1079–1090, *available at* http://www.esajournals.org/doi/abs/10.1890/08-0255.1.

AR_0026415

GHG emissions are consistent with such plans or laws.[74]  For example, the Bureau of

Land Management has discussed how agency actions in California, especially joint

projects with the State, may or may not facilitate California reaching its emission

reduction goals under the State's Assembly Bill 32 (Global Warming Solutions Act).[75]

This approach helps frame the policy context for the agency decision based on its NEPA

review.

C.  Incorporation by Reference

Incorporation by reference is of great value in considering GHG emissions or

where an agency is considering the implications of climate change for the proposed

action and its environmental effects.  Agencies should identify situations where prior

studies or NEPA analyses are likely to cover emissions or adaptation issues, in whole or

in part.  When larger scale analyses have considered climate change impacts and GHG

emissions, calculating GHG emissions and carbon stocks for a specific action may

provide only limited information beyond the information already collected and

considered in the larger scale analyses.  The NEPA reviews for a specific action can

incorporate by reference earlier programmatic studies or information such as

management plans, inventories, assessments, and research that consider potential changes

in carbon stocks, as well as any relevant programmatic NEPA reviews.[76]

Accordingly, agencies should use the scoping process to consider whether they

should incorporate by reference GHG analyses from other programmatic studies, action

---

[74] *See* 40 CFR 1502.16(c), 1506.2(d) (where an inconsistency exists, agencies should describe the extent to which the agency will reconcile its proposed action with the plan or law).  *See also* Exec. Order No. 13693, 80 Fed. Reg. 15869 (Mar. 25, 2015) (establishing GHG emission and related goals for agency facilities and operations.  Scope 1, 2, and 3 emissions are typically separate and distinct from analyses and information used in an EA or EIS.).

[75] *See, e.g.,* U.S. Bureau of Land Management, Desert Renewable Energy Conservation Plan Proposed Land Use Plan Amendment and Final Environmental Impact Statement, Vol. I, § I.3.3.2, at 12, *available at* http://drecp.org/finaldrecp/.

[76] *See* 40 CFR 1502.5, 1502.21.

AR_0026416

specific NEPA reviews, or programmatic NEPA reviews to avoid duplication of effort. Furthermore, agencies should engage other agencies and stakeholders with expertise or an interest in related actions to participate in the scoping process to identify relevant GHG and adaptation analyses from other actions or programmatic NEPA documents.

D.  Using Available Information

Agencies should make decisions using current scientific information and methodologies.  CEQ does not expect agencies to fund and conduct original climate change research to support their NEPA analyses or for agencies to require project proponents to do so.  Agencies should exercise their discretion to select and use the tools, methodologies, and scientific and research information that are of high quality and available to assess the impacts.[77]

Agencies should be aware of the ongoing efforts to address the impacts of climate change on human health and vulnerable communities.[78]  Certain groups, including children, the elderly, and the poor, are more vulnerable to climate-related health effects, and may face barriers to engaging on issues that disproportionately affect them.  CEQ recommends that agencies periodically engage their environmental justice experts, and the Federal Interagency Working Group on Environmental Justice,[79] to identify approaches to avoid or minimize impacts that may have disproportionately high and

---

[77] *See* 40 CFR 1502.24 (requiring agencies to ensure the professional and scientific integrity of the discussions and analyses in environmental impact statements).
[78] USGCRP, *The Impacts of Climate Change on Human Health in the United States  A Scientific Assessment* (Apr. 2016), *available at* https://health2016.globalchange.gov/downloads.
[79] For more information on the Federal Interagency Working Group on Environmental Justice co-chaired by EPA and CEQ, *see* http://www.epa.gov/environmentaljustice/interagency/index.html.

AR_0026417

adverse human health or environmental effects on minority and low-income populations.[80]

### E. Programmatic or Broad-Based Studies and NEPA Reviews

Agency decisions can address different geographic scales that can range from the programmatic or landscape level to the site- or project-specific level. Agencies sometimes conduct analyses or studies that are not NEPA reviews at the national level or other broad scale level (e.g., landscape, regional, or watershed) to assess the status of one or more resources or to determine trends in changing environmental conditions.[81] In the context of long-range energy, transportation, and resource management strategies an agency may decide that it would be useful and efficient to provide an aggregate analysis of GHG emissions or climate change effects in a programmatic analysis and then incorporate by reference that analysis into future NEPA reviews.

A tiered, analytical decision-making approach using a programmatic NEPA review is used for many types of Federal actions[82] and can be particularly relevant to addressing proposed land, aquatic, and other resource management plans. Under such an approach, an agency conducts a broad-scale programmatic NEPA analysis for decisions such as establishing or revising USDA Forest Service land management plans, Bureau of Land Management resource management plans, or Natural Resources Conservation Service conservation programs. Subsequent NEPA analyses for proposed site-specific

---

[80] *President's Memorandum for the Heads of All Departments and Agencies, Executive Order on Federal Actions to Address Environmental Justice in Minority and Low-Income Populations* (Feb. 11, 1994), *available at* https://ceq.doe.gov/nepa/regs/eos/ii-5.pdf; CEQ, *Environmental Justice   Guidance Under the National Environmental Policy Act*, *available at* https://ceq.doe.gov/nepa/regs/ej/justice.pdf.

[81] Such a programmatic study is distinct from a programmatic NEPA review which is appropriate when the action under consideration is itself subject to NEPA requirements. *See* CEQ, *Memorandum for Heads of Federal Departments and Agencies, Effective Use of Programmatic NEPA Reviews*, Dec. 18, 2014, § I(A), p. 9, *available at* https://www.whitehouse.gov/sites/default/files/docs/effective_use_of_programmatic_nepa_reviews_final_dec2014_searchable.pdf (discussing non-NEPA types of programmatic analyses such as data collection, assessments, and research, which previous NEPA guidance described as joint inventories or planning studies).

[82] *See* 40 CFR 1502.20, 1508.28. A programmatic NEPA review may be appropriate when a decision is being made that is subject to NEPA, such as establishing formal plans, programs, and policies, and when considering a suite of similar projects.

AR_0026418

decisions – such as proposed actions that implement land, aquatic, and other resource management plans – may be tiered from the broader programmatic analysis, drawing upon its basic framework analysis to avoid repeating analytical efforts for each tiered decision.  Examples of project- or site-specific actions that may benefit from being able to tier to a programmatic NEPA review include: constructing transmission lines; conducting prescribed burns; approving grazing leases; granting rights-of-way; issuing leases for oil and gas drilling; authorizing construction of wind, solar or geothermal projects; and approving hard rock mineral extraction.

A programmatic NEPA review may also serve as an efficient mechanism in which to assess Federal agency efforts to adopt broad-scale sustainable practices for energy efficiency, GHG emissions avoidance and emissions reduction measures, petroleum product use reduction, and renewable energy use, as well as other sustainability practices.[83]  While broad department- or agency-wide goals may be of a far larger scale than a particular program, policy, or proposed action, an analysis that informs how a particular action affects that broader goal can be of value.

F.  Monetizing Costs and Benefits

NEPA does not require monetizing costs and benefits.  Furthermore, the weighing of the merits and drawbacks of the various alternatives need not be displayed using a monetary cost-benefit analysis and should not be when there are important qualitative considerations.[84]  When an agency determines that a monetized assessment of the impacts of greenhouse gas emissions or a monetary cost-benefit analysis is appropriate and

---

[83] *See* Exec. Order No. 13693, 80 Fed. Reg. 15869 (Mar. 25, 2015).
[84] *See* 40 CFR 1502.23.

32

AR_0026419

relevant to the choice among different alternatives being considered, such analysis may be incorporated by reference[85] or appended to the NEPA document as an aid in evaluating the environmental consequences.[86]  For example, a rulemaking could have useful information for the NEPA review in an associated regulatory impact analysis which could be incorporated by reference.[87]  When using a monetary cost-benefit analysis, just as with tools to quantify emissions, the agency should disclose the assumptions, alternative inputs, and levels of uncertainty associated with such analysis.  Finally, if an agency chooses to monetize some but not all impacts of an action, the agency providing this additional information should explain its rationale for doing so.[88]

## V.  CONCLUSION AND EFFECTIVE DATE

Agencies should apply this guidance to all new proposed agency actions when a NEPA review is initiated.  Agencies should exercise judgment when considering whether to apply this guidance to the extent practicable to an on-going NEPA process.  CEQ does not expect agencies to apply this guidance to concluded NEPA reviews and actions for

---

[85] *See* 40 CFR 1502.21 (material may be cited if it is reasonably available for inspection by potentially interested persons within the time allowed for public review and comment).

[86] When conducting a cost-benefit analysis, determining an appropriate method for preparing a cost-benefit analysis is a decision left to the agency's discretion, taking into account established practices for cost-benefit analysis with strong theoretical underpinnings (for example, see OMB Circular A-4 and references therein).  For example, the Federal social cost of carbon (SCC) estimates the marginal damages associated with an increase in carbon dioxide emissions in a given year.  Developed through an interagency process committed to ensuring that the SCC estimates reflect the best available science and methodologies and used to assess the social benefits of reducing carbon dioxide emissions across alternatives in rulemakings, it provides a harmonized, interagency metric that can give decision makers and the public useful information for their NEPA review.  For current Federal estimates, *see* Interagency Working Group on Social Cost of Carbon, United States Government, *Technical Support Document  Technical Update of the Social Cost of Carbon for Regulatory Impact Analysis Under Executive Order 12866* (revised July 2015), *available at* https://www.whitehouse.gov/omb/oira/social-cost-of-carbon.

[87] For example, the regulatory impact analysis was used as a source of information and aligned with the NEPA review for Corporate Average Fuel Economy (CAFE) standards, *see* National Highway Traffic Safety Administration, Corporate Average Fuel Economy Standards, Passenger Cars and Light Trucks, Model Years 2017-2025, Final Environmental Impact Statement, Docket No. NHTSA-2011-0056 (July 2012), § 5.3.2, *available at* http://www.nhtsa.gov/Laws+&+Regulations/CAFE+-+Fuel+Economy/Environmental+Impact+Statement+for+CAFE+Standards,+2017-2025.

[88] For example, the information may be responsive to public comments or useful to the decision maker in further distinguishing between alternatives and mitigation measures.  In all cases, the agency should ensure that its consideration of the information and other factors relevant to its decision is consistent with applicable statutory or other authorities, including requirements for the use of cost-benefit analysis.

AR_0026420

which a final EIS or EA has been issued.  Agencies should consider applying this guidance to projects in the EIS or EA preparation stage if this would inform the consideration of differences between alternatives or address comments raised through the public comment process with sufficient scientific basis that suggest the environmental analysis would be incomplete without application of the guidance, and the additional time and resources needed would be proportionate to the value of the information included.

# # #

AR_0026421

# ATTACHMENT 2

AR_0026422





STATE OF CALIFORNIA
GOVERNOR'S OFFICE *of* PLANNING AND RESEARCH

EDMUND G. BROWN JR.
GOVERNOR

KEN ALEX
DIRECTOR

March 24, 2015

Thank you for the opportunity to review and provide comments on the White House Council on Environmental Quality's "Revised Draft Guidance on Greenhouse Gases and Climate Change," hereafter referred to as the "Guidance." The Guidance provides suggestions and information to public agencies addressing climate change in environmental documents prepared pursuant to the National Environmental Policy Act, or NEPA. Like NEPA, California's Environmental Quality Act, commonly referred to as CEQA, also requires public agencies to study the potential environmental consequences of proposed projects. Over the past decade, California public agencies have developed rich experience and expertise analyzing climate change in environmental documents pursuant to CEQA. Approximately five years ago, this office developed regulations that explicitly require analysis of greenhouse gas emissions in CEQA documents. Since then, robust analytical tools have been made available that significantly reduce the time and effort needed to analyze climate change impacts of projects. Our understanding of the feasibility and effectiveness of a wide variety of mitigation measures has also dramatically increased.

Initially, we strongly agree that NEPA plainly requires covered agencies to consider the effects, including cumulative effects, of their proposed projects if they may be significant, and that the effects of climate change upon those projects must also be taken into account. NEPA's broad analytic scope, with which federal agencies must comply "to the fullest extent possible," clearly encompasses these climate change-related issues, as the federal courts have repeatedly held.[1] We commend the Council for its efforts to further improve the quality and consistency of NEPA analysis in this area.

The Guidance makes important strides in improving nationwide practice in analyzing climate change impacts of proposed projects. The following comments provide California's perspective on these issues, which is informed by our own experience integrating climate change into CEQA analyses. They are intended to strengthen the Guidance for eventual use on a nation-wide scale.

**The Guidance Provides Needed Advice on Addressing Climate Change**
The Guidance appropriately recommends that agencies analyze not only the project's contribution of greenhouse gas emissions, but also the project's potential to exacerbate effects caused by climate change. California's Natural Resources Agency provides similar direction in regulations requiring the analysis of climate change in documents prepared pursuant to CEQA.

---

[1] *See, e.g.* 42 U.S.C. § 4332; *Center for Biological Diversity v. National Highway Traffic Safety Administration*, 538 F.3d 1172 (2008).

AR_0026423

Section 15126.2 of the CEQA Guidelines[2] states, in part, that an "EIR should evaluate any potentially significant impacts of locating development in other areas susceptible to hazardous conditions (e.g., floodplains, coastlines, wildfire risk areas) as identified in authoritative hazard maps, risk assessments or in land use plans addressing such hazards areas."  In its Final Statement of Reasons, which describes the purpose of the regulations, the Natural Resources Agency explained: "that section contemplates hazards which the presence of a project could exacerbate (i.e., potential upset of hazardous materials in a flood, increased need for firefighting services, etc.)."  (Final Statement of Reasons,[3] at page 43.)

As noted in detail at page 15 of the Guidance, tools are already are available to do this type of analysis.  For example, California worked together with stakeholders to develop tools and resources that could support such analysis. The "Cal-Adapt" website, for example, illustrates impacts of climate change across California using best available science.[4] The Climate Resilience Toolkit[5] was largely modeled after Cal-Adapt and has been referred to as the "Cal-Adapt for the nation".  These resources have been helpful in analyzing climate change impacts in California. Similarly, the Climate Resilience Toolkit could perform this role at the national level. The Climate Resilience Toolkit also has a decision support component, which was inspired by California's Adaptation Planning Guide. As with the Adaptation Planning Guide, a narrative could be added to the Climate Resilience Toolkit which highlights its appropriate use under NEPA.

**The Guidance Can Be Improved in Several Respects**
While the Guidance offers much important information and advice, it can be improved.  The following offers several specific suggestions for improvement.

**The Suggested "Reference Point" May Confuse Public Agencies, and So CEQ Should Delete It From the Guidance.**
The Guidance discourages public agencies from providing a quantitative analysis of greenhouse gas emissions if project emissions fall below a "reference point" of 25,000 metric tons CO2e per year, unless quantification "is easily accomplished."  (Guidance, at page 18.)  This directive in the Guidance may create more problems than it solves.  First, as the Guidance correctly indicates, emissions can be easily quantified for most projects, and consistent with NEPA's information disclosure purposes, agencies should make a good faith effort to analyze and disclose such emissions.  Second, quantification of emissions serves an important purpose of

---

[2] The regulations implementing CEQA are known as the CEQA Guidelines.  They are contained in sections 15000 and following in Title 14 of the California Code of Regulations.

[3] The Final Statement of Reasons is available online at
http://resources.ca.gov/ceqa/docs/Final_Statement_of_Reasons.pdf

[4] The Cal-Adapt website is available online at www.cal-adapt.org

[5] Available online at www.climate.gov/toolkit

AR_0026424

demonstrating where emissions reductions may be easily achieved. Third, application of the reference point might prevent the disclosure of information needed to conduct an adequate cumulative impacts analysis. Finally, the suggested reference is much larger than the quantity of emissions that might be considered to be significant in California. To remedy these concerns, we recommend that the discussion of the "reference point" be removed from the Guidance. These points are discussed in greater detail below.

**Emissions from many projects are easily quantified using existing tools.**
The Guidance correctly advises that "GHG estimation tools have become widely available, and are already in broad use...."( Guidance, at page 15.) This is certainly true in California. The California Air Pollution Control Officers Association (CAPCOA), for example, has pioneered several important guides, including "CEQA & Climate Change,"[6] which includes options for quantifying and evaluating the significance of greenhouse gas emissions, "Model Policies for Greenhouse Gas Emissions in General Plans,"[7] and "Quantifying Greenhouse Gas Mitigation Measures."[8] National protocols for calculating greenhouse gas emissions are also readily available, such as the United States Community Protocol for Calculating Greenhouse Gas Emissions[9] and the Local Government Operations Protocol.[10] Numerous national and international groups and governments participated in the development of these two protocols. California also helped fund the development of the Clearpath suite of software tools to address greenhouse gas emissions through the State Energy Efficiency Collaborative.[11] These tools are in use statewide but were also used as the basis for a national scale resource called Clearpath.[12] The California Air Resources Board has published an extensive list of quantification tools on its "Cool California" website[13] which could be used in a NEPA analysis. Lastly, for project level emissions there are numerous tools available, though the California Emissions Estimator Model, commonly known as CalEEMod,[14] is widely used throughout California to quantify emissions. In part because of the ready availability of estimation tools, California generally requires lead agencies to quantify emissions as part of their CEQA analysis. (CEQA Guidelines § 15064.4 ("A

---

[6] http://www.capcoa.org/wp-content/uploads/downloads/2010/05/CAPCOA-White-Paper.pdf

[7] http://www.capcoa.org/wp-content/uploads/downloads/2010/05/CAPCOA-ModelPolicies-6-12-09-915am.pdf

[8] http://www.capcoa.org/wp-content/uploads/2010/11/CAPCOA-Quantification-Report-9-14-Final.pdf.

[9] http://www.icleiusa.org/tools/ghg-protocol/community-protocol

[10] http://www.arb.ca.gov/cc/protocols/localgov/localgov.htm

[11] http://californiaseec.org/software-tools

[12] http://www.icleiusa.org/tools/clearpath

[13] www.coolcalifornia.org

[14] www.caleemod.com. CalEEMod was developed and is maintained by CAPCOA to support the needs of all air districts in the state.

AR_0026425

lead agency should make a good-faith effort, based to the extent possible on scientific and factual data, to describe, calculate or estimate the amount of greenhouse gas emissions resulting from a project").)  In adopting this rule, the California Natural Resources Agency found that:

> quantification of GHG emissions is possible for a wide range of projects using currently available tools.  Modeling capabilities have improved to allow quantification of emissions from various sources and at various geographic scales. (Office of Planning and Research, CEQA and Climate Change: Addressing Climate Change Through the California Environmental Quality Act Review, Attachment 2: Technical Resources/Modeling Tools to Estimate GHG Emissions (June 2008); CAPCOA White Paper, at pp. 59-78.)  Moreover, one of the models that can be used in a GHG analysis, URBEMIS, is already widely used in CEQA air quality analyses.  (CAPCOA White Paper, at p. 59.)"

(Final Statement of Reasons, at page 21.)  In the five years since California adopted its regulations, tools have been improved and their use has become widespread.

**Not Only Are Most Project Emissions Easily Quantified, but Doing So Provides Agencies and the Public with Valuable Information Regarding Ways to Reduce Project Emissions.**
CEQA generally requires quantification of greenhouse gas emissions not only because it is usually relatively easy to do so, but also because quantification reveals ways to feasibly reduce those emissions.  Again, in adopting its regulations, the California Natural Resources Agency found that:

> [Q]uantification indicates to the lead agency, and the public, whether emissions reductions are possible, and if so, from which sources.  Thus, [for example,] if quantification reveals that a substantial portion of a project's emissions result from energy use, a lead agency may consider whether design changes could reduce the project's energy demand.

(Final Statement of Reasons, at page 21.)  For similar reasons, project emissions should usually be quantified in NEPA analyses.  In fact, such quantification is key to satisfying NEPA's public disclosure policies, and to understanding what level of mitigation is required.  .  (See, e.g., 40 CFR 1500.1(c) ("The NEPA process is intended to help public officials make decisions that are based on understanding of environmental consequences, and take actions that protect, restore, and enhance the environment"); 1500.2 (d)-(e) ("Federal agencies shall to the fullest extent possible: ... [e]ncourage and facilitate public involvement in decisions which affect the quality of the human environment [and] [u]se the NEPA process to identify and assess the reasonable alternatives to proposed actions that will avoid or minimize adverse effects of these actions upon the quality of the human environment"); see also 40 CFR 1502.16 (requiring environmental impact statements to discuss "[m]eans to mitigate adverse environmental impacts....").)

**The Guidance's Focus on the Relative Quantity of Project Emissions May Obscure Consideration of Cumulative Impacts.**
The Guidance correctly notes that climate change impacts "are exacerbated by a series of smaller decisions[.]"  (Guidance, at page 9.)  The Guidance's discussion of "proportionality" and the 25,000 metric ton "reference point," however, suggests that smaller quantities of emissions are not relevant to a NEPA analysis.

AR_0026426

NEPA, however, requires analysis of cumulative impacts.[15]  Particularly relevant in the context of climate change, the CEQ regulations state "the significance of an action must be analyzed in several contexts such as <u>society as a whole</u> (<u>human</u>, national), the affected region, the affected interests, and the locality."  (40 CFR 1508.27 (emphasis added).)  Further, when considering the significance of an effect, an agency should consider "[w]hether the action is related to other actions with individually insignificant but cumulatively significant impacts. <u>Significance exists if it is reasonable to anticipate a cumulatively significant impact on the environment.</u>"  (*Id.* (emphasis added).)

Agencies might read the Guidance's discussion of a "reference point" to mean that emissions below that point need not be considered, or even disclosed.  As a result, neither the agency nor the public would be able to consider the effect of the proposed project in light of the severity of the climate change problem, or other related sources of emissions.  Such potential cumulative effects are exactly what NEPA requires agencies to consider.

Finally, the Guidance includes a confusing sentence on page 11 that states: "CEQ does not expect that an EIS would be required based on cumulative impacts of GHG emissions alone."  This is misleading, since climate change is an inherently cumulative impact, and it is extremely unlikely that the direct emissions from any single project would have a demonstrable effect on the global climate.  Therefore, this sentence should be removed from the Guidance.

### California Agencies Have Found Incremental Contributions of Greenhouse Gas Emissions Considerably Lower than 25,000 CO2e to be Potentially Significant.

Like NEPA, CEQA leaves the ultimate conclusion regarding the significance of a project's impacts to the lead agency, considering the context of the project and its circumstances.  Nevertheless, some California agencies have developed "thresholds of significance" that identify levels of greenhouse gas emissions that might *normally* be considered significant.  The Bay Area Air Quality Management District, for example, developed "thresholds of significance" indicating that emissions of 10,000 metric tons per year are considered cumulatively significant for certain industrial projects, and that emissions as low as 1,100 tons for certain land use projects may be significant.  (BAAQMD, "California Environmental Quality Act Air Quality Guidelines," Revised May 2011, at page 2-4.)[16]  Other California cities, counties, and air

---

[15] Cumulative impacts are also a key consideration under CEQA.  A California court, in one of the seminal cases addressing cumulative impacts under CEQA, observed:

> "One of the most important environmental lessons evident from past experience is that environmental damage often occurs incrementally from a variety of small sources. These sources appear insignificant, assuming threatening dimensions only when considered in light of the other sources with which they interact. Perhaps the best example is air pollution, where thousands of relatively small sources of pollution cause a serious environmental health problem.

> "CEQA has responded to this problem of incremental environmental degradation by requiring analysis of cumulative impacts."

(*Kings County Farm Bureau v. City of Hanford* (1990) 221 Cal. App. 3d 692, 720.)

[16]

http://www.baaqmd.gov/~/media/Files/Planning%20and%20Research/CEQA/BAAQMD%20CEQA%20Guidelines%20May%202011.ashx?la=en

AR_0026427

districts have reviewed projects using similar bright-line significance thresholds, typically in the 10,000 metric ton per year range.  Thus, even as a reference point, 25,000 tons is a very large quantity of emissions.

**To Avoid the Problems Described Above, the Guidance Should Encourage Public Agencies to Calculate and Disclose Project Emissions and Delete the Discussion of the 25,000 Ton "Reference Point".**

For the reasons described above, instead of *discouraging* disclosure of emissions below a reference point, CEQ should consider revising the Guidance to require a good-faith effort, where possible, to disclose a project's greenhouse gas emissions.  Specifically, CEQ should delete the discussion of the 25,000 ton reference point.  Doing so will not pose an undue burden on agencies, as the Guidance already advises that quantification should be done when methods to do so are readily available, and indicates that many quantification tools are already in broad use.

**The Guidance Should Include Information Describing the Magnitude of Emissions Reductions That Will Be Needed to Avoid the Worst Effects of Climate Change.**

The Guidance correctly advises that that projected climate change will adversely affect public health and welfare.  (Guidance, at page 7.)  While the Guidance also notes that agencies should consider their projects' incremental additions of greenhouse gas emissions, the Guidance does not indicate when such incremental additions might be significant.  To help agencies make that determination, CEQ should consider providing additional information regarding the magnitude of emissions reductions that will be needed to avoid the worst effects of climate change.  In particular, the recent U.S. National Climate Assessment reports that greenhouse gas concentrations in the atmosphere are already far above historic levels, and are associated with dangerous changes to the climate now occurring.  The Report also emphasizes that an emission reduction trajectory consistent with or below the "B1" trajectory projected by the Intergovernmental Panel on Climate Change would "reduce the risk of some of the worst impacts of climate change," though it would not fully mitigate them without further reductions.[17] Agencies should be aware of these reduction levels as they consider their NEPA analyses.

Similarly, California's Scoping Plan, which maps out the state's effort to reduce greenhouse gas emissions, also provides relevant information.  For example, it reports:

> To prevent exceeding 450 ppm CO2e, developed countries must substantially reduce their emissions in the near term. The 2008 World Energy Outlook suggests that Organisation for Economic Co-operation and Development (OECD) countries must reduce emissions by about 40 percent below 2006 levels by 2030.18 The Union of Concerned Scientists has suggested a 2030 emissions target for the United States of 56 percent below 2005 levels (44 percent below 1990 levels).19 A governmental study from the Netherlands finds that Europe would have to reduce emissions by 47 percent below 1990 levels and the United States would have to reduce emissions by 37 percent below 1990 levels by 2030. The International Energy Agency comes to a similar conclusion, finding that the United States would have to reduce emissions by about 38

---

[17] See U.S. Global Change Research Program, *Climate Change Impacts in the United States: U.S. National Climate Assessment* (2014) at 13-14.

AR_0026428

AR_0026429

percent below 1990 levels by 2030.21 Note that percent reductions by 2030 depend on the assumed overall trajectory of emissions, including the amount after 2030.

(Scoping Plan Update, at page 13.)  In sum, the research indicates that steep reductions in emissions are needed in the near future.  Providing such information in the Guidance would assist lead agencies in determining whether a particular increment of emissions should be treated as significant in a NEPA analysis.

**Conclusion**

The Guidance provides useful information that should assist lead agencies in analyzing climate change in documents prepared pursuant to NEPA.  It can be improved, however, as suggested above.  Please do not hesitate to contact us if we can be of any assistance.

Sincerely,

Ken Alex
Director, Governor's Office of Planning and Research
Senior Advisor, Office of California Governor Edmund G. Brown, Jr.

# EXHIBIT 3

AR_0026430

**APPENDIX TO COMMENTS OF ATTORNEYS GENERAL OF WASHINGTON AND
CALIFORNIA, ET AL.**

March 9, 2020

VIA OVERNIGHT MAIL
Edward A. Boling
Associate Director for the National Environmental Policy Act
Viktoria Z. Seale
Chief of Staff and General Counsel
Council on Environmental Quality
730 Jackson Place NW
Washington, DC 20503

Re:    Notice of Proposed Rulemaking – Update to the Regulations Implementing the
Procedural Provisions of the National Environmental Policy Act, 85 Fed. Reg. 1684
(Jan. 10, 2020)
Docket ID No. CEQ-2019-0003

Dear Associate Director Boling:

Please find enclosed an appendix to comments on the Council on Environmental Quality's
notice of proposed rulemaking regarding proposed revisions to the regulations implementing the
National Environmental Policy Act, submitted on behalf of the Attorneys General of Washington
and California, et al. The comments will be submitted separately.

Sincerely,

XAVIER BECERRA
Attorney General of the State of California

By:    SARAH MORRISON
Supervising Deputy Attorney General
JOSHUA R. PURTLE
JAMIE JEFFERSON
JULIA FORGIE
Deputy Attorneys General
300 South Spring Street, Ste. 1702
Los Angeles, CA 90013
Sarah.Morrison@doj.ca.gov
Josh.Purtle@doj.ca.gov
Jamie.Jefferson@doj.ca.gov
Julia.Forgie@doj.ca.gov

# APPENDIX TO COMMENTS OF ATTORNEYS GENERAL OF WASHINGTON AND CALIFORNIA, ET AL.

## Council on Environmental Quality's Notice of Proposed Rulemaking – Update to the Regulations Implementing the Procedural Provisions of the National Environmental Policy Act
### 85 Fed. Reg. 1684 (Jan. 10, 2020) Docket ID: CEQ-2019-0003

| Tab | Document Title | Document Source |
|-----|----------------|-----------------|
| 1 | Envtl. Law Inst., NEPA Success Stories: Celebrating 40 Years of Transparency and Open Government (Aug. 2010) | https://ceq.doe.gov/docs/get-involved/NEPA_Success_Stories.pdf |
| 2 | CEQ, Examples of Benefits from the NEPA Process for ARRA [American Recovery and Reinvestment Act] Funded Activities (May 2011) | https://ceq.doe.gov/docs/get-involved/ARRA_NEPA_Benefits_List_May122100.pdf |
| 3 | CEQ, A Citizen's Guide to the NEPA: Having Your Voice Heard (Dec. 2007) | https://ceq.doe.gov/docs/get-involved/Citizens_Guide_Dec07.pdf |
| 4 | U.S. Gov't Accountability Office, GAO-14-369, National Environmental Policy Act: Little Information Exists on NEPA Analyses (2014) | https://www.gao.gov/products/gao-14-369 |
| 5 | Natural Resources Defense Council, Never Eliminate Public Advice: NEPA Success Stories (Feb. 1, 2015) | https://www.nrdc.org/resources/never-eliminate-public-advice-nepa-success-stories |
| 6 | Richard Lazarus, The National Environmental Policy Act in the U.S. Supreme Court: A Reappraisal and a Peek Behind the Curtains, 100 Georgetown L.J. 1507 (2012) | http://www.law.harvard.edu/faculty/rlazarus/docs/articles/Lazarus_APeekBehindtheCurtain_2012.pdf |
| 7 | CEQ, National Environmental Policy Act: A Study of Its Effectiveness After Twenty-five Years (Jan. 1997) | https://ceq.doe.gov/docs/ceq-publications/nepa25fn.pdf |
| 8 | CEQ, Environmental Impact Statement Timelines (2010-2017) (Dec. 14, 2018) | https://www.whitehouse.gov/wp-content/uploads/2017/11/CEQ-EIS-Timelines-Report.pdf |
| 9 | CEQ, Memorandum for Heads of Federal Departments and Agencies on Improving the Process for Preparing Efficient and Timely Environmental Reviews under NEPA (Mar. 6, 2012) | https://ceq.doe.gov/docs/ceq-regulations-and-guidance/Improving_NEPA_Efficiencies_06Mar2012.pdf |
| 10 | CEQ, Memorandum for Heads of Federal Departments and Agencies, Guidance to Federal Agencies Regarding the Environmental Review and Authorization Process for Infrastructure Projects (Jan. 13, 2017) | https://www.permits.performance.gov/sites/permits.performance.gov/files/docs/Official%20Signed%20FAST-41%20Guidance%20M-17-14%202017-01-13.pdf |
| 11 | Richard F. Weingroff, Addressing the Quiet Crisis: Origins of the National Environmental Policy Act of 1969 | https://www.fhwa.dot.gov/highwayhistory/nepa/nepa.pdf |
| 12 | Sam Kalen, Ecology Comes of Age: NEPA's Lost Mandate, 21 Duke Environmental Law & Policy Forum 113 (2010) | https://scholarship.law.duke.edu/cgi/viewcontent.cgi?article=1040&context=delpf |
| 13 | Office of Mgmt. and Budget, Circular A-4 (Sept. 17, 2003) | https://obamawhitehouse.archives.gov/omb/circulars_a004_a-4 |

AR_0026432

# APPENDIX TO COMMENTS OF ATTORNEYS GENERAL OF WASHINGTON AND CALIFORNIA, ET AL.

## Council on Environmental Quality's Notice of Proposed Rulemaking – Update to the Regulations Implementing the Procedural Provisions of the National Environmental Policy Act
### 85 Fed. Reg. 1684 (Jan. 10, 2020) Docket ID: CEQ-2019-0003

| Tab | Document Title | Document Source |
|-----|----------------|-----------------|
| 14 | CEQ, Memorandum to the Heads of Agencies on the Application of NEPA to Proposed Federal Actions in the United States with Transboundary Effects (July 1, 1997) | https://ceq.doe.gov/docs/ceq-regulations-and-guidance/memorandum-transboundary-impacts-070197.pdf |
| 15 | CEQ, Memorandum for Heads of Federal Departments and Agencies: Establishing, Applying, and Revising Categorical Exclusions under the National Environmental Policy Act | https://ceq.doe.gov/docs/ceq-regulations-and-guidance/NEPA_CE_Guidance_Nov232010.pdf |
| 16 | CEQ, Report Regarding the Mineral Management Service's NEPA Policies, Practices, and Procedures as They Relate to Outer Continental Shelf Oil and Gas Exploration (Aug. 16, 2010) | https://www.doi.gov/sites/doi.gov/files/migrated/news/pressreleases/upload/CEQ-Report-Reviewing-MMS-OCS-NEPA-Implementation.pdf |
| 17 | Report of Federal Interagency Working Group on Environmental Justice & NEPA Committee: Promising Practices for EJ Methodologies in NEPA Reviews (March 2016) | https://www.epa.gov/environmentaljustice/ej-iwg-promising-practices-ej-methodologies-nepa-reviews |
| 18 | Council on Environmental Quality, Memorandum to Agencies: 40 Most Asked Questions Concerning CEQ's National Environmental Policy Act Regulations 1986) | https://www.energy.gov/sites/prod/files/2018/06/f53/G-CEQ-40Questions.pdf |
| 19 | CEQ, Considering Cumulative Effects under the National Environmental Policy Act (Jan. 1997) | https://ceq.doe.gov/publications/cumulative_effects.html |
| 20 | Federal Highway Administration, NEPA and Transportation Decisionmaking: Questions and Answers Regarding Consideration of Indirect and Cumulative Impacts in the NEPA Process | https://www.environment.fhwa.dot.gov/nepa/QAimpact.aspx |
| 21 | U.S. EPA, Consideration of Cumulative Impacts in EPA Review of NEPA Documents (May 1999) | https://www.epa.gov/sites/production/files/2014-08/documents/cumulative.pdf |
| 22 | Mark F. Grady, Proximate Cause Decoded, 50 UCLA L. Rev. 293 (2002) | https://www.uclalawreview.org/wp-content/uploads/2019/09/26_50UCLALRev2932002-2003.pdf |
| 23 | Nicole Summers, Setting the Standard for Proximate Cause in the Wake of Bank of America Corp. v. City of Miami, 97 N.C. L. Rev. 529 (2019) | https://scholarship.law.unc.edu/cgi/viewcontent.cgi?article=6714&context=nclr |
| 24 | California Office of Envtl. Health Hazard Assessment, Indicators of Climate Change in California: Environmental Justice Impacts (Dec. 2010) | https://oehha.ca.gov/media/downloads/climate-change/document/climatechangeej123110.pdf |

2

AR_0026433

# APPENDIX TO COMMENTS OF ATTORNEYS GENERAL OF WASHINGTON AND CALIFORNIA, ET AL.

## Council on Environmental Quality's Notice of Proposed Rulemaking – Update to the Regulations Implementing the Procedural Provisions of the National Environmental Policy Act
85 Fed. Reg. 1684 (Jan. 10, 2020) Docket ID: CEQ-2019-0003

| Tab | Document Title | Document Source |
|-----|----------------|-----------------|
| 25 | CEQ, Final Guidance for Federal Departments and Agencies on Consideration of Greenhouse Gas Emissions and the Effects of Climate Change in National Environmental Policy Act Reviews (Aug. 1, 2016) | https://ceq.doe.gov/docs/ceq-regulations-and-guidance/nepa_final_ghg_guidance.pdf |
| 26 | CEQ Environmental Justice Guidance (Dec. 10, 1997) | https://www.epa.gov/sites/production/files/2015-02/documents/ej_guidance_nepa_ceq1297.pdf. |
| 27 | Mercedes A. Bravo et al., Racial isolation and exposure to airborne particulate matter and ozone in understudied US populations: Environmental justice applications of downscaled numerical model output, 92–93 Envt. Int'l 247 (2016) | https://www.ncbi.nlm.nih.gov/pubmed/27115915 |
| 28 | Interdisciplinary Environmental Clinic at Washington University School of Law, Environmental Racism in St. Louis | https://assets.documentcloud.org/documents/6367937/2097-STL-EnvirRacism-Report-04-Web.pdf |
| 29 | US EPA, Environmental Justice | https://www.epa.gov/environmentaljustice |
| 30 | EPA, Supplemental Notice of Proposed Rulemaking, Strengthening Transparency in Regulatory Science | https://www.epa.gov/osa/strengthening-transparency-regulatory-science |
| 31 | FCC, 2019 Broadband Deployment Report (May 29, 2019) | https://docs.fcc.gov/public/attachments/FCC-19-44A1.pdfFCC |
| 32 | CEQ and Advisory Council on Historic Preservation, NEPA and NHPA: A Handbook for Integrating NEPA and Section 106 (Mar. 2013) | https://ceq.doe.gov/docs/ceq-publications/NEPA_NHPA_Section_106_Handbook_Mar2013.pdf |
| 33 | CEQ, Emergencies and the National Environmental Policy Act | https://ceq.doe.gov/docs/ceq-regulations-and-guidance/Emergencies_and_NEPA.pdf |
| 34 | David E. Adelman & Robert L. Glicksman, Presidential and Judicial Politics in Environmental Litigation, 50 Ariz. St. L.J. 4 (2018). | http://arizonastatelawjournal.org/wp-content/uploads/2018/05/Adelman_Pub.pdf |
| 35 | CEQ, States and Local Jurisdictions with NEPA-like Environmental Planning Requirements | https://ceq.doe.gov/laws-regulations/states.html |
| 36 | OEHHA, Tracking and Evaluation of Benefits and Impacts of Greenhouse Gas Limits in Disadvantaged Communities: Initial Report (2017) | https://oehha.ca.gov/media/downloads/environmental-justice/report/oehhaab32report020217.pdf |
| 37 | OEHHA, Indicators of Climate Change in California (2018) | https://oehha.ca.gov/media/downloads/climate-change/report/2018caindicatorsreportmay2018.pdf |

3

## APPENDIX TO COMMENTS OF ATTORNEYS GENERAL OF WASHINGTON AND CALIFORNIA, ET AL.

**Council on Environmental Quality's Notice of Proposed Rulemaking – Update to the Regulations Implementing the Procedural Provisions of the National Environmental Policy Act 85 Fed. Reg. 1684 (Jan. 10, 2020) Docket ID: CEQ-2019-0003**

| Tab | Document Title | Document Source |
|-----|----------------|-----------------|
| 38 | EPA, Memorandum to Regional Administrators and Assistant Administrators, Addressing Environmental Justice through Reviews Conducted Pursuant to the National Environmental Policy Act (NEPA) and Section 309 of the Clean Air Act (Apr. 19, 2011) | https://www.epa.gov/sites/production/files/2014-08/documents/nepa-environmental-justice-memo-pg.pdf |
| 39 | EPA, Memorandum to Regional NEPA Directors and Regional 309 Environmental Review Coordinators, Promoting the Use of Health Impact Assessment to Address Human Health in Reviews Conducted Pursuant to the National Environmental Policy Act and Section 309 of the Clean Air Act (Nov. 10, 2015) | https://www.epa.gov/sites/production/files/2014-08/documents/nepa-environmental-justice-memo-pg.pdf |
| 40 | EPA, Memorandum to EPA Environmental Review Coordinators 1-10, Roger Janson, Region 1, Elizabeth Borowiec, Region 9, Interim OFA Program Guidance on Implementing the EPA Policy on Evaluating Health Risks to Children (Apr. 4, 1996) | https://www.epa.gov/sites/production/files/2014-08/documents/children-health-risks-pg.pdf |
| 41 | EPA, Memorandum to Regional 309 Environmental Review and Regional Children's Environmental Health Coordinators, Addressing Children's Health through Reviews Conducted Pursuant to the National Environmental Policy Act and Section 309 of the Clean Air Act (Aug. 14, 2012) | https://www.epa.gov/sites/production/files/2014-08/documents/nepa-childrens-health-memo-august-2012.pdf |
| 42 | DOE, NEPA and CEQA: Integrating State and Federal Environmental Reviews (Final) (2014) | https://www.energy.gov/nepa/downloads/nepa-and-ceqa-integrating-state-and-federal-environmental-reviews-final |

4

# EXHIBIT

# 3

AR_0026436

1   XAVIER BECERRA
    Attorney General of California
2   SARAH E. MORRISON, SBN 143459
    Supervising Deputy Attorney General
3   JAMIE B. JEFFERSON, SBN 197142
4   JOSHUA R. PURTLE, SBN 298215
    JULIA K. FORGIE, SBN 304701
5   LANI M. MAHER, SBN 318637
    Deputy Attorneys General
6   1515 Clay Street, 20th Floor
7   P.O. Box 70550
    Oakland, CA 94612-0550
8   Phone: (510) 879-1002
    Fax: (510) 622-2270
9   Jamie.Jefferson@doj.ca.gov
    Joshua.Purtle@doj.ca.gov
10

11  *Attorneys for Plaintiff State of California*

ROBERT W. FERGUSON
Attorney General of Washington
AURORA JANKE
ELIZABETH HARRIS
Assistant Attorneys General
Environmental Protection Division
800 5th Ave Ste. 2000 TB-14
Seattle, Washington 98104-3188
Phone: (206) 233-3391
Fax: (206) 464-6451
Aurora.Janke@atg.wa.gov
Elizabeth.Harris@atg.wa.gov

*Attorneys for Plaintiff State of Washington*

*[Additional counsel listed on signature page]*

12          IN THE UNITED STATES DISTRICT COURT
13       FOR THE NORTHERN DISTRICT OF CALIFORNIA

14

15   STATES OF CALIFORNIA,              Case No. 3:20-cv-06057
     WASHINGTON, COLORADO,
16   CONNECTICUT, DELAWARE, ILLINOIS,
     MAINE, MARYLAND, MINNESOTA,
17   NEVADA, NEW JERSEY, NEW MEXICO,
     NEW YORK, NORTH CAROLINA,          **FIRST AMENDED COMPLAINT FOR**
18   OREGON, RHODE ISLAND, VERMONT,     **DECLARATORY AND INJUNCTIVE**
     AND WISCONSIN; PEOPLE OF THE               **RELIEF**
19   STATE OF MICHIGAN;
20   COMMONWEALTHS OF                    (Administrative Procedure Act,
     MASSACHUSETTS AND                   5 U.S.C. §§ 551–559, 701–706; Endangered
21   PENNSYLVANIA; TERRITORY OF         Species Act, 16 U.S.C. §§ 1531–1544;
     GUAM; DISTRICT OF COLUMBIA;        National Environmental Policy Act,
22   HARRIS COUNTY, TEXAS; CITY OF       42 U.S.C. §§ 4321–4347)
23   NEW YORK; CONNECTICUT
     DEPARTMENT OF ENERGY AND
24   ENVIRONMENTAL PROTECTION; AND
     NEW YORK STATE DEPARTMENT OF
25   ENVIRONMENTAL CONSERVATION,

26

AR_0026437

```
1
                                              Plaintiffs,
2
                        v.
3
      COUNCIL ON ENVIRONMENTAL
4     QUALITY AND MARY B. NEUMAYR, in
      her official capacity as Chairman of the
5     Council on Environmental Quality,
6
                                              Defendants.
7
```

8

9          1.    Plaintiffs, the State of California by and through Attorney General Xavier Becerra;

10   the State of Washington, by and through Attorney General Robert W. Ferguson; the State of

11   Colorado, by and through Attorney General Philip J. Weiser; the State of Connecticut and the

12   Connecticut Department of Energy and Environmental Protection, by and through Attorney

13   General William Tong; the State of Delaware, by and through Attorney General Kathleen

14   Jennings; the State of Illinois, by and through Attorney General Kwame Raoul; the State of

15   Maine, by and through Attorney General Aaron Frey; the State of Maryland, by and through

16   Attorney General Brian E. Frosh; the People of the State of Michigan, by and through Attorney

17   General Dana Nessel; the State of Minnesota, by and through Attorney General Keith Ellison;

18   the State of Nevada, by and through Attorney General Aaron Ford; the State of New Jersey, by

19   and through Attorney General Gurbir Grewal; the State of New Mexico, by and through

20   Attorney General Hector Balderas; the State of New York and the New York State Department

21   of Environmental Conservation, by and through Attorney General Letitia James; the State of

22   North Carolina, by and through Attorney General Joshua H. Stein; the State of Oregon, by and

23   through Attorney General Ellen Rosenblum; the State of Rhode Island, by and through

24   Attorney General Peter F. Neronha; the State of Vermont, by and through Attorney General

25   Thomas J. Donovan, Jr.; the State of Wisconsin, by and through Attorney General Joshua L.

26   Kaul; the Commonwealth of Massachusetts, by and through Attorney General Maura Healey;

AR_0026438

1   the Commonwealth of Pennsylvania, by and through Attorney General Josh Shapiro; the

2   Territory of Guam, by and through Attorney General Leevin Taitano Camacho; the District of

3   Columbia, by and through Attorney General Karl A. Racine; Harris County, Texas, by and

4   through Harris County Attorney Vince Ryan; and the City of New York, by and through

5   Corporation Counsel James E. Johnson (collectively State Plaintiffs) bring this action against

6   Defendants Council on Environmental Quality (CEQ) and Mary Neumayr, in her official

7   capacity as Chairman of CEQ.  State Plaintiffs seek judicial review under the Administrative

8   Procedure Act, 5 U.S.C. §§ 551–559 and 701–706 (APA), and the Endangered Species Act, 16

9   U.S.C. §§ 1531–1544 (ESA), of CEQ's final rule revising its longstanding regulations

10  implementing the National Environmental Policy Act (NEPA), 42 U.S.C. § 4321–4347, titled

11  Update to the Regulations Implementing the Procedural Provisions of the National

12  Environmental Policy Act (Final Rule), 85 Fed. Reg. 43,304 (July 16, 2020) (to be codified at

13  40 C.F.R. pt. 1500).

## I.    INTRODUCTION

15      2.      For more than fifty years, NEPA has served as our nation's bedrock law for

16  environmental protection by directing federal agencies to make well-informed decisions that

17  protect public health and the environment.  NEPA embodies our nation's democratic values by

18  involving states, territories, local governments, and the public in the federal decision making

19  process.

20      3.      In enacting NEPA, Congress recognized the "critical importance of restoring

21  and maintaining environmental quality to the overall welfare and development of man" and

22  emphasized a national policy of cooperation with state and local governments as well as

23  concerned individuals and private organizations "to use all practicable means … to create and

24  maintain conditions under which man and nature can exist in productive harmony, and fulfill

25  the social, economic, and other requirements of present and future generations of Americans."

26  42 U.S.C. § 4331(a).

1        4.     Consistent with this overarching policy, Congress directed federal agencies to

2    implement NEPA "to the fullest extent possible" and to conduct a detailed environmental

3    review for "major Federal actions significantly affecting the quality of the human

4    environment" that analyzes an action's environmental impacts, alternatives to the proposed

5    action, the relationship between short-term uses and long-term productivity, and any

6    irreversible and irretrievable commitment of resources. 42 U.S.C. §§ 4332, 4332(2)(C). As

7    the Supreme Court explained, Congress intended NEPA's "action-forcing procedures" to help

8    "insure that the policies [of NEPA] are implemented." *Andrus v. Sierra Club*, 442 U.S. 347,

9    350 (1979) (quoting S. Rep. No. 91-296, at 19 (1969)).

10        5.     NEPA is a success story of government transparency, meaningful public

11   participation, informed decision making, and environmental and public health protection.

12   Before NEPA, federal agencies often could make decisions without considering an action's

13   environmental impacts or public concerns about those impacts. NEPA requires that federal

14   agencies engage in a transparent, public, and informed decision making process to

15   comprehensively evaluate the environmental effects of their actions. NEPA's focus on

16   government transparency and public participation thus ensures that states, territories, local

17   governments, businesses, organizations, and individuals have a role in shaping federal actions.

18   State and territorial agencies, local governments, and the public have long relied on the NEPA

19   process to identify harms from federal actions to state and territorial natural resources

20   (including State Plaintiffs' air, water, public lands, cultural resources, and wildlife) and public

21   health that might otherwise be ignored. NEPA's public process also provides vulnerable

22   communities and communities of color that are too often disproportionately affected by

23   environmental harms a critical voice in the decision making process on actions that threaten

24   adverse environmental and health impacts. NEPA thus reflects the nation's democratic

25   principles by elevating the public's role in agency decision making and ensuring that federal

26   agencies thoughtfully review public input before making a decision.

First Amended Compl. for Declaratory and
Inj. Relief          4
Case No. 3:20-cv-06057

AR_0026440

6.      NEPA prioritizes careful, informed decision making over rushed and reckless action, enabling agencies to consider and adopt alternatives to a proposed action or incorporate mitigation measures that protect public health, preserve irreplaceable natural resources for current and future generations, and avoid long-term, irreversible, and costly environmental harms.  NEPA has thus led to more informed decisions and better environmental and public health outcomes for half a century.

7.      Promoting better decisions by federal agencies is particularly important when the nation faces the unparalleled threat of climate change, which disproportionately impacts communities already overburdened with pollution and associated public health impacts. Federal actions include coal, oil, and natural gas leasing; timber sales; offshore drilling; interstate transportation of coal, crude oil, and natural gas; and interstate transportation projects, among others.  These actions threaten to exacerbate climate change harms, pollute State Plaintiffs' air and water, disrupt wildlife habitats, and contribute to disproportionate public health harms.  Rigorous environmental review under NEPA identifies these harms, helps to mitigate and avoid them, and ultimately results in more responsible, less harmful federal actions.

8.      In 1978, defendant CEQ promulgated regulations that have guided NEPA's success for more than forty years.  These longstanding regulations have directed federal agencies, and, in some situations, state agencies and local governments involved in major Federal actions significantly affecting the environment, on how to comply with NEPA's procedural requirements and its environmental protection policies.  *See* 40 C.F.R. pt. 1500 (1978) (1978 regulations).

9.      Under the current administration, CEQ now seeks to derail NEPA by issuing a Final Rule that rewrites CEQ's enduring regulations implementing NEPA at the expense of the environment and the people it is meant to protect—including State Plaintiffs' residents, wildlife, and natural resources.  The Final Rule (i) severely limits which federal actions require

AR_0026441

1  NEPA compliance; (ii) greatly narrows the scope of federal agencies' obligation to consider

2  environmental impacts; (iii) threatens to render NEPA's public participation process a

3  meaningless paperwork exercise; and (iv) unlawfully seeks to restrict judicial review of agency

4  actions that violate NEPA.

5        10.     The Final Rule strikes at the heart of NEPA—violating NEPA's text and

6  purpose (including NEPA's clear mandate that agencies comply with the statute "to the fullest

7  extent possible," 42 U.S.C. § 4332), and abandoning informed decision making, public

8  participation, and environmental and public health protection.  In the Final Rule, CEQ

9  exceeded its authority by exempting certain actions from environmental review and attempting

10  to place unlawful limits on courts' authority to remedy plaintiffs' injuries from NEPA

11  violations.

12        11.     CEQ failed to provide a rational justification for its sweeping revisions to the

13  1978 regulations.  The Final Rule reverses CEQ's longstanding interpretations of and guidance

14  on NEPA, undercutting decades of reliance by State Plaintiffs on well-established NEPA

15  procedures and policies that allowed states, territories, and local governments to identify

16  potential harms to their natural resources and residents and to advocate for alternatives and

17  mitigation measures to avoid those harms.  CEQ asserted that the Final Rule advances the

18  original objectives of its 1978 regulations to reduce paperwork and delays while asserting that

19  it will "produce better decisions [that] further the national policy to protect and enhance the

20  quality of the human environment."  Final Rule, 85 Fed. Reg. at 43,313 (citing 43 Fed. Reg.

21  55,978 (Nov. 29, 1978)).  But CEQ failed to explain how the Final Rule will advance these

22  objectives when the Final Rule undercuts informed decision making and environmental

23  protection, and sweeps away decades of agency guidance and case law.  CEQ also failed to

24  comply with the APA's notice-and-comment requirements in promulgating the Final Rule.

25  The Final Rule thus violates the basic requirements of rational agency decision making.

26

First Amended Compl. for Declaratory and
Inj. Relief        6
Case No. 3:20-cv-06057

AR_0026442

12.     Further, the Final Rule may impact listed endangered and threatened species and designated critical habitat, yet CEQ failed to consult with the U.S. Fish and Wildlife Service (FWS) and the National Marine Fisheries Service (NMFS) (collectively, Services) regarding those impacts prior to promulgating the Final Rule, as required under section 7 of the ESA. 16 U.S.C. § 1536.

13.     Last, the Final Rule is unlawful because CEQ failed to review the Final Rule's significant environmental and public health impacts as required by NEPA itself.

14.     For these reasons, the Final Rule is arbitrary, capricious, and contrary to law in violation of the APA and NEPA, was promulgated in excess of statutory authority and without observance of procedure required by law, and should be vacated.

## II.     JURISDICTION AND VENUE

15.     This action raises federal questions and arises under NEPA, the APA, and the ESA. This Court therefore has jurisdiction over State Plaintiffs' claims pursuant to 28 U.S.C. § 1331 (action arising under the laws of the United States), 5 U.S.C. §§ 701–06 (APA), and 16 U.S.C. § 1540(g)(1) (ESA). State Plaintiffs seek declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201–02, 5 U.S.C. §§ 701–06, and 16 U.S.C. § 1540(g)(1)(A).

16.     An actual controversy exists between the parties within the meaning of 28 U.S.C. § 2201(a), and the Court may grant declaratory and injunctive relief under 28 U.S.C. §§ 2201–02, 5 U.S.C. §§ 705–06, and 16 U.S.C. § 1540(g)(1)(A).

17.     CEQ is an agency subject to APA requirements. 5 U.S.C. § 551. Each of the State Plaintiffs is a "person" authorized to bring suit under the APA to challenge unlawful final agency action. *Id.* §§ 551(2), 702. The Final Rule is a final agency action subject to review under the APA. *Id.* §§ 704, 706.

18.     The United States has waived sovereign immunity for claims arising under the APA. *Id.* § 702.

1    19.    CEQ is an agency subject to ESA requirements.  16 U.S.C. § 1540(g)(1)(A).

2   Each of the State Plaintiffs is a "person" authorized to bring suit under the ESA to challenge

3   violations of the ESA's requirements.  *Id*. §§ 1532(13), 1540(g)(1).  On September 22, 2020,

4   State Plaintiffs provided Defendants with sixty days' written notice of their intent to sue, in

5   satisfaction of ESA section 11(g).  16 U.S.C. § 1540(g)(2)(i).  A copy of the notice is attached

6   as Exhibit A.

7    20.    State Plaintiffs submitted timely and detailed comments opposing CEQ's

8   proposed rule that preceded the Final Rule, *see* Update to the Regulations Implementing the

9   Procedural Provisions of the National Environmental Policy Act, 85 Fed. Reg. 1,684 (Jan. 10,

10   2020) (Proposed Rule), and have therefore exhausted all administrative remedies.

11    21.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(e) because this is the

12   judicial district in which Plaintiff State of California resides, and this action seeks relief against

13   federal agencies and officials acting in their official capacities.

14       **III.    INTRADISTRICT ASSIGNMENT**

15    22.    Although no basis exists under Civil Local Rule 3-2(c) for assigning this action

16   to any particular location or division of this Court, this case is related to *Alaska Community*

17   *Action on Toxics v. Council on Environmental Quality*, Case No. 3:20-CV-05199, which

18   challenges the same Final Rule and is assigned to Judge Richard Seeborg in the San Francisco

19   Division.

20        **IV.    PARTIES**

21   **A.    Plaintiffs**

22    23.    Plaintiff STATE OF CALIFORNIA brings this action by and through Attorney

23   General Xavier Becerra.  The Attorney General is the chief law enforcement officer of the state

24   and has the authority to file civil actions in order to protect public rights and interests,

25   including actions to protect the natural resources of the state.  Cal. Const. art. V, § 13; Cal.

26   Gov't Code §§ 12600–12.  This challenge is brought in part pursuant to the Attorney General's

First Amended Compl. for Declaratory and
Inj. Relief               8
Case No. 3:20-cv-06057

AR_0026444

independent authority to represent the people's interests in protecting the environment and natural resources of California from pollution, impairment, or destruction.  Cal. Const. art. V, § 13; Cal. Gov't Code §§ 12511, 12600–12; *D'Amico v. Bd. of Med. Exam'rs,* 520 P.2d 10, 14 (Cal. Sup. Ct. 1974).

24.     The State of California has a sovereign interest in its natural resources and is the sovereign and proprietary owner of all the state's fish and wildlife resources, which are state property held in trust by the state for the benefit of the people of California.  *People v. Truckee Lumber Co.*, 48 P. 374, 374 (Cal. Sup. Ct. 1897); *Nat'l Audubon Soc'y v. Superior Ct.*, 658 P.2d 709, 727 (Cal. Sup. Ct. 1983).

25.     California has millions of acres of federal land across twenty national forests, nine national parks (including world-renowned Yosemite National Park), thirty-nine national wildlife refuges, seven national monuments, and numerous Department of Defense facilities, including at least thirty-two military bases.  California is also home to six primary and numerous auxiliary interstate highways, at least nine international airports, and major federal water infrastructure projects, such as the Central Valley Project, which controls a significant proportion of water distribution in the northern and southern regions of the state.  Federal agencies, including the U.S. Navy and the Coast Guard, also routinely engage in activities in California's coastal waters.  Major Federal actions concerning these lands, waters, projects, highways, airports, and other federal facilities are subject to NEPA.

26.     There are currently over 300 species listed as endangered or threatened under the ESA that reside wholly or partially within the State of California and its waters—more than any other mainland state.  Examples include the southern sea otter (*Enhydra lutris nereis*) found along California's central coastline, the desert tortoise (*Gopherus agassizii*) and its critical habitat in the Mojave Desert, the marbled murrelet (*Brachyramphus marmoratus*) in north coast redwood forests, as well as two different runs of Chinook salmon (*Oncorhynchus tshawytscha*) and their spawning, rearing, and migration habitat in the Bay-Delta and Central

AR_0026445

1 Valley rivers and streams. These and other species are affected by federal projects throughout

2 California. For example, Chinook salmon are threatened by the U.S. Bureau of Reclamation's

3 proposal to raise the level of the Shasta Reservoir in northern California.

4       27.    California state agencies, including the California Environmental Protection

5 Agency, the State Water Resources Control Board, the Air Resources Board, the California

6 Department of Food and Agriculture, and the Department of Fish and Wildlife have engaged in

7 the federal NEPA process to protect the state's interest in public health, environmental quality,

8 and state natural resources. For example, California agencies have commented repeatedly on

9 NEPA documents associated with the Bureau of Reclamation's proposal to raise the level of

10 the Shasta Reservoir. The Bureau recently published a draft Supplemental Environmental

11 Impact Statement (EIS) for this project, which is currently open for public comment. The

12 California Department of Water Resources and California Energy Commission also work with

13 federal agencies in preparing NEPA documents. In addition, Caltrans, California's

14 transportation agency, has assumed NEPA responsibilities from the Federal Highway

15 Administration (FHWA), and is thus responsible for complying with all applicable federal

16 environmental laws, including the Final Rule, and with FHWA's NEPA regulations that will

17 be revised under the Final Rule. *See* Memorandum of Understanding Between FHWA and the

18 California Department of Transportation Concerning the State of California's Participation in

19 the Surface Transportation Project Delivery Program Pursuant to 23 U.S.C. § 327 (Dec. 2016).

20       28.    Plaintiff STATE OF WASHINGTON is a sovereign entity and brings this

21 action to protect its sovereign and proprietary rights. The Attorney General is the chief legal

22 advisor to the State of Washington, and his powers and duties include acting in federal court on

23 matters of public concern. This challenge is brought pursuant to the Attorney General's

24 statutory and common law authority to bring suit and obtain relief on behalf of Washington.

25       29.    Washington has a sovereign and propriety interest in protecting its state

26 resources through careful environmental review at both the state and federal level. Washington

First Amended Compl. for Declaratory and
Inj. Relief                10
Case No. 3:20-cv-06057

1  has statutory responsibility to conserve, enhance, and properly utilize the state's natural

2  resources. Wash. Rev. Code. §§ 77.110.030, 90.03.010, 90.58.020; *see also* Wash. Const. art.

3  XVI, § 1. Washington has over six million acres of forest, range, agricultural, aquatic, and

4  commercial lands and holds proprietary rights for wildlife, fish, shellfish, and tide lands. Wash.

5  Const. art. XVII, § 1; Wash. Rev. Code § 77.04.012.

6         30.    Washington State has dozens of federally listed species. These listed species

7  include chinook (*Oncorhynchus tshawytscha*), chum (*Oncorhynchus keta*), and sockeye

8  (*Oncorhynchus nerka*) salmon, steelhead (*Oncorhynchus mykiss*), Southern Resident killer

9  whales (*Orcinus orca*) and the pygmy rabbit (*Brachylagus idahoensis*), the smallest rabbit in

10  North America. Washington also lists thirty-two species as state endangered species and

11  expends significant resources to protect and recover these species, some of which are not

12  federally protected. Wash. Admin. Code 220-610-010.

13         31.    Washington's natural resources generate more than $200 million in annual

14  financial benefits to state public schools, institutions, and county services. They also generate

15  billions of dollars worth of ecosystem services to surrounding communities by filtering

16  drinking water, purifying air, and providing space for recreation. Washington's natural areas

17  generate commercial and recreational opportunities that put billions of dollars into the

18  Washington economy annually.

19         32.    Washington has over 3,000 miles of coastline and millions of acres of federal

20  lands across ten national forests, three national parks, twenty-three national wildlife refuges,

21  three national monuments, and numerous Department of Defense locations, including at least

22  seven military facilities and training areas. Many of these federal lands abut Washington's

23  state-owned lands. Washington is also home to 145 federally owned or regulated dams,

24  including Grand Coulee Dam, three interstate highways, five international airports, and the

25  Hanford Nuclear Reservation. Federal agencies, including the U.S. Navy and the Coast Guard,

26  also routinely engage in activities in Washington's coastal waters and the adjacent exclusive

AR_0026447

1    economic zone and within Puget Sound, one of Washington's most significant ecological,

2    cultural, and economic features.  Major Federal actions concerning these lands, waters,

3    projects, highways, airports, and other federal facilities are subject to NEPA.

4         33.    Washington state agencies, including the Department of Ecology, the

5    Department of Fish and Wildlife, the Department of Transportation (WSDOT), the Department

6    of Natural Resources, and the Department of Health regularly engage in the federal NEPA

7    process as cooperating and commenting agencies or as agencies with special expertise

8    highlighting potential impacts to the state's natural resources and public health.  For example,

9    WSDOT and FHWA jointly worked on the NEPA process to replace the State Route 99

10   Alaskan Way viaduct in Seattle, Washington, where rigorous environmental review and

11   meaningful public engagement led to a selected alternative that worked for state and federal

12   agencies, local governments, tribes, and the public, including minority and low-income

13   communities.  Federal agency activities and actions requiring federal permits that affect

14   Washington's coastal zone, water quality, wildlife, and cultural resources are subject to NEPA

15   and are also reviewed by state agencies for consistency and compliance with Washington's

16   laws and programs.  In some situations, such as certain actions on federal lands, NEPA is the

17   sole means for state agencies to advocate for protection of Washington's resources, including

18   protection of state (but not federally) listed species and other species of concern and their

19   habitat, and to identify unintended consequences of a proposed action.

20        34.    Plaintiff STATE OF COLORADO is a sovereign entity that regulates land use,

21   water and air quality, wildlife, and water resources within its borders through duly enacted

22   state laws.  The State of Colorado brings this action in its sovereign and proprietary capacity to

23   protect public health, safety, welfare, its waters and environment, its wildlife and wildlife

24   habitat, and its economy.

25        35.    Clean air, land, and water provide ecologically vibrant habitats that undergird

26   the state's robust outdoor recreation economy.  For instance, in Colorado, fishing and wildlife

AR_0026448

watching each contribute $2.4 billion in economic output each year, supporting more than

30,000 jobs within the state.  Hunting supports nearly 8,000 additional jobs and contributes

more than $800 million in annual economic output.  The entire outdoor recreation economy,

which also includes hiking, skiing, and other activities, accounts for $62.5 billion dollars of

economic output in Colorado.  Colo. Parks & Wildlife, *The 2017 Economic Contributions of*

*Outdoor Recreation in Colorado* (July 2018).  Agriculture is also an important economic

engine and cultural resource in Colorado.  As of 2019, Colorado's agricultural industry

contributed $47 billion in economic output and directly employed more than 195,000 workers.

The natural environment influences all aspects of agriculture and food production in Colorado.

36.     Colorado is home to seventeen federally listed animals, including the recently-

listed Eastern black rail (*Laterallus jamaicensis*), the Canada lynx (*Lynx canadensis*), the

bonytail (*Gila elegans*), the greenback cutthroat trout (*Oncorhynchus clarki stomias*), which is

designated as the state fish, and the only ferret native to the Americas, the black-footed ferret

(*Mustela nigripes*).  Colorado lists thirty-one animal species as state endangered or threatened

species, a number of which are not federally protected.  The state is also home to sixteen

federally listed plants, including the Colorado hookless cactus (*Sclerocactus glaucus*) and the

Pagosa skyrocket (*Ipomopsis polyantha*).

37.     As Colorado's population rapidly grows, the state must ensure that projects

intended to serve that population also protect the natural environment for current and future

generations.  For example, the Colorado Department of Transportation prepares environmental

analyses for projects involving state and interstate highways, bridges, and multi-modal

transportation.  Similarly, the Colorado Department of Agriculture participates in NEPA

reviews for public-land grazing permit renewals and for range improvement projects involving

water distribution systems and habitat management.  Colorado's Department of Public Health

and Environment reviews projects for oil and gas leases, transportation, and wastewater

infrastructure as part of the NEPA process.  The Colorado Department of Natural Resources

AR_0026449

1    utilizes and participates in NEPA processes for land use and water planning, disaster

2    preparedness, and fish and wildlife protection.

3         38.    Through early and meaningful involvement in the NEPA process, state agencies

4    help ensure that NEPA reviews are informed by accurate technical and scientific analysis and

5    preserve important natural, historic, and cultural resources in Colorado communities.  To this

6    end, Colorado agencies regularly consider direct, indirect, and cumulative impacts on the

7    natural environment and general welfare.

8         39.    Plaintiff STATE OF CONNECTICUT is a sovereign entity and brings this

9    action to protect its citizens and natural resources.  The Connecticut Attorney General is an

10   elected constitutional official and the chief legal officer of the State of Connecticut.  The

11   Connecticut Attorney General's responsibilities include intervening in various judicial and

12   administrative proceedings to protect the interests of the citizens and natural resources of the

13   State of Connecticut and ensuring the enforcement of a variety of laws of the State of

14   Connecticut.  This challenge is brought pursuant to the Attorney General's statutory and

15   common law authority to bring suit and obtain relief on behalf of the State of Connecticut.

16        40.    Connecticut has a sovereign interest in protecting the health and safety of its

17   citizens and its natural resources.  Connecticut has a statutory duty to protect, conserve, and

18   properly utilize its natural resources and public trust lands.  Connecticut has over 1.7 million

19   acres of forest, 173,000 acres of wetlands, 437,000 acres of agricultural land, 70,000 acres of

20   shellfishing beds, and 22,000 acres of public trust lands, not including the entire seafloor of

21   Long Island Sound up to the New York border, which Connecticut holds in public trust.

22   Connecticut lists twenty-three species as endangered species and expends significant resources

23   to protect these species.  Connecticut's natural resources generate hundreds of millions of

24   dollars in annual financial benefits to the state and its citizens.

25        41.    Connecticut is home to fifteen federally listed animals, including the Puritan

26   Tiger Beetle (*Cicindela puritana*), the Dwarf Wedgemussel (*Alasmidonta heterodon*), and the

First Amended Compl. for Declaratory and
Inj. Relief                                              14
Case No. 3:20-cv-06057

1    Roseate Tern (*Sterna dougallii*), and four federally listed plants, including the Small Whorled

2    Pogonia (*Isotria medeoloides*) and the American Chaffseed (*Schwalbea americana*). Seven

3    additional animal species known to occur in Connecticut have been proposed for federal listing

4    under the ESA.

5          42.     Connecticut has 322 miles of coastline and three major ports (Bridgeport, New

6    Haven, and New London). Long Island Sound is Connecticut's largest and most important

7    maritime natural resource and is vital to Connecticut's economy. Maritime business accounts

8    for approximately five billion dollars in state economic output and provides 30,000 jobs and

9    tens of millions of dollars in state and local taxes.

10         43.     Connecticut is also home to sixteen federally regulated dams, three interstate

11   highways, an international airport, and the Naval Submarine Base in New London. Major

12   Federal actions concerning these lands, waters, projects, highways, airports, and other federal

13   facilities are subject to NEPA.

14         44.     Connecticut state agencies, including the Department of Energy and

15   Environmental Protection, the Department of Transportation, and the Department of Health

16   regularly engage in the federal NEPA process, often as agencies with special expertise relevant

17   to the potential impacts to the state's natural resources and public health. In these cases, the

18   opportunity for rigorous environmental review and meaningful public engagement have been

19   critical for state agencies, local governments, tribes, and the public, particularly for minority

20   and low-income communities. Federal agency activities and actions requiring federal permits

21   that affect Connecticut's coastal zone, water quality, wildlife, and cultural resources are subject

22   to NEPA and are also reviewed by state agencies for consistency and compliance with

23   Connecticut's laws and programs. In some situations, NEPA is the sole means for Connecticut

24   agencies to advocate for protection of Connecticut's citizens and natural resources.

25         45.     Plaintiff STATE OF DELAWARE is a sovereign state of the United States of

26   America. Delaware brings this action by and through Attorney General Kathleen Jennings,

AR_0026451

1  who is the chief law officer of Delaware, *Darling Apartment Co. v. Springer*, 22 A.2d 397, 403

2  (Del. 1941), and is empowered and charged with the duty to represent as counsel in all

3  proceedings or actions which may be brought on behalf or against the state and all officers,

4  agencies, departments, boards, commissions and instrumentalities of state government, Del.

5  Code Ann. tit. 29, § 2504.

6       46.    The State of Delaware has twenty-two federally listed endangered and

7  threatened species.  These listed species include Atlantic sturgeon (*Acipenser oxyrhynchus*),

8  shortnose sturgeon (*Acipenser brevirostrum*), loggerhead sea turtle (*Caretta caretta*), bog turtle

9  (*Glyptemys muhlenbergii*), red knot (*Calidris canutus*), black rail (*Laterallus jamaicensis*),

10  piping plover (*Charadrius melodus*), northern long-eared bat (*Myotis septentrionalis*), swamp

11  pink (*Helonias bullata*) and seabeach amaranth (*Amaranthus pumilus*).  Delaware also lists an

12  additional sixty-nine species as state endangered species that are not federally listed.

13       47.    As one of the most low-lying states in the nation, Delaware is particularly at

14  risk from the harms of climate change, including sea level rise.  For example, a 2012 Delaware

15  Sea Level Rise Vulnerability Assessment found that sea level rise of only 0.5 meters would

16  inundate either percent of the state's land area.  Areas inundated would include "transportation

17  and port infrastructure, historic fishing villages, resort towns, agricultural fields, wastewater

18  treatment facilities and vast stretches of wetlands and wildlife habitat of hemispheric

19  importance."  The Assessment concluded that "every Delawarean is likely to be affected by sea

20  level rise whether through increased costs of maintaining public infrastructure, decreased tax

21  base, loss of recreational opportunities and wildlife habitat, or loss of community character."

22       48.    Multiple entities within Delaware rely on NEPA as cooperating agencies.  For

23  example, the Delaware Coastal Management Program uses information provided in the federal

24  consistency determination required under Section 307 of the Coastal Zone Management Act of

25  1972 to assess impacts to Delaware's coastal uses and resources.  Federal agencies are

26  encouraged to use NEPA material to satisfy the federal consistency determination

First Amended Compl. for Declaratory and
Inj. Relief         16
Case No. 3:20-cv-06057

AR_0026452

1   requirements. Therefore, any rollback of NEPA obligations may cause the quality of

2   information submitted to degrade, leaving Delaware's coastal uses and resources more

3   vulnerable to federal activities in the state. Similarly, the Division of Water receives NEPA

4   documents in support of permit applications, such as Water Quality Certification

5   determinations. Delaware relies on the federal NEPA process to coordinate its protection of

6   the state's interests.

7       49.     Plaintiff STATE OF ILLINOIS brings this action by and through Attorney

8   General Kwame Raoul. The Attorney General is the chief legal officer of the State of Illinois

9   (Ill. Const., art. V, § 15) and "has the prerogative of conducting legal affairs for the State."

10  *Envt'l Prot. Agency v. Pollution Control Bd.*, 372 N.E.2d 50, 51 (Ill. Sup. Ct. 1977). He has

11  common law authority to represent the People of the State of Illinois and "an obligation to

12  represent the interests of the People so as to ensure a healthful environment for all the citizens

13  of the State." *People v. NL Indus.*, 604 N.E.2d 349, 358 (Ill. Sup. Ct. 1992).

14      50.     Illinois has a sovereign interest in protecting its natural resources through

15  careful environmental review at the federal level. Among other interests, Illinois has

16  "ownership of and title to all wild birds and wild mammals within the jurisdiction of the state."

17  520 Ill. Comp. Stat. 5/2.1. There are currently thirty-four species listed as endangered or

18  threatened under the ESA that reside wholly or partially within the State of Illinois and its

19  waters. For example, the Illinois cave amphipod (*Gammarus acherondytes*) is a small

20  crustacean that is endemic to six cave systems in Illinois' Monroe and St. Clair County.

21  Illinois is also home to the piping plover (*Charadrius melodus*). Additionally, the Illinois

22  Endangered Species Protection Board has listed 372 endangered species, many of which are

23  not federally protected. The state expends resources to protect and recover these species.

24      51.     Furthermore, federally managed lands in Illinois are vitally important to the

25  state and in need of protection. The Shawnee National Forest spans over 289,000 acres in

26  southern Illinois and straddles six natural ecological regions; the Midewin National Tallgrass

AR_0026453

Prairie is the largest open space in the Chicago metropolitan area.  Additionally, significant oil and gas pipeline development takes place in Illinois.

52.     Plaintiff STATE OF MAINE, a sovereign state of the United States of America, brings this action by and through its Attorney General Aaron Frey.  The Attorney General of Maine is a constitutional officer with the authority to represent the State of Maine in all matters and serves as its chief legal officer with general charge, supervision, and direction of the state's legal business.  Me. Const. art. IX, § 11; 5 M.R.S.A. §§ 191–205.  The Attorney General's powers and duties include acting on behalf of Maine and the people of Maine in the federal courts on matters of public interest.  The Attorney General has the authority to file suit to challenge action by the federal government that threatens the public interest and welfare of Maine residents as a matter of constitutional, statutory, and common law authority.

53.     Maine has a sovereign interest in protecting its natural resources through careful environmental review at both the state and federal level.  Maine has over 3,000 miles of coastline, a coastline that generates millions of dollars in commercial fishing income and tourism income, and recreational opportunities to the residents of the state.  Federal agencies' activities in these vital coastal waters are regulated under NEPA.  Federally protected lands in Maine total 295,479 acres, including Acadia National Park, which includes 47,000 acres, and Katahdin Woods and Waters National Monument, with 87,563 acres.  Maine has eleven National Wildlife Refuges which encompass 76,230 acres, including the renowned Rachel Carson National Wildlife Refuge.  Maine has two federal fish hatcheries, several airports, one military base, 365 miles of federal interstate highways, and ninety-two federally licensed dams.

54.     The State of Maine has seventeen species federally listed as endangered or threatened.  These listed species include Piping Plovers (*Charadrius melodus*), Leatherback sea turtles  (*Dermochelys coriacea*), Roseate terns (*Sterna dougallii*), Northern Atlantic Right Whales (*Eubalaena glacialis*), Canada Lynx (*Lynx canadensis*), Atlantic Salmon (*Salmo salar*), Northern Long-Eared Bats (*Myotis septentrionalis*), and Rusty patched bumble bees

1  (*Bombus affinis*).  Maine lists 64 marine and inland species as endangered or threatened in the

2  State, most of which are not federally listed.  The State devotes considerable resources to

3  protecting these species and the habitat that is vital to their survival and recovery.

4     55. Maine's environmental agencies, including the Department of Environmental

5  Protection, the Department of Marine Resources, the Department of Inland Fisheries and

6  Wildlife, and the Department of Agriculture, Conservation and Forestry, engage in the federal

7  NEPA process to protect the state's natural resources and public health.  NEPA review of

8  Federal agency activities and activities requiring federal permits that affect Maine's natural

9  resources provides essential protection to Maine's environment.

10     56. Plaintiff STATE OF MARYLAND brings this action by and through its

11  Attorney General, Brian E. Frosh.  The Attorney General of Maryland is the state's chief legal

12  officer with general charge, supervision, and direction of the state's legal business.  Under the

13  Constitution of Maryland and as directed by the Maryland General Assembly, the Attorney

14  General has the authority to file suit to challenge action by the federal government that

15  threatens the public interest and welfare of Maryland residents.  Md. Const. art. V, § 3(a)(2);

16  Md. Code. Ann., State Gov't § 6-106.1.  Maryland has enacted its own Environmental Policy

17  Act, *see* Md. Code. Ann., Nat. Res. §§ 1-301 *et seq.*, which is triggered upon the general

18  assembly's appropriation of funding for major projects.

19     57. The State of Maryland has a sovereign and proprietary interest in protecting its

20  state resources through careful environmental review of major federal actions.  These resources

21  include the Chesapeake Bay, one of the nation's most productive estuaries with a watershed

22  that spans 64,000 square miles across six states and the District of Columbia.  It is the official

23  policy of the state "to conserve species of wildlife for human enjoyment, for scientific

24  purposes, and to insure their perpetuation as viable components of their ecosystems."

25  Maryland Nongame and Endangered Species Conservation Act, Md. Code. Ann., Nat. Res.

26  § 10-2A-02.  To that end, more than 150 species of animals and 340 species of plants are listed

First Amended Compl. for Declaratory and
Inj. Relief     19
Case No. 3:20-cv-06057

AR_0026455

1   as state endangered, threatened, or in need of conservation.  *See* COMAR 08.03.08 (providing

2   lists of plant and wildlife species with elevated conservation statuses).

3       58.     Twenty-one federally listed species, including thirteen animals and eight plants,

4   are believed to occur in Maryland.  Currently listed species include the federally endangered

5   dwarf wedgemussel (*Alasmidonta heterodon*), the federally threatened bog turtle (*Glyptemys*

6   *muhlenbergii*), and the federally threatened Puritan tiger beetle (*Cicindela puritan*).  Maryland

7   is also home to one of the Endangered Species Act's biggest success stories, the Delmarva Fox

8   Squirrel (*Sciurus niger cinereus*), which thanks to federal, state, and private conservation

9   efforts, was removed from the list of federally threatened species in 2010.

10      59.     The federal government has a large presence in Maryland.  There are more than

11  480 miles of interstate highways in Maryland, including I-95, I-70, the Baltimore Beltway, and

12  portions of the capital beltway that connects the greater Washington, D.C. Metropolitan Area.

13  A number of federally owned or operated facilities are also located in Maryland including the

14  Aberdeen Proving Ground, U.S. Naval Academy in Annapolis, and Camp David.

15  Additionally, the state is home to five National Wildlife Refuges, the Assateague Island

16  National Seashore, and numerous national parks, monuments, and battlefields.  Major federal

17  actions concerning these lands, waters, highways, and parks are subject to NEPA review.

18      60.     Maryland agencies frequently participate in and rely on the federal NEPA

19  process as cooperating and commenting agencies.  The State Highway Administration, for

20  example, addresses floodplain management for federally funded projects through NEPA, and

21  the Maryland Department of the Environment completes NEPA-like reviews for projects

22  funded through the U.S. Environmental Protection Agency's State Revolving Fund programs

23  for clean water and drinking water.

24      61.     Plaintiff PEOPLE OF THE STATE OF MICHIGAN brings this action by and

25  through Attorney General Dana Nessel, who is authorized by statute and under common law to

26  initiate litigation in the public interest on behalf of the People of the State of Michigan.

AR_0026456

62.     Michigan has twenty-six federally listed threatened and endangered species. The listed species include the Eastern Massasauga rattlesnake (*Sistrurus catenatus*), the Canada lynx (*Lynx canadensis*), and the Piping plover (*Charadrius melodus*).

63.     Among other things, the People of the State of Michigan will be harmed by the federal government's dereliction of duty in the Final Rule's treatment of climate change under NEPA. Michigan is already being harmed by climate change. Since 1951, the average annual temperature has increased by a range of 0.6-1.3 degrees Fahrenheit across the Lower Peninsula. During that same time, annual average precipitation increased by 4.5 percent as well. Michigan faces extreme heat events, excess rain and flooding, respiratory illnesses, heat-related illnesses, and both waterborne and vector-borne diseases. As a result, Michigan is tasked with protecting its citizens from temperature-related illness, respiratory diseases, waterborne diseases exacerbated by extreme rain events, and infectious diseases such as Lyme disease and West Nile Virus. Increased precipitation will also damage Michigan roads, bridges, dams and other physical infrastructure.

64.     Plaintiff STATE OF MINNESOTA brings this action by and through its chief legal officer, Attorney General Keith Ellison, to protect Minnesota's interest in its natural resources and the environment. This challenge is brought pursuant to the Attorney General's authority to represent the state's interests. Minn. Stat. § 8.01. Minnesota has enacted and devotes significant resources to implementing numerous laws concerning the management, conservation, protection, restoration, and enhancement of its natural resources. *See, e.g.*, Minn. Stat. Chs. 116B, 116D. Minnesota owns its wildlife resources, Minn. Stat. § 97A.025, and manages them for the benefit of all citizens. Minnesota state agencies, including the Minnesota Pollution Control Agency, the Department of Natural Resources, the Public Utilities Commission, the Department of Commerce, and the Environmental Quality Board regularly engage in the federal NEPA process to protect the state's interest in public health,

AR_0026457

environmental quality, and state natural resources.  Minnesota has a direct interest in the

strength and integrity of NEPA's implementing regulations.

65.     Minnesota is home to Voyaguers National Park, two national monuments, two

national forests, three wilderness areas, and one national recreation area.  In 2019, there were

1,099,276 recreational visits to federal lands and facilities in Minnesota, generating over $60

million in visitor spending for the Minnesota economy.  *2019 National Park Visitor Spending*

*Effects Report*, National Park Service, (Apr. 2020), https://www.nps.gov/subjects/

socialscience/vse.htm.  These figures do not include the more than 110,000 visitors who

traveled through the Boundary Waters Canoe Area Wilderness (BWCAW) every year between

2009 and 2016.  *USFS Permit and Visitor Use Trends, 2009-2016*, USDA Forest Service, (July

7, 2017), https://www.fs.usda.gov/Internet/FSE_DOCUMENTS/fseprd549672.pdf.  The

BWCAW is the most visited wilderness area in the United States.

66.     Federally listed endangered species in Minnesota include the Rusty-Patched

Bumble Bee, *(bombus affinis)*, the Topeka Shiner (*nontropis topeka*), the Higgins Eye

Pearlymussel (*lampsilis higgininsi*), and the Winged Mapleleaf Mussel (*quadrula fragosa*).  Of

special concern are the Canada lynx (*lynx canadensis*) and the Western Prairie Fringed Orchid

(*plantanthera praeclara*).

67.     There are several major infrastructure projects currently proposed in Minnesota

that have been or will be subject to NEPA review.  For example, Enbridge Energy, Limited

Partnership seeks to replace an oil pipeline that traverses Minnesota, which requires several

state and federal permits.  There are also two proposed copper-nickel mining projects in

Minnesota—one in the watershed of the Boundary Waters Canoe Area Wilderness—that will

require many state and federal permits.  These projects have attracted a great deal of public

attention from Minnesotans and millions, including Minnesota state agencies, have participated

in the review processes to date.

AR_0026458