68.    Plaintiff STATE OF NEVADA is a sovereign entity and brings this action by and through Attorney General Aaron Ford to protect its sovereign and proprietary rights. The Nevada Attorney General is the chief law enforcement officer of the State. Attorney General Ford's powers and duties include acting in federal court on matters of public concern and he has the authority to file civil actions in order to protect public rights and interests, including actions to protect the natural resources of the State. Nev. Const. art. V, § 19; Nev. Rev. Stat. §§ 228.170, 228.180. This challenge is brought pursuant to the Attorney General's independent constitutional, statutory, and common law authority to represent the people's interests in protecting the environment and natural resources of the State of Nevada from pollution, impairment, or destruction. Nev. Const. art. V, § 19; Nev. Rev. Stat. § 228.180.

69.    Nevada has a sovereign and propriety interest in protecting its natural resources through careful environmental review and is the sovereign and proprietary owner of all the State's fish and wildlife and water resources, which are State property held in trust by the State for the benefit of the people of the State. N.R.S. 501.100 provides that "[w]ildlife in this State not domesticated and in its natural habitat is part of the natural resources belonging to the people of the State of Nevada [and t]he preservation, protection, management and restoration of wildlife within the State contribute immeasurably to the aesthetic, recreational and economic aspects of these natural resources." *See Ex parte Crosby*, 38 Nev. 389, 149 P. 989 (1915); *See also*, *Kleppe v. New Mexico*, 426 U.S. 529, 545 (1976) ("Unquestionably the States have broad trustee and police powers over wild animals within their jurisdictions."). In addition, the State of Nevada has enacted numerous laws concerning the conservation, protection, restoration and enhancement of the fish and wildlife resources of the State, including endangered and threatened species, and their habitat. As such, the State of Nevada has an interest in protecting species in the State from actions both within and outside of the State. Nevada's natural resources generate more than one hundred million dollars in annual financial benefits to state public schools, institutions, and county services. Nevada's natural

AR_0026459

1    areas also generate commercial and recreational opportunities that put billions of dollars into

2    Nevada's economy annually.

3        70.    There are currently over thirty-eight species listed as endangered or threatened

4    under the ESA that reside wholly or partially within the State of Nevada.  Examples include

5    the desert tortoise (*Gopherus agassizii*) and its critical habitat in the Mojave Desert, the Devil's

6    Hole pupfish (*Cyprinodon diabolis*) reliant on limited aquifers within the Amargosa Desert

7    ecosystem, the Lahontan cutthroat trout (*Oncorhynchus clarkii henshawi*) indigenous to

8    Pyramid and Walker Lakes and nearly extirpated by American settlement in the Great

9    Basin*,* Sierra Nevada bighorn sheep (*Ovis Canadensis sieera*), and the greater sage-grouse

10   (*Centrocercus urophasianus*) found in the foothills, plains and mountain slopes where

11   sagebrush is present across fifteen of Nevada's seventeen counties.

12       71.    Nevada has approximately 58,226,015 acres of federally-managed lands,

13   totaling about 84.9 percent of the State's lands, including three national forests, two national

14   parks, three national historic trails, nine national wildlife refuges, three national monuments,

15   one national recreation area, two international airports, seventy wilderness areas, and numerous

16   Department of Defense and Department of Energy locations.  The federal agencies that manage

17   these millions of acres and federal actions concerning these lands are subject to NEPA,

18   including the Bureau of Indian Affairs, the Bureau of Land Management, the Bureau of

19   Reclamation, the Department of Defense, the Department of Energy, the FWS, the Forest

20   Service, and the National Park Service.  Moreover, additional non-federal lands and facilities

21   in Nevada are subject to federal permitting and licensing requirements.

22       72.    Nevada state departments and agencies, including the Department of

23   Conservation and Natural Resources and its many Divisions, the Department of Wildlife, the

24   Department of Transportation, the Agency for Nuclear Projects, the Department of Agriculture,

25   the Colorado River Commission, and the Nevada System of Higher Education, regularly

26   engage in the federal NEPA process as cooperating and commenting agencies or as agencies

First Amended Compl. for Declaratory and
Inj. Relief             24
Case No. 3:20-cv-06057

AR_0026460

1    with special expertise highlighting potential impacts to the state's natural resources and public

2    health.  Federal agency activities and actions requiring federal permits that affect Nevada's

3    environmental quality, wildlife, mineral, and cultural resources are subject to NEPA and are

4    also reviewed by state agencies for consistency and compliance with Nevada's laws and

5    programs.  In some situations, NEPA is the sole means for state agencies to advocate for

6    protection of Nevada's resources.

7          73.    Plaintiff STATE OF NEW JERSEY is a sovereign state of the United States of

8    America and brings this action on behalf of itself and as trustee, guardian and representative of

9    the residents and citizens of New Jersey.  As the most densely developed state in the country,

10   New Jersey has actively pursued conservation programs for land and natural resources.  New

11   Jersey's voters have approved more than $3.3 billion in funding for New Jersey Department of

12   Environmental Protection's (NJDEP) Green Acres program to conserve ecologically-sensitive

13   or natural resource-laden properties.  Similarly, over 230,000 acres of farmland have been

14   conserved through New Jersey's State Agricultural Development Committee.

15         74.    New Jersey expends significant resources protecting its natural resources,

16   including eighty-three state-listed threatened or endangered species, and holds all wildlife, fish,

17   shellfish, and tidal waters in trust for its citizens.  New Jersey has at least fourteen federally

18   listed species, including the threatened piping plover (*Charadrius melodus*), red knot (*Calidris*

19   *canutus rufa*), and the recently designated New Jersey state reptile, the bog turtle (*Clemmys*

20   *muhlenbergii*).

21         75.    New Jersey is home to well over one hundred miles of coastline, which includes

22   the famed Jersey Shore as a significant tourism driver, and federal activities such as seismic

23   testing and offshore drilling have historically been proposed off of New Jersey's coastline.

24   New Jersey is also home to three primary interstate highways and numerous auxiliary interstate

25   highways, including auxiliary highways running from other states' interstate systems,

26   numerous military installations, including Joint Base McGuire-Dix-Lakehurst, and federal

AR_0026461

1  parks and natural areas where a fully functional NEPA process is essential to sound

2  environmental planning.  Due to its geographic location, New Jersey has also become the site

3  for numerous proposed energy transmission infrastructure projects which require federal

4  approvals and are subject to NEPA.  New Jersey agencies and authorities, including but not

5  limited to NJDEP, regularly engage in the federal NEPA process.  NJDEP routinely comments

6  during the NEPA process to inform the relevant federal agency about mechanisms to avoid,

7  minimize, and/or mitigate potential impacts to the environment and public health, as well as to

8  educate the federal agency about New Jersey's own statutory and regulatory requirements.

9  Further, project proponents may use an EIS properly completed under NEPA or properly

10  promulgated categorical exemptions as a substitute for compliance with New Jersey's

11  Executive Order 215 (1989).

12      76.     Plaintiff STATE OF NEW MEXICO joins in this action by and through

13  Attorney General Hector Balderas.  The Attorney General of New Mexico is authorized to

14  prosecute in any court or tribunal all actions and proceedings, civil or criminal, when, in his

15  judgment, the interest of the state requires such action.  N.M. Stat. Ann. § 8-5-2.  New Mexico

16  has a statutory duty to "ensure an environment that in the greatest possible measure will confer

17  optimum health, safety, comfort and economic and social well-being on its inhabitants; will

18  protect this generation as well as those yet unborn from health threats posed by the

19  environment; and will maximize the economic and cultural benefits of a healthy people." *Id.*

20  § 74-1-2.

21      77.     Federal agencies have an enormous footprint in New Mexico.  More than one-

22  third of New Mexico's land is federally administered, with the United States Department of

23  Agriculture, Department of the Interior, and Department of Defense playing active roles in

24  land management within the state.  The state is home to the nation's newest national park

25  (White Sands National Park, established 2019); first designated wilderness area (Gila

26  Wilderness, established 1924); and largest military installation (White Sands Missile Range).

AR_0026462

1    It also hosts two National Laboratories, three Air Force Bases, and the nation's only deep

2    geologic repository for nuclear waste (the United States Department of Energy's Waste

3    Isolation Pilot Project or WIPP).  The state contains a significant portion of the Navajo Nation

4    Indian reservation as well as twenty-two other federally recognized Indian tribes.  The U.S.

5    Army Corps of Engineers operates seven dams in New Mexico, and the U.S. Department of

6    Agriculture manages five in-state National Forests, comprising over nine million acres.  The

7    Bureau of Land Management (BLM) also oversees over thirteen million acres of public lands,

8    thirty-six million acres of federal mineral estate, and approximately eight million acres of

9    Indian trust minerals in New Mexico.  BLM has approved over 7,800 oil and gas leases in the

10   state, as well as twenty-one federal coal leases encompassing 42,756 acres.

11        78.     New Mexico is home to a vast array of plant and animal species, many of which

12   are either threatened or endangered.  Indeed, FWS lists forty-one animal and fourteen plant

13   species as threatened or endangered in New Mexico.  These include the endangered, iconic

14   Southwestern willow flycatcher (*Empidonax traillii extimus*), the endangered Rio Grande

15   silvery minnow (*Hybognathus amarus*), the endangered jaguar *(Panthera onca)*, the

16   endangered Mexican wolf (*Canis lupus baileyi*), and the threatened Mexican spotted owl (*Strix

17   occidentalis lucida*).  Furthermore, the New Mexico Department of Game and Fish maintains

18   its own list of 116 in-state threatened and endangered species and subspecies – including

19   crustaceans, mollusks, fishes, amphibians, reptiles, birds, and mammals – many of which are

20   not listed by FWS and do not receive federal protection.  Among the species receiving only

21   state protection are the endangered Gila monster (*Heloderma suspectum*), the endangered

22   brown pelican (*Pelecanus occidentalis*), and the threatened white-sided jackrabbit (*Lepus

23   callotis*).

24        79.     New Mexico faces serious environmental challenges in the 21st century.  The

25   state is already experiencing the adverse effects of climate change, and average temperatures in

26   New Mexico have been increasing fifty percent faster than the global average over the past

AR_0026463

century. According to the Third U.S. National Climate Assessment, streamflow totals in the Rio Grande and other rivers in the Southwest were five percent to thirty-seven percent lower between 2001 and 2010 than the 20th century average flows. As of August 20, 2020, 100 percent of the state is suffering from drought conditions, with approximately 55.5 percent being in a "severe drought." (*See* Nat'l Integrated Drought Info. Sys., https://www.drought.gov/drought/states/new-mexico). It is estimated that forty percent of Navajo Nation residents already lack running water.

80. New Mexico relies on participation in the NEPA process to protect its proprietary and sovereign interests in its natural resources, including weighing the short-term benefits of resource extraction against the long-term effects of climate change, and conserving scarce water resources. In one recent example, the New Mexico State Auditor's Office, the New Mexico Department of Game and Fish, and the New Mexico Department of Agriculture submitted comments to BLM regarding the Farmington Mancos-Gallup Resource Management Plan Amendment, calling BLM's attention to, among other things, the state's land and water conservation planning efforts. Other EISs the state has recently commented on include those for Los Alamos National Lab (Sitewide EIS); the New Mexico Unit of the Central Arizona Project (regarding diversion of water from the Gila River); and Plutonium Pit Production at the Department of Energy's Savannah River Site (regarding effects from waste shipped to WIPP). The New Mexico Environment Department alone has submitted comments on eleven EISs in 2020 so far.

81. Plaintiff STATE OF NEW YORK brings this action on its own behalf and on behalf of its environmental agency, the New York State Department of Environmental Conservation (NYSDEC), to protect New York's sovereign and proprietary interests, which include ownership of all wildlife in the state, N.Y. Envtl. Conserv. Law § 11-0105, and numerous waterbodies, including without limitation: the land under the "marginal sea" to a line three miles from the coast, the Great Lakes within the state's territorial jurisdiction, Lake

1   Champlain and the St. Lawrence and Niagara Rivers, as well as the Hudson and Mohawk

2   Rivers, Lake George, Cayuga Lake, Canandaigua Lake, Oneida Lake, and Keuka Lake. *See*

3   *Town of N. Elba v. Grimditch*, 98 A.D.3d 183, 188–89 (N.Y. App. Div. 3d Dep't 2012). The

4   state also owns approximately 4.8 million acres of park and forest lands, including more than

5   2.8 million acres of "forever wild" forest preserve. N.Y. Const. art. XIV.

6         82.     There are dozens of federally endangered or threatened species that reside in

7   whole or in part within the State of New York and its waters. Examples include four sea

8   turtles that can be found in New York waters—the loggerhead (*Caretta caretta*), green

9   (*Chelonia mydas*), leatherback (*Dermochelys coriacea*) and Kemp's Ridley (*Lepidochelys*

10   *kempii*). New York hosts ten National Wildlife Refuges, home to federally protected species

11   like the Piping Plover (*Charadrius melodus*), and dozens of other federal sites. Other species

12   of concern include the endangered shortnose sturgeon (*Acipenser brevirostrum*), Atlantic

13   sturgeon (*Acipenser oxyrinchus)*, and the Northern long-eared bat (*Myotis septentrionalis*).

14   Strong ESA protections both within its state borders and throughout each species' range are

15   fundamental to New York's interests.

16         83.     New York is home to nine primary and twenty-two auxiliary interstate

17   highways, six international airports, and several federal military installations, including Fort

18   Drum, the United States Military Academy at West Point, and the Watervliet Arsenal. New

19   York is also home to the Western New York Nuclear Service Center, a program of the New

20   York State Energy Research and Development Authority (NYSERDA), which owns, in trust

21   for the People of the State of New York, a 3,300-acre former nuclear waste re-processing

22   facility that is the subject of an ongoing joint lead agency supplemental environmental review

23   of decommissioning activities under NEPA and state law.

24         84.     New York state agencies and authorities, collectively, including without

25   limitation the NYSDEC and NYSERDA, regularly engage or are presently engaged in the

26   federal NEPA process. Federal agency activities and actions requiring federal permits that

First Amended Compl. for Declaratory and
Inj. Relief          29
Case No. 3:20-cv-06057

AR_0026465

1    affect New York's coastal zone, water quality, wildlife, and cultural resources are subject to

2    NEPA, and NEPA analysis is used to support state decision making. For example, where

3    federal and state environmental reviews of a project are undertaken, the NYSDEC may rely on

4    a NEPA EIS where it is sufficient for the agency to make findings under state law. Where no

5    EIS is prepared under NEPA, the NEPA record developed to support a Finding of No

6    Significant Impact may inform the record for analysis under state law. And where state

7    environmental review may be preempted, New York agencies such as NYSDEC may use

8    NEPA analysis to support their decisions, such as water quality certifications.

9        85.    Plaintiff STATE OF NORTH CAROLINA brings this action by and through

10   Attorney General Joshua H. Stein. The North Carolina Attorney General is the chief legal

11   officer of the State of North Carolina. The Attorney General is empowered to appear for the

12   State of North Carolina "in any cause or matter … in which the state may be a party or

13   interested." N.C. Gen. Stat. § 114-2(1). Moreover, the Attorney General is authorized to bring

14   actions on behalf of the citizens of the state in "all matters affecting the public interest." *Id.*

15   § 114-2(8)(a).

16        86.    North Carolina has a sovereign and propriety interest in protecting its state

17   resources through careful environmental review at both the state and federal level. It is the

18   constitutional policy of North Carolina to conserve and protect its lands and waters for the

19   benefit of all its citizenry. N.C. Const. Art. XIV, § 5. Under North Carolina law, "the marine

20   and estuarine and wildlife resources of North Carolina belong to the people of the state as a

21   whole." N.C. Gen. Stat. § 113-131(a). Furthermore, North Carolina's General Assembly has

22   declared that it is the policy of the State of North Carolina to "encourage the wise, productive,

23   and beneficial use of the natural resources of the State without damage to the environment,"

24   and to "maintain a healthy and pleasant environment, and preserve the natural beauty of the

25   State." *Id.* § 113A-3.

26

First Amended Compl. for Declaratory and
Inj. Relief      30
Case No. 3:20-cv-06057

AR_0026466

87.     North Carolina contains over two million acres of federally-owned lands, including lands managed by the U.S. Forest Service, FWS, National Park Service, and Department of Defense. North Carolina has ten national parks and forty-one state parks. North Carolina is home to thirty-nine animal and twenty-seven plant species that have been listed as endangered or threatened by the FWS, including the endangered Red-cockaded woodpecker (*Picoides borealis*), Carolina northern flying squirrel (*Glaucmys sabrinus coloratus*), and Leatherback sea turtle (*Dermochelys coriacea*).

88.     North Carolina agencies regularly engage in the federal NEPA process as cooperating and commenting agencies or as agencies with special expertise highlighting potential impacts to the state's natural resources and public health.

89.     Plaintiff STATE OF OREGON brings this suit by and through Attorney General Ellen Rosenblum. The Oregon Attorney General is the chief legal officer of the State of Oregon. The Attorney General's duties include acting in federal court on matters of public concern and upon request by any state officer when, in the discretion of the Attorney General, the action may be necessary or advisable to protect the Oregon's interests. Or. Rev. Stat. § 180.060(1).

90.     The State of Oregon has a sovereign interest in its natural resources and is the sovereign owner of the state's fish and wildlife. Under Oregon law, "[w]ildlife is the property of the State." *Id.* § 498.002. The State of Oregon has enacted numerous laws and rules concerning the conservation and protection of the natural resources of the state. *See, e.g.*, Oregon Endangered Species Act, Or. Rev. Stat. §§ 496.171–.192, 498.026; Fish and Wildlife Habitat Mitigation Policy, Or. Admin. R. 635-415-0000 (creating "goals and standards to mitigate impacts to fish and wildlife habitat caused by land and water development actions"); Or. Admin. R. 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(5) ("[l]ocal governments shall adopt programs that will protect natural resources"). Oregon State has sixty-six federally listed species (including plants and invertebrates). These listed species include upper Columbia River steelhead (*Oncorhynchus*

AR_0026467

*mykiss*), upper Willamette River chinook salmon (*Oncorhynchus tshawytscha*), the marbled

murrelet (*Brachyramphus marmoratus*), and the Oregon spotted frog (*Rana pretiosa*). Oregon

also lists thirty species as state endangered or threatened species and expends significant

resources to protect and recover these species, some of which (for example, the California

brown pelican) are not federally protected.

91.     Natural resources are the source of substantial economic activity in Oregon.

More than $2.6 billion annually is spent in Oregon by residents and visitors on trips and

equipment for wildlife-watching, fishing, and hunting. The state also owns at least 1.775

million acres of land, including land managed by the Department of Forestry and the

Department of State Lands. (That figure generally excludes state-owned waterbodies and

rights of way.) Revenue from the 780,000 acres of land managed by the Department of State

Lands is placed in the Common School Fund, which generates tens of millions of dollars

annually for Oregon public schools.

92.     More than half of Oregon's land area is owned by the federal government.

BLM manages over fifteen million acres in Oregon. The U.S. Forest Service also manages

over fifteen million acres (across eleven national forests). Oregon has eighteen national

wildlife refuges and Crater Lake National Park. Oregon has three primary and three auxiliary

interstate highways. Many Oregon resources, such as the Common School Trust Lands and

navigable waters, are ecologically connected to federal lands. Oregon's fish and wildlife

resources also rely on federal lands and waters.

93.     Oregon state agencies, including the Department of Fish and Wildlife, the

Department of Transportation, the Department of State Lands, and the Oregon Department of

Parks and Recreation, regularly engage in the federal NEPA process as cooperating and

commenting agencies or as agencies with special expertise highlighting potential impacts to the

state's natural resources and public health.

AR_0026468

94.     Plaintiff STATE OF RHODE ISLAND is a sovereign entity and brings this action to protect its sovereign and proprietary rights.  The Attorney General is the chief legal advisor to the State of Rhode Island, and his powers and duties include acting in federal court on matters of public concern.  This challenge is brought pursuant to the Attorney General's statutory and common law authority to bring suit and obtain relief on behalf of Rhode Island.

95.     Rhode Island has a sovereign and propriety interest in protecting its state resources through careful environmental review at both the state and federal level.  Rhode Island has a statutory responsibility to conserve, enhance, and properly utilize the state's natural resources.  R.I. Gen. Laws § 10-20-1; *see also* R.I. Const. art. I, § 17.  Although Rhode Island is the smallest state in land size, forests cover fifty-nine percent of its land area, with a total of 393,000 acres.  It also has thousands of miles of freshwater streams, rivers, and lakes.  Rhode Island lists over twenty-five species as endangered species and expends significant resources to protect and recover these species, some of which are not federally protected.  Rhode Island's natural resources generate millions of dollars in annual financial benefits to state public schools, institutions, and municipal services.  They also generate millions of dollars' worth of ecosystem services to surrounding communities by filtering drinking water, purifying air, and providing space for recreation.  Rhode Island's natural areas generate commercial and recreational opportunities that put hundreds of millions of dollars into the Rhode Island economy annually.

96.     Rhode Island has over 400 miles of coastline and thousands of acres of federal lands across three National Park Service affiliated sites, five national wildlife refuges, numerous national monuments and historic sites, and numerous Department of Defense locations, including Naval Station Newport and the Quonest Point Air National Guard Station.  Many of these federal lands abut Rhode Island's state-owned lands.  Rhode Island is also home to two interstate highways and one international airport.  Federal agencies, including the U.S. Navy and the Coast Guard, also routinely engage in activities in Rhode Island's coastal waters.

1    Major Federal actions concerning these lands, waters, projects, highways, airports, and other

2    federal facilities are subject to NEPA.

3         97.      Rhode Island state agencies, including the Department of Environmental

4    Management and the Coastal Resources Management Council (CRMC), the Department of

5    Transportation, and the Department of Health regularly engage in the federal NEPA process as

6    cooperating and commenting agencies or as agencies with special expertise highlighting

7    potential impacts to the state's natural resources and public health.  For example, CRMC and

8    the federal Bureau of Offshore Energy Management jointly worked on the NEPA process to

9    design the installation of a new offshore wind energy project, where rigorous environmental

10    review and meaningful public engagement led to a selected alternative that worked for state

11    and federal agencies, local governments, tribes, and the public, including the commercial

12    fishing industry.  Federal agency activities and actions requiring federal permits that affect

13    Rhode Island's coastal zone, water quality, wildlife, and cultural resources are subject to

14    NEPA and are also reviewed by state agencies for consistency and compliance with Rhode

15    Island's laws and programs.  In some situations, NEPA is the sole means for state agencies to

16    advocate for protection of Rhode Island's resources, including protection of state listed species

17    and other species of concern and their habitat, and to identify unintended consequences of a

18    proposed action.

19         98.      Plaintiff STATE OF VERMONT is a sovereign state in the United States of

20    America.  The State of Vermont brings this action through Attorney General Thomas J.

21    Donovan, Jr.  The Attorney General is authorized to represent the state in civil suits involving

22    the state's interests, when, in his judgment, the interests of the state so require.  3 V.S.A. Ch. 7.

23         99.      Vermont brings this action to protect its sovereign and proprietary interests,

24    including its interests in natural resources and infrastructure.  The state has ownership,

25    jurisdiction, and control of all wildlife of the state as trustee for the state's citizens.  10 V.S.A.

26    § 4081(a)(1).  Vermont has eleven federally listed species, including the Canada Lynx (*Lynx*

First Amended Compl. for Declaratory and
Inj. Relief                34
Case No. 3:20-cv-06057

AR_0026470

1  *canadensis*) and Eastern Mountain Lion (*Puma concolor*).  Vermont also lists 215 state-

2  endangered and threatened species, which are protected under 10 V.S.A. §§ 5401-5410.

3       100.    The state is also trustee for navigable waters, lakes, ponds, and groundwater

4  located within the state.  *Id.* §§ 1390(5), 1421; 29 V.S.A. § 401.  Vermont owns, manages and

5  maintains numerous state forests, parks, and wildlife management areas; buildings and other

6  infrastructure, including dams, roads, bridges, airports; and railroad, public transportation,

7  bicycle, and pedestrian facilities.  Significant state-owned infrastructure is located in river

8  valleys and is susceptible to damage or destruction by flooding caused by severe rainstorms,

9  the severity and frequency of which is being exacerbated by climate change.

10       101.    The federal government owns nearly half a million acres of land in Vermont,

11  comprising about eight percent of the state's total land area.  These lands include

12  approximately 400,000 acres within the Green Mountain National Forest.  Located within a

13  day's drive of seventy million people, the national forest is important to Vermont's economy,

14  drawing three to four million visitors to Vermont each year for outdoor recreation, and

15  provides habitat for rare and unique plants, fish, and birds.  Federally owned and managed

16  lands in Vermont also include the Marsh Billings National Historic Park, the Silvia O. Conte

17  National Fish and Wildlife Refuge, the Missiquoi National Wildlife Refuge, and approximately

18  150 miles of the Appalachian Trail.  Vermont is also home to National Guard installations,

19  including the Vermont Air National Guard Base in South Burlington, at which F-35 fighter jets

20  are based.  Low-income residents of surrounding communities are disproportionately impacted

21  by high noise levels from F-35 training runs.  Two major interstate highways and numerous

22  federal aid highways pass through Vermont.  The federal government also issues permits and

23  provides grants and loans for various activities within the state, including Federal Emergency

24  Management Administration disaster assistance grants for rehabilitation and improvement of

25  state infrastructure.  Federal actions concerning these and other federal lands, facilities and

26  programs are subject to NEPA.

First Amended Compl. for Declaratory and
Inj. Relief        35
Case No. 3:20-cv-06057

AR_0026471

102.    Vermont state agencies, including the Vermont Agency of Transportation and Vermont Agency of Natural Resources, regularly participate in federal NEPA proceedings to protect the State's interests.

103.    Plaintiff STATE OF WISCONSIN is a sovereign state of the United States of America and brings this action by and through its Attorney General, Joshua L. Kaul, who is the chief legal officer of the State of Wisconsin and has the authority to file civil actions to protect Wisconsin's rights and interests. *See* Wis. Stat. § 165.25(1m). The Attorney General's powers and duties include appearing for and representing the state, on the governor's request, "in any court or before any officer, any cause or matter, civil or criminal, in which the state or the people of this state may be interested." *Id.* § 165.25(1m).

104.    The State of Wisconsin has a sovereign interest in its natural resources and in ensuring the protection and conservation of those resources. The State of Wisconsin holds legal title to and is the custodian of all wild animals within Wisconsin and regulates them for conservation and use and enjoyment by the public. *Id.* § 29.011. The State of Wisconsin holds title to the navigable waters of the state in trust for the public and has a duty to protect and preserve those waters for the public for fishing, hunting, recreation, and enjoyment of scenic beauty. Wis. Const. art. IX, § 1; *Wis.'s Envtl. Decade, Inc. v. Dep't of Nat. Res.*, 85 Wis. 2d 518, 526 (1978). The State of Wisconsin has a sovereign interest in protecting its state resources through careful environmental review at both the state and federal level.

105.    Wisconsin is home to the Chequamegon-Nicolet National Forest, the Apostle Islands National Lakeshore, the Ice Age National Scenic Trail, the North Country National Scenic Trail, the Saint Croix National Scenic Riverway, nine federal wildlife refuges and wetland management districts, several Department of Defense facilities including Fort McCoy, five primary interstate highways and additional auxiliary federal highways, and several international airports. Major Federal actions concerning these lands, waters, projects, highways, airports, and other federal facilities are subject to NEPA.

106.     Wisconsin has twenty-four federally listed species, including the Northern long-eared bat (*Myotis septentrionalis*), Kirtland's warbler (*Setophaga kirtlandii*), Piping plover (*Charadrius melodus*), Karner blue butterfly (*Lycaeides melissa samuelis*), rusty patched bumble bee (*Bombus affinis*), and Fassett's locoweed (*Oxytropis campestris var. chartaceae*). Wisconsin is home to substantial portions of the global population of the endangered Karner blue butterfly and endangered rusty patched bumble bee. The endangered Kirtland's warbler is only found in Michigan and Wisconsin. The variety of the threatened Fassett's locoweed in Wisconsin is found nowhere else in the world.

107.     Wisconsin state agencies, including the Wisconsin Department of Natural Resources (WDNR), regularly engage in federal NEPA processes to protect the state's interest in public health, environmental quality, and state natural resources. These agencies have participated in the NEPA process as commenting and cooperating agencies. For example, the WDNR recently provided comments on an environmental assessment prepared by the U.S. Army Corps of Engineers on the placement of dredged material in the upper Mississippi River and on an environmental impact statement prepared by the U.S. Airforce on the addition of F-35 fighter jets at the 115th Fighter Wing National Guard base in Madison, Wisconsin. The WDNR is also serving as a cooperating agency for an environmental assessment with the National Park Service for a new segment of the Ice Age National Scenic Trail and for an environmental impact statement on a proposed bridge corridor over the Fox River in Brown County, Wisconsin.

108.     Plaintiff COMMONWEALTH OF MASSACHUSETTS brings this action by and through Attorney General Maura Healey, the chief legal officer of the Commonwealth, on behalf of the Commonwealth and its residents. The Commonwealth has both sovereign and proprietary interests in the conservation and protection of its natural resources and the environment through comprehensive environmental review at both the state and federal level. *See* Mass. Const. Amend. art. 97; Mass. Gen. Laws, ch. 12, §§ 3, 11D.

109.    Federal agencies regularly undertake major actions subject to NEPA throughout Massachusetts, including operating federal land and facilities and permitting, licensing, and funding projects that affect the Commonwealth's natural resources.  Massachusetts is home to fifteen national parks, five national heritage areas, four wild and scenic rivers, and three national trails managed by the National Park Service and other federal agencies, including the Cape Cod National Seashore, which spans nearly forty miles of coastal land along the eastern shore of Cape Cod.  Six Department of Defense military bases, five interstate highways, eight auxiliary interstate highways, two nuclear legacy management sites, one international airport, approximately 1,000 miles of interstate transmission pipelines, and one international liquid natural gas terminal are located in Massachusetts.  Numerous federal agencies operate, license, or permit activities in Massachusetts waterways and off Massachusetts's more than 1,500 miles of coastline, impacting Massachusetts fisheries, other valuable resources, and maritime uses, which are critical to the health and economic vitality of the Commonwealth.

110.    At least seventeen federally listed and protected endangered or threatened species are known to occur in Massachusetts, including, for example, the threatened piping plover (*Charadrius melodus*) and northern long-eared bat (*Myotis septentrionalis*), and the endangered shortnose sturgeon (*Acipenser brevirostrum*) and leatherback sea turtle (*Dermochelys coriacea*).

111.    Massachusetts agencies, including the Massachusetts Executive Office of Energy and Environmental Affairs and its Department of Environmental Protection, Office of Coastal Zone Management, and Division of Fisheries and Wildlife, as well as the Massachusetts Department of Transportation and the Massachusetts Port Authority, engage in the federal NEPA process as coordinating, cooperating, and commenting agencies with specialized expertise to protect the state's interest in public health, environmental quality, and state natural resources.  For example, following extensive community involvement and collaboration between multiple state and federal agencies and the two impacted towns during

AR_0026474

1   coordinated review under NEPA and the Massachusetts Environmental Policy Act (MEPA),

2   Mass. Gen. Laws, ch. 30, §§ 61–62I, the National Park Service adopted an alternative plan for

3   the Herring River Restoration on Cape Cod that will restore at least 346 acres of tidal marsh,

4   protect fish species harmed by existing impeded and degraded river conditions, and improve

5   fishing and shellfishing yields, among other significant benefits to the community and the

6   environment.  The pending coordinated NEPA and MEPA process for the I-90 Allston

7   highway project also has helped to convene a wide range of state and federal agencies and

8   stakeholder groups to explore and assess alternatives that minimize impacts to important

9   natural resources in and along the Charles River.

10          112.    Massachusetts state agencies also review federal agency actions subject to

11   NEPA, including permits, that affect Massachusetts's natural resources for consistency and

12   compliance with Massachusetts laws and policies.  *See, e.g.*, 301 Mass. Code Regs. § 20.04

13   (procedures for consistency determinations under Federal Coastal Zone Management Act,

14   16 U.S.C. § 1456).

15          113.    Plaintiff COMMONWEALTH OF PENNSYLVANIA brings this action by and

16   through Attorney General Josh Shapiro.  The Attorney General is the chief law officer of the

17   Commonwealth of Pennsylvania and has authority to represent the Commonwealth and all

18   Commonwealth agencies in any civil action brought by the Commonwealth. Pa. Const. art. IV,

19   § 4; *Cmwlth. Attorneys Act,* 71 P.S. § 732-204(c).  The Commonwealth brings this action on its

20   own behalf.

21          114.    This action is brought pursuant to the Commonwealth's sovereign interests and

22   its trustee obligations to protect Pennsylvania's public natural resources from degradation.  The

23   Commonwealth of Pennsylvania has a sovereign interest in its public natural resources, which

24   are the common property of all the people, including generations yet to come.  Pa. Const. art. I,

25   § 27. The Pennsylvania Constitution protects every Pennsylvanian's "right to clean air, pure

26   water, and to the preservation of the natural, scenic, historic and esthetic values of the

AR_0026475

1   environment." *Id.*, § 27.  The Commonwealth, as trustee, must conserve and maintain public

2   natural resources for the benefit of all the people.  *Robinson Twp. v. Pennsylvania*, 83 A.3d

3   901, 955–956 (Pa. 2013).

4        115.    Pennsylvania's public natural resources include 83,184 miles of streams and

5   rivers in the Ohio, Genesee, Potomac, Susquehanna, Lake Erie and Delaware River

6   watersheds, more than 4,000 lakes, reservoirs and ponds, 120 miles of coastal waters in the

7   Lake Erie and Delaware Estuary coastal zones and abundant groundwater resources.

8   Pennsylvania's state forest system comprises 2.2 million acres of forestland in forty-eight of

9   Pennsylvania's sixty-seven counties.  Pennsylvania has nineteen federally listed and protected

10  endangered or threatened species are known to occur in Pennsylvania, including the

11  endangered rusty patched bumble bee (*Bombus affinis*) and Piping plover (*Charadrius*

12  *melodus*) and the threatened northern long-eared bat (*Myotis septentrionalis*).

13       116.    Federal actions and activities that propose impacts to the Commonwealth's

14  public natural resources are subject to NEPA.  Commonwealth agencies review these actions to

15  ensure the Commonwealth's public natural resources are protected.  Pennsylvania agencies,

16  including without limit the Department of Environmental Protection, the Department of

17  Conservation and Natural Resources, and the Department of Transportation, engage in the

18  federal NEPA process.  Pennsylvania is home to large-scale pipeline projects subject to NEPA.

19  Commonwealth agencies closely review and comment on these NEPA analyses and utilize

20  these analyses to support state decision making.  Also, Pennsylvania is home to several federal

21  military installations, including those located at the Harrisburg International Airport, the U.S.

22  Army War College and Carlisle Barracks Army Base, New Cumberland Army Depot,

23  Letterkenny Army Depot, the Mechanicsburg Naval Depot, and the Willow Grove Naval Air

24  Station Joint Reserve Base.  Commonwealth agencies review the actions at these facilities to

25  ensure the Commonwealth's public natural resources are protected.

26

First Amended Compl. for Declaratory and
Inj. Relief                                    40
Case No. 3:20-cv-06057

117.     Plaintiff TERRITORY OF GUAM brings this action by and through Attorney General Leevin Taitano Camacho.  The Attorney General is the chief legal officer of the Government of Guam.  48 U.S.C. § 1421g(d)(1).  This challenge is brought pursuant to the Attorney General's statutory and common law authority to bring an action on behalf of Guam.  5 GCA § 30103.

118.     Guam has a sovereign interest in its natural resources, which run two hundred nautical miles seaward from its low-water line.  Guam is the sovereign and proprietary owner of all surface water and ground water within its territory, which it holds in trust for the people of Guam, 12 GCA § 14505, and has a statutory responsibility to conserve, enhance, and properly utilize its natural resources.  5 GCA § 63502.

119.     Guam is home to numerous listed threatened and endangered species and their designated critical habitats.  These species and habitats include the Mariana Fruit Bat (*Pteropus mariannus*), Hayun Lagu (*Serianthes nelsonii*), the largest native tree in the Mariana Islands, and the Guam Rail or the Ko'ko' bird (*Gallirallus owstoni*), which is native to Guam and found nowhere else in the world.

120.     The United States Department of Defense has over fifty military installations in Guam and controls over twenty-five percent of the island.  Federal agencies, including the United States Army, Air Force, Navy, Marine Corps, and the Coast Guard, routinely engage in military exercises in Guam.  These exercises, along with other major Federal actions concerning Guam's land, water, and air, are subject to NEPA.

121.     Over the last decade, there have been several federal actions proposed primarily by the Department of Defense in the Marianas, which have had significant environmental impacts on Guam, including the destruction of hundreds of acres of limestone forest that serve as a habitat for numerous endangered species and the planned construction and operation of a live-fire training range complex over Guam's aquifer.  These projects include the Guam and CNMI Military Relocation Environmental Impact Statement and Supplemental EIS, the

1   Marianas Islands Range Complex EIS, the Mariana Islands Training and Testing EIS, and the

2   Divert Activities and Exercises EIS.  Guam agencies, including the Guam Bureau of Statistics

3   and Plans, Guam Environmental Protection Agency, Guam Waterworks Authority, Guam

4   Department of Agriculture and Guam Department of Public Health and Social Services have

5   and continue to engage in the federal NEPA process to protect Guam's interest in public

6   health, environmental quality, and natural resources.

7       122.    Plaintiff DISTRICT OF COLUMBIA (the District) is a municipal corporation

8   and is the local government for the territory constituting the permanent seat of government of

9   the United States.  The District is represented by and through its chief legal officer the

10  Attorney General for the District of Columbia.  The Attorney General has general charge and

11  conduct of all legal business of the District and all suits initiated by and against the District and

12  is responsible for upholding the public interest.  D.C. Code § 1-301.81(a)(1).

13      123.    As the seat of the nation's capital, the District is uniquely impacted by

14  environmental review on federal actions and projects.  The federal government owns one-third

15  of the land in the District, eighty-five percent of the District's shoreline, and owns the riverbed

16  of the District's two major rivers, the Potomac and Anacostia.  Almost ninety percent of the

17  city's parkland—more than 6,900 acres including Rock Creek Park, the National Mall,

18  Anacostia Park and the Fort Circle Parks—is part of the National Park System.  With the

19  federal government owning or managing federal offices, land, and water resources in the

20  District of Columbia, federal government decisions relating to the environmental impact of

21  projects related to these buildings, land, and resources substantially impacts the District's

22  environment and the public health of its residents.

23      124.    The District is home to one federally listed species, the Hay's Spring Amphipod

24  (*Stygobromus hayi*), which is a small, shrimp-like freshwater crustacean that exists only in five

25  springs, all along Rock Creek Park.

26

First Amended Compl. for Declaratory and
Inj. Relief                                      42
Case No. 3:20-cv-06057

AR_0026478

125.     Under the District's Environmental Policy Act and its implementing

regulations, District agencies evaluate environmental impacts through review and analysis of

environmental impact screening forms.  This review determines whether the District is to

perform an environmental impact statement because a major action is likely to have substantial

negative impact on the environment, if implemented.  However, this analysis is not required

when an environmental analysis has been performed in accordance with NEPA.  Thus, when a

federal agency does not perform an environmental review under NEPA, the District will

perform the analysis to ensure that negative environmental and public health impacts are

mitigated.

126.     Plaintiff HARRIS COUNTY, TEXAS is a local subdivision of the State of

Texas.  Harris County brings this action to protect its citizens and governmental and

proprietary interests, which include parks and greenway spaces.  Harris County is represented

by the Harris County Attorney, an elected official and chief legal officer for Harris

County.  Harris County is the third largest county in the United States, home to more than four

million residents spread over 1,777 square miles, and is the energy capital of the world.

127.     Harris County is often impacted by federal actions subject to NEPA review and

has submitted comments and participated in the NEPA process on a range of matters including

the Keystone XL Pipeline and the Texas Coastal Study.

128.     Plaintiff CITY OF NEW YORK, a municipal subdivision of the State of New

York, brings this action on its own behalf to protect its governmental and proprietary interests,

which include more than 30,000 acres of parks and beaches, 2.6 million trees, 520 linear miles

of waterfront property, and the nation's largest unfiltered water supply system with a

watershed of over one million acres, which provides more than one billion gallons of drinking

water daily from nineteen reservoirs to more than nine million residents of the City and State

of New York.

AR_0026479

1    129.    Federally funded or permitted actions that affect New York City's environment

2    are subject to the federal NEPA environmental review process.  New York City agencies and

3    authorities regularly rely on NEPA analyses to support local decision making.  In particular,

4    pursuant to the New York State Environmental Quality Review Act (SEQRA) and New York

5    City Environmental Quality Review (CEQR) regulations, city agencies may rely on a federal

6    EIS if it is sufficient for the City agency to make its findings under SEQRA/CEQR.  Similarly,

7    a federal Environmental Assessment/Finding of No Significant Impact may serve as the basis

8    for a city agency to issue a negative declaration under SEQRA/CEQR.  In addition, the New

9    York City Department of Housing Preservation and New York City Mayor's Office of

10   Management and Budget have assumed NEPA responsibilities from the U.S. Department of

11   Housing and Urban Development (HUD) when utilizing HUD's housing grant programs and

12   managing allocations of HUD's Community Development Block Grant Disaster Recovery and

13   National Disaster Resilience programs, and are thus responsible for complying with HUD's

14   NEPA regulations that will be revised under the Final Rule.

15   **B.    Defendants**

16   130.    Defendant CEQ is an agency of the federal government created by NEPA.  CEQ

17   is responsible for guiding NEPA's implementation and bears responsibility, in whole or in part,

18   for the acts complained of in this Complaint.

19   131.    Defendant Mary B. Neumayr is the Chairman of CEQ and is sued in her official

20   capacity.  Ms. Neumayr is the official responsible for implementing and fulfilling CEQ's

21   duties, including promulgating the Final Rule, and bears responsibility, in whole or in part, for

22   the acts complained of in this Complaint.

23   **V.    STATUTORY AND REGULATORY BACKGROUND**

24   **A.    Administrative Procedure Act**

25   132.    The APA, 5 U.S.C. §§ 551–559 and 701–706, governs the procedural

26   requirements for federal agency decision making, including the agency rulemaking process.

1  Under the APA, a "reviewing court shall … hold unlawful and set aside" federal agency action

2  found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with

3  law," "without observance of procedure required by law," or "in excess of statutory

4  jurisdiction, authority, or limitations, or short of statutory right." *Id.* § 706(2).  An agency

5  action is arbitrary and capricious under the APA where "the agency has relied on factors which

6  Congress has not intended it to consider, entirely failed to consider an important aspect of the

7  problem, offered an explanation for its decision that runs counter to the evidence before the

8  agency, or is so implausible that it could not be ascribed to a difference in view or the product

9  of agency expertise." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins.*

10  *Co.*, 463 U.S. 29, 43 (1983) (*State Farm*).  An agency does not have authority to adopt a

11  regulation that is "plainly contrary to the statute." *United States v. Morton,* 467 U.S. 822, 833

12  (1984); *see also* 5 U.S.C. § 706(2)(C).

13  133.    "Agencies are free to change their existing policies," but they must "provide a

14  reasoned explanation for the change." *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117,

15  2125 (2016) (citing *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967,

16  981–82 (2005)); *see also Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*,

17  140 S. Ct. 1891, 1913 (2020) ("when an agency rescinds a prior policy its reasoned analysis

18  must consider the 'alterative[s]' that are within the ambit of the existing [policy]") (citations

19  omitted).  An agency must "provide a more detailed justification than what would suffice for a

20  new policy created on a blank slate" when "its new policy rests upon factual findings that

21  contradict those which underlay its prior policy," "or when its prior policy has engendered

22  serious reliance interests that must be taken into account." *FCC v. Fox Television Stations,*

23  *Inc.*, 556 U.S. 502, 515 (2009).

24  134.    Prior to promulgating a rule, agencies must engage in a public notice-and-

25  comment process.  5 U.S.C. §§ 551(5), 553.  Agencies must afford public notice of specific

26  regulatory changes and their reasoned basis to provide the public an opportunity for

AR_0026481

1    meaningful comment, *Home Box Office, Inc. v. FCC*, 567 F.2d 9, 35–36 (D.C. Cir. 1977),

2    including the "technical studies and data that [the agency] has employed in reaching the

3    decision[] to propose particular rules." *Kern Cty. Farm Bureau v. Allen*, 450 F.3d 1072, 1076

4    (9th Cir. 2006).  The agency must consider and respond to all significant comments it receives.

5    *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 96 (2015).

6    **B.      National Environmental Policy Act**

7         135.    NEPA is often referred to as the "Magna Carta" of U.S. environmental law.

8    *See Citizens Against Burlington, Inc. v. Busey*, 938 F.2d 190, 193 (D.C. Cir. 1991).

9         136.    Congress developed NEPA at a time of heightened awareness and growing

10   concern about the environment, amid a series of high-profile environmental crises in the late

11   1960s.  The national perspective was shifting from "preoccupation with the extraction of

12   natural resources to the more compelling problems of deterioration in natural systems of air,

13   land, and water."  S. Comm. on Interior & Insular Affairs and H.R. Comm. on Science and

14   Astronautics, 90th Congress, *Congressional White Paper on a National Policy for the

15   Environment*, at 1 (Oct. 1968).

16        137.    Congress recognized that "[o]ur national resources—our air, water, and land—

17   are not unlimited," and as a country, "[w]e no longer have the margins for error that we once

18   enjoyed."  S. Rep. No. 91-296, at 5 (1969).  A comprehensive national environmental policy

19   would disrupt the current practice of establishing policy "by default and inaction" where

20   "[e]nvironmental problems are only dealt with when they reach crisis proportions.  Public

21   desires and aspirations are seldom consulted.  Important decisions concerning the use and the

22   shape of [humans'] future environment continue to be made in small but steady increments

23   which perpetuate rather than avoid the recognized mistakes of previous decades."  *Id.*

24        138.    NEPA thus declares an overarching national policy to "use all practicable

25   means and measures … to foster and promote the general welfare, to create and maintain

26   conditions under which man and nature can exist in productive harmony, and fulfill the social,

AR_0026482

1  economic and other requirements of present and future generations of Americans." 42 U.S.C.

2  § 4331(a).

3        139.    Cooperation with states and local governments and other concerned public and

4  private organizations is an essential component of this policy. *Id.* §§ 4331(a), 4332(G).

5        140.    NEPA further emphasizes that in carrying out these policies, the federal

6  government has a continuing responsibility "to use all practicable means … to improve and

7  coordinate Federal plans, functions, programs, and resources to the end that the Nation may,"

8  among other things "fulfill the responsibilities of each generation as trustee of the environment

9  for succeeding generations," "assure for all Americans safe, healthful, productive, and

10  esthetically and culturally pleasing surroundings," and "attain the widest range of beneficial

11  uses of the environment without degradation, risk to health or safety, or other undesirable and

12  unintended consequences." *Id.* § 4331(b).

13        141.    To ensure that these policies are "integrated into the very process of agency

14  decision making," NEPA outlines "action-forcing" procedures, *Andrus*, 442 U.S. at 349–50,

15  that require federal agencies "to the fullest extent possible," to prepare a detailed

16  environmental review or EIS for legislation or other "major Federal actions significantly

17  affecting the quality of the human environment." *Id.* §§ 4332, 4332(2)(C).

18        142.    An EIS must evaluate, among other things, all of the environmental impacts of

19  the proposed federal action, any adverse and unavoidable environmental effects, alternatives to

20  the proposed action, the relationship between local short-term uses of the environment and the

21  maintenance and enhancement of long-term productivity, and any irreversible and irretrievable

22  commitment of resources involved in the proposed action. *Id.* § 4332(2)(C).

23        143.    For proposed actions involving unresolved conflicts about alternative uses of

24  available resources, NEPA further directs that federal agencies should "study, develop, and

25  describe appropriate alternatives" to the proposed action. *Id.* § 4332(E).

26

First Amended Compl. for Declaratory and
Inj. Relief          47
Case No. 3:20-cv-06057

AR_0026483

144.    NEPA also requires federal agencies to work in concert with states, local governments, institutions, organizations, and individuals by making available "advice and information useful in restoring, maintaining, and enhancing the quality of the environment." 42 U.S.C. § 4332(G).

145.    In short, NEPA directs federal agencies to make well-informed and transparent decisions based on a thorough review of environmental and public health impacts and meaningful input from states, local governments, and the public.

146.    In NEPA, Congress also created CEQ and directed it to appraise federal programs and activities in light of NEPA's overarching policies: "to be conscious of and responsive to the scientific, economic, social, esthetic, and cultural needs and interests of the Nation; and to formulate and recommend national policies to promote the improvement of the quality of the environment." *Id.* § 4342.  CEQ has the statutory duty to take actions consistent with NEPA's policies of environmental protection and informed decision making.

147.    Many State Plaintiffs have adopted their own state environmental policy acts modeled on NEPA.  These include the California Environmental Quality Act, Cal. Pub. Res. Code § 21000–21189.57, Washington's State Environmental Policy Act, Wash. Rev. Code. ch. 43.21C, New York's State Environmental Quality Review Act, N.Y. Envtl. Conserv. L. art. 8; 6 N.Y. Comp. Codes R. & Regs. Part 617; the Massachusetts Environmental Policy Act, Mass. Gen. Laws, ch. 30, §§ 61-62I; and the District of Columbia's Environmental Policy Act, D.C. Code § 8-109.01–109.12, and 20 D.C. Mun. Regs. § 7200–7299.  These state statutes (or little NEPAs) require detailed environmental review for certain state agency and local government actions.  Where an action subject to state environmental review also requires NEPA review, state and local agencies can often comply with little NEPAs by adopting or incorporating by reference certain environmental documents prepared under NEPA, but only if those NEPA documents meet state statutory requirements. *See, e.g.*, 6 N.Y. Comp. Codes R. & Regs. § 617.15; Mass. Gen. Laws, ch. 30, § 62G.

AR_0026484

148.     CEQ and several states worked together to harmonize the environmental review

processes under NEPA and little NEPAs through state-specific memoranda.  *See, e.g.*, CEQ,

*States and Local Jurisdictions with NEPA-Like Environmental Planning Requirements*,

https://ceq.doe.gov/laws-regulations/states.html.  This collaboration has long allowed state,

local, and federal agencies to share documents, reduce paperwork, and efficiently allocate

limited time and resources.  States rely on this collaboration and the effectiveness of federal

NEPA documents under the 1978 regulations to allocate state resources and determine staffing

needs.

## C.     Endangered Species Act

149.     In 1973, Congress enacted the ESA, 16 U.S.C. §§ 1531–44, "to halt and reverse

the trend toward extinction, whatever the cost."  *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 174

(1978).  As such, the ESA sets forth "a program for the conservation of [] endangered species

and threatened species" through, in part, conservation of the ecosystems upon which such

species depend.  16 U.S.C. § 1531(b).  The Services are the agencies responsible for listing

endangered and threatened species and designating those species' critical habitats.  *Id*.

§§ 1532(15), 1533(a); 50 C.F.R. §§ 17.11(a), 17.12(a). The listing of a species under the ESA

is a last resort to conserve endangered or threatened species and the ecosystems on which they

depend.  The Services currently list over [insert number] species as endangered or threatened

under the ESA.  50 C.F.R. §§ 17.11(a), 17.12(a).

150.     Section 7 of the ESA codifies "an explicit congressional decision to require

agencies to afford first priority to the declared national policy of saving endangered species,"

elevating concern for the protection of such species "over the primary missions of federal

agencies."  *Tenn. Valley Auth. v. Hill*, 437 U.S. at 185 (internal quotation marks omitted).

Pursuant to section 7, unless an exemption has been granted, each federal agency must, in

consultation with one or both of the Services, "insure that any action authorized, funded, or

carried out by such agency . . . is not likely to jeopardize the continued existence of any

1    endangered species or threatened species or result in the destruction or adverse modification of

2    habitat of such species[.]"  16 U.S.C. § 1536(a)(2).  "The minimum threshold for an agency

3    action to trigger consultation with FWS is low."  *W. Watersheds Project v. Kraayenbrink*, 632

4    F.3d 472, 496 (9th Cir. 2011).  Consultation is required if a prospective agency action may

5    affect a listed species or designated critical habitat.  *Id*.; 16 U.S.C. § 1536(a)(2); 50 C.F.R. §

6    402.12(a).  Formal consultation is required if the prospective agency action is likely to

7    adversely affect a listed species or designated critical habitat.  *Id*. § 1536(a)(2)–(3); 50 C.F.R.

8    §§ 402.12(a), (k), 402.14(a)–(b).

9         151.    During formal consultation, the acting federal agency is prohibited from

10   "mak[ing] any irreversible or irretrievable commitment of resources with respect to the agency

11   action which has the effect of foreclosing the formulation or implementation of any reasonable

12   and prudent alternative measures[.]"  16 U.S.C. § 1536(d).

13        152.    At the conclusion of the formal consultation period, the FWS or the NMFS

14   provides the agency with a biological opinion including a determination as to whether the

15   action is likely to "jeopardize the continued existence of a listed species or result in the

16   destruction or adverse modification of critical habitat[.]"  16 U.S.C. § 1536(b)(1)(3)(A); 50

17   C.F.R. § 402.14(g)–(h).  If the FWS or the NMFS determines the proposed action is likely to

18   result in jeopardy to a listed species or destruction or adverse modification of designated

19   critical habitat, it will include "reasonable and prudent alternatives" to the agency action in the

20   biological opinion.  50 C.F.R. § 402.14(h)(2).

21        153.    If the federal agency wishes to proceed with a proposed action that is deemed

22   likely to result in jeopardy or adverse modification, it must generally implement the Services'

23   recommended "reasonable and prudent alternatives" and adopt other "reasonable and prudent

24   measures" to ensure that the action "is not likely to jeopardize the continued existence of any

25   endangered species or threatened species or result in the destruction or adverse modification of

26

AR_0026486

1  habitat of such species," and to minimize the impact of such action on listed species and

2  designated critical habitat.  16 U.S.C. §§ 1536(a)(2), 1536(b)(4); 50 C.F.R. § 402.15(a).

3       154.    Section 7 differs in important respects from NEPA.  As the Ninth Circuit has

4  explained, "[s]ection 7 of the ESA and NEPA involve different processes that measure

5  different kinds of environmental impacts." *San Luis & Delta-Mendota Water Auth. v. Jewell*,

6  747 F.3d 581, 651 (9th Cir. 2014); *see also Fund for Animals v. Hall*, 448 F.Supp.2d 127, 136

7  (D.D.C. 2006).  Indeed, while NEPA review concerns a broad array of impacts, the ESA is

8  solely focused on impacts to listed species and designated critical habitat.

9  **D.    CEQ's 1978 NEPA Regulations**

10      155.    In 1977, President Carter issued Executive Order 11,991 directing CEQ to issue

11 regulations to guide federal agency implementation of NEPA.  *Relating to Protection and*

12 *Enhancement of Environmental Quality*, Exec. Order No. 11,991, 42 Fed. Reg. 26,967

13 (May 24, 1977) (amending in part Executive Order No. 11,514).

14      156.    Before proposing the implementing regulations, CEQ conducted extensive

15 outreach, soliciting "the views of almost 12,000 private organizations, individuals, state and

16 local agencies, and Federal agencies," held public hearings, and considered studies of the

17 environmental impact statement process.  NEPA—Regulations, Implementation of Procedural

18 Provisions, 43 Fed. Reg. 55,978, 55,980 (Nov. 29, 1978).

19      157.    CEQ also prepared an environmental assessment (EA) of its proposed

20 implementing regulations, in compliance with NEPA.  Proposed Implementation of Procedural

21 Provisions, 43 Fed. Reg. 25,230, 25,232 (May 31, 1978).

22      158.    In 1978, CEQ finalized a comprehensive set of regulations implementing the

23 "action-forcing" elements of NEPA "to tell federal agencies what they must do to comply with

24 the procedures and achieve the goals of" the statute.  40 C.F.R. § 1500.1(a) (1978).

25      159.    The 1978 regulations emphasize NEPA's role as "our basic national charter for

26 protection of the environment" and explained that "[t]he NEPA process is intended to help

AR_0026487

1 | public officials make decisions that are based on understanding of environmental

2 | consequences, and take actions that protect, restore, and enhance the environment." *Id.*

3 | § 1500.1(c) (1978).

4 |       160.    The 1978 regulations also emphasize transparency in government decision

5 | making by ensuring agencies provide information to the public before "decisions are made and

6 | before actions are taken." *Id.* § 1500.1(b) (1978).

7 |       161.    The 1978 regulations direct agencies to "[e]ncourage and facilitate public

8 | involvement in decisions which affect the quality of the human environment," *id.* § 1500.2(d)

9 | (1978), allowing states, private organizations, and individuals to inform and influence agency

10 | decision making by commenting on proposed agency actions, *id.* § 1503.1(a)(4) (1978).

11 |       162.    Until the promulgation of the Final Rule, CEQ's 1978 regulations remained

12 | largely unchanged with the exception of two minor amendments.  First, in 1986, CEQ removed

13 | a requirement that agencies analyze the extent of environmental impacts in a hypothetical

14 | "worst case scenario."  NEPA Regulations, Incomplete or Unavailable Information, 51 Fed.

15 | Reg. 15,618 (May 27, 1986) (amending 40 C.F.R. § 1502.22).  CEQ prepared an EA for its

16 | substantive change to the regulations in 1986 and concluded that the amendment would not

17 | have a significant environmental impact.  *Id.* at 15,619.  Then in 2005, CEQ made a minor

18 | amendment to the EIS filing requirements.  Other Requirements of NEPA, 70 Fed. Reg. 41,148

19 | (July 18, 2005).

20 |       163.    CEQ has issued numerous guidance documents on NEPA and its 1978

21 | regulations on which states and other stakeholders have relied.  *See e.g.*, *Final Guidance for*

22 | *Federal Departments and Agencies on Consideration of Greenhouse Gas Emissions and the*

23 | *Effects of Climate Change in National Environmental Policy Act Reviews*, 81 Fed. Reg. 51,866

24 | (Aug. 5, 2016), *withdrawn* 82 Fed. Reg. at 16,576 (Apr. 5, 2017); *Memorandum for Heads of*

25 | *Federal Departments and Agencies: Establishing, Applying, and Revising Categorical*

26 | *Exclusions under the National Environmental Policy Act* (Nov. 23, 2010); *A Citizen's Guide to*

First Amended Compl. for Declaratory and
Inj. Relief               52
Case No. 3:20-cv-06057

AR_0026488

the NEPA: Having Your Voice Heard (Dec. 2007); Forty Most Asked Questions Concerning CEQ's National Environmental Policy Act Regulations, 46 Fed. Reg. 18,026 (Mar. 23, 1982).

164.    Additionally, CEQ's Environmental Justice Guidance provides useful direction for agency consideration of environmental justice impacts during the NEPA review process. CEQ, Environmental Justice: Guidance Under the National Environmental Policy Act (Dec. 10, 1997).  The Environmental Protection Agency (EPA) defines environmental justice as "the fair treatment and meaningful involvement of all people regardless of race, color, national origin, or income with respect to the development, implementation, and enforcement of environmental laws, regulations, and policies."  EPA, Environmental Justice: https://www.epa.gov/environmentaljustice.  CEQ's guidance builds on Executive Order 12,898, which directs federal agencies to identify and address the disproportionately high and adverse human health or environmental effects of their actions on minority and low-income populations, to the greatest extent practicable and permitted by law.  Exec. Order No. 12,898, 59 Fed. Reg. 7,629 (1994) (as amended).

165.    The Presidential Memorandum issued with Executive Order 12,898 further directs federal agencies to analyze under NEPA "the environmental effects, including human health, economic and social effects, of Federal actions, including effects on minority communities and low income communities" and to provide opportunities for community input in the NEPA process, including through "identifying potential effects and mitigation measures in consultation with affected communities …."  White House, Memorandum for the Heads of All Departments and Agencies: Executive Order on Federal Action to Address Environmental Justice in Minority Populations and Low-Income Populations (Feb. 11, 1994).

166.    CEQ's Environmental Justice Guidance explains that agencies should consider environmental justice impacts as part of their obligation to consider "both impacts on the natural or physical environment and related social, cultural, and economic impacts."  CEQ, Environmental Justice, at 8 (citing 40 C.F.R. § 1508.14).  Agencies should consider these

AR_0026489

1   impacts while analyzing the affected area, considering cumulative effects, and developing

2   public participation strategies. *Id.* at 8–9.  CEQ further explained that identification of

3   disproportionately high and adverse human health or environmental effects on low-income,

4   minority, or Tribal populations "should heighten agency attention to alternatives …, mitigation

5   strategies, monitoring needs, and preferences expressed by the affected community." *Id.* at 10.

6        167.  CEQ has also issued a number of studies documenting NEPA's effectiveness.

7   *See, e.g.*, CEQ, *National Environmental Policy Act: A Study of Its Effectiveness After Twenty-*

8   *five Years* (Jan. 1997); NEPA Task Force, *Modernizing NEPA Implementation* (Sept. 2003);

9   CEQ, *Examples of Benefits from the NEPA Process for ARRA Funded Activities* (May 2011).

10  For example, in its NEPA Effectiveness Study, a twenty-five year review of NEPA's

11  implementation, CEQ emphasized that "NEPA is a success—it has made agencies take a hard

12  look at the potential environmental consequences of their actions, and it has brought the public

13  into the agency decision-making process like no other statute." CEQ, *National Environmental*

14  *Policy Act: A Study of Its Effectiveness After Twenty-five Years*, at iii (Jan. 1997).

15       168.  The courts, including the Ninth Circuit, have developed a robust body of case

16  law applying and interpreting NEPA and CEQ's 1978 regulations, providing direction to

17  agencies on how to comply with both CEQ's regulations and the statute.  *See, e.g.*, *Robertson*

18  *v. Methow Valley Citizens Council*, 490 U.S. 332, 351–52 (1989); *Kern v. Bureau of Land*

19  *Mgmt.*, 284 F.3d 1062, 1075 (9th Cir. 2002); *Klamath-Siskiyou Wildlands Ctr. v. Bureau of*

20  *Land Mgmt.*, 387 F.3d 989, 994 (9th Cir. 2004).

21       169.  NEPA, the 1978 regulations, and CEQ's subsequent guidance have promoted

22  more environmentally protective and transparent agency decisions, while not imposing overly

23  burdensome requirements.  In 2014, the Government Accountability Office concluded that the

24  NEPA process "ultimately saves time and reduces overall project costs by identifying and

25  avoiding problems that may occur in later stages of project development." U.S. Gov't

26  Account. Office, *National Environmental Policy Act: Little Information Exists on NEPA*

1  *Analyses*, 17 (Apr. 2014).  Similarly, U.S. Forest Service officials have observed that "NEPA

2  leads to better decisions."  *Id.*

3  **E.     The Proposed Rule**

4        170.    Despite the documented success of the 1978 regulations and reliance by states

5  and the public on NEPA's procedures to protect the environment and public health, CEQ

6  released an Advance Notice of Proposed Rulemaking on June 20, 2018, announcing CEQ's

7  plan to overhaul the 1978 regulations and including a vague list of topics that the rulemaking

8  might address.  Update to the Regulations for Implementing the Procedural Provisions of the

9  National Environmental Policy Act, 83 Fed. Reg. 28,591 (June 20, 2018) (Advance Notice).

10  CEQ issued this proposal in response to President Trump's Executive Order 13,807, which

11  called for revisions to the NEPA regulations, purportedly to expedite infrastructure projects

12  and boost the economy.  Establishing Discipline and Accountability in the Environmental

13  Review and Permitting Process, Exec. Order 13,807, 82 Fed. Reg. 40,463 (Aug. 15, 2017).

14        171.    CEQ allowed only sixty days for public comment on the Advance Notice.  Most

15  State Plaintiffs submitted comments stating that CEQ had not demonstrated a need for

16  substantial revisions and opposing any revisions that would threaten NEPA's fundamental

17  values of environmental protection and informed decision making.

18        172.    On January 10, 2020, CEQ released its proposal to significantly revise the 1978

19  regulations.  85 Fed. Reg. 1,684 (Jan. 10, 2020).

20        173.    The Proposed Rule included numerous revisions to the 1978 regulations that

21  undermine NEPA's environmental and informed decision making purposes.  For example, the

22  Proposed Rule included regulatory changes to remove numerous agency actions from NEPA's

23  reach, narrow the scope of environmental reviews that do occur, limit public participation, and

24  restrict judicial review for those harmed by agency failure to comply with NEPA.

25        174.    After publication of the Proposed Rule, CEQ again provided just sixty days for

26  the public to review, analyze, and submit comments on this far-reaching overhaul of its

AR_0026491

1    longstanding regulations, and hosted only two public hearings on the Proposed Rule.

2    Numerous commenters, including representatives from several State Plaintiffs, were not able to

3    reserve a spot to speak at the hearings due to a limited number of speaking slots.  Although

4    CEQ received requests from State Plaintiffs, members of Congress, and others for more time to

5    comment and for additional public hearings on the complex and wide-ranging Proposed Rule,

6    CEQ closed the comment period without providing additional hearings or extending the

7    comment period.

8        175.    Despite this short timeframe, interested parties submitted over 1.1 million

9    comments, the vast majority of which strongly opposed CEQ's Proposed Rule.  Most State

10   Plaintiffs submitted detailed comments stating that CEQ's Proposed Rule was unlawful,

11   unreasonable, and unjustified and should be withdrawn.  In addition to these comments, many

12   State Plaintiff elected officials and agencies submitted comments expressing concern about

13   CEQ's proposed changes and urging CEQ to withdraw the Proposed Rule.  *See, e.g.*, Letter

14   from Washington State Governor Jay Inslee to Mary Neumayr, re Proposed Rule (Mar. 10,

15   2020) (enclosing comments from seven state agencies and offices opposing the Proposed

16   Rule); Letter from California Governor Gavin Newsom to Edward A. Boling, re Proposed Rule

17   (Mar. 10, 2020).

18   **F.    The Final Rule**

19       176.    Just four months after the close of the comment period, President Trump

20   announced the release of the Final Rule on July 15, 2020.  The Final Rule was published in the

21   Federal Register the following day.  The Final Rule largely adopts the Proposed Rule's

22   unlawful, unjustified, and sweeping revisions to the 1978 Regulations.

23       177.    CEQ claimed that the Final Rule "advance[s] the original goals of the CEQ

24   regulations to reduce paperwork and delays and promote better decisions consistent with the

25   national environmental policy set forth in section 101 of NEPA," Final Rule, 85 Fed. Reg. at

26

AR_0026492

1  43,306. But the Final Rule will do just the opposite—leading to increased confusion and

2  litigation and decisions inconsistent with NEPA's text and purpose.

3         178.    The Final Rule makes substantial and unsupported revisions to the 1978

4  regulations, ignores reliance interests on those longstanding regulations, lacks a rational

5  justification, and undermines NEPA's goals of environmental protection, public participation,

6  and informed decision making.  Among other things, the Final Rule arbitrarily and unlawfully:

7              a.    Deletes language from the 1978 regulations directing federal agencies to

8  comply with "the letter and spirit" of NEPA's "action-forcing" provisions, *compare* 40 C.F.R.

9  § 1500.1(a) (1978), *with* Final Rule, 85 Fed. Reg. at 43,358 (to be codified at § 1500.1(a));

10             b.    Deletes language from the 1978 regulations stating that NEPA "is our

11  basic national charter for protection of the environment" and that "[t]he NEPA process is

12  intended to help public officials make decisions that are based on understanding of

13  environmental consequences, and take actions that protect, restore, and enhance the

14  environment," *compare* 40 C.F.R. § 1500.1(a), (c) (1978), *with* Final Rule, 85 Fed. Reg. at

15  43,357–58 (to be codified at § 1500.1);

16             c.    Deletes language from the 1978 regulations that federal agencies should

17  "to the fullest extent possible … [e]ncourage and facilitate public involvement in decisions

18  which affect the quality of the human environment" and "[u]se all practicable means … to

19  restore and enhance the quality of the human environment and avoid or minimize any possible

20  adverse effects of their action upon the quality of the human environment," *compare* 40 C.F.R.

21  § 1500.2 (1978), *with* Final Rule, 85 Fed. Reg. at 43,317, 43,358 (removing and reserving

22  § 1500.2);

23             d.    Prohibits federal agencies from adopting NEPA regulations that are

24  more stringent than CEQ's Final Rule, 85 Fed. Reg. at 43,373 (to be codified at § 1507.3(a),

25  (b));

26

AR_0026493

1        e.      Preemptively concludes that all categorical exclusions (*i.e.*, actions that

2  federal agencies have determined will not have a significant environmental impact), effective

3  by September 14, 2020, comply with the Final Rule, *id.* at 43,373 (to be codified at

4  § 1507.3(a));

5        f.      Establishes six "NEPA Thresholds" that will allow federal agencies to

6  avoid any environmental review of certain proposed actions, *id.* at 43,359 (to be codified at

7  § 1501.1);

8        g.      Separates the definition of "major Federal action" from an action's

9  significance and narrows the definition to exclude an agency's failure to act as well as actions

10  that are not "subject to" an undefined amount of "Federal control and responsibility" and

11  actions that are extraterritorial, non-discretionary, have minimal federal funding or minimal

12  federal involvement, or receive certain federal loans, *id.* at 43,375 (to be codified at

13  § 1508.1(q));

14        h.      Allows federal agencies to rely on unspecified procedures and

15  documentation prepared under other statutory or Executive Order requirements to avoid

16  conducting environmental review, *id.* at 43,359, 43,372–73 (to be codified at 40 C.F.R.

17  §§ 1501.1, 1506.9, 1507.3);

18        i.      Authorizes federal agencies to determine that other statutes or directives

19  conflict with NEPA and thus excuse agencies from NEPA review, *id.* at 43,359, 43,373,

20  43,374 (to be codified at §§ 1501.1(a)(2), (a)(3), 1507.3(d)(2));

21        j.      Revises the analysis of an agency action's "significance," to (i) diminish

22  the scope of actions that will require more detailed environmental review, (ii) remove a

23  prohibition on improperly segmenting a project to avoid analyzing its collective significant

24  impacts, and (iii) eliminate review of important concerns like an action's public health impacts,

25  cumulative effects, effects on threatened and endangered species and their habitat, and

26  proximity to historic or cultural resources, park lands, farmlands, wetlands, wild and scenic

First Amended Compl. for Declaratory and
Inj. Relief             58
Case No. 3:20-cv-06057

AR_0026494

rivers, or ecologically critical areas, 85 Fed. Reg. at 43,360 (to be codified at 40 C.F.R. § 1501.3(b));

k.      Expands the use of categorical exclusions by adopting a new vague definition that removes consideration of cumulative impacts and allows for use of categorical exclusions in situations with extraordinary circumstances (*i.e.*, circumstances in which a normally excluded action may have a significant effect and would formerly have required preparation of an EA or EIS), *id.* at 43,360 (to be codified at § 1501.4);

l.      Allows certain actions to proceed during NEPA review, potentially limiting the range of alternatives that could be considered during environmental review despite NEPA's direction that environmental review occur before agencies take action, *id.* at 43,370 (to be codified at § 1506.1);

m.      Limits the number of alternatives to the proposed action analyzed in an EA or EIS and the depth of that analysis by, among other things, removing the requirement that agencies "[r]igorously explore and objectively evaluate" all reasonable alternatives to the proposed action, eliminating consideration of alternatives outside the jurisdiction of the lead agency, and removing the requirement that agencies "[d]evote substantial treatment to each alternative," *id.* at 43,365 (to be codified at § 1502.14);

n.      Narrows the scope of effects agencies are required to evaluate, imposes strict causation requirements for determining which environmental effects should be considered, and directs agencies not to consider cumulative and indirect effects, all of which will limit review of environmental justice and climate change impacts, impacts to species listed and critical habitat designated under the ESA, and other impacts, *id.* at 43,360, 43,365–66, 43,375 (to be codified at §§ 1501.3(b), 1502.15, 1508.1(g), (m));

o.      Reduces agencies' obligations to obtain additional information about environmental impacts when such information is not immediately available and further allows

AR_0026495

1  agencies to refuse to consider certain scientific evidence if the agency determines it is not a

2  "reliable data source," *id.* at 43,366–67 (to be codified at §§ 1502.21, 1502.23);

3      p.   Allows project proponents with potential conflicts of interest to prepare

4  the EIS as long as conflicts are disclosed to the federal agency (but not the public), 85 Fed.

5  Reg. at 43,371 (to be codified at § 1506.5(b)(4));

6      q.   Imposes unreasonable and unworkable time and page limits for EAs and

7  EISs, *id.* at 43,360, 43,362–64 (to be codified at §§ 1501.5(f), 1501.10(b), 1502.7);

8      r.   Limits public participation in the NEPA process by striking key

9  provisions emphasizing the importance of public participation and eliminating the requirement

10  that a draft EIS circulated for public comment satisfy NEPA's standards to the fullest extent

11  possible, *id.* at 43,364–65 (to be codified at § 1502.9);

12      s.   Places an undue burden on the public to analyze environmental issues

13  and to meet a vague standard of specificity and detail and imposes burdensome exhaustion

14  requirements on commenters, *id.* at, 43,358, 43,367–68 (to be codified at §§ 1500.3(b)(3),

15  1503.3);

16      t.   Reduces agencies' obligation to consider and respond to public

17  comments, *id.* at 43,366, 43,368–69 (to be codified at §§ 1502.17, 1505.2(b), 1503.4);

18      u.   Permits agencies to claim a presumption that they have adequately

19  considered all public comments on an EIS, *id.* at 43,369 (to be codified at § 1505.2(b)); and

20      v.   Seeks to limit judicial review of agency NEPA compliance by

21  attempting to restrict remedies parties injured by deficient NEPA review can secure through

22  litigation and promoting unlawful bond requirements, 85 Fed. Reg. at 43,358 (to be codified at

23  § 1500.3(c), (d)).

24      179.  NEPA Review.  CEQ did not conduct any environmental review before issuing

25  the Proposed Rule or Final Rule.  Instead, CEQ asserted without adequate explanation that a

26  NEPA review was not required because the regulations are procedural and "apply generally to

AR_0026496

Federal actions affecting the environment." *Id.* at 43,353–54. CEQ then claimed that even if it

were to conduct an EA, it likely would result in a Finding of No Significant Impact, citing its

cursory analysis of environmental impacts in the Final Rule's Regulatory Impact Analysis

(RIA). *Id.* But the RIA analysis of environmental impacts, which consists of only two pages

and a short appendix, does not meet requirements for an EA or an EIS and summarily

concludes that the Final Rule will have no adverse environmental impacts. RIA at 10–11;

App'x. A. The RIA does not analyze alternative actions, and it ignores environmental impacts

of the Final Rule, including climate change and environmental justice impacts. Moreover,

despite relying on the RIA to justify its conclusions of NEPA compliance in the Final Rule,

CEQ did not make the RIA available for public review and comment.

180.   <u>ESA Review.</u>   Although CEQ acknowledged in the Final Rule that the

promulgations of regulations "can be a discretionary action subject to section 7 of the ESA,"

CEQ failed to consult with the Services regarding the impacts that the Final Rule may have on

federally listed endangered and threatened species. Final Rule, 85 Fed. Reg. at 43,354.

Instead, CEQ bypassed section 7's consultation process entirely without providing meaningful

analysis or supporting evidence for its conclusion that the Final Rule, which makes significant

changes to how federal agencies review the environmental impacts of their actions, will have

"no effect" on listed species or designated critical habitat. Final Rule, 85 Fed. Reg. at 43,354-

55. In the Final Rule, CEQ asserts that it "determined that updating its regulations

implementing the procedural provision of NEPA has 'no effect' on listed species or designated

critical habitat. Therefore, section 7 consultation is not required." *Id.* at 43,354. CEQ's

decision to forego consultation with the Services under section 7 regarding the impacts that the

Final Rule may have on listed species or critical habitat violates the ESA because it is clear

that the proposed rule may affect, and is in fact likely to adversely affect, myriad listed species

and designated critical habitat. In addition, CEQ's finding that no impact to listed species or

1   critical habitat will result from the major changes to NEPA because the Final Rules are

2   "procedural in nature" is arbitrary and capricious and violates both the ESA and the APA.

3        181.   <u>Environmental Justice</u>.  CEQ also did not adequately review environmental

4   justice impacts from the Final Rule as required by Executive Order 12,898.  Instead, in the

5   Final Rule, CEQ concluded without rational explanation or support, and again relying on the

6   inadequate RIA, that the Final Rule will "not cause disproportionately high and adverse human

7   health or environmental effects on minority populations and low-income populations."  Final

8   Rule, 85 Fed. Reg. at 43,356–57.

9        182.   The Final Rule will become effective on September 14, 2020.  *Id*. at 43,372 (to

10   be codified at § 1506.13).  At that time, CEQ's existing guidance documents that are

11   inconsistent with the regulatory changes will effectively be withdrawn.  *Id*. at 43,371 (to be

12   codified at § 1506.7).

13        183.   Federal agencies may apply the Final Rule to ongoing activities and

14   environmental documents begun before the effective date.  *Id*. at 43,372-73 (to be codified at

15   § 1506.13).  As a result, federal agencies may apply the revised regulations to NEPA reviews

16   currently in progress, including reviews impacting State Plaintiffs.

17        184.   Federal agencies are also required to amend their NEPA regulations to conform

18   to the Final Rule.  *Id*. at 43,373 (to be codified at § 1507.3(b)).

19        185.   The Final Rule is unlawful and violates NEPA and the APA, because: (i) the

20   Final Rule is contrary to NEPA's text and purpose; (ii) CEQ failed to provide a rational

21   explanation for the Final Rule's numerous changes in policy and interpretation; (iii) CEQ

22   exceeded its statutory authority with certain revisions in the Final Rule; (iv) CEQ violated

23   notice-and-comment requirements; and (v) CEQ failed to analyze the Final Rule's significant

24   environmental impacts or consider reasonable alternatives to the Final Rule, as required by

25   NEPA.  CEQ also violated the ESA and the APA by failing to consult with the Services prior

26   to adopting the Final Rule, despite the fact that the Final Rule may impact federally listed

First Amended Compl. for Declaratory and
Inj. Relief          62
Case No. 3:20-cv-06057

AR_0026498

threatened and endangered species.  For these reasons, the Final Rule is arbitrary, capricious,

and contrary to law, was promulgated in excess of statutory authority and without observance

of procedure required by law, and should be vacated.

## VI.    THE FINAL RULE WILL HARM STATE PLAINTIFFS

186.    State Plaintiffs' unique, concrete, and particularized interests will be harmed by

CEQ's Final Rule, which undermines and weakens key NEPA requirements.  A judgment

vacating the Final Rule and reinstating the 1978 regulations and associated guidance would

redress these harms.

187.    As the Supreme Court has recognized, State Plaintiffs are entitled to "special

solicitude" in seeking to remedy environmental harms.  *Massachusetts v. EPA,* 549 U.S. 497

519–22 (2007).  State Plaintiffs have a concrete proprietary and sovereign interest in

preventing harm to their natural resources, including their state-owned and state-regulated

water, air, coastlines, public lands, and wildlife, as a result of fewer and less robust federal

environmental reviews and diminished public participation.

188.    Many federal actions, including those actions subject to NEPA, impact state-

owned and/or state-regulated resources.  Federal agencies routinely conduct major Federal

actions within and near our states and territories, including those related to federal land

management, infrastructure projects, energy projects, water management, national defense and

military training, and interstate transportation projects.  Federal lands often encompass large-

scale and important ecosystems that help to support biodiversity, including ESA listed species

and their critical habitat.

189.    Among other things, the Final Rule will increase the number of federal actions

that avoid environmental review and diminish the scope of NEPA reviews that do occur.  Both

of these changes will reduce federal agencies' understanding of proposed actions' potential

harms on the environment, including but not limited to, harms to listed species and critical

habitat.  These changes will also limit opportunities through the NEPA process to develop

AR_0026499

1   alternatives or other solutions that avoid or mitigate adverse impacts to state and territorial

2   natural resources (including water, air, coastlines, public lands, wildlife, and species listed and

3   critical habitat designated under the ESA) and public health.  As a result, the Final Rule will

4   cause unmitigated adverse impacts to public health and to state and territorial natural resources

5   (including water, air, coastlines, public lands, wildlife, and species listed and critical habitat

6   designated under the ESA).

7          190.    In particular, the Final Rule eliminates consideration of indirect and cumulative

8   impacts, including a project's reasonably foreseeable upstream and downstream GHG

9   emissions, the impact of those emissions on climate change, and methods for avoiding and

10  mitigating those impacts.  Climate change impacts have already harmed and are continuing to

11  harm state and territorial sovereign lands and coastal areas, state and territorial natural

12  resources (including ESA listed species and their critical habitat), state and territorial

13  infrastructure, and the health and safety of state and territorial residents resulting in economic

14  losses for State Plaintiffs.  State Plaintiffs are already committing significant resources to

15  reduce their own greenhouse gas (GHG) emissions and investing in infrastructure to protect

16  communities and state resources from the impacts of climate change.  Contrary to NEPA, the

17  Final Rule impedes these efforts.  Without detailed information about an action's GHG

18  emissions and climate impacts, federal agencies will not engage in efforts to avoid or mitigate

19  harms from those emissions and impacts, which will exacerbate climate change impacts in our

20  states and territories, diminish our states' understanding of the actions contributing to those

21  impacts, and cause states and territories economic harm.

22         191.    Eliminating consideration of climate impacts will also place an increased

23  burden on efforts by State Plaintiffs to study and abate harms from climate change.  For

24  example, the Final Rule's elimination of climate change considerations will make it more

25  challenging for New York to assess GHGs from projects subject to NEPA review where those

26  GHGs are generated outside New York but are associated with electricity generation or fossil

First Amended Compl. for Declaratory and
Inj. Relief                                  64
Case No. 3:20-cv-06057

1    fuel transportation in New York.  Under New York's Climate Leadership and Community

2    Protection Act, Chapter 106 of the Laws of 2019 (Climate Act), which requires significant

3    statewide emission reductions by set dates, such out-of-state emissions contribute to statewide

4    GHG emissions.  N.Y. Envtl. Conserv. L. § 75-0107(1).  New York thus may need to

5    implement additional and potentially costly regulatory, policy, or other actions to ensure the

6    achievement of the requirements of the Climate Act.  By decreasing the quality of analysis and

7    potential mitigation for GHG emissions from projects with impacts on Massachusetts residents,

8    the Final Rule may impose similar challenges and burdens on Massachusetts' ability to assess

9    and meet the GHG emission-reduction mandates of the Massachusetts Global Warming

10   Solutions Act.  *See* Mass. Gen. Laws. ch. 21N, §§ 1–11.

11        192.    The scope of cumulative impact review required under the 1978 NEPA

12   regulations was broader than the cumulative impact review performed during an ESA

13   consultation process.  The Final Rule, however, eliminates cumulative impact analysis during

14   the NEPA review process entirely, undermining CEQ's conclusion that the Final Rule will

15   have "no effect" on listed species or designated critical habitat.  For example, the Final Rule's

16   instruction that federal agencies should not consider impacts that are "remote in time" and

17   "geographically remote" may result in inadequate analysis of and, consequently, potential

18   damage to the State Plaintiffs' fish and wildlife, including ESA listed species and designated

19   critical habitat.  For ESA listed species and designated critical habitat, this harm will occur

20   even if federal agencies perform site-specific ESA consultation, due to the more limited scope

21   of cumulative impacts analysis required under the ESA's section 7 implementing regulations.

22   *See* 50 C.F.R. §§ 402.02, 402.14(g)(3)–(4).  One example of such harm is apparent in the

23   context of federal dam operations, which have a major impact on several of Oregon's iconic

24   salmon populations, many of which are listed as threatened or endangered under the ESA.

25   Salmon travel hundreds of miles and juvenile salmon may be harmed by powerhouses in the

26   hydrosystem, only to succumb to their injuries after entering the ocean or on their migration

AR_0026501

1  upstream as adults.  Due to the Final Rule's elimination of consideration of "geographically

2  remote" impacts and impacts that are "remote in time," NEPA analysis of federal hydrosystem

3  actions could disregard these impacts to State Plaintiffs' natural resources, including species

4  listed and critical habitat designated under the ESA.

5      193.    By decreasing opportunities for public comment and participation, the Final

6  Rule also limits State Plaintiffs' ability to influence federal projects affecting their natural

7  resources and residents.  Through NEPA, state and territorial agencies regularly engage with

8  federal agencies and permit applicants to identify potential adverse impacts to their state and

9  territorial resources and propose alternatives or mitigation measures to avoid those harms.  For

10  example, the Washington Department of Fish and Wildlife recently commented on the draft

11  EA for a proposed expansion of a ski area on federal lands within the state to highlight impacts

12  to state lands and wildlife and suggest the most effective mitigation of these impacts.

13  Washington state agencies also recently submitted comments on the Draft Supplemental EIS

14  for the Navy's proposed Northwest Training and Testing activities, which threatens harmful

15  impacts to critically endangered Southern Resident Killer Whales, a species that Washington

16  has dedicated significant resources to protect.  Under the Final Rule, these opportunities to

17  comment on and help shape federal actions affecting state resources, including ESA listed

18  species and designated critical habitat, will be diminished in some situations and lost in others.

19  Where actions proceed with diminished public process under the Final Rule, states will lose the

20  opportunity to comment on or, if necessary, challenge the actions before harms occur.

21      194.    Fewer and less robust environmental reviews and diminished opportunities for

22  public participation will also increase the burden on State Plaintiffs to respond to public health

23  disparities flowing from uninformed federal decisions that adversely impact vulnerable

24  communities.  For example, the Final Rule excludes consideration of cumulative impacts to

25  communities that face a historic and disproportionate pattern of exposure to environmental

26  hazards and are more likely to suffer future health disparities due to the elimination of

1   cumulative impact review from the NEPA process.  These communities also are more likely to

2   experience severe impacts of climate change, including flooding, extreme weather events such

3   as extreme heat, and degraded air and water quality.  Increased public health and community

4   harms from weakened NEPA reviews will require greater expenditures of state and territorial

5   funds to remedy increased public health disparities flowing from uninformed federal agency

6   action.

7         195.   These harms will also impair ongoing efforts by State Plaintiffs to reduce public

8   health disparities, which State Plaintiffs already devote significant resources to address.  For

9   example, the New York State Department of Environmental Conservation's Office of

10  Environmental Justice directs resources to disproportionately impacted communities and

11  enhances public participation through grant opportunities, enforcement of environmental laws

12  and programs, and consultation with local industries.  California's Community Air Protection

13  Program (CAPP) helps to reduce exposure in communities most impacted by air pollution.

14  CAPP works with communities throughout California to measure and reduce adverse health

15  impacts from air pollution, including through targeted incentive funding to deploy cleaner

16  technologies in communities experiencing localized air pollution.  In Washington, the

17  Department of Health and a statewide Environmental Justice Task Force are working to reduce

18  health disparities.  The Final Rule hinders these state efforts by adopting changes that allow

19  agencies to avoid thorough consideration of impacts on public health and environmental

20  justice.

21        196.   In addition, fewer and less robust NEPA reviews may increase the burden on

22  some State Plaintiffs to protect vulnerable species and the habitats upon which they depend

23  through the protections afforded under state environmental review laws and other state efforts

24  to protect biodiversity.

25        197.   State Plaintiffs have also relied on the 1978 regulations to review proposed

26  agency NEPA rules and to determine their potential impact on state and territorial natural

1  resources.  For example, the Washington Department of Fish and Wildlife (WDFW) relied on

2  the requirement in the 1978 regulations that projects with extraordinary circumstances will not

3  be subject to a categorical exclusion in assessing potential wildlife impacts from the Forest

4  Service's proposed categorical exclusions.  *See* Letter from WDFW Director Kelly Susewind

5  to Amy Baker, U.S. Forest Service on proposed categorical exclusions, USFS-HQ-2019-12195

6  (Aug. 6, 2019).  The Final Rule, however, authorizes federal agencies to apply a categorical

7  exclusion even where extraordinary circumstances exist, diminishing the protections to state

8  natural resources on which WDFW relied.  Similarly, the Final Rule requires federal agencies

9  to amend their NEPA regulations to meet the lowered environmental review standards of the

10  Final Rule, which will increase the risk of adverse impacts to state and territorial natural

11  resources, including species listed and critical habitat designated under the ESA.

12       198.    Additionally, State Plaintiffs have institutional, proprietary, and economic

13  interests in federal agency compliance with NEPA's text and goals of environmental

14  protection, public participation, and informed decision making.  Fewer and weaker federal

15  environmental reviews mean that state agencies in Washington, California, New York, and

16  Massachusetts will no longer be able to adopt or incorporate most federal NEPA documents

17  into their own state NEPA review processes because the NEPA documents will no longer

18  satisfy state law, including, for example, requirements that state review include climate

19  impacts and greenhouse gas emissions.  *See, e.g.*, Wash. Rev. Code ch. 43.21; Cal. Pub. Res.

20  Code § 21083.5; 6 N.Y. Comp. Codes R. & Regs. § 617.15; Mass. Gen. Laws, ch. 30, §§ 61,

21  62G.  Similarly, state agencies in California will no longer be able to prepare joint documents

22  to satisfy both NEPA and California's little NEPA law, and this will increase the burden on

23  state agencies to prepare their own stand-alone environmental documents.  Cal. Code Regs., tit.

24  14, § 1517.  Similar problems may arise even in states that do not have so-called "little

25  NEPAs."  In Oregon, for example, the State Energy Facility Siting Council may need to

26  develop separate environmental reviews to meet the requirements of Oregon statutory law

AR_0026504

1  before approving energy facilities, rather than rely on federal NEPA documentation according

2  to the Council's longstanding practice.  As a result, State Plaintiff agencies will need to expend

3  significant financial and administrative resources to conduct environmental analyses that

4  would not have been necessary under the 1978 regulations.

5      199.    Robust NEPA review is critical for State Plaintiffs that lack environmental

6  review processes or where state environmental review statutes may not apply.  In these

7  situations, state agencies will be unable to fill significant gaps in analysis through their own

8  state environmental review and will thus need to rely on the federal NEPA process to

9  understand a project's anticipated environmental impacts.  Where the federal environmental

10  review is insufficient, as it will be under the Final Rule, states and territories will lack valuable

11  information to determine how federal projects will impact state and territorial natural

12  resources.

13      200.    Moreover, while State Plaintiffs can act to protect natural resources within their

14  borders, they cannot control decisions made by non-plaintiff states about resources that cross

15  state boundaries, such as water, air, and wildlife.  Thus, despite the State Plaintiffs' efforts,

16  State Plaintiffs may not be able wholly to fill the regulatory gaps created by the Final Rule.

17      201.    Federal agencies will also be required to amend their NEPA regulations to

18  conform to the Final Rule.  85 Fed. Reg. at 43,373 (to be codified at § 1507.3(b)).  These

19  regulatory changes will further burden State Plaintiff agencies that frequently participate in the

20  NEPA process and will place a particular burden on State Plaintiff agencies, like Caltrans, that

21  have been delegated NEPA authority.

22      202.    State Plaintiffs also suffered procedural harm from CEQ's failure to comply

23  with the procedural requirements of the APA, NEPA, and the ESA in promulgating the Final

24  Rule.  CEQ's failure to promulgate a rationally supported and lawful rule, failure to prepare an

25  EA or EIS for the Final Rule, and failure to consult with the Services regarding impacts to

26  listed species and designated critical habitat harms State Plaintiffs' procedural interests in

1    participating in a lawful rulemaking and environmental review process that adequately

2    considers and mitigates impacts on the State Plaintiffs' residents, natural resources, and ESA

3    listed species and designated critical habitat.

4    203.    State Plaintiffs have thus suffered concrete injury caused by CEQ's

5    promulgation of the Final Rule.  A court judgment vacating the entire Final Rule and

6    reinstating the 1978 regulations and associated guidance will redress the harms to State

7    Plaintiffs by requiring that federal agencies continue to review actions under the prior

8    regulations and guidance, consistent with NEPA.  Therefore, State Plaintiffs have standing to

9    bring this action.

10                       **FIRST CAUSE OF ACTION**
       **Violation of the APA and NEPA by Adopting Regulations Contrary to NEPA**
11                 **5 U.S.C. § 706(2); 42 U.S.C. §§ 4321 *et seq.***

12    204.    State Plaintiffs incorporate all preceding paragraphs by reference.

13    205.    The APA provides that this Court shall "hold unlawful and set aside" agency

14    action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with

15    law" or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."

16    5 U.S.C. § 706(2).  An agency does not have authority to adopt a regulation that is "plainly

17    contrary to the statute."  *Morton*, 467 U.S. at 834; *Babbitt v. Sweet Home Chapter of Cmtys.*

18    *for a Great Or.*, 515 U.S. 687, 703 (1995).

19    206.    The Final Rule is "not in accordance with law" because it conflicts with

20    NEPA's text, structure, and purpose and exceeds the scope of CEQ's jurisdiction, authority,

21    and discretion under NEPA.

22    207.     The Final Rule violates NEPA and the APA by adopting provisions that, both

23    individually and collectively, conflict with NEPA's overriding purposes of environmental

24    protection, public participation, and informed decision making and the statute's mandate that

25    agencies apply NEPA "to the fullest extent possible."  5 U.S.C. § 706(2)(A); 42 U.S.C.

26    §§ 4331, 4332.  The Final Rule is unlawful because, among other things, it:

AR_0026506

1               a.     Restricts the number of projects subject to detailed environmental

2 review, including, among others things, through (i) a new "NEPA thresholds" provision that

3 establishes six broad and ill-defined circumstances in which NEPA does not apply, Final Rule,

4 85 Fed. Reg. at 43,359 (to be codified at § 1501.1); (ii) a narrow definition of "major Federal

5 action" that is inconsistent with NEPA's plain language, *id.* at 43,375 (to be codified at

6 § 1508.1(q)); and (iii) a revised analysis for determining what actions are likely to have

7 "significant effects" and thus require an EIS, *id.* at 43,360 (to be codified at § 1501.3). These

8 provisions are directly contrary to NEPA's text and purpose and its mandate that agencies

9 apply the statute "to the fullest extent possible." *See* 42 U.S.C. §§ 4331, 4332.

10               b.     Limits the scope of environmental effects agencies must consider when

11 conducting NEPA review. For example, the Final Rule allows agencies to avoid considering

12 cumulative and indirect impacts, as well as impacts that are "remote in time" or

13 "geographically remote." Final Rule, 85 Fed. Reg. at 43,375 (to be codified at § 1508.1(g));

14 *see also id.* at 43,360 (to be codified at § 1501.3(b)(1)) (limiting the "affected area" in the

15 significance analysis to "national, regional, or local"). Congress however, plainly intended

16 NEPA to address such impacts. NEPA directs agencies to consider "any adverse

17 environmental effects which cannot be avoided should the proposal be implemented,"

18 42 U.S.C. 4332(C)(ii), and "the relationship between local short-term uses of man's

19 environment and the maintenance and enhancement of long-term productivity," *id.*

20 § 4332(2)(C)(iv). NEPA further directs agencies to "recognize the worldwide and long-range

21 character of environmental problems," rather than examine the impacts of each federal

22 proposal in a silo, *id.* § 4332(2)(F). Indeed, the Senate Committee Report on NEPA stated that

23 the statute was necessary because "[i]mportant decisions concerning the use and the shape of

24 man's future environment continue to be made in small but steady increments which

25 perpetuate rather than avoid the recognized mistakes of previous decades." S. Rep. No. 91-

26 296, at 5. Avoiding this death by a thousand cuts demands that federal agencies carefully

First Amended Compl. for Declaratory and
Inj. Relief              71
Case No. 3:20-cv-06057

AR_0026507

1    consider the cumulative environmental impacts of their actions with other related and unrelated

2    actions—not, as the Final Rule would have it, ignore those impacts entirely.

3              c.    Limits the number of alternatives to the proposed action analyzed in an

4    EA or EIS and the depth of that analysis by, among other things, removing the requirement that

5    agencies "[r]igorously explore and objectively evaluate" all reasonable alternatives to the

6    proposed action, eliminating consideration of alternatives outside the jurisdiction of the lead

7    agency, and removing the requirement that agencies "[d]evote substantial treatment to each

8    alternative. Final Rule, 85 Fed. Reg. at 43,365 (to be codified at § 1502.14). The Final Rule

9    also unlawfully allows certain actions to proceed during NEPA review, constraining available

10   alternatives. *Id*. at 43,370 (to be codified at § 1506.1). Contrary to these provisions, NEPA's

11   plain language requires "to the fullest extent possible" consideration of "alternatives to the

12   proposed action" and limits action on proposals until after that comprehensive environmental

13   review occurs. 42 U.S.C. § 4332, 4332(2)(C)(iii); *Robertson*, 490 U.S. at 349 ("Simply by

14   focusing the agency's attention on the environmental consequences of a proposed project,

15   NEPA ensures that important effects will not be overlooked or underestimated only to be

16   discovered after resources have been committed or the die otherwise cast.").

17             d.    Diminishes agencies' obligation to obtain or develop information

18   regarding environmental impacts when such information is not already available. The 1978

19   regulations required agencies to obtain such information when the cost of obtaining it was "not

20   exorbitant." 40 C.F.R. § 1502.22(a) (1978). The Final Rule lowers the bar and permits

21   agencies to forgo additional investigation when the cost would be merely "unreasonable."

22   Final Rule, 85 Fed. Reg. at 43,366 (to be codified at 40 C.F.R. § 1502.21(b)). This vague and

23   lax standard is inconsistent with NEPA's statutory mandate that agencies consider all the

24   environmental impacts of their actions, not just those that are readily apparent. *See* 42 U.S.C.

25   § 4332(2)(C)(ii) (agencies must disclose "*any* adverse environmental effects which cannot be

26   avoided should the proposal be implemented" (emphasis added)).

First Amended Compl. for Declaratory and
Inj. Relief                                          72
Case No. 3:20-cv-06057

AR_0026508

1           e.      Undermines the ability of State Plaintiffs and the public to comment on

2  federal proposals, in direct conflict with NEPA's informed decision making mandate and

3  direction that federal agencies work "in cooperation with State and local governments, and

4  other concerned public and private organizations." *Id.* § 4331(a); *see also id.* § 4332(2)(C)

5  (directing that "the comments and views of the appropriate Federal, State, and local agencies

6  … shall accompany the [agency] proposal through the existing agency review processes" and

7  shall be made available to the public), *id.* § 4332(2)(G) ("make available to States, counties,

8  municipalities, institutions, and individuals, advice and information useful in restoring,

9  maintaining, and enhancing the quality of the environment"). The Final Rule allows federal

10  agencies to claim a "presumption" that they have considered public comments (including

11  comments by states and their agencies) by making a certification in the record of decision

12  approving a proposed action. Final Rule, 85 Fed. Reg. 43,369 (to be codified at 40 C.F.R.

13  § 1505.2(b)). This unjustified presumption invites federal agencies to overlook state and

14  public input on federal proposals. Indeed, the Final Rule adds a provision stating that agencies

15  "are not required to respond to each comment." *Id.* at 43,368 (to be codified at 40 C.F.R.

16  § 1503.4(a)(5)). Together, these changes, which excuse federal agencies from providing

17  meaningful response to comments submitted by State Plaintiffs, local governments, and the

18  public, unlawfully render NEPA's mandated public participation process an empty paperwork

19  exercise.

20        208.    For these reasons, the Final Rule is arbitrary and capricious, an abuse of

21  discretion, and contrary to the requirements of NEPA and the APA. 5 U.S.C. § 706(2);

22  42 U.S.C. §§ 4321 *et seq.* The Final Rule should therefore be held unlawful and set aside.

### SECOND CAUSE OF ACTION
### Violation of the APA for Arbitrary and Capricious Rulemaking
### 5 U.S.C. § 706(2)

25        209.    State Plaintiffs incorporate all preceding paragraphs by reference.

26

First Amended Compl. for Declaratory and
Inj. Relief        73
Case No. 3:20-cv-06057

AR_0026509

210.    The APA provides that this Court shall "hold unlawful and set aside" agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," "without observance of procedure required by law," or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."  5 U.S.C. § 706(2).

211.    Pursuant to the APA, in promulgating a regulation an "agency must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *State Farm*, 463 U.S. at 43.

212.    When the regulation represents a change in policy or interpretation, the agency must provide a rational explanation for that change. *Fox Television, Inc.*, 556 U.S. at 515.  The agency must demonstrate that the new rule "is permissible under the statute, that there are good reasons for it, and that the agency *believes* it to be better, which the conscious change of course adequately indicates." *Id*.

213.    Moreover, in changing policy agencies are "required to assess whether there were reliance interests, determine whether they were significant, and weigh any such interests against competing policy concerns." *Dep't of Homeland Sec.*, 140 S. Ct. at 1915 (citations omitted).

214.    In promulgating the Final Rule, CEQ failed, both for the entire rule and for its individual changes, to provide the reasoned analysis required by the APA.  Specifically, CEQ failed to provide a rational explanation for its changes to its longstanding NEPA interpretations and policies, relied on factors Congress did not intend for CEQ to consider, offered explanations that run counter to the evidence before the agency, ignored substantial reliance interests (including reliance by State Plaintiffs on NEPA's procedures to help protect state and territorial natural resources and public health) in the 1978 regulations and associated guidance, and entirely overlooked important issues.

215.    CEQ provided no reasoned analysis to demonstrate that the revisions in the Final Rule, both individually and collectively, will achieve its purported objectives to reduce

AR_0026510

1   paperwork and delays while "at the same time to produce better decisions [that] further the

2   national policy to protect and enhance the quality of the human environment."  Final Rule,

3   85 Fed. Reg. at 43,313; *see also id*. at 43,307.

4        216.   In particular, CEQ failed to demonstrate how the Final Rule will further

5   NEPA's policies of producing better decisions and furthering protection and enhancement of

6   the human environment when the Final Rule adopts provisions that conflict with NEPA's text,

7   purpose, legislative history, and CEQ's longstanding prior interpretations; that will produce

8   fewer and less robust environmental reviews and restrict public participation; and that will

9   limit judicial review.

10       217.   CEQ further failed to demonstrate how its revisions will reduce delay or add

11  clarity when CEQ's Final Rule injected new, undefined, and poorly explained language and

12  requirements into the NEPA process and swept away decades of agency regulations, guidance,

13  and case law that formerly provided extensive direction for federal agencies implementing

14  NEPA.  If anything, the Final Rule will lead to more delay, confusion, and litigation over the

15  correct interpretation and application of the Final Rule.

16       218.   CEQ also failed to meaningfully examine evidence, including studies developed

17  by CEQ itself, demonstrating successful implementation of NEPA under the 1978 regulations

18  and indicating that delay in project implementation is often caused by factors other than CEQ's

19  implementing regulations.  *See, e.g.*, U.S. Gov't Account. Office, *National Environmental*

20  *Policy Act: Little Information Exists on NEPA Analyses*, 16 (Apr. 2014).

21       219.   CEQ also failed to rationally consider environmental justice impacts from the

22  Final Rule or provide factual support for its conclusion that the Final Rule will "not cause

23  disproportionately high and adverse human health or environmental effects on minority

24  populations and low-income populations."  Final Rule, 85 Fed. Reg. at 43,356–57.  CEQ does

25  not justify its departure from its longstanding policy that environmental justice impacts should

26  be thoroughly analyzed through the NEPA process.

AR_0026511

220.    CEQ also failed to consider important aspects of the Final Rule by, among other things, ignoring evidence of NEPA's successful implementation and sweeping away concerns about environmental justice impacts, natural resource impacts (including climate change impacts), and burdens imposed on State Plaintiffs resulting from the Final Rule.

221.    For these reasons, the Final Rule is arbitrary and capricious, an abuse of discretion, and contrary to the requirements of the APA.  5 U.S.C. § 706(2).  The Final Rule should therefore be held unlawful and set aside.

**THIRD CAUSE OF ACTION**
**Violation of the APA for Promulgating Regulations in Excess of Statutory Authority**
**5 U.S.C. § 706(2); 42 U.S.C. §§ 4321 *et seq.***

222.    State Plaintiffs incorporate all preceding paragraphs by reference.

223.    The APA provides that this Court shall "hold unlawful and set aside" agency action that is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."  5 U.S.C. § 706(2).

224.    Several of the Final Rule's provisions, individually and collectively, exceed CEQ's "statutory jurisdiction [and] authority."  *Id.* § 706(2)(C).

225.    These unlawful revisions include:

a.    Carving out new exceptions to NEPA's requirements.  As discussed above, the Final Rule would greatly expand the circumstances in which agencies can avoid complying with NEPA.  CEQ has no authority to excuse agencies from complying with NEPA's environmental review mandate.

b.    Redefining "major Federal action" to exclude an agency's failure to act, *compare* 40 C.F.R. § 1508.18 ("[a]ctions include the circumstance where the responsible agency officials fail to act and that failure to act is reviewable by courts or administrative tribunals"), *with* Final Rule, 85 Fed. Reg. at 43,375 (to be codified at § 1508.1(q) (removing failure to act language from the definition of "major Federal action")), effectively rewriting the

1  definition of a reviewable agency action under the APA, 5 U.S.C. § 551(13).  CEQ has no

2  authority to limit the application of the APA.

3             c.     Placing a limit on the remedies available in a NEPA lawsuit, stating that

4  "[h]arm from the failure to comply with NEPA can be remedied by compliance with NEPA's

5  procedural requirements," suggesting that courts should decline to invalidate agency action

6  where agencies commit "minor, non-substantive errors that have no effect on agency decision

7  making," and stating that the Final Rule "create[s] no presumption that violation of NEPA is a

8  basis for injunctive relief or for a finding of irreparable harm."  Final Rule, 85 Fed. Reg. at

9  43,358 (to be codified at § 1500.3(d)).  CEQ has no authority, statutory or otherwise, to

10  instruct courts on the remedies they can order.  *See City of Los Angeles v. Barr*, 941 F.3d 931,

11  938 (9th Cir. 2019) ("An agency literally has no power to act ... unless and until Congress

12  confers power upon it.").

13      226.    For these reasons, the Final Rule is arbitrary, capricious, not in accordance with

14  law and in excess of CEQ's statutory authority.  5 U.S.C. § 706(2); 42 U.S.C. §§ 4321 *et seq.*

15  The Final Rule should therefore be held unlawful and set aside.

**FOURTH CAUSE OF ACTION**
**Violation of the APA's Notice-and-Comment Requirements**
**5 U.S.C. § 706(2)**

18      227.    State Plaintiffs incorporate all preceding paragraphs by reference.

19      228.    The APA provides that this Court shall "hold unlawful and set aside" agency

20  action that is "without observance of procedure required by law."  5 U.S.C. § 706(2).

21      229.    Prior to promulgating, amending, or repealing a rule, agencies must engage in a

22  public notice-and-comment process.  *Id.* §§ 551(5), 553.  To satisfy the requirements of APA

23  section 553(b), agencies must afford public notice of specific regulatory changes and their

24  reasoned basis to provide the public an opportunity for meaningful comment.  *Home Box*

25  *Office v. FCC*, 567 F.2d at 35–36.  To allow for meaningful public comment, an agency must

26  "make available" during the public comment period "technical studies and data that it has

First Amended Compl. for Declaratory and
Inj. Relief       77
Case No. 3:20-cv-06057

AR_0026513

1  employed in reaching the decision[] to propose particular rules." *Kern Cty. Farm Bureau*, 450

2  F.3d at 1076. The public may then submit comments on the proposed rule. 5 U.S.C. § 553(c).

3       230. "An agency must consider and respond to significant comments received during

4  the period for public comment." *Perez*, 575 U.S. at 96. "These procedures are 'designed to

5  assure due deliberation' of agency regulations and 'foster the fairness and deliberation that

6  should underlie a pronouncement of such force.'" *E. Bay Sanctuary Covenant v. Trump*, 932

7  F.3d 742, 775 (9th Cir. 2018) (quoting *United States v. Mead Corp.*, 533 U.S. 218, 230

8  (2001)). "In considering and responding to comments, 'the agency must examine the relevant

9  data and articulate a satisfactory explanation for its action including a "rational connection

10  between the facts found and the choice made."'" *Altera Corp. & Subsidiaries v. Comm'r of

11  *Internal Revenue*, 926 F.3d 1061, 1080 (9th Cir. 2019) (quoting *State Farm*, 463 U.S. at 43),

12  *cert. denied sub nom. Altera Corp. & Subsidiaries v. CIR*, No. 19-1009, 2020 WL 3405861

13  (U.S. June 22, 2020).

14       231. CEQ failed to provide a meaningful opportunity to comment on data or

15  technical studies that it employed in reaching conclusions in the Final Rule. *Kern Cty. Farm

16  Bureau*, 450 F.3d at 1076.

17       232. In the Final Rule, CEQ relied repeatedly on its RIA to support its revised

18  regulations and to dismiss harms to the environment, public health, and vulnerable

19  communities, including to dismiss its obligation under NEPA to prepare an EA or EIS and its

20  obligation under Executive Order 12,898 to assess environmental justice impacts. *See, e.g.*,

21  Final Rule, 85 Fed. Reg. at 43,352, 43,354, 43,356. CEQ thus relied on the RIA in reaching its

22  decisions in the Final Rule.

23       233. CEQ did not provide an opportunity for the public to comment on the RIA prior

24  to promulgating the Final Rule.

25

26

First Amended Compl. for Declaratory and
Inj. Relief     78
Case No. 3:20-cv-06057

AR_0026514

234.    CEQ also failed to respond adequately to comments on the Proposed Rule.  For example, State Plaintiffs and others submitted significant comments on the Advance Notice and the Proposed Rule explaining that:

    a.    CEQ has not presented sufficient evidence to demonstrate a need for the Proposed Rule, particularly given that studies, including studies developed by CEQ itself, and State Plaintiffs' own experience with NEPA demonstrate that NEPA leads to better decisions, that external factors contribute to delay in environmental reviews, and that existing tools could remedy CEQ's concerns about delay;

    b.    CEQ's Proposed Rule, if finalized, would increase confusion, uncertainty, and litigation, causing the very delay CEQ claimed that it sought to avoid in promulgating the Final Rule;

    c.    CEQ's Proposed Rule, if finalized, would adversely impact the unique interests of states, territories, and local governments including by harming state resources, limiting state access to information, disrupting coordination with federal agencies, undermining state reliance on the 1978 regulations and associated guidance, and burdening states with increased environmental review;

    d.    CEQ's Proposed Rule, if finalized, would eliminate consideration of climate change impacts, contributing to adverse impacts to natural resources and public health in our states, territories, and communities; and

    e.    CEQ's Proposed Rule, if finalized, would adversely impact vulnerable communities by limiting NEPA's application and scope, including by excluding certain federal actions from environmental review, eliminating consideration of cumulative impacts, and limiting opportunities for public comment.

235.    CEQ failed to provide a rational response to these significant comments.  To the extent CEQ addressed these issues, it provided only cursory responses that did not "examine

AR_0026515

1    the relevant data and articulate a satisfactory explanation for its action." *Altera Corp. &*

2    *Subsidiaries*, 926 F.3d at 1080.

3        236.    Because CEQ failed to provide an opportunity to comment on the RIA and CEQ

4    failed to rationally respond to significant comments, the Final Rule is arbitrary, capricious, an

5    abuse of discretion, and promulgated "without observance of procedure required by law."

6    5 U.S.C. § 706(2).  The Final Rule should therefore be held unlawful and set aside.

7                        **FIFTH CAUSE OF ACTION**
      **Violation of NEPA and the APA for Failure to Prepare an EA or EIS on the Final Rule**
8                    **42 U.S.C. § 4332(2)(C); 5 U.S.C. § 706(2)**

9        237.    State Plaintiffs incorporate all preceding paragraphs by reference.

10       238.    NEPA requires federal agencies to take a "hard look" at the environmental

11   consequences of a proposal before acting on it.  *See* 42 U.S.C. § 4332.  That is, a federal

12   agency must prepare an EIS for all "major Federal actions significantly affecting the quality of

13   the human environment."  *Id.* § 4332(2)(C); 40 C.F.R. § 1502.3 (1978).

14       239.    An EIS must discuss, among other things: the environmental impact of the

15   proposed federal action, any adverse and unavoidable environmental effects, any alternatives

16   to the proposed action, and any irreversible and irretrievable commitment of resources

17   involved in the proposed action.  42 U.S.C. § 4332(2)(C).

18       240.    CEQ is a federal agency subject to NEPA.

19       241.    CEQ's 1978 regulations apply to CEQ's promulgation of the Final Rule.  Final

20   Rule, 85 Fed. Reg. 43,354 (stating that if CEQ were to prepare an EIS on the Final Rule, the

21   1978 regulations would apply).

22       242.    Under CEQ's 1978 regulations, a "major Federal action" included "new or

23   revised agency rules [and] regulations," like the Final Rule.  40 C.F.R. § 1508.18(a) (1978).

24       243.    CEQ's 1978 regulations specify that in an EIS, agencies must rigorously

25   explore and objectively evaluate all reasonable alternatives, including the alternative of taking

26

AR_0026516

1  no action, and must discuss the reasons for eliminating any alternatives rejected from detailed

2  study. *Id*. § 1502.14.

3       244.    The 1978 regulations also require agencies to analyze both the direct impacts

4  that an action will have on the environment, as well as the action's "reasonably foreseeable"

5  indirect and cumulative impacts.  Indirect impacts are "caused by the action and are later in

6  time or farther removed in distance, but are still reasonably foreseeable." *Id*. § 1508.8(b)

7  (1978).  Cumulative impacts are those impacts that result "from the incremental impact of the

8  action when added to other past, present, and reasonably foreseeable future actions." *Id*.

9  § 1508.7 (1978).

10       245.    CEQ's analysis of alternatives and impacts should consider, among other things,

11  the disproportionately high and adverse human health or environmental effects of their actions

12  on minority and low-income populations.  42 U.S.C. § 4332(2)(C); Exec. Order No. 12,898,

13  59 Fed. Reg. 7,629 (1994) (as amended); CEQ, Environmental Justice (1997).

14       246.    As a preliminary step, an agency may first prepare an EA to determine whether

15  the effects of an action may be significant.  40 C.F.R. §§ 1501.4(b), 1508.9 (1978).  If an

16  agency decides not to prepare an EIS, it must supply a "convincing statement of reasons" to

17  explain why a project's impacts are not significant.  *Nat'l Parks Conservation Ass'n v. Babbitt*,

18  241 F.3d 722, 730 (9th Cir. 2001) (internal citations omitted); *see also Save the Yaak Comm. v.*

19  *Block*, 840 F.2d 714, 717 (9th Cir. 1988).

20       247.    An EIS must always be prepared if "substantial questions are raised as to

21  whether a project … *may* cause significant degradation of some human environmental factor."

22  *Idaho Sporting Cong. v. Thomas*, 137 F.3d 1146, 1149 (9th Cir. 1998) (quoting *Greenpeace*

23  *Action v. Franklin*, 14 F.3d 1324, 1332 (9th Cir. 1992)).

24       248.    CEQ's promulgation of the Final Rule is a "major Federal action" that

25  significantly affects the environment.  The Final Rule severely limits federal agencies'

26  obligation to review environmental impacts under NEPA both by excluding federal actions

First Amended Compl. for Declaratory and
Inj. Relief        81
Case No. 3:20-cv-06057

AR_0026517

1    from environmental review and by limiting the scope of environmental reviews that do occur.

2    These changes will cause federal agencies to overlook—and thus fail to address, avoid, or

3    mitigate—their actions' impacts, including significant impacts to State Plaintiffs' natural

4    resources, climate change, public health, and environmental justice.  Projects with significant

5    unstudied and undisclosed impacts will move forward with no or insufficient environmental

6    review in violation of NEPA.  Moreover, excusing agencies from considering cumulative

7    impacts will result in agencies taking actions without fully understanding the impacts of those

8    actions on climate change, overburdened and underserved communities, water and air quality,

9    and sensitive, threatened, and endangered wildlife.

10        249.    Under NEPA, CEQ was required to address the Final Rule's significant

11   environmental impacts and consider reasonable alternatives to the Final Rule in an EIS or, at a

12   minimum, an EA.  42 U.S.C. § 4332(2)(C).  CEQ did neither.

13        250.    CEQ provided no legally sufficient justification—let alone a "convincing

14   statement of reasons"—for failing to comply with NEPA in promulgating the Final Rule.

15   *Babbitt*, 241 F.3d at 730; *see also Sierra Club v. Bosworth,* 510 F.3d. 1016 (9th Cir. 2007).

16        251.    CEQ's failure to take a "hard look" at the environmental impacts of the Final

17   Rule prior to its promulgation was arbitrary and capricious, an abuse of discretion, and

18   contrary to the procedural requirements of NEPA and the APA.  5 U.S.C. § 706(2); 42 U.S.C.

19   § 4332(2)(C).  The Final Rule should therefore be held unlawful and set aside.

20                          **SIXTH CAUSE OF ACTION**
                   **Violation of the ESA and APA for Failing to Consult**
21                          **5 U.S.C. § 706(2)**

22        252.    State Plaintiffs incorporate all preceding paragraphs by reference.

23        253.    Section 7 of the ESA requires each federal agency to engage in consultation

24   with the FWS or the NMFS when a proposed federal action "may affect a listed species or

25   critical habitat."  16 U.S.C. § 1536(a)(2); 50 C.F.R. §§ 402.12(a), (k), 402.14(a)–(b).  This

26   "may affect" threshold is low; and "any possible effect, whether beneficial, benign, adverse, or

First Amended Compl. for Declaratory and
Inj. Relief                                    82
Case No. 3:20-cv-06057

1   of an undetermined character, triggers the formal consultation requirement." *W. Watersheds*

2   *Project v. Kraayenbrink*, 632 F.3d 472, 496 (9th Cir. 2011) (citing 51 Fed. Reg. 19,926, 19,949

3   (June 3, 1986)) (brackets and internal quotation marks omitted).

4       254.    Once consultation has been initiated, the federal agency is prohibited from

5   "mak[ing] any irreversible or irretrievable commitment of resources with respect to the agency

6   action which has the effect of foreclosing the formulation or implementation of any reasonable

7   and prudent alternative measures[.]"  16 U.S.C § 1536(d).  Where a federal agency is required

8   to initiate consultation, but fails to do so, the agency is prohibited from proceeding with any

9   activity that may affect a listed species or designated critical habitat until it complies with the

10  consultation requirement. *Pac. Rivers Council v. Thomas*, 30 F.3d 1050, 1056–57 (9th Cir.

11  1994).

12      255.    Each "department, agency, or instrumentality of the United States" is a federal

13  agency subject to the ESA.  16 U.S.C. § 1532(7).

14      256.    Actions subject to the ESA include "all activities or programs of any kind

15  authorized, funded, or carried out, in whole or in part, by Federal agencies in the United States

16  or upon the high seas." 50 C.F.R. § 402.02.  Such actions include the promulgation of

17  regulations and all other actions directly or indirectly causing modifications to the land, water,

18  or air. *Id.*

19      257.    CEQ is a federal agency subject to the ESA.

20      258.    Promulgation of the Final Rule is an action subject to the ESA.

21      259.    Promulgation of the Final Rule "may affect" numerous listed species and the

22  designated critical habitats upon which they rely, including but not limited to, by revising

23  NEPA's implementing regulations to: exclude certain actions from NEPA review; separate the

24  definition of "major Federal action" from an action's significance; expand the use of

25  categorical exclusions; eliminate review of an agency action's effects on listed species and

26  designated critical habitat when analyzing the significance of an action; reduce the scope of

First Amended Compl. for Declaratory and
Inj. Relief                     83
Case No. 3:20-cv-06057

AR_0026519

1    alternatives considered during environmental review; and direct agencies not to consider

2    cumulative and indirect effects, including climate change impacts.  Final Rule, 85 Fed. Reg. at

3    43,360, 43,365–66, 43,375 (to be codified at §§ 1501.3(b), 1501.4, 1502.14, 1502.15,

4    1508.1(g), (m), (q)).  As such, CEQ's rulemaking for the Final Rule triggered the consultation

5    requirement set forth in section 7(a)(2) of the ESA.  16 U.S.C. § 1536(a)(2).

6         260.    However, CEQ did not consult with the Services with regard to the Final Rule.

7    Rather, CEQ concluded, without any basis or explanation, that the Final Rule would have "no

8    effect" on listed species or designated critical habitat.

9         261.    Once published, the Final Rule can no longer be revised as needed to ensure

10    that it will not jeopardize the continued existence of any listed species or result in the

11    destruction or adverse modification of designated critical habitat of such species.  As such,

12    CEQ's promulgation of the Final Rule constitutes an irreversible and irretrievable commitment

13    of resources, which foreclosed the formulation or implementation of any reasonable and

14    prudent alternative measures[.]"  16 U.S.C. § 1536(d).  As a result of CEQ's failure to initiate

15    consultation, the ESA's prohibition on the irreversible or irretrievable commitment of

16    resources applies.

17        262.    CEQ's promulgation of the Final Rule without consulting with the Services,

18    based on its conclusion that the Final Rule would have "no effect" on listed species, is

19    arbitrary, capricious, and not in accordance with law, in violation of the ESA and the APA.  16

20    U.S.C. § 1536; 5 U.S.C. § 706(2)(A).

21                            **PRAYER FOR RELIEF**

22        WHEREFORE, State Plaintiffs respectfully request that this Court:

23        1.    Declare that CEQ violated NEPA and the APA by promulgating a Final Rule

24    that is contrary to NEPA's language and purpose and exceeds CEQ's statutory authority;

25

26

AR_0026520