2.    Declare that CEQ violated the APA by promulgating a Final Rule that is arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law and fails to follow the procedures required by law;

3.    Declare that CEQ violated NEPA and the APA by promulgating a Final Rule without preparing an EA or an EIS evaluating the Final Rule's environmental and public health impacts;

4.    Declare that CEQ violated the ESA and the APA by promulgating the Final Rule without first consulting with the Services regarding the effects that the Final Rule may have on listed endangered and threatened species and designated critical habitat;

5.    Vacate the entire Final Rule so that the 1978 regulations as amended and associated guidance are immediately reinstated;

6.    Enjoin CEQ from implementing, enforcing, or relying upon the Final Rule;

7.    Award State Plaintiffs their costs, expenses, and reasonable attorneys' fees; and

8.    Award such other relief as the Court deems just and proper.

DATED this 23rd day of November, 2020.

XAVIER BECERRA
Attorney General of California

/s/ Joshua R. Purtle
SARAH E. MORRISON, SBN 143459
Supervising Deputy Attorney General
JAMIE B. JEFFERSON, SBN 197142
JOSHUA R. PURTLE, SBN 298215
JULIA K. FORGIE, SBN 304701
LANI M. MAHER, SBN 318637
Deputy Attorneys General
1515 Clay Street, 20th Floor
P.O. Box 70550
Oakland, CA 94612-0550
(510) 879-1002
Jamie.Jefferson@doj.ca.gov
Joshua.Purtle@doj.ca.gov

*Attorneys for Plaintiff State of California*

PHILIP J. WEISER
Attorney General of Colorado

/s/ Scott Steinbrecher
SCOTT STEINBRECHER
Assistant Deputy Attorney General
Ralph C. Carr Colorado Judicial Center
1300 Broadway, Seventh Floor
Denver, Colorado 80203
(720) 508-6287
Scott.Steinbrecher@coag.gov

*Attorneys for Plaintiff State Colorado*

ROBERT W. FERGUSON
Attorney General of Washington

/s/ Aurora Janke
AURORA JANKE
ELIZABETH HARRIS
Assistant Attorneys General
Washington Attorney General's Office
Environmental Protection Division
800 5th Ave Ste. 2000 TB-14
Seattle, Washington 98104-3188
(206) 233-3391
Aurora.Janke@atg.wa.gov
Elizabeth.Harris@atg.wa.gov

*Attorneys for Plaintiff State of Washington*

WILLIAM TONG
Attorney General of Connecticut

/s/ Robert Snook
ROBERT SNOOK
Assistant Attorney General
Attorney General's Office
165 Capitol Avenue
Hartford, Connecticut, 06106
(860) 808-5250
Robert.Snook@ct.gov

*Attorneys for Plaintiff State of Connecticut*

AR_0026522

KATHERINE S. DYKES
Commissioner Connecticut Department of Energy and Environmental Protection

*/s/ Kirsten S. P. Rigney*
KIRSTEN S. P. RIGNEY
Director, Legal Office
Department of Energy and Environmental Protection
10 Franklin Square
New Britain, CT 06051
(860) 827-2984

*/s/ Robert Snook*
ROBERT SNOOK
Assistant Attorney General
Attorney General's Office
165 Capitol Avenue
Hartford, Connecticut, 06106
(860) 808-5250
Robert.Snook@ct.gov

*Attorneys for Plaintiff Connecticut Department of Energy and Environmental Protection*

KATHLEEN JENNINGS
Attorney General of Delaware

*/s/ Kayli H. Spialter*
KAYLI H. SPIALTER
Deputy Attorney General
Delaware Department of Justice
820 N. French Street
Wilmington, DE 19801
(302) 577-8508
kayli.spialter@delaware.gov

*Attorneys for Plaintiff State of Delaware*

AR_0026523

1
KWAME RAOUL
Attorney General of Illinois

2

AARON FREY
Maine Attorney General

3
/s/ Jason E. James
JASON E. JAMES

/s/ Jillian R. O'Brien
JILLIAN R. O'BRIEN, SBN 251311

4
Assistant Attorney General
MATTHEW J. DUNN

Assistant Attorney General
Office of the Attorney General

5
Chief, Environmental Enforcement/Asbestos
Litigation Division

6 State House Station
Augusta, ME 04333-0006

6
Office of the Attorney General
Environmental Bureau

jill.obrien@maine.gov
(207) 626-8582

7
69 West Washington St., 18th Floor

8
Chicago, IL 60602

*Attorneys for Plaintiff State of Maine*

(312) 814-0660

9
jjames@atg.state.il.us

10
*Attorneys for Plaintiff State of Illinois*

11

12

13
BRIAN E. FROSH
Attorney General of Maryland

FOR THE PEOPLE OF THE STATE
OF MICHIGAN

14

15
/s/ Steven J. Goldstein
STEVEN J. GOLDSTEIN

DANA NESSEL
Attorney General of Michigan

16
Special Assistant Attorney General
200 Saint Paul Place, 20th Floor

17
Baltimore, Maryland 21202

/s/ Elizabeth Morrisseau
ELIZABETH MORRISSEAU

18
(410) 576-6414
sgoldstein@oag.state.md.us

Assistant Attorney General
Environment, Natural Resources, and
Agriculture Division

19
*Attorneys for Plaintiff State of Maryland*

6th Floor G. Mennen Williams Building

20

525 W. Ottawa Street
P.O. Box 30755

21

Lansing, MI 48909
(517) 335-7664

22

MorrisseauE@michigan.gov

23

24

25

26

AR_0026524

KEITH ELLISON
Attorney General of Minnesota

/s/ Peter N. Surdo
PETER N. SURDO
Special Assistant Attorney General
445 Minnesota Street Suite 900
Saint Paul, MN 55101
(651) 757-1061
Peter.Surdo@ag.state.mn.us

*Attorneys for Plaintiff State*
*of Minnesota*

AARON D. FORD
Attorney General of Nevada

/s/ Tori N. Sundheim
TORI N. SUNDHEIM, SBN 294559
Deputy Attorney General
HEIDI PARRY STERN
Solicitor General
Office of the Nevada Attorney General
555 E. Washington Ave., Ste. 3900
Las Vegas, NV 89101
Tsundheim@ag.nv.gov
HStern@ag.nv.gov

*Attorneys for Plaintiff State of Nevada*

GURBIR S. GREWAL
Attorney General of New Jersey

/s/ Lisa Morelli
LISA MORELLI
Deputy Attorney General
Environmental Permitting and Counseling
R.J. Hughes Justice Complex
P.O. Box 093
Trenton, NJ 08625
(609) 376-2804
Lisa.Morelli@law.njoag.gov

*Attorneys for Plaintiff State of New*
*Jersey*

HECTOR BALDERAS
Attorney General of New Mexico

/s/ William Grantham
WILLIAM GRANTHAM
Assistant Attorney General
201 Third Street NW, Suite 300
Albuquerque, New Mexico 87102
(505) 717-3520
wgrantham@nmag.gov

*Attorneys for the State of New Mexico*

AR_0026525

LETITIA JAMES
Attorney General of New York

*/s/ Claiborne E. Walthall*
CLAIBORNE E. WALTHALL
Assistant Attorney General
New York State Office of
the Attorney General
State Capitol
Albany, NY 12224
(518) 776-2380
claiborne.walthall@ag.ny.gov

*Attorneys for Plaintiffs State of New York and
New York State Department of Environmental
Conservation*

JOSHUA H. STEIN
Attorney General of North Carolina

DANIEL S. HIRSCHMAN
Senior Deputy Attorney General

*/s/ Asher P. Spiller*
ASHER P. SPILLER
Assistant Attorney General
North Carolina Department of Justice
P.O. Box 629
Raleigh, NC 27602
(919) 716-6400
aspiller@ncdoj.gov

*Attorneys for Plaintiff State of North
Carolina*

ELLEN ROSENBLUM
Attorney General of Oregon

*/s/ Paul Garrahan*
PAUL GARRAHAN
Attorney-in-Charge
STEVE NOVICK
Special Assistant Attorney General
Natural Resources Section
Oregon Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4593
Paul.Garrahan@doj.state.or.us
Steve.Novick@doj.state.or.us

*Attorneys for Plaintiff State of Oregon*

PETER F. NERONHA
Attorney General of Rhode Island

*/s/ Gregory S. Schultz*
GREGORY S. SCHULTZ
Special Assistant Attorney General
Rhode Island Office of Attorney
General
150 South Main Street
Providence, RI 02903
(401) 274-4400
gschultz@riag.ri.gov

*Attorneys for Plaintiff State of Rhode
Island*

AR_0026526

THOMAS J. DONOVAN, JR.
Attorney General of Vermont

*/s/ Nicholas F. Persampieri*
NICHOLAS F. PERSAMPIERI
Assistant Attorney General
Office of the Attorney General
109 State Street
Montpelier, VT 05609
(802) 828-3171
nick.persampieri@vermont.gov

*Attorneys for Plaintiff State of Vermont*


JOSHUA L. KAUL
Attorney General of Wisconsin

*/s/ Emily M. Ertel*
EMILY M. ERTEL
Assistant Attorney General
Wisconsin Department of Justice
Post Office Box 7857
Madison, Wisconsin 53707-7857
(608) 266-0432
ertelem@doj.state.wi.us

*Attorneys for Plaintiff State of Wisconsin*


MAURA HEALEY
Attorney General of Massachusetts

*/s/ Turner Smith*
TURNER SMITH
MATTHEW IRELAND
Assistant Attorneys General
Office of the Attorney General
Environmental Protection Division
One Ashburton Place, 18th Floor
Boston, MA 02108
(617) 727-2200
Turner.Smith@mass.gov
Matthew.Ireland@mass.gov

*Attorneys for Plaintiff Commonwealth of Massachusetts*


JOSH SHAPIRO
Attorney General of Pennsylvania

MICHAEL J. FISCHER
Chief Deputy Attorney General

*/s/ Ann R. Johnston*
ANN R. JOHNSTON
Senior Deputy Attorney General
Office of the Attorney General
Strawberry Square, 14th Floor
Harrisburg, PA 17120
(717) 705-6938
ajohnston@attorneygeneral.gov

*Attorneys for Plaintiff Commonwealth of Pennsylvania*

AR_0026527

LEEVIN TAITANO CAMACHO
Attorney General of Guam

*/s/ Joseph A. Perez*
JOSEPH A. PEREZ
Assistant Attorney General
Consumer Protection Division
590 South Marine Corps Drive,
Suite 901, ITC Building
Tamuning, Guam 96913
Telephone: (671) 475-3324
Facsimile: (671) 472-2493
jperez@oagguam.org

*Attorneys for Plaintiff Territory
of Guam*

KARL A. RACINE
Attorney General for the District of
Columbia

KATHLEEN KONOPKA
Deputy Attorney General
Public Advocacy Division

*/s/ Alacoque Hinga Nevitt*
ALACOQUE HINGA NEVITT, SBN
268768
WESLEY ROSENFELD
Assistant Attorneys General
District of Columbia Office of the
Attorney General
400 6th Street, NW
Washington, D.C. 20001
(202) 717-1368
alacoque.nevitt@dc.gov

*Attorneys for Plaintiff District of
Columbia*

VINCE RYAN
Harris County Attorney

*/s/ Sarah Jane Utley*
SARAH JANE UTLEY
Managing Attorney
Environmental Practice Group
Harris County Attorney's Office
1019 Congress, 15th Floor
Houston, Texas 77057
(713) 274-5124
Sarah.Utley@cao.hctx.net

*Attorneys for Plaintiff Harris County, Texas*

JAMES E. JOHNSON
Corporation Counsel of the
City of New York

*/s/ Nathan Taylor*
NATHAN TAYLOR
New York City Law Department
100 Church Street, Rm 6-144
New York, NY 10007
(646) 940-0736 (m)
(212) 356-2315
NTaylor@law.nyc.gov

*Attorneys for Plaintiff City of New York*

AR_0026528

# CERTIFICATE OF SERVICE

Case Name:  **State of California, et al. v.**          No.   **3:20-cv-06057**
            **Council on Environmental**
            **Quality, et al.**

I hereby certify that on <u>November 23, 2020</u>, I electronically filed the following documents with the Clerk of the Court by using the CM/ECF system:

**FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

I certify that **all** participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

I declare under penalty of perjury under the laws of the State of California and the United States of America the foregoing is true and correct and that this declaration was executed on <u>November 23, 2020</u>, at Oakland, California.

|                        |                     |
| ---------------------- | ------------------- |
| Maritza Padilla        |                     |
| Declarant              | Signature           |

OK2020303085
91319709.docx

# EXHIBIT 5

AR_0026530

Xavier Becerra
Attorney General of California
Sarah E. Morrison, SBN 143459
Supervising Deputy Attorney General
Jamie B. Jefferson, SBN 197142
Joshua R. Purtle, SBN 298215
Julia K. Forgie, SBN 304701
Lani M. Maher, SBN 318637
Deputy Attorneys General
1515 Clay Street, 20th Floor
P.O. Box 70550
Oakland, CA 94612-0550
Phone: (510) 879-1002
Fax: (510) 622-2270
Jamie.Jefferson@doj.ca.gov
Joshua.Purtle@doj.ca.gov

*Attorneys for Plaintiff State of California*

Robert W. Ferguson
Attorney General of Washington
Aurora Janke
Elizabeth Harris
Assistant Attorneys General
Environmental Protection Division
800 5th Ave Ste. 2000 TB-14
Seattle, Washington 98104-3188
Phone: (206) 233-3391
Fax: (206) 464-6451
Aurora.Janke@atg.wa.gov
Elizabeth.Harris@atg.wa.gov

*Attorneys for Plaintiff State of Washington*

*[Additional counsel listed on signature page]*

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| STATES OF CALIFORNIA, WASHINGTON, COLORADO, CONNECTICUT, DELAWARE, ILLINOIS, MAINE, MARYLAND, MINNESOTA, NEVADA, NEW JERSEY, NEW MEXICO, NEW YORK, NORTH CAROLINA, OREGON, RHODE ISLAND, VERMONT, AND WISCONSIN; PEOPLE OF THE STATE OF MICHIGAN; COMMONWEALTHS OF MASSACHUSETTS AND PENNSYLVANIA; TERRITORY OF GUAM; DISTRICT OF COLUMBIA; HARRIS COUNTY, TEXAS; CITY OF NEW YORK; CONNECTICUT DEPARTMENT OF ENERGY AND ENVIRONMENTAL PROTECTION; AND NEW YORK STATE DEPARTMENT OF ENVIRONMENTAL CONSERVATION, | Case No. 3:20-cv-06057 <br><br> **FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** <br><br> (Administrative Procedure Act, 5 U.S.C. §§ 551–559, 701–706; Endangered Species Act, 16 U.S.C. §§ 1531–1544; National Environmental Policy Act, 42 U.S.C. §§ 4321–4347) |

AR_0026531

Plaintiffs,

v.

COUNCIL ON ENVIRONMENTAL
QUALITY AND MARY B. NEUMAYR, in
her official capacity as Chairman of the
Council on Environmental Quality,

Defendants.

1. Plaintiffs, the State of California by and through Attorney General Xavier Becerra; the State of Washington, by and through Attorney General Robert W. Ferguson; the State of Colorado, by and through Attorney General Philip J. Weiser; the State of Connecticut and the Connecticut Department of Energy and Environmental Protection, by and through Attorney General William Tong; the State of Delaware, by and through Attorney General Kathleen Jennings; the State of Illinois, by and through Attorney General Kwame Raoul; the State of Maine, by and through Attorney General Aaron Frey; the State of Maryland, by and through Attorney General Brian E. Frosh; the People of the State of Michigan, by and through Attorney General Dana Nessel; the State of Minnesota, by and through Attorney General Keith Ellison; the State of Nevada, by and through Attorney General Aaron Ford; the State of New Jersey, by and through Attorney General Gurbir Grewal; the State of New Mexico, by and through Attorney General Hector Balderas; the State of New York and the New York State Department of Environmental Conservation, by and through Attorney General Letitia James; the State of North Carolina, by and through Attorney General Joshua H. Stein; the State of Oregon, by and through Attorney General Ellen Rosenblum; the State of Rhode Island, by and through Attorney General Peter F. Neronha; the State of Vermont, by and through Attorney General Thomas J. Donovan, Jr.; the State of Wisconsin, by and through Attorney General Joshua L. Kaul; the Commonwealth of Massachusetts, by and through Attorney General Maura Healey;

AR_0026532

the Commonwealth of Pennsylvania, by and through Attorney General Josh Shapiro; the

Territory of Guam, by and through Attorney General Leevin Taitano Camacho; the District of

Columbia, by and through Attorney General Karl A. Racine; Harris County, Texas, by and

through Harris County Attorney Vince Ryan; and the City of New York, by and through

Corporation Counsel James E. Johnson (collectively State Plaintiffs) bring this action against

Defendants Council on Environmental Quality (CEQ) and Mary Neumayr, in her official

capacity as Chairman of CEQ.  State Plaintiffs seek judicial review under the Administrative

Procedure Act, 5 U.S.C. §§ 551–559 and 701–706 (APA), and the Endangered Species Act, 16

U.S.C. §§ 1531–1544 (ESA), of CEQ's final rule revising its longstanding regulations

implementing the National Environmental Policy Act (NEPA), 42 U.S.C. § 4321–4347, titled

Update to the Regulations Implementing the Procedural Provisions of the National

Environmental Policy Act (Final Rule), 85 Fed. Reg. 43,304 (July 16, 2020) (to be codified at

40 C.F.R. pt. 1500).

## I.    INTRODUCTION

2.     For more than fifty years, NEPA has served as our nation's bedrock law for
environmental protection by directing federal agencies to make well-informed decisions that
protect public health and the environment.  NEPA embodies our nation's democratic values by
involving states, territories, local governments, and the public in the federal decision making
process.

3.     In enacting NEPA, Congress recognized the "critical importance of restoring
and maintaining environmental quality to the overall welfare and development of man" and
emphasized a national policy of cooperation with state and local governments as well as
concerned individuals and private organizations "to use all practicable means … to create and
maintain conditions under which man and nature can exist in productive harmony, and fulfill
the social, economic, and other requirements of present and future generations of Americans."
42 U.S.C. § 4331(a).

AR_0026533

1        4.      Consistent with this overarching policy, Congress directed federal agencies to

2  implement NEPA "to the fullest extent possible" and to conduct a detailed environmental

3  review for "major Federal actions significantly affecting the quality of the human

4  environment" that analyzes an action's environmental impacts, alternatives to the proposed

5  action, the relationship between short-term uses and long-term productivity, and any

6  irreversible and irretrievable commitment of resources. 42 U.S.C. §§ 4332, 4332(2)(C). As

7  the Supreme Court explained, Congress intended NEPA's "action-forcing procedures" to help

8  "insure that the policies [of NEPA] are implemented." *Andrus v. Sierra Club*, 442 U.S. 347,

9  350 (1979) (quoting S. Rep. No. 91-296, at 19 (1969)).

10        5.      NEPA is a success story of government transparency, meaningful public

11  participation, informed decision making, and environmental and public health protection.

12  Before NEPA, federal agencies often could make decisions without considering an action's

13  environmental impacts or public concerns about those impacts. NEPA requires that federal

14  agencies engage in a transparent, public, and informed decision making process to

15  comprehensively evaluate the environmental effects of their actions. NEPA's focus on

16  government transparency and public participation thus ensures that states, territories, local

17  governments, businesses, organizations, and individuals have a role in shaping federal actions.

18  State and territorial agencies, local governments, and the public have long relied on the NEPA

19  process to identify harms from federal actions to state and territorial natural resources

20  (including State Plaintiffs' air, water, public lands, cultural resources, and wildlife) and public

21  health that might otherwise be ignored. NEPA's public process also provides vulnerable

22  communities and communities of color that are too often disproportionately affected by

23  environmental harms a critical voice in the decision making process on actions that threaten

24  adverse environmental and health impacts. NEPA thus reflects the nation's democratic

25  principles by elevating the public's role in agency decision making and ensuring that federal

26  agencies thoughtfully review public input before making a decision.

First Amended Compl. for Declaratory and
Inj. Relief                    4
Case No. 3:20-cv-06057

AR_0026534

6.     NEPA prioritizes careful, informed decision making over rushed and reckless action, enabling agencies to consider and adopt alternatives to a proposed action or incorporate mitigation measures that protect public health, preserve irreplaceable natural resources for current and future generations, and avoid long-term, irreversible, and costly environmental harms.  NEPA has thus led to more informed decisions and better environmental and public health outcomes for half a century.

7.     Promoting better decisions by federal agencies is particularly important when the nation faces the unparalleled threat of climate change, which disproportionately impacts communities already overburdened with pollution and associated public health impacts. Federal actions include coal, oil, and natural gas leasing; timber sales; offshore drilling; interstate transportation of coal, crude oil, and natural gas; and interstate transportation projects, among others.  These actions threaten to exacerbate climate change harms, pollute State Plaintiffs' air and water, disrupt wildlife habitats, and contribute to disproportionate public health harms.  Rigorous environmental review under NEPA identifies these harms, helps to mitigate and avoid them, and ultimately results in more responsible, less harmful federal actions.

8.     In 1978, defendant CEQ promulgated regulations that have guided NEPA's success for more than forty years.  These longstanding regulations have directed federal agencies, and, in some situations, state agencies and local governments involved in major Federal actions significantly affecting the environment, on how to comply with NEPA's procedural requirements and its environmental protection policies.  *See* 40 C.F.R. pt. 1500 (1978) (1978 regulations).

9.     Under the current administration, CEQ now seeks to derail NEPA by issuing a Final Rule that rewrites CEQ's enduring regulations implementing NEPA at the expense of the environment and the people it is meant to protect—including State Plaintiffs' residents, wildlife, and natural resources.  The Final Rule (i) severely limits which federal actions require

First Amended Compl. for Declaratory and
Inj. Relief                                            5
Case No. 3:20-cv-06057

1    NEPA compliance; (ii) greatly narrows the scope of federal agencies' obligation to consider

2    environmental impacts; (iii) threatens to render NEPA's public participation process a

3    meaningless paperwork exercise; and (iv) unlawfully seeks to restrict judicial review of agency

4    actions that violate NEPA.

5          10.     The Final Rule strikes at the heart of NEPA—violating NEPA's text and

6    purpose (including NEPA's clear mandate that agencies comply with the statute "to the fullest

7    extent possible," 42 U.S.C. § 4332), and abandoning informed decision making, public

8    participation, and environmental and public health protection.  In the Final Rule, CEQ

9    exceeded its authority by exempting certain actions from environmental review and attempting

10    to place unlawful limits on courts' authority to remedy plaintiffs' injuries from NEPA

11    violations.

12          11.     CEQ failed to provide a rational justification for its sweeping revisions to the

13    1978 regulations.  The Final Rule reverses CEQ's longstanding interpretations of and guidance

14    on NEPA, undercutting decades of reliance by State Plaintiffs on well-established NEPA

15    procedures and policies that allowed states, territories, and local governments to identify

16    potential harms to their natural resources and residents and to advocate for alternatives and

17    mitigation measures to avoid those harms.  CEQ asserted that the Final Rule advances the

18    original objectives of its 1978 regulations to reduce paperwork and delays while asserting that

19    it will "produce better decisions [that] further the national policy to protect and enhance the

20    quality of the human environment."  Final Rule, 85 Fed. Reg. at 43,313 (citing 43 Fed. Reg.

21    55,978 (Nov. 29, 1978)).  But CEQ failed to explain how the Final Rule will advance these

22    objectives when the Final Rule undercuts informed decision making and environmental

23    protection, and sweeps away decades of agency guidance and case law.  CEQ also failed to

24    comply with the APA's notice-and-comment requirements in promulgating the Final Rule.

25    The Final Rule thus violates the basic requirements of rational agency decision making.

26

First Amended Compl. for Declaratory and
Inj. Relief          6
Case No. 3:20-cv-06057

AR_0026536

12.     Further, the Final Rule may impact listed endangered and threatened species and designated critical habitat, yet CEQ failed to consult with the U.S. Fish and Wildlife Service (FWS) and the National Marine Fisheries Service (NMFS) (collectively, Services) regarding those impacts prior to promulgating the Final Rule, as required under section 7 of the ESA. 16 U.S.C. § 1536.

13.     Last, the Final Rule is unlawful because CEQ failed to review the Final Rule's significant environmental and public health impacts as required by NEPA itself.

14.     For these reasons, the Final Rule is arbitrary, capricious, and contrary to law in violation of the APA and NEPA, was promulgated in excess of statutory authority and without observance of procedure required by law, and should be vacated.

## II.     JURISDICTION AND VENUE

15.     This action raises federal questions and arises under NEPA, the APA, and the ESA. This Court therefore has jurisdiction over State Plaintiffs' claims pursuant to 28 U.S.C. § 1331 (action arising under the laws of the United States), 5 U.S.C. §§ 701–06 (APA), and 16 U.S.C. § 1540(g)(1) (ESA). State Plaintiffs seek declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201–02, 5 U.S.C. §§ 701–06, and 16 U.S.C. § 1540(g)(1)(A).

16.     An actual controversy exists between the parties within the meaning of 28 U.S.C. § 2201(a), and the Court may grant declaratory and injunctive relief under 28 U.S.C. §§ 2201–02, 5 U.S.C. §§ 705–06, and 16 U.S.C. § 1540(g)(1)(A).

17.     CEQ is an agency subject to APA requirements. 5 U.S.C. § 551. Each of the State Plaintiffs is a "person" authorized to bring suit under the APA to challenge unlawful final agency action. *Id.* §§ 551(2), 702. The Final Rule is a final agency action subject to review under the APA. *Id.* §§ 704, 706.

18.     The United States has waived sovereign immunity for claims arising under the APA. *Id.* § 702.

AR_0026537

19.     CEQ is an agency subject to ESA requirements.  16 U.S.C. § 1540(g)(1)(A).
Each of the State Plaintiffs is a "person" authorized to bring suit under the ESA to challenge
violations of the ESA's requirements.  *Id*. §§ 1532(13), 1540(g)(1).  On September 22, 2020,
State Plaintiffs provided Defendants with sixty days' written notice of their intent to sue, in
satisfaction of ESA section 11(g).  16 U.S.C. § 1540(g)(2)(i).  A copy of the notice is attached
as Exhibit A.

20.     State Plaintiffs submitted timely and detailed comments opposing CEQ's
proposed rule that preceded the Final Rule, *see* Update to the Regulations Implementing the
Procedural Provisions of the National Environmental Policy Act, 85 Fed. Reg. 1,684 (Jan. 10,
2020) (Proposed Rule), and have therefore exhausted all administrative remedies.

21.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(e) because this is the
judicial district in which Plaintiff State of California resides, and this action seeks relief against
federal agencies and officials acting in their official capacities.

### III.     INTRADISTRICT ASSIGNMENT

22.     Although no basis exists under Civil Local Rule 3-2(c) for assigning this action
to any particular location or division of this Court, this case is related to *Alaska Community
Action on Toxics v. Council on Environmental Quality*, Case No. 3:20-CV-05199, which
challenges the same Final Rule and is assigned to Judge Richard Seeborg in the San Francisco
Division.

### IV.     PARTIES

**A.     Plaintiffs**

23.     Plaintiff STATE OF CALIFORNIA brings this action by and through Attorney
General Xavier Becerra.  The Attorney General is the chief law enforcement officer of the state
and has the authority to file civil actions in order to protect public rights and interests,
including actions to protect the natural resources of the state.  Cal. Const. art. V, § 13; Cal.
Gov't Code §§ 12600–12.  This challenge is brought in part pursuant to the Attorney General's

AR_0026538

independent authority to represent the people's interests in protecting the environment and natural resources of California from pollution, impairment, or destruction. Cal. Const. art. V, § 13; Cal. Gov't Code §§ 12511, 12600–12; *D'Amico v. Bd. of Med. Exam'rs,* 520 P.2d 10, 14 (Cal. Sup. Ct. 1974).

24.    The State of California has a sovereign interest in its natural resources and is the sovereign and proprietary owner of all the state's fish and wildlife resources, which are state property held in trust by the state for the benefit of the people of California. *People v. Truckee Lumber Co.*, 48 P. 374, 374 (Cal. Sup. Ct. 1897); *Nat'l Audubon Soc'y v. Superior Ct.*, 658 P.2d 709, 727 (Cal. Sup. Ct. 1983).

25.    California has millions of acres of federal land across twenty national forests, nine national parks (including world-renowned Yosemite National Park), thirty-nine national wildlife refuges, seven national monuments, and numerous Department of Defense facilities, including at least thirty-two military bases. California is also home to six primary and numerous auxiliary interstate highways, at least nine international airports, and major federal water infrastructure projects, such as the Central Valley Project, which controls a significant proportion of water distribution in the northern and southern regions of the state. Federal agencies, including the U.S. Navy and the Coast Guard, also routinely engage in activities in California's coastal waters. Major Federal actions concerning these lands, waters, projects, highways, airports, and other federal facilities are subject to NEPA.

26.    There are currently over 300 species listed as endangered or threatened under the ESA that reside wholly or partially within the State of California and its waters—more than any other mainland state. Examples include the southern sea otter (*Enhydra lutris nereis*) found along California's central coastline, the desert tortoise (*Gopherus agassizii*) and its critical habitat in the Mojave Desert, the marbled murrelet (*Brachyramphus marmoratus*) in north coast redwood forests, as well as two different runs of Chinook salmon (*Oncorhynchus tshawytscha*) and their spawning, rearing, and migration habitat in the Bay-Delta and Central

AR_0026539

1   Valley rivers and streams.  These and other species are affected by federal projects throughout

2   California.  For example, Chinook salmon are threatened by the U.S. Bureau of Reclamation's

3   proposal to raise the level of the Shasta Reservoir in northern California.

4      27.    California state agencies, including the California Environmental Protection

5   Agency, the State Water Resources Control Board, the Air Resources Board, the California

6   Department of Food and Agriculture, and the Department of Fish and Wildlife have engaged in

7   the federal NEPA process to protect the state's interest in public health, environmental quality,

8   and state natural resources.  For example, California agencies have commented repeatedly on

9   NEPA documents associated with the Bureau of Reclamation's proposal to raise the level of

10   the Shasta Reservoir.  The Bureau recently published a draft Supplemental Environmental

11   Impact Statement (EIS) for this project, which is currently open for public comment.  The

12   California Department of Water Resources and California Energy Commission also work with

13   federal agencies in preparing NEPA documents.  In addition, Caltrans, California's

14   transportation agency, has assumed NEPA responsibilities from the Federal Highway

15   Administration (FHWA), and is thus responsible for complying with all applicable federal

16   environmental laws, including the Final Rule, and with FHWA's NEPA regulations that will

17   be revised under the Final Rule.  *See* Memorandum of Understanding Between FHWA and the

18   California Department of Transportation Concerning the State of California's Participation in

19   the Surface Transportation Project Delivery Program Pursuant to 23 U.S.C. § 327 (Dec. 2016).

20      28.    Plaintiff STATE OF WASHINGTON is a sovereign entity and brings this

21   action to protect its sovereign and proprietary rights.  The Attorney General is the chief legal

22   advisor to the State of Washington, and his powers and duties include acting in federal court on

23   matters of public concern.  This challenge is brought pursuant to the Attorney General's

24   statutory and common law authority to bring suit and obtain relief on behalf of Washington.

25      29.    Washington has a sovereign and propriety interest in protecting its state

26   resources through careful environmental review at both the state and federal level.  Washington

AR_0026540

1    has statutory responsibility to conserve, enhance, and properly utilize the state's natural

2    resources. Wash. Rev. Code. §§ 77.110.030, 90.03.010, 90.58.020; *see also* Wash. Const. art.

3    XVI, § 1. Washington has over six million acres of forest, range, agricultural, aquatic, and

4    commercial lands and holds proprietary rights for wildlife, fish, shellfish, and tide lands. Wash.

5    Const. art. XVII, § 1; Wash. Rev. Code § 77.04.012.

6         30.      Washington State has dozens of federally listed species. These listed species

7    include chinook (*Oncorhynchus tshawytscha*), chum (*Oncorhynchus keta*), and sockeye

8    (*Oncorhynchus nerka*) salmon, steelhead (*Oncorhynchus mykiss*), Southern Resident killer

9    whales (*Orcinus orca*) and the pygmy rabbit (*Brachylagus idahoensis*), the smallest rabbit in

10    North America. Washington also lists thirty-two species as state endangered species and

11    expends significant resources to protect and recover these species, some of which are not

12    federally protected. Wash. Admin. Code 220-610-010.

13         31.      Washington's natural resources generate more than $200 million in annual

14    financial benefits to state public schools, institutions, and county services. They also generate

15    billions of dollars worth of ecosystem services to surrounding communities by filtering

16    drinking water, purifying air, and providing space for recreation. Washington's natural areas

17    generate commercial and recreational opportunities that put billions of dollars into the

18    Washington economy annually.

19         32.      Washington has over 3,000 miles of coastline and millions of acres of federal

20    lands across ten national forests, three national parks, twenty-three national wildlife refuges,

21    three national monuments, and numerous Department of Defense locations, including at least

22    seven military facilities and training areas. Many of these federal lands abut Washington's

23    state-owned lands. Washington is also home to 145 federally owned or regulated dams,

24    including Grand Coulee Dam, three interstate highways, five international airports, and the

25    Hanford Nuclear Reservation. Federal agencies, including the U.S. Navy and the Coast Guard,

26    also routinely engage in activities in Washington's coastal waters and the adjacent exclusive

First Amended Compl. for Declaratory and
Inj. Relief        11
Case No. 3:20-cv-06057

AR_0026541

1 | economic zone and within Puget Sound, one of Washington's most significant ecological,

2 | cultural, and economic features. Major Federal actions concerning these lands, waters,

3 | projects, highways, airports, and other federal facilities are subject to NEPA.

4 |       33.     Washington state agencies, including the Department of Ecology, the

5 | Department of Fish and Wildlife, the Department of Transportation (WSDOT), the Department

6 | of Natural Resources, and the Department of Health regularly engage in the federal NEPA

7 | process as cooperating and commenting agencies or as agencies with special expertise

8 | highlighting potential impacts to the state's natural resources and public health. For example,

9 | WSDOT and FHWA jointly worked on the NEPA process to replace the State Route 99

10 | Alaskan Way viaduct in Seattle, Washington, where rigorous environmental review and

11 | meaningful public engagement led to a selected alternative that worked for state and federal

12 | agencies, local governments, tribes, and the public, including minority and low-income

13 | communities. Federal agency activities and actions requiring federal permits that affect

14 | Washington's coastal zone, water quality, wildlife, and cultural resources are subject to NEPA

15 | and are also reviewed by state agencies for consistency and compliance with Washington's

16 | laws and programs. In some situations, such as certain actions on federal lands, NEPA is the

17 | sole means for state agencies to advocate for protection of Washington's resources, including

18 | protection of state (but not federally) listed species and other species of concern and their

19 | habitat, and to identify unintended consequences of a proposed action.

20 |       34.     Plaintiff STATE OF COLORADO is a sovereign entity that regulates land use,

21 | water and air quality, wildlife, and water resources within its borders through duly enacted

22 | state laws. The State of Colorado brings this action in its sovereign and proprietary capacity to

23 | protect public health, safety, welfare, its waters and environment, its wildlife and wildlife

24 | habitat, and its economy.

25 |       35.     Clean air, land, and water provide ecologically vibrant habitats that undergird

26 | the state's robust outdoor recreation economy. For instance, in Colorado, fishing and wildlife

First Amended Compl. for Declaratory and
Inj. Relief            12
Case No. 3:20-cv-06057

AR_0026542

1    watching each contribute $2.4 billion in economic output each year, supporting more than

2    30,000 jobs within the state.  Hunting supports nearly 8,000 additional jobs and contributes

3    more than $800 million in annual economic output.  The entire outdoor recreation economy,

4    which also includes hiking, skiing, and other activities, accounts for $62.5 billion dollars of

5    economic output in Colorado.  Colo. Parks & Wildlife, *The 2017 Economic Contributions of*

6    *Outdoor Recreation in Colorado* (July 2018).  Agriculture is also an important economic

7    engine and cultural resource in Colorado.  As of 2019, Colorado's agricultural industry

8    contributed $47 billion in economic output and directly employed more than 195,000 workers.

9    The natural environment influences all aspects of agriculture and food production in Colorado.

10          36.    Colorado is home to seventeen federally listed animals, including the recently-

11    listed Eastern black rail (*Laterallus jamaicensis*), the Canada lynx (*Lynx canadensis*), the

12    bonytail (*Gila elegans*), the greenback cutthroat trout (*Oncorhynchus clarki stomias*), which is

13    designated as the state fish, and the only ferret native to the Americas, the black-footed ferret

14    (*Mustela nigripes*).  Colorado lists thirty-one animal species as state endangered or threatened

15    species, a number of which are not federally protected.  The state is also home to sixteen

16    federally listed plants, including the Colorado hookless cactus (*Sclerocactus glaucus*) and the

17    Pagosa skyrocket (*Ipomopsis polyantha*).

18          37.    As Colorado's population rapidly grows, the state must ensure that projects

19    intended to serve that population also protect the natural environment for current and future

20    generations.  For example, the Colorado Department of Transportation prepares environmental

21    analyses for projects involving state and interstate highways, bridges, and multi-modal

22    transportation.  Similarly, the Colorado Department of Agriculture participates in NEPA

23    reviews for public-land grazing permit renewals and for range improvement projects involving

24    water distribution systems and habitat management.  Colorado's Department of Public Health

25    and Environment reviews projects for oil and gas leases, transportation, and wastewater

26    infrastructure as part of the NEPA process.  The Colorado Department of Natural Resources

First Amended Compl. for Declaratory and
Inj. Relief          13
Case No. 3:20-cv-06057

AR_0026543

utilizes and participates in NEPA processes for land use and water planning, disaster
preparedness, and fish and wildlife protection.

38.    Through early and meaningful involvement in the NEPA process, state agencies
help ensure that NEPA reviews are informed by accurate technical and scientific analysis and
preserve important natural, historic, and cultural resources in Colorado communities.  To this
end, Colorado agencies regularly consider direct, indirect, and cumulative impacts on the
natural environment and general welfare.

39.    Plaintiff STATE OF CONNECTICUT is a sovereign entity and brings this
action to protect its citizens and natural resources.  The Connecticut Attorney General is an
elected constitutional official and the chief legal officer of the State of Connecticut.  The
Connecticut Attorney General's responsibilities include intervening in various judicial and
administrative proceedings to protect the interests of the citizens and natural resources of the
State of Connecticut and ensuring the enforcement of a variety of laws of the State of
Connecticut.  This challenge is brought pursuant to the Attorney General's statutory and
common law authority to bring suit and obtain relief on behalf of the State of Connecticut.

40.    Connecticut has a sovereign interest in protecting the health and safety of its
citizens and its natural resources.  Connecticut has a statutory duty to protect, conserve, and
properly utilize its natural resources and public trust lands.  Connecticut has over 1.7 million
acres of forest, 173,000 acres of wetlands, 437,000 acres of agricultural land, 70,000 acres of
shellfishing beds, and 22,000 acres of public trust lands, not including the entire seafloor of
Long Island Sound up to the New York border, which Connecticut holds in public trust.
Connecticut lists twenty-three species as endangered species and expends significant resources
to protect these species.  Connecticut's natural resources generate hundreds of millions of
dollars in annual financial benefits to the state and its citizens.

41.    Connecticut is home to fifteen federally listed animals, including the Puritan
Tiger Beetle (*Cicindela puritana*), the Dwarf Wedgemussel (*Alasmidonta heterodon*), and the

AR_0026544

1    Roseate Tern (*Sterna dougallii*), and four federally listed plants, including the Small Whorled

2    Pogonia (*Isotria medeoloides*) and the American Chaffseed (*Schwalbea americana*).  Seven

3    additional animal species known to occur in Connecticut have been proposed for federal listing

4    under the ESA.

5         42.    Connecticut has 322 miles of coastline and three major ports (Bridgeport, New

6    Haven, and New London).  Long Island Sound is Connecticut's largest and most important

7    maritime natural resource and is vital to Connecticut's economy.  Maritime business accounts

8    for approximately five billion dollars in state economic output and provides 30,000 jobs and

9    tens of millions of dollars in state and local taxes.

10        43.    Connecticut is also home to sixteen federally regulated dams, three interstate

11   highways, an international airport, and the Naval Submarine Base in New London.  Major

12   Federal actions concerning these lands, waters, projects, highways, airports, and other federal

13   facilities are subject to NEPA.

14        44.    Connecticut state agencies, including the Department of Energy and

15   Environmental Protection, the Department of Transportation, and the Department of Health

16   regularly engage in the federal NEPA process, often as agencies with special expertise relevant

17   to the potential impacts to the state's natural resources and public health.  In these cases, the

18   opportunity for rigorous environmental review and meaningful public engagement have been

19   critical for state agencies, local governments, tribes, and the public, particularly for minority

20   and low-income communities.  Federal agency activities and actions requiring federal permits

21   that affect Connecticut's coastal zone, water quality, wildlife, and cultural resources are subject

22   to NEPA and are also reviewed by state agencies for consistency and compliance with

23   Connecticut's laws and programs.  In some situations, NEPA is the sole means for Connecticut

24   agencies to advocate for protection of Connecticut's citizens and natural resources.

25        45.    Plaintiff STATE OF DELAWARE is a sovereign state of the United States of

26   America.  Delaware brings this action by and through Attorney General Kathleen Jennings,

AR_0026545

1    who is the chief law officer of Delaware, *Darling Apartment Co. v. Springer*, 22 A.2d 397, 403

2    (Del. 1941), and is empowered and charged with the duty to represent as counsel in all

3    proceedings or actions which may be brought on behalf or against the state and all officers,

4    agencies, departments, boards, commissions and instrumentalities of state government, Del.

5    Code Ann. tit. 29, § 2504.

6         46.     The State of Delaware has twenty-two federally listed endangered and

7    threatened species.  These listed species include Atlantic sturgeon (*Acipenser oxyrhynchus*),

8    shortnose sturgeon (*Acipenser brevirostrum*), loggerhead sea turtle (*Caretta caretta*), bog turtle

9    (*Glyptemys muhlenbergii*), red knot (*Calidris canutus*), black rail (*Laterallus jamaicensis*),

10   piping plover (*Charadrius melodus*), northern long-eared bat (*Myotis septentrionalis*), swamp

11   pink (*Helonias bullata*) and seabeach amaranth (*Amaranthus pumilus*).  Delaware also lists an

12   additional sixty-nine species as state endangered species that are not federally listed.

13        47.     As one of the most low-lying states in the nation, Delaware is particularly at

14   risk from the harms of climate change, including sea level rise.  For example, a 2012 Delaware

15   Sea Level Rise Vulnerability Assessment found that sea level rise of only 0.5 meters would

16   inundate either percent of the state's land area.  Areas inundated would include "transportation

17   and port infrastructure, historic fishing villages, resort towns, agricultural fields, wastewater

18   treatment facilities and vast stretches of wetlands and wildlife habitat of hemispheric

19   importance."  The Assessment concluded that "every Delawarean is likely to be affected by sea

20   level rise whether through increased costs of maintaining public infrastructure, decreased tax

21   base, loss of recreational opportunities and wildlife habitat, or loss of community character."

22        48.     Multiple entities within Delaware rely on NEPA as cooperating agencies.  For

23   example, the Delaware Coastal Management Program uses information provided in the federal

24   consistency determination required under Section 307 of the Coastal Zone Management Act of

25   1972 to assess impacts to Delaware's coastal uses and resources.  Federal agencies are

26   encouraged to use NEPA material to satisfy the federal consistency determination

First Amended Compl. for Declaratory and
Inj. Relief          16
Case No. 3:20-cv-06057

AR_0026546

1    requirements.  Therefore, any rollback of NEPA obligations may cause the quality of

2    information submitted to degrade, leaving Delaware's coastal uses and resources more

3    vulnerable to federal activities in the state.  Similarly, the Division of Water receives NEPA

4    documents in support of permit applications, such as Water Quality Certification

5    determinations.  Delaware relies on the federal NEPA process to coordinate its protection of

6    the state's interests.

7        49.     Plaintiff STATE OF ILLINOIS brings this action by and through Attorney

8    General Kwame Raoul.  The Attorney General is the chief legal officer of the State of Illinois

9    (Ill. Const., art. V, § 15) and "has the prerogative of conducting legal affairs for the State."

10   *Envt'l Prot. Agency v. Pollution Control Bd.*, 372 N.E.2d 50, 51 (Ill. Sup. Ct. 1977).  He has

11   common law authority to represent the People of the State of Illinois and "an obligation to

12   represent the interests of the People so as to ensure a healthful environment for all the citizens

13   of the State."  *People v. NL Indus.*, 604 N.E.2d 349, 358 (Ill. Sup. Ct. 1992).

14       50.     Illinois has a sovereign interest in protecting its natural resources through

15   careful environmental review at the federal level.  Among other interests, Illinois has

16   "ownership of and title to all wild birds and wild mammals within the jurisdiction of the state."

17   520 Ill. Comp. Stat. 5/2.1.  There are currently thirty-four species listed as endangered or

18   threatened under the ESA that reside wholly or partially within the State of Illinois and its

19   waters.  For example, the Illinois cave amphipod (*Gammarus acherondytes*) is a small

20   crustacean that is endemic to six cave systems in Illinois' Monroe and St. Clair County.

21   Illinois is also home to the piping plover (*Charadrius melodus*).  Additionally, the Illinois

22   Endangered Species Protection Board has listed 372 endangered species, many of which are

23   not federally protected.  The state expends resources to protect and recover these species.

24       51.     Furthermore, federally managed lands in Illinois are vitally important to the

25   state and in need of protection.  The Shawnee National Forest spans over 289,000 acres in

26   southern Illinois and straddles six natural ecological regions; the Midewin National Tallgrass

AR_0026547

1  Prairie is the largest open space in the Chicago metropolitan area. Additionally, significant oil

2  and gas pipeline development takes place in Illinois.

3      52.    Plaintiff STATE OF MAINE, a sovereign state of the United States of America,

4  brings this action by and through its Attorney General Aaron Frey. The Attorney General of

5  Maine is a constitutional officer with the authority to represent the State of Maine in all matters

6  and serves as its chief legal officer with general charge, supervision, and direction of the state's

7  legal business. Me. Const. art. IX, § 11; 5 M.R.S.A. §§ 191–205. The Attorney General's

8  powers and duties include acting on behalf of Maine and the people of Maine in the federal

9  courts on matters of public interest. The Attorney General has the authority to file suit to

10  challenge action by the federal government that threatens the public interest and welfare of

11  Maine residents as a matter of constitutional, statutory, and common law authority.

12      53.    Maine has a sovereign interest in protecting its natural resources through careful

13  environmental review at both the state and federal level. Maine has over 3,000 miles of

14  coastline, a coastline that generates millions of dollars in commercial fishing income and

15  tourism income, and recreational opportunities to the residents of the state. Federal agencies'

16  activities in these vital coastal waters are regulated under NEPA. Federally protected lands in

17  Maine total 295,479 acres, including Acadia National Park, which includes 47,000 acres, and

18  Katahdin Woods and Waters National Monument, with 87,563 acres. Maine has eleven

19  National Wildlife Refuges which encompass 76,230 acres, including the renowned Rachel

20  Carson National Wildlife Refuge. Maine has two federal fish hatcheries, several airports, one

21  military base, 365 miles of federal interstate highways, and ninety-two federally licensed dams.

22      54.    The State of Maine has seventeen species federally listed as endangered or

23  threatened. These listed species include Piping Plovers (*Charadrius melodus*), Leatherback

24  sea turtles (*Dermochelys coriacea*), Roseate terns (*Sterna dougallii*), Northern Atlantic Right

25  Whales (*Eubalaena glacialis*), Canada Lynx (*Lynx canadensis*), Atlantic Salmon (*Salmo*

26  *salar*), Northern Long-Eared Bats (*Myotis septentrionalis*), and Rusty patched bumble bees

First Amended Compl. for Declaratory and
Inj. Relief          18
Case No. 3:20-cv-06057

AR_0026548

1    (*Bombus affinis*).  Maine lists 64 marine and inland species as endangered or threatened in the

2    State, most of which are not federally listed.  The State devotes considerable resources to

3    protecting these species and the habitat that is vital to their survival and recovery.

4         55.    Maine's environmental agencies, including the Department of Environmental

5    Protection, the Department of Marine Resources, the Department of Inland Fisheries and

6    Wildlife, and the Department of Agriculture, Conservation and Forestry, engage in the federal

7    NEPA process to protect the state's natural resources and public health.  NEPA review of

8    Federal agency activities and activities requiring federal permits that affect Maine's natural

9    resources provides essential protection to Maine's environment.

10        56.    Plaintiff STATE OF MARYLAND brings this action by and through its

11   Attorney General, Brian E. Frosh.  The Attorney General of Maryland is the state's chief legal

12   officer with general charge, supervision, and direction of the state's legal business.  Under the

13   Constitution of Maryland and as directed by the Maryland General Assembly, the Attorney

14   General has the authority to file suit to challenge action by the federal government that

15   threatens the public interest and welfare of Maryland residents.  Md. Const. art. V, § 3(a)(2);

16   Md. Code. Ann., State Gov't § 6-106.1.  Maryland has enacted its own Environmental Policy

17   Act, *see* Md. Code. Ann., Nat. Res. §§ 1-301 *et seq*., which is triggered upon the general

18   assembly's appropriation of funding for major projects.

19        57.    The State of Maryland has a sovereign and proprietary interest in protecting its

20   state resources through careful environmental review of major federal actions.  These resources

21   include the Chesapeake Bay, one of the nation's most productive estuaries with a watershed

22   that spans 64,000 square miles across six states and the District of Columbia.  It is the official

23   policy of the state "to conserve species of wildlife for human enjoyment, for scientific

24   purposes, and to insure their perpetuation as viable components of their ecosystems."

25   Maryland Nongame and Endangered Species Conservation Act, Md. Code. Ann., Nat. Res.

26   § 10-2A-02.  To that end, more than 150 species of animals and 340 species of plants are listed

1    as state endangered, threatened, or in need of conservation. *See* COMAR 08.03.08 (providing

2    lists of plant and wildlife species with elevated conservation statuses).

3         58.     Twenty-one federally listed species, including thirteen animals and eight plants,

4    are believed to occur in Maryland. Currently listed species include the federally endangered

5    dwarf wedgemussel (*Alasmidonta heterodon*), the federally threatened bog turtle (*Glyptemys*

6    *muhlenbergii*), and the federally threatened Puritan tiger beetle (*Cicindela puritan*). Maryland

7    is also home to one of the Endangered Species Act's biggest success stories, the Delmarva Fox

8    Squirrel (*Sciurus niger cinereus*), which thanks to federal, state, and private conservation

9    efforts, was removed from the list of federally threatened species in 2010.

10        59.     The federal government has a large presence in Maryland. There are more than

11   480 miles of interstate highways in Maryland, including I-95, I-70, the Baltimore Beltway, and

12   portions of the capital beltway that connects the greater Washington, D.C. Metropolitan Area.

13   A number of federally owned or operated facilities are also located in Maryland including the

14   Aberdeen Proving Ground, U.S. Naval Academy in Annapolis, and Camp David.

15   Additionally, the state is home to five National Wildlife Refuges, the Assateague Island

16   National Seashore, and numerous national parks, monuments, and battlefields. Major federal

17   actions concerning these lands, waters, highways, and parks are subject to NEPA review.

18        60.     Maryland agencies frequently participate in and rely on the federal NEPA

19   process as cooperating and commenting agencies. The State Highway Administration, for

20   example, addresses floodplain management for federally funded projects through NEPA, and

21   the Maryland Department of the Environment completes NEPA-like reviews for projects

22   funded through the U.S. Environmental Protection Agency's State Revolving Fund programs

23   for clean water and drinking water.

24        61.     Plaintiff PEOPLE OF THE STATE OF MICHIGAN brings this action by and

25   through Attorney General Dana Nessel, who is authorized by statute and under common law to

26   initiate litigation in the public interest on behalf of the People of the State of Michigan.

First Amended Compl. for Declaratory and
Inj. Relief     20
Case No. 3:20-cv-06057

AR_0026550

1    62.    Michigan has twenty-six federally listed threatened and endangered species.

2    The listed species include the Eastern Massasauga rattlesnake (*Sistrurus catenatus*), the

3    Canada lynx (*Lynx canadensis*), and the Piping plover (*Charadrius melodus*).

4    63.    Among other things, the People of the State of Michigan will be harmed by the

5    federal government's dereliction of duty in the Final Rule's treatment of climate change under

6    NEPA.  Michigan is already being harmed by climate change.  Since 1951, the average annual

7    temperature has increased by a range of 0.6-1.3 degrees Fahrenheit across the Lower

8    Peninsula.  During that same time, annual average precipitation increased by 4.5 percent as

9    well.  Michigan faces extreme heat events, excess rain and flooding, respiratory illnesses, heat-

10   related illnesses, and both waterborne and vector-borne diseases.  As a result, Michigan is

11   tasked with protecting its citizens from temperature-related illness, respiratory diseases,

12   waterborne diseases exacerbated by extreme rain events, and infectious diseases such as Lyme

13   disease and West Nile Virus.  Increased precipitation will also damage Michigan roads,

14   bridges, dams and other physical infrastructure.

15   64.    Plaintiff STATE OF MINNESOTA brings this action by and through its chief

16   legal officer, Attorney General Keith Ellison, to protect Minnesota's interest in its natural

17   resources and the environment.  This challenge is brought pursuant to the Attorney General's

18   authority to represent the state's interests.  Minn. Stat. § 8.01.  Minnesota has enacted and

19   devotes significant resources to implementing numerous laws concerning the management,

20   conservation, protection, restoration, and enhancement of its natural resources.  *See, e.g.*,

21   Minn. Stat. Chs. 116B, 116D.  Minnesota owns its wildlife resources, Minn. Stat. § 97A.025,

22   and manages them for the benefit of all citizens.  Minnesota state agencies, including the

23   Minnesota Pollution Control Agency, the Department of Natural Resources, the Public Utilities

24   Commission, the Department of Commerce, and the Environmental Quality Board regularly

25   engage in the federal NEPA process to protect the state's interest in public health,

26

1    environmental quality, and state natural resources. Minnesota has a direct interest in the

2    strength and integrity of NEPA's implementing regulations.

3        65.    Minnesota is home to Voyageurs National Park, two national monuments, two

4    national forests, three wilderness areas, and one national recreation area. In 2019, there were

5    1,099,276 recreational visits to federal lands and facilities in Minnesota, generating over $60

6    million in visitor spending for the Minnesota economy. *2019 National Park Visitor Spending*

7    *Effects Report*, National Park Service, (Apr. 2020), https://www.nps.gov/subjects/

8    socialscience/vse.htm. These figures do not include the more than 110,000 visitors who

9    traveled through the Boundary Waters Canoe Area Wilderness (BWCAW) every year between

10   2009 and 2016. *USFS Permit and Visitor Use Trends, 2009-2016*, USDA Forest Service, (July

11   7, 2017), https://www.fs.usda.gov/Internet/FSE_DOCUMENTS/fseprd549672.pdf. The

12   BWCAW is the most visited wilderness area in the United States.

13       66.    Federally listed endangered species in Minnesota include the Rusty-Patched

14   Bumble Bee, *(bombus affinis)*, the Topeka Shiner *(nontropis topeka)*, the Higgins Eye

15   Pearlymussel *(lampsilis higgininsi)*, and the Winged Mapleleaf Mussel *(quadrula fragosa)*. Of

16   special concern are the Canada lynx *(lynx canadensis)* and the Western Prairie Fringed Orchid

17   *(plantanthera praeclara)*.

18       67.    There are several major infrastructure projects currently proposed in Minnesota

19   that have been or will be subject to NEPA review. For example, Enbridge Energy, Limited

20   Partnership seeks to replace an oil pipeline that traverses Minnesota, which requires several

21   state and federal permits. There are also two proposed copper-nickel mining projects in

22   Minnesota—one in the watershed of the Boundary Waters Canoe Area Wilderness—that will

23   require many state and federal permits. These projects have attracted a great deal of public

24   attention from Minnesotans and millions, including Minnesota state agencies, have participated

25   in the review processes to date.

26

AR_0026552

1       68.    Plaintiff STATE OF NEVADA is a sovereign entity and brings this action by

2  and through Attorney General Aaron Ford to protect its sovereign and proprietary rights.  The

3  Nevada Attorney General is the chief law enforcement officer of the State.  Attorney General

4  Ford's powers and duties include acting in federal court on matters of public concern and he

5  has the authority to file civil actions in order to protect public rights and interests, including

6  actions to protect the natural resources of the State.  Nev. Const. art. V, § 19; Nev. Rev. Stat.

7  §§ 228.170, 228.180.  This challenge is brought pursuant to the Attorney General's

8  independent constitutional, statutory, and common law authority to represent the people's

9  interests in protecting the environment and natural resources of the State of Nevada from

10  pollution, impairment, or destruction.  Nev. Const. art. V, § 19; Nev. Rev. Stat. § 228.180.

11       69.    Nevada has a sovereign and propriety interest in protecting its natural resources

12  through careful environmental review and is the sovereign and proprietary owner of all the

13  State's fish and wildlife and water resources, which are State property held in trust by the State

14  for the benefit of the people of the State.  N.R.S. 501.100 provides that "[w]ildlife in this State

15  not domesticated and in its natural habitat is part of the natural resources belonging to the

16  people of the State of Nevada [and t]he preservation, protection, management and restoration

17  of wildlife within the State contribute immeasurably to the aesthetic, recreational and

18  economic aspects of these natural resources."  *See Ex parte Crosby*, 38 Nev. 389, 149 P. 989

19  (1915); *See also*, *Kleppe v. New Mexico*, 426 U.S. 529, 545 (1976) ("Unquestionably the States

20  have broad trustee and police powers over wild animals within their jurisdictions.").  In

21  addition, the State of Nevada has enacted numerous laws concerning the conservation,

22  protection, restoration and enhancement of the fish and wildlife resources of the State,

23  including endangered and threatened species, and their habitat.  As such, the State of Nevada

24  has an interest in protecting species in the State from actions both within and outside of the

25  State.  Nevada's natural resources generate more than one hundred million dollars in annual

26  financial benefits to state public schools, institutions, and county services.  Nevada's natural

First Amended Compl. for Declaratory and
Inj. Relief          23
Case No. 3:20-cv-06057

AR_0026553

areas also generate commercial and recreational opportunities that put billions of dollars into Nevada's economy annually.

70.     There are currently over thirty-eight species listed as endangered or threatened under the ESA that reside wholly or partially within the State of Nevada.  Examples include the desert tortoise (*Gopherus agassizii*) and its critical habitat in the Mojave Desert, the Devil's Hole pupfish (*Cyprinodon diabolis*) reliant on limited aquifers within the Amargosa Desert ecosystem, the Lahontan cutthroat trout (*Oncorhynchus clarkii henshawi*) indigenous to Pyramid and Walker Lakes and nearly extirpated by American settlement in the Great Basin*,* Sierra Nevada bighorn sheep (*Ovis Canadensis sieera*), and the greater sage-grouse (*Centrocercus urophasianus*) found in the foothills, plains and mountain slopes where sagebrush is present across fifteen of Nevada's seventeen counties.

71.     Nevada has approximately 58,226,015 acres of federally-managed lands, totaling about 84.9 percent of the State's lands, including three national forests, two national parks, three national historic trails, nine national wildlife refuges, three national monuments, one national recreation area, two international airports, seventy wilderness areas, and numerous Department of Defense and Department of Energy locations.  The federal agencies that manage these millions of acres and federal actions concerning these lands are subject to NEPA, including the Bureau of Indian Affairs, the Bureau of Land Management, the Bureau of Reclamation, the Department of Defense, the Department of Energy, the FWS, the Forest Service, and the National Park Service.  Moreover, additional non-federal lands and facilities in Nevada are subject to federal permitting and licensing requirements.

72.     Nevada state departments and agencies, including the Department of Conservation and Natural Resources and its many Divisions, the Department of Wildlife, the Department of Transportation, the Agency for Nuclear Projects, the Department of Agriculture, the Colorado River Commission, and the Nevada System of Higher Education, regularly engage in the federal NEPA process as cooperating and commenting agencies or as agencies

AR_0026554

1  with special expertise highlighting potential impacts to the state's natural resources and public

2  health. Federal agency activities and actions requiring federal permits that affect Nevada's

3  environmental quality, wildlife, mineral, and cultural resources are subject to NEPA and are

4  also reviewed by state agencies for consistency and compliance with Nevada's laws and

5  programs. In some situations, NEPA is the sole means for state agencies to advocate for

6  protection of Nevada's resources.

7       73.     Plaintiff STATE OF NEW JERSEY is a sovereign state of the United States of

8  America and brings this action on behalf of itself and as trustee, guardian and representative of

9  the residents and citizens of New Jersey. As the most densely developed state in the country,

10  New Jersey has actively pursued conservation programs for land and natural resources. New

11  Jersey's voters have approved more than $3.3 billion in funding for New Jersey Department of

12  Environmental Protection's (NJDEP) Green Acres program to conserve ecologically-sensitive

13  or natural resource-laden properties. Similarly, over 230,000 acres of farmland have been

14  conserved through New Jersey's State Agricultural Development Committee.

15       74.     New Jersey expends significant resources protecting its natural resources,

16  including eighty-three state-listed threatened or endangered species, and holds all wildlife, fish,

17  shellfish, and tidal waters in trust for its citizens. New Jersey has at least fourteen federally

18  listed species, including the threatened piping plover (*Charadrius melodus*), red knot (*Calidris*

19  *canutus rufa*), and the recently designated New Jersey state reptile, the bog turtle (*Clemmys*

20  *muhlenbergii*).

21       75.     New Jersey is home to well over one hundred miles of coastline, which includes

22  the famed Jersey Shore as a significant tourism driver, and federal activities such as seismic

23  testing and offshore drilling have historically been proposed off of New Jersey's coastline.

24  New Jersey is also home to three primary interstate highways and numerous auxiliary interstate

25  highways, including auxiliary highways running from other states' interstate systems,

26  numerous military installations, including Joint Base McGuire-Dix-Lakehurst, and federal

First Amended Compl. for Declaratory and
Inj. Relief     25
Case No. 3:20-cv-06057

AR_0026555

1    parks and natural areas where a fully functional NEPA process is essential to sound

2    environmental planning.  Due to its geographic location, New Jersey has also become the site

3    for numerous proposed energy transmission infrastructure projects which require federal

4    approvals and are subject to NEPA.  New Jersey agencies and authorities, including but not

5    limited to NJDEP, regularly engage in the federal NEPA process.  NJDEP routinely comments

6    during the NEPA process to inform the relevant federal agency about mechanisms to avoid,

7    minimize, and/or mitigate potential impacts to the environment and public health, as well as to

8    educate the federal agency about New Jersey's own statutory and regulatory requirements.

9    Further, project proponents may use an EIS properly completed under NEPA or properly

10   promulgated categorical exemptions as a substitute for compliance with New Jersey's

11   Executive Order 215 (1989).

12        76.    Plaintiff STATE OF NEW MEXICO joins in this action by and through

13   Attorney General Hector Balderas.  The Attorney General of New Mexico is authorized to

14   prosecute in any court or tribunal all actions and proceedings, civil or criminal, when, in his

15   judgment, the interest of the state requires such action.  N.M. Stat. Ann. § 8-5-2.  New Mexico

16   has a statutory duty to "ensure an environment that in the greatest possible measure will confer

17   optimum health, safety, comfort and economic and social well-being on its inhabitants; will

18   protect this generation as well as those yet unborn from health threats posed by the

19   environment; and will maximize the economic and cultural benefits of a healthy people." *Id.*

20   § 74-1-2.

21        77.    Federal agencies have an enormous footprint in New Mexico.  More than one-

22   third of New Mexico's land is federally administered, with the United States Department of

23   Agriculture, Department of the Interior, and Department of Defense playing active roles in

24   land management within the state.  The state is home to the nation's newest national park

25   (White Sands National Park, established 2019); first designated wilderness area (Gila

26   Wilderness, established 1924); and largest military installation (White Sands Missile Range).

AR_0026556

It also hosts two National Laboratories, three Air Force Bases, and the nation's only deep

geologic repository for nuclear waste (the United States Department of Energy's Waste

Isolation Pilot Project or WIPP). The state contains a significant portion of the Navajo Nation

Indian reservation as well as twenty-two other federally recognized Indian tribes. The U.S.

Army Corps of Engineers operates seven dams in New Mexico, and the U.S. Department of

Agriculture manages five in-state National Forests, comprising over nine million acres. The

Bureau of Land Management (BLM) also oversees over thirteen million acres of public lands,

thirty-six million acres of federal mineral estate, and approximately eight million acres of

Indian trust minerals in New Mexico. BLM has approved over 7,800 oil and gas leases in the

state, as well as twenty-one federal coal leases encompassing 42,756 acres.

78.     New Mexico is home to a vast array of plant and animal species, many of which

are either threatened or endangered. Indeed, FWS lists forty-one animal and fourteen plant

species as threatened or endangered in New Mexico. These include the endangered, iconic

Southwestern willow flycatcher (*Empidonax traillii extimus*), the endangered Rio Grande

silvery minnow (*Hybognathus amarus*), the endangered jaguar *(Panthera onca)*, the

endangered Mexican wolf (*Canis lupus baileyi*), and the threatened Mexican spotted owl (*Strix

occidentalis lucida*). Furthermore, the New Mexico Department of Game and Fish maintains

its own list of 116 in-state threatened and endangered species and subspecies – including

crustaceans, mollusks, fishes, amphibians, reptiles, birds, and mammals – many of which are

not listed by FWS and do not receive federal protection. Among the species receiving only

state protection are the endangered Gila monster (*Heloderma suspectum*), the endangered

brown pelican (*Pelecanus occidentalis*), and the threatened white-sided jackrabbit (*Lepus

callotis*).

79.     New Mexico faces serious environmental challenges in the 21st century. The

state is already experiencing the adverse effects of climate change, and average temperatures in

New Mexico have been increasing fifty percent faster than the global average over the past

AR_0026557

century.  According to the Third U.S. National Climate Assessment, streamflow totals in the
Rio Grande and other rivers in the Southwest were five percent to thirty-seven percent lower
between 2001 and 2010 than the 20th century average flows.  As of August 20, 2020,
100 percent of the state is suffering from drought conditions, with approximately 55.5 percent
being in a "severe drought."  (*See* Nat'l Integrated Drought Info. Sys.,
https://www.drought.gov/drought/states/new-mexico).  It is estimated that forty percent of
Navajo Nation residents already lack running water.

80.     New Mexico relies on participation in the NEPA process to protect its
proprietary and sovereign interests in its natural resources, including weighing the short-term
benefits of resource extraction against the long-term effects of climate change, and conserving
scarce water resources.  In one recent example, the New Mexico State Auditor's Office, the
New Mexico Department of Game and Fish, and the New Mexico Department of Agriculture
submitted comments to BLM regarding the Farmington Mancos-Gallup Resource Management
Plan Amendment, calling BLM's attention to, among other things, the state's land and water
conservation planning efforts.  Other EISs the state has recently commented on include those
for Los Alamos National Lab (Sitewide EIS); the New Mexico Unit of the Central Arizona
Project (regarding diversion of water from the Gila River); and Plutonium Pit Production at the
Department of Energy's Savannah River Site (regarding effects from waste shipped to WIPP).
The New Mexico Environment Department alone has submitted comments on eleven EISs in
2020 so far.

81.     Plaintiff STATE OF NEW YORK brings this action on its own behalf and on
behalf of its environmental agency, the New York State Department of Environmental
Conservation (NYSDEC), to protect New York's sovereign and proprietary interests, which
include ownership of all wildlife in the state, N.Y. Envtl. Conserv. Law § 11-0105, and
numerous waterbodies, including without limitation: the land under the "marginal sea" to a line
three miles from the coast, the Great Lakes within the state's territorial jurisdiction, Lake

AR_0026558

Champlain and the St. Lawrence and Niagara Rivers, as well as the Hudson and Mohawk

Rivers, Lake George, Cayuga Lake, Canandaigua Lake, Oneida Lake, and Keuka Lake. *See*

*Town of N. Elba v. Grimditch*, 98 A.D.3d 183, 188–89 (N.Y. App. Div. 3d Dep't 2012). The

state also owns approximately 4.8 million acres of park and forest lands, including more than

2.8 million acres of "forever wild" forest preserve. N.Y. Const. art. XIV.

82.    There are dozens of federally endangered or threatened species that reside in

whole or in part within the State of New York and its waters. Examples include four sea

turtles that can be found in New York waters—the loggerhead (*Caretta caretta*), green

(*Chelonia mydas*), leatherback (*Dermochelys coriacea*) and Kemp's Ridley (*Lepidochelys*

*kempii*). New York hosts ten National Wildlife Refuges, home to federally protected species

like the Piping Plover (*Charadrius melodus*), and dozens of other federal sites. Other species

of concern include the endangered shortnose sturgeon (*Acipenser brevirostrum*), Atlantic

sturgeon (*Acipenser oxyrinchus)*, and the Northern long-eared bat (*Myotis septentrionalis*).

Strong ESA protections both within its state borders and throughout each species' range are

fundamental to New York's interests.

83.    New York is home to nine primary and twenty-two auxiliary interstate

highways, six international airports, and several federal military installations, including Fort

Drum, the United States Military Academy at West Point, and the Watervliet Arsenal. New

York is also home to the Western New York Nuclear Service Center, a program of the New

York State Energy Research and Development Authority (NYSERDA), which owns, in trust

for the People of the State of New York, a 3,300-acre former nuclear waste re-processing

facility that is the subject of an ongoing joint lead agency supplemental environmental review

of decommissioning activities under NEPA and state law.

84.    New York state agencies and authorities, collectively, including without

limitation the NYSDEC and NYSERDA, regularly engage or are presently engaged in the

federal NEPA process. Federal agency activities and actions requiring federal permits that

AR_0026559

affect New York's coastal zone, water quality, wildlife, and cultural resources are subject to NEPA, and NEPA analysis is used to support state decision making. For example, where federal and state environmental reviews of a project are undertaken, the NYSDEC may rely on a NEPA EIS where it is sufficient for the agency to make findings under state law. Where no EIS is prepared under NEPA, the NEPA record developed to support a Finding of No Significant Impact may inform the record for analysis under state law. And where state environmental review may be preempted, New York agencies such as NYSDEC may use NEPA analysis to support their decisions, such as water quality certifications.

85. Plaintiff STATE OF NORTH CAROLINA brings this action by and through Attorney General Joshua H. Stein. The North Carolina Attorney General is the chief legal officer of the State of North Carolina. The Attorney General is empowered to appear for the State of North Carolina "in any cause or matter … in which the state may be a party or interested." N.C. Gen. Stat. § 114-2(1). Moreover, the Attorney General is authorized to bring actions on behalf of the citizens of the state in "all matters affecting the public interest." *Id.* § 114-2(8)(a).

86. North Carolina has a sovereign and propriety interest in protecting its state resources through careful environmental review at both the state and federal level. It is the constitutional policy of North Carolina to conserve and protect its lands and waters for the benefit of all its citizenry. N.C. Const. Art. XIV, § 5. Under North Carolina law, "the marine and estuarine and wildlife resources of North Carolina belong to the people of the state as a whole." N.C. Gen. Stat. § 113-131(a). Furthermore, North Carolina's General Assembly has declared that it is the policy of the State of North Carolina to "encourage the wise, productive, and beneficial use of the natural resources of the State without damage to the environment," and to "maintain a healthy and pleasant environment, and preserve the natural beauty of the State." *Id.* § 113A-3.

AR_0026560

87.     North Carolina contains over two million acres of federally-owned lands, including lands managed by the U.S. Forest Service, FWS, National Park Service, and Department of Defense.  North Carolina has ten national parks and forty-one state parks.  North Carolina is home to thirty-nine animal and twenty-seven plant species that have been listed as endangered or threatened by the FWS, including the endangered Red-cockaded woodpecker (*Picoides borealis*), Carolina northern flying squirrel (*Glaucmys sabrinus coloratus*), and Leatherback sea turtle (*Dermochelys coriacea*).

88.     North Carolina agencies regularly engage in the federal NEPA process as cooperating and commenting agencies or as agencies with special expertise highlighting potential impacts to the state's natural resources and public health.

89.     Plaintiff STATE OF OREGON brings this suit by and through Attorney General Ellen Rosenblum.  The Oregon Attorney General is the chief legal officer of the State of Oregon.  The Attorney General's duties include acting in federal court on matters of public concern and upon request by any state officer when, in the discretion of the Attorney General, the action may be necessary or advisable to protect the Oregon's interests.  Or. Rev. Stat. § 180.060(1).

90.     The State of Oregon has a sovereign interest in its natural resources and is the sovereign owner of the state's fish and wildlife.  Under Oregon law, "[w]ildlife is the property of the State." *Id.* § 498.002.  The State of Oregon has enacted numerous laws and rules concerning the conservation and protection of the natural resources of the state.  *See, e.g.*, Oregon Endangered Species Act, Or. Rev. Stat. §§ 496.171–.192, 498.026; Fish and Wildlife Habitat Mitigation Policy, Or. Admin. R. 635-415-0000 (creating "goals and standards to mitigate impacts to fish and wildlife habitat caused by land and water development actions"); Or. Admin. R. 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(5) ("[l]ocal governments shall adopt programs that will protect natural resources").  Oregon State has sixty-six federally listed species (including plants and invertebrates).  These listed species include upper Columbia River steelhead (*Oncorhynchus*

*mykiss*), upper Willamette River chinook salmon (*Oncorhynchus tshawytscha*), the marbled murrelet (*Brachyramphus marmoratus*), and the Oregon spotted frog (*Rana pretiosa*). Oregon also lists thirty species as state endangered or threatened species and expends significant resources to protect and recover these species, some of which (for example, the California brown pelican) are not federally protected.

91.     Natural resources are the source of substantial economic activity in Oregon. More than $2.6 billion annually is spent in Oregon by residents and visitors on trips and equipment for wildlife-watching, fishing, and hunting. The state also owns at least 1.775 million acres of land, including land managed by the Department of Forestry and the Department of State Lands. (That figure generally excludes state-owned waterbodies and rights of way.) Revenue from the 780,000 acres of land managed by the Department of State Lands is placed in the Common School Fund, which generates tens of millions of dollars annually for Oregon public schools.

92.     More than half of Oregon's land area is owned by the federal government. BLM manages over fifteen million acres in Oregon. The U.S. Forest Service also manages over fifteen million acres (across eleven national forests). Oregon has eighteen national wildlife refuges and Crater Lake National Park. Oregon has three primary and three auxiliary interstate highways. Many Oregon resources, such as the Common School Trust Lands and navigable waters, are ecologically connected to federal lands. Oregon's fish and wildlife resources also rely on federal lands and waters.

93.     Oregon state agencies, including the Department of Fish and Wildlife, the Department of Transportation, the Department of State Lands, and the Oregon Department of Parks and Recreation, regularly engage in the federal NEPA process as cooperating and commenting agencies or as agencies with special expertise highlighting potential impacts to the state's natural resources and public health.

94.     Plaintiff STATE OF RHODE ISLAND is a sovereign entity and brings this action to protect its sovereign and proprietary rights.  The Attorney General is the chief legal advisor to the State of Rhode Island, and his powers and duties include acting in federal court on matters of public concern.  This challenge is brought pursuant to the Attorney General's statutory and common law authority to bring suit and obtain relief on behalf of Rhode Island.

95.     Rhode Island has a sovereign and propriety interest in protecting its state resources through careful environmental review at both the state and federal level.  Rhode Island has a statutory responsibility to conserve, enhance, and properly utilize the state's natural resources.  R.I. Gen. Laws § 10-20-1; *see also* R.I. Const. art. I, § 17.  Although Rhode Island is the smallest state in land size, forests cover fifty-nine percent of its land area, with a total of 393,000 acres.  It also has thousands of miles of freshwater streams, rivers, and lakes.  Rhode Island lists over twenty-five species as endangered species and expends significant resources to protect and recover these species, some of which are not federally protected.  Rhode Island's natural resources generate millions of dollars in annual financial benefits to state public schools, institutions, and municipal services.  They also generate millions of dollars' worth of ecosystem services to surrounding communities by filtering drinking water, purifying air, and providing space for recreation.  Rhode Island's natural areas generate commercial and recreational opportunities that put hundreds of millions of dollars into the Rhode Island economy annually.

96.     Rhode Island has over 400 miles of coastline and thousands of acres of federal lands across three National Park Service affiliated sites, five national wildlife refuges, numerous national monuments and historic sites, and numerous Department of Defense locations, including Naval Station Newport and the Quonest Point Air National Guard Station.  Many of these federal lands abut Rhode Island's state-owned lands.  Rhode Island is also home to two interstate highways and one international airport.  Federal agencies, including the U.S. Navy and the Coast Guard, also routinely engage in activities in Rhode Island's coastal waters.

AR_0026563

1    Major Federal actions concerning these lands, waters, projects, highways, airports, and other

2    federal facilities are subject to NEPA.

3         97.      Rhode Island state agencies, including the Department of Environmental

4    Management and the Coastal Resources Management Council (CRMC), the Department of

5    Transportation, and the Department of Health regularly engage in the federal NEPA process as

6    cooperating and commenting agencies or as agencies with special expertise highlighting

7    potential impacts to the state's natural resources and public health.  For example, CRMC and

8    the federal Bureau of Offshore Energy Management jointly worked on the NEPA process to

9    design the installation of a new offshore wind energy project, where rigorous environmental

10   review and meaningful public engagement led to a selected alternative that worked for state

11   and federal agencies, local governments, tribes, and the public, including the commercial

12   fishing industry.  Federal agency activities and actions requiring federal permits that affect

13   Rhode Island's coastal zone, water quality, wildlife, and cultural resources are subject to

14   NEPA and are also reviewed by state agencies for consistency and compliance with Rhode

15   Island's laws and programs.  In some situations, NEPA is the sole means for state agencies to

16   advocate for protection of Rhode Island's resources, including protection of state listed species

17   and other species of concern and their habitat, and to identify unintended consequences of a

18   proposed action.

19        98.      Plaintiff STATE OF VERMONT is a sovereign state in the United States of

20   America.  The State of Vermont brings this action through Attorney General Thomas J.

21   Donovan, Jr.  The Attorney General is authorized to represent the state in civil suits involving

22   the state's interests, when, in his judgment, the interests of the state so require.  3 V.S.A. Ch. 7.

23        99.      Vermont brings this action to protect its sovereign and proprietary interests,

24   including its interests in natural resources and infrastructure.  The state has ownership,

25   jurisdiction, and control of all wildlife of the state as trustee for the state's citizens.  10 V.S.A.

26   § 4081(a)(1).  Vermont has eleven federally listed species, including the Canada Lynx (*Lynx*

AR_0026564

1  *canadensis*) and Eastern Mountain Lion (*Puma concolor*).  Vermont also lists 215 state-

2  endangered and threatened species, which are protected under 10 V.S.A. §§ 5401-5410.

3       100.  The state is also trustee for navigable waters, lakes, ponds, and groundwater

4  located within the state.  *Id.* §§ 1390(5), 1421; 29 V.S.A. § 401.  Vermont owns, manages and

5  maintains numerous state forests, parks, and wildlife management areas; buildings and other

6  infrastructure, including dams, roads, bridges, airports; and railroad, public transportation,

7  bicycle, and pedestrian facilities.  Significant state-owned infrastructure is located in river

8  valleys and is susceptible to damage or destruction by flooding caused by severe rainstorms,

9  the severity and frequency of which is being exacerbated by climate change.

10       101.  The federal government owns nearly half a million acres of land in Vermont,

11  comprising about eight percent of the state's total land area.  These lands include

12  approximately 400,000 acres within the Green Mountain National Forest.  Located within a

13  day's drive of seventy million people, the national forest is important to Vermont's economy,

14  drawing three to four million visitors to Vermont each year for outdoor recreation, and

15  provides habitat for rare and unique plants, fish, and birds.  Federally owned and managed

16  lands in Vermont also include the Marsh Billings National Historic Park, the Silvia O. Conte

17  National Fish and Wildlife Refuge, the Missiquoi National Wildlife Refuge, and approximately

18  150 miles of the Appalachian Trail.  Vermont is also home to National Guard installations,

19  including the Vermont Air National Guard Base in South Burlington, at which F-35 fighter jets

20  are based.  Low-income residents of surrounding communities are disproportionately impacted

21  by high noise levels from F-35 training runs.  Two major interstate highways and numerous

22  federal aid highways pass through Vermont.  The federal government also issues permits and

23  provides grants and loans for various activities within the state, including Federal Emergency

24  Management Administration disaster assistance grants for rehabilitation and improvement of

25  state infrastructure.  Federal actions concerning these and other federal lands, facilities and

26  programs are subject to NEPA.

AR_0026565

102.    Vermont state agencies, including the Vermont Agency of Transportation and Vermont Agency of Natural Resources, regularly participate in federal NEPA proceedings to protect the State's interests.

103.    Plaintiff STATE OF WISCONSIN is a sovereign state of the United States of America and brings this action by and through its Attorney General, Joshua L. Kaul, who is the chief legal officer of the State of Wisconsin and has the authority to file civil actions to protect Wisconsin's rights and interests. *See* Wis. Stat. § 165.25(1m).  The Attorney General's powers and duties include appearing for and representing the state, on the governor's request, "in any court or before any officer, any cause or matter, civil or criminal, in which the state or the people of this state may be interested." *Id.* § 165.25(1m).

104.    The State of Wisconsin has a sovereign interest in its natural resources and in ensuring the protection and conservation of those resources.  The State of Wisconsin holds legal title to and is the custodian of all wild animals within Wisconsin and regulates them for conservation and use and enjoyment by the public. *Id.* § 29.011.  The State of Wisconsin holds title to the navigable waters of the state in trust for the public and has a duty to protect and preserve those waters for the public for fishing, hunting, recreation, and enjoyment of scenic beauty.  Wis. Const. art. IX, § 1; *Wis.'s Envtl. Decade, Inc. v. Dep't of Nat. Res.*, 85 Wis. 2d 518, 526 (1978).  The State of Wisconsin has a sovereign interest in protecting its state resources through careful environmental review at both the state and federal level.

105.    Wisconsin is home to the Chequamegon-Nicolet National Forest, the Apostle Islands National Lakeshore, the Ice Age National Scenic Trail, the North Country National Scenic Trail, the Saint Croix National Scenic Riverway, nine federal wildlife refuges and wetland management districts, several Department of Defense facilities including Fort McCoy, five primary interstate highways and additional auxiliary federal highways, and several international airports.  Major Federal actions concerning these lands, waters, projects, highways, airports, and other federal facilities are subject to NEPA.

106.     Wisconsin has twenty-four federally listed species, including the Northern long-eared bat (*Myotis septentrionalis*), Kirtland's warbler (*Setophaga kirtlandii*), Piping plover (*Charadrius melodus*), Karner blue butterfly (*Lycaeides melissa samuelis*), rusty patched bumble bee (*Bombus affinis*), and Fassett's locoweed (*Oxytropis campestris var. chartaceae*). Wisconsin is home to substantial portions of the global population of the endangered Karner blue butterfly and endangered rusty patched bumble bee.  The endangered Kirtland's warbler is only found in Michigan and Wisconsin.  The variety of the threatened Fassett's locoweed in Wisconsin is found nowhere else in the world.

107.     Wisconsin state agencies, including the Wisconsin Department of Natural Resources (WDNR), regularly engage in federal NEPA processes to protect the state's interest in public health, environmental quality, and state natural resources.  These agencies have participated in the NEPA process as commenting and cooperating agencies.  For example, the WDNR recently provided comments on an environmental assessment prepared by the U.S. Army Corps of Engineers on the placement of dredged material in the upper Mississippi River and on an environmental impact statement prepared by the U.S. Airforce on the addition of F-35 fighter jets at the 115th Fighter Wing National Guard base in Madison, Wisconsin.  The WDNR is also serving as a cooperating agency for an environmental assessment with the National Park Service for a new segment of the Ice Age National Scenic Trail and for an environmental impact statement on a proposed bridge corridor over the Fox River in Brown County, Wisconsin.

108.     Plaintiff COMMONWEALTH OF MASSACHUSETTS brings this action by and through Attorney General Maura Healey, the chief legal officer of the Commonwealth, on behalf of the Commonwealth and its residents.  The Commonwealth has both sovereign and proprietary interests in the conservation and protection of its natural resources and the environment through comprehensive environmental review at both the state and federal level. *See* Mass. Const. Amend. art. 97; Mass. Gen. Laws, ch. 12, §§ 3, 11D.

1        109.    Federal agencies regularly undertake major actions subject to NEPA throughout

2    Massachusetts, including operating federal land and facilities and permitting, licensing, and

3    funding projects that affect the Commonwealth's natural resources.  Massachusetts is home to

4    fifteen national parks, five national heritage areas, four wild and scenic rivers, and three

5    national trails managed by the National Park Service and other federal agencies, including the

6    Cape Cod National Seashore, which spans nearly forty miles of coastal land along the eastern

7    shore of Cape Cod.  Six Department of Defense military bases, five interstate highways, eight

8    auxiliary interstate highways, two nuclear legacy management sites, one international airport,

9    approximately 1,000 miles of interstate transmission pipelines, and one international liquid

10    natural gas terminal are located in Massachusetts.  Numerous federal agencies operate, license,

11    or permit activities in Massachusetts waterways and off Massachusetts's more than 1,500 miles

12    of coastline, impacting Massachusetts fisheries, other valuable resources, and maritime uses,

13    which are critical to the health and economic vitality of the Commonwealth.

14        110.    At least seventeen federally listed and protected endangered or threatened

15    species are known to occur in Massachusetts, including, for example, the threatened piping

16    plover (*Charadrius melodus*) and northern long-eared bat (*Myotis septentrionalis*), and the

17    endangered shortnose sturgeon (*Acipenser brevirostrum*) and leatherback sea turtle

18    (*Dermochelys coriacea*).

19        111.    Massachusetts agencies, including the Massachusetts Executive Office of

20    Energy and Environmental Affairs and its Department of Environmental Protection, Office of

21    Coastal Zone Management, and Division of Fisheries and Wildlife, as well as the

22    Massachusetts Department of Transportation and the Massachusetts Port Authority, engage in

23    the federal NEPA process as coordinating, cooperating, and commenting agencies with

24    specialized expertise to protect the state's interest in public health, environmental quality, and

25    state natural resources.  For example, following extensive community involvement and

26    collaboration between multiple state and federal agencies and the two impacted towns during

First Amended Compl. for Declaratory and
Inj. Relief      38
Case No. 3:20-cv-06057

AR_0026568

1  coordinated review under NEPA and the Massachusetts Environmental Policy Act (MEPA),

2  Mass. Gen. Laws, ch. 30, §§ 61–62I, the National Park Service adopted an alternative plan for

3  the Herring River Restoration on Cape Cod that will restore at least 346 acres of tidal marsh,

4  protect fish species harmed by existing impeded and degraded river conditions, and improve

5  fishing and shellfishing yields, among other significant benefits to the community and the

6  environment.  The pending coordinated NEPA and MEPA process for the I-90 Allston

7  highway project also has helped to convene a wide range of state and federal agencies and

8  stakeholder groups to explore and assess alternatives that minimize impacts to important

9  natural resources in and along the Charles River.

10       112.    Massachusetts state agencies also review federal agency actions subject to

11  NEPA, including permits, that affect Massachusetts's natural resources for consistency and

12  compliance with Massachusetts laws and policies.  *See, e.g.*, 301 Mass. Code Regs. § 20.04

13  (procedures for consistency determinations under Federal Coastal Zone Management Act,

14  16 U.S.C. § 1456).

15       113.    Plaintiff COMMONWEALTH OF PENNSYLVANIA brings this action by and

16  through Attorney General Josh Shapiro.  The Attorney General is the chief law officer of the

17  Commonwealth of Pennsylvania and has authority to represent the Commonwealth and all

18  Commonwealth agencies in any civil action brought by the Commonwealth.  Pa. Const. art. IV,

19  § 4; *Cmwlth. Attorneys Act,* 71 P.S. § 732-204(c).  The Commonwealth brings this action on its

20  own behalf.

21       114.    This action is brought pursuant to the Commonwealth's sovereign interests and

22  its trustee obligations to protect Pennsylvania's public natural resources from degradation.  The

23  Commonwealth of Pennsylvania has a sovereign interest in its public natural resources, which

24  are the common property of all the people, including generations yet to come.  Pa. Const. art. I,

25  § 27.  The Pennsylvania Constitution protects every Pennsylvanian's "right to clean air, pure

26  water, and to the preservation of the natural, scenic, historic and esthetic values of the

AR_0026569

1    environment." *Id.*, § 27.  The Commonwealth, as trustee, must conserve and maintain public

2    natural resources for the benefit of all the people.  *Robinson Twp. v. Pennsylvania*, 83 A.3d

3    901, 955–956 (Pa. 2013).

4         115.    Pennsylvania's public natural resources include 83,184 miles of streams and

5    rivers in the Ohio, Genesee, Potomac, Susquehanna, Lake Erie and Delaware River

6    watersheds, more than 4,000 lakes, reservoirs and ponds, 120 miles of coastal waters in the

7    Lake Erie and Delaware Estuary coastal zones and abundant groundwater resources.

8    Pennsylvania's state forest system comprises 2.2 million acres of forestland in forty-eight of

9    Pennsylvania's sixty-seven counties.  Pennsylvania has nineteen federally listed and protected

10   endangered or threatened species are known to occur in Pennsylvania, including the

11   endangered rusty patched bumble bee (*Bombus affinis*) and Piping plover (*Charadrius*

12   *melodus*) and the threatened northern long-eared bat (*Myotis septentrionalis*).

13        116.    Federal actions and activities that propose impacts to the Commonwealth's

14   public natural resources are subject to NEPA.  Commonwealth agencies review these actions to

15   ensure the Commonwealth's public natural resources are protected.  Pennsylvania agencies,

16   including without limit the Department of Environmental Protection, the Department of

17   Conservation and Natural Resources, and the Department of Transportation, engage in the

18   federal NEPA process.  Pennsylvania is home to large-scale pipeline projects subject to NEPA.

19   Commonwealth agencies closely review and comment on these NEPA analyses and utilize

20   these analyses to support state decision making.  Also, Pennsylvania is home to several federal

21   military installations, including those located at the Harrisburg International Airport, the U.S.

22   Army War College and Carlisle Barracks Army Base, New Cumberland Army Depot,

23   Letterkenny Army Depot, the Mechanicsburg Naval Depot, and the Willow Grove Naval Air

24   Station Joint Reserve Base.  Commonwealth agencies review the actions at these facilities to

25   ensure the Commonwealth's public natural resources are protected.

26

AR_0026570

117.     Plaintiff TERRITORY OF GUAM brings this action by and through Attorney General Leevin Taitano Camacho.  The Attorney General is the chief legal officer of the Government of Guam.  48 U.S.C. § 1421g(d)(1).  This challenge is brought pursuant to the Attorney General's statutory and common law authority to bring an action on behalf of Guam.  5 GCA § 30103.

118.     Guam has a sovereign interest in its natural resources, which run two hundred nautical miles seaward from its low-water line.  Guam is the sovereign and proprietary owner of all surface water and ground water within its territory, which it holds in trust for the people of Guam, 12 GCA § 14505, and has a statutory responsibility to conserve, enhance, and properly utilize its natural resources.  5 GCA § 63502.

119.     Guam is home to numerous listed threatened and endangered species and their designated critical habitats.  These species and habitats include the Mariana Fruit Bat (*Pteropus mariannus*), Hayun Lagu (*Serianthes nelsonii*), the largest native tree in the Mariana Islands, and the Guam Rail or the Ko'ko' bird (*Gallirallus owstoni*), which is native to Guam and found nowhere else in the world.

120.     The United States Department of Defense has over fifty military installations in Guam and controls over twenty-five percent of the island.  Federal agencies, including the United States Army, Air Force, Navy, Marine Corps, and the Coast Guard, routinely engage in military exercises in Guam.  These exercises, along with other major Federal actions concerning Guam's land, water, and air, are subject to NEPA.

121.     Over the last decade, there have been several federal actions proposed primarily by the Department of Defense in the Marianas, which have had significant environmental impacts on Guam, including the destruction of hundreds of acres of limestone forest that serve as a habitat for numerous endangered species and the planned construction and operation of a live-fire training range complex over Guam's aquifer.  These projects include the Guam and CNMI Military Relocation Environmental Impact Statement and Supplemental EIS, the

1    Marianas Islands Range Complex EIS, the Mariana Islands Training and Testing EIS, and the

2    Divert Activities and Exercises EIS. Guam agencies, including the Guam Bureau of Statistics

3    and Plans, Guam Environmental Protection Agency, Guam Waterworks Authority, Guam

4    Department of Agriculture and Guam Department of Public Health and Social Services have

5    and continue to engage in the federal NEPA process to protect Guam's interest in public

6    health, environmental quality, and natural resources.

7         122.    Plaintiff DISTRICT OF COLUMBIA (the District) is a municipal corporation

8    and is the local government for the territory constituting the permanent seat of government of

9    the United States. The District is represented by and through its chief legal officer the

10    Attorney General for the District of Columbia. The Attorney General has general charge and

11    conduct of all legal business of the District and all suits initiated by and against the District and

12    is responsible for upholding the public interest. D.C. Code § 1-301.81(a)(1).

13         123.    As the seat of the nation's capital, the District is uniquely impacted by

14    environmental review on federal actions and projects. The federal government owns one-third

15    of the land in the District, eighty-five percent of the District's shoreline, and owns the riverbed

16    of the District's two major rivers, the Potomac and Anacostia. Almost ninety percent of the

17    city's parkland—more than 6,900 acres including Rock Creek Park, the National Mall,

18    Anacostia Park and the Fort Circle Parks—is part of the National Park System. With the

19    federal government owning or managing federal offices, land, and water resources in the

20    District of Columbia, federal government decisions relating to the environmental impact of

21    projects related to these buildings, land, and resources substantially impacts the District's

22    environment and the public health of its residents.

23         124.    The District is home to one federally listed species, the Hay's Spring Amphipod

24    (*Stygobromus hayi*), which is a small, shrimp-like freshwater crustacean that exists only in five

25    springs, all along Rock Creek Park.

26

First Amended Compl. for Declaratory and
Inj. Relief           42
Case No. 3:20-cv-06057

AR_0026572

125.   Under the District's Environmental Policy Act and its implementing regulations, District agencies evaluate environmental impacts through review and analysis of environmental impact screening forms.  This review determines whether the District is to perform an environmental impact statement because a major action is likely to have substantial negative impact on the environment, if implemented.  However, this analysis is not required when an environmental analysis has been performed in accordance with NEPA.  Thus, when a federal agency does not perform an environmental review under NEPA, the District will perform the analysis to ensure that negative environmental and public health impacts are mitigated.

126.   Plaintiff HARRIS COUNTY, TEXAS is a local subdivision of the State of Texas.  Harris County brings this action to protect its citizens and governmental and proprietary interests, which include parks and greenway spaces.  Harris County is represented by the Harris County Attorney, an elected official and chief legal officer for Harris County.  Harris County is the third largest county in the United States, home to more than four million residents spread over 1,777 square miles, and is the energy capital of the world.

127.   Harris County is often impacted by federal actions subject to NEPA review and has submitted comments and participated in the NEPA process on a range of matters including the Keystone XL Pipeline and the Texas Coastal Study.

128.   Plaintiff CITY OF NEW YORK, a municipal subdivision of the State of New York, brings this action on its own behalf to protect its governmental and proprietary interests, which include more than 30,000 acres of parks and beaches, 2.6 million trees, 520 linear miles of waterfront property, and the nation's largest unfiltered water supply system with a watershed of over one million acres, which provides more than one billion gallons of drinking water daily from nineteen reservoirs to more than nine million residents of the City and State of New York.

AR_0026573

129.     Federally funded or permitted actions that affect New York City's environment are subject to the federal NEPA environmental review process.  New York City agencies and authorities regularly rely on NEPA analyses to support local decision making.  In particular, pursuant to the New York State Environmental Quality Review Act (SEQRA) and New York City Environmental Quality Review (CEQR) regulations, city agencies may rely on a federal EIS if it is sufficient for the City agency to make its findings under SEQRA/CEQR.  Similarly, a federal Environmental Assessment/Finding of No Significant Impact may serve as the basis for a city agency to issue a negative declaration under SEQRA/CEQR.  In addition, the New York City Department of Housing Preservation and New York City Mayor's Office of Management and Budget have assumed NEPA responsibilities from the U.S. Department of Housing and Urban Development (HUD) when utilizing HUD's housing grant programs and managing allocations of HUD's Community Development Block Grant Disaster Recovery and National Disaster Resilience programs, and are thus responsible for complying with HUD's NEPA regulations that will be revised under the Final Rule.

**B.     Defendants**

130.     Defendant CEQ is an agency of the federal government created by NEPA.  CEQ is responsible for guiding NEPA's implementation and bears responsibility, in whole or in part, for the acts complained of in this Complaint.

131.     Defendant Mary B. Neumayr is the Chairman of CEQ and is sued in her official capacity.  Ms. Neumayr is the official responsible for implementing and fulfilling CEQ's duties, including promulgating the Final Rule, and bears responsibility, in whole or in part, for the acts complained of in this Complaint.

**V.     STATUTORY AND REGULATORY BACKGROUND**

**A.     Administrative Procedure Act**

132.     The APA, 5 U.S.C. §§ 551–559 and 701–706, governs the procedural requirements for federal agency decision making, including the agency rulemaking process.

1    Under the APA, a "reviewing court shall … hold unlawful and set aside" federal agency action

2    found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with

3    law," "without observance of procedure required by law," or "in excess of statutory

4    jurisdiction, authority, or limitations, or short of statutory right." *Id.* § 706(2).  An agency

5    action is arbitrary and capricious under the APA where "the agency has relied on factors which

6    Congress has not intended it to consider, entirely failed to consider an important aspect of the

7    problem, offered an explanation for its decision that runs counter to the evidence before the

8    agency, or is so implausible that it could not be ascribed to a difference in view or the product

9    of agency expertise." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins.*

10   *Co.*, 463 U.S. 29, 43 (1983) (*State Farm*).  An agency does not have authority to adopt a

11   regulation that is "plainly contrary to the statute." *United States v. Morton,* 467 U.S. 822, 833

12   (1984); *see also* 5 U.S.C. § 706(2)(C).

13          133.    "Agencies are free to change their existing policies," but they must "provide a

14   reasoned explanation for the change." *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117,

15   2125 (2016) (citing *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967,

16   981–82 (2005)); *see also Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*,

17   140 S. Ct. 1891, 1913 (2020) ("when an agency rescinds a prior policy its reasoned analysis

18   must consider the 'alterative[s]' that are within the ambit of the existing [policy]") (citations

19   omitted).  An agency must "provide a more detailed justification than what would suffice for a

20   new policy created on a blank slate" when "its new policy rests upon factual findings that

21   contradict those which underlay its prior policy," "or when its prior policy has engendered

22   serious reliance interests that must be taken into account." *FCC v. Fox Television Stations,*

23   *Inc.*, 556 U.S. 502, 515 (2009).

24          134.    Prior to promulgating a rule, agencies must engage in a public notice-and-

25   comment process.  5 U.S.C. §§ 551(5), 553.  Agencies must afford public notice of specific

26   regulatory changes and their reasoned basis to provide the public an opportunity for

AR_0026575

1   meaningful comment, *Home Box Office, Inc. v. FCC*, 567 F.2d 9, 35–36 (D.C. Cir. 1977),

2   including the "technical studies and data that [the agency] has employed in reaching the

3   decision[] to propose particular rules." *Kern Cty. Farm Bureau v. Allen*, 450 F.3d 1072, 1076

4   (9th Cir. 2006). The agency must consider and respond to all significant comments it receives.

5   *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 96 (2015).

6   **B.      National Environmental Policy Act**

7           135.    NEPA is often referred to as the "Magna Carta" of U.S. environmental law.

8   *See Citizens Against Burlington, Inc. v. Busey*, 938 F.2d 190, 193 (D.C. Cir. 1991).

9           136.    Congress developed NEPA at a time of heightened awareness and growing

10  concern about the environment, amid a series of high-profile environmental crises in the late

11  1960s. The national perspective was shifting from "preoccupation with the extraction of

12  natural resources to the more compelling problems of deterioration in natural systems of air,

13  land, and water." S. Comm. on Interior & Insular Affairs and H.R. Comm. on Science and

14  Astronautics, 90th Congress, *Congressional White Paper on a National Policy for the*

15  *Environment*, at 1 (Oct. 1968).

16          137.    Congress recognized that "[o]ur national resources—our air, water, and land—

17  are not unlimited," and as a country, "[w]e no longer have the margins for error that we once

18  enjoyed." S. Rep. No. 91-296, at 5 (1969). A comprehensive national environmental policy

19  would disrupt the current practice of establishing policy "by default and inaction" where

20  "[e]nvironmental problems are only dealt with when they reach crisis proportions. Public

21  desires and aspirations are seldom consulted. Important decisions concerning the use and the

22  shape of [humans'] future environment continue to be made in small but steady increments

23  which perpetuate rather than avoid the recognized mistakes of previous decades." *Id.*

24          138.    NEPA thus declares an overarching national policy to "use all practicable

25  means and measures … to foster and promote the general welfare, to create and maintain

26  conditions under which man and nature can exist in productive harmony, and fulfill the social,

AR_0026576

1    economic and other requirements of present and future generations of Americans." 42 U.S.C.

2    § 4331(a).

3        139.    Cooperation with states and local governments and other concerned public and

4    private organizations is an essential component of this policy.  *Id.* §§ 4331(a), 4332(G).

5        140.    NEPA further emphasizes that in carrying out these policies, the federal

6    government has a continuing responsibility "to use all practicable means … to improve and

7    coordinate Federal plans, functions, programs, and resources to the end that the Nation may,"

8    among other things "fulfill the responsibilities of each generation as trustee of the environment

9    for succeeding generations," "assure for all Americans safe, healthful, productive, and

10   esthetically and culturally pleasing surroundings," and "attain the widest range of beneficial

11   uses of the environment without degradation, risk to health or safety, or other undesirable and

12   unintended consequences."  *Id.* § 4331(b).

13       141.    To ensure that these policies are "integrated into the very process of agency

14   decision making," NEPA outlines "action-forcing" procedures, *Andrus*, 442 U.S. at 349–50,

15   that require federal agencies "to the fullest extent possible," to prepare a detailed

16   environmental review or EIS for legislation or other "major Federal actions significantly

17   affecting the quality of the human environment."  *Id.* §§ 4332, 4332(2)(C).

18       142.    An EIS must evaluate, among other things, all of the environmental impacts of

19   the proposed federal action, any adverse and unavoidable environmental effects, alternatives to

20   the proposed action, the relationship between local short-term uses of the environment and the

21   maintenance and enhancement of long-term productivity, and any irreversible and irretrievable

22   commitment of resources involved in the proposed action.  *Id.* § 4332(2)(C).

23       143.    For proposed actions involving unresolved conflicts about alternative uses of

24   available resources, NEPA further directs that federal agencies should "study, develop, and

25   describe appropriate alternatives" to the proposed action.  *Id.* § 4332(E).

26

AR_0026577

1      144.    NEPA also requires federal agencies to work in concert with states, local

2 governments, institutions, organizations, and individuals by making available "advice and

3 information useful in restoring, maintaining, and enhancing the quality of the environment."

4 42 U.S.C. § 4332(G).

5      145.    In short, NEPA directs federal agencies to make well-informed and transparent

6 decisions based on a thorough review of environmental and public health impacts and

7 meaningful input from states, local governments, and the public.

8      146.    In NEPA, Congress also created CEQ and directed it to appraise federal

9 programs and activities in light of NEPA's overarching policies: "to be conscious of and

10 responsive to the scientific, economic, social, esthetic, and cultural needs and interests of the

11 Nation; and to formulate and recommend national policies to promote the improvement of the

12 quality of the environment." *Id.* § 4342.  CEQ has the statutory duty to take actions consistent

13 with NEPA's policies of environmental protection and informed decision making.

14      147.    Many State Plaintiffs have adopted their own state environmental policy acts

15 modeled on NEPA.  These include the California Environmental Quality Act, Cal. Pub. Res.

16 Code § 21000–21189.57, Washington's State Environmental Policy Act, Wash. Rev. Code.

17 ch. 43.21C, New York's State Environmental Quality Review Act, N.Y. Envtl. Conserv. L.

18 art. 8; 6 N.Y. Comp. Codes R. & Regs. Part 617; the Massachusetts Environmental Policy Act,

19 Mass. Gen. Laws, ch. 30, §§ 61-62I; and the District of Columbia's Environmental Policy Act,

20 D.C. Code § 8-109.01–109.12, and 20 D.C. Mun. Regs. § 7200–7299.  These state statutes (or

21 little NEPAs) require detailed environmental review for certain state agency and local

22 government actions.  Where an action subject to state environmental review also requires

23 NEPA review, state and local agencies can often comply with little NEPAs by adopting or

24 incorporating by reference certain environmental documents prepared under NEPA, but only if

25 those NEPA documents meet state statutory requirements. *See, e.g.*, 6 N.Y. Comp. Codes R. &

26 Regs. § 617.15; Mass. Gen. Laws, ch. 30, § 62G.

First Amended Compl. for Declaratory and
Inj. Relief      48
Case No. 3:20-cv-06057

AR_0026578

148.     CEQ and several states worked together to harmonize the environmental review processes under NEPA and little NEPAs through state-specific memoranda.  *See, e.g.*, CEQ, *States and Local Jurisdictions with NEPA-Like Environmental Planning Requirements*, https://ceq.doe.gov/laws-regulations/states.html.  This collaboration has long allowed state, local, and federal agencies to share documents, reduce paperwork, and efficiently allocate limited time and resources.  States rely on this collaboration and the effectiveness of federal NEPA documents under the 1978 regulations to allocate state resources and determine staffing needs.

**C.     Endangered Species Act**

149.     In 1973, Congress enacted the ESA, 16 U.S.C. §§ 1531–44, "to halt and reverse the trend toward extinction, whatever the cost."  *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 174 (1978).  As such, the ESA sets forth "a program for the conservation of [] endangered species and threatened species" through, in part, conservation of the ecosystems upon which such species depend.  16 U.S.C. § 1531(b).  The Services are the agencies responsible for listing endangered and threatened species and designating those species' critical habitats.  *Id.* §§ 1532(15), 1533(a); 50 C.F.R. §§ 17.11(a), 17.12(a).  The listing of a species under the ESA is a last resort to conserve endangered or threatened species and the ecosystems on which they depend.  The Services currently list over [insert number] species as endangered or threatened under the ESA.  50 C.F.R. §§ 17.11(a), 17.12(a).

150.     Section 7 of the ESA codifies "an explicit congressional decision to require agencies to afford first priority to the declared national policy of saving endangered species," elevating concern for the protection of such species "over the primary missions of federal agencies."  *Tenn. Valley Auth. v. Hill*, 437 U.S. at 185 (internal quotation marks omitted).  Pursuant to section 7, unless an exemption has been granted, each federal agency must, in consultation with one or both of the Services, "insure that any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of any

AR_0026579

1    endangered species or threatened species or result in the destruction or adverse modification of

2    habitat of such species[.]"  16 U.S.C. § 1536(a)(2).  "The minimum threshold for an agency

3    action to trigger consultation with FWS is low."  *W. Watersheds Project v. Kraayenbrink*, 632

4    F.3d 472, 496 (9th Cir. 2011).  Consultation is required if a prospective agency action may

5    affect a listed species or designated critical habitat.  *Id.*; 16 U.S.C. § 1536(a)(2); 50 C.F.R. §

6    402.12(a).  Formal consultation is required if the prospective agency action is likely to

7    adversely affect a listed species or designated critical habitat.  *Id.* § 1536(a)(2)–(3); 50 C.F.R.

8    §§ 402.12(a), (k), 402.14(a)–(b).

9          151.    During formal consultation, the acting federal agency is prohibited from

10    "mak[ing] any irreversible or irretrievable commitment of resources with respect to the agency

11    action which has the effect of foreclosing the formulation or implementation of any reasonable

12    and prudent alternative measures[.]"  16 U.S.C. § 1536(d).

13          152.    At the conclusion of the formal consultation period, the FWS or the NMFS

14    provides the agency with a biological opinion including a determination as to whether the

15    action is likely to "jeopardize the continued existence of a listed species or result in the

16    destruction or adverse modification of critical habitat[.]"  16 U.S.C. § 1536(b)(1)(3)(A); 50

17    C.F.R. § 402.14(g)–(h).  If the FWS or the NMFS determines the proposed action is likely to

18    result in jeopardy to a listed species or destruction or adverse modification of designated

19    critical habitat, it will include "reasonable and prudent alternatives" to the agency action in the

20    biological opinion.  50 C.F.R. § 402.14(h)(2).

21          153.    If the federal agency wishes to proceed with a proposed action that is deemed

22    likely to result in jeopardy or adverse modification, it must generally implement the Services'

23    recommended "reasonable and prudent alternatives" and adopt other "reasonable and prudent

24    measures" to ensure that the action "is not likely to jeopardize the continued existence of any

25    endangered species or threatened species or result in the destruction or adverse modification of

26

First Amended Compl. for Declaratory and
Inj. Relief          50
Case No. 3:20-cv-06057

AR_0026580

1   habitat of such species," and to minimize the impact of such action on listed species and

2   designated critical habitat.  16 U.S.C. §§ 1536(a)(2), 1536(b)(4); 50 C.F.R. § 402.15(a).

3        154.   Section 7 differs in important respects from NEPA.  As the Ninth Circuit has

4   explained, "[s]ection 7 of the ESA and NEPA involve different processes that measure

5   different kinds of environmental impacts." *San Luis & Delta-Mendota Water Auth. v. Jewell*,

6   747 F.3d 581, 651 (9th Cir. 2014); *see also Fund for Animals v. Hall*, 448 F.Supp.2d 127, 136

7   (D.D.C. 2006).  Indeed, while NEPA review concerns a broad array of impacts, the ESA is

8   solely focused on impacts to listed species and designated critical habitat.

9   **D.     CEQ's 1978 NEPA Regulations**

10       155.   In 1977, President Carter issued Executive Order 11,991 directing CEQ to issue

11   regulations to guide federal agency implementation of NEPA.  *Relating to Protection and*

12   *Enhancement of Environmental Quality*, Exec. Order No. 11,991, 42 Fed. Reg. 26,967

13   (May 24, 1977) (amending in part Executive Order No. 11,514).

14       156.   Before proposing the implementing regulations, CEQ conducted extensive

15   outreach, soliciting "the views of almost 12,000 private organizations, individuals, state and

16   local agencies, and Federal agencies," held public hearings, and considered studies of the

17   environmental impact statement process.  NEPA—Regulations, Implementation of Procedural

18   Provisions, 43 Fed. Reg. 55,978, 55,980 (Nov. 29, 1978).

19       157.   CEQ also prepared an environmental assessment (EA) of its proposed

20   implementing regulations, in compliance with NEPA.  Proposed Implementation of Procedural

21   Provisions, 43 Fed. Reg. 25,230, 25,232 (May 31, 1978).

22       158.   In 1978, CEQ finalized a comprehensive set of regulations implementing the

23   "action-forcing" elements of NEPA "to tell federal agencies what they must do to comply with

24   the procedures and achieve the goals of" the statute.  40 C.F.R. § 1500.1(a) (1978).

25       159.   The 1978 regulations emphasize NEPA's role as "our basic national charter for

26   protection of the environment" and explained that "[t]he NEPA process is intended to help

AR_0026581

1  public officials make decisions that are based on understanding of environmental

2  consequences, and take actions that protect, restore, and enhance the environment." *Id.*

3  § 1500.1(c) (1978).

4      160.    The 1978 regulations also emphasize transparency in government decision

5  making by ensuring agencies provide information to the public before "decisions are made and

6  before actions are taken." *Id.* § 1500.1(b) (1978).

7      161.    The 1978 regulations direct agencies to "[e]ncourage and facilitate public

8  involvement in decisions which affect the quality of the human environment," *id.* § 1500.2(d)

9  (1978), allowing states, private organizations, and individuals to inform and influence agency

10  decision making by commenting on proposed agency actions, *id.* § 1503.1(a)(4) (1978).

11     162.    Until the promulgation of the Final Rule, CEQ's 1978 regulations remained

12  largely unchanged with the exception of two minor amendments.  First, in 1986, CEQ removed

13  a requirement that agencies analyze the extent of environmental impacts in a hypothetical

14  "worst case scenario."  NEPA Regulations, Incomplete or Unavailable Information, 51 Fed.

15  Reg. 15,618 (May 27, 1986) (amending 40 C.F.R. § 1502.22).  CEQ prepared an EA for its

16  substantive change to the regulations in 1986 and concluded that the amendment would not

17  have a significant environmental impact.  *Id.* at 15,619.  Then in 2005, CEQ made a minor

18  amendment to the EIS filing requirements.  Other Requirements of NEPA, 70 Fed. Reg. 41,148

19  (July 18, 2005).

20     163.    CEQ has issued numerous guidance documents on NEPA and its 1978

21  regulations on which states and other stakeholders have relied.  *See e.g.*, *Final Guidance for*

22  *Federal Departments and Agencies on Consideration of Greenhouse Gas Emissions and the*

23  *Effects of Climate Change in National Environmental Policy Act Reviews*, 81 Fed. Reg. 51,866

24  (Aug. 5, 2016), *withdrawn* 82 Fed. Reg. at 16,576 (Apr. 5, 2017); *Memorandum for Heads of*

25  *Federal Departments and Agencies: Establishing, Applying, and Revising Categorical*

26  *Exclusions under the National Environmental Policy Act* (Nov. 23, 2010); *A Citizen's Guide to*

1  *the NEPA: Having Your Voice Heard* (Dec. 2007); *Forty Most Asked Questions Concerning*

2  *CEQ's National Environmental Policy Act Regulations*, 46 Fed. Reg. 18,026 (Mar. 23, 1982).

3        164.    Additionally, CEQ's Environmental Justice Guidance provides useful direction

4  for agency consideration of environmental justice impacts during the NEPA review process.

5  CEQ, *Environmental Justice: Guidance Under the National Environmental Policy Act*

6  (Dec. 10, 1997). The Environmental Protection Agency (EPA) defines environmental justice

7  as "the fair treatment and meaningful involvement of all people regardless of race, color,

8  national origin, or income with respect to the development, implementation, and enforcement

9  of environmental laws, regulations, and policies." EPA, Environmental Justice:

10  https://www.epa.gov/environmentaljustice. CEQ's guidance builds on Executive Order

11  12,898, which directs federal agencies to identify and address the disproportionately high and

12  adverse human health or environmental effects of their actions on minority and low-income

13  populations, to the greatest extent practicable and permitted by law. Exec. Order No. 12,898,

14  59 Fed. Reg. 7,629 (1994) (as amended).

15        165.    The Presidential Memorandum issued with Executive Order 12,898 further

16  directs federal agencies to analyze under NEPA "the environmental effects, including human

17  health, economic and social effects, of Federal actions, including effects on minority

18  communities and low income communities" and to provide opportunities for community input

19  in the NEPA process, including through "identifying potential effects and mitigation measures

20  in consultation with affected communities …." White House, *Memorandum for the Heads of*

21  *All Departments and Agencies: Executive Order on Federal Action to Address Environmental*

22  *Justice in Minority Populations and Low-Income Populations* (Feb. 11, 1994).

23        166.    CEQ's Environmental Justice Guidance explains that agencies should consider

24  environmental justice impacts as part of their obligation to consider "both impacts on the

25  natural or physical environment and related social, cultural, and economic impacts." CEQ,

26  *Environmental Justice*, at 8 (citing 40 C.F.R. § 1508.14). Agencies should consider these

First Amended Compl. for Declaratory and
Inj. Relief       53
Case No. 3:20-cv-06057

AR_0026583

1    impacts while analyzing the affected area, considering cumulative effects, and developing

2    public participation strategies. *Id.* at 8–9. CEQ further explained that identification of

3    disproportionately high and adverse human health or environmental effects on low-income,

4    minority, or Tribal populations "should heighten agency attention to alternatives …, mitigation

5    strategies, monitoring needs, and preferences expressed by the affected community." *Id.* at 10.

6    167.   CEQ has also issued a number of studies documenting NEPA's effectiveness.

7    *See, e.g.*, CEQ, *National Environmental Policy Act: A Study of Its Effectiveness After Twenty-*

8    *five Years* (Jan. 1997); NEPA Task Force, *Modernizing NEPA Implementation* (Sept. 2003);

9    CEQ, *Examples of Benefits from the NEPA Process for ARRA Funded Activities* (May 2011).

10   For example, in its NEPA Effectiveness Study, a twenty-five year review of NEPA's

11   implementation, CEQ emphasized that "NEPA is a success—it has made agencies take a hard

12   look at the potential environmental consequences of their actions, and it has brought the public

13   into the agency decision-making process like no other statute." CEQ, *National Environmental*

14   *Policy Act: A Study of Its Effectiveness After Twenty-five Years*, at iii (Jan. 1997).

15   168.   The courts, including the Ninth Circuit, have developed a robust body of case

16   law applying and interpreting NEPA and CEQ's 1978 regulations, providing direction to

17   agencies on how to comply with both CEQ's regulations and the statute. *See, e.g.*, *Robertson*

18   *v. Methow Valley Citizens Council*, 490 U.S. 332, 351–52 (1989); *Kern v. Bureau of Land*

19   *Mgmt.*, 284 F.3d 1062, 1075 (9th Cir. 2002); *Klamath-Siskiyou Wildlands Ctr. v. Bureau of*

20   *Land Mgmt.*, 387 F.3d 989, 994 (9th Cir. 2004).

21   169.   NEPA, the 1978 regulations, and CEQ's subsequent guidance have promoted

22   more environmentally protective and transparent agency decisions, while not imposing overly

23   burdensome requirements. In 2014, the Government Accountability Office concluded that the

24   NEPA process "ultimately saves time and reduces overall project costs by identifying and

25   avoiding problems that may occur in later stages of project development." U.S. Gov't

26   Account. Office, *National Environmental Policy Act: Little Information Exists on NEPA*

First Amended Compl. for Declaratory and
Inj. Relief                                          54
Case No. 3:20-cv-06057

1    *Analyses*, 17 (Apr. 2014).  Similarly, U.S. Forest Service officials have observed that "NEPA

2    leads to better decisions."  *Id.*

3    **E.      The Proposed Rule**

4            170.     Despite the documented success of the 1978 regulations and reliance by states

5    and the public on NEPA's procedures to protect the environment and public health, CEQ

6    released an Advance Notice of Proposed Rulemaking on June 20, 2018, announcing CEQ's

7    plan to overhaul the 1978 regulations and including a vague list of topics that the rulemaking

8    might address.  Update to the Regulations for Implementing the Procedural Provisions of the

9    National Environmental Policy Act, 83 Fed. Reg. 28,591 (June 20, 2018) (Advance Notice).

10   CEQ issued this proposal in response to President Trump's Executive Order 13,807, which

11   called for revisions to the NEPA regulations, purportedly to expedite infrastructure projects

12   and boost the economy.  Establishing Discipline and Accountability in the Environmental

13   Review and Permitting Process, Exec. Order 13,807, 82 Fed. Reg. 40,463 (Aug. 15, 2017).

14           171.     CEQ allowed only sixty days for public comment on the Advance Notice.  Most

15   State Plaintiffs submitted comments stating that CEQ had not demonstrated a need for

16   substantial revisions and opposing any revisions that would threaten NEPA's fundamental

17   values of environmental protection and informed decision making.

18           172.     On January 10, 2020, CEQ released its proposal to significantly revise the 1978

19   regulations.  85 Fed. Reg. 1,684 (Jan. 10, 2020).

20           173.     The Proposed Rule included numerous revisions to the 1978 regulations that

21   undermine NEPA's environmental and informed decision making purposes.  For example, the

22   Proposed Rule included regulatory changes to remove numerous agency actions from NEPA's

23   reach, narrow the scope of environmental reviews that do occur, limit public participation, and

24   restrict judicial review for those harmed by agency failure to comply with NEPA.

25           174.     After publication of the Proposed Rule, CEQ again provided just sixty days for

26   the public to review, analyze, and submit comments on this far-reaching overhaul of its

AR_0026585

1   longstanding regulations, and hosted only two public hearings on the Proposed Rule.

2   Numerous commenters, including representatives from several State Plaintiffs, were not able to

3   reserve a spot to speak at the hearings due to a limited number of speaking slots.  Although

4   CEQ received requests from State Plaintiffs, members of Congress, and others for more time to

5   comment and for additional public hearings on the complex and wide-ranging Proposed Rule,

6   CEQ closed the comment period without providing additional hearings or extending the

7   comment period.

8        175.    Despite this short timeframe, interested parties submitted over 1.1 million

9   comments, the vast majority of which strongly opposed CEQ's Proposed Rule.  Most State

10   Plaintiffs submitted detailed comments stating that CEQ's Proposed Rule was unlawful,

11   unreasonable, and unjustified and should be withdrawn.  In addition to these comments, many

12   State Plaintiff elected officials and agencies submitted comments expressing concern about

13   CEQ's proposed changes and urging CEQ to withdraw the Proposed Rule.  *See, e.g.*, Letter

14   from Washington State Governor Jay Inslee to Mary Neumayr, re Proposed Rule (Mar. 10,

15   2020) (enclosing comments from seven state agencies and offices opposing the Proposed

16   Rule); Letter from California Governor Gavin Newsom to Edward A. Boling, re Proposed Rule

17   (Mar. 10, 2020).

18   **F.**     **The Final Rule**

19        176.    Just four months after the close of the comment period, President Trump

20   announced the release of the Final Rule on July 15, 2020.  The Final Rule was published in the

21   Federal Register the following day.  The Final Rule largely adopts the Proposed Rule's

22   unlawful, unjustified, and sweeping revisions to the 1978 Regulations.

23        177.    CEQ claimed that the Final Rule "advance[s] the original goals of the CEQ

24   regulations to reduce paperwork and delays and promote better decisions consistent with the

25   national environmental policy set forth in section 101 of NEPA," Final Rule, 85 Fed. Reg. at

26

First Amended Compl. for Declaratory and
Inj. Relief               56
Case No. 3:20-cv-06057

AR_0026586