1    43,306.  But the Final Rule will do just the opposite—leading to increased confusion and

2    litigation and decisions inconsistent with NEPA's text and purpose.

3        178.    The Final Rule makes substantial and unsupported revisions to the 1978

4    regulations, ignores reliance interests on those longstanding regulations, lacks a rational

5    justification, and undermines NEPA's goals of environmental protection, public participation,

6    and informed decision making.  Among other things, the Final Rule arbitrarily and unlawfully:

7            a.    Deletes language from the 1978 regulations directing federal agencies to

8    comply with "the letter and spirit" of NEPA's "action-forcing" provisions, *compare* 40 C.F.R.

9    § 1500.1(a) (1978), *with* Final Rule, 85 Fed. Reg. at 43,358 (to be codified at § 1500.1(a));

10           b.    Deletes language from the 1978 regulations stating that NEPA "is our

11   basic national charter for protection of the environment" and that "[t]he NEPA process is

12   intended to help public officials make decisions that are based on understanding of

13   environmental consequences, and take actions that protect, restore, and enhance the

14   environment," *compare* 40 C.F.R. § 1500.1(a), (c) (1978), *with* Final Rule, 85 Fed. Reg. at

15   43,357–58 (to be codified at § 1500.1);

16           c.    Deletes language from the 1978 regulations that federal agencies should

17   "to the fullest extent possible … [e]ncourage and facilitate public involvement in decisions

18   which affect the quality of the human environment" and "[u]se all practicable means … to

19   restore and enhance the quality of the human environment and avoid or minimize any possible

20   adverse effects of their action upon the quality of the human environment," *compare* 40 C.F.R.

21   § 1500.2 (1978), *with* Final Rule, 85 Fed. Reg. at 43,317, 43,358 (removing and reserving

22   § 1500.2);

23           d.    Prohibits federal agencies from adopting NEPA regulations that are

24   more stringent than CEQ's Final Rule, 85 Fed. Reg. at 43,373 (to be codified at § 1507.3(a),

25   (b));

26

AR_0026587

1          e.       Preemptively concludes that all categorical exclusions (*i.e.*, actions that

2  federal agencies have determined will not have a significant environmental impact), effective

3  by September 14, 2020, comply with the Final Rule, *id.* at 43,373 (to be codified at

4  § 1507.3(a));

5          f.       Establishes six "NEPA Thresholds" that will allow federal agencies to

6  avoid any environmental review of certain proposed actions, *id.* at 43,359 (to be codified at

7  § 1501.1);

8          g.       Separates the definition of "major Federal action" from an action's

9  significance and narrows the definition to exclude an agency's failure to act as well as actions

10  that are not "subject to" an undefined amount of "Federal control and responsibility" and

11  actions that are extraterritorial, non-discretionary, have minimal federal funding or minimal

12  federal involvement, or receive certain federal loans, *id.* at 43,375 (to be codified at

13  § 1508.1(q));

14          h.       Allows federal agencies to rely on unspecified procedures and

15  documentation prepared under other statutory or Executive Order requirements to avoid

16  conducting environmental review, *id.* at 43,359, 43,372–73 (to be codified at 40 C.F.R.

17  §§ 1501.1, 1506.9, 1507.3);

18          i.       Authorizes federal agencies to determine that other statutes or directives

19  conflict with NEPA and thus excuse agencies from NEPA review, *id.* at 43,359, 43,373,

20  43,374 (to be codified at §§ 1501.1(a)(2), (a)(3), 1507.3(d)(2));

21          j.       Revises the analysis of an agency action's "significance," to (i) diminish

22  the scope of actions that will require more detailed environmental review, (ii) remove a

23  prohibition on improperly segmenting a project to avoid analyzing its collective significant

24  impacts, and (iii) eliminate review of important concerns like an action's public health impacts,

25  cumulative effects, effects on threatened and endangered species and their habitat, and

26  proximity to historic or cultural resources, park lands, farmlands, wetlands, wild and scenic

First Amended Compl. for Declaratory and
Inj. Relief          58
Case No. 3:20-cv-06057

AR_0026588

rivers, or ecologically critical areas, 85 Fed. Reg. at 43,360 (to be codified at 40 C.F.R. § 1501.3(b));

       k.    Expands the use of categorical exclusions by adopting a new vague definition that removes consideration of cumulative impacts and allows for use of categorical exclusions in situations with extraordinary circumstances (*i.e.*, circumstances in which a normally excluded action may have a significant effect and would formerly have required preparation of an EA or EIS), *id*. at 43,360 (to be codified at § 1501.4);

       l.    Allows certain actions to proceed during NEPA review, potentially limiting the range of alternatives that could be considered during environmental review despite NEPA's direction that environmental review occur before agencies take action, *id*. at 43,370 (to be codified at § 1506.1);

       m.    Limits the number of alternatives to the proposed action analyzed in an EA or EIS and the depth of that analysis by, among other things, removing the requirement that agencies "[r]igorously explore and objectively evaluate" all reasonable alternatives to the proposed action, eliminating consideration of alternatives outside the jurisdiction of the lead agency, and removing the requirement that agencies "[d]evote substantial treatment to each alternative," *id*. at 43,365 (to be codified at § 1502.14);

       n.    Narrows the scope of effects agencies are required to evaluate, imposes strict causation requirements for determining which environmental effects should be considered, and directs agencies not to consider cumulative and indirect effects, all of which will limit review of environmental justice and climate change impacts, impacts to species listed and critical habitat designated under the ESA, and other impacts, *id*. at 43,360, 43,365–66, 43,375 (to be codified at §§ 1501.3(b), 1502.15, 1508.1(g), (m));

       o.    Reduces agencies' obligations to obtain additional information about environmental impacts when such information is not immediately available and further allows

First Amended Compl. for Declaratory and
Inj. Relief      59
Case No. 3:20-cv-06057

AR_0026589

1    agencies to refuse to consider certain scientific evidence if the agency determines it is not a

2    "reliable data source," *id*. at 43,366–67 (to be codified at §§ 1502.21, 1502.23);

3                p.      Allows project proponents with potential conflicts of interest to prepare

4    the EIS as long as conflicts are disclosed to the federal agency (but not the public), 85 Fed.

5    Reg. at 43,371 (to be codified at § 1506.5(b)(4));

6                q.      Imposes unreasonable and unworkable time and page limits for EAs and

7    EISs, *id*. at 43,360, 43,362–64 (to be codified at §§ 1501.5(f), 1501.10(b), 1502.7);

8                r.      Limits public participation in the NEPA process by striking key

9    provisions emphasizing the importance of public participation and eliminating the requirement

10   that a draft EIS circulated for public comment satisfy NEPA's standards to the fullest extent

11   possible, *id*. at 43,364–65 (to be codified at § 1502.9);

12               s.      Places an undue burden on the public to analyze environmental issues

13   and to meet a vague standard of specificity and detail and imposes burdensome exhaustion

14   requirements on commenters, *id*. at, 43,358, 43,367–68 (to be codified at §§ 1500.3(b)(3),

15   1503.3);

16               t.      Reduces agencies' obligation to consider and respond to public

17   comments, *id*. at 43,366, 43,368–69 (to be codified at §§ 1502.17, 1505.2(b), 1503.4);

18               u.      Permits agencies to claim a presumption that they have adequately

19   considered all public comments on an EIS, *id*. at 43,369 (to be codified at § 1505.2(b)); and

20               v.      Seeks to limit judicial review of agency NEPA compliance by

21   attempting to restrict remedies parties injured by deficient NEPA review can secure through

22   litigation and promoting unlawful bond requirements, 85 Fed. Reg. at 43,358 (to be codified at

23   § 1500.3(c), (d)).

24        179.   NEPA Review.  CEQ did not conduct any environmental review before issuing

25   the Proposed Rule or Final Rule.  Instead, CEQ asserted without adequate explanation that a

26   NEPA review was not required because the regulations are procedural and "apply generally to

AR_0026590

1    Federal actions affecting the environment." *Id.* at 43,353–54. CEQ then claimed that even if it

2    were to conduct an EA, it likely would result in a Finding of No Significant Impact, citing its

3    cursory analysis of environmental impacts in the Final Rule's Regulatory Impact Analysis

4    (RIA). *Id.* But the RIA analysis of environmental impacts, which consists of only two pages

5    and a short appendix, does not meet requirements for an EA or an EIS and summarily

6    concludes that the Final Rule will have no adverse environmental impacts. RIA at 10–11;

7    App'x. A. The RIA does not analyze alternative actions, and it ignores environmental impacts

8    of the Final Rule, including climate change and environmental justice impacts. Moreover,

9    despite relying on the RIA to justify its conclusions of NEPA compliance in the Final Rule,

10   CEQ did not make the RIA available for public review and comment.

11        180.   <u>ESA Review.</u> Although CEQ acknowledged in the Final Rule that the

12   promulgations of regulations "can be a discretionary action subject to section 7 of the ESA,"

13   CEQ failed to consult with the Services regarding the impacts that the Final Rule may have on

14   federally listed endangered and threatened species. Final Rule, 85 Fed. Reg. at 43,354.

15   Instead, CEQ bypassed section 7's consultation process entirely without providing meaningful

16   analysis or supporting evidence for its conclusion that the Final Rule, which makes significant

17   changes to how federal agencies review the environmental impacts of their actions, will have

18   "no effect" on listed species or designated critical habitat. Final Rule, 85 Fed. Reg. at 43,354-

19   55. In the Final Rule, CEQ asserts that it "determined that updating its regulations

20   implementing the procedural provision of NEPA has 'no effect' on listed species or designated

21   critical habitat. Therefore, section 7 consultation is not required." *Id.* at 43,354. CEQ's

22   decision to forego consultation with the Services under section 7 regarding the impacts that the

23   Final Rule may have on listed species or critical habitat violates the ESA because it is clear

24   that the proposed rule may affect, and is in fact likely to adversely affect, myriad listed species

25   and designated critical habitat. In addition, CEQ's finding that no impact to listed species or

26

First Amended Compl. for Declaratory and
Inj. Relief                                    61
Case No. 3:20-cv-06057

AR_0026591

critical habitat will result from the major changes to NEPA because the Final Rules are

"procedural in nature" is arbitrary and capricious and violates both the ESA and the APA.

181.    *Environmental Justice*.  CEQ also did not adequately review environmental

justice impacts from the Final Rule as required by Executive Order 12,898.  Instead, in the

Final Rule, CEQ concluded without rational explanation or support, and again relying on the

inadequate RIA, that the Final Rule will "not cause disproportionately high and adverse human

health or environmental effects on minority populations and low-income populations."  Final

Rule, 85 Fed. Reg. at 43,356–57.

182.    The Final Rule will become effective on September 14, 2020.  *Id*. at 43,372 (to

be codified at § 1506.13).  At that time, CEQ's existing guidance documents that are

inconsistent with the regulatory changes will effectively be withdrawn.  *Id*. at 43,371 (to be

codified at § 1506.7).

183.    Federal agencies may apply the Final Rule to ongoing activities and

environmental documents begun before the effective date.  *Id*. at 43,372-73 (to be codified at

§ 1506.13).  As a result, federal agencies may apply the revised regulations to NEPA reviews

currently in progress, including reviews impacting State Plaintiffs.

184.    Federal agencies are also required to amend their NEPA regulations to conform

to the Final Rule.  *Id*. at 43,373 (to be codified at § 1507.3(b)).

185.    The Final Rule is unlawful and violates NEPA and the APA, because: (i) the

Final Rule is contrary to NEPA's text and purpose; (ii) CEQ failed to provide a rational

explanation for the Final Rule's numerous changes in policy and interpretation; (iii) CEQ

exceeded its statutory authority with certain revisions in the Final Rule; (iv) CEQ violated

notice-and-comment requirements; and (v) CEQ failed to analyze the Final Rule's significant

environmental impacts or consider reasonable alternatives to the Final Rule, as required by

NEPA.  CEQ also violated the ESA and the APA by failing to consult with the Services prior

to adopting the Final Rule, despite the fact that the Final Rule may impact federally listed

AR_0026592

threatened and endangered species.  For these reasons, the Final Rule is arbitrary, capricious, and contrary to law, was promulgated in excess of statutory authority and without observance of procedure required by law, and should be vacated.

## VI.     THE FINAL RULE WILL HARM STATE PLAINTIFFS

186.    State Plaintiffs' unique, concrete, and particularized interests will be harmed by CEQ's Final Rule, which undermines and weakens key NEPA requirements.  A judgment vacating the Final Rule and reinstating the 1978 regulations and associated guidance would redress these harms.

187.    As the Supreme Court has recognized, State Plaintiffs are entitled to "special solicitude" in seeking to remedy environmental harms.  *Massachusetts v. EPA,* 549 U.S. 497 519–22 (2007).  State Plaintiffs have a concrete proprietary and sovereign interest in preventing harm to their natural resources, including their state-owned and state-regulated water, air, coastlines, public lands, and wildlife, as a result of fewer and less robust federal environmental reviews and diminished public participation.

188.    Many federal actions, including those actions subject to NEPA, impact state-owned and/or state-regulated resources.  Federal agencies routinely conduct major Federal actions within and near our states and territories, including those related to federal land management, infrastructure projects, energy projects, water management, national defense and military training, and interstate transportation projects.  Federal lands often encompass large-scale and important ecosystems that help to support biodiversity, including ESA listed species and their critical habitat.

189.    Among other things, the Final Rule will increase the number of federal actions that avoid environmental review and diminish the scope of NEPA reviews that do occur.  Both of these changes will reduce federal agencies' understanding of proposed actions' potential harms on the environment, including but not limited to, harms to listed species and critical habitat.  These changes will also limit opportunities through the NEPA process to develop

First Amended Compl. for Declaratory and
Inj. Relief                                    63
Case No. 3:20-cv-06057

AR_0026593

1  alternatives or other solutions that avoid or mitigate adverse impacts to state and territorial

2  natural resources (including water, air, coastlines, public lands, wildlife, and species listed and

3  critical habitat designated under the ESA) and public health.  As a result, the Final Rule will

4  cause unmitigated adverse impacts to public health and to state and territorial natural resources

5  (including water, air, coastlines, public lands, wildlife, and species listed and critical habitat

6  designated under the ESA).

7         190.    In particular, the Final Rule eliminates consideration of indirect and cumulative

8  impacts, including a project's reasonably foreseeable upstream and downstream GHG

9  emissions, the impact of those emissions on climate change, and methods for avoiding and

10  mitigating those impacts.  Climate change impacts have already harmed and are continuing to

11  harm state and territorial sovereign lands and coastal areas, state and territorial natural

12  resources (including ESA listed species and their critical habitat), state and territorial

13  infrastructure, and the health and safety of state and territorial residents resulting in economic

14  losses for State Plaintiffs.  State Plaintiffs are already committing significant resources to

15  reduce their own greenhouse gas (GHG) emissions and investing in infrastructure to protect

16  communities and state resources from the impacts of climate change.  Contrary to NEPA, the

17  Final Rule impedes these efforts.  Without detailed information about an action's GHG

18  emissions and climate impacts, federal agencies will not engage in efforts to avoid or mitigate

19  harms from those emissions and impacts, which will exacerbate climate change impacts in our

20  states and territories, diminish our states' understanding of the actions contributing to those

21  impacts, and cause states and territories economic harm.

22         191.    Eliminating consideration of climate impacts will also place an increased

23  burden on efforts by State Plaintiffs to study and abate harms from climate change.  For

24  example, the Final Rule's elimination of climate change considerations will make it more

25  challenging for New York to assess GHGs from projects subject to NEPA review where those

26  GHGs are generated outside New York but are associated with electricity generation or fossil

1     fuel transportation in New York. Under New York's Climate Leadership and Community

2     Protection Act, Chapter 106 of the Laws of 2019 (Climate Act), which requires significant

3     statewide emission reductions by set dates, such out-of-state emissions contribute to statewide

4     GHG emissions. N.Y. Envtl. Conserv. L. § 75-0107(1). New York thus may need to

5     implement additional and potentially costly regulatory, policy, or other actions to ensure the

6     achievement of the requirements of the Climate Act. By decreasing the quality of analysis and

7     potential mitigation for GHG emissions from projects with impacts on Massachusetts residents,

8     the Final Rule may impose similar challenges and burdens on Massachusetts' ability to assess

9     and meet the GHG emission-reduction mandates of the Massachusetts Global Warming

10     Solutions Act. *See* Mass. Gen. Laws. ch. 21N, §§ 1–11.

11         192.    The scope of cumulative impact review required under the 1978 NEPA

12     regulations was broader than the cumulative impact review performed during an ESA

13     consultation process. The Final Rule, however, eliminates cumulative impact analysis during

14     the NEPA review process entirely, undermining CEQ's conclusion that the Final Rule will

15     have "no effect" on listed species or designated critical habitat. For example, the Final Rule's

16     instruction that federal agencies should not consider impacts that are "remote in time" and

17     "geographically remote" may result in inadequate analysis of and, consequently, potential

18     damage to the State Plaintiffs' fish and wildlife, including ESA listed species and designated

19     critical habitat. For ESA listed species and designated critical habitat, this harm will occur

20     even if federal agencies perform site-specific ESA consultation, due to the more limited scope

21     of cumulative impacts analysis required under the ESA's section 7 implementing regulations.

22     *See* 50 C.F.R. §§ 402.02, 402.14(g)(3)–(4). One example of such harm is apparent in the

23     context of federal dam operations, which have a major impact on several of Oregon's iconic

24     salmon populations, many of which are listed as threatened or endangered under the ESA.

25     Salmon travel hundreds of miles and juvenile salmon may be harmed by powerhouses in the

26     hydrosystem, only to succumb to their injuries after entering the ocean or on their migration

First Amended Compl. for Declaratory and
Inj. Relief            65
Case No. 3:20-cv-06057

AR_0026595

1   upstream as adults.  Due to the Final Rule's elimination of consideration of "geographically

2   remote" impacts and impacts that are "remote in time," NEPA analysis of federal hydrosystem

3   actions could disregard these impacts to State Plaintiffs' natural resources, including species

4   listed and critical habitat designated under the ESA.

5        193.    By decreasing opportunities for public comment and participation, the Final

6   Rule also limits State Plaintiffs' ability to influence federal projects affecting their natural

7   resources and residents.  Through NEPA, state and territorial agencies regularly engage with

8   federal agencies and permit applicants to identify potential adverse impacts to their state and

9   territorial resources and propose alternatives or mitigation measures to avoid those harms.  For

10  example, the Washington Department of Fish and Wildlife recently commented on the draft

11  EA for a proposed expansion of a ski area on federal lands within the state to highlight impacts

12  to state lands and wildlife and suggest the most effective mitigation of these impacts.

13  Washington state agencies also recently submitted comments on the Draft Supplemental EIS

14  for the Navy's proposed Northwest Training and Testing activities, which threatens harmful

15  impacts to critically endangered Southern Resident Killer Whales, a species that Washington

16  has dedicated significant resources to protect.  Under the Final Rule, these opportunities to

17  comment on and help shape federal actions affecting state resources, including ESA listed

18  species and designated critical habitat, will be diminished in some situations and lost in others.

19  Where actions proceed with diminished public process under the Final Rule, states will lose the

20  opportunity to comment on or, if necessary, challenge the actions before harms occur.

21       194.    Fewer and less robust environmental reviews and diminished opportunities for

22  public participation will also increase the burden on State Plaintiffs to respond to public health

23  disparities flowing from uninformed federal decisions that adversely impact vulnerable

24  communities.  For example, the Final Rule excludes consideration of cumulative impacts to

25  communities that face a historic and disproportionate pattern of exposure to environmental

26  hazards and are more likely to suffer future health disparities due to the elimination of

AR_0026596

1  cumulative impact review from the NEPA process.  These communities also are more likely to

2  experience severe impacts of climate change, including flooding, extreme weather events such

3  as extreme heat, and degraded air and water quality.  Increased public health and community

4  harms from weakened NEPA reviews will require greater expenditures of state and territorial

5  funds to remedy increased public health disparities flowing from uninformed federal agency

6  action.

7       195.    These harms will also impair ongoing efforts by State Plaintiffs to reduce public

8  health disparities, which State Plaintiffs already devote significant resources to address.  For

9  example, the New York State Department of Environmental Conservation's Office of

10  Environmental Justice directs resources to disproportionately impacted communities and

11  enhances public participation through grant opportunities, enforcement of environmental laws

12  and programs, and consultation with local industries.  California's Community Air Protection

13  Program (CAPP) helps to reduce exposure in communities most impacted by air pollution.

14  CAPP works with communities throughout California to measure and reduce adverse health

15  impacts from air pollution, including through targeted incentive funding to deploy cleaner

16  technologies in communities experiencing localized air pollution.  In Washington, the

17  Department of Health and a statewide Environmental Justice Task Force are working to reduce

18  health disparities.  The Final Rule hinders these state efforts by adopting changes that allow

19  agencies to avoid thorough consideration of impacts on public health and environmental

20  justice.

21       196.    In addition, fewer and less robust NEPA reviews may increase the burden on

22  some State Plaintiffs to protect vulnerable species and the habitats upon which they depend

23  through the protections afforded under state environmental review laws and other state efforts

24  to protect biodiversity.

25       197.    State Plaintiffs have also relied on the 1978 regulations to review proposed

26  agency NEPA rules and to determine their potential impact on state and territorial natural

AR_0026597

1    resources.  For example, the Washington Department of Fish and Wildlife (WDFW) relied on

2    the requirement in the 1978 regulations that projects with extraordinary circumstances will not

3    be subject to a categorical exclusion in assessing potential wildlife impacts from the Forest

4    Service's proposed categorical exclusions.  *See* Letter from WDFW Director Kelly Susewind

5    to Amy Baker, U.S. Forest Service on proposed categorical exclusions, USFS-HQ-2019-12195

6    (Aug. 6, 2019).  The Final Rule, however, authorizes federal agencies to apply a categorical

7    exclusion even where extraordinary circumstances exist, diminishing the protections to state

8    natural resources on which WDFW relied.  Similarly, the Final Rule requires federal agencies

9    to amend their NEPA regulations to meet the lowered environmental review standards of the

10   Final Rule, which will increase the risk of adverse impacts to state and territorial natural

11   resources, including species listed and critical habitat designated under the ESA.

12        198.    Additionally, State Plaintiffs have institutional, proprietary, and economic

13   interests in federal agency compliance with NEPA's text and goals of environmental

14   protection, public participation, and informed decision making.  Fewer and weaker federal

15   environmental reviews mean that state agencies in Washington, California, New York, and

16   Massachusetts will no longer be able to adopt or incorporate most federal NEPA documents

17   into their own state NEPA review processes because the NEPA documents will no longer

18   satisfy state law, including, for example, requirements that state review include climate

19   impacts and greenhouse gas emissions.  *See, e.g.*, Wash. Rev. Code ch. 43.21; Cal. Pub. Res.

20   Code § 21083.5; 6 N.Y. Comp. Codes R. & Regs. § 617.15; Mass. Gen. Laws, ch. 30, §§ 61,

21   62G.  Similarly, state agencies in California will no longer be able to prepare joint documents

22   to satisfy both NEPA and California's little NEPA law, and this will increase the burden on

23   state agencies to prepare their own stand-alone environmental documents.  Cal. Code Regs., tit.

24   14, § 1517.  Similar problems may arise even in states that do not have so-called "little

25   NEPAs."  In Oregon, for example, the State Energy Facility Siting Council may need to

26   develop separate environmental reviews to meet the requirements of Oregon statutory law

AR_0026598

before approving energy facilities, rather than rely on federal NEPA documentation according to the Council's longstanding practice. As a result, State Plaintiff agencies will need to expend significant financial and administrative resources to conduct environmental analyses that would not have been necessary under the 1978 regulations.

199.    Robust NEPA review is critical for State Plaintiffs that lack environmental review processes or where state environmental review statutes may not apply. In these situations, state agencies will be unable to fill significant gaps in analysis through their own state environmental review and will thus need to rely on the federal NEPA process to understand a project's anticipated environmental impacts. Where the federal environmental review is insufficient, as it will be under the Final Rule, states and territories will lack valuable information to determine how federal projects will impact state and territorial natural resources.

200.    Moreover, while State Plaintiffs can act to protect natural resources within their borders, they cannot control decisions made by non-plaintiff states about resources that cross state boundaries, such as water, air, and wildlife. Thus, despite the State Plaintiffs' efforts, State Plaintiffs may not be able wholly to fill the regulatory gaps created by the Final Rule.

201.    Federal agencies will also be required to amend their NEPA regulations to conform to the Final Rule. 85 Fed. Reg. at 43,373 (to be codified at § 1507.3(b)). These regulatory changes will further burden State Plaintiff agencies that frequently participate in the NEPA process and will place a particular burden on State Plaintiff agencies, like Caltrans, that have been delegated NEPA authority.

202.    State Plaintiffs also suffered procedural harm from CEQ's failure to comply with the procedural requirements of the APA, NEPA, and the ESA in promulgating the Final Rule. CEQ's failure to promulgate a rationally supported and lawful rule, failure to prepare an EA or EIS for the Final Rule, and failure to consult with the Services regarding impacts to listed species and designated critical habitat harms State Plaintiffs' procedural interests in

AR_0026599

1  participating in a lawful rulemaking and environmental review process that adequately

2  considers and mitigates impacts on the State Plaintiffs' residents, natural resources, and ESA

3  listed species and designated critical habitat.

4       203.    State Plaintiffs have thus suffered concrete injury caused by CEQ's

5  promulgation of the Final Rule.  A court judgment vacating the entire Final Rule and

6  reinstating the 1978 regulations and associated guidance will redress the harms to State

7  Plaintiffs by requiring that federal agencies continue to review actions under the prior

8  regulations and guidance, consistent with NEPA.  Therefore, State Plaintiffs have standing to

9  bring this action.

10 **FIRST CAUSE OF ACTION**
**Violation of the APA and NEPA by Adopting Regulations Contrary to NEPA**
**5 U.S.C. § 706(2); 42 U.S.C. §§ 4321 *et seq.***

12      204.    State Plaintiffs incorporate all preceding paragraphs by reference.

13      205.    The APA provides that this Court shall "hold unlawful and set aside" agency

14 action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with

15 law" or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."

16 5 U.S.C. § 706(2).  An agency does not have authority to adopt a regulation that is "plainly

17 contrary to the statute." *Morton*, 467 U.S. at 834; *Babbitt v. Sweet Home Chapter of Cmtys.*

18 *for a Great Or.*, 515 U.S. 687, 703 (1995).

19      206.    The Final Rule is "not in accordance with law" because it conflicts with

20 NEPA's text, structure, and purpose and exceeds the scope of CEQ's jurisdiction, authority,

21 and discretion under NEPA.

22      207.    The Final Rule violates NEPA and the APA by adopting provisions that, both

23 individually and collectively, conflict with NEPA's overriding purposes of environmental

24 protection, public participation, and informed decision making and the statute's mandate that

25 agencies apply NEPA "to the fullest extent possible."  5 U.S.C. § 706(2)(A); 42 U.S.C.

26 §§ 4331, 4332.  The Final Rule is unlawful because, among other things, it:

First Amended Compl. for Declaratory and
Inj. Relief
Case No. 3:20-cv-06057

1         a.     Restricts the number of projects subject to detailed environmental

2 review, including, among others things, through (i) a new "NEPA thresholds" provision that

3 establishes six broad and ill-defined circumstances in which NEPA does not apply, Final Rule,

4 85 Fed. Reg. at 43,359 (to be codified at § 1501.1); (ii) a narrow definition of "major Federal

5 action" that is inconsistent with NEPA's plain language, *id.* at 43,375 (to be codified at

6 § 1508.1(q)); and (iii) a revised analysis for determining what actions are likely to have

7 "significant effects" and thus require an EIS, *id.* at 43,360 (to be codified at § 1501.3). These

8 provisions are directly contrary to NEPA's text and purpose and its mandate that agencies

9 apply the statute "to the fullest extent possible." *See* 42 U.S.C. §§ 4331, 4332.

10         b.     Limits the scope of environmental effects agencies must consider when

11 conducting NEPA review. For example, the Final Rule allows agencies to avoid considering

12 cumulative and indirect impacts, as well as impacts that are "remote in time" or

13 "geographically remote." Final Rule, 85 Fed. Reg. at 43,375 (to be codified at § 1508.1(g));

14 *see also id.* at 43,360 (to be codified at § 1501.3(b)(1)) (limiting the "affected area" in the

15 significance analysis to "national, regional, or local"). Congress however, plainly intended

16 NEPA to address such impacts. NEPA directs agencies to consider "any adverse

17 environmental effects which cannot be avoided should the proposal be implemented,"

18 42 U.S.C. 4332(C)(ii), and "the relationship between local short-term uses of man's

19 environment and the maintenance and enhancement of long-term productivity," *id.*

20 § 4332(2)(C)(iv). NEPA further directs agencies to "recognize the worldwide and long-range

21 character of environmental problems," rather than examine the impacts of each federal

22 proposal in a silo, *id.* § 4332(2)(F). Indeed, the Senate Committee Report on NEPA stated that

23 the statute was necessary because "[i]mportant decisions concerning the use and the shape of

24 man's future environment continue to be made in small but steady increments which

25 perpetuate rather than avoid the recognized mistakes of previous decades." S. Rep. No. 91-

26 296, at 5. Avoiding this death by a thousand cuts demands that federal agencies carefully

First Amended Compl. for Declaratory and
Inj. Relief        71
Case No. 3:20-cv-06057

AR_0026601

consider the cumulative environmental impacts of their actions with other related and unrelated

actions—not, as the Final Rule would have it, ignore those impacts entirely.

    c.    Limits the number of alternatives to the proposed action analyzed in an

EA or EIS and the depth of that analysis by, among other things, removing the requirement that

agencies "[r]igorously explore and objectively evaluate" all reasonable alternatives to the

proposed action, eliminating consideration of alternatives outside the jurisdiction of the lead

agency, and removing the requirement that agencies "[d]evote substantial treatment to each

alternative. Final Rule, 85 Fed. Reg. at 43,365 (to be codified at § 1502.14). The Final Rule

also unlawfully allows certain actions to proceed during NEPA review, constraining available

alternatives. *Id*. at 43,370 (to be codified at § 1506.1). Contrary to these provisions, NEPA's

plain language requires "to the fullest extent possible" consideration of "alternatives to the

proposed action" and limits action on proposals until after that comprehensive environmental

review occurs. 42 U.S.C. § 4332, 4332(2)(C)(iii); *Robertson*, 490 U.S. at 349 ("Simply by

focusing the agency's attention on the environmental consequences of a proposed project,

NEPA ensures that important effects will not be overlooked or underestimated only to be

discovered after resources have been committed or the die otherwise cast.").

    d.    Diminishes agencies' obligation to obtain or develop information

regarding environmental impacts when such information is not already available. The 1978

regulations required agencies to obtain such information when the cost of obtaining it was "not

exorbitant." 40 C.F.R. § 1502.22(a) (1978). The Final Rule lowers the bar and permits

agencies to forgo additional investigation when the cost would be merely "unreasonable."

Final Rule, 85 Fed. Reg. at 43,366 (to be codified at 40 C.F.R. § 1502.21(b)). This vague and

lax standard is inconsistent with NEPA's statutory mandate that agencies consider all the

environmental impacts of their actions, not just those that are readily apparent. *See* 42 U.S.C.

§ 4332(2)(C)(ii) (agencies must disclose "*any* adverse environmental effects which cannot be

avoided should the proposal be implemented" (emphasis added)).

AR_0026602

1       e. Undermines the ability of State Plaintiffs and the public to comment on

2    federal proposals, in direct conflict with NEPA's informed decision making mandate and

3    direction that federal agencies work "in cooperation with State and local governments, and

4    other concerned public and private organizations." *Id.* § 4331(a); *see also id.* § 4332(2)(C)

5    (directing that "the comments and views of the appropriate Federal, State, and local agencies

6    … shall accompany the [agency] proposal through the existing agency review processes" and

7    shall be made available to the public), *id.* § 4332(2)(G) ("make available to States, counties,

8    municipalities, institutions, and individuals, advice and information useful in restoring,

9    maintaining, and enhancing the quality of the environment").  The Final Rule allows federal

10   agencies to claim a "presumption" that they have considered public comments (including

11   comments by states and their agencies) by making a certification in the record of decision

12   approving a proposed action.  Final Rule, 85 Fed. Reg. 43,369 (to be codified at 40 C.F.R.

13   § 1505.2(b)).  This unjustified presumption invites federal agencies to overlook state and

14   public input on federal proposals.  Indeed, the Final Rule adds a provision stating that agencies

15   "are not required to respond to each comment." *Id.* at 43,368 (to be codified at 40 C.F.R.

16   § 1503.4(a)(5)).  Together, these changes, which excuse federal agencies from providing

17   meaningful response to comments submitted by State Plaintiffs, local governments, and the

18   public, unlawfully render NEPA's mandated public participation process an empty paperwork

19   exercise.

20     208. For these reasons, the Final Rule is arbitrary and capricious, an abuse of

21   discretion, and contrary to the requirements of NEPA and the APA.  5 U.S.C. § 706(2);

22   42 U.S.C. §§ 4321 *et seq*.  The Final Rule should therefore be held unlawful and set aside.

23          **SECOND CAUSE OF ACTION**
        **Violation of the APA for Arbitrary and Capricious Rulemaking**

24            **5 U.S.C. § 706(2)**

25     209. State Plaintiffs incorporate all preceding paragraphs by reference.

26

First Amended Compl. for Declaratory and
Inj. Relief     73
Case No. 3:20-cv-06057

AR_0026603

210.   The APA provides that this Court shall "hold unlawful and set aside" agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," "without observance of procedure required by law," or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2).

211.   Pursuant to the APA, in promulgating a regulation an "agency must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *State Farm*, 463 U.S. at 43.

212.   When the regulation represents a change in policy or interpretation, the agency must provide a rational explanation for that change. *Fox Television, Inc.*, 556 U.S. at 515. The agency must demonstrate that the new rule "is permissible under the statute, that there are good reasons for it, and that the agency *believes* it to be better, which the conscious change of course adequately indicates." *Id*.

213.   Moreover, in changing policy agencies are "required to assess whether there were reliance interests, determine whether they were significant, and weigh any such interests against competing policy concerns." *Dep't of Homeland Sec.*, 140 S. Ct. at 1915 (citations omitted).

214.   In promulgating the Final Rule, CEQ failed, both for the entire rule and for its individual changes, to provide the reasoned analysis required by the APA. Specifically, CEQ failed to provide a rational explanation for its changes to its longstanding NEPA interpretations and policies, relied on factors Congress did not intend for CEQ to consider, offered explanations that run counter to the evidence before the agency, ignored substantial reliance interests (including reliance by State Plaintiffs on NEPA's procedures to help protect state and territorial natural resources and public health) in the 1978 regulations and associated guidance, and entirely overlooked important issues.

215.   CEQ provided no reasoned analysis to demonstrate that the revisions in the Final Rule, both individually and collectively, will achieve its purported objectives to reduce

1    paperwork and delays while "at the same time to produce better decisions [that] further the

2    national policy to protect and enhance the quality of the human environment." Final Rule,

3    85 Fed. Reg. at 43,313; *see also id*. at 43,307.

4        216.    In particular, CEQ failed to demonstrate how the Final Rule will further

5    NEPA's policies of producing better decisions and furthering protection and enhancement of

6    the human environment when the Final Rule adopts provisions that conflict with NEPA's text,

7    purpose, legislative history, and CEQ's longstanding prior interpretations; that will produce

8    fewer and less robust environmental reviews and restrict public participation; and that will

9    limit judicial review.

10       217.    CEQ further failed to demonstrate how its revisions will reduce delay or add

11    clarity when CEQ's Final Rule injected new, undefined, and poorly explained language and

12    requirements into the NEPA process and swept away decades of agency regulations, guidance,

13    and case law that formerly provided extensive direction for federal agencies implementing

14    NEPA. If anything, the Final Rule will lead to more delay, confusion, and litigation over the

15    correct interpretation and application of the Final Rule.

16       218.    CEQ also failed to meaningfully examine evidence, including studies developed

17    by CEQ itself, demonstrating successful implementation of NEPA under the 1978 regulations

18    and indicating that delay in project implementation is often caused by factors other than CEQ's

19    implementing regulations. *See, e.g.*, U.S. Gov't Account. Office, *National Environmental*

20    *Policy Act: Little Information Exists on NEPA Analyses*, 16 (Apr. 2014).

21       219.    CEQ also failed to rationally consider environmental justice impacts from the

22    Final Rule or provide factual support for its conclusion that the Final Rule will "not cause

23    disproportionately high and adverse human health or environmental effects on minority

24    populations and low-income populations." Final Rule, 85 Fed. Reg. at 43,356–57. CEQ does

25    not justify its departure from its longstanding policy that environmental justice impacts should

26    be thoroughly analyzed through the NEPA process.

First Amended Compl. for Declaratory and
Inj. Relief        75
Case No. 3:20-cv-06057

AR_0026605

220. CEQ also failed to consider important aspects of the Final Rule by, among other things, ignoring evidence of NEPA's successful implementation and sweeping away concerns about environmental justice impacts, natural resource impacts (including climate change impacts), and burdens imposed on State Plaintiffs resulting from the Final Rule.

221. For these reasons, the Final Rule is arbitrary and capricious, an abuse of discretion, and contrary to the requirements of the APA. 5 U.S.C. § 706(2). The Final Rule should therefore be held unlawful and set aside.

**THIRD CAUSE OF ACTION**
**Violation of the APA for Promulgating Regulations in Excess of Statutory Authority**
**5 U.S.C. § 706(2); 42 U.S.C. §§ 4321 *et seq.***

222. State Plaintiffs incorporate all preceding paragraphs by reference.

223. The APA provides that this Court shall "hold unlawful and set aside" agency action that is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2).

224. Several of the Final Rule's provisions, individually and collectively, exceed CEQ's "statutory jurisdiction [and] authority." *Id.* § 706(2)(C).

225. These unlawful revisions include:

a. Carving out new exceptions to NEPA's requirements. As discussed above, the Final Rule would greatly expand the circumstances in which agencies can avoid complying with NEPA. CEQ has no authority to excuse agencies from complying with NEPA's environmental review mandate.

b. Redefining "major Federal action" to exclude an agency's failure to act, *compare* 40 C.F.R. § 1508.18 ("[a]ctions include the circumstance where the responsible agency officials fail to act and that failure to act is reviewable by courts or administrative tribunals"), *with* Final Rule, 85 Fed. Reg. at 43,375 (to be codified at § 1508.1(q) (removing failure to act language from the definition of "major Federal action")), effectively rewriting the

AR_0026606

1  definition of a reviewable agency action under the APA, 5 U.S.C. § 551(13).  CEQ has no

2  authority to limit the application of the APA.

3         c.    Placing a limit on the remedies available in a NEPA lawsuit, stating that

4  "[h]arm from the failure to comply with NEPA can be remedied by compliance with NEPA's

5  procedural requirements," suggesting that courts should decline to invalidate agency action

6  where agencies commit "minor, non-substantive errors that have no effect on agency decision

7  making," and stating that the Final Rule "create[s] no presumption that violation of NEPA is a

8  basis for injunctive relief or for a finding of irreparable harm."  Final Rule, 85 Fed. Reg. at

9  43,358 (to be codified at § 1500.3(d)).  CEQ has no authority, statutory or otherwise, to

10  instruct courts on the remedies they can order.  *See City of Los Angeles v. Barr*, 941 F.3d 931,

11  938 (9th Cir. 2019) ("An agency literally has no power to act ... unless and until Congress

12  confers power upon it.").

13         226.    For these reasons, the Final Rule is arbitrary, capricious, not in accordance with

14  law and in excess of CEQ's statutory authority.  5 U.S.C. § 706(2); 42 U.S.C. §§ 4321 *et seq.*

15  The Final Rule should therefore be held unlawful and set aside.

## FOURTH CAUSE OF ACTION
### Violation of the APA's Notice-and-Comment Requirements
### 5 U.S.C. § 706(2)

18         227.    State Plaintiffs incorporate all preceding paragraphs by reference.

19         228.    The APA provides that this Court shall "hold unlawful and set aside" agency

20  action that is "without observance of procedure required by law."  5 U.S.C. § 706(2).

21         229.    Prior to promulgating, amending, or repealing a rule, agencies must engage in a

22  public notice-and-comment process.  *Id.* §§ 551(5), 553.  To satisfy the requirements of APA

23  section 553(b), agencies must afford public notice of specific regulatory changes and their

24  reasoned basis to provide the public an opportunity for meaningful comment.  *Home Box*

25  *Office v. FCC*, 567 F.2d at 35–36.  To allow for meaningful public comment, an agency must

26  "make available" during the public comment period "technical studies and data that it has

1    employed in reaching the decision[] to propose particular rules." *Kern Cty. Farm Bureau*, 450

2    F.3d at 1076. The public may then submit comments on the proposed rule. 5 U.S.C. § 553(c).

3        230.   "An agency must consider and respond to significant comments received during

4    the period for public comment." *Perez*, 575 U.S. at 96. "These procedures are 'designed to

5    assure due deliberation' of agency regulations and 'foster the fairness and deliberation that

6    should underlie a pronouncement of such force.'" *E. Bay Sanctuary Covenant v. Trump*, 932

7    F.3d 742, 775 (9th Cir. 2018) (quoting *United States v. Mead Corp.*, 533 U.S. 218, 230

8    (2001)). "In considering and responding to comments, 'the agency must examine the relevant

9    data and articulate a satisfactory explanation for its action including a "rational connection

10   between the facts found and the choice made."'" *Altera Corp. & Subsidiaries v. Comm'r of

11   Internal Revenue*, 926 F.3d 1061, 1080 (9th Cir. 2019) (quoting *State Farm*, 463 U.S. at 43),

12   *cert. denied sub nom. Altera Corp. & Subsidiaries v. CIR*, No. 19-1009, 2020 WL 3405861

13   (U.S. June 22, 2020).

14       231.   CEQ failed to provide a meaningful opportunity to comment on data or

15   technical studies that it employed in reaching conclusions in the Final Rule. *Kern Cty. Farm

16   Bureau*, 450 F.3d at 1076.

17       232.   In the Final Rule, CEQ relied repeatedly on its RIA to support its revised

18   regulations and to dismiss harms to the environment, public health, and vulnerable

19   communities, including to dismiss its obligation under NEPA to prepare an EA or EIS and its

20   obligation under Executive Order 12,898 to assess environmental justice impacts. *See, e.g.*,

21   Final Rule, 85 Fed. Reg. at 43,352, 43,354, 43,356. CEQ thus relied on the RIA in reaching its

22   decisions in the Final Rule.

23       233.   CEQ did not provide an opportunity for the public to comment on the RIA prior

24   to promulgating the Final Rule.

25

26

First Amended Compl. for Declaratory and
Inj. Relief     78
Case No. 3:20-cv-06057

AR_0026608

234.     CEQ also failed to respond adequately to comments on the Proposed Rule.  For example, State Plaintiffs and others submitted significant comments on the Advance Notice and the Proposed Rule explaining that:

a.     CEQ has not presented sufficient evidence to demonstrate a need for the Proposed Rule, particularly given that studies, including studies developed by CEQ itself, and State Plaintiffs' own experience with NEPA demonstrate that NEPA leads to better decisions, that external factors contribute to delay in environmental reviews, and that existing tools could remedy CEQ's concerns about delay;

b.     CEQ's Proposed Rule, if finalized, would increase confusion, uncertainty, and litigation, causing the very delay CEQ claimed that it sought to avoid in promulgating the Final Rule;

c.     CEQ's Proposed Rule, if finalized, would adversely impact the unique interests of states, territories, and local governments including by harming state resources, limiting state access to information, disrupting coordination with federal agencies, undermining state reliance on the 1978 regulations and associated guidance, and burdening states with increased environmental review;

d.     CEQ's Proposed Rule, if finalized, would eliminate consideration of climate change impacts, contributing to adverse impacts to natural resources and public health in our states, territories, and communities; and

e.     CEQ's Proposed Rule, if finalized, would adversely impact vulnerable communities by limiting NEPA's application and scope, including by excluding certain federal actions from environmental review, eliminating consideration of cumulative impacts, and limiting opportunities for public comment.

235.     CEQ failed to provide a rational response to these significant comments.  To the extent CEQ addressed these issues, it provided only cursory responses that did not "examine

AR_0026609

1   the relevant data and articulate a satisfactory explanation for its action." *Altera Corp. &*

2   *Subsidiaries*, 926 F.3d at 1080.

3       236.    Because CEQ failed to provide an opportunity to comment on the RIA and CEQ

4   failed to rationally respond to significant comments, the Final Rule is arbitrary, capricious, an

5   abuse of discretion, and promulgated "without observance of procedure required by law."

6   5 U.S.C. § 706(2).  The Final Rule should therefore be held unlawful and set aside.

7   **FIFTH CAUSE OF ACTION**
**Violation of NEPA and the APA for Failure to Prepare an EA or EIS on the Final Rule**

8   **42 U.S.C. § 4332(2)(C); 5 U.S.C. § 706(2)**

9       237.    State Plaintiffs incorporate all preceding paragraphs by reference.

10      238.    NEPA requires federal agencies to take a "hard look" at the environmental

11  consequences of a proposal before acting on it.  *See* 42 U.S.C. § 4332.  That is, a federal

12  agency must prepare an EIS for all "major Federal actions significantly affecting the quality of

13  the human environment."  *Id.* § 4332(2)(C); 40 C.F.R. § 1502.3 (1978).

14      239.    An EIS must discuss, among other things: the environmental impact of the

15  proposed federal action, any adverse and unavoidable environmental effects, any alternatives

16  to the proposed action, and any irreversible and irretrievable commitment of resources

17  involved in the proposed action.  42 U.S.C. § 4332(2)(C).

18      240.    CEQ is a federal agency subject to NEPA.

19      241.    CEQ's 1978 regulations apply to CEQ's promulgation of the Final Rule.  Final

20  Rule, 85 Fed. Reg. 43,354 (stating that if CEQ were to prepare an EIS on the Final Rule, the

21  1978 regulations would apply).

22      242.    Under CEQ's 1978 regulations, a "major Federal action" included "new or

23  revised agency rules [and] regulations," like the Final Rule.  40 C.F.R. § 1508.18(a) (1978).

24      243.    CEQ's 1978 regulations specify that in an EIS, agencies must rigorously

25  explore and objectively evaluate all reasonable alternatives, including the alternative of taking

26

First Amended Compl. for Declaratory and
Inj. Relief                  80
Case No. 3:20-cv-06057

AR_0026610

1  no action, and must discuss the reasons for eliminating any alternatives rejected from detailed

2  study. *Id*. § 1502.14.

3      244.   The 1978 regulations also require agencies to analyze both the direct impacts

4  that an action will have on the environment, as well as the action's "reasonably foreseeable"

5  indirect and cumulative impacts.  Indirect impacts are "caused by the action and are later in

6  time or farther removed in distance, but are still reasonably foreseeable." *Id*. § 1508.8(b)

7  (1978).  Cumulative impacts are those impacts that result "from the incremental impact of the

8  action when added to other past, present, and reasonably foreseeable future actions." *Id*.

9  § 1508.7 (1978).

10     245.   CEQ's analysis of alternatives and impacts should consider, among other things,

11  the disproportionately high and adverse human health or environmental effects of their actions

12  on minority and low-income populations.  42 U.S.C. § 4332(2)(C); Exec. Order No. 12,898,

13  59 Fed. Reg. 7,629 (1994) (as amended); CEQ, Environmental Justice (1997).

14     246.   As a preliminary step, an agency may first prepare an EA to determine whether

15  the effects of an action may be significant.  40 C.F.R. §§ 1501.4(b), 1508.9 (1978).  If an

16  agency decides not to prepare an EIS, it must supply a "convincing statement of reasons" to

17  explain why a project's impacts are not significant. *Nat'l Parks Conservation Ass'n v. Babbitt*,

18  241 F.3d 722, 730 (9th Cir. 2001) (internal citations omitted); *see also Save the Yaak Comm. v.*

19  *Block*, 840 F.2d 714, 717 (9th Cir. 1988).

20     247.   An EIS must always be prepared if "substantial questions are raised as to

21  whether a project … *may* cause significant degradation of some human environmental factor."

22  *Idaho Sporting Cong. v. Thomas*, 137 F.3d 1146, 1149 (9th Cir. 1998) (quoting *Greenpeace*

23  *Action v. Franklin*, 14 F.3d 1324, 1332 (9th Cir. 1992)).

24     248.   CEQ's promulgation of the Final Rule is a "major Federal action" that

25  significantly affects the environment.  The Final Rule severely limits federal agencies'

26  obligation to review environmental impacts under NEPA both by excluding federal actions

AR_0026611

1   from environmental review and by limiting the scope of environmental reviews that do occur.

2   These changes will cause federal agencies to overlook—and thus fail to address, avoid, or

3   mitigate—their actions' impacts, including significant impacts to State Plaintiffs' natural

4   resources, climate change, public health, and environmental justice. Projects with significant

5   unstudied and undisclosed impacts will move forward with no or insufficient environmental

6   review in violation of NEPA. Moreover, excusing agencies from considering cumulative

7   impacts will result in agencies taking actions without fully understanding the impacts of those

8   actions on climate change, overburdened and underserved communities, water and air quality,

9   and sensitive, threatened, and endangered wildlife.

10       249.   Under NEPA, CEQ was required to address the Final Rule's significant

11   environmental impacts and consider reasonable alternatives to the Final Rule in an EIS or, at a

12   minimum, an EA. 42 U.S.C. § 4332(2)(C). CEQ did neither.

13       250.   CEQ provided no legally sufficient justification—let alone a "convincing

14   statement of reasons"—for failing to comply with NEPA in promulgating the Final Rule.

15   *Babbitt*, 241 F.3d at 730; *see also Sierra Club v. Bosworth,* 510 F.3d. 1016 (9th Cir. 2007).

16       251.   CEQ's failure to take a "hard look" at the environmental impacts of the Final

17   Rule prior to its promulgation was arbitrary and capricious, an abuse of discretion, and

18   contrary to the procedural requirements of NEPA and the APA. 5 U.S.C. § 706(2); 42 U.S.C.

19   § 4332(2)(C). The Final Rule should therefore be held unlawful and set aside.

**SIXTH CAUSE OF ACTION**
**Violation of the ESA and APA for Failing to Consult**
**5 U.S.C. § 706(2)**

22       252.   State Plaintiffs incorporate all preceding paragraphs by reference.

23       253.   Section 7 of the ESA requires each federal agency to engage in consultation

24   with the FWS or the NMFS when a proposed federal action "may affect a listed species or

25   critical habitat." 16 U.S.C. § 1536(a)(2); 50 C.F.R. §§ 402.12(a), (k), 402.14(a)–(b). This

26   "may affect" threshold is low; and "any possible effect, whether beneficial, benign, adverse, or

First Amended Compl. for Declaratory and
Inj. Relief         82
Case No. 3:20-cv-06057

AR_0026612

1    of an undetermined character, triggers the formal consultation requirement." *W. Watersheds*

2    *Project v. Kraayenbrink*, 632 F.3d 472, 496 (9th Cir. 2011) (citing 51 Fed. Reg. 19,926, 19,949

3    (June 3, 1986)) (brackets and internal quotation marks omitted).

4      254. Once consultation has been initiated, the federal agency is prohibited from

5    "mak[ing] any irreversible or irretrievable commitment of resources with respect to the agency

6    action which has the effect of foreclosing the formulation or implementation of any reasonable

7    and prudent alternative measures[.]"  16 U.S.C § 1536(d).  Where a federal agency is required

8    to initiate consultation, but fails to do so, the agency is prohibited from proceeding with any

9    activity that may affect a listed species or designated critical habitat until it complies with the

10   consultation requirement.  *Pac. Rivers Council v. Thomas*, 30 F.3d 1050, 1056–57 (9th Cir.

11   1994).

12     255. Each "department, agency, or instrumentality of the United States" is a federal

13   agency subject to the ESA.  16 U.S.C. § 1532(7).

14     256. Actions subject to the ESA include "all activities or programs of any kind

15   authorized, funded, or carried out, in whole or in part, by Federal agencies in the United States

16   or upon the high seas."  50 C.F.R. § 402.02.  Such actions include the promulgation of

17   regulations and all other actions directly or indirectly causing modifications to the land, water,

18   or air.  *Id.*

19     257. CEQ is a federal agency subject to the ESA.

20     258. Promulgation of the Final Rule is an action subject to the ESA.

21     259. Promulgation of the Final Rule "may affect" numerous listed species and the

22   designated critical habitats upon which they rely, including but not limited to, by revising

23   NEPA's implementing regulations to: exclude certain actions from NEPA review; separate the

24   definition of "major Federal action" from an action's significance; expand the use of

25   categorical exclusions; eliminate review of an agency action's effects on listed species and

26   designated critical habitat when analyzing the significance of an action; reduce the scope of

First Amended Compl. for Declaratory and
Inj. Relief     83
Case No. 3:20-cv-06057

AR_0026613

1    alternatives considered during environmental review; and direct agencies not to consider

2    cumulative and indirect effects, including climate change impacts.  Final Rule, 85 Fed. Reg. at

3    43,360, 43,365–66, 43,375 (to be codified at §§ 1501.3(b), 1501.4, 1502.14, 1502.15,

4    1508.1(g), (m), (q)).  As such, CEQ's rulemaking for the Final Rule triggered the consultation

5    requirement set forth in section 7(a)(2) of the ESA.  16 U.S.C. § 1536(a)(2).

6          260.    However, CEQ did not consult with the Services with regard to the Final Rule.

7    Rather, CEQ concluded, without any basis or explanation, that the Final Rule would have "no

8    effect" on listed species or designated critical habitat.

9          261.    Once published, the Final Rule can no longer be revised as needed to ensure

10    that it will not jeopardize the continued existence of any listed species or result in the

11    destruction or adverse modification of designated critical habitat of such species.  As such,

12    CEQ's promulgation of the Final Rule constitutes an irreversible and irretrievable commitment

13    of resources, which foreclosed the formulation or implementation of any reasonable and

14    prudent alternative measures[.]"  16 U.S.C. § 1536(d).  As a result of CEQ's failure to initiate

15    consultation, the ESA's prohibition on the irreversible or irretrievable commitment of

16    resources applies.

17          262.    CEQ's promulgation of the Final Rule without consulting with the Services,

18    based on its conclusion that the Final Rule would have "no effect" on listed species, is

19    arbitrary, capricious, and not in accordance with law, in violation of the ESA and the APA.  16

20    U.S.C. § 1536; 5 U.S.C. § 706(2)(A).

21                              **PRAYER FOR RELIEF**

22          WHEREFORE, State Plaintiffs respectfully request that this Court:

23          1.    Declare that CEQ violated NEPA and the APA by promulgating a Final Rule

24    that is contrary to NEPA's language and purpose and exceeds CEQ's statutory authority;

25

26

First Amended Compl. for Declaratory and
Inj. Relief              84
Case No. 3:20-cv-06057

AR_0026614

2.      Declare that CEQ violated the APA by promulgating a Final Rule that is arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law and fails to follow the procedures required by law;

3.      Declare that CEQ violated NEPA and the APA by promulgating a Final Rule without preparing an EA or an EIS evaluating the Final Rule's environmental and public health impacts;

4.      Declare that CEQ violated the ESA and the APA by promulgating the Final Rule without first consulting with the Services regarding the effects that the Final Rule may have on listed endangered and threatened species and designated critical habitat;

5.      Vacate the entire Final Rule so that the 1978 regulations as amended and associated guidance are immediately reinstated;

6.      Enjoin CEQ from implementing, enforcing, or relying upon the Final Rule;

7.      Award State Plaintiffs their costs, expenses, and reasonable attorneys' fees; and

8.      Award such other relief as the Court deems just and proper.

DATED this 23rd day of November, 2020.

XAVIER BECERRA
Attorney General of California

/s/ Joshua R. Purtle
SARAH E. MORRISON, SBN 143459
Supervising Deputy Attorney General
JAMIE B. JEFFERSON, SBN 197142
JOSHUA R. PURTLE, SBN 298215
JULIA K. FORGIE, SBN 304701
LANI M. MAHER, SBN 318637
Deputy Attorneys General
1515 Clay Street, 20th Floor
P.O. Box 70550
Oakland, CA 94612-0550
(510) 879-1002
Jamie.Jefferson@doj.ca.gov
Joshua.Purtle@doj.ca.gov

Attorneys for Plaintiff State of California


PHILIP J. WEISER
Attorney General of Colorado

/s/ Scott Steinbrecher
SCOTT STEINBRECHER
Assistant Deputy Attorney General
Ralph C. Carr Colorado Judicial Center
1300 Broadway, Seventh Floor
Denver, Colorado 80203
(720) 508-6287
Scott.Steinbrecher@coag.gov

Attorneys for Plaintiff State Colorado


ROBERT W. FERGUSON
Attorney General of Washington

/s/ Aurora Janke
AURORA JANKE
ELIZABETH HARRIS
Assistant Attorneys General
Washington Attorney General's Office
Environmental Protection Division
800 5th Ave Ste. 2000 TB-14
Seattle, Washington 98104-3188
(206) 233-3391
Aurora.Janke@atg.wa.gov
Elizabeth.Harris@atg.wa.gov

Attorneys for Plaintiff State of Washington


WILLIAM TONG
Attorney General of Connecticut

/s/ Robert Snook
ROBERT SNOOK
Assistant Attorney General
Attorney General's Office
165 Capitol Avenue
Hartford, Connecticut, 06106
(860) 808-5250
Robert.Snook@ct.gov

Attorneys for Plaintiff State of Connecticut

AR_0026616

KATHERINE S. DYKES
Commissioner Connecticut Department of
Energy and Environmental Protection

*/s/ Kirsten S. P. Rigney*
KIRSTEN S. P. RIGNEY
Director, Legal Office
Department of Energy and Environmental
Protection
10 Franklin Square
New Britain, CT 06051
(860) 827-2984

*/s/ Robert Snook*
ROBERT SNOOK
Assistant Attorney General
Attorney General's Office
165 Capitol Avenue
Hartford, Connecticut, 06106
(860) 808-5250
Robert.Snook@ct.gov

*Attorneys for Plaintiff Connecticut
Department of Energy and Environmental
Protection*

KATHLEEN JENNINGS
Attorney General of Delaware

*/s/ Kayli H. Spialter*
KAYLI H. SPIALTER
Deputy Attorney General
Delaware Department of Justice
820 N. French Street
Wilmington, DE 19801
(302) 577-8508
kayli.spialter@delaware.gov

*Attorneys for Plaintiff State of
Delaware*

AR_0026617

KWAME RAOUL
Attorney General of Illinois

*/s/ Jason E. James*
JASON E. JAMES
Assistant Attorney General
MATTHEW J. DUNN
Chief, Environmental Enforcement/Asbestos
Litigation Division
Office of the Attorney General
Environmental Bureau
69 West Washington St., 18th Floor
Chicago, IL 60602
(312) 814-0660
jjames@atg.state.il.us

*Attorneys for Plaintiff State of Illinois*

AARON FREY
Maine Attorney General

*/s/ Jillian R. O'Brien*
JILLIAN R. O'BRIEN, SBN 251311
Assistant Attorney General
Office of the Attorney General
6 State House Station
Augusta, ME 04333-0006
jill.obrien@maine.gov
(207) 626-8582

*Attorneys for Plaintiff State of Maine*

BRIAN E. FROSH
Attorney General of Maryland

*/s/ Steven J. Goldstein*
STEVEN J. GOLDSTEIN
Special Assistant Attorney General
200 Saint Paul Place, 20th Floor
Baltimore, Maryland 21202
(410) 576-6414
sgoldstein@oag.state.md.us

*Attorneys for Plaintiff State of Maryland*

FOR THE PEOPLE OF THE STATE
OF MICHIGAN

DANA NESSEL
Attorney General of Michigan

*/s/ Elizabeth Morrisseau*
ELIZABETH MORRISSEAU
Assistant Attorney General
Environment, Natural Resources, and
Agriculture Division
6th Floor G. Mennen Williams Building
525 W. Ottawa Street
P.O. Box 30755
Lansing, MI 48909
(517) 335-7664
MorrisseauE@michigan.gov

1  KEITH ELLISON                          AARON D. FORD
   Attorney General of Minnesota          Attorney General of Nevada
2

3  /s/ Peter N. Surdo                     /s/ Tori N. Sundheim
   PETER N. SURDO                         TORI N. SUNDHEIM, SBN 294559
4  Special Assistant Attorney General     Deputy Attorney General
   445 Minnesota Street Suite 900         HEIDI PARRY STERN
5  Saint Paul, MN 55101                   Solicitor General
   (651) 757-1061                         Office of the Nevada Attorney General
6  Peter.Surdo@ag.state.mn.us             555 E. Washington Ave., Ste. 3900
                                          Las Vegas, NV 89101
7  Attorneys for Plaintiff State          Tsundheim@ag.nv.gov
8  of Minnesota                           HStern@ag.nv.gov

9                                         Attorneys for Plaintiff State of Nevada

10

11

12 GURBIR S. GREWAL                       HECTOR BALDERAS
   Attorney General of New Jersey         Attorney General of New Mexico
13

14 /s/ Lisa Morelli                       /s/ William Grantham
   LISA MORELLI                           WILLIAM GRANTHAM
15 Deputy Attorney General                Assistant Attorney General
   Environmental Permitting and Counseling 201 Third Street NW, Suite 300
16 R.J. Hughes Justice Complex            Albuquerque, New Mexico 87102
   P.O. Box 093                           (505) 717-3520
17 Trenton, NJ 08625                      wgrantham@nmag.gov
18 (609) 376-2804
   Lisa.Morelli@law.njoag.gov             Attorneys for the State of New Mexico
19
20 Attorneys for Plaintiff State of New
   Jersey

21

22

23

24

25

26

AR_0026619

LETITIA JAMES
Attorney General of New York

/s/ Claiborne E. Walthall
CLAIBORNE E. WALTHALL
Assistant Attorney General
New York State Office of
the Attorney General
State Capitol
Albany, NY 12224
(518) 776-2380
claiborne.walthall@ag.ny.gov

*Attorneys for Plaintiffs State of New York and New York State Department of Environmental Conservation*


JOSHUA H. STEIN
Attorney General of North Carolina

DANIEL S. HIRSCHMAN
Senior Deputy Attorney General

/s/ Asher P. Spiller
ASHER P. SPILLER
Assistant Attorney General
North Carolina Department of Justice
P.O. Box 629
Raleigh, NC 27602
(919) 716-6400
aspiller@ncdoj.gov

*Attorneys for Plaintiff State of North Carolina*


ELLEN ROSENBLUM
Attorney General of Oregon

/s/ Paul Garrahan
PAUL GARRAHAN
Attorney-in-Charge
STEVE NOVICK
Special Assistant Attorney General
Natural Resources Section
Oregon Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4593
Paul.Garrahan@doj.state.or.us
Steve.Novick@doj.state.or.us

*Attorneys for Plaintiff State of Oregon*


PETER F. NERONHA
Attorney General of Rhode Island

/s/ Gregory S. Schultz
GREGORY S. SCHULTZ
Special Assistant Attorney General
Rhode Island Office of Attorney General
150 South Main Street
Providence, RI 02903
(401) 274-4400
gschultz@riag.ri.gov

*Attorneys for Plaintiff State of Rhode Island*

AR_0026620

THOMAS J. DONOVAN, JR.
Attorney General of Vermont

*/s/ Nicholas F. Persampieri*
NICHOLAS F. PERSAMPIERI
Assistant Attorney General
Office of the Attorney General
109 State Street
Montpelier, VT 05609
(802) 828-3171
nick.persampieri@vermont.gov

*Attorneys for Plaintiff State of Vermont*

JOSHUA L. KAUL
Attorney General of Wisconsin

*/s/ Emily M. Ertel*
EMILY M. ERTEL
Assistant Attorney General
Wisconsin Department of Justice
Post Office Box 7857
Madison, Wisconsin 53707-7857
(608) 266-0432
ertelem@doj.state.wi.us

*Attorneys   for   Plaintiff   State   of Wisconsin*

MAURA HEALEY
Attorney General of Massachusetts

*/s/ Turner Smith*
TURNER SMITH
MATTHEW IRELAND
Assistant Attorneys General
Office of the Attorney General
Environmental Protection Division
One Ashburton Place, 18th Floor
Boston, MA 02108
(617) 727-2200
Turner.Smith@mass.gov
Matthew.Ireland@mass.gov

*Attorneys   for   Plaintiff   Commonwealth   of Massachusetts*

JOSH SHAPIRO
Attorney General of Pennsylvania

MICHAEL J. FISCHER
Chief Deputy Attorney General

*/s/ Ann R. Johnston*
ANN R. JOHNSTON
Senior Deputy Attorney General
Office of Attorney General
Strawberry Square, 14th Floor
Harrisburg, PA 17120
(717) 705-6938
ajohnston@attorneygeneral.gov

*Attorneys for Plaintiff Commonwealth of Pennsylvania*

AR_0026621

LEEVIN TAITANO CAMACHO
Attorney General of Guam

*/s/ Joseph A. Perez*
JOSEPH A. PEREZ
Assistant Attorney General
Consumer Protection Division
590 South Marine Corps Drive,
Suite 901, ITC Building
Tamuning, Guam 96913
Telephone: (671) 475-3324
Facsimile: (671) 472-2493
jperez@oagguam.org

*Attorneys for Plaintiff Territory of Guam*

KARL A. RACINE
Attorney General for the District of Columbia

KATHLEEN KONOPKA
Deputy Attorney General
Public Advocacy Division

*/s/ Alacoque Hinga Nevitt*
ALACOQUE HINGA NEVITT, SBN 268768
WESLEY ROSENFELD
Assistant Attorneys General
District of Columbia Office of the
Attorney General
400 6th Street, NW
Washington, D.C. 20001
(202) 717-1368
alacoque.nevitt@dc.gov

*Attorneys for Plaintiff District of Columbia*

VINCE RYAN
Harris County Attorney

*/s/ Sarah Jane Utley*
SARAH JANE UTLEY
Managing Attorney
Environmental Practice Group
Harris County Attorney's Office
1019 Congress, 15th Floor
Houston, Texas 77057
(713) 274-5124
Sarah.Utley@cao.hctx.net

*Attorneys for Plaintiff Harris County, Texas*

JAMES E. JOHNSON
Corporation Counsel of the
City of New York

*/s/ Nathan Taylor*
NATHAN TAYLOR
New York City Law Department
100 Church Street, Rm 6-144
New York, NY 10007
(646) 940-0736 (m)
(212) 356-2315
NTaylor@law.nyc.gov

*Attorneys for Plaintiff City of New York*

AR_0026622

# CERTIFICATE OF SERVICE

Case Name: **State of California, et al. v.**   No.   **3:20-cv-06057**
**Council on Environmental**
**Quality, et al.**

I hereby certify that on <u>November 23, 2020</u>, I electronically filed the following documents with the Clerk of the Court by using the CM/ECF system:

**FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

I certify that **all** participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

I declare under penalty of perjury under the laws of the State of California and the United States of America the foregoing is true and correct and that this declaration was executed on <u>November 23, 2020</u>, at Oakland, California.

_____        _____
Maritza Padilla                                                    Signature
Declarant

OK2020303085
91319709.docx

AR_0026623

# EXHIBIT 6

AR_0026624

**Comments of the Attorneys General of New York, Washington, California, Connecticut, District of Columbia, Illinois, Maine, Maryland, Massachusetts, Michigan, Minnesota, New Jersey, Oregon, Pennsylvania, Rhode Island, Vermont, and Wisconsin, the City of New York, and Harris County, Texas**

April 10, 2023

*Via electronic submission to www.regulations.gov*
**ATTN: Council on Environmental Quality, Docket ID No. CEQ-2022-0005**

Jomar Maldonado
Director for the National Environmental Policy Act
Council on Environmental Quality
730 Jackson Place, NW
Washington, DC 20503

> **Re:** **Council on Environmental Quality's Interim "National Environmental Policy Act Guidance on Consideration of Greenhouse Gas Emissions and Climate Change," 88 Fed. Reg. 1196 (Jan. 9, 2023), Docket No. CEQ-2022-0005**

Dear Mr. Maldonado:

The undersigned State Attorneys General of New York, Washington, California, Connecticut, District of Columbia, Illinois, Maine, Maryland, Massachusetts, Michigan, Minnesota, New Jersey, Oregon, Pennsylvania, Rhode Island, Vermont, and Wisconsin, the City of New York, and Harris County, Texas (States) respectfully submit these comments on the Council on Environmental Quality's Interim "National Environmental Policy Act Guidance on Consideration of Greenhouse Gas Emissions and Climate Change" (Guidance).[1]

## I.    Executive Summary

Although greenhouse gas emissions are a global phenomenon, they cause direct, indirect and cumulative impacts that have local, and often catastrophic, impacts on our States, our residents, and our environment and natural resources. The States have strong interests in robust NEPA reviews that accurately assess greenhouse gas emissions and climate change impacts, particularly where they affect state and local laws, plans and policies that have been adopted to reduce emissions

---

[1] 88 Fed. Reg. 1196 (Jan. 9, 2023), Docket No. CEQ-2022-0005.

1

and address climate change impacts. We support the significant improvements and progress CEQ has made in this Guidance and offer several key recommendations for further strengthening it.

At a high level, the States recommend that CEQ strengthen the Guidance by: (i) clarifying the legal requirements for review, (ii) better coordinating federal actions with adopted state, Tribal and local laws and plans, and (iii) addressing environmental justice impacts from greenhouse gas emissions and climate change. More specifically, we recommend that the Guidance state that federal agencies should consider reasonable alternatives to their proposed actions wherever possible to be more consistent with state, Tribal and local measures designed to address climate change. We support analysis of all reasonably foreseeable direct, indirect and cumulative greenhouse gas emissions and also recommend that CEQ provide examples and additional tools to assist agencies in such quantification and assessment. The States applaud the Guidance's discussion of environmental justice concerns and urge CEQ to further strengthen its recommendations to prioritize the voices of overburdened communities and place them at the center of these analyses.

## II.   The States Have Strong Interests in Ensuring Federal Agencies Comply with NEPA's Mandate to Make Informed Decisions Based on a Robust Review of Environmental Impacts, Including Greenhouse Gas Emissions and Climate Change.

### a.   NEPA Requires Consideration of Greenhouse Gas Emissions and Climate Change Impacts and State Efforts to Reduce Them.

The National Environmental Policy Act, 42 U.S.C. § 4321 et seq. (NEPA) directs federal agencies to implement the statute "to the fullest extent possible" and to conduct a detailed environmental review for "major Federal actions significantly affecting the quality of the human environment."[2] That review should analyze an action's environmental impacts, alternatives to the proposed action, the relationship between short-term uses and long-term productivity, and any irreversible and irretrievable commitment of resources.[3] Consistent with this statutory mandate, the Guidance recognizes that federal agencies must identify, analyze and consider alternatives and mitigation measures for the reasonably foreseeable direct, indirect, and cumulative effects of all major federal actions.[4]

---

[2] 42 U.S.C. § 4332.

[3] *Id.* §§ 4331(a), 4321, & 4332(F) (NEPA intended to "recognize the worldwide and long-range character of environmental problems.").

[4] 88 Fed. Reg. at 1197; *id.* at 1197 n. 5.

2

Such analysis should prioritize the voices of affected communities and thoroughly analyze and disclose the environmental justice concerns presented by an action's greenhouse gas emissions and climate impacts.[5] NEPA further directs agencies to "identify and develop methods and procedures" to ensure appropriate consideration of "presently unquantified environmental amenities."[6] Accordingly, as the Guidance correctly states, NEPA requires federal agencies to consider climate change impacts both from and to a proposed action as well as the impacts on affected communities. Agencies' consideration should include assessing reasonably foreseeable greenhouse gas emissions and climate change impacts, whether quantifiable or not.[7]

NEPA further requires federal agencies to act "in cooperation with State and local governments," to evaluate potential environmental impacts in fulfillment of NEPA's purposes.[8] CEQ's regulations authorize federal agencies "to cooperate with State, Tribal, and local agencies that are responsible for preparing environmental documents, including those prepared pursuant to section 102(2)(D) of NEPA,"[9] and direct federal agencies preparing Environmental Impact Statements (EISs) to assess a proposed action's consistency "with any approved State, Tribal, or local plan or law."[10] With respect to greenhouse gas emissions and climate change, NEPA thus directs federal agencies to consider and account for state, Tribal, and local efforts to reduce emissions, combat the climate crisis, and advance environmental justice.

     b.  <u>State and Local Governments Have Strong Interests in Robust Review of Greenhouse Gas Emissions and Climate Change.</u>

The States are critical stakeholders in NEPA reviews, particularly for proposed federal actions that may increase the emissions of greenhouse gases and impacts of climate change in our States. Cooperation with state, Tribal, and local governments

---

[5] *See* 42 U.S.C. §§ 4331(a), 4332(2).

[6] *Id.* § 4332(2)(B).

[7] *Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin.*, 538 F.3d 1172, 1217 (9th Cir. 2008) ("[t]he impact of greenhouse gas emissions on climate change is precisely the kind of cumulative impacts analysis that NEPA requires agencies to conduct."); *cf. Kleppe v. Sierra Club*, 427 U.S. 390, 410 (1976) ("Thus, when several proposals for coal-related actions that will have cumulative or synergistic environmental impact upon a region are pending concurrently before an agency, their environmental consequences must be considered together.").

[8] 42 U.S.C. § 4331(a).

[9] 40 C.F.R. § 1506.2.

[10] *Id.* § 1506.2(d).

3

and the public is an essential component of NEPA's informed decision making process.[11] And as a practical matter, since federal lands comprise a significant portion of the lands in several of our jurisdictions, federal actions taken on those lands often affect our States' residents, natural resources, recreation and tourism.[12]

Our States are on the front lines of climate change, facing threats to our residents' health and property, state public lands, state coastlines, wildlife, threatened and endangered species, water, air, cultural resources, state transportation systems and infrastructure, tourism, and recreation.[13] The Intergovernmental Panel on Climate Change has recently warned that current national commitments to reduce greenhouse gas emissions by 2030 are insufficient to limit warming to 1.5 degrees Celsius by the end of the 21st century. Warming above this level increases the likelihood of significant, irreversible consequences from climate change.[14] In the face of these threats, state and local governments have adopted climate protection laws, greenhouse gas reduction targets, and regulations and guidelines for analyzing and adapting to climate change impacts.[15] Many of our

---

[11] *See* 42 U.S.C. §§ 4331(a), 4332(G).

[12] For example, federal lands comprise 84.9% of Nevada, more than half of Oregon, almost half of California, one-third of New Mexico, one-third of the District of Columbia. *See* Congressional Research Service, "Federal Land Ownership: Overview and Data," Feb. 21, 2020, https://sgp.fas.org/crs/misc/R42346.pdf.

[13] *See* U.S. Global Change Research Program, Fourth Nat'l Climate Assessment, Summary Findings at 25-32 (2018), https://nca2018.globalchange.gov/downloads/NCA4_Ch01_Summary-Findings.pdf; *See* U.S. Global Change Research Program, 2017: *Climate Science Special Report: Fourth National Climate Assessment, Volume I* [D.J. Wuebbles *et al.* (eds.)], U.S. Global Change Research Program, Washington, DC, USA 17-22 (USGCRP 2017); *see* New York State Climate Action Council. 2022. "New York State Climate Action Council Scoping Plan." § 1.1 (Dec. 2022) ("Climate change is adversely affecting New York's economic well-being, public health, natural resources, and environment. The severity of climate change and the threat of more severe impacts will be determined by the actions undertaken in New York and other jurisdictions to reduce GHG emissions.") https://climate.ny.gov/Resources/Scoping-Plan.

[14] Intergovtl. Panel on Climate Change, Synthesis Report of the IPCC Sixth Assessment Report (AR6), Longer Report § 6.3.1 (Mar. 2023), ("If the 'emission gap' is not reduced, global GHG emissions in 2030 consistent with NDCs announced prior to COP26 make it likely that warming will exceed 1.5°C during the 21st century, while limiting warming to 2°C (>67%) would imply an unprecedented acceleration of mitigation efforts during 2030–2050."), *id.* at § 3.1.3 ("The likelihood of abrupt and irreversible changes and their impacts increase with higher global warming levels . . .") https://report.ipcc.ch/ar6syr/pdf/IPCC_AR6_SYR_LongerReport.pdf.

[15] *See, e.g.,* New York CLCPA 7(2), 7(3); Comm'rs Policies 49 and DAR 21, OCC/DEP Policy on Evaluating GHGs for EISs; Community Risk and Resiliency Act and Related

4

States have also acted to advance environmental justice and have recognized that the impacts of climate change are often disproportionately distributed.[16] Therefore, federal actions impact the States' interests in addressing the climate threat,

---

guidance, Smart Growth Public Infrastructure Policy Act; 6 NYCRR Part 494; New York State Climate Action Council, "New York State Climate Action Council Scoping Plan." CA Executive Order B-55-18 (carbon neutrality by 2045 & net negative GHG thereafter); SB 32 (reduce GHG 40% below 1990 levels by 2030); SB 375 (regional transportation plans consistent with GHG reduction targets); Cal. Code Regs. tit. 13, § 1961.4 (requiring all new passenger vehicles to be zero-emission by 2035); Wash. Rev. Code § 70A.45.020(1) (setting incremental limits on statewide emissions to reduce them to 95% below 1990 levels by 2050); Wash. Rev. Code § 70A.65.060 (establishing a cap and invest program); Wash Rev. Code § 19.405.040-050 (requiring retail sales of electricity to Washington customers to be greenhouse gas neutral by 2030 and 100% renewable by 2045); Massachusetts Clean Energy and Climate Plan for 2025 and 2030, which requires, pursuant to the Massachusetts Global Warming Solutions Act, Mass. Gen. Law ch. 21N, as amended by the Next-Generation Roadmap for Massachusetts Climate Policy, 2021 Mass. Acts Ch. 8, that the Commonwealth achieve at least net zero greenhouse gas emissions statewide and economywide by 2050, and in no event higher than a level 85% below a 1990 emissions baseline (with interim limits requiring emissions at least 50% below 1990 by 2030, and at least 75% below by 2040). *See* https://www.mass.gov/doc/clean-energy-and-climate-plan-for-2025-and-2030/download; 38 M.R.S. § 576-A (setting forth Maine's greenhouse gas reductions of 45% below 1990 gross annual greenhouse gas levels by 2030 and 80% by 2050); Oregon's Clean Energy Targets legislation, passed in 2021, requires Oregon's investor-owned electric utilities to reduce greenhouse gas emissions to 80% below baseline levels by 2035 and to zero by 2040. ORS 469A.410(1)(a)-(c). Oregon's Climate Protection Program, adopted by administrative rule in 2021, adopts a declining cap on greenhouse gas emissions from covered fuel suppliers (including suppliers of fuel for transportation and fuel used in residential, commercial and industrial settings). OAR 340-271. The overall cap declines from 28,081,335 MT CO2e in 2022 to 15,021,080 in 2035 and to 3,004,216 in 2050. OAR 340-271-9000, Table 2. In 2007, the Oregon Legislature established a goal of reducing greenhouse gas emissions to 75% below 1990 levels by 2050. ORS 468A.205. And in March 2020, Governor Kate Brown signed Executive Order 20-04, directing State of Oregon agencies to take action to reduce and regulate greenhouse gas emissions toward meeting reduction goals of at least 45 percent below 1990 emissions levels by 2035 and at least 80 percent below 1990 levels by 2050. https://www.oregon.gov/gov/eo/eo_20-04.pdf.

[16] *See* Wash. Rev. Code § 70A.02.005 (discussing Washington's interest in reducing disparate environmental health impacts, including from climate change). In addition, New Jersey's Environmental Justice Law requires the New Jersey Department of Environmental Protection (NJDEP) to evaluate the environmental and public health impacts of certain facilities on overburdened communities when reviewing certain permit applications. N.J.S.A. 13:1D-157 et seq. New Jersey's Governor Murphy has directed NJDEP to facilitate an Environmental Justice Interagency Council (EJIC), which convenes to help agencies adopt EJ principles into their regulatory and programmatic responsibilities; complete EJ initial assessments; participate in workshops and trainings; and create EJ action plans. N.J. Exec. Order No. 23.

AR_0026629

interacting and potentially conflicting with adopted laws, policies and plans, many of which recognize the disproportionate harms to already overburdened communities from greenhouse gas emissions and associated climate change impacts.

### III.    The Guidance Is a Critical Step Forward and Can Be Strengthened in Several Key Ways.

The States applaud CEQ's guidance to agencies as they comply with NEPA's mandate to analyze greenhouse gas emissions, climate impacts, and environmental justice. The Guidance updates and improves upon guidance issued in 2016 during the Obama Administration and recognizes the growing urgency of climate issues and their disproportionate impacts on communities with environmental justice concerns. We support the Guidance's strong yet balanced approach to assessing the effects of greenhouse gases and impacts to proposed actions from climate change.

Many of the undersigned States have been involved in CEQ's work to update its GHG guidance.[17] Meanwhile, the States have continued to develop approaches to assessing climate impacts under our own state-level environmental reviews and climate laws, policies and plans. The lessons we have learned from analyzing these issues at multiple levels inform these comments. As discussed further below, the States support strengthening the Guidance to assist federal agencies in accounting for inconsistencies with state, Tribal and local climate goals and to assess reasonable alternatives and mitigation measures to make actions under review more consistent with those efforts.[18]

Regardless of the extent of the required analysis, however, agencies need sufficient financial and personnel resources to analyze greenhouse gas emissions. Limited funding has long impeded the speed and efficacy of NEPA reviews. As agencies undertake increasingly rigorous greenhouse gas analyses under the Guidance, adequate funding and staffing are critically important.

The Guidance addresses 11 major areas for how agencies should apply NEPA and existing best practices to analyze climate change when performing environmental reviews. The Guidance:

---

[17] *See, e.g.*, Draft National Environmental Policy Act Guidance on Consideration of Greenhouse Gas Emissions, 84 Fed. Reg. 30097 (June 26, 2019); *see also* Comments of the Attorneys General of California, *et al.*, Docket ID. CEQ-2019-0002-6749 (Aug. 26, 2019), https://www.regulations.gov/comment/CEQ-2019-0002-6749. This draft guidance was rescinded in 2021. Executive Order 13990, at § 7(e) (Jan. 20, 2021).

[18] Unless otherwise noted, the States use NEPA terms of art, such as alternatives and mitigation, consistent with the definitions at 40 C.F.R. § 1508.1.

AR_0026630

i. recommends agencies leverage early planning processes to integrate greenhouse gas emissions and related climate concerns when identifying proposed actions, alternatives, and mitigation measures;

ii. recommends agencies quantify a proposed action's projected greenhouse gas emissions or reductions for the action's lifetime, considering available tools and data;

iii. recommends agencies use projected greenhouse gas emissions of proposed actions and their reasonable alternatives to assess potential climate changes effects;

iv. recommends agencies provide additional context for greenhouse gas emissions, including estimating the social cost of greenhouse gas emissions (SC-GHG);

v. discusses methods to appropriately analyze reasonably foreseeable direct, indirect and cumulative greenhouse gas emissions;

vi. guides agencies in considering alternatives and mitigation measures and addressing short- and long-term climate change effects;

vii. advises agencies to use best available information and provides current examples of existing sources of scientific information;

viii. recommends agencies use the information developed during NEPA review to consider reasonable alternatives to make proposed actions and affected communities more resilient;

ix. outlines unique considerations for agencies analyzing biogenic carbon dioxide sources and carbon stocks associated with land and resource management actions;

x. advises agencies that the "rule of reason" should guide agencies in determining how to consider environmental effects and prepare analysis based on available information; and

xi. reminds agencies to incorporate environmental justice considerations into analysis of climate-related effects consistent with Executive Orders 12898 and 14008.[19]

In the detailed comments that follow, the States expand on their support for key provisions and provide suggestions on where CEQ could further strengthen agencies' analysis of these issues in NEPA reviews. For clarity, the States discuss the following key sections of the Guidance indicated by the section headings used in CEQ's Federal Register notice.

---

[19] 88 Fed. Reg. at 1198.

7

a. <u>The States Agree that NEPA Requires Agencies to Quantify a Proposed Action's Greenhouse Gas Emissions, And Urge CEQ to Provide Additional Direction (Guidance Section IV(A)).</u>

The States strongly support CEQ's clear statement that federal agencies should quantify and assess the greenhouse gas emissions from proposed federal actions, using federal resources to assist with the analysis. The States agree that it is insufficient for federal agencies to simply state that a proposed action and its alternatives are only a small fraction of global or domestic emissions because such comparisons do "not reveal anything beyond the nature of the climate change challenge itself."[20]

The States further support the Guidance's recommendation to center analysis around the public health and environmental effects of a proposed action and to explain these impacts in clear terms with sufficient information to yield a reasoned decision. The States also support directing guiding agencies to calculate gross and net emission reductions or increases and prepare annual calculations where appropriate. As directed by the Guidance, a full lifecycle analysis of greenhouse gas emissions should be performed when relevant that includes an analysis of upstream and downstream emissions from an action for the foreseeable lifetime of that action.[21] Where information about these emissions is missing or otherwise unknown, we support the Guidance's emphasis that such omitted information is not a basis to ignore and fail to analyze these impacts, which are still reasonably foreseeable.[22]

CEQ should strengthen the Guidance by providing more information and examples on how agencies should determine the significance of greenhouse gas emissions using the criteria in CEQ's NEPA regulations. CEQ should also provide more technical resources specifically aimed at facilitating timely and robust reviews of the avoided emissions associated with individual clean energy projects.

For example, the Guidance refers to quantification and assessment tools available on CEQ's website.[23] These include EPA's AVERT tool for analyzing emission impacts from energy efficiency and renewable energy policies and programs

---

[20] 88 Fed. Reg. at 1201.

[21] *See id.* at 1202; *Ctr. for Biological Diversity v. Bernhardt*, 982 F.3d 723, 735 (9th Cir. 2020); *Diné Citizens Against Ruining Our Env't v. Haaland*, 59 F.4th 1016, 1043 (10th Cir. 2023).

[22] 88 Fed. Reg. at 1202.

[23] *Id.* at 1201 n.56.

AR_0026632

in the electric power sector,[24] the Emissions Generation Resource Integrated Database (eGrid) for providing data on the carbon intensity of electricity generation, the Grid Project Impact Quantification Tool (GridPIQ) for estimating the impacts of smart grid technology deployments, and several transportation-related tools for estimating GHG emissions from the construction and maintenance of transportation facilities and modes of transit. These tools are valuable for their intended purposes; however, some of them are less effective for assessing specific clean energy projects. For example, AVERT expressly excludes emission reductions upstream of the utility sector and is not recommended for use on small local program or individual development projects.[25] Therefore, the Guidance could be strengthened by discussing and providing examples of resources specifically geared to evaluating the greenhouse gas emissions and climate impacts of individual proposed actions and clean energy projects.

In particular, we recommend that CEQ provide technical resources and examples of how to quantify avoided emissions, potential methodologies for those calculations, and suggestions of how to best disclose assumptions and provide rational analysis for those assumptions for individual projects. This would make review of clean energy projects more efficient, keep the Guidance current even as quantification tools evolve, and better inform the public and decision makers about the potential environmental benefits of such projects. Providing these additional resources would help to ensure that agencies use reasonable methodologies to conduct this analysis without creating an additional burden and potential delay from having agencies develop those methodologies on their own.[26]

The States also recommend strengthening the approach to calculating methane emissions, an important and potent greenhouse gas. In discussing the nature of climate change generally, the Guidance highlights the importance of

---

[24] CEQ, GHG Tools and Resources, GHG Estimating Tools, Energy (Efficiency, Renewable), Avoided Emissions and GeneRation Tool (AVERT), https://ceq.doe.gov/guidance/ghg-tools-and-resources.html.

[25] *Id.* Similarly, the existing transportation tools may not be applicable to all projects, particularly smaller projects. State transportation departments could benefit from additional guidance, from CEQ or from USDOT, on issues like quantifying avoided emissions.

[26] *See* 42 U.S.C. §§ 4344(5), (6) (under NEPA, CEQ must "conduct investigations, studies, surveys, research, and analyses relating to ecological systems and environmental quality . . . [and] document and define changes in the natural environment, including the plant and animal systems, and to accumulate necessary data and other information for a continuing analysis of these changes or trends and an interpretation of their underlying causes.").

AR_0026633

methane,[27] echoing the most recent Intergovernmental Panel on Climate Change Sixth Assessment Report.[28] We recommend that the Guidance encourage agencies to use the most up-to-date GWPs available from the Intergovernmental Panel on Climate Change when making decisions, because these values reflect current atmospheric conditions.[29]

b. <u>NEPA Requires Federal Agencies to Disclose and Provide Context for a Proposed Action's GHG Emissions and Climate Effects (Guidance Sections IV(B) and IV (F)).</u>

The States agree with CEQ's direction in Section IV(B) that federal agencies must disclose and provide the context for a proposed action's greenhouse gas emissions and associated climate impacts in addition to quantifying the project's emissions. As the Guidance properly notes, a simple comparison of the proposed action's emissions to global or domestic emissions does not comply with NEPA because "[s]uch a statement merely notes the nature of the climate change challenge" and does not inform the agency's decision.[30] Instead, NEPA's informed and transparent decision making mandate requires agencies to rely on scientifically accurate and reliable information to contextualize the significance of a project's greenhouse gas emissions and associated environmental consequences.[31]

The States applaud CEQ's general direction that agencies should (1) apply the "best available estimates of the SC-GHG to the incremental metric tons of each type of [greenhouse gas] emissions from a proposed action and its alternatives"; (2) explain

---

[27] 88 Fed. Reg. at 1199.

[28] *See, e.g.*, Intergovernmental Panel on Climate Change, Sixth Assessment Report, Synthesis Report, Summary for Policymakers, Finding B.1.2 (2023), https://report.ipcc.ch/ar6syr/pdf/IPCC_AR6_SYR_SPM.pdf.

[29] *See, e.g.*, EPA, Climate Change Indicators, https://www.epa.gov/climate-indicators/greenhouse-gases#major-long-lived-greenhouse-gases-and-their-characteristics (referencing values from the Sixth Assessment Report); *see also* MD. Code. Ann., Envir. § 2-1205(e)(3) (2022) (Instructing state greenhouse gas reduction plans "shall use the global warming potential for methane over a 20-year time horizon").

[30] 88 Fed. Reg. at 1201; *see also Diné Citizens Against Ruining Our Env't*, 59 F.4th at 1043 ("Simply stating what percentage the emissions will make up of regional, national, and global emissions does not meaningfully inform the public or decisionmakers about the impact of the emissions."); *350 Montana v. Haaland*, 50 F.4th 1254, 1268-70 (9th Cir. 2022) (holding that the Bureau of Land Management violated NEPA by failing to rationally contextualize the significance of a project's greenhouse gas emissions and instead relying on "an opaque comparison to total global emissions.")

[31] 42 U.S.C. § 4332(2)(F) (requiring agencies to consider worldwide and long-range environmental problems); *Diné Citizens Against Ruining Our Env't*, 59 F.4th at1043; *350 Montana*, 50 F.4th at 1269-70.

10

AR_0026634

how certain proposed actions "would help meet or detract from achieving relevant climate action goals and commitments," including federal, international, state, Tribal, and local goals and commitments; (3) "summarize and cite to available scientific literature to help explain the real-world effects" of the proposed action; and (4) make their analyses accessible to the public by providing comparisons or equivalents of greenhouse gas emissions in familiar terms such as the number of cars on the road.[32]

CEQ should strengthen the Guidance by (i) ensuring agencies disclose and analyze any inconsistencies between a proposed action and state, Tribal, and local laws, goals, commitments and policies to address climate change and, where appropriate, consider alternatives to reduce those inconsistencies; and (ii) strengthening language to provide additional context for SC-GHG calculations.

   i.  Federal agencies should disclose and analyze any inconsistencies between a proposed action and state, Tribal, and local laws, commitments, and policies to address climate change and, where appropriate, consider alternatives to reduce those inconsistencies.

To properly contextualize a project's emissions and make an informed decision, federal agencies must consider the impact of a proposed action and its alternatives on relevant climate action laws, goals and commitments. Only with this context can an agency's NEPA review allow the public and decision makers to make meaningful comparisons between an action and its alternatives.[33] To that end, the States applaud CEQ's statement that agencies should provide context by explaining how the proposed action and its alternatives would help meet or detract from relevant climate action goals and commitments, including international agreements, federal laws and goals (including agency-specific goals), state law mandates and goals, Tribal laws and goals, regional goals, and others as appropriate.[34] Such guidance is consistent with CEQ's longstanding practice of encouraging federal agencies to coordinate NEPA review with other federal approvals and planning processes, and with state and local agencies.[35]

CEQ should strengthen its Guidance by emphasizing that federal agencies should be transparent about how their proposed actions will impact state, Tribal, and

---

[32] 88 Fed. Reg. at 1202-03.

[33] *Id.* at 1198.

[34] *Id.* at 1203; *see also id.* at 1201; 40 C.F.R. § 1506.2.

[35] *See* CEQ, NATIONAL ENVIRONMENTAL POLICY ACT: A STUDY OF ITS EFFECTIVENESS AFTER TWENTY-FIVE YEARS, at 25 (Jan. 1997), https://ceq.doe.gov/docs/ceq-publications/nepa25fn.pdf ("By working at the level of specific places, and involving the planning goals of local and state agencies, federal agencies can make better decisions for an ecosystem and its surrounding communities.").

11

local efforts to address the climate crisis and to account for "any relevant approved State, Tribal or local plan, law or policy" including any specific greenhouse gas reduction mandates or goals, climate priorities, and scientifically established state-specific climate change projections for sea level rise and extreme precipitation events. For example, the Guidance should recommend that agencies presume that a project increasing emissions is inconsistent with emission reduction targets, and guide agencies to determine if there are reasonable alternatives that avoid such conflicts.[36] NEPA's plain language supports such firm direction by emphasizing the important role of states in the NEPA review process.[37] Consistent with this language, CEQ has long directed federal agencies to cooperate with state and local agencies and to address any inconsistencies with state and local plans and laws.[38]

Sometimes proposed federal actions directly conflict with state emission reduction laws, policies, and goals, but they may also indirectly conflict. For example, federal actions providing additional natural gas for electricity generation may make clean energy transitions more costly, impeding state laws requiring energy generators to shift to renewable resources and may also conflict with similar Tribal climate goals and efforts to reduce fossil fuels.[39]

Similarly, federal actions may conflict with state efforts to address disparate climate change impacts. Accordingly, NEPA reviews should also consider state efforts to advance environmental justice and, where appropriate, work in partnership with state agencies to ensure federal projects account for state environmental justice

---

[36] 40 C.F.R. § 1506.2.

[37] 42 U.S.C. § 4332(2)(G) (directing agencies to work in concert with state and local governments by making available "advice and information useful in restoring, maintaining, and enhancing the quality of the environment"); *see also id.* § 4332(2)(F).

[38] *Compare* 40 C.F.R § 1506.2(d) (2022) (directing that EISs "shall discuss any inconsistency of a proposed action with any approved State, Tribal, or local plan or law" and to "describe the extent to which the agency would reconcile its proposed action with the plan or law"), *with id.* § 1502.2(d) (2019) (directing that environmental impact "statements shall discuss any inconsistency of a proposed action with any approved State or local plan and laws" and to "describe the extent to which the agency would reconcile its proposed action with the plan or law.").

[39] *See* Comments on the Draft Environmental Impact Statement by the States of Washington, Oregon, and California, at 6-9, Gas Transmission Northwest, LLC, Docket No. CP22-2-000 (GTN Xpress Project) (Aug. 22, 2022), https://elibrary.ferc.gov/eLibrary/search; Comments on the Draft Environmental Impact Statement by the Columbia River Inter-Tribal Fish Commission, at 1, Gas Transmission Northwest, LLC, Docket No. CP22-2-000 (GTN Xpress Project) (Aug. 22, 2022) ("[T]he [GTN Xpress] Project is in direct conflict with tribes' and states' climate goals for reducing fossil fuels."), https://elibrary.ferc.gov/eLibrary/search.

AR_0026636

efforts.[40] Federal actions that present climate-related risks also may be inconsistent with state, Tribal, and local plans for resilience and adaptation.[41] Given the range of potential inconsistencies, CEQ should strengthen the Guidance by providing examples of how agencies could address and mitigate any inconsistencies that may arise. Examples could include both situations in which possible mitigation measures could better protect human health and safety and natural resources under projected future climate conditions, or in which reasonable alternatives may offer better protection.

Many states and state agencies have developed their own processes for evaluating greenhouse gas emissions for proposed actions.[42] As with other parts of

---

[40] Wash. Rev. Code ch. 70A.65 (Washington Climate Commitment Act); Wash. Rev. Code ch. 70A.02 (Washington Healthy Environment for All Act); St. 2021, ch. 8, §§ 56-60 and related revisions to the Massachusetts Environmental Policy Act (MEPA) regulations at 301 Code Mass. Reg. §§ 11.00 et seq. (effective Dec. 24, 2021), to require that projects undergoing review under MEPA, Mass. Gen. Laws ch. 30, §§ 61-62L, and located within certain designated geographic areas around Environmental Justice (EJ) populations conduct enhanced outreach and analysis of potential disproportionate adverse effects, including increased climate risks, on such EJ Populations, *see* https://www.mass.gov/service-details/information-about-upcoming-regulatory-updates. MEPA also released two protocols (effective Jan. 1, 2022) that provide further guidance and identify methodologies for complying with the new EJ regulations; MEPA Public Involvement Protocol for EJ Populations and the Protocol for Analysis of Project Impacts on EJ Populations, *see* https://www.mass.gov/guides/environmental-justice-protocols-and-resources#-updates-to-eea-ej-maps-viewer-.

[41] *See* 88 Fed. Reg. at 1209 (noting that "[w]here the analysis identifies climate-related risks to the proposed action or to the area affected by the proposed action, the agency should consider possible resilience and adaptation measures, including measures consistent with State, Tribal, or local adaptations plans—that could be employed to manage those effects."). For example, in Massachusetts, the MEPA Interim Protocol on Climate Change Adaptation and Resiliency (effective Oct. 1, 2021) requires consideration of climate change risks and resilience measures for all projects filed with the MEPA Office. *See* https://www.mass.gov/doc/mepa-interim-protocol-on-climate-change-adaptation-and-resiliency-effective-oct-1-2021/download.

[42] *See e.g.*, California Code of Regulations, title 14, section 15064.4 (providing guidance to lead state agencies on GHG impact significance determinations); California's recommendations: https://opr.ca.gov/docs/20181228-Discussion_Draft_Climate_Change_Adivsory.pdf; NY DEC Guide for Assessing Energy Use and Greenhouse Gas Emissions in an Environmental Impact Statement (addressing analysis of direct and indirect sources of GHG); PennDOT Publication No. 321 "Project Level Air Quality Handbook," last updated in 2017; N.Y. Dep't of Envtl. Conserv., Comm'r Policy CP-49: Climate Change and DEC Action (rev. Dec. 14, 2022), *available at* https://www.dec.ny.gov/docs/administration_pdf/cp492022.pdf; Massachusetts Environmental Policy Act (MEPA), Greenhouse Gas Policy and Protocol (2010) (requiring that projects undergoing environmental impact report (EIR) review under MEPA, Mass. Gen. Laws ch. 30, §§ 61-62L, quantify the proposed project's

13

the NEPA review process,[43] CEQ should encourage federal agencies to coordinate with state and local partners where projects require similar analyses under state laws. CEQ could potentially aid this federal-state partnership by providing a tool or clearinghouse, in addition to this Guidance, to connect federal agencies with state agencies engaged in similar analyses.

In addition, as noted in more detail in Section III.b.ii, below, the Guidance should instruct agencies that they cannot avoid providing the necessary context for proposed fossil fuel-related actions by defining the project's purpose and need so narrowly that it excludes consideration of clean energy alternatives that would address or mitigate inconsistencies with federal, international, state, Tribal, and local efforts to address climate change.

ii. <u>Federal agencies should provide additional context for Social Cost of Greenhouse Gases (SC-GHG) calculations.</u>

The SC-GHG tool is critical to understanding a project's social impacts and costs,[44] and the States applaud CEQ's direction that agencies should broadly consider SC-GHG in their NEPA analyses. Courts and agencies at the federal and state levels recognize the SC-GHG as methodologically sound and the best available method for assigning a monetary value to greenhouse gas emissions.[45] In particular, the States agree that putting a price tag on the long-term costs of greenhouse gas emissions—particularly carbon dioxide, methane, and nitrous oxide—provides meaningful

greenhouse gas emissions and identify mitigation measures—including the direct and indirect emissions from stationary sources (both on-site emissions and off-site energy generation from the project's energy use), mobile sources (traffic generation from both project vehicles and inducted travel by third parties), and additional optional categories, including direct emissions and lost carbon sequestration from large scale land and forest clearing, *see.* https://www.mass.gov/doc/greehouse-gas-emissions-policy-and-protocol/download.

[43] *See* Council on Environmental Quality, States and Local Jurisdictions with NEPA-like Environmental Planning Requirements, https://ceq.doe.gov/laws-regulations/states.html.

[44] *See* IWG-SC-GHG, U.S. Gov't, Technical Support Document, Social Cost of Carbon, Methane, and Nitrous Oxide Interim Estimates under Executive Order 13990, at 2 (Feb. 2021) ("The SC-GHG- is the monetary value of the net harm to society associated with adding a small amount of that GHG to the atmosphere in a given year."), https://www.whitehouse.gov/wp-content/uploads/2021/02/TechnicalSupportDocument_SocialCostofCarbonMethaneNitrousOxide.pdf?msclkid=b3970d46bc0911ecb2044bed89fb2b76.

[45] State of New York, et al., Comments on the Office of Management and Budget's Request for Comment on Technical Support Document: Social Cost of Carbon, Methane, and Nitrous Oxide Interim Estimates Under Executive Order 13990, 86 Fed. Reg. 24,669, at 14-17 (June 21, 2021) (Multistate TSD Comments), https://www.doj.state.or.us/wp-content/uploads/2021/06/multistate_scc_comments.pdf.

14

context for a proposed action and that such monetization is appropriate in "most," if not all, circumstances.[46]

As the Guidance accurately observes, application of the SC-GHG tool "provides an appropriate and valuable metric that gives decision makers and the public useful information and context about a proposed action's climate effects even if no other costs or benefits are monetized, because metric tons of greenhouse gases can be difficult to understand and assess the significance of in the abstract."[47] Monetization of these climate costs and benefits can also be particularly helpful for agencies, stakeholders, and the public when comparing clean energy project alternatives to proposed fossil fuel projects and when comparing project costs to quantified project benefits.[48] Monetization could also be used to analyze GHG mitigation banking options, setting aside funds to offset increased emissions from some projects to pay for projects to reduce emissions elsewhere. Because monetization of climate impacts leads to more informed and transparent decision making, it is a critical component of the NEPA analysis for proposed projects that will result in greenhouse gas emissions.[49]

The States believe that the Guidance's SC-GHG provisions should be strengthened, however, in several key ways:

<u>First</u>, in addition to stating that agencies "should apply the best available estimates of the SC-GHG" tool,[50] the Guidance should emphasize that principles of reasoned and informed decision making require federal agencies to disclose and explain the methodology and assumptions underlying their SC-GHG calculations.[51] In particular, agencies should disclose any omission of global impacts from the SC-GHG calculation and explain their reasoning for excluding this component.[52] Agencies should also disclose the estimated price of carbon and discount rate used in

---

[46] 88 Fed. Reg. at 1202.

[47] *Id.*

[48] *Id.* at 1203.

[49] *See Andrus v. Sierra Club*, 442 U.S. 347, 350-51 (1979) ("If environmental concerns are not interwoven into the fabric of agency planning, the 'action-forcing' characteristics of § 102(2)(C) would be lost . . . ."); *Ctr. for Biological Diversity*, 538 F.3d at 1198–1203; *cf. Sierra Club v. Federal Energy Regul. Comm'n*, 867 F.3d 1357, 1374 (D.C. Cir. 2017) (emphasizing that quantifying emissions is critical to informed decision making under NEPA).

[50] 88 Fed. Reg. at 1202.

[51] *See Seattle Audubon Soc. v. Espy*, 998 F.2d 699, 705 (9th Cir. 1993) (holding agency violated NEPA when the EIS rested on stale scientific evidence and the agency did not address uncertainties surrounding the scientific evidence).

[52] Multistate TSD Comments at 17-18.

15

their SC-GHG calculation, their basis for using that rate, and how their selected price and/or discount rate may affect a project's social cost.

This recommendation is consistent with the Guidance's direction that agencies utilize the best available SC-GHG estimates, and it recognizes that those estimates will be fine-tuned over time as the price of greenhouse gas emissions continues to evolve. Federal agencies should ensure that they rely on the most up-to-date calculations to best account for a project's social costs. Lower prices of carbon and higher discount rates may undervalue future social costs of greenhouse gas emissions. Accordingly, many of the undersigned States and their agencies have adopted discount rates under 3 percent to better account for the social costs of greenhouse gas emissions in their decisions.[53] In the *Technical Support Document: Social Cost of Carbon, Methane and Nitrous Oxide – Interim Estimates Under Executive Order 13990*,[54] the Interagency Working Group on Social Cost of Greenhouse Gases explained why it, too, believes "a consideration of discount rates below 3 percent, including 2 percent and lower, are warranted when discounting intergenerational impacts."[55] The Technical Support Document noted that a survey of "over 200 experts . . . found a 'surprising degree of consensus among experts, with more than three-quarters finding the median risk-free social discount rate of 2 percent acceptable.'"[56] Transparency around these metrics will aid agencies, stakeholders, and the public as they review the SC-GHG calculations and will help them to better understand where the "SC-GHG estimates . . . may be conservative underestimates" of a proposed action's climate harms.[57]

Second, while the States applaud CEQ's direction that agencies should acknowledge that the SC-GHG estimates may undercount climate harms by excluding various damage categories like ocean acidification, the States recommend that CEQ advise agencies to explain in their NEPA analyses where the SC-GHG calculation excludes the costs of certain climate change impacts or omits certain damage categories.[58] As New York's evaluation of appropriate SC-GHG values observed, "[t]he [climate models] only partially account for, or omit, many significant impacts of climate change that are difficult to quantify or monetize, including ecosystems, increased fire risk, the spread of pests and pathogens, mass extinctions,

---

[53] *Id.* at 21-24.

[54] Interagency Working Grp. On Social Cost of Greenhouse Gases, *Technical Support Document: Social Cost of Carbon, Methane and Nitrous Oxide – Interim Estimates Under Executive Order 13990* (February 2021), available at https://perma.cc/5B4Q-3T5Q.

[55] Multistate TSD Comments at 21.

[56] *Id.* at 20.

[57] 88 Fed. Reg. at 1203.

[58] *See, e.g.*, Multistate TSD Comments at 25-30, 32-24.

16

large-scale migration, increased conflict, slower economic growth, and potential catastrophic impacts."[59] A report sponsored by the Environmental Defense Fund, Natural Resources Defense Council, and the Institute for Policy Integrity observed that the "omission [of wildfires] is particularly problematic."[60] Another example of impacts that current models do not account for is damages to historically and culturally significant resources.[61]

These unquantified impacts can have significant social costs that disproportionately harm communities already experiencing disparate climate impacts. For example, as the wildfire season becomes lengthier and more destructive due to climate changes, millions of Americans are exposed to prolonged episodes of dangerously poor air quality.[62] Black communities, Indigenous communities, communities of color, and low-income communities are often most impacted by and vulnerable to wildfire smoke and other air pollution.[63] The loss of culturally and historically significant resources, which is not accounted for in the current SC-GHG calculation may, among other things, result in the SC-GHG tool significantly undervaluing the unique cost of a proposed action on Tribes and Indigenous communities and their cultural traditions.[64] And the SC-GHG tool may also fail to

---

[59] Resources for the Future, *Estimating the Value of Carbon: Two Approaches*, at 3 (Oct. 2020, revised April 2021), https://media.rff.org/documents/RFF_NYSERDA_Valuing_Carbon_Synthesis_Memo.pdf; *see also* Att. 24, Ruth DeFries, et al., *The missing economic risks in assessments of climate change impacts* (Sept. 2019), *available at* https://www.lse.ac.uk/granthaminstitute/wp-content/uploads/2019/09/The-missing-economic-risks-in-assessments-of-climate-change-impacts-2.pdf; Att. 25, Institute for Policy Integrity, *A Lower Bound: Why the Social Cost of Carbon Does Not Capture Critical Climate Damages and What that Means for Policymakers* (Feb. 2019), https://policyintegrity.org/files/publications/Lower_Bound_Issue_Brief.pdf; Att. 26, Peter Howard, *Omitted Damages: What's Missing from the Social Cost of Carbon*, at 30 (Mar. 13, 2014).

[60] Peter Howard, *Flammable Planet: Wildfires and the Social Cost of Carbon* (2014), found at https://costofcarbon.org/files/Flammable_Planet__Wildfires_and_Social_Cost_of_Carbon.pdf.

[61] *See* National Academy of Sciences, Valuing Climate Damages: Updating Estimation of the Social Cost of Carbon Dioxide (2017) at 152-53.

[62] *Fourth National Climate Assessment*, at 521-22 (explaining that "[e]xposure to wildfire smoke increases the risk of respiratory disease and mortality").

[63] Davies et al., IP, The unequal vulnerability of communities of color to wildfire. PLoS ONE 13(11): e0205825 (2018), https://doi.org/10.1371/journal.pone.0205825.

[64] *See* National Academy of Sciences, *Valuing Climate Damages: Updating Estimation of the Social Cost of Carbon Dioxide*, at 152 (2017). EPA-HQ-OAR-2021-0317-1566, Regulatory Impact Analysis of the Supplemental Proposal for the Standards of Performance for New, Reconstructed, and Modified Sources and Emissions Guidelines for

AR_0026641

account for the varying impact of climate change on communities experiencing environmental injustices. Agencies should disclose where the SC-GHG tool underestimates or fails to account for the disproportionate impacts on Black communities, Indigenous communities, communities of color, and low-income communities.[65]

The fact that the SC-GHG calculations do not account for the cultural and historic value of resources is particularly important to acknowledge in the NEPA context. The definition of "effects" in the NEPA implementing regulations specifically includes "historic [and] cultural" effects.[66] And NEPA itself states that one of the purposes of NEPA is to "preserve important [and] cultural . . . aspects of our national heritage."[67] Thus, the readers of NEPA analyses that employ the SC-GHG would assume, absent any disclaimer, that the metric captures those effects.

The threat that climate change poses to culturally and historically significant resources extends beyond the impact on Tribes and Indigenous communities. The Union of Concerned Scientists has identified many historic sites and landmarks at risk from climate change, including:

- Boston historic districts and Faneuil Hall, MA
- The Statue of Liberty and Ellis Island, NY
- Harriet Tubman National Monument, MD
- Historic Annapolis, MD
- Historic Jamestown, VA
- Fort Monroe National Monument, VA
- NASA's Coastal Facilities, FL and TX
- Cape Hatteras Lighthouse, NC
- Historic Charleston, SC
- Historic St. Augustine, FL
- Mesa Verde National Park, CO

---

Existing Sources: Oil and Natural Gas Sector Climate Review; Carlson Viles, *Tribal Climate Change Profile: First Foods and Climate Change* (December 2011), *available at* http://www7.nau.edu/itep/main/tcc/docs/tribes/tribes_FirstFoodsCC.pdf. The States, of course, do not presume to speak for the sovereign tribal nations or their interests. We encourage the CEQ and other federal agencies to engage in government to government consultation with Tribal nations to learn of specific threats climate change poses to their governments, communities, and cultural resources.

[65] *See, e.g.*, Multistate TSD Comments at 30-31.

[66] 40 C.F.R. § 508.1(g)(4).

[67] 42 U.S.C. § 4331(b)(4).

AR_0026642

- Bandelier National Monument, NM
- Cesar Chavez National Monument, CA.[68]

Agencies should acknowledge in their NEPA analyses where the SC-GHG calculation excludes these significant public health, cultural, and economic costs, and where possible, attempt to identify and account for these unquantified costs in their analyses. NEPA analysis is not a cost-benefit exercise, but rather requires identification and discussions of all reasonably foreseeable effects. [69] Even if an impact cannot be quantified, it should still be disclosed, contextualized, and discussed so as to inform a reasoned decision. Furthermore, we recommend that the Guidance provide information on how federal agencies can use resilience metrics and monetization of ecosystem services as part of providing context for emissions.

Third, the Guidance should specify that even where a project will have overall net beneficial SC-GHG effects (i.e., reductions in the social costs of climate change impacts), agencies must balance these benefits with the project's other potentially more localized environmental and public health impacts, such as impacts to local air quality, disparate impacts on underserved communities, and ecosystem impacts, as discussed further in Section III.l. To this end, the Guidance should affirmatively state that monetized factors should not take precedence or be elevated above non-monetized factors such as community and ecosystem health. As part of this contextual analysis of greenhouse gas emissions, the Guidance should direct agencies to consider environmental and racial justice impacts, including past disparate and cumulative impacts, as part of its contextual analysis.

Finally, the Guidance should remind agencies of their obligation to obtain the information necessary to provide the context for a project's greenhouse gas emissions or explain why they cannot do so, where such information is currently lacking.[70]

---

[68] Union of Concerned Scientists, *National Landmarks at Risk: How Rising Seas, Floods, and Wildfires Are Threatening the United States' Most Cherished Historic Sites*, at 4-32, 36-40, 44 (2014).

[69] *See also* OMB Circular A-4 (Sept. 17, 2003) at 2, which guides agencies conducting cost-benefit analyses, highlighting the importance of identifying significant non-quantified impacts, stating "[i]t will not always be possible to express in monetary units all of the important benefits and costs . . . . If the non-quantified benefits and costs are likely to be important, you should carry out a 'threshold' analysis to evaluate their significance . . . . [Y]ou should indicate, where possible, which non-quantified effects are most important and why."

[70] *See* 40 C.F.R. § 1502.21 (2022). To the extent CEQ's upcoming Phase 2 Rule revises this regulation, the States ask that CEQ direct agencies to comply with their obligations as codified in the Phase 2 Rule.

AR_0026643

c.  <u>Considering Reasonable Alternatives Is Critical to Thorough Environmental Review (Guidance Section IV(C)).</u>

The States support CEQ's emphasis in Section IV(C) of the Guidance on the central role that the alternatives analysis, including detailed analysis of the no-action alternative, plays in informed decision making under NEPA.[71] Courts interpreting NEPA and its implementing regulations have long recognized that the alternatives analysis is the "heart" of an EIS.[72] A NEPA review that fails to consider reasonable alternatives wastes taxpayer dollars, risks increased litigation and delays, and—most importantly—ignores creative, efficient, and beneficial alternatives to a proposed action. In the context of greenhouse gas emissions and climate impacts, as the Guidance observes, "[c]onsidering reasonable alternatives, including alternatives that avoid or mitigate GHG emissions, is fundamental" to NEPA.[73]

The States strongly agree that NEPA requires federal agencies to identify and analyze alternatives to the proposed action that will eliminate or reduce the actions' environmental harms.[74] As CEQ explains in the Guidance, "[a]gencies make better informed decisions by comparing relevant greenhouse gas emissions, greenhouse gas emission reductions, and carbon sequestration potential across reasonable alternatives, assessing trade-offs with other environmental values, and evaluating the risks from or resilience to climate change inherent in a proposed action and its design."[75] To fulfill NEPA's informed-decision making and alternatives analysis requirements, the Guidance correctly directs federal agencies considering fossil fuel projects to analyze in detail reasonable alternatives with lower greenhouse gas emissions, including reasonable clean energy alternatives.[76]

The Guidance should be strengthened by indicating that consideration of reasonable clean energy alternatives is appropriate and necessary for most fossil fuel projects. If CEQ encourages agencies in this context to determine which alternatives

---

[71] 88 Fed. Reg. at 1203.

[72] *See, e.g., Wildearth Guardians v. U.S. Bureau of Land Mgmt.*, 870 F.3d 1222, 1226 (10th Cir. 2017) (citing 40 C.F.R. § 1502.14); *Navajo Nation v. U.S. Forest Serv.*, 479 F.3d 1024, 1054 (9th Cir. 2007) (same); Nat'l Env'tl Policy Act Implementing Regulations Revisions, Notice of Proposed Rule, 86 Fed. Reg. 55757, 55,760 (Oct. 7, 2021) (recognizing the importance of considering appropriate alternatives to "meet the policies and responsibilities set forth in NEPA.").

[73] *Id.; see also Ctr. for Biological Diversity*, 538 F.3d at 1219 (holding environmental analysis violated NEPA where it did not consider reasonable alternative fuel economy standards that would conserve more energy).

[74] 88 Fed. Reg. at 1203.

[75] *Id.* at 1203-04.

[76] *Id.* at 1204.

20

are "technically and economically feasible,"[77] then the Guidance should also provide more information and examples about such feasibility determinations to ensure that agencies still consider the "reasonable range of alternatives" that NEPA requires. Otherwise, agencies may use these criteria to exclude consideration of reasonable alternatives such as emerging clean energy technologies and unduly or unlawfully narrow the scope of analysis.

CEQ should also provide additional guidance for agencies on the development and consideration of reasonable mitigation measures that could be employed to reduce greenhouse gas emissions and climate impacts, including mitigation measures that reduce harms to communities with environmental justice concerns.

As noted above, CEQ should also direct agencies to consider state, Tribal, and local climate change laws, commitments, and goals when developing alternatives and mitigation measures and to identify where certain alternatives are inconsistent with state, Tribal, and local efforts to lower emissions, reduce climate change impacts, and address disparate impacts from climate change. Particularly where a proposed action conflicts with federal, state, Tribal, or local climate change laws, commitments, and goals, CEQ should direct federal agencies to consider at least one action alternative that better aligns with those efforts.[78]

The Guidance should be further strengthened by directing agencies to ensure that their purpose and need statements are not crafted so narrowly as to arbitrarily and unlawfully exclude consideration of reasonable alternatives, including alternatives with lower greenhouse gas emissions or other mitigation measures that will reduce an action's climate harms. Such overly narrow purpose and need statements violate NEPA and undermine informed decision making.[79] Consistent with CEQ's recent observation that factors relevant to the development of a purpose and need statement may include "national, agency, or other policy objectives applicable to a proposed action" and "desired conditions on the landscape or other environmental outcomes,"[80] CEQ should direct federal agencies to consider national, state, Tribal, and local efforts on climate change as relevant factors in developing the purpose and need statement for a project to ensure federal agencies do not unlawfully

---

[77] *Id.*

[78] *See* 42 U.S.C. § 4332(2)(C), (E), (G); 40 C.F.R. § 1506.2.

[79] *See* National Environmental Policy Act Implementing Regulations Revisions, Final Rule (Phase I Rule), 87 Fed. Reg. 23453, 23459 (Apr. 20, 2022) ("It is contrary to NEPA for agencies to contrive a purpose as to define competing reasonable alternatives out of consideration (and even out of existence.") (cleaned up) (quoting *Simmons v. U.S. Army Corps of Engineers*, 120 F.3d 664, 666 (9th Cir. 1997)); *see also* 42 U.S.C. § 4332(2)(E).

[80] Phase I Rule, 87 Fed. Reg. at 23,458.

21

foreclose consideration of reasonable alternatives that may have lower greenhouse gas emissions and climate impacts.

        d.   NEPA Requires an Accurate Baseline for Considering Environmental Effects (Guidance Section IV(D)).

Establishing an accurate and relevant baseline is critical to a meaningful greenhouse gas emissions analysis of a proposed action. An improper baseline may obscure and improperly minimize the contribution of greenhouse gas emissions from a proposed action. Accordingly, the States agree with CEQ's Guidance directing that a NEPA review must identify the area affected by a proposed action (including reasonably foreseeable environmental and climate change trends), the current and future state of the environment under the no-action alternative, and an accurate estimate of greenhouse gas emissions without the proposed action.[81] The States also support requiring agencies to consider the full lifetime of the proposed action and its effects when setting the temporal bounds for the baseline (i.e., no action alternative) and analysis of the proposed action.[82]

To achieve this analysis and clarify the requirement, we recommend that the Guidance specify that an action's lifetime action be defined to include the full lifecycle of associated upstream and downstream emissions where relevant. Court decisions have held that analysis of greenhouse gas emissions should account for the reasonably foreseeable lifetime emissions of an action.[83] Additionally, many state and local climate laws, policies and programs count the full lifecycle upstream and downstream emissions in making certain determinations. Therefore, accounting for all relevant emissions is needed to assess consistency with state and local climate goals and emissions reduction targets.[84] The Guidance should clearly state that the lifetime of an action encompasses the full lifecycle of its upstream and downstream emissions and effects, including under projected future climate conditions.

---

[81] 88 Fed. Reg. at 1204.

[82] *Id.*

[83] *See Diné Citizens Against Ruining Our Env't*, 59 F.4th at 1043; *Ctr. for Biological Diversity*, 538 F.3d at 1216 ("The impact of greenhouse gas emissions on climate change is precisely the kind of cumulative impacts analysis that NEPA requires agencies to conduct.").

[84] *See, e.g.*, N.Y. Dep't of Envtl. Conserv., Program Policy DAR-21: The Climate Leadership and Community Protection Act & Air Permit Applications, at 1-2 (Dec. 14, 2022) (citing N.Y. Envtl. Conserv. L. § 75-0101(13)), https://www.dec.ny.gov/docs/air_pdf/dar21.pdf?source=email; N.Y. Dep't of Envtl. Conserv., Commissioner Policy CP-49, at 5.

AR_0026646

The Guidance should also be strengthened by further elaborating on, including by providing illustrative examples, the definition of the affected environment and no action alternative. The Guidance states that "an accurate estimate of [greenhouse gas] emissions without the proposed action should be included in a NEPA review."[85] This directive could be clarified in at least two ways.

First, the Guidance should better identify the scale of emissions if the agency pursued the no action alternative, preferably by reference to an identifiable state, Tribal, local, or national legal mandate, target, or goal. For example, a federal agency could estimate what a state's greenhouse gas emissions would be without the proposed action, referring to an identified state emissions reduction goal or requirement.

Second, the Guidance should provide more information and examples as to the relevant comparative situation or situations, especially where the proposed action does not plainly substitute one activity with identified greenhouse gas emissions for another. For example, a federal agency's action replacing existing equipment with new equipment may provide a relatively straightforward existing condition to compare emissions between the proposed action and no action alternative. But a federal agency undertaking a new initiative with no obvious predecessor program should also provide an accurate estimate of greenhouse gas emissions under a no action alternative. We recommend that the Guidance provide more examples and discussion of the relevant status quo or no action alternative whose emissions should be estimated.

e.  Agency Analysis of Direct and Indirect Effects Must Include All Reasonably Foreseeable Greenhouse Gas Emissions (Guidance Section IV(E)).

NEPA requires agencies to consider all reasonably foreseeable direct, indirect and cumulative effects of a proposed action, including all reasonably foreseeable greenhouse gas emissions.[86] Informed decision making is simply not possible under NEPA without an adequate quantification of reasonably foreseeable emissions.[87] Among other things, such "[q]uantification would permit the agency to compare the emissions from [a] project to emissions from other projects, to total emissions from the state or the region, or to regional or national emissions-control goals."[88]

---

[85] 88 Fed. Reg. at 1204.

[86] *See* 42 U.S.C. § 4332(2)(C).

[87] *See Sierra Club*, 867 F.3d at 1374.

[88] *Id.*

23

The States strongly support the Guidance directing agencies to comply with this core NEPA mandate by considering all reasonably foreseeable greenhouse gas emissions. Reasonably foreseeable effects are "sufficiently likely to occur [such] that a person of ordinary prudence would take them into account in reaching a decision."[89] The Guidance correctly directs agencies to consider direct and indirect greenhouse gas emissions, stating that "[i]ndirect effects generally include reasonably foreseeable emissions related to a proposed action that are upstream or downstream of the activity resulting from the proposed action."[90]

While the States recognize that agencies generally apply a "rule of reason," as discussed in the Guidance,[91] the Guidance could be clarified to discourage agencies from unreasonably limiting their environmental reviews based on a misunderstanding of the rule of reason. To ensure full compliance with NEPA's environmental review mandate, the States recommend that the Guidance provide more examples of projects where it would be reasonable and consistent with NEPA for agencies to engage in a less detailed environmental review. The Guidance provides a general example that "actions with only small GHG emissions may be able to rely on less detailed emissions estimates."[92] We encourage more examples of projects that would fall within this example, both to facilitate application of the rule of reason consistently and appropriately and also to discourage agencies from unreasonably using this provision to avoid review. In addition, the Guidance suggests that the rule of reason may counsel in favor of less detailed environmental review for proposed actions intended to reduce greenhouse gas emissions, such as clean energy projects, stating that "[a]bsent exceptional circumstances, the relative minor and short-term GHG emissions associated with construction of certain renewable energy projects, such as utility-scale solar and offshore wind, should not warrant a detailed analysis of lifetime GHG emissions."[93] The States generally support efficient review of climate-beneficial actions. However, we request more examples of how agencies should apply a rule of reason when analyzing projects intended to meet climate laws, goals, plans and policies. This would assist those agencies in implementing the Guidance and properly accounting for emissions, while also facilitating climate beneficial projects.

---

[89] *Sierra Club*, 867 F.3d at 1371.

[90] 88 Fed. Reg. at 1204.

[91] *Id.* at 1204-05.

[92] *Id.* at 1202.

[93] *Id.*

AR_0026648

f.  Agencies Must Evaluate the Cumulative Effects of a Project on Greenhouse Gas Emissions and Climate Change (Guidance Section IV(F)).

The States firmly agree that cumulative effects analysis is critical to highlighting the incremental and overlapping impacts of greenhouse gas emissions and associated climate change. As CEQ explains in Section IV(F) of the Guidance, climate change "is inherently cumulative in nature," and these cumulative climate impacts frequently cause disproportionate impact on overburdened communities.[94] Accordingly, NEPA requires agencies to consider the cumulative impacts of GHG emissions on climate change.[95]

In addition to the recommended analysis, CEQ should strengthen its Guidance by providing further information on how federal agencies should analyze climate change impacts on communities experiencing environmental justice concerns in the context of socio-economic and race equity, and by evaluating the extent to which these communities are already overburdened with adverse environmental and public health impacts, including the polluting effects of greenhouse gases, such as air toxins and increased particulate matter. This analysis of cumulative impacts from co-pollutants, should account for future projected climate conditions, including extreme heat and other changes such as sea level rise and flooding, and discuss how the increased levels of these emissions would affect overburdened communities in those contexts. Agencies simply cannot know the full impact of a project on a community

---

[94] *Id.* at 1206.

[95] *See Ctr. for Biological Diversity*, 538 F.3d at 1217 ("The fact that climate change is largely a global phenomenon that includes actions that are outside of [the agency's] control . . . does not release the agency from the duty of assessing the effects of its actions on global warming within the context of other actions that also affect global warming.") (cleaned up); *see also* Exec. Order 14,008, 86 Fed. Reg. 7619 (Jan. 27, 2021) (directing federal agencies to "secure environmental justice and spur economic opportunity for disadvantaged communities that have been historically marginalized and overburdened by pollution and underinvestment"); Exec. Order 13,985, 86 Fed. Reg. 7009 (Jan. 25, 2021) (directing all federal agencies to "work to redress inequities in their policies and programs that serve as barriers to equal opportunity"); Exec. Order 13,990, 86 Fed. Reg. 7037 (Jan. 25, 2021) (directing all executive departments and agencies to address any actions that conflict with goal of prioritizing environmental justice, among other national objectives); Exec. Order 13,563, 76 Fed. Reg. 3821 (Jan. 21, 2011) (directing agencies to select regulatory approaches that maximize net benefits including "distributive impacts[] and equity"); Exec. Order 12,898, 59 Fed. Reg. 7629 (Feb. 16, 1994) (directing each federal agency to "make achieving environmental justice part of its mission by identifying and addressing, as appropriate, disproportionately high and adverse human health or environmental effects of its programs, policies, and activities on minority populations and low-income populations"); Exec. Order 12,866, 51 Fed. Reg. 51,735 (Oct. 4, 1993) (ordering agencies to consider "distributive impacts[] and equity" in designing regulations).

25

without considering the existing levels of pollution and the cumulative impacts in the community of adding another pollution source.

Accordingly, CEQ should strengthen the Guidance by instructing agencies how to conduct analysis in a manner that ensures that federal NEPA reviews identify and disclose the full scope of potential impacts to communities, particularly overburdened communities. To make the Guidance meaningful and accessible to impacted communities, CEQ should direct agencies on how to employ consistent frameworks and methodologies across analyses, and as noted below, should clarify how and when in the process agencies should utilize existing federal agency tools. These tools include—but are not limited to—CEQ's Environmental Justice Guidance,[96] Executive Order 12898, Executive Order 14008, EPA's EJ Screen 2.0 and CEQ's Climate and Economic Justice Screening Tool. For example, CEQ could recommend that agencies use the Climate and Economic Justice Screening Tool to identify the overburdened communities that may be impacted by an agency action, as the agencies initiate their environmental review process under NEPA.

### g. Agencies Must Conduct a Holistic Analysis of Short- and Long-Term Effects (Guidance Section IV(G)).

The States support the Guidance's discussion in Section IV(G) that agencies consider progressive stages of proposed actions and alternatives to capture the emissions from the reasonably foreseeable lifetime of an action.[97] For example, agencies should consider greenhouse gas emissions from construction, operation and maintenance phases, each of which may have distinct emissions profiles and durations.

We urge, however, that the Guidance clarify this discussion to ensure that agencies do not take it as a suggestion to only consider one stage of a project at a time, effectively segmenting greenhouse gas emissions review of a project.[98] We understand the goal of this portion of the Guidance to be encouraging holistic review of the greenhouse gas emissions from a project's various stages together, not dilute review of overall impacts by encouraging segmentation.

---

[96] CEQ, Environmental Justice: Guidance Under NEPA (1997), https://www.energy.gov/nepa/ceq-guidance-documents.

[97] 88 Fed. Reg. at 1206.

[98] *See Swain v. Brinegar*, 542, F.2d 364, 368-69 (7th Cir. 1976) (finding improper segmentation; "although the individual environmental impact might be slight, the cumulative consequences could be devastating."); *see generally Coal. on Sensible Transp., Inc. v. Dole*, 826 F.2d 60, 68 (D.C. Cir. 1987) ("Agencies may not evade their responsibilities under NEPA by artificially dividing a major federal action into smaller components, each without 'significant' impact.").

AR_0026650

h. <u>Agencies Must Evaluate Meaningful Mitigation Measures to Avoid or Reduce GHG Emissions (Guidance Section IV(H)).</u>

The States agree with the discussion in Guidance Section IV(H) that NEPA requires agencies to consider mitigation measures for impacts that cannot be avoided or minimized to reduce an action's greenhouse gas emissions and climate impacts.[99]

The States recommend that CEQ provide examples and other resources for agencies to analyze mitigation measures to reduce an action's emissions and climate impacts. For example, effective mitigation measures could include implementing methods to conserve energy and water, strategies to sequester carbon to offset emissions from an action, measures to promote climate resiliency or adaptation, or other measures that lessen project emission or impacts. Consideration of such mitigation should also strive to align with adopted climate laws, policies and programs in the state, Tribe or municipality where the action or its effects will occur.

We acknowledge that emissions trading programs, carbon credits, and offsite mitigation may be considered in certain circumstances. We think such mitigation measures are most appropriately considered where they are consistent with national, state, Tribal and municipal programs and goals and when an action and its alternatives will have significant greenhouse gas emissions, particularly when no other alternatives are feasible.[100] We caution, however, that these measures may not mitigate—and indeed may exacerbate—the impacts of more localized air pollution on nearby communities, including communities that are already overburdened by air pollution. Where agencies consider emission trading programs as a climate mitigation measure, CEQ should make clear that the agencies should also consider mitigation measures or other alternatives that will reduce or eliminate direct air quality harms to nearby affected communities and should analyze the environmental justice impacts of each mitigation measure considered.

i. <u>Agencies Should Consider Biological Greenhouse Gas Sources and Sinks (Guidance Section IV(I)).</u>

As the Guidance discusses in Section IV(I), some greenhouse gas emissions are related to the natural carbon cycle or result from processing of biologically based materials such as timber.[101] These types of emissions occur in addition to those

---

[99] 88 Fed. Reg. at 1206; *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350-52 (1989) (explaining that NEPA's action-forcing provisions require "a detailed discussion of possible mitigation measures").

[100] Cal. Air Res. Bd., 2022 Scoping Plan, App'x D (Local Actions), https://ww2.arb.ca.gov/resources/documents/2022-scoping-plan-documents.

[101] 88 Fed. Reg. at 1207.

27

generated by fossil fuel extraction and use. Biogenic emissions are particularly prone to occur when federal agencies are making land and resource management decisions. The States agree that federal agencies should consider the net change in greenhouse gas emissions and carbon stocks as part of calculating lifestyle greenhouse gas emissions where relevant.[102] We recommend that the Guidance make clear that agencies should consider the timing of biogenic emissions and the timing of any increase in carbon sequestration. Federal agencies should assess these impacts when an action will affect existing landcover types, such as clearance of grasslands or forest lands as well as other development or land management actions. We recommend strengthening the Guidance to discuss the importance of using appropriate and reliable information sources, such as studies and established datasets on carbon storage capacity of the region under review and similar information from comparable ecoregions, i.e., the areas where ecosystems (and thus likely biogenic carbon sinks) are generally similar.[103] Otherwise, projects risk making assumptions about rates of greenhouse gas emissions or removal that may be incorrect or misleading.

> **j.  Agencies Should Broadly Define the Affected Environment when Considering Effects of Climate Change on a Proposed Action (Guidance Section V(A)).**

The States support defining the affected environment as the reasonably foreseeable affected environment and the temporal bounds of an action as the expected life of the action and its effects.[104] As discussed above related to baseline considerations, however, we recommend including additional examples to illustrate this point.

We further recommend that the Guidance direct agencies to consider the increasing risk posed by climate change as it progresses. The Guidance should address best practices for assessing and comparing the range of impacts expected to occur under different emissions and global temperature rise scenarios.[105] For example, agencies should consider how the incidence of flooding may affect projects constructed near shorelines more severely in a few decades than in the immediate term and the severity of impacts may vary depending on the degree of warming that occurs. Similarly, agencies should consider how the property losses associated with wildfires are projected to increase in coming decades because climate change is predicted to increase the frequency and size of fires, and also many more people will

---

[102] *Id.*

[103] *See* EPA, Ecoregions, https://www.epa.gov/eco-research/ecoregions.

[104] 88 Fed. Reg. at 1208.

[105] *Id.*

AR_0026652

have moved into fire-prone locations.[106] Analysis of these impacts should consider a reasonable range of emissions and global temperature scenarios, which may determine the magnitude of longer term effects.[107] The Guidance could be strengthened to provide examples of how agencies should account for these scenarios and the unfolding of effects over time.

      k. <u>Agencies Should Use the Best Available Science and Data to Assess Present and Future Impacts, Resilience and Adaptation (Guidance Sections V(C) and V(D)).</u>

The States support the Guidance's directive that agencies consider the most current reports on climate impacts, including national climate assessments.[108] For the United States, the existing 2018 Fourth National Climate Assessment, while still valuable, will be updated by the Fifth National Climate Assessment in 2023, and therefore will provide timely information as agencies implement this Guidance. Similarly, the Intergovernmental Panel on Climate Change continues to report on updated climate change models and projections, with a sixth assessment synthesis report released in March of 2023.[109] Agencies should reference the most recent reports and projections in preparing NEPA documents.

In addition, the States recommend that the Guidance direct agencies also to consider more specific regional or state-level estimates, such as rainfall and sea level rise projections relevant to the specific project site. For effects such as increased precipitation (and its associated impacts of increased flooding, stormwater runoff, waterbody turbidity, etc.), the regional and local projections may be more relevant and useful for agencies' NEPA analysis and ultimately project design and adaptation. For example, the Northeast Regional Climate Center offers several valuable climate change resources such as information on increasing extreme precipitation events[110]

---

[106] Sleeter, B.M., T. Loveland, G. Domke, N. Herold, J. Wickham, and N. Wood, 2018: Land Cover and Land-Use Change. In Impacts, Risks, and Adaptation in the United States: Fourth National Climate Assessment, Volume II [Reidmiller, D.R., C.W. Avery, D.R. Easterling, K.E. Kunkel, K.L.M. Lewis, T.K. Maycock, and B.C. Stewart (eds.)]. U.S. Global Change Research Program, Washington, DC, USA, pp. 214-215. doi: 10.7930/NCA4.2018.CH5, https://nca2018.globalchange.gov/chapter/5/.

[107] *Id.* at 215.

[108] 88 Fed. Reg. at 1208.

[109] Intergovernmental Panel on Climate Change, AR6 Synthesis Report: Climate Change 2023, https://www.ipcc.ch/report/sixth-assessment-report-cycle/.

[110] Northeast Regional Climate Center, Recent Extreme Precipitation Changes in the Northeast U.S., https://precipchange.nrcc.cornell.edu/.

29

and updated Intensity Duration Frequency Curves for New York State.[111] These data and projections are intended to downscale outputs from global climate models such as the work of the Intergovernmental Panel on Climate Change to regional and state-level planning tools. Where the Intergovernmental Panel's most recent Sixth Assessment gives a fairly wide range of increased precipitation on land through the end of the 21st century,[112] the Northeast Regional Climate Center provides actual rainfall distribution curves that can be incorporated into state and local climate change adaptation planning in New York State. As state and local governments and private project sponsors increasingly rely on these localized resources, federal agencies should do the same. Federal agencies' analysis of the effects of climate change on their proposed actions and alternatives would be much stronger and more accurate if they consider these more granular analyses directed at areas of particular local and regional concern in addition to national and international assessments.

The States also support the Guidance's directive to consider appropriate resilience and adaptation measures such as state, Tribal or local adaptation plans.[113] The Guidance should highlight consideration of appropriate measures to ensure both resilience of the project and avoidance of harmful effects to public health and safety, natural resources, and infrastructure under projected future climate conditions. Many state-level plans incorporate equity objectives to ensure that climate adaptation does not exacerbate past discrimination, but instead may address it. Similarly, we support the directive to incorporate environmental justice principles and robust community engagement around GHG emissions and climate impacts[114] to consider whether the effects of climate change, when associated with other effects of

---

[111] Northeast Regional Climate Center, Intensity Duration Frequency Curves for New York State: Future Projections for a Changing Climate, https://ny-idf-projections.nrcc.cornell.edu/index.html.

[112] Lee, J.-Y., J. Marotzke, G. Bala, L. Cao, S. Corti, J.P. Dunne, F. Engelbrecht, E. Fischer, J.C. Fyfe, C. Jones, A. Maycock, J. Mutemi, O. Ndiaye, S. Panickal, and T. Zhou, 2021: Future Global Climate: Scenario-Based Projections and Near-Term Information. In Climate Change 2021: The Physical Science Basis. Contribution of Working Group I to the Sixth Assessment Report of the Intergovernmental Panel on Climate Change [Masson-Delmotte, V., P. Zhai, A.Pirani, S.L. Connors, C. Péan, S. Berger, N. Caud, Y. Chen, L. Goldfarb, M.I. Gomis, M. Huang, K. Leitzell, E. Lonnoy, J.B.R. Matthews, T.K. Maycock, T. Waterfield, O. Yelekçi, R. Yu, and B. Zhou (eds.)]. Cambridge University Press, Cambridge, United Kingdom and New York, NY, USA, pp. 556, doi:10.1017/9781009157896.006, https://www.ipcc.ch/report/ar6/wg1/downloads/report/IPCC_AR6_WGI_Chapter04.pdf.

[113] 88 Fed. Reg. at 1208.

[114] Id. at 1209.

AR_0026654

a proposed action, may result in disproportionate impacts on communities with environmental justice concerns.

     1. <u>The Guidance Makes Great Strides to Elevate the Thorough Analysis of Environmental Justice Concerns, But Should be Further Strengthened (Guidance Sections V(B) and VI(E)).</u>

To advance environmental justice, federal agencies must center, elevate, and thoroughly analyze environmental justice impacts throughout their NEPA analyses. The States strongly agree with the Guidance that environmental justice is a critical issue that must be considered early and often in the NEPA process.[115] The States also support the Guidance's recognition that climate change often exacerbates environmental justice impacts, including cumulative impacts. We therefore recommend more strongly linking this analysis of the effects of climate change on environmental justice communities to agencies' cumulative impacts analysis.

As the Guidance notes, climate change raises significant environmental justice concerns because it will have disproportionate and adverse public health and environmental impacts in communities of color, low-income communities, and Tribal Nations and Indigenous communities.[116] Accordingly, "[u]nderstanding the comparative risks to vulnerable populations is critical for developing effective and equitable strategies for responding to climate change."[117]

But a focus on climate change effects alone is not enough. Communities most affected by climate change are also often those that face immediate and significant impacts from localized adverse air quality and other environmental harms that must also be addressed as part of the detailed environmental review required by NEPA. As part of the Guidance, CEQ should ensure that federal agencies analyze, disclose, and seek to mitigate both disproportionate climate impacts and other disproportionate impacts in their environmental reviews. In addition to instructing federal agencies to "regularly engage with environmental justice experts,"[118] CEQ should provide clarity on how and when in the process agencies should utilize existing federal agency tools, including CEQ's Environmental Justice Guidance,[119] Executive Order 12898, Executive Order 14008, Executive Order 14091, EPA's EJ Screen 2.0 and CEQ's

---

[115] *Id.* at 1211.

[116] *Id.* at 1197.

[117] EPA, Climate Change and Social Vulnerability in the United States: A focus on Six Impacts, at 9 (Sept. 2021), <u>Climate Change and Social Vulnerability in the United States: A Focus on Six Impacts (epa.gov).</u>

[118] 88 Fed. Reg. at 1211.

[119] CEQ, Environmental Justice: Guidance Under NEPA (1997), available at <u>https://www.epa.gov/sites/default/files/2015-02/documents/ej_guidance_nepa_ceq1297.pdf</u>.

31

Climate and Economic Justice Screening Tool. This would ensure consistency and reduce confusion among stakeholders and the public, particularly in states without defined criteria for disadvantaged communities. The States recommend that in states with established criteria for identifying disadvantaged communities, that NEPA reviews consider those state criteria to avoid confusion.

As the Guidance observes, early consideration of climate and environmental justice impacts ensures that agencies properly determine the scope of the project and consider a full range of alternatives and mitigation measures.[120] In order to meet these aims, the Guidance should more explicitly recommend that agencies develop and consider alternatives and mitigation measures that minimize climate impacts to environmental justice communities. To do so effectively, agencies should incorporate environmental justice principles throughout their NEPA reviews. In particular, the Guidance should direct agencies to analyze environmental justice impacts as part of their detailed review of alternatives and mitigation measures.

Federal agencies must also promote meaningful community participation in the NEPA process. As a statute that prioritizes public participation, NEPA is well-tailored to advance environmental justice and incorporate the impacted community into the decision-making process but it takes concentrated time and effort by federal agencies to make meaningful public participation a reality. To facilitate meaningful public participation, the Guidance should provide more precise instructions to federal agencies on what it means to "engage" affected communities during the various NEPA stages, starting with scoping and project planning through the end of the environmental review process, and how to incorporate community voices and recommendations in the decision-making process.[121]

The Guidance should also note that our States can be important partners in community engagement, and many States have climate laws and plans that specifically require assessment of environmental justice in this context. For example, New York's Climate Leadership and Community Protection Act prohibits disproportionately burdening disadvantaged communities in considering and issuing permits, licenses and other approvals (including grants, loans and contracts), and also directs state agencies to prioritize reductions of greenhouse gases and co-pollutants in disadvantaged communities.[122] Similarly, Washington's Climate Commitment Act prioritizes environmental justice by ensuring that cutting carbon pollution produces health and economic benefits for the communities that bear the

---

[120] 88 Fed. Reg. at 1198; Executive Order 14008; Executive Order 12898; https://www.whitehouse.gov/briefing-room/presidential-actions/2023/02/16/executive-order-on-further-advancing-racial-equity-and-support-for-underserved-communities-through-the-federal-government/.

[121] *See* 88 Fed. Reg. at 1211.

[122] N.Y. CLCPA 7(3).

brunt of air pollution today and directing revenue from emissions allowance auctions to address air quality issues in these communities and to advance health and environmental equity statewide.[123] To implement these directives and their broad commitment to environmental justice, many of our state agencies have best practices on community engagement with an emphasis on advancing environmental justice.[124] For example, coordinating federal and state outreach on projects with overlapping authorities can also help to avoid confusion about which entity has authority over which aspect of the project and to reduce the burden on community to participate in multiple agency processes.

To facilitate meaningful engagement, the Guidance should also recommend that federal agencies translate key greenhouse gas and climate impact analyses into the language(s) used by local communities. These translations would promote the ability of non-English speaking communities to engage in the NEPA process and communicate NEPA documents and correspondence through a medium accessible to those communities. Particularly for technical issues like greenhouse gas emissions and climate impacts, agencies should provide information in plain language that is accessible to the general public and the impacted communities. The Guidance should further instruct federal agencies to hold public meetings early and often during the planning and environmental review process at times and places that facilitate community participation, including multiple options during daytime and evening hours and options for both remote and telephonic participation. To further advance environmental justice in the entire NEPA process, CEQ should consider incorporating some or all of these measures in its upcoming Phase 2 Rule revising its NEPA regulations.

Thank you for your work on the Guidance and for your consideration of these comments.


Respectfully submitted,

*Signatures contained on pages 34-38*

---

[123] *See generally* Wash. Rev. Code 70A.65; *see also* WA Dep't of Ecology, The Climate Commitment Act: Washington's path to carbon-neutrality by 2050 (Feb. 18, 2022), https://ecology.wa.gov/Blog/Posts/February-2022/The-Climate-Commitment-Act-Washington-s-Path-to-Ca.

[124] *See, e.g.*, https://opr.ca.gov/docs/20190717-Community_Engagement_Best_Practices.pdf.

AR_0026657