| | |
|---|---|
| FOR THE STATE OF NEW YORK AND NEW YORK STATE DEPARTMENT OF ENVIRONMENTAL CONSERVATION<br><br>LETITIA JAMES<br>Attorney General<br><br><br>By: */s/ Claiborne Walthall*<br>MICHAEL J. MYERS<br>Senior Counsel<br>CLAIBORNE E. WALTHALL<br>Assistant Attorney General<br>Environmental Protection Bureau<br>New York State Attorney General<br>The Capitol<br>Albany, NY 12224<br> (518) 776-2380<br>Claiborne.Walthall@ag.ny.gov | FOR THE STATE OF WASHINGTON<br><br><br>ROBERT W. FERGUSON<br>Attorney General<br><br><br><br>*/s/ Aurora Janke*<br>AURORA JANKE<br>Assistant Attorney General<br>Washington Attorney General's Office<br>Environmental Protection Division<br>800 5th Ave., Ste. 2000 TB-14<br>Seattle, Washington 98104-3188<br>(206) 233-3391<br>Aurora.Janke@atg.wa.gov |
| FOR THE STATE OF CALIFORNIA<br><br>ROB BONTA<br>Attorney General<br><br>*/s/ Thomas Schumann*<br>SARAH E. MORRISON<br>Supervising Deputy Attorney General<br>YUTING CHI<br>THOMAS SCHUMANN<br>TAYLOR WETZEL<br>Deputy Attorneys General<br>1515 Clay Street, 20th Floor<br>Oakland, CA 94602<br>(510) 879-3298<br>Yuting.Chi@doj.ca.gov | FOR THE STATE OF CONNECTICUT<br><br>WILLIAM TONG<br>Attorney General<br><br>*/s/ Christopher P. Kelly*<br>CHRISTOPHER P. KELLY<br>Assistant Attorney General<br>Office of the Attorney General<br>165 Capitol Avenue<br>Hartford, CT 06106<br>(860) 808-5250<br>christopher.kelly@ct.gov |

34

| FOR THE STATE OF ILLINOIS | FOR THE STATE OF MAINE |
|---|---|
| KWAME RAOUL<br>Attorney General of Illinois<br><br>*/s/Jason E. James*<br>JASON E. JAMES<br>Assistant Attorney General<br>MATTHEW J. DUNN<br>Chief, Environmental<br>Enforcement/Asbestos Litigation<br>Division<br>Office of the Attorney General<br>201 West Pointe Drive, Suite 7<br>Belleville, IL 62226<br>Tel: (872) 276-3583<br>Jason.james@ilag.gov | AARON M. FREY<br>Attorney General<br><br>*/s/ Emma Akrawi*<br>EMMA AKRAWI<br>Assistant Attorney General<br>Office of the Attorney General<br>6 State House Station<br>Augusta, ME 04333<br>Tel: (207) 626-8800<br>emma.akrawi@maine.gov |
| FOR THE STATE OF MARYLAND | FOR THE COMMONWEALTH OF MASSACHUSETTS |
| ANTHONY G. BROWN<br>Attorney General of Maryland<br><br>*/s/ Steven J. Goldstein*<br>STEVEN J. GOLDSTEIN<br>Special Assistant Attorney General<br>200 Saint Paul Place, 20th Floor<br>Baltimore, MD 21202<br>(410) 576-6414<br>sgoldstein@oag.state.md.us | ANDREA JOY CAMPBELL<br>Attorney General<br><br>*/s/ Turner H. Smith*<br>TURNER H. SMITH<br>Assistant Attorney General<br>Deputy Chief<br>MATTHEW IRELAND<br>Assistant Attorney General<br>Office of the Attorney General<br>Energy and Environmental Bureau<br>One Ashburton Place, 18th Floor<br>Boston, MA 02108<br>(617) 727-2200<br>Turner.Smith@mass.gov<br>Matthew.Ireland@mass.gov |

35

| FOR THE STATE OF MICHIGAN | FOR THE STATE OF MINNESOTA |
|---|---|
| DANA NESSEL<br>Attorney General<br><br>*/s/ Elizabeth Morrisseau*<br>ELIZABETH MORRISSEAU<br>Assistant Attorney General<br>Environment, Natural Resources, and<br>Agriculture Division<br>6th Floor G. Mennen Williams<br>Building<br>525 W. Ottawa Street<br>P.O. Box 30755<br>Lansing, MI 48909<br>(517) 335-7664<br>MorrisseauE@michigan.gov | KEITH ELLISON<br>Attorney General of Minnesota<br><br>*/s/ Peter N. Surdo*<br>PETER N. SURDO<br>Special Assistant Attorney General<br>445 Minnesota Street<br>Town Square Tower Suite 1400<br>Saint Paul, MN 55101<br>(651) 757-1061<br>Peter.Surdo@ag.state.mn.us |
| FOR THE STATE OF NEW JERSEY | FOR THE STATE OF OREGON |
| MATTHEW J. PLATKIN<br>Acting Attorney General<br><br>*/s/ Matthew Novak*<br>MATTHEW NOVAK<br>Deputy Attorney General<br>Environmental Enforcement and<br>Environmental Justice<br>R.J. Hughes Justice Complex<br>P.O. Box 093<br>Trenton, NJ 08625<br>(609) 376-2804 | ELLEN ROSENBLUM<br>Attorney General<br><br>*/s/ Paul A. Garrahan*<br>PAUL A. GARRAHAN<br>Attorney-in-Charge<br>STEVE NOVICK<br>Special Assistant Attorney General<br>Natural Resources Section<br>Oregon Department of Justice<br>1162 Court Street NE<br>Salem, OR 97301-4096<br>(503) 947-4540<br>Paul.Garrahan@doj.state.or.us<br>Steve.Novick@doj.state.or.us |

AR_0026660

| | |
|---|---|
| FOR THE COMMONWEALTH OF PENNSYLVANIA<br><br>MICHELLE A. HENRY<br>Attorney General of Pennsylvania<br><br>JILL GRAZIANO<br>Chief Deputy Attorney General<br><br>*/s/ Ann R. Johnston*<br>ANN R. JOHNSTON<br>Senior Deputy Attorney General<br>Office of Attorney General<br>Strawberry Square, 14th Floor<br>Harrisburg, PA 17120<br>(717) 705-6938<br>ajohnston@attorneygeneral.gov | FOR THE STATE OF RHODE ISLAND<br><br>PETER F. NERONHA<br>Attorney General<br><br>*/s/ Randelle L. Boots*<br>Special Assistant Attorney General<br>Rhode Island Office of the Attorney General<br>150 South Main Street<br>Providence, RI 02903<br>Phone: (401) 274-4400 ext. 2122<br>Email: rboots@riag.ri.gov |
| FOR THE STATE OF VERMONT<br><br>CHARITY R. CLARK<br>Attorney General<br><br>*/s/ Nicholas F. Persampieri*<br>NICHOLAS F. PERSAMPIERI<br>Assistant Attorney General<br>Office of the Attorney General<br>109 State Street<br>Montpelier, VT 05609<br>(802) 828-6902<br>nick.persampieri@vermont.gov | FOR THE STATE OF WISCONSIN<br><br>JOSHUA L. KAUL<br>Attorney General<br><br>*/s/ Tressie K. Kamp*<br>TRESSIE K. KAMP<br>Assistant Attorney General<br>Wisconsin Department of Justice<br>17 W. Main Street<br>Madison, WI 53707-7857<br>(608) 266-9595<br>kamptk@doj.state.wi.us |

AR_0026661

| FOR THE DISTRICT OF COLUMBIA | FOR THE CITY OF NEW YORK |
|---|---|
| BRIAN L. SCHWALB<br>Attorney General<br><br>JENNIFER C. JONES<br>Deputy Attorney General<br>Public Advocacy Division<br><br>ARGATONIA D. WEATHERINGTON<br>Chief, Social Justice Section<br><br>*/s/ Wesley Rosenfeld*<br>WESLEY ROSENFELD<br>Assistant Attorney General<br>400 Sixth St. N.W.<br>Washington, D.C. 20001<br>(202) 368-2569 (phone)<br>Wesley.Rosenfeld1@dc.gov | SYLVIA O. HINDS-RADIX<br>Corporation Counsel of the<br>City of New York<br><br>*/s/ Nathan Taylor*<br>NATHAN TAYLOR<br>New York City Law Department<br>100 Church Street, Rm 6-144<br>New York, NY 10007<br>(646) 940-0736 (m)<br>(212) 356-2315<br>NTaylor@law.nyc.gov |
| FOR HARRIS COUNTY, TEXAS<br><br>CHRISTIAN D. MENEFEE<br>Harris County Attorney<br><br>*/s/ Sarah Jane Utley*<br>SARAH JANE UTLEY<br>Environment Division Director<br>Harris County Attorney's Office<br>1019 Congress, 15th Floor<br>Houston, Texas 77002<br>(713) 274-5124<br>Sarah.Utley@cao.hctx.net | |

38

AR_0026662

Knowledge would be helpful to include in the NEPA regulations for agencies less familiar with the knowledge system. PGST recognizes that there are a number of viable definitions for Indigenous Knowledge but would recommend a definition similar to the description in the first paragraph on the second page of the November 15, 2021 OTSP and CEQ Memorandum on *Indigenous Traditional Ecological Knowledge and Federal Decision Making*. However, PGST suggests that CEQ consult with tribes on a government-to-government basis in order to further refine that description of Indigenous Knowledge. It would also help if, after completion of the NEPA Phase 2 rule, CEQ and OTSP could put on training sessions for Federal agency employees to become more familiar with the concept of Indigenous Knowledge, how to incorporate it into agency decision making, how to be respectful of the sensitive nature of some Indigenous Knowledge, and how to avoid pitfalls in soliciting and using Indigenous Knowledge, such as the mistake that considering Indigenous Knowledge could substitute for government-to-government consultation with Tribal leaders, which is a separate, independent obligation.

Finally, in its discussion of proposed § 1502.23 (Methodology and scientific accuracy), the preamble indicates that "Indigenous Knowledge also can be a source of high-quality information." 88 Fed. Reg. at 49,951. The Tribe generally supports the proposed language of this provision, including requirements like the need to disclose assumptions and any limitations of the agency's models and methods, striking the 2020 Amendment's flat statement that agencies do not need to undertake new research to inform their analysis, and the requirement that agencies use projections when evaluating reasonably foreseeable effects, including climate change-related effects. However, the final regulatory language should include the same statement regarding Indigenous Knowledge as does the preamble. Agency staff are more likely to read and adhere to the NEPA regulations, and to incorporate and build on elements of those regulations in the agency-specific NEPA implementation regulations, than they are to review and incorporate language from a preamble. In order to advance the use of Indigenous Knowledge (not just when a tribe is designated as a cooperating agency), the regulatory language itself should acknowledge it when describing methods and scientific accuracy.

The use of Indigenous Knowledge will allow for better and more accurate analysis of effects, and the Tribe emphasizes, in particular, its potential role in improving *cumulative effects* and *cumulative impacts* analyses in Environmental Assessments (EAs) and Environmental Impact Statements. Agencies are required to take a "hard look" at the effects of the alternatives under consideration. However, those analyses are frequently woefully inadequate, and agencies' cumulative effects analyses are often the worst offenders. We are at a stage in Puget Sound, and throughout the Tribe's usual and accustomed fishing grounds, that we can no longer countenance the feeble cumulative effects analyses we normally see in EAs and EISs. The Federal agencies must do better. Truly hearing and incorporating Indigenous Knowledge in the effects analysis, and especially the cumulative effects analysis, is essential to measure the true effects of development in Puget Sound since white settlement of the region. And time is of the essence. As Western District of Washington Judge Ricardo Martinez wrote over a decade ago:

> "Which raindrop caused the flood?" With those closing words (and due credit to the author), plaintiffs at oral argument expressed the central issue here. No single project or human activity has caused the depletion of the salmon runs, the near-extinction of the SR Orca, or the general degradation of the marine environment of Puget Sound. Yet every project has the potential to incrementally increase the burden upon the species and the Sound. Human development will always have *some* impact on the surrounding environment. The Court fully recognizes the desirability and economic necessity of industrial progress in order for a community to flourish.
>
> However, under the National Environmental Policy Act and the Endangered Species Act, it is the Federal agencies' obligation to ensure that this progress does not cause irreversible harm to the environment. Thus, NEPA provides a mandate to the agencies "to

AR_0026674

as well as numerous other designated federal and state representatives who make up the Council. Both NRDA and RESTORE Act have components that result in major federal actions subject to NEPA.

Restoration of the injured natural resources of Mississippi and the entire Gulf region is critical and must be accomplished in a timely manner. While MDEQ recognizes the need to evaluate the environmental consequences of proposed actions (i.e., restoration projects), it is imperative to keep in mind that these are restoration projects intended to benefit natural resources, which need to be implemented in a timely manner to prevent any further degradation of injuries resulting from the spill. Further, any projects whose benefits are outweighed by collateral damage to other resources would not make it through the review and evaluation process or meet the NRDA project selection guidelines as required under the Oil Pollution Act.

In addition to MDEQ's restoration roles noted above, MDEQ also oversees other federal programs that may be subject to NEPA. The proposed rule would also impact programs such as those found under the American Rescue Plan Act of 2021 (ARPA) and the Infrastructure Investment and Jobs Act (IIJA), as administered by MDEQ, and any project requiring federal approval that rises to the level of a federal action that triggers NEPA.

**Comments on Proposed Revisions to the NEPA Implementing Regulations**

1. Page limitations (§1501.5(g) and §1502.7)

    MDEQ supports the page limitations that set a cap of seventy-five (75) pages for environmental assessments and 175 pages for environmental impact statements. MDEQ encourages (CEQ) to require federal agencies to strictly adhere to these limitations in order to reduce duplication and unnecessary paperwork as well as to comply with the deadlines prescribed in §1501.10. Further, these provisions should be incorporated into updates to each federal agency's NEPA regulations.

2. Categorical Exclusions (§1501.4)

    MDEQ supports CEQ's efforts for federal agencies to utilize categorical exclusions for efficiency in the NEPA process and to allow federal agencies to develop categorical exclusions jointly. Under §1500.5, federal agencies are required to improve efficiency of their NEPA processes. One means of accomplishing this goal is through the use of categorical exclusions.  Further, allowing agencies to establish categorical exclusions through a land use plan, a decision document supported by a programmatic environmental impact statement or programmatic environmental assessment, or other equivalent planning or programmatic decision is fully supported by MDEQ as another way to obtain efficiency in the NEPA process.

    The efficiency from this process is easily illustrated through the RESTORE Council's ability to utilize categorical exclusions from federal member agencies. MDEQ and other RESTORE Council members have saved countless hours of time and administrative dollars through the ability to utilize categorical exclusions for specific restoration projects rather than having to undertake the long, arduous process of performing lengthy NEPA analyses in the form of environmental assessments, which can take more than a year to complete.

3. Deadlines and schedule for NEPA process (§1501.10)

    MDEQ supports imposing deadlines and schedules for environmental assessments and environmental impact statements. In particular, having a strict one-year completion deadline for restoration work is imperative to restore injured natural resources and the economy as

**National Environmental Policy Act Implementing Regulations Revisions Phase 2**
CEQ-2023-0003 RIN: 0331-AA07
September 29, 2023
Page 30

§ 1502.21(b) Incomplete or unavailable information

*"If the incomplete information relevant to reasonably foreseeable significant adverse effects is essential to a reasoned choice among alternatives, and the overall costs of obtaining it are not <u>unreasonable</u>, the agency shall include the information in the environmental impact statement."*

[emphasis added].

The term "unreasonable" used in this proposed subsection is vague and subjective. What is "unreasonable" to an agency official may not qualify as such for a litigant, who (based on the Proposed Rule) may petition a court to argue that the cost of obtaining the missing information was reasonable and that the environmental analysis was faulty for failure to obtain that information. The 2020 Rule attempted to focus the analysis on available information rather than require agencies to spend additional time and money searching for answers to every conceivable question. The CEQ should reconsider the removal of this aspect of the 2020 Rule to help reduce the length of environmental documents, the time to prepare such documents, and the opportunities for litigation over vague and subjective terminology in the Proposed Rule.

§ 1502.21 (c) (3) (4) and (d) Incomplete or unavailable information.

*(3) A summary of existing <u>credible scientific evidence</u> that is relevant to evaluating the reasonably foreseeable significant adverse effects on the human environment; and*

*(4) The agency's evaluation of such effects based upon theoretical approaches or research methods <u>generally accepted in the scientific community</u>.*

*(d) For the purposes of this section, ''reasonably foreseeable'' includes effects that have catastrophic consequences, even if their probability of occurrence is low, provided that the analysis of the effects is supported by <u>credible scientific evidence</u>, is not based on pure conjecture, and is within the rule of reason.*

[emphasis added].

Using subjective terms, not defined in the Proposed Rule, such as "credible scientific evidence" and "generally accepted in the scientific community" will invite litigation over the requirements of the Proposed Rule. What may be credible to an agency official may not

AR_0026801

**National Environmental Policy Act Implementing Regulations Revisions Phase 2**
CEQ-2023-0003 RIN: 0331-AA07
September 29, 2023
Page 31

qualify as such for a litigant, who (based on the Proposed Rule) may petition a court to argue that the information used in an environmental document does not meet the "credible" standard or runs contrary to what the litigant perceives as being "generally accepted in the scientific community".

### § 1502.22 Cost-benefit analysis

In this section, the CEQ should make it clear that agencies and preparers of environmental documents are not required and should not attempt to subjectively assign monetary values to unquantified environmental amenities and values.

### § 1502.23 Methodology and scientific accuracy (a)

*"Agencies shall use high quality information, such as best available science…"*

The State notes that the terms "high-quality information" and "best available science" are not defined in the Proposed Rule. Including vague terms in the Proposed Rule will fuel never-ending litigation. What is regarded as "high-quality information" or the "best available science" to an agency official may not be considered so by certain special interest groups who will in turn identify information, science, or data that supports their position. At the very least, these terms should be defined to include information, science, and data made available by independent sources that have been peer-reviewed.

### § 1502.23 Methodology and scientific accuracy (c)

*"Where appropriate, agencies shall use projections when evaluating the reasonably foreseeable effects, <u>including climate change-related effects</u>. Such projections may employ mathematical or other <u>models</u> that project a range of possible future outcomes, so long as agencies disclose the relevant assumptions or limitations."*

The State is adamantly opposed to the Proposed Rule addressing a single category of impacts; such as *"climate-related effects"* as used in this section. If the CEQ wishes to issue separate guidance outside the framework of the Proposed Rule for different categories of impacts; that may be appropriate.

The use of projections and models involves speculation, conjecture, and inputs that may introduce subjectivity or inaccuracy. This nature of projections and modeling will invite litigation as project proponents seek to justify their projects and opponents use the Proposed

coordination and collaboration with the White House Office of Science and Technology Policy (OSTP) issued a "Guidance Memorandum for Federal Departments and Agencies on Indigenous Knowledge" (Guidance) on November 30, 2022. CEQ states, however, that the Guidance does not define Indigenous Knowledge.

USET SPF is concerned with defining what constitutes Indigenous Knowledge in its NEPA regulations since—as was repeatedly stated in the Tribal consultations contributing to development of the Guidance—Indigenous Knowledge can incorporate a broad range of cultural and spiritual beliefs and Tribal lifeways. This was consistently raised during Tribal consultations on development of the Guidance where Tribal Leaders and our recognized cultural/spiritual leaders emphasized that the Guidance needed to recognize and take a holistic approach and understanding of what Indigenous Knowledge is. The comments during these Tribal consultations eventually lead to CEQ and OSTP renaming "Indigenous Traditional Ecological Knowledge" to simply "Indigenous Knowledge" in recognition that Indigenous Knowledge goes beyond the special, spiritual, and cultural relationships and connections we have with our environment and ecosystems. If CEQ moves forward to consider adopting a definition of Indigenous Knowledge, then it should do so in consultation with Tribal Nations before adopting a definition in its NEPA regulations. At a minimum, USET SPF recommends that references to the Guidance be included in all proposed Phase II NEPA revisions that reference Indigenous Knowledge in the regulations. Further, revisions to NEPA regulations that reference Indigenous Knowledge should also acknowledge that we are the sole and final arbiters in identifying what constitutes Indigenous Knowledge and what does not—not the federal government.

- **Protect sensitive Tribal information and Indigenous Knowledge from FOIA requests and do not allow interagency sharing of this information and knowledge without Tribal consent.**
Tribal Nations are best positioned to identify what types of our Indigenous Knowledge sets are sensitive or sacred and should be protected from public dissemination. CEQ and OSTP's 2022 Guidance instructs federal agencies to, "…consult with Federal agency legal counsel regarding the agency's obligations under the Freedom of Information Act (FOIA) and other public disclosure laws, and legal authorities that may apply to inclusion of Indigenous Knowledge." While inclusion of this language was a step in the right direction, USET SPF strongly urges that this language be expanded upon. Prior to the sharing of Indigenous Knowledge, there must be an established and respected high level of trust between the federal government and Tribal Leaders and our recognized cultural/spiritual leaders. This trust has been broken in the past and its restoration will require federal agencies to actively adopt, implement, and adhere to policies that provide the utmost protections for Tribal Nations sharing sensitive Indigenous Knowledge. Federal agencies must work with our Tribal Leaders and our recognized cultural/spiritual leaders to ensure sensitive Indigenous Knowledge is never shared with the public. Furthermore, federal agencies receiving Indigenous Knowledge from Tribal Nations should not share this information with other federal agencies in the absence of express Tribal Nation consent. Federal agencies that receive inquiries or requests for the sharing of Indigenous Knowledge from other federal agencies must also inform the respective Tribal Nation regarding these requests. We should be the sole determiners regarding whether this information should be shared or withheld.

Moving forward, CEQ must work with the Office of Management and Budget to develop guidance for federal agencies on how FOIA requests on our information should be handled regarding Indigenous Knowledge. First and foremost, during the exchange of Indigenous Knowledge and other sensitive Tribal cultural information, federal agencies should actively work with Tribal Leaders



STATE OF NORTH DAKOTA

# OFFICE OF ATTORNEY GENERAL
www.attorneygeneral.nd.gov
(701) 328-2210

**DIVISION OF NATURAL RESOURCES
AND NATIVE AMERICAN AFFAIRS**
500 NORTH 9TH STREET
BISMARCK, ND 58501-4509
(701) 328-3640   FAX (701) 328-4300

Drew H. Wrigley
ATTORNEY GENERAL

September 29, 2023

Brenda Mallory, Chair
Council on Environmental Quality
730 Jackson Place N.W.
Washington D.C. 20503

**Re: State of North Dakota Comments on CEQ Proposed Rule, "National Environmental Policy Act Implementing Regulations Revisions Phase 2," CEQ–2023–0003, RIN 0331–AA07**

Dear Chair Mallory:

The State of North Dakota respectfully submits these comments in response to the Council on Environmental Quality's (CEQ) proposed rulemaking, "National Environmental Policy Act [NEPA] implementing Regulations Revisions Phase 2" that would revise the implementing regulations for NEPA across the federal government (Proposed Rule). The State has extensive experience working with federal agencies, tribes, and other stakeholders to implement NEPA in various sectors including energy, transportation, mining, water supply, and other contexts. Pursuant to its Constitution, the State has a strong public interest in environmental stewardship on behalf of its citizens, as well as in protecting the rights and ensuring the well-being of all people of the State through the exercise of its sovereign powers for stewardship and development of its natural resources. The appropriate role of NEPA for federally permitted or financially assisted projects in North Dakota is to ensure environmentally informed decision-making and public participation. Accordingly, the State has a keen interest in the Proposed Rule and CEQ's continued adherence to NEPA.

In 2020, CEQ undertook a generational update of its NEPA regulations (2020 Rule). That comprehensive update to the 1978 regulations was necessary to modernize and consolidate NEPA direction across the federal government after more than four decades of implementation. Another comprehensive update just three years later appears unwarranted, except to implement Congress' amendments to the NEPA statute via the Fiscal Responsibility Act of 2023 (FRA). CEQ's NEPA regulations, particularly given their broad applicability, should not become the target of seriatim changes in each subsequent administration. Nor should they be utilized to achieve preferred policy outcomes, at odds with the solely procedural mandates of NEPA.

North Dakota is concerned that the Proposed Rule's deletions of improvements in the 2020 Rule, coupled with newly added provisions that overstep NEPA's well-established boundaries, improperly inject substantive considerations into a purely procedural statute, add new sources for delay, and risk yielding the opposite of NEPA's stated goals. Moreover, the Proposed Rule unduly emphasizes open-ended climate change and environmental justice concerns above all other relevant considerations, which may impede addressing the needs for all forms of energy development and other critical infrastructure. And although the State supports public engagement and participation of all interested parties in the NEPA process, the Rule's emphasis on certain, vaguely defined groups, including, for example, anyone with purported "indigenous knowledge" and "communities with environmental justice concerns," could elevate voices and concerns extraneous to NEPA reviews of proposed actions, exacerbate delays already inherent in the NEPA process, and work against the goal of encouraging balanced public engagement. For example,

1

Proposed Rule § 1500.2(f) requires that federal agencies: "Use all practicable means, consistent with the requirements of the Act *and other essential considerations of national policy*, to restore and enhance the quality of the human environment and avoid or minimize any possible adverse effects of their actions upon the quality of the human environment." (emphasis added). The sum result of the Proposed Rule's injecting new requirements and terms and punting issues to courts and individual agencies would be more, not less, NEPA litigation. That is viewed as a good thing only by those special interests who would continue to abuse NEPA to force their own policy views onto the State and the federal government and deprive the State's citizens of much-needed infrastructure and other projects.

CEQ therefore should not finalize its Proposed Rule, at least not without substantial changes to remedy its shortcomings and overreach. North Dakota also endorses and incorporates by reference herein the separate comments on the Proposed Rule submitted jointly by (i) the Governors of multiple States including North Dakota; (ii) the Attorneys General of multiple States including North Dakota; and (iii) the transportation departments of multiple States, including the North Dakota Department of Transportation.

### The Proposed Rule Puts NEPA Back on the Wrong Track.

Stakeholders in the NEPA process have long recognized that the process is broken. Since 1970, NEPA has set forth procedural requirements for federal agencies to consider environmental effects before acting and to involve the public in that analysis. *Dep't of Transportation v. Public Citizen*, 541 U.S. 752, 756-57 (2004). "NEPA itself does not mandate particular results"—only a process. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989). In lieu of these basic aims, however, NEPA has transformed into a vehicle for encyclopedic, lengthy, copious, repetitive documents that are nearly unintelligible to the public or decision-makers. In turn, such excessive analysis leads to paralysis, as agencies strive to do even more analysis and indulge all participants in the hopes—often futile—of avoiding litigation or building a bulletproof NEPA document. The ensuing delay jeopardizes the sizable investments and planning necessary to realize complex infrastructure and other projects in North Dakota and elsewhere. Meanwhile, the public's needs for improved transportation, energy, minerals, water resources, and other projects only continue to grow, including in our State.

In the 2020 Rule, CEQ finally took lasting action and enacted welcome clarifications to its regulations implementing NEPA. These revisions essentially codified decades of agency guidance, best practices, and case law. They ensured NEPA documents would inform rather than confuse their readers, relied on the best available information, and guarded against unhelpful speculation. They also enabled efficiencies in the timing and length of NEPA documents, assistance by external preparers, interagency coordination, and public commenting. Congress followed suit in 2023 via the FRA, codifying several of CEQ's reforms in the 2020 Rule and adding further backstops against mismanagement and gamesmanship of the NEPA process.

By contrast, the Proposed Rule sets out to undo most of that progress and would return NEPA reviews and associated permitting to lengthy delays and uncertainty. Though certain of CEQ's stated goals are laudable (e.g., proposed § 1500.1 calls for NEPA reviews to be done in a "coordinated, consistent, predictable, and timely manner, and to reduce unnecessary burdens and delays"), its Proposed Rule would not serve them. While CEQ appears to believe the Proposed Rule will fast-track politically preferred types of projects, that is highly unlikely. Rather, even projects incentivized by recent legislation providing financial assistance likely will continue to experience NEPA delays under the Proposed Rule. Moreover, the salient criterion for different levels of NEPA review is the existence or absence of significant environmental impacts from a proposed major federal action. The whole precept that projects should be put on separate faster or slower tracks for NEPA reviews based on CEQ's or agencies' subjective perceptions of those

AR_0027235

projects' desirability from a climate change, environmental justice, or other standpoint is arbitrary and divorced from NEPA. Just like the Proposed Rule's rationale for removing express consideration of economic factors because "it is inappropriate to single out these considerations for special treatment," it is inappropriate to single out climate change, environmental justice, and tribal considerations in the regulations, and to a greater extent. *See* 88 Fed. Reg. at 49,952.

The Proposed Rule's backsliding has heightened impacts on North Dakota's interests. North Dakota is a sovereign State, governed by elected officials, and serves the needs of its citizens as expressed via the ballot box and continuous engagement. It is not for CEQ to determine what types of projects or resources are best for North Dakota to develop, or to utilize NEPA as a tool to do so. North Dakota has its own policy prerogatives, exercises delegated authority for multiple federal environmental programs, and utilizes detailed standards for generating and utilizing environmental data. NEPA does not afford an opportunity for federal interference or displacement of the State's priorities and processes.

Moreover, the delays and problems perpetuated by the Proposed Rule will impair the State's ability to run its own programs. Energy offers a cogent example. North Dakota contains areas rich in oil and gas, namely in the Bakken. But ownership of these lands, both surface and subsurface, is largely checkerboarded, with federally managed lands adjacent to state, tribal, and privately owned lands. In addition, due to North Dakota's unique history, a significant portion of the State consists of split estate lands, with different surface and subsurface owners. Prompt realization of other critically needed energy infrastructure such as electric transmission lines crossing federal lands and resources also is jeopardized by the Proposed Rule's unwarranted expansion of NEPA.

Unlike many western States that contain large blocks of unified federal surface and federal mineral ownership, the surface and mineral estates in North Dakota were at one time more than 97 percent private- and State-owned as a result of the railroad and homestead acts of the late 1800s. However, during the Depression and drought years of the 1930s, numerous small tracts in North Dakota went through foreclosure, and the federal government through the Federal Land Bank and the Bankhead Jones Act foreclosed on many farms taking ownership of both the mineral and surface estates. Although some of the mineral estates were later sold to private parties, many mineral estates were retained by the federal government. This has resulted in a large number of small federally owned mineral estate tracts scattered throughout western North Dakota.

Additionally, many resource plays require participation of multiple leases and tracts, including through communitization agreements or forced pooling. More than 30 percent of the potential mineral development occurring on State-owned or privately-owned surface estates includes underlying federal mineral interests. As a result of this intertwined land ownership, the State frequently is necessarily a partner with the federal government for development of oil and gas resources—what the federal government does on its lands directly affects what the State can do with its own lands. In those instances, NEPA review typically is implicated for any proposed action affecting production of federal oil and gas, from federal resource management plans to leasing to development approvals. Though the federal government has jurisdiction only over federal lands, as a practical matter NEPA delays may trickle down to delayed development of interspersed and surrounding non-federal lands because NEPA must conclude before a major federal action takes place. This is true even when the federal mineral interest in the communitized or pooled spacing unit is de minimis. And such NEPA reviews are often fragmented, involving multiple and repetitive reviews by multiple agencies such as the Bureau of Land Management, Bureau of Indian Affairs, and U.S. Forest Service.

3

AR_0027236

The resulting NEPA delays cost both time and money, including lost investment opportunity costs. If NEPA were construed to substantially delay or even prohibit development of federally-owned mineral interests pooled together with State-owned mineral interests, the State could lose up to approximately $1.5 billion in revenue from State-owned mineral interests, or approximately 60 percent of the estimated fair market value of all State-owned mineral interests, thereby severely impacting our State. The Proposed Rule's added restrictions also could impair the State's ability carry out its fiduciary obligations to manage its trust lands under the Enabling Act of 1889, Ch. 180, 25 Statutes at Large 676, as many such trust lands are completely landlocked by federal lands. Furthermore, the Proposed Rule's effects may reduce land values and good jobs in these areas and throughout the State. Such outcomes contradict federal law recognizing retention of State and private mineral rights. *See, e.g.*, 30 U.S.C. §§ 187, 189; *see also* U.S. Const., Amend. X.

CEQ's stated rationale for many of its proposed changes centers on avoidance of litigation, or at least adverse litigation outcomes. Ironically, however, the Proposed Rule is almost assuredly a recipe for *more* litigation. Its baseless removal of the 2020 Rule's comment exhaustion requirement and like provisions sends a signal that CEQ is at least indifferent on the occurrence of litigation. Project opponents inevitably will raise new arguments based on agencies' interpretations of the Proposed Rule's added vague and subjective terms and hyperfocus on climate, environmental justice, and tribal issues. Though the Proposed Rule uses different terms like "shall," "should," and "may," litigants and courts might not perceive any meaningful difference and view them all as strict NEPA requirements.

North Dakota finds it particularly concerning that the Proposed Rule opens the door to broader regional or national interest groups. Many federal actions already implicate the State's knowledge and analysis concerning its own resources and affect its control over its own future. Expanding the environmental review and decision-making process from local or State agencies to a broader basis devalues the State's expertise and renders the NEPA process less scientific and increasingly political or policy-based, thereby causing uncertainty and costly disruptions.

Therefore, the Proposed Rule indeed does impact North Dakota and other states. CEQ thus also should revisit its summary conclusion that the Proposed Rule has no federalism implications simply because it formally applies to federal agencies. *See* 88 Fed. Reg. at 49,965.

### NEPA Is Procedural, But the Proposed Rule Is Impermissibly Substantive.

Rather than further improve the NEPA review process, the Proposed Rule unduly focuses on certain environmental outcomes. CEQ should not explicitly or impliedly endorse use of NEPA to delay projects or dictate outcomes. That is particularly true because the NEPA statute itself does not mandate any substantive decision or the avoidance or mitigation of every adverse environmental impact from a proposed action. Rather, it calls for environmental considerations in the course of serving the needs of "Americans," including North Dakotans (43 U.S.C. § 4331(a))— and *not* "global" interests as reflected in the Proposed Rule (§ 1501.3(d)(1)). At a minimum, CEQ should make clear that the myriad interests, goals, and needs of North Dakota and other sovereign States hosting proposed actions are not subordinated to the Proposed Rule emphasis on other interests and policies, including addressing environmental justice, climate change, and tribal interests.

The Proposed Rule's overreach is epitomized by its removal of text from § 1500.1(a) that NEPA is "a procedural statute intended to ensure Federal agencies consider the environmental impacts," and its substituted language that suggests NEPA is, instead, an "action forcing" statute to preserve and even "enhance" the environment. Section 1502.1 of the Proposed Rule likewise would add that "(a) The primary purpose of an environmental impact statement prepared pursuant to section 102(2)(C) of NEPA is *to serve as an action-forcing device* by ensuring agencies consider

4

the environmental effects of their action in decision making, so that the policies and goals defined in the Act are infused into the ongoing programs and actions of the Federal Government" (emphasis added). In reality, the only actions that NEPA forces are preparation of NEPA documents and public involvement; the ultimate decision on a proposed major federal action is up to the federal agency, working in conjunction with other cooperating federal and State agencies and the applicant.

Other Proposed Rule provisions addressing mitigation appear substantive and thus are troubling as well. The Proposed Rule would delete the current definition of "mitigation" (in existing § 1508.1) and seemingly create new substantive mitigation requirements, even after a federal decision is rendered. It would do so via a monitoring and compliance plan towards uncertain ends, enforcement, and consequences, and through express calls for mitigation of environmental justice concerns (§ 1505.3(b) & (c)). The Supreme Court, however, has rejected any notion that NEPA mandates mitigation or a plan as opposed to consideration of potential mitigation. *E.g.*, *Robertson*, 490 U.S. at 352-53. CEQ thus should abandon this proposal.

Other proposed provisions that sound in substance involve a requirement to identify "the environmentally preferable alternative" that would "best promote the national environmental policy expressed in section 101 of NEPA by maximizing environmental benefits" as delineated in a new list of regulatory criteria (e.g., §§ 1502.14, 1508.1(l)). These criteria are selective, subjective, open-ended, and nowhere mentioned in the NEPA statute. It is unclear how to objectively define such an alternative, or whether it requires creation of a brand-new alternative for this purpose or instead (correctly) just identification of the existing reasonable range of alternatives carried forward in a NEPA document. This proposed new requirement may cast an unfavorable light on proposed energy, highway, mining, and other projects due to short-term environmental impacts. North Dakota can foresee several circumstances where the no action alternative unhelpfully will be deemed "the environmentally preferable alternative" because it will result in no change to the status quo, even when doing nothing in the face of pressing public needs is not a realistic option. To be sure, underground resources cannot be produced without breaking ground somewhere. At a minimum, CEQ should acknowledge the linkage between identification of "the environmentally preferable alternative" and its separately proposed provision (§ 1502.16(a)(3)) to examine any adverse effects under the no action alternative.

### The Proposed Rule Adds Delay and Complexity to NEPA Reviews.

The Proposed Rule appears to curtail rather than foster categorical exclusions (CEs) for NEPA compliance. CEs are critical to the practical functioning of NEPA, including in North Dakota. In several key sectors in North Dakota, including oil and gas, CEs are the only realistic means available under NEPA to timely advance projects. Without CEs, NEPA would grind an even greater ambit of projects to a near-halt, contrary to Congressional intent. Yet the proposed re-definition of extraordinary circumstances for categorical exclusions (§ 1508.1) to include EJ or climate change effects risks undercutting the use of duly established CEs, such as for oil and gas projects, without any adequate rationale for potentially curtailing these existing CEs. The Proposed Rule also does not clearly define requisite documentation for CE. It should not be necessary to perform analysis equivalent to that for an EA or EIS just to establish and apply a CE. The Proposed Rule additionally places conditions on a federal agency's adoption of another agency's CE, when no such conditions exist in NEPA as amended by the FRA. *Compare* 43 U.S.C. § 4336(c) *with* proposed § 1506.3(d) (uniquely providing for adoption only of a CE *determination*, and subject to verification of no extraordinary circumstances and to publication of the adoption determination). At bottom, CEs should remain the most common level of NEPA review. Making CEs more difficult to establish and apply would make permitting and development much more difficult, which is unwarranted.

AR_0027238

Separately, CEQ should not squander the opportunity to uniformly endorse agencies' invitation and use of initial NEPA documents prepared by the applicant or a consultant. Currently, federal agency practices regarding third-party initial preparation of NEPA documents are all over the map, even within different offices of the same agency. Artificially keeping non-agency persons at bay during preparation of NEPA document is unnecessary, counterproductive, and contrary to NEPA's public participation core aim, as Congress now has clearly indicated (42 U.S.C. § 4336a(f)). As a State subject to appropriations processes and budgetary limitations, North Dakota can understand and empathize with the challenges presented by stretched-thin federal agency staff and resources. Because these challenges always exist, North Dakota urges CEQ and federal agencies to maximize the use of project proponent and other external resources to prepare NEPA documents in the first instance, of course subject to independent federal agency review. CEQ should not wholly defer to individual agencies as the Proposed Rule would do (§§ 1506.5, 1507.3(c)(12)). Otherwise, the inconsistencies and corresponding delays across agencies will only continue.

The Proposed Rule also does not sufficiently address avoidance of duplication between the NEPA process and States' environmental review and permitting processes. North Dakota has a robust suite of environmental protections and generates extensive work product that can readily be incorporated into NEPA reviews. State-generated data adheres to detailed protocols and standards, sometimes expressly endorsed by federal agencies. Repetitive analysis by the State and the federal government is a major source of confusion and delay. CEQ should make clear in proposed § 1501.12 that there is a presumption that environmental studies prepared in accordance with State procedural requirements akin to NEPA can be incorporated by reference in NEPA documents.

The Proposed Rule's "innovative approaches" (§ 1506.12) provision is confusing at best and should either be deleted or substantially revised. At the outset, as discussed above, there is no reason for CEQ to limit NEPA process innovation to certain types of projects, much less ill-defined actions "to address extreme environmental challenges consistent with section 101 of NEPA." Rather, CEQ should promote NEPA innovation for all projects. CEQ's "emergencies" provision (existing § 1506.12/proposed § 1506.11) already allows different procedures in those circumstances.

The Proposed Rule raises other NEPA process concerns as well, including, but not limited to, the following.

1) The Proposed Rule (§ 1507.1) overtly welcomes "flexibility" in different agencies' application of NEPA. But while agencies might properly tailor NEPA to the particular activities they respectively undertake, CEQ's embrace of inconsistent NEPA application across the federal government is unfounded and contradicts CEQ's stated goals. This inconsistency will be of particular concern to the State when serving as co-lead or participating agencies for NEPA review—particularly where multiple federal agencies have jurisdiction over the same project. For example, North Dakota may serve as a participating agency for NEPA review on a water delivery project, as well as for a mineral development project, with each project involving different federal agencies. Under the Proposed Rule, such "flexibility" defeats predictability or consistency for the State in its participation in the NEPA process and may only serve to delay both projects.

2) The Proposed Rule exempts projects with only "beneficial" effects from having to prepare an EIS, even if those beneficial effects are significant (§ 1501.3(d)(2)(i)). This again is a subjective standard and lends itself to more limited analysis for activities favored by federal policy at any given time. By comparison, mere allegations of adverse or even of lacking beneficial effects could be used to delay projects that are politically disfavored. Relatedly, the "reasonably foreseeable" standard with respect to the effects of an action is subject to manipulation under the Proposed Rule such that the effects of a favored action, for

6

example, a wind farm, can be characterized as "short term," while the effects of a producing oil well may be characterized as long-term.

3)   The Proposed Rule also makes the process for an EA less distinguishable from an EIS (e.g., § 1501.5(j)), such as for scoping and public engagement.   Too many EAs today already look like EISs; that trend should be reversed, not encouraged.

4)   The Proposed Rule (e.g., proposed §§ 1503.1(c), 1502.21, 1502.23(c)) raises the prospect of agencies needing to perform their own research to satisfy NEPA.   At the same time, CEQ would delete from § 1502.23(b) that "Agencies are not required to undertake new scientific and technical research to inform their analyses."   The Proposed Rule is at least inconsistent on this topic, as such direct research would impede other provisions such as those on third-party preparation of NEPA documents and established timeframes for EAs and EISs.   As noted above, State approved or sponsored studies should presumptively be incorporated by reference in NEPA reviews.

## The Proposed Rule Will Exacerbate NEPA Litigation.

CEQ should not adopt its proposed regulatory text that "courts share responsibility for enforcing the act" (§ 1500.1(a)(2)) because judicial review applies to nearly every federal program, not just NEPA.   In fact, NEPA does not even contain a cause of action; lawsuits instead must be brought under the Administrative Procedure Act.   Including this proposed language suggests that CEQ is abdicating its role to establish clear government-wide direction for NEPA reviews, and instead is content to multiply already pervasive litigation alleging noncompliance with NEPA. CEQ through clear regulations implementing NEPA instead should obviate any need for courts to reinterpret those regulations in litigation challenging individual projects' compliance with NEPA.

CEQ also should uphold the 2020 Rule's terms requiring the public to raise or otherwise waive comments during the NEPA process, facilitating dispute resolution during NEPA, and discouraging drastic judicial remedies when agency decisions are challenged on NEPA grounds. There is no good reason for CEQ to re-inject uncertainty into NEPA reviews and subsequent litigation.   Project opponents are likely to view these changes as an open door by CEQ to bring even more NEPA claims.

The State also is concerned with the increased litigation opportunities afforded by the Proposed Rule when combined with other current regulatory initiatives that would inject new subjective criteria and agency overreach into management of various federal lands.   NEPA cannot excuse federal agencies' substantive responsibilities, and provides no avenue to delay their performance based on claimed needs to perform more detailed NEPA reviews.

Lastly, CEQ should be clear in any final rule as to what is and is not required.   The Proposed Rule vacillates among terms like "shall," "should," "may," and "encourage," without explanation of these differences.   This will confuse agencies, the public, and courts alike.

## The Proposed Rule Emphasizes Tribal and Indigenous Interests Without Expressly Affording Similar Regard to the Interests of Sovereign States.

The Proposed Rule adds "Indigenous Knowledge" as a new area of special expertise for a cooperating agency but it does not define that term (§ 1501.8).   If CEQ intends to apply that term as used in the Guidance for Federal Departments and Agencies on Indigenous Knowledge issued by the Office of Science and Technology Policy in November 2022, (i.e., interchangeably with "a variety of terms, including Traditional Ecological Knowledge, Traditional Knowledge, Indigenous Traditional Knowledge, Native Science, and related formulations."), that formulation is vague and potentially unbounded.   The preamble claims that this change will help ensure that federal agencies

7

respect and benefit from unique knowledge that tribal governments may bring to the review process. However, "indigenous" is not synonymous with, and in fact could be broader than, "tribal." Indeed, proposed § 1500.2(d) would require engagement with *both* "indigenous communities, and Tribal communities."

This new addition could artificially elevate some voices over others in the NEPA process. Indeed, the Proposed Rule does not similarly contain express recognition of the unique interests and input of North Dakota and other States. Further, the new focus also may substantially delay many projects, for example, projects involving U.S. Forest Service public grasslands or Bureau of Reclamation public recreational lands, in areas like North Dakota with prominent and vocal indigenous populations (both federally recognized Tribes and unrecognized groups) where identifying all possibly interested parties and the issues at stake, obtaining information, and notifying and consulting with interested parties could result in significant delays. CEQ also should clarify that all input will be held to the same standard in the NEPA process under § 1502.23(a).

Moreover, adding "Indigenous Knowledge" to the requisite considerations for NEPA risks attempting to codify reliance on oral history, which is amorphous and open-ended. Such knowledge should be quantifiable in some way and should not be weighed more heavily than other sources of scientific experience and expertise. Specifically, unsubstantiated or anecdotal claims should not control over data that is based on established and verifiable protocols and thus the "best available science or data" under the Proposed Rule (§§ 1502.15(b), 1502.23(a)).

Like other sovereign States, North Dakota knows its own natural resources better than anyone else, including the federal government. Accordingly, the State should be allowed, as it has been from the time it was established, to appropriately evaluate the best available information, and to ultimately develop those resources as its residents elect.

\* \* \*

Thank you again for the opportunity to provide these comments, which the State hopes CEQ will carefully consider and incorporate into any final rule. The State looks forward to continuing to work with its federal partners to improve implementation of the NEPA process for both routine and complex projects throughout North Dakota.

Sincerely,

Matthew Sagsveen
Assistant Attorney General
Director of Natural Resources and
Native American Affairs Division

8



BRENNA BIRD
ATTORNEY GENERAL

1305 E. WALNUT ST.
DES MOINES, IA 50319
515-281-5164
www.iowaattorneygeneral.gov

**IOWA DEPARTMENT OF JUSTICE**
**OFFICE OF THE ATTORNEY GENERAL**

September 29, 2023

Council on Environmental Quality
730 Jackson Place NW
Washington, DC 20503

Re:     ***Reconsideration of Council on Environmental Quality
National Environmental Policy Act Implementing
Regulations Revisions Phase Two (Docket ID CEQ–
2023–0003)***

The Attorneys General of Iowa and the 23 undersigned States respectfully submit these comments in response to the Council on Environmental Quality's (CEQ) Revisions of the National Environmental Policy Act's (NEPA) Implementing Regulations Revisions Phase Two (Proposed Rule).[1]

CEQ's Proposed Rule serves as a dramatic example of federal and administrative overreach. Rather than serve its long-term goals of collecting information about large development projects, the Proposed Rule injects major substantive considerations into the NEPA process. In doing so, the Proposed Rule turns NEPA on its head, and turns it farther away from the effective reform process started in 2020. This radical and illegal climate power grab goes far beyond CEQ's delegated authority.

Congress passed NEPA to achieve laudable goals: to reduce delays and promote better decision-making consistent with national environmental policy.[2] Tasked with NEPA's

---

[1] National Environmental Policy Act Implementing Regulations Revisions Phase Two, 88 Fed. Reg. 49924 (Aug. 31, 2023), available at https://www.govinfo.gov/content/pkg/FR-2023-01-27/pdf/2023-00269.pdf [hereinafter Proposed Rule].

[2] *See* Update to the Regulations Implementing the Procedural Provisions of the National Environmental Policy Act, 85 Fed. Reg. 43304, 43307 (July 16, 2020) ("2020 Rule").

AR_0027339

implementation, CEQ issued initial guidelines for NEPA in 1970 and has modified those rules since. But despite its goals, NEPA's implementation has led to increased complexity and has slowed or prevented the development of important infrastructure and other projects.[3] In response, President Trump's proposed 2020 rule sought to fix the accumulated problems with NEPA implementation. President Biden's CEQ rolled back those fixes and now seeks to go even further.

The States are concerned that CEQ's Proposed Rule will hinder NEPA's purported goal of facilitating better-informed agency decisions. That harms a broad array of federal and nonfederal projects and activities. Moving farther away from the 2020 Rule[4] will continue to reduce clarity. The 2020 Rule aligned with CEQ's original 1978 NEPA regulations by incorporating longstanding interpretations and realigning the regulations with NEPA's purpose to facilitate timely agency action through informed decision-making.

Like the original 1978 regulations, the 2020 regulations balanced priorities and resources "to reduce paperwork, to reduce delays, and at the same time to produce better decisions [that] further the national policy to protect and enhance the quality of the human environment."[5] In promulgating the 2020 Rule, CEQ pursued those goals by considering (and, ultimately, both rejecting and adopting) a wide range of proposed updates to the old regulations to reflect CEQ's experience with NEPA. That experience, accrued over several decades, intended to resolve problems and issues that had arisen during agency NEPA practice during that period.

CEQ's Phase One Rule[6] undid much of the good that the 2020 Rule put forward. Delays in obtaining necessary NEPA review may

---

[3] *Id.* at 43304.

[4] *See generally id.*

[5] *Id.* at 43307.

[6] National Environmental Policy Act Implementing Regulations Revisions, 87 Fed. Reg. 23453 (May 20, 2022), available at https://www.federalregister.gov/documents/2022/04/20/2022-08288/national-environmental-policy-act-implementing-regulations-revisions.

AR_0027340

cause stakeholders to experience monetary losses and force changes to project specifications, mitigation, or design. Preconstruction delays for projects—whether they be for utility-scale solar or other energy infrastructure—may also impact the economy by hurting project timelines, domestic supply chains, and the jobs required to complete those projects.

CEQ should withdraw the proposed change. The Proposed Rule transforms NEPA from a procedural to substantive statute, ignores relevant case law and exceeds CEQ's statutory authority under NEPA, increases costs and uncertainty, and imposes real harm. We, therefore, urge CEQ to withdraw the Proposed Rule.

# I.    Background

A nearly unanimous Congress and President Nixon enacted NEPA in 1969.[7] Soon after, President Nixon issued Executive Order 11514, *Protection and Enhancement of Environmental Quality*, asking CEQ to issue guidelines implementing section 102(2)(C) of NEPA.[8] CEQ followed by issuing interim and then final guidelines to introduce the concept of environmental assessments (EAs) and environmental impact statements (EISs).

In 1977, President Carter issued a new executive order, directing CEQ to issue regulations for implementing section 102(2)(C) of NEPA and requiring that federal agencies comply with those regulations.[9] CEQ promulgated regulations responsive to that Executive Order in 1978.[10] Those 1978 regulations are found to reflect the fundamental principles behind NEPA regulations.[11]

CEQ made minor typographical amendments to the 1978 implementing regulations in 1979. CEQ substantively amended one provision in 1986 but otherwise left the regulations largely

---

[7] 88 Fed. Reg. 49924

[8] E.O. 11514, *Protection and Enhancement of Environmental Quality*, 35 Fed. Reg. 4247 (Mar. 7, 1970), sec. 3(h).

[9] E.O. 11991, *Relating to Protection and Enhancement of Environmental Quality*, 42 FR 26967 (May 25, 1977).

[10] Implementation of Procedural Provisions, 43 FR 55978 (Nov. 29, 1978).

[11] 88 Fed. Reg. at 49927.

unchanged until 2017.[12] On August 15, 2017, President Trump issued Executive Order 13807, *Establishing Discipline and Accountability in the Environmental Review and Permitting Process for Infrastructure Projects*, which directed CEQ to establish an interagency working group to propose changes to NEPA regulations.[13]

That began CEQ's thorough rulemaking process. CEQ considered more than one million comments, from a diverse set of commenters.[14] Incorporating those suggestions, that proposed rule intended to increase effectiveness of NEPA regulations through modernization, embracing the original CEQ regulations' goals of reducing paperwork and delays, and promoting better decision-making consistent with the national environmental policy set forth in section 101 of NEPA.[15] Each of the 1978 goals was to be improved, without going beyond the historical role played by NEPA regulations.

On President Biden's first day in office, he issued Executive Order 13990, *Protecting Public Health and the Environment and Restoring Science to Tackle the Climate Crisis*, which called on federal agencies to review regulations issued by the Trump administration and to rescind any rules implementing Trump's Executive Order 13807. That blanket rescission included a specific admonition to CEQ to review its policies for consistency with Executive Order 13990.[16] CEQ did just that. CEQ reviewed the 2020 Rule and, consistent with Executive Order 13990, began to reverse the prior Administration's work.[17]

First, CEQ issued an interim rule in 2021 reversing the 2020 Rule's tasking of federal agencies to make their procedures

---

[12] *Id.*

[13] E.O. 13807, *Establishing Discipline and Accountability in the Environmental Review and Permitting Process for Infrastructure Projects*, 82 Fed. Reg. 40463 (Aug. 24, 2017)

[14] *See* Docket No. CEQ–2019–0003, https:// www.regulations.gov/document/CEQ-2019-0003-0001.

[15] 87 Fed. Reg. 43304.

[16] 88 Fed. Reg. 49928.

[17] *Id.*

AR_0027342

consistent with 2020 Rule.[18] That change undid all the good work of the prior 2020 Rule,

Next, on October 7, 2021, CEQ issued its "Phase One" proposed rule. Phase One sought to roll back many of the 2020 Rule's salutary changes.[19] That included three changes highlighted in the Proposed Rule: "First, CEQ proposed to revise 40 CFR 1502.13 to clarify that agencies have discretion to consider a variety of factors when assessing an application for authorization by removing a requirement that an agency base the purpose and need on the goals of an applicant and the agency's statutory authority. CEQ also proposed a conforming edit to the definition of 'reasonable alternatives' in 40 CFR 1508.1(z). Second, CEQ proposed to remove language in 40 CFR 1507.3 that could be construed to limit agencies' flexibility to develop or revise procedures to implement NEPA specific to their programs and functions that may go beyond CEQ's regulatory requirements. Finally, CEQ proposed to revise the definition of 'effects' in 40 CFR 1508.1(g) to restore the substance of the definitions of 'effects' and 'cumulative impacts' contained in the 1978 regulations."[20]

Having attempted to roll back the 2020 Rule, the Proposed Rule self-consciously acknowledges that this is a "broader rulemaking to revise, update, and modernize the NEPA implementing regulations."[21] Among the goals and priorities embodied in the proposed rule are to "ultimately promote better informed Federal decisions that protect and enhance the quality of the human environment, including by ensuring climate change, environmental justice, and other environmental issues are fully accounted for in agencies' decision-making process."[22]

CEQ's Proposed Rule goes too far. It improperly transforms NEPA from its longstanding roots as a procedural statute to a more substantive statute—with commensurate obligations and

---

[18] *Id.*

[19] *Id.*

[20] *Id.*

[21] *Id.*

[22] *Id.*

AR_0027343

impositions on entities that seek regulatory approval for important projects. The definition ignores longstanding precedents that should have guided CEQ's approach. And the Proposed Rule will both slow development and introduce significant costs to future projects.

## II.    ANALYSIS

### a. CEQ's Revisions Improperly Transform NEPA from a Procedural and Informational Statute into a Substantive Statute.

CEQ is improperly attempting to transform NEPA from a procedural and informational statute into a substantive one. That is part of a broader Biden Administration goal of turning NEPA into a tool to accelerate an "energy transition" away from traditional sources of energy and towards renewable generation. Just as EPA did in the Clean Power Plan, CEQ is acting as if Congress at some point passed an "Energy Transition Act"—but of course it passed no such law. Even under last term's Democratic trifecta, Congress failed to authorize the policy that CEQ now seeks to administratively enact. Yet CEQ here still seeks to impose the Biden Administration's will despite no authorization from Congress.

CEQ's intent to expand NEPA beyond its procedural nature is clear from the Proposed Rule's plain text. The Proposed Rule removes language from current regulations "that describes NEPA as a purely procedural statute" because, CEQ contends, that neglects NEPA's "broader goals."[23] But those "broader goals" refer to Congress's aspirational statements set forth elsewhere in the statute, *see* 42 U.S.C. §§ 4321, 4331,[24] and not to the actual requirements enacted in NEPA's "business end"—the section that delineates the agency's study of its major actions, *see* 42 U.S.C. § 4332(C).

---

[23] 88 Fed. Reg. 49930.
[24] *See id.* at 49924.

AR_0027344

Section 4332(C)'s requirements are narrow in scope and unmistakably procedural rather than substantive.[25] Indeed, courts interpret NEPA to require agencies to consider significant environmental impacts before they act and to offer those views to the public.[26] But as a procedural statute, courts have never interpreted NEPA to require agencies to prioritize environmental concerns over other priorities. The Proposed Rule does just that. It does so by imposing a double standard creating separate requirements for projects that depend on whether a proposed project fits into a favored or disfavored category.

Under that double standard only actions with "significant adverse effects" require an EIS.[27] So an action with purported beneficial effects and no significant adverse effects will not require an EIS. And projects like those creating "green" energy will be presumptively exempt. That is the clearest evidence that CEQ is seeking to turn NEPA into a substantive and transformative tool.

That standard first appeared in CEQ's January 2023 NEPA Greenhouse Gas (GHG) Guidance. The GHG guidance excused favored projects, like those building renewable energy production, from detailed GHG analysis. That exemption rests on a blanket, ex ante, and unsubstantiated assumption that renewable projects' emissions will be small or short-lived.[28] Yet disfavored projects like projects building traditional energy production will be required to meet stringent requirements. They now must not only undergo

---

[25] This remains true even after the amendments to NEPA in this year's Fiscal Responsibility Act. *See* Pub. L. No. 118-5, 137 Stat. 10.

[26] *See, e.g., Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 351–53 (1989) (while "one important ingredient of an EIS is the discussion of steps that can be taken to mitigate adverse environmental consequences," NEPA only requires a "reasonably complete discussion of possible mitigation measures," and "it would be inconsistent with NEPA's reliance on procedural mechanisms-as opposed to substantive, result-based standards-to demand the presence of a fully developed plan that will mitigate environmental harm before an agency can act"). *See also, e.g., Citizens Against Burlington, Inc. v. Busey*, 938 F.2d 190, 206 (D.C. Cir. 1991) ("NEPA not only does not require agencies to discuss any particular mitigation plans that they might put in place, it does not require agencies—or third parties—to effect any."); *High Country Conservation Advocs. v. United States Forest Serv.*, 951 F.3d 1217, 1223 (10th Cir. 2020) (noting that NEPA "is strictly a procedural statute" that "does not mandate substantive results") (internal quotations omitted).

[27] 88 Fed. Reg. 49924, 49936.

[28] *See* 88 Fed. Reg. 1204–05.

AR_0027345

analysis of the project's own GHG emissions, but also may need to account for upstream and downstream emissions related to the project (*e.g.*, for oil and gas infrastructure projects, upstream extraction, and downstream consumption/combustion).[29] So while there very well may be an environmental impact from building a utility solar farm, it may be exempted from some of NEPA's regulations. But any project using a traditional energy source will find itself facing significantly more onerous requirements.

The Proposed Rule details another example of favored treatment beyond a subset of green energy projects.[30] In that example, CEQ describes a forest restoration project that may have a short-term adverse effect on a species by displacing it from the area while the project is carried out but have a long-term beneficial effect on the species by reducing the risk that wildfire will destroy the habitat altogether. The agency would consider both effects in assessing whether the action significantly impacts the species and might determine that the overall impact would not be significantly adverse and, therefore, not require an EIS. This example highlights the distinct categories of favored and unfavored projects.

Congress, in enacting NEPA, did not authorize CEQ to create this distinction between favored and unfavored projects. That distinction is not based on NEPA's text, and by creating such a scheme flouts the Major Questions Doctrine. In *West Virginia v. EPA*, 142 S. Ct. 2587 (2022), the Supreme Court found that the Clean Air Act did not give EPA the authority to reshape the nation's fuel mix. If Section 111 of the Clean Air Act, which is and has historically been a substantive, regulatory statute, did not give EPA license to reshape the nation's electric generation mix, then NEPA certainly does not give CEQ that authority to reshape energy development through other means.

Another aspect of the "double standard" is evident in CEQ's proposal to allow for "innovative" NEPA approaches.[31] Under that

---

[29] *Id.*

[30] *Id.* at 49936.

[31] *Id.* at 49957 *et seq.*

AR_0027346

provision, CEQ can grant a request for modification to authorize agencies to pursue innovative approaches to comply with NEPA to address extreme environmental challenges. But CEQ gives a very broad list of examples of such "extreme" challenges, which again imposes value judgments into what should be a procedural and informative process. Even worse is that the final item in the list covers potentially any environmental impact, including "sea level rise or increased wildfire risk, or bolstering the resilience of infrastructure to increased disaster risk from the effects of climate change; water scarcity; degraded water or air quality; species loss; disproportionate and adverse effects on communities with environmental justice concerns; imminent or reasonably foreseeable loss of historic, cultural, or Tribal resources; and impaired ecosystem health."[32] Depending on how CEQ chooses to interpret that part of the Proposed Rule, it could end up defeating its own attempt through the double-standard to streamline the process for some favored projects. Then, all projects will suffer from these overly burdensome requirements.

Through this alternative compliance provision, CEQ appears to be reserving for itself the discretion whether to approve agency requests to undertake "innovative" approaches. And, further, to articulate no meaningful criteria for when and how to approve these requests, which suggests that this new "innovative" approach will function in a "double standard" manner to ease analytical requirements on favored projects or to increase requirements on disfavored ones.

### b. CEQ Ignores Key Caselaw from the Supreme Court and D.C. Circuits in Adopting a Maximalist Approach.

CEQ ignores key caselaw from the Supreme Court and D.C. Circuit whose teachings bear little resemblance to the maximalist approach to NEPA analysis taken in the proposal. In *Department*

---

[32] *Id.*

AR_0027347

*of Transportation v. Public Citizen*, 541 U.S. 752 (2004), the Supreme Court held that an agency did not need to consider certain information under NEPA where the agency had no discretion to alter its action based on that information. In other words, an agency's NEPA analysis is properly limited by the scope of the agency's authority.

In keeping with *Public Citizen*, the D.C. Circuit decided a line of related cases.[33] In those cases, the court accepted the Federal Energy Regulatory Commission's (FERC) rationale that it did not consider downstream/combustion emissions in its NEPA analysis. Those cases rose on a request to authorize a liquified natural gas export terminal under Natural Gas Act Section 3 because FERC itself does not authorize export of the fuel (the Department of Energy does that), only the export facility itself.

This provides further evidence that the Proposed Rule is CEQ's attempt to turn NEPA into a substantive statute. Its re-introduction of language allowing agencies to consider reasonable alternatives outside their jurisdiction vastly expands the potential impact NEPA may have on agency decisions.[34] But whether an agency has any authority under NEPA to consider an "alternative" to its contemplated action, where the "alternative" is outside the agency's jurisdiction, is arguable (and stands in at best severe tension with *Public Citizen*). CEQ may be contemplating that an agency faced with, for example, a request for authorization of a new gas pipeline or a new fossil-fired power plant may choose to consider the "alternative" of a solar or wind generation project. That will transform NEPA into an "energy transition" tool, but it bears no resemblance to the text or purpose of NEPA itself. And just as the Supreme Court rejected such an attempt to force major policy changes through EPA without an act of Congress, so too does this attempt run afoul of prior court decisions limiting agency autonomy without Congressional authorization.

---

[33] *See Sierra Club v. FERC*, 827 F.3d 36 (D.C. Cir. 2016); *Sierra Club v. FERC*, 827 F.3d 59 (D.C. Cir. 2016); *EarthReports, Inc. v. FERC*, 828 F.3d 949 (D.C. Cir. 2016).
[34] 88 Fed. Reg. 49949.

AR_0027348

Moreover, the Proposed Rule seeks to remove language from the 2020 Rule emphasizing that agencies may have other statutory obligations or restrictions that conflict with NEPA compliance.[35] Removing that language conflicts with existing case law because it indicates that an agency may be obligated to comply with NEPA. After the salutary effort in the 2020 Rule to try to bring NEPA compliance within the bounds of authorized law, the Proposed Rule will so far broaden NEPA's application that it is almost certain to run afoul of these precedents.

CEQ's Proposed Rule ignores those holdings. Whether it is the Major Questions Doctrine or the D.C. Circuit, the Proposed Rule vastly expands NEPA's reach without accounting for the recent precedents intended to curtail agency authority to act without Congress.

### c. CEQ is Introducing Open-Ended and Amorphous Concepts into NEPA that will Impose Real Costs, Create Slowdowns, and Increase Uncertainty.

CEQ is introducing open-ended, amorphous concepts into requirements for NEPA analysis. These ambiguous concepts will slow down the permitting process and create legal uncertainty. Simultaneously, CEQ is removing references currently in the regulations to comments focused on economic and employment impacts.

CEQ's rationale for those actions conflicts with its approach taken to other issues in the same proposal such as climate and environmental justice. But it tracks the proposal's overarching–and unlawful–goal: to turn an informational, procedural, outcome-neutral statute into a transformative tool to shape our economy and society to the Administration's chosen policy goals.

The Proposed Rule includes broad requirements for agencies to analyze climate and environmental justice issues, with vague or no guardrails on "when enough is enough," *i.e.*, when agencies have

---

[35] *See* 88 Fed. Reg. at 49933, 49934.

AR_0027349

considered enough factors to comply with NEPA. For example, CEQ proposes adding language that would require agencies to consider "other requirements" and factors beyond "statutory requirements" in determining the degree of the effects of their actions.[36] The proposal, however, fails to specify what these requirements are and how to weigh them.

While the Proposed Rule seeks to impose consideration of environmental justice, there is no authority to consider disparate impacts or environmental justice within NEPA. While environmental justice has been a component in NEPA reviews since 1994,[37] environmental justice has not been specifically included in or defined by NEPA regulations since then. The Proposed Rule seeks to define "environmental justice" as "the just treatment and meaningful involvement of all people so that they are fully protected from disproportionate and adverse human health and environmental effects and hazards, and have equitable access to a healthy, sustainable, and resilient environment."[38] The proposed definition matches the definition proposed by this Administration in Executive Order 14096, which directed all of government to consider environmental justice in its NEPA process.[39]

The Proposed Rule would also incorporate climate change and environmental justice into the definition of "effects."[40] The issue with such a sweeping definition is that it is nearly impossible for an agency to show causation between any one project and adverse climate change or environmental justice outcomes—again injecting uncertainty into what is supposed to be a streamlined process.

In other contexts, environmental justice has led to inappropriate consideration of protected factors in decision-making. To the extent CEQ did consider race or other

---

[36] *See* 88 Fed. Reg. at 43936.

[37] E.O. 12898, *Federal Actions to Address Environmental Justice in Minority Populations and Low-Income Populations*, 59 Fed. Reg. 7629 (Feb. 16, 1994).

[38] 88 Fed. Reg. at 49961 (proposing to amend 40 C.F.R.§ 1508.1(k) to include a definition of environmental justice).

[39] E.O. 14096, *Revitalizing Our Nation's Commitment to Environmental Justice for All*, 88 Fed. Reg. 25251 (April 21, 2023).

[40] 88 Fed. Reg. 49986.

12

AR_0027350

constitutionally suspect categories—particularly as a "central consideration"—the Proposed Rule plainly violates the constitutional command of Equal Protection. *See*, *e.g.*, *Students for Fair Admissions, Inc. v. President and Fellows of Harvard College*, 143 S. Ct. 2141 (2023); *Ricci v. DeStefano*, 129 S. Ct. 2658, 2683 (Scalia, J., concurring).

The current approach of "[l]imit[ing] inquiry to statutory requirements" has the advantage of being a clear, administrable rule. Adding an open-ended "other requirements," by contrast, will leave an agency unsure of when it has considered enough factors in its analysis. That uncertainty will lead to front-end delays and back-end litigation risk. How can a court determine whether an NGO plaintiff is correct that the agency didn't consider enough of these "other requirements" in its initial planning? And even if a court adjudicated that issue, the guidance is vague enough that other courts in other jurisdictions could come to conflicting outcomes. Such a regulatory patchwork stands to create real harm, particularly given the lack of certainty for the Proposed Rule's consistent application.

Similarly, references in the Proposed Rule to "meaningful" public engagement and public participation introduce a fuzzy, unpredictable, un-analyzable element into the NEPA process. The 2020 CEQ regulatory revision was largely motivated by a desire to streamline and simplify what had grown over the decades since NEPA's enactment into a sprawling, byzantine, insiders' game. Project reviews were taking too long, taking up too many pages, sprawling into subject areas beyond what Congress intended, and slowing down or deterring needed permits and other actions.

Many, if not most, supporters of the NEPA amendments in the recent FRA intended to similarly streamline the process, as evidence by those amendments' adoption of key aspects of the 2020 rule. But CEQ here is adding or restoring (from the original 1978 regulations) elements that will cause *longer, broader-ranging* reviews and *less* legal certainty. The Proposed Rule is therefore in tension not only with the original statute, but also with Congress's intent in amending NEPA earlier this year.

13

Moreover, the proposed rule is arbitrary and capricious. The Administrative Procedure Act requires CEQ "to engage in reasoned decisionmaking, and directs that agency actions be set aside if they are arbitrary or capricious." *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1905 (2020) (cleaned up). Courts will evaluate whether the Proposed Rule "was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Id.* (cleaned up). So among other evidence, CEQ must show that it "examined the relevant data and articulated a satisfactory explanation for [its] decision, including a rational connection between the facts found and the choice made." *Dep't of Com. v. New York*, 139 S. Ct. 2551, 2569 (2019) (cleaned up). "Unsubstantiated or bare assumptions" are not enough. *Nat. Res. Def. Council v. EPA*, 31 F.4th 1203, 1207 (9th Cir. 2022) (cleaned up).

The Proposed Rule also rolls back provisions established by the 2020 rule increasing requirements on what public comments must contain to be considered by agencies. CEQ proposes to delete language describing the types of impacts that a comment should cover, including the reference to economic and employment impacts because it is inappropriate to "single out these considerations for special treatment and unduly burdensome to expect commenters to address economic and employment impacts."[41] This is an odd explanation, because the proposal is at the same time requiring analysis (and implicitly "singling out" as worthy of comment) other issues that are not on the face of the NEPA statute.

Overall, the Proposed Rule increases uncertainty and imposes costs with little benefit. It exceeds CEQ's authority and does so in a way that is harmful to broad and beneficial development.

## III.  Conclusion

For these reasons, the Council on Environmental Quality should withdraw the Proposed Rule. We look forward to your response.

---

[41] 88 Fed. Reg. 49952.

AR_0027352

AR_0027353

Respectfully submitted,

Brenna Bird
Attorney General of Iowa


Steve Marshall
Attorney General of Alabama

Chris Carr
Attorney General of Georgia

Treg Taylor
Attorney General of Alaska

Raúl R. Labrador
Attorney General of Idaho

Tim Griffin
Attorney General of Arkansas

Theodore E. Rokita
Attorney General of Indiana

Ashley Moody
Attorney General of Florida

Kris Kobach
Attorney General of Kansas

16

Jeff Landry
Attorney General of Louisiana

Andrew T. Bailey
Attorney General of Missouri

Lynn Fitch
Attorney General of
Mississippi

Austin Knudsen
Attorney General of Montana

Mike Hilgers
Nebraska Attorney General

Drew Wrigley
Attorney General of North
Dakota

Dave Yost
Attorney General of Ohio

Gentner Drummond
Attorney General of Oklahoma

Alan Wilson
Attorney General of South
Carolina

Jonathan Skrmetti
Tennessee Attorney General

17

Ken Paxton
Attorney General of Texas


Sean D. Reyes
Attorney General of Utah


Jason Miyares
Attorney General of Virginia

Patrick Morrisey
Attorney General of West
Virginia


Bridget Hill
Attorney General of Wyoming

18

AR_0027356



September 26, 2023

Chair Brenda Mallory
Council on Environmental Quality
730 Jackson Place, NW
Washington, DC 20503

Dear Chair Mallory,

As governors who frequently deal with the on-the-ground challenges of federal regulations, we write to address common concerns related to the Council on Environmental Quality's ("CEQ") National Environmental Policy Act Implementing Regulations Revisions Phase 2 ("Proposed Rule"). Although we were encouraged by several of the NEPA-related reforms Congress included in the Fiscal Responsibility Act (P.L. 118-5), we believe CEQ's Proposed Rule will undermine the impact of several of those reforms. The stated purpose for the Proposed Rule is to increase the efficiency and effectiveness of the NEPA process. It fails in both regards. Instead, the Proposed Rule eliminates the clarity of the existing rule, decreases NEPA's efficiency, and drastically increases the potential for litigation related to NEPA decisions.

The Proposed Rule would largely undo many of the changes promulgated on July 16, 2020 ("2020 Rule"), which were designed to increase the overall efficiency and effectiveness of the NEPA process. Now, only three years later, CEQ once again proposes wholesale revisions to the implementing regulations. Implementing sweeping changes after only 3 years of application creates significant confusion and decreases the certainty associated with CEQ's regulations.

Additionally, the general direction of the Proposed Rule will significantly impact management within the individual states, incentivize increased litigation, and decrease the overall efficiency of the process. For instance, CEQ is recommending removal of the language that describes NEPA as a purely procedural statute, even after admitting in the Proposed Rule that this is an accurate statement. The rationale for this change suggests NEPA has been used in the past, or may in the future be treated, as merely a "check-the-box" exercise. There is no validity to this concern, as the processes outlined in NEPA have always had tremendous on-the-ground effect, despite its procedural nature. Moreover, removal of the "procedural" language changes at least the perception of NEPA's effect, if not the reality, and increases confusion as to its applicability. This is concerning, particularly when there are multiple changes in the Proposed Rule that diminish the value of state-specific input in the NEPA

AR_0027703

September 26, 2023
Page 2 of 4

process. Moreover, any increase in confusion will result in increased litigation, a general concern we have with many of the changes in the Proposed Rule.

In addition to creating confusion, many of the changes in the Proposed Rule invite significant additional legal challenges. For instance, CEQ is recommending the removal of the exhaustion process for public comments and allowing agencies discretion to determine whether to consider an issue or whether it was forfeited in the comment process. While CEQ suggests agencies could make these determinations on an individual basis to address "unusual circumstances," the mere allowance of such discretion will significantly increase the opportunity for litigation and inefficiency. Public involvement is a necessary element of the NEPA process. However, allowing agencies discretion to consider concerns not properly raised in the comment process and/or allowing legal challenges absent proper procedural constraints will have a tremendous effect on the efficiency of the NEPA process.

Similarly, the Proposed Rule encourages legal challenges regarding the sufficiency of cumulative effects analysis. Phase 1 of these proposed NEPA changes, issued by CEQ on April 20, 2022, made it considerably more difficult and speculative to determine what qualifies as cumulative effects and how those effects must be evaluated in the NEPA process. The Proposed Rule goes even further, demanding, for example, increased consideration for climate change-related effects, including effects of climate change on the proposed action and alternatives (which may in turn alter the effects of the proposed action and alternatives). This is a major weapon already employed by litigants, and agencies spend enormous time and resources attempting to address this requirement, both within the courtroom and without. The Proposed Rule does not address this need for reform and only adds to the confusion.

As Marlo Lewis, Jr. of the Competitive Enterprise Institute wrote, "NEPA reviews are concerned with 'major' federal actions 'significantly affecting the quality of the human environment.' The GHG [greenhouse gas] emissions of even the largest infrastructure project are several orders of magnitude smaller than any quantity capable of having detectable effects on global temperatures. Climatically-inconsequential GHG emissions are not 'significant' effects for NEPA purposes."

The Proposed Rule also places significant emphasis on public engagement, with particular focus on communities with environmental justice concerns. While we encourage increased public engagement, the Proposed Rule oversimplifies this topic and drastically increases the confusion associated with such involvement. For instance, governmental involvement in the management of wildlife resources is critical at early stages of the NEPA process, as states have primary jurisdiction over wildlife within their borders (except for endangered/threatened species). States must therefore be involved in the development of alternatives for NEPA consideration, while public involvement would significantly complicate an already difficult process. The Proposed Rule nevertheless suggests inclusion of "flexibility to agencies to tailor engagement strategies, considering the scope, scale, and complexity of the proposed action and alternatives, the degree of public interest, and other relevant factors." Allowing this level of engagement in the development of alternatives and proposed actions significantly diminishes the role of the states, both as cooperating agencies and as participants in the NEPA process. States are not simply another stakeholder, and as such, state involvement must be given deference, especially in areas where the states possess the best information available. This clear delineation between governmental and public involvement must be reflected in NEPA regulations.

AR_0027704

September 26, 2023
Page 3 of 4

There are multiple suggestions in the Proposed Rule that will certainly cause further delays in the NEPA process, even if they do not result in litigation. For example, CEQ is proposing to potentially require agencies to conduct new studies, investigations, or other forms of data collection to inform a NEPA analysis. Setting aside the potential for agencies to reach decisions before the existence of supportive science, this suggested change will add significant delay to the NEPA process. Similarly, the Proposed Rule suggests removing language that provides general guidance adopted in the 2020 Rule for the public commenting process. Without that guidance, public comments will increase in length, again contributing to the inefficiency of this process. This proposed change also conflicts with other rule provisions regarding the role of applicants and third parties in preparing draft NEPA documents and federal agencies independently reviewing rather than redoing such work. These are only a few examples from the Proposed Rule that will decrease the efficiency of NEPA, and we cannot support changes of this nature.

We recognize that some provisions of the 2020 Rule may need revision and clarification. However, the 2020 Rule increased the efficiency and effectiveness of the NEPA process. The examples provided herein demonstrate that the Proposed Rule undermines the progress made in the 2020 Rule by decreasing certainty and efficiency in the NEPA process, increasing the potential for litigation, and minimizing the role of state government.

We look forward to your prompt reply so we can continue to cooperate with CEQ and provide an informed perspective in these critical conversations. We also continue to support meaningful revisions to NEPA, where appropriate, but will not support changes that make the process less efficient, less effective, invite litigation, and/or fail to fully consider state-specific information in the NEPA process. Thank you in advance for your consideration.

Sincerely,

Governor Joe Lombardo
State of Nevada

Governor Spencer Cox
State of Utah

Governor Kay Ivey
State of Alabama

Governor Brian Kemp
State of Georgia

Governor Brad Little
State of Idaho

Governor Eric Holcomb
State of Indiana

Governor Kim Reynolds
State of Iowa

Governor Tate Reeves
State of Mississippi

Governor Mike Parson
State of Missouri

September 26, 2023
Page 4 of 4

Governor Greg Gianforte
State of Montana

Governor Jim Pillen
State of Nebraska

Governor Chris Sununu
State of New Hampshire

Governor Doug Burgum
State of North Dakota

Governor Kevin Stitt
State of Oklahoma

Governor Kristi Noem
State of South Dakota

Governor Greg Abbott
State of Texas

Governor Mark Gordon
State of Wyoming

# Council on Environmental Quality

# National Environmental Policy Act Implementing Regulations Revisions Phase 2

## Special Environmental Assessment

## April 2024

### I.    Background

Section 102(2) of the National Environmental Policy Act of 1969 (NEPA), 42 U.S.C. 4321 *et seq.*, requires Federal agencies to consider in their decision-making processes the environmental effects of their proposed actions, disclose those impacts, and involve the public in the NEPA process. 42 U.S.C. 4332(2). The Council on Environmental Quality (CEQ) oversees the implementation of NEPA. 42 U.S.C. 4342, 4344. In 1978, CEQ issued NEPA implementing regulations at 40 CFR parts 1500 through 1508 (NEPA regulations), which set forth the procedures for agencies to comply with section 102(2) of NEPA. 43 FR 55978 (Nov. 29, 1978). CEQ subsequently made technical amendments in 1979, 44 FR 873 (Jan. 3, 1979), and amended one provision in 1986, 51 FR 15618 (Apr. 25, 1986). The NEPA regulations, as amended through April 25, 1986, are referred to collectively as the 1978 regulations. In 2020, CEQ made significant changes throughout the NEPA regulations. 85 FR 43304 (July 16, 2020) (2020 regulations).

CEQ has since engaged in a review of the 2020 regulations and is revising them using a phased rulemaking approach. First, CEQ issued an interim final rule that amended the 2020 regulations to extend the deadline for Federal agencies to make their agency NEPA procedures consistent with the 2020 regulations. 86 FR 34154 (June 29, 2021). Next, CEQ issued a final rule that made three targeted changes to the NEPA regulations, clarifying the 2020 regulation's definition of "effects;" the requirements for addressing the purpose and need of an action in an environmental impact statement; and agencies' authority to develop NEPA implementing procedures that go beyond the minimum requirements set forth in the NEPA regulations. 87 FR 23453 (April 20, 2022).

On June 3, 2023, President Biden signed the Fiscal Responsibility Act of 2023 (FRA) into law, which included a range of amendments to NEPA (referred to as the "2023 NEPA amendments"). These amendments modified section 102(2)(C), added sections 102(2)(D) through (F), and added sections 106 through 111 to NEPA. Sec. 321, Pub. L. 118-5, 137 Stat. 10.

CEQ proposed additional changes to the NEPA regulations to implement the 2023 NEPA amendments and to better align the regulations with CEQ's extensive experience implementing NEPA; CEQ's perspective on how NEPA can most effectively inform agency decision making; longstanding Federal agency experience and practice with environmental review processes; NEPA's purpose and statutory text, including making decisions informed by science and other high-quality information; and case law interpreting NEPA's requirements. CEQ detailed these proposed changes in a notice of proposed rulemaking (NPRM). 88 FR 49924 (July 31, 2023).

1

The 2023 NEPA amendments are also further explained in the NPRM. CEQ provided a 60–day public comment period for the proposed rule and held 4 virtual public meetings and 2 virtual Tribal consultations. Responses to public comments are summarized in the final rule and detailed comment summaries and responses are provided in the document "Phase 2 Rule Response to Comments," which CEQ posted in the docket for this rulemaking. See Docket ID CEQ-2023-0003 on regulations.gov. After considering public comments and participation, CEQ developed the final rule for which it prepared this special EA.

The NEPA regulations provide for three levels of NEPA review for major Federal actions. When a Federal agency is considering an action that is likely to have significant environmental effects, it must prepare an environmental impact statement (EIS). See 40 CFR part 1502.[1] Agencies also must identify categories of actions that normally do not have significant environmental effects in their agency NEPA procedures, and then apply these categorical exclusions (CEs) to individual actions after considering whether extraordinary circumstances exist that preclude the application of the CE. See 40 CFR 1501.4, 1507.3(e)(2)(ii) (2022). Finally, for actions where the significance of the effects is unknown or for those actions that are not likely to have significant environmental effects and where the agency does not have an established CE, agencies prepare an environmental assessment (EA) to comply with NEPA. See 40 CFR 1501.5 (2020). EAs briefly provide sufficient evidence and analysis to determine whether to prepare an EIS or to make a finding of no significant impact (FONSI). 40 CFR 1501.5(c)(1) (2020). Agencies may prepare EAs on any action to assist agency planning and decision making. 40 CFR 1501.5(b) (2020).

CEQ has not adopted agency-specific NEPA procedures and has not established CEs for its own actions. Consistent with the majority of CEQ's past practice, it has prepared this special EA to accompany and inform its rulemaking to amend the NEPA regulations.

## II.    Purpose and Need

The purpose and need for this rulemaking is to implement the 2023 NEPA amendments; provide for an effective environmental review process that promotes better decision making; ensure full and fair public involvement; provide for an efficient process and regulatory certainty; and provide for sound decision making grounded in science, including consideration of relevant environmental, climate change, and environmental justice effects. CEQ's action to address those elements will help to better execute NEPA's statutory requirements and purposes, including to clearly communicate requirements for Federal agencies, to ensure that Federal decisions are guided by the best available information, to better protect and enhance the quality of the human environment, and to provide timely and meaningful processes that inform and engage the public before decisions are made.

## III.    Proposed Action and Alternatives

The proposed action would include revisions throughout the NEPA regulations, as described in the NPRM and the notice of final rule. CEQ incorporates the NPRM and final rule herein and

---

[1] In this document, CEQ uses the section symbol (§) to refer to the final regulations; 40 CFR 150X.X (2020) or (2022) to refer to the current CEQ regulations as set forth in 40 CFR parts 1500–1508, which this Final Rule amends.

AR_0027753

refers readers to that document for a more detailed description of CEQ's proposed and final rule changes. In this special EA, CEQ groups the changes into the following five categories: improvements to provide efficiency and flexibility in the NEPA process, promoting better environmental outcomes, prioritizing meaningful public engagement, structural updates, and clarifying amendments.

- **Changes to improve NEPA efficiency and add flexibility** would update requirements for agency collaboration and expand agency flexibility to allow agencies to adapt environmental reviews to their unique operational needs and statutory obligations.
- **Changes would promote better environmental outcomes** by codifying the need to evaluate climate change impacts in environmental analyses; by encouraging the use of high-quality information, including reliable data and resources, models, and Indigenous Knowledge; and by directing agencies to engage with impacted stakeholders, including communities with environmental justice concerns, such as communities of color, low-income communities, and Tribal Nations, earlier in the process.
- **Changes would prioritize meaningful public engagement** by improving agency notice requirements, encouraging robust and meaningful comments from stakeholders, and ensuring agencies advance environmental justice and respect Tribal sovereignty.
- **Structural updates** to the CEQ regulations would ensure internal consistency and enhance the readability of the regulations.
- **Clarifying amendments** would provide clear direction to agencies in implementing NEPA by more closely aligning the regulations with the requirements and policy objectives of NEPA, including incorporating the 2023 NEPA amendments into the regulations, codifying agency best practices, and identifying appropriate agency roles and responsibilities.

This special EA only considers the proposed action and no action alternative because CEQ does not anticipate any reasonably foreseeable significant effects from the rule, and to extent there are they would be beneficial. Therefore, CEQ concludes that this action does not involve unresolved conflicts concerning the alternative uses of available resources that would warrant consideration of other alternatives required by 42 U.S.C. 4332(2)(H).

## IV.    Environmental Effects

The changes to the CEQ regulations, in themselves, have no environmental effect. The regulations do not dictate that Federal agencies reach any particular outcome or take any specific action. Rather, the CEQ regulations establish a process that Federal agencies must follow consistent with the national environmental policy set forth in section 101 of NEPA and the procedural requirements set forth in section 102 of NEPA. The changes will improve this process, which is expected to result in Federal agencies making better and more timely decisions that take into account potential environmental effects of their actions.

### A.    *Changes to Improve NEPA Efficiency and Add Flexibility*

CEQ proposes to make substantive changes to agency obligations within the NEPA regulations. In some instances, these changes reflect a return to the longstanding requirements under the 1978 regulations. In other places, CEQ proposes changes that are intended to implement the 2023

AR_0027754

NEPA amendments, improve the efficiency of agency processes, facilitate collaboration, and provide agencies with greater flexibility to prepare environmental analyses in the context of their unique operational needs and statutory obligations. These changes include, among others:

- Amending language in § 1500.6 regarding agency implementation of NEPA "as interpreted by the regulations" and confirming agencies have an independent obligation to ensure full compliance with NEPA, conforming this section with the update to § 1507.3 in the 2022 final rule that eliminated the concept that the CEQ regulations are a ceiling for NEPA compliance;

- Moving and consolidating the threshold NEPA applicability factors and adding factors from section 106 of NEPA in § 1501.3(a)(1)–(5), as well as restoring and updating the context and intensity factors for determining significance that the 2020 rule removed;

- Updating the process for establishing CEs in §§ 1501.4 and 1507.3, including confirming that agencies can jointly develop CEs, allowing agencies to establish CEs through programmatic environmental reviews and other planning processes, clarifying that agencies may incorporate mitigation into CEs when establishing them in their agency procedures, and enabling agencies to adopt and apply another agency's CE to a proposed action or category of actions consistent with section 109 of NEPA;

- Clarifying the roles and responsibilities of lead and cooperating agencies in §§ 1501.7 and 1501.8;

- Improving flexibility for interagency coordination and early interagency collaboration and dispute resolution in §§ 1504.1 and 1504.2;

- Requiring agencies to set schedules in § 1501.10 to meet the one- and two-year deadlines for an EA and EIS, respectively;

- Directing agencies to establish EIS and EA schedules in § 1501.10 in consultation and concurrence with cooperating and participating agencies and in consultation with applicants, where applicable;

- Codifying best practices for programmatic environmental documents and tiering in § 1501.11;

- Providing clearer direction on agency adoption of EAs, EISs, and CE determinations in § 1506.3; and

- Adding additional clarification on requirements for developing agency NEPA procedures in § 1507.3, including for establishing CEs, identifying extraordinary circumstances, and emergency actions.

CEQ does not anticipate that there would be any reasonably foreseeable environmental effects from these changes, but to the extent there are, such effects would be beneficial. CEQ expects these changes will increase the efficiency of environmental reviews, lead to a more predictable and transparent NEPA process, and result in better environmental documents.

B.    *Changes to Promote Better Environmental Outcomes*

In order to promote better environmental outcomes, CEQ proposes to ensure that NEPA documents appropriately consider all reasonably foreseeable environmental effects, including climate change and the impacts of greenhouse gas emissions, using high-quality information. CEQ proposes to improve the use of scientific analyses by reverting some provisions back to the

4

original 1978 language, modernizing some of those 1978 provisions, and adding new requirements to reflect the current consensus of the scientific community. CEQ also proposes to add language to implement the 2023 NEPA amendments. These changes include, among others:

- Clarifying the expectations for the use of incomplete or unavailable information, ensuring evaluation of high-quality and accurate information, and ensuring the professional integrity, including scientific integrity of the discussions and analyses in environmental documents in §§ 1500.1(b), 1501.5(i), 1502.21, 1506.6, and 1506.6;
- Highlighting climate change and disproportionate adverse health and environmental effects on communities with environmental justice concerns as important considerations when evaluating project alternatives in § 1500.2(e);
- Requiring the consideration of reasonably foreseeable climate change-related effects, including, where feasible, quantification of greenhouse gas emissions, from the proposed action and reasonable alternatives, and the reasonably foreseeable effects of climate change on the proposed action and reasonable alternatives in § 1502.16;
- Requiring discussion of reasonably foreseeable disproportionate and adverse human health and environmental effects on communities with environmental justice concerns, in § 1502.16;
- Requiring analysis of the no action alternative, including any adverse environmental effects, in § 1502.16;
- Restoring and updating agency evaluation of context and intensity factors and encouraging appropriate consideration of beneficial effects when making a determination of significance in § 1501.3(d);
- Amplifying the use of Indigenous Knowledge as a source of relevant expertise for cooperating agencies in § 1501.8(a) and high-quality information in § 1506.6;
- Requiring identification of the environmentally preferable alternative in EISs in § 1502.14;
- Requiring the use of high-quality information for reasonably foreseeable trends, including the effects of climate change, in § 1502.15;
- Expanding the use of reliable high-quality information, including the flexibility for agencies to use newly gathered data in § 1506.6;
- Requiring agencies to develop a monitoring and compliance plan when the analysis of the reasonably foreseeable environmental effects of a proposed action in an EA or EIS is based on mitigation in §§ 1501.6, 1505.2, and 1505.3; and
- Modernizing definitions in § 1508.1 to incorporate climate change, including "effects," and "extraordinary circumstances."

CEQ does not anticipate that there would be any reasonably foreseeable environmental effects from these changes, but to the extent there are, such effects would be beneficial. CEQ expects the changes will result in the use of high-quality information, including reliable data and resources, models, and Indigenous Knowledge, and encourage a systems-based approach to analyze potential effects. These changes will result in more informative environmental documents, more scientifically accurate analyses, and better-informed government decision making. The changes also will increase the predictability of the NEPA process and, as a result, may reduce litigation risks. Taken together, CEQ expects the changes to have no or net-positive effects on the environment.

AR_0027756

C.    *Changes to Prioritize Meaningful Public Engagement, Including Advancing Environmental Justice and Respecting Tribal Sovereignty*

Consulting with and responding to affected stakeholders is critical to achieving the requirements and policy objectives of NEPA and the goals of transparent and informed decision making. In particular, ensuring agencies listen to and incorporate feedback from communities with environmental justice concerns is critical to considering and addressing the disproportionately adverse health and environmental effects on these groups. CEQ proposes to clarify or strike certain provisions in the 2020 regulations that may be misinterpreted to limit public engagement and community involvement in Federal decision making. CEQ also proposes to provide procedures to facilitate evaluation of local and cumulative impacts to vulnerable communities and achieve better environmental and community outcomes. CEQ further proposes procedures to ensure that public engagement occurs early in the NEPA process because early identification of issues and conflicts can lead to more efficient and effective decision making. These changes include, among others:

- Restoring and modifying the policy provision of § 1500.2 from the 1978 regulations by updating paragraphs (d) and (e) to promote meaningful engagement, specifically including engaging with communities with environmental justice concerns as well as clarifying in § 1501.5(c)(3) that agencies should list the Federal agencies, as well as the State, Tribal, and local governments with which they consulted;
- Improving transparency by encouraging publication of an agency determination where the agency determines to apply a CE when an extraordinary circumstance exists in § 1501.4(b)(1), and requiring notice and public comment in § 1501.4(c)(2) when an agency establishes a CE through a programmatic review;
- Adding consideration of disproportionate and adverse effects on communities with environmental justice concerns and adverse effects on rights of Tribal Nations that have been reserved through treaties, statutes, or Executive Orders to the list of intensity factors in § 1501.3(d)(2)(vii) and (viii);
- Clarifying that if an agency publishes a draft EA, they must invite public comment on the draft EA in § 1501.5(e);
- Determining the appropriate methods of public and government engagement, including the right mechanisms for notification, publication, and public meetings and hearings, in § 1501.9;
- Conforming the scoping requirements in § 1502.4 with provisions on public engagement, in § 1501.9;
- Clarifying that agencies should "work together and with" potential applicants and relevant agencies in § 1502.5(b) to encourage early coordination, process efficiencies, and better environmental outcomes;
- Increasing accessibility of conclusions for public review; for instance, requiring that draft and final EIS identify the environmentally preferable alternative in § 1502.14;
- Removing some of the commenting burdens added by the 2020 regulations in § 1503.3, including removing language encouraging commenters to discuss economic and employment impacts, and removing ambiguity around requirements for agencies to respond to public comments from § 1503.4(a);

6

- Promoting the incorporation of mitigation measures that address or ameliorate significant adverse human health and environmental effects of proposed Federal actions that disproportionately and adversely affect communities with environmental justice concerns in § 1505.3(b); and
- Modernizing definitions in § 1508.1 to incorporate communities with environmental justice concerns, such as within the definitions of "effects" and "extraordinary circumstances" and adding definitions of "environmental justice" and "communities with environmental justice concerns."

CEQ does not anticipate that there would be any reasonably foreseeable environmental effects from these changes, but to the extent there are, such effects would be beneficial. The changes will facilitate public engagement to ensure that agencies incorporate perspectives from communities regarding direct, indirect, and cumulative effects, including effects that may otherwise not be analyzed. In addition, these changes would result in better community outcomes by amplifying the voices of those who may be most impacted by the proposed Federal action and, because the changes prioritize early public engagement, they may result in more efficient and effective decision making and reduce potential litigation risks.

D.   *Changes to Update Structure and Consistency of NEPA Regulations*

CEQ proposes to improve the logical structure of the NEPA regulations to ensure consistency among internal cross-references and to make additional non-substantive changes. These changes would improve the readability and clarity of the regulations, which is likely to improve the efficiency of agency compliance with NEPA. These changes include, among others:

- Restoring the purpose and policy sections in §§ 1500.1 and 1500.2 to reflect a structure similar to the longstanding purpose and policy sections in the 1978 regulations, and updating sections to be consistent with other regulatory changes, such as the inclusion of climate change and consideration of effects on communities with environmental justice concerns, throughout the regulations;
- Removing the comment exhaustion requirement from § 1500.3(b) to reduce burden on public commenters and making substantive changes to §§ 1501.9, 1502.17, 1503.1 and 1503.3 to conform with this change;
- Emphasizing the importance of public engagement in the NEPA process, including adding early engagement language in § 1501.1(b), moving the requirements for public engagement to part 1501 to highlight it as a core component of the NEPA process and agency planning, and updating and moving requirements for scoping in § 1502.4;
- Consolidating provisions on applicability of NEPA, consideration of scope, and determination of the level of NEPA review into one section in § 1501.3, along with restoring and updating the context and intensity factors for evaluating significant effects; and
- Consolidating provisions on programmatic environmental documents and tiering in § 1501.11.

CEQ does not anticipate that there would be any reasonably foreseeable environmental effects from changes that improve the structure of the regulations and provide for internal consistency. CEQ expects that organizing the regulations logically, consolidating related provisions, and

7

ensuring internal conformity would improve efficiency in the NEPA process, in part by reducing agency and public confusion regarding regulatory provisions. This generally would lead to improved NEPA compliance and better-informed agency decision making.

E.    *Changes to Enhance Clarity in NEPA Regulations*

CEQ proposes to enhance the clarity of the NEPA regulations by more clearly articulating the intent of NEPA, identifying agency best practices, and providing certainty for agency roles and responsibilities. These changes would provide agencies and the public with a clear understanding of how to implement NEPA in a way that encourages the consideration of high-quality information, supports robust public engagement, and results in fully informed and transparent Federal decision making. CEQ also proposes changes that would implement the 2023 NEPA amendments. These changes include, among others:

- Implementing the provisions of the 2023 NEPA amendments, including threshold considerations, adoption of CEs, the role of lead and cooperating agencies, deadlines and schedules, page limits, programmatic environmental documents, applicant-prepared NEPA documents, and others in §§ 1501.3, 1501.4, 1501.5, 1501.7, 1501.8, 1501.10, 1501.11, 1502.7, and 1507.3;
- Clarifying that the purpose of the NEPA regulations is to advance the "letter and spirit" of NEPA and achieve the environmental and community benefits envisioned by Congress in §§ 1500.1 and 1500.3(a);
- Removing the misleading emphasis that NEPA is simply a procedural statute from § 1500.1;
- Ensuring that consideration of climate change and environmental justice are appropriately included throughout the regulations in §§ 1500.2(e), 1502.14, 1502.16, 1506.6, and 1508.1(i);
- Clearly describing and cross-referencing agency requirements for creating concise and informative environmental documents in § 1500.4, including amending potentially confusing provisions from the 2020 regulations, and clarifying the limited conditions in which it may be impossible for agencies to comply with NEPA requirements in § 1500.6;
- Highlighting the importance of early stakeholder engagement in describing the overarching purpose of the regulations in § 1501.1;
- Striking the "functional equivalence" provision from 40 CFR 1501.1(a)(6) (2020), consistent with the NEPA statute and case law;
- Clarifying the determination of scope and closely related activities or decisions as well as the appropriate level of NEPA review in § 1501.3;
- Codifying best practices, such as for mitigated findings of no significant impact in § 1501.6, programmatic environmental documents in § 1501.11, and early interagency dispute resolution in § 1504.2; and
- Adding language regarding flexibility and agency obligations when establishing CEs in § 1501.4, allowing agencies to establish CEs through programmatic or planning NEPA documents, and setting forth the process through which an agency can adopt and apply another agency's CE.

8

CEQ does not anticipate that there would be any reasonably foreseeable environmental effects from these changes, but to the extent there are, such effects would be beneficial. CEQ expects that updating the regulatory language to reflect more accurately the requirements and policy objectives of NEPA will help agencies more effectively and efficiently carry out their obligations consistent with NEPA and has the potential to reduce litigation risk. These changes will result in transparent agency decision making, concise and informative environmental documents, and better environmental outcomes.

## V. List of Agencies and Persons Consulted

CEQ provided this special EA to Federal agencies as part of the Office of Management and Budget's Office of Information and Regulatory Affairs interagency review process for significant rules under E.O. 12866, *Regulatory Planning and Review*, 58 FR 51735 (Oct. 4, 1993). CEQ made the draft special EA available to the public and received comments through the NPRM process.

## VI. Finding of No Significant Impact

Based on this special EA, CEQ finds that engaging in this rulemaking to implement the identified changes would not result in reasonably foreseeable significant effects to the human environment. Therefore, CEQ makes a finding of no significant impact.

9

**Regulatory Impact Analysis for the Final Rule, National Environmental Policy Act Implementing Regulations Revisions Phase 2**
**RIN: 0331–AA07**
**April 2024**

## Executive Summary

In July 2020, the Council on Environmental Quality (CEQ) issued the first substantial revision of its regulations implementing the National Environmental Policy Act of 1969 (NEPA), 42 U.S.C. §§ 4321 *et seq.*, in 40 years. On January 20, 2021, President Biden issued Executive Order (E.O.) 13990, *Protecting Public Health and the Environment and Restoring Science to Tackle the Climate Crisis*,[1] which directed agencies to review regulations promulgated during the prior four years for consistency with the policies articulated in the E.O., and take action to address identified inconsistencies. CEQ reviewed the 2020 NEPA regulations for consistency with E.O. 13990's direction.

Based on this review, CEQ undertook a multi-phase rulemaking process to better align its NEPA regulations with NEPA's statutory goals and purpose of promoting sound decision making informed by science, as well as CEQ and agency expertise. As a first step, CEQ issued an interim final rule extending the deadline for Federal agencies to make their procedures consistent with the 2020 regulations.[2] Next, CEQ finalized revisions to the 2020 regulations in "Phase 1" of the rulemaking process to restore three discrete aspects of the 1978 regulations.[3] Then, on July 31, 2023, CEQ issued a notice of proposed rulemaking—the Bipartisan Permitting Reform Implementation Rule—initiating a "Phase 2" rulemaking (NPRM or proposed rule) and a 60–day public comment period.[4] Now, CEQ is issuing a final rule to further revise, update, and modernize the NEPA regulations in order to ensure that the regulations promote NEPA's statutory purposes and are consistent with the Administration's policies to improve public health, protect the environment, prioritize environmental justice, provide access to clean air and water, reduce greenhouse gas emissions, enhance government transparency, and fully support science-based decision making. In addition, CEQ is addressing provisions of the 2020 regulations that may have created confusion among agencies, applicants, and the public and that limited the scope of NEPA analysis in some circumstances.

While CEQ was developing a proposed rule for Phase 2 of its rulemaking effort, on June 3, 2023, President Biden signed into law the Fiscal Responsibility Act of 2023 (FRA), Pub. L. 118–5,

---

[1] E.O. 13990, *Protecting Public Health and the Environment and Restoring Science to Tackle the Climate Crisis*, 86 FR 7037 (Jan. 25, 2021).

[2] Deadline for Agencies to Propose Updates to National Environmental Policy Act Procedures, 86 FR 34154 (June 29, 2021) (amending 40 CFR 1507.3).

[3] National Environmental Policy Act Implementing Regulations Revisions, 87 FR 23453 (Apr. 20, 2022) (Phase 1 Final Rule) (amending 40 CFR 1507.3, 1508.1 (2020)). As in the preamble for the final rule, the RIA uses the phrase "1978 regulations" to refer to the regulations promulgated in 1978 with typographic amendments in 1979 and an amendment to one section in 1986. *See* CEQ, National Environmental Policy Act Regulations; Incomplete or Unavailable Information, 51 FR 15618 (Apr. 25, 1986) (amending 40 CFR 1502.22); CEQ, Implementation of Procedural Provisions; Corrections, 44 FR 873 (Jan. 3, 1979).

[4] National Environmental Policy Act Implementing Regulations Revisions Phase 2, 88 FR 49924 (July 31, 2023).

AR_0027761

which includes amendments to NEPA (referred to as the "2023 NEPA amendments"). The FRA modified section 102(2) of NEPA, 42 U.S.C. § 4332(2), by amending subparagraph (C) and adding new subparagraphs (D) through (F); and adding new sections 106 through 111, 42 U.S.C. §§ 4336–4336e.[5]

CEQ's regulatory changes in the final rule are necessary to better effectuate the requirements and objectives of NEPA, and to implement the 2023 NEPA amendments. The changes in the final Phase 2 rule are justified by the information included in the NPRM preamble, final rule preamble, final rule response to comments, and final rule text. Together, these materials constitute the reasonable basis for the changes in the final Phase 2 rule, which CEQ has determined is the option that best satisfies NEPA's statutory mandate and implements the 2023 NEPA amendments and provides the greatest net benefits to society by promoting informed, collaborative, and efficient agency decision making.

CEQ has considered the benefits and the costs of the changes relative to a baseline and against alternative regulatory actions it could have adopted. CEQ acknowledges that limited data is available to quantitatively assess the costs and benefits of the final rule.[6] In addition to the availability of data, CEQ considered performing an event study[7] on changes in agency policies, procedures, decision-making processes, or outcomes in response to the implementation of the 2020 rule. CEQ deemed this approach not feasible because the short period of time that has elapsed since the 2020 rule went into effect provided an inadequately small sample size from which to complete a quantitative analysis, and because of other significant statutory and policy changes that may affect agencies', applicants', and the public's responses to the 2020 rule.[8] Given these considerations, CEQ has primarily assessed costs and benefits using qualitative measures, which is consistent with the Office of Management and Budget's (OMB) approach discussed in OMB Circular No. A–4, Regulatory Analysis.[9] The Circular acknowledges that when cost and benefits are difficult or not feasible to quantify, agencies should analyze them qualitatively and detail who is affected and how.

The changes promulgated in the final Phase 2 rule are likely to benefit Federal agencies, applicants, environmental stakeholders, and members of communities affected by Federal actions, including members of communities with environmental justice concerns. The changes

---

[5] *Id.* at 49924–25.

[6] U.S. Gov't Accountability Off., GAO–14–370, National Environmental Policy Act: Little Information Exists on NEPA Analyses (Apr. 15, 2014), https://www.gao.gov/products/gao-14-370.

[7] An event study is a research method in the economics profession in which variables or outcomes are observed before, during, and after a key event of interest.

[8] *See* A. Craig MacKinlay, *Event Studies in Economics and Finance*, 35 J. of Econ. Literature 13, 37 (1997). MacKinlay, in discussing event studies in economics and finance, notes, "An important characteristic of a successful event study is the ability to precisely identify the date of the event. In cases where the event date is difficult to identify or the event date is partially anticipated, studies have been less useful. For example, the wealth effects of regulatory changes for affected entities can be difficult to detect using event study methodology." In this case, it would be difficult to conduct an event study, first, because little time has passed since the event (*i.e.*, the promulgation of the 2020 Rule) and, second, because other intervening events, including various additional rulemakings and policy developments, make it difficult to determine the true date of the measured "event."

[9] OMB, OMB Circular No. A–4, Regulatory Analysis (Nov. 9, 2023), https://www.whitehouse.gov/wp-content/uploads/2023/11/CircularA-4.pdf.

AR_0027762

will improve communication across agencies, which will help avoid and address interagency disputes and reduce delay and duplication; clarify the roles of lead and cooperating agencies, which will enhance agency coordination and improve efficiency; encourage the use of programmatic environmental impact statements (EISs) and environmental assessments (EAs) in appropriate circumstances to promote efficiency in the review process and help reduce delays and duplication; help agencies prepare more informative and complete environmental documents, which is likely to improve public engagement with agencies regarding proposed actions and may reduce the risk of litigation; provide agencies with more flexible strategies for NEPA compliance; promote more durable and climate-resilient projects and actions; foster better long-term decision making, including through consideration of reasonably foreseeable climate change-related effects; and promote a more equitable distribution of environmental benefits and costs by encouraging agencies to prioritize public engagement and to consider environmental justice.

The final rule provides that agencies should prepare informative yet concise environmental documents that address climate risk and provide for better public engagement. These provisions may result in agencies conducting more public engagement and preparing more thorough analyses, which could result in additional up-front costs. However, other aspects and consequences of the final rule, such as more streamlined processes, enhanced interagency and intergovernmental coordination, reduced delays and duplication, greater predictability in the decision-making process, better supported decisions, and potentially reduced litigation risk, are likely to lead to long-term cost savings, and these savings are anticipated to exceed additional costs.

CEQ considered several alternatives to the final rule, including reverting back to the pre-2020 version of the regulations in their entirety, restoring the 2020 regulations in their entirety by undoing the revisions made in the phase 1 rulemaking, and retaining the 2020 regulations as modified by the phase 1 rulemaking. CEQ has considered these alternatives and concluded that the preferred alternative—making the changes to the 2020 regulations that are contained in the final Phase 2 rule, including necessary changes to reflect the 2023 NEPA amendments— provides the highest net benefits of the options considered. Tabular summaries of the rule provisions that are likely to have impacts and comparison of rule provisions across alternatives are contained in appendices 1 and 2.

## I.    <u>Background</u>

NEPA was signed into law in 1970, codifying a visionary national policy to promote environmental protection for present and future generations. NEPA requires Federal agencies to interpret and administer Federal policies, regulations, and laws in accordance with NEPA's policies, and to appropriately consider environmental values in agency decision making. Furthermore, NEPA seeks to promote efforts to prevent or eliminate damage to the environment and stimulate the health and welfare of people, making it the continuing policy of the Federal Government to use all practicable means and measures to create and maintain conditions that reduce potential harms and enhance ecological, social, and economic well-being. As discussed above, the FRA amended NEPA on June 3, 2023, by modifying section 102(2) and adding new sections 106 through 111.

3

necessary to meaningfully participate and fully inform the agency of the commenter's position in § 1503.3(a), and removing the exhaustion requirement for public commenters in §§ 1500.3 and 1503.3(b) (2020) will allow both the public and agencies to focus on the most critical issues at hand, make the commenting process more accessible to the public, and, as needed, incorporate important information presented to the agency outside the comment period into its decision making.

The changes also will result in an indirect benefit to agencies by improving efficiency in completing NEPA reviews, allowing agencies to more efficiently allocate resources to other priorities relative to the baseline. For example, revisions to § 1501.4 will give agencies new flexibility to establish CEs using additional mechanisms outside their NEPA procedures, promoting more efficient CE development, and potentially broader use of CEs. Additionally, removing § 1502.11's requirement to provide estimates of EIS preparation costs will allow agencies to eliminate the administrative costs of collecting this data. Time and resources saved can then be directed towards other agency needs.

Finally, the changes in the final rule will produce benefits to agencies by promoting decisions and actions that are more effective and durable. For example, the additions concerning climate change, resilience, and environmental justice will promote science-based decision making and lead to more sustainable and resilient projects and actions on the ground. These provisions may result in agencies conducting more public engagement and preparing more thorough analyses, which both could result in additional up-front costs. However, other aspects and consequences of the final rule, such as more streamlined processes, enhanced interagency and intergovernmental coordination, reduced delays and duplication, greater predictability in the decision-making process, better supported decisions, and potentially reduced litigation risk are likely to lead to long-term cost savings, and these savings may exceed these upfront costs. Improving the efficacy of Federal actions also will allow agencies to advance their missions and mandates more efficiently, allowing agencies to shift attention to other mission requirements or mandates.

For example, in-depth interviews of staff at Federal and state land management agencies have identified the lack of institutional capacity as a constraint on public land managers' ability to consider climate change adaptation in their planning and management.[34] The compilation of additional information, made possible by more efficient resource allocation, will allow Federal agencies to improve evaluations from both an adaptation and mitigation standpoint. Considering extreme heat events, drought, wildfire, flood, and climate-related public health outcomes, as well as the greenhouse gas emissions impact of an investment or activity, will facilitate more efficient and beneficial resource deployment for current and future generations.

<u>Applicants</u>

Applicants also may indirectly benefit from the final rule. Early interagency coordination and public engagement coupled with greater clarity in project schedules and deadlines will increase predictability in the environmental review process. Earlier issue identification may also facilitate

---

[34] Katherine R. Clifford et al., *Navigating Climate Adaptation on Public Lands: How Views on Ecosystem Change and Scale Interact with Management Approaches*, 66 Envtl. Mgmt. 614, 621–22 (July 29, 2020), https://link.springer.com/article/10.1007/s00267-020-01336-y.

AR_0027777

opportunities to incorporate design features or mitigation measures when doing so is easiest and least expensive. Earlier issue identification may also help applicants avoid misallocating resources to project locations or proposals that may ultimately prove difficult to approve or implement.[35] For example, changes to § 1506.5(b)(1) encourage agencies to provide applicants with an outline of environmental information needed when preparing environmental documents. These changes will likely improve coordination between the applicant and the agency, and reduce the likelihood of inadequate, unnecessary, or redundant applicant submissions.

Additionally, early identification of issues, leading to more effective analyses, mitigation, and issue resolution has the potential to reduce public controversy and litigation risk. Reduced litigation risk will result in benefits to applicants, such as time savings, greater certainty in budgets, and security in investments and project financing.

Applicants also indirectly benefit from the changes in § 1507.3 that require agencies to prescribe procedures to allow an applicant to prepare an EA or EIS under the supervision of the agency. Earlier direction from agencies will improve certainty and predictability for applicants.

Section 1507.4, added in the final rule, directs agencies to improve access to information. Easier and more comprehensive access to information will assist applicants in formulating proposed actions, identifying likely issues, and understanding how similar issues have been dealt with elsewhere, all of which translates into increased certainty and predictability for applicants.

The changes in the final rule add new provisions and modernize existing provisions to promote consideration of the effects of climate change and greenhouse gas emissions. These changes codify many agencies' current practices, creating consistency and predictability for applicants. By considering climate change, agencies can promote the development of more resilient projects that are better prepared to withstand climate impacts, thereby benefiting applicants. For example, several authors have found that many infrastructure sectors are particularly exposed to changes in climate conditions, and because infrastructure projects require long-term planning, long-lived investments, and some irreversibility in choice, such projects need to account for climate uncertainty.[36] Damage caused by climate events can also lead to impacts that exceed the cost of

---

[35] *See, e.g.*, Interagency Working Group on Mining Laws, Regulations, and Permitting, *Final Report: Recommendations to Improve Mining on Public Lands* (Sept. 2023) (making multiple recommendations to improve coordination and efficiency during the NEPA and permitting processes, including increased pre-application between agencies and applicants in order to produce complete and review-ready permit applications), https://www.doi.gov/media/document/mriwg-report-final-508-pdf.

[36] Alejandro E. Camacho, *Adapting Governance to Climate Change: Managing Uncertainty Through a Learning Infrastructure*, 59 Emory L. J. 1 (2009), https://scholarlycommons.law.emory.edu/elj/vol59/iss1/1; Wenyi Xia & Robin Lindsey, *Port adaptation to climate change and capacity investments under uncertainty*, 152 Transp. Rsch. Part B: Methodological 180 (2021), https://doi.org/10.1016/j.trb.2021.08.009; Arash Beheshtian et al., *Climate-adaptive planning for the long-term resilience of transportation energy infrastructure*, 113 Transp. Rsch. Part E: Logistics & Transp. Rev. 99 (2018), https://doi.org/10.1016/j.tre.2018.02.009.

AR_0027778

infrastructure replacement: for example, damage to a transportation network imposes direct rebuilding costs and, as an indirect effect, slows the recovery of the affected region.[37]

The Organization for Economic Co-operation and Development (OECD) recommends that decisions about infrastructure be adaptive and consider future climate uncertainties to ensure that infrastructure is resilient to climate risks.[38] The final rule includes climate change in the analysis of reasonable alternatives, *see* § 1500.2(e), and incorporates climate-related changes in the analysis of foreseeable trends at § 1502.15(b). These additions are anticipated to improve an agency's analysis of environmental consequences and mitigation measures and indirectly benefit applicants that are subject to climate-related risks. The final rule also encourages more durable and climate-resilient construction, likely benefitting applicants through improved project outcomes and, potentially, increased returns on investment through more durable project design.[39] This anticipated benefit is supported by research showing that, relative to ordinary infrastructure projects, climate-resilient infrastructure projects generate better outcomes, including increased reliability and efficiency of service provision, increased asset life coupled with reduced repair and maintenance costs, and co-benefits across society and the environment.[40]

Furthermore, assessments that embrace resiliency can adopt more rigorous design processes, *e.g.*, by considering "safe-to-fail" principles, which involve acknowledging the possibility of system failure and designing systems to minimize the negative impacts of potential failures. Applying these principles ensures that any failures that do occur result in controlled consequences rather than catastrophic outcomes. These approaches differ from the traditional "fail-safe" approaches currently in use today, which focus solely on preventing failures from happening at all.[41] Finally, more robust environmental analyses resulting from the changes, including those in §§ 1502.15 and 1502.16, may result in greater community support for projects and more durable project design, saving applicants' money and resulting in indirect project benefits.

Applicants also will benefit from shorter timelines for project completion (i.e., planning, construction, and implementation) resulting from improved efficiency and the ability to identify problems earlier in the process.

Increased Public Engagement

CEQ is also making structural changes throughout the final rule to improve clarity, to ensure consistency among internal cross references, and to conform certain sections with revisions to other sections. The improvements to structure and consistency in §§ 1500.1 and 1500.2 improve

---

[37] Thahomina Jahan Nipa & Sharareh Kermanshachi, *Resilience measurement in highway and roadway infrastructures: Experts' perspectives*, 14 Progress in Disaster Sci., art. 100230, April 2022, at 1, https://www.sciencedirect.com/science/article/pii/S2590061722000175.
[38] Michael Mullan et al., Org. for Econ. Coop. & Dev., OECD Environment Policy Paper No. 14: Climate-resilient Infrastructure (2018), https://www.oecd.org/environment/cc/policy-perspectives-climate-resilient-infrastructure.pdf.
[39] *See* Hossein Mahmoudi et al., *Integrating Resilience Assessment in Environmental Impact Assessment*, 14 Integrated Envtl. Assessment & Mgmt. 567 (2018), https://doi.org/10.1002/ieam.4075.
[40] Michael Mullan et al., Org. for Econ. Coop. & Dev., OECD Environment Policy Paper No. 14: Climate-resilient Infrastructure at 9.
[41] Mikhail V. Chester, B. Shane Underwood, and Constantine Samaras, *Keeping infrastructure reliable under climate uncertainty*, 10 Nature Climate Change 488, 489 (2020), https://par.nsf.gov/servlets/purl/10165222.

19

**National Environmental Policy Act Implementing Regulations Revision**

**Phase 2 Final Rule Response to Comments**

**RIN 0331–AA07**

**Docket ID CEQ–2023–0003**

**Council on Environmental Quality**

**April 2024**

# Introduction

This "Phase 2 Response to Comments" document, together with the preamble to the final rule titled, "National Environmental Policy Act Implementing Regulations Revisions Phase 2," presents the responses of the Council on Environmental Quality (CEQ) to the public comments received on the July 31, 2023 notice of proposed rulemaking[1] (NPRM or proposed rule). CEQ has responded to all substantive issues raised in the public comments.

Many of the comments overlap in various respects. To avoid redundancy, CEQ incorporates by reference all of its responses below, to the extent relevant, to any individual comment response. At certain points, CEQ incorporates by reference other specific comment responses. The fact that a specific comment response is incorporated does not prejudice the general incorporation by reference noted in the previous sentences. Citation of any case in these comments or in the preamble of the final rule is not intended to endorse the entirety of the analysis in any case.

---

[1] 88 FR 49924 (Jul. 31, 2023).

AR_0027822

# Table of Contents

Introduction ........................................................................................................ ii

List of Acronyms and Abbreviations ............................................................. viii

List of Frequently Used References and Short Names ..................................... ix

A.    General Comments on the Proposed Rule ................................................ 1

    1.    General Comments on the Rulemaking Approach ................................. 1

    2.    Other General Comments .................................................................... 8

    3.    Comments on Codification of the 2023 Greenhouse Gas Guidance ................. 43

B.    Comments Regarding Changes Throughout Parts 1500–1508 ............................. 47

    1.    General Comments on Inclusion of Environmental Justice
        and Climate Change ............................................................................. 47

    2.    General Comments on Tribal Issues ................................................... 68

    3.    Use of "Significant" or "Important" .................................................. 79

    4.    Use of "Effects" in Place of "Impacts" .............................................. 82

    5.    Grammatical Changes ......................................................................... 82

C.    Comments on Issues Spanning Multiple Rule Sections ........................................ 84

    1.    Unique Identification Numbers (§§ 1501.5(c)(4) and 1502.4(e)(10)) ............... 84

    2.    Page Limits (§§ 1501.5(g) and 1502.7) ............................................. 90

        i.    Machine-readable Environmental Documents .............................. 104

    3.    Role of Senior Agency Official ......................................................... 106

D.    Comments on Purpose and Policy (Part 1500) ................................................... 107

    1.    Comments on both Purpose (§ 1500.1) and Policy (§ 1500.2) ........................ 107

    2.    Purpose (§ 1500.1) ........................................................................... 115

    3.    Policy (§ 1500.2) .............................................................................. 126

    4.    NEPA Compliance (§ 1500.3) .......................................................... 138

    5.    Concise and Informative Documents (§ 1500.4)
        and Efficient Process (§ 1500.5) ........................................................ 147

    6.    Agency Authority (§ 1500.6) ........................................................... 156

E.    Comments on NEPA and Agency Planning (Part 1501) .................................. 160

    1.    Purpose (§ 1501.1) ........................................................................... 160

        i.    Deletion of Provision on Functional Equivalence ......................... 168

    2.    Apply NEPA Early in the Process (§ 1501.2) .................................... 172

    3. Determine the Appropriate Level of NEPA Review (§ 1501.3) ............................. 174

iii

i.      Applicability (§ 1501.3(a)) ............................................................ 174

ii.     Scope of Action and Analysis (§ 1501.3(b)) ................................. 181

iii.    Levels of NEPA Review (§ 1501.3(c)) ......................................... 193

iv.     Significance Determination (§ 1501.3(d)) ................................... 199

v.      Significance Determination—Context .......................................... 220

vi.     Significance Determination—Intensity ........................................ 232

4.   Categorical Exclusions (§ 1501.4) ................................................... 249

i.      Use of "Individually or in the Aggregate" ................................... 249

ii.     Applying CEs when Extraordinary Circumstances Exist ............... 254

iii.    Establishing CEs Jointly and New Process for Establishing CEs ........ 264

iv.     Examples of Features that may be Included in a CE ...................... 275

v.      Process for Adopting and Applying Another Agency's CEs ........... 282

vi.     Other Comments on CEs ............................................................... 296

5.   Environmental Assessments (§ 1501.5) ............................................ 307

6.   Findings of No Significant Impact (§ 1501.6) ................................... 324

7.   Lead Agency (§ 1501.7) .................................................................... 331

8.   Cooperating Agencies (§ 1501.8) ...................................................... 345

9.   Public and Governmental Engagement (§ 1501.9) ............................ 355

10.  Deadlines (§ 1501.10) ....................................................................... 392

11.  Programmatic Environmental Documents and Tiering (§ 1501.11) ........ 429

12.  Incorporation by Reference (§ 1501.12) ............................................ 446

F.   Comments on Environmental Impact Statements (Part 1502) ............. 451

1.   Purpose of an Environmental Impact Statement (§ 1502.1) ............. 451

2.   Implementation (§ 1502.2) ................................................................ 454

3.   Scoping (§ 1502.4) ............................................................................ 456

i.      Notice of Intent Requirements ..................................................... 466

4.   Timing (§ 1502.5) .............................................................................. 469

5.   Interdisciplinary Preparation (§ 1502.6) .......................................... 472

6.   Writing (§ 1502.8) ............................................................................. 473

7.   Draft, Final, and Supplemental Statements (§ 1502.9) ..................... 474

8.   Recommended Format (§ 1502.10) .................................................... 480

9.   Cover (§ 1502.11) .............................................................................. 481

10.  Summary (§ 1502.12) ........................................................................ 484

AR_0027824

11.      Purpose and Need (§ 1502.13) ........................................................... 486

12.      Alternatives Including the Proposed Action (§ 1502.14) .................................. 502

    i.     Reasonable Alternatives Not Within the Jurisdiction of the Lead Agency ... 515

    ii.    Environmentally Preferable Alternative ....................................................... 526

13.      Affected Environment (§ 1502.15) .................................................................... 539

14.      Environmental Consequences (§ 1502.16) ...................................................... 548

    i.     No Action Alternative ............................................................................. 553

    ii.    Irreversible or Irretrievable commitments of Federal resources ................. 561

    iii.   Climate ........................................................................................................ 562

    iv.   Disproportionate and Adverse Human Health and Environmental Effects on Communities with Environmental Justice Concerns ..................................... 583

    v.    Economic or Social Effects ..................................................................... 587

15.      Summary of Scoping Information (§ 1502.17) .................................................. 589

16.      List of Preparers (§ 1502.18) ........................................................................... 593

17.      Publication of the EIS (§ 1502.20) .................................................................... 594

18.      Incomplete or Unavailable Information (§ 1502.21) ......................................... 595

19.      Cost-benefit Analysis (§ 1502.22) ..................................................................... 614

20.      Environmental Review and Consultation Requirements (§ 1502.24) ............... 615

G.     Comments on Part 1503, Commenting on Environmental Impact Statements .... 617

  1.    Inviting Comments and Requesting Information and Analyses (§ 1503.1) ...... 618

  2.    Specificity of Comments and Information (§ 1503.3) ..................................... 619

  3.    Response to Comments (§ 1503.4) ................................................................... 633

H.     Comments on Dispute Resolution and Pre-Decisional Referrals ........................ 637

  1.    Early Dispute Resolution (§ 1504.2) ............................................................... 638

  2.    Criteria and Procedure for Referrals and Response (§ 1504.3) ........................ 641

I.      Comments on NEPA and Agency Decision Making (Part 1505) ........................ 644

  1.    Record of Decision in Cases Requiring Environmental Impact Statements (§ 1505.2) ........................................................................................................ 650

  2.    Implementing the Decision (§ 1505.3) ............................................................ 658

J.     Comments on Other Requirements of NEPA (Part 1506) ................................... 673

  1.    Limitations on Actions During NEPA Process (§ 1506.1) .............................. 673

  2.    Elimination of Duplication with State, Tribal, and Local Procedures (§ 1506.2) ........................................................................................................ 684

v

3. Adoption (§ 1506.3) ................................................................. 685

4. Agency Responsibility for Environmental Documents (§ 1506.5) .................. 694

5. Methodology and Scientific Accuracy (§ 1506.6 (proposed § 1502.23)) ......... 702

6. Proposals for Legislation (§ 1506.8) ....................................... 734

7. Removal of Proposals for Regulations (40 CFR 1506.9 (2020)) ................ 734

8. EIS Filing Requirements with EPA (§ 1506.9) ............................... 735

9. Timing of Agency Action (§ 1506.10) ....................................... 735

10. Emergencies (§ 1506.11) .................................................... 738

11. Innovative Approaches (proposed § 1506.12) ................................ 739

12. Effective Date (§ 1506.12 (proposed § 1506.13)) ........................... 746

K. Comments on Agency Compliance .............................................. 758

1. Compliance (§ 1507.1) ...................................................... 758

2. Agency Capability to Comply (§ 1507.2) ..................................... 761

    i. Chief Public Engagement Officer ........................................ 763

3. Agency NEPA Procedures (§ 1507.3) .......................................... 769

4. Agency NEPA Program Information (§ 1507.4) .................................. 793

L. Comments on Definitions (Part 1508) ......................................... 798

1. Definition of Categorical Exclusion (§ 1508.1(e)) ........................... 798

2. Definition of Communities with Environmental Justice Concerns (§ 1508.1(f)) ......................................................... 799

3. Definition of "Effects" or "Impacts" (§ 1508.1(i)) ......................... 807

4. Definition of Environmental Assessment (§ 1508.1(j)) ....................... 829

5. Definition of Environmental Document (§ 1508.1(k)) ......................... 829

6. Definition of Environmental Justice (§ 1508.1(m)) .......................... 832

7. Definition of Environmentally Preferable Alternative (§ 1508.1(n)) ......... 847

8. Definition of Extraordinary Circumstances (§ 1508.1(o)) .................... 850

9. Definition of Finding of No Significant Impact (§ 1508.1(q)) ............... 855

10. Definition of Human Environment or Environment (§ 1508.1(r)) .............. 856

11. Definition of Joint Lead Agency (§ 1508.1(s)) ............................. 860

12. Definition of Major Federal Action (§ 1508.1(w)) .......................... 860

    i. Examples of major Federal actions ...................................... 864

    ii. Exclusions from the definition of "major Federal actions" ............. 876

13. Definition of Mitigation (§ 1508.1(y)) .................................... 889

vi

AR_0027826

14.    Definition of Notice of Intent (§ 1508.1(aa)) .................................................... 895

15.    Definition of Page (§ 1508.1(bb)) ...................................................................... 896

16.    Definitions of Participating Agency (§ 1508.1(cc)) and Participating Federal Agency (§ 1508.1(dd))................................................... 898

17.    Definition of Reasonable Alternatives (§ 1508.1(hh))...................................... 898

18.    Definition of Reasonably Foreseeable (§ 1508.1(ii))........................................ 902

19.    Definition of Scope (§ 1508.1(kk)) .................................................................... 904

20.    Definition of Significant Effects (§ 1508.1(mm))............................................. 905

21.    Comments on Other Definitions.......................................................................... 906

M.    Comments on Rulemaking Analyses and Notices ............................................. 910

N.    Requests for Extension of the Comment Period ................................................. 921

O.    Comments Outside the Scope of the Rulemaking .............................................. 923

AR_0027827

## List of Acronyms and Abbreviations

| | |
|---|---|
| Administrative Procedure Act | APA |
| Bipartisan Infrastructure Law | BIL |
| Categorical Exclusion | CE |
| Code of Federal Regulations | CFR |
| Council on Environmental Quality | CEQ |
| Environmental Assessment | EA |
| Environmental Impact Statement | EIS |
| Environmental Justice | EJ |
| Environmental Protection Agency | EPA |
| Endangered Species Act | ESA |
| Finding of No Significant Impact | FONSI |
| Infrastructure Investment and Jobs Act | IIJA |
| Inflation Reduction Act | IRA |
| National Environmental Policy Act | NEPA |
| Notice of Intent | NOI |
| Notice of Proposed Rulemaking | NPRM |
| Record of Decision | ROD |
| United States Code | U.S.C. |

AR_0027828

## List of Frequently Used References and Short Names

### CEQ Guidance Documents

| Citation | Short Name |
|---|---|
| CEQ, *A Citizen's Guide to the National Environmental Policy Act; Having Your Voice Heard* (Jan. 2021), https://ceq.doe.gov/get-involved/citizens_guide_to_nepa.html. | CEQ Citizen's Guide |
| CEQ, Establishing, Applying, and Revising Categorical Exclusions under the National Environmental Policy Act (Nov. 23, 2010), https://ceq.doe.gov/docs/ceq-regulations-and-guidance/NEPA_CE_Guidance_Nov232010.pdf. | 2010 CE Guidance |
| CEQ, Final Guidance for Federal Departments and Agencies on the Appropriate Use of Mitigation and Monitoring and Clarifying the Appropriate Use of Mitigated Findings of No Significant Impact, 76 FR 3843 (Jan. 21, 2011), https://ceq.doe.gov/docs/ceq-regulations-and-guidance/Mitigation_and_Monitoring_Guidance_14Jan2011.pdf. | 2011 Mitigation Guidance |
| CEQ, Effective Use of Programmatic NEPA Reviews (Dec. 18, 2014), https://ceq.doe.gov/docs/ceq-regulations-and-guidance/Effective_Use_of_Programmatic_NEPA_Reviews_Final_Dec2014_searchable.pdf. | 2014 Programmatic Guidance |
| CEQ, Forty Most Asked Questions Concerning CEQ's National Environmental Policy Act Regulations, 46 FR 18026 (Mar. 23, 1981), https://www.energy.gov/nepa/downloads/forty-most-asked-questions-concerning-ceqs-national-environmental-policy-act. | Forty Questions |
| CEQ, National Environmental Policy Act Guidance on Consideration of Greenhouse Gas Emissions and Climate Change, 88 FR 1196 (Jan. 9, 2023) ("2023 GHG Guidance"), https://ceq.doe.gov/guidance/ceq_guidance_nepa-ghg.html. | 2023 GHG Guidance |
| CEQ and OSTP, Guidance for Federal Departments and Agencies on Indigenous Knowledge (Nov. 30, 2022), https://www.whitehouse.gov/wp-content/uploads/2022/12/OSTP-CEQ-IK-Guidance.pdf. | 2022 IK Guidance |
| CEQ, Environmental Justice: Guidance under the National Environmental Policy Act (Dec. 10, 1997) ("Environmental Justice Guidance"), https://ceq.doe.gov/docs/ceq-regulations-and-guidance/regs/ej/justice.pdf. | 1997 Environmental Justice Guidance |

### Executive Orders

| Citation | Short Name |
|---|---|
| E.O. 11514, *Protection and Enhancement of Environmental Quality*, 35 FR 4247 (Mar. 7, 1970), https://www.archives.gov/federal-register/codification/executive-order/11514.html. | E.O. 11514 |
| E.O. 11991, *Relating to Protection and Enhancement of Environmental Quality*, 42 FR 26967 (May 25, 1977), https://www.archives.gov/federal-register/codification/executive-order/11990.html. | E.O. 11991 |
| E.O. 12898, *Federal Actions to Address Environmental Justice in Minority Populations and Low-Income Populations*, 59 FR 7629 (Feb. 16, 1994), https://www.archives.gov/files/federal-register/executive-orders/pdf/12898.pdf. | E.O. 12898 |
| E.O. 13175, *Consultation and Coordination with Indian Tribal Governments*, 65 FR 67249 (Nov. 6, 2000), https://www.federalregister.gov/d/00-29003. | E.O. 13175 |
| E.O. 13807, *Establishing Discipline and Accountability in the Environmental Review and Permitting Process for Infrastructure Projects*, 82 FR 40463 (Aug. 24, 2017), https://www.federalregister.gov/d/2017-18134. | E.O. 13807 |

AR_0027829

| E.O. 13990, *Protecting Public Health and the Environment and Restoring Science to Tackle the Climate Crisis*, 86 FR 7037 (Jan. 25, 2021), https://www.federalregister.gov/d/2021-01765. | E.O. 13990 |
|---|---|
| E.O. 14008, *Tackling the Climate Crisis at Home and Abroad*, 86 FR 7619 (Feb. 1, 2021), https://www.federalregister.gov/d/2021-02177. | E.O. 14008 |
| E.O. 14096, *Revitalizing Our Nation's Commitment to Environmental Justice for All*, 88 FR 25251 (Apr. 26, 2023), https://www.federalregister.gov/d/2023-08955. | E.O. 14096 |

### CEQ Regulations and Rulemaking Documents

| Citation | Short Name |
|---|---|
| CEQ, Update to the Regulations Implementing the Procedural Provisions of the National Environmental Policy Act, 85 FR 1684 (Jan. 10, 2020), https://www.federalregister.gov/d/2019-28106. | 2020 NPRM |
| CEQ, Update to the Regulations Implementing the Procedural Provisions of the National Environmental Policy Act, 85 FR 43304 (July 16, 2020), https://www.federalregister.gov/d/2020-15179. | 2020 Final Rule |
| CEQ, Update to the Regulations Implementing the Procedural Provisions of the National Environmental Policy Act Final Rule Response to Comments (June 30, 2020), https://www.regulations.gov/document/CEQ-2019-0003-720629 | 2020 Response to Comments |
| CEQ, National Environmental Policy Act Implementing Regulations Revisions, 87 FR 23453 (Apr. 20, 2022), https://www.federalregister.gov/d/2022-08288. | Phase 1 Final Rule |
| CEQ, National Environmental Policy Act Implementing Regulations Revision Phase 1 Response to Comments (Apr. 2022), https://www.regulations.gov/document/CEQ-2021-0002-39427. | Phase 1 Response to Comments |
| CEQ, National Environmental Policy Act Implementing Regulations Revision Phase 2, 88 FR 49924 (July 31, 2023), https://www.federalregister.gov/d/2023-15405. | NPRM or proposed rule |
| CEQ, RIN 0331–AA03, Regulatory Impact Analysis for the Final Rule, Update to the Regulations Implementing the Procedural Provisions of the National Environmental Policy Act (2020). | 2020 RIA |
| CEQ, RIN 0331–AA07, Regulatory Impact Analysis for the Final Rule, National Environmental Policy Act Implementing Regulations Revisions Phase 2 (2024) | Final Rule RIA |

x

A.    **General Comments on the Proposed Rule**

1.    **General Comments on the Rulemaking Approach**

*Comment*: Some commenters expressed general support for what they characterized as a reversal of the 2020 rule, asserting it was problematic and unlawful. Other commenters expressed general support for what they viewed as the proposed restoration of core National Environmental Protection Act (NEPA) protections required by the statute and from the 1978 regulations because they provide for increased public participation and community engagement. One commenter expressed particular approval for the parts of the rulemaking that rescind elements of the 2020 rulemaking.

*CEQ Response*: CEQ acknowledges the supportive comments.

*Comment*: Multiple commenters expressed their general support for the proposed rule and for an efficient and effective NEPA review process that protects the public's interests, directs agencies to carefully consider the environmental effects of proposed actions and engage the public in the environmental review process, and encourages the use of mitigation measures. Some commenters describe the proposed rule generally as a positive step forward.

*CEQ Response*: CEQ acknowledges the supportive comments.

*Comment*: Numerous commenters requested that CEQ strengthen and quickly finalize the proposed regulations. They requested that the regulations ensure that federally assisted projects are subject to NEPA; and that the regulations protect the right of public participation by requiring that decision-related documents are, in fact, made public, recognize the rights and interests of Indigenous communities, and focus on climate change and environmental justice.

*Response*: The final rule concludes the Phase 2 rulemaking process. The final rule ensures that efficient and effective NEPA reviews of major Federal actions are informed by

1

AR_0027831

public input, including engagement and consultation with Tribes. *See, e.g.*, §§ 1501.9, 1503.1, 1503.4. The final rule also integrates provisions for an agency to consider climate change-related effects and effects on communities with environmental justice concerns so that Federal agencies may make well informed decisions.

*Comment*: Multiple commenters expressed general support for CEQ's description of the need for rulemaking, including CEQ's proposal to make the regulations more modern, efficient, and robust.

*CEQ Response*: CEQ acknowledges the supportive comments.

*Comment*: Some commenters requested that CEQ restore the 1978 regulations in whole because doing so would best protect the environment and people.

*CEQ Response*: While CEQ acknowledges the support for the 1978 regulations, CEQ did not consider restoring the 1978 approach to be the correct approach for this rulemaking for multiple reasons. CEQ made revisions to the regulations to implement the 2023 amendments to NEPA; therefore, restoration of the 1978 regulations would not be consistent with the current statute. However, where CEQ determined that the 1978 language provides clearer and more effective and predictable direction or guidance to implement NEPA, CEQ reverted to and revised the 1978 language for clarity.

*Comment*: Some commenters expressed general opposition to the proposed rule, asserting that it introduces burdensome requirements and complexities that could prolong NEPA reviews, increase litigation risks, and slow down the overall permitting process. Other commenters expressed general opposition to the proposed rule, asserting it would go against the stated purpose of the proposed rule, decrease efficiency, eliminate clarity, and undermine progress made by the 2020 rule.

2

*CEQ Response:* CEQ disagrees with the commenters' assertions. CEQ considers the final rule to provide for an efficient and effective environmental review process; ensure full and fair public engagement; enhance efficiency and regulatory certainty; and promote sound Federal agency decision making that is grounded in science. These changes reflect CEQ's extensive experience implementing NEPA; CEQ's perspective on how NEPA can best inform agency decision making; longstanding Federal agency experience and practice; NEPA's statutory text and purpose, including making decisions informed by science; and case law interpreting NEPA's requirements.

*Comment*: Some commenters expressed a general preference for returning to or retaining the 2020 regulations. For example, one commenter asserted that issuing new regulatory changes three years after the 2020 rulemaking creates significant confusion and decreases the certainty associated with CEQ's regulations. Commenters who requested that CEQ retain the 2020 rule asserted that it modernized the NEPA process, improved efficiency, enhanced accountability, encouraged interagency coordination, and provided clarity while incorporating best practices. They asserted that the proposed rule would undermine the 2023 amendments to NEPA and undo progress made by the 2020 rule.

*CEQ Response*: CEQ disagrees with the commenters' assertions. The final rule implements the 2023 amendments to NEPA, as described in the final rule preamble. *See* section I.A; *see also* Fiscal Responsibility Act of 2023, Pub. L. No. 118-5, § 321, 137 Stat. 10, 38-46 (amending 42 U.S.C. 4321 *et seq.*). While the final rule removes certain provisions added by the 2020 rule that CEQ considers imprudent or legally unsettled, or that create uncertainty or ambiguity that could reduce efficiency or increase the risk of litigation, CEQ retains many of the changes made in the 2020 rulemaking, including changes that codified longstanding practice or

3

guidance or enhanced the efficiency and effectiveness of the NEPA process. For example, CEQ identified for retention the inclusion of Tribal interests throughout the regulations, the integration of mechanisms to facilitate better interagency cooperation, and the reorganization and modernization of provisions addressing certain elements of the process to make the regulations easier to understand and follow.

*Comment*: A couple of commenters asserted that while CEQ stated in the proposed rule that it is proposing changes to better align with its extensive experience implementing NEPA, CEQ is proposing changes to regulations that have been in effect for less than two years. Other than the required revisions for consistency with the recent amendments to NEPA, the commenters asserted that CEQ has not provided adequate justification for reverting back to the pre-2020 rule in certain areas. One commenter stated that CEQ is changing position without adequate analysis, which the commenter asserted is a reason why courts have found previous agency rulemakings to be arbitrary and capricious and not deserving of *Chevron* deference.

A commenter further stated that while a new administration has the right to reconsider regulations and policies adopted by a previous administration, changing course must be adequately explained and comply with the procedural requirements of the Administrative Procedure Act (APA). The commenter asserted that CEQ cites to the recent NEPA amendments as the primary impetus of the proposed rule, but goes beyond the amendments to revise larger components of the regulations that were finalized in 2020. The commenter asserted that the 2020 rule outlined a well-reasoned analysis for each change and why the 1978 rule was outdated and subsequently revised.

The commenter pointed to CEQ's asserted reliance on E.O. 13990, and the subsequent list of actions to review, as the basis for the changes, and stated that, as its rationale to rescind,

AR_0027834

CEQ merely reiterates the points that were already adequately addressed and sufficiently reasoned in the 2020 rule. As such, the commenter asserted CEQ has failed to provide a "reasoned explanation" for disregarding prior factual findings from the 2020 rule.

*CEQ Response*: CEQ disagrees with the commenters that CEQ has not provided adequate justification for the changes made in this rule. The preamble to the final rule discusses, in sections II.B through II.J, each change made in the rule, and provides explanations and justifications on a provision-by-provision basis.

While implementing the 2023 amendments to NEPA is one important reason for CEQ's rulemaking, implementing these statutory amendments is not the only justification for the rulemaking, as explained in sections I.E and II of the proposed and final rule preambles. For example, certain changes, as explained in section II, reflect developments in case law that warrant updating the regulations, including clarifying direction on how to address climate change in NEPA documents. *See, e.g.*, *Diné Citizens Against Ruining Our Env't v. Haaland*, 59 F.4th 1016 (10th Cir. 2023); *350 Mont. v. Haaland*, 29 F.4th 1158 (9th Cir. 2022); *Food & Water Watch v. FERC*, 28 F.4th 277 (D.C. Cir. 2022). Since the 2020 rule was promulgated, courts have also clarified for agencies how to define a reasonable range of alternatives, *see, e.g.*, *Env't Def. Ctr. v. Bureau of Ocean Energy Mgmt.*, 36 F.4th 850 (9th Cir. 2022), and how to address extraordinary circumstances, *see, e.g.*, *Rocky Mt. Peace & Justice Ctr. v. U.S. Fish and Wildlife Serv.*, 40 F.4th 1133 (10th Cir. 2022).

With regard to E.O. 13990, while the E.O. directed CEQ to review the 2020 rule, it did not require CEQ to initiate a rulemaking or dictate any outcomes. As CEQ explained in the preamble to the Phase 1 proposed rule, after beginning its review:

> It is CEQ's view that the 2020 NEPA Regulations may have the effect of limiting the scope of NEPA analysis, with negative repercussions for environmental

AR_0027835

protection and environmental quality, including in critical areas such as climate change and environmental justice. Portions of the 2020 NEPA Regulations also may not reflect NEPA's statutory purposes to "encourage productive and enjoyable harmony" between humans and the environment, promote efforts that will prevent or eliminate damage to the environment and biosphere, and enhance public health and welfare. *See* 42 U.S.C. 4321. Some changes introduced by the 2020 NEPA Regulations also may not support science-based decision making or be compatible with the Administration's policies to improve public health, protect the environment, prioritize environmental justice, provide access to clean air and water, and reduce greenhouse gas emissions that contribute to climate change.[2]

CEQ decided to proceed with a two-phase rulemaking to consider revisions to the NEPA regulations, to address the concerns CEQ had identified, and more generally to improve the efficiency and effectiveness of the NEPA permitting process. When Congress enacted the 2023 NEPA amendments, CEQ expanded its rulemaking to fully implement the amendments.

While E.O. 13990 led CEQ to initiate its review of the NEPA regulations, the Executive Order is not the authority relied on in this rulemaking, and it did not provide the basis for the specific changes proposed in the NPRM and made in this final rule. Rather, the preamble describes the rationale for each change and the basis for that change. *See* section II. While in some cases, the final rule's changes may further the policy goals of E.O. 13990, the Executive Order does not provide the authority or basis for such changes.

Finally, with regard to factual findings, the revised regulations do not generally "rest[] upon factual findings that contradict those which underlay" the prior regulations, *see FCC v. Fox TV Stations, Inc.*, 556 U.S. 502, 515 (2009), but rather upon revised legal and policy views, including CEQ's interpretation of NEPA; to the extent that the revised regulations do rest on revised factual findings, however, CEQ has provided an adequately detailed justification for any such change in views. It is unclear what prior factual findings from the 2020 rule the commenter

---

[2] 86 FR 55757, 55759 (Oct. 7, 2021).

6

is referring to, but to the extent the commenter means to suggest that the 2020 rule was predicated on a generalized factual finding that aspects of environmental review processes under the 1978 regulations did not lead to efficient and effective environmental reviews, CEQ continues to consider that to be the case. Improving efficiency and effectiveness is among the important policy goals CEQ is pursuing in this rulemaking.

*Comment*: Some commenters criticized CEQ for assuming a policy-making role reserved for Congress because, they believe, the proposed rule elevates environmental considerations above financial and economic considerations. Others suggested that rescinding portions of the 2020 rule will frustrate the Federal Government's ability to reduce paperwork, reduce delays, and at the same time produce better decisions that further the national policy to protect and enhance the quality of the human environment.

*CEQ Response*: CEQ disagrees that the rule elevates environmental considerations above financial and economic considerations. CEQ notes that the definition of "effects" includes ecological, aesthetic, historic, cultural, economic, social, or health effects, such as disproportionate and adverse effects on communities with environmental justice concerns, whether direct, indirect, or cumulative in nature. *See* § 1508.1(i). Therefore, agencies must consider economic impacts of the proposed action and alternatives, and the final rule does not direct agencies to weigh certain environmental effects over others or in a manner biased either for or against particular alternatives based on such effects.

CEQ disagrees that rescinding portions of the 2020 rule will frustrate the ability of agencies to reduce paperwork and delays while producing better decisions. The 1978 regulations stated that "NEPA's purpose is not to generate paperwork—even excellent paperwork—but to foster excellent action." 40 CFR 1500.1(c) (2019). The final rule's return to the 1978 language in

AR_0027837

§ 1500.1(c) advances the objective, noted by the commenter, that NEPA's implementing regulations "produce better decisions which further the national policy to protect and enhance the quality of the human environment."[3] Deadlines and page limits included in the final rule, as well as myriad procedural improvements, advance the goal of reducing paperwork and reducing delays. *See, e.g.*, §§ 1501.10, 1501.5, 1502.7.

### 2.    Other General Comments

*Comment*: CEQ received a number of comments addressing the relationship between the proposed rule and the recent amendments to NEPA. Commenters questioned whether the final rule appropriately incorporates the purposes of the amendments, which commenters asserted are to streamline the decision-making process, shorten the timeframes within which decisions should be made, and increase the predictability of the environmental review process. Commenters also requested that CEQ clarify specifically how the final rule implements specific provisions of the NEPA amendments, including:

- The requirement to consider reasonably foreseeable environmental effects, 42 U.S.C. 4332(2)(C)(i);

- The requirements to consider a reasonable range of alternatives and to consider any negative environmental impacts of not implementing the proposed agency action in the case of a no action alternative, 42 U.S.C. 4332(2)(C)(iii);

- Threshold determination of applicability, 42 U.S.C. 4336(a);

- Provisions for determining lead and cooperating agencies, 42 U.S.C. 4336a(a);

- Page limits for EISs and EAs, 42 U.S.C. 4336a(e);

- Provisions related to sponsor-prepared environmental documents, 42 U.S.C. 4336a(f);

---

[3] 43 FR 55978, 55978 (Nov. 29, 1978).

AR_0027838

- Deadlines for EISs and EAs, including provisions for judicial review, 42 U.S.C. 4336a(g);

- Provisions for adoption of categorical exclusions (CEs), 42 U.S.C. 4336c;

- Provisions related to a permitting portal study, 42 U.S.C. 4336d; and,

- The definition of "major Federal action," 42 U.S.C. 4336e(10).

*CEQ Response*: As noted in the preambles of both the proposed and final rules, this rulemaking is specifically designed to address how agencies should implement NEPA consistent with the 2023 amendments. This rule will help agencies achieve the purposes of NEPA of improving the efficiency and effectiveness of the environmental review process, including streamlining the decision-making process, shortening timeframes, increasing predictability, and ensuring that agencies consider all reasonably foreseeable significant effects on the human environment.

With regard to the specific provisions identified by commenters, the list below highlights the key provisions of the regulations that incorporate the 2023 NEPA amendments:

- The requirement to consider reasonably foreseeable environmental effects from 42 U.S.C. 4332(2)(C)(i) is incorporated into §§ 1502.16(a) and 1508.1(i); CEQ notes that because the definition of "effects" in § 1508.1(i) includes that such effects must be "reasonably foreseeable," the qualifier "reasonably foreseeable" is implicit in each instance in which the regulations use the term "effects."

- The requirements to consider a reasonable range of alternatives and to consider any negative environmental impacts of not implementing the proposed agency action in the case of a no action alternative from 42 U.S.C. 4332(2)(C)(iii) are incorporated into §§ 1502.14(a), (c), 1502.16(a)(2), and 1508.1(hh).

9

AR_0027839

- The threshold determination of applicability from 42 U.S.C. 4336(a) is incorporated into § 1501.3(a).

- The provisions for determining lead and cooperating agencies from 42 U.S.C. 4336a(a) are incorporated into §§ 1501.7 and 1501.8.

- The page limits for EISs and EAs from 42 U.S.C. 4336a(e) are incorporated into §§ 1501.5(g) and 1502.7.

- The provisions related to sponsor-prepared environmental documents from 42 U.S.C. 4336a(f) are incorporated into §§ 1506.5(a) and (b)(3) and 1507.3(c)(12).

- The deadlines for EISs and EAs from 42 U.S.C. 4336a(g) are incorporated into § 1501.10.

- The provisions for adoption of CEs from 42 U.S.C. 4336c are incorporated into § 1501.4(e).

- The definition of "major Federal action" from 42 U.S.C. 4336e(10) is incorporated into § 1508.1(w).

CEQ notes that the final rule does not address two provisions listed by commenters because they generally are outside the scope of the regulations. The provision related to a project sponsor's right to obtain judicial review of an alleged failure by an agency to act in accordance with an applicable deadline (42 U.S.C. 4336a(g)(3)) is outside the scope of the regulations because this statutory provision will be implemented by Federal courts, and not by agencies. However, the regulations do acknowledge the availability of this judicial review provision in § 1500.3(b). With respect to a permitting portal study, section 110 of NEPA, 42 U.S.C. 4336d, directs CEQ to undertake the study and submit a report to Congress. CEQ is currently conducting

AR_0027840

a study on the potential for online and digital technology to enhance the effectiveness, efficiency, and accessibility of NEPA reviews, separately from this rulemaking. Once the study is complete, CEQ anticipates that it will provide additional guidance to agencies on the subject. CEQ also notes that the regulations do require agencies to post a variety of information on their websites (§ 1507.4) and use unique identification numbers for documents (§ 1501.5(c)(4) and 1502.4(e)(10)).

*Comment*: Several commenters asked CEQ to clarify the relationship between the proposed rule and two recent pieces of legislation, the Inflation Reduction Act (IRA) (Pub. L. No. 117-169, 136 Stat. 1818 (2022)) and the Infrastructure Investment and Jobs Act (IIJA), also known as the Bipartisan Infrastructure Law (BIL) (Pub. L. No. 117-58, 135 Stat. 429 (2021)). Commenters asserted that these statutes do not provide CEQ any additional authorities related to NEPA, and they asserted CEQ seeks to advance policy goals that the commenters state are inconsistent with the proposed rule, including expediting the production of critical minerals, deployment of broadband infrastructure and streamlining the permitting process.

*CEQ Response*: The revised rule does not purport to implement the IRA or BIL, which CEQ agrees do not amend or otherwise directly address NEPA. At the same time, CEQ considers the revised rule to advance the policy goals of the IRA and the BIL, which include facilitating the responsible deployment of necessary infrastructure while protecting ecosystems and communities from the dangers posed by climate change.

*Comment*: One commenter asked CEQ to clarify how its regulations interact with Subchapter IV of NEPA. In particular, the commenter asked how CEQ's regulations interact with 42 U.S.C. 4370m-6(a)(1)(B)(ii), which provides that judicial review of any Federal authorization for a "covered project" is barred unless "any commenter filed a sufficiently

11

detailed comment so as to put the lead agency on notice of the issue on which the party seeks judicial review, or the lead agency did not provide a reasonable opportunity for such a comment on that issue."

*CEQ Response*: Subchapter IV of Chapter 55, National Environmental Policy, 42 U.S.C. 4370m through 4370m-11, is not a part of NEPA. Congress enacted these provisions in Title 41 of the Fixing America's Surface Transportation Act (FAST-41) (Pub. L. No. 114-94, 129 Stat. 1311 (2015)).

CEQ's NEPA regulations do not implement FAST-41 and do not provide specific guidance on complying with the requirements of FAST-41. Rather, the Federal Permitting Improvement Steering Council (Permitting Council), of which CEQ is a member, administers FAST-41. Where an agency decision is subject to the requirements of FAST-41, FAST-41 requirements supplement the provisions of these regulations (or would supersede in the case of a direct conflict). FAST-41 requirements include, as applicable, the limitation on claims imposed by 42 U.S.C. 4370m-6(a)(1), which apply to "a claim arising under Federal law seeking judicial review of any authorization" for a FAST-41 "covered project." CEQ notes that consistent with FAST-41's directive, on January 13, 2017, CEQ and the Office of Management and Budget jointly issued guidance to Federal agencies on implementing FAST-41. *See* 42 U.S.C. 4370m-1(c)(1)(D) (providing that the Executive Director of the Federal Permitting Improvement Steering Council may recommend to CEQ or OMB that such guidance be issued); Off. of Mgmt. & Budget and Council on Env't Quality, M-17-14, Memorandum for Heads of Federal Departments and Agencies: Guidance to Federal Agencies Regarding the Environmental Review and Authorization Process for Infrastructure Projects (Jan. 13, 2017).

AR_0027842

*Comment*: One commenter urged CEQ to ensure that the proposed regulations align with and support DOE efforts to facilitate transmission siting and development under section 216 of the Federal Power Act (16 U.S.C. 824p), including by accommodating provisions of proposed DOE rules related to timelines; pre-application procedures; and meaningful engagement with Tribes, local communities, and other interested entities.

*CEQ Response*: In the final rule, CEQ recognizes in § 1500.6 that specific agency actions may be subject to the requirements of other statutes that supplement or supersede specific provisions of NEPA and of these regulations. CEQ takes no position on the specific DOE regulations addressed by the commenter, but notes that the NEPA regulations align with the general goals of reducing review timelines, *see, e.g.*, § 1501.10, accommodating pre-application procedures, *see, e.g.*, §§ 1502.4(a), 1502.5(b), and ensuring meaningful engagement with Tribal Nations, local communities, and other interested governments and entities, *see, e.g.*, § 1501.9.

*Comment*: Two commenters asked CEQ to clarify the relationship between the proposed rule and various laws governing the management of Federal public lands, including the Federal Land Policy and Management Act of 1976 and the General Mining Law. One commenter asserted in particular that the statement in § 1502.14(f) that "[t]he environmentally preferable alternative may be the proposed action, the no action alternative, or a reasonable alternative" violates certain laws that the commenter asserts prohibit land management agencies, under certain conditions, from selecting the no action alternative.

*CEQ Response*: CEQ recognizes in § 1500.6 that specific agency actions may be subject to the requirements of other statutes that supplement or supersede specific provisions of NEPA and of these regulations. CEQ notes that neither § 1502.14(f) nor any other provision of the regulations require agencies to select the environmentally preferable alternative, or any other

AR_0027843

particular alternative. Therefore, in a situation where an agency identified the environmentally preferable alternative to be the no action alternative, the agency is under no obligation to select that alternative.

*Comment*: One commenter asked CEQ to clarify the relationship between the proposed rule and Title XI of the Alaska National Interest Lands Conservation Act (ANILCA), including, among other provisions, the EIS timing requirements of section 1104(e) of ANILCA, 16 U.S.C. 3164(e).

*CEQ Response*: CEQ recognizes that specific agency actions may be subject to the requirements of other statutes that supplement or supersede specific provisions of NEPA and of these regulations. These requirements may include, where relevant, the EIS timing requirements of section 1104(e) of ANILCA.

*Comment*: Several commenters requested that CEQ clarify which changes to the regulations CEQ intends to be substantive and which are for clarity, as well as which provisions of the regulations are mandatory and which are not.

*CEQ Response*: The NPRM and the final rule, as well as this Response to Comments, explain the purpose of each change to the regulations, including identifying which changes CEQ intends to improve clarity. Regarding mandatory and non-mandatory provisions, the regulations consistently use the word "shall" to indicate that a provision is mandatory, and the word "should" to encourage agencies to take certain actions without mandating those actions. *See* JD Shambie Singer, Sutherland's Statutes and Statutory Construction § 57:10 (8th ed. 2020) ("[T]he term 'should' indicates a recommended course of action, but does not itself imply the obligation associated with 'shall.'"); Mathew Bender & Co., Statutory Interpretation in the Federal and State Courts § 3.03(3)(c)(iv) (2024) ("The legislature's verb choice is the most important

14

consideration in determining whether a statute is mandatory. Ordinarily, . . . *shall* is considered

mandatory, . . . and *should* is considered discretionary. When the legislature uses *shall* or *must*,

judges generally interpret those words as excluding judicial or executive discretion to take into

account equity or policy." (footnotes omitted)).

*Comment*: One commenter asserted that agencies lack the expertise or legal authority to

identify and consider Tribal treaty rights, as required to implement proposed § 1501.3(d)(2)(x)

and § 1502.14(f). Citing *Maine v. Johnson*, 498 F.3d 37, 45 (1st Cir. 2007), the commenter stated

that agencies have not been delegated the authority to interpret treaties. The commenter also

stated that agencies generally lack the expertise to apply what the commenter characterized as

the complex body of constitutional law that governs the interpretation of treaties, which,

according to the commenter, may include significant historical research to determine which

treaties apply, much less what they mean. The commenter stated that there is no single repository

of such legal documents, much less any resource that could point agencies to a definitive list of

reserved rights established, identified, or quantified under such documents. The commenter

further asserted that agencies would be forced to defer to a Tribal Nation's assertion of reserved

rights under a treaty or other instrument and fail to undertake appropriate analysis of such claims,

to the derogation of the interests of States and private landowners.

*CEQ Response*: CEQ disagrees that consideration of Tribal treaty rights necessarily

requires interpreting the treaties and also disagrees that Federal agencies lack expertise and legal

authority to identify and consider reserved Tribal treaty rights. Many Tribal treaty rights are

clearly defined, have been interpreted by courts, or have been the subject of ongoing discussions

between Tribes and the Federal Government. Like statutes, "federal treaties . . . are the 'supreme

Law of the Land.'" *McGirt v. Oklahoma*, 140 S. Ct. 2452, 2462 (2020) (quoting U.S. Const. art.

AR_0027845

VI, cl. 2). Accordingly, Federal agencies have not only the authority but the obligation to interpret and apply treaties, as they have the obligation to interpret and apply any other Federal law.[4] The decision cited by the commenter, *Maine v. Johnson*, held that an agency was not entitled to deference in its interpretation of a statute resolving Tribal treaty claims as it would in its interpretation of a statute that the agency administers, but did not hold, or even imply, that an agency is precluded from interpreting or considering a treaty. *See Johnson*, 498 F.3d at 45; *see also id.* at 41 (noting that "EPA gets a measure of deference in applying ambiguous terms in any statute it administers, including the Clean Water Act"). Furthermore, there is ample precedent for Federal regulations to require agencies to interpret and consider treaties, both with Tribal Nations and with foreign countries, in the course of implementing the regulations. *See, e.g.*, 10 CFR 20.1405 (requiring the Nuclear Regulatory Commission to "[n]otify and solicit comments from: (1) . . . any Indian Nation or other indigenous people that have treaty or statutory rights that could be affected by the decommissioning"); 14 CFR 34.3(d) ("[T]his regulation does not apply where it would be inconsistent with an obligation assumed by the United States to a foreign country in a treaty, convention, or agreement."); 15 CFR 922.193(b) ("Members of a federally-recognized Indian tribe may exercise treaty-secured rights, subject to the requirements of other applicable law, without regard to the requirements of this subpart."); 36 CFR 2.6(c)(2) ("The Superintendent will also consult with any other tribe that has gathering rights in that park area under a treaty or federal statute or is party to a valid plant-gathering agreement with the NPS for

---

[4]*See* Advisory Council on Historic Preservation et al., Memorandum of Understanding Regarding Interagency Coordination and Collaboration for the Protection of Tribal Treaty Rights and Reserved Rights 3 (2021), https://www.doi.gov/sites/doi.gov/files/interagency-mou-protecting-tribal-treaty-and-reserved-rights-11-15-2021.pdf (memorializing the agreement of 17 signatory agencies to "[c]ontinue and enhance the [agencies'] ongoing efforts to integrate consideration of tribal treaty and reserved rights early into [the agencies'] decision-making and regulatory processes to ensure that agency actions are consistent with constitutional, treaty, reserved, and statutory rights," and to "[c]ontinue to develop, improve and share tools and resources to identify, understand, and analyze tribal treaty and reserved rights that may be adversely impacted or otherwise affected by agency decision-making, regulatory processes or other actions or inaction").

AR_0027846

that park area."); 36 CFR 223.15(g) ("All decisions made under this section must comply with

. . . all other applicable laws and regulations, and are subject to tribal treaty and other reserved

rights . . . ."); 43 CFR 2650.4-7(a)(1) ("Only public easements which are reasonably necessary to

guarantee access to publicly owned lands or major waterways and the other public uses which

are contained in these regulations, or to guarantee international treaty obligations shall be

reserved."); 50 CFR 600.310(e)(3)(iii)(B)(1) ("Other factors that may be considered include . . .

obligations under tribal treaties . . . .").

CEQ recognizes that Tribal treaty rights may present complex legal and factual

determinations, but observes that agencies regularly address complex legal and factual issues in

the course of complying with NEPA and other laws. Moreover, where a Tribe's treaty rights may

be implicated, agencies should engage in nation-to-nation consultation with Tribes, which

provides an opportunity to gather additional information about the Treaty and the Tribes'

understanding of the rights it secures to them. CEQ also notes that a variety of public resources

are available to help agencies identify potentially relevant treaties,[5] and agencies can also seek

the advice of the Bureau of Indian Affairs at the Department of the Interior in appropriate

circumstances. NEPA calls on agencies to "utilize a systematic, interdisciplinary approach" in

planning and decision making, 42 U.S.C. 4332(2)(A); *accord* §§ 1501.2(b)(1), 1502.6,

1507.2(b), and the CEQ regulations encourage lead and cooperating agencies and other

participants in the NEPA process to share resources and expertise to enable this interdisciplinary

approach, *see* §§ 1501.8(b)(4), 1507.2. While agencies may appropriately consider the expertise

---

[5] *See, e.g.,* National Archives and Records Administration, American Indian Treaties: Catalog Links,
https://www.archives.gov/research/native-americans/treaties/catalog-links; Oklahoma State University, Tribal
Treaties Database, https://treaties.okstate.edu/; *see also* Working Group of the Memorandum of Understanding
Regarding Interagency Coordination and Collaboration for the Protection of Tribal Treaty and Reserved Rights, Best
Practices for Identifying and Protecting Tribal Treaty Rights, Reserved Rights, and Other Similar Rights in Federal
Regulatory Actions and Federal Decision-Making (Nov. 30, 2022),
https://www.bia.gov/sites/default/files/dup/inline-files/best_practices_guide.pdf.

AR_0027847

of Tribal Nations on those Nations' own reserved treaty rights, agencies can also consider any contrary views of States and private landowners as part of the public and governmental engagement process, without having to defer unduly to one participant in the process or to adjudicate disputes outside their expertise. For these reasons, CEQ disagrees that agencies lack the expertise or legal authority to identify and consider Tribal treaty rights, as required in order to implement § 1501.3(d)(2)(viii) (which was proposed paragraph (d)(2)(x)) and § 1502.14(f).

*Comment*: Several commenters asserted that provisions in the proposed rule encouraging agencies to consider environmental effects in a global context are unlawful, in light of the presumption against extraterritorial application of statutes, as well as several specific statutes, such as the Energy Policy and Conservation Act and the Federal Land Policy and Management Act of 1976, which the commenters assert require agencies to focus on domestic considerations.

*CEQ Response*: As discussed in responses to comments on the definition of "major Federal action" in section L.12 of this document, CEQ disagrees that the regulations have the effect of applying NEPA in an extraterritorial manner, or of unlawfully requiring agencies to disregard domestic considerations. Under NEPA, the statutory definition of "major Federal action" excludes "extraterritorial activities or decisions, which means agency activities or decisions with effects located *entirely* outside of the jurisdiction of the United States." 42 U.S.C. 4336e(10)(B)(6) (emphasis added). CEQ's regulations incorporate this exclusion. *See* § 1508.1(w)(2)(vi). At the same time, the final rule in § 1501.3(d) requires agencies to analyze the significance of an action in several contexts which, depending on the scope of the action, may require agencies to consider the potential global, national, regional, and local contexts. These provisions are not in conflict with each other; rather, the regulations clarify that in the course of considering the effects of an action that is *not* extraterritorial—that is, that has at least

AR_0027848

some effects that are located within "the jurisdiction of the United States," *see* 42 U.S.C. 4336e(10)(B)(6)—an agency may be required to consider effects within the "global . . . context[]," alongside the "national, regional, and local contexts." As such, CEQ disagrees that the regulations apply NEPA in an extraterritorial manner or require agencies to disregard domestic considerations.

*Comment*: CEQ received a number of comments asserting that the proposed regulations attempt to make NEPA into a substantive rather than a procedural statute. In particular, commenters pointed to CEQ's addition of provisions requiring agencies to consider climate change and environmental justice effects and encouraging agencies to mitigate these effects; changes to the provision requiring agencies to identify an environmentally preferable alternative; removal of provisions explicitly describing NEPA as a procedural statute; and restoration of language describing NEPA as a "basic national charter" and EISs as an "action-forcing device." Commenters suggested that the purported transformation of NEPA into a substantive statute would run afoul of the "major questions doctrine," as articulated by the Supreme Court in *West Virginia v. EPA*, 142 S. Ct. 2587 (2022).

*CEQ Response*: As discussed further in section D.2 of this document, the provisions identified by the commenters do not convert NEPA into a substantive statute and are consistent with case law, existing guidance, and agency practice. CEQ further addresses this concern in the specific context of provisions requiring agencies to consider climate change and environmental justice effects in sections D.3 and L.6; in the context of provisions encouraging agencies to mitigate climate change and environmental justice effects in section I.2; in the context of changes to the provision requiring agencies to identify an environmentally preferable alternative in sections F.10 and F.12.ii; in the context of the removal of provisions explicitly describing

19

NEPA as a procedural statute in sections A.1, D.2, and F.13; and in the context of the restoration of language describing NEPA as a "basic national charter" and EISs as an "action-forcing device" in sections D.2 and F.1. Moreover, because CEQ's interpretation of NEPA through this rulemaking is consistent with past interpretations—including CEQ's past interpretations in guidance and prior versions of the regulation and the interpretation of the courts—it does not "effect[] a fundamental revision of the statute," and does not implicate the major questions doctrine. 142 S. Ct. at 2612, 2610–16.

*Comment*: CEQ received several comments asserting that CEQ lacks statutory authority to issue binding regulations.

*CEQ Response*: CEQ was established by NEPA. *See* 42 U.S.C. 4342 *et seq.* E.O. 11991, issued in 1977, directed CEQ to "[i]ssue regulations to Federal agencies for the implementation of the procedural provisions of [NEPA]," and directed Federal agencies to "comply with the regulations issued by [CEQ] except where such compliance would be inconsistent with statutory requirements." E.O. 11991, sec. 1–2. The Supreme Court has consistently held since 1979 that the interpretation of NEPA found in CEQ's "mandatory regulations" is entitled to "substantial deference" from the Court. *See Andrus v. Sierra Club*, 442 U.S. 347, 357–358 (1979); *accord Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 372 (1989); *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 355–356 (1989). At least eight U.S. Courts of Appeal have similarly described CEQ's regulations as "binding" or "mandatory." *See Brodsky v. United States NRC*, 704 F.3d 113, 120 n.3 (2d Cir. 2013) ("The weight of authority . . . holds CEQ regulations binding on federal agencies."); *State Dep't of Nat. Res. & Envtl. Control v. United States Army Corps of Eng'rs*, 685 F.3d 259, 269 (3d Cir. 2012) ("CEQ regulations are mandatory for all federal agencies, carry the force of law, and are entitled to substantial deference." (quotation

20

AR_0027850

marks omitted)); *City of Dallas v. Hall*, 562 F.3d 712, 722 (5th Cir. 2009) ("[T]he CEQ regulations that the City points to are binding on federal agencies . . . ."); *Piedmont Envtl. Council v. FERC*, 558 F.3d 304, 318 (4th Cir. 2009) ("CEQ regulations are binding on federal agencies."); *Colo. Wild v. United States Forest Serv.*, 435 F.3d 1204, 1209 (10th Cir. 2006) ("The CEQ administers NEPA and promulgates regulations related to NEPA that are binding on federal agencies."); *Cmtys. Against Runway Expansion, Inc. v. FAA*, 355 F.3d 678, 681 (D.C. Cir. 2004) ("The FAA's review under NEPA is governed in part by guidelines promulgated by the Council on Environmental Quality ('CEQ'), which are binding on federal agencies."); *Defs. of Wildlife v. Hogarth*, 330 F.3d 1358, 1369 (Fed. Cir. 2003) ("CEQ promulgated regulations for implementing NEPA that are binding on all agencies."); *Heartwood, Inc. v. United States Forest Serv.*, 230 F.3d 947, 949 (7th Cir. 2000) ("The Council on Environmental Quality ('CEQ') administers NEPA and promulgates regulations related to NEPA that are binding on federal agencies."). Accordingly, CEQ disagrees with these commenters' assertions.

*Comment*: Several commenters questioned whether CEQ has adequately explained the reasoning for the changes to the regulations and the factors it considered in developing the regulations, as required by the Supreme Court's holding in *FCC v. Fox TV Stations, Inc*. Two commenters specifically asserted that CEQ had failed to explain the reasoning for its change in views regarding the status of loans and loan guarantees as major Federal actions. One commenter asserted that CEQ's revisions to the regulations reflected a change in CEQ's views on data regarding average time to complete EISs, and that CEQ had not adequately explained its revised views. This commenter also asserted that CEQ had failed to account for reliance interests created by the 2020 rule.

AR_0027851

*CEQ Response*: The Supreme Court has established standards for the reasoning that agencies must provide when they change their policy positions. *FCC v. Fox TV Stations, Inc.*, 556 U.S. 502, 515–16 (2009); *accord Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221–222 (2016). The Court has explained that an agency "need not demonstrate to a court's satisfaction that the reasons for the new policy are better than the reasons for the old one." *See Fox TV*, 556 U.S. at 515. Rather, an agency must "display awareness that it *is* changing position," show "that there are good reasons for the new policy," and articulate "that the agency *believes* [the new policy] to be better, which the conscious change of course adequately indicates." *Id.* At the same time, the Court has suggested that "a more detailed justification" may be necessary "when, for example, [an agency's] new policy rests upon factual findings that contradict those which underlay its prior policy; or when its prior policy has engendered serious reliance interests that must be taken into account." *Id.*; *see also Organized Vill. of Kake v. United States Dep't of Agric.*, 795 F.3d 956, 966–969 (9th Cir. 2015) (addressing the "factual findings" prong).

Throughout the NPRM and final rule, as further discussed in this Response to Comments, CEQ has identified each change it is making in the regulations, demonstrating awareness of those changes, and has explained the policy or other reasons for each change, including the change specifically noted by the commenters related to the treatment of loans and loan guarantees.

The revised regulations do not "rest[] upon factual findings that contradict those which underlay" the prior regulations, *see Fox TV*, 556 U.S. at 515, but rather upon revised legal and policy views, including CEQ's interpretation of the 2023 NEPA amendments. With respect to the commenter's assertions regarding data on average time to complete EISs, CEQ notes that the

AR_0027852

final rule includes the statutory deadlines of two years for EISs and one year for EAs, and that

the statutory deadlines were established after CEQ completed the 2020 rulemaking.

Finally, CEQ disagrees that the existing regulations have engendered any reliance

interests. The 2020 rule directly regulates Federal agencies, which are subject to NEPA's

requirements, and not private parties or other non-Federal actors. Even if procedural rules for

agency decision making could engender reliance interests in theory, the final rule provides that

agencies are not required to apply the revised regulations to NEPA processes begun before the

rule's effective date. Therefore, to the extent that any party might have a reliance interest in the

applicability of the 2020 rule to an ongoing environmental review, that reliance interest would be

adequately protected. With respect to environmental reviews that commence after the effective

date of the revised regulations, parties do not have a legitimate reliance interest in the procedures

that the government will use for actions that have not begun the environmental review process,

and in any event, no such reliance interests could reasonably exist where the 2020 rule, which

substantially revised regulations that had been in effect for decades, came into effect on

September 14, 2020, 40 CFR 1506.13 (2020), and CEQ publicly acknowledged that it was

"engaging in an ongoing and comprehensive" review of the rule less than a year later. 86 FR

34154 (June 29, 2021).

*Comment*: One commenter stated that NEPA does not allow for Federal interference with

State priorities and processes, and according to the commenter, the proposed rule would interfere

with a State's ability to run its own programs. A separate commenter recommended harmonizing

requirements with recent California Environmental Quality Act (CEQA) reforms.

*CEQ Response*: CEQ disagrees with the commenter's assertion that the rule will interfere

with a State's ability to run its own programs. CEQ also declines to compare the rule with the

AR_0027853

CEQA reforms; however, when a proposed action requires a NEPA review as well as compliance with State or local environmental reviews, it is important for Federal practitioners to understand the Federal and State or local environmental review requirements to achieve common goals and avoid duplication or conflict. On its website, CEQ has a page regarding NEPA and CEQA, located at https://ceq.doe.gov/publications/NEPA-CEQA_Handbook.html. After publication of the final rule, CEQ will consider if updates are needed to this page.

*Comment*: A commenter recommended that CEQ emphasize that agencies will respect private property rights to the extent allowed by law and ensure affected landowners are given participation opportunities. A couple of commenters said CEQ should address situations involving forced eminent domain relocations or buy-outs.

*CEQ Response*: CEQ considers the scenarios described by the commenters to be outside the scope of this rulemaking as well as agency-specific and best addressed by the agency involved in a local action. Further, the final rule includes numerous provisions regarding the engagement of affected communities, including § 1501.9.

*Comment*: One commenter wrote that projects of national importance should be prioritized over localized concerns, and that NEPA reviews should be held only to a "substantial compliance" standard such that if an environmental document is "mostly right," a project can go forward while the agency revises the document. The commenter went on to state that Congress should take action to address this issue.

*CEQ Response*: CEQ defers to the courts to make such determinations about whether agencies have met requirements under NEPA but notes the longstanding provision in § 1500.3 that minor, non-substantive errors that have no effect on agency decision making be considered

AR_0027854

harmless and not invalidate an agency action. CEQ acknowledges the comment regarding Congressional action, which is outside the scope of this rulemaking.

*Comment*: Multiple commenters expressed general support for CEQ's description of the need for rulemaking, including CEQ's proposal to make the regulations more modern, efficient, and robust.

*CEQ Response*: CEQ acknowledges the commenters' general support of CEQ's description of the need for rulemaking. The purpose of the rulemaking is to revise, update, and modernize the NEPA implementing regulations in order to ensure the NEPA process provides for efficient and effective environmental reviews that are guided by science and are consistent with the statute's text and purpose; enhance clarity and certainty for Federal agencies, applicants, and the public; inform the public about the potential environmental effects of Federal Government actions and enable full and fair public participation; and ultimately, promote better informed Federal decisions that protect and enhance the quality of the human environment, including by ensuring that agencies' decision-making processes fully account for climate change, environmental justice, and other environmental issues.

*Comment*: Many commenters expressed their general view that it is necessary to streamline the NEPA process in order to increase the certainty of the Federal decision-making process; encourage the investment of private capital; protect the environment and the public; reduce the risk of litigation; decrease the delays and costs associated with environmental reviews; achieve the objectives of the BIL and the IRA; and facilitate agencies' compliance with the rule. Multiple commenters also expressed general support for the proposed rulemaking and indicated that it would accomplish these objectives.

AR_0027855

Other commenters expressed the opinion that NEPA practice has deviated from the original purpose of the legislation in that, in the commenters' views, agencies often conduct unnecessary NEPA analyses in order to avoid the risk of litigation. These commenters asserted that the environmental review process causes lengthy delays, which hinder rather than advance NEPA's objectives. The commenters emphasized the need to streamline the NEPA process in order to support the development of projects that would improve the quality of the environment (such as projects that would produce or transmit electricity, including carbon pollution-free energy) or projects that would benefit the United States' economic or strategic interests (such as the reliability of the electrical grid or the availability of critical minerals). One commenter remarked that recent changes to NEPA regulations have increased the administrative burdens and duration of NEPA reviews, and added that CEQ should ground changes to the NEPA regulations in statute and case law.

Some commenters asserted that the proposed rule would fail to alleviate and could even exacerbate the project delays attributable to NEPA reviews. Some of these commenters asserted that the proposed rule erects new barriers to project completion; creates new opportunities for litigation over NEPA compliance; disregards the Administration's policy objectives; or will increase costs for consumers. Other commenters advocated for CEQ to strengthen the requirements of the regulation or identify ways to hold agencies implementing NEPA more accountable for implementing the law faithfully.

One commenter asserted that the prolonged duration of NEPA reviews has increased costs for local governments, depleted their budgets for infrastructure projects, and hampered their capacity to fulfill their public responsibilities. This commenter advocated for an expedited review process that would provide for appropriate consideration of environmental effects while

26

AR_0027856

facilitating the timely completion of economic development projects that will enhance residents'
lives, create jobs, and improve the environment.

*CEQ Response*: CEQ acknowledges these comments. CEQ is updating the NEPA
regulations to provide for sound and efficient environmental review of Federal actions, including
those actions integral to tackling the climate crisis, in a manner that enables meaningful public
participation, provides for an expeditious process, discloses climate change-related effects,
advances environmental justice, respects Tribal sovereignty, protects our Nation's resources, and
promotes better and more equitable environmental and community outcomes. CEQ disagrees
with the assertion that the revised regulations will increase litigation or result in additional
delays.

*Comment*: Multiple commenters remarked on NEPA's positive effects for projects and
communities. One commenter asserted, based on numerous studies, that insufficient funding is
the chief cause of project delays, rather than the NEPA review process, and that NEPA
compliance actually expedites the planning process. The commenter stated that the NEPA
process will assist Federal agencies in making the most efficient use of the funds that Congress
appropriated to them in the BIL and the IRA; that NEPA is facilitating the efficient and equitable
development of renewable energy while protecting communities' environmental and cultural
interests; and that the NEPA process is ideal for helping decision makers and the public
understand the interconnected relationship between proposed Federal actions and their climate
consequences, and thereby improves the quality of decisions.

*CEQ Response*: CEQ acknowledges these comments in support of the rulemaking and of
NEPA as a whole. The final rule provides for an effective environmental review process that
promotes better decision making; ensures full and fair public involvement; provides for an

AR_0027857

efficient process and regulatory certainty; and provides for sound decision making grounded in science, including consideration of relevant environmental, climate change, and environmental justice effects. CEQ agrees with the commenters that compliance with NEPA can improve both the efficiency and the effectiveness of Federal planning and decision-making processes and reduce the risk of litigation.

*Comment*: Many commenters asserted that the recent amendments to NEPA weakened the statute and urged CEQ to strengthen the provisions of the regulations in order to prompt Federal agencies to consider endangered wildlife, climate change, and environmental justice in their decision making. Other commenters asserted that the rulemaking disregards or subverts the intent of the 2023 NEPA amendments.

*CEQ Response*: The final rule updates the regulations to address how agencies should carry out their obligations under NEPA in light of the recent amendments to the statute. The purpose of the regulations is to faithfully implement the statute as enacted and amended by Congress.

Consistent with NEPA, as amended, the final rule directs agencies to consider reasonably foreseeable effects on endangered wildlife, climate change, and communities with environmental justice concerns in the environmental review process, as appropriate. *See, e.g.*, §§ 1501.3(d)(2)(vi) (endangered species); 1502.14(f) (climate change and environmental justice); 1502.16(a)(6) (climate change).

*Comment*: Several commenters expressed the need for CEQ to design the NEPA regulations in a manner that would encourage consistent application across projects, including by making the regulations easy for non-experts to understand and use.

AR_0027858

*CEQ Response*: CEQ acknowledges these comments. One of CEQ's purposes in developing and updating the NEPA regulations is to promote the consistent application of NEPA across Federal agencies. This rulemaking makes the NEPA regulations clearer and more specific, which reduces confusion and results in more consistent implementation, and facilitates participation by non-experts in the environmental review process.

*Comment*: Multiple commenters discussed concerns about potential politicization of the CEQ rule and reasoned that future Administrations may seek to alter provisions that they perceive as politically motivated.

*CEQ Response*: CEQ disagrees with the commenters' characterization of the rulemaking as politically motivated. One of the key purposes of the rulemaking is to implement the 2023 amendments to NEPA. The rulemaking also better aligns the provisions of the regulation with CEQ's extensive experience implementing NEPA; CEQ's perspective on how NEPA can best inform agency decision making; longstanding Federal agency experience and practice; NEPA's statutory text and purpose, including its mandate that Federal agencies make decisions informed by science; and case law interpreting NEPA's requirements.

*Comment*: Several commenters requested that the final rule satisfy broad objectives with regards to environmental and climate science, such as: full analysis and disclosure of environmental impacts of proposed actions; a requirement for agencies to choose project alternatives that avoid causing harm to the climate and biodiversity; streamlined permitting of clean energy projects; early engagement with affected communities; implementation of mitigation measures; or protection of communities.

*CEQ Response*: Numerous provisions address the commenters' concerns. For example, § 1502.16 includes robust requirements for rigorously analyzing the reasonably foreseeable

AR_0027859

environmental consequences of a proposed action and alternatives. Section 1502.14(f) indicates that minimizing damage to the biological and physical environment, climate change-related effects, and disproportionate and adverse effects on communities with environmental justice concerns are factors to be considered in identifying the environmentally preferable alternative. CEQ notes that the regulations do not require agencies to select this alternative because NEPA does not dictate a particular outcome. CEQ agrees that early engagement with affected communities is important and includes provisions providing for early engagement in the purpose section of the final rule, § 1501.1(b), as well as §1501.9(c)(2). CEQ also agrees that mitigation is important and includes in § 1502.14(e) the requirement to include appropriate mitigation measures not already included in the proposed action as part of the alternative development process. Lastly, CEQ notes that while NEPA does not address permitting, including "streamlined permitting of clean energy projects," the regulations encourage agencies to integrate the NEPA process with other environmental review and permitting processes. *See, e.g.*, § 1502.24.

*Comment*: A commenter suggested that by eliminating language that limits agency implementation of NEPA, the environmental review process will be tailored to meet specific agency and public needs. Commenters either asserted that some agencies define impact levels differently than others or requested standardization for the definitions and presentation of impact levels in environmental review documents. A commenter requested that CEQ clarify whether agencies are required to assume the greater of negative impacts and the lesser of beneficial impacts of an action. A couple of other commenters suggested that until CEQ updates the proposed rule with codified guardrails to fix the "chronic failures" found in EIS documents, agencies will continue practices which lead to inaccurate information for decision makers and distort GHG emissions estimates.

AR_0027860

*CEQ Response*: CEQ disagrees that the rule eliminates language limiting agency implementation of NEPA. Section 1500.1(a)(1) addresses the "national environmental policy" and "continuing responsibility of the Federal Government" to implement NEPA. The final rule does not weaken this mandate. CEQ does agree that the final rule will help agencies tailor their environmental reviews to "meet specific agency and public needs." Changes throughout the final rule clarify and improve NEPA practice, allowing agencies to, among other things and as set forth in § 1507.3(c)(3), better "integrate the environmental review into the decision-making process." While this creates flexibility, the definitions of "effects or impacts" at § 1508.1(i) and "significant effects" at § 1508.1(mm) of the final rule ensure standardization across agencies. While agencies should continue to consider both beneficial and adverse effects, under § 1501.3(d), agencies "shall not offset an action's adverse effects with other beneficial effects to determine significance" or give disproportionate weight to either positive or negative effects. The final rule also reinforces CEQ's commitment to "high-quality" information, as noted in §§ 150.1(b), 1502.15(b), and 1506.6.

*Comment*: A commenter questioned why CEQ is pushing for a streamlined process "when there is no actual environmental protection enforcement." Another commenter suggested that agencies may require additional support to conduct effects analyses considering possible conflicts between the proposed action and the objectives of other governmental plans. The commenter added that the proposed rule does not explicitly state whether agencies are expected to seek additional information to support an environmental review.

*CEQ Response*: CEQ disagrees that providing for an efficient and effective process is unnecessary. It is correct that "NEPA itself does not mandate particular results, but simply prescribes the necessary process," and that NEPA's procedures "are almost certain to affect the

AR_0027861

applicable, including in the context of the affected environment (§ 1502.15) or the no action alternative (§ 1502.16(a)(2)).

**3.  Comments on Codification of the 2023 Greenhouse Gas Guidance**

*Comment*: Several commenters expressed concern that the 2023 GHG Guidance wrongfully elevates climate change and its effects in the evaluation of a project, and that such emphasis is inconsistent with the purpose of NEPA and the revised statutory language. Another commenter stated that changes to regulatory text to include the guidance would signal a greater importance of climate change effects over other environmental effects and could potentially lead to biased analyses.

*CEQ Response*: CEQ has considered the comments in response to its request for comment on whether and how to codify the 2023 GHG Guidance and generally does not codify it in the final rule. As discussed in section F.14, CEQ has made one revision to require quantification of reasonably foreseeable climate-change related effects where feasible in § 1502.16(a)(6). CEQ will consider these and the comments received on the interim GHG guidance during development of any final GHG guidance.

*Comment*: A commenter reiterated a comment they submitted on the 2023 GHG Guidance, expressing concern about the potential effects the interim guidance will have on the timeliness and related costs of the NEPA review processes.

*CEQ Response*: CEQ will consider the comment on the interim GHG guidance during development of any final GHG guidance.

*Comment*. Several commenters remarked that it is likely that the regulatory approach to climate change will continue to shift and that while regulatory text remains stable, revisions to the GHG Guidance that need additional explanation or examples should not be codified.

AR_0027873

*CEQ Response*: CEQ acknowledges the comment. CEQ has decided not to codify the 2023 GHG Guidance in the rule except to require quantification of reasonably foreseeable climate-change related effects where feasible.

*Comment*: A few commenters suggested that CEQ adopt sections IV(B), (E), (F), V, VI(A), (B), (C), (E), and VII of the interim GHG Guidance into the final rule. A commenter recommended that the final rule should incorporate with modifications the Guidance's Conclusions and Effective Date with modifications to mandate consideration of the guidelines in planning and writing an EIS or EA. Another commenter suggested that Section V of the Interim Guidance be adopted as an amendment in its entirety to build upon the Phase 2's proposed changes. The commenter also recommended that Section IV(A)'s direction to evaluate emissions across different alternatives and thoroughly calculate the emissions of a scenario should be included in the final rule. A commenter stated that the final rule should include the Guidance's direction to identify potentially affected communities, including communities with environmental justice concerns, and rely on the most current scientific information available (subsections VI(A), (B), (C), and (E) of the Guidance). The commenters also recommended CEQ codify Section B of the Guidance with regard to GHG analyses, comparing multiple scenarios, and presenting monetized costs associated with a project.

*CEQ Response:* CEQ acknowledges the comment. CEQ has decided not to codify the 2023 GHG Guidance in the rule except to require quantification of reasonably foreseeable climate-change related effects where feasible. CEQ determined that maintaining these sections as guidance is the most appropriate and flexible approach to ensure that agencies continue to consider climate change and GHG effects appropriately as the science around these effects

AR_0027874

continues to improve. CEQ will consider these comments when developing any final GHG guidance.

*Comment*: A commenter requested that the final rule discuss consideration for proportionality and causality in the NEPA analysis of GHG-related impacts to more appropriately assign mitigation efforts to the true source of GHGs.

*CEQ Response:* CEQ declines to add a specific discussion of proportionality and causation in the context of GHG-related effects in the regulations. CEQ considers this level of specificity to be more appropriate for guidance than the NEPA regulations and notes that proportionality is addressed in Section IV (A) of the interim GHG guidance. CEQ will consider these and the comments received on the interim GHG guidance during development of any final GHG guidance.

*Comment*: A commenter suggested that the final rule emphasize that agencies' analyses of GHG emissions and climate change effects should be proportional to the significance of the effects, consistent with the interim GHG guidance.

*CEQ Response*: CEQ agrees that analyses in the environmental review process should be commensurate with the importance of the effect. For EISs, this is specifically noted in § 1502.15(c), which states that "[d]ata and analyses . . . shall be commensurate with the importance of the effect." Additionally, § 1502.16(a) states that in an EIS, "[t]he comparison of the proposed action and reasonable alternatives shall be based on the discussion of their reasonably foreseeable effects and the significance of those effects . . . , focusing on the significant or important effects." Therefore, CEQ declines to specifically address proportionality in the context of GHG emissions and climate change-related effects because it would be redundant to these more broadly applicable provisions and could improperly suggest that

AR_0027875

proportionality for GHG emissions and climate-change related effects is different from proportionality for other effects.

*Comment*: A commenter suggested that CEQ integrate the warning against perfect substitution analysis from the guidance directly into the regulatory text. The commenter also requested the rule include a provision on the appropriate use of the social cost of GHGs in climate change analyses.

*CEQ Response*: CEQ considered the commenter's suggestions but declines to add it to the regulatory text because they are more appropriate for guidance. As discussed in CEQ's GHG guidance, using the best available social cost of GHG can provide important information to decision makers and the public about an action's effects and facilitate comparison of alternatives, but the regulations and guidance do not require agencies to use this tool. CEQ will consider whether it should incorporate additional information on perfect substitution or social cost of GHGs into the GHG guidance during development of any final GHG guidance.

*Comment*s: Multiple commenters opposed codification of the interim GHG Guidance in the final rule, stating that doing so would result in overreach of authority by the Executive Branch. Some commenters stated that CEQ should not codify the guidance until CEQ resolves policy issues and addresses the public comments. Another commenter asserted that codification is premature because climate science continues to evolve. Another commenter suggested that codification of guidance would be arbitrary and capricious and asserted that NEPA was never intended to be a climate policy framework.

*CEQ Response*: CEQ acknowledges the commenters concerns. CEQ has decided not to codify the 2023 GHG Guidance in the rule, except to require quantification of reasonably

AR_0027876

foreseeable climate-change related effects where feasible, which is consistent with existing case law addressing the quantification of GHG emissions.

*Comment*: Multiple commenters stated that if CEQ codifies all or part of the 2023 GHG Guidance in the final rule, CEQ should publish a supplemental NPRM with proposed regulatory text and provide an opportunity for the public to comment before issuing a final rule, in accordance with the APA. Similarly, several commenters stated that CEQ has not provided enough information about how the final rule may incorporate the guidance or which parts of the document it would include, and that any attempt to codify the interim guidance through this rulemaking process would be contrary to the APA. Another commenter requested that CEQ respond to comments provided previously on the interim Guidance before incorporating it into the proposed rule.

*CEQ Response*: CEQ has decided not to codify the 2023 GHG Guidance in the rule, except as described above, which is consistent with case law and a logical outgrowth of the proposed rule. The proposed rule invited comment on codification of the GHG guidance, thereby putting the public on "fair notice" of the provision in the final rule. *Long Island Care at Home, Ltd. v. Coke*, 551 U.S. 158, 174 (2007). CEQ will consider these and the comments received on the interim GHG guidance during development of any final GHG Guidance.

**B.    Comments Regarding Changes Throughout Parts 1500–1508**

**1.    General Comments on Inclusion of Environmental Justice and Climate Change**

*Comment*: Commenters expressed their views that the proposed rule emphasizes climate change and environmental justice in the environmental review process, and articulated both support for and opposition to these perceived emphases. One commenter expressed the opinion

47

AR_0027877

accordingly the inclusion of provisions regarding climate change in the final rule represents an arbitrary and capricious change in CEQ's position.

*CEQ Response*: CEQ disagrees with the commenter's interpretation. The 2020 NPRM stated,

> CEQ received comments requesting that the regulations address analysis of greenhouse gas emissions and potential climate change impacts. CEQ has proposed guidance titled 'Draft National Environmental Policy Act Guidance on Consideration of Greenhouse Gas Emissions' to address how NEPA analyses should address greenhouse gas (GHG) emissions. CEQ does not consider it appropriate to address a single category of impacts in the regulations.[7]

The final rule identifies climate change-related effects as an example of one of the types of effects that agencies should consider in NEPA reviews. *E.g.*, §§ 1502.14(f), 1502.16(a)(6), 1508.1(i)(4). Contrary to the commenter's suggestion, CEQ's regulations, including the 1978 regulations and the 2020 rule, have long identified specific types of environmental effects as examples of the types of effects that agencies should consider. *See, e.g.*, 40 CFR 1501.3(b)(1) (2020) (directing agencies to "consider, as appropriate to the specific action, the affected area (national, regional, or local) and its resources, *such as listed species and designated critical habitat under the Endangered Species Act*" (emphasis added)); 40 CFR 1502.16(a)(6)–(8) (2020) (requiring the environmental consequences section of an EIS to address "[e]nergy requirements and conservation potential of various alternatives and mitigation measures," "[n]atural or depletable resource requirements and conservation potential of various alternatives and mitigation measures," and "[u]rban quality, historic and cultural resources, and the design of the built environment"); 40 CFR 1508.27(b)(2), (3), (8), (9) (2019) (identifying specific types of effects).

---

[7] 2020 NPRM, 85 FR at 1710 (internal citation omitted).

AR_0027880

Even if the addition of references to climate change represents a change in CEQ's position, the preambles to both the Phase 2 proposed rule and final rule articulate the agency's reasons for the change. Inclusion of climate change in the regulations responds to a large volume of case law invalidating NEPA analyses that failed to adequately consider reasonably foreseeable effects related to climate change. *See e.g.*, *Vecinos para el Bienestar de la Comunidad Costera v. FERC*, 6 F.4th 1321 (D.C. Cir. 2021) (holding NEPA analysis for pipeline and liquified natural gas port deficient due to inadequate climate change analysis); *WildEarth Guardians v. Zinke*, 368 F. Supp. 3d 41 (D.C. Cir. 2019) (invalidating oil and gas leases for failure to consider downstream greenhouse gas emissions during the NEPA process); *WildEarth Guardians v. U.S. Bureau of Land Mgmt.*, 870 F.3d 1222 (10th Cir. 2017) (holding that the EIS and ROD for four coal leases were arbitrary and capricious because they failed to adequately consider climate change).

*Comment*: Some commenters generally stated that they view the proposed rule as providing agencies with a clear and reliable path to advance projects on time and within budget, aligning with the Administration's climate and environmental justice objectives. Relatedly, numerous commenters expressed general support for the provisions in the proposed rule that encourage consideration of climate change and communities with environmental justice concerns.

*CEQ Response*: CEQ acknowledges the supportive comments.

*Comment*: Many commenters expressed general support for the provisions of the rulemaking that pertain to environmental justice. In particular, some commenters expressed support for provisions of the rule that direct agencies to consider the effects of actions on communities that, in the commenters' view, are most vulnerable to the effects of climate change.

51

*Comment*: Many commenters expressed support for engagement with communities with environmental justice concerns and urged CEQ to strengthen and expand the provisions of the NEPA regulations that protect these communities or require agencies to solicit their input.

*CEQ Response*: CEQ agrees with commenters and considers it critically important that agencies engage with all communities, including communities with environmental justice concerns, in the NEPA process. The final rule emphasizes the importance of this engagement in § 1500.2(d) (directing agencies to "[e]ncourage and facilitate public engagement in decisions that affect the quality of the human environment, including meaningful engagement with communities such as those with environmental justice concerns") and § 1501.9 (directing agencies to conduct early engagement with agencies and members of the public who are likely to be affected by or interested in a decision).

*Comment*: Multiple commenters asserted that NEPA's statutory text and legislative history, case law interpreting the statute, and various Executive Orders all affirm that environmental justice is a core principle of NEPA, and that agencies must give proper consideration when conducting environmental reviews.

*CEQ Response*: CEQ agrees that the environmental justice-related provisions of the rulemaking advance NEPA's statutory policies, which include avoiding environmental degradation; preserving historic, cultural, and natural resources; and attaining the widest range of beneficial uses of the environment without degradation, risk to health or safety, or other undesirable and unintended consequences. *See* 42 U.S.C. 4331(b). CEQ also considers the consideration of effects on communities with environmental justice concerns to be consistent with longstanding agency practice, case law, and Executive Orders. *See, e.g.*, CEQ, Environmental Justice: Guidance; *Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety*

55

*Admin.*, 538 F.3d 1172 (9th Cir. 2008); E.O. 14096; *see also* 42 U.S.C. 4331(b) ("[I]t is the continuing responsibility of the Federal Government to . . . assure for *all* Americans safe, healthful, productive, and esthetically and culturally pleasing surroundings . . . [and to] maintain, wherever possible, an environment which supports diversity and variety of individual choice" (emphasis added); 42 U.S.C. 4332(2)(I) ("all agencies of the Federal Government shall . . . recognize the worldwide and long-range character of environmental problems").

*Comment*: Several commenters expressed concern that the proposed rule fails to adequately address environmental justice concerns and urged CEQ to take further action to advance environmental justice.

*CEQ Response*: The final rule includes multiple provisions that direct agencies to consider environmental justice in environmental reviews. CEQ will consider whether additional guidance would help agencies implement these provisions.

*Comment*: One commenter suggested that CEQ should require agencies to carry out more ecological justice analysis and mitigation when conducting NEPA reviews.

*CEQ Response*: To the extent the commenter means "environmental justice" when referring to "ecological justice," the final rule requires agencies to consider environmental justice throughout the NEPA process. *See, e.g.*, § 1502.14(f). In particular, agencies must include analysis of disproportionate and adverse human health and environmental effects on communities with environmental justice concerns in an EIS and should consider the possibility of mitigation to address environmental justice concerns and, *see* §§ 1502.16(a)(13), 1505.3(b), consistent with the NEPA statute, longstanding agency practice, and case law, as well as Executive Orders.

AR_0027886

*v. NRDC*, 462 U.S. 87, 97 (1983) (noting that one of the "twin aims" of NEPA is to "ensure[]

that the agency will inform the public that it has indeed considered environmental concerns in its

decisionmaking process").

     CEQ notes that other Federal agencies have developed resources to guide agencies'

consideration of which information FOIA requires them to disclose, including guidance

specifically related to the treatment of Indigenous Knowledge.[15] Moreover, the legal authorities

and policy considerations that determine which information to disclose and which to withhold

will vary in some cases from agency to agency. *See, e.g.*, 25 U.S.C. 3056 (requiring or allowing

the U.S. Forest Service to withhold from disclosure certain categories of information related to

human remains, or cultural items, resources, uses, or sites). CEQ therefore encourages agencies

to develop guidance and policy on these topics, in consultation with Tribal Nations, and to

consider including such policies in agency NEPA procedures established pursuant to

§ 1507.3(b). At the same time, because of the complex and context-specific nature of these

determinations, CEQ declines to add the specific regulatory text suggested by the commenters,

but will consider developing additional guidance in the future.

     *Comment*: Multiple commenters encouraged CEQ to include a provision in the

regulations setting forth standards for Tribal consultation and to require agencies to comply with

those standards in the course of their environmental reviews. Among the elements that the

organizations recommended for inclusion in this provision were requirements for joint

---

[15] *See, e.g.*, U.S. Dep't of the Interior, FOIA Guidance, https://www.doi.gov/foia/news/guidance; U.S. Dep't of Just., Guide to the Freedom of Information Act, https://www.justice.gov/oip/doj-guide-freedom-information-act-0; U.S. Dep't of Just., Guide to the Freedom of Information Act: Exemption 3, https://www.justice.gov/media/1144226/dl?inline; U.S. Dep't of Just., Statutes Found to Qualify under Exemption 3 of the FOIA, https://www.justice.gov/oip/page/file/623931/download;. Working Group of the Memorandum of Understanding Regarding Interagency Coordination and Collaboration for the Protection of Indigenous Sacred Sites, *Best Practices Guide for Federal Agencies Regarding Tribal and Native Hawaiian Sacred Sites* (Dec. 2023), https://www.bia.gov/sites/default/files/media_document/sacred_sites_guide_508_2023-1205.pdf, at 25–29.

AR_0027904

42 U.S.C. 4331(b); 40 CFR 1500.1(a) (2019). CEQ remains cognizant of the goals Congress intended to achieve through the NEPA process in developing its implementing regulations, and agencies should carry out NEPA's procedural requirements in a manner faithful to the purposes of the statute.

*Comment*: Multiple commenters provided general comments about the adequacy CEQ's justification for the Phase 2 rulemaking, questioning whether CEQ provided a "reasoned explanation" for the rulemaking effort or ignored an important aspect of the problem, including whether the Phase 2 rule failed to conform the regulations to existing, well-reasoned case law and to improve decision-making timelines for important projects.

*CEQ Response*: CEQ disagrees that it has not explained its reasons for the revisions to the NEPA regulations in the final rule. CEQ has provided specific reasons for the revisions it has made in the proposed rule throughout the preamble for the final rule and also in the proposed rule. CEQ's final rule resolves ambiguities contained in the current regulations, addresses potential legal vulnerabilities in the current regulations, and incorporates new statutory directions from the 2023 amendments to NEPA. The final rule also advances NEPA's multiple statutory objectives, which include promoting interagency coordination and cooperation, promoting conformity of administrative procedures to national environmental policy, clarifying procedures for the determination of level of environmental review, and promoting timely and unified Federal reviews. *See* 42 U.S.C. 4333, 4336, 4336a. CEQ's final rule clarifies, strengthens, and improves the efficiency of procedural requirements that "encourage productive and enjoyable harmony between" humans and the environment; "promote efforts [that] will prevent or eliminate damage to the environment and biosphere and stimulate the health and welfare of [humans]; [and] enrich

AR_0027943

the understanding of the ecological systems and natural resources important to the Nation."
42 U.S.C. 4321.

The final rule responds to the 2023 amendments to NEPA. Other revisions reflect clarifications in light of holdings in recent court cases. Examples of updates to CEQ's regulations that are driven by statutory changes include incorporating deadlines for environmental assessment (EA) and environmental impact statement (EIS) preparation that are set forth in section 107(g) of NEPA; incorporating page limits for EAs and EISs as set forth in section 107(e); clarifying requirements for determining whether to prepare an environmental document and the appropriate level of NEPA review in accordance with section 106; creating a process for Federal agencies to use CEs established by another agency in accordance with section 109; incorporating definitions contained in section 111; and incorporating provisions protecting scientific integrity in accordance with section 105.

Additional revisions reflect developments in case law, including clarifying direction on how to address climate change in NEPA documents in light of case law such as *Diné Citizens Against Ruining Our Env't v. Haaland*, 59 F.4th 1016, 1039–44 (10th Cir. 2023) (finding analysis of greenhouse gas and hazardous air pollutants inadequate), *350 Montana. v. Haaland*, 29 F.4th 1158, 1176(9th Cir. 2022) (addressing the cumulative effects analysis area), and *Food & Water Watch v. FERC*, 28 F.4th 277, 288–89 (D.C. Cir. 2022) (addressing the extent to which NEPA analysis for a natural gas pipeline needs to consider downstream emissions of natural gas). These revisions also reflect clarifying direction regarding a reasonable range of alternatives, in light of case law such as *Environmental Defense Center v. Bureau of Ocean Energy Management*, 36 F.4th 850, 877 (9th Cir. 2022) (finding an EA's alternative analysis inadequate because of insufficient meaningful difference between the action alternatives). Finally, they

AR_0027944

area," and the addition of "relevant" could have the unintended consequence of indicating to agencies that this provision requires a substantially different analysis. CEQ declines to define "geographic area" and "unique or sensitive resources" as these phrases have been used in the regulations since 1978, and agencies have extensive experience interpreting them in the context of particular proposed actions. Further, CEQ is unaware of any misunderstanding about the meaning of these phrases and is concerned that adding a new regulatory definition could be disruptive for agencies.

*Comment*: One commenter expressed concern with CEQ's expansion of the regulations to include "global" contexts in proposed § 1501.3(d)(1) and asserted it was a "startling overreach."

*CEQ Response*: CEQ disagrees with the commenter's assertion that the language describing context to include "global" will result in agencies expanding the evaluation of effects beyond those that are reasonably foreseeable. The context considerations in § 1501.3(d)(1) provide guidance to agencies on how to determine whether an effect is significant, and accordingly, to help determine the appropriate level of NEPA review. Identifying the global, national, regional, and local contexts reminds agencies that they should consider whether proposed actions have reasonably foreseeable effects across these various contexts. As described in section II.C.2 of the final rule preamble, describing context using these four situations is consistent with the decades of experience agencies had implementing the 1978 regulations and is consistent with the concepts of indirect and cumulative effects, as defined in § 1508.1(i). Further, the definition of "effects" limits effects to those that are reasonably foreseeable. CEQ also notes that § 1501.3(d)(1) does not require agencies to evaluate all four contexts for every proposed action. Agencies should determine the appropriate contexts to consider based on the scope of the action and its anticipated reasonably foreseeable effects.

224

AR_0028054

*Comment*: Multiple commenters stated that proposed § 1501.4(e) should include a requirement that the agency document its basis for determining use of the CE is appropriate and suggested that § 1501.4(e)(5) require agencies to publish a decision document. Commenters suggested CEQ should encourage accessible and consistent public disclosure practices across agencies for adopting CEs. One commenter suggested CEQ develop a clearinghouse for CEs.

*CEQ Response*: Section 1501.4(e)(2) incorporates the statutory mandate that the adopting agency consult with the establishing agency, and § 1501.4(e)(3) incorporates the statutory mandate that the adopting agency provide public notification of its adoption. Such public notification must include a brief description of the proposed action or category of proposed actions to which the agency intends to apply the CE, the process the agency will use to evaluate for extraordinary circumstances consistent with § 1501.4(b), and a brief description of the agencies' consultation. Finally, § 1501.4(e)(5) requires the adopting agency to document and publish its application of the CE to a specific proposed action. CEQ currently maintain links to agency procedures and a list of established CEs on NEPA.gov. CEQ will consider the commenter's suggestion regarding a list of adopted CEs but declines to create a clearinghouse at this time.

*Comment*: A commenter stated that in proposed § 1501.4(e)(4), CEQ should clarify that public notice is not intended for each individual project using the other agency's CE, but rather when one agency decides to borrow another agency's CE. Other commenters stated that the procedural requirements of proposed § 1501.4(e) regarding public notice are unnecessary and could make the NEPA process more difficult and burdensome, which is contrary to the intent of the 2023 amendments to NEPA. Specifically, some commenters opposed the proposed requirement that agencies publish the documentation required under § 1501.4(e)(5). Another

AR_0028120

commenter suggested that at a minimum CEQ should clarify that formal public comment and agency responses are not required.

*CEQ Response*: Sections 109(3) and (4) of NEPA require an agency to "identify to the public the categorical exclusion that the agency plans to use for its proposed actions," and to "document adoption of the categorical exclusion." 42 U.S.C. 4336c(3), (4). CEQ reads sections 109(3) and (4) of NEPA together to be consistent with requiring both notice of the adopting agency's adoption, which would describe the agency's intended use, as well as actual application of the adopted CE to proposed actions. Agencies should prepare the documentation required by section 109(4) each time the agency applies the CE to a proposed action and should include a determination that the CE's application is appropriate for the proposed action and a record of the agency's review of extraordinary circumstances for the specific action in question, including, if extraordinary circumstances exist, the adopting agency's determination that there is no potential for significant effects notwithstanding those extraordinary circumstances.

CEQ disagrees that § 1501.4(e) adds complications to the process beyond what the statute requires. Rather, CEQ's interpretation gives meaning to both sections 109(3) and 109(4) of NEPA. CEQ interprets section 109(3) as referring to the agency's overall adoption of the CE, which can occur in advance for a category of individual actions, and has incorporated this requirement as § 1501.4(e)(3). In contrast, CEQ interprets section 109(4) as referring to the agency's application of the adopted CE to an individual action and has incorporated this requirement as §1501.4(e)(5). The only requirement that CEQ has added to § 1501.4(e)(5) beyond what the statute specifically requires is the requirement that the agency publish the documentation. CEQ notes that the regulation adopts a broad definition of publication, *see*

AR_0028121

§ 1508.1(gg), and considers publishing this documentation, once it is prepared, to impose minimal burdens or delays on agencies.

The final rule does not require the agency to take public comment on the public notification required in § 1501.4(e)(3) or on the documentation required in § 1501.4(e)(5).

*Comment*: Several commenters requested that CEQ provide clarity on requirements for public notice, including the duration of the public notice period and the need for agency response to comments. One commenter suggested that following public notice there should be a comment period of at least 30 days to ensure accountability and transparency.

*CEQ Response*: The regulations require an agency to provide public notification, but do not require the agency invite or respond to public comments, or to wait until the agency receives public comments before taking action. While CEQ encourages agencies to do so in appropriate cases, such as when there is community interest in the action, the statute does not require agencies to seek public comment on the adoption and application of another agency's CE.

*Comment*: Several commenters suggested CEQ provide guidance to agencies on interagency coordination and consultation with CEQ on potential environmental effects of CE adoption to ensure proper use. Another commenter asked CEQ to provide more specifics on how agencies would implement the adoption process, if specific circumstances apply, and what would be required. One commenter also suggested CEQ should include under the documentation requirement that the adopting agency should specify how this proposed application fits within or alters current agency practice under its existing CEs and otherwise.

*CEQ Response*: In response to comments, CEQ has revised § 1501.4(e)(3) to clarify the contents of the public notification required under section 109 of NEPA. CEQ declines to mandate additional requirements as to consultation and notification, noting that these processes

AR_0028122

practices agencies should already be undertaking. For example, § 1507.3(c)(8)(ii) explicitly requires agencies to include their CE substantiation materials in the public notice required for new CEs. Agencies have long been required to prepare such materials to justify CEs, and providing them as part of the public notice is good agency practice that should not delay the development of CEs. Similarly, § 1501.4(b)(1)'s requirement that an agency document and publish CE determinations made notwithstanding the existence of extraordinary circumstances should not delay the proper application of CEs. The analysis required to apply a CE in such circumstances is not new. This provision simply adds transparency.

*Comment*: Many commenters complained of "abuses" from the use of CEs under the 1978 regulations and expressed concern that the proliferation of pathways to promulgating new CEs will multiply these problems. One commenter warned that CEQ must ensure that each NEPA class of action is clearly defined within the scope of an agency's purview and caution is exercised if using outdated documentation or supporting material that does not meet rigorous standards.

*CEQ Response*: The provisions of §§ 1501.4(b) and 1507.3(c)(8) are designed to provide transparency to the CE development and application process and should reduce the possibility of agency abuse of CEs, *e.g.*, by crafting or applying them too broadly. CEQ disagrees that the alternative process in § 1501.4(c) for establishing CEs will exacerbate perceived CE abuse. Rather, CEQ expects this provision to lead to NEPA analyses that are both more efficient and comprehensive by encouraging agencies to conduct programmatic reviews.

*Comment*: Some commenters urged CEQ to ensure that CEs are not used to avoid or minimize public involvement or environmental analysis and requested that the rule require agencies to notify the public of a proposed use of a CE. Others suggested that CEQ adopt

302

responsibility to "assure for all Americans safe, healthful, productive, and esthetically and culturally pleasing surroundings." Some commenters encouraged CEQ to go further and require agencies to mitigate adverse impacts to communities with environmental justice concerns. Opponents of the proposed addition pointed to the Supreme Court's decision in *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332 (1989), and stated that as a procedural statute, NEPA does not empower CEQ to require agencies to adopt mitigation measures.

    *CEQ Response*: CEQ acknowledges the Supreme Court's holding in *Methow Valley* that NEPA does not require "that a complete mitigation plan be actually . . . adopted," *see* 490 U.S. at 352, and has not changed its longstanding position that "NEPA in itself does not compel the selection of a mitigated approach," *see* 2011 Mitigation Guidance, 76 FR at 3844. At the same time, as described below, CEQ has long encouraged agencies, as a policy matter, to adopt mitigation measures that will reduce the adverse environmental effects of their actions. The language in § 1505.3(b) reflects the Administration's policy goals without imposing new legal requirements on Federal agencies.

    Section 1505.3(b) does not impose any binding requirements on agencies. Rather, it codifies in the regulation CEQ's longstanding position that agencies "should," as a policy matter, mitigate significant adverse effects "where relevant and appropriate," and focuses in particular on "actions that disproportionately and adversely affect communities with environmental justice concerns." *See* § 1505.3(b); *see also* NPRM, 88 FR at 49953–54. The encouragement to agencies to mitigate disproportionate and adverse effects to communities with environmental justice concerns is grounded in NEPA, which, while not imposing a requirement to mitigate adverse effects, nonetheless does "set forth significant substantive goals for the Nation." *See Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council*, 435 U.S. 519, 558 (1978); *see also* NPRM,

AR_0028494

88 FR at 49924. Specifically, NEPA declares that the purposes of the statute are "to promote efforts which will prevent or eliminate damage to the environment and biosphere and stimulate the health and welfare of [humans]"; establishes "the continuing policy of the Federal Government" to "assure for all Americans safe, healthful, productive, and esthetically and culturally pleasing surroundings" and to "preserve important historic, cultural, and natural aspects of our national heritage"; and "recognizes that each person should enjoy a healthful environment." 42 U.S.C. 4321, 4331(a), 4331(c); *see also* NPRM, 88 FR at 49924.

CEQ's guidance has long "encourage[d] agencies to commit to mitigation to achieve environmentally preferred outcomes, particularly when addressing unavoidable adverse environmental impacts." *See* 2011 Mitigation Guidance, 76 FR at 3847.

CEQ acknowledges that the addition of § 1505.3(b) to encourage mitigation of these effects represents a different policy approach from the 2020 rule, which did not include such encouragement. However, the final rule language does not impose new legal requirements on agencies or reflect a change in CEQ's underlying views regarding the legal requirements of NEPA. Rather, the final rule reflects a return to CEQ's longstanding view that agencies should, when appropriate, "commit to mitigation to achieve environmentally preferred outcomes, particularly when addressing unavoidable adverse environmental impacts." *See* 2011 Mitigation Guidance, 76 FR at 3847.

Because CEQ recognizes that NEPA, as interpreted by the Supreme Court in *Methow Valley*, does not require "that a complete mitigation plan be actually . . . adopted," 490 U.S. at 352, CEQ declines to go further and require agencies to mitigate adverse impacts to communities with environmental justice concerns, as suggested by some commenters. For these reasons, CEQ

AR_0028495

(or even effectively restart) the process. The commenter asserted this could result in projects close to a completed NEPA review and signed ROD being severely delayed if the agency suddenly decides that CEQ's new final rule applies to the project and requires the project to publish new drafts or supplements to comply with new requirements that CEQ is only now introducing. The commenter asserted their recommendations outlined will promote efficiency, fairness, and reliance.

*CEQ Response*: CEQ did not add new requirements in proposed § 1506.13 and only proposed to modify the effective date. The final rule makes this change and redesignates 40 CFR 1506.13 (2020) as § 1506.12. Similar to the 2020 rule, this final rule will apply to any NEPA process begun after the effective date of the final rule, but a Federal agency may still apply the regulations to ongoing activities and environmental documents begun before the effective date of the final rule when it decides the purposes of NEPA are better served in doing so. CEQ declines to limit agencies' flexibility in doing so. Federal agencies have had to consider implementation of the appropriate regulation since the 2020 rule; as such, this is not a new requirement, nor does it undermine CEQ's goal of regulatory certainty and predictability.

For ongoing activities and environmental documents begun before the final rule's effective date, agencies may choose whether to apply the final rule or existing agency NEPA procedures. This choice is intended merely to provide the flexibility necessary to transitioning to the new NEPA regulations, not to slow down actions. The final rule is flexible in its application to ongoing reviews because agencies are well positioned to assess whether applying the final rule to ongoing reviews will result in a more efficient and effective process. For example, it would be more reasonable and potentially more efficient to transition an ongoing project to this final rule if an agency recently published a NOI than if the agency is close to publishing a draft EIS. CEQ

748

determination that the category of actions normally does not result in significant effects. Agencies must also address how they will consider extraordinary circumstances in applying CEs. CEQ does not consider it appropriate to specify these limitations within its regulations; rather, agencies and CEQ must consider these concerns on a case-by-case basis when substantiating and reviewing proposed new CEs.

*Comment*: Several commenters asserted that CEQ should clarify that its proposal to require agencies to substantiate new or revised CEs does not apply to existing, long-established CEs that CEQ has concluded are in conformity with the statute and regulations, and that agencies should retain discretion to determine when to substantiate existing CEs. The commenter asserted it is important to make clear that there is no immediate need to re-substantiate existing CEs or to impose an arbitrary deadline to do so.

*CEQ Response*: The final rule's requirements for establishing a new CE or revising an existing CE do not apply to an existing CE that an agency is not revising. Section 1507.3(c)(8) outlines the requirements agencies must follow when they are establishing a new CE or revising an existing CE. Section § 1507.3(c)(9) requires agencies to identify a process for periodically reviewing their existing CEs. As part of this review, if an agency determines that revisions to a CE are appropriate, then the agency would follow the requirements of § 1507.3(c)(8). The final rule does not mandate that agencies revise existing CEs, though CEQ has long encouraged agencies to evaluate their CEs and views this practice as essential to ensure that the underlying analysis and conclusions remain valid. *See* 2010 CE Guidance at 15 ("Where an agency's categorical exclusions have not been regularly reviewed, they should be reviewed by the agency as soon as possible.").

AR_0028610

provision, the final rule provides agencies discretion to tailor their NEPA procedures under § 1507.3 to provide a list of extraordinary circumstances consistent with their programs and authorities. The regulations have always required agencies to consider extraordinary circumstances when applying a CE, agencies have decades of experience analyzing proposed actions for extraordinary circumstances, and providing a definition within the regulations helps provide clarity to agencies, applicants, and the public. The list of examples in the definition is not exclusive, and agencies have discretion to determine whether inclusion of these examples in their NEPA procedures is appropriate for their particular programs and authorities. Accordingly, CEQ disagrees that the definition will lead to delay in the application of CEs.

CEQ disagrees with the commenter's assertions that the accelerating nature of climate change-related effects suggests that agencies should not consider such effects an extraordinary circumstance when substantial. In fact, the growing threat of climate change is precisely why agencies should consider such effects to be an extraordinary circumstance. To the extent the commenter is expressing concern about shifting baselines making it difficult to establish a threshold for climate change-related effects, CEQ refers commenter to the provisions of § 1507.3 requiring agencies to review their procedures on an ongoing basis and to establish a process for reviewing their CEs at least every ten years.

CEQ disagrees that the definition is inconsistent with the recent amendments to NEPA because NEPA requires agencies to conduct an EIS for actions that will have significant effects, and extraordinary circumstances are the mechanism by which an agency assesses whether a particular proposed action that is normally categorically excluded may have significant effects and, therefore, that reliance on a CE is inappropriate. As explained in other responses to comments in this section, CEQ views the extraordinary circumstances evaluation as a critical

AR_0028682

# COUNCIL ON ENVIRONMENTAL QUALITY

**40 CFR Parts 1500, 1501, 1502, 1503, 1504, 1505, 1506, 1507, and 1508**

[CEQ–2023–0003]

RIN 0331–AA07

## National Environmental Policy Act Implementing Regulations Revisions Phase 2

**AGENCY:** Council on Environmental Quality.

**ACTION:** Final rule.

---

**SUMMARY:** The Council on Environmental Quality (CEQ) is finalizing its "Bipartisan Permitting Reform Implementation Rule" to revise its regulations for implementing the procedural provisions of the National Environmental Policy Act (NEPA), including the recent amendments to NEPA in the Fiscal Responsibility Act. CEQ is making these revisions to provide for an effective environmental review process; ensure full and fair public engagement; enhance efficiency and regulatory certainty; and promote sound Federal agency decision making that is grounded in science, including consideration of relevant environmental, climate change, and environmental justice effects. These changes are grounded in NEPA's statutory text and purpose, including making decisions informed by science; CEQ's extensive experience implementing NEPA; CEQ's perspective on how NEPA can best inform agency decision making; longstanding Federal agency experience and practice; and case law interpreting NEPA's requirements.

**DATES:** The effective date is July 1, 2024.

**ADDRESSES:** CEQ established a docket for this action under docket number CEQ–2023–0003. All documents in the docket are listed on *www.regulations.gov.*

**FOR FURTHER INFORMATION CONTACT:** Amy B. Coyle, Deputy General Counsel, 202–395–5750, *Amy.B.Coyle@ceq.eop.gov;* Megan Healy, Deputy Director for NEPA, 202–395–5750, *Megan.E.Healy@ceq.eop.gov.*

**SUPPLEMENTARY INFORMATION:**

## I. Background

This final rule completes a multiphase rulemaking process that CEQ initiated in 2021 to revise its regulations to improve implementation of the National Environmental Policy Act (NEPA). Throughout the process, CEQ engaged with agency experts who implement NEPA on a daily basis to develop revisions to the regulations to enhance the clarity of the regulatory text, improve the efficiency and effectiveness of the NEPA process, enhance regulatory certainty and address potential sources of litigation risk, and promote consistency across the Federal Government while recognizing the importance of providing agencies with flexibility to tailor their NEPA processes to the specific statutes and factual contexts in which they administer their programs and decisions. CEQ also engaged with individuals affected by agency implementation of NEPA, including representatives of Tribal Nations, environmental justice experts, and representatives of various industries, to gather input on how to improve the NEPA process. CEQ proposed and is now finalizing this rule to reflect the input CEQ has received, the decades of CEQ and agency experience implementing NEPA, and the recent statutory amendments to NEPA. This final rule will help agencies more successfully implement NEPA and facilitate a more efficient and effective environmental review process.

### A. NEPA Statute

To declare an ambitious and visionary national policy to promote environmental protection for present and future generations, Congress enacted NEPA in 1969 by a unanimous vote in the Senate and a nearly unanimous vote in the House,[1] and President Nixon signed it into law on January 1, 1970. NEPA seeks to "encourage productive and enjoyable harmony" between humans and the environment, recognizing the "profound impact" of human activity and the "critical importance of restoring and maintaining environmental quality" to the overall welfare of humankind. 42 U.S.C. 4321, 4331. Furthermore, NEPA seeks to promote efforts that will prevent or eliminate damage to the environment and biosphere and stimulate the health and welfare of people, making it the continuing policy of the Federal Government to use all practicable means and measures to create and maintain conditions under which humans and nature can exist in productive harmony and fulfill the social, economic, and other requirements of present and future generations of Americans. 42 U.S.C. 4331(a). It also recognizes that each person should have the opportunity to enjoy a healthy environment and has a responsibility to contribute to the preservation and enhancement of the environment. 42 U.S.C. 4331(c).

NEPA requires Federal agencies to interpret and administer Federal policies, regulations, and laws in accordance with NEPA's policies and to consider environmental values in their decision making. 42 U.S.C. 4332. To that end, section 102(2)(C) of NEPA requires Federal agencies to prepare "detailed statement[s]," referred to as environmental impact statements (EISs), for "every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment" and, in doing so, provide opportunities for public participation to help inform agency decision making. 42 U.S.C. 4332(2)(C). The EIS process embodies the understanding that informed decisions are better decisions and lead to better environmental outcomes when decision makers understand, consider, and publicly disclose environmental effects of their decisions. The EIS process also enriches understanding of the ecological systems and natural resources important to the Nation and helps guide sound decision making based on high-quality information, such as decisions on infrastructure and energy development.[2] *See, e.g., Winter v. NRDC,* 555 U.S. 7, 23 (2008) ("Part of the harm NEPA attempts to prevent in requiring an EIS is that, without one, there may be little if any information about prospective environmental harms and potential mitigating measures.").

In many respects, NEPA was a statute ahead of its time and remains vital today. It codifies the common-sense idea of "look before you leap" to guide agency decision making, particularly in complex and consequential areas, because conducting sound environmental analysis before agencies take actions reduces conflict and waste in the long run by avoiding unnecessary harm and uninformed decisions. *See, e.g.,* 42 U.S.C. 4332; *Laclede Gas Co.* v. *FERC,* 873 F.2d 1494, 1499 (D.C. Cir. 1989) ("When so much depends upon the agency having a sure footing, it is not too much for us to demand that it look first, and then leap if it likes."). It establishes a framework for agencies to ground decisions in science, by

---

[1] *See* Linda Luther, Cong. Rsch. Serv., RL33152, The National Environmental Policy Act: Background and Implementation, 4 (2011), *https://crsreports.congress.gov/product/details?prodcode=RL33152.*

[2] *See* CEQ, *The National Environmental Policy Act: A Study of Its Effectiveness after Twenty-five Years* 17 (Jan. 1997) (noting that study participants, which included academics, nonprofit organizations, and businesses, "applauded NEPA for opening the federal process to public input and were convinced that this open process has improved project design and implementation.").

requiring professional and scientific integrity, and recognizes that the public may have important ideas and information on how Federal actions can occur in a manner that reduces potential harms and enhances ecological, social, and economic well-being. *See, e.g.,* 42 U.S.C. 4332.

On June 3, 2023, President Biden signed into law the Fiscal Responsibility Act of 2023, which included amendments to NEPA. Specifically, it amended section 102(2)(C) and added sections 102(2)(D) through (F) and sections 106 through 111. 42 U.S.C. 4332(2)(C)–(D), 4336–4336e. The amendments codify longstanding principles drawn from CEQ's NEPA regulations, decades of agency practice, and case law interpreting the NEPA regulations, and provide additional direction to improve the efficiency and effectiveness of the NEPA process consistent with NEPA's purposes. Section 102(2)(C) provides that EISs should include discussion of reasonably foreseeable environmental effects of the proposed action, reasonably foreseeable adverse environmental effects that cannot be avoided, and a reasonable range of alternatives to the proposed action; section 102(2)(D) requires Federal agencies to ensure the professional integrity of the discussion and analysis in an environmental document; section 102(2)(E) requires use of reliable data and resources when carrying out NEPA; and section 102(2)(F) requires agencies to study, develop, and describe technically and economically feasible alternatives. 42 U.S.C. 4332(2)(C)–(F).

Section 106 adds provisions for determining the appropriate level of NEPA review. It clarifies that an agency is required to prepare an environmental document when proposing to take an action that would constitute a final agency action, and codifies existing regulations and case law that an agency is not required to prepare an environmental document when doing so would clearly and fundamentally conflict with the requirements of another law or a proposed action is non-discretionary. *See Flint Ridge Development Co.* v. *Scenic Rivers Ass'n of Oklahoma,* 426 U.S. 776, 791 (1976) (holding that a 30–day statutory deadline for a certain agency action created a "clear and fundamental conflict of statutory duty" that excused the agency from NEPA compliance with regard to that action); *Dep't of Transp.* v. *Pub. Citizen,* 541 U.S. 752, 756 (2004) (concluding that NEPA did not require an agency to evaluate the environmental effects of certain actions because the agency lacked discretion over those

actions). Section 106 also largely codifies the current CEQ regulations and longstanding practice with respect to the use of categorical exclusions (CEs), environmental assessments (EAs), and EISs, as modified by the new provision expressly permitting agencies to adopt CEs from other agencies established in section 109 of NEPA. 42 U.S.C. 4336, 4336c.

Section 107 addresses timely and unified Federal reviews, largely codifying existing practice with a few adjustments, including provisions clarifying lead, joint-lead, and cooperating agency designations, generally requiring development of a single environmental document, directing agencies to develop procedures for project sponsors to prepare EAs and EISs, and prescribing page limits and deadlines. 42 U.S.C. 4336a. Section 108 codifies time lengths and circumstances for when agencies can rely on programmatic environmental documents without additional review, and section 109 allows a Federal agency to adopt and use another agency's CE. 42 U.S.C. 4336b, 4336c. Section 111 adds statutory definitions. 42 U.S.C. 4336e. This final rule updates the regulations to address how agencies should implement NEPA consistent with these recent amendments.

Section 110 directs CEQ to conduct a study and submit a report to Congress on the potential to use online and digital technologies to improve NEPA processes. The development of this report is outside the scope of this rulemaking and the final rule does not incorporate provisions related to implementation of section 110.

*B. The Council on Environmental Quality*

NEPA codified the existence of the Council on Environmental Quality (CEQ), which had been established 6 months earlier through E.O. 11472, *Establishing the Environmental Quality Council and the Citizen's Advisory Committee on Environmental Quality,* as a component of the Executive Office of the President. 42 U.S.C. 4342. For more than 50 years, CEQ has advised presidents on national environmental policy, assisted Federal agencies in their implementation of NEPA and engaged with them on myriad of environmental policies, and overseen implementation of a variety of other environmental policy initiatives from the expeditious and thorough environmental review of

infrastructure projects[3] to the sustainability of Federal operations.[4]

NEPA charges CEQ with overseeing and guiding NEPA implementation across the Federal Government. In addition to issuing the regulations for implementing NEPA, 40 CFR parts 1500 through 1508 (referred to throughout as "the CEQ regulations"), CEQ has issued guidance on numerous topics related to NEPA review. In 1981, CEQ issued the "Forty Most Asked Questions Concerning CEQ's National Environmental Policy Act Regulations,"[5] which CEQ has routinely identified as an invaluable tool for Federal, Tribal, State, and local governments and officials, and members of the public, who have questions about NEPA implementation.

CEQ also has issued guidance on a variety of other topics, from scoping to cooperating agencies to consideration of

---

[3] *See, e.g.,* E.O. 14008, *Tackling the Climate Crisis at Home and Abroad,* 86 FR 7619 (Feb. 1, 2021); E.O. 13604, *Improving Performance of Federal Permitting and Review of Infrastructure Projects,* 77 FR 18887 (Mar. 28, 2012); E.O. 13274, *Environmental Stewardship and Transportation Infrastructure Project Reviews,* 67 FR 59449 (Sept. 23, 2002); *see also* Presidential Memorandum, Modernizing Federal Infrastructure Review and Permitting Regulations, Policies, and Procedures, 78 FR 30733 (May 22, 2013).

[4] *See, e.g.,* E.O. 14057, *Catalyzing Clean Energy Industries and Jobs Through Federal Sustainability,* 86 FR 70935 (Dec. 13, 2021); E.O. 13834, *Efficient Federal Operations,* 83 FR 23771 (May 22, 2018); E.O. 13693, *Planning for Federal Sustainability in the Next Decade,* 80 FR 15871 (Mar. 25, 2015); E.O. 13514, *Federal Leadership in Environmental, Energy, and Economic Performance,* 74 FR 52117 (Oct. 8, 2009); E.O. 13423, *Strengthening Federal Environmental, Energy, and Transportation Management,* 72 FR 3919 (Jan. 26, 2007); E.O. 13101, *Greening the Government Through Waste Prevention, Recycling, and Federal Acquisition,* 63 FR 49643 (Sept. 16, 1998). For Presidential directives pertaining to other environmental initiatives, see E.O. 13432, *Cooperation Among Agencies in Protecting the Environment With Respect to Greenhouse Gas Emissions From Motor Vehicles, Nonroad Vehicles, and Nonroad Engines,* 72 FR 27717 (May 16, 2007) (requiring CEQ and OMB to implement the E.O. and facilitate Federal agency cooperation to reduce greenhouse gas emissions); E.O. 13141, *Environmental Review of Trade Agreements,* 64 FR 63169 (Nov. 18, 1999) (requiring CEQ and the U.S. Trade Representative to implement the E.O., which has the purpose of promoting Trade agreements that contribute to sustainable development); E.O. 13061, *Federal Support of Community Efforts Along American Heritage Rivers,* 62 FR 48445 (Sept. 15, 1997) (charging CEQ with implementing the American Heritage Rivers initiative); E.O. 13547, *Stewardship of the Ocean, Our Coasts, and the Great Lakes,* 75 FR 43023 (July 22, 2010) (directing CEQ to lead the National Ocean Council); E.O. 13112, *Invasive Species,* 64 FR 6183 (Feb. 8, 1999) (requiring the Invasive Species Council to consult with CEQ to develop guidance to Federal agencies under NEPA on prevention and control of invasive species).

[5] CEQ, Forty Most Asked Questions Concerning CEQ's National Environmental Policy Act Regulations, 46 FR 18026 (Mar. 23, 1981) (Forty Questions), *https://www.energy.gov/nepa/downloads/forty-most-asked-questions-concerning-ceqs-national-environmental-policy-act.*

**35444**    **Federal Register** / Vol. 89, No. 85 / Wednesday, May 1, 2024 / Rules and Regulations

effects.[6] For example, in 1997, CEQ issued guidance documents on the consideration of environmental justice in the NEPA context[7] under E.O. 12898, *Federal Actions to Address Environmental Justice in Minority Populations and Low-Income Populations,*[8] and on analysis of cumulative effects in NEPA reviews.[9] From 2010 to the present, CEQ developed additional guidance on CEs, mitigation, programmatic reviews, and consideration of greenhouse gas (GHG) emissions in NEPA.[10] To ensure coordinated environmental reviews,

CEQ has issued guidance to integrate NEPA reviews with other environmental review requirements such as the National Historic Preservation Act, E.O. 11988, *Floodplain Management,* and E.O. 11990, *Protection of Wetlands.*[11] Additionally, CEQ has provided guidance to ensure efficient and effective environmental reviews, particularly for infrastructure projects.[12] Finally, CEQ has published resources for members of the public to assist them in understanding the NEPA process and how they can effectively engage in agency NEPA reviews to make sure their voices are heard.[13]

In addition to guidance, CEQ engages frequently with Federal agencies on their implementation of NEPA. CEQ is responsible for consulting with all agencies on the development of their NEPA implementing procedures and determining that those procedures conform with NEPA and the CEQ regulations. Through this process, CEQ engages with agencies to understand their specific authorities and programs to ensure agencies integrate consideration of environmental effects into their decision-making processes. CEQ also provides feedback and advice on how agencies may effectively implement NEPA through their procedures. Additionally, CEQ provides recommendations on how agencies can coordinate on or align their respective procedures to ensure consistent implementation of NEPA across

agencies. This role is particularly important in situations where multiple agencies and applicants are regularly involved, such as the review of infrastructure projects.

Second, CEQ consults with agencies on the efficacy and effectiveness of NEPA implementation. Where necessary or appropriate, CEQ engages with agencies on NEPA reviews for specific projects or project types to provide advice and identify any emerging or cross-cutting issues that would benefit from CEQ issuing formal guidance or assisting with interagency coordination. This includes establishing alternative arrangements for compliance with NEPA when agencies encounter emergency situations where they need to act swiftly while also ensuring they meet their NEPA obligations. CEQ also advises on NEPA compliance when agencies are establishing new programs or implementing new statutory authorities. Finally, CEQ helps advance the environmental review process for projects or initiatives deemed important to an administration such as nationally and regionally significant projects, major infrastructure projects, and consideration of certain types of effects, such as climate change-related effects and effects on communities with environmental justice concerns.[14]

Third, CEQ meets regularly with external stakeholders to understand their perspectives on the NEPA process. These meetings can help inform CEQ's development of guidance or other initiatives and engagement with Federal agencies. Finally, CEQ coordinates with other Federal agencies and components of the White House on a wide array of environmental issues and reviews that intersect with the NEPA process, such as Endangered Species Act consultation or effects to Federal lands and waters from federally authorized activities.

In addition to its NEPA responsibilities, CEQ is currently charged with implementing several of the administration's key environmental priorities, including efficient and effective environmental review and permitting. On January 27, 2021, the President signed E.O. 14008, *Tackling the Climate Crisis at Home and Abroad,* to establish a government-wide approach to the climate crisis by

---

[6] *See, e.g.,* CEQ, Memorandum for General Counsels, NEPA Liaisons and Participants in Scoping (Apr. 30, 1981), *https://www.energy.gov/ nepa/downloads/scoping-guidance-memorandum-general-counsels-nepa-liaisons-and-participants-scoping;* CEQ, Incorporating Biodiversity Considerations into Environmental Impact Analysis Under the National Environmental Policy Act (Jan. 1993), *https://ceq.doe.gov/publications/ incorporating_biodiversity.html;* CEQ, Council on Environmental Quality Guidance on NEPA Analyses for Transboundary Impacts (July 1,1997), *https://ceq.doe.gov/docs/ceq-regulations-and-guidance/memorandum-transboundary-impacts-070197.pdf;* CEQ, Designation of Non-Federal Agencies to be Cooperating Agencies in Implementing the Procedural Requirements of the National Environmental Policy Act (July 28, 1999), *https://ceq.doe.gov/docs/ceq-regulations-and-guidance/regs/ceqcoop.pdf;* CEQ, Identifying Non-Federal Cooperating Agencies in Implementing the Procedural Requirements of the National Environmental Policy Act (Sept. 25, 2000), *https:// ceq.doe.gov/docs/ceq-regulations-and-guidance/ memo-non-federal-cooperating-agencies-09252000.pdf;* CEQ & DOT Letters on Lead and Cooperating Agency Purpose and Need (May 12, 2003), *https://ceq.doe.gov/docs/ceq-regulations-and-guidance/CEQ-DOT_PurposeNeed_May-2013.pdf.*

[7] CEQ, Environmental Justice: Guidance under the National Environmental Policy Act (Dec. 10, 1997) (Environmental Justice Guidance), *https:// ceq.doe.gov/docs/ceq-regulations-and-guidance/ regs/ej/justice.pdf.*

[8] E.O. 12898, *Federal Actions To Address Environmental Justice in Minority Populations and Low-Income Populations,* 59 FR 7629 (Feb. 16, 1994).

[9] CEQ, Considering Cumulative Effects Under the National Environmental Policy Act (Jan. 1997), *https://ceq.doe.gov/publications/cumulative_ effects.html; see also* CEQ, Guidance on the Consideration of Past Actions in Cumulative Effects Analysis (June 24, 2005), *https://www.energy.gov/ sites/default/files/nepapub/nepa_documents/ RedDont/G-CEQ-PastActsCumulEffects.pdf.*

[10] CEQ, Establishing, Applying, and Revising Categorical Exclusions under the National Environmental Policy Act (Nov. 23, 2010) (CE Guidance), *https://ceq.doe.gov/docs/ceq-regulations-and-guidance/NEPA_CE_Guidance_ Nov232010.pdf;* CEQ, Final Guidance for Federal Departments and Agencies on the Appropriate Use of Mitigation and Monitoring and Clarifying the Appropriate Use of Mitigated Findings of No Significant Impact, 76 FR 3843 (Jan. 21, 2011) (Mitigation Guidance), *https://ceq.doe.gov/docs/ ceq-regulations-and-guidance/Mitigation_and_ Monitoring_Guidance_14Jan2011.pdf;* CEQ, National Environmental Policy Act Guidance on Consideration of Greenhouse Gas Emissions and Climate Change, 88 FR 1196 (Jan. 9, 2023) (2023 GHG Guidance), *https://ceq.doe.gov/guidance/ceq_ guidance_nepa-ghg.html.*

[11] CEQ, Implementation of Executive Order 11988 on Floodplain Management and Executive Order 11990 on Protection of Wetlands (Mar. 21, 1978), *https://ceq.doe.gov/docs/ceq-regulations-and-guidance/Memorandum-Implementation-of-E.O.-11988-and-E.O.-11990-032178.pdf;* CEQ & Advisory Council on Historic Preservation, NEPA and NHPA: A Handbook for Integrating NEPA and Section 106 (Mar. 2013), *https://ceq.doe.gov/docs/ceq-publications/NEPA_NHPA_Section_106_ Handbook_Mar2013.pdf.*

[12] *See, e.g.,* CEQ, Final Guidance on Improving the Process for Preparing Efficient and Timely Environmental Reviews Under the National Environmental Policy Act, 77 FR 14473 (Mar. 12, 2012), *https://ceq.doe.gov/docs/ceq-regulations-and-guidance/Improving_NEPA_Efficiencies_ 06Mar2012.pdf;* CEQ, Effective Use of Programmatic NEPA Reviews (Dec. 18, 2014) (Programmatic Guidance), *https://www.energy.gov/sites/default/ files/2016/05/f31/effective_use_of_programmatic_ nepa_reviews_18dec2014.pdf;* OMB & CEQ, M–15– 20, Guidance Establishing Metrics for the Permitting and Environmental Review of Infrastructure Projects (Sept. 22, 2015), *https:// www.whitehouse.gov/wp-content/uploads/legacy_ drupal_files/omb/memoranda/2015/m-15-20.pdf;* OMB & CEQ, M–17–14, Guidance to Federal Agencies Regarding the Environmental Review and Authorization Process for Infrastructure Projects (Jan. 13, 2017), *https://www.whitehouse.gov/wp-content/uploads/legacy_drupal_files/omb/ memoranda/2017/m-17-14.pdf.*

[13] CEQ, *A Citizen's Guide to the National Environmental Policy Act; Having Your Voice Heard* (Jan. 2021), *https://ceq.doe.gov/get-involved/ citizens_guide_to_nepa.html.*

[14] *See, e.g.,* Presidential Memorandum, *Speeding Infrastructure Development Through More Efficient and Effective Permitting and Environmental Review* (Aug. 31, 2011), *https://obamawhitehouse. archives.gov/the-press-office/2011/08/31/ presidential-memorandum-speeding-infrastructure-development-through-more;* E.O. 13807, *Establishing Discipline and Accountability in the Environmental Review and Permitting Process for Infrastructure Projects,* 82 FR 40463 (Aug. 24, 2017).

reducing GHG emissions across the economy; increasing resilience to climate change-related effects; conserving land, water, and biodiversity; transitioning to a clean-energy economy; and advancing environmental justice, including delivering the benefits of Federal investments to disadvantaged communities.[15] CEQ is leading the President's efforts to secure environmental justice consistent with sections 219 through 223 of the E.O. For example, CEQ has developed the Climate and Economic Justice Screening Tool,[16] and collaborates with the Office of Management and Budget (OMB) and the National Climate Advisor on implementing the Justice40 initiative, which sets a goal that 40 percent of the overall benefits of certain Federal investments flow to disadvantaged communities.[17]

Section 205 of the E.O. also charged CEQ with developing the Federal Sustainability Plan to achieve a carbon pollution-free electricity sector and clean and zero-emission vehicle fleets. Thereafter, CEQ issued the Federal Sustainability Plan,[18] which accompanied E.O. 14057, *Catalyzing Clean Energy Industries and Jobs Through Federal Sustainability.*[19] CEQ is leading the efforts with its agency partners to implement E.O. 14057's ambitious goals, which include reducing Federal agency GHG emissions by 65 percent and improving the climate resilience of Federal infrastructure and operations. CEQ also is collaborating with the Departments of the Interior, Agriculture, and Commerce on the implementation of the America the Beautiful Initiative, which was issued to achieve the goal of conserving at least 30 percent of our lands and waters by 2030 as set forth in E.O. 14008.[20] Additionally, E.O. 14008 requires the Chair of CEQ and the Director of OMB to ensure that Federal permitting decisions consider the effects of GHG emissions and climate change.[21]

CEQ is also instrumental to the President's efforts to institute a government-wide approach to advancing environmental justice. On April 21, 2023, the President signed E.O. 14096, *Revitalizing Our Nation's Commitment to Environmental Justice for All,* to further embed environmental justice into the work of Federal agencies and ensure that all people can benefit from the vital safeguards enshrined in the Nation's foundational environmental and civil rights laws.[22] The E.O. charges each agency to make achieving environmental justice part of its mission consistent with the agency's statutory authority,[23] and requires each agency to submit to the Chair of CEQ and make publicly available an Environmental Justice Strategic Plan setting forth the agency's goals and plans for advancing environmental justice.[24] Further, section 8 of the E.O. establishes a White House Office of Environmental Justice within CEQ.

Additionally, CEQ plays a significant role in improving interagency coordination and providing for efficient environmental reviews and permitting under the Biden-Harris Permitting Action Plan.[25] The Action Plan outlines the Administration's strategy for ensuring that Federal environmental reviews and permitting processes are effective, efficient, and transparent, guided by the best available science to promote positive environmental and community outcomes, and shaped by early and meaningful public engagement. The Action Plan contains five key elements that build on strengthened Federal approaches to environmental reviews and permitting: (1) accelerating permitting through early cross-agency coordination to appropriately scope reviews, reduce bottlenecks, and use the expertise of sector-specific teams; (2) establishing

clear timeline goals and tracking key project information to improve transparency and accountability, providing increased certainty for project sponsors and the public; (3) engaging in early and meaningful outreach and communication with Tribal Nations, States, Territories, and local communities; (4) improving agency responsiveness, technical assistance, and support to navigate the environmental review and permitting process effectively and efficiently; and (5) adequately resourcing agencies and using the environmental review process to improve environmental and community outcomes.

Finally, CEQ is staffed with experts with decades of NEPA experience as well as other environmental law and policy experience. As part of CEQ's broader environmental policy role, CEQ advises the President on environmental issues facing the nation, and on the design and implementation of the President's environmental initiatives. In that role, CEQ collaborates with agencies and provides feedback on their implementation of the numerous environmental statutes and directives. CEQ's diverse array of responsibilities and expertise has long influenced the implementation of NEPA, and CEQ relied extensively on this experience in developing this rulemaking.

*C. NEPA Implementation 1970–2019*

Following shortly after the enactment of NEPA, President Nixon issued E.O. 11514, *Protection and Enhancement of Environmental Quality,* directing CEQ to issue guidelines for implementation of section 102(2)(C) of NEPA.[26] In response, CEQ in April 1970 issued interim guidelines, which addressed the provisions of section 102(2)(C) of the Act regarding EIS requirements.[27] CEQ revised the guidelines in 1971 and 1973 to address public involvement and introduce the concepts of EAs and draft and final EISs.[28]

In 1977, President Carter issued E.O. 11991, *Relating to Protection and Enhancement of Environmental Quality,* amending E.O. 11514 and directing CEQ to issue regulations for implementation

---

[15] E.O. 14008, *supra* note 3.

[16] CEQ, *Explore the Map,* Climate and Economic Justice Screening Tool, *https://screeningtool.geoplatform.gov/.*

[17] E.O. 14008, *supra* note 3, sec. 223.

[18] CEQ, *Federal Sustainability Plan* (Dec. 2021), *https://www.sustainability.gov/federalsustainabilityplan/.*

[19] E.O. 14057, *supra* note 4.

[20] E.O. 14008, *supra* note 3.

[21] *Id.* at sec. 213(a); *see also id.,* sec. 219 (directing agencies to "make achieving environmental justice part of their missions by developing programs, policies, and activities to address the disproportionately high and adverse human health, environmental, climate-related and other cumulative impacts on disadvantaged communities").

[22] E.O. 14096, *Revitalizing Our Nation's Commitment to Environmental Justice for All,* 88 FR 25251 (Apr. 26, 2023). E.O. 14096 builds upon efforts to advance environmental justice and equity consistent with the policy advanced in documents including E.O. 13985, E.O. 14091, and E.O. 14008, and supplements the foundational efforts of E.O. 12898 to deliver environmental justice to communities across America. *See* E.O. 13985, *Advancing Racial Equity and Support for Underserved Communities Through the Federal Government,* 86 FR 7009 (Jan. 25, 2021); E.O. 14091, *Further Advancing Racial Equity and Support for Underserved Communities Through the Federal Government,* 88 FR 10825 (Feb. 22, 2023); E.O. 14008, *supra* note 3; E.O. 12898, *supra* note 8.

[23] E.O. 14096, *supra* note 22, sec. 3.

[24] *Id.* at sec. 4.

[25] The Biden-Harris Permitting Action Plan to Rebuild America's Infrastructure, Accelerate the Clean Energy Transition, Revitalize Communities, and Create Jobs (May 22, 2022), *https://www.whitehouse.gov/wp-content/uploads/2022/05/Biden-Harris-Permitting-Action-Plan.pdf.*

[26] E.O. 11514, *Protection and Enhancement of Environmental Quality,* 35 FR 4247 (Mar. 7, 1970), sec. 3(h).

[27] *See* CEQ, Statements on Proposed Federal Actions Affecting the Environment, 35 FR 7390 (May 12, 1970) (interim guidelines).

[28] CEQ, Statements on Proposed Federal Actions Affecting the Environment, 36 FR 7724 (Apr. 23, 1971) (final guidelines); CEQ, Preparation of Environmental Impact Statements, 38 FR 10856 (May 2, 1973) (proposed revisions to the guidelines); CEQ, Preparation of Environmental Impact Statements: Guidelines, 38 FR 20550 (Aug. 1, 1973) (revised guidelines).

**35446**    **Federal Register** / Vol. 89, No. 85 / Wednesday, May 1, 2024 / Rules and Regulations

of section 102(2)(C) of NEPA and requiring that Federal agencies comply with those regulations.[29] CEQ promulgated its NEPA regulations in 1978.[30] Issued 8 years after NEPA's enactment, the NEPA regulations reflected CEQ's interpretation of the statutory text and Congressional intent, expertise developed through issuing and revising the CEQ guidelines and advising Federal agencies on their implementation of NEPA, initial interpretations of the courts, and Federal agency experience implementing NEPA. The 1978 regulations reflected the fundamental principles of informed and science-based decision making, transparency, and public engagement that Congress established in NEPA. The regulations further required agency-level implementation, directing Federal agencies to issue and periodically update agency-specific implementing procedures to supplement CEQ's procedures and integrate the NEPA process into the agencies' specific programs and processes. Consistent with 42 U.S.C. 4332(2)(B), the regulations also required agencies to consult with CEQ in the development or update of these agency-specific procedures to ensure consistency with CEQ's regulations.

CEQ made typographical amendments to the 1978 implementing regulations in 1979[31] and amended one provision in 1986 (CEQ refers to these regulations, as amended, as the "1978 regulations" in this preamble).[32] Otherwise, CEQ left the regulations unchanged for over 40 years. As a result, CEQ and Federal agencies developed extensive experience implementing the 1978 regulations, and a large body of agency practice and case law developed based on them. *See, e.g., Robertson v. Methow Valley Citizens Council,* 490 U.S. 332, 355 (1989) ("CEQ regulations are entitled to substantial deference."); *Wild Va. v. Council on Env't Quality,* 56 F.4th 281, 288 (4th Cir. 2022) (noting that prior to the 2020 rule, CEQ's NEPA regulations "had remained virtually unchanged since 1978.")

## D. 2020 Amendments to the CEQ Regulations

On August 15, 2017, President Trump issued E.O. 13807, *Establishing Discipline and Accountability in the Environmental Review and Permitting Process for Infrastructure Projects,*[33] which directed CEQ to establish and lead an interagency working group to identify and propose changes to the NEPA regulations.[34] In response, CEQ issued an advance notice of proposed rulemaking (ANPRM) on June 20, 2018,[35] and a notice of proposed rulemaking (NPRM) on January 10, 2020, proposing broad revisions to the 1978 regulations.[36] A wide range of stakeholders submitted more than 12,500 comments on the ANPRM[37] and 1.1 million comments on the proposed rule,[38] including from State and local governments, Tribes, environmental advocacy organizations, professional and industry associations, other advocacy or non-profit organizations, businesses, and private citizens. Many commenters provided detailed feedback on the legality, policy wisdom, and potential consequences of the proposed amendments. In keeping with the proposed rule, the final rule, promulgated on July 16, 2020 (2020 regulations or 2020 rule), made wholesale revisions to the regulations; it took effect on September 14, 2020.[39]

In the months following the issuance of the 2020 rule, five lawsuits were filed challenging the 2020 rule.[40]

These cases challenge the 2020 rule on a variety of grounds, including under the Administrative Procedure Act (APA), NEPA, and the Endangered Species Act, and contend that the rule exceeded CEQ's authority and that the related rulemaking process was procedurally and substantively defective. The district courts issued temporary stays in each of these cases, except for *Wild Virginia v. Council on Environmental Quality,* which the district court dismissed without prejudice on June 21, 2021.[41] The Fourth Circuit affirmed that dismissal on December 22, 2022.[42]

## E. CEQ's Review of the 2020 Regulations

On January 20, 2021, President Biden issued E.O. 13990, *Protecting Public Health and the Environment and Restoring Science To Tackle the Climate Crisis,*[43] to establish an administration policy to listen to the science; improve public health and protect our environment; ensure access to clean air and water; limit exposure to dangerous chemicals and pesticides; hold polluters accountable, including those who disproportionately harm communities of color and low-income communities; reduce GHG emissions; bolster resilience to the impacts of climate change; restore and expand the Nation's treasures and monuments; and prioritize both environmental justice and the creation of well-paying union jobs necessary to achieve these goals.[44] The Executive Order calls for Federal agencies to review existing regulations issued between January 20, 2017, and January 20, 2021, for consistency with the policy it articulates and to take appropriate action.[45] The Executive Order also revokes E.O. 13807 and directs agencies to take steps to rescind any rules or regulations implementing it.[46] An accompanying White House fact sheet, published on January 20, 2021, specifically identified the 2020 regulations for CEQ's review for consistency with E.O. 13990's policy.[47]

---

[29] E.O. 11991, *Relating to Protection and Enhancement of Environmental Quality,* 42 FR 26967 (May 25, 1977).

[30] CEQ, Implementation of Procedural Provisions; Final Regulations, 43 FR 55978 (Nov. 29, 1978).

[31] CEQ, Implementation of Procedural Provisions; Corrections, 44 FR 873 (Jan. 3, 1979).

[32] CEQ, National Environmental Policy Act Regulations; Incomplete or Unavailable Information, 51 FR 15618 (Apr. 25, 1986) (amending 40 CFR 1502.22).

[33] E.O. 13807, *supra* note 14.

[34] *Id.* at sec. 5(e)(iii).

[35] CEQ, Update to the Regulations for Implementing the Procedural Provisions of the National Environmental Policy Act, 83 FR 28591 (June 20, 2018).

[36] CEQ, Update to the Regulations Implementing the Procedural Provisions of the National Environmental Policy Act, 85 FR 1684 (Jan. 10, 2020).

[37] *See* Docket No. CEQ–2018–0001, *Update to Regulations for Implementing the Procedural Provisions of the National Environmental Policy Act, https://www.regulations.gov/document/CEQ-2018-0001-0001.*

[38] *See* Docket No. CEQ–2019–0003, *Update to the Regulations for Implementing the Procedural Provisions of the National Environmental Policy Act, https://www.regulations.gov/document/CEQ-2019-0003-0001.*

[39] CEQ, Update to the Regulations Implementing the Procedural Provisions of the National Environmental Policy Act, 85 FR 43304 (July 16, 2020) (2020 Final Rule).

[40] *Wild Va. v. Council on Env't Quality,* No. 3:20cv45 (W.D. Va. 2020); *Env't Justice Health All. v. Council on Env't Quality,* No. 1:20cv06143 (S.D.N.Y. 2020); *Alaska Cmty. Action v. Council on Env't Quality,* No. 3:20cv5199 (N.D. Cal. 2020); *California v. Council on Env't Quality,* No. 3:20cv06057 (N.D. Cal. 2020); *Iowa Citizens for Cmty. Improvement v. Council on Env't Quality,* No. 1:20cv02715 (D.D.C. 2020). Additionally, in *Clinch Coalition v. U.S. Forest Serv.,* No. 2:21cv00003 (W.D. Va. 2021), plaintiffs challenged the U.S.

Forest Service's NEPA implementing procedures, which established new CEs, and, relatedly, the 2020 rule's provisions on CEs.

[41] *Wild Va. v. Council on Env't Quality,* 544 F. Supp. 3d 620 (W.D. Va. 2021).

[42] *Wild Va. v. Council on Env't Quality,* 56 F.4th 281 (4th Cir. 2022).

[43] E.O. 13990, *Protecting Public Health and Environment and Restoring Science To Tackle the Climate Crisis,* 86 FR 7037 (Jan. 25, 2021).

[44] *Id.* at sec. 1.

[45] *Id.* at sec. 2.

[46] *Id.* at sec. 7.

[47] The White House, Fact Sheet: List of Agency Actions for Review (Jan. 20, 2021), *https:// www.whitehouse.gov/briefing-room/statements-releases/2021/01/20/fact-sheet-list-of-agency-actions-for-review/.*

Consistent with E.O. 13990 and E.O. 14008, CEQ has reviewed the 2020 regulations and engaged in a multi-phase rulemaking process to ensure that the NEPA implementing regulations provide for sound and efficient environmental review of Federal actions, including those actions integral to tackling the climate crisis, in a manner that enables meaningful public participation, provides for an expeditious process, discloses climate change-related effects, advances environmental justice, respects Tribal sovereignty, protects our Nation's resources, and promotes better and more equitable environmental and community outcomes.

On June 29, 2021, CEQ issued an interim final rule to amend the requirement in 40 CFR 1507.3(b) (2020)[48] that agencies propose changes to existing agency-specific NEPA procedures to make those procedures consistent with the 2020 regulations by September 14, 2021.[49] CEQ extended the date by 2 years to avoid agencies proposing changes to agency-specific implementing procedures on a tight deadline to conform to regulations that were undergoing extensive review and would likely change in the near future.

Next, on October 7, 2021, CEQ issued a "Phase 1" proposed rule to focus on a discrete set of provisions designed to restore three elements of the 1978 regulations, which CEQ finalized on April 20, 2022.[50] First, the Phase 1 rule revised 40 CFR 1502.13 (2020), with a conforming edit to 40 CFR 1508.1(z) (2020), to clarify that agencies have discretion to consider a variety of factors when assessing an application for authorization by removing a requirement that an agency base the purpose and need on the goals of an applicant and the agency's statutory authority. Second, CEQ removed language in 40 CFR 1507.3 (2020) that could be construed to limit agencies' flexibility to develop or revise procedures to implement NEPA specific to their programs and functions that may go beyond CEQ's regulatory requirements. Finally, CEQ revised the

definition of "effects" in 40 CFR 1508.1(g) (2020) to restore the substance of the definitions of "effects" and "cumulative impacts" contained in the 1978 regulations.

On July 31, 2023, CEQ published the Phase 2 notice of proposed rulemaking (proposed rule or NPRM), initiating a broader rulemaking to revise, update, and modernize the NEPA implementing regulations.[51] Informed by CEQ's extensive experience implementing NEPA, public and agency input, and Congress's amendments to NEPA, CEQ proposed further revisions to improve the efficiency and effectiveness of environmental reviews; ensure that environmental reviews are guided by science and are consistent with the statute's text and purpose; enhance clarity and certainty for Federal agencies, project proponents, and the public; enable full and fair public participation and a process that informs the public about the potential environmental effects of agency actions; and ultimately promote better informed Federal decisions that protect and enhance the quality of the human environment, including by ensuring climate change, environmental justice, and other environmental issues are fully accounted for in agencies' decision-making processes.

Publication of the proposed rule initiated a 60–day public comment period that concluded on September 29, 2023. CEQ held four virtual public meetings on the proposed rule on August 26, 2023; August 30, 2023; September 11, 2023; and September 21, 2023, as well as two Tribal consultations on September 6, 2023, and September 12, 2023. CEQ received approximately 147,963 written comments and 86 oral comments in response to the proposed rule and considered these 148,049 comments in the development of this final rule. A majority of the comments (approximately 147,082) were campaign form letters sent in response to an organized initiative and are identical or very similar in form and content. CEQ received approximately 920 unique public comments, of which 540 were substantive comments on a variety of aspects of the rulemaking approach and contents of the proposed rule.

The majority of the unique comments expressed overall or conditional support for the proposed rule. CEQ provides a summary of the comments received on the proposed rule and responses to those comment summaries in the

document, "National Environmental Policy Act Implementing Regulations Revision Phase 2 Response to Comments" (Phase 2 Response to Comments). Additionally, CEQ provides brief comment summaries and responses for many of the substantive comments it received as part of the summary and rationale for the final rule in section II.

As discussed in section I.B, CEQ relies on its extensive experience overseeing and implementing NEPA in the development of this rule. CEQ has over 50 years of experience advising Federal agencies on the implementation of NEPA and is staffed by NEPA practitioners who have decades of experience implementing NEPA at agencies across the Federal Government as well as from outside the government, including State governments and applicants whose activities require Federal action. CEQ collaborates daily with Federal agencies on specific NEPA reviews, provides government-wide guidance on NEPA implementation, including the recent NEPA amendments, consults with agencies on the development of agency-specific NEPA implementing procedures and determines whether the procedures conform with NEPA and the CEQ regulations, and advises the President on a vast array of environmental issues. This experience also enables CEQ to contextualize the patchwork of fact-specific judicial decisions that have evolved under NEPA. This rulemaking seeks to bring clarity and predictability to Federal agencies and outside parties whose activities require Federal action and therefore trigger NEPA review, while also facilitating better environmental and social outcomes due to informed decision making.

## II. Summary of and Rationale for the Final Rule

This section summarizes the changes CEQ proposed to its NEPA implementing regulations in the notice of proposed rulemaking (NPRM or proposed rule), the public comments CEQ received on those proposed changes, a description of the revisions made through this final rule, and the rationale for those changes. CEQ's revisions fall into five general categories. First, CEQ makes revisions to the regulations to implement the amendments to NEPA made by the Fiscal Responsibility Act. Second, CEQ amends the regulations to enhance consistency and clarity. Third, CEQ revises the regulations based on decades of CEQ and agency experience implementing and complying with NEPA to improve the efficiency and

[48] In the preamble, CEQ uses the section symbol (§) to refer to the proposed or final regulations; 40 CFR 150X.X (2020) or (2022) to refer to the current CEQ regulations as set forth in 40 CFR parts 1500–1508, which this Final Rule amends; and 40 CFR 150X.X (2019) to refer to the CEQ regulations as they existed prior to the 2020 rule.

[49] CEQ, Deadline for Agencies to Propose Updates to National Environmental Policy Act Procedures, 86 FR 34154 (June 29, 2021).

[50] CEQ, National Environmental Policy Act Implementing Regulations Revisions, 86 FR 55757 (Oct. 7, 2021) (Phase 1 proposed rule); CEQ, National Environmental Policy Act Implementing Regulations Revisions, 87 FR 23453 (Apr. 20, 2022) (Phase 1 Final Rule).

[51] CEQ, National Environmental Policy Act Implementing Regulations Revision Phase 2, 88 FR 49924 (July 31, 2023) (Phase 2 proposed rule).

**35448** **Federal Register** / Vol. 89, No. 85 / Wednesday, May 1, 2024 / Rules and Regulations

effectiveness of the environmental review process, foster science-based decision making, better effectuate NEPA's statutory purposes, and reflect developments in case law. Fourth, CEQ reverts to and revises for clarity certain language from the 1978 regulations, which were in effect for more than 40 years before the 2020 rule revised them, where CEQ determined the 1978 language provides clearer and more effective and predictable direction or guidance to implement NEPA. Fifth, CEQ removes certain provisions added by the 2020 rule that CEQ considers imprudent or legally unsettled, or that create uncertainty or ambiguity that could reduce efficiency or increase the risk of litigation. Outside of those revisions, CEQ retains many of the changes made in the 2020 rulemaking, including changes that codified longstanding practice or guidance or enhanced the efficiency and effectiveness of the NEPA process. For example, CEQ identified for retention the inclusion of Tribal interests throughout the regulations, the integration of mechanisms to facilitate better interagency cooperation, and the reorganization and modernization of provisions addressing certain elements of the process to make the regulations easier to understand and follow. CEQ considers it important that the regulations meet current goals and objectives, including to promote the development of NEPA documents that are concise but also include the information needed to inform decision makers and reflect public input.

In response to the Phase 1 proposed rule, CEQ received many comments on provisions not addressed in Phase 1. CEQ indicated in the Phase 1 Final Rule that it would consider such comments during the development of this Phase 2 rulemaking. CEQ has done so, and where applicable, this final rule provides a high-level summary of the important issues raised in those public comments. Where CEQ has retained provisions as finalized in the Phase 1 rulemaking, CEQ incorporates by reference the discussion of those provisions in the Phase 1 proposed and final rule, as well as the Phase 1 Response to Comments.[52] CEQ is revising and republishing the entirety of the NEPA regulations, Subpart A of Chapter V, Title 40 of the Code of Federal Regulations.[53]

*A. Changes Throughout Parts 1500–1508*

In the NPRM, CEQ proposed several revisions throughout parts 1500 through 1508 to provide consistency, improve clarity, and correct grammatical errors. CEQ proposed clarifying edits because unclear language can create confusion and undermine consistent implementation, thereby improving the efficiency of the NEPA process and reducing the risk of litigation.

For these reasons, CEQ proposed to change the word "impact" to "effect" throughout the regulations where this term is used as a noun because these two words are synonymous, with three exceptions. The regulations would continue to refer to a finding of no significant impact (FONSI) because that term has been widely used and recognized and making the substitution of effect for impact in that instance could create confusion rather than add clarity, and environmental impact statement because this term is used in the NEPA statute. Third, CEQ proposed to use "cumulative impact" in the definition of "environmental justice" as discussed further in section II.J.9. CEQ makes these change in the final rule as proposed.

Also, to enhance clarity, CEQ proposed to use the word "significant" only to modify the term "effects" throughout the regulations. Accordingly, where "significant" modifies a word other than "effects," CEQ proposed to replace "significant" with another synonymous adjective, typically "important" or "substantial," which have also been used in varying provisions throughout the CEQ regulations since 1978. CEQ proposed this change to avoid confusion about what "significant" means in these other contexts without substantively changing any of the provisions so revised.

CEQ proposed this change based on public comments and agency feedback on the Phase 1 rulemaking that use of the word "significant" in phrases such as "significant issues" or "significant actions" creates confusion on what the word "significant" means.[54] CEQ also proposed the change to align with the definition of "significant effects" in

§ 1508.1(mm), as discussed in section II.J.24.

One commenter supported the use of "important" in place of "significant," asserting that the change will reduce unnecessary confusion and delays because use of consistent terminology will eliminate ambiguity and increase consistency and will speed up future reviews because all parties will understand what is meant by a term. A few other commenters supported the changes in terms generally, saying that the changes help make the NEPA regulations easier to understand.

A separate commenter supported the use of the term "important" arguing that it would broaden the scope of what agencies should consider under NEPA. The commenter described significance, in the context of NEPA, as a high bar, and agreed with CEQ that important issues should also be subject to thorough consideration in environmental reviews.

Multiple commenters disagreed with the proposed use of "important" in place of "significant" or "unimportant" in place of "insignificant." These commenters expressed concern about the interpretation of "important" without a definition or additional guidance, and that the use of these adjectives could cause confusion and increase litigation risk. A few commenters requested that the final rule replace "issues" with "effects" and change "important issues" to "significant effects" asserting that the phrase "important issues" is subjective. One commenter stated that while CEQ described the changes as minor, these terms are well understood by courts and agencies and as such changing them will result in numerous updates of related procedures, regulations, and guidance documents that use these terms just for editorial purposes.

Another commenter expressed concern that replacing the word "significant" with another adjective is unnecessary, and points to CEQ's own description in the NPRM that it does not intend to "substantively change the meaning of the provisions" and suggesting the replacement words will be synonymous. The commenter further asserted that it will be difficult to ensure consistency of implementation if CEQ continually changes language that has no substantive effect on the regulations.

A separate commenter asserted that while they appreciated the return of the definition of "significance," the use of the new term "important" is confusing. The commenter further stated that with the heightened focus on environmental justice, human health, and social or societal effects, it is unclear what is

---

[52] CEQ, Phase 1 proposed rule, *supra* note 50; CEQ, Phase 1 Final Rule, *supra* note 50; CEQ, National Environmental Policy Act Implementing Regulations Revision Phase 1 Response to Comments (Apr. 2022) (Phase 1 Response to Comments), *https://www.regulations.gov/document/CEQ-2021-0002-39427.*

[53] Consistent with guidance from the Office of **Federal Register**, republishing the provisions that are unchanged in this rulemaking provides context for the revisions. *See* Office of the Federal Register, Amendatory Instruction: Revise and Republish, *https://www.archives.gov/federal-register/write/ddh/revise-republish.*

[54] CEQ, Phase 1 Response to Comments, *supra* note 52, at 120–21.

AR_0028768

considered important and who determines whether something is important.

CEQ implements this change from "significant" to one of its synonyms when it is not modifying "effect" in the final rule. The NEPA regulations have long required agencies to focus on the "important" issues, *see* 40 CFR 1500.1 (2019), and agencies have decades of experience doing just that—CEQ disagrees that use of this term in other provisions as a substitute for "significant issues" alters the scope of the issues to which those provisions refer. CEQ declines to add a definition for this term because its plain meaning is sufficient and notes that the phrase "significant issues" was not defined in the 1978 regulations.[55] CEQ's intent is that agencies focus their NEPA documents on the issues that are key for the public to comment on and the agency to take into account in the decision-making process, and only briefly explain why other, unimportant issues are not discussed. As CEQ indicated in the proposed rule, it does not intend the substitution of "important" and "substantial" for "significant" to substantively change the meaning of the provisions, but rather to bring greater consistency and clarity to agencies in implementing these provisions by eliminating a potential ambiguity that these phrases incorporate the definition of "significant effects"; for example, ensuring that the phrase "significant actions" is not mistakenly understood to mean actions that have significant effects, which was not the meaning of the phrase in the regulations. CEQ discusses comments on specific uses of the terms in specific sections of the rule and in the Phase 2 Response to Comments.

For clarity, CEQ proposed to change "statement" to "environmental impact statement" and "assessment" to "environmental assessment" where the regulations only use the short form in the paragraph. *See, e.g.,* §§ 1502.3 and 1506.3(e)(1) through (e)(3). CEQ did not receive comments on this proposal and makes these changes throughout the rule as proposed.

CEQ also proposed to make non-substantive grammatical corrections or consistency edits throughout the regulations where CEQ considered the changes to improve readability. Finally, CEQ proposed to update the authorities for each part, update the references to NEPA as amended by the Fiscal

Responsibility Act, and fix internal cross references to other sections of the regulations throughout to follow the correct **Federal Register** format. CEQ makes these changes in the final rule.

*B. Revisions To Update Part 1500, Purpose and Policy*

CEQ proposed substantive revisions to all sections in part 1500. These revisions include reinstating § 1500.2, "Policy," as its own section separate from § 1500.1, "Purpose" consistent with the approach taken in the 1978 regulations. Some commenters recommended that CEQ title § 1500.1 "Purpose and Policy" and title § 1500.2 "Additional Policy" because, in their view, § 1500.2 reflects CEQ's policy judgments rather than the commands of the NEPA statute.

CEQ declines to make this change. The purpose of §§ 1500.1 and 1500.2 is to place the regulations into their broader context by restating the policies of the Act within the regulations, which will improve readability by avoiding the need for cross references to material outside the text of the regulations. Section 1500.2 reflects CEQ's interpretation of the policies of the Act, rather than CEQ's own policy priorities.

1. Purpose (§ 1500.1)

In § 1500.1, CEQ proposed to restore much of the language from the 1978 regulations with revisions to further incorporate the policies Congress established in the NEPA statute. CEQ proposed these changes to restore text regarding NEPA's purpose and goals, placing the regulations into their broader context and to restate the policies of the Act within the regulations. Some commenters expressed general support for proposed § 1500.1 stating that the revisions appropriately frame NEPA's purposes. CEQ revises § 1500.1 as discussed in this section to recognize that the procedural provisions of NEPA are intended to further the purpose and goals of the Act. One of those goals is to make informed and sound government decisions.

First, CEQ proposed to revise paragraph (a) of 40 CFR 1500.1 (2020) by subdividing it into paragraphs (a), (a)(1), and (a)(2). In paragraph (a), CEQ proposed to revise the first sentence to restore language from the 1978 regulations stating that NEPA is "the basic national charter for protection of the environment" and add a new sentence stating that NEPA "establishes policy, sets goals" and "provides direction" for carrying out the principles and policies Congress established in sections 101 and 102 of

NEPA. 42 U.S.C. 4331, 4332. CEQ proposed to remove language from the first sentence of paragraph (a) describing NEPA as a purely procedural statute because CEQ considers that language to be an inappropriately narrow view of NEPA's purpose and ignores the fact that Congress established the NEPA process for the purpose of promoting informed decision making and improved environmental outcomes.

Some commenters objected to the proposed use of the phrase "basic national charter for protection of the environment" in paragraph (a), asserting it misrepresents NEPA's purpose as a procedural statute. Other commenters opposed the proposed changes to remove the language clarifying that NEPA is a procedural statute, asserting the proposed changes could give the impression that CEQ seeks to expand NEPA beyond its original mandate.

Another commenter objected to the restoration of the language in paragraph (a) asserting that describing NEPA as the "basic national charter for the protection of the environment" displaces the U.S. Constitution from the role of "America's basic national charter for protection." CEQ declines to remove this language, which accurately describes NEPA's purpose, was included in the 1978 regulations, and remained in place until the 2020 rule. CEQ disagrees that describing NEPA as the basic national charter for the protection of the environment denigrates the role of the U.S. Constitution. Congress enacted NEPA exercising its Constitutional authority to declare a national environmental policy and describing NEPA as "America's basic national charter for the protection of the environment" does not imply that NEPA overshadows the U.S. Constitution. CEQ also notes that several courts have quoted this language approvingly. *See, e.g., Ctr. for Biological Diversity* v. *Bernhardt,* 982 F.3d 723, 734 (9th Cir. 2020); *Habitat Educ. Ctr., Inc.* v. *United States Forest Serv.,* 673 F.3d 518, 533 (7th Cir. 2012).

In the final rule, CEQ revises paragraph (a) as proposed, but removes the parenthetical references to sections 101 and 102 as unnecessary and incomplete because other sections of NEPA also provide direction for carrying out NEPA's policy, which are addressed throughout the regulations. While CEQ agrees that the NEPA analysis required by section 102(2)(C) and these regulations does not dictate a particular outcome, Congress did not establish NEPA to create procedure for procedure's sake, but rather, to provide for better informed Federal decision making and improved environmental

---

[55] *See, e.g., Significant,* Merriam-Webster, *https://www.merriam-webster.com/dictionary/significant* (defining "significant" as "having or likely to have influence or effect: IMPORTANT").

outcomes. These goals are not fulfilled if the NEPA analysis is treated merely as a check-the-box exercise. 42 U.S.C. 4332(2)(C). CEQ does not consider it necessary to repeatedly emphasize in the regulations the procedural nature of the statutory mechanism Congress chose to advance the purposes of NEPA as described in section 2 and the policy directions established in section 101 of NEPA. 42 U.S.C. 4321, 4331. Doing so may suggest that NEPA mandates a rote paperwork exercise and de-emphasizes the Act's larger goals and purposes. Instead, CEQ remains cognizant of the goals Congress intended to achieve through the NEPA process in developing CEQ's implementing regulations, and agencies should carry out NEPA's procedural requirements in a manner faithful to the purposes of the statute.

Second, in § 1500.1(a)(1), CEQ proposed to retain the second sentence of 40 CFR 1500.1(a) (2020) summarizing section 101(a) of NEPA, change "man" to "people" to remove gendered language, and delete "of Americans" after "present and future generations." 42 U.S.C. 4331(a). CEQ proposed to add a second sentence summarizing section 101(b) to clarify that agencies should advance the purposes in section 101(b) through their NEPA reviews. 42 U.S.C. 4331(b). CEQ proposed to include this language in § 1500.1(a)(1) to help agencies understand what the regulations refer to when the regulations direct or encourage agencies to act in a manner consistent with the purposes or policies of the Act. *See, e.g.,* §§ 1500.2(a), 1500.6, 1501.1(a), 1502.1(a), and 1507.3(b).

Some commenters objected to the proposal to remove "of Americans" from paragraph (a)(1) contending that the removal would be inconsistent with the statute. After considering these comments, CEQ has determined not to make this change and leave the phrase "of Americans" at the end of the first sentence of paragraph (a)(1), because this sentence is specifically describing section 101(a) of NEPA, which includes the phrase. However, CEQ notes that this text in section 101(a) and paragraph (a)(1) does not limit NEPA's concerns solely to Americans or the United States. For example, other language in section 101 reflects NEPA's broader purpose to "create and maintain conditions under which [humans] and nature can exist in productive harmony" without qualification. 42 U.S.C. 4331(a). As discussed further in section II.J.13, CEQ removes "of Americans" from the definition of "human environment" in § 1508.1(r) for

consistency with the statute's overall broader purpose.

A commenter recommended CEQ add a dash after "national policy" in the second sentence for consistency with the statute to ensure that all six of the goals are modified by the phrase "consistent with considerations of national policy." CEQ agrees that the beginning of the sentence, including the phrase "consistent with other essential considerations of national policy" modifies all of the listed items that follow and, in the final rule, revises the sentence to subdivide it into paragraphs (a)(1)(i) through (vi) to make this clarification. Lastly in paragraph (a)(1), in the final rule, CEQ changes "man" to "humans" rather than the proposed "people" to remove the gendered language while also providing consistency with the term "human" and "human environment" used in the NEPA statute and throughout the regulations.

Third, CEQ proposed to begin § 1500.1(a)(2) with the third sentence of 40 CFR 1500.1(a) (2020), modify it, and add two new sentences to generally restore the language of the 1978 regulations stating that the purpose of the regulations is to convey what agencies should and must do to comply with NEPA to achieve its purpose. Specifically, CEQ proposed to revise the first sentence to state that section 102(2) of NEPA establishes the procedural requirements to carry out the policies "and responsibilities established" in section 101, and contains " 'action-forcing' procedural provisions to ensure Federal agencies implement the letter and spirit of the Act." 42 U.S.C. 4332(2), 42 U.S.C. 4331. CEQ proposed to add a new second sentence stating the purpose of the regulations is to set forth what agencies must and should do to comply with the procedures and achieve the goals of the Act. In the third new sentence, CEQ proposed to restore the language from the 1978 regulations that the President, Federal agencies, and the courts share responsibility for enforcing the Act to achieve the policy goals of section 101. 42 U.S.C. 4331.

Fourth, CEQ proposed to strike the fourth and fifth sentences of 40 CFR 1500.1(a) (2020), added by the 2020 rule, which state that NEPA requires Federal agencies to provide a detailed statement for major Federal actions, that the purpose and function of NEPA is satisfied if agencies have considered environmental information and informed the public, and that NEPA does not mandate particular results. While the NEPA process does not mandate that agencies reach specific decisions, CEQ proposed to remove this

language because CEQ considered this language to unduly minimize Congress's understanding that procedures ensuring that agencies analyze, consider, and disclose environmental effects will lead to better substantive outcomes. CEQ also considered this language inconsistent with Congress's statements of policy in the NEPA statute.

Some commenters objected specifically to the proposed addition of the phrase "action-forcing," and others contended that the proposed rule would revise the regulation not merely to force action, but to require specific outcomes. Another commenter asserted that proposed paragraph (a)(2) goes too far in separating policy goals from the procedures passed by Congress to achieve them.

CEQ finalizes paragraph (a)(2) as proposed and removes the language that describes NEPA as a purely procedural statute because CEQ considers the language to reflect an inappropriately narrow view of NEPA's purpose that minimizes Congress's broader goals in enacting the statute, as specified in sections 2 and 101 of NEPA. 42 U.S.C. 4321, 4331. While NEPA does not mandate particular results in specific decision-making processes, Congress intended the procedures required under the Act to result in more informed decisions, with the goal that information about the environmental effects of those decision would facilitate better environmental outcomes. *See, e.g., Andrus* v. *Sierra Club,* 442 U.S. 347, 350–51 (1979) ("If environmental concerns are not interwoven into the fabric of agency planning, the action-forcing characteristics of [NEPA] would be lost.").

Fifth, CEQ proposed to strike the first two sentences of 40 CFR 1500.1(b) (2020), which the 2020 rule added, because they provide an unnecessarily narrow view of the purposes of NEPA and its implementing regulations. CEQ proposed to revise the third sentence and add two new sentences to restore in paragraph (b) language from the 1978 regulations emphasizing the importance of the early identification of high-quality information that is relevant to a decision. Early identification and consideration of issues using high-quality information have long been fundamental to the NEPA process, particularly because such identification and consideration facilitates comprehensive analysis of alternatives and timely and efficient decision making, and CEQ considers it important to emphasize these considerations in this section. CEQ also proposed the changes to emphasize that the environmental information that agencies

use in the NEPA process should be high-quality, science-based, and accessible.

Multiple commenters supported the proposed provisions of § 1500.1(b). One commenter supported the provision for agencies to "concentrate on the issues that are truly relevant to the action in question, rather than amassing needless detail," and to use "high quality, science-based, and accessible" information. One commenter recommended that CEQ revise "Most important" to "Most importantly" in § 1500.1(b). CEQ agrees that this change would improve the readability of the sentence and makes this clarifying edit in the final rule.

Other commenters opposed the change to proposed paragraph (b), asserting it would delete important regulatory text. The commenters asserted that by striking the language, CEQ has turned the section from one that says follow the rules into one that adds to the rules. Upon further consideration, CEQ has determined not to finalize the proposed revisions to the beginning of paragraph (b) because the text from the 1978 regulations could be construed as a direction to agencies rather than a statement about the purpose of the CEQ regulations. Specifically, the final rule retains "[t]he regulations in this subchapter implement" from the current regulations and then replaces "section 102(2) of NEPA" with "the requirements of NEPA," because the requirements of NEPA extend to additional sections following the 2023 NEPA amendments. Additionally, CEQ includes the proposed new second sentence, with revisions. In the final rule, this provision requires rather than recommends that information be high quality for consistency with § 1506.6. CEQ does not include the proposed references to "science-based" and "accessible" to avoid potential confusion that this provision was establishing a separate obligation from § 1506.6, which addresses methodology and scientific accuracy.

Finally, CEQ proposed a new paragraph (c) to restore text from the 1978 regulations, most of which the 2020 rule deleted, emphasizing the importance of NEPA reviews for informed decision making. Some commenters recommended CEQ further amend proposed paragraph (c) to state that agencies only have to "protect" or "restore and protect," rather than "enhance" the environment for consistency with sections 101 and 102 of NEPA. 42 U.S.C. 4331, 4332.

CEQ disagrees with the commenters' view of NEPA's purposes and scope. To the extent that a substantive difference exists between the terms in this context, CEQ notes that section 101(c) of NEPA recognizes "that each person has a responsibility to contribute to the preservation *and enhancement* of the environment." 42 U.S.C. 4331(c) (emphasis added); *see also, e.g., Douglas Ctny.* v. *Babbitt,* 48 F.3d 1495, 1505 (9th Cir. 1995) ("The purpose of NEPA is to 'provide a mechanism to *enhance* or improve the environment and prevent further irreparable damage.'" (emphasis added) (quoting *Pac. Legal Found.* v. *Andrus,* 657 F.2d 829, 837 (6th Cir. 1981)). Another commenter recommended that CEQ qualify the second sentence of proposed paragraph (c) by appending, "within the agency's Congressional authorizations." CEQ declines to make this change. In implementing any statute, agencies must act within the scope of their legal authority; adding a specific qualification to that effect here is therefore unnecessary and could be confusing. CEQ finalizes paragraph (c) as proposed.

### 2. Policy (§ 1500.2)

The 2020 rule struck 40 CFR 1500.2 (2019), stating that it was duplicative of other sections, and integrated policy language into 40 CFR 1500.1 (2020).[56] CEQ proposed to restore § 1500.2 because a robust articulation of NEPA's policy principles is fundamental to the NEPA process. CEQ also proposed to restore the policy section because it is helpful to agency practitioners and the public to have a consolidated listing of policy objectives regardless of whether other sections of the regulations address those objectives. CEQ proposed to restore with some updates the language of the 1978 regulations to § 1500.2.

First, CEQ proposed to restore an introductory paragraph to require agencies "to the fullest extent possible" to comply with the policy set forth in paragraphs (a) through (f). One commenter asserted that the final rule should delete "to the fullest extent possible" because it improperly expands the regulation's authority. CEQ disagrees with the commenter's interpretation of the phrase, which does not expand, but rather qualifies, the scope of § 1500.2 and conforms with the text in section 102 of NEPA, which directs agencies to comply with that section's requirements, including the requirement to prepare an EIS, "to the fullest extent possible." *See* 42 U.S.C. 4332.

Second, CEQ proposed to restore in paragraph (a) the 1978 language

directing agencies to interpret and administer policies, regulations, and U.S. laws consistent with the policies of NEPA and the CEQ regulations. Some commenters recommended the final rule revise paragraph (a) to replace "the policies set forth in the Act and in these regulations," with "with other applicable laws and regulations, in addition to NEPA." CEQ finalizes paragraph (a) as proposed and declines to make this change because it aligns with the language of section 102(1) of NEPA. *See* 42 U.S.C. 4332(1). The purpose of § 1500.2(a) is to place the CEQ regulations into their broader context by restating NEPA's policies. Doing so improves readability by avoiding the need for cross references to material outside the text of the regulations.

Third, in paragraph (b), CEQ proposed to restore with clarifying edits the 1978 language directing agencies to implement procedures that facilitate a meaningful NEPA process, including one that is useful to decision makers and the public with environmental documents that are concise and clear, emphasize the important issues and alternatives, and are supported by evidence. CEQ did not receive comments specific to this proposed paragraph and finalizes paragraph (b) as proposed.

Fourth, in paragraph (c), CEQ proposed to direct agencies to integrate NEPA with other planning and environmental review requirements to promote efficient, concurrent processes. One commenter requested the final rule revise proposed paragraph (c) to add qualifying language to require the integration be done at the earliest reasonable time, consistent with § 1501.2(a), except where inconsistent with other statutory requirements or where inefficient. The commenter generally supported integrating the NEPA process with other processes when it is efficient, but asserted that sometimes it may be more efficient to have other processes run consecutively instead of concurrently. CEQ agrees that processes should run consecutively where it is more efficient to do so, and that agencies should not integrate processes when doing so would be inefficient. Therefore, in the final rule, CEQ adds proposed paragraph (c) but does not include "all" before "such procedures," and adds "where doing so promotes efficiency" at the end of the paragraph.

Fifth, in paragraph (d) CEQ proposed to modernize language from the 1978 regulations in 40 CFR 1500.2(d) (2019) to emphasize public engagement, including "meaningful public

[56] CEQ, 2020 Final Rule, *supra* note 39, at 43316–17.

engagement with communities with environmental justice concerns, which often include communities of color, low-income communities, indigenous communities, and Tribal communities."

One commenter requested that CEQ clarify whether the phrase "affect the quality of the human environment" in paragraph (d) refers to beneficial or adverse effects and whether it covers temporary effects in addition to permanent ones. CEQ declines to amend the language in question, which CEQ is restoring from the 1978 regulations. Because NEPA directs agencies to consider all of the reasonably foreseeable effects of a proposed action—including positive, negative, temporary, and permanent effects—this phrase is appropriately broad. While the final rule defines "significant effects" as limited to only adverse effects, *see* § 1508.1(mm), paragraph (d) is broader because the NEPA regulations encourage and facilitate public engagement for actions that may not have significant effects, including actions that agencies analyze through an EA.

Multiple commenters supported proposed § 1500.2(d) and the emphasis on public engagement. Some commenters recommended the final rule expand the paragraph to clarify how agencies should facilitate public engagement and education. CEQ declines to expand this paragraph because the intent of § 1500.2 is to place the regulations into their broader policy context. Instead, § 1501.9 describes agencies' public engagement responsibilities in detail.

Some commenters opposed proposed paragraph (d) and the emphasis on public engagement. One commenter expressed concern that the proposed rule does not include a similar increased emphasis on State-specific involvement, requested the final rule delineate between State involvement and public involvement, and explicitly emphasize the importance of State-specific engagement, much the same way CEQ has outlined for Tribal engagement.

In the final rule, CEQ adds proposed paragraph (d) but omits the last clause of the proposal and declines to specifically address State-specific involvement in this paragraph because this paragraph is about involving the public, rather than coordinating with other government entities such as States and Tribes. While public involvement and inter-governmental coordination are both critically important components of the NEPA process, they implicate different considerations and are addressed by different portions of the

NEPA regulations. CEQ does not include the proposed language describing what communities are often included as communities with environmental justice concerns because "environmental justice" and "communities with environmental justice concerns" are defined terms in § 1508.1(f) and (m) and the explanatory language is unnecessary in § 1500.2. CEQ also revises the clause in the final rule to clarify the example by adding "such as those" after communities so that the example refers to communities in general and communities with environmental justice concerns more specifically, because the regulations encourage meaningful engagement with all communities that are potentially affected by an action. The reference to engagement with communities with environmental justice concerns is an example and not exhaustive. Further, CEQ views an emphasis on engagement with such communities to be important because agencies have not always meaningfully engaged with them, and such communities have been disproportionately and adversely affected by certain Federal activities, and such communities often face challenges in engaging with the Federal Government. In making this change to emphasize public engagement, CEQ notes that consultation with Tribal Nations on a nation-to-nation basis is distinct from the public engagement requirements of NEPA.[57]

Sixth, in paragraph (e), CEQ proposed to restore language from the 1978 regulations regarding use of the NEPA process to identify and assess the reasonable alternatives to proposed actions that avoid or minimize adverse effects. CEQ also proposed to add examples of such alternatives, including those that will reduce climate change-related effects or address health and environmental effects that disproportionately affect communities with environmental justice concerns.

One commenter requested that the final rule further clarify paragraph (e) by adding examples of reasonable alternatives. CEQ declines to add examples to paragraph (e) because reasonable alternatives are not amenable to easy generalization or simple description as they depend on project-specific factors, such as purpose and need, and technical and economic feasibility. Therefore, examples of reasonable alternatives are ill-suited to regulatory text. Some commenters

opposed the references to climate change and environmental justice in § 1500.2(e), contending that the references indicate that CEQ's regulations direct or favor particular substantive outcomes, such as the disapproval of oil and gas projects, and will therefore prejudice agencies' analysis of environmental effects; that the NEPA statute does not explicitly address these subjects; or that it will be difficult or burdensome for agencies to account for climate change when conducting environmental reviews.

CEQ adds paragraph (e) as proposed in the final rule. CEQ agrees that NEPA does not dictate a particular outcome, and disagrees that the references to climate change and environmental justice in § 1500.2(e) are contrary to this principle. Rather, Congress enacted and amended NEPA based on the understanding that agency decision makers will make better decisions if they are fully informed about each decision's reasonably foreseeable environmental effects. Paragraph (e) prompts agencies to give appropriate regard to environmental effects related to climate change and environmental justice.

Further, the references to climate change and environmental justice in paragraph (e) reflect and advance NEPA's statutory objectives, text, and policy statements, which include analyzing a reasonable range of alternatives; avoiding environmental degradation; preserving historic, cultural, and natural resources; and "attain[ing] the widest range of beneficial uses of the environment without degradation, risk to health or safety, or other undesirable and unintended consequences." 42 U.S.C. 4331(b), 4332(2)(C)(iii). The references emphasize that decision makers should integrate those subjects into the analysis of the environmental effects of a proposed action and any reasonable alternatives, as appropriate. Additionally, these changes are consistent with the goal of providing "safe, healthful, productive, and esthetically and culturally pleasing surroundings" across the Nation, and the goal that all people can "enjoy a healthful environment," 42 U.S.C. 4331(b), (c), and highlight the importance of considering such effects in environmental documents, consistent with NEPA's requirements and agency practice.[58] The changes are also

---

[57] *See* E.O. 13175, *Consultation and Coordination with Indian Tribal Governments,* 65 FR 67249 (Nov. 9, 2000); Presidential Memorandum, Tribal Consultation and Strengthening Nation-to-Nation Relationships, 86 FR 7491 (Jan. 29, 2021).

[58] Consistent with section 102(2)(C) of NEPA, consideration of environmental justice and climate change-related effects has long been part of NEPA analysis. *See, e.g., Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin.,* 538 F.3d 1172

consistent with E.O. 12898 and E.O. 14096.

Finally, in paragraph (f), CEQ proposed to restore the direction from the 1978 regulations to use all practicable means, consistent with the policies of NEPA, to restore and enhance the environment and avoid or minimize any possible adverse effects of agency actions. These revisions to § 1500.2(d), (e), and (f) reflect longstanding practice among Federal agencies and align with NEPA's statutory policies, including to avoid environmental degradation, preserve historic, cultural, and natural resources, and "attain the widest range of beneficial uses of the environment without degradation, risk to health or safety, or other undesirable and unintended consequences." 42 U.S.C. 4331(b).

Multiple commenters expressed support for the proposed changes to paragraphs (d), (e), and (f), asserting the changes appropriately emphasize agency obligations to facilitate public participation in the decision-making process, instead of merely keeping the public informed, and to act on information they obtain in that process. These commenters asserted the proposed changes properly describe the objectives of environmental reviews under NEPA as informed decision making, robust public engagement, and protection of the environment.

One commenter requested the final rule revise paragraph (f) to add other laws and agency authorities after "the requirements of the Act." CEQ finalizes paragraph (f) as proposed and declines to make this change because this paragraph aligns with section 101(b) of NEPA. 42 U.S.C. 4331(b). The purpose of §§ 1500.1 and 1500.2 is to place the regulations into their broader context by restating NEPA's policies within the regulations. Doing so improves readability by avoiding the need for cross references to material outside the text of the regulations. CEQ agrees that agencies should comply with other laws and with agency authorities, which are examples of "other essential considerations of national policy." CEQ also notes that this text was in the 1978 regulation, in effect until 2020, and did not create confusion that the NEPA regulations prevented agencies from complying with other legal requirements.

Commenters recommended that CEQ add various qualifiers to § 1500.2 asserting that agencies have limited authorities and resources and must

comply with other applicable laws in addition to NEPA. CEQ declines to make these changes. The introductory paragraph of § 1500.2 provides that agencies must carry out the policies set forth in the section "to the fullest extent possible," which renders the suggested amendments redundant. Moreover, § 1501.3 directs agencies to consider, for a particular action, whether compliance with NEPA would clearly and fundamentally conflict with the requirements of another provision of Federal law when determining NEPA applicability to that action, which is consistent with the manner in which Congress addressed this issue in section 106 of NEPA. 42 U.S.C. 4336.

Likewise, commenters suggested that CEQ clarify particular points of NEPA practice, such as defining "all practicable means;" explaining how agencies should facilitate public engagement and education; adding examples of reasonable alternatives; requiring environmental documents to describe the steps that the agency has taken to avoid or minimize adverse effects; providing standards against which to quantitatively assess agencies' implementation of the NEPA regulations; requiring only that agencies minimize the "significant" adverse effects of a proposed action; or directing agencies to make their planning efforts consistent with State and local plans to the maximum extent possible.

CEQ declines to revise the regulations in response to these comments. The purpose of §§ 1500.1 and 1500.2 is to place the regulations into their broader context by restating the purposes and policies of the Act and addressing a variety of aspects of NEPA practice would distract from that purpose. Other provisions in the regulations implement the provisions of NEPA that effectuate these purposes and policies, and set forth specific procedures that agencies must and should follow. Accordingly, it is not necessary or appropriate for § 1500.2 to address these subjects in greater detail.

Lastly, one commenter recommended that CEQ add a new paragraph to § 1500.2 to require agencies to realize the Federal Government's trust responsibility to Tribal Nations by acting on and not merely considering Indigenous Knowledge. Another commenter made a related recommendation that § 1500.1 explicitly recognize the Federal Government's trust responsibilities to Tribes.

CEQ agrees that agencies should consider and include Indigenous Knowledge in Federal research, policies, and decision making, including as part of the environmental review process

under NEPA. CEQ also recognizes that the Federal trust responsibility to Tribal Nations may shape both the procedures that agencies follow and the substantive outcomes of agencies' decision-making processes. CEQ does not, however, view it as properly within the scope of CEQ's authority to direct agencies to act on Indigenous Knowledge through the NEPA regulations, because the NEPA statute includes procedural, rather than substantive requirements, and the obligation to honor the trust responsibility, including the obligation to engage in Tribal consultation, does not arise from the NEPA statute.

### 3. NEPA Compliance (§ 1500.3)

CEQ proposed to revise § 1500.3 to restore some language from the 1978 regulations and remove some provisions added by the 2020 rule regarding exhaustion and remedies, which aimed to limit legal challenges and judicial remedies.[59] The process established by the 2020 rule provided that first, an agency must request in its notice of intent (NOI) comments on all relevant information, studies, and analyses on potential alternatives and effects. 40 CFR 1500.3(b)(1) (2020). Second, the agency must summarize all the information it receives in the draft EIS and specifically seek comment on it. 40 CFR 1500.3(b)(2), 1502.17, 1503.1(a)(3) (2020). Third, decision makers must certify in the record of decision (ROD) that they considered all the alternatives, information, and analyses submitted by public commenters. 40 CFR 1500.3(b)(4), 1505.2(b) (2020). And fourth, any comments not submitted within the comment period were considered forfeited as unexhausted. 40 CFR 1500.3(b)(3), 1505.2(b) (2020).

First, CEQ proposed to revise paragraph (a) to remove the phrase "except where compliance would be inconsistent with other statutory requirements" from the end of the first sentence because § 1500.6 addresses this issue. CEQ also proposed to remove the references to E.O. 13807, which E.O. 13990 revoked, as well as the reference to section 309 of the Clean Air Act because this provision is implemented by EPA.[60]

CEQ removes the clause "except where compliance would be inconsistent with other statutory requirements" in the final rule because the relationship between NEPA and agency statutory authority is addressed in § 1500.6 and the circumstances in

(9th Cir. 2008) and CEQ, Environmental Justice Guidance, *supra* note 7.

[59] CEQ, 2020 Final Rule, *supra* note 39, at 43317–18.

[60] *See* E.O. 13807, *supra* note 14; E.O. 13990, *supra* note 43.

**35454**    **Federal Register** / Vol. 89, No. 85 / Wednesday, May 1, 2024 / Rules and Regulations

which an agency does not need to prepare an environmental document due to a conflict with other statutes is addressed in § 1501.3. Moreover, to the extent that this phrase could be read as identifying when an agency does not need to conduct an environmental review, the NEPA amendments address that in section 106(a)(3) using different language, specifically, that an agency does not need to prepare an environmental document where "the preparation of such document would clearly and fundamentally conflict with the requirements of another provision of law." 42 U.S.C. 4336(a)(3). CEQ also removes the references to E.O. 13807 and section 309 of the Clean Air Act consistent with the proposal.

Second, CEQ proposed to delete paragraphs (b) and (b)(1) through (b)(4) of 40 CFR 1500.3 (2020) addressing exhaustion. CEQ proposed to remove these provisions because they establish an inappropriately stringent exhaustion requirement for public commenters and agencies. CEQ also proposed to delete this paragraph because it is unsettled whether CEQ has the authority under NEPA to set out an exhaustion requirement that bars parties from bringing claims on the grounds that an agency's compliance with NEPA violated the APA, pursuant to 5 U.S.C. 702. As explained in the proposed rule, while the 2020 rule correctly identifies instances in which courts have ruled that parties may not raise legal claims based on issues that they themselves did not raise during the comment period,[61] other courts have sometimes ruled that a plaintiff can bring claims where another party raised an issue in comments or where the agency should have identified an issue on its own. *Pac. Coast Fed'n of Fishermen's Ass'ns* v. *U.S. Dep't of Interior,* 929 F. Supp. 2d 1039, 1045–46 (E.D. Cal. 2013); *Wyo. Lodging and Rest. Ass'n* v. *U.S. Dep't of Interior,* 398 F. Supp. 2d 1197, 1210 (D. Wyo. 2005); *see Pub. Citizen,* 541 U.S. at 765 (noting that "[T]he agency bears the primary responsibility to ensure that it complies with NEPA . . . and an EA's or an EIS' flaws might be so obvious that there is no need for a commentator to point them out specifically in order to preserve its ability to challenge a proposed action").

Because the fundamental question raised by these cases is the availability of a cause of action under the APA and not a question of interpreting NEPA, CEQ proposed to delete the exhaustion provision because CEQ considers interpreting and applying the APA more appropriate for the courts.

CEQ also proposed to remove the exhaustion requirement because it is at odds with longstanding agency practice. While courts have ruled that agencies are not required to consider comments that are not received until after comment periods end, *see, e.g., Pub. Citizen,* 541 U.S. at 764–65 (finding that where a party does not raise an objection in their comments on an EA, the party forfeits any objection to the EA on that ground), agencies have discretion to do so and have sometimes chosen to exercise this discretion, particularly where a comment provides helpful information to inform the agency's decision. As explained in the proposed rule, the exhaustion requirement could encourage agencies to disregard important information presented to the agency shortly after a comment period closes, and such a formalistic approach would not advance NEPA's goal of informed decision making.

Many commenters supported CEQ's proposal to remove the exhaustion provisions asserting that the provisions were unlawful, created additional compliance burdens, did not improve the efficiency of the NEPA process, and did not reduce litigation risk; and that removal is consistent with the NEPA statute, which does not provide for an exhaustion requirement. One commenter that supported removal, asserted that because NEPA does not impose a statutory exhaustion requirement, the determination of whether a particular plaintiff may go forward with a particular claim is a matter for the judiciary. CEQ agrees with this commenter's view. Where appropriate in light of the statutes they administer, individual agencies may address exhaustion through their agency-specific rules of procedure, and courts will continue to consider exhaustion as a normal part of judicial review.

Commenters that opposed removing the exhaustion requirements argued they are necessary to curb "frivolous litigation claims;" assist agencies and the public by providing helpful information on filing timely comments and incentivizing them to raise concerns during the NEPA process; and communicate the need for prompt and active participation in the NEPA review process. While CEQ agrees with these

commenters' assertions that the regulations should promote early engagement and public participation and the timely identification of concerns during the NEPA process, CEQ disagrees that the exhaustion provisions are the mechanism to achieve these goals. CEQ considers other provisions in the regulations, including §§ 1501.9 and 1502.4, and part 1503, to be the better means of achieving these goals without incurring the risk of including provisions in the regulations that are legally uncertain.

For these reasons, CEQ removes the exhaustion provisions from the regulations and strikes paragraphs (b) and (b)(1) through (b)(4) of 40 CFR 1500.3 (2020) consistent with the proposal. Removal of these exhaustion provisions does not relieve parties interested in participating in, commenting on, or ultimately challenging a NEPA analysis of the obligation to "structure their participation so that it is meaningful." *Vt. Yankee Nuclear Power Corp.* v. *Nat. Res. Def. Council, Inc.,* 435 U.S. 519, 553 (1978). As CEQ's regulations have made clear since 1978, parties must provide comments that are as specific as possible to enable agencies to consider and address information during the decision-making processes. *See* 40 CFR 1503.3(a) (2019).

Further, nothing in this revision limits the positions the Federal Government may take regarding whether, based on the facts of a particular case, a particular issue has been forfeited by a party's failure to raise it before the agency, and removing this provision does not suggest that a party should not be held to have forfeited an issue by failing to raise it. By deleting the exhaustion requirements, CEQ does not take the position that plaintiffs may raise new and previously unraised issues in litigation. Rather, CEQ considers this to be a question of general administrative law best addressed by the courts based on the facts of a particular case.

Third, CEQ proposed to redesignate paragraph (c), "Review of NEPA compliance," of 40 CFR 1500.3 (2020) as paragraph (b) and add a clause, "except with respect to claims brought by project sponsors related to deadlines under section 107(g)(3) of NEPA" to the end of the first sentence stating that judicial review of NEPA compliance does not occur before an agency issues a ROD or takes a final agency action. CEQ did not receive specific comments on this proposal and adds to redesignated paragraph (b) the exception clause to acknowledge the ability of project sponsors to petition a

---

[61] CEQ, 2020 Final Rule, *supra* note 39, at 43317–18 (citing *Dep't of Transp.* v. *Pub. Citizen,* 541 U.S. 752, 764–65 (2004); *Karst Env't. Educ. & Prot., Inc.* v. *Fed. Highway Admin.,* 559 F. App'x 421, 426–27 (6th Cir. 2014); *Friends of the Norbeck* v. *U.S. Forest Serv.,* 661 F.3d 969, 974 (8th Cir. 2011); *Exxon Mobil Corp.* v. *U.S. EPA,* 217 F.3d 1246, 1249 (9th Cir. 2000); and *Nat'l Ass'n of Mfrs.* v. *U.S. Dep't of the Interior,* 134 F.3d 1095, 1111 (D.C. Cir. 1998)).

court when an agency allegedly fails to meet a deadline consistent with section 107(g)(3) of NEPA. 42 U.S.C. 4336(a)(g)(3).

Fourth, CEQ proposed to move the last sentence of paragraph (d) of 40 CFR 1500.3 (2020) regarding harmless error for minor, non-substantive errors, a concept that has been in place since the 1978 regulations, to redesignated paragraph (b). CEQ also proposed to delete the second sentence of paragraph (c) of 40 CFR 1500.3 (2020) stating that noncompliance with NEPA and the CEQ regulations should be resolved as expeditiously as possible. While CEQ agrees with expeditious resolution of issues, CEQ proposed to delete this sentence reasoning that CEQ cannot compel members of the public or courts to resolve NEPA disputes expeditiously.

One commenter opposed the proposed deletion of the second sentence of paragraph (c) of 40 CFR 1500.3 (2020) and disagreed with CEQ's rationale, asserting that it is proper for CEQ to express its interest in agencies resolving NEPA compliance issues as soon as practicable. The commenter further argued that doing so is in the interest of Federal agencies, project proponents, and the public, and that unresolved NEPA disputes can lead to costly litigation that prolongs the NEPA process, wastes taxpayer and project proponent resources, and deprives communities of infrastructure improvements.

CEQ agrees that efficiency is an important goal, and that resolving claims of NEPA noncompliance can result in costly and time-consuming litigation. Upon further consideration, CEQ retains the second sentence of paragraph (c) of 40 CFR 1500.3(2020) in the final rule as the third sentence of § 1500.3(b), but revises the text from "as expeditiously as possible" to "as expeditiously as appropriate." While it is true that CEQ cannot compel members of the public or courts to resolve disputes expeditiously, as noted in CEQ's justification for proposing to delete this provision, CEQ considers this sentence to appropriately express CEQ's intention, rather than purporting to inappropriately bind those parties to litigation or dictate what timeline is appropriate for any particular case. Further, CEQ notes that the regulations promote public engagement, appropriate analysis, and informed decision making to facilitate NEPA compliance and avoid such disputes from the outset. CEQ moves the last sentence of 40 CFR 1500.3(d) (2020) to § 1500.3(b) as proposed.

Fifth, CEQ proposed to strike the last sentence of paragraph (c) of 40 CFR 1500.3 (2020) allowing agencies to include bonding and other security requirements in their procedures consistent with their organic statutes and as part of implementing the exhaustion requirements because this relates to litigation over an agency action and not the NEPA process. CEQ explained in the proposed rule that it is unsettled whether NEPA provides agencies with authority to promulgate procedures that require plaintiffs to post bonds in litigation brought under the APA, and that CEQ does not consider it appropriate to address this issue in the NEPA implementing procedures.

Multiple commenters urged CEQ not to remove this sentence or encouraged CEQ to revise the regulations to require parties to post such a bond when petitioning a court to enjoin a NEPA decision during the pendency of litigation. Conversely, many commenters supported the proposed elimination of the bonding provision, which the commenters said discourages public engagement, appropriate analysis, and informed decision making and inequitably burdens disadvantaged communities.

CEQ removes the bonding provision in the final rule by striking the last sentence of 40 CFR 1500.3(c) (2020). NEPA does not authorize CEQ to require posting of bonds or other financial securities prior to a party challenging an agency decision. Agencies may have various authorities independent of NEPA to require bonds or other securities as a condition of filing an administrative appeal or obtaining injunctive relief; this rule does not modify those authorities. CEQ continues to consider it unsettled whether NEPA provides agencies with authority to promulgate procedures that require plaintiffs to post bonds in litigation brought under the APA, commenters did not identify any specific statutory authorities, and even if such authority exists, CEQ does not view such a requirement as appropriate for inclusion in the NEPA regulations. Agency authority to require bonds or other securities as a condition of an administrative appeal or injunctive relief may exist independent of NEPA, and to the extent that such authority does exist, it likely varies by agency. The rule does not modify any existing authority.

CEQ proposed to strike paragraph (d) of 40 CFR 1500.3 (2020) regarding remedies, with the exception of the last sentence, which CEQ proposed to move to proposed paragraph (c) as discussed earlier in this section. CEQ proposed to remove this provision because it is questionable whether CEQ has the authority to direct courts about what remedies are available in litigation brought under the APA, and in any case, CEQ considers the 2020 rule's addition of this paragraph to be inappropriate.

CEQ strikes 40 CFR 1500.3(d) (2020) in the final rule. CEQ considers courts to be in the best position to determine the appropriate remedies when a plaintiff successfully challenges an agency's NEPA compliance. *See, e.g., N. Cheyenne Tribe* v. *Norton,* 503 F.3d 836, 842 (9th Cir. 2007) (rejecting successful NEPA plaintiffs' contention that CEQ regulations mandated a particular remedy and holding that "a NEPA violation is subject to traditional standards in equity for injunctive relief").

Finally, CEQ proposed to redesignate paragraph (e) of 40 CFR 1500.3 (2020) on Severability, as proposed paragraph (c), without change. CEQ makes this change in the final rule because CEQ intends these regulations to be severable. This final rule amends existing regulations, and the NEPA regulations can be functionally implemented if each revision in this final rule occurred on its own or in combination with any other subset of revisions. As a result, if a court were to invalidate any particular provision of this final rule, allowing the remainder of the rule to remain in effect would still result in a functional NEPA review process. This approach to severability is the same as the approach that CEQ took when it promulgated the 2020 regulations, because those amendments similarly could be layered onto the 1978 regulations individually without disrupting the overarching NEPA review process.

### 4. Concise and Informative Environmental Documents (§ 1500.4)

CEQ proposed to revise § 1500.4, which briefly describes and cross references certain other provisions of the CEQ regulations, to emphasize the important values served by concise and informative NEPA documents beyond merely reducing paperwork, such as promoting informed and efficient decision making and facilitating meaningful public participation and transparency. CEQ proposed these changes to encourage the preparation of documents that can be easily read and understood by decision makers and the public, which in turn promotes informed and efficient decision making and public participation.

First, CEQ proposed to retitle § 1500.4 from "Reducing paperwork" to "Concise and informative environmental documents" and revise the introductory text to clarify that the

listed paragraphs provide examples of the regulatory mechanisms that agencies can use to prepare concise and informative environmental documents. Multiple commenters supported the proposed changes in § 1500.4, opining the changes properly direct agencies to streamline the process of preparing environmental documents and make those documents analytical, concise, and informative. One commenter recommended that CEQ add "for example" and "as appropriate" to the introductory paragraph.

CEQ revises the title and introductory text of § 1500.4 in the final rule as proposed. Concise and informational documents make the NEPA process more accessible and transparent to the public, allowing the public an opportunity to contribute to the NEPA process. The changes in § 1500.4 align the regulations with the intent of NEPA to allow the public to provide input and enhance transparency, while providing agencies flexibility on how to achieve concise and informative documents. CEQ declines to add "for example" and "as appropriate" to the introductory paragraph. Those qualifiers are unnecessary because CEQ proposed and is adding "*e.g.,*" throughout § 1500.4, where appropriate, to clarify that the cross-references are non-exclusive examples of strategies that agencies must use in preparing analytical, concise, and informative environmental documents.

CEQ proposed to strike paragraphs (a) and (b) of 40 CFR 1500.4 (2020) because they are redundant with § 1500.5(a) and (b) and are more appropriately addressed in that section, which addresses an efficient process. CEQ also proposed to strike paragraph (d) of 40 CFR 1500.4 (2020) because this provision would be addressed in the revised introductory text.

A few commenters objected to the deletion of 40 CFR 1500.4(a) and (b) (2020), which pertain to using CEs and FONSIs, respectively. The commenters asserted that the use of CEs and FONSIs is critical to ensuring "analytical, concise, and informative" environmental documents, and that the inclusion of such language encourages concision in the evaluation process. While recognizing the paragraphs are redundant with § 1500.5(a) and (b), they asserted that § 1500.5(a) and (b) address improving efficiency in the process, while § 1500.4 addresses concise environmental documents. The commenters further asserted that the two sections are separate in substance and in form, and each should therefore include independent language addressing any inefficiencies.

CEQ strikes paragraphs (a), (b), and (d) of 40 CFR 1500.4 (2020) consistent with the proposal. While CEQ agrees that, where appropriate, applying CEs and preparing EAs and FONSIs typically result in shorter evaluation timelines, this section addresses the preparation of documents, including CE determinations, EAs, and FONSIs, rather than addressing the use of different types of environmental documents.

CEQ proposed to redesignate paragraphs (c) and (e) through (q) of 40 CFR 1500.4 (2020) as § 1500.4(a) and (b) through (n), respectively. CEQ proposed to add "*e.g.,*" to the cross references listed in proposed paragraphs (b), (c), and (e) to clarify that they are non-exclusive examples of how agencies can briefly discuss unimportant issues, write in plain language, and reduce emphasis on background material. CEQ also proposed to update the regulatory section cross references for consistency with the proposed changes in the rule. CEQ makes these changes in the final rule as proposed.

In proposed paragraphs (c) and (e), CEQ proposed to expand the reference from EISs to all environmental documents, as the concepts discussed are more broadly applicable. Additionally, in paragraph (e), CEQ proposed to insert "most" before "useful" to clarify that the environmental documents should not contain portions that are useless.

In proposed paragraph (f), CEQ proposed to replace "significant" with "important" and insert "unimportant" to modify "issues" consistent with the proposal to only use "significant" to modify "effects." CEQ also proposed to clarify in paragraph (f) that scoping may apply to EAs. Additionally, CEQ proposed to expand paragraph (h), regarding programmatic review and tiering, to include EAs to align with the proposed changes to § 1501.11. CEQ makes these changes to paragraphs (c), (e), (f), and (h) in the final rule as proposed.

While CEQ did not propose any changes to paragraph (*l*) regarding use of errata sheets, in the final rule, CEQ moves the clause "when changes are minor" from the end to the beginning of the paragraph to make the language clearer that agencies use errata sheets only when changes between the draft EIS and final EIS are minor. Finally, in paragraph (m), CEQ proposed to insert "Federal" before "agency" consistent with § 1506.3, which allows adoption of NEPA documents prepared by other Federal agencies.

One commenter objected to paragraph (m), contending that directing agencies to eliminate duplication by preparing environmental documents jointly with relevant State, Tribal, and local agencies would threaten the autonomy of Tribes by obligating them to coordinate with Federal agencies in preparing environmental documents. CEQ disagrees with this commenter's interpretation of paragraph (m). Paragraph (m) refers agencies to § 1506.2, which makes clear that agencies should only prepare joint environmental documents by mutual consent. CEQ makes the changes as proposed in the final rule.

Commenters recommended including additional strategies in § 1500.4, including minimizing unnecessary repetition in describing and assessing alternatives, limiting discussion of effects to those that are reasonably foreseeable, and resolving disagreements in the review process expeditiously. CEQ declines to add additional paragraphs. Section 1500.4 lists regulatory provisions that agencies must use in preparing concise and informative environmental documents; these provisions already direct agencies to minimize unnecessary repetition, evaluate the reasonably foreseeable effects of proposed actions, and resolve disagreements expeditiously.

5. Efficient Process (§ 1500.5)

CEQ proposed minor changes to § 1500.5 to provide clarity and flexibility regarding mechanisms by which agencies can apply the CEQ regulations to improve efficiency in the environmental review process. CEQ proposed these changes to acknowledge that unanticipated events and circumstances beyond agency control may delay the environmental review process, and to recognize that, while these approaches may improve efficiency for many NEPA reviews, they could be inefficient for others. To that end, CEQ proposed to retitle § 1500.5 from "Reducing delay" to "Efficient process" and revise the introductory text to replace "reduce delay" with "improve efficiency of the NEPA processes" consistent with the new title.

Some commenters recommended against these changes asserting that they give the impression that it is unimportant for agencies to reduce delays in the permitting process. CEQ revises the title and introductory text as proposed. The purpose of the changes is not to discount the importance of reducing delays in the environmental review process, but to emphasize that agencies should make their review processes broadly efficient and not merely fast—recognizing that efficiency also requires effectiveness and quality of

work. CEQ agrees that reducing delays is important but considers the text to give the wrong impression that there are always delays in the NEPA process.

CEQ proposed to add EAs to paragraph (d) to make the provision consistent with the definition of "categorical exclusion;" phrase paragraph (d) in active voice; change "real issues" to "important issues that required detailed analysis" in paragraph (f) for consistency with § 1502.4; change "time limits" to "deadlines" in paragraph (g) for consistency with § 1501.10; and expand the scope of paragraph (h) from EISs to environmental documents to make clear that, regardless of the level of NEPA review, agencies should prepare environmental documents early in the process. CEQ proposed these revisions to recognize the importance of timely information for decision making and encourage agencies to implement the 12 listed mechanisms to achieve timely and efficient NEPA processes. CEQ did not receive any comments specific to these proposed changes and makes them in the final rule. Additionally, CEQ revises § 1500.5(a) to change "using" to "establishing" and adds a cross reference to § 1507.3(c)(8) because the language in this provision is addressing the development of CEs, not their application to proposed actions.

One commenter recommended the final rule revise paragraph (d)—requiring interagency cooperation during preparation of an EA or EIS rather than waiting to submit comments on a completed document—to require the lead agency to involve other relevant agencies in the determination of whether to review a proposed action by applying a CE, preparing an EA, or preparing an EIS.

CEQ revises paragraph (d) to incorporate some of the text proposed by the commenter. Specifically, CEQ adds "including with affected Federal, State, Tribal, and local agencies" to highlight the efficiency benefits of interagency cooperation with those non-Federal entities, and also adds the words "request or" before the "submit comments" to highlight the importance of both the lead agency and other agencies to interagency cooperation.

### 6. Agency Authority (§ 1500.6)

CEQ proposed revisions to § 1500.6 to clarify that agencies have an independent responsibility to ensure compliance with NEPA and a duty to harmonize NEPA with their other statutory requirements and authorities to the maximum extent possible. CEQ proposed to revise the second and third

sentences in § 1500.6 and strike the fourth sentence.

While CEQ did not propose changes to the first sentence, which requires an agency to view its policies and missions in the light of NEPA's environmental objectives to the extent consistent with its existing authority, one commenter recommended that CEQ revise the sentence to restore phrasing from the 1978 regulations. In particular, the commenter recommended the final rule delete the last clause, "to the extent consistent with its existing authority" because it is "internally inconsistent and contrary to the plain language of NEPA Section 105." 42 U.S.C. 4335. Another commenter recommended the final rule delete the first sentence and disagreed with the description in the proposed rule that "an irreconcilable conflict exists only if the agency's authorizing statute grants it no discretion to comply with NEPA while also satisfying the statutory mandate," asserting that if a statute delegates authority, it does so expressly and there is no presumption that an agency's authorizing statute delegates the agency authority to comply with NEPA.

CEQ declines to revise the first sentence. This provision generally directs agencies to interpret the provisions of NEPA, including section 2's statement of purpose, section 101's statement of policy, and sections 102 through 111's procedural provisions as a supplement to their existing authorities, and agencies can only do so to the extent consistent with those authorities. *See* 42 U.S.C. 4321 *et seq.* This provision does not address the more specific issue of when an agency is excused from completing an environmental document because of contrary statutory authority. That issue is addressed in § 1501.3(a)(2), which incorporates section 106(a) of NEPA's directive that agencies are not required to prepare an environmental document where "the preparation of such document would clearly and fundamentally conflict with the requirements of another provision of law." 42 U.S.C. 4336(a)(3). NEPA applies to all Federal agencies and includes a specific statutory directive that "the policies, regulations, and public laws of the United States shall be interpreted and administered in accordance with the policies set forth in [NEPA]." 42 U.S.C. 4332(1). While there may be situations in which compliance with another Federal law precludes an agency from complying with NEPA, agencies have an obligation to harmonize NEPA with their other statutes where possible to do so.

CEQ proposed to revise the second sentence of § 1500.6 to remove the qualification added in the 2020 rule that agencies must ensure full compliance with the Act "as interpreted by" the CEQ regulations so the provision would instead state that agencies must review and revise their procedures to ensure compliance with NEPA and the CEQ regulations. CEQ proposed this change because the phrase "as interpreted by" could be read to indicate that agencies have no freestanding requirement to comply with NEPA itself, which would be untrue. CEQ also considered the change necessary for consistency with § 1507.3(b), which CEQ revised in its Phase 1 rulemaking to make clear that, while agency procedures must be consistent with the CEQ regulations, agencies have discretion and flexibility to develop procedures beyond the CEQ regulatory requirements, enabling agencies to address their specific programs, statutory mandates, and the contexts in which they operate. CEQ proposed to make conforming edits in §§ 1502.2(d) and 1502.9(b) to remove this phrase.

Several commenters expressed support for CEQ's proposal to restore language emphasizing each Federal agency's independent obligation and ability to implement NEPA. The commenters asserted that removing this language would make it clear that agencies have an obligation to comply with NEPA by following CEQ's regulations and also reviewing and revising, as necessary, their own agency policies, procedures, and activities. The commenter further asserted this independent obligation to comply with NEPA, combined with revisions to § 1507.3 in the Phase 1 rule, provides Federal agencies with flexibility to craft regulations tailored to their agency's work, even if they go beyond the requirements of the CEQ NEPA regulations.

Another commenter expressed support for this proposed change and agreed with CEQ's statement that the current text could be read to mistakenly indicate that agencies have no freestanding requirement to comply with NEPA. The commenter suggested that the final rule add to the beginning of the second sentence, to state that "[a]gencies shall comply with the purposes and provisions of the Act and with the requirements under this Part, to the fullest extent possible." The commenter asserted that regardless of what an agency's policies, procedures, and regulations say, it is critical that the agency comply with both NEPA and the CEQ regulations, unless an agency activity, decision, or action is exempted

by law or compliance with NEPA is impossible.

In the final rule, CEQ revises the second sentence of § 1500.6 as proposed to replace "as interpreted by" with "and" and makes conforming changes to §§ 1502.2(d) and 1502.9(b). CEQ declines to add the clause suggested by the commenter because compliance with NEPA and the regulations is already addressed in the last sentence of this section as well as §§ 1507.1 and 1507.2.

In the third sentence, CEQ proposed to remove the cross-reference to § 1501.1 for consistency with the proposed revisions to § 1501.1 and add the text, consistent with language from the 1978 regulations, explaining that the phrase "to the fullest extent possible" means that each agency must comply with section 102 of NEPA unless an agency activity, decision, or action is exempted by law or compliance with NEPA is impossible. 42 U.S.C. 4332.

A couple of commenters suggested revisions to the last sentence of § 1500.6. They asserted that the proposed revisions would create confusion by creating a distinction between complying with section 102 of NEPA and complying with all of NEPA, and that this was incorrect given the recent NEPA amendments and the proposed implementation of those amendments in these regulations. 42 U.S.C. 4321 *et seq.* The commenters recommended the final rule replace "that section unless" with "the Act and the regulations of this subchapter."

CEQ agrees with the commenter that the statement in section 102 is not limited to that section and replaces the phrase "that section" with "the Act" for consistency with the statute. Section 102(2) authorizes and directs that, to the fullest extent possible the policies, regulations, and public laws of the United States shall be interpreted and administered in accordance with the policies set forth in NEPA. 42 U.S.C. 4332(2). CEQ does not include a reference to the regulations as these are not specifically identified in section 102, and § 1507.1 addresses the requirement to comply with the NEPA regulations.

The commenters also recommended the final rule replace "compliance with NEPA is impossible" with "compliance is impracticable." The commenters recommended this change because section 101 refers to the Federal Government taking all "practicable means" to advance NEPA's goals, implicitly sparing the need to pursue "impracticable" steps. 42 U.S.C. 4331.

CEQ declines to make this change and revises the last sentence as proposed to

strike "consistent with § 1501.1 of this chapter" and replace it with "unless an agency activity, decision, or action is exempted from NEPA by law or compliance with NEPA is impossible." Compliance with NEPA is only impossible within the meaning of this subsection when the conflict between another statute and the requirements of NEPA are clear, unavoidable, and irreconcilable. Absent exemption by Congress or a court, an irreconcilable conflict exists if the agency's authorizing statute does not provide the agency any discretion to comply with NEPA while also satisfying its statutory mandate. While NEPA requires agencies "to use all practicable means" to achieve the Act's environmental goals, *see* 42 U.S.C. 4331, the Act does not limit its procedural requirements in the same fashion. Instead, it directs agencies to fulfill the obligations in section 102 of NEPA, which establishes NEPA's procedural obligations, "to the fullest extent possible," 42 U.S.C. 4332, which the Supreme Court has interpreted to require compliance except for "where a clear and unavoidable conflict in statutory authority exists." *See Flint Ridge Dev. Co.* 426 U.S. at 788. Therefore, revising proposed paragraph (a)(3) to replace "impossible" with "impracticable" would be inconsistent with the statute and deviate from the established legal standard implementing it.

Finally, CEQ proposed to strike the last sentence of 40 CFR 1500.6 (2020) stating that the CEQ regulations do not limit an agency's other authorities or legal responsibilities. In the 2020 rule, CEQ stated that it added this sentence to acknowledge the possibility of different statutory authorities with different requirements and for consistency with E.O. 11514, as amended by section 2(g) of E.O. 11991.[62] CEQ reconsidered its position and proposed to delete the sentence as superfluous and unnecessarily vague. CEQ proposed that the revised last sentence of § 1500.6—agencies must comply with NEPA in carrying out an activity, decision, or action unless exempted by law (including where courts have held that a statute is functionally equivalent) or compliance with NEPA is impossible—accurately reflects the directive that Federal agencies comply with the CEQ regulations "except where such compliance would be inconsistent with statutory requirements."[63] CEQ

removes this sentence from 40 CFR 1500.6 (2020) in the final rule.

*C. Revisions To Update Part 1501, NEPA and Agency Planning*

CEQ proposed substantive revisions to all sections in part 1501 except § 1501.2, "Apply NEPA early in the process," to which CEQ proposed minor edits for readability that are non-substantive. CEQ received a few comments on § 1501.2 requesting additional revisions but declines to make additional changes in response to the comments, which are discussed in the Phase 2 Response to Comments.

1. Purpose (§ 1501.1)

CEQ proposed to revise § 1501.1 to address the purpose and goals of part 1501, consistent with the approach in the 1978 regulations, and move the text in paragraph (a) of 40 CFR 1501.1 (2020) regarding NEPA thresholds to § 1501.3(a). CEQ discusses the revisions to that paragraph in section II.C.2 of this rule. Multiple commenters expressed general support for the overall changes to § 1501.1.

First, consistent with the approach in the 1978 regulations, CEQ proposed to retitle § 1501.1 to "Purpose," and add an introductory paragraph to indicate that this section would address the purposes of part 1501. CEQ did not receive any specific comments on these proposed changes and makes them in the final rule consistent with the proposal.

Second, in paragraph (a), CEQ proposed to highlight the importance of integrating NEPA early in agency planning processes by restoring some of the language from the 1978 regulations, while also including language that emphasizes that early integration of NEPA promotes an efficient process and can reduce delay. CEQ proposed these revisions for consistency with section 102(2)(C) of NEPA and the objective to build into agency decision making, beginning at the earliest point, an appropriate consideration of the environmental aspects of a proposed action. 42 U.S.C. 4332(2)(C). CEQ did not receive any specific comments on proposed paragraph (a) and includes it in the final rule as proposed.

Third, CEQ proposed in paragraph (b) to emphasize early engagement in the environmental review process to elevate the importance of early coordination and engagement throughout the NEPA process to identify and address potential issues early in the decision-making process, thereby helping to reduce the overall time required to approve a project and improving outcomes. Multiple commenters expressed support

---

[62] E.O. 11514, *supra* note 26; E.O. 11991, *supra* note 29.

[63] CEQ, 2020 Final Rule, *supra* note 39, at 43319.

for proposed paragraph (b) and the emphasis on early engagement in the environmental review process. One commenter suggested additional language to clarify that engagement should occur both prior to and during preparation of environmental documents. CEQ agrees that public engagement should continue throughout the NEPA process. However, this section outlines the purposes of part 1501, and while § 1501.1(b) emphasizes that engagement should start early in the NEPA process, the full breadth of appropriate engagement in the NEPA process is more appropriately discussed in § 1501.9. Therefore, CEQ includes paragraph (b), which is consistent with other changes throughout the regulations emphasizing the importance of engagement, as proposed, in the final rule.

Fourth, CEQ proposed to add a new paragraph (c) to restore text from the 1978 regulations regarding expeditious resolution of interagency disputes. One commenter suggested appending "and in the best interest of the public" to the end of paragraph (c) and expressed concern that the proposed language, particularly the reference to "fair," implies agencies have an interest of their own. The commenter recommended the regulations clarify that interagency disputes should be resolved in a manner that advances the public interest and not just the interests of the agencies.

CEQ adds paragraph (c), as proposed, to the final rule. While CEQ considers expeditious resolution of interagency disputes to be in the best interest of the public, the purpose of part 1501 is to facilitate the resolution of such disputes in an efficient fashion that accommodates the perspectives, expertise, and relevant statutory authority of the agencies involved in the dispute.

Fifth, CEQ proposed to add paragraph (d) to restore the direction to identify the scope of the proposed action and important environmental issues consistent with § 1501.3, which can enhance efficiency. One commenter requested clarity on what "important environmental issues" means, while another commenter asserted that all issues that acutely and negatively impact the environment deserve full study. One commenter also requested the final rule add language to clarify that agencies should remove unimportant issues from study or analysis, not just deemphasize them.

CEQ adds paragraph (d), as proposed, to the final rule. CEQ declines to make the commenter's recommended changes in paragraph (d). Agencies must

consider all issues during the environmental review process, but the level of analysis should be commensurate with the importance of the effect, with some issues requiring less analysis. This approach is consistent with the approach of the 1978 regulations that agencies have decades of experience implementing, which indicated that agencies should "concentrate on the issues that are truly significant to the action in question, rather than amassing needless detail." 40 CFR 1500.1(b) (2019).

Sixth, CEQ proposed to add paragraph (e) to highlight the importance of schedules consistent with § 1501.10, which includes provisions requiring agencies to develop a schedule for all environmental reviews and authorizations, as well as §§ 1501.7 and 1501.8, which promote interagency coordination including with respect to schedules. CEQ did not receive any specific comments on proposed paragraph (e) and includes it in the final rule as proposed.

Seventh, as discussed further in section II.C.2, CEQ proposed to combine the threshold considerations provision with the process to determine the appropriate level of NEPA review in § 1501.3 by moving paragraphs (a)(1), (a)(2), (a)(4), and (a)(5) of 40 CFR 1501.1 (2020) to § 1501.3(a)(1), (2), (4), and (4)(ii), respectively, and striking paragraphs (a)(3) and (a)(6).

CEQ proposed to delete the factor listed in 40 CFR 1501.1(a)(3) (2020), inconsistency with Congressional intent expressed in another statute, because upon further consideration, CEQ considers this factor to have inadequately accounted for agencies' responsibility to harmonize NEPA with other statutes, as discussed further in section II.C.2. As discussed in section II.B.5, the regulations provide that an agency should determine if a statute or court decision exempts an action from NEPA or if compliance with NEPA and another statute would be impossible; if not, the agency must comply with NEPA. To the extent the factor suggested that agencies should seek to go beyond these two questions to determine Congress's intent regarding NEPA compliance in enacting another statute, the factor is incorrect.

One commenter objected to CEQ's removal of the factor at 40 CFR 1501.1(a)(3) (2020) directing agencies to consider "[w]hether compliance with NEPA would be inconsistent with Congressional intent expressed in another statute." The commenter asserted the proposed rule does not provide sufficient guidance to Federal agencies to determine whether an action

is consistent with Congressional intent. In the final rule, CEQ strikes 40 CFR 1501.1(a)(3) (2020) as proposed because CEQ considers this factor to have inadequately accounted for agencies' responsibility to harmonize NEPA with other statutes. Section 1501.3(a)(2) of the final rule requires agencies to consider "[w]hether compliance with NEPA would clearly and fundamentally conflict with the requirements of another provision of Federal law." As discussed further in section II.C.2, § 1501.3(a)(2) incorporates the language of section 106(1)(a)(3) of NEPA, 42 U.S.C. 4336(a)(3), and aligns with the statutory mandate in section 102 of NEPA, 42 U.S.C. 4332, that agencies comply with NEPA "to the fullest extent possible." Therefore, CEQ is removing this factor because it provides an inadequately rigorous standard for exempting agency actions from NEPA and is redundant with § 1501.3(a)(2).

CEQ proposed to strike the factor in 40 CFR 1501.1(a)(6) (2020) regarding functional equivalence to restore the status quo as it existed in the longstanding 1978 regulations. The NPRM explained that certain Environmental Protection Agency (EPA) actions are explicitly exempted from NEPA's environmental review requirements, *see, e.g.,* 15 U.S.C. 793(c)(1) (exempting EPA actions under the Clean Air Act); 33 U.S.C. 1371(c)(1) (exempting most EPA actions under the Clean Water Act), and courts have found EPA's procedures under certain other environmental statutes it administers and certain procedures under the Endangered Species Act (ESA) to be functionally equivalent to or otherwise exempt from NEPA. *See, e.g., Env't Def. Fund, Inc.* v. *EPA,* 489 F.2d 1247, 1256–57 (D.C. Cir. 1973) (exempting agency actions under the Federal Insecticide, Fungicide, and Rodenticide Act); *W. Neb. Res. Council* v. *U.S. Env't Prot. Agency,* 943 F.2d 867, 871–72 (8th Cir. 1991) (noting exemptions under the Safe Drinking Water Act); *Douglas County* v. *Babbitt,* 48 F.3d 1495, 1503 (9th Cir. 1995) (holding that Endangered Species Act procedures for designating a critical habitat replace the NEPA requirements). Nevertheless, CEQ considered this language added to the 2020 rule to go beyond the scope of the NEPA statute and case law because the language could be construed to expand functional equivalence beyond the narrow contexts in which it has been recognized.

Some commenters opposed the proposed removal of the factor on functional equivalence from 40 CFR 1501.1(a)(6) (2020) as well as in other provisions of the regulations, including the removal of 40 CFR 1500.1(a), 1506.9,

1507.3(c)(5), and 1507.3(d)(6) (2020). One commenter asserted that removing it would extend duplicative activity among agencies. Other opponents underscored that courts have held on several occasions that statutes that include their own environmental review processes can make compliance with NEPA redundant. These commenters asserted that CEQ's removal of regulatory language recognizing those decisions will encourage duplication and inefficiency. One commenter asserted that language in the rulemaking that encourages agencies "to establish mechanisms in their agency NEPA procedures to align processes and requirements from other environmental laws with the NEPA process" would turn the functional equivalence doctrine on its head, by requiring a specific statute to give way to a general statute rather than *vice versa*.

By contrast, supporters of these changes asserted that the language in question had no justification in law, and that Congress had considered incorporating language related to functional equivalence into NEPA as part of the development of the Fiscal Responsibility Act but had ultimately chosen not to do so.

CEQ strikes the factor in 40 CFR 1501.1(a)(6) (2020) from the final rule. As several commenters acknowledged, courts decided some of the cases addressing functional equivalence before CEQ issued the 1978 regulations, which encouraged agencies to combine environmental documents with "any other agency document[s] to reduce duplication and paperwork," 40 CFR 1506.4 (2019),[64] and to "adapt[] [their] implementing procedures authorized by § 1507.3 to the requirements of other applicable laws." 40 CFR 1507.1 (2019). CEQ acknowledges the continuing validity of the judicial decisions finding EPA's procedures under certain environmental statutes it administers and certain procedures under the ESA are functionally equivalent to NEPA. CEQ considers these circumstances to fall within the scope of the activities and decisions addressed in § 1501.3(a)(1) as "exempted from NEPA by law." CEQ considers it unhelpful to separately discuss functional equivalence in the regulations to avoid suggesting that other agencies and activities or decisions are also exempted from NEPA. CEQ disagrees with commenters who contended that the functional equivalence decisions give agencies license to create new NEPA

exemptions.[65] Rather, the appropriate approach is for agencies to align their NEPA procedures with their statutory requirements—an approach that does not require a more specific statute to give way to a more general one, as asserted by a commenter, but rather allows agencies to comply with both statutes at once.

Eighth, CEQ proposed to remove the language in paragraph (b) of 40 CFR 1501.1 (2020) allowing agencies to make threshold determinations individually or in their NEPA procedures because CEQ proposed to move the consideration of thresholds into § 1501.3 to consolidate the steps agencies should take to determine whether NEPA applies and, if so, what level of NEPA review is appropriate. CEQ also proposed to strike this language because it is redundant to language in § 1507.3(d)(1), which provides that agency NEPA procedures may identify activities or decisions that are not subject to NEPA.

Ninth, CEQ proposed to remove as unnecessary paragraph (b)(1) of 40 CFR 1501.1 (2020) because agencies have discretion to consult with CEQ and have done so for decades on a wide variety of matters, including on determining NEPA applicability, without such specific language in the CEQ regulations.

Finally, CEQ proposed to eliminate paragraph (b)(2) of 40 CFR 1501.1 (2020) directing agencies to consult with another agency when they jointly administer a statute if they are making a threshold applicability determination. CEQ proposed to delete this paragraph because while CEQ agrees that consultation is a good practice in such circumstances, it does not consider such a requirement necessary for these regulations because consultation is best determined by the agencies involved.

One commenter expressed appreciation for the consolidation of threshold considerations from paragraph (b) but asserted that the final rule should retain an acknowledgement that the threshold considerations are a non-exhaustive list and that agencies should identify considerations on a case-by-case basis. CEQ considers the language in §§ 1501.3(a) and 1507.3(d)(1) to address the commenter's concern and removes paragraphs (b), (b)(1), and (b)(2) of 40 CFR 1501.1 (2020) in the final rule.

2. Determine the Appropriate Level of NEPA Review (§ 1501.3)

CEQ proposed substantive revisions to § 1501.3 to provide a more robust and consolidated description of the process agencies should use to determine the appropriate level of NEPA review, including addressing the threshold question of whether NEPA applies. CEQ also proposed clarifying edits, including adding paragraph headings to paragraphs (a) through (d). CEQ proposed these revisions to clarify the steps for assessing the appropriate level of NEPA review to facilitate a more efficient and predictable review process.

First, as noted in section II.C.1, CEQ proposed to move paragraph (a) of 40 CFR 1501.1 (2020) to a new § 1501.3(a), title it "Applicability," and add a sentence requiring agencies to determine whether NEPA applies to a proposed activity or decision as a threshold matter. CEQ proposed this move because the inquiry into whether NEPA applies is a component of determining the level of NEPA review. CEQ proposed to consolidate the steps in this process into one regulatory section to improve the clarity of the regulations. CEQ also noted that this consolidated provision is consistent with the approach in section 106 of NEPA, which addresses threshold determinations on whether to prepare an EA/FONSI or EIS. 42 U.S.C. 4336. In moving the text, CEQ proposed to strike "or is otherwise fulfilled" after "[i]n assessing whether NEPA applies" because, as discussed in section II.C.1, CEQ proposed to remove the functional equivalence factor from the regulation.

Second, CEQ proposed to move the threshold determination factors agencies should consider when determining whether NEPA applies from paragraphs (a)(1) and (a)(2) of 40 CFR 1501.1 (2020), to proposed paragraphs (a)(1) and (2), respectively. CEQ proposed to align the text in paragraph (a)(1) with the language proposed in § 1500.6 by deleting "expressly" and replacing "exempt from NEPA under another statute" with "exempted from NEPA by law." CEQ proposed to align the text in paragraph (a)(2) with the language in section 106(a)(3) of NEPA, changing "another statute" to "another provision of law" for consistency with the statutory text. 42 U.S.C. 4336(a)(3).

One commenter requested that the final rule revise paragraph (a)(2) to clarify that in the event of a clear and fundamental conflict with another law, an agency should consider "whether NEPA or that provision prevails under legal rules for resolving such conflicts between Federal laws." In requesting

---

[64] *See* CEQ, Phase 2 proposed rule, *supra* note 51, at 49956.

[65] *See also* CEQ, Phase 2 proposed rule, *supra* note 51, at 49959 ("CEQ has concerns about . . . language added by the 2020 rule [in 40 CFR 1507.3(c)(5)] to substitute other reviews as functionally equivalent for NEPA compliance, and therefore proposes to remove it.").

AR_0028780

this revision, the commenter described that if a situation arises in which NEPA clearly and fundamentally conflicts with a provision of State, Tribal, or local law, the agency has no further assessment to make before determining that NEPA prevails. However, if a situation arises in which NEPA clearly and fundamentally conflicts with another provision of a Federal law or a U.S. treaty with a foreign power, the commenter asserted the agency must make further assessments before it can determine whether NEPA or the other provision prevails.

In the final rule, CEQ moves paragraph (a) of 40 CFR 1501.1 (2020) to a new § 1501.3(a), ''Applicability,'' and makes the changes to paragraph (a) as proposed. CEQ also moves paragraphs (a)(1) and (a)(2) of 40 CFR 1501.1 (2020), to § 1501.3(a)(1) and (2), respectively, except that CEQ adds the word ''Federal'' to the phrase ''another provision of law.'' CEQ interprets section 106(a)(3), 42 U.S.C. 4336(a)(3), in light of the bedrock legal principle established by the Supremacy Clause of the Constitution that State, Tribal, or local laws do not override Federal law, the corollary that the Federal Government is not subject to State regulation in the absence of clear and unambiguous Congressional authorization, *see EPA* v. *California ex rel. State Water Resources Control Bd.,* 426 U.S. 200, 211 (1976), and decades of case law that predated the NEPA amendments and informed CEQ's 2020 rule considering whether NEPA conflicts with another Federal law. *See, e.g., Flint Ridge Development Co.* v. *Scenic Rivers Ass'n of Oklahoma,* 426 U.S. 776, 788 (1976). To improve the clarity of the NEPA regulations, CEQ adds the word ''Federal'' to the sentence to avoid any potential confusion that non-Federal legal requirements can override NEPA. CEQ disagrees that an agency must apply principles of statutory interpretation to determine whether NEPA applies where its application would present a clear and fundamental conflict with the requirements of another provision of Federal law, because section 106(a) of NEPA provides that in such circumstances ''an agency is not required to prepare an environmental document with respect to a proposed agency action.'' 42 U.S.C. 4336(a).

Third, CEQ proposed a new factor in paragraph (a)(3) to address circumstances where statutory provisions applicable to a proposed activity or decision make compliance with NEPA impossible. CEQ explained in the proposed rule that this factor is consistent with case law, principles of

statutory construction, and the statutory requirement of section 102 of NEPA that agencies interpret and administer ''the policies, regulations, and public laws of the United States'' in accordance with NEPA's policies. 42 U.S.C. 4332(1).

One commenter recommended the final rule change ''impossible'' to ''impracticable'' while another commenter suggested that the final rule remove paragraph (a)(3) because it is duplicative of paragraph (a)(2). CEQ has considered the comments and agrees that proposed paragraph (a)(3) is duplicative of proposed paragraph (a)(2) and could therefore cause confusion. Therefore, CEQ does not include proposed paragraph (a)(3) in the final rule.

Fourth, consistent with section 106(a)(1) and (4) of NEPA, 42 U.S.C. 4336(a)(1) and (4), CEQ proposed to move the threshold determination factor regarding whether the activity or decision is a major Federal action from paragraph (a)(4) of 40 CFR 1501.1 (2020) and the factor regarding whether the activity or decision is non-discretionary from paragraph (a)(5) of 40 CFR 1501.1 (2020), to proposed § 1501.3(a)(4) and (a)(4)(ii), respectively. CEQ proposed to add a new paragraph (a)(4)(i) to add the factor regarding whether the proposed activity or decision is a final agency action under the APA. CEQ proposed to include whether an activity or decision is a final agency action or non-discretionary as subfactors of whether an activity or decision is a major Federal action in § 1501.3(a)(4) because CEQ also proposed these as exclusions from the definition of ''major Federal action.'' The proposed rule explained that when agencies assess whether an activity or decision is a major Federal action, agencies determine whether they have discretion to consider environmental effects consistent with the definition of ''major Federal action'' in § 1508.1.

One commenter recommended the final rule exclude proposed paragraph (a)(4) because the question of whether NEPA applies precedes the determination of whether the proposed action is a major Federal action, and there is no need to consider whether an action is a major Federal action if NEPA does not apply to the action. Other commenters recommended proposed paragraphs (a)(4), (a)(4)(i), and (a)(4)(ii) be separated from paragraph (a) in order to clearly distinguish the factors for threshold applicability determination from the definition of ''major Federal action.''

In the final rule, CEQ moves paragraph (a)(4) of 40 CFR 1501.1(2020) regarding major Federal action to § 1501.3(a)(3) and adds a cross reference

to the definition § 1508.1(w). CEQ makes this revision to enhance the clarity of the regulation and for consistency with section 106(a) of NEPA. 42 U.S.C. 4336(a). CEQ disagrees with the commenter that determining whether an action constitutes a major Federal action is not a component of determining NEPA applicability or that treating this determination separately will improve efficiency. Agencies have the flexibility to consider the factors in paragraph (a) in any order and, therefore, the regulation does not require an agency to evaluate whether an action is a major Federal action if NEPA does not apply to it for other reasons.

In the final rule CEQ adds proposed paragraph (a)(4)(i) regarding final agency action to § 1501.3(a)(4) to make this a stand-alone factor, rather than a component of determining whether an action is a major Federal action, for consistency with section 106(a) of NEPA and improved clarity. 42 U.S.C. 4336(a). The final rule also adds the word ''not'' to paragraph (a)(4), so that it reads ''[w]hether the proposed activity or decision is not a final agency action'' for consistency with section 106(a)(1) of NEPA and parallelism with the other factors, which identify circumstances in which NEPA does not apply. 42 U.S.C. 4336(a)(1). CEQ notes that this factor requires the agency to evaluate whether the proposed action would be a final agency action if ultimately taken by the agency. CEQ does not include a cross reference to the definition of ''major Federal action'' as proposed because the final rule does not include this as an exclusion from the definition.

Lastly within paragraph (a), CEQ moves paragraph (a)(5) of 40 CFR 1501.1 (2020) on non-discretionary actions to § 1501.3(a)(5) to make this a stand-alone factor, rather than a sub-factor of major Federal action, for consistency with section 106(a)(4) of NEPA. 42 U.S.C. 4336(a)(4). While non-discretionary actions are excluded from the definition of ''major Federal action'' in section 111(10) of NEPA and § 1508.1(w), Congress determined that it was important to highlight this category as a component of determining NEPA applicability, and CEQ considers it appropriate for the regulations to do so as well. 42 U.S.C. 4336e(10). CEQ does not include a cross reference to the definition of ''major Federal action'' as proposed because the language in the statutory exclusion from the definition of ''major Federal action'' is different from this exclusion.

CEQ notes that where some components of an action are non-discretionary, but others are

**35462**    **Federal Register** / Vol. 89, No. 85 / Wednesday, May 1, 2024 / Rules and Regulations

discretionary, an agency can exclude considerations of the non-discretionary components from its NEPA analysis. That circumstance more logically presents an issue of the appropriate scope of the analysis, rather than of NEPA applicability, so, as discussed below, CEQ has included a reference to it in paragraph (b). For example, if a statute mandated an agency to make an affirmative decision once a set of criteria are met, but the agency has flexibility in how to meet those criteria, the agency exercises discretion on aspects of its decision and an analysis of alternatives and effects would inform the agency's exercise of discretion. Similarly, if a statute directs an agency to take an action, but the agency has discretion in how it takes that action, the agency can still comply with NEPA while carrying out its statutory mandate.

Fifth, CEQ proposed to move, with clarifying edits and additions, paragraph (e) and its subparagraphs of 40 CFR 1501.9 (2020), "Determination of scope," to a new § 1501.3(b), "Scope of action and analysis," to provide the next step in determining the appropriate level of NEPA review—the scope of the proposed action and its potential effects. In addition, CEQ proposed moving into § 1501.3(b) one sentence from paragraph (a) of 40 CFR 1502.4 (2020) directing agencies to evaluate in a single NEPA review proposals sufficiently closely related to be considered a single action, and the text from paragraph (e)(1) of 40 CFR 1501.9 (2020) regarding connected actions, which are closely related Federal activities or decisions that agencies should consider in a single NEPA document. CEQ proposed to move paragraphs (e)(1)(i) through (e)(1)(iii) of 40 CFR 1501.9 (2020) providing the types of connected actions into § 1501.3(b)(1) through (b)(3), respectively.

CEQ proposed these changes because this longstanding principle from the 1978 regulations—that agencies should not improperly segment their actions—is relevant not only when agencies are preparing EISs, but also when agencies determine whether to prepare an EA or apply a CE. *See, e.g., Fath* v. *Texas DOT,* 924 F.3d 132, 137 (5th Cir. 2018) ("Agencies generally should not segment, or divide artificially a major Federal action into smaller components to escape the application of NEPA to some of its segments.") (quotations omitted). CEQ proposed to consolidate this text into § 1501.3(b) because the determination of the scope of the action, including any connected actions, necessarily informs the appropriate level of NEPA review. Because including this provision in § 1501.3

would make it applicable to environmental reviews other than EISs, CEQ proposed to strike the sentence that accompanied the text in 40 CFR 1502.4(a) (2020) directing the lead agency to determine the scope and significant issues for analysis in the EIS as part of the scoping process. CEQ proposed in § 1501.3(b)(1) to make a conforming change of "environmental impact statements" to "NEPA review."

Multiple commenters provided feedback on the first sentence of proposed § 1501.3(b) suggesting the final rule include additional language to limit it to an action that is under Federal agency control, and that NEPA reviews should not be used as a "Federal handle" to subject an entire project to Federal review where the Federal action comprises only one portion of the project. CEQ declines these edits because the sentence in question appropriately directs agencies to consider the scope of the proposed action and its potential effects consistent with longstanding agency practice.

In the final rule, CEQ moves paragraphs (e) and (e)(1) of 40 CFR 1501.9 (2020), to § 1501.3(b), and moves paragraph (e)(1)(i) through (e)(1)(iii) of 40 CFR 1501.9 (2020) to § 1501.3(b)(1) through (b)(3), respectively. CEQ adds the first sentence of proposed § 1501.3(b) as proposed with an additional phrase "whether aspects of the action are non-discretionary" at the end of the first sentence for consistency with agency practice and case law recognizing that where some aspects of an agency's action are non-discretionary, the agency can properly exclude them from the scope of its analysis. Adding this reference to this sentence clarifies that while NEPA does not apply to an action that is wholly non-discretionary, agencies should approach circumstances in which aspects of an action are non-discretionary, but others are discretionary, as a component of determining scope.

Another commenter suggested use of "potential effects" be replaced with "reasonably foreseeable effects" to emphasize that agencies are not required to consider effects that are not reasonably foreseeable. CEQ agrees that an agency only needs to consider reasonably foreseeable effects in determining the scope of analysis but declines to make this change as the word "effects" is a defined term in the regulations meaning reasonably foreseeable effects. Upon further consideration, CEQ deletes the word "potential" before the word "effects" to avoid any confusion that agencies must

consider effects other than reasonably foreseeable effects.

Some commenters requested additional clarity on the meaning of scope and how determination of scope under paragraph (b) relates to public engagement and the scoping process under § 1502.4. CEQ adds a new second sentence to paragraph (b) to require agencies to use, as appropriate, the public engagement and scoping mechanisms in §§ 1501.9 and 1502.4 to inform consideration of the scope of the proposed action and determination of the level of NEPA review. CEQ adds this language, consistent with other changes made in §§ 1501.9 and 1502.4 to better explain the connection between scope, scoping, and public engagement.

One commenter requested clarity on the relationship between the second and third sentences of proposed § 1501.3(b), specifically suggesting deletion of the second sentence and revisions to the third sentence to provide a clearer standard for connected actions. Another commenter requested the final rule exclude "Federal" in the proposed sentence. CEQ declines the suggested edits. These sentences are based on longstanding provisions from 40 CFR 1502.4 and 1501.9(e)(1) (2020) and 40 CFR 1508.25(a)(1) (2019), and agencies have decades of experience applying them, including experience identifying those components of a project that have independent utility and therefore can be analyzed separately without running afoul of the prohibition on segmentation. The two regulatory requirements of the proposed second and third sentences—prohibiting agencies from breaking up a single "action" into separate reviews and requiring them to review together closely related "connected actions"— are related but distinct requirements, which is why CEQ included them in a single paragraph but in different sentences. CEQ also disagrees that connected actions should be broadened to include non-Federal actions. Non-Federal actions have long been excluded from connected actions because the purpose of the doctrine is to prevent the Federal Government from segmenting Federal actions into separate projects and thereby failing to consider the scope and impact of the Federal activity. *See Sierra Club* v. *U.S. Army Corps of Engineers,* 803 F.3d 31 (D.C. Cir. 2015). Including non-Federal actions as connected actions would be inconsistent with the purpose of the concept and unsettle an aspect of the NEPA implementation that has been stable for decades.

One commenter suggested that CEQ add language to § 1501.3(b) stating that

to avoid segmentation, projects that are separate and distinct must have a logical end point; substantial independent utility; do not foreclose the opportunity to consider alternatives; and do not irretrievably commit Federal funds for closely related projects during the same time period, place, and type. CEQ declines to adopt the language suggested by the commenter. CEQ recognizes that some courts and agencies have included similar language in decisions and agency NEPA procedures (*see, e.g., Del. Riverkeeper Network* v. *FERC,* 753 F.3d 1304, 1315 (D.C. Cir. 2014) (quoting *Taxpayers Watchdog, Inc.* v. *Stanley,* 819 F.2d 294, 298 (D.C. Cir. 1987))); 23 CFR 771.111(f)) (2018), but considers providing additional details on segmentation more appropriately addressed in agency procedures that can be tailored to specific agency programs and actions.

In moving the text from 40 CFR 1501.9(e) (2020) to § 1501.3(b), CEQ proposed to strike paragraphs (e)(2) and (e)(3) of 40 CFR 1501.9 (2020) relating to alternatives and impacts, respectively. CEQ proposed to delete these paragraphs because both the 2020 regulations and the proposed rule separately address the analyses of alternatives and effects regarding EISs (§§ 1502.14, 1502.15) and EAs (§ 1501.5(c)(2)(ii) and (c)(2)(iii)). CEQ considers it to be premature in the process, unnecessary, and unhelpful to address alternatives as part of determining the level of NEPA review.

One commenter requested the final rule provide a better explanation regarding the deletion of 40 CFR 1501.9(e)(2) and (e)(3) (2020) and requested that CEQ provide more direction and guidance on consideration of alternatives and impacts. The commenter stated that this text has been in the regulations since 1978 and requested clearer justification for the changes. CEQ agrees that the effects of a proposed action are relevant to determining the scope of the action and analysis, which is why the first sentence of § 1501.3(b) references effects. However, CEQ does not consider alternatives to be relevant to identifying the scope of action and analysis under paragraph (b), which is intended to inform an agency's determination under paragraph (c) of the appropriate level of review.

In the final rule, CEQ adds the second sentence from proposed paragraph (d)(2)(vi), in which CEQ proposed to include an intensity factor from the 1978 regulations related to the relationship of actions, to be the fourth sentence of § 1501.3(b). CEQ revises the language for clarity to specify that

agencies "shall not term an action temporary that is not temporary in fact or segment an action into smaller component parts to avoid significant effects." CEQ has made this change in the final rule because the text in proposed paragraph (d)(2)(vi) directs agencies not to segment actions, which is more appropriately addressed in the paragraph on scope than in the paragraph on intensity.

Sixth, CEQ proposed to redesignate paragraph (a) of 40 CFR 1501.3 (2020) as paragraph (c), title it "Levels of NEPA review," incorporate the language of section 106(b)(3) of NEPA, 42 U.S.C. 4336(b)(3), addressing the sources of information agencies may rely on when determining the appropriate level of NEPA review, and redesignate paragraphs (a)(1) through (a)(3) describing three levels of review—CEs, EAs, and EISs—as paragraphs (c)(1) through (c)(3), respectively without change.

CEQ received multiple comments on the incorporation of section 106(b)(3) of NEPA into proposed paragraph (c). 42 U.S.C. 4336(b)(3). Some commenters supported this incorporation, while others urged CEQ to limit the standard established in section 106(b)(3) to the determination of whether to prepare an EA or an EIS. CEQ disagrees with these commenters and adds the proposed language in the final rule because CEQ considers it appropriate to direct agencies to make use of any reliable data source in considering whether to apply a CE to an action and notes that a decision based on unreliable data would likely be inconsistent with the principles of reasoned decision making. CEQ also considers the approach to reliable data and producing new research in section 106(b)(3) to be consistent with longstanding practice and case law and appropriate to apply broadly to an agency's determination of the appropriate level of NEPA review, including a determination that no such review is required. 42 U.S.C. 4336(b)(3). Moreover, because section 106(b)(3)(B) provides that an agency "is not required to undertake new scientific or technical research" outside of the identified circumstances, making this language inapplicable to CE determinations would mean that agencies have a broader (but undefined) obligation to undertake new scientific or technical research for those determinations. 42 U.S.C. 4336(b)(3). Such a result would undermine the efficiency of CEs and create confusion for agencies.

Multiple commenters requested additional guidance from CEQ on how to apply the standard, what is considered a reliable data source, what

costs or delays make obtaining new information unreasonable, and how long information will continue to be considered reliable. CEQ considers those questions to raise detailed or fact-specific issues that may be better suited to address in guidance or by agencies in considering specific NEPA reviews. CEQ notes that agencies have extensive experience in assessing the reliability of information in the NEPA process, and the regulations provide additional direction in §§ 1502.21 and 1506.6. CEQ will consider whether additional guidance is necessary to assist agencies in applying the standard.

CEQ makes these revisions as proposed in the final rule with one clarifying change to paragraph (c)(1) to replace "[n]ormally does not have significant effects and is" with "[i]s appropriately." As phrased, this provision could be read to conflict with the process provided for in § 1501.4(b) for an agency to determine that a proposed action can be categorically excluded notwithstanding the existence of extraordinary circumstances. This change also provides for a parallel structure with paragraphs (c)(2) and (c)(3).

Seventh, CEQ proposed to redesignate paragraph (b) of 40 CFR 1501.3 (2020) as § 1501.3(d), title it "Significance determination—context and intensity," and address factors agencies must consider in determining significance by restoring with some modifications the consideration of "context" and "intensity" from the 1978 regulations, which appeared in the definition of "significantly." *See* 40 CFR 1508.27 (2019). The proposed rule explained that because this text provides direction on how agencies determine the significance of an effect, rather than a definition, addressing significance determinations in § 1501.3 is more appropriate than § 1508.1.

Eighth, CEQ proposed to modify the introductory language in paragraph (d) by replacing the requirement that agencies "analyze the potentially affected environment and degree of the effects" with a requirement for agencies to consider the context of an action and the intensity of the effects when considering whether the proposed action's effects are significant. CEQ proposed to strike the second sentence of 40 CFR 1501.3(b) (2020) requiring agencies to consider connected actions because this concept would be included in proposed paragraph (c).

Multiple commenters expressed support for the overall restoration of the context and intensity factors, as well as the proposed expansion of the factors, asserting that doing so aligns with

longstanding case law and adds certainty to the process. A few commenters generally opposed the reintroduction and expansion of the factors, asserting they would expand the scope of NEPA review rather than encourage streamlining and that the expansion of the factors is inconsistent with the statutory amendments to NEPA. A few commenters requested that proposed paragraph (d) clarify that agencies may consider mitigation in making a significance determination.

In the final rule, consistent with the proposal, CEQ redesignates paragraph (b) of 40 CFR 1501.3 (2020) as § 1501.3(d), titles it "Significance determination—context and intensity," revises the first sentence of paragraph (d) with additional modifications to the proposal, and strikes the second sentence of 40 CFR 1501.3(b) (2020). CEQ adds and revises the factors as discussed further in this section. CEQ disagrees that the factors will expand the scope of NEPA review. Rather, these factors, including the additional factors, will assist agencies in determining the appropriate level of NEPA review for their proposed actions by focusing their review on the critical factors in determining significance.

As discussed further in this section, CEQ moves language regarding beneficial and adverse effects as well as the language regarding segmentation to the end of paragraph (d) in response to commenters' recommendations because this language is more generally applicable and not specific to context or intensity. Finally, CEQ declines to address the role of mitigation in this paragraph. CEQ has clarified in § 1501.6 that if an agency determines that a proposed action would not have a significant effect because of the implementation of mitigation, then the agency must document its finding in a mitigated FONSI. Therefore, addressing mitigation and its relation to significance is unnecessary in this paragraph.

Ninth, CEQ proposed to strike 40 CFR 1501.3(b)(1) (2020), replace it with proposed paragraph (d)(1), and restore the requirement for agencies to analyze the significance of an action in several contexts consistent with the 1978 regulations. CEQ also proposed to add examples of contexts that may be relevant. In the first sentence, CEQ proposed to encourage agencies to consider the characteristics of the relevant geographic area, such as proximity to unique or sensitive resources or vulnerable communities. The proposed rule indicated that such resources may include historic or cultural resources, Tribal sacred sites,

and various types of ecologically sensitive areas. CEQ explained that this revision relates to the intensity factor in proposed paragraph (d)(2)(iii), which CEQ proposed to restore from the 1978 regulations. CEQ proposed to include it as a context factor as well since it relates to the setting of the proposed action and to encourage agencies to consider proximity to communities with environmental justice concerns.

CEQ also proposed to add a third sentence to paragraph (d)(1) encouraging agencies to consider the potential global, national, regional, and local contexts, which may be relevant depending on the scope of the action, consistent with the 2020 and 1978 regulations. Additionally, CEQ proposed to move and revise text providing that the consideration of short- and long-term effects is relevant to the context of a proposed action from 40 CFR 1501.3(b)(2)(i) (2020) to the end of the third proposed sentence in paragraph (d)(1) to encourage agencies to consider the duration of the potential effects whether they are anticipated to be short- or long-term.

Multiple commenters expressed support for the proposed restoration of the consideration of context in determining significance, asserting that doing so is consistent with case law and would promote compliance with NEPA's mandate to consider all significant effects. A few commenters requested the regulations define or add clarity on the terms "unique or sensitive resources," "vulnerable communities," and "relevant geographic area." Some commenters supported the use of these terms while others expressed concern that without clear definitions there could be project delays or increased litigation risk.

In the final rule CEQ strikes 40 CFR 1501.3(b)(1) (2020) and replaces it in § 1501.3(d)(1) with the text in proposed paragraph (d)(1) with a few modifications. CEQ notes that paragraph (d)(1) requires agencies to analyze the significance of an action in several contexts, as evidenced by use of the term "shall" in the first sentence, while the second and third sentences use "should" to clarify that the determination the appropriate contextual factors will depend on the particular proposed action. In the final rule, CEQ uses the term "communities with environmental justice concerns" instead of "vulnerable communities" because CEQ has added this as a defined term in § 1508.1, and it is consistent with use of this term elsewhere in the rule. CEQ excludes the word "relevant" before "geographic area" in the final rule text as an unnecessary modifier

since the encouragement is to consider the geographic area of the proposed action, which will necessarily depend on the context and scope of the proposed action. Moreover, agencies have decades of experience implementing a similar provision in the 1978 regulations, which did not include the word "relevant" before "geographic area," and the addition of "relevant" could have the unintended consequence of indicating to agencies that this provision requires a substantially different analysis. CEQ declines to define "geographic area" and "unique or sensitive resources" as these phrases have been used in the regulations since 1978, and agencies have extensive experience interpreting them in the context of particular proposed actions. Further, CEQ is unaware of any misunderstanding about the meaning of these phrases and is concerned that adding a new regulatory definition could be disruptive for agencies.

Some commenters expressed support for the language encouraging agencies to consider the potential global, national, regional, and local contexts. Other commenters opposed the inclusion of all four contexts, and in particular the inclusion of "global," stating that requiring agencies to consider all four would expand the complexity and scope of NEPA reviews and lead to inappropriate determinations that certain projects require an EIS, strain agency resources, cause delays and increase litigation risk, and allow subjectivity to be introduced to the decision. Other commenters requested more clarity on the types of actions that require consideration of potential global, national, regional, and local contexts, with another commenter requesting that the language be modified to provide flexibility to consider appropriate geographic contexts based on the site-specific action rather than always require evaluation of all four contexts.

In the final rule, CEQ includes the language on global, national, regional, and local contexts as proposed in § 1501.3(d)(1). The 2020 rule described "context" as related to the potentially affected environment in determining significance, stating that this reframing relates more closely to physical, ecological, and socio-economic aspects of the environment.[66] CEQ has reconsidered this approach and now finds it to be unhelpful and potentially limiting. While CEQ agrees that the contexts relevant to an agency's assessment of significance will be those that are potentially affected, identifying

---

[66] CEQ, 2020 Final Rule, *supra* note 39, at 43322.

AR_0028784

the global, national, regional, and local contexts reminds agencies that they should consider whether proposed actions have reasonably foreseeable effects across these various contexts. Describing context in this manner is also consistent with the decades of experience agencies had implementing the 1978 regulations and is consistent with the concepts of indirect and cumulative effects. CEQ has also reconsidered the statement in the 2020 rule that the affected environment, is "usually" only the local area, 40 CFR 1501.3(b)(1) (2020) ("For instance, in the case of a site-specific action, significance would *usually* depend only upon the effects in the local area.") (emphasis added), because many Federal actions have reasonably foreseeable effects that extend regionally, nationally, or globally.

CEQ notes that § 1501.3(d)(1) does not require agencies to evaluate all four contexts—global, national, regional, and local—for every proposed action. Rather, agencies should determine the appropriate contexts to consider based on the scope of the action and its anticipated reasonably foreseeable effects.

CEQ disagrees with commenters' assertion that this language will lead agencies to expand the evaluation of effects beyond those that are reasonably foreseeable. This provision provides guidance to agencies on how to determine whether an effect is significant, and the word "effect" is a defined term in the regulations that is always limited to reasonably foreseeable effects. This text recognizes that the global, national, regional, or local context may bear on assessing the significance of reasonably foreseeable effects. For example, in determining the significance of an effect on highly migratory marine species that travels thousands of miles each year from waters around Antarctica to the Arctic Ocean, the agency may need to consider the global context in which the species migrates, including other stressors that occur at other points of the migration route. Conversely, dam operations in a transboundary watershed may have consequences on aquatic ecosystems that are appropriately considered at the regional or watershed level and that may need to consider management and stressors extending across national boundaries. The regional nature of the resource effects, however, may not necessitate an analysis of global context. A decision to fund a project to construct a building to provide additional office space for a Federal agency on previously developed land may have consequences limited to the local area around the new building, and may not necessitate an analysis of global, State, or regional context.

Tenth, CEQ proposed to strike 40 CFR 1501.3(b)(2) (2020), replace it with proposed paragraph (d)(2), and reinstate "intensity" as a consideration in determining significance, which CEQ reframed in the 2020 rule as the "degree" of the action's effects. Specifically, CEQ proposed to strike the sentence in 40 CFR 1501.3(b)(2) (2020) encouraging agencies to consider the list of factors in assessing the degree of effects and replace it with a requirement to analyze the intensity of effects in light of the list of factors as applicable to the proposed action and in relation to one another. CEQ proposed to reinstate consideration of intensity because the concept of intensity and the intensity factors have long provided agencies with guidance in how the intensity of an action's effects may inform the significance determination. Further, CEQ noted it had reconsidered its position in the 2020 rule that removal of intensity as a consideration was based in part on the proposition that effects are not required to be intense or severe to be considered significant.[67] CEQ does not consider "intense" to be a synonym for "significant;" rather, it points to factors to inform the determination of significance that are part of longstanding agency practice.

Multiple commenters expressed general support for the restoration of the intensity factors in the proposed rule or identified support for specific factors, whereas others expressed general opposition or opposition to particular factors. One commenter suggested that the final rule replace the phrases "potential" and "degree to which the proposed action may adversely affect" in proposed paragraphs (d)(2)(ii), (iii), (v), (viii), and (x) with "the degree of any reasonably foreseeable adverse effect of the proposed action on." The commenter also suggested the final rule revise paragraph (d)(2)(ix) to "the degree of any reasonably foreseeable and disproportionate adverse effects from the proposed action on communities with environmental justice concerns." The commenter asserted these changes would focus the consideration on reasonably foreseeable effects, consistent with the statute, while "may adversely affect" could be read to mean agencies should consider speculative scenarios and effects that are not reasonably foreseeable. Other commenters made similar suggestions, requesting the regulations consistently refer to "reasonably foreseeable effects."

Relatedly, a commenter recommended the regulations consistently refer to "the proposed action," rather than "the action" in the factors. Some commenters opposed the inclusion of "adverse" in front of multiple factors.

CEQ declines to make these changes in the final rule. The intensity factors inform an agency's determination of whether an effect is significant, and the word "effect" is a defined term that means reasonably foreseeable effects. Therefore, paragraph (d)(2) applies only to reasonably foreseeable effects and repeating the phrase "reasonably foreseeable" throughout this paragraph is unnecessary. CEQ retains "adverse" in the final rule consistent with the definition of "significant effects" and the language in § 1501.3(d), which clarify that only adverse effects can be significant.

Eleventh, CEQ proposed to clarify in proposed paragraph (d)(2)(i) that agencies should focus on adverse effects in determinations of significance, consistent with NEPA's policies and goals as set forth in section 101 of the statute. 42 U.S.C. 4331. CEQ proposed to redesignate paragraph (b)(2)(ii) of 40 CFR 1501.3 (2020) as paragraph (d)(2)(i) regarding beneficial and adverse effects and revise it to state that "[e]ffects may be beneficial or adverse" but "only actions with significant adverse effects require an [EIS]."

CEQ proposed to add a third sentence to this paragraph to indicate that a significant adverse effect may exist even if the agency considers that on balance the effects of the action will be beneficial. The proposed rule explained that this provision is intended to be distinct from weighing beneficial effects against adverse effects to determine that an action's effects on the whole are not significant. Rather, an action with only beneficial effects and no significant adverse effects does not require an EIS, consistent with CEQ's proposed revisions to § 1501.3(d)(2), regarding the meaning of intensity.

CEQ proposed to strike paragraph (b)(2)(i) of 40 CFR 1501.3 (2020) but incorporate the text into a fourth sentence in paragraph (d)(2)(i) to clarify that agencies should consider the duration of effects and include an example of such consideration—an action with short-term adverse effects but long-term beneficial effects. The proposed rule explained that while significant adverse effects may exist even if the agency considers that on balance the effects of the action will be beneficial, the agency should consider any related short- and long-term effects in the same effect category together in evaluating intensity.

---

[67] CEQ, 2020 Final Rule, *supra* note 39, at 43322.

Multiple commenters supported proposed paragraph (d)(2)(i), expressing support for the qualification that only actions with significant adverse effects require an EIS because it will reduce expenditure of agency resources on unnecessary EISs, streamline the NEPA process, and promote a holistic review of projects. One commenter cited *Friends of Fiery Gizzard v. Farmers Home Admin.*, 61 F.3d 501 (6th Cir. 1995) to support CEQ's proposed approach.

Multiple commenters also opposed the proposal to only require an EIS for actions with significant adverse effects. Some commenters asserted that proposed (d)(2)(i) and the reference to adverse effects in other proposed intensity factors would illegally limit the scope of NEPA because the statutory requirement to prepare an EIS does not distinguish between adverse and beneficial effects. A few commenters cited case law that they argued contravenes the proposed change. *Hiram Clarke Civil Club* v. *Lynn*, 476 F.2d 421 (5th Cir. 1973); *Environmental Defense Fund* v. *Marsh*, 651 F.2d 983 (5th Cir. 1981). One commenter also asserted the proposal poses a risk that agencies will not assess significant adverse effects or evaluate less damaging alternatives, and that the proposed provision could be interpreted to give agencies discretion to opt out of preparing an EIS based on unsupported claims that the project will be beneficial or based on the project's stated intent. One commenter further asserted that almost no environmentally significant project completely avoids all potentially significant adverse effects and also expressed concern about the lack of an EIS limiting the opportunity for the public to provide comment where they might raise other potentially adverse effects. A few commenters expressed concern that the proposed language favors a certain type of project over another without statutory or factual support for doing so.

Some commenters interpreted the language in the last two sentences of proposed paragraph (d)(2)(i) to read that CEQ supported a "netting" approach to EISs, whereby if an action has significant adverse effects but had net beneficial effects then the agency would not have to prepare an EIS. Some commenters supported this interpretation while others opposed it. A few commenters requested CEQ clarify that the significance determination through the application of context and intensity factors across timescales or duration applies to each individual "effect category" that is implicated by the proposed action. The

commenters state that without this clarification, decision makers could conflate categories of effects by considering an action's effects as a whole thereby dismissing significant adverse effects within an individual category on a given timescale if the decision maker determines the action is beneficial overall. Another commenter requested the regulations clarify that an EIS is not required where the beneficial effects of a proposed action outweigh its adverse effects.

In the final rule, CEQ addresses the concept that only adverse effects are significant by moving the last sentence of proposed paragraph (d)(2)(i) to paragraph (d) and revising it because this concept is a more general consideration and not specific to intensity. CEQ also includes a definition of "significant effect" in § 1508.1 to provide further clarity.

Specifically, CEQ strikes 40 CFR 1501.3(b)(2)(i) and (ii) (2020) because § 1501.3(d) addresses consideration of the duration of effects and whether a particular category of effect is adverse or beneficial coupled with the definition of "significant effects" in § 1501.1(mm). CEQ includes the first clause of the last sentence of proposed paragraph (d)(2)(i), encouraging agencies to consider the duration of effects, as the second sentence of § 1501.3(d) and adds an introductory clause to the sentence: "[i]n assessing context and intensity." CEQ also makes "effects" singular to emphasize that this analysis is done on an effect-by-effect basis and does not allow agencies to weigh a beneficial effect of one kind against an adverse effect of another kind or evaluate whether an action is beneficial or adverse in net to determine significance. For example, an agency cannot compare and determine significance by weighing adverse water effects against beneficial air effects, or adverse effects to one species against beneficial effects to another species. Then, CEQ includes and modifies the second clause of the last sentence of proposed paragraph (d)(2)(i), providing that an action may have short-term adverse effects but long-term beneficial effects, as the third sentence in § 1501.3(d) to explain that agencies may consider the extent to which an effect is adverse at some points in time and beneficial at others. CEQ also includes an illustrative example of a proposed action for habitat restoration where an agency may consider both any short-term harm to a species during implementation of the action and any benefit to the same species once the action is complete. As another example, an action that will enhance recharge of a groundwater

aquifer once completed could have an adverse effect on groundwater recharge in the short term. In evaluating the significance of the action's effect on groundwater recharge, the agency should consider both the short-term harm and long-term benefit. In some circumstances, an effect may be significant due to the harm during one period of time regardless of the benefit at another. For example, if implementation of a habitat restoration action may extirpate a species from the area, then an agency could not reasonably rely on long-term habitat improvements resulting from the action to determine that the overall effect to the species is not significant. The approach to considering duration contemplated by this language is similar to the familiar analysis agencies engage in with respect to compensatory mitigation, in which they may conclude that benefits from the implementation of mitigation measures reduce the anticipated adverse effects of a proposed action below the level of significance.

In place of the third sentence of proposed paragraph (d)(2)(i), CEQ adds a new third sentence at the end of paragraph (d) that prohibits agencies from offsetting an action's adverse effects with other beneficial effects to determine significance. This sentence also includes a parenthetical example that agencies may not offset an action's adverse effect on one species with a beneficial effect on another species. The CEQ regulations have never allowed agencies to use a net benefit analysis across environmental effects to inform the level of NEPA review. Because the final rule clarifies that only adverse effects may be significant, CEQ considers it especially important to emphasize this prohibition in the regulatory text to ensure agencies identify the appropriate level of review for their proposed actions. Finally, CEQ does not include the second sentence of proposed paragraph (d)(2)(i) stating that only actions with significant adverse effects require an EIS because this is made clear through the limitation in the definition of "significant effects" in § 1508.1(mm) to adverse effects.

The Fifth and Sixth Circuit cases cited by the commenters illustrate the split among courts on whether actions with only significant beneficial effects and no significant adverse effects trigger an EIS. *See also Humane Soc'y of U.S.* v. *Locke*, 626 F.3d 1040, 1056 n.9 (9th Cir. 2010) and *Drakes Bay Oyster Co.* v. *Jewell*, 747 F.3d 1073, 1090 n.11 (2014) discussing the split in courts in dicta. CEQ considers the Congressional declaration of purpose in section 2 of NEPA and the Congressional declaration of national

environmental policy in section 101 of NEPA to indicate that Congress intended for "significant effects" to be those that are damaging, which is what CEQ interprets the phrase "adverse effects" to mean. 42 U.S.C. 4321, 4331. The recent amendments to NEPA bolster this interpretation because section 102(2)(C)(iii) directs analysis of "negative environmental impacts of the no action alternative" and section 108(1) refers to the significance of adverse effects related to programmatic environmental documents. 42 U.S.C. 4332(2)(C)(iii), 4336b(l). CEQ notes too that the definition of "significant effects" and § 1501.3(d) do not eliminate the requirement for agencies to identify and discuss all reasonably foreseeable environmental effects whether adverse or beneficial when preparing an EIS.

Twelfth, CEQ proposed to redesignate paragraph (b)(2)(iii) of 40 CFR 1501.3 (2020) as paragraph (d)(2)(ii) and make a clarifying edit to the factor relating to effects on health and safety by adding language indicating that the relevant consideration is "the degree to which" the proposed action may "adversely" affect public health and safety. Commenters suggested that the final rule add "welfare" and "public well-being" to this factor. CEQ declines these additions because public health and safety have a more precise meaning than "welfare" and "well-being" and therefore, will be more readily applied by agencies. Further, this factor has remained unchanged since 1978, so agencies have a long history of examining these in the consideration of significant effects on the human environment. In the final rule, CEQ redesignates paragraph (b)(2)(iii) of 40 CFR 1501.3 (2020) as § 1501.3(d)(2)(i) and revises it as proposed but omits "proposed" before "action" for consistency with the language of the factors.

Thirteenth, CEQ proposed to add a new paragraph (d)(2)(iii) to add a new intensity factor to consider the degree to which the proposed action may adversely affect unique characteristics of the geographic area such as historic or cultural resources, park lands, Tribal sacred sites, prime farmlands, wetlands, wild and scenic rivers, or ecologically critical areas. CEQ proposed this factor to reinstate a factor from the 1978 regulations, with clarifying edits, which agencies have considered for decades. As noted earlier in this section, CEQ proposed to use the wording from the 1978 factor on unique characteristics in paragraph (d)(1) on context because they relate to the setting of an action. The proposed rule indicated that consideration of this factor is consistent

with both the definition of "effects" and the policies and goals of NEPA. 42 U.S.C. 4331.

Some commenters expressed support for the restoration of the factor in proposed paragraph (d)(2)(iii) and the proposed modifications to the 1978 regulatory text. One commenter recommended removing "historic or cultural resources" because it is redundant and imprecise. Two commenters asked that the final rule define "park lands," "prime farmlands," and "ecologically critical areas" for clarity. A few commenters requested that the final rule broaden the reference to Tribal sacred sites to include culturally significant sites, including sites of Native Hawaiians, Alaskan Natives, and indigenous peoples in the United States and its Territories. Other commenters requested use of "and other indigenous communities" to include non-federally recognized Tribes.

CEQ adds proposed new paragraph (d)(2)(iii) at § 1501.3(d)(2)(ii) in the final rule, revising "park lands" to "parks" to modernize the language that was included in the 1978 regulations and omitting "proposed" before "action" for consistency with the language of the factors. CEQ declines to remove the word "prime" before "farmlands," which would substantially expand this factor beyond historical practice and including all farmland within this factor would be inconsistent with directing agencies to consider the "unique characteristics of the geographic area." CEQ declines to make the other changes suggested by the commenters. However, CEQ notes that in addition to "Tribal sacred sites," the list of intensity factors includes several other factors that may be relevant to Tribal and Indigenous cultural sites, including "historic or cultural resources" and "resources listed or eligible for listing in the National Register of Historic Places." The list also directs agencies to consider "[w]hether the action may violate relevant Federal, State, Tribal, or local laws," as well as "[t]he degree to which the action may have disproportionate and adverse effects on communities with environmental justice concerns" and "[t]he degree to which the action may adversely affect rights of Tribal Nations that have been reserved through treaties, statutes, or Executive orders." Finally, CEQ notes that the list is not intended to be an exhaustive list of all potential factors, and agencies can consider other factors in their determination of significance as appropriate for the proposed action.

Fourteenth, CEQ proposed to redesignate paragraph (b)(2)(iv) of 40 CFR 1501.3 (2020) as paragraph

(d)(2)(iv) and revise "effects that would" to "actions that may" violate "relevant" Federal, State, Tribal, or local laws. CEQ proposed to add "other requirements" after law as well as "inconsistencies" with "policies designed for protection of the environment" because agencies should not necessarily limit their inquiry to statutory requirements. CEQ explained that it may be appropriate for agencies to give relatively more weight to whether the action threatens to violate a law imposed for environmental protection as opposed to a policy, but formally adopted policies designed for the protection of clean air, clean water, or species conservation, for example, may nonetheless be relevant in evaluating intensity.

Some commenters recommended the final rule strengthen this factor to identify examples of relevant environmental protection laws and policies to ensure Federal agencies do not overlook actions taken by States to address climate change or environmental justice. Another commenter suggested CEQ provide guidance encouraging agencies to coordinate with coastal programs to achieve consistency with all relevant State and Territory plans, policies, and initiatives to protect coastal uses and resources.

In the final rule, CEQ redesignates paragraph (b)(2)(iv) of 40 CFR 1501.3 (2020) as § 1501.3(d)(2)(iii) and revises it as proposed. CEQ declines to make the commenters' suggested edits as they are unnecessarily specific for this rule and encompassed in the proposed text. However, this does not preclude an agency from identifying more specific examples in its agency NEPA procedures if the agency determines it would be helpful for assessing significance for its proposed actions.

Fifteenth, CEQ proposed to add a new paragraph (d)(2)(v) to consider the degree to which effects are highly uncertain. The 1978 regulations included factors for "controversial" effects and those that are "highly uncertain or involve unique or unknown risks." CEQ proposed to restore a modified version of this concept that makes clear that the uncertainty of an effect is the appropriate consideration, and not whether an action is controversial. The proposed rule explained that while a legitimate disagreement on technical grounds may relate to uncertainty, this approach would make clear that public controversy over an activity or effect is not a factor for determining significance.

A few commenters expressed support for proposed paragraph (d)(2)(v). A couple of commenters suggested the

final rule include the phrase "high degree of uncertainty" to better conform with NEPA practice under the 1978 regulations. Another commenter requested clarity on what is meant by "highly uncertain." A few commenters recommended the regulations restore "highly controversial" from the 1978 regulations because it was well-developed in case law and doing so would provide clarity to agencies on how to assess the degree to which effects were "highly controversial."

CEQ adds proposed new paragraph (d)(2)(v) at § 1501.3(d)(2)(iv) in the final rule. CEQ declines to use the term "highly controversial." While some may be familiar with the terminology, it could mistakenly give the impression that it refers to public controversy. CEQ also declines to use "high degree of uncertainty," which means the same thing as "highly uncertain," because the phrase "highly uncertain" has been included in the NEPA regulations since 1978 and making this substitution would require restructuring the sentence in a manner that would reduce parallelism and readability without otherwise improving the clarity or improving meaning. *See* 40 CFR 1508.27(b)(5) (2019).

Sixteenth, CEQ proposed to add a new paragraph (d)(2)(vi) to consider the degree to which the action may relate to other actions with adverse effects. CEQ proposed this paragraph to reinstate a factor from the 1978 regulations and for consistency with the longstanding NEPA principle that agencies cannot segment actions to avoid significance. *See, e.g., Sierra Club* v. *Marsh,* 769 F.2d 868 (1st Cir. 1985); *Kern* v. *U.S. Bureau of Land Mgmt.,* 284 F.3d 1062 (9th Cir. 2002).

Some commenters supported the restoration of this factor, but suggested removal of the term "adverse." Other commenters indicated that CEQ did not explain why it proposed to use "in the aggregate" instead of the 1978 regulations' phrasing "cumulatively significant impact on the environment" and asserted that this would be a confusing change. One commenter expressed support for the second sentence in the factor specifying that an agency cannot segment or term an action temporary that is not in fact temporary.

Another commenter opposed the restoration of this intensity factor, asserted it would confuse the NEPA process and imply that an EIS can be required solely based on the effects of other actions when the action under consideration does not have significant adverse effects itself. Another commenter also expressed concern

about the factor and stated that if CEQ's goal is to ensure that the potential for repetition or recurrence of an impact is considered, the regulations should state this more clearly.

Upon further consideration, CEQ is not restoring this text from the 1978 regulations to the final rule. The inclusion of cumulative effects as a component of effects already addresses the interrelationship between the effects of an action under consideration. Moreover, rather than identifying a factor for an agency to consider in assessing significance, this language more directly relates to the prohibition on an agency segmenting an action, which the final rule addresses in § 1501.3(b) related to the scope of an action and effects.

Seventeenth, CEQ proposed to add a new paragraph (d)(2)(vii) to add a factor relating to actions that would affect historic resources listed or eligible for listing in the National Register of Historic Places. CEQ proposed this factor to generally reinstate a factor from the 1978 regulations, which agencies have decades of experience considering. The proposed rule explained that consideration of this factor furthers the policies and goals of NEPA, including to "preserve important historic, cultural, and natural aspects of our national heritage." 42 U.S.C. 4331.

A couple of commenters expressed support for proposed paragraph (d)(2)(vii), while another commenter requested the final rule broaden the factor by inserting "or State or Tribal equivalents to registers of historic places" to the end of the factor. CEQ adds proposed new paragraph (d)(2)(vii) at § 1501.3(d)(2)(v) in the final rule. CEQ declines the commenter's recommended addition because the revised provision is consistent with decades of agency practice. CEQ notes that the list of intensity factors is not exhaustive.

Eighteenth, CEQ proposed to add a new paragraph (d)(2)(viii) to add the degree to which the action may adversely affect an endangered or threatened species or its habitat, including critical habitat under the Endangered Species Act. 16 U.S.C. 1532(5). CEQ proposed to reinstate and expand an intensity factor from the 1978 regulations, which only addressed critical habitat. CEQ proposed this addition to clarify that agencies should consider effects to the habitat of endangered or threatened species even if it has not been designated as critical habitat.

Some commenters expressed support for the expansion of the factor to include impacts to habitat regardless of whether they have been designated as

critical. A few commenters disagreed with the proposed expansion of this intensity factor and suggested that the final rule restore the 1978 language that "limited" this factor to review of critical habitat. Multiple commenters requested the final rule exclude this factor, asserting that CEQ failed to justify the proposed expansion to require agencies to consider the effect of an action on habitat that have not been designated as critical habitats under the Endangered Species Act. Commenters stated that it was unclear why this would be an intensity factor when agencies already must engage in ESA section 7 consultation. One commenter expressed concern the proposed expansion would expand the scope of the significance determination, resulting in project delays and siting issues. Other commenters specifically recommended removing "habitat, including" because the language expands habitat considerations beyond what is protected by Federal law.

CEQ adds proposed new paragraph (d)(2)(viii) in § 1501.3(d)(2)(vi) of the final rule, as proposed, because critical habitat is a regulatory category under the Endangered Species Act designation process and does not necessarily align with the geographic range of the species or the habitat a species is using. Major Federal actions can have significant effects on endangered or threatened species habitat regardless of whether critical habitat has been designated. Moreover, the section 7 consultation process considers effects to listed species generally, including where habitat that has not been designated as critical habitat is used by a species and therefore, damage to that habitat may affect the species. As a result, revising the factor in this manner helps to align environmental review under NEPA and the section 7 consultation process.

Nineteenth, CEQ proposed to add a new paragraph (d)(2)(ix) to include consideration of the degree to which the action may have disproportionate and adverse effects on communities with environmental justice concerns. CEQ proposed this factor because evidence continues to accumulate that communities with environmental justice concerns often experience disproportionate environmental burdens such as pollution or urban heat stress, and often experience disproportionate health and other socio-economic burdens that make them more susceptible to adverse effects.

Multiple commenters expressed support for the proposed addition of environmental justice as an intensity factor. One commenter requested clarity on what is meant by "the degree to

which an action may have a disproportionate effect.'' Another commenter recommended the final rule revise the factor to read ''the degree of any reasonably foreseeable and adverse effects from the proposed action on communities with environmental justice concerns'' to focus on reasonably foreseeable effects.

CEQ adds the factor in proposed paragraph (d)(2)(ix) related to communities with environmental justice concerns in § 1501.3(d)(2)(vii) in the final rule with modifications. Specifically, the final rule revises the factor to revise the phrase ''have disproportionate and adverse effects'' to ''adversely affect'' to enhance the consistency of this factor with the other intensity factors. CEQ notes that the intensity factors inform an agency's determination of whether an effect is significant, and the word ''effect'' is defined to mean reasonably foreseeable effect.

Finally, CEQ proposed to add a new proposed paragraph (d)(2)(x) to include effects upon rights of Tribal Nations that have been reserved through treaties, statutes, or Executive orders. CEQ proposed this factor because Tribes' ability to exercise these rights often depends on the conditions of the resources that support the rights, and agencies should consider these reserved rights when determining whether effects to such resources are significant. CEQ specifically sought comments from Tribes on this proposed addition.

Multiple commenters, including Tribal government agencies and Tribal leaders, supported the addition of proposed paragraph (d)(2)(x), but also urged CEQ to specifically address effects on Tribal sovereignty, reservations, religious and cultural practices and cultural heritage, current cultural practices, and habitat on which resources crucial to the exercise of Tribal Nations' reserved rights depend. A few commenters recommended the factor include broader references when discussing ''rights'' to ensure inclusion of the rights of indigenous peoples not denominated as Tribes. A few commenters opposed the proposed addition, asserting that it prejudges which effects would be significant.

CEQ adds proposed new paragraph (d)(2)(x) in § 1501.3(d)(2)(viii) of the final rule, as proposed. The provision identifies an important factor that agencies should consider in determining whether an effect is significant and will help agencies consider rights that have been reserved through treaties, statutes, or Executive orders during the NEPA process, without prejudging which categories of environmental effects will

be most important in any given analysis. Regarding the additional considerations that commenters suggest that CEQ incorporate into these provisions, CEQ notes that paragraphs (d)(2)(ii), (iii), (v), and (vii) capture many of them in whole or in part. Because the list of considerations in paragraph (d)(2) is not exhaustive, CEQ declines to specify these additional terms. Regarding the recommendation to add a reference to rights of indigenous peoples in this factor, CEQ does not make this revision because this factor addresses the unique and distinctive rights of Tribal Nations that have a nation-to-nation relationship with the United States.

3. Categorical Exclusions (§ 1501.4)

CEQ proposed revisions to § 1501.4 regarding CEs to clarify this provision, and provide agencies new flexibility to establish CEs using additional mechanisms outside of their NEPA procedures to promote more efficient and transparent development of CEs that may be tailored to specific environmental contexts or project types.

Many commenters expressed general support for the proposed changes to § 1501.4. Some of these commenters suggested that the final rule go further to encourage the use of CEs. Other commenters advocated for additional provisions in the section, such as requiring agencies to notify the public of the proposed use of a CE and make all documentation on the use of a CE for a specific action available to the public. CEQ addresses the specific comments throughout this section and in the Phase 2 Response to Comments.

CEQ intends the changes in the final rule to promote agency use of CEs whenever appropriate for a proposed action. The mechanisms in § 1501.4 as well as § 1507.3 will provide agencies with additional flexibility in establishing CEs while ensuring that CEs are appropriately substantiated and bounded to ensure they apply to actions that normally do not have significant effects. CEQ declines to require agencies to provide public notice in advance of using a CE. While agencies may choose to do this where they deem appropriate, an across-the-board requirement would burden agency resources and undermine the efficiency of the CE process. Similarly, requiring agencies to publish documentation of every CE determination would be overly burdensome. Consistent with § 1507.3(c)(8)(i), agencies must identify in their NEPA procedures which of their CEs require documentation. Agencies also can identify processes or specific CEs in their agency procedures for which they will make determinations

publicly available where they determine this is appropriate. CEQ encourages agencies to notify the public and make documentation publicly available for CEs when they expect public interest in the determination.

CEQ proposed changes throughout § 1501.4. First, CEQ proposed to revise the first sentence in paragraph (a) to strike the clause requiring agencies to identify CEs in their agency NEPA procedures and replace it with a clause requiring agencies to establish CEs consistent with § 1507.3(c)(8), which requires agencies to establish CEs in their NEPA procedures. CEQ proposed this revision because it would more fully and accurately reflect the purposes and of requirements for CEs. Because paragraph (c) provides mechanisms for agencies to establish CEs outside of their NEPA procedures, CEQ makes this change to § 1501.4(a) in the final rule but adds ''or paragraph (c)'' so that the first sentence refers to the various mechanisms for establishing CEs. As is reflected in the regulations, CEQ views CEs to be important tools to promote efficiency in the NEPA process where agencies have long exercised their expertise to identify and substantiate categories of actions that normally do not have a significant effect on the human environment.

Second, in the description of CEs in the first sentence of paragraph (a), CEQ proposed to add the clause ''individually or in the aggregate'' to modify the clause ''categories of actions that normally do not have a significant effect on the human environment.'' CEQ proposed to add this language to clarify that when establishing a CE, an agency must determine that the application of the CE to a single action and the repeated collective application to multiple actions would not have significant effects on the human environment. CEQ proposed this clarification to recognize that agencies often use CEs multiple times over many years and for consistency with the reference to a ''category of actions'' in the definition of ''categorical exclusion'' provided by section 111(1) of NEPA, which highlights the manner in which CEs consider an aggregation of individual actions. 42 U.S.C. 4336e(1).

CEQ intended the proposed change to have a meaning similar to the 1978 regulations' definition ''categorical exclusion'' as categories of actions that do not ''individually or cumulatively'' have significant effects, which the 2020 rule removed stating that the removal was consistent with its removal of the term ''cumulative impacts'' from the regulations. The Phase 1 rulemaking reinstated cumulative effects to the

**35470**    **Federal Register** / Vol. 89, No. 85 / Wednesday, May 1, 2024 / Rules and Regulations

definition of "effects," [68] so the 2020 rule's justification for removing the phrase no longer has a basis. However, CEQ proposed to use the phrase "in the aggregate" rather than "cumulatively" to avoid potential confusion. Cumulative effects refer to the incremental effects of an agency action added to the effects of other past, present, and reasonably foreseeable actions. In the context of establishing CEs, agencies consider both the effects of a single action as well as the aggregation of effects from anticipated multiple actions covered by the CE such that the aggregate sum of actions covered by the CE does not normally have a significant effect on the human environment. As part of this analysis, agencies consider the effects—direct, indirect, and cumulative—of the individual and aggregated actions.

Because the definition of "effects" includes cumulative effects, CEQ proposed the phrase "in the aggregate" to more clearly define what agencies must consider in establishing a CE—the full scope of direct, indirect, and cumulative effects of the category of action covered by the CE. Agencies have flexibility on how to evaluate whether the aggregate actions covered by a CE will not ordinarily have significant effects and may consider the manner in which the agency's extraordinary circumstances may apply to avoid multiple actions taken in reliance on the CE having reasonably foreseeable significant effects in the aggregate.

Commenters both supported and opposed the addition of the phrase "individually or in the aggregate" in proposed § 1501.4(a) and § 1507.3(c)(8)(ii). Commenters who supported the inclusion of the text asserted that it restores an important clarification regarding the proper scope of CEs from the 1978 regulations and that it gives meaning to the statutory definition of "categorical exclusion" in section 111(1) of NEPA. 42 U.S.C. 4336e(1). Commenters opposed to this phrase asserted it is undefined, lacks foundation in the statute, is burdensome on agencies, and will require agencies to consider effects beyond those that are reasonably foreseeable.

CEQ disagrees that the phrase "individually or in the aggregate" lacks foundation in the statute because use of the phrase "does not significantly affect" in section 111(1) of NEPA indicates it is the "*category* of actions" that the agency has determined normally would not result in significant effects to the environment, not an individual action to which the CE would apply. *See* 42 U.S.C. 4336e(1) (emphasis added). CEQ also disagrees that this phrase will add burden to agencies because CEQ considers this a clarifying edit consistent with the longstanding definition of "categorical exclusion" and agency practice. Finally, CEQ notes that all effects analyses are bounded by reasonable foreseeability, including in the establishment of CEs.

Some commenters also requested the regulations clarify the relationship between the phrase "individually or in the aggregate" and the definition of cumulative effects. CEQ views these terms as related. The term "effects" as used in the definition of "categorical exclusion" and throughout the regulations includes cumulative effects, which, in turn, refers to the effects of the action being analyzed in an environmental document when added to the effects of other past, present, and reasonably foreseeable actions. The use of "in the aggregate" in this paragraph refers to the fact that in substantiating a CE to determine that a category of actions normally does not have significant effects, the agency must consider both the effects—including cumulative effects as well as direct and indirect—of an individual action within that category and of the aggregate of the actions that the agency can reasonably foresee will be taken and covered by the CE. Because the regulations use the phrase "in the aggregate" consistent with the ordinary meaning of the phrase, CEQ does not consider it necessary to add additional explanatory text.

A few commenters requested the regulations clarify that an agency should ensure that actions covered by a CE will not have a significant effect "individually or in the aggregate" at the time the agency establishes and substantiates the CE. Conversely, another commenter asserted considering the aggregate effects of a CE is inappropriate when an agency establishes a CE, asserting that an agency should consider any aggregate effects when applying the CE to a proposed action. CEQ declines to address substantiation of CEs in § 1501.4 as this issue is addressed in § 1507.3(c)(8)(ii). Further, CEQ disagrees that agencies would need to analyze aggregate effects each time the agency applies a CE, except to the extent the agency's extraordinary circumstances review requires such an analysis. Requiring such an analysis each time an agency applies a CE, independent of any analysis required as part of the agency's extraordinary circumstances review, would undermine the efficiency of CEs.

Instead, agencies must consider whether a category of actions normally does not have a significant effect individually or in the aggregate at the time that the agency establishes a CE.

Some commenters opposed the use of the term "normally" in the description of a CE in paragraph (a), which CEQ discusses in section II.J.2. CEQ retains this term for the reasons discussed in the 2020 rule, section II.J.2, and the Phase 2 Response to Comments.

Third, CEQ proposed to revise the end of the first sentence of paragraph (a) to add the qualifier, "unless extraordinary circumstances exist that make application of the categorical exclusion inappropriate" with a cross reference to paragraph (b). As discussed in section II.J.11, CEQ proposed to add a definition of "extraordinary circumstances." CEQ stated in the proposed rule, that these provisions are consistent with longstanding practice and recognize that, as the definition provided by section 111(1) of NEPA indicates, CEs are a mechanism to identify categories of actions that normally do not have significant environmental effects. *See* 42 U.S.C. 4336e(1). Extraordinary circumstances serve to identify individual actions whose effects exceed those normally associated with that category of action and therefore, may not be within the scope of the CE. CEQ did not receive comments on this specific proposed change and makes this addition to paragraph (a) in the final rule.

Fourth, CEQ proposed to add a new sentence at the end of paragraph (a) to clarify that agencies may establish CEs individually or jointly with other agencies. The proposed rule noted that where agencies establish CEs jointly, they may use a shared substantiation document and list the CE in both agencies' NEPA procedures or identify them through another joint document as provided for by § 1501.4(c). CEQ proposed this addition to clarify that agencies may use this mechanism to establish CEs transparently and with appropriate public process. The proposed rule noted that agencies may save administrative time and resources by establishing a CE jointly for activities that they routinely work on together and where having a CE would create efficiency in project implementation.

Multiple commenters supported the inclusion of this clarification in paragraph (a), stating that joint establishment of CEs by agencies can help improve efficiency, reduce redundancy, and improve cohesion between agencies. On the other hand, one commenter opposed the proposed addition asserting that joint CEs will not

---

[68] CEQ, Phase 1 Final Rule, *supra* note 50, at 23469.

help communities participate fully in the NEPA process. CEQ adds the proposed language in § 1501.4(a) in the final rule. The NEPA regulations have never prohibited agencies from establishing CEs jointly, and the proposed change in paragraph (a) provides clarity to agencies and the public that this is an acceptable practice. The requirement to substantiate CEs as described in § 1507.3(c)(8), including public review and comment, apply to establishment of joint CEs in the same manner as CEs established by an individual agency.

Fifth, CEQ proposed edits to paragraph (b)(1) addressing what agencies do when there are extraordinary circumstances for a particular action. CEQ proposed to change "present" to "exist" and clarify the standard for when an agency may apply a CE to a proposed action notwithstanding the extraordinary circumstances. CEQ proposed to make explicit that an agency must conduct an analysis to satisfy the requirements of the paragraph. Next, CEQ proposed to change the description of the determination that agencies must make from "there are circumstances that lessen the impacts" to "the proposed action does not in fact have the potential to result in significant effects notwithstanding the extraordinary circumstance." Then CEQ proposed to change "or other conditions sufficient to avoid significant effects" to "or the agency modifies the action to address the extraordinary circumstance." CEQ proposed this standard for consistency with agency practice and case law. Additionally, CEQ proposed this change because the language in paragraph (b)(1) of 40 CFR 1501.4 (2020) could be construed to mean that agencies may mitigate on a case-by-case basis extraordinary circumstances that would otherwise have the potential for significant effects and thereby apply a CE with no opportunity for public review or engagement on such actions. While the 2020 Response to Comments sought to distinguish "circumstances that lessen the impacts" from required mitigation to address significant effects,[69] based on CEQ's discussions with agency representatives and stakeholders, the potential for confusion remained. CEQ proposed the revised text to make clear that if an extraordinary circumstance exists, an agency must make an affirmative

determination that there is no potential for significant effects in order to apply a CE. If the agency cannot make this determination, the agency must either modify its proposed action in a way that will address the extraordinary circumstance, or prepare an EA or EIS.

Sixth, CEQ proposed to add a sentence to paragraph (b)(1) to require agencies to document their determinations in those instances where an agency applies a CE notwithstanding extraordinary circumstances. While not required, CEQ proposed to encourage agencies to publish such documentation to provide transparency to the public of an agency determination that there is no potential for significant effects. CEQ proposed this sentence in response to feedback from the public requesting such transparency.

Multiple commenters generally supported proposed § 1501.4(b), which sets out the process for applying a CE to a proposed action, and its subparagraphs addressing consideration of extraordinary circumstances. Several commenters opposed the proposed requirement in paragraph (b)(1) to prepare a separate analysis as part of the extraordinary circumstances review, asserting it will decrease efficiency, disincentivize use of CEs, and strain already limited agency resources.

Multiple commenters opposed allowing an agency to apply a CE when extraordinary circumstances exist and expressed concerns that this provision would allow the use of mitigated CEs. Some of these commenters recommended the final rule remove paragraph (b)(1); further specify what extraordinary circumstances agencies must consider, such as the presence of endangered, threatened, or rare or sensitive species; or include "other protective measures." Some commenters urged the final rule to require, rather than encourage, publication of the CE determinations in paragraph (b)(1). Other commenters urged CEQ not to make publication a requirement because it would be burdensome on agencies. One commenter who supported proposed paragraph (b)(1) also suggested the regulations clarify that the standard to apply a CE to a proposed action also includes mitigation commitments to address extraordinary circumstances.

CEQ revises paragraph (b)(1) as proposed with two additional clarifying edits. In applying CEs, the evaluation of extraordinary circumstances is critical to ensure that a proposed action to which a CE may apply would not cause significant effects. However, mere presence of an extraordinary circumstance does not mean that the

proposed action has the potential to result in significant effects. To ensure both the efficient and the appropriate use of CEs, CEQ revises paragraph (b)(1) to enable agencies to analyze and document that analysis to ensure application of the CE is valid. CEQ disagrees that requiring agencies to document this analysis is inefficient because this provision does not require an agency to prepare documentation of every extraordinary circumstance review. Rather, the provision requires documentation only when the agency identifies the presence of extraordinary circumstances but nevertheless determines that application of the CE is appropriate. Documentation in such instances is appropriate so that the agency can demonstrate that it adequately assessed the extraordinary circumstances and determined that the action will nonetheless not have the potential to result in significant effects. CEQ declines to require agencies to publish this documentation because it could burden agency resources and undermine the efficiency of the CE process.

CEQ has considered the comments on this paragraph related to mitigated CEs and modifies the text in the final rule to clarify what it means for an agency to modify its action. Specifically, CEQ replaces the phrase "address the extraordinary circumstance" with the phrase "avoid the potential to result in significant effects." This change clarifies that while an agency may rely on measures that avoid potential significant effects, it may not rely on measures to compensate for potential significant effects as the basis for relying on a CE when extraordinary circumstances are present, and the agency has determined that the proposed action has the potential to result in significant effects. While CEQ has determined that reliance on compensatory mitigation in this provision is inappropriate, it notes that other provisions of the regulations, such as the allowance for mitigated FONSIs in § 1501.6, promote the use of compensatory mitigation to promote efficient environmental reviews and quality decision making. CEQ also revises the introductory clause of the last sentence from "In such cases" to "in these cases" to make it clear that the documentation requirement applies to both situations—(1) when the agency conducts an analysis and determines that the proposed action does not in fact have the potential to result in significant effects notwithstanding the extraordinary circumstance or (2) the agency modifies the action to avoid the potential to result in significant effects.

---

[69] CEQ, Update to the Regulations Implementing the Procedural Provisions of the National Environmental Policy Act Final Rule Response to Comments 130 (June 30, 2020) (2020 Response to Comments), *https://www.regulations.gov/document/CEQ-2019-0003-720629.*

Seventh, CEQ proposed to add a new paragraph (c) to provide agencies more flexibility to establish CEs outside of their NEPA procedures. CEQ proposed this provision to allow agencies to establish CEs through a land use plan, a decision document supported by a programmatic EIS or EA, or other equivalent planning or programmatic decisions. Once established, the proposal would allow agencies to apply CEs to future actions addressed in the program or plan, including site-specific or project-level actions. CEQ proposed this provision because it anticipated that expanding the mechanisms through which agencies may establish CEs will encourage agencies to conduct programmatic and planning reviews, increase the speed with which agencies can establish CEs while ensuring public participation and adequate substantiation, promote the development of CEs that are tailored to specific contexts, geographies, or project-types, and allow decision makers to consider the cumulative effects of related actions on a geographic area over a longer time frame than agencies generally consider in a review of a single action.

Proposed paragraph (c) would not require agencies to establish CEs through this new mechanism, but rather would provide new options for agencies to consider. CEQ also noted in the proposed rule that this mechanism does not preclude agencies from conducting and relying on programmatic analyses in making project-level decisions consistent with § 1501.11 in the absence of establishing a CE. Additionally, the proposed rule noted that it does not require agencies to conduct a NEPA analysis to establish CEs generally, consistent with § 1507.3(c)(8).

Numerous commenters expressed support for proposed paragraph (c), asserting it will improve flexibility and efficiency. Some commenters opposed the proposed provision, expressing concern about public engagement. One commenter requested that CEQ exclude "other equivalent planning or programmatic decision" from paragraph (c) asserting that CEQ should limit the provision to documents prepared pursuant to NEPA to ensure public transparency and early public involvement. Another commenter recommended that the final rule include an example in paragraph (c) to illustrate the appropriateness of creating a CE for restoration actions in a planning document, referencing § 1500.3(d)(2)(i) for proposed Federal actions with short-term, non-significant, adverse effects and long-term beneficial effects, such as restoration projects.

CEQ adds paragraph (c) with additional text to clarify that the phrase "other equivalent planning or programmatic decision" requires that such decision be supported by a environmental document prepared under NEPA. CEQ anticipates that this alternative approach will provide agencies with more flexibility on how to identify categories of actions that normally will not have significant effects and establish a CE for those categories. An environmental document such as a programmatic EIS prepared for land use plans or other planning and programmatic decisions can provide the analysis necessary to substantiate a new CE established by the associated decision document that makes sense in the context of the overall program decision or land use plan. For example, a land management agency could consider establishing a CE for zero or minimal impact resilience-related activities through a land use plan and the associated EIS. Enabling an agency to establish a CE through this mechanism will reduce duplication of effort by obviating the need for the agency to revise its NEPA procedures consistent with § 1507.3 after completing a programmatic EIS. Agencies also may find it efficient to establish a CE through a land use planning process rather than undertaking a separate process to establish the CE via agency procedures after completion of the land use planning process.

Eighth, CEQ proposed to add paragraphs (c)(1) through (c)(6) to set forth the requirements for the establishment of CEs through the mechanism proposed in paragraph (c). In paragraphs (c)(1) and (c)(2), CEQ proposed to require agencies to provide CEQ an opportunity to review and comment and provide opportunities for public comment. The proposed rule noted that agencies may satisfy the requirement for notification and comment under paragraph (c)(2) by incorporating the proposed CEs into any interagency and public review process that involves notice and comment opportunities applicable to the relevant programmatic or planning document.

One commenter requested that paragraph (c)(1) include a requirement for CEQ to provide review and comment to agencies within 30 days of the receipt of the draft plan, programmatic environmental document, or equivalent decision document, consistent with the timeframe included in § 1507.3(b)(2). Another commenter asserted that requiring agencies to coordinate with CEQ defeats the purpose of having an alternative mechanism for establishing

CEs outside of an agency's NEPA procedures.

Some commenters asserted that bundling new CEs with other large actions could make it hard for the public to track and result in a lack of public participation and potential for abuse. CEQ disagrees that the alternative process for establishing CEs will curtail meaningful public engagement on proposed CEs and notes that paragraph (c)(2) would require notification and an opportunity for public comment. Further, programmatic environmental documents are subject to the public and governmental engagement requirements in § 1501.9.

The final rule adds paragraphs (c)(1) and (c)(2) as proposed. CEQ declines to include a timeline in the final rule but notes that it will strive to provide comments as quickly and efficiently as possible. CEQ disagrees that requiring agencies to consult with CEQ defeats the purpose of this alternative mechanism. Consultation with CEQ facilitates consistency and coordination across the government, which can lead to greater efficiency. CEQ also can help ensure that agencies are adequately substantiating CEs through this new mechanism.

In paragraphs (c)(3) and (c)(4), CEQ proposed to include the same requirements for agencies to substantiate CEs and provide for extraordinary circumstances when they establish CEs under this section as when they establish CEs through their agency NEPA procedures pursuant to § 1507.3. Specifically, paragraph (c)(3) would require agencies to substantiate their determinations that the category of actions covered by a CE normally will not result in significant effects, individually or in the aggregate. Paragraph (c)(4) would require agencies to identify extraordinary circumstances.

CEQ did not receive comments specific to paragraphs (c)(3) and (c)(4) and adds them to the final rule as proposed. CEQ notes that agencies have flexibility in how they identify the list of new extraordinary circumstances. For example, agencies could rely on their list set forth in their NEPA procedures. Or, the agency could identify a list specific to the CEs established under paragraph (c). Agencies also could do a combination of both. CEQ also notes that while agencies would need to satisfy the requirements in paragraphs (c)(3) and (c)(4) in a manner consistent with the establishment of CEs under § 1507.3, agencies could document their compliance with these requirements in the relevant programmatic or planning documents.

AR_0028792

In paragraph (c)(5), CEQ proposed to direct agencies to establish a process for determining that a CE applies to a specific action in the absence of extraordinary circumstances or determine the CE still applies notwithstanding the presence of extraordinary circumstances. Finally, in paragraph (c)(6), CEQ proposed to direct agencies to maintain a list of all such CEs on their websites, similar to the requirement for agencies to publish CEs established in their agency NEPA procedures consistent with §§ 1507.3(b)(2) and 1507.4(a).

One commenter asserted that requiring agencies to publish a list of all CEs established pursuant paragraph (c) on an agency's website defeats the purpose of having an alternative mechanism for establishing CEs outside of an agency's NEPA procedures. CEQ adds paragraphs (c)(6) as proposed. CEQ disagrees that providing transparency on a website is burdensome or will affect the efficiency of the alternative process for establishing CEs. Agency websites should clearly link the CEs established pursuant to § 1504.1(c) to their underlying programmatic or planning documents. Additionally, where they determine it is efficient and helpful to do so, agencies may incorporate CEs established through these mechanisms into their agency NEPA procedures during a subsequent revision. Irrespective of whether agencies do this, CEQ encourages agencies to list all agency CEs in one location, regardless of how the agency established the CE, so that the public can easily access the full list of an agency's CEs.

Ninth, CEQ proposed new paragraphs (d) and (d)(1) through (d)(4) to identify a list of examples of features agencies may want to consider including when establishing CEs, regardless of what mechanism they use to do so. In paragraph (d)(1), CEQ proposed to specifically allow for CEs that cover specific geographic areas or areas that share common characteristics, such as a specific habitat type for a given species. CEQ did not receive any comments specific to this proposal and adds paragraphs (d) and (d)(1) to the final rule.

To promote experimentation and evaluation, CEQ proposed in paragraph (d)(2) to indicate that agencies may establish CEs for limited durations. CEQ did not receive any comments specific to this proposal and adds paragraph (d)(2) to the final rule. Agencies may establish CEs for limited durations when doing so will enable them to narrow the scope of analysis necessary to substantiate that a class of activities

normally will not have a significant environmental effect where uncertainty exists about changes to the environment that may occur later in time that could affect the analysis or where an agency anticipates that the frequency of actions covered by a CE may increase in the future. As with all CEs, agencies should review their continued validity periodically, consistent with the CE review timeframe in § 1507.3(c)(9). Once the limited duration threshold is met, agencies may either consider the CE expired, conduct additional analysis to create a permanent CE, or reissue the CE for a new period if they can adequately substantiate the reissued CE.

CEQ proposed in paragraph (d)(3) to provide that a CE may include mitigation measures to address potential significant effects. The proposed rule explained that a CE that includes mitigation is different than an agency modifying an action to avoid an extraordinary circumstance that would otherwise require preparation of an EA or EIS.

Numerous commenters interpreted proposed paragraph (d)(3) to allow "mitigated CEs," and commenters expressed both support and opposition for the proposed provision. Supportive commenters asserted that mitigated CEs can provide efficiencies to agencies. Commenters opposed to the provision expressed concern that this would allow agencies to provide compensatory mitigation for impacts of CEs and asserted the provision violates a bedrock principle of NEPA that an agency may not weigh beneficial effects against adverse effects to determine that an action's effects on a whole are not significant. Some commenters objected to the proposal that mitigation included as part of a CE must be legally binding, enforceable, and subject to monitoring.

CEQ includes paragraph (d)(3) as proposed. This provision provides for a CE that includes mitigation measures integrated into the category of action itself, which agencies would adopt through a public comment process, and does not enable mitigation that is identified after the fact or on a case-by-case basis. Where an agency establishes a CE for a category of activities that include mitigation measures, agencies would implement the activities covered by the CE as well as the mitigation incorporated into those activities as described in the text of CE. This provision would enable agencies to incorporate mitigation as part of the category of action covered by a CE. The potential to integrate compensatory mitigation into a CE does not authorize weighing beneficial and adverse effects, just as agencies may not weigh

beneficial effects against adverse effects to determine significance of a proposed action. Rather, a CE may incorporate compensatory mitigation requirements as part of the action to ensure that an environmental effect is not significant. For example, in appropriate circumstances an agency might conclude that a category of activity that results in degradation of five acres of habitat will not ordinarily have significant effects where five acres of equivalent habitat are effectively restored or conserved elsewhere within that same geographic location. As another example, a CE might cover a category of activities that result in releasing a certain volume of sediment into a waterway if measures were taken to reduce sediment into the waterway from other sources. In establishing a CE that incorporates a mitigation measure, the agency would need to determine that implementation of the mitigation measure will mean that the category of activities will not normally have a significant effect. Where an agency establishes a CE with a mitigation requirement, the agency would need to include such mitigation in their proposed actions in order for the CE to apply.

In paragraph (d)(4), CEQ proposed to provide that agencies can include criteria for when a CE might expire such that, if such criteria occur, the agency could no longer apply that CE. For example, an agency could establish a CE for certain activities up to a threshold, such as a specified number of acres or occurrences. Once the applications of the CE met the threshold, the agency could no longer use the CE. Similarly, an agency might set an expiration date or threshold where the agency can substantiate that a category of activities will not have a significant effect up to a certain number of applications of the CE, but beyond that point there is uncertainty or analytic difficulty determining whether application of the CE would have significant effects. Adopting CEs of this type may significantly reduce the difficulty substantiating a CE and therefore, may promote more efficient and appropriate establishment of CEs in certain circumstances.

Some commenters requested that the criteria to cause a CE to expire be mandatory while another commenter asserted the expiration criteria would undermine the use of the CEs. CEQ includes paragraph (d)(4) as proposed in the final rule and notes that this provision is merely an example of a type of feature that can be incorporated into a CE. In establishing the CE, agencies

would determine whether the criteria were mandatory.

Finally, CEQ proposed to add paragraph (e) to implement the process for adoption and use of another agency's CE consistent with section 109 of NEPA. 42 U.S.C. 4336c. As discussed in section II.I.3, CEQ proposed to strike the provision that would allow an agency to establish a process in its agency NEPA procedures to apply a CE listed in another agency's NEPA procedures in 40 CFR 1507.3(f)(5) (2020) and replace it with this provision.

Numerous commenters generally opposed the concept of adopting and using another agency's CE. A few commenters asserted that such an allowance could be "disastrous" because it allows agencies to skip full assessment of the potential environmental and socioeconomic impacts of the proposed action required by NEPA, and it limits public engagement.

CEQ includes paragraph (e) in the final rule because it implements the provisions of section 109 of NEPA, which allows agencies to adopt and apply the CEs of other agencies. 42 U.S.C. 4336c. CEQ notes that the statutory provision only allows for agency adoption and use of CEs established administratively by the agency, including those that Congress directs agencies to establish administratively, but does not permit adoption of CEs directly created by statute, for which an agency has not evaluated whether the category of activities that fall within the CE will not normally have significant effects. While CEQ encourages agencies to include legislative CEs established by statute in their NEPA procedures to provide transparency, they are not "established" by the agency, but rather by Congress. Therefore, this provision does not apply to legislative CEs.

In paragraph (e)(1), CEQ proposed to require the adopting agency to identify the proposed action or category of proposed actions that falls within the CE. CEQ did not receive comments on this proposed paragraph and adds it to the final rule as proposed.

In paragraph (e)(2), CEQ proposed to require the adopting agency to consult with the agency that established the CE, consistent with the requirement of section 109(2) of NEPA that an agency consult with "the agency that established the categorical exclusion." 42 U.S.C. 4336c(2). While some commenters opposed the consultation requirements included in paragraph (e)(2), it is consistent with section 109(2) of NEPA. Therefore, CEQ adds paragraph (e)(2) in the final rule with

revisions to clarify that "the application" refers to "the proposed action or category of proposed actions to which the agency intends to apply" the adopted CE. Consultation with the agency that established the CE ensures that the CE is appropriate for the proposed action or categories of action that the adopting agency is contemplating as well as to ensure the adopting agency follows any process contemplated in the establishing agency's procedures. Agencies structure their CEs in a variety of manners, and it is essential that the adopting agency comport with the establishing agency's process necessary for appropriate application of the CE. For example, some agencies structure their CEs to have a list of conditions or factors to consider in order to apply the CE. Other agencies require documentation for certain CEs. These conditions would apply to the adopting agency as well. In contrast, procedures internal to the establishing agency and unrelated to proper application of the CE, such as protocols for seeking legal review or briefing agency leadership, would not.

CEQ proposed in paragraph (e)(3) to require the adopting agency to evaluate the proposed action for extraordinary circumstances and to incorporate the process for documenting use of the CE when extraordinary circumstances are present but application of the CE is still appropriate consistent with § 1504.1(b)(1). One commenter requested additional clarity on which agency's extraordinary circumstances the adopting agency needs to consider while another commenter asserted both agencies' extraordinary circumstances should apply. Another commenter asserted that section 109 of NEPA does not require the extraordinary circumstances review included in paragraph (e)(3), and suggested the final rule include this in paragraph (e)(1). The commenter further asserted that the cross-reference to § 1501.4(b) in paragraph (e)(3) presents problems of action-specific application.

In the final rule, CEQ swaps proposed paragraphs (e)(3) and (e)(4) to better reflect the order in which these activities occur. CEQ includes proposed paragraph (e)(3) at § 1501.4(e)(4), adds an introductory clause, "[i]n applying the adopted categorical exclusion to a proposed action," and removes reference to a "category of proposed actions" since consideration of extraordinary circumstances would come at the stage of application and evaluation of a particular action, not at the adoption stage, because the purpose of assessing for extraordinary circumstances is to determine whether a

particular action normally covered by a CE requires preparation of an EA or EIS.

CEQ declines to specify which agency's extraordinary circumstances apply in this paragraph and instead adds language to § 1501.4(e)(3) (proposed paragraph (e)(4)) to require agencies to explain the process the agency will use to evaluate for extraordinary circumstances in its notification under § 1501.4(e)(4). When the agencies consult regarding the appropriateness of the CE consistent with paragraph (e)(2), the agencies should discuss how the adopting agency will review for extraordinary circumstances (e.g., whether the adopting agency will apply the establishing agency's extraordinary circumstances exclusively or both agencies' provisions), taking into account how each agency's NEPA procedures define and require consideration of extraordinary circumstances. The adopting agency should then explain how it will address extraordinary circumstances in its notification under § 1501.4(e)(4). CEQ expects that agencies will follow the extraordinary circumstances process set forth in the NEPA procedures containing the CE, but may determine it is appropriate to also consider the extraordinary circumstances process in their own procedures because, for example, their extraordinary circumstances address agency-specific considerations.

In proposed paragraph (e)(4), CEQ proposed to require the adopting agency to provide public notice of the CE it plans to use for its proposed action or category of proposed actions. Some commenters asserted the procedural requirements under paragraph (e)(4) are unnecessary and could make the process more difficult. One commenter requested the regulations clarify that public notice is not intended for each individual project using the other agency's CE, but rather when one agency decides to use another agency's CE. Some commenters requested the final rule require agencies to accept public comment on the notice. Conversely, a few commenters expressed concern that the requirement to provide notice contemplates the potential for pre-adoption public comment and necessitates formal comment. These latter commenters requested CEQ clarify that formal public comment and agency response are not required for the notice.

In the final rule, CEQ adds proposed paragraph (e)(4) at § 1501.4(e)(3) because section 109(3) of NEPA requires public notice of CE adoption. 42 U.S.C. 4336c(3). In the final rule text, CEQ uses "public notification" instead of "public

notice" for consistency with use of "notification" throughout the rule. CEQ changes "use" to "is adopting" to clarify that this notice is about adoption of the CE for a proposed action or category of actions, not the application of the adopted CE to a particular proposed action. CEQ replaces "for" with "including a brief description of" before "the proposed action or category of proposed actions" and adds the clause "to which the agency intends to apply the adopted categorical exclusion" to further clarify the purpose of the notice. Then, as discussed earlier in this section, the final rule requires that the notice specify the process for consideration of extraordinary circumstances. CEQ notes that several agencies have already successfully adopted other agencies' CEs and provided such notice since the NEPA amendments were enacted.[70] CEQ declines to add a requirement to this paragraph to require agencies to seek comment on the adoption. While CEQ encourages agencies to do so in appropriate cases, such as when there is community interest in the action, the statute does not require agencies to seek public comment on the adoption and use of another agency's CE. Finally, CEQ adds a brief description of the consultation process required by § 1501.4(c)(2) to demonstrate that this process occurred.

Lastly, in paragraph (e)(5), CEQ proposed to require the adopting agency to publish the documentation of the application of the CE. Some commenters opposed this proposed requirement, asserting it is not required by NEPA and differs from the section 109(4) requirement to document adoption of the CE, and that the requirement will only delay projects that clearly qualify for use of a CE. 42 U.S.C. 4336c(4). Other commenters supported the documentation requirement and requested that paragraph (e)(5) require agencies to publish decision documents.

CEQ adds § 1501.4(e)(5) in the final rule with the addition of "adopted" to modify "categorical exclusion" for clarity and consistency with § 1501.4(c)(3) and (c)(4). Paragraph (e)(5) implements sections 109(3) and 109(4) of NEPA and reflects CEQ's understanding that section 109(4) of NEPA describes a step that is distinct from and occurs later than the step described in section 109(3). *See* 42

U.S.C. 4336c(3), (4). Section 109(3) requires agencies to "identify to the public the categorical exclusion that the agency plans to use for its proposed actions," while section 109(4) requires an agency to "document adoption of the categorical exclusion." CEQ reads these provisions together to be consistent with requiring both notice of the adopting agency's adoption, which would describe the agency's intended use, as well as actual application of the adopted CE to proposed actions. It also furthers the purposes of NEPA to inform the public. Additionally, providing transparency about how agencies are using the adopted CEs will help allay commenters' concerns about this provision because they will be made aware of what CEs agencies are adopting and how they are using them. Therefore, agencies must prepare such documentation each time they apply the CE to a proposed action. Paragraph (e)(5) requires agencies to publish this determination that the application of the CE is appropriate for the proposed action, and that there are no extraordinary circumstances requiring preparation of an EA or EIS, including the analysis required by § 1501.4(b)(1) if the agency determines that there is no potential for significant effects notwithstanding those extraordinary circumstances. CEQ notes that use of the defined term "publish" in § 1501.4(e)(5) provides agencies with discretion to determine the appropriate manner in which to publish the documentation and that § 1501.4(e)(5) does not require agencies to publish any pre-decisional or deliberative materials the agencies may use to support a determination of the applicability of the adopted CE.

When an agency is adopting one or more CEs that it plans to use for one or more categories of actions, it may publish a single notice of the adoption under § 1501.4(e)(3), consistent with section 109(3) of NEPA. *See* 42 U.S.C. 4336c(3). However, when the agency then applies the adopted CE to a specific action, it must document that particular use of the CE to satisfy section 109(4) of NEPA, as reflected in § 1501.4(e)(4) and (5). *See* 42 U.S.C. 4336c(4). Finally, agencies must publish the documentation to provide transparency to the public consistent with section 109(3) and (4) of NEPA.

If an adopting agency anticipates long-term use of an adopted CE, CEQ encourages agencies to establish the CE either in their own procedures or through the process set forth in § 1501.4(c). Section 1501.4(e) can serve as an important bridge when agencies are implementing new programs where they have not yet established relevant

CEs or when existing programs begin to undertake new categories of actions but where other agencies have experience with similar actions and have established a CE for those actions. In these circumstances, the agency can immediately begin to implement the new programs or activities after adoption of another agency's CE for similar actions without the need to first develop its own CE to cover them.

CEQ notes that section 109 of NEPA does not provide that an agency can modify the CE it is adopting. 42 U.S.C. 4336c. Therefore, agencies must adopt a CE as established and cannot modify the text of the adopted CE. However, in the public notification required by § 1501.4(e)(3), agencies must describe the action or category of actions to which they intend to apply the adopted CE and the action or category of actions for which the CE is adopted may be narrower in scope than the CE might otherwise encompass. If an agency later seeks to apply the adopted CE to a different category of actions than those identified in the prior public notice, the agency must further consult with the establishing agency and provide new public notification consistent with § 1501.4(e). If the agency publishes a consolidated list of CEs on its website, as CEQ recommends, the adopting agency should include identification of the action or category of actions for which it has adopted the CE with the list. If an adopting agency would prefer to narrow or otherwise modify the text of the adopted CE, it should instead substantiate and establish a new CE in its agency NEPA procedures.

**4. Environmental Assessments (§ 1501.5)**

CEQ proposed to revise § 1501.5 to make it consistent with section 106(b)(2) of NEPA, which addresses when an agency must prepare an EA, and section 107(e)(2) of NEPA, which address EA page limits. 42 U.S.C. 4336(b)(2), 4336a(e)(2). CEQ also proposed to revise § 1501.5 to provide greater clarity to agencies on the requirements that apply to the preparation of EAs and codify agency practice. CEQ proposed edits to address what agencies must discuss in an EA, how agencies should consider public comments they receive on draft EAs, what page limits apply to EAs, and what other requirements in the CEQ regulations agencies should apply to EAs.

First, regarding the contents of an EA, CEQ proposed to split paragraph (c)(2) of 40 CFR 1501.5 (2020), requiring an EA to briefly discuss the purpose and need for the proposed action, alternatives, and effects, into paragraphs

---

[70] *See, e.g.,* U.S. Dep't of Com., Adoption of Energy Categorical Exclusions under the National Environmental Policy Act, 88 FR 64884 (Sept. 20, 2023); U.S. Dep't of Transp., Notice of Adoption of Electric Vehicle Charging Stations Categorical Exclusion under the National Environmental Policy Act, 88 FR 64972 (Sept. 20, 2023).

(c)(2)(i) through (iii) to improve readability and provide a clearly defined list of requirements for EAs. CEQ proposed this formatting change to make it easier for the public and agencies to ascertain whether an EA includes the necessary contents. For example, when an agency develops an EA for a proposal involving unresolved conflicts concerning alternative uses of available resources, section 102(2)(H) of NEPA requires an analysis of alternatives, which will generally require analysis of one or more reasonable alternatives, in addition to a proposed action and no action alternative. *See* 42 U.S.C. 4332(2)(H). CEQ did not receive specific comments on these proposed changes and makes them in the final rule.

Second, CEQ proposed to move the requirement for EAs to list the agencies and persons consulted in the development of the EA from paragraph (c)(2) of 40 CFR 1501.5 (2020) into its own paragraph at § 1501.5(c)(3). CEQ also proposed to clarify the term "agencies" in this paragraph by specifying that the EA should list the Federal agencies and State, Tribal, and local governments and agencies consulted. CEQ did not receive specific comments on these proposed changes and makes them in the final rule to improve readability and improve clarity.

Third, CEQ proposed to add a new paragraph at § 1501.5(c)(4) to require each EA to include a unique identification number that can be used for tracking purposes, which the agency would then carry forward to all other documents related to the environmental review of the action, including the FONSI. As discussed in section II.D.4, CEQ proposed a comparable provision for EISs in § 1502.4(e)(10). CEQ included this proposal because identification numbers can help the public and agencies track the progress of an EA for a specific action as it moves through the NEPA process and may allow for more efficient and effective use of technology such as databases.

Many commenters expressed support for the addition of these requirements. Commenters agreed with CEQ's proposal that having a consistent reference point to facilitate public and agency engagement would increase transparency and accessibility and improve the public's ability to track agency reviews and decision making. Other supportive commenters indicated that the use of unique identification numbers would or should promote the use of technology, such as databases by Federal agencies, for tracking purposes and some commenters encouraged CEQ to require agencies to use technology and databases. Commenters also suggested that the final rule provide additional information such as standardizing the number format or specifying which documents require the numbering. Commenters that raised concern about the requirement suggested that without a requirement for electronic tracking systems, the requirement is premature and burdensome.

In this final rule, CEQ is retaining the proposed text and, in response to comments, adding a clause to also require use of the identification numbers in any agency databases or tracking systems. Identification numbers can help both the public and the agencies track the progress of an action as it moves through the NEPA process from initiation to final decision. The use of identification numbers will increase transparency and accountability to the public when a proposed action is tiered from an existing analysis or when an agency adopts another agency's NEPA analysis to support its own decision making. In addition to the Permitting Dashboard, many agencies already have internal or external databases and tracking systems for their environmental review documents.[71] While the proposed requirement would likely result in agencies using these tracking numbers in their systems, CEQ considers it important to add text to the final rule to emphasize their use as agencies continue to develop new ways to provide transparency and improve efficiency in their processes.

CEQ agrees with commenters that additional information will be needed for agencies to implement this provision. For example, there is a question whether to have a government-wide system assign the unique identification number, to use a standardized numbering format, or whether agencies will develop their own format. However, CEQ considers these questions best answered through instructions to agencies, which CEQ can revise or reissue as needed, especially given the speed at which technology advances and changes. CEQ intends to develop such instructions following issuance of this final rule.

Fourth, to reflect current agency practice and provide the public with a clearer understanding about potential public participation opportunities with respect to EAs, CEQ proposed to add a new paragraph (e) that would provide that if an agency chooses to publish a draft EA, it must invite public comment

---

[71] *See, e.g.,* U.S. Forest Serv. Schedule of Proposed Actions, *https://www.fs.usda.gov/sopa/index.php.*

---

on the draft and consider those comments when preparing a final EA.

Numerous commenters expressed support for this proposed change. Some commenters recommend the final rule go further to require public comment on all EAs, with at least one commenter suggesting a 30-day minimum comment period. Another commenter requested the regulations require agencies to respond to comments on an EA and publish the comments on a website, similar to the requirements for EISs.

Some commenters opposed the proposed change, asserting that it creates the perception that publication of a draft EA for public comment should be the default practice when in fact, agencies have discretion not to do this. They also requested CEQ explicitly state in the rule and preamble that there is no obligation for agencies to publish a draft EA for comment. Other commenters emphasized discretion, stating that because agencies already have discretion to prepare a draft EA, they should have discretion on whether to invite public comment on it. The commenters also expressed concern that proposed § 1501.5(e) removes agency discretion on how to manage EAs and could prolong the development of EAs. Some commenters asserted that the language on draft EAs contradicts case law, hinders the efficiency of the EA process, and could disincentivize agencies from publishing draft EAs.

CEQ considered these comments and includes paragraph (e) as proposed. CEQ considers this approach to strike the right balance between agency discretion and ensuring that agencies consider public comments when they choose to prepare both a draft and final EA. As the proposed rule articulated, this provision reflects the fact that one of the primary purposes for which agencies choose to prepare draft EAs is to facilitate public participation. Codifying this practice enhances the public's understanding of the NEPA process and meaningful public engagement and does not restrict agency discretion over whether to choose to prepare a draft EA for public comment.

CEQ declines to mandate that all EAs be made available for comment because agencies appropriately have flexibility to determine what level of engagement is appropriate for an EA given the specific circumstances of a proposed action, consistent with § 1501.5(f). However, in developing EAs, agencies must involve the public, State, Tribal, and local governments, relevant agencies, and any applicants, to the extent practicable, in accordance with § 1501.5(f). CEQ also declines to require agencies to respond to comments and

publish public comments on a website. Doing so would unduly limit the discretion of agencies to tailor the public engagement process for EAs to the specific circumstances of a proposed action, which could include responding to comments or publishing them on a website though the regulations do not require it. Adding such requirements instead of leaving it to agency discretion could disincentivize agencies from publishing draft EAs due to concerns about the burden of responding to voluminous comments.

Fifth, CEQ proposed to redesignate paragraphs (e) and (f) of 40 CFR 1501.5 (2020) as § 1501.5(f) and (g) respectively. CEQ makes these changes in the final rule.

Sixth, CEQ proposed to revise paragraph (g) addressing page limits to dispense with the requirement for senior agency official approval to exceed 75 pages, not including any citations or appendices, for consistency with section 107(e)(2) of NEPA. 42 U.S.C. 4336a(e)(2). CEQ did not receive any comments on this proposed change and makes this change in the final rule.

Seventh, CEQ proposed to add paragraph (h) to clarify that agencies may reevaluate or supplement an EA if a major Federal action remains to occur and the agency considers it appropriate to do so. Proposed paragraph (h) also provided that agencies may reevaluate an EA or otherwise document a finding that changes to the proposed action or new circumstances or information relevant to environmental concerns are not substantial, or the underlying assumptions of the analysis remain valid. CEQ proposed to add this language to clarify that an agency may apply the provisions at § 1502.9 regarding supplemental EISs to a supplemental EA to improve efficiency and effectiveness.

A few commenters expressed that supplemental EAs should consider whether the effects analysis still supports a FONSI rather than merely addressing underlying assumptions. Some commenters interpreted the supplementation and reevaluation language to allow an agency to change its finding after it issued the FONSI.

In the final rule, CEQ includes § 1501.5(h) to address supplementation and reevaluation, but revises it from the proposal to address concerns raised by the commenters about potential confusion. The final rule divides supplementation and reevaluation into subparagraphs and incorporates the same supplementation standard as § 1502.9. Paragraph (h)(1) provides that agencies "should" supplement EAs rather than "may" as proposed. CEQ

uses "should" in the final rule because there may be instances where an agency determines that supplementation is appropriate because the changes to the proposed action or new information indicate the potential for significant effects, and in such instances, agencies should supplement their analysis if an action remains to occur and is therefore incomplete or ongoing. As discussed in section II.D.8, CEQ replaces "remains to occur" with "incomplete or ongoing" to more clearly describe the standard for supplementation, and CEQ uses this same phrasing in § 1501.5(h)(1).

In § 1501.5(h)(1)(i) and (ii), the final rule includes the same criteria for supplementation as in § 1502.9(d)(i) and (ii) with an additional clause at the end of (h)(ii) to clarify the meaning in the case of EAs. CEQ includes "to determine whether to prepare a finding of no significant impact or an environmental impact statement" at the end of paragraph (h)(ii) to clarify what "that bear on the analysis" means in the context of an EA. After considering the comments, CEQ determined that it should not create a different supplementation standard for EAs from EISs since the purpose of supplementation is to address circumstances where the analysis upon which the agency based its decision has changed and there is potential for new significant effects. Aligning the standards for EISs and EAs will also reduce the complexity of the NEPA regulations and the environmental review process.

To further align this provision with § 1502.9, CEQ adds in § 1501.5(h)(2) the same text in § 1502.9 to state that agencies may prepare supplements when the agency determines the purposes of NEPA will be furthered in doing so. CEQ includes this paragraph for consistency with EISs and to make clear that agencies have such discretion.

Two commenters requested CEQ revise paragraph (h) to clarify that new circumstances or information in the absence of remaining discretionary approval involving a major Federal action do not trigger a requirement to reevaluate or supplement an EA. The commenters stated the proposed text could be interpreted to suggest that agencies are obligated to reevaluate an EA whenever new circumstances or information arise. While the proposed qualifier that "an action remains to occur," would address the commenters' concerns, as noted in this section, the final rule clarifies that "remains to occur" means when an action is incomplete or ongoing, which is consistent with § 1502.9 as well as longstanding case law that makes clear

that there must be an incomplete or ongoing action in order for reevaluation or supplementation to be necessary.

Some commenters expressed that paragraph (h) would result in the public and project sponsor not having certainty on the whole of the administrative record. These commenters requested the regulations require an agency to rescind the FONSI until a new one is reached; another commenter similarly requested CEQ add a paragraph on rescission of FONSIs. CEQ declines to require agencies to rescind a FONSI while a reevaluation or supplemental EA is ongoing because these processes are intended to inform whether a FONSI remains valid. If an agency prepares a supplemental EA, it will determine whether it is necessary to revise or issue a new FONSI or whether the existing FONSI remains valid based on the outcome of the supplemental analysis.

In the final rule, CEQ addresses reevaluation in its own paragraph, consistent with § 1502.9, by adding § 1501.5(i) to provide that an agency may use a reevaluation to document its consideration of changes to the proposed action or new information and its determination that supplementation is not required. For example, a reevaluation can be a short memo describing a change in project design that briefly explains why that change does not change the analysis conducted in the EA in a manner that warrants supplementation.

Finally, CEQ proposed to clarify which provisions applicable to EISs agencies should or may apply to EAs. CEQ proposed to replace paragraph (g) of 40 CFR 1501.5 (2020), listing the provisions for incomplete or unavailable information, methodology and scientific accuracy, and environmental review and consultation requirements, with proposed new paragraphs (i) and (j). CEQ proposed in paragraph (i) to clarify that agencies generally should apply the provisions of § 1502.21 regarding incomplete or unavailable information and § 1502.23 regarding scientific accuracy. CEQ proposed to revise these from "may apply" to "should apply" because CEQ considers it important to disclose where information is incomplete or unavailable and ensure scientific accuracy for all levels of NEPA review, not just EISs.

CEQ proposed in paragraph (j) that agencies may apply the other provisions of parts 1502 and 1503 as appropriate to improve efficiency and effectiveness of EAs. The proposed list included example provisions where this might be the case—scoping (§ 1502.4), cost-benefit analysis (§ 1502.22), environmental review and consultation

requirements (§ 1502.24), and response to comments (§ 1503.4).

Various commenters asked for clarity regarding proposed §§ 1501.5(i) and (j), expressing confusion on the difference between "generally should apply" and "may apply." Some commenters requested the final rule require application of §§ 1502.4, 1502.21, 1502.22, 1502.23, 1502.24, and 1503.4 to EAs.

In the final rule, CEQ adds proposed paragraph (i) at § 1501.5(j) but only references § 1502.21 regarding incomplete and unavailable information because CEQ has moved 40 CFR 1502.23 (2020), which is applicable to environmental documents, including EAs, to § 1506.6 as discussed in sections II.D.18 and II.H.4. CEQ retains "generally should" in the final rule. While CEQ encourages agencies to follow § 1502.21, CEQ retains the "generally" qualifier to acknowledge that there may be some circumstances where the section does not or should not apply. Additionally, because EAs can include significant effects that an agency mitigates to reach a FONSI, it is important that agencies apply § 1502.21 in such cases. CEQ also adds proposed paragraph (j) at § 1501.5(k), consistent with the proposal, to encourage agencies to apply the provisions of parts 1502 and 1503 where it will improve the efficiency and effectiveness of an EA.

Some commenters provided general comments on EAs. Some commenters requested the final rule add more requirements to align with EISs, including requiring agencies to consider the same scope of effects as those considered in an EIS; to provide decision makers with a summary and comparison of effects; and to consider alternatives to address adverse environmental effects. Other commenters argued generally that the proposed changes to § 1501.5 would result in EAs looking more like EISs, which is contrary to goal of an efficient process.

CEQ declines to make additional changes to § 1501.5. As discussed in this section, CEQ concluded that § 1501.5 strikes the right balance to ensure agencies preparing an EA conduct an appropriate and efficient review without imposing unnecessary requirements that would mirror an EIS or result in a less efficient process.

5. Findings of No Significant Impact (§ 1501.6)

CEQ proposed two revisions to § 1501.6 on findings of no significant impact (FONSIs) to clarify the 2020 rule's codification of the longstanding agency practice of relying on mitigated

FONSIs in circumstances where the agency incorporates mitigation into the action to reduce its effects below significance. Mitigated FONSIs are an important efficiency tool for NEPA compliance because they expand the circumstances in which an agency may prepare an EA and reach a FONSI, rather than preparing an EIS, consistent with the requirements of NEPA.

CEQ proposed to revise paragraph (a), which provides that an agency must prepare a FONSI if it determines, based on an EA, not to prepare an EIS because the action will not have significant effects. At the end of paragraph (a), CEQ proposed to clarify that agencies can prepare a mitigated FONSI if the action will include mitigation to avoid the significant effects that would otherwise occur or minimize or compensate for them to the point that the effects are not significant. The proposed rule noted that so long as the agency can conclude that effects will be insignificant in light of mitigation, the agency can issue a mitigated FONSI. The proposed rule noted this change improved consistency with the language in § 1501.6(c) and aligns with CEQ's guidance on appropriate use of mitigation, monitoring, and mitigated FONSIs.[72]

Numerous commenters supported proposed § 1501.6(a), viewing the proposed changes as consistent with agency practice and longstanding CEQ guidance as well as promoting efficiency in the NEPA process. In contrast, multiple commenters opposed the proposed changes and raised concerns that use of mitigated FONSIs would reduce opportunities for public participation and allow agencies to trade off different kinds of environmental effects to rely on a net benefit outcome to arrive at a FONSI.

In the final rule, CEQ revises paragraph (a) with additional, non-substantive edits for clarity, including subdividing paragraph (a) into subparagraphs. In paragraph (a), CEQ adds an introductory clause to make clear that an agency prepares a FONSI after completing an EA. In paragraph (a)(1), CEQ revises the text to clarify that an agency prepares a FONSI when it determines that NEPA does not require preparation of an EIS because the proposed action will not have significant effects. In paragraph (a)(2), CEQ also repeats the clause "if the agency determines, based on the environmental assessment, that NEPA does not require preparation of an environmental impact statement" after mitigated FONSI to make clear that a mitigated FONSI is also based on the

EA. Finally, CEQ adds a new paragraph (a)(3) to clarify that an agency must prepare an EIS following an EA if the agency determines that the action will have significant effects.

CEQ has long recognized in guidance that agencies may use mitigation to reduce the anticipated adverse effects of a proposed action below the level of significance, resulting in a FONSI. CEQ agrees that mitigated FONSIs promote efficiency, and the final rule includes safeguards to ensure that agencies will only use mitigated FONSIs when they can reasonably conclude that the mitigation measures will occur. Regarding opportunities for public engagement, the final rule supports public engagement in the EA process, consistent with § 1501.9.

CEQ disagrees that the use of a mitigated FONSI allows agencies to trade off different kinds of environmental effects and rely on a net benefit outcome to arrive at a FONSI. The CEQ regulations have never allowed agencies to use a net benefit analysis across environmental effects to inform the level of review. Instead, agencies must consider each type of effect or affected resources separately when determining whether a proposed action would have a significant effect. Therefore, an agency could not rely upon mitigation focused on one type of effect to arrive at a FONSI if the proposed action would nonetheless have a significant adverse effect of a different kind or on a different resource. A mitigated FONSI only enables an agency, consistent with existing practice, to determine that an effect is not significant in light of mitigation.

To accommodate the changes to paragraph (a), in the final rule, CEQ redesignates paragraphs (a)(1), (a)(2), and (b) of 40 CFR 1501.6 (2020) as § 1501.6(b)(1), (b)(2), and (c), respectively. CEQ also makes a non-substantive, clarifying change to § 1501.6(b)(2) to simplify the language from "makes its final determination" to "determines."

Next, CEQ proposed to revise proposed § 1501.6(c) addressing what an agency must include in a FONSI regarding mitigation. The second sentence provides that when an agency relies on mitigation to reach a FONSI, the mitigated FONSI must state the enforceable mitigation requirements or commitments that will be undertaken to avoid significant effects. CEQ proposed to strike the last clause, "to avoid significant impacts" at the end of the second sentence and replace that phrase with a requirement for the FONSI to state the authorities for the enforceable mitigation requirements or

---

[72] CEQ, Mitigation Guidance, *supra* note 10.

commitments, since they must be enforceable for agencies to reach a mitigated FONSI. CEQ proposed this change because, where a proposed action evaluated in an EA may have significant effects, and an agency is not preparing an EIS, the FONSI must include mitigation of the significant effects. CEQ also proposed to add examples of enforcement authorities including "permit conditions, agreements, or other measures."

Commenters were generally supportive of proposed § 1501.6(c). A few commenters opposed the proposed changes or questioned CEQ's authority to include them in the regulations. As discussed in sections II.I.1 and II.I.2 on §§ 1505.2(c) and 1505.3(c), the rule reinforces the integrity of environmental reviews by ensuring that if an agency assumes as part of its analysis that mitigation will occur and will be effective, the agency takes steps to ensure that the assumption is correct. In the final rule, which redesignates proposed paragraph (c) as § 1501.6(d), CEQ strikes the phrase "to avoid significant impacts," as proposed, from the end of the second sentence and replaces it with the clause "and the authority to enforce them" such that the sentence requires agencies to both state the enforceable mitigation requirements or commitments and the authority to enforce those commitments when the agency finds no significant effects based on mitigation. Next, the sentence includes a list of examples of such commitments and authorities. The final rule includes more specificity than the proposed rule, to include "terms and conditions or other measures in a relevant permit, incidental take statement, or other agreement."

Finally, as discussed further in section II.G.2, CEQ proposed to add a new sentence at the end of paragraph (c) to require agencies to prepare a monitoring and compliance plan when the EA relies on mitigation as a component of the proposed action, consistent with § 1505.3(c). CEQ proposed these changes to help effectuate NEPA's purpose as articulated in section 101, including to "attain the widest range of beneficial uses of the environment without degradation, risk to health or safety, or other undesirable and unintended consequences" and to "preserve important historic, cultural, and natural aspects of our national heritage." 42 U.S.C. 4331(b).

For the reasons discussed in section II.G.2, CEQ adds this requirement in the final rule in § 1501.6(d). Specifically, the final rule requires agencies to prepare a mitigation and compliance plan for the enforceable mitigation and

any other mitigation required by § 1505.3(c) to ensure that if an agency assumes as part of its analysis that mitigation will occur and will be effective, the agency takes steps to ensure that the assumption is correct.

### 6. Lead Agency (§ 1501.7)

CEQ proposed several changes to § 1501.7, which addresses the responsibilities of lead agencies. First, CEQ proposed to retitle § 1501.7 from "Lead agencies" to "Lead agency" to align with section 107(a) of NEPA. 42 U.S.C. 4336a(a). CEQ did not receive comments specific to the section title and makes this change in the final rule.

Second, in paragraph (a) of § 1501.7, CEQ proposed to eliminate the reference to "complex" EAs so that the regulations would require a lead agency to supervise the preparation of any EIS or EA for an action or group of actions involving more than one Federal agency. The 2020 rule added the concept of complex EAs to this section without defining the term. CEQ invited comment on whether it should retain the concept of a complex EA in the regulations, and if so, how the regulations should define a complex EA.

Three commenters supported removal of complex EAs arguing it was confusing and unnecessary. A commenter suggested that if CEQ retains the concept, the rule define it as an EA that requires reviews from multiple Federal agencies. CEQ removes the reference to complex EAs as unnecessary given that the provision already states that a lead agency must supervise preparation of an EA when more than one Federal agency is involved and the term is not used elsewhere in the rule.

Some commenters suggested that the text of proposed § 1501.7(a) was inconsistent with sections 107(a)(2) and 111(9) of NEPA, which address the role of and define "lead agency." CEQ disagrees that the language in paragraph (a) is inconsistent. CEQ considers the longstanding language in paragraphs (a)(1) and (a)(2) to describe the situations where there are more than one Federal agency participating in the environmental review process for purposes of identifying the lead agency and therefore retains this text in the final rule.

Third, CEQ proposed to revise paragraph (b) regarding joint lead agencies for consistency with section 107(a)(1)(B) of NEPA. 42 U.S.C. 4336a(a)(1)(B). CEQ proposed to clarify that Federal, State, Tribal, or local agencies may serve as a joint lead agency upon invitation from the Federal lead agency and acceptance by the

invited agency, consistent with paragraph (c). CEQ proposed to retain Federal agencies in the list of potential joint lead agencies because, consistent with current practice, there are circumstances in which having another Federal agency serving as a joint lead agency will enhance efficiency. CEQ noted in the proposed rule that it does not read the text in section 107(a)(1)(B) of NEPA, 42 U.S.C. 4336a(a)(1)(B), as precluding this approach; rather, Congress specified that State, Tribal, and local agencies may serve as joint lead agencies because they are ineligible to serve as the lead agency. CEQ also proposed to add a sentence at the end of paragraph (b) to require joint lead agencies to fulfill the role of a lead agency, consistent with the last sentence of section 107(a)(1)(B) of NEPA. 42 U.S.C. 4336a(a)(1)(B).

One commenter asserted CEQ's proposal was inconsistent with section 107(a)(1)(B) of NEPA. 42 U.S.C. 4336a(a)(1)(B). Other commenters expressed concerns or asked questions about how this might work in practice and how agencies might manage and share responsibilities. One commenter asserted that the proposal for lead agencies to jointly fulfill the role of a lead agency may be complicated and difficult to implement and requested CEQ maintain the existing regulatory approach for providing for joint lead agencies generally.

In the final rule, CEQ revises paragraph (b) as proposed, but makes agency singular in the first sentence for consistency with the rest of the paragraph. In general, CEQ anticipates that there will only be one joint lead agency but does not intend the regulations to be so restrictive. While section 107(a)(1)(B) does not specifically refer to Federal agencies, it makes clear that there is one lead agency when there is more than one Federal agency, but it is silent as to what role the other Federal agency or agencies will fulfill. 42 U.S.C. 4336a(a)(1)(B). Therefore, CEQ is clarifying in the final rule that other Federal agencies may serve as joint lead agencies or cooperating agencies. With respect to the questions about how agencies manage and share responsibilities, CEQ notes that the provision for joint lead agencies has been in the regulations since 1978, and agencies have a great deal of experience in implementing these provisions. Sometimes agencies will engage in an MOU or otherwise outline their respective roles and responsibilities. CEQ encourages this as a best practice to facilitate an efficient process, and agencies should consider using the letter or memorandum required by

**35480** **Federal Register** / Vol. 89, No. 85 / Wednesday, May 1, 2024 / Rules and Regulations

§ 1501.7(c) to set out their roles and responsibilities.

Fourth, CEQ proposed to revise paragraph (c) for consistency with section 107(a)(1) of NEPA to clarify that the participating Federal agencies must determine which agency will be the lead agency and any joint lead agencies, and that the lead agency determines any cooperating agencies. 42 U.S.C. 4336a(a)(1). CEQ also proposed this change for consistency with the text in § 1506.2(c) on joint EISs.

One commenter interpreted paragraph (c) to mean that the factors listed in paragraphs (c)(1) through (c)(5) apply only if there is disagreement among participating agencies on which agency should be the lead agency and asserted this interpretation is inconsistent with section 107(a)(1)(A) of NEPA. 42 U.S.C. 4336a(a)(1)(A). CEQ did not intend this interpretation. Therefore, in the final rule, for clarity and greater consistency with the statute, CEQ adds the clause "considering the factors in paragraphs (c)(1) through (c)(5)" to the first sentence in paragraph (c) to clarify that participating Federal agencies should consider these factors in determining which agency should serve as the lead agency.

One commenter suggested that proposed paragraphs (b) and (c) might create confusion between agencies and a project proponent regarding which agency is ultimately the lead agency for the NEPA review, is responsible for meeting timeframes and deadlines, and serves as the contact for the project proponent.

In the final rule, CEQ revises the first sentence of paragraph (c) for additional clarity by moving the reference to joint lead agencies to the end. Consistent with this provision, participating Federal agencies will first determine which agency will serve as the lead agency. Then, the lead agency will determine which agencies will serve as joint lead or cooperating agencies. While agencies are in the best position to communicate with applicants about responsibilities and appropriate points of contact, the language in paragraphs (b) and (c) make clear that the lead agency is ultimately responsible, though it may share responsibilities with a joint lead agency if the participating agencies designate one. Further, § 1501.10(a) sets forth the provisions on setting deadlines and schedules and § 1500.5(g) indicates that all agencies are responsible for meeting deadlines.

Fifth, in paragraph (d), CEQ proposed to revise the text for consistency with section 107(a)(4) of NEPA, which allows any Federal, State, Tribal, or local agency or a person that is substantially

affected by a lack of lead agency designation to submit a request for designation to a participating Federal agency. 42 U.S.C. 4336a(a)(4). CEQ also proposed to add a requirement for the receiving agency to provide a copy of such a request to CEQ consistent with the statute. Finally, CEQ proposed to make a non-substantive change to replace the phrase "private person" with the word "individual" for consistency with this term's use in other sections of the regulations.

Sixth, in paragraph (e), which addresses what happens if Federal agencies are unable to agree which agency will serve as the lead agency, CEQ proposed to revise the text for consistency with section 107(a)(5) of NEPA, clarify that the 45 days is calculated from the date of the written request to the senior agency officials as set forth in § 1501.7(d), and replace "persons" with "individuals" for consistency with the rest of regulations. 42 U.S.C. 4336a(a)(5).

A commenter stated that the change of "person" to "individual" is inconsistent with sections 107(a)(4) and (a)(5)(A) of NEPA. 42 U.S.C. 4336a(a)(4), 4336a(a)(5)(A). While CEQ does not view this as a substantive change, in the final rule, CEQ revises references to "individual" or "private person" to "person" throughout the regulations for consistency with the recent amendments to NEPA, including in § 1501.7(d) and (e), and to avoid using the word "person" and the word "individual" in different sections of the regulations where the same meaning is intended. Otherwise, CEQ makes the changes to paragraph (d) and (e) as proposed.

Seventh, in paragraph (f), CEQ proposed to revise the text for consistency with section 107(a)(5)(C) and (a)(5)(D) of NEPA, to change "within 20 days" to "no later than 20 days" in the first sentence, and "20 days" to "40 days" and "determine" to "designate" in the second sentence. 42 U.S.C. 4336a(a)(5)(C)–(D). CEQ did not receive any comments to this specific proposal and revises paragraph (f) as proposed in the final rule except that the final rule strikes "and all responses to it" to clarify that the 40-day deadline for CEQ to designate a lead agency runs from the date of request. This change is consistent with section 107(a)(5)(D) which requires that CEQ designate the lead agency "[n]ot later than 40 days after the date of the submission of a request." 42 U.S.C. 4336a(a)(5)(D).

Eighth, CEQ proposed minor edits to paragraph (g), which addresses joint environmental documents, including EISs, RODs, EAs, and FONSIs. While

section 107(b) of NEPA addresses joint EISs, EAs, and FONSIs, which are defined collectively as an "environmental document" in section 111(5) of NEPA, the statute does not explicitly address joint RODs. 42 U.S.C. 4336a(b); 4336e(5). Because joint RODs can in some circumstances be inefficient, CEQ proposed to revise § 1501.7(g) to add a caveat that agencies must issue joint RODs except where it is "inappropriate or inefficient" to do so, such as when an agency has a separate statutory directive, or it would take significantly longer to issue a joint ROD than separate ones. Additionally, for consistency with § 1501.5, CEQ proposed to add that agencies can jointly determine to prepare an EIS if a FONSI is inappropriate.

Commenters generally supported CEQ's proposal. Some commenters recommended CEQ expand the inappropriate or inefficient exception to EISs, EAs, and FONSIs. Another comment suggested the regulations require agencies to document their rationale for not preparing a joint document.

CEQ finalizes § 1501.7(g) as proposed with minor, non-substantive clarifying edits. CEQ is not applying the inappropriate or inefficient exception to EISs, EAs, and FONSIs because section 107(b) of NEPA directs agencies to prepare joint EISs, EAs, and FONSIs "to the extent practicable." 42 U.S.C. 4336a(b). With respect to RODs, CEQ includes the inappropriate or inefficient exception in the final rule text in recognition that, in some cases, requiring a joint ROD could inadvertently slow the NEPA process down, and the exclusion of RODs from section 107(b) of NEPA makes it appropriate to apply a tailored standard to joint RODs. *See* 42 U.S.C. 4336a(b). For example, agencies may have different procedures for issuing authorizations under their applicable legal authorities or may need to consider different factors. However, in other cases, a joint ROD could improve efficiency by avoiding duplication of effort or analysis. Agencies collaborating on a NEPA document for a specific action are in the best position to identify when a joint ROD is not appropriate for that particular action.

Lastly, in paragraph (h)(2), CEQ proposed to add a clause to the beginning of the paragraph, consistent with section 107(a)(2)(C) of NEPA, to require the lead agency to give consideration to a cooperating agency's analyses and proposals. 42 U.S.C. 4336a(a)(2)(C). CEQ proposed to move the qualifier clause—to the extent practicable—to precede the existing

requirement to use the environmental analysis and information provided by cooperating agencies. CEQ proposed this move to clarify that this qualifier only modifies the second clause. CEQ also proposed to change "proposals" to "information" to make the text consistent with § 1501.8(b)(3) and because the use of "proposal" here was inconsistent with the definition of "proposal" provided in § 1508.1(ff). Finally, because the reference to jurisdiction by law or special expertise was unnecessarily redundant given that the definition of "cooperating agency" in § 1508.1(g) incorporates those phrases, CEQ proposed to remove them from the sentence.

One commenter asserted that proposed § 1501.7(h)(2) unnecessarily conflicts with section 107(a)(2)(C) of NEPA, 42 U.S.C. 4336a(a)(2)(C), and is inconsistent with proposed §§ 1501.8(b)(3), 1508.1(e), and 1508.1(dd). Another commenter opposed the changes to paragraph (h)(2) and requested CEQ retain the existing language. The commenter asserted that the existing text provides a clear statement that agencies should use information and analyses provided by cooperating agencies to the maximum extent practicable and that the proposed changes remove this clarity. As a result, the commenter opined that for cooperating agencies, it will be unclear on what qualifies as an analysis or proposal for consideration and what qualifies as information.

In the final rule, CEQ makes the changes as proposed but retains "proposal" in the second clause because, upon further consideration, CEQ has determined removing "proposal" could introduce unnecessary confusion and potential delay, particularly because both the 1978 regulations and the 2020 regulations treated proposals in the same manner as environmental analysis for purposes of this provision, and agencies have not raised concerns that the inclusion of proposals creates challenges for lead agencies. CEQ retains the qualifier "to the maximum extent practicable," which CEQ views as striking the right balance between ensuring that the lead agency uses the environmental analysis, proposal, and information provided by cooperating agencies and providing the lead agency with flexibility in determining the content of a document. CEQ disagrees that this provision is in conflict with § 1501.8(b)(3), which merely states the requirement for cooperating agencies to assist with developing information and analyses for NEPA documents; it does not address the lead agency's role in considering or

using that content. CEQ similarly does not see a conflict with the definitions of "cooperating agency" and "proposal" and the commenter who asserted that a conflict exists did not explain the conflict. Finally, CEQ disagrees that this provision conflicts with section 107(a)(2)(C) of NEPA; the provision incorporates the text of the statute and goes beyond it to require lead agencies to use the information in their documents to the maximum extent practicable. 42 U.S.C. 4336a(a)(2)(C).

Other commenters requested CEQ add a requirement for lead agencies to document how and to what extent they have considered the studies, analyses, and other information provided by cooperating agencies. CEQ declines to add this requirement as unnecessary and burdensome. In most cases, lead and cooperating agencies can address these issues informally and disclosure of this informal process is unnecessary for the decision maker to make an informed decision and documenting them would consume agency resources and could lead to a more formalized and less collaborative process between the agencies.

CEQ did not propose edits to paragraph (h)(4) requiring the lead agency to determine the purpose and need, and alternatives in consultation with any cooperating agency. One commenter recommended the final rule add "with ultimate authority to finalize the purpose and need and alternatives resting with the lead agency" to the end of this paragraph. CEQ declines to make this change. While the lead agency has ultimate responsibility, in order for documents to address the decisions of all agencies with jurisdiction by law and therefore result in an efficient review and decision-making process, the cooperating agency must have a consultative role. CEQ encourages agencies to collaborate early on purpose and need and alternatives to resolve any disputes early in the process and ensure the document will meet the needs of all agencies relying on the documents for their actions.

As discussed further in section II.C.8, CEQ proposed to move the requirements for schedules and milestones in paragraphs (i) and (j) of 40 CFR 1501.7 (2020) to § 1501.10(c) in order to consolidate provisions related to deadlines, schedules, and milestones in one section. CEQ makes this change in the final rule as discussed further in section II.C.9.

### 7. Cooperating Agencies (§ 1501.8)

CEQ proposed an addition to paragraph (a) of § 1501.8 to clarify the meaning of the phrase "special

expertise," which is one of the criteria that qualifies an agency to serve as a cooperating agency. Among other things, paragraph (a) provides that, at the request of a lead agency, an agency with special expertise may elect to serve as a cooperating agency. CEQ proposed to clarify in paragraph (a) that special expertise may include Indigenous Knowledge.

While a few commenters opposed the inclusion of Indigenous Knowledge as a form of special expertise, many commenters expressed support. Having considered the comments, CEQ continues to view the inclusion of Indigenous Knowledge as a form of special expertise as appropriate and, therefore, finalizes the change to § 1501.8(a) as proposed except that CEQ removes the cross reference to § 1507.3(e) because this provision does not address the appeals procedures for cooperating agencies. This addition of Indigenous Knowledge as a form of special expertise helps ensure that Federal agencies respect and benefit from the unique knowledge that Tribal governments bring to the environmental review process.

CEQ invited comment on whether it should include a definition of "Indigenous Knowledge" in the regulations. CEQ received a range of comments on this question. Some commenters opposed a definition, and several commenters suggested a range of diverse definitions. Other commenters recommended CEQ engage in Tribal consultation on the definition, CEQ held two Tribal consultations on the rule but a consensus view on a definition did not emerge from those consultations. CEQ has determined not to define "Indigenous Knowledge" in this rulemaking. The comments CEQ received did not provide an adequate basis for CEQ to determine that providing a definition in the regulations would be workable across contexts and Tribal Nations. CEQ, therefore, considers it appropriate for agencies to have flexibility to approach Indigenous Knowledge in a fashion that makes sense for their programs and the Tribal Nations with which they work. Agencies' implementation of this provision may be informed by the existing approaches that some agencies have developed to Indigenous Knowledge[73] and the Guidance for

[73] See, e.g., U.S. Dep't of the Interior, 301 Departmental Manual 7, Departmental Responsibilities for Consideration and Inclusion of Indigenous Knowledge in Departmental Actions and Scientific Research (Dec. 5, 2023), https://www.doi.gov/document-library/departmental-

Continued

Federal Departments and Agencies on Indigenous Knowledge that CEQ and the Office of Science and Technology Policy issued on November 30, 2022.[74] CEQ will consider whether additional guidance specific to the environmental review context or a regulatory definition is needed in the future.

A couple of commenters requested CEQ clarify what is meant by "jurisdiction by law" in § 1501.8(a). CEQ declines to add additional language to explain this phrase, which has been in the regulations since 1978 and generally has been construed to mean when an agency has a role in an action that is conferred by law. CEQ has not heard concern from agencies that the phrase is unclear or that a lack of definition is creating practical problems. Therefore, establishing a definition is unnecessary and could unsettle existing agency practice that has successfully implemented this provision.

Another commenter requested CEQ revise paragraph (a) to require the lead agency to grant cooperating agency status if a State or local agency has jurisdiction by law or special expertise over a project that could impact the local agency's interest. Other commenters requested that CEQ compel lead agencies to invite certain parties as a cooperating agency, such as substantially affected Tribal agencies. CEQ declines to make it a requirement for the lead agency to invite or grant cooperating agency status to a State, Tribal, or local agency. Section 107(a)(3) of NEPA permits but does not require lead agencies to designate Federal, State, Tribal, or local agencies that have jurisdiction by law or special expertise as cooperating agencies. *See* 42 U.S.C. 4336a(a)(3). Because agency authorities and obligations can vary dramatically, CEQ considers it important to maintain flexibility for the lead agency to determine on a case-by-case basis whether a State, Tribal, or local agency should serve as a cooperating agency.

One commenter requested that CEQ extend to potential non-Federal cooperating agencies the right to appeal to CEQ when a lead Federal agency denies them cooperating agency status. CEQ declines to make this change in the final rule because lead agencies are in the best position to make a case-by-case determination of whether to invite non-Federal agencies to be cooperating agencies. Such an appeal process could

also unduly burden CEQ and its limited resources and delay the environmental review process.

In paragraph (b)(6) regarding consultation with the lead agency on developing schedules, CEQ adds "and updating" after "developing" for consistency with § 1501.10(a) that provides for both the development and updates to schedules. In paragraph (b)(7), CEQ proposed to require cooperating agencies to meet the lead agency's schedule for providing comments, but strike the second clause requiring cooperating agencies to limit their comments to those for which they have jurisdiction by law or special expertise with respect to any environmental issue. CEQ proposed this deletion to align this paragraph with section 107(a)(3) of NEPA, which provides that a cooperating agency may submit comments to the lead agency no later than a date specified in the lead agency's schedule. *See* 42 U.S.C. 4336a(a)(3).

Some commenters recommended CEQ retain this clause to avoid unnecessary delays and avoid disagreements amongst lead and cooperating agencies. CEQ disagrees that this clause will necessarily avoid disagreements amongst lead and cooperating agencies because agencies may disagree on whether an agency's comments fall within its jurisdiction or special expertise. Imposing this limitation on the participation of cooperating agencies may also undermine the kind of collaborative engagement between lead agencies and cooperating agencies that enhances the efficiency and quality of environmental reviews. CEQ is also concerned that retaining the clause could have unintended consequences that could delay decision making by cooperating agencies with jurisdiction by law. For example, if a cooperating agency considers a document to be legally insufficient with respect to a particular issue, this could lead the cooperating agency to develop its own, separate NEPA document, resulting in a delay in the cooperating agency's action and potential legal risk to the lead agency with a different analysis. CEQ encourages cooperating agencies to identify and seek to resolve issues as early in the process as possible.

### 8. Public and Governmental Engagement (§ 1501.9)

CEQ proposed to address public and governmental engagement in a revised § 1501.9 by moving the provisions of 40 CFR 1506.6 (2020), "Public involvement," into proposed § 1501.9 and updating them as described in this section, and moving the provisions of 40

CFR 1501.9 (2020) specific to the EIS scoping process to § 1502.4. CEQ proposed these updates to better promote agency flexibility to tailor engagement to their specific programs and actions, maintaining the requirements to engage the public and affected parties in the NEPA process, and thereby fostering improved public and governmental engagement. CEQ proposed the revisions to § 1501.9 to emphasize the importance of creating an accessible and transparent NEPA process. CEQ also proposed many of these changes in response to feedback on the Phase 1 proposed rule, the 2020 proposed rule, and input received from stakeholders and agencies during development of this proposed rule. Much of that feedback requested increased opportunities for public engagement and increased transparency about agency decision making, along with general requests that CEQ elevate the importance of public engagement in the NEPA process. Finally, CEQ proposed to move general requirements related to public engagement to part 1501 to emphasize that public engagement is important to multiple components of the NEPA process and agency planning, while moving other provisions related to scoping for EISs to § 1502.4.

First, CEQ proposed to move the provisions of 40 CFR 1501.9 (2020) on scoping for EISs—paragraphs (a), (b), (c), (d), (d)(1) through (8), (f), and (f)(1) through (5)—to proposed § 1502.4, "Scoping." As discussed in sections II.C.2 and II.C.10 CEQ proposed to move the provisions in 40 CFR 1502.4 (2020) on "Major Federal actions requiring the preparation of environmental impact statements" to §§ 1501.3 and 1501.11. Also, as discussed in section II.C.2, CEQ proposed to move the remaining text of 40 CFR 1501.9(e) and (e)(1) through (3) (2020) on the determination of scope to § 1501.3 because determining the scope of actions applies to all levels of NEPA review.

Many commenters were supportive of CEQ's proposed approach. Commenters expressed support for the restoration of provisions related to early review and coordination and the proposed revisions to §§ 1501.9 and 1502.4 to reinforce the importance of early public engagement designed to meet the needs of the community. Supportive commenters characterized CEQ's proposed changes as being more in line with the statute as well as best practice by emphasizing the importance of initiating public outreach and planning as early as possible. Commenters also pointed to early engagement and opportunities for comment as trademarks of an effective

*manual/301-dm-7-departmental-responsibilities-consideration-and.*

[74] *See* Office of Science and Technology Policy and CEQ, Guidance for Federal Departments and Agencies on Indigenous Knowledge (Nov. 30, 2022), *https://www.whitehouse.gov/wp-content/uploads/2022/12/OSTP-CEQ-IK-Guidance.pdf.*

NEPA process that can help prevent unexpected problems and delays by helping agencies identify potential roadblocks early, design effective solutions when proposals and alternatives are still being developed, and build trust with communities. Some commenters opposed the outreach and engagement requirements in proposed § 1501.9, asserting that they were too open ended and would add burden and time to the process.

In this final rule, CEQ is reorganizing these sections as proposed. Public engagement is a foundational element of the NEPA process and is appropriately addressed in part 1501. Agencies have decades of experience designing effective outreach strategies that are tailored to the specifics of their programs and actions. Technology, when used appropriately, can further improve these strategies, and this final rule will provide agencies with the flexibility and encouragement to more effectively engage with interested or affected governments, communities, and people.

Second, CEQ proposed to retitle § 1501.9 to "Public and governmental engagement" and accordingly update references to "public involvement" within this section and throughout the CEQ regulations to "public engagement." CEQ proposed this change to better reflect how Federal agencies should interact with the public and interested or affected parties, stating that the word "engagement" reflects a process that is more interactive and collaborative compared to simply including or notifying the public of an action. Engagement is also a common term for Federal agencies with experience developing public engagement strategies or that work with public engagement specialists. CEQ proposed to add "governmental" to the title to better reflect the description of the provisions included in the section, which relate to both public and governmental entities.

Commenters were generally supportive of this proposed change because it implies a process that is more interactive and collaborative instead of just notifying the public of an action. CEQ is revising the title of § 1501.9 as proposed.

Third, CEQ proposed to add proposed paragraphs (a) and (b) to articulate the purposes of public and governmental engagement and to identify the responsibility of agencies to determine the appropriate methods of public and governmental engagement and conduct scoping consistent with § 1502.4 for EISs. CEQ proposed to use the phrase "meaningful" engagement in this

particular paragraph to better describe the purpose of this process because public and governmental engagement should not be a mere check-the-box exercise, and agencies should conduct engagement with appropriate planning and active dialogue or other interaction with stakeholders in which all parties can contribute.

Many commenters expressed support for CEQ's use of "meaningful engagement." Commenters who disliked the descriptor "meaningful" stated that the word is too subjective, open to differing interpretations, and likely to cause unnecessary controversy and delay. Other commenters suggested the description of "meaningful" was not strong or specific enough, as proposed, to result in the desired outcome and recommended CEQ define meaningful engagement.

In the final rule, CEQ combines purpose and responsibility, which it had proposed to address in separate paragraphs, in § 1501.9(a) because these concepts are linked, and upon further consideration, CEQ considers addressing them together to reduce redundancy in proposed paragraphs (a) and (b), and enhance the clarity of the final rule. Additionally, the second sentence of proposed paragraph (b) addresses the role of engagement in determining the scope of a NEPA review; as discussed further in this section, CEQ revises § 1501.9(b) to address this topic. The first two sentences in § 1501.9(a) describe the purposes of public engagement and governmental engagement. CEQ is retaining "meaningful engagement" as proposed to better describe the overall purpose of public engagement. Public engagement should not be a simple check-the-box exercise, and agencies should conduct engagement with appropriate planning and active dialogue or other interaction with interested parties in which all can contribute. Federal agencies have flexibility to determine what methods are appropriate to achieve a collaborative and inclusive process that meaningfully and effectively engages communities affected by their proposed actions. As part of meaningful engagement, CEQ encourages agencies to engage with all potentially affected communities including communities with environmental justice concerns, consistent with § 1500.2(d).

In the final rule, CEQ adds a new third sentence to paragraph (a) to clarify that the purpose of § 1501.9 is to set forth agencies' responsibilities and best practices for such engagement. Finally, CEQ moves the first sentence of proposed paragraph (b) to be the last

sentence of paragraph (a) requiring agencies to determine the appropriate methods of engagement for their proposed actions. Agencies are best situated to carry out this responsibility, because agencies understand their programs and authorities, and the communities that are interested in and affected by them.

CEQ revises § 1501.9(b) in the final rule, different from the proposal, to clarify the role of public and governmental engagement in determining the scope of a NEPA analysis. As discussed in section II.C.2, agencies must identify the scope of their proposed action, consistent with the definition of "major Federal action," which in turn informs the level of NEPA review, and what alternatives and effects an agency must consider; public input has long informed this process. Therefore, CEQ has added a sentence to § 1501.9(b) to require agencies to use public and governmental engagement to inform the level of review for and scope of analysis of a proposed action consistent with § 1501.3. CEQ qualifies this provision "as appropriate" to account for the variety of ways that agencies should engage with the public and because not all actions will necessitate public engagement. For example, agencies must engage with the public when developing new CEs, but generally do not do so when applying CEs to their proposed actions.

CEQ adds the second sentence of proposed paragraph (b) in the final rule, which cross references to scoping for EISs as set forth in § 1502.4. Finally, CEQ adds a new sentence to § 1501.9(b) encouraging agencies to apply that scoping provision to EAs as appropriate. This addition is consistent with § 1501.5(j), which encourages agencies to apply § 1502.4 to EAs as appropriate to improve efficiency and effectiveness and is also responsive to public comments requesting more clarity on what is required for an EIS versus an EA as well as comments requesting increased opportunities for involvement on EAs. Agencies have experience successfully using the scoping process for EAs, and the regulatory text clarifies that agencies may continue to use the scoping process to inform the level of review, or find it helpful when they intend to rely on mitigation in an EA to reduce effects below significance and reach a FONSI rather than preparing an EIS.

Fourth, in the proposed rule, § 1501.9 had separate paragraphs addressing outreach (paragraph (c)) and notification (paragraph (d)) with the former recommended procedures and the latter required. Specifically, proposed

paragraph (c)(1) recommended that agencies invite likely affected agencies and governments, and proposed paragraph (c)(2) recommended that agencies conduct early engagement with likely affected or interested members of the public. CEQ modeled these provisions on the prior approaches in 40 CFR 1501.7(a)(1) (2019) and 40 CFR 1501.9(b) (2020) requiring the lead agency to invite early participation of likely affected parties. Proposed paragraph (c)(3) would provide flexibility to agencies to tailor engagement strategies, considering the scope, scale, and complexity of the proposed action and alternatives, the degree of public interest, and other relevant factors. CEQ proposed to move from 40 CFR 1506.6(c) (2020) to § 1501.9(c)(3) the requirement that agencies consider the ability of affected parties to access electronic media when selecting the appropriate methods of notification. CEQ also proposed to add a clause to the end of paragraph (c)(3) to require agencies to consider the primary language of affected persons when determining the appropriate notification methods to use.

At least one commenter noted that the use of ''should'' in proposed paragraph (c)(1) was inconsistent with proposed § 1501.7(h)(1) requiring lead agencies to invite the participation of cooperating agencies. Other commenters asked that the language on outreach be stronger, recommending that CEQ change ''should'' to ''shall'' in proposed paragraph (c) and ''consider'' to ''ensure'' in proposed paragraph (c)(3).

In the final rule, CEQ combines proposed paragraphs (c) and (d) in § 1501.9(c) to address outreach and notification. CEQ revised the introductory text from ''lead agency'' to ''agencies'' for consistency with the use of ''agencies'' in the rest of § 1501.9. This change does not mean that each agency involved in an EIS or EA needs to conduct these responsibilities independently or that the lead agency is not ultimately responsible given its role in supervising the preparation of an EIS or EA consistent with § 1501.7(a), but rather that there is flexibility in which agency conducts these responsibilities under the lead agency's supervision.

CEQ also revises the introductory text from agencies ''should'' to ''shall'' for consistency with the both the 2020 and 1978 regulations and to resolve the inconsistency between § 1501.7(h)(1), which requires the lead agency to invite cooperating agencies at the earliest practicable time and proposed § 1501.9(c)(1) encouraging the lead agency to invite the participation of likely affected agencies and

governments, including cooperating agencies, as early as practicable. CEQ also is changing ''should'' to ''shall'' because using ''should'' would be confusing and inaccurate to the extent that it could be read to suggest that some requirements are optional. CEQ adds ''as appropriate'' to qualify the requirement in paragraph (c)(2) to conduct early engagement to make clear that when the regulations require or encourage agencies to conduct engagement, they should do so early in the process. These changes from the proposal do not establish new obligations for agencies, but rather, clarify which provisions are obligatory in light of the requirements of the NEPA statute and other provisions in the regulations.

CEQ also adds ''any'' in paragraph (c)(1) to acknowledge that for some actions, there will not be any likely affected agencies or governments. CEQ finalizes paragraph (c)(3) as proposed with two changes, which requires agencies to consider the appropriate methods of outreach and notification, including the ability of affected persons and agencies to access electronic media and the primary language of affected persons. In the final rule, CEQ includes ''and persons'' after entities consistent with the phrasing in paragraph (c)(5)(i) and makes language plural for consistency with ''persons.'' Additionally, CEQ notes that agencies will also need to consider other statutory requirements, such as those under the Rehabilitation Act, when selecting appropriate methods of outreach and notification.

Fifth, CEQ proposed to move the introductory clause of 40 CFR 1506.6 (2020), ''Agencies shall'' to proposed paragraph (d) and add the paragraph heading ''Notification.'' As discussed earlier in this section, CEQ is combining proposed paragraph (c) and (d) in the final rule. CEQ proposed in § 1501.9 and throughout the proposed regulations to replace the word ''notice'' with ''notification,'' except where ''notice'' is used in reference to a **Federal Register** notice. CEQ is making this change in the final rule to clearly differentiate between those requirements to publish a notice in the **Federal Register** and other requirements to provide notification of an activity, which may include a notice in the **Federal Register** or use of other mechanisms.

Sixth, in the proposed rule, CEQ proposed a new paragraph (d)(1) to require agencies to publish notification of proposed actions they are analyzing through an EIS. CEQ proposed this requirement in response to feedback from multiple stakeholders and

members of the public requesting more transparency about agency proposed actions. CEQ finalizes the proposed provision in § 1501.9(c)(4) with an additional clause at the end of its proposed language to reference that this requirement can be met through a NOI consistent with § 1502.4. CEQ adds this language in response to at least one comment expressing confusion on this point.

Agencies may publish notification through websites, email notifications, or other mechanisms such as the Permitting Dashboard,[75] so long as the notification method or methods are designed to adequately inform the persons and agencies who may be interested or affected, consistent with the definition of ''publish'' in § 1508.1(gg). An NOI in the **Federal Register,** consistent with § 1502.4(e), can fulfill the notification requirement, but agencies also may elect to use additional notification methods.

Seventh, CEQ proposed to move 40 CFR 1506.6(b) (2020), including its subparagraphs, (b)(1) through (b)(3) and (b)(3)(i) through (b)(3)(x), to proposed § 1501.9(d)(2) (including (d)(2)(i) through (d)(2)(iii) and (d)(2)(iii)(A) through (d)(2)(iii)(I)), and proposed to make minor revisions to improve readability and consistency with the rest of § 1501.9. CEQ is finalizing these changes with some additional edits as described in the following paragraphs.

In the final rule, proposed paragraph (d)(2) becomes § 1501.9(c)(5) requiring agencies to provide public notification of NEPA-related hearings, public meetings, or other opportunities for public engagement, as well as the availability of environmental documents. At least one commenter noted that CEQ's proposed addition of the qualifier ''as appropriate'' before the requirement to provide public notification of the availability of documents could be read to give agencies discretion to provide such notice. This was not CEQ's intent as the regulations have always required agencies to provide such notice so CEQ does not include this qualifier in the final rule.

In the proposed rule, paragraphs (d)(2)(i) through (d)(2)(iii) expanded on these general public notification requirements in paragraph (d)(2). Specifically, CEQ proposed to move 40 CFR 1506.6(b)(1) and (b)(2) (2020) to proposed paragraphs (d)(2)(i) and (d)(2)(ii), respectively, and change

---

[75] *See* Fed. Permitting Improvement Steering Council, Permitting Dashboard for Federal Infrastructure Projects, *https://www.permits. performance.gov/.*

"organizations" to "entities and persons" in paragraph (d)(2)(ii). In the final rule, CEQ strikes the introductory clause, "In all cases," as superfluous, and consolidates into § 1501.9(c)(5)(i) the requirement to notify both those entities and persons who have requested notification on an individual action as well as those who have requested regular notification, such as actions in a geographic region or a category of actions an agency typically takes. Paragraph (c)(5)(ii), which was proposed paragraph (d)(2)(ii), only addresses when notification is required in the **Federal Register**—when an action has effects of national concerns. CEQ also changes "notice" to "notification" in § 1501.9(c)(5)(ii) for consistency with the rest of § 1501.9 and adds the word "also" to make clear that this notification is in addition to the notification required by paragraph (c)(5)(i).

Eighth, CEQ proposed to move 40 CFR 1506.6(b)(3) (2020) to proposed paragraph (d)(2)(iii), which addressed notification for actions for which the effects are primarily of local concern. CEQ proposed to change "notice may include" to "notification may include distribution to or through" followed by a list of mechanisms for notification. CEQ makes this change as proposed in § 1501.9(c)(5)(iii) the final rule.

Ninth, CEQ proposed to move 40 CFR 1506.6(b)(3)(i) and (b)(3)(iii) through (b)(3)(x) (2020) to proposed § 1501.9(d)(2)(iii)(A) through (d)(2)(iii)(I), respectively. CEQ proposed to combine the provisions from 40 CFR 1506.6(b)(3)(i) and (ii) (2020) on notice to State, Tribal, and local governments and agencies in proposed § 1501.9(d)(2)(iii)(A) to consolidate similar provisions. CEQ also proposed to remove the parenthetical in proposed paragraph (d)(2)(iii)(C) and instead refer to local newspapers "having general circulation." Lastly, CEQ proposed to add a sentence in proposed paragraph (d)(2)(iii)(I) that recommended agencies establish email notification lists or similar methods for the public to easily request electronic notifications for proposed actions. CEQ includes all of these changes as proposed in the final rule at § 1501.9(c)(5)(iii)(A) through (I).

Tenth, CEQ proposed to move the requirements to make EISs available under FOIA from 40 CFR 1506.6(f) (2020) to § 1501.9(d)(3). CEQ received comments on this provision requesting that CEQ restore the language from the 1978 regulations because some members of the public do not have easy access to electronic information, it is important for the public to have access to agency comments, and that restoring the language would help restore consistency in agency implementation of FOIA to ensure transparency. CEQ considered the comments and the changes between the 1978 and 2020 rules and determined the existing language addresses access to underlying documents and comments. However, CEQ determined it is appropriate to restore language related to fees as the 2020 rule removed language that agencies should make documents related to the development of NEPA documents free of charge or no more than the cost of duplication. Therefore, in the final rule, CEQ adds a clause to § 1501.9(c)(6) to require agencies to make EISs and any underlying documents available consistent with FOIA and without charge to the extent practicable.

Eleventh, CEQ proposed to move 40 CFR 1506.6(c) (2020) requiring agencies to hold or sponsor public meetings or hearings to § 1501.9(e), with modification, including adding the paragraph heading "Public meetings and hearings." Additionally, CEQ proposed to make this provision discretionary, and add that agencies could do so in accordance with "regulatory" requirements as well as statutory requirements or in accordance with "applicable agency NEPA procedures." In the proposal, CEQ revised the sentence requiring agencies to consider the ability of affected entities to access electronic media and to instead encourage agencies to "consider the needs of affected communities" when determining what format to use for a public hearing or public meeting because the best option for the communities involved may vary. Lastly, CEQ proposed to add a sentence to clarify that when an agency accepts comments for electronic or virtual meetings, agencies must allow the public to submit them electronically, via regular mail, or another appropriate method.

Commenters raised concerns about the proposed change from "shall" to "may" suggesting that this would make discretionary whether to hold public hearings, meetings and other opportunities for public engagement. CEQ notes that this provision gives agencies the discretion to determine the appropriate methods of public engagement except where required by other statutory or regulatory requirements, including agency NEPA procedures. However, CEQ did not intend to make a substantive change to this provision, and therefore, in § 1501.9(d) of the final rule, retains the use of "shall" consistent with 40 CFR 1506.6(c) (2020). In the third sentence addressing format for hearings or meetings, CEQ adds examples of formats agencies might consider—whether an in-person or virtual meeting or a formal hearing or listening session is most appropriate—and requires rather than encourages agencies to consider the needs of affected communities.

Commenters also requested that CEQ restore the recommendation from the 1978 regulations that agencies make draft EISs available at least 15 days in advance when they are the subject of a public meeting or hearing. CEQ agrees that this recommendation is helpful to facilitate a more effective public engagement, and therefore includes a new sentence at the end of § 1501.9(d) consistent with the longstanding recommendation from the 1978 regulations but broadening it to apply to draft environmental documents.

Twelfth, CEQ proposed to move 40 CFR 1506.6(a) (2020) requiring agencies to involve the public in preparing and implementing their agency NEPA procedures to proposed § 1501.9(f), adding a paragraph heading "Agency procedures" and changing the word "involve" to "engage" consistent with CEQ's proposed change of "involvement" to "engagement" through the regulations. CEQ finalizes this provision in § 1501.9(e) as proposed.

Finally, CEQ notes two provisions in 40 CFR 1506.6 (2020) that it did not incorporate into § 1501.9. First, as discussed in section II.I.3, CEQ proposed to move the requirement for agencies to explain in their NEPA procedures where interested persons can get information on EISs and the NEPA process from 40 CFR 1506.6(e) (2020) to § 1507.3(c)(11) since this is a requirement for NEPA procedures, not public engagement. And second, CEQ proposed to delete 40 CFR 1506.6(d) (2020) on soliciting information from the public because that concept is present in the purpose and language of revised § 1501.9. In the final rule, CEQ strikes these paragraphs from 40 CFR 1506.6 (2020).

### 9. Deadlines and Schedule for the NEPA Process (§ 1501.10)

CEQ proposed to retitle § 1501.10 to "Deadlines and schedule for the NEPA process" from "Time limits" and revise the section to direct agencies to set deadlines and schedules for NEPA reviews to achieve efficient and informed NEPA analyses consistent with section 107 of NEPA, 42 U.S.C. 4336a. CEQ proposed these changes to improve transparency and predictability for stakeholders and the public regarding NEPA reviews.

Commenters were generally supportive of CEQ's proposed changes to this provision in order to promote a timely NEPA process. Some commenters expressed support while suggesting additional changes as described further in this section and in the Phase 2 Response to Comments. Other commenters opposed the inclusion of the deadlines, expressing concerns that the deadlines would result in rushed analyses, strain agency and applicant resources, and have negative impacts on public engagement. CEQ addresses these concerns in the context of specific provisions discussed in this section.

CEQ revises the title of § 1501.10 and reorganizes and revises the provision as discussed further in this section. As discussed in section II.J.1, CEQ removes the references to "project sponsor" in favor of the defined term "applicant," which includes project sponsors, throughout § 1501.10 and the rest of the regulations.

In addition to those revisions, CEQ proposed revisions to specific provisions of § 1501.10. First, in paragraph (a), CEQ proposed an edit to the first sentence to emphasize that while NEPA reviews should be efficient and expeditious, they also must include "sound" analysis. CEQ also proposed to direct agencies to set "deadlines and schedules" appropriate to individual or types of proposed actions to facilitate meeting the deadlines proposed in § 1501.10(b). Consistent with section 107(a)(2)(D) of NEPA, CEQ also proposed in this paragraph to require, where applicable, the lead agency to consult with and seek concurrence of joint lead, cooperating, and participating agencies and consult with project sponsors and applicants when establishing and updating schedules. 42 U.S.C. 4336a(a)(2)(D).

Some commenters supported the proposed requirement for consultation on schedules in paragraph (a), as well as in paragraph (c). Multiple commenters opposed the proposed requirements to seek concurrence asserting that it would result in delay and exceed the statutory requirements of section 107(a)(2)(D) of NEPA. 42 U.S.C. 4336a(a)(2)(D). Multiple commenters requested additional clarity on how agencies would carry out consultation with the applicant pursuant to paragraphs (a) and (c). One commenter suggested making reference to "use of reliable and currently accurate data" as an example of sound analysis in paragraph (a).

CEQ makes the revisions to paragraph (a) as proposed with three additional edits. First, CEQ excludes the reference to project sponsors in favor of the

defined term "applicant" in § 1508.1(c). Second, CEQ adds "for the proposed action" after "schedule" to clarify that lead agencies establish schedules for each action. Third, CEQ includes the requirement to seek the concurrence of any joint lead, cooperating, and participating agencies, and in consultation with any applicants, adding the word "any" to clarify that not all actions will necessarily have a joint lead, cooperating, and participating agencies or applicants.

CEQ adds the requirement to "seek the concurrence" as proposed to encourage up-front agreement on schedules to facilitate achieving the statutory deadlines. This provision requires the lead agency to seek concurrence, not obtain concurrence. While lead agencies should strive to reach agreement on schedules because agreement on a schedule up front will facilitate the agencies' meeting a deadline, lead agencies do not need to obtain concurrence to proceed if the agencies cannot reach an agreement on the schedule. CEQ considers this approach to strike the right balance because requiring the lead agency to obtain, rather than seek, concurrence could unreasonably delay the process if an agency will not concur and not requiring any agreement would undermine the efficacy of the schedule if other agencies cannot meet the schedule or have unaddressed concerns with it. CEQ declines to add a reference to the "use of reliable and currently accurate data" as an example of sound analysis because § 1506.6 addresses the requirement to use reliable data, and CEQ does not consider it necessary or appropriate to address data in this section on deadlines and schedules.

Second, CEQ proposed to update paragraph (b) and its subparagraphs for consistency with section 107(g) of NEPA. *See* 42 U.S.C. 4336a(g). In the proposed revisions, paragraphs (b)(1) and (b)(2) would require agencies to complete an EA within one year and an EIS in two years, respectively, unless the lead agency, in consultation with any applicant or project sponsor, extends the deadline in writing and establishes a new deadline providing only as much time as necessary to complete the EA or EIS. CEQ proposed to include "any" to account for circumstances where there is no applicant or project sponsor, in which case the consultation requirement would be inapplicable to extension of deadlines.

Some commenters opposed the deadlines asserting that agencies will shortcut public participation or Tribal consultation in the NEPA process, and

that the deadlines create conflicts with implementation of section 106 of the National Historic Preservation Act. 54 U.S.C. 306101. Other commenters expressed concern that the deadlines will impede the ability of "minority and Indigenous communities" to organize and advise their communities of impending harm. Other commenters expressed concerns that other proposed changes, including consideration of reasonably foreseeable climate change related effects and disproportionate and adverse effects on communities with environmental justice concerns, will make it challenging for agencies to meet the prescribed deadlines. One commenter asserted that the proposed deadlines are arbitrary and at odds with the need for rigorous scientific study to support NEPA findings.

CEQ makes the changes to paragraphs (b), (b)(1), and (b)(2) as proposed with two additions to implement the statutory deadlines established in section 107(g) of NEPA. 42 U.S.C. 4336a(g). First, CEQ excludes the reference to project sponsors in favor of the defined term "applicant" in § 1508.1(c). Second, CEQ includes "as applicable" before "in consultation with any applicant" in § 1501.10(b)(1) and (b)(2) to emphasize that not all actions have applicants. In such cases, an agency may extend the deadline and set a new deadline in writing. CEQ appreciates the concerns expressed by commenters that timelines could lead to rushed analysis but recognizes that establishing deadlines can improve the efficiency and timeliness of the environmental review process and notes that section 107(g) of NEPA and this provision provide agencies with the ability to extend the deadline where necessary to ensure they meet their public engagement and consultation obligations and conduct the requisite analysis. 42 U.S.C. 4336a(g). Further, agencies have demonstrated that they can complete robust and high-quality environmental reviews within these timelines. CEQ encourages agencies to conduct early public engagement, consistent with § 1501.9, because early engagement can improve the efficiency and quality of the environmental review process and can help ensure agencies conduct meaningful engagement while also meeting the statutory timeframes.

CEQ also notes that nothing in the regulations modifies compliance with section 106 of NHPA. CEQ disagrees that the updated provisions of these regulations, including §§ 1502.15(b); 1502.16(a)(6), (a)(9), and (a)(13); and 1508.1(g)(4)—which reflect current practice and requirements such as those requiring consideration of certain effects

like climate-related effects—impose new requirements that will increase review timeframes such that agencies will not be able to meet timelines. Rather, as discussed in section II.D.14, II.D.15, and II.J.5, CEQ is updating these provisions to reflect current practice and categories of reasonably foreseeable effects long considered under NEPA consistent with the statute and case law. CEQ disagrees that these changes will prevent agencies from complying with the deadlines or that the deadlines will prevent agencies from conducting rigorous analysis. Many agencies already have considerable experience analyzing these types of effects.

Third, consistent with section 107(g) of NEPA, CEQ proposed a new paragraph (b)(3) to identify the starting points from which agencies measure the deadline for EAs and EISs and to require agencies to measure from the soonest of three dates, as applicable. 42 U.S.C. 4336a(g). Consistent with section 107(g)(1) of NEPA, the proposed dates were: (i) the date the agency determines an EA or EIS is required; (ii) the date the agency notifies an applicant that its application to establish a right-of-way is complete; and (iii) the date the agency issues an NOI. 42 U.S.C. 4336a(g)(1).

Multiple commenters expressed support for the starting points proposed in paragraph (b)(3), with some commenters suggesting changes for further clarification. Many of these commenters requested the regulations require agencies to include in their agency NEPA procedures criteria for automatically starting the one-year or two-year periods. Suggestions included criteria for when an application for a permit, authorization, or right-of-way is considered complete.

CEQ makes the changes as proposed in paragraph (b)(3) and (b)(3)(i) through (b)(3)(iii) because they incorporate the statutory provisions of section 107(g)(1) of NEPA. *See* 42 U.S.C. 4336a(g)(1). CEQ declines to require agencies to include criteria in their agency NEPA procedures, though agencies may do so at their discretion so long as they are consistent with this provision.

Fourth, after considering the comments on this section and more generally emphasizing the importance of consistency and clarity, in the final rule, CEQ adds paragraph (b)(4) to address the end dates for measuring the deadlines. This revision is consistent with CEQ's approach in the proposed rule to implementing section 107(g)(1) in a manner that is transparent and practical and will ensure consistency across Federal agencies in measuring deadlines, avoiding inconsistencies that could create confusion among agencies

and applicants. 42 U.S.C. 4336a(g)(1). Paragraphs (b)(4)(i) and (b)(4)(i)(A) through (b)(4)(i)(C) specify that for EAs, the end date is the date on which the agency publishes an EA; makes the EA available pursuant to an agency's pre-decisional administrative review process, where applicable; or issues an NOI to prepare an EIS. CEQ notes that in situations where an agency publishes both a draft EA and a final EA, the final EA is the EA used to determine the end date. Paragraph (b)(4)(ii) specifies for EISs that the end date is the date on which EPA publishes a notice of availability of the final EIS or, where applicable, the date the agency makes the final EIS available pursuant to its pre-decisional administrative review process, consistent with § 1506.10(c)(1).

Fifth, CEQ proposed in paragraph (b)(4) to require agencies to submit the report to Congress on any missed deadlines as required by section 107(h) of NEPA. 42 U.S.C. 4336a(h). Some commenters requested the regulations include additional detail on the annual report to Congress, including detail on the content and deadlines for submitting the report. One commenter also requested that the regulations allow for a pause in the time periods for specific scenarios, such as when the agency is waiting for information from an applicant or to award contracts to support analyses. Similarly, other commenters suggested generally that the final rule include provisions to provide more flexibility in measuring the deadlines to avoid rushed environmental analyses.

CEQ finalizes proposed § 1501.10(b)(4) in paragraph (b)(5) as proposed but changes "The" to "Each" to clarify that each lead agency separately has a responsibility to report to Congress if it misses a deadline. CEQ declines to provide more specifics about the report to Congress at this time, but will consider whether guidance is necessary to assist agencies in their reporting obligations. CEQ also declines to provide a mechanism for pausing the deadline clock. The regulations, consistent with the statute, provide that a lead agency may extend the deadline in order to provide any additional time necessary to complete an EIS or EA. Where an agency has extended a deadline for an EA or EIS in conformity with this section and section 107(g) of NEPA, the agency has not missed a deadline for purposes of 107(h) and would not need to submit a report to Congress. 42 U.S.C. 4336a(g)–(h). For example, if an agency is experiencing a delay outside its control such that it does not have the requisite information to complete its EA or EIS, the lead

agency may extend the one- or two-year deadlines. Because the statute and regulations provide agencies with the flexibility to extend deadlines when necessary to complete an EA or EIS, CEQ does not consider it necessary or appropriate to establish a mechanism for agencies to pause the deadline clock.

Sixth, to enhance predictability, CEQ proposed to move the text from paragraph (i) of 40 CFR 1501.7 (2020) to the beginning of a new paragraph (c) and modify the language for consistency with sections 107(a)(2)(D) and 107(a)(2)(E) of NEPA, which require the lead agency to develop schedules for EISs and EAs. 42 U.S.C. 4336a(a)(2)(D), 4336a(a)(2)(E). CEQ proposed to divide the first sentence moved from 40 CFR 1501.7(i) (2020) into two sentences and add an introductory clause, "[t]o facilitate predictability," to reinforce the purpose of schedules. CEQ proposed to add "for completion of environmental impact statements and environmental assessments as well as any authorizations required to carry out the action" after "the lead agency shall develop a schedule" for consistency with section 107(a)(2)(D) of NEPA. 42 U.S.C. 4336a(a)(2)(D). CEQ proposed in the second sentence to retain the requirement for the lead agency to set milestones for environmental reviews and authorizations, and add "permits" for consistency with section 107(a)(2)(D) of NEPA. 42 U.S.C. 4336a(a)(2)(D). CEQ also proposed in the second sentence to require agencies to develop the schedules in consultation with the applicant or project sponsor, and in consultation with and seek the concurrence of any joint lead, cooperating, and participating agencies.

CEQ proposed to add a new third and fourth sentence to paragraph (c) to note that schedules may vary depending on the type of action; agencies should develop schedules based on their experience reviewing similar types of actions; and highlight factors listed in paragraph (d) that may help agencies set specific schedules to meet the deadlines.

Finally, CEQ proposed to move the text from paragraph (j) of 40 CFR 1501.7 (2020) regarding missed schedule milestones to the end of paragraph (c) and modify it to make it consistent with section 107(a)(2)(E) of NEPA and provide clarification to enhance interagency communication and issue resolution. 42 U.S.C. 4336a(a)(2)(E). CEQ proposed to require that, when the lead or any participating agency anticipates a missed milestone, that agency notify the responsible agency (and the lead agency if identified by another agency) and request that they

**35488**    **Federal Register** / Vol. 89, No. 85 / Wednesday, May 1, 2024 / Rules and Regulations

take action to comply with the schedule. To emphasize the importance of informed and efficient decision making, CEQ proposed to require agencies to elevate any unresolved disputes contributing to the missed milestone to the appropriate officials for resolution within the deadlines for the individual action.

One commenter requested that the final rule include a deadline for the development of a schedule. CEQ declines to include this proposal in the final rule. While CEQ encourages agencies to work efficiently in developing a schedule, CEQ recognizes that the complexity of the schedule will vary considerably from case to case, and defers to agencies to oversee the efficient and effective preparation of a schedule. Also, as discussed earlier in this section, commenters both supported and opposed the requirement for lead agencies to consult with applicants and consult and seek concurrence of joint lead, cooperating, and participating agencies when establishing schedule milestones. Another commenter stated that, with respect to the fifth sentence of paragraph (c), the final rule should require, not just recommend, agencies to consider all previous relevant actions and incorporate that information into their schedules.

In the final rule, CEQ revises the existing text of paragraph (c) as proposed excluding the reference to project sponsors in favor of the defined term "applicant" in § 1508.1(c)) for consistency with section 107(a)(2)(D) of NEPA and to ensure that agencies are identifying at the beginning of the process the steps they need to take and the timeframe in which they need to take them in order to meet the statutory timeframes. 42 U.S.C. 4336a(a)(2)(D). For the reasons articulated earlier in this section, CEQ includes the requirements for consultation and seeking concurrence on schedules. Next, CEQ adds a new sentence in the final rule to direct all agencies with milestones to take appropriate measures to meet the schedule. Finally, CEQ moves paragraph (j) of 40 CFR 1501.10 (2020) regarding missed milestones to the end of paragraph (c) as proposed, but further revises it for clarity in the final rule. CEQ simplifies the text to clarify that any participating agency can identify a potentially missed milestone to the lead agency and the agency responsible for the milestone. CEQ also adds "potentially" before "missed milestone" in the last sentence for consistency of use in the sentence.

Seventh, CEQ proposed to redesignate paragraph (c) of 40 CFR 1501.10 (2020),

addressing factors in setting deadlines, as paragraph (d), and make changes to the text for consistency with proposed paragraph (b). Specifically, CEQ proposed to change "senior agency official" to "lead agency" and "time limits" to reference "the schedule and deadlines."

Eighth, CEQ proposed to add a new factor that the lead agency may consider in determining the schedule and deadlines to paragraph (d)(7): the degree to which a substantial dispute exists regarding the size, location, nature, or consequences of the proposed action and its effects. CEQ proposed this factor to restore and clarify a factor included in the 1978 regulations at 40 CFR 1501.8(a)(vii) (2019) regarding the degree to which the action is controversial. While the 2020 regulations removed this factor because it overlapped with other factors, CEQ reconsidered its position and determined that this is an important factor that could have implications for establishing schedules and milestones. CEQ noted in the proposed rule that, in such instances, agencies should seek ways to resolve disputes early in the process, including using conflict resolution and other tools, to achieve efficient outcomes and avoid costly and time-consuming litigation later in the process. To accommodate this new factor, CEQ proposed to redesignate paragraph (c)(7) of 40 CFR 1501.10 (2020) to be paragraph (d)(8).

One commenter suggested CEQ append "or benefit" to "[p]otential for environmental harm" in paragraph (d)(1). CEQ declines this change because "environmental benefits" is already covered by the factor in paragraph (d)(4) regarding public need. Other commenters suggested CEQ modify paragraph (d)(4) in the final rule to include consideration of the impact on the environment in addition to public need or modify it to reflect that the consequences of delay include cost considerations of short- and long-term delays. CEQ declines to make these changes because paragraph (d)(1) already covers potential for environmental harm, and CEQ interprets "consequences of delay" to include any cost-related consequences to the public of short- or long-term delays.

Regarding paragraph (d)(7), one commenter opposed the replacement of "controversial" from the 1978 regulations with "substantial dispute" asserting that "controversial" is well defined in case law as scientific rather than public controversy. The commenter further asserted that shifting this language could become a new

source of dispute. CEQ disagrees and considers this change consistent with case law interpreting the term "controversial," as used in the 1978 regulations as distinct from general public controversy or opposition. *See, e.g., Bark* v. *United States Forest Serv.,* 958 F.3d 865, 870 (9th Cir. 2020) ("A project is 'highly controversial' [under the 1978 regulations] if there is a 'substantial dispute about the size, nature, or effect of the major Federal action rather than the existence of opposition to a use.' " (quoting *Native Ecosystems Council* v. *United States Forest Serv.,* 428 F.3d 1233, 1240 (9th Cir. 2005) (alteration omitted)); *see also Standing Rock Sioux Tribe* v. *U.S. Army Corps of Eng'rs,* 985 F.3d 1032, 1042 (D.C. Cir. 2021).

One commenter recommended the final rule add a factor to accommodate government-to-government consultation with Tribal Nations, while other commenters requested inclusion of consideration of Tribal consultation in developing schedules overall. In the final rule, CEQ adds paragraph (d)(9) for consideration of the time necessary to conduct government-to-government Tribal consultation. While agencies are already able to take this into account when building schedules, CEQ adds this factor to encourage agencies to ensure they are building sufficient time in the schedule to conduct meaningful consultation. Finally, CEQ adds "court ordered deadlines" to paragraph (d)(8), which lists time limits imposed on the agency, since agencies are sometimes conducting NEPA for actions subject to a court order.

Ninth, CEQ proposed to redesignate paragraph (d) of 40 CFR 1501.10 (2020) as paragraph (e), strike the text allowing a senior agency official to set time limits because this is superseded by the enactment of section 107(g) of NEPA, 42 U.S.C. 4336a(g), setting statutory deadlines, and replace it with a requirement for EIS schedules to include a list of specific milestones. CEQ proposed to strike the text in paragraphs (d)(1) through (d)(7) of 40 CFR 1501.10 (2020) listing potential time limits a senior agency official could set and replace them with proposed new paragraphs (e)(1) through (e)(5) to list the minimum milestones that an EIS schedule must include: publication of the NOI, issuance of the draft EIS, the public comment period, issuance of the final EIS, and issuance of the ROD.

Relatedly, CEQ proposed to add new paragraphs (f) and (f)(1) through (f)(4) to identify the milestones that agencies must include in schedules for EAs: the decision to prepare an EA; issuance of

a draft EA, where applicable; the public comment period, where applicable; and issuance of the final EA and a decision whether to issue a FONSI or NOI to prepare an EIS.

Multiple commenters expressed support for proposed § 1501.10(e) and (f), asserting the changes would improve the transparency, timeliness, and certainty of environmental reviews. Some commenters suggested additional milestones to further these goals, such as the starting points in proposed paragraph (b)(3), specific stages of the review process (*i.e.*, decision to prepare a document and issuance of a draft or final document), and 60-or 90-day deadlines for cooperating and participating agency review stages.

CEQ declines to add additional milestones at this time. CEQ notes that this is a non-exhaustive list, and CEQ may issue guidance with recommendations for additional milestones in the future or agencies may elect to include additional milestones on an action-by-action basis or in their agency NEPA procedures.

Tenth, CEQ proposed to redesignate paragraph (e) of 40 CFR 1501.10 (2020) as paragraph (g) allowing an agency to designate a person to expedite the NEPA process, with no proposed changes to the language. One commenter asserted that paragraph (g) provides agencies too much discretion as to whether they should designate someone to expedite the NEPA process. The commenter suggested that, at a minimum, the paragraph be expanded to discuss when that role would be beneficial and set requirements on who can fill the role. CEQ declines additional edits to paragraph (g), which has been in the regulations since 1978. CEQ considers it appropriate to preserve agency flexibility to assign staff to expedite the NEPA process.

Eleventh, CEQ proposed to strike paragraph (f) of 40 CFR 1501.10 (2020), allowing State, Tribal, or local agencies, or members of the public to request a Federal agency set time limits. One commenter opposed the proposed removal of this paragraph, expressing concern that the proposal would diminish the involvement and use of information from States. CEQ makes this change in the final rule because the NEPA statute sets deadlines for EAs and EISs rendering this paragraph unnecessary and inconsistent with the statute. However, CEQ notes that State, Tribal, and local agencies have a role in the development of schedules to the extent they are serving as joint lead, cooperating, or participating agencies.

Finally, to increase predictability and enhance agency accountability, CEQ

proposed to add a new paragraph (h) to require agencies to make schedules for EISs publicly available and to publish revisions to the schedule. The proposal also would require agencies to publish revisions to the schedule and include an explanation for substantial revisions to increase transparency and public understanding of decision making and to encourage agencies to avoid unnecessary delays.

One commenter expressed concern that paragraph (h) would increase the potential for litigation related to timelines. Another commenter opposed the requirement for agencies to publicly post schedules for an EIS, asserting that the requirement would distract from analyzing and disclosing significant environmental effects.

CEQ adds paragraph (h) as proposed in the final rule. CEQ disagrees that making schedules publicly available will have any meaningful effect on the agency's analysis. CEQ also does not see litigation risk attached to the posting of schedules, which would not constitute a final agency action for purposes of judicial review, and the commenter did not provide an explanation as to how this might be the case.

Multiple commenters requested clarity on what qualifies as "substantial" changes to an EIS schedule. CEQ declines to include additional language in the rule and defers to agencies to determine what schedule changes are "substantial" and require an explanation. CEQ anticipates this may vary from case-to-case depending on the agency and the complexity of the proposed action. CEQ will continue to consider whether additional guidance would be helpful.

A few commenters requested that the final rule expand paragraph (h) to require agencies to make EA schedules publicly available. CEQ declines to require agencies to publish schedules for EAs, though CEQ encourages agencies to do so, especially when doing so would facilitate public engagement. CEQ is concerned that requiring agencies to make schedules for all EAs publicly available could significantly increase the administrative burden on agencies especially since not all EAs will involve complex schedules, *i.e.*, they may only include the dates for the decision to prepare an EA and the issuance of an EA.

Some commenters expressed general support for § 1501.10 but suggested additional changes arguing that there are "loopholes" for agencies to exploit or manipulate the deadlines. Commenters requested the regulations provide for oversight of agencies to ensure they are adhering to the

deadlines. Another commenter suggested CEQ add incentives to the final rule for agencies to adhere to the timelines.

CEQ declines to make additional revisions to address the commenters' suggestions. The final rule implements the statutory deadlines, and Congress has provided a reporting mechanism to address situations where agencies miss deadlines. Further, section 107(g)(3) of NEPA provides a mechanism for project sponsors to petition the courts for relief if an agency fails to meet the deadlines. 42 U.S.C. 4336a(g)(3). The statute does not establish a mechanism for CEQ to enforce deadlines, and CEQ declines to revise the regulations in a manner that would substantially change the role that CEQ has played with respect to environmental reviews for decades.

A commenter requested clarification on supplementation and whether or not supplemental environmental documents would affect the timeline of the original document. CEQ declines to add additional language to § 1501.10 in response to this comment. In cases where an agency determines a supplemental draft EA or a supplemental draft EIS is necessary, the end point remains the final EA or final EIS. However, as provided in § 1501.10(b), the lead agency may extend the deadline to provide additional time necessary to complete the final EA or final EIS. When an agency prepares a supplemental EA or EIS following the completion of a final EA or EIS, the lead agency should adhere to the deadlines and develop schedules for the supplemental NEPA review consistent with paragraph (b) and section 107(g) of NEPA. 42 U.S.C. 4336a(g).

10. Programmatic Environmental Documents and Tiering (§ 1501.11)

CEQ has encouraged agencies to engage in environmental reviews for broad Federal actions through the NEPA process since CEQ's initial guidelines issued in 1970. This continues to be a best practice for addressing broad actions, such as programs, policies, rulemakings, series of projects, and larger or multi-phase projects. CEQ developed guidance in 2014 on Effective Use of Programmatic NEPA Reviews,[76] compiling best practices across the Federal Government on the development of programmatic environmental reviews. CEQ proposed to codify some of these principles in the CEQ regulations.

First, CEQ proposed to revise and retitle § 1501.11, "Programmatic

---

[76] CEQ, Programmatic Guidance, *supra* note 12.

environmental documents and tiering,'' for consistency with section 108 of NEPA, to consolidate relevant provisions, and to add new language to codify best practices for developing programmatic NEPA reviews and tiering, which are important tools to facilitate more efficient environmental reviews and project approvals. 42 U.S.C. 4336b. As discussed further in this section, CEQ proposed to move portions of 40 CFR 1502.4 (2020) on EISs for broad Federal actions to § 1501.11 because agencies can review actions at a programmatic level in both EAs and EISs.

Several commenters expressed support for the overall proposed changes in § 1501.11 and for use of programmatic reviews and tiering. These commenters asserted that programmatic reviews and tiering are important tools for efficiency and supported the clarity provided in the proposed rule on both tools. In the final rule, CEQ revises the title of § 1501.11 and moves the text of 40 CFR 1502.4 (2020) to § 1501.11 as further described in this section.

CEQ proposed to reorganize the paragraphs in § 1506.11 to address programmatic environmental documents and then tiering. Accordingly, second, CEQ proposed to add a new paragraph (a) to address programmatic environmental documents. CEQ proposed to move paragraph (b) of 40 CFR 1502.4 (2020) to § 1501.11(a) and revise the first sentence to clarify that agencies may prepare programmatic EAs or EISs to evaluate the environmental effects of policies, programs, plans, or groups of related activities. CEQ proposed to revise the second sentence to provide that programmatic environmental documents should be relevant to the agency's decisions and timed to coincide with meaningful points in agency planning and decision making; change ''statements'' to ''documents'' to include EAs; and change ''program'' to ''agency'' to broaden the language for consistency with the revised first sentence of paragraph (a). Finally, CEQ proposed a third sentence in paragraph (a) to clarify that agencies can use programmatic environmental documents in a variety of ways, highlighting some examples for agencies to consider to facilitate better and more efficient environmental reviews.

One commenter requested that CEQ change paragraph (a) to require agencies to prepare programmatic environmental documents. CEQ declines to require preparation of programmatic environmental documents as agencies need flexibility to determine when a programmatic environmental document is appropriate.

Another commenter suggested CEQ add language stating if an agency is preparing to make a programmatic decision on a policy, program, plan, or group of related activities that meets other applicable thresholds for NEPA analysis, an agency must prepare a programmatic analysis commensurate with the scope of that decision. The commenter asserted that while it may be permissible to prepare a programmatic analysis when an agency is not presently making a decision, it is mandatory to prepare one when making a programmatic decision.

A few commenters requested CEQ restore regulatory language from 40 CFR 1502.4(b) (2019) stating that programmatic EISs are sometimes required for proposed decisions regarding new agency programs or regulations. The commenter stated that the 2020 rule removed this direction to focus the provision on the discretionary use of programmatic EISs in support of clearly defined decision-making purposes. The commenter asserted CEQ would better serve agencies and the public by acknowledging that programmatic EISs are sometimes required.

CEQ declines to make these change in the final rule. Agencies have the discretion to determine whether to prepare a programmatic or non-programmatic NEPA document to evaluate their actions, and CEQ is concerned that the commenter's proposals are unnecessarily prescriptive and declines to introduce a new concept of ''programmatic decision.''

Third, CEQ proposed to move the list of ways agencies may find it useful to evaluate a proposal when preparing programmatic documents from paragraphs (b)(1) and (b)(1)(i) through (b)(1)(iii) of 40 CFR 1502.4 (2020) to § 1501.11(a)(1) and (a)(1)(i) through (a)(1)(iii), respectively. CEQ proposed to expand the list to encompass EAs as well as EISs. CEQ proposed to modify the beginning of paragraph (a)(1)(ii) to clarify ''[g]enerically'' to mean ''[t]hematically or by sector,'' and add technology as an example action type. CEQ proposed in paragraph (a)(1)(iii) to modify ''available'' to ''completed'' for clarity. CEQ moves these provisions and makes these revisions as proposed in the final rule.

One commenter opined that the language in proposed paragraph (a)(i)(iii) regarding stage of technological development makes it seem as though environmental review must happen more quickly than accrual of significant investment. The commenter asserted

that the accrual of significant investment would prejudice the review and, therefore, should be barred until the review takes place and suggested regulatory language to that effect.

CEQ declines to modify paragraph (a)(1)(iii) to incorporate the commenter's proposed language. The concept the commenter proposes to add—to not prejudice the outcome of dependent decisions—is addressed in § 1506.1, and it is unnecessary and potentially confusing to address that issue here. However, CEQ changes ''restrict later alternatives'' to ''limit the choice of reasonable alternatives'' to align the text with § 1506.1(a).

Fourth, CEQ proposed to add a new paragraph (a)(2) to provide examples of the types of agency actions that may be appropriate for programmatic environmental documents, including programs, policies, or plans; regulations; national or regional actions; or actions with multiple stages and are part of an overall plan or program. CEQ did not receive any comments specific to this paragraph and adds it in the final rule.

Fifth, CEQ proposed to move paragraph (b)(2) of 40 CFR 1502.4 (2020) to § 1501.11(a)(3) and revise it to recommend, rather than require, that agencies employ scoping, tiering, and other tools to describe the relationship between programmatic environmental documents and related actions to reduce duplication. CEQ proposed to strike the last sentence of 40 CFR 1502.4(b)(2) (2020) stating that agencies may tier their analyses because tiering and programmatic environmental documents would now be addressed together in this section, rendering the language unnecessary.

A commenter requested CEQ replace ''should'' with ''shall'' in paragraph (a)(3) because the discretionary language relaxes the standard for agencies to seek efficiencies. CEQ declines to make this change. While scoping is required for EISs, including programmatic EISs, it is not required for EAs. It also would unnecessarily constrain agency processes to require tiering for all programmatic environmental documents, particularly because at the time that an agency prepares a programmatic environmental document, it may not yet know whether or what agency actions it may consider in the future related to the programmatic environmental document. Rather, CEQ intends this provision to encourage agencies to use scoping, tiering, and other methods to make programmatic environmental documents more effective, efficient, and transparent.

A commenter requested that CEQ add text to proposed paragraph (a)(3)

providing that programmatic documents should explain which issues the programmatic document analyzes and which issues the agency is deferring. This commenter pointed to CEQ's 2014 memorandum on use of programmatic NEPA reviews, which explains that the programmatic analysis and the decision document should explain which decisions are supported by the programmatic NEPA document and which decisions are deferred to a later time. Two commenters further requested CEQ clarify that tiering is required to analyze the deferred analysis of issues, effects, or alternatives before making a final project-level or site-specific decision; stating that the current text is permissive in that it allows but does not require tiering.

CEQ considered the comments and in the final rule revises § 1501.11(a)(3) to clarify that a programmatic document must identify any decisions or categories of decisions that the agency anticipates making in reliance on it. This direction includes any action or category of action that the agency anticipates making in reliance on a programmatic environmental document without additional analysis and any action or category of action the agency anticipates making after developing a subsequent, tiered environmental document. This provision only requires agencies to identify actions the agency anticipates making when it prepares a programmatic environmental document; it does not require agencies to identify every conceivable circumstance in which the agency could develop a tiered environmental review in the future. Including this information in a programmatic environmental document ensures that agencies are transparent about the relationship between their programmatic documents and any subsequent documents and decisions. Failure to anticipate and list a particular circumstance where a programmatic environmental document could inform a future decision does not preclude tiering to the programmatic environmental document in an environmental document related to that future circumstance.

Sixth, CEQ proposed to redesignate paragraphs (a), (b), and (c) of 40 CFR 1501.11 (2020), which address tiering, as paragraphs (b), (b)(1), and (b)(2), respectively, with some modifications as discussed further in this section. CEQ also proposed to redesignate paragraphs (c), (c)(1), and (c)(2) as paragraphs (b)(2), (b)(2)(i), and (b)(2)(ii), respectively, with no proposed modifications. CEQ proposed to title paragraph (b) "Tiering." CEQ makes these changes in the final rule.

Seventh, CEQ proposed to add two new sentences at the beginning of paragraph (b) to describe when agencies may employ tiering. The first proposed sentence would allow agencies to employ tiering with an EIS, EA, or programmatic environmental document relevant to a later proposed action. The sentence emphasizes the benefits of tiering to avoid duplication and focus on issues, effects, or alternatives, not fully addressed in the earlier document. In the existing text, CEQ proposed to strike as redundant the reference to issues not yet ripe for decision as well as the last sentence on applying tiering to different stages of actions. CEQ did not receive comments specific to the changes proposed in this paragraph and finalizes them as proposed except that CEQ reorders the list of documents—EISs, EAs, and programmatic environmental documents—in § 1501.11(b)(1) for consistency with paragraph (b).

Eighth, in § 1501.11(b)(1) CEQ proposed to add "programmatic environmental review" to the list of documents from which agencies may tier. CEQ also proposed to clarify that the tiered document must discuss the relationship between the tiered analysis and the previous review; analyze site-, phase-, or stage-specific conditions and effects; and allow for public engagement opportunities consistent with the type of environmental document prepared and that are appropriate for the location, phase, or stage. Finally, CEQ proposed to clarify that the tiered document must state where the earlier document is "publicly" available.

One commenter requested CEQ clarify that tiering to a previous programmatic analysis is only appropriate if those analyses took the requisite "hard look" at site-specific environmental impacts. CEQ declines to make this change. While agencies must ensure a hard look at site-specific effects before finalizing a site-specific agency action, agencies have discretion to consider such effects in a programmatic environmental document or subsequent tiered documents. Multiple commenters requested CEQ clarify that tiered reviews must include the requisite site-specific analysis for the action, with some commenters raising concerns that agencies do not provide the necessary opportunity for the public to review alternatives and provide comments by using programmatic environmental reviews without subsequent site-specific reviews. CEQ agrees that tiering does not authorize an agency to avoid the public engagement, including any opportunity for comment, that it would need to do if it analyzed an action

through a single environmental document, rather than through a tiered approach and notes that the text CEQ proposed in § 1501.11(b)(1) addresses this issue. Regardless of whether an agency employs tiering, agencies must comply with the requirements for consideration of alternatives and public comments consistent with the requirements for EAs or EISs, as applicable.

A few commenters expressed concern that the use of tiering would lead to delays in incorporating new scientific evidence into environmental reviews and allow agencies to circumvent the requirement to consider alternatives. Another commenter expressed similar concern that the expanded use of programmatic documents with CEs would limit consideration of alternatives. CEQ disagrees with the commenters' concerns because agencies cannot use programmatic documents or tiering to circumvent the requirements of NEPA, including section 102(2)(C)(iii) requirement to consider a reasonable range of alternatives for actions requiring an EIS. 42 U.S.C. 4332(2)(C)(iii).

Other commenters requested CEQ clarify certain aspects of tiering, including establishing bounds for use of programmatic CEs. As described in § 1501.11(a), programmatic environmental documents may be an EA or EIS. As such, § 1501.11 does not address programmatic CEs. Section 1501.4 addresses circumstances in which agencies may conduct programmatic reviews to establish new CEs.

One commenter stated that the rule needs to clearly distinguish between tiering and supplementation and suggested CEQ could clarify the different approaches in § 1501.11(b)(2)(ii). CEQ agrees that the reference to supplementation in § 1501.11(b)(2)(ii) is confusing because supplementation is a different concept. Section 1502.9(d) sets forth the standard for supplementation of EISs, and agencies may supplement EAs at their discretion. Therefore, CEQ strikes "a supplement (which is preferred)" from the first sentence of this paragraph.

CEQ makes the changes to § 1501.11(b) and (b)(1) as proposed, though CEQ revises programmatic environmental "review" to "document" in paragraph (b)(1) for consistency with the rest of the section. CEQ notes that programmatic documents can most effectively address later activities when they provide a description of planned activities that would implement the program and consider the effects of the program as specifically and

comprehensively as possible. A sufficiently detailed programmatic analysis with such project descriptions can allow agencies to rely upon programmatic environmental documents for further actions with no or little additional environmental review necessary. When conducting programmatic analyses, agencies should engage the public throughout the NEPA process and consider when it is appropriate to re-engage the public prior to implementation of the action.

Ninth, in paragraph (c), CEQ proposed to include the provisions of section 108 of NEPA, which address when an agency may rely on a programmatic document in subsequent environmental documents. 42 U.S.C. 4336b. CEQ notes that it interprets the reference to "judicial review" in paragraph (c)(1) to mean an opportunity for a party to challenge the programmatic document, including through an administrative proceeding or challenge brought under the Administrative Procedure Act. CEQ proposed in paragraph (c)(2) to require agencies to briefly document their reevaluations when relying on programmatic environmental documents older than 5 years. Two commenters opined that there is no incentive for an agency to prepare a programmatic environmental document if the statute and regulations require them to complete it within one or two years and then review it every five years. The commenters asserted that programmatic documents generally take longer to prepare, but the long-term benefits are worth the investment. The commenters are concerned that the time limits for EAs and EISs will result in agencies preparing fewer programmatic environmental documents. A separate commenter indicated that many agencies review programmatic documents at longer intervals than five years.

CEQ appreciates the commenters' concerns but notes that the timeframes are statutory. CEQ encourages agencies to use programmatic environmental documents and tiering whenever it will result in more efficiency overall. CEQ also notes that a reevaluation of a programmatic document need not be a lengthy process especially where agencies can quickly and easily verify the ongoing accuracy of the evaluation.

One commenter asserted that the process for reevaluation is unclear in the statute and in the proposed rule and asked CEQ to clarify the steps. The commenter requested that the regulations state that the tiered environmental review is what triggers the need for reevaluation and that it also

serves as the documentation of the reevaluation.

CEQ declines to articulate additional steps for reevaluation. The regulations already provide a process for reevaluation in §§ 1501.5 and 1502.9(e). CEQ agrees that agencies may make use of tiered documents to support their reevaluation. However, because of the nature of tiering, such documents may not assess all of the underlying assumptions of the programmatic document.

Another commenter recommended that the regulations allow agencies to tier from programmatic documents while reevaluation is ongoing and requested CEQ clarify that those projects are not at risk of noncompliance for reliance on previous versions should the agency issue a new version of the document.

CEQ declines to make these specifications in the final rule. CEQ agrees that a tiered document may also serve as a reevaluation of the programmatic document. CEQ considers the language in section 108(1) of NEPA to be clear that agencies may tier from a programmatic review in a subsequent environmental document for up to five years without additional analysis, and therefore any tiered documents relying on the programmatic document during those five years is entitled to the statutory presumption that no additional review is required even where the agency subsequently revises the programmatic document. 42 U.S.C. 4336b(1).

A few commenters requested that the regulations require the five-year reevaluation for EISs and EAs be subject to public comment; that agencies provide public notice of the reevaluation; and that reevaluation of programmatic analyses be made publicly available.

CEQ declines to make these changes to retain flexibility depending on the context of the reevaluation. Some reevaluations may be simple and not require public comment. Other reevaluations may warrant and benefit from public engagement, including public comment. If the agency finds that any assumptions are no longer valid or that the criteria for supplementation in § 1502.9(d) are met, then the regulations require the agency to conduct a supplemental analysis to continue to rely on the programmatic review in subsequent environmental documents.

**11. Incorporation by Reference Into Environmental Documents (§ 1501.12)**

CEQ proposed minor modifications to § 1501.12 to emphasize the importance of transparency and accessibility of

material that agencies incorporate by reference. First, CEQ proposed to revise the title to add "into environmental documents" at the end to clarify into what agencies incorporate by reference. CEQ makes this change in the final rule.

Second, CEQ proposed to add to the second sentence a specific requirement for agencies to briefly explain the relevance of any material incorporated by reference into the environmental document to clarify that agencies must not only summarize the content incorporated but also explain its relevance to the environmental review document. CEQ proposed this addition because explaining the relevance of incorporated material in addition to summarizing it will better inform the decision maker and the public.

A few commenters opposed the proposed requirement for agencies to briefly explain the relevance of the incorporated material to the environmental document, asserting that the relevance of the material is often obvious and that requiring this explanation would add burdensome paperwork without additional benefit. A commenter also asserted that the requirement defeats the purpose of incorporating material by reference.

CEQ disagrees with the commenters' assertions and makes the proposed addition in the final rule. CEQ adds the language to emphasize the importance of transparency regarding material that agencies incorporate by reference and rely upon as part of their analysis. Briefly explaining the relevance of incorporated material should not require substantial agency resources or lengthy text. Section 1501.11 already requires an agency to briefly summarize material that it incorporates by reference; briefly explaining the relevance of the material does not require additional analysis, but rather, only requires that the agency briefly document how the material is related to the agency action it is reviewing in an environmental document. While in some cases the relevance of material incorporated by reference may be obvious, in such cases, briefly explaining relevance will be a trivial task that may require no more than a sentence. Where the relevance of the material is not immediately obvious, a brief explanation will help better inform both the public and decision makers. CEQ disagrees that the requirement is burdensome or duplicative, and encourages agencies to integrate the description of relevance into the summary of the material.

Third, CEQ proposed to change "may not" to "shall not" in the third sentence to eliminate a potential ambiguity over

whether agencies must make material they incorporate by reference reasonably available for public inspection. One commenter supported the preclusion of incorporation by reference if the material is not reasonably available for public inspection. Another commenter requested that CEQ define "reasonably available for inspection" to clarify what information should be made available prior to public comment. In considering this comment, CEQ determined that it was more appropriate to revise the text in the final rule to improve clarity rather than define this phrasing from the 1978 regulations, and therefore changes "inspection" to "review." CEQ does not intend this change in wording to be substantive, but rather to modernize the regulatory language and, thereby, improve clarity of the requirement. CEQ anticipates that agencies will generally make this material available electronically or online, though it may be appropriate for agencies to provide physical copies in certain circumstances such as for localized actions where internet access or bandwidth is limited.

Another commenter expressed support for incorporation by reference, but questioned whether the standard should allow agencies to incorporate by reference proprietary data. CEQ declines to change the "reasonably available for review" standard. Incorporation by reference is a tool that agencies can use to improve the efficiency of their environmental review process. However, it cannot be used to circumvent the public engagement, public comment, public access, and transparency requirements of NEPA and these regulations, including section 107(c)'s requirement that for an EIS, an agency must request public comment on "alternatives or impacts and on relevant information, studies, or analyses with respect to the proposed agency action." 42 U.S.C. 4336a(c). CEQ therefore retains the requirement that has been in the NEPA regulations since 1978 that prohibits agencies from incorporating by reference material that is not reasonably available for review, including proprietary data that is not available for review and comment.

Another commenter recommended CEQ revise existing regulatory text in the third sentence. The commenter suggested CEQ replace "within the time" with "at the beginning of and throughout the time" asserting that the current language allows an agency to post documents near the end of the comment period. The commenter stated that documents should be available for the full comment period to allow for meaningful public review and comment. CEQ agrees that materials that are

incorporated by reference should be reasonably available throughout the public comment period. CEQ is unaware of agencies incorporating by reference material that is not available throughout the comment period. However, CEQ agrees that the reasonable availability of material incorporated by reference is critical to the public comment process for EISs under the regulations and under section 107(c) of NEPA, which requires agencies preparing EISs to request public comment on "relevant information, studies, or analyses with respect to the proposed agency action." 42 U.S.C. 4336a(c). Therefore, the final rule replaces the word "inspection" with "review" and the word "within" with the word "throughout" to remove any ambiguity over when the materials an agency incorporates by reference must be reasonably available to the public. The final rule also adds "or public review" after "comment" to make it clear that the material must be available while an environmental document is available for public review in those cases where the regulations do not require an agency to seek public comment. CEQ makes these changes in the final rule to ensure that material incorporated by reference, including research publications and data, is openly available and accessible to the public.

Fourth, CEQ proposed in the third sentence to add a reference to "publicly accessible website" as an example of a mechanism through which material incorporated by reference may be reasonably available to the public. CEQ did not receive any comments specific to this proposed example. CEQ makes this change in the final rule.

Finally, CEQ proposed to add a new fourth sentence encouraging agencies to provide digital references, such as hyperlinks, to incorporated material or otherwise indicate how the public can access the material for review. One commenter expressed support for the proposed inclusion of digital references. CEQ adds this sentence in the final rule.

A few commenters expressed general support for proposed § 1501.12. Another supportive commenter appreciated the emphasis on transparency and accessibility of material incorporated by reference, but suggested CEQ establish standards for the digital format of environmental documents and their underlying analysis to facilitate interagency information sharing and collaboration. CEQ appreciates the comment and notes that it is currently engaged in an eNEPA study, consistent with section 110 of NEPA, to assesses such issues. *See* 42 U.S.C. 4336d. Following the completion of that study,

CEQ may issue guidance or consider additional rulemaking in the future to address these issues.

Another commenter requested that the regulations require agencies to disclose if the cited material is outdated, disputed, or not fully proven. CEQ declines to make this change. Agencies generally have an obligation under § 1506.6 and § 1502.21 for EISs to disclose any relevant assumptions or limitations of the information on which they rely, including information incorporated by reference. Imposing a distinct requirement for material that is incorporated by reference is unnecessary and could create confusion.

One commenter expressed agreement that incorporation by reference can cut down on bulk but indicated that CEQ should expand § 1501.12 to address other reasons to incorporate materials by reference, such as to reduce duplicative work and ensure efficient use of agency resources. The commenter also requested CEQ rephrase the section to ensure that agencies can use pre-existing documents to further the efficiency requirements of NEPA. While CEQ agrees that incorporation by reference also reduces duplicative work and facilitates efficient use of agency resources, CEQ does not consider it necessary to add additional text to the regulations to make these points as the regulations already emphasize efficiency and use of other documents. *See, e.g.,* §§ 1506.2, 1506.3.

Finally, a commenter asserted the proposed rule did not sufficiently address avoidance of duplication between the NEPA process and States' environmental review and permitting processes. The commenter requested that CEQ clarify in § 1501.12 that there is a presumption that agencies can incorporate by reference environmental studies prepared in accordance with State procedural requirements akin to NEPA. CEQ declines to make this change. Establishing a presumption that agencies can incorporate by reference States' materials would be confusing and is unnecessary because the language in § 1501.12 allows agencies to incorporate material generated by States, and § 1506.2 has long promoted elimination of duplication with State requirements.

*D. Revisions To Update Part 1502, Environmental Impact Statements*

CEQ proposed to revise several sections of part 1502, as discussed in section II.D of the NPRM. CEQ is not implementing any substantive changes to § 1502.3, but is revising the section title to read "Statutory requirements for environmental impact statements." CEQ

is not making substantive changes to § 1502.6, Interdisciplinary preparation; § 1502.18, List of preparers; § 1502.19, Appendix; § 1502.20, Publication of the environmental impact statement; § 1502.22, Cost-benefit analysis; or § 1502.24, Environmental review and consultation requirements. CEQ received some comments on these sections but declines to make additional changes, as further explained in the Phase 2 Response to Comments.

1. Codification of 2023 GHG Guidance

CEQ invited comment on whether it should codify any or all of its 2023 National Environmental Policy Act Guidance on Consideration of Greenhouse Gas Emissions and Climate Change (2023 GHG guidance).[77] CEQ also invited comment on which provisions of part 1502 or other provisions of the CEQ regulations CEQ should amend if a commenter recommended codification of part of the guidance.

CEQ received numerous comments responding to this request for comments on codification of the 2023 GHG guidance. Comments expressed both support and opposition, with many commenters including general recommendations or considerations that did not specify what amendments to the rule CEQ should consider. Others identified specific text or concepts they recommended CEQ include. Some commenters resubmitted the same comments they submitted on the interim guidance, whereas others reiterated points they made as part of their comments on the interim guidance.

Some commenters requested that CEQ incorporate quantification and contextualization of climate effects from the guidance into the final rule, with specific suggestions for adding text to §§ 1502.16(a)(1), 1501.3(d), and 1508.1(g). Another commenter requested that CEQ modify § 1502.16(a)(7) to align the provision with the guidance for emphasizing quantification of emissions in determining reasonably foreseeable climate change-related effects. This commenter also recommended CEQ add provisions to § 1501.3 recognizing that while there is no particular threshold for GHG emissions that triggers an EIS, Federal agencies should quantify, where relevant, the reasonably foreseeable direct and indirect GHG emissions of their proposed actions and reasonable alternatives and the effects associated with those projected emissions in the determination of significance.

Another commenter asked that CEQ expand § 1502.6(a)(7) or § 1508.1(g)(4) to include key principles from the guidance. The commenter provided as an example that CEQ could clarify that climate change related effects should include analysis of reasonably foreseeable direct, indirect, and cumulative GHG emissions over the expected lifetime of the action.

Multiple commenters requested that CEQ add, in full, sections IV(B), (E), and (F); V; VI(A) through (C) and (E); and VII of the guidance. One commenter requested that CEQ strengthen proposed § 1502.15(b) and proposed § 1502.23(c) to require consideration of projections based on varying emissions scenarios and related variations in climate change effects on the proposed action and alternatives. The commenter referenced information included in the 2023 GHG guidance that provides important information on quantifying and analyzing uncertainty in the long-range projects of climate change. The commenter requested CEQ strengthen the final rule by codifying the need to manage this uncertainty and analyze it; otherwise, the commenter asserted, agencies may unlawfully seek to minimize or avoid analysis of long-range projects of climate change altogether.

One commenter requested that CEQ add consideration for proportionality and causality in the NEPA analysis of GHG-related impacts to more appropriately assign mitigation efforts to the true source of greenhouse gases. Another commenter suggested that CEQ integrate the warning against perfect substitution analysis from the guidance directly into the regulatory text. They also requested the rule include a provision on the appropriate use of the social cost of GHGs in climate change analyses.

Some commenters opposed codifying any part of the 2023 GHG guidance for multiple reasons. Two commenters expressed that inclusion of the guidance in the regulations would trigger concerns on overreach of the authority of the administrative branch. Other commenters expressed the view that CEQ should not codify any parts of the guidance until CEQ resolves policy issues and addresses the comments submitted on the guidance. A few other commenters were concerned that incorporation of climate change would unlawfully expand the scope of NEPA analyses past "foreseeable effects" and result in agencies prioritizing climate change above other environmental issues. One commenter expressed that because climate change science continues to evolve, it would be

premature to codify the guidance and that retaining it as guidance would provide flexibility to continue to update the manner in which agencies address climate change in NEPA reviews as science evolves. Another commenter stated that codification of guidance would be arbitrary and capricious, and that NEPA was not intended to be a climate policy framework.

Two commenters stated that if CEQ does decide to codify all or part of the 2023 GHG guidance, CEQ should issue another NPRM to provide an opportunity for the public to comment prior to issuing a final rule, consistent with the APA. Similarly, a few other commenters stated that CEQ did not provide enough information about how CEQ may incorporate the guidance, including what parts of the guidance CEQ would include, and that any attempt to codify the interim guidance through the final rule would be contrary to CEQ's obligations under the APA.

A few commenters asserted that the guidance wrongfully elevates climate change and its effects, no matter how small the effect may be, and that this emphasis is inconsistent with the purpose of NEPA and recent NEPA amendments.

After considering the comments, CEQ has determined not to revise the text of the proposed rule in the final rule to codify the 2023 GHG guidance, with the exception of one revision on quantification that was requested by commenters and that is included in the final rule in § 1502.16. CEQ responds to the comments summarized here in the Phase 2 Response to Comments, and CEQ will consider these and the comments received on the 2023 GHG guidance during development of any final GHG guidance. If CEQ deems it appropriate, CEQ may consider codification of the 2023 GHG guidance in a future rulemaking.

2. Purpose of an Environmental Impact Statement (§ 1502.1)

CEQ proposed to divide § 1502.1 into paragraphs (a), (b), and (c) to enhance readability and amend the text in the section to restore the approach taken in the 1978 regulations regarding the purpose of EISs as they relate to NEPA.

In proposed paragraph (a), CEQ proposed to restore language from the 1978 regulations clarifying that one purpose of an EIS is to "serve as an action-forcing device" for implementing the policies set out in section 101 of NEPA by ensuring agencies consider the environmental effects of their action in decision making. 42 U.S.C. 4331. CEQ proposed these changes because Congress did not enact NEPA to create

---

[77] See CEQ, 2023 GHG Guidance, *supra* note 10.

procedure for procedure's sake; rather, NEPA's procedures serve the substantive policies and goals Congress established and restoring the action-forcing language would clarify how EISs serve this broader function. CEQ proposed this change for consistency with the proposed edits in § 1500.1. *See* section II.B.1.

One commenter expressed support for the proposed changes in paragraph (a), specifying that the action-forcing language captures the intent of NEPA and serves the substantive policies and goals established by Congress. Multiple commenters opposed the proposed changes in paragraph (a), asserting that the language is contrary to the procedural approach of NEPA, and that it elevates the goals of the Act above the statutory requirements of other legislation. One commenter requested CEQ replace the proposed clause at the end of the sentence with language stating that the goals of NEPA cannot and do not supersede the requirements of other Federal statutes. Specific to the restoration of the action-forcing language, one commenter opposed the language because they do not agree that an EIS could be an action-forcing device on its own. The commenter described that an environmental study could reveal information that could be action forcing but that an EIS itself should not be and that an EIS is a device used to disclose and study the environmental consequences of actions. Other comments expressed that the phrasing inappropriately inserts a substantive element into NEPA's procedural requirements.

CEQ disagrees with the assertions of the commenters opposing this change and restores the language from the 1978 regulations as proposed in § 1502.1(a). As CEQ articulated in the proposed rule, CEQ considers it appropriate to restore this text from the 1978 regulations to ensure that agencies use the information gathered and analyzed in an EIS in their decision-making processes. CEQ disagrees that this language, which was part of the 1978 regulations implemented by agencies and interpreted by courts for decades, imposes a substantive requirement inconsistent with the statute. This provision does not require agency decision makers to make any particular decision based on the information in an EIS; it only requires that the information in an EIS inform the agency's decision, which is consistent with NEPA, agency practice, and case law.

In proposed paragraph (b), CEQ proposed minor edits for clarity and consistency with other changes proposed throughout the regulations.

CEQ proposed to change "It" to "Environmental impact statements" to improve readability in light of the proposal to break this section into lettered paragraphs. CEQ also proposed to change "significant" to "important" before "environmental issues" and insert "reasonable" before "alternatives" for consistency with similar phrasing throughout the regulations.

Two commenters requested that CEQ further revise paragraph (b). One requested that CEQ replace "enhance" with "restore and maintain" because the underlying statute does not put the burden on Federal decision makers or project sponsors to "enhance" the quality of the human environment. This commenter pointed to 42 U.S.C. 4331(a) and the language "restoring and maintaining environmental quality." A second commenter requested CEQ replace "avoid and minimize" with "reduce to the extent practical" to conform to the plain language of the NEPA statute.

CEQ finalizes § 1502.1(b) as proposed. CEQ does not consider it necessary to further revise this paragraph as the commenters suggested because this language has been in the regulations since 1978, and CEQ is unaware of any confusion or practical or legal problems created by this language. In the absence of such confusion or problem, CEQ views the potential cost to agencies and applicants of assessing what, if any, change in practice is needed to accommodate revised text as likely to outweigh any potential benefit of the language proposed by the commenters.

In proposed paragraph (c), CEQ proposed to restore the 1978 language clarifying that an EIS is more than a disclosure document, and that agencies must use EISs concurrently with other relevant information to make informed decisions. CEQ considers this language to provide important direction to agencies to ensure that EISs inform planning and decision making and do not serve as a perfunctory check-the-box exercise.

One commenter expressed support for the changes in proposed paragraph (c) stating that it reinforces that EISs must state how alternatives and decisions will or will not achieve the requirements of NEPA, the CEQ regulations, and other environmental laws and policies. Another commenter expressed that the language regarding an EIS being more than a disclosure document suggests that something more than a disclosure of environmental impacts is required to comply with the regulations. The commenter asserted this is contrary to NEPA's original intent.

One commenter requested that CEQ delete the last sentence of the paragraph requiring agencies to use EISs in conjunction with other relevant material to plan actions and make decisions. The commenter asserted that the sentence is not tethered to the EIS review process but addresses agency efforts to plan actions and make decisions, and therefore, the commenter asserted, CEQ is inserting itself into ongoing activities beyond environmental review pursuant to NEPA.

CEQ makes the changes as proposed in § 1502.1(c) and adds "involve the public" to the last sentence directing agencies to use other material to plan actions and make decisions. As CEQ noted elsewhere in this final rule, CEQ disagrees that NEPA is merely a check-the-box exercise, and considers it appropriate to reinforce this point in the regulations. CEQ also declines to exclude the proposed last sentence of paragraph (c). This provision does not go beyond NEPA, but rather emphasizes that an EIS is one of the documents agencies must use in their decision-making processes along with other relevant documents.

### 3. Implementation (§ 1502.2)

CEQ proposed minor modifications to § 1502.2. First, CEQ proposed to restore from the 1978 regulations the introductory paragraph directing agencies to prepare EISs consistent with paragraphs (a) through (g) to achieve the purpose established in § 1502.1. While the 2020 rule removed this paragraph as unnecessary, upon reconsideration CEQ proposed to restore the language to provide clarity on the purpose of this section and improve readability.

One commenter expressed support for all of the proposed revisions in § 1502.2 to ensure that lead agencies explain in an EIS how alternatives and agency decisions will or will not achieve the requirements of NEPA, CEQ regulations, and other environmental policies. Further, the commenter characterized the proposed changes as necessary to facilitate NEPA's goals of transparency and public participation. CEQ appreciates the commenters' supportive statements and in the final rule adds the introductory paragraph to § 1502.2 as proposed.

Next, in paragraph (b), CEQ proposed to replace the word "significant" with "important" and add a reference to an EA for clarity and consistency. In paragraph (c), CEQ proposed to change "analytic" to "analytical," and "project size" to "the scope and complexity of the action" since this provision is

**35496**    **Federal Register** / Vol. 89, No. 85 / Wednesday, May 1, 2024 / Rules and Regulations

applicable to more than projects, and the length of an EIS should be proportional to the scope and complexity of the action analyzed in the document.

One commenter expressed support for EISs being brief, concise, and no longer than necessary, but expressed concern over the language encouraging that the length of an EIS should be proportional to the effects and scope because this language conflicts with the page limits identified in § 1502.7. The commenter requested CEQ delete the sentence discussing proportionality to resolve any confusion.

CEQ disagrees with the commenter. The page limits provide the maximum length for EISs. Agencies should not automatically use every page allowable under the page limits and should not write documents longer than necessary. This statement acknowledges that some EISs may be less than the page limits.

CEQ proposed to delete "as interpreted in" before "the regulations in this subchapter" in paragraph (d), for consistency with the changes in §§ 1500.6 and 1502.9 as discussed in section II.B.6. The proposed rule explained that this phrase could inappropriately constrain agencies whose agency NEPA procedures go beyond the CEQ regulations. One commenter opposed the deletion of this language, expressing support for the inclusion of it to meet the spirit and flexibility of the 2020 rule.

CEQ removes "as interpreted in" from paragraph (d) in the final rule because CEQ considers this language inappropriately constricting and potentially causing confusion in light of changes CEQ is making to other provisions of the regulations allowing agencies to tailor their procedures to their programs and include more specific requirements and suggestions. Under the revisions, EISs must state how alternatives and decisions will or will not achieve the requirements of NEPA, the CEQ regulations, and other environmental laws and policies.

Finally, CEQ proposed to delete the word "final" in paragraph (f) because the regulations do not distinguish between a decision and final decision and, therefore, using the phrase "final decision" is inconsistent with use of "decision" elsewhere in the regulations. CEQ makes this change as proposed in the final rule.

### 4. Scoping (§ 1502.4)

As discussed in section II.C.8 on § 1501.9, "Public and governmental engagement," section II.C.2 on § 1501.3, "Determine the appropriate level of NEPA review," and section II.C.10 on

§ 1501.11, "Programmatic environmental document and tiering," CEQ proposed to revise § 1502.4 by retitling it "Scoping" and moving provisions from 40 CFR 1501.9 (2020) to this section and moving the existing provisions of 40 CFR 1502.4 (2020), "Major Federal actions requiring the preparation of environmental impact statements" to §§ 1501.3 and 1501.11. CEQ proposed to move the requirements of scoping for EISs to part 1502, which addresses the requirements specific to EISs, while moving requirements for determining scope applicable to all environmental reviews to § 1501.3(b). CEQ also proposed to revise the provisions moved from 40 CFR 1501.9 (2020) to proposed § 1502.4 to align scoping with related changes made on public engagement in § 1501.9 and to add requirements focused on increasing efficiency in the EIS scoping process.

As discussed further in sections II.C.8 and section II.C.10, commenters were generally supportive of this approach. Commenters did provide a few targeted comments as discussed further in this section and the Phase 2 Response to Comments.

CEQ proposed these changes because it has heard from multiple Federal agencies that there is uncertainty over the differences between the scoping process required for EISs and other public involvement or engagement requirements for NEPA reviews more generally. By revising § 1501.9 on public and governmental engagement and moving the scoping provisions to § 1502.4, CEQ is emphasizing the importance of public engagement in the NEPA process generally, clarifying what requirements are specific to the scoping process for EISs, and clarifying what requirements and best practices agencies should consider regardless of the level of NEPA review.

First, CEQ proposed to move 40 CFR 1501.9(a) (2020), outlining the general purpose of scoping, to § 1502.4(a) and proposed to change the words "significant" and "non-significant" to "important" and "unimportant," respectively, to align with CEQ's proposed change to only use the word "significant" when describing effects, which CEQ indicated was a clarifying, non-substantive change. CEQ finalizes this paragraph as proposed with three additional changes to replace the paragraph heading "Generally" with "Purpose," to more accurately describe the paragraph; to add use of the word "scoping" in the first sentence to make clear that this sentence is describing the purpose of scoping; and to change "may" to "should" in the second sentence to address comments

requesting clarification that scoping can and should begin prior to issuance of the NOI. This last change also emphasizes the importance for agencies to begin scoping work early to facilitate meeting the statutory two-year deadline for completing EISs. CEQ made clear in the 2020 regulations that scoping should begin as soon as practicable, so the agency can gather the requisite information to allow the public to provide meaningful input on the NOI, including on the topics specifically identified for inclusion in the notice in § 1502.4(e)(1) through (e)(10). Agencies cannot be reasonably expected to have this information available to them without beginning scoping prior to issuance of the NOI.

Second, CEQ proposed to move paragraph (c) of 40 CFR 1501.9 (2020) on scoping outreach to § 1502.4(b) and add an introductory sentence requiring agencies to facilitate notification to persons and agencies that may be interested or affected by an agency's proposed action, consistent with the public and governmental engagement requirements in proposed § 1501.9. CEQ finalizes this paragraph as proposed.

Third, CEQ proposed to move paragraph (b) of 40 CFR 1501.9 (2020) on cooperating and participating agencies to § 1502.4(c) and retitle it "Inviting participation" to better reflect that the paragraph covers cooperating and participating agencies as well as proponents of the action and other likely affected or interested persons. CEQ also proposed to strike the last sentence providing an example of when an agency might hold a scoping meeting.

Some commenters expressed concern for the removal of the language requiring cooperating and participating agencies be invited and consulted, and noted their specific reference in the NEPA statute. CEQ did not intend a substantive change by modifying the paragraph heading and notes that §§ 1501.7 and 1501.8 have long provided for the invitation of such agencies to serve as cooperating or participating agencies. In the final rule, CEQ adds a clause to the regulatory text to make clear that the invitation to Federal, State, Tribal, and local agencies and governments is to participate as cooperating or participating agencies. CEQ also notes that agencies invited to serve as cooperating or participating agencies should respond in a timely manner to facilitate the inclusion in the NOI of any information that these agencies may need as part of the scoping process.

A commenter also expressed confusion about the reference to the

proponent of the action" since that is the lead agency. This phrase, which has been in the regulations since 1978, refers to an outside party such as a project sponsor or applicant. Therefore, in this final rule, CEQ revises this phrase to "any applicant" for consistency with the final rule's definition of "applicant" and includes "any" since not all actions will involve such parties.

Fourth, CEQ proposed to move paragraphs (f) and (f)(1) through (f)(5) of 40 CFR 1501.9 (2020), which addresses additional scoping responsibilities, to § 1502.4(d) and (d)(1) through (d)(5), respectively. Within this list, CEQ proposed modifications to paragraph (d)(1) to change "significant" to "important" to align with changes in paragraph (a) and the use of "significant" throughout the regulations, which CEQ intended to be a clarifying, non-substantive change. CEQ finalizes these changes consistent with its proposal. Additionally, in paragraph (d)(3) of the final rule, CEQ changes "public" EAs and other EISs to "publicly available" to clarify the meaning of this provision.

Fifth, CEQ proposed to move the requirements for an NOI from paragraphs (d) and (d)(1) through (d)(8) of 40 CFR 1501.9 (2020) to § 1502.4(e) and (e)(1) through (e)(8), respectively. CEQ proposed to delete the reference to 40 CFR 1507.3(f)(3) (2020) because CEQ proposed to remove that provision from the regulations, as discussed in section II.I.3 of the proposed rule. CEQ proposed to revise the language in paragraph (e)(7) for consistency with section 107(c) of NEPA requiring the NOI to include a request for public comment on alternatives or impacts and on relevant information, studies, or analyses, and proposed to delete the cross reference to § 1502.17 because CEQ proposed to broaden the language in § 1502.17. 42 U.S.C. 4336a(c). CEQ also proposed to delete the cross reference because it would no longer be necessary since CEQ proposed to remove the exhaustion process in 40 CFR 1500.3 (2020), which relied, in part, on this provision as the first step in that process. Lastly, CEQ proposed these edits because the purpose of scoping is to receive input from the public on the proposed action and alternatives as well as other information relevant to consideration of the proposed action, and CEQ considered the language in this paragraph to be redundant to the other required information in proposed paragraph (e). CEQ is finalizing these changes as proposed for the reasons set forth in the NPRM and this final rule. Also, CEQ

revises paragraph (e)(1) to add the word "agency" between "proposed action" to align the text with changes to § 1502.13 and for consistency with section 107(d) of NEPA. *See* 42 U.S.C. 4336a(d).

Sixth, to this list of NOI requirements, CEQ proposed to add paragraph (e)(9) to require the lead agency to list any cooperating and participating agencies that have been identified at the time of the NOI, as well as any information those agencies require to facilitate their decisions or authorizations related to the EIS. CEQ proposed to add this requirement to ensure that lead and cooperating agencies communicate about any unique statutory or regulatory requirements of each agency so that the necessary information is included in the initial NOI and does not require re-issuance of a second NOI by the cooperating or participating agency. For example, the U.S. Forest Service's regulations regarding administrative review require the responsible official to disclose during the NEPA scoping process that a proposed project or activity or proposed plan, plan amendment, or plan revision is subject to one of its administrative review regulations. 36 CFR 218.7(a), 219.52(a). When the Forest Service acts as a cooperating agency and the lead agency does not include the necessary information in the NOI, the Forest Service then must issue its own NOI, which can add additional time to the NEPA process. CEQ is finalizing this proposal consistent with the NPRM.

Seventh, CEQ proposed to add paragraph (e)(10) to require that the NOI include a unique identification number for tracking purposes that would be carried forward in all other documents related to the action such as the draft and final EISs and ROD (comparable to the provision in § 1501.5(c)(4) requiring tracking numbers for EAs). As discussed in greater detail in section II.C.4, CEQ proposed this provision because identification numbers can help both the public and agencies track the progress of an EIS for a specific action as it moves through the NEPA process. In the final rule, CEQ has retained the proposal and, in response to comments, added a clause to also require use of the unique identification numbers in any agency databases or tracking systems.

Eighth, CEQ proposed to move and edit the second sentence regarding supplemental notices in 40 CFR 1507.3(f)(3) (2022) to paragraph (f), "Notices of withdrawal or cancellation," to require that an agency publish in the **Federal Register** a notice of withdrawal of the NOI or a supplemental notice to inform the public that it is no longer considering a proposed action and,

therefore, discontinuing preparation of an EIS. CEQ proposed this requirement to codify common agency practice and to increase transparency to the public. CEQ is finalizing this change as proposed because agencies should publish such notices if they withdraw, cancel, or otherwise cease the consideration of a proposed action before completing a final EIS in order to provide notice to the public that a proposed action is no longer under consideration. Such a notice does not need to be lengthy, but should clearly reference the original NOI, name of the project in the original notice, unique identification number, and who to contact for additional information.[78]

Finally, CEQ proposed to move paragraph (g) of 40 CFR 1501.9 (2020) on NOI revisions to § 1502.4(g), updating the cross references and changing "significant" to "important" and "impacts" to "effects," which CEQ indicated was a clarifying, non-substantive edit. CEQ makes this change in the final rule, consistent with the NPRM to align the text with the changes to § 1502.9(d)(1)(ii).

### 5. Timing (§ 1502.5)

CEQ proposed to make three clarifying amendments to § 1502.5. First, in paragraph (a), CEQ proposed to add "*e.g.,*" in the parenthetical "(go/no-go)." CEQ proposed this amendment in response to agency feedback during the development of the proposed rule to clarify that the feasibility analysis and the "go/no-go" stage may not occur at the same point in time and may differ depending on what is included in the feasibility analysis and how the agency has structured that analysis. CEQ proposed this change for consistency with the longstanding practice that agencies have discretion to decide the appropriate time to begin the NEPA analysis, but also that agencies should integrate the NEPA process and other planning or authorization processes early. *See* § 1501.2(a).

Two commenters recommended CEQ delete the introductory paragraph of § 1502.5 encouraging agencies to commence preparation of an EIS as close as practicable to the time the agency is developing or receives a proposal, as well as the feasibility analysis and go/no-go language in

[78] *See, e.g.,* U.S. Forest Serv., Powell Ranger District; Utah; Powell Travel Management Project; Withdrawal of Notice of Intent to Prepare an Environmental Impact Statement, 87 FR 1109 (Jan. 10, 2022); U.S. Army Corps of Eng'rs, Withdrawal of the Notice of Intent to Prepare an Environmental Impact Statement for the Carpinteria Shoreline, a Feasibility Study in the City of Carpinteria, Santa Barbara County, CA, 86 FR 41028 (July 30, 2021).

paragraph (a). The commenters asserted that the feasibility analysis stage is generally considered an early stage of project management and suggested this stage was pre-proposal and therefore pre-NEPA. The commenters explained that this stage can and should take considerable time, and therefore should not be covered by the time limits, or agencies will likely miss the statutory deadlines. The commenters asserted that the NEPA process should not commence until this stage is completed. One of these commenters further pointed to the statutory definition of "proposal" added in 2023 and asserted this should be the starting point for the timing requirements for EISs and EAs. The commenter further asserted that CEQ should encourage pre-NEPA "environmental considerations" early in agency planning and decision making prior to issuing a NOI to file an EIS.

In the final rule CEQ revises § 1502.5(a) to revise "at the feasibility analysis (go/no-go) stage" to instead refer to the feasibility analysis or equivalent stage evaluating whether to proceed with the project. This revised text improves the clarity of the sentence and recognizes that feasibility analyses are not a component of project authorizations for every agency. The regulations have long encouraged agencies to integrate NEPA into their planning and decision-making processes. As CEQ advised in the 2020 regulatory revisions, agencies often begin "pre-NEPA" work before they make the formal determination to prepare an EIS by issuing a NOI. As discussed in section II.D.4, agencies must commence this work before issuing an NOI in order to meet the content requirements for an NOI. CEQ does not consider it necessary to delineate these phases in the regulations, as the commenter suggests, because agencies have decades of experience in developing EISs consistent with this provision, and CEQ is unaware of any agency concerns with or practical problems created by this provision.

Second, CEQ proposed to add "complete" in the first sentence of paragraph (b) to clarify that agencies must begin preparing an EIS after receiving a complete application, though agencies can elect to begin the process earlier if they choose to do so. CEQ also proposed to add "together and" in the second sentence of paragraph (b) to clarify further that agencies should work "together and with" potential applicants and other entities before receiving the application. CEQ proposed these changes based on its experience that early conversations

and coordination among Federal agencies, the applicant, and other interested entities can improve efficiencies in the NEPA process and ultimately lead to better environmental outcomes. Additionally, CEQ noted that similar to the proposed change to paragraph (a), the proposed changes to paragraph (b) are consistent with other directions in the regulations to integrate the NEPA process and other processes early. *See* §§ 1500.5(h)–(i), 1501.2(a).

One commenter requested CEQ revise paragraph (b) in order to ensure there are no unnecessary delays in proceeding. The commenter suggested language be added to require agencies to commence review of the application and decide on its completeness within 30 days and issue a NOI within 6 months. The commenter also requested CEQ add language requiring agencies to establish objective measures in their regulations for determining when an application is complete.

CEQ declines to add this level of specificity in its regulations because the regulations apply to a broad range of agencies and contexts, and these specific requirements may not work for all of them. Instead, it is best left to agency-specific NEPA procedures or agency program regulations to articulate these sorts of deadlines. In the final rule, CEQ adds "complete" in paragraph (b) consistent with its proposal.

### 6. Page Limits (§ 1502.7)

CEQ proposed to amend § 1502.7, to align the text with section 107(e) of NEPA, which sets page limits for EISs at 150 pages or 300 pages for proposals of extraordinary complexity, not including citations or appendices. 42 U.S.C. 4336(e). CEQ proposed to remove the requirement for the senior agency official of the lead agency to approve longer documents for consistency with the statute, which does not provide a mechanism to approve longer documents.

CEQ received a number of comments on page limits. Some commenters expressed concerns that the page limits would prevent agencies from conducting the requisite analysis under NEPA. Some of those commenters requested that CEQ retain the provision allowing the senior agency official to authorize an exceedance of the page limits. Other commenters expressed support for the page limits and requested that CEQ impose additional requirements to ensure agencies do not circumvent the page limits. Commenters also requested CEQ define "extraordinary complexity."

CEQ makes the changes as proposed in the final rule. The NEPA statute sets

clear page limits for EAs and EISs and does not establish a mechanism for exceeding those page limits. Allowing senior agency officials to approve an exceedance of the page limits would undermine the direction in the statute and CEQ's longstanding goals of developing concise, readable NEPA documents that will inform the decision maker and the public. CEQ is confident that agencies can both meet page limits and fully consider the elements required by the statute and these regulations.

CEQ has long encouraged and continues to strongly encourage agencies to prepare EISs that are both comprehensive and informative, as well as understandable, to the decision maker and the public. Agencies should consider establishing within their procedures mechanisms to do so that will be most effective for their programs and activities. These mechanisms could include placing technical analyses in appendices and summarizing them in plain language in the EIS; making use of visual aids, which are excluded from the definition of "page" provided by § 1508.1(bb), including sample images, maps, drawings, charts, graphs, and tables; and using interactive documents, insets, colors, and highlights to create visually interesting ways to draw attention to key information and conclusions. Agencies should consider making EISs and technical appendices machine readable, where possible and feasible, to facilitate data sharing and reuse in future analyses.

### 7. Writing (§ 1502.8)

CEQ proposed minor edits to § 1502.8 to change "may" to "should" and change "graphics" to "visual aids or charts" for consistency with modifications proposed in § 1502.12 regarding visual aids or charts. One commenter expressed support for the proposed changes to require agencies to use plain language and encourage use of visual aids and charts. However, this commenter stated that use of visual aids and charts must be designed to be understandable to non-technical audiences, pointing to documents they have reviewed that included tables that are difficult to understand.

CEQ makes the edits as proposed in § 1502.8 in the final rule. The CEQ regulations have long required agencies to write environmental documents in plain language as a means to preparing readable, concise, and informative documents. *See, e.g.,* §§ 1500.4 and 1502.8. Agencies commonly use visual aids, such as graphics, maps, and pictures, throughout their environmental documents. CEQ agrees with the commenters that the visual

aids and charts must be understandable but does not consider it necessary to make additional changes to the regulatory text since the text indicates that the purpose of visual aids and charts is to enable decision makers and the public to readily understand the EIS. EISs must be written in plain language, and this requirement would also apply to visual aids and charts.

8. Draft, Final, and Supplemental Statements (§ 1502.9)

CEQ did not propose any substantive changes to paragraph (a) of § 1502.9 and did not receive any comments on it. Therefore, CEQ finalizes paragraph § 1502.9(a) as proposed.

CEQ proposed to revise paragraph (b) addressing draft EISs by deleting "as interpreted" from the requirement that draft EISs meet the requirements for final EISs in section 102(2)(C) of NEPA "as interpreted in the regulations in this subchapter." 42 U.S.C. 4332(2)(c). CEQ proposed to delete this clause as inappropriately restrictive and for consistency with the same proposed change in §§ 1500.6 and 1502.2. CEQ makes this change in the final rule for the reasons discussed in section II.B.6 with respect to deleting the same phrase in § 1500.6.

CEQ also proposed to add the phrase "the agency determines that" to the introductory clause of the third sentence of § 1502.9(b) so that the beginning of the sentence would read, "If the agency determines that a draft statement is so inadequate as to preclude meaningful analysis." CEQ proposed this addition to clarify that it is the agency preparing a draft EIS that determines a draft statement requires supplementation to inform its decision-making process.

A commenter suggested additional language for the second sentence of paragraph (b) to clarify that a lead agency must work with a cooperating agency to develop the proposed action and subsequent range of all alternatives. Another commenter recommended CEQ add the phrase "may identify a preferred alternative" to the end of § 1502.9(b) to clarify that agencies have the authority to identify a preferred alternative in a draft EIS.

In the final rule, CEQ revises paragraph (b) consistent with its proposed clarifying changes. CEQ declines to make the edits suggested by the commenters as §§ 1501.7 and 1501.8 address the roles of lead and cooperating agencies, and § 1502.14(d) already requires agencies to identify a preferred alternative or alternatives in the draft EIS, if one or more exists.

In § 1502.9(c), CEQ proposed to clarify that a final EIS should "consider

and respond" to comments rather than just "address" them, thereby restoring language from the 1978 regulations and aligning the language with text in § 1503.4(a) regarding consideration of comments. The proposed rule explained that the 2020 rule did not explain the change from "consider and respond" to "address," [79] and CEQ is concerned that it could be read as weakening the standard for responding to comments within § 1502.9 and in § 1503.4. CEQ makes this change in the final rule for consistency with § 1503.4(a).

One commenter suggested that CEQ replace "responsible opposing view" in paragraph (c) with "relevant and non-frivolous opposing view" to promote transparency and remove subjectivity regarding the definition of "responsible." In the final rule, CEQ revised paragraph (c) consistent with its proposed clarifying changes. CEQ declines to change "responsible," which has been in the regulations since 1978, and CEQ has not heard that there is confusion regarding the meaning of this term or that it is creating practical problems for agencies implementing NEPA or the public seeking to participate in NEPA reviews. CEQ interprets this phrasing to mean that there is a reasoned basis for the opposing view, not one that is arbitrary.

Paragraph (d) of § 1502.9 and its subparagraphs address the standards for supplemental EISs. While CEQ did not propose changes to paragraph (d)(1), a commenter suggested that the phrase "if a major Federal action remains to occur" is vague. In the final rule, CEQ revises the text in paragraph (d)(1) addressing when an agency has to consider a supplemental EIS. In the 2020 rule, CEQ added a clause to specify that agencies prepare supplements if an action "remains to occur." Upon further consideration, CEQ revises this phrase in the final rule to "is incomplete or ongoing" to provide more clarity and specifically identify the circumstances when an agency needs to consider supplementation. CEQ intends the phrase "incomplete and ongoing" to have the same substantive meaning as "remains to occur," and notes that courts have used both phrases. *See, e.g., Marsh v. Or. Nat. Res. Council,* 490 U.S. 360, 373 (1989) (holding that supplementation may be required "[i]f there remains major Federal action to occur"; *Norton v. S. Utah Wilderness All.,* 542 U.S. 55, 73 (2004) (citing *Marsh* and holding that an agency is not required to supplement when the action in question is

"completed," and is no longer "ongoing").

In paragraph (d)(1)(ii), CEQ proposed to replace the word "significant" with "important" and "impacts" with "effects" (except where "impact" is used as part of the term FONSI) for consistency, as discussed in section II.A. CEQ also proposed to add "substantial or" before "important new circumstances or information," for consistency with language in section 108(1) of NEPA, which confirms that an agency may rely on the analysis in an existing programmatic environmental document for five years without having to supplement or reevaluate the analysis, provided no substantial new circumstances or information exists. 42 U.S.C. 4336b(1).

Two commenters indicated that the proposed rule does not align with the statutory language in section 108 of NEPA regarding supplementation and reevaluation, because that section does not include the words "or important" before "new circumstances." *See* 42 U.S.C. 4336b. Two commenters opposed the replacement of "significant" with "substantial," expressing concern that it will increase uncertainty. A few commenters also requested that CEQ add definitions for "substantial changes," "substantial or important new circumstances," and "environmental concerns are not substantial."

In the final rule, CEQ revises paragraph (d)(1)(ii) by replacing "significant" with "substantial" to track the language of section 108(1) of NEPA requiring agencies to supplement if there are substantial new circumstances or information about the significance of adverse effects that bear on the analysis. 42 U.S.C. 4336b(1). CEQ interprets this language as consistent with the longstanding standard for supplementation and considers it a non-substantive change that clarifies one of the standards for supplementation of an EIS. Directly incorporating the language from section 108(1) of NEPA also avoids creating an implication that there are different supplementation standards for programmatic environmental documents and other environmental documents. As noted, the language in section 108(1) is consistent with longstanding practice, so there are not different standards for supplementation for programmatic environmental documents. 42 U.S.C. 4336b(1). This approach also obviates the need for the definitions requested by commenters because agencies have extensive experience applying the supplementation standard.

One commenter suggested that CEQ revise § 1502.9(d)(1)(ii) to clarify that

[79] *See* CEQ, 2020 Final Rule, *supra* note 39, at 43364–65.

supplementation is not limited to new environmental effects and that it also would apply to situations where the purpose and need or the alternatives are changed. CEQ declines to edit this paragraph to clarify this point because this scenario would be covered by the other criterion for supplementation in paragraph (d)(1)(i). Consistent with existing agency practice, agencies should continue to focus on whether a change to the proposed action could have environmental effects that have not been analyzed in determining whether changes to the proposed action require supplementation.

Another commenter noted that the cross-reference to the Emergencies section, § 1506.11, was incorrect in proposed paragraph (d)(3). In the final rule, CEQ fixes the cross reference and revises "alternative procedures" to "alternative arrangements" for consistency with the phrasing of § 1506.11.

CEQ proposed to redesignate paragraph (d)(4) of 40 CFR 1502.9 (2020) as paragraph (e) of § 1502.9 and title it "Reevaluation" to clarify that reevaluation is a separate tool to document new information when supplementation is not required. CEQ proposed to add in paragraph (e) that agencies may "reevaluate" an EIS in part to determine that changes to the proposed action or new circumstances or information relevant to environmental concerns are not "substantial" or "that the underlying assumptions of the analysis remains valid," and therefore, the agency does not need to prepare a supplemental EIS. CEQ proposed this language in part for consistency with section 108(2) of NEPA's rule that an agency may rely on programmatic documents that are more than five years old if it reevaluates the underlying analysis. 42 U.S.C. 4336b(2). However, while section 108(2) requires reevaluation for programmatic documents more than five years old, CEQ proposed to leave agencies discretion over whether and when to reevaluate non-programmatic documents. 42 U.S.C. 4336b(1).

One commenter requested that CEQ revise paragraph (e) to clarify that when agencies reevaluate their NEPA documents, supplementation is required if the changes are substantial or the underlying assumptions of the analysis do not remain valid. A couple of commenters requested specific wording changes, including adding "or important" after "substantial" in the first sentence of paragraph (e) and changing "the agency should" to "the agency must document the finding." Another commenter asked CEQ to revise

paragraph (e) to clarify that new circumstances or information in the absence of a major Federal action do not trigger a requirement to reevaluate an EIS. Another commenter recommended language to clarify that reevaluation should only be permitted in circumstances for which the proposed action has not changed physical location.

In the final rule, CEQ revises paragraph (e) to simplify the paragraph on reevaluation and provide that agencies may reevaluate EISs to determine that supplementation is not required. This text is substantively the same as the proposed rule, but avoids unnecessary repetition of the standard for supplementation and avoids any potential confusion that there is an independent standard for reevaluation. Agencies may use reevaluation to document why a change to an action or new information does not require supplementation. Additionally, agencies may use reevaluation to conduct additional analysis to determine whether the change to the action or the new information meets either of the criteria for supplementation; in such cases, the agency would then prepare a supplemental EIS. Some agency procedures already provide such processes and § 1507.3(c)(10) provides that agencies must include such processes in their NEPA procedures, as appropriate. CEQ revises the last sentence of paragraph (e) to clarify that agencies also may prepare a supplemental EA and FONSI to reevaluate an EIS. Some agencies already do this in practice, and CEQ is revising this language in the final rule to codify the practice.

One commenter provided general feedback on § 1502.9 recommending CEQ include language requiring that final EISs and reevaluated EISs adhere to the regulatory requirements in place at the time the agency develops the supplement. CEQ declines to make these changes as agencies are in the best position to determine which regulatory requirements apply on a case-by-case basis, consistent with § 1506.12, which addresses the effective date of the final rule.

### 9. Recommended Format (§ 1502.10)

In § 1502.10, CEQ proposed to revise the recommended format of an EIS. CEQ proposed to add cross references to the relevant regulatory sections at the end of paragraphs (a)(1), (a)(2), and (a)(4) through (a)(6). In paragraph (a)(7), CEQ proposed to strike the reference to "submitted alternatives, information, and analyses" given the proposed revisions to § 1502.17. CEQ proposed to

move appendices to paragraph (a)(7), include the summary of scoping information required by § 1502.17 and the list of preparers required by § 1502.18 in appendices, rather than the main body of the EIS, and add cross references to the relevant regulatory sections. Therefore, CEQ proposed to strike paragraphs (a)(8) and (a)(9) of 40 CFR 1502.10 (2020) referencing the list of preparers and appendices since these lists would be addressed in paragraph (a)(7). Finally, CEQ proposed to revise paragraph (b) to require agencies to include all of the sections referenced in paragraph (a) if they choose to use a different format.

CEQ received minimal comments on the proposed changes to § 1502.10, and the few comments submitted expressed support for the proposed changes. One commenter also requested that CEQ require the EIS format for EAs. CEQ makes the changes to § 1502.10 as proposed. CEQ declines to apply this section to EAs as well because § 1501.5 already addresses the required sections of an EA.

### 10. Cover (§ 1502.11)

CEQ proposed to revise § 1502.11(a) to clarify that the list of "responsible agencies" on an EIS cover are the "lead, joint lead, and any cooperating agencies." CEQ did not receive comments specific to this proposal but has added the phrase "to the extent feasible" before "any cooperating agencies" to address the rare circumstance in which there may be such a large number of cooperating agencies that listing all of them on the cover would make the cover unreadable. In such circumstances, an agency may include a note on the cover that identifies where in the EIS a list of the cooperating agencies is found.

Consistent with the proposed change in § 1502.4(e)(10) to require a unique identification number for tracking purposes, CEQ proposed to amend paragraph (g) to require the cover to include the identification number identified in the NOI. As discussed further in sections II.C.4 and II.D.4, CEQ is including the requirement for unique identification numbers in the final rule, and therefore adds this requirement to § 1502.11(g) as proposed. The inclusion of the identification number on the cover clarifies the relationships of documents to one another, helps the public and decision makers easily track the progress of the EIS as it moves through the NEPA process, and facilitates digitization and analysis.

CEQ proposed to strike the requirement in paragraph (g) of 40 CFR 1502.11 (2020) to include on the cover

of the final EIS the estimated preparation cost. Multiple agencies requested this change during development of the proposed rule. The 2020 rule added this requirement stating that including estimated total costs would be helpful for tracking such costs, and that agencies could develop their own methodologies for tracking EIS preparation costs in their agency NEPA procedures.[80] However, Federal agency commenters stated that agencies typically do not estimate total costs, that they are difficult to monitor especially when applicants and contractors are bearing some of the cost, that the methodology for estimating costs is inconsistent across agencies, and that providing these estimates would be burdensome. At least one agency commenter noted that agencies inconsistently implemented a similar requirement in E.O. 13807,[81] which undermined the utility of the estimates, that tracking costs added a significant new burden on staff, and that it was not clear whether tracking such costs provided useful information for agencies or the public.

Commenters both supported and opposed the proposal to remove the requirement to include the estimated preparation costs on the cover of the final EIS. Commenters who supported removing the requirement stated that the requirement added in 2020 imposed a substantial administrative burden on agencies and increased the length of the EIS preparation process because accurately tracking the total cost of preparation is difficult and labor-intensive. A few commenters expressed support for removing the requirement but suggested that, in order to facilitate transparency, CEQ could encourage agencies to include estimated cost information in the EIS, indicating this information could easily be included in an appendix.

Commenters who opposed the removal expressed that the requirement improves transparency and accountability and also suggested that tracking costs can improve the efficiency of the NEPA process. One commenter also asserted that CEQ failed to explain why it is no longer necessary to fulfill the data gap that was outlined in the 2020 rulemaking as a basis for adding the requirement.

As stated in the proposed rule, CEQ does not consider EIS costs to be germane to the purpose of an EIS. Requiring that they be included on the cover could incorrectly lead the public and decision makers to believe that

those costs provide information about the proposed action addressed in the EIS. In general, the purpose of the cover is to indicate the subject matter of the document and provide the public with an agency point of contact, provide a short abstract of the EIS, and indicate the date by which the public must submit comments. Further, CEQ was concerned that requiring agencies to calculate costs may unnecessarily add time and expense to the EIS preparation process, particularly where aspects of an environmental review serve multiple purposes, and allocating costs to NEPA compliance and other obligations may be complicated.

CEQ recognizes the value in gathering information on overall costs, trends in costs, and approaches that can reduce costs, as this can provide a full picture of how and whether agencies are effectively using their resources, including to conduct environmental reviews. Each agency should track and monitor these costs through their own procedures and mechanisms and consult with CEQ about any lessons learned to inform CEQ's ongoing evaluation of the efficiency and effectiveness of the NEPA process. However, CEQ does not consider requiring in the NEPA regulations that agencies publish costs on the cover of EISs to be the appropriate mechanism to develop that information.

CEQ considered the comments it received and is removing the requirement to include costs from paragraph (g). Removing this requirement does not preclude agencies from developing cost information or including it in an EIS if they deem it appropriate, but CEQ is concerned that the increased administrative burden of tracking costs, including the potential additional time needed to gather information, will unnecessarily delay NEPA processes. Further, the lack of consistent methodology across agencies coupled with the significant burden to develop consistent methodology, for which CEQ lacks the specialized expertise to do so, limits the utility of requiring agencies to present this information.

11. Summary (§ 1502.12)

CEQ proposed modifications to § 1502.12 to clarify the purpose of the summary and update what elements agencies should include in the summary, with a goal of creating summaries that are more useful to the public and agency decision makers. CEQ proposed these changes so that the summary would provide the public and agency decision makers with a clear, high-level overview of the proposed

action and alternatives, the significant effects, and other critical information in the EIS.

In the second sentence of § 1502.12, CEQ proposed to replace the word "stress" with "include" in describing the contents of the summary to clarify that an adequate and accurate summary may include more than what is listed in § 1502.12. Next, CEQ proposed to clarify that the summary should "summarize any disputed issues," "any issues to be resolved," and "key differences among alternatives."

CEQ proposed these changes to provide the public and decision makers with a more complete picture of the disputed issues, rather than focusing on "areas of" disputed issues, and to facilitate informed decision making and transparency. CEQ also proposed these edits for consistency with § 1502.14(b), which requires agencies to discuss alternatives in detail. CEQ explained in the proposed rule that summarizing the key differences between alternatives would enhance the public's and decision makers' understandings of the relative trade-offs between the alternatives that the agency considered in detail.

One commenter expressed concern with CEQ's proposal stating that summarizing "any" issue trivializes the analytical process and makes the summary more like a catalog of issues raised, regardless of how ill-informed or baseless the issues may be.

CEQ finalizes the changes as proposed. CEQ disagrees with the commenter's interpretation of the use of the term "any." CEQ's intent in using the qualifier "any" is to acknowledge that some EISs will not have any disputed issues or issues for resolution. It is not CEQ's intent for agencies to include a laundry list of every minor issue. Rather, CEQ intends the summary to explain the big-picture and important issues that the EIS addresses.

CEQ also proposed to add language to the second sentence to require that the summary identify the environmentally preferable alternative or alternatives. CEQ proposed this addition to enhance the public's and decision makers' understandings of the alternative or alternatives that will best promote the national environmental policy, as expressed in section 101 of NEPA, by providing a summary of that alternative early on in the document. As discussed further in section II.D.13, CEQ is finalizing its proposal to require agencies to identify the environmentally preferable alternative in the EIS, and therefore finalizes this addition to § 1502.12 as proposed.

**35502**    **Federal Register** / Vol. 89, No. 85 / Wednesday, May 1, 2024 / Rules and Regulations

CEQ proposed to add a third sentence to § 1502.12 to require agencies to write the summary in plain language and encourage use of visual aids and charts. CEQ proposed this addition to make EIS summaries easier to read and understand.

One commenter expressed support for the proposed changes to require agencies to write the summary in plain language and to encourage use of visual aids and charts. However, this commenter stated that agencies must design their use of visual aids and charts to be understandable to non-technical audiences, pointing to documents they have reviewed that included tables that are difficult to understand.

CEQ adds the proposed sentence to § 1502.12 in the final rule. The CEQ regulations have long required agencies to write environmental documents in plain language as a means to preparing readable, concise, and informative documents. *See, e.g.,* 40 CFR 1500.4 and 1502.8 (2019). Agencies commonly use visual aids, such as graphics, maps, and pictures, throughout their environmental documents. CEQ agrees with the commenters that visual aids and charts should be understandable but does not consider it necessary to make additional changes to the regulatory text. Section 1502.8 explains that agencies should use visual aids or charts in EISs so that decision makers and the public can readily understand them, which includes in the summary.

Finally, similar to other changes regarding page limits, CEQ proposed to allow agencies flexibility in the length of a summary. CEQ proposed to remove the 15-page limitation on summaries and instead to encourage that summaries not exceed 15 pages. Although summaries should be brief, CEQ acknowledged with this proposed change that some proposed actions are more complex and may require additional pages.

One commenter suggested that CEQ require the summary to include a consistency analysis that compares the proposed action and alternatives with applicable State and county resource management plans and State statutes. To accommodate their suggestion, the commenters indicated that the page limit might need to be adjusted to more than 15 pages.

CEQ makes the change to the length of summaries as proposed to provide agencies with flexibility to vary the length of documents based on the complexity of the action. Because summaries count toward the page limits set in § 1502.7, agencies have an incentive to keep summaries as short as possible while providing necessary information to the public and decision makers. While CEQ declines to require the summary to include a consistency analysis per the commenter's suggestion because it is inappropriately specific for government-wide regulations, the additional flexibility for length would accommodate such an approach, should an agency choose to do so.

### 12. Purpose and Need (§ 1502.13)

CEQ proposed to revise § 1502.13 to align the language with the text of section 107(d) of NEPA, which requires an EIS to include a statement that briefly summarizes the underlying purpose and need for the proposed agency action. *See* 42 U.S.C. 4336a(d).

CEQ received multiple commenters requesting that CEQ revise § 1502.13 to revert to the 2020 rule's language providing that when an agency's statutory duty is to review an application for authorization, the agency must base the purpose and need on the applicant's goals and the agency's authority. CEQ revised this language in the Phase 1 rulemaking and declines to restore the 2020 language for the reasons discussed in the Phase 1 rulemaking, the Phase 1 Response to Comments, and the Phase 2 Response to Comments. Additionally, CEQ declines to include this language in the final rule because it is inconsistent with section 107(d) of NEPA. 42 U.S.C. 4336a(d). CEQ revises § 1502.13 as proposed.

One commenter requested CEQ clarify that the purpose and need of a proposed action should define or limit the reasonableness of the range of alternatives, which is identified in the statutory amendments. CEQ addresses alternatives in § 1502.14 and declines to edit this section to address alternatives. Another commenter requested CEQ add a direction for agencies to use narrow purpose and need statements that limit the potential reasonable alternatives. CEQ declines to make this change because it would be inconsistent with section 107(d) of NEPA and would undermine the discretion and judgment that agencies appropriately exercise in defining the purpose and need for their actions. *See* 42 U.S.C. 4336a(d).

### 13. Alternatives Including the Proposed Action (§ 1502.14)

CEQ proposed revisions to § 1502.14 to promote the rigorous analysis and consideration of alternatives. To that end, CEQ proposed to reintroduce to § 1502.14 much of the 1978 text that the 2020 rule removed and to modernize it to ensure agency decision makers are well-informed. Many commenters on the Phase 1 rule requested CEQ revise this provision to revert to the 1978 language or otherwise revise it to ensure agencies fully explore the reasonable alternatives to their proposed actions.[82]

First, CEQ proposed to revise the introductory paragraph of § 1502.14 to reinstate the language from the 1978 regulations that provided that the alternatives analysis "is the heart of the environmental impact statement." As CEQ explained in the NPRM, while the 2020 rule described this clause as "colloquial language" to justify its removal,[83] CEQ has reconsidered its position and now considers the language to be an integral policy statement that emphasizes the importance of the alternatives analysis to allow decision makers to assess a reasonable range of possible approaches to the matters before them, and notes that numerous court decisions quoted this language from the 1978 regulations in stressing the importance of the alternatives analysis. *See, e.g., Wyoming* v. *U.S. Dep't of Agric.,* 661 F.3d 1209, 1243 (10th Cir. 2011). The proposed rule also noted that numerous commenters on the 2020 rule and the 2022 Phase 1 rule supported the inclusion of this language.[84]

Multiple commenters supported restoring the language that describes the alternatives section as the heart of the EIS, citing pre-1978 case law and asserting that without evaluation of reasonable alternatives, the NEPA process loses its potential to truly inform better decision making. Another commenter asserted that robust analysis of the relative environmental effects of a range of reasonable alternatives is necessary to ensure the EIS serves the regulatory purpose of providing for meaningful public input and informed agency decision making. In the final rule, CEQ reinstates the language from the 1978 regulations to the introductory paragraph of § 1502.14, as proposed.

Second, CEQ proposed a clarifying edit in the second sentence of the introductory paragraph to replace "present the environmental impacts" with "identify the reasonably foreseeable environmental effects" for consistency with § 1500.2(e) and section 102(2)(C)(i) of NEPA. 42 U.S.C. 4332(2)(C)(i). CEQ did not receive comments specific to this proposal and makes this change in the final rule.

Third, in the introductory paragraph, CEQ proposed to add a third sentence

---

[82] *See* CEQ, Phase 1 Response to Comments, *supra* note 52, at 162.

[83] *See* CEQ, 2020 Final Rule, *supra* note 39, at 43330.

[84] *See, e.g.,* CEQ, 2020 Response to Comments, *supra* note 69, at 274; CEQ, Phase 1 Response to Comments, *supra* note 52, at 55.

stating that the alternatives analysis should sharply define issues for the decision maker and the public and provide a clear basis for choice among the alternatives. CEQ proposed reintroducing this language from the 1978 regulations because it provides an important policy statement, concisely explaining the goals of the alternatives analysis. CEQ received generally supportive comments on this proposal, and CEQ makes this edit to the third sentence of the introductory paragraph in the final rule.

Fourth, CEQ proposed in paragraph (a) to restore from the 1978 regulations the clause that agencies must "rigorously explore and objectively evaluate" reasonable alternatives at the beginning of the first sentence. CEQ proposed to reinsert this language because it provides a standard that agencies have decades of experience applying in the analysis of alternatives.

Some commenters expressed general support for restoring the requirement to rigorously explore and objectively evaluate reasonable alternatives in paragraph (a). Other commenters opposed the restoration of this language, asserting that it is arbitrary and subjective and has the potential to increase litigation over whether an agency met the subjective test of rigorous and objective evaluation. CEQ makes this change in the final rule because restoring this language will help ensure agencies conduct a robust analysis of alternatives and their effects, rather than a cursory, box-checking analysis.

One commenter asserted that the first sentence of paragraph (a) should refer to the definition of "reasonable alternatives" to make it clear that alternatives proposed in scoping that do not meet the purpose and need and that are not technically and economically feasible should be eliminated from further consideration. CEQ declines to add a cross reference to the definition of "reasonable alternatives" as unnecessary because the phrase "reasonable alternatives" is a defined term in the regulations, and the definition applies whenever the regulations use the term.

Fifth, CEQ proposed to add two additional sentences to paragraph (a). CEQ proposed the first sentence to clarify that agencies need not consider every conceivable alternative to a proposed action, but rather must consider a reasonable range of alternatives that fosters informed decision making. CEQ proposed to add this sentence to replace the first sentence of paragraph (f) of 40 CFR 1502.14 (2020), which required agencies

to limit their consideration to a reasonable number of alternatives. CEQ proposed this language for consistency with longstanding CEQ guidance [85] and to reinforce that the alternatives analysis is not boundless; the key is to provide the decision maker with reasonable options to ensure informed decision making. CEQ did not receive specific comments on this proposed change and adds the proposed new sentence to § 1502.14(a).

CEQ also proposed a second new sentence in paragraph (a) to clarify that agencies have the discretion to consider reasonable alternatives not within their jurisdiction, but NEPA and the CEQ regulations generally do not require them to do so. CEQ explained that such alternatives may be relevant, for instance, when agencies are considering program-level decisions [86] or anticipate funding for a project not yet authorized by Congress.[87]

Several commenters opposed this proposal, asserting that if an agency has no authority to implement an alternative, it is unreasonable, and the agency should not consider it. One commenter stated that NEPA is a procedural statute that does not confer substantive authority; as such, NEPA cannot authorize an agency to pursue an action that is otherwise not authorized. Some commenters characterized consideration of alternatives outside the agency's jurisdiction as inefficient and a waste of agency resources. Others expressed that allowing consideration of such alternatives would be contrary to law, and the alternatives would not be consistent with the purpose and need of the proposal. Multiple commenters stated that *Public Citizen* supports the proposition that an agency's NEPA analysis is properly limited by the scope of the agency's authority and that, as such, CEQ's proposed language is in tension with this ruling as well as other case law. However, other commenters stated the opposite—that case law has well established that agencies may and in some cases must consider alternatives beyond the agency's jurisdiction.

CEQ adds this second new sentence to the end of § 1502.14(a) in the final rule to acknowledge that in limited situations, it may be appropriate for an agency to consider an alternative outside its jurisdiction. As noted in the proposed rule, CEQ anticipates that such consideration will occur relatively infrequently and notes that such alternatives would still need to be technically and economically feasible and meet the purpose and need for the proposed action, consistent with the definition of "reasonable alternatives." CEQ's revision is intended to strike a balance; the final rule does not require agencies to consider alternatives outside their jurisdiction or preclude agencies from doing so. Further, the final rule retains the qualification that the agency need only consider reasonable alternatives.

Some commenters requested CEQ revise § 1502.14(a) to expressly comply with the statutory direction that alternatives must be technically and economically feasible and must meet the purpose and need of the proposal. 42 U.S.C. 4332(2)(C)(iii). The commenters stated the alternatives that do not meet those criteria are not consistent with the statute. CEQ declines to add additional language in § 1502.14(a) because the definition of "reasonable alternatives" already includes the requirement that an alternative be technically and economically feasible and meet the purpose and need. CEQ addresses additional comments on the definition of "reasonable alternatives" in section II.J.22.

Sixth, as noted earlier in this section, CEQ proposed to strike the requirement to limit consideration to a reasonable number of alternatives from paragraph (f) and to add a sentence to paragraph (a) directing agencies to consider a reasonable range of alternatives that fosters informed decision making. CEQ proposed to repurpose paragraph (f) to establish a requirement to identify the environmentally preferable alternative. In addition to proposing a new definition of "environmentally preferable alternative" in § 1508.1(*l*), CEQ proposed in this provision to describe elements that the environmentally preferable alternative may generally include. CEQ proposed to use "or" in the list to make clear that the environmentally preferable alternative need not include each delineated element and recognize that identifying the environmentally preferable alternative may entail making trade-offs in some cases. CEQ explained that it proposed this approach to provide agencies flexibility to rely on

[85] *See* CEQ, Forty Questions, *supra* note 5.

[86] *See, e.g.,* Fed. R.R. Admin., Final Program Environmental Impact Report/Environmental Impact Statement (EIR/EIS) for the proposed California High-Speed Train System (2005), *https:// hsr.ca.gov/programs/environmental-planning/ program-eir-eis-documents-for-the-statewide-high-speed-rail-system-tier-1/final-program-environmental-impact-report-environmental-impact-statement-eir-eis-for-the-proposed-california-high-speed-train-system-2005/.*

[87] *See, e.g.,* U.S. Army Corps of Eng'rs, *Final Environmental Impact Statement for Savannah Harbor Expansion Project* (rev. July 2012), *https:// www.sas.usace.army.mil/Missions/Civil-Works/ Savannah-Harbor-Expansion/Final-Environmental-Impact-Statement/.*

AR_0028823

their discretion and expertise to strike an appropriate balance in identifying the environmentally preferable alternative. Finally, CEQ proposed to clarify in paragraph (f) that the environmentally preferable alternative may be the proposed action, the no action alternative, or a reasonable alternative and that agencies may identify more than one environmentally preferable alternative as they deem appropriate.

Two commenters opposed the removal of "limit their consideration to a reasonable number of alternatives" in paragraph (f), asserting the statement is consistent with long-standing CEQ guidance and case law. The commenter further opined that the proposed paragraph (f) unnecessarily and inexplicably creates an open question regarding the number of alternatives an agency must consider and is likely to result in delays and increase litigation risk. One commenter stated that while they recognize that proposed paragraph (a) states that an agency does not need to consider every conceivable alternative, they asserted that it is helpful and consistent with judicial precedent to describe what constitutes a "reasonable number." Another commenter asserted that removal of this language could lead agencies to develop more alternatives than are reasonable or necessary under NEPA.

CEQ declines to retain the statement that agencies must limit their consideration to a reasonable number of alternatives because CEQ considers the new sentence in paragraph (a) to provide clearer direction to agencies that they should consider a reasonable range of alternatives that foster informed decision making. Agencies have long had discretion to identify that range, and CEQ encourages agencies to identify and consider an appropriate range and explain why it considered and dismissed other alternatives so that agency decision makers and the public have a clear understanding as to how the agency arrived at the alternatives it considered in the document. While CEQ considers the new sentence in paragraph (a) to be clearer than the sentence previously included in paragraph (f), it does not interpret the new sentence to require agencies to consider a greater number of alternatives and does not intend for agencies to do so.

Multiple commenters supported proposed § 1502.14(f), while other commenters opposed it. Those who supported identification of the environmentally preferable alternative in the EIS expressed that earlier identification will provide more transparency to the public and allow the public an opportunity to comment on it. Some commenters also specifically supported the inclusion of addressing climate-change related effects and disproportionate and adverse effects on communities with environmental justice concerns in the examples of an environmentally preferable alternative.

Commenters who opposed the proposed language expressed concern that the concept of an environmentally preferable alternative would create new complexity and risk for litigation. They expressed that the identification of such an alternative is inherently subjective and would result in unnecessarily broad and time-consuming environmental reviews not supported by the statute. One commenter contended that the proposed new requirement inappropriately introduces political doctrine into the rule. One commenter suggested that if CEQ retains the requirement to identify the environmentally preferable alternative in the EIS, that the final rule should be less prescriptive about the attributes of the environmentally preferable alternative.

CEQ adds the requirement to identify the environmentally preferable alternative or alternatives in the EIS in § 1502.14(f), and adds a clause to clarify that the agency must identify the environmentally preferable alternative from amongst the alternatives considered in the EIS. CEQ adds this clarification to address a misunderstanding by some of the commenters that the environmentally preferable alternative or alternatives that § 1502.14(f) requires agencies to identify is an additional alternative to the proposed action, no action, and reasonable alternatives that the agency would otherwise consider in an EIS. Rather, this provision requires agencies to identify which alternative amongst the proposed action, no action, and reasonable alternatives is the environmentally preferable alternative.

CEQ disagrees that requiring agencies to identify the environmentally preferable alternative in the EIS requires an inherently subjective determination, would result in unnecessarily broad and time-consuming environmental reviews, or introduces political doctrine. As CEQ noted in the proposed rule, the regulations have always required agencies to identify the environmentally preferable alternative in a ROD. 40 CFR 1505.2 (2019) and 40 CFR 1505.2 (2020). Agencies, therefore, have decades of experience with identifying the environmentally preferable alternative.

Moreover, CEQ views this information as helpful for decision makers and the public. Requiring agencies to identify the environmentally preferable alternative in the draft EIS will enable public comment on this determination, which can include comment on whether the agency has adequately explained its conclusion or whether the determination is overly subjective. This new provision provides additional guidance on what this alternative entails, improving consistency and furthering NEPA's goal of ensuring that agencies make informed decisions regarding actions that impact the environment. Additionally, requiring the draft and final EIS to identify the environmentally preferable alternative will increase the transparency of the agency's decision-making process at an earlier stage, as well as provide an opportunity for the public to comment on the environmentally preferable alternative before the agency makes its decision.

CEQ disagrees that merely requiring agencies to identify which alternative or alternatives are environmentally preferable in the EIS, rather than only in the ROD, will increase litigation. The requirement in the final rule shifts the timing of identifying the environmentally preferred alternative or alternatives, but commenters have not explained why requiring agencies to make this identification earlier in the decision-making process would increase litigation risk, and CEQ does not view this shift as materially affecting litigation risk, since claims alleging a violation of NEPA must be brought after an agency issues a ROD. *See, e.g., Oregon Nat. Res. Council* v. *Harrell,* 52 F.3d 1499, 1504 (9th Cir. 1995). CEQ also notes the regulations do not require agencies to select the environmentally preferable alternative, just as the long-standing requirement for agencies to identify the environmentally preferable alternative in a ROD did not. Rather, identifying the environmentally preferable alternative will increase transparency and allow the public to comment on it.

Some commenters expressed that, overall, the proposed changes to § 1502.14 expand the alternatives analysis and could interfere with agencies' ability to meet the page and time limits. CEQ disagrees with the commenters' assertions because the revised regulations clarify, rather than expand, the requirements for alternatives analysis.

While CEQ did not propose edits to § 1502.14(b), one commenter requested that CEQ restore the 1978 language to ensure agencies devote substantial treatment to each alternative they considered in detail. The 2020 rule removed the substantial treatment

language and replaced it with the requirement to discuss each alternative. The commenter asserted that CEQ should restore this language because restoring direction to rigorously explore and objectively evaluate reasonable alternatives would ensure agencies take a hard look at their proposed action. CEQ declines to add this language. The language that CEQ adds to paragraph (a), requiring agencies to rigorously explore and objectively evaluate alternatives to foster informed decision making, addresses this concern and provides agencies sufficient direction to take a hard look at their proposed actions and alternatives.

### 14. Affected Environment (§ 1502.15)

CEQ proposed revisions to § 1502.15 to emphasize the use of high-quality information; clarify considerations of reasonably foreseeable environmental trends; and emphasize efficiency and concise documents. CEQ also proposed to divide § 1502.15 into separate lettered paragraphs.

First, CEQ proposed to move the first sentence of 40 CFR 1502.15 (2020) into paragraph (a) of § 1502.15 but did not propose any changes to the text. One commenter suggested changes to proposed paragraph (a) to more clearly describe that the affected environment must be a clear, unambiguous base case against which the agency can compare all effects equally and noted a particular example in which, the commenter asserted, confusion about this point had resulted in distorted analyses for a category of actions that did not provide the agency decision maker and the public an appropriate comparison of the proposed actions, no action alternatives, and reasonable alternatives. In the final rule, CEQ deletes "or created" in the first sentence because areas created by the proposed action or alternatives would constitute reasonably foreseeable effects, and are not part of the affected environment. CEQ notes, however, that the affected environment cannot be frozen in time and therefore must examine reasonably foreseeable environmental trends in the affected areas.

Second, CEQ proposed to add new paragraph (b) to encourages agencies to use high-quality information, including best available science and data—in recognition that high-quality information should inform all agency decisions—to describe reasonably foreseeable environmental trends. CEQ also proposed to note explicitly that such trends include anticipated climate-related changes to the environment and that agencies should provide relevant information, consistent with § 1502.21,

when such information is lacking. CEQ proposed this paragraph to articulate clearly NEPA's statutory mandate that science inform agencies' decisions as part of a systematic, interdisciplinary approach. *See* 42 U.S.C. 4332(2)(A).

In the second sentence of paragraph (b), CEQ proposed to encourage agencies to use the description of baseline environmental conditions and reasonably foreseeable trends to inform its analysis of environmental consequences and mitigation measures by connecting the description of the affected environment with the agency's analysis of effects and mitigation. CEQ proposed this language to clarify that agencies should consider reasonably foreseeable future changes to the environment, including changes of climate conditions on affected areas, rather than merely describing environmental trends or climate change trends at the global or national level. When describing the proposed changes to paragraph (b) in the proposed rule, CEQ noted that, in line with scientific projections, accurate baseline assessment of the affected environment over an action's lifetime should incorporate forward-looking climate projections rather than relying on historical data alone.

A few commenters opposed proposed § 1502.15(b), with some commenters particularly taking issue with the singling out of climate change. A few commenters requested that the final rule require agencies to use high-quality information, with some further requesting that the regulations define high-quality information. One commenter expressed that it will be nearly impossible to use best available science, and another requested that Indigenous Knowledge be included as a source of high-quality information.

CEQ adds proposed § 1502.15(b) in the final rule with a few modifications. In the first sentence, CEQ changes "should" to "shall" before "use high-quality information" for consistency with § 1506.6 (proposed as § 1502.23) and modifies the clause providing examples of high-quality information for consistency with the changes to the examples CEQ makes in § 1506.6, as discussed in section II.H.4. The final rule includes "reliable data and resources, models, and Indigenous Knowledge" as examples of high-quality information in lieu of the proposed phrase "including the best available science and data." As noted in section II.H.4, this change incorporates the language of section 102(2)(E) of NEPA and is consistent with section 102(2)(D) of NEPA. 42 U.S.C. 4332(2)(D)–(E). Peer-reviewed studies and models are

examples of reliable data and resources.[88] The final rule also replaces "lacking" with "incomplete or unavailable" for consistency with the language of § 1502.21, which the sentence cross-references. CEQ declines to remove the example of climate change from this sentence. Because climate change has implications for numerous categories of effects—from species to water to air quality—it is a particularly important environmental trend for agencies to consider in addressing the affected environment.[89] *See* 42 U.S.C. 4321, 4331, 4332(2)(C)(iv). Lastly, CEQ includes the third proposed sentence in the final rule but uses "affected environment" instead of "baseline" and describes existing "environmental conditions, reasonably foreseeable trends, and planned actions in the area" as examples of the affected environmental that should inform the agency's analysis of environmental consequences and mitigation measures.

Third, CEQ proposed to move the second through fourth sentences of 40 CFR 1502.15 (2020) to new paragraph (c) and revise the second sentence to divide it into two sentences to enhance readability. In the first sentence of paragraph (c), CEQ proposed minor revisions to clarify that agencies may combine the affected environment and environmental consequences sections in an EIS. In the second sentence, CEQ proposed to clarify that the description "should," rather than "shall," be no longer than necessary to understand the "relevant affected environment" and the effects of the alternatives.

One commenter disagreed with allowing agencies to combine the affected environment and environmental consequences sections of the EIS. The commenter asserted that agencies should discuss the two issues separately so that it is clear in the EIS how much attention is paid to each section and in order to "force the agency to present actual" effects in the EIS. The commenter asserted that agencies will provide more material on the affected environment instead of describing effects.

CEQ makes the change as proposed in § 1502.15(c) of the final rule. The final rule allows but does not require

---

[88] *See, e.g.,* OMB, Guidelines for Ensuring and Maximizing the Quality, Objectivity, Utility, and Integrity of Information Disseminated by Federal Agencies, 67 FR 8452 (Feb. 22, 2002); OMB, Final Information Quality Bulletin for Peer Review, 70 FR 2664 (Jan. 14, 2005); and OMB, M–19–15, Improving Implementation of the Information Quality Act (2019), *https://www.whitehouse.gov/wp-content/uploads/2019/04/M-19-15.pdf*.

[89] *See, e.g.,* U.S. Glob. Change Rsch. Program, Fifth National Climate Assessment (2023), *https://nca2023.globalchange.gov*.

**35506**    **Federal Register** / Vol. 89, No. 85 / Wednesday, May 1, 2024 / Rules and Regulations

agencies to combine the description of the affected environment with the analysis of environmental consequences. CEQ added this provision in the 2020 regulations to promote more efficient documents, and CEQ encourages agencies to reduce redundancy in their documents and provide clear and concise but thorough descriptions in the EIS. CEQ disagrees that allowing agencies to combine these discussions also allows them to give more weight to one section or the other. Agencies must thoroughly discuss both the affected environment and the environmental consequences of their proposed actions and alternatives to meet the requirements of both §§ 1502.15 and 1502.16.

15. Environmental Consequences (§ 1502.16)

CEQ proposed several changes to § 1502.16 to clarify the role of this section and methods of analysis and make updates to ensure that agencies integrate climate change and environmental justice considerations into the analysis of environmental effects. First, CEQ proposed to add "reasonably foreseeable" in proposed paragraph (a)(1) before "environmental effects" for consistency with section 102(2)(C)(i) of NEPA and in proposed paragraph (a)(2) before "adverse environmental effects" for consistency with section 102(2)(C)(ii) of NEPA. 42 U.S.C. 4332(2)(C)(i)–(ii). In the final rule, CEQ reorganizes § 1502.16 to integrate proposed paragraph (a)(1) into § 1502.16(a), as discussed further in this section, and adds the reference to "reasonably foreseeable" effects in paragraph (a) to make clear that agencies must discuss the environmental consequences described in paragraphs (a)(1) through (a)(13) when they are reasonably foreseeable effects of the proposed action or alternatives. Therefore, CEQ omits further references to "reasonably foreseeable" in paragraphs (a)(1) through (a)(13) to avoid duplication. The recent amendments to NEPA codified the longstanding principle from the 1978 regulations and recognized by the courts that effects must be reasonably foreseeable. CEQ also notes that the definition of "effects" in § 1508.1(i) incorporates "reasonably foreseeable" into the definition such that the term "effects" incorporates the reasonably foreseeable standard each time it is used in this section and throughout the regulations.

Second, in proposed paragraph (a)(1), CEQ proposed to modify the second sentence, requiring agencies to base the comparison of the proposed action and

reasonable alternatives on the discussion of effects, to add a clause at the end: "focusing on the significant or important effects." CEQ proposed this change to emphasize that agencies' analyses of effects should be proportional to the significance or importance of the effects. CEQ did not receive specific comments on this proposal, and CEQ makes this change in the final rule in paragraph (a), into which CEQ integrates proposed paragraph (a)(1) as discussed further in this section. CEQ includes the word "important" in addition to "significant" because even if an agency does not identify which effects rise to the level of significance, it should still focus on the effects that are important for the agency decision maker to be aware of and consider. Consistent with this provision, agencies should generally identify the effects they deem significant to inform the public and decision makers.

While CEQ did not propose any substantive changes to paragraph (a), a few commenters suggested changes. One commenter expressed that even though paragraph (a) specifies that the environmental consequences discussion should not duplicate discussions from § 1502.14, it is confusing and unnecessary for the regulations to essentially require the same information in both sections. Another commenter requested that CEQ add qualifying language, "as relevant or appropriate" to the last sentence of paragraph (a) stating that "[t]he discussion shall include." The commenter asserted this language would help improve efficiency by providing lead agencies flexibility to tailor the EIS to the specifics of the action.

CEQ agrees with the commenter that the language in paragraph (a) could be confusing. To enhance clarity, the final rule integrates proposed paragraph (a)(1) into § 1502.16(a) and combines the first two sentences of proposed paragraph (a)(1), to require that the comparison of the proposed action and alternatives "be based on their reasonably foreseeable effects and the significance of those effects" and that this discussion focus on the significant and important effects. The final rule also consolidates the last two sentences of proposed paragraph (a) to state that the environmental consequences section should not duplicate discussions "required by" § 1502.14, which CEQ revises to address the commenter's confusion about this text, and must include "an analysis of" the issues discussed in the subparagraphs to paragraph (a).

CEQ declines to add the qualifier "as relevant or appropriate" to the last sentence, because some of the items in

the list are always required. For paragraphs (a)(5) through (a)(10) and (a)(13), which are only required when they are reasonably foreseeable, the final rule adds the qualifier "where applicable"—in some cases replacing the word "any," as used in the proposed rule—to make clear that an EIS need only include the specific topics where those effects are reasonably foreseeable. Where the effects that relate to a particular topic in the list exist but are not significant or important, the EIS can briefly describe the effect and explain why the agency has reached the conclusion that it is not significant or important.

Third, CEQ proposed to add a new sentence to the end of proposed paragraph (a)(1) clarifying the proper role of the no action alternative to ensure that agencies do not distort the comparative analysis by selecting a different alternative (for example, the preferred alternative) as the baseline against which the agency assesses all other alternatives. CEQ also invited comment on whether it should include additional direction or guidance regarding the no action alternative in the final rule.

One commenter requested that the regulations clarify the proper role of the no action alternative and disagreed with the direction included in the proposed rule. The commenter asserted that establishing a no action alternative as the baseline against which alternatives are compared, rather than establishing the proposed action as the baseline, favors the no action alternative over the proposed action and is contrary to NEPA's goals of informing rather than driving decisions. CEQ disagrees with the commenter's position as agencies have long used the no action alternative as the baseline from which to assess the proposed action and alternatives,[90] and this approach is consistent with the requirement of section 102(2)(C)(i)–(ii) of NEPA that an EIS include the reasonably foreseeable environmental effects of the proposed agency action. 42 U.S.C. 4332(2)(C)(i)–(ii). The no action alternative is a particularly useful comparison for the effects of the proposed action, and the CEQ

---

[90] *See* CEQ, *Forty Questions, supra* note 5, Question 3, "No Action Alternative" (stating that the no action alternative "provides a benchmark, enabling decisionmakers to compare the magnitude of environmental effects of the action alternatives."); *see also Ctr. for Biological Diversity* v. *United States DOI,* 72 F.4th 1166, 1185 (10th Cir. 2023) ("'In general, NEPA analysis uses a no-action alternative as a baseline for measuring the effects of the proposed action.'" (quoting *Biodiversity Conservation All.* v. *U.S. Forest Serv.,* 765 F.3d 1264, 1269 (10th Cir. 2014)).

regulations require agencies to compare effects across alternatives.

Multiple commenters requested guidance on how to evaluate the no action alternative in circumstances in which the Federal action does not dictate whether the underlying project will occur. CEQ declines to add additional specifications to the regulations but will consider whether additional guidance on this topic will help agencies carry out their NEPA responsibilities. CEQ notes that agencies have decades of experience with this issue even prior to the addition of this provision into NEPA and the CEQ regulations.

One commenter requested CEQ revise the language to make it clear that the no action alternative is focused on the environmental consequences of not issuing the approval rather than on the proposed facility not being built or the proposed physical action not occurring. CEQ declines to add this specific additional language to the regulations as the consideration of the no action alternative is specific to the agency's authority and the scope of the NEPA review.

One commenter stated CEQ should provide additional guidance to ensure that Federal agencies fully disclose the environmental implications of the no action alternative. Another commenter requested CEQ provide additional guidance encouraging agencies to select the no action alternative, when appropriate. Relatedly, another commenter stated that the no action alternative should be more than a baseline for comparison; it should also be an alternative that the agency can select even if it does not meet the applicant's or project's purpose and need. CEQ agrees that in many cases, the no action alternative is among the alternatives that the agency may select, and that doing so is consistent with the regulations and long-standing agency practice, but this is a fact-specific inquiry based on the agency's authority. CEQ will consider this and the other recommended topics when developing guidance.

One commenter requested the regulations include a new section on the no action alternative instead of including it in § 1502.16. Another commenter requested the regulations include a definition of "no action alternative" and requested clarification that agencies should analyze more than one action alternative and therefore must include more than just the no action alternative and one action alternative. CEQ declines to add a separate section on or define the phrase "no action alternative." CEQ includes

the proposed language in the final rule, as the fourth sentence of paragraph (a), to provide additional context for the longstanding requirement in § 1502.14 to assess the no action alternative and for consistency with section 102(2)(C)(iii) of NEPA and longstanding agency practice. 42 U.S.C. 4332(2)(C)(iii).

Fourth, CEQ proposed to add a new paragraph (a)(3), requiring an analysis of the effects of the no action alternative, including any adverse environmental effects. CEQ proposed this change for consistency with section 102(2)(C)(iii) of NEPA, which requires "an analysis of any negative environmental impacts of not implementing the proposed action in the case of a no action alternative." 42 U.S.C. 4332(2)(C)(iii).

One commenter suggested that the phrase "including any adverse effects" does not conform with section 102(2)(C)(iii) of NEPA. CEQ disagrees with the commenter's characterization. The difference in phrasing between proposed paragraph (a)(3) and section 102(2)(C)(iii) is because paragraph (a)(3) addresses what needs to be contained in the discussion of environmental consequences, while section 102(2)(C)(iii) of NEPA addresses the range of alternatives. 42 U.S.C. 4332(2)(C)(iii). Multiple commenters were generally supportive of the requirement to analyze the adverse effects of the no action alternative.

CEQ adds proposed paragraph (a)(3) in the final rule at § 1502.16(a)(2). As CEQ noted in the proposed rule, CEQ interprets "negative" to have the same meaning as the term "adverse." For example, an environmental restoration project that helps mitigate the effects of climate change and restores habitat could have adverse effects if it were not implemented or the construction of a commuter transit line could have adverse effects from persistent traffic congestion, air pollution, and related effects to local communities if it were not implemented.

Fifth, to accommodate proposed new paragraph (a)(3), CEQ proposed to redesignate paragraphs (a)(3) through (a)(5) of 40 CFR 1502.16 (2020) as paragraphs (a)(4) through (a)(6), respectively. CEQ did not receive any comments on this proposed reorganization. However, because the final rule integrates proposed paragraph (a)(1) into paragraph (a), the final rule does not redesignate these paragraphs.

Sixth, in proposed paragraph (a)(5), CEQ proposed to insert "Federal" before "resources" for consistency with section 102(2)(C)(v) of NEPA. 42 U.S.C. 4332(2)(C)(v). One commenter asserted that the proposed insertion of "Federal"

ignores analysis and reporting of potentially significant resources committed by other entities. CEQ adds the word "Federal" to the final rule in § 1502.16(a)(4) because Congress added it to the corresponding phrase in the statute. Another commenter suggested CEQ revise this paragraph to encompass resources held in trust. CEQ declines to make this addition, as CEQ interprets the phrase "Federal resources" to plainly mean resources owned by the Federal Government or held in trust for Tribal Nations.

Seventh, CEQ proposed to add references to two specific elements that agencies must include in the analysis of environmental consequences and revise the reference to another element, all related to climate change. CEQ proposed to revise proposed paragraph (a)(6), addressing possible conflicts between the proposed action and the objectives of Federal, regional, State, Tribal and local land use plans, policies, and controls for the area concerned. CEQ proposed to broaden "land use plans" to "plans" generally and to add an example that clarifies that these plans, policies, and controls include those addressing climate change.

Eighth, CEQ proposed to add a new paragraph (a)(6) to clarify that the discussion of environmental consequences in an EIS must include any reasonably foreseeable climate change-related effects, including effects of climate change on the proposed action and alternatives (which may in turn alter the effects of the proposed action and alternatives).

Ninth, CEQ proposed to add a new paragraph (a)(9) to require agencies to address any risk reduction, resiliency, or adaptation measures included in the proposed action and alternatives. CEQ proposed this addition to ensure that agencies consider resiliency to the risks associated with a changing climate, including wildfires, extreme heat and other extreme weather events, drought, flood risk, loss of historic and cultural resources, and food scarcity. CEQ noted in the proposed rule that these analyses further NEPA's mandate that agencies use "the environmental design arts" in decision making and consider the relationship between the "uses" of the environment "and the maintenance and enhancement of long-term productivity." 42 U.S.C. 4332(2)(A), 4332(2)(C)(iv). CEQ also noted that the proposed change helps achieve NEPA's goals of protecting the environment across generations, preserving important cultural and other resources, and attaining "the widest range of beneficial uses of the environment without degradation, risk to health or safety, or

**35508**    **Federal Register** / Vol. 89, No. 85 / Wednesday, May 1, 2024 / Rules and Regulations

other undesirable and unintended consequences." 42 U.S.C. 4331(b)(3).

Multiple commenters expressed support generally for both proposed paragraphs (a)(6) and (a)(7), asserting that it is necessary to emphasize climate change. On the other hand, one commenter opposed proposed paragraphs (a)(6) and (a)(7) and asserted that they are based on political doctrine rather than scientific and technical analyses. CEQ disagrees with the commenter's assertion and notes that the inclusion of climate change in proposed paragraphs (a)(6) and (a)(7) is consistent with section 102(2)(C)(i) of NEPA, 42 U.S.C. 4332(2)(C)(i), which requires agencies to address "reasonably foreseeable environmental effects of the proposed agency action;" with section 102(2)(I) of NEPA, 42 U.S.C. 4332(I), which requires Federal agencies to "recognize the worldwide and long-range character of environmental problems;" and with a large volume of case law invalidating NEPA analyses that failed to adequately consider reasonably foreseeable effects related to climate change. *See e.g., Vecinos para el Bienestar de la Comunidad Costera* v. *FERC,* 6 F.4th 1321 (D.C. Cir. 2021) (holding NEPA analysis for pipeline and liquified natural gas port deficient due to inadequate climate change analysis); *WildEarth Guardians* v. *Zinke,* 368 F.3d 41 (D.C. Cir. 2019) (invalidating oil and gas leases for failure to consider downstream greenhouse gas emissions during the NEPA process); and *WildEarth Guardians* v. *BLM,* 870 F.3d 1222 (10th Cir. 2017) (holding that EIS and ROD for four coal leases were arbitrary and capricious because they failed to adequately consider climate change).

With respect to proposed paragraph (a)(6), a couple of commenters asserted the regulations should not direct agencies to discuss a proposed action's relationship with governmental plans related to climate change. The commenters urged CEQ to exclude the language "those addressing climate change" from the final rule or recommended the regulations clarify that NEPA does not require agencies to attempt to resolve these conflicts. Another commenter opined that the proposal to remove "land use plans" and instead include plans addressing climate change threatens to lead to speculative analyses. Further, the commenter asserted that the regulations do not explain how agencies should analyze multi-State projects or determine how a particular project conflicts with a State- or region-wide plan or emissions target.

In the final rule, CEQ removes "land use" and adds the example of plans that address climate change in the final rule at § 1502.16(a)(5). CEQ notes that the reference to climate change plans is only an example, but also that the example is consistent with the 2023 GHG guidance, which identifies climate change plans as having the potential to assist agencies in their analysis of reasonably foreseeable GHG emissions. CEQ also notes that nothing in this provision or any other provision of the NEPA regulations has ever required agencies to resolve conflicts; it merely requires agencies to discuss any possible conflicts. With respect to multi-State projects, CEQ does not consider it appropriate to modify this provision to address a specific type of project. However, CEQ is unaware of agency confusion regarding how to address multi-State projects. CEQ will consider whether additional guidance is needed in the future. CEQ retains the term "policies" to promote inclusive consideration of positions taken by regional, State, Tribal and local government entities, noting that policies are formally adopted by those entities while preferences or positions generally are not formally adopted.

Multiple commenters specifically opposed proposed paragraph (a)(7) and the singling out of reasonably foreseeable climate change-related effects in the regulations. One commenter stated that the integration of one specific category of potential environmental effects is a notable break from NEPA precedent and historic practice, which emphasizes that NEPA is neutral towards the type of resource concern and the type of potential environmental effect. CEQ disagrees with the assertion that identifying a category of effects is unprecedented and notes that this provision has always referenced certain types of effects, including effects related to energy, natural and depletable resources, and historic and cultural resources.

A commenter asserted that the references to climate change-related effects in proposed paragraph (a)(7) and other provisions of the regulations inconsistently refer to NEPA's reasonable foreseeability limitation and otherwise ignore the fundamental principle of causation. A few other commenters also raised the issue of causation, arguing that NEPA only requires an agency to consider effects that have a sufficiently close causal connection to the proposed action and stating that the proposed rule, and specifically proposed paragraph (a)(7), diverges from this principle by requiring analysis of any reasonably foreseeable

climate-change related effects of the proposed action. One commenter asserted CEQ is rewriting the standard that requires an agency to consider effects that have a sufficiently close causal relationship to the proposed action. They also asserted proposed paragraph (a)(7) could require an agency to discuss effects that are remote and speculative because it does not require the ability to demonstrate a direct causal chain between a project and climate change or how a specific project's greenhouse gas emissions would lead to actual environmental effects in that specific location.

Another commenter asserted that proposed paragraph (a)(7) places unnecessary emphasis on climate change when there are many other effects on the environment that may occur due to a proposed action. A separate commenter asserted the proposed paragraph conflicts with the flexibility provided in CEQ's Interim Greenhouse Gas Guidance, which explains that agencies have the flexibility to discuss climate change and any other environmental issues to the extent the information will or will not be useful to the decision-making process and the public consistent with the "rule of reason." Another commenter stated proposed paragraph (a)(7) is inconsistent with NEPA and would be impractical, resulting in lengthy reviews for projects without climate consequences.

CEQ disagrees with these commenters' assertions and includes proposed paragraph (a)(7) at § 1502.16(a)(6) in the final rule. CEQ adds the phrase "where feasible, quantification of greenhouse gas emissions from the proposed action and alternatives and" before "the effects of climate change on the proposed action and alternatives." This provision incorporates into the final rule one of the recommendations of CEQ's 2023 GHG guidance.[91] CEQ includes this provision in response to comments that CEQ received in response to CEQ's request for comment on potentially codifying elements of the Guidance in the rule. *See* section II.D.1.[92] CEQ agrees with the comments discussed in section II.D.1 that contend that requiring agencies to quantify greenhouse gas emissions, where feasible, will increase the clarity of the regulations and is consistent with case law. *See, e.g., Food & Water Watch* v. *FERC,* 28 F.4th 277, 289 (D.C. Cir. 2022) (remanding to the agency to prepare a supplemental EA

[91] *See* CEQ, 2023 GHG Guidance, *supra* note 10.
[92] *See* CEQ, Phase 2 proposed rule, *supra* note 51, at 49945.

"in which it must either quantify and consider the project's downstream carbon emissions or explain in more detail why it cannot do so''); *Sierra Club* v. *FERC*, 867 F.3d 1357, 1375 (D.C. Cir. 2017) (holding that the agency "must either quantify and consider the project's downstream carbon emissions or explain in more detail why it cannot do so''); *WildEarth Guardians* v. *Zinke*, 368 F.Supp.3d 41, 68 (D.D.C. 2019) (BLM's failure to quantify greenhouse gas emissions that were reasonably foreseeable effects of oil and gas development during the leasing and development process was arbitrary and capricious). As such, CEQ disagrees with the commenters' assertions that the rule requires agencies to go beyond what case law generally already requires them to consider under NEPA. Moreover, as CEQ indicates earlier in this section and makes clearer with its edits to paragraph (a) in the final rule, this paragraph indicates that agencies must analyze climate-related effects that meet the definition of "effects"—that is, are reasonably foreseeable—and includes the qualifier "where applicable" to acknowledge that not all actions will have climate-related effects that require analysis in the EIS.

A few commenters opposed the addition of proposed paragraphs (a)(7) and (a)(10), stating that taken together, the proposed changes expand the scope of NEPA effects and alternatives analyses relative to discrete projects and authorizations and will result in agencies relying on unsubstantiated projections on a project's potential to impact climate change locally or globally.

Other commenters opposed proposed paragraph (a)(10) for various reasons. One commenter asserted risk reduction, resiliency, or adaptation measures are best addressed through planning and programming, asset management, and emergency response that occurs programmatically prior to NEPA review and in final design that occurs after the NEPA review, instead of as part of the project-specific review. Similarly, another commenter stated requiring an EIS to incorporate these measures into the proposed action or alternatives will be costly if completed during the NEPA process and should be done earlier, such as during long-range planning processes that occur prior to NEPA. CEQ notes that if an agency engages in long-range planning processes, the agency may incorporate by reference any analyses that are completed programmatically prior to the NEPA review for a specific action. With respect to final design, agencies may discuss such measures generally in the

EIS. Further, agencies have decades of experience analyzing proposed actions before final design, and agencies can do so similarly for risk reduction, resiliency, or adaptation measures.

Another commenter asserted that the term "relevant" is subjective and suggested that CEQ define it to include peer-reviewed science and data made available by independent sources. CEQ declines to add this specificity in the final rule and leaves it to agency judgment to identify what is relevant for a particular proposed action.

One commenter supported proposed paragraph (a)(10) but requested the regulations clarify that the language does not require an agency to gather new data, consistent with NEPA. Another commenter also supported the proposal, but suggested that CEQ remove the mandate to use accurate and up-to-date information from proposed § 1502.21. CEQ considers it important to specifically reference science and data on the affected environment and expected future conditions in this paragraph because they are essential to determine what resiliency and adaptation measures are relevant. CEQ declines to specify that agencies do not need to gather new data as this is addressed in § 1502.21, regarding incomplete or unavailable information as well, as § 1506.6, regarding methodology and scientific accuracy. Therefore, CEQ adds proposed paragraph (a)(10) at § 1502.16(a)(9) in the final rule.

In the final rule, CEQ revises § 1502.16(a)(5) and adds § 1502.16(a)(6) and (a)(9) to clarify that agencies must address both the effects of the proposed action and alternatives on climate change, and the resiliency of the proposed action and alternatives in light of climate change.[93] These revisions are consistent with what NEPA has long required: using science to make decisions informed by an understanding of the effects of the proposed action and of its alternatives. In particular, understanding how climate change will affect the proposed action and the various alternatives to that action is necessary to understanding what constitutes "a reasonable range of alternatives" and which alternatives are "technically and economically feasible"

and "appropriate," *see* 42 U.S.C. 4332(2)(C)(iii), (F), (H). Moreover, the effects that climate change will have on the proposed action and its alternatives may in turn alter the effects that the action has on the environment. For example, an increase in extreme weather events may affect the amount of stream sedimentation that results from a new road or the risk that an industrial facility will experience a catastrophic release. Therefore, considering the effects of climate change on the action and its alternatives is necessary to understand the "reasonably foreseeable environmental effects" of the proposed action and its alternatives, 42 U.S.C. 4332(2)(C)(i). These revisions also align with the definition of "effects" to encompass reasonably foreseeable indirect and cumulative effects, which are integral to NEPA analyses.

Tenth, to accommodate the newly proposed paragraphs (a)(7) and (a)(10), CEQ proposed to redesignate paragraphs (a)(6) and (a)(7) of 40 CFR 1502.16 (2020) as paragraphs (a)(8) and (a)(9), respectively. In the final rule, CEQ redesignates these paragraphs as § 1502.16(a)(7) and (a)(8). CEQ also proposed to redesignate paragraphs (a)(8) through (a)(10) of 40 CFR 1502.16 (2020) as paragraphs (a)(11) through (a)(13), respectively. In the final rule, CEQ redesignates these paragraphs as § 1502.16(a)(10) through (a)(12).

Eleventh, CEQ proposed to add a new paragraph (a)(14) to require agencies to discuss any potential for disproportionate and adverse health and environmental effects on communities with environmental justice concerns, consistent with sections 101, 102(2)(A), 102(2)(C)(i), and 102(2)(I) of NEPA. *See* 42 U.S.C. 4331, 4332(2)(A), 4332(2)(C)(i), 4332(2)(I). CEQ proposed this paragraph to clarify that EISs generally must include an environmental justice analysis to ensure that decision makers consider disproportionate and adverse effects on these communities.

A few commenters expressed general support for proposed paragraph (a)(14), with some stating that the inclusion of disproportionate effects on communities with environmental justice concerns is long overdue. Some of these supportive commenters requested CEQ provide additional clarity in the regulations or through guidance on what constitutes a robust environmental justice analysis. One commenter suggested the final rule include additional text to emphasize welfare effects and to state that the evaluation should not offset positive effects on one community with environmental justice concerns against

---

[93] Such analysis is not new, and CEQ has issued guidance consistent with these proposed provisions for nearly a decade. *See generally* CEQ, Final Guidance for Federal Departments and Agencies on Consideration of Greenhouse Gas Emissions and the Effects of Climate Change in National Environmental Policy Act Reviews, 81 FR 51866 (Aug. 8, 2016), *https://ceq.doe.gov/docs/ceq-regulations-and-guidance/nepa_final_ghg_guidance.pdf*, and CEQ, 2023 GHG Guidance, *supra* note 10.

negative effects on another community with environmental justice concerns.

Multiple commenters opposed proposed paragraph (a)(14) for reasons similar to the opposition to including climate change-related effects, asserting that it is inappropriate to single out these types of effects. One commenter suggested the proposed paragraph will allow consideration of remote and speculative environmental justice concerns and is in conflict with case law. Another commenter stated the proposed paragraph requires agencies to consider effects that are not "reasonably foreseeable." Further, another commenter requested that the regulations clarify that not all environmental effects will be "disproportionate and adverse."

In the final rule, CEQ adds proposed paragraph (a)(14) at § 1502.16(a)(13) and modifies the text from the proposal to replace "[t]he potential for" with "[w]here applicable" before "disproportionate and adverse human health and environmental effects on communities with environmental justice concerns." As discussed earlier in this section, CEQ adds the "where applicable" qualifier to make clear that not all proposed actions will have such effects. The final rule also omits "potential," given the changes to paragraph (a) to clarify that all effects in the list must be reasonably foreseeable.

Multiple commenters grouped their general concerns on proposed § 1502.16(a)(7), (a)(10), and (a)(14) together, expressing overall concern regarding the inclusion of climate change and environmental justice-related provisions in § 1502.16. These commenters asserted that these proposed additions are contrary to the purpose of NEPA and inappropriately elevate climate change and environmental justice over other issues, such as water quality, waste management, and air quality. Other commenters expressed concern over the addition of policy priorities to the regulations. As CEQ has discussed in this section and elsewhere in this preamble and the Phase 2 Response to Comments, CEQ considers these additions consistent with the text of NEPA, longstanding practice, and case law and finds it appropriate to recognize the importance of climate change and environmental justice effects to inform agency decision making and the public about a proposed action. CEQ notes that the list of effects in § 1502.16(a) is not exhaustive, and that agencies must determine on a case-by-case basis which effects are relevant to address in an EIS.

Finally, in paragraph (b), which addresses economic or social effects,

CEQ proposed to strike "and give appropriate consideration to" from paragraph (b). CEQ proposed this revision to remove unnecessary language that could be read to require the decision maker to make consideration of such effects a higher priority than other effects listed in this section.

One commenter expressed support for the proposed change in paragraph (b) but requested that the final rule include language requiring specific analyses of housing affordability, availability, and quality. CEQ declines to add this language because, while these considerations may be appropriate for some projects, this level of specificity is unnecessary in the regulations, as housing-related effects are a subset of social and economic effects. Another commenter requested that the final rule include cultural effects in the second sentence. CEQ declines to add cultural effects to paragraph (b) because historic and cultural resources are included in § 1502.16(a)(10), and agencies also may address effects to cultural resources consistent with § 1502.16(a)(5).

CEQ did not receive comments specific to its proposed edits to paragraph (b). In the final rule, CEQ strikes the phrase "and give appropriate consideration to," as proposed, from § 1502.16(b).

16. Summary of Scoping Information (§ 1502.17)

CEQ proposed to revise § 1502.17 and retitle it "Summary of scoping information" to more accurately reflect the proposed revisions to this section and align it with the common practice of what many agencies produce in scoping reports. CEQ proposed other changes in this section to simplify and remove unnecessary or redundant text and clarify requirements. Commenters were generally supportive of CEQ's proposal and provided a few suggested edits to the regulatory text, as discussed in this section. A few commenters expressed concern about the additional burden of preparing a summary of scoping information.

CEQ finalizes this section as proposed with a few additional edits. Agencies have long collected the information addressed in this section as part of the scoping process and provided it in various formats, such as in scoping reports or by integrating it into the EIS itself. Transparency about this information is valuable to the NEPA process because it demonstrates what agencies have considered in preparing an EIS. Further, CEQ disagrees that preparing a summary of such information is a significant burden on

agencies because the regulations do not require a lengthy, detailed summary and provide agencies sufficient flexibility to exercise their discretion in what to prepare.

CEQ proposed to revise paragraph (a) to require agencies to include a summary of the information they receive from commenters during the scoping process in draft EISs, consistent with the revisions to §§ 1500.4, 1501.9, and 1502.4. CEQ proposed to replace "State, Tribal, and local governments and other public commenters" with "commenters" because this phrase is all encompassing. CEQ also proposed to clarify that a draft EIS should include a summary of information, including alternative and analyses, that commenters submitted during scoping.

At least one commenter inquired whether an agency could meet the requirements of paragraph (a) by including a summary in an appendix to the draft EIS. CEQ did not intend its proposal to limit where agencies provide the summary of scoping information. To make clear that agencies have the flexibility on where to place this section in their EISs, CEQ has added "or appendix" after "draft environmental impact statement." Another commenter asked whether inserting the word "draft" before the second instance of "environmental impact statement" in paragraph (a) precluded agencies from considering such information in the final EIS. This was not CEQ's intent, so the final rule text does not include the word "draft" as CEQ proposed. CEQ otherwise revises paragraph (a) as proposed. This change provides agencies flexibility to develop a broader summary of information received during scoping. While agencies should still summarize alternatives and analyses, this provision does not require them to provide a specific summary of every individual alternative, piece of information, or analysis commenters submit during scoping.

CEQ proposed to redesignate paragraph (a)(1) as paragraph (b) and modify it to clarify that agencies can either append comments received during scoping to the draft EIS or otherwise make them publicly available. CEQ proposed this modification to clarify that the requirements of this paragraph can be met through means other than an appendix, such as a scoping report, which is common practice for some Federal agencies. CEQ proposed a conforming edit in paragraph (d) of § 1502.19, "Appendix," for consistency with this language.

CEQ received a comment questioning why CEQ would change "publish" to "otherwise make publicly available all

comments," which could suggest an agency could make comments publicly available by providing them in response to a FOIA request rather than by affirmatively providing them. This was not the intent of CEQ's proposed change. Therefore, CEQ is not making this change in the final rule. With these modifications, CEQ amends this provision as proposed.

Finally, CEQ proposed to delete 40 CFR 1502.17(a)(2) and (b) (2020) because the requirements of these paragraphs are redundant to the requirements in part 1503 for Federal agencies to invite comment on draft EISs in their entirety and review and respond to public comments. CEQ makes this change in the final rule.

### 17. Incomplete or Unavailable Information (§ 1502.21)

CEQ proposed one revision to paragraph (b) of § 1502.21, which addresses when an agency needs to obtain and include incomplete information in an EIS. CEQ proposed to strike "but available" from the sentence, which the 2020 rule added, to clarify that agencies must obtain information relevant to reasonably foreseeable significant adverse effects when that information is essential to a reasoned choice between alternatives, where the overall costs of doing so are not unreasonable, and the means of obtaining that information are known. CEQ proposed to remove the phrase "but available" because it could be read to significantly narrow agencies' obligations to obtain additional information even when it is easily attainable and the costs are reasonable. During the development of the proposed rule, agency NEPA experts indicated that this qualifier could be read to say that agencies do not need to collect additional information that could and should otherwise inform the public and decision makers.

Some commenters supported the proposed deletion of "but available" in paragraph (b), reasoning that this edit will ensure agencies obtain necessary information regarding reasonably foreseeable significant adverse effects that is essential to a reasoned choice among alternatives rather than dismissing the information as unavailable. Another commenter supported the change because it better ensures agencies obtain high quality information to inform their analyses. Other commenters opposed the change, asserting it unduly expands agencies' obligations to obtain additional information. One commenter stated the change removes a bright-line requirement to rely on existing

information and another commenter agreed, stating the inclusion of "but available" helped to focus the scope of the inquiry on available information. Without this limitation, the commenter asserted agencies could face litigation over the subjective reasonableness of failing to obtain new information. Some commenters expressed concern that the proposed change broadens the circumstances when agencies must obtain new information and increases the risk of reliance on poor quality information developed quickly to meet the statutory timeframes.

One commenter provided that if CEQ finalizes the proposed change, it should clarify that agencies should not delay the NEPA process by obtaining non-essential information. This commenter also requested that CEQ clarify that agencies only need to produce new information where the agencies would not be able to make an informed decision about the reasonably foreseeable effects of a project otherwise. Similarly, another commenter stated that if finalized, CEQ should clarify that new agency research is required only in limited circumstances and is the exception, not the rule.

CEQ makes the change to remove "but available" from § 1502.21(b) in the final rule. CEQ has reconsidered its position in the 2020 rule and now considers it vital to the NEPA process for agencies to undertake studies and analyses where the information from those studies and analyses is essential to a reasoned choice among alternatives and the overall costs are not unreasonable, rather than relying solely on available information. In particular, CEQ notes its longstanding interpretation of "incomplete information" as articulated in the 1986 amendments to this provision. CEQ defined "incomplete information" as information that an agency cannot obtain because the overall costs of doing so are exorbitant and "unavailable information" as information that an agency cannot obtain it because "the means to obtain it are not known." [94] In response to comments in 1986, CEQ further explained that the phrase " 'the means to obtain it are not known' is meant to include circumstances in which the unavailable information cannot be obtained because adequate scientific knowledge, expertise, techniques or equipment do not exist." [95] The 2020 rule disregarded this longstanding

interpretation and instead suggested that new scientific or technical research is "unavailable information." Upon further consideration, CEQ disagrees with the interpretation in the 2020 rule and re-adopts its longstanding interpretation that the phrase "incomplete information" applies only to information from new scientific or technical research, the cost of which are unreasonable.

Removing the phrase "but available" also is consistent with section 106(b)(3) of NEPA, which was added by the recent NEPA amendments and states that in determining the level of NEPA review, agencies are only required to undertake new scientific or technical research where essential to a reasoned choice among alternatives and the overall costs and time frame of obtaining it are not unreasonable. 42 U.S.C. 4336(b)(3). While section 106(3) only directly applies to determining the level of NEPA review, the provision's limitation on when agencies need to undertake new scientific or technical research in that context refutes an interpretation of NEPA as limiting agencies to considering available information. 42 U.S.C. 4336(b)(3). Establishing a consistent standard to address incomplete information in the NEPA review process that is consistent with the text of section 106(3) will lead to a more orderly and predictable environmental review process. 42 U.S.C. 4336(b)(3). Similarly, CEQ considers it appropriate to require agencies to ensure professional integrity, including scientific integrity, and use reliable data and resources, as well as other provisions in the regulations emphasizing the importance of relying on high-quality and accurate information throughout implementation of NEPA. *See, e.g.,* §§ 1500.1(b), 1506.6.

CEQ disagrees that this change will unduly expand agencies' obligations to obtain additional information. CEQ is reverting to the longstanding approach in the regulations that will ensure agencies appropriately gather information when it is necessary to inform the decision maker and the public. CEQ considers the bounding language of reasonable costs and necessity to make a reasoned choice to be the appropriate cabining so that agencies are reasonably gathering any additional information needed for a sufficient NEPA analysis without creating undue burden or facilitating a boundless collection of information. With respect to litigation risk, as with many other aspects of a NEPA review, agencies should explain in their documents their rationale when they determine it is unreasonable or

AR_0028831

unnecessary to obtain new information. Finally, CEQ acknowledges the potential tension between the time it takes to gather new information and statutory deadlines. CEQ encourages agencies to identify incomplete information as early as possible in the process to ensure they have time to gather the information necessary to satisfy their NEPA obligations during the statutory timeframes. CEQ also notes that where an agency cannot obtain incomplete information within the statutory timeframes, but the costs are reasonable, the agency could conclude that it is necessary to set a new deadline that allows only as much time as necessary to obtain the information so long as the costs of obtaining the information, including any cost from extending the deadline and delaying the action, are reasonable.

Finally, CEQ removes the modifier "adverse" from "significant adverse effects" throughout this section because the final rule defines "significant effects" to be adverse effects. CEQ makes this change for clarity and consistency with the definition.

### 18. Methodology and Scientific Accuracy (Proposed § 1502.23)

In the proposed rule, CEQ proposed updates to § 1502.23, "Methodology and Scientific Accuracy," which requires agencies to ensure the professional integrity, including scientific integrity, of the discussions and analyses in environmental documents. CEQ proposed revisions to promote use of high-quality information; require agencies to explain assumptions; and, where appropriate, incorporate projections, including climate change-related projections, in the evaluation of reasonably foreseeable effects.

CEQ received a number of comments expressing confusion regarding the applicability of this provision. In particular, since 1978, the provision has used the term "environmental documents," making it broadly applicable. However, it is included in part 1502, which addresses requirements for EISs. Additionally, the amendments to NEPA make clear that agencies must ensure the professional integrity, including scientific integrity, of the discussion and analysis in their NEPA documents, not just in EISs, and make use of reliable data and resources in carrying out NEPA. To address the confusion amongst commenters and for consistency with the NEPA statute, CEQ moves this provision to part 1506, specifically § 1506.6, which addresses other requirements of NEPA.

For the discussion of the specific proposed changes and comments on those changes as well as a description of the final rule, refer to section II.H.4.

### E. Revisions To Update Part 1503, Commenting on Environmental Impact Statements

CEQ is making substantive revisions to all sections of part 1503, except § 1503.2, "Duty to comment." While CEQ invited comment on whether it should make any substantive changes to this section, CEQ did not receive any specific comments recommending such changes to § 1503.2. Therefore, CEQ finalizes § 1503.2 with the non-substantive edits proposed in the NPRM (spelling out EIS and fixing citations).

#### 1. Inviting Comments and Requesting Information and Analyses (§ 1503.1)

CEQ did not propose substantive changes to § 1503.1 except to delete paragraph (a)(3) of 40 CFR 1503.1 (2020), requiring agencies to invite comment specifically on the submitted alternatives, information, and analyses and the summary thereof, for consistency with the proposed changes to the exhaustion provision in § 1500.3 and the corresponding revisions to § 1502.17. CEQ discusses the comments on removal of the exhaustion provisions generally in section II.B.3, and CEQ did not receive any comments specific to the proposed deletion of 40 CFR 1503.1(a)(3) (2020). CEQ deletes this paragraph in the final rule because CEQ is revising § 1500.3 to remove the exhaustion provision in this final rule as discussed in section II.B.3. Therefore, this requirement to invite comment is unnecessary and redundant as Federal agencies invite comment on all sections of draft EISs, including any appendices, and thus need not invite comment on one specific section of an EIS.

#### 2. Specificity of Comments and Information (§ 1503.3)

CEQ proposed edits to § 1503.3 to clarify the expected level of detail in comments submitted by the public and other agencies to facilitate consideration of such comments by agencies in their decision-making processes. CEQ proposed these edits to remove or otherwise modify provisions that could inappropriately restrict public comments and place unnecessary burden on public commenters.

Multiple commenters expressed support for the proposed rule's edits to § 1503.3 to remove language in the 2020 rule and argued that the language impeded public participation and unlawfully sought to limit access to the courts. Commenters asserted that the 2020 language impeded participation in the NEPA process by members of the public with valuable information and perspective on the proposed action. Specifically, the commenters supported the removal of the requirement for the public to provide as much detail as necessary in paragraph (a), along with the proposed clarification that commenters do not need to describe their data, sources, or methodologies. Commenters further stated that the requirement to provide as much detail as necessary was ambiguous and could have been interpreted to establish an unjustified barrier to public comment to those who do not have access to technical experts or consultants. As discussed further in this section, CEQ is finalizing all but one of its proposed changes.

CEQ proposed to remove language from § 1503.3(a), which the 2020 rule added, that requires comments to be as detailed "as necessary to meaningfully participate and fully inform the agency of the commenter's position" because this requirement could lead commenters to provide unnecessarily long comments that will impede efficiency. Commenters generally supported this proposal. In support of the proposed removal, one commenter asserted that the ambiguity of the requirement to provide as much detail as necessary would prompt unnecessary litigation over whether particular comments were sufficient to "fully inform" the agency.

CEQ strikes this language in the final rule. Paragraph (a) of § 1503.3 has always required comments to be "as specific as possible," *see* 40 CFR 1503.3(a) (2019); 40 CFR 1503.3(a) (2020), and the language CEQ is removing could be read to require commenters to provide detailed information that either is not pertinent to the NEPA analysis or is about the commenter's position on the proposed action, the project proponent, the Federal agency, or other issues. For example, the text could be read to require a commenter to provide a detailed explanation of a moral objection to a proposed action or a personal interest in it if those inform the commenter's position on the project. The text also could imply that commenters must either be an expert on the subject matter or hire an expert to provide the necessary level of detail. Further, the text could be read to imply that commenters are under an obligation to collect or produce information necessary for agencies to fully evaluate issues raised in comments even if the commenters do not possess that information or the skills necessary to produce it.

As CEQ explained in the proposed rule, some commenters on the 2020 rule

AR_0028832

raised this issue, expressing concerns that this language could be read to require the general public to demonstrate a level of sophistication and technical expertise not required historically under the CEQ regulations or consistent with the NEPA statute.[96] Commenters also expressed concern that the requirement would discourage or preclude laypersons or communities with environmental justice concerns from commenting.[97] Other commenters on the 2020 rule expressed concern that the changes would shift the responsibility of analysis from the agencies to the general public.[98] Finally, CEQ is removing this language because the requirements that comments provide as much detail as necessary to "meaningfully" participate and "fully inform" the agency are vague and put the burden on the commenter to anticipate the appropriate level of detail to meet those standards.

CEQ also proposed to delete from the second sentence in paragraph (a) language describing certain types of impacts that a comment should cover, including the reference to economic and employment impacts as well as the phrase "and other impacts affecting the quality of the human environment" because it is unnecessary and duplicative of "consideration of potential effects and alternatives," which appears earlier in the sentence. CEQ proposed to delete the reference to economic and employment impacts because this language imposes an inappropriate burden on commenters by indicating that comments need to explain why an issue matters for economic and employment purposes. NEPA requires agencies to analyze the potential effects on the human environment and does not require that these effects be specified in economic terms or related specifically to employment considerations. Therefore, it is inappropriate to single out these considerations for special consideration by commenters and unduly burdensome to expect every commenter to address economic and employment impacts.

A few commenters opposed the deletion, expressing concerns that removal of this language would discourage agencies from considering economic or employment impacts, or indicate that agencies are not interested in considering such information. CEQ disagrees with the commenters' assertions. This provision addresses the role of commenters, who are in the best

position to assess the appropriate scope of their comments. CEQ broadens the language in the final rule, consistent with the proposal, to invite and welcome comments on effects of all kinds. The revision in the final rule will not have the effect of limiting commenters from addressing economic or employment impacts in their comments but would avoid the implication that members of the public are welcome to comment only if they address those issues. Further, the removal of this language in the provisions on public comments for an EIS does not affect potential consideration of these effects during the environmental review process. Specifically, § 1501.2(b)(2) requires agencies to identify environmental effects and values in adequate detail so the decision maker can appropriately consider such effects and values alongside economic and technical analyses. For these reasons, CEQ makes the edits as proposed to the second sentence of § 1503.3(a) in the final rule.

Finally, in paragraph (a), CEQ proposed changes to the last sentence to clarify that, only where possible, the public should include citations or proposed changes to the EIS or describe the data, sources, or methodologies that support the proposed changes in their comments. While such information is helpful to the agency whenever it is readily available, CEQ had concerns that this could be construed to place an unreasonable burden on commenters. CEQ did not receive any comments specific to this change and makes these edits as proposed in the final rule.

CEQ proposed to strike paragraph (b) of 40 CFR 1503.3 (2020) and redesignate paragraphs (c) and (d) as § 1503.3(b) and (c), respectively. CEQ proposed to delete paragraph (b) for consistency with the proposed removal of the exhaustion requirement from 40 CFR 1500.3 (2020) and corresponding changes to § 1502.17. CEQ also proposed to remove this paragraph because it is unrelated to the subject addressed in § 1503.3, which addresses the specificity of comments, rather than when commenters should file their comments. Finally, CEQ proposed to remove this paragraph because agencies have long had the discretion to consider special or unique circumstances that may warrant consideration of comments outside those time periods.

While most commenters were supportive of the deletion of the provisions related to exhaustion, a few commenters specifically requested CEQ retain paragraph (b) of 40 CFR 1503.3 (2020) in the final rule. These commenters expressed concern about

increased litigation and commenters raising issues at the last minute or in litigation for the first time.

CEQ removes paragraph (b) of 40 CFR 1503.3 (2020) in the final rule. The CEQ regulations have long encouraged the identification of issues early in the NEPA process by providing multiple opportunities for the public to engage—first through the scoping process and then through the public comment period on the draft EIS. As CEQ explains in section II.B.3, CEQ has determined it is appropriate to remove the exhaustion provisions in 40 CFR 1500.3 (2020), which CEQ considers related to general principles of administrative law applied by courts rather than to principles specific to NEPA. Therefore, CEQ removes this paragraph for the reasons set forth in the NPRM, the Phase 2 Response to Comments, and the preamble of this final rule.

Next, CEQ proposed to strike "site-specific" from 40 CFR 1503.3(d) (2020) in proposed paragraph (c) to clarify that cooperating agencies must identify additional information needed to address significant effects generally. CEQ proposed this change to enhance efficiency because it ensures that cooperating agencies have the information they need to fully comment on EISs, averting potential delay in the environmental review process. CEQ did not receive any comments specific to this proposed change. CEQ makes this change for clarity in the final rule.

Finally, CEQ proposed to strike the requirement for cooperating agencies to cite their statutory authority for recommending mitigation from 40 CFR 1503.3(e) (2020). The NPRM explained that this requirement is unnecessary since, at this stage in development of an EIS, those agencies with jurisdiction by law have already established their legal authority to participate as cooperating agencies. Two commenters opposed this change, suggesting that requiring cooperating agencies to provide this additional detail to the lead agency will help the lead agency and applicants assess the reasonableness of such recommendations. Upon further consideration, CEQ has decided not to remove this requirement in the final rule. CEQ revises the beginning of the sentence from "When a cooperating agency with jurisdiction by law specifies" to "A cooperating agency with jurisdiction by law shall specify" to clarify the requirement to identify mitigation measures. Then, in the last clause, CEQ replaces "the cooperating agency shall" with "and" to retain the requirement for a cooperating agency to cite its applicable statutory authority.

---

[96] CEQ, 2020 Response to Comments, *supra* note 69, at 326–27.

[97] *Id.* at 327.

[98] *Id.* at 328.

**35514**    **Federal Register** / Vol. 89, No. 85 / Wednesday, May 1, 2024 / Rules and Regulations

CEQ agrees that identifying the statutory authorities for mitigation is useful information. CEQ encourages cooperating agencies to identify such information as early as practicable in development of the EIS, but no later than at the time of their review of a draft EIS. CEQ also proposed in paragraph (d) to replace the reference to "permit, license, or related requirements" with "authorizations" because the definition of "authorization" in § 1508.1(d) is inclusive of those terms. CEQ makes this change as proposed for clarity and consistency in the final rule.

### 3. Response to Comments (§ 1503.4)

CEQ proposed to revise paragraph (a) of § 1503.4 to clarify that agencies must respond to comments but may do so either individually, in groups, or in some combination thereof. CEQ proposed to change "may" to "shall," which would revert a change made in the 2020 rule, because the change created ambiguity that could be read to mean that agencies have discretion in whether to respond to comments at all, not just in the manner in which they respond, *i.e.*, individually or in groups. CEQ did not indicate that it intended to make responding to comments voluntary when it made this change in the 2020 rule, and CEQ has determined that amending the regulations to avoid this ambiguity improves the clarity of the regulations.

CEQ received a few comments on paragraph (a). A commenter suggested that the rule provide greater latitude to agencies to summarize and respond to comments of a similar nature or decline to respond to comments that the agency determines provide no substantive information applicable to the EIS. CEQ agrees that Federal agencies should have flexibility to summarize and respond to similar comments or decline to respond to non-substantive comments where appropriate. The proposed language provides this flexibility, and CEQ makes this change in the final rule. Restoring "shall" in place of "may" removes any ambiguity created by revisions to the paragraph in the 2020 regulations and is consistent with the longstanding requirement and expectation for agencies to respond to comments received on an EIS, while also clarifying that agencies have discretion on how to respond to comments to promote the efficiency of the NEPA process.

A couple of commenters requested that CEQ define "substantive comments;" modify the last sentence of paragraph (a) to make the list of means by which an agency may respond in the final EIS to be a required list by changing "may respond" to "will respond;" and modify paragraph (a)(2) to clarify that the only alternatives an agency should develop and evaluate following public comments are those that are consistent with the purpose and need and are technically and economically feasible. CEQ declines to make these changes in the final rule. Agencies have extensive experience assessing whether a comment is substantive and should have the flexibility to do so—CEQ is concerned that a definition would be unnecessarily restrictive. Similarly, CEQ declines to make the list of means by which an agency responds to comments mandatory, as unnecessarily prescriptive; paragraph (a) lists the key ways agencies may address comments, but as long as agencies respond to individual comments or groups of comments, as required by the second sentence of paragraph (a), they should have flexibility to determine the appropriate means of response. Lastly, CEQ does not consider the proposed change to paragraph (a)(2) necessary because alternatives already must be consistent with the purpose and need consistent with § 1502.14.

In paragraph (c), CEQ proposed changes to clarify that when an agency uses an errata sheet, the agency must publish the entire final EIS, which would include the errata sheet, a copy of the draft EIS, and the comments with their responses. CEQ proposed these edits to reflect typical agency practice and to reflect the current requirement for electronic submission of EISs rather than the old practice of printing EISs for distribution. One commenter suggested that proposed edits would eliminate the errata sheet. The intent of CEQ's edits is to ensure that the public can access the complete analysis in one place. CEQ disagrees with the commenter's interpretation of the proposed text, but to remove any ambiguity, CEQ has revised the provision in the final rule to make clear that the final EIS includes the errata sheet and "a copy of the draft statement."

### F. Revisions To Update Part 1504, Dispute Resolution and Pre-Decisional Referrals

In the NPRM, CEQ proposed to revise part 1504 to add a new section on early dispute resolution and reorganize the existing sections. As discussed further in this section, CEQ makes the changes in the final rule with some additional edits that are responsive to commenters. One commenter noted that CEQ did not propose to revise the title of part 1504 to reflect this approach. Therefore, in this final rule, CEQ revises and simplifies the title of part 1504 to "Dispute resolution and pre-decisional referrals" for consistency with the revisions to this part. CEQ notes that the criteria and procedures for agencies to make a referral apply to agencies that make a referral under the NEPA regulations and do not apply to EPA when exercising its referral authority under section 309 of the Clean Air Act, 42 U.S.C. 7609.

### 1. Purpose (§ 1504.1)

CEQ proposed in § 1504.1(a) to add language encouraging agencies to engage early with each other to resolve interagency disagreements concerning proposed major Federal actions before such disputes are referred to CEQ. CEQ also proposed to add language clarifying that part 1504 establishes procedures for agencies to submit requests to CEQ for informal dispute resolution, expanding the purpose to reflect the changes proposed in § 1504.2 and described in section II.F.2. While CEQ did not receive any comments on the language of this specific provision, CEQ revises the proposed language to make clear that agencies need not engage in dispute resolution before a referral. At least one commenter interpreted the optional early dispute resolution provision in § 1504.2 as a required precursor to a referral. Therefore, in the final rule, CEQ revises the first sentence as proposed to encourage agencies to engage with one another to resolve interagency disputes and adds the proposed new sentence indicating that part 1504 establishes the procedures for early dispute resolution, but does not include the clause referencing the referral process. As discussed further in section II.F.2, these revisions are consistent with CEQ's ongoing role in promoting the use of environmental collaboration and conflict resolution,[99] and serving as a convener and informal mediator for interagency disputes. CEQ strongly encourages agencies to resolve disputes informally and as early as possible so that referrals under part 1504 are used only as a last resort. Early resolution of disputes is essential to ensuring an efficient and effective environmental review process.

In paragraph (b), which notes EPA's role pursuant to section 309 of the Clean Air Act, 42 U.S.C. 7609, CEQ proposed to strike the parenthetical providing the

---

[99] *See* OMB & CEQ, Memorandum on Environmental Collaboration and Conflict Resolution (Sept. 7, 2012), *https://ceq.doe.gov/ docs/ceq-regulations-and-guidance/OMB_CEQ_ Env_Collab_Conflict_Resolution_20120907.pdf;* OMB & CEQ, Memorandum on Environmental Conflict Resolution (Nov. 28, 2005), *https:// ceq.doe.gov/docs/ceq-regulations-and-guidance/ regs/OMB_CEQ_Joint_Statement.pdf.*

term "environmental referrals," as this term is not used elsewhere in part 1504. CEQ notes that EPA's section 309 authority is distinct from the ability of an agency to make a referral pursuant to § 1504.3, and therefore part 1504 does not apply to EPA when it is exerting its section 309 authority. Finally, CEQ proposed to revise the second sentence in paragraph (c) to eliminate the passive voice to improve clarity. CEQ did not receive any specific comments on its proposed changes to paragraphs (b) and (c). Consistent with the NPRM, this final rule removes the parenthetical in paragraph (b) and revises paragraph (c) to add the second sentence as proposed. Additionally, the final rule strikes "similar" from the first sentence of paragraph (c) because the bases for referral under NEPA and section 309 are distinct.

2. Early Dispute Resolution (§ 1504.2)

As discussed further in section II.F.3, CEQ proposed to move the provisions in 40 CFR 1504.2 (2020) to § 1504.3(a) and to repurpose § 1504.2 for a new section on early dispute resolution. CEQ proposed to add this section to codify agencies' current and longstanding practice of engaging with one another and enlisting CEQ to help resolve interagency disputes. While CEQ did not receive many comments on this provision, the vast majority of those it did receive supported the new provision, and some recommended CEQ make the language in the provision stronger and more directive. On the other hand, one commenter suggested dispute resolution would slow the environmental review process. CEQ is finalizing the provision as proposed because CEQ considers a flexible, informal, and non-binding approach rather than a mandatory and prescriptive process to strike the right balance to advance early resolution of interagency disputes. CEQ does not consider this provision to abrogate CEQ's authorities, as one commenter suggested, but rather to encourage agencies to resolve disputes early amongst themselves and elevate issues to CEQ when doing so will help advance resolution. Making the language in the regulations discretionary rather than mandatory does not affect CEQ's authorities.

CEQ revises § 1504.2 as proposed. Specifically, new paragraph (a) encourages agencies to engage in interagency coordination and collaboration within planning and decision-making processes and to identify and resolve interagency disputes. Further, paragraph (a) encourages agencies to elevate issues to

appropriate agency officials or to CEQ in a timely manner that is consistent with the schedules for the proposed action established under § 1501.10.

Paragraph (b) allows a Federal agency to request that CEQ engage in informal dispute resolution. When making such a request to CEQ, the agency must provide CEQ with a summary of the proposed action, information on the disputed issues, and agency points of contact. This provision codifies the longstanding practice of CEQ helping to mediate and resolve interagency disputes outside of and well before the formal referral process (§ 1504.3) and to provide additional direction to agencies on what information CEQ needs to mediate effectively.

Paragraph (c) provides CEQ with several options to respond to a request for informal dispute resolution, including requesting additional information, convening discussions, and making recommendations, as well as the option to decline the request.

3. Criteria and Procedure for Referrals and Response (§ 1504.3)

As noted in section II.F.2, CEQ proposed to move the criteria for referral set forth in 40 CFR 1504.2 (2020) to a new paragraph (a) in § 1504.3 and redesignate paragraphs (a) through (h) of 40 CFR 1504.3 (2020) as § 1504.3(b) through (i), respectively. Because of this consolidation, CEQ proposed to revise the title of § 1504.3 to "Criteria and procedure for referrals and response."

At least one commenter supported the move of 40 CFR 1504.2 (2020) to proposed § 1504.3(a) to facilitate the addition of the informal dispute resolution process. A few commenters requested that CEQ make additional changes to § 1504.3 to restore language from the 1978 regulations allowing public comment during CEQ's deliberations on whether to accept a particular referral and, if CEQ accepts a referral, during CEQ's consideration of recommendations to resolve the dispute.

In the final rule, CEQ adds an additional factor, "other appropriate considerations," at § 1504.3(a)(8) to clarify that the list of considerations for referral is not an exclusive list. Additionally, CEQ revises paragraph (f) to allow "other interested persons" to provide views on the referrals because CEQ agrees with the commenters that the opportunity to provide views should not be limited to applicants. Relatedly, CEQ clarifies in paragraph (g)(3) that CEQ may obtain additional views and information "including through public meetings or hearings." While the language in 40 CFR 1504.3(f)(3) (2020) and the proposed rule would not

preclude CEQ from holding public meetings or hearings, CEQ considers it important to provide this clarification in the regulations to respond to comments. CEQ otherwise finalizes this provision as proposed.

*G. Revisions to NEPA and Agency Decision Making (Part 1505)*

1. Record of Decision in Cases Requiring Environmental Impact Statements (§ 1505.2)

The proposed rule included proposed modifications in § 1505.2 to align this section with other proposed changes to the regulations relating to exhaustion and to clarify which alternatives agencies must identify in RODs. CEQ also proposed to modify the provision on mitigation. As discussed further in this section, CEQ proposed to strike paragraph (b) of 40 CFR 1505.2 (2020), make paragraph (a) of 40 CFR 1505.2 (2020) the undesignated introductory paragraph in § 1505.2, and redesignate paragraphs (a)(1) through (a)(3) of 40 CFR 1505.2 (2020) as § 1505.2(a) through (c), respectively. CEQ makes these reorganizational changes in the final rule.

In proposed paragraph (b), CEQ proposed to restructure the first sentence—by splitting it into two sentences and reframing it in active voice—to improve readability and clarify that an agency must identify the alternatives it considered in reaching its decision and also specify one or more environmentally preferable alternatives in the ROD, consistent with proposed changes to § 1502.14(f) requiring an agency to identify one or more environmentally preferable alternatives in the EIS. CEQ makes these changes as proposed in the final rule.

CEQ received a number of comments on the "environmentally preferable alternative" generally, which are discussed in detail in sections II.D.13 and II.J.10. CEQ notes that it did not intend a substantive change to the longstanding requirement to identify which alternative (or alternatives) considered in the EIS is the environmentally preferable alternative(s). Some commenters suggested that the "environmentally preferable alternative" could be an alternative other than the proposed action, no action, or reasonable alternatives (which must be technically and economically feasible and meet the definition of purpose and need). However, this is incorrect because the environmentally preferable alternative is one of the alternatives included in the analysis, which consist of the proposed action, no action, or reasonable

alternatives. CEQ is revising § 1502.14(f) in the final rule, to which § 1505.2(b) cross references, to make this clear. CEQ revises § 1505.2 as proposed in the final rule.

Another commenter suggested CEQ require an agency to specify if it selected the environmentally preferable alternative and if not, why not. CEQ declines to make this change in the final rule because it is overly prescriptive. The regulations have long required agencies to discuss myriad factors and considerations that agencies balance in making their decisions without specifically requiring an agency to explain why it did not select the environmentally preferable alternative, and CEQ does not consider a change from this longstanding practice to be warranted.

In the third sentence of proposed § 1505.2(b), CEQ added environmental considerations to the list of example relevant factors upon which an agency may base discussion of preferences among alternatives. CEQ did not receive any specific comments on this proposed change to § 1505.2(b) and makes the changes in the final rule consistent with its proposal.

In proposed § 1505.2(c), CEQ proposed to change "avoid or minimize" to "mitigate" in the first sentence for consistency with the remainder of the paragraph. One commenter opposed this change, arguing that it would impose a burdensome requirement on agencies to consider mitigation for each of the effects of the proposed action and explain in a ROD why each impacted resource will not be replaced with a substitute. CEQ disagrees with the commenter's interpretation of the proposed revision. This provision has never required agencies to discuss avoidance or minimization at this level of detail, *i.e.*, for each resource category. Rather, it requires an agency to discuss generally whether it has "adopted all practicable means" and if not, the reasons for not doing so. CEQ makes this change in the final rule to clarify that agencies should discuss generally whether they have adopted practicable mitigation to address environmental harms from the selected alternative. Agencies need not do so on an impact category-by-impact category basis.

Additionally, CEQ proposed to clarify in proposed § 1505.2(c) that any mitigation must be enforceable, such as through permit conditions or grant agreements, if an agency includes the mitigation as a component of the selected action in the ROD, and the analysis of reasonably foreseeable effects in the EISs relies on effective implementation of that mitigation. CEQ also proposed to require agencies to identify the authority for enforceable mitigation. Lastly, CEQ proposed to replace the requirement to adopt and summarize a monitoring and enforcement program for any enforceable mitigation requirements or commitments, with a requirement to adopt a monitoring and compliance plan consistent with proposed § 1505.3(c).

CEQ received a large number of comments both supporting and opposing the proposed requirement to ensure that mitigation is enforceable in certain cases and to identify the authority for the enforceable mitigation. Supporters of the proposed change generally expressed concerns that mitigation incorporated in RODs or FONSIs is often not carried out, undermining the evaluation of effects required by NEPA. By contrast, opponents of the proposed change expressed concern that the provision would require enforceable mitigation in every case, and that the requirement for enforceability would discourage project proponents from proposing voluntary mitigation. These commenters also stated that NEPA does not require mitigation of adverse effects or give agencies the authority to require or enforce mitigation measures. They expressed concern that to the extent that the authority to require or enforce mitigation comes from other statutes, the requirement in proposed § 1505.2(c) would be duplicative. Finally, commenters noted that "enforcement" may be the responsibility of an agency other than the lead agency and may consist of suspension or revocation of an authorization under terms and conditions included in the authorization rather than direct civil or administrative enforcement actions.

In the final rule, CEQ retains the requirement to make mitigation enforceable in those circumstances in which agencies rely upon that mitigation as part of its analysis. CEQ has revised the sentence in § 1505.2(c) to enhance readability and to address some of the confusion raised by commenters by specifying that mitigation must be enforceable by a lead, joint lead, or cooperating agency when the ROD incorporates mitigation and the analysis of the reasonably foreseeable effects of the proposed action is based on implementation of that mitigation. The final rule further revises the second sentence of proposed § 1505.2(c) by breaking it into two sentences. The first identifies when mitigation must be enforceable. The second requires agencies to identify the authority for enforceable mitigation, provides examples of enforceable mitigation—specifically, permit conditions, agreements, or other measures—and requires agencies to prepare a monitoring and compliance plan. CEQ received a number of comments on the monitoring and compliance plan proposal, which are discussed in detail in section II.G.2. For the reasons discussed in that section, as well as the Phase 2 Response to Comments and NPRM, CEQ revises the last sentence of § 1505.2(c) to require agencies to prepare a monitoring and compliance plan consistent with § 1505.3.

Section 1505.2(c) does not require agencies to include enforceable mitigation measures in every decision subject to NEPA or require them to adopt mitigation in any circumstance; rather, the provision reinforces the integrity of environmental reviews by ensuring that if an agency assumes as part of its analysis that mitigation will occur and will be effective, the agency takes steps to ensure that this assumption is correct, including by making the mitigation measures enforceable.

This provision does not prohibit agencies from approving proposals with unmitigated adverse environmental effects or from approving proposals that include unenforceable mitigation measures so long as the agency does not rely on the effective implementation of those measures to determine the potential reasonably foreseeable effects of the action. Rather, the provision only prohibits an agency from basing its environmental analysis on mitigation that the agency cannot be reasonably sure will occur. If an agency treats the proposal's unmitigated effects as "reasonably foreseeable," and analyzes them in its environmental review, then the rule does not require the agency to make the mitigation measures discussed in the environmental document enforceable or to identify the authority for those measures.

The text in the final rule is consistent with CEQ's longstanding position that agencies should not base their NEPA analyses on mitigation measures that they lack the authority to carry out or to require others to carry out. CEQ agrees with the commenters that enforcing mitigation measures will generally rely on authorities conferred on the agency (or other participating agencies) by statutes other than NEPA. Rather than duplicating work done under those other statutes, however, the requirement to identify those authorities will help integrate NEPA with other

AR_0028836

statutory processes and promote efficiency and transparency.

Finally, CEQ proposed to strike paragraph (b) of 40 CFR 1505.2 (2020), requiring a decision maker to certify in the ROD that the agency considered all of the submitted alternatives, information, and analyses in the final EIS, consistent with paragraph (b) of 40 CFR 1502.17 (2020), and stating that such certification is entitled to a presumption that the agency considered such information in the EIS. CEQ proposed to strike this paragraph because such certification is redundant—the discussion in the ROD and the decision maker's signature on such document have long served to verify the agency has considered the entirety of the EIS's analysis of the proposed action, alternatives, and effects, as well as the public comments received. As a result, the certification that this paragraph required could have the unintended consequence of suggesting that the agency has not considered other aspects of the EIS, such as the comments and response to comments, in making the decision. CEQ also proposed this change because agencies are entitled to a presumption of regularity under the tenets of generally applicable administrative law, rather than this presumption arising from NEPA; therefore, CEQ considers it inappropriate to address in the NEPA regulations.

CEQ also proposed to strike paragraph (b) for consistency with its proposal to remove the exhaustion provision in 40 CFR 1500.3 (2020), as discussed in section II.B.3. As CEQ discussed in that section, CEQ now considers it more appropriately the purview of the courts to make determinations regarding exhaustion. Therefore, to the extent that the certification requirement was intended to facilitate the exhaustion provision in 40 CFR 1500.3 (2020), it is no longer necessary.

As discussed in section II.B.3, CEQ considered the comments regarding the exhaustion-related provisions and is removing them in this final rule. While most commenters discussed the provisions collectively, at least one commenter recommended removing this certification provision because it created an additional compliance burden on agencies without improving efficiency or reducing litigation risk. CEQ agrees that the certification provision does not increase efficiency or reduce litigation risk, and that this is an additional reason to remove this provision. For the reasons discussed here and in section II.B.3, CEQ removes this paragraph in the final rule. As noted in this section, CEQ considers such certification to be redundant to the decision maker's signature on a ROD, which indicates that the decision maker has considered all of the information, including the public comments.

2. Implementing the Decision (§ 1505.3)

CEQ proposed to add provisions to § 1505.3 for mitigation and related monitoring and compliance plans. To accommodate the changes, CEQ proposed to designate the undesignated introductory paragraph of 40 CFR 1505.3 (2020) as paragraph (a) and redesignate 40 CFR 1505.3(a) and (b) (2020) as § 1505.3(a)(1) and (a)(2), respectively. CEQ makes these reorganizational changes in the final rule with two clarifying edits to § 1505.3(a). First, CEQ adds an introductory clause in § 1505.3, "[i]n addition to the requirements of paragraph (c) of this section," to distinguish the discussion of monitoring in paragraph (a) from the new monitoring and compliance plans provided for in paragraph (c). Second, CEQ deletes "lead" before agency in the last sentence for consistency with the prior sentence, stating that the lead or other appropriate consenting agency shall implement mitigation committed to as part of the decision.

CEQ proposed to add new § 1505.3(b) to encourage lead and cooperating agencies to incorporate, where appropriate, mitigation measures addressing a proposed action's significant adverse human health and environmental effects that disproportionately and adversely affect communities with environmental justice concerns. CEQ proposed this addition to highlight the importance of considering environmental justice and addressing disproportionate effects through the NEPA process and the associated decision. CEQ proposed this addition based on public and agency feedback received during development of this proposed rule requesting that this rule address mitigation of disproportionate effects. Additionally, CEQ proposed this change to encourage agencies to incorporate mitigation measures to address disproportionate burdens on communities with environmental justice concerns.

Numerous commenters opposed CEQ's proposed addition of § 1505.3(b), pointing to the Supreme Court's decision in *Robertson* v. *Methow Valley Citizens Council*, 490 U.S. 332 (1989). These commenters stated that as a procedural statute, NEPA does not empower CEQ to require agencies to adopt mitigation measures. In contrast, other commenters supported CEQ's inclusion of the proposed new language in § 1505.3(b), and in some cases, encouraged CEQ to go further to require agencies to mitigate adverse effects to communities with environmental justice concerns.

CEQ finalizes § 1505.3(b) as proposed with two edits. The final rule includes "into its decision" after "incorporate" to clarify where agencies incorporate mitigation measures and does not include "adverse" after "significant" since "significant effects" is defined to only be adverse effects. CEQ has long encouraged agencies, as a policy matter, to adopt mitigation measures that will reduce the adverse environmental effects of their actions.[100] The addition of the language in § 1505.3(b) is consistent with this approach without imposing new legal requirements on Federal agencies.

CEQ recognizes the Supreme Court's holding in *Methow Valley* that NEPA does not require "that a complete mitigation plan be actually . . . adopted," 490 U.S. at 352, and has not changed its longstanding position that "NEPA in itself does not compel the selection of a mitigated approach."[101] Accordingly, this provision does not impose any binding requirements on agencies, but rather codifies a portion of CEQ's longstanding position that agencies should, as a policy matter, mitigate significant adverse effects where relevant and appropriate, in particular for "actions that disproportionately and adversely affect communities with environmental justice concerns." The encouragement to agencies to mitigate disproportionate and adverse human health and environmental effects on communities with environmental justice concerns is grounded in NEPA, which, while not imposing a requirement to mitigate adverse effects, nonetheless does "set forth significant substantive goals for the Nation." See *Vt. Yankee*, 435 U.S. at 558. Specifically, NEPA declares that the purposes of the statute are "to promote efforts which will prevent or eliminate damage to the environment and biosphere and stimulate the health and welfare of [people]"; establishes "the continuing policy of the Federal Government" to "assure for all Americans safe, healthful, productive, and esthetically and culturally pleasing surroundings" and to "preserve important historic, cultural, and natural aspects of our national heritage"; and "recognizes that each person should

---

[100] *See, e.g.,* CEQ, Mitigation Guidance, *supra* note 10, at 3847 ("CEQ encourages agencies to commit to mitigation to achieve environmentally preferred outcomes, particularly when addressing unavoidable adverse environmental impacts").

[101] *See id.* at 3844.

enjoy a healthful environment." 42 U.S.C. 4321, 4331(a), (b)(2), (b)(4), (c).

CEQ's policy guidance has long "encourage[d] agencies to commit to mitigation to achieve environmentally preferred outcomes, particularly when addressing unavoidable adverse environmental impacts." [102] CEQ's choice to encourage agencies in § 1505.3(b) to mitigate, "where relevant and appropriate," the significant effects of "actions that disproportionately and adversely affect communities with environmental justice concerns," reflects the particular importance of addressing environmental justice. CEQ does not intend the codification of its encouragement to mitigate this category of effects to imply that CEQ does not also continue to encourage agencies to commit to mitigation more broadly as set forth in CEQ's guidance. Rather, CEQ has determined to focus the regulation on mitigation where actions disproportionately and adversely affect communities with environmental justice concerns, due to its heightened policy concern when actions further burden communities that already experience disproportionate burdens.

Next, CEQ proposed to revise the text in paragraph (c) regarding mitigation and strike 40 CFR 1505.3(d) (2020) regarding publication of monitoring results, and replace them with new language in § 1505.3(c) regarding the contents of a monitoring and compliance plan. As proposed, this provision would require agencies to prepare a monitoring and compliance plan in certain circumstances when the agency commits to mitigation in a ROD, FONSI, or separate document. CEQ proposed to require agencies to prepare a plan for any mitigation committed to and adopted as the basis for analyzing the reasonably foreseeable effects of a proposed action, not just mitigation to address significant effects. In the NPRM, CEQ explained that it views such plans as necessary in order for an agency to conclude that it is reasonably foreseeable that a mitigation measure will be implemented, and, therefore, that the agency does not have to analyze and disclose the effects of the action without mitigation because they are not reasonably foreseeable. The proposal would not require a monitoring and compliance plan where an agency analyzes and discloses the effects of the action without the mitigation measure because, in that circumstance, the agency would not base its identification of reasonably foreseeable effects on the mitigation measure.

CEQ received many comments both supporting and opposing the requirement for mitigation monitoring and compliance plans under prescribed circumstances. Supporters of the proposed changes generally expressed concerns that without monitoring and compliance plans, agencies' assumptions regarding the ability of mitigation to reduce the adverse effects of the proposed action may be speculative. Opponents of the changes, meanwhile, raised similar concerns to those raised in connection with the language in § 1505.2(c) regarding the enforceability of mitigation, as discussed in section II.G.1. Specifically, commenters expressed concern that enforceable mitigation would be required in every case, and that the requirement for enforceability would discourage project proponents from proposing voluntary mitigation. These commenters also noted that NEPA does not require or authorize CEQ to require detailed mitigation plans and expressed concern that preparing monitoring and compliance plans would be duplicative and burdensome. Commenters also suggested that CEQ require monitoring plans in a broader range of cases; require plans to include more detailed information regarding effectiveness and uncertainty; require agencies to engage the public in connection with mitigation plans; and provide guidance on topics including interagency coordination and mitigation funding.

In the final rule, CEQ strikes paragraph (d) of 40 CFR 1505.3 (2020) and revises § 1505.3(c) to require the lead or cooperating agency to prepare and publish a monitoring and compliance plan for mitigation in certain circumstances identified in § 1505.3(c)(1) and (c)(2)—the final rule subdivides the text from proposed paragraph (c) to improve readability. The final rule clarifies that an agency must publish the plan. While publication is implied in the proposed rule, since such plans would be completed in or with the ROD or FONSI, and these documents must be published, commenters requested CEQ address this explicitly in the final rule, and CEQ has done so to avoid any confusion over whether agencies must publish these plans.

CEQ revises the language from the proposed rule to make clear that agencies must prepare such plans when the following conditions are met. First, the analysis of the reasonably foreseeable effects of a proposed action in an EA or EIS is based on implementation of mitigation. Second, the agency incorporates the mitigation

into its ROD, FONSI, or separate decision document.

As with the requirements related to mitigation enforceability in § 1505.2(c), this provision does not require agencies to include mitigation monitoring and compliance plans for every action subject to NEPA or even for every decision that includes mitigation. Rather, the final rule requires the agency to prepare and publish a mitigation monitoring and compliance plan when an agency bases its identification of the reasonably foreseeable effects of the action, as required by section 102(2)(C) of NEPA, on implementation of mitigation. Specifically, the statutory text requires an agency to identify the "reasonably foreseeable environmental effects" of the proposed action; to the extent that identification assumes the implementation of mitigation measures to avoid adverse effects, it follows, in turn, that implementation of mitigation must also be reasonably foreseeable. The preparation of a monitoring and compliance plan therefore provides the agency with reasonable certainty that the mitigation measures upon which it has based its effects analysis will be implemented, and therefore, that the effects of the action in the absence of mitigation do not need to be analyzed and disclosed to satisfy the requirements of the NEPA statute. For example, if an agency concluded that issuing a permit allowing fill of five acres of wetlands would not have a significant effect based on the applicant's agreement to restore five acres of comparable wetlands in the same watershed, then the agency has based its conclusion that the action to grant the permit does not have significant effects on implementation of the mitigation measure and would need to prepare a monitoring and compliance plan. The same would be true if the agency's analysis in its EA or EIS found that authorizing the filling of five acres of wetlands would not have a reasonably foreseeable effect on the availability of wetlands habitat in the watershed based on the implementation of the wetlands restoration measure.

The language in § 1505.3 builds on CEQ's longstanding positions regarding the information that agencies must include in NEPA documents when agencies choose to base their effects analysis on the implementation of mitigation measures. To the extent that other authorities may require monitoring and compliance plans, agencies should leverage those existing plans to comply with the requirements of the rule, rather than duplicating efforts.

---

[102] *See id.* at 3847.

CEQ proposed paragraphs (c)(1) and (c)(1)(i) through (c)(1)(vi) of § 1505.3 to describe the contents of a monitoring and compliance plan and provide agencies flexibility to tailor plans to the complexity of the mitigation that the agency has incorporated into a ROD, FONSI, or other document. Contents should include a description of the mitigation measures; the parties responsible for monitoring and implementation; how the information will be made publicly available, as appropriate; the anticipated timeframe for implementing and completing the mitigation; the standards for compliance with the mitigation; and how the mitigation will be funded.

A commenter suggested that CEQ require in § 1505.3(c)(1)(v) that the standards address effectiveness of the mitigation. CEQ declines to make this change in the final rule. The goal of this provision is to ensure that agencies have reasonable certainty that mitigation measures that serve as the basis for the effects analysis will be implemented, and therefore, that the effects of the action in the absence of implementation of mitigation are not reasonably foreseeable and can be excluded from the analysis. Agencies appropriately evaluate the effectiveness of mitigation measures as part of the NEPA process and rely on various techniques, such as adaptive management plans, to address circumstances where there is substantial uncertainty over effectiveness, for example where a mitigation measure is new or novel.

CEQ finalizes these paragraphs in § 1505.3(d) and (d)(1) through (d) as proposed, with an addition to § 1505.3(d) to reference the monitoring and compliance plan required by paragraph (c). Agencies may tailor monitoring and compliance plans to the particular action, but they should contain sufficient detail to inform the participating and cooperating agencies and the public about relevant considerations, such as the magnitude of the environmental effects that would be subject to mitigation, the degree to which the mitigation represents an innovative approach, any technical or other challenges with implementation, the time frame for implementation and monitoring, and other relevant facts that support a determination that the mitigation will be implemented. Where a proposed action involves more than one agency, the lead and cooperating agencies should collaboratively develop a monitoring and compliance plan that clearly defines agency roles and avoids duplication of effort.

Requiring agencies to prepare a monitoring and compliance plan for mitigation in the circumstances identified in paragraph § 1505.3(c) is intended to address concerns that mitigation measures included in agency decisions are not always carried out. If it is reasonably foreseeable that a mitigation measure will not be implemented, then the agency cannot appropriately base its analysis of the effects of the action on the implementation of the mitigation measure. A monitoring and compliance plan will address this concern and support an agency relying on mitigation for purposes of analyzing and disclosing the reasonably foreseeable environmental effects of a proposed action, as required by section 102(2)(C) of NEPA, and, in some circumstances, concluding that a FONSI is appropriate.

Finally, CEQ proposed to add a new paragraph (c)(2) to provide that any new information developed through the monitoring and compliance plan would not require an agency to supplement its environmental documents solely because of this new information. CEQ proposed this provision to clarify that the existence of a monitoring and compliance plan by itself would not mean that the action to which it relates is an ongoing action if it would otherwise be considered completed.

CEQ received comments supporting, opposing, and asking CEQ to clarify proposed § 1505.3(c)(2). In the final rule, CEQ includes proposed paragraph (c)(2) at § 1505.3(e) with some revisions to the proposal. CEQ revises the beginning of the first sentence to clarify that where an action is incomplete or ongoing, the information developed through the monitoring and compliance plan itself cannot induce the requirement to supplement or revise environmental documents. CEQ includes this provision to avoid perverse incentives that could lead agencies to adopt less effective monitoring and compliance plans, or forgo commitments to mitigation entirely, to avoid revision and supplementation. This clarification is also consistent with the purpose of the monitoring and compliance plan, which is to ensure that the agency has a reasonable basis for assessing environmental effects at the time that it makes its decision, rather than creating a new obligation for ongoing NEPA analysis after a decision is made. Second, CEQ adds an additional sentence at the end of the paragraph to clarify that the ongoing implementation of a monitoring and compliance plan by itself is not an incomplete or ongoing Federal action that induces supplementation under §§ 1501.5(h) or 1502.9(d).

The changes to § 1505.3 are consistent with the final rule's revisions to § 1505.2(c), which direct agencies to adopt and summarize a monitoring and enforcement program for any enforceable mitigation requirements or commitments for a ROD, and to § 1501.6(a) to clarify the use of mitigated FONSIs. The changes also provide more consistency in the content of monitoring and compliance plans, increase transparency in the disclosure of mitigation measures, and provide the public and decision makers with relevant information about mitigation measures and the process to comply with them.

*H. Revisions to Other Requirements of NEPA (Part 1506)*

CEQ proposed multiple revisions to part 1506, as described in this section. As noted in section II.C.8, CEQ proposed to move 40 CFR 1506.6 (2020), "Public involvement," to § 1501.9, "Public and governmental engagement." CEQ did not propose changes to § 1506.2, "Elimination of duplication with State, Tribal, and local procedures;" § 1506.4, "Combining documents;" or § 1506.8, "Proposals for legislation," but invited comments on whether it should make changes to these provisions in the final rule.

CEQ received several general comments of support on § 1506.2 regarding elimination of duplication with State, Tribal, and local procedures, and one commenter suggested the final rule change § 1506.2(d) to require rather than recommend that EISs describe how the agency will reconcile an inconsistency between the proposed action and an approved State, Tribal, or local plan or law. CEQ declines to make this change to this longstanding language from the 1978 regulations. As also noted in this provision, NEPA does not require such reconciliation.

CEQ did not receive any recommendations to amend § 1506.4 regarding combining documents, though one commenter requested additional guidance on use of this and other provisions to facilitate sound and efficient decision making and avoid duplication. Finally, CEQ received one comment on § 1506.8 regarding legislative EISs, requesting CEQ include public notification and participation requirements for legislative EAs/EISs in § 1506.8(b). CEQ notes that consistent with § 1506.8(c), agencies must provide for public notice and seek comment like any other draft EIS. After considering these comments, CEQ has determined to finalize the rule without making changes to §§ 1506.2, 1506.4, or 1506.8.

1. Limitations on Actions During NEPA Process (§ 1506.1)

CEQ proposed to edit § 1506.1(b) to provide further clarity on the limitations on actions during the NEPA process to ensure that agencies and applicants do not take actions that will adversely affect the environment or limit the choice of reasonable alternatives until an agency concludes the NEPA process.

CEQ proposed to amend the last sentence in paragraph (b), which provides that agencies may authorize certain activities by applicants for Federal funding while the NEPA process is ongoing. To better align this provision with NEPA's requirements, CEQ proposed to add a clause to the sentence clarifying that such activities cannot limit the choice of reasonable alternatives, and the Federal agency must notify the applicant that the agency retains discretion to select any reasonable alternative or the no action alternative regardless of any potential prior activity taken by the applicant prior to the conclusion of the NEPA process. CEQ also proposed this revision to provide additional clarity consistent with § 1506.1(a) and the 2020 Response to Comments, which state that this provision allows certain activities to proceed, prior to a ROD or FONSI, so long as they do not have an adverse environmental impact or limit the choice of reasonable alternatives.[103] The NPRM also noted that the proposed change is responsive to comments received on the 2020 rule expressing concern that the existing language could allow pre-decisional activities to proceed that would inappropriately narrow the range of alternatives considered by an agency.

A few commenters expressed support for the proposed changes to § 1506.1(b), including commenters who also requested additions to the list of examples of potentially permissible activities. Several other commenters opposed the proposed language, pointing to sector-specific reasons; citing cases where courts issued preliminary injunctions predicated on a ruling that limiting reasonable alternatives before the NEPA analysis is complete is irreparable harm; citing cases where courts ruled that undertaking project actions before NEPA is completed undermines the law; and asserting that allowing any economic investment in an action before completing the NEPA process undermines confidence in agency decisions.

Some commenters opposed the examples of activities an agency could authorize, asserting that land rights acquisition and long lead time equipment purchases are apt to bias agency decision making and recommended CEQ revise the list to prohibit acquisition of interests in land, purchase of long lead-time equipment, and purchase options made by applicants before NEPA review.

One commenter asserted that the proposed revisions to paragraph (b) undermine the value of an agency authorization and recommended the provision state that project applicants may proceed at their own risk without agency authorization. Another commenter requested that CEQ add language to paragraph (b) to provide Tribes with more flexibility to undertake interim actions.

CEQ considered the comments and finalizes § 1506.1(b) as proposed with two additional revisions. Specifically, CEQ changes the phrase "non-Federal entity" to "applicant" in the first sentence of paragraph (b) for consistency with the definition of "applicant" added to § 1508.1(c) and does not include the phrase "potential prior" before the word "activity," so that the provision requires notification that the agency retains discretion regardless of any activity taken by the applicant prior to the conclusion of the NEPA process. CEQ has deleted this phrase because, upon further consideration, it considers it to be confusing because the sentence refers to activity taken prior to the conclusion of the NEPA process, and, therefore, the earlier use of "prior" is redundant and the use of "potential" is unnecessary because such activity would be actual and not potential at the conclusion of the NEPA process. CEQ considers the provision as revised to strike the right balance between preserving the integrity of the NEPA process, including preserving an agency's right to select no action or a reasonable alternative, and providing applicants sufficient flexibility to make business decisions. This approach is consistent with the fact that NEPA applies to Federal agencies and does not directly regulate applicants (unless the applicants are themselves Federal agencies). This approach is also consistent with longstanding practice under § 1506.1. Further, applicants are in the best position to assess and determine their tolerance for risk, and agencies should never be unduly influenced by these decisions in their NEPA processes.

CEQ also proposed to strike "required" in paragraph (c). This edit is consistent with § 1501.11, which

encourages, but does not require, the use of programmatic environmental reviews.

A few commenters opposed the proposed change to paragraph (c), asserting that it is contrary to NEPA and multiple other laws by restricting actions during discretionary or non-required programmatic environmental reviews. One commenter stated that the proposal would authorize agencies to suspend programs like Federal coal leasing while environmental studies are ongoing, and that NEPA does not provide agencies with authority for such action. The commenter asserted that expanding proposed § 1506.1 beyond required programmatic environmental reviews is arbitrary and capricious because CEQ has failed to describe a valid purpose for the deletion.

CEQ has reviewed this provision in response to comments and retains "required" in the final rule. CEQ also revises "programmatic environmental review" to "environmental review for a program" to revert to the approach in the 1978 regulations. The 2020 rule changed "program" EIS to "programmatic environmental review" stating that "programmatic" is the term commonly used by NEPA practitioners.[104] However, paragraphs (c) and (c)(1) continue to refer to "program," and the definition of "programmatic environmental document" in § 1508.1(ee) is not limited to reviews of programs, but extends other reviews such as reviews of groups of related actions. To resolve any ambiguity, the final rule is using "program" throughout these paragraphs and changes "existing programmatic review" to "environmental document." CEQ also notes that the longstanding principles set forth in paragraph (c)— that agencies must comply with NEPA for specific Federal actions before taking the action and that agencies cannot engage in activities that prejudice the outcome of the NEPA process—apply to programmatic environmental reviews irrespective of whether a programmatic review is required.

2. Adoption (§ 1506.3)

CEQ proposed changes to § 1506.3 in the NPRM to facilitate an agency's adoption of the EISs, EAs, and CE determinations of another agency in an appropriate and transparent manner. As CEQ noted in the proposed rule, the 2020 regulations expanded § 1506.3 to codify longstanding agency practice of adopting EAs and explicitly allowed for adoption of other agencies' CE determinations. CEQ proposed

---

[103] CEQ, 2020 Response to Comments, *supra* note 69, at 356.

[104] CEQ, 2020 Final Rule, *supra* note 39, at 43327.

**Federal Register** / Vol. 89, No. 85 / Wednesday, May 1, 2024 / Rules and Regulations    **35521**

modifications to § 1506.3 to improve clarity, reduce redundancy, and ensure that when an agency adopts an EIS, EA, or CE determination, the agency conducts an independent review to determine that the EIS, EA, or CE determination meets certain basic standards. CEQ also proposed to add new requirements regarding the adoption of another agency's CE determination to increase public transparency.

Comments on the proposed changes to § 1506.3 expressed both opposition and support for adoption in general, the approach to enabling adoption taken in the proposed rule, and its application to EISs, EAs, and CE determinations. Commenters who supported the adoption provisions as proposed point to the efficiencies gained in reducing time. Commenters who opposed CEQ's proposed changes asserted that the proposed rule went beyond the intended goal of NEPA and that adoption limits public engagement. Additionally, one commenter requested that throughout this section, CEQ replace "substantially the same" with "the same" to strengthen the requirements for adoption.

CEQ finalizes the proposed changes to § 1506.3 as discussed in this section. CEQ disagrees that adoption goes beyond NEPA's intended goals. Because actions must be substantially the same, the public will have had the opportunity to engage during the preparation of the original document to the extent engagement is required or appropriate for that particular action; and, where the actions are not substantially the same, additional public engagement may be required consistent with the requirements for the document type. Additionally, the CEQ regulations have provided for adoption since 1978 and included the "substantially the same" standard. Such language is critical to facilitating adoption because agency actions are often not the same, but relate to the same overall project. For example, one agency's funding decision is not the same action as another agency's decision to issue a permit. However, if the underlying activity analyzed in the NEPA document is the same project, then adoption is appropriate.

In paragraph (a), which provides that an agency may adopt EISs, EAs or CE determinations, CEQ proposed to strike the language requiring an EIS, EA, or CE determination to meet relevant standards and instead articulate the standards in paragraphs (b) through (d), which address adoption of EISs, EAs, and CE determinations, respectively. CEQ proposed to replace this clause

with language that requires adoption to be done "consistent with this section." CEQ proposed to remove "Federal" before the types of documents an agency may adopt as unnecessary and to make clear that agencies can adopt NEPA documents prepared by non-Federal entities that are doing so pursuant to delegated authority from a Federal agency. *See, e.g.,* 23 U.S.C. 327. CEQ makes these changes in the final rule as proposed.

In paragraph (b), CEQ proposed to add text after the heading "Environmental impact statements" to provide that an agency may adopt a draft or final EIS, or a portion of a draft or final EIS, if the adopting agency independently reviews the statement and concludes it meets the standards for an adequate statement pursuant to the CEQ regulations and the adopting agency's NEPA procedures.

A commenter opposed the proposed requirement for agencies to confirm that an adopted EIS, as well as an EA under paragraph (c), meets the standards of the adopting agency's NEPA procedures. The commenter asserted that this requirement is burdensome and can cause delays. One commenter also asserted that paragraph (b) requires standards for EIS adoption in agency NEPA procedures and that because agencies have a year to adopt new procedures, this will set adoption back by a year.

CEQ finalizes the changes to paragraph (b) as proposed but replaces "a draft or final" EIS with "another agency's draft or final" EIS to respond to commenters' requests for additional clarity and for consistency with the existing phrasing in paragraph (d). CEQ disagrees that requiring adopting agencies to assess consistency with their procedures will add substantial additional burden. Ensuring consistency with the adopting agency's procedures is a codification of longstanding agency practice and is necessary so that an agency can ensure that the adopted document satisfies the requirements applicable to the adopting agency. CEQ also disagrees that agencies must update their procedures to address adoption before they can make use of this tool. While agencies may consider including the adoption process in their procedures, § 1507.3 does not require agencies to do so and does not preclude an agency from using adoption before its procedures are updated. Therefore, CEQ disagrees with the commenter's assertion that agencies cannot adopt EISs until their agency NEPA procedures are updated.

In paragraph (b)(1), which addresses adoption of an EIS for actions that are substantially the same, CEQ proposed to

insert "and file" after "republish" to improve consistency with § 1506.9 and because agencies must both publish the EIS and file it with EPA. Further in paragraph (b)(1), CEQ proposed to add text to clarify that agencies should supplement or reevaluate an EIS if the agency determines that the EIS requires additional analysis.

One commenter questioned if the phrase "or reevaluate it as necessary" means an agency could adopt an EIS through an EA and FONSI. Another commenter requested that CEQ more clearly require agencies to supplement an EIS, interpreting the proposed rule text to encourage, rather than require, supplementation when there is new or updated data. Similarly, the commenter also requested that CEQ define when it is necessary to supplement or reevaluate an EA in paragraph (c). CEQ finalizes this provision with an additional revision to change "the statement requires supplementation" to "the statement may require supplementation consistent with § 1502.9 of this subchapter," which adds a cross-reference to the section of the regulations addressing supplementation and reevaluation. CEQ includes these revisions to clarify that agencies can conduct additional analysis to determine whether the supplementation criteria of § 1502.9(d) are met or document why supplementation is not required. This revised provision codifies agency practice and provides agencies more flexibility to use the efficiency mechanism of adoption while also ensuring that the analysis included in an adopted document is valid and complete. For example, if an agency is adopting an EIS that was prepared several years prior, and there is more recent data or updated information available on one of the categories of effects, the agency may need to do additional analysis if the supplementation standard in § 1502.9(d) is met, or document in a reevaluation, consistent with § 1502.9(e), why the supplementation standard is not met. Similarly, if an action is not substantially the same, and the adopting agency determines that the EIS requires supplemental analysis, the agency would treat the EIS as a draft, prepare the additional analysis, and publish the new draft EIS for notice and comment. Where a proposed action is not substantially the same, an agency must, at minimum, supplement the adopted EIS to ensure it adequately covers its proposed action.

In paragraph (b)(2), which addresses adoption of an EIS by a cooperating agency, CEQ proposed to clarify that this provision is triggered when a

cooperating agency does not issue a joint or concurrent ROD consistent with § 1505.2. In the proposed rule, CEQ explained that this provision covers instances when a cooperating agency adopts an EIS for an action the cooperating agency did not anticipate at the time the EIS was issued, such as a funding action for a project that was not contemplated at the time of the EIS. In such instances, the cooperating agency may issue a ROD adopting the EIS of the lead agency without republication of the EIS. CEQ proposed to strike the text at the end of paragraph (b)(2) regarding independent review because CEQ proposed to capture that standard in paragraph (b).

CEQ did not receive comments on its proposed changes to paragraph (b)(2). Therefore, CEQ finalizes this provision consistent with its proposal.

In paragraph (c), CEQ proposed to add language to clarify the standard for adopting an EA, which mirrors the standard for adoption of an EIS. CEQ similarly proposed edits to align the process with the processes for EISs by clarifying that the adopting agency may adopt the EA, and supplement or reevaluate it as necessary, in its FONSI.

A few commenters opposed the adoption of EAs, in particular expressing opposition to the adoption of draft EAs or EAs that are the subject of formal dispute resolution or litigation, and suggested these should instead be incorporated by reference pursuant to § 1501.12. One commenter requested that CEQ revise paragraph (c) to align it with paragraph (d) to require agencies to document the reasons for its adoption and make its reasoning publicly available.

In the final rule, CEQ finalizes the text as proposed in paragraph (c) with an additional revision to replace "an environmental assessment" with "another agency's environmental assessment" to respond to commenters' requests for additional clarity and for consistency with the same change to paragraph (b) and the existing language in paragraph (d). For the reasons articulated with respect to EISs, CEQ revises the language that if an agency determines an EA "may require supplementation consistent with § 1501.5(h) of this subchapter," it may adopt and supplement or reevaluate the EA as necessary and issue its FONSI. CEQ agrees that an agency may only adopt a final EA, and that use of a draft EA through incorporation by reference is appropriate. However, CEQ interprets the proposed text as precluding adoption of a draft EA and, therefore, does not consider additional revisions necessary to address this comment. The

reference to EAs in this section necessarily means final EAs, since the regulations do not require a draft and final EA; therefore, the reference to EA without specification means a final EA.

For additional clarity, CEQ proposed to add "determinations" to the title of paragraph (d). CEQ also proposed to revise this paragraph to improve readability and clarify that the adopting agency is adopting another agency's determination that a CE applies to a particular proposed action where the adopting agency's proposed action is substantially the same. As CEQ noted in the proposed rule, this provision does not allow an agency to unilaterally use another agency's CE for an independent proposed action; rather, the process for such reliance on another agency's CE is addressed in § 1501.4(e).

To ensure that there is public transparency for adoption of CE determinations, like adoption of EAs and EISs, CEQ proposed new paragraphs (d)(1) and (d)(2) to require agencies to document and publish their adoptions of CE determinations, such as on their website. CEQ proposed in paragraph (d)(1) to specify that agencies must document a determination that the proposed action is substantially the same as the action covered by the original CE determination, and there are no extraordinary circumstances present requiring preparation of an EA or EIS. Because agencies typically already make such determinations in the course of adopting CE determinations for actions that are substantially the same, CEQ has concluded that this documentation requirement will not be onerous or time consuming. In paragraph (d)(2), CEQ proposed to require agencies to publicly disclose when they are adopting a CE determination. CEQ stated in the proposed rule that this proposed change was intended to increase transparency on use of CEs to respond to feedback from stakeholders that they often do not know when an agency is proceeding with a CE. This adds a standard to adoption of CE determinations that is similar to the practice for adoption of EAs and EISs. Agencies, however, have flexibility to determine how to make this information publicly available, including through posting on an agency's website.

One commenter requested that CEQ require an agency to both publish a determination on its website and make it publicly available in other ways, as opposed to one or the other. CEQ declines to require agencies to publish CE adoption determinations in multiple places as unnecessarily burdensome on agencies. However, CEQ notes that the language in paragraph (d)(2) does not

preclude agencies from both publishing an adoption of a CE determination on its website and making it publicly available in other ways when they determine doing so is appropriate. CEQ finalizes these paragraphs as proposed with one clarifying change to add introductory language at the end of paragraph (d)— "In such circumstances the adopting agency shall"—to make clear that paragraphs (d)(1) and (d)(2) apply when adopting another agency's CE determination to distinguish this process from the adoption process under § 1501.4(e).

## 3. Agency Responsibility for Environmental Documents (§ 1506.5)

CEQ proposed modifications and additions to § 1506.5 to clarify the roles and responsibilities for agencies, applicants, and agency-directed contractors in preparing environmental documents and to make the provision consistent with section 107(f) of NEPA, which requires agencies to prescribe procedures to allow project sponsors to prepare EAs and EISs under the agencies' supervision and to independently evaluate and take responsibility for such documents. 42 U.S.C. 4336a(f). The 2020 rule amended § 1506.5 to allow an applicant to prepare EISs on behalf of the agency; however, the 2023 amendments to NEPA make clear that agencies themselves must establish procedures for project sponsors to prepare EAs and EISs, not the CEQ regulations. As noted in the NPRM, CEQ understands the 2023 amendments to NEPA to use the terms "applicant" and "project sponsor" interchangeably and, therefore, CEQ proposed to use the term "applicant" and, in the final rule, CEQ uses and defines the term "applicant." See section II.J.1. However, as discussed further in this section, CEQ notes that the 2023 NEPA amendments' requirement that agencies establish procedures for project sponsors to prepare EAs and EIS does not affect the ability of applicants and project sponsors to provide information to agencies to assist agencies or their agency-directed contractors in the preparation of environmental documents consistent with § 1506.5(c).

CEQ received multiple comments that generally supported the proposed changes to allow applicants to prepare EAs and EISs, as well as multiple commenters who generally opposed the provision and opposed section 107(f) of NEPA, 42 U.S.C. 4336a(f). CEQ discusses these comments and responses in section II.I.3 of this final rule, which addresses the statutory

requirement for agencies to prescribe applicant procedures.

In paragraph (a), CEQ proposed to clarify that regardless of who prepares an environmental document—the agency itself, a contractor under the direction of the agency, or the applicant pursuant to agency procedures—the agency must ensure the document is prepared with professional and scientific integrity using reliable data and resources, consistent with sections 102(2)(D) and (2)(E) of NEPA, 42 U.S.C. 4332(2)(D)–(E), and exercise its independent judgment to review, take responsibility for, and briefly document its determination that the document meets all necessary requirements and standards related to NEPA, the CEQ regulations, and the agency's NEPA procedures.

A few commenters provided suggestions for CEQ to consider regarding the changes in paragraph (a). These commenters asked CEQ to define what "under the supervision of the agency" means; require agencies to fully rather than briefly document its determination that an environmental document meets the standards of NEPA, the CEQ regulations, and the agency's NEPA procedures; and adopt a clearer standard for guaranteeing professional and scientific integrity to ensure all EISs and EAs receive the same level of scrutiny regardless of who prepares them.

Multiple commenters also provided feedback on the language in paragraph (a) referring to agency procedures adopted pursuant to § 1507.3(c)(12), which are discussed in section II.I.3 of this final rule.

In the final rule, CEQ makes a few clarifying updates to the proposed text in paragraph (a). Specifically, CEQ revises the paragraph heading to "agency responsibility" to clarify that this paragraph addresses agency responsibility for environmental documents generally. CEQ adds "and direction" after "supervision" to better distinguish contractors under the supervision of the agency from applicant-directed contractors. This provision addresses contractors hired directly by the agency and third-party contractors where the applicant pays for the contractor but otherwise has no role in directing that contractor during the preparation of the document; rather, the agency supervises and provides the direction. Contractors hired by the applicant and supervised by the applicant directly are covered by the language in the regulation addressing applicant-prepared EAs and EISs pursuant to § 1507.3(c)(12).

CEQ declines to specifically define "supervision" as this is a commonly understood term, and CEQ considers the addition of the word "direction" in this paragraph to capture the appropriate role of agencies, which have decades of experience with supervising the work of contractors preparing NEPA documents. CEQ also declines to require agencies to do more than briefly document their determination that an environmental document meets the standards under NEPA, the regulations in this subchapter, and the agency's NEPA procedures. In general, NEPA documents themselves demonstrate that they meet these standards; the determination required by this paragraph merely requires that an agency documents that it has also made this determination.

Lastly with respect to paragraph (a), CEQ declines to include standards for scientific and professional integrity. These concepts have been in the regulations since 1978, and the final rule further clarifies these concepts by moving 40 CFR 1502.23 (2020) to § 1506.6 as discussed further in section II.H.4.

In the NPRM, CEQ proposed in the second sentence of paragraph (b) to remove text providing that agencies may direct an applicant to prepare an environmental document and also replace the phrase "environmental document" with specific reference to EAs or EISs. CEQ also proposed to add a clause to allow agencies to authorize a contractor to draft a FONSI or ROD, while also providing that the agency is nevertheless responsible for the accuracy, scope, and contents of contractor-drafted FONSIs and RODs. CEQ proposed to add this clause because a FONSI or ROD represents an agency's conclusions regarding potential environmental effects and other aspects of a proposed action. CEQ also proposed these changes to exclude applicants from directly preparing EAs and EISs under this section, given the direction in section 107(f) of NEPA that a lead agency must prescribe procedures to allow a project sponsor to prepare an EA or EIS, 42 U.S.C. 4336a(f), and CEQ proposed to require agencies to include these procedures as part of their agency NEPA procedures in § 1507.3(c)(12). CEQ also proposed these edits to clarify the role of contractors because finalizing and verifying the contents of FONSIs and RODs is appropriately the responsibility of the Federal agency and is consistent with longstanding agency practice.

CEQ received comments expressing confusion regarding this paragraph given the reference to applicants in the first sentence. CEQ also received multiple comments interpreting this provision to allow applicants to prepare draft FONSIs or RODs. Some of these commenters objected to this perceived allowance asserting that applicants should not be allowed to draft decision documents because they are biased and have a conflict of interest. Conversely, three commenters supported the ability of applicants, contractors, or project sponsors to prepare FONSIs and RODs, pointing to time and cost savings, with one commenter specifically interpreting section 107(f) of NEPA, 42 U.S.C. 4336a(f), to allow applicants to prepare all environmental documents. One commenter suggested CEQ edit the beginning of the second sentence of proposed paragraph (b) to address conflict of interest by adding a qualifier that would limit the applicability of the paragraph to circumstances in which an agency has established the absence of any conflict of interest.

In the final rule, CEQ addresses the confusion around this provision by separating the provisions related to applicants from provisions related to agency-directed contractors. First, CEQ revises the paragraph heading for paragraph (b) to read "applicant information" and retains the first sentence allowing agencies to require applicants to submit environmental information for agency use in preparing an environmental document. The CEQ regulations have long allowed agencies to collect information from applicants to help them prepare NEPA documents, and CEQ considers this allowance essential to an efficient environmental review process because in many cases, the applicant will already have obtained or be in the best position to obtain information that an agency needs.

Second, in paragraphs (b)(1) through (b)(3) of the final rule, CEQ includes the provisions that provide directions related to applicant-provided information. Paragraph (b)(1) retains the first sentence from paragraph (b)(1) of the proposed rule, which provides that agencies should outline the information that the agency needs from the applicant to prepare an environmental document.

Paragraph (b)(2) retains the requirement in the current regulations and proposed paragraph (b)(2) that the agency independently evaluate the environmental information provided by an applicant and be responsible for the accuracy, scope, and contents of any applicant-provided environmental information included in the environmental document. CEQ does not require agencies to specifically document their evaluation of this information since the agencies are

responsible for preparing the NEPA document, and therefore any applicant-provided environmental information included in the NEPA document becomes the agency's responsibility. While paragraph (a) requires agencies to briefly document its determination that a contractor-prepared environmental document meets the standards under NEPA, the CEQ regulations, and the agency's NEPA procedures, requiring an agency to specifically address each piece of information or analysis provided by an applicant that the agency has incorporated into an environmental document would be burdensome. Under this provision, agencies have discretion to integrate applicant-provided information in environmental documents as the agency sees fit, and the agency is responsible for the accuracy of that information, just as it is responsible for the accuracy of information from other sources that the agency relies upon. And, as with all NEPA documents, the agencies are responsible for ensuring their documents are appropriately scoped and satisfy all legal requirements including compliance with these regulations and their agency NEPA procedures. Lastly, CEQ includes a new paragraph (b)(3) to note that an agency may allow applicants to prepare EAs or EISs consistent with agency procedures issued pursuant to section 107(f) of NEPA, 42 U.S.C. 4336a(f), and § 1507.3(c)(12).

Third, the second sentence of proposed § 1506.5(b) becomes paragraph (c) in the final rule, and CEQ adds a paragraph heading, "Agency-directed contractor," to clarify that this provision addresses contractors where the agency supervises and directs their work. CEQ adds "and direction" after "supervision" for consistency with its edit in paragraph (a) and to clarify that this provision does not apply to contractors hired and overseen by applicants. In the final rule, CEQ does not revise "environmental document" to be "environmental assessment or environmental impact statement" or include the language allowing an action to authorize a contractor to draft a FONSI or ROD. Since this provision is specific to agency-directed contractors, and an agency may direct a contractor in helping to draft any environmental document, these limitations are unnecessary.

Fourth, paragraph (c)(1) of the final rule contains the second sentence of proposed § 1506.5(b)(1) and requires agencies to provide their contractors guidance, and participate in and supervise the environmental document's preparation. Fifth,

paragraph (c)(2) of the final rule addresses proposed § 1506.5(b)(2) and requires agencies to independently evaluate contractor-prepared environmental documents, be responsible for their accuracy, scope, and contents, and document the evaluations in the environmental documents themselves. As discussed earlier in this section, CEQ addresses applicant-submitted information in paragraph (b)(2).

One commenter requested that CEQ add in proposed paragraph (b)(2), which is § 1506.5(c)(2) in the final rule, a requirement for agencies to explain how it independently evaluated the information prepared by the contractor and upon what basis the agency is able to vouch for the accuracy, scope, and contents of the information or documents submitted. This comment aligns with other commenters who requested that CEQ strengthen agency responsibility for the accuracy, scope, and contents of environmental documents.

CEQ declines to add greater specificity about how agencies must evaluate and document their evaluations. Such evaluations may vary greatly depending on what the agency is evaluating and setting a regulatory standard would be inappropriate and inefficient. Further, the level of evaluation needed may vary depending on the guidance and direction agencies provide to the contractors in the first place.

Fifth, paragraph (c)(3) of the final rule requires agencies to include the names and qualifications of the persons preparing and independently evaluating the contractor-prepared environmental documents, such as in the list of preparers for EISs, consistent with § 1502.18. This provision is identical to proposed § 1506.5(b)(3), in which CEQ proposed to remove the reference to applicants as discussed earlier in this section.

Next, CEQ proposed to revise paragraph (b)(4) of 40 CFR 1506.5 (2020) to clarify that the Federal agency is responsible for preparing a disclosure statement for the contractor to execute, specifying that the contractor does not have any financial or other interest in the outcome of the proposed action.

CEQ received multiple comments regarding the proposed changes to paragraph (b)(4). One commenter expressed that the paragraph provides for less disclosure than the 1978 regulations did. One commenter expressed direct support for the paragraph and encouraged CEQ to retain the disclosure requirement. Another commenter requested that CEQ delete

"where appropriate" interpreting the clause to modify "shall prepare" instead of "cooperating agency" and arguing deletion of this clause will minimize conflicts of interest. One commenter opposed paragraph (b)(4), asserting that it is not workable for a contractor to have no financial or other interest in the outcome of an action because it is common for a firm that assists with preparing the NEPA documents to perform subsequent engineering and design work if a project moves forward.

CEQ finalizes this provision in § 1506.5(c)(4) as proposed, but adds "where appropriate" to precede rather than follow (as proposed) "a cooperating agency" to make it clear that the clause modifies "cooperating agency." CEQ makes this change in the final rule to address commenters' concerns that the provision, as drafted in the proposed rule, would have given agencies the discretion whether to prepare a disclosure statement. The revised language is generally consistent with the approach in the 1978 regulations, and CEQ disagrees that it provides for less disclosure than the 1978 regulations. CEQ does not consider the potential for a contractor to perform future engineering and design work to present a conflict of interest in the outcome of an action. Instead, a conflict of interest would exist if a contractor possessed a direct financial interest in the project, for example if it entered into a contingency fee arrangement that provided for an additional payment if an agency authorized an action. However, CEQ encourages agencies to disclose this information to the public in their contractor disclosure statements.

Finally, CEQ proposed to change "any agency" to "an agency" in paragraph (b)(5). In the final rule, CEQ redesignates paragraph (b)(5) of 40 CFR 1506.5 (2020) to be paragraph (d) as this paragraph is a general statement about the operations of § 1506.5 and is not specific to agency-directed contractors. CEQ adds a paragraph heading, "Information generally" for consistency with the paragraph headings added throughout.

## 4. Methodology and Scientific Accuracy (§ 1506.6)

As discussed in section II.D.18, in the final rule, CEQ moves the provision on methodology and scientific accuracy, from proposed § 1502.23 to § 1506.6, because this provision is generally applicable to NEPA reviews. As discussed further in this section, CEQ finalizes the text from proposed § 1502.23 with additional clarifying edits.

CEQ proposed to separate 40 CFR 1502.23 (2020) into paragraphs (a) and (b), with some modification, and add a new paragraph (c). In the final rule, CEQ further subdivides these paragraphs for additional clarity.

First, the first sentence of proposed § 1502.23(a), which is the opening sentence of 40 CFR 1502.23 (2020), requires agencies to ensure the professional integrity, including scientific integrity, of the discussions and analyses in environmental documents. This sentence has been in the regulations unchanged since 1978, is consistent with section 102(2)(D) of NEPA, 42 U.S.C. 4332(2)(D), and CEQ did not propose any revisions to this sentence in the proposed rule. CEQ finalizes this sentence in a standalone paragraph, § 1506.6(a), in the final rule.

Second, CEQ proposed to use the term high-quality information, which the 1978 regulations required agencies to use, *see* 40 CFR 1500.1 (2019), in the second sentence of proposed § 1502.23(a). CEQ proposed to clarify that such information includes best available science and reliable data, models, and resources.

Some commenters requested that CEQ add definitions for "high-quality information" and "best available science." One commenter expressed that "high-quality information" is ambiguous and recommended CEQ remove it. Other commenters interpreted the example best available science to set a standard and asserted that this conflicts with the direction in section 102 of NEPA to establish information quality standards. Some commenters opposed the use of best available science and stated that the high-quality information standard is sufficient to ensure scientific integrity.

A few commenters pointed to case law to support their opinion that NEPA does not require agencies to use the best scientific methodology available. These commenters expressed concerns that a best available science standard could result in increased costs and delays that may not be justified and instead supported the high-quality information standard. Another commenter asserted that a best available science standard could be inconsistent with the rule of reason, which is supported by case law, and result in agencies unreasonably gathering information to meet a best available science standard. Conversely, another commenter stated that the reference to best available science and data is consistent with the rule of reason and relevant case law.

In § 1506.6(b) of the final rule, CEQ makes the change in the second sentence of proposed § 1502.23(a) to require agencies to use high-quality information. For clarity, CEQ replaces the last clause of the sentence, "to analyze effects resulting from a proposed action and alternatives," with a more general clause at the beginning of the first sentence of § 1506.6(b) to avoid an ambiguity in the proposed text that could be read to imply that agencies do not need to rely on high-quality information for aspects of their environmental documents other than analyzing the effects of a proposed action and alternatives. CEQ did not intend to suggest that agencies can rely on anything other than high-quality information in their decision making, and the revision in the final rule makes clear that agencies must use high-quality information "[i]n preparing environmental documents." Given the more general language in the NEPA statute and the general applicability of this provision, CEQ considers this phrasing to more accurately reflect the standard. CEQ includes, with minor reorganization, three of the proposed examples of high-quality information in the final rule: "reliable data," "models," and "resources." The final rule uses the combined phrase "reliable data and resources" as one example to directly track the provision in section 102(2)(E) of NEPA, 42 U.S.C. 4332(2)(E), with "models" being another example. CEQ also notes that the Information Quality Act (Pub. L. 106–554, 44 U.S.C. 3516 note) and other authorities establish requirements for the quality, utility, objectivity, and integrity of the information that agencies disseminate, including, in some cases, requirements for peer review, and agencies should ensure compliance with those authorities as applicable.[105]

In the final rule, CEQ does not include "best available science" as an example of high-quality information. While CEQ considers "best available science" to be one example of high-quality information, CEQ agrees with commenters that NEPA does not require use of "best available science" in order to meet the statute's requirement for professional integrity, including scientific integrity. While CEQ did not intend for the inclusion of "best available science" as one example of "high quality information" in the proposed rule to require agencies to use

the best available science, based on the comments, CEQ is concerned that this text could be misconstrued by agencies and potential litigants to require use of best available science in all cases. Therefore, CEQ does not include this example in the final rule to avoid any confusion.

Third, in the preamble to the proposed rule, CEQ provided Indigenous Knowledge as an example of high-quality information. Several commenters recommended CEQ include this as an example in the regulatory text to make clear that Indigenous Knowledge can constitute high-quality information upon which agencies could rely consistent with the regulations. One commenter expressed concern about the addition of Indigenous Knowledge in the preamble because the commenter worried that agencies may weigh Indigenous Knowledge more heavily than other sources of scientific expertise. Another commenter requested that CEQ define "Indigenous Knowledge" and explain how agencies can best use it as high-quality information. Some commenters provided a suggested definition, while others opposed CEQ defining "Indigenous Knowledge" in the rule.

In the final rule, CEQ includes Indigenous Knowledge as an example of high-quality information in the regulatory text. CEQ disagrees with the concern that identifying Indigenous Knowledge as an example of high-quality information—whether in the preamble or regulatory text—requires agencies to weigh this knowledge more heavily than other sources of scientific expertise. The regulations require agencies to rely on high-quality information and provide several examples, one of which is Indigenous Knowledge, and do not create a preference for one kind of high-quality information over others. CEQ declines to define Indigenous Knowledge in the regulations as it did not receive sufficient input from commenters or through its Tribal consultation for it to develop an appropriate definition that could apply to all of the contexts in which Federal agencies operate governed by the CEQ regulations. Additionally, while some Tribes provided feedback on a definition, others expressed concerns about a regulatory definition. While CEQ is not including a definition in the final rule, CEQ notes that agencies may look to the CEQ/OSTP guidance as a resource, and CEQ will consider whether additional guidance is needed to help agencies incorporate Indigenous Knowledge into its NEPA reviews.

---

[105] *See* OMB, Guidelines for Ensuring and Maximizing the Quality, Objectivity, Utility, and Integrity of Information Disseminated by Federal Agencies, 67 FR 8452 (Feb. 22, 2002); OMB, Final Information Quality Bulletin for Peer Review, 70 FR 2664 (Jan. 14, 2005); and OMB, M–19–15, Improving Implementation of the Information Quality Act (2019), *https://www.whitehouse.gov/wp-content/uploads/2019/04/M-19-15.pdf.*

Fourth, CEQ proposed to include a clause in the second sentence of proposed § 1502.23(a) to reference that high-quality information includes existing sources and materials. This proposed change moved the word "existing" in the second sentence of 40 CFR 1502.23 (2020) to the end of the sentence. CEQ proposed these changes to clarify that while agencies must use reliable data and resources, which can include existing data and resources, they are not limited to using existing sources and materials. CEQ proposed these changes in response to public commenters on the 2020 rule and Federal agency experts who raised concerns that the 2020 language could limit agencies to "existing" resources and preclude agencies from undertaking site surveys and performing other forms of data collection, which have long been standard practice when analyzing an action's potential environmental effects and may be necessary for agencies to adequately understand particular effects.

Some commenters stated the removal of the word "existing" in proposed paragraph (a) is in conflict with section 106(b)(3) of NEPA, 42 U.S.C. 4336(b)(3), because it suggests agencies have the discretion to undertake new, non-essential scientific or technical research without regard for whether the information to be obtained is essential to a reasoned choice among alternatives or for the cost or time considerations under NEPA. Another commenter requested that CEQ amend this statement to specify that where project-specific data is available, agencies should rely on that information rather than theoretical models. One commenter suggested that CEQ clarify that while new research may not be required, agencies must consider new information in their analyses.

In the final rule, CEQ replaces the proposed clause in the second sentence of proposed § 1502.23(a), "including existing sources and materials," with a new sentence, "Agencies may rely on existing information as well as information obtained to inform the analysis," to make clear that agencies can and should rely on existing information, but may also undertake new or additional information gathering as needed to adequately analyze their proposed actions. For example, in the context of analyzing historical, cultural, or biological effects, agencies may need to conduct survey work or reassess existing survey work periodically. Requiring an agency to rely on outdated data would not comport with sections 102(2)(D) through (F) of NEPA, 42 U.S.C. 4332(2)(D)–(F). While there are

numerous reliable data sources for a variety of resources analyzed in NEPA documents, and the CEQ regulations encourage the use of existing information wherever possible, *see* § 1501.12, agencies should be permitted to exercise their judgment in determining when additional data and analyses are necessary for their analyses and decision making.

Fifth, CEQ moves the third sentence of 40 CFR 1502.23 (2020), which allows agencies to use any reliable data sources, such as remotely gathered information or statistical models to be the third sentence of § 1506.6(b) in the final rule and makes the clarifying edits consistent with the proposal.

Sixth, CEQ proposed to add a new sentence at the end of proposed § 1502.23(a) to encourage agencies to explain their assumptions and any limitations of their models and methods. CEQ proposed this addition to support this section's overall purpose of ensuring the integrity of the discussions and analyses in environmental documents. Additionally, CEQ proposed this addition to codify typical agency practice to explain relevant assumptions or limitations of the information in environmental documents.

A commenter recommended CEQ change the proposed new sentence from a recommendation to a requirement, stating that it is necessary for agencies to explain relevant assumptions or limitations of any models or methodologies on which they rely for their analyses to adequately inform the public and the agency decision makers. CEQ agrees that disclosing this information is necessary in order for the decision maker and the public to assess the reliability of the information. Therefore, CEQ includes the proposed sentence at the end of § 1506.6(b), but changes "should" to "shall" in the final rule.

Seventh, in proposed § 1502.23(b), CEQ proposed to strike the statement that agencies are not required to undertake new research to inform their analyses, consistent with the proposed change to proposed § 1502.23(a) regarding existing information. Some commenters opposed the proposed deletion of this language in proposed § 1502.23(b) and disagreed with CEQ's rationale for the deletion, stating that the existing language could not be reasonably read to prohibit agencies from undertaking additional analyses. One commenter opposed the proposed deletion, expressing concern that without the language, agencies may feel compelled to complete new research, which could interfere with agencies' ability to provide services, not just

analysis, in contravention of NEPA's broad purposes in sections 101(a) and (b) of NEPA, 42 U.S.C. 4331(a)–(b) to balance other national priorities, including conserving agency resources. Another commenter suggested that CEQ clarify that while new research may not be required, agencies must consider new information in their analyses. Other commenters opposed to the proposed deletion stated that the proposed change conflicts with other provisions of the proposed rule, such as the intent of proposed § 1506.5(b)(3) for acceptable work to not be redone and proposed § 1506.4 to reduce duplication and paperwork. Multiple commenters expressed concern that deleting this language could result in additional litigation risk and delays by encouraging agencies to conduct additional analyses. One commenter also suggested that the deletion is unnecessary because agencies already know that they are not limited to existing materials.

CEQ strikes this sentence in the final rule. In order for agencies to meet the requirements of the NEPA statute to analyze the effects of their proposed actions and, where appropriate, study alternatives, while ensuring professional integrity, including scientific integrity, CEQ considers it necessary to remove this statement because in some instances, in order to meet the statutory requirements, agencies will need to undertake research. CEQ disagrees that agencies will read this deletion to mean they need to do so in all cases, even where unnecessary or unreasonable. As one commenter noted, the CEQ regulations have long encouraged agencies to rely on existing information and analyses, and incorporate them by reference, *see, e.g.,* §§ 1501.12, 1506.2, and 1506.3.

A few commenters stated that the deletion of this text conflicts with section 106(b)(3) of NEPA, 42 U.S.C. 4336(b)(3), by implying agencies have discretion to undertake new, non-essential scientific or technical research without regard to whether the information to be obtained is essential to a reasoned choice among alternatives. CEQ disagrees with this assertion because section 106(b)(3) expressly applies only to an agency's determination of the level of NEPA review it needs to perform for an action, and does not apply to the analysis in an environmental document. Further, these comments suggest conflict with the statute because deleting this sentence disregards direction to make use of reliable data and resources. CEQ disagrees that section 102(2)(E) of NEPA, 42 U.S.C. 4332(2)(E), refers only to existing reliable data and resources,

because such a reading of 102(2)(E) would be inconsistent with the provision of section 106(b)(3) indicating that agencies are only required to undertake new scientific or technical research in determining the level of NEPA review in certain circumstances. Rather, section 102(2)(E) does not address whether agencies can conduct new research or gather new data, but only provides that any data or resources an agency relies upon, whether existing or new, must be reliable. As noted in this section, it is common practice for agencies, when necessary or appropriate, to engage in additional research and create new data based on an action's particular circumstances (such as the affected environment) when analyzing proposed actions under NEPA. By striking the sentence added in 2020, CEQ is not imposing a new requirement for agencies to undertake new research in all cases, but rather is allowing agencies to continue to exercise their judgment and expertise in determining whether and when to undertake new research.

Eighth, CEQ strikes the last sentence in 40 CFR 1502.23 (2020), which the NPRM proposed to retain as the second sentence in proposed § 1502.23(b) regarding continued compliance with other statutory requirements related to scientific and technical research. In the 2020 rule, CEQ added this sentence to clarify the preceding sentence that agencies are not required to undertake new scientific and technical research to inform their analyses. Because the final rule strikes that sentence, it is unnecessary to retain the sentence that follows. Therefore, the final rule removes the last sentence of 40 CFR 1502.23 (2020) because it is unnecessary.

Some commenters suggested additional items be added to proposed § 1502.23(b). One commenter requested that CEQ incorporate the language from section 106(b)(3) of NEPA, 42 U.S.C. 4336(b)(3), to establish a clear standard for when new scientific research is needed. As CEQ noted earlier in this section, section 106(b)(3) applies only to determining the level of NEPA review. Another commenter requested CEQ add language to address information quality standards and transparency requirements for modeling. CEQ does not consider this level of detail appropriate for the regulations but will consider whether additional guidance on this topic could assist agencies in carrying out their NEPA responsibilities.

Ninth, CEQ moves to § 1506.6(c) the first and second sentences in proposed § 1502.23(b), which are the fourth and fifth sentences in 40 CFR 1502.23

(2020), requiring agencies to identify any methodologies used and make explicit reference to the scientific and other sources relied upon for conclusions in the environmental document, which agencies may place in an appendix. This change improves the organizational clarity of the section and is non-substantive.

Finally, CEQ proposed to add a new paragraph (c) to proposed § 1502.23 to require agencies to use projections when evaluating reasonably foreseeable effects, including climate change-related effects, where appropriate. CEQ also proposed to clarify that such projections may employ mathematical or other models that project a range of possible future outcomes, so long as agencies disclose the relevant assumptions or limitations. CEQ proposed this addition for consistency with the other proposed amendments to this section.

Some commenters expressed support for proposed § 1502.23(c) but recommended that CEQ provide guidance on how to support agencies in evaluating climate modeling projects or add additional language to address localized impacts of climate change on a project along with global impacts of the project on climate change. Another commenter requested that CEQ recommend, rather than require, use of projections, while another commenter expressed that the rule strikes an appropriate balance between allowing modeling necessary to project future effects and providing transparency for public viewing of the modeling on which agencies rely.

One commenter opposed the changes in paragraph (c) to require the use of projections because they interpret the language to be referring to the social cost of greenhouse gases and argued that this is inappropriate for project-specific NEPA reviews. They also offered the opinion that social cost of greenhouse gas models is not best available science. Another commenter requested CEQ remove the reference to climate-change related effects in paragraph (c) because it elevates climate change effects over other potential effects. Another commenter also expressed concern about the requirement to use projections because they asserted it may encourage agencies to attempt to model relationships between incremental greenhouse gas emissions from a particular project with actual environmental impacts, which is impossible, or use metrics like social cost of greenhouse gas emissions, which are not suited to environmental reviews. Another commenter also expressed concern that the project effects of climate change are too difficult to model

and that the proposed language could create delays and increase litigation risk.

CEQ includes proposed § 1502.23(c) in the final rule at § 1506.6(d). CEQ notes that projections are required only where an agency considers them appropriate. CEQ disagrees that including the example of climate-change related effects elevates these above other effects; it is an example, and agencies may determine projections are appropriate in analyzing a variety of other effects such as water or air quality, or effects on endangered species or historic properties. CEQ also disagrees that this language is intended to require agencies to use the social cost of greenhouse gases. As discussed in CEQ's 2023 GHG guidance, agencies may use this as a proxy to compare alternatives, but the regulations and the guidance do not require agencies to use this tool.

As CEQ noted in the proposed rule, based on existing agency practice and academic literature, agencies can and do use reliable projections to analyze reasonably foreseeable effects, including climate change-related effects. Where available and appropriate, agencies also can use or rely on projections that are scaled to a more targeted and localized geographic scope, such as land use projections, air emissions, and modeling, or to evaluate effects, including climate effects, experienced locally in relation to the proposed action. When doing so, agencies should explain the basis for relying on those projections and their underlying assumptions. In particular, climate projections can vary based on different factors and assumptions such as geography, location, and existing and future GHG emissions, and agencies should disclose the assumptions and limitations underlying any projection upon which the agency relies. Agencies can use models that analyze a range of possible future outcomes, but again agencies must disclose the underlying relevant assumptions or limitations of those models.

CEQ expects that modeling techniques will continue to improve in the future, resulting in more precise projections. To be consistent with § 1506.6, as modeling techniques advance, agencies should continue to rely on high-quality information when evaluating reasonably foreseeable effects.

### 5. Further Guidance (§ 1506.7)

CEQ proposed to simplify § 1506.7(a) by deleting references to Executive orders that have been revoked. CEQ will continue to provide guidance

concerning NEPA and its implementation on an as-needed basis. Any such guidance will be consistent with NEPA, the CEQ regulations, and any other applicable requirements. Future guidance could include updates to existing CEQ guidance [106] or new guidance. CEQ also proposed to update paragraph (b) to reflect the date upon which the final rule is effective. If there is a conflict between existing guidance and an issued final rule, the final rule will prevail after the date upon which it becomes effective. CEQ did not receive any comments on these proposed changes and finalizes this section as proposed.

### 6. Proposals for Regulations (40 CFR 1506.9)

CEQ proposed to strike 40 CFR 1506.9 (2020), "Proposals for regulations." The 2020 rule added this provision to allow agencies to substitute processes and documentation as part of the rulemaking process for corresponding requirements in these regulations.[107] Since 1978, the CEQ regulations have encouraged agencies to combine environmental documents with any other agency document to reduce duplication and paperwork (40 CFR 1506.4 (2019)), and agencies also may combine procedural steps, for example, to satisfy the public comment requirements of a rulemaking process and NEPA. *See* § 1507.3(c)(5). As such, CEQ concluded that the provision at 40 CFR 1506.9 (2020) was unnecessary to achieve the desired effect of improved efficiency.

CEQ received one comment on this proposed change expressing support for the removal of the section. CEQ removes this section as proposed. Removing this section avoids confusion and controversy over whether the procedures of a separate process meet the requirements of CEQ's regulations. Further, courts have questioned whether separate regulatory processes can be a substitute for NEPA in some cases. *See e.g., Sierra Club v Fed. Energy Regul. Comm'n,* 867 F.3d 1357, 1375 (D.C. Cir. 2017) ("[T]he existence of permit requirements overseen by another [F]ederal agency or [S]tate permitting authority cannot substitute for a proper NEPA analysis."). Additionally, CEQ does not consider it appropriate to single out one particular type of action—rulemaking—for combining procedural steps. Indeed, one of the key objectives of agency NEPA procedures is to integrate the NEPA process into other

agency processes. Therefore, the more prudent approach is for agencies to combine NEPA reviews with other reviews for rulemaking, similar to longstanding agency practice to combine NEPA documents with other review processes, such as compliance with section 106 of the National Historic Preservation Act or section 7 of the Endangered Species Act, or set out processes in their NEPA procedures to comply concurrently with multiple legal requirements.

### 7. Filing Requirements (§ 1506.9)

CEQ proposed to redesignate 40 CFR 1506.10 (2020) as § 1506.9, which would restore the same numbering for this and subsequent sections used in the 1978 regulations. CEQ proposed to replace the acronym for EPA with the full name "Environmental Protection Agency" here and in § 1506.10, consistent with the format in the rest of the CEQ regulations. CEQ also proposed to add a new paragraph (c) to clarify that agencies must notify EPA when they adopt an EIS consistent with § 1506.3(b). CEQ proposed this change to codify common practice and guidance from EPA.[108] EPA notification ensures initiation of the appropriate comment or review period. Such notification, even where a cooperating agency is adopting an EIS without public comment consistent with § 1506.3(b)(1), improves transparency to the public regarding the status of the EIS and also helps track the status of EISs across the Federal Government.

One commenter provided feedback on this proposed change, asking CEQ to insert the word "timely" or more clearly specify a period within which agencies must notify EPA when they adopt EISs. CEQ declines the commenter's suggested edit because the language specifies that the agency must notify EPA when they adopt the EIS; therefore, notification must occur at the same time as adoption. CEQ adds paragraph (c) in the final rule to require agencies to file an adoption of an EIS with EPA consistent with current practice and agency guidance. CEQ modifies the text from the proposal to cross reference to § 1506.3(b)(1) rather than require the notice be consistent with § 1506.3(b). It is only an adoption made pursuant to

§ 1506.3(b)(1) that requires agencies to file their adoption notices with EPA.

### 8. Timing of Agency Action (§ 1506.10)

To accommodate the change in numbering described in section II.H.6, CEQ proposed to renumber 40 CFR 1506.11 (2020), "Timing of agency action," to § 1506.10. CEQ proposed in paragraph (b) to change "may not" to "shall not" to eliminate a potential ambiguity and make clear that the minimum periods between a draft EIS and ROD as set forth in paragraph (b)(1) and between a final EIS and ROD as set forth in paragraph (b)(2) are mandatory. CEQ did not receive any comments specific to this proposal and revises the final rule consistent with the proposal.

Two commenters requested that CEQ remove the minimum time periods prescribed in paragraphs (b)(1) and (2) as well as the minimum 45-day public comment period for draft EISs prescribed in paragraph (d), asserting that these timing requirements conflict with the statutory timeframes. The commenters suggested that CEQ instead allow agencies more flexibility for public engagement and comment within the statutory timeframes. Another commenter requested that CEQ expand the minimum comment period for a draft EIS to 90 days because commenters are often not notified of an open comment period until midway through.

CEQ considered the commenters' suggested changes but declines to revise the final rule to adopt them. Agencies and the public have worked within these timeframes since issuance of the 1978 regulations. CEQ intends these provisions to facilitate a transparent and open process that ensures agencies are taking the time to carefully consider public input and analyze alternatives prior to making a decision. CEQ is concerned that shortening these periods will significantly impede the public's ability to engage in the NEPA process. Further, CEQ notes that the minimum timeframe between a final EIS and ROD does not implicate the statutory deadlines because the statutory timeframe ends upon completion of the EIS, not issuance of the EIS.

Finally, with respect to the concern raised about the delay in notification to the public regarding open comment periods, CEQ intends the revisions to § 1501.9 regarding public engagement to better facilitate notification to interested parties, and considers improving notification to be the more appropriate mechanism to address the concern that interested parties sometimes do not receive notice until partway through a comment period, rather than extending

---

[106] *See* CEQ, *CEQ Guidance Documents, https://www.energy.gov/nepa/ceq-guidance-documents.*

[107] CEQ, 2020 Final Rule, *supra* note 39, at 43338–39.

[108] EPA must be notified when a Federal agency adopts an EIS to commence the appropriate comment or review period. If a Federal agency chooses to adopt an EIS written by another agency, and it was not a cooperating agency in the preparation of the original EIS, the EIS must be republished and filed with EPA. *See* EPA, *Environmental Impact Statement Filing Guidance, https://www.epa.gov/nepa/environmental-impact-statement-filing-guidance.*

the comment period. Agencies must notify the public of opportunities for public comment, and CEQ encourages agencies to consider effective and efficient ways to do so, such as providing opportunities for the public to sign up for distribution lists to be notified of an ongoing review and opportunities for engagement.

CEQ proposed changes to paragraph (c)(1), addressing appeals processes, to update this provision to reflect current practices within Federal agencies. Specifically, CEQ proposed to change references to "appeal processes" to "administrative review processes" and add examples, which can include processes such as appeals, objections, and protests. CEQ further proposed updates to the text to provide flexibility in timing to agencies that use these administrative review processes and clarify that such a process may be initiated either prior to or after the filing and publication of a final EIS with EPA, depending on the specifics of the agency's authorities. Depending on the agency involved and its associated authorities, administrative review processes generally allow other agencies or the public to raise issues about a decision and make their views known. CEQ proposed to clarify that the period for administrative review of the decision and the 30-day review period prescribed in paragraph (b)(2) for when a ROD can be issued may run concurrently. CEQ proposed these changes to reflect changes in Federal agency regulations and procedures since this text was promulgated in 1978 and to allow for greater efficiency.

CEQ did not receive comments on these proposed changes and makes the changes as proposed in the final rule to better accommodate existing agency practices. For example, the U.S. Department of Agriculture's Forest Service has an objections process outlined at 36 CFR part 218 whereby the public can object to a draft decision; these regulations replaced the prior appeal process formerly used by the agency. To initiate the objections process, Forest Service regulations require that the final EIS and a draft ROD be made available to the public, but the Forest Service does not have to publish the final EIS with EPA until the conclusion of the objections process. *See* 36 CFR 218.7(b). The objections process can take 120 to 160 days, during which the agency makes the final EIS available to the public. Allowing the agency to file the final EIS with EPA and issue a ROD at the same time as the conclusion of the objections process rather than waiting an additional 30 days following the official filing will

avoid inefficiency. These changes also will accommodate similar administrative review procedures maintained by other agencies. *See e.g.,* 43 CFR 1610.5–2 (outlining the Bureau of Land Management (BLM) protest procedures).

CEQ also proposed minor edits in paragraphs (d) and (e) for clarity and readability. CEQ did not receive comments on the proposed changes. CEQ has made an additional revision to paragraphs (c)(2) and (e) to correct the reference to § 1506.9 to § 1506.10.

Finally, one commenter requested that CEQ remove the language in paragraph (e), arguing that the failure to file timely comments is not a sufficient reason for extending a timeframe because the public often does not find out about the draft EIS until late in the 45-day comment period. The commenter stated that CEQ should recognize that agencies do not notify the public about when an EA or EIS is released and therefore commenters may be late in providing comments because they did not receive adequate, proper, timely notification. CEQ declines to make this change. As discussed in II.C.8 and II.E.1, § 1501.9 identifies requirements for how and when agencies must notify the public of an action and § 1503.1 requires agencies to request comments from the public on an EIS. Further, agencies have long had the discretion to consider special or unique circumstances that may warrant consideration of comments outside the public comment period.

### 9. Emergencies (§ 1506.11)

Consistent with changes in the preceding sections, CEQ proposed to renumber 40 CFR 1506.12 (2020), "Emergencies," to § 1506.11. CEQ proposed to strike the last sentence, stating other actions remain subject to NEPA review because it erroneously implies that actions covered by § 1506.11 are not subject to NEPA review. Instead, CEQ proposed to replace the sentence with language clarifying that alternative arrangements are not a waiver of NEPA; rather, they establish an alternative means for NEPA compliance.

Commenters recommended CEQ make it a requirement rather than a recommendation for agencies to consult with CEQ about alternative arrangements. Additionally, commenters disagreed with CEQ's deletion of the statement that other actions remain subject to NEPA, expressing concern that the revised provision would rely on negative implication as a substitute for this clear statement.

In the final rule, CEQ has revised this provision to change "should" to "shall" to make clear that agencies must consult with CEQ on alternative arrangements for an action with significant effects. CEQ agrees with commenters' suggestion, which is consistent with longstanding agency practice. Such consultation ensures that the agency is limiting the scope of such arrangements to those actions that are necessary to address the emergency and that the public is appropriately notified and involved in the process. CEQ is also revising "will" to "shall" in the second sentence to clarify that this is a regulatory requirement rather than a statement of fact. Upon further consideration, CEQ retains the clause "other actions remain subject to NEPA review" and adds the clause "consistent with this subchapter" to make clear that agencies and CEQ are required to limit such arrangements, and that any remaining actions not covered by the alternative arrangements must comply with the regulations.

Finally, CEQ adds the last sentence as proposed to address confusion [109] as to whether, during emergencies, agency actions are exempted from NEPA. This addition clarifies that the regulations do not create a NEPA exemption; rather, they provide a pathway for compliance with NEPA where the exigencies of emergency situations do not provide sufficient time for an agency to complete an EIS in conformity with the CEQ regulations for an action with significant environmental effects.

CEQ does not have the authority to exempt agency actions from NEPA, regardless of whether an emergency exists. The changes to § 1506.11 clarify that CEQ does not offer "alternative arrangements" to circumvent appropriate NEPA analysis but rather to enable Federal agencies to establish alternative means for NEPA compliance to ensure that agencies can act swiftly to address emergencies while also meeting their statutory obligations under NEPA. CEQ's revisions clarify that when emergencies arise, § 1506.11 allows agencies to adjust the means by which they achieve NEPA compliance. This approach is also consistent with CEQ's guidance on NEPA and emergencies, updated in 2020.[110]

Finally, CEQ notes that, consistent with longstanding practice, agencies have discretion to determine how to proceed with actions to respond to

---

[109] *See* CEQ, 2020 Response to Comments, *supra* note 69, at 417–19.

[110] *See* CEQ, Emergencies and the National Environmental Policy Act Guidance (Sept. 14, 2020), *https://ceq.doe.gov/docs/nepa-practice/emergencies-and-nepa-guidance-2020.pdf.*

emergencies that do not have significant environmental effects, which agencies would ordinarily analyze through an EA. Agencies may continue to consult with CEQ where they are unsure whether alternative arrangements or an EA is the appropriate course of action. And, as discussed in section II.I.3, some agencies include procedures for addressing such situations in their agency NEPA procedures, and CEQ encourages agencies to do so where appropriate for their programs and activities.

**10. Innovative Approaches to NEPA Reviews (Proposed § 1506.12)**

CEQ proposed to add a new section to the regulations in § 1506.12 to allow CEQ to grant a request for modification to authorize Federal agencies to pursue innovative approaches to comply with NEPA and the regulations in order to address extreme environmental challenges. CEQ proposed this new concept to be distinct from the emergency provisions in § 1506.11 with different considerations and criteria.

Commenters generally opposed this proposed provision. Some commenters thought it was unnecessary, and CEQ did not receive concrete examples of situations where commenters thought agencies could successfully use such approaches. Other commenters were concerned the proposal did not contain enough guideposts for agencies. Commenters also raised concerns that the lack of notice and comment for rulemaking could lead to uncertainty about durability of the provisions and potential litigation and delay.

Upon further consideration, including the public comments received on the proposed provision, CEQ is not including this provision in the final rule. The mechanisms provided in this final rule, including updated provisions on programmatic environmental reviews and agency NEPA procedures that should be tailored to agencies' unique programs and actions, as well as new methods of establishing or adopting CEs, provide agencies sufficient flexibility to innovate and address extreme environmental challenges.

**11. Effective Date (§ 1506.12)**

CEQ proposed to remove the 2020 effective date in § 1506.13 and replace it with the date upon which a final rule is effective. CEQ received a variety of comments on this provision, including one commenter requesting that it require agencies to apply the final rule to ongoing actions. Conversely, a group of commenters requested that the final rule explicitly state that agencies should follow the NEPA regulations that were

effective at the time at which the agency initiated the environmental review, asserting that allowing agencies flexibility to apply the final rule to ongoing actions will cause delays, create uncertainty, and increase costs for project proponents.

Some commenters requested that CEQ revise this section to not allow the regulations to apply to a Federal agency's actions until the agency adopts new agency procedures under § 1507.3 to avoid confusion and inconsistency, and that CEQ provide additional clarity on which version of CEQ's regulations and an agency's procedures apply to each Federal action moving forward.

CEQ finalizes this section as proposed in § 1506.12. Section 1506.12 requires agencies to comply with the regulations for proposed actions begun after the effective date of this final rule. Agencies are in the best position to determine on a case-by-case basis whether applying provisions of the revised regulations to ongoing reviews will facilitate a more effective and efficient process, and CEQ declines to limit agency flexibility in this regard. Regarding potential conflict with existing agency procedures, an agency's existing NEPA procedures remain in effect until the agency revises its procedures consistent with § 1507.3; however, agencies should read their existing procedures in concert with the final rule to ensure they are meeting the requisite requirements of both wherever possible. Additionally, CEQ notes that the Fiscal Responsibility Act's amendments to NEPA were effective upon enactment, so to the extent the regulations implement provisions of the NEPA amendments, these are applicable to ongoing reviews.

For the last several years, agencies have had experience reconciling differences between their procedures and the current regulations, and CEQ is unaware of significant issues that have arisen. While certain provisions included in this final rule may be missing from agency procedures, these provisions are requirements that agencies would need to add to their procedures and are therefore less likely to pose a direct conflict or create inconsistencies. Additionally, where CEQ is restoring the regulatory text or approach from the 1978 regulations, CEQ notes that most agency procedures are consistent with the 1978 regulations, and therefore there is less likely to be conflict with those provisions. To the extent that there is conflict between an agency's procedures and CEQ's regulations, the CEQ regulations generally will apply, and CEQ is available to assist in addressing any such conflicts. Lastly, CEQ notes that

Federal agencies would not need to redo or supplement a completed NEPA review (e.g., where a CE determination, FONSI, or ROD has been issued) as a result of the issuance of this rulemaking.

*I. Revisions to Agency Compliance (Part 1507)*

**1. Compliance (§ 1507.1)**

CEQ proposed to add a second sentence to § 1507.1 to restore language from the 1978 regulations to state that agencies have flexibility to adapt their implementing procedures to the requirements of other applicable laws. CEQ made this proposal because restoring this language is consistent with the changes CEQ made to 40 CFR 1507.3 (2022) in its Phase 1 rulemaking to restore agency discretion to tailor their NEPA procedures to their unique missions and contexts, creating opportunity for agencies to innovate and improve efficiency.

One commenter requested that CEQ delete the first sentence of § 1507.1, which requires all agencies to comply with the CEQ regulations, and add a clause at the end of the proposed second sentence making requirements with other applicable laws dependent upon compliance with the regulations. The commenter asserted this change would allow an agency to tailor its NEPA procedures as appropriate, but make clear that the agency still must comply with these regulations.

Another commenter expressed concerns that the flexibility proposed in § 1507.1 will result in inconsistency, especially where a State agency serves as a co-lead agency or as a participating agency for a project over which multiple Federal agencies have jurisdiction. The commenter asserted that the flexibility in the proposed text in § 1507.1 undermines predictability and consistency and will result in delays in the environmental review process.

CEQ considered the commenters' suggestions and finalizes the language as proposed. With respect to the first comment, CEQ considers the language in the final rule to be consistent with the commenter's objective and longstanding practice: agencies may tailor their procedures to their unique programs, but they must also comply with NEPA and the CEQ regulations. This point is reinforced by § 1500.6, which requires agencies to fully comply with the purposes and provisions of the NEPA statute and CEQ's NEPA regulations unless an agency activity, decision, or action is exempted from NEPA by law or compliance with NEPA is impossible.

CEQ disagrees with the other commenter's assertions that this provision undermines predictability. To ensure NEPA reviews inform decision making, Federal agencies need to integrate the NEPA process into the decision-making process, and having a "one size fits all" approach to agency procedures would not achieve that objective. The CEQ regulations encourage agencies to engage in early coordination to prevent delays in individual NEPA reviews. Further, the regulations have long encouraged agencies to consult with other agencies with which they have similar programs or frequently take actions on the same projects, and CEQ encourages agencies to strive to reconcile their processes as they update their procedures for consistency with this rule. *See* § 1507.3(b)(1).

2. Agency Capability To Comply (§ 1507.2)

CEQ proposed edits to § 1507.2 to emphasize agencies' responsibilities under NEPA, including to incorporate the requirements added to section 102(2) of NEPA, 42 U.S.C. 4332, and to require agencies to designate a Chief Public Engagement Officer. First, CEQ proposed to move the first sentence of paragraph (a) of 40 CFR 1507.2 (2020), which requires agencies to fulfil the requirements of section 102(2)(A) of NEPA, 42 U.S.C. 4332(2)(A), to use a systematic, interdisciplinary approach, to a new § 1507.2(b). Second, CEQ proposed to require in § 1507.2(a) that in addition to designating a senior agency official responsible for overall agency NEPA compliance, agencies identify a Chief Public Engagement Officer who would be responsible for facilitating community engagement across the agency and, where appropriate, the provision of technical assistance to communities.

CEQ received multiple comments on the requirement for Federal agencies to identify a Chief Public Engagement Officer. Numerous supportive commenters expressed that this position would benefit all stakeholders, quicken public engagement processes by making the environmental review processes more accessible and transparent, facilitate consistent engagement practices, and promote a level of accountability that enhances engagement. Some supportive commenters asked CEQ to clarify expectations for the position, such as identifying a minimum level of seniority within the agency and to clarify that "community engagement" includes "industry engagement." A couple of commenters were supportive of the

general idea, but expressed concern about how agencies would define the role and whether agencies would have resources to support the Officer. A few commenters suggested that the person who serves in the position within an agency must be a neutral party and trusted expert with necessary experience to be effective in the position. Multiple commenters also provided suggestions for additional guidance regarding the duties of the Chief Public Engagement Officer.

Several commenters opposed the proposed requirement for agencies to designate a Chief Public Engagement Officer asserting that the NEPA amendments do not require it; there is lack of clarity on whether this position would help mediate resolutions to allow more efficient completion of the environmental review process; and it would create a burden on agencies because they will need to hire a Chief Public Engagement Officer.

Another commenter raised the concern that by requiring agencies to identify a Chief Public Engagement Officer, CEQ is creating a new and potentially overlapping position with the Chief Environmental Review and Permitting Officer (CERPO) that already exists to manage environmental review and authorization processes.

CEQ considered the comments and includes the requirement in § 1507.2(a) to identify a Chief Public Engagement Officer with clarifying edits. To address commenters' concerns about agency burden and the scope of the position, CEQ adds language to clarify that the regulations make the Chief Public Engagement Officer responsible for facilitating community engagement in environmental reviews and does not direct agencies to make the officer responsible for all engagement activities within an agency, though agencies have the discretion to define the role more broadly should they determine doing so is appropriate.

CEQ also adds a sentence to the end of paragraph (a) to clarify that when an agency is a department, it may be efficient for major subunits to identify senior agency officials or Chief Public Engagement Officers within those subunits. This language is consistent with the approach for agency NEPA procedures in § 1507.3(b), and the regulations provide that the department-level official or Officer would have oversight over the subunit officials or officers. CEQ adds this language to provide large departments the flexibility to effectively manage their programs while ensuring that there is also centralized, consistent coordination across the whole department. CEQ notes

that a senior agency official must be "an official of assistant secretary rank or higher (or equivalent)," in accordance with § 1508.1(*ll*); in the case of a senior agency official designated by a major subunit, that individual must have a degree of authority and responsibility within the subunit that is equivalent to the authority and responsibility that an assistant secretary would have within a department.

CEQ notes that Federal agencies may designate current employees to serve as the senior agency official and Chief Public Engagement Officer, and need not hire new employees. Regarding the variety of comments recommending specific responsibilities for the Chief Public Engagement Officer, CEQ will consider providing guidance to agencies that addresses the role and expectations of the Officer, but CEQ considers this level of detail unnecessary for the regulations. Lastly, CEQ revises paragraph (a) to strike "Agencies shall" from the beginning of the paragraph because it is duplicative to the end of the introductory paragraph of § 1507.2.

Third, CEQ proposed to redesignate paragraphs (b) and (c), and (d) through (f) of 40 CFR 1507.2 (2020) as § 1507.2(c) and (d), and (h) through (j) respectively. CEQ makes these changes in the final rule.

Fourth, CEQ proposed to add a new paragraph (e) to require agencies to prepare environmental documents with professional integrity consistent with section 102(2)(D) of NEPA, 42 U.S.C. 4332(2)(D). In a new paragraph (f), CEQ proposed to require agencies to make use of reliable data and resources, consistent with section 102(2)(E) of NEPA, 42 U.S.C. 4332(2)(E). And, in a new paragraph (g), CEQ proposed to require agencies to study, develop, and describe technically and economically feasible alternatives, consistent with section 102(2)(F) of NEPA, 42 U.S.C. 4332(2)(F). Finally, in redesignated paragraph (j), CEQ proposed to delete the reference to E.O. 13807 because E.O. 13990 revoked E.O. 13807.[111]

CEQ did not receive any substantive comments on these proposed changes. CEQ finalizes these provisions as proposed.

3. Agency NEPA Procedures (§ 1507.3)

CEQ proposed several updates to § 1507.3 to reorganize paragraphs to improve readability, consolidate related provisions, restore text from the 1978 regulations, and codify CEQ guidance on CEs. First, in paragraphs (a) and (b), CEQ proposed to update the effective date to reflect the effective date of a

---

[111] E.O. 13990, *supra* note 43.

final rule. CEQ received several comments expressing concern about paragraph (a), which provides that CEQ determined that the CEs contained in agency NEPA procedures as of the final rule effective date are consistent with the CEQ regulations. Commenters raised concerns about the lack of evidence that all CEs are consistent with CEQ's proposal and, in some instances, identified particular CEs that the commenters stated were inconsistent. Commenters also asked about how this provision would interact with § 1507.3(c)(8) and (9) regarding the process for establishing and periodically reviewing existing CEs.

CEQ considered the comments and revises this paragraph in the final rule for clarity. CEQ's intent with this provision is to clarify that the changes made in the final rule, including revisions to the definition of "categorical exclusion" and § 1501.4 do not implicate the validity of existing CEs. CEQ revises the paragraph to clarify that it has determined that the revisions to its regulations made in this final rule do not affect the validity of agency CEs that are in place as of the effective date of this rule. Further, as discussed more in this section, CEQ is encouraging agencies to prioritize their older CEs for review.

Second, in § 1507.3(b), CEQ proposed to give agencies 12 months after the effective date to develop proposed procedures and initiate consultation with CEQ to implement the CEQ regulations. CEQ also proposed moving, with some modification, language from paragraph (c) of 40 CFR 1507.3 (2022) to § 1507.3(b) for clarity and to improve organization since the language is generally applicable to all agency NEPA procedures. The NPRM explained that proposed procedures should facilitate efficient decision making and ensure that agencies make decisions in accordance with the policies and requirements of NEPA.

One commenter requested that CEQ explicitly state that in the case of conflicts, an agency's NEPA procedures supersede the CEQ regulations, and that such a statement would increase certainty and reduce litigation risks. CEQ declines to add this language. Agencies and courts have extensive experience applying both CEQ's regulations and agency-specific procedures, and in CEQ's experience, this relationship has not led to uncertainty or litigation risk that would outweigh the uncertainty that could be created from a new regulatory provision on this subject.

Two commenters asserted that 12 months is not enough time for agencies to propose procedures, take public comment, and produce final procedures. CEQ declines to revise the timing provided in § 1507.3(b). While CEQ will work with agencies to update their procedures as quickly as possible, agencies only need to provide CEQ with proposed revisions within 12 months. Therefore, CEQ considers 12 months sufficient for agencies to propose procedures and finalizes § 1507.3(b) as proposed, except a grammatical change from "agencies make" to "the agency makes" for consistency with the rest of the sentence.

Third, in paragraph (b)(2), CEQ proposed to change "adopting" to "issuing" to avoid confusion with adoption under § 1506.3. CEQ also proposed to restore text from the 1978 regulations requiring agencies to continue to review their policies and procedures and revise them as necessary to be in full compliance with NEPA. The 2020 rule deleted this language as redundant to language added to paragraph (b) of 40 CFR 1507.3 (2020) requiring agencies to update their procedures to implement the final rule.[112]

One commenter opposed CEQ's proposed restoration of this language in § 1507.3(b)(2), asserting that the requirement for agencies to continually review their NEPA policies and procedures could reduce stability because agencies will be in a constant cycle of revision. CEQ disagrees with the commenter's assertions because this provision was in the 1978 regulations and has not resulted in agencies continually updating their procedures. CEQ also considers it important for agencies to review their procedures to ensure that they are meeting the intent of NEPA and are updated to address any changes to agencies' authorities or programs so that the NEPA process is effectively integrated in agencies' decision-making processes.

CEQ makes the changes to paragraph (b)(2) as proposed with one additional change in the fourth sentence to change "to" to "and" for clarity. CEQ is restoring this language because the requirement for an agency to continue to review their policies and procedures is different than the requirement in paragraph (b) to initially update procedures consistent with the final rule. Further, restoring this requirement is consistent with the requirement in § 1507.3(c)(9) for agencies to review CEs at least every 10 years.

Fourth, CEQ proposed to add a new paragraph (b)(3) to clarify that, consistent with longstanding practice,

---

[112] CEQ, 2020 Final Rule, *supra* note 39, at 43340.

---

the issuance of new agency procedures or an update to existing agency procedures is not itself subject to NEPA review. CEQ did not receive comments on this paragraph and adds it with the language as proposed in the final rule.

Fifth, paragraphs (c) and (c)(1) through (c)(10) of 40 CFR 1507.3 (2022) list the items that all agency NEPA procedures must include, and CEQ proposed minor revisions to paragraphs (c)(1) through (c)(4) to improve clarity and conciseness. Specifically, CEQ proposed to modify paragraph (c)(1) to clarify that agencies should designate the major decision points for their programs and actions subject to NEPA and ensure that the NEPA process begins at the earliest reasonable time. In paragraph (c)(2), CEQ proposed to remove the reference to "formal" as unnecessarily limiting since agencies generally engage in informal rulemaking, and change "or" to "and" to clarify that agencies should make relevant environmental documents, comments, and responses part of the record in both rulemakings and adjudicatory proceedings. CEQ proposed to modify paragraph (c)(3) to clarify that procedures should integrate environmental review into agency decision-making processes so that decision makers use the information in making decisions. CEQ did not receive comments on these specific changes and makes the edits as proposed in the final rule.

Sixth, CEQ proposed to modify paragraph (c)(5) to emphasize that combining environmental documents should be done to facilitate sound and efficient decision making and avoid duplication. CEQ proposed to strike the language from this paragraph allowing agencies to designate and rely on other procedures or documents to satisfy NEPA compliance. As discussed further in sections II.C.1 and II.C.2 of the NPRM, CEQ had concerns about this language added by the 2020 rule to substitute other reviews as functionally equivalent for NEPA compliance, and therefore proposed to remove it.

One commenter stated that paragraph (c)(5) should implement section 107(b) of NEPA, 42 U.S.C. 4336a(b). Section 107(b) of NEPA addresses preparation of a single environmental document for lead and cooperating agencies. CEQ addresses this in § 1501.7(g) and therefore declines to make this change. The intent of paragraph (c)(5) is to ensure that agency procedures require the combination of environmental documents with other agency documents in order to facilitate sound and efficient decision making and avoid duplication where consistent with

applicable statutory requirements. CEQ makes the changes to § 1507.3(c)(5) as proposed.

Seventh, to consolidate into one paragraph—paragraph (c)—the required aspects of agency NEPA procedures, CEQ proposed to move paragraphs (e)(1), (e)(2), (e)(2)(i), and (e)(2)(iii) of 40 CFR 1507.3 (2022) to paragraphs (c)(6), (c)(7), (c)(7)(i) and (c)(7)(ii), respectively, with minor wording modification for readability. Proposed paragraph (c)(6) addressed procedures required by § 1501.2(b)(4) regarding assistance to applicants. Proposed paragraphs (c)(7), (c)(7)(i), and (c)(7)(ii) addressed criteria to identify of typical classes of action that normally require EISs and EAs.

One commenter questioned if paragraphs (c)(7)(i) and (ii) are intended to make EIS and EA thresholds more definitive. These provisions—which have been in the CEQ regulations since 1978 and to which CEQ only proposed minor, non-substantive edits for readability—require agencies to identify their common activities or decisions that typically require an EIS or EA. While not determinative for any particular action, these lists put the public on notice of the decisions agencies regularly make that require these levels of NEPA review. CEQ has not substantively changed these provisions and, therefore, does not intend for them to affect EIS and EA thresholds or otherwise change current practice. CEQ makes the changes to § 1507.3(6) and (7) as proposed.

Eighth, CEQ proposed to move with modification paragraph (e)(2)(ii) of 40 CFR 1507.3(2022), requiring agencies to establish CEs and identify extraordinary circumstances, to paragraph (c)(8). CEQ proposed in paragraphs (c)(8)(i) through (c)(8)(iii) to include more specificity about the process for establishing new or revising existing CEs, consistent with CEQ's 2010 CE guidance and agency practice. CEQ proposed to move the existing requirement that agencies identify when documentation is required for a determination that a CE applies to a proposed action from paragraph (e)(2)(i) of 40 CFR 1507.3 (2022) to proposed paragraph (c)(8)(i). CEQ proposed a new paragraph (c)(8)(ii) to require agencies to substantiate new or revised CEs with sufficient information to conclude that the category of actions does not have a significant effect, individually or in the aggregate, and make the documentation publicly available for comment. Lastly, CEQ proposed to add paragraph (c)(8)(iii) to require agencies to describe how they will consider extraordinary circumstances, a concept that was

moved from paragraph (e)(2)(ii) of 40 CFR 1507.3 (2022). CEQ proposed these provisions for consistency with its 2010 guidance and CEQ's longstanding practice requiring agencies to demonstrate that agency activities are eligible for CEs.[113]

One commenter requested that CEQ revise proposed paragraph (c)(8)(i) to require agencies to provide the public with documentation of a determination that a CE applies to a proposed action. CEQ declines to require agencies to document and publish all determinations that a CE applies to an action, as many CEs are used for routine actions with no potential for environmental effects and documentation of all determinations would result in burdensome and unnecessary paperwork. CEQ considers the better approach to be for agencies to identify which CEs require documentation and whether to make that documentation publicly available.

One commenter requested that CEQ expand paragraph (c)(8)(ii) to preclude agencies from establishing CEs if similar categories of actions have historically been controversial, are known to have substantial environmental justice considerations, or have previously resulted in preparation of an EIS. Another commenter suggested that CEQ replace the use of "or in the aggregate" with "cumulative," to use the term from the 1978 regulations.

Some commenters opposed proposed paragraph (c)(8)(iii), stating that agencies should not have to delineate the extraordinary circumstances under which an action normally excluded from further NEPA review nonetheless requires additional review. The commenters asserted that the proposed section substantially limits the breadth of extraordinary circumstances under which an action normally excluded requires further review. CEQ disagrees with the commenters' assertions. The provision clarifies that an explanation of how the agency will consider extraordinary circumstances when applying a proposed CE is a necessary component of substantiating the CE. The provision should be read in context with the definition of "extraordinary circumstances" in § 1508.1(o).

CEQ considers these comments but finalizes the provisions in § 1507.3(c)(8) and (c)(8)(i) through (iii) as proposed, with one change: instead of restating the process for consideration of extraordinary circumstances in paragraph (c)(8)(iii), the final rule cross-references to § 1501.4(b), which sets for the process for consideration of

extraordinary circumstances, including documenting when an agency determines that a CE applies notwithstanding extraordinary circumstances. CEQ declines to make the commenters' recommended changes. When establishing CEs, agencies must provide sufficient information to CEQ and to the public to substantiate the determination that the category of actions normally does not result in significant effects. Agencies must also address how they will consider extraordinary circumstances in applying CEs. CEQ does not consider it appropriate to specify these limitations within its regulations; rather, agencies and CEQ must consider these concerns on a case-by-case basis when substantiating and reviewing proposed new CEs.

As discussed further in section II.C.3, CEQ also declines to replace "or in the aggregate" in the paragraph because it is consistent with § 1501.4 on establishment of CEs. CEQ considers "individually or in the aggregate" to have the same meaning as the 1978 regulation's definition of "categorical exclusion" as a category of actions that do not "individually or cumulatively" have significant effects. CEQ uses "in the aggregate" instead of "cumulatively" within the regulations to avoid potential confusion with the definition of "effects," which includes cumulative effects.

Ninth, CEQ proposed to add a new paragraph (c)(9) to require agencies to include in their NEPA procedures a process for reviewing their CEs every 10 years to codify recommendations in CEQ's guidance on establishing CEs,[114] which encourages agencies to review CEs periodically. While the guidance recommends every 7 years,[115] CEQ proposed requiring that review occur at least every 10 years because it can take about a year to complete the steps involved to conduct such a review and revise CEs. These steps typically include conducting the analysis, developing a proposal to update procedures to reflect the review, consulting with CEQ on any proposed update to procedures, soliciting public comment, developing final procedures, and receiving a CEQ conformity determination. CEQ noted in the proposed rule that Federal agencies should review their CEs for multiple reasons, including to determine if CEs remain useful, whether they should modify them, and to determine if circumstances have changed resulting in

---

[113] See CEQ, CE Guidance, *supra* note 10.

[114] *Id.* at 15–18.
[115] *Id.* at 16.

an existing category rising the potential for significant effects.

Multiple commenters supported this requirement, with some suggesting that this review be subject to notice and public comment and others requesting the 10-year timeframe start at the time the agency issues the CE. One commenter requested that the regulations instruct agencies to take a holistic and comprehensive look at their current CEs to determine if any changes are needed, while another suggested that the periodic reviews need to account for the latest science and design practices.

CEQ declines to require agencies to provide notice and comment for their periodic review of CEs, but notes that where an agency decides to revise a CE based on the review, such revisions would require notice and comment under § 1507.3(b), for CEs established through agency procedures, or § 1501.4(c), for CEs developed through the mechanisms identified in that paragraph. CEQ declines to require agencies to comprehensively review their CEs, because allowing agencies to review their CEs on a rolling basis will provide for a more orderly and efficient review process and allow agencies to complete their review of their oldest CEs more quickly than would occur if the agency were to review all of its CEs at one time. CEQ declines to include additional requirements for the periodic review but agrees that the standard set forth in § 1501.4(d)(4) may help inform agencies as to when an agency should revise or remove a CE.

Some commenters opposed the proposed requirement to review existing CEs, asserting that it places an administrative burden on agencies that is unjustified to the extent it goes beyond how agencies currently administer CEs. While CEQ recognizes that this review process may be new for some agencies, CEQ has encouraged agencies to review CEs since the 2010 guidance. CEQ's experience with agencies that have undertaken this review is that it is a valuable process for agencies because it results in revised and new CEs that better align with the agencies' programs and experience. Such reviews are animated by the same principle as the longstanding practices to reexamine an analysis when an agency has an ongoing action, such as reevaluation and supplementation. A periodic analysis of existing CEs serves the same purpose—to ensure the underlying analysis and conclusions remain valid.

One commenter requested that the final rule add "which does not impact projects approved under a categorical

exclusion that existed at the time" to paragraph (c)(9) to clarify that review of and changes to CEs are forward-looking and do not affect previously approved actions. CEQ agrees that any review of CEs does not have implications for prior CE determinations and does not consider the text in the final rule to raise any question that a review would require an agency to reopen the approval process for such actions. As a result, CEQ views this addition to be unnecessary.

In the final rule, CEQ adds this provision with an additional clause to clarify that agencies do not need to review all of their CEs at once and may do so on a rolling basis, but should focus on the oldest CEs first. CEQ adds this provision to clarify that agencies need not undertake a comprehensive review of all CEs but could instead break them up such that they review them in tranches on some periodic schedule but where the review of each CE occurs once every 10 years. Additionally, in response to comments on the interaction between § 1507.3(a) regarding the validity of existing CEs and this provision, CEQ clarifies that agencies should prioritize its oldest CEs first.

Tenth, CEQ proposed to move 40 CFR 1507.3(e)(3) (2020) to paragraph (c)(10) without substantive change. This provision addresses the requirement that agencies include a process for introducing a supplemental EA or EIS into its formal administrative record. CEQ did not receive comments on this provision. In the final rule, CEQ moves 40 CFR 1507.3(e)(3) (2020) to § 1507.3(c)(10) and revises the text to require agencies to include processes for reevaluating and supplementing EAs and EISs, as appropriate. CEQ has revised the text in this provision to enhance clarity by referring to "processes for" rather than "a process for introducing" and removing the reference to including supplemental materials in a formal administrative record to enable agencies flexibility to develop procedures that work with their programs consistent with longstanding agency practice. Additionally, 40 CFR 1502.9(d)(4) (2020) implicitly requires agency procedures to address reevaluation by encouraging agencies to document their findings consistent with their agency NEPA procedures. CEQ adds an explicit requirement in § 1507.3(c)(10) in the final rule for consistency with § 1502.9(e) and to make clear that agencies must include such a process in their agency procedures.

Eleventh, CEQ proposed to move the requirement for agencies to explain in

their NEPA procedures where interested persons can get information on EISs and the NEPA process from paragraph (e) of 40 CFR 1506.6 (2020) to § 1507.3(c)(11) and add a reference to EAs as well. CEQ did not receive comments on this provision and makes this change as proposed in the final rule.

Twelfth, CEQ proposed to codify section 107(f) of NEPA, 42 U.S.C. 4336a(f), in a new paragraph (c)(12) requiring agencies to include procedures, where applicable, to allow a project sponsor to prepare EAs and EISs consistent with § 1506.5. Since not all agency actions involve project sponsors, CEQ proposed to include "where applicable" to qualify this requirement so that it applies only where agencies have actions where there is a project sponsor. The proposal included "consistent with § 1506.5" so that such procedures would ensure environmental documents prepared by project sponsors (or a contractor on the project sponsor's behalf) are prepared with professional and scientific integrity, and ensure that the agency independently evaluates and takes responsibility for the contents of such documents. The proposed rule also explained that this would ensure that agencies require project sponsors to execute a disclosure statement to address financial or other interests. In addition to procedures, agencies may provide project sponsors with guidance and assist in the preparation of the documents consistent with § 1506.5(b)(1).

CEQ received multiple comments that generally supported the proposed changes to allow applicants to prepare EAs and EISs, as well as multiple commenters who generally opposed the provision and opposed section 107(f) of NEPA. Some commenters who oppose the proposed changes recognized that it is not within CEQ's authority to modify section 107(f) of NEPA but stated that CEQ could provide more oversight and guardrails for how agencies carry this out and that CEQ should provide more guidance on avoiding conflicts of interest. Another group of commenters asked CEQ to provide more specificity for what agency procedures should specify regarding applicant or project sponsor-prepared EAs and EISs.

Commenters who supported the proposal pointed to time and cost savings and asserted that allowing project proponents, applicants, and contractors more opportunities to prepare EAs and EISs will help reduce inaccuracies and delays. Some supportive commenters also requested that CEQ go further, such as by allowing

a project sponsor a first right of refusal to prepare an EA or EIS.

One commenter opposed the addition of paragraph (c)(12) and the general allowance of project sponsors to prepare EAs and EISs. However, they noted that their concerns could be mitigated if there is a definition of "project sponsor." Another commenter requested that CEQ add to paragraph (c)(12) a requirement for agencies to include specific public engagement requirements in their procedures when a project sponsor prepares an EA or EIS. Additionally, as discussed further in section II.H.3, commenters were confused about the applicability of this provision and § 1506.5.

In the final rule, CEQ includes § 1507.3(c)(12) to address preparation of EAs and EISs by applicants, including project sponsors. As discussed in section II.J.1, CEQ is adding a definition of "applicant," which is inclusive of "project sponsors" to address confusion regarding the meaning of this term here and elsewhere in the regulations. CEQ also revises the "where applicable" language to "where an agency has applicants that seek its action" to address concerns that the provision could be read as discretionary. As CEQ noted in the preamble to the proposed rule, not all agencies have applicants or project sponsors; therefore, such agencies need not include procedures for non-existent applicants. This phrasing is consistent with the definition of "applicant" in the final rule. Additionally, CEQ adds a sentence in the final rule to clarify that such procedures will not apply to applicants when they serve as joint lead agencies. Section 107 of NEPA allows the Federal lead agency to appoint a State, Tribal, or local agency as a joint lead agency and jointly fulfill the role of the lead agency. In such cases, the joint lead agency and lead agency would work together to prepare the document, including development of the purpose and need, identification of alternatives, and preparing the FONSI or ROD.

In § 1507.3(c)(12), CEQ also revises the cross reference to § 1506.5(a) and (c). As discussed in section II.H.3, CEQ is modifying § 1506.5 for clarity, and therefore the provisions in § 1506.5 regarding applicant-provided information for a NEPA document prepared by the agency or an agency-directed contractor are inapplicable in this instance where the applicant or its contractor is preparing the EA or EIS.

In the final rule, CEQ adds paragraphs (c)(12)(i), (ii) and (iii), to set out minimum requirements for such procedures. CEQ includes these provisions to respond to comments

requesting CEQ include more specificity about the agency's role with respect to applicant prepared EAs and EIS. Paragraph (c)(12)(i) requires that agency procedures provide for agency review and approval of the purpose and need and alternatives. Agency involvement in development of these key features of the environmental document is critical to ensure that applicant prepared EISs and EAs will be appropriately scoped and include the reasonable alternatives as determined by the agency. Paragraph (c)(12)(ii) requires agencies to include process for the agency to independently evaluate the applicant-prepared EA or EIS; take responsibility for its accuracy, scope, and contents; and document the agency's evaluation in the document consistent with the requirements in § 1506.5(a). CEQ adds paragraph (c)(12)(iii) to address comments requesting that CEQ clarify that applicants cannot prepare FONSIs or RODs. CEQ agrees that this is consistent with section 107(f) of NEPA and agrees that it is an important clarification to ensure that the agency's determinations and decisions are its own.

CEQ declines to add additional requirements regarding public engagement in paragraph (c)(12) because the regulations require agencies to engage the public in the preparation of an EA and EIS, which is required regardless of the preparer.

Numerous commenters expressed the view that CEQ is not fully implementing section 107(f) of NEPA because it is not specifically requiring agencies to allow project sponsors or applicants the opportunity to prepare documents in the absence of prescribed procedures. Some commenters referred to the fact that agencies have 12 months to propose procedures to CEQ following the effective date of the final rule, which means it will be more than a year before agencies have final procedures in place and be able to implement section 107(f) of NEPA. One commenter also pointed to some agencies already accepting sponsor-prepared documents for years and having a process in place to facilitate doing so and asserting that those agencies should not be prevented from continuing to accept these documents.

CEQ agrees that agencies have long allowed applicants to prepare EAs and that many agencies already have procedures in place for applicant-prepared documents. CEQ disagrees that this provision in the regulations precludes agencies from implementing applicant-prepared documents if they already have procedures that enable them to do so. Agencies are currently implementing section 107(f) of NEPA

and this provision does not prevent them from continuing to do so. Rather, this provision ensures that going forward, agencies include their procedures for applicant prepared EAs and EISs in their NEPA procedures. Doing so will ensure that the procedures include the criteria set forth in this final rule and that the public has an opportunity to review and comment on the agency procedures without disrupting existing practice implementing 107(f) of NEPA.

Thirteenth, CEQ proposed to move, with revisions, paragraph (d) of 40 CFR 1507.3 (2022) to § 1507.3(d)(1) and strike the provisions in paragraphs (d)(1) through (d)(6) of 40 CFR 1507.3 (2022), which recommended agency procedures identify different classes of activities or decisions that may not be subject to NEPA. CEQ proposed to remove these provisions for consistency with its revisions to § 1501.1. *See* section II.C.1.

Instead, CEQ proposed § 1507.3(d) and its subparagraphs to provide a list of items that agencies may include in their procedures, as appropriate, which would include, at paragraph (d)(1), identifying activities or decisions that are not subject to NEPA. CEQ proposed in paragraph (d)(2) to allow agencies to include processes for emergency actions that would not result in significant environmental effects. Finally, CEQ proposed to move, without modification, paragraphs (f)(1) and (f)(2) of 40 CFR 1507.3 (2022) to paragraphs (d)(3) and (d)(4), respectively.

One commenter expressed support for the proposed § 1507.3(d), and specifically identified additional support for paragraphs (d)(1) and (d)(2) through (6). Another commenter requested that CEQ make the list of items in § 1507.3(d) required rather than optional for inclusion in agency procedures. This commenter also opposed the allowance in paragraph (d)(3) regarding classified proposals, asserting that this language invites abuse by agencies that will classify proposals that should not be classified to avoid public input and requested that there be public comment periods for classified proposals.

CEQ finalizes the list of items agencies may include in their procedures in § 1507.3(d) as proposed. It is appropriate for this list of items to be optional because the items included in the list will not always be applicable to every agency.

CEQ notes that the provision in (d)(2) regarding emergency actions is similar to CEQ's emergency process for EISs provided in § 1506.11, but relates to activities that would not require

**35536** **Federal Register** / Vol. 89, No. 85 / Wednesday, May 1, 2024 / Rules and Regulations

preparation of an EIS. Some agencies have programs that focus on these types of emergency actions and may need to consider special arrangements for their EAs in these circumstances. These special arrangements could focus on the format of the documents, special distribution and public involvement procedures, and timing considerations. Some agencies have already established such processes in their procedures to ensure efficient NEPA compliance in an emergency. *See, e.g.,* 36 CFR 220.4(b); U.S. Dep't of Homeland Sec., Instruction Manual #023–01–001–01, Section VI.[116]

Regarding classified proposals, CEQ declines to further modify paragraph (d)(3), which has been in place since the 1978 regulations and is important for agencies who handle classified information. CEQ notes that the provision encourages agencies to withhold only what is necessary for the protection of classified information and structure the document such that it can easily make unclassified portions available for public comment.

Fourteenth, CEQ proposed to strike paragraph (e) of 40 CFR 1507.3 (2020) because it was unnecessary and potentially confusing. CEQ makes this change in the final rule because this provision is redundant with the regulations' longstanding requirement that agencies develop agency NEPA procedures that CEQ has determined conform to the NEPA regulations. Further, its requirement that agency procedures "comply" with the CEQ regulations could be read to suggest that agencies must complete a NEPA review when establishing their procedures, which is inconsistent with paragraph (b)(3).

Fifteenth, CEQ proposed to remove, as superfluous, the first sentence of paragraph (f)(3) of 40 CFR 1507.3 (2020) regarding lengthy periods between an agency's decision to prepare an EIS and actual preparation, as the regulations prescribe specific timelines for preparation of environmental documents. As discussed in section II.D.3, CEQ proposed to move the second sentence of 40 CFR 1507.3(f)(3) regarding supplemental notices when an agency withdraws, cancels, or otherwise ceases the consideration of a proposed action before completing an EIS to § 1502.4(f) with modifications. CEQ makes these changes in the final rule.

Sixteenth, CEQ proposed to remove as unnecessary paragraph (f)(4) of 40 CFR

[116] DHS, 023–01–001–01, Implementation of the National Environmental Policy Act (Nov. 6, 2014), *https://www.dhs.gov/sites/default/files/publications/DHS_Instruction%20Manual%20023-01-001-01%20Rev%2001_508%20Admin%20Rev.pdf.*

1507.3 (2022) regarding combining the agency's EA process with its scoping process. Section 1501.5(k) clarifies that agencies can employ scoping at their discretion when it will improve the efficiency and effectiveness of EAs, including combining scoping with a comment period on a draft EA.

One commenter opposed this deletion because integrating scoping with the EA process can be an inclusive method of soliciting input and save time and money during the NEPA process. CEQ agrees that integrating scoping with an EA process can provide efficiency benefits, which §§ 1501.5(k) and 1501.9(b) address. CEQ finalizes the proposal to remove paragraph (f)(4) because it is redundant with those provisions.

Finally, as discussed in section II.C.3, CEQ proposed to strike paragraph (f)(5) of 40 CFR 1507.3 (2022) and replace it with a provision in § 1501.4(e) that is consistent with the process established by section 109 of NEPA, 42 U.S.C. 4336c, for adoption or use of another agency's CE. CEQ makes this change in the final rule.

## 4. Agency NEPA Program Information (§ 1507.4)

CEQ proposed revisions to § 1507.4, which describes the use of agency websites and other information technology tools to promote transparency and efficiency in the NEPA process. In paragraph (a), CEQ proposed to change "other means" to "other information technology tools" and to remove "environmental" before "documents" because "environmental documents" is a defined term, and the intent of the sentence is to refer to NEPA-related information and documents more broadly and not only to those documents that are included in the definition of "environmental document." CEQ proposed the same edit, removing "environmental" before "documents," in paragraph (a)(1). CEQ also proposed in paragraph (a) to require agencies to provide on their websites or through other information technology tools (to account for new technologies) their agency NEPA procedures and a list of EAs and EISs that are in development and complete. Lastly, in paragraph (a), CEQ proposed to encourage rather than allow agencies to include the information listed in paragraphs (a)(1) through (a)(4) on agency websites or other information technology tools.

CEQ proposed to revise paragraph (a)(2) to encourage agencies to post their environmental documents to their websites or other information technology tools. Finally, CEQ proposed edits to paragraph (b), which promotes

interagency coordination of environmental program websites and shared databases, to provide agencies with additional flexibility and clarify that the section is not limited to the listed technology.

One commenter opposed CEQ's proposed requirement for agencies to provide a list of EAs and EISs that are in development and complete because the regulations already require publication of the NOI, draft EIS, final EIS, and ROD; require completed EISs to be publicly accessible via EPA's EIS database; encourage publication of draft EAs; and require publication of FONSIs. Combined with CEQ's proposed requirements for notification in § 1501.9(d)(2), the commenter asserted the requirement to post a list of EAs and EISs is redundant and adds another administrative burden on agencies.

CEQ makes the changes as proposed, including the requirement for agencies to provide a list of EAs and EISs that are in development and complete. During the rulemaking process, CEQ heard from multiple members of the public that it can be challenging to identify what NEPA reviews are active within an agency. CEQ considers the requirement to maintain a website or other electronic listing of EAs and EISs to be an important method of transparency that provides easily accessible information to the public. CEQ notes that the provision does not require agencies to publish the documents themselves, rather, it only requires a list of documents that are in development or completed. Agencies already routinely consolidate this type of information and can cross-reference to other repositories, such as the **Federal Register** or EPA's EIS database, on the agency website in order to reduce or avoid duplication. Agencies have discretion to determine when a NEPA review is sufficiently in development to list it on its website, and this provision does not require agencies to post publicly pre-decisional or deliberative information, including non-public information that an agency is working on an environmental document.

Regarding the proposal to encourage, rather than allow, agencies to include the information listed in paragraphs (a)(1) through (a)(4), one commenter asked CEQ to go further and make the listed items a requirement. CEQ declines to require agencies to include this information, but strongly encourages them to do so.

## J. Revisions to Definitions (Part 1508)

In § 1508.1, CEQ proposed revisions to the definitions of "categorical exclusion," "cooperating agency,"

"effects" or "impacts," "environmental assessment," "environmental document," "environmental impact statement," "finding of no significant impact," "human environment," "lead agency," "major Federal action," "mitigation," "notice of intent," "page," "scope," and "tiering." CEQ proposed to add definitions for "environmental justice," "environmentally preferable alternative," "extraordinary circumstances," "joint lead agency," "participating Federal agency," "programmatic environmental document," and "significant effects."

CEQ did not propose substantive edits to any other definitions, but proposed to redesignate most of the paragraphs to keep the list of terms in alphabetical order. CEQ invited comment on whether it should modify the remaining definitions or define additional terms.

Multiple commenters requested that CEQ add other definitions or edit existing definitions where no changes were proposed. Commenters requested that CEQ define a number of additional terms including "unresolve conflicts," "Tribal consultation," "final action," "monitoring," "environmental design arts," "reasonably available for inspection," "substantive comments," "earliest reasonable time," and "issues." One commenter requested additional modification to the definition of "publish" and "publication" to encourage agencies to inform as broad an audience as possible. CEQ declines to make these changes in the final rule and discusses the rationale for not making these changes in the Phase 2 Response to Comments as well as in other sections of the preamble. CEQ is adding definitions for several additional terms and modifying definitions contained in the proposed rule as explained below.

### 1. Applicant (§ 1508.1(c))

CEQ adds a definition of "applicant" to § 1508.1(c). CEQ defines this term as a non-Federal entity that seeks an action by a Federal agency and clarifies that this term is inclusive of project sponsors. The CEQ regulations have long used the term "applicant" as well as "non-Federal entity" and "project sponsor." The recent NEPA amendments also use both terms interchangeably. Because applicants can include project sponsors, as well as non-Federal entities that are seeking agency action for other activities that are not ordinarily referred to as projects, CEQ is electing to use the term "applicants" throughout these regulations. Therefore, for consistency and clarity, CEQ revises the regulations to use this term consistently throughout, replacing

references to "non-Federal entity" and "project sponsor" with "applicant."

### 2. Categorical Exclusion (§ 1508.1(e))

CEQ proposed to modify the definition of "categorical exclusion" in proposed paragraph (d) to add a cross reference to proposed § 1501.4(c), in which CEQ proposed to establish a new way for agencies to establish CEs. CEQ also proposed minor grammatical edits to change "the agency" to "an agency" and "normally do not" to "normally does not."

A number of commenters expressed opposition to the existing term "normally" in the definition of "categorical exclusion," which CEQ did not propose to change, and asked that the final rule clarify the meaning of the term. Commenters opposed to the term "normally" asserted it makes the standard for establishing a CE insufficiently rigorous. Other commenters specifically asked that the final rule specify that "normally" means "in the absence of extraordinary circumstances," and that an agency cannot establish a CE if some actions will have significant adverse effects but will nonetheless be approved under the CE.

CEQ revises the definition of "categorical exclusion" as proposed in the final rule at § 1508.1(e) because it is consistent with section 111(1) of NEPA, which defines a CE in part as "a category of actions that a Federal agency has determined *normally* does not significantly affect the quality of the human environment." 42 U.S.C. 4336e(1) (emphasis added). CEQ has long used the term "normally" to mean in the absence of extraordinary circumstances,[117] and CEQ added "normally" in the definition of "categorical exclusion" in the 2020 rule for this reason.[118] Agency-established CEs are not exemptions from the requirement of section 102(2)(C) of NEPA that an agency prepare an EIS before taking a major Federal action significantly affecting the environment. 42 U.S.C. 4332(2)(C). Instead, CEs are a mechanism for complying with this requirement for actions of a kind the agency has determined will not

normally have significant effects with the extraordinary circumstances applicable to a CE serving to identify actions of the kind covered by the CE that could nonetheless have significant effects and therefore require additional analysis pursuant to the documentation requirement of § 1501.4(b)(1) or through an EA or EIS. Therefore, when developing a CE to identify categories of actions that will not normally have significant effects, an agency must also provide for the consideration of extraordinary circumstances to identify when a specific action that falls within the category is not of the normal variety that the agency has already determined will not have significant effects and, therefore, requires further analysis.

### 3. Communities With Environmental Justice Concerns (§ 1508.1(f))

CEQ did not propose a specific definition of "communities with environmental justice concerns" but invited comment on whether the final rule should define the term, and if so, how. CEQ explained in the proposed rule that it intended the phrase to mean communities that do not experience environmental justice as defined in proposed § 1508.1(k) (88 FR 49960).

Multiple commenters recommended the final rule define "communities with environmental justice concerns." Some commenters recommended CEQ define it as "communities that do not experience environmental justice as described in § 1508.1(k)." Another commenter suggested the definition of "environmental justice" was "politicized" and therefore referring to § 1508.1(k) would do little to add clarity. One commenter asserted that CEQ's intended meaning would burden communities with raising concerns rather than a definition with "objective measures of adverse health and environmental effects and disproportionate impacts that warrant alternatives analysis."

Numerous commenters requested the final rule include a specific definition because it would provide consistency and clarity to Federal agencies on how they should assess environmental justice impacts and how they should define communities with environmental justice concerns. Commenters also asserted that including a definition is important because the phrase is used frequently in the proposed rule. Many commenters also requested that CEQ provide additional guidance on how to identify communities with environmental justice concerns, and some specifically asserted that a definition will only be beneficial if there is additional guidance that includes

---

[117] *See, e.g.,* CEQ, CE Guidance, *supra* note 10, at 2 ("Extraordinary circumstances are factors or circumstances in which a normally excluded action may have a significant environmental effect that then requires further analysis in an environmental assessment (EA) or an environmental impact statement (EIS).").

[118] *See* CEQ, 2020 Final Rule, *supra* note 39, at 43342 ("CEQ proposed to revise the definition of 'categorical exclusion' in paragraph (d) by inserting 'normally' to clarify that there may be situations where an action may have significant effects on account of extraordinary circumstances.").

**35538**    **Federal Register** / Vol. 89, No. 85 / Wednesday, May 1, 2024 / Rules and Regulations

robust public engagement with environmental justice stakeholders. Some commenters provided specific language for consideration, which CEQ describes in the Phase 2 Response to Comments.

Some commenters asserted that the final rule does not need a definition, and one commenter suggested that the regulations already account for such groups.

After considering the comments, CEQ agrees that a definition would help provide consistency and clarity for Federal agencies and adds one at § 1508.1(f). CEQ defines "communities with environmental justice concerns" to mean communities "that may not experience environmental justice as defined . . . in § 1508.1(m)." The definition also indicates that agencies may use available screening tools, as appropriate to their activities and programs, to assist them in identifying these communities and includes two examples of existing tools that agencies could use: the Climate and Economic Justice Screening Tool and the EJScreen Tool.[119] The definition also clarifies that agencies have flexibility to develop procedures for the identification of such communities in their agency NEPA procedures. CEQ considers the definition provided in paragraph (f) that connects the definition of "communities with environmental justice concerns" with the definition of "environmental justice," alongside an indication that agencies may use available screening tools to assist them, to strike the right balance between providing additional guidance to agencies and recognizing that agencies should have flexibility to identify communities with environmental justice concerns in light of the unique circumstances associated with each action.

CEQ encourages agencies to make use of all available tools and resources in identifying communities with environmental justice concerns. CEQ notes that this definition is not intended to make such communities self-identify; it is incumbent on the agencies to proactively identify such communities. While many agencies have experience in doing so, CEQ anticipates that agencies will develop more expertise over time, which is why CEQ encourages agencies to consider further defining their methodology for identifying communities with environmental justice concerns in their agency NEPA procedures. CEQ also may

### 4. Cooperating Agency (§ 1508.1(g))

In proposed paragraph (d) of § 1508.1, CEQ proposed to revise the definition of "cooperating agency" for clarity and consistency with the definition of "cooperating agency" in sections 111(2) of and 107(a)(3) of NEPA, which provides that a lead agency may designate as a cooperating agency "any Federal, State, Tribal, or local agency that has jurisdiction by law or special expertise with respect to any environmental impact involved in a proposal." *See* 42 U.S.C. 4336a(a)(3), 4336e(2).

One commenter requested CEQ modify the definition to be more inclusive of State and local governments and Tribal entities by allowing them to serve as cooperating agencies when there are potential impacts in their communities or jurisdictions, and they are "involved in a proposal." Another commenter requested CEQ add a specific exclusion of non-governmental organizations or quasi-governmental organizations from the definition.

CEQ declines to expand the definition of "cooperating agency" to include agencies "involved in a proposal" as this is overly broad. Instead, CEQ finalizes the definition in § 1508.1(g) consistent with the proposal, which incorporates the language in section 107(a)(3) of NEPA. *See* 42 U.S.C. 4336(a)(3). However, CEQ encourages agencies to invite local governments and Tribes to participate as cooperating agencies where they have special expertise about a proposed action and its environmental effects. CEQ also declines to add the recommended explicit exclusion of non-governmental organizations or quasi-governmental organizations from the definition of "cooperating agency" because the definition of "cooperating agency" sets forth the entities that are eligible to serve as cooperating agencies, and this does not include non-governmental organizations or quasi-governmental organizations.

### 5. Effects or Impacts (§ 1508.1(i))

In proposed paragraph (g), CEQ proposed to make clarifying edits to the definition of "effects" and to add and modernize examples. Paragraph (g)(4) of 40 CFR 1508.1 (2022) listed common types of effects that may arise during NEPA review. CEQ proposed to update the list to add "disproportionate and adverse effects on communities with environmental justice concerns,

whether direct, indirect, or cumulative" and "climate change-related effects." For climate change-related effects, CEQ proposed to clarify that these effects can include both contributions to climate change from a proposed action and its alternatives as well as the potential effects of climate change on the proposed action and its alternatives. CEQ proposed these changes to update the definition to include effects that have been an important part of NEPA analysis for more than a decade and will continue to be relevant, consistent with best available science and NEPA's requirements. Also, CEQ proposed these changes in response to comments received during the Phase 1 rulemaking that the definition of "effects" or "impacts" should explicitly address environmental justice and climate change.[120]

CEQ received a variety of comments on the proposed definition of "effects" or "impacts." Some commenters supported the proposed definition generally, and specifically supported the retention of the changes made in the Phase 1 rulemaking to include direct, indirect, and cumulative effects in the definition.

Some commenters requested CEQ add additional examples of effects, including vandalism, destruction of cultural resources, and adverse effects to resources crucial to the exercise of Tribal Nations' reserved rights or the habitat such resources depend on for any part of their lifecycle.

Some commenters characterized the proposed definition of "effects" as an attempt to inappropriately broaden the definition, contravene NEPA, and invite litigation, delays, and complexity. These commenters primarily focused on the additions of environmental justice and climate change into proposed paragraph (g)(4), taking issue with CEQ codifying concepts that have previously only been included in guidance documents and Executive orders. One commenter generally described the proposed changes to the definition of "effects" as broadening the non-statutory definition of effects and asserted that it is at odds with NEPA, going beyond what the statute authorizes or requires. They also asserted the proposed changes have nothing to do with the mission of most agencies.

CEQ adds the proposed examples in § 1501.8(i)(4) of the final rule, and also adds "effects on Tribal resources" in response to commenters' suggestions. CEQ also revises the last sentence of the paragraph to substitute "adverse" for its

---

[119] CEQ, *Explore the Map*, Climate and Economic Justice Screening Tool, *https://screeningtool. geoplatform.gov/*; EPA, EJScreen: *Environmental Justice Screening and Mapping Tool*, *https:// www.epa.gov/ejscreen*.

[120] CEQ, Phase 1 Response to Comments, *supra* note 52, at 87, 99.

synonym "detrimental" before "effects," for consistency with the usage of the phrase "adverse effects" in other provisions in the regulations. CEQ declines to add the other proposed examples as they are overly specific. CEQ notes that this paragraph is a non-exhaustive list of examples, and that effects vary widely depending on the nature and scope of an agency action. CEQ considers it irrelevant to this rulemaking whether environmental effects, including climate-related and environmental justice effects, relate to an agency's mission. The purpose of NEPA is for agency decision makers to consider environmental effects in their decision making regardless of an agency's mission or purpose.

CEQ acknowledges that the term "effects" is not statutorily defined. A definition of "effects," however, has been a part of CEQ's regulations since 1978, which included direct, indirect, and cumulative effects, *see* 40 CFR 1508.8 (2019), and which CEQ restored to the regulations in its Phase 1 rulemaking. Including explicit references to "climate change-related effects" and "disproportionate and adverse effects on communities with environmental justice concerns" as examples of effects is consistent with that definition of "effects," and the approach the CEQ regulations have taken since 1978 of identifying examples of categories of effects that fall within the regulation's definition of "effects." See 40 CFR 1508.1(g)(1) (2020); 40 CFR 1508.8 (2019). The addition of these new examples to the regulatory text provides further specificity consistent with the statutory text and do not expand the scope of the definition of "effects." For example, section 2 of NEPA, 42 U.S.C. 4321, notes that in enacting NEPA Congress declared a national policy, among other things, "to promote efforts which will prevent or eliminate damage to the environment and *biosphere*" (emphasis added). Section 102 of NEPA, for example, directs the "Federal Government to use all practical means" to ensure "for *all* Americans safe, healthful, productive, and esthetically and culturally pleasing surroundings," and that "Congress recognizes that *each person* should enjoy a healthful environment." 42 U.S.C. 4331(b) and (c) (emphasis added). And as section 102(2)(C)(i) of NEPA also notes, an agency's NEPA analysis must address the "reasonably foreseeable adverse environmental effects" of the proposed action, which has long been interpreted in CEQ's regulations (and affirmed by courts) to include direct, indirect, and

cumulative effects. 42 U.S.C. 4332(2)(C)(ii). As a result, expressly identifying climate change, effects to communities with environmental justice concerns, and similar considerations simply draws attention to various categories of effects that already merit consideration.

A commenter recommended CEQ clarify that agencies focus cumulative effects analyses on "significant" cumulative effects to improve efficiency. The commenter also asked CEQ to recognize that a qualitative analysis is sufficient when describing potential cumulative effects. CEQ has determined not to include these suggestions in the regulatory definition because they are overly specific and prescriptive and notes that CEQ has issued guidance on cumulative effects that address these issues.

One commenter asserted that "effects of the proposed agency action" in section 102(2)(C) of NEPA cannot be read to include effects that are totally unrelated to the proposed agency action and therefore inclusion of cumulative effects in the definition of "effects" is precatory and irrelevant to the legal sufficiency of an EIS.

Some commenters asserted that the amendments to NEPA prohibit consideration of cumulative effects because they do not demonstrate a reasonably close causal relationship, and stated that Congress intentionally codified "reasonably foreseeable" effects rather than "cumulative" or "aggregate" effects and urged CEQ to adopt language consistent with the statutory amendments.

CEQ disagrees with the commenters' assertions. The first sentence of the definition of "effects" is clear—effects must be reasonably foreseeable. Direct, indirect, and cumulative effects are categories of reasonably foreseeable effects. Therefore, CEQ declines to make changes to the definition to remove "cumulative" from the types of effects.

Some commenters requested that CEQ restore the definition of "effects" from the 2020 rule, in particular emphasizing the restoration of "reasonably close causal relationship to the proposed action," which CEQ removed in the Phase 1 rulemaking. CEQ declines to restore the 2020 definition for the reasons discussed in the Phase 1 rulemaking, the Phase 1 Response to Comments, and the Phase 2 Response to Comments. CEQ also notes that Congress did not include this language in the 2023 NEPA amendments, but instead used the phrase "reasonably foreseeable effects."

CEQ also proposed minor, non-substantive edits to paragraph (g)(3)

regarding cumulative effects. Consistent with CEQ's proposal to ensure "significant" only modify "effects," CEQ proposed to revise the phrase to read "actions with individually minor but collectively significant effects." A commenter on the Phase 1 rulemaking had also noted that the word "actions" should be "effects." CEQ did not receive any comments specific to this proposed change and makes it in the final rule in § 1508.1(i)(3).

6. Environmental Assessment (§ 1508.1(j))

CEQ proposed to update the definition of "environmental assessment" in proposed paragraph (h) for consistency with sections 106(b)(2) and 111(4) of NEPA, proposed § 1501.5, and longstanding agency practice. *See* 42 U.S.C. 4336(b)(2), 4336e(4). CEQ proposed to strike "prepared by a Federal agency" and change it to "for which a Federal agency is responsible" for consistency with section 107(f) of NEPA and § 1506.5, which allow a project sponsor (following agency issuance of procedures) or agency-directed contractor, respectively, to prepare an EA but requires that the agency take responsibility for the accuracy of its contents irrespective of who prepares it. *See* 42 U.S.C. 4336a(f).

To improve readability, CEQ proposed to strike "to aid an agency's compliance with the Act" and replace it with text from § 1501.5 clarifying that an agency prepares an EA when a proposed action is not likely to have a significant effect or the significance of the effects is unknown. CEQ also proposed to insert additional language to clarify that an EA is "used to support an agency's" determination of whether to prepare an EIS, add a parenthetical cross reference to part 1502, and make the cross reference to the provision on FONSIs a parenthetical to match. CEQ noted in the proposed rule that the proposed changes would not alter the intention that an EA is used to support an agency's determination whether to prepare an EIS (part 1502) or issue a FONSI (§ 1501.6).

One commenter requested that the definition of "environmental assessment" reference the requirements of an EA with a mitigated FONSI and clarify that an agency may incorporate mitigation to reach a FONSI determination. CEQ revises the definition of "environmental assessment" as proposed in § 1508.1(j). CEQ declines to make additional edits to address mitigated FONSIs because the definition already cross-references to § 1501.6, which addresses mitigated FONSIs.

7. Environmental Document (§ 1508.1(k))

CEQ proposed to add "record of decision" to the definition of "environmental document" in proposed paragraph (i) for clarity. CEQ also proposed to add a "documented categorical exclusion determination" to the definition to reflect the longstanding agency practice of documenting some CE determinations.

A few commenters opposed the proposed addition of a documented CE determination to the definition. One commenter opposed the definition stating that it is inconsistent with the definition of "environmental document" in section 111 of NEPA. Another commenter opposed the change asserting some of the regulatory requirements for environmental documents should only apply to EAs and EISs, and that the proposed definition further obscures the distinction between a CE compared to an EA or EIS. A third commenter requested confirmation that undocumented CEs are excluded from the definition and also generally opposed the inclusion of CEs in the definition of "environmental document."

CEQ makes the changes as proposed to the definition of "environmental document" in § 1508.1(k). This change is consistent with the changes to §§ 1501.4 and 1507.3 that reference CE determinations. Therefore, for clarity and efficiency, CEQ is incorporating documented CE determinations into the definition of "environmental document." As CEQ acknowledged in its proposed rule, CEQ intentionally proposed a broader definition of "environmental document" than the definition in the NEPA statute because the CEQ regulations have long defined this term more broadly for the regulation's purposes, and narrowing the definition in the regulations would require substantial further conforming revisions that could create additional uncertainty and would disrupt existing practices. In developing the proposed and final rule, CEQ reviewed each use of the term to ensure its definition is appropriate as well as consistent with the NEPA statute. CEQ is unclear how this definition "obscures the distinction" between CEs and EAs or EISs, and therefore declines to make any changes in response to this comment. Lastly, CEQ agrees with the commenter that this would exclude undocumented CE determinations but declines to remove documented CE determinations as discussed earlier in this section.

8. Environmental Impact Statement (§ 1508.1(l))

CEQ proposed to change "as required" to "that is required" in the definition of "environmental impact statement" in proposed paragraph (j) for consistency with the definition of "environmental impact statement" in section 111(6) of NEPA. *See* 42 U.S.C. 4336(6). CEQ did not receive comments on this proposed change. CEQ makes this change in the final rule in § 1508.1(l).

9. Environmental Justice (§ 1508.1(m))

CEQ proposed to add a new definition of "environmental justice" at proposed paragraph (k) to define "environmental justice" as the just treatment and meaningful involvement of all people so that they are fully protected from disproportionate and adverse human health and environmental effects and hazards, and have equitable access to a healthy, sustainable, and resilient environment. In defining "environmental justice," CEQ proposed to use the phrase "cumulative impacts," rather than the phrase "cumulative effects," as used elsewhere in the proposed regulations because the phrase "cumulative impacts" has a meaning in the context of environmental justice relating to the aggregate effect of multiple stressors and exposures on a person, community, or population. *See, e.g.,* Environmental Protection Agency, Cumulative Impacts Research: Recommendations for EPA's Office of Research and Development (2022). CEQ explained in the proposed rule that it views the evolving science on cumulative impacts as sufficiently distinct from the general meaning of cumulative effects under the NEPA regulations such that using a different term could be helpful to agencies and the public. CEQ invited comment on this approach.

Multiple commenters expressed support for the proposed definition, with many saying the language is clear and comprehensive and others welcoming the inclusion of a definition, saying it is long overdue. Some commenters expressed support for specific components of the definition, such as the inclusion of Tribal affiliation. Numerous commenters suggested specific revisions to the definition or asked that the final rule include additional elements, which CEQ discusses in the Phase 2 Response to Comments.

Some commenters supported use of the phrase "cumulative impacts" in the definition and CEQ's rationale for doing so. One commenter asserted that

"cumulative impacts" is a newly introduced concept and urged CEQ to clarify its meaning, expressing concern that it is open-ended and could result in agencies inaccurately interpreting the term to call for an unnecessarily expansive historical baseline in the analysis that could slow or discourage development or require projects to mitigate historical environmental burdens that go beyond the impacts of a proposed project. One commenter requested that CEQ add a separate definition for "cumulative impacts" as it is used in the definition of "environmental justice" to distinguish it from "cumulative effects."

Multiple commenters opposed the proposed definition of "environmental justice" for a variety of reasons. Commenters asserted that it was subjective, vague, difficult to implement, an impossibly high standard, politically motivated, inconsistent with § 1502.16(b), unlawful and not supported by statute, vulnerable to legal challenges, could open the door to endless project delays, and changes NEPA procedural requirements to achieve substantive goals.

In the final rule, CEQ adds a definition of "environmental justice" in § 1508.1(m) consistent with the proposal. Consideration of environmental justice is within the scope of NEPA's purpose to provide for the social, economic, and other requirements of present and future generations and allowing for all Americans to participate in a wide sharing of life's amenities. *See* 42 U.S.C. 4331. NEPA also recognizes that each person should have the opportunity to enjoy a healthy environment. 42 U.S.C. 4331. Consideration of environmental justice also informs an agency's analysis of reasonably foreseeable effects. Agencies have decades of experience integrating consideration of environmental justice in their NEPA reviews and incorporating a definition of "environmental justice" into the regulations will provide additional clarity and consistency as agencies continue to analyze environmental justice in environmental documents, as they have for many years. The definition added to the regulations is consistent with longstanding agency practice evaluating potential effects to communities that experience disproportionate and adverse human health and environmental effects and ensuring meaningful engagement with communities affected by proposed actions. The definition is also consistent with the definition of "environmental

justice'' in section 2(b) of E.O. 14096.[121] CEQ declines to define the phrase ''cumulative impacts.'' As noted in the proposed rule, ''cumulative impacts'' has a meaning in the context of environmental justice relating to the aggregate effect of multiple stressors and exposures on a person, community, or population. The science of ''cumulative impacts'' is an evolving field, and CEQ has determined that it is premature and inappropriately limiting to establish a regulatory definition of the phrase at this time. CEQ will consider whether guidance on cumulative impacts would assist agencies conducting environmental reviews.

Some commenters asked CEQ to provide clearer direction and guidance on how to apply the definition and consideration of environmental justice to improve consistency and clarity amongst Federal agencies. CEQ will consider what additional guidance may be necessary.

### 10. Environmentally Preferable Alternative (§ 1508.1(n))

CEQ proposed to add a new definition of ''environmentally preferable alternative'' at § 1508.1(*l*), a concept that has been in the regulations since 1978, and define it as the alternative or alternatives that will best promote the national environmental policy in section 101 of NEPA. CEQ based its proposed definition on CEQ's Forty Questions guidance that was issued in 1981 and has remained an important resource for agencies since that time.[122]

Some commenters expressed general support for the proposed definition. Others expressed support and suggested changes, such as incorporating the phrases ''reasonable alternative'' and ''economically and technically feasible.'' Other commenters opposed the proposed definition. Multiple commenters asserted the definition conflicts with the mandates of section 101 of NEPA and asserted that because section 101 is about striking a balance, the environmentally preferable alternative should be defined as the alternative that best strikes a balance. Another commenter asserted the proposed definition is at odds with the statutory language of NEPA arguing that agencies must only consider alternatives that are technically and economically feasible and asserting that the environmentally preferable alternative may not always be technically and economically feasible.

CEQ adds the definition of ''environmentally preferable

alternative'' in § 1508.1(n) as proposed. As CEQ has clarified in § 1502.14(f) and in the discussion in section II.D.9, agencies identify the environmentally preferable alternative amongst the alternatives considered in the EIS, which are the proposed action, no action, and reasonable alternatives. Therefore, the definition of ''environmentally preferable alternative'' does not require agencies to consider alternatives beyond those already identified for consideration. CEQ disagrees that it is necessary to include text indicating that the environmentally preferable alternative must be a reasonable alternative, because agencies select the environmentally preferable alternative from the alternatives analyzed in the EIS, which include the proposed action, no action, and reasonable alternatives, which is defined as a range of alternatives that are technically and economically feasible, and meet the purpose and need for the proposed action. CEQ also disagrees that the environmentally preferable alternative should be defined as the alternative that best balances competing considerations. While balance is an important part of NEPA, identifying the environmentally preferable alternative provides information to decision makers and the public, and is a longstanding part of the NEPA process. Agencies are not required to adopt the environmentally preferred alternative as its final decision. Additionally, CEQ disagrees that the definition is at odds with section 101 of NEPA because that section is incorporated into the definition.

### 11. Extraordinary Circumstances (§ 1508.1(o))

CEQ proposed to add a definition of ''extraordinary circumstances'' in proposed paragraph (m). While the 1978 regulations explained the meaning of extraordinary circumstances as part of the definition of ''categorical exclusion'' at 40 CFR 1508.4 (2019), which the 2020 rule moved to 40 CFR 1501.4(b) (describing how to apply extraordinary circumstances when considering use of a CE) and 40 CFR 1507.3(e)(2)(ii) (requiring agencies to establish extraordinary circumstances for CEs in their procedures),[123] CEQ proposed to create a standalone definition to improve clarity when this term is used throughout the rule.

CEQ also proposed to add several examples of extraordinary circumstances to help agencies and the

public understand common situations that agencies may consider in determining whether an action normally covered by a CE falls outside the category of actions the agency has determined will not have significant effects and, therefore, additional analysis is required either under § 1501.4(b), if the agency can determine that it can rely on the CE notwithstanding the presence of the extraordinary circumstance, or through an EA or EIS. The proposed examples included effects on sensitive environmental resources, disproportionate and adverse effects on communities with environmental justice concerns, effects associated with climate change, and effects on historic properties or cultural resources. This list of examples is not exclusive, and agencies continue to have the discretion to identify extraordinary circumstances in their NEPA implementing procedures, consistent with § 1507.3, as well as through the new mechanism to establish CEs in § 1501.4(c), that are specific and appropriate to their particular actions and CEs.

Multiple commenters expressed general support for the proposed definition of ''extraordinary circumstances.'' A few commenters specifically supported the inclusion of the examples of extraordinary circumstances, including the references to climate change effects, effects on sensitive environmental resources, effects on communities with environmental justice concerns, and effects on historic properties and cultural resources.

Other commenters criticized the proposed definition, asserting it is too broad, vague, and subjective. Some commenters suggested the proposed definition is contrary to the NEPA amendments allowing expanded use of CEs. Other commenters specifically objected to the examples, specifically effects on climate change and communities with environmental justice concerns. One commenter stated the definition could result in confusion because it does not provide clarity on what agencies must evaluate. Similarly, another commenter stated this lack of clarity provides too much freedom to agencies that may not properly assess the effects of projects for the sake of efficiency.

CEQ adds a definition of ''extraordinary circumstances'' in § 1508.1(o) as proposed with minor changes. In the final rule, CEQ uses ''means'' instead of ''are'' for consistency with other definitions in § 1508.1. The final rule removes ''environmental'' from ''significant

[121] *See* E.O. 14096, *supra* note 22, at 25253.
[122] CEQ, Forty Questions, *supra* note 5, at 6.

[123] CEQ, 2020 Final Rule, *supra* note 39, at 43342–43.

environmental effects'' because "significant effects" is a defined term. CEQ also revises the examples of extraordinary circumstances to use the same introductory text, "substantial" effects as discussed further in this section. The operative language included in this definition has been in the regulations since 1978, and agencies have decades of experience analyzing proposed actions for extraordinary circumstances. CEQ disagrees that the definition is inconsistent with the recent amendments to NEPA because NEPA requires agencies to conduct an EIS for actions that will have significant effects, and extraordinary circumstances are the mechanism by which an agency assesses whether a particular proposed action may have significant effects and, therefore, that reliance on a CE is inappropriate. CEQ disagrees that the definition is overbroad and considers it to provide agencies the necessary flexibility to tailor their extraordinary circumstances consistent with their programs and authorities. CEQ also disagrees that the proposed definition impedes the ability of agencies to use CEs or apply the provisions of NEPA regarding CEs. The regulations have always required agencies to consider extraordinary circumstances when applying a CE and providing a definition within the regulations helps provide clarity to agencies, applicants, and the public.

Multiple commenters asserted that the undefined phrase "substantial effects" used in the examples of extraordinary circumstances may result in confusion, delays, and increased litigation risk. Another commenter questioned why "potential substantial effects" is used in the examples instead of "reasonably foreseeable" and "significant effects." CEQ used this different phrasing because the purpose of extraordinary circumstances is to screen an individual action, which would normally be covered by a CE, for further analysis to assess whether the action has reasonably foreseeable significant effects requiring the preparation of an EIS. While an agency could adopt extraordinary circumstances that directly implement the reasonably foreseeable significant effects standard, doing so could degrade the efficiency of applying CEs by requiring a more complex analysis in applying its extraordinary circumstances that would consider the context and intensity factors that govern an assessment of significance. CEQ notes that many agencies have long used this phrase in their lists of existing extraordinary circumstances and that this approach

has resulted in an efficient process for applying CEs.

Some commenters also questioned why the example for effects on communities with environmental justice concerns or effects on historic properties or cultural resources did not use the phrase "substantial effects." CEQ revises the examples to use "substantial" effects for consistency with the other examples in § 1508.1(o), although CEQ notes that agencies have flexibility to design extraordinary circumstances in a manner that makes sense for their programs.

### 12. Finding of No Significant Impact (§ 1508.1(q))

In the definition of "finding of no significant impact" proposed in paragraph (o), CEQ proposed to insert "agency's determination that and" after "presenting the" for consistency with the definition of "finding of no significant impact" in section 111(7) of NEPA, which defines the term to mean "a determination by a Federal agency that a proposed agency action does not require the issuance of an environmental impact statement." 42 U.S.C. 4336e(7).

One commenter suggested CEQ revise the definition to clarify that the proposed action will not have a significant adverse effect on any aspect of the human environment. CEQ revises the definition of "finding of no significant impact" in § 1508.1(q) as proposed, and CEQ declines to make additional changes to the definition. CEQ agrees that the purpose of a FONSI is to document the determination that the proposed action will not have a significant effect, which is specified in § 1501.3(d)(2)(i), and does not consider repeating that proposition here necessary. Another commenter suggested the final rule include a definition for mitigated FONSI, which CEQ declines to add because the meaning of a mitigated FONSI is conveyed in § 1501.6(a).

### 13. Human Environment or Environment (§ 1508.1(r))

CEQ proposed to clarify in proposed paragraph (p) that "human environment" and "environment" are synonymous in the regulations given that "environment" is the more commonly used term across the regulations.

A few commenters expressed support for the use of "human environment" and "environment" synonymously. A couple of commenters asked for CEQ to define "human environment" and "environment" as separate terms but did not include a rationale for doing so.

One commenter was supportive but requested that CEQ expand the definition to explicitly include cultural and socio-economic conditions.

CEQ makes this change as proposed in the final rule at § 1508.1(r). CEQ declines to explicitly reference cultural and socio-economic conditions in the definition, because the definition cross-references the definition of "effects," which notes that effects include ecological, aesthetic, historic, cultural, economic, social, or health.

CEQ proposed a minor edit to "human environment" in § 1508.1(p) to remove "of Americans" after "present and future generations." This minor edit improves consistency with section 101(a) of NEPA, which speaks generally about the impact of people's "activity on the interrelations of all components of the natural environment" and the need "to create and maintain conditions under which [humans] and nature can exist in productive harmony." 42 U.S.C. 4331(a).

One commenter opposed the removal of the phrase "of Americans" and disagreed with CEQ's characterization of the change as minor. CEQ disagrees with the commenter's assertion and makes this change in the final rule. In the 2020 rule, CEQ changed "people" to "of Americans," explaining that this change was made to be consistent with section 101(a) of NEPA.[124] However, CEQ has reconsidered that explanation, which overlooks the context in which the phrase "present and future generations of Americans" is used in section 101(a). That paragraph of the Act refers to Americans at the end of the last sentence after using the broader term "man" three times. "Human environment" refers broadly to the interrelationship between people and the environment. The phrase "present and future generations of Americans" is used in a narrower context to "fulfill the social, economic, and other requirements of present and future generations of Americans." 42 U.S.C. 4331(a). CEQ notes that it considers the removal of the phrase "of Americans" in the definition of "human environment" to be consistent with CEQ's determination to retain the phrase in the first sentence of § 1501.1(a). That sentence specifically describes section 101(a) of NEPA and does not define the undefined term "human environment," which appears in NEPA section 102(2)(C). CEQ considers it appropriate to define "human environment" in consideration of the totality of section 101, rather than solely based on the last phrase in section 101(a). A definition of

---

[124] *Id.* at 43344–45.

AR_0028862

"human environment" that is not limited by the phrase "of Americans" is also consistent with the statutory exclusion in section 111(10)(b)(vi) of NEPA of activities or decisions with effects located entirely outside of the jurisdiction of the United States from the definition of "major Federal action." This exclusion—consistent with decades of agency practice—requires agencies to evaluate effects that occur outside of U.S. jurisdiction as a component of the human environment because it does not limit the definition of "effects," but rather excludes a narrow category of activities from the definition of "major Federal action." 42 U.S.C. 4336e(10)(b)(vi).

### 14. Joint Lead Agency (§ 1508.1(s))

CEQ proposed to add a definition for "joint lead agency" to mean "a Federal, State, Tribal, or local agency designated pursuant to § 1501.7(c) that shares the responsibilities of the lead agency" for preparing an EA or EIS. CEQ proposed the definition for consistency with the usage of that term in section 107(a)(1)(B) of NEPA and § 1501.7(b) and (c). *See* 42 U.S.C. 4336a(a)(1)(B).

One commenter expressed that NEPA establishes two categories of joint lead agencies: Federal joint lead agencies and non-Federal joint lead agencies. The commenter requested CEQ clarify this distinction in the definition. CEQ declines to make the commenter's recommended change. CEQ reviewed the use of the term in the regulations and identified no circumstance where the term was used in a fashion that required distinguishing between Federal joint lead agencies and non-Federal joint lead agencies. Therefore, CEQ finalizes the definition of "joint lead agency" as proposed in § 1508.1(s).

### 15. Lead Agency (§ 1508.1(u))

CEQ proposed in paragraph (s) to revise the definition of "lead agency" as "the Federal agency that proposes the agency action or is designated pursuant to § 1501.7(c) for preparing or having primary responsibility." CEQ proposed this revision for consistency with the definition of "lead agency" in section 111(9) of NEPA and to expand the definition "to also include EAs, consistent with longstanding practice. CEQ did not receive any comments on its proposed revisions to the definition of "lead agency" and finalizes the definition of "lead agency" as proposed in § 1508.1(u). *See* 42 U.S.C. 4336e(9).

### 16. Major Federal Action (§ 1508.1(w))

CEQ proposed to revise the definition of "major Federal action" in proposed paragraph (u) to clarify the list of

example activities or decisions that meet the definition, and revise the list of exclusions from the definition consistent with section 111(10) of NEPA. *See* 42 U.S.C. 4336e(10). First, CEQ proposed to revise the introductory paragraph to change "activity or decision" to "action that the agency carrying out such action determines is" and insert "substantial" before "Federal control and responsibility" and delete "subject to the following" to align the text with the language in section 111(10) of NEPA.

Some commenters requested the final rule provide further clarity and specificity regarding "substantial Federal control and responsibility" contending that this phrase is ambiguous and confusing. Another commenter argued that Congress made a significant change to the definition of "major Federal action" in section 111(10) of NEPA in using the phrase "substantial Federal control and responsibility" over the action the agency is carrying out, instead of adopting the definition of "major Federal action" from the 1978 regulations, "actions with effects which are potentially subject to Federal control and responsibility" or the 2020 regulations "Federal control and responsibility." This commenter argued the use of "substantial" by Congress further limits the definition of "major Federal action" and therefore NEPA's applicability generally. Several other commenters agreed with this premise and suggested the intention of the NEPA amendments was to narrow the application of NEPA. Other commenters asked CEQ to define the term "substantial" in the context of the definition.

CEQ disagrees that "substantial Federal control and responsibility" applies in a more limited manner than "Federal control and responsibility." Substantial modifies Federal control and responsibility and indicates that a large amount, but not complete, control and responsibility is required for an action to be a major Federal action. This interpretation is consistent with Supreme Court precedent interpreting the meaning of substantial in various statutes. *See, e.g., Ayestas* v. *Davis,* 584 U.S., 28, 45 (2018); *Life Technologies Corp.* v. *Promega Corp.,* 580 U.S. 140, 145–46 (2017); *Virginia* v. *Hicks,* 539 U.S. 113, 119–20, 122–24 (2003). CEQ interprets substantial Federal control and responsibility to mean the agency has a large amount of control and responsibility over the action the agency is carrying out but not complete control over the action or its effects. The phrase "substantial Federal control and

responsibility" could, therefore, be interpreted to capture a broader set of actions than the phrase in the absence of the word "substantial," because "Federal control and responsibility" unqualified could be read to require complete control and responsibility. Contrary to the commenters' assertion, the phrase "substantial Federal control and responsibility" does not require a narrower scope for the term major Federal action than the phrase "Federal control and responsibility."

CEQ notes that the phrase "substantial Federal control and responsibility" in section 111(10) applies to the actions an agency is carrying out. 42 U.S.C. 4336e(10)(A). In most cases, agencies exercise control and responsibility over the actions they carry out, unless those actions are non-discretionary. CEQ declines to define "substantial" in the final rule but will consider whether to issue guidance in the future and will assist agencies in evaluating circumstances in which the agency carries out an action but lacks complete control and responsibility for it.

CEQ revises the introductory paragraph of the definition of "major Federal action" in § 1508.1(w) as proposed because the text aligns with the definition of "major Federal action" in section 111(10) of NEPA. 42 U.S.C. 4336e(10). The determination of whether an activity or decision is a major Federal action is a fact-specific analysis that agencies have long engaged in, and they should continue to exercise judgment as they evaluate the contexts in which they operate. The regulations provide a list of example activities and decisions in § 1508.1(w)(1) to assist agencies in making these determinations.

Second, CEQ proposed to reorder and revise the definition to first list the examples of activities or decisions that may be included in the definition of "major Federal action" before the exclusions. To that end, CEQ proposed to move paragraph (q)(3) of 40 CFR 1508.1 (2020) to proposed paragraph (u)(1), and revise "tend to fall within one of the following categories" to read "generally include."

Several commenters opposed the proposed list of example activities or decisions that meet the definition of "major Federal action" and recommended the final rule retain only the exclusions set forth in section 111(10) of NEPA. The commenters argued that these examples go beyond the text of NEPA, subvert Congressional intent, and limit an agency's ability to make case-by-case determinations.

Other commenters expressed support for the list of examples.

CEQ considered the range of comments on the definition of "major Federal action" and determined that providing both examples of activities or decisions that typically meet the definition of "major Federal action" as well as exclusions from the definition strikes the right balance to help agencies as they make case-by-case factual determinations of whether an action qualifies as a major Federal action and for consistency with section 111(10). *See* 42 U.S.C. 4336e(10). To provide additional clarity that this is a fact-specific, case-by-case determination, CEQ moves paragraph (q)(3) of 40 CFR 1508.1 (2020) to § 1508.1(w)(1) in the final rule, revises it consistent with the proposal, and adds an introductory clause, "[e]xamples of" before "major Federal actions generally include" to the beginning of the paragraph to make clear that this is a list of example activities and decisions that may meet the definition of "major Federal action."

Third, CEQ proposed to strike paragraph (q)(2) of 40 CFR 1508.1 (2020) and replace it with proposed paragraph (u)(1)(i) to include the granting of authorizations such as permits, licenses, and rights-of way. CEQ proposed to strike the examples in paragraph (q)(2) 40 CFR 1508.1 (2020) because the proposed example addresses regulated activities, and the other examples are redundant to those listed in proposed paragraphs (u)(1)(ii) through (u)(1)(vi). CEQ did not receive any comments specific to this proposal. CEQ strikes paragraph (q)(2) of 40 CFR 1508.1 (2020) in the final rule and replaces it in § 1508.1(w)(1)(i) with the language as proposed.

Fourth, CEQ proposed to redesignate paragraphs (q)(3)(i) through (q)(3)(iv) of 40 CFR 1508.1 (2020) as proposed paragraphs (u)(1)(ii) through (u)(1)(v). CEQ did not receive any comments specific to this proposal. In the final rule, CEQ redesignates paragraphs (q)(3)(i) through (q)(3)(iv) of 40 CFR 1508.1 (2020) as § 1508.1(w)(3)(i) through (w)(3)(iv), respectively.

Fifth, in paragraph (u)(1)(iv), CEQ proposed to change the phrase "connected agency decisions" to "related agency decisions" to clarify that the concept in this paragraph is not meant to refer to "connected actions" as discussed in § 1501.3. CEQ proposed this as a non-substantive, clarifying change to avoid any confusion with connected actions. CEQ did not receive specific comments on this proposed change and revises this provision as proposed in § 1508.1(w)(1)(iv).

Sixth, CEQ proposed to revise paragraph (u)(1)(v) to change "approval of" to "carrying out" specific projects to address projects carried out directly by a Federal agency. CEQ proposed to strike "located in a defined geographic area" from the example of management activities; while this is merely an example, CEQ is concerned it could be read as limiting. CEQ also proposed to strike the sentence regarding permits and address them in the example in proposed paragraph (u)(1)(i).

One commenter requested removal of the term "carrying out," asserting that CEQ has not shown that carrying out construction activities constitutes major Federal action. In the final rule, CEQ retains the example in § 1501.8(w)(1)(v) and adds "or carrying out" after "[a]pproval of" rather than replacing it because the phrase "carrying out" is consistent with section 111(10) of NEPA, which includes the phrase "the agency carrying out such action." 42 U.S.C. 4336e(10)(A). CEQ also adds "agency" before "projects" to distinguish this example from non-Federal projects. Because this is a list of examples and both approving or carrying out construction projects can be major Federal actions, CEQ includes both in the final rule. For example, an agency may approve construction of a Federal facility and then contract out with another entity to actually carry out that construction.

Seventh, CEQ proposed to add a new example in proposed paragraph (u)(1)(vi) to improve clarity and ensure appropriate application of NEPA by explaining when Federal financial assistance is a major Federal action. Generally, actions to provide Federal financial assistance, other than actions that provide only minimal Federal funding, are major Federal actions so long as the Federal agency has authority and discretion over the financial assistance in a manner that could address environmental effects from the activities receiving the financial assistance. In such circumstances, the agency has sufficient control and responsibility over the use of the funds or the effects of the action for the action providing financial assistance to constitute a major Federal action consistent with the definition in section 111(10) of NEPA. 42 U.S.C. 4336e(10)(A). This includes circumstances where the agency could deny the financial assistance, in whole or in part, due to environmental effects from the activity receiving the financial assistance, or could impose conditions on the financial assistance that could address the effects of such activity.

Several commenters contended that CEQ's proposal to include financial assistance as an example of a major Federal action in proposed paragraph (u)(1)(vi) is inconsistent with the statutory definition of "major Federal action" in section 111(10)(B) of NEPA. The commenters stated that the proposed language is overly broad and could cover too many Federal loan or grant programs. One commenter asserted that this language "could cover virtually any Federal grant or loan program, including ones that are not currently subject to NEPA." Another commenter asserted that financial assistance should never be considered a major Federal action.

CEQ disagrees that the examples of how an agency may exercise "sufficient control and responsibility" with regard to financial assistance to meet the statutory definition of "major Federal action" are inconsistent with the statute. The language in paragraph (u)(1)(vi) provides examples of where financial assistance meets the definition of "major Federal action" and is not covered by the exclusion of "financial assistance where a Federal agency does not exercise sufficient control and responsibility over the subsequent use of such financial assistance or the effect of the action." 42 U.S.C. 4336e(10)(B)(iii).

CEQ adds the proposed examples in the final rule at § 1508.1(w)(1)(vi) with an additional clause to incorporate the phrase "more than a minimal amount" into the example to avoid any confusion about the relationship of the example to the exclusion in paragraph (w)(2)(i)(A) and NEPA section 111(10)(B)(ii). CEQ also makes two editorial corrections to add the missing word "to" after "due" and repeat the subject "authority to" before "impose conditions." Except in circumstances in which an agency provides minimal Federal funding, where an agency has substantial control and responsibility over a recipient's environmental effects or sufficient discretion to consider the environmental effects when making decisions, the agency must comply with NEPA. While an agency can appropriately tailor the scope of its NEPA analysis to the environmental effects that it can take into account in making its decision, the agency cannot exclude such actions from NEPA review altogether.

CEQ disagrees with the assertion that the example broadens the applicability of NEPA to financial assistance that is excluded by section 111(10)(B)(ii) and § 1508.1(w)(2)(iii). Rather, the example describes circumstances in which an agency exercises sufficient control or

responsibility over the use of financial assistance or the effect of the action to fall outside the exception. In evaluating whether a particular action qualifies as a major Federal action consistent with this example and the definition in § 1508.1(w)(2)(iii), agencies should consider the specific circumstances and legal authorities involved. As with any NEPA review, where an agency determines that an action providing financial assistance constitutes a major Federal action, the agency should scope the NEPA review in light of the statutory and factual context presented.

Other commenters specifically questioned the inclusion of financial assistance where the agency "otherwise has sufficient control and responsibility over the subsequent use of the financial assistance or the effects of the activity for which the agency is providing the financial assistance" in the example. A commenter asserted that this phrase's breadth and ambiguity could lead to litigation and recommended narrowing this flexibility clause to apply only where the agency "otherwise has authority to impose conditions on the receipt of the financial assistance to address environmental effects."

CEQ declines to make the commenters' proposed changes. The text the commenter addresses reflects the exclusion in section 111(10)(B)(iii) of NEPA. *See* 42 U.S.C. 4336e(10)(B)(iii). CEQ agrees that authority to impose conditions to address environmental effects, along with authority to deny in whole or in part assistance due to environmental effects, would satisfy the statutory test, and those situations are identified in the sentence immediately preceding the text that is the focus of the comment. Describing these situations, along with the remainder of § 1508.1(w)(1)(vi), can assist agencies in evaluating actions providing financial assistance, in light of the relevant statutory authorities and factual context, to determine if such action falls within the exclusion in section 111(10)(B)(iii) of NEPA and § 1508.1(w)(2)(iii). In addition to reflecting the statutory exclusion, this clause recognizes the varying degrees of control and responsibility agencies have over a wide variety of financial assistance programs, as well as the agencies' responsibility to determine the proper scope of its NEPA review with regard to such programs.

Eighth, CEQ proposed to replace the exclusions in paragraphs (q)(1)(i) through (vi) of 40 CFR 1508.1 (2020) with the exclusions from the definition of "major Federal action" codified in the definition in section 111(10)(B) of NEPA. *See* 42 U.S.C. 4336e(10)(B). CEQ proposed to include in proposed paragraph (u)(2)(i), (u)(2)(i)(A), and (u)(2)(i)(B) the exclusion of non-Federal actions with no or minimal funding; or with no or minimal Federal involvement where the agency cannot control the outcome of the project consistent with section 111(10)(B)(i) of NEPA. CEQ proposed these exclusions to replace the exclusion in 40 CFR 1508.1(q)(1)(vi) (2020), which CEQ proposed to strike. CEQ also invited comment on whether it should add additional provisions to the regulations to implement the "minimal Federal funding" exclusion in proposed paragraph (u)(2)(i)(A), noting that agencies currently evaluate the provision of minimal Federal funding based on specific factual contexts. CEQ asked whether additional procedures, including thresholds related to the amount or proportion of Federal funding, could increase predictability while ensuring that Federal agencies do not disregard effects to vital components of the human environment, including the health of children and vulnerable populations, drinking water, communities with environmental justice concerns, and similar considerations.

CEQ received some comments on the exclusion for non-Federal actions with no or minimal Federal involvement where the Federal agency cannot control the outcome of the project, which mirrors the exclusion in section 111(10)(B)(i)(II) of NEPA, and in response to the request for comment. One commenter recommended against setting a threshold, given the fact-specific nature of the inquiry. The commenter expressed concern that setting a threshold for the amount or proportion of Federal funding necessary for agency action to trigger NEPA would undermine the statute's emphasis that it apply to the "fullest extent possible." The commenter further asserted that the 2023 NEPA amendments, as clarified by CEQ's proposed regulations, are sufficient to provide clarity on the scope of NEPA's application, and a threshold amount is not necessary or useful.

Two commenters recommended that the regulations establish thresholds for minimal Federal funding or direct agencies to establish thresholds in their NEPA procedures, asserting that clear thresholds will improve efficiency and reduce litigation risk. Two other commenters supported establishing a threshold for minimum funding and included suggestions for what that threshold should be. A couple of commenters requested CEQ define "minimum" in the context of minimum funding.

CEQ strikes 40 CFR 1508.1(q)(1)(vi) (2020) and adds this exclusion in the final rule as proposed at § 1508.1(w)(2)(i), (w)(2)(i)(A), and (w)(2)(i)(B). CEQ has considered the broad range of suggestions to thresholds it received but has not identified a threshold that would be appropriate across the broad range of Federal programs or that would address CEQ's concern about the health of children and vulnerable populations, drinking water, communities with environmental justice concerns, and similar circumstances. CEQ also notes that there is limited case law as to what constitutes "minimal Federal funding" and that the case law that exists does not define a clear threshold that could be incorporated into the regulations. Therefore, agencies should continue to evaluate whether funding is "minimal" based on the specific factual context of the proposed action.

CEQ also adds the exclusion for non-Federal actions "with no or minimal Federal involvement where a Federal agency cannot control the outcome of the project" in § 1508.1(w)(2)(i)(B) as proposed. This provision reinforces the general rule that major Federal actions are actions carried out by an agency, and not non-Federal actions, and that a non-Federal action does not become a Federal action due to only minimal Federal involvement. Note, this exclusion does not bear on whether an action undertaken by a Federal agency, such as issuing a regulatory authorization or deciding to provide funding assistance, is a major Federal action, because in such circumstances the agency is undertaking an action itself. There are, however, circumstances where Federal involvement in a non-Federal action does not constitute an action, for example, where an agency informally provides a non-Federal party information that the non-Federal party considers in developing the non-Federal action. The provision of the information may not qualify as an agency action and the minimal Federal involvement would not result in the non-Federal action being considered a Federal action.

Ninth, CEQ proposed to include the exclusion of funding assistance solely in the form of general revenue sharing funds consistent with section 111(10)(B)(ii) of NEPA in proposed paragraph (u)(2)(ii). *See* 42 U.S.C. 4336e(10)(B)(ii). CEQ proposed this exclusion to replace the similar exclusion in 40 CFR 1508.1(q)(1)(v) (2020), which CEQ proposed to strike. CEQ did not receive substantive comments on this proposed revision. CEQ strikes 40 CFR 1508.1(q)(1)(v)

(2020) and adds this exclusion in the final rule as proposed at § 1508.1(w)(2)(ii).

Tenth, CEQ proposed to include the exclusion of loans, loan guarantees, or other forms of financial assistance where a Federal agency does not exercise sufficient control and responsibility over the subsequent use of such financial assistance or the effects of the action, consistent with section 111(10)(B)(iii) of NEPA, in proposed paragraph (u)(2)(iii). *See* 42 U.S.C. 4336e(10)(B)(iii). CEQ did not receive substantive comments on this proposed revision, although as discussed above, CEQ did receive related comments on the example about financial assistance added to paragraph (w)(1)(vi). CEQ adds this exclusion in the final rule as proposed at § 1508.1(w)(2)(iii).

Eleventh, CEQ proposed to include the exclusion of certain business loan guarantees provided by the Small Business Administration, consistent with section 111(10)(B)(iv) of NEPA, in proposed paragraph (u)(2)(iv). *See* 42 U.S.C. 4336e(10)(B)(iv). CEQ proposed this exclusion to replace the similar exclusion in 40 CFR 1508.1(q)(1)(vii) (2020), which CEQ proposed to strike. In particular, CEQ proposed to strike the example in 40 CFR 1508.1(q)(1)(vii) of farm ownership and operating loan guarantees by the Farm Service Agency (FSA) pursuant to 7 U.S.C. 1925 and 1941 through 1949 because CEQ considered it best left to agencies to identify exclusions from the definition of "major Federal action" absent specific statutory authority like those for the Small Business Administration loan guarantees.

Several commenters requested that CEQ retain the explicit exclusion of FSA loans and loan guarantees from the definition of "major Federal action." These commenters contended that the loan amounts are low, that activities funded do not require an agency permit, and that the agency does not have sufficient control or authority over the use of the funds. These commenters disagreed with CEQ's explanation that it is best left to agencies to identify exclusions from the definition of "major Federal action" absent specific statutory authority like those for the Small Business Administration (SBA) loan guarantees, arguing that the FSA loans are clearly outside the statutory definition, and that CEQ did not provide sufficient justification for not retaining the explicit exclusion.

CEQ strikes 40 CFR 1508.1(q)(1)(vii) (2020) and adds this exclusion in the final rule as proposed at § 1508.1(w)(2)(iv). When Congress

amended NEPA to provide a definition of "major Federal action" in section 111(10), it included an exclusion for one of the two loan guarantee programs identified in 40 CFR 1508.1(q)(1)(vii) (2020), excluding business loan guarantees provided by the Small Business Administration, but not farm ownership and operating loan guarantees by the FSA. 42 U.S.C. 4336e(10)(B)(iv). In light of Congress's action, CEQ does not consider it appropriate to retain the exclusion for FSA loan guarantees in the NEPA regulations. FSA, like other agencies that administer loan and loan guarantee programs, should evaluate specific actions providing loans and loan guarantees to determine if the action falls within the exclusion in section 111(10) of NEPA and § 1508.1(w)(2)(iii) and, if appropriate, could address the applicability of this exclusion to this program in its NEPA procedures.

CEQ disagrees with the assertion that providing financial assistance for a non-Federal action cannot constitute a major Federal action. As discussed earlier, section 111(10)(B)(iii) of NEPA excludes financial assistance "where a Federal agency does not exercise sufficient control and responsibility over the subsequent use of such financial assistance or the effect of the action." 42 U.S.C. 4336e(10)(B)(iii). This limited exclusion is inconsistent with treating actions providing financial assistance for non-Federal activities as categorically excluded from the definition of "major Federal action."

One commenter suggested that if CEQ does not retain the explicit exclusion for FSA loans and loan guarantees, CEQ should clearly explain in the final rule that it understands that FSA loans and loan guarantees are the types of loans and guarantees covered by proposed paragraph (u)(1)(iv), and that no additional procedures are necessary to apply proposed paragraph 1508.1(u)(1)(iv) to the FSA loans and loan guarantees. CEQ declines to make these statements. FSA is in the best position to determine whether its loans and loan guarantees meet the requirements for the exclusion established in § 1508.1 (w)(2)(iii). FSA, like other agencies administering financial assistance programs, may determine whether specific actions providing financial assistance are major Federal actions or may address such programs in their NEPA implementing procedures.

One commenter requested that CEQ explicitly indicate that farm operations funded through FSA loans or subject to loan guarantees are not excluded from the definition. Other commenters

expressed support for CEQ's proposed removal of the exclusion but requested further guidance on when loans and loan guarantees are actions subject to substantial Federal control and responsibility, citing FSA and Department of Energy programs specifically.

CEQ disagrees with the commenter that farm operations by non-Federal actors are major Federal actions if they are funded by FSA loans or loan guarantees. Rather, the question that FSA, like other agencies, will need to consider is whether FSA's action to provide a loan or loan guarantee is a major Federal action in consideration of the exclusion. FSA is in the best position to determine whether an action or category of actions by the agency to provide loan or loan guarantees involve a circumstance where the agency does not exercise sufficient control and responsibility over the subsequent use of the financial assistance or the effects and, therefore are excluded.

Finally, one commenter requested additional guidance regarding the exclusion of SBA loans. While CEQ incorporates the statutory exclusion of certain business loan guarantees provided by the Small Business Administration (SBA) into § 1508.1(w)(2)(iv), CEQ considers it best left to SBA, which has expertise in the statutes it administers, to determine the applicability of the exclusion to the specific programs it administers.

Twelfth, CEQ proposed to move, without change, the exclusions in paragraphs (q)(1)(iv), (q)(1)(i), and (q)(1)(ii) of 40 CFR 1508.1 (2020) to proposed paragraphs (u)(2)(v) through (u)(2)(vii), respectively because section 111(10)(B)(v) through (vii) of NEPA codified these exclusions verbatim. *See* 42 U.S.C. 4336e(10)(B)(v)–(vii). Specifically, proposed paragraph (u)(2)(v) would exclude bringing judicial or administrative civil or criminal enforcement actions. Proposed paragraph (u)(2)(vi) would exclude extraterritorial activities or decisions. Proposed paragraph (u)(2)(vii) would exclude activities or decisions that are non-discretionary.

One commenter requested that CEQ expand the exclusion in proposed in paragraph (u)(2)(v) to exclude from NEPA applicability all judicial proceedings when an agency joins a lawsuit. CEQ declines to make this revision in the final rule, which incorporates the statutory text and is consistent with long-standing agency practice, but agrees with the commenter that the exclusion encompasses an agency's decision to join a lawsuit. In the final rule, CEQ moves, without

change, the exclusion for bringing judicial or administrative civil or criminal enforcement actions in paragraph (q)(1)(iv) of 40 CFR 1508.1 (2020) to § 1508.1(w)(2)(v).

A few commenters requested the final rule remove proposed paragraph (u)(2)(vi), arguing that it impermissibly expands the scope of NEPA and is inconsistent with the statute. CEQ declines to make this change as the language in proposed paragraph (u)(2)(vi) aligns with the text of section 111(10)(B)(vi) of NEPA, 42 U.S.C. 4336e(10)(B)(vi). In the final rule, CEQ moves, without change, the exclusion for extraterritorial activities or decisions, which refers to activities or decisions with effects located entirely outside the jurisdiction of the United States,[125] from paragraph (q)(1)(i) of 40 CFR 1508.1 (2020) to § 1508.1(w)(2)(vi).[126]

A few commenters supported the inclusion of proposed (u)(2)(ii) asserting that CEQ rightfully excluded non-discretionary actions from NEPA, as NEPA is designed to help agencies make better decisions. In the final rule, CEQ moves, without change, the exclusion for non-discretionary activities or decisions in paragraph (q)(1)(ii) of 40 CFR 1508.1 (2020) to § 1508.1(w)(2)(vii). As discussed in section II.C.2 addressing § 1501.3, some activities or decisions may be partially, but not entirely, non-discretionary, and while such actions may constitute major Federal actions under this definition, the agency may appropriately exclude the non-discretionary aspects of its decision from the scope of its NEPA analysis.

Thirteenth, CEQ proposed to move the exclusion regarding non-final agency actions from 40 CFR 1508.1(q)(1)(iii) to § 1508.1(u)(2)(viii) and make changes for consistency with section 106(a)(1) of NEPA, 42 U.S.C. 4336(a)(1). CEQ proposed this revision for consistency with longstanding case

law excluding non-final agency actions from the definition of "major Federal action." Therefore, CEQ proposed to include the finality of an action as a threshold consideration as well as an exclusion from the definition of "major Federal action." Upon further consideration, CEQ considers finality to be adequately addressed as a threshold consideration in § 1501.3 and concludes that both the existing regulatory text and the proposed revision are confusing. Therefore, CEQ strikes 40 CFR 1508.1(q)(1)(iii) (2020) in the final rule and does not add proposed paragraph (u)(2)(viii). CEQ does not intend this deletion to have any substantive effect because § 1501.3 provides that NEPA does not apply where a proposed activity or decision is not a final agency action.

Finally, CEQ proposed a new exclusion in paragraph (u)(2)(ix) for activities or decisions for projects approved by a Tribal Nation that occur on or involve land held in trust or restricted status when the activities involve no Federal funding or other Federal involvement. CEQ proposed this exclusion in recognition of the unique circumstances facing Tribal Nations due to the United States' holding land in trust for them or the Tribal Nation holding land in restricted status. CEQ proposed to clarify that activities or decisions for projects approved by a Tribal Nation on trust lands are not major Federal actions where such activities do not involve Federal funding or other Federal involvement. CEQ proposed this exclusion because Tribal leaders raised this issue during consultations that CEQ held on its NEPA regulations and voiced concerns that the NEPA process placed Tribal Nations in a disadvantageous position relative to State and local governments because of the United States' ownership interest in Tribal lands.

A few commenters argued that the final rule should not include this exclusion because it was not included in the recent amendments to NEPA. Numerous other commenters supported the exclusion, and a large portion of those commenters asked that the final rule expand the exclusion to include additional actions, activities, or lands. One commenter asked CEQ to expand the provision to exclude all Tribal development from the definition of "major Federal action." Another commenter recommended that the terminology in proposed paragraph (u)(ix) "when no such activities or decisions involve no Federal funding" be revised to match the language in paragraph (2)(i)(A) which states "[w]ith no or minimal Federal funding."

CEQ adds the exclusion in the final rule at § 1508.1(w)(2)(viii), but adds "or minimal" before "involvement" for consistency with section 111 of NEPA, 42 U.S.C. 4336e(10)(B). CEQ declines to make the exclusion broader than this because it considers the exclusion to strike the right balance in recognizing the unique circumstances facing Tribal Nations and carrying out the purposes of NEPA. CEQ notes that categories of activities on trust lands that typically will not constitute major Federal actions include the transfer of existing operation and maintenance activities of Federal facilities to Tribal groups, water user organizations, or other entities; human resources programs such as social services, education services, employment assistance, Tribal operations, law enforcement, and credit and financing activities not related to development; self-governance compacts for Bureau of Indian Affairs programs; service line agreements for an individual residence, building, or well from an existing facility where installation will involve no clearance of vegetation from the right-of-way other than for placement of poles, signs (including highway signs), or buried power/cable lines; and approvals of Tribal regulations or other documents promulgated in exercise of Tribal sovereignty, such as Tribal Energy Resource Agreements, certification of a Tribal Energy Development Organization, Helping Expedite and Advance Responsible Tribal Homeownership Act Tribal regulations, Indian Trust Asset Reform Act Tribal regulations and trust asset management plans, and Tribal liquor control ordinances.

One commenter asked CEQ to clarify if the proposed exclusion would extend to activities or projects that are approved by Tribal Nations and focused entirely on managing, accessing, or protecting resources or sites on Federal land that is not held in trust but to which the Tribe has reserved rights. CEQ declines to make this change. Because of the diversity of statutory, treaty, and factual considerations that can be involved, determining whether such circumstances involve a major Federal action is appropriately left to the administering agency.

One commenter requested the proposed provision be expanded to include any grant funding awarded to a Tribe. CEQ declines to make this change as section 111(10) of NEPA sets the standard for when actions to provide financial assistance, including grants, constitute a major Federal action. *See* 42 U.S.C. 4336e(10).

---

[125] CEQ notes that the jurisdiction of the United States is not limited to the United States' land territory. "For purposes of the presumption against extraterritoriality, the territorial jurisdiction of the United States includes its land, internal waters, territorial sea, the adjacent airspace, and other places over which the United States has sovereignty or some measure of legislative control." Restatement (Fourth) of Foreign Relations Law § 404 cmt. d (Am. Law Inst. 2019).

[126] NEPA statutorily excludes from the definition of "major Federal action" "extraterritorial activities or decisions, which means agency activities or decisions with effects located entirely outside of the jurisdiction of the United States." 42 U.S.C. 4336e(10)(B)(vi). However, this exclusion does not change the scope of environmental effects that agencies must assess or expand the set of actions that are subject to NEPA review to extraterritorial matters that do not have effects within the jurisdiction of the United States.

Other commenters requested the proposed exclusion be expanded to include certain contracts, cooperative agreements, and similar funding vehicles authorizing the transfer of Federal funding to a Tribe for carrying out Federal programs. CEQ declines to make this change due to the complexity and numerosity of these arrangements but notes that the agencies that administer these programs could consider whether to include provisions addressing these programs in their NEPA procedures.

One commenter argued the proposed exclusion is impermissibly narrow, and the final rule should exclude entire categories of actions in the rule text. CEQ declines to make this change as agencies are in a better position to consider the legal and factual circumstances for their actions either on a case-by-case basis or through their agency NEPA procedures.

Several commenters asked for clarification of the term "other Federal involvement." One commenter suggested defining it as any proposed Federal permits or other Federal approvals. Other commenters suggested "other Federal involvement" be defined as any proposed Federal permits or other Federal approvals on Tribal lands or ceded lands. CEQ declines to further define the term as agencies administering programs are best situated to consider the factual and legal contexts in which they operate to determine whether there is other Federal involvement that would make application of this exclusion inappropriate.

### 17. Mitigation (§ 1508.1(y))

CEQ proposed three edits to the definition of "mitigation" in proposed paragraph (w). First, CEQ proposed to change "nexus" to the more commonly used word "connection" to describe the relationship between a proposed action or alternatives and any associated environmental effects. CEQ did not receive comments specific to this proposed change and makes this revision in the final rule at § 1508.1(y).

Second, CEQ proposed to delete the sentence that NEPA "does not mandate the form or adoption of any mitigation" because this sentence was unnecessary and could mislead readers because it does not acknowledge that agencies may use other authorities to require mitigation or may incorporate mitigation in mitigated FONSIs (§ 1501.6) and RODs (§ 1505.2).

CEQ received comments that both supported and opposed the removal of this language from the definition of "mitigation." Supportive commenters

agreed with the approach CEQ proposed in the definition because it is consistent with established mitigation practices and because they were generally supportive regarding the prioritization listed. Opponents generally questioned the effect of this removal, suggesting it contradicts the Supreme Court's holding in *Robertson* v. *Methow Valley Citizens Council* that NEPA does not require agencies to mitigate adverse effects. CEQ disagrees with the commenters' assertions regarding *Methow Valley*, as discussed further in section II.G.2 and the Phase 2 Response to Comments. CEQ removes this language from the final rule consistent with the proposal.

Third, CEQ proposed to add the clause "in general order of priority" to the sentence, "Mitigation includes" which introduces the list of mitigation types. CEQ proposed this change to clarify that the types of mitigation provided in proposed paragraphs (u)(1) though (u)(5) are listed in general order of priority, consistent with the familiar "mitigation hierarchy." [127] This list was prioritized in the 1978 regulations with avoidance coming before other types of mitigation and the proposed addition highlights that intent, which is consistent with longstanding agency practice.[128]

---

[127] *See e.g.*, U.S. Dep't of the Interior, A Strategy for Improving the Mitigation Policies and Practices of the Department of the Interior (Apr. 2014), *https://www.doi.gov/sites/doi.gov/files/migrated/news/upload/Mitigation-Report-to-the-Secretary_FINAL_04_08_14.pdf* at 2–3 (discussing the development of a "mitigation hierarchy"—which starts with avoidance—in the implementation of NEPA and the Clean Water Act); Bureau of Land Mgmt., H–1794–1, Mitigation Handbook (P) (Sept. 22, 2021), *https://www.blm.gov/sites/default/files/docs/2021-10/IM2021-046_att2.pdf* at 2–1 (citing CEQ regulations and noting that the "five aspects of mitigation (avoid, minimize, rectify, reduce/eliminate, compensate) are referred to as the mitigation hierarchy because they are generally applied in a hierarchical manner"); U.S. Env't Prot. Agency & U.S. Dep't of Def., Memorandums of Agreement (MOA); Clean Water Act Section 404(b)(1) Guidelines; Correction, 55 FR 9210, 9211 (Mar. 12, 1990) (noting that under section 404 of the Clean Water Act, the Army Corps of Engineers evaluates potential mitigation efforts sequentially, starting with avoidance, minimization, and then compensation).

[128] *See, e.g.*, 10 CFR 900.3 (defining a regional mitigation approach under NEPA as "an approach that applies the mitigation hierarchy (first seeking to avoid, then minimize impacts, then, when necessary, compensate for residual impacts)"); Presidential Memorandum, Mitigating Impacts on Natural Resources From Development and Encouraging Related Private Investment, 80 FR 68743, 68745 (Nov. 6, 2015) (addressing five agencies and noting that, "[a]s a practical matter, [mitigation is] captured in the terms avoidance, minimization, and compensation. These three actions are generally applied sequentially . . . ."); Fed. Highway Admin., *NEPA and Transportation Decisionmaking: Questions and Answers Regarding the Consideration of Indirect and Cumulative Impacts in the NEPA Process, https://www.environment.fhwa.dot.gov/nepa/*

Some commenters supported the added language clarifying the general order of priority for mitigation. Supportive commenters stated this language is consistent with established mitigation practices and asserted that it will encourage agencies to avoid adverse effects rather than try to rectify or compensate for them after they have occurred. Other commenters opposed the added language, stating that agencies may not in all cases have authority to avoid adverse effects, and that providing a rigid prioritization fails to guide agencies to consider the full range of mitigation opportunities.

CEQ adds the clause "in general order of priority" to the definition in the final rule. CEQ uses the qualifier "in general" to provide flexibility and acknowledge that such prioritization will not apply to every situation. Further, the language does not prohibit agencies from applying the elements of the mitigation hierarchy out of order when they determine it is appropriate to do so, and CEQ encourages agencies to consider the full range of mitigation opportunities before deciding on an appropriate mitigation approach.

Some commenters asserted that CEQ has "concealed" its prioritization by placing it in the definitions section of the regulations. CEQ disagrees that placing this language in the definitions conceals it and CEQ notes that the definitions are essential elements of the NEPA regulations. Further, the definition of "mitigation," including discussion of the categories of mitigation, has been in the regulations since 1978. Therefore, this is a logical place in the regulations for agencies or the public to look for text addressing the categories of mitigation.

Some commenters provided specific feedback on compensatory mitigation, including some that expressed concern that it can be ineffective. One commenter asserted that some agencies are prohibited from requiring compensatory mitigation. Another commenter requested CEQ clarify that agencies may rely on third-party mitigation or restoration providers to carry out compensatory mitigation.

CEQ declines to make additional edits to the definition of "mitigation." Agencies must identify the authority for any mitigation that they rely on in their analysis, and agencies should not rely on mitigation absent the authority to ensure that the mitigation is performed. Because NEPA requires agencies to

---

*QAimpact.aspx* (describing the importance of "sequencing," which refers to the process of prioritizing avoidance and minimization of effects over replacement or compensation for NEPA mitigation efforts).

consider mitigation, not implement it, CEQ defers to agencies regarding the appropriate use of compensatory mitigation, third-party mitigation, or restoration providers.

One commenter requested that CEQ establish a preference for mitigation that is practicable, effective, and as minimally disruptive to a proposed project as possible. CEQ agrees that mitigation measures should be practicable and effective, but considers these requirements to be clear from the regulations as a whole and do not need to be reiterated in the definition.

Finally, CEQ makes two additional clarifying edits. First, CEQ adds "adverse" to modify "effects" in each instance it is used in the definition of "mitigation" to clarify that mitigation addresses adverse effects, not beneficial effects, and for consistency with the definition of "significant effects," which is defined as adverse effects. Second, CEQ changes "effects" to "the adverse effect" in paragraph (y)(2) for consistency with paragraphs (y)(1) and (y)(3) through (y)(5), which all use the singular of effect.

### 18. Notice of Intent (§ 1508.1(aa))

CEQ proposed to modify the definition of "notice of intent" to include EAs, as applicable. CEQ proposed this change for consistency with § 1501.5(j), which provides that agencies may issue an NOI for an EA where it is appropriate to improve efficiency and effectiveness, and § 1501.10(b)(3)(iii), which sets forth one of the three potential starting points from which deadlines are measured for EAs consistent with section 107(g)(1)(B)(iii) of NEPA, 42 U.S.C. 4336a(g)(1)(B)(iii).

One commenter recommended the final rule clarify whether the addition of EA to the proposed definition requires an NOI for EAs, and if so, noted that this would be a new requirement. Another commenter similarly stated that including an EA in the definition will cause confusion over whether an NOI is required for an EA, and asserted that it clearly is not.

CEQ adds "environmental assessment" to the definition of "notice of intent" for consistency with §§ 1501.5(j) and 1501.10(b)(3), but moves the qualifier "as applicable" to precede "environmental assessment" to make clear that the regulations do not require agencies to issue an NOI for an EA, but provide them the discretion to do so.

### 19. Page (§ 1508.1(bb))

CEQ proposed to modify the definition of "page" for consistency with section 107(e) of NEPA, 42 U.S.C. 4336a(e), to exclude citations from the definition of "page" and therefore the page limits for EISs and EAs. To facilitate better NEPA documents, CEQ proposed to retain the exclusions for maps, diagrams, graphs, tables, and other means of graphically displaying quantitative or geospatial information from the definition of "page." While agencies could move these visual representations of information to appendices, which could come at the end of an EIS or the end of EIS chapters, CEQ expressed concern that this will make the documents less understandable and useful to decision makers and the public. Further, such graphical displays themselves could be considered appendices consistent with the ordinary definition of appendix as "supplementary material usually attached at the end of a piece of writing." [129]

Multiple commenters supported the proposed definition of "page," specifically asserting that the listed exclusions will help agencies integrate those types of information into the body of an EA or EIS without affecting the document's page limit and asserting that inclusion of these elements in the body of an EA or EIS provide a more readable and accessible document. Conversely, several commenters opposed the exclusion of certain elements from the definition of "page," except for citations and appendices as provided for in section 107(e) of NEPA. These commenters assert that the proposed exclusion of other items—maps, diagrams, graphs, and tables— circumvents Congress' intent to mandate strict page limits, and that these items should be included in the definition of "page" and be subject to the page limit. They also asserted that the exclusion of these elements from the page count results in environmental documents that are longer, more complex, and more difficult for the public and decision makers to understand.

NEPA does not define the term "page," but rather provides, in section 107(e), that each type of environmental document "shall not exceed [the specified number of] pages, not including any citations or appendices." 42 U.S.C. 4336a(e). When Congress enacted this language in 2023, it had before it the CEQ regulations, which define "page" as excluding "explanatory maps, diagrams, graphs, tables, and other means of graphically displaying quantitative or geospatial

information." Had Congress intended to eliminate these regulatory exclusions from the definition of "page," it could have done so by providing a contrary definition of "page" in section 111 of NEPA, 42 U.S.C. 4336e. Instead, Congress chose to leave the term "page" undefined, therefore leaving CEQ's definition undisturbed, while separately specifying that the page limits of section 107(e) would exclude two additional elements that were *not* specifically set forth in the 2020 regulatory definition— citations and appendices. *See* 42 U.S.C. 4336a(e). Therefore, CEQ's continued use of a regulatory definition based on the one promulgated in 2020 does not circumvent, but rather complements, the statutory exclusion for citations and appendices.

CEQ disagrees that the proposed definition of "page" contradicts section 107(e) of NEPA or will make more documents more complex and difficult to understand. Rather, CEQ considers the flexibility to include additional visual elements in environmental documents will reduce the complexity of environmental documents by making the content easier to understand for the public and decision makers and facilitate the delivery of clearer and more useful documents. Agencies should limit the visual elements in the body of the document to those that enhance comprehensibility and place additional information in appendices, in keeping with the general principles CEQ has set forth regarding clear and concise writing in NEPA documents.

### 20. Participating Federal Agency (§ 1508.1(dd))

CEQ proposed to add a definition of "participating Federal agency" to proposed paragraph (bb) and define it to mean "a Federal agency participating in an environmental review or authorization of an action" consistent with the definition of the same term in section 111(8) of NEPA. 42 U.S.C. 4336e(8). CEQ did not receive any substantive comments on the definition of "participating Federal agency" and finalizes it in § 1508.1(dd) as proposed.

### 21. Programmatic Environmental Document (§ 1508.1(ee))

CEQ proposed to add a definition of "programmatic environmental document" to proposed paragraph (cc) and define it consistent with the definition of the same term in section 111(11) of NEPA, 42 U.S.C. 4336e(11). One commenter asserted that "programmatic" is not well defined in the proposed rule, stating that neither § 1501.11 or the proposed definition of "programmatic environmental

[129] See *Appendix*, Merriam-Webster, *https://www.merriam-webster.com/dictionary/appendix.*

document" provide a clear way to distinguish between programmatic and non-programmatic analyses. The commenter described that the essential characteristic of a programmatic document includes some aspect of the decision that is deferred.

CEQ adds a definition of "programmatic environmental document" at § 1508.1(ee) consistent with the proposal and declines to modify it as the commenter suggests because the uses of programmatic environmental documents are addressed in § 1501.11, as discussed in section II.C.10 and in the Phase 2 Response to Comments.

22. Reasonable Alternatives (§ 1508.1(hh))

CEQ did not propose revisions to the definition of "reasonable alternatives" but received comments on the existing definition. Commenters requested guidance on the meaning of "technically and economically feasible," and one commenter requested the regulations direct agencies to consult with project sponsors to determine economic and technical feasibility. Some commenters requested that CEQ use the Forty Questions guidance as a starting point for additional clarity on technical and economic feasibility, specifically referencing the description that technical and economic feasibility must be based on common sense rather than a project proponent's preferences.

One commenter requested guidance on how to identify and evaluate reasonable alternatives and include clear criteria and examples for defining and selecting reasonable alternatives, such as feasibility, cost, effectiveness, and public acceptability. One commenter asserted that the regulations should not define "reasonable alternatives" as a "reasonable range of alternatives" because the language "reasonable range" suggests that agencies do not have to consider all reasonable alternatives. The commenter asserted that Federal courts have long held that NEPA requires agencies to consider all reasonable alternatives, and that an agency's failure to consider a reasonable alternative is fatal to an agency's NEPA analysis. The commenter further expressed that "reasonable range of alternatives" is ambiguous.

CEQ does not make revisions to the definition of "reasonable alternatives" in § 1508.1(hh). CEQ will consider whether to issue additional guidance but notes that agencies have long used the Forty Questions to assist them in identifying alternatives. With respect to the phrase "reasonable range," CEQ

disagrees that agencies must consider "all" reasonable alternatives or that the case law requires this. In some circumstances, there could be a limitless number of reasonable alternatives to a proposed action, with each alternative including slight changes to the action. NEPA does not require agencies to evaluate all such alternatives, but rather, a reasonable range of alternatives to inform decision makers and the public. Agencies must consider a reasonable range of alternatives that facilitates the comparison of effects and helps inform the decision maker and the public. Further, the regulations have long provided that agencies should discuss alternatives that they dismiss from detailed analysis and explain their rationale.

22. Reasonably Foreseeable (§ 1508.1(ii))

CEQ did not propose to revise the definition of "reasonably foreseeable" but received comments on the existing definition. A few commenters described the definition as vague, subject to manipulation, and inconsistent with case law and Congressional intent. Some commenters suggested edits to the definition, such as adding that an effect is "reasonably foreseeable" when an agency can conclude with a high degree of confidence that the effect is more likely than not to occur. Some commenters asked for more clarity on how certain industries might meet the reasonably foreseeable standard, or suggested that what constitutes reasonably foreseeable, or a person of ordinary prudence, is subjective. Relatedly, another commenter stated that agency decision makers have access to knowledge, skills, resources, and statutory duties not applicable to a person of ordinary prudence. The commenter recommended CEQ replace "person of ordinary prudence" with "prudent agency decision maker."

CEQ declines to make change to the definition of "reasonably foreseeable" and finalizes it in § 1508.1(ii) as proposed. Regarding additional qualifiers or concerns that the definition is subjective, CEQ declines additional changes because the application of reasonably foreseeable is influenced by the context of the proposed action. Inherent in the application of reasonably foreseeable is the concept that Federal agencies are not required to "foresee the unforeseeable" or engage in speculative analysis. Agencies must forecast to the extent they can do so either quantitatively or qualitatively within a reasonable range. Further, the term "reasonably foreseeable" is consistent with the ordinary person standard—that is, what a person of

ordinary prudence would consider in reaching a decision. CEQ is unaware of any practical challenges or confusion that has arisen from connecting this definition to the ordinary person, or circumstances where an agency has excluded analysis of an effect that the agency views as reasonably foreseeable because an ordinary person would not. Changing the regulatory text could create uncertainty as agencies and courts consider what, if any, implications the change would have, and CEQ considers creating that uncertainty unnecessary.

23. Scope (§ 1508.1(kk))

CEQ proposed to expand the definition of "scope" to include EAs and revise the definition to include both the range and breadth of the actions, alternatives, and effects to be considered in an EIS or EA, consistent with CEQ's proposal to relocate the discussion of scope in § 1501.3(b). CEQ also proposed to strike the last sentence regarding tiering because it was not definitional language and was unnecessary because this concept is more addressed in § 1501.11.

One commenter expressed support for the proposed definition of "scope," asserting it strengthens EAs and EISs. CEQ revises the definition of "scope" in § 1501.8(kk) as proposed. As discussed further in section II.C.2, agencies have long examined the scope of their actions to determine what alternatives and effects they must analyze. This is a fact-specific analysis that agencies undertake informed by their statutory authority and control and responsibility over the activity. Other comments regarding scope are further discussed in section II.C.2 and the Phase 2 Response to Comments.

24. Significant Effects (§ 1508.1(mm))

CEQ proposed to add a definition for "significant effects" to define those effects that are central to determining the appropriate level of review in the NEPA process. CEQ proposed the definition to align with the restoration of the context and intensity factors for determining significance in § 1501.3(d). CEQ proposed to define "significant effects" as adverse effects identified by an agency as significant, based on the criteria set forth in § 1501.3(d), to clarify that beneficial effects are not significant effects as the phrase is used in NEPA and, therefore, do not require an agency to prepare an EIS. CEQ proposed this as an alternative approach to that taken by the proposal in § 1501.3(d)(2)(i) where an action "does not" require an EIS when it would result only in significant

beneficial effects and invited comment on which approach is preferred.

One commenter supported a standalone definition of "significant effects" but expressed concern that only including adverse effects could create confusion over how agencies assess which effects are truly beneficial and from whose perspective. Other commenters asserted that the limitation of significant effects to adverse effects, in conjunction with proposed § 1501.3(d)(2)(i) to only require an EIS for significant adverse effects, is unlawful and contrary to NEPA's policy. These commenters asserted that NEPA requires an environmental review if an action's effects are significant, regardless of whether those effects are exclusively beneficial, and requested that the final rule remove "adverse" from the definition. A few commenters supported the proposed definition for varying reasons, including because it is straightforward and because it will help encourage streamlined processes by reducing the need for EISs.

Regarding CEQ's request for comment on the preferred approach—proposed § 1501.3(d)(2)(i) or proposed § 1508.1(kk)—one commenter recommended the final rule include both provisions because the definition serves to strengthen the concept that NEPA analyses should focus on actions with adverse effects. Another commenter preferred proposed § 1501.3(d)(2)(i), asserting it provides stronger guidance for agencies.

CEQ adds the definition of "significant effects" as proposed in § 1508.1(mm), and CEQ revises § 1501.3(d) for greater clarity on this approach as discussed in section II.C.2. This approach means that an agency does not need to prepare an EIS if a proposed action's effects are exclusively beneficial. However, irrespective of the level of NEPA review, agencies still need to analyze both adverse and beneficial effects in NEPA documents if they are reasonably foreseeable.

25. Tiering (§ 1508.1(oo))

CEQ proposed to revise the definition of "tiering" to cross reference the process as set forth in § 1501.11. CEQ proposed this revision to avoid any potential inconsistencies between the definition and the provisions of § 1501.11. CEQ did not receive any comments on the proposed definition of "tiering" and revises it as proposed in § 1508.1(oo). Other comments regarding the application of tiering are discussed in section II.C.10 and the Phase 2 Response to Comments.

## III. Rulemaking Analyses and Notices

### A. Executive Order 12866, Regulatory Planning and Review

E.O. 12866, as supplemented and affirmed by E.O. 13563 and amended by E.O. 14094, provides that the Office of Information and Regulatory Affairs (OIRA) will review all significant rules.[130] This final rule is a significant regulatory action under section 3(f)(1) of E.O. 12866, as amended by E.O. 14094, that CEQ submitted to OIRA for review. The changes in the final rule will improve the CEQ regulations to benefit agencies and the public. Furthermore, an effective NEPA process can save time and reduce overall project costs by providing a clear process for evaluating alternatives and effects, coordinating agencies and relevant stakeholders including the public, and identifying and avoiding problems—including potential significant effects—that may occur in later stages of project development.[131] Additionally, if agencies choose to consider additional alternatives and conduct clearer or more robust analyses, such analyses will improve societal outcomes by facilitating improved agency decision making on the whole, even if the NEPA statute and regulations do not dictate the outcome of any specific decision. Because individual cases will vary, the magnitude of potential costs and benefits resulting from these changes are difficult to anticipate, but CEQ has prepared a qualitative analysis in the accompanying regulatory impact analysis (RIA).

CEQ received two comments on the draft RIA. One commenter stated that CEQ should include more detailed explanation of the flaws associated with the 2020 Rule's RIA and how the revised rule rectifies those flaws to produce net benefits, including by discussing evidence that suggests the NEPA process contributes to greater environmental benefits that the 2020 RIA did not consider; aligning the explanation of the alternative of retaining the 2020 Rule, as amended by the Phase I rulemaking, with guidance regarding baselines as a scenario with zero incremental benefits or costs; and removing any distinction between direct and indirect benefits or costs to avoid

inadvertently downplaying the proposed rule's benefits and costs. The second commenter stated that CEQ should account for economic impacts of NEPA-related delays in project implementation in the RIA, and provided information on how labor, procurement, and material costs increase as a project is delayed.

In response to the first comment, CEQ has revised the RIA. In response to the second comment, CEQ acknowledges that project delays often result in labor, procurement, and material costs increases. The revisions to the NEPA regulations in this final rule will improve the efficiency and effectiveness of the NEPA process, and thereby save time and reduce overall project costs by providing a clear process for evaluating alternatives and effects; coordinating agencies and relevant stakeholders, including the public, more efficiently; identifying and avoiding problems that may occur in later stages of project development; and reducing litigation. CEQ provides its detailed analysis in the accompanying Regulatory Impact Analysis, which CEQ incorporates by reference into this final rule.

### B. Regulatory Flexibility Act and Executive Order 13272, Proper Consideration of Small Entities in Agency Rulemaking

The Regulatory Flexibility Act (RFA), as amended, 5 U.S.C. 601 *et seq.*, and E.O. 13272, *Proper Consideration of Small Entities in Agency Rulemaking*,[132] require agencies to assess the impacts of proposed and final rules on small entities. Under the RFA, small entities include small businesses, small organizations, and small governmental jurisdictions. An agency must prepare an Initial Regulatory Flexibility Analysis unless it determines and certifies that the rule will not have a significant economic impact on a substantial number of small entities. *See* 5 U.S.C. 605(b). This final rule does not directly regulate small entities. Rather, the rule applies to Federal agencies and sets forth the process for their compliance with NEPA. Accordingly, CEQ hereby certifies that the rule will not have a significant economic impact on a substantial number of small entities.

One commenter asserted that CEQ should develop an economic sustainability plan for the proposed rule. Another commenter asserted that CEQ's statement in the proposed rule that the rulemaking would not impact small businesses was insufficient and that CEQ must prepare a regulatory

---

[130] *See* E.O. 12866, *Regulatory Planning and Review,* 58 FR 51735, 51737 (Oct. 4, 1993); E.O. 14094, *Modernizing Regulatory Review,* 88 FR 21879, 21879–80 (Apr. 11, 2023); E.O. 13563, *Improving Regulation and Regulatory Review,* 76 FR 3821, 3822 (Jan. 21, 2011).

[131] *See generally* Cong. Rsch. Serv. R42479, *The Role of the Environmental Review Process in Federally Funded Highway Projects: Background and Issues for Congress* (2012), *https://crsreports. congress.gov/product/pdf/R/R42479.*

[132] 67 FR 53461 (Aug. 16, 2002).

**35552**    **Federal Register** / Vol. 89, No. 85 / Wednesday, May 1, 2024 / Rules and Regulations

flexibility plan that describes the impact of the proposed rule on small entities to comply with the Small Business Regulatory Enforcement Fairness Act. The commenter asserted that the proposed rulemaking will impact small businesses, particularly in the mining industry. For the reasons set forth in this preamble, CEQ declines to prepare the requested plan because the final rule applies to Federal agencies and does not directly regulate small businesses or other small entities.

*C. National Environmental Policy Act*

Under the CEQ regulations, major Federal actions may include regulations. When CEQ issued regulations in 1978, it prepared a "special environmental assessment" for illustrative purposes pursuant to E.O. 11991.[133] The NPRM for the 1978 rule stated "the impacts of procedural regulations of this kind are not susceptible to detailed analysis beyond that set out in the assessment." [134] Similarly, in 1986, while CEQ stated in the final rule that there were "substantial legal questions as to whether entities within the Executive Office of the President are required to prepare environmental assessments," it also prepared a special EA.[135] The special EA issued in 1986 supported a FONSI, and there was no finding made for the assessment of the 1978 final rule. CEQ also prepared a special EA and reached a FONSI for the Phase 1 rulemaking.

The final rule makes it explicit that a NEPA analysis is not required for establishing or updating NEPA procedures, *see* § 1507.3(b)(3), and CEQ continues to consider NEPA not to require a NEPA analysis for CEQ's NEPA regulations. *See Heartwood* v. *U.S. Forest Serv.*, 230 F.3d 947, 954–55 (7th Cir. 2000) (finding that neither NEPA or the CEQ regulations required the Forest Service to conduct an EA or an EIS prior to the promulgation of its procedures creating a CE). Nevertheless, based on past practice, CEQ developed a draft special EA, has posted it in the docket, and invited comments in the proposed rule.

CEQ received two comments on its compliance with NEPA. The commenters generally asserted that the Special EA conducted for this rulemaking was inadequate and not justified by precedent. One commenter argued that this rulemaking requires an EIS because the proposed changes can reasonably be expected to have a significant effect on the environment. The commenter asserted that provisions allowing the adoption and use of another agency's CEs, allowing agencies to modify their NEPA procedures without going through the rulemaking process; and exempting large-scale power plants from having to prepare an EIS supported their position. The commenter also argued that comments on the rulemaking were not visible to the public, and therefore did not fulfill public comment requirements.

CEQ declines to prepare an EIS for the reasons discussed earlier in this section. CEQ notes that the first proposed change noted by the commenter, related to adopting CEs, implements section 109 of NEPA, which allows such adoption and use by statute. *See* 42 U.S.C. 4336c. With respect to the second proposed change noted by the commenter, the CEQ regulations have never required agencies to conduct rulemaking for the development or revision of their implementing procedures, but have always required agencies to provide public notice and comment. Further, this final rule does not specifically address NEPA reviews for large-scale power plants. Rather the regulations set the standards for when agencies must prepare EISs and leaves the decision of whether an EIS is required to a case-by-case determination by the agencies, as has always been the case. Finally, CEQ notes that, in the interest of transparency, comments received on the proposed rule were posted to the public docket.[136]

*D. Executive Order 13132, Federalism*

E.O. 13132 requires agencies to develop an accountable process to ensure meaningful and timely input by State and local officials in the development of regulatory policies that have federalism implications.[137] Policies that have federalism implications include regulations that have substantial direct effects on the States, on the relationship between the national government and the States, or on the distribution of power and responsibilities among the various levels of government.[138] CEQ received one comment asserting that this rulemaking would impact States, and requested that CEQ revisit its conclusion that the rulemaking does not pose federalism implications. CEQ disagrees with the commenter. This rule does not have federalism implications because it applies to Federal agencies, not States. CEQ notes that States may elect to assume NEPA responsibilities under Federal statutes,[139] but States are further governed by the regulations and agreements under those programs.

*E. Executive Order 13175, Consultation and Coordination With Indian Tribal Governments*

E.O. 13175 requires agencies to have a process to ensure meaningful and timely input by Tribal officials in the development of policies that have Tribal implications.[140] Such policies include regulations that have substantial direct effects on one or more Tribal Nations, on the relationship between the Federal Government and Tribal Nations, or on the distribution of power and responsibilities between the Federal Government and Tribal Nations.[141] CEQ has assessed the impact of this final rule on Indian Tribal governments and has determined that the rule does not significantly or uniquely affect Tribal Nations. CEQ engaged in government-to-government consultation with Tribal Nations on the Phase 2 rulemaking. As required by E.O. 13175, CEQ held a Tribal consultation on the NEPA regulations generally on September 30, 2021, on this rulemaking on November 12, 2021, prior to the publication of the NPRM, and on September 6, 2023, and September 12, 2023, following publication of the NPRM.[142] In addition to the feedback provided during these consultation sessions, CEQ received a number of written comments from Tribal Nations during the public comment period, and considered these written comments in the development of the final rule.

Several Tribal Nations agreed with CEQ's preliminary determination that the proposed rule significantly or uniquely affects Tribal Nations. One Tribal Nation requested that CEQ acknowledge its written comments as part of the Tribal consultation process, and not only as public comments. Several Tribes also requested additional consultation with CEQ in the future.

CEQ acknowledges that the written comments it received from Tribal Nations constitute part of the Tribal consultation process in addition to the

---

[133] *See* CEQ, National Environmental Policy Act—Regulations: Proposed Implementation of Procedural Provisions, 43 FR 25230, 25232 (June 9, 1978); *see* E.O. 11991, *supra* note 29.

[134] *See* CEQ, National Environmental Policy Act—Regulations: Proposed Implementation of Procedural Provisions, *supra* note 133, at 25232.

[135] *See* National Environmental Policy Act Regulations; Incomplete or Unavailable Information, *supra* note 32, at 15619.

[136] *See* National Environmental Policy Act Implementing Regulations Revision Phase 2, Docket No. CEQ–2023–0003, *https://www.regulations.gov/docket/CEQ-2023-0003.*

[137] E.O. 13132, *Federalism*, 64 FR 43255 (Aug. 10, 1999).

[138] *Id.* at 43256.

[139] *See, e.g.,* 23 U.S.C. 327.

[140] E.O. 13175, *supra* note 57, at sec. 5(a).

[141] *Id.* sec. 1(a).

[142] *Id.* sec. 5.

public comment process and considered those comments accordingly. CEQ appreciates the considerable time and effort that Tribal Nations invested in their oral and written comments, which helped illuminate many aspects of how NEPA affects Tribal Nations, their lands and legal rights, and their citizens. These comments helped CEQ to develop a better final rule. CEQ plans to continue to engage in government-to-government consultation with federally recognized Tribes and in consultation with Alaska Native Corporations on the implementation of its NEPA regulations.

*F. Executive Order 12898, Federal Actions To Address Environmental Justice in Minority Populations and Low-Income Populations and Executive Order 14096, Revitalizing Our Nation's Commitment to Environmental Justice for All*

E.O. 12898 and E.O. 14096 charge agencies to make achieving environmental justice part of their missions, as appropriate and consistent with applicable law, by identifying, analyzing, and addressing disproportionate and adverse human health and environmental effects (including risks) and hazards of Federal activities, including those related to climate change and cumulative impacts of environmental and other burdens, on communities with environmental justice concerns.[143]

CEQ has analyzed this final rule and determined that it will not cause disproportionate and adverse human health or environmental effects on communities with environmental justice concerns. This rule sets forth implementing regulations for NEPA; it is in the agency implementation of NEPA when conducting reviews of proposed agency actions where consideration of environmental justice effects typically occurs.

CEQ received one comment requesting that CEQ conduct research into the effect of immigration on environmental quality, including on communities with environmental justice concerns, and include study of immigration impacts during NEPA analysis. CEQ declines to conduct this research because this rule does not specifically address issues related to immigration or make any changes to the U.S. immigration laws or their implementing regulations. Any environmental effects resulting from specific agency actions related to immigration would be addressed by agencies with relevant authorities and

requirements to do so and are not within the scope of the analysis of this rulemaking.

*G. Executive Order 13211, Actions Concerning Regulations That Significantly Affect Energy Supply, Distribution, or Use*

Agencies must prepare a Statement of Energy Effects for significant energy actions under E.O. 13211.[144] CEQ has determined that this rulemaking is not a "significant energy action" because it is not likely to have a significant adverse effect on the supply, distribution, or use of energy.

CEQ received one comment related to its compliance with E.O. 13211. The commenter disagreed with CEQ's determination that the proposed rule is not a "significant energy action" as described in E.O. 13211, and further stated that the proposed rulemaking is incongruous with E.O. 14008, which directs agencies to deploy their full capabilities in combating climate change. The commenter asserted that the proposed rule will have an effect on the energy supply that exceeds $100 million and would hamper efforts to achieve a clean energy transition.

For the reasons set forth in this preamble, CEQ disagrees that the rule will hamper efforts to achieve a clean energy transition or have a significant effect on the energy supply. To the contrary, the proposed rule will facilitate the responsible development of energy resources, including carbon pollution-free energy, by promoting efficient and effective environmental reviews.

*H. Executive Order 12988, Civil Justice Reform*

Under section 3(a) of E.O. 12988, agencies must review their proposed regulations to eliminate drafting errors and ambiguities, draft them to minimize litigation, and provide a clear legal standard for affected conduct.[145] Section 3(b) provides a list of specific issues for review to conduct the reviews required by section 3(a).[146] CEQ did not receive any comments specific to E.O. 12988. CEQ has conducted the review under E.O. 12988 and determined that this final rule complies with its requirements.

*I. Unfunded Mandates Reform Act*

Section 201 of the Unfunded Mandates Reform Act of 1995, 2 U.S.C.

1531, requires Federal agencies to assess the effects of their regulatory actions on Tribal, State, and local governments, and the private sector to the extent that such regulations incorporate requirements specifically set forth in law. Before promulgating a rule that may result in the expenditure by a Tribal, State, or local government, in the aggregate, or by the private sector of $100 million, adjusted annually for inflation, in any 1 year, an agency must prepare a written statement that assesses the effects on Tribal, State, and local governments and the private sector. 2 U.S.C. 1532. CEQ did not receive any comments related to the Unfunded Mandates Reform Act.

This final rule applies to Federal agencies and will not result in expenditures of $100 million or more for Tribal, State, and local governments, in the aggregate, or the private sector in any 1 year. This action also will not impose any enforceable duty, contain any unfunded mandate, or otherwise have any effect on small governments subject to the requirements of 2 U.S.C. 1531 *et seq.*

*J. Paperwork Reduction Act*

This final rule will not impose any new information collection burden that would require additional review or approval by OMB under the Paperwork Reduction Act (PRA), 44 U.S.C. 3501 *et seq.*

CEQ received one comment related to the PRA. The commenter disagreed with CEQ's preliminary determination that the proposed rule would not impose additional burden under the PRA, stating that the review of proposed changes to NEPA and future changes to agency NEPA procedures and guidelines will impose significant burdens on State agencies. The commenter also expressed concern that the proposed changes to include technical analyses in appendices does not change or limit the amount of material that must be reviewed.

CEQ disagrees with the commenter's assertions. General solicitations of public comments of the sort associated with the development of agency NEPA procedures and guidelines or the publication of a draft environmental document are not subject to the PRA. *See* 5 CFR 1320.3(h)(4), (8) (exempting from the PRA "[f]acts or opinions submitted in response to general solicitations of comments from the public, published in the **Federal Register** or other publications, regardless of the form or format thereof, provided that no person is required to supply specific information pertaining to the commenter, other than that

---

[143] E.O. 12898, *supra* note 8; E.O. 14096, *supra* note 22.

[144] E.O. 13211, *Actions Concerning Regulations That Significantly Affect Energy Supply, Distribution, or Use*, 66 FR 28355 (May 22, 2001).

[145] E.O. 12988, *Civil Justice Reform*, 61 FR 4729, 4731 (Feb. 7, 1996).

[146] *Id.*

necessary for self-identification, as a condition of the agency's full consideration of the comment,'' and ''[f]acts or opinions obtained or solicited at or in connection with public hearings or meetings''). Furthermore, while the rule clarifies which material agencies should include in the body of an environmental document and which they should include in an appendix, it does not increase the overall amount of materials available to States or members of the public to review, or require States or members of the public to review those materials.

**List of Subjects in 40 CFR Parts 1500, 1501, 1502, 1503, 1504, 1505, 1506, 1507, and 1508**

Administrative practice and procedure; Environmental impact statements; Environmental protection; Natural resources.

**Brenda Mallory,**
*Chair.*

■ For the reasons discussed in the preamble, the Council on Environmental Quality amends 40 CFR chapter V by revising and republishing subchapter A to read as follows:

**Chapter V—Council on Environmental Quality**

**Subchapter A—National Environmental Policy Act Implementing Regulations**

Part 1500—Purpose And Policy
Part 1501—NEPA And Agency Planning
Part 1502—Environmental Impact Statement
Part 1503—Commenting On Environmental Impact Statements
Part 1504—Dispute Resolution And Pre-Decisional Referrals
Part 1505—NEPA and Agency Decision Making
Part 1506—Other Requirements Of NEPA
Part 1507—Agency Compliance
Part 1508—Definitions

**PART 1500—PURPOSE AND POLICY**

Sec.
1500.1   Purpose.
1500.2   Policy.
1500.3   NEPA compliance.
1500.4   Concise and informative environmental documents.
1500.5   Efficient process.
1500.6   Agency authority.

**Authority:** 42 U.S.C. 4321–4347; 42 U.S.C. 4371–4375; 42 U.S.C. 7609; and E.O. 11514, 35 FR 4247, 3 CFR, 1966–1970, Comp., p. 902, as amended by E.O. 11991, 42 FR 26967, 3 CFR, 1977 Comp., p. 123.

**§ 1500.1   Purpose.**

(a) The National Environmental Policy Act (NEPA) is the basic national charter for protection of the environment. It establishes policy, sets goals, and provides direction for carrying out the policy.

(1) Section 101(a) of NEPA establishes the national environmental policy of the Federal Government to use all practicable means and measures to foster and promote the general welfare, create and maintain conditions under which humans and nature can exist in productive harmony, and fulfill the social, economic, and other requirements of present and future generations of Americans. Section 101(b) of NEPA establishes the continuing responsibility of the Federal Government to use all practicable means, consistent with other essential considerations of national policy, to:

(i) Help each generation serve as a trustee of the environment for succeeding generations;

(ii) Assure for all people safe, healthful, productive, and aesthetically and culturally pleasing surroundings;

(iii) Attain the widest range of beneficial uses of the environment without degradation, risk to health or safety, or other undesirable and unintended consequences;

(iv) Preserve important historic, cultural, and natural aspects of our national heritage, and maintain, wherever possible, an environment which supports diversity and variety of individual choice;

(v) Achieve a balance between population and resource use which will permit high standards of living and a wide sharing of life's amenities; and

(vi) Enhance the quality of renewable resources and approach the maximum attainable recycling of depletable resources.

(2) Section 102(2) of NEPA establishes procedural requirements to carry out the policy and responsibilities established in section 101 of NEPA and contains "action-forcing" procedural provisions to ensure Federal agencies implement the letter and spirit of the Act. The purpose of the regulations in this subchapter is to set forth what Federal agencies must and should do to comply with the procedures and achieve the goals of the Act. The President, the Federal agencies, and the courts share responsibility for enforcing the Act so as to achieve the policy goals of section 101.

(b) The regulations in this subchapter implement the requirements of NEPA and ensure that agencies identify, consider, and disclose to the public relevant environmental information early in the process before decisions are made and before actions are taken. These information shall be of high quality. Accurate scientific analysis, expert agency comments, and public scrutiny are essential to implementing NEPA. Most importantly, environmental

documents must concentrate on the issues that are truly relevant to the action in question, rather than amassing needless detail. The regulations in this subchapter also are intended to ensure that Federal agencies conduct environmental reviews in a coordinated, consistent, predictable, and timely manner, and to reduce unnecessary burdens and delays. Finally, the regulations in this subchapter promote concurrent environmental reviews to ensure timely and efficient decision making.

(c) Ultimately, of course, it is not better documents but better decisions that count. NEPA's purpose is not to generate paperwork—even excellent paperwork—but to foster excellent action. The NEPA process is intended to help public officials make decisions that are based on an understanding of environmental consequences and take actions that protect, restore, and enhance the environment. The regulations in this subchapter provide the direction to achieve this purpose.

**§ 1500.2   Policy.**

Federal agencies shall to the fullest extent possible:

(a) Interpret and administer the policies, regulations, and public laws of the United States in accordance with the policies set forth in the Act and in these regulations.

(b) Implement procedures to make the NEPA process more useful to decision makers and the public; to reduce paperwork and the accumulation of extraneous background data; and to emphasize important environmental issues and alternatives. Environmental documents shall be concise, clear, and supported by evidence that agencies have conducted the necessary environmental analyses.

(c) Integrate the requirements of NEPA with other planning and environmental review procedures required by law or by agency practice so that such procedures run concurrently rather than consecutively where doing so promotes efficiency.

(d) Encourage and facilitate public engagement in decisions that affect the quality of the human environment, including meaningful engagement with communities such as those with environmental justice concerns.

(e) Use the NEPA process to identify and assess the reasonable alternatives to proposed actions that will avoid or minimize adverse effects of these actions upon the quality of the human environment, such as alternatives that will reduce climate change-related effects or address adverse health and environmental effects that

disproportionately affect communities with environmental justice concerns.

(f) Use all practicable means, consistent with the requirements of the Act and other essential considerations of national policy, to restore and enhance the quality of the human environment and avoid or minimize any possible adverse effects of their actions upon the quality of the human environment.

### § 1500.3  NEPA compliance.

(a) *Mandate.* This subchapter is applicable to and binding on all Federal agencies for implementing the procedural provisions of the National Environmental Policy Act of 1969, as amended (Pub. L. 91–190, 42 U.S.C. 4321 *et seq.*) (NEPA or the Act). The regulations in this subchapter are issued pursuant to NEPA; the Environmental Quality Improvement Act of 1970, as amended (Pub. L. 91–224, 42 U.S.C. 4371 *et seq.*); and Executive Order 11514, Protection and Enhancement of Environmental Quality (March 5, 1970), as amended by Executive Order 11991, Relating to the Protection and Enhancement of Environmental Quality (May 24, 1977). The regulations in this subchapter apply to the whole of section 102(2) of NEPA. The provisions of the Act and the regulations in this subchapter must be read together as a whole to comply with the Act.

(b) *Review of NEPA compliance.* It is the Council's intention that judicial review of agency compliance with the regulations in this subchapter not occur before an agency has issued the record of decision or taken other final agency action, except with respect to claims brought by project sponsors related to deadlines under section 107(g)(3) of NEPA. It is also the Council's intention that minor, non-substantive errors that have no effect on agency decision making shall be considered harmless and shall not invalidate an agency action. It is the Council's intention that any allegation of noncompliance with NEPA and the regulations in this subchapter should be resolved as expeditiously as appropriate.

(c) *Severability.* The sections of this subchapter are separate and severable from one another. If any section or portion therein is stayed or determined to be invalid, or the applicability of any section to any person or entity is held invalid, it is the Council's intention that the validity of the remainder of those parts shall not be affected, with the remaining sections to continue in effect.

### § 1500.4  Concise and informative environmental documents.

Agencies shall prepare analytical, concise, and informative environmental documents by:

(a) Meeting appropriate page limits (§§ 1501.5(g) and 1502.7 of this subchapter).

(b) Discussing only briefly issues other than important ones (*e.g.*, § 1502.2(b) of this subchapter).

(c) Writing environmental documents in plain language (*e.g.*, § 1502.8 of this subchapter).

(d) Following a clear format for environmental impact statements (§ 1502.10 of this subchapter).

(e) Emphasizing the portions of the environmental document that are most useful to decision makers and the public (*e.g.*, §§ 1502.14, 1502.15, and 1502.16 of this subchapter) and reducing emphasis on background material (*e.g.*, § 1502.1 of this subchapter).

(f) Using the scoping process to identify important environmental issues deserving of study and to deemphasize unimportant issues, narrowing the scope of the environmental impact statement process (or, where an agency elects to do so, the environmental assessment process) accordingly (§§ 1501.9 and 1502.4 of this subchapter).

(g) Summarizing the environmental impact statement (§ 1502.12 of this subchapter).

(h) Using programmatic environmental documents and tiering from documents of broad scope to those of narrower scope, to eliminate repetitive discussions of the same issues (§ 1501.11 of this subchapter).

(i) Incorporating by reference (§ 1501.12 of this subchapter).

(j) Integrating NEPA requirements with other environmental review and consultation requirements (§ 1502.24 of this subchapter).

(k) Requiring that comments be as specific as possible (§ 1503.3 of this subchapter).

(l) When changes are minor, attaching and publishing only changes to the draft environmental impact statement rather than rewriting and publishing the entire statement (§ 1503.4(c) of this subchapter).

(m) Eliminating duplication with State, Tribal, and local procedures, by providing for joint preparation of environmental documents where practicable (§ 1506.2 of this subchapter), and with other Federal procedures, by providing that an agency may adopt appropriate environmental documents prepared by another Federal agency (§ 1506.3 of this subchapter).

(n) Combining environmental documents with other documents (§ 1506.4 of this subchapter).

### § 1500.5  Efficient process.

Agencies shall improve efficiency of their NEPA processes by:

(a) Establishing categorical exclusions to define categories of actions that normally do not have a significant effect on the human environment (§§ 1501.4 and 1507.3(c)(8) of this subchapter) and therefore do not require preparation of an environmental assessment or environmental impact statement.

(b) Using a finding of no significant impact when an action not otherwise excluded will not have a significant effect on the human environment (§ 1501.6 of this subchapter) and therefore does not require preparation of an environmental impact statement.

(c) Integrating the NEPA process into early planning (§ 1501.2 of this subchapter).

(d) Engaging in interagency cooperation, including with affected Federal, State, Tribal, and local agencies, before or during the preparation of an environmental assessment or environmental impact statement, rather than waiting to request or submit comments on a completed document (§§ 1501.7 and 1501.8 of this subchapter).

(e) Ensuring the swift and fair resolution of lead agency disputes (§ 1501.7 of this subchapter).

(f) Using the scoping process for early identification of the important issues that require detailed analysis (§ 1502.4 of this subchapter).

(g) Meeting appropriate deadlines for the environmental assessment and environmental impact statement processes (§ 1501.10 of this subchapter).

(h) Preparing environmental documents early in the process (§§ 1502.5 and 1501.5(d) of this subchapter).

(i) Integrating NEPA requirements with other environmental review and consultation requirements (§ 1502.24 of this subchapter).

(j) Eliminating duplication with State, Tribal, and local procedures by providing for joint preparation of environmental documents where practicable (§ 1506.2 of this subchapter) and with other Federal procedures by providing that agencies may jointly prepare or adopt appropriate environmental documents prepared by another agency (§ 1506.3 of this subchapter).

(k) Combining environmental documents with other documents (§ 1506.4 of this subchapter).

AR_0028875

(l) Using accelerated procedures for proposals for legislation (§ 1506.8 of this subchapter).

§ 1500.6   Agency authority.

Each agency shall interpret the provisions of the Act as a supplement to its existing authority and as a mandate to view policies and missions in the light of the Act's national environmental objectives, to the extent consistent with its existing authority. Agencies shall review their policies, procedures, and regulations accordingly and revise them as necessary to ensure full compliance with the purposes and provisions of the Act and the regulations in this subchapter. The phrase "to the fullest extent possible" in section 102 of NEPA means that each agency of the Federal Government shall comply with the Act unless any agency activity, decision, or action is exempted from NEPA by law or compliance with NEPA is impossible.

PART 1501—NEPA AND AGENCY PLANNING

Sec.
1501.1   Purpose.
1501.2   Apply NEPA early in the process.
1501.3   Determine the appropriate level of NEPA review.
1501.4   Categorical exclusions.
1501.5   Environmental assessments.
1501.6   Findings of no significant impact.
1501.7   Lead agency.
1501.8   Cooperating agencies.
1501.9   Public and governmental engagement.
1501.10   Deadlines and schedule for the NEPA process.
1501.11   Programmatic environmental documents and tiering.
1501.12   Incorporation by reference into environmental documents.

   **Authority:** 42 U.S.C. 4321–4347; 42 U.S.C. 4371–4375; 42 U.S.C. 7609; and E.O. 11514, 35 FR 4247, 3 CFR, 1966–1970, Comp., p. 902, as amended by E.O. 11991, 42 FR 26967, 3 CFR, 1977 Comp., p. 123.

§ 1501.1   Purpose.

The purposes of this part include:
(a) Integrating the NEPA process into agency planning at an early stage to facilitate appropriate consideration of NEPA's policies, promote an efficient process, and reduce delay;
(b) Providing for early engagement in the environmental review process with other agencies, State, Tribal, and local governments, and affected or interested persons, entities, and communities before a decision is made;
(c) Providing for the swift and fair resolution of interagency disputes;
(d) Identifying at an early stage the important environmental issues deserving of study, and deemphasizing unimportant issues, narrowing the scope of the environmental review and enhancing efficiency accordingly; and
(e) Promoting accountability by establishing appropriate deadlines and requiring schedules.

§ 1501.2   Apply NEPA early in the process.

(a) Agencies should integrate the NEPA process with other planning and authorization processes at the earliest reasonable time to ensure that agencies consider environmental effects in their planning and decisions, to avoid delays later in the process, and to head off potential conflicts.
(b) Each agency shall:
(1) Comply with the mandate of section 102(2)(A) of NEPA to utilize a systematic, interdisciplinary approach, which will ensure the integrated use of the natural and social sciences and the environmental design arts in planning and in decision making that may have an impact on the human environment, as specified by § 1507.2(a) of this subchapter.
(2) Identify environmental effects and values in adequate detail so the decision maker can appropriately consider such effects and values alongside economic and technical analyses. Whenever practicable, agencies shall review and publish environmental documents and appropriate analyses at the same time as other planning documents.
(3) Study, develop, and describe appropriate alternatives to recommended courses of action in any proposal that involves unresolved conflicts concerning alternative uses of available resources, as provided by section 102(2)(H) of NEPA.
(4) Provide for actions subject to NEPA that are planned by applicants before Federal involvement so that:
(i) Policies or designated staff are available to advise potential applicants of studies or other information foreseeably required for later Federal action.
(ii) The Federal agency consults early with appropriate State, Tribal, and local governments and with interested persons and organizations when their involvement is reasonably foreseeable.
(iii) The Federal agency commences its NEPA process at the earliest reasonable time (§§ 1501.5(d) and 1502.5(b) of this subchapter).

§ 1501.3   Determine the appropriate level of NEPA review.

(a) *Applicability.* As a threshold determination, an agency shall assess whether NEPA applies to the proposed activity or decision. In assessing whether NEPA applies, Federal agencies should determine:

(1) Whether the proposed activity or decision is exempted from NEPA by law;
(2) Whether compliance with NEPA would clearly and fundamentally conflict with the requirements of another provision of Federal law;
(3) Whether the proposed activity or decision is not a major Federal action (§ 1508.1(w) of this subchapter);
(4) Whether the proposed activity or decision is not a final agency action within the meaning of such term in chapter 5 of title 5, United States Code; or
(5) Whether the proposed activity or decision is a non-discretionary action with respect to which such agency does not have authority to take environmental factors into consideration in determining whether to take the proposed action.
(b) *Scope of action and analysis.* If the agency determines that NEPA applies, the agency shall consider the scope of the proposed action and its effects to inform the agency's determination of the appropriate level of NEPA review and whether aspects of the action are non-discretionary. The agency shall use, as appropriate, the public engagement and scoping mechanisms in §§ 1501.9 and 1502.4 of this subchapter to inform consideration of the scope of the proposed action and determination of the level of NEPA review. The agency shall evaluate, in a single review, proposals or parts of proposals that are related closely enough to be, in effect, a single course of action. The agency shall not avoid a determination of significance under paragraph (c) of this section by terming an action temporary that is not temporary in fact or segmenting an action into smaller component parts. The agency also shall consider whether there are connected actions, which are closely related Federal activities or decisions that should be considered in the same NEPA review that:
(1) Automatically trigger other actions that may require NEPA review;
(2) Cannot or will not proceed unless other actions are taken previously or simultaneously; or
(3) Are interdependent parts of a larger action and depend on the larger action for their justification.
(c) *Levels of NEPA review.* In assessing the appropriate level of NEPA review, agencies may make use of any reliable data source and are not required to undertake new scientific or technical research unless it is essential to a reasoned choice among alternatives, and the overall costs and timeframe of obtaining it are not unreasonable.

Agencies should determine whether the proposed action:

(1) Is appropriately categorically excluded (§ 1501.4);

(2) Is not likely to have significant effects or the significance of the effects is unknown and is therefore appropriate for an environmental assessment (§ 1501.5); or

(3) Is likely to have significant effects and is therefore appropriate for an environmental impact statement (part 1502 of this subchapter).

(d) *Significance determination—context and intensity.* In considering whether an adverse effect of the proposed action is significant, agencies shall examine both the context of the action and the intensity of the effect. In assessing context and intensity, agencies should consider the duration of the effect. Agencies may also consider the extent to which an effect is adverse at some points in time and beneficial in others (for example, in assessing the significance of a habitat restoration action's effect on a species, an agency may consider both any short-term harm to the species during implementation of the action and any benefit to the same species once the action is complete). However, agencies shall not offset an action's adverse effects with other beneficial effects to determine significance (for example, an agency may not offset an action's adverse effect on one species with its beneficial effect on another species).

(1) Agencies shall analyze the significance of an action in several contexts. Agencies should consider the characteristics of the geographic area, such as proximity to unique or sensitive resources or communities with environmental justice concerns. Depending on the scope of the action, agencies should consider the potential global, national, regional, and local contexts as well as the duration, including short-term and long-term effects.

(2) Agencies shall analyze the intensity of effects considering the following factors, as applicable to the proposed action and in relationship to one another:

(i) The degree to which the action may adversely affect public health and safety.

(ii) The degree to which the action may adversely affect unique characteristics of the geographic area such as historic or cultural resources, parks, Tribal sacred sites, prime farmlands, wetlands, wild and scenic rivers, or ecologically critical areas.

(iii) Whether the action may violate relevant Federal, State, Tribal, or local laws or other requirements or be inconsistent with Federal, State, Tribal,

or local policies designed for the protection of the environment.

(iv) The degree to which the potential effects on the human environment are highly uncertain.

(v) The degree to which the action may adversely affect resources listed or eligible for listing in the National Register of Historic Places.

(vi) The degree to which the action may adversely affect an endangered or threatened species or its habitat, including habitat that has been determined to be critical under the Endangered Species Act of 1973.

(vii) The degree to which the action may adversely affect communities with environmental justice concerns.

(viii) The degree to which the action may adversely affect rights of Tribal Nations that have been reserved through treaties, statutes, or Executive Orders.

### § 1501.4    Categorical exclusions.

(a) For efficiency and consistent with § 1507.3(c)(8)(ii) of this subchapter or paragraph (c), agencies shall establish categorical exclusions for categories of actions that normally do not have a significant effect on the human environment, individually or in the aggregate, and therefore do not require preparation of an environmental assessment or environmental impact statement unless extraordinary circumstances exist that make application of the categorical exclusion inappropriate, consistent with paragraph (b) of this section. Agencies may establish categorical exclusions individually or jointly with other agencies.

(b) If an agency determines that a categorical exclusion identified in its agency NEPA procedures covers a proposed action, the agency shall evaluate the action for extraordinary circumstances in which a normally excluded action may have a significant effect.

(1) If an extraordinary circumstance exists, the agency nevertheless may apply the categorical exclusion if the agency conducts an analysis and determines that the proposed action does not in fact have the potential to result in significant effects notwithstanding the extraordinary circumstance, or the agency modifies the action to avoid the potential to result in significant effects. In these cases, the agency shall document such determination and should publish it on the agency's website or otherwise make it publicly available.

(2) If the agency cannot categorically exclude the proposed action, the agency shall prepare an environmental

assessment or environmental impact statement, as appropriate.

(c) In addition to the process for establishing categorical exclusions under § 1507.3(c)(8) of this subchapter, agencies may establish categorical exclusions through a land use plan, a decision document supported by a programmatic environmental impact statement or programmatic environmental assessment, or other equivalent planning or programmatic decision for which an environmental document has been prepared, so long as the agency:

(1) Provides the Council an opportunity to review and comment prior to public comment;

(2) Provides notification and an opportunity for public comment;

(3) Substantiates its determination that the category of actions normally does not have significant effects, individually or in the aggregate;

(4) Identifies extraordinary circumstances;

(5) Establishes a process for determining that a categorical exclusion applies to a specific action or actions in the absence of extraordinary circumstances, or, where extraordinary circumstances are present, for determining the agency may apply the categorical exclusion consistent with (b)(1) of this section; and

(6) Publishes a list of all categorical exclusions established through these mechanisms on its website.

(d) Categorical exclusions established consistent with paragraph (c) of this section or § 1507.3(c)(8) of this subchapter may:

(1) Cover specific geographic areas or areas that share common characteristics, *e.g.,* habitat type;

(2) Have a limited duration;

(3) Include mitigation measures that, in the absence of extraordinary circumstances, will ensure that any environmental effects are not significant, so long as a process is established for monitoring and enforcing any required mitigation measures, including through the suspension or revocation of the relevant agency action; or

(4) Provide criteria that would cause the categorical exclusion to expire because the agency's determination that the category of action does not have significant effects, individually or in the aggregate, is no longer applicable, including, as appropriate, because:

(i) The number of individual actions covered by the categorical exclusion exceeds a specific threshold;

(ii) Individual actions covered by the categorical exclusion are too close to one another in proximity or time; or

(iii) Environmental conditions or information upon which the agency's determination was based have changed.

(e) An agency may adopt and apply a categorical exclusion listed in another agency's NEPA procedures to a proposed action or a category of proposed actions consistent with this paragraph. The agency shall:

(1) Identify the categorical exclusion listed in another agency's NEPA procedures that covers its proposed action or a category of proposed actions;

(2) Consult with the agency that established the categorical exclusion to ensure that the proposed action or category of proposed actions to which the agency intends to apply the categorical exclusion is appropriate;

(3) Provide public notification of the categorical exclusion that the agency is adopting, including a brief description of the proposed action or category of proposed actions to which the agency intends to apply the adopted categorical exclusion, the process the agency will use to evaluate for extraordinary circumstances consistent with paragraph (b) of this section, and a brief description of the agencies' consultation;

(4) In applying the adopted categorical exclusion to a proposed action, evaluate the proposed action for extraordinary circumstances, consistent with paragraph (b) of this section; and

(5) Publish the documentation of the application of the adopted categorical exclusion.

### § 1501.5   Environmental assessments.

(a) An agency shall prepare an environmental assessment for a proposed action that is not likely to have significant effects or when the significance of the effects is unknown unless the agency finds that a categorical exclusion (§ 1501.4) is applicable or has decided to prepare an environmental impact statement.

(b) An agency may prepare an environmental assessment on any action to assist agency planning and decision making.

(c) An environmental assessment shall:

(1) Briefly provide sufficient evidence and analysis for determining whether to prepare an environmental impact statement or a finding of no significant impact;

(2) Briefly discuss the:

(i) Purpose and need for the proposed agency action;

(ii) Alternatives as required by section 102(2)(H) of NEPA; and

(iii) Environmental effects of the proposed action and alternatives;

(3) List the Federal agencies; State, Tribal, and local governments and agencies; or persons consulted; and

(4) Provide a unique identification number for tracking purposes, which the agency shall reference on all associated environmental review documents prepared for the proposed action and in any database or tracking system for such documents.

(d) For applications to the agency requiring an environmental assessment, the agency shall commence the environmental assessment as soon as practicable after receiving the application.

(e) If an agency publishes a draft environmental assessment, the agency shall invite public comment and consider those comments in preparing the final environmental assessment.

(f) Agencies shall involve the public, State, Tribal, and local governments, relevant agencies, and any applicants, to the extent practicable in preparing environmental assessments (*see* § 1501.9).

(g) The text of an environmental assessment shall not exceed 75 pages, not including any citations or appendices.

(h) Agencies:

(1) Should supplement environmental assessments if a major Federal action is incomplete or ongoing, and:

(i) The agency makes substantial changes to the proposed action that are relevant to environmental concerns; or

(ii) There are substantial new circumstances or information about the significance of the adverse effects that bear on the analysis to determine whether to prepare a finding of no significant impact or an environmental impact statement.

(2) May also prepare supplements when the agency determines that the purposes of the Act will be furthered by doing so.

(i) Agencies may reevaluate an environmental assessment to determine that the agency does not need to prepare a supplemental environmental assessment and a new finding of no significant impact or an environmental impact statement.

(j) Agencies generally should apply § 1502.21 of this subchapter to environmental assessments.

(k) As appropriate to improve efficiency and effectiveness of environmental assessments, agencies may apply the other provisions of part 1502 and 1503 of this subchapter, including §§ 1502.4, 1502.22, 1502.24, and 1503.4, to environmental assessments.

### § 1501.6   Findings of no significant impact.

(a) After completing an environmental assessment, an agency shall prepare:

(1) A finding of no significant impact if the agency determines, based on the environmental assessment, that NEPA does not require preparation of an environmental impact statement because the proposed action will not have significant effects;

(2) A mitigated finding of no significant impact if the agency determines, based on the environmental assessment, that NEPA does not require preparation of an environmental impact statement because the proposed action will not have significant effects due to mitigation; or

(3) An environmental impact statement if the agency determines, based on the environmental assessment, that the action will have significant effects.

(b)(1) The agency shall make the finding of no significant impact available to the affected public as specified in § 1501.9(c)(5).

(2) In the following circumstances, the agency shall make the finding of no significant impact available for public review for 30 days before the agency determines whether to prepare an environmental impact statement and before the action may begin:

(i) The proposed action is or is closely similar to one that normally requires the preparation of an environmental impact statement under the procedures adopted by the agency pursuant to § 1507.3 of this subchapter; or

(ii) The nature of the proposed action is one without precedent.

(c) The finding of no significant impact shall include the environmental assessment or incorporate it by reference and shall note any other environmental documents related to it (§ 1502.4(d)(3) of this subchapter). If the environmental assessment is included, the finding need not repeat any of the discussion in the assessment but may incorporate it by reference.

(d) The finding of no significant impact shall state the authority for any mitigation that the agency has adopted and any applicable monitoring or enforcement provisions. If the agency finds no significant effects based on mitigation, the mitigated finding of no significant impact shall state the enforceable mitigation requirements or commitments that will be undertaken and the authority to enforce them, such as terms and conditions or other measures in a relevant permit, incidental take statement, or other agreement, and the agency shall prepare a monitoring and compliance plan for that mitigation consistent with

AR_0028878

§ 1505.3(c) of this subchapter. In addition, the agency shall prepare a monitoring and compliance plan for other mitigation as required by § 1505.3(c) of this subchapter.

### § 1501.7    Lead agency.

(a) A lead agency shall supervise the preparation of an environmental impact statement or environmental assessment if more than one Federal agency either:

(1) Proposes or is involved in the same action; or

(2) Is involved in a group of actions directly related to each other because of their functional interdependence or geographical proximity.

(b) A Federal, State, Tribal, or local agency may serve as a joint lead agency to prepare an environmental impact statement or environmental assessment (§ 1506.2 of this subchapter). A joint lead agency shall jointly fulfill the role of a lead agency.

(c) If an action falls within the provisions of paragraph (a) of this section, the participating Federal agencies shall determine, by letter or memorandum, which agency will be the lead agency, considering the factors in paragraphs (c)(1) through (c)(5) of this section, and the lead agency shall determine which agencies will be joint lead or cooperating agencies. The agencies shall resolve the lead agency question so as not to cause delay. If there is disagreement among the agencies, the following factors (which are listed in order of descending importance) shall determine lead agency designation:

(1) Magnitude of agency's involvement;

(2) Project approval or disapproval authority;

(3) Expertise concerning the action's environmental effects;

(4) Duration of agency's involvement; and

(5) Sequence of agency's involvement.

(d) Any Federal, State, Tribal, or local agency or person substantially affected by the absence of a lead agency designation, may make a written request to the senior agency officials of the potential lead agencies that a lead agency be designated. An agency that receives a request under this paragraph shall transmit such request to each participating Federal agency and to the Council.

(e) If Federal agencies are unable to agree on which agency will be the lead agency or if the procedure described in paragraph (c) of this section has not resulted in a lead agency designation within 45 days of the written request to the senior agency officials, any of the agencies or persons concerned may file

a request with the Council asking it to determine which Federal agency shall be the lead agency. The Council shall transmit a copy of the request to each potential lead agency. The request shall consist of:

(1) A precise description of the nature and extent of the proposed action; and

(2) A detailed statement of why each potential lead agency should or should not be the lead agency under the criteria specified in paragraph (c) of this section.

(f) Any potential lead agency may file a response no later than 20 days after a request is filed with the Council. As soon as possible, but not later than 40 days after receiving the request, the Council shall designate which Federal agency will be the lead agency and which other Federal agencies will be cooperating agencies.

(g) To the extent practicable, if a proposal will require action by more than one Federal agency and the lead agency determines that the proposal requires preparation of an environmental impact statement, the lead and cooperating agencies shall evaluate it in a single environmental impact statement; the lead and cooperating agencies shall issue, except where inappropriate or inefficient, a joint record of decision. To the extent practicable, if a proposal will require action by more than one Federal agency and the lead agency determines that it requires preparation of an environmental assessment, the lead and cooperating agencies shall evaluate the proposal in a single environmental assessment and issue a joint finding of no significant impact or jointly determine to prepare an environmental impact statement.

(h) With respect to cooperating agencies, the lead agency shall:

(1) Request the participation of each cooperating agency in the NEPA process at the earliest practicable time;

(2) Consider any analysis or proposal created by a cooperating agency and, to the maximum extent practicable, use the environmental analysis, proposal, and information provided by cooperating agencies;

(3) Meet with a cooperating agency at the latter's request; and

(4) Determine the purpose and need, and alternatives in consultation with any cooperating agency.

### § 1501.8    Cooperating agencies.

(a) The purpose of this section is to emphasize agency cooperation early in the NEPA process. Upon request of the lead agency, any Federal agency with jurisdiction by law shall be a cooperating agency. In addition, upon

request of the lead agency, any other Federal agency with special expertise with respect to any environmental issue may be a cooperating agency. A State, Tribal, or local agency of similar qualifications may become a cooperating agency by agreement with the lead agency. Relevant special expertise may include Indigenous Knowledge. An agency may request that the lead agency designate it a cooperating agency, and a Federal agency may appeal a denial of its request to the Council.

(b) Each cooperating agency shall:

(1) Participate in the NEPA process at the earliest practicable time.

(2) Participate in the scoping process (described in § 1502.4).

(3) On request of the lead agency, assume responsibility for developing information and preparing environmental analyses, including portions of the environmental impact statement or environmental assessment concerning which the cooperating agency has special expertise.

(4) On request of the lead agency, make available staff support to enhance the lead agency's interdisciplinary capability.

(5) Normally use its own funds. To the extent available funds permit, the lead agency shall fund those major activities or analyses it requests from cooperating agencies. Potential lead agencies shall include such funding requirements in their budget requests.

(6) Consult with the lead agency in developing and updating the schedule (§ 1501.10), meet the schedule, and elevate, as soon as practicable, to the senior agency official of the lead agency any issues relating to purpose and need, alternatives, or other issues that may affect any agencies' ability to meet the schedule.

(7) Meet the lead agency's schedule for providing comments.

(8) To the maximum extent practicable, jointly issue environmental documents with the lead agency.

(c) In response to a lead agency's request for assistance in preparing the environmental documents (described in paragraph (b)(3), (4), or (5) of this section), a cooperating agency may reply that other program commitments preclude any involvement or the degree of involvement requested in the action that is the subject of the environmental impact statement or environmental assessment. The cooperating agency shall submit a copy of this reply to the Council and the senior agency official of the lead agency.

**§ 1501.9 Public and governmental engagement.**

(a) *Purpose and responsibility.* The purpose of public engagement is to inform the public of an agency's proposed action, allow for meaningful engagement during the NEPA process, and ensure decision makers are informed by the views of the public. The purpose of governmental engagement is to identify the potentially affected Federal, State, Tribal, and local governments, invite them to serve as cooperating agencies, as appropriate, and ensure that participating agencies have opportunities to engage in the environmental review process, as appropriate. This section sets forth agencies' responsibilities and best practices to conduct public and governmental engagement. Agencies shall determine the appropriate methods of public and governmental engagement for their proposed actions.

(b) *Determination of scope.* Agencies shall use public and governmental engagement, as appropriate, to inform the level of review for and scope of analysis of a proposed action, consistent with § 1501.3 of this subchapter. For environmental impact statements, in addition to the requirements of this section, agencies also shall comply with the requirements for scoping set forth in § 1502.4 of this subchapter. For environmental assessments, in addition to the requirements of this section, agencies should consider applying the requirements for scoping set forth in § 1502.4 of this subchapter, as appropriate.

(c) *Outreach and notification.* Agencies shall:

(1) Invite the participation of any likely affected Federal, State, Tribal, and local agencies and governments, as early as practicable, including, as appropriate, as cooperating agencies under § 1501.8 of this subchapter;

(2) Conduct, as appropriate, early engagement with likely affected or interested members of the public (including those who might not be in accord with the action), unless there is a limited exception under § 1507.3(d)(3) of this subchapter; and

(3) Consider what methods of outreach and notification are necessary and appropriate based on the likely affected entities and persons; the scope, scale, and complexity of the proposed action and alternatives; the degree of public interest; and other relevant factors. When selecting appropriate methods for providing public notification, agencies shall consider the ability of affected persons and agencies to access electronic media and the primary languages of affected persons.

(4) Publish notification of proposed actions they are analyzing through an environmental impact statement, including through a notice of intent consistent with § 1502.4 of this subchapter.

(5) Provide public notification of NEPA-related hearings, public meetings, and other opportunities for public engagement, and the availability of environmental documents to inform those persons and agencies who may be interested or affected by their proposed actions.

(i) The agency shall notify those entities and persons who have requested notification on a particular action and those who have requested regular notification from the agency on its actions.

(ii) In the case of an action with effects of national concern, notification shall also include publication of a notice in the **Federal Register**.

(iii) In the case of an action with effects primarily of local concern, the notification may include distribution to or through:

(A) State, Tribal, and local governments and agencies that may be interested or affected by the proposed action.

(B) Following the affected State or Tribe's public notification procedures for comparable actions.

(C) Publication in local newspapers having general circulation.

(D) Other local media.

(E) Potentially interested community organizations, including small business associations.

(F) Publication in newsletters that may be expected to reach potentially interested persons.

(G) Direct mailing to owners and occupants of nearby or affected property.

(H) Posting of notification on- and off-site in the area where the action is to be located.

(I) Electronic media (*e.g.,* a project or agency website, dashboard, email list, or social media). Agencies should establish email notification lists or similar methods for the public to easily request electronic notifications for a proposed action.

(6) Make environmental impact statements, the comments received, and any underlying documents available to the public pursuant to the provisions of the Freedom of Information Act, as amended (5 U.S.C. 552), and without charge to the extent practicable.

(d) *Public meetings and hearings.* Agencies shall hold or sponsor public hearings, public meetings, or other opportunities for public engagement whenever appropriate or in accordance with statutory or regulatory requirements or applicable agency NEPA procedures. Agencies may conduct public hearings and public meetings by means of electronic communication except where another format is required by law. When determining the format for a public hearing or public meeting, such as whether an in-person or virtual meeting, or formal hearing or listening session is most appropriate, agencies shall consider the needs of affected communities. When accepting comments for electronic or virtual public hearings or meetings, agencies shall allow the public to submit comments electronically, by regular mail, or by other appropriate methods. Agencies should make a draft environmental document available to the public at least 15 days in advance when it is the subject of a public hearing or meeting unless the purpose of such hearing or meeting is to provide information for the development of the document.

(e) *Agency procedures.* Agencies shall make diligent efforts to engage the public in preparing and implementing their NEPA procedures (§ 1507.3 of this subchapter).

**§ 1501.10 Deadlines and schedule for the NEPA process.**

(a) To ensure that agencies conduct sound NEPA reviews as efficiently and expeditiously as practicable, Federal agencies shall set deadlines and schedules appropriate to individual actions or types of actions consistent with this section and the time intervals required by § 1506.10 of this subchapter. Where applicable, the lead agency shall establish the schedule for a proposed action and make any necessary updates to the schedule in consultation with and seek the concurrence of any joint lead, cooperating, and participating agencies, and in consultation with any applicants.

(b) To ensure timely decision making, agencies shall complete:

(1) Environmental assessments within 1 year, unless the lead agency extends the deadline in writing and, as applicable, in consultation with any applicant, and establishes a new deadline that provides only so much additional time as is necessary to complete the environmental assessment.

(2) Environmental impact statements within 2 years, unless the lead agency extends the deadline in writing and, as applicable, in consultation with any applicant and establishes a new deadline that provides only so much additional time as is necessary to complete the environmental impact statement.

(3) The deadlines in paragraphs (b)(1) and (2) of this section are measured from the sooner of, as applicable:

(i) the date on which the agency determines that NEPA requires an environmental impact statement or environmental assessment for the proposed action;

(ii) the date on which the agency notifies an applicant that the application to establish a right-of-way for the proposed action is complete; or

(iii) the date on which the agency issues a notice of intent for the proposed action.

(4) The deadlines in paragraphs (b)(1) and (2) of this section are measured to, as applicable:

(i) For environmental assessments, the date on which the agency:

(A) Publishes an environmental assessment;

(B) Where applicable, makes the environmental assessment available pursuant to an agency's pre-decisional administrative review process; or

(C) Issues a notice of intent to prepare an environmental impact statement; and

(ii) For environmental impact statements, the date on which the Environmental Protection Agency publishes a notice of availability of the final environmental impact statement or, where applicable, the date on which the agency makes the final environmental impact statement available pursuant to an agency's pre-decisional administrative review process, consistent with § 1506.10(c)(1) of this subchapter.

(5) Each lead agency shall annually submit the report to Congress on any missed deadlines for environmental assessments and environmental impact statements required by section 107(h) of NEPA.

(c) To facilitate predictability, the lead agency shall develop a schedule for completion of environmental impact statements and environmental assessments as well as any authorizations required to carry out the action. The lead agency shall set milestones for all environmental reviews, permits, and authorizations required for implementation of the action, in consultation with any applicant and in consultation with and seek the concurrence of all joint lead, cooperating, and participating agencies, as soon as practicable. Schedules may vary depending on the type of action and in consideration of other factors in paragraph (d) of this section. The lead agency should develop a schedule that is based on its expertise reviewing similar types of actions under NEPA. All agencies with milestones, including those for a review, permit, or

authorization, in the schedule shall take appropriate measures to meet the schedule. If a participating agency anticipates that a milestone will be missed, the agency shall notify, as applicable, the agency responsible for the milestone and the lead agency, and request that they take appropriate measures to comply with the schedule. As soon as practicable, the lead and any other agency affected by a potentially missed milestone shall elevate any unresolved disputes contributing to the potentially missed milestone to the appropriate officials of the agencies responsible for the potentially missed milestone, to ensure timely resolution within the deadlines for the individual action.

(d) The lead agency may consider the following factors in determining the schedule and deadlines:

(1) Potential for environmental harm.

(2) Size of the proposed action.

(3) State of the art of analytic techniques.

(4) Degree of public need for the proposed action, including the consequences of delay.

(5) Number of persons and agencies affected.

(6) Availability of relevant information.

(7) Degree to which a substantial dispute exists as to the size, location, nature, or consequences of the proposed action and its effects.

(8) Time limits imposed on the agency by law, regulation, Executive order, or court ordered deadlines.

(9) Time necessary to conduct government-to-government Tribal consultation.

(e) The schedule for environmental impact statements shall include the following milestones:

(1) The publication of the notice of intent;

(2) The issuance of the draft environmental impact statement;

(3) The public comment period on the draft environmental impact statement, consistent with § 1506.10 of this subchapter;

(4) The issuance of the final environmental impact statement; and

(5) The issuance of the record of decision.

(f) The schedule for environmental assessments shall include the following milestones:

(1) Decision to prepare an environmental assessment;

(2) Issuance of the draft environmental assessment, where applicable;

(3) The public comment period on the draft environmental assessment, consistent with § 1501.5 of this subchapter, where applicable; and

(4) Issuance of the final environmental assessment and decision on whether to issue a finding of no significant impact or issue a notice of intent to prepare an environmental impact statement.

(g) An agency may designate a person (such as the project manager or a person in the agency's office with NEPA responsibilities) to expedite the NEPA process.

(h) For environmental impact statements, agencies shall make schedules for completing the NEPA process publicly available, such as on their website or another publicly accessible platform. If agencies make subsequent changes to the schedule, agencies shall publish revisions to the schedule and explain the basis for substantial changes.

**§ 1501.11  Programmatic environmental documents and tiering.**

(a) *Programmatic environmental documents.* Agencies may prepare programmatic environmental documents, which may be either environmental impact statements or environmental assessments, to evaluate the environmental effects of policies, programs, plans, or groups of related activities. When agencies prepare such documents, they should be relevant to the agency decisions and timed to coincide with meaningful points in agency planning and decision making. Agencies may use programmatic environmental documents to conduct a broad or holistic evaluation of effects or policy alternatives; evaluate widely applicable measures; or avoid duplicative analysis for individual actions by first considering relevant issues at a broad or programmatic level.

(1) When preparing programmatic environmental documents (including proposals by more than one agency), agencies may find it useful to evaluate the proposal(s) in one of the following ways:

(i) Geographically, including actions occurring in the same general location, such as body of water, region, or metropolitan area.

(ii) Thematically or by sector, including actions that have relevant similarities, such as common timing, effects, alternatives, methods of implementation, technology, media, or subject matter.

(iii) By stage of technological development, including Federal or federally assisted research, development, or demonstration programs for new technologies that, if applied, could significantly affect the quality of the human environment. Documents on such programs should be

completed before the program has reached a stage of investment or commitment to implementation likely to determine subsequent development or limit the choice of reasonable alternatives.

(2) Agency actions that may be appropriate for programmatic environmental documents include:

(i) Programs, policies, or plans, including land use or resource management plans;

(ii) Regulations;

(iii) National or regional actions;

(iv) Actions that have multiple stages or phases, and are part of an overall plan or program; or

(v) A group of projects or related types of projects.

(3) Agencies should, as appropriate, employ scoping (§ 1502.4 of this subchapter), tiering (paragraph (b) of this section), and other methods listed in §§ 1500.4 and 1500.5 of this subchapter, to describe the relationship between the programmatic environmental document and related individual actions and to avoid duplication and delay. The programmatic environmental document shall identify any decisions or categories of decisions that the agency anticipates making in reliance on it.

(b) *Tiering.* Where an existing environmental impact statement, environmental assessment, or programmatic environmental document is relevant to a later proposed action, agencies may employ tiering. Tiering allows subsequent tiered environmental analysis to avoid duplication and focus on issues, effects, or alternatives not fully addressed in a programmatic environmental document, environmental impact statement, or environmental assessment prepared at an earlier phase or stage. Agencies generally should tier their environmental impact statements and environmental assessments when it would eliminate repetitive discussions of the same issues, focus on the actual issues ripe for decision, and exclude from consideration issues already decided.

(1) When an agency has prepared an environmental impact statement, environmental assessment or programmatic environmental document for a program or policy and then prepares a subsequent statement or assessment on an action included within the program or policy (such as a project- or site-specific action), the tiered document shall discuss the relationship between the tiered document and the previous review, and summarize and incorporate by reference the issues discussed in the broader

document. The tiered document shall concentrate on the issues specific to the subsequent action, analyzing site-, phase-, or stage-specific conditions and reasonably foreseeable effects. The agency shall provide for public engagement opportunities consistent with the type of environmental document prepared and appropriate for the location, phase, or stage. The tiered document shall state where the earlier document is publicly available.

(2) Tiering is appropriate when the sequence from an environmental impact statement or environmental assessment is:

(i) From a programmatic, plan, or policy environmental impact statement or environmental assessment to a program, plan, or policy statement or assessment of lesser or narrower scope or to a site-specific statement or assessment.

(ii) From an environmental impact statement or environmental assessment on a specific action at an early stage (such as need and site selection) to a subsequent statement or assessment at a later stage (such as environmental mitigation). Tiering in such cases is appropriate when it helps the agency to focus on the issues that are ripe for decision and exclude from consideration issues already decided or not yet ripe.

(c) *Reevaluation.* When an agency prepares a programmatic environmental document for which judicial review was available, the agency may rely on the analysis included in the programmatic environmental document in a subsequent environmental document for related actions as follows:

(1) Within 5 years and without additional review of the analysis in the programmatic environmental document, unless there are substantial new circumstances or information about the significance of adverse effects that bear on the analysis; or

(2) After 5 years, so long as the agency reevaluates the analysis in the programmatic environmental document and any underlying assumption to ensure reliance on the analysis remains valid. The agency shall briefly document its reevaluation and explain why the analysis remains valid considering any new and substantial information or circumstances.

**§ 1501.12   Incorporation by reference into environmental documents.**

Agencies shall incorporate material, such as planning studies, analyses, or other relevant information, into environmental documents by reference when the effect will be to cut down on bulk without impeding agency and

public review of the action. Agencies shall cite the incorporated material in the document, briefly describe its content, and briefly explain the relevance of the incorporated material to the environmental document. Agencies shall not incorporate material by reference unless it is reasonably available for review, such as on a publicly accessible website, by potentially interested persons throughout the time allowed for comment or public review. Agencies should provide digital references, such as hyperlinks, to the incorporated material or otherwise indicate how the public can access the material for review. Agencies shall not incorporate by reference material based on proprietary data that is not available for review and comment.

## PART 1502—ENVIRONMENTAL IMPACT STATEMENT

Sec.

1502.1   Purpose of environmental impact statement.
1502.2   Implementation.
1502.3   Statutory requirements for environmental impact statements.
1502.4   Scoping.
1502.5   Timing.
1502.6   Interdisciplinary preparation.
1502.7   Page limits.
1502.8   Writing.
1502.9   Draft, final, and supplemental statements.
1502.10   Recommended format.
1502.11   Cover.
1502.12   Summary.
1502.13   Purpose and need.
1502.14   Alternatives including the proposed action.
1502.15   Affected environment.
1502.16   Environmental consequences.
1502.17   Summary of scoping information.
1502.18   List of preparers.
1502.19   Appendix.
1502.20   Publication of the environmental impact statement.
1502.21   Incomplete or unavailable information.
1502.22   Cost-benefit analysis.
1502.23   [Reserved]
1502.24   Environmental review and consultation requirements.

**Authority:** 42 U.S.C. 4321–4347; 42 U.S.C. 4371–4375; 42 U.S.C. 7609; and E.O. 11514, 35 FR 4247, 3 CFR, 1966–1970, Comp., p. 902, as amended by E.O. 11991, 42 FR 26967, 3 CFR, 1977 Comp., p. 123.

**§ 1502.1   Purpose of environmental impact statement.**

(a) The primary purpose of an environmental impact statement prepared pursuant to section 102(2)(C) of NEPA is to serve as an action-forcing device by ensuring agencies consider the environmental effects of their action in decision making, so that the policies and goals defined in the Act are infused

AR_0028882

into the ongoing programs and actions of the Federal Government.

(b) Environmental impact statements shall provide full and fair discussion of significant effects and shall inform decision makers and the public of reasonable alternatives that would avoid or minimize adverse effects or enhance the quality of the human environment. Agencies shall focus on important environmental issues and reasonable alternatives and shall reduce paperwork and the accumulation of extraneous background data.

(c) Environmental impact statements shall be concise, clear, and to the point, and shall be supported by evidence that the agency has made the necessary environmental analyses. An environmental impact statement is more than a disclosure document. Federal agencies shall use environmental impact statements in conjunction with other relevant material to plan actions, involve the public, and make decisions.

### § 1502.2   Implementation.

To achieve the purposes set forth in § 1502.1, agencies shall prepare environmental impact statements in the following manner:

(a) Environmental impact statements shall not be encyclopedic.

(b) Environmental impact statements shall discuss effects in proportion to their significance. There shall be only brief discussion of other than important issues. As in an environmental assessment and finding of no significant impact, there should be only enough discussion to show why more study is not warranted.

(c) Environmental impact statements shall be analytical, concise, and no longer than necessary to comply with NEPA and with the regulations in this subchapter. Length should be proportional to potential environmental effects and the scope and complexity of the action.

(d) Environmental impact statements shall state how alternatives considered in them and decisions based on them will or will not achieve the requirements of sections 101 and 102(1) of NEPA, the regulations in this subchapter, and other environmental laws and policies.

(e) The range of alternatives discussed in environmental impact statements shall encompass those to be considered by the decision maker.

(f) Agencies shall not commit resources prejudicing the selection of alternatives before making a decision (*see also* § 1506.1 of this subchapter).

(g) Environmental impact statements shall serve as the means of assessing the environmental impact of proposed agency actions, rather than justifying decisions already made.

### § 1502.3   Statutory requirements for environmental impact statements.

As required by section 102(2)(C) of NEPA, environmental impact statements are to be included in every Federal agency recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment.

### § 1502.4   Scoping.

(a) *Purpose.* Agencies shall use scoping, an early and open process consistent with § 1501.9 of this subchapter, to determine the scope of issues for analysis in an environmental impact statement, including identifying the important issues and eliminating from further study unimportant issues. Scoping should begin as soon as practicable after the proposal for action is sufficiently developed for agency consideration. Scoping may include appropriate pre-application procedures or work conducted prior to publication of the notice of intent (see §§ 1501.3 and 1501.9 of this subchapter).

(b) *Scoping outreach.* When preparing an environmental impact statement, agencies shall facilitate notification to persons and agencies who may be interested or affected by an agency's proposed action, consistent with § 1501.9 of this subchapter. As part of the scoping process, the lead agency may hold a scoping meeting or meetings, publish scoping information, or use other means to communicate with those persons or agencies who may be interested or affected, which the agency may integrate with any other early planning meeting.

(c) *Inviting participation.* As part of the scoping process, and consistent with § 1501.9 of this subchapter, the lead agency shall invite the participation of likely affected Federal, State, Tribal, and local agencies and governments as cooperating or participating agencies, as appropriate; any applicant; and other likely affected or interested persons (including those who might not be in accord with the action), unless there is a limited exception under § 1507.3(d)(3) of this subchapter.

(d) *Additional scoping responsibilities.* As part of the scoping process, the lead agency shall:

(1) Identify and eliminate from detailed study the issues that are not important or have been covered by prior environmental review(s) (§§ 1501.12 and 1506.3 of this subchapter), narrowing the discussion of these issues in the environmental impact statement to a brief presentation of why they will not be important or providing a reference to their coverage elsewhere.

(2) Allocate assignments for preparation of the environmental impact statement among the lead and cooperating agencies, with the lead agency retaining responsibility for the statement.

(3) Indicate any publicly available environmental assessments and other environmental impact statements that are being or will be prepared and are related to but are not part of the scope of the environmental impact statement under consideration.

(4) Identify other environmental review, authorization, and consultation requirements so the lead and cooperating agencies may prepare other required analyses and studies concurrently and integrated with the environmental impact statement, as provided in § 1502.24.

(5) Indicate the relationship between the timing of the preparation of environmental analyses and the agencies' tentative planning and decision-making schedule.

(e) *Notice of intent.* As soon as practicable after determining that a proposal is sufficiently developed to allow for meaningful public comment and requires an environmental impact statement, the lead agency shall publish a notice of intent to prepare an environmental impact statement in the **Federal Register**. In addition to the **Federal Register** notice, an agency also may publish notification in accordance with § 1501.9 of this subchapter. The notice shall include, as appropriate:

(1) The purpose and need for the proposed agency action;

(2) A preliminary description of the proposed action and alternatives the environmental impact statement will consider;

(3) A brief summary of expected effects;

(4) Anticipated permits and other authorizations;

(5) A schedule for the decision-making process;

(6) A description of the public scoping process, including any scoping meeting(s);

(7) A request for comment on alternatives and effects, as well as on relevant information, studies, or analyses with respect to the proposed action;

(8) Contact information for a person within the agency who can answer questions about the proposed action and the environmental impact statement;

(9) Identification of any cooperating and participating agencies, and any information that such agencies require in the notice to facilitate their decisions

or authorizations that will rely upon the resulting environmental impact statement; and

(10) A unique identification number for tracking purposes, which the agency shall reference on all environmental documents prepared for the proposed action and in any database or tracking system for such documents.

(f) *Notices of withdrawal or cancellation.* If an agency withdraws, cancels, or otherwise ceases the consideration of a proposed action before completing a final environmental impact statement, the agency shall publish a notice in the **Federal Register**.

(g) *Revisions.* An agency shall revise the determinations made under paragraphs (b), (c), and (d) of this section if substantial changes are made later in the proposed action, or if important new circumstances or information arise that bear on the proposal or its effects.

### § 1502.5 Timing.

An agency should commence preparation of an environmental impact statement as close as practicable to the time the agency is developing or receives a proposal so that preparation can be completed in time for the final statement to be included in any recommendation or report on the proposal. The statement shall be prepared early enough so that it can serve as an important practical contribution to the decision-making process and will not be used to rationalize or justify decisions already made (§§ 1501.2 of this subchapter and 1502.2). For instance:

(a) For projects directly undertaken by Federal agencies, the agency shall prepare the environmental impact statement at the feasibility analysis or equivalent stage evaluating whether to proceed with the project and may supplement it at a later stage, if necessary.

(b) For applications to the agency requiring an environmental impact statement, the agency shall commence the statement as soon as practicable after receiving the complete application. Federal agencies should work together and with potential applicants and applicable State, Tribal, and local agencies and governments prior to receipt of the application.

(c) For adjudication, the final environmental impact statement shall normally precede the final staff recommendation and that portion of the public hearing related to the impact study. In appropriate circumstances, the statement may follow preliminary hearings designed to gather information for use in the statement.

(d) For informal rulemaking, the draft environmental impact statement shall normally accompany the proposed rule.

### § 1502.6 Interdisciplinary preparation.

Agencies shall prepare environmental impact statements using an interdisciplinary approach that will ensure the integrated use of the natural and social sciences and the environmental design arts (section 102(2)(A) of NEPA). The disciplines of the preparers shall be appropriate to the scope and issues identified in the scoping process (§ 1502.4 of this subchapter).

### § 1502.7 Page limits.

The text of final environmental impact statements, not including citations or appendices, shall not exceed 150 pages except for proposals of extraordinary complexity, which shall not exceed 300 pages.

### § 1502.8 Writing.

Agencies shall write environmental impact statements in plain language and should use, as relevant, appropriate visual aids or charts so that decision makers and the public can readily understand such statements. Agencies should employ writers of clear prose or editors to write, review, or edit statements, which shall be based upon the analysis and supporting data from the natural and social sciences and the environmental design arts.

### § 1502.9 Draft, final, and supplemental statements.

(a) *Generally.* Except for proposals for legislation as provided in § 1506.8 of this subchapter, agencies shall prepare environmental impact statements in two stages and, where necessary, supplement them as provided in paragraph (d)(1) of this section.

(b) *Draft environmental impact statements.* Agencies shall prepare draft environmental impact statements in accordance with the scope decided upon in the scoping process (§ 1502.4 of this subchapter). The lead agency shall work with the cooperating agencies and shall obtain comments as required in part 1503 of this subchapter. To the fullest extent practicable, the draft statement must meet the requirements established for final statements in section 102(2)(C) of NEPA and in the regulations in this subchapter. If the agency determines that a draft statement is so inadequate as to preclude meaningful analysis, the agency shall prepare and publish a supplemental draft of the appropriate portion. At appropriate points in the draft statement, the agency shall discuss all major points of view on the

environmental effects of the alternatives, including the proposed action.

(c) *Final environmental impact statements.* Final environmental impact statements shall consider and respond to comments as required in part 1503 of this subchapter. At appropriate points in the final statement, the agency shall discuss any responsible opposing view that was not adequately discussed in the draft statement and shall indicate the agency's response to the issues raised.

(d) *Supplemental environmental impact statements.* Agencies:

(1) Shall prepare supplements to either draft or final environmental impact statements if a major Federal action is incomplete or ongoing, and:

(i) The agency makes substantial changes to the proposed action that are relevant to environmental concerns; or

(ii) There are substantial new circumstances or information about the significance of adverse effects that bear on the analysis.

(2) May also prepare supplements when the agency determines that the purposes of the Act will be furthered by doing so.

(3) Shall prepare, publish, and file a supplement to an environmental impact statement (exclusive of scoping (§ 1502.4 of this subchapter)) as a draft and final environmental impact statement, as is appropriate to the stage of the environmental impact statement involved, unless the Council approves alternative arrangements (§ 1506.11 of this subchapter).

(e) *Reevaluation.* An agency may reevaluate an environmental impact statement to determine that the agency does need to prepare a supplement under paragraph (d) of this section. The agency should document its finding consistent with its agency NEPA procedures (§ 1507.3 of this subchapter), or, if necessary, prepare a supplemental environmental assessment and finding of no significant impact.

### § 1502.10 Recommended format.

(a) Agencies shall use a format for environmental impact statements that will encourage good analysis and clear presentation of the alternatives, including the proposed action. Agencies should use the following standard format for environmental impact statements unless the agency determines that there is a more effective format for communication:

(1) Cover (§ 1502.11);

(2) Summary (§ 1502.12);

(3) Table of contents;

(4) Purpose of and need for action (§ 1502.13);

AR_0028884

(5) Alternatives including the proposed action (sections 102(2)(C)(iii) and 102(2)(H) of NEPA) (§ 1502.14);

(6) Affected environment and environmental consequences (especially sections 102(2)(C)(i), (ii), (iv), and (v) of NEPA) (§§ 1502.15 and 1502.16); and

(7) Appendices (§ 1502.19), including the summary of scoping information (§ 1502.17) and the list of preparers (§ 1502.18).

(b) If an agency uses a different format, it shall include paragraph (a) of this section, as further described in §§ 1502.11 through 1502.19, in any appropriate format.

### § 1502.11  Cover.

The environmental impact statement cover shall not exceed one page and shall include:

(a) A list of the lead, joint lead, and, to the extent feasible, any cooperating agencies;

(b) The title of the proposed action that is the subject of the statement (and, if appropriate, the titles of related cooperating agency actions), together with the State(s) and county(ies) (or other jurisdiction(s), if applicable) where the action is located;

(c) The name, address, and telephone number of the person at the agency who can supply further information;

(d) A designation of the statement as a draft, final, or draft or final supplement;

(e) A one-paragraph abstract of the statement;

(f) The date by which the agency must receive comments (computed in cooperation with the Environmental Protection Agency under § 1506.10 of this subchapter); and

(g) The identification number included in the notice of intent (§ 1502.4(e)(10)).

### § 1502.12  Summary.

Each environmental impact statement shall contain a summary that adequately and accurately summarizes the statement. The summary shall include the major conclusions and summarize any disputed issues raised by agencies and the public, any issues to be resolved, and key differences among alternatives, and identify the environmentally preferable alternative or alternatives. Agencies shall write the summary in plain language and should use, as relevant, appropriate visual aids and charts. The summary normally should not exceed 15 pages.

### § 1502.13  Purpose and need.

The environmental impact statement shall include a statement that briefly summarizes the underlying purpose and need for the proposed agency action.

### § 1502.14  Alternatives including the proposed action.

The alternatives section is the heart of the environmental impact statement. The alternatives section should identify the reasonably foreseeable environmental effects of the proposed action and the alternatives in comparative form based on the information and analysis presented in the sections on the affected environment (§ 1502.15) and the environmental consequences (§ 1502.16). In doing so, the analysis should sharply define the issues for the decision maker and the public and provide a clear basis for choice among options. In this section, agencies shall:

(a) Rigorously explore and objectively evaluate reasonable alternatives to the proposed action, and, for alternatives that the agency eliminated from detailed study, briefly discuss the reasons for their elimination. The agency need not consider every conceivable alternative to a proposed action; rather, it shall consider a reasonable range of alternatives that will foster informed decision making. Agencies also may include reasonable alternatives not within the jurisdiction of the lead agency.

(b) Discuss each alternative considered in detail, including the proposed action, so that reviewers may evaluate their comparative merits.

(c) Include the no action alternative.

(d) Identify the agency's preferred alternative or alternatives, if one or more exists, in the draft statement and identify such alternative in the final statement unless another law prohibits the expression of such a preference.

(e) Include appropriate mitigation measures not already included in the proposed action or alternatives.

(f) Identify the environmentally preferable alternative or alternatives amongst the alternatives considered in the environmental impact statement. The environmentally preferable alternative will best promote the national environmental policy expressed in section 101 of NEPA by maximizing environmental benefits, such as addressing climate change-related effects or disproportionate and adverse effects on communities with environmental justice concerns; protecting, preserving, or enhancing historic, cultural, Tribal, and natural resources, including rights of Tribal Nations that have been reserved through treaties, statutes, or Executive Orders; or causing the least damage to the biological and physical environment. The environmentally preferable alternative may be the proposed action, the no action alternative, or a reasonable alternative.

### § 1502.15  Affected environment.

(a) The environmental impact statement shall succinctly describe the environment of the area(s) to be affected by the alternatives under consideration, including the reasonably foreseeable environmental trends and planned actions in the area(s).

(b) Agencies shall use high-quality information, including reliable data and resources, models, and Indigenous Knowledge, to describe reasonably foreseeable environmental trends, including anticipated climate-related changes to the environment, and when such information is incomplete or unavailable, provide reasonable foreseeable environmental trends, including existing environmental conditions, reasonably foreseeable trends, and planned actions in the area, should inform the agency's analysis of environmental consequences and mitigation measures (§ 1502.16).

(c) The environmental impact statement may combine the description of the affected environment with evaluation of the environmental consequences (§ 1502.16). The description should be no longer than necessary to understand the relevant affected environment and the effects of the alternatives. Data and analyses in a statement shall be commensurate with the importance of the effect, with less important material summarized, consolidated, or simply referenced. Agencies shall avoid useless bulk in statements and shall concentrate effort and attention on important issues. Verbose descriptions of the affected environment are themselves no measure of the adequacy of an environmental impact statement.

### § 1502.16  Environmental consequences.

(a) The environmental consequences section forms the scientific and analytic basis for the comparisons under § 1502.14. It shall consolidate the discussions of those elements required by sections 102(2)(C)(i), (ii), (iv), and (v) of NEPA that are within the scope of the environmental impact statement and as much of section 102(2)(C)(iii) of NEPA as is necessary to support the comparisons. The comparison of the proposed action and reasonable alternatives shall be based on the discussion of their reasonably foreseeable effects and the significance of those effects (§ 1501.3 of this subchapter), focusing on the significant or important effects. The no action alternative should serve as the baseline

against which the proposed action and other alternatives are compared. This section should not duplicate discussions required by § 1502.14 and shall include an analysis of:

(1) Any adverse environmental effects that cannot be avoided should the proposal be implemented.

(2) The effects of the no action alternative, including any adverse environmental effects;

(3) The relationship between short-term uses of the human environment and the maintenance and enhancement of long-term productivity;

(4) Any irreversible or irretrievable commitments of Federal resources that would be involved in the proposal should it be implemented;

(5) Where applicable, possible conflicts between the proposed action and the objectives of Federal, regional, State, Tribal, and local plans, policies, and controls for the area concerned, including those addressing climate change (§ 1506.2(d) of this subchapter);

(6) Where applicable, climate change-related effects, including, where feasible, quantification of greenhouse gas emissions, from the proposed action and alternatives and the effects of climate change on the proposed action and alternatives;

(7) Where applicable, energy requirements and conservation potential of various alternatives and mitigation measures;

(8) Where applicable, natural or depletable resource requirements and conservation potential of various alternatives and mitigation measures;

(9) Where applicable, relevant risk reduction, resiliency, or adaptation measures incorporated into the proposed action or alternatives, informed by relevant science and data on the affected environment and expected future conditions;

(10) Where applicable, urban quality, historic and cultural resources, and the design of the built environment, including the reuse and conservation potential of various alternatives and mitigation measures;

(11) Means to mitigate adverse environmental effects (if not fully covered under § 1502.14(e));

(12) Where applicable, economic and technical considerations, including the economic benefits of the proposed action; and

(13) Where applicable, disproportionate and adverse human health and environmental effects on communities with environmental justice concerns.

(b) Economic or social effects by themselves do not require preparation of an environmental impact statement.

However, when the agency determines that economic or social and natural or physical environmental effects are interrelated, the environmental impact statement shall discuss these effects on the human environment.

### § 1502.17   Summary of scoping information.

(a) The draft environmental impact statement or appendix shall include a summary of information, including alternatives and analyses, submitted by commenters during the scoping process for consideration by the lead and cooperating agencies in their development of the environmental impact statement.

(b) The agency shall append to the draft environmental impact statement or publish all comments (or summaries thereof where the response has been exceptionally voluminous) received during the scoping process.

### § 1502.18   List of preparers.

The environmental impact statement shall list the names, together with their qualifications (expertise, experience, professional disciplines), of the persons who were primarily responsible for preparing the environmental impact statement or important background papers, including basic components of the statement. Where possible, the environmental impact statement shall identify the persons who are responsible for a particular analysis, including analyses in background papers. Normally the list will not exceed two pages.

### § 1502.19   Appendix.

If an agency prepares an appendix, the agency shall publish it with the environmental impact statement, and it shall consist of, as appropriate:

(a) Material prepared in connection with an environmental impact statement (as distinct from material that is not so prepared and is incorporated by reference (§ 1501.12 of this subchapter));

(b) Material substantiating any analysis fundamental to the impact statement.

(c) Material relevant to the decision to be made.

(d) For draft environmental impact statements, all comments (or summaries thereof where the response has been exceptionally voluminous) received during the scoping process that identified information for the agency's consideration.

(e) For final environmental impact statements, the comment summaries and responses consistent with § 1503.4 of this chapter.

### § 1502.20   Publication of the environmental impact statement.

Agencies shall publish the entire draft and final environmental impact statements and unchanged statements as provided in § 1503.4(c) of this subchapter. The agency shall transmit the entire statement electronically (or in paper copy, if requested due to economic or other hardship) to:

(a) Any Federal agency that has jurisdiction by law or special expertise with respect to any environmental impact involved and any appropriate Federal, State, Tribal, or local agency authorized to develop and enforce environmental standards.

(b) The applicant, if any.

(c) Any person, organization, or agency requesting the entire environmental impact statement.

(d) In the case of a final environmental impact statement, any person, organization, or agency that submitted substantive comments on the draft.

### § 1502.21   Incomplete or unavailable information.

(a) When an agency is evaluating reasonably foreseeable significant effects on the human environment in an environmental impact statement, and there is incomplete or unavailable information, the agency shall make clear that such information is lacking.

(b) If the incomplete information relevant to reasonably foreseeable significant effects is essential to a reasoned choice among alternatives, and the overall costs of obtaining it are not unreasonable, the agency shall include the information in the environmental impact statement.

(c) If the information relevant to reasonably foreseeable significant effects cannot be obtained because the overall costs of obtaining it are unreasonable or the means to obtain it are not known, the agency shall include within the environmental impact statement:

(1) A statement that such information is incomplete or unavailable;

(2) A statement of the relevance of the incomplete or unavailable information to evaluating reasonably foreseeable significant effects on the human environment;

(3) A summary of existing credible scientific evidence that is relevant to evaluating the reasonably foreseeable significant effects on the human environment; and

(4) The agency's evaluation of such effects based upon theoretical approaches or research methods generally accepted in the scientific community.

(d) For the purposes of this section, "reasonably foreseeable" includes

effects that have catastrophic consequences, even if their probability of occurrence is low, provided that the analysis of the effects is supported by credible scientific evidence, is not based on pure conjecture, and is within the rule of reason.

### § 1502.22   Cost-benefit analysis.

If an agency is considering a cost-benefit analysis for the proposed action relevant to the choice among alternatives with different environmental effects, the agency shall incorporate the cost-benefit analysis by reference or append it to the statement as an aid in evaluating the environmental consequences. In such cases, to assess the adequacy of compliance with section 102(2)(B) of NEPA (ensuring appropriate consideration of unquantified environmental amenities and values in decision making, along with economical and technical considerations), the statement shall discuss the relationship between that analysis and any analyses of unquantified environmental impacts, values, and amenities. For purposes of complying with the Act, agencies need not display the weighing of the merits and drawbacks of the various alternatives in a monetary cost-benefit analysis and should not do so when there are important qualitative considerations. However, an environmental impact statement should at least indicate those considerations, including factors not related to environmental quality, that are likely to be important and important to a decision.

### § 1502.23   [Reserved]

### § 1502.24   Environmental review and consultation requirements.

(a) To the fullest extent possible, agencies shall prepare draft environmental impact statements concurrent and integrated with environmental impact analyses and related surveys and studies required by all other Federal environmental review laws and Executive orders applicable to the proposed action, including the Fish and Wildlife Coordination Act (16 U.S.C. 661 *et seq.*), the National Historic Preservation Act of 1966 (54 U.S.C. 300101 *et seq.*), and the Endangered Species Act of 1973 (16 U.S.C. 1531 *et seq.*).

(b) The draft environmental impact statement shall list all Federal permits, licenses, and other authorizations that must be obtained in implementing the proposal. If it is uncertain whether a Federal permit, license, or other authorization is necessary, the draft environmental impact statement shall so indicate.

## PART 1503—COMMENTING ON ENVIRONMENTAL IMPACT STATEMENTS

Sec.
1503.1   Inviting comments and requesting information and analyses.
1503.2   Duty to comment.
1503.3   Specificity of comments and information.
1503.4   Response to comments.

**Authority:** 42 U.S.C. 4321–4347; 42 U.S.C. 4371–4375; 42 U.S.C. 7609; and E.O. 11514, 35 FR 4247, 3 CFR, 1966–1970, Comp., p. 902, as amended by E.O. 11991, 42 FR 26967, 3 CFR, 1977 Comp., p. 123.

### § 1503.1   Inviting comments and requesting information and analyses.

(a) After preparing a draft environmental impact statement and before preparing a final environmental impact statement the agency shall:

(1) Obtain the comments of any Federal agency that has jurisdiction by law or special expertise with respect to any environmental impact involved or is authorized to develop and enforce environmental standards; and

(2) Request the comments of:

(i) Appropriate State, Tribal, and local agencies that are authorized to develop and enforce environmental standards;

(ii) State, Tribal, or local governments that may be affected by the proposed action;

(iii) Any agency that has requested it receive statements on actions of the kind proposed;

(iv) The applicant, if any; and

(v) The public, affirmatively soliciting comments in a manner designed to inform those persons or organizations who may be interested in or affected by the proposed action.

(b) An agency may request comments on a final environmental impact statement before the final decision and set a deadline for providing such comments. Other agencies or persons may make comments consistent with the time periods under § 1506.10 of this subchapter.

(c) An agency shall provide for electronic submission of public comments, with reasonable measures to ensure the comment process is accessible to affected persons.

### § 1503.2   Duty to comment.

Cooperating agencies and agencies that are authorized to develop and enforce environmental standards shall comment on environmental impact statements within their jurisdiction, expertise, or authority within the time period specified for comment in § 1506.10 of this subchapter. A Federal agency may reply that it has no comment. If a cooperating agency is satisfied that the environmental impact statement adequately reflects its views, it should reply that it has no comment.

### § 1503.3   Specificity of comments and information.

(a) To promote informed decision making, comments on an environmental impact statement or on a proposed action shall be as specific as possible, and may address either the adequacy of the statement or the merits of the alternatives discussed or both. Comments should explain why the issues raised are important to the consideration of potential environmental effects and alternatives to the proposed action. Where possible, comments should reference the corresponding section or page number of the draft environmental impact statement, propose specific changes to those parts of the statement, and describe any data, sources, or methodologies that support the proposed changes.

(b) When a participating agency criticizes a lead agency's predictive methodology, the participating agency should describe the alternative methodology that it prefers and why.

(c) A cooperating agency shall specify in its comments whether it needs additional information to fulfill other applicable environmental review or consultation requirements and what information it needs. In particular, it shall specify any additional information it needs to comment adequately on the draft statement's analysis of significant effects associated with the granting or approving by that cooperating agency of necessary Federal permits, licenses, or authorizations.

(d) A cooperating agency with jurisdiction by law shall specify mitigation measures it considers necessary to allow the agency to grant or approve applicable authorizations or concurrences and cite to its applicable statutory authority.

### § 1503.4   Response to comments.

(a) An agency preparing a final environmental impact statement shall consider substantive comments timely submitted during the public comment period. The agency shall respond to individual comments or groups of comments. In the final environmental impact statement, the agency may respond by:

(1) Modifying alternatives including the proposed action;

(2) Developing and evaluating alternatives not previously given serious consideration by the agency;

(3) Supplementing, improving, or modifying its analyses;

(4) Making factual corrections; or

(5) Explaining why the comments do not warrant further agency response, recognizing that agencies are not required to respond to each comment.

(b) An agency shall append or otherwise publish all substantive comments received on the draft statement (or summaries thereof where the response has been exceptionally voluminous).

(c) If changes in response to comments are minor and are confined to the responses described in paragraphs (a)(4) and (5) of this section, an agency may write any changes on errata sheets and attach the responses to the statement instead of rewriting the draft statement. In such cases, the agency shall publish the final statement (§ 1502.20 of this subchapter), which includes the errata sheet, a copy of the draft statement, the comments, and the responses to those comments. The agency shall file the final statement with the Environmental Protection Agency (§ 1506.10 of this subchapter).

## PART 1504—DISPUTE RESOLUTION AND PRE-DECISIONAL REFERRALS

Sec.
1504.1   Purpose.
1504.2   Early dispute resolution.
1504.3   Criteria and procedure for referrals and response.

**Authority:** 42 U.S.C. 4321–4347; 42 U.S.C. 4371–4375; 42 U.S.C. 7609; and E.O. 11514, 35 FR 4247, 3 CFR, 1966–1970, Comp., p. 902, as amended by E.O. 11991, 42 FR 26967, 3 CFR, 1977 Comp., p. 123.

### § 1504.1   Purpose.

(a) This part establishes procedures for referring to the Council Federal interagency disagreements concerning proposed major Federal actions that might cause unsatisfactory environmental effects. It provides means for early resolution of such disagreements, and encourages Federal agencies to engage with each other as early as practicable to resolve interagency disagreements concerning proposed major Federal actions before referring disputes to the Council. This part also establishes procedures for Federal agencies to submit a request to the Council to provide informal dispute resolution on NEPA issues.

(b) Section 309 of the Clean Air Act (42 U.S.C. 7609) directs the Administrator of the Environmental Protection Agency to review and comment publicly on the environmental impacts of Federal activities, including actions for which agencies prepare environmental impact statements. If, after this review, the Administrator determines that the matter is

"unsatisfactory from the standpoint of public health or welfare or environmental quality," section 309 directs that the matter be referred to the Council.

(c) Under section 102(2)(C) of NEPA (42 U.S.C. 4332(2)(C)), other Federal agencies may prepare reviews of environmental impact statements, including judgments on the acceptability of anticipated environmental impacts. These agencies must make these reviews available to the President, the Council, and the public.

### § 1504.2   Early dispute resolution.

(a) Federal agencies should engage in interagency coordination and collaboration in their planning and decision-making processes and should identify and resolve disputes concerning proposed major Federal actions early in the NEPA process. To the extent practicable, agencies should elevate issues to appropriate agency officials or the Council in a timely manner that will accommodate schedules consistent with § 1501.10 of this subchapter.

(b) A Federal agency may request that the Council engage in informal dispute resolution to provide recommendations on how to resolve an interagency dispute concerning an environmental review. In making the request, the agency shall provide the Council with a summary of the proposed action, information on the disputed issues, and agency points of contact.

(c) In response to a request for informal dispute resolution, the Council may request additional information, provide non-binding recommendations, convene meetings of those agency decision makers necessary to resolve disputes, or determine that informal dispute resolution is unhelpful or inappropriate.

### § 1504.3   Criteria and procedure for referrals and response.

(a) Federal agencies should make environmental referrals to the Council only after concerted, timely (as early as practicable in the process), but unsuccessful attempts to resolve differences with the lead agency. In determining what environmental objections to the matter are appropriate to refer to the Council, an agency should weigh potential adverse environmental effects, considering:

(1) Possible violation of national environmental standards or policies;

(2) Severity;

(3) Geographical scope;

(4) Duration;

(5) Importance as precedents;

(6) Availability of environmentally preferable alternatives;

(7) Economic and technical considerations, including the economic costs of delaying or impeding the decision making of the agencies involved in the action; and

(8) Other appropriate considerations.

(b) A Federal agency making the referral to the Council shall:

(1) Notify the lead agency at the earliest possible time that it intends to refer a matter to the Council unless a satisfactory agreement is reached;

(2) Include such a notification whenever practicable in the referring agency's comments on the environmental assessment or draft environmental impact statement;

(3) Identify any essential information that is lacking and request that the lead agency make it available at the earliest possible time; and

(4) Send copies of the referring agency's views to the Council.

(c) The referring agency shall deliver its referral to the Council no later than 25 days after the lead agency has made the final environmental impact statement available to the Environmental Protection Agency, participating agencies, and the public, and in the case of an environmental assessment, no later than 25 days after the lead agency makes it available. Except when the lead agency grants an extension of this period, the Council will not accept a referral after that date.

(d) The referral shall consist of:

(1) A copy of the letter signed by the head of the referring agency and delivered to the lead agency informing the lead agency of the referral and the reasons for it; and

(2) A statement supported by factual evidence leading to the conclusion that the matter is unsatisfactory from the standpoint of public health or welfare or environmental quality. The statement shall:

(i) Identify any disputed material facts and incorporate (by reference if appropriate) agreed upon facts;

(ii) Identify any existing environmental requirements or policies that would be violated by the matter;

(iii) Present the reasons for the referral;

(iv) Contain a finding by the agency whether the issue raised is of national importance because of the threat to national environmental resources or policies or for some other reason;

(v) Review the steps taken by the referring agency to bring its concerns to the attention of the lead agency at the earliest possible time; and

(vi) Give the referring agency's recommendations as to what mitigation

AR_0028888

alternative, further study, or other course of action (including abandonment of the matter) are necessary to remedy the situation.

(e) No later than 25 days after the referral to the Council, the lead agency may deliver a response to the Council and the referring agency. If the lead agency requests more time and gives assurance that the matter will not go forward in the interim, the Council may grant an extension. The response shall:

(1) Address fully the issues raised in the referral;

(2) Be supported by evidence and explanations, as appropriate; and

(3) Give the lead agency's response to the referring agency's recommendations.

(f) Applicants or other interested persons may provide views in writing to the Council no later than the response.

(g) No later than 25 days after receipt of both the referral and any response or upon being informed that there will be no response (unless the lead agency agrees to a longer time), the Council may take one or more of the following actions:

(1) Conclude that the process of referral and response has successfully resolved the problem.

(2) Initiate discussions with the agencies with the objective of mediation with referring and lead agencies.

(3) Obtain additional views and information, including through public meetings or hearings.

(4) Determine that the issue is not one of national importance and request the referring and lead agencies to pursue their decision process.

(5) Determine that the referring and lead agencies should further negotiate the issue, and the issue is not appropriate for Council consideration until one or more heads of the agencies' report to the Council that the agencies' disagreements are irreconcilable.

(6) Publish its findings and recommendations (including, where appropriate, a finding that the submitted evidence does not support the position of an agency).

(7) When appropriate, submit the referral and its response together with the Council's recommendation to the President for action.

(h) The Council shall take no longer than 60 days to complete the actions specified in paragraph (g)(2), (3), or (5) of this section.

(i) The referral process is not intended to create any private rights of action or to be judicially reviewable because any voluntary resolutions by the agency parties do not represent final agency action and instead are only provisional and dependent on later consistent action by the action agencies.

## PART 1505—NEPA AND AGENCY DECISION MAKING

Sec.
1505.1  [Reserved]
1505.2  Record of decision in cases requiring environmental impact statements.
1505.3  Implementing the decision.

**Authority:** 42 U.S.C. 4321–4347; 42 U.S.C. 4371–4375; 42 U.S.C. 7609; and E.O. 11514, 35 FR 4247, 3 CFR, 1966–1970, Comp., p. 902, as amended by E.O. 11991, 42 FR 26967, 3 CFR, 1977 Comp., p. 123.

### § 1505.1  [Reserved]

### § 1505.2  Record of decision in cases requiring environmental impact statements.

At the time of its decision (§ 1506.10 of this subchapter) or, if appropriate, its recommendation to Congress, each agency shall prepare and timely publish a concise public record of decision or joint record of decision. The record, which each agency may integrate into any other record it prepares, shall:

(a) State the decision.

(b) Identify alternatives considered by the agency in reaching its decision. The agency also shall specify the environmentally preferable alternative or alternatives (§ 1502.14(f) of this subchapter). The agency may discuss preferences among alternatives based on relevant factors, including environmental, economic, and technical considerations and agency statutory missions. The agency shall identify and discuss all such factors, including any essential considerations of national policy, that the agency balanced in making its decision and state how those considerations entered into its decision.

(c) State whether the agency has adopted all practicable means to mitigate environmental harm from the alternative selected, and if not, why the agency did not. Mitigation shall be enforceable when the record of decision incorporates mitigation and the analysis of the reasonably foreseeable effects of the proposed action is based on implementation of that mitigation. The agency shall identify the authority for enforceable mitigation, such as through permit conditions, agreements, or other measures, and prepare a monitoring and compliance plan consistent with § 1505.3(c).

### § 1505.3  Implementing the decision.

(a) In addition to the requirements of paragraph (c) of this section, agencies may provide for monitoring to assure that their decisions are carried out and should do so in important cases. Mitigation (§ 1505.2(c)) and other conditions established in the environmental impact statement or during its review and committed as part

of the decision shall be implemented by the lead agency or other appropriate consenting agency. The agency shall:

(1) Include appropriate conditions in grants, permits, or other approvals; and

(2) Condition funding of actions on mitigation.

(b) The lead or cooperating agency should, where relevant and appropriate, incorporate into its decision mitigation measures that address or ameliorate significant human health and environmental effects of proposed Federal actions that disproportionately and adversely affect communities with environmental justice concerns.

(c) The lead or cooperating agency shall prepare and publish a monitoring and compliance plan for mitigation when:

(1) The analysis of the reasonably foreseeable effects of a proposed action in an environmental assessment or environmental impact statement is based on implementation of mitigation; and

(2) The agency incorporates the mitigation into a record of decision, finding of no significant impact, or separate decision document.

(d) The agency should tailor the contents of a monitoring and compliance plan required by paragraph (c) of this section to the complexity of the mitigation committed to and include:

(1) A basic description of the mitigation measure or measures;

(2) The parties responsible for monitoring and implementing the mitigation;

(3) If appropriate, how monitoring information will be made publicly available;

(4) The anticipated timeframe for implementing and completing mitigation;

(5) The standards for determining compliance with the mitigation and the consequences of non-compliance; and

(6) How the mitigation will be funded.

(e) If an action is incomplete or ongoing, an agency does not need to supplement its environmental impact statement (§ 1502.9(d) of this subchapter) or environmental assessment (§ 1501.5 of this subchapter) or revise its record of decision or finding of no significant impact or separate decision document based solely on new information developed through a monitoring and compliance plan required by paragraph (c) of this section. The ongoing implementation of a monitoring and compliance plan shall not be considered an incomplete or ongoing Federal action.

## PART 1506—OTHER REQUIREMENTS OF NEPA

Sec.
1506.1    Limitations on actions during NEPA process.
1506.2    Elimination of duplication with State, Tribal, and local procedures.
1506.3    Adoption.
1506.4    Combining documents.
1506.5    Agency responsibility for environmental documents.
1506.6    Methodology and scientific accuracy.
1506.7    Further guidance.
1506.8    Proposals for legislation.
1506.9    Filing requirements.
1506.10    Timing of agency action.
1506.11    Emergencies.
1506.12    Effective date.

**Authority:** 42 U.S.C. 4321–4347; 42 U.S.C. 4371–4375; 42 U.S.C. 7609; and E.O. 11514, 35 FR 4247, 3 CFR, 1966–1970, Comp., p. 902, as amended by E.O. 11991, 42 FR 26967, 3 CFR, 1977 Comp., p. 123.

### § 1506.1    Limitations on actions during NEPA process.

(a) Except as provided in paragraphs (b) and (c) of this section, until an agency issues a finding of no significant impact, as provided in § 1501.6 of this subchapter, or record of decision, as provided in § 1505.2 of this subchapter, no action concerning the proposal may be taken that would:

(1) Have an adverse environmental effect; or

(2) Limit the choice of reasonable alternatives.

(b) If an agency is considering an application from an applicant and is aware that the applicant is about to take an action within the agency's jurisdiction that would meet either of the criteria in paragraph (a) of this section, then the agency shall promptly notify the applicant that the agency will take appropriate action to ensure that the objectives and procedures of NEPA are achieved. This section does not preclude development by applicants of plans or designs or performance of other activities necessary to support an application for Federal, State, Tribal, or local permits or assistance. An agency considering a proposed action for Federal funding may authorize such activities, including, but not limited to, acquisition of interests in land (*e.g.*, fee simple, rights-of-way, and conservation easements), purchase of long lead-time equipment, and purchase options made by applicants, if the agency determines that such activities would not limit the choice of reasonable alternatives and notifies the applicant that the agency retains discretion to select any reasonable alternative or the no action alternative regardless of any activity

taken by the applicant prior to the conclusion of the NEPA process.

(c) While work on a required environmental review for a program is in progress and an action is not covered by an existing environmental document, agencies shall not undertake in the interim any major Federal action covered by the program that may significantly affect the quality of the human environment unless such action:

(1) Is justified independently of the program;

(2) Is itself accompanied by an adequate environmental review; and

(3) Will not prejudice the ultimate decision on the program. Interim action prejudices the ultimate decision on the program when it tends to determine subsequent development or limit alternatives.

### § 1506.2    Elimination of duplication with State, Tribal, and local procedures.

(a) Federal agencies are authorized to cooperate with State, Tribal, and local agencies that are responsible for preparing environmental documents, including those prepared pursuant to section 102(2)(G) of NEPA.

(b) To the fullest extent practicable unless specifically prohibited by law, agencies shall cooperate with State, Tribal, and local agencies to reduce duplication between NEPA and State, Tribal, and local requirements, including through use of studies, analyses, and decisions developed by State, Tribal, or local agencies. Except for cases covered by paragraph (a) of this section, such cooperation shall include, to the fullest extent practicable:

(1) Joint planning processes.

(2) Joint environmental research and studies.

(3) Joint public hearings (except where otherwise provided by statute).

(4) Joint environmental assessments.

(c) To the fullest extent practicable unless specifically prohibited by law, agencies shall cooperate with State, Tribal, and local agencies to reduce duplication between NEPA and comparable State, Tribal, and local requirements. Such cooperation shall include, to the fullest extent practicable, joint environmental impact statements. In such cases, one or more Federal agencies and one or more State, Tribal, or local agencies shall be joint lead agencies. Where State or Tribal laws or local ordinances have environmental impact statement or similar requirements in addition to but not in conflict with those in NEPA, Federal agencies may cooperate in fulfilling these requirements, as well as those of Federal laws, so that one document will comply with all applicable laws.

(d) To better integrate environmental impact statements into State, Tribal, or local planning processes, environmental impact statements shall discuss any inconsistency of a proposed action with any approved State, Tribal, or local plan or law (whether or not federally sanctioned). Where an inconsistency exists, the statement should describe the extent to which the agency would reconcile its proposed action with the plan or law. While the statement should discuss any inconsistencies, NEPA does not require reconciliation.

### § 1506.3    Adoption.

(a) *Generally.* An agency may adopt a draft or final environmental impact statement, environmental assessment, or portion thereof, or categorical exclusion determination, consistent with this section.

(b) *Environmental impact statements.* An agency may adopt another agency's draft or final environmental impact statement, or portion thereof, provided that the adopting agency conducts an independent review of the statement and concludes that it meets the standards for an adequate statement, pursuant to the regulations in this subchapter and the adopting agency's NEPA procedures.

(1) If the actions covered by the original environmental impact statement and the proposed action are substantially the same, the adopting agency shall republish and file it as a final statement consistent with § 1506.9. If the actions are not substantially the same or the adopting agency determines that the statement may require supplementation consistent with § 1502.9 of this subchapter, the adopting agency shall treat the statement as a draft, supplement or reevaluate it as necessary, and republish and file it, consistent with § 1506.9.

(2) Notwithstanding paragraph (b)(1) of this section, if a cooperating agency does not issue a record of decision jointly or concurrently consistent with § 1505.2 of this subchapter, a cooperating agency may issue a record of decision adopting the environmental impact statement of a lead agency without republication.

(c) *Environmental assessments.* An agency may adopt another agency's environmental assessment, or portion thereof, if the actions covered by the original environmental assessment and the proposed action are substantially the same, and the assessment meets the standards for an adequate environmental assessment under the regulations in this subchapter and the adopting agency's NEPA procedures. If the actions are not substantially the

same or the adopting agency determines that the environmental assessment may require supplementation consistent with § 1501.5(h) of this subchapter, the adopting agency may adopt and supplement or reevaluate the environmental assessment as necessary, issue its finding of no significant impact, and provide notice consistent with § 1501.6 of this subchapter.

(d) *Categorical exclusion determinations.* An agency may adopt another agency's determination that a categorical exclusion applies to a particular proposed action if the action covered by that determination and the adopting agency's proposed action are substantially the same. In such circumstances, the adopting agency shall:

(1) Document its adoption, including the determination that its proposed action is substantially the same as the action covered by the original categorical exclusion determination and that there are no extraordinary circumstances present that require the preparation of an environmental assessment or environmental impact statement; and

(2) Publish its adoption determination on an agency website or otherwise make it publicly available.

(e) *Identification of certain circumstances.* The adopting agency shall specify if one of the following circumstances is present:

(1) The agency is adopting an environmental assessment or environmental impact statement that is not final within the agency that prepared it.

(2) The action assessed in the environmental assessment or environmental impact statement is the subject of a referral under part 1504 of this subchapter.

(3) The environmental assessment or environmental impact statement's adequacy is the subject of a judicial action that is not final.

**§ 1506.4  Combining documents.**

Agencies should combine, to the fullest extent practicable, any environmental document with any other agency document to reduce duplication and paperwork.

**§ 1506.5  Agency responsibility for environmental documents.**

(a) *Agency responsibility.* The agency is responsible for the accuracy, scope (§ 1501.3(b) of this subchapter), and content of environmental documents and shall ensure they are prepared with professional and scientific integrity, using reliable data and resources, regardless of whether they are prepared

by the agency or a contractor under the supervision and direction of the agency or by the applicant under procedures the agency adopts pursuant to section 107(f) of NEPA and § 1507.3(c)(12) of this subchapter. The agency shall exercise its independent judgment and briefly document its determination that an environmental document meets the standards under NEPA, the regulations in this subchapter, and the agency's NEPA procedures.

(b) *Applicant-provided information.* An agency may require an applicant to submit environmental information for possible use by the agency in preparing an environmental document.

(1) The agency should assist the applicant by outlining the types of information required for the preparation of environmental documents.

(2) The agency shall independently evaluate the information submitted by the applicant and, to the extent it is integrated into the environmental document, shall be responsible for its accuracy, scope, and contents.

(3) An agency may allow an applicant to prepare environmental assessments and environmental impact statements pursuant to its agency procedures, consistent with section 107(f) of NEPA and § 1507.3(c)(12) of this subchapter.

(c) *Agency-directed contractor.* An agency may authorize a contractor to prepare an environmental document under the supervision and direction of the agency.

(1) The agency shall provide guidance to the contractor and participate in and supervise the environmental document's preparation.

(2) The agency shall independently evaluate the environmental document prepared by the agency-directed contractor, shall be responsible for its accuracy, scope, and contents, and document the agency's evaluation in the environmental document.

(3) The agency shall include in the environmental document the names and qualifications of the persons preparing environmental documents, and conducting the independent evaluation of any information submitted or environmental documents prepared by a contractor, such as in the list of preparers for environmental impact statements (§ 1502.18 of this subchapter). It is the intent of this paragraph (c)(3) that acceptable work not be redone, but that it be verified by the agency.

(4) The lead agency or, where appropriate, a cooperating agency shall prepare a disclosure statement for the contractor's execution specifying that the contractor has no financial or other interest in the outcome of the action.

Such statement need not include privileged or confidential trade secrets or other confidential business information.

(d) *Information generally.* Nothing in this section is intended to prohibit an agency from requesting any person, including the applicant, to submit information to it or to prohibit any person from submitting information to an agency for use in preparing environmental documents.

**§ 1506.6  Methodology and scientific accuracy.**

(a) Agencies shall ensure the professional integrity, including scientific integrity, of the discussions and analyses in environmental documents.

(b) In preparing environmental documents, agencies shall use high-quality information, including reliable data and resources, models, and Indigenous Knowledge. Agencies may rely on existing information as well as information obtained to inform the analysis. Agencies may use any reliable data sources, such as remotely gathered information or statistical models. Agencies shall explain any relevant assumptions or limitations of the information or the particular model or methodology selected for use.

(c) Agencies shall identify any methodologies used and shall make explicit reference to the scientific and other sources relied upon for conclusions in the environmental document. Agencies may place discussion of methodology in an appendix.

(d) Where appropriate, agencies shall use projections when evaluating the reasonably foreseeable effects, including climate change-related effects. Such projections may employ mathematical or other models that project a range of possible future outcomes, so long as agencies disclose the relevant assumptions or limitations.

**§ 1506.7  Further guidance.**

(a) The Council may provide further guidance concerning NEPA and its procedures.

(b) To the extent that Council guidance issued prior to July 1, 2024 is in conflict with this subchapter, the provisions of this subchapter apply.

**§ 1506.8  Proposals for legislation.**

(a) When developing legislation, agencies shall integrate the NEPA process for proposals for legislation significantly affecting the quality of the human environment with the legislative process of the Congress. Technical drafting assistance does not by itself

constitute a legislative proposal. Only the agency that has primary responsibility for the subject matter involved will prepare a legislative environmental impact statement.

(b) A legislative environmental impact statement is the detailed statement required by law to be included in an agency's recommendation or report on a legislative proposal to Congress. A legislative environmental impact statement shall be considered part of the formal transmittal of a legislative proposal to Congress; however, it may be transmitted to Congress up to 30 days later to allow time for completion of an accurate statement that can serve as the basis for public and Congressional debate. The statement must be available in time for Congressional hearings and deliberations.

(c) Preparation of a legislative environmental impact statement shall conform to the requirements of the regulations in this subchapter, except as follows:

(1) There need not be a scoping process.

(2) Agencies shall prepare the legislative statement in the same manner as a draft environmental impact statement and need not prepare a final statement unless any of the following conditions exist. In such cases, the agency shall prepare and publish the statements consistent with §§ 1503.1 of this subchapter and 1506.10:

(i) A Congressional committee with jurisdiction over the proposal has a rule requiring both draft and final environmental impact statements.

(ii) The proposal results from a study process required by statute (such as those required by the Wild and Scenic Rivers Act (16 U.S.C. 1271 *et seq.*)).

(iii) Legislative approval is sought for Federal or federally assisted construction or other projects that the agency recommends be located at specific geographic locations. For proposals requiring an environmental impact statement for the acquisition of space by the General Services Administration, a draft statement shall accompany the Prospectus or the 11(b) Report of Building Project Surveys to the Congress, and a final statement shall be completed before site acquisition.

(iv) The agency decides to prepare draft and final statements.

(d) Comments on the legislative statement shall be given to the lead agency, which shall forward them along with its own responses to the Congressional committees with jurisdiction.

## § 1506.9   Filing requirements.

(a) Agencies shall file environmental impact statements together with comments and responses with the Environmental Protection Agency, Office of Federal Activities, consistent with the Environmental Protection Agency's procedures.

(b) Agencies shall file statements with the Environmental Protection Agency no earlier than they are also transmitted to participating agencies and made available to the public. The Environmental Protection Agency may issue guidelines to agencies to implement its responsibilities under this section and § 1506.10.

(c) Agencies shall file an adoption of an environmental impact statement with the Environmental Protection Agency (see § 1506.3(b)(1)).

## § 1506.10   Timing of agency action.

(a) The Environmental Protection Agency shall publish a notice in the **Federal Register** each week of the environmental impact statements filed since its prior notice. The minimum time periods set forth in this section are calculated from the date of publication of this notice.

(b) Unless otherwise provided by law, including statutory provisions for combining a final environmental impact statement and record of decision, Federal agencies shall not make or issue a record of decision under § 1505.2 of this subchapter for the proposed action until the later of the following dates:

(1) 90 days after publication of the notice described in paragraph (a) of this section for a draft environmental impact statement.

(2) 30 days after publication of the notice described in paragraph (a) of this section for a final environmental impact statement.

(c) An agency may make an exception to the rule on timing set forth in paragraph (b) of this section for a proposed action in the following circumstances:

(1) Some agencies have formally established administrative review processes (*e.g.*, appeals, objections, protests), which may be initiated prior to or after filing and publication of the final environmental impact statement with the Environmental Protection Agency, that allow other agencies or the public to raise issues about a decision and make their views known. In such cases where a real opportunity exists to alter the decision, the agency may make and record the decision at the same time it publishes the environmental impact statement. This means that the period for administrative review of the decision and the 30-day period set forth in

paragraph (b)(2) of this section may run concurrently. In such cases, the environmental impact statement shall explain the timing and the public's right of administrative review and provide notification consistent with § 1506.9; or

(2) An agency engaged in rulemaking under the Administrative Procedure Act or other statute for the purpose of protecting the public health or safety may waive the time period in paragraph (b)(2) of this section, publish a decision on the final rule simultaneously with publication of the notice of the availability of the final environmental impact statement, and provide notification consistent with § 1506.9, as described in paragraph (a) of this section.

(d) If an agency files the final environmental impact statement within 90 days of the filing of the draft environmental impact statement with the Environmental Protection Agency, the minimum 30-day and 90-day periods may run concurrently. However, subject to paragraph (e) of this section, agencies shall allow at least 45 days for comments on draft statements.

(e) The lead agency may extend the minimum periods in paragraph (b) of this section and provide notification consistent with § 1506.9. Upon a showing by the lead agency of compelling reasons of national policy, the Environmental Protection Agency may reduce the minimum periods and, upon a showing by any other Federal agency of compelling reasons of national policy, also may extend the minimum periods, but only after consultation with the lead agency. The lead agency may modify the minimum periods when necessary to comply with other specific statutory requirements (§ 1507.3(d)(4) of this subchapter). Failure to file timely comments shall not be a sufficient reason for extending a period. If the lead agency does not concur with the extension of time, the Environmental Protection Agency may not extend it for more than 30 days. When the Environmental Protection Agency reduces or extends any period it shall notify the Council.

## § 1506.11   Emergencies.

Where emergency circumstances make it necessary to take an action with significant effects without observing the provisions of the regulations in this subchapter, the Federal agency taking the action shall consult with the Council about alternative arrangements for compliance with section 102(2)(C) of NEPA. Agencies and the Council shall limit such arrangements to actions necessary to control the immediate impacts of the emergency; other actions

remain subject to NEPA review consistent with this subchapter. Alternative arrangements do not waive the requirement to comply with the statute, but establish an alternative means for NEPA compliance.

### § 1506.12　Effective date.

The regulations in this subchapter apply to any NEPA process begun after July 1, 2024. An agency may apply the regulations in this subchapter to ongoing activities and environmental documents begun before July 1, 2024.

## PART 1507—AGENCY COMPLIANCE

### Sec.

1507.1　Compliance.
1507.2　Agency capability to comply.
1507.3　Agency NEPA procedures.
1507.4　Agency NEPA program information.

**Authority:** 42 U.S.C. 4321–4347; 42 U.S.C. 4371–4375; 42 U.S.C. 7609; and E.O. 11514, 35 FR 4247, 3 CFR, 1966–1970, Comp., p. 902, as amended by E.O. 11991, 42 FR 26967, 3 CFR, 1977 Comp., p. 123.

### § 1507.1　Compliance.

All agencies of the Federal Government shall comply with the regulations in this subchapter. It is the intent of these regulations to allow each agency flexibility in adapting its implementing procedures authorized by § 1507.3 to the requirements of other applicable laws.

### § 1507.2　Agency capability to comply.

Each agency shall be capable (in terms of personnel and other resources) of complying with the requirements of NEPA and the regulations in this subchapter. Such compliance may include use of the resources of other agencies, applicants, and other participants in the NEPA process, but the agency using the resources shall itself have sufficient capability to evaluate what others do for it and account for the contributions of others. Agencies shall:

(a) Designate a senior agency official to be responsible for overall review of agency NEPA compliance, including resolving implementation issues, and a Chief Public Engagement Officer to be responsible for facilitating community engagement in environmental reviews across the agency and, where appropriate, the provision of technical assistance to communities. When the agency is a department, it may be efficient for major subunits (with the consent of the department) to identify senior agency officials or Chief Public Engagement Officers within those subunits, whom the department-level official or Officer oversees.

(b) Fulfill the requirements of section 102(2)(A) of NEPA to utilize a systematic, interdisciplinary approach that will ensure the integrated use of the natural and social sciences and the environmental design arts in planning and in decision making that may have an impact on the human environment.

(c) Identify methods and procedures required by section 102(2)(B) of NEPA to ensure that presently unquantified environmental amenities and values may be given appropriate consideration.

(d) Prepare adequate environmental impact statements pursuant to section 102(2)(C) of NEPA and cooperate on the development of environmental impact statements in the areas where the agency has jurisdiction by law or special expertise or is authorized to develop and enforce environmental standards.

(e) Ensure environmental documents are prepared with professional integrity, including scientific integrity, consistent with section 102(2)(D) of NEPA.

(f) Make use of reliable data and resources in carrying out their responsibilities under NEPA, consistent with section 102(2)(E) of NEPA.

(g) Study, develop, and describe technically and economically feasible alternatives, consistent with section 102(2)(F) of NEPA.

(h) Study, develop, and describe alternatives to recommended courses of action in any proposal that involves unresolved conflicts concerning alternative uses of available resources, consistent with section 102(2)(H) of NEPA.

(i) Comply with the requirement of section 102(2)(K) of NEPA that the agency initiate and utilize ecological information in the planning and development of resource-oriented projects.

(j) Fulfill the requirements of sections 102(2)(I), 102(2)(J), and 102(2)(L), of NEPA, and Executive Order 11514, Protection and Enhancement of Environmental Quality, section 2, as amended by Executive Order 11991, Relating to Protection and Enhancement of Environmental Quality.

### § 1507.3　Agency NEPA procedures.

(a) The Council has determined that the revisions to this subchapter as of July 1, 2024 do not affect the validity of categorical exclusions contained in agency NEPA procedures as of this date.

(b) No more than 12 months after July 1, 2024, or 9 months after the establishment of an agency, whichever comes later, each agency shall develop or revise, as necessary, proposed procedures to implement the regulations in this subchapter, facilitate efficient decision making, and ensure that the

agency makes decisions in accordance with the policies and requirements of the Act. When the agency is a department, it may be efficient for major subunits (with the consent of the department) to adopt their own procedures.

(1) Each agency shall consult with the Council while developing or revising its proposed procedures and before publishing them in the **Federal Register** for comment. Agencies with similar programs should consult with each other and the Council to coordinate their procedures, especially for programs requesting similar information from applicants.

(2) Agencies shall provide an opportunity for public review and review by the Council for conformity with the Act and the regulations in this subchapter before issuing their final procedures. The Council shall complete its review within 30 days of the receipt of the proposed final procedures. Once in effect, agencies shall publish their NEPA procedures and ensure that they are readily available to the public. Agencies shall continue to review their policies and procedures, in consultation with the Council, and revise them as necessary to ensure full compliance with the purposes and provisions of the Act.

(3) The issuance or update of agency procedures is not subject to NEPA review under this subchapter.

(c) Agency procedures shall:

(1) Designate the major decision points for the agency's programs and actions subject to NEPA, ensuring that the NEPA process begins at the earliest reasonable time, consistent with § 1501.2 of this subchapter, and aligns with the corresponding decision points;

(2) Require that relevant environmental documents, comments, and responses be part of the record in rulemaking and adjudicatory proceedings;

(3) Integrate the environmental review into the decision-making process by requiring that relevant environmental documents, comments, and responses accompany the proposal through existing agency review processes so that decision makers use them in making decisions;

(4) Require that the alternatives considered by the decision maker are encompassed by the range of alternatives discussed in the relevant environmental documents and that the decision maker consider the alternatives described in the environmental documents. If another decision document accompanies the relevant environmental documents to the decision maker, agencies are encouraged

to make available to the public before the decision is made any part of that document that relates to the comparison of alternatives;

(5) Require the combination of environmental documents with other agency documents to facilitate sound and efficient decision making and avoid duplication, where consistent with applicable statutory requirements;

(6) Include the procedures required by § 1501.2(b)(4) of this subchapter (assistance to applicants);

(7) Include specific criteria for and identification of those typical classes of action that normally:

(i) Require environmental impact statements; and

(ii) Require environmental assessments but not necessarily environmental impact statements;

(8) Establish categorical exclusions and identify extraordinary circumstances. When establishing new or revising existing categorical exclusions, agencies shall:

(i) Identify when documentation of a determination that a categorical exclusion applies to a proposed action is required;

(ii) Substantiate the proposed new or revised categorical exclusion with sufficient information to conclude that the category of actions does not have a significant effect, individually or in the aggregate, on the human environment and provide this substantiation in a written record that is made publicly available as part of the notice and comment process (§ 1507.3(b)(1) and (2)); and

(iii) Describe how the agency will consider extraordinary circumstances consistent with § 1501.4(b) of this subchapter;

(9) Include a process for reviewing the agency's categorical exclusions at least every 10 years, which the agency may conduct on a rolling basis, starting with its oldest categorical exclusions;

(10) Include processes for reevaluating and supplementing environmental assessments and environmental impact statements, as appropriate;

(11) Explain where interested persons can get information or status reports on environmental impact statements, environmental assessments, and other elements of the NEPA process; and

(12) Where an agency has applicants that seek its action, include procedures to allow an applicant (including an applicant-directed contractor) to prepare environmental assessments and environmental impact statements under the agency's supervision. Such procedures shall not apply to applicants when they serve as joint lead agencies.

Such procedures shall be consistent with § 1506.5(a) and (c) of this subchapter, and at a minimum shall include the following:

(i) Requirements that the agency review and approve the purpose and need (§§ 1501.5(c)(2)(i) or 1502.13 of this subchapter) and reasonable alternatives (§§ 1501.5(c)(2)(ii) or 1502.14 of this subchapter);

(ii) A process for the agency to independently evaluate the applicant-prepared environmental assessment or environmental impact statement; take responsibility for its accuracy, scope, and contents; and document the agency's evaluation in the document; and

(iii) A prohibition on the preparation of a finding of no significant impact or record of decision by applicants.

(d) Agency procedures also may:

(1) Identify activities or decisions that are not subject to NEPA;

(2) Include processes for consideration of emergency actions that would not result in significant effects;

(3) Include specific criteria for providing limited exceptions to the provisions of the regulations in this subchapter for classified proposals. These are proposed actions that are specifically authorized under criteria established by an Executive order or statute to be kept secret in the interest of national defense or foreign policy and are in fact properly classified pursuant to such Executive order or statute. Agencies may safeguard and restrict from public dissemination environmental assessments and environmental impact statements that address classified proposals in accordance with agencies' own regulations applicable to classified information. Agencies should organize these documents so that classified portions are included as annexes, so that the agencies can make the unclassified portions available to the public; and

(4) Provide for periods of time other than those presented in § 1506.10 of this subchapter when necessary to comply with other specific statutory requirements, including requirements of lead or cooperating agencies.

**§ 1507.4  Agency NEPA program information.**

(a) To allow agencies and the public to efficiently and effectively access information about NEPA reviews, agencies shall provide for agency websites or other information technology tools to make available documents, relevant notices, and other relevant information for use by agencies, applicants, and interested persons. The

website or other such means of publication shall include the agency's NEPA procedures, including those of subunits, and a list of environmental assessments and environmental impact statements that are in development and complete. As appropriate, agencies also should include:

(1) Agency planning and other documents that guide agency management and provide for public involvement in agency planning processes;

(2) Environmental documents;

(3) Agency policy documents, orders, terminology, and explanatory materials regarding agency decision-making processes;

(4) Agency planning program information, plans, and planning tools; and

(5) A database searchable by geographic information, document status, document type, and project type.

(b) Agencies shall provide for efficient and effective interagency coordination of their environmental program websites and other information technology tools, such as use of shared databases or application programming interfaces, in their implementation of NEPA and related authorities.

## PART 1508—DEFINITIONS

**Sec.**

1508.1  Definitions.
1508.2  [Reserved]

**Authority:** 42 U.S.C. 4321–4347; 42 U.S.C. 4371–4375; 42 U.S.C. 7609; and E.O. 11514, 35 FR 4247, 3 CFR, 1966–1970, Comp., p. 902, as amended by E.O. 11991, 42 FR 26967, 3 CFR, 1977 Comp., p. 123.

**§ 1508.1  Definitions.**

The following definitions apply to the regulations in this subchapter. Federal agencies shall use these terms uniformly throughout the Federal Government.

(a) *Act* or *NEPA* means the National Environmental Policy Act, as amended (42 U.S.C. 4321, *et seq.*).

(b) *Affecting* means will or may have an effect on.

(c) *Applicant* means a non-Federal entity, including a project sponsor, that seeks an action by a Federal agency such as granting a permit, license, or financial assistance.

(d) *Authorization* means any license, permit, approval, finding, determination, or other administrative decision issued by an agency that is required or authorized under Federal law in order to implement a proposed action.

(e) *Categorical exclusion* means a category of actions that an agency has determined, in its agency NEPA

procedures (§ 1507.3 of this subchapter) or pursuant to § 1501.4(c) of this subchapter, normally does not have a significant effect on the human environment.

(f) *Communities with environmental justice concerns* means those communities that may not experience environmental justice as defined in paragraph (m) of this section. To assist in identifying communities with environmental justice concerns, agencies may use available screening tools, such as the Climate and Economic Justice Screening Tool and the EJScreen Tool, as appropriate to their activities and programs. Agencies also may develop procedures for the identification of such communities in their agency NEPA procedures.

(g) *Cooperating agency* means any Federal, State, Tribal, or local agency with jurisdiction by law or special expertise with respect to any environmental impact involved in a proposal that has been designated by the lead agency.

(h) *Council* means the Council on Environmental Quality established by title II of the Act.

(i) *Effects* or *impacts* means changes to the human environment from the proposed action or alternatives that are reasonably foreseeable and include the following:

(1) Direct effects, which are caused by the action and occur at the same time and place.

(2) Indirect effects, which are caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable. Indirect effects may include growth-inducing effects and other effects related to induced changes in the pattern of land use, population density or growth rate, and related effects on air and water and other natural systems, including ecosystems.

(3) Cumulative effects, which are effects on the environment that result from the incremental effects of the action when added to the effects of other past, present, and reasonably foreseeable actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions. Cumulative effects can result from actions with individually minor but collectively significant effects taking place over a period of time.

(4) Effects include ecological (such as the effects on natural resources and on the components, structures, and functioning of affected ecosystems), aesthetic, historic, cultural, economic, social, or health, such as disproportionate and adverse effects on communities with environmental justice concerns, whether direct, indirect, or cumulative. Effects also include effects on Tribal resources and climate change-related effects, including the contribution of a proposed action and its alternatives to climate change, and the reasonably foreseeable effects of climate change on the proposed action and its alternatives. Effects may also include those resulting from actions which may have both beneficial and adverse effects, even if on balance the agency believes that the effects will be beneficial.

(j) *Environmental assessment* means a concise public document, for which a Federal agency is responsible, for an action that is not likely to have a significant effect or for which the significance of the effects is unknown (§ 1501.5 of this subchapter), that is used to support an agency's determination of whether to prepare an environmental impact statement (part 1502 of this subchapter) or a finding of no significant impact (§ 1501.6 of this subchapter).

(k) *Environmental document* means an environmental assessment, environmental impact statement, documented categorical exclusion determination, finding of no significant impact, record of decision, or notice of intent.

(l) *Environmental impact statement* means a detailed written statement that is required by section 102(2)(C) of NEPA.

(m) *Environmental justice* means the just treatment and meaningful involvement of all people, regardless of income, race, color, national origin, Tribal affiliation, or disability, in agency decision making and other Federal activities that affect human health and the environment so that people:

(1) Are fully protected from disproportionate and adverse human health and environmental effects (including risks) and hazards, including those related to climate change, the cumulative impacts of environmental and other burdens, and the legacy of racism or other structural or systemic barriers; and

(2) Have equitable access to a healthy, sustainable, and resilient environment in which to live, play, work, learn, grow, worship, and engage in cultural and subsistence practices.

(n) *Environmentally preferable alternative* means the alternative or alternatives that will best promote the national environmental policy as expressed in section 101 of NEPA.

(o) *Extraordinary circumstances* means factors or circumstances that indicate a normally categorically excluded action may have a significant effect. Examples of extraordinary circumstances include potential substantial effects on sensitive environmental resources; potential substantial disproportionate and adverse effects on communities with environmental justice concerns; potential substantial effects associated with climate change; and potential substantial effects on historic properties or cultural resources.

(p) *Federal agency* means all agencies of the Federal Government. It does not mean the Congress, the Judiciary, or the President, including the performance of staff functions for the President in his Executive Office. For the purposes of the regulations in this subchapter, Federal agency also includes States, units of general local government, and Tribal governments assuming NEPA responsibilities from a Federal agency pursuant to statute.

(q) *Finding of no significant impact* means a document by a Federal agency briefly presenting the agency's determination that and reasons why an action, not otherwise categorically excluded (§ 1501.4 of this subchapter), will not have a significant effect on the human environment and for which an environmental impact statement therefore will not be prepared.

(r) *Human environment* or *environment* means comprehensively the natural and physical environment and the relationship of present and future generations with that environment. (*See also* the definition of "effects" in paragraph (i) of this section.)

(s) *Joint lead agency* means a Federal, State, Tribal, or local agency designated pursuant to § 1501.7(c) that shares the responsibilities of the lead agency for preparing the environmental impact statement or environmental assessment.

(t) *Jurisdiction by law* means agency authority to approve, veto, or finance all or part of the proposal.

(u) *Lead agency* means the Federal agency that proposes the agency action or is designated pursuant to § 1501.7(c) for preparing or having primary responsibility for preparing the environmental impact statement or environmental assessment.

(v) *Legislation* means a bill or legislative proposal to Congress developed by a Federal agency, but does not include requests for appropriations or legislation recommended by the President.

(w) *Major Federal action* or *action* means an action that the agency carrying out such action determines is subject to substantial Federal control and responsibility.

AR_0028895

**35576**    **Federal Register** / Vol. 89, No. 85 / Wednesday, May 1, 2024 / Rules and Regulations

(1) Examples of major Federal actions generally include:

(i) Granting authorizations, including permits, licenses, rights-of-way, or other authorizations.

(ii) Adoption of official policy, such as rules, regulations, and interpretations adopted under the Administrative Procedure Act, 5 U.S.C. 551 *et seq.*, or other statutes; implementation of treaties and international conventions or agreements, including those implemented pursuant to statute or regulation; formal documents establishing an agency's policies that will result in or substantially alter agency programs.

(iii) Adoption of formal plans, such as official documents prepared or approved by Federal agencies, which prescribe alternative uses of Federal resources, upon which future agency actions will be based.

(iv) Adoption of programs, such as a group of concerted actions to implement a specific policy or plan; systematic and related agency decisions allocating agency resources to implement a specific statutory program or executive directive.

(v) Approval of or carrying out specific agency projects, such as construction or management activities.

(vi) Providing more than a minimal amount of financial assistance, including through grants, cooperative agreements, loans, loan guarantees, or other forms of financial assistance, where the agency has the authority to deny in whole or in part the assistance due to environmental effects, has authority to impose conditions on the receipt of the financial assistance to address environmental effects, or otherwise has sufficient control and responsibility over the subsequent use of the financial assistance or the effects of the activity for which the agency is providing the financial assistance.

(2) Major Federal actions do not include the following:

(i) Non-Federal actions:

(A) With no or minimal Federal funding; or

(B) With no or minimal Federal involvement where the Federal agency cannot control the outcome of the project;

(ii) Funding assistance solely in the form of general revenue sharing funds that do not provide Federal agency compliance or enforcement responsibility over the subsequent use of such funds;

(iii) Loans, loan guarantees, or other forms of financial assistance where a Federal agency does not exercise sufficient control and responsibility over the subsequent use of such

financial assistance or the effects of the action;

(iv) Business loan guarantees provided by the Small Business Administration pursuant to section 7(a) or (b) and of the Small Business Act (15 U.S.C. 636(a) and (b)), or title V of the Small Business Investment Act of 1958 (15 U.S.C. 695 through 697g);

(v) Judicial or administrative civil or criminal enforcement actions;

(vi) Extraterritorial activities or decisions, which means agency activities or decisions with effects located entirely outside of the jurisdiction of the United States;

(vii) Activities or decisions that are non-discretionary and made in accordance with the agency's statutory authority; and

(viii) Activities or decisions for projects approved by a Tribal Nation that occur on or involve land held in trust or restricted status by the United States for the benefit of that Tribal Nation or by the Tribal Nation when such activities or decisions involve no or minimal Federal funding or other Federal involvement.

(x) *Matter* means for purposes of part 1504 of this subchapter:

(1) With respect to the Environmental Protection Agency, any proposed legislation, project, action, or regulation as those terms are used in section 309(a) of the Clean Air Act (42 U.S.C. 7609).

(2) With respect to all other agencies, any proposed major Federal action to which section 102(2)(C) of NEPA applies.

(y) *Mitigation* means measures that avoid, minimize, or compensate for adverse effects caused by a proposed action or alternatives as described in an environmental document or record of decision and that have a connection to those adverse effects. Mitigation includes, in general order of priority:

(1) Avoiding the adverse effect altogether by not taking a certain action or parts of an action.

(2) Minimizing the adverse effect by limiting the degree or magnitude of the action and its implementation.

(3) Rectifying the adverse effect by repairing, rehabilitating, or restoring the affected environment.

(4) Reducing or eliminating the adverse effect over time by preservation and maintenance operations during the life of the action.

(5) Compensating for the adverse effect by replacing or providing substitute resources or environments.

(z) *NEPA process* means all measures necessary for compliance with the requirements of section 2 and title I of NEPA.

(aa) *Notice of intent* means a public notice that an agency will prepare and

consider an environmental impact statement or, as applicable, an environmental assessment.

(bb) *Page* means 500 words and does not include citations, explanatory maps, diagrams, graphs, tables, and other means of graphically displaying quantitative or geospatial information.

(cc) *Participating agency* means a Federal, State, Tribal, or local agency participating in an environmental review or authorization of an action.

(dd) *Participating Federal agency* means a Federal agency participating in an environmental review or authorization of an action.

(ee) *Programmatic environmental document* means an environmental impact statement or environmental assessment analyzing all or some of the environmental effects of a policy, program, plan, or group of related actions.

(ff) *Proposal* means a proposed action at a stage when an agency has a goal, is actively preparing to make a decision on one or more alternative means of accomplishing that goal, and can meaningfully evaluate its effects. A proposal may exist in fact as well as by agency declaration that one exists.

(gg) *Publish* and *publication* mean methods found by the agency to efficiently and effectively make environmental documents and information available for review by interested persons, including electronic publication, and adopted by agency NEPA procedures pursuant to § 1507.3 of this subchapter.

(hh) *Reasonable alternatives* means a reasonable range of alternatives that are technically and economically feasible, and meet the purpose and need for the proposed action.

(ii) *Reasonably foreseeable* means sufficiently likely to occur such that a person of ordinary prudence would take it into account in reaching a decision.

(jj) *Referring agency* means the Federal agency that has referred any matter to the Council after a determination that the matter is unsatisfactory from the standpoint of public health or welfare or environmental quality.

(kk) *Scope* consists of the range and breadth of actions, alternatives, and effects to be considered in an environmental impact statement or environmental assessment.

(*ll*) *Senior agency official* means an official of assistant secretary rank or higher (or equivalent) that is designated for overall agency NEPA compliance, including resolving implementation issues.

(mm) *Significant effects* means adverse effects that an agency has

identified as significant based on the criteria in § 1501.3(d) of this subchapter.

(nn) *Special expertise* means statutory responsibility, agency mission, or related program experience.

(oo) *Tiering* refers to the process described in § 1501.11 of this subchapter by which an environmental document may rely on an existing and broader or more general environmental document.

§ 1508.2  [Reserved]

[FR Doc. 2024–08792 Filed 4–30–24; 8:45 am]

**BILLING CODE 3325–FC–P**

AR_0028897

# Department of the Interior
# Departmental Manual

---

**Effective Date**: 12/05/23
**Series**: Environmental Quality Programs
**Part 301**: Major Program Issues and Decisions
**Chapter 7**: Departmental Responsibilities for Consideration and Inclusion of Indigenous Knowledge in Departmental Actions and Scientific Research

**Originating Office**: Office of Policy Analysis

---

**301 DM 7**

7.1    **Purpose.** This chapter establishes Department of the Interior (Department) policies, responsibilities, and procedures to respect, and equitably promote the inclusion of, Indigenous Knowledge in the Department's decision making, resource management, program implementation, policy development, scientific research, and other actions.

7.2    **Scope**.

    A.    The policy in this chapter applies to the Department and its component Bureaus and Offices.

    B.    This chapter does not apply to the Office of the Inspector General.

7.3    **Authorities**. The policy in this chapter is consistent with the following authorities:

    A.    National Environmental Policy Act: Public Law 91-190 as amended, codified at 42 U.S.C. § 4321 et seq.

    B.    National Historic Preservation Act: Public Law 89-665 as amended, codified in multiple sections of 54 U.S.C., Subtitle III.

    C.    Native American Graves Protection and Repatriation Act: Public Law 101-601, codified at 25 U.S.C. § 3001 et seq.

    D.    Endangered Species Act: Public Law 93-205 as amended, codified at 16 U.S.C. § 1531 et seq.

    E.    Marine Mammal Protection Act: Public Law 92-522, codified at 16 U.S.C. Chapter 31.

    F.    Magnuson-Stevens Fishery Conservation and Management Act: Public Law 94-265 as amended, codified in multiple sections of 16 U.S.C., Chapter 38.

12/04/23 #5153
New

G.      Migratory Bird Treaty Act: 40 Stat. 755 as amended, codified at 16 U.S.C. § 703 et seq.

H.      Bald Eagle and Golden Eagle Protection Act: Public Law 86-70 as amended; 16 U.S.C. § 668 et seq.

I.      Foundations for Evidence-Based Policymaking Act of 2018: Public Law 115-435, relevant sections codified at 5 U.S.C. § 306 et seq. and multiple sections of 44 U.S.C., Subchapter I.

J.      Information Quality Act: section 515 of Public Law 106-554, codified at 44 U.S.C. § 3504(d)(1) and § 3516.

K.      Alaska Native Claims Settlement Act: Public Law 92-203 as amended; 43 U.S.C. § 1601 et seq.

L.      Alaska National Interest Lands Conservation Act: Public Law 96-487; 16 U.S.C. § 3101 et seq.

M.      Executive Order 12898: Federal Actions to Address Environmental Justice in Minority Populations and Low-Income Populations, 59 Fed. Reg. 7629 (Feb. 16, 1994).

N.      Executive Order 14096: Revitalizing Our Nation's Commitment to Environmental Justice for All, 88 Fed. Reg. 25251 (April 21, 2023).

O.      Executive Order 13175: Consultation and Coordination with Indian Tribal Governments, 65 Fed. Reg. 67249 (Nov. 6, 2000).

P.      Executive Order 13985: Advancing Racial Equity and Support for Underserved Communities Through the Federal Government, 86 Fed. Reg. 7009 (Jan. 20, 2021).

Q.      Executive Order 14031: Advancing Equity, Justice, and Opportunity for Asian Americans, Native Hawaiians, and Pacific Islanders, 86 Fed. Reg. 29675 (May 28, 2021).

R.      Secretary's Order 3206: American Indian Tribal Rights, Federal-Tribal Trust Responsibilities, and the Endangered Species Act (June 5, 1997).

S.      Secretary's Order No. 3342 on Identifying Opportunities for Cooperative and Collaborative Partnerships with Federally Recognized Indian Tribes in the Management of Federal Lands and Resources (Oct. 21, 2016).

T.      Joint Secretary's Order 3403 on Fulfilling the Trust Responsibility to Indian Tribes in the Stewardship of Federal Lands and Waters (Nov. 15, 2021).

U.      Presidential Memorandum on Tribal Consultation and Strengthening Nation-to-Nation Relationships, 86 Fed. Reg. 7491 (Jan. 26, 2021).

12/04/23 #5153
New

AR_0029030

V.     Memorandum on "Indigenous Traditional Ecological Knowledge and Federal Decision Making" from White House Office of Science and Technology Policy and Council on Environmental Quality (Nov. 15, 2021).

W.     White House Office of Science and Technology Policy – Council on Environmental Quality Guidance for Federal Departments and Agencies on Indigenous Knowledge (Nov. 30, 2022).

X.     United Nations Declaration on the Rights of Indigenous Peoples (UNDRIP, September 13, 2007), consistent with the "Announcement of U.S. Support for the United Nations Declaration on the Rights of Indigenous Peoples" (January 12, 2011).

7.4     **Definitions.** For the purposes of this policy the following definitions apply.

A.     Indigenous Knowledge (IK) – The following are generally agreed upon universal concepts that are often used to describe Indigenous Knowledge. IK is a body of observations, oral and written knowledge, innovations, technologies, practices, and beliefs developed by Indigenous Peoples through interaction and experience with the environment. It is applied to phenomena across biological, physical, social, cultural, and spiritual systems. IK can be developed over millennia, continues to develop, and includes understanding based on evidence acquired through direct contact with the environment and long-term experiences, as well as extensive observations, lessons, and skills passed from generation to generation. IK is developed, held, and stewarded by Indigenous Peoples and is often intrinsic within Indigenous legal traditions, including customary law or traditional governance structures and decision-making processes. Other terms such as Traditional Knowledge(s), Traditional Ecological Knowledge, Genetic Resources associated with Traditional Knowledge, Traditional Cultural Expression, Tribal Ecological Knowledge, Native Science, Indigenous Applied Science, Indigenous Science, and others, are sometimes used to describe this knowledge system. This chapter uses the term IK throughout.

B.     Indigenous Peoples – Indigenous Peoples refers to people of Native American, Alaska Native, Native Hawaiian, Pacific Islander (e.g., American Samoans, Chamorros and Carolinians of Guam and the Northern Mariana Islands, and others), and Caribbean Islander (e.g., Taíno and others) descent, and others whose ancestors have occupied what is now known as the United States and its territories since time immemorial, including members of Tribal Nations.

C.     Tribal Nation – American Indian or Alaska Native Tribe, band, nation, pueblo, village, or community that the Secretary of the Interior acknowledges as a Federally recognized Tribe pursuant to the Federally Recognized Indian Tribe List Act of 1994, 25 U.S.C. § 5130.

D.     Free, Prior, and Informed Consent (FPIC) – Article 19 of the United Nations Declaration of the Rights of Indigenous Peoples uses the term "Free, Prior, and Informed Consent" (FPIC), although it is not defined therein. The Food and Agriculture Organization of the United Nations defines FPIC as "a specific right that pertains to indigenous peoples and is recognized in the United Nations Declaration on the Rights of Indigenous Peoples (UNDRIP). It

AR_0029031

allows them to give or withhold consent to a project that may affect them or their territories."
This term is used in this Chapter for consent to the use of IK by the Department, not for consent
to any underlying project.

7.5    **Background**. Indigenous Knowledge (IK) is a specific type of knowledge that is passed
from one generation to the next and integrated at the cultural level within an Indigenous group.
IK uses systematic methodologies and verification through repetition and observation, derives
from relationships with the environment and cultural ceremonies, evolves over time as new
information is gained, and reflects cultural values. Generally, IK calls upon individuals,
communities, organizations, governments, and others to act and make moral and ethical
decisions in the best interests of future generations and place collective interests - including non-
human interests - above individual interests. Indigenous Peoples are not homogenous: each
nation and community holds and retains its own IK based on unique foundations and experiences
as well as relationships with varied environments. IK is distinct from local knowledge or
individual knowledge, both of which are based on experiences that may not have been validated
within the culture of an Indigenous group.

IK includes holistic approaches to complex systems and should not be separated from its
cultural, social, place-based, and ecological context or applied piecemeal. The importance of
stories should not be understated or minimized by other scientific approaches because
Indigenous oral histories, traditions, and stories about the natural world inform everyday life.

Bringing IK and other scientific approaches into dialogue and mutual understanding can generate
a more holistic understanding of social and ecological processes. This can provide a foundation
for improved implementation of Departmental actions, including agency decision making,
resource management, program implementation, policy development, scientific research, and
other actions.

Understanding and acknowledging the different experiences of Indigenous Peoples is critical for
working with and effective engagement with IK. Recognizing past injustice, while upholding
Tribal treaty and reserved rights, and respecting Tribal and Indigenous communities, cultures,
and values will assist in developing collaborative processes that are more equitable and inclusive
of Indigenous Peoples and their knowledge systems. Yet while the Departmental Bureaus and
Offices have at times historically included IK in certain actions or scientific research, this
chapter is intended to facilitate and encourage the Department's consistent, broad, respectful, and
equitable inclusion of IK in its internal and external engagements.

To begin the process of seeking IK to inform policies and decisions, Bureaus and Offices must
work with the Indigenous nation or community's governance structure, leadership, or trusted
advisors—in keeping with their traditions and practices, and the Department's trust
responsibilities and consultation requirements—to identify IK holders who are generally
respected and affirmed as knowledge holders by the appropriate Indigenous governing body or
social structure. Bureaus and Offices must ensure that IK is generally considered authoritative
by the Indigenous Peoples who possess it. Bureaus and Offices must obtain FPIC from
Indigenous Peoples before receiving and including IK in Departmental actions and scientific

AR_0029032

research. Terminology and descriptions of IK preferred by the group one is working with should be used.

7.6     **Policy.** It is the Department's policy to respect and promote the inclusion of IK in the Department's decision making, resource management, program implementation, policy development, scientific research, and other actions. The Department recognizes IK as one of the many important knowledge systems that contribute to the scientific, technical, social, economic, cultural, and political well-being of the United States and to the collective understanding of the natural world. The term "Indigenous Knowledge" should be used by the Department. If a different term is preferred by the Indigenous nation or community with whom the Department is working, the appropriate office should consider using the preferred term, while explaining why it has been chosen.

A.     <u>Consistent with existing laws and regulations, it is the Department's policy to:</u>

(1)     Develop collegial and collaborative relationships with Indigenous Peoples built on reciprocity, equity, and mutual respect to facilitate the inclusion of IK in Departmental actions and scientific research, but that are not solely for the purpose of learning IK or obtaining consent to include IK. Bureaus and Offices will engage Indigenous Peoples as true, vested, and enduring partners. Bureaus and Offices will comply with the Department's policies regarding consultation as set forth in 512 DM 4 through 7, where required. Bureaus and Offices should:

(a)     Communicate to Indigenous Peoples that they have the right to grant or withhold consent to share their IK with the Department; and to the extent permitted by law to maintain control and access to their IK and dictate the terms of inclusion and application of their IK.

(b)     Exercise caution not to overstate or overcommit regarding the Department's ability to protect the confidentiality of IK, including recognizing the limitations of protections such as exemption requirements from the Freedom of Information Act, or regarding the outcome of a decision-making process or a conclusion of scientific research. Specific policies regarding communication with Indigenous Peoples are discussed in paragraph (3) below.

(c)     Communicate to Indigenous Peoples in a timely manner and in an appropriate format how their IK was interpreted and was or was not included. Where inclusion of IK is ongoing, Departmental employees should, in collaboration with and with the consent of Indigenous Peoples, develop a schedule for continuing engagement.

(2)     Obtain FPIC from the appropriate Indigenous governing body, if any, and Indigenous knowledge holders prior to learning and including IK in Departmental actions and scientific research. Departmental employees should:

(a)     Allow Indigenous Peoples to determine the processes by which such consent is given, consistent with applicable law and Departmental policy.

12/04/23 #5153
New

AR_0029033

(b)    Communicate to Indigenous People when obtaining their consent, the impacts to them of learning, including or not including, or limiting the inclusion of IK in Departmental actions and scientific research.

(c)    Inform Indigenous Peoples, when obtaining their consent, of federal laws affecting the process of learning, including, or disclosing IK, including but not limited to, the Paperwork Reduction Act, Freedom of Information Act, and Information Quality Act.

(d)    Inform Indigenous Peoples when obtaining their consent of the purpose, nature, scope, and parameters of the proposed Departmental action, scientific research, or administrative record, and how their IK is anticipated to be included. Inform Indigenous Peoples that the Department cannot ensure in advance a particular decision outcome or scientific conclusion.

(e)    Be aware of the perspectives and processes of institutional review boards and similar research approval processes, which may be required when working with Indigenous Peoples.

(f)    Communicate to Indigenous Peoples the potential for re-use of IK outside of its intended or original inclusion and any limits on the Department's ability to control re-use. Ensure that the expression of consent provided by Indigenous Peoples clearly states their position regarding re-use.

(3)    Include IK in a manner that complies with federal laws, including the Information Quality Act when applicable, and with guidance and policies promulgated under these laws.

(a)    Under the Information Quality Act, technical or scientific information, including IK, that is disseminated by Bureaus and Offices must generally meet the standards for objectivity, utility, and integrity set forth in the Department's Information Quality Guidelines. This requirement applies to information collected by the Bureaus and Offices themselves as well as information, including IK, provided by entities outside the Department. When a Bureau or Office relies on IK, the Department will disclose the inclusion of IK to the public.

(b)    Federal statutes that require consideration of scientific information allow the inclusion of IK under established standards. In these cases, Bureaus and Offices should include IK as an aspect of best available science when it is generally considered authoritative by the Indigenous Peoples who possess it and is publicly available without restrictions or gained by consent.

(4)    Learn, apply, and include IK by using appropriate processes and procedures developed by Indigenous Peoples when preferred and available, or by relying on experts in the field that use appropriate and vetted social science methods as defined by Office of Personnel Management's Qualification Standards for Social Science, Psychology, and Welfare 0100-0199.

12/04/23 #5153
New

(5)     Rely on Indigenous Peoples to interpret their own IK in its applicability to the activities of the Department consistent with free, prior, and informed consent previously provided.

(6)     Consistent with applicable law, appropriately compensate IK holders or other Indigenous Peoples for providing time and services to the Department while recognizing that IK is inalienable from Indigenous People. The Department will create guidance for the consistent implementation of this direction.

(7)     Support IK holders, Tribes, and other appropriate governance bodies in their efforts to develop, hold, and steward IK, including evaluating opportunities for training, technical and financial assistance and to work collaboratively with other Federal agencies.

(8)     Ensure that Departmental employees and those representing the Department are trained regarding the Department's policies for learning and including IK before engaging with Indigenous Peoples.

B.     Bureaus and Offices will update existing policies and guidance or develop new policies and guidance, as needed, for inclusion of IK in their programs and activities, including for:

(1)     Ensuring that the inclusion of IK complies with applicable federal law and policy, including:

(a)     Ensuring that IK is learned with consent from Indigenous Peoples.

(b)     Understanding and accounting for differences between IK and other scientific approaches, including different forms (e.g., songs, oral histories, and others) and from different sources among Indigenous Peoples.

(c)     Developing procedures for citing or describing IK in Bureau and Office documents.

(2)     Outreach and communications materials that describe IK and its role in Bureau or Office actions or scientific research.

(3)     Procedures for the identification of IK holders with the guidance of the Tribal Historic Preservation Officer or Cultural Director, or other trusted advisors within an Indigenous nation or community, as appropriate.

(4)     Procedures for including IK in scientific research conducted by the Bureau or Office when appropriate, including:

(a)     Collaborating with Indigenous Peoples in the development of processes for learning and including IK into Departmental actions and scientific research to the extent they are willing and able to participate.  Bureaus and Offices should engage Indigenous

12/04/23 #5153
New

Peoples as early as possible and throughout the duration of an action or scientific research project.

(b)   Compliance with the Information Quality Act and other federal laws when including IK, consistent with paragraph 7.6(a)(4) above.

(c)   Procedures to ensure that one or more subject matter expert(s) in the field of IK are included in the peer review of scientific reports or decision documents, which include IK and require peer review.

(5)   Compensation should recognize that IK holders provide services similar to those provided by subject matter experts, consultants, or contractors. Compensation does not imply transfer of ownership, nor does it dispossess or alienate IK from Indigenous Peoples. Following the issuance of Departmental guidance for the consistent implementation of this policy, Bureaus and Offices should create a policy to compensate IK holders or other Indigenous Peoples for providing their time and services, as authorized by law.

(6)   Procedures and processes for storing, maintaining, sharing for scientific or other purposes, and disclosing IK, including procedures to identify information that is exempt from disclosure under federal law, and procedures for working with IK that do not rely on, or result in, the creation of disclosable federal records.

(7)   Communication and reporting procedures for informing Indigenous Peoples how their IK was or was not included.

(8)   Including IK in the development or revision of land and resources management related planning documents and in resource management actions, including actions involving co-stewardship, co-management, or collaborative management, as well as actions in which Indigenous Peoples do not have a specified role in management.

(9)   Training requirements for Bureau and office employees and representatives when engaging Indigenous Peoples for the purposes of learning and including IK in Departmental actions and scientific research.

7.7   **Implementation**.  The Department will include IK in its actions and scientific research, where appropriate and available, consistent with FPIC to its use unless explicitly prohibited by federal law or policy, and will at a minimum:

A.   Elevate IK in the creation, selection, development, and implementation of Departmental actions, programs, and scientific research by inviting Indigenous Peoples to identify the IK they consider pertinent to the action or scientific research under consideration. For example, but not limited to:

(1)   Providing Tribal Nations and Territorial governments opportunities to serve as joint lead agencies or cooperating agencies in the development of environmental impact statements or environmental assessments, consistent with the Council on Environmental Quality's National Environmental Policy Act implementing regulations and encouraging

AR_0029036

Indigenous Peoples to suggest ways to include IK to inform the development of alternatives, analysis of effects, and when necessary, identification of mitigation measures.

(2)    Inviting Indigenous Peoples to provide IK or other relevant information to inform decisions under the Endangered Species Act.

(3)    Considering IK when evaluating features or circumstances unique to Tribal Nation under the Tribal Forest Protection Act.

(4)    Including IK when evaluating the eligibility of traditional cultural site landscapes or seascapes for inclusion on the National Register of Historic Places or evaluating potential impacts to eligible properties under the National Historic Preservation Act.

(5)    Including IK to identify Native American Graves Protection and Repatriation Act cultural items and human remains during project planning and in existing Bureau and Office collections.

(6)    Including available IK when sponsoring or conducting scientific research and other actions of the Department.

(7)    Ensuring that Bureau and Office funding or financial assistance opportunities include IK to the fullest extent allowable, including, but not limited to, ensuring that selection, award, and oversight processes are unbiased and value IK on par with other forms of evidence and methods of inquiry.

(8)    Encouraging recipients of Departmental funding or financial assistance to include IK in the implementation of the funding consistent with this policy.

(9)    Including multiple knowledge systems in Bureau and Office actions, when available, and considering the knowledge from each system without using one system to validate another on the understanding that results may differ by system.

(10)    Encourage Departmental Indigenous employees to utilize their own IK, when appropriate and pursuant to FPIC, in the activities of the Department as consistent with this policy.

B.    Use hiring authorities to recruit, hire, and retain employees, including Indigenous Peoples, with the experience, knowledge, and skills needed to work with IK and to engage IK holders through:

(1)    Working with professional and Indigenous organizations and Departmental employee affinity groups on recruitment and retention.

(2)    Collaborating with the Bureau of Indian Education and Indigenous Peoples regarding career development programs through Tribal colleges and universities, Native American-Serving Nontribal Institutions, and other educational institutions serving Indigenous Peoples.

12/04/23 #5153
New

(3)     Recruiting and hiring via the Pathways Program or other internship opportunities.

(4)     Including standards for cultural competencies as job skill requirements, where appropriate.

(5)     Using the Indian Preference Hiring Authority, where appropriate and allowed.

(6)     Using the Intergovernmental Personnel Mobility Act.

(7)     Using other appropriate hiring authorities or mechanisms, including Bureau and Office, regional, or site-specific authorities.

(8)     Incorporating education or experience working with IK, IK holders, and with Indigenous Peoples into position descriptions and qualifications, where appropriate.

7.8     **Responsibilities.**

A.      Assistant Secretary-Policy, Management and Budget.

(1)     Oversee the Department's compliance with this policy, provide staff support to monitor implementation of the policy and coordinate budgets and practices that support consideration and inclusion of IK in Departmental actions and scientific research.

(2)     Establish an Indigenous Knowledge Coordination Committee (IKCC) and approve the IKCC Charter (see section F. below).

(3)     Oversee the development of implementation guidance through the Office of the Solicitor to assist Bureaus as they consider how and when to compensate IK holders to include fair market value and threshold for compensation.

B.      Assistant Secretaries. Confirm that their Bureaus and Offices comply with this chapter.

C.      Heads of Bureaus/Offices.

(1)     Report to their respective Assistant Secretary on the implementation of this chapter.

(2)     Develop policy and guidance specific to the needs of their Bureau or Office to implement this chapter, including the guidance documents described in 7.6.B of this chapter, and ensuring that IK is described and included in Bureau or Office – level policy, guidance, and handbooks.

12/04/23 #5153
New

(3)   Ensure that personnel involved in planning, decision making, program implementation, policy development, scientific research, and other actions are aware of this policy and have the appropriate experience and training to implement this policy.

(4)   Include standards for the application of the policies set forth in this chapter in employee performance appraisal plans, where appropriate.

(5)   Appoint Departmental employees with appropriate technical and subject matter expertise to represent the Bureau or Office on the Department IKCC.  Representatives are required from the following Bureaus and Offices: Bureau of Indian Affairs, Bureau of Indian Education, Bureau of Land Management, Bureau of Ocean Energy Management, Bureau of Reclamation, Bureau of Safety and Environmental Enforcement, , National Park Service, Office of Surface Mining Reclamation and Enforcement, Office of Insular Affairs, Office of Native Hawaiian Relations, Office of Policy Analysis, Office of Environmental Policy and Compliance, U.S. Fish and Wildlife Service, and U.S. Geological Survey.  Heads of other Bureaus and Offices are encouraged, but not required, to appoint a representative to the Department IKCC.

(6)   Ensure response to reporting requirements established by the Department IKCC and or reporting requested by the Executive Office of the President.

D.   The Office of Policy Analysis (PPA):

(1)   Serve as the lead Office for revising this policy when warranted by changes in technical information, federal statutes, regulations, Departmental policy, or other considerations. Any Bureau or Office can initiate changes by contacting the PPA. In recommending revisions to this chapter, Bureaus and Offices will provide PPA with appropriate supporting information.

(2)   Solicit and consider the views of all interested Departmental Offices and Bureaus when the Department contemplates changes to this chapter.

(3)   When requested, provide technical assistance and guidance to Departmental Offices and Bureaus in understanding and implementing this policy.

(4)   Conduct Tribal Consultation, Native Hawaiian Community Consultation, and other appropriate consultations or listening sessions to inform the revision process.

E.   Tribal Liaison Officers. Promote and facilitate the identification and inclusion of IK and facilitate appropriate contacts between Bureaus or Offices and Indigenous Peoples in support of the policies set forth in this chapter.

F.   The Department Indigenous Knowledge Coordination Committee (IKCC)is responsible for:

(1)   Establishing and maintaining a charter, to direct the operations of the Committee including the process of designating a Committee Chair.

12/04/23 #5153
New

(2)    Providing communication, coordination, oversight, training, research, and technical assistance to Bureaus and Offices on the inclusion of IK by:

(a)    Synthesizing and integrating new IK research, promising practices, case studies on IK, decision science, and climate adaptation into IK guidance and trainings.

(b)    Identifying opportunities to work with Indigenous Peoples to build capacity and provide technical assistance.

(c)    Developing IK reporting metrics for Bureaus, collecting reporting data, and sharing reporting and lessons learned within and across Bureaus and among partners, Indigenous Peoples, and other collaborators.

(d)    Establishing reporting requirements on the application of this policy as it relates to Bureau/Office-specific missions and authorities, consistent with existing Departmental performance metrics.

(f)    Developing strategies to promote Bureau and Office engagement and investment in the consideration and inclusion of IK in Departmental actions and scientific research.

(f)    Coordinate with the Department's Data Governance Board, and other entities as appropriate, to ensure IK is managed and protected consistent with this chapter.

(3)    Integrating approaches for the inclusion of IK into Departmental strategic plans and budget submissions where appropriate.

7.9    **Guidance.**

A.    Departmental employees shall refer to the CEQ's "Guidance for Federal Departments and Agencies on Indigenous Knowledge" for further guidance on this topic. See https://www.bia.gov/sites/default/files/dup/inline-files/ik_guidance_implementation_memo.pdf.

B.    The Advisory Council on Historic Preservation (ACHP), Office of Native American Affairs, maintains a website on Traditional Knowledge.  The ACHP resources include a white paper discussing the importance of IK in the Section 106 process entitled "Traditional Knowledge and the Section 106 Process: Information for Federal Agencies and Other Participants."  See https://www.achp.gov/indian-tribes-and-native-hawaiians/traditional-knowledge.

C.    The National Park Service maintains a website with resources related to Indigenous Knowledge and Traditional Ecological Knowledge.  See https://www.nps.gov/subjects/tek/index.htm.

D.    The Department's guidance under the Foundations for Evidence-Based Policymaking Act of 2018, is available at https://www.doi.gov/performance/evidence-doi.

12/04/23 #5153
New

     E.     The Departmental Manual contains chapters on consultation, including: 512 DM 4 - Department of the Interior Policy on Consultation with Indian Tribes; 512 DM 5 – Procedures for Consultation with Indian Tribes; and 512 DM 6 Department of the Interior Policy on Consultation with Alaska Native Claims Settlement Act Corporations.

7.10    **Legal Effect**. This policy is intended to improve the internal management of the Department. It does not create any right or benefit, substantive or procedural, enforceable at law or in equity by any person against the United States, its agencies, it officers or employees, or any other person.

12/04/23 #5153
New

## COUNCIL ON ENVIRONMENTAL QUALITY

**40 CFR Parts 1500, 1501, 1502, 1503, 1504, 1505, 1506, 1507, 1508, 1515, 1516, 1517, and 1518**

[CEQ–2019–0003]

RIN 0331–AA03

## Update to the Regulations Implementing the Procedural Provisions of the National Environmental Policy Act

**AGENCY:** Council on Environmental Quality.

**ACTION:** Final rule.

**SUMMARY:** The Council on Environmental Quality (CEQ) issues this final rule to update its regulations for Federal agencies to implement the National Environmental Policy Act (NEPA). CEQ has not comprehensively updated its regulations since their promulgation in 1978, more than four decades ago. This final rule comprehensively updates, modernizes, and clarifies the regulations to facilitate more efficient, effective, and timely NEPA reviews by Federal agencies in connection with proposals for agency action. The rule will improve interagency coordination in the environmental review process, promote earlier public involvement, increase transparency, and enhance the participation of States, Tribes, and localities. The amendments will advance the original goals of the CEQ regulations to reduce paperwork and delays, and promote better decisions consistent with the national environmental policy set forth in section 101 of NEPA.

**DATES:** This is a major rule subject to congressional review. The effective date is September 14, 2020. However, if congressional review has changed the effective date, CEQ will publish a document in the **Federal Register** to establish the actual effective date or to terminate the rule.

**ADDRESSES:** CEQ has established a docket for this action under docket number CEQ–2019–0003. All documents in the docket are listed on *www.regulations.gov*.

**FOR FURTHER INFORMATION CONTACT:** Viktoria Z. Seale, Chief of Staff and General Counsel, 202–395–5750, *NEPA-Update@ceq.eop.gov*.

**SUPPLEMENTARY INFORMATION:**

## Table of Contents

I. Background
  A. National Environmental Policy Act
  B. Council on Environmental Quality Regulations, Guidance, and Reports
  1. Regulatory History
  2. CEQ Guidance and Reports
  3. Environmental Impact Statement Timelines and Page Count Reports
  C. Judicial Review of Agency NEPA Compliance
  D. Statutory Developments
  E. Presidential Directives
  F. Advance Notice of Proposed Rulemaking
  G. Notice of Proposed Rulemaking
II. Summary of Final Rule
  A. Changes Throughout Parts 1500–1508
  B. Revisions To Update the Purpose, Policy, and Mandate (Part 1500)
  1. Purpose and Policy (§ 1500.1)
  2. Remove and Reserve Policy (§ 1500.2)
  3. NEPA Compliance (§ 1500.3)
  4. Reducing Paperwork and Delay (§§ 1500.4 and 1500.5)
  5. Agency Authority (§ 1500.6)
  C. Revisions to NEPA and Agency Planning (Part 1501)
  1. NEPA Thresholds (§ 1501.1)
  2. Apply NEPA Early in the Process (§ 1501.2)
  3. Determine the Appropriate Level of NEPA Review (§ 1501.3)
  4. Categorical Exclusions (§ 1501.4)
  5. Environmental Assessments (§ 1501.5)
  6. Findings of No Significant Impact (§ 1501.6)
  7. Lead and Cooperating Agencies (§§ 1501.7 and 1501.8)
  8. Scoping (§ 1501.9)
  9. Time Limits (§ 1501.10)
  10. Tiering (§ 1501.11)
  11. Incorporation by Reference (§ 1501.12)
  D. Revisions to Environmental Impact Statements (Part 1502)
  1. Purpose of Environmental Impact Statement (§ 1502.1)
  2. Implementation (§ 1502.2)
  3. Statutory Requirements for Statements (§ 1502.3)
  4. Major Federal Actions Requiring the Preparation of Environmental Impact Statements (§ 1502.4)
  5. Timing (§ 1502.5)
  6. Interdisciplinary Preparation (§ 1502.6)
  7. Page Limits (§ 1502.7)
  8. Writing (§ 1502.8)
  9. Draft, Final and Supplemental Statements (§ 1502.9)
  10. Recommended Format (§ 1502.10)
  11. Cover (§ 1502.11)
  12. Summary (§ 1502.12)
  13. Purpose and Need (§ 1502.13)
  14. Alternatives Including the Proposed Action (§ 1502.14)
  15. Affected Environment (§ 1502.15)
  16. Environmental Consequences (§ 1502.16)
  17. Submitted Alternatives, Information, and Analyses (§ 1502.17)
  18. List of Preparers (§ 1502.18)
  19. Appendix (§ 1502.19)
  20. Publication of the Environmental Impact Statement (§ 1502.20)
  21. Incomplete or Unavailable Information (§ 1502.21)
  22. Cost-Benefit Analysis (§ 1502.22)
  23. Methodology and Scientific Accuracy (§ 1502.23)
  24. Environmental Review and Consultation Requirements (§ 1502.24)
  E. Revisions to Commenting on Environmental Impact Statements (Part 1503)
  1. Inviting Comments and Requesting Information and Analyses (§ 1503.1)
  2. Duty To Comment (§ 1503.2)
  3. Specificity of Comments and Information (§ 1503.3)
  4. Response to Comments (§ 1503.4)
  F. Revisions to Pre-Decisional Referrals to the Council of Proposed Federal Actions Determined To Be Environmentally Unsatisfactory (Part 1504)
  1. Purpose (§ 1504.1)
  2. Criteria for Referral (§ 1504.2)
  3. Procedure for Referrals and Response (§ 1504.3)
  G. Revisions to NEPA and Agency Decision Making (Part 1505)
  1. Remove and Reserve Agency Decisionmaking Procedures (§ 1505.1)
  2. Record of Decision in Cases Requiring Environmental Impact Statements (§ 1505.2)
  3. Implementing the Decision (§ 1505.3)
  H. Revisions to Other Requirements of NEPA (Part 1506)
  1. Limitations on Actions During NEPA Process (§ 1506.1)
  2. Elimination of Duplication With State, Tribal, and Local Procedures (§ 1506.2)
  3. Adoption (§ 1506.3)
  4. Combining Documents (§ 1506.4)
  5. Agency Responsibility for Environmental Documents (§ 1506.5)
  6. Public Involvement (§ 1506.6)
  7. Further Guidance (§ 1506.7)
  8. Proposals for Legislation (§ 1506.8)
  9. Proposals for Regulations (§ 1506.9)
  10. Filing Requirements (§ 1506.10)
  11. Timing of Agency Action (§ 1506.11)
  12. Emergencies (§ 1506.12)
  13. Effective Date (§ 1506.13)
  I. Revisions to Agency Compliance (Part 1507)
  1. Compliance (§ 1507.1)
  2. Agency Capability To Comply (§ 1507.2)
  3. Agency NEPA Procedures (§ 1507.3)
  4. Agency NEPA Program Information (§ 1507.4)
  J. Revisions to Definitions (Part 1508)
  1. Clarifying the Meaning of "Act"
  2. Definition of "Affecting"
  3. New Definition of "Authorization"
  4. Clarifying the Meaning of "Categorical Exclusion"
  5. Clarifying the Meaning of "Cooperating Agency"
  6. Definition of "Council"
  7. Definition of "Cumulative Impact" and Clarifying the Meaning of "Effects"
  8. Clarifying the Meaning of "Environmental Assessment"
  9. Clarifying the Meaning of "Environmental Document"
  10. Clarifying the Meaning of "Environmental Impact Statement"
  11. Clarifying the Meaning of "Federal Agency"
  12. Clarifying the Meaning of "Finding of No Significant Impact"
  13. Clarifying the Meaning of "Human Environment"
  14. Definition of "Jurisdiction by Law"
  15. Clarifying the Meaning of "Lead Agency"

AR_0029042

16. Clarifying the Meaning of ''Legislation''
17. Clarifying the Meaning of ''Major Federal Action''
18. Definition of ''Matter''
19. Clarifying the Meaning of ''Mitigation''
20. Definition of ''NEPA Process''
21. Clarifying the Meaning of ''Notice of Intent''
22. New Definition of ''Page''
23. New Definition of ''Participating Agency''
24. Clarifying the Meaning of ''Proposal''
25. New Definition of ''Publish and Publication''
26. New Definition of ''Reasonable Alternatives''
27. New Definition of ''Reasonably Foreseeable''
28. Definition of ''Referring Agency''
29. Definition of ''Scope''
30. New Definition of ''Senior Agency Official''
31. Definition of ''Special Expertise''
32. Striking the Definition of ''Significantly''
33. Clarifying the Meaning of ''Tiering''
K. CEQ Guidance Documents
III. Rulemaking Analyses and Notices
   A. Executive Order 12866, Regulatory Planning and Review and Executive Order 13563, Improving Regulation and Regulatory Review
   B. Executive Order 13771, Reducing Regulation and Controlling Regulatory Costs
   C. Regulatory Flexibility Act and Executive Order 13272, Proper Consideration of Small Entities in Agency Rulemaking
   D. Congressional Review Act
   E. National Environmental Policy Act
   F. Endangered Species Act
   G. Executive Order 13132, Federalism
   H. Executive Order 13175, Consultation and Coordination With Indian Tribal Governments
   I. Executive Order 12898, Federal Actions To Address Environmental Justice in Minority Populations and Low-Income Populations
   J. Executive Order 13211, Actions Concerning Regulations That Significantly Affect Energy Supply, Distribution, or Use
   K. Executive Order 12988, Civil Justice Reform
   L. Unfunded Mandates Reform Act
   M. Paperwork Reduction Act

# I. Background

President Nixon signed the National Environmental Policy Act of 1969, 42 U.S.C. 4321 *et seq.,* (NEPA or the Act) into law on January 1, 1970. The Council on Environmental Quality (CEQ) initially issued interim guidelines for implementing NEPA in 1970, revised those guidelines in 1971 and 1973, and subsequently promulgated its regulations implementing NEPA in 1978. The original goals of those regulations were to reduce paperwork and delays, and promote better decisions consistent with the national environmental policy established by the Act.

Since the promulgation of the 1978 regulations, however, the NEPA process has become increasingly complicated and can involve excessive paperwork and lengthy delays. The regulations have been challenging to navigate with related provisions scattered throughout, and include definitions and provisions that have led to confusion and generated extensive litigation. The complexity of the regulations has given rise to CEQ's issuance of more than 30 guidance documents to assist Federal agencies in understanding and complying with NEPA. Agencies also have developed procedures and practices to improve their implementation of NEPA. Additionally, Presidents have issued directives, and Congress has enacted legislation to reduce delays and expedite the implementation of NEPA and the CEQ regulations, including for transportation, water, and other types of infrastructure projects.

Despite these efforts, the NEPA process continues to slow or prevent the development of important infrastructure and other projects that require Federal permits or approvals, as well as rulemakings and other proposed actions. Agency practice has also continued to evolve over the past four decades, but many of the most efficient and effective practices have not been incorporated into the CEQ regulations. Further, a wide range of judicial decisions, including those issued by the Supreme Court, evaluating Federal agencies' compliance with NEPA have construed and interpreted key provisions of the statute and CEQ's regulations. CEQ's guidance, agency practice, more recent presidential directives and statutory developments, and the body of case law related to NEPA implementation have not been harmonized or codified in CEQ's regulations.

As discussed further below, NEPA implementation and related litigation can be lengthy and significantly delay major infrastructure and other projects.[1] For example, CEQ has found that NEPA reviews for Federal Highway Administration projects, on average take more than seven years to proceed from a notice of intent (NOI) to prepare an environmental impact statement (EIS) to issuance of a record of decision (ROD). This is a dramatic departure from CEQ's prediction in 1981 that Federal agencies would be able to complete most EISs, the most intensive review of a project's environmental impacts under NEPA, in 12 months or less.[2] In its most recent

review, CEQ found that, across the Federal Government, the average time for completion of an EIS and issuance of a ROD was 4.5 years and the median was 3.5 years.[3] CEQ determined that one quarter of EISs took less than 2.2 years, and one quarter of the EISs took more than 6 years. And these timelines do not necessarily include further delays associated with litigation over the legal sufficiency of the NEPA process or its resulting documentation.

Although other factors may contribute to project delays, the frequency and consistency of multi-year review processes for EISs for projects across the Federal Government leaves no doubt that NEPA implementation and related litigation is a significant factor.[4] It is critical to improve NEPA implementation, not just for major projects, but because tens of thousands of projects and activities are subject to NEPA every year, many of which are important to modernizing our Nation's infrastructure.[5]

As noted above, an extensive body of case law interpreting NEPA and CEQ's implementing regulations drives much of agencies' modern day practice. Though courts have correctly recognized that NEPA requires agencies to follow certain procedures and not to reach particular substantive results, the accretion of cases has not necessarily clarified implementation of the law. In light of the litigation risk such a situation presents, agencies have responded by generating voluminous studies analyzing impacts and alternatives well beyond the point where useful information is being produced and utilized by decision makers. In its most recent review, CEQ found that final EISs averaged 661 pages in length, and the median document was 447 pages.[6] One quarter were 748 pages or longer. The page count and document length data do not include

---

[1] *See infra* sec. I.B.3 and I.C.
[2] Forty Most Asked Questions Concerning CEQ's National Environmental Policy Act Regulations, 46

FR 18026 (Mar. 23, 1981) (''Forty Questions''), *https://www.energy.gov/nepa/downloads/forty-most-asked-questions-concerning-ceqs-national-environmental-policy-act.* ''The Council has advised agencies that under the new NEPA regulations even large complex energy projects would require only about 12 months for the completion of the entire EIS process. For most major actions, this period is well within the planning time that is needed in any event, apart from NEPA.'' *Id.* at Question 35.
[3] *See infra* sec. I.B.3.
[4] *See also,* Philip K. Howard, Common Good, Two Years, Not Ten: Redesigning Infrastructure Approvals (Sept. 2015) (''Two Years, Not Ten''), *https://www.commongood.org/wp-content/uploads/2017/07/2YearsNot10Years.pdf.*
[5] As discussed in sections II.D and II.C.5, CEQ estimates that Federal agencies complete 176 EISs and 10,000 environmental assessments each year. In addition, CEQ estimates that agencies apply categorical exclusions to 100,000 actions annually. *See infra* sec. II.C.4.
[6] *See infra* sec. I.B.3.

appendices. The average modern EIS is more than 4 times as long as the 150 pages contemplated by the 1978 regulations.

By adopting these regulations following so many decades of NEPA practice, implementation, and litigation, CEQ is acting now to enhance the efficiency of the process based on its decades of experience overseeing Federal agency practice, and clarifying a number of key NEPA terms and requirements that have frequently been subject to litigation. The modifications and refinements reflected in the final rule will contribute to greater certainty and predictability in NEPA implementation, and thus eliminate at least in some measure the unnecessary and burdensome delays that have hampered national infrastructure and other important projects.

In June 2018, CEQ issued an advance notice of proposed rulemaking (ANPRM) requesting comment on potential updates and clarifications to the CEQ regulations.[7] On January 10, 2020, CEQ published a notice of proposed rulemaking[8] (NPRM or proposed rule) in the **Federal Register** proposing to update its regulations for implementing the procedural provisions of NEPA.

Following the publication of the NPRM, CEQ received approximately 1,145,571 comments on the proposed rule.[9] A majority of the comments (approximately 1,136,755) were the result of mass mail campaigns, which are comments with multiple signatories or groups of comments that are identical or very similar in form and content. CEQ received approximately 8,587 unique public comments of which 2,359 were substantive comments raising a variety of issues related to the rulemaking and contents of the proposed rule, including procedural, legal, and technical issues. Finally, 229 comments were duplicate or non-germane submissions, or contained only supporting materials.

The background section below summarizes NEPA, the CEQ regulations, and developments since CEQ issued those regulations. Specifically, section

I.A provides a brief summary of the NEPA statute. Section I.B describes the history of CEQ's regulations implementing NEPA and provides an overview of CEQ's numerous guidance documents and reports issued subsequent to the regulations. Section I.C discusses the role of the courts in interpreting NEPA. Section I.D provides a brief overview of Congress's efforts, and section I.E describes the initiatives of multiple administrations to reduce delays and improve implementation of NEPA. Finally, sections I.F and I.G provides the background on this rulemaking, including the ANPRM and the NPRM.

In section II, CEQ provides a summary of the final rule, including changes CEQ made from the proposed rule, which comprehensively updates and substantially revises CEQ's prior regulations. This final rule modernizes and clarifies the CEQ regulations to facilitate more efficient, effective, and timely NEPA reviews by Federal agencies by simplifying regulatory requirements, codifying certain guidance and case law relevant to these regulations, revising the regulations to reflect current technologies and agency practices, eliminating obsolete provisions, and improving the format and readability of the regulations. CEQ's revisions include provisions intended to promote timely submission of relevant information to ensure consideration of such information by agencies. CEQ's revisions will provide greater clarity for Federal agencies, States, Tribes, localities, and the public, and advance the original goals of the CEQ regulations to reduce paperwork and delays and promote better decisions consistent with the national environmental policy set forth in section 101 of NEPA.

CEQ provides a summary of the comments received on the proposed rule and responses in the document titled "Update to the Regulations Implementing the Procedural Provisions of the National Environmental Policy Act Final Rule Response to Comments"[10] ("Final Rule Response to Comments"). This document organizes the comments by the parts and sections of the proposed rule that the comment addresses, and includes a subsection on other general or crosscutting topics.

Ultimately, the purpose of the NEPA process is to ensure informed decision making by Federal agencies with regard to the potential environmental effects of

proposed major Federal actions and to make the public aware of the agency's decision-making process. When effective and well managed, the NEPA process results in more informative documentation, enhanced coordination, resolution of conflicts, and improved environmental outcomes. With this final rule, CEQ codifies effective agency practice and provides clarity on the requirements of the NEPA process.

*A. National Environmental Policy Act*

Congress enacted NEPA to establish a national policy for the environment, provide for the establishment of CEQ, and for other purposes. Section 101 of NEPA sets forth a national policy "to use all practicable means and measures, including financial and technical assistance, in a manner calculated to foster and promote the general welfare, to create and maintain conditions under which man and nature can exist in productive harmony, and [to] fulfill the social, economic, and other requirements of present and future generations of Americans." 42 U.S.C. 4331(a). Section 102 of NEPA establishes procedural requirements, applying that national policy to proposals for major Federal actions significantly affecting the quality of the human environment by requiring Federal agencies to prepare a detailed statement on: (1) The environmental impact of the proposed action; (2) any adverse environmental effects that cannot be avoided; (3) alternatives to the proposed action; (4) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity; and (5) any irreversible and irretrievable commitments of resources that would be involved in the proposed action. 42 U.S.C. 4332(2)(C). NEPA also established CEQ as an agency within the Executive Office of the President to administer Federal agency implementation of NEPA. 42 U.S.C. 4332(2)(B), (C), (I), 4342, 4344; *see also Dep't of Transp.* v. *Pub. Citizen,* 541 U.S. 752, 757 (2004); *Warm Springs Dam Task Force* v. *Gribble,* 417 U.S. 1301, 1309–10 (Douglas, J. Circuit Justice 1974).

NEPA does not mandate particular results or substantive outcomes. Rather, NEPA requires Federal agencies to consider environmental impacts of proposed actions as part of agencies' decision-making processes. Additionally, NEPA does not include a private right of action and specifies no remedies. Challenges to agency action alleging noncompliance with NEPA procedures are brought under the Administrative Procedure Act (APA). 5

---

[7] 83 FR 28591 (June 20, 2018).

[8] 85 FR 1684 (Jan. 10, 2020).

[9] In the NPRM, CEQ listed several methods for members of the public to submit written comments, including submittal to the docket on *regulations.gov,* by fax, or by mail. In addition, CEQ also included an email address (*NEPA-Update@ceq.eop.gov*) in the NPRM for further information. While the NPRM did not list this email address among the several methods for the public to provide comments, CEQ has considered comments received through this email address during the public comment period and included them in the docket on *regulations.gov.*

[10] The Update to the Regulations Implementing the Procedural Provisions of the National Environmental Policy Act Final Rule Response to Comments document is available under "Supporting Documents" in the docket on *regulations.gov* under docket ID CEQ–2019–0003.

U.S.C. 551 *et seq.* Accordingly, NEPA cases proceed as APA cases. Limitations on APA cases and remedies thus apply to the adjudication of NEPA disputes.

*B. Council on Environmental Quality Regulations, Guidance, and Reports*

1. Regulatory History

In 1970, President Nixon issued Executive Order (E.O.) 11514, titled "Protection and Enhancement of Environmental Quality," which directed CEQ to "[i]ssue guidelines to Federal agencies for the preparation of detailed statements on proposals for legislation and other Federal actions affecting the environment, as required by section 102(2)(C) of the Act." [11] CEQ issued interim guidelines in April of 1970 and revised them in 1971 and 1973.[12]

In 1977, President Carter issued E.O. 11991, titled "Relating to Protection and Enhancement of Environmental Quality." [13] E.O. 11991 amended section 3(h) of E.O. 11514, directing CEQ to "[i]ssue regulations to Federal agencies for the implementation of the procedural provisions of [NEPA] . . . to make the environmental impact statement process more useful to decision[ ]makers and the public; and to reduce paperwork and the accumulation of extraneous background data, in order to emphasize the need to focus on real environmental issues and alternatives," and to "require [environmental] impact statements to be concise, clear, and to the point, and supported by evidence that agencies have made the necessary environmental analyses." E.O. 11991 also amended section 2 of E.O. 11514, requiring agency compliance with the regulations issued by CEQ. The Executive order was based on the President's constitutional and statutory authority, including NEPA, the Environmental Quality Improvement Act, 42 U.S.C. 4371 *et seq.,* and section 309 of the Clean Air Act, 42 U.S.C. 7609. The President has a constitutional duty to ensure that the "Laws be faithfully executed," U.S. Const. art. II, sec. 3, which may be delegated to appropriate officials. 3 U.S.C. 301. In signing E.O. 11991, the President delegated this authority to CEQ.[14]

In 1978, CEQ promulgated its "National Environmental Policy Act, Regulations, Implementation of Procedural Provisions," 40 CFR parts 1500–1508 ("CEQ regulations" or "NEPA regulations"), "[t]o reduce paperwork, to reduce delays, and at the same time to produce better decisions [that] further the national policy to protect and enhance the quality of the human environment." [15] The Supreme Court has explained that E.O. 11991 requires all "heads of [F]ederal agencies to comply" with the "single set of uniform, mandatory regulations" that CEQ issued to implement NEPA's provisions. *Andrus* v. *Sierra Club,* 442 U.S. 347, 357 (1979).

The Supreme Court has afforded the CEQ regulations "substantial deference." *Robertson* v. *Methow Valley Citizens Council,* 490 U.S. 332, 355 (1989) (citing *Andrus,* 442 U.S. at 358); *Pub. Citizen,* 541 U.S. at 757 ("The [CEQ], established by NEPA with authority to issue regulations interpreting it, has promulgated regulations to guide [F]ederal agencies in determining what actions are subject to that statutory requirement." (citing 40 CFR 1500.3)). The new regulations are intended to embody CEQ's interpretation of NEPA for *Chevron* purposes and to operate as legislative rules.[16] *See Chevron U.S.A., Inc.* v. *Nat. Res. Def. Council, Inc.,* 467 U.S. 837, 842–43 (1984); *see also Nat'l Cable & Telecomm. Ass'n* v. *Brand X internet Servs.,* 545 U.S. 967, 980–86 (2005) (applying *Chevron* deference to Federal Communications Commission regulations); *United States* v. *Mead Corp.,* 533 U.S. 218, 227–30 (2001) (properly promulgated agency regulations addressing ambiguities or gaps in a statute qualify for *Chevron* deference when agencies possess the authority to issue regulations interpreting the statute). The Supreme

Court has held that NEPA is a procedural statute that serves the twin aims of ensuring that agencies consider the significant environmental consequences of their proposed actions and inform the public about their decision making. *Balt. Gas & Elec. Co.* v. *Nat. Res. Def. Council, Inc.,* 462 U.S. 87, 97 (1983) (citing *Vt. Yankee Nuclear Power Corp.* v. *Nat. Res. Def. Council, Inc.,* 435 U.S. 519, 553 (1978); *Weinberger* v. *Catholic Action of Haw./ Peace Educ. Project,* 454 U.S. 139, 143 (1981)).

Furthermore, in describing the role of NEPA in agencies' decision-making processes, the Supreme Court has stated, "Congress in enacting NEPA, however, did not require agencies to elevate environmental concerns over other appropriate considerations." [17] *Balt. Gas & Elec. Co.,* 462 U.S. at 97 (citing *Strycker's Bay Neighborhood Council* v. *Karlen,* 444 U.S. 223, 227 (1980) (per curiam)). Instead, NEPA requires agencies to analyze the environmental consequences before taking a major Federal action. *Id.* (citing *Kleppe* v. *Sierra Club,* 427 U.S. 390, 410 n.21 (1976)). The Supreme Court has recognized that agencies have limited time and resources and that "[t]he scope of the agency's inquiries must remain manageable if NEPA's goal of '[insuring] a fully informed and well-considered decision,' . . . is to be accomplished." *Metro. Edison Co.* v. *People Against Nuclear Energy,* 460 U.S. 766, 776 (1983) (quoting *Vt. Yankee,* 435 U.S. at 558).

CEQ has substantively amended its NEPA regulations only once, at 40 CFR 1502.22, to replace the "worst case" analysis requirement with a provision for the consideration of incomplete or unavailable information regarding reasonably foreseeable significant adverse effects.[18] CEQ found that the amended 40 CFR 1502.22 would "generate information and discussion on those consequences of greatest concern to the public and of greatest relevance to the agency's decision," [19] rather than distorting the decision-making process by overemphasizing highly speculative harms.[20] The Supreme Court found this reasoning to

---

[11] 35 FR 4247 (Mar. 7, 1970), sec. 3(h).

[12] *See* 35 FR 7390 (May 12, 1970) (interim guidelines); 36 FR 7724 (Apr. 23, 1971) (final guidelines); 38 FR 10856 (May 2, 1973) (proposed revisions to guidelines); 38 FR 20550 (Aug. 1, 1973) (revised guidelines).

[13] 42 FR 26967 (May 25, 1977).

[14] The Presidential directive was consistent with the recommendation of the Commission on Federal Paperwork that the President require the development of consistent regulations and definitions and ensure coordination among agencies in the implementation of Environmental Impact

Statement preparation. *See* The Report of the Commission on Federal Paperwork, Environmental Impact Statements 16 (Feb. 25, 1977).

[15] 43 FR 55978 (Nov. 29, 1978); *see also* 44 FR 873 (Jan. 3, 1979) (technical corrections), and 43 FR 25230 (June 9, 1978) (proposed rule).

[16] Even without expressly invoking *Chevron* here and noting that CEQ intends these regulations to operate as legislative rules, *Chevron* would still apply. *See Guedes* v. *ATF,* 920 F.3d 1, 23 (D.C. Cir. 2019) ("And for this Rule in particular, another telltale sign of the agency's belief that it was promulgating a rule entitled to *Chevron* deference is the Rule's invocation of *Chevron* by name. To be sure, an agency of course need not expressly invoke the *Chevron* framework to obtain *Chevron* deference: '*Chevron* is a standard of *judicial* review, not of *agency* action.' *SoundExchange[, Inc.* v. *Copyright Royalty Bd.,*] 904 F.3d [41,] 54 [(D.C. Cir. 2018)]. Still, the Bureau's invocation of *Chevron* here is powerful evidence of its intent to engage in an exercise of interpretive authority warranting *Chevron* treatment.") (emphasis in original).

[17] Section 101 of NEPA provides that it is the Federal Government's policy "to use all practicable means and measures . . . to create and maintain conditions under which man and nature can exist in productive harmony, and [to] *fulfill the social, economic, and other requirements of present and future generations of Americans.*" 42 U.S.C. 4331(a) (emphasis added).

[18] 51 FR 15618 (Apr. 25, 1986).

[19] 50 FR 32234, 32237 (Aug. 9, 1985).

[20] 51 FR 15618, 15620 (Apr. 25, 1986).

**43308**    **Federal Register** / Vol. 85, No. 137 / Thursday, July 16, 2020 / Rules and Regulations

be a well-considered basis for the change, and that the new regulation was entitled to substantial deference. *Methow Valley*, 490 U.S. at 356.

The NEPA regulations direct Federal agencies to adopt their own implementing procedures, as necessary, in consultation with CEQ. 40 CFR 1507.3. Under this regulation, over 85 Federal agencies and their subunits have developed such procedures.[21]

2. CEQ Guidance and Reports

Over the past four decades, numerous questions have been raised regarding appropriate implementation of NEPA and the CEQ regulations. Soon after the issuance of the CEQ regulations and in response to CEQ's review of NEPA implementation and input from Federal, State, and local officials, including NEPA practitioners, CEQ issued the "Forty Most Asked Questions Concerning CEQ's National Environmental Policy Act Regulations"[22] in 1981 ("Forty Questions"). This guidance covered a wide range of topics including alternatives, coordination among applicants, lead and cooperating agencies, and integration of NEPA documents with analysis for other environmental statutes. In addition, CEQ has periodically examined the effectiveness of the NEPA process and issued a number of reports on NEPA implementation. In some instances, these reports led to additional guidance. These documents have been intended to provide guidance and clarifications with respect to various aspects of the implementation of NEPA and the definitions in the CEQ regulations, and to increase the efficiency and effectiveness of the environmental review process.[23]

In January 1997, CEQ issued "The National Environmental Policy Act: A Study of Its Effectiveness After Twenty-five Years."[24] In that report, CEQ acknowledged that NEPA has ensured that agencies adequately analyze the potential environmental consequences of their actions and bring the public into the decision-making processes of Federal agencies. However, CEQ also identified matters of concern to participants in the study, including concerns with overly lengthy documents that may not enhance or

improve decision making,[25] and concerns that agencies may seek to "'litigation-proof' documents, increasing costs and time but not necessarily quality."[26] The report further stated that "[o]ther matters of concern to participants in the Study were the length of NEPA processes, the extensive detail of NEPA analyses, and the sometimes confusing overlay of other laws and regulations."[27] The participants in the study identified five elements of the NEPA process' collaborative framework (strategic planning, public information and input, interagency coordination, interdisciplinary place-based decision making, and science-based flexible management) as critical to effective and efficient NEPA implementation.

In 2002, the Chairman of CEQ established a NEPA task force, composed of Federal agency officials, to examine NEPA implementation by focusing on (1) technology and information management and security; (2) Federal and intergovernmental collaboration; (3) programmatic analyses and tiering; (4) adaptive management and monitoring; (5) categorical exclusions (CEs); and (6) environmental assessments (EAs). In 2003, the task force issued a report[28] recommending actions to improve and modernize the NEPA process, leading to additional guidance documents and handbooks.

Over the past 4 decades, CEQ has issued over 30 documents on a wide variety of topics to provide guidance and clarifications to assist Federal agencies in more efficiently and effectively implementing the NEPA regulations.[29] While CEQ has sought to

provide clarity and direction related to implementation of the regulations and the Act through the issuance of guidance, agencies continue to face implementation challenges. Further, the documentation and timelines for completing environmental reviews can be very lengthy, and the process can be complex and costly.

In 2018, CEQ and the Office of Management and Budget (OMB) issued a memorandum titled "One Federal Decision Framework for the Environmental Review and Authorization Process for Major Infrastructure Projects under E.O. 13807" ("OFD Framework Guidance").[30] CEQ and OMB issued this guidance pursuant to E.O. 13807, titled "Establishing Discipline and Accountability in the Environmental Review and Permitting Process for Infrastructure Projects,"[31] to improve agency coordination for infrastructure

---

[21] A list of agency NEPA procedures is available at *https://ceq.doe.gov/laws-regulations/agency_implementing_procedures.html*.

[22] Forty Questions, *supra* note 2.

[23] *See https://www.energy.gov/nepa/ceq-guidance-documents*.

[24] *https://ceq.doe.gov/docs/ceq-publications/nepa25fn.pdf*.

[25] *Id.* at iii.

[26] *Id.*

[27] *Id.* In the 50 years since the passage of NEPA, Congress has amended or enacted a number of other environmental laws that may also apply to proposed Federal agency actions, such as the Endangered Species Act, the Clean Water Act, the Clean Air Act, and other substantive statutes. *See* discussion *infra* sec. I.D. Consistent with 40 CFR 1502.25, longstanding agency practice has been to use the NEPA process as the umbrella procedural statute, integrating compliance with these laws into the NEPA review and discussing them in the NEPA document. However, this practice sometimes leads to confusion as to whether an agency does an analysis to comply with NEPA or another, potentially substantive, environmental law.

[28] *See* The NEPA Task Force Report to the Council on Environmental Quality, Modernizing NEPA Implementation (Sept. 2003) ("NEPA Task Force Report"), *https://ceq.doe.gov/docs/ceq-publications/report/finalreport.pdf*.

[29] *See, e.g.*, Emergencies and the National Environmental Policy Act (Oct. 2016) ("Emergencies Guidance"), *https://ceq.doe.gov/docs/nepa-practice/Emergencies_and_NEPA.pdf*; Effective Use of Programmatic NEPA Reviews (Dec. 18, 2014) ("Programmatic Guidance"), *https://ceq.doe.gov/docs/ceq-regulations-and-guidance/Effective_Use_of_Programmatic_NEPA_Reviews_*

*Final_Dec2014_searchable.pdf*; NEPA and NHPA: A Handbook for Integrating NEPA and Section 106 (Mar. 2013), *https://ceq.doe.gov/publications/nepa-handbooks.html*; Memorandum on Environmental Conflict Resolution (Nov. 28, 2005), as expanded by Memorandum on Environmental Collaboration and Conflict Resolution (Sept. 7, 2012), *https://ceq.doe.gov/nepa-practice/environmental-collaboration-and-conflict-resolution.html*; Final Guidance on Improving the Process for Preparing Efficient and Timely Environmental Reviews Under the National Environmental Policy Act, 77 FR 14473 (Mar. 12, 2012) ("Timely Environmental Reviews Guidance"), *https://ceq.doe.gov/ceq-regulations-and-guidance/Improving_NEPA_Efficiencies_06Mar2012.pdf*; Final Guidance for Federal Departments and Agencies on the Appropriate Use of Mitigation and Monitoring and Clarifying the Appropriate Use of Mitigated Findings of No Significant Impact, 76 FR 3843 (Jan. 21, 2011) ("Mitigation Guidance"), *https://ceq.doe.gov/docs/ceq-regulations-and-guidance/Mitigation_and_Monitoring_Guidance_14Jan2011.pdf*; Council on Environmental Quality, Final Guidance for Federal Departments and Agencies on Establishing, Applying, and Revising Categorical Exclusions under the National Environmental Policy Act, 75 FR 75628 (Dec. 6, 2010) ("CE Guidance"), *https://ceq.doe.gov/docs/ceq-regulations-and-guidance/NEPA_CE_Guidance_Nov232010.pdf*; Letter from the Hon. James L. Connaughton, Chairman, Council on Environmental Quality, to the Hon. Norman Y. Mineta, Secretary, Department of Transportation (May 12, 2003) ("Connaughton Letter"), *https://ceq.doe.gov/docs/ceq-regulations-and-guidance/CEQ-DOT_PurposeNeed_May-2013.pdf*; Considering Cumulative Effects Under the National Environmental Policy Act (Jan. 1997) ("Cumulative Effects Guidance"), *https://ceq.doe.gov/publications/cumulative_effects.html*; Environmental Justice: Guidance under the National Environmental Policy Act (Dec. 10, 1997) ("EJ Guidance"), *https://ceq.doe.gov/docs/ceq-regulations-and-guidance/regs/ej/justice.pdf*; Forty Questions, *supra* note 2. CEQ also issued a resource for the public, A Citizen's Guide to the NEPA: Having Your Voice Heard (Dec. 2007), *https://ceq.doe.gov/get-involved/citizens_guide_to_nepa.html*.

[30] M–18–13 (Mar. 20, 2018), *https://www.whitehouse.gov/wp-content/uploads/2018/04/M-18-13.pdf*.

[31] 82 FR 40463 (Aug. 24, 2017).

projects requiring an EIS and permits or other authorizations from multiple agencies and to improve the timeliness of the environmental review process. *See* E.O. 13807, *infra* sec. I.E. Consistent with the OFD Framework Guidance, *supra* note 30, Federal agencies signed a memorandum of understanding committing to implement the One Federal Decision (OFD) policy for major infrastructure projects, including by committing to establishing a joint schedule for such projects, preparation of a single EIS and joint ROD, elevation of delays and dispute resolution, and setting a goal of completing environmental reviews for such projects within two years.[32] Subsequently, CEQ and OMB issued guidance for the Secretary of Transportation regarding the applicability of the OFD policy to States under the Surface Transportation Project Delivery Program,[33] and for the Secretary of Housing and Urban Development (HUD) regarding the applicability of the OFD policy to entities assuming HUD environmental review responsibilities.[34] CEQ also has provided direction to the Federal Energy Regulatory Commission (FERC) relating to the requirement for joint RODs under the OFD policy.[35]

3. Environmental Impact Statement Timelines and Page Count Reports

CEQ also has conducted reviews and prepared reports on the length of time it takes for agencies to prepare EISs and the length of these documents. These reviews found that the process for preparing EISs is taking much longer than CEQ advised, and that the documents are far longer than the CEQ regulations and guidance recommended. In December 2018, CEQ issued a report compiling information relating to the timelines for preparing EISs during the period of 2010–2017, and the NPRM included a summary of the report. CEQ

has since updated this analysis to include EISs completed in 2018, and this section reflects the updated data.[36]

While CEQ's Forty Questions states that the time for an EIS, even for a complex project, should not exceed 1 year,[37] CEQ found that, across the Federal Government, the average time for completion of an EIS and issuance of a ROD was 4.5 years and the median was 3.5 years. One quarter of the EISs took less than 2.2 years, and one quarter of the EISs took more than 6 years.

As reflected in the timelines report, the period from publication of a NOI to prepare an EIS to the notice of availability of the draft EIS took, on average, 58.4 percent of the total time, while preparing the final EIS, including addressing comments received on the draft EIS, took, on average, 32.2 percent of the total time. The period from the final EIS to publication of the ROD took, on average, 9.4 percent of the total time. This report recognized that EIS timelines vary widely and many factors may influence the timing of the document, including variations in the scope and complexity of the actions, variations in the extent of work done prior to issuance of the NOI, and suspension of EIS activities due to external factors.

Additionally, in July 2019, CEQ issued a report on the length, by page count, of EISs (excluding appendices) finalized during the period of 2013– 2017, and the NPRM included a summary of the report. CEQ has since updated this analysis to include EISs completed in 2018, and this section reflects the updated data.

While the CEQ regulations include recommended page limits for the text of final EISs of normally less than 150 pages, or normally less than 300 pages for proposals of "unusual scope or complexity," 40 CFR 1502.7, CEQ found that many EISs are significantly longer. In particular, CEQ found that across all Federal agencies, draft EISs averaged 575 pages in total, with a median document length of 397 pages.[38] One quarter of the draft EISs were 279 pages or shorter, and one quarter were 621 pages or longer. For final EISs, the average document length was 661 pages, and the median document length was 447 pages. One quarter of the final EISs were 286 pages or shorter, and one

quarter were 748 pages or longer. On average, the change in document length from draft EIS to final EIS was an additional 86 pages or a 15 percent increase.

With respect to final EISs, CEQ found that approximately 7 percent were 150 pages or shorter, and 27 percent were 300 pages or shorter.[39] Similar to the conclusions of its EIS timelines study, CEQ noted that a number of factors may influence the length of EISs, including variation in the scope and complexity of the decisions that the EIS is designed to inform, the degree to which NEPA documentation is used to document compliance with other statutes, and considerations relating to potential legal challenges. Moreover, variation in EIS length may reflect differences in management, oversight, and contracting practices among agencies that could result in longer documents.

While there can be many factors affecting the timelines and length of EISs, CEQ has concluded that revisions to the CEQ regulations to advance more timely reviews and reduce unnecessary paperwork are warranted. CEQ has determined that improvements to agency processes, such as earlier solicitation of information from States, Tribes, and local governments and the public, and improved coordination in the development of EISs, can achieve more useful and timely documents to support agency decision making.

*C. Judicial Review of Agency NEPA Compliance*

NEPA is the most litigated environmental statute in the United States.[40] Over the past 50 years, Federal courts have issued an extensive body of case law addressing appropriate implementation and interpretation of NEPA and the CEQ regulations.[41] The Supreme Court has directly addressed NEPA in 17 decisions, and the U.S. district and appellate courts issue approximately 100 to 140 decisions

[32] *See* Memorandum of Understanding Implementing One Federal Decision under Executive Order 13807 (2018), *https:// www.whitehouse.gov/wp-content/uploads/2018/04/ MOU-One-Federal-Decision-m-18-13-Part-2-1.pdf.*

[33] Guidance on the Applicability of E.O. 13807 to States with NEPA Assignment Authority Under the Surface Transportation Project Delivery Program, M–19–11 (Feb. 26, 2019), *https:// www.whitehouse.gov/wp-content/uploads/2017/11/ 20190226OMB-CEQ327.pdf.*

[34] Guidance on the Applicability of E.O. 13807 to Responsible Entities Assuming Department of Housing and Urban Development Environmental Review Responsibilities, M–19–20 (June 28, 2019), *https://www.whitehouse.gov/wp-content/uploads/ 2019/06/M-19-20.pdf.*

[35] *See* Letter from the Hon. Mary B. Neumayr, Chairman, Council on Environmental Quality, to the Hon. Neil Chatterjee, Chairman, Federal Energy Regulatory Comm'n (Aug. 22, 2019), *https:// www.whitehouse.gov/wp-content/uploads/2017/11/ 20190822FERCOFDLetter.pdf.*

[36] *See* Council on Environmental Quality, Environmental Impact Statement Timelines (2010– 2018), (June 12, 2020), *https://ceq.doe.gov/nepa-practice/eis-timelines.html.*

[37] Forty Questions, *supra* note 2, at Question 35.

[38] *See* Council on Environmental Quality, Length of Environmental Impact Statements (2013–2018), (June 12, 2020) ("CEQ Length of EISs Report"), *https://ceq.doe.gov/nepa-practice/eis-length.html.*

[39] The page counts compiled for 2010–2017 include the text of the EIS as well as supporting content to which the page limit in 40 CFR 1502.7 does not apply. For 2018, CEQ analyzed the data to determine the length of the text of the EISs and found that 19 percent of the final EISs were 150 pages or shorter and 51 percent were 300 pages or shorter.

[40] James E. Salzman and Barton H. Thompson, Jr., *Environmental Law and Policy* 340 (5th ed. 2019) ("Perhaps surprisingly, there have been thousands of NEPA suits. It might seem strange that NEPA's seemingly innocuous requirement of preparing an EIS has led to more lawsuits than any other environmental statute.").

[41] The 2019 edition of NEPA Law and Litigation includes a 115-page Table of Cases decisions construing NEPA. *See* Daniel R. Mandelker et al., NEPA Law and Litigation, Table of Cases (2d ed. 2019).

each year interpreting NEPA. The Supreme Court has construed NEPA and the CEQ regulations in light of a "rule of reason," which ensures that agencies determine whether and to what extent to prepare an EIS based on the usefulness of information to the decision-making process. *See Marsh* v. *Or. Nat. Res. Council,* 490 U.S. 360, 373–74 (1989). "Although [NEPA] procedures are almost certain to affect the agency's substantive decision, it is now well settled that NEPA itself does not mandate particular results, but simply prescribes the necessary process." *Methow Valley,* 490 U.S. at 350 (citing *Strycker's Bay Neighborhood Council, Inc.,* 444 U.S. at 227–28; *Vt. Yankee,* 435 U.S. at 558; *see also Pub. Citizen,* 541 U.S. at 756–57 ("NEPA imposes only procedural requirements on [F]ederal agencies with a particular focus on requiring agencies to undertake analyses of the environmental impact of their proposals and actions." (citing *Methow Valley,* 490 U.S. at 349–50)). The thousands of decisions interpreting NEPA and the current CEQ regulations being amended here drive much of agencies' modern-day practice. A challenge for agencies is that courts have interpreted key terms and requirements differently, adding to the complexity of environmental reviews. For example, in 2018 and 2019, the U.S. Courts of Appeals issued 56 substantive decisions on a range of topics, including assessment of impacts, sufficiency of alternatives, whether an agency's action qualified as Federal action, and purpose and need statements.[42] As discussed below, the final rule codifies longstanding case law in some instances, and, in other instances, clarifies the meaning of the regulations where there is a lack of uniformity in judicial interpretation of NEPA and the CEQ regulations.

*D. Statutory Developments*

Since the enactment of NEPA in 1970, Congress has amended or enacted a large number of substantive environmental statutes. These have included significant amendments to the Clean Water Act and Clean Air Act, establishment of new Federal land management standards and planning processes for National forests, public lands, and coastal zones, and statutory requirements to conserve fish, wildlife, and plant species.[43] Additionally, the consideration of the effects on historic properties under the National Historic Preservation Act is typically integrated into the NEPA review.[44] NEPA has served as the umbrella procedural statute, integrating these laws into NEPA reviews and discussing them in NEPA documents.

Over the past two decades and multiple administrations, Congress has also undertaken efforts to facilitate more efficient environmental reviews by Federal agencies, and has enacted a number of statutes aimed at improving the implementation of NEPA, including in the context of infrastructure projects. In particular, Congress has enacted legislation to improve coordination among agencies, integrate NEPA with other environmental reviews, and bring more transparency to the NEPA process.

In 2005, Congress enacted 23 U.S.C. 139, "Efficient environmental reviews for project decisionmaking," a streamlined environmental review process for highway, transit, and multimodal transportation projects (the "section 139 process"), in the Safe, Accountable, Flexible, Efficient Transportation Equity Act: A Legacy for Users (SAFETEA–LU), Public Law 109–59, sec. 6002(a), 119 Stat. 1144, 1857. Congress amended section 139 with additional provisions designed to improve the NEPA process in the 2012 Moving Ahead for Progress in the 21st Century Act (MAP–21), Public Law 112–141, sec. 1305–1309, 126 Stat. 405, and the 2015 Fixing America's Surface Transportation (FAST) Act, Public Law 114–94, sec. 1304, 129 Stat. 1312, 1378. Section 139 provides for an environmental review process that is based on and codifies many aspects of the NEPA regulations, including provisions relating to lead and cooperating agencies, concurrent environmental reviews in a single NEPA document, coordination on the development of the purpose and need statement and reasonable alternatives, and adoption of environmental documents. Further, section 139 provides for referral to CEQ for issue resolution, similar to part 1504 of the NEPA regulations, and allows for the use of errata sheets, consistent with 40 CFR 1503.4(c).[45]

When Congress enacted section 2045 of the Water Resources Development Act of 2007, Public Law 110–114, 121 Stat. 1041, 1103, it created a similar environmental review provision for water resources development projects by the U.S. Army Corps of Engineers (Corps). 33 U.S.C. 2348.[46] This project acceleration provision also requires a coordinated environmental review process, provides for dispute resolution, and codifies aspects of the NEPA regulations such as lead and cooperating agencies, concurrent environmental reviews, and the establishment of CEs. Section 2348(o) also directs the Corps to consult with CEQ on the development of guidance for implementing this provision.

In 2015 Congress enacted Title 41 of the FAST Act (FAST–41), to provide for a more efficient environmental review and permitting process for "covered projects." *See* Public Law 114–94, sec. 41001–41014, 129 Stat. 1312, 1741 (42 U.S.C. 4370m—4370m–12). These are projects that require Federal environmental review under NEPA, are expected to exceed $200 million, and involve the construction of infrastructure for certain energy production, electricity transmission, water resource projects, broadband, pipelines, manufacturing, and other sectors. *Id.* FAST–41 codified certain roles and responsibilities required by the NEPA regulations. In particular, FAST–41 imports the concepts of lead and cooperating agencies, and the different levels of NEPA analysis—EISs, EAs, and CEs. Consistent with 40 CFR 1501.5(e) through (f), CEQ is required to resolve any dispute over designation of a facilitating or lead agency for a covered project. 42 U.S.C. 4370m–2(a)(6)(B). Section 4370m–4 codified several requirements from the CEQ

---

[42] National Association of Environmental Professionals, 2019 Annual NEPA Report of the National Environmental Policy Act (NEPA) Practice (2020) at 30–31, *https://naep.memberclicks.net/ assets/annual-report/2019_NEPA_Annual_Report/ NEPA_Annual_Report_2019.pdf;* National Association of Environmental Professionals, 2018 Annual NEPA Report of the National Environmental Policy Act (NEPA) Practice (2019) at 41–51, *https://naep.memberclicks.net/assets/ documents/2019/NEPA_Annual_Report_2018.pdf.*

[43] *See, e.g.,* the Clean Air Act, 42 U.S.C. 7401–7671q; Clean Water Act, 33 U.S.C. 1251–1388; Coastal Zone Management Act, 16 U.S.C. 1451–1466; Federal Land Policy and Management Act, 43 U.S.C. 1701–1787; Forest and Rangeland Renewable Resources Planning Act of 1974, 16 U.S.C. 1600–1614; Magnuson-Stevens Fishery Conservation and Management Act, 16 U.S.C. 1801–1884; Endangered Species Act, 16 U.S.C. 1531–1544; Oil Pollution Act of 1990, 33 U.S.C. 2701–2762; Surface Mining Control and Reclamation Act of 1977, 30 U.S.C. 1201, 1202, and 1211; and Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. 9601–9675.

[44] Similar to NEPA, section 106 (54 U.S.C. 306108) of the National Historic Preservation Act is a procedural statute.

[45] To facilitate the NEPA process for transportation projects subject to section 139, the statute specifically calls for development of a coordination plan, including development of a schedule, and publicly tracking the implementation of that schedule through use of the Permitting Dashboard. *See infra* sec. I.E. In addition, the section 139 process provides for "participating" agencies, which are any agencies invited to participate in the environmental review process. Section 139 also requires, to the maximum extent practicable, issuance of a combined final EIS and ROD.

[46] Congress significantly revised this provision in the Water Resources Reform and Development Act of 2014, Public Law 113–121, sec. 1005(a)(1), 128 Stat. 1193 1199.

regulations, including the requirement for concurrent environmental reviews, which is consistent with 40 CFR 1500.2(c), 1501.7(a)(6), and 1502.25(a), and the tools of adoption, incorporation by reference, supplementation, and use of State documents, consistent with 40 CFR 1506.3, 1502.21, 1502.9(c), and 1506.2.[47] Finally, 42 U.S.C. 4370m–4 addresses interagency coordination on key aspects of the NEPA process, including scoping (40 CFR 1501.7), identification of the range of reasonable alternatives for study in an EIS (40 CFR 1502.14), and the public comment process (40 CFR part 1503).

To ensure a timely NEPA process so that important infrastructure projects can move forward, Congress has also established shorter statutes of limitations for challenges to certain types of projects. SAFETEA–LU created a 180-day statute of limitations for highway or public transportation capital projects, which MAP–21 later reduced to 150 days. 23 U.S.C. 139(l). The Water Resources Reform and Development Act of 2014 established a three-year statute of limitations for judicial review of any permits, licenses, or other approvals for water resources development project studies. 33 U.S.C. 2348(k). Most recently in FAST–41, Congress established a two-year statute of limitations for covered projects. 42 U.S.C. 4370m–6.

There are a number of additional instances where Congress has enacted legislation to facilitate more timely environmental reviews. For example, similar to the provisions described above, there are other statutes where Congress has called for a coordinated and concurrent environmental review. *See, e.g.,* 33 U.S.C. 408(b) (concurrent review for river and harbor permits); 49 U.S.C. 40128 (coordination on environmental reviews for air tour management plans for national parks); 49 U.S.C. 47171 (expedited and coordinated environmental review process for airport capacity enhancement projects).

Additionally, Congress has established or directed agencies to establish CEs to facilitate NEPA compliance. *See, e.g.,* 16 U.S.C. 6554(d)

(applied silvicultural assessment and research treatments); 16 U.S.C. 6591d (hazardous fuels restoration projects to carry out forest restoration treatments); 16 U.S.C. 6591e (vegetation management activity in greater sage-grouse or mule deer habitat); 33 U.S.C. 2349 (actions to repair, reconstruct, or rehabilitate water resources projects in response to emergencies); 42 U.S.C. 15942 (certain activities for the purpose of exploration or development of oil or gas); 43 U.S.C. 1772(c)(5) (development and approval of vegetation management, facility inspection, and operation and maintenance plans); MAP–21, Public Law 112–141, sec. 1315 (actions to repair or reconstruct roads, highways, or bridges damaged by emergencies), 1316 (projects within the operational right-of-way), and 1317 (projects with limited Federal assistance); FAA Modernization and Reform Act of 2012, Public Law 112–95, sec. 213(c), 126 Stat. 11, 46 (navigation performance and area navigation procedures); and Omnibus Appropriations Act, 2009, Public Law 111–8, sec. 423, 123 Stat. 524, 748 (Lake Tahoe Basin Management Unit hazardous fuel reduction projects).

Further, in the context of emergency response, including economic crisis, Congress has enacted legislation to facilitate timely NEPA reviews or to exempt certain actions from NEPA review. Congress has directed the use or development of alternative arrangements in accordance with 40 CFR 1506.11 for reconstruction of transportation facilities damaged in an emergency (FAST Act, Pub. L. 114–94, sec. 1432, 129 Stat. 1312, 1429) and for projects by the Departments of the Interior and Commerce to address invasive species (Water Infrastructure Improvements for the Nation Act, Pub. L. 114–322, sec. 4010(e)(3), 130 Stat. 1628, 1877). Section 1609(c) of the American Recovery and Reinvestment Act of 2009 directed agencies to complete environmental reviews under NEPA on an expedited basis using the most efficient applicable process. Public Law 111–5, sec. 1609, 123 Stat. 115, 304.

In 2013, Congress also enacted section 429 of the Robert T. Stafford Disaster Relief and Emergency Assistance Act ("Stafford Act"), 42 U.S.C. 5189g, which directed the President, in consultation with CEQ and the Advisory Council on Historic Preservation, to "establish an expedited and unified interagency review process to ensure compliance with environmental and historic requirements under Federal law relating to disaster recovery projects, in order to expedite the recovery process, consistent with applicable law." Sandy

Recovery Improvement Act of 2013, Public Law 113–2, sec. 1106, 127 Stat. 4, 45–46. This unified Federal environmental and historic preservation review (UFR) process is a framework for coordinating Federal agency environmental and historic preservation reviews for disaster recovery projects associated with presidentially declared disasters under the Stafford Act. The goal of the UFR process is to enhance the ability of Federal environmental review and authorization processes to inform and expedite disaster recovery decisions for grant applicants and other potential beneficiaries of disaster assistance by improving coordination and consistency across Federal agencies, and assisting agencies in better leveraging their resources and tools.[48]

Finally, in some instances, Congress has exempted actions from NEPA. In 1996, Congress enacted the Illegal Immigration Reform and Immigrant Responsibility Act, which authorized the waiver of NEPA for the construction of the physical barriers and roads between the United States and Mexico border when necessary to "ensure expeditious construction." Public Law 104–208, sec. 102(c), 110 Stat. 3009.[49] In 2013, Congress exempted certain disaster recovery actions or financial assistance to restore "a facility substantially to its condition prior to the disaster or emergency." 42 U.S.C. 5159. In 2020, Congress enacted the Coronavirus Aid, Relief, and Economic Security Act, which created an exemption from NEPA for the General Services Administration's acquisition of real property and interests in real property or improvements in real property in response to coronavirus in

---

[47] For covered projects, section 4370m–4 authorizes lead agencies to adopt or incorporate by reference existing environmental analyses and documentation prepared under State laws and procedures if the analyses and documentation meet certain requirements. 42 U.S.C. 4370m–4(b)(1)(A)(i). This provision also requires that the lead agency, in consultation with CEQ, determine that the analyses and documentation were prepared using a process that allowed for public participation and consideration of alternatives, environmental consequences, and other required analyses that are substantially equivalent to what a Federal agency would have prepared pursuant to NEPA. *Id.*

[48] *See generally* Memorandum of Understanding Establishing the Unified Federal Environmental and Historic Preservation Review Process for Disaster Recovery Projects (July 29, 2014), *https://www.fema.gov/media-library-data/1414507626204-f156c4795571b85a4f8e1c1f4c4b7de1/Final_Signed_UFR_MOU_9_24_14_508_ST.PDF.*

[49] The Homeland Security Act of 2002 transferred responsibility for the construction of border barriers from the Attorney General to the Department of Homeland Security. Public Law 107–296, 116 Stat. 2135. In 2005, the REAL ID Act amended the waiver authority of section 102(c) expanding the Secretary of DHS' authority to waive "all legal requirements" that the Secretary, in his or her own discretion, determines "necessary to ensure expeditious construction" of certain "barriers and roads." Public Law 109–13, Div. B, tit. I, sec. 102, 119 Stat. 231, 302, 306. It also added a judicial review provision that limited the district court's jurisdiction to hear any causes or claims concerning the Secretary's waiver authority to solely constitutional claims. *Id.* sec. 102(c)(2)(A). Further, the provision directed that any review of the district court's decision be raised by petition for a writ of certiorari with the Supreme Court of the United States. *Id.* sec. 102(c)(2)(C). *See In re Border Infrastructure Envtl. Litig.,* 284 F. Supp. 3d 1092 (S.D. Cal. 2018).

**43312**    **Federal Register**/Vol. 85, No. 137/Thursday, July 16, 2020/Rules and Regulations

conjunction with the provision of additional funding to prevent, prepare for, and respond to the coronavirus. Public Law 116–136, Div. B.

These statutes reflect that Congress has recognized that the environmental review process can be more efficient and effective, including for infrastructure projects, and that in certain circumstances, Congress has determined it appropriate to exempt certain actions from NEPA review. Congress also has identified specific process improvements that can accelerate environmental reviews, including improved interagency coordination, concurrent reviews, and increased transparency.

### E. Presidential Directives

Over the past two decades and multiple administrations, Presidents also have recognized the need to improve the environmental review process to make it more timely and efficient, and have directed agencies, through Executive orders and Presidential memoranda, to undertake various initiatives to address these issues. In 2002, President Bush issued E.O. 13274 titled "Environmental Stewardship and Transportation Infrastructure Project Reviews," [50] which stated that the development and implementation of transportation infrastructure projects in an efficient and environmentally sound manner is essential, and directed agencies to conduct environmental reviews for transportation projects in a timely manner.

In 2011, President Obama's memorandum titled "Speeding Infrastructure Development Through More Efficient and Effective Permitting and Environmental Review" [51] directed certain agencies to identify up to three high-priority infrastructure projects for expedited environmental review and permitting decisions to be tracked publicly on a "centralized, online tool." This requirement led to the creation of what is now the Permitting Dashboard, *www.permits.performance.gov.*

In 2012, E.O. 13604, titled "Improving Performance of Federal Permitting and Review of Infrastructure Projects," [52] established an interagency Steering Committee on Federal Infrastructure Permitting and Review Process Improvement ("Steering Committee") to facilitate improvements in Federal permitting and review processes for infrastructure projects. The Executive

order directed the Steering Committee to develop a plan "to significantly reduce the aggregate time required to make Federal permitting and review decisions on infrastructure projects while improving outcomes for communities and the environment." Similarly, E.O. 13616, titled "Accelerating Broadband Infrastructure Deployment," [53] established an interagency working group to, among other things, avoid duplicative reviews and coordinate review processes to advance broadband deployment.

A 2013 Presidential Memorandum titled "Modernizing Federal Infrastructure Review and Permitting Regulations, Policies, and Procedures" [54] directed the Steering Committee established by E.O. 13604 to work with agencies, OMB, and CEQ to "modernize Federal infrastructure review and permitting regulations, policies, and procedures to significantly reduce the aggregate time required by the Federal Government to make decisions in the review and permitting of infrastructure projects, while improving environmental and community outcomes" and develop a plan to achieve this goal. Among other things, the memorandum directed that the plan create process efficiencies, including additional use of concurrent and integrated reviews; expand coordination with State, Tribal, and local governments; and expand the use of information technology tools. CEQ and OMB led the effort to develop a comprehensive plan to modernize the environmental review and permitting process while improving environmental and community outcomes, including budget proposals for funding and new authorities. Following the development of the plan, CEQ continued to work with agencies to improve the permitting process, including through expanded collection of timeframe metrics on the Permitting Dashboard. In late 2015, these ongoing efforts were superseded by the enactment of FAST–41, which codified the use of the Permitting Dashboard, established the Federal Permitting Improvement Steering Council ("Permitting Council"), and established other requirements for managing the environmental review and permitting process for covered infrastructure projects.

On August 15, 2017, President Trump issued E.O. 13807 titled "Establishing Discipline and Accountability in the Environmental Review and Permitting Process for Infrastructure Projects." [55]

Section 5(e)(i) directed CEQ to develop an initial list of actions to enhance and modernize the Federal environmental review and authorization process, including issuing such regulations as CEQ deems necessary to: (1) Ensure optimal interagency coordination of environmental review and authorization decisions; (2) ensure that multi-agency environmental reviews and authorization decisions are conducted in a manner that is concurrent, synchronized, timely, and efficient; (3) provide for use of prior Federal, State, Tribal, and local environmental studies, analysis, and decisions; and (4) ensure that agencies apply NEPA in a manner that reduces unnecessary burdens and delays, including by using CEQ's authority to interpret NEPA to simplify and accelerate the NEPA review process. In response to E.O. 13807, CEQ published an initial list of actions and stated its intent to review its existing NEPA regulations in order to identify potential revisions to update and clarify these regulations. [56]

### F. Advance Notice of Proposed Rulemaking

Consistent with E.O. 13807 and CEQ's initial list of actions, and given the length of time since CEQ issued its regulations, on June 20, 2018, CEQ published an ANPRM titled "Update to the Regulations for Implementing the Procedural Provisions of the National Environmental Policy Act." [57] The ANPRM requested public comments on how CEQ could ensure a more efficient, timely, and effective NEPA process consistent with the Act's national environmental policy and provided for a 30-day comment period. [58]

The ANPRM requested comment on potential revisions to update and clarify the NEPA regulations, and included a list of questions on specific aspects of the regulations. For example, with respect to the NEPA process, the ANPRM asked whether there are provisions that CEQ could revise to ensure more efficient environmental reviews and authorization decisions, such as facilitating agency use of existing environmental studies, analyses and decisions, as well as improving interagency coordination. The ANPRM also requested comments on the scope of NEPA reviews, including whether CEQ should revise, clarify, or add definitions. The ANPRM also asked whether additional revisions relating to

[50] 67 FR 59449 (Sept. 23, 2002).
[51] *https://www.govinfo.gov/content/pkg/DCPD-201100601/pdf/DCPD-201100601.pdf.*
[52] 77 FR 18887 (Mar. 28, 2012).

[53] 77 FR 36903 (June 20, 2012).
[54] 78 FR 30733 (May 22, 2013).
[55] 82 FR 40463 (Aug. 24, 2017).

[56] 82 FR 43226 (Sept. 14, 2017).
[57] 83 FR 28591 (June 20, 2018).
[58] In response to comments, CEQ extended the comment period 31 additional days to August 20, 2018. 83 FR 32071 (July 11, 2018).

environmental documentation issued pursuant to NEPA, including CEs, EAs, EISs, and other documents, would be appropriate. Finally, the ANPRM requested general comments, including whether there were obsolete provisions that CEQ could update to reflect new technologies or make the process more efficient, or that CEQ could revise to reduce unnecessary burdens or delays.

In response to the ANPRM, CEQ received over 12,500 comments, which are available for public review.[59] These included comments from a wide range of stakeholders, including States, Tribes, localities, environmental organizations, trade associations, NEPA practitioners, and interested members of the public. While some commenters opposed any updates to the regulations, other commenters urged CEQ to consider potential revisions. Though the approaches to the update of the NEPA regulations varied, most of the substantive comments supported some degree of updating of the regulations. Many noted that overly lengthy documents and the time required for the NEPA process remain real and legitimate concerns despite the NEPA regulations' explicit direction with respect to reducing paperwork and delays. In general, numerous commenters requested that CEQ consider revisions to modernize its regulations, reduce unnecessary burdens and costs, and make the NEPA process more efficient, effective, and timely.

*G. Notice of Proposed Rulemaking*

On January 9, 2020, President Trump announced the release of CEQ's NPRM titled "Update to the Regulations Implementing the Procedural Provisions of the National Environmental Policy Act" and the rule was published in the **Federal Register** on January 10, 2020.[60] The NPRM provided a 60-day comment period, and the comment period ended on March 10, 2020.

CEQ hosted two public hearings in Denver, Colorado on February 11, 2020, and in Washington, DC on February 25, 2020.[61] CEQ also notified all federally recognized Tribes and over 400 interested groups, including State, Tribal, and local officials, environmental organizations, trade associations, NEPA practitioners, and interested members of the public

representing a broad range of diverse views, that CEQ had issued the proposed rule for public comment.[62] Additionally, CEQ made information to aid the public's review of the proposed rule available on its websites at *www.whitehouse.gov/ceq* and *www.nepa.gov,* including a redline version of the proposed changes to the regulations posted on *www.regulations.gov,* along with a presentation on the proposed rule and other background information.[63] CEQ also conducted additional public outreach to solicit comments, including meetings with Tribal representatives in Denver, Colorado, Anchorage, Alaska, and Washington, DC.[64]

In response to the NPRM, CEQ received comments from a broad range of stakeholders on a diversity of issues relating to the proposed rule. These included comments from members of Congress, State, Tribal, and local officials, environmental organizations, trade associations, NEPA practitioners, and interested members of the public. CEQ also received a large number of campaign comments, including comments with multiple signatories or groups of comments that were identical or very similar in form or content. The comments received on the NPRM raised a variety of issues related to the rulemaking and contents of the proposed rule, including procedural, legal, and technical issues. The Final Rule Response to Comments provides a summary of the comments and responses to those comments.

**II. Summary of Final Rule**

In this section, CEQ summarizes the NPRM proposed changes and the final rule, including any changes or additions to what CEQ proposed. CEQ makes the additions, clarifications, and updates to its regulations based on its record evaluating the implementation of the NEPA regulations, suggestions in response to the ANPRM, and comments provided in response to the NPRM. The revisions finalized in this rule advance the original objectives of the 1978 regulations[65] "[t]o reduce paperwork, to reduce delays, and at the same time to produce better decisions [that] further

the national policy to protect and enhance the quality of the human environment." [66]

In this final rule, CEQ makes various revisions to align the regulations with the text of the NEPA statute, including revisions to reflect the procedural nature of the statute, including under section 102(2). CEQ also revises the regulations to ensure that environmental documents prepared pursuant to NEPA are concise and serve their purpose of informing decision makers regarding significant potential environmental effects of proposed major Federal actions and the public of the environmental issues in the pending decision-making process. CEQ makes changes to ensure that the regulations reflect changes in technology, increase public participation in the process, and facilitate the use of existing studies, analyses, and environmental documents prepared by States, Tribes, and local governments.

CEQ also makes its regulations consistent with the OFD policy established by E.O. 13807 for multi-agency review and related permitting and other authorization decisions. The Executive order specifically instructed CEQ to take steps to ensure optimal interagency coordination, including through a concurrent, synchronized, timely, and efficient process for environmental reviews and authorization decisions. In response to the NPRM, CEQ received many comments supporting revisions to codify key aspects of the OFD policy in the NEPA regulations, including by providing greater specificity on the roles and responsibilities of lead and cooperating agencies. Commenters also suggested that the regulations require agencies to establish and adhere to timetables for the completion of reviews, another key element of the OFD policy. To promote improved interagency coordination and more timely and efficient reviews and in response to these comments, CEQ codifies and generally applies a number of key elements from the OFD policy in this final rule. These include development by the lead agency of a joint schedule, procedures to elevate delays or disputes, preparation of a single EIS and joint ROD to the extent practicable, and a two-year goal for completion of environmental reviews. Consistent with section 104 of NEPA (42 U.S.C. 4334), codification of these policies will not limit or affect the authority or legal responsibilities of agencies under other statutory mandates that may be covered by joint schedules,

---

[59] *See https://www.regulations.gov,* docket no. CEQ–2018–0001.

[60] *Supra* note 8.

[61] Transcripts of the two public hearings with copies of testimony and written comments submitted at the hearings are available in the docket on *www.regulations.gov,* docket ID CEQ–2019– 0003.

[62] Notices are available under "Supporting Documents" in the docket, *www.regulations.gov,* docket ID CEQ–2019–0003, *https:// www.regulations.gov/docketBrowser?rpp= 25&so=DESC&sb=commentDueDate&po= 0&dct=SR%2BO&D=CEQ-2019-0003.*

[63] *Id.*

[64] CEQ also includes meeting summaries under supplemental materials. *Id.*

[65] In this final rule, CEQ uses the term "1978 regulations" to refer to the regulations as they exist prior to this final rule's amendment thereof, which includes the 1986 amendment to 40 CFR 1502.22.

[66] 43 FR 55978 (Nov. 29, 1978).

**43314**     **Federal Register** / Vol. 85, No. 137 / Thursday, July 16, 2020 / Rules and Regulations

and CEQ includes language to that effect in § 1500.6.[67]

CEQ also clarifies the process and documentation required for complying with NEPA by amending part 1501 to add sections on threshold considerations, determination of the appropriate level of NEPA review, and the application of CEs; and revising sections in part 1501 on EAs and findings of no significant impact (FONSIs), and EISs in part 1502. CEQ further revises the regulations to promote more efficient and timely environmental reviews, including revisions to promote interagency coordination by amending sections of parts 1501, 1506, and 1507 relating to lead, cooperating, and participating agencies, timing of agency action, scoping, and agency NEPA procedures.

To promote a more efficient and timely NEPA process, CEQ amends provisions in parts 1501, 1506, and 1507 relating to applying NEPA early in the process, scoping, tiering, adoption, use of current technologies, and avoiding duplication of State, Tribal, and local environmental reviews; revises parts 1501 and 1502 to provide for presumptive time and page limits; and amends part 1508 to clarify the definitions. For example, CEQ includes two new mechanisms to facilitate the use of CEs when appropriate. Under § 1506.3(d), an agency can adopt another agency's determination that a CE applies to a proposed action when the adopting agency's proposed action is substantially the same. This extends the adoption process and standards from EISs to CE determinations.[68] This allows agencies to "piggyback" where more than one agency is taking an action related to the same project or activity. Alternatively, to apply CEs listed in another agency's procedures (without that agency already having made a determination that a CE applies to a substantially similar action), agencies can establish a process in their agency NEPA procedures to coordinate and apply CEs listed in other agencies' procedures.

Another efficiency included in this final rule is the ability for agencies to identify other requirements that serve the function of agency compliance with NEPA. Under §§ 1501.1 and 1507.3(d)(6), agencies may determine that another statute's requirements serve the function of agency compliance with

NEPA. Alternatively, agencies may designate in their agency NEPA procedures one or more procedures or documents under other statutes or Executive orders that satisfy one or more requirements in the NEPA regulations, consistent with § 1507.3(c)(5). Finally, § 1506.9 allows agencies to substitute processes and documentation developed as part of the rulemaking process for corresponding requirements in these regulations.

As noted above, NEPA is a procedural statute that has twin aims. The first is to promote informed decision making, while the second is to inform the public about the agency's decision making. In this final rule, CEQ amends parts 1500, 1501, 1502, 1503, 1505, and 1508 to ensure that agencies solicit and consider relevant information early in the NEPA process and have the maximum opportunity to take that information into account in their decision making.

In situations where an EIS is required, this process takes place in two discrete steps. First, § 1501.9(d) directs agencies to include information on the proposed action in the NOI, including its expected impacts and alternatives, and a request for comments from interested parties on the potential alternatives, information, and analyses relevant to the proposed action. Second, § 1503.1(a) requires agencies to request comments on the analysis and conclusions of the draft EIS. The purpose of these two provisions is to bring relevant comments, information, and analyses to the agency's attention, as early in the process as possible, to enable the agency to make maximum use of this information.

To facilitate this process, § 1503.3 requires comments on the draft EIS to be submitted on a timely basis and to be as specific as possible. Similarly, § 1503.1(a)(3) requires agencies to invite interested parties to comment specifically on the alternatives, information, and analyses submitted for consideration in the development of the draft EIS. Finally, § 1503.3(b) provides that comments, information, and analyses on the draft EIS not timely received are deemed unexhausted and therefore forfeited. The intent of these amendments is two-fold: (1) To ensure that comments are timely received and at a level of specificity where they can be meaningfully taken into account, where appropriate; and (2) to prevent unnecessary delay in the decision-making process.

Consistent with this intent, § 1503.3(b)(2) also directs agencies to include a new section in both the draft and final EIS that summarizes all alternatives, information, and analyses

submitted by interested parties in response to the agency's requests for comment in the NOI and on the draft EIS. In addition, §§ 1502.17(a)(2) and 1503.1(a)(3) direct agencies to request comment on the summary in the draft EIS. The purpose of these provisions is to ensure that the agency, through outreach to the public, has identified all relevant information submitted by State, Tribal, and local governments and other public commenters. Although not a substitute for the entire record, the summary will assist agency decision makers in their consideration of the record for the proposed action. As the Supreme Court observed in *Metropolitan Edison Co.* v. *People Against Nuclear Energy,* "[t]he scope of [an] agency's inquiries must remain manageable if NEPA's goal of '[insuring] a fully informed and well-considered decision' . . . is to be accomplished." 460 U.S. at 776 (quoting *Vt. Yankee,* 435 U.S. at 558).

Finally, informed by the summary included in the final EIS pursuant to §§ 1500.3(b)(2) and 1502.17 and the response to comments pursuant to § 1503.4, together with any other material in the record that he or she determines to be relevant, the decision maker is required under § 1505.2(b) to certify in the ROD that the agency has considered the alternatives, information, analyses, and objections submitted by State, Tribal, and local governments and public commenters for consideration in the development of the final EIS. Section 1505.2(b) further provides that a decision certified in this manner is entitled to a presumption that the agency has adequately considered the submitted alternatives, information, and analyses, including the summary thereof, in reaching its decision. This presumption will advance the purposes of the directive in E.O. 11991 to ensure that EISs are supported by evidence that agencies have performed the necessary environmental analyses. *See* E.O. 11991, sec. 1 amending E.O. 11514, sec. 3(h). This presumption is also consistent with the longstanding presumption of regularity that government officials have properly discharged their official duties. *See U.S. Postal Serv.* v. *Gregory,* 534 U.S. 1, 10 (2001) ("[W]e note that a presumption of regularity attaches to the actions of government agencies." (citing *United States* v. *Chem. Found., Inc.,* 272 U.S. 1, 14–15 (1926)); *INS* v. *Miranda,* 459 U.S. 14, 18 (1982) (specific evidence required to overcome presumption that public officers have executed their responsibilities properly); *Citizens to Preserve Overton Park, Inc.* v. *Volpe,* 401 U.S. 402, 415 (1971) (Although a

---

[67] In the preamble, CEQ uses the section symbol (§) to refer to the final regulations as set forth in this final rule and 40 CFR to refer to the 1978 CEQ regulations as set forth in 40 CFR parts 1500–1508.

[68] The final rule also extends the adoption process and standards, which only applies to EISs under the 1978 regulations, to EAs as well.

statute prohibited Federal funds for roads through parks absent a feasible and prudent alternative, and although the Secretary of Transportation approved funds without formal findings, the Secretary's decision-making process was nevertheless entitled to a presumption of regularity.); *Fed. Commc'ns Comm'n* v. *Schreiber*, 381 U.S. 279, 296 (1965) (noting "the presumption to which administrative agencies are entitled—that they will act properly and according to law"); *Phila. & T. Ry.* v. *Stimpson*, 39 U.S. (14 Pet.) 448, 458 (1840) (Where a statute imposed certain conditions before a corrected patent could issue, the signatures of the President and the Secretary of State on a corrected patent raised a presumption that the conditions were satisfied, despite absence of recitals to that effect on face of patent.); *Martin* v. *Mott*, 25 U.S. (12 Wheat.) 19, 33 (1827) ("Every public officer is presumed to act in obedience to his duty, until the contrary is shown . . . ."); *Udall* v. *Wash., Va. & Md. Coach Co.*, 398 F.2d 765, 769 (D.C. Cir. 1968) (The Secretary of the Interior's determination that limitation of commercial bus service was required to preserve a parkway's natural beauty was entitled to presumption of validity, and the burden was on the challenger to overcome it.).

In light of this precedent and the interactive process established by these regulations, under which the agency and interested parties exchange information multiple times, the agency compiles and evaluates summaries of that information, and a public official is required to certify the agency's consideration of the record, it is CEQ's intention that this presumption may be rebutted only by clear and convincing evidence that the agency has not properly discharged its duties under the statute.

Finally, CEQ revises the regulations to make them easier to understand and apply. CEQ reorganizes the regulatory text to move topics addressed in multiple sections and sometimes multiple parts into consolidated sections. CEQ simplifies and clarifies part 1508 to focus on definitions by moving operative requirements to the relevant regulatory provisions. CEQ revises the regulations to consolidate provisions and reduce duplication. Such consolidation, reordering, and reorganization promotes greater clarity and ease of use.

*A. Changes Throughout Parts 1500–1508*

CEQ proposed several revisions throughout parts 1500–1508 to provide consistency, improve clarity, and correct grammatical errors. CEQ proposed to make certain grammatical corrections in the regulations where it proposed other changes to the regulations to achieve the goals of this rulemaking, or where CEQ determined the changes are necessary for the reader to understand fully the meaning of the sentence. CEQ proposed to revise sentences from passive voice to active voice to help identify the responsible parties. CEQ also proposed to correct the usage of the term "insure" with "ensure" consistent with modern usage. "Insure" is typically used in the context of providing or obtaining insurance, whereas "ensure" is used in the context of making something sure, certain, or safe. While NEPA uses the term "insure," the context in which it is used makes it clear that Congress meant "ensure" consistent with modern usage. Similarly, CEQ proposed to correct the use of "which" and "that" throughout the rule.

CEQ proposed to add paragraph letters to certain introductory paragraphs where it would improve clarity. Finally, CEQ invited comment on whether it should make these types of grammatical and editorial changes throughout the rule or if there are additional specific instances where CEQ should make these types of changes. In the final rule, CEQ adopts the proposed revisions to provide consistency and clarity and to correct grammatical errors and makes these types of changes throughout.

CEQ proposed to add "Tribal" to the phrase "State and local" throughout the rule to ensure consultation with Tribal entities and to reflect existing NEPA practice to coordinate or consult with affected Tribal governments and agencies, as necessary and appropriate for a proposed action. CEQ also proposed this change in response to comments on the ANPRM supporting expansion of the recognition of the sovereign rights, interests, and expertise of Tribes. CEQ proposed to eliminate the provisions in the regulations that limit Tribal interest to reservations. CEQ adopts these proposals in the final rule and makes these addition and revisions in §§ 1500.3(b)(2)–(4), 1500.4(p), 1500.5(j), 1501.2(b)(4)(ii), 1501.3(b)(2)(iv), 1501.5(e), 1501.7(b) and (d), 1501.8(a), 1501.9(b), 1501.10(f), 1502.5(b), 1502.16(a)(5), 1502.17(a) and (b), 1502.20(a), 1503.1(a)(2)(i) and (ii), 1505.2(b), and 1506.1(b), 1506.2, 1506.6(b)(3)(i)–(iii), and 1508.1(e), (k), and (w). As noted in the NPRM, these changes are consistent with and in support of government-to-government consultation pursuant to E.O. 13175,

titled "Consultation and Coordination With Indian Tribal Governments." [69]

CEQ proposed several changes for consistent use of certain terms. In particular, CEQ proposed to change "entitlements" to the defined term "authorizations" proposed in § 1508.1(c) throughout the regulations and added "authorizations" where appropriate to reflect the mandate in E.O. 13807 for better integration and coordination of authorization decisions and related environmental reviews. CEQ is adopting these revisions in the final rule in §§ 1501.2(a), 1501.7(i), 1501.9(d)(4) and (f)(4), 1502.13, 1502.24(b), 1503.3(d), and 1508.1(w).

CEQ proposed to use the term "decision maker" to refer to an individual responsible for making decisions on agency actions and "senior agency official" to refer to the individual who oversees the agency's overall compliance with NEPA. CEQ adopts these changes in the final rule. There may be multiple individuals within certain departments or agencies that have these responsibilities, including where subunits have developed agency procedures or NEPA compliance programs.

CEQ proposed to replace "circulate" or "circulation" with "publish" or "publication" throughout the rule and make "publish or publication" a defined term in § 1508.1(y), which provides agencies with the flexibility to make environmental review and information available to the public by electronic means not available at the time of promulgation of the CEQ regulations in 1978. As explained in the NPRM, historically, the practice of circulation included mailing of hard copies or providing electronic copies on disks or CDs. While it may be necessary to provide a hard copy or copy on physical media in limited circumstances, agencies now provide most documents in an electronic format by posting them online and using email or other electronic forms of communication to notify interested or affected parties. This change will help reduce paperwork and delays, and modernize the NEPA process to be more accessible to the public. CEQ finalizes these changes in §§ 1500.4(o), 1501.2(b)(2), 1502.9(b) and (d)(3), 1502.20, 1503.4(b) and (c), 1506.3(b)(1) and (2), and 1506.8(c)(2).

CEQ proposed to change the term "possible" to "practicable" in the NPRM in a number of sections of the regulations. As noted in the NPRM, "practicable" is the more commonly used term in regulations to convey the ability for something to be done,

---

[69] 65 FR 67249 (Nov. 9, 2000).

considering the cost, including time required, technical and economic feasibility, and the purpose and need for agency action. The term "practicable," which is in the statute (42 U.S.C. 4331(a), (b)) and used many times in the 1978 regulations,[70] is consistent with notions of feasibility, which the case law has recognized as part of the NEPA process. *See, e.g., Vt. Yankee,* 435 U.S. at 551 ("alternatives must be bounded by some notion of feasibility"); *Kleppe,* 427 U.S. at 414 ("[P]ractical considerations of feasibility might well necessitate restricting the scope" of an agency's analysis.) CEQ makes these changes in the final rule in §§ 1501.7(h)(1) and (2), 1501.8(b)(1), 1502.5, 1502.9(b), 1504.2, and 1506.2(b) and (c).

Similarly, CEQ proposed to change "no later than immediately" to "as soon as practicable" in § 1502.5(b), and CEQ finalizes this change. Finally, CEQ proposed to refer to the procedures required in § 1507.3 using the term "agency NEPA procedures" throughout. CEQ makes this change in the final rule.

CEQ proposed to eliminate obsolete references and provisions in several sections of the CEQ regulations. In particular, CEQ proposed to remove references to the 102 Monitor in 40 CFR 1506.6(b)(2) and 1506.7(c) because the publication no longer exists, and OMB Circular A–95, which was revoked pursuant to section 7 of E.O. 12372 (47 FR 30959, July 16, 1982), including the requirement to use State and area-wide clearinghouses in 40 CFR 1501.4(e)(2), 1503.1(a)(2)(iii), 1505.2, and 1506.6(b)(3)(i). CEQ removes these references in the final rule.

CEQ proposed changes to citations and authorities in parts 1500 through 1508. CEQ is updating the authorities sections for each part to correct the format. CEQ also is removing cross-references to the sections of part 1508, "Definitions," and updates or inserts new cross-references throughout the rule to reflect revised or new sections. CEQ makes these changes throughout the final rule.

Finally, CEQ is reorganizing chapter V of title 40 of the Code of Federal Regulations to place the NEPA regulations into a new subchapter A, "National Environmental Policy Act Implementing Regulations," and organizing its other regulations into their own new subchapter B, "Administrative Procedures and Operations." References to "parts 1500 through 1508" in the proposed rule are referenced to "this subchapter" in the

final rule. CEQ notes that the provisions of the NEPA regulations, which the final rule comprehensively updates, should be read in their entirety to understand the requirements under the modernized regulations.[71]

*B. Revisions To Update the Purpose, Policy, and Mandate (Part 1500)*

In part 1500, CEQ proposed several revisions to update the policy and mandate sections of the regulations to reflect statutory, judicial, policy, and other developments since the CEQ regulations were issued in 1978. CEQ includes the proposed changes with some revisions in the final rule.

1. Purpose and Policy (§ 1500.1)

In the NPRM, CEQ proposed to retitle and revise § 1500.1, "Purpose and policy," to align this section with the statutory text of NEPA and certain case law, and reflect the procedural requirements of section 102(2) (42 U.S.C. 4332(2)). These changes also are consistent with the President's directive to CEQ to "[i]ssue regulations to Federal agencies for the implementation of the procedural provisions of the Act (42 U.S.C. 4332(2))." E.O. 11514, as amended by E.O. 11991, sec. 3(h). Many commenters supported these revisions to promote more efficient and timely reviews under NEPA, while others opposed the changes and requested that CEQ maintain the existing language. CEQ revises this section in the final rule consistent with its proposal.

Section 1500.1 provides that NEPA is a procedural statute intended to ensure Federal agencies consider the environmental impacts of their actions in the decision-making process. The Supreme Court has made clear that NEPA is a procedural statute that does not mandate particular results; "[r]ather, NEPA imposes only procedural requirements on [F]ederal agencies with a particular focus on requiring agencies to undertake analyses of the environmental impact of their proposals and actions." *Pub. Citizen,* 541 U.S. at 756–57 (citing *Methow Valley,* 490 U.S. at 349–50); *see also Vt. Yankee,* 435 U.S. at 558 ("NEPA does set forth significant substantive goals for the Nation, but its mandate to the agencies is essentially procedural.").

As proposed in the NPRM, CEQ revises § 1500.1(a) to summarize section

101 of the Act (42 U.S.C. 4331) and to reflect that section 102(2) establishes the procedural requirements to carry out the policy stated in section 101. CEQ revises § 1500.1(a) consistent with the case law to reflect that the purpose and function of NEPA is satisfied if Federal agencies have considered relevant environmental information and the public has been informed regarding the decision-making process, and to reflect that NEPA does not mandate particular results or substantive outcomes. *Marsh,* 490 U.S. at 373–74; *Vt. Yankee,* 435 U.S. at 558. CEQ replaces the vague reference to "action-forcing" provisions ensuring that Federal agencies act "according to the letter and spirit of the Act" (as well as consistently with their organic and program-specific governing statutes) with a more specific reference to the consideration of environmental impacts of their actions in agency decisions. These changes codify the Supreme Court's interpretation of section 102 in two important respects: Section 102 "ensures that the agency, in reaching its decision, will have available, and will carefully consider, detailed information concerning significant environmental impacts; it also guarantees that the relevant information will be made available to the larger audience that may also play a role in both the decision[-]making process and the implementation of that decision." *Methow Valley,* 490 U.S. at 349; *see also Winter* v. *Nat. Res. Def. Council, Inc.,* 555 U.S. 7, 23 (2008); *Pub. Citizen,* 541 U.S. at 756–58.

Consistent with CEQ's proposal in the NPRM, CEQ revises § 1500.1(b) to describe the NEPA regulations as revised in this final rule. In particular, CEQ revises this paragraph to reflect that the regulations include direction to Federal agencies to determine what actions are subject to NEPA's procedural requirements and the level of NEPA review, where applicable. The revisions also ensure that Federal agencies identify and consider relevant environmental information early in the process in order to promote informed decision making. These revisions reduce unnecessary burdens and delays consistent with E.O. 13807 and the purposes of the regulations as originally promulgated in 1978. These amendments emphasize that the policy of integrating NEPA with other environmental reviews is to promote concurrent and timely reviews and decision making consistent with statutes, Executive orders, and CEQ guidance. *See, e.g.,* 42 U.S.C. 5189g; 23 U.S.C. 139; 42 U.S.C. 4370m *et seq.;* E.O. 13604; E.O. 13807; Mitigation

---

[70] *See* 40 CFR 1500.2(f), 1501.4(b), 1501.7, 1505.2(c), 1506.6(f) and 1506.12(a).

[71] While the final rule retains, in large part, the numbering scheme used in the 1978 regulations, the final rule comprehensively updates the prior regulations. The new regulations should be consulted and reviewed to ensure application is consistent with the modernized provisions. Assumptions should not be made concerning the degree of change to, similarity to, or any interpretation of the prior version of the regulations.

AR_0029054

Guidance, *supra* note 29, and Timely Environmental Reviews Guidance, *supra* note 29.

## 2. Remove and Reserve Policy (§ 1500.2)

CEQ proposed to remove and reserve 40 CFR 1500.2, "Policy." The section included language that is identical or similar to language in E.O. 11514, as amended. That Executive order directed CEQ to develop regulations that would make the "[EIS] process more useful to decision makers and the public; and . . . reduce paperwork and the accumulation of extraneous background data, in order to emphasize the need to focus on real environmental issues and alternatives." *See* E.O. 11514, as amended by E.O. 11991, sec. 3(h). The Executive order also directed CEQ to require EISs to be "concise, clear and to the point, and supported by evidence that agencies have made the necessary environmental analyses." *Id.* CEQ proposed to remove this section because it is duplicative of other sections of the regulations, thereby eliminating redundancy. CEQ is making this change in the final rule.

Specifically, 40 CFR 1500.2(a) restated the statutory text in section 102 of NEPA (42 U.S.C. 4332) and is duplicative of language in § 1500.6, "Agency authority," requiring each agency to interpret the provisions of NEPA as a supplement to its existing authority and as a mandate to view policies and missions in light of the Act's national environmental objectives. Paragraph (b) required agencies to implement procedures to make the NEPA process more useful to decision makers and the public; reduce paperwork and accumulation of extraneous background data; emphasize relevant environmental issues and alternatives; and make EISs concise, clear, and to the point and supported by evidence that they have made the necessary analyses. This paragraph is duplicative of language in § 1502.1, "Purpose of environmental impact statement," and paragraphs (c) through (i) of § 1500.4, "Reducing paperwork."

Paragraph (c) of 40 CFR 1500.2, requiring agencies to integrate NEPA requirements with other planning and review procedures to run concurrently rather than consecutively, is duplicative of language in § 1502.24, "Environmental review and consultation requirements," § 1501.2, "Apply NEPA early in the process," § 1501.9, "Scoping," and § 1500.4, "Reducing paperwork." Paragraph (d) encouraging public involvement is duplicative of sections that direct agencies to provide notice and information to and seek comment from

the public regarding proposed actions and environmental documents, including provisions in § 1506.6, "Public involvement," § 1501.9, "Scoping," and § 1503.1, "Inviting comments and requesting information and analyses." [72] Paragraph (e), which required agencies to use the NEPA process to identify and assess reasonable alternatives to proposed actions that will avoid or minimize adverse effects, is duplicative of language in § 1502.1, "Purpose of environmental impact statement," and paragraph (c) of § 1505.2, "Record of decision in cases requiring environmental impact statements."

Paragraph (f) of 40 CFR 1500.2 required agencies to use all practicable means, consistent with the Act and other essential considerations of national policy, to restore and enhance the quality of the human environment and avoid or minimize any possible adverse effects of their actions upon the quality of the human environment. The rule specifically directs agencies to consider reasonable alternatives to avoid or minimize adverse environmental impacts in § 1502.1, "Purpose of environmental impact statement." The final rule also provides direction to agencies about the relevant environmental information to be considered in the decision-making process, including potential adverse effects and alternatives, and expressly directs agencies to identify alternatives considered (§§ 1502.14 and 1502.16), and to state in their RODs whether they have adopted all practicable means to avoid or minimize environmental harm from the alternative selected (§ 1505.2).

## 3. NEPA Compliance (§ 1500.3)

CEQ proposed numerous changes and additions to § 1500.3, "NEPA compliance," including the addition of paragraph headings to improve readability. In paragraph (a), "Mandate," CEQ proposed to update the authorities under which it issues the regulations. CEQ adds these references, including to E.O. 13807, in the final rule. In the NPRM, CEQ proposed to add a sentence to this paragraph regarding

agency NEPA procedures not imposing additional procedures or requirements beyond those set forth in the regulations. To address confusion expressed by some commenters, CEQ does not include this sentence in the final rule because it includes this requirement in § 1507.3, "Agency NEPA procedures."

CEQ proposed to add a new paragraph (b), "Exhaustion," to summarize public comment requirements and an exhaustion requirement. Specifically, CEQ proposed in paragraph (b)(1) to require that, in a NOI to prepare an EIS, agencies request comments from interested parties on the potential effects of and potential alternatives to proposed actions, and also request that interested parties identify any relevant information, studies, or analyses of any kind concerning such effects. CEQ includes this provision in the final rule to ensure that agencies solicit and consider relevant information early in the development of an EIS.

In paragraph (b)(2) of § 1500.3, CEQ proposed to require that the EIS include a summary of all the comments received for consideration in developing the EIS. CEQ includes this provision in the final rule with some changes. For consistency with the language in § 1502.17, the final rule specifies that the draft and final EISs must include a summary of "all alternatives, information, and analyses." Also, in response to comments requesting clarification on the meaning of "public commenters," the final rule changes this phrase in paragraphs (b)(2) and (3) of § 1500.3 and in § 1502.17 to "State, Tribal, and local governments and other public commenters" for consistency with §§ 1501.9 and 1506.6 and to clarify that public commenters includes governments as well as other commenters such as organizations, associations, and individuals.

In paragraph (b)(3) of § 1500.3, CEQ proposed to require that public commenters timely submit comments on draft EISs and any information on environmental impacts or alternatives to a proposed action to ensure informed decision making by Federal agencies. CEQ further proposed to provide that comments not timely raised and information not provided shall be deemed unexhausted and forfeited. This reinforces the principle that parties may not raise claims based on issues they themselves did not raise during the public comment period. *See, e.g., Pub. Citizen,* 541 U.S. at 764–65 (finding claims forfeited because respondents had not raised particular objections to the EA in their comments); *Karst Envtl. Educ. & Prot., Inc.* v. *Fed. Highway Admin.,* 559 Fed. Appx. 421, 426–27

---

[72] Section 1506.6 includes detailed provisions directing agencies to facilitate public involvement, including by providing the public with notice regarding actions, holding or sponsoring public hearings, and providing notice of NEPA-related hearings, public meetings, and other opportunities for public involvement, and the availability of environmental documents. Section 1501.9 requires agencies to issue a public notice regarding proposed actions for which the agencies will be preparing an EIS and to include specific information for, and to solicit information from the public regarding such proposed actions. Section 1503 provides direction to agencies regarding inviting comments from the public and requesting information and analyses.

(6th Cir. 2014) (concluding that comments did not raise issue with "sufficient clarity" to alert the Federal Highway Administration to concerns); *Friends of the Norbeck* v. *U.S. Forest Serv.,* 661 F.3d 969, 974 (8th Cir. 2011) (concluding that comments were insufficient to give the Forest Service an opportunity to consider claim and that judicial review was therefore improper); *Exxon Mobil Corp.* v. *U.S. EPA,* 217 F.3d 1246, 1249 (9th Cir. 2000) (arguments not raised in comments are waived); *Ass'n of Mfrs.* v. *Dep't of the Interior,* 134 F.3d 1095, 1111 (D.C. Cir. 1998) (failure to raise argument in rulemaking constitutes failure to exhaust administrative remedies). Finally, CEQ proposed to require that the public raise any objections to the submitted alternatives, information, and analyses section within 30 days of the notice of availability of the final EIS.

The final rule includes paragraph (b)(3) with some modifications. The final rule requires State, Tribal, and local governments and other public commenters to submit comments within the comment periods provided under § 1503.1 and that comments be as specific as possible under § 1503.3. The rule specifies that comments or objections of any kind not submitted "shall be forfeited as unexhausted" to clarify any ambiguity about forfeiture and exhaustion. CEQ received comments opposing the proposal to require the public to raise objections to the submitted alternatives, information, and analyses section within 30 days of the notice of availability of the final EIS. The final rule does not include the proposed mandatory 30-day comment period. However, § 1506.11 retains from the 1978 regulations the 30-day waiting period prior to issuance of the ROD, subject to limited exceptions, and under § 1503.1(b), agencies may solicit comments on the final EIS if they so choose. Each commenter should put its own comments into the record as soon as practicable to ensure that the agency has adequate time to consider the commenter's input as part of the agency's decision-making process. Finally, to ensure commenters timely identify issues, CEQ expresses its intention that commenters rely on their own comments and not those submitted by other commenters in any subsequent litigation, except where otherwise provided by law.

CEQ also proposed in paragraph (b)(4) of § 1500.3 to require that the agency decision maker certify in the ROD that the agency has considered all of the alternatives, information, and analyses submitted by public commenters based on the summary in the EIS. CEQ

includes this section in the final rule with some modifications. The final rule requires the decision maker, informed by the final EIS (including the public comments, summary thereof, and responses thereto) and other relevant material in the record, certify that she or he considered the alternatives, information, and analyses submitted by States, Tribes, and local governments and other public commenters. Relevant material includes both the draft and final EIS as well as any supporting materials incorporated by reference or appended to the document. The final rule does not specify the decision maker "for the lead agency" to account for multiple decision makers, consistent with the OFD policy.

CEQ proposed to add a new paragraph (c), "Review of NEPA compliance," to § 1500.3 to reflect the development of case law since the promulgation of the CEQ regulations. Specifically, CEQ proposed to revise the sentence regarding timing of judicial review to strike references to the filing of an EIS or FONSI and replace them with the issuance of a signed ROD or the taking of another final agency action. CEQ includes this change in the final rule. Judicial review of NEPA compliance for agency actions can occur only under the APA, which requires finality. 5 U.S.C. 704. A private right of action to enforce NEPA, which is lacking, would be required to review non-final agency action. In addition, non-final agency action may not be fit for judicial review as a matter of prudential standing. *See Abbott Labs* v. *Gardner,* 387 U.S. 136, 148–49 (1967). Under the APA, judicial review does not occur until an agency has taken final agency action. *Bennett* v. *Spear,* 520 U.S. 154, 177–78 (1997) ("[T]he action must mark the 'consummation' of the agency's decision[-]making process—it must not be of a merely tentative or interlocutory nature. And second, the action must be one by which 'rights or obligations have been determined' or from which 'legal consequences will flow'" (citations omitted)). Because NEPA's procedural requirements apply to proposals for agency action, judicial review should not occur until the agency has completed its decision-making process, and there are "direct and appreciable legal consequences." *Id.* at 178. Final agency action for judicial review purposes is not necessarily when the agency publishes the final EIS, issues a FONSI, or makes the determination to categorically exclude an action.

CEQ also proposed in paragraph (c) to clarify that any allegation of noncompliance be resolved as expeditiously as possible, and that

agencies may structure their decision making to allow private parties to seek agency stays or provide for efficient mechanisms, such as imposition of bonds, for seeking, granting, and imposing conditions on stays. The final rule clarifies that it is CEQ's intention that any allegation of noncompliance be resolved as expeditiously as possible. The final rule also clarifies that agencies may structure their procedures consistent with their organic statutes, and as part of implementing the exhaustion provisions in paragraph (b) of § 1500.3, to include an appropriate bond or other security requirement to protect against harms associated with delays.

Consistent with their statutory authorities, agencies may impose, as appropriate, bond and security requirements or other conditions as part of their administrative processes, including administrative appeals, and a prerequisite to staying their decisions, as courts do under rule 18 of the Federal Rules of Appellate Procedure and other rules.[73] *See, e.g.,* Fed. R. App. P. 18(b); Fed. R. App. P. 8(a)(2)(E); Fed. R. Civ. P. 65(c); Fed. R. Civ. P. 62(b); Fed. R. Civ. P. 62(d). CEQ notes that there is no "NEPA exception" that exempts litigants bringing NEPA claims from otherwise applicable bond or security requirements or other appropriate conditions, and that some courts have imposed substantial bond requirements in NEPA cases. *See, e.g., Save Our Sonoran, Inc.* v. *Flowers,* 408 F.3d 1113, 1125–26 (9th Cir. 2005) (concluding that district court's imposition of a $50,000 bond was appropriate and supported by the record); *Stockslager* v. *Carroll Elec. Co-op Corp.,* 528 F.2d 949 (8th Cir. 1976) (concluding that district court's imposition of a $10,000 bond was appropriate).

CEQ proposed to add a new paragraph (d), "Remedies," to § 1500.3. CEQ proposed to state explicitly that harm from the failure to comply with NEPA can be remedied by compliance with NEPA's procedural requirements, and that CEQ's regulations do not create a cause of action for violation of NEPA. The statute does not create any cause of action, and agencies may not create private rights of action by regulation; "[l]ike substantive [F]ederal law itself, private rights of action to enforce [F]ederal law must be created by Congress." *Alexander* v. *Sandoval,* 532 U.S. 275, 286 (2001) (citing *Touche Ross*

---

[73] *See, e.g.,* 26 CFR 2.6 (Bureau of Indian Affairs' regulatory provision that allows a person that believes he or she may suffer a measurable and substantial financial loss as a result of the delay caused by an appeal to request that the official require the posting of a reasonable bond).

& Co. v. *Redington,* 442 U.S. 560, 578 (1979)). This is particularly relevant where, as here, the counterparty in any action to enforce NEPA would be a Federal officer or agency. *See San Carlos Apache Tribe* v. *United States,* 417 F.3d 1091, 1096–97 (9th Cir. 2005) ("[C]reating a direct private action against the federal government makes little sense in light of the administrative review scheme set out in the APA.").

The CEQ regulations create no presumption that violation of NEPA is a basis for injunctive relief or for a finding of irreparable harm. As the Supreme Court has held, the irreparable harm requirement, as a prerequisite to the issuance of preliminary or permanent injunctive relief, is neither eliminated nor diminished in NEPA cases. A showing of a NEPA violation alone does not warrant injunctive relief and does not satisfy the irreparable harm requirement. *See Monsanto Co.* v. *Geertson Seed Farms,* 561 U.S. 139, 157 (2010) ("[T]he statements quoted [from prior Ninth Circuit cases] appear to presume that an injunction is the proper remedy for a NEPA violation except in unusual circumstances. No such thumb on the scales is warranted."); *Winter,* 555 U.S. at 21–22, 31–33; *see also Amoco Prod. Co.* v. *Vill. of Gambell,* 480 U.S. 531, 544–45 (1987) (rejecting proposition that irreparable damage is presumed when an agency fails to evaluate thoroughly the environmental impact of a proposed action). Moreover, a showing of irreparable harm in a NEPA case does not entitle a litigant to an injunction or a stay. *See Winter,* 555 U.S. at 20 ("A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, *and* that an injunction is in the public interest.") (emphasis added); *Geertson Seed Farms,* 561 U.S. at 157 ("The traditional four-factor test applies when a plaintiff seeks a permanent injunction to remedy a NEPA violation . . . . An injunction should issue only if the traditional four-factor test is satisfied.").

Consistent with the Supreme Court's analysis in *Geertson Seed Farms,* agencies (as well as applicants) should give practical consideration to measures that might serve to anticipate, reduce, or eliminate possible adverse effects from a project. To the extent such measures are incorporated into an agency's ROD, they may provide grounds upon which a court, presented with an alleged violation of NEPA, might reasonably conclude that injunctive relief is not warranted because the measures prevent any irreparable harm from occurring. *See* § 1505.3. For example, regular inspections or requirements that applicants obtain third-party insurance, for example, might constitute such measures in certain circumstances. Inspections can reveal defects before they cause harm. Third-party insurers, because of their exposure to risk, have an economic incentive to conduct thorough inspections, facilitating discovery of defects. Such measures would be relevant to whether a valid claim of irreparable harm has been established.

CEQ also proposed to state that any actions to review, enjoin, vacate, stay, or alter an agency decision on the basis of an alleged NEPA violation be raised as soon as practicable to avoid or minimize any costs to agencies, applicants, or any affected third parties. As reflected in comments received in response to the ANPRM, delays have the potential to result in substantial costs. CEQ also proposed to replace the language providing that trivial violations should not give rise to an independent cause of action with language that states that minor, non-substantive errors that have no effect on agency decision making shall be considered harmless and shall not invalidate an agency action. Invalidating actions due to minor errors does not advance the goals of the statute and adds delays and costs. CEQ includes paragraph (d) in the final rule with a change to clarify that it is CEQ's intention that the regulations create no presumption that violation of NEPA is a basis for injunctive relief or for a finding of irreparable harm. As noted above, NEPA is a procedural statute and any harm is thus reparable by providing the necessary environmental documentation in accordance with the Act and these regulations. CEQ also adds "vacate, or otherwise" to the types of actions that may alter a decision to address situations where there may be a nationwide or other vacatur and "after final agency action" to clarify when the actions should be raised.

Finally, CEQ proposed to add a new paragraph (e), "Severability," to § 1500.3 to address the possibility that this rule, or portions of this rule, may be challenged in litigation. CEQ finalizes this paragraph as proposed, correcting the cross reference. As stated in the NPRM, it is CEQ's intention that the individual sections of this rule be severable from each other, and that if a court stays or invalidates any sections or portions of the regulations, this will not affect the validity of the remainder of the sections, which will continue to be operative.

### 4. Reducing Paperwork and Delay (§§ 1500.4 and 1500.5)

In the NPRM, CEQ proposed to reorder the paragraphs in § 1500.4, "Reducing paperwork," and § 1500.5, "Reducing delay," for a more logical ordering, consistent with the three levels of NEPA review. CEQ also proposed edits to §§ 1500.4 and 1500.5 for consistency with proposed edits to the cross-referenced sections. CEQ makes these proposed changes in the final rule. Additionally, the final rule revises the language in paragraphs (a) and (b) of §§ 1500.4 and 1500.5 to make the references to CEs and FONSIs consistent with the language in §§ 1501.4(a) and 1501.6(a), respectively. CEQ also proposed conforming edits to § 1500.4(c) to broaden the paragraph to include EAs by changing "environmental impact statements" to "environmental documents" and changing "setting" to "meeting" since page limits would be required for both EAs and EISs. CEQ makes these changes in the final rule and corrects the cross-reference. CEQ revises paragraph (h) of § 1500.4 to add "*e.g.*" to the citations to clarify that these are just examples of the useful portions of EISs and to correct the cross-reference to background material from § 1502.16 to § 1502.1. CEQ revises the citations in paragraph (k) of § 1500.4 to make them sequential. Finally, CEQ revises paragraph (d) of § 1500.5 for clarity.

### 5. Agency Authority (§ 1500.6)

CEQ proposed to add a savings clause to § 1500.6, "Agency authority," to clarify that the CEQ regulations do not limit an agency's other authorities or legal responsibilities. This clarification is consistent with section 104 of NEPA (42 U.S.C. 4334), section 2(g) of E.O. 11514, and the 1978 regulations, but acknowledges the possibility of different statutory authorities that may set forth different requirements, such as timeframes. In the final rule, CEQ makes the proposed changes and clarifies further that agencies interpret the provisions of the Act as a mandate to view the agency's policies and missions in the light of the Act's national environmental objectives, to the extent NEPA is consistent with the agency's existing authority. This is consistent with E.O. 11514, which provides that Federal agencies shall "[i]n carrying out their responsibilities under the Act and this Order, comply with the [CEQ regulations] except where such compliance would be inconsistent with statutory requirements." E.O. 11514, as amended by E.O. 11991, sec. 2(g). CEQ also proposed to clarify that compliance

**43320**    Federal Register / Vol. 85, No. 137 / Thursday, July 16, 2020 / Rules and Regulations

with NEPA means the Act "as interpreted" by the CEQ regulations. CEQ makes this change in the final rule in § 1500.6, as well as in §§ 1502.2(d) and 1502.9(b), to clarify that agencies should implement the statute through the framework established in these regulations. Finally, CEQ revises the sentence explaining the meaning of the phrase "to the fullest extent possible" in section 102, to replace "unless existing law applicable to the agency's operations expressly prohibits or makes compliance impossible" with "consistent with § 1501.1." As discussed in section II.C.1, § 1501.1 sets forth threshold considerations for assessing whether NEPA applies or is otherwise fulfilled, including considerations related to other statutes with which agencies must comply.

*C. Revisions to NEPA and Agency Planning (Part 1501)*

CEQ proposed significant changes to modernize and clarify part 1501. CEQ proposed to replace the current 40 CFR 1501.1, "Purpose," because it is unnecessary and duplicative, with a new section, "NEPA threshold applicability analysis," to address threshold considerations of NEPA applicability. CEQ proposed to add additional sections to address the level of NEPA review and CEs. CEQ further proposed to consolidate and clarify provisions on EAs and FONSIs, and relocate to part 1501 from part 1502 the provisions on tiering and incorporation by reference. CEQ also proposed to set presumptive time limits for the completion of NEPA reviews, and clarify the roles of lead and cooperating agencies to further the OFD policy and encourage more efficient and timely NEPA reviews. CEQ makes many of these changes in the final rule with modifications as discussed further in this section.

1. NEPA Thresholds (§ 1501.1)

Since the enactment of NEPA, courts have examined the applicability of NEPA to proposed agency activities and decisions, based on a variety of considerations. Courts have found that NEPA is inapplicable when an agency's statutory obligations clearly or fundamentally conflict with NEPA compliance; when Congress has established requirements under another statute that displace NEPA compliance in some fashion; when an agency is carrying out a non-discretionary duty or obligation (in whole or in part); or when environmental review and public participation procedures under another statute satisfy the requirements (*i.e.*, are functionally equivalent) of NEPA.

CEQ proposed a new § 1501.1 to provide a series of considerations to assist agencies in a threshold analysis for determining whether NEPA applies to a proposed activity or whether NEPA is satisfied through another mechanism. CEQ proposed to title this section "NEPA threshold applicability analysis" in the NPRM. CEQ includes this provision in the final rule at § 1501.1, "NEPA thresholds." This section recognizes that the application of NEPA by Congress and the courts has evolved over the last four decades in light of numerous other statutory requirements implemented by Federal agencies. CEQ reorders these considerations in the final rule and adds a new consideration to paragraph (a)(1)—whether another statute expressly exempts a proposed activity or decision from NEPA. *See, e.g.*, 15 U.S.C. 793(c)(1) (exempting Environmental Protection Agency (EPA) actions under the Clean Air Act); 33 U.S.C. 1371(c)(1) (exempting certain EPA actions under the Clean Water Act); 42 U.S.C. 5159 (exempting certain actions taken or assistance provided within a Presidentially declared emergency or disaster area); and 16 U.S.C. 3636(a) (exempting regulation of Pacific salmon fishing).

The second consideration in paragraph (a)(2) is whether compliance with NEPA would clearly and fundamentally conflict with the requirements of another statute. *See, e.g., Flint Ridge Dev. Co.* v. *Scenic Rivers Ass'n*, 426 U.S. 776, 791 (1976) (concluding that the Secretary of Housing and Urban Development could not comply with NEPA's EIS requirement because it conflicted with requirements of the Interstate Land Sales Full Disclosure Act). The third consideration in paragraph (a)(3) is whether compliance with NEPA would be inconsistent with congressional intent expressed in another statute. *See, e.g., Douglas County* v. *Babbitt*, 48 F.3d 1495, 1503 (9th Cir. 1995) (holding that NEPA was displaced by the Endangered Species Act's procedural requirements for designating critical habitat); and *Merrell* v. *Thomas*, 807 F.2d 776, 778–80 (9th Cir. 1986) (holding that NEPA did not apply to the EPA's registration of pesticides under the Federal Insecticide, Fungicide, and Rodenticide Act (FIFRA)).

The fourth and fifth considerations in paragraphs (a)(4) and (5) are whether the proposed activity or decision meets the definition of a major Federal action generally and whether the proposed activity or decision does not meet the definition because it is non-discretionary such that the agency lacks authority to consider environmental

effects as part of its decision-making process. *See, e.g., Pub. Citizen*, 541 U.S. at 768–70 (concluding that, because the Federal Motor Carrier Safety Administration lacked discretion to prevent the entry of Mexican trucks into the United States, the agency did not need to consider under NEPA the environmental effects of Mexican trucks' cross-border operations that the President authorized); *Nat'l Wildlife Fed'n* v. *Sec'y of the U.S. Dep't. of Transp.*, 2020 U.S. App. LEXIS 17723, at *15–18 (6th Cir. June 5, 2010) (applying *Public Citizen* and finding NEPA not applicable as EPA lacked discretion to reject Clean Water Act oil spill response plans that satisfied enumerated criteria); *Citizens Against Rails-To-Trails* v. *Surface Transp. Bd.*, 267 F.3d 1144, 1152–54 (D.C. Cir. 2001) (concluding that because the Surface Transportation Board lacked significant discretion regarding issuance of a certificate of interim trail use under the National Trails System Act, NEPA was not applicable); *South Dakota* v. *Andrus*, 614 F.2d 1190, 1193–95 (8th Cir. 1980) (concluding that the granting of a mineral patent for a mining claim was a non-discretionary, ministerial act and non-discretionary acts should be exempt from NEPA). Consistent with *Public Citizen*, 541 U.S. at 768–70, NEPA applies to the portion of an agency decision that is discretionary. In *Public Citizen*, the Supreme Court considered whether the Federal Motor Carrier Safety Administration was required to consider the effects of a non-discretionary action in its NEPA document and concluded that it was not required to do so because it had no authority to prevent the cross-border entry of Mexican motor carriers, which was the result of presidential action. *Id.*

Finally, the sixth consideration in paragraph (a)(6) is whether the proposed action is an action for which another statute's requirements serve the function of agency compliance with NEPA. *See, e.g., Envtl. Def. Fund, Inc.* v. *U.S. EPA*, 489 F.2d 1247, 1256–57 (D.C. Cir. 1973) (concluding that the substantive and procedural standards of FIFRA were functionally equivalent to NEPA and therefore formal compliance was not necessary); *W. Neb. Res. Council* v. *U.S. EPA*, 943 F.2d 867, 871–72 (8th Cir. 1991) (finding that the procedures of the Safe Drinking Water Act were functionally equivalent to those required by NEPA); *Cellular Phone Taskforce* v. *Fed. Commc'ns Comm'n*, 205 F.3d 82, 94–95 (2d Cir. 2000) (concluding that the procedures followed by the Federal Communications Commission were

functionally compliant with EA and FONSI requirements under NEPA). Paragraph (b) of § 1501.1 clarifies that agencies can make this determination in their agency NEPA procedures in accordance with § 1507.3(d) or on a case-by-case basis. The final rule adds a new paragraph (b)(1) to state that agencies may request assistance from CEQ in making a case-by-case determination under this section, and a new paragraph (b)(2) to require agencies to consult with other Federal agencies for their concurrence when making a determination where more than one Federal agency administers the statute (*e.g.,* the Endangered Species Act (ESA)). Agencies may document these consultations, as appropriate. Agencies will only apply the thresholds in this section after consideration on a case-by-case basis, or after agencies have determined whether and how to incorporate them into their own agency NEPA procedures.

Some agencies already include information related to the applicability of NEPA to their actions in their agency NEPA procedures. For example, EPA's NEPA procedures include an applicability provision that explains which EPA actions NEPA does not apply to, including actions under the Clean Air Act and certain actions under the Clean Water Act. *See* 40 CFR 6.101. The final rule codifies the agency practice of including this information in agency NEPA procedures but also provides agencies' flexibility to make case-by-case determinations as needed.

2. Apply NEPA Early in the Process (§ 1501.2)

CEQ proposed to amend § 1501.2, "Apply NEPA early in the process," designating the introductory paragraph as paragraph (a) and changing "shall" to "should" and "possible" to "reasonable." CEQ makes these changes in the final rule. Agencies need the discretion to structure the timing of their NEPA processes to align with their decision-making processes, consistent with their statutory authorities. Agencies also need flexibility to determine the appropriate time to start the NEPA process, based on the context of the particular proposed action and governed by the rule of reason, so that the NEPA analysis meaningfully informs the agency's decision. The appropriate time to begin the NEPA process is dependent on when the agency has sufficient information, and on how it can most effectively integrate the NEPA review into the agency's decision-making process. Further, some courts have viewed this provision as a legally enforceable standard, rather than

an opportunity for agencies to integrate NEPA into their decision-making programs and processes. *See, e.g., N.M. ex rel. Richardson* v. *Bureau of Land Mgmt.,* 565 F.3d 683 (10th Cir. 2009); *Metcalf* v. *Daley,* 214 F.3d 1135 (9th Cir. 2000). As discussed above, only final agency action is subject to judicial review under the APA. CEQ's view is that agencies should have discretion with respect to timing, consistent with the regulatory provisions in §§ 1501.11 and 1502.4 for deferring NEPA analysis to appropriate points in the decision-making process. As noted in the NPRM, this change is consistent with CEQ guidance that agencies should "concentrate on relevant environmental analysis" in their EISs rather than "produc[ing] an encyclopedia of all applicable information." Timely Environmental Reviews Guidance, *supra* note 29; *see also* §§ 1500.4(b), 1502.2(a). Therefore, CEQ makes these changes to clarify that agencies have discretion to structure their NEPA processes in accordance with the rule of reason. CEQ also proposed to change "possible" to "reasonable" in paragraph (b)(4)(iii) and "shall" to "should" in the introductory paragraph of § 1502.5 for consistency with the changes to § 1502.2. CEQ makes these changes in the final rule.

CEQ also proposed to change "planning and decisions reflect environmental values" to "agencies consider environmental impacts in their planning and decisions" in paragraph (a). CEQ makes this change in the final rule because "consider environmental impacts" provides more explicit direction to agencies and is more consistent with the Act and the CEQ regulations.

CEQ proposed to redesignate the remaining paragraphs in § 1501.2 to list out other general requirements for agencies. In paragraph (b)(1), the final rule removes the direct quote of NEPA consistent with the **Federal Register's** requirements for the Code of Federal Regualtions. In paragraph (b)(2), CEQ proposed to clarify that agencies should consider economic and technical analyses along with environmental effects. This change is consistent with section 102(2)(B) of NEPA, which directs agencies, in consultation with CEQ, to identify and develop methods and procedures to ensure environmental amenities and values are considered along with economic and technical considerations in decision making. CEQ makes this change in the final rule and revises the second sentence in this paragraph to qualify that agencies must review and publish environmental documents and appropriate analyses at

the same time as other planning documents "whenever practicable." CEQ recognizes that it is not always practicable to publish such documents at the same time because it can delay publication of one or the other. Finally, CEQ proposed to amend paragraph (b)(4)(ii) to change "agencies" to "governments" consistent with and in support of government-to-government consultation pursuant to E.O. 13175[74] and E.O. 13132, "Federalism."[75] CEQ makes these changes in the final rule.

3. Determine the Appropriate Level of NEPA Review (§ 1501.3)

As discussed in the NPRM, NEPA requires a "detailed statement" for "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. 4332(2)(C). To determine whether an action requires such a detailed statement, the 1978 regulations provided three levels of review for Federal agencies to assess proposals for agency action. Specifically, the CEQ regulations allow agencies to review expeditiously those actions that normally do not have significant effects by using CEs or, for actions that are not likely to have significant effects, by preparing EAs. By using CEs and EAs whenever appropriate, agencies then can focus their limited resources on those actions that are likely to have significant effects and require the "detailed statement," or EIS, required by NEPA.

While the 1978 CEQ regulations provided for these three levels of NEPA review, they do not clearly set out the decisional framework by which agencies should assess their proposed actions and select the appropriate level of review. To provide this direction and clarity, the NPRM proposed to add a new section at § 1501.3, "Determine the appropriate level of NEPA review." The proposal described the three levels of NEPA review and the basis upon which an agency makes a determination regarding the appropriate level of review for a proposed action. CEQ includes the proposal in the final rule at paragraph (a) of § 1501.3.

CEQ proposed to address the consideration of significance in paragraph (b) since it is central to determining the appropriate level of review. CEQ proposed to move the language from 40 CFR 1508.27, "Significantly," since it did not contain a definition, but rather set forth factors for considering whether an effect is significant, to paragraph (b). CEQ also proposed to eliminate most of the

---

[74] *Supra* note 69.

[75] 64 FR 43255 (Aug. 10, 1999).

factors in favor of a simpler, more flexible approach for agencies to assess significance. Specifically, CEQ proposed to change "context" to "potentially affected environment" and "intensity" to "degree" to provide greater clarity as to what agencies should consider in assessing potential significant effects. The phrase "potentially affected environment" relates more closely to physical, ecological, and socio-economic aspects than "context." The final rule reorganizes several factors formerly categorized under "intensity" to clarify further this distinction. The final rule uses the term "degree" because some effects may not necessarily be of an intense or severe nature, but nonetheless should be considered when determining significance. While 40 CFR 1508.27 used several different words to explain what was meant by "intensity," it also used "degree" numerous times. Therefore, the consistent use of "degree" throughout is clearer. In the final rule, CEQ includes these proposed changes in paragraph (b) with some additional revisions in response to comments. CEQ clarifies in paragraph (b)(1) that agencies "should" (rather than "may") consider the affected area specific to the proposed action, consistent with the construction of paragraph (b)(2), and the affected area's resources. The final rule includes one example, listed species and designated critical habitat under the Endangered Species Act, but this could include any type of resource such as historic, cultural, or park lands. The final rule also modifies the example of significance varying with the setting, because there was some misunderstanding of the proposed change from "world" to "Nation." This sentence merely serves as an example. Consistent with the NPRM, paragraph (b)(2) addresses considerations of the degree of effects. CEQ moves short- and long-term effects from "affected environment" in (b)(1) to "degree" in paragraph (b)(2)(i). CEQ proposed to exclude consideration of controversy (40 CFR 1508.27(b)(4)) because the extent to which effects may be controversial is subjective and is not dispositive of effects' significance. Further, courts have interpreted controversy to mean scientific controversy, which the final rule addresses within the definition of effects, as the strength of the science informs whether an effect is reasonably foreseeable. The controversial nature of a project is not relevant to assessing its significance.

Additionally, CEQ proposed to remove the reference in 40 CFR 1508.27(b)(7) to "[s]ignificance cannot be avoided by terming an action temporary or by breaking it down into small component parts" because this is addressed in the criteria for scope in §§ 1501.9(e) and 1502.4(a), which would provide that agencies evaluate in a single EIS proposals or parts of proposals that are related closely enough to be, in effect, a single course of action. Commenters noted that §§ 1501.9 and 1502.4 are applicable only to EISs. Therefore, in the final rule CEQ includes a sentence in paragraph (b) stating that agencies should consider connected actions when determining the significance of the effects of the proposed action.

### 4. Categorical Exclusions (§ 1501.4)

Under the 1978 regulations, agencies could categorically exclude actions from detailed review where the agency has found in its agency NEPA procedures that the action normally would not have significant effects. Over the past 4 decades, Federal agencies have developed more than 2,000 CEs.[76] CEQ estimates that each year, Federal agencies apply CEs to approximately 100,000 Federal agency actions that typically require little or no documentation.[77] While CEs are the most commonly used level of NEPA review, CEQ has addressed CE development and implementation in only one comprehensive guidance document, see CE Guidance, supra note 29, and the 1978 regulations did not address CEs in detail.

In response to the ANPRM, many commenters requested that CEQ update the NEPA regulations to provide more detailed direction on the application of CEs. To provide greater clarity, CEQ proposed to add a new section on CEs in proposed § 1501.4, "Categorical exclusions," to address in more detail the process by which an agency considers whether a proposed action is categorically excluded under NEPA.

Proposed paragraph (a) stated that agencies identify CEs in their NEPA procedures. CEQ adds this paragraph to the final rule, reiterating the requirement in § 1507.3(e)(2)(ii) that agencies establish CEs in their agency

NEPA procedures. The NPRM proposed in paragraph (b) to set forth the requirement to consider extraordinary circumstances once an agency determines that a CE covers a proposed action, consistent with the current requirement in 40 CFR 1508.4. CEQ includes this provision in the final rule, changing the language from passive to active voice. CEQ proposed in paragraph (b)(1) to provide that, when extraordinary circumstances are present, agencies may consider whether mitigating circumstances, such as the design of the proposed action to avoid effects that create extraordinary circumstances, are sufficient to allow the proposed action to be categorically excluded. CEQ includes this paragraph in the final rule, but revises it to address confusion over whether CEQ is creating a "mitigated CE." In the final rule, paragraph (b)(1) provides that an agency can categorically exclude a proposed action when an environmental resource or condition identified as a potential extraordinary circumstance is present if the agency determines that there are "circumstances that lessen the impacts" or other conditions sufficient to avoid significant effects. This paragraph clarifies that agencies' extraordinary circumstances criteria are not intended to necessarily preclude the application of a CE merely because a listed factor may be present or implicated. Courts have rejected a "mere presence" test for CEs. Sierra Club v. U.S. Forest Serv., 828 F.3d 402 (6th Cir. 2016); Sierra Club v. Bosworth, 510 F.3d 1016 (9th Cir. 2007); Utah Envtl. Cong. v. Bosworth, 443 F.3d 732 (10th Cir. 2006); Sw. Ctr. for Biological Diversity v. U.S. Forest Serv., 100 F.3d 1443, 1450 (9th Cir. 1996); cf. Rhodes v. Johnson, 153 F.3d 785 (7th Cir. 1998). Instead, the agency may consider in light of the extraordinary circumstances criteria, whether the proposed action would take place in such a way that it would not have significant effects, or whether the agency could modify the proposed action to avoid the extraordinary circumstances so that the action remains eligible for categorical exclusion. While this reflects current practice for some agencies,[78] this revision would assist agencies as they consider whether to categorically exclude an action that would otherwise be considered in an EA and FONSI.

Finally, CEQ proposed paragraph (b)(2) to address agencies' obligation to prepare an EA or EIS, as appropriate, if the agency cannot categorically exclude

---

[76] See Council on Environmental Quality, List of Federal Agency Categorical Exclusions (June 18, 2020), https://ceq.doe.gov/nepa-practice/categorical-exclusions.html.

[77] See, e.g., Council on Environmental Quality, The Eleventh and Final Report on the National Environmental Policy Act Status and Progress for American Recovery and Reinvestment Act of 2009 Activities and Projects (Nov. 2, 2011), https://ceq.doe.gov/docs/ceq-reports/nov2011/CEQ_ARRA_NEPA_Report_Nov_2011.pdf.

[78] See, e.g., Forest Service categorical exclusions, 36 CFR 220.6(b)(2); surface transportation categorical exclusions, 23 CFR 771.116–771.118.

a proposed action. CEQ includes this provision in the final rule revising the language to active voice and making it consistent with the format of paragraph (b).

CEQ invited comment on the proposed revisions and asked whether it should address any other aspects of CEs in its regulations. CEQ also invited comment on whether it should establish government-wide CEs in its regulations to address routine administrative activities, for example, internal orders or directives regarding agency operations, procurement of office supplies and travel, and rulemakings to establish administrative processes such as those established under the Freedom of Information Act or Privacy Act. After considering the comments, as discussed in the Final Rule Response to Comments, CEQ is not including any additional provisions on CEs in the final rule.

5. Environmental Assessments (§ 1501.5)

Under the 1978 regulations, when an agency has not categorically excluded a proposed action, the agency can prepare an EA to document its effects analysis. If the analysis in the EA demonstrates that the action's effects would not be significant, the agency documents its reasoning in a FONSI, which completes the NEPA process; otherwise, the agency uses the EA to help prepare an EIS. CEQ estimates that Federal agencies prepare over 10,000 EAs each year.[79]

CEQ proposed to consolidate the requirements for EAs that are scattered throughout the 1978 regulations into a new § 1501.5, "Environmental assessments." CEQ proposed to revise paragraph (a) to state when agencies are required to prepare EAs. CEQ proposed minor clarifying edits to paragraph (b), which states that agencies may prepare an EA to assist in agency planning and decision making. The NPRM proposed to move the operative language regarding the requirements for an EA from the definition of EA in 40 CFR 1508.9 to paragraph (c). CEQ makes these proposed changes in the final rule.

Under the final rule, the format for an EA is flexible and responsive to agency decision-making needs and the circumstances of the particular proposal for agency action. Requirements for documenting the proposed action and alternatives in an EA continue to be

more limited than EIS requirements. An agency must briefly describe the need for the proposed action by describing the existing conditions, projected future conditions, and statutory obligations and authorities that may relate to the proposed agency action with cross-references to supporting documents. The final rule continues to require agencies to describe briefly the proposed action and any alternatives it is considering that would meet the need of the proposed agency action. For actions to protect or restore the environment, without unresolved conflicts concerning alternative uses of available resources, CEQ expects agencies to examine a narrower range of alternatives to the proposed action. When the action may have significant impacts, the agency should consider reasonable alternatives that would avoid those impacts or otherwise mitigate those impacts to less than significant levels.

An agency does not need to include a detailed discussion of each alternative in an EA, nor does it need to include any detailed discussion of alternatives that it eliminated from study. While agencies have discretion to include more information in their EAs than is required to determine whether to prepare an EIS or a FONSI, they should carefully consider their reasons and have a clear rationale for doing so. Agencies should focus on analyzing material effects and alternatives, rather than marginal details that may unnecessarily delay the environmental review process.

Under the final rule, an agency must describe the environmental impacts of its proposed action and alternatives, providing enough information to support a decision to prepare either a FONSI or an EIS. The EA should focus on whether the proposed action (including mitigation) would "significantly" affect the quality of the human environment and tailor the length of the discussion to the relevant effects. The agency may contrast the impacts of the proposed action and alternatives with the current and expected future conditions of the affected environment in the absence of the action, which constitutes consideration of a no-action alternative.

Under the final rule, agencies should continue to list persons, relevant agencies, and applicants involved in preparing the EA to document agency compliance with the requirement to involve the public in preparing EAs to the extent practicable, consistent with paragraph (e). This may include incorporation by reference of records related to compliance with other

environmental laws such as the National Historic Preservation Act, Clean Water Act, Endangered Species Act, or Clean Air Act.

CEQ adds a new paragraph (d) to the final rule to move the language from 40 CFR 1502.5(b) regarding when to begin preparing an EA that is required for an application to the agency.[80] Agencies may specify in their NEPA procedures when an application is complete such that it can commence the NEPA process. While the NPRM did not propose this change, the move is consistent with CEQ's proposal to consolidate EA requirements in § 1501.5.

The final rule continues to provide that agencies may prepare EAs by and with other agencies, applicants, and the public. Modern information technology can help facilitate this collaborative EA preparation, allowing the agency to make a coordinated but independent evaluation of the environmental issues and assume responsibility for the scope and content of the EA. CEQ proposed to move the public involvement requirements for EAs from the current 40 CFR 1501.4(b) to § 1501.5 and change "environmental" to "relevant" agencies to include all agencies that may contribute information that is relevant to the development of an EA. CEQ makes these changes in paragraph (e) in the final rule. CEQ also adds to and reorders the list to "the public, State, Tribal, and local governments, relevant agencies, and any applicants," to address some confusion by public commenters that interpreted relevant to modify the public and applicants. In addition, this revision acknowledges that there will not be an applicant in all instances. Consistent with the 1978 regulations, the final rule does not specifically require publication of a draft EA for public review and comment, but continues to require agencies to reasonably involve the public prior to completion of the EA, so that they may provide meaningful input on those subject areas that the agency must consider in preparing the EA. Depending on the circumstances, the agency could provide adequate information through public meetings or by a detailed scoping notice, for example. There is no single correct approach for public involvement. Rather, agencies should consider the circumstances and have discretion to conduct public involvement tailored to the interested public, to available means of communications to reach the interested and affected parties, and to

---

[79] See, e.g., Council on Environmental Quality, Fourth Report on Cooperating Agencies in Implementing the Procedural Requirements of the National Environmental Policy Act, Attachment A (Oct. 4, 2016), https://ceq.doe.gov/docs/ceq-reports/ Attachment-A-Fourth-Cooperating-Agency-Report_Oct2016.pdf.

[80] CEQ also retains the statement in § 1502.5(b), as proposed, with respect to EISs.

the particular circumstances of each proposed action.

The NPRM proposed to establish a presumptive 75-page limit for EAs, but allow a senior agency official to approve a longer length and establish a new page limit in writing. CEQ adds this new requirement at paragraph (f) in the final rule. As noted in the NPRM, while Question 36a of the Forty Questions, *supra* note 2, stated that EAs should be approximately 10 to 15 pages, in practice, such assessments are often longer to address compliance with other applicable laws, and to document the effects of mitigation to support a FONSI. To achieve the presumptive 75-page limit, agencies should write all NEPA environmental documents in plain language, follow a clear format, and emphasize important impact analyses and relevant information necessary for those analyses, rather than providing extensive background material. An EA should have clear and concise conclusions and may incorporate by reference data, survey results, inventories, and other information that support these conclusions, so long as this information is reasonably available to the public.

The presumptive EA page limit promotes more readable documents and provides agencies flexibility to prepare longer documents, where necessary, to support the agency's analysis. This presumptive page limit is consistent with CEQ's guidance on EAs, which advises agencies to avoid preparing lengthy EAs except in unusual cases where a proposal is so complex that a concise document cannot meet the goals of an EA and where it is extremely difficult to determine whether the proposal could cause significant effects. Page limits will encourage agencies to identify the relevant issues, focus on significant environmental impacts, and prepare concise readable documents that will inform decision makers as well as the public. Voluminous, unfocused environmental documents do not advance the goals of informed decision making or protection of the environment.

CEQ proposed to add a new paragraph (f) to § 1501.5 to clarify that agencies also may apply, as appropriate, certain provisions in part 1502 regarding incomplete or unavailable information, methodology and scientific accuracy, and environmental review and consultation requirements to EAs. CEQ includes this new paragraph at § 1501.5(g) in the final rule.

In addition to the new § 1501.5, CEQ incorporates reference to EAs in other sections of the regulations to codify existing agency practice where it would

make the NEPA process more efficient and effective. As discussed in section II.C.9, CEQ makes a presumptive time limit applicable to EAs in § 1501.10. Further, for some agencies, it is a common practice to have lead and cooperating agencies coordinate in the preparation of EAs where more than one agency may have an action on a proposal; therefore, CEQ adds EAs to §§ 1501.7 and 1501.8, as discussed in section II.C.7. Finally, as discussed in section II.C.10, CEQ proposed to add EAs to § 1501.11, "Tiering," to codify current agency practice of using EAs where the effects of a proposed agency action are not likely to be significant. These include program decisions that may facilitate later site-specific EISs as well as the typical use of EAs as a second-tier document tiered from an EIS. CEQ makes these changes in the final rule.

### 6. Findings of No Significant Impact (§ 1501.6)

When an agency determines in its EA that an EIS is not required, it typically prepares a FONSI. The FONSI reflects that the agency has engaged in the necessary review of environmental impacts under NEPA. The FONSI shows that the agency examined the relevant data and explained the agency findings by providing a rational connection between the facts presented in the EA and the conclusions drawn in the finding. Any finding should clearly identify the facts found and the conclusions drawn by the agency based on those facts.

In response to the ANPRM, CEQ received comments requesting that CEQ update its regulations to consolidate provisions and provide more detailed requirements for FONSIs. CEQ proposed to consolidate the operative language of 40 CFR 1508.13, "Finding of no significant impact" with 40 CFR 1501.4, "Whether to prepare an environmental impact statement," in the proposed § 1501.6, "Findings of no significant impact." CEQ proposed to strike paragraph (a) as the requirements in that paragraph are addressed in § 1507.3(d)(2) (§ 1507.3(e)(2) in the final rule). As noted in section II.C.5, CEQ proposed to move 40 CFR 1501.4(b) to § 1501.5, "Environmental assessments." Similarly, CEQ proposed to strike 40 CFR 1501.4(d), because § 1501.9, "Scoping," addresses this requirement. CEQ makes these changes in the final rule.

CEQ proposed to make 40 CFR 1501.4(e) the new § 1501.6(a), and revise the language to clarify that an agency must prepare a FONSI when it determines that a proposed action will

not have significant effects based on the analysis in the EA, consistent with the definition of FONSI. The proposed rule had erroneously included the standard for preparing an EA—"is not likely to have significant effects." CEQ proposed to clarify in paragraph (a)(2) that the circumstances listed in paragraphs (a)(2)(i) and (ii) are the situations where the agency must make a FONSI available for public review. CEQ makes these changes in the final rule.

CEQ proposed to move the operative requirement that a FONSI include the EA or a summary from the definition of FONSI in 40 CFR 1508.13 to a new paragraph (b). CEQ also proposed to change the requirement that the FONSI include a summary of the EA to "incorporate it by reference." Consistent with § 1501.12, in order to incorporate the EA by reference, the agency would need to briefly summarize it. Making this change ensures that the EA is available to the public. CEQ makes these changes in the final rule.

Finally, CEQ proposed a new paragraph (c) to address mitigation, which CEQ includes in the final rule. The first sentence addresses mitigation generally in a FONSI, requiring agencies to state the authority for any mitigation adopted and any applicable monitoring or enforcement provisions. This sentence applies to all FONSIs. CEQ omits the "means of" mitigation from the final rule because it is unnecessary and many commenters misunderstood its meaning or found it confusing. The second sentence codifies the practice of mitigated FONSIs, consistent with CEQ's Mitigation Guidance.[81] This provision requires the agency to identify the enforceable mitigation requirements and commitments, which are those mitigation requirements and commitments needed to reduce the effects below the level of significance.[82] When preparing an EA, many agencies develop, consider, and commit to mitigation measures to avoid, minimize, rectify, reduce, or compensate for potentially significant adverse environmental impacts that would otherwise require preparation of an EIS. An agency can commit to mitigation

---

[81] The Mitigation Guidance, *supra* note 29, amended and supplemented the Forty Questions, *supra* note 2, specifically withdrawing Question 39 insofar as it suggests that mitigation measures developed during scoping or in an EA "[do] not obviate the need for an EIS."

[82] As discussed in sections I.B.1 and II.B, NEPA is a procedural statute and does not require adoption of a mitigation plan. However, agencies may consider mitigation measures that would avoid, minimize, rectify, reduce, or compensate for potentially significant adverse environmental impacts and may require mitigation pursuant to substantive statutes.

measures for a mitigated FONSI when it can ensure that the mitigation will be performed, when the agency expects that resources will be available, and when the agency has sufficient legal authorities to ensure implementation of the proposed mitigation measures. CEQ does not intend this codification of CEQ guidance to create a different standard for analysis of mitigation for a "mitigated FONSI," but to provide clarity regarding the use of FONSIs.

### 7. Lead and Cooperating Agencies (§§ 1501.7 and 1501.8)

The 1978 CEQ regulations created the roles of lead agency and cooperating agencies for NEPA reviews, which are critical for actions, such as non-Federal projects, requiring the approval or authorization of multiple agencies. Agencies need to coordinate and synchronize their NEPA processes to ensure an efficient environmental review that does not cause delays. In recent years, Congress and several administrations have worked to establish a more synchronized procedure for multi-agency NEPA reviews and related authorizations, including through the development of expedited procedures such as the section 139 process and FAST–41. In response to the ANPRM, CEQ received comments requesting that CEQ update its regulations to clarify the roles of lead and cooperating agencies.

CEQ proposed a number of modifications to § 1501.7, "Lead agencies," and § 1501.8, "Cooperating agencies," (40 CFR 1501.5 and 1501.6, respectively, in the 1978 regulations) to improve interagency coordination, make development of NEPA documents more efficient, and facilitate implementation of the OFD policy. As stated in the NPRM, CEQ intends these modifications to improve the efficiency and outcomes of the NEPA process—including cost reduction, improved relationships, and better outcomes that avoid litigation— by promoting environmental collaboration.[83] These modifications are consistent with Questions 14a and 14c of the Forty Questions, *supra* note 2. CEQ proposed to apply §§ 1501.7 and 1501.8 to EAs as well as EISs consistent with agency practice. CEQ makes these changes in the final rule, but clarifies that the provisions apply to "complex" EAs and not routine EAs where

involving multiple agencies could slow down an already efficient and effective process.[84]

CEQ proposed to clarify in § 1501.7(d) that requests for lead agency designations should be sent in writing to the senior agency officials of the potential lead agencies. CEQ makes this change in the final rule. CEQ did not propose any changes to paragraphs (e) and (f) of § 1501.7, but makes clarifying edits by reorganizing phrases and changing the language to active voice in the final rule.

Consistent with the OFD policy to ensure coordinated and timely reviews, CEQ proposed to add a new paragraph (g) to § 1501.7 to require that Federal agencies evaluate proposals involving multiple Federal agencies in a single EIS and issue a joint ROD[85] or single EA and joint FONSI when practicable. CEQ adds this paragraph to the final rule with edits to the EA sentence to make the language consistent with the EIS sentence.

CEQ proposed to move language from the cooperating agency provision, 40 CFR 1501.6(a), that addresses the lead agency's responsibilities with respect to cooperating agencies to proposed paragraph (h) in § 1501.7 so that all of the lead agency's responsibilities are in a single section. CEQ also proposed to clarify in paragraph (h)(4) that the lead agency is responsible for determining the purpose and need, and alternatives in consultation with any cooperating agencies.[86] CEQ makes this move and

addition in the final rule. In response to comments, the final rule eliminates the phrase "consistent with its responsibility as lead agency" in paragraph (h)(2) because it is non-specific and could cause agencies to reject germane and informative scientific research.

CEQ proposed new paragraphs (i) and (j) in § 1501.7, and (b)(6) and (7) in § 1501.8, to require development of and adherence to a schedule for the environmental review of and any authorizations required for a proposed action, and resolution of disputes and other issues that may cause delays in the schedule. CEQ includes these provisions in the final rule with minor edits for clarity. These provisions are consistent with current practices at agencies that have adopted elevation procedures pursuant to various statutes and directives, including 23 U.S.C. 139, FAST–41, and E.O. 13807. In response to comments, CEQ includes a new paragraph (b)(8) in § 1501.8 requiring cooperating agencies to jointly issue environmental documents with the lead agency, to the maximum extent practicable. This addition is consistent with the goal of interagency cooperation and efficiency.

CEQ proposed to move the operative language that State, Tribal, and local agencies may serve as cooperating agencies from the definition of cooperating agency (40 CFR 1508.5) to paragraph (a) of § 1501.8. Upon the request of the lead agency, non-Federal agencies should participate in the environmental review process to ensure early collaboration on proposed actions where such entities have jurisdiction by law or special expertise. CEQ also proposed in paragraph (a) to codify current practice to allow a Federal agency to appeal to CEQ a lead agency's denial of a request to serve as cooperating agency. Resolving disputes among agencies early in the process furthers the OFD policy and the goal of more efficient and timely NEPA reviews. CEQ makes these changes in the final rule with minor edits for clarity. Finally, CEQ proposed clarifications and grammatical edits throughout § 1501.8. CEQ makes these changes in the final rule.

### 8. Scoping (§ 1501.9)

In response to the ANPRM, CEQ received comments requesting that CEQ update its regulations related to scoping,

---

[83] *See, e.g.,* Federal Forum on Environmental Collaboration and Conflict Resolution, Environmental Collaboration and Conflict Resolution (ECCR): Enhancing Agency Efficiency and Making Government Accountable to the People (May 2, 2018), *https://ceq.doe.gov/docs/nepa-practice/ECCR_Benefits_Recommendations_Report_%205-02-018.pdf.*

[84] This is consistent with CEQ's reports on cooperating agencies, which have shown that use of cooperating agencies for EAs has remained low. Council on Environmental Quality, Attachment A, The Fourth Report on Cooperating Agencies in Implementing the Procedural Requirements of the National Environmental Policy Act (NEPA) 1 (Oct. 2016), *https://ceq.doe.gov/docs/ceq-reports/Attachment-A-Fourth-Cooperating-Agency-Report_Oct2016.pdf* (percentage of EAs with cooperating agencies was 6.8 percent for Fiscal Years 2012 through 2015); *see also* Council on Environmental Quality, Attachment A, The Second Report on Cooperating Agencies in Implementing the Procedural Requirements of the National Environmental Policy Act (NEPA) 2 (May 2012), *https://ceq.doe.gov/docs/ceq-reports/Cooperating_Agency_Report_2005-11_Attachment_23May2012.pdf* (percentage of EAs with cooperating agencies was 5.9 percent for Fiscal Years 2005 through 2011).

[85] A "single ROD," as used in E.O. 13807, is the same as a "joint ROD," which is a ROD addressing all Federal agency actions covered in the single EIS and necessary for a proposed project. 40 CFR 1508.25(a)(3). The regulations would provide flexibility for circumstances where a joint ROD is impracticable. Examples include the statutory directive to issue a combined final EIS and ROD for transportation actions and the FERC's adjudicatory process.

[86] *See* OFD Framework Guidance, *supra* note 30, sec. VII.A.5 ("The lead agency is responsible for developing the Purpose and Need, identifying the range of alternatives to be analyzed, identifying the

preferred alternative and determining whether to develop the preferred alternative to a higher level of detail."); Connaughton Letter, *supra* note 29 ("[j]oint lead or cooperating agencies should afford substantial deference to the [ ] agency's articulation of purpose and need.")

including comments requesting that agencies have greater flexibility in how to conduct scoping. CEQ proposed to reorganize in more chronological order, § 1501.9, "Scoping," (40 CFR 1501.7 in the 1978 regulations), consolidate all the requirements for the NOI and the scoping process into the same section, and add paragraph headings to improve clarity. CEQ makes these changes in the final rule with minor edits as described further in this section.

Specifically, CEQ proposed to revise paragraph (a) to state the general requirement to use scoping for EISs. Rather than requiring publication of an NOI as a precondition to the scoping process, CEQ proposed to modify paragraph (a) so that agencies can begin the scoping process as soon as the proposed action is developed sufficiently for meaningful agency consideration. Some agencies refer to this as pre-scoping under the existing regulations to capture scoping work done before publication of the NOI. Rather than tying the start of scoping to the agency's decision to publish an NOI to prepare an EIS, the timing and content of the NOI would instead become an important step in the scoping process itself, thereby obviating the artificial distinction between scoping and pre-scoping. However, agencies should not unduly delay publication of the NOI and should be transparent about any work done prior to publication of the NOI. CEQ makes the changes as proposed in the final rule.

Paragraph (b) addresses the responsibility of the lead agency to invite cooperating and participating agencies as well as other likely affected or interested persons. CEQ proposed to add "likely" to this paragraph to capture the reality that, at the scoping stage, agencies may not know the identities of all affected parties and that one of the purposes of scoping is to identify affected parties. CEQ makes this change in the final rule. In the final rule, CEQ strikes "on environmental grounds" from the parenthetical noting that likely affected or interested persons include those who might not agree with the action because the clause is unnecessarily limiting. Agencies should invite the participation of those who do not agree with the action irrespective of whether it is on environmental grounds.

The NPRM proposed to move the existing (b)(4) to paragraph (c), "Scoping outreach." CEQ proposed to broaden the types of activities agencies might hold during scoping, including meetings, publishing information, and other means of communication to provide agencies additional flexibility in how to reach interested or affected parties in

the scoping process. CEQ finalizes this change as proposed.

Paragraph (d) proposed to address the NOI requirements. CEQ proposed a list of what agencies must include in an NOI to standardize NOI format, achieve greater consistency across agencies, provide the public with more information and transparency, and ensure that agencies conduct the scoping process in a manner that facilitates implementation of the OFD policy for multi-agency actions, including by proactively soliciting comments on alternatives, impacts, and relevant information to better inform agency decision making. CEQ makes these changes in the final rule with minor edits for clarity and edits to paragraph (d)(7) for consistency with §§ 1500.3 and 1502.17 and to correct the cross-reference.

CEQ proposed to move the criteria for determining scope from the definition of scope, 40 CFR 1508.25, to paragraph (e) and to strike the paragraph on "cumulative actions" for consistency with the proposed revisions to the definition of "effects" discussed below. CEQ makes this change in the final rule, but does not include the reference to "similar actions" in proposed paragraph (e)(1)(ii) because commenters expressed confusion regarding whether the determination of the scope of the environmental documentation, as discussed in proposed § 1501.9(e)(1)(i)(C) was directly related to the discussion of the "effects of the action" as effects are defined in § 1508.1(g). To eliminate this confusion, CEQ strikes the language in proposed § 1501.9(e)(1)(i)(C) (40 CFR 1508.25(a)(3)) regarding similar actions. Further, CEQ notes that, in cases where the question of the consideration of similar actions to determine the scope of the NEPA documentation was raised, courts noted the discretionary nature of the language (use of the word "may" and "should" in proposed § 1501.9(e)(1)(i)(C) (40 CFR 1508.25(a)(3)) and have held that determinations as to the scope of a NEPA document based on a consideration of similar actions was left to the agency's discretion. *See e.g., Klamath-Siskiyou Wildlands Ctr.* v. *Bureau of Land Mgmt.,* 387 F.3d 989, 1000–01 (9th Cir. 2004). CEQ also notes that the reference to "other reasonable courses of action" in paragraph (e)(2) are within the judgement of the agency. Agencies have discretion to address similar actions through a single analysis, pursuant to revised § 1502.4(b).

Finally, paragraph (f) addresses other scoping responsibilities, including

identifying and eliminating from detailed study non-significant issues, allocating assignments among lead and cooperating agencies, indicating other related NEPA documents, identifying other environmental review requirements, and indicating the relationship between the environmental review and decision-making schedule. CEQ retains this paragraph in the final rule as proposed with minor grammatical edits.

### 9. Time Limits (§ 1501.10)

In response to the ANPRM, CEQ received many comments on the lengthy timelines and costs of environmental reviews, and many suggestions for more meaningful time limits for the completion of the NEPA process. Accordingly, and to promote timely reviews, CEQ proposed to establish presumptive time limits for EAs and EISs consistent with E.O. 13807 and prior CEQ guidance. In Question 35 of the Forty Questions, *supra* note 2, CEQ stated its expectation that "even large complex energy projects would require only about 12 months for the completion of the entire EIS process" and that, for most major actions, "this period is well within the planning time that is needed in any event, apart from NEPA." CEQ also recognized that "some projects will entail difficult long-term planning and/or the acquisition of certain data which of necessity will require more time for the preparation of the EIS." *Id.* Finally, Question 35 stated that an EA "should take no more than 3 months, and in many cases substantially less as part of the normal analysis and approval process for the action."

Based on agency experience with the implementation of the regulations, CEQ proposed in § 1501.10, "Time limits," to change the introductory text to paragraph (a) and add a new paragraph (b) to establish a presumptive time limit for EAs of one year and a presumptive time limit for EISs of two years. However, the NPRM also proposed that a senior agency official could approve in writing a longer period. CEQ proposed to define the start and end dates of the period consistent with E.O. 13807. CEQ makes these changes in the final rule. CEQ eliminates the sentence regarding lead agency from paragraph (a) because it is no longer needed given the revisions to this section changing "agency" to "senior agency official." In response to comments, the final rule also adds "FONSI" to paragraph (b)(1) to clarify that the time limit for EAs is measured from the date of decision to prepare to the publication of an EA or FONSI, since agencies may not publish

the EA separately. The final rule also clarifies that the time period is measured from the date the agency decides to prepare an EA, since applicants sometimes prepare EAs on behalf of agencies.

Consistent with CEQ and OMB guidance, agencies should begin scoping and development of a schedule for timely completion of an EIS prior to issuing an NOI and commit to cooperate, communicate, share information, and resolve conflicts that could prevent meeting milestones.[87] CEQ recognizes that agency capacity, including those of cooperating and participating agencies, may affect timing, and that agencies should schedule and prioritize their resources accordingly to ensure effective environmental analyses and public involvement. Further, agencies have flexibility in the management of their internal processes to set shorter time limits and to define the precise start and end times for measuring the completion time of an EA. Therefore, CEQ proposed to retain the factors for determining time limits in paragraph (c). CEQ proposed to revise paragraph (c)(6) for clarity and strike paragraph (c)(7) regarding controversial actions because it overlaps with numerous other factors, and because whether or not an action is controversial is not relevant to the analysis under NEPA. CEQ also proposed to retain with edits for clarity the list of parts of the NEPA process for which the senior agency official may set time limits in paragraph (d). CEQ retains paragraphs (c) and (d) in the final rule with the changes as proposed.

CEQ proposed conforming edits to § 1500.5(g) to change "establishing" to "meeting" time limits and add "environmental assessment." CEQ makes these edits in the final rule.

### 10. Tiering (§ 1501.11)

CEQ proposed to move 40 CFR 1502.20, "Tiering," to a new § 1501.11 and revise it to make clear that this provision is applicable to both EAs and EISs. CEQ proposed a number of revisions in § 1501.11 to clarify when agencies can use existing studies and environmental analyses in the NEPA process and when agencies would need to supplement such studies and analyses. The revisions clarify that agencies do not need to conduct site-specific analyses prior to an irretrievable commitment of resources, which in most cases will not be until

the decision at the site-specific stage. CEQ makes these changes with additional updates in the final rule.

Specifically, the final rule splits proposed paragraph (a) into two paragraphs. In the new paragraph (a), CEQ changes "are encouraged to" to "should" and moves to the end of this paragraph the sentence stating that tiering may also be appropriate for different stages of actions. The new paragraph (b) addresses the relationship between the different levels of tiered documents, and CEQ makes additional edits to this paragraph for clarity.

CEQ also proposed to move the operative language addressing specific examples of when tiering is appropriate from the definition of tiering in 40 CFR 1508.28 to proposed paragraph (b). CEQ moves this language to paragraph (c) in the final rule with the edits as proposed.

### 11. Incorporation by Reference (§ 1501.12)

CEQ proposed to move 40 CFR 1502.21, "Incorporation by reference," to a new § 1501.12 and change "environmental impact statements" to "environmental documents" because this provision is applicable generally, not just to EISs. CEQ makes this change in the final rule. CEQ makes additional changes in the final rule to revise sentences from passive to active voice. In response to comments, CEQ adds examples to the types of material that agencies may incorporate, including planning studies and analyses.

### D. Revisions to Environmental Impact Statements (Part 1502)

As stated in the NPRM, the most extensive level of NEPA analysis is an EIS, which is the "detailed statement" required under section 102(2)(C) of NEPA. When an agency prepares an EIS, it typically issues a ROD at the conclusion of the NEPA review. Based on the Environmental Protection Agency (EPA) weekly Notices of Availability published in the **Federal Register** between 2010 and 2019, Federal agencies published approximately 176 final EISs per year. CEQ proposed to update the format, page length, and timeline to complete EISs to better achieve the purposes of NEPA. CEQ also proposed several changes to streamline, allow for flexibility in, and improve the preparation of EISs. CEQ includes provisions in part 1502 to promote informed decision making by agencies and to inform the public about the decision-making process. The final rule continues to encourage application of NEPA early in the process and early

engagement with applicants for non-Federal projects.

### 1. Purpose of Environmental Impact Statement (§ 1502.1)

CEQ proposed to revise § 1502.1 for consistency with the statutory language of NEPA and make other non-substantive revisions for clarity. CEQ makes these changes in the final rule. The final rule also retitles this section.

### 2. Implementation (§ 1502.2)

CEQ proposed to strike the introductory text of § 1502.2 as unnecessary and revise the text in paragraphs (a) and (c) for clarity and consistency with the language in the rule and regulatory text generally. CEQ makes these changes in the final rule with minor clarifying edits. The final rule clarifies in paragraph (d) that, in preparing an EIS, agencies shall state how the alternatives considered in it and decisions based on it serve the purposes of the statute as interpreted in the CEQ regulations. The final rule strikes "ultimate agency" in paragraph (e) because there may be multiple individuals within certain departments or agencies that have decision-making responsibilities, including where subunits have developed agency procedures or NEPA compliance programs.

### 3. Statutory Requirements for Statements (§ 1502.3)

CEQ proposed to revise § 1502.3 to make it a single paragraph, remove cross-references to the definition, and make minor clarifying edits. CEQ makes these changes in the final rule.

### 4. Major Federal Actions Requiring the Preparation of Environmental Impact Statements (§ 1502.4)

CEQ proposed to revise § 1502.4 to clarify in paragraph (a) that a "properly defined" proposal is one that is based on the statutory authorities for the proposed action. CEQ proposed to change "broad" and "program" to "programmatic" in this section, as well as §§ 1500.4(k) and 1506.1(c), since "programmatic" is the term commonly used by NEPA practitioners. The NPRM proposed further revisions to paragraph (b), including eliminating reference to programmatic EISs that "are sometimes required," to focus the provision on the discretionary use of programmatic EISs in support of clearly defined decision-making purposes. For consistency, CEQ proposed to change the mandatory language to be discretionary in proposed paragraph (c)(3) (paragraph (b)(1)(iii) in the final rule). As CEQ stated in its 2014 guidance, programmatic NEPA reviews

---

[87] *See* OFD Framework Guidance, *supra* note 30 ("[w]hile the actual schedule for any given project may vary based upon the circumstances of the project and applicable law, agencies should endeavor to meet the two-year goal . . . .").

"should result in clearer and more transparent decision[ ]making, as well as provide a better defined and more expeditious path toward decisions on proposed actions." [88] Other statutes or regulations may grant discretion or otherwise identify circumstances for when to prepare a programmatic EIS. *See, e.g.,* National Forest Management Act, 16 U.S.C. 1604(g); 36 CFR 219.16. CEQ makes these changes in the final rule, and reorganizes proposed paragraphs (c) and (d) to be paragraphs (b)(1) and (2) since these paragraphs all address programmatic reviews. Finally, CEQ proposed to add a new sentence to proposed paragraph (d) (paragraph (b)(2) in the final rule) to clarify that when conducting programmatic reviews, agencies may tier their analyses to defer detailed analysis of specific program elements until they are ripe for decisions that would involve an irreversible or irretrievable commitment of resources. The final rule removes this latter clause and simplifies it to elements "ripe for final agency action" because NEPA review occurs pursuant to the APA and "final agency action," as construed in *Bennett* v. *Spear,* is the test for when judicial review can commence. *See* 520 U.S. at 177–78.

### 5. Timing (§ 1502.5)

For the reasons discussed in section II.C.2 and consistent with the edits to § 1501.2, CEQ proposed to change "shall" to "should" in the introductory text so that agencies can exercise their best judgement about when to begin the preparation of an EIS. CEQ also proposed to revise paragraph (b) to clarify that agencies should work with potential applicants and applicable agencies before applicants submit applications. CEQ makes these changes in the final rule. Also, as noted in section II.C.7, CEQ revises paragraph (b) in the final rule to only address EISs in this section and move the discussion of EAs to § 1501.5. Finally, CEQ adds "and governments" to "State, Tribal, and local agencies" to be comprehensive and consistent with similar changes made throughout the rule.

### 6. Interdisciplinary Preparation (§ 1502.6)

CEQ proposed minor edits to § 1502.6 consistent with the global changes discussed in section II.A. CEQ includes these changes in the final rule and revises this provision from passive to active voice.

### 7. Page Limits (§ 1502.7)

In response to the ANPRM, CEQ received many comments on the length, complexity, and readability of environmental documents, and many suggestions for more meaningful page limits. As the President Carter noted in 1977 regarding issuance of E.O. 11991, "to be more useful to decision[ ]makers and the public, [EISs] must be concise, readable, and based upon competent professional analysis. They must reflect a concern with quality, not quantity. We do not want [EISs] that are measured by the inch or weighed by the pound." [89] The core purpose of page limits from the original regulations remains— documents must be a reasonable length and in a readable format so that it is practicable for the decision maker to read and understand the document in a reasonable time period. If documents are unreasonable in their length or unwieldy, there is a risk that they will not inform the decision maker, thereby undermining the purposes of the Act. As the Supreme Court noted in *Metropolitan Edison Co.* v. *People Against Nuclear Energy,* "[t]he scope of the agency's inquiries must remain manageable if NEPA's goal of '[insuring] a fully informed and well-considered decision,' . . . is to be accomplished." 460 U.S. at 776 (quoting *Vt. Yankee,* 435 U.S. at 558). Therefore, CEQ proposed to reinforce the page limits for EISs set forth in § 1502.7, while allowing a senior agency official to approve a statement exceeding 300 pages when it is useful to the decision-making process. CEQ makes these changes in the final rule.

As captured in CEQ's updated report on the length of final EISs, these documents average over 600 pages. *See* CEQ Length of EISs Report, *supra* note 38. While the length of an EIS will vary based on the complexity and significance of the proposed action and environmental effects the EIS considers, every EIS must be bounded by the practical limits of the decision maker's ability to consider detailed information. CEQ proposed this change to ensure that agencies develop EISs focused on significant effects and on the information useful to decision makers and the public to more successfully implement NEPA.

CEQ intends for senior agency officials to take responsibility for the quantity, quality, and timelines of environmental analyses developed in support of the decisions of their agencies. Therefore, the senior agency official approving an EA or EIS in excess of the page limits should ensure that the final environmental document meets the informational needs of the agency's decision maker. For example, the agency decision makers may have varying levels of capacity to consider the information presented in the environmental document. In ensuring that the agency provides the resources necessary to implement NEPA, in accordance with § 1507.2, senior agency officials should ensure that agency staff have the resources and competencies necessary to produce timely, concise, and effective environmental documents. Decisions as to page length for these documents are therefore closely related to an agency's decision as to how to structure its decision-making process, and for that reason must ultimately remain within the discretion of the agency.

### 8. Writing (§ 1502.8)

CEQ did not propose any changes to § 1502.8. In the final rule, CEQ revises this provision to correct grammatical errors, including revising it from passive to active voice.

### 9. Draft, Final and Supplemental Statements (§ 1502.9)

CEQ proposed to include headings for each of the paragraphs in § 1502.9, "Draft, final, and supplemental statements," to improve readability. CEQ proposed edits to paragraph (b) for clarity, replacing "revised draft" with "supplemental draft." CEQ makes these changes in the final rule and makes additional clarifying edits in § 1502.9, including to revise the language from passive to active voice.

CEQ also received many comments in response to the ANPRM requesting clarification regarding when supplemental statements are required. CEQ proposed revisions to paragraph (d)(1) to clarify that agencies need to update environmental documents when there is new information or a change in the proposed action only if a major Federal action remains to occur and other requirements are met. CEQ makes this change in the final rule. As noted in the NPRM, this revision is consistent with Supreme Court case law holding that a supplemental EIS is required only "[i]f there remains 'major Federal actio[n]' to occur, and if the new information is sufficient to show that the remaining action will 'affec[t] the quality of the human environment' in a significant manner or to a significant extent not already considered . . . ." *Marsh,* 490 U.S. at 374 (quoting 42 U.S.C. 4332(2)(C)); *see also Norton* v. *S. Utah Wilderness All.,* 542 U.S. 55, 73 (2004). For example, supplementation

---

[88] Programmatic Guidance, *supra* note 29, at 7.

[89] The Environment—Message to the Congress, 1977 Pub. Papers 967, 985 (May 23, 1977).

AR_0029066

may be triggered after an agency executes a grant agreement but before construction is complete because the agency has yet to provide all of the funds under that grant agreement. On the other hand, when an agency issues a final rule establishing a regulatory scheme, there is no remaining action to occur, and therefore supplementation is not required. If there is no further agency action after the agency's decision, supplementation does not apply because the Federal agency action is complete. *S. Utah Wilderness All.,* 542 U.S. at 73 ("although the '*[a]pproval* of a [land use plan]' is a 'major Federal action' requiring an EIS . . . that action is completed when the plan is approved. . . . There is no ongoing 'major Federal action' that could require supplementation (though BLM *is* required to perform additional NEPA analyses if a plan is amended or revised . . . .)") (emphasis in original).

In order to determine whether a supplemental analysis is required, CEQ proposed a new paragraph (d)(4) to provide that an agency may document its determination of whether a supplemental analysis is required consistent with its agency NEPA procedures or may, although it is not required, do so in an EA. CEQ adds this paragraph to the final rule, codifying the existing practice of several Federal agencies, such as the Department of Transportation's reevaluation provided for highway, transit, and railroad projects (23 CFR 771.129); the Bureau of Land Management's Determination of NEPA Adequacy (Department of the Interior Departmental Manual, Part 516, Chapter 11, § 11.6); and the Corps' Supplemental Information Report (section 13(d) of Engineering Regulation 200–2–2).

### 10. Recommended Format (§ 1502.10)

CEQ proposed to revise § 1502.10 to provide agencies with more flexibility in formatting an EIS given that most EISs are prepared and distributed electronically. Specifically, CEQ proposed to eliminate the requirement to have a list of agencies, organizations and persons to whom copies of the EIS are sent since EISs are published online, and an index, as this is no longer necessary when most documents are produced in an electronically searchable format. Proposed changes to this section would also allow agencies to use a different format so that they may customize EISs to address the particular proposed action and better integrate environmental considerations into agency decision-making processes. CEQ makes these changes in the final rule.

### 11. Cover (§ 1502.11)

CEQ proposed to retitle and amend § 1502.11 to remove the reference to a "sheet" since agencies prepare EISs electronically. CEQ also proposed to add a requirement to include the estimated cost of preparing the EIS to the cover in new paragraph (g) to provide transparency to the public on the costs of EIS-level NEPA reviews. To track costs, the NPRM proposed that agencies must prepare an estimate of environmental review costs, including costs of the agency's full-time equivalent (FTE) personnel hours, contractor costs, and other direct costs related to the environmental review of the proposed action.[90] CEQ also proposed this amendment to address the concerns raised by the U.S. Government Accountability Office that agencies are not tracking the costs of NEPA analyses, as well as the many comments CEQ received from stakeholders regarding the costs associated with development of NEPA analyses.[91] CEQ noted in the NPRM that including such costs on the cover sheet would also be consistent with current OMB direction to Federal agencies to track costs of environmental reviews and authorizations for major infrastructure projects pursuant to E.O. 13807 and would provide the public with additional information regarding EIS-level NEPA documents.

CEQ adds this new paragraph (g) in the final rule with additional changes to clarify that agencies should provide the estimate on the final EIS, and that it should include the costs of preparing both the draft EIS and the final EIS. The final rule also adds a sentence to clarify that agencies should include the costs of cooperating and participating agencies if practicable. If not practicable, agencies must so indicate. For integrated documents where an agency is preparing a document pursuant to multiple environmental statutory requirements, it may indicate that the

---

[90] *See, e.g.,* U.S. Department of the Interior, Reporting Costs Associated with Developing Environmental Impact Statements (July 23, 2018), *https://www.doi.gov/sites/doi.gov/files/uploads/ dep_sec_memo_07232018_-_reporting_costs_ associated_w_developing_environmental_impact_ statements.pdf.*

[91] In a 2014 report, the U.S. Government Accountability Office found that Federal agencies do not routinely track data on the cost of completing NEPA analyses, and that the cost can vary considerably, depending on the complexity and scope of the project. U.S. Gov't Accountability Office, GAO–14–370, National Environmental Policy Act: Little Information Exists on NEPA Analyses (Apr. 15, 2014) ("GAO NEPA Report"), *https://www.gao.gov/products/GAO-14-370.* The report referenced the 2003 CEQ task force analysis referenced above which estimated that a typical EIS costs from $250,000 to $2 million. *See* NEPA Task Force Report, *supra* note 28, at p. 65.

estimate reflects costs associated with NEPA compliance as well as compliance with other environmental review and authorization requirements. Agencies can develop methodologies for preparing these cost estimates and include them in their implementing procedures.

### 12. Summary (§ 1502.12)

CEQ proposed to change "controversy" to "disputed" in § 1502.12. CEQ makes this and grammatical changes in the final rule. This change will better align the second clause of the sentence, "areas of disputed issues raised by agencies and the public," with the final clause of the sentence, "and the issues to be resolved (including the choice among alternatives)."

### 13. Purpose and Need (§ 1502.13)

CEQ received a number of comments in response to the ANPRM recommending that CEQ better define the requirements for purpose and need statements. The focus of a purpose and need statement is the purpose and need for the proposed action, and agencies should develop it based on consideration of the relevant statutory authority for the proposed action. The purpose and need statement also provides the framework in which the agency will identify "reasonable alternatives" to the proposed action. CEQ has advised that this discussion of purpose and need should be concise (typically one or two paragraphs long) and that the lead agency is responsible for its definition. *See* Connaughton Letter, *supra* note 29 ("Thoughtful resolution of the purpose and need statement at the beginning of the process will contribute to a rational environmental review process and save considerable delay and frustration later in the decision[-]making process."). "In situations involving two or more agencies that have a decision to make for the same proposed action and responsibility to comply with NEPA or a similar statute, it is prudent to jointly develop a purpose and need statement that can be utilized by both agencies. An agreed-upon purpose and need statement at this stage can prevent problems later that may delay completion of the NEPA process." *Id.* The lead agency is responsible for developing the purpose and need, and cooperating agencies should give deference to the lead agency and identify any substantive concerns early in the process to ensure swift resolution. *See* OFD Framework Guidance, sec. VIII.A.5 and XII, *supra* note 30; Connaughton Letter, *supra* note 29.

Agencies should tailor the purpose and need statement to meet the authorization requirements of both the lead and cooperating agencies.

Consistent with CEQ guidance and in response to the ANPRM comments, CEQ proposed to revise § 1502.13, "Purpose and need," to clarify that the statement should focus on the purpose and need for the proposed action. In particular, CEQ proposed to strike "to which the agency is responding in proposing the alternatives including" to focus on the proposed action. CEQ further proposed, as discussed below, to address the relationship between the proposed action and alternatives in the definition of reasonable alternatives and other sections that refer to alternatives. Additionally, CEQ proposed to add a sentence to clarify that when an agency is responsible for reviewing applications for authorizations, the agency shall base the purpose and need on the applicant's goals and the agency's statutory authority. *See, e.g., Citizens Against Burlington, Inc.* v. *Busey*, 938 F.2d 190, 196 (D.C. Cir. 1991) (agencies must consider the relevant factors including the needs and goals of the applicants and Congress' views as expressed in the agency's statutory authorization). This addition is consistent with the definition of reasonable alternatives, which must meet the goals of the applicant, where applicable. CEQ revises § 1502.13 in the final rule consistent with the NPRM proposal.

14. Alternatives Including the Proposed Action (§ 1502.14)

CEQ also received many comments on the ANPRM requesting clarification regarding "alternatives" under the regulations. This section of an EIS describes the proposed action and alternatives in comparative form, including their environmental impacts, such that the decision maker and the public can understand the basis for choice. However, as explained in § 1502.16, this section of the EIS should not duplicate the affected environment and environmental consequences sections, and agencies have flexibility to combine these three sections in a manner that clearly sets forth the basis for decision making.

CEQ proposed changes to § 1502.14, "Alternatives including the proposed action," to simplify and clarify the language and provide further clarity on the scope of the alternatives analysis in an EIS. Specifically, CEQ proposed to revise the introductory paragraph to remove the colloquial language, including "heart of" the EIS and "sharply defining," and clarify that the alternatives section of the EIS should

present the environmental impacts in comparative form. CEQ makes these changes in the final rule.

In paragraph (a), CEQ proposed to delete "all" before "reasonable alternatives" and add "to the proposed action" afterward for clarity because NEPA does not require consideration of all alternatives and does not provide specific guidance concerning the range of alternatives an agency must consider for each proposal. Section 102(2)(C) provides only that an agency must prepare a detailed statement addressing, among other things, "alternatives to the proposed action." 42 U.S.C. 4332(2)(C). Section 102(2)(E) requires only that agencies "study, develop, and describe appropriate alternatives to recommended courses of action." 42 U.S.C. 4332(2)(E). Implementing this limited statutory direction, CEQ has long advised that "[w]hen there are potentially a very large number of alternatives, only a reasonable number of examples, covering the full spectrum of alternatives, must be analyzed and compared in the EIS." Forty Questions, *supra* note 2, at Question 1b. CEQ makes this change in the final rule and rephrases paragraph (a) from passive to active voice.

As stated in the NPRM, it is CEQ's view that NEPA's policy goals are satisfied when an agency analyzes reasonable alternatives, and that an EIS need not include every available alternative where the consideration of a spectrum of alternatives allows for the selection of any alternative within that spectrum. The reasonableness of the analysis of alternatives in a final EIS is resolved not by any particular number of alternatives considered, but by the nature of the underlying agency action and by the inherent practical limitations of the decision-making process. The discussion of environmental effects of alternatives need not be exhaustive, but must provide information sufficient to permit a reasoned choice of alternatives for the agency to evaluate available reasonable alternatives including significant alternatives that are called to its attention by other agencies, organizations, communities, or a member of the public.[92] As discussed in section II.C.8, to aid agencies in identification of alternatives, § 1501.9, "Scoping," requires agencies to request identification of potential alternatives in the NOI. Analysis of alternatives also

may serve purposes other than NEPA compliance, such as evaluation of the least environmentally damaging practicable alternative for the discharge of dredged or fill material under section 404(b)(1) of the Clean Water Act, 33 U.S.C. 1344(b)(1).

The number of alternatives that is appropriate for an agency to consider will vary. For some actions, such as where the Federal agency's authority to consider alternatives is limited by statute, the range of alternatives may be limited to the proposed action and the no action alternative. For actions where the Federal authority to consider a range of alternatives is broad, the final EIS itself should consider a broader range of reasonable alternatives. However, a process of narrowing alternatives is in accord with NEPA's "rule of reason" and common sense—agencies need not reanalyze alternatives previously rejected, particularly when an earlier analysis of numerous reasonable alternatives was incorporated into the final analysis and the agency has considered and responded to public comment favoring other alternatives. Furthermore, agencies should limit alternatives to those available to the decision maker at the time of decision.

For consistency with this change, CEQ proposed to strike "the" before "reasonable alternatives" in § 1502.1, and amend § 1502.16, "Environmental consequences," to clarify in proposed paragraph (a)(1) that the discussion must include the environmental impacts of the "proposed action and reasonable alternatives." CEQ makes these changes in the final rule.

In response to CEQ's ANPRM, some commenters urged that the regulations should not require agencies to account for impacts over which the agency has no control, including those resulting from alternatives outside its jurisdiction. CEQ proposed to strike 40 CFR 1502.14(c) requiring consideration of reasonable alternatives not within the jurisdiction of the lead agency for all EISs because it is not efficient or reasonable to require agencies to develop detailed analyses relating to alternatives outside the jurisdiction of the lead agency. CEQ removes this paragraph in the final rule. Further, the new definition of "reasonable alternatives" excludes alternatives outside the agency's jurisdiction when they would not be technically feasible due to the agency's lack of statutory authority to implement that alternative. However, an agency may discuss reasonable alternatives not within its jurisdiction when necessary for the agency's decision-making process such as when preparing an EIS to address

---

[92] Additionally, by crafting alternatives, agencies can "bound" different options and develop information on intermediate options that occupy the logical space in between different formal alternatives. *See, e.g.,* H.A. Simon, "Bounded Rationality," in *Utility and Probability* (J. Eatwell, M. Milgate, & P. Newman P. eds. 1990).

AR_0029068

legislative EIS requirements pursuant to § 1506.8 and to address specific congressional directives.

A concern raised by many ANPRM commenters is that agencies have limited resources and that it is important that agencies use those resources effectively. The provisions inviting commenters to identify potential alternatives will help to inform agencies as to how many alternatives are reasonable to consider, and allow agencies to assess whether any particular submitted alternative is reasonable to consider. Analyzing a large number of alternatives, particularly where it is clear that only a few alternatives would be economically and technically feasible and could be realistically implemented by the applicant, can divert limited agency resources. CEQ invited comment on whether the regulations should establish a presumptive maximum number of alternatives for evaluation of a proposed action, or alternatively for certain categories of proposed actions. CEQ sought comment on (1) specific categories of actions, if any, that should be identified for the presumption or for exceptions to the presumption; and (2) what the presumptive number of alternatives should be (*e.g.*, a maximum of three alternatives including the no action alternative). CEQ did not receive sufficient information to establish a minimum, but adds a new paragraph (f) to the final rule to state that agencies shall limit their consideration to a reasonable number of alternatives. The revisions to the regulations to promote earlier solicitation of information and identification of alternatives, and timely submission of comments, will assist agencies in establishing how many alternatives are reasonable to consider and assessing whether any particular submitted alternative is reasonable to consider.

## 15. Affected Environment (§ 1502.15)

CEQ proposed in § 1502.15, "Affected environment," to explicitly allow for combining of affected environment and environmental consequences sections to adopt what has become a common practice in some agencies. This revision would ensure that the description of the affected environment focuses on those aspects of the environment that the proposed action affects. CEQ makes this change in the final rule. Additionally, the final rule adds a clause to emphasize that the affected environment includes reasonably foreseeable environmental trends and planned actions in the affected areas. This change responds to comments raising concerns that eliminating the definition of cumulative

impact (40 CFR 1508.7) would result in less consideration of changes in the environment. To the extent environmental trends or planned actions in the area(s) are reasonably foreseeable, the agency should include them in the discussion of the affected environment. Consistent with current agency practice, this also may include non-Federal planned activities that are reasonably foreseeable.

In response to the NPRM, commenters expressed concerns that impacts of climate change on a proposed project would no longer be taken into account. Under the final rule, agencies will consider predictable environmental trends in the area in the baseline analysis of the affected environment. Trends determined to be a consequence of climate change would be characterized in the baseline analysis of the affected environment rather than as an effect of the action. Discussion of the affected environment should be informative but should not be speculative.

## 16. Environmental Consequences (§ 1502.16)

CEQ proposed to reorganize § 1502.16, "Environmental consequences." CEQ proposed to designate the introductory paragraph as paragraph (a), move up the sentence that it should not duplicate the alternatives discussion, and create subordinate paragraphs (a)(1) through (10) for clarity. In paragraph (a)(1), CEQ proposed to consolidate into one paragraph the requirements regarding effects scattered throughout 40 CFR 1502.16, including paragraphs (a), (b), and (d), to include a discussion of the effects of the proposed action and reasonable alternatives. Also consistent with the definition of effects, CEQ proposed to strike references to direct, indirect, and cumulative effects. The combined discussion should focus on those effects that are reasonably foreseeable and have a reasonably close causal relationship to the proposed action, consistent with the proposed revised definition of effects addressed in § 1508.1(g). CEQ proposed to move 40 CFR 1502.16(c) and (e) through (h) to be paragraphs (a)(5) through (9). To align with the statute, CEQ also proposed to add a new paragraph (a)(10) to provide that discussion of environmental consequences should include, where applicable, economic and technical considerations consistent with section 102(2)(B) of NEPA. CEQ makes these changes in the final rule with minor edits to clarify that "this section" in paragraph (a) refers to the "environmental consequences" section;

address the dangling modifier, "their significance," in paragraph (a)(1); correct the usage of "which" and "that" throughout; and clarify the language in paragraph (b).

Further, CEQ proposed to move the operative language that addresses when agencies need to consider economic and social effects in EISs from the definition of human environment in 40 CFR 1508.14 to proposed § 1502.16(b). CEQ also proposed to amend the language for clarity, explain that the agency makes the determination of when consideration of economic and social effects is interrelated with consideration of natural or physical environmental effects at which point the agency should give appropriate consideration to those effects, and strike "all of" as unnecessary. CEQ makes these changes in the final rule.

## 17. Submitted Alternatives, Information, and Analyses (§ 1502.17)

To ensure agencies have considered the alternatives, information, and analyses submitted by the public, including State, Tribal, and local governments as well as individuals and organizations, CEQ proposed to add a new § 1502.17 to require a new "submitted alternatives, information, and analyses" section in draft and final EISs. CEQ includes this new provision in the final rule with some modifications to separate the requirements for draft and final EISs, as discussed in this section.

To ensure agencies receive and consider relevant information as early in the process as possible, § 1501.9, "Scoping," requires agencies to specifically solicit such information in their notices of intent. Under § 1502.17, agencies must include a summary in the EIS identifying all alternatives, information, and analyses the agency received from State, Tribal, and local governments and other public commenters. In developing the summary, agencies may refer to other relevant sections of the EIS or to appendices. A new paragraph (a)(1) requires agencies to append to the draft EIS or otherwise publish the comments received during scoping and, consistent with the proposed rule, paragraph (a)(2) requires the lead agency to invite comment on the summary. Finally, paragraph (b) requires agencies to prepare a summary in the final EIS based on all comments received on the draft EIS.

CEQ proposed to require in a new § 1502.18, "Certification of alternatives, information, and analyses section," that, informed by the alternatives, information, and analyses section

required under § 1502.17, the decision maker for the lead agency certify that the agency has considered such information and include the certification in the ROD under proposed § 1505.2(e). CEQ moves this provision to § 1505.2(b) in the final rule, as discussed in further detail in section II.G.2.

### 18. List of Preparers (§ 1502.18)

CEQ proposed to move "List of preparers" from § 1502.17 to § 1502.19 to accommodate the two new sections addressing submitted alternatives, information, and analyses. The final rule moves this section to § 1502.18 and makes minor revisions to change the language from passive to active voice and remove the erroneous cross-references.

### 19. Appendix (§ 1502.19)

CEQ proposed to move "Appendix" from § 1502.18 to § 1502.20 and revise the language for clarity. The final rule moves this provision to § 1502.19 with additional clarifying revisions. The final rule also adds a new paragraph (d) to reflect the potential appendix for scoping comments on alternatives, information, and analyses pursuant to § 1502.17(a)(1) and a new paragraph (e) for the potential appendix of draft EIS comments pursuant to §§ 1503.1 and 1503.4(b).

### 20. Publication of the Environmental Impact Statement (§ 1502.20)

CEQ proposed to move "Circulation of the environmental impact statement" from § 1502.19 to § 1502.21 and retitle it "Publication of the environmental impact statement." CEQ moves this to § 1502.20 in the final rule. CEQ proposed to modernize this provision, changing circulate to publish and eliminating the option to circulate the summary of an EIS given that agencies electronically produce most EISs. CEQ proposed to require agencies to transmit the EIS electronically, but provide for paper copies by request. CEQ makes these changes in the final rule.

### 21. Incomplete or Unavailable Information (§ 1502.21)

CEQ proposed several revisions to proposed § 1502.22, "Incomplete or unavailable information," which CEQ redesignates as § 1502.21 in the final rule. Specifically, CEQ proposed to further subdivide the paragraphs for clarity and strike the word "always" from paragraph (a) as unnecessarily limiting and inconsistent with the rule of reason, and replaced the term "exorbitant" with "unreasonable" in paragraphs (b) and (c), which is

consistent with CEQ's description of "overall cost" considerations in its 1986 promulgation of amendments to this provision.[93] CEQ reiterates that the term "overall cost" as used in this section includes "financial costs and other costs such as costs in terms of time (delay) and personnel."[94] CEQ invited comment on whether the "overall costs" of obtaining incomplete or unavailable information warrants further definition to address whether certain costs are or are not "unreasonable." CEQ does not include any definition in the final rule.

For clarity and in response to comments, the final rule inserts "but available" in paragraph (b) to clarify that agencies will continue to be required to obtain available information essential to a reasoned choice between alternatives where the overall costs are not unreasonable and the means of obtaining that information are known.[95] New scientific or technical research is unavailable information and is addressed in § 1502.23. Where the overall costs are unreasonable or means of obtaining the information are not known, agencies will continue to be required to disclose in the EIS that information is incomplete or unavailable and provide additional information to assist in analyzing the reasonably foreseeable significant adverse impacts. However, § 1502.23 does not require agencies to undertake new scientific and technical research to inform their analyses.

Finally, CEQ proposed to eliminate 40 CFR 1502.22(c) addressing the applicability of the 1986 amendments to this section because this paragraph is obsolete. CEQ does not include this provision in the final rule.

### 22. Cost-Benefit Analysis (§ 1502.22)

CEQ did not propose changes to the cost-benefit analysis section other than an update to the citation. In the final rule, CEQ moves this provision from § 1502.23 to § 1502.22 and adds a parenthetical after "section 102(2)(B) of NEPA" that paraphrases the statutory text relating to considering unquantified environmental amenities and values along with economic and technical considerations. This is consistent with the policy established in section 101(a), which also refers to fulfilling the social,

economic, and other requirements of present and future generations of Americans. Finally, CEQ revises the language for clarity, including changing from passive to active voice.

### 23. Methodology and Scientific Accuracy (§ 1502.23)

CEQ proposed revisions to update proposed § 1502.24, which CEQ redesignates § 1502.23 in the final rule. The NPRM proposed to broaden this provision to environmental documents and CEQ makes this change in the final rule. CEQ proposed to clarify that agencies must make use of reliable existing data and resources when they are available and appropriate. CEQ also proposed to revise this section to allow agencies to draw on any source of information (such as remote sensing and statistical modeling) that the agency finds reliable and useful to the decision-making process. As noted in the NPRM, these changes will promote the use of reliable data, including information gathered using modern technologies. CEQ makes these changes in the final rule with minor changes. The final rule revises the sentence regarding placing the discussion of methodology in an appendix from singular to plural for consistency with the rest of the language in this section. In response to comments, CEQ moves the proposed sentence regarding new scientific and technical research to a new sentence at the end of the section and adds a sentence clarifying that nothing in this provision is intended to prohibit agencies from compliance with the requirements of other statutes pertaining to scientific and technical research. Agencies must continue to conduct surveys and collect data where required by other statutes.

### 24. Environmental Review and Consultation Requirements (§ 1502.24)

CEQ proposed to revise this section to clarify that agencies must integrate, to the fullest extent possible, their NEPA analysis with all other applicable Federal environmental review laws and Executive orders in furtherance of the OFD policy established by E.O. 13807 and to make the environmental review process more efficient.[96] CEQ redesignates this section in the final rule to § 1502.24, updates a statutory

---

[93] 51 FR at 15622 (Apr. 25, 1986).

[94] *Id.*

[95] *See, e.g. Pub. Citizen*, 541 U.S. at 767 ("Also, inherent in NEPA and its implementing regulations is a 'rule of reason,' which ensures that agencies determine whether and to what extent to prepare an EIS based on the usefulness of any new potential information to the decision[-]making process."); *see also Marsh*, 490 U.S. at 373–74 (agencies should apply a "rule of reason").

[96] The Permitting Council has compiled a list of environmental laws and Executive orders that may apply to a proposed action. *See* Federal Environmental Review and Authorization Inventory, *https://www.permits.performance.gov/tools/federal-environmental-review-and-authorization-inventory.*

citation, and revises the text as proposed.

*E. Revisions to Commenting on Environmental Impact Statements (Part 1503)*

Section 102(2)(C) of NEPA requires that agencies obtain views of Federal agencies with jurisdiction by law or expertise with respect to any environmental impact, and also directs that agencies make copies of the EIS and the comments and views of appropriate Federal, State, and local agencies available to the President, CEQ and the public. 42 U.S.C. 4332(2)(C). Part 1503 of the CEQ regulations include provisions relating to inviting and responding to comments. CEQ proposed to modernize part 1503 given modern technologies not available at the time of the 1978 regulations. In particular, the proposed regulations encouraged agencies to use the current methods of electronic communication both to publish important environmental information and to structure public participation for greater efficiency and inclusion of interested persons. Additionally, CEQ proposed changes to encourage commenters to provide information early and to require comments to be as specific as possible to ensure agencies can consider them in their decision-making process. CEQ finalizes many of the proposed changes with modifications as this section discusses in further detail.

1. Inviting Comments and Requesting Information and Analyses (§ 1503.1)

CEQ proposed to retitle and revise § 1503.1, "Inviting comments and requesting information and analyses," to better reach interested and affected parties and ensure agencies receive the relevant information they need to complete their analyses. CEQ proposed to revise paragraphs (a)(2)(i) and (ii) to include State, Tribal and local agencies and governments to be comprehensive and consistent with the addition of "Tribal" as discussed in section II.A. CEQ proposed to eliminate the obsolete reference to OMB Circular A–95 from paragraph (a)(2)(iii) and move paragraphs (a)(3) and (4) to (a)(2)(iv) and (v), respectively, since these are additional parties from which agencies should request comments. CEQ also proposed in paragraph (a)(2)(v) to give agencies flexibility to tailor their public involvement process to more effectively reach interested and affected parties by soliciting comments "in a manner designed to inform" parties interested or affected "by the proposed action." CEQ makes these changes in the final rule.

CEQ also proposed to add a new paragraph (a)(3) that requires agencies to specifically invite comment on the completeness of the submitted alternatives, information and analyses section (§ 1502.17). CEQ includes this new paragraph in the final rule with revisions to clarify that agencies should invite comments on the submitted alternatives, information, and analyses generally as well as the summary required under § 1502.17, rather than on the completeness of the summary, as proposed. Interested parties who may seek to challenge the agency's decision have an affirmative duty to comment during the public review period in order for the agency to consider their positions. *See Vt. Yankee,* 435 U.S. at 553.

In paragraph (b), CEQ proposed to require agencies to provide a 30-day comment period on the final EIS's submitted alternatives, information and analyses section. As noted in the discussion of § 1500.3(b) in section II.B.3, CEQ does not include this requirement in the final rule. However, the final rule adds language that if an agency requests comments on a final EIS before the final decision, the agency should set a deadline for such comments. This provides agencies the flexibility to request comments on a final EIS. Agencies may use this option where it would be helpful to inform the agency's decision making process.

Finally, CEQ proposed a new paragraph (c) to require agencies to provide for commenting using electronic means while ensuring accessibility to those who may not have such access to ensure adequate notice and opportunity to comment. CEQ includes this proposed paragraph in the final rule.

2. Duty To Comment (§ 1503.2)

Section 1503.2, "Duty to comment," addresses the obligations of other agencies to comment on an EIS. CEQ proposed to clarify that this provision applies to cooperating agencies and agencies authorized to develop and enforce environmental standards. CEQ makes this change in the final rule and makes additional revisions to change the language from passive to active voice.

3. Specificity of Comments and Information (§ 1503.3)

CEQ proposed to revise paragraph (a) and retitle § 1503.3, "Specificity of comments and information," to explain that the purposes of comments is to promote informed decision making and further clarify that comments should provide sufficient detail for the agency to consider the comment in its decision-making process. *See Pub. Citizen,* 541 U.S. at 764; *Vt. Yankee,* 435 U.S. at 553 (while "NEPA places upon an agency the obligation to consider every significant aspect of the environmental impact of a proposed action, it is still incumbent upon [parties] who wish to participate to structure their participation so that it is meaningful, so that it alerts the agency to the [parties'] position . . . ."). CEQ also proposed in this paragraph that comments should explain why the issues raised are significant to the consideration of potential environmental impacts and alternatives to the proposed action, as well as economic and employment impacts, and other impacts affecting the quality of the human environment. In addition, CEQ proposed in this paragraph that comments should reference the section or page of the draft EIS, propose specific changes to those parts of the statement, where possible, and include or describe the data sources and methodologies supporting the proposed changes. *See Vt. Yankee,* 435 U.S. at 553 ("[Comments] must be significant enough to step over a threshold requirement of materiality before any lack of agency response or consideration becomes a concern. The comment cannot merely state that a particular mistake was made . . . ; it must show why the mistake was of possible significance in the results . . . ." (quoting *Portland Cement Ass'n* v. *Ruckelshaus,* 486 F.2d 375, 394 (D.C. Cir. 1973)). CEQ includes these changes in the final rule to ensure that agencies are alerted to all interested and affected parties' concerns, but changes "significant" to "important" issues in the second sentence to avoid confusion with significant effects. Nothing in these revisions should be construed to limit public comment to those members of the public with scientific or technical expertise, and agencies should continue to solicit comment from all interested and affected members of the public. Consistent with the goal of promoting a manageable process and a meaningful focus on pertinent issues, CEQ also clarifies that commenters should submit information and raise issues as early in the process as possible, including during scoping to the extent practicable. Commenters should timely submit all comments and make their comments as specific as possible to promote informed and timely decision making.

CEQ also proposed a new paragraph (b) to emphasize that comments on the submitted alternatives, information, and analyses section should identify any additional alternatives, information, or

analyses not included in the draft EIS, and should be as specific as possible. The proposal required comments and objections to be raised within 30 days of publication of the notice of availability of the final EIS and noted that comments and objections not provided within those 30 days are considered exhausted and forfeited under § 1500.3(b). In the final rule, CEQ includes this paragraph with some changes. The final rule provides that comments should be on the submitted alternatives, information, and analyses themselves as well as the summary that § 1502.17 requires and be as specific as possible. It further provides that comments and objections on the draft EIS must be raised within the comment period provided by the agency, consistent with § 1506.11. The final rule does not include the 30-day comment period, as discussed in sections II.B.3 and II.E.1; however, it provides that if the agency requests comments on the final EIS, comments and objections must be raised within the comment period. The final rule also provides that comments and objections not provided within the relevant comment periods are considered unexhausted and forfeited under § 1500.3(b).

CEQ proposed to change "commenting" agency to "participating" agency in paragraph (c), and "entitlements" to "authorizations" in paragraph (d). CEQ makes these changes in the final rule. Finally, CEQ proposed to broaden paragraph (e) to require cooperating agencies with jurisdiction by law to specify the mitigation measures they consider necessary for permits, licenses, or related requirements, including the applicable statutory authority. CEQ includes this change in the final rule because it will provide greater transparency and clarity to the lead agency and the public when mitigation is required under another statute.

### 4. Response to Comments (§ 1503.4)

In practice, the processing of comments can require substantial time and resources. CEQ proposed to amend § 1503.4, "Response to comments," to simplify and clarify in paragraph (a) that agencies are required to consider substantive comments timely submitted during the public comment period. CEQ also proposed to clarify that an agency may respond to comments individually or collectively. Consistent with this revision, CEQ proposed to clarify that, in the final EIS, agencies may respond by a variety of means, and to strike the detailed language in paragraph (a)(5) relating to comments that do not warrant further agency response. CEQ

includes these changes with some modifications in the final rule. Specifically, CEQ changes "individually" to "individual" and "collectively" to "groups of comments" to clarify that agencies may respond to individual comments or group and respond once to a group of comments addressing the same issue. CEQ also modifies paragraph (a) introductory text to make clear that the list in paragraphs (a)(1) through (5) is how the agency may respond to comments. Finally, CEQ adds a clause to paragraph (a)(5) to reinforce that agencies do not have to respond to each comment individually. Under the 1978 regulations, agencies have had flexibility in how they structure their responses to comments, and CEQ does not consider this clarification to be a change in position.

CEQ proposed to clarify in paragraph (b) that agencies must append comments and responses to EISs rather than including them in the body of the EIS, or otherwise publish them. Under current practice, some agencies include these comment responses in the EISs themselves, which can contribute to excessive length. *See* CEQ Length of EISs Report, *supra* note 38. CEQ makes this change in the final rule. As noted in the NPRM, these changes do not preclude an agency from summarizing or discussing specific comments in the EIS as well.

Finally, CEQ proposed to amend paragraph (c) for clarity. CEQ makes the proposed changes and additional clarifying edits in the final rule.

### F. Revisions to Pre-Decisional Referrals to the Council of Proposed Federal Actions Determined To Be Environmentally Unsatisfactory (Part 1504)

CEQ proposed edits to part 1504, "Pre-decisional Referrals to the Council of Proposed Federal Actions Determined to be Environmentally Unsatisfactory," to improve clarity, including grammatical corrections. CEQ also proposed to reference specifically EAs in this part. Although infrequent, agencies have made referrals to CEQ on EAs. CEQ also proposed a minor revision to the title of part 1504, striking "Predecision" and inserting "Pre-decisional." CEQ makes these changes in the final rule.

### 1. Purpose (§ 1504.1)

Section 1504.1, "Purpose," addresses the purpose of part 1504, including CEQ referrals by the EPA. Section 309 of the Clean Air Act (42 U.S.C. 7609) requires EPA to review and comment on certain proposed actions of other Federal agencies and to make those comments

public. Where appropriate, EPA may exercise its authority under section 309(b) of the Clean Air Act and refer the matter to CEQ, as stated in paragraph (b). The final rule revises this paragraph for clarity, changing it from passive to active voice. Paragraph (c) provides that other Federal agencies also may prepare such reviews. In the NPRM, CEQ proposed to change "may make" to "may produce" in this paragraph. The final rule changes this phrase to "may prepare" since "prepare" is the commonly used verb in these regulations.

### 2. Criterial for Referral (§ 1504.2)

CEQ proposed to change "possible" to "practicable" in the introductory paragraph of § 1504.2, "Criteria for referral." CEQ makes this change in the final rule as discussed in section II.A. Consistent with the NEPA statute, CEQ proposed to add economic and technical considerations to paragraph (g) of § 1504.2, "Criteria for referrals." CEQ includes this change in the final rule.

### 3. Procedure for Referrals and Response (§ 1504.3)

In § 1504.3, "Procedure for referrals and response," CEQ proposed changes to simplify and modernize the referral process to ensure it is timely and efficient. CEQ proposed to change the language in this section from passive to active voice and make other clarifying edits to the language. CEQ includes these changes with some additional clarifying edits in the final rule. Specifically, in paragraphs (a)(1) and (2), CEQ changes "advise" and "such advice" to "notify" and "a notification" respectively. CEQ proposed to eliminate the exception in paragraph (a)(2) for statements that do not contain adequate information to permit an assessment of the matter's environmental acceptability. CEQ removes this clause in the final rule. The referring agency should provide the lead agency and CEQ with as much information as possible, including identification of when the information is inadequate to permit an assessment. In paragraph (a)(4), CEQ changes "such advice" to "the referring agency's views" in the final rule to clarify what the referring agency is sending to CEQ.

In paragraph (b), CEQ proposed to change "commenting agencies" to "participating agencies," a change CEQ proposed throughout the rule, and to add a timeframe for referrals of EAs. CEQ makes these changes in the final rule. CEQ proposed to strike from paragraph (c)(1) the clause requiring the referral request that no action be taken to implement the matter until CEQ takes

AR_0029072

action. CEQ removes this clause in the final rule because it is unnecessarily limiting. Agencies should have the flexibility to determine what they are requesting of the lead agency when making a referral, which may include a request not to take any action on the matter.

CEQ proposed to change "material facts in controversy" to "disputed material facts" in paragraph (c)(2)(i) for clarity and to simplify paragraph (c)(2)(iii) to focus on the reasons for the referral, which may include that the matter is environmentally unsatisfactory. CEQ proposed to revise paragraph (d)(2) to emphasize that the lead agency's response should include both evidence and explanations, as appropriate. CEQ proposed to revise paragraph (e) to simplify the process and to provide direction to applicants regarding the submittal of their views to the CEQ. CEQ proposed to strike the reference to public meetings or hearings in paragraph (f)(3) to provide more flexibility to CEQ in how it obtains additional views and information, which could include a public meeting or hearing. However, there may be other, more effective mechanisms to collect such information, including through use of current technologies. CEQ makes these changes in the final rule.

Finally, CEQ proposed to modify paragraph (h) to clarify that the referral process is not a final agency action that is judicially reviewable and to remove the requirement that referrals be conducted consistent with the APA where a statute requires that an action be determined on the record after an opportunity for a hearing. Where other statutes govern the referral process, those statutes continue to apply, and these regulations do not need to speculate about what process might be required. Therefore, CEQ eliminates this language in the final rule and replaces it with the clarification that the referral process does not create a private right of action because, among other considerations, there is no final agency action.

*G. Revisions to NEPA and Agency Decision Making (Part 1505)*

1. Remove and Reserve Agency Decisionmaking Procedures (§ 1505.1)

In the NPRM, CEQ proposed to move the text of 40 CFR 1505.1, "Agency decisionmaking procedures," to § 1507.3(b). As discussed further in section II.I.3, CEQ makes this change in the final rule and reserves § 1505.1 for future use.

2. Record of Decision in Cases Requiring Environmental Impact Statements (§ 1505.2)

CEQ proposed to redesignate the introductory paragraph of § 1505.2, "Record of decision in cases requiring environmental impact statements," as paragraph (a) and revise it to require agencies to "timely publish" a ROD. CEQ also proposed to clarify that the CEQ regulations allow for "joint" RODs by two or more Federal agencies; this change is also consistent with the OFD policy and E.O. 13807. Finally, CEQ proposed to remove references to OMB Circular A–95 as noted previously in section II.A.

CEQ proposed clarifying edits to proposed paragraphs (a) and (c) (paragraphs (a)(1) and (3) in the final rule) to change from passive to active voice for clarity. The final rule makes these changes in paragraphs (a)(1), (2), and (3) in the final rule. The final rule also removes "all" before "alternatives" in paragraph (a)(2) for consistency with the same change in § 1502.14(a).

CEQ proposed to include a requirement in proposed paragraph (d) to require agencies to respond to any comments on the submitted alternatives, information, and analyses section in the final EIS. As discussed in sections II.B.3 and II.E.1, CEQ does not include the proposed 30-day comment period in the final rule; therefore, CEQ is not including proposed § 1505.2(d) in the final rule.

In the NPRM, proposed paragraph (e) would require the ROD to include the decision maker's certification regarding consideration of the submitted alternatives, information, and analyses section, which proposed § 1502.18 required. The final rule replaces what was proposed paragraph (e) with the language moved from proposed § 1502.18, "Certification of alternatives, information, and analyses section," in paragraph (b). In the NPRM, § 1502.18 stated that, based on the alternatives, information, and analyses section required under § 1502.17, the decision maker for the lead agency must certify that the agency has considered such information and include the certification in the ROD under § 1505.2(d) (as proposed). This provision also proposed a conclusive presumption that the agency has considered information summarized in that section because it is reasonable to presume the agency has considered such information based on the process to request and summarize public comments on the submitted alternatives, information, and analyses.

CEQ modifies the proposed text of § 1502.18 in the final rule and in paragraph (b) of § 1505.2 to clarify that the decision maker's certification in the ROD is informed by the summary of submitted alternatives, information, and analyses in the final EIS and any other material in the record that the decision maker determines to be relevant. This includes both the draft and final EIS as well as any supporting materials incorporated by reference or appended to the document. The final rule also changes "conclusive presumption" to a "presumption" and clarifies that the agency is entitled to a presumption that it has considered the submitted alternatives, information, and analyses, including the summary thereof in the final EIS. Establishing a rebuttable presumption will give appropriate weight to the process that culminates in the certification, while also allowing some flexibility in situations where essential information may have been inadvertently overlooked. The presumption and associated exhaustion requirement also will encourage commenters to provide the agency with all available information prior to the agency's decision, rather than disclosing information after the decision is made or in subsequent litigation. This is important for the decision-making process and efficient management of agency resources.

3. Implementing the Decision (§ 1505.3)

CEQ proposed minor edits to § 1505.3, "Implementing the decision" to change "commenting" agencies to "participating" in paragraph (c) and "make available to the public" to "publish" in paragraph (d). CEQ makes these changes in the final rule.

*H. Revisions to Other Requirements of NEPA (Part 1506)*

CEQ proposed a number of edits to part 1506 to improve the NEPA process to make it more efficient and flexible, especially where actions involve third-party applicants. CEQ also proposed several edits for clarity. CEQ finalizes many of these proposed changes in the final rule with some additional clarifying edits.

1. Limitations on Actions During NEPA Process (§ 1506.1)

CEQ proposed to add FONSIs to paragraph (a) of § 1506.1, "Limitations on actions during NEPA process," to clarify existing practice and judicial determinations that the limitation on actions applies when an agency is preparing an EA as well as an EIS. CEQ proposed to consolidate paragraph (d) with paragraph (b) and revise the

language to provide additional clarity on what activities are allowable during the NEPA process. Specifically, CEQ proposed to eliminate reference to one specific agency, broadening the provision to all agencies and providing that this section does not preclude certain activities by an applicant to support an application of Federal, State, Tribal, or local permits or assistance. As an example of activities an applicant may undertake, CEQ proposed to add "acquisition of interests in land," which includes acquisitions of rights-of-way and conservation easements. CEQ invited comment on whether it should make any additional changes to § 1506.1, including whether there are circumstances under which an agency may authorize irreversible and irretrievable commitments of resources. CEQ finalizes this provision as proposed with minor grammatical changes, and simplifying the references in paragraphs (c) introductory text and (c)(2) from programmatic environmental impact "statement" to "review."

## 2. Elimination of Duplication With State, Tribal, and Local Procedures (§ 1506.2)

CEQ proposed revisions to § 1506.2, "Elimination of duplication with State, Tribal, and local procedures" to promote efficiency and reduce duplication between Federal and State, Tribal, and local requirements. These changes are consistent with the President's directive in E.O. 13807 to provide for agency use, to the maximum extent permitted by law, of environmental studies, analysis, and decisions in support of earlier Federal, State, Tribal, or local environmental reviews or authorization decisions. E.O. 13807, sec. 5(e)(i)(C). CEQ proposed to revise paragraph (a) to acknowledge the increasing number of State, Tribal, and local governments conducting NEPA reviews pursuant to assignment from Federal agencies. *See, e.g.,* 23 U.S.C. 327, and 25 U.S.C. 4115 and 5389(a). CEQ makes this change in the final rule. The revision in paragraph (a) clarifies that Federal agencies are authorized to cooperate with such State, Tribal, and local agencies, and paragraph (b) requires cooperation to reduce duplication.

CEQ proposed to add examples to paragraph (b) to encourage use of prior reviews and decisions and modify paragraph (c) to give agencies flexibility to determine whether to cooperate in fulfilling State, Tribal, or local EIS or similar requirements. CEQ includes these proposed changes in the final rule and reorders the language to provide additional clarity. Additionally, the

final rule makes further changes to paragraph (b) to remove potential impediments for agency use of studies, analysis, and decisions developed by State, Tribal, and local government agencies. Some commenters stated that CEQ proposed to limit agency use to only environmental studies, analysis, and decisions and exclude socio-economic and other information. The final rule clarifies that agencies should make broad use of studies, analysis, and decisions prepared by State, Tribal, and local agencies, as appropriate based on other requirements including § 1502.23. Finally, CEQ proposed to clarify in paragraph (d) that NEPA does not require reconciliation of inconsistencies between the proposed action and State, Tribal, or local plans or laws, although the EIS should discuss the inconsistencies. CEQ makes these revisions in the final rule.

## 3. Adoption (§ 1506.3)

CEQ proposed to expand adoption to EAs, consistent with current practice by many agencies, and CE determinations and clarify the process for documenting the decision to adopt. CEQ includes these proposed changes in the final rule with additional revisions to align the language for consistency in each paragraph and better organize § 1506.3 by grouping the provisions relating to EISs into paragraph (b), EAs in paragraph (c), and CE determinations in paragraph (d).

Paragraph (a) includes the general requirement for adoption, which is that any adoption must meet the standard for an adequate EIS, EA, or CE determination, as appropriate, under the CEQ regulations. CEQ proposed to reference EAs in this paragraph. The final rule includes CE determinations as well as EAs and reorders the documents for consistency with the ordering of paragraphs (b) through (d)—EISs, EAs (including portions of EISs or EAs), and CE determinations.

CEQ proposed clarifying edits in paragraph (b) and changed references from recirculation to republication consistent with this change throughout the rule. In the final rule, CEQ subdivides paragraph (b) into subordinate paragraphs (b)(1) and (2). Paragraph (b)(1) addresses EISs where the adopting agency is not a cooperating agency. CEQ moves the cooperating agency exception to republication to paragraph (b)(2). Consistent with the proposed rule, this paragraph also clarifies that the cooperating agency adopts such an EIS by issuing its own ROD.

In the NPRM, proposed paragraph (f) would allow an agency to adopt another

agency's determination that its CE applies to an action if the adopting agency's proposed action is substantially the same. CEQ includes this provision in paragraph (d) of the final rule with clarifying edits. The final rule provides agencies the flexibility to adopt another agency's determination that a CE applies to an action when the actions are substantially the same to address situations where a proposed action would result in a CE determination by one agency and an EA and FONSI by another agency. For example, this would be the case when two agencies are engaging in similar activities in similar areas like small-scale prescribed burns, ecological restoration, and small-scale land management practices. Another example is when one agency's action may be a funding decision for a proposed project, and another agency's action is to consider a permit for the same project.

To allow agencies to use one another's CEs without the agency that promulgated the CE having to take an action, CEQ also proposed a new § 1507.3(e)(5), which would allow agencies to establish a process in their NEPA procedures to apply another agency's CE. CEQ notes that there was some confusion among commenters regarding the difference between the adoption of CEs under § 1506.3 and the provision in § 1507.3(f)(5) (proposed § 1507.3(e)(5)).[97] CEQ has made clarifying edits to address this confusion.

The adoption process in § 1506.3(d) first requires that an agency has applied a CE listed in its agency NEPA procedures. Then, the adopting agency must verify that its proposed action is substantially the same as the action for which it is adopting the CE determination. CEQ adds a sentence in § 1507.3(f)(5) of the final rule to clarify that agencies may establish a separate process for using another agency's listed CE and applying the CE to its proposed actions. The final rule also requires the adopting agency to document the adoption. Agencies may publish, where appropriate, such documentation or other information relating to the adoption.

## 4. Combining Documents (§ 1506.4)

CEQ proposed to amend § 1506.4, "Combining documents," to encourage agencies "to the fullest extent practicable" to combine their environmental documents with other

---

[97] For a discussion of the differences between these two provisions, see section I.3 of the Final Rule Response to Comments.

agency documents to reduce duplication and paperwork. For example, the Corps routinely combines EISs with feasibility reports, and agencies may use their NEPA documents to satisfy compliance with section 106 of the National Historic Preservation Act under 36 CFR 800.8. CEQ includes the proposed revisions in the final rule with no changes.

5. Agency Responsibility for Environmental Documents (§ 1506.5)

As discussed in the NPRM, CEQ proposed to revise § 1506.5, ''Agency responsibility for environmental documents,'' in response to ANPRM comments urging CEQ to allow greater flexibility for the project sponsor (including private entities) to participate in the preparation of NEPA documents under the supervision of the lead agency. CEQ proposed updates to give agencies more flexibility with respect to the preparation of environmental documents while continuing to require agencies to independently evaluate and take responsibility for those documents. Under the proposal, applicants and contractors would be able to assume a greater role in contributing information and material to the preparation of environmental documents, subject to the supervision of the agency. However, agencies would remain responsible for taking reasonable steps to ensure the accuracy of information prepared by applicants and contractors. If a contractor or applicant prepares the document, proposed paragraph (c)(1) would require the decision-making agency official to provide guidance, participate in the preparation, independently evaluate the statement, and take responsibility for its content.

In the final rule, CEQ retains these concepts, but reorganizes § 1506.5 to better communicate the requirements. Specifically, paragraph (a) contains a clear statement that the Federal agency is ultimately responsible for the environmental document irrespective of who prepares it. While this is consistent with the 1978 regulations, CEQ provides this direct statement at the beginning of the section to respond to comments that suggested agencies would be handing over their responsibilities to project sponsors under the proposed rule.

Paragraph (b) introductory text and its subordinate paragraphs capture the requirements when a project sponsor or contractor prepares an environmental document, consolidating requirements for EISs and EAs into one because there is no longer a distinction between the requirements for each document in this context. Paragraph (b) allows an agency to require an applicant to submit environmental information for the agency's use in preparing an environmental document or to direct an applicant or authorize a contractor to prepare an environmental document under the agency's supervision. As noted in the NPRM, CEQ intends these changes to improve communication between proponents of a proposal for agency action and the officials tasked with evaluating the effects of the action and reasonable alternatives, to improve the quality of NEPA documents and efficiency of the NEPA process.

Paragraph (b)(1) requires agencies to provide guidance to the applicant or contractor and participate in the preparation of the NEPA document. Paragraph (b)(2) continues to require the agency to independently evaluate the information or environmental document and take responsibility for its accuracy, scope, and contents. Paragraph (b)(3) requires the agency to include the names and qualifications of the persons who prepared the environmental document. Adding ''qualifications'' is consistent with § 1502.18 and is important for transparency. For an EIS, this information would be included in the list of preparers as required by § 1502.18, but agencies have flexibility on where to include such information in an EA. Paragraph (b)(4) requires contractors or applicants preparing EAs or EISs to submit a disclosure statement to the lead agency specifying any financial or other interest in the outcome of the action, but it need not include privileged or confidential trade secrets or other confidential business information. In the NPRM, CEQ had proposed to remove the requirement for a disclosure statement. In response to comments, CEQ is retaining this concept in the final rule, recognizing that most applicants will have such a financial interest. However, as discussed above, CEQ finds that it is appropriate to allow applicants to prepare documents for the sake of efficiency and because agencies retain responsibility to oversee and take responsibility for the final environmental document.

6. Public Involvement (§ 1506.6)

CEQ proposed to update § 1506.6, ''Public involvement,'' to give agencies greater flexibility to design and customize public involvement to best meet the specific circumstances of their proposed actions. The NPRM proposed revisions to paragraphs (b) and (c) to add ''other opportunities for public engagement'' to recognize that there are other ways to engage with interested and affected parties besides hearings and meetings. CEQ finalizes these changes in the final rule but changes ''engagement'' to ''involvement'' consistent with the title of the section. Additionally, the final rule adds a sentence to these paragraphs to require agencies to consider interested and affected parties' access to electronic media, such as in rural locations or economically distressed areas. CEQ had proposed to state in a new paragraph (b)(3)(x) that notice may not be limited solely to electronic methods for actions occurring in an area with limited access to high-speed internet. However, CEQ is including this more general statement in paragraph (b) as it is a consideration for notice generally. In paragraph (b)(1), CEQ proposed to change the requirement to mail notice in paragraphs (b)(1) and (2) to the more general requirement to ''notify'' to give agencies the flexibility to use email or other mechanisms to provide such notice. CEQ makes this change in the final rule. CEQ also eliminates the requirement in paragraph (b)(2) to maintain a list of organizations reasonably expected to be interested in actions with effects of national concern because such a requirement is unnecessarily prescriptive given that agencies may collect and organize contact information for organizations that have requested regular notice in another format given advances in technology. In the proposed rule, CEQ proposed to change paragraph (b)(3)(i) to modify State clearinghouses to State and local agencies, and change paragraph (b)(3)(ii) to affected Tribal governments. In the final rule, CEQ modifies paragraph (b)(3)(i) to include notice to State, Tribal, and local agencies, and paragraph (b)(3)(ii) to include notice to interested or affected State, Tribal, and local governments for consistency with § 1501.9 and part 1503. CEQ proposed a new paragraph (b)(3)(x) to allow for notice through electronic media. CEQ includes this provision in the final rule, moving the language regarding consideration of access to paragraph (b), as noted previously.

In addition to the changes described above, CEQ proposed to strike the mandatory criteria in paragraph (c) for consideration of when to hold or sponsor public hearings or meetings. CEQ is removing this language in the final rule because such criteria are unnecessarily limiting. Agencies consider many factors in determining the most appropriate mechanism for promoting public involvement, including the particular location of the proposed action (if one exists), the types of effects it may have, and the needs of interested and affected parties, and may design their outreach in a manner that

best engages with those parties. The flexibility to consider relevant factors is critical especially in light of unexpected circumstances, such as the COVID–19 pandemic, which may require agencies to adapt their outreach as required by State, Tribal, and local authorities and conditions.

Finally, CEQ proposed to simplify paragraph (f) to require agencies to make EISs, comments and underlying documents available to the public consistent with the Freedom of Information Act (FOIA), removing the provisos regarding interagency memoranda and fees. Congress has amended FOIA numerous times since the enactment of NEPA, mostly recently by the FOIA Improvement Act of 2016, Public Law 114–185, 130 Stat. 538. Additionally, the revised paragraph (f) is consistent with the text of section 102(2)(C) of NEPA, including with regard to fees. CEQ makes these changes as proposed in the final rule.

### 7. Further Guidance (§ 1506.7)

CEQ proposed to update and modernize § 1506.7, "Further guidance," to remove the specific references to handbooks, memoranda, and the 102 monitor, and replace it with a statement that CEQ may provide further guidance concerning NEPA and its procedures consistent with E.O. 13807 and E.O. 13891, "Promoting the Rule of Law Through Improved Agency Guidance Documents." [98] CEQ makes these changes in paragraph (a) in the final rule. This rule supersedes preexisting CEQ guidance and materials in many respects. CEQ intends to publish a separate notice in the **Federal Register** listing guidance it is withdrawing. CEQ will issue new guidance, as needed, consistent with the final rule and Presidential directives. In the interim, in any instances where an interpretation of the 1978 regulations is inconsistent with the new regulations or this preamble's interpretation of the new regulations, the new regulations and interpretations shall apply, and CEQ includes a new paragraph (b) in the final rule to provide this clarification. CEQ notes that guidance does not have the force and effect of law and is meant to provide clarity regarding existing law and policy.

### 8. Proposals for Legislation (§ 1506.8)

CEQ proposed to move the legislative EIS requirements from the definition of legislation in 40 CFR 1508.17 to paragraph (a) of § 1506.8, "Proposals for legislation," and revise the section for clarity. As noted in the NPRM, agencies

prepare legislative EISs for Congress when they are proposing specific actions. CEQ also invited comment on whether the legislative EIS requirement should be eliminated or modified because the President proposes legislation, and therefore it is inconsistent with the Recommendations Clause of the U.S. Constitution, which provides the President shall recommend for Congress' consideration "such [m]easures as he shall judge necessary and expedient . . . ." U.S. Const., art. II, § 3. The President is not a Federal agency, 40 CFR 1508.12, and the proposal of legislation by the President is not an agency action. *Franklin* v. *Mass.*, 505 U.S. 788, 800–01 (1992).

In the final rule, CEQ retains the provision, but removes the reference to providing "significant cooperation and support in the development" of legislation and the test for significant cooperation to more closely align this provision with the statute. The final rule clarifies that technical drafting assistance is not a legislative proposal under these regulations. Consistent with these edits, CEQ strikes the reference to the Wilderness Act. The mandate has expired.[99] Under the Wilderness Act, a study was required to make a recommendation to the President. If the President agreed with the recommendation, the President then provided "advice" to Congress about making a wilderness determination. The President is not subject to NEPA in his direct recommendations to Congress, but agencies subject to the APA are subject to NEPA, as appropriate, concerning legislative proposals they develop. This avoids the constitutional issue. *See Ashwander* v. *Tenn. Valley Auth.,* 297 U.S. 288, 347 (1936) (Brandeis, J., concurring); *Rescue Army* v. *Mun. Court of L.A.,* 331 U.S. 549, 569 (1947).

### 9. Proposals for Regulations (§ 1506.9)

CEQ proposed to add a new § 1506.9, "Proposals for regulations," to address the analyses required for rulemakings and to promote efficiency and reduce duplication in the assessment of regulatory proposals. CEQ proposed criteria for agencies to identify analyses that could serve as the functional equivalent of the EIS. In response to comments, CEQ revises this section in the final rule. This section clarifies that one or more procedures and documentation prepared pursuant to other statutory or Executive order requirements may satisfy one or more requirements of the CEQ regulations. When a procedure or document satisfies

one or more requirements of this subchapter, the agency may substitute it for the corresponding requirements in this subchapter and need not carry out duplicative procedures or documentation. Agencies must identify which corresponding requirements in this subchapter are satisfied and consult with CEQ to confirm such determinations.

CEQ invited comments on analyses agencies are already conducting that, in whole or when aggregated, can serve as the functional equivalent of the EIS. Aspects of the cost-benefit analysis prepared pursuant to E.O. 12866, "Regulatory Planning and Review," the Regulatory Flexibility Act, or the Unfunded Mandates Reform Act, may overlap with aspects of the CEQ regulations. Further, an agency may rely on the procedures implementing the requirements of a variety of statutes and Executive orders that could meet some or all of the requirements of this subchapter. CEQ does not expressly include specific analyses in the final rule that satisfy the requirements of the CEQ regulations. In all instances, agencies should clearly identify how and which specific parts of the analyses serve the purpose of NEPA compliance, including which requirements in the CEQ regulations are satisfied.

### 10. Filing Requirements (§ 1506.10)

CEQ proposed to update § 1506.10, "Filing requirements," to remove the obsolete process for filing paper copies of EISs with EPA and EPA's delivery of a copy to CEQ, and instead provide for electronic filing, consistent with EPA's procedures. CEQ proposed this change to provide flexibility to adapt as EPA changes its processes. CEQ revises this section in the final rule, making the proposed changes as well as phrasing the language in active voice.

### 11. Timing of Agency Action (§ 1506.11)

CEQ proposed to revise paragraph (a) of § 1506.11, "Timing of agency action," to clarify the timing of EPA's notices of availability of EISs. In paragraph (b), CEQ proposed to add a clause to acknowledge statutory authorities that provide for the issuance of a combined final EIS and ROD. *See* 23 U.S.C. 139(n)(2); 49 U.S.C. 304a(b). CEQ makes these changes in the final rule.

In proposed paragraph (c), CEQ proposed to add introductory text and create subordinate paragraphs to address those situations where agencies may make an exception to the time provisions in paragraph (b). Specifically, paragraph (c)(1) addresses agencies with formal appeals processes. Paragraph (c)(2) provides exceptions for

---

[98] 84 FR 55235 (Oct. 15, 2019).

[99] 16 U.S.C. 1132(b)–(c).

AR_0029076

rulemaking to protect public health or safety. Paragraph (d) addresses timing when an agency files the final EIS within 90 days of the draft EIS. Finally, paragraph (e) addresses when agencies may extend or reduce the time periods. The proposed rule made edits to clarify the language in these paragraphs without changing the substance of the provisions. CEQ includes these changes in the final rule and makes additional clarifying revisions.

12. Emergencies (§ 1506.12)

Section 1506.12, "Emergencies," addresses agency compliance with NEPA when an agency has to take an action with significant environmental effects during emergency circumstances. Over the last 40 years, CEQ has developed significant experience with NEPA in the context of emergencies and disaster recoveries. Actions following Hurricanes Katrina, Harvey, and Michael, and other natural disasters, have given CEQ the opportunity to respond to a variety of circumstances where alternative arrangements for complying with NEPA are necessary. CEQ has approved alternative arrangements to allow a wide range of proposed actions in emergency circumstances including catastrophic wildfires, threats to species and their habitat, economic crisis, infectious disease outbreaks, potential dam failures, and insect infestations.[100] CEQ proposed to amend § 1506.12, "Emergencies," to clarify that alternative arrangements are still meant to comply with section 102(2)(C)'s requirement for a "detailed statement." This amendment is consistent with CEQ's longstanding position that it has no authority to exempt Federal agencies from compliance with NEPA, but that CEQ can appropriately provide for exceptions to specific requirements of CEQ's regulations to address extraordinary circumstances that are not addressed by agency implementing procedures previously approved by CEQ. *See* Emergencies Guidance, *supra* note 29. CEQ maintains a public description of all pending and completed alternative arrangements on

its website.[101] CEQ makes this change in the final rule.

13. Effective Date (§ 1506.13)

Finally, CEQ proposed to modify § 1506.13, "Effective date," to clarify that these regulations would apply to all NEPA processes begun after the effective date, but agencies have the discretion to apply them to ongoing NEPA processes. CEQ also proposed to remove the 1979 effective date from the introductory paragraph, and strike 40 CFR 1506.13(a) referencing the 1973 guidance and 40 CFR 1506.13(b) regarding actions begun before January 1, 1970 because they are obsolete. This final rule makes these changes.

*I. Revisions to Agency Compliance (Part 1507)*

CEQ proposed modifications to part 1507, which addresses agency compliance with NEPA, to consolidate provisions relating to agency procedures from elsewhere in the CEQ regulations, and add a new section to address the dissemination of information about agency NEPA programs. CEQ makes these changes in the final rule with some modifications to the proposed rule as discussed in the following sections.

1. Compliance (§ 1507.1)

CEQ proposed a change to § 1507.1, "Compliance," to strike the second sentence regarding agency flexibility in adapting its implementing procedures to the requirements of other applicable laws for consistency with changes to paragraphs (a) and (b) of § 1507.3, "Agency NEPA procedures." This change is also consistent with the direction of the President to Federal agencies to "comply with the regulations issued by the Council except where such compliance would be inconsistent with statutory requirements." E.O. 11514, as amended by E.O. 11991, sec. 2(g). CEQ makes this change in the final rule. Under the final rule, § 1507.1 requires all Federal agencies to comply with the CEQ regulations as set forth in parts 1500 through 1508.

2. Agency Capability To Comply (§ 1507.2)

CEQ proposed edits to the introductory paragraph of § 1507.2, "Agency capability to comply," to clarify its meaning, which is to allow agencies to use the resources (including personnel and financial resources) of other parties, including agencies and applicants, and to specifically require

agencies to account for the contributions of these other parties in complying with NEPA. This section also requires agencies to have their own capacity to comply with NEPA and the implementing regulations. This includes staff with the expertise to independently evaluate environmental documents, including those prepared by applicants and contractors. CEQ makes these clarifying edits in the final rule.

Additionally, CEQ proposed to revise paragraph (a) to make the senior agency official responsible for overall agency compliance with NEPA, including coordination, communication, and resolution of implementation issues. CEQ is finalizing this change. Under the final rule, the senior agency official is an official of assistant secretary rank or higher (or equivalent) with responsibilities consistent with the responsibilities of senior agency officials in E.O. 13807 to whom agencies elevate anticipated missed or extended permitting timetable milestones. The senior agency official is responsible for addressing disputes among lead and cooperating agencies and enforcing page and time limits. The senior agency official also is responsible for ensuring all environmental documents—even exceptionally lengthy ones—are provided to Federal agency decision makers in a timely, readable, and useful format. *See* §§ 1501.5(f), 1501.7(d), 1501.8(b)(6) and (c), 1501.10, 1502.7, 1507.2, 1508.1(dd).

CEQ proposed to amend paragraph (c) to emphasize agency cooperation, which includes commenting on environmental documents on which an agency is cooperating. CEQ makes this change in the final rule. CEQ revises paragraph (d) in response to comments to strike the second sentence, which created confusion regarding the reach of section 102(2)(E) of NEPA. Finally, CEQ proposed to add references to E.O. 11991, which amended E.O. 11514, and E.O. 13807 in paragraph (f) to codify agencies' responsibility to comply with the orders. CEQ makes both of these changes in the final rule.

3. Agency NEPA Procedures (§ 1507.3)

Agency NEPA procedures set form the process by which agencies comply with NEPA and the CEQ regulations in the context of their particular programs and processes. In developing their procedures, agencies should strive to identify and apply efficiencies, such as use of applicable CEs, adoption of prior NEPA analyses, and incorporation by reference to prior relevant Federal, State, Tribal, and local analyses, wherever practicable. To facilitate effective and efficient procedures, CEQ

---

[100] In response to the economic crisis associated with the coronavirus outbreak, Executive Order 13927, titled "Accelerating the Nation's Economic Recovery From the COVID–19 Emergency by Expediting Infrastructure Investments and Other Activities," was issued on June 4, 2020. 85 FR 35165. This Executive order directs agencies to identify planned or potential actions to facilitate the Nation's economic recovery, including identification of actions that may be subject to emergency treatment as alternative arrangements.

[101] *https://ceq.doe.gov/nepa-practice/alternative_arrangements.html.*

AR_0029077

proposed to consolidate all of the requirements for agency NEPA procedures in § 1507.3, as discussed in detail below.

In the final rule, CEQ adds a new paragraph (a) to clarify the applicability of these regulations in the interim period between the effective date of the final rule and when the agencies complete updates to their agency NEPA procedures for consistency with these regulations. Consistent with § 1506.13, "Effective date," which makes the regulations applicable to NEPA reviews begun after the effective date of the final rule, paragraph (a) of § 1507.3 requires agencies to apply these regulations to new reviews unless there is a clear and fundamental conflict with an applicable statute. For NEPA reviews in process that agencies began before the final rule's effective date, agencies may choose whether to apply the revised regulations or proceed under the 1978 regulations and their existing agency NEPA procedures. Agencies should clearly indicate to interested and affected parties which procedures it is applying for each proposed action. The final rule does not require agencies to withdraw their existing agency NEPA procedures upon the effective date, but agencies should conduct a consistency review of their procedures in order to proceed appropriately on new proposed actions.

Paragraph (a) also provides that agencies' existing CEs are consistent with the subchapter. CEQ adds this language to ensure CEs remain available for agencies' use to ensure a smooth transition period while they work to update their existing agency procedures, including their CEs, as necessary. This change allows agencies to continue to use their existing CEs for ongoing activities as well as proposed actions that begin after the effective date of the CEQ final rule, and clarifies that revisions to existing CEs are not required within 12 months of the publication date of the final rule. Agencies must still consider whether extraordinary circumstances are present and should rely upon any extraordinary circumstances listed in their agency NEPA procedures as an integral part of an agency's process for applying CEs.

In paragraph (b) (proposed paragraph (a)), CEQ proposed to provide agencies the later of one year after publication of the final rule or nine months after the establishment of an agency to develop or revise proposed agency NEPA procedures, as necessary, to implement the CEQ regulations and eliminate any inconsistencies with the revised regulations. CEQ includes this sentence in the final rule with a correction to the

deadline—the deadline is calculated from the effective date, not the publication date. CEQ notes that this provision references "proposed procedures," and agencies need not finalize them by this date. The final rule strikes a balance between minimizing the disruption to ongoing environmental reviews while also requiring agencies to revise their procedures in a timely manner to ensure future reviews are consistent with the final rule. Agencies have the flexibility to address the requirements of the CEQ regulations as they relate to their programs and need not state them verbatim in their procedures. In addition, CEQ proposed to clarify that, except as otherwise provided by law or for agency efficiency, agency NEPA procedures shall not impose additional procedures or requirements beyond those set forth in the CEQ regulations. CEQ includes this language in the final rule, changing the order of the phrases, changing "provided by law" to "required by law" to enhance clarity, and adding a cross-reference to paragraph (c), which references efficiencies. This change is consistent with the direction of the President to Federal agencies in E.O. 11514 to comply with the CEQ regulations issued except where such compliance would be inconsistent with statutory requirements. E.O. 11514, as amended by E.O. 11991, sec. 2(g). Finally, the final rule eliminates the sentence from 40 CFR 1507.3(a) prohibiting agencies from paraphrasing the CEQ regulations because it is unnecessarily limiting on agencies. Agencies have the flexibility to address the requirements of the CEQ regulations as they relate to their programs and need not state them verbatim in their procedures.

Consistent with its proposal, the final rule requires agencies to develop or revise, as necessary, proposed procedures to implement these regulations. In the NPRM, CEQ proposed to subdivide 40 CFR 1507.3(a) into subordinate paragraphs (a)(1) and (2) for additional clarity because each of these paragraphs have an independent requirement. CEQ finalizes this change as paragraphs (b)(1) and (2) in the final rule. Paragraph (b)(1) addresses the requirement for agencies to consult with CEQ when developing or revising proposed procedures. Paragraph (b)(2) requires agencies to publish proposed agency NEPA procedures for public review and comment. After agencies address these comments, CEQ must determine that the agency NEPA procedures conform to and are consistent with NEPA and the CEQ

regulations. CEQ proposed to eliminate the recommendation to agencies to issue explanatory guidance and the requirement to review their policies and procedures. CEQ makes this change in the final rule because it is redundant to the proposed language in paragraph (b) requiring agencies to update their procedures to implement the final rule.

The NPRM proposed to move the provisions in § 1505.1, "Agency decision making procedures," to proposed § 1507.3(b). The final rule moves these provisions to paragraph (c). As stated in the NPRM, consistent with the proposed edits to § 1500.1, CEQ proposed to revise this paragraph to clarify that agencies should ensure decisions are made in accordance with the Act's procedural requirements and policy of integrating NEPA with other environmental reviews to promote efficient and timely decision making. CEQ includes these edits in the final rule, along with an additional edit to change passive to active voice. CEQ does not include proposed paragraph (b)(1) (40 CFR 1505.1(a)) in the final rule because the phrase "[i]mplementing procedures under section 102(2) of NEPA to achieve the requirements of section 101 and 102(1)" could be read to suggest that agencies could interpret NEPA in a manner that would impose more burdens than the requirements of the final rule. Including this provision in the final rule would be inconsistent with the language in paragraph (b) that limits agency NEPA procedures to the requirements in these regulations unless otherwise required by law or for agency efficiency. Finally, CEQ corrects the reference in paragraph (c)(4) to EIS, changing it to "environmental documents" consistent with the rest of the paragraph.

CEQ proposed a new paragraph (b)(6) to direct agencies to set forth in their NEPA procedures requirements to combine their NEPA documents with other agency documents, especially where the same or similar analyses are required for compliance with other requirements. As stated in the NPRM, many agencies implement statutes that call for consideration of alternatives to the agency proposal, including the no action alternative, the effects of the agencies' proposal and alternatives, and public involvement. Agencies can use their NEPA procedures to align compliance with NEPA and these other statutory authorities to integrate NEPA's goals for informed decision making with agencies' specific statutory requirements. This approach is consistent with some agency practice. *See, e.g.,* 36 CFR part 220; Forest Service Handbook 1909.15 (U.S.

AR_0029078

Department of Agriculture Forest Service NEPA procedures). More agencies could use it to achieve greater efficiency and reduce unnecessary duplication. Additionally the NPRM proposed to allow agencies to designate analyses or processes that serve as the functional equivalent of NEPA compliance.

CEQ includes this provision in the final rule at paragraph (c)(5) with revisions to clarify that agencies may designate and rely on one or more procedures or documents under other statutes or Executive orders as satisfying some or all of the requirements in the CEQ regulations. While courts have held that agencies do not need to conduct NEPA analyses under a number of statutes that are "functionally equivalent," including the Clean Air Act, the Ocean Dumping Act, the Federal Insecticide, Fungicide, and Rodenticide Act, the Resource Conservation and Recovery Act, and the Comprehensive Environmental Response, Compensation, and Liability Act,[102] the final rule recognizes that agencies may substitute processes or documentation prepared pursuant to other statutes or Executive orders to satisfy one or more requirements in the CEQ regulations to reduce duplication. Agencies must identify the respective requirements in this subchapter that are satisfied by other statutes or Executive orders.

Furthermore, CEQ proposed to add a new paragraph to allow agencies to identify activities or decisions that are not subject to NEPA, consistent with § 1501.1, in their agency NEPA procedures. CEQ adds this provision to paragraph (d) in the final rule. The final

---

[102] *See Portland Cement Ass'n,* 486 F.2d at 387 (finding an exemption from NEPA for Clean Air Act section 111); *see also Envtl. Def. Fund, Inc,* 489 F.2d at 1254–56 (concluding that the standards of FIFRA provide the functional equivalent of NEPA); *Cellular Phone Taskforce,* 205 F.3d at 94–95 (concluding that the procedures followed by the Federal Communications Commission were functionally compliant with NEPA's EA and FONSI requirements); *W. Neb. Res. Council,* 943 F.2d at 871–72 (concluding that EPA's procedures and analysis under the Safe Drinking Water Act were functionally equivalent to NEPA); *Wyo. v. Hathaway,* 525 F.2d 66, 71–72 (10th Cir. 1975) (concluding that EPA need not prepare an EIS before cancelling or suspending registrations of three chemical toxins used to control coyotes under FIFRA); *State of Ala. ex rel. Siegelman* v. *U.S. EPA,* 911 F.2d 499, 504–05 (11th Cir. 1990) (holding that EPA did not need to comply with NEPA when issuing a final operating permit under the Resource Conservation and Recovery Act); *Envtl. Def. Fund, Inc.* v. *Blum,* 458 F. Supp. 650, 661–62 (D.D.C. 1978) (EPA need not prepare an EIS before granting an emergency exemption to a state to use an unregistered pesticide); *State of Md.* v. *Train,* 415 F. Supp. 116, 121–22 (D. Md. 1976) (Ocean Dumping Act functional equivalent of NEPA). For further discussion, see section J.3 of the Final Rule Response to Comments.

rule uses "should" instead of "may" to encourage agencies to make these identifications in their agency NEPA procedures. The final rule also replaces "actions" with "activities or decisions" to avoid confusion with the definition of "action" in § 1508.1(q). CEQ includes this list in the final rule consistent with the changes in § 1501.1 as discussed in section II.C.1, with minor revisions to improve readability and a reordering of the provisions consistent with the reordering of the provisions in § 1501.1.

Paragraph (e) (proposed paragraph (d)) maintains much of the language from 40 CFR 1507.3(b). CEQ proposed to add parenthetical descriptions of the cross-references in proposed paragraph (d)(1), and CEQ includes these in the final rule at paragraph (e)(1). CEQ proposed to revise paragraph (d)(2)(ii), which requires agencies to identify CEs in their agency NEPA procedures, move the requirement for extraordinary circumstances from the definition of CEs in 40 CFR 1508.4, and require agencies to identify in their procedures when documentation of a CE determination is required. CEQ also proposed to add language to proposed paragraph (e) to codify existing agency practice to publish notices when an agency pauses an EIS or withdraws an NOI. CEQ includes this provision with the proposed revisions in the final rule at paragraph (f)(3). Finally, CEQ proposed to move from 40 CFR 1502.9(c)(3) to proposed paragraph (d)(3) the requirement to include procedures for introducing a supplement into its formal administrative record and clarify that this includes EAs and EISs. CEQ includes this provision in the final rule at paragraph (e)(3).

Paragraphs (f)(1) through (3) (proposed paragraphs (e)(1) through (3)) maintain much of the language from 40 CFR 1507.3(c) through (e). In proposed paragraph (e)(1), CEQ proposed to revise the language to active voice and encourage, rather than just allow, agencies to organize environmental documents in such a way as to make unclassified portions of environmental documents available to the public. CEQ makes these revisions in the final rule in paragraph (f)(1). CEQ also modifies paragraph (f)(2) to add a reference to the requirements of lead and cooperating agencies. CEQ adds this example consistent with the addition to § 1506.11(b) referencing statutory provisions for combining a final EIS and ROD. This is also consistent with CEQ's goal of improving coordination between lead and cooperating agencies and providing efficient processes to allow for integration of the NEPA review with

reviews conducted under other statutes. This allows for altering time periods to facilitate issuance of a combined FEIS and ROD. Additionally, CEQ proposed to move the language allowing agencies to adopt procedures to combine their EA process with their scoping process from 40 CFR 1501.7(b)(3) to paragraph (e)(4). CEQ makes this change in the final rule at paragraph (f)(4).

Finally, CEQ proposed in paragraph (e)(5) to allow agencies to establish a process in their agency NEPA procedures to apply the CEs of other agencies. CEQ also invited comment on whether to set forth this process in these regulations. In the final rule, CEQ includes the provision to allow agencies to establish a process in paragraph (f)(5) with some changes. CEQ includes clarifying language to address the confusion commenters had as to differences between this section and adoption of a CE determination under § 1506.3. An agency's process must provide for consultation with the agency that listed the CE in its NEPA procedures to ensure that the planned use of the CE is consistent with the originating agency's intent and practice.[103] The process should ensure documentation of the consultation and identify to the public those CEs the agency may use for its proposed actions. Consistent with § 1507.4, agencies could post such information on their websites. Then, an agency may apply the CE to its proposed actions, including proposed projects or activities or groups of proposed projects or activities.

### 4. Agency NEPA Program Information (§ 1507.4)

CEQ proposed to add a new § 1507.4, "Agency NEPA program information," to provide the means of publishing information on ongoing NEPA reviews and agency records relating to NEPA reviews. CEQ is finalizing this provision as proposed with no changes. As stated in the NPRM, this provision requires agencies in their NEPA procedures to provide for a website or other means of publishing certain information on ongoing NEPA reviews and maintaining and permitting public access to agency records relating to NEPA reviews.

Section 1507.4 promotes transparency and efficiency in the NEPA process, and improves interagency coordination by

---

[103] The use of another agency's CE under a process in the agency's NEPA procedures is an option separate from the adoption, under § 1506.3(f), of another agency's determination that its CE applies to a particular action that is substantially the same as the adopting agency's proposed action. An agency may adopt another agency's CE determination for a particular action regardless of whether its procedures provide a process for application of other agencies' CEs.

ensuring that information is more readily available to other agencies and the public. As discussed in the NPRM, opportunities exist for agencies to combine existing geospatial data, including remotely sensed images, and analyses to streamline environmental review and better coordinate development of environmental documents for multi-agency projects, consistent with the OFD policy. One option involves creating a single NEPA application that facilitates consolidation of existing datasets and can run several relevant geographic information system (GIS) analyses to help standardize the production of robust analytical results. This application could have a public-facing component modeled along the lines of EPA's NEPAssist,[104] which would aid prospective project sponsors with site selection and project design and increase public transparency. The application could link to the Permitting Dashboard to help facilitate project tracking and flexibilities under §§ 1506.5 and 1506.6. CEQ invited comment on this proposal, including comment on whether additional regulatory changes could help facilitate streamlined GIS analysis to help agencies comply with NEPA. While some commenters supported the development of a single NEPA application, others identified challenges to ensuring databases are useful, as well as privacy and security concerns. CEQ did not receive sufficient comment to lead CEQ to make additional regulatory changes to facilitate streamlined GIS analysis to help agencies comply with NEPA, and the final rule does not contain any changes from the proposal.

*J. Revisions to Definitions (Part 1508)*

NEPA does not itself include a set of definitions provided by Congress. CEQ, in the 1978 regulations, established a set of definitions for NEPA and the CEQ regulations. In this final rule, CEQ has clarified or supplemented the definitions as discussed below and further described in the Final Rule Response to Comments at section K. As noted above, see *Public Citizen,* 541 U.S. at 757; *Methow Valley,* 490 U.S. at 355 (citing *Andrus,* 442 U.S. at 358); *Brand X,* 545 U.S. at 980–86; and *Mead Corp.,* 533 U.S. at 227–30, CEQ has the authority to interpret NEPA. *See, e.g., Barnhart* v. *Walton,* 535 U.S. 212, 218 (2002) ("[S]ilence, after all, normally creates ambiguity. It does not resolve it."). Existing NEPA case law inevitably

rests directly on interpretive choices made in the 1978 regulations or on cases that themselves through some chain of prior cases also trace to the 1978 regulations. Yet consistent with *Chevron,* CEQ's NEPA regulations are subject to change. *See also Brand X,* 545 U.S. 967.

CEQ's intention to make use of its interpretive authority under *Chevron* is particularly applicable as to part 1508 where CEQ defines or revises key terms in the NEPA statute and the CEQ regulations. As a result, this confers on CEQ an even greater degree of latitude to elucidate the meaning of the statute's terms in these regulations—the same basic authority exercised by CEQ back in 1978 in the original form of the NEPA regulations. *See, e.g., Demski* v. *U.S. Dep't of Labor,* 419 F.3d 488, 491 (6th Cir. 2005) ("In the absence of a congressional definition or an explicit delegation of congressional authority to the agency, we determine how the agency responsible for implementing the statute . . . understands the term, and, under *Chevron* . . . we determine whether such an understanding is a 'reasonable interpretation' of the statute." (citing *Chevron,* 467 U.S. at 844)); *London* v. *Polishook,* 189 F.3d 196, 200 (2d Cir. 1999) ("[J]udicial deference does apply to the guidelines that [the] Department's Office of Labor–Management Standards Enforcement has developed and set out in its LMRDA Interpretive Manual § 030.425—guidelines to which [the D.C. Circuit in *Martoche*] deferred in the absence of a clear definition of 'political subdivision' in the Act or in its legislative history."); *Hawaii Gov't Employees Ass'n, Am. Fed'n of State, Cty. & Mun. Employees, Local 152* v. *Martoche,* 915 F.2d 718, 721 (D.C. Cir. 1990) ("With some imprecision in the statutory text [as to an undefined term] and a nearly total lack of elucidation in the legislative history, the situation is squarely one in which Congress implicitly left a gap for the agency to fill."). *See also Perez* v. *Commissioner,* 144 T.C. 51, 59 (2015); *Saha Thai Steel Pipe (Pub.) Co.* v. *United States,* 33 C.I.T. 1541, 1547 (Ct. of Int'l Trade 2009).[105] In promulgating new or revised definitions and other changes to the NEPA regulations, CEQ has considered the

ordinary meaning of the terms used by Congress in the statute.

As discussed in the NPRM, CEQ proposed significant revisions to part 1508. CEQ proposed to move the operative language, which is regulatory language that provides instruction or guidance, included throughout the regulations in this section to the relevant substantive sections of the regulations. Consistent with this change, CEQ proposed to retitle part 1508 from "Terminology and Index" to "Definitions." [106] CEQ also proposed to clarify the definitions of a number of key NEPA terms in order to reduce ambiguity, both through modification of existing definitions and the addition of new definitions. CEQ proposed to eliminate individual section numbers for each term in favor of a single section of defined terms in the revised § 1508.1. Finally, CEQ proposed to remove citations to the specific definition sections throughout the rule. CEQ makes these changes in the final rule.

1. Clarifying the Meaning of "Act"

CEQ proposed in paragraph (a) to add "NEPA" as a defined term with the same meaning as "Act." CEQ makes this change in the final rule.

2. Definition of "Affecting"

CEQ did not propose to make any change to the defined term "affecting" in paragraph (b). CEQ does not make any changes to this definition in the final rule.

3. New Definition of "Authorization"

CEQ proposed to define the term "authorization" in paragraph (c) to refer to the types of activities that might be required for permitting a proposed action, in particular infrastructure projects. This definition is consistent with the definition included in FAST–41 and E.O. 13807. CEQ proposed to replace the word "entitlement" with "authorization" throughout the rule. CEQ adds this definition and makes these changes in the final rule.

4. Clarifying the Meaning of "Categorical Exclusion"

CEQ proposed to revise the definition of "categorical exclusion" in paragraph (d) by inserting "normally" to clarify that there may be situations where an action may have significant effects on account of extraordinary circumstances.

---

[104] *https://nepassisttool.epa.gov/nepassist/ nepamap.aspx. See also* the Marine Cadastre, which provides consolidated GIS information for offshore actions, *https://marinecadastre.gov/.*

[105] "Although NEPA's statutory text specifies *when* an agency must comply with NEPA's procedural mandate; it is the Council on Environmental Quality Regulations ('CEQ') regulations which dictate the *how,* providing the framework by which all [F]ederal agencies comply with NEPA." *Dine' Citizens Against Ruining Our Environment v. Klein,* 747 F. Supp. 2d 1234, 1248 (D. Colo. 2010) (emphasis in original).

[106] CEQ has maintained an index in the Code of Federal Regulations, but this is not a part of the regulations. CEQ does not intend to continue to maintain such an index because it is no longer necessary given that the regulations are typically accessed electronically and the regulations' organization has been significantly improved.

CEQ also proposed to strike "individually or cumulatively" for consistency with the proposed revisions to the definition of "effects" as discussed in this section. CEQ proposed conforming edits in §§ 1500.4(a) and 1500.5(a). As noted in section II.I.3, CEQ proposed to move the requirement to provide for extraordinary circumstances in agency procedures to § 1507.3(d)(2)(ii) (§ 1507.3(e)(2)(ii) in the final rule). CEQ makes these changes in the final rule. CEQ notes that the definition of "categorical exclusion" only applies to those CEs created by an agency in its agency NEPA procedures and does not apply to "legislative" CEs created by Congress, which are governed by the terms of the specific statute and statutory interpretation of the agency charged with the implementation of the statute.

### 5. Clarifying the Meaning of "Cooperating Agency"

CEQ proposed to amend the definition of "cooperating agency" in paragraph (e) to make clear that a State, Tribal, or local agency may be a cooperating agency when the lead agency agrees, and to move the corresponding operative language allowing a State, Tribal, or local agency to become a cooperating agency with the lead agency's agreement to paragraph (a) of § 1501.8, "Cooperating agencies." CEQ also proposed to remove the sentence cross-referencing the cooperating agency section in part 1501 and stating that the selection and responsibilities of a cooperating agency are described there because it is unnecessary and does not define the term. CEQ makes these changes in the final rule.

### 6. Definition of "Council"

CEQ did not propose any changes to the definition of "Council" in paragraph (f). CEQ also invited comment on whether to update references to "Council" in the regulations to "CEQ" throughout the rule. CEQ did not receive sufficient comments on this proposal; therefore, CEQ does not make this change in the final rule.

### 7. Definition of "Cumulative Impact" and Clarifying the Meaning of "Effects"

CEQ proposed to remove the definition of "cumulative impact" and revise the definition of "effects" in paragraph (g). As noted in the NPRM, many commenters to the ANPRM urged CEQ to refine the definition based on concerns that it creates confusion, and that the terms "indirect" and "cumulative" have been interpreted expansively resulting in excessive

documentation about speculative effects and leading to frequent litigation. Commenters also raised concerns that this has expanded the scope of NEPA analysis without serving NEPA's purpose of informed decision making. Commenters stressed that the focus of the effects analysis should be on those effects that are reasonably foreseeable, related to the proposed action under consideration, and subject to the agency's jurisdiction and control. Commenters also noted that NEPA practitioners often struggle with describing cumulative impacts despite a number of publications that address the topic.

While NEPA refers to environmental impacts and environmental effects, it does not subdivide the terms into direct, indirect, or cumulative. Nor are the terms "direct," "indirect," or "cumulative" included in the text of the statute. CEQ created those concepts and included them in the 1978 regulations.

To address commenters' concerns and reduce confusion and unnecessary litigation, CEQ proposed to simplify the definition of effects by striking the specific references to direct, indirect, and cumulative effects and providing clarity on the bounds of effects consistent with the Supreme Court's holding in *Public Citizen,* 541 U.S. at 767–68. Under the proposed definition, effects must be reasonably foreseeable and have a reasonably close causal relationship to the proposed action or alternatives; a "but for" causal relationship is insufficient to make an agency responsible for a particular effect under NEPA. This close causal relationship is analogous to proximate cause in tort law. *Id.* at 767; *see also Metro. Edison Co.,* 460 U.S. at 774 (interpreting section 102 of NEPA to require "a reasonably close causal relationship between a change in the physical environment and the effect at issue" and stating "[t]his requirement is like the familiar doctrine of proximate cause from tort law."). CEQ sought comment on whether to include in the definition of effects the concept that the close causal relationship is "analogous to proximate cause in tort law," and if so, how CEQ could provide additional clarity regarding the meaning of this phrase.

In the final rule, CEQ revises the definition of effects consistent with the proposal, with some additional edits. First, to eliminate the circularity in the definition, CEQ changes the beginning of the definition from "means effects of" to "means changes to the human environment from" the proposed action or alternatives. This change also associates the definition of effects with

the definition of human environment, which continues to cross-reference to the definition of effects in the final rule. It also makes clear that, when the regulations use the term "effects," it means effects on the human environment. This responds to comments suggesting CEQ add "on the human environment" after "effects" in various sections of the rule.

The final rule also consolidates the first two sentences of the definition to clarify that, for purposes of this definition, "effects that occur" at the "same time and place as the proposed action or alternatives," or that "are later in time or farther removed in distance" must nevertheless be reasonably foreseeable and have a reasonably close causal relationship to the proposed action or alternatives. As a separate sentence that only referenced reasonable foreseeability, there was ambiguity as to whether a reasonably close causal relationship was required. Additionally, the final rule adds a clause to clarify that the consideration of time and place or distance are relative to the proposed action or alternatives.

CEQ proposed to strike the definition of "cumulative impact" and the terms "direct" and "indirect" in order to focus agency time and resources on considering whether the proposed action causes an effect rather than on categorizing the type of effect. As stated in the NPRM, CEQ intends the revisions to simplify the definition to focus agencies on consideration of effects that are reasonably foreseeable and have a reasonably close causal relationship to the proposed action. In practice, agencies have devoted substantial resources to categorizing effects as direct, indirect, or cumulative, which, as noted above, are not terms referenced in the NEPA statute. CEQ eliminates these references in the final rule.

To further assist agencies in their assessment of significant effects, CEQ also proposed to clarify that agencies should not consider effects significant if they are remote in time, geographically remote, or the result of a lengthy causal chain. *See, e.g., Pub. Citizen,* 541 U.S. at 767–68 ("In particular, 'courts must look to the underlying policies or legislative intent in order to draw a manageable line between those causal changes that may make an actor responsible for an effect and those that do not.'" (quoting *Metro. Edison Co.,* 460 U.S. at 774 n.7)); *Metro. Edison Co.,* 460 U.S. at 774 (noting effects may not fall within section 102 of NEPA because "the causal chain is too attenuated"). CEQ revises this sentence in the final rule to add "generally" to reflect the fact that there may occasionally be a

circumstance where an effect that is remote in time, geographically remote, or the product of a lengthy causal chain is reasonably foreseeable and has a reasonably close causal relationship to the proposed action.

Further, CEQ proposed to codify a key holding of *Public Citizen* relating to the definition of effects to make clear that effects do not include effects that the agency has no authority to prevent or that would happen even without the agency action, because they would not have a sufficiently close causal connection to the proposed action. For example, this would include effects that would constitute an intervening and superseding cause under familiar principles of tort law. *See, e.g., Sierra Club* v. *FERC*, 827 F.3d 36, 47–48 (D.C. Cir. 2016) (NEPA case incorporating these principles) ("[C]ritical to triggering that chain of events is the intervening action of the Department of Energy in granting an export license. The Department's independent decision to allow exports—a decision over which the Commission has no regulatory authority—breaks the NEPA causal chain and absolves the Commission of responsibility to include in its NEPA analysis considerations that it 'could not act on' and for which it cannot be 'the legally relevant cause.'" (quoting *Pub. Citizen*, 541 U.S. at 769)). As discussed in the NPRM, this clarification will help agencies better understand what effects they need to analyze and discuss, helping to reduce delays and paperwork with unnecessary analyses. CEQ includes this language in the final rule as proposed.

In addition, CEQ proposed a change in position to state that analysis of cumulative effects, as defined in the 1978 regulations, is not required under NEPA. Categorizing and determining the geographic and temporal scope of such effects has been difficult and can divert agencies from focusing their time and resources on the most significant effects. Past CEQ guidance has not been successful in dispelling ambiguity. Excessively lengthy documentation that does not focus on the most meaningful issues for the decision maker's consideration can lead to encyclopedic documents that include information that is irrelevant or inconsequential to the decision-making process. Instead, agencies should focus their efforts on analyzing effects that are most likely to be potentially significant and effects that would occur as a result of the agency's decision, rather than effects that would be the result of intervening and superseding causes. Agencies are not expected to conduct exhaustive

research on identifying and categorizing actions beyond the agency's control.

CEQ intended the proposed elimination of the definition of cumulative impact to focus agencies on analysis of effects that are reasonably foreseeable and have a reasonably close causal relationship to the proposed action. Cumulative effects analysis has been interpreted so expansively as to undermine informed decision making, and led agencies to conduct analyses to include effects that are not reasonably foreseeable or do not have a reasonably close causal relationship to the proposed action or alternatives. CEQ also invited comment on whether to include an affirmative statement that consideration of indirect effects is not required; the final rule does not include additional direction to agencies specific to indirect effects.

CEQ received many comments on cumulative effects. In the final rule, to provide further clarification, CEQ includes a new provision at paragraph (g)(3) that states that the analysis of effects shall be consistent with the definition of effects, and that cumulative impact, defined in 40 CFR 1508.7 (1978), is repealed. This language explains how agencies should apply the definition of effects with respect to environmental documents and other provisions in the final rule. Specifically, analyses are bound by the definition of effects as set forth in § 1508.1(g)(1) and (2) and should not go beyond the definition of effects set forth in those two paragraphs. The final rule provides considerable flexibility to agencies to structure the analysis of effects based on the circumstances of their programs.

In response to the NPRM, commenters stated that agencies would no longer consider the impacts of a proposed action on climate change. The rule does not preclude consideration of the impacts of a proposed action on any particular aspect of the human environment. The analysis of the impacts on climate change will depend on the specific circumstances of the proposed action. As discussed above, under the final rule, agencies will consider predictable trends in the area in the baseline analysis of the affected environment.

## 8. Clarifying the Meaning of "Environmental Assessment"

CEQ proposed to revise the definition of "environmental assessment" in paragraph (h), describing the purpose for the document and moving all of the operative language setting forth the requirements for an EA from the

definition to proposed § 1501.5. CEQ makes this change in the final rule.

## 9. Clarifying the Meaning of "Environmental Document"

CEQ proposed to remove the cross-references from the definition of "environmental document" in paragraph (i). CEQ makes this change in the final rule.

## 10. Clarifying the Meaning of "Environmental Impact Statement"

CEQ proposed to change "the Act" to "NEPA" in the definition of "environmental impact statement" in paragraph (j). CEQ makes this change in the final rule.

## 11. Clarifying the Meaning of "Federal Agency"

CEQ proposed to amend the definition of "Federal agency" in paragraph (k) to broaden it to include States, Tribes, and units of local government to the extent that they have assumed NEPA responsibilities from a Federal agency pursuant to statute. As stated in the NPRM, since the issuance of the CEQ regulations, Congress has authorized assumption of NEPA responsibilities in other contexts besides the Housing and Community Development Act of 1974, Public Law 93–383, sec. 104(h), 88 Stat. 633, 640, 42 U.S.C. 5304. *See, e.g.,* Surface Transportation Project Delivery Program, 23 U.S.C. 327. This change acknowledges these programs and helps clarify roles and responsibilities. CEQ makes this change and minor clarifying edits in the final rule.

## 12. Clarifying the Meaning of "Finding of No Significant Impact"

CEQ proposed to revise the definition of "finding of no significant impact" in paragraph (l) to insert the word "categorically" into the phrase "not otherwise excluded," change the cross-reference to the new section addressing CEs at § 1501.4, and move the operative language requiring a FONSI to include an EA or a summary of it and allowing incorporation by reference of the EA to § 1501.6, which addresses the requirements of a FONSI. CEQ makes these revisions in the final rule.

## 13. Clarifying the Meaning of "Human Environment"

CEQ proposed to change "people" to "present and future generations of Americans" consistent with section 101(a) of NEPA to the definition of human environment in paragraph (m). CEQ also proposed to move the operative language stating that economic or social effects by themselves

AR_0029082

do not require preparation of an EIS to § 1502.16(b), which is the section of the regulations that addresses when agencies should consider economic or social effects in an EIS. CEQ makes these changes in the final rule to assist agencies in understanding and implementing the statute and regulations.

14. Definition of "Jurisdiction by Law"

The NPRM did not propose any changes to the definition of jurisdiction by law in paragraph (n). CEQ did not revise this definition in the final rule.

15. Clarifying the Meaning of "Lead Agency"

CEQ proposed to amend the definition of lead agency in paragraph (o) to clarify that this term includes joint lead agencies, which are an acceptable practice. CEQ makes this change in the final rule.

16. Clarifying the Meaning of "Legislation"

CEQ proposed to move the operative language regarding the test for significant cooperation and the principle that only the agency with primary responsibility will prepare a legislative EIS to § 1506.8. CEQ also proposed to strike the example of treaties, because the President is not a Federal agency, and therefore a request for ratification of a treaty would not be subject to NEPA. CEQ makes these changes in the final rule, striking the references to "significant cooperation and support," in paragraph (p) to narrow the definition to comport with the NEPA statute, as discussed in section II.H.8.

17. Clarifying the Meaning of "Major Federal Action"

CEQ received many comments on the ANPRM requesting clarification of the definition of major Federal action. For example, CEQ received comments proposing that non-Federal projects should not be considered major Federal actions based on a very minor Federal role. Commenters also recommended that CEQ clarify the definition to exclude decisions where agencies do not have discretion to consider and potentially modify their actions based on the environmental review.

CEQ proposed to amend the first sentence of the definition in paragraph (q) to clarify that an action meets the definition if it is subject to Federal control and responsibility, and it has effects that may be significant. CEQ proposed to replace "major" effects with "significant" in this sentence to align with the NEPA statute. In the final rule,

CEQ revises the definition to remove reference to significance. CEQ also revises the definition to remove the circularity in the definition, changing "means an action" to "means an activity or decision" that is subject to Federal control and responsibility.

i. Independent Meaning of "Major"

CEQ proposed to strike the second sentence of the definition, which provides "Major reinforces but does not have a meaning independent of significantly." CEQ makes this change in the final rule. This is a change in position as compared to CEQ's earlier interpretation of NEPA and, in finalizing this change, CEQ intends to correct this longstanding misconstruction of the NEPA statute. The statutory aim of NEPA is to focus on "major Federal actions significantly affecting the quality of the human environment," 42 U.S.C. 4332(2)(C), rather than on non-major Federal actions that simply have some degree of Federal involvement. Under the 1978 regulations, however, the word "major" was rendered virtually meaningless.

CEQ makes this change because all words of a statute must be given meaning consistent with longstanding principles of statutory interpretation. *See, e.g., Bennett,* 520 U.S. at 173 ("It is the cardinal principle of statutory construction . . . that it is our duty to give effect, if possible, to every clause and word of a statute . . . rather than to emasculate an entire section.") (internal quotations and citations omitted) (quoting *United States* v. *Menasche,* 348 U.S. 528, 538 (1955)). Although the 1978 regulations treated the terms "major" and "significantly" as interchangeable, there is an important distinction between the two terms and how they apply in the NEPA process. "Major" refers to the type of action, including the role of the Federal agency and its control over any environmental impacts. "Significant" relates to the effects stemming from the action, including consideration of the affected area, resources, and the degree of the effects. In the statute, "major" occurs twice, and in both instances is a modifier of "Federal action"—in section 102(2)(C) in the phrase "other major Federal actions significantly affecting the quality of the human environment," and section 102(2)(D) in the phrase, "any major Federal action funded under a program of grants to States." NEPA also uses "significant" or "significantly" twice as a modifier of the similar words "affecting" in section 102(2)(C) and "impacts" in section 102(2)(D)(iv).

The legislative history of NEPA also reflects that Congress used the term

"major" independent of "significantly," and provided that, for major actions, agencies should make a determination as to whether the proposal would have a significant environmental impact. Specifically, the Senate Report for the National Environmental Policy Act of 1969 (Senate Report) states, "*Each agency which proposes any major actions,* such as project proposals, proposals for new legislation, regulations, policy statements, or expansion or revision of ongoing programs, *shall make a determination as to whether the proposal would have a significant effect upon the quality of the human environment.*" S. Rep. No. 91–296, at 20 (1969) (emphasis added).[107] Further, the Senate Report shows that OMB's predecessor, the Bureau of the Budget, submitted comments on the legislation to provide the views of the Executive Office of the President and recommended that Congress revise the text of the bill to include two separate modifiers: "major" before Federal actions and "significantly" before affecting the quality of the human environment. *See id.* at 30 (Bureau of the Budget's markup returned to the Senate on July 7, 1969). The enacted legislation included these revisions. While CEQ followed the Eighth Circuit's approach in *Minnesota Public Interest Research Group* v. *Butz,* 498 F.2d 1314, 1321–22 (8th Cir. 1974), in the 1978 regulations, other courts had interpreted "major" and "significantly" as having independent meaning before CEQ issued its 1978 regulations. *See NAACP* v. *Med. Ctr., Inc.,* 584 F.2d 619, 629 (3d Cir. 1978) (analyzing the Secretary's ministerial approval of a capital expenditure under a framework that first considered whether there had been agency action, and then whether that action was "major"); *Hanly* v. *Mitchell,* 466 F.2d 640, 644–45 (2d Cir. 1972) ("There is no doubt that the Act contemplates some agency action that does not require an impact statement because the action is minor and has so little effect on the environment as to be insignificant." (internal citations omitted)); *Scherr* v. *Volpe,* 466 F.2d 1027, 1033 (7th Cir. 1972) (finding that a highway project qualifies as major before turning to the second step of whether the project would have a significant effect); *Julius* v. *City of Cedar Rapids,* 349 F. Supp. 88, 90 (N.D. Iowa 1972) (finding that a lane widening project was not a major Federal action); *Goose Hollow Foothills League* v. *Romney,* 334 F. Supp. 877, 879 (D. Or. 1971) (discussing whether a proposed

---

[107] https://ceq.doe.gov/docs/laws-regulations/Senate-Report-on-NEPA.pdf.

building project was "major"); *SW Neighborhood Assembly* v. *Eckard,* 445 F. Supp. 1195, 1199 (D.D.C. 1978) ("The phrase 'major Federal action' has been construed by the Courts to require an inquiry into such questions as the amount of federal funds expended by the action, the number of people affected, the length of time consumed, and the extent of government planning involved." (citing *Hanly,* 460 F.2d at 644)); *Nat. Res. Def. Council* v. *Grant,* 341 F. Supp. 356, 366 (E.D.N.C. 1972) ("Certainly, an administrative agency [such] as the Soil Conservation Service may make a decision that a particular project is not major, or that it does not significantly affect the quality of the human environment, and, that, therefore, the agency is not required to file an impact statement."). Moreover, as discussed further below, over the past four decades, in a number of cases, courts have determined that NEPA does not apply to actions with minimal Federal involvement or funding. Under the revised definition, these would be non-major Federal actions.

In the final rule, CEQ reorganizes the remainder of the definition of major Federal action into subordinate paragraphs. Paragraph (q)(1) provides a list of activities or decisions that are not included within the definition.

### ii. Extraterritoriality

In the NPRM, CEQ requested comment on whether to clarify that major Federal action does not include extraterritorial actions because NEPA does not apply extraterritorially, consistent with *Kiobel* v. *Royal Dutch Petroleum Co.,* 569 U.S. 108, 115–16 (2013), in light of the ordinary presumption against extraterritorial application when a statute does not clearly indicate that extraterritorial application is intended by Congress. In the final rule, CEQ revises the definition of "Major Federal action" in a new paragraph (q)(1)(i) to exclude extraterritorial activities or decisions, which mean activities or decisions with effects located entirely outside the jurisdiction of the United States.[108]

The Supreme Court has stated that "[i]t is a longstanding principle of American law 'that legislation of Congress, unless a contrary intent appears, is meant to apply only within the territorial jurisdiction of the United

States.' " *EEOC* v. *Arabian Am. Oil Co. (Aramco),* 499 U.S. 244, 248 (1991) (quoting *Foley Bros.* v. *Filardo, Inc.,* 336 U.S. 281, 285 (1949)). During the past decade, the Supreme Court has considered the application of the presumption to a variety of Federal statutes.[109] As the Supreme Court has stated, the presumption "rests on the perception that Congress ordinarily legislates with respect to domestic, not foreign matters." *Morrison,* 561 U.S. at 255 (citing *Smith* v. *United States,* 507 U.S. 197, 204 n.5 (1993)). "Thus, 'unless there is the affirmative intention of the Congress clearly expressed' to give a statute extraterritorial effect, 'we must presume it is primarily concerned with domestic conditions.' " *Morrison,* 561 U.S. at 255 (citing *Aramco,* 499 U.S. at 248). The Supreme Court has held, including in more recent decisions, that the presumption applies regardless of whether there is a risk of conflict between the U.S. statute and a foreign law. *Morrison,* 561 U.S. at 255 (citing *Sale* v. *Haitian Ctrs. Council, Inc.,* 509 U.S. 155, 173–74 (1993)); *RJR Nabisco,* 136 S. Ct. at 2100; *see also Smith,* 507 U.S. at 204 n.5.

The Supreme Court has established a two-step framework for analyzing whether the presumption against extraterritoriality applies to a Federal statute.[110] Under this framework, the first step is to ask whether the presumption against extraterritoriality has been rebutted because "the statute gives a clear, affirmative indication that it applies extraterritorially." *RJR Nabisco,* 136 S. Ct. at 2101. If the presumption has not been rebutted, the second step is to determine whether the case involves a domestic application of the statute, and courts have done this by looking to the statute's "focus." [111]

Under the two-step framework, CEQ has determined that because the legislative history and statutory text of

section 102(2)(C) gives no clear indication that it applies extraterritorially, the presumption against extraterritoriality has not been rebutted. The plain language of section 102(2)(C) does not require it to be applied to actions occurring outside the jurisdiction of the United States.[112] The only reference in the Act to international considerations is in section 102(2)(F), which refers to "international cooperation" and the "worldwide and long-range character of environmental problems," and directs agencies to "where consistent with the foreign policy of the United States, lend appropriate support to initiatives, resolutions, and programs designed to maximize international cooperation" to protect the environment. 42 U.S.C. 4332(2)(F). International cooperation is inherently voluntary and not part of the mandatory analysis required under the statute, and this provision does not indicate in any way that the requirements of section 102(2)(C) to prepare detailed statements applies outside of U.S. territorial jurisdiction. The limited legislative history of section 102(2)(C) similarly does not include discussion of application of the requirements of section 102(2)(C) to extraterritorial actions.[113]

Under the two-step framework, CEQ has also considered the purpose of section 102(2)(C), which is to ensure that a Federal agency, as part of its decision making process, considers the potential environmental impacts of proposed actions. The focus of congressional concern is the proposed action and its potential environmental effects. The effects of a proposed action may occur both within U.S. territorial jurisdiction as well as outside that jurisdiction. To the extent effects of a proposed action occur entirely outside the territorial jurisdiction of the United States, the application of section 102(2)(C) would not be permissible, consistent with the Supreme Court's holding that where the conduct relevant to the statute's focus occurred in the United States, then "the case involves a

---

[108] The Restatement of Foreign Relations Law provides that the areas within the territorial jurisdiction of the United States include "its land, internal waters, territorial sea, the adjacent airspace, and other places over which the United States has sovereignty or some measure of legislative control." Restatement (Fourth) of Foreign Relations Law sec. 404 (2018).

[109] *See RJR Nabisco, Inc.* v. *European Cmty.,* 136 S. Ct. 2090 (2016) (Racketeer Influenced and Corrupt Organizations Act); *Kiobel,* 569 U.S. at 115–16 (Alien Tort Statute); *Morrison* v. *Nat'l Austl. Bank Ltd.,* 561 U.S. 247, 255 (2010) (Securities and Exchange Act of 1934); *WesternGeco LLC* v. *ION Geophysical Corp.,* 138 S. Ct. 2129 (2018) (Patent Act).

[110] *See RJR Nabisco,* 136 S. Ct. at 2101 (citing *Morrison,* 561 U.S. at 267 n.9; *Kiobel,* 569 U.S. 108); *see also WesternGeco LLC,* 138 S. Ct. 2129.

[111] *Id.* ("If the conduct relevant to the statute's focus occurred in the United States, then the case involves a permissible domestic application even if other conduct occurred abroad; but if the conduct relevant to the focus occurred in a foreign country, then the case involves an impermissible extraterritorial application regardless of any other conduct that occurred in U.S. territory."). This two-step framework for analyzing extraterritoriality issues is also reflected in the Restatement of Foreign Relations Law. *See* Restatement (Fourth) of Foreign Relations Law sec. 404 (2018).

[112] Section 102(2)(C) directs Federal agencies to provide a detailed statement for major Federal actions significantly affecting the quality of the human environment, and requires the responsible official to consult with and obtain the comments of Federal agencies with jurisdiction or special expertise, as well as to make copies of the statement and comments and views of Federal, state and local agencies available to the President, CEQ and the public. 42 U.S.C. 4332(2)(C). Nothing in the text states that this section was intended to require the preparation of detailed statements for actions located outside the United States.

[113] *See also Nat. Res. Def. Council* v. *Nuclear Regulatory Comm'n,* 647 F. 2d 1345, 1367 (D.C. Cir. 1981) ("NEPA's legislative history illuminates nothing in regard to extraterritorial application.").

permissible domestic application even if other conduct occurred abroad; but if the conduct relevant to the focus occurred in a foreign country, then the case involves an impermissible extraterritorial application regardless of any other conduct that occurred in U.S. territory." *RJR Nabisco,* 136 S. Ct. at 2101. Therefore, CEQ provides in paragraph (q)(1)(i) of the final rule that NEPA does not apply to "agency activities or decisions with effects located entirely outside of the jurisdiction of the United States."

### iii. Non-Discretionary Activities or Decisions

In the NPRM, CEQ proposed to clarify that the definition does not include non-discretionary activities or decisions made in accordance with the agency's statutory authority. The Supreme Court has held that analysis of a proposed action's effects under NEPA is not required where an agency has limited statutory authority and "simply lacks the power to act on whatever information might be contained in the EIS." *Pub. Citizen,* 541 U.S. at 768; *see also South Dakota,* 614 F.2d at 1193 (holding that the Department of the Interior's issuance of a mineral patent that was a ministerial act did not come within NEPA); *Milo Cmty. Hosp.* v. *Weinberger,* 525 F.2d 144, 148 (1st Cir. 1975) (NEPA analysis of impacts not required when agency was under a statutory duty to take the proposed action of terminating a hospital). CEQ includes this clarification in paragraph (q)(1)(ii).

### iv. Final Agency Action and Failure To Act

CEQ proposed to strike the statement that major Federal action includes a failure to act and instead clarify that the definition excludes activities or decisions that do not result in final agency action under the APA. The basis for including only final agency actions is the statutory text of the APA, which provides a right to judicial review of all "final agency action[s] for which there is no other adequate remedy in a court." 5 U.S.C. 704. CEQ includes this clarification in paragraph (q)(1)(iii) of the final rule and includes "or other statute that also includes a finality requirement" because CEQ recognizes that other statutes may also contain finality requirements beyond those of the APA. As the NPRM noted, NEPA applies when agencies are considering a proposal for decision. In the case of a "failure to act," there is no proposed action and therefore there are no alternatives that the agency may consider. *S. Utah Wilderness All.,* 542

U.S. at 70–73. Judicial review is available only when an agency fails to take a discrete action it is required to take. *Id.* In omitting the reference to a failure to act from the definition of "major Federal action," CEQ does not contradict the definition of "agency action" under the APA at 5 U.S.C. 551(13), and recognizes that the APA may compel agency action that is required but has been unreasonably withheld. If an agency is compelled to take such agency action, it should prepare a NEPA analysis at that time, as appropriate.

### v. Enforcement Actions

In the final rule, CEQ moves the exclusion of judicial or administrative civil or criminal enforcement actions from 40 CFR 1508.18(a) to paragraph (q)(1)(iv) of § 1508.1. CEQ did not propose changes to this language in the NPRM. In the final rule, CEQ moves this language and revises it consistent with the format of the list in paragraph (q)(1).

### vi. General Revenue Sharing Funds

CEQ proposed to strike the specific reference to the State and Local Fiscal Assistance Act of 1972 from 40 CFR 1508.18(a) and clarify that general revenue sharing funds do not meet the definition of major Federal action because the agency has no discretion. CEQ includes this change in paragraph (q)(1)(v) in the final rule.

### vii. Minimal Federal Funding or Involvement

CEQ proposed to clarify that non-Federal projects with minimal Federal funding or minimal Federal involvement such that the agency cannot control the outcome of the project are not major Federal actions. The language in paragraph (q)(1)(vi) of the final rule is consistent with the holdings of relevant circuit court cases that have addressed this issue. *See Rattlesnake Coal.* v. *U.S. EPA,* 509 F.3d 1095, 1101 (9th Cir. 2007) (Federal funding comprising six percent of the estimated implementation budget not enough to federalize implementation of entire project); *New Jersey Dep't of Envtl. Prot. & Energy* v. *Long Island Power Auth.,* 30 F.3d 403, 417 (3d Cir. 1994) ("Federal approval of a private party's project, where that approval is not required for the project to go forward, does not constitute a major Federal action."); *United States* v. *S. Fla. Water Mgmt. Dist.,* 28 F.3d 1563, 1572 (11th Cir. 1994) ("The touchstone of major [F]ederal activity constitutes a [F]ederal agency's authority to influence nonfederal activity. 'The [F]ederal agency must possess actual power to

control the nonfederal activity.' " (quoting *Sierra Club* v. *Hodel,* 848 F.2d 1068, 1089 (10th Cir. 1988), *overruled on other grounds by Vill. of Los Ranchos de Albuquerque* v. *Marsh,* 956 F.2d 970 (10th Cir. 1992)); *Sugarloaf Citizens Ass'n* v. *FERC,* 959 F.2d 508, 512 (4th Cir. 1992); *Save Barton Creek Ass'n* v. *Fed. Highway Admin.,* 950 F.2d 1129, 1134–35 (5th Cir. 1992); *Macht* v. *Skinner,* 916 F.2d 13, 20 (D.C. Cir. 1990) (funding for planning and studies not enough to federalize a project); *Vill. of Los Ranchos de Albuquerque* v. *Barnhart,* 906 F.2d 1477, 1482 (10th Cir. 1990); *Sierra Club* v. *Penfold,* 857 F.2d 1307, 1314 (9th Cir. 1998) (finding that the Bureau of Land Management's review of Notice mines, which do not require agency approval before commencement of mining, is "only a marginal [F]ederal action rather than a major action"); *Winnebago Tribe of Neb.* v. *Ray,* 621 F.2d 269, 272 (8th Cir. 1980) ("Factual or veto control, however, must be distinguished from legal control or 'enablement'" (citing *Med. Ctr., Inc.,* 584 F.2d 619)); *Atlanta Coal. on the Transp. Crisis* v. *Atlanta Reg'l Comm'n,* 599 F.2d 1333, 1347 (5th Cir. 1979); *Ctr. for Biological Diversity* v. *HUD,* 541 F. Supp. 2d 1091, 1099 (D. Ariz. 2008), *aff'd, Ctr. for Biological Diversity* v. *HUD,* No. 09–16400, 359 Fed. Appx. 781, 2009 WL 4912592 (9th Cir. Nov. 25, 2009) (unreported); *see also Touret* v. *NASA,* 485 F. Supp. 2d 38 (D.R.I. 2007).

As discussed in the NPRM, in these circumstances, there is no practical reason for an agency to conduct a NEPA analysis because the agency could not influence the outcome of its action to address the effects of the project. For example, this might include a very small percentage of Federal funding provided only to help design an infrastructure project that is otherwise funded through private or local funds. This change would help to reduce costs and delays by more clearly defining the kinds of actions that are appropriately within the scope of NEPA. The final rule includes these criteria in paragraph (q)(1)(vi) to make clear that these projects are ones where the agency does not exercise sufficient control and responsibility over the outcome of the project.

CEQ expects that agencies will further define these non-major actions, for which the agency does not exercise sufficient control and responsibility over the outcome of the project, in their agency NEPA procedures pursuant to § 1507.3(d)(4). For example, agencies that exercise trust responsibilities over activities or decisions that occur on or involve land held in trust by the United

States for the benefit of an Indian Tribe, or are held in fee subject to a restriction against alienation, may define those activities or decisions that involve minimal Federal funding or involvement. In such circumstances, the Federal Government does not exercise sufficient control and responsibility over the effects of actions on Indian lands, and a "but for" causal relationship of requiring Federal approval for such actions is insufficient to make an agency responsible for any particular effects from such actions.

In the NPRM, CEQ also invited comment on whether there should be a threshold (percentage or dollar figure) for "minimal Federal funding," and if so, what would be an appropriate threshold and the basis for such a threshold. CEQ did not receive sufficient information to establish such a threshold in the final rule.

viii. Loans and Loan Guarantees

CEQ also proposed to exclude loans, loan guarantees, and other forms of financial assistance where the Federal agency does not exercise sufficient control and responsibility over the effects of the action. CEQ includes this in the final rule in paragraph (q)(1)(vii), changing "action" to "such assistance" to remove the ambiguity with the use of the defined term in the definition. CEQ proposed to also exclude the farm ownership and operating loan guarantees provided by the Farm Service Agency (FSA) of the U.S. Department of Agriculture pursuant to 7 U.S.C. 1925 and 1941 through 1949, and the business loan guarantee programs of the Small Business Administration (SBA), 15 U.S.C. 636(a), 636(m), and 695 through 697f. CEQ includes these as examples of loan guarantees in paragraph (q)(1)(vii) and makes one correction to the citation to SBA's business loan guarantee programs, changing the final section cited from 697f to 697g.

By guaranteeing loans, FSA is not lending Federal funds; a "guaranteed loan" under FSA regulations is defined in 7 CFR 761.2(b) as a "loan made and serviced by a lender for which the Agency has entered into a Lender's Agreement and for which the Agency has issued a Loan Guarantee." The FSA loan guarantees are limited statutorily to an amount not to exceed $1.75 million (with allowance for inflation). *See* 7 U.S.C. 1925 and 1943. For fiscal year 2019, the average loan amount for a guaranteed operating loan is $289,393; and the average for a guaranteed farm

ownership loan is $516,859.[114] The relatively modest amounts of these loan guarantees suggest that these are not "major" within the meaning of the NEPA statute and for that reason CEQ makes this result clear in a specific application of its definition of "major Federal action." In determining whether Federal funding federalizes a non-Federal action, courts have considered whether the proportion of Federal funds in relation to funds from other sources is "significant." *See, e.g., Ka Makani 'O Kohala Ohana Inc.* v. *Dep't of Water Supply*, 295 F.3d 955, 960 (9th Cir. 2002) ("While significant [F]ederal funding can turn what would otherwise be a [S]tate or local project into a major Federal action, consideration must be given to a great disparity in the expenditures forecast for the [S]tate [and county] and [F]ederal portions of the entire program. . . . In the present case, the sum total of all of the [F]ederal funding that was ever offered . . . is less than two percent of the estimated total project cost." (alteration in original) (internal quotation marks and citation omitted)); *Friends of the N.*, *Inc.* v. *Coleman*, 518 F.2d 323, 329 (9th Cir. 1975) (holding Federal funding amounting to 10 percent of the total project cost not adequate to federalize project under NEPA); *Sancho* v. *Dep't of Energy*, 578 F. Supp. 2d 1258, 1266–68 (D. Haw. 2008) (Federal provision of less than 10 percent of project costs not sufficient to federalize project); *Landmark West!* v. *U.S. Postal Serv.*, 840 F. Supp. 994, 1009 (S.D.N.Y. 1993), *aff'd*, 41 F.3d 1500 (2d Cir. 1994) (holding U.S. Postal Service's role in private development of new skyscraper was not sufficient to federalize the project).

Furthermore, FSA loan guarantee programs do not provide any Federal funding to the participating borrower. Rather, FSA's role is limited to providing a guaranty to the private lender; no Federal funds are expended unless the borrower defaults on the private third-party loan, and the lender is unable to recover its debt through foreclosure of its collateral. In the event of default, the guarantee is paid to the lender, not to lender's borrower. FSA rarely makes guaranteed loan loss claim payments because delinquency rates are very low, ranging from between 0.98 and 1.87 percent from 2005 to 2019, and

1.62 percent in 2019.[115] The FSA guaranteed loan loss rates have ranged between 0.2 and 0.6 percent during the same time period.[116]

For purposes of triggering NEPA, "[t]he mere possibility of [F]ederal funding in the future is too tenuous to convert a local project into [F]ederal action." *Pres. Pittsburgh* v. *Conturo*, 2011 U.S. Dist. LEXIS 101756, at *13 (W.D. Pa. 2011). Indeed, in *Sancho*, the court observed that "analysis of the 'major Federal action' requirement in NEPA must focus upon [F]ederal funds that have already been distributed. Federal funds that have only been budgeted or allocated toward a project cannot be considered because they are not an 'irreversible and irretrievable commitment of resources.'" *Sancho*, 578 F. Supp. 2d at 1267 (internal citation omitted). The court further stated that "[t]he expectation of receiving future funds will not transform a local or state project into a federal project. . . . Regardless of the percentage, consideration of the budgeted future federal funds is not ripe for consideration in the 'major Federal action' analysis." *Id.* Other district courts have also found that, to federalize a project, the Federal funding must be more than "the passive deferral of a payment" and must be provided "primarily to directly further a policy goal of the funding agency." *Hamrick* v. *GSA*, 107 F. Supp. 3d 910, 926 (C.D. Ill. 2015) (citing *Landmark West!*, 840 F. Supp. at 1007).

FSA's role is to protect the financial interests of the United States, and its relationship is with the lender not the borrower. 7 CFR 762.103(a). FSA's involvement is primarily to ensure the financial stability of the loan and ensure proper loan servicing by the lender. Therefore, the context of these FSA regulations does not involve NEPA and is not compliance-driven but only meant to ensure that, in the event of a default, the loan proceeds are disbursed by the lender, used properly, and that the project is completed and operating so as to produce income necessary for the loan to be repaid.

If a lender violates one of FSA's regulations, FSA's only remedy is not to pay the loss claim in the event of a liquidation. FSA does not possess control or actual decision-making authority over the lender's issuance of the loan, the funded facility, or operations of the borrower. Courts have

---

[114] *See* Executive Summary for Farm Programs in Fiscal Year 2019, *https:// www.fsa.usda.gov/Assets/USDA-FSA-Public/ usdafiles/Farm-Loan-Programs/pdfs/program-data/ FY2019_Executive_Summary.pdf. See generally https://www.fsa.usda.gov/programs-and-services/ farm-loan-programs/program-data/index.*

[115] *See* Guaranteed Loan Executive Summary, as of FY 2019, *https://www.fsa.usda.gov/Assets/ USDA-FSA-Public/usdafiles/Farm-Loan-Programs/ pdfs/program-data/FLP_Guaranteed_Loan_ Servicing_Executive_Summary.pdf.*

[116] *Id.*

recognized Federal agencies do not have sufficient control over loan guarantees to trigger NEPA. *See, e.g., Ctr. for Biological Diversity,* 541 F. Supp. 2d 1091, *aff'd, Ctr. for Biological Diversity,* No. 08–16400, 359 F. Appx. 781 ("The agencies guarantee loans issued by private lenders to qualified borrowers, but do not approve or undertake any of the development projects at issue. The agencies' loan guarantees have such a remote and indirect relationship to the watershed problems allegedly stemming from the urban development that they cannot be held to be a legal cause of any effects on the protected species for purposes of either the ESA or the NEPA." *Ctr. for Biological Diversity,* No. 08–16400, 359 F. Appx. at 783). "The [F]ederal agency must possess actual power to control the nonfederal activity." *Hodel,* 848 F.2d at 1089, *overruled on other grounds by Vill. of Los Ranchos de Albuquerque* v. *Marsh,* 956 F.2d 970.

SBA's business loan programs include general business loan programs (7(a) Program), authorized by section 7(a) of the Small Business Act, 15 U.S.C. 636(a); the microloan demonstration loan program (Microloan Program), authorized by section 7(m) of the Small Business Act, 15 U.S.C. 636(m); and the development company program (504 Program), which is a jobs-creation program, authorized by Title V of the Small Business Investment Act of 1958, 15 U.S.C. 695–697g. Under all of these programs, SBA does not recruit or work with the borrower, or service the loan unless, following a default in payment, the lender has collected all that it can under the loan.

Under the 7(a) Program, SBA guarantees a percentage of the loan amount extended by a commercial lender to encourage such lenders to make loans to eligible small businesses. The lender seeks and receives the guaranty, not the applicant small business. In over 80 percent of loans stemming from the 7(a) Program, the lender approves the loan without SBA's prior review and approval through the 7(a) Program's Preferred Lender Program ("PLP program").[117] Further, SBA does

not expend Federal funds unless there is a default by the borrower in paying the loan; in such cases, SBA reimburses the lender in accordance with SBA's guarantee percentage. The maximum amount for a standard loan under the 7(a) program is $5 million, while various 7(a) loans have lesser maximum amounts of $500,000 or less.[118]

Under the Microloan Program, recipient entities can obtain loans, up to $50,000, for certain, limited purposes. SBA provides funds to designated intermediary lenders, which are non-profit, community-based organizations. Each of the lenders has its own lending and credit requirements, and the lenders extend the microloan financing. Recipients only may use the funds for working capital, inventory or supplies, furniture or fixtures, or machinery or equipment. They cannot purchase real estate or pay existing debt.

Under the 504 Program, small businesses can obtain long-term, fixed-rate financing to acquire or improve capital assets. Certified Development Companies (CDCs), which are private, mostly non-profit, corporations certified by SBA to promote local and community economic development, implement the program. Typically, a 504 Program project is funded by three sources: (1) A loan, secured with a senior lien, from a private-sector lender for 50 percent of the project costs; (2) an equity contribution from the borrower of at least 10 percent of the project costs; and (3) a loan covering up to 40 percent of the total costs, which is funded by proceeds from the sale to investors of an SBA-guaranteed debenture issued by a CDC.[119] The 504's Premier Certified Lender Program ("PCLP program") provides for only limited SBA review of eligibility, and SBA delegates the responsibility to CDCs to issue an SBA guarantee of debenture for eligible loans without prior approval by SBA. 15 U.S.C. 697e.[120] Under the 504 program, the maximum loan amount is $5 million, although small manufacturers or certain energy projects, including energy efficiency or renewable generation projects, may qualify for a $5.5 million debenture.[121] SBA does not expend Federal funds unless there is a default by the borrower in paying the

debenture-funded loan, in which case SBA pays the outstanding balance owed on the debenture to the investors. SBA expends Federal funds on its loan guarantee programs only when expected losses from defaults exceed expected fee collections. Section 7(a) and 504 loan program delinquency rates are 0.8 percent and 0.7 percent as of July 2019 respectively.[122]

CEQ has determined that FSA and SBA do not have sufficient control and responsibility over the underlying activities to meet the definition of major Federal action. The issuance of loan guarantees to a non-Federal lender to back a percentage of a loan that the lender decides to make to a private, third-party borrower is insufficient control or authority over the underlying project. *See Rattlesnake Coal.,* 509 F.3d at 1102 ("The United States must maintain decision making authority over the local plan in order for it to become a major [F]ederal action."); *Ka Makani,* 295 F.3d at 961 ("Because the final decision-making power remained at all times with [the State agency], we conclude that the [Federal agency] involvement was not sufficient to constitute 'major [F]ederal action.'" (quoting *Barnhart,* 906 F.2d at 1482)); *S. Fla. Water Mgmt. Dist.,* 28 F.3d at 1572 ("The [F]ederal agency must possess actual power to control the nonfederal activity." (citation omitted)).

CEQ also invited comment on whether any other types of financial instruments should be considered non-major Federal actions and the basis for such exclusion. CEQ did not receive sufficient comments to make any additional changes to the definition of major Federal action with respect to other financial instruments.

### ix. Other Changes to Major Federal Action

In the final rule, paragraphs (q)(2) and (3) include the examples of activities and decisions that are in 40 CFR 1508.18(a) and (b). CEQ invited comment on whether it should change "partly" to "predominantly" in paragraph (q)(2) for consistency with the edits to the introductory text regarding "minimal Federal funding." CEQ does not make this change in the final rule. CEQ notes that "continuing" activities in paragraph (q)(2) refers to situations where a major Federal action remains to occur, consistent with § 1502.9(d) and *Norton* v. *Southern Utah Wilderness Alliance.* 542 U.S. at 73.

---

[117] Pursuant to the Small Business Act, under the PLP program, SBA delegates responsibility to experienced and qualified lenders to issue an SBA guarantee on a loan without prior approval by SBA. The PLP program is defined as a "program established by the Administrator . . . under which a written agreement between the lender and the Administration delegates to the lender . . . complete authority to make and close loans with a guarantee from the Administration without obtaining the prior specific approval of the Administration . . . ." 15 U.S.C. 636(a)(2)(C)(iii). Thus, PLP program lenders have delegated authority to make SBA-guaranteed loans without any approval from SBA.

[118] 15 U.S.C. 636(a).

[119] In the 504 program, SBA guarantees payments of debentures, which are bonds sold to investors. The proceeds from the sale of the debentures are used to fund the underlying loans to borrowers.

[120] Congress has mandated that guaranteed loans made by PCLPs shall not include SBA "review of decisions by the lender involving creditworthiness, loan closing, or compliance with legal requirements imposed by law or regulation." 15 U.S.C. 697e(e)(2).

[121] 15 U.S.C. 696(2)(A).

[122] *See* SBA Fiscal Year 2019 Agency Financial Report at 22, *available at https://www.sba.gov/ document/report--agency-financial-report.*

CEQ proposed to insert "implementation of" before "treaties" in proposed paragraph (q)(2)(i) to clarify that the major Federal action is not the treaty itself, but rather an agency's action to implement that treaty. CEQ makes this change in § 1508.1(q)(3)(i) of the final rule and clarifies that this includes an agency's action to implement a treaty pursuant to statute or regulation. CEQ also changes "pursuant to" to "under" the APA and adds a reference to "other statutes" after the APA. While agencies conduct the rulemaking process pursuant to the APA, they also may do so under the authority of the specific statutes.

CEQ proposed to strike "guide" from proposed paragraph (q)(2)(ii) because guidance is non-binding. CEQ makes this change in the final rule in § 1508.1(q)(3)(ii).

Finally, CEQ invited comment in the NPRM on whether CEQ should further revise the definition of "major Federal action" to exclude other *per se* categories of activities or to further address what NEPA analyses have called "the small handle problem." [123] CEQ did not receive sufficient information to make any additional changes.

### 18. Definition of "Matter"

The NPRM did not propose any changes to the definition of matter in paragraph (r). CEQ did not revise this definition in the final rule.

### 19. Clarifying the Meaning of "Mitigation"

CEQ proposed to amend the definition of "mitigation" to define the term and clarify that NEPA does not require adoption of any particular mitigation measure, consistent with *Methow Valley*, 490 U.S. at 352–53. In *Methow Valley*, the Supreme Court held that NEPA and the CEQ regulations require "that mitigation be discussed in sufficient detail to ensure that environmental consequences have been fairly evaluated," but do not establish "a substantive requirement that a complete mitigation plan be actually formulated and adopted" before the agency can make its decision. *Id.* at 352.

CEQ also proposed to amend the definition of "mitigation" to make clear that mitigation must have a nexus to the effects of the proposed action, is limited to those actions that have an effect on the environment, and does not include actions that do not have an effect on the environment. This change will make the NEPA process more effective by clarifying that mitigation measures must actually be designed to mitigate the effects of the proposed action. This amended definition is consistent with CEQ's Mitigation Guidance, *supra* note 29.

Under that guidance, if an agency believes that the proposed action will provide net environmental benefits through use of compensatory mitigation, the agency should incorporate by reference the documents that demonstrate that the proposed mitigation will be new or in addition to actions that would occur under the no-action alternative, and the financial, legal, and management commitments for the mitigation. Use of well-established compensatory mitigation legal structures should provide the necessary substantiation for the agency's findings on the effectiveness (nexus to effects of the action, proportionality, and durability) of the mitigation. Other actions may be effectively mitigated through use of environmental management systems that provide a structure of procedures and policies to systematically identify, evaluate, and manage environmental impacts of an action during its implementation.[124]

CEQ makes the proposed changes in the final rule with minor edits to improve clarity. Specifically, CEQ replaces "reasonably foreseeable impacts to the human environment" with "effects" to more precisely refer to the defined term "effects." In response to comments, CEQ also adds "or alternatives" after "proposed action" to clarify that mitigation measures mean measures to avoid, minimize, or compensate for effects caused by a proposed action or its alternatives. CEQ also replaces "the effects of a proposed action" with "those effects" to reduce wordiness and provide additional clarity.

### 20. Definition of "NEPA Process"

The NPRM did not propose any changes to the definition of NEPA process in paragraph (t). CEQ did not revise this definition in the final rule.

### 21. Clarifying the Meaning of "Notice of Intent"

CEQ proposed to revise the definition of "notice of intent" in paragraph (u) to move the operative requirements for what agencies must include in the notices to § 1501.9(d) and add the word "public" to clarify that the NOI is a public notice. CEQ makes these changes in the final rule.

### 22. New Definition of "Page"

CEQ proposed a new definition of "page" in paragraph (v) to provide a word count (500 words) for a more standard functional definition of "page" for page count and other NEPA purposes. CEQ adds this definition as proposed to the final rule. As discussed in the NPRM, this change updates NEPA for modern electronic publishing and internet formatting, in which the number of words per page can vary widely depending on format. It also ensures some uniformity in document length while allowing unrestricted use of the graphic display of quantitative information, tables, photos, maps, and other geographic information that can provide a much more effective means of conveying information about environmental effects. This change supports the original CEQ page limits as a means of ensuring that environmental documents are readable and useful to decision makers.

### 23. New Definition of "Participating Agency"

CEQ proposed to add the concept of a participating agency to the CEQ regulations in paragraph (w). CEQ proposed to define participating agency consistent with the definition in FAST–41 and 23 U.S.C. 139. CEQ proposed to add participating agencies to § 1501.7(i) regarding the schedule and replace the term "commenting" agencies with "participating" agencies throughout. CEQ adds this definition as proposed to the final rule.

### 24. Clarifying the Meaning of "Proposal"

CEQ proposed clarifying edits to the definition of proposal in paragraph (x) and to strike the operative language regarding timing of an EIS because it is already addressed in § 1502.5. CEQ makes these changes in the final rule.

### 25. New Definition of "Publish and Publication"

CEQ proposed to define publish and publication in paragraph (y) to provide agencies with the flexibility to make environmental reviews and information available to the public by electronic means. The 1978 regulations predate personal computers and a wide range of technologies now used by agencies such as the modern internet and GIS mapping tools. To ensure that agencies do not exclude the affected public from the NEPA process due to a lack of resources (often referred to as the "digital

---

[123] *See* Daniel R. Mandelker et al., NEPA Law and Litigation, sec. 8:20 (2d ed. 2019) ("This problem is sometimes called the 'small handle' problem because [F]ederal action may be only be a 'small handle' on a non[-F]ederal project.").

[124] *See* Council on Environmental Quality, Aligning National Environmental Policy Act Processes with Environmental Management Systems (Apr. 2007), *https://ceq.doe.gov/docs/ceq-publications/NEPA_EMS_Guide_final_Apr2007.pdf.*

AR_0029088

divide''), the definition retains a provision for printed environmental documents where necessary for effective public participation. CEQ adds this definition as proposed in the final rule.

### 26. New Definition of ''Reasonable Alternatives''

Several ANPRM commenters asked CEQ to include a new definition of ''reasonable alternatives'' in the regulations with emphasis on how technical and economic feasibility should be evaluated. CEQ proposed a new definition of ''reasonable alternatives'' in paragraph (z) to provide that reasonable alternatives must be technically and economically feasible and meet the purpose and need of the proposed action. *See, e.g., Vt. Yankee,* 435 U.S. at 551 (''alternatives must be bounded by some notion of feasibility''). CEQ also proposed to define reasonable alternatives as ''a reasonable range of alternatives'' to codify Questions 1a and 1b in the Forty Questions, *supra* note 2. Agencies are not required to give detailed consideration to alternatives that are unlikely to be implemented because they are infeasible, ineffective, or inconsistent with the purpose and need for agency action.

Finally, CEQ proposed to clarify that a reasonable alternative must also consider the goals of the applicant when the agency's action involves a non-Federal entity. These changes will help reduce paperwork and delays by helping to clarify the range of alternatives that agencies must consider. Where the agency action is in response to an application for permit or other authorization, the agency should consider the applicant's goals based on the agency's statutory authorization to act, as well as other congressional directives, in defining the proposed action's purpose and need. CEQ adds this definition as proposed in the final rule.

### 27. New Definition of ''Reasonably Foreseeable''

CEQ received comments on the ANPRM requesting that the regulations provide a definition of ''reasonably foreseeable.'' CEQ proposed to define ''reasonably foreseeable'' in paragraph (aa) consistent with the ordinary person standard—that is what a person of ordinary prudence in the position of the agency decision maker would consider in reaching a decision. *Sierra Club* v. *Marsh,* 976 F.2d 763, 767 (1st Cir. 1992). CEQ adds this definition as proposed in the final rule.

### 28. Definition of ''Referring Agency''

CEQ proposed a grammatical edit to the definition of referring agency in paragraph (bb). CEQ makes this change in the final rule.

### 29. Definition of ''Scope''

CEQ proposed to move the operative language from paragraph (cc), which tells agencies how to determine the scope of an EIS, to § 1501.9(e). CEQ makes this change in the final rule.

### 30. New Definition of ''Senior Agency Official''

CEQ proposed to define the new term ''senior agency official'' in paragraph (dd) to provide for agency officials that are responsible for the agency's NEPA compliance. As reflected in comments, implementation of NEPA can require significant agency resources. Without senior agency official leadership and effective management of NEPA reviews, the process can be lengthy, costly, and subject to uncertainty and delays. CEQ seeks to advance efficiencies to ensure that agencies use their limited resources to effectively consider environmental impacts and support timely and informed decision making by the Federal Government. CEQ adds this definition with some changes in the final rule. Specifically, CEQ does not include the phrase ''and representing agency analysis of the effects of agency actions on the human environment in agency decision-making processes'' because the duties and responsibilities of the ''senior agency official,'' including representing the agency, are discussed in various provisions of the subchapter. *See* §§ 1501.5(f), 1501.7(d), 1501.8(b)(6) and (c), 1501.10, 1502.7, 1507.2.

### 31. Definition of ''Special Expertise''

The NPRM did not propose any changes to the definition of special expertise in paragraph (ee). CEQ did not revise this definition in the final rule.

### 32. Striking the Definition of ''Significantly''

Because 40 CFR 1508.27 did not define ''significantly,'' but rather set out factors for agencies to consider in assessing whether a particular effect is significant, CEQ proposed to strike this definition and discuss significance in § 1501.3(b), as described in section II.C.3. CEQ makes this change in the final rule.

### 33. Clarifying the Meaning of ''Tiering''

CEQ proposed to amend the definition of ''tiering'' in paragraph (ff) to make clear that agencies may use EAs at the programmatic stage as well as the subsequent stages. This clarifies that agencies have flexibility in structuring programmatic NEPA reviews and associated tiering. CEQ proposed to move the operative language describing how any agency determines when and how to tier from 40 CFR 1508.28 to § 1501.11(b). CEQ makes these changes in the final rule.

### K. CEQ Guidance Documents

In the proposed rule, CEQ stated that if the proposal was adopted as a final rule, it would supersede any previous CEQ NEPA guidance and handbooks. With this final rule, CEQ clarifies that it will provide notice in the **Federal Register** listing withdrawn guidance. CEQ will issue updated or new guidance consistent with Presidential directives. CEQ also intends to update the Citizen's Guide to NEPA.[125]

### III. Rulemaking Analyses and Notices

*A. Executive Order 12866, Regulatory Planning and Review and Executive Order 13563, Improving Regulation and Regulatory Review*

E.O. 12866 [126] directs agencies to assess all costs and benefits of available regulatory alternatives, and if regulation is necessary, to select regulatory approaches that maximize net benefits, including potential economic, environmental, public health and safety effects, and other advantages; distributive impacts; and equity. E.O. 13563 [127] reaffirms E.O. 12866, and directs agencies to use a process that provides for public participation in developing rules; promotes coordination, simplification, and harmonization; and reduces burdens and maintains flexibility.

Section 3(f) of E.O. 12866 sets forth the four categories of regulatory action that meet the definition of a significant regulatory action. The first category includes rules that have an annual effect on the economy of $100 million or adversely affect in a material way the economy, a sector of the economy, productivity, competition, jobs, the environment, public health or safety, or State, Tribal, or local governments or communities. Some commenters stated that this rulemaking would have such an effect, and therefore CEQ should have prepared a regulatory impact statement. Commenters noted, for example, proposed changes to the definition of effects, alternatives analysis, and overall effect on the number of Federal actions subject to NEPA as examples of impacts

---

[125] *Supra* note 29.
[126] 58 FR 51735 (Oct. 4, 1993).
[127] 76 FR 3821 (Jan. 21, 2011).

contributing to an impact of over $100 million on the public.

CEQ agrees that this an economically significant action. However, many of the changes made in this rule codify long-standing practices and case law that have developed since CEQ issued the 1978 regulations. Under OMB Circular A–4, "Regulatory Analysis" (Sept. 17, 2003),[128] the "no action" baseline is "what the world will be like if the proposed rule is not adopted." Changes to the regulations based on long-standing guidance and Supreme Court case law would be included in the baseline for the rule; therefore, their codification would generate marginal cost savings. Similarly, changes that clarify or otherwise improve the ability to interpret and implement the regulations would have little to no quantifiable impact. The appendix to the Regulatory Impact Analysis for the Final Rule, Update to the Regulations Implementing the Procedural Provisions of the National Environmental Policy Act [129] ("RIA Appendix") provides a summary of the anticipated economic and environmental impacts associated with the changes in the final rule. In evaluating economic and environmental impacts, CEQ has considered the statute and Supreme Court case law, and the 1978 regulations. As discussed throughout Section II and the Final Rule Response to Comments, CEQ has made revisions to better align the regulations with the statute, codify Supreme Court case law and current agency practice, improve the timeliness and efficiency of the NEPA process, and make other changes to improve the clarity and readability of the regulations.

The revisions to CEQ's regulations are anticipated to significantly lower administrative costs as a result of changes to reduce unnecessary paperwork. Government-wide, the average number of pages for a final EIS is approximately 661 pages. The final rule includes numerous changes to reduce the duplication of paperwork and establishes presumptive page limits for EAs of 75 pages, and for EISs of 150 pages (or 300 pages for proposals of unusual scope or complexity).[130] However, agencies may request longer page limits with approval from a senior agency official and include additional

material as appendices. The final rule also makes numerous changes to improve the efficiency of the NEPA process and establishes presumptive time limits for EAs of one year and for EISs of two years, which may be extended with approval of a senior agency official. CEQ expects the final rule to reduce the length of EAs and EISs, and the time for completing and these analyses, and to lower administrative costs government-wide.

A total of 1,276 EISs were completed from 2010 through 2018, and the median EIS completion time was 3.5 years with only 257 EISs completed in 2 years or less.[131] Based on the efficiencies and presumptive time limit for EISs in the final rule, the length of time to complete the 1019 EISs that took longer than 2 years could be reduced by 58 percent, assuming a 2-year completion time for all of those actions. Applying this potential time savings to the total administrative cost to prepare those EISs taking in excess of 2 years could result in roughly $744 million in savings over the 9-year time period for an annualized savings of roughly $83 million (2016 adjusted dollars).[132] The amount of time required to prepare an EIS does not necessarily correlate with the total cost. However, for those EISs taking over two years to prepare, comparing the anticipated time savings with the respective administrative costs provides insight into the potential cost savings that an agency may generate under the final rule. Additionally, CEQ notes that there may be cost savings related to the preparation of EAs and application of CEs. While the cost of these actions is significantly lower, agencies conduct such reviews in much larger numbers than EISs.

Agencies have not routinely tracked costs of completing NEPA analyses.[133] With implementation of this final rule, in particular § 1502.11(g), agencies will be required to provide the estimated total cost of preparing an EIS. CEQ

expects this will begin to address the data gap that currently exists relating to the administrative costs of NEPA compliance.

CEQ expects these and other changes in the final rule to catalyze economic benefits by expediting some reviews, including through improved coordination and management and less focus on non-significant impacts. Commenters from industry on both the ANPRM and proposed rule frequently discussed that delays under the 1978 regulations resulted in higher costs; however, these costs are difficult to quantify. One estimate in 2015 found that the cost of a 6-year delay in infrastructure projects across the electricity transmission, power generation, inland waterways, roads and bridges, rail, and water (both drinking and wastewater) sectors is $3.7 trillion,[134] which was subsequently updated to $3.9 trillion in 2018.[135] There may be underlying permits and consultations (e.g., the Endangered Species Act) and other issues that contribute to a delay and therefore allocating a portion of the cost to the NEPA process would be challenging.

NEPA is a procedural statute requiring agencies to disclose and consider potential environmental effects in their decision-making processes. The final rule does not alter any substantive environmental law or regulation such as the Clean Air Act, the Clean Water Act, and the Endangered Species Act. Under the final rule, agencies will continue to consider all significant impacts to the environment. Although some may view the changes in the final rule as reducing the number or scope of analyses, CEQ has determined that, using a baseline of the statutory requirements of NEPA and Supreme Court case law, there are no adverse environmental impacts (see RIA Appendix).

OMB has determined that this final rule is an economically significant regulatory action because it may have an annual effect on the economy of $100 million or more associated with lower administrative costs and reduced paperwork and delays in the environmental review process. This rule sets forth the government-wide process for implementing NEPA in a consistent and coordinated manner. The rule will also require agencies to update their existing NEPA procedures for

---

[128] 68 FR 58366 (Oct. 10, 2003).

[129] The Regulatory Impact Analysis for the Final Rule, Update to the Regulations Implementing the Procedural Provisions of the National Environmental Policy Act is available under "Supporting Documents" in the docket on regulations.gov under docket ID CEQ–2019–0003.

[130] The 1978 regulations recommended the same page limits for EISs but did not include provisions requiring agencies to meet those page limits. 40 CFR 1502.7.

[131] See Council on Environmental Quality, EIS Timeline Data Excel Workbook, (June 12, 2020), https://ceq.doe.gov/docs/nepa-practice/CEQ_EIS_Timeline_Data_2020-6-12.xlsx.

[132] This calculation uses the mid-point ($1.125 million) of the $250,000 to $2 million cost range found in the NEPA Task Force report and assumes a 58 percent reduction in costs for those EISs taking longer than 2 years. NEPA Task Force Report, supra, note 28. This number is similar to the cost data from the Department of Energy, which found a median EIS cost of $1.4 million. GAO NEPA Report, supra, note 91.

[133] As noted above, a 2014 U.S. Government Accountability Office report found that Federal agencies do not routinely track data on the cost of completing NEPA analyses, and that the cost can vary considerably, depending on the complexity and scope of the project. GAO NEPA Report, supra note 91.

[134] Two Years, Not Ten, supra note 4.

[135] Press Release, Common Good, Common Good Updates the Cost of US Infrastructure Delays Costs Have Risen $200 Billion Over Five Years to Nearly $3.9 Trillion (May 2018), https://www.commongood.org/wp-content/uploads/2018/05/Two-Years-Update.pdf.

AR_0029090

consistency with the changes set forth in this final rule.

*B. Executive Order 13771, Reducing Regulation and Controlling Regulatory Costs*

Under E.O. 13771,[136] agencies must identify for elimination two prior regulations for every one regulation issued, and promulgate regulations consistent with a regulatory budget. This rule is a deregulatory action under E.O. 13771 and OMB's guidance implementing E.O. 13771, titled "Reducing Regulation and Controlling Regulatory Costs" (April 5, 2017).[137] CEQ anticipates that the changes made in this rule will reduce unnecessary paperwork and expedite some reviews through improved coordination and management.

*C. Regulatory Flexibility Act and Executive Order 13272, Proper Consideration of Small Entities in Agency Rulemaking*

The Regulatory Flexibility Act, as amended, (RFA), 5 U.S.C. 601 *et seq.*, and E.O. 13272 [138] require agencies to assess the impacts of proposed and final rules on small entities. Under the RFA, small entities include small businesses, small organizations, and small governmental jurisdictions. An agency must prepare a regulatory flexibility analysis at the proposed and final rule stages unless it determines and certifies that the rule, if promulgated, would not have a significant economic impact on a substantial number of small entities. 5 U.S.C. 605(b). An agency need not perform an analysis of small entity impacts when a rule does not directly regulate small entities. *See Mid-Tex Electric Coop., Inc.* v. *FERC,* 773 F.2d 327 (D.C. Cir. 1985). This rule does not directly regulate small entities. Rather, it applies to Federal agencies and sets forth the process for their compliance with NEPA. As noted above, NEPA is a procedural statute requiring agencies to disclose and consider potential environmental effects in their decision-making processes, and does not alter any substantive environmental law or regulation. Under the final rule, agencies will continue to consider all significant impacts to the environment.

A few commenters asserted that the rule would impact small entities, including small businesses that provide services relating to the preparation of NEPA documents, outdoor recreation businesses, and other related small

businesses. To the extent that the rule may affect small entities, this rulemaking will make the NEPA process more efficient and consistent and clarify the procedural requirements, which CEQ expects to directly benefit Federal agencies and indirectly benefit all other entities engaged in the process, including applicants seeking a Federal permit and those engaged in NEPA compliance activities. In addition, CEQ expects that small businesses and farmers seeking SBA or FSA guaranteed loans will indirectly benefit from the clarifying revisions in the final rule to the definition of major Federal action. Accordingly, CEQ hereby certifies that the rule will not have a significant economic impact on a substantial number of small entities.

*D. Congressional Review Act*

Before a rule can take effect, the Congressional Review Act (CRA) requires agencies to submit to the House of Representatives, Senate, and Comptroller General a report containing a copy of the rule and a statement identifying whether it is a "major rule." 5 U.S.C. 801. OMB determines if a final rule constitutes a major rule. The CRA defines a major rule as any rule that the Administrator of OMB's Office of Information and Regulatory Affairs finds has resulted in or is likely to result in—(A) an annual effect on the economy of $100,000,000 or more; (B) a major increase in costs or prices for consumers, individual industries, Federal, State, or local government agencies, or geographic regions, or (C) significant adverse effects on competition, employment, investment, productivity, innovation, or on the ability of United States-based enterprises to compete with foreign-based enterprises in domestic and export markets. 5 U.S.C. 804(2).

OMB has determined that this final rule is a major rule for purposes of the Congressional Review Act. CEQ will submit a report, including the final rule, to both houses of Congress and the Government Accountability Office for review.

*E. National Environmental Policy Act*

Under the CEQ regulations, major Federal actions may include regulations. When CEQ issued regulations in 1978, it prepared a "special environmental assessment" for illustrative purposes pursuant to E.O. 11991. 43 FR at 25232. The NPRM for the 1978 regulations stated "the impacts of procedural regulations of this kind are not susceptible to detailed analysis beyond that set out in the assessment." *Id.* Similarly, in 1986, while CEQ stated in

the final rule that there were "substantial legal questions as to whether entities within the Executive Office of the President are required to prepare environmental assessments," it also prepared a special environmental assessment. 51 FR at 15619. The special environmental assessment issued in 1986 made a finding of no significant environmental impact, and there was no finding made for the assessment of the 1978 regulations.

Some commenters expressed the view that CEQ failed to comply with NEPA when publishing the proposed rule that precedes this final rule, and CEQ should have prepared an EA or EIS. The commenters stated that section 102(2)(C) of NEPA requires environmental review of major Federal actions. By not conducting an environmental review under NEPA, commenters stated that CEQ violated its own regulations and past practices in prior regulations. Other commenters stated that NEPA review was required if the proposed rule "created the possibility" of significant impacts on the environment. They asserted that the proposed rule was a "sweeping re-write" of the 1978 regulations that would alter Federal agencies' consideration of environmental effects of proposed projects. Aspects of the proposed rule that were referenced in this regard include expanded use of CEs, narrow definitions of significance and effects, weakened alternatives analysis, and reduced public participation and agency accountability. Commenters asserted that the consequence of these changes is truncated analysis, a less informed public, and less mitigation.

CEQ disagrees with commenters. CEQ prepared a special assessment on its prior rules for illustrative purposes. Those long-prior voluntary decisions do not forever establish that CEQ has an obligation to apply the CEQ's regulations to changes to those regulations. As noted above, CEQ has the authority to promulgate and revise its regulations consistent with *Chevron* and other applicable case law.

This rule would not authorize any activity or commit resources to a project that may affect the environment. Similar to the 1978 regulations, these regulations do not concern any particular environmental media, nor are the regulations tied to a specific environmental setting. Rather, these regulations apply generally to Federal actions affecting the environment. No action under the regulations or specific issue or problem is singled out for special consideration. *See* Council on Environmental Quality, Special

---

[136] 82 FR 9339 (Feb. 3, 2017).
[137] *Available at https://www.whitehouse.gov/sites/whitehouse.gov/files/omb/memoranda/2017/M-17-21-OMB.pdf.*
[138] 67 FR 53461 (Aug. 16, 2002).

Environmental Assessment of Regulations Proposed Under E.O. 11991 to Implement the Procedural Provisions of the National Environmental Policy Act, p. 6 (1978). Further, as stated by CEQ when it proposed the regulations in 1978, procedural rules of this kind are not susceptible to detailed analysis. 43 FR at 25232.

Even if CEQ were required to prepare an EA, it likely would result in a FONSI. CEQ has reviewed the changes made in this final rule and determined that they would not result in environmental impacts. *See* RIA Appendix. For reasons explained in the respective areas of this preamble and further summarized in the RIA Appendix, CEQ disagrees that the clarifications and changes to the processes that Federal agencies follow when relying on CEs, analyzing alternatives, and engaging the public will themselves result in any environmental impacts, let alone potentially significant impacts. This thorough review, in combination with the aforementioned circumstances of the special environmental assessments prepared for the 1978 and 1986 regulations, and the procedural nature of these regulations, reinforces CEQ's view that an EA is neither required nor necessary.

Moreover, preparing an EA for the final rule would not meaningfully inform CEQ or the public. The clarifications and changes in the final rule are entirely procedural and will help to inform the processes used by Federal agencies to evaluate the environmental effects of their proposed actions in the future.

For reasons explained in the respective areas of this preamble and further summarized in the RIA Appendix, CEQ disagrees that changes relating to CEs, analysis of alternatives, public participation, and agency responsibilities will have environmental impacts, let alone potentially significant ones.

In addition, commenters referenced several court opinions in support of their view that an agency's interpretation of a statute can be subject to NEPA review when that interpretation can lead to subsequent, significant effects on the environment, including *Citizens for Better Forestry* v. *U.S. Dep't of Agric.,* 481 F. Supp. 2d 1059 (N.D. Cal. 2007) and *Sierra Club* v. *Bosworth,* 510 F. 3d 1016 (9th Cir. 2007). Commenters stated that CEQ was required to request comment on the appropriate scope of the environmental review of the proposed rule and then prepare, and notice for public comment, an EIS before or in tandem with its publication.

The circumstances in this rule are distinctly different from the case law referenced by commenters. *Citizens for Better Forestry* pertains to the misapplication of an existing CE, where the court found that the agency improperly expanded the scope of an existing CE when applying it to a National Forest Management Act rulemaking. 481 F. Supp. at 1086. In *Sierra Club* v. *Bosworth,* the court agreed with previous cases finding that the promulgation of agency NEPA procedures, including the establishment of new CEs, did not itself require preparation of an EA or EIS, but that agencies need only comply with CEQ regulations setting forth procedural requirements, including consultation with CEQ, and **Federal Register** publication for public comment (40 CFR 1507.3). 510 F.3d at 1022. The court, however, found that the record relied on by the U.S. Forest Service to develop and justify a CE was deficient. *Id.* at 1026–30. Neither of the circumstances in those cases is comparable to the circumstances of this rule. Further, in another relevant case, *Heartwood* v. *U.S. Forest Service,* the court found that neither NEPA nor the CEQ regulations required the agency to conduct an EA or an EIS prior to the promulgation of its procedures creating a CE. 230 F.3d 947, 954–55 (7th Cir. 2000).

This rule serves as the primary regulation from which agencies develop procedures to implement the statute. To prepare an EIS, as some commenters had requested, would necessitate that CEQ apply the 1978 regulations to a rule that revises those same regulations. There is no indication that the statute contemplated such circumstances, and CEQ is not aware of other examples in law where the revisions to procedural rules were subject to the requirements of the rule that those same rules replaced. Further, the 1978 regulations do not require agencies to prepare a NEPA analysis before establishing or updating agency procedures for implementing NEPA. Since this rule would not authorize any activity or commit resources to a project that may affect the environment, preparation of an environmental review is not required.

*F. Endangered Species Act*

Under the ESA, the promulgation of regulations can be a discretionary agency action subject to section 7 of the ESA. CEQ has determined that updating its regulations implementing the procedural provisions of NEPA has "no effect" on listed species and critical habitat. Therefore, ESA section 7 consultation is not required.

Commenters stated that consultation with the Fish and Wildlife Service and the National Marine Fisheries Service is required because the rule may affect or may adversely affect species listed under the ESA. In support of this point, commenters referenced proposed changes to the definition of "effects" and "significantly," development of alternatives, and obligations for agencies to obtain information. Commenters noted that a programmatic consultation may be appropriate where an agency promulgates regulations that may affect endangered species. Other commenters believe that the rule is contrary to section 7(a)(1) of ESA, which imposes a specific obligation upon all federal agencies to carry out programs to conserve endangered and threatened species. Commenters stated that the proposed changes eliminate or otherwise weaken requirements pertaining to the assessment of impacts and, in doing so, CEQ fails to satisfy responsibilities under section 7(a)(1).

CEQ disagrees that the aforementioned regulatory changes "may affect" listed species or critical habitat. Initially, it is important to note that commenters are conflating ESA and NEPA. As courts have stated numerous times, these are two different statutes with different standards and definitions and, in fact, different underlying policies. As discussed in section II.B.1, the Supreme Court has stated that NEPA is a procedural statute. In contrast, the ESA is principally focused on imposing substantive duties on Federal agencies and the public. Regardless of how definitions or other procedures under NEPA are changed under this regulation or any other regulatory process, it will not change the requirements for Federal agencies under the ESA or its implementing regulations.

This rulemaking is procedural in nature, and therefore does not make any final determination regarding the level of NEPA analysis required for particular actions. CEQ's approach is consistent with the approach taken by other Federal agencies that similarly make determinations of no effect on listed species and critical habitat when establishing or updating agency NEPA procedures. CEQ also notes that neither the 1978 regulations nor the 1986 amendments indicate that CEQ consulted under ESA section 7(a)(2). Setting aside the procedural nature of this rule, CEQ reviewed it to determine if it "may affect" listed species or their designated critical habitat. CEQ has closely reviewed the impacts of all the changes made to the 1978 regulations, as summarized in the RIA Appendix and described in greater detail in the

respective responses to comments. None of the changes to the 1978 regulations are anticipated to have environmental impacts, including potential effects to listed species and critical habitat. For example, under § 1501.3 of the final rule, agencies should continue to consider listed species and designated habitat when making a determination of significance with respect to the level of NEPA review.

Contrary to several comments, the final rule does not ignore cumulative effects on listed species. Rather, the final rule includes a definition of effects that comports with Supreme Court case law to encompass all effects that are reasonably foreseeable and have a reasonably close causal relationship to the proposed action or alternatives. In general, the changes improve the timeliness and efficiency of the NEPA process while retaining requirements to analyze all activities and environmental impacts covered within the scope of the statute. To the extent the rule modifies the 1978 regulations, the changes do not diminish the quality and depth of environmental review relative to the baseline, which is defined as how NEPA is conducted under applicable Supreme Court case law.

Neither the ESA regulations nor the ESA Section 7 Consultation Handbook (1998) require the action agency to request concurrence from the Fish and Wildlife Service and National Marine Fisheries Service for determinations that an action will have no effect on listed species or their critical habitat. The final rule does not change the obligations of Federal agencies under the ESA; as noted above, importantly, all of the requirements under section 7 and associated implementing regulations and policies continue to apply regardless of whether NEPA analysis is triggered or the form of the NEPA documentation. For the aforementioned reasons, CEQ has determined that the final rule will have no effect on ESA listed species and designated critical habitat.

To the extent commenters imply that, under the authority of ESA section 7(a)(1), CEQ can regulate Federal action agencies with regard to the ESA, this is not accurate. For example, CEQ does not have the authority, under the guise of NEPA, to dictate to Federal action agencies that they may only choose an alternative that has the most conservation value for listed species or designated critical habitat.

All Federal agencies continue to be subject to the ESA and its requirements. Further, as described in detail in the RIA Appendix and in Final Rule Response to Comments on specific changes, none of the changes to the 1978 regulations are anticipated to have environmental impacts, including potential effects to listed species and critical habitat. In general, the changes improve the timeliness and efficiency of the NEPA process while retaining requirements to analyze all environmental impacts covered within the ambit of the statute. CEQ notes that the rulemaking is procedural in nature, and therefore does not make any final determination regarding the level of NEPA analysis required for particular actions.

*G. Executive Order 13132, Federalism*

E.O. 13132 requires agencies to develop an accountable process to ensure meaningful and timely input by State and local officials in the development of regulatory policies that have federalism implications.[139] Policies that have federalism implications include regulations that have substantial direct effects on the States, on the relationship between the national government and the States, or on the distribution of power and responsibilities among the various levels of government. This rule does not have federalism implications because it applies to Federal agencies, not States. However, CEQ notes that States may elect to assume NEPA responsibilities under Federal statutes. CEQ received comments in response to the NPRM from a number of States, including those that have assumed NEPA responsibilities, and considered these comments in development of the final rule.

*H. Executive Order 13175, Consultation and Coordination With Indian Tribal Governments*

E.O. 13175 requires agencies to have a process to ensure meaningful and timely input by Tribal officials in the development of policies that have Tribal implications.[140] Such policies include regulations that have substantial direct effects on one or more Indian Tribes, on the relationship between the Federal Government and Indian Tribes, or on the distribution of power and responsibilities between the Federal Government and Indian Tribes. While the rule is not a regulatory policy that has Tribal implications, the rule does, in part, respond to Tribal government comments concerning Tribal sovereign rights, interests, and the expertise of Tribes in the NEPA process and the CEQ regulations implementing NEPA.

Several commenters stated that it is inaccurate for CEQ to conclude that the rule "is not a regulatory policy that has Tribal implications," under E.O. 13175. Commenters noted that NEPA uniquely and substantially impacts Tribes, and Tribal lands are ordinarily held in Federal trust. Commenters also stated that through NEPA and its implementing regulations, Tribes often engage with the Federal agency on projects located within the Tribes' ancestral lands, including on projects that may affect cultural resources, sacred sites, and other resources. Commenters noted Tribal nations routinely participate in the NEPA process as participating, cooperating, or sometimes lead agencies. Further, the proposed regulations specifically contain provisions that explicitly reference Tribal nations.

Commenters stated that consultation is required by the Presidential Memorandum for the Heads of Executive Departments and Agencies on Tribal Consultation dated November 5, 2009,[141] which supplements E.O. 13175 and requested formal consultation and additional meetings in their region with CEQ on the proposed rule. Commenters stated that the Tribal meetings CEQ held were insufficient in number or capacity for meaningful consultation. Other commenters stated that consultation should start at the outset of the process, and some reference comments provided on the need for consultation during the ANPRM process. Some commenters stated that CEQ should withdraw the proposed rule, and others asked that CEQ postpone or extend the comment period for the rulemaking in order to engage in consultation with Tribal governments in order to make the regulatory framework more responsive to Tribal needs.

The final rule does not meet the criteria in E.O. 13175 that require government-to-government consultation. This rule does not impose substantial direct compliance costs on Tribal governments (section 5(b)) and does not preempt Tribal law (section 5(c)). However, CEQ solicited and received numerous Tribal governmental and organizational public comments during the rulemaking process. The comments received through the ANPRM informed the development of CEQ's proposed rule. For the proposed rule, CEQ provided for a 60-day public comment period, which is consistent with the length of the comment period provided by CEQ for the original 1978 proposed regulations, as well as the APA and E.O. 12866. CEQ notified all

---

[139] *Supra* note 75.

[140] *Supra* note 69.

[141] 74 FR 57881 (Nov. 9, 2009).

Tribal leaders of federally recognized Tribes by email or mail of the proposed rule and invited comments. CEQ conducted additional Tribal outreach to solicit comments from Tribal leaders and members through three listening sessions held in Denver, Colorado, Anchorage, Alaska, and Washington, DC. CEQ made information to aid the Tribes and the public's review available on its websites at *www.whitehouse.gov/ceq* and *www.nepa.gov,* including a redline version of the proposed changes, a presentation on the proposed rule, and other background information.

One commenter argued that CEQ made a "substantive" decision to forego Tribal consultation that it must support with substantial evidence in the administrative record under the APA. While compliance with E.O. 13175 is not subject to judicial review, the final rule explains how CEQ received meaningful and timely input from Tribal leaders and members.

In its ANPRM, CEQ included a specific question regarding the representation of Tribal governments in the NEPA process. *See* ANPRM Question 18 ("Are there ways in which the role of [T]ribal governments in the NEPA process should be clarified in CEQ's NEPA regulations, and if so, how?"). More generally, CEQ's ANPRM sought the views of Tribal governments and others on regulatory revisions that CEQ could propose to improve Tribal participation in Federal NEPA processes. *See* ANPRM Question 2 ("Should CEQ's NEPA regulations be revised to make the NEPA process more efficient by better facilitating agency use of environmental studies, analysis, and decisions conducted in earlier Federal, State, Tribal or local environmental reviews or authorization decisions, and if so, how?"). As discussed in section II.A, CEQ is amending its regulations in the final rule to further support coordination with Tribal governments and agencies and analysis of a proposed action's potential effects on Tribal lands, resources, or areas of historic significance as an important part of Federal agency decision making.

*I. Executive Order 12898, Federal Actions To Address Environmental Justice in Minority Populations and Low-Income Populations*

E.O. 12898 requires agencies to make achieving environmental justice part of their missions by identifying and addressing, as appropriate, disproportionately high and adverse human health or environmental effects of its programs, policies, and activities on minority populations and low-

income populations.[142] CEQ has analyzed this final rule and determined that it would not cause disproportionately high and adverse human health or environmental effects on minority populations and low-income populations. This rule would set forth implementing regulations for NEPA; it is in the agency implementation of NEPA when conducting reviews of proposed agency actions where agencies can consider, as needed, environmental justice issues.

Several commenters disagreed with CEQ's determination that the proposed rule would not cause disproportionately high and adverse human health or environmental effects on minority populations and low-income populations. Commenters stated NEPA's mandate to consider environmental effects, E.O. 12898, agency guidance, and case law establish that agencies cannot ignore the impacts of their actions on low-income and minority communities, and that CEQ is relinquishing its responsibility to oversee compliance with E.O. 12898 and NEPA. Further, commenters contended that CEQ's failure to analyze how the proposed rule and its implementation would affect E.O. 12898's mandates would render the regulations arbitrary and capricious, and exceed the agency's statutory authority.

Commenters stated that CEQ provided no explanation or analysis of how the development and implementation of this rule would affect implementation of E.O. 12898 and, consequently, environmental justice communities. Commenters noted the fundamental proposed changes to nearly every step of the NEPA review process will disproportionately impact environmental justice communities and will reduce or limit opportunities for such communities to understand the effects of proposed projects and to participate in the NEPA review process.

NEPA is a procedural statute that does not presuppose any particular substantive outcomes. In addition, CEQ has reviewed the changes in this final rule and has determined that they would not result in environmental impacts. *See* RIA Appendix. CEQ disagrees that the final rule will have disproportionately high and adverse human health or environmental effects on minority populations and low-income populations. Rather, the final rule modernizes and clarifies the procedures that NEPA contemplates. Among other things, this will give agencies greater flexibility to design and customize public involvement to best

address the specific circumstances of their proposed actions. The final rule expands the already wide range of tools agencies may use when providing notice to potentially affected communities and inviting public involvement. CEQ has made further changes to § 1506.6 in the final rule to clarify that agencies should consider the public's access to electronic media when selecting appropriate methods for providing public notice and involvement. The final rule also better informs the public by extending the scoping period so that it may occur prior to publication of the NOI, where appropriate, and increasing the specificity of the NOI.

Commenters also raised concerns that CEQ did not follow the E.O. 12898 directive to ensure that environmental justice communities can meaningfully participate in public processes and Federal agency decision making, including making public information and hearings "readily accessible." Commenters stated that CEQ failed to follow this directive in designing its rulemaking process, and in fact, excluded environmental justice communities from the process. Further, commenters stated that, over 20 years ago, CEQ acknowledged that traditional notice and comment procedures may be insufficient to engage environmental justice communities. These barriers may range from agency failure to provide translation of documents to the scheduling of meetings at times and in places that are not convenient to working families. Commenters stated that CEQ failed to mention environmental justice communities in its opening statement during the Washington, DC hearing.

Commenters also stated that CEQ failed to take note of the thousands of comments submitted in response to the ANPRM raising concerns about the health and environment of environmental justice communities that could come from limiting opportunities to gain access to information about projects and to comment. Commenters stated that if CEQ's rulemaking process was more inclusive and expansive it would enable some valuable clarifications in the regulations of how environmental justice impacts should be taken more definitively into account in NEPA reviews. Commenters also stated that the proposed rule changes show no particular interest in better clarifying this important aspect of environmental review, and show no evidence of interest in bettering environmental justice impact assessment.

In response to the ANPRM, CEQ received over 12,500 comments, including from those representing

---

[142] 59 FR 7629 (Feb. 16, 1994).

environmental justice organizations. The diverse range of public comments informed CEQ's development of the proposed rule to improve interagency coordination in the environmental review process, promote earlier public involvement, increase transparency, and enhance the participation of States, Tribes, and localities.

In issuing the NPRM, CEQ took a number of further actions to hear from the public and to encourage all interested stakeholders to submit comments. These actions included notifying and inviting comment from all federally recognized Tribes and over 400 interested groups, including States, localities, environmental organizations, trade associations, NEPA practitioners, and other interested members of the public, representing a broad range of diverse views. Additionally, CEQ made information to aid the public's review available on its websites at *www.whitehouse.gov/ceq* and *www.nepa.gov,* including a redline version of the proposed changes to the regulations, along with a presentation on the proposed rule and other background information.

CEQ engaged in extensive public outreach with the benefit of modern technologies and rulemaking procedures. CEQ held two public hearings each with morning, afternoon, and evening sessions, in Denver, Colorado on February 11, 2020, and in Washington, DC on February 25, 2020. Both hearings had diverse representation from stakeholders, including many speaking on behalf of environmental justice communities or about their concerns. CEQ also attended the National Environmental Justice Advisory Committee (NEJAC) meeting in Jacksonville, Florida to brief NEJAC members and the public on the proposed rule and to answer questions. CEQ also conducted additional public outreach to solicit comments and receive input, including Tribal engagement in Denver, Colorado, Anchorage, Alaska and Washington, DC.

### J. Executive Order 13211, Actions Concerning Regulations That Significantly Affect Energy Supply, Distribution, or Use

Agencies must prepare a Statement of Energy Effects for significant energy actions under E.O. 13211.[143] This final rule is not a "significant energy action" because it is not likely to have a significant adverse effect on the supply, distribution, or use of energy.

### K. Executive Order 12988, Civil Justice Reform

Under section 3(a) E.O. 12988,[144] agencies must review their proposed regulations to eliminate drafting errors and ambiguities, draft them to minimize litigation, and provide a clear legal standard for affected conduct. Section 3(b) provides a list of specific issues for review to conduct the reviews required by section 3(a). CEQ has conducted this review and determined that this final rule complies with the requirements of E.O. 12988.

### L. Unfunded Mandates Reform Act

Section 201 of the Unfunded Mandates Reform Act of 1995 (2 U.S.C. 1531) requires Federal agencies to assess the effects of their regulatory actions on State, Tribal, and local governments, and the private sector to the extent that such regulations incorporate requirements specifically set forth in law. Before promulgating a rule that may result in the expenditure by a State, Tribal, or local government, in the aggregate, or by the private sector of $100 million, adjusted annually for inflation, in any one year, an agency must prepare a written statement that assesses the effects on State, Tribal, and local governments and the private sector. 2 U.S.C. 1532. This final rule applies to Federal agencies and would not result in expenditures of $100 million or more for State, Tribal, and local governments, in the aggregate, or the private sector in any 1 year. This action also does not impose any enforceable duty, contain any unfunded mandate, or otherwise have any effect on small governments subject to the requirements of 2 U.S.C. 1531–38.

### M. Paperwork Reduction Act

This final rule does not impose any new information collection burden that would require additional review or approval by OMB under the Paperwork Reduction Act (PRA), 44 U.S.C. 3501 *et seq.*

### List of Subjects

#### 40 CFR Parts 1500, 1501, 1502, 1503, 1504, 1505, 1506, 1507, and 1508

Administrative practice and procedure, Environmental impact statements, Environmental protection, Natural resources.

#### 40 CFR Part 1515

Freedom of information.

#### 40 CFR Part 1516

Privacy.

#### 40 CFR Part 1517

Sunshine Act.

#### 40 CFR Part 1518

Accounting, Administrative practice and procedure, Environmental impact statements.

**Mary B. Neumayr,**
*Chairman.*

For the reasons stated in the preamble, and under the authority of 42 U.S.C. 4321–4347; 42 U.S.C. 4371–4375; 42 U.S.C. 7609; E.O. 11514, 35 FR 4247, 3 CFR, 1966–1970, Comp., p. 902, as amended by E.O. 11991, 42 FR 26967, 3 CFR, 1977 Comp., p. 123; and E.O. 13807, 82 FR 40463, 3 CFR, 2017, Comp., p. 369, the Council on Environmental Quality amends chapter V in title 40 of the Code of Federal Regulations as follows:

### PARTS 1500 THROUGH 1508 [DESIGNATED AS SUBCHAPTER A]

■ 1. Designate parts 1500 through 1508 as subchapter A and add a heading for newly designated subchapter A to read as follows:

### Subchapter A—National Environmental Policy Act Implementing Regulations

■ 2. Revise part 1500 to read as follows:

### PART 1500—PURPOSE AND POLICY

Sec.
1500.1   Purpose and policy.
1500.2   [Reserved].
1500.3   NEPA compliance.
1500.4   Reducing paperwork.
1500.5   Reducing delay.
1500.6   Agency authority.

**Authority:** 42 U.S.C. 4321–4347; 42 U.S.C. 4371–4375; 42 U.S.C. 7609; E.O. 11514, 35 FR 4247, 3 CFR, 1966–1970, Comp., p. 902, as amended by E.O. 11991, 42 FR 26967, 3 CFR, 1977 Comp., p. 123; and E.O. 13807, 82 FR 40463, 3 CFR, 2017, Comp., p. 369.

### § 1500.1   Purpose and policy.

(a) The National Environmental Policy Act (NEPA) is a procedural statute intended to ensure Federal agencies consider the environmental impacts of their actions in the decision-making process. Section 101 of NEPA establishes the national environmental policy of the Federal Government to use all practicable means and measures to foster and promote the general welfare, create and maintain conditions under which man and nature can exist in productive harmony, and fulfill the social, economic, and other requirements of present and future generations of Americans. Section 102(2) of NEPA establishes the procedural requirements to carry out the policy stated in section 101 of NEPA. In

---

[143] 66 FR 28355 (May 22, 2001).

[144] 61 FR 4729 (Feb. 7, 1996).

particular, it requires Federal agencies to provide a detailed statement on proposals for major Federal actions significantly affecting the quality of the human environment. The purpose and function of NEPA is satisfied if Federal agencies have considered relevant environmental information, and the public has been informed regarding the decision-making process. NEPA does not mandate particular results or substantive outcomes. NEPA's purpose is not to generate paperwork or litigation, but to provide for informed decision making and foster excellent action.

(b) The regulations in this subchapter implement section 102(2) of NEPA. They provide direction to Federal agencies to determine what actions are subject to NEPA's procedural requirements and the level of NEPA review where applicable. The regulations in this subchapter are intended to ensure that relevant environmental information is identified and considered early in the process in order to ensure informed decision making by Federal agencies. The regulations in this subchapter are also intended to ensure that Federal agencies conduct environmental reviews in a coordinated, consistent, predictable and timely manner, and to reduce unnecessary burdens and delays. Finally, the regulations in this subchapter promote concurrent environmental reviews to ensure timely and efficient decision making.

**§ 1500.2   [Reserved]**

**§ 1500.3   NEPA compliance.**

(a) *Mandate.* This subchapter is applicable to and binding on all Federal agencies for implementing the procedural provisions of the National Environmental Policy Act of 1969, as amended (Pub. L. 91–190, 42 U.S.C. 4321 *et seq.*) (NEPA or the Act), except where compliance would be inconsistent with other statutory requirements. The regulations in this subchapter are issued pursuant to NEPA; the Environmental Quality Improvement Act of 1970, as amended (Pub. L. 91–224, 42 U.S.C. 4371 *et seq.*); section 309 of the Clean Air Act, as amended (42 U.S.C. 7609); Executive Order 11514, Protection and Enhancement of Environmental Quality (March 5, 1970), as amended by Executive Order 11991, Relating to the Protection and Enhancement of Environmental Quality (May 24, 1977); and Executive Order 13807, Establishing Discipline and Accountability in the Environmental Review and Permitting Process for Infrastructure Projects

(August 15, 2017). The regulations in this subchapter apply to the whole of section 102(2) of NEPA. The provisions of the Act and the regulations in this subchapter must be read together as a whole to comply with the law.

(b) *Exhaustion.* (1) To ensure informed decision making and reduce delays, agencies shall include a request for comments on potential alternatives and impacts, and identification of any relevant information, studies, or analyses of any kind concerning impacts affecting the quality of the human environment in the notice of intent to prepare an environmental impact statement (§ 1501.9(d)(7) of this chapter).

(2) The draft and final environmental impact statements shall include a summary of all alternatives, information, and analyses submitted by State, Tribal, and local governments and other public commenters for consideration by the lead and cooperating agencies in developing the draft and final environmental impact statements (§ 1502.17 of this chapter).

(3) For consideration by the lead and cooperating agencies, State, Tribal, and local governments and other public commenters must submit comments within the comment periods provided, and comments shall be as specific as possible (§§ 1503.1 and 1503.3 of this chapter). Comments or objections of any kind not submitted, including those based on submitted alternatives, information, and analyses, shall be forfeited as unexhausted.

(4) Informed by the submitted alternatives, information, and analyses, including the summary in the final environmental impact statement (§ 1502.17 of this chapter) and the agency's response to comments in the final environmental impact statement (§ 1503.4 of this chapter), together with any other material in the record that he or she determines relevant, the decision maker shall certify in the record of decision that the agency considered all of the alternatives, information, and analyses, and objections submitted by States, Tribal, and local governments and other public commenters for consideration by the lead and cooperating agencies in developing the environmental impact statement (§ 1505.2(b) of this chapter).

(c) *Review of NEPA compliance.* It is the Council's intention that judicial review of agency compliance with the regulations in this subchapter not occur before an agency has issued the record of decision or taken other final agency action. It is the Council's intention that any allegation of noncompliance with NEPA and the regulations in this

subchapter should be resolved as expeditiously as possible. Consistent with their organic statutes, and as part of implementing the exhaustion provisions in paragraph (b) of this section, agencies may structure their procedures to include an appropriate bond or other security requirement.

(d) *Remedies.* Harm from the failure to comply with NEPA can be remedied by compliance with NEPA's procedural requirements as interpreted in the regulations in this subchapter. It is the Council's intention that the regulations in this subchapter create no presumption that violation of NEPA is a basis for injunctive relief or for a finding of irreparable harm. The regulations in this subchapter do not create a cause of action or right of action for violation of NEPA, which contains no such cause of action or right of action. It is the Council's intention that any actions to review, enjoin, stay, vacate, or otherwise alter an agency decision on the basis of an alleged NEPA violation be raised as soon as practicable after final agency action to avoid or minimize any costs to agencies, applicants, or any affected third parties. It is also the Council's intention that minor, non-substantive errors that have no effect on agency decision making shall be considered harmless and shall not invalidate an agency action.

(e) *Severability.* The sections of this subchapter are separate and severable from one another. If any section or portion therein is stayed or determined to be invalid, or the applicability of any section to any person or entity is held invalid, it is the Council's intention that the validity of the remainder of those parts shall not be affected, with the remaining sections to continue in effect.

**§ 1500.4   Reducing paperwork.**

Agencies shall reduce excessive paperwork by:

(a) Using categorical exclusions to define categories of actions that normally do not have a significant effect on the human environment and therefore do not require preparation of an environmental impact statement (§ 1501.4 of this chapter).

(b) Using a finding of no significant impact when an action not otherwise excluded will not have a significant effect on the human environment and therefore does not require preparation of an environmental impact statement (§ 1501.6 of this chapter).

(c) Reducing the length of environmental documents by means such as meeting appropriate page limits (§§ 1501.5(f) and 1502.7 of this chapter).

(d) Preparing analytic and concise environmental impact statements (§ 1502.2 of this chapter).

(e) Discussing only briefly issues other than significant ones (§ 1502.2(b) of this chapter).

(f) Writing environmental impact statements in plain language (§ 1502.8 of this chapter).

(g) Following a clear format for environmental impact statements (§ 1502.10 of this chapter).

(h) Emphasizing the portions of the environmental impact statement that are useful to decision makers and the public (*e.g.*, §§ 1502.14 and 1502.15 of this chapter) and reducing emphasis on background material (§ 1502.1 of this chapter).

(i) Using the scoping process, not only to identify significant environmental issues deserving of study, but also to deemphasize insignificant issues, narrowing the scope of the environmental impact statement process accordingly (§ 1501.9 of this chapter).

(j) Summarizing the environmental impact statement (§ 1502.12 of this chapter).

(k) Using programmatic, policy, or plan environmental impact statements and tiering from statements of broad scope to those of narrower scope, to eliminate repetitive discussions of the same issues (§§ 1501.11 and 1502.4 of this chapter).

(l) Incorporating by reference (§ 1501.12 of this chapter).

(m) Integrating NEPA requirements with other environmental review and consultation requirements (§ 1502.24 of this chapter).

(n) Requiring comments to be as specific as possible (§ 1503.3 of this chapter).

(o) Attaching and publishing only changes to the draft environmental impact statement, rather than rewriting and publishing the entire statement when changes are minor (§ 1503.4(c) of this chapter).

(p) Eliminating duplication with State, Tribal, and local procedures, by providing for joint preparation of environmental documents where practicable (§ 1506.2 of this chapter), and with other Federal procedures, by providing that an agency may adopt appropriate environmental documents prepared by another agency (§ 1506.3 of this chapter).

(q) Combining environmental documents with other documents (§ 1506.4 of this chapter).

**§ 1500.5    Reducing delay.**

Agencies shall reduce delay by:

(a) Using categorical exclusions to define categories of actions that normally do not have a significant effect on the human environment (§ 1501.4 of this chapter) and therefore do not require preparation of an environmental impact statement.

(b) Using a finding of no significant impact when an action not otherwise excluded will not have a significant effect on the human environment (§ 1501.6 of this chapter) and therefore does not require preparation of an environmental impact statement.

(c) Integrating the NEPA process into early planning (§ 1501.2 of this chapter).

(d) Engaging in interagency cooperation before or as the environmental assessment or environmental impact statement is prepared, rather than awaiting submission of comments on a completed document (§§ 1501.7 and 1501.8 of this chapter).

(e) Ensuring the swift and fair resolution of lead agency disputes (§ 1501.7 of this chapter).

(f) Using the scoping process for an early identification of what are and what are not the real issues (§ 1501.9 of this chapter).

(g) Meeting appropriate time limits for the environmental assessment and environmental impact statement processes (§ 1501.10 of this chapter).

(h) Preparing environmental impact statements early in the process (§ 1502.5 of this chapter).

(i) Integrating NEPA requirements with other environmental review and consultation requirements (§ 1502.24 of this chapter).

(j) Eliminating duplication with State, Tribal, and local procedures by providing for joint preparation of environmental documents where practicable (§ 1506.2 of this chapter) and with other Federal procedures by providing that agencies may jointly prepare or adopt appropriate environmental documents prepared by another agency (§ 1506.3 of this chapter).

(k) Combining environmental documents with other documents (§ 1506.4 of this chapter).

(l) Using accelerated procedures for proposals for legislation (§ 1506.8 of this chapter).

**§ 1500.6    Agency authority.**

Each agency shall interpret the provisions of the Act as a supplement to its existing authority and as a mandate to view policies and missions in the light of the Act's national environmental objectives, to the extent consistent with its existing authority. Agencies shall review their policies, procedures, and regulations accordingly and revise them as necessary to ensure full compliance with the purposes and provisions of the Act as interpreted by the regulations in this subchapter. The phrase "to the fullest extent possible" in section 102 of NEPA means that each agency of the Federal Government shall comply with that section, consistent with § 1501.1 of this chapter. Nothing contained in the regulations in this subchapter is intended or should be construed to limit an agency's other authorities or legal responsibilities.

■ 3. Revise part 1501 to read as follows:

**PART 1501—NEPA AND AGENCY PLANNING**

Sec.
1501.1    NEPA thresholds.
1501.2    Apply NEPA early in the process.
1501.3    Determine the appropriate level of NEPA review.
1501.4    Categorical exclusions.
1501.5    Environmental assessments.
1501.6    Findings of no significant impact.
1501.7    Lead agencies.
1501.8    Cooperating agencies.
1501.9    Scoping.
1501.10    Time limits.
1501.11    Tiering.
1501.12    Incorporation by reference.

**Authority:** 42 U.S.C. 4321–4347; 42 U.S.C. 4371–4375; 42 U.S.C. 7609; E.O. 11514, 35 FR 4247, 35 FR 4247, 3 CFR, 1966–1970, Comp., p. 902, as amended by E.O. 11991, 42 FR 26967, 3 CFR, 1977 Comp., p. 123; and E.O. 13807, 82 FR 40463, 3 CFR, 2017, Comp., p. 369.

**§ 1501.1    NEPA thresholds.**

(a) In assessing whether NEPA applies or is otherwise fulfilled, Federal agencies should determine:

(1) Whether the proposed activity or decision is expressly exempt from NEPA under another statute;

(2) Whether compliance with NEPA would clearly and fundamentally conflict with the requirements of another statute;

(3) Whether compliance with NEPA would be inconsistent with Congressional intent expressed in another statute;

(4) Whether the proposed activity or decision is a major Federal action;

(5) Whether the proposed activity or decision, in whole or in part, is a non-discretionary action for which the agency lacks authority to consider environmental effects as part of its decision-making process; and

(6) Whether the proposed action is an action for which another statute's requirements serve the function of agency compliance with the Act.

(b) Federal agencies may make determinations under this section in their agency NEPA procedures (§ 1507.3(d) of this chapter) or on an individual basis, as appropriate.

(1) Federal agencies may seek the Council's assistance in making an individual determination under this section.

(2) An agency shall consult with other Federal agencies concerning their concurrence in statutory determinations made under this section where more than one Federal agency administers the statute.

### § 1501.2 Apply NEPA early in the process.

(a) Agencies should integrate the NEPA process with other planning and authorization processes at the earliest reasonable time to ensure that agencies consider environmental impacts in their planning and decisions, to avoid delays later in the process, and to head off potential conflicts.

(b) Each agency shall:

(1) Comply with the mandate of section 102(2)(A) of NEPA to utilize a systematic, interdisciplinary approach which will ensure the integrated use of the natural and social sciences and the environmental design arts in planning and in decision making which may have an impact on man's environment, as specified by § 1507.2(a) of this chapter.

(2) Identify environmental effects and values in adequate detail so the decision maker can appropriately consider such effects and values alongside economic and technical analyses. Whenever practicable, agencies shall review and publish environmental documents and appropriate analyses at the same time as other planning documents.

(3) Study, develop, and describe appropriate alternatives to recommended courses of action in any proposal that involves unresolved conflicts concerning alternative uses of available resources as provided by section 102(2)(E) of NEPA.

(4) Provide for actions subject to NEPA that are planned by private applicants or other non-Federal entities before Federal involvement so that:

(i) Policies or designated staff are available to advise potential applicants of studies or other information foreseeably required for later Federal action.

(ii) The Federal agency consults early with appropriate State, Tribal, and local governments and with interested private persons and organizations when their involvement is reasonably foreseeable.

(iii) The Federal agency commences its NEPA process at the earliest reasonable time (§§ 1501.5(d) and 1502.5(b) of this chapter).

### § 1501.3 Determine the appropriate level of NEPA review.

(a) In assessing the appropriate level of NEPA review, Federal agencies

should determine whether the proposed action:

(1) Normally does not have significant effects and is categorically excluded (§ 1501.4);

(2) Is not likely to have significant effects or the significance of the effects is unknown and is therefore appropriate for an environmental assessment (§ 1501.5); or

(3) Is likely to have significant effects and is therefore appropriate for an environmental impact statement (part 1502 of this chapter).

(b) In considering whether the effects of the proposed action are significant, agencies shall analyze the potentially affected environment and degree of the effects of the action. Agencies should consider connected actions consistent with § 1501.9(e)(1).

(1) In considering the potentially affected environment, agencies should consider, as appropriate to the specific action, the affected area (national, regional, or local) and its resources, such as listed species and designated critical habitat under the Endangered Species Act. Significance varies with the setting of the proposed action. For instance, in the case of a site-specific action, significance would usually depend only upon the effects in the local area.

(2) In considering the degree of the effects, agencies should consider the following, as appropriate to the specific action:

(i) Both short- and long-term effects.

(ii) Both beneficial and adverse effects.

(iii) Effects on public health and safety.

(iv) Effects that would violate Federal, State, Tribal, or local law protecting the environment.

### § 1501.4 Categorical exclusions.

(a) For efficiency, agencies shall identify in their agency NEPA procedures (§ 1507.3(e)(2)(ii) of this chapter) categories of actions that normally do not have a significant effect on the human environment, and therefore do not require preparation of an environmental assessment or environmental impact statement.

(b) If an agency determines that a categorical exclusion identified in its agency NEPA procedures covers a proposed action, the agency shall evaluate the action for extraordinary circumstances in which a normally excluded action may have a significant effect.

(1) If an extraordinary circumstance is present, the agency nevertheless may categorically exclude the proposed action if the agency determines that

there are circumstances that lessen the impacts or other conditions sufficient to avoid significant effects.

(2) If an agency cannot categorically exclude the proposed action, the agency shall prepare an environmental assessment or environmental impact statement, as appropriate.

### § 1501.5 Environmental assessments.

(a) An agency shall prepare an environmental assessment for a proposed action that is not likely to have significant effects or when the significance of the effects is unknown unless the agency finds that a categorical exclusion (§ 1501.4) is applicable or has decided to prepare an environmental impact statement.

(b) An agency may prepare an environmental assessment on any action in order to assist agency planning and decision making.

(c) An environmental assessment shall:

(1) Briefly provide sufficient evidence and analysis for determining whether to prepare an environmental impact statement or a finding of no significant impact; and

(2) Briefly discuss the purpose and need for the proposed action, alternatives as required by section 102(2)(E) of NEPA, and the environmental impacts of the proposed action and alternatives, and include a listing of agencies and persons consulted.

(d) For applications to the agency requiring an environmental assessment, the agency shall commence the environmental assessment as soon as practicable after receiving the application.

(e) Agencies shall involve the public, State, Tribal, and local governments, relevant agencies, and any applicants, to the extent practicable in preparing environmental assessments.

(f) The text of an environmental assessment shall be no more than 75 pages, not including appendices, unless a senior agency official approves in writing an assessment to exceed 75 pages and establishes a new page limit.

(g) Agencies may apply the following provisions to environmental assessments:

(1) Section 1502.21 of this chapter—Incomplete or unavailable information;

(2) Section 1502.23 of this chapter—Methodology and scientific accuracy; and

(3) Section 1502.24 of this chapter—Environmental review and consultation requirements.

### § 1501.6 Findings of no significant impact.

(a) An agency shall prepare a finding of no significant impact if the agency

AR_0029098

determines, based on the environmental assessment, not to prepare an environmental impact statement because the proposed action will not have significant effects.

(1) The agency shall make the finding of no significant impact available to the affected public as specified in § 1506.6(b) of this chapter.

(2) In the following circumstances, the agency shall make the finding of no significant impact available for public review for 30 days before the agency makes its final determination whether to prepare an environmental impact statement and before the action may begin:

(i) The proposed action is or is closely similar to one that normally requires the preparation of an environmental impact statement under the procedures adopted by the agency pursuant to § 1507.3 of this chapter; or

(ii) The nature of the proposed action is one without precedent.

(b) The finding of no significant impact shall include the environmental assessment or incorporate it by reference and shall note any other environmental documents related to it (§ 1501.9(f)(3)). If the assessment is included, the finding need not repeat any of the discussion in the assessment but may incorporate it by reference.

(c) The finding of no significant impact shall state the authority for any mitigation that the agency has adopted and any applicable monitoring or enforcement provisions. If the agency finds no significant impacts based on mitigation, the mitigated finding of no significant impact shall state any enforceable mitigation requirements or commitments that will be undertaken to avoid significant impacts.

### § 1501.7    Lead agencies.

(a) A lead agency shall supervise the preparation of an environmental impact statement or a complex environmental assessment if more than one Federal agency either:

(1) Proposes or is involved in the same action; or

(2) Is involved in a group of actions directly related to each other because of their functional interdependence or geographical proximity.

(b) Federal, State, Tribal, or local agencies, including at least one Federal agency, may act as joint lead agencies to prepare an environmental impact statement or environmental assessment (§ 1506.2 of this chapter).

(c) If an action falls within the provisions of paragraph (a) of this section, the potential lead agencies shall determine, by letter or memorandum, which agency will be the lead agency

and which will be cooperating agencies. The agencies shall resolve the lead agency question so as not to cause delay. If there is disagreement among the agencies, the following factors (which are listed in order of descending importance) shall determine lead agency designation:

(1) Magnitude of agency's involvement.

(2) Project approval or disapproval authority.

(3) Expertise concerning the action's environmental effects.

(4) Duration of agency's involvement.

(5) Sequence of agency's involvement.

(d) Any Federal agency, or any State, Tribal, or local agency or private person substantially affected by the absence of lead agency designation, may make a written request to the senior agency officials of the potential lead agencies that a lead agency be designated.

(e) If Federal agencies are unable to agree on which agency will be the lead agency or if the procedure described in paragraph (c) of this section has not resulted in a lead agency designation within 45 days, any of the agencies or persons concerned may file a request with the Council asking it to determine which Federal agency shall be the lead agency. A copy of the request shall be transmitted to each potential lead agency. The request shall consist of:

(1) A precise description of the nature and extent of the proposed action; and

(2) A detailed statement of why each potential lead agency should or should not be the lead agency under the criteria specified in paragraph (c) of this section.

(f) Any potential lead agency may file a response within 20 days after a request is filed with the Council. As soon as possible, but not later than 20 days after receiving the request and all responses to it, the Council shall determine which Federal agency shall be the lead agency and which other Federal agencies will be cooperating agencies.

(g) To the extent practicable, if a proposal will require action by more than one Federal agency and the lead agency determines that it requires preparation of an environmental impact statement, the lead and cooperating agencies shall evaluate the proposal in a single environmental impact statement and issue a joint record of decision. To the extent practicable, if a proposal will require action by more than one Federal agency and the lead agency determines that it requires preparation of an environmental assessment, the lead and cooperating agencies should evaluate the proposal in a single environmental assessment and, where appropriate,

issue a joint finding of no significant impact.

(h) With respect to cooperating agencies, the lead agency shall:

(1) Request the participation of each cooperating agency in the NEPA process at the earliest practicable time.

(2) Use the environmental analysis and proposals of cooperating agencies with jurisdiction by law or special expertise, to the maximum extent practicable.

(3) Meet with a cooperating agency at the latter's request.

(4) Determine the purpose and need, and alternatives in consultation with any cooperating agency.

(i) The lead agency shall develop a schedule, setting milestones for all environmental reviews and authorizations required for implementation of the action, in consultation with any applicant and all joint lead, cooperating, and participating agencies, as soon as practicable.

(j) If the lead agency anticipates that a milestone will be missed, it shall notify appropriate officials at the responsible agencies. As soon as practicable, the responsible agencies shall elevate the issue to the appropriate officials of the responsible agencies for timely resolution.

### § 1501.8    Cooperating agencies.

(a) The purpose of this section is to emphasize agency cooperation early in the NEPA process. Upon request of the lead agency, any Federal agency with jurisdiction by law shall be a cooperating agency. In addition, upon request of the lead agency, any other Federal agency with special expertise with respect to any environmental issue may be a cooperating agency. A State, Tribal, or local agency of similar qualifications may become a cooperating agency by agreement with the lead agency. An agency may request that the lead agency designate it a cooperating agency, and a Federal agency may appeal a denial of its request to the Council, in accordance with § 1501.7(e).

(b) Each cooperating agency shall:

(1) Participate in the NEPA process at the earliest practicable time.

(2) Participate in the scoping process (described in § 1501.9).

(3) On request of the lead agency, assume responsibility for developing information and preparing environmental analyses, including portions of the environmental impact statement or environmental assessment concerning which the cooperating agency has special expertise.

(4) On request of the lead agency, make available staff support to enhance

the lead agency's interdisciplinary capability.

(5) Normally use its own funds. To the extent available funds permit, the lead agency shall fund those major activities or analyses it requests from cooperating agencies. Potential lead agencies shall include such funding requirements in their budget requests.

(6) Consult with the lead agency in developing the schedule (§ 1501.7(i)), meet the schedule, and elevate, as soon as practicable, to the senior agency official of the lead agency any issues relating to purpose and need, alternatives, or other issues that may affect any agencies' ability to meet the schedule.

(7) Meet the lead agency's schedule for providing comments and limit its comments to those matters for which it has jurisdiction by law or special expertise with respect to any environmental issue consistent with § 1503.2 of this chapter.

(8) To the maximum extent practicable, jointly issue environmental documents with the lead agency.

(c) In response to a lead agency's request for assistance in preparing the environmental documents (described in paragraph (b)(3), (4), or (5) of this section), a cooperating agency may reply that other program commitments preclude any involvement or the degree of involvement requested in the action that is the subject of the environmental impact statement or environmental assessment. The cooperating agency shall submit a copy of this reply to the Council and the senior agency official of the lead agency.

### § 1501.9  Scoping.

(a) *Generally.* Agencies shall use an early and open process to determine the scope of issues for analysis in an environmental impact statement, including identifying the significant issues and eliminating from further study non-significant issues. Scoping may begin as soon as practicable after the proposal for action is sufficiently developed for agency consideration. Scoping may include appropriate pre-application procedures or work conducted prior to publication of the notice of intent.

(b) *Invite cooperating and participating agencies.* As part of the scoping process, the lead agency shall invite the participation of likely affected Federal, State, Tribal, and local agencies and governments, the proponent of the action, and other likely affected or interested persons (including those who might not be in accord with the action), unless there is a limited exception under § 1507.3(f)(1) of this chapter.

(c) *Scoping outreach.* As part of the scoping process the lead agency may hold a scoping meeting or meetings, publish scoping information, or use other means to communicate with those persons or agencies who may be interested or affected, which the agency may integrate with any other early planning meeting. Such a scoping meeting will often be appropriate when the impacts of a particular action are confined to specific sites.

(d) *Notice of intent.* As soon as practicable after determining that a proposal is sufficiently developed to allow for meaningful public comment and requires an environmental impact statement, the lead agency shall publish a notice of intent to prepare an environmental impact statement in the **Federal Register**, except as provided in § 1507.3(f)(3) of this chapter. An agency also may publish notice in accordance with § 1506.6 of this chapter. The notice shall include, as appropriate:

(1) The purpose and need for the proposed action;

(2) A preliminary description of the proposed action and alternatives the environmental impact statement will consider;

(3) A brief summary of expected impacts;

(4) Anticipated permits and other authorizations;

(5) A schedule for the decision-making process;

(6) A description of the public scoping process, including any scoping meeting(s);

(7) A request for identification of potential alternatives, information, and analyses relevant to the proposed action (*see* § 1502.17 of this chapter); and

(8) Contact information for a person within the agency who can answer questions about the proposed action and the environmental impact statement.

(e) *Determination of scope.* As part of the scoping process, the lead agency shall determine the scope and the significant issues to be analyzed in depth in the environmental impact statement. To determine the scope of environmental impact statements, agencies shall consider:

(1) Actions (other than unconnected single actions) that may be connected actions, which means that they are closely related and therefore should be discussed in the same impact statement. Actions are connected if they:

(i) Automatically trigger other actions that may require environmental impact statements;

(ii) Cannot or will not proceed unless other actions are taken previously or simultaneously; or

(iii) Are interdependent parts of a larger action and depend on the larger action for their justification.

(2) Alternatives, which include the no action alternative; other reasonable courses of action; and mitigation measures (not in the proposed action).

(3) Impacts.

(f) *Additional scoping responsibilities.* As part of the scoping process, the lead agency shall:

(1) Identify and eliminate from detailed study those issues that are not significant or have been covered by prior environmental review(s) (§ 1506.3 of this chapter), narrowing the discussion of these issues in the statement to a brief presentation of why they will not have a significant effect on the human environment or providing a reference to their coverage elsewhere.

(2) Allocate assignments for preparation of the environmental impact statement among the lead and cooperating agencies, with the lead agency retaining responsibility for the statement.

(3) Indicate any public environmental assessments and other environmental impact statements that are being or will be prepared and are related to but are not part of the scope of the impact statement under consideration.

(4) Identify other environmental review, authorization, and consultation requirements so the lead and cooperating agencies may prepare other required analyses and studies concurrently and integrated with the environmental impact statement, as provided in § 1502.24 of this chapter.

(5) Indicate the relationship between the timing of the preparation of environmental analyses and the agencies' tentative planning and decision-making schedule.

(g) *Revisions.* An agency shall revise the determinations made under paragraphs (b), (c), (e), and (f) of this section if substantial changes are made later in the proposed action, or if significant new circumstances or information arise which bear on the proposal or its impacts.

### § 1501.10  Time limits.

(a) To ensure that agencies conduct NEPA reviews as efficiently and expeditiously as practicable, Federal agencies should set time limits appropriate to individual actions or types of actions (consistent with the time intervals required by § 1506.11 of this chapter).

(b) To ensure timely decision making, agencies shall complete:

(1) Environmental assessments within 1 year unless a senior agency official of the lead agency approves a longer

AR_0029100

period in writing and establishes a new time limit. One year is measured from the date of agency decision to prepare an environmental assessment to the publication of an environmental assessment or a finding of no significant impact.

(2) Environmental impact statements within 2 years unless a senior agency official of the lead agency approves a longer period in writing and establishes a new time limit. Two years is measured from the date of the issuance of the notice of intent to the date a record of decision is signed.

(c) The senior agency official may consider the following factors in determining time limits:

(1) Potential for environmental harm.

(2) Size of the proposed action.

(3) State of the art of analytic techniques.

(4) Degree of public need for the proposed action, including the consequences of delay.

(5) Number of persons and agencies affected.

(6) Availability of relevant information.

(7) Other time limits imposed on the agency by law, regulations, or Executive order.

(d) The senior agency official may set overall time limits or limits for each constituent part of the NEPA process, which may include:

(1) Decision on whether to prepare an environmental impact statement (if not already decided).

(2) Determination of the scope of the environmental impact statement.

(3) Preparation of the draft environmental impact statement.

(4) Review of any comments on the draft environmental impact statement from the public and agencies.

(5) Preparation of the final environmental impact statement.

(6) Review of any comments on the final environmental impact statement.

(7) Decision on the action based in part on the environmental impact statement.

(e) The agency may designate a person (such as the project manager or a person in the agency's office with NEPA responsibilities) to expedite the NEPA process.

(f) State, Tribal, or local agencies or members of the public may request a Federal agency to set time limits.

### § 1501.11  Tiering.

(a) Agencies should tier their environmental impact statements and environmental assessments when it would eliminate repetitive discussions of the same issues, focus on the actual issues ripe for decision, and exclude from consideration issues already decided or not yet ripe at each level of environmental review. Tiering may also be appropriate for different stages of actions.

(b) When an agency has prepared an environmental impact statement or environmental assessment for a program or policy and then prepares a subsequent statement or assessment on an action included within the entire program or policy (such as a project- or site-specific action), the tiered document needs only to summarize and incorporate by reference the issues discussed in the broader document. The tiered document shall concentrate on the issues specific to the subsequent action. The tiered document shall state where the earlier document is available.

(c) Tiering is appropriate when the sequence from an environmental impact statement or environmental assessment is:

(1) From a programmatic, plan, or policy environmental impact statement or environmental assessment to a program, plan, or policy statement or assessment of lesser or narrower scope or to a site-specific statement or assessment.

(2) From an environmental impact statement or environmental assessment on a specific action at an early stage (such as need and site selection) to a supplement (which is preferred) or a subsequent statement or assessment at a later stage (such as environmental mitigation). Tiering in such cases is appropriate when it helps the lead agency to focus on the issues that are ripe for decision and exclude from consideration issues already decided or not yet ripe.

### § 1501.12  Incorporation by reference.

Agencies shall incorporate material, such as planning studies, analyses, or other relevant information, into environmental documents by reference when the effect will be to cut down on bulk without impeding agency and public review of the action. Agencies shall cite the incorporated material in the document and briefly describe its content. Agencies may not incorporate material by reference unless it is reasonably available for inspection by potentially interested persons within the time allowed for comment. Agencies shall not incorporate by reference material based on proprietary data that is not available for review and comment.

■ 4. Revise part 1502 to read as follows:

## PART 1502—ENVIRONMENTAL IMPACT STATEMENT

Sec.
1502.1   Purpose of environmental impact statement.
1502.2   Implementation.
1502.3   Statutory requirements for statements.
1502.4   Major Federal actions requiring the preparation of environmental impact statements.
1502.5   Timing.
1502.6   Interdisciplinary preparation.
1502.7   Page limits.
1502.8   Writing.
1502.9   Draft, final, and supplemental statements.
1502.10   Recommended format.
1502.11   Cover.
1502.12   Summary.
1502.13   Purpose and need.
1502.14   Alternatives including the proposed action.
1502.15   Affected environment.
1502.16   Environmental consequences.
1502.17   Summary of submitted alternatives, information, and analyses.
1502.18   List of preparers.
1502.19   Appendix.
1502.20   Publication of the environmental impact statement.
1502.21   Incomplete or unavailable information.
1502.22   Cost-benefit analysis.
1502.23   Methodology and scientific accuracy.
1502.24   Environmental review and consultation requirements.

**Authority:** 42 U.S.C. 4321–4347; 42 U.S.C. 4371–4375; 42 U.S.C. 7609; E.O. 11514, 35 FR 4247, 3 CFR, 1966–1970, Comp., p. 902, as amended by E.O. 11991, 42 FR 26967, 3 CFR, 1977 Comp., p. 123; and E.O. 13807, 82 FR 40463, 3 CFR, 2017, Comp., p. 369.

### § 1502.1  Purpose of environmental impact statement.

The primary purpose of an environmental impact statement prepared pursuant to section 102(2)(C) of NEPA is to ensure agencies consider the environmental impacts of their actions in decision making. It shall provide full and fair discussion of significant environmental impacts and shall inform decision makers and the public of reasonable alternatives that would avoid or minimize adverse impacts or enhance the quality of the human environment. Agencies shall focus on significant environmental issues and alternatives and shall reduce paperwork and the accumulation of extraneous background data. Statements shall be concise, clear, and to the point, and shall be supported by evidence that the agency has made the necessary environmental analyses. An environmental impact statement is a document that informs Federal agency decision making and the public.

## § 1502.2 Implementation.

(a) Environmental impact statements shall not be encyclopedic.

(b) Environmental impact statements shall discuss impacts in proportion to their significance. There shall be only brief discussion of other than significant issues. As in a finding of no significant impact, there should be only enough discussion to show why more study is not warranted.

(c) Environmental impact statements shall be analytic, concise, and no longer than necessary to comply with NEPA and with the regulations in this subchapter. Length should be proportional to potential environmental effects and project size.

(d) Environmental impact statements shall state how alternatives considered in it and decisions based on it will or will not achieve the requirements of sections 101 and 102(1) of NEPA as interpreted in the regulations in this subchapter and other environmental laws and policies.

(e) The range of alternatives discussed in environmental impact statements shall encompass those to be considered by the decision maker.

(f) Agencies shall not commit resources prejudicing selection of alternatives before making a final decision (*see also* § 1506.1 of this chapter).

(g) Environmental impact statements shall serve as the means of assessing the environmental impact of proposed agency actions, rather than justifying decisions already made.

## § 1502.3 Statutory requirements for statements.

As required by section 102(2)(C) of NEPA, environmental impact statements are to be included in every Federal agency recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment.

## § 1502.4 Major Federal actions requiring the preparation of environmental impact statements.

(a) Agencies shall define the proposal that is the subject of an environmental impact statement based on the statutory authorities for the proposed action. Agencies shall use the criteria for scope (§ 1501.9(e) of this chapter) to determine which proposal(s) shall be the subject of a particular statement. Agencies shall evaluate in a single environmental impact statement proposals or parts of proposals that are related to each other closely enough to be, in effect, a single course of action.

(b) Environmental impact statements may be prepared for programmatic

Federal actions, such as the adoption of new agency programs. When agencies prepare such statements, they should be relevant to the program decision and timed to coincide with meaningful points in agency planning and decision making.

(1) When preparing statements on programmatic actions (including proposals by more than one agency), agencies may find it useful to evaluate the proposal(s) in one of the following ways:

(i) Geographically, including actions occurring in the same general location, such as body of water, region, or metropolitan area.

(ii) Generically, including actions that have relevant similarities, such as common timing, impacts, alternatives, methods of implementation, media, or subject matter.

(iii) By stage of technological development including Federal or federally assisted research, development or demonstration programs for new technologies that, if applied, could significantly affect the quality of the human environment. Statements on such programs should be available before the program has reached a stage of investment or commitment to implementation likely to determine subsequent development or restrict later alternatives.

(2) Agencies shall as appropriate employ scoping (§ 1501.9 of this chapter), tiering (§ 1501.11 of this chapter), and other methods listed in §§ 1500.4 and 1500.5 of this chapter to relate programmatic and narrow actions and to avoid duplication and delay. Agencies may tier their environmental analyses to defer detailed analysis of environmental impacts of specific program elements until such program elements are ripe for final agency action.

## § 1502.5 Timing.

An agency should commence preparation of an environmental impact statement as close as practicable to the time the agency is developing or receives a proposal so that preparation can be completed in time for the final statement to be included in any recommendation or report on the proposal. The statement shall be prepared early enough so that it can serve as an important practical contribution to the decision-making process and will not be used to rationalize or justify decisions already made (§§ 1501.2 of this chapter and 1502.2). For instance:

(a) For projects directly undertaken by Federal agencies, the agency shall prepare the environmental impact statement at the feasibility analysis (go/

no-go) stage and may supplement it at a later stage, if necessary.

(b) For applications to the agency requiring an environmental impact statement, the agency shall commence the statement as soon as practicable after receiving the application. Federal agencies should work with potential applicants and applicable State, Tribal, and local agencies and governments prior to receipt of the application.

(c) For adjudication, the final environmental impact statement shall normally precede the final staff recommendation and that portion of the public hearing related to the impact study. In appropriate circumstances, the statement may follow preliminary hearings designed to gather information for use in the statements.

(d) For informal rulemaking, the draft environmental impact statement shall normally accompany the proposed rule.

## § 1502.6 Interdisciplinary preparation.

Agencies shall prepare environmental impact statements using an interdisciplinary approach that will ensure the integrated use of the natural and social sciences and the environmental design arts (section 102(2)(A) of NEPA). The disciplines of the preparers shall be appropriate to the scope and issues identified in the scoping process (§ 1501.9 of this chapter).

## § 1502.7 Page limits.

The text of final environmental impact statements (paragraphs (a)(4) through (6) of § 1502.10) shall be 150 pages or fewer and, for proposals of unusual scope or complexity, shall be 300 pages or fewer unless a senior agency official of the lead agency approves in writing a statement to exceed 300 pages and establishes a new page limit.

## § 1502.8 Writing.

Agencies shall write environmental impact statements in plain language and may use appropriate graphics so that decision makers and the public can readily understand such statements. Agencies should employ writers of clear prose or editors to write, review, or edit statements, which shall be based upon the analysis and supporting data from the natural and social sciences and the environmental design arts.

## § 1502.9 Draft, final, and supplemental statements.

(a) *Generally.* Except for proposals for legislation as provided in § 1506.8 of this chapter, agencies shall prepare environmental impact statements in two stages and, where necessary,

supplement them, as provided in paragraph (d)(1) of this section.

(b) *Draft environmental impact statements.* Agencies shall prepare draft environmental impact statements in accordance with the scope decided upon in the scoping process (§ 1501.9 of this chapter). The lead agency shall work with the cooperating agencies and shall obtain comments as required in part 1503 of this chapter. To the fullest extent practicable, the draft statement must meet the requirements established for final statements in section 102(2)(C) of NEPA as interpreted in the regulations in this subchapter. If a draft statement is so inadequate as to preclude meaningful analysis, the agency shall prepare and publish a supplemental draft of the appropriate portion. At appropriate points in the draft statement, the agency shall discuss all major points of view on the environmental impacts of the alternatives including the proposed action.

(c) *Final environmental impact statements.* Final environmental impact statements shall address comments as required in part 1503 of this chapter. At appropriate points in the final statement, the agency shall discuss any responsible opposing view that was not adequately discussed in the draft statement and shall indicate the agency's response to the issues raised.

(d) *Supplemental environmental impact statements.* Agencies:

(1) Shall prepare supplements to either draft or final environmental impact statements if a major Federal action remains to occur, and:

(i) The agency makes substantial changes to the proposed action that are relevant to environmental concerns; or

(ii) There are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts.

(2) May also prepare supplements when the agency determines that the purposes of the Act will be furthered by doing so.

(3) Shall prepare, publish, and file a supplement to a statement (exclusive of scoping (§ 1501.9 of this chapter)) as a draft and final statement, as is appropriate to the stage of the statement involved, unless the Council approves alternative procedures (§ 1506.12 of this chapter).

(4) May find that changes to the proposed action or new circumstances or information relevant to environmental concerns are not significant and therefore do not require a supplement. The agency should document the finding consistent with its agency NEPA procedures (§ 1507.3 of

this chapter), or, if necessary, in a finding of no significant impact supported by an environmental assessment.

## § 1502.10    Recommended format.

(a) Agencies shall use a format for environmental impact statements that will encourage good analysis and clear presentation of the alternatives including the proposed action. Agencies should use the following standard format for environmental impact statements unless the agency determines that there is a more effective format for communication:

(1) Cover.

(2) Summary.

(3) Table of contents.

(4) Purpose of and need for action.

(5) Alternatives including the proposed action (sections 102(2)(C)(iii) and 102(2)(E) of NEPA).

(6) Affected environment and environmental consequences (especially sections 102(2)(C)(i), (ii), (iv), and (v) of NEPA).

(7) Submitted alternatives, information, and analyses.

(8) List of preparers.

(9) Appendices (if any).

(b) If an agency uses a different format, it shall include paragraphs (a)(1) through (8) of this section, as further described in §§ 1502.11 through 1502.19, in any appropriate format.

## § 1502.11    Cover.

The cover shall not exceed one page and include:

(a) A list of the responsible agencies, including the lead agency and any cooperating agencies.

(b) The title of the proposed action that is the subject of the statement (and, if appropriate, the titles of related cooperating agency actions), together with the State(s) and county(ies) (or other jurisdiction(s), if applicable) where the action is located.

(c) The name, address, and telephone number of the person at the agency who can supply further information.

(d) A designation of the statement as a draft, final, or draft or final supplement.

(e) A one-paragraph abstract of the statement.

(f) The date by which the agency must receive comments (computed in cooperation with EPA under § 1506.11 of this chapter).

(g) For the final environmental impact statement, the estimated total cost to prepare both the draft and final environmental impact statement, including the costs of agency full-time equivalent (FTE) personnel hours, contractor costs, and other direct costs.

If practicable and noted where not practicable, agencies also should include costs incurred by cooperating and participating agencies, applicants, and contractors.

## § 1502.12    Summary.

Each environmental impact statement shall contain a summary that adequately and accurately summarizes the statement. The summary shall stress the major conclusions, areas of disputed issues raised by agencies and the public, and the issues to be resolved (including the choice among alternatives). The summary normally will not exceed 15 pages.

## § 1502.13    Purpose and need.

The statement shall briefly specify the underlying purpose and need for the proposed action. When an agency's statutory duty is to review an application for authorization, the agency shall base the purpose and need on the goals of the applicant and the agency's authority.

## § 1502.14    Alternatives including the proposed action.

The alternatives section should present the environmental impacts of the proposed action and the alternatives in comparative form based on the information and analysis presented in the sections on the affected environment (§ 1502.15) and the environmental consequences (§ 1502.16). In this section, agencies shall:

(a) Evaluate reasonable alternatives to the proposed action, and, for alternatives that the agency eliminated from detailed study, briefly discuss the reasons for their elimination.

(b) Discuss each alternative considered in detail, including the proposed action, so that reviewers may evaluate their comparative merits.

(c) Include the no action alternative.

(d) Identify the agency's preferred alternative or alternatives, if one or more exists, in the draft statement and identify such alternative in the final statement unless another law prohibits the expression of such a preference.

(e) Include appropriate mitigation measures not already included in the proposed action or alternatives.

(f) Limit their consideration to a reasonable number of alternatives.

## § 1502.15    Affected environment.

The environmental impact statement shall succinctly describe the environment of the area(s) to be affected or created by the alternatives under consideration, including the reasonably foreseeable environmental trends and planned actions in the area(s). The environmental impact statement may

**43366**    **Federal Register**/Vol. 85, No. 137/Thursday, July 16, 2020/Rules and Regulations

combine the description with evaluation of the environmental consequences (§ 1502.16), and it shall be no longer than is necessary to understand the effects of the alternatives. Data and analyses in a statement shall be commensurate with the importance of the impact, with less important material summarized, consolidated, or simply referenced. Agencies shall avoid useless bulk in statements and shall concentrate effort and attention on important issues. Verbose descriptions of the affected environment are themselves no measure of the adequacy of an environmental impact statement.

### § 1502.16   Environmental consequences.

(a) The environmental consequences section forms the scientific and analytic basis for the comparisons under § 1502.14. It shall consolidate the discussions of those elements required by sections 102(2)(C)(i), (ii), (iv), and (v) of NEPA that are within the scope of the statement and as much of section 102(2)(C)(iii) of NEPA as is necessary to support the comparisons. This section should not duplicate discussions in § 1502.14. The discussion shall include:

(1) The environmental impacts of the proposed action and reasonable alternatives to the proposed action and the significance of those impacts. The comparison of the proposed action and reasonable alternatives shall be based on this discussion of the impacts.

(2) Any adverse environmental effects that cannot be avoided should the proposal be implemented.

(3) The relationship between short-term uses of man's environment and the maintenance and enhancement of long-term productivity.

(4) Any irreversible or irretrievable commitments of resources that would be involved in the proposal should it be implemented.

(5) Possible conflicts between the proposed action and the objectives of Federal, regional, State, Tribal, and local land use plans, policies and controls for the area concerned. (§ 1506.2(d) of this chapter)

(6) Energy requirements and conservation potential of various alternatives and mitigation measures.

(7) Natural or depletable resource requirements and conservation potential of various alternatives and mitigation measures.

(8) Urban quality, historic and cultural resources, and the design of the built environment, including the reuse and conservation potential of various alternatives and mitigation measures.

(9) Means to mitigate adverse environmental impacts (if not fully covered under § 1502.14(e)).

(10) Where applicable, economic and technical considerations, including the economic benefits of the proposed action.

(b) Economic or social effects by themselves do not require preparation of an environmental impact statement. However, when the agency determines that economic or social and natural or physical environmental effects are interrelated, the environmental impact statement shall discuss and give appropriate consideration to these effects on the human environment.

### § 1502.17   Summary of submitted alternatives, information, and analyses.

(a) The draft environmental impact statement shall include a summary that identifies all alternatives, information, and analyses submitted by State, Tribal, and local governments and other public commenters during the scoping process for consideration by the lead and cooperating agencies in developing the environmental impact statement.

(1) The agency shall append to the draft environmental impact statement or otherwise publish all comments (or summaries thereof where the response has been exceptionally voluminous) received during the scoping process that identified alternatives, information, and analyses for the agency's consideration.

(2) Consistent with § 1503.1(a)(3) of this chapter, the lead agency shall invite comment on the summary identifying all submitted alternatives, information, and analyses in the draft environmental impact statement.

(b) The final environmental impact statement shall include a summary that identifies all alternatives, information, and analyses submitted by State, Tribal, and local governments and other public commenters for consideration by the lead and cooperating agencies in developing the final environmental impact statement.

### § 1502.18   List of preparers.

The environmental impact statement shall list the names, together with their qualifications (expertise, experience, professional disciplines), of the persons who were primarily responsible for preparing the environmental impact statement or significant background papers, including basic components of the statement. Where possible, the environmental impact statement shall identify the persons who are responsible for a particular analysis, including analyses in background papers. Normally the list will not exceed two pages.

### § 1502.19   Appendix.

If an agency prepares an appendix, the agency shall publish it with the environmental impact statement, and it shall consist of:

(a) Material prepared in connection with an environmental impact statement (as distinct from material that is not so prepared and is incorporated by reference (§ 1501.12 of this chapter)).

(b) Material substantiating any analysis fundamental to the impact statement.

(c) Material relevant to the decision to be made.

(d) For draft environmental impact statements, all comments (or summaries thereof where the response has been exceptionally voluminous) received during the scoping process that identified alternatives, information, and analyses for the agency's consideration.

(e) For final environmental impact statements, the comment summaries and responses consistent with § 1503.4 of this chapter.

### § 1502.20   Publication of the environmental impact statement.

Agencies shall publish the entire draft and final environmental impact statements and unchanged statements as provided in § 1503.4(c) of this chapter. The agency shall transmit the entire statement electronically (or in paper copy, if so requested due to economic or other hardship) to:

(a) Any Federal agency that has jurisdiction by law or special expertise with respect to any environmental impact involved and any appropriate Federal, State, Tribal, or local agency authorized to develop and enforce environmental standards.

(b) The applicant, if any.

(c) Any person, organization, or agency requesting the entire environmental impact statement.

(d) In the case of a final environmental impact statement, any person, organization, or agency that submitted substantive comments on the draft.

### § 1502.21   Incomplete or unavailable information.

(a) When an agency is evaluating reasonably foreseeable significant adverse effects on the human environment in an environmental impact statement, and there is incomplete or unavailable information, the agency shall make clear that such information is lacking.

(b) If the incomplete but available information relevant to reasonably foreseeable significant adverse impacts is essential to a reasoned choice among alternatives, and the overall costs of obtaining it are not unreasonable, the agency shall include the information in the environmental impact statement.

AR_0029104

(c) If the information relevant to reasonably foreseeable significant adverse impacts cannot be obtained because the overall costs of obtaining it are unreasonable or the means to obtain it are not known, the agency shall include within the environmental impact statement:

(1) A statement that such information is incomplete or unavailable;

(2) A statement of the relevance of the incomplete or unavailable information to evaluating reasonably foreseeable significant adverse impacts on the human environment;

(3) A summary of existing credible scientific evidence that is relevant to evaluating the reasonably foreseeable significant adverse impacts on the human environment; and

(4) The agency's evaluation of such impacts based upon theoretical approaches or research methods generally accepted in the scientific community.

(d) For the purposes of this section, "reasonably foreseeable" includes impacts that have catastrophic consequences, even if their probability of occurrence is low, provided that the analysis of the impacts is supported by credible scientific evidence, is not based on pure conjecture, and is within the rule of reason.

### § 1502.22  Cost-benefit analysis.

If the agency is considering a cost-benefit analysis for the proposed action relevant to the choice among alternatives with different environmental effects, the agency shall incorporate the cost-benefit analysis by reference or append it to the statement as an aid in evaluating the environmental consequences. In such cases, to assess the adequacy of compliance with section 102(2)(B) of NEPA (ensuring appropriate consideration of unquantified environmental amenities and values in decision making, along with economical and technical considerations), the statement shall discuss the relationship between that analysis and any analyses of unquantified environmental impacts, values, and amenities. For purposes of complying with the Act, agencies need not display the weighing of the merits and drawbacks of the various alternatives in a monetary cost-benefit analysis and should not do so when there are important qualitative considerations. However, an environmental impact statement should at least indicate those considerations, including factors not related to environmental quality, that are likely to be relevant and important to a decision.

### § 1502.23  Methodology and scientific accuracy.

Agencies shall ensure the professional integrity, including scientific integrity, of the discussions and analyses in environmental documents. Agencies shall make use of reliable existing data and resources. Agencies may make use of any reliable data sources, such as remotely gathered information or statistical models. They shall identify any methodologies used and shall make explicit reference to the scientific and other sources relied upon for conclusions in the statement. Agencies may place discussion of methodology in an appendix. Agencies are not required to undertake new scientific and technical research to inform their analyses. Nothing in this section is intended to prohibit agencies from compliance with the requirements of other statutes pertaining to scientific and technical research.

### § 1502.24  Environmental review and consultation requirements.

(a) To the fullest extent possible, agencies shall prepare draft environmental impact statements concurrent and integrated with environmental impact analyses and related surveys and studies required by all other Federal environmental review laws and Executive orders applicable to the proposed action, including the Fish and Wildlife Coordination Act (16 U.S.C. 661 *et seq.*), the National Historic Preservation Act of 1966 (54 U.S.C. 300101 *et seq.*), and the Endangered Species Act of 1973 (16 U.S.C. 1531 *et seq.*).

(b) The draft environmental impact statement shall list all Federal permits, licenses, and other authorizations that must be obtained in implementing the proposal. If it is uncertain whether a Federal permit, license, or other authorization is necessary, the draft environmental impact statement shall so indicate.

■ 5. Revise part 1503 to read as follows:

## PART 1503—COMMENTING ON ENVIRONMENTAL IMPACT STATEMENTS

Sec.
1503.1  Inviting comments and requesting information and analyses.
1503.2  Duty to comment.
1503.3  Specificity of comments and information.
1503.4  Response to comments.

**Authority:** 42 U.S.C. 4321–4347; 42 U.S.C. 4371–4375; 42 U.S.C. 7609; E.O. 11514, 35 FR 4247, 3 CFR, 1966–1970, Comp., p. 902, as amended by E.O. 11991, 42 FR 26967, 3 CFR, 1977 Comp., p. 123; E.O. 13807, 82 FR 40463, 3 CFR, 2017, Comp., p. 369.

### § 1503.1  Inviting comments and requesting information and analyses.

(a) After preparing a draft environmental impact statement and before preparing a final environmental impact statement the agency shall:

(1) Obtain the comments of any Federal agency that has jurisdiction by law or special expertise with respect to any environmental impact involved or is authorized to develop and enforce environmental standards.

(2) Request the comments of:

(i) Appropriate State, Tribal, and local agencies that are authorized to develop and enforce environmental standards;

(ii) State, Tribal, or local governments that may be affected by the proposed action;

(iii) Any agency that has requested it receive statements on actions of the kind proposed;

(iv) The applicant, if any; and

(v) The public, affirmatively soliciting comments in a manner designed to inform those persons or organizations who may be interested in or affected by the proposed action.

(3) Invite comment specifically on the submitted alternatives, information, and analyses and the summary thereof (§ 1502.17 of this chapter).

(b) An agency may request comments on a final environmental impact statement before the final decision and set a deadline for providing such comments. Other agencies or persons may make comments consistent with the time periods under § 1506.11 of this chapter.

(c) An agency shall provide for electronic submission of public comments, with reasonable measures to ensure the comment process is accessible to affected persons.

### § 1503.2  Duty to comment.

Cooperating agencies and agencies that are authorized to develop and enforce environmental standards shall comment on statements within their jurisdiction, expertise, or authority within the time period specified for comment in § 1506.11 of this chapter. A Federal agency may reply that it has no comment. If a cooperating agency is satisfied that the environmental impact statement adequately reflects its views, it should reply that it has no comment.

### § 1503.3  Specificity of comments and information.

(a) To promote informed decision making, comments on an environmental impact statement or on a proposed action shall be as specific as possible, may address either the adequacy of the statement or the merits of the alternatives discussed or both, and shall

provide as much detail as necessary to meaningfully participate and fully inform the agency of the commenter's position. Comments should explain why the issues raised are important to the consideration of potential environmental impacts and alternatives to the proposed action, as well as economic and employment impacts, and other impacts affecting the quality of the human environment. Comments should reference the corresponding section or page number of the draft environmental impact statement, propose specific changes to those parts of the statement, where possible, and include or describe the data sources and methodologies supporting the proposed changes.

(b) Comments on the submitted alternatives, information, and analyses and summary thereof (§ 1502.17 of this chapter) should be as specific as possible. Comments and objections of any kind shall be raised within the comment period on the draft environmental impact statement provided by the agency, consistent with § 1506.11 of this chapter. If the agency requests comments on the final environmental impact statement before the final decision, consistent with § 1503.1(b), comments and objections of any kind shall be raised within the comment period provided by the agency. Comments and objections of any kind not provided within the comment period(s) shall be considered unexhausted and forfeited, consistent with § 1500.3(b) of this chapter.

(c) When a participating agency criticizes a lead agency's predictive methodology, the participating agency should describe the alternative methodology that it prefers and why.

(d) A cooperating agency shall specify in its comments whether it needs additional information to fulfill other applicable environmental reviews or consultation requirements and what information it needs. In particular, it shall specify any additional information it needs to comment adequately on the draft statement's analysis of significant site-specific effects associated with the granting or approving by that cooperating agency of necessary Federal permits, licenses, or authorizations.

(e) When a cooperating agency with jurisdiction by law specifies mitigation measures it considers necessary to allow the agency to grant or approve applicable permit, license, or related requirements or concurrences, the cooperating agency shall cite to its applicable statutory authority.

**§ 1503.4    Response to comments.**

(a) An agency preparing a final environmental impact statement shall consider substantive comments timely submitted during the public comment period. The agency may respond to individual comments or groups of comments. In the final environmental impact statement, the agency may respond by:

(1) Modifying alternatives including the proposed action.

(2) Developing and evaluating alternatives not previously given serious consideration by the agency.

(3) Supplementing, improving, or modifying its analyses.

(4) Making factual corrections.

(5) Explaining why the comments do not warrant further agency response, recognizing that agencies are not required to respond to each comment.

(b) An agency shall append or otherwise publish all substantive comments received on the draft statement (or summaries thereof where the response has been exceptionally voluminous).

(c) If changes in response to comments are minor and are confined to the responses described in paragraphs (a)(4) and (5) of this section, an agency may write any changes on errata sheets and attach the responses to the statement instead of rewriting the draft statement. In such cases, only the comments, the responses, and the changes and not the final statement need be published (§ 1502.20 of this chapter). The agency shall file the entire document with a new cover sheet with the Environmental Protection Agency as the final statement (§ 1506.10 of this chapter).

■ 6. Revise part 1504 to read as follows:

**PART 1504—PRE–DECISIONAL REFERRALS TO THE COUNCIL OF PROPOSED FEDERAL ACTIONS DETERMINED TO BE ENVIRONMENTALLY UNSATISFACTORY**

Sec.
1504.1    Purpose.
1504.2    Criteria for referral.
1504.3    Procedure for referrals and response.

  **Authority:** 42 U.S.C. 4321–4347; 42 U.S.C. 4371–4375; 42 U.S.C. 7609; E.O. 11514, 35 FR 4247, 3 CFR, 1966—1970, Comp., p. 902, as amended by E.O. 11991, 42 FR 26967, 3 CFR, 1977 Comp., p. 123; E.O. 13807, 82 FR 40463, 3 CFR, 2017, Comp., p. 369.

**§ 1504.1    Purpose.**

(a) This part establishes procedures for referring to the Council Federal interagency disagreements concerning proposed major Federal actions that might cause unsatisfactory environmental effects. It provides means for early resolution of such disagreements.

(b) Section 309 of the Clean Air Act (42 U.S.C. 7609) directs the Administrator of the Environmental Protection Agency to review and comment publicly on the environmental impacts of Federal activities, including actions for which agencies prepare environmental impact statements. If, after this review, the Administrator determines that the matter is "unsatisfactory from the standpoint of public health or welfare or environmental quality," section 309 directs that the matter be referred to the Council (hereafter "environmental referrals").

(c) Under section 102(2)(C) of NEPA (42 U.S.C. 4332(2)(C)), other Federal agencies may prepare similar reviews of environmental impact statements, including judgments on the acceptability of anticipated environmental impacts. These reviews must be made available to the President, the Council, and the public.

**§ 1504.2    Criteria for referral.**

Environmental referrals should be made to the Council only after concerted, timely (as early as practicable in the process), but unsuccessful attempts to resolve differences with the lead agency. In determining what environmental objections to the matter are appropriate to refer to the Council, an agency should weigh potential adverse environmental impacts, considering:

(a) Possible violation of national environmental standards or policies;

(b) Severity;

(c) Geographical scope;

(d) Duration;

(e) Importance as precedents;

(f) Availability of environmentally preferable alternatives; and

(g) Economic and technical considerations, including the economic costs of delaying or impeding the decision making of the agencies involved in the action.

**§ 1504.3    Procedure for referrals and response.**

(a) A Federal agency making the referral to the Council shall:

(1) Notify the lead agency at the earliest possible time that it intends to refer a matter to the Council unless a satisfactory agreement is reached;

(2) Include such a notification whenever practicable in the referring agency's comments on the environmental assessment or draft environmental impact statement;

(3) Identify any essential information that is lacking and request that the lead agency make it available at the earliest possible time; and

(4) Send copies of the referring agency's views to the Council.

(b) The referring agency shall deliver its referral to the Council no later than 25 days after the lead agency has made the final environmental impact statement available to the Environmental Protection Agency, participating agencies, and the public, and in the case of an environmental assessment, no later than 25 days after the lead agency makes it available. Except when the lead agency grants an extension of this period, the Council will not accept a referral after that date.

(c) The referral shall consist of:

(1) A copy of the letter signed by the head of the referring agency and delivered to the lead agency informing the lead agency of the referral and the reasons for it; and

(2) A statement supported by factual evidence leading to the conclusion that the matter is unsatisfactory from the standpoint of public health or welfare or environmental quality. The statement shall:

(i) Identify any disputed material facts and incorporate (by reference if appropriate) agreed upon facts;

(ii) Identify any existing environmental requirements or policies that would be violated by the matter;

(iii) Present the reasons for the referral;

(iv) Contain a finding by the agency whether the issue raised is of national importance because of the threat to national environmental resources or policies or for some other reason;

(v) Review the steps taken by the referring agency to bring its concerns to the attention of the lead agency at the earliest possible time; and

(vi) Give the referring agency's recommendations as to what mitigation alternative, further study, or other course of action (including abandonment of the matter) are necessary to remedy the situation.

(d) No later than 25 days after the referral to the Council, the lead agency may deliver a response to the Council and the referring agency. If the lead agency requests more time and gives assurance that the matter will not go forward in the interim, the Council may grant an extension. The response shall:

(1) Address fully the issues raised in the referral;

(2) Be supported by evidence and explanations, as appropriate; and

(3) Give the lead agency's response to the referring agency's recommendations.

(e) Applicants may provide views in writing to the Council no later than the response.

(f) No later than 25 days after receipt of both the referral and any response or upon being informed that there will be no response (unless the lead agency agrees to a longer time), the Council may take one or more of the following actions:

(1) Conclude that the process of referral and response has successfully resolved the problem.

(2) Initiate discussions with the agencies with the objective of mediation with referring and lead agencies.

(3) Obtain additional views and information.

(4) Determine that the issue is not one of national importance and request the referring and lead agencies to pursue their decision process.

(5) Determine that the referring and lead agencies should further negotiate the issue, and the issue is not appropriate for Council consideration until one or more heads of agencies report to the Council that the agencies' disagreements are irreconcilable.

(6) Publish its findings and recommendations (including, where appropriate, a finding that the submitted evidence does not support the position of an agency).

(7) When appropriate, submit the referral and the response together with the Council's recommendation to the President for action.

(g) The Council shall take no longer than 60 days to complete the actions specified in paragraph (f)(2), (3), or (5) of this section.

(h) The referral process is not intended to create any private rights of action or to be judicially reviewable because any voluntary resolutions by the agency parties do not represent final agency action and instead are only provisional and dependent on later consistent action by the action agencies.

■ 7. Revise part 1505 to read as follows:

## PART 1505—NEPA AND AGENCY DECISION MAKING

Sec.
1505.1   [Reserved]
1505.2   Record of decision in cases requiring environmental impact statements.
1505.3   Implementing the decision.

**Authority:** 42 U.S.C. 4321–4347; 42 U.S.C. 4371–4375; 42 U.S.C. 7609; E.O. 11514, 35 FR 4247, 3 CFR, 1966–1970, Comp., p. 902, as amended by E.O. 11991, 42 FR 26967, 3 CFR, 1977 Comp., p. 123; and E.O. 13807, 82 FR 40463, 3 CFR, 2017, Comp., p. 369.

### § 1505.1   [Reserved]

### § 1505.2   Record of decision in cases requiring environmental impact statements.

(a) At the time of its decision (§ 1506.11 of this chapter) or, if appropriate, its recommendation to Congress, each agency shall prepare and timely publish a concise public record of decision or joint record of decision. The record, which each agency may integrate into any other record it prepares, shall:

(1) State the decision.

(2) Identify alternatives considered by the agency in reaching its decision, specifying the alternative or alternatives considered environmentally preferable. An agency may discuss preferences among alternatives based on relevant factors including economic and technical considerations and agency statutory missions. An agency shall identify and discuss all such factors, including any essential considerations of national policy, that the agency balanced in making its decision and state how those considerations entered into its decision.

(3) State whether the agency has adopted all practicable means to avoid or minimize environmental harm from the alternative selected, and if not, why the agency did not. The agency shall adopt and summarize, where applicable, a monitoring and enforcement program for any enforceable mitigation requirements or commitments.

(b) Informed by the summary of the submitted alternatives, information, and analyses in the final environmental impact statement (§ 1502.17(b) of this chapter), together with any other material in the record that he or she determines to be relevant, the decision maker shall certify in the record of decision that the agency has considered all of the alternatives, information, analyses, and objections submitted by State, Tribal, and local governments and public commenters for consideration by the lead and cooperating agencies in developing the environmental impact statement. Agency environmental impact statements certified in accordance with this section are entitled to a presumption that the agency has considered the submitted alternatives, information, and analyses, including the summary thereof, in the final environmental impact statement (§ 1502.17(b)).

### § 1505.3   Implementing the decision.

Agencies may provide for monitoring to assure that their decisions are carried out and should do so in important cases. Mitigation (§ 1505.2(a)(3)) and other conditions established in the environmental impact statement or during its review and committed as part of the decision shall be implemented by the lead agency or other appropriate consenting agency. The lead agency shall:

(a) Include appropriate conditions in grants, permits, or other approvals.

(b) Condition funding of actions on mitigation.

(c) Upon request, inform cooperating or participating agencies on progress in carrying out mitigation measures that they have proposed and were adopted by the agency making the decision.

(d) Upon request, publish the results of relevant monitoring.

■ 8. Revise part 1506 to read as follows:

## PART 1506—OTHER REQUIREMENTS OF NEPA

Sec.

1506.1    Limitations on actions during NEPA process.
1506.2    Elimination of duplication with State, Tribal, and local procedures.
1506.3    Adoption.
1506.4    Combining documents.
1506.5    Agency responsibility for environmental documents.
1506.6    Public involvement.
1506.7    Further guidance.
1506.8    Proposals for legislation.
1506.9    Proposals for regulations.
1506.10    Filing requirements.
1506.11    Timing of agency action.
1506.12    Emergencies.
1506.13    Effective date.

**Authority:** 42 U.S.C. 4321–4347; 42 U.S.C. 4371–4375; 42 U.S.C. 7609; E.O. 11514, 35 FR 4247, 3 CFR, 1966–1970, Comp., p. 902, as amended by E.O. 11991, 42 FR 26967, 3 CFR, 1977 Comp., p. 123; and E.O. 13807, 82 FR 40463, 3 CFR, 2017, Comp., p. 369.

### § 1506.1  Limitations on actions during NEPA process.

(a) Except as provided in paragraphs (b) and (c) of this section, until an agency issues a finding of no significant impact, as provided in § 1501.6 of this chapter, or record of decision, as provided in § 1505.2 of this chapter, no action concerning the proposal may be taken that would:

(1) Have an adverse environmental impact; or

(2) Limit the choice of reasonable alternatives.

(b) If any agency is considering an application from a non-Federal entity and is aware that the applicant is about to take an action within the agency's jurisdiction that would meet either of the criteria in paragraph (a) of this section, then the agency shall promptly notify the applicant that the agency will take appropriate action to ensure that the objectives and procedures of NEPA are achieved. This section does not preclude development by applicants of plans or designs or performance of other activities necessary to support an application for Federal, State, Tribal, or local permits or assistance. An agency considering a proposed action for Federal funding may authorize such activities, including, but not limited to,

acquisition of interests in land (*e.g.*, fee simple, rights-of-way, and conservation easements), purchase of long lead-time equipment, and purchase options made by applicants.

(c) While work on a required programmatic environmental review is in progress and the action is not covered by an existing programmatic review, agencies shall not undertake in the interim any major Federal action covered by the program that may significantly affect the quality of the human environment unless such action:

(1) Is justified independently of the program;

(2) Is itself accompanied by an adequate environmental review; and

(3) Will not prejudice the ultimate decision on the program. Interim action prejudices the ultimate decision on the program when it tends to determine subsequent development or limit alternatives.

### § 1506.2  Elimination of duplication with State, Tribal, and local procedures.

(a) Federal agencies are authorized to cooperate with State, Tribal, and local agencies that are responsible for preparing environmental documents, including those prepared pursuant to section 102(2)(D) of NEPA.

(b) To the fullest extent practicable unless specifically prohibited by law, agencies shall cooperate with State, Tribal, and local agencies to reduce duplication between NEPA and State, Tribal, and local requirements, including through use of studies, analysis, and decisions developed by State, Tribal, or local agencies. Except for cases covered by paragraph (a) of this section, such cooperation shall include, to the fullest extent practicable:

(1) Joint planning processes.

(2) Joint environmental research and studies.

(3) Joint public hearings (except where otherwise provided by statute).

(4) Joint environmental assessments.

(c) To the fullest extent practicable unless specifically prohibited by law, agencies shall cooperate with State, Tribal, and local agencies to reduce duplication between NEPA and comparable State, Tribal, and local requirements. Such cooperation shall include, to the fullest extent practicable, joint environmental impact statements. In such cases, one or more Federal agencies and one or more State, Tribal, or local agencies shall be joint lead agencies. Where State or Tribal laws or local ordinances have environmental impact statement or similar requirements in addition to but not in conflict with those in NEPA, Federal agencies may cooperate in fulfilling

these requirements, as well as those of Federal laws, so that one document will comply with all applicable laws.

(d) To better integrate environmental impact statements into State, Tribal, or local planning processes, environmental impact statements shall discuss any inconsistency of a proposed action with any approved State, Tribal, or local plan or law (whether or not federally sanctioned). Where an inconsistency exists, the statement should describe the extent to which the agency would reconcile its proposed action with the plan or law. While the statement should discuss any inconsistencies, NEPA does not require reconciliation.

### § 1506.3  Adoption.

(a) *Generally.* An agency may adopt a Federal draft or final environmental impact statement, environmental assessment, or portion thereof, or categorical exclusion determination provided that the statement, assessment, portion thereof, or determination meets the standards for an adequate statement, assessment, or determination under the regulations in this subchapter.

(b) *Environmental impact statements.* (1) If the actions covered by the original environmental impact statement and the proposed action are substantially the same, the adopting agency shall republish it as a final statement consistent with § 1506.10. If the actions are not substantially the same, the adopting agency shall treat the statement as a draft and republish it, consistent with § 1506.10.

(2) Notwithstanding paragraph (b)(1) of this section, a cooperating agency may adopt in its record of decision without republishing the environmental impact statement of a lead agency when, after an independent review of the statement, the cooperating agency concludes that its comments and suggestions have been satisfied.

(c) *Environmental assessments.* If the actions covered by the original environmental assessment and the proposed action are substantially the same, the adopting agency may adopt the environmental assessment in its finding of no significant impact and provide notice consistent with § 1501.6 of this chapter.

(d) *Categorical exclusions.* An agency may adopt another agency's determination that a categorical exclusion applies to a proposed action if the action covered by the original categorical exclusion determination and the adopting agency's proposed action are substantially the same. The agency shall document the adoption.

(e) *Identification of certain circumstances.* The adopting agency

shall specify if one of the following circumstances is present:

(1) The agency is adopting an assessment or statement that is not final within the agency that prepared it.

(2) The action assessed in the assessment or statement is the subject of a referral under part 1504 of this chapter.

(3) The assessment or statement's adequacy is the subject of a judicial action that is not final.

### § 1506.4  Combining documents.

Agencies should combine, to the fullest extent practicable, any environmental document with any other agency document to reduce duplication and paperwork.

### § 1506.5  Agency responsibility for environmental documents.

(a) *Responsibility.* The agency is responsible for the accuracy, scope (§ 1501.9(e) of this chapter), and content of environmental documents prepared by the agency or by an applicant or contractor under the supervision of the agency.

(b) *Information.* An agency may require an applicant to submit environmental information for possible use by the agency in preparing an environmental document. An agency also may direct an applicant or authorize a contractor to prepare an environmental document under the supervision of the agency.

(1) The agency should assist the applicant by outlining the types of information required or, for the preparation of environmental documents, shall provide guidance to the applicant or contractor and participate in their preparation.

(2) The agency shall independently evaluate the information submitted or the environmental document and shall be responsible for its accuracy, scope, and contents.

(3) The agency shall include in the environmental document the names and qualifications of the persons preparing environmental documents, and conducting the independent evaluation of any information submitted or environmental documents prepared by an applicant or contractor, such as in the list of preparers for environmental impact statements (§ 1502.18 of this chapter). It is the intent of this paragraph (b)(3) that acceptable work not be redone, but that it be verified by the agency.

(4) Contractors or applicants preparing environmental assessments or environmental impact statements shall submit a disclosure statement to the lead agency that specifies any financial or other interest in the outcome of the action. Such statement need not include privileged or confidential trade secrets or other confidential business information.

(5) Nothing in this section is intended to prohibit any agency from requesting any person, including the applicant, to submit information to it or to prohibit any person from submitting information to any agency for use in preparing environmental documents.

### § 1506.6  Public involvement.

Agencies shall:

(a) Make diligent efforts to involve the public in preparing and implementing their NEPA procedures (§ 1507.3 of this chapter).

(b) Provide public notice of NEPA-related hearings, public meetings, and other opportunities for public involvement, and the availability of environmental documents so as to inform those persons and agencies who may be interested or affected by their proposed actions. When selecting appropriate methods for providing public notice, agencies shall consider the ability of affected persons and agencies to access electronic media.

(1) In all cases, the agency shall notify those who have requested notice on an individual action.

(2) In the case of an action with effects of national concern, notice shall include publication in the **Federal Register**. An agency may notify organizations that have requested regular notice.

(3) In the case of an action with effects primarily of local concern, the notice may include:

(i) Notice to State, Tribal, and local agencies that may be interested or affected by the proposed action.

(ii) Notice to interested or affected State, Tribal, and local governments.

(iii) Following the affected State or Tribe's public notice procedures for comparable actions.

(iv) Publication in local newspapers (in papers of general circulation rather than legal papers).

(v) Notice through other local media.

(vi) Notice to potentially interested community organizations including small business associations.

(vii) Publication in newsletters that may be expected to reach potentially interested persons.

(viii) Direct mailing to owners and occupants of nearby or affected property.

(ix) Posting of notice on and off site in the area where the action is to be located.

(x) Notice through electronic media (*e.g.,* a project or agency website, email, or social media).

(c) Hold or sponsor public hearings, public meetings, or other opportunities for public involvement whenever appropriate or in accordance with statutory requirements applicable to the agency. Agencies may conduct public hearings and public meetings by means of electronic communication except where another format is required by law. When selecting appropriate methods for public involvement, agencies shall consider the ability of affected entities to access electronic media.

(d) Solicit appropriate information from the public.

(e) Explain in its procedures where interested persons can get information or status reports on environmental impact statements and other elements of the NEPA process.

(f) Make environmental impact statements, the comments received, and any underlying documents available to the public pursuant to the provisions of the Freedom of Information Act, as amended (5 U.S.C. 552).

### § 1506.7  Further guidance.

(a) The Council may provide further guidance concerning NEPA and its procedures consistent with Executive Order 13807, Establishing Discipline and Accountability in the Environmental Review and Permitting Process for Infrastructure Projects (August 5, 2017), Executive Order 13891, Promoting the Rule of Law Through Improved Agency Guidance Documents (October 9, 2019), and any other applicable Executive orders.

(b) To the extent that Council guidance issued prior to September 14, 2020 is in conflict with this subchapter, the provisions of this subchapter apply.

### § 1506.8  Proposals for legislation.

(a) When developing legislation, agencies shall integrate the NEPA process for proposals for legislation significantly affecting the quality of the human environment with the legislative process of the Congress. Technical drafting assistance does not by itself constitute a legislative proposal. Only the agency that has primary responsibility for the subject matter involved will prepare a legislative environmental impact statement.

(b) A legislative environmental impact statement is the detailed statement required by law to be included in an agency's recommendation or report on a legislative proposal to Congress. A legislative environmental impact statement shall be considered part of the formal transmittal of a legislative proposal to Congress; however, it may be transmitted to Congress up to 30 days

later in order to allow time for completion of an accurate statement that can serve as the basis for public and Congressional debate. The statement must be available in time for Congressional hearings and deliberations.

(c) Preparation of a legislative environmental impact statement shall conform to the requirements of the regulations in this subchapter, except as follows:

(1) There need not be a scoping process.

(2) Agencies shall prepare the legislative statement in the same manner as a draft environmental impact statement and need not prepare a final statement unless any of the following conditions exist. In such cases, the agency shall prepare and publish the statements consistent with §§ 1503.1 of this chapter and 1506.11:

(i) A Congressional committee with jurisdiction over the proposal has a rule requiring both draft and final environmental impact statements.

(ii) The proposal results from a study process required by statute (such as those required by the Wild and Scenic Rivers Act (16 U.S.C. 1271 et seq.)).

(iii) Legislative approval is sought for Federal or federally assisted construction or other projects that the agency recommends be located at specific geographic locations. For proposals requiring an environmental impact statement for the acquisition of space by the General Services Administration, a draft statement shall accompany the Prospectus or the 11(b) Report of Building Project Surveys to the Congress, and a final statement shall be completed before site acquisition.

(iv) The agency decides to prepare draft and final statements.

(d) Comments on the legislative statement shall be given to the lead agency, which shall forward them along with its own responses to the Congressional committees with jurisdiction.

### § 1506.9  Proposals for regulations.

Where the proposed action is the promulgation of a rule or regulation, procedures and documentation pursuant to other statutory or Executive order requirements may satisfy one or more requirements of this subchapter. When a procedure or document satisfies one or more requirements of this subchapter, the agency may substitute it for the corresponding requirements in this subchapter and need not carry out duplicative procedures or documentation. Agencies shall identify which corresponding requirements in this subchapter are satisfied and consult

with the Council to confirm such determinations.

### § 1506.10  Filing requirements.

(a) Agencies shall file environmental impact statements together with comments and responses with the Environmental Protection Agency (EPA), Office of Federal Activities, consistent with EPA's procedures.

(b) Agencies shall file statements with the EPA no earlier than they are also transmitted to participating agencies and made available to the public. EPA may issue guidelines to agencies to implement its responsibilities under this section and § 1506.11.

### § 1506.11  Timing of agency action.

(a) The Environmental Protection Agency shall publish a notice in the **Federal Register** each week of the environmental impact statements filed since its prior notice. The minimum time periods set forth in this section are calculated from the date of publication of this notice.

(b) Unless otherwise provided by law, including statutory provisions for combining a final environmental impact statement and record of decision, Federal agencies may not make or issue a record of decision under § 1505.2 of this chapter for the proposed action until the later of the following dates:

(1) 90 days after publication of the notice described in paragraph (a) of this section for a draft environmental impact statement.

(2) 30 days after publication of the notice described in paragraph (a) of this section for a final environmental impact statement.

(c) An agency may make an exception to the rule on timing set forth in paragraph (b) of this section for a proposed action in the following circumstances:

(1) Some agencies have a formally established appeal process after publication of the final environmental impact statement that allows other agencies or the public to take appeals on a decision and make their views known. In such cases where a real opportunity exists to alter the decision, the agency may make and record the decision at the same time it publishes the environmental impact statement. This means that the period for appeal of the decision and the 30-day period set forth in paragraph (b)(2) of this section may run concurrently. In such cases, the environmental impact statement shall explain the timing and the public's right of appeal and provide notification consistent with § 1506.10; or

(2) An agency engaged in rulemaking under the Administrative Procedure Act

or other statute for the purpose of protecting the public health or safety may waive the time period in paragraph (b)(2) of this section, publish a decision on the final rule simultaneously with publication of the notice of the availability of the final environmental impact statement, and provide notification consistent with § 1506.10, as described in paragraph (a) of this section.

(d) If an agency files the final environmental impact statement within 90 days of the filing of the draft environmental impact statement with the Environmental Protection Agency, the decision-making period and the 90-day period may run concurrently. However, subject to paragraph (e) of this section, agencies shall allow at least 45 days for comments on draft statements.

(e) The lead agency may extend the minimum periods in paragraph (b) of this section and provide notification consistent with § 1506.10. Upon a showing by the lead agency of compelling reasons of national policy, the Environmental Protection Agency may reduce the minimum periods and, upon a showing by any other Federal agency of compelling reasons of national policy, also may extend the minimum periods, but only after consultation with the lead agency. The lead agency may modify the minimum periods when necessary to comply with other specific statutory requirements. (§ 1507.3(f)(2) of this chapter) Failure to file timely comments shall not be a sufficient reason for extending a period. If the lead agency does not concur with the extension of time, EPA may not extend it for more than 30 days. When the Environmental Protection Agency reduces or extends any period of time it shall notify the Council.

### § 1506.12  Emergencies.

Where emergency circumstances make it necessary to take an action with significant environmental impact without observing the provisions of the regulations in this subchapter, the Federal agency taking the action should consult with the Council about alternative arrangements for compliance with section 102(2)(C) of NEPA. Agencies and the Council will limit such arrangements to actions necessary to control the immediate impacts of the emergency. Other actions remain subject to NEPA review.

### § 1506.13  Effective date.

The regulations in this subchapter apply to any NEPA process begun after September 14, 2020. An agency may apply the regulations in this subchapter to ongoing activities and environmental

documents begun before September 14, 2020.

■ 9. Revise part 1507 to read as follows:

## PART 1507—AGENCY COMPLIANCE

Sec.
1507.1  Compliance.
1507.2  Agency capability to comply.
1507.3  Agency NEPA procedures.
1507.4  Agency NEPA program information.

**Authority:** 42 U.S.C. 4321–4347; 42 U.S.C. 4371–4375; 42 U.S.C. 7609; E.O. 11514, 35 FR 4247, 3 CFR, 1966–1970, Comp., p. 902, as amended by E.O. 11991, 42 FR 26967, 3 CFR, 1977 Comp., p. 123; and E.O. 13807, 82 FR 40463, 3 CFR, 2017, Comp., p. 369.

### § 1507.1  Compliance.

All agencies of the Federal Government shall comply with the regulations in this subchapter.

### § 1507.2  Agency capability to comply.

Each agency shall be capable (in terms of personnel and other resources) of complying with the requirements of NEPA and the regulations in this subchapter. Such compliance may include use of the resources of other agencies, applicants, and other participants in the NEPA process, but the agency using the resources shall itself have sufficient capability to evaluate what others do for it and account for the contributions of others. Agencies shall:

(a) Fulfill the requirements of section 102(2)(A) of NEPA to utilize a systematic, interdisciplinary approach that will ensure the integrated use of the natural and social sciences and the environmental design arts in planning and in decision making that may have an impact on the human environment. Agencies shall designate a senior agency official to be responsible for overall review of agency NEPA compliance, including resolving implementation issues.

(b) Identify methods and procedures required by section 102(2)(B) of NEPA to ensure that presently unquantified environmental amenities and values may be given appropriate consideration.

(c) Prepare adequate environmental impact statements pursuant to section 102(2)(C) of NEPA and cooperate in the development of statements in the areas where the agency has jurisdiction by law or special expertise or is authorized to develop and enforce environmental standards.

(d) Study, develop, and describe alternatives to recommended courses of action in any proposal that involves unresolved conflicts concerning alternative uses of available resources, consistent with section 102(2)(E) of NEPA.

(e) Comply with the requirements of section 102(2)(H) of NEPA that the agency initiate and utilize ecological information in the planning and development of resource-oriented projects.

(f) Fulfill the requirements of sections 102(2)(F), 102(2)(G), and 102(2)(I), of NEPA, Executive Order 11514, Protection and Enhancement of Environmental Quality, section 2, as amended by Executive Order 11991, Relating to Protection and Enhancement of Environmental Quality, and Executive Order 13807, Establishing Discipline and Accountability in the Environmental Review and Permitting for Infrastructure Projects.

### § 1507.3  Agency NEPA procedures.

(a) Where existing agency NEPA procedures are inconsistent with the regulations in this subchapter, the regulations in this subchapter shall apply, consistent with § 1506.13 of this chapter, unless there is a clear and fundamental conflict with the requirements of another statute. The Council has determined that the categorical exclusions contained in agency NEPA procedures as of September 14, 2020 are consistent with this subchapter.

(b) No more than 12 months after September 14, 2020, or 9 months after the establishment of an agency, whichever comes later, each agency shall develop or revise, as necessary, proposed procedures to implement the regulations in this subchapter, including to eliminate any inconsistencies with the regulations in this subchapter. When the agency is a department, it may be efficient for major subunits (with the consent of the department) to adopt their own procedures. Except for agency efficiency (see paragraph (c) of this section) or as otherwise required by law, agency NEPA procedures shall not impose additional procedures or requirements beyond those set forth in the regulations in this subchapter.

(1) Each agency shall consult with the Council while developing or revising its proposed procedures and before publishing them in the **Federal Register** for comment. Agencies with similar programs should consult with each other and the Council to coordinate their procedures, especially for programs requesting similar information from applicants.

(2) Agencies shall provide an opportunity for public review and review by the Council for conformity with the Act and the regulations in this subchapter before adopting their final procedures. The Council shall complete its review within 30 days of the receipt of the proposed final procedures. Once in effect, the agency shall publish its NEPA procedures and ensure that they are readily available to the public.

(c) Agencies shall adopt, as necessary, agency NEPA procedures to improve agency efficiency and ensure that agencies make decisions in accordance with the Act's procedural requirements. Such procedures shall include:

(1) Designating the major decision points for the agency's principal programs likely to have a significant effect on the human environment and assuring that the NEPA process begins at the earliest reasonable time, consistent with § 1501.2 of this chapter, and aligns with the corresponding decision points.

(2) Requiring that relevant environmental documents, comments, and responses be part of the record in formal rulemaking or adjudicatory proceedings.

(3) Requiring that relevant environmental documents, comments, and responses accompany the proposal through existing agency review processes so that decision makers use the statement in making decisions.

(4) Requiring that the alternatives considered by the decision maker are encompassed by the range of alternatives discussed in the relevant environmental documents and that the decision maker consider the alternatives described in the environmental documents. If another decision document accompanies the relevant environmental documents to the decision maker, agencies are encouraged to make available to the public before the decision is made any part of that document that relates to the comparison of alternatives.

(5) Requiring the combination of environmental documents with other agency documents. Agencies may designate and rely on one or more procedures or documents under other statutes or Executive orders as satisfying some or all of the requirements in this subchapter, and substitute such procedures and documentation to reduce duplication. When an agency substitutes one or more procedures or documents for the requirements in this subchapter, the agency shall identify the respective requirements that are satisfied.

(d) Agency procedures should identify those activities or decisions that are not subject to NEPA, including:

(1) Activities or decisions expressly exempt from NEPA under another statute;

(2) Activities or decisions where compliance with NEPA would clearly

and fundamentally conflict with the requirements of another statute;

(3) Activities or decisions where compliance with NEPA would be inconsistent with Congressional intent expressed in another statute;

(4) Activities or decisions that are non-major Federal actions;

(5) Activities or decisions that are non-discretionary actions, in whole or in part, for which the agency lacks authority to consider environmental effects as part of its decision-making process; and

(6) Actions where the agency has determined that another statute's requirements serve the function of agency compliance with the Act.

(e) Agency procedures shall comply with the regulations in this subchapter except where compliance would be inconsistent with statutory requirements and shall include:

(1) Those procedures required by §§ 1501.2(b)(4) (assistance to applicants) and 1506.6(e) of this chapter (status information).

(2) Specific criteria for and identification of those typical classes of action:

(i) Which normally do require environmental impact statements.

(ii) Which normally do not require either an environmental impact statement or an environmental assessment and do not have a significant effect on the human environment (categorical exclusions (§ 1501.4 of this chapter)). Any procedures under this section shall provide for extraordinary circumstances in which a normally excluded action may have a significant environmental effect. Agency NEPA procedures shall identify when documentation of a categorical exclusion determination is required.

(iii) Which normally require environmental assessments but not necessarily environmental impact statements.

(3) Procedures for introducing a supplement to an environmental assessment or environmental impact statement into its formal administrative record, if such a record exists.

(f) Agency procedures may:

(1) Include specific criteria for providing limited exceptions to the provisions of the regulations in this subchapter for classified proposals. These are proposed actions that are specifically authorized under criteria established by an Executive order or statute to be kept secret in the interest of national defense or foreign policy and are in fact properly classified pursuant to such Executive order or statute. Agencies may safeguard and restrict from public dissemination

environmental assessments and environmental impact statements that address classified proposals in accordance with agencies' own regulations applicable to classified information. Agencies should organize these documents so that classified portions are included as annexes, so that the agencies can make the unclassified portions available to the public.

(2) Provide for periods of time other than those presented in § 1506.11 of this chapter when necessary to comply with other specific statutory requirements, including requirements of lead or cooperating agencies.

(3) Provide that, where there is a lengthy period between the agency's decision to prepare an environmental impact statement and the time of actual preparation, the agency may publish the notice of intent required by § 1501.9(d) of this chapter at a reasonable time in advance of preparation of the draft statement. Agency procedures shall provide for publication of supplemental notices to inform the public of a pause in its preparation of an environmental impact statement and for any agency decision to withdraw its notice of intent to prepare an environmental impact statement.

(4) Adopt procedures to combine its environmental assessment process with its scoping process.

(5) Establish a process that allows the agency to use a categorical exclusion listed in another agency's NEPA procedures after consulting with that agency to ensure the use of the categorical exclusion is appropriate. The process should ensure documentation of the consultation and identify to the public those categorical exclusions the agency may use for its proposed actions. Then, the agency may apply the categorical exclusion to its proposed actions.

### § 1507.4  Agency NEPA program information.

(a) To allow agencies and the public to efficiently and effectively access information about NEPA reviews, agencies shall provide for agency websites or other means to make available environmental documents, relevant notices, and other relevant information for use by agencies, applicants, and interested persons. Such means of publication may include:

(1) Agency planning and environmental documents that guide agency management and provide for public involvement in agency planning processes;

(2) A directory of pending and final environmental documents;

(3) Agency policy documents, orders, terminology, and explanatory materials regarding agency decision-making processes;

(4) Agency planning program information, plans, and planning tools; and

(5) A database searchable by geographic information, document status, document type, and project type.

(b) Agencies shall provide for efficient and effective interagency coordination of their environmental program websites, including use of shared databases or application programming interface, in their implementation of NEPA and related authorities.

■ 10. Revise part 1508 to read as follows:

## PART 1508—DEFINITIONS

Sec.
1508.1  Definitions.
1508.2  [Reserved]

**Authority:** 42 U.S.C. 4321–4347; 42 U.S.C. 4371–4375; 42 U.S.C. 7609; E.O. 11514, 35 FR 4247, 3 CFR, 1966–1970, Comp., p. 902, as amended by E.O. 11991, 42 FR 26967, 3 CFR, 1977 Comp., p. 123; and E.O. 13807, 82 FR 40463, 3 CFR, 2017, Comp., p. 369.

### § 1508.1  Definitions.

The following definitions apply to the regulations in this subchapter. Federal agencies shall use these terms uniformly throughout the Federal Government.

(a) *Act* or *NEPA* means the National Environmental Policy Act, as amended (42 U.S.C. 4321, *et seq.*).

(b) *Affecting* means will or may have an effect on.

(c) *Authorization* means any license, permit, approval, finding, determination, or other administrative decision issued by an agency that is required or authorized under Federal law in order to implement a proposed action.

(d) *Categorical exclusion* means a category of actions that the agency has determined, in its agency NEPA procedures (§ 1507.3 of this chapter), normally do not have a significant effect on the human environment.

(e) *Cooperating agency* means any Federal agency (and a State, Tribal, or local agency with agreement of the lead agency) other than a lead agency that has jurisdiction by law or special expertise with respect to any environmental impact involved in a proposal (or a reasonable alternative) for legislation or other major Federal action that may significantly affect the quality of the human environment.

(f) *Council* means the Council on Environmental Quality established by title II of the Act.

AR_0029112

(g) *Effects* or *impacts* means changes to the human environment from the proposed action or alternatives that are reasonably foreseeable and have a reasonably close causal relationship to the proposed action or alternatives, including those effects that occur at the same time and place as the proposed action or alternatives and may include effects that are later in time or farther removed in distance from the proposed action or alternatives.

(1) Effects include ecological (such as the effects on natural resources and on the components, structures, and functioning of affected ecosystems), aesthetic, historic, cultural, economic (such as the effects on employment), social, or health effects. Effects may also include those resulting from actions that may have both beneficial and detrimental effects, even if on balance the agency believes that the effect will be beneficial.

(2) A "but for" causal relationship is insufficient to make an agency responsible for a particular effect under NEPA. Effects should generally not be considered if they are remote in time, geographically remote, or the product of a lengthy causal chain. Effects do not include those effects that the agency has no ability to prevent due to its limited statutory authority or would occur regardless of the proposed action.

(3) An agency's analysis of effects shall be consistent with this paragraph (g). Cumulative impact, defined in 40 CFR 1508.7 (1978), is repealed.

(h) *Environmental assessment* means a concise public document prepared by a Federal agency to aid an agency's compliance with the Act and support its determination of whether to prepare an environmental impact statement or a finding of no significant impact, as provided in § 1501.6 of this chapter.

(i) *Environmental document* means an environmental assessment, environmental impact statement, finding of no significant impact, or notice of intent.

(j) *Environmental impact statement* means a detailed written statement as required by section 102(2)(C) of NEPA.

(k) *Federal agency* means all agencies of the Federal Government. It does not mean the Congress, the Judiciary, or the President, including the performance of staff functions for the President in his Executive Office. For the purposes of the regulations in this subchapter, Federal agency also includes States, units of general local government, and Tribal governments assuming NEPA responsibilities from a Federal agency pursuant to statute.

(l) *Finding of no significant impact* means a document by a Federal agency

briefly presenting the reasons why an action, not otherwise categorically excluded (§ 1501.4 of this chapter), will not have a significant effect on the human environment and for which an environmental impact statement therefore will not be prepared.

(m) *Human environment* means comprehensively the natural and physical environment and the relationship of present and future generations of Americans with that environment. (*See also* the definition of "effects" in paragraph (g) of this section.)

(n) *Jurisdiction by law* means agency authority to approve, veto, or finance all or part of the proposal.

(o) *Lead agency* means the agency or agencies, in the case of joint lead agencies, preparing or having taken primary responsibility for preparing the environmental impact statement.

(p) *Legislation* means a bill or legislative proposal to Congress developed by a Federal agency, but does not include requests for appropriations or legislation recommended by the President.

(q) *Major Federal action* or *action* means an activity or decision subject to Federal control and responsibility subject to the following:

(1) Major Federal action does not include the following activities or decisions:

(i) Extraterritorial activities or decisions, which means agency activities or decisions with effects located entirely outside of the jurisdiction of the United States;

(ii) Activities or decisions that are non-discretionary and made in accordance with the agency's statutory authority;

(iii) Activities or decisions that do not result in final agency action under the Administrative Procedure Act or other statute that also includes a finality requirement;

(iv) Judicial or administrative civil or criminal enforcement actions;

(v) Funding assistance solely in the form of general revenue sharing funds with no Federal agency control over the subsequent use of such funds;

(vi) Non-Federal projects with minimal Federal funding or minimal Federal involvement where the agency does not exercise sufficient control and responsibility over the outcome of the project; and

(vii) Loans, loan guarantees, or other forms of financial assistance where the Federal agency does not exercise sufficient control and responsibility over the effects of such assistance (for example, action does not include farm ownership and operating loan

guarantees by the Farm Service Agency pursuant to 7 U.S.C. 1925 and 1941 through 1949 and business loan guarantees by the Small Business Administration pursuant to 15 U.S.C. 636(a), 636(m), and 695 through 697g).

(2) Major Federal actions may include new and continuing activities, including projects and programs entirely or partly financed, assisted, conducted, regulated, or approved by Federal agencies; new or revised agency rules, regulations, plans, policies, or procedures; and legislative proposals (§ 1506.8 of this chapter).

(3) Major Federal actions tend to fall within one of the following categories:

(i) Adoption of official policy, such as rules, regulations, and interpretations adopted under the Administrative Procedure Act, 5 U.S.C. 551 *et seq.* or other statutes; implementation of treaties and international conventions or agreements, including those implemented pursuant to statute or regulation; formal documents establishing an agency's policies which will result in or substantially alter agency programs.

(ii) Adoption of formal plans, such as official documents prepared or approved by Federal agencies, which prescribe alternative uses of Federal resources, upon which future agency actions will be based.

(iii) Adoption of programs, such as a group of concerted actions to implement a specific policy or plan; systematic and connected agency decisions allocating agency resources to implement a specific statutory program or executive directive.

(iv) Approval of specific projects, such as construction or management activities located in a defined geographic area. Projects include actions approved by permit or other regulatory decision as well as Federal and federally assisted activities.

(r) *Matter* includes for purposes of part 1504 of this chapter:

(1) With respect to the Environmental Protection Agency, any proposed legislation, project, action or regulation as those terms are used in section 309(a) of the Clean Air Act (42 U.S.C. 7609).

(2) With respect to all other agencies, any proposed major Federal action to which section 102(2)(C) of NEPA applies.

(s) *Mitigation* means measures that avoid, minimize, or compensate for effects caused by a proposed action or alternatives as described in an environmental document or record of decision and that have a nexus to those effects. While NEPA requires consideration of mitigation, it does not mandate the form or adoption of any mitigation. Mitigation includes:

(1) Avoiding the impact altogether by not taking a certain action or parts of an action.

(2) Minimizing impacts by limiting the degree or magnitude of the action and its implementation.

(3) Rectifying the impact by repairing, rehabilitating, or restoring the affected environment.

(4) Reducing or eliminating the impact over time by preservation and maintenance operations during the life of the action.

(5) Compensating for the impact by replacing or providing substitute resources or environments.

(t) *NEPA process* means all measures necessary for compliance with the requirements of section 2 and title I of NEPA.

(u) *Notice of intent* means a public notice that an agency will prepare and consider an environmental impact statement.

(v) *Page* means 500 words and does not include explanatory maps, diagrams, graphs, tables, and other means of graphically displaying quantitative or geospatial information.

(w) *Participating agency* means a Federal, State, Tribal, or local agency participating in an environmental review or authorization of an action.

(x) *Proposal* means a proposed action at a stage when an agency has a goal, is actively preparing to make a decision on one or more alternative means of accomplishing that goal, and can meaningfully evaluate its effects. A proposal may exist in fact as well as by agency declaration that one exists.

(y) *Publish* and *publication* mean methods found by the agency to efficiently and effectively make environmental documents and information available for review by interested persons, including electronic publication, and adopted by agency NEPA procedures pursuant to § 1507.3 of this chapter.

(z) *Reasonable alternatives* means a reasonable range of alternatives that are technically and economically feasible, meet the purpose and need for the proposed action, and, where applicable, meet the goals of the applicant.

(aa) *Reasonably foreseeable* means sufficiently likely to occur such that a person of ordinary prudence would take it into account in reaching a decision.

(bb) *Referring agency* means the Federal agency that has referred any matter to the Council after a determination that the matter is unsatisfactory from the standpoint of public health or welfare or environmental quality.

(cc) *Scope* consists of the range of actions, alternatives, and impacts to be considered in an environmental impact statement. The scope of an individual statement may depend on its relationships to other statements (§ 1501.11 of this chapter).

(dd) *Senior agency official* means an official of assistant secretary rank or higher (or equivalent) that is designated for overall agency NEPA compliance, including resolving implementation issues.

(ee) *Special expertise* means statutory responsibility, agency mission, or related program experience.

(ff) *Tiering* refers to the coverage of general matters in broader environmental impact statements or environmental assessments (such as national program or policy statements) with subsequent narrower statements or environmental analyses (such as regional or basin-wide program statements or ultimately site-specific statements) incorporating by reference the general discussions and concentrating solely on the issues specific to the statement subsequently prepared.

**§ 1508.2  [Reserved]**

**PARTS 1515 THROUGH 1518 [DESIGNATED AS SUBCHAPTER B]**

■ 11. Designate parts 1515 through 1518 as subchapter B and add a heading for newly designated subchapter B to read as follows:

**Subchapter B—Administrative Procedures and Operations**

[FR Doc. 2020–15179 Filed 7–15–20; 4:15 pm]

**BILLING CODE 3225–F0–P**

timely and predictable process, and avoidance of litigation.

## C. Proposed Revisions to NEPA and Agency Planning (Part 1501)

CEQ proposes significant changes to part 1501. CEQ proposes to replace the current 40 CFR 1501.1, "Purpose," because it is unnecessary and duplicative, with a new section to address threshold considerations. CEQ proposes to add additional sections to address the level of NEPA review and CEs. CEQ further proposes to consolidate and clarify provisions on EAs and FONSIs, and relocate from part 1502 the provisions on tiering and incorporation by reference. CEQ also proposes to set presumptive time limits for the completion of NEPA reviews, and clarify the roles of lead and cooperating agencies to further the OFD policy and encourage more efficient and timely NEPA reviews.

### 1. NEPA Threshold Applicability Analysis (§ 1501.1)

Since the enactment of NEPA, courts have examined the applicability of NEPA based on a variety of considerations. For example, courts have found that NEPA is inapplicable where an agency is carrying out a non-discretionary duty or obligation, where an agency's statutory obligations clearly or fundamentally conflict with NEPA compliance, where Congress has established requirements under another statute that displaces NEPA compliance, and where environmental review and public participation procedures under another statute are functionally equivalent to those required by NEPA.

CEQ proposes a new § 1501.1, "NEPA threshold applicability analysis," to provide a series of considerations to assist agencies in a threshold analysis for determining whether NEPA applies. CEQ also proposes related changes in § 1507.3(c) to provide that agencies may identify actions that are not subject to NEPA in their agency NEPA procedures. Paragraph (b) of § 1501.1 would clarify that agencies can also make this determination on a case-by-case basis.

### 2. Apply NEPA Early in the Process (§ 1501.2)

CEQ proposes to amend the introductory paragraph of § 1501.2, "Apply NEPA early in the process," to change "shall" to "should" and "possible" to "reasonable." Agencies need the discretion to structure the timing of their NEPA processes to align with their decision-making processes, consistent with their statutory authorities. Agencies need flexibility to determine the appropriate time to start the NEPA process, based on the context of the particular proposed action and governed by the rule of reason, so that the NEPA analysis meaningfully informs the agency's decision. The appropriate time to begin the NEPA process is dependent on when the agency has sufficient information and how it can most effectively integrate the NEPA review into the agency's decision-making process. Further, some have viewed this provision as a legally enforceable standard, rather than an opportunity for agencies to integrate NEPA into their decision-making programs and processes. CEQ's view is that agencies should have discretion with respect to timing, consistent with its regulatory provisions for deferring NEPA analysis to appropriate points in the decision-making process. *See* 40 CFR 1508.28. This proposed amendment is consistent with CEQ guidance that agencies should "concentrate on relevant environmental analysis" in their EISs rather than "produc[ing] an encyclopedia of all applicable information." Timely Environmental Reviews Guidance, *supra* note 21; *see also* 40 CFR 1500.4(b) and 1502.2(a). Therefore, CEQ proposes these changes to clarify that agencies have discretion to structure their NEPA processes in accordance with the rule of reason. CEQ also proposes to change "possible" to "reasonable" in paragraph (b)(4)(iii) and "shall" to "should" in the introductory paragraph of § 1502.5 for consistency.

CEQ also proposes to amend § 1501.2(b)(2) to clarify that agencies should consider economic and technical analyses along with environmental effects. Finally, CEQ proposes to amend paragraph (b)(4)(ii) to change "agencies" to "governments" consistent with and in support of government-to-government consultation pursuant to E.O. 13175 [56] and E.O. 13132, "Federalism." [57] For consistency, CEQ also proposes revisions to §§ 1501.9(b) and 1503.1(a)(2)(ii).

### 3. Determine the Appropriate Level of NEPA Review (§ 1501.3)

NEPA requires a "detailed statement" for "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. 4332(2)(C). To determine whether an action requires such a detailed statement, the CEQ regulations provide three levels of review for Federal agencies to assess proposals for agency action. Specifically, the CEQ regulations allow agencies to review expeditiously those actions that normally do not have significant effects by using CEs or, for actions that are not likely to have significant effects, by preparing an EA. Through the use of CEs and EAs, agencies then can focus their limited resources on those actions that are likely to have significant effects and require the "detailed statement," or EIS, required by NEPA.

While the existing CEQ regulations provide for these three levels of NEPA review, they do not clearly set out the decisional framework by which agencies should assess their proposed actions and select the appropriate level of review. To provide this direction and clarity, the proposed rule would add two additional sections to part 1501, renumber the remaining sections, and retitle two sections. The proposed § 1501.3, "Determine the appropriate level of NEPA review," would describe the three levels of NEPA review and the basis upon which an agency makes a determination regarding the appropriate level of review for a proposed action. While this section would supplement the existing regulations, these concepts exist in the current 40 CFR 1501.4 (whether to prepare an EIS), 1508.4 (CEs), and 1508.9 (EAs).

Additionally, paragraph (b) would address the consideration of significance, which is central to determining the appropriate level of review. CEQ proposes to move and simplify the operative language from 40 CFR 1508.27, "Significantly." CEQ proposes to change "context" to "potentially affected environment" and "intensity" to "degree" to provide greater clarity as to what agencies should consider in assessing potential significant effects. CEQ did not include a consideration regarding controversy (40 CFR 1508.27(b)(4)) because this has been interpreted to mean scientific controversy. Additionally, CEQ did not include a consideration regarding the reference in 40 CFR 1508.27(b)(7) to "[s]ignificance cannot be avoided by terming an action temporary or by breaking it down into small component parts" because this is addressed in the criteria for scope in § 1501.9(e) and § 1502.4(a), which would provide that agencies evaluate in a single EIS proposals or parts of proposals that are related closely enough to be, in effect, a single course of action.

### 4. Categorical Exclusions (CEs) (§ 1501.4)

Under the CEQ regulations, agencies can categorically exclude actions from detailed review where the agency has found in its agency NEPA procedures that the action normally would not have

---

[56] *Supra* note 53.

[57] 64 FR 43255 (Aug. 10, 1999).

significant effects. Over the past 4 decades, Federal agencies have developed and documented more than 2,000 CEs.[58] CEQ estimates that each year, Federal agencies apply CEs to approximately 100,000 Federal agency actions that typically require little or no documentation.[59] While CEs are the most common level of NEPA review, CEQ has only addressed CE development and implementation in one comprehensive guidance document, see CE Guidance, supra note 17, and does not address CEs in detail in its current regulations.

In response to the ANPRM, many commenters requested that CEQ update the NEPA regulations to provide more detailed direction on the application of CEs. To provide greater clarity, CEQ proposes to add a new section on CEs. The proposed § 1501.4, "Categorical exclusions," would address in more detail the process by which an agency considers whether a proposed action is categorically excluded under NEPA. This proposed provision is consistent with the definition of categorical exclusion in 40 CFR 1508.4, which is a category of actions that the agency has found normally do not have a significant effect and listed in its agency NEPA procedures.

The proposed CE section would provide additional clarity on the process that agencies follow in applying a CE. In particular, paragraph (a) would provide that agencies identify CEs in their NEPA procedures, consistent with the requirement to establish CEs in agency NEPA procedures currently set forth in 40 CFR 1507.3(b)(2)(ii). The proposed regulations would move the requirement that agency NEPA procedures provide for extraordinary circumstances from the current 40 CFR 1508.4 to the proposed § 1507.3(d)(2)(ii) to consolidate all the requirements for establishing CEs in that regulation, while providing in the proposed § 1501.4 the procedure for evaluation of a proposed action for extraordinary circumstances. The definition of categorical exclusion only applies to those CEs created by an administrative determination in its agency NEPA procedures and does not apply to "legislative categorical exclusions" created by Congress, which are

governed by the terms of the specific statute and statutory interpretation of the agency charged with the implementation of the statute.

Paragraph (b) of proposed § 1501.4 would set forth the requirement for consideration of extraordinary circumstances once an agency determines that a CE covers a proposed action, consistent with the current requirement in 40 CFR 1508.4. Finally, paragraph (b)(1) would provide that, when extraordinary circumstances are present, agencies may consider whether mitigating circumstances, such as the design of the proposed action to avoid effects that create extraordinary circumstances, are sufficient to allow the proposed action to be categorically excluded. The change would clarify that the mere presence of extraordinary circumstances does not preclude the application of a CE. Rather, the agency may consider whether there is a close causal relationship between a proposed action and the potential effect on the conditions identified as extraordinary circumstances, and if such a relationship exists, the potential effect of a proposed action on these conditions. Accordingly, the agency could modify the proposed action to avoid the extraordinary circumstances so that the action fits in the categorical exclusion. While this reflects current practice for some agencies,[60] this revision would assist agencies as they consider whether to categorically exclude an action that would otherwise be considered in an EA and FONSI.

CEQ invites comment on these proposed revisions and on whether there are any other aspects of CEs that CEQ should address in its regulations. Specifically, CEQ invites comment on whether it should establish government-wide CEs in its regulations to address routine administrative activities, for example, internal orders or directives regarding agency operations, procurement of office supplies and travel, and rulemakings to establish administrative processes such as those established under the Freedom of Information Act or Privacy Act. Alternatively, CEQ invites comment on whether and how CEQ should revise the definition of major Federal action to exclude these categories from the definition, and if so, suggestions on how it should be addressed.

**5. Environmental Assessments (EAs) (§ 1501.5)**

Under the current CEQ regulations, when an agency has not categorically excluded a proposed action, the agency can prepare an EA to document its effects analysis. If the analysis in the EA demonstrates that the action's effects would not be significant, the agency documents its reasoning in a FONSI, which completes the NEPA process; otherwise, the agency uses the EA to help prepare an EIS. See 40 CFR 1508.9 and 1508.13. CEQ estimates that Federal agencies prepare approximately 10,000 EAs each year.[61]

The current CEQ regulations address the requirements for EAs in a few provisions, and, in response to the ANPRM, some commenters requested that the regulations provide more detailed direction related to EAs. Currently, 40 CFR 1508.9 defines an EA as a "concise public document" that agencies may use to comply with NEPA and determine whether to prepare an EIS or a FONSI. This section also sets forth the basic requirements for an EA's contents. Current 40 CFR 1501.4(b) provides the public involvement requirements for EAs. These essential requirements of an EA would remain under the proposed regulations, but CEQ proposes to consolidate them into a single section to improve readability.

Under the current regulations, the format for an EA is flexible and responsive to agency decision-making needs and the circumstances of the particular proposal for agency action. The proposed CEQ regulations would continue to provide that an EA may be prepared by and with other agencies, applicants, and the public. Modern information technology can help facilitate this collaborative EA preparation, allowing the agency to make a coordinated but independent evaluation of the environmental issues and assume responsibility for the scope and content of the EA.

CEQ proposes to revise paragraph (a) of proposed § 1501.5 (current 40 CFR 1501.3) to clarify that an agency must prepare an EA when necessary to determine whether a proposed action would have a significant effect or the significance of the effects is unknown, unless a CE applies to the proposed action or the agency decides to prepare an EIS. CEQ proposes to move the operative language relating to an EA

---

[58] See Council on Environmental Quality, List of Federal Agency Categorical Exclusions (Dec. 14, 2018), https://ceq.doe.gov/nepa-practice/categorical-exclusions.html.

[59] See, e.g., Council on Environmental Quality, The Eleventh and Final Report on the National Environmental Policy Act Status and Progress for American Recovery and Reinvestment Act of 2009 Activities and Projects (Nov. 2, 2011), https://ceq.doe.gov/docs/ceq-reports/nov2011/CEQ_ARRA_NEPA_Report_Nov_2011.pdf.

[60] See, e.g., Forest Service categorical exclusions, 36 CFR 220.6(b)(2) and surface transportation categorical exclusions, 23 CFR 771.116–771.118.

[61] See, e.g., Council on Environmental Quality, Fourth Report on Cooperating Agencies in Implementing the Procedural Requirements of the National Environmental Policy Act, Attachment A (Oct. 4, 2016), https://ceq.doe.gov/docs/ceq-reports/Attachment-A-Fourth-Cooperating-Agency-Report_Oct2016.pdf.

AR_0029127



# A Strategy for Improving the Mitigation Policies and Practices of The Department of the Interior












## A Report to The Secretary of the Interior

## From The Energy and Climate Change Task Force



## April 2014

AR_0029200



# A Strategy for Improving the Mitigation Policies and Practices of The Department of the Interior

*A Report to The Secretary of the Interior
From The Energy and Climate Change Task Force*

**Lead Authors:**

Joel P. Clement
Alletta d'A. Belin
Michael J. Bean
Ted A. Boling
James R. Lyons

**April 2014**

AR_0029201

# Table of Contents

**Executive Summary** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    i

**Chapter 1** - *Introduction* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    1

**Chapter 2** - *Mitigation: Origin, Purpose, and Basic Concepts* . . . . . . . . . . . . . . . . . . . . . . . . .    2

**Chapter 3** - *Mitigation Challenges* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    5

**Chapter 4** - *Landscape-Scale Mitigation Strategy: Guiding Principles* . . . . . . . . . . . . . . . . . . . .    9

**Chapter 5** - *Landscape-Scale Mitigation Strategy: Implementation* . . . . . . . . . . . . . . . . . . . . .   13

**Chapter 6** - *Signs of Progress* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   16

**Chapter 7** - *Conclusion* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   19

**References** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   20

**Appendix I:** *Authorities, Regulations, and Guidance* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   21

**Appendix II:** *Outreach* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   24

**Appendix III:** *Key To Acronyms* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   25

**Suggested citation:**
Clement, J.P. et al. 2014. A strategy for improving the mitigation policies and practices of the Department of the Interior. A report to the Secretary of the Interior from the Energy and Climate Change Task Force, Washington, D.C., 25 p.