documented consistent with legal requirements and applicable docket policies. Generally, all significant public comments received by the Agency should be responded to either in the preamble of the action itself or in an accompanying Response to Comments document.

In general, you will be expected to follow the same basic process steps to finalize the action, thereby having additional opportunities to ensure that you satisfy the Agency's commitments to both identify and address EJ concerns, and to provide meaningful involvement in the ADP.

The Action Memorandum for the final action should address the management questions identified previously, as well as related public comments, and how the action changed as a result of those comments. These answers will accompany the action when it goes to the Administrator or other Agency official for signature.

---

### Rulemaking Gateway

When considering public comments and consulting with management, your office may alter its belief that an action might be of particular interest to or have particular impacts upon minority, low-income, or indigenous populations, or tribes. Should such a change occur, you should alter the answer you provide to the EJ Question in RAPIDS (illustrated in the section titled "ADP Steps 1 and 2"). The EJ Question is on the Maintenance Form for every action in RAPIDS and can be altered at any time. Changes to Tier 1 and Tier 2 actions are updated once a month on the Rulemaking Gateway so the public can access EPA's latest thinking about an action.

---

# Appendix A

# Executive Order 12898: Federal Actions to Address Environmental Justice in Minority Populations and Low-Income Populations[1]

### Title 3—The President

"By the authority invested in me as President by the Constitution and the laws of the United States of America, it is hereby ordered as follows:"

### Section 1-1. *Implementation.*

**1-101.** *Agency Responsibilities.* To the greatest extent practicable and permitted by law, and consistent with the principles set forth in the report on the National Performance Review, each Federal agency shall make achieving environmental justice part of its mission by identifying and addressing, as appropriate, disproportionately high and adverse human health or environmental effects of its programs, policies, and activities on minority populations and low-income populations in the United States and its territories and possessions, the District of Columbia, the Commonwealth of Puerto Rico, and the Commonwealth of the Mariana Islands.

**1-102.** *Creation of an Interagency Working Group on Environmental Justice.* (a) Within 3 months of the date of this order, the Administrator of the Environmental Protection Agency ("Administrator") or the Administrator's designee shall convene an interagency Federal Working Group on Environmental Justice ("Working Group"). The Working Group shall comprise the heads of the following executive agencies and offices, or their designees: (a) Department of Defense; (b) Department of Health and Human Services; (c) Department of Housing and Urban Development; (d) Department of Labor; (e) Department of Agriculture; (f) Department of Transportation; (g) Department of Justice; (h) Department of the Interior; (i) Department of Commerce; (j) Department of Energy; (k) Environmental Protection Agency; (l) Office of Management and Budget; (m) Office of Science and Technology Policy; (n) Office of the Deputy Assistant to the President for Environmental Policy; (o) Office of the Assistant to the President for Domestic Policy; (p) National Economic Council; (q) Council of Economic Advisers; and (r) such other Government officials as the President may designate. The Working Group shall report to the President through the Deputy Assistant to the President for Environmental Policy and the Assistant to the President for Domestic Policy.

(b) The Working Group shall: (1) provide guidance to Federal agencies on criteria for identifying disproportionately high and adverse human health or environmental effects on minority populations and low-income populations;

Appendix A Executive Order 12898: Federal Actions to Address Environmental Justice in Minority Populations and Low-Income Populations

[1] *59 FR 7629, Feb. 16, 1994.*

A-1

(2) coordinate with, provide guidance to, and serve as a clearinghouse for, each Federal agency as it develops an environmental justice strategy as required by section 1-103 of this order, in order to ensure that the administration, interpretation and enforcement of programs, activities and policies are undertaken in a consistent manner;

(3) assist in coordinating research by, and stimulating cooperation among, the Environmental Protection Agency, the Department of Health and Human Services, the Department of Housing and Urban Development, and other agencies conducting research or other activities in accordance with section 3-3 of this order;

(4) assist in coordinating data collection, required by this order;

(5) examine existing data and studies on environmental justice;

(6) hold public meetings as required in section 5-502(d) of this order; and

(7) develop interagency model projects on environmental justice that evidence cooperation among Federal agencies.

1-103. *Development of Agency Strategies.* (a) Except as provided in section 6-605 of this order, each Federal agency shall develop an agency-wide environmental justice strategy, as set forth in subsections (b)-(e) of this section that identifies and addresses disproportionately high and adverse human health or environmental effects of its programs, policies, and activities on minority populations and low-income populations. The environmental justice strategy shall list programs, policies, planning and public participation processes, enforcement, and/or rulemakings related to human health or the environment that should be revised to, at a minimum: (1) promote enforcement of all health and environmental statutes in areas with minority populations and low-income populations: (2) ensure greater public participation; (3) improve research and data collection relating to the health of and environment of minority populations and low-income populations; and (4) identify differential patterns of consumption of natural resources among minority populations and low-income populations. In addition, the environmental justice strategy shall include, where appropriate, a timetable for undertaking identified revisions and consideration of economic and social implications of the revisions.

(b) Within 4 months of the date of this order, each Federal agency shall identify an internal administrative process for developing its environmental justice strategy, and shall inform the Working Group of the process.

(c) Within 6 months of the date of this order, each Federal agency shall provide the Working Group with an outline of its proposed environmental justice strategy.

(d) Within 10 months of the date of this order, each Federal agency shall provide the Working Group with its proposed environmental justice strategy.

(e) Within 12 months of the date of this order, each Federal agency shall finalize its environmental justice strategy and provide a copy and written description of its strategy to the Working Group. During the 12 month period from the date of this order, each Federal agency, as part of its environmental justice strategy, shall identify several specific projects that can be promptly undertaken to address particular concerns identified during the development of the proposed environmental justice strategy, and a schedule for implementing those projects.

(f) Within 24 months of the date of this order, each Federal agency shall report to the Working Group on its progress in implementing its agency-wide environmental justice strategy.

(g) Federal agencies shall provide additional periodic reports to the Working Group as requested by the Working Group.

**1-104.** *Reports to the President.* Within 14 months of the date of this order, the Working Group shall submit to the President, through the Office of the Deputy Assistant to the President for Environmental Policy and the Office of the Assistant to the President for Domestic Policy, a report that describes the implementation of this order, and includes the final environmental justice strategies described in section 1-103(e) of this order.

## Sec. 2-2. *Federal Agency Responsibilities for Federal Programs.*

Each Federal agency shall conduct its programs, policies, and activities that substantially affect human health or the environment, in a manner that ensures that such programs, policies, and activities do not have the effect of excluding persons (including populations) from participation in, denying persons (including populations) the benefits of, or subjecting persons (including populations) to discrimination under, such programs, policies, and activities, because of their race, color, or national origin.

## Sec. 3-3. *Research, Data Collection, and Analysis.*

3-301. *Human Health and Environmental Research and Analysis.* (a) Environmental human health research, whenever practicable and appropriate, shall include diverse segments of the population in epidemiological and clinical studies, including segments at high risk from environmental hazards, such as minority populations, low-income populations and workers who may be exposed to substantial environmental hazards.

(b) Environmental human health analyses, whenever practicable and appropriate, shall identify multiple and cumulative exposures.

(c) Federal agencies shall provide minority populations and low-income populations the opportunity to comment on the development and design of research strategies undertaken pursuant to this order.

3-302. *Human Health and Environmental Data Collection and Analysis.* To the extent permitted by existing law, including the Privacy Act, as amended (5 U.S.C. section 552a): (a) each Federal agency, whenever practicable and appropriate, shall collect, maintain, and analyze information assessing and comparing environmental and human health risks borne by populations identified by race, national origin, or income. To the extent practical and appropriate, Federal agencies shall use this information to determine whether their programs, policies, and activities have disproportionately high and adverse human health or environmental effects on minority populations and low-income populations;

(b) In connection with the development and implementation of agency strategies in section 1-103 of this order, each Federal agency, whenever practicable and appropriate, shall collect, maintain and analyze information on the race, national

Appendix A: Executive Order 12898: Federal Actions to Address Environmental Justice in Minority Populations and Low-Income Populations

A-3

origin, income level, and other readily accessible and appropriate information for areas surrounding facilities or sites expected to have a substantial environmental, human health, or economic effect on the surrounding populations, when such facilities or sites become the subject of a substantial Federal environmental administrative or judicial action. Such information shall be made available to the public, unless prohibited by law; and

(c) Each Federal agency, whenever practicable and appropriate, shall collect, maintain, and analyze information on the race, national origin, income level, and other readily accessible and appropriate information for areas surrounding Federal facilities that are: (1) subject to the reporting requirements under the Emergency Planning and Community Right-to-Know Act, 42 U.S.C. section 11001-11050 as mandated in Executive Order No. 12856; and (2) expected to have a substantial environmental, human health, or economic effect on surrounding populations. Such information shall be made available to the public unless prohibited by law.

(d) In carrying out the responsibilities in this section, each Federal agency, whenever practicable and appropriate, shall share information and eliminate unnecessary duplication of efforts through the use of existing data systems and cooperative agreements among Federal agencies and with State, local, and tribal governments.

## Sec. 4-4. *Subsistence Consumption Of Fish And Wildlife.*

**4-401.** *Consumption Patterns.* In order to assist in identifying the need for ensuring protection of populations with differential patterns of subsistence consumption of fish and wildlife, Federal agencies, whenever practicable and appropriate, shall collect, maintain, and analyze information on the consumption patterns of populations who principally rely on fish and/or wildlife for subsistence. Federal agencies shall communicate to the public the risks of those consumption patterns.

**4-402.** *Guidance.* Federal agencies, whenever practicable and appropriate, shall work in a coordinated manner to publish guidance reflecting the latest scientific information available concerning methods for evaluating the human health risks associated with the consumption of pollutant-bearing fish or wildlife. Agencies shall consider such guidance in developing their policies and rules.

## Sec. 5-5. *Public Participation and Access to Information.*

(a) The public may submit recommendations to Federal agencies relating to the incorporation of environmental justice principles into Federal agency programs or policies. Each Federal agency shall convey such recommendations to the Working Group.

(b) Each Federal agency may, whenever practicable and appropriate, translate crucial public documents, notices, and hearings relating to human health or the environment for limited English speaking populations.

(c) Each Federal agency shall work to ensure that public documents, notices, and hearings relating to human health or the environment are concise, understandable, and readily accessible to the public.

(d) The Working Group shall hold public meetings, as appropriate, for the purpose of fact-finding, receiving public comments, and conducting inquiries concerning environmental justice. The Working Group shall prepare for public review a summary of the comments and recommendations discussed at the public meetings.

## Sec. 6-6. *General Provisions.*

**6-601.** *Responsibility for Agency Implementation.* The head of each Federal agency shall be responsible for ensuring compliance with this order. Each Federal agency shall conduct internal reviews and take such other steps as may be necessary to monitor compliance with this order.

**6-602.** *Executive Order No. 12250.* This Executive order is intended to supplement but not supersede Executive Order No. 12250, which requires consistent and effective implementation of various laws prohibiting discriminatory practices in programs receiving Federal financial assistance. Nothing herein shall limit the effect or mandate of Executive Order No. 12250.

**6-603.** *Executive Order No. 12875.* This Executive order is not intended to limit the effect or mandate of Executive Order No. 12875.

**6-604.** *Scope.* For purposes of this order, Federal agency means any agency on the Working Group, and such other agencies as may be designated by the President, that conducts any Federal program or activity that substantially affects human health or the environment. Independent agencies are requested to comply with the provisions of this order.

**6-605.** *Petitions for Exemptions.* The head of a Federal agency may petition the President for an exemption from the requirements of this order on the grounds that all or some of the petitioning agency's programs or activities should not be subject to the requirements of this order.

**6-606.** *Native American Programs.* Each Federal agency responsibility set forth under this order shall apply equally to Native American programs. In addition, the Department of the Interior, in coordination with the Working Group, and, after consultation with tribal leaders, shall coordinate steps to be taken pursuant to this order that address Federally-recognized Indian Tribes.

**6-607.** *Costs.* Unless otherwise provided by law, Federal agencies shall assume the financial costs of complying with this order.

**6-608.** *General.* Federal agencies shall implement this order consistent with, and to the extent permitted by, existing law.

**6-609.** *Judicial Review.* This order is intended only to improve the internal management of the executive branch and is not intended to, nor does it create any right, benefit, or trust responsibility, substantive or procedural, enforceable at law or equity by a party against the United States, its agencies, its officers, or any person. This order shall not be construed to create any right to judicial review involving the compliance or non-compliance of the United States, its agencies, its officers, or any other person with this order.

William J. Clinton
THE WHITE HOUSE
*February 11, 1994*

Appendix A: Executive Order 12898:
Federal Actions to Address Environmental
Justice in Minority Populations and Low-
Income Populations

A-5

# Appendix B

## Incorporating Environmental Justice into Tier 1 and Tier 2 Actions under the ADP



1. Statute, court order, Presidential Initiative, or Administrator's priority as cause for taking a regulatory-related action.

1. Addressing an identified EJ concern could also serve as a reason to take an action.

2. Tiering: Lead program gives tiering form with recommended tier level to Regulatory Management Division for distribution to the Regulatory Steering Committee.

2. Answer EJ question in RAPIDS, answer gets posted on Rulemaking Gateway.

3. Workgroup prepares Preliminary Analytic Blueprint.

3. Complete an initial EJ screen. If there are potential EJ concerns, conduct initial outreach; notify/consult EJ Coordinator; identify issues; and determine any data gathering, consultation, and analyses that should be undertaken. If no potential EJ concerns, rule writer does not address EJ until Step 9 (preamble development), unless unexpected EJ concerns arise.

4. Early Guidance: T1: A/DA & AAs; T2: Lead AA & participating AAs.

4. Managers ask if there are EJ concerns. If yes, managers may ask 3 core questions. Review information to be gathered for the analysis.

5. Workgroup prepares Detailed Analytic Blueprint (DABP)—a workgroup's plan for developing analysis and outreach on scientific, economic, and legal issues; stakeholder involvement; and implementation, enforcement, and compliance assurance.

5. Ensure DABP addresses EJ, i.e., in public involvement plan, key analyses, information gathered, options to be considered, & in the timeline.

6. Management approves DAPB

6. Managers assess how EJ concerns are addressed in DABP before approving it.

7. Workgroup undertakes outreach, required consultation, & conducts analyses (e.g., impacts on state, local, and tribal gov'ts; small businesses, children's health issues; etc.); and develops options.

7. Prepare data on results of consultations/public involvement and data on EJ impacts and options, including options to mitigate adverse effects, as appropriate.

8. Options selection: T1: A/DA & AAs; T2: Lead AA & Workgroup.

8. Identify whether EJ concerns have been addressed. Be prepared to answer 3 core questions.

9. Workgroup prepares preamble, rule/action, and supporting documents.

9. Discuss and document EJ in impact analyses; address E.O. 12898 and EJ policies in preamble. If applicable, address outreach, consider highlighting EJ options for comment, and address significant EJ issues in Action Memo.

10. Final Agency Review (FAR) meeting: AA/RA position of participating Offices/Regions.

10. As part of Action Memo, address 3 core questions.

11. If rule is "significant" under E.O. 12866, OPEI reviews and submits to OMB.

12. OMB Review: OMB has 90 days to review "significant" rules.

13. Administrator or AA/RA signs.

13. All Action Memos describe what was done to identify and address EJ concerns.

14. EPA submits rule to the Office of Federal Register for publication. Docket opened to the public.

14. Document what was done to identify and address EJ concerns.

15. Public comment period (typically 60-90 days); public hearing as applicable.

15A. If EJ concerns were identified, conduct appropriate outreach.

15B. Address EJ comments and consider new options as appropriate.

16. Develop the final action. (Process Steps 4-14 are repeated.)

## Incorporating Environmental Justice into Tier 3 Actions under the ADP



AR_0029275

# Appendix C
# A Quick Reference Guide for EPA Managers: Integrating EJ Into the ADP

This Quick Reference Guide is intended to serve as a reference tool for EPA Managers by providing a brief overview of the guidance provided in this new Interim Guide. It is not intended to replace the Guide and does not, therefore, repeat the details provided in it or elsewhere. Instead, this quick reference hits the highlights to point you to the Guide and/or other sources.

**What is Meant by "Environmental Justice?"**

EPA defines "environmental justice" as the *fair treatment and meaningful involvement* of all people, particularly minority, low-income, and indigenous populations, and tribes, in the development, implementation, and enforcement of environmental laws, regulations, and policies.

**What is the Manager's Overall Role?**

EPA Managers decide what needs to be done related to EJ concerns for Agency actions under development. This decision may be made in the context of a particular action or can also be made for a category of actions that are similar and have the same general impacts.[1] Managers communicate expectations to the Workgroup, establish policy priorities, identify issues of significant concern, and guide the process of developing the action. As a result, Managers play a key role in ensuring that the potential EJ implications of an action are considered during the development of that action, and that populations affected by the action have an opportunity to participate.

**What Are the Management Questions for the Workgroup?**

The Guide suggests that Managers ask Workgroups about their efforts to address the following questions at key points during the development of the action under the ADP (such as at Early Guidance, Options Selection, or Final Agency Review):

1. How will your (or how did your) public participation process provide transparency and meaningful participation for minority, low-income, and indigenous populations, and tribes?

---

[1] In the Guide, this is referred to as "screening." See page 19 of *Interim Guidance on Considering Environmental Justice During the Development of an Action.*

2. How do you plan to (or how did you) identify and address existing and new disproportionate environmental and public health impacts on minority, low-income, and indigenous populations during the rulemaking process?

3. How did the actions taken under #1 and #2 impact the outcome or final decision?

## When and How Can Managers Participate?

| Activities for Managers | See page: |
|---|---|
| <u>Consider EJ when you decide which actions to pursue.</u> The decision to initiate an action is an opportunity for you to consider whether the actions under consideration involve—or have the potential to involve—EJ concerns. | 19 |
| <u>Identify the potential for EJ concerns at the beginning.</u> EJ concerns may arise when a proposed action would: a) create disproportionate impacts, b) exacerbate existing disproportionate impacts, or c) not address existing disproportionate impacts. | 6, 19 |
| <u>Set clear expectations about EJ concerns in the Early Guidance you provide to the Workgroup.</u> This is likely to be the first opportunity for you to meet with the Workgroup to discuss the action and provide your expectations on that effort—including those associated with identifying and addressing EJ concerns. To start, you can provide the management questions that the Workgroup will be expected to answer at the end of their effort. Consider also providing your guidance on the level of analysis you might like to see when making decisions later, as well as the level of outreach to and involvement of populations affected by the action. Consider asking for an assessment of resource needs to perform different levels of analyses and/or outreach. | 24 |
| <u>Review the Analytic Blueprint to ensure the Workgroup addresses EJ concerns.</u> Your review and approval of the Analytic Blueprint may be the final opportunity for you to provide direction before resources are committed. In this review, you may want to consider whether the Analytic Blueprint includes the following information:<br><br>• The identification of potentially affected populations and related stakeholders, along with a plan for how the Workgroup will ensure outreach and meaningful involvement of these populations.<br><br>• The identification of analytical needs (scientific and economic) and a plan for ensuring the consideration of EJ in those analyses.<br><br>• An identification of related resources needed to address both the outreach activities and analytical needs, along with whether additional resources are needed to meet expectations. | 27 |
| <u>Consider EJ concerns related to the options presented to you.</u> Different options may involve different EJ concerns or provide different opportunities to address existing disproportionate impacts. The Workgroup should highlight this information for your consideration in making decisions about the options. | 28 |
| <u>Document the Workgroup's efforts and activities to identify and address EJ concerns.</u> The Action Memorandum on which you concur or sign should describe the efforts undertaken by providing answers to the management questions. | 29 |

## Where Can I Get More Information About EJ Considerations or the ADP?

Internal EPA guidance and information about the ADP can be found at http://intranet.epa.gov/adplibrary/. Tools and guidance for assessing potential EJ concerns are available at http://www.epa.gov/Compliance/resources/policies/ej/#tools.

AR_0029277

# Appendix D
# A Checklist for EPA Workgroup Chairs: Integrating EJ Into the ADP

EPA Workgroup Chairs can use this checklist to identify what they may need to know and/or do to integrate EJ into the development of their action. The checklist is based on available guidance, including that provided in the Agency's new *Interim Guidance on Considering Environmental Justice During the Development of an Action (Interim Guide)*. It is not intended to replace the Guide and does not, therefore, repeat the details provided there or elsewhere. Instead, the checklist identifies ADP-related activities and provides relevant highlights and references to the Guide and/or other resources.

| ✓ | Activity |
|---|---|
| **1.** | **BEFORE you start – LEARN the basics about the ADP and EJ** ⎮ Pages 1-32, B1-B2 |
| ❏ | Are you familiar with the process steps under the ADP?[1] |
| ❏ | Have you read the new Agency Interim Guide?[2] |
| ❏ | Do you know what the Executive Order on EJ requires? |
| ❏ | What is meant by "environmental justice?" |
| ❏ | What is meant by an "EJ concern?" |
| ❏ | How can a workgroup identify, assess, and address potential EJ concerns during the development of the action? <br><br> -If you need a refresher on the process steps involved in the ADP, please see the flowcharts provided in Appendix B of the Interim Guide. |
| ❏ | Do you know the roles of different workgroup members? |
| ❏ | Do you know the core management questions? (See item #6 on this Checklist). |
| **2.** | **Getting Started – SCREEN your action** ⎮ Pages 19-25 |
| ❏ | Does your Program Office have guidance specifically applicable to your action? <br><br> - Such guidance might include specific instructions about the consideration of EJ in the context of a category of similar actions, or otherwise facilitate the identification of actions for which further evaluation of EJ concerns is warranted. |
| ❏ | What do you know about the issue you've been asked to address? <br><br> - Understand what you are doing in this action and why it is necessary. This will help you gather preliminary information to set the context for your action. <br><br> - This will facilitate the workgroup's initial assessment (necessary for planning the development of the action) along with the identification of initial issues to raise to management for guidance or direction. |

D-1

---

[1] Agency Guidance on the ADP is available at http://intranet.epa.gov/adplibrary.

[2] The new Agency Interim Guide is available at http://intranet.epa.gov/adplibrary.

| ✓ | **Activity** |
|---|---|
| ☐ | Does your action have the potential to raise or address EJ concerns?<br><br>   - If not, you should document your determination and rationale, and then proceed with the development of your action under the ADP. Remember to revisit your determination if new information becomes available. |
| ☐ | Did you receive guidance or direction from management as part of the Early Guidance step of the ADP?<br><br>   - Under the ADP, Early Guidance provides an opportunity for senior management to communicate expectations, identify policy and procedural issues worthy of examination, and highlight policy issues of significant concern for the workgroup to consider in developing the action. |
| ☐ | Are there any limitations in terms of time or resources that need to be considered in your planning efforts? |
| **3.** | **PLANNING – Complete an Analytic Blueprint (ABP) for your action.** │ Pages 25-26<br><br>- Your ABP should identify the key activities, analyses, consultation activities (including those called for by relevant statutes and Executive Orders), contributors, and timeline. |
| ☐ | Who are the potential stakeholders and what are their interests?<br><br>   - This will help you choose appropriate consultation methods and schedules.<br><br>   - Specifically address the identity and size of potentially affected communities, including minority, low-income, and indigenous populations, and tribes.<br><br>   - Involving affected communities or areas can help you obtain information or data that could inform decisions on the scope of EJ concerns and their impacts, and even help identify appropriate preliminary options to consider. |
| ☐ | Does your ABP address your plans for achieving meaningful involvement?<br><br>   - Meaningful involvement is more than simply providing the minimum notice and comment opportunity.<br><br>   - Identify the most effective ways to engage the minority, low-income, and indigenous populations, and tribes who will be affected by your action. Have any potentially affected groups historically been unable to participate in Agency processes due to circumstances unique to them (e.g., low-income community may not have been able to participate in previous public meetings because of the location of those meetings)? |
| ☐ | What do you know about potentially impacted communities (i.e., what is likely to cause impacts, what is the nature of those impacts, what are the sources of exposure)?<br><br>   - Identify the minority, low-income, and indigenous populations. |
| ☐ | Do you need to collect data or other information about the impacted communities or the nature of the impacts?<br><br>   - You may need a statistician or someone with Geographical Information System (GIS) expertise (e.g., to apply a GIS platform to demographic data and geographic data).<br><br>   - Consider potential cumulative impacts and, where appropriate, factors that may enhance the susceptibility of communities to environmental stressors (e.g., linguistically isolated, low socioeconomic status, reduced access to health care). Use reference communities to compare impacts. |
| ☐ | Do you plan to identify alternative approaches for addressing EJ concerns (regulatory, voluntary, and/or innovative approaches)? |
| ☐ | What resources will you need to achieve meaningful involvement, gather needed data, and conduct identified analyses? |
| **4.** | **Identify and Analyze OPTIONS** │ Pages 27-28 |
| ☐ | Consider what you learned from affected communities, in terms of both potential impacts and options to consider. |
| ☐ | Integrate the consideration of EJ concerns into the analyses you perform, including economic and scientific. |
| ☐ | Did you identify an existing disproportionate impact? |
| ☐ | Can you describe that existing condition in a quantifiable way? |
| ☐ | In what ways can your action address the existing disproportionate impact? |
| ☐ | Does your action have the potential to create a new disproportionate impact? |

AR_0029279

| ✔ | Activity |
|---|---|
| ☐ | Did you identify options that will avoid or mitigate that creation? |
| ☐ | For all options identified, did you assess the potential for EJ concerns and related impacts? |
| ☐ | Is the workgroup ready to present options to management for decisions?<br><br>  - At this point, the workgroup has completed its research; provided opportunities for meaningful involvement; completed requirements for consultation; conducted analyses and completed peer review; and identified issues and scoped out the costs and benefits, pros and cons, and feasibility of the options available. |
| **5.** | **Select Options – Presentation to Management** \| Pages 28-29 |
| ☐ | Has the workgroup identified several possible options for each issue and recommended the one(s) that would achieve a quality action? |
| ☐ | Are you presenting the identified options to management along with the pros and cons, feasibility of the options, estimated costs and benefits, etc.? |
| ☐ | Are you prepared to present to your management EJ concerns, impacts, and considerations related to your action and each option? |
| **6.** | **Documentation – Prepare your action and final documents** \| Pages 29-32 |
| ☐ | Document your outreach and consultation efforts, as well as the results of those efforts. |
| ☐ | Ensure that your final economic and scientific analyses clearly present the EJ considerations. |
| ☐ | Describe in your preamble any identified potential disproportionate EJ impacts and explain how they are addressed by your action. |
| ☐ | Answer these core management questions in your Action Memo:<br><br>1. How did your public participation process provide transparency and meaningful participation for minority, low-income, and indigenous populations, and tribes?<br><br>2. How did you identify and address existing and/or new disproportionate environmental and public health impacts on minority, low-income, and indigenous populations during the action development process?<br><br>3. How did the actions taken under #1 and #2 impact the outcome or final decision? |

**Where Can I Get More Information About EJ Considerations or the ADP?**

Internal EPA guidance and information about the ADP can be found at http://intranet.epa.gov/adplibrary/.

Tools and guidance for assessing potential EJ concerns are available at http://www.epa.gov/Compliance/resources/policies/ej/#tools.

Appendix D: A Checklist for EPA Workgroup Chairs: Integrating EJ Into the ADP

# Appendix E
# Resources

| | |
|---|---|
| **Executive Order 12898: Environmental Justice**<br><br>http://www.epa.gov/Compliance/resources/policies/ej/#tools | Text of E.O. directing agencies to address EJ in minority and low-income populations. |
| **EPA's Definition of Environmental Justice**<br><br>http://www.epa.gov/environmentaljustice/basics/index.html | EJ and related terms defined for use at EPA. |
| **Memorandum for the Heads of All Departments and Agencies: Executive Order on Federal Actions to Address Environmental Justice in Minority Populations and Low-Income Populations (1994)**<br><br>http://www.epa.gov/Compliance/resources/policies/ej/clinton_memo_12898.pdf | President Clinton's cover memorandum for E.O. 12898. |
| **EPA's Environmental Justice Program: Background**<br><br>http://www.epa.gov/environmentaljustice/index.html | Background information, definitions, and resources related to EJ. |
| **EPA's Environmental Justice Strategy (1995)**<br><br>http://www.epa.gov/Compliance/resources/policies/ej/ej_strategy_1995.pdf | Strategy developed in response to E.O. 12898. |
| **Environmental Justice Implementation Plan**<br><br>http://www.epa.gov/Compliance/resources/policies/ej/implementation_plan_ej_1996.pdf | Plan to integrate EJ into the Agency's work under Administrator Carol Browner (1996). |
| **Final Guidance for Incorporating Environmental Justice Concerns in EPA's NEPA Compliance Analysis (1998)**<br><br>http://www.epa.gov/compliance/resources/policies/ej/ej_guidance_nepa_epa0498.pdf | Guidance for incorporating EJ goals into EPA's preparation of environmental impact statements and environmental assessments under NEPA. |
| **Environmental Justice: Guidance under the National Environmental Policy Act (1997)**<br><br>http://www.epa.gov/compliance/environmentaljustice/resources/policy/ej_guidance_nepa_ceq1297.pdf | Original guidance provided by CEQ. |
| **Toolkit for Assessing Potential Allegations of Environmental Justice (2004)**<br><br>http://www.epa.gov/compliance/environmentaljustice/resources/policy/ej-toolkit.pdf | Reference guide to assist Agency personnel in assessing potential allegations of environmental injustice and to provide a framework for understanding national policy on EJ. |

Appendix E: Resources

| | |
|---|---|
| **Strengthening EPA's Environmental Justice Program (June 9, 2008)**<br><br>http://www.epa.gov/compliance/environmentaljustice/resources/policy/admin-ej-strength-memo-060908.pdf | Administrator Stephen Johnson directs EPA to conduct EJ reviews of its program, policies, and activities. |
| **Reaffirming the U.S. EPA's Commitment to Environmental Justice– Memo from Stephen L. Johnson (November 4, 2005)**<br><br>http://www.epa.gov/compliance/environmentaljustice/resources/policy/admin-ej-commit-letter-110305.pdf | Administrator Stephen Johnson outlines the Agency's commitment to EJ and its integration into all EPA programs, policies, and activities. |
| **EPA's Policy of Evaluating Health Risks to Children**<br><br>http://yosemite.epa.gov/ochp/ochpweb.nsf/content/riskpolicy.htm/$File/riskpolicy.pdf | Policy applied to assessments started or revised on or after November 1, 1995. |
| **Executive Order 13175: Consultation and Coordination with Indian Tribal Governments**<br><br>http://www.epa.gov/fedreg/eo/eo13175.htm | E.O. directing Federal agencies to establish regular and meaningful consultation and collaboration with tribal officials in the development of Federal policies that have tribal implications. |
| **EPA's Public Involvement Policy**<br><br>http://www.epa.gov/publicinvolvement/pdf/policy2003.pdf | Complete Agency policy with four appendices and two addenda. |
| **Public Involvement**<br><br>http://www.epa.gov/publicinvolvement | Information on the full range of activities that EPA uses to engage the American people in the Agency's decision-making. |
| **Engaging the American People: A Review of EPA's Public Participation Policy and Regulations with Recommendations for Action, Appendix A (2000)**<br><br>http://www.epa.gov/publicinvolvement/pdf/eap_appendices.pdf | Listing of key EPA programs' public participation requirements. |
| **International Association for Public Participation**<br><br>www.IAP2.org | Provides discussion on the spectrum of public involvement; identifies useful publications and training opportunities. |
| **EPA's Web 2.0**<br><br>http://yosemite.epa.gov/oei/webguide.nsf/socialmedia | Provides information about EPA social media use and necessary steps for setting up Web 2.0 applications such as wikis and blogs. |
| **Environmental Justice Coordinators – Media Offices**<br><br>http://epa.gov/environmentaljustice/contact/ej-contacts-media.html | List of contacts with name, phone, location, and area of expertise. |
| **Environmental Justice Coordinators – Regional Offices**<br><br>http://epa.gov/environmentaljustice/contact/ej-contacts-regional.html | List of contacts with name, phone, and address. |
| **Action Development Process**<br><br>http://intranet.epa.gov/adplibrary/adp/index.htm | Information about the roles and responsibilities of the different participants in the development of an action. |
| **Action Development Checklist**<br><br>*See Appendix D of this Guidance on Considering Environmental Justice During the Development of an Action* | Illustrative list to help workgroup determine whether the action being developed may involve a subject of particular interest to— or may have particular impacts on—vulnerable populations. |

Appendix E: Resources

AR_0029282

| | |
|---|---|
| **Environmental Justice Preamble Templates**<br><br>http://intranet.epa.gov/adplibrary/adp-templates/index.htm#stat | Suggested language for addressing E.O. 12898 in preambles for proposed and final rules. |
| **Action Development Guidelines for Preparing Analytic Blueprints**<br><br>http://intranet.epa.gov/adplibrary/documents/abp09-30-04.pdf | Discusses the timing and steps for the drafting and approval of Analytic Blueprints (applicable to all Tier 1 and 2 actions); directs reader to resources for more information and guidance. |
| **Regulatory Gateway**<br><br>http://yosemite.epa.gov/opei/RuleGate.nsf/ | Offers the public a means of learning about and tracking EPA actions. |

Appendix E: Resources

AR_0029283



EXECUTIVE OFFICE OF THE PRESIDENT
COUNCIL ON ENVIRONMENTAL QUALITY
WASHINGTON, D.C. 20503

MEMORANDUM TO HEADS OF AGENCIES ON THE APPLICATION OF THE
NATIONAL ENVIRONMENTAL POLICY ACT TO PROPOSED FEDERAL ACTIONS IN
THE UNITED STATES WITH TRANSBOUNDARY EFFECTS

FROM:    KATHLEEN A. MCGINTY
         CHAIR

DATE:    JULY 1, 1997

In recent months, the Council has been involved in discussions with several agencies concerning
the applicability of the National Environmental Policy Act (NEPA) to transboundary impacts
that may occur as the result of proposed federal actions in the United States. To set forth a
consistent interpretation of NEPA, CEQ is today issuing the attached guidance on NEPA
analysis for transboundary impacts. In it, we advise that NEPA requires analysis and disclosure
of transboundary impacts of proposed federal actions taking place in the United States.

We recommend that agencies which take actions with potential transboundary impacts consult as
necessary with CEQ concerning specific procedures, proposals or programs which may be
affected.

---

# COUNCIL ON ENVIRONMENTAL QUALITY GUIDANCE ON NEPA ANALYSES FOR TRANSBOUNDARY IMPACTS

JULY 1, 1997

The purpose of this guidance is to clarify the applicability of the National Environmental Policy Act (NEPA) to proposed federal actions in the United States, including its territories and possessions, that may have transboundary effects extending across the border and affecting another country's environment. While the guidance arises in the context of negotiations undertaken with the governments of Mexico and Canada to develop an agreement on transboundary environmental impact assessment in North America, [1] the guidance pertains to all federal agency actions that are normally subject to NEPA, whether covered by an international agreement or not.

It is important to state at the outset the matters to which this guidance is addressed and those to which it is not. This guidance does not expand the range of actions to which NEPA currently applies. An action that does not otherwise fall under NEPA would not now fall under NEPA by virtue of this guidance. Nor does this guidance apply NEPA to so-called "extraterritorial actions"; that is, U.S. actions that take place in another country or otherwise outside the jurisdiction of the United States[2]. The guidance pertains only to those proposed actions currently covered by NEPA that take place within the United States and its territories, and it does not change the applicability of NEPA law, regulations or case law to those actions. Finally, the guidance is consistent with long-standing principles of international law.

## NEPA LAW AND POLICY

NEPA declares a national policy that encourages productive and enjoyable harmony between human beings and their environment, promotes efforts which will prevent or eliminate damage to the environment and biosphere, stimulates the health and welfare of human beings, and enriches the understanding of ecological systems.[3] Section 102(1) of NEPA "authorizes and directs that, to the fullest extent possible . .

. . the policies, regulations and public laws of the United States shall be interpreted and administered in accordance with the policies set forth in [the] Act."[4] NEPA's explicit statement of policies calls for the federal government "to use all practical means and measures . . . . to create and maintain conditions under which man and nature can exist in productive harmony . . . ."[5] In addition, Congress directed federal agencies to "use all practical means . . . . to improve and coordinate Federal plans, functions, programs, and resources to the end that the Nation may . . . . attain the widest range of beneficial uses of the environment without degradation, risk to health or safety, or other undesirable and unintended consequences."[6] Section 102(2)(C) requires federal agencies to assess the environmental impacts of and alternatives to proposed major federal actions significantly affecting the quality of the human environment.[7] Congress also recognized the "worldwide and long-range character of environmental problems" in NEPA and directed agencies to assist other countries in anticipating and preventing a decline in the quality of the world environment.[8]

Neither NEPA nor the Council on Environmental Quality's (CEQ) regulations implementing the procedural provisions of NEPA define agencies' obligations to analyze effects of actions by administrative boundaries. Rather, the entire body of NEPA law directs federal agencies to analyze the effects of proposed actions to the extent they are reasonably foreseeable consequences of the proposed action, regardless of where those impacts might occur. Agencies must analyze indirect effects, which are caused by the action, are later in time or farther removed in distance, but are still reasonably foreseeable, including growth-inducing effects and related effects on the ecosystem,[9] as well as cumulative effects.[10] Case law interpreting NEPA has reinforced the need to analyze impacts regardless of geographic boundaries within the United States,[11] and has also assumed that NEPA requires analysis of major federal actions that take place entirely outside of the United States but could have environmental effects within the United States.[12]

Courts that have addressed impacts across the United States' borders have assumed that the same rule of law applies in a transboundary context. In Swinomish Tribal Community v. Federal Energy Regulatory Commission,[13] Canadian intervenors were allowed to challenge the adequacy of an environmental impact statement (EIS) prepared by FERC in connection with its approval of an amendment to the City of Seattle's license that permitted raising the height of the Ross Dam on the Skagit River in Washington State. Assuming that NEPA required consideration of Canadian impacts, the court concluded that the report had taken the requisite "hard look" at Canadian impacts. Similarly, in Wilderness Society v. Morton,[14] the court granted intervenor status to Canadian environmental organizations that were challenging the adequacy of the trans-Alaska pipeline EIS. The court granted intervenor status because it found that there was a reasonable possibility that oil spill damage could significantly affect Canadian resources, and that Canadian interests were not adequately represented by other parties in the case.

In sum, based on legal and policy considerations, CEQ has determined that agencies must include analysis of reasonably foreseeable transboundary effects of proposed actions in their analysis of proposed actions in the United States.

PRACTICAL CONSIDERATIONS

CEQ notes that many proposed federal actions will not have transboundary effects, and cautions agencies against creating boilerplate sections in NEPA analyses to address this issue. Rather, federal agencies should use the scoping process[15] to identify those actions that may have transboundary environmental effects and determine at that point their information needs, if any, for such analyses. Agencies should be particularly alert to actions that may affect migratory species, air quality, watersheds, and other components of the natural ecosystem that cross borders, as well as to interrelated social and economic effects.[16] Should such potential impacts be identified, agencies may rely on available professional sources of information and should contact agencies in the affected country with relevant expertise.

Agencies have expressed concern about the availability of information that would be adequate to comply with NEPA standards that have been developed through the CEQ regulations and through judicial

decisions. Agencies do have a responsibility to undertake a reasonable search for relevant, current information associated with an identified potential effect. However, the courts have adopted a "rule of reason" to judge an agency's actions in this respect, and do not require agencies to discuss "remote and highly speculative consequences".[17] Furthermore, CEQ's regulation at 40 CFR 1502.22 dealing with incomplete or unavailable information sets forth clear steps to evaluating effects in the context of an EIS when information is unobtainable.[18] Additionally, in the context of international agreements, the parties may set forth a specific process for obtaining information from the affected country which could then be relied upon in most circumstances to satisfy agencies' responsibility to undertake a reasonable search for information.

Agencies have also pointed out that certain federal actions that may cause transboundary effects do not, under U.S. law, require compliance with Sections 102(2)(C) and 102(2)(E) of NEPA. Such actions include actions that are statutorily exempted from NEPA, Presidential actions, and individual actions for which procedural compliance with NEPA is excused or modified by virtue of the CEQ regulations[19] and various judicial doctrines interpreting NEPA[20]. Nothing in this guidance changes the agencies' ability to rely on those rules and doctrines.

INTERNATIONAL LAW

It has been customary law since the 1905 Trail Smelter Arbitration that no nation may undertake acts on its territory that will harm the territory of another state[21]. This rule of customary law has been recognized as binding in Principle 21 of the Stockholm Declaration on the Human Environment and Principle 2 of the 1992 Rio Declaration on Environment and Development. This concept, along with the duty to give notice to others to avoid or avert such harm, is incorporated into numerous treaty obligations undertaken by the United States. Analysis of transboundary impacts of federal agency actions that occur in the United States is an appropriate step towards implementing those principles.

CONCLUSION

NEPA requires agencies to include analysis of reasonably foreseeable transboundary effects of proposed actions in their analysis of proposed actions in the United States. Such effects are best identified during the scoping stage, and should be analyzed to the best of the agency's ability using reasonably available information. Such analysis should be included in the EA or EIS prepared for the proposed action.

---

[1] The negotiations were authorized in Section 10.7 of the North American Agreement on Environmental Cooperation, which is a side agreement to the North American Free Trade Agreement. The guidance is also relevant to the ECE Convention on Environmental Impact Assessment in a Transboundary Context, signed in Espoo, Finland in February, 1991, but not yet in force.

[2] For example, NEPA does apply to actions undertaken by the National Science Foundation in the Antarctica. Environmental Defense Fund v. Massey, 986 F.2d 528 (D.C. Cir. 1993).

[3] 42 USC 4321.

[4] 42 USC 4332(1).

[5] 42 USC 4331(a).

[6] 42 USC 4331(b)(3).

[7] 42 USC 4332(2)(C).

[8] 42 USC 4332(2)(F).

[9] 40 CFR 1508.8(b).

[10] 40 CFR 1508.7.

[11] See, *for example*, Sierra Club v. U.S.Forest Service, 46 F.3d 835 (8th Cir. 1995); Resources Ltd., Inc. v. Robertson, 35 F.3d 1300 and 8 F.3d 1394 (9th Cir. 1993); Natural Resources Defense Council v. Hodel, 865 F.2d 288 (D.C. Cir. 1988); County of Josephine v. Watt, 539 F.Supp. 696 (N.D. Cal. 1982).

[12] See Sierra Club v. Adams, 578 F.2d 389 (D.C. Cir. 1978); NORML v. Dept. of State, 452 F.Supp. 1226 (D.D.C. 1978).

[13] 627 F.2d 499 (D.C. Cir. 1980).

[14] 463 F.2d 1261 (D.C. Cir. 1972).

[15] 40 CFR 1501.7. Scoping is a process for determining the scope of the issues to be addressed and the parties that need to be involved in that process prior to writing the environmental analyses.

[16] It is a well accepted rule that under NEPA, social and economic impacts by themselves do not require preparation of an EIS. 40 CFR 1508.14.

[17] Trout Unlimited v. Morton, 509 F.2d 1276, 1283 (9th Cir. 1974). See also, Northern Alaska Environmental Center v. Lujan, 961 F.2d 886, 890 (9th Cir. 1992); Idaho Conservation League v. Mumma, 956 F.2d 1508, 1519 (9th Cir. 1992); San Luis Obispo Mothers for Peace v. N.R.C., 751 F.2d 1287, 1300 (D.C. Cir. 1984); Scientists Institute for Public Information, Inc. v. Atomic Energy Commission, 481 F.2d 1079, 1092 (D.C. Cir. 1973).

[18] See Preamble to Amendment of 40 CFR 1502.22, deleting prior requirement for "worst case analysis" at 51 Federal Register 15625, April 25, 1986, for a detailed explanation of this regulation.

[19] For example, agencies may contact CEQ for approval of alternative arrangements for compliance with NEPA in the case of emergencies. 40 CFR 1506.11.

[20] For example, courts have recognized that NEPA does not require an agency to make public information that is otherwise properly classified information for national security reasons, Weinberger v. Catholic Action of Hawaii, 454 U.S. 139 (1981).

[21] *Trail Smelter Arbitration*, U.S. v. Canada, 3 UN Rep. Int'l Arbit. Awards 1911 (1941). The case involved a smelter in British Columbia that was causing environmental harm in the state of Washington. The decision held that "under principles of International Law, as well as the law of the United States, no State has the right to use or permit the use of its territory in such a manner as to cause injury by fumes in or to the territory of another or the properties or persons therein, when the case is of serious consequence and the injury is described by clear and convincing injury." *Id*. at 1965). Also see the American Law Institute's Restatement of the Foreign Relations Law of the United States 3d, Section 601, ("State obligations with respect to environment of other States and the common environment").

| Category | CAS No. | Special exemptions | Effective date | Sunset date |
|---|---|---|---|---|
| Di-isobutyl phthalate (DIBP)—(1,2-Benzene-dicarboxylic acid, 1,2-bis-(2methylpropyl) ester) | 84–69–5 | § 716.21(a)(9) | 7/29/21 | 9/27/21 |
| Ethylene dibromide | 106–93–4 | § 716.21(a)(9) | 7/29/21 | 9/27/21 |
| Formaldehyde | 50–00–0 | § 716.21(a)(9) | 7/29/21 | 9/27/21 |
| 1,3,4,6,7,8-Hexahydro-4,6,6,7,8,8-hexamethylcyclopenta [g]-2-benzopyran (HHCB) | 1222–05–5 | § 716.21(a)(9) | 7/29/21 | 9/27/21 |
| 4,4′-(1-Methylethylidene)bis[2, 6-dibromophenol] (TBBPA) | 79–94–7 | § 716.21(a)(9) | 7/29/21 | 9/27/21 |
| Phosphoric acid, triphenyl ester (TPP) | 115–86–6 | § 716.21(a)(9) | 7/29/21 | 9/27/21 |
| Phthalic anhydride | 85–44–9 | § 716.21(a)(9) | 7/29/21 | 9/27/21 |
| 1,1,2-Trichloroethane | 79–00–5 | § 716.21(a)(9) | 7/29/21 | 9/27/21 |
| Tris(2-chloroethyl) phosphate (TCEP) | 115–96–8 | § 716.21(a)(9) | 7/29/21 | 9/27/21 |
| *          *          *          * | | * | * | * |
| Organohalogen flame retardants: | | | | |
| Bis(2-ethylhexyl) tetrabromophthalate | 26040–51–7 | § 716.21(a)(10) | 7/29/21 | 9/27/21 |
| Bis(hexachlorocyclopentadieno)cyclooctane | 13560–89–9 | § 716.21(a)(10) | 7/29/21 | 9/27/21 |
| 1,2-Bis(2,4,6-tribromophenoxy)ethane | 37853–59–1 | § 716.21(a)(10) | 7/29/21 | 9/27/21 |
| 1,1′-Ethane-1,2-diylbis(pentabromobenzene) | 84852–53–9 | § 716.21(a)(10) | 7/29/21 | 9/27/21 |
| 2-Ethylhexyl-2,3,4,5-tetrabromobenzoate | 183658–27–7 | § 716.21(a)(10) | 7/29/21 | 9/27/21 |
| 2-(2-Hydroxyethoxy)ethyl          2-hydroxypropyl          3,4,5,6-tetrabromophthalate | 20566–35–2 | § 716.21(a)(10) | 7/29/21 | 9/27/21 |
| 2,2′-[(1-Methylethylidene)bis[(2,6-dibromo-4,1-phenylene)oxymethylene]]bis[oxirane] | 3072–84–2 | § 716.21(a)(10) | 7/29/21 | 9/27/21 |
| Mixture of chlorinated linear alkanes C14–17 with 45–52% chlorine | 85535–85–9 | § 716.21(a)(10) | 7/29/21 | 9/27/21 |
| N,N-Ethylene-bis(tetrabromophthalimide) | 32588–76–4 | § 716.21(a)(10) | 7/29/21 | 9/27/21 |
| Pentabromochlorocyclohexane | 87–84–3 | § 716.21(a)(10) | 7/29/21 | 9/27/21 |
| (Pentabromophenyl)methyl acrylate | 59447–55–1 | § 716.21(a)(10) | 7/29/21 | 9/27/21 |
| Pentabromotoluene | 87–83–2 | § 716.21(a)(10) | 7/29/21 | 9/27/21 |
| Perbromo-1,4-diphenoxybenzene | 58965–66–5 | § 716.21(a)(10) | 7/29/21 | 9/27/21 |
| Phosphonic acid, (2-chloroethyl)-, bis(2-chloroethyl) ester | 6294–34–4 | § 716.21(a)(10) | 7/29/21 | 9/27/21 |
| Phosphoric    acid,    2,2-bis(chloromethyl)-1,3-propanediyl    tetrakis(2-chloroethyl) ester | 38051–10–4 | § 716.21(a)(10) | 7/29/21 | 9/27/21 |
| Propanoic acid, 2-bromo-, methyl ester | 5445–17–0 | § 716.21(a)(10) | 7/29/21 | 9/27/21 |
| Tetrabromobisphenol A-bis(2,3-dibromopropyl ether) | 21850–44–2 | § 716.21(a)(10) | 7/29/21 | 9/27/21 |
| Tetrabromobisphenol A bis(2-hydroxyethyl) ether | 4162–45–2 | § 716.21(a)(10) | 7/29/21 | 9/27/21 |
| Tetrabromobisphenol A diallyl ether | 25327–89–3 | § 716.21(a)(10) | 7/29/21 | 9/27/21 |
| Tetrabromobisphenol A dimethyl ether | 37853–61–5 | § 716.21(a)(10) | 7/29/21 | 9/27/21 |
| 2,4,6-Tribromoaniline | 147–82–0 | § 716.21(a)(10) | 7/29/21 | 9/27/21 |
| 1,3,5-Tribromo-2-(prop-2-en-1-yloxy)benzene | 3278–89–5 | § 716.21(a)(10) | 7/29/21 | 9/27/21 |
| Tris(2-chloroethyl)phosphite | 140–08–9 | § 716.21(a)(10) | 7/29/21 | 9/27/21 |
| Tris(1-chloro-2-propyl)phosphate | 13674–84–5 | § 716.21(a)(10) | 7/29/21 | 9/27/21 |
| Tris(2-chloro-1-propyl)phosphate | 6145–73–9 | § 716.21(a)(10) | 7/29/21 | 9/27/21 |
| Tris(2,3-dibromopropyl)phosphate | 126–72–7 | § 716.21(a)(10) | 7/29/21 | 9/27/21 |
| 1,3,5-Tris(2,3-dibromopropyl)-1,3,5-triazine-2,4,6(1H,3H,5H)-trione | 52434–90–9 | § 716.21(a)(10) | 7/29/21 | 9/27/21 |
| Tris(1,3-dichloro-2-propyl)phosphate | 13674–87–8 | § 716.21(a)(10) | 7/29/21 | 9/27/21 |
| Tris(tribromoneopentyl)phosphate | 19186–97–1 | § 716.21(a)(10) | 7/29/21 | 9/27/21 |
| 2,4,6-Tris-(2,4,6-tribromophenoxy)-1,3,5-triazine | 25713–60–4 | § 716.21(a)(10) | 7/29/21 | 9/27/21 |

[FR Doc. 2021–13212 Filed 6–28–21; 8:45 am]

BILLING CODE 6560–50–P

## COUNCIL ON ENVIRONMENTAL QUALITY

**40 CFR Part 1507**

[CEQ–2021–0001]

RIN 0331–AA08

## Deadline for Agencies To Propose Updates to National Environmental Policy Act Procedures

**AGENCY:** Council on Environmental Quality.

**ACTION:** Interim final rule; request for comments.

**SUMMARY:** The Council on Environmental Quality (CEQ) is extending the deadline by two years for Federal agencies to develop or revise proposed procedures for implementing the procedural provisions of the National Environmental Policy Act (NEPA).

**DATES:**

*Effective date:* This interim rule is effective June 29, 2021.

*Comments due date:* CEQ must receive comments on this interim rule by July 29, 2021.

**ADDRESSES:** You may submit comments through any of the following methods:

■ *Federal eRulemaking Portal:* https:// www.regulations.gov. Follow the instructions for submitting comments.

■ *Fax:* 202–456–6546.

■ *Mail:* Council on Environmental Quality, 730 Jackson Place NW, Washington, DC 20503.

*Instructions:* All submissions must include the agency name, "Council on Environmental Quality," and docket number, CEQ–2021–0001, for this rulemaking. All comments received will be posted without change to https:// www.regulations.gov, including any personal information provided. Do not submit electronically any information you consider to be private, Confidential Business Information (CBI), or other information whose disclosure is restricted by statute.

*Docket:* For access to the docket to read background documents or comments received, go to https:// www.regulations.gov.

AR_0032897

**FOR FURTHER INFORMATION CONTACT:**
Amy B. Coyle, Deputy General Counsel,
202–395–5750, *Amy.B.Coyle@
ceq.eop.gov.*

**SUPPLEMENTARY INFORMATION:**

## I. Background

The National Environmental Policy
Act of 1969, 42 U.S.C. 4321 *et seq.,*
(NEPA) directs Federal agencies to ''use
all practicable means and measures . . .
to create and maintain conditions under
which man and nature can exist in
productive harmony, and fulfill the
social, economic, and other
requirements of present and future
generations of Americans.'' 42 U.S.C.
4331(a). In pursuit of that directive,
NEPA requires Federal agencies to
prepare an environmental impact
statement for ''major Federal actions
significantly affecting the quality of the
human environment.'' 42 U.S.C.
4332(2)(C). NEPA also established the
Council on Environmental Quality
(CEQ) in the Executive Office of the
President, 42 U.S.C. 4342, which
oversees Federal agency implementation
of NEPA.

In 1970, President Nixon issued E.O.
11514, *Protection and Enhancement of
Environmental Quality,* which directed
CEQ to issue guidelines for
implementation of NEPA.[1] In 1977,
President Carter issued E.O. 11991,
*Relating to Protection and Enhancement
of Environmental Quality,* directing CEQ
to issue regulations to govern
implementation of NEPA and requiring
that Federal agencies comply with those
regulations.[2] CEQ promulgated
implementing regulations in 1978 at 40
CFR parts 1500 through 1508 (''1978
Rule'').[3] Consistent with the
requirement in 40 CFR 1507.3, Federal
agencies, in turn, issued their own
implementing procedures to
supplement the 1978 Rule and integrate
the NEPA process into the agencies'
specific programs and processes. CEQ
made technical amendments to the 1978
Rule in 1979[4] and promulgated minor
amendments to it in 1986,[5] but left the
regulations largely unchanged for over
forty years. As a result, an extensive
body of agency practice and caselaw
developed based on the 1978 Rule.

On July 16, 2020, CEQ issued a final
rule substantially revising the NEPA
implementing regulations (''2020

Rule'').[6] As amended, 40 CFR 1507.3(b)
requires Federal agencies to propose
their own regulations to implement the
2020 Rule by September 14, 2021. CEQ
issued a Memorandum to the Federal
agencies on July 16, 2020, and the Office
of Management and Budget (OMB)
issued a Memorandum to the Federal
agencies on November 2, 2020,
establishing deadlines for Federal
agencies to implement the September
14, 2021 deadline.[7]

On January 20, 2021, President Biden
signed E.O. 13990, *Protecting Public
Health and the Environment and
Restoring Science to Tackle the Climate
Crisis,* to empower America's workers,
combat climate change, address
environmental justice, and improve and
protect public health and the
environment.[8] In accomplishing these
goals, E.O. 13990 directs Federal
agencies to ensure the integrity of their
decision-making processes and make
sound decisions based on science. E.O.
13990 directs Federal agencies to review
Federal agency actions taken between
January 20, 2017, and January 20, 2021,
including the promulgation of
regulations, for consistency with those
priorities and to take appropriate action,
including publishing for notice and
comment a proposed rule suspending,
revising, or rescinding actions found to
be inconsistent with them. An
accompanying White House Fact Sheet
specifically identifies the 2020 Rule as
among the actions to be reviewed.[9] On
January 27, 2021, the President signed
E.O. 14008, *Tackling the Climate Crisis
at Home and Abroad,* which establishes
a government-wide approach to
reducing climate pollution and
establishes an Administration policy to
increase climate resilience, transition to
a clean-energy economy and support
economic opportunities in energy
communities, address environmental
justice issues and invest in
disadvantaged communities, and spur
well-paying union jobs and economic

growth.[10] E.O. 14008 also requires the
Chair of CEQ and the Director of OMB
to ensure that Federal infrastructure
investments reduce climate pollution
and that Federal permitting decisions
consider the effects of greenhouse gas
emissions and climate change.[11]

CEQ is engaged in an ongoing and
comprehensive review of the 2020 Rule
for consistency with the nation's
environmental, equity, and economic
priorities; to evaluate the process CEQ
used in developing the 2020 Rule; and
to consider whether the 2020 Rule
properly and lawfully interprets and
implements NEPA. In conducting its
review, CEQ will assess how to amend
its NEPA regulations to deliver an
efficient environmental review process
that ensures robust public participation
and environmental protection.

## II. Summary of Final Rule

CEQ has begun its review of the 2020
Rule and has substantial concerns about
the legality of the 2020 Rule, the process
that produced it, and whether the 2020
Rule meets the nation's needs and
priorities, including the priorities set
forth in E.O. 13990 and E.O. 14008.
These concerns include that some of the
changes made to the NEPA regulations
create confusion with respect to NEPA
implementation, break from
longstanding caselaw interpreting
NEPA's statutory requirements, and may
have the purpose or effect of improperly
limiting relevant NEPA analysis, with
negative repercussions in critical areas
such as climate change and
environmental justice that are
inconsistent with the mandates of E.O.
13990 and E.O. 14008. CEQ plans to
address these issues through further
rulemaking, as described below.
Notwithstanding CEQ's ongoing review,
the severity of CEQ's concerns, and the
likelihood that CEQ will propose
significant amendments to the 2020
Rule, 40 CFR 1507.3(b) currently
requires Federal agencies to propose
revisions to agency-specific NEPA
regulations within 12 months of
September 14, 2020—by September 14,
2021. Through this interim final rule,
CEQ revises § 1507.3(b) to change 12
months to 36 months, providing Federal
agencies an additional two years, until
September 14, 2023, to propose
revisions to their NEPA procedures.
Federal agencies have raised concerns to
CEQ about developing revised
procedures consistent with the 2020
Rule given its inconsistency with E.O.
13990 and E.O. 14008 and CEQ's
ongoing review, which could result in

---

[1] 35 FR 4247 (Mar. 7, 1970), sec. 3(h).

[2] 42 FR 26967 (May 25, 1977), sec. 2(g).

[3] Regulations for Implementing the Procedural
Provisions of the National Environmental Policy
Act, 43 FR 55978 (Nov. 23, 1978).

[4] 44 FR 873 (Jan. 3, 1979).

[5] 51 FR 15618 (Apr. 25, 1986) (amending 40 CFR
1502.22).

[6] 85 FR 43304 (July 16, 2020).

[7] CEQ, Memorandum for Heads of Federal
Departments and Agencies, *Implementation of
Updated National Environmental Policy Act
Regulations* (July 16, 2020), *https://ceq.doe.gov/
docs/laws-regulations/memo-implementation-
updated-regs-2020-07-16-withdrawn.pdf; Budget
and Management Guidance on Updates to the
Regulations Implementing the Procedural
Provisions of the National Environmental Policy
Act,* M–21–01 (Nov. 2, 2020), *https://
www.whitehouse.gov/wp-content/uploads/2020/11/
M-21-01.pdf.*

[8] 86 FR 7037 (Jan. 25, 2021).

[9] White House Fact Sheet: List of Agency Actions
for Review (Jan. 20, 2021), *https://
www.whitehouse.gov/briefing-room/statements-
releases/2021/01/20/fact-sheet-list-of-agency-
actions-for-review/.*

[10] 86 FR 7619, 7622 (Feb. 1, 2021).

[11] *Id.* § 213(a).

additional changes to CEQ's NEPA regulations that would need to be reflected in agency procedures. This additional period of time will address these concerns and allow Federal agencies to avoid wasting resources developing procedures based upon regulations that CEQ may repeal or substantially amend.

Following this rulemaking, CEQ will initiate further rulemaking to propose amendments to the 2020 Rule to revise the NEPA implementing regulations to comply with the statute's text and goals; provide regulatory certainty to stakeholders; promote better decision making consistent with NEPA's statutory requirements; ensure appropriate coordination among Federal agencies, and State, Tribal, and local governments during the environmental review process; and meet environmental, climate change, and environmental justice objectives.

Extending the deadline in § 1507.3(b) without first seeking comment is appropriate for two reasons. First, this amendment is a rule "of agency organization, procedure, or practice" exempted from the Administrative Procedure Act's (APA's) notice and comment rulemaking procedures and the requirement that substantive rules be published in the **Federal Register** thirty days before the effective date. *See* 5 U.S.C. 553(b)(A), (d). Such procedural rules "are 'primarily directed toward improving the efficient and effective operations of an agency, not toward a determination of the rights [or] interests of affected parties.' " *Mendoza* v. *Perez*, 754 F.3d 1002, 1023 (D.C. Cir. 2014) (*quoting Batterton* v. *Marshall*, 648 F.2d 694, 702 n. 34 (D.C.Cir.1980)). In addressing rules of agency organization, procedure, or practice, "Congress intended . . . to distinguish between rules affecting different subject matters—the rights or interests of regulated parties, and agencies' internal operations." *Air Transp. Ass'n of Am.* v. *Dep't of Transp.*, 900 F.2d 369, 378 (D.C. Cir. 1990), *vacated*, 498 U.S. 1077, 111 S. Ct. 944, 112 L. Ed. 2d 1033 (1991), and *vacated*, 933 F.2d 1043 (D.C. Cir. 1991) (internal quotations and citations omitted). Providing Federal agencies with additional time to prepare and propose their own NEPA implementing regulations does not "encode[] a substantive value judgment," *Public Citizen* v. *Dep't of State*, 276 F.3d 634, 641 (D.C. Cir. 2002) (quoting *JEM Broadcasting Co.* v. *FCC*, 22 F.3d 320, 327–28 (D.C. Cir. 1994), but rather merely avoids the wasted resources that could occur by requiring Federal agencies to propose revisions to their regulations before CEQ

has completed its review. *See also, e.g., Elec. Priv. Info. Center* v. *U.S. Dep't of Homeland Sec.*, 653 F.3d 1, 5–6 (D.C. Cir. 2011); *Aulenback, Inc. v Fed. Highway Admin.*, 103 F.3d 156, 169 (D.C. Cir. 1997).

The purely procedural character of extending the time provided by § 1507.3(b) is reinforced by the fact that this provision only sets forth the deadline for Federal agencies to propose procedural revisions, rather than to finalize those revisions, and therefore has no substantive effect. Because § 1507.3(b) merely establishes an internal government deadline for Federal agencies to propose revisions to that agency's internal NEPA procedures, CEQ has determined that amending that deadline fits within the category of procedural rules exempted from notice-and-comment rulemaking. CEQ nonetheless invites comments on this determination.

Second, even if extending the deadline in 40 CFR 1507.3(b) is not an exempted procedural rule, CEQ has good cause to issue an interim final rule. The APA authorizes agencies to issue regulations without notice and public comment when an agency finds, for good cause, that notice and comment is "impracticable, unnecessary, or contrary to the public interest," 5 U.S.C. 553(b)(B), and to make the rule effective immediately for good cause. 5 U.S.C. 553(d)(3). As discussed, 40 CFR 1507.3(b) requires agencies to submit proposals to implement the 2020 Rule within 12 months of September 14, 2020, and section 1507.3(b)(1) requires Federal agencies to consult with CEQ while developing proposals. To meet that deadline, agencies must therefore budget and devote funds and other resources for the revision of procedures in an expedited manner. CEQ also would have to expend its limited resources reviewing Federal agencies' proposed implementing procedures before CEQ completes its review of the 2020 Rule and adopts any amendments. Prior to President Biden issuing E.O. 13990 and E.O. 14008, which initiated CEQ's comprehensive review of the 2020 Rule, only the U.S. Department of Transportation (DOT) had published proposed procedures in the **Federal Register** for public comment after consulting with CEQ as required by 40 CFR 1507.3(b)(1). CEQ estimates that at least 85 more agencies must comply with the deadline established by 40 CFR 1507.3(b).

It is impracticable to amend the deadline in 40 CFR 1507.3(b) through an ordinary notice and comment process because there is not enough time to conduct an adequate public comment

process and complete the rulemaking before the September 14, 2021, deadline and, even if CEQ could finalize amendment of this provision before September 14, 2021, Federal agencies would already have devoted significant resources to preparing their revised procedures. Given the extensive changes made to the NEPA regulations in the 2020 Rule, the proposed revisions to agency NEPA procedures called for in 40 CFR 1507.3 may be substantial and require significant lead time for agencies to complete before September 14, 2021, underscoring the impracticability of proceeding through ordinary notice and comment. The development of agency NEPA procedures typically involves significant coordination internal to the agency, especially when large Departments have multiple agencies within them. Additionally, the consultation process with CEQ involves discussions both during the agencies' development of their procedures as well as a formal review process where CEQ provides comments and agencies make additional revisions to their proposals before the agency issues them for public comment. As described above, only DOT published proposed procedures to satisfy the directive of 40 CFR 1507.3 between the time that the 2020 Rule was promulgated on July 16, 2020 and January 20, 2021, when E.O. 13990 directed CEQ to commence a review of the 2020 Rule, which evidences the significant investment of time and resources required for agencies to develop proposed implementing procedures. For this same reason, keeping the September 14, 2021, deadline without immediate action is contrary to the public interest because it would result in Federal agencies' wasteful expenditure of their resources and personnel to develop proposed procedures to implement a rule that CEQ is reviewing and intends to revise.

Finally, CEQ finds that it is unnecessary to accept comment before taking this action because extending the deadline for Federal agencies to propose implementing procedures would have no impact on the public. *See, e.g., Mack Trucks, Inc.* v. *EPA*, 682 F.3d 87, 94 (D.C. Cir. 2012). Additionally, CEQ accepted public comment on this 12-month deadline before promulgating the 2020 Rule, and the extension of the deadline involves similar issues (the need for time for agencies to update their procedures following changes to CEQ regulations). *See, e.g., Priests for Life* v. *U.S. Dep't of Health & Human Servs.*, 772 F.3d 229, 276 (D.C. Cir. 2014), vacated and remanded sub nom. *Zubik* v. *Burwell*, 136 S. Ct. 1557 (2016).

AR_0032899

Furthermore, OMB, the agency with oversight responsibility on regulatory processes, also has reached the conclusion that requiring agencies to report on their progress towards the September 14, 2021 deadline would be inconsistent with the Administration's policies.[12]

CEQ invites comment on this rule's amendment of § 1507.3(b) to extend by 2 years the period of time Federal agencies have to propose implementing procedures that conform with the 2020 Rule, and CEQ's bases for issuing this amendment as an interim final rule. CEQ will consider comments it receives and take further action, if appropriate.

## III. Rulemaking Analyses and Notices

### A. Regulatory Procedures

Under the APA, an agency may waive notice and comment procedures if an action is an interpretative rule, a general statement of policy, or a rule of agency organization, procedure, or practice. *See* 5 U.S.C. 553(b)(A). As discussed in section II, CEQ has determined that this rule is a rule of "agency organization, procedure, or practice" and, therefore, CEQ is not required to engage in a notice and comment rulemaking process. Furthermore, because the rule is a procedural rule, rather than a substantive rule, it may be made effective immediately upon publication. *See* 5 U.S.C. 553(d).

### B. E.O. 12866, Regulatory Planning and Review, and E.O. 13563, Improving Regulation and Regulatory Review

E.O. 12866 provides that OIRA will review all significant rules. E.O. 13563 reaffirms the principles of E.O. 12866, calling for improvements in the Federal Government's regulatory system to promote predictability, reduce uncertainty, and use the best, most innovative, and least burdensome tools for achieving regulatory objectives. OMB determined that this final rule does not meet the requirements for a significant regulatory action under E.O. 12866, as supplemented by E.O. 13563, and therefore it was not subject to review.

### C. Regulatory Flexibility Act and E.O. 13272, Proper Consideration of Small Entities in Agency Rulemaking

The Regulatory Flexibility Act, as amended, (RFA), 5 U.S.C. 601 *et seq.*,

and E.O. 13272[13] require agencies to assess the impacts of proposed and final rules on small entities. Under the RFA, small entities include small businesses, small organizations, and small governmental jurisdictions. An agency must prepare an Initial Regulatory Flexibility Analysis (IRFA) unless it determines and certifies that a proposed rule, if promulgated, would not have a significant economic impact on a substantial number of small entities. 5 U.S.C. 605(b). This interim rule does not directly regulate small entities. Rather, the rule applies to Federal agencies and sets forth the process for their compliance with NEPA. Accordingly, CEQ hereby certifies that this interim final rule will not have a significant economic impact on a substantial number of small entities.

### D. National Environmental Policy Act

Under the CEQ regulations, major Federal actions may include regulations. When CEQ issued regulations in 1978, it prepared a "special environmental assessment" for illustrative purposes pursuant to E.O. 11991. 43 FR 25230, 25232 (June 9, 1978). The NPRM for the 1978 Rule stated "the impacts of procedural regulations of this kind are not susceptible to detailed analysis beyond that set out in the assessment." *Id.* Similarly, in 1986, although CEQ stated in the final rule that there were "substantial legal questions as to whether entities within the Executive Office of the President are required to prepare environmental assessments," it also prepared a special environmental assessment. 51 FR 15618, 15619 (Apr. 25, 1986). The special environmental assessment issued in 1986 made a finding of no significant environmental impact, and there was no finding made for the assessment of the 1978 Rule. CEQ has similarly developed a special environmental assessment for this rule and made a finding of no significant impact, and included them in the docket for this rulemaking.

### E. E.O. 13132, Federalism

E.O. 13132 requires agencies to develop an accountable process to ensure meaningful and timely input by State and local officials in the development of regulatory policies that have federalism implications.[14] Policies that have federalism implications include regulations that have substantial direct effects on the States, on the relationship between the national government and the States, or on the distribution of power and

responsibilities among the various levels of government. CEQ does not anticipate that this interim final rule has federalism implications because it applies to Federal agencies, not States.

### F. E.O. 13175, Consultation and Coordination With Indian Tribal Governments

E.O. 13175 requires agencies to have a process to ensure meaningful and timely input by Tribal officials in the development of policies that have Tribal implications.[15] Such policies include regulations that have substantial direct effects on one or more Indian Tribes, on the relationship between the Federal Government and Indian Tribes, or on the distribution of power and responsibilities between the Federal Government and Indian Tribes. The Presidential Memorandum of January 26, 2021 on Tribal Consultation and Strengthening Nation-to-Nation Relationships reaffirms the provisions of E.O. 13175 and directs Federal agencies to develop an action plan to implement E.O. 13175. CEQ adopted an Action Plan for Consultation and Coordination with Tribal Nations on April 26, 2021, to direct CEQ's actions to identify policies with Tribal implications and ensure sustained and meaningful consultation. This interim final rule is not a regulatory policy that has Tribal implications because it merely extends the time by which Federal agencies have to propose updates to their NEPA implementing procedures.

### G. E.O. 12898, Federal Actions To Address Environmental Justice in Minority Populations and Low-Income Populations

E.O. 12898 requires agencies to make achieving environmental justice part of their missions by identifying and addressing, as appropriate, disproportionately high and adverse human health or environmental effects of agency programs, policies, and activities, including rulemakings, on minority populations and low-income populations.[16] This interim final rule would extend the deadline by which agencies have to submit proposals for changes to their NEPA procedures. Submitting a proposal for changes to the NEPA procedures does not change the manner in which Federal agencies implement NEPA; agencies would still need to subject those procedures to notice and comment and then issue final procedures. Therefore, submitting a proposal does not have adverse human health or environmental effects. CEQ

---

[12] *See Revocation of OMB Memorandum M–21–01,* "*Budget and Management Guidance on Updates to the Regulations Implementing the Procedural Provisions of the National Environmental Policy Act*", M–21–23 (Apr. 26, 2021), *https:// www.whitehouse.gov/wp-content/uploads/2021/04/ M-21-23.pdf.*

[13] 67 FR 53461 (Aug. 16, 2002).
[14] 64 FR 43255 (Aug. 10, 1999).

[15] 65 FR 67249 (Nov. 9, 2000).
[16] 59 FR 7629 (Feb. 16, 1994).

has determined, therefore, that this interim final rule would not cause disproportionately high and adverse human health or environmental effects on minority populations and low-income populations.

*H. E.O. 13211, Actions Concerning Regulations That Significantly Affect Energy Supply, Distribution, or Use*

Agencies must prepare a Statement of Energy Effects for significant energy actions under E.O. 13211.[17] This interim final rule is not a ''significant energy action'' because it is not likely to have a significant adverse effect on the supply, distribution, or use of energy.

*I. E.O. 12988, Civil Justice Reform*

Under section 3(a) of E.O. 12988,[18] agencies must review their proposed regulations to eliminate drafting errors and ambiguities, draft them to minimize litigation, and provide a clear legal standard for affected conduct. Section 3(b) provides a list of specific issues that agencies should consider when conducting the reviews required by section 3(a). CEQ has conducted this review and determined that this interim final rule complies with the requirements of E.O. 12988.

*J. Unfunded Mandate Reform Act*

Section 201 of the Unfunded Mandates Reform Act of 1995 (2 U.S.C. 1531) requires Federal agencies to assess the effects of their regulatory actions on State, Tribal, and local governments, and the private sector to the extent that such regulations incorporate requirements specifically set forth in law. Before promulgating a rule that may result in the expenditure by a State, Tribal, or local government, in the aggregate, or by the private sector of $100 million, adjusted annually for inflation, in any 1 year, an agency must prepare a written statement that assesses the effects on State, Tribal, and local governments and the private sector. 2 U.S.C. 1532. This interim final rule applies to Federal agencies and would not result in expenditures of $100 million or more for State, Tribal, and local governments, in the aggregate, or the private sector in any 1 year. This action also does not impose any enforceable duty, contain any unfunded mandate, or otherwise have any effect on small governments subject to the requirements of 2 U.S.C. 1531–1538.

*K. Paperwork Reduction Act*

This interim final rule does not impose any new information collection

burden that would require additional review or approval by OMB under the Paperwork Reduction Act, 44 U.S.C. 3501 *et seq.*

**List of Subjects in 40 CFR Part 1507**

Administrative practice and procedure, Environmental impact statements, Environmental protection, Natural resources.

Dated: June 22, 2021.

**Brenda Mallory,**

*Chair.*

For the reasons stated in the preamble, the Council on Environmental Quality amends part 1507 in title 40 of the Code of Federal Regulations to read as follows:

**PART 1507—AGENCY COMPLIANCE**

■ 1. The authority citation for part 1507 continues to read as follows:

**Authority:** 42 U.S.C. 4321–4347; 42 U.S.C. 4371–4375; 42 U.S.C. 7609; E.O. 11514, 35 FR 4247, 3 CFR, 1966–1970, Comp., p. 902, as amended by E.O. 11991, 42 FR 26967, 3 CFR, 1977 Comp., p. 123; and E.O. 13807, 82 FR 40463, 3 CFR, 2017, Comp., p. 369.

■ 2. Amend § 1507.3 by revising the first sentence of paragraph (b) introductory text to read as follows:

**§ 1507.3    Agency NEPA procedures.**

\*    \*    \*    \*    \*

(b) No more than 36 months after September 14, 2020, or 9 months after the establishment of an agency, whichever comes later, each agency shall develop or revise, as necessary, proposed procedures to implement the regulations in this subchapter, including to eliminate any inconsistencies with the regulations in this subchapter. \* \* \*

\*    \*    \*    \*    \*

[FR Doc. 2021–13770 Filed 6–28–21; 8:45 am]

**BILLING CODE 3225–F1–P**

**FEDERAL COMMUNICATIONS COMMISSION**

**47 CFR Part 73**

**[MB Docket No. 21–127; RM–11894; DA 21–700; FR ID 34398]**

**Television Broadcasting Services Schenectady, New York**

**AGENCY:** Federal Communications Commission (FCC).

**ACTION:** Final rule.

**SUMMARY:** On April 5, 2021, the Media Bureau, Video Division (Bureau) issued a *Notice of Proposed Rulemaking* (*NPRM*) in response to a petition for

rulemaking filed by WRGB Licensee, LLC (Petitioner), the licensee of WRGB, channel 6 (CBS), Schenectady, New York, requesting the substitution of channel 35 for channel 6 at Schenectady in the DTV Table of Allotments. For the reasons set forth in the *Report and Order* referenced below, the Bureau amends FCC regulations to substitute channel 35 for channel 6 at Schenectady.

**DATES:** Effective June 29, 2021.

**FOR FURTHER INFORMATION CONTACT:** Joyce Bernstein, Media Bureau, at (202) 418–1647 or *Joyce.Bernstein@fcc.gov.*

**SUPPLEMENTARY INFORMATION:** This is a synopsis of the Commission's *Report and Order,* MB Docket No. 21–127; RM–11894; DA 21–700, adopted and released on June 16, 2021. The full text of this document is available for download on the FCC's website at *https://docs.fcc.gov/public/ attachments/DA-21-700A1.pdf.* To request materials in accessible formats for people with disabilities (braille, large print, electronic files, audio format), send an email to *fcc504@fcc.gov* or call the Consumer & Governmental Affairs Bureau at 202–418–0530 (voice), 202–418–0432 (tty).

The proposed rule was published at 86 FR 21681 on April 23, 2021. The Petitioner filed comments in support of the petition reaffirming its commitment to apply for channel 35. No other comments were filed. The Petitioner states that VHF channels have certain propagation characteristics which may cause reception issues for some viewers. In addition, WRGB has received numerous complaints from viewers unable to receive the Station's over-the-air signal, despite being able to receive signals from other stations. While the proposed channel 35 noise limited contour does not completely encompass the relevant channel 6 noise limited contour, WRGB is a CBS affiliate and there are three other CBS affiliated stations that serve some portion of the loss area. In addition, the Petitioner submitted an analysis, using the Commission's *TVStudy* software analysis program, demonstrating that, after taking into account service provided by other CBS stations, all of the population located within WRGB's original post-DTV transition channel 6 noise limited contour will continue to receive CBS service, except for 30 people, a number the Commission considers *de minimis.* As the Bureau explained in the *NPRM,* it used the technical parameters of WRGB's original post-transition digital channel 6 facility (File No. BPCDT–20080307AAK) in

---

[17] 66 FR 28355 (May 22, 2001).

[18] 61 FR 4729 (Feb. 7, 1996).

AR_0032901

# Environmental Justice

## Guidance Under the National Environmental Policy Act



**Council on Environmental Quality**

AR_0033077

Front cover photograph of John Heinz National Wildlife Refuge at Tinicum by John and Karen Hollingsworth

Front cover photograph of school bus and children by Sam Kittner.

AR_0033078

# *ENVIRONMENTAL JUSTICE*
## *Guidance Under the*
## *National Environmental Policy Act*



**Council on Environmental Quality**
**Executive Office of the President**
**Old Executive Office Building, Room 360**
**Washington, D.C. 20502**
**(202)395-5750**
**http://www.whitehouse.gov/CEQ/**
**December 10, 1997**

AR_0033079

# Table of Contents

**I. Introduction** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

**II. Executive Order 12898 and the Presidential Memorandum** . . . . . . . . . 3

**III. Executive Order 12898 and NEPA** . . . . . . . . . . . . . . . . . . . . . . . 7

    *A. NEPA Generally* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

    *B. Principles for Considering Environmental Justice under NEPA* . . . . . . . . . . 8
        1. **General Principles** . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
        2. **Additional Considerations** . . . . . . . . . . . . . . . . . . . . . . . . . 9

    *C. Considering Environmental Justice in Specific Phases of the NEPA Process*    10
        1. **Scoping** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
        2. **Public Participation** . . . . . . . . . . . . . . . . . . . . . . . . . . 13
        3. **Determining the Affected Environment** . . . . . . . . . . . . . . . . . . 14
        4. **Analysis** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
        5. **Alternatives** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
        6. **Record of Decision** . . . . . . . . . . . . . . . . . . . . . . . . . . 15
        7. **Mitigation** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

    *D. Where No EIS or EA is Prepared* . . . . . . . . . . . . . . . . . . . . . . . 16

**IV. Regulatory Changes** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

**V. Effect of this Guidance** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

**Appendix:** *Guidance for Agencies on Key Terms in Executive Order 12898* . 23

AR_0033082

# I.

## Introduction

Executive Order 12898, "Federal Actions to Address Environmental Justice in Minority Populations and Low-Income Populations,"[1] provides that "each Federal agency shall make achieving environmental justice part of its mission by identifying and addressing, as appropriate, disproportionately high and adverse human health or environmental effects of its programs, policies, and activities on minority populations and low-income populations." The Executive Order makes clear that its provisions apply fully to programs involving Native Americans.

In the memorandum to heads of departments and agencies that accompanied Executive Order 12898, the President specifically recognized the importance of procedures under the National Environmental Policy Act (NEPA)[2] for identifying and addressing environmental justice concerns. The memorandum states that "each Federal agency shall analyze the environmental effects, including human health, economic and social effects, of Federal actions, including effects on minority communities and low-income communities, when such analysis is required by [NEPA]." The memorandum particularly emphasizes the importance of NEPA's public participation process, directing that "each Federal agency shall provide opportunities for community input in the NEPA process." Agencies are further directed to "identify potential effects and mitigation measures in consultation with affected communities, and improve the accessibility of meetings, crucial documents, and notices."

The Council on Environmental Quality (CEQ) has oversight of the Federal government's compliance with Executive Order 12898 and NEPA.[3] CEQ, in consultation with EPA and other affected agencies, has developed this guidance to further assist Federal agencies with their NEPA procedures so that environmental justice concerns are effectively identified and addressed. To the extent practicable and permitted by law, agencies may supplement this guidance with more specific procedures tailored to particular programs or activities of an individual department, agency, or office.

---

[1]  59 Fed. Reg. 7629 (1994).

[2]  42 U.S.C. §4321 et seq.

[3]  Certain oversight functions in the Executive Order are delegated to the Deputy Assistant to the President for Environmental Policy. Following the merger of the White House Office on Environmental Policy with CEQ, the Chair of CEQ assumed those functions. The Environmental Protection Agency (EPA) has lead responsibility for implementation of the Executive Order as Chair of the Interagency Working Group (IWG) on Environmental Justice.

AR_0033083

# II.

## Executive Order 12898 and the Presidential Memorandum

In addition to the general directive in Executive Order 12898 that each agency identify and address, as appropriate, "disproportionately high and adverse human health or environmental effects of its programs, policies, and activities on minority populations and low-income populations,"[4] there are several provisions of the Executive Order and a number of supporting documents to which agencies should refer when identifying and addressing environmental justice concerns in the NEPA process.

First, the Executive Order itself contains particular emphasis on four issues that are pertinent to the NEPA process:

- The Executive Order requires the development of agency-specific environmental justice strategies.[5] Thus, agencies have developed and should periodically revise their strategies providing guidance concerning the types of programs, policies, and activities that may, or historically have, raised environmental justice concerns at the particular agency. These guidances may suggest possible approaches to addressing such concerns in the agency's NEPA analyses, as appropriate.

- The Executive Order recognizes the importance of research, data collection, and analysis, particularly with respect to multiple and cumulative exposures to environmental hazards for low-income populations, minority populations, and Indian tribes.[6] Thus, data on these exposure issues should be incorporated into NEPA analyses as appropriate.[7]

- The Executive Order provides for agencies to collect, maintain, and analyze information on patterns of subsistence consumption of fish, vegetation, or wildlife.[8] Where an agency action may affect fish, vegetation, or wildlife, that agency action may

---

[4] Executive Order No. 12898, 59 Fed. Reg. at 7630 (Section 1-101).

[5] *Id.* at 7630 (Section 1-103).

[6] *Id.* at 7631 (Section 3-3).

[7] For further information on considering cumulative effects, see Considering Cumulative Effects Under The National Environmental Policy Act (Council on Environmental Quality, Executive Office of the President, Jan. 1997)

[8] *Id.* at 7631 (Section 4-401).

AR_0033085

also affect subsistence patterns of consumption and indicate the potential for disproportionately high and adverse human health or environmental effects on low-income populations, minority populations, and Indian tribes.

- The Executive Order requires agencies to work to ensure effective public participation and access to information.[9] Thus, within its NEPA process and through other appropriate mechanisms, each Federal agency shall, "wherever practicable and appropriate, translate crucial public documents, notices and hearings, relating to human health or the environment for limited English speaking populations." In addition, each agency should work to "ensure that public documents, notices, and hearings relating to human health or the environment are concise, understandable, and readily accessible to the public."[10]

Second, the memorandum accompanying the Executive Order identifies four important ways to consider environmental justice under NEPA.

- Each Federal agency should analyze the environmental effects, including human health, economic, and social effects of Federal actions, including effects on minority populations, low-income populations, and Indian tribes, when such analysis is required by NEPA.[11]

- Mitigation measures identified as part of an environmental assessment (EA), a finding of no significant impact (FONSI), an environmental impact statement (EIS), or a record of decision (ROD), should, whenever feasible, address significant and adverse environmental effects of proposed federal actions on minority populations, low-income populations, and Indian tribes.[12]

- Each Federal agency must provide opportunities for effective community participation in the NEPA process, including identifying potential effects and mitigation measures in consultation with affected communities and improving the accessibility of public meetings, crucial documents, and notices.[13]

- Review of NEPA compliance (such as EPA's review under § 309 of the Clean Air Act)

---

[9] *Id.* at 7632 (Section 5-5).

[10] *Id.* at 7632 (Section 5-5).

[11] Memorandum from the President to the Heads of Departments and Agencies. Comprehensive Presidential Documents No. 279. (Feb. 11, 1994).

[12] *Id.*

[13] *Id.*

4

must ensure that the lead agency preparing NEPA analyses and documentation has appropriately analyzed environmental effects on minority populations, low-income populations, or Indian tribes, including human health, social, and economic effects.[14]

Third, the Interagency Working Group (IWG), established by the Executive Order to implement the order's requirements, has developed guidance on key terms in the Executive Order. The guidance, reproduced as Appendix A, reflects a general consensus based on Federal agencies' experience and understanding of the issues presented. Agencies should apply the guidance with flexibility, and may consider its terms a point of departure rather than conclusive direction in applying the terms of the Executive Order.

---

[14] *Id.*

AR_0033087

AR_0033088

# III.

# Executive Order 12898 and NEPA

## A. *NEPA Generally*

NEPA's fundamental policy is to "encourage productive and enjoyable harmony between man and his environment."[15] In the statute, Congress "recognizes that each person should enjoy a healthful environment and that each person has a responsibility to contribute to the preservation and enhancement of the environment."[16] The following goals, set forth in NEPA, make clear that attainment of environmental justice is wholly consistent with the purposes and policies of NEPA[17]:

- to "assure for all Americans safe, healthful, productive, and aesthetically and culturally pleasing surroundings"[18];

- to "attain the widest range of beneficial uses of the environment without degradation, risk to health or safety, or other undesirable and unintended consequences";[19]

- to "preserve important historic, cultural, and natural aspects of our natural heritage, and maintain, wherever possible, an environment which supports diversity and variety of individual choice"[20]; and

- to "achieve a balance between population and resource use which will permit high standards of living and a wide sharing of life's amenities."[21]

These goals are promoted through the requirement that all agencies of the Federal government shall include in every recommendation or report on proposals for legislation and other

---

[15]   42 U.S.C. § 4321.

[16]   42 U.S.C. § 4331(c).

[17]   42 U.S.C. § 4331(b).

[18]   42 U.S.C. § 4331(b)(2).

[19]   42 U.S.C. § 4331(b)(3).

[20]   42 U.S.C. § 4331(b)(4).

[21]   42 U.S.C. § 4331(b)(5).

AR_0033089

major Federal actions significantly affecting the quality of the human environment, a "detailed statement by the responsible official" on:  the environmental impacts of the proposed action; adverse environmental effects that cannot be avoided should the proposal be implemented; alternatives to the proposed action; the relationship between local, short-term uses of man's environment and long-term productivity; and any irreversible or irretrievable commitments of resources involved in the proposed action itself.[22]

Preparation of an EA may precede preparation of an EIS, to determine whether a proposed action may "significantly affect" the quality of the human environment.  The EA either will support a finding of no significant impact (FONSI), or will document the need for an EIS. Agency procedure at each step of this process should be guided by the agency's own NEPA regulations and by the CEQ regulations found at 40 C.F.R. Parts 1500-1508.

## B.  Principles for Considering Environmental Justice under NEPA

Environmental justice issues may arise at any step of the NEPA process and agencies should consider these issues at each and every step of the process, as appropriate.  Environmental justice issues encompass a broad range of impacts covered by NEPA, including impacts on the natural or physical environment and interrelated social, cultural and economic effects.[23]  In preparing an EIS or an EA, agencies must consider both impacts on the natural or physical environment and related social, cultural, and economic impacts.[24]  Environmental justice concerns may arise from impacts on the natural and physical environment, such as human health or ecological impacts on minority populations, low-income populations, and Indian tribes, or from related social or economic impacts.

### 1. General Principles

Agencies should recognize that the question of whether agency action raises environmental justice issues is highly sensitive to the history or circumstances of a particular community or population, the particular type of environmental or human health impact, and the nature of the proposed action itself.  There is not a standard formula for how environmental justice issues should be identified or addressed.  However, the following six principles provide general guidance.

---

[22]    42 U.S.C. § 4332(c).

[23]  The CEQ implementing regulations define "effects" or "impacts" to include "ecological...aesthetic, historic, cultural, economic, social or health, whether direct, indirect or cumulative."  40 C.F.R. 1508.8.

[24] 40 C.F.R. 1508.14.

**8**

- Agencies should consider the composition of the affected area, to determine whether minority populations, low-income populations, or Indian tribes are present in the area affected by the proposed action, and if so whether there may be disproportionately high and adverse human health or environmental effects on minority populations, low-income populations, or Indian tribes.

- Agencies should consider relevant public health data and industry data concerning the potential for multiple or cumulative exposure to human health or environmental hazards in the affected population and historical patterns of exposure to environmental hazards, to the extent such information is reasonably available. For example, data may suggest there are disproportionately high and adverse human health or environmental effects on a minority population, low-income population, or Indian tribe from the agency action. Agencies should consider these multiple, or cumulative effects, even if certain effects are not within the control or subject to the discretion of the agency proposing the action.

- Agencies should recognize the interrelated cultural, social, occupational, historical, or economic factors that may amplify the natural and physical environmental effects of the proposed agency action. These factors should include the physical sensitivity of the community or population to particular impacts; the effect of any disruption on the community structure associated with the proposed action; and the nature and degree of impact on the physical and social structure of the community.

- Agencies should develop effective public participation strategies. Agencies should, as appropriate, acknowledge and seek to overcome linguistic, cultural, institutional, geographic, and other barriers to meaningful participation, and should incorporate active outreach to affected groups.

- Agencies should assure meaningful community representation in the process. Agencies should be aware of the diverse constituencies within any particular community when they seek community representation and should endeavor to have complete representation of the community as a whole. Agencies also should be aware that community participation must occur as early as possible if it is to be meaningful.

- Agencies should seek tribal representation in the process in a manner that is consistent with the government-to-government relationship between the United States and tribal governments, the federal government's trust responsibility to federally-recognized tribes, and any treaty rights.

## 2. Additional Considerations

The preceding principles must be applied in light of these further considerations that are

9

pertinent to any analysis of environmental justice under NEPA.

● The Executive Order does not change the prevailing legal thresholds and statutory interpretations under NEPA and existing case law. For example, for an EIS to be required, there must be a sufficient impact on the physical or natural environment to be "significant" within the meaning of NEPA. Agency consideration of impacts on low-income populations, minority populations, or Indian tribes may lead to the identification of disproportionately high and adverse human health or environmental effects that are significant and that otherwise would be overlooked.[25]

● Under NEPA, the identification of a disproportionately high and adverse human health or environmental effect on a low-income population, minority population, or Indian tribe does not preclude a proposed agency action from going forward, nor does it necessarily compel a conclusion that a proposed action is environmentally unsatisfactory. Rather, the identification of such an effect should heighten agency attention to alternatives (including alternative sites), mitigation strategies, monitoring needs, and preferences expressed by the affected community or population.

● Neither the Executive Order nor this guidance prescribes any specific format for examining environmental justice, such as designating a specific chapter or section in an EIS or EA on environmental justice issues. Agencies should integrate analyses of environmental justice concerns in an appropriate manner so as to be clear, concise, and comprehensible within the general format suggested by 40 C.F.R. § 1502.10.

## C. Considering Environmental Justice in Specific Phases of the NEPA Process

While appropriate consideration of environmental justice issues is highly dependent upon the particular facts and circumstances of the proposed action, the affected environment, and the affected populations, there are opportunities and strategies that are useful at particular stages of the NEPA process.

### 1. Scoping

During the scoping process, an agency should preliminarily determine whether

---

[25] Title VI of the Civil Rights Act of 1964, U.S.C. 2000d *et seq.*, and agency implementing regulations, prohibit recipients of federal financial assistance from taking actions that discriminate on the basis of race, sex, color, national origin, or religion. If an agency is aware that a recipient of federal funds may be taking action that is causing a racially discriminatory impact, the agency should consider using Title VI as a means to prevent or eliminate that discrimination.

an area potentially affected by a proposed agency action may include low-income populations, minority populations, or Indian tribes, and seek input accordingly. When the scoping process is used to develop an EIS or EA, an agency should seek input from low income populations, minority populations, or Indian tribes as early in the process as information becomes available.[26] Any such determination, as well as the basis for the determination, should be more substantively addressed in the appropriate NEPA documents and communicated as appropriate during the NEPA process.

If an agency identifies any potentially affected minority populations, low-income populations, or Indian tribes, the agency should develop a strategy for effective public involvement in the agency's determination of the scope of the NEPA analysis. Customary agency practices for notifying the public of a proposed action and subsequent scoping and public events may be enhanced through better use of local resources, community and other nongovernmental organizations, and locally targeted media.

---

**Agencies should consider enhancing their outreach through the following means:**

- Religious organizations (e.g., churches, temples, ministerial associations);

- Newspapers, radio and other media, particularly media targeted to low-income populations, minority populations, or Indian tribes;

- Civic associations;

- Minority business associations;

- Environmental and environmental justice organizations;

- Legal aid providers;

- Homeowners', tenants', and neighborhood watch groups;

- Federal, state, local, and tribal governments;

- Rural cooperatives;

- Business and trade organizations;

- Community and social service organizations;

- Universities, colleges, vocational and other schools;

- Labor organizations;

- Civil rights organizations;

- Local schools and libraries;

- Senior citizens' groups;

- Public health agencies and clinics; and

- The Internet and other electronic media.

---

[26] For more information on scoping, see Memorandum from Nicolas C. Yost, Scoping Guidance (Council on Environmental Quality, Executive Office of the President, April 30, 1981).

AR_0033093

The participation of diverse groups in the scoping process is necessary for full consideration of the potential environmental impacts of a proposed agency action and any alternatives. By discussing and informing the public of the emerging issues related to the proposed action, agencies may reduce misunderstandings, build cooperative working relationships, educate the public and decisionmakers, and avoid potential conflicts. Agencies should recognize that the identity of the relevant "public" may evolve during the process and may include different constituencies or groups of individuals at different stages of the NEPA process. This may also be the appropriate juncture to begin government-to-government consultation with affected Indian tribes and to seek their participation as cooperating agencies. For this participation to be meaningful, the public should have access to enough information so that it is well informed and can provide constructive input.

---

**The following information may help inform the public during the scoping process:**

- A description of the proposed action;

- An outline of the anticipated schedule for completing the NEPA process, with key milestones;

- An initial list of alternatives (including alternative sites, if possible) and potential impacts;

- An initial list of other existing or proposed actions, Federal and non-Federal, that may have cumulative impacts;

- Maps, drawings, and any other appropriate material or references;

- An agency point of contact;

- Timely notice of locations where comments will be received or public meetings held;

- Any telephone number or locations where further information can be obtained;

- Examples of past public comments on similar agency actions.

---

Thorough scoping is the foundation for the analytical process and provides an early opportunity for the public to participate in the design of alternatives for achieving the goals and objectives of the proposed agency action.

**12**

## 2. Public Participation

Early and meaningful public participation in the federal agency decision making process is a paramount goal of NEPA. CEQ's regulations require agencies to make diligent efforts to involve the public throughout the NEPA process. Participation of low-income populations, minority populations, or tribal populations may require adaptive or innovative approaches to overcome linguistic, institutional, cultural, economic, historical, or other potential barriers to effective participation in the decision-making processes of Federal agencies under customary NEPA procedures. These barriers may range from agency failure to provide translation of documents to the scheduling of meetings at times and in places that are not convenient to working families.

**The following steps may be considered, as appropriate, in developing an innovative strategy for effective public participation:**

- Coordination with individuals, institutions, or organizations in the affected community to educate the public about potential health and environmental impacts and enhance public involvement;

- Translation of major documents (or summaries thereof), provision of translators at meetings, or other efforts as appropriate to ensure that limited-English speakers potentially affected by a proposed action have an understanding of the proposed action and its potential impacts;

- Provision of opportunities for limited-English speaking members of the affected public to provide comments throughout the NEPA process;

- Provision of opportunities for public participation through means other than written communication, such as personal interviews or use of audio or video recording devices to capture oral comments;

- Use of periodic newsletters or summaries to provide updates on the NEPA process to keep the public informed;

- Use of different meeting sizes or formats, or variation on the type and number of media used, so that communications are tailored to the particular community or population;

- Circulation or creation of specialized materials that reflect the concerns and sensitivities of particular populations such as information about risks specific to subsistence consumers of fish, vegetation, or wildlife;

- Use of locations and facilities that are local, convenient, and accessible to the disabled, low-income and minority communities, and Indian tribes; and

- Assistance to hearing-impaired or sight-impaired individuals.

13

AR_0033095

### 3. Determining the Affected Environment

In order to determine whether a proposed action is likely to have disproportionately high and adverse human health or environmental effects on low-income populations, minority populations, or Indian tribes, agencies should identify a geographic scale for which they will obtain demographic information on the potential impact area. Agencies may use demographic data available from the Bureau of the Census (BOC) to identify the composition of the potentially affected population. Geographic distribution by race, ethnicity, and income, as well as a delineation of tribal lands and resources, should be examined. Census data are available in published formats, and on CD-ROM available through the BOC. This data also is available from a number of local, college, and university libraries, and the World Wide Web. Agencies may also find that Federal, tribal, state and local health, environmental, and economic agencies have useful demographic information and studies, such as the Landview II system, which is used by the BOC to assist in utilizing data from a geographic information system (GIS). Landview II has proven to be a low-cost, readily available means of graphically accessing environmental justice data. These approaches already should be incorporated into current NEPA compliance.

Agencies should recognize that the impacts within minority populations, low-income populations, or Indian tribes may be different from impacts on the general population due to a community's distinct cultural practices. For example, data on different patterns of living, such as subsistence fish, vegetation, or wildlife consumption and the use of well water in rural communities may be relevant to the analysis. Where a proposed agency action would not cause any adverse environmental impacts, and therefore would not cause any disproportionately high and adverse human health or environmental impacts, specific demographic analysis may not be warranted. Where environments of Indian tribes may be affected, agencies must consider pertinent treaty, statutory, or executive order rights and consult with tribal governments in a manner consistent with the government-to-government relationship.

### 4. Analysis

When a disproportionately high and adverse human health or environmental effect on a low-income population, minority population, or Indian tribe has been identified, agencies should analyze how environmental and health effects are distributed within the affected community. Displaying available data spatially, through a GIS, can provide the agency and the public with an effective visualization of the distribution of health and environmental impacts among demographic populations. This type of data should be analyzed in light of any additional qualitative or quantitative information gathered through the public participation process.

**14**

Where a potential environmental justice issue has been identified by an agency, the agency should state clearly in the EIS or EA whether, in light of all of the facts and circumstances, a disproportionately high and adverse human health or environmental impact on minority populations, low-income populations, or Indian tribe is likely to result from the proposed action and any alternatives. This statement should be supported by sufficient information for the public to understand the rationale for the conclusion. The underlying analysis should be presented as concisely as possible, using language that is understandable to the public and that minimizes use of acronyms or jargon.

### 5. Alternatives

Agencies should encourage the members of the communities that may suffer a disproportionately high and adverse human health or environmental effect from a proposed agency action to help develop and comment on possible alternatives to the proposed agency action as early as possible in the process.

Where an EIS is prepared, CEQ regulations require agencies to identify an environmentally preferable alternative in the record of decision (ROD).[27] When the agency has identified a disproportionately high and adverse human health or environmental effect on low-income populations, minority populations, or Indian tribes from either the proposed action or alternatives, the distribution as well as the magnitude of the disproportionate impacts in these communities should be a factor in determining the environmentally preferable alternative. In weighing this factor, the agency should consider the views it has received from the affected communities, and the magnitude of environmental impacts associated with alternatives that have a less disproportionate and adverse effect on low-income populations, minority populations, or Indian tribes.

### 6. Record of Decision

When an agency reaches a decision on an action for which an EIS was prepared, a public record of decision (ROD) must be prepared that provides information on the alternatives considered and the factors weighed in the decision-making process. Disproportionately high and adverse human health or environmental effects on a low-income population, minority population, or Indian tribe should be among those factors explicitly discussed in the ROD, and should also be addressed in any discussion of whether all practicable means to avoid or minimize environmental and other interrelated effects were adopted. Where relevant, the agency should discuss how these issues are addressed

---

[27]  40 C.F.R. § 1505.2(b)

15

in any monitoring and enforcement program summarized in the ROD.[28]

Dissemination of the information in the ROD may provide an effective means to inform the public of the extent to which environmental justice concerns were considered in the decision-making process, and where appropriate, whether the agency intends to mitigate any disproportionately high and adverse human health or environmental effects within the constraints of NEPA and other existing laws. In addition to translating crucial portions of the EIS where appropriate, agencies should provide translation, where practicable and appropriate, of the ROD in non-technical, plain language for limited-English speakers. Agencies should also consider translating documents into languages other than English where appropriate and practical.

### 7. Mitigation

Mitigation measures include steps to avoid, mitigate, minimize, rectify, reduce, or eliminate the impact associated with a proposed agency action.[29] Throughout the process of public participation, agencies should elicit the views of the affected populations on measures to mitigate a disproportionately high and adverse human health or environmental effect on a low-income population, minority population, or Indian tribe and should carefully consider community views in developing and implementing mitigation strategies. Mitigation measures identified in an EIS or developed as part of a FONSI should reflect the needs and preferences of affected low-income populations, minority populations, or Indian tribes to the extent practicable.

### D. Where no EIS or EA is prepared

There are certain circumstances in which the policies of NEPA apply, and a disproportionately high and adverse human health or environmental impact on low-income populations, minority populations, or Indian tribes may exist, but where the specific statutory requirement to prepare an EIS or EA does not apply. These circumstances may arise because of an exemption from the requirement, a categorical exclusion of specific activities by regulation, or a claim by an agency that another environmental statute establishes the "functional equivalent" of an EIS or EA. For example, neither an EIS nor an EA is prepared for certain hazardous waste facility permits.

In circumstances in which an EIS or EA will not be prepared and a disproportionately high and adverse human health or environmental impact on low-income

---

[28] See 40 C.F.R. § 1505.2(c).

[29] See 40 C.F.R. § 1508.20.

AR_0033098

populations, minority populations, or Indian tribes may exist, agencies should augment their procedures as appropriate to ensure that the otherwise applicable process or procedure for a federal action addresses environmental justice concerns. Agencies should ensure that the goals for public participation outlined in this guidance are satisfied to the fullest extent possible. Agencies also should fully develop and consider alternatives to the proposed action whenever possible, as would be required by NEPA.

17

AR_0033099

AR_0033100

# IV.

## Regulatory Changes

Consistent with the obligation of all agencies to promote consideration of environmental justice under NEPA and in all of their programs and activities, agencies that promulgate or revise regulations, policies, and guidances under NEPA or under any other statutory scheme should consult with CEQ and EPA to ensure that the principles and approaches presented in this guidance are fully incorporated into any new or revised regulations, policies, and guidances.

AR_0033101

AR_0033102

# V.

## Effect of this Guidance

Agencies should apply, and comply with, this guidance prospectively.  If an agency has made substantial investments in NEPA compliance, or public participation with respect to a particular agency action, prior to issuance of this guidance, the agency should ensure that application of this guidance does not result in additional delays or costs of compliance.

This guidance is intended to improve the internal management of the Executive Branch with respect to environmental justice under NEPA.  The guidance interprets NEPA as implemented through the CEQ regulations in light of Executive Order 12898.  It does not create any rights, benefits, or trust obligations, either substantive or procedural, enforceable by any person, or entity in any court against the United States, its agencies, its officers, or any other person.

AR_0033103

# APPENDIX A

## *GUIDANCE FOR FEDERAL AGENCIES ON KEY TERMS IN EXECUTIVE ORDER 12898*

### INTRODUCTION

Pursuant to Executive Order 12898 on Environmental Justice, Federal agencies are to make the achievement of environmental justice part of their mission by identifying and addressing, as appropriate, disproportionately high and adverse human health or environmental effects of their programs, policies, and activities on minority populations, low-income populations, and Indian tribes and allowing all portions of the population a meaningful opportunity to participate in the development of, compliance with, and enforcement of Federal laws, regulations, and policies affecting human health or the environment regardless of race, color, national origin, or income. To that end, set forth below is guidance for Federal agencies on key terms contained in Executive Order 12898.

This guidance is intended only to improve the internal management of the Executive Branch. It shall not be deemed to create any right, benefit, or trust obligation, either substantive or procedural, enforceable by any person, or entity in any court against the United States, its agencies, its officers, or any other person. Consequently, neither this Guidance nor the deliberative processes or products resulting from the implementation of this Guidance shall be treated as establishing standards or criteria that constitute any basis for review of the actions of the Executive Branch. Compliance with this Guidance shall not be justiciable in any proceeding for judicial review of Agency action.

AR_0033105

AR_0033106

TEXT OF EXECUTIVE ORDER 12898,
"FEDERAL ACTIONS TO ADDRESS ENVIRONMENTAL JUSTICE IN
MINORITY POPULATIONS AND LOW-INCOME POPULATIONS,"
ANNOTATED
WITH PROPOSED GUIDANCE ON TERMS IN THE EXECUTIVE ORDER[30]

Section 1-1. IMPLEMENTATION.

1-101. *Agency Responsibilities*. To the greatest extent practicable and permitted by law, and consistent with the principles set forth in the report on the National Performance Review, each Federal agency shall make achieving environmental justice part of its mission by identifying and addressing, as appropriate, disproportionately high and adverse human health or environmental effects of its programs, policies, and activities on minority populations and low-income populations in the United States and its territories and possessions, the District of Columbia, the Commonwealth of Puerto Rico, and the Commonwealth of the Marianas Islands.

**Low-income population: Low-income populations in an affected area should be identified with the annual statistical poverty thresholds from the Bureau of the Census' Current Population Reports, Series P-60 on Income and Poverty. In identifying low-income populations, agencies may consider as a community either a group of individuals living in geographic proximity to one another, or a set of individuals (such as migrant workers or Native Americans), where either type of group experiences common conditions of environmental exposure or effect.**

**Minority: Individual(s) who are members of the following population groups: American Indian or Alaskan Native; Asian or Pacific Islander; Black, not of Hispanic origin; or Hispanic.**

**Minority population: Minority populations should be identified where either: (a) the minority population of the affected area exceeds 50 percent or (b) the minority population percentage of the affected area is meaningfully greater than the minority population percentage in the general population or other appropriate unit of geographic analysis. In identifying minority communities, agencies may consider as a community either a group of individuals living in**

---

[30] Executive Order provisions are in standard font. Guidance is in **bold** font.

AR_0033107

geographic proximity to one another, or a geographically dispersed/transient set of individuals (such as migrant workers or Native American ), where either type of group experiences common conditions of environmental exposure or effect.  The selection of the appropriate unit of geographic analysis may be a governing body's jurisdiction, a neighborhood, census tract, or other similar unit that is to be chosen so as to not artificially dilute or inflate the affected minority population.  A minority population also exists if there is more than one minority group present and the minority percentage, as calculated by aggregating all minority persons, meets one of the above-stated thresholds.

**Disproportionately high and adverse human health effects:**  When determining whether human health effects are disproportionately high and adverse, agencies are to consider the following three factors to the extent practicable:

(a) Whether the health effects, which may be measured in risks and rates, are significant (as employed by NEPA), or above generally accepted norms. Adverse health effects may include bodily impairment, infirmity, illness, or death; and

(b)  Whether the risk or rate of hazard exposure by a minority population, low-income population, or Indian tribe to an environmental hazard is significant (as employed by NEPA) and appreciably exceeds or is likely to appreciably exceed the risk or rate to the general population or other appropriate comparison group; and

(c)  Whether health effects occur in a minority population,  low-income population, or Indian tribe affected by cumulative or multiple adverse exposures from  environmental hazards.

**Disproportionately high and adverse environmental effects:** When determining whether environmental effects are disproportionately high and adverse, agencies are to consider the following three factors to the extent practicable:

(a)  Whether there is or will be an impact on the natural or physical environment that significantly (as employed by NEPA) and adversely affects a minority population,  low-income population, or Indian tribe.  Such effects may include ecological, cultural, human health, economic, or social impacts on minority communities,  low-income communities, or Indian tribes when those impacts are interrelated to impacts on the natural or physical environment; and

AR_0033108

**(b)  Whether environmental effects are significant (as employed by NEPA) and are or may be having an adverse impact on minority populations, low-income populations, or Indian tribes that appreciably exceeds or is likely to appreciably exceed those on the general population or other appropriate comparison group; and**

**(c)  Whether the environmental effects occur or would occur in a minority population, low-income population, or Indian tribe affected by cumulative or multiple adverse exposures from environmental hazards.**

*1-102.  Creation of an Interagency Working Group on Environmental Justice.* (a) Within 3 months of the date of this order, the Administrator of the Environmental Protection Agency ("Administrator") or the Administrator's designee shall convene an interagency Federal Working Group on Environmental Justice ("Working Group"). The Working Group shall comprise the heads of the following executive agencies and offices, or their designees: (a) Department of Defense; (b) Department of Health and Human Services; (c) Department of Housing and Urban Development; (d) Department of Labor; (e) Department of Agriculture; (f) Department of Transportation; (g) Department of Justice; (h) Department of the Interior; (I) Department of Commerce; (j) Department of Energy; (k) Environmental Protection Agency; (1) Office of Management and Budget; (m) Office of Science and Technology Policy; (n) Office of the Deputy Assistant to the President for Environmental Policy; (o) Office of the Assistant to the President for Domestic Policy; (p) National Economic Council; (q) Council of Economic Advisers; and (r) such other Government officials as the President may designate.  The Working Group shall report to the President through the Deputy Assistant to the President for Environmental Policy and the Assistant to the President for Domestic Policy.

(b)  The Working Group shall:

(1) provide guidance to Federal agencies on criteria for identifying disproportionately high and adverse human health or environmental effects on minority populations and low-income populations.

(2) coordinate with, provide guidance to, and serve as a clearinghouse for, each Federal agency as it develops an environmental justice strategy as required by section 1-103 of this order, in order to ensure that the administration, interpretation and enforcement of programs, activities and policies are undertaken in a consistent manner;

(3) assist in coordinating research by, and stimulating cooperation among, the Environmental Protection Agency, the Department of Health and Human Services, the

AR_0033109

Department of Housing and Urban Development, and other agencies conducting research or other activities in accordance with section 3-3 of this order;

    (4) assist in coordinating data collection, required by this order;

    (5) examine existing data and studies on environmental justice;

    (6) hold public meetings as required in section 5-502(d) of this order; and

    (7) develop interagency model projects on environmental justice that evidence cooperation among Federal agencies.

1-103.  *Development of Agency Strategies.*

(a) Except as provided in section 6-605 of this order, each Federal agency shall develop an agency-wide environmental justice strategy, as set forth in subsections (b)-(e) of this section that identifies and addresses disproportionately high and adverse human health or environmental effects of its programs, policies, and activities on minority populations and low-income populations.  The environmental justice strategy shall list programs, policies, planning and public participation processes, enforcement, and/or rulemakings related to human health or the environment that should be revised to, at a minimum:  (1) promote enforcement of all health and environmental statutes in areas with minority populations and low-income populations; (2) ensure greater public participation; (3) improve research and data collection relating to the health of and environment of minority populations and low-income populations; and (4) identify differential patterns of consumption of natural resources among minority populations and low-income populations.  In addition, the environmental justice strategy shall include, where appropriate, a timetable for undertaking identified revisions and consideration of economic and social implications of the revisions.

**Differential patterns of consumption of natural resources:  The term "differential patterns of consumption of natural resources" relates to subsistence and differential patterns of subsistence, and means differences in rates and/or patterns of fish, water, vegetation and/or wildlife consumption among minority populations,  low-income populations, or Indian tribes, as compared to the general population.**

(b) Within 4 months of the date of this order, each Federal agency shall identify an internal administrative process for developing its environmental justice strategy, and shall inform this Working Group of the process.

AR_0033110

(c) Within 6 months of the date of this order, each Federal agency shall provide the Working Group with an outline of its proposed environmental justice strategy.

(d) Within 10 months of the date of this order, each Federal agency shall provide the Working Group with its proposed environmental justice strategy.

(e) Within 12 months of the date of this order, each Federal agency shall finalize its environmental justice strategy and provide a copy and written description of its strategy to the Working Group. During the 12 month period from the date of this order, each Federal agency, as part of its environmental justice strategy, shall identify several specific projects that can be promptly undertaken to address particular concerns identified during the development of the proposed environmental justice strategy, and a schedule for implementing those projects.

(f) Within 24 months of the date of this order, each Federal agency shall report to the Working Group on its progress in implementing its agency-wide environmental justice strategy.

(g) Federal agencies shall provide additional periodic reports to the Working Group as requested by the Working Group.

1-104. *Reports to the President.* Within 14 months of the date of this order, the Working Group shall submit to the President, through the Office of the Deputy Assistant to the President for Environmental Policy and the Office of the Assistant to the President for Domestic Policy, a report that describes the implementation of this order, and includes the final environmental justice strategies described in section 1-103(e) of this order.

Sec. 2-2.  FEDERAL AGENCY RESPONSIBILITIES FOR FEDERAL PROGRAMS.

Each Federal agency shall conduct its programs, policies, and activities that substantially affect human health or the environment, in a manner that ensures that such programs, policies, and activities do not have the effect of excluding persons (including populations) from participation in, denying persons (including populations) the benefits of, or subjecting persons (including populations) to discrimination under, such programs, policies, and activities, because of their race, color, or national origin.

AR_0033111

Sec. 3-3.  RESEARCH, DATA COLLECTION, AND ANALYSIS.

  3-301.  *Human Health and Environmental Research and Analysis.*

  (a) Environmental human health research, whenever practicable and appropriate, shall include diverse segments of the population in epidemiological and clinical studies, including segments at high risk from environmental hazards, such as minority populations, low-income populations and workers who may be exposed to substantial environmental hazards.

  **Environmental hazard and substantial environmental hazard:  For purposes of research, data collection, and analysis under Section 3-3 of the Executive Order, the term "environmental hazard" means a chemical, biological, physical or radiological agent, situation or source that has the potential for deleterious effects to the environment and/or human health.  Among the factors that may be important in defining a substantial environmental hazard are:  the likelihood, seriousness, and magnitude of the impact.**

  (b) Environmental human health analyses, whenever practical and appropriate, shall identify multiple and cumulative exposures.

  **Environmental Exposure:  For purposes of research, data collection, and analysis under Section 3-3 of the Executive Order, the term "environmental exposure" means contact with a chemical (e.g., asbestos, radon), biological (e.g., Legionella),  physical (e.g., noise), or radiological agent.**

  **Multiple Environmental Exposure:  For purposes of research, data collection, and analysis under Section 3-3 of the Executive Order, the term "multiple environmental exposure" means exposure to any combination of two or more chemical, biological, physical or radiological agents (or two or more agents from two or more of these categories) from single or multiple sources that have the potential for deleterious effects to the environment and/or human health.**

  **Cumulative Environmental Exposure: For purposes of research, data collection, and analysis under Section 3-3 of the Executive Order, the term "cumulative environmental exposure" means exposure to one or more chemical, biological, physical, or radiological agents across environmental media (e.g., air, water, soil) from single or multiple sources, over time in one or more locations, that have the potential for deleterious effects to the environment and/or human health.**

AR_0033112

(c) Federal agencies shall provide minority populations and low-income populations the opportunity to comment on the development and design of research strategies undertaken pursuant to this order.

3-302. *Human Health and Environmental Data Collection and Analysis.* To the extent permitted by existing law, including the Privacy Act, as amended (5 U.S.C. § 552a):

(a) each Federal agency, whenever practicable and appropriate, shall collect, maintain, and analyze information assessing and comparing environmental and human health risks borne by populations identified by race, national origin, or income. To the extent practical and appropriate, Federal agencies shall use this information to determine whether their programs, policies, and activities have disproportionately high and adverse human health or environmental effects on minority populations and low-income populations;

(b) In connection with the development and implementation of agency strategies in section 1-103 of this order, each Federal agency, whenever practicable and appropriate, shall collect, maintain and analyze information on the race, national origin, income level, and other readily accessible and appropriate information for areas surrounding facilities or sites expected to have a substantial environmental, human health, or economic effect on the surrounding populations, when such facilities or sites become the subject of a substantial Federal environmental administrative or judicial action. Such information shall be made available to the public unless prohibited by law; and

**<u>Federal environmental administrative or judicial action</u> includes any administrative enforcement action, civil enforcement action, or criminal enforcement action initiated by, or permitting or licensing determination undertaken by, a Federal agency to enforce or execute a Federal law intended, in whole or in part, to protect human health or the environment.**

(c) Each Federal agency, whenever practicable and appropriate, shall collect, maintain, and analyze information on the race, national origin, income level, and other readily accessible and appropriate information for areas surrounding Federal facilities that are: (1) subject to the reporting requirements under the Emergency Planning and Community Right-to-Know Act, 42 U.S.C. section 11001-11050 as mandated in Executive Order No. 12856; and (2) expected to have a substantial environmental, human health, or economic effect on surrounding populations. Such information shall be made available to the public, unless prohibited by law.

**31**

(d) In carrying out the responsibilities in this section, each Federal agency, whenever practicable and appropriate, shall share information and eliminate unnecessary duplication of efforts through the use of existing data systems and cooperative agreements among Federal agencies and with State, local, and tribal governments.

Sec. 4-4. SUBSISTENCE CONSUMPTION OF FISH AND WILDLIFE.

4-401. *Consumption Patterns*. In order to assist in identifying the need for ensuring protection of populations with differential patterns of subsistence consumption of fish and wildlife, Federal agencies, whenever practicable and appropriate, shall collect, maintain, and analyze information on the consumption patterns of populations who principally rely on fish and/or wildlife for subsistence. Federal agencies shall communicate to the public the risks of those consumption patterns.

**Subsistence consumption of fish and wildlife:** **Dependence by a minority population, low-income population, Indian tribe or subgroup of such populations on indigenous fish, vegetation and/or wildlife, as the principal portion of their diet.**

**Differential patterns of subsistence consumption:** **Differences in rates and/or patterns of subsistence consumption by minority populations, low-income populations, and Indian tribes as compared to rates and patterns of consumption of the general population.**

4-402. *Guidance*. Federal agencies, whenever practicable and appropriate, shall work in a coordinated manner to publish guidance reflecting the latest scientific information available concerning methods for evaluating the human health risks associated with the consumption of pollutant-bearing fish or wildlife. Agencies shall consider such guidance in developing their policies and rules.

Sec. 5-5. PUBLIC PARTICIPATION AND ACCESS TO INFORMATION.

(a) The public may submit recommendations to Federal agencies relating to the incorporation of environmental justice principles into Federal agency programs or policies. Each Federal agency shall convey such recommendations to the Working Group.

(b) Each Federal agency may, whenever practicable and appropriate, translate crucial public documents, notices, and hearings relating to human health or the environment for limited English speaking populations.

(c) Each Federal agency shall work to ensure that public documents, notices, and hearings relating to human health or the environment are concise, understandable, and readily accessible to the public.

(d) The Working Group shall hold public meetings, as appropriate, for the purpose of fact-finding, receiving public comments, and conducting inquiries concerning environmental justice. The Working Group shall prepare for public review a summary of the comments and recommendations discussed at the public meetings.

Sec. 6-6. GENERAL PROVISIONS.

6-601. *Responsibility for Agency Implementation.* The head of each Federal agency shall be responsible for ensuring compliance with this order. Each Federal agency shall conduct internal reviews and take such other steps as may be necessary to monitor compliance with this order.

6-602. *Executive Order No. 12250.* This Executive order is intended to supplement but not supersede Executive Order No. 12250, which requires consistent and effective implementation of various laws prohibiting discriminatory practices in programs receiving Federal financial assistance. Nothing herein shall limit the effect or mandate of Executive Order No. 12250.

6-603. *Executive Order No. 12875.* This Executive order is not intended to limit the effect or mandate of Executive Order No. 12875.

6-604. *Scope.* For purposes of this order, Federal agency means any agency on the Working Group, and such other agencies as may be designated by the President, that conducts any Federal program or activity that substantially affects human health or the environment. Independent agencies are requested to comply with the provisions of this order.

6-605. *Petitions for Exemptions.* The head of a Federal agency may petition the President for an exemption from the requirements of this order on the grounds that all or some of the petitioning agency's programs or activities should not be subject to the requirements of this order.

6-606. *Native American Programs.* Each Federal agency responsibility set forth under this order shall apply equally to Native American programs. In addition, the Department of the Interior, in coordination with the Working Group, and, after consultation with tribal leaders, shall coordinate steps to be taken pursuant to this order that address Federally-recognized Indian Tribes.

**33**

**Native American programs:**  **Native American programs include those Federal programs designed to serve Indian Tribes or individual Indians, recognizing that such programs are to be guided, as appropriate, by the government-to-government relationship, the Federal trust responsibility, and the role of tribes as governments within the Federal system.**

6-607.  *Costs.*  Unless otherwise provided by law, Federal agencies shall assume the financial costs of complying with this order.

6-608.  *General.*  Federal agencies shall implement this order consistent with, and to the extent permitted by, existing law.

6-609.  *Judicial Review.*  This order is intended only to improve the internal management of the executive branch and is not intended to, nor does it create any right, benefit, or trust responsibility, substantive or procedural, enforceable at law or equity by a party against the United States, its agencies, its officers, or any person. This order shall not be construed to create any right to judicial review involving the compliance or noncompliance of the United States, its agencies, its officers, or any other person with this order.

AR_0033116

# III.

## Executive Order 12898 and NEPA

### A. NEPA Generally

NEPA's fundamental policy is to "encourage productive and enjoyable harmony between man and his environment."[15] In the statute, Congress "recognizes that each person should enjoy a healthful environment and that each person has a responsibility to contribute to the preservation and enhancement of the environment."[16] The following goals, set forth in NEPA, make clear that attainment of environmental justice is wholly consistent with the purposes and policies of NEPA[17]:

- to "assure for all Americans safe, healthful, productive, and aesthetically and culturally pleasing surroundings"[18];

- to "attain the widest range of beneficial uses of the environment without degradation, risk to health or safety, or other undesirable and unintended consequences";[19]

- to "preserve important historic, cultural, and natural aspects of our natural heritage, and maintain, wherever possible, an environment which supports diversity and variety of individual choice"[20]; and

- to "achieve a balance between population and resource use which will permit high standards of living and a wide sharing of life's amenities."[21]

These goals are promoted through the requirement that all agencies of the Federal government shall include in every recommendation or report on proposals for legislation and other

---

[15]  42 U.S.C. § 4321.

[16]  42 U.S.C. § 4331(c).

[17]  42 U.S.C. § 4331(b).

[18]  42 U.S.C. § 4331(b)(2).

[19]  42 U.S.C. § 4331(b)(3).

[20]  42 U.S.C. § 4331(b)(4).

[21]  42 U.S.C. § 4331(b)(5).

AR_0033089

Vol.42—No.101
5-25-77

PAGES
26645-26968

# federal register

**WEDNESDAY, MAY 25, 1977**



# highlights

## "THE FEDERAL REGISTER—WHAT IT IS AND HOW TO USE IT"

Reservations for July are being accepted for the free Wednesday workshops on how to use the FEDERAL REGISTER. The sessions are held at 1100 L St. N.W., Washington, D.C. in Room 9409, from 9 to 11:30 a.m.

Each session includes a brief history of the FEDERAL REGISTER, the difference between legislation and regulations, the relationship of the FEDERAL REGISTER to the Code of Federal Regulations, the elements of a typical FEDERAL REGISTER document, and an introduction to the finding aids.

FOR RESERVATIONS call: Dean Smith, 202-523-5282.

SUNSHINE ACT MEETINGS.......................... 26722

## ENVIRONMENTAL PROTECTION
Executive Orders 11987, 11988, 11989, 11990, and 11991 (Part VI of this issue)....................... 26947

## VOLUNTARY CONSUMER PRODUCT INFORMATION LABELING PROGRAM
Commerce/Secy establishes procedures; effective 6-24-77 ....................................................... 26647

## EMISSIONS PERFORMANCE WARRANTY
EPA proposes testing methods and procedures (2 documents); comments by 8-23-77 (Part II of this issue).... 26742, 26759

## SMALL FARM
SBA proposes standards for financial assistance; comments by 6-16-77............................................ 26660

## PESTICIDE PROGRAMS
EPA notice of rebuttable presumption against registration and continued registration of products containing toxaphene (Part IV of this issue)........................ 26859

## TREASURY NOTES
Treasury/Secy announces interest rate on Notes of Series Q-1979............................................... 26712

CONTINUED INSIDE

# AGENCY PUBLICATION ON ASSIGNED DAYS OF THE WEEK

The six-month trial period ended August 6. The program is being continued on a voluntary basis (see OFR notice, 41 FR 32914, August 6, 1976). The following agencies have agreed to remain in the program:

| Monday | Tuesday | Wednesday | Thursday | Friday |
|--------|---------|-----------|----------|--------|
| NRC | USDA/ASCS | | NRC | USDA/ASCS |
| DOT/COAST GUARD | USDA/APHIS | | DOT/COAST GUARD | USDA/APHIS |
| DOT/NHTSA | USDA/FNS | | DOT/NHTSA | USDA/FNS |
| DOT/FAA | USDA/REA | | DOT/FAA | USDA/REA |
| DOT/OHMO | CSC | | DOT/OHMO | CSC |
| DOT/OPSO | LABOR | | DOT/OPSO | LABOR |
| | HEW/FDA | | | HEW/FDA |

Documents normally scheduled on a day that will be a Federal holiday will be published the next work day following the holiday.

Comments on this program are still invited. Comments should be submitted to the Day-of-the-Week Program Coordinator, Office of the Federal Register, National Archives and Records Service, General Services Administration, Washington, D.C. 20408.

---

**ATTENTION:** For questions, corrections, or requests for information please see the list of telephone numbers appearing on opposite page.

---



**federal register**

Phone 523-5240

Area Code 202

Published daily, Monday through Friday (no publication on Saturdays, Sundays, or on official Federal holidays), by the Office of the Federal Register, National Archives and Records Service, General Services Administration, Washington, D.C. 20408, under the Federal Register Act (49 Stat. 500, as amended; 44 U.S.C. Ch. 15) and the regulations of the Administrative Committee of the Federal Register (1 CFR Ch. I). Distribution is made only by the Superintendent of Documents, U.S. Government Printing Office, Washington, D.C. 20402.

The FEDERAL REGISTER provides a uniform system for making available to the public regulations and legal notices issued by Federal agencies. These include Presidential proclamations and Executive orders and Federal agency documents having general applicability and legal effect, documents required to be published by Act of Congress and other Federal agency documents of public interest. Documents are on file for public inspection in the Office of the Federal Register the day before they are published, unless earlier filing is requested by the issuing agency.

The FEDERAL REGISTER will be furnished by mail to subscribers, free of postage, for $5.00 per month or $50 per year, payable in advance. The charge for individual copies is 75 cents for each issue, or 75 cents for each group of pages as actually bound. Remit check or money order, made payable to the Superintendent of Documents, U.S. Government Printing Office, Washington, D.C. 20402.

There are no restrictions on the republication of material appearing in the FEDERAL REGISTER.

FEDERAL REGISTER, VOL. 42, NO. 101—WEDNESDAY, MAY 25, 1977

# INFORMATION AND ASSISTANCE

Questions and requests for specific information may be directed to the following numbers. General inquiries may be made by dialing **202–523–5240**.

**FEDERAL REGISTER, Daily Issue:**

| | |
|---|---|
| Subscription orders (GPO) | 202–783–3238 |
| Subscription problems (GPO) | 202–275–3050 |
| "Dial - a - Regulation" (recorded summary of highlighted documents appearing in next day's issue). | 202–523–5022 |
| Scheduling of documents for publication. | 523–5220 |
| Copies of documents appearing in the Federal Register. | 523–5240 |
| Corrections | 523–5286 |
| Public Inspection Desk | 523–5215 |
| Finding Aids | 523–5227 |
| Public Briefings: "How To Use the Federal Register." | 523–5282 |
| Code of Federal Regulations (CFR) | 523–5266 |
| Finding Aids | 523–5227 |

**PRESIDENTIAL PAPERS:**

| | |
|---|---|
| Executive Orders and Proclamations. | 523–5233 |
| Weekly Compilation of Presidential Documents. | 523–5235 |
| Public Papers of the Presidents | 523–5235 |
| Index | 523–5235 |

**PUBLIC LAWS:**

| | |
|---|---|
| Public Law dates and numbers | 523–5237 |
| Slip Laws | 523–5237 |
| U.S. Statutes at Large | 523–5237 |
| Index | 523–5237 |
| **U.S. Government Manual** | 523–5230 |
| **Automation** | 523–5240 |
| **Special Projects** | 523–5240 |

---

## HIGHLIGHTS—Continued

**WILD FREE-ROAMING HORSE AND BURRO MANAGEMENT**
Interior/BLM prescribes conditions under which helicopters may be used for management; effective 5–25–77 ........................ 26653

**LICENSED NUT INSPECTOR**
USDA/AMS amends definition; effective 5–25–77 ........... 26645

**CALIFORNIA PLUMS**
USDA/AMS sets minimum grade and size requirements; effective 6–1–77 .................................................... 26646

**RAIL SYSTEMS**
ICC publishes system diagram maps for various railroad companies (24 documents) (Part III of this issue) .. 26770–26858

**MEETINGS—**
Commerce/DIBA: Semiconductor Manufacturing and Test Equipment Technical Advisory Committee, 6–22 and 6–23–77 ................................................. 26681
Telecommunications Equipment Technical Advisory Committee, 6–30–77 .......................................... 26682
NOAA: Caribbean Fishery Management Council and its Advisory Panel, 6–20 thru 6–23–77 .... 26685
Mid-Atlantic Fishery Management Council, 6–15 and 6–16–77 ............................................... 26685
Mid-Atlantic Fishery Management Council's Scientific and Statistical Committee, 6–13 and 6–14–77 .................................................. 26685
National Marine Fisheries Service, 6–8–77 .......... 26683
Pacific Fishery Management Council, 6–13 and 6–14–77 ..................................................... 26684
Commission on Federal Paperwork: 6–10–77 ............. 26692
DOD/AF: Scientific Advisory Board:
Ad Hoc Committee on Defensive Chemical Systems, 6–15–77 .......................................... 26692
Aerospace Vehicles Panel Committee on B–1 Structures, 6–30 and 7–1–77 ....................... 26692

FCC: Purac Task on the General Mobile Radio Service, 6–10–77 ................................................. 26693
GSA: Regional Public Advisory Panel on Architectural and Engineering Services, 6–10–77 .................. 26702
HEW/NIH: Comprehensive Sickle Cell Center Ad Hoc Review Committee, 6–23 and 6–24–77 ............... 26702
Heart, Lung, and Blood Research Review Committee A, 6–24 and 6–25–77 ............................. 26702
Heart, Lung, and Blood Research Review Committee B, 6–24 and 6–25–77 ............................. 26702
National Cancer Institute, Committees Advisory, 7–12, 7–18, 7–19 and 7–25–77 ...................... 26702
Recombinant DNA Molecule Program Advisory Committee, 6–22 and 6–23–77 ...................... 26703
Research Manpower Review Committee, 6–12 thru 6–14–77 ........................................ 26703
National Advisory Council on the Education of Disadvantaged Children: 6–10 and 6–11–77 ...... 26709
OMB: Business Advisory Council on Federal Reports .. 26710
NSF: International Decade of Ocean Exploration Proposal Review Panel, 6–10–77 ...................... 26709
Sociology Advisory Panel, 6–10 and 6–11–77 ......... 26710
State: Advisory Committee on Transnational Enterprises, 6–10–77 ..................................... 26710
CCITT National Committee, Study Group 1, 6–9–77 ................................................. 26711
Shipping Coordinating Committee, Subcommittee on Safety of Life at Sea, 6–16–77 .................. 26711

**CANCELLED MEETING—**
USDA/FS: Apache National Forest Grazing Advisory Board, 6–9–77 ........................................ 26674
Sitgreaves National Forest Grazing Advisory Board, 6–10–77 ................................................. 26674

**RESCHEDULED MEETING—**
HEW/NIH: Cellular and Molecular Basis of Disease Review Committee, 6–20 thru 6–24–77 .......... 26702

**HEARING—**
Interior/FWS: Migratory Game Bird Regulations, 6–21–77 ................................................. 26709

iii

AR_0033245

## SEPARATE PARTS OF THIS ISSUE

Part II, EPA................................................................ 26741
Part III, ICC.............................................................. 26769
Part IV, EPA.............................................................. 26859
Part V, FCC............................................................... 26921
Part VI, Executive Orders........................................ 26947

# contents

## THE PRESIDENT

### Executive Orders

Environmental impact statements; Council on Environmental Quality, responsibilities. 26967
Exotic organisms; restriction on introduction into United States. 26949
Floodplain management.......... 26951
Off-road vehicles, use on public lands; restriction............ 26959
Wetlands, protection............ 26961

## EXECUTIVE AGENCIES

### AGRICULTURAL MARKETING SERVICE

#### Rules

Pears, plums, and peaches (fresh) grown in Calif.............. 26646
Warehouses, nut................ 26645

### AGRICULTURE DEPARTMENT

See also Agricultural Marketing Service, Farmers Home Administration, Forest Service.

#### Rules

Authority delegations by Secretary and General Officers:
Assistant Secretary for Conservation, Research, and Education, National Forest System; protect, manage, and administer ......................... 26645

#### Notices

Meetings:
Apache National Forest Grazing Advisory Board.......... 26674
Sitgreaves National Forest Grazing Advisory Board..... 26674

### AIR FORCE DEPARTMENT

#### Notices

Meetings:
Scientific Advisory Board, Aerospace Vehicles Panel Committee .......................... 26692
Scientific Advisory Board, Defense Chemical System ad hoc Committee .................... 26692

### ALCOHOL, TOBACCO AND FIREARMS BUREAU

#### Notices

Firearms, granting of relief....... 26711

### CIVIL AERONAUTICS BOARD

#### Notices

Fares, domestic passenger; increase, various carriers; correction ........................... 26680

Hearings, etc.:
International Air Transport Association (2 documents) ..... 26674, 26675

## COMMERCE DEPARTMENT

See also Domestic and International Business Administration; National Oceanic and Atmospheric Administration.

### Rules

Consumer product information labeling program, voluntary; operation and procedures....... 26647

## DEFENSE DEPARTMENT

See Air Force Department.

## DOMESTIC AND INTERNATIONAL BUSINESS ADMINISTRATION

### Notices

Meetings:
Semiconductor Manufacturing and Test Equipment Technical Advisory Committee...... 26681
Telecommunications Equipment Technical Advisory Committee ........................... 26682
Scientific articles; duty free entry:
University of Idaho et al....... 26680
University of Rochester et al... 26680

## EDUCATION OF DISADVANTAGED CHILDREN, NATIONAL ADVISORY COUNCIL

### Notices

Meeting .......................... 26709

## EMERGENCY NATURAL GAS ACT OF 1977, ADMINISTRATOR

### Notices

Emergency orders, etc.:
Tennessee Gas Pipeline Co.... 26674

## ENVIRONMENTAL PROTECTION AGENCY

### Proposed Rules

Air pollution control, new motor vehicles and engines:
Emission control system performance warranty (2 documents) ............... 26742, 26759

### Notices

Pesticide applicator certification and interim certification; State plans:
Puerto Rico..................... 26692
Pesticide programs:
Toxaphene, pesticide products containing; rebuttable presumption against registration and continued registration... 26860

## FARMERS HOME ADMINISTRATION

### Proposed Rules

Thermal performance standards, new and existing dwellings; establishment; extension of time. 26660

## FEDERAL COMMUNICATIONS COMMISSION

### Rules

Maritime services, shipboard stations:
Mobile-satellite service; conformance with Geneva code; correction ...................... 26656
Radio broadcast services:
Antenna monitors type approved by AM broadcasting stations operating directional antenna systems; editorial changes; correction.......... 26655

### Proposed Rules

FM broadcast stations; table of assignments:
Georgia (2 documents) .. 26665, 26666
Texas ........................... 26667

### Notices

Emergency radio service, special; central station electrical protection industry licensees, transfer from business radio service; petition denied................... 26692
Meetings:
Personal Use Radio Advisory Committee .................... 26693
World Administrative Radio Conference ........................ 26922

## FEDERAL ENERGY ADMINISTRATION

### Notices

Consent orders:
Guam Oil and Refining Co..... 26693
Refiners buy-sell list; crude oil allocation ......................... 26694

## FEDERAL HIGHWAY ADMINISTRATION

### Rules

Right-of-way and environment:
Acquisition function, project procedures, location/design approval, and public hearings ........................... 26651

## FEDERAL MARITIME COMMISSION

### Proposed Rules

Practice and procedure:
Employees, former; appearance and practice before Commission ............................ 26664

### Notices

Agreements filed, etc.:
Lykes Bros. Steamship Co., Inc., et al............................. 26695

AR_0033246

CONTENTS

FEDERAL PAPERWORK COMMISSION

Notices

Meeting ------------------------ 26692

FEDERAL POWER COMMISSION

Notices

*Hearings, etc.:*
Arkansas Louisiana Gas Co.---- 26695
Consolidated Gas Supply Corp. 26696
Continental Oil Co.----------- 26696
Florida Gas Transmission Co.
et al.------------------------ 26697
Great Lakes Gas Transmission
Co ------------------------- 26698
Iowa Power & Light Co.-------- 26698
Louisville Gas & Electric Co.---- 26698
Michigan Wisconsin Pipe Line
Co ------------------------- 26699
Mountain Fuel Supply Co.----- 26699
Pacific Power & Light Co.------ 26699
United Gas Pipe Line Co.------- 26700

FEDERAL RESERVE SYSTEM

Notices

Federal Open Market Committee:
Domestic policy directives------- 26701
*Applications, etc.:*
Central Bancorporation, Inc.---- 26701
Chemical New York Corp.------ 26700
Old Kent Financial Corp.------- 26701
Texas Commerce Bancshares,
Inc ------------------------ 26701

FEDERAL TRADE COMMISSION

Proposed Rules

Consent orders:
Walgreen Co.------------------ 26661

FISH AND WILDLIFE SERVICE

Rules

Endangered species convention;
wild fauna and flora; correc-
tion ------------------------- 26659

Proposed Rules

Migratory bird hunting:
Seasons, limits, and shooting
hours establishment; etc.---- 26669

Notices

Endangered and threatened
species permits; applications (3
documents)------------- 26705-26707
Migratory bird hunting:
Early seasons set, hearing----- 26709

FOREIGN ASSETS CONTROL OFFICE

Rules

Rhodesian sanctions:
Steel mill products in transit on
March 18, 1977.------------- 26653

FOREST SERVICE

Proposed Rules

Prohibitions ------------------- 26662

GENERAL SERVICES ADMINISTRATION

Notices

Meetings:
Architectural and Engineering
Services Regional Public Ad-
visory Panel.---------------- 26702

HEALTH, EDUCATION, AND WELFARE
DEPARTMENT

*See* National Institutes of Health.

INDIAN AFFAIRS BUREAU

Rules

Enrollment:
Grand River Ottawa Indians.-- 26652

INTERIOR DEPARTMENT

*See* Fish and Wildlife Service;
Indian Affairs Bureau; Land
Management Bureau; Recla-
mation Bureau.

INTERSTATE COMMERCE COMMISSION

Rules

Rail carriers:
Subsidies, rail service continua-
tion; determination stand-
ards; Northeast-Midwest Re-
gion ------------------------ 26657
Railroad car service orders:
Trailers, return--------------- 26657
Railroad car service orders; vari-
ous companies:
Louisiana & Arkansas Railway
Co ------------------------- 26656

Proposed Rules

Motor carriers and freight for-
warders:
Exemptions and interpretations;
transportation of property
and passengers incidental to
transportation by aircraft.--- 26667

Notices

Abandonment of railroad services,
etc.:
Bessemer & Lake Erie Railroad
Co ------------------------- 26770
Birmingham Southern Railroad
Co ------------------------- 26771
Carbon County Railway Co.---- 26772
Chicago & North Western
Transportation Co.---------- 26773
Elgin, Joliet & Eastern Railway
Co ------------------------- 26787
Fort Worth & Denver Railway
Co ------------------------- 26788
Johnstown & Stony Creek Rail-
road Co.--------------------- 26790
Lake Terminal Railroad Co.---- 26791
Los Angeles & Salt Lake Rail-
road Co --------------------- 26792
McKeesport Connecting Rail-
road Co.--------------------- 26798
Mount Hood Railroad Co.------ 26799
New Orleans & Lower Coast
Railroad Co.----------------- 26720
Newburgh & South Shore Rail-
way Co.---------------------- 26801
Norfolk & Western Railway Co.- 26802
Northampton & Bath Railroad
Co ------------------------- 26813
Oregon Short Line Railroad
Co ------------------------- 26816
Oregon-Washington Railroad &
Navigation Co.--------------- 26822
Sacramento Northern Railway
Co ------------------------- 26827
Soo Line Railroad Co.--------- 26829

Spokane International Railroad
Co ------------------------- 26841
St. Joseph & Grand Island Rail-
road Co.--------------------- 26843
Tidewater Southern Railway
Co ------------------------- 26845
Toledo, Angola & Western Rail-
way Co.---------------------- 26847
Union Pacific Railroad Co.----- 26849
Yakima Valley Transportation
Co ------------------------- 26856
Car service rules, mandatory;
exemptions ------------------ 26713
Hearing assignments.----------- 26712
Motor carriers:
Temporary authority applica-
tions (2 documents)--- 26713, 26715
Rerouting of traffic:
Green Mountain Railroad Corp.- 26721

JUSTICE DEPARTMENT

Notices

Pollution control; consent judg-
ments; U.S. versus listed com-
panies:
Corning Fibers, Inc.----------- 26709

LAND MANAGEMENT BUREAU

Rules

Horses and burros, wild free-
roaming; protection, manage-
ment and control:
Helicopter use in management.- 26653

Notices

Airport leases:
Nevada ---------------------- 26704
Applications, etc.:
Utah (3 documents)---------- 26704
Wyoming (2 documents)------- 26704
Outer Continental Shelf:
Oil and gas leasing, Louisiana
and Texas; correction-------- 26705
Oil and gas leasing; qualified
joint bidders; hearing post-
poned ---------------------- 26703
Withdrawal and reservation of
lands, proposed, etc.:
California -------------------- 26703

MANAGEMENT AND BUDGET OFFICE

Notices

Clearance of reports; list of re-
quests ----------------------- 26710
Meetings:
Business Advisory Council on
Federal Reports.------------- 26710

NATIONAL INSTITUTES OF HEALTH

Notices

Meetings:
Cancer Panel, President's, et al. 26702
Cellular and Molecular Basis of
Disease Review Committee;
meeting change.------------- 26702
Comprehensive Sickle Cell
Center ad hoc Review Com-
mittee --------------------- 26702
Heart, Lung, and Blood Re-
search Manpower Review
Committee ----------------- 26703
Heart, Lung, and Blood Re-
search Review Committee A.- 26702

AR_0033247

CONTENTS

Heart, Lung, and Blood Research Review Committee B... 26702
Recombinant DNA Molecule Program Advisory Committee ......................... 26703

**NATIONAL OCEANIC AND ATMOSPHERIC ADMINISTRATION**

**Notices**

Marine mammal permit applications, etc.:
Hokuyo Longline-Gillnet Association, et al.................. 26683
Lake Merritt Parks and Recreation Office................. 26683
Payne, Dr. Roger S............... 26684
Meetings:
Caribbean Fishery Management, Advisory Panel................ 26685
Mid-Atlantic Fishery Management Council................... 26685
Mid-Atlantic Fishery Management Council, Scientific and Statistical Committee........ 26685

National Marine Fisheries Service ............................. 26683
Pacific Fishery Management Council, Scientific and Statistical Committee and Foreign Ownership of U.S. Fishing Vessels Committee........ 26684

**NATIONAL SCIENCE FOUNDATION**

**Notices**

Meetings:
International Decade of Ocean Exploration Proposal Review Panel ...................... 26709
Sociology Advisory Panel....... 26710

**RECLAMATION BUREAU**

**Notices**

Environmental statements; availability, etc.:
Colorado River Water Quality Improvement Program....... 26705

**SMALL BUSINESS ADMINISTRATION**

**Proposed Rules**

Small business size standards:
Farm, small, definition.......... 26660

**STATE DEPARTMENT**

**Notices**

Meetings:
International Telegraph and Telephone Consultative Committee ...................... 26711
Shipping Coordinating Committee; Subcommittee on Safety of Life at Sea................ 26711
Transnational Enterprises Advisory Committee.......... 26710

**TEXTILE AGREEMENTS IMPLEMENTATION COMMITTEE**

**Notices**

Textile category system, proposed revisions; category consolidation for negotiations................ 26686

**TRANSPORTATION DEPARTMENT**

See Federal Highway Administration.

**TREASURY DEPARTMENT**

See also Alcohol, Tobacco and Firearms Bureau; Foreign Assets Control Office.

**Notices**

Notes, Treasury:
Q–1979 series.................. 26712

# list of cfr parts affected in this issue

The following numerical guide is a list of the parts of each title of the Code of Federal Regulations affected by documents published in today's issue. A cumulative list of parts affected, covering the current month to date, follows beginning with the second issue of the month.
A Cumulative List of CFR Sections Affected is published separately at the end of each month. The guide lists the parts and sections affected by documents published since the revision date of each title.

**3 CFR**

EXECUTIVE ORDERS:

11987............................ 26949
11988............................ 26951
11989............................ 26959
11990............................ 26961
11991............................ 26967

**7 CFR**

2................................ 26645
107.............................. 26645
917.............................. 26646

PROPOSED RULES:
1804............................ 26660

**13 CFR**

PROPOSED RULES:
121............................. 26660

**15 CFR**

16............................... 26647

**16 CFR**

PROPOSED RULES:
13............................... 26661

**23 CFR**

712.............................. 26651
790.............................. 26651

**25 CFR**

43n.............................. 26652

**31 CFR**

530.............................. 26653

**36 CFR**

PROPOSED RULES:
231.............................. 26662
261.............................. 26662
291.............................. 26662
293.............................. 26662

**40 CFR**

PROPOSED RULES:
85 (2 documents) ...... 26742, 26759

**43 CFR**

4700............................. 26653

**46 CFR**

PROPOSED RULES:
502.............................. 26664

**47 CFR**

73............................... 26655
83............................... 26656

PROPOSED RULES:
73 (3 documents) ...... 26665–26667

**49 CFR**

1033 (2 documents) ........ 26656, 26657
1125............................. 26657

PROPOSED RULES:
1047............................ 26667
1082............................ 26667

**50 CFR**

23............................... 26659

PROPOSED RULES:
20............................... 26669

AR_0033248

# CUMULATIVE LIST OF PARTS AFFECTED DURING MAY

The following numerical guide is a list of parts of each title of the Code of
Federal Regulations affected by documents published to date during May.

**1 CFR**

Ch. I ......... 22125

**3 CFR**

EXECUTIVE ORDERS:

11296 (Revoked by EO 11988) ..... 26951
11460 (Revoked by EO 11984) ..... 23129
11514 (See EO 11990) ..... 26961
  (Amended by EO 11991) ..... 26967
  (See EO 11988) ..... 26951
11644 (Amended by EO 11989) ..... 26959
11861 (Amended by EO 11983) ..... 23127
11861 (Amended by EO 11986) ..... 26407
11872 (Revoked by EO 11983) ..... 23127
11905 (Amended by EO 11985) ..... 25487
11971 (Amended by EO 11982) ..... 22859
11932 ..... 22859
11983 ..... 23127
11984 ..... 23129
11985 ..... 25487
11986 ..... 26407
11987 ..... 26949
11988 ..... 26951
11989 ..... 26959
11990 ..... 26961
11991 ..... 26967

MEMORANDUMS:

May 4, 1977 ..... 23499
May 19, 1977 ..... 26195

**5 CFR**

213 ..... 22355,
  22356, 23131, 24743, 25313, 25314,
  25869, 25870, 26409
550 ..... 23131

PROPOSED RULES:

733 ..... 23160

**7 CFR**

1 ..... 23597
2 ..... 26645
6 ..... 22874
28 ..... 24711
52 ..... 22356
107 ..... 26645
230 ..... 23155
271 ..... 22356, 26002–26006, 26409
272 ..... 23599
295 ..... 23155
301 ..... 25849
354 ..... 25314
401 ..... 26197
410 ..... 24712
Ch. VII ..... 25314
701 ..... 22358
905 ..... 24715
907 ..... 22874, 24061
908 ..... 24061, 25719, 26197
910 ..... 22359, 23156, 24716, 25849, 26410
916 ..... 23156, 24229
917 ..... 22875, 23157, 24230, 26646
928 ..... 25719
944 ..... 24717
953 ..... 25720, 26410
959 ..... 22125
1068 ..... 22360
1260 ..... 25315
1421 ..... 22126, 24231, 25720
1430 ..... 22126
1464 ..... 23795
1823 ..... 24232
1832 ..... 24062
1888 ..... 23158
1933 ..... 24232
1980 ..... 24252

**7 CFR—Continued**

PROPOSED RULES:

53 ..... 23514
201 ..... 25738
225 ..... 23606
911 ..... 24066
915 ..... 23607
916 ..... 26430
918 ..... 23160, 24744
944 ..... 23514
967 ..... 25872
1002 ..... 23841
1065 ..... 24744
1071 ..... 26217
1073 ..... 26217
1097 ..... 26217
1102 ..... 26217
1104 ..... 26217
1106 ..... 26217
1108 ..... 26217
1120 ..... 26217
1126 ..... 26217
1132 ..... 26217
1138 ..... 26217
1207 ..... 24066
1421 ..... 23613, 25329
1425 ..... 23614
1446 ..... 25329
1804 ..... 26660
1845 ..... 26358
1980 ..... 26358

**8 CFR**

214 ..... 26411

PROPOSED RULES:

103 ..... 22148
244 ..... 22148
252 ..... 25738
299 ..... 22149

**9 CFR**

73 ..... 25317, 25849
78 ..... 22370
79 ..... 25850
94 ..... 23131
301 ..... 22373
307 ..... 22373
308 ..... 22373
310 ..... 22373
318 ..... 22373
320 ..... 22373
325 ..... 22373
327 ..... 22373
331 ..... 22373
350 ..... 22373
354 ..... 22373
355 ..... 22373
362 ..... 22373
381 ..... 22373
390 ..... 22373
391 ..... 22373

PROPOSED RULES:

1 ..... 22374
2 ..... 22374
3 ..... 22374

**10 CFR**

2 ..... 22128, 22882
30 ..... 25721
31 ..... 25721
32 ..... 25721
33 ..... 25721
34 ..... 25721
35 ..... 25721
36 ..... 25721

**10 CFR—Continued**

50 ..... 22882
140 ..... 23501
205 ..... 23501, 23722, 25648
212 ..... 22131, 22881
303 ..... 23134
305 ..... 23140
307 ..... 23142
309 ..... 23144
420 ..... 26413

RULINGS:

1977–6 ..... 23501

PROPOSED RULES:

2 ..... 22168
35 ..... 25743
50 ..... 25744
70 ..... 25744
73 ..... 25744
170 ..... 22149
211 ..... 22889, 23859
212 ..... 23374, 22889, 25329
430 ..... 23860, 25329, 26430
810 ..... 23865
871 ..... 26431

**12 CFR**

7 ..... 24206
202 ..... 22861
220 ..... 22862
226 ..... 22360, 25489, 25491
265 ..... 25318
329 ..... 22362
701 ..... 25850
702 ..... 24252, 26197

PROPOSED RULES:

202 ..... 25508
220 ..... 22894
225 ..... 22560
226 ..... 23516
329 ..... 22378

**13 CFR**

302 ..... 23795
306 ..... 26198
309 ..... 23146
500 ..... 22135
520 ..... 22135
551 ..... 22135
552 ..... 22136
553 ..... 22137
554 ..... 22137
555 ..... 22137
560 ..... 22137

PROPOSED RULES:

120 ..... 23614
121 ..... 26660

**14 CFR**

39 ..... 22137,
  22862, 22863, 23502–23504, 24717–
  24723, 25721–25723, 26199–26201
71 ..... 22138, 23505, 24045
91 ..... 22139, 24196, 25724
97 ..... 22863, 24724, 26203
133 ..... 24196, 25724
221a ..... 26422
241 ..... 23146
385 ..... 23600, 25851

PROPOSED RULES:

39 ..... 22172, 22896, 24751
71 ..... 22172,
  22173, 24066, 24752, 25739, 25740,
  26217

AR_0033249

**14 CFR—Continued**

PROPOSED RULES—Continued

| | |
|---|---|
| 152 | 22896 |
| Ch. II | 26558 |
| 241 | 24216 |
| 302 | 23841 |
| 399 | 26612 |
| 1245 | 25508 |

**15 CFR**

| | |
|---|---|
| 16 | 26647 |
| 50 | 22362 |
| 376 | 23796 |
| 950 | 25852 |

**16 CFR**

| | |
|---|---|
| 13 | 22876, 23799, 26661 |
| 1014 | 22878 |
| 1021 | 25494 |
| 1202 | 22656 |
| 1500 | 22878 |

PROPOSED RULES:

| | |
|---|---|
| 2 | 22897 |
| 13 | 23841–23849, 24753, 25335 |
| 441 | 26398 |
| 443 | 26432 |
| 1031 | 25513 |
| 1201 | 24067 |
| 1205 | 23052, 24755 |
| 1616 | 23853 |

**17 CFR**

| | |
|---|---|
| 1 | 23988 |
| 15 | 25485 |
| 231 | 22139 |
| 239 | 22139 |
| 240 | 23786, 23799, 24062, 25318 |
| 249 | 23786, 24062 |
| 259 | 24253, 26204 |

PROPOSED RULES:

| | |
|---|---|
| 1 | 23614 |
| 32 | 23614 |
| 210 | 23853 |
| 230 | 24069 |
| 239 | 26010 |
| 240 | 24069, 26010, 26436 |
| 249 | 23792, 26010 |

**18 CFR**

| | |
|---|---|
| 1000 | 22146 |

PROPOSED RULES:

| | |
|---|---|
| 1 | 23160 |
| 2 | 25513 |
| 3 | 23160 |
| 4 | 23160 |
| 5 | 23160 |
| 6 | 23160 |
| 16 | 23160 |
| 35 | 22897 |
| 101 | 26436 |
| 104 | 26436 |
| 141 | 25337, 26436 |
| 154 | 23615 |
| 260 | 26436 |

**19 CFR**

| | |
|---|---|
| 148 | 25324 |
| 159 | 23146, 23505, 23801 |
| 162 | 25324 |

**20 CFR**

| | |
|---|---|
| 200 | 22865 |

PROPOSED RULES:

| | |
|---|---|
| 655 | 22378 |

**21 CFR**

| | |
|---|---|
| 8 | 24254 |
| 25 | 25854 |
| 169 | 25324 |
| 172 | 23148 |
| 193 | 23148 |
| 310 | 23772, 25854 |
| 500 | 24254 |
| 502 | 24254 |
| 503 | 24254 |
| 510 | 23149 |
| 514 | 24254 |
| 520 | 23600 |
| 522 | 24254 |
| 540 | 23149 |
| 558 | 25854 |
| 561 | 22363, 23148 |
| 571 | 24254 |
| 701 | 24255, 25855 |
| 801 | 23772, 25854 |
| 1308 | 25498 |

PROPOSED RULES:

| | |
|---|---|
| 2 | 24536 |
| 145 | 25339 |
| 150 | 25339 |
| 172 | 25339 |
| 180 | 25339 |
| 189 | 24536, 25339 |
| 201 | 24279 |
| 310 | 24536, 25339 |
| 330 | 24279 |
| 361 | 23161 |
| 430 | 25339 |
| 500 | 24536 |
| 510 | 24536, 25339 |
| 589 | 25339 |
| 640 | 25339 |
| 700 | 24536, 25339 |
| 801 | 24536 |

**23 CFR**

| | |
|---|---|
| 712 | 26651 |
| 790 | 26651 |

PROPOSED RULES:

| | |
|---|---|
| 640 | 22173 |
| 642 | 22173 |

**24 CFR**

| | |
|---|---|
| 200 | 25724 |
| 201 | 26552 |
| 235 | 22557 |
| 241 | 23601 |
| 812 | 23582 |
| 860 | 23584 |
| 880 | 23585 |
| 881 | 23585 |
| 882 | 23585 |
| 883 | 23585 |
| 886 | 23585 |
| 888 | 22363 |
| 1914 | 22865–22867, 24932, 24937 |
| 1915 | 24944, 24986 |
| 1917 | 23972–23975, 25436–25440 |
| 1920 | 24255–24262, 24725–24731 |

PROPOSED RULES:

| | |
|---|---|
| 20 | 24200 |
| 58 | 24755 |
| 803 | 22704 |
| 888 | 22704, 24279 |
| 1917 | 25441–25444 |
| 1932 | 22900 |

**25 CFR**

| | |
|---|---|
| 43n | 26652 |
| 219 | 22141 |

**25 CFR—Continued**

PROPOSED RULES:

| | |
|---|---|
| 221 | 22902 |

**26 CFR**

| | |
|---|---|
| 1 | 24263 |
| 7 | 26204 |
| 33 | 24046 |
| 53 | 24264 |
| 301 | 22143 |

PROPOSED RULES:

| | |
|---|---|
| 1 | 24279, 26437 |
| 53 | 23517 |

**27 CFR**

| | |
|---|---|
| 178 | 22144 |
| 181 | 22144 |

**28 CFR**

| | |
|---|---|
| 0 | 22557, 23801, 25499, 26205 |
| 16 | 23506 |
| 32 | 23252 |
| 42 | 25724 |

PROPOSED RULES:

| | |
|---|---|
| 500 | 26334 |
| 501 | 26334 |
| 523 | 26334 |
| 540 | 26335 |
| 541 | 26340 |
| 543 | 26346 |

**29 CFR**

| | |
|---|---|
| 9 | 22364 |
| 40 | 22364 |
| 94 | 24522 |
| 95 | 24522 |
| 98 | 24522 |
| 99 | 24522 |
| 1910 | 22516, 23601, 26429 |
| 2520 | 25870 |

PROPOSED RULES:

| | |
|---|---|
| 40 | 24289 |

**30 CFR**

| | |
|---|---|
| 18 | 25855 |

PROPOSED RULES:

| | |
|---|---|
| 211 | 23855, 26218 |

**31 CFR**

| | |
|---|---|
| 51 | 24731 |
| 315 | 25725 |
| 316 | 25725 |
| 332 | 25725 |
| 515 | 25499 |
| 530 | 23605, 26653 |

PROPOSED RULES:

| | |
|---|---|
| 215 | 22174 |

**32 CFR**

| | |
|---|---|
| 191 | 26422 |
| 351 | 25855 |
| 352 | 25856 |
| 518 | 26423 |
| 553 | 25725 |
| 865 | 23601 |
| 1900 | 24049 |

**32A CFR**

| | |
|---|---|
| 634 | 25327 |

**33 CFR**

| | |
|---|---|
| 1 | 23506 |
| 25 | 22879 |
| 127 | 24738 |

FEDERAL REGISTER

**33 CFR—Continued**

183_____ 24738, 24739
209_____ 24049

PROPOSED RULES:

110_____ 24755
157_____ 24868, 24869
164_____ 24877
204_____ 26437
303_____ 24756

**36 CFR**

7_____ 22557, 25857
231_____ 24739
261_____ 24265, 24739

PROPOSED RULES:

231_____ 26662
261_____ 24290, 26662
291_____ 26662
293_____ 26662

**37 CFR**

PROPOSED RULES:

4_____ 22378, 25513
201_____ 25514

**38 CFR**

3_____ 22868, 26205

PROPOSED RULES:

1_____ 26437

**39 CFR**

111_____ 24266
3001_____ 25728

PROPOSED RULES:

111_____ 22176
3001_____ 25741

**40 CFR**

33_____ 22144
39_____ 25666
52_____ 22869,
      23802–23805, 25500, 25501, 25504,
      25730
60_____ 26205
80_____ 25731
86_____ 24739
115_____ 25478
180_____ 22364
228_____ 22144
255_____ 24926
435_____ 22558

PROPOSED RULES:

51_____ 22177
52___ 22902, 23162, 25878, 26438, 26439
60_____ 22508, 26222
85_____ 26742, 26759
180_____ 24071, 26440
228_____ 23163
250_____ 22332
432_____ 26226
435_____ 22560
712_____ 24542
761_____ 26564
762_____ 24542

**41 CFR**

1–1_____ 23507
1–14_____ 23507
6–1_____ 24739
9–7_____ 23507
9–15_____ 23507
9–51_____ 25732
14–4_____ 25857

**41 CFR—Continued**

15–3_____ 22145
101–25_____ 22558
101–40_____ 25858
101–43_____ 24051
101–44_____ 24052
101–45_____ 24052
Ch. 114_____ 24740
114–25_____ 23150

PROPOSED RULES:

3–4_____ 26314
50–201_____ 26022
50–206_____ 26022

**42 CFR**

PROPOSED RULES:

23_____ 25992
36_____ 26306
86_____ 25340

**43 CFR**

3040_____ 25462

3500_____ 25462
3520_____ 25462
4700_____ 26653

PUBLIC LAND ORDERS:

5617_____ 22365

PROPOSED RULES:

29_____ 26441

**45 CFR**

4_____ 22145
84_____ 22676, 22888
144_____ 25862
145_____ 26206
155_____ 26536
157_____ 26541
159_____ 26546
233_____ 26426
250_____ 23508
304_____ 26427
500_____ 24740
531_____ 24740
1060_____ 23151
1067_____ 22365
1068_____ 22145
1071_____ 25733
1611_____ 24271, 25734

PROPOSED RULES:

144_____ 24291
166_____ 22336
168_____ 24291
175_____ 24291
176_____ 24291
178_____ 24291
178a_____ 24291
187_____ 24758
190_____ 24291
191_____ 25881

**46 CFR**

32_____ 25734
35_____ 25734
12_____ 24741
148_____ 22145
502_____ 23509

PROPOSED RULES:

10_____ 22903
12_____ 22903
25_____ 26229
30_____ 24874
32_____ 24874

**46 CFR—Continued**

PROPOSED RULES—Continued

33_____ 26229
35_____ 23517
50_____ 22296
54_____ 22296
56_____ 22296
58_____ 22296
61_____ 22296
75_____ 26229
94_____ 26229
107_____ 22296
108_____ 22296
109_____ 22296
151_____ 22903
153_____ 23518
161_____ 26229
164_____ 26229
167_____ 26229
180_____ 26229
192_____ 26229
502_____ 22383, 26664

**47 CFR**

1_____ 25735
2_____ 23509, 24054
19_____ 25735, 26216
73_____ 22558,
      24055, 24272, 24273, 25505, 25736,
      26655
74_____ 22558
76_____ 23510
81_____ 22869–22872, 23510
83_____ 22869–22872, 23510, 26656
87_____ 23509, 24054
91_____ 24274
94_____ 24276

PROPOSED RULES:

21_____ 25341
31_____ 24291, 26444
61_____ 23615
64_____ 23615, 25741
68_____ 25342
73_____ 22183,
      22569, 23165, 25342, 25343, 25742,
      26232, 26665–26667
76_____ 23519
83_____ 25879
89_____ 25881, 26030
91_____ 25881, 26030
93_____ 25881, 26030
95_____ 25881

**49 CFR**

1_____ 22366
99_____ 24277
172_____ 22366, 22880
175_____ 22366, 22880
Ch. III_____ 26428
581_____ 24056
1002_____ 25862
1003_____ 25862
1033_____ 22367,
      22368, 22880, 24278, 25325, 26656,
      26657
1036_____ 23511
1041_____ 22369
1043_____ 25862
1045A_____ 25862
1048_____ 24741
1100_____ 23806, 25862
1121_____ 25327
1125_____ 26657
1320_____ 22369, 23840
1322_____ 22369, 23842

AR_0033251

**49 CFR—Continued**

PROPOSED RULES:
| | |
|---|---|
| 193 | 24758 |
| 218 | 24293 |
| Ch. II | 22184, 25743 |
| 1047 | 26667 |
| 1082 | 26667 |

**50 CFR**

| | |
|---|---|
| 23 | 26659 |
| 26 | 23151 |
| 33 | 22874, 24060, 25736, 25737, 26428, 26429 |
| 216 | 24742 |

**50 CFR—Continued**

| | |
|---|---|
| 280 | 25863 |
| 611 | 22559 |
| 661 | 26580 |

PROPOSED RULES:
| | |
|---|---|
| 20 | 26669 |
| 32 | 22903 |

## FEDERAL REGISTER PAGES AND DATES—MAY

| Pages | Date | Pages | Date | Pages | Date |
|---|---|---|---|---|---|
| 22125–22354 | May 2 | 23597–23794 | 10 | 25719–25848 | 19 |
| 22355–22556 | 3 | 23795–24044 | 11 | 25849–26194 | 20 |
| 22557–22858 | 4 | 24045–24227 | 12 | 26195–26405 | 23 |
| 22859–23125 | 5 | 24229–24709 | 13 | 26407–26644 | 24 |
| 23127–23497 | 6 | 25313–25485 | 17 | 26645–26968 | 25 |
| 23499–23596 | 9 | 25487–25717 | 18 | | |

AR_0033252

# reminders

(The items in this list were editorially compiled as an aid to FEDERAL REGISTER users. Inclusion or exclusion from this list has no legal significance. Since this list is intended as a reminder, it does not include effective dates that occur within 14 days of publication.)

---

### Rules Going Into Effect Today

CSA—Revision of income poverty guidelines.................... 21108; 4–25–77

### Next Week's Deadlines for Comments On Proposed Rules

**AGRICULTURE DEPARTMENT**
Agricultural Marketing Service—
Peaches, fresh, grown in Georgia; expenses and rate of assessment of 1977–87 fiscal period; comments by 5–31–77............ 24744; 5–16–77
Watermelons; United States grade standards; comments by 5–31–77. 8644; 2–11–77
Animal and Plant Health Inspection Service—
Denaturing of animal carcasses, parts, or meat food products other than rendered animal fats; required standards for darkness when denatured by charcoal; comments by 6–2–77.. 12435; 3–4–77
Forest Service—
Electric power transmission lines; rights-of-way; comments by 5–31–77.................... 21818; 4–29–77
**CIVIL AERONAUTICS BOARD**
Small air carriers, revision of accounting and reporting requirements; comments by 5–30–77.. 21793; 4–29–77
**CIVIL SERVICE COMMISSION**
Garnishment of moneys due from U.S., uniform procedures for all executive agencies; comments by 5–31–77. 19882; 4–15–77
**COMMERCE DEPARTMENT**
National Oceanic and Atmospheric Administration—
Citations to fishing vessel owners or operators; enforcement of Fishery Conservation and Management Act; comments by 5–31–77. 11839; 3–1–77
Civil procedures, enforcement of Fishery Conservation and Management Act of 1976; comments by 5–31–77................ 12026; 3–1–77
Fishing vessel obligation guarantee program procedures; comments by 5–31–77............ 21488; 4–27–77
Patent and Trademark Office—
Trademark forms; comments by 6–1–77.................... 22378; 5–3–77
**COMMUNITY SERVICES ADMINISTRATION**
Uniform Federal Standards; revised policy on monitoring and reporting program performance; comments by 5–31–77.................... 21623; 4–28–77
**CONSUMER PRODUCT SAFETY COMMISSION**
Self-pressurized consumer products containing chlorofluorocarbon propellants; labeling and data submission requirements; comments by 5–31–77.................... 21807; 4–29–77

**DEFENSE DEPARTMENT**
Engineers Corps—
Commercial statistics; policy on release; comments by 6–1–77. 18863; 4–11–77
Naval restricted areas in Cooper River, Charleston County, S.C.; comments by 6–1–77........ 21622; 4–28–77
Navigation regulations, disestablishment of seaplane restricted area; comments extended to 6–1–77. 21300; 4–26–77
[First published at 42 FR 14739, Mar. 16, 1977]
Office of the Secretary—
Privacy Act of 1974; additional exemption; comments by 5–31–77. 21817; 4–29–77
**ENVIRONMENTAL PROTECTION AGENCY**
National secondary drinking water regulations; comments by 6–1–77. 17143; 3–31–77
Nonferrous metals manufacturing point source category; pretreatment standards; comments by 5–31–77.. 17444; 4–1–77
[First published at 41 FR 54850, Dec. 15, 1976]
Northern Cheyenne Indian Reservation; redesignation for prevention of significant deterioration; comments by 5–31–77................ 21819; 4–29–77
Oil and gas extraction point source category, onshore segment; effluent limitations and guidelines; comments by 6–3–77.................... 22558; 5–4–77
[First published at 41 FR 44942, Oct. 13, 1976]
Oil and gas extraction point source category, onshore segment; effluent limitations and guidelines for existing sources, standards of performance and pretreatment standards for new sources; comments by 6–3–77. 22560; 5–4–77
[First published at 41 FR 44949, Oct. 13, 1976]
Pima County, Ariz.; air pollution control; comments by 5–31–77........... 21820; 4–29–77
Ventura County, Calif.; air pollution control rules; comments by 5–31–77. 21819; 4–29–77
**FEDERAL COMMUNICATIONS COMMISSION**
Cable television annual financial report; uniform financial reporting system; comments by 6–3–77............ 23519; 5–9–77
Class D transmitters operating in citizens radio service; Harmonic emissions for Class D Transmitters; comments extended to 5–31–77.. 11252; 2–28–77
[First published at 41 FR 52709; Nov. 30, 1976]
FM broadcast stations, table of assignments; Presque Isle, Maine; comments by 5–23–77.. 20152; 4–18–77

FM broadcast and TV broadcast stations in Federalsburg, Md., Florence, Oreg., Altoona, Pa., Highland and Kieler, Wis.; table of assignments and assignment of channels; (4 documents) comments by 5–31–77.......... 21627–21631; 4–28–77
**FEDERAL MARITIME COMMISSION**
Rules of practice and procedure; designation of parties; comments by 6–1–77.................... 22383; 5–3–77
**FEDERAL POWER COMMISSION**
Electric utilities; application procedures; comments by 5–30–77........... 23160; 5–6–77
Natural Gas Pipeline Companies and Public Utilities; just and reasonable rate of return, extension of time for filing reply comments by 6–2–77. 25513; 5–18–77
[First published at 42 FR 17142, Mar. 31, 1977]
Statements and reports; residential electric bill data for CPI; comments by 6–1–77.................... 25337; 5–17–77
**FEDERAL RESERVE SYSTEM**
Credit to exchange specialists; comments by 5–31–77.... 22895; 5–5–77
**FEDERAL TRADE COMMISSION**
Advertising, disclosure, cooling-off and refund requirements, proprietary vocational and home study schools; comments by 5–31–77.......... 20303; 4–19–77
**HEALTH, EDUCATION, AND WELFARE DEPARTMENT**
Education Office—
Emergency adult education program for Indo-China refugees; comments by 6–1–77........ 22336; 5–2–77
Certification of antibiotic drugs; revision of sampling procedure; comments by 5–31–77........... 16638; 3–29–77
Food additives; resinous and polymeric coatings for beverage containers; comments by 5–31–77. 21770; 4–29–77
Polychlorinated biphenyls (PCB's); food and food packaging; reduction in temporary tolerances; comments by 5–31–77........... 17487; 4–1–77
**INTERIOR DEPARTMENT**
Fish and Wildlife Service—
Hatachie National Wildlife Refuge; hunting regulations; comments by 5–30–77................ 22903; 5–5–77
Proposed endangered status and critical habitat for pine barrens treefrog in Fla.; comments by 6–3–77. 18109; 4–5–77
Indian Affairs Bureau—
Water use regulations; comments extended to 6–2–77................ 20480; 4–20–77
[First published at 42 FR 14885, Mar. 17, 1977]

AR_0033253

## REMINDERS—Continued

Land Management Bureau—
  Carey Act grants, proposed regulations for segregating and patenting public lands; comments by 5–31–77 .......................... 18100; 4–5–77

### JUSTICE DEPARTMENT
Immigration and Naturalization Service—
  Voluntary departure, application for extension of time to depart; comments by 6–1–77.. 22148; 5–2–77

### LABOR DEPARTMENT
Occupational Safety and Health Administration—
  On-site consultation agreements; revisions; comments by 5–31–77. 22059; 4–29–77

### NUCLEAR REGULATORY COMMISSION
Revision of license fee schedules, fees for facilities and materials licenses under Atomic Energy Act, 1954, as amended; comments by 6–1–77. 22149; 5–2–77

### PENSION BENEFIT GUARANTY CORPORATION
Plan assets; allocation; comments by 6–2–77...................... 20156; 4–18–77
Plan assets; valuation; comments by 6–2–77...................... 20158; 4–18–77

### POSTAL SERVICE
Mailing list services, address cards arranged in sequence of carrier delivery; comments by 6–1–77... 22176; 5–2–77

### SECURITIES AND EXCHANGE COMMISSION
FOCUS reporting system; comments by 5–30–77................. 23786; 5–10–77
Institutional investment managers; reporting of information with respect to accounts; comments by 6–1–77. 16831; 3–30–77
Lease disclosure requirements; comments by 5–31–77.. 13838; 3–14–77
Requirements for financial reporting, FOCUS reporting system; comments by 5–30–77............ 23792; 5–10–77
Uniform net capital rule; comments by 6–1–77...................... 23799; 5–11–77

### TRANSPORTATION DEPARTMENT
Federal Aviation Administration—
  Aircraft security—use of X-ray devices; comments by 5–31–77. 17141; 3–31–77
  Boeing model 727 series airplanes; airworthiness directive; comments by 6–1–77........... 18861; 4–11–77
  Control zone; Riverside, Calif., alteration; comments by 6–3–77. 22173; 5–2–77
  Transition area; Yuma, Ariz., comments by 6–2–77................ 21620; 4–28–77
Federal Railroad Administration—
  Improved glazing material in windows of locomotive cabs, railroad passenger and commuter cars, rapid transit cars, and cabooses; comments by 6–1–77.............. 13309; 3–10–77
  Minimum safety requirements for railroad caboose cars; comments by 5–30–77........ 19359; 4–13–77

Workmen, blue signal protection; comments by 5–30–77...... 20154; 4–18–77

### TREASURY DEPARTMENT
Internal Revenue Service—
  General tax credit; married individuals; comments by 6–2–77. 20150; 4–18–77

---

### Next Week's Meetings

### AGRICULTURE DEPARTMENT
Agricultural Marketing Service—
  Shippers Advisory Committee, Lakeland, Fla. (open), 5–31–77. 24074; 5–12–77
  [First published at 42 FR 21124, Apr. 25, 1977]
Cooperative State Research Service—
  Committee of Nine, Washington, D.C. (open), 6–2 and 6–3–77.... 24074; 5–12–77
  [First published at 42 FR 21500, Apr. 27, 1977]
Food Safety and Quality Service—
  Expert Panel on Nitrites and Nitrosamines; Washington, D.C. (open), 5–31–77............ 24294; 5–13–77
Forest Service—
  Cascade Head Scenic-Research Area Advisory Council (Pacific Northwest Region) Lincoln City, Oreg. (open), 5–31–77.. 23533; 5–9–77

### ARTS AND HUMANITIES, NATIONAL FOUNDATION
Research Grants Panel, Washington, D.C. (closed), 6–2 and 6–3–77. 24126; 5–12–77

### CIVIL RIGHTS COMMISSION
Advisory Committees—
  Alaska, Anchorage, Alaska (open), 6–3–77..................... 22388; 5–3–77
  Massachusetts, Boston, Mass. (open with restrictions), 5–31–77. 20324; 4–19–77
  Minnesota, Minneapolis, Minn. (open), 5–31–77..20841; 4–22–77
  New Jersey, Newark, N.J. (open), 6–2–77................ 24764; 5–16–77

### COMMERCE DEPARTMENT
Census Bureau—
  Census Advisory Committee on the Spanish Origin Population for 1980 Census, Suitland, Md. (open), 6–3–77................ 24764; 5–16–77
Domestic and International Business Administration—
  Licensing Procedures Subcommittee of the Computer Systems Technical Advisory Committee, Los Angeles, Calif. (open with restrictions), 6–1 through 6–3–77. 20650; 4–21–77
National Oceanic and Atmospheric Administration—
  Gulf of Mexico Fishery Management Council Shallow Water Shrimp and Groundfish Advisory Panels, 5–31 and 6–1–77.......... 22390; 5–3–77
  Sea Grant Review Panel, Washington, D.C. (partially closed), 6–1 and 6–2–77 ............... 24076; 5–12–77

Weather Modification Advisory Board, Washington, D.C. (open), 5–31 and 6–1–77 ............... 24077; 5–12–77

### DEFENSE DEPARTMENT
Air Force Department—
  Scientific Advisory Boards:
    Edgewood, Md. (closed), 6–1 and 6–2–77............. 24765; 5–16–77
    Langley Air Force Base, Va. (closed), 6–1–77............. 23533; 5–9–77
    St. Louis, Mo. (closed), 6–2 and 6–3–77............. 24765; 5–16–77
Office of the Secretary—
  Armed Forces Epidemiological Board, Environmental Quality Subcommittee, Washington, D.C. (open), 6–1–77 ............... 24077; 5–12–77
  Board of Visitors National Defense University, National War College (open with restrictions), 6–1 and 6–2–77.................. 23533; 5–9–77
  Defense Intelligence Agency Scientific Advisory Committee, Washington, D.C. (closed), 6–1 and 6–2–77................ 10886; 2–24–77
  Defense Intelligence Agency Scientific Advisory Committee, Rosslyn, Va. (closed) (2 documents), 5–31 and 6–3–77........ 20848; 4–22–77
  Electron Devices Advisory Group, New York, N.Y. (closed), 6–2–77. 24766; 5–16–77

### ECONOMIC OPPORTUNITY NATIONAL ADVISORY COUNCIL
Washington, D.C. (open), 6–2 and 6–3–77.................... 23563; 5–9–77
  [First published at 42 FR 18906, April 11, 1977]

### ENVIRONMENTAL PROTECTION AGENCY
Air quality model guidelines, New York, N.Y. (open), 6–1–77............. 20492; 4–20–77
Federal Insecticide, Fungicide and Rodenticide Act Scientific Advisory Panel, San Francisco, Calif. (open), 6–2 and 6–3–77...... 25349; 5–17–77
Great Lakes Water Quality Agreement, Duluth, Minn. (open), 6–3–77. 21643; 4–28–77
Science Advisory Group Environmental Health Advisory Committee; Arlington, Va. (open), 6–1–77........ 24305; 5–13–77

### EXTENSION AND CONTINUING EDUCATION, NATIONAL ADVISORY COUNCIL
Meeting, Washington, D.C. (open with restrictions), 6–1–77.............. 24773; 5–16–77

### FEDERAL COMMUNICATIONS COMMISSION
WARC 79 Auxiliary Broadcasting Service Group, Washington, D.C. (open), 6–2–77...................... 23535; 5–9–77
WARC 79 International Broadcasting Service Group, Washington, D.C. (open), 6–2–77........ 23535; 5–9–77
WARC 79 TV Broadcasting Service Group, Washington, D.C. (open), 6–2–77...................... 23535; 5–9–77

AR_0033254

**FEDERAL ENERGY ADMINISTRATION**
Coal Policy Subcommittee and Air Quality Standards Subcommittee, Washington, D.C. (open), 6–2–77.
25522; 5–18–77
Energy Conservation Subcommittee, Washington, D.C. (open), 6–2–77.
25522; 5–18–77
Environmental Advisory Committee, Washington, D.C. (open), 6–3–77.
25522; 5–18–77

**FEDERAL POWER COMMISSION**
Supply-Technical Advisory Task Force, Synthesized Gaseous Hydrocarbon Fuels, Washington, D.C. (open), 6–2–77............... 23543; 5–9–77

**HEALTH, EDUCATION, AND WELFARE DEPARTMENT**
Alcohol, Drug Abuse, and Mental Health Administration—
Advisory committees, Rockville, Md. and Washington, D.C. (open and closed), 6–2 thru 6–4–77.. 23879; 5–11–77

Disease Control Center—
Safety and Occupational Health Study Section; Bethesda, Md. (partially open), 6–2 thru 6–3–77.
24319; 5–13–77

Education Office—
Equality of Educational Opportunity National Advisory Council, Boston, Mass. (open), 6–3 and 6–4–77.
23548; 5–9–77

Food and Drug Administration—
Anesthesiology Device Classification Panel; Washington, D.C. (open), 6–2–77................ 24320; 5–13–77
Dentifrice and Dental Care Panel; Rockville, Md. (open), 6–1 and 6–2–77................ 24320; 5–13–77
Dermatology Advisory Committee; Rockville, Md. (open), 6–2–77.
24320; 5–13–77
Ophthalmic Panel; Rockville, Md. (open), 6–3 thru 6–4–77.... 24320; 5–13–77
Pulmonary Functions and Respiratory Therapy Subcommittee of the Anesthesiology Device Classification Panel, Washington, D.C. (open), 6–1–77.......... 24320; 5–13–77
Radiological Device Classification Panel; Washington, D.C. (open), 6–3–77................ 24320; 5–13–77
Ultrasound sources; biological effects and characterizations, Rockville, Md. (open), 6–2 and 6–3–77.
20859; 4–22–77

Health Resources Administration—
Advisory Committee, Washington, D.C. (open-closed), 6–1 thru 6–3–77.......... 25533; 5–18–77

National Institutes of Health—
Animal Resources Advisory Committee, Bethesda, Md. (open with restrictions), 6–1–77............ 20504; 4–20–77
Biometry and Epidemiology Contract Review Committee, Bethesda, Md. (open and closed), 5–31 and 6–1–77................ 19401; 4–13–77

Board of Scientific Counselors, NEI, Bethesda, Md. (open), 6–3 and 6–4–77................ 20505; 4–20–77
Cancer Control Intervention Programs Review Committee, Silver Spring, Md. (open and closed), 6–2 and 6–3–77................ 23175; 5–6–77
Clearinghouse on Environmental Carcinogens, Data Evaluation Subgroup, Bethesda, Md. (open) (2 documents), 5–31–77.
19402; 4–13–77
21520; 4–27–77
Clinical Cancer Education Committee, Bethesda, Md. (open and closed), 6–1 and 6–2–77.... 23176; 5–6–77
Combined Modality Committee, Bethesda, Md. (open and closed), 5–31 and 6–1–77.. 23175; 5–6–77
Maternal and Child Health Research Committee, Bethesda, Md. (open and closed), 6–2 and 6–3–77.
19403; 4–13–77
National Commission on Digestive Diseases, Bethesda, Md. (open), 6–1–77................ 21521; 4–27–77
National Prostatic Cancer Project Working Cadre, Buffalo, N.Y. (open and closed), 6–1–77...:...... 23175; 5–6–77
Population Research Committee, Bethesda, Md. (open with restrictions), 6–1 through 6–3–77.
20507; 4–20–77
Research Grants Division Study Sections, Bethesda, Md. (open), 5–31 through 6–4–77.... 23176; 5–6–77
Workshop on Current Research in Cardiac and Vascular Disease in Relation to Diabetes Mellitus, Bethesda, Md. (open with restrictions),.6–3–77.... 19402; 4–13–77

**INTERIOR DEPARTMENT**
National Park Service—
Historic American Buildings Survey Advisory Board; San Diego, Calif. (open), 6–2 thru 6–3–77.... 24341; 5–13–77
Pictured Rocks National Lakeshore Advisory Commission, Munising, Mich. (open), 6–2–77........ 24341; 5–13–77

**JUSTICE DEPARTMENT**
Law Enforcement Assistance Administration—
Guards and Investigators Committee, Alexandria, Va.. (open), 6–2 and 6–3–77................ 25774; 5–19–77

**LABOR DEPARTMENT**
Occupational Safety and Health Administration—
Construction Safety and Health Advisory Committee; Seattle, Wash. (open), 6–2–77.. 24342; 5–13–77
Federal Advisory Council on Occupational Safety and Health; Washington, D.C. (open), 6–1–77.. 24343; 5–13–77

**NATIONAL AERONAUTICS AND SPACE ADMINISTRATION**
Space Program Advisory Council, Life Sciences Committee; Washington, D.C. (open), 6–1 thru 6–2–77.
24346; 5–13–77

Stratospheric Research Advisory Committee, Washington, D.C. (open), 5–31 and 6–1–77.... 24121; 5–12–77

**NATIONAL CAPITAL PLANNING COMMISSION**
Washington, D.C. (open), 6–2–77.
20865; 4–22–77

**NATIONAL CREDIT UNION ADMINISTRATION**
National Credit Union Board, Washington, D.C. (open), 6–2 and 6–3–77.
22207; 5–2–77

**NATIONAL SCIENCE FOUNDATION**
Advisory Council, Task Group 2, Washington, D.C. (open), 6–2 and 6–3–77.
25391; 5–17–77
Advisory Panels:
Information Dissemination for Science Education Program, Washington, D.C. (closed), 6–2 through 6–4–77 ............ 25391; 5–17–77
5–17–77
History and Philosophy of Science, Princeton, N.J. (open-closed), 6–3 and 6–4–77........ 25549; 5–18–77
Neurobiology, La Jolla, Calif. (partially open), 6–1 through 6–3–77.
23670; 5–10–77
Science Education Prospects, Handicapped in Science Program Subpanel, Washington, D.C. (closed), 6–2 and 6–3–77.............. 25392; 5–17–77
Sensory Physiology and Perception, Washington, D.C. (partially open), 6–1 through 6–3–77........ 23671; 5–10–77
Very Large Array, Socorro, NM (open), 6–1 and 6–2–77................ 25391; 5–17–77
Ethics and Values Advisory Committee in Science and Technology, Washington, D.C. (open with restrictions), 6–3–77..................... 25549; 5–18–77
Minority Programs in Science Education Advisory Committee, Washington, D.C. (open), 6–2 and 6–3–77.
25391; 5–17–77
Research in Science Education Subpanel, Washington, D.C. (closed), 6–1 thru 6–4–77............. 25391; 5–17–77
Science Education Advisory Panel, Subpanel on the Development in Science Education Program, Chevy Chase, Md. (closed), 5–29 thru 6–4–77.. 21875; 4–29–77

**NUCLEAR REGULATORY COMMISSION**
Reactor Safeguards Advisory Committee, Cologne, Germany (closed) (2 documents), 5–31 thru 6–3–77.
24778; 5–16–77
25780; 5–19–77

**RENEGOTIATION BOARD**
Meeting, Washington, D.C. (partially open), 5–31–77...... 24801; 5–16–77

**SCIENCE AND TECHNOLOGY POLICY OFFICE**
Space Systems Advisory Committee, Washington, D.C. (closed), 5–31 and 6–1–77..................... 25394; 5–17–77

AR_0033255

**STATE DEPARTMENT**
Office of the Secretary—
International Intellectual Property Advisory Committee, Washington, D.C. (open with restrictions), 6–1–77.................. 22967; 5–5–77
Overseas Schools Advisory Council, New York, N.Y. (open), 6–1–77.
22967; 5–5–77

**TELECOMMUNICATIONS POLICY OFFICE**
Frequency Management Advisory Council, Washington, D.C. (open and closed), 6–1–77...... 25394; 5–17–77

**TRANSPORTATION DEPARTMENT**
Coast Guard—
Ship Structure Committee, Washington, D.C. (open), 6–2–77.. 20697; 4–21–77

**VETERANS ADMINISTRATION**
Wage Committee, Washington, D.C. (closed), 6–2–77.... 20210; 4–18–77

---

## Next Week's Public Hearings

**ENVIRONMENTAL PROTECTION AGENCY**
Ocean dumping; municipal sludge dumping, Toms River, NJ (open), 5–31 and 6–1–77....... 23163; 5–6–77

**TRANSPORTATION DEPARTMENT**
Federal Railroad Administration—
Blue signal protection of workmen; Washington, D.C. (open), 6–1–77.
24293; 5–13–77
[First published at 42 FR 20154; 4–18–77]
National Highway Traffic Safety Administration—
Ambassador Leather Products Child Safety Harness, Washington, D.C. (open), 6–1–77.... 22215; 5–2–77

---

## List of Public Laws

This is a continuing listing of public bills that have become law, the text of which is not published in the FEDERAL REGISTER. Copies of the laws in individual pamphlet form (referred to as "slip laws") may be obtained from the U.S. Government Printing Office.

H.R. 3477.............................. Pub. L. 95–30
"Tax Reduction and Simplification Act of 1977". (May 23, 1977; 91 Stat. 126). Price: $.55.

S. 1279.............................. Pub. L. 95–31
"Community Emergency Drought Relief Act of 1977". (May 23, 1977; 91 Stat. 169). Price: $.35.

AR_0033256

# rules and regulations

This section of the FEDERAL REGISTER contains regulatory documents having general applicability and legal effect most of which are keyed to and codified in the Code of Federal Regulations, which is published under 50 titles pursuant to 44 U.S.C. 1510.

The Code of Federal Regulations is sold by the Superintendent of Documents. Prices of new books are listed in the first FEDERAL REGISTER issue of each month.

## Title 7—Agriculture

### SUBTITLE A—OFFICE OF THE SECRETARY OF AGRICULTURE

### PART 2—DELEGATIONS OF AUTHORITY BY THE SECRETARY OF AGRICULTURE AND GENERAL OFFICERS OF THE DEPARTMENT

**Amendment of Authority Reservations**

**AGENCY:** Office of the Secretary, USDA.

**ACTION:** Final rule.

**SUMMARY:** This document amends the reservations of authority to the Assistant Secretary for Conservation, Research, and Education. This amendment is necessitated by section 17 of the National Forest Management Act amending the Weeks Law of March 1, 1911, by transferring the functions of the National Forest Reservation Commission to the Secretary of Agriculture.

This amendment (1) deletes the reservation of authority for the Assistant Secretary to serve as a matter of the National Forest Reservation Commission, (2) reserves to the Assistant Secretary the authority to establish purchase units as previously had been done by the Commission and (3) reserves to the Assistant Secretary the authority to transmit to the Congress reports on land purchases and exchanges as required by section 17(b) of the National Forest Management Act.

**EFFECTIVE DATE:** May 25, 1977.

**FOR FURTHER INFORMATION CONTACT:**

G. W. Van Gilst, Director, Lands Staff, Forest Service, USDA, P.O. Box 2417, Washington, D.C. 20013, 703–235–8212.

**SUPPLEMENTARY INFORMATION:** A specific delegation of authority from the Secretary to the Assistant Secretary to establish purchase units under the provisions of Weeks Law, as amended, is deemed unnecessary in light of the authority presently delegated under 7 CFR 2.19(d)(2) to "protect, manage, and administer the national forests, national forest purchase units, * * * including the acquisition and disposition of lands."

In accordance with exceptions to rulemaking procedures in 5 U.S.C. 553 and Department of Agriculture policy (36 FR 13804), it has been determined that advance notice and request for comments are unnecessary.

Accordingly, paragraph (b) of 7 CFR 2.60 is amended by revising subparagraph (2) to read as follows:

§ 2.60   Chief, Forest Service.

* * * * *

(b) *Reservations.* The following authorities are reserved to the Assistant

Secretary of Agriculture for Conservation, Research, and Education.

* * * * *

(2) The authority as successor to the National Forest Reservation Commission to perform all functions previously performed by the Commission, including the establishment of purchase units, and to transmit purchase and exchange cases to Congress as required by section 17(b) of the National Forest Management Act of 1976 (16 U.S.C. 521b).

* * * * *

(80 Stat. 379 (5 U.S.C. 301))

Signed at Washington, D.C. on May 18, 1977.

M. RUPERT CUTLER,
*Assistant Secretary.*

[FR Doc.77–14794 Filed 5–24–77;8:45 am]

---

### CHAPTER I—AGRICULTURAL MARKETING SERVICE (STANDARDS, INSPECTIONS, MARKETING PRACTICES), DEPARTMENT OF AGRICULTURE

#### SUBCHAPTER E—WAREHOUSE REGULATIONS, U.S. WAREHOUSE ACT

### PART 107—NUT WAREHOUSES

**Licensing of Nut Inspectors**

**AGENCY:** Agricultural Marketing Service, USDA.

**ACTION:** Final rule.

**SUMMARY:** This action changes the definiton of licensed inspectors under the U.S. Warehouse Act to include inspectors licensed under the Agricultural Marketing Act of 1946. The change will result in an avoidance of a duplication in licensing certain nut inspectors. The action will authorize one license to serve the licensing requirements of two laws where there is a common need.

**EFFECTIVE DATE:** May 25, 1977.

**FOR FURTHER INFORMATION CONTACT:**

Arthur R. Willis, Transportation and Warehouse Division, Agricultural Marketing Service, Department of Agriculture, Washington, DC 20250, 202–447–3616.

**SUPPLEMENTARY INFORMATION:** Notice is hereby given in accordance with the administrative provisions in 5 U.S.C. 553, that the Agricultural Marketing Service (AMS), pursuant to the authority conferred by section 28 of the U.S. Warehouse Act, as amended, (7 U.S.C. 241 et seq.), is amending warehouse regulations appearing in Part 107 of Subchapter E of Chapter I in Title 7 of the Code of Federal Regulations to recognize inspectors licensed to inspect

and grade nuts under the Agricultural Marketing Act of 1946 as a "licensed" inspector for purposes of the U.S. Warehouse Act.

Regulations under the U.S. Warehouse Act for nut warehouses require, with certain exceptions, that nuts received into and delivered out of a licensed warehouse be inspected and graded by an inspector licensed under the Act. Presently all the inspecting and grading at licensed nut warehouses is done by persons who are licensed as inspectors under the Agricultural Marketing Act of 1946. The U.S. Warehouse Act regulations have recognized such inspectors by providing that they be licensed under the U.S. Warehouse Act without further show of evidence that they can correctly grade nuts in accordance with official or approved standards and have provided that they will not be charged the usual licensing fees. Based upon such recognition, a license document under the U.S. Warehouse Act was issued to those persons holding valid licenses under the Agricultural Marketing Act of 1946. It has now been determined that the issuance of a license document under the U.S. Warehouse Act is an unnecessary duplication of effort inasmuch as the same safeguards of licensing are being met under another Federal authority.

Recognizing Agricultural Marketing Act of 1946 licensed inspectors as licensed inspectors under the U.S. Warehouse Act will serve to streamline the Federal licensing procedures where more than one statutory authority is involved in the licensing process. This will be accomplished by changing the definition of licensed inspector to include a person licensed under the Agricultural Marketing Act of 1946 as well as Federal employees authorized to inspect under that Act. The current provisions for licensing applicants who hold an effective license under the Agricultural Marketing Act of 1946, will no longer have any application and will be deleted from the regulations.

Editorial changes are being made in the definition for a licensed weigher to make it conform with the language format of the definition of a licensed inspector.

An editorial change is being made in the section that prohibits any unlicensed person from representing that he is licensed, by making reference to the definition of inspectors and weighers.

The amendments now being made to the regulations will not, in any way, relieve any inspector, weigher, sampler, or any other person regardless of whether they are licensed under the Warehouse Act, or the Agricultural Marketing Act of 1946, from the provisions of section

AR_0033257

Case 1:24-cv-00089-DMT-CRH    Document 113-15    Filed 10/31/24    Page 82 of 127

30 of the U.S. Warehouse Act which specifies criminal penalties for certain violations of the Act.

Said regulations therefore are amended to read:

1. Section 107.2 (m) and (n) are amended to read:

§ 107.2   Terms defined.

\*    \*    \*    \*    \*

(m) *Licensed inspector.* (1) A person licensed under provisions of Section 11 of the United States Warehouse Act (7 U.S.C. 241 et. seq.), or, (2) A Federal employee authorized under provisions of the Agricultural Marketing Act of 1946 (7 U.S.C. 1621 et. seq.), or (3) a person licensed under the provisions of the Agricultural Marketing Act of 1946 (7 U.S.C. 1621 et. seq.) to inspect, grade, and certificate the grade or other class and/or condition of nuts stored or to be stored in a warehouse licensed under the U.S. Warehouse Act (the terms "persons duly licensed to inspect" or "licensed inspector" shall be defined accordingly.)

(n) *Licensed weigher.* A person licensed under the provisions of Section 11 of the United States Warehouse Act (7 U.S.C. 241 et. seq.), to weigh and certificate the weight of nuts stored or to be stored in a warehouse licensed under the U.S. Warehouse Act (the terms "persons duly licensed to weigh" or "licensed weigher" shall be defined accordingly.)

\*    \*    \*    \*    \*

§ 107.60   [Amended]

2. Section 107.60 is amended as follows: Paragraph (c) is deleted in its entirety. Paragraph (d) is redesignated as paragraph (c).

Paragraph (e) is redesignated as paragraph (d).

Paragraph (f) is redesignated as paragraph (e).

3. Section 107.74 is amended to read:

§ 107.74   Unlicensed inspectors and weighers.

No person shall in any way represent himself to be an inspector or weigher licensed under the Act unless he is a licensed inspector or licensed weigher as defined in accordance with the provisions of paragraphs (m) and (n) of § 107.2.

It is hereby found impracticable and contrary to the public interest to give preliminary notice and engage in public rulemaking procedure and postpone the effective date of these amendments until 30 days after publication in the FEDERAL REGISTER (5 U.S.C. 553) in view of the fact that these changes do not add additional restrictions to warehouses licensed under the United States Warehouse Act or impose any additional requirements upon users of warehouse services.

Done at Washington, DC, May 19, 1977.

WILLIAM T. MANLEY,
*Acting Administrator.*

[FR Doc.77-14907 Filed 5-24-77;8:45 am]

CHAPTER IX—AGRICULTURAL MARKETING SERVICE (MARKETING AGREEMENTS AND ORDERS; FRUITS, VEGETABLES, NUTS), DEPARTMENT OF AGRICULTURE

[Plum Reg. 13]

PART 917—FRESH PEARS, PLUMS, AND PEACHES GROWN IN CALIFORNIA

Minimum Grade and Size Requirements

AGENCY: Agricultural Marketing Service, USDA.

ACTION: Final rule.

SUMMARY: This regulation sets minimum grade and size requirements for fresh shipments of California plums during the period June 1 through July 16, 1977. These requirements are needed to provide for orderly marketing in the interest of producers and consumers.

EFFECTIVE DATE: June 1, 1977.

FOR FURTHER INFORMATION CONTACT:

Charles R. Brader, Deputy Director, Fruit and Vegetable Division, Agricultural Marketing Service, U.S. Department of Agriculture, Washington, D.C. 20250, 202-447-3545.

SUPPLEMENTARY INFORMATION: (a) *Findings.*—1. Pursuant to the amended marketing agreement and Order No. 917 (7 CFR Part 917), regulating the handling of fresh pears, plums, and peaches grown in California, effective under the applicable provisions of the Agricultural Marketing Agreement Act of 1937, as amended (7 U.S.C. 601–674), and upon the basis of the recommendations of the Plum Commodity Committee established under the amended marketing agreement and order and upon other information, it is found that this regulation will tend to effectuate the declared policy of the act.

2. This regulation is based upon an appraisal of the current and prospective market conditions for California plums. The committee estimates that 9,132,000 packages of plums will be available for fresh shipment during the 1977 season compared to actual shipment of 7,911,000 packages last season. The 1977 California plum crop is reported to be of good quality at this time with uniform sizing. Industry reports indicate that 1977 shipments of fresh California peaches will be larger than last season and nectarine shipments will be down slightly from last year's record high. These fruits will provide strong market competition for fresh California plums. The grade and size requirements are necessary to prevent the shipment of California plums of a lower grade and smaller size than specified and are designed to provide ample supplies of good quality plums in the interest of producers and consumers pursuant to the declared policy of the act.

3. It is further found that it is impracticable, unnecessary, and contrary to the public interest to give preliminary notice,

engage in public rulemaking procedure, and postpone the effective date of this regulation until 30 days after publication in the FEDERAL REGISTER (5 U.S.C. 553) in that the time intervening between the date when information upon which this regulation is based became available and the time when this regulation must become effective in order to effectuate the declared policy of the act is insufficient. A reasonable time is permitted for preparation for the effective time; and good cause exists for making the regulation effective as specified. The committee held an open meeting on May 5, 1977, after giving due notice, to consider supply and market conditions for plums and the need for regulation. Interested persons were afforded an opportunity to submit information and views at this meeting. The recommendation and supporting information for regulation during the period specified were promptly submitted to the Secretary after the meeting was held, and information concerning the provisions and effective time has been provided to handlers of plums. Shipments of some early maturing varieties of 1977 season California plums are expected to begin about May 19, 1977, with most shipments beginning after June 1, 1977. Any shipments occurring prior to June 1, 1977, are regulated under Plum Regulation 12 (41 FR 21174, 30013) which is effective through May 31, 1977. This regulation should apply to all shipments after June 1, 1977, in order to effectuate the declared policy of the act. The provisions of this regulation are identical with the recommendation of the committee and compliance with the provisions of this regulation will not require of handlers any preparation which cannot be completed by the effective date. It is necessary, to effectuate the declared policy of the act, to make this regulation effective as specified.

§ 917.444   Plum Regulation 13.

*Order.* (a) During the period June 1, 1977, through July 16, 1977, no handler shall ship any lot of packages or containers of any plums, other than the varieties named in paragraph (b) hereof, unless such plums grade at least U.S. No. 1.

(b) During the period June 1, 1977, through July 16, 1977, no handler shall ship:

1. Any lot of packages or containers of Tragedy or Kelsey plums unless such plums grade U.S. No. 1, with a total tolerance of 10 percent for defects not considered serious damage in addition to the tolerances permitted by such grade: or

2. Any lot of packages or containers of Angeleno, Andys Pride, Bee Gee, Casselman, Empress, Fresno Rosa, Grand Rosa, Improved Late Santa Rosa, King David, Late Santa Rosa, Linda Rosa, Red Rosa, Rosa Grande, Roysum, SW-1, and Swall Rosa plums unless such plums grade U.S. No. 1, except that healed cracks emanating from the stem end which do not cause serious damage shall

AR_0033258

not be considered as a grade defect with respect to such grade; or

3. Any lot of packages or other containers of Late Tragedy plums unless such plums grade U.S. No. 1, except that gum spots which do not cause serious damage shall not be considered as a grade defect with respect to such grade.

(c) During the period June 1, 1977, through July 16, 1977, no handler shall ship any package or other container of any variety of plums listed in Column A of the following Table I unless such plums are of a size that an eight-pound sample, representative of the sizes of the plums in the package or container, contains not more than the number of plums listed for the variety in Column B of said table.

TABLE I

| Column A Variety: | Column B Plums-per-sample |
|---|---|
| Ace | 55 |
| Amazon | 64 |
| Andys Pride | 69 |
| Angeleno | 67 |
| Autumn Rosa | 72 |
| Beauty | 91 |
| Bee Gee | 65 |
| Burmosa | 60 |
| Casselman | 63 |
| Duarte | 62 |
| El Dorado | 68 |
| Elephant Heart | 53 |
| Empress | 57 |
| Friar | 56 |
| Frontier | 61 |
| Gar-Rosa | 71 |
| Grand Rosa | 54 |
| July Santa Rosa | 60 |
| Kelsey | 47 |
| Laroda | 58 |
| Late Duarte | 60 |
| Late Santa Rosa (including Improved Late Santa Rosa and Swall Rosa) | 64 |
| Late Tragedy | 93 |
| Linda Rosa | 63 |
| Mariposa | 61 |
| Midsummer | 63 |
| Nubiana | 56 |
| President | 57 |
| Queen Ann | 50 |
| Queen Rosa | 53 |
| Red Beaut | 91 |
| Red Ross | 64 |
| Redroy | 58 |
| Rosa Grande | 63 |
| Roysum | 80 |
| Santa Rosa | 60 |
| Simka, Arrosa, New Yorker | 48 |
| Standard | 83 |
| Tragedy | 114 |
| Wickson | 51 |

(d) When used herein, "U.S. No. 1" and "serious damage" shall have the same meaning as set forth in the United States Standards for Fresh Plums and Prunes (7 CFR 51.1520–1538); and all other terms shall have the same meaning as when used in the amended marketing agreement and order.

(Secs. 1–19, 48 Stat. 31, as amended; (7 U.S.C. 601–674).)

Dated, May 20, 1977, to become effective June 1, 1977.

CHARLES R. BRADER,
Deputy Director, Fruit and Vegetable Division, Agricultural Marketing Service.

[FR Doc.77–14908 Filed 5–24–77;8:45 am]

Title 15—Commerce and Foreign Trade

SUBTITLE A—OFFICE OF THE SECRETARY OF COMMERCE

PART 16—PROCEDURES FOR A VOLUNTARY CONSUMER PRODUCT INFORMATION LABELING PROGRAM

AGENCY: Assistant Secretary of Commerce for Science and Technology, Commerce.

ACTION: Final rule.

SUMMARY: This new part to Title 15 CFR establishes procedures under which a voluntary consumer product information labeling program administered by the Department of Commerce will function. Consumers today are unable in many cases to make rational and accurate marketplace decisions because of lack of comparative, easily comprehensible information at the point of sale on important product performance characteristics. Accordingly, the goal of this program is to make available to consumers, at the point of sale, information on consumer product performance in an understandable and useful form. The program is also intended to educate consumers, distributors, and retailers in the use of the product performance information displayed and provide manufacturers and other participants in the program with an opportunity to convey to the public the particular advantages of their products.

EFFECTIVE DATE: June 24, 1977.

FOR FURTHER INFORMATION CONTACT:

Dr. Howard I. Forman, Deputy Assistant Secretary for Product Standards, Room 3876, U.S. Department of Commerce, Washington, D.C. 20230, 202–377–3221.

SUPPLEMENTARY INFORMATION: On May 25, 1976, the Department announced in the FEDERAL REGISTER (41 FR 21389) proposed procedures under which a voluntary consumer product information labeling program would be carried out provided substantial need and support for such a program could be demonstrated. The notice invited interested persons to participate in the proposed rulemaking by submitting written comments or suggestions to the Department. In addition, the notice advised that three informal hearings would be held on the proposed procedures.

Following the publication of the above mentioned May 25 notice, written statements and oral testimony were received by the Department from 97 respondents. The comments and testimony represented input from private citizens, consumer organizations, retailers, manufacturers, trade associations, testing laboratories, consulting organizations, educators, and government agencies. The written comments and transcripts of the hearings are part of the public record which is available for inspection and copying in the Department's Central Reference and Records Inspection Facility, Room 5316, Main Commerce Building, 14th Street between E Street and

Constitution Avenue, NW., Washington, D.C. 20230.

The comments and testimony on the proposed procedures have been carefully considered and evaluated. A summary and analysis of the public's comments and testimony has been prepared by the Department. This document also is available for inspection and copying at the Department's Central Reference and Records Inspection Facility mentioned above.

With regard to the question of whether substantial need and support for the program were demonstrated in the comments received, sixty-four respondents favored initiation of the program. Those favoring the program included a majority of the private citizens, consumer organizations, educators, government agencies, and manufacturers of products other than mechanical, electrical and electronic products who commented. Twenty-three respondents opposed initiation of the program, and this group included a majority of the trade associations and manufacturers of mechanical, electrical and electronic products who commented. Seven respondents from various groups stated that they would support initiation of a mandatory program; however, such a course would, be beyond the scope of the Department's proposal.

As noted, the comments received indicated that a number of private citizens, consumer organizations, educators, government agencies and manufacturers feel that there is a need for a consumer product information labeling program. Other comments indicated a lack of support by some manufacturers and trade associations comprising a significant segment of the consumer product industry. Upon balancing the respective views, the Department has determined that the public interest will be served best by instituting the program on a limited pilot project basis, and at the end of one year of its operation, the Department will evaluate its results to decide whether the program merits continuance and, if so, whether to enlarge or reduce the size and scope of its operation.

A number of substantive changes in the proposed procedures were made as a result of the public's comments. The most significant changes involve simplification of the "finding of need" process and the addition of provisions under which portions of the program can be administered by designated agents who would make it unnecessary for program participants to report sensitive sales data directly to the Department of Commerce. Other changes in the procedures involve clarification of the language used and the addition of several terms to the section on definitions. These various changes are discussed in greater detail below.

The proposed procedures called for the use of a "finding of need" process that would have required two separate publications of notices in the FEDERAL REGISTER before work could be started on any Performance Information Labeling Specification. Though this procedure was designed to insure ample opportunity for public input into the product selection

AR_0033259

process, it also would have resulted in what some respondents believed to be unnecessary preliminary work and delay. Two respondents suggested that the selection process be simplified and shortened. Accordingly, upon further consideration it was deemed appropriate to eliminate the preliminary finding of need. Under § 16.4(c) the Secretary, upon receiving a request for a finding of need to establish a specification for labeling a consumer product may, if she deems it to be in the public interest, develop whatever additional information she feels is necessary. This could include consultation on a one-time basis with consumers, consumer organizations, and others. Accordingly, it is unnecessary to have a preliminary finding of need. Rather, the Secretary will make only one finding of need which will be a final agency action.

The proposed procedures also called for the establishment of fees and charges for participation in the program. According to most respondents who commented on this topic, the most equitable basis for establishing such fees would be to relate the total fee paid by any one participant to the number of units of the product on which labels were placed. The administration of such a fee schedule, however, would require participants to report to the Department the number of units produced and labeled. Such information is considered by many producers to be confidential. Hence, in order to avoid the necessity for the disclosure of such confidential data or other valuable proprietary trade information to the Secretary and thus permit the association of such data and information with a particular participant, and in accordance with other suggestions made that the program be at least partly administered by industry, provisions were added to the final procedures under which individuals or organizations could, when authorized by the Secretary of Commerce, serve as designated agents who would collect fees and statistical information from consenting participants, consolidate such fees and information from a number of participants, and transmit to the Secretary the consolidated fees and information (§ 16.9). In addition, the proposed procedures were revised to recognize the validity of cost to participants as an item to be considered in the program (§ 16.4(b)(8)).

Finally, the proposed procedures were revised to clarify and improve the language in some areas. For example, the term "participant" is now used to indicate any manufacturer, assembler, private brand labeler, or importer of consumer products who participates in the program, in place of the term "manufacturer" that was used previously. The definition of the term "consumer product" was revised specifically to exclude products customarily intended primarily for business, commercial, or industrial use. Definitions for the terms "Specification" and "designated agent" were added to the final procedures, and several other minor changes were made.

The procedures appended to this notice have been carefully reviewed pursuant to the provisions of Executive Order No. 11821 dated November 27, 1976 (39 FR 41501 dated November 29, 1974). Office of Management and Budget Circular No. A-107 dated January 28, 1975, and Department of Commerce Administrative Order 218-6 dated September 12, 1975, and it has been determined that the promulgation of these procedures will have no major inflationary impact. Each project to develop a Performance Information Labeling Specification initiated under these procedures to effect the labeling of a specific class of consumer product will be carefully examined and evaluated to ascertain whether such project would have a major inflationary impact under the criteria described in the above referenced Executive Order, Office of Management and Budget Circular, and Department of Commerce Administrative Order.

Issued: May 19, 1977.

JORDAN J. BARUCH,
*Assistant Secretary for*
*Science and Technology.*

Part 16 is added to Title 15 CFR to read as follows:

Sec.
16.1    Purpose.
16.2    Description and goal of program.
16.3    Definitions.
16.4    Finding of need to establish a specification for labeling a consumer product.
16.5    Development of performance information labeling specifications.
16.6    Establishment of fees and charges.
16.7    Participation in program.
16.8    Termination of participation.
16.9    Rules governing designated agents.
16.10   The Department of Commerce mark.
16.11   Amendment or revision of a performance information labeling specification.
16.12   Consumer education.
16.13   Coordination with State and local programs.
16.14.  Annual report.

AUTHORITY: Sec. 2, 31 Stat. 1449, as amended; sec. 1, 64 Stat. 371; (15 U.S.C. 272); Reorganization Plan No. 3 of 1946, Part VI.

§ 16.1  Purpose.

The purpose of this part is to establish procedures under which a voluntary consumer product information labeling program administered by the Department of Commerce will function.

§ 16.2  Description and goal of program.

(a) The Department's Voluntary Consumer Product Information Labeling Program makes available to consumers, at the point of sale, information on consumer product performance in an understandable and useful form so as to facilitate accurate consumer purchasing decisions and enhance consumer satisfaction. It also educates consumers, distributors and retailers in the use of the product performance information displayed and provides manufacturers and other persons who participate in the program with an opportunity to convey to the public the particular advantages of

their products. These objectives are accomplished by;

1. Selecting or developing standardized test methods by which selected product performance characteristics can be measured;

2. Developing labeling methods by which information concerning product performance can be transmitted in useful form to consumers at the point of sale;

3. Encouraging manufacturers and other participants in the program voluntarily to test and label their products according to the selected or developed methods; and

4. Encouraging consumers through various informational and educational programs to utilize the product performance information provided.

(b) The program involves voluntary labeling by enrolled participants of selected categories of consumer products with information concerning selected performance characteristics of those products. The performance characteristics selected are those that are of demonstrable importance to consumers, that consumers cannot evaluate through mere inspection of the product, and that can be measured objectively and reported understandably to consumers. The consumer products covered include those for which incorrect purchase decision can result in financial loss, dissatisfaction, or inconvenience. The program seeks to avoid the duplication of other Federal programs under which performance characteristics are labeled by exempting those performance characteristics from this program.

(c) For selected categories of consumer products, the program includes advertising guidelines covering situations where quantitative performance values are stated in advertising or where qualitative comparisions are made of the performance of different products.

§ 16.3  Definitions.

(a) The term "Secretary" means the Secretary of Commerce or her designee.

(b) The term "consumer" means the first person who purchases a consumer product for purposes other than resale.

(c) The term "participant" means a manufacturer, assembler or private brand labeler of consumer products or an importer of such products for resale and who participates in the program.

(d) The term "consumer product" means any article produced or distributed for sale to a consumer for the use, consumption, or enjoyment of such consumer. The term does not include products customarily intended primarily for business, commercial, or industrial use.

(e) The term "person" means an individual; a manufacturer; distributor; retailer; importer; private brand labeler; government agency at the Federal (including any agency of the Department of Commerce), State and local level; consumer organization; trade association; standards writing body; professional society; testing laboratory; or educational institution.

AR_0033260

(f) The term "performance characteristic" means a performance characteristic of a consumer product that can be measured in an objective manner with respect to a given consumer product.

(g) The term "Specification" means a Performance Information Labeling Specification developed under § 16.5.

(h) The term "label" means printed matter affixed to or otherwise provided with a consumer product and containing all of the performance characteristics as prescribed by the Specification applicable to that product.

(i) The term "designated agent" means a person as defined in paragraph (e) of this section, who has been designated by the Secretary to carry out appropriate operational procedures on behalf of more than one participant in this program in accordance with rules set out under § 16.9.

§ 16.4 Finding of need to establish a specification for labeling a consumer product.

(a) Any person may request the Secretary to find that there is a need to label a particular consumer product with information concerning one or more specific performance characteristics of that product.

(b) Such a request shall be in writing and will, to the extent practicable, include the following information:

1. Identification of the consumer product;

2. Extent that the product identified in subparagraph (1) of this paragraph is used by the public and, if known, what the production or sales volume is of such product;

3. Nature and extent of difficulty experienced by consumers in making informed purchase decisions because of a lack of knowledge regarding the performance characteristics of the identified consumer product;

4. Potential or actual loss to consumers as a result of an incorrect decision based on an inadequate understanding of the performance characteristics of the identified consumer product;

5. Extent or incidence of consumer complaints arising from or reasonably traceable to lack of knowledge regarding the performance characteristics of the identified consumer product;

6. If known, whether there currently exist test methods which could be used to test the performance characteristics of the identified consumer product and an identification of those test methods;

(7) Reasons why it is felt, in cases where existing test methods are identified in responding to subparagraph (6) of this paragraph, that such test methods are suitable for making objective measurements of the performance characteristics of the identified consumer product; and

(8) Estimated cost to participants to test and label the product.

(c) The Secretary may ask for more information to support a request made under paragraph (a) of this section if she feels it is necessary to do so, or, if she deems it to be in the public interest.

may develop such information herself as by consultation on a one-time basis with consumers, consumer organizations, and others. The Secretary shall act expeditiously on all requests and shall notify the requester of her decision in writing. If the Secretary determines that there is no need to establish a Specification for labeling the requested consumer product performance characteristics, or because of a lack of resources, she will decline to act further on the request. In those instances where the Secretary declines a request, she shall state the reasons for so declining.

(d) If the Secretary finds that a need exists to establish a Specification for labeling a consumer product under this program, she shall publish a notice in the FEDERAL REGISTER setting out such finding and its basis and stating that she is developing a proposed Specification in accordance with § 16.5.

§ 16.5 Development of performance information labeling Specifications.

(a) If the Secretary makes a finding of need pursuant to § 16.4, she will publish a proposed Performance Information Labeling Specification in the FEDERAL REGISTER with a notice giving the complete text of the proposed Specification and any other pertinent information. The notice will invite any interested person to submit written comments on the proposed Specification within 45 days after its publication in the FEDERAL REGISTER, unless another time limit is provided by the Secretary. Interested persons wanting to express their views in an informal hearing may do so, if within 15 days after the proposed Specification is published in the FEDERAL REGISTER, they request the Secretary to hold a hearing. Such informal hearings shall be held so as to give all interested persons an opportunity for the oral presentation of data, views, or arguments in addition to the opportunity to make written submissions. Notice of such hearings shall be published in the FEDERAL REGISTER. A transcript shall be kept of any oral presentations.

(b) Each Specification shall as a minimum include:

(1) A description of the performance characteristics of the consumer product covered;

(2) An identification by reference of the test methods to be used in measuring the performance characteristics. The test methods, where they exist and are deemed appropriate for inclusion in the particular Specification involved, shall be those which are described in nationally-recognized voluntary standards. Where appropriate test methods do not exist, they will be developed by the Department of Commerce in cooperation with interested parties and set out in full in the Specification;

(3) A prototype label and directions for displaying the label on or with the consumer product concerned. Such directions will not prohibit the display of additional information by the participant on space adjacent to the marked boundaries of the label; and

(4) Conditions of participation.

(c) The Secretary, after consideration of all written and oral comments and other materials received, in accordance with paragraph (a) of this section, shall publish in the FEDERAL REGISTER within 30 days after the final date for receipt of comments, or as soon as practicable thereafter, a notice either:

(1) Giving the complete text of a final Specification, including conditions of use, and stating that any prospective participant in the program desiring voluntarily to use the Department of Commerce Mark developed under § 16.10 must advise the Department of Commerce; or

(2) Stating that the proposed Specification will be further developed before final publication; or

(3) Withdrawing the proposed Specification from further consideration.

§ 16.6 Establishment of fees and charges.

(a) The Secretary in conjunction with the use of the Working Capital Fund of the National Bureau of Standards, as authorized under section 12 of the Act of March 3, 1901, as amended (15 U.S.C. 278b), for this program, shall establish fees and charges for use of the Department of Commerce Label and Mark on each product. Such fees and charges shall be related to the number of units of products labeled, where appropriate. The fees and charges established by the Secretary, which may be revised by her when she deems it appropriate to do so, shall be in amounts calculated to make the operation of this program as self-sufficient as reasonable. A separate notice will be published in the FEDERAL REGISTER simultaneously with the notice of each proposed Specification referred to in § 16.5(a). Such notice will set out a schedule of estimated fees and charges the Secretary proposes to establish. The notice would be furnished for informational and guidance purposes only in order that the public may evaluate the proposed Specification in light of the expected fees to be charged.

(b) At such time as the Secretary publishes the notice announcing the final Specification referred to in § 16.5(c)(1), she shall simultaneously publish a separate notice in the FEDERAL REGISTER setting forth the final schedule of fees that will be charged participants in the program. The effective date of such final schedule of fees shall be the same as the date on which the final Specification takes effect.

(c) Revisions, if any, to the fees and charges established by the Secretary under paragraph (b) of this section shall be published in subsequent FEDERAL REGISTER notices and shall take effect not less than thirty (30) days after the date of publication of such notice.

§ 16.7 Participation in Program.

(a) Any manufacturer, assembler, or private brand labeler of consumer products, or importer of such products for resale, desiring to participate in this program will so notify the Secretary. The notification will identify the particular

AR_0033261

Specification to be used and the prospective participant's identification and model numbers for the products to be labeled. The notification must include a statement that if accepted as a participant in the program by the Secretary, the prospective participant will:

(1) Abide by all conditions imposed by these procedures;

(2) Abide by the conditions contained in the Specification, as prescribed in paragraph (d) of this section;

(3) Pay the fees and charges established by the Secretary; and

(4) Desist from using the Department of Commerce Label and Mark if his participation is terminated under § 16.8.

(b) The Secretary shall act expeditiously on all requests to participate in the program and shall notify each prospective participant of her decision in writing. In those instances where the Secretary declines a request, she shall state the reasons for so declining.

(c) If a prospective participant seeking to participate in the program is notified by the Secretary that she proposes to deny that prospective participant the right to participate, that prospective participant shall have thirty (30) days from the receipt of such notification to request a hearing under the provisions of 5 U.S.C. 556. The Secretary's proposed denial shall become final through the issuance of a written decision to such prospective participant in the event that he does not appeal such notification by the end of the thirty (30) day period. If however, such prospective participant requests a hearing within that thirty (30) day period, the Secretary's proposed denial shall be stayed pending the outcome of the hearing held pursuant to 5 U.S.C. 556.

(d) The conditions set out in each Specification will include, but not be limited to, the following:

(1) Prior to the use of a Label, the participant will make or have made the measurements to obtain the information required for inclusion on the Label and, if requested, will forward within 30 days such measurement data to the Secretary. Such measurement data will be kept on file by the participant or his agent for two years after that product is no longer manufactured unless otherwise provided in the Specification.

(2) The participant will describe the test results on the Label as prescribed in the Specification.

(3) The participant will display or arrange to display, in accordance with the appropriate Specification, the Label on or with each individual product of the type covered except for units exported from the U.S. Participants who utilize more than one brand name may participate by labeling some or all of the brand names. All models with the same brand name must be included in the program unless they are for export only.

(4) The participant agrees at his expense to comply with any reasonable request of the Secretary to have consumer products manufactured, assembled, imported, or privately brand labeled by him tested to determine that testing has been

done according to the relevant Specification.

(5) Participants may reproduce the Department of Commerce Label and Mark in advertising: *Provided*, That the entire Label, complete with all information required to be displayed at the point of retail sale, is shown legibly and is not combined or associated directly with any other mark or logo.

§ 16.8  Termination of participation.

(a) The Secretary upon finding that a participant is not complying with the conditions set out in these procedures or in a Specification may terminate upon 30 days notice the participant's right to continue his participation in the program: *Provided*, That the participant shall first be given an opportunity to show cause why the participation should not be terminated.

(b) Upon receipt of a notice from the Secretary of the proposed termination, which notice shall set forth the reasons for such proposed termination, the participant shall have thirty (30) days from the date of receipt of such notification to request a hearing under the provisions of 5 U.S.C. 556. The Secretary's proposed termination shall become final through the issuance of a written decision to the participant in the event such participant does not appeal the proposed termination within the thirty (30) day period. If, however, the participant requests a hearing within the thirty (30) day period, the Secretary's proposed termination shall be stayed pending the outcome of the hearing held pursuant to 5 U.S.C. 556.

(c) A participant may at any time terminate his participation and responsibilities under this program with regard to a specific type of product by giving written notice to the Secretary that he has discontinued use of the Department of Commerce Label and Mark for all consumer products of the type involved.

§ 16.9  Rules  Governing  Designated Agents.

(a) The following rules, requirements and tasks shall be applicable with respect to the seeking of designated agent status and the performance of that role after such status has been obtained. Each person desiring to be designated as a designated agent under this program shall:

(1) Make written application to the Secretary;

(2) Provide appropriate information showing his qualifications to represent members within a given product area and that more than one prospective participant in that product area is agreeable to such representation; and

(3) Agree to service any participant in this program in the agent's cognizant product area whether or not such participant is a member of the organization or body which that agent represents.

(b) The Secretary may require a person seeking designated agent status to supply further information before granting such status to that person. The Secretary will notify each person seeking designated agent status, in writing, as

expeditiously as possible after evaluating such person's application.

(c) Each person granted designated agent status shall:

(1) Provide the Secretary with a list of the participants that the designated agent services under the program. The Secretary shall also be provided an updated list as soon thereafter as may be practicable whenever there are any changes in the list;

(2) Collect fees and charges from the participants serviced under this program, consolidate such sums, and transmit those fees and charges required under § 16.6 to the Secretary;

(3) Distribute Department of Commerce Marks developed under § 16.10 or instructions for the printing of such Marks to the participants that the designated agent services under this program;

(4) Gather and consolidate such statistical information as may be required by the Secretary from individual participants serviced;

(5) Provide the Secretary with reports, including the consolidated statistical information referred to in subparagraph (4) of this paragraph, as may be called for by her, relative to the activities of the participants the designated agent is servicing; and

(6) Perform any additional tasks mutually agreed upon by the designated agent and the Secretary.

(d) If, a person seeking designated agent status is notified by the Secretary that she proposes to deny that person such status, that person shall have thirty (30) days from the date of receipt of such notification to request a hearing under the provisions of 5 U.S.C. 556. The Secretary's proposed denial shall become final through the issuance of a written decision to such person in the event that he does not appeal such notification by the end of that thirty (30) day period. If, however, such person requests a hearing within that thirty (30) day period, the Secretary proposed denial shall be stayed pending the outcome of the hearing held pursuant to 5 U.S.C. 556.

(e) If the Secretary finds that a designated agent has violated the terms of paragraph (c) of this section, she may, after consultation with such designated agent, notify such person that she proposes to revoke his status as a designated agent.

(f) Upon receipt of a notice from the Secretary of the proposed revocation, which notice shall set forth the reasons for such proposed revocation, the designated agent shall have thirty (30) days from the date of receipt of such notification to request a hearing under the provisions of U.S.C. 556. The Secretary's proposed revocation shall become final through the issuance of a written decision to the designated agent in the event such designated agent does not appeal the proposed revocation within that thirty (30) day period. If, however, the designated agent requests a hearing within that thirty (30) day period, the Secretary's proposed revocation shall be stayed pending the outcome of the hearing held pursuant to 5 U.S.C. 556.

AR_0033262

## § 16.10  The Department of Commerce Mark.

The Department of Commerce shall develop a Mark which shall be registered in the U.S. Patent and Trademark Office under 15 U.S.C. 1054 for use on each Label described in a Specification.

## § 16.11  Amendment or Revision of a Performance Information Labeling Specification.

The Secretary may by order amend or revise any Specification published under § 16.5. The procedure applicable to the establishment of a Specification under § 16.5 shall be followed in amending or revising such Specification. Such amendment or revision shall not apply to consumer products manufactured prior to the effective date of the amendment or revision.

## § 16.12  Consumer Education.

The Secretary, in close cooperation and coordination with interested Government agencies, appropriate trade associations and industry members, consumer organizations, an other interested persons shall carry out a program to educate consumers relative to the significance of the labeling program. Some elements of this program shall also be directed toward informing retailers and other interested groups about the program.

## § 16.13  Coordination with State and Local Programs.

The Secretary will establish and maintain an active program of communication with appropriate State and local government offices and agencies and will furnish and make available information and assistance that will promote uniformity in State and local programs for the labeling of performance characteristics of consumer products.

## § 16.14  Annual Report.

The Secretary will prepare an annual report of activities under the program, including an evaluation of the program and a list of participants, designated agents, and types of consumer products covered.

[FR Doc.77-14851 Filed 5–20–77;3:00 pm]

---

### Title 23—Highways

**CHAPTER I—FEDERAL HIGHWAY ADMINISTRATION, DEPARTMENT OF TRANSPORTATION**

SUBCHAPTER H—RIGHT-OF-WAY AND ENVIRONMENT

PART 712—THE ACQUISITION FUNCTION

PART 790—PUBLIC HEARINGS AND LOCATION/DESIGN APPROVAL

**Right-of-Way Parcels**

AGENCY: Federal Highway Administration, Department of Transportation.

ACTION: Amendments to final rules.

SUMMARY: These amendments revise current procedures for the advance acquisition of right-of-way parcels to conform with a recent order of the United States District Court for the District of Columbia. These revisions are intended to make it clear that Federal funds may be expended to finance advance acquisition of right-of-way parcels only in extraordinary cases or emergency situations and only after (a) the State highway department has given official notice to the public that it has selected a particular location to be the preferred or recommended alignment for a proposed highway, or (b) a public hearing has been held or an opportunity for a public hearing has been afforded.

EFFECTIVE DATE: May 18, 1977.

FOR FURTHER INFORMATION CONTACT:

Mr. William B. Bynum, Real Property Acquisition Division, Office of Right-of-Way (202–426–0142), or Mr. Stanley H. Abramson, Office of Chief Counsel (202–426–0791), Federal Highway Administration, 400 7th Street, SW., Washington, D.C. 20590. Hours are from 7:45 a.m. to 4:15 p.m. EST, Monday through Friday.

SUPPLEMENTARY INFORMATION: Under current Federal Highway Administration (FHWA) procedures, acquisition of right-of-way for a Federal-aid highway project normally occurs after (1) a final environmental impact statement has been processed or a negative declaration adopted pursuant to 23 CFR Part 771, (2) the FHWA has approved a route location under 23 CFR 790.9(e) (1), or accepted the general location of a highway section under 23 CFR 771.5, and (3) the public hearing requirements of 23 U.S.C. 128 have been satisfied. In certain cases the normal project development process is delayed by funding problems, changing legal requirements, lawsuits or similar problems. Public awareness that a particular route is under serious consideration develops as a result of public meetings and hearings, announcements made by the State highway department, prior approval actions taken by FHWA, publicity surrounding court cases and controversial projects, or various combinations of these factors.

Project delays, which run anywhere from a period of several months to ten years or more, coupled with public awareness of the project proposal often result in property owners being unable to sell their properties on the open market due to uncertainty over the proposed highway project, and a corresponding reluctance to improve or maintain these properties. In certain cases the inability to sell and lack of maintenance may present truly unique situatons involving extreme financial hardship and/or endangering the health and welfare of the property owner or a member of the owner's household.

In other cases project delays may prompt some property owners to invest substantial sums of money to develop their properties (e.g. construction of a housing subdivision or shopping center). If a decision is finally made to construct a transportation facility, the new development may unduly restrict the choice of alternative transportation modes or corridors, preclude selection of safe design configurations or result in undue community disruption.

For the foregoing reasons, the acquisition of particular parcels within the limits of a proposed Federal-aid highway corridor prior to normal right-of-way acquisition activities has been permitted in individual cases of demonstrated need under § 790.9(f) and the criteria in § 712.204(d) of Title 23, Code of Federal Regulations (23 CFR). In addition to normal Federal-aid project funds, the Federal share of the cost of advance acquisitions may also be drawn from a special fund established by Congress in 1956 for the specific purpose of advance acquisition of highway right-of-way (23 U.S.C. 108).

Certain aspects of the FHWA's advance acquisition procedure were criticized in an opinion by the United States Court of Appeals for the District of Columbia Circuit in "National Wildlife Federation v. Tiemann," Civil Action No. 75-1214 (D.C. Cir. October 28, 1976). Following the Circuit Court opinion the FHWA instituted an interim procedure for processing advance acquisition applications (42 FR 5774, January 31, 1977).

The case was remanded to the United States District Court for the District of Columbia for entry of a decree in accordance with the October 28 opinion. That decree, issued by the District Court on February 18, 1977 (Civil Action No. 1270–73, filed February 22, 1977), enjoins the Federal Highway Administration from ordinarily expending Federal funds to finance advance acquisition of right-of-way prior to (1) the holding of a final valid location hearing, (2) final consideration of the economic, social, environmental and other effects of the location and its alternatives as required by 23 U.S.C. 128(a), and (3) firm commitment to location pursuant to that statute and 23 CFR 790.9(e)(1). The decree also renders null and void the current provisions of 23 CFR 790.9(f) which were construed to ordinarily permit authorization of the acquisition of right-of-way prior to a location hearing.

The procedures formerly required under 23 CFR 790.9(f) have been revised in light of the judicial rulings and updated to conform with current program terminology. In order to give maximum effect to the court decisions, § 790.9(f) is being deleted and the new provisions added to the advance acquisition section of 23 CFR Part 712. The new provisions clarify the circumstances under which particular acquisitions proposed by a State prior to normal right-of-way acquisition activities will be considered eligible for Federal-aid funding.

A State's request for Federal participation will be approved only in extraordinary cases or emergency situations and then only upon submission of proper documentation demonstrating that the acquisition is in the public interest and is necessary to alleviate particular hardship to a property owner, on his request, in contrast to others because of an inability to sell his property or to prevent imminent development and increased costs of a parcel which would

AR_0033263

tend to limit the choice of highway alternatives. The documentation requirements are part of the previous regulation. The "extraordinary" and "emergency" standards are new and are intended to emphasize that only truly unique situations will be considered for Federal-aid funding.

Another new provision permits Federal approval only after a public hearing has been held or the opportunity for such a hearing has been given in conformance with 23 U.S.C. 128, or after the State highway department has given official notice to the public that it has selected a particular location to be the preferred or recommended alignment for the proposed highway. Federal participation in the acquisition of right-of-way prior to one of these two occurrences will not be possible under any circumstances. Existing safeguards regarding parklands, historic sites and environmental assessments will remain in effect (23 CFR 712.204(d) (2), (3)).

States remain free to finance advance acquisitions out of their own funds and seek Federal funds for subsequent project costs. Current guidelines for preserving eligibility for Federal-aid highway funds under such circumstances will remain in effect (23 CFR 712.204(d) (5)).

NOTE.—The FHWA has determined that this document does not contain a major proposal requiring preparation of an Economic Impact Statement under Executive Orders 11821 and 11949 and OMB Circular A-107.

1. Accordingly, 23 CFR Part 712, Subpart B, is amended by revising § 712.204 (d) (1) to read as follows:

§ 712.204   Project procedures.

*        *        *        *        *

(d) * * *

(1) In extraordinary cases or emergency situations the State highway department may request and the Federal Highway Administrator may approve Federal participation in the acquisition of a particular parcel or a limited number of particular parcels within the limits of a proposed highway corridor prior to completion of processing of the final environmental impact statement or adoption of the negative declaration, but only after (i) the State highway department has given official notice to the public that it has selected a particular location to be the preferred or recommended alignment for a proposed highway, or (ii) a public hearing has been held or an opportunity for such a hearing has been afforded. Proper documentation shall be submitted to show that the acquisition is in the public interest and is necessary to:

(A) Alleviate particular hardship to a property owner, on his request, in contrast to others because of an inability to sell his property;

(B) Prevent imminent development and increased costs of a parcel which would tend to limit the choice of highway alternatives.

*        *        *        *        *

§ 790.9   [Amended]

2. 23 CFR 790.9(f) is deleted.

Issued on: May 18, 1977.

WILLIAM M. COX,
*Federal Highway Administrator.*

[FR Doc.77-14869 Filed 5-24-77;8:45 am]

Title 25—Indians

CHAPTER I—BUREAU OF INDIAN AFFAIRS, DEPARTMENT OF THE INTERIOR

SUBCHAPTER F—ENROLLMENT

PART 43n—PREPARATION OF A ROLL OF PERSONS OF GRAND RIVER OTTAWA INDIAN BLOOD TO BE USED AS THE BASIS TO DISTRIBUTE JUDGMENT FUNDS

MAY 18, 1977.

AGENCY: Bureau of Indian Affairs, Interior.

ACTION: Final rule.

SUMMARY: The purpose of this new Part 43n is to establish procedures to govern preparation of a roll, as provided in the Act of October 18, 1976, of persons of Grand River Ottawa Indian blood to be used as the basis to distribute the judgment funds.

EFFECTIVE DATES: These regulations shall become effective on: June 24, 1977.

FOR FURTHER INFORMATION CONTACT:

Miss Janet Parks, Division of Tribal Government Services, telephone: 202-343-2985.

SUPPLEMENTARY INFORMATION: Beginning on page 13123 of the March 9, 1977, FEDERAL REGISTER (42 FR 13123), there was published a notice of proposed rulemaking. All interested persons were given until April 8 to submit their written comments, suggestions or objections regarding the proposed rule.

After consideration of all such relevant matter presented by interested persons, the revision as so proposed is hereby adopted with the following changes:

1. In line six of § 43n.3(f) add "s" to "paragraph", and after (b) in line seven add "and (g)".

2. After § 43n.3(f), new paragraph (g) is added as set forth below.

The authority for the Commissioner to issue these regulations is contained in 5 U.S.C. 301, and sections 463 and 465 of the revised statutes (25 U.S.C. 2 and 9), and 230 DM 1 and 2.

Subchapter F of Chapter I of Title 25 of the Code of Federal Regulations is hereby amended by adding a new Part 43n to read as follows:

| Sec. | |
|---|---|
| 43n.1 | Definitions. |
| 43n.2 | Purpose. |
| 43n.3 | Qualifications for enrollment. |

| Sec. | |
|---|---|
| 43n.4 | Filing of applications and deadline for filing. |
| 43n.5 | Burden of proof. |
| 43n.6 | Action by the Superintendent. |
| 43n.7 | Appeals. |

| Sec. | |
|---|---|
| 43n.8 | Preparation of the roll. |
| 43n.9 | Certification and approval of the roll. |
| 43n.10 | Special instructions. |

AUTHORITY: 90 Stat. 2503.

§ 43n.1   Definitions.

(a) "Act" means the Act of October 18, 1976 (90 Stat. 2503), which directs the Secretary of the Interior to prepare the roll of the Grand River Band of Ottawa Indians.

(b) "Secretary" means the Secretary of the Interior or his authorized representative.

(c) "Commissioner" means the Commissioner of Indian Affairs or his authorized representative.

(d) "Area Director" means the Area Director, Minneapolis Area Office or his authorized representative.

(e) "Superintendent" means the Superintendent of the Michigan Agency.

§ 43n.2   Purpose.

The regulations in this part govern the preparation of a roll of persons who possess Grand River Ottawa Indian blood to be used to distribute the judgment funds awarded the Grand River Band of Ottawa Indians in Indian Claims Commission docket 40-K.

§ 43n.3   Qualifications for enrollment.

The roll shall contain the names of persons who meet the following requirements:

(a) They were born on or prior to and living on October 18, 1976;

(b) Their name or the name of a lineal ancestor through whom they claim eligibility appears as a Grand River Ottawa on the roll of the Ottawa and Chippewa Tribe of Michigan, Durant Roll of 1908, containing the Commissioner's recommendation that it be approved except for those persons listed opposite numbers 747, 1331, 2437, 3957, 4462, 4684, 6151, 6273, 6275, 6496, 6525, 7028, 7035 and 7168, and those persons whose names are checked in red pencil, indicating descendants of half-breeds or mixed bloods, and in blue pencil, indicating persons who affiliated with, received rights or were enrolled members of other tribes, approved by the Secretary on February 18, 1910, with the Commissioner's recommendation, or on any available census rolls or other records acceptable to the Secretary;

(c) They possess one-fourth degree or more Grand River Ottawa Indian blood;

(d) They are citizens of the United States; and,

(e) They file or have filed in their behalf applications for enrollment within the time specified in § 43n.4.

(f) In the absence of proof to the contrary, for the purposes of determining degree of Grand River Ottawa blood, all persons named as Grand River Ottawas on the Durant Roll of 1908 with the exceptions specified in paragraphs (b) and (g) of this section shall be considered as possessing 4/4 degree Grand River Ottawa Indian blood.

AR_0033264

RULES AND REGULATIONS 26653

(g) Children named on the Durant Roll with an indication that one parent is non-Indian will be considered to possess ½ degree Grand River Ottawa Indian blood and children named on the roll with an Indian parent whose spouse is shown as non-Indian will be considered to possess ½ degree Grand River Ottawa Indian blood, provided, it can be established the non-Indian spouse is the other parent of the child.

§ 43n.4  Filing of applications and deadline for filing.

(a) Application forms may be obtained from the Superintendent, Michigan Agency, Bureau of Indian Affairs, Sault Ste. Marie, Michigan 47983. Completed applications must be received by the Superintendent by close of business on September 2, 1977.

(b) Applications received after that date will be denied for failure to file in time regardless of whether the applicants otherwise meet the requirements for enrollment.

§ 43n.5  Burden of proof.

The burden of proof rests upon the applicant to establish his eligibility for enrollment. Documentary evidence such as birth certificates, baptismal records, copies of probate findings or affidavits may be used to support claims for enrollment. Records of the Bureau of Indian Affairs may also be used to establish eligibility.

§ 43n.6  Action by the Superintendent.

The Superintendent must notify rejected applicants by certified mail, addressee only, return receipt requested, explaining the reason for the adverse action and advising them of their right to appeal to the Secretary.

§ 43n.7  Appeals.

Appeals from rejected applicants must be in writing and filed pursuant to Part 42 of this subchapter, a copy of which will be furnished with each notice of rejection.

§ 43n.8  Preparation of the roll.

The roll shall contain for each person a roll number, name, address, sex, date of birth, and, when applicable, the roll number and name and relationship of applicant to ancestor through whom eligibility is established.

§ 43n.9  Certification and approval of the roll.

The Superintendent shall attach a statement to the roll certifying that to the best of his knowledge and belief the roll contains only the names of those persons who meet the requirements for enrollment. The roll shall be submitted to the Area Director for approval.

§ 43n.10  Special instructions.

To facilitate the work of the Superintendent the Commissioner may issue special instructions not inconsistent with the regualtions in this part.

RAYMOND V. BUTLER,
*Acting Deputy Commissioner of
Indian Affairs.*

[FR Doc.77–14800 Filed 5–24–77;8:45 am]

**Title 31—Money and Finance: Treasury**

**CHAPTER V—OFFICE OF FOREIGN ASSETS CONTROL, DEPARTMENT OF THE TREASURY**

**PART 530—RHODESIAN SANCTIONS REGULATIONS**

**Steel Mill Products in Transit**

AGENCY: Office of Foreign Assets Control, Treasury.

ACTION: Final rules.

SUMMARY: The amendment permits importation after May 18, 1977 of ferrochromium and specialty steel products for which an ocean bill of lading had been issued before March 18, 1977. The amendment is needed because the current authorization would have expired at the close of business on May 18, 1977.

EFFECTIVE DATE: May 19, 1977.

FOR FURTHER INFORMATION CONTACT:

George F. Hazard, Chief of Licensing, Office of Foreign Assets Control, Department of the Treasury, Washington, D.C. 20220, 202–376–0428.

SUPPLEMENTARY INFORMATION: Section 530.520(a) of the Regulations authorizes the importation of ferrochromium and steel mill products provided that the pertinent ocean bill of lading was issued before March 18, 1977. Under paragraph (c) of § 530.520, this authorization would have expired at the close of business on May 18, 1977. The current amendment deletes paragraph (c) and thus permits the unrestricted importation of ferrochromium and specialty steel products after May 18, 1977 if the ocean bill of lading was issued before March 18, 1977. The effect of the amendment is to permit products which were in bonded warehouse on March 18 to be withdrawn from warehouse and entered after June 14, 1977, when a new quota period for specialty steel products opens.

The primary author of this amendment is Stanley Sommerfield.

Since this amendment relaxes existing restrictions and involves a foreign affairs function, the provisions of the Administrative Procedures Act (5 U.S.C. 553) requiring notice of proposed rulemaking, the opportunity for public participation, and a delay in effective date are inapplicable.

§ 530.520  [Amended]

31 CFR, Part 530, is amended by the deletion of paragraph(c) of §530.520.

(22 U.S.C. 287(c); Pub. L. 95–12, March 18, 1977, 91 Stat. 22; Executive Order 11322; Executive Order 11419; Executive Order 11978.)

STANLEY L. SOMMERFIELD,
*Acting Director.*

Approved: May 18, 1977.
BETTE M. ANDERSON,
*Under Secretary.*

[FR Doc.77–14899 Filed 5–24–77;8:45 am]

**Title 43—Public Lands: Interior**

**CHAPTER II—BUREAU OF LAND MANAGEMENT, DEPARTMENT OF THE INTERIOR**

**SUBCHAPTER D—RANGE MANAGEMENT (4000)**

[Circular No. 2422]

**PART 4700—WILD FREE-ROAMING HORSE AND BURRO PROTECTION, MANAGEMENT, AND CONTROL**

**Use of Helicopters in Management of Wild Free-Roaming Horses and Burros**

AGENCY: Land Management Bureau, Interior.

ACTION: Final rulemaking.

SUMMARY: This rule prescribes conditions under which helicopters may be used in the gathering and capturing of wild free-roaming horses and burros. This rule implements part of the Federal Land Policy and Management Act of 1976 (16 U.S.C. 1338a) and is intended to provide the most humane method of removing excess horses and burros.

EFFECTIVE DATE: May 25, 1977.

FOR FURTHER INFORMATION CONTACT:

Robert J. Springer, 202–343–4328.

SUPPLEMENTARY INFORMATION: On January 25, 1977, the Land Management Bureau: Interior published proposed rulemaking (43 FR 4500) regarding the use of helicopters in the management of wild free-roaming horses and burros. Public comments were invited through April 22, 1977 and public meetings were held in 10 western States to discuss the proposal with interested persons. Written comments were received from 30 sources and verbal comments were recorded from 82 persons. Comments from all sources are summarized as follows:

Forty-two persons and interest groups expressed general concurrence with the rulemaking and nine persons and interest groups expressed general opposition to the rulemaking. Comments of persons and groups who made specific suggestions are grouped as comments leading to changes in the rulemaking, comments not leading to changes in the rulemaking, and suggested changes not possible under the existing authorities.

COMMENTS LEADING TO CHANGES IN THE RULEMAKING

1. It was suggested that the definition of "malicious harassment" be clarified to include deliberate disregard for the welfare of the animals.

2. It was suggested that the definition of "humane procedure" be changed by eliminating the clause beginning with the words, "in all actions involving roundups," to eliminate redundant and limiting words.

3. Thirty persons and groups suggested that the use of helicopters to gather claimed animals should be permitted. The rulemaking is amended to provide that the authorized officer may use helicopters in areas where all animals are claimed, if forage, habitat, or watershed resources are being adversely affected by horses and burros and the use of helicopters is the only feasible method

AR_0033265

available to capture and remove the animals. Captured animals determined to be privately owned may be secured by the appropriate claimant upon payment of trespass charges under 43 CFR 4720.3 and a per head share of the helicopter rental and associated costs of the roundup and capture of the animals.

4. Three comments on § 4730.7-1 regarding the use of fixed-wing aircraft suggested (a) use no fixed-wing aircraft, (b) use no fixed-wing aircraft below 1,000 feet in altitude, and (c) ensure that wording in the rulemaking will permit utilization of fixed-wing aircraft to carry personnel and supplies to gather sites if needed.

The concerns were safety of people, unnecessary harassment of animals, and flexibility in the choice of support vehicles to conduct an efficient operation. The action is clarified to satisfy all three concerns.

5. It was suggested that § 4740.4(a)(4) be changed to provide that animals be moved in such a way as to prevent unnecessary stress or injury during capture operations. The words "or injury" are added.

6. Comments addressed to the issue of sorting animals for transportation suggested criteria for sorting and provision for efficiency of operations. Section 4740.4(b)(4) is changed to respond to both concerns.

7. Other minor editorial changes were made as identified.

COMMENTS NOT LEADING TO CHANGES IN THE RULEMAKING

1. It was suggested that the definition of "malicious harassment" be reworded to remove the exclusion of the agencies and to use only the dictionary definitions of the terms. This is not practical because the objective is to include any unlawful gathering of animals as malicious harassment regardless of methods used. Therefore, to avoid confusion, lawful gathering of animals by the agencies under humane, controlled conditions must be excluded from the meaning of the terms.

2. It was suggested that "undue stress" be defined. The term used in § 4700.0-5 (m) is "unnecessary stress." The comments indicated a desire to set criteria for measuring stress. No criteria have been set which could be applied in the field. It is understood that the animals will be under stress during the operation. The intent of this rulemaking is to keep the stress to a minimum.

3. Several comments suggested elimination of trespass charges on claimed animals. Trespass was not a substantive issue in the proposed rulemaking.

4. Several comments suggested allowing State brand and estray laws to apply in ownership determinations. No change is needed since these are the standards currently used by the authorized officer and the appropriate State official to determine ownership of claimed animals.

5. It was suggested that saddle horses used simultaneously with helicopters would add efficiency. No change is needed; both can be used on the same operation.

6. It was suggested that helicopters only be allowed to fly under 1,000 feet at the immediate capture site. This change is not made because a capable pilot and the authorized officer must have flexibility to determine a safe and efficient altitude in accordance with field conditions and terrain encountered on each operation.

7. Suggestions were received to provide for more than one helicopter on a gather and to provide for ground to air communications. Both are permissible under the rules as written.

8. It was suggested that § 4730.7-3 be reworded to allow the utilization of wheeled vehicles in the actual driving and capture of animals. The change would violate existing law.

9. Suggestions were made that the rules provide that a representative of a humane organization be in any helicopter engaged in a gather of horses and burros, that a public representative be present, and that the authorized officer always be in the helicopter. These changes are not made because, for safety and liability reasons, no one except the pilot and authorized officers should be in the helicopter and in certain situations the pilot may determine that no other person should be in the helicopter for safety reasons.

10. It was suggested that the rules be written to provide for gathering only one band at a time. Such a provision is impractical because there may be natural mixing of bands at water holes or accidental mixing of bands by the disturbance of a roundup. Additionally, the efficiency of operations and related expense of gathering in an area where several bands range would be significantly affected by a piecemeal effort directed to single bands of horses and burros.

11. It was suggested that no contract be issued on a per head basis. To make the suggested provision would restrict contracting to a time of operation basis and could be expected to lead to much higher costs per animal captured.

12. A comment suggested that in gathering and driving animals, weaker animals such as colts and mares in foal should be considered in setting the speed of movement. This is provided for in § 4740.4(a)(2).

13. Several comments suggested that the regulations provide for notification of humane groups, special interest groups, and the general public and that hearings be conducted prior to each roundup. It is not necessary to include such provisions in these regulations; the provisions of the Act relating to public hearings can be more efficiently complied with on an area, State, or regional basis at the discretion of the authorized officer.

14. It was suggested that these rules include a provision for medical examination of horses to ensure that disease is not transmitted to already domesticated animals. No change is needed. The precaution is already being taken.

SUGGESTED CHANGES EXCEEDING EXISTING AUTHORITY

The following suggested changes in the proposed rulemaking cannot be made because they violate existing authorities:

1. Allow roundup of wild free-roaming horses and burros by any method and free of charge by an individual.

2. Provide for the sale and passage of free title on animals.

3. Pass all responsibility for wild free-roaming horses and burros to the State government.

4. Do not allow Federal government to gather animals because of competition with free enterprise.

Additionally, these comments and suggestions do not belong in the regulations but will be considered in the preparation of manual directives for the program or in the specific plans for each roundup and capture operation:

1. Operate in a manner that will keep bands together.

2. If more than one band is handled at one time, transport the animals immediately after capture to minimize fighting and the chance of injury.

3. Consider issuing contracts to reliable individuals using saddle mounts to gather animals.

4. Provide for a reconnaissance flight to locate and map potential hazards such as cliffs and fences before a gather-and-drive is underway.

5. For the vehicles to be used to transport captured animals provide specific standards as to the construction of the inside of the vehicle, its condition as related to possible injury inflicting hazards, and the number of animals to be transported per vehicle.

6. In transporting of animals, provide for adequate rest periods and feeding and watering at appropriate intervals.

The proposed rulemaking amending Part 4700, Subchapter D, Chapter II, Title 43 of the Code of Federal Regulations is adopted with changes as set forth below.

GUY R. MARTIN,
*Assistant Secretary*
*of the Interior.*

MAY 20, 1977.

1. Section 4700.0-3 is revised to read as follows:

§ 4700.0-3    Authority.

The Act of December 15, 1971 (16 U.S.C. 1331-1340), as amended, and the Act of June 28, 1934 (43 U.S.C. 314-315r).

2. Section 4700.0-5 is amended by revising paragraph (i) and by adding new paragraphs (k), (l), and (m) to read as follows:

§ 4700.0-5    Definitions.

\*    \*    \*    \*    \*

(i) "Act" means the Act of December 15, 1971 (16 U.S.C. 1331-1340), as amended.

\*    \*    \*    \*    \*

(k) "Malicious harassment" means any intentional act which demonstrates a deliberate disregard for the well-being of wild free-roaming horses and burros and which creates the likelihood of

AR_0033266

injury, or is detrimental to normal behavior patterns of wild free-roaming horses and burros including feeding, watering, resting, and breeding. Such acts include, but are not limited to, unauthorized chasing, pursuing, herding, roping, or attempting to gather or catch wild free-roaming horses and burros. It does not apply to lawfully conducted activities by or on behalf of the Bureau of Land Management or the Forest Service in implementation or performance of duties and responsibilities under this Act.

(l) "Captured animal" means a wild free-roaming horse or burro taken and held in the custody of the authorized officer. This term does not apply to an animal placed in private custody through a cooperative agreement under § 4740.2 (b) or § 4750.2.

(m) "Humane procedure" means kind and merciful treatment, without causing unnecessary stress or suffering to the animal.

3. Section 4720.2 is amended by revising paragraph (a) to read as follows:

§ 4720.2 Claimed animals.

(a) Any person claiming ownership under State branding and estray laws of unbranded or branded horses or burros on public land where such animals are not authorized must present evidence of ownership to justify a roundup before permission will be granted to gather such animals. Claims of ownership with supporting evidence were required to be filed during a 90-day claiming period which expired November 15, 1973. Unauthorized privately owned horses or burros entering onto the public lands after November 15, 1973, may be claimed by filing an application with the District Manager. All written authorizations to gather claimed animals shall be on a form approved by the Director and shall provide for compliance with appropriate provisions of Subpart 4720. After such public notice as the authorized officer deems appropriate to inform interested parties, he may authorize the gathering or roundup. The authorized officer shall provide in the authorization that the gathering or roundup shall be consistent with these regulations; shall establish in the authorization a reasonable period of time to allow the gathering of the claimed animals; and shall provide such other conditions in the authorization which he deems necessary to minimize stress on any associated wild free-roaming horses or burros and to protect other resources.

(b) Animals captured in Bureau of Land Management conducted roundups and determined to be privately owned may be secured by the appropriate claimant upon payment of trespass charges in accordance with § 4720.3, and a per head share of helicopter rental and other associated costs determined appropriate by the authorized officer.

*        *        *        *        *

4. Subpart 4730 is amended by adding §§ 4730.7, 4730.7-1, 4730.7-2 and 4730.7-3 to read as follows:

§ 4730.7 Aircraft and motor vehicles.

§ 4730.7-1 Fixed-wing aircraft.

Fixed-wing aircraft may be used for inventory, observation, and surveillance purposes required for the administration of the Act. Such aircraft use shall be consistent with the Act of September 8, 1959, as amended (18 U.S.C. 41 et seq.). Fixed-wing aircraft shall not be used in connection with capture operations except as support vehicles.

§ 4730.7-2 Helicopters.

Only the authorized officer may use or contract for the use of helicopters in the administration of the Act. Helicopters may be used in all phases 'of the administration of the Act including, but not limited to, inventory, observation, surveillance, and capture operations (see § 4740.4). Helicopters may be used in areas where all animals are claimed, only if forage, habitat, or watershed resources are being adversely affected by horses and burros and helicopters are the only feasible method available to capture and remove the animals. The authorized officer shall supervise all helicopter use as follows:

(a) The authorized officer shall have the means to communicate with the pilot and be able to direct the use of the helicopter.

(b) The authorized officer shall be able to observe the effects of the use of the helicopter on the well-being of the animals.

§ 4730.7-3 Motor vehicles.

Motor vehicles may be used in the administration of the Act except that such vehicles shall not be used in connection with capture operations for driving or chasing the animals. The use of motor vehicles for the purpose of transporting captured animals is subject to the provisions of § 4740.4(b).

5. Subpart 4740 is amended by adding § 4740.4 to read as follows:

§ 4740.4 Humane use of helicopters and motor vehicles.

(a) The use of helicopters is authorized to locate the animals involved and for related purposes such as to transport personnel and equipment. The condition of the animals shall be continuously observed by the authorized officer and should signs of unnecessary stress be noted, the source of stress shall be removed so as to allow for recovery. Helicopters may be used in roundups or other capture operations subject to the following humane procedures:

(1) Helicopters shall be used in such a manner that bands or herds will tend to remain together.

(2) The rate of movement shall not exceed limitations set by the authorized officer who shall consider terrain, weather, distance to be traveled, and condition of animals.

(3) The helicopter shall be used to enable the authorized officer to look for the presence of dangerous areas and move the animals away from hazards during the capture operation.

(4) During capture operations, animals shall be moved in such a way as to prevent unnecessary stress or injury.

(b) Motor vehicles may be used for the purposes of transporting captured animals, subject to the following humane procedures:

(1) All such transportation shall be in compliance with appropriate State and Federal laws and regulations applicable to the humane transportation of horses and burros.

(2) Vehicles shall be in good repair, of adequate rated capacity, and carefully operated so as to insure that captured animals are transported without undue risk of injury.

(3) Vehicles shall be inspected and approved by an authorized officer prior to use.

(4) Where necessary and practical, animals shall be sorted as to age, size, temperament, sex, and condition when transporting them so as to minimize, to the extent possible, injury due to fighting and trampling.

(5) The authorized officer shall consider the condition of the animals, weather conditions, type of vehicles, and distance to be transported when planning for the movement of captured animals.

[FR Doc.77-14929 Filed 5-24-77;8:45 am]

---

## Title 47—Telecommunication

### CHAPTER I—FEDERAL COMMUNICATIONS COMMISSION

**PART 73—RADIO BROADCAST SERVICES**

**Type Approved Antenna Monitors by AM Broadcast Stations Operating Directional Antenna Systems; Correction**

AGENCY: Federal Communications Commission.

ACTION: Correction.

SUMMARY: In an Order adopted on April 28, 1977, Mimeo No. 69455, concerning use of type approved antenna monitors by AM broadcast stations operating directional antenna systems, paragraph (a)(8)(iv) of § 73.114 was omitted. This Erratum includes the omitted subparagraph.

EFFECTIVE DATE: June 1, 1977.

ADDRESSES: Federal Communications Commission, Washington, D.C. 20554.

FOR FURTHER INFORMATION CONTACT:

John W. Reiser, Broadcast Bureau, 202-632-9660.

SUPPLEMENTARY INFORMATION:

Released: May 20, 1977.

In the matter of amendment of part 73 of the Commission's rules and regulations in reference to the use of type approved antenna monitors by AM broadcast stations operating directional antenna systems.

In the Order in the above-entitled proceeding, Mimeo No. 69455, adopted April 28, 1977, subparagraph (iv) was inadvertently omitted from the amendment

AR_0033267

of paragraph (a) (8) of § 73.114 as shown on page 24056, May 12, 1977, the omitted subparagraph should be added to read as follows:

§ 73.114    Maintenance log.

(a) * * *

(8) * * *

(iv) Antenna monitor phase indications and the deviation of those indications, in degrees, from values specified in the station authorization.

*        *        *        *        *

FEDERAL COMMUNICATIONS
COMMISSION,
VINCENT J. MULLINS,
Secretary.

[FR Doc.77-14889 Filed 5-24-77;8:45 am]

[Docket No. 20603]

PART 83—STATIONS ON SHIPBOARD IN THE MARITIME SERVICES

Conforming to Extent Practicable With International Radio Regulations Pertaining to Maritime Mobile-Satellite Service, Geneva 1971 and Maritime WARC, Geneva, 1974; Correction

AGENCY: Federal Communications Commission.

ACTION: Second correction.

SUMMARY: Deletion of reference to a non-existent section in the Commission's rules.

EFFECTIVE DATE: July 23, 1976.

ADDRESSES: Federal Communications Commission, Washington, D.C. 20554.

FOR FURTHER INFORMATION CONTACT:

John Gilsenan, Safety and Special Radio Services Bureau, 202-632-7197.

SUPPLEMENTARY INFORMATION:

Released: May 19, 1977.

In the matter of amendment of Part 83 of the Commission's rules to conform to the extent practicable with the International Radio Regulations pertaining to the Maritime Mobile-Satellite Service, Geneva 1971 and Maritime WARC, Geneva, 1974, Docket No. 20603.

In the Report and Order in the above-entitled matter [1], FCC 76-530, adopted June 9, 1976, released June 18, 1976, and published in the FEDERAL REGISTER at 41 FR 25009, on page 25012, § 83.139(g) is corrected by the deletion of the reference to a non-existent § 83.51. As corrected § 83.139(g) reads as follows:

§ 83.139    Acceptability of transmitters for licensing.

*        *        *        *        *

(g) Pending the establishment of additional technical standards, type acceptance is not required for transmitters operating in the MARISAT system in the band 1636.5–1644 MHz, Provided, That, such equipment shall comply with all the

[1] See also 41 FR 27365, July 2, 1976.

technical standards contained in this subpart.

FEDERAL COMMUNICATIONS
COMMISSION,
VINCENT J. MULLINS,
Secretary.

[FR Doc.77-14901 Filed 5-24-77;8:45 am]

Title 49—Transportation

CHAPTER X—INTERSTATE COMMERCE COMMISSION

SUBCHAPTER A—GENERAL RULES AND REGULATIONS

[S.O. NO. 1267]

PART 1033—CAR SERVICE

LOUISIANA & ARKANSAS RAILWAY CO.

Authorized To Operate Over Tracks of the Atchison, Topeka and Santa Fe Railway Company and Over Tracks of Chicago, Rock Island and Pacific Railroad Company

AGENCY: Interstate Commerce Commission.

ACTION: Emergency order (Service Order No. 1267).

SUMMARY: This order authorizes the Louisiana & Arkansas Railway to use a portion of the Cadiz Yard of the Chicago, Rock Island and Pacific Railroad in Dallas, Texas, and to operate over approximately 2.6 miles of tracks of The Atchison, Topeka and Santa Fe Railway in order to gain access to the Cadiz Yard. The present yard facilities used by the Louisiana & Arkansas and by The Atchison, Topeka and Santa Fe in Dallas are no longer adequate because of increased traffic. Transfer of Louisiana & Arkansas operations to the Cadiz Yard will eliminate congestion on and will expedite car movements on both railroads, thereby increasing freight car utilization and improving overall rail service to the public.

DATES: Effective 12:01 a.m., May 19, 1977. Expires 11:59 p.m., August 15, 1977.

FOR FURTHER INFORMATION CONTACT:

C.C. Robinson, Chief, Utilization and Distribution Branch, Interstate Commerce Commission, Washington, D.C. 20423. Telephone 202-275-7840.

SUPPLEMENTARY INFORMATION: The order is reprinted in full below.

At a Session of the Interstate Commerce Commission, Railroad Service Board, held in Washington, D.C., on the 18th day of May, 1977.

It appearing, That because of increased traffic on the lines of the Louisiana & Arkansas Railway Company (L&A) and The Atchison, Topeka and Santa Fe Railway Company (ATSF), the ATSF yard at Dallas, Texas, used jointly by the ATSF and the L&A has become badly congested; that such congestion is resulting in excessive delays to shipments in transit and is causing the loss of utilization of badly needed freight cars; that the operating agreement between the ATSF and the L&A has expired; that use of the ATSF yard by the

L&A is being continued under a compromise agreement reached in an action before the Federal District Court in Dallas, Texas, which agreement requires the L&A to seek an alternative to its continued use of the aforementioned ATSF yard; that the Chicago, Rock Island and Pacific Railway Company (RI) Cadiz yard in Dallas has sufficient capacity to absorb the traffic of the L&A presently being handled in the ATSF yard; that the RI has consented to joint use with the L&A of the RI's Cadiz yard; that the ATSF has consented to use of certain of its tracks in Dallas by the L&A to provide that line with access to the Cadiz yard of the RI; that transfer of L&A operations from the ATSF yard at Dallas to the Cadiz yard of the RI at Dallas will substantially relieve congestion on both the L&A and the ATSF thereby expediting the movement of traffic via these lines through the Dallas terminal and contributing to more effective utilization of freight cars; that operation by the L&A over the aforementioned tracks of the ATSF and the RI is necessary in the interest of the public and the commerce of the people; that notice and public procedure herein are impracticable and contrary to the public interest and that good cause exists for making this order effective upon less than thirty days' notice.

It is ordered, That:

§ 1033.1267    Louisiana & Arkansas Railway Company authorized to operate over tracks of the Atchison, Topeka and Santa Fe Railway Company and over tracks of Chicago, Rock Island and Pacific Railroad Company.

(a) The Louisiana & Arkansas Railway Company (L&A) be, and it is hereby, authorized to operate over tracks one through six of the Chicago, Rock Island and Pacific Railroad Company's (RI) Cadiz yard in Dallas, Texas, commencing at the point of connection of RI track six with the tracks of the Atchison, Topeka and Santa Fe Railway Company (ATSF) in the southwest quadrant of the crossing of the ATSF and the Missouri-Kansas-Texas Railroad Company (MKT) at interlocking station No. 19; and

(b) It is further ordered, That the L&A be, and it is hereby, authorized to operate over the ATSF between ATSF milepost 53 plus 1802.2 feet and ATSF milepost 50 plus 4100 feet, together with necessary connecting trackage between the ATSF and the RI in the southwest quadrant of the crossing of the ATSF and the MKT at interlocking station No. 19 in Dallas, Texas.

(c) Nothing herein shall be considered as a prejudgment by the Commission of the application of the L&A seeking permanent authority to operate over the aforementioned tracks of the RI and the ATSF.

(d) Application. The provisions of this order shall apply to intrastate, interstate, and foreign traffic.

(e) Rates applicable. Inasmuch as this operation by the L&A over tracks of the

AR_0033268

RI and of the ATSF is deemed to be due to carrier's disability, the rates applicable to traffic moved by the L&A over the tracks of the RI and of the ATSF shall be the rates which were applicable at the shipments at the time of shipment as originally routed.

(f) Effective date: This order shall become effective at 12:01 a.m., May 19, 1977.

(g) Expiration date: The provisions of this order shall expire at 11:59 p.m., August 15, 1977, unless otherwise modified, changed, or suspended by order of this Commission.

(Secs. 1, 12, 15, and 17(2), 24 Stat. 379, 383, 384, as amended 49 U.S.C. 1, 12, 15, and 17(2). Interprets or applies Secs. 1(10-17), 15(4), and 17(2), 40 Stat. 101, as amended, 54 Stat. 911; 49 U.S.C. 1(10-17), 15(4), and 17(2).)

It is further ordered, That copies of this order shall be served upon the Association of American Railroads, Car Service Division, as agent of all railroads subscribing to the car service and car hire agreement under the terms of that agreement, and upon the American Short Line Railroad Association; and that notice of this order shall be given to the general public by depositing a copy in the Office of the Secretary of the Commission at Washington, D.C., and by filing it with the Director, Office of the Federal Register.

By the Commission.[1]

ROBERT L. OSWALD,
Secretary.

[FR Doc.77-14786 Filed 5-24-77;8:45 am]

---

[S.O. No. 1268]

### PART 1033—CAR SERVICE TRAILERS

#### Regulations for Return

AGENCY: Interstate Commerce Commission.

ACTION: Emergency Order (Service Order No. 1268).

SUMMARY: Service Order No. 1268 directs the return to Seaboard Coast Line (SCL), Louisville and Nashville (L&N), and Richmond, Fredericksburg and Potomac (RFP) of insulated trailer-on-flat-car (TOFC) trailers owned or leased by Seaboard Coast Line and affiliated lines. Named railroads prohibited from furnishing insulated TOFC trailers except for transportation of freight requiring protection from heat. L&N and RFP directed to deliver surplus insulated trailers to SCL. There is a shortage of insulated TOFC trailers on SCL in Florida for transporting shipments of watermelons, potatoes, and other perishable commodities.

DATES: Effective 12:01 a.m., May 23, 1977. Expires 11:59 p.m., June 15, 1977.

[1] Railroad Service Board, members Joel E. Burns, Robert S. Turkington, and John R. Michael. Member John R. Michael not participating.

---

FOR FURTHER INFORMATION CONTACT:

C. C. Robinson, Chief, Utilization and Distribution Branch, Interstate Commerce Commission, Washington, D.C., 20423. Telephone 202-275-7840. TLX 89-2742.

SUPPLEMENTARY INFORMATION: The order is reprinted in full below.

At a Session of the Interstate Commerce Commission, Railroad Service Board, held in Washington, D.C., on the 19th day of May, 1977.

It appearing, That an acute shortage of insulated trailers equipped with ventilating devices exists on certain railroads in the southeast for transporting melons, potatoes, and other perishable products requiring protection from heat; that shippers are being deprived of the insulated and ventilated trailers required to transport such perishable freight, thus creating spoilage of produce and great economic loss; that insulated, ventilated trailers, after being unloaded are being retained and appropriated for other services which do not result in their return to the major origin areas for perishable freight; that present regulations and practices with respect to the use, supply, control, movement, distribution, exchange, interchange, and return of insulated, ventilated trailers are ineffective. It is the opinion of the Commission that an emergency exists requiring immediate action to promote car service in the interest of the public and the commerce of the people. Accordingly, the Commission finds that notice and public procedure are impracticable and contrary to the public interest, and that good cause exists for making this order effective upon less than thirty days' notice.

It is ordered, That:

§ 1033.1268  Regulations for return of trailers.

(a) Each common carrier by railroad subject to the Interstate Commerce Act shall observe, enforce, and obey the following rules, regulations, and practices with respect to its car service:

(1) Remove from general distribution and deliver by rail, on flat cars insulated trailers described in paragraph (i) herein to any of the following railroads:

Louisville and Nashville Railroad Company (L&N)
Richmond, Fredericksburg and Potomac Railroad Company (RFP)
Seaboard Coast Line Railroad Company (SCL)

(i) Insulated trailers subject to this order are identified as follows:

Reporting Marks: RCLZ, RCRZ, RGRZ, RSCZ—Series 700000-709999 SBD, Series 30230, 30899, SBDZ 703043, 703076 and 703105.

(2) Trailers described in part (1) of this section, located on railroads other than the L&N, RFP or SCL, may be loaded with freight requiring protection from heat to any destination to which loading is authorized by Rule 2 of the Code of Trailer Service Rules, published

---

on page 185 of the Official Intermodal Equipment Register, ICC-OLER No. 29, issued by R. G. Hilts, or reissues thereof; or, such trailers may be loaded with any type of freight to any station on the lines of the L&N, RFP or SCL.

(3) Trailers described in part (1) of this section located on the L&N or RFP for which no suitable loading, as defined in part (4) of this section is available, shall be delivered empty, on cars, to the SCL.

(4) Trailers described in part (1) of this section, located on the L&N, RFP or SCL, may be used only for transporting traffic requiring protection from heat.

(b) For the purpose of improving car utilization and the efficiency of railroad operations, or alleviating inequities or hardships, modifications may be authorized by the Director, Bureau of Operations, Interstate Commerce Commission, Washington, D.C. 20423.

(c) No common carrier by railroad subject to the Interstate Commerce Act shall accept from shipper any loaded trailer, described in this order contrary to the provisions of the order.

(d) Application. The provisions of this order shall apply to intrastate, interstate and foreign commerce.

(e) Effective date. This order shall become effective at 12:01 a.m., May 23, 1977.

(f) Expiration date. The provisions of this order shall expire at 11:59 p.m., June 15, 1977, unless otherwise modified, changed or suspended by order of this Commission.

(Secs. 1, 12, 15, and 17(2), 24 Stat. 379, 383, 384, as amended; 49 U.S.C. 1, 12, 15, and 17(2). Interprets or applies Secs. 1(10-17), 15(4) and 17(2), 40 Stat. 101, as amended, 54 Stat. 911 (49 U.S.C. 1(10-17)  15(4), and 17(2)).)

It is further ordered, That a copy of this order and direction shall be served upon the Association of American Railroads, Car Service Division, as agent of all railroads subscribing to the car service and car hire agreement under the terms of that agreement, and upon the American Short Line Railroad Association; and that notice of this order be given to the general public by depositing a copy in the Office of the Secretary of the Commission at Washington, D.C., and by filing it with the Director, Office of the Federal Register.

By the Commission, Railroad Service Board, members Joel E. Burns, Robert S. Turkington, and John R. Michael.

ROBERT L. OSWALD,
Secretary.

[FR Doc.77-14787 Filed 5-24-77;8:45 am]

---

SUBCHAPTER B—PRACTICE AND PROCEDURE

[Ex Parte No. 293 (Sub-No. 2)]

### PART 1125—STANDARDS FOR DETERMINING RAIL SERVICE CONTINUATION SUBSIDIES

#### Northeast-Midwest Region of the United States

AGENCY: Rail Services Planning Office, Interstate Commerce Commission.

ACTION: Final rule.

AR_0033269

SUMMARY: The provision in the standards governing the determination of costs under Accounts 269 and 271 has been modified. This action has been taken in response to the petition of the New York State Department of Transportation for reconsideration of the original rule governing the computation of these costs, which became effective December 16, 1976 (See 41 FR 55686).

EFFECTIVE DATE: May 20, 1977.

FOR FURTHER INFORMATION CONTACT:

James R. Wells, 202–254–7553.

SUPPLEMENTARY INFORMATION: On December 16, 1976, the Rail Services Planning Office (the Office) of the Interstate Commerce Commission issued a number of clarifications and amendments to the Standards for Determining Rail Service Continuation Subsidies in the Northeast-Midwest Region of the United States (49 CFR Part 1125). The amendments and a discussion of the issues involved were published in the FEDERAL REGISTER of December 21, 1976 (41 FR 55686). One of the amendments added two accounts, *Account 269—Roadway machines* and *Account 271—Small tools and supplies*, to the accounts includable in the determination under § 1125.5 of the avoidable costs of providing the subsidized service. Account 269 includes the cost of repairing roadway machine which are used for repairs of roadway and structures. Account 271 includes the cost of obtaining and repairing roadway tools; the cost of supplies consumed in the operation of roadway machines; and the cost of supplies used by trackwalkers, track watchmen and roadway and track repairmen.

The Office first discussed the possibility of adding Accounts 269 and 271 to § 1125.5 in a notice and order, dated August 24, 1976 (41 FR 35730). In that notice, the Office stated that Consolidated Rail Corporation (ConRail) had requested that the two accounts be included in the standards and that they be apportioned to the individual branch on the ratio of maintenance costs performed on the branch in the subsidy year to the total ConRail system maintenance costs in the subsidy year (41 FR 35731).

The Office stated its belief that the costs covered by Accounts 269 and 271, if incurred solely as a result of work done on the branch, should be included as a direct cost, not as an apportioned cost, and it requested the parties to state their views as to how these costs should be determined and how they could be included without cross-subsidizing the upkeep of the carrier's maintenance of way equipment.

After consideration of the responses to its invitation, the Office concluded that it would not be practical to include all of the costs involved on an actual basis and that the fairest approach would be to assign costs under Accounts 269 and 271 in the same proportion that roadway maintenance costs (Accounts 202–220) for the branch bear to roadway maintenance costs for the operating carrier's

system. The Office concluded that "* * * this approach should fairly apportion costs while minimizing recordkeeping and clerical time." (41 FR 55688).

The New York State Department of Transportation (NYDOT) has filed a petition seeking reconsideration of this amendment. NYDOT estimates that the apportionment formula adopted by the Office will result in a cost per year for Accounts 269 and 271 for the total subsidized mileage in New York State of approximately $300,000. This figure is based on the $3,000 per mile which NYDOT has budgeted for track maintenance costs. Using Penn Central system costs, NYDOT estimates that the branch costs for Accounts 269 and 271 would be 17.2 percent of the amount charged to the branch for Accounts 202–220, a percentage which NYDOT contends is unjustifiably high.

In further support of its petition, NYDOT notes that planning for branch line maintenance on New York State branch lines for the calendar year 1977 includes almost no major machine use. Thus, any apportionment for repair charges to major machines would result in cross-subsidization of the repairs to equipment used on non-subsidized lines. NYDOT also cites the massive tie renewal, surfacing and rail renewal programs undertaken by ConRail this year and asserts that it is obvious that the roadway machines involved in these programs have been used almost exclusively on main lines and will continue to be so used through 1977, at the least, as rehabilitation of main line track is the top priority of ConRail's program.

Although NYDOT agrees with the Office that it would be desirable to charge costs for Accounts 269 and 271 on a ratio basis, it submits that the Office should devise an equitable ratio that gives due consideration to the limited use of roadway machines on branch lines or else the Office should adopt the method proposed by NYDOT, wherein the repair cost element of machine rental costs would be assigned to the branch based on the number of days a machine is actually used on a subsidized line.

After giving full consideration to NYDOT's petition, the Office has concluded that the methods for determining the cost of repairing roadway machines, under Account 269, and the cost of supplies consumed in the operation of roadway machines, under account 271, should be modified. The method for determining the remaining costs under Account 271 will not be modified. This will result in two different methods being used for calculation of Account 271 costs.

First, with regard to roadway machines, Account 269, the Office has concluded that it would be more equitable to determine the amount that should be included in the subsidy calculation for this account on the basis of the average repair costs, for each type of machine, included in the daily rental fees charged by the operating railroad to other railroads or as published by the General Managers' Association of Chicago (GMA), based on the actual number of

days each type of machine is used on the branch.

Second, with regard to supplies consumed in the operation of roadway machines, part of Account 271, the Office has concluded that the standard should be modified to provide that the costs for these supplies shall be the average cost of supplies per day, included in the daily rental fees charged by the operating railroad to other railroads or as published by the GMA, multiplied by the actual number of days that the machine is used on the branch.

Third, with regard to the remaining costs under Account 271 (costs of small tools and of supplies used by trackwalkers, track watchmen and roadway and track repairmen), the Office has concluded that, until it is demonstrated either that the present ratio formula is inequitable or that an alternate formula would be more equitable, the ratio contained in the present standards should not be changed. The Office believes that it would be impractical to require carriers to report these costs on an actual basis, since such a requirement would place a difficult and costly recordkeeping burden on the carriers.

The Office attempted to devise an apportionment formula which would be based on actual practices and requested permission from the General Managers' Association of Chicago to audit its records to determine what percentage of Account 271 represents the costs of small tools and what percentage represents the costs of supplies. However, permission was denied.

### ORDER

In light of the foregoing:

*It is ordered,* That Part 1125 of Subchapter B of Chapter X of Title 49 of the Code of Federal Regulations be amended by making the changes set forth below to the standards adopted on January 8, 1975, and amended on March 28, 1975, January 22, 1976, March 26, 1976, December 16, 1976, and February 4, 1977.

*And it is further ordered,* That this order shall become effective May 20, 1977.

NOTE.—This is not a major Federal action significantly affecting the quality of the human environment within the meaning of the National Environmental Policy Act of 1969.

Issued May 20, 1977 by Alan M. Fitzwater, Director, Rail Services Planning Office.

By the Commission.

ROBERT L. OSWALD,
*Secretary.*

1. Section 1125.5 is amended by revising paragraph (a) (5) to read as follows:

§ 1125.5   Avoidable costs of providing service.

*       *       *       *       *

(a) * * *

(5) *Account 269—Roadway machines;* and *Account 271—Small tools and supplies.* The costs under Account 269 shall be assigned to the branch on the basis of the average repair costs, for each type of machine, included in the daily rental

AR_0033270

fees charged by the operating railroad to other railroads or as published by the General Managers' Association of Chicago (GMA), based on the actual number of days each type of machine is used on the branch. The costs of supplies under Account 271, consumed in the operation of roadway machines, shall be assigned to the branch on the basis of the average costs of supplies per day, included in the daily rental fees charged by the operating railroad to other railroads or as published by the GMA, multiplied by the actual number of days that the machine is used in the branch. The remaining costs under Account 271 (costs of small tools and of supplies used by trackwalkers, track watchmen and roadway and track repairmen) shall be assigned to the branch on the basis of the ratio that the branch amounts in Accounts 202–220 bear to the carrier's system total for the same accounts.

\* \* \* \* \*

[FR Doc.77–14937 Filed 5–24–77;8:45 am]

---

Title 50—Wildlife and Fisheries

**CHAPTER I—UNITED STATES FISH AND WILDLIFE SERVICE, DEPARTMENT OF THE INTERIOR**

**SUBCHAPTER B—TAKING, POSSESSION, TRANSPORTATION, SALE, PURCHASE, EXPORTATION, AND IMPORTATION OF WILDLIFE**

**PART 23—ENDANGERED SPECIES CONVENTION**

**International Trade in Endangered Species of Wild Fauna and Flora—Implementation of Convention; Correction**

AGENCY: U.S. Fish and Wildlife Service, Interior.

ACTION: Correction.

SUMMARY: The Director, U.S. Fish and Wildlife Service, hereby issues a correction to § 23.23 concerning species listed in Appendices I, II, and III. This correction remedies typographical or clerical errors and is not a substantive change in the rule.

EFFECTIVE DATE: May 25, 1977.

ADDRESSES: Comment concerning this correction should be sent to the Director (FWS/WPO), U.S. Fish and Wildlife Service, U.S. Department of the Interior, Washington, D.C. 20240.

FOR FURTHER INFORMATION CONTACT:

Mr. Richard M. Parsons, Chief, Federal Wildlife Permit Office, Fish and Wildlife Service, U.S. Department of the Interior, Washington, D.C. 20240, Telephone 202–634–1496.

In FR Doc. 77–5006 appearing at pages 10462–10488 in the FEDERAL REGISTER of February 22, 1977, the following changes should be made:

1. On page 10468, lines 3–8 of § 23.23 (a) are corrected to read "\* \* \* Appendix I, II, or III. The regulations in this Part do not apply to parts or derivatives of wildlife listed in Appendix III or of plants listed in Appendix II or III, unless such parts or derivatives are specified herein."

2. On page 10469, the Appendix listing of "Antelope, sassaby" is corrected to "III (Ghana)."

3. On page 10470, the scientific name of "Colobus, Zanzibar red" is corrected to read *"Colobus badius kirkii."*

4. On page 10471, the common name of "Langur, common capped" is corrected to read "Langur, capped."

5. On page 10482, correct the list of reptiles by adding after "Turtle, green:"

| Common name | Scientific name | Appendix |
|---|---|---|
| \* | \* | \* | \* |
| Turtle, hawksbill...... | *Eretmochelys imbricata.* | I\* |
| \* | \* | \* | \* |

6. On page 10482, the common name of "Turtle, olive" is corrected to read "Turtle, olive ridley."

Dated: May 6, 1977.

LYNN A. GREENWALT,
*Director,*
*Fish and Wildlife Service.*

[FR Doc.77–14823 Filed 5–24–77;8:45 am]

AR_0033271

# proposed rules

This section of the FEDERAL REGISTER contains notices to the public of the proposed issuance of rules and regulations. The purpose of these notices is to give interested persons an opportunity to participate in the rule making prior to the adoption of the final rules.

## DEPARTMENT OF AGRICULTURE

**Farmers Home Administration**

[ 7 CFR Part 1804 ]

[FmHA Instruction 424.1]

**PLANNING AND PERFORMING DEVELOPMENT WORK**

**Extension of Comment Period**

AGENCY: Farmers Home Administration, USDA.

ACTION: Extension of Comment Period of Proposed Rule.

SUMMARY: The Farmers Home Administration is extending the comment period of the proposed rule on thermal performance standards published at page 15317 of the FR on March 21, 1977, FR Doc. 77–8323, because of the unprecedented number of comments by the general public and an internal administrative decision. This extension is necessary because of the obvious interest expressed by the general public and the need to thoroughly consider all of the comments received.

DATE: Comments must be received on or before July 19, 1977.

ADDRESSES: Submit written comments to the Office of the Chief, Directives Management Branch, Farmers Home Administration, U.S. Department of Agriculture, Room 6316, South Building, Washington, D.C. 20250. All written comments made pursuant to this notice will be available for public inspection at the address given above.

FOR FURTHER INFORMATION CONTACT:

Mr. Daniel Ball, 202–447–3394.

SUPPLEMENTARY INFORMATION: The comment period for the proposed rule on thermal performance standards published at page 15317 of the FR on March 21, 1977, FR Doc. 77–8323, was initially extended for 30 days in a document published at page 20825 of the FR for Friday, April 22, 1977, FR document 77–11740. This additional 60 day extension is promulgated so as to allow the public sufficient time to submit all relevant comments.

(7 U.S.C. 1989; 42 U.S.C. 1480; delegation of authority by the Sec. of Agri., 7 CFR 2.23; delegation of authority by the Asst. Sec. for Rural Development, 7 CFR 2.70.)

Dated: May 19, 1977.

DENTON E. SPRAGUE,
*Acting Administrator,*
*Farmers Home Administration.*

[FR Doc.77–14824 Filed 5–24–77;8:45 am]

## SMALL BUSINESS ADMINISTRATION

[ 13 CFR Part 121 ]

**SMALL BUSINESS SIZE STANDARDS**

**Establishment of Farm Size Standards for Purpose of Financial Assistance**

AGENCY: Small Business Administration.

ACTION: Proposed rule.

SUMMARY: The Small Business Administration proposes to define a small farm, for the purpose of Small Business Administration loans, as one with average annual receipts for the farm's preceding 3 fiscal years not exceeding $1 million. This proposal is being made after evaluating responses to an earlier proposal which appeared in the FEDERAL REGISTER on December 17, 1976 (41 FR 55202), and which is hereby rescinded. If adopted, this action will increase the number of farms eligible for SBA financial assistance.

COMMENT DATE: Comments must be received on or before June 16, 1977.

ADDRESS ALL COMMENTS TO: William L. Pellington, Director, Size Standards Division, Small Business Administration, 1441 L Street NW., Washington, D.C. 20416.

FOR FURTHER INFORMATION CONTACT:

Harvey D. Bronstein, 202–653–6373.

SUPPLEMENTARY INFORMATION: The Size Standards Division has received no comments to lower the $275,000 farm size standard proposed on December 17, 1976. Rather all comments have indicated that the proposed standard is too low.

*Reason for a new proposal:* Initially, the Size Standards Division approached this problem in the usual manner of examining the size distribution by annual receipts of all farms. Based on data from the Internal Revenue Service for 1973 (the most recent year for such information), the current size standard enables about 99 percent of all farms to qualify for SBA assistance. A size standard which covers all but one percent of farms seemed appropriate.

The uniqueness of agriculture, however, is such that the usual statistical analysis is inadequate. After extensive comments from agricultural experts, farmers, bankers, economists, SBA personnel, association representatives, and others, the following picture emerges:

*Farms not typical business ventures:* First, most farms are not commercial operations in the sense of being reasonably efficient, economically viable ventures. Most farmers are carrying on a traditional way of life, not a for-profit business. The majority of farms, unlike any other industry, are part-time operations too small to be efficient. The average annual gross receipts for a farm in 1974 were only $28,000; hardly an economically viable size. Farmers earn most of their income from off-farm sources, and experience a low rate of return on their investment. About one-half earn a negative rate of return.

*Problem of financial access:* Second, while a farm grossing less than several hundred thousand dollars may be efficient and financially able, many observers indicate that often farms with up to $1 million in gross annual receipts experience difficulty in obtaining bank credit, especially of an intermediate nature. Short-term crop loans are usually available, and long-term loans for land purchases can be financed through the Federal Land Banks. However, as farming becomes more mechanized, there is a need for loans to finance equipment purchases, and these often are most easily handled on an intermediate, i.e., 3- to 6-year basis. Smaller commercial farmers, i.e., under $1 million have difficulty obtaining this kind of financing, in part due to their size.

*Farm size compared to other industries:* Third, while the top one percent of farms (which produce 38 percent of farm receipts) are large in comparison to all other farms, they are small when compared to other businesses in the economy. Pub. L. 94–305 instructs the SBA to aid and assist small businesses engaged in agricultural production, not small farms. A farm of, for example, $1 million in annual receipts is a large farm, but a small business, in a general sense; probably worked by only two or three persons.

*Economic viability and loan repayability:* Fourth, when a bank or the SBA examines a loan applicant, it is concerned about repayability. In farming, the economically viable size helps determine repayability, and for many types of farms in certain parts of the country, the current size standard is below the viable farm size. Thus, even though a farm passes the size standard test, it may fail the repayability test. Commenters felt that the SBA should be able to assist farms of an economically viable size, provided that it stops short of aiding the very large corporate farms.

*Crop rotation:* Fifth, it has been brought to our attention that many farmers typically rotate crops from season to season, and thus a farm size standard by type of crop would be diffi-

AR_0033272

cult to administer. A uniform size standard for all farms, it was felt, would simplify matters.

*Rationale:* A farm size standard of $1 million annual gross receipts would speak to the financial difficulty of these size farms and also cover the minimum sizes necessary for economically viable farms. The standard would be based not on the usual criterion of size distribution of farms, but on commercial viability and access to bank financing.

The $1 million size standard should be a 3-year average to account for the cyclical nature of farming, much as the procurement size standard for services is now.

*Proposal:* Specifically, the proposal to adopt a $275,000 annual receipts size standard for the various farm industries is rescinded and it is proposed instead to amend Part 121, Chapter I, Title 13, of the Code of Federal Regulations by deleting § 121.3–10(k) and revising § 121.3–10(j) to read as follows:

§ 121.3–10  Definition of small business for SBA loans.

\*    \*    \*    \*    \*

(j) *Farms.* Any concern primarily engaged in the operation of a farm is classified as small if its average annual receipts for its preceding 3 fiscal years do not exceed $1 million.

Dated: May 18, 1977.

RICHARD HERNANDEZ,
*Acting Administrator.*

[FR Doc.77–14827 Filed 5–24–77;8:45 am]

## FEDERAL TRADE COMMISSION

[ 16 CFR Part 13 ]

[File No. 742 3256]

WALGREEN CO.

**Consent Agreement With Analysis to Aid Public Comment**

AGENCY: Federal Trade Commission.

ACTION: Provisional consent agreement.

SUMMARY: This consent agreement contains an order requiring a Deerfield, Ill., retail drug store chain, among other things, to cease disseminating advertisements that offer any item for sale, unless such item is available for sale at or below advertised price, in reasonably sufficient quantities to meet anticipated demands. Further, respondent is required to conspicuously post advertisements and disclosure statements at designated locations; maintain specified business records; and institute a surveillance program designed to ensure that its stores comply with the terms of the order.

DATE: Comments must be received on or before July 22, 1977.

ADDRESS: Comments should be directed to: Office of the Secretary, Federal Trade Commission, 6th and Pennsylvania Ave. NW., Washington, D.C. 20580.

FOR FURTHER INFORMATION CONTACT:

Stephanie W. Kanwit, Regional Director, Chicago Regional Office, Federal Trade Commission, 55 East Monroe St., Suite 1437, Chicago, Ill. 60603. 312–353–4423.

SUPPLEMENTARY INFORMATION: Pursuant to section 6(f) of the Federal Trade Commission Act, 38 Stat. 721, 15 U.S.C. 46 and § 2.34 of the Commission's rules of practice (16 CFR 2.34), notice is hereby given that the following consent agreement containing a consent order to cease and desist and an explanation thereof, having been filed with and provisionally accepted by the Commission, has been placed on the public record for a period of sixty (60) days. Public comment is invited. Such comments or views will be considered by the Commission and will be available for inspection and copying at its principal office in accordance with § 4.9(b)(14) of the Commission's rules of practice (16 CFR 4.9(b)(14)).

BEFORE FEDERAL TRADE COMMISSION

[File No. 742 3256]

WALGREEN CO.

AGREEMENT CONTAINING CONSENT ORDER TO
CEASE AND DESIST

The Federal Trade Commission having initiated an investigation of certain acts and practices of Walgreen Co., a corporation, and it now appearing that Walgreen Co., a corporation, hereinafter sometimes referred to as proposed respondent, is willing to enter into an agreement containing an order to cease and desist from the use of the acts and practices being investigated.

It is hereby agreed by and between Walgreen Co., by its duly authorized officer, and counsel for the Federal Trade Commission that:

1. Proposed respondent Walgreen Co. is a corporation organized, existing and doing business under and by virtue of the laws of the State of Illinois, with its office and principal place of business located at 200 Wilmot Road, Deerfield, Illinois 60015.

2. Proposed respondent admits all the jurisdictional facts set forth in the draft of complaint here attached.

3. Proposed respondent waives:
(a) Any further procedural steps;
(b) The requirement that the Commission's decision contain a statement of findings of fact and conclusions of law; and
(c) All rights to seek judicial review or otherwise to challenge or contest the validity of the order entered pursuant to this agreement.

4. This agreement shall not become a part of the official record of the proceeding unless and until it is accepted by the Commission. If this agreement is accepted by the Commission it, together with the draft of complaint contemplated thereby, will be placed on the public record for a period of sixty (60) days and information in respect thereto publicly released; and such acceptance may be withdrawn by the Commission if, within thirty (30) days after the sixty (60) day period, comments or views submitted to the Commission disclose facts or considerations which indicate that the order contained in the agreement is inappropriate, improper, or inadequate.

5. This agreement is for settlement purposes only and does not constitute an admission by proposed respondent that the law has been violated as alleged in the draft of complaint here attached.

6. This agreement contemplates that, if it is accepted by the Commission, and if such acceptance is not subsequently withdrawn by the Commission pursuant to the provisions of § 2.34 of the Commission's rules, the Commission may, without further notice to proposed respondent, (1) issue its complaint corresponding in form and substance with the draft of complaint here attached and its decision containing the following order to cease and desist in disposition of the proceeding and (2) make information public in respect thereto. When so entered, the order to cease and desist shall have the same force and effect and may be altered, modified or set aside in the same manner and within the same time provided by statute for other orders. The order shall become final upon service. The complaint may be used in construing the terms of the order, and no agreement, understanding, representation, or interpretation not contained in the order or the agreement may be used to vary or contradict the terms of the order.

7. Proposed respondent has read the proposed complaint and order contemplated hereby, and it understands that once the order has been issued, it will be required to file one or more compliance reports showing that it has fully complied with the order, and that it may be liable for a civil penalty in the amount provided by law for each violation of the order after it becomes final.

ORDER

I. *It is ordered,* That respondent Walgreen Co., a corporation, its successors or assigns, its officers, agents, representatives and employees, directly or through any corporation, subsidiary, division or other device, in connection with the advertising, offering for sale, sale or distribution of general merchandise, drug or cosmetic products, hereafter sometimes referred to as items, offered or sold in its retail drug stores, in or affecting commerce, as "commerce" is defined in the Federal Trade Commission Act, do forthwith cease and desist from, directly or indirectly.

A. Disseminating, or causing the dissemination of any advertisement by any means which offers any item for sale at a stated price, unless during the effective period of the advertised offer at each retail store covered by the advertisement:

1. Each advertised item is readily available for sale to customers in the public area of the store, or if not readily available there, a clear and conspicuous notice is posted where the item is regularly displayed which states that the item is in stock and may be obtained upon request, and said item is furnished on request;

2. There is a sign or other conspicuous marking at the place where an item advertised below regular shelf price is displayed for sale, clearly disclosing that the item is "as advertised" or "on sale" or words of similar import as appropriate, and disclosing on such sign or marking, the advertised price;

3. Each advertised item which is usually and customarily individually marked with a price, is individually, clearly, and conspicuously marked with the advertised price;

4. Each advertised item is sold to customers at or below the advertised price.

The Commission recognizes that technical per se violations of Section I of this order are inevitable despite the honest best efforts of respondent to ensure availability and proper pricing of advertised items. Therefore,

AR_0033273

20862      PROPOSED RULES

in determining compliance with Section I of this order, the Commission will consider (a) all circumstances surrounding nondelivery of advertised products which were actually ordered in quantities sufficient to meet reasonably anticipated demands but were not delivered due to circumstances beyond respondent's control, and (b) all circumstances surrounding failure to make advertised items conspicuous and readily available for sale at or below the advertised prices due to circumstances beyond respondent's control.

*Provided*, It shall constitute a defense to a charge of unavailability under subparagraph I.A.1. if respondent maintains and furnishes or makes available for inspection and copying upon the request of the Federal Trade Commission, such records and affidavita as will show that (a) the advertised items were delivered to its stores in quantities sufficient to meet reasonably anticipated demand, or (b) the advertised items were ordered but not delivered due to circumstances beyond respondent's control, and that respondent, upon notice or knowledge of such nondelivery acted immediately to contact the media to correct the advertisement or proposed advertisement to reflect the limited availability or unavailability of each advertised item, and (c) respondent immediately offered to customers on inquiry a "rain check" for each unavailable item which entitled the holder to purchase the item in the near future at or below the advertised price or a similar product of equal or better quality at or below the advertised price of the unavailable product.

*Provided, further*, That it shall not be deemed a violation of subparagraphs I.A.1., I.A.2., I.A.3., or I.A.4., if respondent is complying with a specific exemption, limitation or restriction with respect to store, item or price which is clearly and conspicuously disclosed in all advertisements for the product in question.

*Provided, further*, That an advertised item which is usually and customarily individually marked with a price, need not be marked with the advertised price but may remain marked at its regular price if both (i) a conspicuous sign at the site of the display of such item clearly states that the cashiers know the sale price; and (ii) the cashiers do in fact have a written list containing such sale price, have been instructed to charge the sale price for said item, and do in fact charge the customer the sale price.

II. *It is further ordered*, That throughout each advertised sale period in each of its retail stores covered by an advertisement, respondent shall post conspicuously (1) at or near each doorway affording entrance to the public, and (2) at or near the place where customers pay for merchandise, notices which contain the following information:

A. A copy of the advertisement.

B. A statement that: "All items listed in the advertisement are required to be available for sale at or below the advertised price."

C. A clear and conspicuous statement of respondent's rain check program which will inform customers that:

1. A rain check will be promptly issued by any store employee when an advertised item is unavailable.

2. A rain check will enable customers to purchase an unavailable item at the advertised price when stocks are replenished or, if such replenishment is impossible, a similar item of equal or better quality will be substituted.

3. A rain check will be valid for a period of thirty (30) days.

III. *It is further ordered*, That respondent shall cause the following statement to be clearly and conspicuously set forth in each

advertisement which represents that items are available for sale at a stated price at any of its stores: "Each of these advertised items is required to be readily available for sale at or below the advertised price in each Walgreen store, except as specifically noted in this ad".

IV. *It is further ordered*, That:

A. Respondent shall forthwith deliver a copy of this order to each of its operating divisions and to each of its present and future officers and other personnel in its organization down to the level of and including assistant store directors who, directly or indirectly, have any supervisory responsibilities as to individual retail stores of respondent, or who are engaged in any aspect of preparation, creation, or placing of advertising, and that respondent shall secure a signed statement acknowledging receipt of said order from each such person;

B. Respondent shall institute and maintain a program of continuing surveillance adequate to reveal whether the business practices of each of its retail stores conform to this order, and shall confer with any duly authorized representative of the Commission;

C. Respondent shall, for a period of three (3) years subsequent to the date of this order:

1. Maintain business records which show the efforts taken to insure continuing compliance with the terms and provisions of this order;

2. Grant any duly authorized representative of the Federal Trade Commission access to all such business records;

3. Furnish to the Federal Trade Commission copies of such records which are requested by any of its duly authorized representatives.

D. Respondent shall, all other provisions of this order notwithstanding, on or before each of the first three (3) anniversary dates of this order, file with the Commission a report, in writing, setting forth in detail the manner and form in which it has complied with this order in the preceding year.

*It is further ordered*, That no provision of this order shall be construed in any way to annul, invalidate, repeal, terminate, modify or exempt respondents from complying with agreements, orders or directives of any kind obtained by any other agency or act as a defense to actions instituted by municipal or state regulatory agencies. No provision of this order shall be construed to imply that any past or future conduct of respondents complies with the rules and regulations of, or the statutes administered by, the Federal Trade Commission.

*It is further ordered*, That respondent shall notify the Commission at least thirty days prior to any proposed change in the corporate respondent, such as dissolution, assignment or sale resulting in the emergence of a successor corporation, the creation or dissolution of subsidiaries or any other change in the respondent which may affect compliance obligations arising out of this order.

*It is further ordered*, That respondent shall, within sixty days after service upon it of this order, file with the Commission a written report setting forth in detail the manner and form of its compliance with this order.

[File No. 742-3256]

WALGREEN CO.

ANALYSIS OF PROPOSED CONSENT ORDER TO AID PUBLIC COMMENT

The Federal Trade Commission has accepted an agreement to a proposed consent order from the Walgreen Co.

The proposed consent order has been placed on the public record for sixty (60) days for reception of comments by interested persons. Comments received during this period will become part of the public record. After sixty (60) days, the Commission will again review the agreement and the comments received and will decide whether it should withdraw from the agreement or make final the agreement's proposed order.

Walgreen Co. is an Illinois corporation engaged in the operation of a large chain of retail drug stores throughout the United States. Its national distribution of products is broadened by the franchising of over 1800 independently owned "Walgreen Agency Stores". Its newspaper advertisements regularly list and depict general merchandise, drug and cosmetic products and state the prices at which such items will be offered for sale during a specific time period.

The complaint alleges that in a number of Walgreen retail drug stores a substantial number of items listed in its advertisements were not available, or were not conspicuously available for sale at or below the advertised prices, or were sold to customers at prices higher than the advertised prices during the effective period of the advertisement.

The consent order requires Walgreen to make advertised items readily available, to use shelf signs to indicate the location of items advertised below regular shelf price, to mark customarily price-marked items with their advertised prices, and to sell advertised items at the advertised price. Exceptions make provision for unanticipated demand, circumstances beyond Walgreen's control, and limitations clearly set forth in the advertising.

The order requires Walgreen to post in its stores: copies of advertisements, notices that all advertised items are required to be available at the advertised prices, and the availability of rain checks for them. Other provisions of the order are designed to ensure Walgreen's compliance with it.

The purpose of this analysis is to facilitate public comment on the proposed order and it is not intended to constitute an official interpretation of the agreement and proposed order or to modify in any way their terms.

JOHN F. DUGAN,
*Acting Secretary.*

[FR Doc. 77-14822 Filed 5-24-77; 8:45 am]

# DEPARTMENT OF AGRICULTURE

## Forest Service

### [ 36 CFR Parts 231, 261, 291, 293 ]

### PROHIBITIONS

#### Miscellaneous Changes

AGENCY: Forest Service, USDA.

ACTION: Proposed rule.

SUMMARY: The Forest Service, Department of Agriculture is considering amending regulations in 36 CFR Parts 231, 261, 291, and 293. The previous such amendment appearing at page 2956 FEDERAL REGISTER dated Friday, January 14, 1977, is hereby being supplemented to make Part 261—Prohibitions the only part containing prohibitions as was the original intent.

DATES: Comments must be received on or before June 24, 1977.

ADDRESS: Submit comments to: William L. Rice, Director, Fiscal and Ac-

AR_0033274

counting Management, U.S. Department of Agriculture, Forest Service, P.O. Box 2417, Washington, D.C. 20013. All written submissions made pursuant to this notice will be available for public inspection in room 4017, South Building, Department of Agriculture, 14th and Independence Avenue, SW., Washington, D.C., during regular business hours (7 CFR 1.27(b)).

FOR FURTHER INFORMATION CONTACT:

Kenneth L. Evans, Fiscal and Accounting Management, 202–447–7850.

SUPPLEMENTARY INFORMATION: It is proposed to amend 36 CFR, Chapter II as follows:

### PART 231—GRAZING

1. By revising § 231.11 (p) and (q) to read as follows:

§ 231.11   Wild free-roaming horses and burros.

* * * * *

(p) *Arrest.* Any employee designated by the Chief, Forest Service, shall have the power to arrest without warrant, any person committing in the presence of the employee a violation of the Act or of § 261.21 of this chapter and to take such person immediately for examination or trial before an officer or court of competent jurisdiction. Any employee so designated shall have power to execute any warrant or other process issued by an officer or court of competent jurisdiction to enforce the provisions of the Act and the regulations in § 261.21 of this chapter.

(q) *Penalties.* In accordance with Section 8 of the Act, any person who willfully violates a regulation issued pursuant to the Act shall be subject to a fine of not more than $2,000 or imprisonment for not more than 1 year, or both. Any person so charged with such violation by the authorized officer may be tried and sentenced by a United States commissioner or magistrate, designated for that purpose by the court by which he was appointed, in the same manner and subject to the same conditions as provided in section 3401, Title 18, U.S.C.

(85 Stat. 649, as amended, (16 U.S.C. 1331–1340); sec. 1, 30 Stat. 35, as amended, (16 U.S.C. 551); sec. 32, 50 Stat. 525, as amended, (7 U.S.C. 1011); 74 Stat. 215 (16 U.S.C. 528–531).)

### PART 261—PROHIBITIONS

AUTHORITY: 30 Stat. 35, as amended, (16 U.S.C. 551); sec. 1, 33 Stat. 628 (16 U.S.C. 472); 50 Stat. 526, as amended, (7 U.S.C. 1011(f)); 82 Stat. 916 (16 U.S.C. 1281(d)); 82 Stat. 922 (16 U.S.C. 1246(i)), unless otherwise noted.

§ 261.7   [Amended]

2. By revising § 261.7(a) by deleting the period following the word "System" and adding the words "or other lands under Forest Service control."

3. By revising § 261.7(b), by deleting the period following the "System" and adding the words "or other lands under Forest Service control."

4. By deleting paragraph (e) of § 261.7.

5. By amending § 261.10, adding paragraph (k) as follows:

§ 261.10   Occupancy and use.

* * * * *

(k) Violating the terms or conditions of a permit issued under § 261.50(f).

6. By amending § 261.13 to add the following new paragraphs (h) and (i):

§ 261.13   Use of vehicles off roads.

* * * * *

(h) In a manner which damages or disturbs the land, wildlife, or vegetative resources.

(i) In violation of applicable State or county laws and regulations established for vehicles used off roads.

8. By amending § 261.16 (c) and (d) to read as follows:

§ 261.16   National Forest wilderness.

* * * * *

The following are prohibited in a National Forest wilderness:

* * * * *

(c) Landing of aircraft, or the dropping or picking up of any material, supplies, or person by means of aircraft, including helicopter.

(d) Motels, summer homes, stores, resorts, organization camps, hunting and fishing lodges, and similar facilities and uses.

8. By amending § 261.19 to read as follows:

§ 261.19   National   Forest   Primitive Areas.

Except as may be authorized as necessary for prospecting, locating, and developing of mineral resources or for a statutory right of ingress or egress, the following are prohibited in any area classified as a National Forest Primitive Area on September 3, 1964:

(a) Roads or other provisions for motorized transportation.

(b) Commercial timber cutting.

(c) Motels, summer homes, stores, resorts, organization camps, hunting and fishing lodges, and similar facilities and uses.

(d) Landing of aircraft or the use of motor boats, unless such use had become well established.

(e) Possessing or using a motor vehicle.

(f) Possessing or using a motor or motorized equipment, except small battery powered, hand-held devices, such as cameras, shavers, flashlights, and geiger-counters.

9. By adding a new § 261.21, consisting of provisions presently in § 261.7(e) and § 231.11(q), to read as follows:

§ 261.21   Wild free-roaming horses and burros.

(a) The following are prohibited:

(1) Willfully removing of, or attempting to remove, a wild free-roaming horse or burro from the National Forest System.

(2) Converting a wild free-roaming horse or burro to private use, without

authority from the Chief, Forest Service.

(3) Maliciously causing the death or harassment of any wild free-roaming horse or burro.

(4) Processing or permitting to be processed into commercial products, the remains of a wild free-roaming horse or burro.

(5) Selling, directly or indirectly, a wild horse or burro allowed on private or leased land pursuant to section 4 of the Wild Free-Roaming Horses and Burros Act.

(85 Stat. 649, as amended, 16 U.S.C. 1331–1340.)

10. By amending § 261.50(e)(1) and (f) to read as follows:

§ 261.50   Orders.

* * * * *

(e) * * *

(1) Persons with a permit specifically authorizing the otherwise prohibited act or omission.

* * * * *

(f) The Chief, each Regional Forester, each Forest Supervisor, and each District Ranger or equivalent officer may issue permits to persons authorizing the occupancy or use of a road, trail, area, or other part of the National Forest System in accordance with authority which is delegated elsewhere in this chapter or in the Forest Service Manual. The issuing officer may authorize in the permit an act or omission which would otherwise be a violation of a Subpart A or C regulation or a Subpart B order. The issuing officer may include in any permit such conditions as he considers necessary for the protection and administration of the National Forest System, or for the promotion of public health, safety, or welfare.

11. By revising § 261.52, paragraphs (d), (h), and (j) to read as follows:

§ 261.52   Fire.

* * * * *

(d) Smoking, except within enclosed vehicles or buildings, developed recreation sites, or while stopped in an area at least three feet in diameter that is barren or cleared of all flammable materials.

* * * * *

(h) Operating an internal combustion engine.

* * * * *

(j) Operating or using any internal or external combustion engine on any timber, brush, or grass covered land, including trails traversing such land, without a spark arrester, maintained in effective working order, meeting either (1) Department of Agriculture, Forest Service Standard 5100–1a; or (2) appropriate Society of Automotive Engineers (SAE) recommended practices J335 and J350.

12. By adding paragraph (e) to § 261.55 as follows:

§ 261.55   Forest development trails.

* * * * *

(e) Operating any vehicle in violation of any applicable noise emission standard established by any Federal or State agency.

AR_0033275

13. By adding paragraphs (w), (x), and (y) to § 261.58 as follows:

## § 261.58   Occupancy and use.

When provided by an order, the following are prohibited:

\* \* \* \* \*

(w) Transporting, across National Forest System land, motors capable of propelling a water craft.

(x) Using wheels, rollers, or other mechanical devices for the overland transportation of any water craft.

(y) The land or water landing of aircraft, or the dropping or picking up of materials, supplies, or persons by means of an aircraft, including a helicopter.

## PART 291—OCCUPANCY AND USE OF DEVELOPED SITES AND AREAS OF CONCENTRATED PUBLIC USE

### § 291.9   [Amended]

14. By deleting the last sentence each of paragraphs (a), (b), and (c) of § 291.9.

## PART 293—WILDERNESS—PRIMITIVE AREAS

15. By adding alpha numeration to the existing paragraph (designate) and a new paragraph (b) to § 293.3 to read as follows:

### § 293.3   Control of uses.

(a) \* \* \*

(b) For all prohibitions in National Forest wilderness, see Part 261 of this chapter.

### § 293.8   [Amended]

16. By deleting the first sentence of § 293.8, Permanent structures and commercial services. This subject is covered in Part 261.

### § 293.9   [Reserved]

17. By revoking and reserving § 293.9, *Poisons and herbicides.* This item is covered in Part 261.

### § 293.15   [Amended]

18. By revoking and reserving paragraph (b) of § 293.15, *Gathering information about resources other than minerals.*

19. By amending § 293.16(b) to read as follows:

### § 293.16   Special provisions governing the Boundary Waters Canoe Area, Superior National Forest.

\* \* \* \* \*

(b) Except as provided in the Wilderness Act, in this section, and in § 294.2 (b), (c), and (e) of this chapter and subject to existing private rights, there shall be no prohibitions except as provided for in Part 261 of this chapter. For all prohibitions in the Boundary Waters Canoe Area, see Part 261 of this Chapter.

(1) The Chief, Forest Service, may permit temporary structures and commercial services within the Boundary Waters Canoe Area to the extent necessary for realizing the recreational and other wilderness purposes, which may include the public services generally offered by outfitters and guides.

(2) In the Portal Zone, temporary roads and the use of motorized equipment and mechanical transport for the authorized travel and removal of forest products will be permitted in accordance with special conditions established by the Chief, Forest Service. Such use of the roads for other purposes is not permitted.

(3) The overland transportation of any watercraft by mechanical transport and necessary attendant facilities may be permitted, in accordance with special conditions established by the Chief, Forest Service, over portages along the International Boundary, including the Loon River Portage, when acquired; Beatty Portage and Prairie Portage; the other major portages into Basswood Lake; namely, Four Mile and Fall-Newton-Pipestone Bay Portages; and the Vermilion-Trout Lake Portage. Mechanical transport over Four Mile and Fall-Newton-Pipestone Bay Portages may be suspended, modified, or revoked upon acquisition by the United States of all lands on Basswood Lake, and the expiration of rights reserved in connection with the acquisition of such lands.

(4) The Chief, Forest Service may designate special routes, for the transporting of motors or other mechanical device capable of propelling a water craft, across National Forest land. The Chief, Forest Service, shall cause a list and map of all routes so designated, and any special conditions governing their use, to be maintained for public reference in the offices of the Regional Forester, the Forest Supervisor, and the District Ranger having jurisdiction.

(5) The Chief, Forest Service, may permit the use of motor-driven ice and snow craft on routes over which motors may be transported, as authorized in subparagraph (4) of this paragraph; and over the Crane Lake-Little Vermilion Lake Winter Portage; and over the Saganaga Lake Winter Portage, in sections 18–19, T. 66N., R.4 W. The Chief shall cause a list and a map of routes over which use of ice and snow craft is permitted and any special conditions governing their use, to be maintained for public reference in the offices of the Regional Forester, the Forest Supervisor, and the District Ranger having jurisdiction.

(6) In order to permit customary use of the Boundary Waters Canoe Area to continue pending a permanent solution to the change of water levels resulting from the failure of Prairie Portage Dam and notwithstanding the provision of subparagraph (3) of this paragraph until December 31, 1969, use of portage wheels to transport boats across the temporary portage between Moose Lake and Newfound Lake may be permitted, and permits may be issued for the storage of boats and related equipment in the vicinity of this temporary portage to the extent consistent with the operating practices of the permittee prior to the failure of Prairie Portage Dam as determined by the Forest Supervisor; and notwithstanding the provisions of subparagraph (1) of this paragraph, a structure to maintain normal water levels in Moose Lake is authorized.

\* \* \* \* \*

(78 Stat. 890, (16 U.S.C. 1131–1136); 74 Stat. 215, (16 U.S.C. 528–531); 46 Stat. 1020, (16 U.S.C. 577–577c).)

20. By revising § 293.17 as follows:

### § 293.1   National Forest Primitive Areas.

(a) All prohibitions for those areas of National Forest classified as "Primitive" on the effective date of the Wilderness Act, September 3, 1964, are established in or pursuant to Part 261 of this chapter.

(b) Existing roads over National Forest lands reserved from the public domain and roads necessary for the exercise of a statutory right of ingress and egress may be allowed under appropriate conditions determined by the Chief, Forest Service.

(c) The grazing of domestic livestock, development of water storage projects which do not involve road construction, and improvements necessary for the protection of the National Forests, may be permitted, subject to such restrictions as the Chief, Forest Service, deems desirable.

(d) Within Primitive Areas the Chief, Forest Service, may authorize the landing of aircraft, the use of motor boats, motor vehicle, or motorized equipment for the administrative needs of the Forest Service, use by other Federal agencies, in emergencies, or where necessary for the exercise of a statutory right.

(78 Stat. 890 (16 U.S.C. 1131–1136); 74 Stat. 215 (16 U.S.C. 528–531).)

M. RUPERT CUTLER,
*Assistant Secretary.*

MAY 20, 1977.

[FR Doc.77–14853 Filed 5–24–77;8:45 am]

## FEDERAL MARITIME COMMISSION

### [ 46 CFR Part 502 ]

[Docket No. 77–14]

### APPEARANCES AND PRACTICE BEFORE THE COMMISSION

#### Proposed Rulemaking

AGENCY: Federal Maritime Commission.

ACTION: Proposed rule.

SUMMARY: The Federal Maritime Commission proposes to amend its Rules of Practice and Procedure governing the appearance and practice before the Commission of former employees to prohibit any former Commission member, officer or employee from practicing, appearing, or representing anyone before the Commission within one year of the termination of their service with the Commission unless it is shown that the particular matter under consideration by the Commission was not under the official responsibility of such former member, officer or employee at any time within a period of one year prior to the termination of such responsibility. These changes are being made to conform this Commission's rule with 18 U.S.C. 207(b).

AR_0033276

DATES: Comments on or before: June 23, 1977.

ADDRESSES: Comments to: Secretary, Federal Maritime Commission, 1100 L Street NW., Washington, D.C. 20573.

FOR FURTHER INFORMATION CONTACT:

Joseph C. Polking, Acting Secretary, Federal Maritime Commission, 1100 L Street NW., Washington, D.C. 20573 (202-523-5725).

SUPPLEMENTARY INFORMATION: It has come to the attention of the Commission that Rule 32(b) of the Rules of Practice and Procedure (46 CFR 502.32 (b)), governing the practice before the Commission of former employees within one year of the termination of such employee's service with the Commission is inconsistent with the relevant criminal statute (18 U.S.C. § 207(b)) governing the same conduct for former government officers or employees. Rule 32(b) of the Commission's Rules of Practice and Procedure provides:

(b) *Matters pending; waiver.* (1) No former member, officer, or employee of the Commission shall practice, appear, or represent anyone before the Commission, within one year after the termination of his or her service with the Commission, in connection with any particular Commission matter involving a specific party or parties which was pending before the Commission at any time during the period of his or her service with the Commission, unless he shall first apply for and obtain written consent of the Commission. This consent will not be granted unless it appears that the applicant did not, as member, officer or employee of the Commission *participate personally and substantially in the matter through decision, approval, disapproval, recommendation, the rendering of service, investigation, or otherwise gain knowledge of the facts of the matter.* (Emphasis added.)

However, 18 U.S.C. 207(b) is somewhat more strict. It provides that:

(b) Whoever, having been so employed, within one year after his employment has ceased, appears personally before any court or department or agency of the government as agent, or attorney for, anyone other than the United States in connection with any proceeding, application, requesting for a ruling or other determination, contract, claim, controversy, charge, accusation, arrest, or other particular matter involving a specific party or parties in which the United States is a party or directly and substantially interested, *and which was under his official responsibility as an officer or employee of the Government* at any time within a period of one year prior to the termination of such responsibility—

Shall be fined not more than $10,000 or imprisoned for not more than two years, or both: * * * (Emphasis added.)

A comparison of Rule 32(b) and 18 U.S.C. 207(b) shows that a former employee of the Commission could unwittingly violate the criminal provision even though he was in compliance with the Commission rule. Therefore, the Commission proposes to amend paragraph (b), § 502.32, Title 46 CFR as follows:

§ 502.32    Former employees.

* * * * *

(b) *Matters pending; waiver.* (1) No former member, officer, or employee of the Commission shall practice, appear, or represent anyone before the Commission, within one year after the termination of his or her service with the Commission, in connection with any particular Commission matter involving a specific party or parties which was pending before the Commission at any time during the period of his or her service with the Commission, unless prior written consent of the Commission is applied for and obtained. This consent will not be granted unless it appears that the particular matter was not under the applicant's official responsibility as a member, officer, or employee of the Federal Maritime Commission at any time within a period of one year prior to the termination of such responsibility.

(2) Such applicant shall be required to file an affidavit to the effect that the particular Commission matter was not under the applicant's official responsibility as a member, officer or employee of the Federal Maritime Commission at any time within a period of one year prior to the termination of such responsibility; that the applicant is not associated with, and will not in such matter be associated with, any former member, officer, or employee of the Commission who is either permanently or temporarily precluded from practicing, appearing or representing anyone before the Commission in connection with the particular matter; and that the applicant's employment is not prohibited by any law of the United States or by the regulations of the Commission. The statements contained in such affidavit shall not be sufficient if disproved by an examination of the files and records of the case.

(3) Applications for consent should be directed to the Commission, should state the former connection of the applicant with the Commission, and should identify the matter in which the applicant desires to appear. The applicant shall be promptly advised as to his privilege to appear in the particular matter, and the application, affidavit and consent, or refusal to consent, shall be filed by the Commission in its records relative thereto. Separate consents to appear must be obtained to appear in separate cases.

* * * * *

(18 U.S.C. § 207(b); E.O. 11222 of May 8, 1965 (30 F.R. 6169); section 43, Shipping Act, 1916 (46 U.S.C. 841a); (5 U.S.C. § 553).)

By Order of the Federal Maritime Commission.

JOSEPH C. POLKING,
*Acting Secretary.*

[FR Doc.14789 Filed 5-24-77; 8:45 am]

## FEDERAL COMMUNICATIONS COMMISSION

[ 47 CFR Part 73 ]

[Docket No. 21238; RM-2632]

**FM BROADCAST STATION IN McRAE, GA.**

**Proposed Change in Table of Assignments**

AGENCY: Federal Communications Commission.

ACTION: Notice of proposed rulemaking.

SUMMARY: Upon petition filed by John W. Davidson, this Notice proposes the assignment of a first FM channel to McRae, Georgia (1970 pop. 3,061).

DATES: Comments must be received on or before June 24, 1977, and reply comments must be received on or before July 14, 1977.

ADDRESSES: Send comments to: Federal Communications Commission, Washington, D.C. 20554.

FOR FURTHER INFORMATION CONTACT:

James J. Gross, Broadcast Bureau (202-632-7792).

SUPPLEMENTARY INFORMATION:

Adopted: May 10, 1977.

Released: May 17, 1977.

In the matter of amendment of § 73.202(b), *Table of Assignments,* FM Broadcast Stations (McRae, Georgia), Docket No. 21238, RM-2632.

1. *Petitioner, proposal, and comments.* (a) Petition for rule making filed December 10, 1975, by John W. Davidson,[1] licensee of daytime-only AM Station WDAX, McRae, Georgia, proposing the assignment of Channel 237A or 232A to McRae, as a first FM assignment to that community. Public Notice of the filing of the petition was given on January 14, 1976.

(b) Channel 237A could be assigned in full conformity with the Commission's minimum distance separation requirements. Channel 232A is short-spaced to a new site granted to Station WTOC-FM (Channel 231) at Savannah, Georgia. Since there is no alternative, Channel 232A will not be proposed.

(c) Opposition was filed by Broadcast Good Music! Committee in connection with its own proposal to add a seventh FM assignment at Atlanta, Georgia, and to change seven other assignments in Georgia. However, this proposal was denied by the Commission in *Atlanta, Georgia,* 49 F.C.C. 2d 1270 (1974), and the denial was upheld by the U.S. Court of Appeals (D.C. Cir.), Case No. 75-1926, 543 F. 2d 416 (1976). Thus, this matter is no longer an obstacle to the McRae proposal.

(d) Davidson states that, if the channel is assigned, he will promptly file an application to construct a station.

2. *Community data.* (a) *Location.* McRae, county seat of Telfair, is located in south central Georgia some 113 kilometers (70 miles) southeast of Macon and 145 kilometers (90 miles) east of Savannah.

(b) *1970 U.S. Census population.* McRae—3,061; Telfair County—11,381.

(c) *Local broadcast service.* The only local broadcast service in McRae and

---

[1] Davidson is also the principal in Jesup Broadcasting Corporation, licensee of WLOP and WIFO(FM), in Jesup, Georgia; and Davidson Communications, Inc., licensee of WDKD and WDKD-FM, Kingstree, South Carolina.

AR_0033277

**PROPOSED RULES**

Telfair County is petitioner's AM station (1 kilowatt, daytime-only).

3. *Economic data.* Davidson states that farming is the major industry of the area, and that pulpwood, corn and cattle are the basic products. Davidson states that manufacturers also employ some of the McRae residents.

4. In view of the apparent need for a first local FM service and first local nighttime aural service for McRae and Telfair County, we find that consideration of the proposed FM assignment in a rulemaking proceeding would be in the public interest.

5. Accordingly, it is proposed to amend the FM Table of Assignments (§ 73.202 (b) of the Commission's rules and regulations) as follows for the city listed below:

| City | Channel No. | |
|---|---|---|
| | Present | Proposed |
| McRae, Ga. | | 297A |

6. Authority to institute rulemaking proceedings; showings required; cut-off procedures; and filing requirements are contained below and are incorporated by reference herein.

7. Interested parties may file comments on or before June 24, 1977, and reply comments on or before July 14, 1977.

FEDERAL COMMUNICATIONS
COMMISSION,
WALLACE E. JOHNSON,
*Chief, Broadcast Bureau.*

1. Pursuant to authority found in sections 4(i), 5(d)(1), 303 (g) and (r), and 307(b) of the Communications Act of 1934, as amended, and § 0.28(b)(6) of the Commission's rules, it is proposed to amend the FM Table of Assignments, § 73.202(b) of the Commission's rules and regulations, as set forth in this notice of proposed rulemaking.

2. *Showings required.* Comments are invited on the proposal(s) discussed in this notice of proposed rulemaking. Proponent(s) will be expected to answer whatever questions are presented in initial comments. The proponent of a proposed assignment is also expected to file comments even if it only resubmits or incorporates by reference its former pleadings. It should also restate its present intention to apply for the channel if it is assigned, and, if authorized, to build the station promptly. Failure to file may lead to denial of the request.

3. *Cut-off procedures.* The following procedures will govern the consideration of filings in this proceeding.

(a) Counterproposals advanced in this proceeding itself will be considered, if advanced in initial comments, so that parties may comment on them in reply comments. They will not be considered if advanced in reply comments. (See § 1.420 (d) of Commission Rules.)

(b) With respect to petitions for rule making which conflict with the proposal(s) in this notice, they will be considered as comments in the proceeding, and Public Notice to this effect will be given

as long as they are filed before the date for filing initial comments herein. If filed later than that, they will not be considered in connection with the decision in this docket.

4. *Comments and reply comments; service.* Pursuant to applicable procedures set out in §§ 1.415 and 1.420 of the Commission's rules and regulations, interested parties may file comments and reply comments on or before the dates set forth in this notice of proposed rule making. All submissions by parties to this proceeding or persons acting on behalf of such parties must be made in written comments, reply comments, or other appropriate pleadings. Comments shall be served on the petitioner by the person filing the comments. Reply comments shall be served on the person(s) who filed comments to which the reply is directed. Such comments and reply comments shall be accompanied by a certificate of service. (See § 1.420 (a), (b) and (c) of the Commission rules.)

5. *Number of copies.* In accordance with the provisions of § 1.420 of the Commission's rules and regulations, an original and four copies of all comments, reply comments, pleadings, briefs, or other documents shall be furnished the Commission.

6. *Public inspection of filings.* All filings made in this proceeding will be available for examination by interested parties during regular business hours in the Commission's Public Reference Room at its headquarters, 1919 M Street NW., Washington, D.C.

[FR Doc.77–14831 Filed 5–24–77;8:45 am]

## [ 47 CFR Part 73 ]

[Docket No. 21237; RM–2538]

### FM BROADCAST STATION IN WRENS, GA.

#### Proposed Change in Table of Assignments

AGENCY: Federal Communications Commission.

ACTION: Notice of proposed rulemaking.

SUMMARY: Upon petition filed by Mayor J. J. Raburn, this notice of proposed rule making proposes the assignment of a first FM channel to Wrens, Georgia.

DATES: Comments must be received on or before June 24, 1977, and reply comments must be received on or before July 14, 1977.

ADDRESSES: Send comments to: Federal Communications Commission, Washington, D.C. 20554.

FOR FURTHER INFORMATION CONTACT:

James J. Gross, Broadcast Bureau (202–632–7792).

SUPPLEMENTAL INFORMATION:

Adopted: May 10, 1977.

Released: May 17, 1977.

In the matter of amendment of § 73.202(b), *Table of Assignments*, FM Broadcast Stations (Wrens, Georgia), Docket No. 21237, RM–2538.

1. *Petitioner, proposal, and comments.* (a) Petition for rulemaking, filed March 28, 1975, by Mayor J. J. Rabun, proposing Channel 232A or 244A as a first FM assignment to Wrens, Georgia.[1]

(b) Channel 232A would be short-spaced to an assignment at Sandersville and to Station WTOC (Channel 231), Savannah, Georgia (conditionally granted a construction permit for a new transmitter site). Therefore, we shall not propose Channel 232A for Wrens.

(c) Channel 244A would meet the Commission's spacing requirements at Wrens if its transmitter site were located at least 8 kilometers (5 miles) northwest of the community.

(d) Rabun states that an application would be expeditiously filed for construction of a station at Wrens if the channel is made available.

2. *Community data.* (a) *Location.* Wrens is located in eastern Georgia in Jefferson County, some 48 kilometers (30 miles) southwest of Augusta, Georgia.

(b) *1970 Census population.* Wrens—2,204; Jefferson County—17,174.

(c) *Local aural service.* Wrens has no local broadcast stations. Louisville, Georgia (1970 pop. 2,691), is 24 kilometers (15 miles) south of Wrens and has AM Station WPEH (1 kW, daytime) and a Class A FM station, WPEH-FM.

3. *Economic data.* Demographic information shows that Wrens is a manufacturing and industrial community which is increasing in population (35 percent between 1960 and 1970). Petitioner presents a list of industries, raw materials, schools, health facilities, recreation, churches, banks, and public services to support the assertion of Wrens' need for the assignment.

4. Rabun claims that a first FM service and a first nighttime aural service would be provided to 2,364 persons. The assignment would be a first local aural service for Wrens itself.

5. In view of the apparent need for a local broadcast service, and the showing of the new service it would make possible in the area, we find that consideration of the proposed FM assignment in a rulemaking proceeding would be in the public interest.

6. Accordingly, it is proposed to amend the FM Table of Assignments, § 73.202(b) of the Commission's rules and regulations, for the community listed below:

| City | Channel No. | |
|---|---|---|
| | Present | Proposed |
| Wrens, Ga. | | 244A |

7. Proponents should show the availability of a transmitter site at least 8 kilometers (5 miles) northwest of Wrens which would be free of obstruction to the propagation of FM signals to the com-

[1] Conflicts with a proposal to assign Channel 233 to Baxley, Georgia, have been eliminated by our decision to deny that assignment and propose Channel 240A for Baxley instead, as had been suggested by Rabun.

AR_0033278

munity. See § 73.208(a)(4) of the Commission's rules.

8. The Commission's authority to institute rule making proceedings, showings required, cut-off procedures, and filing requirements are contained below.

9. Interested parties may file comments on or before June 24, 1977, and reply comments on or before July 14, 1977.

FEDERAL COMMUNICATIONS
COMMISSION,
WALLACE E. JOHNSON,
Chief, Broadcast Bureau.

1. Pursuant to authority found in sections 4(i), 5(d)(1), 303(g) and (r), and 307(b) of the Communications Act of 1934, as amended, and § 0.281(b)(6) of the Commission's rules, it is proposed to amend the FM Table of Assignments, § 73.202(b) of the Commission's rules and regulations, as set forth in this notice of proposed rulemaking.

2. *Showings required.* Comments are invited on the proposal(s) discussed in this notice of proposed rulemaking. Proponent(s) will be expected to answer whatever questions are presented in initial comments. The proponent of a proposed assignment is also expected to file comments even if it only resubmits or incorporates by reference its former pleadings. It should also restate its present intention to apply for the channel if it is assigned, and, if authorized, to build the station promptly. Failure to file may lead to denial of the request.

3. *Cut-off procedures.* The following procedures will govern the consideration of filings in this proceeding.

(a) Counterproposals advanced in this proceeding itself will be considered, if advanced in initial comments, so that parties may comment on them in reply comments. They will not be considered if advanced in reply comments. (See § 1.420(d) of Commission rules.)

(b) With respect to petitions for rule making which conflict with the proposal(s) in this Notice, they will be considered as comments in the proceeding, and Public Notice to this effect will be given as long as they are filed before the date for filing initial comments herein. If filed later than that, they will not be considered in connection with the decision in this docket.

4. *Comments and reply comments; service.* Pursuant to applicable procedures set out in §§ 1.415 and 1.420 of the Commission's rules and regulations, interested parties may file comments and reply comments on or before the dates set forth in this Notice of proposed rulemaking. All submissions by parties to this proceeding or persons acting on behalf of such parties must be made in written comments, reply comments, or other appropriate pleadings. Comments shall be served on the petitioner by the person filing the comments. Reply comments shall be served on the person(s) who filed comments to which the reply is directed. Such comments and reply comments shall be accompanied by a certifi-

cate of service( See § 1.420(a), (b) and (c) of the Commission rules.)

5. *Number of Copies.* In accordance with the provisions of Section 1.420 of the Commission's rules and regulations, an original and four copies of all comments, reply comments, pleadings, briefs, or other documents shall be furnished the Commission.

6. *Public inspection of filings.* All filings made in this proceeding will be available for examination by interested parties during regular business hours in the Commission's Public Reference Room at its headquarters, 1919 M Street, NW., Washington, D.C.

[FR Doc.77–14832 Filed 5–24–77;8:45 am]

---

[ 47 CFR Part 73 ]

[Docket No. 20413; RM–2505]

FM BROADCAST STATIONS, COPPERAS COVE, TEXAS

Memorandum Opinion and Order Dismissing Further Proposal

AGENCY: Federal Communications Commission.

ACTION: Memorandum Opinion and Order.

SUMMARY: Action dismissing a proposal to assign a second FM channel to Copperas Cove, Texas, because the proponent (Kove Broadcasting Company) no longer has an interest in applying for the assignment. The proponent has entered into a buy-out agreement with the estate of a competing applicant (B. Rex Samford) for the existing FM assignment at Copperas Cove, Texas.

DATES: Non-Applicable.

ADDRESSES: Federal Communications Commission, Washington, D.C. 20554.

FOR FURTHER INFORMATION CONTACT:

James J. Gross, Broadcast Bureau, (202–632–7792).

SUPPLEMENTARY INFORMATION:

Adopted: May 18, 1977.

Released: May 20, 1977.

In the matter of Amendment of § 73.202(b) Table of Assignments, FM Broadcast Stations. (Copperas Cove, Texas), Docket No. 20413, RM–2505.

1. On December 11, 1975, the Commission reopened this proceeding by Further Notice of Proposed Rule Making (41 FR 1088; Jan. 6, 1976), to consider the proposal of Kove Broadcasting Company to add Channel 288A to Copperas Cove, Texas, as a second FM assignment.[1] Since Kove was a competing applicant with B. Rex Samford for the first FM assignment at Copperas Cove (Channel 276A), the Commission asked for a statement of intention by Request for Fur-

ther Information on July 29, 1976 (41 FR 34078).

2. The executrix of the Samford estate has informed the Commission that Mr. Samford is deceased, and she requests that his application for Channel 276A be withdrawn. Kove has entered into an agreement with the estate and has agreed to pay expenses incurred by the dismissing applicant. Kove intends to prosecute its application for Channel 276A, and requests dismissal of its proposal for a second assignment at Copperas Cove, Texas.

3. As a result and since no other party has expressed an interest in this assignment: *It is ordered,* That the proposed assignment of Channel 288A to Copperas Cove, Texas, is hereby dismissed.

4. *It is further ordered,* That this proceeding is terminated.

WALLACE E. JOHNSON,
Chief, Broadcast Bureau.

[FR Doc.77–14882 Filed 5–24–77;8:45 am]

---

INTERSTATE COMMERCE COMMISSION

[ 49 CFR Parts 1047, 1082 ]

[Nos. MC–C–3437, MC–C–4000]

MOTOR TRANSPORTATION OF PROPERTY INCIDENTAL AND PASSENGERS INCIDENTAL TO TRANSPORTATION BY AIRCRAFT

AGENCY: Interstate Commerce Commission.

ACTION: Proposed rule.

SUMMARY: The purpose of this document is to institute a proceeding to determine whether the area (the "air terminal area") within which motor transportation of property and passengers incidental to transportation by aircraft is exempt from economic regulation under the Interstate Commerce Act should be redefined and expanded.

DATES: Comments must be received on or before: August 8, 1977.

ADDRESSES: Send comments to: Interstate Commerce Commission, 12th and Constitution Avenue, Washington, D.C. 20423. All written submissions will be available for public inspection during regular business hours at the same address.

FOR FURTHER INFORMATION CONTACT:

Michael Erenberg, Assistant Deputy Director, Section of Operating Rights, Office of Proceedings, 202–275–7292.

SUPPLEMENTARY INFORMATION: Section 203(b)(7a) of the Interstate Commerce Act (49 U.S.C. 303(b)(7a)) exempts from economic regulation "the transportation of persons or property by motor vehicle when incidental to transportation by aircraft". The statute fails to specify the circumstances in which a movement by motor vehicle is to be considered "incidental to transportation by aircraft". We have adopted regulations giving meaning to the broad statutory

---

[1] Channel 276A was assigned to Copperas Cove by Report and Order, 40 FR 49335, October 14, 1975. The proposal for a second channel was in the comments of Kove's principals.

AR_0033279

language. In "Motor Transp. of Property Incidental to Air", 95 M.C.C. 71 (1964), 112 M.C.C. 1 (1970), we adopted regulations (a) specifying the circumstances in which the transportation of property by motor vehicle is to be considered incidental to transportation by aircraft, and (b) specifying the circumstances in which an air freight forwarder subject to economic regulation under the Federal Aviation Act might receive from or turn over to motor common carriers subject to economic regulation under Part II of the Interstate Commerce Act shipments the transportation of which is not within the scope of the incidental-to-aircraft exemption of Section 203(b)(7a) without being considered as conducting operations as a freight forwarder subject to Part IV of the Interstate Commerce Act. These regulations are codified at 49 CFR 1047.40 and 1082.1, respectively. In "Interpretation of Rights—Designated Airports", 110 M.C.C. 597 (1969), we adopted a regulation specifying the circumstances in which motor carriers holding certificates or permits authorizing service at named airports or at certain facilities at named airports could serve also airfreight terminals located beyond the physical boundaries of the named airports. This regulation is codified as 49 CFR 1041.23. "In Motor Transp. of Passengers Incidental to Air", 95 M.C.C. 526 (1964), we adopted a regulation specifying the circumstances in which the transportation of passengers by motor vehicle is to be considered incidental to transportation by aircraft. This regulation is codified as 49 CFR 1047.45.

We are instituting this rulemaking proceeding because we believe at this time that a redefinition of the term "air terminal area," and an expansion of existing air terminal areas, as defined in the regulations cited above, may be reasonable and in the public interest. Established airports have expanded enormously in the last decade and new airports have come into being. Large capacity aircraft can accommodate more freight than ever before and air freight tonnage has risen accordingly. Each year we receive a large number of applications for motor carrier operating authority to transport property between named airports, on the one hand, and, on the other, points in named counties located near the named airports but beyond the existing air terminal area. The traffic for which authority is thus sought seems to be "incidental" to transportation by aircraft as contemplated by the statute. In recent years we have received several petitions requesting expansion of the "air terminal areas" around named airports, including Philadelphia International Airport, Philadelphia, Pa., Miami International Airport, Miami, Fla., Fort Lauderdale International Airport, Fort Lauderdale, Fla., O'Hare International Airport, Chicago, Ill., and Savannah, Ga., Airport. These petitions have been filed pursuant to 49 CFR 1047.40(c) and 1047.-45(c). The filing of these petitions would seem to evidence an increasing belief that the air terminal areas as currently defined ought to be expanded.

The Commission's Blue Ribbon Staff Study Panel recommended in 1975 (a) that the Commission's 25-mile "rule of thumb" standard exempting motor carrier transportation of property from economic regulation under Section 203(b) (7a) of the Interstate Commerce Act be dropped in favor of an exempt zone coextensive with the Civil Aeronautics Board-accepted terminal area of the air carrier, and (b) that the existing 25-mile limitation to the exempt zone covering transportation of passengers moving incidental to air transportation be removed. (See Internal Staff Study Recommendations, Commission release No. 187-75, released July 7, 1975, recommendations 29. and 30.) We believe at this time that the expansion of existing air terminal areas is worthy of further study.

We believe at this time that a redefinition of the term "air terminal area" (so as to define an air terminal area as a zone extending a fixed distance from the boundaries of an airport) and an expansion of air terminal areas (so as to set the fixed distance referred to above at 100 miles, and to include points located within commercial zones any part of which is within 100 miles of the airport) might be warranted. The definition of an air terminal area partly in terms of distances from cities does not seem to be entirely appropriate—air traffic moves to and from airports, not cities. We would note too that a single airport can serve more than one city. We, therefore, believe at this time that air terminal areas ought to be defined as zones surrounding airports. The present extent of air terminal areas (i.e., as generally limited by the so-called 25-mile "rule of thumb" in 49 CFR 1047.40, and the 25-mile standard in 49 CFR 1047.45) would seem to be too limited. Motor movement of air freight consists essentially of pickup and delivery within a broad area served by a particular airport. The fact that a motor movement is 100 miles instead of 25 miles would seem not to be the relevant criterion. The pertinent factor would seem to be that the motor movement is incidental to the air movement. The same observation would seem to be applicable to motor movement of passengers to or from airports. We, therefore, believe at this time that consideration should be given to whether the air terminal area of any particular airport ought to be expanded to embrace all points located within 100 miles of the said airport, and to include also points located within commercial zones any part of which is within 100 miles of the said airport. We would expect that the proposed expansion of air terminal areas would allow direct air carriers and air freight forwarders to operate with greater flexibility, and would thereby improve the climate for intermodalism and containerization. We would note too that adoption of a 100-mile standard would eliminate all the "special" definitions of air terminal areas now codified as 49 CFR 1047.40(d) and 1047.45(d), and would thereby simplify our regulations.

The particular changes in the wording of our regulations would be as follows. Regulation 1041.23, which incorporates by reference the provisions of Regulation 1047.40, would remain as is. Regulations 1047.40 and 1047.45 would be consolidated into a revised Regulation 1047.40, and the present Regulation 1047.45 would be eliminated. The revised Regulation 1047.40 would carry forward all the provisions of the present Regulations 1047.40 and 1047.45 (except subsection (d) of each), with these changes: In subsection (a), the term "air terminal area" would be defined as the area encompassed by a 100-mile radius of the boundary of the airport at which the shipments are received or delivered or the passengers arrive or depart and by the boundaries of the commercial zones (as defined by the Commission) of any municipalities any part of whose commercial zones falls within the 100-mile radius of the pertinent airport; and in subsection (c), the provisions for individual determination of air terminal areas would allow for individual determination of air terminal areas around airports, but not around cities. In regulation 1082.1, the reference to an air freight forwarder's "terminal area" would be changed to "the air terminal area (as described in § 1047.40 of this chapter) of the airport at which the actual air movement begins or ends." In summary, Regulation 1041.23 would remain as is, Regulation 1047.45 would be deleted, and Regulation 1047.40 and 1082.1 would be amended as set forth below.

We anticipate that there will be many questions at issue in this proceeding, including but not limited to the following: (1) Are the existing 25-mile "rule of thumb" standard in 49 CFR 1047.40, and the 25-mile standard in 49 CFR 1047.45, adequate? (2) Should air terminal areas be redefined as zones surrounding airports? (3) Would an expanded 100-mile standard better satisfy Section 203(b) (7a) of the Interstate Commerce Act and the needs of the shipping and travelling public? (4) Would an expanded mileage standard other than 100 miles better satisfy Section 203(b)(7a) and the public interest? (5) What impact will an expanded mileage standard have on regulated motor carriers, nonregulated motor carriers, surface freight forwarders, air freight forwarders, and direct air carriers? (6) How many operating rights applications have been filed within the past 2 calendar years for motor carrier operating authority to transport property between named airports, on the one hand, and, on the other, points in one or more counties located near the named airports? (7) What changes would adoption of an expanded mileage standard create in (a) competitive relations, (b) quality of transportation services, (c) rates, revenues, and financial results, (d) operating efficiency, (e) conservation of scarce resources, (f) impact on the environment, and (g) operating rights application activity? and (8) Would a standard based upon some factor other

AR_0033280

than mileage better satisfy section 203(b)(7a) and public interest?

Oral hearings do not appear necessary at this time and none is contemplated. Anyone wishing to present views and evidence concerning the matters involved in this notice may do so by the submission of written data, views, or arguments.

Parties will be expected to present economic data supporting their contentions to the extent feasible. An original (and 15 copies whenever possible) of such data, views, or arguments shall be filed with this Commission on or before 75 days after publication in the FEDERAL REGISTER.

This notice of proposed rulemaking is issued under the authority of sections 552, 553, and 559 of the Administrative Procedure Act (5 U.S.C. 552, 553, and 559) and sections 203, 204, 207, 208, 209, 403, 404, and 413 of the Interstate Commerce Act (49 U.S.C. 303, 304, 307, 308, 309, 1003, 1004, and 1013).

By the Commission.

ROBERT L. OSWALD,
Secretary.

Parts 1047 and 1082 of Chapter X of Title 49 of the Code of Federal Regulations would be amended by deleting § 1047.45 and by revising § 1047.40 and § 1082.1 as set forth below:

§ 1047.40   Motor transportation of property and passengers incidental to transportation by aircraft.

(a) *Definition*—(1) *Motor transportation of property incidental to transportation by aircraft.* The transportation of property by motor vehicle to or from points in the zone defined in subparagraph (3) of this paragraph, except as said zone may be individually determined as provided in paragraph (c) of this section, is transportation incidental to transportation by aircraft within the meaning of section 203(b)(7a) of the Interstate Commerce Act: *Provided,* (i) That it is confined to the transportation of shipments in bona fide collection, delivery, or transfer service, and (ii) that it is confined to the transportation of shipments which have been received from or will be delivered to a direct air carrier or air freight forwarder (indirect air carrier) as part of a continuous movement which, if provided by an air carrier subject to economic regulation under the Federal Aviation Act, shall be provided for in tariffs filed with and accepted by the Civil Aeronautics Board, and shall be performed on a through air bill of lading covering, in addition to the line-haul movement by air, the collection, delivery, or transfer service performed by the motor carrier.

(2) *Motor transportation of passengers incidental to transportation by aircraft.* The transportation of passengers by motor vehicle to or from points in the zone defined in subparagraph (3) of this paragraph, except as said zone may be individually determined as provided in paragraph (c) of this section, is transportation incidental to transportation by aircraft within the meaning of section 203(b)(7a) of the Interstate Commerce

Act: *Provided,* That it is confined to the transportation of passengers who have had or will have an immediately prior or immediately subsequent movement by air.

(3) *Air terminal area.* The zone within which motor transportation is incidental to transportation by aircraft within the meaning of section 203(b)(7a) of the Interstate Commerce Act, except as it may be individually determined as provided in paragraph (c) of this section, is the area encompassed by a 100-mile radius of the boundary of the airport at which the shipments are received or delivered or the passengers arrive or depart and by the boundaries of the commercial zones (as defined by the Commission) or any municipalities any part of whose commercial zones falls within the 100-mile radius of the pertinent airport.

(b) *Substitution of motor-for-air transportation due to emergency conditions*—(1) *Motor transportation of property.* The transportation of property by motor vehicle is transportation incidental to transportation by aircraft if it constitutes substituted motor-for-air service, performed at the expense of the direct air carrier or air freight forwarder, on a through air bill of lading, in emergency situations arising from the inability of the direct air carrier to perform air transportation due to adverse weather conditions, equipment failure, or other causes beyond the control of the direct air carrier.

(2) *Motor transportation of passengers.* The transportation of passengers by motor vehicle is transportation incidental to transportation by aircraft if it constitutes substituted motor-for-air service, performed at the expense of the air carrier in emergency situations arising from the inability of the air carrier to perform air transportation due to adverse weather conditions, equipment failure, or other causes beyond the control of the air carrier.

(c) *Individual determination of exempt zones*—(1) *Motor transportation of property.* Upon its own motion or upon petition filed by any interested person, the Interstate Commerce Commission may, in an appropriate proceeding, determine whether the area within which the transportation of property by motor vehicle, in bona fide collection, delivery, or transfer service, must be performed, in order to come within the provisions of paragraph (a)(1) of this section, should be individually determined with respect to any particular airport authorized to be served by a direct air carrier or air freight forwarder holding authority from the Civil Aeronautics Board, and whether there should be established therefor appropriate boundaries, differing in extent from those defined in paragraph (a)(3) of this section.

(2) *Motor transportation of passengers.* Upon its own motion or upon petition filed by any interested person, the Interstate Commerce Commission may, in an appropriate proceeding, determine whether the area within which the transportation by motor vehicle of pas-

sengers-having an immediately prior or immediately subsequent movement by air must be performed, in order to come within the provisions of paragraph (a)(2) of this section, should be individually determined with respect to any particular airport, and whether there should be established therefor appropriate boundaries differing in extent from those defined in paragraph (a)(3) of this section.

§ 1047.45   [Deleted]

§ 1082.1   Use by air freight forwarders of regulated motor common carrier service.

An air freight forwarder (indirect air carrier) subject to economic regulation under the Federal Aviation Act may receive from or turn over to motor common carriers subject to economic regulation under part II of the Interstate Commerce Act shipments the transportation of which is not within the scope of the incidental-to-air exemption of section 203(b)(7a) of the Interstate Commerce Act without being considered as conducting operations as a freight forwarder subject to part IV of the Interstate Commerce Act: *Provided:*

(a) That the air freight forwarder shall not hold out to assume responsibility for, nor make any claim in its advertising, solicitation of freight, or tariff publications that it will assume responsibility for, any shipment prior to its receipt from or after it is turned over to an authorized motor common carrier for movement beyond the air terminal area (as described in § 1047.40 of this chapter) of the airport at which the actual air movement begins or ends.

(b) That all shipment documents issued by the air freight forwarder shall state clearly that its responsibility for the shipment does not extend beyond its actual air movement and the territorial extent of the air terminal area (as described in § 1047.40 of this chapter) of the airport at which the actual air movement begins or ends.

(c) That the air freight forwarder shall receive no compensation from any shipper or motor carrier for services rendered in connection with the receipt of shipments from or the delivery of shipments to a motor carrier for movement beyond the air terminal area (as described in § 1047.40 of this chapter) of the airport at which the actual air movement begins or ends.

[FR Doc.77-14852 Filed 5-24-77;8:45 am]

# DEPARTMENT OF THE INTERIOR

## Fish and Wildlife Service

[ 50 CFR Part 20 ]

### MIGRATORY BIRD HUNTING

#### Supplemental Proposed Rulemaking

AGENCY: Fish and Wildlife Service, Interior.

ACTION: Supplemental proposed rulemaking.

SUMMARY: This document supplements FEDERAL REGISTER Document 77-6969, published on March 10, 1977,

AR_0033281

which notified the public that the U.S. Fish and Wildlife Service proposes to establish hunting season regulations for certain migratory game birds during 1977–78, and provided information on certain proposed regulations. Further information, clarification or correction is provided relative to certain regulatory items for which information was not complete when FR Doc. 77-6969 was published. The more important of those relate to zoning in Illinois, Indiana, Maine, Michigan, Missouri, and Ohio for duck seasons; changes in daily bag and possession limits and season lengths for Canada geese in a portion of the Atlantic Flyway; regulatory relaxations for wood ducks in southeastern States in early October; and modifications of lesser sandhill crane seasons in portions of the Central Flyway.

**DATES:** Initial comments: May 18, 1977; comments on this supplemental proposed rulemaking will be accepted until July 14, 1977.

**ADDRESS:** Comments to: Director (FWS/MBM), U.S. Fish and Wildlife Service, Department of the Interior, Washington, D.C. 20240.

**FOR FURTHER INFORMATION CONTACT:**

John P. Rogers, Chief, Office of Migratory Bird Management, U.S. Fish and Wildlife Service, Department of the Interior, Washington, D.C. 20240 (202-343-8827), who is also the originator of this supplemental proposed rulemaking.

**SUPPLEMENTARY INFORMATION:** On March 10, 1977, the Fish and Wildlife Service published for comment in the FEDERAL REGISTER (42 FR 13311) a proposal to amend 50 CFR Part 20. That document dealt with minor modifications in § 20.11 of Subpart B and the addition of a new § 20.40 in Subpart D of 50 CFR Part 20, and with establishment of seasons, limits and shooting hours for migratory game birds under §§ 20.101 through 20.107 of Subpart K of 50 CFR Part 20. In that document, the Service indicated that a supplemental proposed rulemaking containing proposals and other considerations was scheduled for publication on May 16, 1977. Consequently, this supplemental proposed rulemaking is the second in a series of proposed and final rulemaking documents for migratory bird hunting regulations and deals specifically with a number of supplemental or modified proposals and clarification or correction of minor portions of the earlier document. Included is further information relative to zoning in Illinois, Indiana, Maine, Michigan, Missouri, and Ohio for duck seasons; regulatory relaxation for wood ducks in southeastern States in early October; changes in daily bag and possession limits and season lengths for Canada geese in a portion of the Atlantic Flyway; and modifications of lesser sandhill crane seasons in portions of the Central Flyway.

## CLARIFICATIONS AND CORRECTIONS

In the definitions of the four flyways, the biological-ecological units frequently used for references in setting hunting regulations for many migratory birds, the New Mexico portion of the Central Flyway given in FR Doc. 77-6969 appearing on page 13313 in the FEDERAL REGISTER of March 10, 1977, needs further clarification. In New Mexico, the Central Flyway is confined to that portion of the State east of the Continental Divide and outside the Jicarilla Apache Indian Reservation. In the March 10, 1977, FEDERAL REGISTER the Central Flyway portion was described as being "east of the Continental Divide and the Jicarilla Apache Indian Reservation."

In Item 23, Woodcock, there was a typographical omission of the daily bag limit. The second sentence should read, "States in the Atlantic, Mississippi, and Central Flyways may select hunting seasons between September 1, 1977, and February 28, 1978, of not more than 65 days, with daily bag and possession limits of 5 and 10, respectively: * * *."

## ZONING PROPOSALS AND OTHER CONSIDERATIONS

The following zoning proposals and other considerations are numbered to correspond with topics or items published in the FEDERAL REGISTER of March 10, 1977.

2. *Frameworks dates for ducks and geese in the continental United States.* The FEDERAL REGISTER dated March 10, 1977, identified the general hunting season framework for geese in the Mississippi Flyway as being from October 1, 1977, through January 20, 1978; however, it did not note the exception in Louisiana where later framework closing dates have been allowed in recent years in recognition of crop depredations caused by geese. Therefore, the following additional exception to the general Mississippi Flyway goose season framework is proposed:

(f) Louisiana goose season framework: October 1, 1977, through February 14, 1978.

4. *Wood duck.* The FEDERAL REGISTER dated March 10, 1977, noted that the increased population of this species and an analysis of population and banding data suggests that the wood duck population in the southeastern United States could sustain additional harvests, provided that such liberalizations did not increase the harvest of wood ducks from breeding populations in the north. For purposes of this discussion the southeastern United States is defined as Virginia, Kentucky, Tennessee, Arkansas, and Louisiana and all States of the Atlantic and Mississippi Flyways south and east thereof. Various means of providing for additional harvest opportunities on southeastern wood ducks on a trial basis and evaluating its effects were considered and discussed this spring. Accordingly, the Service proposes to consider regulations aimed at additional wood duck harvest in the southeastern States only within the following guidelines:

(a) In 1977 States in the southeastern United States may split their regular duck hunting season in such a way that a hunting season not to exceed 9 consecutive days occurs between October 1 and October 15.

(b) During this period under conventional regulations, no special restrictions within the regular daily bag and possession limits established for the Flyway in 1977 shall apply to wood ducks, and under the point system, the point value for wood ducks shall be reduced from the high to the mid-point category. For other species of ducks daily bag and possession limits shall be the same as established for the Flyway under conventional or point system regulations.

(c) In addition, the extra blue-winged teal option available to States in the Atlantic and Mississippi Flyways that select conventional regulations and do not have a September teal season may be applied during this period.

(d) This exception to the daily bag and possession limits for wood ducks shall not apply to that portion of the duck hunting season that occurs after October 15.

(e) This special provision for wood ducks shall be regarded as experimental, and subject to annual and final evaluations by participating States of population, harvest, banding, and other available information.

(f) The experiment shall be conducted for a specified time period to be agreed upon between the Service and participating States.

13. *Zoning.* Five States in the Mississippi Flyway and one in the Atlantic Flyway have submitted proposals to the Service to establish within-State zones, in each of which the season for hunting waterfowl would be set separately rather than Statewide beginning in the 1977–78 waterfowl hunting season. According to these proposals, season length, daily bag limits and possession limits would conform to the general framework for the respective Flyway. Only the season dates would differ between zones. The purpose is to provide a more equitable distribution of harvest opportunity within the States. The zones proposed by these States are as follows:

### ATLANTIC FLYWAY

#### MAINE

North Zone—Game Management Zones 1, 2, and 3.
South Zone—Game Management Zones 4 through 8.

### MISSISSIPPI FLYWAY

#### ILLINOIS

North Zone—St. Clair, Clinton, Marion, Clay, Richland, and Lawrence Counties and all counties to the north.
South Zone—All counties south of St. Clair, Clinton, Marion, Clay, Richland, and Lawrence Counties.

#### INDIANA

North Zone—That portion of Indiana north of State Highway 18.
South Zone—That portion of Indiana south of State Highway 18.

AR_0033282

MICHIGAN

North Zone—The Upper Peninsula.
South Zone—The Lower Peninsula.

MISSOURI

North Zone (entitled Upper Zone in proposal)—That portion of Missouri lying north of a line running easterly from the Kansas-Missouri border along U.S. Highway 160 to the junction of U.S. Highway 60 in Springfield, along U.S. Highway 60 to the junction of State Highway 34, and along State Highway 34 to the Illinois-Missouri border along the Mississippi River at Cape Girardeau.
South Zone—The remainder of Missouri.

OHIO

North Zone—That portion of Ohio north of U.S. Highway 30 North.
South Zone—That portion of Ohio south of U.S. Highway 30 North.

The Service will consider the establishment of the proposed zones based on an evaluation of each of the State proposals according to the following criteria:

1. The establishment of any of these zones shall be considered experimental until the effects of the zoning are more clearly defined and understood.

2. The primary purpose of the zoning shall be to provide more equitable distribution of harvest opportunity for hunters throughout a State.

3. Proposed zones and season dates shall not substantially change the pattern of harvest distribution among States within a flyway.

4. Zoning shall not detrimentally change the harvest distribution pattern among species or populations at either the State or flyway level.

5. Each zoning proposal shall include a detailed evaluation plan describing how changes in harvest will be measured, and what steps will be taken to compensate for any significant changes that might occur.

6. Each zoning proposal shall include an evaluation of anticipated changes due to zoning. If on the basis of this evaluation the Service and the State agree that no significant increase in harvest is likely, the zoning experiment may be conducted without a reduction in season length for each zone, pending further evaluation. If the evaluation indicates that a significant increase in harvest is likely, an appropriate reduction in season length compared to what would be permitted without zoning shall be made for each zone.

7. Where two or more adjoining States in a flyway may be involved simultaneously in zoning experiments, consideration shall be given to the possibility of consolidating zones.

14. *Goose and brant seasons.—Atlantic Flyway.* Notice was given in the FEDERAL REGISTER dated March 10, 1977, that a lengthening of snow goose season from 30 to 50 days would be considered in view of the expanding population of greater snow geese. The greater snow goose population has increased in recent years. Surveys of the main wintering areas in the United States, which do not account for all of the population, indicate an increase in recent years from 63,000 birds in 1971 to 109,000 in 1977. Spring

surveys of the St. Lawrence River of Canada indicate a May 1976 population of 185,000 birds. Concurrent with the growth of this population, there is evidence of increasing damage to marsh habitat caused by feeding geese, and increasing crop depredations. After reviewing this situation, the Atlantic Flyway Council recommended at its meeting of March 6, 1977, a snow goose season length of 60 days with a bag limit of 3 birds daily and 6 in possession, regardless of production rates in 1977. The Council further recommended establishing minimum population levels for the conduct of hunting seasons for the greater snow goose. The Service hereby provides notice of the Atlantic Flyway Council recommendation which will be considered along with other recommendations and comments during the regulations process. The March 10, 1977, FEDERAL REGISTER identified the sources of information which will be considered regarding the proposed regulatory changes for snow geese.

In recent years, the Canada goose population in the Atlantic Flyway has increased significantly, now numbering well over one million birds in the fall flight. The upward trend is continuing. In 1975, 819,000 birds were counted in the January surveys, and 924,000 in 1977. When harvest data are considered, the Flyway population objective of one million geese in the fall flight has been exceeded in recent years. The Service is of the view that concentration of these geese in the main portions of their wintering range is now excessive. Excessive winter concentrations of Canada geese pose a risk of disease outbreaks which could result in large-scale mortality. States in the main wintering area have recommended and the Service proposes that the Canada goose season length in this area be extended from 70 to 90 days with increases in the daily bag limit from 3 to 4 birds, and the possession limit from 6 to 8 birds. The area in which the proposed changes would apply comprises Delaware, the Delmarva Peninsula portion of Maryland, and that portion of Pennsylvania lying east and south of a boundary beginning at the Maryland border or Interstate Highway 83 and extending north to Harrisburg, then east on U.S. Highway 22 to the New Jersey border.

The Service is of the view that this regulatory change will not result in excessive harvests of these geese nor adversely affect their status insofar as population management objectives are concerned.

*Mississippi Flyway.* For Canada geese in portions of the Mississippi Flyway, Statewide harvest quotas are proposed as follows: Illinois, 35,000 birds; Kentucky, 15,000 birds; and Wisconsin, 35,000 birds. These harvest quotas support efforts to manage the segment of Mississippi Valley Population Canada geese that concentrates in excessive numbers near Horicon National Wildlife Refuge in Wisconsin, and concurrent efforts to achieve a more satisfactory distribution of these geese throughout the Mississippi Flyway. The quotas are consistent with recommendations of the Ad Hoc Committee assigned

by the Mississippi Flyway Council to develop a management plan for Mississippi Valley Population Canada geese. This is the first harvest quota for Kentucky where a sizable portion of the harvest of this population now occurs. The 1977 winter count of Mississippi Valley Population Canada geese was well above the management objective of 300,000 wintering birds. The distribution and regulation of the harvest quota for Wisconsin will be described by State regulations.

*Pacific Flyway.* In the March 10, 1977, FEDERAL REGISTER, changes were proposed in closure dates for Canada goose hunting in the Sacramento and San Joaquin areas of California to provide added protection of the endangered Aleution Canada goose. The Service now proposes that Canada goose hunting in the Sacramento area be closed from the beginning of the regular waterfowl hunting season to December 15 instead of December 20 as originally proposed. This modification is based on a re-analysis of band recovery data and field observations of Aleutian Canada geese. The original proposal to extend the beginning of the closed period in the San Joaquin closed area from December 15 to December 1 is reaffirmed. To date, only one Aleutian Canada goose band has been reported from the Sacramento and San Joaquin areas outside the proposed closure periods. No plans are contemplated at this time to change the boundaries or numbers of closed areas.

In the Pacific Flyway, Nevada has requested that it be allowed to select a single Statewide waterfowl season. Presently, the seasons for Clark and Lincoln Counties, along the Colorado River, coincide with seasons selected by California and Arizona. This proposal is made pending further review and evaluation by the Pacific Flyway Council which has not yet had an opportunity to consider it.

17. *Migratory game bird seasons for falconers.* In the March 10, 1977, FEDERAL REGISTER the Service indicated it would consider proposals from States to establish extended seasons for taking migratory game birds by falconry under certain conditions. The Service now proposes to establish a new Section, if the proposals are accepted, for setting hunting seasons, limits, and hours for taking migratory game birds by falconry and the heading of this new section would read as follows:

*§ 20.109 Extended seasons, limits, and hours for taking migratory game birds by falconry.*

18. *Lesser sandhill (little brown) cranes.* The FEDERAL REGISTER dated March 10, 1977, indicated that no changes in sandhill crane hunting regulations were contemplated at that time but that additional data would be examined. Discussions with the Central Flyway Council and a review of additional data indicate that a modification in the crane season framework for North Dakota and South Dakota is warranted. Specifically, the Service now proposes that lesser sandhill crane hunting in designated portions of these States be

AR_0033283

permitted during the period of September 1 through 11, 1977, in lieu of the 30-day seasons from November 6 to December 5 offered in 1976. The earlier but shorter seasons would better coincide with the period when huntable numbers of sandhill cranes are present, and reduce the period when endangered whooping cranes might be present during the sandhill crane season. A review of observation records indicates that whooping cranes seldom arrive in the two hunting areas prior to mid-September. No change is proposed in the area where hunting would be allowed in North Dakota. It is proposed that South Dakota be offered the option of defining its hunting area by county boundaries rather than by highways. The Service proposes that the hunting season length in Colorado be increased one day to 37 days, to provide full weekends at the beginning and ending of the season as its generally provided in many Central Flyway areas for other migratory game birds. The impact of these changes is expected to be a small increase in sandhill crane harvests and better protection for whooping cranes.

25. *Mourning doves.* Eastern Management Unit: Four States (Alabama, Georgia, Mississippi, and Louisiana) have been allowed for several years to select differential mourning dove hunting seasons by north and south zones. Two States have asked that minor changes be made in zone boundaries. Alabama requests that its boundary of the South Zone be changed to run from the Mississippi line via U.S. Highway 84 to the Covington County line, and include the counties of Coffee, Covington, Dale, Geneva, Henry, and Houston. This change would shift a relatively small area of southwestern Alabama from the south zone into the north zone. Georgia requests that the zone boundary be changed to run from the Alabama line via U.S. Highway 280 to Abbeville, thence east along the Ocmulgee and Altamaha Rivers to the Atlantic Ocean. This change would shift a relatively small portion of southeastern Georgia from the south zone to the north zone. The proposed boundary changes are expected to result in no significant change in mourning dove harvests.

Central Management Unit: Except for Texas, all States in the Central Management Unit which choose mourning dove hunting seasons permit shooting hours to extend from ½ hour before sunrise to sunset. It is proposed that these shooting hours be allowed in Texas for all days when mourning dove hunting is allowed. This would bring all shooting hours frameworks for mourning doves in the management unit into uniformity. Shooting hour restrictions within this time frame may be set by State regulation. Also, it is proposed that the closing date for mourning dove season framework be changed from January 20 to January 22, 1978. The effect of this change is expected to have an insignificant impact upon the State's mourning dove harvest.

26. *White-winged doves.* It is proposed that shooting hours for white-winged doves be changed from noon until sunset to ½ hour before sunrise to sunset. This would bring the shooting hours in Texas for white-winged doves into conformance with those proposed for Arizona, California, Nevada, and New Mexico. This change is expected to have no significant impact upon the Texas whitewinged dove harvest.

Texas requests that the white-winged dove frameworks in Texas be modified by deleting mention at this time of the specific counties in which hunting would be allowed. The proposed change gives Texas greater flexibility following the completion of breeding population surveys in defining areas where hunting will be allowed. The occurrence and distribution of breeding white-winged doves in south Texas and along the Rio Grande River appear to be expanding northward and it may be desirable to modify the permitted hunting area. Consequently, the last two paragraphs in Item 26 of the March 10, 1977, FEDERAL REGISTER are modified to read as follows:

The number of hunting days allowed in Texas, and areas where hunting will be allowed, will depend upon results of breeding population surveys conducted there. The daily bag and possession limits may not exceed 10 and 20 white-winged doves, respectively. The season may be split within the overall time frame.

These changes have been endorsed by the Central Flyway Council. The areas open to hunting will be described in frameworks scheduled for FEDERAL REGISTER publication on July 22, 1977

The March 10, 1977, FEDERAL REGISTER contained an extensive discussion of shooting hours for migratory game birds, and advised that the Service was examining and will make available additional information on the subject. This plan complies with the U.S. District Court, District of Columbia, ruling of March 11, 1977, that the Service should in the future provide greater information regarding migratory game bird shooting hours.

### STEEL SHOT REGULATIONS

On April 28, 1977, the Service published in the FEDERAL REGISTER (42 FR 21614) final regulations regarding areas in the Atlantic and Mississippi Flyways in which shotshells loaded with steel shot will be required for waterfowl hunting in seasons commencing in 1977. The intended effect of establishing these steel shot zones is to reduce the number of deaths of waterfowl caused by ingesting spent lead pellets. The regulations appear under § 20.108 and will also be summarized in the Service's waterfowl regulations leaflets to be published late this summer.

### HEARINGS

Two public hearings are scheduled pertaining to migratory bird hunting regulations being considered for the 1977-78 hunting seasons. Both will be conducted in accordance with Part 455 of the Departmental Manual (Hearings). On June 21, 1977, a public hearing will be held at 9 a.m. in the Auditorium of the General Services Building, 18th and F Streets NW., Washington, D.C., to review proposed hunting regulations of species for which early (prior to October 1) seasons are set. This hearing is for the purpose of reviewing the status of mourning doves, woodcock, band-tailed pigeons, white-winged doves, rails, gallinules, and common snipe. Proposed hunting regulations for these species will be discussed, plus regulations governing migratory game birds in Alaska, Puerto Rico, the Virgin Islands; mourning doves in Hawaii; September teal seasons; and special sea duck seasons in the Atlantic Flyway. On August 2, 1977, a public hearing will be held at 9 a.m. in the Auditorium of the General Services Building, 18th and F Streets NW., Washington, D.C., to review the status of other waterfowl and consider proposed regulations for migratory game birds that were not previously set. These deliberations will pertain to seasons commencing October 1 or later. The public is invited to participate in both hearings.

Persons wishing to participate in these hearings should notify the Director (FWS/MBM), United States Fish and Wildlife Service, Washington, D.C. 20240, or call 202–343–8827. Those wishing to have statements included in the record should file them in writing in duplicate with the Director before or at each hearing.

### PUBLIC COMMENT INVITED

Based on the results of migratory game bird studies now in progress and having due consideration for any data or views submitted by interested parties, the amendments resulting from these supplemental proposals will specify open seasons, shooting hours, and bag and possession limits for doves, pigeons, rails, gallinules, woodcock, common (Wilson's) snipe, coots, cranes, swans, and certain waterfowl in the contiguous United States; coots, cranes, common (Wilson's) snipe and waterfowl in Alaska; sea ducks in coastal waters of certain eastern States; migratory game birds in Puerto Rico and the Virgin Islands; and mourning doves in Hawaii; and would further clarify existing tagging requirements.

The Director intends that finally adopted rules be as responsive as possible to all concerned interests. He therefore desires to obtain the comments and suggestions of the public, other concerned governmental agencies, and private interests on these proposals and will take into consideration the comments received. Such comments, and any additional information received, may lead the Director to adopt final regulations differing from these proposals.

### COMMENT PROCEDURE

It is the policy of the Department of the Interior, whenever practicable, to afford the public an opportunity to participate in the rulemaking process. Accordingly, interested persons may participate in this rulemaking by submitting

AR_0033284

written comments to the Director (FWS/MBM), U.S. Fish and Wildlife Service, Department of the Interior, Washington, D.C. 20240. Comments received will be available for public inspection during normal business hours at the Service's office in Room 2243, Department of the Interior, C Street between 18th and 19th Streets NW., Washington, D.C.

All relevant comments received no later than July 14, 1977, will be considered. The Service will attempt to acknowledge received comments, but substantive response to individual comments may not be provided.

ENVIRONMENTAL REVIEW

The "Final Environmental Statement for the Issuance of Annual Regulations Permitting the Sport Hunting of Migratory Birds (FES 75–54)" was filed with the Council on Environmental Quality on June 6, 1975, and notice of availability was published in the FEDERAL REGISTER on June 13, 1975 (40 FR 25241).

NOTE.—The U.S. Fish and Wildlife Service, Department of the Interior, has determined that this document does not contain a major proposal requiring preparation of an Economic Impact Statement under Executive Order 11949 and OMB Circular A-107.

AUTHORITY: This notice of proposed rulemaking is issued under the authority of the Migratory Bird Treaty Act (40 Stat. 755; 16 U.S.C. 703–711).

Issued in Washington, D.C., May 19, 1977.

LYNN A. GREENWALT,
*Director,*
*U.S. Fish and Wildlife Service.*

[FR Doc.77–14821 Filed 5–24–77; 8:45 am]

AR_0033285

# notices

This section of the FEDERAL REGISTER contains documents other than rules or proposed rules that are applicable to the public. Notices of hearings and investigations, committee meetings, agency decisions and rulings, delegations of authority, filing of petitions and applications and agency statements of organization and functions are examples of documents appearing in this section.

## ADMINISTRATOR EMERGENCY NATURAL GAS ACT OF 1977

[Docket No. E77–104]

### TENNESSEE GAS PIPELINE CO.

#### Emergency Order Pursuant to Section 6 of Pub. L. 95–2

On May 13, 1977, Tennessee Gas Pipeline Company (Tennessee) filed, pursuant to Section 6 of the Emergency Natural Gas Act of 1977 (Act), Pub. L. 95–2 (91 Stat. 4 (1977)), an application to make certain emergency purchases of natural gas from the Louisiana Land and Exploration Company and General Crude Oil Company (Seller). For the reasons set forth below, I authorize the purchase of this emergency natural gas.

By agreement dated May 10, 1977, Tennessee agreed to purchase up to 1000 Mcfd of natural gas from Seller's No. 1 C. L. Cruse Well, Tyler County, Texas with the gas to be made available at a mutually agreeable point in Tyler County, Texas. The contract between Tennessee and Seller is to begin on issuance of Administrator's order and terminate on July 31, 1977.

Tennessee will purchase these supplies at a price of $1.5738 per MMBtu inclusive of all state and local taxes and other adjustments. I find this price to be fair and equitable in accordance with Order No. 2. In addition, Seller advised that an estimated 17,000 feet of pipeline facilities were installed in order to deliver the gas to Tennessee. Tennessee will install a hot tap and side valve at an estimated cost of $7,700.

The sale of gas for which Tennessee seeks approval may result in a commingling of interstate natural gas with Seller's normal intrastate system gas supply and with volumes of gas owned by other parties. The contractual provisions between Seller and its producers, transporters and other suppliers of gas prohibit the sale of natural gas in interstate commerce and the commingling of their intrastate pipeline system gas supplies with gas moving in interstate commerce. The sale of gas for which Tennessee seeks approval may result in some commingling of interstate natural gas with Seller's normal intrastate gas supplies and with gas owned by other third parties. This order shall be considered as applying to all such commingled gas.

Under the provisions of section 9 (b), (c) of Pub. L. 95–2 (91 Stat. 4,9), the suppliers of such gas, which is so commingled, may not terminate existing contracts with Seller or such other parties or require a redetermination of the prices provided in such contracts by reason of this transaction. Contractual termination, prohibition or redetermination provisions in any such contracts

referred to above are not enforceable by reason of Section 9 of Pub. L. 95–2 since Seller is selling gas to Tennessee pursuant to Section 6(a) of that Act. Seller and any third person whose gas is commingled with Tennessee's gas shall refer all relevant information concerning any attempt to terminate existing contracts or require a redetermination of prices to the Administrator for appropriate action.

According to the official files of the Federal Power Commission, Seller is not classified as a natural gas company within the meaning of the Natural Gas Act. Section 6(b)(1)(A) of the Act provides in part that "(t)he provisions of the Natural Gas Act shall not apply * * * to any sale to an interstate pipeline * * * under the authority of subsection (a) or to any transportation by an intrastate pipeline in connection with such sale * * *" 91 Stat. at 8. In addition 6(c) (2) provides:

Compliance by any pipeline with any order under this subsection shall not subject such pipeline to regulation under the Natural Gas Act or to regulation as a common carrier under any provision of state law.

Tennessee shall submit weekly reports as required by Order No. 4.

Pursuant to Section 6(a) of the Act, I hereby authorize Seller to sell Tennessee up to 1000 Mcfd of natural gas from No. 1 C. L. Cruse Well, Tyler County, Texas with the subject gas to be made available at a mutually agreeable point on Tennessee's pipeline in Tyler County, Texas, in accordance with the terms and conditions set forth in Tennessee's filing in this proceeding.

This order is issued pursuant to the authority delegated to me by the President in Executive Order No. 11969 (February 2, 1977), and shall be served upon Tennessee and Seller. This order shall also be published in the FEDERAL REGISTER.

This order and authorization granted herein are subject to the continuing authority of the Administrator under Pub. L. 95–2 and the rules and regulations which may be issued thereunder.

RICHARD L. DUNHAM,
*Administrator.*

MAY 19, 1977.

[FR Doc.77–14850 Filed 5–20–77;3:15 pm]

## DEPARTMENT OF AGRICULTURE

### Forest Service

#### APACHE NATIONAL FOREST GRAZING ADVISORY BOARD

##### Meeting Cancellation

The Apache Grazing Advisory Board meeting, originally scheduled for 1:00 p.m. on June 9, 1977, at the Ramada Inn,

Springerville, Arizona has been cancelled.

MILES P. HANRAHAN,
*Acting Forest Supervisor.*

MAY 16, 1977.

[FR Doc.77–14855 Filed 4–24–77;8:45 am]

#### SITGREAVES NATIONAL FOREST GRAZING ADVISORY BOARD

##### Meeting Cancellation

The Sitgreaves Grazing Advisory Board Meeting, originally scheduled for 10:00 a.m. on June 10, 1977, at the Maxwell House, Show Low, Arizona has been cancelled.

MILES P. HANRAHAN,
*Acting Forest Supervisor.*

MAY 16, 1977.

[FR Doc.77–14854 Filed 5–24–77;8:45 am]

## CIVIL AERONAUTICS BOARD

[Order 77–5–97; Docket 29123, Agreement C.A.B. 26574]

### INTERNATIONAL AIR TRANSPORT ASSOCIATION

#### Agreement Adopted Relating to North/ Central Pacific Passenger Fares

Adopted by the Civil Aeronautics Board at its office in Washington, D.C., on the 18th day of May 1977.

An agreement has been filed with the Board pursuant to section 412(a) of the Federal Aviation Act of 1958 (the Act) and Part 261 of the Board's Economic Regulations between various air carriers, foreign air carriers, and other carriers, embodied in the resolutions of the Joint Traffic Conferences of the International Air Transport Association (IATA). The agreement, adopted by mail vote at the request of the IATA North/Central Pacific Policy Group, has been assigned the above C.A.B. agreement number.

The agreement would establish an IATA North/Central Pacific fare structure for effect from June 1977 through March 1978, and is consistent with the Board's earlier disposition of an IATA Pacific fare proposal (Order 77–3–163, March 29, 1977). As set forth in the attached appendix, the agreement would establish fares, including those for normal economy service and the 14/21-day excursion fares, at levels which have been approved by the Board on earlier occasions. The agreement would also bring forward unchanged most of the applicable rules and amendments thereto. However, the 30/120-day excursion fare applicable westbound from U.S. points, which was previously disapproved by the Board, has been excluded from the new structure, while the affinity group-100 fares from Alaska to Japan would be reinstated.

AR_0033286

We will approve the agreement as proposed, subject to conditions which have been imposed earlier upon individual resolutions, with specific reference to a condition set forth in Order 77–1–60 which precludes individual return-travel on the 14/35-day group inclusive-tour fare. The proposed fare levels have all been approved by the Board on prior occasions,[1] and we anticipate that the formal closing of fares in this area will have a beneficial impact of fostering greater stability in this market.

The Board, acting pursuant to sections 102, 204(a), and 412 of the Act, does not find that special readopting and amending resolution JT31 (Mail 126) 002u, incorporated in Agreement C.A.B. 26574, to be adverse to the public interest or in violation of the Act provided that approval of the individual resolutions readopted therein are subject, where applicable, to conditions previously imposed by the Board.

Accordingly, *IT IS ORDERED* That:

1. Agreement C.A.B. 26574 be and hereby is approved, subject, where applicable, to conditions previously imposed by the Board; and

2. Tariffs implementing Agreement C.A.B. 26574 may be filed on not less than one day's notice for effectiveness not earlier than June 1, 1977 and shall be marked to expire March 31, 1978. The short notice authority in this paragraph expires July 1, 1977.

This order will be published in the FEDERAL REGISTER.

By the Civil Aeronautics Board.

PHYLLIS T. KAYLOR,
*Secretary.*

[1] See Order 77–3–163, Mar. 29, 1977, for most fares; Order 77–1–60, Jan. 11, 1977, for 14/21-day excursion fares; Order 76–5–158, May 28, 1976, for normal economy fares except to/from Japan; and Order 74–10–88, Oct. 17, 1974, for normal economy fares to/from Japan.

APPENDIX A.—*Summary of North/Central Pacific Fares*

| Fare category | West Coast-Tokyo | | | | Honolulu-Tokyo | | | | Anchorage-Tokyo | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Present tariff fare | CAB 26064 fare [1] | CAB 26257 fare [2] | Proposed CAB 26574 fare | Present tariff fare | CAB 26064 fare [1] | CAB 26257 fare [2] | Proposed CAB 26574 fare | Present tariff fare | CAB 26064 fare [1] | CAB 26257 fare [2] | Proposed CAB 26574 fare |
| 1st class | $1,624 | $1,706 | $1,786 | $1,786 | $1,278 | $1,342 | $1,402 | $1,402 | $1,476 | $1,536 | $1,536 | $1,536 |
| Economy | 1,004 | 1,004 | 1,074 | 1,004 | 806 | 830 | 860 | 800 | 908 | 908 | 908 | 908 |
| 2-d excursion | 853 | 938 | 938 | 938 | 694 | 729 | 760 | 729 | 694 | 694 | 734 | 694 |
| 14 to 35 day IIT | 853 | 896 | | | 694 | 729 | | | 694 | 694 | | |
| Affinity group (25) | 793 | 833 | 883 | 883 | 647 | 679 | 719 | 719 | 647 | 647 | 687 | 687 |
| Affinity group (70) | 550 | 578 | 628 | 628 | 459 | 482 | 520 | 520 | 459 | 459 | 500 | 500 |
| Affinity group (100) | 437 | 481 | 541 | 541 | 377 | 415 | 465 | 465 | 377 | 415 | | 465 |
| GIT (basic) | 564 | 642 | 662 | 692 | 372 | 441 | 481 | 481 | 372 | 397 | 437 | 437 |
| GIT (peak) | 684 | 718 | 768 | 768 | 492 | 517 | 557 | 557 | 492 | 492 | 532 | 532 |

[1] Order 77–1–60, Jan. 11, 1977, disapproved proposed normal fare increases and proposed Asia-originating 30 to 120 d excursion fares, but approved all other increases.
[2] Order 77–3–163, Mar. 29, 1977, disapproved proposed normal economy and 14 to 21 d excursion fare increases, but approved all other increases.

*Summary of North/Central Pacific fares*

| Fare category | West Coast-Hong Kong | | | | Honolulu-Hong Kong | | | | Anchorage-Hong Kong | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Present tariff fare | CAB 26064 fare [1] | CAB 26257 fare [2] | Proposed CAB 26574 fare | Present tariff fare | CAB 26064 fare [1] | CAB 26257 fare [2] | Proposed CAB 26574 fare | Present tariff fare | CAB 26064 fare [1] | CAB 26257 fare [2] | Proposed CAB 26574 fare |
| 1st class | $2,156 | $2,242 | $2,322 | $2,322 | $1,784 | $1,856 | $1,916 | $1,916 | $1,854 | $1,960 | $1,960 | $1,960 |
| Economy | 1,312 | 1,312 | 1,352 | 1,312 | 1,102 | 1,102 | 1,132 | 1,102 | 1,192 | 1,192 | 1,192 | 1,192 |
| 2-d excursion | 1,147 | 1,147 | 1,167 | 1,147 | 962 | 962 | 1,002 | 962 | 916 | 916 | 956 | 916 |
| 120-d excursion (ex-Asia) | | 770 | 820 | 820 | | 650 | 690 | 690 | | | | |
| 14 to 35 d IIT | 1,094 | 1,094 | | | 962 | 962 | | | 916 | 916 | | |
| Affinity group (25) | 1,016 | 1,016 | 1,066 | 1,066 | 855 | 855 | 896 | 896 | 814 | 814 | 854 | 854 |
| Affinity group (70) | 719 | 719 | 794 | 794 | 584 | 584 | 644 | 644 | 556 | 556 | 616 | 616 |
| GIT (basic) | 780 | 830 | 880 | 880 | 660 | 719 | 759 | 759 | 637 | 662 | 702 | 702 |
| GIT (peak) | 925 | 925 | 975 | 975 | 814 | 814 | 854 | 854 | 775 | 775 | 815 | 815 |

[1] Order 77–1–60, Jan. 11, 1977, disapproved proposed normal fare increases and proposed Asia-originating 30 to 120 d excursion fares, but approved all other increases.
[2] Order 77–3–163, Mar. 29, 1977, disapproved proposed normal economy and 14 to 21 d excursion fare increases, but approved all other increases.

[FR Doc.77–14707 Filed 5–24–77; 8:45 am]

[Order 77–5–91; Docket 29123]

**INTERNATIONAL AIR TRANSPORT ASSOCIATION**

**Order Regarding North Atlantic Passenger Fares**

Adopted by the Civil Aeronautics Board at its office in Washington, D.C., on the 18th day of May 1977.

Agreements adopted by the Joint Traffic Conferences of the International Air Transport Association relating to North Atlantic passenger fares; Agreement C.A.B. 26555, R–1 through R–19; Agreement C.A.B. 26556, R–1 through R–14; Agreement C.A.B. 26557, R–1 through R–8.

By Order 77–3–54, March 9, 1977, the Board generally approved an agreement among the carrier members of the International Air Transport Association (IATA) to establish North Atlantic passenger fares from April 1, 1977, through March 31, 1978. We did, however, disapprove the proposed increases in normal economy fares as well as all increases proposed in fares between Florida and London; and placed a condition on our approval of amendments to the seasonality pattern on several fares, to provide that such changes not become effective before June 1, 1977.

The IATA carriers have now submitted new agreements to the Board for approval which are intended to satisfy the Board's objections to the previous IATA package. Generally the agreements would retain normal economy fares at status quo levels; reduce the magnitude of increases proposed in Miami-London first-class and promotional fares; and amend the proposed seasonality changes in line with the Board's condition. The agreements would also amend Resolution 001vv, disapproved by the Board in Order 77–3–54. The resolution would, inter alia, permit carriers to reduce fares from the United States, by individual tariff filings, in response to changes in non-IATA-agreed transatlantic fares from Canada. The proposed amendment clarifies the tariff filing requirement as an addition to the provision for cable notice from the carrier to the IATA Secretariat.

Justification in support of the agreement has been submitted by National Airlines, Inc. (National) and Trans World Airlines, Inc. (TWA).

National, whose earnings position was the basis of the Board's disapproval of Florida/London fare increases, states that the new proposal would retain normal economy fares at status quo; and that other fares would be held at present levels during April and May, increased by about half the amount originally proposed for the peak season (June 1–September 14), and increased the full amount originally proposed during the remainder of the basic season (September 15–March 31).[1] In support of the

[1] See app. A.

AR_0033287

agreement, National alleges that these revisions have already resulted in Mexico-Europe fares being removed from the overall IATA transatlantic package due to undercuts and would probably cause the negation of the Mid-Atlantic fare package as well if not approved; that even under the revised increases in Miami-London fares substantial undercuts of fares from points such as Atlanta and Washington would occur; and that Miami-originating passengers will experience extremely low fares per mile compared with transatlantic fares from other U.S. cities. The carrier has also submitted a revised forecast of financial results in Miami-London combination service for the year ending March 31, 1978, showing returns on investment (ROI) of 10.45 and 11.44 percent under present and proposed fares, respectively.

National's forecast reflects a 53.78-percent load factor rather than the 51.06 percent it had projected in support of the previous agreement; National states it has accepted the Board's capacity adjustment but has estimated traffic at 15 percent above that for calendar year 1976.[2] National alleges that its revised traffic and load factor projections are reasonable since British Airways will enjoy a 40-percent capacity advantage over National during the forecast period due to different equipment types;[3] and avers that any comparison with previous load factors is invalid since the historical figures for 1975 did not reflect results in the normally "softer" months of September through December when operations were suspended due to a strike.

TWA supports the approval of revised Resolution 001vv and incorporates by reference its petition for reconsideration of the Board's disapproval of the resolution in Order 77-3-54.

The Board has concluded to approve the bulk of the agreement, which is consistent with our actions in Order 77-3-54, with certain exceptions.

First, increases in Miami-London fares have not been shown to be warranted and they will, therefore, be disapproved. National's economic justification reflects a forecast load factor of 53.78 percent which is better than the 51.06 percent previously forecast, but which still falls considerably below the 58.37 percent attained during the historical period. In

[2] In Order 77-3-54, the Board adjusted National's capacity downward in order to maintain the 58.4-percent load factor experienced during the historical period, stating that there was no reason to anticipate such a precipitous decline in load factor—to 51.06 percent—as that forecast by National.

[3] National operates DC-10-30 aircraft on the Miami-London route while British Airways operates a B-747. During most of 1976, the capacity advantage of the larger B-747 was checked due to the roped-off provision of the capacity agreement then in force.

view of National's contention that the historical results for the years ended September 30, 1976, or December 31, 1975, are invalid because the low traffic months of September–December were excluded by a strike, we have reviewed the carrier's reported results for the year ending December 31, 1976. During that period National's international load factor was 57.34 percent, a modest decline from the earlier periods but hardly the drastic decline National now forecasts. Therefore, we have adjusted National's forecast load factor to reflect its calendar 1976 experience. This increases the carrier's ROI to 12.36 percent under present fares and to 13.39 percent under proposed fares. Thus, it is clear that National's earnings will be adequate under existing fares and that no increase is needed.

We are not unmindful of the alleged fare undercuts, for routings via Miami, of other transatlantic fares to/from U.S., Caribbean and Mexican points. However, National has made no showing that this problem, to the extent it exists, is so serious as to justify approval of otherwise unwarranted increases in transatlantic fares to/from Miami. In the case of U.S. points, National cites only a sampling of fares to London which are lower from Miami than from Atlanta or Washington. We have examined the fares from these points, as well as from New Orleans, and are not convinced that the carriers would suffer unduly from this situation since in but a few cases does combination of the New Orleans, Atlanta, or Washington domestic fares with the present Miami-London fare undercut the constructed IATA fares from New Orleans, Atlanta, or Washington to London. Only in the case of the 22/45-day excursion fares from New Orleans and Atlanta could the passenger achieve a saving by connecting over Miami, and then a saving of only $13–$34. Indeed, since Miami may, in many cases, be a more convenient departure gateway for travelers originating at these cities anyway, and thus the Miami routings reduce congestion at New York, the Board cannot fault such combinations of fares which have been established at reasonable levels on each sector.[4]

As to undercuts of transatlantic fares for Mexico and Caribbean points, National has provided no figures whatso-

[4] Consistently with our action in Orders 73-7-65, 73-9-58, and 73-11-30, we will condition our approval of the applicable resolutions to require that all travelers qualifying for these fares on routings over Miami be quoted and charged the lower combination of fares over Miami rather than the IATA through fare constructed over New York, so that this benefit will not be discriminatorily limited to those sophisticated travelers who know how to obtain the combination of local fares, by double-ticketing if necessary. See also Order 72-10-1.

ever.[5] Our review of the fares in the Caribbean area shows a very limited number of potential undercuts, and no evidence has ever been presented concerning the extent to which such undercuts are actually used or whether there has been any discernible diversion of traffic via Miami.[6]

Second, we will condition our approval of the 7/8-day group inclusive tour (GIT) fares to provide for continued application of the spring shoulder period through May 22, 1977. Order 77-3-54 stipulated that proposed seasonality changes not become effective before June 1, which in the case of the 7/8-day GIT would retain last year's seasons this spring. The current application of the shoulder period on this fare extends through May 22, yet the agreement before us still proposes a cutoff date of May 14. In order to prevent an unexpected impact on passengers who have already booked on this fare we will maintain our prior condition.

Finally, we will condition amended Resolution 001vv to require such changes to be filed with the Board as an agreement and approved prior to filing in tariffs. The amendment merely clarifies the necessity to file tariffs implementing the contemplated changes which is a requirement of section 403 of the Federal Aviation Act in any event. As more fully discussed in concurrent Order 77-5-92, denying TWA's petition for reconsideration, the Board is not prepared to permit such wholesale changes in fares without the benefit of an agreement filed with the Board, justified by the carriers, and approved under section 412 of the Act.

The Board, acting pursuant to sections 102, 204(a), and 412 of the Act, makes the following findings:

1. It is not found that the following resolutions, incorporated in the agreements indicated, are adverse to the public interest or in violation of the Act provided that approval is subject, where applicable, to conditions previously imposed by the Board:

[5] For instance, National states that the revised fares for Miami have already resulted in negation of the Mexico/Europe IATA fares agreement. Yet that agreement, as submitted to the Board, covered only first-class and normal economy fares. The normal economy fares to/from Miami are not proposed to be increased in any event, and moreover our examination of London-Mexico fares discloses no undercuts using a combination of fares via Miami.

[6] We would also point out that combinations of transatlantic promotional fares from London to Miami with Miami-Mexico or Miami-Caribbean fares cannot be through ticketed, and may necessitate an overnight layover in Miami. Potential undercuts of transatlantic fares between Mexico or the Caribbean and Europe are further limited by the required matchings of fare seasonalities and ticket validities.

AR_0033288

| Agreement CAB | IATA No. | Title | Application |
|---|---|---|---|
| 26556: | | | |
| R-1........ | LA9 | North Atlantic Limited Agreement U.S.A.-Europe (New)............. | 1/2. |
| R-5........ | 064a | North Atlantic Economy-Class Fares (Readopting and Amending).... | 1/2 (North Atlantic-Europe). |
| 26555: | | | |
| R-4........ | 064a | ......do............................................................ | 1/2 (North Atlantic-Middle East). |
| 26557: | | | |
| R-4........ | 064a | ......do............................................................ | 1/2 (North Atlantic Africa). |

2. It is not found that the following resolutions, set forth in the agreements indicated, are adverse to the public interest or in violation of the Act except insofar as increased New York-London fares would be used to construct through fares to and from points in Florida, provided that approval is subject, where applicable, to conditions previously imposed by the Board:

| Agreement CAB | IATA No. | Title | Application |
|---|---|---|---|
| 26556: | | | |
| R-3........ | 002ce | Special Readoption Resolution............................... | 1/2 North Atlantic-Europe |
| R-4........ | 015 | North Atlantic Proportional Fares North American (Readopting and Amending) Except Note "M". | Do. |
| R-6........ | 070d | North Atlantic 14/21-Day and 14/45-Day Excursion Fares (Readopting and Amending). | Do. |
| R-7........ | 071p | North Atlantic Advance-Purchase Excursion Fares (Readopting and Amending). | Do. |
| R-8........ | 071q | North Atlantic 22/45-Day Excursion Fares (Readopting and Amending). | Do. |
| R-9........ | 076e | North Atlantic Affinity Group Fares (Readopting and Amending)...... | Do. |
| R-10........ | 076p | North Atlantic 14-Day Incentive Group Fares (Readopting and Amending). | Do. |
| R-11........ | 084a | North Atlantic 21, 28, and 30 Day Group Inclusive-Tour Fares (Re-adopting and Amending). | Do. |
| R-14........ | 092ff | North Atlantic Individual Youth Fares (Readopting and Amending).... | Do. |
| R-2........ | 002ff | Special Readoption Resolution............................... | 1/2 North Atlantic-Middle East). |
| R-3........ | 015 | North Atlantic Proportional Fares North American (Readopting and Amending) Except Note "M". | Do. |
| R-5........ | 070d | North Atlantic 14/21-Day and 14/45-Day Excursion Fares (Readopting and Amending). | Do. |
| R-6........ | 070t | North Atlantic 14/21-Day Excursion Fares—Amman, Baghdad, Beirut, Cairo, Damascus, Jerusalem, Kuwait, Nicosia, Tehran (Readopting and Amending). | Do. |
| R-7........ | 070x | ......do........................................... | Do. |
| R-8........ | 071q | North Atlantic 22/45-day Excursion Fares (Readopting and Amending). | Do. |
| R-9........ | 073i | North Atlantic Group Fares—Israel (Readopting and Amending)....... | Do. |
| R-10........ | 073r | North Atlantic 8/21-Day Group Fares—Israel (Readopting and Amending). | Do. |
| R-11........ | 075rr | North Atlantic 8/21-Day Group Fares—Amman, Baghdad, Beirut, Cairo, Damascus, Jerusalem, Nicosia (Readopting and Amending). | Do. |
| R-12........ | 076e | North Atlantic Affinity Group Fares (Readopting and Amending)...... | Do. |
| R-13........ | 076p | North Atlantic 14-Day Incentive Group Fares (Readopting and Amending). | Do. |
| R-14........ | 084a | North Atlantic 21, 28, and 30 Day Group Inclusive-Tour Fares (Re-adopting and Amending). | Do. |
| R-15........ | 084cc | North Atlantic Winter Group Inclusive-Tour Fares to Middle East (Readopting and Amending). | Do. |
| R-17........ | 092ff | North Atlantic Individual Youth Fares (Readopting and Amending)... | Do. |
| R-19........ | 092gg | North Atlantic Group Youth Fares, U.S.A.-Israel (Readopting and Amending). | Do. |
| 26557: | | | |
| R-2........ | 002gg | Special Readoption Resolution............................... | 1/2 (North-Atlantic-Africa). |
| R-3........ | 015 | North Atlantic Proportional Fares North American (Readopting and Amending) Except Note "M". | Do. |
| R-5........ | 070d | North Atlantic 14/21-Day and 14/45-Day Excursion Fares (Readopting and Amending). | Do. |
| R-6........ | 076e | North Atlantic Affinity Group Fares (Readopting and Amending)...... | Do. |
| R-7........ | 076p | North Atlantic 14-Day Incentive Group Fares (Readopting and Amending). | Do. |
| R-8........ | 084a | North Atlantic 21, 28, and 30 Day Group Inclusive-Tour Fares (Re-adopting and Amending). | Do. |

3. It is found that the following resolutions, incorporated in the agreements indicated, are adverse to the public interest and in violation of the Act insofar as increased New York-London fares would be used to construct fares to and from points in Florida:

AR_0033289

| Agreement CAB | IATA No. | Title | Application |
|---|---|---|---|
| 26556: | | | |
| R-3....... | 002ve | Special Readoption Resolution.................................... | 1/2 (North Atlantic-Europe). |
| R-6....... | 070d | North Atlantic 14/21-Day and 14/45-Day Excursion Fares (Readopting and Amending). | Do. |
| R-7....... | 071p | North Atlantic Advance-Purchase Excursion Fares (Readopting and Amending). | Do. |
| R-8....... | 071q | North Atlantic 22/45 Day Excursion Fares (Readopting and Amending). | Do. |
| R-9....... | 076e | North Atlantic Affinity Group Fares (Readopting and Amending) ...... | Do. |
| R-10..... | 076p | North Atlantic 14-Day Incentive Group Fares (Readopting and Amending). | Do. |
| R-11..... | 084a | North Atlantic 21, 28, and 30-Day Group Inclusive-Tour Fares (Readopting and Amending). | Do. |
| R-12..... | 084p | North Atlantic 7/8, 7/10, and 7/13-Day Group Inclusive-Tour Fares—Europe (Readopting and Amending). | Do. |
| R-14..... | 092ff | North Atlantic Individual Youth Fares (Readopting and Amending).. | Do. |
| 26555: | | | |
| R-2....... | 002ff | Special Readoption Resolution.................................... | 1/2 (North Atlantic-Middle East. |
| R-5....... | 070d | North Atlantic 14/21-Day and 14/45-Day Excursion Fares (Readopting and Amending). | Do. |
| R-6....... | 070t | North Atlantic 14/21-Day Excursion Fares—Amman, Baghdad, Beirut Cairo, Damascus, Jerusalem, Kuwait, Nicosia, Tehran (Readopting and Amending). | Do. |
| R-7....... | 070t | ....do............................................................ | Do. |
| R-8....... | 071q | North Atlantic 22/45-Day Excursion Fares (Readopting and Amending). | Do. |
| R-9....... | 073i | North Atlantic Group Fares—Israel (Readopting and Amending)...... | Do. |
| R-10..... | 075r | North Atlantic 8/21-Day Group Fares—Israel (Readopting and Amending). | Do. |
| R-11..... | 075cr | North Atlantic 8/21-Day Group Fares—Amman, Baghdad, Beirut, Cairo, Damascus, Jerusalem, Nicosia (Readopting and Amending). | Do. |
| R-12..... | 076e | North Atlantic Affinity Group Fares (Readopting and Amending)...... | Do. |
| R-13..... | 076p | North Atlantic 14-Day Incentive Group Fares (Readopting and Amending). | Do. |
| R-14..... | 084a | North Atlantic 21, 28, and 30 Day Group Inclusive-Tour Fares (Readopting and Amending). | Do. |
| R-15..... | 084cc | North Atlantic Winter Group Inclusive—Tour Fares to Middle East (Readopting and Amending). | Do. |
| R-17..... | 092ff | North Atlantic Individual Youth Fares (Readopting and Amending).. | Do. |
| R-19..... | 092gg | North Atlantic Group Youth Fares, U.S.A.-Israel (Readopting and Amending). | Do. |
| 26557: | | | |
| R-2....... | 002gg | Special Readoption Resolution.................................... | 1/2 (North Atlantic-Africa). |
| R-5....... | 070d | North Atlantic 14/21-Day and 14/45-Day Excursion Fares (Readopting and Amending). | Do. |
| R-6....... | 076e | North Atlantic Affinity Group Fares (Readopting and Amending)...... | Do. |
| R-7....... | 076p | North Atlantic 14-Day Incentive Group Fares (Readopting and Amending). | Do. |
| R-8....... | 084a | North Atlantic 21, 28, and 30 Day Group Inclusive-Tour Fares (Readopting and Amending). | Do. |

4. It is found that the following resolutions, incorporated in the agreements indicated, are adverse to the public interest and in violation of the Act:

| Agreement CAB | IATA No. | Title | Application |
|---|---|---|---|
| 26556: | | | |
| R-4....... | 015 | North Atlantic Proportional Fares North American (Readopting and Amending) Note "M". | 1/2 (North Atlantic.—Europe). |
| 26555: | | | |
| R-3....... | 015 | ....do............................................................ | 1/2 (North Atlantic.—Middle East). |
| 26557: | | | |
| R-3....... | 015 | ....do............................................................ | 1/2 (North Atlantic.—Africa). |

5. It is not found that the following resolution, incorporated in Agreement C.A.B. 26556 as indicated, is adverse to the public interest or in violation of the Act except insofar as increased New York-London fares would be used to construct fares to and from points in Florida, provided that approval is subject to conditions previously imposed by the Board as well as the additional condition hereinafter stated:

| Agreement CAB | IATA No. | Title | Application |
|---|---|---|---|
| 26556: | | | |
| R-12..... | 084p | North Atlantic 7/8, 7/10, and 7/13 Day Group Inclusive-Tour Fares—Europe (Readopting and Amending). | 1/2 (North Atlantic-Europe). |

NOTE.—Provided that the 1977 shoulder season fares from the United States set forth in subpar. (4)(a)(ii) shall be applicable through May 22, 1977, and from Sept. 15 through Oct. 31, 1977.

6. It is not found that the following resolutions, incorporated in the agreements indicated, are adverse to the public interest or in violation of the Act provided that approval is subject to the condition hereinafter stated:

AR_0033290

| Agreement C.A.B. | IATA No. | Title | Application |
|---|---|---|---|
| 26536: R-2...... | 001vv | JT12 (North Atlantic) Special Escape Resolution (Readopting and Amending). | 1/2 (North Atlantic-Europe). |
| 26555: R-1...... | 001vv | ...do............................................. | 1/2 (North Atlantic-Middle East). |
| 26557: R-1...... | 001vv | ...do............................................. | 1/2 (North Atlantic-Africa). |

NOTE.—Provided that: No changes in fares to/from U.S. points pursuant to the resolution shall be filed in tariffs unless previously filed with and approved by the Board as an agreement under sec. 412 of the act.

7. It is not found that the following resolutions, incorporated in the agreements indicated, affect air transportation within the meaning of the Act:

| Agreement CAB | IATA No. | Title | Application |
|---|---|---|---|
| 26556: R-13..... | 002f | North Atlantic Individual Youth Fares (Readopting and Amending)... | 1/2 North Atlantic-Europe). |
| 26555: R-16..... | 002f | ...do............................................. | 1/2 (North Atlantic-Middle East). |
| R-18..... | 002g | North Atlantic Group Youth Fares Canada/Mexico-Israel (Readopting and Amending). | Do. |

Accordingly, It is ordered, That:

1. Those portions of Agreements C.A.B. 26556, C.A.B. 26555, and C.A.B. 26557 set forth in finding paragraph 1 above be and hereby are approved subject, where applicable, to conditions previously imposed by the Board;

2. Those portions of Agreements C.A.B. 26556, C.A.B. 26555, and C.A.B. 26557 set forth in finding paragraph 2 above be and hereby are approved subject, where applicable, to conditions previously imposed by the Board, provided further that, for transportation between points in the United States and Traffic Conference 2 involving an actual routing via Miami, tariffs shall provide a through fare not in excess of the sum of the local sector fares over Miami;

3. That portion of Agreement C.A.B. 26556 set forth in finding paragraph 5 above be and hereby is approved subject to conditions previously imposed by the Board and, in addition, to the condition stated therein, provided further that, for transportation between points in the United States and Traffic Conference 2

involving an actual routing via Miami, tariffs shall provide a through fare not in excess of the same of the local sector fares over Miami;

4. Those portions of Agreements C.A.B. 26556, C.A.B. 26555, and C.A.B. 26557 set forth in finding paragraph 6 above be and hereby are approved subject to the condition stated herein;

5. Those portions of Agreements C.A.B. 26556, C.A.B. 26555, and C.A.B. 26557 set forth in finding paragraphs 3 and 4 above be and hereby are disapproved;

6. Jurisdiction be and hereby is disclaimed with respect to those portions of Agreements C.A.B. 2656 and C.A.B. 26555 set forth in finding paragraph 7 above; and

7. Tariffs implementing the resolutions approved herein shall be marked to expire March 31, 1978.

This order will be published in the FEDERAL REGISTER.

By the Civil Aeronautics Board.

PHYLLIS T. KAYLOR,
Secretary.

APPENDIX A.—Miami-London roundtrip air fares

| | Present | Agreement CAB 26392 | Agreement CAB 26556 | Increase |
|---|---|---|---|---|
| | | | | Percent |
| 1st class: | | | | |
| Peak................ | $1,350 | $1,412 | $1,380 | 2.2 |
| Basic............... | 1,350 | 1,412 | ¹ 1,412 | 4.6 |
| Normal economy: | | | | |
| Peak................ | 864 | 874 | 864 | .......... |
| Basic............... | 726 | 746 | 726 | .......... |
| 14/21 excursion: | | | | |
| Peak................ | 664 | 696 | 680 | 2.4 |
| Basic............... | 579 | 606 | ¹ 606 | 4.7 |
| 22/45 excursion: | | | | |
| Peak................ | 566 | 632 | 599 | 5.8 |
| Basic............... | 466 | 512 | ¹ 512 | 9.9 |
| APEX: | | | | |
| Peak................ | 477 | 495 | 486 | 1.9 |
| Basic............... | 392 | 405 | ¹ 405 | 3.3 |
| Youth: | | | | |
| Peak................ | 602 | 698 | 693 | 4.7 |
| Basic............... | 603 | 635 | ¹ 650 | 7.8 |
| Group inclusive tour (GIT): | | | | |
| Peak................ | 558 | 601 | 580 | 3.9 |
| Basic............... | 456 | 492 | ¹ 492 | 7.9 |
| 7/8 GIT: | | | | |
| Shoulder............ | 487 | 499 | ¹ 499 | 1.0 |
| Winter.............. | 426 | 457 | ¹ 457 | 7.3 |
| Affinity/incentive group: | | | | |
| Peak................ | 556 | (²) | (²) | (²) |
| Basic............... | 447 | 512 | ³ 512 | 14.5 |

¹ Status quo would be maintained during April and May of the 1977 basic season as well as during April/May 1977, for the winter and shoulder periods of the 7/8-day GIT.
² Discontinued.

APPENDIX B.—National Airlines, Inc.—Miami-London service forecast year ending Mar. 31, 1978

[In thousands]

| | National justification | | Adjusted | |
|---|---|---|---|---|
| | Present | Proposed | Present | Proposed |
| Revenue passenger-miles............. | 486,763 | 486,763 | 486,763 | 486,763 |
| Available seat-miles................. | 903,112 | 902,112 | ² 848,907 | ² 848,907 |
| Load factor (percent)............... | 53.78 | 53.78 | ¹ 57.34 | ¹ 57.34 |
| Total operating revenue.............. | $30,129 | $30,824 | $30,129 | $30,824 |
| Total operating expense.............. | 23,516 | 23,516 | ² 22,545 | ² 22,545 |
| Operating profit (loss)............. | 6,613 | 7,308 | 7,584 | 8,279 |
| Nonoperating income and expense, net. | (809) | (809) | ² (771) | ² (771) |
| Net income before tax............... | 5,804 | 6,499 | 6,813 | 7,508 |
| Income tax (credit) at 48 pct....... | 2,786 | 3,120 | 3,270 | 3,604 |
| Net income after tax................ | 3,018 | 3,379 | 3,543 | 3,904 |
| Add: Interest expense............... | 809 | 809 | ² 771 | ² 771 |
| Return element...................... | 3,827 | 4,188 | 4,314 | 4,675 |
| Investment.......................... | 36,623 | 36,623 | ² 34,917 | ² 34,917 |
| Returns on investment (percent)..... | 10.45 | 11.44 | 12.36 | 13.39 |

¹ Historical load factor for calendar 1976.
² Capacity adjusted to achieve historical load factor. Capacity costs, investment, and interest expense revised downward accordingly.

[FR Doc.77-14705 Filed 5-24-77;8:45 am]

NOTICES

AR_0033291

26679

**NOTICES**

[Docket No. 30880; Order 77-5-62 [1]]

**DOMESTIC PASSENGER-FARE INCREASE PROPOSED BY VARIOUS CARRIERS**

**Order of Investigation and Suspension; Errata**

Adopted by the Civil Aeronautics Board at its office in Washington, D.C. on the 13th day of May, 1977.

1. Paragraph 2 of the ordering paragraphs should be amended by changing "Appendix B" in the fourth line to read "Appendix C".

2. Refer to Appendix B under heading for Tariff C.A.B. No. 142 and change to read as follows:

Rules 85(h) and (J) on 47th, 48th, 49th. 50th and 51st Revised Pages 28.

By the Civil Aeronautics Board.

Dated: May 16, 1977.

PHYLLIS T. KAYLOR,
*Secretary.*

[FR Doc.77-14909 Filed 5-24-77; 8:45 am]

---

**DEPARTMENT OF COMMERCE**

**Domestic and International Business Administration**

**UNIVERSITY OF IDAHO ET AL.**

**Consolidated Decision on Applications for Duty-Free Entry of Electron Microscopes**

The following is a consolidated decision on applications for duty-free entry of electron microscopes pursuant to Section 6(c) of the Educational, Scientific, and Cultural Materials Importation Act of 1966 (Pub. L. 89-651, 80 Stat. 897) and the regulations issued thereunder as amended (15 CFR Part 301). (See especially § 301.11(e).)

A copy of the record pertaining to each of the applications in this consolidated decision is available for public review during ordinary business hours of the Department of Commerce, at the Special Import Programs Division, Office of Import Programs, Department of Commerce, Washington, D.C. 20230.

Docket Number: 77-00086. Applicant: University of Idaho, Electron Microscopy Center, Department of Veterinary Science, Moscow, Idaho 83843. Article: Electron Miscroscope, Model EM 10a with Goniometer Stage and 70 mm Camera. Manufacturer: Carl Zeiss, West Germany. Intended use of article: The article is intended to be used to study a wide variety of materials or phenomena including (1) cells from diseased and normal animals and plants; (2) microorganisms, mycoplasma, etc.; (3) crystal structures; (4) synthetic fibers and particles; (5) nucleic acid strands extracted from viral agents; (6) morphogenesis of subcellular elements in eukaryotic and prokaryotic cells; (7) ingestion and digestion of infectious agents and inert particles by phagocytic and nonphagocytic cells; and (8) replication or growth and binary division of infectious agents in parasitized host cells. The experiments that will be conducted include the fol-

[1] Published at 42 FR 25517 5-18-77.

lowing: (1) Morphologic characterization of infectious agents, (2) Ultrastructural Studies of Abnormal Leukocytes, and (3) Origin of Ascospore—Delimiting Membranes.

In addition, the article will be used in a laboratory course in electron microscopy which is designed to develop proficiency in the use of the transmission electron microscope and selected preparation techniques used for electron microscopy. Application received by Commissioner of Customs: January 10, 1977. Advice submitted by the Department of Health, Education, and Welfare on: April 22, 1977. Article ordered: December 22, 1976.

Docket Number: 77-00095. Applicant: University of Rochester School of Medicine & Dentistry, Department of Anatomy, Box 603, 601 Elmwood Ave., Rochester, New York 14642. Article: Electron Microscope, Model EM 10A and High Goniometer Stage. Manufacturer: Carl Zeiss, West Germany. Intended use of article: The article is intended to be used for the investigation of junctional complexes and cell to cell communication in normal and malignant tissues. DNA-RNA configurations in normal and malignant brain tissues will also be studied. Experiments will involve growing normal and tumor cell lines in vitro. At various time periods of growth, the spheroids will be prepared for electron microscopy to determine the type, development and duration of attachment of cell junctions in an attempt to elucidate the role of cell to cell communication in cancer cells which afford greater resistance to irradiation and/or chemotherapeutic agents. These cell lines will also be grown in laboratory animals to determine the in vivo effects of the drugs and/or irradiation on cell junctions and cell to cell communication. The article will also be used to train graduate students, medical students and post-doctoral fellows in the use of the microscope and ancillary techniques. Application received by Commissioner of Customs: January 10, 1977. Advice submitted by the Department of Health, Education, and Welfare on: April 22, 1977. Article ordered: December 21, 1976.

Comments: No comments have been received in regard to any of the foregoing applications.

Decision: Applications approved. No instrument or apparatus of equivalent scientific value to the foreign articles, for the purposes for which the articles are intended to be used, was being manfactured in the United States at the time the articles were ordered.

Reasons: Each foreign article has a specified resolving capability of 3.5 Angstroms. The Department of Health, Education, and Welfare (HEW) advises in the respectively cited memoranda, that the additional resolving capability of the foreign articles is pertinent to the purposes for which each of the foreign articles to which the foregoing applications relate is intended to be used. HEW also advises that it knows of no domestic instrument which provided the pertinent

features of each article at the time of order. The Department of Commerce knows of no other instrument or apparatus of equivalent scientific value to any of the foreign articles to which the foregoing application relate, for such purposes as these articles are intended to be used, which was being manfactured in the United States at the time the articles were ordered.

(Catalog of Federal Domestic Assistance Program No. 11.105, Importation of Duty-Free Educational and Scientific Materials.)

RICHARD M. SEPPA,
*Director, Special*
*Import Programs Division.*

[FR Doc.77-14806 Filed 5-24-77; 8:45 am]

---

**UNIVERSITY OF ROCHESTER ET AL.**

**Consolidated Decision on Applications for Duty-Free Entry of Electron Microscopes**

The following is a consolidated decision on applications for duty-free entry of electron microscopes pursuant to Section 6(c) of the Educational, Scientific, and Cultural Materials Importation Act of 1966 (Pub. L. 89-651, 80 Stat. 897) and the regulations issued thereunder as amended (15 CFR Part 301). (See especially § 301.11(e).)

A copy of the record pertaining to each of the applications in this consolidated decision is available for public review during ordinary business hours of the Department of Commerce, at the Special Import Programs Division, Office of Import Programs, Department of Commerce, Washington, D.C. 20230.

Docket Number: 77-00078. Applicant: University of Rochester, 601 Elmwood Avenue, Rochester, NY 14642. Article: Electron Microscope, Model EM 10-A and accessories. Manufacturer: Carl Zeiss, West Germany. Intended use of article: The article is intended to be used for studies of materials and phenomena related directly to the analysis of the mammalian central nervous system and specifically to the ultrastructural correlates of neuroendocrine mechanisms and the fine structural localization of brain hormones. The properties of the material to be investigated for the phenomena relates to the capability of localizing radio-labelled neurohormones releasing factors and neurotransmitters with transmission electron microscopy in the primate central nervous system, that has been embedded in plastic and thin sectioned. Relevant regions of the primate brain including the hypothalamus, brain stem, and other circumventricular organs will be analyzed as to their capacity to sequester various radioactive bioactive peptide molecules. The article will also be used for educational purposes in the courses: Anatomy 595, Ph.D. Research; Anatomy 395, Research in Anatomy; Anatomy 500, Techniques in Neuroendocrine Morphology; and Anatomy 596, Ultrastructural Correlates of Neuroendocrine Mechanisms. The objectives of these courses are to instill in students basic

AR_0033292

fundamental ultrastructural techniques to determine the fine anatomy of the central nervous system and provide advanced training for senior graduate students, post-doctoral fellows and research associates. Application received by Commissioner of Customs: January 7, 1977. Advice submitted by the Department of Health, Education, and Welfare on: April 22, 1977. Article ordered: December 23, 1976.

Docket Number: 77-00080. Applicant: The Regents of the University of California, San Diego. Department of Pathology. M-012, La Jolla, CA 92093. Article: Electron Microscope, Model EM 10A and accessories. Manufacturer: Carl Zeiss, West Germany. Intended use of article: The article is intended to be used for studying mechanisms of disease affecting brain, nerve, heart, and liver in human and experimental animals. Specific investigations will include the following:

(1) Studies on the alteration of brain tissue concerned with the interaction of plasma membranes and virus with particular reference to changes seen in transmissible spongiform encephalopathy,

(2) Studies on peripheral nerves concentrated on the ultrastructural localization of heavy metals in demyelinating euuropathies such as lead, mercury, thallium, arsenic and calcium,

(3) Studies on the heart concerned with early changes in mitochondrial and plasma membranes as well as myofilaments in heart muscle and the deposition of minerals in mitochrondria during cardiac ischemia, and

(4) Studies on the liver that elucidate the localization of bile salts in the liver after their precipitation by alkali metals. In addition, the article will be used for the training of interns, residents and medical students in course 208L (Pathology, Microbiology, Pathophysiology, Epidermiology, and Clinical Pharmacology) and 199 (Independent Studies). Ph. D. candidates in Pathology will also use the article. Application received by Commissioner of Customs: January 7, 1977. Advice submitted by the Department of Health, Education, and Welfare on: April 23, 1977. Article ordered: November 30, 1976.

Comments: No comments have been received in regard to any of the foregoing applications.

Decision: Applications approved. No instrument or apparatus of equivalent scientific value to the foreign articles, for the purposes for which the articles are intended to be used, was being manufactured in the United States at the time the articles are ordered.

Reasons: Each foreign article provides a wide magnification range of 100 to 200,000X and a guaranteed resolution of 3.5 angstroms point to point. The Department of Health, Education, and Welfare (HEW) advises in its respectively cited memoranda that the capabilities of each article described above are pertinent to each applicant's intended purposes. HEW further advises that it knows of no domestic instrument which pro-

vided the pertinent features of the articles at the time each article was ordered.

The Department of Commerce knows of no other inestrument or apparatus of equivalent scientific value to any of the foreign articles to which the foregoing applications relate, for such purposes as these articles are intended to be used, which was being manufactured in the United States at the time the articles were ordered.

(Catalog of Federal Domestic Assistance Program No. 11.105, Importation of Duty-Free Educational and Scientific Materials.)

RICHARD M. SEPPA,
*Director, Special
Import Programs Division.*

[FR Doc. 77-14807 Filed 5-24-77;8:45 am]

## SEMICONDUCTOR MANUFACTURING AND TEST EQUIPMENT TECHNICAL ADVISORY COMMITTEE

### Partially Closed Meeting

Pursuant to the provisions of the Federal Advisory Committee Act, 5 U.S.C. App. I (Supp. V, 1975), notice is hereby given that a meeting of the Semiconductor Manufacturing and Test Equipment Technical Advisory Committee will be held on Wednesday, June 22, 1977, at 9:30 a.m. in Room 4833, Main Commerce Building, 14th and Constittuion Avenue, N.W. Washington, D.C. The meeting will continue June 23 in Room 3817, Main Commerce Building, to the conclusion of the agenda.

The Semiconductor Manufacturing and Test Equipment Technical Advisory Committee was initially established on January 3, 1973. On December 20, 1974 and January 13, 1977, the Assistant Secretary for Administration approved the recharter and extension of the Committee for two additional years, pursuant to Section 5(c)(1) of the Export Administration Act of 1969, as amended, 50 U.S.C. App. Sec. 2404(c)(1) (Supp. V, 1975) and the Federal Advisory Committee Act.

The Committee advises the Office of Export Administration, Bureau of East-West Trade, with respect to questions involving technical matters, worldwide availability and actual utilization of production and technology, and licensing procedures which may affect the level of export controls applicable to semiconductor manufacturing and test equipment, including technical data related thereto, and including those whose export is subject to multilateral (COCOM) controls.

The Committee meeting agenda has four parts:

GENERAL SESSION

1. Opening remarks by the Chairman, Mr. Larry L. Hansen.
2. Presentation of papers or comments by the public.
3. Review of assignments made at last meeting.

EXECUTIVE SESSION

4. Discussion of matters properly classified under Executive Order 11652, dealing with

the U.S. and COCOM control program and strategic criteria related thereto.

The General Session of the meeting is open to the public, at which a limited number of seats will be available. To the extent time permits members of the public may present oral statements to the Committee. Written statements may be submitted at any time before or after the meeting.

With respect to agenda item (4), the Acting Assistant Secretary of Commerce for Administration, with the concurrence of the delegate of the General Counsel, formally determined on January 27, 1977, pursuant to Section 10(d) of the Federal Advisory Committee Act, as amended by Section 5(c) of the Government in the Sunshine Act, Pub. L. 94-409, that the matters to be discussed in the Executive Session should be exempt from the provisions of the Federal Advisory Committee Act relating to open meetings and public participation therein, because the Executive Session will be concerned with matters listed in 5 U.S.C. 552b(c)(1). Such matters are specifically authorized under criteria established by an Executive Order to be kept secret in the interests of national defense or foreign policy. All materials to be reviewed and discussed by the Committee during the Executive Session of the meeting have been properly classified under Executive Order 11652. All Committee members have appropriate security clearances.

Copies of the minutes of the open portion of the meeting will be available upon written request addressed to the Freedom of Information Officer, Room 3012, Domestic and International Business Administration, U.S. Department of Commerce, Washington, D.C. 20230.

For further information, contact Mr. Charles C. Swanson, Director, Operations Division, Office of Export Administration, Domestc and Internatonal Business Administration, Room 1617M, U.S. Department of Commerce, Washington, D.C. 20230, telephone: A/C 202-377-4196.

The complete Notice of Determination to close portions of the series of meetings of the Semiconductor Manufacturing and Test Equipment Technical Advisory Committee and of any subcommittees thereof is hereby published.

Dated: May 20, 1977.

RAUER H. MEYER,
*Director, Office of Export Administration, Bureau of East-West Trade, Department of Commerce.*

SEMICONDUCTOR MANUFACTURING AND TEST EQUIPMENT TECHNICAL ADVISORY COMMITTEE

NOTICE OF DETERMINATION

In responce to written requests of representatives of a substantial segment of the semiconductor manufacturing and test equipment industry, the Semiconductor Manufacturing and Test Equipment Technical Advisory Committee was established by the Secretary of Commerce pursuant to Section 5(c)(1) of the Export Administration Act of 1969, 50 U.S.C. App. 2404(c)(1) (Supp. V, 1975), to advise the Department

AR_0033293

of Commerce with respect to questions involving technical matters, worldwide availability, and actual utilization of production and technology, and licensing procedures which may affect the level of export controls applicable to semiconductor manufacturing and test equipment, including technical data related thereto, and including those whose export is subject to multilateral (COCOM) controls.

The Committee, which currently has twelve members representing industry and six members representing government agencies, will terminate no later than August 29, 1978, unless extended by the Secretary of Commerce or his designee. All members of the Committee have the appropriate security clearances.

The Committee's activities are conducted pursuant to 50 U.S.C. App. 2404(c)(1), P.L. 94-362, 50 U.S.C. App. 5(b), Executive Order No. 11940, 15 C.F.R. § 390.1, the provisions of the Federal Advisory Committee Act, 5 U.S.C. App. I (Supp. V, 1975), and Office of Management and Budget Circular A-63 (Revised), Advisory Committee Management, effective May 1, 1974. Section 10 of the Federal Advisory Committee Act provides, among other things, that the meetings of advisory committees are to be open to the public, and to public participation, unless the head of the agency (or his delegate) to which the committee reports determines in writing that all, or some portion, of the agenda of the meeting of the Committee is concerned with matters listed in Section 552(b) of Title 5 of the United States Code. Section 5(c) of the Government in the Sunshine Act P.L. 94-409, effective March 12, 1977, provides that advisory committee meetings or portions thereof may be exempt from the open meeting and public participation requirements of the Federal Advisory Committee Act if the President, or the head of the agency to which the Advisory Committee reports, determines that such portion of such meeting may be closed to the public in accordance with 5 U.S.C. 552b(c).

Section 552(b)(1) of Title 5, United States Code, provides that information may be withheld from the public if it concerns matters specifically required by Executive Order to be kept secret in the interest of national defense or foreign policy, and is in fact properly classified pursuant to such Executive Order.

5 U.S.C. 552b(c)(1) provides that agency meetings or portions thereof may be closed to the public where they are likely to disclose matters that are specifically authorized under criteria established by an Executive Order to be kept secret in the interest of national defense or foreign policy and are in fact properly classified pursuant to such Executive Order.

Notices of Determination authorizing the closing of meetings, or portions thereof, of the Semiconductor Manufacturing and Test Equipment Technical Advisory Committee and its formal subcommittees, dealing with security classified matters, were approved on March 6, 1973 for the meeting of March 27, 1973; on June 18, 1973 for the meeting of June 29, 1973; on August 21, 1973 for a series of meetings from August 21, 1973 through December 31, 1973; on December 26, 1973 for a series of meetings for the period January 1, 1974 through April 30, 1974; on May 16, 1974, covering a series of meetings from May 1, 1974 through January 3, 1975; on December 16, 1974, covering a series of meetings from January 4, 1975 to January 3, 1976; and on November 25, 1975, covering a series of meetings from January 4, 1976 through January 3, 1977.

In order to provide advice to the Department under the terms of its charter, the Committee and formal subcommittees there-

of will continue to hold a series of meetings dealing with the matters set forth in the first paragraph of this Determination. These meetings will include discussions of the COCOM control list as it relates to the commodities and technical data under its purview, and with the foreign availability of these commodities and technical data. In addition, the Committee and its formal subcommittees will be preparing recommendations for the Department's consideration relating to the U.S. Government's negotiating position on COCOM-related matters. Much of the information relating to the COCOM control list, as well as proposed changes, is now or will be security classified for national defense or foreign policy reasons, pursuant to Executive Order No. 11652, 3 CFR 339 (1974). In order for the Committee and its formal subcommittees to provide required advice to the U.S. Government, it will be necessary to provide the Committee and its formal subcommittees with such classified material. Therefore, the portions of the series of meetings of the Committee and of subcommittees thereof that will involve discussions of matters specifically authorized under criteria established by an Executive Order to be kept secret in the interest of national defense or foreign policy and are in fact properly classified pursuant to such Executive Order, must be closed to the public. The remaining portions of the series of meetings will be open to the public.

Accordingly, I hereby determine, pursuant to Section 10(d) of the Federal Advisory Committee Act, as amended by Section 5(c) of the Government in the Sunshine Act, Pub. L. 94-409, that those portions of the series of meetings of the Committee and of any subcommittees thereof, dealing with the aforementioned classified materials shall be exempt, for the period from the date of the signing of this determination, to August 29, 1978, from the provisions of Section 10 (a)(1) and (a)(3), relating to open meetings and public participation therein, because the Committee and subcommittee discussions will be concerned with matters listed in 5 U.S.C. 552(b)(1) and 5 U.S.C. 552b(c)(1). The remaining portions of the meetings will be open to the public.

GUY W. CHAMBERLIN, Jr.,
*Acting Assistant Secretary
for Administration.*

JANUARY 29, 1977.

ALFRED MEISNER, Jr.,
*General Counsel.*

JANUARY 27, 1977.

[FR Doc.77-14884 Filed 5-24-77;8:45 am]

---

## TELECOMMUNICATIONS EQUIPMENT TECHNICAL ADVISORY COMMITTEE

### Partially Closed Meeting

Pursuant to Section 10(a)(2) of the Federal Advisory Committee Act, 5 U.S.C. App. I (Supp. V, 1975), notice is hereby given that a meeting of the Telecommunications Equipment Technical Advisory Committee will be held on Thursday, June 30, 1977, at 10 a.m., in Room 3817, Main Commerce Building, 14th and Constitution Avenue NW., Washington, D.C.

The Telecommunications Equipment Technical Advisory Committee was initially established on April 5, 1973. On March 12, 1975, and March 16, 1977, the Acting Assistant Secretary for Administration approved the recharter and extension of the Committee for two addi-

tional years, pursuant to Section 5(c)(1) of the Export Administration Act of 1969, as amended, 50 U.S.C. App. Sec. 2404(c)(1) and the Federal Advisory Committee Act.

The Committee advises the Office of Export Administration, Bureau of East-West Trade, with respect to questions involving technical matters, worldwide availability, and actual utilization of production and technology, and licensing procedures which may affect the level of export controls applicable to telecommunications equipment, including technical data related thereto, and including those whose export is subject to multilateral (COCOM) controls.

The Committee meeting agenda has five parts:

GENERAL SESSION

(1) Opening remarks by the Chairman.
(2) Presentation of papers or comments by the public.
(3) Nomination and election of a new Chairman.
(4) Discussion on draft sections of Findings—Volume I of the annual report.

EXECUTIVE SESSION

(5) Discussion of matters properly classified under Executive Order 11652, dealing with the U.S. and COCOM control program and strategic criteria related thereto.

The General Session of the meeting is open to the public, at which a limited number of seats will be available. To the extent time permits members of the public may present oral statements to the Committee. Written statements may be submitted at any time before or after the meeting.

With respect to agenda item (5), the Acting Assistant Secretary of Commerce for Administration, with the concurrence of the delegate of the General Counsel, formally determined on April 22, 1977, pursuant to Section 10(d) of the Federal Advisory Committee Act, as amended by Section 5(c) of the Government in the Sunshine Act, Pub. L. 94-409, that the matters to be discussed in the Executive Session should be exempt from the provisions of the Federal Advisory Committee Act relating to open meetings and public participation therein, because the Executive Session will be concerned with matters listed in 5 U.S.C. 552b(c)(1). Such matters are specifically authorized under criteria established by an Executive Order to be kept secret in the interest of the national defense or foreign policy. All materials to be reviewed and discussed by the Committee during the Executive Session of the meeting have been properly classified under the Executive Order. All Committee members have appropriate security clearances.

Copies of the minutes of the open portion of the meeting will be available upon written request addressed to the Freedom of Information Officer, Domestic and International Business Administration, Room 3012, U.S. Department of Commerce, Washington, D.C. 20230.

For further information, contact Mr Charles C. Swanson, Director, Operations Division, Office of Export Administra-

AR_0033294

NOTICES

tion, Domestic and International Business Administration, Room 1617M, U.S. Department of Commerce, Washington, D.C. 20230, telephone A/C 202-377-4196.

The complete Notice of Determination to close portions of the meetings of the Telecommunications Equipment Technical Advisory Committee and of any subcommittees thereof is hereby published.

Dated: May 20, 1977.

RAUER H. MEYER,
*Director, Office of Export Administration, Bureau of East-West Trade, U.S. Department of Commerce.*

TELECOMMUNICATIONS EQUIPMENT TECHNICAL ADVISORY COMMITTEE

NOTICE OF DETERMINATION

In response to written requests of representatives of a substantial segment of the telecommunications industry, the Telecommunications Equipment Technical Advisory Committee was established by the Secretary of Commerce pursuant to Section 5(c)(1) of the Export Administration Act of 1969, 50 U.S.C. App. 2404(c)(1) (Supp. V, 1975), to advise the Department of Commerce with respect to questions involving technical matters, worldwide availability, and actual utilization of production and technology, and licensing procedures which may affect the level of export controls applicable to telecommunications equipment, including technical data related thereto, and including those whose export is subject to multilateral (COCOM) controls.

The Committee, which currently has four members representing industry and six members representing government agencies, will terminate no later than August 29, 1978, unless extended by the Secretary of Commerce. All members of the Committee have the appropriate security clearances.

The Committee's activities are conducted pursuant to 50 U.S.C. App. 2404(c)(1), Pub. L. 94-362, 50 U.S.C. App. 5(b), Executive Order No. 11940, 15 CFR § 390.1, the provisions of the Federal Advisory Committee Act, 5 U.S.C. App. I (Supp. V, 1975, and Office of Management and Budget Circular A-63 (Revised), Advisory Committee Management, effective May 1, 1974. Section 10 of the Federal Advisory Committee Act as amended by Section 5(c) of the Government in the Sunshine Act, Pub. L. 94-409, provides that advisory committee meetings or portions thereof may be exempt from the open meeting and public participation requirements of the Federal Advisory Committee Act if the President, or the head of the agency to which the Advisory Committee reports, determines that such meetings or portions thereof may be closed to the public in accordance with 5 U.S.C. 552b(c).

5 U.S.C. 552b(c)(1) provides that agency meetings or portions thereof may be closed to the public where they are likely to disclose matters that are specifically authorized under criteria established by an Executive Order to be kept secret in the interests of national defense or foreign policy and are in fact properly classified pursuant to such Executive Order.

Seven Notices of Determination authorizing the closing of meetings, or portions thereof, of the Telecommunications Equipment Technical Advisory Committee and its formal subcommittees, dealing with security classified matters, have been approved in the past.

In order to provide advice to the Department under the terms of its charter, the Committee and formal subcommittees thereof will continue to hold a series of meetings dealing with the matters set forth in the first paragraph of this Determination. These meetings will include discussions of the COCOM control list as it relates to the commodities and technical data under its purview, and with the foreign availability of these commodities and technical data. In addition, the Committee and its formal subcommittees will be preparing recommendations for the Department's consideration relating to the U.S. Government's negotiating position on COCOM-related matters. Much of the information relating to the COCOM control list, as well as proposed changes, is now or will be security classified for national defense or foreign policy reasons, pursuant to Executive Order No. 11652, 3 CFR 339 (1974). In order for the Committee and its formal subcommittees to provide required advice to the U.S. Government, it will be necessary to provide the Committee and its formal subcommittees with such classified material. Therefore, the series of meetings or portions of meetings of the Committee and of subcommittees thereof that will involve discussions of matters specifically authorized under criteria established by an Executive Order to be kept secret in the interest of national defense or foreign policy and are in fact properly classified pursuant to such Executive Order, must be closed to the public. The remaining portions of the series of meetings will be open to the public.

Accordingly, I hereby determine, pursuant to Section 10(d) of the Federal Advisory Committee Act, as amended by Section 5(c) of the Government In the Sunshine Act, Pub. L. 94-409, that the series of meetings or portions of meetings of the Committee and of any subcommittees thereof, dealing with the aforementioned classified materials shall be exempt, for the period from the date of the signing of this determination, to August 29, 1978, from the provisions of Section 10 (a)(1) and (a)(3), relating to open meetings and public participation therein, because the Committee and subcommittee discussions will be concerned with matters listed in 5 U.S.C. 552b(c)(1). The remaining meetings or portions thereof will be open to the public.

GUY W. CHAMBERLAIN, Jr.,
*Acting Assistant Secretary for Administration.*

APRIL 22, 1977.

ALFRED MEISNER, Jr.,
*General Counsel.*

APRIL 19, 1977.

[FR Doc.77-14881 Filed 4-24-77;8:45 am]

**National Oceanic and Atmospheric Administration**

**AMERICAN FORESTRY ASSOCIATION CONFERENCE**

**Public Meeting**

AGENCY HOLDING THE MEETING: National Marine Fisheries Service, NOAA, Commerce.

DATE AND TIME: June 8, 1977; 2 p.m.

PLACE: American Forestry Association Conference, Room 1319, 18th Street NW., Washington, D.C.

STATUS: Open meeting.

MATTERS TO BE CONSIDERED: Discuss possible regulation of the Alaska native harvest of the bowhead whale (*Balaena mysticetus*).

PERSON TO CONTACT FOR INFORMATION:
Thomas C. Andrews, Marine Mammal and Endangered Species Division, National Marine Fisheries Service, Washington, D.C. 20235, Area Code 202-634-7287.

Dated: May 18, 1977.

WINFRED H. MEIBOHM,
*National Marine Fisheries Service.*

[FR Doc.77-14925 Filed 5-24-77;8:45 am]

**HOKUYO LONGLINE—GILLNET ASSOCIATION, ET AL.**

**Issuance of General Permits**

On May 11, 1977, General Permits were issued to the following associations, to take marine mammals incidental to commercial fishing operations, pursuant to 50 CFR 216.24 (39 FR 32117-32124), as amended:

Hokuyo Longline—Gillnet Association, Zenkeiren Building, 7, Hirakawa-cho 2, Chiyoda-ku, Tokyo, Japan, has been issued a General Permit, Category 5, "Other Gear;"

Japan Deep Sea Trawlers Association, Daito Building, 6/F, Ogawa-che, 3-6, Kanda, Chiyoda-ku, Tokyo, Japan, has been issued a General Permit, Category 1, "Towed or Dragged Gear;"

The National Federation of Medium Trawlers, Showa Kaikan, 3-2, Kasumigaseki 3, Chiyoda-ku, Tokyo, Japan, has been issued a General Permit, Category 1. "Towed or Dragged Gear;"

North Pacific Fisheries Development Association, Seoul, Korea, has been issued a General Permit, Category 1, "Towed and Dragged Gear;"

North Pacific Fisheries Development Association, Seoul, Korea, has been issued a General Permit, Category 4, "Stationary Gear;" and

North Pacific Fisheries Development Association, Seoul, Korea, has been issued a General Permit, Category 5, "Other Gear."

The Permits are available for public inspection in the office of the Director, National Marine Fisheries Service, 3300 Whitehaven Street NW., Washington, D.C.

Dated: May 11, 1977.

WINFRED H. MEIBOHM,
*Associate Director,
National Marine Fisheries Service.*

[FR Doc.77-14926 Filed 5-24-77;8:45 am]

**OFFICE OF PARKS AND RECREATION**

**Issuance of Permit To Take Marine Mammals**

On January 12, 1977, notice was published in the FEDERAL REGISTER (42 FR 2520), that an application had been filed with the National Marine Fisheries Service by the Office of Parks and Recreation, Lake Merritt, 1520 Lakeside Drive, Oakland, California 94612, for a Permit to take three (3) California sea lions (*Zalophus californianus*) for the purpose of public display.

AR_0033295

Notice is hereby given that on May 9, 1977, and as authorized by the provisions of the Marine Mammal Protection Act of 1972 (16 U.S.C. 1361–1407), the National Marine Fisheries Service issued a Permit for the above taking to the Office of Parks and Recreation subject to certain conditions set forth therein. The Permit is available for review by interested persons in the following offices:

Director, National Marine Fisheries Service, 3300 Whitehaven Street NW., Washington, D.C.; and

Regional Director, National Marine Fisheries Service, Southwest Region, 300 South Ferry Street, Terminal Island, California 90731.

Dated: May 9, 1977.

JACK W. GEHRINGER,
*Deputy Director,*
*National Marine Fisheries Service.*

[FR Doc.77–14927 Filed 5–24–77; 8:45 am]

## PACIFIC FISHERY MANAGEMENT COUNCIL, SCIENTIFIC AND STATISTICAL COMMITTEE, AND THE SUBCOMMITTEE ON FOREIGN OWNERSHIP OF U.S. FISHING VESSELS

### Public Meetings

Notice is hereby given of meetings of (1) the Pacific Fishery Management Council, established under Section 302 of the Fishery Conservation and Management Act of 1976 (Public Law 94–265), (2) the Council's Scientific and Statistical Committee, and (3) the Council's Subcommittee on Foreign Ownership of U.S. Fishing Vessels, both established under Section 302(g) of the Act.

The Pacific Fishery Management Council has authority, effective March 1, 1977, over fisheries within the fishery conservation zone adjacent to the States of California, Oregon, and Washington. The Council will, among other things, prepare and submit to the Secretary of Commerce, fishery management plans with respect to the fisheries within its area of authority, prepare comments on foreign fishing applications, and conduct public hearings.

The Scientific and Statistical Committee assists the Council in the development, collection, and evaluation of such statistical, biological, economic, social, and other scientific information as is relevant to the Council's development and amendment of any fishery management plan.

The Subcommittee on Foreign Ownership of U.S. Fishing Vessels was appointed to consider problems associated with foreign ownership of U.S. fishing vessels.

All meetings will be held at the Sheraton-Los Angeles Airport Hotel, 9750 Airport Boulevard, Los Angeles, California 90045.

The Pacific Fishery Management Council will convene in Dickens A and D Room at 1 p.m. and adjourn about 5 p.m. on June 13, 1977, and reconvene at 8 a.m. and adjourn about 5 p.m. on June 14, 1977. The meeting may be extended or shortened depending on progress on the agenda.

### PROPOSED AGENDA

1. Organization of the Council, including its staff, advisory panels, and committees, and operational and procedural matters.

2. Consideration of development of fishery management plans, including anchovy, ground fish, and comprehensive salmon management plans.

3. Consideration of a report from the Council's Subcommittee on Foreign Ownership of U.S. Fishing Vessels.

4. Development of Council recommendation with regards to Soviet permit application to receive Pacific hake from U.S. fishermen within the 200-mile zone.

5. Consideration of report from Council's Subcommittee on Scheduling of Management Plans and Their Implementation.

6. Review of communications from other agencies and organizations.

7. Budget and administrative matters.

8. Other business.

This meeting is open to the public and there will be seating for approximately 150 public members available on a first-come, first-served basis.

The Scientific and Statistical Committee will meet in the San Diego Room at 10:30 a.m. on June 13, 1977 and adjourn about 5 p.m. The Committee will tentatively reconvene, dependent upon Council developments, at 8 a.m. and adjourn about 5 p.m. on June 14, 1977.

The meeting may be extended or shortened depending on progress on the agenda.

### PROPOSED AGENDA

1. Consideration of development of fishery management plans, including anchovy, groundfish, and comprehensive salmon management plans.

2. Organization of the Council, including fishery advisory panels and management development teams, and operational and procedural matters.

3. Other business.

This meeting is open to the public and there will be seating for approximately 25 public members available on a first-come, first served basis.

The Subcommittee on Foreign Ownership of U.S. Fishing Vessels will convene in the Tokyo Room at 9 a.m. and adjourn about 12 noon on June 13, 1977. The meeting may be extended or shortened depending on progress on the agenda.

### PROPOSED AGENDA

1. Review of permit application for Soviet vessel to receive and process hake from U.S. fishermen within 200-mile zone and implications of approval of such application.

2. Review of the issue of citizenship requirements for captains and crews of U.S. fishing vessels to determine whether loopholes exist which would enable foreign captains and crews to operate U.S. fishing vessels within U.S. fishery zone.

3. Development of recommendations to the Council on items listed above.

4. Other business.

This meeting is open to the public and there will be seating for approximately 50 public members available on a first-some, first-served basis.

Members of the public having an interest in specific items for discussion are also advised that agenda changes are, at times, made prior to the meetings. To receive information on changes, if any, made to the agendas, interested members of the public should contact on or about June 3, 1977:

Lorry M. Nakatsu, Executive Director, Pacific Fishery Management Council, 526 S.W. Mill Street, Portland, Oregon 97201 (503–229–5769).

At the discretion of the Council and its Committees, interested members of the public may be permitted to speak at times which will allow the orderly conduct of business. Interested members of the public who wish to submit written statements should do so by addressing Lorry Nakatsu at the above address. To receive due consideration and facilitate inclusion of these comments in the record of the meeting, typewritten statements should be received within 10 days after the close of the meetings.

Dated: May 20, 1977.

WINFRED H. MEIBOHM,
*Associate Director,*
*National Marine Fisheries Service.*

[FR Doc.77–14843 Filed 5–24–77; 8:45 am]

## ENDANGERED SPECIES AND MARINE MAMMALS

### Issuance of Permit

On January 12, 1977, notice was published in the FEDERAL REGISTER (42 FR 2520) that an application had been filed with the National Marine Fisheries Service by Dr. Roger S. Payne, Weston Road, Lincoln, Massachusetts 01773, for a Permit to take, by potential harassment, an unspecified number of humpback whales in various waters for the purpose of scientific research.

Notice is hereby given that on May 11, 1977, and as authorized by the provisions of the Marine Mammal Protection Act of 1972 (16 U.S.C. 1361–1407), and the Endangered Species Act of 1973 (16 U.S.C. 1531–1543), the National Marine Fisheries Service issued a Permit to Dr. Roger S. Payne, for the above taking, subject to certain conditions therein.

Issuance of this Permit, as required by the Endangered Species Act of 1973, is based on a finding that such Permit: (1) was applied for in good faith; (2) will not operate to the disadvantage of the endangered species which are the subject of the Permit; and (3) will be consistent with the purposes and policies set forth in Section 2 of the Endangered Species Act of 1973. This Permit was also issued in accordance with, and is subject to, Parts 220 and 222 of Title 50 CFR, the National Marine Fisheries Service regulations governing endangered species Permits (39 FR 14357, November 27, 1974).

The Permit is available for review by interested persons in the following offices:

AR_0033296

Director, National Marine Fisheries Service, 3300 Whitehaven Street NW., Washington, D.C.;

Regional Director, National Marine Fisheries Service, Northeast Region, Federal Building, 14 Elm Street, Gloucester, Massachusetts 01930;

Regional Director, National Marine Fisheries Service, Southeast Region, Duval Building, 9450 Gandy Boulevard, St. Petersburg, Florida 33702;

Regional Director, National Marine Fisheries Service, Northwest Region, 1700 Westlake Avenue North, Seattle, Washington 98109;

Regional Director, National Marine Fisheries Service, Southwest Region, 300 South Ferry Street, Terminal Island, California 90731; and

Regional Director, National Marine Fisheries Service, Alaska Region, P.O. Box 1668, Juneau, Alaska 99802.

Dated: May 11, 1977.

JACK W. GEHRINGER,
*Deputy Director,*
*National Marine Fisheries Service.*

[FR Doc.77-14928 Filed 5-24-77;8:45 am]

## CARIBBEAN FISHERY MANAGEMENT COUNCIL AND ITS ADVISORY PANEL

### Public Meeting

Notice is hereby given of a meeting of the Caribbean Fishery Management Council and its Advisory Panel.

The Council was established by section 302 of the Fishery Conservation and Management Act of 1976 (Pub. L. 94–265). The Council has authority over fisheries within the fishery conservation zone adjacent to Puerto Rico and the Virgin Islands. The Councils will, among other things, prepare and submit to the Secretary of Commerce fishery management plans with respect to fisheries within its area of authority, prepare comments on applications for foreign fishing, and conduct public hearings.

This is one of a series of organizational meetings of the Council. The meeting will be held Monday through Thursday, June 20 to June 23, 1977, at the Caneel Bay Plantation, St. John, Virgin Islands. The meeting will convene at 1 p.m. on June 20 and adjourn at about noon on June 23. Daily sessions will normally start at 9 a.m. and adjourn at 5 p.m., except as otherwise noted. The meeting may be extended or shortened depending upon progress on the agenda.

#### *Proposed Agenda*

1. Council Organization and Administrative Procedures.
2. Technical Organization and Procedures.
3. The Advisory Panel may meet in conjunction with the Council.
4. Review of foreign fishing applications, if any.
5. Domestic fishery in foreign zones.
6. Other management business.

Meeting concurrently with the Council will be the Council's Advisory Panel. This is established pursuant to section 302(g) of the Act. The Advisory Panel contains broad representation from interests affected by Council activities in order to assist the Council in carrying out its functions under the Act.

#### *Proposed Agenda*

1. Consideration of internal program matters.
2. Review of fishery management plan issues.
3. Appropriate recommendations to the Council.
4. Other management business.

All of these meetings will be open to the public, and there will be seating for a limited number of public members available on a first-come, first-served basis. Members of the public having an interest in specific items for discussion are also advised that agenda changes are at times made prior to the meetings. To receive information on changes, if any, made to the agendas, interested members of the public should contact, on or about June 10, 1977:

Mr. Omar Munoz-Roure, Executive Director, Caribbean Fishery Management Council, Banco de Ponce Building, Suite 806, Munoz Rivera Avenue, Halo Rey, Puerto Rico 00936.

At the discretion of the Council or the Panel, as appropriate, interested members of the public may be permitted to speak at times which will allow the orderly conduct of official business. Interested members of the public who wish to submit written comments should so by addressing the Executive Director at the above address. To receive due consideration and to facilitate inclusion of these comments in the record of the meetings, typewritten statements should be received within 10 days after the close of the meetings.

Dated: May 20, 1977.

WINFRED H. MEIBOHM,
*Associate Director,*
*National Marine Fisheries Service.*

[FR Doc.77-14841 Filed 5-24-77;8:45 am]

## MID-ATLANTIC FISHERY MANAGEMENT COUNCIL

### Public Meeting

Notice is hereby given of a meeting of the Mid-Atlantic Fishery Management Council established by section 302 of the Fishery Conservation and Management Act of 1976 (Pub. L. 94-265).

The Mid-Atlantic Fishery Management Council has authority, effective March 1, 1977, over fisheries within the fishery conservation zone adjacent to the States of New York, New Jersey, Delaware, Pennsylvania, Maryland and Virginia. The Council will, among other things, prepare and submit to the Secretary of Commerce fishery management plans with respect to fisheries within its area of authority, prepare comments on applications for foreign fishing, and conduct public hearings.

This meeting of the Council will be held on June 15 and 16, 1977, 9 a.m. to 3 p.m., at the Southampton Inn, Southampton, Long Island, New York, 11968. The meeting may be extended or shortened depending on progress on the agenda.

#### *Proposed Agenda*

1. Surf Clam/Ocean Quahog Management Plan.
2. Report of foreign fishing activity.
3. Status of fishery management plans.
4. Other management business.

This meeting is open to the public and there will be seating for approximately 30 public members available on a first-come, first-served basis. Members of the public having an interest in specific items for discussion are also advised that agenda changes are at times made prior to the meetings. To receive information on changes, if any, made to the agenda, interested members of the public should contact, on or about June 3, 1977:

Mr. John C. Bryson, Executive Director, Mid-Atlantic Fishery Management Council, Federal Building, Room 2115, North and New Streets, Dover, Delaware 19901.

At the discretion of the Council, interested members of the public may be permitted to speak at times which will allow the orderly conduct of official business. Interested members of the public who wish to provide written comments should do so by submitting them to Mr. Bryson at the above address. To receive due consideration and facilitate inclusion of these comments in the record of the meeting, typewritten statements should be received within 10 days after the close of the Council meeting.

Dated: May 20, 1977.

WINFRED H. MEIBOHM,
*Associate Director,*
*National Marine Fisheries Service.*

[FR Doc.77-14840 Filed 5-24-77;8:45 am]

## MID-ATLANTIC FISHERY MANAGEMENT COUNCIL'S SCIENTIFIC AND STATISTICAL COMMITTEE

### Public Meeting

Notice is hereby given of a meeting of the Scientific and Statistical Committee of the Mid-Atlantic Fishery Management Council, established by Section 302 of the Fishery Conservation and Management Act of 1976 (Pub. L. 94-265).

The Mid-Atlantic Fishery Management Council has authority, effective March 1, 1977, over fisheries within the fishery conservation zone adjacent to the States of New York, New Jersey, Delaware, Pennsylvania, Maryland and Virginia. The Council will, among other things, prepare and submit to the Secretary of Commerce fishery management plans with respect to fisheries within its area of authority, prepare comments on applications for foreign fishing, and conduct public hearings. The Scientific and Statistical Committee assists the Council in the development, collection and evaluation of such statistical, biological, economic, social and other scientific information as is relevant to the Council's development and amendment of fishery management plans.

The meeting of the Scientific and Statistical Committee will be held on June 13 and 14, 1977, from 9:30 a.m. to 4:00

AR_0033297

p.m., and 9:00 a.m. to 3:00 p.m. respectively, at the Southampton Inn, 91 Hill Street, Southampton, Long Island, New York 11968. The meeting may be extended or shortened depending on progress on the agenda.

*Proposed Agenda*

1. Mackerel Management Plan.
2. Administrative Matters.
3. Other Business.

This meeting is open to the public and there will be seating for approximately twenty public members available on a first-come, first-served basis. Members of the public having an interest in specific items for discussion are also advised that agenda changes are at times made prior to the meeting. To receive information on changes, if any, made to the agenda, interested members of the public should contact on or about June 3, 1977:

Mr. John C. Bryson, Executive Director, Mid-Atlantic Fishery Management Council, Room 2115, Federal Building, Dover, Delaware 19901.

At the discretion of the Committee, interested members of the public may be permitted to speak at times which will allow the orderly conduct of Committee business. Interested members of the public who want to provide written comments should do so by submitting them to Mr. Bryson at the above address. To receive due consideration and facilitate inclusion of these comments in the record of the meeting, typewritten statements should be received within 10 days after the close of the meeting.

Dated: May 20, 1977.

WINFRED H. MEIBOHM,
*Associate Director,*
*National Marine Fisheries Service.*

[FR Doc.77-14842 Filed 5-24-77;8:45 am]

## COMMITTEE FOR THE IMPLEMENTATION OF TEXTILE AGREEMENTS

### TEXTILE CATEGORY SYSTEM

MAY 19, 1977.

The Committee for the Implementation of Textile Agreements is planning to revise the textile category system used in the bilateral textile agreements negotiated with other countries under the Arrangement Regarding International Trade in Textiles. The new system, published below, is based on the existing sys-

tem but would streamline and consolidate that system. Such revisions are designed to improve the implementation of bilateral agreements by strengthening category uniformity among fibers and reducing the incidence of category classification problems. The number of categories under the revised system would be reduced from 137 to 106. The new system will be effective on January 1, 1978.

Interested parties are invited to submit their written views and comments concerning the revised textile category system to Mr. Robert E. Shepherd, Chairman of the Committee for the Implementation of Textile Agreements and Deputy Assistant Secretary for Resources and Trade Assistance, U.S. Department of Commerce, 14th and Constitution Avenue, N.W., Room 3826, Washington, D.C.

20230. All submissions should be made in ten copies. Because of pending bilateral negotiations with countries which will involve the use of the revised textile category system, such submissions should be received no later than June 15, 1977.

Copies of all written comments received will be available for public inspection between the hours of 8:30 a.m. and 5:30 p.m., Monday through Friday, in the Office of Textiles, Room 2815, Department of Commerce, Washington, D.C.

ROBERT E. SHEPHERD,
*Chairman, Committee for the Implementation of Textile Agreements, and Deputy Assistant Secretary for Resources and Trade Assistance, Department of Commerce.*

CATEGORY CONSOLIDATION FOR NEGOTIATIONS

5/13/77

| Description | Composition | | |
|---|---|---|---|
| **YARN** | | | |
| Cotton | | | |
| Carded | 1 | | Singles |
| | 2 | | Plied |
| | Pt 64: | 300.6020 | Singles (CVC) |
| | | 22 | Singles (CVC) |
| | | 24 | Plied (CVC) |
| Combed | 3 | | Singles |
| | 6 | | Plied |
| | Pt 64: | 300.6026 | Singles (CVC) |
| | | 28 | Plied (CVC) |
| Wool | | | |
| Tops & Yarn | 101 | | Tops |
| | 102 | | Angora Rabbit Hair Yarn |
| | 103 | | Wool Yarn |
| Man-Made Fiber | | | |
| Textured | 200 | | |
| Cont. cellulosic | 201 | | |
| Cont. non-cellulosic | 202 | | |
| Spun cellulosic | 203 | | |
| Spun non-cellulosic | 204 | | |
| Other yarns | 205 | | |
| **FABRIC** | | | |
| Cotton | | | |
| Ginghams | 5/6 | | |
| Velveteens | 7 | | |
| Corduroy | 8 | | |
| Sheeting | 9/10 | | |
| Broadcloth | 15/16 | | |
| Printcloths | 18/19 | | |
| | Pt 26: | 320.--34 | |
| | | 321.--34 | |
| | | 322.--34 | |
| | | 326.--34 | |
| | | 327.--34 | |
| | | 328.--34 | |
| Shirtings | 20/21 | | |
| Twills & sateens | 22/23 | | |
| Yarn-dyed | 24/25 | | |

AR_0033298

CATEGORY CONSOLIDATION FOR NEGOTIATIONS
5/13/77

| Description | Composition | | |
|---|---|---|---|
| FABRIC Cont. | | | |
| Cotton Cont. | | | |
| Duck | Pt 26: | 320.01 thru .08 | |
| | | 321.01 thru .08 | |
| | | 322.01 thru .08 | |
| | | 326.01 thru .08 | |
| | | 327.01 thru .08 | |
| | | 328.01 thru .08 | |
| Other fabrics, N.K. | 11/12 | | Lawns |
| | 13/14 | | Voiles |
| | 17 | | Typewriter ribbon |
| | Pt 26: | | Remaining TSUSA Nos. |
| | 27 | | Other combed fabrics |
| Wool | | | |
| Woolens & Worsted | 104 | | |
| Tapestries & Upholstery | 108 | | |
| Knit | 110 | | |
| Other Fabrics | 105 | | Billiard cloth |
| | 109 | | Pile & tufted |
| Man-Made Fiber | | | |
| Cont. Cellulosic, N.K. | 206 | | |
| Spun Cellulosic, N.K. | 207 | | |
| Cont. Noncell., N.K. | 208 | | |
| Spun Noncellulosic, N.K. | 209 | | |
| Other fabrics, N.K. | 211 | | |
| Knit | 210 | | |
| Pile & tufted | 212 | | |
| Specialty | 213 | | |
| APPAREL | | | |
| Cotton | | | |
| Handkerchiefs | 32 | | |
| Gloves | 39 | | |
| Hosiery | 40 | | |
| | Pt 62: | 374.1520 | Lace |
| Suit-Type Coats, M & B | Pt 49: | 380.0940 | Corduroy |
| | | 0960 | Other |
| | | 1240 | Corduroy |
| | | 1260 | Other |
| | | 5104 | Veg. fiber |
| | Pt 63: | 380.0043 | Orn. |
| Other Coats, M & B | Pt 48: | 380.0910 | Corduroy |
| | | 0920 | Other |
| | | 1210 | Corduroy |
| | | 1220 | Other |

CATEGORY CONSOLIDATION FOR NEGOTIATIONS
5/13/77

| Description | Composition | | |
|---|---|---|---|
| APPAREL Cont. | | | |
| Cotton Cont. | | | |
| Other Coats, M & B (cont.) | Pt 49: | 376.5410 | Designed for rainwear |
| | | 380.0980 | Other, corduroy |
| | | 380.0990 | Other, other |
| | | 1280 | Other, corduroy |
| | | 1290 | Other, other |
| | | 5108 | Other, veg. fiber |
| | Pt 62: | 380.0003 | Raincoats, orn. |
| | | 0610 | Raincoats, N. orn. |
| | | 0006 | Other, orn. |
| | | 0501 | Other, other fiber |
| | | 0615 | Other, not orn. |
| | Pt 63: | 380.0040 | Raincoats, orn. |
| | | 0046 | Other, orn. |
| Coats, W G I | Pt 48: | 382.0902 | Corduroy |
| | | 0904 | Velveteen |
| | | 0906 | Other |
| | | 0908 | Corduroy |
| | | 0910 | Velveteen |
| | | 0912 | Other |
| | | 1202 | Corduroy |
| | | 1204 | Velveteen |
| | | 1206 | Other |
| | | 1208 | Corduroy |
| | | 1210 | Velveteen |
| | | 1212 | Other |
| | Pt 49: | 382.0914 | Corduroy |
| | | 0916 | Velveteen |
| | | 0918 | Other |
| | | 0920 | Corduroy |
| | | 0922 | Velveteen |
| | | 0924 | Other |
| | | 1214 | Corduroy |
| | | 1216 | Velveteen |
| | | 1218 | Other |
| | | 1220 | Corduroy |
| | | 1222 | Velveteen |
| | | 1224 | Other |
| | | 3313 | Imported in sets |
| | | 4208 | Veg. fiber |

NOTICES

26687

AR_0033299

4.

5.

CATEGORY CONSOLIDATION FOR NEGOTIATIONS

5/13/77

| Description | Composition | | |
|---|---|---|---|
| APPAREL Cont. | | | |
| Cotton Cont. | | | |
| Coats, W G I (cont.) | Pt 62: 382.0004 | Raincoats, orn. | |
| | 0006 | Raincoats, orn. | |
| | 0008 | Other, orn. | |
| | 0010 | Other, orn. | |
| | 0615 | Raincoats | |
| | 0620 | Raincoats | |
| | 0625 | Other | |
| | 0630 | Other | |
| | Pt 63: 382.0052 | Raincoats, orn. | |
| | 0054 | Other, orn. | |
| | 0056 | Other, orn. | |
| Dresses | 53 | | |
| | Pt 62: 382.0012 | Knit, orn. | |
| | 0014 | Knit, orn. | |
| | 0635 | Knit, N. orn. | |
| | 0640 | Knit, N. orn. | |
| | 3908 | Veg. fiber | |
| | 6905 | Silk | |
| Playsuits | 54 | | |
| | Pt 62: 380.0015 | Knit, orn. M & B | |
| | 0630 | Knit, N. orn. M & B | |
| | 382.0020 | Knit, orn. W G I | |
| | 0655 | Knit, N. orn. W G I | |
| Knit Shirts, M & B | Pt 42: 380.0018 | White, orn. T-shirts | |
| | 0021 | Other, orn. T-shirts | |
| | 0640 | Other, N. orn. T-shirts | |
| | Pt 43: 380.0650 | N. orn., other shirts | |
| | Pt 62: 380.0024 | Sweatshirts, orn. | |
| | 0027 | Shirts, orn. | |
| | 0645 | Sweatshirts, N. orn. | |
| Knit Shirts & Blouses, WGI | Pt 42: 382.0032 | Orn. T-shirts | |
| | 0660 | N. orn. T-shirts | |
| | Pt 43: 382.0670 | Shirts, N. orn. | |
| | Pt 62: 382.0002 | Orn. | |
| | 0024 | Sweatshirt | |
| | 0026 | Orn. | |
| | 0605 | Orn. | |
| | 0610 | Orn. | |
| | 0665 | Sweatshirt | |
| | 3904 | Veg. fiber | |
| | 6904 | Silk | |

CATEGORY CONSOLIDATION FOR NEGOTIATIONS

5/13/77

| Description | Composition | | |
|---|---|---|---|
| APPAREL Cont. | | | |
| Cotton Cont. | | | |
| Shirts, N.K. | 45 | Dress | |
| | 46 | Sport | |
| | 47 | Work | |
| Blouses, N.K. | Pt 63: 380.5112 | Veg. fiber | |
| Skirts | 52 | | |
| | Pt 62: 382.0028 | Knit | |
| | 0675 | Knit | |
| | 3912 | Veg. fiber, knit | |
| | Pt 63: 382.0080 | Woven, orn. | |
| | 0082 | Woven, orn. | |
| | 3334 | Corduroy | |
| | 3336 | Corduroy | |
| | 3338 | Velveteen | |
| | 3340 | Velveteen | |
| | 3342 | Other, woven | |
| | 3344 | Other, woven | |
| | 0216 | Vegetable fiber, woven | |
| Suits, M & B | Pt 63: 380.5116 | Veg. fiber | |
| | Stat. Annotation by 484-E Committee | | |
| Suits, WGI | Pt 63: 382.4222 | Veg. fiber | |
| | Stat. Annotation by 484-E Committee | | |
| Sweaters | 44 | | |
| | Pt 62: 380.0030 | Orn. | |
| | 382.0030 | Orn. | |
| Trousers, M & B | 50 | | |
| | Pt 62: 380.0033 | Knit orn. | |
| | 0660 | Knit | |
| | Pt 63: 380.0070 | Orn. | |
| Trousers, W G I | 51 | | |
| | Pt 62: 382.0032 | Knit, orn. | |
| | 0685 | Knit | |
| | 0690 | Knit | |
| | 3922 | Veg. fiber | |
| | 6916 | Silk | |
| Brassieres, etc. | 61 | | |
| Dressing Gowns | 55 | Bras, etc. | |
| | Pt 62: 380.0009 | Knit, orn., M & B | |
| | 0620 | Knit, N. orn., M & B | |
| | 382.0016 | Knit, Orn., W G I | |
| | 0645 | Knit, N. Orn., W G I | |
| | Pt 63: 382.7212 | Silk | |

AR_0033300

6.

CATEGORY CONSOLIDATION FOR NEGOTIATIONS

5/13/77

| Description | Composition | |
|---|---|---|
| **APPAREL** Cont. | | |
| **Cotton** Cont. | | |
| Nightwear | 60 | Pajamas, etc. |
| | Pt 63:  380.0052 | Orn. |
| |             0055 | Orn. |
| |        382.0072 | Orn. |
| Underwear | 41 | White T-shirts |
| | 56 | Undershirts, knit |
| | 57 | Briefs, woven & knit |
| | 58 | Other, knit |
| | 59 | Other, woven |
| | Pt 62:  378.1012 | Union suits |
| |             1512 | Union suits |
| Other apparel | Pt 62:  Remaining TSUSA Nos. | |
| | Pt 63:  Remaining TSUSA Nos. | |
| **Wool** | | |
| Gloves | 112 | |
| Hosiery | 111 | |
| | Pt 117:  374.3000 | Orn. |
| Suit-Type Coats, M & B | Pt 121:  380.0240 | Orn. |
| | 5134 | Veg. fiber |
| | 6310 | |
| | 6610 | |
| Other Coats, M & B | Pt 121:  380.0245 | Orn. |
| | 5138 | Veg. fiber |
| | 6320 | |
| | 6620 | |
| | Pt 116:  380.5710 | |
| | Pt 117:  380.6110 | |
| Coats, W G I | Pt 122:  382.0255 | Orn. |
| | 4238 | Veg. fiber |
| | 6015 | |
| | 6020 | |
| | 6315 | |
| | 6320 | |
| | Pt 117:  382.5820 | |
| Dresses | Pt 116:  382.5420 | Knit |
| | Pt 117:  382.0210 | Knit |
| | 3938 | Veg. fiber |
| | 5830 | Knit |
| | 6928 | Silk, knit |

CATEGORY CONSOLIDATION FOR NEGOTIATIONS

5/13/77

| Description | Composition | |
|---|---|---|
| **APPAREL** Cont. | | |
| **Wool** Cont. | | |
| Dresses (cont.) | Pt 125  382.4242 | Woven |
| | 6025 | Woven |
| | 6325 | Woven |
| | 7228 | Woven |
| Knit Shirts & Blouses | Pt 116:  380.5720 | Shirts |
| | 382.5410 | Blouses |
| | Pt 117:  380.0205 | Shirts |
| | 6120 | Shirts |
| | 382.0205 | Blouses |
| | 3934 | Veg. fiber |
| | 5810 | Blouses |
| | 6924 | Silk blouses |
| Shirts, N.K. | Pt 125:  380.0255 | Shirts |
| | 5142 | Veg. fiber |
| | 6340 | Shirts |
| | 6640 | Shirts |
| | 382.0250 | Blouses |
| | 4234 | Veg. fiber, blouses |
| | 6010 | Blouses |
| | 6310 | Blouses |
| | 7224 | Silk blouses |
| Skirts | 123 | |
| | Pt 116:  382.5425 | |
| | Pt 117:  382.0215 | |
| | 5840 | |
| Suits, M & B | 120 | |
| Suits, W G I | Pt 122:  382.4252 | |
| | 6040 | |
| | 6140 | |
| | Pt 117:  382.0235 | |
| | 5845 | |
| Sweaters, M & B | Pt 116:  380.5730 | |
| | 5740 | |
| | 5750 | |
| | Pt 117:  380.0210 | |
| | 0215 | |
| | 0220 | |
| | 5900 | |
| | 6130 | |
| | 6140 | |
| | 6150 | |

NOTICES

AR_0033301

26689

26690

8.

CATEGORY CONSOLIDATION FOR NEGOTIATIONS

5/13/77

| Description | Composition | |
|---|---|---|
| APPAREL Cont. | | |
| Wool Cont. | | |
| Sweaters, W G I | Pt 116: 382.5430 | |
| | 5435 | |
| | 5440 | |
| | Pt 117: 382.0220 | |
| | 0225 | |
| | 0230 | |
| | 3946 | Veg. fiber |
| | 5600 | |
| | 5850 | |
| | 5860 | |
| | 5870 | |
| | 6932 | Silk |
| Trousers, M & B | Pt 124: 380.0265 | Orn. |
| | 5154 | Veg. fiber |
| | 6360 | |
| | 6660 | |
| Trousers, W G I | Pt 124: 382.3952 | Veg. fiber, knit |
| | 4256 | Veg. fiber, not knit |
| | 6045 | |
| | 6345 | |
| | 6936 | Silk, knit |
| | 7238 | Silk, not knit |
| Other Wool apparel | 113 | Underwear |
| | 114 | Infants' articles |
| | 115 | Knit hats |
| | 118 | Hats, not blocked |
| | 119 | Hats, blocked |
| | Pt 116: Remaining TSUSA Nos. | |
| | Pt 117: Remaining TSUSA Nos. | |
| | Pt 125: Remaining TSUSA Nos. | |
| Man-Made Fiber | | |
| Handkerchiefs | 226 | |
| Gloves | 214 | |
| Hosiery | 215 | |
| Suit-Type Coats, M & B | Pt 229: 380.0443 | Orn. |
| | 5164 | Veg. fiber |
| | 8415 | |
| | Pt 224: 380.0402 | Orn. |
| | 8103 | |

9.

CATEGORY CONSOLIDATION FOR NEGOTIATIONS

5/13/77

| Description | Composition | |
|---|---|---|
| APPAREL Cont. | | |
| Man-Made Fiber Cont. | | |
| Other Coats, M & B | Pt 229: 376.5610 | Designed for rainwear |
| | 380.0440 | Raincoats, orn. |
| | 0446 | Other, orn. |
| | 5168 | Other, veg. fiber |
| | 8410 | Raincoats, N. orn. |
| | 8420 | Other, N. orn. |
| | Pt 224: 380.0401 | Raincoats, orn. |
| | 0404 | Other, orn. |
| | 8101 | Raincoats, N. orn. |
| | 8107 | Other, N. orn. |
| Coats, W G I | Pt 229: 382.0462 | Raincoats, orn. |
| | 0464 | Other, orn. |
| | 4268 | Veg. fiber |
| | 8106 | Raincoats, N. orn. |
| | 8108 | Other, N. orn. |
| | 8110 | Other, N. orn. |
| | Pt 224: 382.0405 | Raincoats, orn. |
| | 0407 | Other, orn. |
| | 7807 | Raincoats, N. orn. |
| | 7809 | Other, N. orn. |
| Dresses | 216 | Knit |
| | 230 | Woven |
| Playsuits | 233 | Woven |
| | Pt 224: 380.0404 | Orn. |
| | 8127 | N. orn. |
| | 382.7841 | N. orn. |
| Knit Shirts, M & B | Pt 218: 380.0416 | White, T-shirts, orn. |
| | 0417 | Other, T-shirts, orn. |
| | 8133 | White, T-shirts, N. orn. |
| | 8134 | Other, T-shirts, N. orn. |
| | Pt 219: 380.0419 | Shirts, orn. |
| | 8137 | Shirts, N. orn. |
| Knit Shirts & Blouses, W G I | Pt 218: 382.0439 | T-shirts, orn. |
| | 0851 | T-shirts, N. orn. |
| | Pt 219: 382.0401 | Blouses, orn. |
| | 0443 | Other shirts, orn. |
| | 3964 | Veg. fiber, orn. |
| | 6944 | Silk, orn. |
| | 7801 | Blouses, N. orn. |
| | 7859 | Other shirts, orn. |
| | Pt 224: 382.0455 | Tops & Vests, orn. |
| | 7859 | Tops & Vests, N. orn. |
| | 0403 | Body suits |
| | 7805 | Body suits |

NOTICES

AR_0033302

CATEGORY CONSOLIDATION FOR NEGOTIATIONS

5/13/77

| Description | Composition | |
|---|---|---|
| APPAREL Cont. | | |
| Man-Made Fiber Cont. | | |
| Shirts | 234 | Dress |
| | 235 | Other |
| Blouses | 228 | |
| Skirts | 220 | Knit |
| | 236 | Woven |
| | Pt 224: 382.0410 | Culottes |
| | 7815 | Culottes |
| Suits, M & B | Pt 224: 380.0420 | Orn. |
| | 8143 | N. orn. |
| | Pt 237: 380.0464 | Orn. |
| | 5176 | Veg. fiber, N. orn. |
| | 8450 | N. orn. |
| Suits, W G I | Pt 224: 382.0451 | Orn. |
| | 7867 | N. orn. |
| | Pt 237: 382.0478 | Orn. |
| | 4282 | Veg. fiber, N. orn. |
| | 8126 | N. orn. |
| Sweaters, M & B | Pt 221: 380.0423 | Orn. |
| | 8147 | N. orn. |
| Sweaters, W G I | Pt 221: 382.0427 | Infants' orn. |
| | 0430 | Other, orn. |
| | 3976 | Veg. fiber, N. orn. |
| | 6952 | Silk, N. orn. |
| | 7870 | Infants' N. orn. |
| | 7873 | Other, N. orn. |
| Trousers, M & B | Pt 222: 380.0428 | Orn. |
| | 8165 | Not orn. |
| | Pt 238: 380.0467 | Orn. |
| | 5184 | Veg. fiber, N. orn. |
| | 8455 | N. orn. |
| Trousers, W G I | Pt 222: 382.0454 | Orn. |
| | 3982 | Veg. fiber, N. orn. |
| | 6956 | Silk, N. orn. |
| | 7888 | N. orn. |
| | Pt 238: 382.0480 | Orn. |
| | 4286 | Veg. fiber |
| | 7258 | Silk |
| | 8128 | Man-made fiber |
| Brassieres, etc. | 225 | |
| Dressing Gowns | 231 | Woven |
| | Pt 224: 380.0408 | Orn. |
| | 8117 | N. orn. |
| | 382.0417 | Orn. |
| | 7821 | N. orn. |

CATEGORY CONSOLIDATION FOR NEGOTIATIONS

5/13/77

| Description | Composition | |
|---|---|---|
| APPAREL Cont. | | |
| Man-Made Fiber Cont. | | |
| Nightwear | 217 | Knit |
| | 232 | Woven |
| Underwear | 223 | Knit |
| | 239 | Woven |
| Other apparel | Pt 224: Remaining | TSUSA Nos. |
| | 227 | Mufflers, etc. |
| | 240 | Other N. knit apparel |
| | | |
| MADE-UPS & MISC. | | |
| Cotton | | |
| Pillowcases | 28/29 | |
| | Pt 64: 363.0120 | Orn. |
| Sheets | 34/35 | |
| | Pt 64: 363.0140 | Orn. |
| Bedspreads & Quilts | 36 | |
| | Pt 64: 363.6025 | Quilt covers |
| Terry & other pile towels | Pt 31: 366.1865 | Terry |
| | 1880 | Pile or tufted |
| | 2160 | Terry |
| | 2180 | Pile or tufted |
| | 2460 | Terry |
| | 2480 | Pile or tufted |
| | 2720 | Jacquard-figured |
| Other Cotton manufactures | 30 | Dish towels |
| | Pt 31: Remaining | TSUSA Nos. |
| | 33 | Table Damask |
| | 37 | Elastic |
| | 38 | Fish nets |
| | 64 | Other manufactures |
| | | |
| Wool | | |
| Blankets | 106 | Blankets |
| | 107 | Auto robes |
| Floor covering | 131 | Braided |
| | 132 | Other |
| Other wool manufactures | 126 | Lace & net articles |
| | 128 | Other wool manufactures |
| | | |
| Man-Made Fiber | | |
| Floor coverings | 241 | |
| Other furnishings | 242 | |
| Other man-made manufactures | 243 | |

[FR Doc. 77-14631 Filed 5-24-77;8:45 am]

NOTICES

26691

FEDERAL REGISTER, VOL. 42, NO. 101—WEDNESDAY, MAY 25, 1977

AR_0033303