## COMMISSION ON FEDERAL PAPERWORK

### PUBLIC MEETING

Notice is hereby given of the eleventh regular meeting of the Commission on Federal Paperwork to be held on June 10, 1977, in Room 2154, Rayburn House Office Building, Washington, D.C.

The meeting will begin at 9:00 a.m. and will continue until approximately 12:30 p.m. The meeting is open to the public. The Commission will review progress on approved projects, staff proposals for future projects, and proposed Commission positions on specific paperwork problems. Among the topics to be considered are welfare reform, Title XX, housing, procurement, public works, and ombudsmen.

Anyone wishing to attend the meeting is invited. For further details, contact the Commission on Federal Paperwork, Room 2000, 1111 20th Street NW., Washington, D.C. 20582, telephone (202) 654-5400.

FRANK HORTON,
*Chairman.*

[FR Doc. 77-14830 Filed 5-24-77; 8:45 am]

## DEPARTMENT OF DEFENSE

### Department of the Air Force

### USAF SCIENTIFIC ADVISORY BOARD

#### Meeting

MAY 16, 1977.

The USAF Scientific Advisory Board ad hoc Committee on Defensive Chemical Systems will hold a meeting on June 15 at the Life Support Program Office, Wright-Patterson Air Force Base, Ohio, from 8 a.m. to 4 p.m.

The purpose of the meeting is to hold classified discussions on the ability of USAF Tactical Air Forces to operate in a chemically hostile environment.

The meeting will be open to the public upon verification of appropriate security clearances.

For those not having clearances the meeting will be closed to the public in accordance with Section 552b(c) of Title 5, United States Code, specifically subparagraph (1).

For further information, contact the Scientific Advisory Board at (202-697-4648).

FRANKIE S. ESTEP,
*Air Force Federal Register Liaison Officer, Directorate of Administration.*

[FR Doc.77-14857 Filed 5-24-77; 8:45 am]

## USAF SCIENTIFIC ADVISORY BOARD

#### Meeting

MAY 17, 1977.

Members of the USAF Scientific Advisory Board Aerospace Vehicles Panel Committee on B-1 Structures will hold a meeting at Rockwell International, Los Angeles, California, on June 30 and July 1, 1977, from 8 a.m. to 5 p.m.

The members of the Committee will receive classified briefings and hold classified discussions on the structural aspects of the B-1 aircraft development program.

The meeting concerns matters listed in Section 552b(c) of Title 5, United States Code, specifically subparagraph (1) thereof, and accordingly the meeting will be closed to the public.

For further information contact the Scientific Advisory Board Secretariat at 202-697-8845.

FRANKIE S. ESTEP,
*Air Force Federal Register, Liaison Officer, Directorate of Administration.*

[FR Doc.77-14856 Filed 5-24-77; 8:45 am]

## ENVIRONMENTAL PROTECTION AGENCY

[FRL 732-7; (OPP-42013B)]

### PUERTO RICO

#### Extension of Contingent Approval of State Plan for Certification of Pesticide Applicators

Section 4(a)(2) of the Federal Insecticide, Fungicide, and Rodenticide Act (FIFRA), as amended (86 Stat. 973; 7 U.S.C. 136b), and the implementing regulations of 40 CFR Part 171, require each State desiring to certify applicators to submit a plan for such purpose, subject to approval by the Environmental Protection Agency (EPA). On November 6, 1975, the Honorable Rafael Hernandez-Colon, then Governor of the Commonwealth of Puerto Rico, submitted a Commonwealth of Puerto Rico Plan for Certification of Commercial and Private Applicators of Restricted Use Pesticides to EPA.

A summary of the Commonwealth of Puerto Rico Plan was published in the FEDERAL REGISTER on March 10, 1976 (41 FR 10255). On April 30, 1976, the Regional Administrator, EPA Region II, approved the plan on a contingent basis for a twelve-month period. Contingent approval was based upon EPA approval of implementing regulations to be promulgated by the Puerto Rico Department of Agriculture (PRDA). Notice of contingent approval was published in the FEDERAL REGISTER June 3, 1976 (41 FR 22410).

The Puerto Rico Pesticide Control Act was passed by the Puerto Rico Legislature on October 30, 1975. Proposed regulations for the enforcement of the Act have been drafted, submitted to concerned agencies for comment and are expected to be published by June 30, 1977. As a result, on April 18, 1977, the Commonwealth of Puerto Rico requested an extension of the Commonwealth of Puerto Rico contingent approval pending final promulgation of regulations.

The Regional Administrator, EPA Region II, finds that there is good cause for approving the request and hereby gives notice that an extension has been granted until September 30, 1977.

Dated: May 13, 1977.

HERBERT BARRACK,
*Acting Regional Administrator, U.S. Environmental Protection Agency, Region II.*

[FR Doc.77-14788 Filed 5-24-77; 8:45 am]

## FEDERAL COMMUNICATIONS COMMISSION

[FCC 77-321; RM-2698]

### BUSINESS RADIO SERVICE; SPECIAL EMERGENCY RADIO SERVICE

#### Memorandum Opinion and Order; Denying Petition for Rule Making

Adopted: May 11, 1977.

Released: May 20, 1977.

In the Matter of Amendment of Parts 89 and 91 of the Commission's Rules to transfer central station electrical protection industry licensees and certain frequencies allocated for their use from the Business Radio Service to the Special Emergency Radio Service.

By the Commission.

1. The Central Station Electrical Protection Association has petitioned the Commission to amend Part 89 (Public Safety Radio Services) and Part 91 (Industrial Radio Services) of the Commission's Rules to recognize central station electrical protection companies as a class of eligible in the Commission's Special Emergency Radio Service (Part 89, Subpart P) and to transfer 5 pairs of frequencies [1] in the Business Radio Service designated for use by this industry's members to the Special Emergency Radio Service.

2. Additionally, petitioner requests, upon transfer to the Special Emergency Radio Service, that central station electrical protection industry licensees be permitted to use their presently assigned mobile service frequencies above 25 MHz for fixed point-to-point tone or impulse signalling, subject to the condition that harmful interference not be caused to the primary mobile service operations of other licensees.

3. The International Municipal Signal Association (IMSA) and the associated Public-Safety Communications Officers, Inc. (APCO) have filed comments opposing CSEPA's petition on the grounds that the petition does not demonstrate a need for the proposed change, and because the service CSEPA members provide differs fundamentally from the public safety functions of the entities and personnel now eligible for licensing in the Special Emergency Radio Service.

4. We have carefully considered the petitioner's proposals and the arguments made in support of them, but we have not

[1] 460.900 MHz/465.900 MHz; 460.925 MHz/465.925 MHz; 460.950 MHz/465.950 MHz; 460.975 MHz/465.975 MHz; and 461.000 MHz/466.000 MHz.

AR_0033304

been able to conclude that it would be in the public interest to grant the petition. Our reasons for this conclusion are stated briefly below.

5. First, we do not believe that the petitioner has made an adequate case for its proposals, and has not shown how its members and, more importantly, how the public would benefit from their adoption. For example, CSEPA has not shown (nor indeed alleged) that the five pairs of frequencies designated for the industry's use in the Business Radio Service are not adequate. In this connection, it is noted that the petition, although not entirely clear on this point, does not propose that central station protection companies be made eligible to use the frequencies allocated in the Special Emergency Radio Services.[4] It would seem, therefore, that continued eligibility in the Business Radio Service would be advantageous for the central station protection industry because it would continue to have access to all Business Radio frequencies, not only in the 460–470 MHz band but also in the lower and in the higher bands as well.

6. Additionally, as we have indicated above, one immediate objective of the petitioner is to qualify its members to use their designated mobile service frequencies for fixed point-to-point operations. This, however, is not allowed in the Special Emergency Radio Service under existing rules, although it is permitted in other public safety radio services, see Section 89.126. Such a fixed use has been previously proposed by the petitioners in the Business Radio Service in an earlier petition, RM–1513, and was considered and denied by the Commission, see *Memorandum Opinion and Order*, RM–1513, 34 FCC 2d 350 (1972). Nothing presented here requires or warrants a different conclusion on that proposal now.

7. Finally, we agree with APCO and IMSA that commercial central station protection companies do not belong in the Special Emergency Radio Service. That service was established principally to accommodate activities oriented towards life protection, such as hospitals, ambulances, rescue and disaster organizations, and physicians, additionally, our extensive regulatory program for authorizing emergency medical service communication systems has been incorporated into the Special Emergency Radio Service. The activities of the petitioner's members, although important, are profoundly different from these types of activities. Thus, while we want to emphasize that we are aware of the importance of the protection services being provided by the central station protection industry[5], we simply do not believe

---

[4] If full eligibility in the Special Emergency Radio Service were proposed, other public interest issues would be raised.

[5] It was in recognition of the important functions performed by the central station protection industry that we designated five pairs of frequencies for its use in Docket 13847 and provide for the use of frequencies in the 952–960 MHz band for operation of central station alarm systems.

that its radio communications operations should be accommodated in the Special Emergency Radio Service.

8. Accordingly, it is ORDERED, That the petition filed by the Central Station Electrical Protection Association (RM–2698) is denied.

FEDERAL COMMUNICATIONS
COMMISSION,
VINCENT J. MULLINS,
*Secretary.*

[FR Doc.77–14888 Filed 5–24–77;8:45 am]

---

## PURAC TASK ON THE GENERAL MOBILE RADIO SERVICE

### Meeting

In preparation for the next meeting of the Personal Use Radio Advisory Committee (PURAC), the PURAC task investigating the personal uses of the General Mobile Radio Service will meet June 10, 1977 at 9 A.M. in Room 7317 of the offices of the Federal Communications Commission at 2025 "M" Street NW., Washington, D.C. 20554. The agenda for this meeting will be to report on progress made in identifying the uses of the General Mobile Radio Service and to review the work schedule for the task area for 1977.

Members of the public, especially those interested in personal use two-way radio, are invited to attend. For more information, contact Mr. Corwin Moore, Jr., Highway Safety Research Institute, University of Michigan, Huron Parkway and Baxter Road, Ann Arbor, Michigan 48109 (313–763–3232).

FEDERAL COMMUNICATIONS
COMMISSION,
VINCENT J. MULLINS,
*Secretary.*

[FR Doc.77–14892 Filed 5–24–77;8:45 am]

---

## FEDERAL ENERGY ADMINISTRATION

### GUAM OIL AND REFINING CO.

#### Proposed Consent Order

#### I. INTRODUCTION

Pursuant to 10 CFR § 205.197(c), the Federal Energy Administration (FEA) hereby gives notice of a Consent Order, which was executed between Guam Oil and Refining Company (GORCO) and the FEA on April 22, 1977. In accordance with that Section, FEA will receive comments with respect to this Consent Order. Although this Consent Order has been signed and tentatively accepted by FEA, the FEA may, after consideration of comments received, withdraw its acceptance and, if appropriate, attempt to negotiate an alternative Consent Order.

#### II. THE CONSENT ORDER

Guam Oil and Refining Company, with its executive office located in Dallas, Texas, is a firm engaged in the refining and marketing of petroleum products subject to FEA regulations.

As a result of an audit conducted by FEA of GORCO's costs and recovery of

costs reflected in its Forms FEO–96 for the period between January 1974 through March 1975, FEA advised GORCO that GORCO had (1) understated its recoveries of increased crude oil costs in sales of "other covered products" by $2,277,-417 by failing to consider certain sales in calculating its cost recoveries and (2) understated its increased costs of crude oil by $101,030 by improperly calculating its "crude oil cost differential." The net result of GORCO's miscalculations is that GORCO overstated on its Forms FEO–96 its "Net Increased Costs Attributable to Other Covered Products" by $2,176,387 between January 1974 through March 1975.

In resolution of the issues raised by the audit results, FEA and GORCO executed a Consent Order on April 22, 1977, the significant terms of which are as follows:

(1) In an effort to resolve its dispute with FEA, GORCO agrees to make adjustments to Line 18, Part V of its March 1975 FEO–96 to reflect adjustments resulting from its understatement of costs and understatment of cost recoveries, and to resubmit Forms FEO–96 filed for the period March 1975 to the present, reflecting all necessary adjustments based on the above-described March 1975 adjustment. (Based on the available information, GORCO had unrecovered increased product costs in each month of measurement, January 1974 through March 1975, after applying the corrected amounts determined in this Consent Order).

(2) In submitting revised Forms FEO–96, GORCO agrees that amounts removed in one month shall be carried forward and deducted from GORCO's Forms FEO–96 for all subsequent months, including the most recently filed Form FEO–96 and FEA–P110–M–1 filed for all future months.

(3) The provisions of 10 CFR 205.–197, including the publication of this Notice, are applicable to the Consent Order.

#### III. SUBMISSION OF WRITTEN COMMENTS

Interested persons are invited to comment on this Consent Order by submitting such comments in writing to Mr. D. M. Fowler, Regional Administrator, Region VI, Federal Energy Administration, P.O. Box 35228, Dallas, Texas 75235.

Copies of this Consent Order may be received free of charge by written request to this same address or by calling 214–749–7626.

Comments should be identified on the outside of the envelope and on documents submitted with the designation "Comments on GORCO Consent Order." All comments received on or before _____, 1977, will be considered by the FEA in evaluating the Consent Order.

Any information or data which, in the opinion of the person furnishing it, is confidential, must be identified as such and submitted in accordance with the procedures outlined in 10 CFR 205.9(f).

26694

NOTICES

Issued in Washington, D.C., May 19, 1977.

Eric J. Fygi,
*Acting General Counsel.*

[FR Doc.77–14814 Filed 5–20–77; 11:15 am]

## REFINERS' CRUDE OIL ALLOCATION PROGRAM

### Allocation Quarter of June 1 Through August 31, 1977

The notice specified in § 211.65(e) of the refiners' crude oil allocation program is hereby published for the allocation quarter of June 1, 1977, through August 31, 1977.

The buy-sell list for refiners is set forth as an appendix to this notice. The provisions of 10 CFR 211.65 apply to all transactions made under the buy-sell list. Included as part of the list, as required by § 211.65(e), are: The quantity of crude oil each refiner-buyer is eligible to purchase; the total allocation obligation for all refiner-sellers; the fixed percentage share for each refiner-seller; and the quantity of crude oil each that refiner-seller is obligated to offer for sale to refiner-buyers, with a specification as to the portions thereof that constitute the primary and secondary sales obligations for each refiner-seller, in accordance with 10 CFR 211.65(d).

The allocations shown on the buy-sell list for refiner-buyers that own and operate Canadian Crude Oil Allocation Program second priority refineries (as defined in Part 214 of 10 CFR) reflect two types of adjustments resulting from reductions in Canadian crude oil exports to the United States. Adjustments have been made for the June 1977–August 1977 allocation quarter based on FEA's estimate of Canadian crude oil exports during that allocation quarter. In addition, a further adjustment has been made for certain refiner-buyers that operate second priority refineries and that purchased their entire allocation for the March 1977–May 1977 allocation quarter. This adjustment reflects the difference between FEA's estimates of Canadian crude oil available for March 1977 through May 1977, which were used to adjust allocations during the March 1977–May 1977 allocation quarter, and the actual export level subsequently announced by the Canadian government.

Adjustments have also been made pursuant to 10 CFR 211.65(a)(4) for refiner-buyers that have recently experienced losses of Federal royalty oil. Additionally, FEA made corresponding adjustments for refiner-buyers that are gaining Federal royalty oil for this allocation quarter. Similar adjustments have been made in the last three allocation quarters.

The buy-sell list reflects a reduction in the sale obligation of Continental Oil Company (Conoco) to account for domestic crude oil directed away from Conoco to another refiner under FEA's Decision and Order in "Continental Oil Company," 2 FEA ¶80,503 (January 7, 1975). As has been the case for buy-sell lists since the effectiveness of primary and secondary sales obligations for refiner-sellers in the allocation quarter commencing September 1, 1975, Conoco's primary sales obligation is reduced by the amount of the redirected domestic crude oil under "Farmariss Oil and Refining Company and Navajo Refining Company," CCH Fed. Energy Guidelines, ¶20,629 (July 22, 1974). However, with the issuance of the Decision and Order in "Exxon Company," U.S.A., 5 FEA ¶___ (April 25, 1977), the relief under which is reflected for the first time in this notice, it appears that Conoco's adjustment reducing its sales obligation should have been applied proportionately to both its primary and secondary obligations, as is specified for Exxon in this recent decision involving similar facts. Accordingly, FEA hereby gives notice that, for future allocation quarters for which the buy-sell program continues in its present form, the reduction of Conoco's sale obligation will be calculated in the same manner as is Exxon's adjustment under the "Exxon" decision.

The buy-sell list covers PAD Districts I through V, and amounts shown are in barrels of 42 gallons each, for the specified period. Pursuant to § 211.65(d), each refiner-seller shall offer for sale, directly or through exchange, to refiner-buyers during an allocation quarter a quantity of crude oil equal to that refiner-seller's primary sales obligation plus any portion of that refiner-seller's secondary sales obligation as to which FEA directs a sale pursuant to 10 CFR 211.65(h). No refiner-seller shall be required to offer for sale to refiner-buyers, whether by directed sale or otherwise, any portion of its secondary sales obligation until each other refiner-seller (except refiner-sellers with minimal primary sales obligations) has sold at least 80% of its primary obligation.

The procedures of 10 CFR 211.65(h) provide that if a sale is not agreed upon within 15 days of the date of publication of this notice, a refiner-buyer that has not been able to negotiate a contract to purchase crude oil may request FEA to direct one or more refiner-sellers to sell a suitable type of crude oil to such refiner-buyer. Such a request must not be made earlier than 15 days nor later than 30 days after the publication of this notice. Upon such request, FEA may direct one or more refiner-sellers that have not completed their required sales to sell crude oil to the refiner-buyer. If the refiner-buyer declines to purchase the crude oil specified by FEA, the rights of that refiner-buyer to purchase that volume of crude oil are forfeited during this allocation quarter, providing that the refiner-seller or refiner-sellers in question have fully complied with provisions of 10 CFR 211.65. Refiner-buyers making such requests must provide FEA with the following information:

1. Name of the refiner-buyer and of the person authorized to act for the refiner-buyer in buy-sell list transactions.

2. Names and locations of the refineries for which crude oil is sought, the amount of crude oil sought for each refinery, and the technical specifications of crude oil that have historically been processed in each refinery.

3. Statement of any restrictions, limitations or constraints on the refiner-buyer's purchases of crude oil, particularly concerning the manner or time of deliveries.

4. Names and locations of all refiner-sellers from which crude oil has been sought under the buy-sell list and the volume and specifications of the crude oil sought from each.

5. The response of each refiner-seller to which a request to purchase crude oil has been made, and the name and telephone number of the individual contacted at each such refiner-seller.

6. Such other pertinent information as FEA may request.

Each refiner-buyer and refiner-seller will report the details of each transaction under the buy-sell list to FEA on Form FEA P–118–Q–1 within 15 days of the completion of arrangements for the transaction. Each refiner-buyer and refiner-seller is requested to report as promptly as practicable every such transaction to which it is a party.

Refiner-buyers wishing to receive an allocation in the allocation quarter commencing September 1, 1977, with respect to future refining capacity (as defined in 10 CFR 211.62) that is not presently taken into account in determining their respective purchase opportunities, must apply to the FEA for certification of that capacity and provide all necessary information required to enable FEA to evaluate the factors set forth in 10 CFR 211.65(b)(1) no later than July 1, 1977.

All reports and applications made under this notice should be addressed to:

Manager, Crude Oil Allocation Programs, Crude Oil Buy-Sell Program, 20th Street Postal Station, P.O. Box 19028, Washington, D.C. 20036.

This notice is issued pursuant to Subpart G of FEA's regulations governing its administrative procedures and sanctions, 10 CFR Part 205. Any person aggrieved hereby may file an appeal with FEA's Office of Exceptions and Appeals in accordance with Subpart H of 10 CFR Part 205. Any such appeal shall be filed on or before June 27, 1977.

Issued in Washington, D.C. May 19, 1977.

Eric J. Fygi,
*Acting General Counsel.*

#### Appendix

The list of refiner-sellers and refiner-buyers for the period June 1, 1977, through August 31, 1977, is as follows. The list sets forth the identity of each refiner-seller and refiner-buyer, the fixed percentage share of each refiner-seller and the volumes of crude oil (reflecting all adjustments required under § 211.65) that each such refiner-seller is obligated to offer for sale (with a specification as to primary and secondary sales obligations) or that each such refiner-buyer is eligible to purchase, as the case may be.

AR_0033306

*FEA crude oil allocation program for the period June through August 1977*

### Sales

| | Share | Primary obligation | Secondary obligation |
|---|---|---|---|
| | | *Barrels* | *Barrels* |
| Amoco Oil Co. | 0.090 | 2,992,284 | 3,940,419 |
| Atlantic Richfield | .072 | 2,128,984 | 2,893,645 |
| Chevron U.S.A. | .066 | 4,888,179 | 3,820,914 |
| Cities Service Oil | .023 | 2,465,783 | 925,369 |
| Continental Oil Co. | .024 | 0 | 949,097 |
| Exxon Corp. | .112 | 1,896,172 | 2,456,803 |
| Getty | .020 | 465,614 | 798,309 |
| Gulf Oil Corp. | .086 | 2,409,897 | 3,427,651 |
| Marathon Oil Co. | .022 | 508,815 | 859,819 |
| Mobil Oil Corp. | .069 | 2,147,127 | 3,530,447 |
| Phillips Petroleum | .039 | 922,910 | 1,526,317 |
| Shell Oil Co. | .107 | 2,872,988 | 4,274,329 |
| Sun Oil Co. | .052 | 1,160,626 | 2,067,817 |
| Texaco Inc. | .107 | 3,422,379 | 4,277,504 |
| Union Oil Co. of California | .043 | 1,678,095 | 1,719,597 |
| | | | |
| Total | | 30,000,000 | 37,526,850 |
| Total allocation obligation | | | 67,526,850 |

### FEDERAL ENERGY ADMINISTRATION

CRUDE OIL ALLOCATION PROGRAM FOR THE PERIOD JUNE 1977 THROUGH AUGUST 1977—PURCHASES

| | *Barrels* |
|---|---|
| Allied Materials Co. | 164,311 |
| Amerada Hess Corp. | 10,085,883 |
| American Petrofina | 0 |
| Apco Oil Corp. | 418,113 |
| Arizona Fuels Corp. | 0 |
| Asamera Oil, Inc. | 201,606 |
| Ashland Oil, Inc. | 1,934,524 |
| Axel Johnson | 130,486 |
| Bayou State Oil Corp. | 0 |
| Beacon Oil Co. | 0 |
| Boswell Oil Co. of Louisiana | 0 |
| Calumet Industries | 0 |
| Canal Refining Co. | 0 |
| Caribou Four Corners | 0 |
| C&H Refinery | 4,130 |
| Champlin Petroleum | 1,243,281 |
| Charter Oil Co. | 0 |
| Claiborne Gas Co. | 0 |
| Clark Oil & Refining | 103,299 |
| Coastal States Gas | 1,043,832 |
| Commonwealth Oil Ref. | 2,731,250 |
| CRA-Farmland Ind. Inc. | 875,293 |
| Cross Oil & Ref-Ark. | 121,093 |
| Crown Central Petro. | 1,999,000 |
| Crystal Oil Co. | 0 |
| Crystal Refining Co. | 186,862 |
| Delta Refining Co. | 1,417,029 |
| Diamond Shamrock Corp. | 164,262 |
| Dorchester Gas | 0 |
| Dow/Refinery | 1,114,327 |
| Eco Petroleum Inc. | 45,078 |
| Eddy Refining Co. | 22,116 |
| Edgington Oil Co. | 603,475 |
| Edgington Oxnard Ref. | 0 |
| Energy Cooperative, Inc. | 0 |
| Evangeline Refining | 0 |
| Farmers Union Central Exchange | 1,219,597 |
| Fletcher Oil and Ref. | 30,689 |
| Flint Chemical Corp. | 0 |
| Gary Western Co. | 195,500 |
| Giant Industries | 271,000 |
| Glacier Park | 0 |
| Gladieux Refining | 389,966 |
| Golden Eagle Ref. Co. | 467,250 |
| Good Hope Refineries | 860,000 |
| Guam Oil & Refining | 0 |
| Gulf States | 46,700 |
| HIRI | 0 |
| Howell Corp. | 282,250 |
| Hunt Oil Co. | 420,126 |
| Husky Oil Co. | 1,164,380 |
| Independent Refinery Corp. | 0 |

| | *Barrels* |
|---|---|
| Indiana Farm Bureau | 293,500 |
| J&W Refining Inc. | 558,119 |
| Kentucky Oil Ref. Co. | 0 |
| Kern County Ref., Inc. | 0 |
| Kerr McGee Co. | 4,115,753 |
| Koch Refining Co. | 406,492 |
| La Gloria Oil-Gas Co. | 506,625 |
| Laketon Asphalt Ref. | 0 |
| Lakeside Refining Co. | 60,408 |
| Little America Ref. | 1,467,024 |
| La. Land & Exploration Co. | 0 |
| MacMillan RF Oil Co. | 344,750 |
| Marion Corp. | 289,466 |
| Mid-America Refining | 0 |
| Mohawk Petroleum Co. | 107,625 |
| Mansato Co. | 1,634,100 |
| Morrison Petroleum | 0 |
| Mountaineer Refinery | 15,066 |
| Murphy Oil Corp. | 1,763,078 |
| National Coop. Ref. | 801,188 |
| Navajo Refining Co. | 0 |
| Navada Refining Co. | 25,701 |
| Newhall Refining Co. | 149,375 |
| North American Petroleum | 0 |
| Northland Oil & Ref. | 155,535 |
| OKC Corp. | 377,045 |
| Pennzoil Co. | 338,060 |
| Pester Petroleum Co. | 0 |
| Pioneer Refining | 0 |
| Placid Refining | 2,145,000 |
| Plateau Inc. | 288,244 |
| Powerine Oil Co. | 1,151,705 |
| Pride Refining Inc. | 1,086,712 |
| Princeton | 0 |
| Quaker State Oil Refining Co. | 0 |
| Road Oil Sales, Inc. | 5,750 |
| Rock Island Refining | 0 |
| Saber Refining Co. | 289,997 |
| Sabre Refining Inc. (Dingman) | 0 |
| Sage Creek Refining Co. | 37,045 |
| San Joaquin Refining | 0 |
| Seminole Asphalt Ref. | 48,369 |
| Signoor Corp. | 24,500 |
| Somerset Refinery | 0 |
| Sound Refining, Inc. | 0 |
| South Hampton | 1,160,599 |
| Southern Union | 1,228,076 |
| Southland Oil Co. | 260,250 |
| Southwestern Refining Co. | 0 |
| Standard Oil of Ohio | 6,604,625 |
| Sunland Refining Co. | 352,236 |
| Tenneco Oil Co. | 819,125 |
| Tesoro Petroleum Co. | 540,027 |
| Texas American Petrochemicals, Inc. | 278,866 |
| Texas Asphalt & Refining | 0 |
| Texas City Refining | 3,521,750 |
| Thagard Oil | 0 |
| Thriftway Oil Co. | 0 |
| Thunderbird Resources | 0 |
| Tonkawa Refining Co. | 0 |
| TOSCO | 0 |
| Total Petroleum, Inc. | 907,650 |
| Trans-Ocean Petroleum | 0 |
| United Independent Oil Co. | 10,171 |
| United Refining Co. | 835,500 |
| U.S. Oil & Refining Co. | 368,555 |
| USA Petrochem | 0 |
| Vickers Petroleum Co. | 1,135,835 |
| Vulcan Asphalt Ref. | 0 |
| Warrior Asphalt Corp. | 0 |
| West Coast Oil | 0 |
| Western Refining Co. | 255,192 |
| Winston Refining Co. | 82,991 |
| Wireback Oil Co. | 8,095 |
| Witco Chemical Corp. | 522,375 |
| Yetter Oil Co. | 1,000 |
| Young Refining Corp. | 190,902 |
| | |
| Total | 67,526,850 |

[FR Doc.77-14518 Filed 5-20-77;11:15 am]

---

## FEDERAL MARITIME COMMISSION

### LYKES BROS. STEAMSHIP CO., INC. AND PANAMERICANA INSURGENTES (BERMUDA) LTD.

#### Agreement Filed

Notice is hereby given that the following agreement has been filed with the Commission for approval pursuant to section 15 of the Shipping Act, 1916, as amended (39 Stat. 733, 75 Stat. 763, 46 U.S.C. 814).

Interested parties may inspect and obtain a copy of the agreement at the Washington office of the Federal Maritime Commission, 1100 L Street NW., Room 10126; or may inspect the agreement at the Field Offices located at New York, N.Y., New Orleans, Louisiana, San Francisco, California and San Juan, Puerto Rico. Comments on such agreements, including requests for hearing, may be submitted to the Secretary, Federal Maritime Commission, Washington, D.C. 20573, on or before June 14, 1977. Any person desiring a hearing on the proposed agreement shall provide a clear and concise statement of the matters upon which they desire to adduce evidence. An allegation of discrimination or unfairness shall be accompanied by a statement describing the discrimination or unfairness with particularity. If a violation of the Act or detriment to the commerce of the United States is alleged, the statement shall set forth with particularity the acts and circumstances said to constitute such violation or detriment to commerce.

A copy of any such statement should also be forwarded to the party filing the agreement (as indicated hereinafter) and the statement should indicate that this has been done.

Notice of Agreement Filed by R. J. Finnan, Pricing Analyst, Lykes Bros. Steamship Co., Inc., 300 Poydras Street, New Orleans, Louisiana 70130.

Agreement No. 10296, between the above named parties, is an equipment lending arrangement whereby Panamericana Insurgentes will allow Lykes to use its equipment, i.e., dry or reefer containers mounted on chassis, according to the terms, conditions and to the extent set forth in the agreement.

By Order of the Federal Maritime Commission.

Dated: May 19, 1977.

JOSEPH C. POLKING,
*Acting Secretary.*

[FR Doc.77-14906 Filed 5-24-77;8:45 am]

---

## FEDERAL POWER COMMISSION

### ARKANSAS LOUISIANA GAS CO.

[Docket No. RP77-55]

#### Notice of Revised Tariff Sheet

MAY 17, 1977.

Take notice that on April 29, 1977, Arkansas Louisiana Gas Company (Arkla)

AR_0033307

**NOTICES**

tendered for filing "Revised Sheet No. 4 issued on May 1, 1977" to its Rate Schedule No. G-2 FPC Gas Tariff First Revised Volume No. 1, which Arkla states represents the rates as filed in the captioned docket adjusted to reflect its currently effective purchased gas cost of 52.29¢ per Mcf at 14.73 psia and surcharge rate of 23.27¢ per Mcf at 14.73 psia.

Arkla requests the above described tariff sheet be substituted for the "Revised Sheet No. 4 issued on April 18, 1977" in its Notice of Rate Change filed on April 18, 1977 in Docket No. RP77-55 to be effective June 1, 1977.

Arkla also states that copies of its filing were mailed to the jurisdictional customer affected and other interested parties.

Any person desiring to be heard or to protest said filing should file a Petition to Intervene or Protest with the Federal Power Commission, 825 North Capitol Street NE., Washington, D.C. 20426, in accordance with Sections 1.8 and 1.10 of the Commission's Rules of Practice and Procedure (18 CFR 1.8, 1.10). All such petitions or protests should be filed on or before May 25, 1977. Protests will be considered by the Commission in determining the appropriate action to be taken, but will not serve to make the protestants parties to the proceeding. Any person wishing to become a party must file a Petition to Intervene. Copies of this filing are on file with the Commission and are available for public inspection.

KENNETH F. PLUMB,
*Secretary.*

[FR Doc. 77-14870 Filed 5-24-77;8:45 am]

[Docket No. CP77-372]

**CONSOLIDATED GAS SUPPLY CORP.**

**Notice of Application**

MAY 18, 1977.

Take notice that on May 5, 1977, Consolidated Gas Supply Corporation (Applicant), 445 West Main Street, Clarksburg, West Virginia 26301, filed in Docket No. CP77-372 an application pursuant to Section 7 of the Natural Gas Act and § 157.7(g) of the Regulations thereunder (18 CFR 157.7(g)) for a certificate of public convenience and necessity authorizing the construction and for permission for and approval of the abandonment, during the twelve-month period ending June 30, 1978, and operation of field gas compression and related metering and appurtenant facilities, all as more fully set forth in the application on file with the Commission and open to public inspection.

The stated purpose of this budget-type application is augment Applicant's ability to act with reasonable dispatch in the construction and abandonment of facilities which would not result in changing Applicant's system salable capacity or service from that authorized prior to the filing of the instant application.

Applicant states that the total cost of the proposed construction and abandonment would not exceed $2,000,000 and that the cost of any single project would not exceed $500,000. These costs would be financed from funds on hand and funds to be obtained from its parent corporation, Consolidated Natural Gas Company, it is said.

Any person desiring to be heard or to make any protest with reference to said application should on or before June 6, 1977, file with the Federal Power Commission, Washington, D.C. 20426, a petition to intervene or a protest in accordance with the requirements of the Commission's Rules of Practice and Procedure (18 CFR 1.8 or 1.10) and the Regulations under the Natural Gas Act (18 CFR 157.10). All protests filed with the Commission will be considered by it in determining the appropriate action to be taken but will not serve to make the protestants parties to the proceeding. Any person wishing to become a party to a proceeding or to participate as a party in any hearing therein must file a petition to intervene in accordance with the Commission's Rules.

Take further notice that, pursuant to the authority contained in and subject to the jurisdiction conferred upon the Federal Power Commission by Section 7 and 15 of the Natural Gas Act and the Commission's Rules of Practice and Procedure, a hearing will be held without further notice before the Commission on this application if no petition to intervene is filed within the time required herein, if the Commission on its own review of the matter finds that a grant of the certificate and permission and approval for the proposed abandonment are required by the public convenience and necessity. If a petition for leave to intervene is timely filed, or if the Commission on its own motion believes that a formal hearing is required, further notice of such hearing will be duly given.

Under the procedure herein provided for, unless otherwise advised, it will be unnecessary for Applicant to appear or be represented at the hearing.

KENNETH F. PLUMB,
*Secretary.*

[FR Doc.77-14873 Filed 5-24-77;8:45 am]

[Docket No. G-10122, et al.]

**CONTINENTAL OIL CO.**

**Applications for Certificates, Abandonment of Service and Petitions To Amend Certificates** [1]

MAY 13, 1977.

Take notice that each of the Applicants listed herein has filed an application or petition pursuant to Section 7 of the Natural Gas Act for authorization to sell natural gas in interstate commerce or to abandon service as described herein, all as more fully described in the respective applications and amendments which are on file with the Commission and open to public inspection.

Any person desiring to be heard or to make any protest with reference to said applications should on or before June 6, 1977, file with the Federal Power Commission, Washington, D.C. 20426, petitions to intervene or protests in accordance with the requirements of the Commission's Rules of Practice and Procedure (18 CFR 1.8 or 1.10). All protests filed with the Commission will be considered by it in determining the appropriate action to be taken but will not serve to make the protestants parties to the proceeding. Persons wishing to become parties to a proceeding or to participate as a party in any hearing therein must file petitions to intervene in accordance with the Commission's Rules.

Take further notice that, pursuant to the authority contained in and subject to the jurisdiction conferred upon the Federal Power Commission by Sections 7 and 15 of the Natural Gas Act and the Commission's Rules of Practice and Procedure a hearing will be held without further notice before the Commission on all applications in which no petition to intervene is filed within the time required herein if the Commission on its own review of the matter believes that a grant of the certificates or the authorization for the proposed abandonment is required by the public convenience and necessity. Where a petition for leave to intervene is timely filed, or where the Commission on its own motion believes that a formal hearing is required, further notice of such hearing will be duly given.

Under the procedure herein provided for, unless otherwise advised, it will be unnecessary for Applicants to appear or to be represented at the hearing.

LOIS D. CASHELL,
*Secretary.*

[1] This notice does not provide for consolidation for hearing of the several matters covered herein.

AR_0033308

| Docket No. and date filed | Applicant | Purchaser and location | Price per 1,000 ft³ | Pressure base |
|---|---|---|---|---|
| CI77-440, 4-26-77 A | Anadarko Production Co., P.O. Box 1330, Houston, Tex. 77001. | Panhandle Eastern Pipe Line Co., Hayter "A" No. 1 Well, Hayter Field, Harper County, Kans. | [1][1] $1.45 | 14.73 |
| CI77-441, 4-26-77 A | Anadarko Production Co. .... | Panhandle Eastern Pipe Line Co., Loco Hills Federal "A" No. 1 Well, Loco Hills Morrow Field, Eddy County, N. Mex. | [1][1] 1.44212¢ | 14.73 |
| CI77-442, 4-27-77 A | Flacid Oil Co., 1600 1st National Bank Bldg., Dallas, Tex. 75202. | Transcontinental Gas Pipe Line Corp., Bowie Creek Field, Jefferson Davis County, Miss. | [1][1][1] 53.0¢ | 14.73 |
| CI77-443, 4-27-77 A | General American Oil Co. of Texas, Meadow Bldg., Dallas, Tex. 75206. | Transwestern Pipeline Co., Loco Hills Federal Unit No. 1 Well, Eddy County, N. Mex. | [4] 176.2652¢ | ........ |
| CI77-444, 4-28-77 A | Union Oil Co. of California. .... | Transcontinental Gas Pipe Line Corp., Block 67 in Block 76 Field, Vermilion area, offshore Louisiana. | [4] 163.00¢ | 15.025 |
| CI77-445, 4-28-77 A | McCulloch Oil & Gas Corp., 10880 Wilshire Blvd., suite 1500, Los Angeles, Calif. 90024. | Michigan Wisconsin Pipe Line Co., Smith "A" No. 1 Well, southeast Aledo area, Custer County, Okla. | [1] $1.45 | 14.66 |
| CI77-449, 5-2-77 A | Amoco Production Co., Security Life Bldg., Denver, Colo. 80202. | Colorado Interstate Gas Co., Coldwater Creek Field, Sherman County, Tex. | [1] $1.45 | 14.73 |
| G-10122, 3-14-77 B | Continental Oil Co., P.O. Box 2197, Houston, Tex. 77001. | Tennessee Gas Pipe Line Co., west delta block 58, offshore Louisiana. | (7) | ........ |
| G-20092, 5-2-77 C | Sun Oil Co., P.O. Box 20, Dallas, Tex. 75221. | Arkansas Louisiana Gas Co., Rocky Mount Field, Bossier Parish, La. | [1] $1.45 | 14.73 |
| CI76-801, 4-25-77 C | Amoco Production Co., 500 Jefferson Bldg., P.O. Box 3092, Houston, Tex. 77001. | El Paso Natural Gas Co., Carlsbad South et al. fields, Eddy and Lea Counties, N. Mex. | [1] $1.7691 | 14.73 |
| CI77-237, 4-25-77 A | Cities Service Oil Co., F.O. Box 300, Tulsa, Okla. 74102. | El Paso Natural Gas Co., Elizando Federal "A" No. 1 Well, Morrow Zone and Tracy E. No. 1 Well, Eddy County, N. Mex. | [4] 163.913¢ | 14.73 |
| CI77-339, 4-22-77 C | Tenneco Oil Co., P.O. Box 2511, Houston, Tex. 77001. | El Paso Natural Gas Co., Leonard Brothers No. 3, South Leonard Queen Field, Lea County, N. Mex. | [1] $1.45 | 14.73 |
| CI77-200, 4-22-77 C | Union Oil Co. of California, P.O. Box 7600, Los Angeles, Calif. 90051. | El Paso Natural Gas Co., Burton Flats Field, Eddy County, N. Mex. | [1] $1.45 | 14.73 |
| CI77-408, 4-24-77 A | Sun Oil Co. .................... | Northern Natural Gas Co., Emperor Field, Winkler County, Tex. | [4] 53¢ | 14.73 |
| CI77-421, 4-20-77 C | Cities Service Co. ............. | Sea Robin Pipeline Co., block 586, West Cameron area, offshore Louisiana. | [4][4][4] $1.75 | 15.025 |
| CI77-402, 4-20-77 A | Getty Oil Co., P.O. Box 1404, Houston, Tex. 77001. | Transcontinental Gas Pipe Line Corp., High Island Block 111 Field, offshore Texas. | [1] $1.45 | 14.73 |
| CI77-433, 4-25-77 A | Texaco Inc., P.O. Box 60252, New Orleans, La. 70160. | Tennessee Gas Pipeline Co., Bayou Blaine Field, Plaquemines Parish, La. | [1] $1.45 | 14.73 |
| CI77-406, 4-20-77 A | Sun Oil Co. .................... | Trunkline Gas Co. Eugene Island Block 360 (south addition) offshore Louisiana. | [1] $1.45 | 14.73 |
| CI77-447, 4-25-77 A | Phillips Petroleum Co., 5 C4 Phillips Bldg., Bartlesville, Okla. 74004. | El Paso Natural Gas Co., Exxon-Laguna Grande Unit No. 1 Well, Eddy County, N. Mex. | [4] 145.00¢ | 14.73 |
| CI77-438, 4-25-77 A | Getty Oil Co. .................. | United Gas Pipe Line Co., High Island Block 111 Field, offshore Texas. | [1] $1.45 | 14.73 |
| CI77-439, (CI73-108) 4-28-77 D | Raymond Friedlander et al., Box 1416, Oklahoma City, Okla. | Panhandle Eastern Pipe Line Co., sec. 20, township 25N, range 11W, Alfalfa County, Okla. | (7) | ........ |

[1] Applicant proposes to collect the applicable national rate as prescribed in opinion No. 770-A, subject to adjustments contained therein.
[2] Applicant and purchaser are affiliated.
[3] Subject to upward and downward Btu adjustment.
[4] Includes 100 pct tax reimbursement.
[5] Plus 1.0¢ yearly escalation.
[6] Applicant is willing to accept a permanent certificate in accordance with opinion No. 770, as amended, subject to adjustments contained therein.
[7] Lease has terminated.
[8] Plus 2.0¢ escalation beginning each succeeding 1-yr period.
[9] Will be plugged.

Filing code: A—Initial service.
  B—Abandonment.
  C—Amendment to add acreage.
  D—Amendment to delete acreage.
  E—Succession.
  F—Partial succession.

[FR Doc.77-14771 Filed 5-24-77;8:45 am]

[Docket No. CP77-367]

**FLORIDA GAS TRANSMISSION CO. AND TRANSCONTINENTAL GAS PIPE LINE CORP.**

Notice of Application

MAY 18, 1977.

Take notice that on May 4, 1977, Florida Gas Transmission Company (Florida Gas), P.O. Box 44, Winter Park, Florida, and Transcontinental Gas Pipe Line Corporation (Transco), P.O. Box 1396, Houston, Texas 77001, (Applicants) filed in Docket No. CP77-367 a joint application pursuant to Section 7 of the Natural Gas Act for a certificate of public convenience and necessity authorizing the exchange of 3,000,000,000 Btu's of natural gas per day at a new and additional delivery point located in Jones County, Mississippi, all as more fully set forth in the application which is on file with the Commission and open to public inspection.

Applicant proposes to exchange 3,000,-000,000 Btu's of natural gas per day pursuant to a letter agreement dated April 11, 1977 between the two parties. It is stated that Florida Gas has contracted for a supply of natural gas from Florida

Gas Exploration Company (Exploration), a producing affiliate, to be produced from the Calhoun Field, Jones County, Mississippi, and that Florida would deliver the gas, or cause the gas to be delivered to Transco for the account of Florida Gas at the existing valve located on Transco's pipeline facilities in Jones County, Mississippi. It is further stated that Transco would redeliver equivalent volumes of natural gas to Florida at any mutually agreeable existing authorized interconnection between Applicants' systems.

Applicants state that it would not be necessary to construct any new facilities to render the instant service; however, if additional facilities are required to ensure the proper measurement of the quantities of natural gas proposed to be exchanged, such facilities would be installed and operated or caused to be installed and operated by Florida Gas at no expense to Transco.

Applicants indicate that the proposed exchange of natural gas could provide additional and immediate volumes to the interstate market and that it would assist Florida Gas in maintaining adequate supplies of gas to its customers.

Any person desiring to be heard or to make any protest with reference to said application should on or before June 3, 1977, file with the Federal Power Commission, Washington, D.C. 20426, a petition to intervene or a protest in accordance with the requirements of the Commission's Rules of Practice and Procedure (18 CFR 1.8 or 1.10) and the Regulations under the Natural Gas Act (18 CFR 157.10). All protests filed with the Commission will be considered by it in determining the appropriate action to be taken but will not serve to make the protestants parties to the proceeding. Any person wishing to become a party to a proceeding or to participate as a party in any hearing therein must file a petition to intervene in accordance with the Commission's Rules.

Take further notice that, pursuant to the authority contained in and subject to the jurisdiction conferred upon the Federal Power Commission by Sections 7 and 15 of the Natural Gas Act and the Commission's Rules of Practice and Procedure, a hearing will be held without further notice before the Commission on this application if no petition to intervene is filed within the time required herein, if the Commission on its own review of the matter finds that a grant of the certificate is required by the public convenience and necessity. If a petition for leave to intervene is timely filed, or if the Commission on its own motion believes that a formal hearing is required, further notice of such hearing will be duly given.

Under the procedure herein provided for, unless otherwise advised, it will be unnecessary for Applicants to appear or be represented at the hearing.

KENNETH F. PLUMB,
Secretary.

[FR Doc.77-14876 Filed 5-24-77;8:45 am]

AR_0033309

[Docket No. CP75-283]

## GREAT LAKES GAS TRANSMISSION CO.

### Notice of Amendment to Application

#### MAY 18, 1977.

Take notice that on May 6, 1977, Great Lakes Gas Transmission Company (Applicant), 2100 Buhl Building, Detroit, Michigan 48226, filed in Docket No. CP75-283 an amendment to its application filed in said docket pursuant to Section 7 of the Natural Gas Act so as to authorize the construction and operation of a total of approximately 217 miles of 36-inch diameter pipeline loop and related facilities, of which approximately 125 miles of the loop would be constructed for transportation of commingled gas during Phase I, and modification and utilization of existing facilities, all as more fully set forth in the amendment which is on file with the Commission and open to public inspection.

In its initial application filed in the instant docket, Applicant proposed (1) to transport for the account of ANG Coal Gasification Company (Gasification Company), commingled synthetic and natural gas (commingled gas) from Thief River Falls, Minnesota to Crystal Falls, Michigan and (2) to construct, modify and operate facilities to enable it to receive and transport such gas. The synthetic gas which would be commingled with natural gas flowing through Applicant's existing facilities would be produced in a coal gasification plant to be built in Mercer County, North Dakota, it is said. Applicant states that at the time it filed its original application, such plant was proposed to be built and owned solely by the Gasification Company and the plant output was anticipated to be 275,000 Mcf of natural gas per day.

Applicant states that the following changes have occurred since the filing of its original application:

(1) In April 1976, the Gasification Company decided to construct the plant in two phases with Phase I to be completed by 1981; the plant output after completion of the first phase is anticipated to be 137,500 Mcf of natural gas per day which is half of the total projected output of 275,000 Mcf of natural gas per day after completion of Phase II; (2) In April, 1977, the Gasification Company advised Great Lakes that an interim agreement had been reached between the Gasification Company and PGC Coal Gasification Company (PGC), wholly-owned subsidiary of The Peoples Gas Company of Chicago, Illinois, which provided for the sharing of front end costs and which outlined the basis of co-ownership of Phase I of the gasification plant. ANR Gasification Properties Company (ANP) a newly formed wholly-owned subsidiary of American Natural Resources Company and PGC would be the co-owners as tenants in common of Phase I; additionally, these two companies would equally share in the output of the proposed plant. Such change of ownership would not change the con-

struction or operation of the facilities to be installed by Applicant, it is said.

Applicant proposes to construct during Phase I 365 miles of 20-inch diameter synthetic natural gas (SNG) pipeline which would be used for transportation of the SNG from the outlet of the gasification plant to the interconnection of SNG line with the existing facilities of Applicant at Thief River Falls, Minnesota (Thief River Falls interconnection).

Applicant states that the transportation of commingled gas from the Thief River Falls interconnection to the interconnection of Applicant's facilities with those of Mchigan Wisconsin Pipe Line Company (Michigan Wisconsin) near Crystal Falls, Michigan (Crystal Falls interconnection) during Phase I would require construction of approximately 125 miles of 36-inch diameter looping in seven segments and utilization of 35.8 miles of Applicant's existing 36-inch diameter loop which is presently being used to render a transportation service for Northern Natural Gas Company.

It is indicated that Applicant has now updated the costs of Phase I facilities to constant mid-1976 dollars, and that the total estimated cost of Applicant's Phase I SNG facilities in mid-1976 constant dollars is $70,567,200 and the total estimated cost of the jurisdictional facilities is $55,680,700. Applicant states that the financing plan for this undated cost is not different in any material respect from the financing plan originally proposed.

It is stated that in the event that PGC does not become a co-owner of Phase I of the gasification plant and output, renegotiation of Applicant's transportation contracts for both the non-jurisdictional SNG transportation service and the jurisdictional commingled gas transportation service would be necessary. It is further stated that both these transportation services are expected to be performed under the terms and conditions similar to those of the contracts which are already on file with the Commission except for the following changes: (1) Applicant would have separate transportation contracts with the coowners; (2) the new contracts would pertain to half of the anticipated gasification plant out-put; and (3) each of these contracts would reflect the two-phase construction of the facilities.

Any person desiring to be heard or to make any protest with reference to said amendment should on or before June 6, 1977, file with the Federal Power Commission, Washington, D.C. 20426, a petition to intervene or a protest in accordance with the requirements of the Commission's Rules of Practice and Procedures (18 CFR 1.8 or 1.10) and the Regulations under the Natural Gas Act (18 CFR 157.10). All protests filed with the Commission will be considered by it in determining the appropriate action to be taken but will not serve to make the protestants parties to the proceeding. Any person wishing to become a party to a proceeding or to participate as a party in any hearing therein must file a peti-

tion to intervent in accordance with the Commission's Rules. All persons who have heretofore filed need not file again.

KENNETH F. PLUMB,
*Secretary.*

[FR Doc.77–14877 Filed 5–24–77;8:45 am]

[Docket No. ER77-359]

## LOUISVILLE GAS AND ELECTRIC CO.

### Notice of Tariff Change

#### MAY 18, 1977.

Take notice that Louisville Gas and Electric Company (LG&E) on May 4, 1977, tendered for filing proposed changes in its Interconnection Agreement between LG&E and East Kentucky Power Cooperative (East Ky.), formerly East Kentucky Rural Electric Cooperative Corporation, designated Louisville Gas and Electric Company. FPC Rate Schedule No. 25.

LG&E indicates that the purpose of this filing is to increase the demand charge as set forth under Article VI of the Interconnection Agreement from $0.075 per kilowatt per weekday (Monday through Saturday) to $0.10 per kilowatt per weekday (Monday through Saturday). LG&E further indicates that this proposed revision reflects a desire on the part of both parties to attain the optimum benefit from the interconnection of their systems.

According to LG&E copies of the filing were served upon East Kentucky Power Cooperative.

Any person desiring to be heard or to protest said application should file a petition to intervene or protest with the Federal Power Commission, 825 North Capitol Street NE., Washington, D.C. 20426, in accordance with Sections 1.8 and 1.10 of the Commission's Rules of Practice and Procedure (18 CFR 1.8, 1.10). All such petitions or protests should be filed on or before May 31, 1977. Protests will be considered by the Commission in determining the appropriate action to be taken, but will not serve to make protestants parties to the proceeding. Any person wishing to become a party must file a petition to intervene. Copies of this application are on file with the Commission and are available for public inspection.

KENNETH F. PLUMB,
*Secretary.*

[FR Doc.77–14872 Filed 5–24–77;8:45 am]

[Docket No. ES77-39]

## IOWA POWER & LIGHT CO.

### Notice of Application

#### MAY 18, 1977.

Take notice that on May 12, 1977, Iowa Power & Light Company (Applicant) of Des Moines, Iowa, filed an application seeking an order pursuant to Section 204 of the Federal Power Act authorizing the issuance of not more than 450,000 shares of Common Stock, par value $10 per share.

AR_0033310

Applicant proposes to issue and sell for cash the aforesaid 450,000 shares of Common Stock, par value $10 per share, under an Automatic Dividend Reinvestment and Stock Purchase Plan.

The purpose for which the Common Stock is to be issued is to obtain funds to pay a portion of short-term borrowings outstanding from commercial banking institutions and commercial paper from time to time and for general corporate purposes.

Any person desiring to be heard or to make any protest with reference to the application should on or before June 6, 1977, file with the Federal Power Commission, Washington, D.C. 20426, petitions or protests in accordance with the Commission's Rules of Practice and Procedure (18 CFR 1.8 or 1.10). All protests filed with the Commission will be considered by it in determining the appropriate action to be taken but will not serve to make the protestant a party to the proceeding. Persons wishing to become parties to a proceeding or to participate as a party in any hearing therein must file petitions to intervene in accordance with the Commission's Rules. The application is on file with the Commission and is available for public inspection.

KENNETH F. PLUMB,
Secretary.

[FR Doc.77-14878 Filed 5-24-77;8:45 am]

[Docket No. CP77-373]

MICHIGAN WISCONSIN PIPE LINE CO.

Notice of Application

MAY 18, 1977.

Take notice that on May 9, 1977, Michigan Wisconsin Pipe Line Company (Applicant), One Woodward Avenue, Detroit, Michigan 48226, filed in Docket No. CP77-373 an application pursuant to Section 7(c) of the Natural Gas Act and §157.7(b) of the Regulations thereunder (18 CFR 157.7(b)) for a certificate of public convenience and necessity authorizing the construction during the 12-month period commencing July 13, 1977, and operation of facilities to enable Applicant to take into its certificated main pipeline system natural gas which would be purchased from producers and other similar sellers thereof, all as more fully set forth in the application on file with the Commission and open to public inspection.

The stated purpose of this budget-type application is to augment Applicant's ability to act with reasonable dispatch in connecting to its pipeline system supplies of natural gas which may become available from various producing areas generally co-extensive with its pipeline system or the system of other pipeline companies which may be authorized to transport gas for the account of or exchange with Applicant.

Applicant states that the total cost of the proposed facilities would not exceed $12,000,000 with no single offshore project to exceed a cost of $2,500,000 and no single onshore project to exceed a cost

of $1,500,000. These costs would be financed with cash on hand, it is said.

Any person desiring to be heard or to make any protest with reference to said application should on or before June 6, 1977, file with the Federal Power Commission, Washington, D.C. 20426, a petition to intervene or a protest in accordance with the requirements of the Commission's Rules of Practice and Procedure (18 CFR 1.8 or 1.10) and the Regulations under the Natural Gas Act (18 CFR 157.10). All protests filed with the Commission will be considered by it in determining the appropriate action to be taken but will not serve to make the protestants parties to the proceeding. Any person wishing to become a party to a proceeding or to participate as a party in any hearing therein must file a petition to intervene in accordance with the Commission's Rules.

Take further notice that, pursuant to the authority contained in and subject to the jurisdiction conferred upon the Federal Power Commission by Sections 7 and 15 of the Natural Gas Act and the Commission's Rules of Practice and Procedure, a hearing will be held without further notice before the Commission on this application if no petition to intervene is filed within the time required herein, if the Commission on its own review of the matter finds that a grant of the certificate is required by the public convenience and necessity. If a petition for leave to intervene is timely filed, or if the Commission on its own motion believes that a formal hearing is required, further notice of such hearing will be duly given.

Under the procedure herein provided for, unless otherwise advised, it will be unnecessary for Applicant to appear or be represented at the hearing.

KENNETH F. PLUMB,
Secretary.

[FR Doc.77-14874 Filed 5-24-77;8:45 am]

[Docket No. CP77-371]

MOUNTAIN FUEL SUPPLY CO.

Notice of Application

MAY 18, 1977.

Take notice that on May 5, 1977, Mountain Fuel Supply Company (Applicant), 180 East First South Street, Salt Lake City, Utah 84139, filed in Docket No. CP77-371 an application pursuant to Section 7(c) of the Natural Gas Act and §157.7(b) of the Regulations thereunder (18 CFR 157.7(b)) for a certificate of public convenience and necessity authorizing the construction, during the 12-month period commencing on the date of the order granting the requested authorization, and operation of facilities to enable Applicant to take into its certificated main pipeline system natural gas which would be purchased or received from producers and other similar sellers thereof, or produced by Applicant, from time to time, all as more fully set forth in the application on file with the Commission and open to public inspection.

The stated purpose of this budget-type application is to augment Applicant's ability to act with reasonable dispatch in connecting to its pipeline system supplies of natural gas which may become available from various producing areas generally co-extensive with its pipeline system or the systems of other pipeline companies which may be authorized to transport gas for the account of or exchange with Applicant.

Applicant states that the total cost of the proposed facilities would not exceed $6,000,000, with no single project to exceed a cost of $1,500,000. These costs would be financed out of funds obtained from internal sources and from short-term bank borrowings as may be required.

Any person desiring to be heard or to make any protest with reference to said application should on or before June 6, 1977, file with the Federal Power Commission, Washington, D.C. 20426, a petition to intervene or a protest in accordance with the requirements of the Commission's Rules of Practice and Procedure (18 CFR 1.8 or 1.10) and the Regulations under the Natural Gas Act (18 CFR 157.10). All protests filed with the Commission will be considered by it in determining the appropriate action to be taken but will not serve to make the protestants parties to the proceeding. Any person wishing to become a party to a proceeding or to participate as a party in any hearing therein must file a petition to intervene in accordance with the Commission's Rules.

Take further notice that, pursuant to the authority contained in and subject to the jurisdiction conferred upon the Federal Power Commission by Sections 7 and 15 of the Natural Gas Act and the Commission's Rules of Practice and Procedure, a hearing will be held without further notice before the Commission on this application if no petition to intervene is filed within the time required herein, if the Commission on its own review of the matter finds that a grant of the certificate is required by the public convenience and necessity. If a petition for leave to intervene is timely filed, or if the Commission on its own motion believes that a formal hearing is required, further notice of such hearing will be duly given.

Under the procedure herein provided for, unless otherwise advised, it will be unnecessary for Applicant to appear or be represented at the hearing.

KENNETH F. PLUMB,
Secretary.

[FR Doc.77-14875 Filed 5-24-77;8:45 am]

[Docket No. ES77-36]

PACIFIC POWER & LIGHT CO.

Notice of Application

MAY 18, 1977.

Take notice that on May 5, 1977, the Pacific Power & Light Company (Applicant), a corporation organized under the laws of the state of Maine and quali-

AR_0033311

fied to transact business in the states of Oregon, Wyoming, Washington, California, Montana and Idaho, with its principal business office at Portland, Oregon, filed an application with the Federal Power Commission, pursuant to Section 204 of the Federal Power Act, seeking an order authorizing the issuance of not exceeding $160,000,000 in an aggregate principal amount at any one time outstanding of unsecured promissory notes (1) pursuant to Lines of Credit ($85,000,-000), and (2) in the form of Commercial Paper ($75,000,000).

(1) Unsecured promissory notes in an aggregate principal amount not exceeding $85,000,000 at any one time outstanding would be issued by Applicant to evidence borrowings from commercial banks under Lines of Credit. Each note so issued would be dated the day of issuance and would have a maturity of up to three months from the date thereof. All notes issued pursuant to the Lines of Credit would mature not later than June 30, 1979.

(2) Unsecured promissory notes in an aggregate principal amount not exceeding $75,000,000 at any one time outstanding would be issued and sold by Applicant to one or more commercial paper dealers. Each note issued as Commercial Paper would be dated the day of issuance, would have a maturity of not more than 270 days from the date thereof, but not later than June 30, 1979, and would be discounted at the rate prevailing at the time of issuance for Commercial Paper of comparable quality and maturity.

Proceeds from the borrowings to be made under the Lines of Credit and in the form of Commercial Paper would be used to temporarily finance current transactions, including Applicant's construction expenditures, which for 1977 and 1978 are presently estimated at $602,141,000. The balance of funds required to meet estimated construction expenditures is expected to come, in part, from funds to be generated internally, from borrowings pursuant to a Letter Agreement dated March 10, 1977, not exceeding $50,000,000 at any one time outstanding, and from permanent financing of types and magnitudes not yet finally determined.

Any person desiring to be heard or to make any protest with reference to this application should, on or before May 31, 1977, file with the Federal Power Commission, Washington, D.C. 20426, petitions to intervene or protests in accordance with the requirements of the Commission's Rules of Practice and Procedure (18 CFR 1.8 or 1.10). All protests filed with the Commission will be considered by it in determining the appropriate action to be taken but will not serve to make the protestants parties to the proceeding. Persons wishing to become parties to a proceeding or to participate as a party in any hearing therein must file petitions to intervene in accordance with the Commission's Rules. The application is on file with the Com-

mission and available for public inspection.

KENNETH F. PLUMB,
Secretary.

[FR Doc.77-14871 Filed 5-24-77;8:45 am]

[Docket No. CP77-374]

## UNITED GAS PIPE LINE CO.

### Notice of Application

MAY 17, 1977.

Take notice that on May 11, 1977, United Gas Pipe Line Company (Applicant), P.O. Box 1478, Houston, Texas 77001, filed in Docket No. CP77-374 an application pursuant to Section 7(c) of the Natural Gas Act for a certificate of public convenience and necessity authorizing the transportation of up to 5,000 Mcf of natural gas per day for Mississippi River Transmission Corporation (Mississippi River) and the construction and operation of a tap or taps at the proposed delivery point in order to receive such gas, all as more fully set forth in the application on file with the Commission and open to public inspection.

Applicant proposes to transport up to 5,000 Mcf of natural gas per day for Mississippi River for 10 years pursuant to a transportation agreement dated April 6, 1977, between Applicant and Mississippi River. It is stated that Mississippi River would deliver or cause to be delivered to Applicant the proposed volumes of gas at the tap or taps to be installed by Applicant at Mississippi River's expense on Applicant's 24-inch line located in Desoto Parish, Louisiana, and Applicant would redeliver such gas to Mississippi River at the outlet side of its existing measuring and regulating stations located at Mississippi River's Perryville Compressor site located in the Monroe Field, Quachita Parish, Louisiana. Applicant states that it is currently selling gas to Mississippi River under a service agreement dated September 11, 1970, at this point.

It is stated that Mississippi River would pay Applicant for gas transported under the instant agreement an amount per Mcf equal to Applicant's average jurisdictional transmission cost of service in to effect from time to time in Applicant's northern rate zone as such may be determined by Applicant based on rate filings made from time to time, less any amount included in such average jurisdictional cost of service which is attributable to gas consumer in the operation of Applicant's pipeline system. The current average jurisdictional transmission cost of service, exclusive of the cost of gas consumed in Applicant's operation, is 20.04 cents per Mcf, it is said.

Any person desiring to be heard or to make any protest with reference to said application should on or before June 7, 1977, file with the Federal Power Commission, Washington, D.C. 20426, a petition to intervene or a protest in accordance with the requirements of the

Commission's Rules of Practice and Procedure (18 CFR 1.8 or 1.10) and the Regulations under the Natural Gas Act (18 CFR 157.10). All protests filed with the Commission will be considered by it in determining the appropriate action to be taken but will not serve to make the protestants parties to the proceeding. Any person wishing to become a party to a proceeding or to participate as a party in any hearing therein must file a petition to intervene in accordance with the Commission's Rules.

Take further notice that, pursuant to the authority contained in and subject to the jurisdiction conferred upon the Federal Power Commission by Sections 7 and 15 of the Natural Gas Act and the Commission's Rules of Practice and Procedure, a hearing will be held without further notice before the Commission on this application if no petition to intervene is filed within the time required herein, if the Commission on its own review of the matter finds that a grant of the certificate is required by the public convenience and necessity. If a petition for leave to intervene is timely filed, or if the Commission on its own motion believes that a formal hearing is required, further notice of such hearing will be duly given.

Under the procedure herein provided for, unless otherwise advised, it will be unnecessary for Applicant to appear or be represented at the hearing.

KENNETH F. PLUMB,
Secretary.

[FR Doc.77-14879 Filed 5-24-77;8:45 am]

## FEDERAL RESERVE SYSTEM

### CHEMICAL NEW YORK CORP.

#### Proposed Performance of Industrial Bank Activities

Chemical New York Corporation, New York, New York, has applied, pursuant to section 4(c)(8) of the Bank Holding Company Act (12 U.S.C. 1843(c)(8)) and § 225.4(b)(2) of the Board's Regulation Y (12 CFR 225.4(b)(2)), for permission to convert the Boulder, Colorado office of its subsidiary, Sun Finance and Loan Company, into an industrial bank to be known as Depositors Industrial Bank. Notice of the application was published on April 19, 1977, in "The Boulder Daily Camera," a newspaper circulated in Boulder, Colorado.

Applicant states that the proposed subsidiary would engage in the activities of an industrial bank, including making direct loans and purchasing sales finance contracts and other extensions of credit as would be made or acquired by an industrial bank; providing group credit life and group credit accident and health insurance directly related to such extensions of credit; receiving time savings deposits. Such activities have been specified by the Board in § 225.4(a) of Regulation Y as permissible for bank holding companies, subject to Board ap-

AR_0033312

proval of individual proposals in accordance with the procedures of § 225.4(b).

Interested persons may express their views on the question whether consummation of the proposal can "reasonably be expected to produce benefits to the public, such as greater convenience, increased competition, or gains in efficiency, that outweigh possible adverse effects, such as undue concentration of resources, decreased or unfair competition, conflicts of interests, or unsound banking practices." Any request for a hearing on this question should be accompanied by a statement summarizing the evidence the person requesting the hearing proposes to submit or to elicit at the hearing and a statement of the reasons why this matter should not be resolved without a hearing.

The application may be inspected at the offices of the Board of Governors or at the Federal Reserve Bank of New York.

Any views or requests for hearing should be submitted in writing and received by the Secretary, Board of Governors of the Federal Reserve System, Washington, D.C. 20551, not later than June 16, 1977.

Board of Governors of the Federal Reserve System, May 19, 1977.

GRIFFITH L. GARWOOD,
*Deputy Secretary of the Board.*

[FR Doc.77-14809 Filed 5-24-77;8:45 am]

## TEXAS COMMERCE BANCSHARES, INC.

### Acquisition of Bank

Texas Commerce Bancshares, Inc., Houston, Texas, has applied for the Board's approval under section 3(a)(3) of the Bank Holding Company Act (12 U.S.C. 1842(a)(3)) to acquire 100 percent of the voting shares of Main Street National Bank of Dallas, Dallas, Texas. The factors that are considered in acting on the application are set forth in section 3(c) of the Act (12 U.S.C. 1842(c)).

The application may be inspected at the offices of the Board of Governors or at the Federal Reserve Bank of Dallas. Any person wishing to comment on the application should submit views in writing to the Secretary, Board of Governors of the Federal Reserve System, Washington, D.C. 20551, to be received not later than June 16, 1977.

Board of Governors of the Federal Reserve System, May 19, 1977.

GRIFFITH L. GARWOOD,
*Deputy Secretary of the Board.*

[FR Doc.77-14810 Filed 5-24-77;8:45 am]

## THE CENTRAL BANCORPORATION, INC.

### Acquisition of Bank

The Central Bancorporation, Inc., Cincinnati, Ohio, has applied for the Board's approval under section 3(a)(3) of the Bank Holding Company Act (12 U.S.C. 1842(a)(3)) to acquire 100 per

cent of the voting shares, less directors' qualifying shares, of the successor by merger to The Central Security National Bank of Lorain County, Lorain, Ohio. The factors that are considered in acting on the application are set forth in section 3(c) of the Act (12 U.S.C. 1842(c)).

The application may be inspected at the offices of the Board of Governors or at the Federal Reserve Bank of Cleveland. Any person wishing to comment on the application should submit views in writing to the Secretary, Board of Governors of the Federal Reserve System, Washington, D.C. 20551, to be received not later than June 17, 1977.

Board of Governors of the Federal Reserve System, May 20, 1977.

GRIFFITH L. GARWOOD,
*Deputy Secretary of the Board.*

[FR Doc.77-14897 Filed 5-24-77;8:45 am]

## OLD KENT FINANCIAL CORP.

### Acquisition of Bank

Old Kent Financial Corporation, Grand Rapids, Michigan, has applied for the Board's approval under section 3 (a)(3) of the Bank Holding Company Act (12 U.S.C. 1842(a)(3)) to acquire 100 per cent of the voting shares of Old Kent Bank of Norton Shores, Norton Shores, N.A., Norton Shores, Michigan, a proposed de novo bank. The factors that are considered in acting on the application are set forth in section 3(c) of the Act (12 U.S.C. 1842(c).

The application may be inspected at the offices of the Board of Governors or at the Federal Reserve Bank of Chicago. Any person wishing to comment on the application should submit views in writing to the Secretary, Board of Governors of the Federal Reserve System, Washington, D.C. 20551, to be received not later than June 14, 1977.

Board of Governors of the Federal Reserve System, May 19, 1977.

GRIFFITH L. GARWOOD,
*Deputy Secretary of the Board.*

[FR Doc.77-14898 Filed 5-24-77;8:45 am]

## FEDERAL OPEN MARKET COMMITTEE

### Domestic Policy Directive of April 19, 1977

In accordance with § 271.5 of its rules regarding availability of information, there is set forth below the Committee's Domestic Policy Directive issued at its meeting held on April 19, 1977.[1]

The information reviewed at this meeting suggests that growth in real output of goods and services increased in the first quarter from the reduced pace in the fourth quarter of 1976. In March industrial output, retail

[1] The Record of Policy Actions of the Committee for the meeting of April 19, 1977, is filed as part of the original document. Copies are available on request to the Board of Governors of the Federal Reserve System, Washington, D.C. 20551.

sales, and employment expanded substantially further. Although the labor force also increased sharply, the unemployment rate declined from 7.5 to 7.3 percent. The wholesale price index for all commodities again rose substantially; increases were particularly sharp among farm products and foods, and there were sizable advances for many industrial commodities. The index of average wage rates rose in the first quarter of 1977 at a somewhat faster pace than it had on the average during 1976, reflecting largely an increase in the minimum wage.

The average value of the dollar against leading foreign currencies has declined somewhat over the past month, returning to about the level at the beginning of the year. Demand for the Japanese yen and the U.K. pound intensified. The U.S. foreign trade deficit continued large in February.

M-1 grew at a moderate pace in March but increased substantially in early April. At banks and thrift institutions, inflows of time and savings deposits other than large-denomination CD's continued to slacken in March. Market interest rates declined considerably in mid-April, after having changed little since mid-March.

In light of the foregoing developments, it is the policy of the Federal Open Market Committee to foster bank reserve and other financial conditions that will encourage continued economic expansion, while resisting inflationary pressures and contributing to a sustainable pattern of international transactions.

Growth in M-1, M-2, and M-3 within ranges of 4½ to 6½ percent, 7 to 9½ percent, and 8½ to 11 percent, respectively, from the first quarter of 1977 to the first quarter of 1978 appears to be consistent with these objectives. These ranges are subject to reconsideration at any time as conditions warrant.

The Committee seeks to encourage near-term rates of growth in M-1 and M-2 on a path believed to be reasonably consistent with the longer-run ranges for monetary aggregates cited in the preceding paragraph. Specifically, at present, it expects the annual growth rates over the April–May period to be within the ranges of 6 to 10 percent for M-1 and 8 to 12 percent for M-2. In the judgment of the Committee such growth rates are likely to be associated with a weekly average Federal funds rate of about 4¾ percent. If, giving approximately equal weight to M-1 and M-2, it appears that growth rates over the 2-month period will deviate significantly from the midpoints of the indicated ranges, the operational objective for the Federal funds rate shall be modified in an orderly fashion within a range of 4½ to 5¼ percent.

If it appears during the period before the next meeting that the operating constraints specified above are proving to be significantly inconsistent, the Manager is promptly to notify the Chairman who will then decide whether the situation calls for supplementary instructions from the Committee.

NOTE.—On May 6, 1977, the Committee modified the inter-meeting range for the Federal funds rate specified in the next-to-last paragraph of the domestic policy directive issued on April 19, 1977, by increasing the upper limit for 5¼ to 5½ percent.

By order of the Federal Open Market Committee, May 20, 1977.

ARTHUR L. BROIDA,
*Secretary.*

[FR Doc.77-14896 Filed 5-24-77;8:45 am]

AR_0033313

## GENERAL SERVICES ADMINISTRATION

**REGIONAL PUBLIC ADVISORY PANEL ON ARCHITECTURAL AND ENGINEERING SERVICES**

### Meeting

Pursuant to Public Law 92–463, notice is hereby given of a meeting of the Regional Public Advisory Panel on Architectural and Engineering Services, Region 1; Friday, June 10, 1977, from 9 a.m. to 4:30 p.m.; Room 927, J. W. McCormack Post Office and Courthouse, Post Office Square, Boston, Massachusetts 02109.

The meeting will be devoted to the initial step of the procedures for screening and evaluating the qualifications of architect-engineers under consideration for selection to furnish professional services for the following project:

"Building Modernization", J. W. McCormack Post Office and Courthouse, Boston, Massachusetts.

The meeting will be open to the public.

Dated: May 13, 1977.

ALBERT A GAMMAL, JR.,
*Regional Administrator.*

[FR Doc.77–14858 Filed 5–24–77;8:45 am]

## DEPARTMENT OF HEALTH, EDUCATION, AND WELFARE

### National Institutes of Health

**CELLULAR AND MOLECULAR BASIS OF DISEASE REVIEW COMMITTEE**

#### Amended Notice of Meeting

Notice is hereby given of a change in the date and location of the next meeting of the Cellular and Molecular Basis of Disease Review Committee, National Institute of General Medical Sciences.

As published in the FEDERAL REGISTER on April 4, 1977 (42 FR 17914), this committee was to have met on June 6–10, 1977 at the National Institutes of Health, Building 31, Conference Room 4, Bethesda, Maryland. The meeting dates have been changed to June 20–24, 1977, and the location to the New Jersey Room of the Holiday Inn, Bethesda, Maryland. The meeting will be open to the public on June 20th from 9 a.m. to 11 a.m. and will be closed to the public from 11 a.m., June 20 until adjournment on June 24, 1977.

Dated: May 18, 1977.

SUZANNE L. FREMEAU,
*Committee Management Officer,*
*National Institutes of Health.*

[FR Doc.77–14839 Filed 5–24–77;8:45 am]

**COMPREHENSIVE SICKLE CELL CENTER AD HOC REVIEW COMMITTEE**

#### Meeting

Pursuant to Pub. L. 92–463, notice is hereby given of the meeting of the Comprehensive Sickle Cell Center ad hoc Review Committee, National Heart, Lung, and Blood Institute, June 23–24, 1977,

Barbizon Plaza Hotel, New York, New York 10019.

In accordance with the provisions set forth in Section 552b(c) (6), Title 5, U.S. Code and Section 10(d) of Pub. L. 92–463, the meeting will be closed to the public on June 23 from 6:00 p.m. to midnight, and on June 24 from 8:00 a.m. to adjournment at 2:00 p.m. for the review, discussion and evaluation of individual grant applications. These applications and the discussions could reveal personal information concerning individuals associated with the applications.

Mr. York E. Onnen, Chief, Public Inquiries and Reports Branch, NHLBI, NIH, Room 5A03, Building 31, Bethesda, Maryland 20014, phone (301) 496–4236, will provide summaries of the meeting and rosters of the committee members. Dr. Michael A. Oxman, Executive Secretary, NHLBI, NIH, Room 555, Westwood Building, Bethesda, Maryland 20014, phone (301) 496–7351, will furnish substantive program information.

(Catalog of Federal Domestic Assistance Program No. 13.839, National Institutes of Health)

Dated: May 16, 1977.

SUZANNE L. FREMEAU,
*Committee Management Officer,*
*National Institutes of Health.*

[FR Doc.77–14837 Filed 5–24–77;8:45 am]

**HEART, LUNG, AND BLOOD RESEARCH REVIEW COMMITTEE A**

#### Meeting

Pursuant to Pub. L. 92–463, notice is hereby given of the meeting of the Heart, Lung, and Blood Research Review Committee A, National Heart, Lung, and Blood Institute, June 24–25, 1977, Conference Room 9, Building 31, NIH Campus, Bethesda, Maryland.

This meeting will be open to the public on June 24, 1977 from 8:30 am to approximately 9:30 am to discuss administrative details and to hear reports concerning the current status of the National Heart, Lung, and Blood Institute. Attendance by the public will be limited to space available.

In accordance with provisions set forth in Section 552b(c) (6), Title 5, U.S. Code and Section 10(d) of Pub. L. 92–463, the meeting will be closed to the public on June 24, 1977 from 9:30 am until adjournment on June 25, 1977, for the review, discussion and evaluation of individual grant applications. These applications and the discussions could reveal personal information concerning individuals associated with the applications.

Mr. York E. Onnen, Chief, Public Inquiries and Reports Branch, NHLBI, NIH, Room 5A03, Building 31, Bethesda, Maryland 20014, phone (301) 496–4236, will provide summaries of the meeting and rosters of the committee members. Dr. Arthur W. Merrick, Executive Secretary, NHLBI, NIH, Room 552, Westwood Building, Bethesda, Maryland 20014, phone (301) 496–7917, will furnish substantive program information.

(Catalog of Federal Domestic Assistance Program No. 13.837 and 13.838, National Institutes of Health.)

Dated: May 16, 1977.

SUZANNE L. FREMEAU,
*Committee Management Officer,*
*National Institutes of Health.*

[FR Doc.77–14836 Filed 5–24–77;8:45 am]

**HEART, LUNG, AND BLOOD RESEARCH REVIEW COMMITTEE B**

#### Meeting

Pursuant to Pub. L. 92–463, notice is hereby given of the meeting of the Heart, Lung, and Blood Research Review Committee B, National Heart, Lung, and Blood Institute, June 24–25, 1977, Conference Room 7, Building 31, NIH Campus, Bethesda, Maryland.

This meeting will be open to the public on June 24, 1977 from 8:30 am to approximately 9:30 am to discuss administrative details and to hear reports concerning the current status of the National Heart, Lung, and Blood Institute. Attendance by the public will be limited to space available.

In accordance with the provisions set forth in Section 552b(c) (6), Title 5, U.S. Code and Section 10(d) of Pub. L. 92–463, the meeting will be closed to the public on June 24, 1977 from 9:30 AM until the adjournment on June 25, 1977, for the review, discussion and evaluation of individual grant applications. These applications and the discussions could reveal personal information concerning individuals associated with the applications.

Mr. York E. Onnen, Chief, Public Inquiries and Reports Branch, NHLBI, NIH, Room 5A03, Building 31, Bethesda, Maryland 20014, phone (301) 496–4236, will provide summaries of the meeting and rosters of the committee members. Dr. Henry G. Roscoe, Executive Secretary, NHLBI, NIH, Room 554, Westwood Building, Bethesda, Maryland 20014, phone (301) 496–7915, will furnish substantive program information.

(Catalog of Federal Domestic Assistance Program No. 13.837, 13.838, National Institutes of Health.)

Dated: May 16, 1977.

SUZANNE L. FREMEAU,
*Committee Management Officer,*
*National Institutes of Health.*

[FR Doc.77–14835 Filed 5–24–77;8:45 am]

**PRESIDENT'S CANCER PANEL ET AL.**

#### Open Meetings

Pursuant to Pub. L. 92–463, notice is hereby given of the meetings of committees advisory to the National Cancer Institute.

These meetings will be entirely open to the public to discuss issues relating to committee business as indicated in the notices. Attendance by the public will be limited to space available. Meetings will be held at the National Institutes of

AR_0033314

Health, 9000 Rockville Pike, Bethesda, Maryland 20014, unless otherwise stated. Mrs. Marjorie F. Early, Committee Management Officer, NCI, Building 31, Room 4B43, National Institutes of Health, Bethesda, Maryland 20014 (301/495-5708) will furnish summaries of the meetings and rosters of committee members, upon request.

Other information pertaining to the meeting can be obtained from the Executive Secretary indicated.

PRESIDENT'S CANCER PANEL

Dates and time: July 12, 1977; 9:30 a.m., adjournment.
Place: Building 31A, Conference Room 4, National Institutes of Health.
Type of meeting: Open for the entire meeting.
Agenda: To hear reports of the Chairman, President's Cancer Panel and the Director, National Cancer Program, NCI.
Executive Secretary: Richard A. Tjalma, Building 31A, Room 11A46, National Institutes of Health, Phone: 301-496-5854.

CARCINOGENESIS SCIENTIFIC ADVISORY COMMITTEE

Date and time: July 18-19, 1977; 8:30 a.m., adjournment.
Place: Building 31C, Conference Room 9, National Institutes of Health.
Type of meeting: Open for the entire meeting.
Agenda: To review the scientific research program of the Carcinogenesis Program, Division of Cancer Cause and Prevention, NCI.
Executive Secretary: Dr. Gio B. Gori, Building 31, Room 11A05, National Institutes of Health, Phone: 301-496-6616.
Name of committee: Data Evaluation and Risk Assessment Subgroup of the Clearinghouse on Environmental Carcinogens.
Dates: July 25, 1977; 8:30 a.m., adjournment.
Place: Building 31C, Conference Room 6, National Institutes of Health.
Type of meeting: Open for the entire meeting.
Agenda: To review available bioassay reports and other matters relevant to data evaluation and risk assessment.
Executive Secretary:
Dr. James M. Sontag, Building 31A, Room 3A16, National Institutes of Health. Phone: 301-496-5106.

Dated: May 18, 1977.

SUZANNE L. FREMEAU,
Committee Management Officer,
National Institutes of Health.
[FR Doc.77-14834 Filed 5-24-77;8:45 am]

RECOMBINANT DNA MOLECULE PROGRAM ADVISORY COMMITTEE

Meeting

Pursuant to Pub. L. 92-463, notice is hereby given of a meeting of the Recombinant DNA Molecule Program Advisory Committee at the Linden Hill Hotel, Terrace Room, 5400 Pooks Hill Road, Bethesda, Maryland 20014 on June 22, 1977 from 9 a.m. to 5 p.m., and June 23, 1977 from 9 a.m. to 12 p.m.

The entire meeting will be open to the public for consideration of proposed re-

visions of the NIH Guidelines for Research Involving Recombinant DNA Molecules, and other matters requiring necessary action by the Committee. Attendance by the public will be limited to space available.

Dr. William J. Gartland, Executive Secretary, Recombinant DNA Molecule Program Advisory Committee, National Institutes of Health, Building 31, Room 4A52, telephone 301-496-2323, will provide summaries of the meeting, rosters of committee members and substantive program information.

Dated: May 18, 1977.

SUZANNE L. FREMEAU,
Committee Management Officer,
National Institutes of Health.
[FR Doc.77-14833 Filed 5-24-77;8:45 am]

RESEARCH MANPOWER REVIEW COMMITTEE

Meeting

Pursuant to Pub. L. 92-463, notice is hereby given of the meeting of the Research Manpower Review Committee, National Heart, Lung, and Blood Institute, June 12-14, 1977, Conference Room, Chevy Chase Holiday Inn, Chevy Chase, Maryland.

This meeting will be open to the public on June 12, 1977 from 8:30 p.m. to approximately 10:30 p.m. to discuss administrative details and to hear reports concerning the current status of the National Heart, Lung, and Blood Institute. Attendance by the public will be limited to space available.

In accordance with the provisions set forth in Section 552b(c)(6), Title 5, U.S. Code and Section 10(d) of Pub. L. 92-463, the meeting will be closed to the public on June 13 and 14, 1977 from 8 a.m. until adjournment on both days, for the review, discussion and evaluation of individual grant applications. These applications and the discussions could reveal personal information concerning individuals associated with the applications.

Mr. York E. Onnen, Chief, Public Inquiries and Reports Branch, NHLBI, NIH, Room 5A03, Building 31, Bethesda, Maryland 20014, phone 301-496-4236, will provide summaries of the meeting and rosters of the committee members.

Dr. Charles L. Turbyfill, Executive Secretary, NHLBI, NIH, Room 553, Westwood Building, Bethesda, Maryland 20014, phone 301-496-7351, will furnish substantive program information.

(Catalog of Federal Domestic Assistance Program Nos. 13.837, 13.838, 13.839, National Institutes of Health.)

Dated: May 16, 1977.

SUZANNE L. FREMEAU,
Committee Management Officer,
National Institutes of Health.
[FR Doc.77-14838 Filed 5-24-77;8:45 am]

## DEPARTMENT OF THE INTERIOR

### Bureau of Land Management

ALASKA, OUTER CONTINENTAL SHELF IN THE WESTERN GULF

Postponement of Public Hearings Regarding Proposed Oil and Gas Lease Sale

The location and date of the public hearings scheduled for June 1-4, 1977, in Kodiak and Anchorage, Alaska were announced in the FEDERAL REGISTER on May 11, 1977, (42 FR 23885) Volume 42, No. 91. These hearings concerning the proposed oil and gas lease sale in the Western Gulf of Alaska have been postponed. The Secretary of the Interior announced an 18 month planning schedule for Outer Continental Shelf oil and gas leasing on May 17, 1977. This schedule does not include the proposed Kodiak sale, but it will be considered for inclusion in the schedule being developed for 1979-1978).

We are still soliciting comments from the public on the draft environmental impact statement which was made available to the public on April 12, 1977. Comments should be sent to the Manager, Alaska Outer Continental Shelf Office, P.O. Box 1159, Anchorage, Alaska 99510, by June 24, 1977.

Dated: May 19, 1977.

CURT BERKLUND,
Director, Bureau of
Land Management.

Approved: May 20, 1977.

GUY R. MARTIN,
Assistant Secretary of the
Interior.
[FR Doc.77-14829 Filed 5-24-77;8:45 am]

[SAC 062886]

### CALIFORNIA

Termination of Proposed Withdrawal and Reservation of Land

May 17, 1977.

Notice of a Bureau of Reclamation, U.S. Department of the Interior, application Sacramento 062886, for withdrawal and reservation of lands for the planned facilities of the Trinity River Division, Central Valley Project, California, was published as FR Doc. 60-5869 on page 5848 of the issue of June 24, 1960. The applicant agency has cancelled its application.

MOUNT DIABLO MERIDIAN

T. 32 N., R. 6 W.,
Sec. 19, SE¼NE¼.

The area described aggregates 40 acres.

Therefore, pursuant to the regulations contained in 43 CFR Part 2350, such lands at 10 a.m. on June 27, 1977, will be relieved of the segregative effect of the above mentioned application.

JOAN B. RUSSELL,
Chief, Lands Section, Branch of
Lands and Minerals Operations.
[FR Doc.77-14860 Filed 5-24-77;8:45 am]

AR_0033315

[N-16657]

## NEVADA

### Airport Lease Application Amended

Notice is hereby given that pursuant to the Act of May 24, 1928 (49 U.S.C. 211.-214), Agricultural Aviation Services has amended its lease application to include the following lands:

MOUNT DIABLO MERIDIAN, NEVADA

T. 38 N., R. 36 E.,
Sec. 12, NW¼NE¼NE¼, N½NW¼NE¼, N½N½NW¼.

The purpose of this notice is to inform the public that the filing of this application segregated the described public lands from all other forms of appropriation under the public land laws.

Interested persons desiring to express their views should promptly send their comments together with their name and address to the Winnemucca District Manager, Bureau of Land Management, 705 East Fourth Street, Winnemucca, Nevada 89445.

WM. J. MALENCIK,
*Chief, Division of*
*Technical Services.*

. [FR Doc.77-14861 Filed 5-24-77;8:45 am]

[U-37233]

### UTAH

#### Application

MAY 17, 1977.

Notice is hereby given that pursuant to Section 28 of the Mineral Leasing Act of 1920, as amended (30 U.S.C. 185), the Northwest Pipeline Corporation has applied for a 4½-inch natural gas pipeline right-of-way across the following lands:

SALT LAKE MERIDIAN, UTAH

T. 20 S., R. 23 E., Sec. 14, NE¼NW¼, SE¼NW¼.

The needed right-of-way is a portion of applicant's gas gathering system located in Grand County, Utah.

The purpose of this notice is to inform the public that the Bureau will be proceeding with the preparation of environmental and other analyses necessary for determining whether the application should be approved, and if so, under what terms and conditions.

Interested persons should express their interest and views to the Moab District Manager, Bureau of Land Management, P.O. Box 970, Moab, Utah 84532.

PAUL HOWARD,
*State Director.*

[FR Doc.77-14862 Filed 5-24-77;8:45 am]

[U-37227]

### UTAH

#### Application

MAY 17, 1977.

Notice is hereby given that pursuant to Section 28 of the Mineral Leasing Act of 1920, as amended (30 U.S.C. 185), the Northwest Pipeline Corporation has applied for a 4½-inch natural gas pipeline right-of-way across the following lands:

SALT LAKE MERIDIAN, UTAH

T. 17 S., R. 25 E., Secs. 3 and 4.

The needed right-of-way is a portion of applicant's gas gathering system located in Grand County, Utah.

The purpose of this notice is to inform the public that the Bureau will be proceeding with the preparation of environmental and other analyses necessary for determining whether the application should be approved, and if so, under what terms and conditions.

Interested persons should express their interest and views to the Moab District Manager, Bureau of Land Management, P.O. Box 970, Moab, Utah 84532.

PAUL HOWARD,
*State Director.*

[FR Doc.77-14863 Filed 5-24-77;8:45 am]

[U-37226]

### UTAH

#### Application

MAY 17, 1977.

Notice is hereby given that pursuant to Section 28 of the Mineral Leasing Act of 1920, as amended (30 U.S.C. 185), the Northwest Pipeline Corporation has applied for a 4½-inch natural gas pipeline right-of-way across the following lands:

SALT LAKE MERIDIAN, UTAH

T. 20 S., R. 22 E.,
Sec. 31, lot 1, NE¼NW¼.

The needed right-of-way is a portion of applicant's gas gathering system located in Grand County, Utah.

The purpose of this notice is to inform the public that the Bureau will be proceeding with the preparation of environmental and other analyses necessary for determining whether the application should be approved, and if so, under what terms and conditions.

Interested persons should express their interest and views to the Moab District Manager, Bureau of Land Management, P.O. Box 970, Moab, Utah 84532.

PAUL HOWARD,
*State Director.*

[FR Doc.77-14864 Filed 5-24-77;8:45 am]

[Wyoming 59407]

### WYOMING

#### Application

MAY 16, 1977.

Notice is hereby given that pursuant to section 28 of the Mineral Leasing Act of 1920, as amended (30 U.S.C. 185), the Panhandle Pipe Line Company of Kansas City, Missouri filed an application for a right-of-way to construct a 4'' natural gas pipeline for the purpose of transporting natural gas across the following described national resource lands:

SIXTH PRINCIPAL MERIDIAN, WYOMING

T. 44 N., R. 77 W.
Sec. 3, lot 4, SW¼NW¼;
Sec. 4, lot 1.

T. 45 N., R. 77 W.
Sec. 1, SE¼SE¼;
Sec. 11, E½SE¼, SW¼SE¼;
Sec. 13, NW¼NE¼, E½NW¼, SW½NW¼;
Sec. 14, NE¼NW¼, S½NW¼;
Sec. 15, SE¼SW¼, SE¼NE¼, NE¼SE¼, SW¼SE¼;
Sec. 21, E½SE¼;
Sec. 22, N½NW¼, SW¼NW¼, NW¼SW¼;
Sec. 28, E½E½;
Sec. 33, E½E½.

The pipeline is to transport natural gas from wells located in Johnson County, Wyoming, and will connect the wells with an existing gas transmission line in Johnson County.

The purpose of this notice is to inform the public that the Bureau will be proceeding with consideration of whether the application should be approved and, if so, under what terms and conditions.

Interested persons desiring to express their views should do so promptly. Persons submitting comments should include their name and address and send them to the District Manager, Bureau of Land Management, Union & Overland Blvd., P.O. Box 2834, Casper, Wyoming 82601.

WILLIAM S. GILMER,
*Acting Chief, Branch of Lands*
*and Minerals Operations.*

[FR Doc.77-14865 Filed 5-24-77;8:45 am]

[Wyoming 59189]

### WYOMING

#### Application

MAY 17, 1977.

Notice is hereby given that pursuant to section 28 of the Mineral Leasing Act of 1920, as amended (30 U.S.C. 185), the Marathon Pipe Line Company of Casper, Wyoming filed an application for the purpose of authorizing existing 3'', 4'', 6'' and 8'' pipelines and related facilities which have been constructed for the transportation of oil and other synthetic liquid fuels across the following described national resource lands:

SIXTH PRINCIPAL MERIDIAN, WASHAKIE
COUNTY, WYOMING

T. 47 N., R. 90 W.
Secs. 7, 8, and 18.
T. 45 N., R. 91 W.
Secs. 19 and 30.
T. 46 N., R. 91 W.
Sec 6
T. 47 N., R. 91 W.
Secs. 5, 7, 8, 9, 10, 11, 13, 14, 22, 23, 24, 27, 28, 29, 31, 32, and 33.
T. 48 N., R. 91 W.
Secs. 29 and 32.
T. 45 N., R. 92 W.
Secs 6, 7, 8, 17, 20, 21, 22, 25, 26, and 27.
T. 46 N., R. 92 W.
Sec. 1.
T. 47 N., R. 92 W.
Secs 1, 2, 3, 11, 12, 13, 33, and 34.

The pipeline for which this right-of-way application is made is utilized as a gathering system comprised of five basic components, each an integral part of the whole. Utilization of the component parts of the right-of-way was commenced between 1957 and 1972, and has continued since that time as the only practicable

AR_0033316

way of gathering and transporting crude oil produced from the wells served.

The purpose of this notice is to inform the public that the Bureau will be proceeding with consideration of whether the application should be approved, and if so, under what terms and conditions.

Interested persons desiring to express their views should do so promptly. Persons submitting comments should include their name and address and send them to the District Manager, Bureau of Land Management, 1700 Robertson Avenue, P.O. Box 119, Worland, Wyoming 82401.

HAROLD G. STINCHCOMB,
*Chief, Branch of Lands and Minerals Operations.*

[FR Doc. 77-14866 Filed 5-24-77;8:45 am]

---

## OUTER CONTINENTAL SHELF OFF LOUISIANA AND TEXAS

### Oil and Gas Lease Sale No. 47, June 23, 1977

#### Correction

In FR Doc. 77-14474 appearing at page 26250 in the issue of Monday, May 23, 1977, make the following changes:

1. In the last three lines of paragraph 5, first column, page 26251, "Affirmative Representation Form" should read "Affirmative Action Representation Form."

2. In the title of the tract listing for Green Canyon, first column, page 26253, "protection" should read "protraction."

3. In the tract listig for Mississippi Canyon, first column, page 26253, the "Block" entry for Tract 47-230, which now reads "380," should read "280."

4. In the form on page 26254, there should be a gap in the dotted line following "N.O. misc No," to indicate that two entries are to be placed there.

---

### Bureau of Reclamation

[INT FES 77-15]

### COLORADO RIVER WATER QUALITY IMPROVEMENT PROGRAM

#### Availability of Final Environmental Statement

Pursuant to section 102(2)(C) of the National Environmental Policy Act of 1969, the Department of the Interior and Department of Agriculture have prepared a final environmental statement for the Colorado River Water Quality Improvement Program.

The environmental statement concerns a basinwide salinity control program to reduce the salinity of the Colorado River in order to provide water quality benefits to agricultural and municipal and industrial water users in the basin states. Copies are available for inspection at the following locations:

Office of Communications, Room 7220, Department of the Interior, Washington, D.C. 20240, telephone (202) 343-9247
Office of Assistant to the Commission, Ecology, Room 7620, Bureau of Reclamation, Department of the Interior, Washington, D.C. 20240, telephone 202-343-4991.

Chief, Colorado River Water Quality Office, Bureau of Reclamation, Engineering and Research Center, Denver Federal Center, P.O. Box 25007, Denver, Colorado, telephone 303-234-3826.
Regional Director, Upper Colorado Region, Bureau of Reclamation, Federal Building, 125 South State Street, Salt Lake City, Utah 84111, telephone 801-588-5392.
Regional Director, Lower Colorado Region, Bureau of Reclamation, P.O. Box 427, Boulder City, Nevada 89005, telephone 702-598-7411.

Single copies of the final environmental statement may be obtained on request to the Commissioner of Reclamation, Engineering and Research Center, or the Regional Directors. In addition, copies may be purchased from the National Technical Information Service, Department of Commerce, Springfield, Virginia 22151. Please refer to the statement number above.

Dated: May 19, 1977.

HEATHER L. ROSS,
*Acting Deputy Assistant Secretary.*

[FR Doc.77-14826 Filed 5-24-77;8:45 am]

---

### Fish and Wildlife Service

#### THREATENED SPECIES PERMIT

#### Notice of Receipt of Application

Notice is hereby given that the following application for a permit is deemed to have been received under section 4(d), 16 U.S.C. 1533(d), of the Endangered Species Act of 1973 (Pub. L. 93–205).

Applicant: Charles Kamm, Route 1, Box 87, Courtland, Minnesota 56021.



COMMON AND SCIENTIFIC NAME

1. Pheasant, Bar-tailed, *Syrmaticus huminae*.

Pheasant, Brown-eared, *Crossoptilon mantchuricum*.

Pheasant, Edwards, *Lophura edwardsi*.

Pheasant, Mikado, *Syrmaticus mikado*.

Pheasant, Palawan Peacock, *Polyplectron emphanum*.

Pheasant, Swinhoe, *Lophura swinhoii*.

√Pheasant, Western Tragopan, *Tragopan melanocephalus*.

Pheasant, White-eared, *Crossoptilon crossoptilon*.

√Pheasant, Elliot, *Syrmaticus ellioti*.

√Pheasant, Impeyan, *Lophophorus impeyanus*.

√Prairie Chicken, Attwater's Greater, *Tympanuchus cupido attwateri*.

2. These birds were raised in captivity.

3. Any birds can be obtained from captive-reared stock within the U.S. under permits issued by your department.

4. The birds to be covered will be raised in Minnesota at my residence at Route 1, Box 87, Courtland, MN, U.S.A. 56021.

5. The facilities available for maintaining these birds are as follows: The 18 breeding pens are 6 ft. high and 12X12. These pens house 1 pair of birds, then they also have a pen within a winterized building approximately 6X8 floor space. We maintain an outer fence with electric wire around it to protect the birds from predators. The one in poultry netting is used on the sides of pens and tops are covered with either poultry netting or toprite plastic netting. All birds are fed a commercially prepared feed and those needing heat during the winter are provided heat. The young birds are raised in free standing brooders and are started on a good quality commercial starter, switching later to grower, then flyer, etc. According to recommendations of producers and researchers, this is fed throughout their lives. I have large 50 x 50 pens, plus some individual pens for these young birds.

(ii) I have bred and maintained and raised over 30 species of birds, some of them prior to them being placed on the endangered list, and many that are considered to be delicate and difficult to maintain or breed in captivity. I have been raising game birds as a hobby for around 10 years, because we love the birds, and we're proud of the care we give them and the condition they are in. I make every effort to stay up on the latest publications and research related to my interest in captive propagation and feel that I'm well aware of the needs of the endangered birds and meet this need.

(iii) I am always willing to cooperate in the expansion of the populations of these birds and will give any data and knowledge I might have to further the populations of those species.

(iv) Any transporting is done in standard, roomy, well-ventilated cardboard or wood containers with food and water supplied. However, I don't ship any of these birds or plan to have birds shipped to me at this time. I have in the past shipped these birds (before the 1973 Endangered Species law became effective) and these containers were very adequate and no loss resulted.

(v) I have had to destroy 1 male Edwards because of a broken leg. We checked with the veterinarian and it was impossible to set. This was two years ago. Since then I have had no mortalities in birds to be covered by this permit.

7. I have no pending contracts or agreements pertaining to these birds.

8. (i) The activities include keeping and breeding of the endangered species listed in this application. I want to either sell or trade young birds I raise in captivity and to

be able to obtain either by buying or trading for new birds from other breeders so that strong blood lines are kept going, and perhaps some day some of these birds can be restored to the wild from captive stock.

(ii) The activity will be carried out through proper routine care and maintenance of the birds involved so that through proper care, they will reproduce and help to increase the numbers of these dwindling species.

(iii) I don't need to restate the plight of these birds that are endangered, but it is my belief that through sound management of the captive strains of these birds they can at least keep extinction at bay in captivity, if not in the wild. I believe that I have the expertise and experience to propagate these birds as I have in the past and plan to indefinitely.

(iv) Any birds that are raised will either be paired up for breeding or distributed to other breeders interested in the captive propagation and preservation of these birds and considered qualified by State and Federal agencies, but I would also like to see these agencies granting permission and permits to the young people with the desire and love of these birds, not only to those with the expertise. Many of these young persons hold the key to the future and they can't learn if we don't let them. I for one will give all the advice needed to successfully breed any of these species—so long as they have the love and desire, that generally makes the difference between success and failure.

(v) Should the Impeyan pheasant (*Lophophorus impeyanus*) be put on the Endangered or Threatened list at a later date, I would like this permit to cover this bird as well even though at present it is not on the list or considered endangered or threatened.

Thank you.

Documents and other information submitted in connection with this application are available for public inspection during normal business hours at the Service's office in Room 512 1717 H Street NW., Washington, D.C.

Interested persons may comment on this application by submitting written data, views, or arguments, preferably in triplicate, to the Director (FWS/WPO), U.S. Fish and Wildlife Service, Washington, D.C. 20240. This application has been assigned File Number PRT 2-718-25; please refer to this number when submitting comments. All relevant comments received on or before June 24, 1977.

Dated: May 20, 1977.

DONALD G. DONAHOO,
*Chief, Permit Branch, Federal Wildlife Permit Office U.S. Fish and Wildlife Service.*

[FR Doc.77-14819 Filed 5-24-77;8:45 am]

## ENDANGERED SPECIES PERMIT

### Notice of Receipt of Application

Notice is hereby given that the following application for a permit is deemed to have been received under section 10 of the Endangered Species Act of 1973 (Pub. L. 93-205).

Applicant: Woodland Park Zoological Gardens, 5500 Phinney Avenue North, Seattle, Washington 98103. David Hancocks, General Director.

AR_0033318

26707



DEPARTMENT OF ?... INTERIOR
U.S. FISH AND WILDLIFE SERVICE

FEDERAL FISH AND WILDLIFE
LICENSE/PERMIT APPLICATION

Woodland Park Zoological Gardens
5500 Phinney Avenue North
Seattle, Washington 98103
Phone: 782-1265

Wish to send on Breeding Loan one
male snow leopard, *Panthera uncia*,
to Marwell Zoological Park, England

Non-profit public zoological
park

David Hancocks, General Director

Not applicable

Import Permit from Department of
The Environment, England

As soon           90 days
as possible.

17.22  Title 50, questions 1 - 8 answered on attached sheet.

**CERTIFICATION**

---

17.22  Permit Application for Scientific Purposes.

(1) Snow leopard, *Panthera uncia*, one male, born Woodland Park Zoological Gardens, on May 2, 1975, to be sent to Marwell Zoological Park, England, for breeding purposes.

(2) Snow leopard was born in captivity at Woodland Park Zoological Gardens on May 2, 1975.

(3) Not applicable.

(4) The subject animal was born in captivity at Woodland Park Zoological Gardens, Seattle, Washington, U.S.A.

(5) Marwell Zoological Park is a large reputable zoo which has considerable success in breeding endangered species. The address is:

Colden Common, Nr. Winchester, Hampshire, SO211JH, England.

6. (i) A copy of the enclosure plans where the snow leopards will be housed is enclosed. It has the considerable advantage which does not show from the plan, of being placed on a wooded slope with the woodland to the south of the enclosure, so that it is always shaded and secluded and does not become too hot even when it has temperatures as high as it did last year, of 90 degrees F. The inside enclosures are not open to the public and the dens are arranged to give complete seclusion to the inhabitants. The complex was in fact designed for snow leopards, though to date it has been occupied by European lynx who have bred regularly therein.

(ii) Marwell Zoological Park has bred the following felines since 1972: 11 Siberian tigers, 8 jaguars, 7 lynx, 12 leopards and 3 servals. In addition, they are presently involved in a comprehensive program for the breeding of cheetahs. They have a close connection with the Zoological Society of London and conduct many reciprocal breeding agreements with them. They have a qualified animal keeper staff and their curator, before coming there, was for six years a veterinary aide in the Animal Hospital of the Zoological Society of London. They have an extensive program of monitoring the health of all of their animals by routine visits of their own veterinary surgeon, and a complete laboratory monitoring of health by the local Ministry of Agriculture diagnostic laboratories.

(iii) Both Woodland Park Zoological Gardens and Marwell Zoological Park have a reputable history and intensive interest in the breeding and propogation of endangered species.

(iv) The animal will be shipped in a container that will comply with guidelines issued by zoological parks and in a manner that is humane.

(v) They have had no morialities in snow leopards.

7. Copy of breeding loan agreement is attached.

8. The sending of a snow leopard to Marwell Zoological Park will help the zoo to establish a breeding population.

Documents and other information submitted in connection with this application are available for public inspection during normal business hours at the Service's office in Room 512, 1717 H Street, NW, Washington, D.C.

Interested persons may comment on this application by submitting written data, views, or arguments, preferably in triplicate, to the Director (FWS/WPO), U.S. Fish and Wildlife Service, Washington, D.C. 20240. This application has been assigned File Number PRT 2-49-C07; please refer to this number when submitting comments. All relevant comments received on or before June 24, 1977 will be considered.

Dated: May 20, 1977.

DONALD G. DONAHOO,
*Chief, Permit Branch, Federal Wildlife Permit Office, Fish and Wildlife Service.*

[FR Doc.77-14816 Filed 5-24-77;8:45 am]

---

**ENDANGERED SPECIES PERMIT**

**Notice of Receipt of Application**

Notice is hereby given that the following application for a permit is deemed to have been received under section 10 of the Endangered Species Act of 1973 (Pub. L. 93-205).

Applicant: John S. Nero, 414 S. Military Avenue, Green Bay, Wisconsin 54303.

AR_0033319



breeding. To further encourage breeding, all birds are put into outside aviaries during the summer, providing as natural of an environment as possible. I have been keeping and raising foreign birds for the past 13 years, breeding primarily Cockatiels and Lovebirds.

We put every conceivable effort into successfully maintaining and propagating all our birds, as can be attested to by our veterinarian, Dr. B. J. Roningen (see Attachment III) and Special Agent Dan Pooler, FWS from Oshkosh, WI, who has inspected our facilities.

(ii) We fully and sincerely intend to carry on a cooperative breeding program with the birds we seek to be covered by the permit. Additionally, we will maintain pertinent written data concerning all activities involving these birds.

(iv) The birds in question will be transported via automobile from Ohio to Wisconsin. While in transit, they will be kept in a small wire cage (approx. 20" x 12" x 12") with suitable perches, food and water. They will be covered and kept from extremes in temperature.

(v) We have had few mortalities that involved related birds—in particular, Lovebirds: one bird as a result of a crop tumor, surgery was attempted unsuccessfully by Dr. Roningen; another died of a ruptured uterus while attempting to breed. Finches have died for undetermined reasons, though senility was perhaps a contributing factor (6 years of age). In the event of any mortalities of our birds, post-mortems are performed by Dr. Roningen to attempt to find the causes of death, thus reducing the chances for further casualties.

(7) There is only a verbal agreement between us and Dr. Lindsay of Columbus, Ohio, from whom we are intending to purchase the 4 Scarlet-chested Parakeets. The purchase and subsequent transportation will take place immediately following the issuance of the necessary permits.

(8)(i) We wish to establish a successful captive breeding colony of the Scarlet-chested Parakeets in Wisconsin. As far as we know, there are no other birds of this species present or propagating in Wisconsin. By expanding their captive territory, we hope to increase the species' total population.

(ii) The birds in question have proven to be free and highly successful breeders in confinement, particularly in California. There seems to be no set season for breeding and, in fact, nest boxes must be removed frequently to avoid over-breeding!

The past, present and future success in captive breeding of these endangered birds may probably be the only means in which they may be saved from extinction. This has been proven not only by their very prolific nature in captivity, but also by the existence of a fair and increasing number of these birds already in confinement.

We have the sincere desire to participate in the enhancement and, indeed, the saving of this extremely lovely species of bird. We are and will continue to endeavor to continue to take any pains, expense and effort to successfully achieve this goal.

Documents and other information submitted in connection with this application are available for public inspection during normal business hours at the Service's office in Room 512, 1717 H Street NW., Washington, D.C.

Interested persons may comment on this application by submitting written data, views, or arguments, preferably in triplicate, to the Director (FWS/WPO), U.S. Fish and Wildlife Service, Washing-

---

ATTACHMENT I—APPLICATION FOR PERMIT SECTION 17.22(A)

(1) We seek a permit to cover 4 Scarlet-chested Parakeets (Neophema splendida); 1 male, 2½ year of age; 1 female, 2½ years; 2 females, about 4 weeks at this date. The activity sought to be authorized is the purchase of these birds in Ohio and transporting them back to Wisconsin.

(2) All birds were born in captivity.

(3) We have attempted unsuccessfully to locate these birds within our state of Wisconsin. We have since found the birds in question from a breeder in Ohio.

(4) The birds that we wish to be covered by the permit were bred in confinement by Dr. William K. Lindsay, 288 N. Virginia Lee Rd., Columbus, Ohio 43209.

(5) and (6) (1) The birds will be housed during winter months (Sept.–May) in a separate indoor flight measuring 3' x 7' x 8' long. A sufficient number of natural perches are always provided. The concrete floor is covered with cedar shavings which is changed as necessary. Temperature is maintained at

62–65° F. The flights are artificially illuminated by fluorescent lights. All birds are given every opportunity to propagate during this time (next boxes, nesting material and other pertinent stimulae).

During the summer months (May–Sept.), all birds are housed in outdoor aviaries (see Attachment II) measuring a minimum of 4' wide x 6' high x 8' long. A 6' high chain link fence protects the entire premises from intruders, animal and otherwise. Natural perches are again used. A dry, protective shelter (4' x 4' x 6') adjoins each flight for use at night and during severe weather. All flights are built on natural turf with wire netting buried underground around the perimeter to minimize rodent intrusion. Natural plantings are used where possible. Additionally, for further enhancement of our birds, we put a maximum effort into providing the highest quality and most complete diet at all times.

(ii) We presently maintain a very large group of exotic birds, all housed individually to reduce stress and increase potential for

AR_0033320

ton, D.C. 20240. This application has been assigned File Number PRT 2-746-07; please refer to this number when submitting comments. All relevant comments received on or before June 24, 1977 will be considered.

Dated: May 20, 1977.

DONALD G. DONAHOO,
*Chief, Permit Branch, Federal Wildlife Permit Office, Fish and Wildlife Service.*

[FR Doc.77-14820 Filed 5-24-77; 8:45 am]

## MIGRATORY GAME BIRD REGULATIONS

### Public Hearing

Notice is hereby given that a public hearing will be held in accordance with Part 455 of the Departmental Manual (Hearings) to review proposed hunting regulations of migratory birds for which early (prior to October 1) seasons are set, as follows:

PUBLIC HEARING ON EARLY SEASON MIGRATORY BIRD HUNTING REGULATIONS

Date and time: June 21, 1977, at 9 a.m.

Place: Auditorium, General Services Building, 18th and F Streets, NW., Washington, D.C.

Purpose of hearing: This hearing is for the purpose of reviewing the status of mourning doves, woodcock, band-tailed pigeons, white-winged doves, rails, gallinules, and common snipe. Proposed hunting regulations for these species will be discussed plus regulations governing migratory game birds in Alaska, Puerto Rico, and the Virgin Islands; mourning doves in Hawaii; September teal seasons in the Mississippi and Central Flyways; and special sea duck seasons in the Atlantic Flyway.

Persons wishing to participate in this public hearing should notify the Director (FWS/MBM), U.S. Fish and Wildlife Service, Department of the Interior, C Street between 18th and 19th Streets, NW., Washington, D.C. 20240, or call 202/343-5827. Statements from interested persons should be presented in writing in duplicate to the Hearing Officer at the meeting or forwarded to the U.S. Fish and Wildlife Service (FWS/MBM) at the above address prior to the meeting.

Minutes of the hearing will be available for purchase from a public stenographic services company.

Dated: May 18, 1977.

LYNN A. GREENWALT,
*Director, Fish and Wildlife Service.*

[FR Doc.77-14813 Filed 5-24-77; 8:45 am]

## DEPARTMENT OF JUSTICE

### UNITED STATES v. CORNING FIBERS, INC.

#### Proposed Consent Decree in Action To Enjoin Discharge of Water Pollutants

In accordance with Departmental Policy, 28 CFR 50.7, 38 FR 19029, notice is hereby given that on May 5, 1977, a proposed consent decree in *United States* v. *Corning Fibers, Inc.*, was lodged with the

District Court for the District of Vermont. The proposed decree would require Corning Fibers, Inc., to complete installation of a wastewater treatment facility by May 1, 1978, and to attain operational level with that wastewater treatment facility by June 1, 1978.

The Department of Justice will receive until June 24, 1977, written comments relating to the proposed judgment. Comments should be addressed to the Assistant Attorney General of the Land and Natural Resources Division, Department of Justice, Washington, D.C. 20530, and refer to *United States* v. *Corning Fibers, Inc.*, D.J. Ref. 90-5-1-1-699.

The proposed consent decree may be examined at the office of the United States Attorney, P.O. Box 10, Rutland, Vermont, at the Region I Office of the Environmental Protection Agency, Enforcement Division, John F. Kennedy Federal Building, Boston, Massachusetts 02203, and at the Pollution Control Section, Land and Natural Resources Division of the Department of Justice, Room 2625, Department of Justice Building, Ninth Street and Pennsylvania Avenue, Northwest, Washington, D.C. 20530. A copy of the proposed consent judgment may be obtained in person or by mail from the Pollution Control Section, Land and Natural Resources Division of the Department of Justice.

PETER R. TAFT,
*Assistant Attorney General, Land and Natural Resources Division.*

[FR Doc. 77-14867 Filed 5-24-77; 8:45 am]

## NATIONAL ADVISORY COUNCIL ON THE EDUCATION OF DISADVAN-TAGED CHILDREN

### MEETING

Notice is hereby given, pursuant to Pub. L. 92-463, that the next meeting of the National Advisory Council on the Education of Disadvantaged Children will be held on Friday, June 10 and on Saturday, June 11, 1977. Friday will be set aside for site visits in the Appalachian states (Tennessee, Southern Ohio, Kentucky, Georgia, Alabama and Mississippi) and will start at 8:30 a.m. and end at 5:30 p.m. The Saturday meeting will be held in Atlanta, Georgia (meeting room and place to be announced at a later date) from 9 a.m. until 2 p.m.

The National Advisory Council on the Education of Disadvantaged Children is established under section 148 of the Elementary and Secondary Act (20 U.S.C. 2411) to advise the President and the Congress on the effectiveness of compensatory education to improve the educational attainment of disadvantaged children.

The main purpose of the two-day activities is to study rural issues in compensatory education in the various Appalachian States and to examine the role of the Appalachian Regional Commission.

Because of limited space, all persons wishing to attend should call for reservations by June 3, 1977, area code 202-382-6945.

Records shall be kept of all Council proceedings and shall be available for public inspection at the Office of the National Advisory Council on the Education of Disadvantaged Children, located at 425 Thirteenth Street NW., Suite 1012, Washington, D.C. 20004.

Signed at Washington, D.C., on May 23, 1977.

ROBERTA LOVENHEIM,
*Executive Director.*

[FR Doc.77-15036 Filed 5-24-77; 8:45 am]

## NATIONAL SCIENCE FOUNDATION

### INTERNATIONAL DECADE OF OCEAN EXPLORATION PROPOSAL REVIEW PANEL

#### Meeting

In accordance with the Federal Advisory Committee Act, as amended, Pub. L. 92-463, the National Science Foundation announces the following meeting:

NAME: Proposal Review Panel of the Office for the International Decade of Ocean Exploration, Ad Hoc Subpanel for the BIOTRANS Project.

DATE AND TIME: June 10, 1977; 9 a.m. to 5 p.m.

PLACE: National Science Foundation, 1800 G Street NW., Washington, D.C. 20550.

TYPE OF MEETING: Closed.

CONTACT PERSON:

Mr. Feenan D. Jennings, Head, Office for the International Decade of Ocean Exploration, Room 605, National Science Foundation, Washington, D.C. 20550, telephone 202-632-7356.

PURPOSE OF PANEL: To provide the IDOE Proposal Review Panel members with additional expertise in the review and evaluation of proposals relating to oceanographic research related to Biological Transport (BIOTRANS).

AGENDA: Detailed review and evaluation of proposals for support of the BIO TRANS Project.

REASON FOR CLOSING: The proposals being reviewed included information of a proprietary or confidential nature, including technical information; financial data, such as salaries; and personal information concerning individuals associated with the proposals. These matters are within exemptions (4) and (6) of 5 U.S.C. 552b(c), Government in the Sunshine Act.

AUTHORITY TO CLOSE MEETING: This determination was made by the Committee Management Officer pursuant to provisions of Section 10(d) of Pub. L. 92-463. The Committee Management Officer was delegated the authority to make such determinations by the Acting Director, NSF, on February 18, 1977.

M. REBECCA WINKLER,
*Acting Committee Management Officer.*

MAY 20, 1977.

[FR Doc.77-14904 Filed 5-24-77; 8:45 am]

AR_0033321

## SOCIOLOGY ADVISORY PANEL

### Meeting

In accordance with the Federal Advisory Committee Act, Pub. L. 92-463, the National Science Foundation announces the following meeting:

NAME: Advisory Panel for Sociology.

DATE AND TIME: June 10 and 11, 1977; 9 a.m. each day.

PLACE: Room 628, National Science Foundation, 1800 G Street NW., Washington, D.C.

TYPE OF MEETING: Closed.

CONTACT PERSON:

Mr. Garry Wallace, Assistant Program Director for Sociology, Room 312, National Science Foundation, Washington, D.C. 20550, telephone 202-632-4204.

PURPOSE OF PANEL: To provide advice and recommendations concerning support research in sociology.

AGENDA, CLOSED SESSION: To review and evaluate research proposals and projects as part of the selection process for awards.

REASON FOR CLOSING: The proposals being reviewed include information of a proprietary or confidential nature, including technical information: financial data, such as salaries; and personal information concerning individuals associated with the proposals. These matters are within exemptions (4) and (6) of 5 U.S.C. 552b(c), Government in the Sunshine Act.

AUTHORITY TO CLOSE MEETING: This determination was made by the Committee Management Officer pursuant to provisions of Section 10(d) of Pub. L. 92-463. The Committee Management Officer was delegated the authority to make such determinations by the Director, NSF, on February 18, 1977.

M. REBECCA WINKLER,
*Acting Committee
Management Officer.*

[FR Doc.77-14905 Filed 5-24-77;8:45 am]

## OFFICE OF MANAGEMENT AND BUDGET

### CLEARANCE OF REPORTS

#### List of Requests

The following is a list of requests for clearance of reports intended for use in collecting information from the public received by the Office of Management and Budget on May 18, 1977 (44 U.S.C. 3509). The purpose of publishing this list in the FEDERAL REGISTER is to inform the public.

The list includes the title of each request received; the name of the agency sponsoring the proposed collection of information; the agency form number(s), if applicable; the frequency with which

the information is proposed to be collected; the name of the reviewer or reviewing division within OMB, and an indication of who will be the respondents to the proposed collection.

Requests for extension which appear to raise no significant issues are to be approved after brief notice through this release.

Further information about the items on this daily list may be obtained from the Clearance Office, Office of Management and Budget, Washington, D.C. 20503, 202-395-4529, or from the reviewer listed.

NEW FORMS

UNITED STATES INTERNATIONAL TRADE COMMISSION

Importers' questionnaire (malleable cast-iron pipe and tube fittings), single time, importers of malleable cast-iron pipe and tube fittings, Evinger, S. K., 395-3710.

FEDERAL MEDIATION AND CONCILIATION SERVICE

Request for arbitration panel, on occasion, labor and management organizations, Warren Topelius, 395-5872.

DEPARTMENT OF COMMERCE

Economic development administration, certification by contractor or subcontractor regarding equal employment opportunity, ed-120, on occasion, contractors and subcontractors, Lowry, R. L, 395-3772.

National Bureau of Standards, Survey of Radiation Calibration Needs in Therapy, NBS-1978, single time, medical physicists and radiotherapists, Richard Eisinger, 395-6140.

DEPARTMENT OF HEALTH, EDUCATION, AND WELFARE

Public Health Service, Survey of Hospital Staff, single time, administrators of short-stay hospitals, Richard Eisinger, 395-6140.

DEPARTMENT OF TRANSPORTATION

Federal Highway Administration, Proposed Appendix C to the Joint FHWA/UMTA Urban Transportation Planning Regulation, Other (See SF-831), Metro planning orgs. in all 279 urbanized areas, Strasser, A., 395-5867.

National Highway Traffic Safety Administration Motorcycle Accident Factors/Exposure Data, on occasion, motorcyclists, Strasser, A., 395-5867.

REVISIONS

DEPARTMENT OF COMMERCE

Domestic and International Business Administration Marketing Data Form, DIB-466P, weekly, manufacturers and exporters, Warren Topelius, 395-5872.

DEPARTMENT OF HEALTH, EDUCATION, AND WELFARE

Social Security Administration, Statement for Determining Continuing Eligibility for SSI Payments, SSA-8203, single time, aged, blind or disabled recipients of SSI payments, housing, veterans and labor division, 395-3532.

EXTENSIONS

FEDERAL MEDIATION AND CONCILIATION SERVICE

Arbitrators Personal Data, R-22, on occasion, labor arbitrators, Warren Topelius, 395-5872.

DEPARTMENT OF AGRICULTURE

Agricultural Stabilization and Conservation Service:

Application for Settlement of Indebtedness (to U.S. Department of Agriculture), ASCS-539, on occasion, individual farmers or ex-farmers, Warren Topelius, 395-5872.

Estimate of production (Tobacco), MQ92, on occasion, farms, Warren Topelius, 395-5872.

DEPARTMENT OF COMMERCE

Domestic and International Business Administration, Steel Producers Production (Directive) Report, DIB 943, quarterly, steel producers, Warren Topelius, 395-5872.

DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT

Housing Management, Requirement for Preparation of Financial Reports, HUD92310NH, HUD92408, on occasion, all multifamily housing projects, Housing, Veterans and Labor Division, 395-3532.

PHILLIP D. LARSEN,
*Budget and Management Officer.*

[FR Doc.77-14893 Filed 5-24-77;8:45 am]

## BUSINESS ADVISORY COUNCIL ON FEDERAL REPORTS

### Public Meeting

Pursuant to Public Law 92-463, notice is hereby given of a meeting of the Business Advisory Council on Federal Reports to be held in Room 2010, New Executive Office Building, 726 Jackson Place, N.W., Washington, D.C. on June 16, 1977, at 10:00 a.m.

The purpose of the meeting is to conduct Council business such as the Treasurer's Report, Council budget, and reports of various Committees; to hear remarks from the Deputy Associate Director for Statistical Policy; and to receive reports of recent actions by the Office of Management and Budget which affect the reporting of business firms to Federal agencies. The meeting will be open to public observation and participation.

Anyone wishing to participate should contact the Deputy Associate Director for Statistical Policy, Room 10202, New Executive Office Building, Washington, D.C., 20503, Telephone (202) 395-3730.

VELMA N. BALDWIN,
*Assistant to
the Director for Administration.*

[FR Doc.77-14868 Filed 5-24-77;8:45 am]

[Public Notice CM-7/69]

## DEPARTMENT OF STATE

### ADVISORY COMMITTEE TRANSNATIONAL ENTERPRISES

#### Meeting

The Department of State Advisory Committee on Transnational Enterprises will hold its eighth meeting on Friday, June 10 at 9:30 a.m. in Room 1105 of the

AR_0033322

Department of State, 2201 C Street NW., Washington, D.C. The meeting will be open to the public.

The purpose of the meeting will be to discuss the ongoing work in international fora in regard to questionable payments, and codes of conduct relating to transfer of technology and transnational enterprises.

Requests for further information on the meeting should be directed to Stephen Bond, Department of State, 2201 C Street NW., Washington, D.C. 20520. He may be reached by telephone on area code 202-632-0349.

Members of the public wishing to attend the meeting must contact Mr. Bond's office in order to arrange entrance to the State Department building.

The Chairman will, as time permits, entertain oral comments from members of the public attending the meeting.

Dated: May 13, 1977.

STEPHEN R. BOND,
*Executive Secretary.*

[FR Doc.77-14791 Filed 5-24-77;8:45 am]

[Public Notice CM-7/70]

SHIPPING COORDINATING COMMITTEE

Subcommittee on Safety of Life at Sea

Meeting

The working group on the carriage of dangerous goods of the Subcommittee on Safety of Life at Sea, a subcommittee of the Shipping Coordinating Committee, will hold an open meeting at 9:30 on Thursday, June 16, 1977, in Room 8334 of the Department of Transportation, 400 Seventh Street SW., Washington, D.C.

The purpose of the meeting will be to discuss:

The report to the Maritime Safety Committee of the 27th Session of the Intergovernmental Maritime Consultative Organization (IMCO) Subcommittee on the Carriage of Dangerous Goods.

U.S. positions on matters to be considered at the 28th Session of the IMCO Subcommittee on the Carriage of Dangerous Goods scheduled to be held in London September 19-23, 1977.

The progress of IMCO activities of a continuing nature, such as implementation of the International Maritime Dangerous Goods Code (IMDG).

Requests for further information on the meeting should be directed to Captain C. E. Mathieu, United States Coast Guard. He may be reached by telephone on area code 202-426-3296.

The Chairman will entertain comments from the public as time permits.

CARL TAYLOR, Jr.,
*Acting Director,*
*Office of Maritime Affairs.*

MAY 16, 1977.

[FR Doc.77-14792 Filed 5-24-77;8:45 am]

STUDY GROUP 1 OF THE U.S. NATIONAL COMMITTEE OF THE INTERNATIONAL TELEGRAPH AND TELEPHONE CONSULTATIVE COMMITTEE (CCITT)

Meeting

The Department of State announces that Study Group 1 of the U.S. CCITT National Committee will meet on June 9, 1977 at 10 a.m. in Room 511 of the Federal Communications Commission, 1919 M Street NW., Washington, D.C. This Study Group deals with U.S. Government regulatory aspects of international telegraph and telephone operations and tariffs.

The Committee will discuss international telecommunications questions relating to telegraph and telex services, and will consider the development of U.S. positions to be taken at an international CCITT meeting to be held June 20-24, 1977 in Geneva, Switzerland.

Members of the general public may attend the meeting and join in the discussion subject to instructions of the Chairman. Admittance of public members will be limited to the seating available.

Dated: May 16, 1977.

ARTHUR L. FREEMAN,
*Chairman,*
*U.S. CCITT National Committee.*

[FR Doc.77-14790 Filed 5-24-77;8:45 am]

# DEPARTMENT OF THE TREASURY

Bureau of Alcohol, Tobacco and Firearms

GRANTING OF RELIEF

Notice is hereby given that pursuant to 18 U.S.C. section 925(c) the following named persons have been granted relief from disabilities imposed by Federal laws with respect to acquisition, transfer, receipt, shipment, or possession of firearms incurred by reason of their convictions of crimes punishable by imprisonment for a term exceeding one year.

It has been established to my satisfaction that the circumstances regarding the convictions of each applicant's record and reputation are such that the applicants will not be likely to act in a manner dangerous to public safety, and that the granting of the relief will not be contrary to the public interest.

Agnese, Carlos E., 700C Raleigh Avenue, Norfolk, Virginia, convicted on March 29, 1974, in the United States District Court for the Eastern District of Norfolk, Virginia.

Askenette, Alexander, Jr., Star Route, Keshena, Wisconsin, convicted on March 22, 1967, in the County Court of Shawano, Menominee County, Wisconsin.

Baldwin, Ardeth D., 1007 Okoboji Avenue, Milford, Iowa, convicted on September 7, 1948, in the United States District Court, Northern District, Iowa.

Bathke, Randolph O., RFD, Plankinton, South Dakota, convicted on March 25, 1974, in the Fourth Judicial Circuit, Aurora County, South Dakota.

Belcher, Edward F., 220 Chestnut Street, Suffolk, Virginia, convicted on May 8, 1951, in the Circuit Court of Charlotte County, Virginia.

Boynton, David B., 1719 Oak Drive, Augusta, Georgia, convicted on June 16, 1966, in the Superior Court of Richmond County, Georgia.

Brannen, Robert F., 2210 Country Bend South, Lakeland, Florida, convicted on September 8, 1972, in the United States District Court, Middle District of Florida, Tampa, Florida.

Brewer, Jack H., Route 10, Box 621-Z, Fort Worth, Texas, convicted on April 10, 1975, in the United States District Court, Northern District, Fort Worth, Texas.

Brown, Franklin D., 105 Greenbriar Road, Gadsden, Alabama, convicted on October 28, 1954, in the District Court, Northern District of Illinois, Eastern Division.

Browning, Bobby R., Route 1, Box 186, Franklin, North Carolina, convicted on October 9, 1974, in the Superior Court for Jackson County, North Carolina.

Burt, Jay Dee, 1916 Rancho Road, Lincoln, Nebraska, convicted on February 2, 1973, in the Lancaster County District Court, Nebraska.

Caldero, Santiago L., 2716 West Division Street, Chicago, Illinois, convicted on November 6, 1956, in a General Court Martial, Fort Sill, Oklahoma.

Campbell, Neil J., 3318 Comanche, Flint, Michigan, convicted on October 31, 1963, in the Circuit Court for the County of Huron, Michigan.

Carey, Martin F., 6031 Madison, Groves, Texas, convicted on January 8, 1975, in the Criminal District Court of Jefferson County, Texas.

Carey, Martin J., 200 West Hermosa Drive, I-201, Tempe, Arizona, convicted on May 26, 1972, in the Court of Common Pleas, Philadelphia, Pennsylvania.

Chaffin, Robert M., Route 1, Box 5, Drewryville, Virginia, convicted on January 19, 1965, in the Campbell County Circuit Court, Rustberg, Virginia.

Cook, Phillip D., 1027 South Bell Street, Kokomo, Indiana, convicted on March 4, 1966, in the Russell Circuit Court, Jamestown, Kentucky.

Cook, Victor H., 4472 Daisy Street, Springfield, Oregon, convicted on February 27, 1974, in the Circuit Court for Lane County, Oregon.

Dahlin, Roy G., 612 73rd Avenue North, Minneapolis, Minnesota, convicted on October 10, 1950, in the Fourth Judicial District Court, Hennepin County, Minnesota.

DuBois, Raymond L., Jr., 216 East Third Street, Winona, Minnesota, convicted on December 6, 1963, in the Third Judicial District Court, Winona County, Winona, Minnesota.

Flowers, Richmond M., 209 North Oates Street, Dothan, Alabama, convicted on March 10, 1969, in the United States District Court, Northern District, Alabama.

Foss, Gerard J., 291 Garfield Avenue, Battle Creek, Michigan, convicted on November 16, 1962, in the Barry County Circuit Court, Michigan.

Furr, Jerry Franklin, Route 4, Box 154-5, Albermarle, North Carolina, convicted on November 19, 1973, in the Stanly County Superior Court, North Carolina.

Gallaher, Hubert L., Jr., 1168 Sheffield Drive, Lynchburg, Virginia, convicted on June 10, 1974, in the United States District Court, Western District, Virginia, Lynchburg, Virginia.

AR_0033323

Genest, Wilfred P., 551 Indian Head Street, Hanson, Massachusetts, convicted on December 3, 1968, in the Boston Municipal Court, Boston, Massachusetts.

Gilmore, Jackson L., Route 2, Box 62, Wadesboro, North Carolina, convicted on August 16, 1971, in the United States District Court, Western District, Charlotte, North Carolina.

Graves, James H., 3244 Southwest 88th Place, Miami, Florida, convicted on July 9, 1973, in the United States District Court, Southern District of California.

Green, Riza L., 1456 South Seventh Street, Louisville, Kentucky, convicted on April 27, 1972, in the Circuit Court, McCracken County, Paducah, Kentucky.

Hammons, Ellis, Jr., 2560 White River Boulevard #2, Muncie, Indiana, convicted on April 24, 1941, in the Delaware County Circuit Court, Muncie, Indiana.

Harlan, Richard C., 2028 West Fourth, Spokane, Washington, convicted on October 4, 1957, in the District Court of Blackhawk County, Waterloo, Iowa.

Hays, Dennis C., 72 Russell Street, Melrose, Massachusetts, convicted on May 7, 1962, in the Plymouth Superior Court, Plymouth, Massachusetts.

Hemphill, Charles L., Box 324, Deer River, Minnesota, convicted on March 26, 1973, in the Ninth Judicial District Court, County of Itasca, Minnesota.

Huckabee, Donald J., Route 4, Box 180-B, Gainesville, Florida, convicted on April 13, 1959; April 11, 1961; July 5, 1966; and on July 20, 1967, in the Alachua County Circuit Court, Florida.

Hurlburt, Todd O., 1401 Rand Street, Boise, Idaho, convicted on January 28, 1972, in the Yakima County Superior Court, Yakima, Washington.

Kaminski, Bernard W., 1123 North Second Avenue, Wausau, Wisconsin, convicted on March 19, 1973, in the Marathon County Court, Wausau, Wisconsin.

Kimbro, Frank, Bur Cole Ranch, Route 1, Grovetown, Georgia, convicted in October 1954, in the Superior Court, Green County, Georgia; and on April 9, 1957, in the United States District Court, Southern District, Georgia.

Klamert, Glenn E., 2513 Brown Street, Flint, Michigan, convicted on December 30, 1963, in the Circuit Court for Genesee County, Michigan.

Kraft, Monroe E., Box 219, Timber Lake, South Dakota, convicted on September 18, 1973, in the Jones County Circuit Court, Murdo, South Dakota.

Lape, Lillian R., Bay Crest Estates, P.O. Box 5508, Charleston, Oregon, convicted on April 5, 1960, in the Coffee County District Court, Burlington, Kansas.

Lee, David A., RFD #3, Augusta, Maine, convicted on June 10, 1974, in the Penobscot Superior Court, Maine.

Loignon, Kennard L., Box 380, Pine Ridge, South Dakota, convicted on March 5, 1975, in the United States District Court, Maryland.

Loomis, Arthur C., 414 West 12th Street, Vancouver, Washington, convicted on August 19, 1935, in the Superior Court, State of Washington, Clark County.

Luce, Donald E., 360 East Atherton Road, Flint Michigan, convicted on January 15, 1951; and on December 2, 1964, in the Circuit Court, for the County of Genesee, Michigan; and on November 20, 1964, in the Circuit Court for the County of Ingham, Michigan.

Mills, James H., R.D. #2, Mercersburg, Pennsylvania, convicted on July 26, 1957, and on January 29, 1960, in the Franklin County Court, Pennsylvania.

Moore, Luther D., 19 Lake Hills, North, Northport, Alabama, convicted on April 18, 1966, in the United States District Court for the Northern District of Alabama.

Packett, Irving D., Jr., Route 2, Warsaw, Virginia, convicted on January 29, 1973, in the Circuit Court of Franklin County, Virginia.

Payne, Wesley D., 508 Sandy Valley Court, Virginia Beach, Virginia, convicted on May 24, 1974, in the United States District Court, Eastern District, Virginia, Norfolk Division.

Pettigrew, Roosevelt, 1810 North Washington Street, Baltimore, Maryland, convicted on August 2, 1973, in the United States District Court, for the District of Maryland.

Pickler, Edgar L., Jr., 7200 Galveston Boulevard, Norfolk, Virginia, convicted on March 29, 1974, in the United States District Court, Eastern District of Virginia, Norfolk, Virginia.

Pullar, Michael W., 1621 Township Street, Sedro Woolley, Washington, convicted on July 13, 1973, in the Superior Court of Skagot County, Washington; and on July 16, 1973, in the Superior Court of Whatcom County, Washington.

Rowan, Donald R., 29 Allen Avenue, Painesville, Ohio, convicted on or about May 22, 1962, in the Common Pleas Court, Lake County, Ohio.

Sandra, Jerry L., Route 1, Hiawassee Georgia, convicted on May 28, 1970, in the United States District Court, Western District, Bryson City, North Carolina.

Schultz, Raymond S., 839 Victory Drive, Westwego, Louisiana, convicted on October 22, 1974, in the United States District Court, Eastern District of Louisiana.

Seiber, Robert H., Route 8, Powell, Tennessee, convicted on January 3, 1944; on January 10, 1966; on August 15, 1968; on December 9, 1970; and on January 9, 1974, in the United States District Court, Eastern District, Tennessee.

Snedegar, Robert S., P.O. Box 54, Columbia, Tennessee, convicted on October 11, 1954, in the United States District Court, Middle District of Tennessee; and on May 10, 1955, in the United States District Court, Middle District of Tennessee.

Swelsford, Raymond C., 1308 North Oregon Street, El Paso, Texas, convicted on October 2, 1969, in the United States District Court, Western District, Texas.

Tharpe, Loton E., Route 1, Box 469, Ronda, North Carolina, convicted on or about May 18, 1953; and on May 23, 1957, in the United States District Court, Wilkesboro, North Carolina.

Tickner, Darrel D., 8616 Airline, Houston, Texas, convicted on February 26, 1973, in the District Court, Harris County, Texas.

Tinnerello, Dominic A., Sr., 241 Buttrick Avenue, Bronx, New York, convicted on June 13, 1958, in the County Court of Putnam County, New York.

Williams, Tommy Ray, Box 341, Pascagoula, Mississippi, convicted on June 27, 1966, in a General Court Martial, Fort Bragg, North Carolina.

Yaughn, Franklin L., 1202 Glendale Avenue, Macon, Georgia, convicted on January 18, 1973, in the United States District Court, Northern District of Georgia.

Signed at Washington, D.C., this 17th day of May 1977.

REX D. DAVIS,
*Director, Bureau of Alcohol,*
*Tobacco and Firearms.*

[FR Doc.77-14812 Filed 5-24-77; 8:45 am]

[Supplement to Dept. Circular Public Debt Series—No. 12-77]

**Office of the Secretary**

**TREASURY NOTES OF SERIES Q-1979**

**Interest Rate**

MAY 19, 1977.

The Secretary of the Treasury announced on May 18, 1977, that the interest rate on the notes described in Department Circular—Public Debt Series—No. 12-77, dated May 12, 1977, will be 6⅛ percent per annum. Accordingly, the notes are hereby redesignated 6⅛ percent Treasury Notes of Series Q-1979. Interest on the notes will be payable at the rate of 6⅛ percent per annum.

DAVID MOSSO,
*Fiscal Assistant Secretary.*

[FR Doc.77-14811 Filed 5-24-77; 8:45 am]

---

**INTERSTATE COMMERCE COMMISSION**

[Notice No. 397]

**ASSIGNMENT OF HEARINGS**

MAY 20, 1977.

Cases assigned for hearing, postponement, cancellation or oral argument appear below and will be published only once. This list contains prospective assignments only and does not include cases previously assigned hearing dates. The hearings will be on the issues as presently reflected in the Official Docket of the Commission. An attempt will be made to publish notices of cancellation of hearings as promptly as possible, but interested parties should take appropriate steps to insure that they are notified of cancellation or postponements of hearings in which they are interested.

MC 141431 Sub 2, Cal-Valley Transportation, Inc., now assigned June 8, 1977, at San Francisco, Calif., will be held in the Tax Court, Room 2021, Federal Bldg. and Courthouse, 450 Golden Gate Ave.

MC 121775 Sub 2, Milton B. Anderson and Melvin K. Anderson. A Partnership d.b.a. Overland Express, now assigned June 13, 1977 at Reno, Nevada, will be held in Courtroom 2, 5th Floor, Federal Bldg., 300 Booth.

MC 117604 Sub 11, Meadors Freight Lines, Inc., now assigned September 12, 1977, at Atlanta, Ga., will be held in Room 305, 1252 W. Peachtree St. NW.

MC 117940 Sub 187, Nationwide Carriers, Inc., now assigned June 16, 1977, at Minneapolis, Minn., will be held in Room 627, Federal Bldg., 316 N. Robert Street.

MC 127187 Sub 16, Floyd Duenow, Inc., now assigned June 20, 1977, at Minneapolis, Minn., will be held in Court Room 2, Federal Bldg., U.S. Courthouse, 316 N. Robert Street.

MC 133490 Sub 11, Lees Trucking, Inc., now assigned June 14, 1977 at Minneapolis, Minn., will be held in room 627, Federal Bldg., 316 N. Robert Street.

MC 136786 Sub 103, Robco Transportation, Inc., now assigned June 15, 1977, at Minneapolis, Minn., will be held in Room 627, Federal Bldg., 316 N. Robert Street.

AR_0033324

MC 123407 Sub 346, Sawyer Transport, Inc., now assigned June 13, 1977, at Boise, Idaho, will be held in Room 429, Federal Bldg., 550, W. Fort Street.

MC 117940 Sub 202, Nationwide Carriers, Inc., now assigned June 27, 1977, at New York City, N.Y., will be held in Room 2839, Federal Bldg., 26 Federal Plaza.

MC 29613 Sub 8, Jayne's Motor Freight, Inc., now assigned June 29, 1977, at New York, N.Y., will be held in Room 2839 Federal Bldg., 26 Federal Plaza.

MC 140889 Sub 9, Osborn Transportation, Inc., now assigned June 20, 1977, at Atlanta, Ga., will be held in Room 305, 1252 W. Peachtree St. N.W., and on July 18, 1977, at San Francisco, Calif., will be held on the 5th Floor Room 510 211 Main Street.

MC 84687 Sub 4, Veterans Truck Line, Inc., now assigned June 14, 1977, at Chicago, Ill., will be held Room 286, Everett McKinley Dirksen Bldg., 219 S. Dearborn St.

MC 29839 Sub 6, Evergreen Stage Lines, Inc., now assigned June 20, 1977, at Portland, Oregon, will be held in Room 103, Pioneer Courthouse, 555 SW. Yamhill Street.

MC-F-13044, Consolidated Freightways Corp., of Del.—Purchase (Portion)—Point Express, Inc., now assigned June 8, 1977, at Columbus, Ohio, will be held in room 235, Federal Bldg., 85 Marconi Blvd.

MC 110012 Sub 33, Roy Widener Motor Lines, Inc., now assigned June 1, 1977, at Columbus, Ohio, will be held in Room 235, Federal Bldg., 85 Marconi Blvd.

MC 139279 Sub 2, Conalco Contract Carriers, Inc., now assigned June 3, 1977, at Columbus, Ohio, will be held in Room 235, Federal Bldg., 85 Marconi Blvd.

MC 142287 Sub 3, Tom Younkin, Inc., now assigned June 2, 1977, at Columbus, Ohio, will be held in Room 235, Federal Bldg., 85 Marconi Blvd.

MC 139495 Sub 180, National Carriers, Inc., now assigned June 6, 1977, at Columbus, Ohio, will be held in Room 235, Federal Bldg., 85 Marconi Blvd.

MC-F 12774, O'Nan Transportation Co., Inc.—Investigation of Control — Owention Express, Inc., MC-F 136018, Tri-City Express, Inc., MC-F 12598, Cooper-Jarrett, Inc.—Purchase—Tri-City Express, Inc., MC 35334 Sub No. 78, Cooper-Jarrett, Inc., MC 134817 and MC 134817 Sub 1, Owenton Express, Inc. now being assigned July 12, 1977 (4 days) for continued hearing at Lexington, Kentucky in a hearing room to be later designated.

ROBERT L. OSWALD,
Secretary.

[FR Doc.77-14931 Filed 5-24-77;8:45 am]

[Rule 19; Ex Parte No. 241; Exemption No. 139]

## BURLINGTON NORTHERN INC.

### Exemption Under Mandatory Car Service Rules

It appearing that the railroads named herein own numerous 40-ft., narrow door, plain boxcars; that under present conditions, there is virtually no demand for these cars on the lines of the car owners; that return of these cars to the car owners would result in their being stored idle on these lines; that such cars can be used by other carriers for transporting traffic offered for shipments to points remote from the car owners; and that compliance with Car Service Rules 1 and 2 prevents such use of plain boxcars owned by the railroads listed herein, re-

sulting in unnecessary loss of utilization of such cars.

*It is ordered,* That, pursuant to the authority vested in me by Car Service Rule 19, plain boxcars described in the Official Railway Equipment Register, I.C.C.—R.E.R. No. 403, issued by W. J. Trezise, or successive issues thereof, as having mechanical designation "XM", with inside length 44-ft. 6 in. or less, equipped with doors less than 9 ft. wide; and bearing reporting marks assigned to the railroads named below, shall be exempt from the provisions of Car Service Rules 1(a), 2(a), and 2(b).

BURLINGTON NORTHERN INC.

Reporting Marks: BN-CBQ-GN-NP-SPS

*Effective 11:30 a.m., May 13, 1977,* and continuing in effect until further order of this Commission.

Issued at Washington, D.C., May 13, 1977.

INTERSTATE COMMERCE
COMMISSION,
JOEL E. BURNS,
Agent.

[FR Doc.77-14936 Filed 5-24-77;8:45 am]

[Notice No. 65]

## MOTOR CARRIER TEMPORARY AUTHORITY APPLICATIONS

MAY 20, 1977.

The following are notices of filing of applications for temporary authority under Section 210a(a) of the Interstate Commerce Act provided for under the provisions of 49 CFR 1131.3. These rules provide that an original and six (6) copies of protests to an application may be filed with the field official named in the FEDERAL REGISTER publication no later than the 15th calendar day after the date the notice of the filing of the application is published in the FEDERAL REGISTER. One copy of the protest must be served on the applicant, or its authorized representative, if any, and the protestant must certify that such service has been made. The protest must identify the operating authority upon which it is predicated, specifying the "MC" docket and "Sub" number and quoting the particular portion of authority upon which it relies. Also, the protestant should specify the service it can and will provide and the amount and type of equipment it will make a-vailable for use in connection with the service contemplated by the TA application. The weight accorded a protest shall be governed by the completeness and pertinence of the protestant's information.

Except as otherwise specifically noted, each applicant states that there will be no significant effect on the quality of the human environment resulting from approval of its application.

A copy of the application is on file, and can be examined at the Office of the Secretary, Interstate Commerce Commission, Washington, D.C., and also in the ICC Field Office to which protests are to be transmitted.

### MOTOR CARRIERS OF PROPERTY

No. MC 78118 (Sub-No. 33TA), filed April 22, 1977. Applicant: W. H. JONES, INC., 35 Witmer Road, Lancaster, Pa. 17602. Applicant's representative: Christian V. Graf, 407 North Front Street, Harrisburg, Pa. 17101. Authority sought to operate as a *common carrier,* by motor vehicle, over irregular routes, transporting: *Paper and paper products,* from the plantsite and shipping facilities of Container Corporation of America in Hanover Township, Lehigh County, Pa., to points in that portion of New Jersey on and north of U.S. Highway 40. Restricted to traffic originating at and destined to the above origin and destination territory, for 180 days. Applicant has also filed an underlying ETA seeking up to 90 days of operating authority. Supporting shipper(s): Container Corporation of America, Philadelphia, Pa. Send protests to: Robert P. Amerine, District Supervisor, Bureau of Operations, Interstate Commerce Commission, 278 Federal Building, P.O. Box 869, Harrisburg, Pa. 17108.

No. MC 107460 (Sub-No. 67TA), filed April 26, 1977. Applicant: WILLIAM Z. GETZ, INC., 3055 Yellow Goose Road, Lancaster, Pa. 17601. Applicant's representative: Donald D. Shipley (same address as applicant). Authority sought to operate as a *contract carrier,* by motor vehicle, over irregular routes, transporting: *Printed matter,* from the plantsite of R. R. Donnelley Corporation located at or near Crawfordsville, Ind., to the plantsite of Random House, Inc., located at or near Westminster, Md., under a continuing contract or contracts with R. R. Donnelley Corporation, for 180 days. Supporting shipper(s): R. R. Donnelley Corporation, 2223 King Drive, Chicago, Ill. 60616. Send protests to: Robert P. Amerine, District Supervisor, Bureau of Operations, Interstate Commerce Commission, 278 Federal Building, P.O. Box 869, Harrisburg, Pa. 17108.

No. MC 108393 (Sub-No. 119TA), filed May 2, 1977. Applicant: SIGNAL DELIVERY SERVICE, INC., 201 E. Ogden Avenue, Hinsdale, Ill. 60521. Applicant's representative: Thomas B. Hill (same address as applicant). Authority sought to operate as a *contract carrier,* by motor vehicle, over irregular routes, transporting: *Parts of electrical and gas appliances, equipment, materials and supplies* used in the manufacture, distribution and repair of electrical and gas appliances, between Lowell, Mich. and Clyde, Ohio, under continuing contract or contracts with Whirlpool Corporation, for 180 days. Supporting shipper: Whirlpool Corporation, Carl R. Anderson, Director of Corporate Traffic, Administrative Center, Benton Harbor, Mich. 49022. Send protests to: Transportation Assistant Patricia A. Roscoe, Interstate Commerce Commission, Everett McKinley Dirksen Building, 219 S. Dearborn Street, Room 1386, Chicago, Ill. 60604.

No. MC 110525 (Sub-No. 1191TA), filed April 22, 1977. Applicant: CHEMICAL LEAMAN TANK LINES, INC., 520

AR_0033325

East Lancaster Avenue, P.O. Box 200, Downingtown, Pa. 19335. Applicant's representative: Thomas J. O'Brien (same address as applicant). Authority sought to operate as a *common carrier*, by motor vehicle, over irregular routes, transporting: *Phenols*, in bulk, in tank vehicles, from Rotterdam Junction, N.Y., to points of entry on the International Boundary between the United States and Canada located on the St. Lawrence River at Alexandria Bay, N.Y., and Rooseveltown, N.Y., for furtherance of Belleville, Ontario, Canada, for 180 days. Supporting shipper(s): Schenectady Chemicals, Inc., Congress Street, Schenectady, N.Y. 12301. Send protests to: Monica A. Blodgett, Transportation Assistant, Interstate Commerce Commission, 600 Arch Street, Room 3238, Philadelphia, Pa. 19106.

No. MC 111812 (Sub-No. 533TA), filed April 26, 1977. Applicant: MIDWEST COAST TRANSPORT, INC., 900 West Delaware, P.O. Box 1233, Sioux Falls, S. Dak. 57101. Applicant's representative: David Peterson (same address as applicant). Authority sought to operate as a *common carrier*, by motor vehicle, over irregular routes, transporting: *Confectionery and confectionery products*, except in bulk, in vehicles equipped with mechanical refrigeration from the storage facilities utilized by M&M/MARS, located at or near Hampden Township, Cumberland County, Pa., to Arizona, California, Colorado, Illinois, Indiana, Iowa, Michigan, Minnesota, Missouri, Nebraska, North Dakota, Ohio, Oregon, South Dakota, Utah, Washington and Wisconsin, for 180 days. Applicant has also filed an underlying ETA seeking up to 90 days of operating authority. Supporting shipper(s): M&M/MARS, High Street, Hackettstown, N.J. 07840, Daniel B. Craver, Traffic Manager. Send protests to: J. L. Hammond, District Supervisor, Interstate Commerce Commission, Bureau of Operations, Room 369, Federal Building, Pierre, S. Dak. 57501.

No. MC 117940 (Sub-No. 219TA), filed April 26, 1977. Applicant: NATIONWIDE CARRIERS, INC., P.O. Box 104, Maple Plain, Minn. 55359. Applicant's representative: Allan L. Timmerman (same address as applicant). Authority sought to operate as a *common carrier*, by motor vehicle, over irregular routes, transporting: *Such merchandise as* is dealt in by retail and wholesale department and hardware stores (except foodstuffs, articles of unusual value, commodities in bulk, and household goods as defined by the Commission) (1) from the Los Angeles, California Harbor Commercial Zone to Brookings, S. Dak. and Minneapolis, Minn., (2) from the facilities of the Port of Tacoma, Wash. and the Port of Seattle, Wash., to Brookings and Sioux Falls, S. Dak., and to points in the Minneapolis-St. Paul, Minnesota Commercial Zone, for 180 days. Applicant has also filed an underlying ETA seeking up to 90 days of operating authority. Supporting shipper(s): There are approximately four (4) statements of support attached

to the application which may be examined at the Interstate Commerce Commission in Washington, D.C., or copies thereof which may be examined at the field office named below. Send protests to: Mrs. Marion L. Cheney, Transportation Assistant, Interstate Commerce Commission, Bureau of Operations, 414 Federal Building and U.S. Court House, 110 S. 4th St., Minneapolis, Minn. 55401.

No. MC 119789 (Sub-No. 345TA), filed April 25, 1977. Applicant: CARAVAN REFRIGERATED CARGO, INC., P.O. Box 6188, Dallas, Tex. 75222. Applicant's representative: James K. Newbold, Jr. (same address as applicant). Authority sought to operate as a *common carrier*, by motor vehicle, over irregular routes, transporting: *Meats, meat products, meat by-products, and articles distributed by meat packinghouses*, as described in Sections A and C of Appendix I to the report in *Descriptions in Motor Carrier Certificates*, 61 M.C.C. 209 and 766 (except hides and commodities in bulk), from Los Angeles, Calif., to points in New York—Representative destinations New York City, Westbury, Mt. Kisco and Waterford, for 180 days. Applicant has also filed an underlying ETA seeking up to 90 days of operating authority. Supporting shipper(s): Ward Foods Company, Inc., Gold Ring Meat Division, 3461 E. Vernon Avenue, Los Angeles, Calif. 90058. Send protests to: Opal M. Jones, Transportation Assistant, Interstate Commerce Commission, 1100 Commerce Street, Room 13C12, Dallas, Tex. 75242.

No. MC 139520 (Sub-No. 2TA) (Correction), filed March 25, 1977, published in the FEDERAL REGISTER issue of April 13, 1977, and republished this issue. Applicant: DEAN MCCARY, doing business as FLYING "S" FEED EXPRESS, Route 4, Box 84, Clovis, N. Mex. 88101. Applicant's representative: James E. Sneed, P.O. Box 2228, Santa Fe, N. Mex 87501. Authority sought to operate as a *contract carrier*, by motor vehicle, over irregular routes, transporting: (a) *Livestock feed*, between points in California, on the one hand, and, on the other, points in Arizona, Colorado, Kansas, New Mexico, Oklahoma, Texas and California, (b) *livestock feed ingredients*, between points in the states of Arizona, Colorado, Kansas, New Mexico, Oklahoma, Texas and California, under a continuing contract with Wilbur-Ellis Company, for 180 days. Applicant has also filed an underlying ETA seeking up to 90 days of operating authority. Supporting shipper: Wilbur-Ellis Company, P.O. Box 427, Clovis, N. Mex. Send protests to: District Supervisor, John H. Kirkemo, Interstate Commerce Commission, Bureau of Operations, 1106 Federal Office Bldg., 517 Gold Ave., S.W., Albuquerque, N. Mex. 87101. The purpose of this republication is to include part (b) to the requested authority.

No. MC 139824 (Sub-No. 3TA), filed April 27, 1977. Applicant: BITTERSWEET ENTERPRISES, INC., Rural

Route 1, Manhatten, Kans. 66502. Applicant's representative: Clyde N. Christy, 514 Capitol Federal Building, Topeka, Kans. 66603. Authority sought to operate as a *common carrier*, by motor vehicle, over irregular routes, transporting: *Complete buildings, except prefabricated* building when transported in wheeled undercarriages equipped with hitchball connectors, between Marshall County, Kans., on the one hand, and points in Nebraska, on the other hand, for 180 days. Applicant has also filed an underlying ETA seeking up to 90 days of operating authority. Supporting shipper(s): Meyer Lumber and Hardware, Inc., Box 8, Summerfield, Kans. 66541. Send protests to: Thomas P. O'Hara, District Supervisor, Bureau of Operations, Interstate Commerce Commission, 147 Federal Building and U.S. Courthouse, 444 S. E. Quincy, Topeka, Kans. 66683.

No. MC 143013 (Sub-No. 1TA), (Partial correction), filed March 21, 1977, published in the FEDERAL REGISTER issue of April 20, 1977, republished as a partial correction this issue. Applicant: ROGER CHILTON, doing business as CHILTON TRUCKING COMPANY P.O. Box 841, Beaumont, Tex. 77704. Applicant's representative: John W. Carlisle, 4100 Greenbriar, Suite 215, Houston, Tex. 77098. Authority sought to operate as a *common carrier*, by motor vehicle, over irregular routes, transporting: *Engine or motor parts and equipment and parts thereof*, used on ships and ocean going vessels for the operation, maintenance and safety of such ships and vessels; (3) between the following airport: Bates Field, Mobile, Ala.; Ferguson Regional Airport, Pensacola, Fla.; Clearwater Airport and Albert Whitted Airport, St. Peterburg, Fla.; Tampa International Airport, Peter O. Knoght Airport and Vandenberg Airport, Tampa, Fla.; Page Field, Ft. Myers, Fla.; Executive Airport and Hollywood International Airport, Ft. Lauderdale, Fla.; Key West International Airport, Key West, Fla.; Miami International Airport, Miami, Fla.; Palm Beach International Airport, West Palm Beach, Fla.; Harry W. Nelson Airport, Ft. Pierce, Fla.; Daytona Beach Regional Airport, Daytona Beach, Fla.; St. Augustine Municipal Airport, St. Augustine Fla.; Golden Isles Municipal Airport and Malcom McKinnon Airport, Brunswick, Ga.; Savannah Municipal Airport.

No. MC 143118 (Sub-No. 1TA) (Correction) filed April 8, 1977, published in the FEDERAL REGISTER issue of April 28, 1977, republished as corrected this issue. Applicant: ALFRED SWINFORD, doing business as SWINFORD TRUCKING, Route 8, Hendron Road, Paducah, Ky. 42001. Applicant's representative: H. S. Melton, Jr., P.O. Box 1407, Paducah, Ky. 42001. Authority sought to operate as a *common carrier*, by motor vehicle, over irregular routes, transporting: *Wire coil hangers*, from the plantsite of Laidlaw Corporation, Metropolis, Ill., to Miami, Fla., for 180 days. Applicant has also filed an underlying ETA seeking up to 90 days of operating authority. Supporting

AR_0033326

shipper: Laidlaw Corporation, 1212 5th St., Metropolis, Ill. 62960. Send protests to: Floyd A. Johnson, District Supervisor, Interstate Commerce Commission, 100 N. Main Bldg., 100 B. Main St., Suite 2906, Memphis, Tenn. 38103. The purpose of this republication is to correct the applicant's name.

No. MC 143161 (Sub-No. 1TA), filed April 26, 1977. Applicant: BEVERAGE TRANSPORT, INC., Box 13515, 1210 Bluff Road, Columbia, S.C. 29201. Applicant's representative: Harry S. Dent, Drawer 175, West Columbia, S.C. 29169. Authority sought to operate as a *contract carrier*, by motor vehicle, over irregular routes, transporting: *Non-alcoholic beverages and soft drinks and materials, supplies, and equipment* used in the manufacture, mixing, distribution, and sale of non-alcoholic beverages and soft drinks, between Cheraw, S.C., on the one hand, and, on the other, North Carolina; Georgia; Virginia; West Virginia; Kentucky; Gainesville and Jacksonville, Fla.; Johnson City and Knoxville, Tenn.; Philadelphia and Allentown, Pa.; Mt. Vernon, N.Y.; Cheverly, Forestville, Salisbury and Silver Spring, Md.; Teterboro, Caldwell, Kearny, and Brunswick, N.J.; and Washington, D.C., under a continuing contract, or contracts, with Carolina Canners, Inc., for 180 days. Applicant has also filed an underlying ETA seeking up to 90 days of operating authority. Supporting shipper(s): Carolina Canners, Inc., P.O. Box 965, Cheraw, S.C. 29520. Send protests to: E. E. Strotheid, District Supervisor, Interstate Commerce Commission, Room 302, 1400 Building, 1400 Pickens St., Columbia, S.C. 29201.

No. MC 143177TA, filed April 22, 1977. Applicant: MICHAEL C. STRICKLAND, d.b.a. STRICKLAND FEED SERVICE, West 6th Street, P.O. Box 10, Luverne, Ala. 36049. Applicant's representative: Michael C. Strickland (same address as applicant). Authority sought to operate as a *common carrier*, by motor vehicle, over irregular routes, transporting: *Dry animal and poultry feeds and feedstuff* only in bulk, in tank trailers with auger self unloading devices, from the plant-site and storage facilities of Cargill, Inc., Nutrena Feed Division, in the Montgomery Industrial terminal in Montgomery, Ala., to all points in Georgia and Florida, for 180 days. Applicant has also filed an underlying ETA seeking up to 90 days of operating authority. Supporting shipper(s): Cargill, Inc., Nutrena Feed Division, P.O. Box 9407, Montgomery, Ala. 36108. Send protests to: Clifford W. White, District Supervisor, Bureau of Operations, Interstate Commerce Commission, Room 1616, 2121 Building, Birmingham, Ala. 35203.

No. MC 143206TA, filed April 25, 1977. Applicant: PRIVATE COURIERS, INC., 4661 N. 24th Avenue, Schiller Park, Ill. 60176. Applicant's representative: Donald S. Mullins, 4704 W. Irving Park Road, Chicago, Ill. 60641. Authority sought to operate as a *common carrier*, by motor vehicle, over irregular routes,

transporting: *Medicines, drugs, supplies, and equipment*, and parts thereto, normally used in the operation of a hospital or medical clinic, including, but not limited to, medical isotopes, test kits, and radiopharmaceuticals, between the facilities of Abbott Laboratories at or near North Chicago, Ill., on the one hand, and, on the other facilities of air carriers and/or air freight forwarders located in the commercial zones of Chicago and Wheeling, Ill. and Milwaukee, Wis., restricted to traffic having prior or subsequent movement by air, for 180 days. Applicant has also filed an underlying ETA seeking up to 90 days of operating authority. Supporting shipper(s): Abbott Laboratories, Robert E. Schayer, Manager-Distribution Planning, Abbott Park, AP-8, North Chicago, Ill. 60064. Send protests to: Transportation Assistant Patricia A. Roscoe, Interstate Commerce Commission, Everett McKinley Dirksen Building, 219 S. Dearborn Street, Room 1386, Chicago, Ill. 60604.

### PASSENGER APPLICATIONS

No. MC 143176TA, filed April 19, 1977. Applicant: GOLF HOST WEST, INC., d/b/a. TAMARRON INN AND GOLF CLUB, U.S. Highway 550, 18 miles north of Durango, Post Office Drawer 3131, Durango, Colo. 81301. Applicant's representative: Lester I. Sherman, 124 E. 9th St., P.O. Box 1121, Durango, Colo. 81301. Authority sought to operate as a *common carrier*, by motor vehicle, over irregular routes, transporting: *Guests of Tamarron Inn and Golf Club*, having subsequent or prior movement by air, between Farmington, N. Mex., and Tamarron 18 miles north of Durango, Colo., and their baggage in the same vehicle or towed trailer. From Tamarron, 18 miles north of Durango, Colo., to Farmington, N. Mex. Airport via the following routes: U.S. Highway 550 south to Durango, U.S. Highways 550 and 160 south five miles, U.S. Highway 550 south to Farmington, N. Mex., and return over the same route, for 180 days. Applicant has also filed an underlying ETA seeking up to 90 days of operating authority. Supporting shipper(s): Tamarron Association of Condominum Owners, Inc., 124 E. 9th St., P.O. Box 1121, Durango, Colo. 81301. Send protests to: Herbert C. Ruoff, District Supervisor, 492 U.S. Customs House, 721 19th Street, Denver, Colo. 80202.

No. MC 143202TA, filed April 27, 1977. Applicant: E & P AUTO LIVERY INC., 43 Easton Avenue, New Brunswick, N.J. 08003. Applicant's representative: Robert B. Pepper, 168 Woodbridge Avenue, Highland Park, N.J. 08904. Authority sought to operate as a *common carrier*, by motor vehicle, over irregular routes, transporting: *Passengers and their baggage*, in special operations, in nonscheduled door to door service of not more than six passengers in any one vehicle not including driver, over irregular routes, between points in Middlesex County, N.J., on the one hand, and, on the other, John F. Kennedy International Airport and LaGuardia Airport,

New York, N.Y., and Philadelphia International Airport, Philadelphia, Pa., for 180 days. Supporting shipper(s): There are approximately four (4) statements of support attached to the application which may be examined at the Interstate Commerce Commission in Washington, D.C., or copies thereof which may be examined at the field office named below. Send protests to: District Supervisor Robert S. H. Vance, Interstate Commerce Commission, 9 Clinton Street, Newark, N.J. 07102.

By the Commission.

ROBERT L. OSWALD,
*Secretary.*

[FR Doc.77-14933 Filed 5-24-77; 8:45 am]

### [Notice No. 66]

## MOTOR CARRIER TEMPORARY AUTHORITY APPLICATIONS

MAY 20, 1977.

The following are notices of filing of applications for temporary authority under Section 210a(a) of the Interstate Commerce Act provided for under the provisions of 49 CFR 1131.3. These rules provide that an original and six (6) copies of protests to an application may be filed with the field official named in the FEDERAL REGISTER publication no later than the 15th calendar day after the date the notice of the filing of the application is published in the FEDERAL REGISTER. One copy of the protest must be served on the applicant, or its authorized representative, if any, and the protestant must certify that such service has been made. The protest must identify the operating authority upon which it is predicated, specifying the "MC" docket and "Sub" number and quoting the particular portion of authority upon which it relies. Also, the protestant shall specify the service it can and will provide and the amount and type of equipment it will make available for use in connection with the service contemplated by the TA application. The weight accorded a protest shall be governed by the completeness and pertinence of the protestant's information.

Except as otherwise specifically noted, each applicant states that there will be no significant effect on the quality of the human environment resulting from approval of its application.

A copy of the application is on file, and can be examined at the Office of the Secretary, Interstate Commerce Commission, Washington, D.C., and also in the ICC Field Office to which protests are to be transmitted.

### MOTOR CARRIERS OF PROPERTY

No. MC 35807 (Sub-No. 74TA), filed May 13, 1977. Applicant: WELLS FARGO ARMORED SERVICE CORPORATION, P.O. Box 4313, 210 Baker St. NW., Atlanta, Ga. 30302. Applicant's representative: Steven J. Thatcher (same address as applicant). Authority sought to operate as a *contract carrier*, b motor vehicle, over irregular routes, transporting:

AR_0033327

*Coin, currency and securities,* between Denver, Colo., and all points and places in Jewell, Mitchell, Lincoln, Ellsworth, Rice, Reno, Kingman, and Harper Counties, Kans., and all points and places in Kansas west thereof, under a continuing contract or contracts with Federal Reserve Bank of Kansas City, for 180 days. Applicant has also filed an underlying ETA seeking up to 90 days of operating authority. Supporting shipper(s) : Federal Reserve Bank of Kansas City, 925 Grand, Kansas City, Mo. 64198. Send protests to: Sara K. Davis, Transportation Assistant, Bureau of Operations, Interstate Commerce Commission, 1252 W. Peachtree St. NW., Rm. 546, Atlanta, Ga. 30309.

No. MC 40494 (Sub-No. 12TA), filed April 18, 1977. Applicant: HILBURN TRUCKING, INC., Sixth and Locust, Wellsville, Kans. 66092. Applicant's representative: S. Harrison Kahn, Suite 733 Investment Building, Washington, D.C. 20005. Authority sought to operate as a *common carrier,* by motor vehicle over irregular routes, transporting: *New and used combines, knocked down or set up, and parts thereof* between Independence, Missouri on the one hand, and, on the other, points and places in the states of Nebraska, Kansas, Colorado, Illinois, Wisconsin, Indiana, Ohio, and Michigan, for 180 days. Supporting shipper: Allis-Chalmers, P.O. Box 1099, Independence, Mo. 64051. Send protests to: Vernon V. Coble, District Supervisor, Interstate Commerce Commission, 600 Federal Building, 911 Walnut Street, Kansas City, Mo. 64106.

No. MC 48958 (Sub-No. 132TA), filed May 5, 1977. Applicant: ILLINOIS-CALIFORNIA EXPRESS, INC., 510 East 51st Avenue, P.O. Box 16404, Denver, Colo. 80216. Applicant's representative: Mr. Lee Lucero (same address as applicant). Authority sought to operate as a *common carrier,* by motor vehicle, over irregular routes, transporting: *Packaged meats and meat products,* in mechanically refrigerated equipment, from the plantsite and storage facilities of Land O' Frost, Inc., at Searcy, Ark., to Phoenix, Ariz., and points in California, for 180 days. Applicant has also filed an underlying ETA seeking up to 90 days of operating authority. Supporting shipper(s) : Land O' Frost, Inc., 16850 Chicago Avenue, Lansing, Ill. 60438. Send protests to: Roger L. Buchanan, District Supervisor, Interstate Commerce Commission, 721 19th Street, 492 U.S. Customs House, Denver, Colo. 80202.

No. MC 71642 (Sub-No. 25TA) (Correction), filed March 25, 1977, published in the FEDERAL REGISTER issue of April 13, 1977, republished as corrected this issue. Applicant: CONTRACTUAL CARRIERS, INC., Harmony Industrial Park, Allen Drive, Newark, Del. 19711. Applicant's representative: Samuel W. Earnshaw, 833 Washington Bldg., Washington, D.C. 20005. Authority sought to operate as a *contract carrier,* by motor vehicle, over irregular routes, transporting: *Chemically hardened fibre and insulating mate-*

*rials, articles, sheets, shapes and forms, including plastics and plastic articles, sheets, shapes, forms, rods, tubes, grinding, and pellets,* for the account of Delaware-Century Corporations, between Delaware City Commercial Zone, and Newark, Del., on the one hand, and, the commercial zones of Hialeah and Miami, Fla., and Mt. Vernon, N.Y., and Holtsville and Holbrook, Long Island, N.Y., and return from these points, under a continuing contract with Keysor Century Corp., for 180 days. Supporting shipper: Keysor Century Corp., P.O. Box 311, Delaware City, Del. 19706. Send protests to: Monica A. Blodgett, Transportation Assistant, Interstate Commerce Commission, 600 Arch Street, Rm. 3238, Philadelphia, Pa., 19106. The purpose of this republication is to indicate the location as to where protests are to be filed.

No. MC 73165 (Sub-No. 404TA), filed May 5, 1977. Applicant: EAGLE MOTOR LINES, INC., 830 North 33rd Street, P.O. Box 11086, Birmingham, Ala. 35202. Applicant's representative: William P. Parker (same address as applicant). Authority sought to operate as a *common carrier,* by motor vehicle, over irregular routes, transporting: *Roofing and roofing materials,* from Stephens and East Camden, Ark., to points in Alabama, Kentucky, Louisiana, Mississippi, Oklahoma, Tennessee, and Texas, for 180 days. Applicant has also filed an underlying ETA seeking up to 90 days of operating authority. Supporting shipper(s) : Elk Corporation, P.O. Box 37, Stephens, Ark. Send protests to Clifford W. White, District Supervisor, Bureau of Operations, Interstate Commerce Commission, Room 1616, 2121 Building, Birmingham, Ala. 35203.

No. MC 82063 (Sub-No. 79TA), filed May 6, 1977. Applicant: KLIPSCH HAULING CO., 10795 Watson Road, St. Louis, Mo. 63127. Applicant's representative: W. E. Klipsch (same address as applicant). Authority sought to operate as a *common carrier,* by motor vehicle, over irregular routes, transporting: *Liquid plastic resins,* in bulk, in tank vehicles, from Monticello, Ark., to Decatur, Ala., Jeffersonville, Ind., Louisville, Ky., New Orleans, La., and Houston, Tex., for 180 days. Applicant has also filed an underlying ETA seeking up to 90 days of operating authority. Supporting shipper: Empro Corporation, 5250 West 74th Street, Edina, Minn. 55435. Send protests to: District Supervisor J. P. Werthmann, Interstate Commerce Commission, Rm. 1465, 210 N. 12th Street, St. Louis, Mo. 63101.

No. MC 96938 (Sub-No. 6TA), filed May 10, 1977. Applicant: ARKANSAS TRANSIT HOMES, INC., 8400 Mabelvale Pike, Little Rock, Ark. 72209. Applicant's representative: Harold G. Hernly, Jr., 118 North St. Asaph Street, Alexandria, Va. 22314. Authority sought to operate as a *common carrier,* by motor vehicle, over irregular routes, transporting: *Trailers,* designed to be drawn by passenger automobiles (except recreational vehicles) ; and buildings, in sections, mounted on

wheeled undercarriages (except prefabricated buildings) in secondary movements, in truckaway service: (1) from points in Mississippi to points in Arkansas; (2) between points in Texas and Louisiana, on the one hand, and, on the other, points in Arkansas; and (3) from points in Arkansas to points in Oklahoma, for 180 days. Applicant has also filed an underlying ETA seeking up to 90 days of operating authority. Supporting shipper(s) : There are approximately ten (10) statements of support attached to the application which may be examined at the Interstate Commerce Commission in Washington, D.C., or copies thereof which may be examined at the field office named below. Send protests to: District Supervisor William H. Land, Jr., 3108 Federal Office Building, 700 West Capitol, Little Rock, Ark. 72201.

No. MC 105566 (Sub-No. 142TA), filed May 5, 1977. Applicant: SAM TANKSLEY TRUCKING, INC., P.O. Box 1120, Cape Girardeau, Mo. 63701. Applicant's representative: Thomas F. Kilroy, 6901 Old Keene Mill Road, Suite 406, Springfield, Va. 22150. Authority sought to operate as a *common carrier,* by motor vehicle, over irregular routes, transporting: *Drugs, medicines, and toilet preparations,* from Bristol, Tennessee to Elmhurst, Ill., Dallas, Tex., and Sacramento and San Francisco, Calif. Supporting shipper: Beecham Laboratories (Division of Beecham, Inc.), 501 5th Street, Bristol, Tenn. 37620. Send protests to: District Supervisor J. P. Werthamann, Interstate Commerce Commission, Bureau of Operations, Rm. 1465, 210 N. 12th Street, St. Louis, Mo. 62101.

No. MC 107295 (Sub-No. 850TA), filed May 6, 1977. Applicant: PRE-FAB TRANSIT CO., 100 South Main Street, Farmer City, Ill. 61842. Applicant's representative: Duane Zehr (same address as applicant). Authority sought to operate as a *common carrier,* by motor vehicle, over irregular routes, transporting: *Paper and paper products,* including *returned or refused shipments,* from International Falls, Minn. to points in Arkansas, Illinois, Indiana, Iowa, Kansas, Michigan, Minnesota, Missouri, Ohio, Pennsylvania, and Wisconsin, for 180 days. Supporting shipper: G. B. Bundy, Asst. General Manager, Transportation Services, Boise Cascade Corporation, P.O. Box 2885, Portland, Oreg. 97208. Send protests to: Harold C. Jolliff, District Supervisor, Interstate Commerce Commission, P.O. Box 2413, Springfield, Ill. 62705.

No. MC 111045 (Sub-No. 141TA), filed May 6, 1977. Applicant: REDWING CARRIERS, INC., P.O. Box 426, 7809 Palm River Road, Tampa, Fla. 33601. Applicant's representative: L. W. Fincher (same address as applicant). Authority sought to operate as a *common carrier,* by motor vehicle, over irregular routes, transporting: *Chemicals,* in bulk, from the plantsite and storage facilities of Alpine Laboratories, Inc., at or near Bay Minette, Ala.; to points in the United States, except Alaska and Hawaii, for 180

AR_0033328

days. Supporting shipper: Alpine Laboratories, Inc., P.O. Box 147, Bay Minette, Ala. 36507. Send protests to: Dona M. Jones, Transportation Assistant, Interstate Commerce Commission, Bureau of Operations, 8410 N.W. 53rd Terrace, Miami, Fla. 33166.

No. MC 111170 (Sub-No. 236TA), filed May 3, 1977. Applicant: WHEELING PIPE LINE, INC., P.O. Box 1718, 2811 N. West Ave., El Dorado, Ark. 71730. Applicant's representative: Tom E. Moore (same address as applicant). Authority sought to operate as a *common carrier*, by motor vehicle, over irregular routes, transporting: *Fuel oil*, Burner FS-2, from Conway, Ark., to Lone Star Ammunition Depot, Texarkana, Tex., for 180 days. Applicant has also filed an underlying ETA seeking up to 90 days of operating authority. Supporting shipper(s): Department of Defense, Office of the Judge Advocate General, Department of the Army, Washington, D.C. 20310. Send protests to: District Supervisor William H. Land, Jr., 3108 Federal Office Building, 700 West Capitol, Little Rock, Ark. 72201.

No. MC 111302 (Sub-No. 106TA), filed May 4, 1977. Applicant: HIGHWAY TRANSPORT, INC., P.O. Box 10470, Amherst Rd., Knoxville, Tenn. 37919. Applicant's representative: David A. Petersen (same address as applicant). Authority sought to operate as a *common carrier*, by motor vehicle, over irregular routes, transporting: *Liquid citric acid*, in bulk, in tank vehicles, from Elkhart, Ind. to New Johnsonville, Tenn., for 180 days. Applicant has also filed an underlying ETA seeking up to 90 days of operating authority. Supporting shipper(s): Miles Laboratories, Inc., 1127 Myrtle St., Elkhart, Ind. 46514. Send protests to: Joe J. Tate, District Supervisor, Bureau of Operations, Interstate Commerce Commission, Suite A-422, U.S. Court House, 801 Broadway, Nashville, Tenn. 37203.

No. MC 111397 (Sub-No. 123TA), filed May 6, 1977. Applicant: DAVIS TRANSPORT, INC., 1345 South 4th Street, Paducah, Ky. 42001. Applicant's representative: Mr. H. S. Melton, Jr., P.O. Box 1407, Paducah, Ky 42001. Authority sought to operate as a *common carrier*, by motor vehicle, over irregular routes, transporting: *Uranium hexafluoride* in steel cylinders from port of entry on the United States-Canada Boundary Line at Port Huron, Mich., to Energy Research and Development Agency Plant sites, at or near Sargents, Ohio, at Oak Ridge, Tenn., and at points in McCracken County, Ky. for 180 days. Applicant has also filed an underlying ETA seeking up to 90 days of operating authority. Supporting shipper: Eldorado Nuclear Limited, Port Hope, Ontario, Canada. Send protests to: Mr. Floyd A. Johnson, District Supervisor, Interstate Commerce Commission, 100 North Main Street, 100 North Main Building, Suite 2006, Memphis, Tenn. 38103.

No. MC 112520 (Sub-No. 339TA), filed May 6, 1977. Applicant: MCKENZIE TANK LINES, INC., P.O. Box 1200, 122 Appleyard Drive, Tallahassee, Fla. 32302.

Applicant's representative: Sol H. Proctor, 1101 Blackstone Building, Jacksonville, Fla. 32202. Authority sought to operate as a *common carrier*, by motor vehicle, over irregular routes, transporting: *Processed clay catalyst*, in bulk, in tank vehicles, from Attapulgus, Ga., to Cyril, Okla., for 180 days. Applicant has also filed an underlying ETA seeking up to 90 days of operating authority. Supporting shipper: Englehard Minerals & Chemicals, Menlo Park, Edison, N.J. 08817. Send protests to: Dist. Supv. G. H. Fauss, Jr., Bureau of Operations, Interstate Commerce Commission, Box 35008, 400 West Bay Street, Jacksonville, Fla. 32202.

No. MC 114457 (Sub-No. 305TA), filed May 11, 1977. Applicant: DART TRANSIT COMPANY, 2102 University Avenue, St. Paul, Minn. 55114. Applicant's representative: James H. Wills (same address as applicant). Authority sought to operate as a *common carrier*, by motor vehicle, over irregular routes, transporting: *Composite containers*, from Ponca City, Okla., to St. Paul, Minn., for 180 days. Applicant has also filed an underlying ETA seeking up to 90 days of operating authority. Supporting shipper(s): Metalcote Grease & Oil Co., P.O. Box 16435, St. Paul, Minn. 55116. Send protests to: Mrs. Marion L. Cheney, Transportation Assistant, Interstate Commerce Commission, Bureau of Operations, 414 Federal Building & U.S. Court House, 110 S. 4th St., Minneapolis, Minn. 55401.

No. MC 114457 (Sub-No. 307TA), filed May 12, 1977. Applicant: DART TRANSIT COMPANY, 2102 University Avenue, St. Paul, Minn. 55114. Applicant's representative: James H. Wills (same address as applicant). Authority sought to operate as a *common carrier*, by motor vehicle, over irregular routes, transporting: *Paper and paper products*, from International Falls, Minn., to points in Arkansas, Illinois, Indiana, Iowa, Kansas, Michigan., Missouri, Nebraska, North Dakota, Ohio, Pennsylvania, South Dakota and Wisconsin, for 180 days. Supporting shipper(s): Boise Cascade Corporation, P.O. Box 2885, Portland, Oreg. 97208. Send protests to: Mrs. Marion L. Cheney, Transportation Assistant, Interstate Commerce Commission, Bureau of Operations, 414 Federal Building and U.S. Court House, 110 S. 4th St., Minneapolis, Minn. 55401.

No. MC 116280 (Sub-No. 17TA), filed May 9, 1977. Applicant: W. C. Mc QUAIDE, INC., 153 Macridge Avenue, Johnstown, Pa. 15904. Applicant's representative: Robert E. McFarland, 999 West Big Beaver Road, Suite 1002, Troy, Mich. 48084. Authority sought to operate as a *common carrier*, by motor vehicle, over irregular routes, transporting: *General commodities* limited to individual articles, not exceeding 100 pounds in weight from one consignor to one consignee in a single day, on bills of lading of surface, interstate freight forwarders, between points in Pennsylvania; Jefferson, Ashtabula, Trumbull, Mahoning, and Cuyahoga Counties, Ohio; Chautau-

qua, Chemung, Broome, and Orange Counties, New York; Warren, Mercer, and Camden Counties, New Jersey; New Castle County, Delaware; Baltimore and Washington Counties, Maryland; and Hancock, Brooke, Ohio and Monongalia Counties, W. Va., for 180 days. Applicant has also filed an underlying ETA seeking up to 90 days of operating authority. Supporting shipper(s): American Delivery Systems, Inc., 300 East Seven Mile Road, Detroit, Mich. 48203. Send protests to: Richard C. Gobbell, District Supervisor, Interstate Commerce Commission, 2111 Federal Building, 1000 Liberty Ave., Pittsburgh, Pa. 15222.

No. MC 116459 (Sub-No. 63TA), filed May 6, 1977. Applicant: RUSS TRANSPORT, INC., P.O. Box 4022, Pineville Rd., Route 5, Chattanooga, Tenn. 37405. Applicant's representative: Charles T. Williams (same address as applicant). Authority sought to operate as a *common carrier*, by motor vehicle, over irregular routes, transporting: *Fertilizer and fertilizer material* from Tyner, Tenn., to points in Alabama, Georgia, and Kentucky, for 180 days. Applicant has also filed an underlying ETA seeking up to 90 days of operating authority. Supporting shipper: CF Industries, Inc., Salem Lake Drive, Long Grove, Ill. 60047. Send protests to: Joe J. Tate, District Supervisor, Bureau of Operations, Interstate Commerce Commission, Suite A-422, U.S. Court House, Nashville, Tenn. 37219.

No. MC 118142 (Sub-No. 145TA), filed May 3, 1977. Applicant: M. BRUENGER & CO., INC., 6250 North Broadway, Wichita, Kans. 67219. Applicant's representative: Lester C. Arvin, 814 Century Plaza Building, Wichita, Kans. 67202. Authority sought to operate as a *common carrier*, by motor vehicle, over irregular routes, transporting: *Bananas*, (having prior movement by water), from Norfolk, Va., to the states of Ohio, Indiana, Illinois, Missouri, Kansas, Colorado, Oklahoma, Arkansas, Tennessee, Nebraska, Iowa, Michigan and Wisconsin, for 180 days. Supporting shipper(s): Dominion Import Co., Inc., 700 Boundary Avenue, Chesapeake, Va. 23324. Send protests to: M. E. Taylor, District Supervisor, Interstate Commerce Commission, 101 Litwin Building, 110 North Market, Wichita, Kans. 67202.

No. MC 118142 (Sub-No. 148TA), filed May 6, 1977. Applicant: M. BRUENGER & CO., INC., 6250 North Broadway, Wichita, Kans. 67219. Applicant's representative: Lester C. Arvin, 814 Century Plaza Building, Wichita, Kans. 67202. Authority sought to operate as a *common carrier*, by motor vehicle, over irregular routes, transporting: *Frozen and dry processed potatoes*, from the facilities of American Potatoe Co., at or near Plover, Wis., to points and places in Alabama, Arkansas, Florida, Georgia, Louisiana, Mississippi, Tennessee and Texas, for 180 days. Supporting shipper(s): American Potatoe Company, 4600 Bank of America Center, San Francisco, Calif. 94104. Send protests to: M. E. Taylor, District Supervisor, Interstate Commerce Commission, 101 Litwin

AR_0033329

Building, 110 North Market, Wichita, Kans. 67202.

No. MC 118989 (Sub-No. 158TA), filed May 11, 1977. Applicant: CONTAINER TRANSIT, INC., 5223 South Ninth St., Milwaukee, Wis. 53221. Applicant's representative: Rolland K. Draves (same address as applicant). Authority sought to operate as a *common carrier*, by motor vehicle, over irregular routes, transporting: *Empty aluminum containers*, from Milwaukee, Wis., to Perry, Ga., for 180 days. Applicant has also filed an underlying ETA seeking up to 90 days of operating authority. Supporting shipper(s): Continental Can Company, 10050 Regency Circle, Omaha, Nebr. 68114 (Richard S. Skalla). Send protests to: Gail Daugherty, Transportation Assistant, Interstate Commerce Commission, Bureau of Operations, U.S. Federal Building and Courthouse, 517 East Wisconsin Avenue, Room 619, Milwaukee, Wis. 53202.

No. MC 119726 (Sub-No. 59TA), filed May 3, 1977. Applicant: N.A.B. TRUCK-ING CO., INC., 1644 W. Edgewood Avenue, Indianapolis, Ind. 46217. Applicant's representative: James L. Beattey, Suite 1000, 130 E. Washington St., Indianapolis, Ind. 46204. Authority sought to operate as a *common carrier*, by motor vehicle, over irregular routes, transporting: *Glass containers and closures therefore*, from the plantsite of Midland Glass Company located at or near Warner Robins, Ga., to Williamsburg, Va., for 180 days. Applicant has also filed an underlying ETA seeking up to 90 days of operating authority. Supporting shipper(s): Midland Glass Co., Inc., P.O. Box 557, Cliffwood, N.J. Send protests to: William S. Ennis, District Supervisor, Interstate Commerce Commission, Federal Bldg. and U.S. Courthouse, 46 East Ohio Street, Room 429, Indianapolis, Ind. 46204.

No. MC 119908 (Sub-No. 41TA) filed May 2, 1977. Applicant: WESTERN LINES, INC., P.O. Box 1145, 3523 N. McCarty, Houston, Texas 77029. Applicant's representative: Austin L. Hatchell, 1102 Perry Brooks Bldg., Austin, Tex. 78702. Authority sought to operate as a *common carrier*, by motor vehicle, over irregular routes, Lumber from Dudley and Blackshear, Ga., to points in Arkansas, for 180 days. Applicant has also filed an underlying ETA seeking up to 90 days of operating authority. Supporting shipper: Gilman Paper Company, P.O. Box 520, St. Marys, Ga. 31558. Send protests to: District Supervisor John Mensing, Interstate Commerce Commission, 515 Rusk, 8610 Federal Bldg., Houston, Tex. 77002.

No. MC 124407 (Sub-No. 370TA), filed May 4, 1977. Applicant: SAWYER TRANSPORT, INC., South Haven Square, U.S. Highway 6, Valparaiso, Ind. 46383. Applicant's representative: H. E. Miller, Jr. (same address as applicant). Authority sought to operate as a *common carrier*, by motor vehicle, over irregular routes, transporting: *Roofing materials*, from the facilities of Fry Di-

vision of Owens Corning Fiberglass located at or near North Kansas City, Mo., to points in the states of Minnesota, North Dakota, and South Dakota, for 180 days. Applicant has also filed an underlying ETA seeking up to 90 days of operating authority. Supporting shipper(s): Fry Division of Owens Corning Fiberglass, 5818 Archer Road, Summit (Argo P.O.), Ill. 60501. Send protests to: J. H. Gray, District Supervisor, Bureau of Operations, Interstate Commerce Commission, 343 West Wayne Street, Suite 113, Fort Wayne, Ind. 46802.

No. MC 124947 (Sub-No. 58TA), filed May 6, 1977. Applicant: MACHINERY TRANSPORTS, INC., 608 Cass St., Box 2338, East Peoria, Ill. 61611. Applicant's representative: T. M. Brown, 223 Cuidad Bldg., Oklahoma City, Okla. 73112. Authority sought to operate as a *common carrier*, by motor vehicle, over irregular routes, transporting: *Lumber, lumber products, forest products and wood products*, from Idaho, Montana, Oregon and Washington to points in Texas, Oklahoma, Iowa, Missouri, Wisconsin, Illinois, Michigan, Indiana, Ohio, Minnesota, and Omaha, Nebr. Restricted to the transportation of traffic for the account of the Wickes Corporation and its wholly owned subsidiaries, for 180 days. Applicant has also filed an underlying ETA seeking up to 90 days of operating authority. Supporting shipper(s): The Wickes Corporation, 515 N. Washington Ave., Saginaw, Mich. 48607. Send protests to: District Supervisor Joe Green, Rm. 240, Old Post Office Bldg., 215 Northwest Third St., Oklahoma City, Okla. 73102.

No. MC 125023 (Sub-No. 45TA), filed May 11, 1977. Applicant: SIGMA-4 EX-PRESS, INC., 3825 Beech Avenue, P.O. Box 9117, Erie, Pa. 16504. Applicant's representative: Richard G. McCurdy (same address as applicant). Authority sought to operate as a *common carrier*, by motor vehicle, over irregular routes, transporting: *Malt beverages*, in containers, from facilities of Pabst Brewing Company, Houston County, Ga., to points in Pa., for 180 days. Applicant has also filed an underlying ETA seeking up to 90 days of operating authority. Supporting shipper(s): There are approximately five (5) statements of support attached to the application which may be examined at the Interstate Commerce Commission in Washington, D.C., or copies thereof which may be examined at the field office named below. Send protests to: John J. England, District Supervisor, Interstate Commerce Commission, 2111 Federal Bldg., 1000 Liberty Ave., Pittsburgh, Pa. 15222.

No. MC 129994 (Sub-No. 22TA), filed May 5, 1977. Applicant: RAY BETHERS TRUCKING, INC., a Utah corporation, 176 West Central Avenue, Murray, Utah 84107. Applicant's representative: Lon Rodney Kump, 333 East Fourth South, Salt Lake City, Utah 84111. Authority sought to operate as a *common carrier*, by motor vehicle, over irregular routes, transporting: *Brick*, (1) from points in

Utah, Arizona, and Nevada to California, and (2) from Nevada and Utah to Arizona, for 180 days. Supporting shipper: R. & D. Enterproses. 1855 South Beverly, Casper, Wyo. 82601 (Daniel E. Indgjer, Partner). Send protests to: District Supervisor Lyle D. Hiefer, Interstate Commerce Commission, Bureau of Operations, 5301 Federal Building, 125 South State Street, Salt Lake City, Utah 84138.

No. MC 135452 (Sub-No. 3TA), filed May 11, 1977. Applicant: JOHN R. SHEARON & FRED D. SHEARON, individuals, doing business as SHEARON TRUCKING, P.O. Box 387, Ashland City, Tenn. 37015. Applicant's representative: Roland M. Lowell, 618 United American Bank Building, Nashville, Tenn. 37219. Authority sought to operate as a *contract carrier*, by motor vehicle, over-irregular routes, transporting: *Water heaters*, from Ashland City, Tenn., to Alabama, Arizona, Florida, Georgia, Illinois, Indiana, Louisiana, Maryland, Minnesota, Missouri, Oklahoma, Ohio, Pennsylvania, Texas and West Virginia, under a continuing contract, or contracts, with State Industries, Inc., for 180 days. Applicant has also filed an underlying ETA seeking up to 90 days of operating authority. Supporting shipper(s): State Industries, Inc., Ashland City, Tenn. 37015. Send protests to: Joe J. Tate, District Supervisor, Bureau of Operations, Interstate Commerce Commission, Suite A-422, U.S. Court House, 801 Broadway, Nashville, Tenn. 37219.

No. MC 135684 (Sub-No. 38TA), filed May 4, 1977. Applicant: BASS TRANS-PORTATION CO., INC., P.O. Box 391, Old Croton Rd., Flemington, N.J. 08822. Applicant's representative: Ronald L. Knorowski (same address as applicant). Authority sought to operate as a *common carrier*, by motor vehicle, over irregular routes, transporting: *Plastic products*, from Bohemia, Long Island, N.Y., to Minneapolis, Minn., for 180 days. Applicant has also filed an underlying ETA seeking up to 90 days of operating authority. Supporting shipper(s): Tenneco Chemicals, Inc. West 100 Century Road, Paramus, N.J. 07652. Send protests to: Dieter H. Harper, District Supervisor, Interstate Commerce Commission, 428 East State Street, Room 204, Trenton, N.J. 08608.

No. MC 138777 (Sub-No. 1TA), filed May 12, 1977. Applicant: FETZ INCOR-PORATED, 2784 Woodwin Rd., Doraville, Ga. 30340. Applicant's representative: Guy H. Postell, Suite 713, 3384 Peachtree Road, N.E., Atlanta, Ga. 30326. Authority sought to operate as a *common carrier*, by motor vehicle, over irregular routes, transporting: *Naphtha*, in bulk, in tank vehicles, from the facilities of Young Refining Company at Douglasville, Ga., to Oxford, Ala., for 180 days. Applicant has also filed an underlying ETA seeking up to 90 days of operating authority. Supporting shipper(s): Young Refining Corporation, P.O. Box 775, Douglasville, Ga. 30134. Send protests to: Sara K. Davis, Trans-

AR_0033330

portation Assistant, Bureau of Operations, Interstate Commerce Commission, 1252 W. Peachtreet St., NW., Rm. 546, Atlanta, Ga. 30309.

No. MC 139254 (Sub-No. 10TA), filed May 5, 1977. Applicant: BROOKS TRANSPORTATION, INC., 30650 Carter Road, Solon, Ohio 44139. Applicant's representative: Henry U. Snavely, 419 Pine Street, Vienna, Va. 22180. Authority sought to operate as a *contract carrier*, by motor vehicle, over irregular routes, transporting: *Paper and paper products* (except commodities in bulk), from the facilities of Champion International Corporation at Asheville, Canton, Fletcher and Waynesville, N.C., to points in New York, New Jersey and Pennsylvania, for 180 days. Supporting shipper(s): Champion International Corporation, Knightsbridge Drive, Hamilton, Ohio 45020. Send Protests to: James Johnson, District Supervisor, Interstate Commerce Commission, Bureau of Operations, 731 Federal Office Bldg., 1240 East Ninth Street, Cleveland, Ohio. 44199.

No. MC 141546 (Sub-No. 17TA), filed May 10, 1977. Applicant: BULK TRANSPORT SERVICE, INC., 1 Dundee Park, Andover, Mass. 01810. Applicant's representative: Kenneth B. Williams, 84 State St., Boston, Mass. 02109. Authority sought to operate as a *common carrier*, by motor vehicle, over irregular routes, transporting: *Cement* in bulk, in tank trucks, from Hudson and Greenport, in Columbia County, N.Y., to points in Massachusetts, New Hampshire, Vermont, Rhode Island, Connecticut, New Jersey, and Pennsylvania, for 180 days. Supporting shipper(s): Independent Cement Corporation, 65 William St., Wellesley Office Park, Wellesley, Mass. 02181. Send protests to: Max Gorenstein, District Supervisor, Bureau of Operations, Interstate Commerce Commission, 150 Causeway St., Boston, Mass. 02114.

No. MC 141804 (Sub-No. 55TA), filed May 9, 1977. Applicant: WESTERN EXPRESS, Division of Interstate Rental, Inc., P.O. Box 422, Goodlettsville, Tenn. 37072. Applicant's representative: Frederick J. Coffman, P.O. Box 81849, Lincoln, Nebr. 68501. Authority sought to operate as a *common carrier*, by motor vehicle, over irregular routes, transporting: *Hair and skin products, toilet preparations, and equipment, materials, and supplies* used in the production and distribution thereof (except commodities in bulk) between points in Ventura, Los Angeles, Orange, San Bernardino, and Riverside Counties, Calif., on the one hand and, on the other, West Memphis, Ark., for 180 days. Supporting shipper(s): Redken Laboratories, Inc., 14721 Califa Street, Van Nuys, Calif. 91411. Send protests to: Joe J. Tate, District Supervisor, Bureau of Operations, Interstate Commerce Commission, Suite A-422, U.S. Court House, 801 Broadway, Nashville, Tenn. 37203.

No. MC 141804 (Sub-No. 56TA), filed May 9, 1977. Applicant: WESTERN

EXPRESS, Division of Interstate Rental, Inc., P.O. Box 422, Goodlettsville, Tenn. 37072. Applicant's representative: Frederick J. Coffman, P.O. Box 81849, Lincoln, Nebr. 68501. Authority sought to operate as a *common carrier*, by motor vehicle, over irregular routes, transporting: *Hair and skin products, toilet preparations, and equipment, materials, and supplies* used in the production and distribution thereof, (except commmodities in bulk), between points in Ventura, Los Angeles, Orange, San Bernardino, and Riverside Counties, Calif., on the one hand, and, on the other, points in Minnesota, Iowa, Wisconsin, Kansas, Missouri, Nebraska, North Dakota, South Dakota, and Kentucky, for 180 days. Supporting shipper(s): Redken Laboratories, Inc., 14721 Califa Street, Van Nuys, Calif. 91411. Send protests to: Joe J. Tate, District Supervisor, Bureau of Operations, Interstate Commerce Commission, Suite A-422, U.S. Court House, 801 Broadway, Nashville, Tenn. 37203.

No. MC 141804 (Sub-No. 58TA), filed May 11, 1977. Applicant: WESTERN EXPRESS, division of Interstate Rental, Inc., P.O. Box 422, 847 Springfield Highway, Goodlettsville, Tenn. 37072. Applicant's representative: Frederick J. Coffman, P.O. Box 81849, Lincoln, Nebr. 68501. Authority sought to operate as a *common carrier*, by motor vehicle, over irregular routes, transporting: *Alcoholic beverages* (except commodities in bulk), from Frankfort, Louisville, Owensboro, and Lawrenceburg, Ky.; Cincinnati, Ohio; Lynchburg, Tenn.; Detroit and Allen Park, Mich.; Lawrenceburg, Ind.; St. Louis, Mo.; Dundalk and Relay, Md.; Linfield and Philadelphia, Pa.; Hammondsport, N.Y.; Edison and Lawrenceville, N.J.; Plainfield and Chicago, Ill., to points in California, Arizona, and Nevada, for 180 days. Supporting shipper(s): There are approximately seven (7) statements of support attached to the application which may be examined at the Interstate Commerce Commission in Washington, D.C., or copies thereof which may be examined at the field office named below. Send protests to: District Supervisor Joe J. Tate, Bureau of Operations, Interstate Commerce Commission, Suite A-422, U.S. Court House, 801 Broadway, Nashville, Tenn. 37203.

No. MC 142177 (Sub-No. 2TA), filed April 26, 1977. Applicant: B.W.C.S., INC., 14 Park Avenue, Salem, N.H. 03079. Applicant's representative: Frank J. Weiner, 15 Court Square, Boston, Mass. 02108. Authority sought to operate as a *common carrier*, by motor vehicle, over irregular routes, transporting: *Non-negotiable checks, drafts, deposit slips, and documents*, from Amherst, N.H., to Brookline and Boston, Mass., and *data processing papers, cancelled checks, and audit and accounting media*, from Brookline and Boston, Mass., to Amherst, N.H., restricted against the transportation of any package or article weighing more than 70 pounds or ex-

ceeding 108 inches in length and girth combined and each package or article shall be considered as a separate and distinct shipment, and restricted against transportation of packages or articles weighing in the aggregate more than 150 pounds from one consignor at one location to one consignee at one location on any one day, for 180 days. Supporting shipper: Glenn W. Vorce, Vice President and Treasurer, Amherst Bank & Trust Company, Junction 101A and 122, Amherst, N.H. 03031. Send Protests to: District Supervisor Ross J. Seymour, Bureau of Operations, Interstate Commerce Commission, 415 Federal Building, 55 Pleasant Street, Concord, N.H. 03301.

No. MC 142353 (Sub-No. 2TA), filed May 11, 1977. Applicant: ADAMS SAND CO., INC., Highway 90, General Delivery, Mossy Head, Fla. 32434. Applicant's representative: Edward L. Adams (same address as applicant). Authority sought to operate as a *common carrier*, by motor vehicle, over irregular routes, transporting: *Fertilizer and fertilizer materials*, in bulk, in side-dump trailers. From Cottondale and Pace, Fla., to points in Alabama and Georgia on and south of U.S. Highway 80 and west of Interstate 75, for 180 days. Applicant has also filed an underlying ETA seeking up to 90 days of operating authority. Supporting shipper(s): Kerr-McGee Chemical Corp., Kerr-McGee Center, Oklahoma City, Okla. 73125. Send protests to: District Supervisor G. H. Fauss, Jr., Bureau of Operations, Interstate Commerce Commission, Box 35008, 400 West Bay Street, Jacksonville, Fla. 32202.

No. MC 142550 (Sub 1TA), filed April 11, 1977. Applicant: BERT E. JESSUP TRANSPORTATION, INC., 3387 Wrightwood Drive, Studio City, Calif. 91604. Applicant's representative: Bert E. Jessup (same address as applicant). Authority sought to operate as a *contract carrier*, by motor vehicle, over irregular routes, transporting: *Ice Cream*, from Seattle, Wash., to Los Angeles, Calif., under a continuing contract or contracts with Adohr Farms, for 180 days. Supporting shipper: Adohr Farms 4002 W. Westminister Avenue, Santa Ana, Calif. Send protests to: Irene Carolos, Interstate Commerce Commission, Room 1321, Federal Building, 300 North Los Angeles Street, Los Angeles, Calif. 90012.

No. MC 142941 (Sub-No. 4TA), filed May 13, 1977. Applicant: SCARBOROUGH TRUCK LINES, 1313 N. 25th Avenue, Phoenix, Ariz. 85009. Applicant's representative: Lewis P. Ames, 10th Floor, 111 West Monroe, Phoenix, Ariz. 85003. Authority sought to operate as a *common carrier*, by motor vehicle, over irregular routes, transporting: *Foodstuffs, prepared and frozen*, NOI, from the plant site and storage facilities of Kitchens of Sara Lee, located at or near Deerfield, Ill., and New Hampton, Iowa, to points in Arizona, California, New Mexico, and Nevada, for 180 days. Applicant has also filed an underlying ETA

AR_0033331

seeking up to 90 days of operating authority. Supporting shipper(s) : Kitchens of Sara Lee, 500 Waukeegan Road, Deerfield, Ill. 60015. Send protests to: Andrew V. Baylor, District Supervisor, Interstate Commerce Commission, Room 3427, Federal Bldg., 230 N. First Avenue, Phoenix, Ariz. 85025.

No. MC 143155TA, filed April 13, 1977. Applicant: RICHARD'S HAULING, 508 Clinton Avenue, Wyckoff, N.J. 07481. Applicant's representative: Mr. Ralph August, 222 Greenridge Road, Franklin Lakes, N.J. 07417. Authority sought to operate as a *contract carrier*, by motor vehicle, over irregular routes, transporting: *Cut and uncut rolls and cartons of fabrics*, between Fairview, N.J., and Lawrenceville, Ga., under a continuing contract with August Fabrics, Inc., for 180 days. Supporting shipper: August Fabrics, Inc., 37 Industrial Avenue, Fairview, N.J. 07022. Send protests to: District Supervisor, Joel Morrows, Interstate Commerce Commission, 9 Clinton Street, Newark, N.J. 07102.

No. MC 143179TA, filed April 19, 1977. Applicant: CNM CONTRACT CARRIERS, INC., P.O. Box 1017, Omaha, Nebr. 68101. Applicant's representative: Marshall D. Becker, Suite 530, Univac Building, 7100 West Center Road, Omaha, Nebr. 68106. Authority sought to operate as a *contract carrier*, by motor vehicle, over irregular routes, transporting: *Polyurethane foam*, (1) from Middleton, Wis., to points in Iowa (except Council Bluffs), Illinois, Minnesota, Michigan, Missouri, and Indiana; and (2) between Council Bluffs, Iowa, and Middleton, Wis., under a continuing contract, or contracts, with Future Foam, Inc., for 180 days. Supporting shipper(s) : Foster L. Kent, Administration Manager/Sales and Marketing, Future Foam, Inc., 400 North 10th Street, Council Bluffs, Iowa 51501. Send protests to: Carrol Russell, District Supervisor, Interstate Commerce Commission, Suite 620, 110 North 14th Street, Omaha, Nebr. 68102.

No. MC 143180TA, filed April 20, 1977. Applicant: B & F DISTRIBUTING CO., 325 N. Lee Avenue, Idaho Falls, Idaho 83401. Applicant's representative: William D. Faler, P.O. Box 129, Idaho Falls, Idaho 83401. Authority sought to operate as a *contract carrier*, by motor vehicle, over irregular routes, transporting: *Beer and wine*, from Los Angeles, Fairfield, Oakland, Santa Rosa, Napa, Modesto, San Jose, all in California, to Pocatello, Soda Springs, Idaho Falls, and Salmon, all in Idaho, under a continuing contract or contracts with K & S Distributors, for 180 days. Supporting shipper(s) : K & S Distributors, P.O. Box 852, Salmon, Idaho 83467. Send protests to: Barney L. Hardin, District Supervisor, Interstate Commerce Commission, 550 W. Fort St., Box 07, Boise, Idaho 83724.

No. MC 143203TA, filed April 27, 1977. Applicant: UNITED TRUCKING CO., P.O. Box 1158, Miles City, Mont. 59301. Applicant's representative, Joe Gerbase, 100 Transwestern Building, 404 North 31st St., Billings, Mont. 59101. Authority sought to operate as a *contract carrier*, by motor vehicle, over irregular routes, transporting: *Beer and malt beverages and empty containers*, between Olympia, Wash., on the one hand, and, on the other, Miles City, Mont., under a continuing contract or contracts with Olympia Brewing Company, for 180 days. Applicant has also filed an underlying ETA seeking up to 90 days of operating authority. Supporting shipper(s) : R. H. Rutledge, Traffic Manager, Olympia Brewing Company, P.O. Box 947, Olympia, Wash. 98501. Send protests to: District Supervisor Paul J. Labana, Interstate Commerce Commission, 2602 First Avenue North, Billings, Mont. 59101.

No. MC 143210 (Sub-No. 1TA), filed May 12, 1977. Applicant: W. C. HALL, P.O. Box 102, Callao, Va. 22435. Applicant's representative: Calvin F. Major, 200 Grace Street, Richmond, Va. 23220. Authority sought to operate as a *common carrier*, by motor vehicle, over irregular routes, transporting: *Agricultural limestone*, in bulk, from Texas, Md., to Heathsville and Village, Va., for 180 days. Applicant has also filed an underlying ETA seeking up to 90 days of operating authority. Supporting shipper(s) : Alliance Fertilizer Corp., P.O. Box 56, Heathsville, Va. 22473; Village Seed Service, Village, Va. Send protests to: District Supervisor Paul Collins, Interstate Commerce Commission, Room 10–502, Federal Building, 400 North Eighth Street, Richmond, Va. 23240.

No. MC 143230 (Sub-No. 1TA), filed May 5, 1977. Applicant: LUCK TRUCKING, INC., R.R. 1, Box 190, Wolcott, Ind. 47995. Applicant's representative: Walter F. Jones, Jr., 601 Chamber of Commerce Building, Indianapolis, Ind. 46204. Authority sought to operate as a *common carrier*, by motor vehicle, over irregular routes, transporting: (1) *Anhydrous ammonia*, from Huntington, Ind., to Ohio and Michigan; (2) *Liquid fertilizer*, from Yoder, Ind., to Ohio and Michigan; and from Kentland, Indiana, to Illinois for 180 days. Applicant has also filed an underlying ETA seeking up to 90 days of operating authority. Supporting shipper: Amoco Oil Company, 200 East Randolph Drive, Chicago, Ill. 60601. Send protests to: J. H. Gray, District Supervisor, Bureau of Operations, Interstate Commerce Commission, 343 West Wayne Street, Suite 113, Fort Wayne, Ind. 46802.

### PASSENGER APPLICATIONS

No. MC 1515 (Sub-No. 227TA), filed May 13, 1977. Applicant: GREYHOUND LINES, INC., Greyhound Tower, Suite 1602, Phoenix, Ariz. 85077. Applicant's representative: W. L. McCracken (same address as applicant). Authority sought to operate as a *common carrier*, by motor vehicle, over regular routes, transporting: *Passengers and their baggage, express, and newspapers* in regular route service and *passengers and their baggage in charter service*. Operate from, to, or between: (A) Regular route: *Passengers and their baggage and express and*

*newspapers* in the same vehicle with passengers, between Chico, Calif., and the junction of California Highway 191 and California Highway 70, serving all intermediate points; from Chicago over Skyway Road to Paradise, thence over California Highway 191 to junction California Highway 70 and return over the same route; (B) Irregular route: *Passengers and their baggage*, in one-way and round-trip charter operations: from points in Butte County, Calif., to all points in the United States (including Alaska but excluding Hawaii). Applicant seeks the requested authority to establish direct service to the City of Paradise, Calif. Passengers and bus express shippers from this community must now travel by other means approximately 20 miles to avail themselves of existing Greyhound service, for 180 days. Applicant has also filed an underlying ETA seeking up to 90 days of operating authority. Supporting shipper(s) : Passenger Public. Send protests to: Andrew V. Baylor, District Supervisor, Interstate Commerce Commission, Room 3427, Federal Bldg., 230 N. First Avenue, Phoenix, Ariz. 85025.

No. MC 143162 (Sub-No. 1TA), filed April 28, 1977. Applicant: KLATT TRAVEL, INC., 651 Main Avenue, P.O. Box 1161, Durango, Colo. 81301. Applicant's representative: William F. Schenkein, Suite 1600, 718 Seventeenth Street, Denver, Colo. 80202. Authority sought to operate as a *common carrier*, by motor vehicle, over regular routes, transporting: *Passengers and their baggage*, originating on or destined to Frontier Airlines flights, and to be transported in vehicles limited in capacity to no more than 12 passengers and baggage; between Durango, Colo., and Farmington, New Mexico Airport over U.S. Highway 550, for 180 days. Applicant has also filed an underlying ETA seeking up to 90 days of operating authority. Supporting shipper(s) : Frontier Airlines, 8250 Smith Road, Denver, Colo. 80207; Durango Chamber of Commerce, 2301 North Main, P.O. Box 1311, Durango, Colo. 81301. Send protests to: Herbert C. Ruoff, District Supervisor, Interstate Commerce Commission, 492 U.S. Customs House, 721 19th Street, Denver, Colo. 80202.

By the Commission.

ROBERT L. OSWALD,
*Secretary.*

[FR Doc.77–14934 Filed 5–24–77;8:45 am]

[Notice No. AB 142]

### NEW ORLEANS & LOWER COAST RAILROAD CO.

**Abandonment of Line of Railroad Known as "South End" Between Port Sulphur and Empire in Plaquemine Parish, Louisiana**

MAY 17, 1977.

The Interstate Commerce Commission hereby gives notice that: 1. The Commission's Section of Energy and Environment has prepared an environmental

AR_0033332

threshold assessment survey in the above-entitled proceeding in which it was concluded that the proceeding does not constitute a major Federal action significantly affecting the quality of the human environment within the meaning of the National Environmental Policy Act of 1969 (NEPA), 42 U.S.C. §§ 4321, et seq. 2. A notice setting forth this conclusion was served April 20, 1977, and no substantive comments in opposition, of an environmental nature, have been received by the Commission in response to said notice. 3. This proceeding is now ready for further disposition within the Office of Hearings or the Office of Proceedings as appropriate.

ROBERT L. OSWALD,
*Secretary.*

[FR Doc.77–14932 Filed 5–24–77;8:45 am]

---

[Amdt. No. 2 to I.C.C. Order No. 26 Under Service Order No. 1252]

**Rerouting of Traffic**

## GREEN MOUNTAIN RAILROAD CORP.

Upon further consideration of I.C.C. Order No. 26, (Green Mountain Railroad Corporation) and good cause appearing therefor:

*It is ordered,* That:

I.C.C. Order No. 26 be, and it is hereby, amended by substituting the following paragraph (g) for paragraph (g) thereof:

(g) *Expiration date.* This order shall expire at 11:59 p.m., July 15, 1977, unless otherwise modified, changed or suspended.

*It is further ordered,* That this amendment shall become effective at 11:59 p.m., May 15, 1977, and that this order shall be served upon the Association of American Railroads, Car Service Division, as agent of all railroads subscribing to the car service and car hire agreement under the terms of that agreement, and upon the American Short Line Railroad Association; and that it be filed with the Director, Office of the Federal Register.

Issued at Washington, D.C., May 13, 1977.

INTERSTATE COMMERCE
COMMISSION,
JOEL E. BURNS,
*Agent.*

[FR Doc.77–14935 Filed 5–24–77;8:45 am]

AR_0033333

# sunshine act meetings

This section of the FEDERAL REGISTER contains notices of meetings published under the "Government in the Sunshine Act" (Pub. L. 94-409, 5 U.S.C. 552b(e)(3).

## CONTENTS

|  | Item |
|---|---|
| Federal Communications Commission | 1, 2, 3 |
| Federal Trade Commission | 4 |
| National Mediation Board | 5 |

---

**1**

**AGENCY HOLDING THE MEETING:** Federal Communications Commission.

**TIME AND DATE:** 9:30 a.m., Thursday, May 26, 1977.

**PLACE:** Room 856, 1919 M Street NW., Washington, D.C.

**STATUS:** Open Commission Meeting.

**MATTERS TO BE CONSIDERED:**

*Agenda, Item No., and Subject*

General—1—Amendment of Part 91 of the Commission's Rules to require type acceptance for transmitters used at radiolocation stations (Docket No. 20547).

General—2—Photographs on Radio Operator Certificates.

Safety and Special Radio Services—1—Application of Western Information Network Association (WIN) for Review of Bureau action denying WIN's petition for waiver of Section 1.932 of the Rules and reinstatement of its lapsed authorizations for private microwave facilities to operate a closed circuit educational television system in the 6575–6875 and 12,300–12,700 MHz frequency bands.

Safety and Special Radio Services—2—Notice of Proposed Rule Making relating to amendment of Part 83 to delete the requirement that voluntarily equipped ship stations be provided with a copy of Part 83 of the rules, and to require manufacturers to supply an instructional sheet with the radio equipment package.

Common Carrier—1—A Motion for Leave to File Comments filed by the Independent Data Communications Manufacturers Association, Inc. to supplement its petition for reconsideration of the Final Decision and Order in Docket No. 20288 (DDS), FCC 77-35 (released January 17, 1977).

Common Carrier—2—RCA Global Communications, Inc. (RCA Globcom) Request for Stay of Commission Final Decision and Order in Docket No. 20452, Interconnection Facilities Provided to the International Record Carriers, FCC 77-176, adopted March 8, 1977, released March 23, 1977.

Cable Television—1—Joint petition requesting issuance of order to show cause (CSC-167) filed by Station WPSD-TV (NBC, Channel 6), Paducah, Kentucky, inter alia, directed against Jackson Cable TV, Jackson, Missouri.

Renewal—1—Application (BRTT-775) of Gilbert Nathanson for renewal of license of TV translator K73AD, Palm Springs and Desert Hot Springs, California.

Special—1—Reconsideration of the July 20, 1976 Rate Integration Order, 61 FCC 2d 380 (1976).

Special—2—Creation of Joint Board for the purpose of determining the Separations methodologies applicable to Alaska and Hawaii.

Special—3—Creation of Joint Board for the purpose of prescribing the separations methodologies applicable to Puerto Rico and Virgin Islands.

Special—4—Carrier Agreement setting forth a proposal to implement MTS rate integration for Puerto Rico and Virgin Islands.

Special—5—Petitions to Reject or Suspend and Investigate tariff changes contained in Graphnet Systems, Inc. Transmittal No. 28.

Special—6—Memorandum Opinion and Notice of Proposed Rule Making concerning uniform settlement rates on parallel international communications routes.

**CONTACT PERSON FOR MORE INFORMATION:**

Samuel M. Sharkey, FCC Public, Information Officer, telephone number 202-632-7260.

Issued: May 19, 1977.

[S-484-77 Filed 5-20-77;3:46 pm]

---

**2**

**AGENCY HOLDING THE MEETING:** Federal Communications Commission.

**TIME AND DATE:** Follows scheduled open meeting Thursday, May 26, 1977.

**PLACE:** Room 856, 1919 M Street NW., Washington, D.C.

**STATUS:** Closed Commission Meeting.

**MATTERS TO BE CONSIDERED:**

*Agenda, Item No., and Subject*

Hearing—1—Petition to Add Disqualification Issue in the Norfolk, Virginia WTAR-TV comparative renewal proceeding (Docket Nos. 18791-2).

Hearing—2—Request by WNIA for extension of silence authority pendente lite in the Rochester and Cheekowaga, New York, standard broadcast renewal proceedings (Docket Nos. 20791-2).

Complaints and Compliance—1—Field investigation into the operation of Station WAEO-TV, Rhinelander, Wisconsin.

Complaints and Compliance—2—Field investigation into the operation of Station WDRK(FM), Greenville, Ohio.

**CONTACT PERSON FOR MORE INFORMATION:**

Samuel M. Sharkey, FCC Public Information Officer, telephone number 202-632-7260.

Issued: May 19, 1977.

[S-485-77 Filed 5-20-77;3:46 pm]

---

**3**

**AGENCY HOLDING THE MEETING:** Federal Communications Commission.

**TIME AND DATE:** Follows 2 p.m. Oral Argument, Thursday, May 26, 1977.

**PLACE:** Room 814, 1919 M Street NW., Washington, D.C.

**STATUS:** Closed Commission Meeting.

**MATTER TO BE CONSIDERED:**

Instructions to the staff following oral argument on the exceptions to the Initial Decision in the WLLE(AM), Raleigh, North Carolina, proceeding (Docket No. 19908).

**CONTACT PERSON FOR MORE INFORMATION:**

Samuel M. Sharkey, FCC Public Information Officer, telephone number 202-632-7260.

Issued: May 19, 1977.

[S-486-77 Filed 5-20-77;3:46 pm]

---

**4**

**AGENCY HOLDING THE MEETING:** Federal Trade Commission.

**"FEDERAL REGISTER" CITATION OF PREVIOUS ANNOUNCEMENT:** May 19, 1977, page 25827.

**PREVIOUSLY ANNOUNCED TIME AND DATE OF THE MEETING:** 10 a.m. Wednesday, May 25, 1977.

**CHANGES IN THE MEETING:** The meeting is now scheduled for Wednesday, June 1, 1977.

[S-483-77 Filed 5-20-77;2:28 pm]

---

**5**

**AGENCY HOLDING THE MEETING:** National Mediation Board.

**TIME AND DATE:** 2 p.m.; Wednesday, June 1, 1977.

**PLACE:** Board Hearing Room, 8th Floor, 1425 K Street NW., Washington, D.C.

**STATUS:** Open.

**MATTERS TO BE CONSIDERED:**

(1) Amendment to NMB fee schedule for Freedom of Information Act records searches.

(2) Findings Upon Investigation in NMB Case No. R-4582, Frontier Airlines, Inc.

**CONTACT PERSON FOR MORE INFORMATION:**

Mr. Rowland K. Quinn, Jr., Executive Secretary; Tel. 202-523-5920.

(Date of Notice: May 23, 1977.)

[S-486-77 Filed 5-23-77;11:17 am]

AR_0033334

**WEDNESDAY, MAY 25, 1977**

PART II





# ENVIRONMENTAL PROTECTION AGENCY

■

## MOTOR VEHICLES

Emission Control System Performance Warranty Regulations—Short Test Establishment

## ENVIRONMENTAL PROTECTION AGENCY

### [ 40 CFR Part 85 ]

[FRL 689-6]

### MOTOR VEHICLES

**Emission Control System Performance Warranty Regulations—Short Test Establishment**

AGENCY: Environmental Protection Agency.

ACTION: Proposed Rule.

SUMMARY: Section 207(b) of the Clean Air Act, 42 U.S.C. 1857f-5a, deals with the periodic inspection of motor vehicles to determine whether they comply in actual use with applicable air pollution emission standards, and with the remedy of any deficiencies identified in such inspections. Two separate rulemakings are required to fully implement Section 207 (b): (a) The establishment by regulation of testing methods and procedures for ascertaining whether a vehicle complies with the emission standard, and (b) the establishment by regulation of a warranty by which the owner of a vehicle that fails to demonstrate in such a test that it complies with emission standards will have his vehicle repaired without cost by its manufacturer if the owner has properly operated and maintained his vehicle.

This Notice of Proposed Rulemaking deals with the first of these matters, i.e., the establishment of testing methods and procedures for ascertaining whether a vehicle complies with emission standards. Regulations dealing with the warranty for cars failing such a test are being proposed today as Subpart V of Part 85 of Title 40 of the Code of Federal Regulations.

DATES: All relevant material received on or before August 23, 1977, will be considered.

Final regulations, modified as the Administrator deems appropriate after consideration of comments, will be promulgated as soon as practicable after such consideration and will be applicable to model year 1979 and later light-duty vehicles and light-duty trucks.

ADDRESS: Interested persons may participate in this rulemaking by submitting written comments to the Administrator, Environmental Protection Agency, Attention: Office of Mobile Source Air Pollution Control (AW-455), 401 M Street SW., Washington, D.C. 20460. Ten copies are requested but not required.

FOR FURTHER INFORMATION CONTACT:

Paul Lapsley, Regulatory Management Staff, Office of Mobile Source Air Pollution Control, Environmental Protection Agency, Washington, D.C. 20460 at 202–755–0596.

SUPPLEMENTARY INFORMATION:

STATUTORY REQUIREMENTS AND PURPOSE

The statutory requirement for a "short test" capable of being correlated with the Federal Test Procedure is stated in Section 207(b) of the Clean Air Act:

If the Administrator determines that (1) there are available testing methods and procedures to ascertain whether, when in actual use throughout its useful life (as determined under section 202(d)), each vehicle and engine to which regulations under section 202 apply complies with the emmission standards of such regulations, (11) such methods and procedures are in accordance with good engineering practices, and (111) such methods and procedures are reasonably capable of being correlated with tests conducted under section 206(a)(1), then—
(1) he shall establish such methods and procedures by regulation, * * *

The requirement that the 207(b) test (hereinafter called a short test) reasonably correlate with the Federal Test Procedure (FTP) conducted under section 206(a)(1) has proved to be a difficult and controversial task. A short test must be performed in a short time on a fully warmed up vehicle, is limited at best to a very few vehicle speed/load conditions, and will be performed under a wide range of environmental conditions (i.e., temperature, humidity, human factors and instrument factors which are either uncontrollable or under limited control). Conversely, the FTP is performed with a cold start, includes a very large number of vehicle speed and load conditions simulating a typical stop-and-go urban commutation, and is performed under closely controlled laboratory environmental conditions (temperature and humidity are rigidly controlled and test personnel are under engineering quality control supervision).

The identification of testing methods and procedures and the determination that these methods and procedures are in accordance with good engineering practice and are reasonably capable of being correlated with tests conducted under section 206(a)(1) has involved the agency in an extensive testing program in which the short test (plus the FTP) were administered to each vehicle in the following fleets:

a. *The Experimental Catalyst Fleet.* This fleet consisted of approximately fifty 1973 model year automobiles which had been fitted with catalysts and secondary air injection.

b. *The 1974 Model Year Fleet.* This fleet consisted of approximately one hundred and fifty privately owned 1974 model year automobiles and represented non-catalyst 1975 technology.

c. *The Defects Test Fleet.* This fleet was comprised of five catalyst-equipped cars. The vehicles were first sent to the manufacturers' specifications and then a series of defects were introduced and the subsequent effect on emissions recorded.

d. *300-Car Test Fleet.* Approximately one hundred 1975 model year privately owned production vehicles were selected in each of three cities: Chicago, Houston and Phoenix.

In addition, EPA has another program planned to generate additional data on correlatability:

e. *State/EPA Pilot Project.* Approximately 2400, 1975/76 model year light-duty vehicles will be tested in Portland, Oregon by the FTP and the proposed

short tests. Approximately 86 engine-vehicle groups will be represented in the sample.

Finally, EPA is evaluating commercially available test equipment for measuring hydrocarbons (HC), carbon monoxide (CO) and oxides of nitrogen (NOx) in terms of accuracy, repeatability, response time and deficiencies in order to provide reports on which is acceptable.

THE PROPOSED REGULATIONS

On the basis of the data which have been collected from light-duty vehicles in the four test fleets described above, the Agency proposes that all of the following five tests be designated as "short tests" which meet the statutory requirements of availability, correlation and good engineering practice: The idle test, the Federal 3 Mode, the Clayton Key Mode,[1] The Federal Short Cycle, and the N.Y./N.J. composite test. These test procedures are discussed in detail in Subpart W and briefly described below.

(a) *Idle test.* The raw exhaust gas is measured with simple instrumentation to determine HC and CO concentration in the raw exhaust gases with the engine in an idling condition. Procedural variations of the idle test studied included running the test with the automatic transmission in neutral vs. drive, and idle speed at normal RPM vs. high RPM with the transmission in neutral. NOx concentration cannot be meaningfully measured at idle since NOx emissions are insignificant under idle conditions—an important limitation of the idle test. The idle test has been the predominant inspection test procedure utilized in currently operational and contemplated state programs.

(b) *Steady State Modal Tests. (Federal 3 Mode and Clayton Key Mode).* The raw exhaust gas is measured with simple instrumentation to determine HC, CO, and NOx concentrations while the vehicle is driven under prescribed load conditions at two different speeds and at idle. A dynamometer is used in this test to simulate nonvarying speed and load conditions. Procedural variations between the two tests involve the severity of the load simulated. The Clayton Key Mode test is currently being evaluated by the states of Arizona and California.

(c) *Transient tests. (Federal Short Cycle and NY/NJ Composite Test).* A sample of the dilute exhaust gas (a CVS unit is used)[2] is collected in a bag while the vehicle is driven on a dynamometer to simulate a driving cycle that includes acceleration, deceleration, and cruise modes. The sample accumulated in the bag is analyzed for MC, CO, and NOx concentration. The concentration values

[1] The Clayton Manufacturing Company has applied for patents on the Key Mode emissions test procedure and has stated its intent to charge fees for use of the diagnostic information provided with the test results. The status of the patent and the extent to which it applies to other steady state modal tests is unknown at this time.
[2] Substitution of a less costly procedure for obtaining the sample than a Constant Volume Sampler (CVS) may be possible. A substitute procedure was not evaluated.

AR_0033336

**PROPOSED RULES**

26743

measured are converted to a mass (gm/mile) basis. At present there is no field experience data available for these tests and no state is using or contemplating the use of such a test. In theory a large number of different transient tests are possible for simulating different driving cycles; however, in practice only two cycles have been studied: (1) A composite of the N.J. and the N.Y. Short Test and (2) the EPA Short Cycle Test developed by the Office of Mobile Source Air Pollution Control.

Both the idle test and the steady state modal tests have been used in state I/M programs. Because of the differences in equipment, manpower requirements and time required to conduct steady state modal tests over the idle test, the choice between these two tests is dependent upon the incremental improvement in accuracy and correlation derived by the steady state modal tests. The transient tests, requiring greater investment in resources, have not been implemented to date by state or local governments.

The Agency proposes, therefore, to specify these five short tests as being suitable for use, either in total or in part (where so identified), in light-duty vehicles and light-duty truck inspection programs; to identify the methodology which has been used in defining correlation for these tests; to specify the mathematical methodology to be used in the setting of short test cutpoints (that value, as measured by appropriate instruments for each pollutant, above which the vehicle fails the short test); and to specify the methodology which will be used to collect the data from which the short test cutpoints will be developed.

### IMPLEMENTATION OF PERFORMANCE WARRANTY

Implementation of the warranty provisions of section 207(b), after the warranty regulations are promulgated by EPA, will occur when a vehicle which has been properly maintained and operated fails to conform at any time during its useful life (5 years or 50,000 miles, whichever first occurs) to the applicable emissions standards and such nonconformity results in the ultimate purchaser of such vehicle having to bear any penalty or other sanction (including the denial of the right to use such vehicle) under State or Federal law. The determination of whether a vehicle is conforming to applicable emission standards will most likely occur through the adoption of any one of the designated short tests and its associated cutpoints into a State or local government vehicle inspection program.

Currently available evidence indicates that the appropriate short test cutpoints for new model year vehicles will have to be established on a yearly basis. Further testing may reveal that cutpoints need not be set annually or for all many groups of vehicles as anticipated which would result in the development of short test cutpoints on an as needed basis. These cutpoints would remain in effect throughout the useful life

of each vehicle. (Provisions are included in §85.2306 of Subpart X to enable the EPA or the manufacturers to modify the short test cutpoints over time, given that sufficient test data can be provided which indicate that the cutpoints for a given group need to be revised. Provisions are also included for the updating of the cutpoints at the time of significant manufacturer changes to a vehicle covered by certification. There are essentially three options for establishing the cutpoints: states can determine the cutpoints, or they can be provided by EPA, or the manufacturers could provide the data on the basis of which cutpoints would be set either by the states or the EPA.

Although the procedures being proposed herein are aimed at the development of cutpoints by the Agency, it is feasible that the cutpoints can be developed by the states using the methodology being proposed by the agency. Comments on the way in which states would implement these provisions and the desirability for such implementation as part of the states' inspection and maintenance programs are requested. Comments are also requested on the feasibility and desirability of permitting or requiring each individual manufacturer to utilize the methodology for generating the data on the basis of which cutpoints will be set, and providing the resulting data to the EPA or to the several states for the setting of cutpoints; since it is obvious that each individual manufacturer would have a significant incentive to establish the cutpoint for his cars at the highest possible level, so as to minimize potential warranty claims, comments should include a discussion of how the EPA or the States might best supervise and control the process of data generation by manufacturers so as to assure that the resulting data are valid.

In the case that the agency develops the cutpoints, they would be developed through yearly programs wherein new model-year, privately owned, production vehicles and/or vehicles at the assembly line are tested by the FTP and by each short test. Sufficient quantities of vehicles would be obtained so as to furnish statistically meaningful results. The short test cutpoints would be determined on the basis of these data in accordance with the methodology set forth in these regulations and would then be disseminated to each state for use in its vehicle inspection program.

### DISCUSSION OF ISSUES

#### (A) CORRELATION METHODOLOGY

Statistically, three different methodologies are associated with the concept of correlation: Regression analysis, ranking analysis and contingency table analysis.

Regression analysis is a technique by which one parameter of interest is predicted by one or more other variables of interest. Thus, a functional relationship is defined between the variables. For every value or set of values for the predictor variable, there is a value of the predicted variable.

Regression analysis can be performed with one or more predictor variables (independent variables) and with one or more predicted variables (dependent variables). When there is one dependent variable and one independent variable, the technique is usually called simple regression. A regression analysis is based upon the assumption of a relationship between the dependent and independent variables.

Most regression is based upon the "least squares" approach, although other approaches could be used. Thus, the coefficients are selected to minimize the sum of the squares of the actual values minus the predicted values. Least squares is the preferred approach since it provides estimates of the coefficients which have the minimum possible variance.

For the case of 207(b) correlation, the dependent variable is the Federal Test Procedure (FTP) emission for a specified pollutant. The independent variable is the short test emission for the same pollutant. In cases where the short test has more than one mode, there are multiple independent variables.

The disadvantage of using a regression methodology to evaluate correlation is that determination of the exact form of the functional relationship is necessary. Also, it is equally important to predict each and every dependent data point with the same absolute degree of accuracy. Thus, a given error in the prediction of a gross emitter will affect correlation as much as the same error in a vehicle which just fails the Federal standards.

Ranking analysis is a technique by which two variables are compared without any assumption as to a predictable relationship between the variables. Each variable is compared and ordered within itself with the largest value of each variable assigned the rank of 1. Then the ranks of each pair of variables are subtracted and the differences are summed. The rank correlation coefficient is a function of the number of data points and the sum of the differences; it will be low when the variables are independent and high when they are correlated.

A rank correlation value near 1 indicates that two variables, when normalized, tend to be high or low together. A rank correlation near zero indicates that the relative rank of one variable cannot predict the relative rank of the second variable. A high but nonperfect rank correlation, however, does not allow for an assessment of the magnitude of error which would occur with the prediction process.

Contingency table analysis assumes that there is a discrete number of groups of individual measurements of a given dependent variable. There are also one or more independent variables. The analysis attempts to find one or more independent variables which can be used to discriminate between the different classes of the dependent variable. In other words, the contingency table approach says that a predictive relationship between the dependent and inde-

AR_0033337

pendent variables is not important. Rather, the only thing of interest is that the independent variable be able to classify the dependent group into one of the available group categories. Contingency table analysis is based upon the assumption that cutpoints can be found for one or more independent variables which will discriminate among the groups of the dependent variable. The selection of the cutpoints results in the development of a contingency table.

Contingency tables are considerably simpler to deal with than regression analyses since it is not necessary to determine the exact predictive relationship. Rather, it is sufficient to identify the number of important groups into which the dependent variable needs to be classified. For the purposes of 207(b) implementation, there are only two such groups: Vehicles which pass the FTP and vehicles which fail the FTP. Thus, Figure 1 shows the 207(b) application of a contingency table.

*Predicted variable*

|  | (FTP) of— | |
|---|---|---|
|  | Pass | Fail |
| Predictor variable (short test): |  |  |
| Pass........ | Correctly passed... | Incorrectly passed by the short test (error of omission). |
| Fail........ | Incorrectly failed by the short test (error of commission). | Correctely failed. |

FIGURE 1

The definition of correlation in a contingency table can be addressed in several ways (unlike regression analysis correlation or rank correlation). First, a measure of independence between the two variables can be determined. This indicator will fall between $-1$ and $+1$, as did the other measures of correlation. Because of the simple form of the predictive relationship inherent in the table, other more meaningful measurement quantities can be computed, e.g., the ratio of vehicles failing the short test to vehicles failing the FTP, the ratio of cars incorrectly failing the short test to the total number of cars failed by the short test, etc. These quantities express the ability of the short test to correctly identify passing and failing vehicles on the FTP. A selection as to which of these quantities best expresses correlation depends upon the specific application, the relative importance of the types of errors, and the magnitude of the correctly identified vehicles.

It was anticipated that the short tests would not correlate with the FTP in a classical statistical sense, i.e., no short test is capable of a reliable and consistent prediction of the FTP mass emissions. The extensive fleet tests verified that the statistical correlation coefficients arrived at through regression techniques were low (generally less than 0.8), indicating unacceptable correlation.

However, EPA interprets the Clean Air Act requirement of "reasonable correlation" to be met if the short test is capable of reliably and consistently predicting whether the vehicle would pass or fail the FTP even if it cannot give the magnitude of the passing or failing margin. Therefore, the contingency table approach has been adopted as the method for determining correlation between the FTP and selected short tests. The reasonableness of such correlation depends on the ratio of incorrect predictions to correct predictions. In the case of the 207(b) short test the incorrect predictions are of two types, errors of commission and errors of omission, each with significantly different consequences. An error of commission (i.e., the short test incorrectly predicts failure for a vehicle that really passes the FTP) would cause a vehicle which conforms to all Federal emission requirements to be repaired under warranty at some cost to the manufacturer. It is possible, however, that air quality benefit may still be obtained from vehicles which are in conformance with the emission standards at the time of failure; vehicles in a good state of tune can often emit at levels substantially below the emission standards, especially at low mileage. An error of omission (i.e., the short test incorrectly passes a vehicle that would fail the EFP) has no cost impact on the manufacturer but represents a lost opportunity for air quality improvement.

By varying the severity of the short test cutpoint (i.e., the numerical value used to predict passing or failing on the FTP) it is possible to reduce errors of commission to any desired level, but always at the cost of increasing errors of omission.

(b) GOOD ENGINEERING PRACTICE

The criterion of good engineering practice must be resolved in terms of whether the test(s) can: (1) Be conducted with reasonable demands upon test personnel and equipment and (2) yield reasonably accurate and reproducible results when the test is performed as specified. All five of the short tests identified in these proposed regulations meet these criteria. The basis for this conclusion is explained in detail in: Regulatory Support Document—Section 207(b) NPRM. Single copies may be obtained from the Director, Emission Control Technology Division, 2565 Plymouth Road, Ann Arbor, Michigan 48105; a copy is also on file in the EPA Public Information Reference Unit, Room 2922 Waterside Mall, U.S./EPA, 401 M Street SW., Washington, D.C. 20460.

(c) SHORT TEST STANDARDS DEVELOPMENT

On a yearly basis, the Agency proposes to test vehicles of the latest model year which are privately-owned production vehicles and/or vehicles at the assembly line. (Further testing may reveal that cutpoints need not be set annually or for as many groups of vehicles as anticipated, which would result in the Agency providing short test cutpoints on an as-needed basis). The vehicles will

be tested by each approved short test and by the FTP. Vehicles will be selected for testing on the basis of those engine/vehicle size/emissions control technology combination(s) (called groups) which are in production and which are significantly different. A sufficient number of vehicles will be tested in each group to satisfy statistical requirements for sample size. The data will be collected during the first nine months of the model year (these data could also serve to supplement Section 207(c), the "recall" provision, of the Clean Air Act if testing is performed with rigorous quality control). The Agency will analyze the data by the prescribed methodology and select the short test cutpoints for each group. Consolidation within groups of the final number of short test cutpoints will be performed in accordance with the methodology prescribed. The effects of real world variables (temperature, humidity, human factors, instrumentation, etc.) on short test cutpoints as determined by the state/EPA pilot project being conducted in Portland, Oregon, will be incorporated in the sets of short test cutpoints which are furnished to each state or local government.

Because errors do occur in the categorization of vehicles in the contingency table and because of the relative difference in importance of the two types of errors (Errors of Commission (Ec) and Errors of Omission (Eo), the Agency is proposing five approaches for the selection of the short test cutpoints. These five approaches are stated below and the one which is judged to best fulfill the requirements of Section 207(b) based on the data which the Agency has available and on the comments received from this notice of proposed rule making will be adopted.

*Option 1.* Set the short test cutpoints at the level which corresponds to a 5 percent error of commission rate (based on the total number of vehicles tested) within each group.

This method has several advantages. First, it is easy to implement. Second, each vehicle group manufacturer will be incorrectly penalized for the same fraction of his sales of that vehicle as every other vehicle group manufacturer. There are some disadvantages to this method. This occurs when the number of vehicle groups is greater than one. First, the mean FTP emissions of failed vehicles in group 1 may be very different from the mean FTP emissions of failed vehicles in group 2 even though both short test pass/fail cutpoints were set to ensure 5 percent commission errors. Second, vehicle group 1 may contain a greater percentage of error of omissions than vehicle group 2 and thus be required to repair fewer vehicles than vehicle group 2, even though both groups have the same percentage of vehicles exceeding emission standards when measured by the FTP. Third, assume that vehicle group 1 has extremely high short test variability. Then, it is likely that due to short test variability, cars with low FTP emissions will have high short test levels. This situation will result in a higher

AR_0033338

short test pass/fail cutpoint than for a low test variability class, since high test variability increases commission errors and omission errors. Thus, a manufacturer could be rewarded for high short test variability. The same situation could occur with high FTP variability.

*Option 2.* Set the short test rejection ratio, $(E_c + FF)/(E_c + FF)$, equal to unity. (Vehicles which are correctly failed by the short test are classified as "FF" vehicles.)

This option is no more difficult to implement than the fixed error of commission approach. It treats all manufacturers equitably and does not give any advantage to manufacturers who produce vehicles with high FTP and/or ST (short test) variability. Rather, it encourages improvements in emissions performance because the manufacturer is never allowed to repair fewer vehicles than he should, i.e., true FTP failing vehicles. This approach does not permit the setting of a single ST cutpoint for all vehicles. This is true for all equitable approaches for setting cutpoints and therefore cannot be treated as a negative characteristic of the method. Air quality benefits will tend to improve from the original approach because the error of omission rate will be lowered. However, mean FTP emissions of failed vehicles in two different groups could still be significantly different. Many manufacturers will have to repair more error of commission vehicles than under the original concept.

*Option 3.* Set a fixed level of $E_c/(E_c + FF)$ for each group.

This option is more difficult to implement since $E_c/(E_c + FF)$ can be small when FF is large or when $E_c$ is small. Thus, there is more than one way to satisfy the function. This option does, however, have the potential for crediting manufacturers of vehicle classes which have low FTP failure rates. This option does not alter the variability considerations of the first approach.

*Option 4.* Set the short test cutpoints so that equivalent FTP pass/fail levels are enacted for each vehicle group while maintaining the error of commission rate at five percent or less. This option has the potential for crediting groups with low FTP emissions but at the expense of increasing errors of omission. In fact, under certain circumstances, the group having the highest true failures could experience the greatest increase in errors of omission.

*Option 5.* Set an error of commission rate or $E_c/(E_c + FF)$ rate as a function of test variability. Allow a five percent error of commission rate when test variability is at the maximum acceptable level.

This option eliminates the variability problem inherent in Options 1 and 3. A functional relationship between errors of commission or $E_c/(FF + E_c)$ and variability could be developed using mathematical simulation techniques. This could be accomplished by taking a set of data and, using probability distribution theory and random numbers, variability could be introduced into the data base at different levels. Then, using fixed

short test cutpoints, commission errors can be computed and plotted against variability.

These five approaches for the selection of short test cutpoints are detailed in Subpart X, § 85.2308. While more extensive analysis has been completed on some of these approaches, further efforts are aimed at examining the potential effects of adopting any of the five approaches for selecting short test cutpoints. Comments are particularly requested on each of the above approaches.

## (d) REAL WORLD CONSIDERATIONS

All of the data available to EPA on the correlation of short tests to the FTP have been established under laboratory conditions. Inspection of vehicles at state inspection lanes will occur under varying atmospheric conditions and will also be subject to personnel errors as well as problems associated with correct instrument calibration and maintenance. The Portland study is being performed by the Agency to quantify the effects of these variables on short test correlation and to determine the effectiveness of the short test in the real world. Once the magnitudes of these variables have been quantified, they will be factored into the cutpoints for 207(b) to be published by the Agency. Incorporation of these variables will not result in unacceptable error rates or correlation. However, they may reduce the predicted air quality benefits relative to those projected from laboratory data.

## (e) EFFECTS ON STATE I/M PROGRAM

Publication of Section 207(b) cutpoints will not require their adoption by a state or local government. However, if the cutpoints used by a state or local government are less stringent than the 207(b) cutpoints, then that locality will not be achieving as great an air quality improvement from the I/M program as possible. The only vehicle owners who would be afforded the warranty protection of section 207(b) are those whose emissions exceed the state I/M cutpoints.

The opposite scenario, i.e., where the state cutpoints are more stringent than the section 207(b) cutpoints, could also exist. In this case, only those vehicles whose short test levels exceed the 207(b) cutpoints would be covered by warranty. The owners of vehicles whose short test values were below the 207(b) cutpoints but above the state standards would have to bear the cost of repairing their own vehicles.

Each state will have to evaluate the relative merits of either adopting the 207(b) cutpoints or adopting less stringent or more stringent short test pass/fail values.

### (F) NEED FOR NEW SHORT TEST DEVELOPMENT

In light of the rapid changes which are taking place in the technology being used to meet the present and future emissions standards, it is possible that cases will occur where the proposed short tests will not function effectively as predictors of the FTP emissions from those vehicles. Should this possibility occur, the Agency will implement one or more new short tests which will apply to these new technology vehicles.

### (G) ANTICIPATED AIR QUALITY BENEFITS

Because of the intimate relationship between I/M and the execution of a 207 (b) program, it is very difficult to separate their respective effectivenesses. The predicted effectiveness is, therefore, presented in two ways. The first case is for a joint 207(b)/Inspection and Maintenance program, where the 207(b) cutpoints ($E_c=5$ percent) are used and no I/M program previously existed. The second case is where an I/M program existed prior to the implementation of 207(b) and had been failing approximately $\frac{1}{3}$ of the vehicles in each model year. In this case the 207(b) cutpoints ($E_c=5$ percent) are adopted following implementation of section 207(b). The effectiveness is expressed as a percent reduction in total emissions over the useful life of the vehicles.

*Effectiveness of sec. 207(b) over the useful life of the vehicle*

| | Case I (no prior I/M) (percent) | | | Case II (previous I/M programs) (percent) | | |
|---|---|---|---|---|---|---|
| | HC | CO | NOx | HC | CO | NOx |
| | 34.6 to 21.1 | 42.8 to 24.6 | 2.0 to 0.33 | 7.6 to 6.4 | 8.7 to 7.8 | 0.22 to 0.09 |

The technical issues involved in preparing the various short tests and statistical procedures are discussed in detail in: Regulatory Support Document Section 207(b) NPRM.

### (H) APPLICABILITY OF 207(B) TO LIGHT-DUTY TRUCKS

At the present time, available vehicle test data on the short tests and the FTP have only been measured on light-duty vehicles. Before final rulemaking, data will be available on light-duty trucks. Because light-duty trucks are similar to light-duty vehicles both in engineering design and in usage, the same tests which are appropriate for light-duty vehicles are expected to be appropriate for light-

duty trucks. The specific short test cutpoints for light-duty trucks may differ from the light-duty vehicle cutpoints and will be determined in a separate test program. However, the methodology for determining the cutpoints is expected to apply to both light-duty vehicles and light-duty trucks.

## REQUEST FOR COMMENTS

EPA is particularly interested in receiving comments and information on the following topics:

1. Appropriateness in terms of correlatability and good engineering practice of the proposed test procedures for light-duty vehicles and light-duty trucks.

AR_0033339

## PROPOSED RULES

2. Appropriateness of the test procedures proposed with respect to existing technology and "new" technology.

3. Appropriateness of the short test cutpoint selection methodologies proposed for light-duty vehicles and light-duty trucks. What is the most equitable approach, which is the most applicable in practice? Who should establish the cutpoints? In which way would the states establish the cutpoints?

4. Alternative methods for determining short test cutpoint values. Particularly, should some weighting factor be used to balance errors of commission and omission in terms of air quality? Also, what approach should be taken when no car in the test group exceeds the standards or all cars in the test group fail the standards?

5. Should prototype or new assembly line vehicles be used instead of privately owned vehicles in the test group? This might involve inducing typical faults. What are typical faults and what are typical failure rates on the assembly line?

6. Problems anticipated by the manufacturers caused by including the short tests in all tests performed on certification and/or assembly line vehicles—both at the EPA laboratory and at their facilities.

7. Should the short test cutpoints be based on a small number of broad groupings of vehicles (e.g., according to five engine displacement categories) rather than the engine/vehicle/technology groups proposed for use in determination of short test cutpoints.

8. Suggestions for a uniform report format and test card information. Assess the difficulty in ensuring that vehicles are tested under proper conditions, weights and shift points—running changes during year, etc.

9. Suggestions on labeling of vehicles to ensure that they are properly identified by the vehicle's inspection lane operators. Can this be incorporated into the Vehicle Identification Number (VIN) or should it be an under hood label?

10. What is reasonable short test variability and how should it be defined and incorporated?

A copy of all public comments will be available for inspection and copying at the U.S. Environmental Protection Agency, Public Information Reference Unit, Room 2922 (EPA Library) 401 M Street SW., Washington, D.C. 20460. As provided in 40 CFR Part 2, a reasonable fee may be charged for copying services.

Notice is hereby given that Part 85 of Title 40 of the Code of Federal Regulations is proposed to be revised by the addition of new Subparts W and X as set forth below.

This Notice of Proposed Rulemaking is issued under authority of section 207(b) of the Clean Air Act, as amended (42 U.S.C. 1857f–5a).

NOTE.—The Environmental Protection Agency has determined that this document does not contain a major proposal requiring preparation of an Inflation Impact Statement under Executive Order 11821 and OMB Circular A–107.

Dated: May 6, 1977.

DOUGLAS M. COSTLE,
*Administrator.*

It is proposed to amend Part 85 of Chapter I, Title 40 of the Code of Federal Regulations by adding Subpart W and Subpart X as follows:

**Subpart W—Section 207(b) Exhaust Emission Test Procedures**

Sec.
85.2201  General Applicability.
85.2202  Definitions.
85.2203  Abbreviations.
85.2204  Overview.
85.2205  Transient test specifications, overview.
85.2206  Transient test procedures, general requirements.
85.2207  Federal short cycle test specifications.
85.2208  Federal short cycle test—calculations.
85.2209  New Jersey/New York composite test specifications.
85.2210  New Jersey/New York composite test—calculations.
85.2211  [Reserved]
85.2212  Dynamometer systems.
85.2213  Exhaust gas sampling system.
85.2214  Calibration procedures for transient mode tests.
85.2215  [Reserved]
85.2216  Steady state modal test specifications, overview.
85.2217  Steady state modal test procedures, general requirements.
85.2218  Clayton Key Mode test specifications.
85.2219  Federal Three Mode test specifications.
85.2220  Equipment specifications — steady state modal tests.
85.2221  Dynamometer system.
85.2222  Exhaust gas sampling system.
85.2223  Calibration procedures—steady state modal tests.
85.2224  [Reserved]
85.2225  Idle test specifications.
85.2226  Equipment specifications—Idle test.
85.2227  Dynamometer system.
85.2228  Exhaust gas sampling system.
85.2229  Calibration procedures—Idle test.

**Subpart X—Section 207(b) Short Test Cutpoint Methodology**

85.2301  General applicability.
85.2302  Definitions.
85.2303  Overview.
85.2304  Vehicle grouping.
85.2305  Data collection.
85.2306  Short test cutpoint selection.
85.2307  Analytical technique.
85.2308  Cutpoint selection methodologies.

AUTHORITY: Sec. 207(b), Clean Air Act, as amended (42 U.S.C. 1857f–5a).

**Subpart W—Section 207(b) Exhaust Emission Test Procedures**

§ 85.2201  General applicability.

This subpart contains short test exhaust emission test methods to be used in implementing the emissions control system performance warranty regulations. The provisions of this subpart are applicable to 1979 and later model year light-duty vehicles and 1979 and later model year light-duty trucks.

§ 85.2202  Definitions.

The following definitions apply to this subpart beginning with the 1979 model

year. Section 86.078–2 remains effective excepting those definitions which are hereby superseded and/or added.

"Car line" means a name denoting class of vehicles within a make or car division which has a degree of commonality in construction (e.g., body, chassis). Car line does not consider any level of decor or opulence and is not generally distinguished by such characteristics as roof line, number of doors, seats or windows except for station wagons. Station wagons are considered to be different car lines than passenger cars.

"Calibration" means the set of specifications, including tolerances, unique to a particular design, version, or application of a component or component assembly capable of functionally describing its operation over its working range.

"Clustering" means the tendency of data points, when plotted on cartesian coordinates, to appear together in distinct, compact groups.

"Discrimination" means the division of a batch of data points into 2 or more distinct groups, e.g. the division of vehicle emission data obtained by the FTP and short test(s) into groups of Ec, Eo, FF, and PP.

"Driver's Aid" means a device which graphically displays the speed-time requirements of a given test schedule and the actual vehicle test speed to assist the test technician in maintaining the proper vehicle speeds throughout the test.

"Group" means a classification of vehicles into classes having the same manufacturer, engine displacement, cylinder block configuration (e.g. V–8, I–6, etc.), number of cylinders, fuel injection or carburetion (number of carburetors, and number of carburetor venturies), emission control systems, inertia weight, and car line.

"Instrument-to-instrument variation" means variations in calibration (zero and span point) settings and/or test readings between two (or more) identical instruments produced by the same manufacturer when measuring samples from the same source (e.g. gas bottles or vehicle exhaust).

"Laboratory conditions" means a testing environment (e.g. test cell) in which as many test variables as possible are controlled (e.g. ambient temperature and humidity, on-the-job human errors) and laboratory grade instrumentation is used (when possible).

"Light-Duty Truck" means any motor vehicle, rated at 8,500 pounds GVW or less which has a vehicle curb weight of 6,000 pounds or under and which has a basic vehicle frontal area of 46 square feet or less, which is: (1) Designed primarily for purposes of transportation of property or is a derivation of such a vehicle or (2) designed primarily for transportation of persons and having a capacity for more than 12 persons, or (3) available with special features enabling off-street or off-highway operation and use.

"Light-Duty Vehicle" means a passenger car or passenger car derivative capable of seating 12 passengers or less.

AR_0033340

"Make" means the division or similar name within a manufacturing corporation which appears on the vehicle, e.g., Chevrolet, Mercury, Dodge etc.

"Manufacturer-to-manufacturer instrument variation" means variations in calibration (zero and span point) settings and/or test readings between two (or more) instruments intended for the same use (i.e., HC analyzers) but produced by different manufacturers when measuring samples from the same source (e.g. gas bottles or vehicle exhaust).

"Manufacturer" means the major financial entity whose divisions market vehicles, e.g. General Motors, Ford Motor Company etc.

"Overheating" means engine operating temperature in excess of the temperature for which the engine and engine systems were designed, as evidenced by temperature warning light on, temperature gauge reading in the hot region, stalling or rough idling.

"Owner" means the ultimate purchaser or subsequent purchaser in whose name the vehicle is titled at the time that the short test is performed.

"Precision" means the standard deviation of replicated measurements.

"Production tolerances stack-up" means each component of an assembly is manufactured within specified tolerances, and the system, when assembled, acquires a production tolerance stack-up that is the result of the cumulative effect of the interaction of the individual tolerances of the components.

"Repeatability" means the ability of an instrument to duplicate the same results each time measurement is made under conditions as close to being identical as possible.

"Road Load" means the loading imposed on a test vehicle, expressed as power measured at the point of contact between the vehicle and the road.

"Short test" means a hot exhaust emissions test of less than five minutes duration.

"Short test cutpoint" means the value as measured by appropriate instruments for each pollutant above which the vehicle fails the short test.

"Span" means adjust the gain of an instrument to a given reading while measuring a calibration parameter under conditions designed to yield that reading. Analyzers should be spanned using calibration gases with concentrations equal to 75 to 100 percent of full scale.

"State of tune" means carburetion, ignition, and emission control system parameter settings (e.g., idle CO, idle rpm, timing, and dwell settings).

"Steady state modal test" means a short test during which undiluted, raw exhaust emission levels are collected and measured continuously while the test vehicle is operated in one or more constant speed (or idle) modes.

"Tolerance" means the range of variation permitted in maintaining a specified dimension during the manufacturing of a product.

"Transient test" means an exhaust emissions test during which exhaust samples are collected under constant volume conditions (variable dilution) while the test vehicle is operated on a dynamometer over a driving schedule consisting of a series of constant rate accelerations, constant rate decelerations, and steady state cruises, with test results reported as mass emissions.

"Vehicle registration weight" means the vehicle weight indicated on the state vehicle registration records.

"Zero" means adjust the output signal on an instrument to obtain a reading of zero while measuring a calibration parameter under conditions designed to yield a zero reading.

## § 85.2203  Abbreviations.

The abbreviations used in this subpart have the following meanings, when used in both capital and lower case:

AC = Alternating Current.
Auto. = Automatic.
C = Celsius.
CEV = Catalyst equipped experimental vehicles.
cfh = Cubic feet per hour.
CFV = Critical flow venturi.
CI = Contingency table correlation index.
CID = Cubic inch displacement.
$CO_2$ = Carbon dioxide.
CO = Carbon monoxide.
Conc. = Concentration.
Cu. in. = Cubic inch(es).
CVS = Constant volume sampler.
E. = Errors of commission.
Eo = Errors of omission.
EFP = Emission factors program.
EGR = Exhaust—gas recirculation.
F = Fahrenheit.
FP = Correctly failed vehicles.
FID = Flame ionization detector.
FS = Full scale.
ft. = Feet.
FTP = Federal Test Procedure.
FY = Fiscal year.
gm = Grams.
g/mi = Grams per mile.
HC = Hydrocarbon(s).
Hg = Mercury.
Hi. = High.
Hp = Horsepower.
Hr = Hour.
I/M = Inspection/maintenance.
in. = Inches.
km = Kilometers.
km/h = Kilometers per hour.
kPa = Kilopascal(s).
lb. = Pounds.
Lo. = Low.
Max. = Maximum.
in²/hr = Cubic inches per hour.
Min. = Minute(s).
mph = Miles per hour.
MY = Model year.
NBS = National Bureau of Standards.
NDIR = Nondispersive infrared.
NJ/NY = New Jersey/New York.
$NO_x$ = Oxides of nitrogen.
No. = Number.
OMSAPC = Office of Mobile Source Air Pollution Control.
PCV = Positive Crankcase Ventilation.
PDP = Positive displacement pump.
P/F = Pass/fail.
PP = Correctly passed vehicles.
ppm = Parts per million by volume.
psi = Pounds per square inch.
r = Conventional (Pearson) correlation coefficient.
rpm = Revolutions per minute.
Sec. = Seconds.
ST = Short test.
Std. = Standard.
Trans. = Transmission.

## § 85.2204  Overview.

This subpart is divided into three categories:

(a) Test procedures, Emission calculation procedures, Equipment and Equipment Calibration procedures for Transient Tests.

(b) Test procedures, Emission calculation procedures, Equipment and Equipment Calibration procedures for Steady State Modal Tests.

(c) Test procedures, Emission calculation procedures, Equipment and Equipment Calibration procedures for the idle test.

## § 85.2205  Transient test specifications, review.

The transient short tests consist of vehicle operation on a chassis dynamometer over one or two specified driving schedules, during which hydrocarbon, carbon monoxide, and oxides of nitrogen mass emissions are measured. A proportional part of the diluted exhaust emissions is collected continuously for subsequent analysis, using a constant volume (variable dilution) sampler (CVS).

## § 85.2206  Transient test procedures, general requirements.

(a) Vehicles shall be tested in the state of adjustment in which they arrive at the test site, with no vehicle preparation or preconditioning of any sort. Vehicles shall be tested at the ambient conditions encountered at the test site. Vehicles shall be approximately level during all phases of the test sequence to prevent abnormal fuel distribution.

(b) Exhaust samples shall be taken from both tailpipes on vehicles having more than one tailpipe exhaust outlet. The samples shall be merged prior to the CVS unit so that a composite sample can be taken. The pollutant concentration levels shall be measured according to the procedures outlined in this subpart and shall be reported as the official test results.

(c) The transient tests follow closely the Federal Test Procedure used for vehicle certification, Subpart B of Part 86 of this chapter. There are several important differences to be noted, however.

(1) The test begins with the vehicle warmed up and idling.

(2) No evaporative emission measurements are made.

(3) Different driving schedules are used.

(4) Actual distance driven is not measured.

## § 85.2207  Federal short cycle test specifications.

(a) Road load power and inertia weight settings shall be determined in accordance with the procedures used for emission certification vehicles outlined in Part 86, Subpart B of this chapter. A compete listing of all possible vehicle/ engine configurations must be available at each test site prior to initiation of testing for use in determining appropriate inertia weight and road load power

AR_0033341

requirements for each vehicle to be tested.

(b) Transmissions:

(1) Transmissions, overdrives and free wheeling units shall be operated in accordance with the manufacturers' recommendations to the ultimate purchaser as indicated in the owners manual or as supplied by EPA.

(2) Idle modes shall be run with automatic transmissions in "Drive" with the wheels braked and manual transmissions shall be in gear with the clutch disengaged.

(3) The vehicle shall be driven with minimum accelerator pedal movement to maintain the desired speed.

(4) Accelerations shall be driven smoothly according to the manufacturers' recommendations to the ultimate purchaser. For manual transmissions, the operator shall release the accelerator pedal during each shift and accomplish the shift with minimum time. If the vehicle cannot accelerate at the specified rate, the vehicle shall be operated with the accelerator pedal fully depressed until the vehicle speed reaches the value prescribed for that time in the driving schedule.

(5) The deceleration modes shall be run in gear using brakes or accelerator pedal as necessary to maintain the desired speed. Manual transmission vehicles shall have the clutch engaged and shall not change gears from the previous mode. For those modes which decelerate to zero, manual transmission clutches shall be depressed when the speed drops below 15 mph (24 km/h), when engine roughness is evident, or when engine stalling is imminent.

(6) Downshifting is allowed at the beginning of or during a power mode in accordance with the manufacturers' recommendations to the ultimate purchaser.

(c) Dynamometer procedure:

(1) The Federal Short Cycle dynamometer sequence consists of a 125 second long driving schedule consisting of a series of constant rate accelerations, constant rate decelerations, and steady speed cruises. The exhaust emissions are diluted with ambient air and a continuously proportional sample is collected for analysis. The composite samples, collected in bags, are analyzed for hydrocarbons carbon monoxide, carbon dioxide, and oxides of nitrogen. A parallel sample of the dilution air is similarly analyzed for hydrocarbons, carbon monoxide, carbon dioxide, and oxides of nitrogen.

(2) The vehicle engine compartment hood shall remain open for the duration of the Federal Short Cycle. If vehicle overheating occurs (or is anticipated), a cooling fan(s) meeting the specifications in § 85.2212(e) may be used.

(3) The vehicle speed as measured from the dynamometer rolls shall be used. The speed vs. time characteristics of each test shall be checked against the specification to assure test validity.

(4) Practice runs over the prescribed driving schedule may be performed, pro-

vided an emission sample is not taken, for the purpose of finding the minimum throttle action to maintain the proper speed-time relationship, or to permit sampling system adjustments.

Note.—When using two-roll dynamometers a truer speed-time trace may be obtained by minimizing the rocking of the vehicle on the rolls. The rocking of the vehicle changes the tire rolling radius on each roll. This rocking may be minimized by restraining the vehicle horizontally (or nearly so) by using a cable and winch.

(5) The drive wheels shall be at the pressure prescribed for operation of the vehicle on the road by the tire manufacturer. If the tires are at normal operating temperature (not cold) at the time of testing, the pressure may be 2 to 3 psi above the manufacturers' recommended pressure. The vehicle shall not be tested with underinflated tires.

(6) If the dynamometer has not been operated during the 2-hour period immediately preceding the test it shall be warmed up for 15 minutes by operating at 30 mph (48km/h) using a non-test vehicle or as recommended by the dynamometer manufacturer.

(7) The inertia weight and road load power shall be set to the values determined from § 85.2207(a).

(8) If the engine stalls at any point during the dynamometer run, that test shall be voided. The engine shall then be restarted and run at 2500 rpm ± 200 rpm in neutral for 15 to 30 seconds preceding a retest. This procedure shall be followed until a complete, valid test is run.

(d) Test sequence:

(1) Adjust the dynamometer for the required road load and inertia.

(2) Drive or push test vehicle onto the dynamometer so that wheels are centered on rolls.

(3) Examine vehicle information label to determine group. Record information on test report.

(4) Attach restraining device to vehicle in such a fashion that the vehicle is not damaged. Release dynamometer brake.

(5) With the sample selector valves in the "standby" position connect evacuated sample collection bags to the dilute exhaust and dilution air sample collection systems.

(6) Start the Constant Volume Sampler (if not already on), the sample pumps and the temperature recorder. The heat exchanger of the constant volume sampler, if used, should be preheated to its operating temperature before the test begins.

(7) Adjust the sample flow rates to the desired flow rate (minimum of 10 cfh, (0.28 m³/hr)) and set the gas flow measuring devices to zero.

Note.—CFV-CVS sample flow rate is fixed by the venturi design.

(8) Attach adaptor(s) and exhaust collection tube(s) to vehicle tailpipe(s).

(9) Attach engine speed pickup.

(10) Idle vehicle in neutral at 2500 ±200 rpm for 15 to 30 seconds within 1 minute of beginning of dynamometer run.

(11) Place transmission in "Drive" or in gear with clutch disengaged.

(12) Turn on driver's aid and begin the initial acceleration of the driving schedule.

(13) Simultaneous with (12), start the gas flow measuring device, position the sample selector valves to direct the sample flow into the exhaust sample bag and dilution air sample bag.

(14) Operate the vehicle according to the following dynamometer driving schedule:

| Mode: | Time in mode (seconds) |
|---|---|
| 1. 0 to 16 mph (0 to 26 km/h) acceleration | 6.0 |
| 2. 16 to 29 mph (26 to 47 km/h) acceleration | 23.0 |
| 3. 29 mph (47 km/h) cruise | 10.0 |
| 4. 29 to 37 mph (47 to 60 km/h) acceleration | 18.0 |
| 5. 37 to 42 mph (60 to 68 km/h) acceleration | 4.5 |
| 6. 42 to 37 mph (68 to 60 km/h) deceleration | 2.5 |
| 7. 37 to 20 mph (60 to 32 km/h) deceleration | 32.0 |
| 8. 20 to 0 mph (32 to 0 km/h) deceleration | 7.5 |
| 9. Idle | 21.5 |
| Total | 125.0 |

The speed at any given time on the dynamometer driving schedule must be within the tolerances given in § 86.115–78. The speed tolerance at any given time on the dynamometer driving schedule prescribed above or as printed on a driver's aid chart approved by the Administrator, is defined by upper and lower limits. The upper limit is 2 mph (3.2 km/h) higher than the highest point on the trace within 1 second of the given time. The lower limit is 2 mph (3.2 km/h) lower than the lowest point on the trace within 1 second of the given time. Speed variations greater than the tolerances (such as may occur during gear changes) are acceptable provided they occur for less than 2

seconds on any occasion. Speeds lower than those prescribed are acceptable: Provided, The vehicle is operated at maximum available power during such occurrences.

(15) At the end of the driving schedule simultaneously turn off the gas flow measuring device and position the sample selector valve to the "standby" position. This ends the driving portion of test.

(16) As soon as possible, transfer the exhaust and dilution air samples to the analytical system and process. A stabilized reading for the exhaust sample must be obtained within 20 minutes of the end of the sample collection phase of the test.

AR_0033342

(17) Disconnect the engine speed pickup, adaptor(s), exhaust collection tube(s), and restraining device.

(18) Lock dynamometer rolls and drive vehicle off of dynamometer. This ends the test sequence.

(e) Measurement operations. The following sequence of operations shall be performed in conjunction with each series of measurements:

(1) Zero the analyzers and obtain a stable zero reading. Recheck after tests.

(2) Introduce span gases and set instrument gains. In order to avoid corrections, span and calibrate at the same flow rates used to analyze the test sample. Span gases should have concentrations equal to 75 to 100 percent of full scale. If gain has shifted significantly on the analyzers, check the calibrations. Show actual concentrations on chart.

(3) Check zeros; repeat the procedure in paragraphs (1) and (b) of this section if required.

(4) Check flowrates and pressures.

(5) Measure HC, CO, CO₂ and NOx concentrations of samples.

(6) Check zero and span points. If difference is greater than 2 percent of full scale, repeat the procedure in paragraphs (e) (1) through (5) of this section.

(f) Records required: The following information shall be recorded with respect to each test:

(1) Test number.

(2) Date and time of day for each test.

(3) Instrument operator.

(4) Driver or operator.

(5) Vehicle: Make; Model; Vehicle Identification Number; Vehicle registration number and year; Vehicle Model year; Transmission type; Odometer reading; Engine displacement; Idle rpm; Fuel system (fuel injection, number of carburetors, number of carburetor barrels); Inertia loading; Vehicle registration weight; Actual road load at 50 mph (80 km/h); drive wheel tire pressures, as applicable; emission control technology.

(6) All pertinent instrument information such as tuning-gain-serial number-detector number-range. As an alternative, a reference to a test lane number may be used, providing test lane calibration records show the pertinent instrument information.

(7) Recorder charts: Identify zero, span, exhaust gas, and dilution air sample traces.

(8) Test lane barometric pressure, ambient temperature and humidity.

Note: A central test site barometer may be used provided that individual test cell barometric pressures are shown to be within ±0.1 percent of the barometric pressure at the central barometer location.

(9) Pressure of the mixture of exhaust and dilution air entering the CVS metering device, the pressure increase across the device, and the temperature at the inlet. The temperature may be recorded continuously or digitally to determine temperature variations.

(10) The number or revolutions of the positive displacement pump accumulated during each test phase while exhaust samples are being collected. The number of standard cubic feet metered by a critical flow of venturi during each test phase would be the equivalent record for a CFV-CVS.

(11) The humidity of the dilution air.

Note: If conditioning columns are not used (see § 86.122 and 86.144) this measurement can be deleted. If the conditioning columns are used and the dilution air is taken from the test cell, the ambient humidity can be used for this measurement.

(g) Test Report. A test report shall be completed in triplicate and shall contain the information given below. One copy shall be given to the vehicle owner or his agent.

(1) Test type and driving schedule.

(2) VIN/License No.

(3) Owner's name and address.

(4) Car make, model, MY, engine size.

(5) Date of test.

(6) Odometer reading.

(7) Date of previous test on vehicle, if retest.

(8) Inertia and road load if applicable.

(9) Test site location, lane identification.

(10) Test results (including emission measurement values).

(11) Certification by instrument operator and driver that test was correctly performed.

§ 85.2208    Federal short cycle test calculations.

(a) For light duty vehicles and light duty trucks, the mass emissions for each pollutant shall be computed by the following formulae:

(1) Hydrocarbon mass emissions:
$$HC_{mass} = V_{mix} \times Density_{HC} \times (HC_{conc} \times 10^{-6})/L$$

(2) Carbon monoxide mass emissions:
$$CO_{mass} = V_{mix} \times Density_{CO} \times (CO_{conc} \times 10^{-6})/L$$

(3) Oxides of Nitrogen mass emissions:
$$NO_{x_{mass}} = V_{mix} \times Density_{NO_x} \times K_H \times (NO_{x_{conc}} \times 10^{-6})/L$$

(4) Carbon dioxide mass emissions:
$$CO_{2_{mass}} = V_{mix} \times Density_{CO_2} \times (CO_{2_{conc}} \times 10^{-2})/L$$

(b) Meaning of symbols

(1) $HC_{mass}$ = Hydrocarbon emissions, in grams per mile.

$H$ = Absolute humidity in grains (grams) of water per pound (kilogram) of dry air.

$$H = [(43.478) R_a \times P_d]/[P_B = (P_a \times R_a/100)]$$ for SI units, $H = [(6.211) R_a \times P_d]/P_B = (P_a \times R_a/100)]$.

$R_a$ = Relative humidity of the ambient air, in percent.

$P_d$ = Saturated vapor pressure, in mm Hg (kPa) at the ambient dry bulb temperature.

$P_B$ = Barometric pressure, in mm Hg (kPa).

$V_{mix}$ = Total dilute exhaust volume in cubic feet per test corrected to standard conditions (538 $R$) (293 $K$) and 760 mm Hg (101.3 kPa). For PDP-CBS, $V_{mix}$ is:

$$V_{mix} = V_o \times \frac{N(P_B - P_4)(528) R)}{(760 \text{ mm Hg}) (T_o)}$$

for SI units,

$$V_{mix} = V_o \times \frac{N(P_B - P_4)(293.15 K)}{(101.325 \text{ kPa})(T_o)}$$

$Density_{HC}$ = Density of hydrocarbon is 16.33 g/ft³ (.5767 kg/m³), assuming an average carbon to hydrogen ratio of 1:1.85, at 68°F (20°C) and 760 mm Hg (101.3 kPa) pressure.

$$HC_{conc} = HC_e - HC_d (1-1/DF)$$

Where:

$HC_e$ = Hydrocarbon concentration of the dilute exhaust sample in ppm carbon equivalent.

$HC_d$ = Hydrocarbon concentration of the dilution air as measured, in ppm carbon equivalent.

(2) $NOx_{mass}$ = Oxides of nitrogen emissions, in grams per mile.

$Density_{NOx}$ = Density of oxides of nitrogen is 54.16 g/ft³ (1.913 kg/m³), assuming they are in the form of nitrogen dioxide, at 68°F (20°C) and 760 mm Hg (101.3 kPa) pressure.

$NO_{x_{conc}}$ = Oxides of nitrogen concentration of the dilution exhaust sample corrected for background, in ppm.

$$NOx_{conc} = NOx_e - NOx_d(1-1/DF)$$

Where:

$NOx_e$ = Oxides of nitrogen concentration of the dilute exhaust sample as measured, in ppm.

$NOx_d$ = Oxides of nitrogen concentration of the dilution air as measured, in ppm.

(3) $CO_{mass}$ = Carbon monoxide emissions, in grams per mile.

$Density_{CO}$ = Density of carbon monoxide is 32.97 g/ft³ at 68°F (20°C) and 760 mm Hg (101.3 kPa) pressure.

$CO_{conc}$ = Carbon monoxide concentration of the dilute exhaust sample corrected for background, water vapor, and $CO_2$ extraction, in ppm.

$$CO_{conc} = CO_e - CO_d(1-1/DF).$$

Where:

$CO_e$ = Carbon monoxide concentration of the dilute exhaust sample volume corrected for water vapor and carbon dioxide extraction, in ppm. The calculation assumes the carbon to hydrogen ratio of the fuel is 1:1.85.

$$CO_e = (1-0.01925 \quad CO_{2e} - 0.000323 \quad R) CO_{em}$$

Where:

$CO_{em}$ = Carbon monoxide concentration of the dilute exhaust sample as measured, in ppm.

$CO_{2e}$ = Carbon dioxide concentration of the dilute exhaust sample, in percent.

$R$ = Relative humidity of the dilution air, in percent (see § 86.142(n)).

$CO_d$ = Carbon monoxide concentration of the dilution air corrected for water vapor extraction, in ppm.

$$CO_d = (1-0.000322 R) CO_{dm}.$$

Where:

$CO_{dm}$ = Carbon monoxide concentration of the dilution air sample as measured, in ppm.

Note.—If a CO instrument which meets the criteria specified in § 86.111 is used and the conditioning column has been deleted, $CO_{em}$ can be substituted directly for $CO_e$ and $CO_{dm}$ can be substituted directly for $CO_d$.

(4) $CO_{2_{mass}}$ = Carbon dioxide emissions, in grams per mile.

AR_0033343

## PROPOSED RULES

Density $_{CO_2}$ = Density of carbon dioxide is 51.85 g/ft³ (1.843 kg/m³), at 68° F (20° C) and 760 mm Hg (101.3 kPa) pressure.

$CO_{2conc}$ = Carbon dioxide concentration of the dilute exhaust sample corrected for background, in percent.

$CO_{2conc} = CO_{2e} - CO_{2d} (1-1/DF)$.

Where:

$CO_{2d}$ = Carbon dioxide concentration of the dilution air as measured, in percent.

(5) $L$ = Cycle length, in mi (km)

$L$ = 0.75 mi (0.21 km)

$DF = 13.4/[CO_{2e} + (HC_e + CO_e) \ 10^{-6}]$

$KH$ = Humidity correction factor.

$KH = 1/[1-0.0047 \ (H-75)]$

for SI units = $1/[1-0.0329 \ (H-10.71)]$

Where:

$V_o$ = Volume of gas pumped by the positive displacement pump, in cubic feet (ft³) per revolution. This volume is dependent on the pressure differential across the positive displacement pump.

$N$ = Number of revolutions of the positive displacement pump during the test phase while samples are being collected.

$P_B$ = Barometric pressure, in mm Hg (kPa).

$P_4$ = Pressure depression below atmospheric measured at the inlet to the positive displacement pump, in mm Hg (kPa) (during an idle mode).

$T_p$ = Average temperature of dilute exhaust entering positive displacement pump during test, R(K).

(c) Example calculation of mass values of exhaust emissions using positive displacement pump:

(1) Assume the following:
$V_o$ = 0.29344 ft³/revolution; $N$ = 1,048; $R$ = 48.0 pct.; $P_4$ = 48.2 pct.; $P_B$ = 762 mm Hg; $P_4$ = 22.225 mm Hg; $T_p$ = 70 mm Hg; $T_p$ = 570 R; $HC_e$ = 105.8 ppm, carbon equivalent; $NOx_e$ = 11.2 ppm; $CO_e$ = 306.6 ppm; $CO_{2e}$ = 1.43 pct.; $HC_d$ = 12.1 ppm; $NOx_d$ = 0.8 ppm; $CO_{dm}$ = 15.3 ppm.

The basic procedures in § 86.144 are used to calculate mass emissions. Since the short test only has one phase the weighting formula in paragraph (a) of § 86.144 is not used. The mass emission values of paragraph (b) of § 86.144 are divided by the distance traveled, which, for the Federal Short Cycle, is 0.75 mi (1.2 km).

(2) The mass emission results for the Federal Short Cycle example are:

$HC_{mass} = [(259)(16.33)(95.03/1,000,000)]/(0.75)$.

$HC_{mass}$ = 0.534 grams per vehicle mile.

$CO_{mass} = [(259)(32.97)(280/1,000,000)/(0.75)$.

$CO_{mass}$ = 3.188 grams per vehicle mile.

$NOx_{mass} = [(259)(54.16)(10.49/1,000,000)](0.75)$.

$NOx_{mass}$ = 0.196 grams per vehicle mile.

Then:

$V_{mix} = [(0.29344)(1,048)(762-70)(528)/(760)(570)]$.

$V_{mix}$ = 259.0 ft³.

$H = (43.478)(48.2)(22.225)/[762-(22.225 \times 48.2/100)]$.

$H$ = 62 grams/lb.

$K_H = 1/[1-0.0047(62-75)] = 0.9424$.

$CO_e = [1-(0.01925)(1.43)-(0.000323)(48)](306.0)$

$CO_e$ = 293.4 ppm.

$CO_d = [1-(0.000323)(48)]15.3 = 15.1 -$ ppm.

$DF = 13.4/[1.43+(105.8+293.4)\times10^{-6}]$

$DF$ = 9.116.

$HC_{conc} = 105.8-12(1-1/9.116) = 95.03$ ppm.

$CO_{conc} = 293.4-15.1(1-1/9.116) = 280.0$ ppm.

$NOx_{conc} = 11.2-0.8(1-1/9.116) = 10.49$ ppm.

### § 85.2209 New Jersey/New York Composite test specifications.

(a) *Road load power and inertia weight settings.* All vehicles shall be tested at 3000 lb. inertia weight and 3.5 ± 1 hp @ 30 mph.

(b) *Transmission.* (1) Transmissions, overdrives and free wheeling units shall be operated in accordance with the manufacturers' recommendations to the ultimate purchaser as indicated in the owners manual or as supplied by EPA.

(2) Idle modes shall be run with automatic transmissions in "Drive" with the wheels braked and manual transmissions in gear with the clutch disengaged.

(3) The vehicle shall be driven with minimum accelerator pedal movement to maintain the desired speed.

(4) Accelerations shall be driven smoothly according to the manufacturers' recommendation to the ultimate purchaser. For manual transmissions, the operator shall release the accelerator pedal during each shift and accomplish the shift with minimum time. If the vehicle cannot accelerate at the specified rate, the vehicle shall be operated with the accelerator pedal fully depressed until the vehicle speed reaches the value prescribed for that time in the driving schedule.

(5) The declaration modes shall be run in gear using brakes or accelerator pedal as necessary to maintain the desired speed. Manual transmission vehicles shall have the clutch engaged and shall not change gears from the previous mode. For those modes which decelerate to zero, manual transmission clutches shall be depressed when the speed drops below 15 mph (24 km/h), when engine roughness is evident, or when engine stalling is imminent.

(6) Downshifting is allowed at the beginning of or during a power mode in accordance with the manufacturers' recommendation to the ultimate purchaser.

(c) *Dynamometer procedure.* (1) The New Jersey/New York Composite test consists of a 75 second driving schedule composed of a series of constant rate accelerations, constant rate decelerations, and steady speed cruises. The exhaust emissions are diluted with ambient air and a continuously proportional sample is collected for analysis. The composite samples collected in bags are analyzed for hydrocarbons, carbon monoxide, carbon dioxide, and oxides of nitrogen. A parallel sample of the dilution air is similarly analyzed for hydrocarbon, carbon monoxide, carbon dioxide, and oxides of nitrogen.

(2) The vehicle engine compartment hood shall remain open for the duration of the NJ/NY Composite test. If vehicle overheating occurs (or is anticipated), a cooling fan(s) meeting the specifications set forth in § 85.2212(e) may be used.

(3) The vehicle speed as measured from the dynamometer rolls shall be used. The speed vs. time characteristics of each test shall be checked against the specification to assure test validity.

(4) Practice runs over the prescribed driving schedule may be performed at test points: *Provided,* An emission sample is not taken, for the purpose of finding the minimum throttle action to maintain the proper speed-time relationship, or to permit sampling system adjustments.

NOTE.—When using two-roll dynamometers a truer speed-time trace may be obtained by minimizing the rocking of the vehicle in the rolls. The rocking of the vehicle changes the tire rolling radius on each roll. This rocking may be minimized by restraining the vehicle horizontally (or nearly so) by using a cable and winch.

(5) The drive wheels shall be at the pressure prescribed for operation of the vehicle on the road by the tire manufacturer. If the tires are at normal operating temperature (not cold) at the time of testing, the pressure may be 2 to 3 psi above the manufacturers' recommended pressure. The vehicle shall not be tested with underinflated tires.

(6) If the dynamometer has not been operated during the 2-hour period immediately preceding the test it shall be warmed up for 15 minutes by operating at 30 mph (48 km/h) using a non-test vehicle or as recommended by the dynamometer manufacturer.

(7) The inertia weight and road load power shall be set at 3000 lb. and 3.5±1 hp at 30 mph prior to testing.

(8) If the engine stalls at any point during the dynamometer run, that test shall be voided. The engine shall then be restarted and run at 2500 rpm ± 200 rpm in neutral for 15 to 30 seconds preceding a retest. This procedure shall be followed until a complete, valid test is run.

(d) *Test sequence.* (1) Adjust the dynamometer for the required road load and inertia.

(2) Drive or push test vehicle onto the dynamometer so that wheels are centered on rolls.

(3) Examine emission control information label to determine engine family and displacement. Record information on test report.

(4) Attach restraining device to vehicle in such a fashion that the vehicle is not damaged. Release dyno brake.

(5) With the sample selector valves in the "standby" position connect evacuated sample collection bags to the dilute exhaust and dilution air sample collection systems.

(6) Start the Constant Volume Sampler (if not already on), the sample pumps, the temperature recorder and the vehicle cooling fan. The heat exchanger of the constant volume sampler, if used, should be preheated to its operating temperature before the test begins.

(7) Adjust the sample flow rates to the desired flow rate (minimum of 10 cfh.

AR_0033344

0.28 m³/hr) and set the gas flow measuring devices to zero.

Note.—CFV-CVS sampler flow rate is fixed by the venturi design.

(8) Attach adaptor(s) and exhaust collection tube(s) to vehicle tailpipe(s) (engine may be shutoff, if necessary).

(9) Attach engine speed pickup.

(10) Idle vehicle in neutral at 2,500 ±200 rpm for 15 to 30 seconds within 1 minute of beginning of dynamometer run.

(11) Place transmission in "Drive" or in gear with clutch disengaged.

(12) Start the gas flow measuring device, position the sample selector valves to direct the sample flow into the exhaust sample bag and the dilution air sample bag.

(13) Simultaneous with (12), turn on driver's aid and begin the initial acceleration of the driving schedule.

(14) Operate the vehicle according to the following dynamometer driving schedule:

| Mode: | | Times in mode (seconds) |
|---|---|---|
| 1. | Idle | 22 |
| 2. | 0-30 mph (0-48 km/hr) acceleration | 15 |
| 3. | 30 mph (48 km/hr) cruise | 15 |
| 4. | 30-10 mph (48-16 km/hr) deceleration | 12 |
| 5. | 10 mph (16 km/hr) cruise | 7 |
| 6. | 10-0 mph (16-0 km/hr) deceleration | 4 |
| | Total | 75 |

The speed at any given time on the dynamometer driving schedule must be within the tolerances given in § 86.115-78.

(15) At the end of the driving schedule, simultaneously turn off the gas flow measuring device and position the sample selector valve to the "standby" position. This ends the driving portion of the test.

(16) As soon as possible, tranfer the exhaust and dilution air samples to the analytical system and process them. A stabilized reading for the exhaust sample must be obtained within 20 minutes of the end of the sample collection phase of the test.

(17) Disconnect the engine speed pickup, adaptor(s), exhaust collection tube(s), and restraining device.

(18) Lock the dynamometer rolls and drive the vehicle off the dynamometer. This ends the test sequence.

(e) *Measurement operations.* The following sequence of operations shall be performed in conjunction with each service measurements:

(1) Zero the analyzers and obtain a stable zero reading. Recheck after tests.

(2) Introduce span gases and set instrument gains. In order to avoid corrections, span and calibrate at the same flow rates used to analyze the test sample. Span gases should have concentrations equal to 75 to 100 percent of full scale. If gain has shifted significantly on the analyzers, check the calibrations. Show actual concentrations on chart.

(3) Check zeros; repeat the procedure in paragraphs (e) (1) and (2) of this section if required.

(4) Check flow rates and pressures.

(5) Measure HC, CO, CO₂ and NOx concentrations of samples.

(6) Check zero and span points. If difference is greater than 2 percent of full scale, repeat the procedure in paragraphs (e) (1) through (5) of this section.

(f) *Records required.* The following information shall be recorded with respect to each test:

(1) Test number.

(2) Date and time of day for each test.

(3) Instrument operator.

(4) Driver or operator.

(5) Vehicle: Make; Model; Vehicle identification Number; Vehicle registration number and year; Vehicle Model year; Transmission type; Odometer reading; Engine displacement; Idle rpm; Fuel system (fuel injection, number of carburetors, number of carburetor barrels); Inertia loading; Vehicle registration weight; Actual road load at 50 mph (80 km/h); drive wheel tire pressures, as applicable; emission control technology.

(6) All pertinent instrument information such as tuning-gain-serial number-detector number-range. As an alternative, a reference to a vehicle test cell number may be used, with the advance approval of the EPA, provided test cell calibration records show the pertinent instrument information.

(7) Recorder charts: Identify zero, span, exhaust gas, and dilution air sample traces.

(8) Test cell barometric pressure, ambient temperature and humidity.

Note.—A central laboratory barometer may be used: *Provided,* That individual test cell barometric pressures are shown to be within ±0.1 percent of the barometric pressure at the central barometer location.

(9) Fuel temperatures, as prescribed.

(10) Pressure of the mixture of exhaust and dilution air entering the CVS metering device, the pressure increase across the device, and the temperature at the inlet. The temperature may be recorded continuously or digitally to determine temperature variations.

(11) The number of revolutions of the positive displacement pump accumulated during each test phase while exhaust samples are being collected. The number of standard cubic feet metered by a critical flow venturi during each test phase would be the equivalent record for a CFV-CVS.

(12) The humidity of the dilution air.

Note.—If conditioning columns are not used (see § 86.111-78) this measurement can be deleted. If the conditioning columns are used and the dilution air is taken from the test cell, the ambient humidity can be used for this measurement.

(g) *Test report.* A test report shall be completed in triplicate on a form approved by EPA and shall contain the information given below. One copy of this report should be given to the vehicle owner or his agent.

(1) Test type and driving schedule.

(2) VIN/License No.

(3) Owner's name and address.

(4) Car make, model, MY, engine size.

(5) Date of test.

(6) Odometer reading.

(7) Date of previous test on vehicle, if retest.

(8) Inertia and road load if applicable.

(9) Test site location, lane identification.

(10) Test results (including emission measurement values).

(11) Certification by instrument operator and driver that test was correctly performed.

§ 85.2210  New Jersey/New York composite test—calculations.

(a) For light duty vehicles and light duty trucks the mass emissions for each pollutant shall be computed by the following formulae:

(1) Hydrocarbon mass emissions:
$$HC_{mass} = V_{mix} \times Density_{HC} \times (HC_{conc} \times 10^{-6})/L.$$
(2) Carbon monoxide mass emissions:
$$CO_{mass} = V_{mix} \times Density_{CO} \times (CO_{conc} \times 10^{-6})/L.$$
(3) Oxides of Nitrogen mass emissions:
$$NOx_{mass} = V_{mix} \times Density_{NO_2} \times K_H \times (NOx_{conc} \times 10^{-6})/L.$$
(4) Carbon dioxide mass emissions:

$$CO_{2mass} = V_{mix} \times Density_{CO_2} \times (CO_{2conc} \times 10^{-2})/L.$$

(b) Meaning of symbols

(1) $HC_{mass}$ = Hydrocarbon emissions, in grams per mile.
Density$_{HC}$ = Density of hydrocarbon is 16.33 g/ft³ (.5767 kg/m³), assuming an average carbon to hydrogen ratio of 1:1.85, at 68°F (20°C) and 760 mm Hg (101.3 kPa) pressure.
$HC_{conc} = HC_e - HC_d (1-1/DF).$
Where:
$HC_e$ = Hydrocarbon concentration of the dilute exhaust sample in ppm carbon equivalent.
$HC_d$ = Hydrocarbon concentration of the dilution air as measured, in ppm carbon equivalent.
(2) $NOx_{mass}$ = Oxides of nitrogen emissions, in grams per mile.
Density$_{NO_2}$ = Density of oxides of nitrogen is 54.16 g/ft³ (1.913 kg/m³), assuming they are in the form of nitrogen dioxide, at 68°F (20°C) and 760 mm Hg (101.3 kPa) pressure.
$NO_{conc}$ = Oxides of nitrogen concentration of the dilute exhaust sample corrected for background, in ppm.
$NOx_{conc} = NOx_e - NOx_d(1-1/DF).$
Where:
$NOx_e$ = Oxides of nitrogen concentration of the dilute exhaust sample as measured, in ppm.
$NOx_d$ = Oxides of nitrogen concentration of the dilution air as measured, in ppm.
(3) $CO_{mass}$ = Carbon monoxide emissions, in grams per mile.
Density$_{CO}$ = Density of carbon monoxide is 32.97 g/ft³, at 68°F (20°C) and 760 mm Hg (101.3 kPa) pressure.
$CO_{conc}$ = Carbon monoxide concentration of the dilute exhaust sample corrected for background, water vapor, and CO₂ extraction, in ppm.
$CO_{conc} = CO_e - CO_d (1-1/DF).$

AR_0033345

Where:

$CO_z$ = Carbon monoxide concentration of the dilute exhaust sample volume corrected for water vapor and carbon dioxide extraction, in ppm. The calculation assumes the carbon to hydrogen ratio of the fuel is 1:1.85.

$CO_z = (1 - 0.01925 \ CO_{2e} - 0.000323 \ R) \ CO_{em}$.

Where:

$CO_{em}$ = Carbon monoxide concentration of the dilute exhaust sample as measured, in ppm.

$CO_{2e}$ = Carbon dioxide concentration of the dilute exhaust sample, in percent.

R = Relative humidity of the dilution air, in percent (see § 86.142(n)).

$CO_d$ = Carbon monoxide concentration of the dilution air corrected for water vapor extraction, in ppm.

$CO_d = (1 - 0.000322 \ R) \ CO_{dm}$.

Where:

$CO_{dm}$ = Carbon monoxide concentration of dilution air sample as measured, in ppm.

NOTE.—If a CO instrument which meets the criteria specified in § 86.111 is used and the conditioning column has been deleted, $CO_{em}$ can be substituted directly for $CO_z$ and $CO_{dm}$ can be substituted directly for $CO_d$.

(4) $CO_{2 \ mass}$ = Carbon dioxide emissions, in grams per mile.

Density $e_{B}$ = Density of carbon dioxide is 51.85 g/ft³ (1.843 kg/m³), at 68° F (20° C) and 760 mm Hg (101.3 kPa) pressure

$CO_{2 \ conc}$ = Carbon dioxide concentration of the dilute exhaust sample corrected for background, in percent.

$CO_{2 \ conc} = CO_{2e} - CO_{2d}(1 - 1/DF)$.

Where:

$CO_{2d}$ = Carbon dioxide concentration of the dilution air as measured, in percent.

(5) L = Cycle length, in mi (km).

L = 0.28 mi (0.45 km).

$DF = 13.4/[CO_{2e} + (HC_e + CO_e) \ 10^{-4}]$.

KH = Humidity correction factor.

$KH = 1/[1 - 0.0047(H - 75)]$ for SI units = $1/[1 - 0.0329(H - 10.71)]$.

Where:

H = Absolute humidity in grains (grams) of water per pound (kilogram) of dry air.

$H = [(43.478) \ R_a \times P_d]/[P_B - (P_a \times R_a/100)]$ for SI units, $H = (6.211) \ R_a \times P_d/[P_B - (P_a \times R_a/100)]$.

$R_a$ = Relative humidity of the ambient air, in percent.

$P_d$ = Saturated vapor pressure, in mm Hg (kPa) at the ambient dry bulb temperature.

$P_B$ = Barometric pressure, in mm Hg (kPa).

$V_{mix}$ = Total dilute exhaust volume in cubic feet per test corrected to standard conditions (538 B) (293 K) and 760 mm Hg (101.3 kPa)).

For PDP-CVS, $V_{MIX}$ is:

$$V_{mix} = V_o \times \frac{N(P_B - P_4)(528R)}{(760 \ mm \ Hg)(T_p)}$$

for SI units,

$$V_{mix} = V_o \times \frac{N(P_B - P_4)(293.15K)}{(101.325 \ kPa)(T_p)}$$

Where:

$V_o$ = Volume of gas pumped by the positive displacement pump, in cubic feet (m³) per revolution. This volume is dependent on the pressure differential across the positive displacement pump.

N = Number of revolutions of the positive displacement pump during the test phase when samples are being collected.

$P_B$ = Barometric pressure, in mm Hg (kPa).

$P_4$ = Pressure depression below atmospheric measured at the inlet to the positive displacement pump, in mm Hg (kPa) (during an idle mode).

$T_p$ = Average temperature of dilute exhaust entering positive displacement pump during test, $R(K)$.

(c) Example calculation of mass values of exhaust emissions using positive displacement pump:

(1) Assume the following:

$V_o$ = 0.29344 ft³/revolution; N = 1,048; R = 48.0 pct.; $R_a$ = 48.2 pct.; $P_B$ = 762 mm Hg; $P_d$ = 22.225 mm Hg; $P^a$ = 70 mm Hg; $T_p$ = 570 R; $HC_e$ = 105.8 ppm, carbon equivalent; $NOx_e$ = 11.2 ppm; $CO_{em}$ = 306.6 ppm; $CO_{2e}$ = 1.43 pct. $HC_d$ = 12.1 ppm; $NOx_d$ = 0.8ppm; $CO_{dm}$ = 15.3 ppm.

The basic procedures in § 86.144 are used to calculate mass emissions. Since the short test only has one phase the weighting formula in paragraph (a) of § 86.144 is not used. The mass emission values of paragraph (b) of § 86.144 are divided by the distance traveled, which, for the NJ/NY Composite test, is 0.28 mi (0.45 km).

Then:

$V_{mix} = (0.29344)(1,048)(762 - 70)(528)/(760)(570)$.

$V_{mix} = 259.0 \ ft^3$.

$H = (43.478)(48.2)(22.225)/[762 - (22.225 \times 48.2/100)]$.

H = 62 grams/lb.

$K_H = 1/[1 - 0.0047(62 - 75)] = 0.9424$.

$CO_z = [1 - (0.01925)(1.43) - (0.000323)(48)](306.6)$.

$CO_z = 293.4 \ ppm$.

$CO_d = [1 - (0.000323)(48)]15.3 = 15.1 \ ppm$.

$DF = 13.4/[1.43 + (105.8 + 293.4) \times 10^{-4})]$.

DF = 9.116.

$HC_{conc} = 105.8 - 12(1 - 1/9.116)$

= 95.03 ppm.

$CO_{conc} = 293.4 - 15.1(1 - 1/9.116) = 280.0 \ ppm$.

$NOx_{conc} = 11.2 - 0.8(1 - 1/9.116) = 10.49 \ ppm$.

(2) The mass emission results for the NJ/NY Composite test example are:

$HC_{mass} = [(259)(16.33)(95.03/1,000,000)]/(0.28)$.

$HC_{mass} = 1.435$ grams per vehicle mile.

$CO_{mass} = [(259)(32.97)(280/1,000,000)]/(0.28)$.

$CO_{mass} = 8.539$ grams per vehicle mile.

$NOx_{mass} = [(259)(54.16)(10.49/1,000,-000)]/(0.28)$.

$NOx_{mass} = 0.525$ grams per vehicle mile.

## § 85.2211   [Reserved]

## § 85.2212   Dynamometer systems.

(a) *Dynamometer for Federal Short Cycle test.* (1) The dynamometer used for

the Federal Short Cycle test shall be equipped with preselectable loads and inertia weights for the vehicles to be tested.

(2) The chassis dynamometer for the Federal Short Cycle test shall be capable of a minimum of 50 horsepower load absorption at 50 MPH repeatable to ± 0.25 horsepower without control adjustment. Torque measurement signals shall be accurate to ± 0.25 percent of full scale. Instrumentation shall be readable from the vehicle drivers seat and shall have readout accuracies within 1 percent of full scale for vehicle speed, engine RPM, torque and horsepower.

(3) The dynamometer to be used for the Federal Short Cycle test shall require inertia simulation loading from 1750 to 6000 pounds with automatic road load selections (horsepower and inertia) at 12 settings (from 1750 to 6000 pounds) that are in agreement with the specifications of § 86.129. The controls for the road load system should be capable of being interfaced with those for the variable inertia or being separated for individual load and inertia controls. An additional remote control device should be provided for the driver to set the dynamometer load when operating under separate load and inertia controls.

(b) *Dynamometer for NJ/NY Composite test.* The dynamometer used for the composite NJ/NY test shall be capable of setting a 3.5 HP load setting @ 30 mph with a 3000 lb inertia weight.

(c) *Vehicle restrainnig.* A vehicle restraining device is necessary to hold the vehicle on the dynamometer rolls effectively for both rear and front wheel drive vehicles.

(d) *Driver's aid.* A drivers aid device relating vehicle speed in MPH to time of test shall be used for variable speed mode tests as in paragraphs (a) and (b) of this section. While it is preferable to use preprinted or computer-drawn charts approved by the administrator for purposes of record keeping and driver test validity, computer-controlled oscilloscopes or digital readout devices can be employed for directing drivers but should be provided with a test validity check so that the speed-time tolerances are met as specified in § 86.115-78(b).

(e) *Cooling fan.* Cooling fan(s) are not normally needed for the short tests but some vehicles, when the ambient temperature exceeds 95° F, tend to overheat. In these cases it is permissible to use an engine cooling fan normally rated at 5300 CFM. The fan must have been certified for its capacity by the fan manufacturers and positioned as outlined in § 86.135-78(b).

(f) *RPM meter.* The engine rpm meter shall be AC powered and provided with an induction type pickup so that no tools will be needed for attachment to the ignition system.

## § 85.2213   Exhaust gas sampling system.

(a) *General.* The exhaust gas sampling systems used in the Federal Short Cycle Test and the composite New Jer-

AR_0033346

**PROPOSED RULES**

sey/New York Test are identical. The Federal Short Cycle Test and the composite New Jersey/New York Test employ Variable Speed Modes. Density of sampling systems to be used in these tests are designed to measure the true mass emissions of vehicles.

(b) *Mass Emission Exhaust Sampling Systems.* The requirements are identical to those described in § 86.109-78(a) and the component descriptions in § 86.109-78 (b) and (c).

§ 85.2214  Calibration procedures for transient mode tests.

(a) *Calibration of dynamometer.* The dynamometer system for transient mode tests shall be calibrated in accordance with the manufacturers basic instructions and then with the procedure outlined in § 86.118-78. The following conditions shall constitute an acceptable calibration of the system components.

(1) Four or more data points shall be measured that adequately span the horsepower range of the vehicles to be tested on the dynamometer.

(2) The minimum range covered by the data points shall be 20 horsepower.

(b) *Calibration of driver's aid.* The drivers aid device shall be calibrated for time and speed accuracy as follows:

(1) The calibration of the unit for time shall be performed using a timer with an accuracy of ±0.1 second in 60 minutes to measure the total time for the travel of the preprinted chart or computer actuated trace and the accuracy at any point shall be within ±0.2 second. The measurement shall be repeated with adjustments as needed until the accuracy is attained.

(2) The speed indication shall be calibrated by measuring the relationship between the RPM of the rolls and the readout in mph of the recorder. The relationship is expressed by the formula,

$$mph = \frac{RPM \times II \times D}{1056}$$ where D equals

roll diameter in inches and mph is determined to one significant decimal place.

(3) The calibration shall be performed with the use of a precision tachometer (accuracy = ±1 percent F.S. or better) to determine the RPM of the roll normally connected to the system tachometer. One reading shall be taken at 1800 rpm roll speed and a second reading 900 RPM roll speed in order to establish linearity of the system. Perform any adjustments needed to make MPH indicator of system read accurately at zero and the two points represented above.

(4) After this calibration, the system MPH meter can be used to calibrate the speed (MPH) portion of the Driver's aid recorder.

(c) *Calibration of CVS.* The requirements are identical to those described in § 86.119-78.

(d) *Calibration of HC Analyzer.* The requirements are identical to those described in § 86.121-78.

(e) *Calibration of CO Analyzer.* The requirements are identical to those described in § 86.122-78.

(f) *Calibration of NO₂ Analyzer.* The requirements are identical to those described in § 86.123-78.

(g) *Calibration of CO₂ Analyzer.* The requirements are identical to those described in § 86.124-78.

(h) *Calibration of Other Equipment.* The requirements are identical to those described in § 86.126-78.

(i) *Frequency of analyzer calibrations.* The requirements are identical to those described in § 86.116-78(c)(1)(3), (d) (1)(2), (e), (f).

(j) *Frequency of dynamometer calibration.* The frequency of dynamometer calibration and the associated equipment used for testing shall, in general, be performed as often as required by the individual manufacturers of the equipment. In order to insure good standards of performance, however, both vehicle conformance checks and quality control calibrations should be performed as follows:

(1) Cross checks shall be made weekly on dynamometer systems using a vehicle with uniform or repeatable emissions to find the correlation between dynamometers and establish an acceptable degree of uniformity. Of necessity, this final emission test involves individual calibrations of the CVS (§ 85.2214-(c)) and the analytical instruments (§ 85.2214-(d) through (g)) in addition to the chassis dynamometer calibration. A desirable alternative method is to use a vehicle with repeatable emissions that has been equipped with analytical instruments and calibration gases, thereby reducing the unknowns to the CVS and chassis dynamometer.

(2) The dynamometer system shall be calibrated at least monthly according to paragraph (a) of this section unless dynamometer maintenance has been performed which could alter the calibration. In that case, or if performance cross

checks show deterioration, the calibration should be made as soon as possible.

(k) *Frequency of calibration of other equipment.* Other test equipment shall be calibrated as often as required by the manufacturer or as necessary according to good engineering practice.

§ 85.2215  [Reserved]

§ 85.2216  Steady state modal test specifications, overview.

The steady state modal exhaust emission short test consists of vehicle operation over 3 steady state modes during which undiluted exhaust samples are analyzed for hydrocarbon, carbon monoxide and oxides of nitrogen.

§ 85.2217  Steady state modal test procedures, general requirements.

(a) Vehicles shall be tested in the configuration in which they arrive at the test site, with no preconditioning or vehicle preparation. Vehicles shall be tested at the ambient temperatures encountered at the test sites. Vehicles shall be approximately level during the test sequence to prevent abnormal fuel distribution.

(b) Exhaust samples shall be taken from both tailpipes on vehicles having more than one tailpipe exhaust outlet. The pollutant concentration level shall be measured for exhaust samples from each tailpipe according to the procedures outlined in this subpart and then the average emission level of the two tailpipe exhaust samples shall be reported as the official test results.

§ 85.2218  Clayton Key Mode test specifications.[1]

(a) Transmission ranges, speed ranges, and road load power settings. Transmission ranges, speed ranges, and road load power settings shall be determined according to the following schedule:

| Vehicle weight class (lb) | Transmission, range/gear | Dyno load hp at mph | High-speed cruise | Low-speed cruise | Idle [1] |
|---|---|---|---|---|---|
| Up to 2,800 lb...... | Drive for auto trans; high gear (3d) manual trans. | 15 at 38.. | 36 to 38.. | 22 to 25.. | Automatic transmission in drive. |
| 2,801 to 3,800 lb...... | Drive for auto trans; high gear for manual trans. | 24 at 46.. | 44 to 46.. | 29 to 32.. | Do. |
| 3,801 lb and up.......... | do.................. | 30 at 50.. | 48 to 50.. | 22 to 35.. | Do. |

[1] Tests in which the idle speed is not within ±100 rpm of manufacturers specification shall be declared invalid.

(b) *Test weights.* A complete listing of all vehicle/engine displacement combinations and their respective inertia test weights must be available at each test site prior to initiation of testing.

(c) Dynamometer procedure: (1) During the steady state exhaust emission test, the raw exhaust is collected via a sample probe(s) (as described in § 85.2232(m)) inserted directly into the vehicle tailpipe(s). The undiluted exhaust is analyzed continuously while the vehicle is run on the dynamometer in three steady state modes, and the emission levels are monitored and recorded upon stabilization of readings. Pollutant emission levels are read and reported as volumetric concentrations, expressed in parts per million of hydrocarbons and

oxide of nitrogen and in percent (by volume) for carbon monoxide.

(2) Under normal test conditions, and normal vehicle operation, no cooling fan shall be in use. The vehicle engine compartment hood shall remain open during the dynamometer run. However, if problems with vehicle overheating are encountered or anticipated, a cooling fan(s) meeting the requirements set forth in § 86.135-78(b) may be used.

(3) The vehicle speed as measured from the dynamometer rolls shall be

[1] Clayton Key Mode is a proprietary procedure for which a patent has been applied for by the Clayton Manufacturing Company, which company has stated that it will charge fees for the use of this test procedure.

AR_0033347

used for speed determination during the high speed and low speed modes. The speed of each test shall be checked against the specification to assure test validity.

(4) Rocking of the test-vehicle on a two-roll dynamometer shall be minimized by restraining the vehicle horizontally (or nearly so) by using a cable and winch restraining device.

(5) The drive wheels shall be at the pressure prescribed for operation of the vehicle on the road by the tire manufacturer. If the tires are at normal operating temperature (not cold) at the time of testing, the pressure may be 2 to 3 psi above the manufacturers' recommended pressure. The vehicle shall not be tested with underinflated tires.

(6) If the dynamometer has not been operated during the 2 hour period immediately preceding the test, it shall be warmed up for 15 minutes at 30 mph using a non-test vehicle or as recommended by the manufacturer.

(7) If the engine stalls at anytime during one of the steady-state tests, the engine shall be restarted and idled at 2,500±200 rpm for 15–30 seconds and the test resumed at the point of the stall.

(d) Test sequence: (1) Drive or push test vehicle onto the dynamometer so that drive wheels are centered on rolls.

(2) Attach restraining device to vehicle in such a fashion that the vehicle is not damaged.

(3) Open engine compartment and attach engine speed pickup.

(4) Insert sample probe(s) into tailpipe(s).

(5) Examine emission control information label to determine engine family and displacement. Record information on test report.

(6) Adjust dynamometer for the required road load.

(7) Calibrate analyzers according to § 85.2223(c) within 1 hour of the beginning of each test.

(8) Idle vehicle in neutral at 2500± 200 rpm for 15 to 30 seconds within 1 minute of start of each test.

(9) Run test vehicle in high speed mode until emission levels stabilize or for a maximum of 2 minutes.

(10) Record concentration of HC, CO, and NOx upon stabilization or record the highest reading obtained during the last 30 seconds of the 2 minute test period.

(11) Run vehicle in low speed mode until emission levels stabilize or for a maximum of 2 minutes.

(12) Record concentrations of HC, CO, and NOx upon stabilization or record the highest reading reached during the final 30 seconds of the 2 minute test period.

(13) Idle vehicle in drive until emission levels stabilize or for a maximum of 2 minutes.

(14) Record concentrations of HC, CO, and NOx upon stabilization or record the highest reading reached during the last 30 seconds of the 2 minute sampling periods.

(15) Remove sample probe(s).

(16) Remove engine speed pickup and close engine compartment.

(17) Release restraining device.

(18) Lock dynamometer rolls.

(19) Drive vehicle off of dynamometer.

(e) Record required: The following information shall be recorded with respect to each test:

(1) Test number.

(2) Date and time of day for each test.

(3) Instrument operator.

(4) Driver or operator.

(5) Vehicle: Make; Model; Vehicle identification number; Model year; vehicle registration number and year; Transmission type; Odometer reading; Engine displacement; Idle rpm; Fuel system (fuel injection, number of carburetors, number of carburetor barrels); Inertia loading; vehicle registration weight; Actual road load at 50 mph (80 km/h); drive wheel tire pressure, and applicable emission control technology.

(6) All pertinent instrument information such as tunning; gain; serial number; detector number; range. As an alternative, a reference to a vehicle test lane number may be used, with the advance approval of the Administrator, provided test lane calibration records show the pertinent instrument information.

(7) Recorder charts: Identify zero, span, exhaust gas, and dilution air sample traces.

(8) Test cell barometric pressure, ambient temperature and humidity.

NOTE: A central inspection station barometer may be used: Provided, That individual test lane barometric pressures are shown to be within ±0.1 percent of the barometric pressure at the central barometer location.

(9) Readings obtained during each of the three test modes shall be the final reported emission levels, expressed in ppm for HC and NOx with CO expressed in percent by volume.

(f) Test report: A test report shall be completed in triplicate on a form approved by EPA and shall contain the following information. One copy shall be given to the vehicle owner or his agent.

(1) Test type and driving schedule.

(2) VIN/License No.

(3) Owner's name and address.

(4) Car make, model, MY, engine size, group.

(5) Date of test.

(6) Odometer reading.

(7) Date of previous test on vehicle, if retest.

(8) Inertia and road load if applicable.

(9) Test site location, lane identification.

(10) Test results (including emission measurement values).

(11) Certification by instrument operation and driver that test was correctly performed.

§ 85.2219   Federal Three-Mode test specifications.

(a) Transmission ranges, speed ranges, and road load power settings. Transmission ranges, speed ranges, and road load power settings shall be determined according to the following schedule:

| Vehicle weight class (lb) | Transmission range | High-speed mode | | Low-speed mode | | Idle mode[1] |
|---|---|---|---|---|---|---|
| | | Speed (mph) | Load (hp) | Speed (mph) | Load (hp) | |
| Up to 2,500 lb. | Drive for auto trans; high (3d) gear for manual trans. | 50 | 21 | 30 | 0 | Automatic transmission in neutral. |
| 2,501 to 3,500 lb. | Drive for auto trans; high gear for manual trans. | 50 | 26 | 30 | 12 | Do. |
| 3,501 to 4,500 lb. | do. | 50 | 31 | 30 | 15 | Do. |
| Above 4,501 lb. | do. | 50 | 36 | 30 | 18 | Do. |

[1] Test in which the idle speed is not within ±100 rpm of manufacturer's specification shall be declared invalid.

(b) Test weights. A complete listing of all vehicle/engine displacement combinations and their respective inertia test weights shall be provided to each test site prior to initiation of testing.

(c) Dynamometer procedure:

(1) During the steady state exhaust emission test, the raw exhaust is collected via a sample probe(s) (as described in § 85.2222(m)) inserted directly into the vehicle tailpipe(s). The undiluted exhaust is analyzed continuously while the vehicle is run on the dynamometer in three steady state modes, and the emission levels are monitored and recorded upon stabilization of readings. Pollutant emission levels are read and reported as volumetric concentrations, expressed in parts per million of hydrocarbons and oxides of nitrogen and in percent (by volume) for carbon monoxide.

(2) Under normal test conditions, and normal vehicle operation, no cooling fan shall be in-use. The vehicle engine compartment hood shall remain open during the dynamometer run. However, if problems with vehicle overheating are encountered or anticipated, a cooling fan(s) meeting the requirements set forth in § 86.135–78(b) may be used.

(3) The vehicle speed as measured from the dynamometer rolls shall be used for speed determination during the high speed and low speed modes. The speed of each test shall be checked against the specification to assure test validity.

(4) Rocking of the test vehicle on a two-roll dynamometer shall be minimized by restraining the vehicle horizontally (or nearly so) by using cable and winch.

(5) The drive wheels shall be at the pressure prescribed for operation of the vehicle on the road by the tire manufacturer. If the tires are at normal operating temperature (not cold) at the time of testing, the pressure may be 2 to 3 psi

above the manufacturers' recommended pressure. The vehicle shall not be tested with underinflated tires.

(6) If the dynamometer has not been operated during the 2 hour period immediately preceding the test, it shall be warmed up for 15 minutes at 30 mph using a non-test vehicle or as recommended by the manufacturer.

(7) If the engine stalls at anytime during one of the steady state tests, the engine shall be restarted and idled at 2500 ± 200 rpm for 15–30 seconds and the test resumed at the point of the stall.

(d) Test sequence: (1) Drive or push test vehicle onto the dynamometer so that drive wheels are centered on rolls.

(2) Attach restraining device to vehicle in such a fashion that the vehicle is not damaged.

(3) Open engine compartment and attach engine speed pickup.

(4) Insert sample probe(s) into tailpipe(s).

(5) Examine emission control information label to determine engine family and displacement. Record information on test report.

(6) Adjust dynamometer for the required road load.

(7) Calibrate analyzers according to § 85.2223(c) within 1 hour of the beginning of each test.

(8) Idle vehicle in neutral at 2,500 ± 200 rpm for 15 to 30 seconds within 1 minute of start of each test.

(9) Run test vehicle in high speed mode until emission levels stabilize or for a maximum of 2 minutes.

(10) Record concentration of HC, CO, and NOx upon stabilization or record the highest reading obtained during the last 30 seconds of the 2 minute test period.

(11) Run vehicle in low speed mode until emissions levels stabilize or for a maximum of 2 minutes.

(12) Record concentrations of HC, CO, and NOx upon stabilization or record the highest reading reached during the final 30 seconds of the 2 minute test period.

(13) Idle vehicle in neutral until emission levels stabilize or for a maximum of 2 minutes.

(14) Record concentrations of HC, CO, and NOx upon stabilization or record the highest reading reached during the last 30 seconds of the 2 minutes sampling period.

(15) Remove sample probe(s).

(16) Remove engine speed pickup and close engine compartment.

(17) Release restraining device.

(18) Lock dynamometer rolls.

(19) Drive vehicle off of dynamometer.

(e) Records required: The following information shall be recorded with respect to each test:

(1) Test number.

(2) Date and time of day for each test.

(3) Instrument operator.

(4) Driver or operator.

(5) Vehicle: Make; model; vehicle identification number; model year; vehicle registration number and year; transmission type; odometer reading; engine displacement; idle rpm; fuel system (fuel injection, number of carburetors,

number of carburetor barrels); inertia loading; vehicle registration weight; actual road load at 50 mph (80 km/h); drive wheel tire pressure, as applicable; emission control technology.

(6) All pertinent instrument information such as tuning; gain; serial number; detector number; range. As an alternative, a reference to a vehicle test lane number may be used, with the advance approval of the Administrator, provided test lane calibration records show the pertinent instrument information.

(7) Recorder charts: Identify zero, span, exhaust gas, and dilution air sample traces.

(8) Test cell barometric pressure, ambient temperature and humidity.

Note.—A central laboratory barometer may be used: Provided, That individual test cell barometric pressures are shown to be within ±0.1 percent of the barometric pressure at the central barometer location.

(9) Readings obtained during each of the three test modes shall be the final reported emission levels, expressed in ppm for HC and NOx with CO expressed in percent by volume.

(f) Test report: A test report shall be completed in triplicate and on a form approved by EPA and shall contain the following information. One copy shall be given to the vehicle owner or his agent.

(1) Test type and driving schedule.

(2) VIN/License No.

(3) Owner's name and address.

(4) Car make, model, MY, engine size.

(5) Date of test.

(6) Odometer reading.

(7) Date of previous test on vehicle, if retest.

(8) Inertia and road load if applicable.

(9) Test site location, lane identification.

(10) Test results (including emission measurement values).

(11) Certification by instrument operation and driver that test was correctly performed.

§ 85.2220  Equipment specifications—steady state modal tests.

Equipment which is equivalent in all material respects to that described in §§ 85.2211 to 85.2214 may be used for steady state short tests. However, equipment described in §§ 85.2221 and 85.2222 may also be used.

§ 85.2221  Dynamometer System.

(a) General requirements. Steady state tests such as the Federal Three Mode and the Key Mode require a dynamometer with a power absorption unit but no inertia simulation. The same type of dynamometer specified in § 85.2212(a) can be used with the inertia assembly disengaged.

(b) Road load power settings. Road load power for the dynamometer shall be set according to the individual test requirements.

(c) Dynamometer tolerance requirements. The chassis dynamometer used for steady state tests shall be capable of a minimum of 50 HP load absorption at 50 MPH that is repeatable to ±0.25 HP without control readjustment. Torque

measurement signals shall be accurate to ±0.25% of full scale. Instrumentation shall be readable from the vehicle drivers seat and shall have readout accuracies within 1% of full scale for vehicle speed, engine RPM, torque and horsepower.

(d) Vehicle restraining device. A vehicle restraining device is necessary to hold the vehicle on the dynamometer rolls effectively for both front and rear-wheel driven vehicles.

(e) Driver's aid. A drivers aid device is not required but verification of vehicle speed by recording is necessary.

(f) Cooling fan. External cooling fans are not normally needed for the short tests, but some vehicles, when the ambient temperature exceeds 95°F, tend to overheat. In these cases it is permissible to use an engine cooling fan normally rated at 5300 CFM. The fan must have been certified for its capacity by the fan manufacturer and positioned as outlined in § 86.135-78(b).

(g) RPM meter. The engine rpm meter shall be AC powered and be provided with an induction type pickup so that no tools will be needed for attachment to the ignition system.

§ 85.2222  Exhaust gas sampling system.

(a) General. The existing sampling systems available for use in short tests are designed to sample the raw engine exhaust and determine the concentration of the pollutants by volume. The sample handling system is an integral part of the exhaust gas analyzer package and includes the pumps, valves, filters, moisture separator, lines, detectors, meters and sample probes.

(b) Analyzer operation, maintenance, and durability. The analyzer shall be simple to operate and maintain by garage personnel. The analyzer shall have sufficient durability and ruggedness for frequent use and continuous analysis at various vehicle exhaust flow rates for long periods in a garage environment.

(c) Continuous measurement. The instruments shall be capable of continuously measuring the concentration of carbon monoxide, hydrocarbons, and/or oxides of nitrogen in vehicle exhaust emissions during a succession of "Idle Mode", "Key Mode" and/or other short inspection tests.

(d) Instrument readout. A direct meter readout is required for each pollutant measured and an automatic or semiautomatic digital emission indication is desirable, with a voltage output capable of continuously interfacing with a digital indicator or computer for recording vehicle exhaust emissions.

(e) Analyzer ranges. The analyzers shall have either a multiple range or expanded scale presentation that provides the following approximate capabilities:

Maximum Ranges = 0—10% CO, 0–2000 ppm HC, 0–2000 ppm NO. Minimum Graduations = 0.05% CO, 5 ppm HC, 10 ppm NO.

(f) Accuracy. The accuracy of the analyzer shall be closer than ±3% of the full scale reading for all ranges.

(g) Response time. The response time for an exhaust gas sample introduced at

AR_0033349

the probe shall be less than 10 seconds for 90% of the reading.

(h) *Calibration check.* The system shall contain a convenient calibration check for performance testing. The calibration method may be a gas standard or other mechanical or electrical method. Air may be used for zero checking.

(i) *Warm-up time.* Warm-up time shall be as short as possible, but not greater than 30 minutes from a cold start.

(j) *Electronic circuitry.* All electronics circuitry should be solid state.

(k) *Zero and span procedures.* Zeroing and spanning of the individual instruments of the system shall be performed before and after each emission test using the instrument manufacturers recommended methods, or other method if shown to be more satisfactory.

(l) *Sample line.* The sampling probe and sample line shall be long enough to cool the exhaust gas to a temperature sufficient to condense the water of combustion, so that there is no possibility of moisture condensing in the infrared cell or sampling handling system outside of the moisture separator and water drain, and that the specific humidity of the exhaust sample gas remain relatively constant so as not to cause undue interference. The moisture separator should be of such design that it does not require cooling water.

(m) *Sample probe.* The sample probe shall be of a replaceable type and shall be made from stainless steel tubing (or other inert metal) that is not less than ¼'' inner diameter (I.D.) and not greater than ⅜'' outer diameter (O.D.). The probe shall be of rugged construction, especially in the area where the probe is connected to the sample line, and be equipped with an insulated handle of proper length for easy use. The insertion end of the probe tubing shall be closed and the exhaust gas sample shall be drawn through four ⅛'' holes regularly spaced away from the closed end.

(n) *Repeatability.* Repeatability of the system shall be ±1% of full scale during five successive samples of the same gas source over a one hour period of continuous operation. The zero and drift of a warm-up system shall be less than ±1% of full scale during an 8 hour period of continuous operation.

### § 85.2223   Calibration procedures—steady state modal tests.

(a) *Dynamometer calibration.* The dynamometer system described in § 85.-2212(a) shall be calibrated in accordance with the manufacturer's basic instructions and then with the procedure specified in § 86.118-78 except that for use in these steady mode short tests, no inertia simulation is used (Item 3). The following conditions shall constitute an acceptable calibration of the system components:

(1) Four or more data points shall be measured that adequately span the horsepower range of the vehicles to be tested on the dynamometer.

(2) The minimum range covered by the data points shall be 20 horsepower.

(b) *Analyzer calibration.* Instruments shall be calibrated at least once during each testing day (usually just previous to the commencement of testing) in accordance with the manufacturer's instructions. Cross checks shall be made weekly using calibration gases of known accuracy that are related to N.B.S. standards. A desirable alternative method is to use a vehicle with repeatable emissions that has been equipped with analytical instruments and calibration gases, thereby reducing the unknowns.

(c) *Frequency of calibration.* The frequency of dynamometer calibration and the associated equipment used for testing shall, in general, be performed as often as required by the individual manufacturers of the equipment. In order to insure good standards of performance, however, both vehicle conformance checks and quality control calibrations should be performed as follows:

(1) Cross checks shall be made weekly on dynamometer systems using a vehicle with uniform or repeatable emissions to confirm the correlation between dynamometers and establish an acceptable degree of conformance. Of necessity this final emission test involves individual calibrations of the analytical instruments and gas correlation in addition to the chassis dynamometer calibration. A desirable alternative method is to use a vehicle with repeatable emissions that has been equipped with analytical instruments and calibration gases, thereby reducing the unknowns.

(2) The dynamometer system shall be calibrated at least monthly according to paragraph (a) of this section unless dynamometer maintenance has been performed which could alter the calibration. In that case, or if performance cross checks show deterioration, the calibration should be made as soon as possible.

### § 85.2224   [Reserved]

### § 85.2225   Idle test specifications.

(a) *General requirements.* Raw exhaust is collected via a sample probe(s) (as described in § 85.2222(m)) which is inserted into the vehicle tailpipe(s) while the vehicle idles in neutral at normal idle speed. The undiluted exhaust is analyzed continuously for the duration of the idle period, and the pollutant concentrations are read and recorded upon stabilization (or at the end of a 2 minute sample period). Emission concentrations are reported in ppm (by volume) for hydrocarbons and percent (by volume) for carbon monoxide.

(1) Vehicles shall be tested in the configuration in which they arrive at the test site, with no preconditioning or vehicle preparation. Vehicles shall be tested at the ambient temperatures encountered at the test sites. Vehicles shall be approximately level during the test sequence to prevent abnormal fuel distribution.

(2) Exhaust samples shall be taken from both tailpipes on vehicles which have more than one tailpipe exhaust outlet. The pollutant concentration levels shall be measured for exhaust samples from each tailpipe according to the procedures outlined in this subpart and then the average emission level of the two tailpipe exhaust samples shall be reported as the official test results.

(3) Under normal test condition, and normal vehicle operation, no cooling fan shall be used.

(4) If the engine stalls at any time during idle test, the engine be restarted and idled at 2500±200 rpm for 15–30 seconds and the test resumed.

(b) *Test sequence.* (1) Drive vehicle into test area.

(2) Attach engine speed pickup.

(3) Insert sample probe(s) into tailpipe(s).

(4) Calibrate analyzers according to § 85.2223(c) within 1 hour of the beginning of each test.

(5) Idle vehicle in neutral at 2500±200 rpm for 15 to 30 seconds within 1 minute of start at each test.

(6) Idle vehicle in neutral until emission levels stabilize or for a maximum of 2 minutes.

(7) Record concentrations of HC and CO upon stabilization or record the highest reading reached during the last 30 seconds of the 2 minute sampling period.

(8) Remove sample probe(s).

(9) Remove engine speed pickup.

(10) Drive vehicle out of test area.

(c) *Records required.* The following information shall be recorded with respect to each test:

(1) Test number.

(2) Date and time of day for each test.

(3) Instrument operator.

(4) Driver or operator.

(5) Vehicle: Make; model; vehicle identification number; model year; vehicle registration number and year; transmission type; odometer reading; engine displacement; idle rpm; fuel system (fuel injection, number of carburetors, number of carburetor barrels); inertia loading; vehicle registration weight; actual road load at 50 mph (80 km/h); drive wheel tire pressure, as applicable; emission control technology.

(6) All pertinent instrument information such as tuning; gain; serial number; detector number; range. As an alternative, a reference to a vehicle test lane number may be used, with the advance approval of EPA, provided test lane calibration records show the pertinent instrument information.

(7) Recorder charts: Identify zero, span, exhaust gas, and dilution air sample traces.

(8) Test cell barometric pressure, ambient temperature and humidity.

Note.—A central laboratory barometer may be used: *Provided,* That individual test lane barometric pressures are shown to be within ±0.1 percent of the barometric pressure at the central barometer location.

(d) *Test report.* A test report shall be completed in triplicate on a form ap-

AR_0033350

proved by EPA and shall contain the following information. One copy shall be given to the vehicle owner or his agent.

(1) Test type and driving schedule.
(2) VIN/License No.
(3) Owners name and address.
(4) Car make, model, MY, engine size.
(5) Date of test.
(6) Odometer reading.
(7) Date of previous test on vehicle, if retest.
(8) Inertia and road load if applicable.
(9) Test site location, lane identification.
(10) Test results (including emission measurement values).
(11) Certification by instrument operation and driver that test was correctly performed.

§ 85.2226    Equipment specifications—idle test.

The equipment described in §§ 85.2227 and 85.2228 shall be used in idle mode tests.

§ 85.2227    Dynamometer system.

None required.

§ 85.2228    Exhaust gas sampling system.

(a) *General.* The existing sampling systems available for use in short tests are designed to sample the raw engine exhaust and determine the concentration of the pollutants by volume. The sample handling system is an integral part of the exhaust gas analyzer package and includes the pumps, valves, filters, moisture separator, lines, detectors, meters, and sample probes.

(b) *Analyzer operation, maintenance, and durability.* The analyzer shall be simple to operate and maintain by garage personnel. The analyzer shall have sufficient durability and ruggedness for frequent use and continuous analysis at various vehicle exhaust flow rates for long periods in a garage environment.

(c) *Continuous measurement.* The instruments shall be capable of continuously measuring the concentration of carbon monoxide and hydrocarbons in vehicle exhaust emissions during an "Idle Mode".

(d) *Instrument readout.* A direct meter readout is required for each pollutant measured and an automatic or semi-automatic digital emission indication is desirable, with a voltage output capable of continuously interfacing with a digital indicator or computer for recording vehicle exhaust emissions.

(e) *Analyzer ranges.* The analyzers shall have either a multiple range or expanded scale presentation that provides the following approximate capabilities:

Maximum ranges—0—10 percent CO, 0-2000 ppm HB.
Minimum graduations—0.05 percent CO, 10 ppm HC.

(f) *Accuracy.* The accuracy of the analyzer shall be closer than ±3 percent of the full scale reading for all ranges.
(g) *Response time.* The response time for an exhaust gas sample introduced at

the probe shall be less than 10 seconds for 90 percent of the reading.

(h) *Calibration check.* The system shall contain a convenient calibration check for performance testing. The calibration method may be a gas standard or other mechanical or electrical method. Air may be used for zero checking.

(i) *Warm-up time.* Warm-up time shall be short as possible, but not greater than 30 minutes from a cold start.

(j) *Electronic circuitry.* All electronics circuitry should be solid state.

(k) *Zero and span procedures.* Zeroing and spanning of the individual instruments of the system shall be performed before and after each emission test using the instrument manufacturers' recommended methods, or other method if shown to be more satisfactory.

(l) *Sample line.* The sampling probe and sample line shall be long enough to cool the exhaust gas to a temperature sufficient to condense the water of combustion. This is to assure that no moisture condenses in the infrared cell or sample handling system outside of the moisture separator and water drain, and to assure that the specific humidity of the exhaust sample gas remains relatively constant so as not to cause undue interference. The moisture separator should be of such design that it does not require cooling water.

(m) *Sample probe.* The sample probe shall be of a replaceable type and it shall be made from stainless steel tubing (or other inert metal) that is not less than ¼″ I.D. and not greater than ⅜″ O.D. The probe shall be of rugged construction, especially in the area where the probe is connected to the sample line, and be equipped with an insulated handle of proper length for easy use. The insertion end of the probe tubing shall be closed and the exhaust gas sample shall be drawn through four ⅛″ holes regularly spaced away from the closed end.

(n) *Repeatability.* Repeatability of the system shall be ±1 percent of full scale during five successive samples of the same gas source over a one hour period of continuous operation. The zero and drift of a warmed-up system shall be less than ±1 percent of full scale during an 8-hour period of continuous operation.

§ 85.2229    Calibration procedures—idle test.

(a) Instruments shall be calibrated in accordance with the manufacturers' instructions. Cross checks shall be made weekly using calibration gases of known accuracy that are related to N.B.S. standards. A desirable alternative method is to use a vehicle with repeatable emissions that has been equipped with analytical instruments and calibration gases, thereby reducing the unknowns.

Subpart X—Section 207(b) Short Test Cutpoint Methodology

§ 85.2301    General applicability.

The provisions of this subpart are applicable to 1979 and later model year

light-duty vehicles and 1979 and later model year light-duty trucks.

§ 85.2302    Definitions.

The following definitions apply to this subpart beginning with the 1979 model year. Section 86.078–2 remains effective excepting those definitions which are hereby superseded and/or added.

"Car line" means a name denoting a class of vehicles within a make or car division which has a degree of commonality in construction (e.g., body, chassis). Car line does not consider any level of decor or opulence and is not generally distinguished by such characteristics as roof line, number of doors, seats or windows except for station wagons. Station wagons are considered to be different car lines than passenger cars.

"Contingency table analysis" is based upon the assumption that cutpoints can be found for one or more independent variables which will discriminate on the groups of the dependent variable. The selection of the cutpoints results in the contingency table analysis it is sufficient to identify the number of important ent to identify the number of important groups into which the dependent variable needs to be classified. For the purposes of 207(b) implementation, there are only two such groups: vehicles which pass the FTP and vehicles which fail the FTP. Thus, Figure 1 shows the 207(b) application of a contingency table.

*Predicted variable*

| | | (FTP) of— | |
|---|---|---|---|
| | | Pass | Fail |
| Predictor variable (ST): | | | |
| Pass | Correctly passed vehicles, *PP* | Error of omission vehicles, *E<sub>o</sub>* | |
| Fail | Error of Commission vehicles. *E<sub>c</sub>* | Correctly failed vehicles. *FF* | |

FIGURE 1

"*E<sub>c</sub>*"=cars which are incorrectly failed by the ST (commission errors).

"*E<sub>o</sub>*"=cars which are incorrectly passed by the ST (omission errors).

"*FF*"=cars which are correctly failed by the ST.

"*PP*"=cars which are correctly passed by the ST.

"Distribution Characteristics" means the curve which best fits the emissions data when plotted as emission levels vs the fraction of vehicles which exhibit each emission level. The curve fit is accomplished using standard statistical distributions such as the normal, log-normal, Weibull, etc.

"Engine size" means the displacement of the engine and is not dependent upon the "engine family" definition used in the vehicle certification process.

"Group" means a classification of vehicles into classes having the same manufacturer, engine displacement, cylinder block configuration (e.g. V-8, I-6, etc.), number of cylinders, fuel injection or carburetion (number of carburetors and number of carburetor venturies), emis-

AR_0033351

sion control systems, inertia weight, and car line.

"Light-Duty Truck" means any motor vehicle, rated at 8,500 pounds GVW or less which has a vehicle curb weight of 6,000 pounds or under and which has a basic vehicle frontal area of 46 square feet or less, which is: (1) Designed primarily for purposes of transportation of property or is a derivation of such a vehicle or (2) designed primarily for transportation of persons and having a capacity for more than 12 persons, or (3) available with special features enabling off-street or off-highway operation and use.

"Light-Duty Vehicle" means a passenger car or passenger car derivative capable of seating 12 passengers or less.

"Make" means the division or similar name within a manufacturing corporation which appears on the vehicle, e.g., Chevrolet, Mercury, Dodge etc.

"Manufacturer" means the major financial entity whose divisions market vehicles, e.g. General Motors, Ford Motor Company etc.

"Short Test Rejection Ratio" means the ratio of vehicles failing the short test to vehicles failing the FTP. Expressed as an ($E_c$ equation: $STRR = (E_c + FP)/(E_o + FP)$.

"Short test variability" means the ratio of the standard deviation to the mean of the short test levels within a narrow range of FTP levels.

"Technology" is used to differentiate between diverse concepts used in meeting the emission standards, e.g. catalyst, "lean burn", thermal reactor, etc.

"Vehicle size and/or weight" uses the manufacturing corporation body coding to identify vehicles in a group, as this body coding is generally understood to differentiate between full size, intermediate size, compact, etc. vehicles.

§ 85.2303   Overview.

Short test cutpoints will be established on a yearly basis by the United States Environmental Protection Agency for the most recent model year light duty vehicles and light duty trucks for each of the approved short tests. These short test cutpoints will remain in effect for the useful life of each vehicle as defined in § 86.077–2.

§ 85.2304   Vehicle grouping.

(a) For the purposes of establishing short test cutpoints, vehicles will be grouped by make, engine size, vehicle size and/or weight, and the technology used to meet the emissions standards. Vehicles so classified will be defined as a "group."

(b) In order to reduce the number of groups, when two vehicles are the same except for make they will be classified into a single group. For example, Ford Granada and Mercury Monarch will be classified into the same group because they are built from the same manufacturer's body. However, more than one group will exist for this example of consolidation by body code because of the different engine options which are offered in this basic body.

(c) In order to facilitate the process of consolidation, manufacturers will be required to provide the Agency with the marketing model identifications which are derived from the same basic body type, the commonality of engines which are used across manufacturer brands, and the differences in technology that can exist within otherwise identical vehicles and can result in the establishment of a new group. This information is to be supplied to the Administrator by September 30 of the calendar year in which the new model year vehicles are introduced.

§ 85.2305   Data collection.

(a) Data which will be used in the establishment of the short test cutpoints will be collected from one or both of the following sources:

(1) Through the testing of consumer-owned production vehicles. The testing will be performed by the EPA or its contractors. Testing will occur at different locations throughout the country so that the data may be collected in a timely fashion. Additionally, the collection of data in several localities will account for the variations in weather which occur throughout the Nation, as these variations may impact the short test/FTP relationship.

(2) Through the extrapolation of assembly line test data acquired during production of representative samples of each vehicle group.

(b) Testing of these vehicles will consist of the FTP and each approved short test. The FTP will be performed as specified in the FEDERAL REGISTER for that model year vehicle, exclusive of evaporative emissions. The short test will be performed as specified under conditions which reflect real world vehicle inspection station conditions (i.e., ambient conditions, fuel used, etc).

(c) Approximately fifty vehicles will be tested in each group. This sample size is selected because it is the smallest size which is judged to be capable of producing statistically viable results on the effects of production variables as these variables impact on the short test and FTP results.

(d) If the Administrator determines that sufficient evidence of commonality exists, groups of vehicles may be combined in order to minimize the amount of testing required and the number of different cutpoints which must be established. Manufacturers of vehicle groups which have been combined may submit test data to the Administrator to support claims that particular groups of vehicles should not (or should no longer) be included in combined groups. Based upon available data the Administrator may combine or separate vehicles groups at any time subsequent to the establishment of the initial cutpoints.

§ 85.2306   Short test cutpoint selection.

(a) Short test cutpoints will be selected for each vehicle group based upon the analytical technique described in § 85.2307 and the cutpoint selection methodologies described in § 85.2308.

(b) Manufacturers will be given two weeks to review the selected cutpoints before they are promulgated. Unless the manufacturers can submit data indicating why the selected cutpoints are not appropriate for one or more of their car groups, the cutpoints will become effective.

(c) Cutpoint information will be on file at the U.S. Environmental Protection Agency, Public Information Reference Unit, Rm. 2922, 401 M Street, SW., Washington, D.C. 20460.

(d) Should the Administrator determine, through testing by EPA or by review of manufacturer submitted data, that the cutpoints for a given group need to be changed, such a change will become effective immediately.

(e) Should a manufacturer request a vehicle running change under § 86.077–33, Part 86, of this Title 40, CFR, which requires him to run further certification tests, the manufacturer will be required to submit to the Administrator, data which would indicate any changes in the short tests (as specified in Subpart W) to FTP relationships which occur because of the running change.

§ 85.2307   Analytical technique.

(a) The cutpoints for each pollutant for each short test will be established by the use of the contingency table analytical technique.

(b) The data used to establish each group's cutpoints will be generated from the sample of test data as follows:

(1) Establish the FTP and short test distribution characteristics per pollutant for each group and for each short test from the test data.

(2) Using these data, a distribution will be developed for a very large (e.g., 50,000 vehicle) fleet of vehicles in the group. This step smooths the data and prevents the distortion of the selected cutpoints by gaps which may exist in the test data.

(3) Using the prescribed methodology for short test cutpoint selection, an iterative procedure will be followed to select the short test cutpoints which meet the criteria for each pollutant, for each short test and for each group.

§ 85.2308   Cutpoint selection methodologies.

(a) Any of the following techniques can be used by the EPA to select cutpoints.

(1) A fixed error of commission rate for each pollutant for each group. The short test cutpoints are determined on the basis of the distribution characteristics of the vehicles tested in each group so that the error of commission rate meets a set value.

(2) A fixed Short Test Rejection Ratio for each pollutant for each group. The short test cutpoints are determined on the basis of the distribution characteristics of the vehicles' emissions as determined in each group so as to meet the prescribed short test rejection ratio value.

(3) A fixed level for $E_c/(E_c + FF)$; which expresses the percentage of improperly failed vehicles as a function of all vehicles failing the short test in a par-

AR_0033352

ticular group. The short test cutpoints are determined from the test data as described above but to meet the prescribed value of $E_c/(E_c+FF)$.

(4) Set the short test cutpoints so that equivalent FTP pass/fail levels are enacted for each vehicle group. This option would work in conjunction with a fixed acceptable commission error rate. For all groups of vehicles with acceptable test variability, the fixed error of commission cutpoint would be computed using the contingency table technique. Then, the FTP levels equivalent to the short test cutpoints for each group would be computed using linear regression estimates with the FTP as the independent variable and the short test as the dependent variable. In order to treat each group of vehicles equally from an air quality standpoint, the highest computed FTP levels for each pollutant would be selected as the equivalent FTP levels for the short test cutpoints. Using regression techniques, the short test cutpoints equivalent to these FTP levels would be determined for each vehicle group and would become the 207(b) short test cutpoints.

(5) Set the error of commission rate or $E_c/(E_c+FF)$ rate as a function of short test variability. Allow a five percent error of commission rate when test variability is at the maximum acceptable level.

$$ST_{\text{cutpoint}} = ST_{\text{value at regression line intercept with FTP}} \times (f) \frac{1}{\text{correlation coefficient}}$$

where f is determined from analysis of data from groups including passing and failing vehicles.

(2) Option 2 would fit a statistical probability distribution to the available data. Then, data would be mathematically generated in the region where they do not exist. The chosen method of selecting the cutpoints would then be applied.

(3) A defect test program would be initiated to obtain data in the region where the population of vehicles is scarce. In cases where there is no data on FTP passing cars, the program would consist of tune-ups rather than incorporation of defects. Such a program would require a knowledge of what defects to introduce as well as a large number of vehicles and tests, so as to include vehicle to vehicle variability.

(4) An additional group of vehicles would be tested. If this second group of vehicles included vehicles dissimilar to those originally tested (i.e., not all either FTP passing or failing vehicles), the ST cutpoint would be set from the second group of vehicles. This option possesses the weakness that the second group could behave the same as the first group and nothing would have been accomplished.

(5) Standards from a similar group would be transferred. This option would apply within groups of vehicles produced by the same manufacturer. Provided the same vehicle size/engine size/technology is utilized in meeting emissions standards, it can be argued that

A functional relationship between errors of commission or $E_c/(E_c+FF)$ and variability will be developed using mathematical simulation techniques. This will be accomplished by taking a set of data and using probability distribution theory and introducing random numbers variability into the data base at different levels. Then, using fixed short test cutpoints, commission errors can be computed and plotted against variability.

(b) The above procedures of setting short test cutpoints are applicable where the vehicles in each group are divided between FTP passing and FTP failing characteristics. Cases can arise, however, when the vehicles in a group either all pass or all fail the FTP. Under these conditions, none of the above options are viable as means of setting the short test cutpoints. There are six options possible for handling this problem. Two are by mathematical means, two require additional testing and two rely on engineering judgment. Any of the following methods can be used to select short test cutpoints.

(1) This option would fit a linear regression equation to the available data and use it to project the short test/FTP relationship beyond the region of available data. The short test cutpoint would be selected to correspond with the FTP standard, allowing a margin of safety to account for correlation. Expressed in equation form, this approach says:

the products manufactured by Division A of a corporation are sufficiently similar to the products from Division B for the ST cutpoints to be transferable in this eventuality. An example of this approach is the use of Chevrolet Division intermediate size vehicle short test cutpoints for Pontiac Division intermediate size vehicles: Provided, The same displacement engine (but not necessarily the same engine family) and emissions control technology (e.g., catalyst) were used in both groups.

(6) Use the manufacturers' HC and CO idle specifications for the idle test cutpoint. This option only applies to inspection programs where the idle test is utilized.

[FR Doc 77-14620 Filed 5-24-77; 8:45 am]

---

## [ 40 CFR Part 85 ]

[FRL-691-4]

## EMISSION CONTROL SYSTEM PERFORMANCE

### Warranty Regulations

**AGENCY:** Environmental Protection Agency.

**ACTION:** Notice of proposed rulemaking.

**SUMMARY:** This notice proposes regulations to implement section 207(b)(2) of the Clean Air Act—the emissions performance warranty. The warranty would require that a properly maintained and

operated vehicle which fails an EPA-approved emissions short test during its useful life (5 years or 50,000 miles, whichever first occurs) will be remedied by the manufacturer should the owner face a penalty or sanction because of that failure. Emissions short tests are being proposed in a separate notice in today's FEDERAL REGISTER.

**DATE:** Deadline for submission of written comments: August 23, 1977.

**FOR FURTHER INFORMATION CONTACT:**

Mr. Michael Scibinico, Environmental Protection Agency, Mobile Source Enforcement Division (EN-340), 401 M Street, SW., Washington, D.C. 20460, 202-755-0298.

**SUPPLEMENTARY INFORMATION:**

I. EXPLANATORY STATEMENT

Section 207(b) of the Clean Air Act provides, in total:

If the Administrator determines that (i) there are available testing methods and procedures to ascertain whether, when in actual use throughout its useful life (as determined under section 202(d)), each vehicle and engine to which regulations under section 202 apply complies with the emission standards of such regulations, (ii) such methods and procedures are in accordance with good engineering practices and (iii) such methods and procedures are reasonably capable of being correlated with tests conducted under section 206(a)(1), then—

[(b)(1)]

(1) he shall establish such methods and procedures by regulation, and

[(b)(2)]

(2) at such time as he determines that inspection facilities or equipment are available for purposes of carrying out testing methods and procedures established under paragraph (1), *he shall prescribe regulations which shall require manufacturers to warrant* the emission control device or system of each new motor vehicle or new motor vehicle engine to which a regulation under section 202 applies and which is manufactured in a model year beginning after the Administrator first prescribes warranty regulations under this paragraph (2). The warranty under such regulations shall run to the ultimate purchaser and each subsequent purchaser and shall provide that if—

(A) the vehicle or engine is maintained and operated in accordance with instructions under subsection (c)(3),

(B) it fails to conform at any time during its useful life (as determined under section 202(d)) to the regulations prescribed under section 202, and

(C) such nonconformity results in the ultimate purchaser (or any subsequent purchaser) of such vehicle or engine having to bear any penalty or other sanction (including the denial of the right to use such vehicle or engine) under State or Federal law,

then such manufacturer shall remedy such nonconformity under such warranty with the cost thereof to be borne by the manufacturer." (Emphasis added.)

Thus, full implementation of this section requires a number of findings by the Administrator leading to regulations under subsection (b)(1), and then a separate

AR_0033353

finding leading to regulations under subsection (b)(2). The Agency is today proposing both sets of regulations under separate headings. This notice relates exclusively to subsection (b)(2), although some general background information is given below for the reader's convenience. The subsection (b)(1) proposal is entitled "Emission Control Performance Warranty Regulations—Short Test Establishment" and can be found in this volume of the FEDERAL REGISTER.

Section 207(b) requires a vehicle manufacturer, following implementation of subsection (b)(2), to warrant that a properly maintained and operated vehicle which fails a subsection (b)(1) test (hereinafter called a short test) during its useful life (5 years or 50,000 miles, whichever comes first, for all vehicles covered by this proposal) will be remedied by the manufacturer should the owner face a penalty or sanction because of that failure. This warranty (hereinafter called the Emissions Performance Warranty) is expected to become an important element in state and local emissions inspection programs, and an inducement towards improved maintenance on vehicles. These factors (often considered together as "Inspection/Maintenance" or "I/M") represent the Clean Air Act strategy which ultimately has the greatest potential for ensuring that in-use vehicles perform within emission standards.

The major obstacle which has delayed implementation to date of the Emissions Performance Warranty has been the technical difficulty in identifying short tests which "are reasonably capable of being correlated" (as the Act requires) with the sophisticated test used to define the Federal emission standards. That test, set out at 40 CFR Part 86, Subpart B, for 1977 and later model year light duty vehicles and light duty trucks, is too complex to be of use in a State or local inspection program.

The Agency believes that such short tests are now identifiable, and that the remaining criteria for publication of regulations under subsection (b)(1) are also satisfied. Consequently, those regulations are being proposed today, and form the basis for the proposal set out herein.

Under subsection (b)(2), the Administrator must "determine that inspection facilities or equipment are available for purposes of carrying out (the identified short tests)". This is interpreted to require a finding either that facilities exist which could be use to carry out the short tests, or that equipment needed to establish testing capability is available at a reasonable cost. The Administrator hereby finds that both of these circumstances presently exist. A number of emissions inspection facilities are already in operation in different States across the country. New Jersey has had a statewide program in operation for over four years. Active testing is ongoing in Portland, Oregon; Phoenix, and Tucson, Arizona; Riverside, California; Las Vegas, Nevada; Chicago, Illinois; and Cincinnati, Ohio. In all, millions of vehicles have been inspected to date using tests

basically identical to those proposed today under subsection (b)(1), including both "idle" and "key mode" tests. It should be noted that the idle test may be performed without special facilities, and that the analyzers required for it are readily available and presently being sold to many service facilities for use as maintenance equipment. In sum, a State or local government which desires to engage in short test inspections is presently able to establish and equip a site capable of this type of testing.

## II. GENERAL DESCRIPTION OF REGULATIONS.

The provisions of this notice cover all aspects of the Emissions Performance Warranty. They apply to light duty vehicles and light duty trucks; those being the categories covered by today's short test proposal. Further, as specifically required by the Act, the warranty will be applicable only to those vehicles manufactured in a model year beginning after the regulations are promulgated. (It is anticipated that 1979 and later model year vehicles will be covered.) The required warranty itself is taken directly from subsection 207(b)(2) of the Act. Under the proposal, it would have to be printed in the owner's manual for each vehicle.

Much of the proposal is devoted to the proper maintenance and operation condition of subsection 207(b)(2)(A) of the Act. Provisions cover the permissible content of maintenance and operation instructions, limits on brand name specifications, the types of evidence which will establish compliance with such instructions, Agency review and disapproval of them, and communication of these requirements to vehicle owners. Each is disscussed in detail below. The maintenance condition represents the most critical aspect of the Emission Performance Warranty. Given the fact that most vehicles do require periodic service in order to perform within emission standards for 5 years/50,000 miles, and that the owner is responsible for such work, the question becomes how this duty is to be fairly administered.

From the standpoint of the vehicle manufacturers, a simple solution might be to require that all maintenance be performed at dealer service centers or other authorized facilities. This would give the manufacturer control over the product which he must warrant. However, such an approach is unacceptable for a number of reasons. First, it is unlikely that there are enough authorized facilities in existence to handle the workload that could result. Second, this requirement would have a tremendous anticompetitive impact on the vast independent automotive service and parts industry presently in existence, in contradiction to the Agency's general policy to minimize any such impact from its regulations. Third, the right of an owner to personally maintain his own vehicle would be hindered. Lastly, there is no indication that this course of action would, in fact, ensure that vehicles would be significantly better maintained than they are today.

The Agency believes that the Emissions Performance Warranty may be implemented within the context of the traditional relationships among the affected parties, and that this should be a primary goal of the regulations. Consequently, the maintenance provisions are aimed at ensuring owners may continue to care for their vehicles as they presently do, without jeopardizing protection under the warranty.

The remainder of the proposal speaks of the remedy required by a manufacturer under the Emissions Performance Warranty, and the procedure by which a claim may be brought. Since communication to the warranty is crucial to the effectiveness of this or any other warranty, detailed requirements are set out for the inclusion of all provisions in vehicle owner's manuals.

## III. BENEFITS OF THE EMISSIONS PERFORMANCE WARRANTY

By its nature, the Emissions Performance Warranty does not contain a direct, quantifiable air quality benefit. All warranties are in theory only cost-shifting mechanisms. That is, they determine who will pay to correct a problem; they do not attack the problem itself. In this case, the problem is poor emissions performance of in-use vehicles. The key to reducing it lies in State and local "Inspection/Maintenance" programs, as previously mentioned. Since, a local jurisdiction could enforce emissions standards by requiring the owner to bear any repair expense, and thus obtain emissions reductions without warranty coverage, the warranty may not be fairly credited with the major reduction expected from enforcement of "I/M" programs. However, some indirect air quality benefits may arise from the Warranty to the extent that it provides an incentive to establishment of "I/M" programs in areas which would otherwise not have them, causes programs to enforce stricter standards, encourages owners to better maintain their cars, and influences manufacturers to build more durable emissions control systems. The magnitude of these benefits is not quantifiable, and only experience will demonstrate the extent to which they will contribute to the overall benefits expected from "Inspection/Maintenance."

The Agency considers the Emissions Performance Warranty, coupled with the establishment of "I/M" programs, to be a major step in the Clean Air Act approch to reduction of vehicle emissions. Present Agency efforts include certification of vehicles and recall of classes which perform poorly in-use. Regulations for assembly line testing of vehicles (Selective Enforcement Auditing or SEA) where recently promulgated, and testing under them has begun. The establishment of a warranty to all individual owners that their vehicles will, if properly maintained and operated, continue to meet emissions standards is another substantial inducement to manufacturers to produce vehicles capable of meeting standards for their useful life.

AR_0033354

IV. SPECIFIC PROVISIONS

The major sections of the proposed regulations are discussed below.

A. SECTION 85.2103 WARRANTY

The proposed basic statement of the warranty is fashioned directly from section 207(b) (2) of the Clean Air Act. Some changes have been made as follows in an effort to make the provisions more easily understandable to vehicle owners.

First, in subsection (a) (1), the maintenance and operation requirement of section 207(b) (2) (A) of the Act is spelled out rather than referencing section 207 (c) (3) as is done in the Act. Since the proposal requires the manufacturer to list all such instructions applicable to the Emissions Performance Warranty in the owner's manual, it is believed that the least confusing approach to informing the owner of his duty in this regard is simply to identify the requirement as consisting of those listed instructions.

Second, the words "applicable emissions standards of the U.S. Environmental Protection Agency" are substituted for the reference in section 207(b) (2) (B) to section 202 of the Act.

Third, the term "EPA-approved emission test" is used to signify a "correlateable short test" as required by section 207(b) for implementation of the Emissions Performance Warranty. This is intended to provide a non-technical label by which those tests which qualify for section 207(b) warranty purposes may be identified. Further, § 85.2103(a) (2) makes clear the fact that it is failure of such a test that initially triggers the possibility of manufacturer liability under the Emissions Performance Warranty.

No substantive effects are intended by any of the above modifications; any comments that such may occur are specifically requested.

An important issue under the Emissions Performance Warranty is the required scope of coverage. Section 207(b) of the Act states that manufacturers shall warrant "the emission control device or system of each new motor vehicle * * * manufactured in a model year beginning after (regulations are promulgated)." The phrase "emission control device or system" raises the question as to exactly what parts or systems of a vehicle are to be covered by the warranty. The proposal takes a broad interpretation here by defining coverage to include "any system, assembly, device, or component thereof which can affect emissions." An alternative approach would be to limit coverage to a specific list of those items constituting the emission control system, perhaps limited only to those components added solely for the purpose of controlling emissions. However, measures adopted for controlling emissions include important alterations to components and operating parameters of engines which are also vital to the non-emissions performance of those engines. To ignore such items would both excuse the manufacturer from responsibility for a substantial number of potential causes of emissions nonconformities

within his ability to affect, and would leave the owner unprotected to the same extent. Hence, the Agency believes that the proposed option is most in keeping with the intent behind the Emissions Performance Warranty.

It has been postulated that the "list approach" would have the advantage of reducing the potential anticompetitive effect of the warranty simply because fewer components would be covered. However, given the possibility of warranty protection, it is presumed that any properly maintained and operated vehicle which fails an Agency-approved short-test will initially be taken to a dealer for repairs. Should the cause of the failure be investigated and found to be a part not on a given list, then the manufacturer would escape liability, but, the dealer would most likely still make the repair. Thus, little if any significant reduction in anticompetitive effect could be expected. In any case, a much larger potential for anticompetitive effect lies in the possible tying of preventative maintenance to the warranty, as opposed to actual repair of failed vehicles. This area, discussed in detail below, would not be affected by a restrictive definition of the scope of coverage of the warranty.

Comments on this aspect of the proposal are particularly requested. Those favoring a list approach are asked to give a sample list, if possible, of those parts which they believe should be included, or in the alternative, a list of those parts which are felt to be incorrectly encompassed by the proposal.

Subsection (b) specifies the time from which the 5 year protection of the Emissions Performance Warranty is to begin. In the vast majority of cases, this will coincide with delivery of the vehicle to its ultimate purchaser. However, for those vehicles used as "demonstrators" or "company cars" by a manufacturer or dealer, the period is begun at the point they are placed in this service. Although such a vehicle is not then in the hands of an ultimate purchaser, the Agency believes that it is reasonable to view it as having begun its useful life. There is little chance of consumer deception here since these cars are not sold as new, and thus purchasers generally realize that they have been used and that, consequently, their warranty protection may be less.

With regard to mileage, the warranty period is to be judged simply by a vehicle's odometer reading. That reading is protected today by numerous Federal and State consumer laws, and need not be further considered here. Any odometer which is adjusted in violation of applicable law will no longer be controlling as to the Emissions Performance Warranty.

Manufacturers should bear in mind that section 203(a) (4) (A) of the Act makes it a prohibited act to sell or lease a vehicle without warranting the emission control device or system pursuant to section 207(b). EPA will investigate any pattern of activity of a manufacturer which suggests that such warranty was not made in good faith.

B. SECTION 85.2104 INSTRUCTIONS FOR MAINTENANCE AND PROPER OPERATION

This section sets out basic criteria for inclusion of instructions under the maintenance and operation condition of § 85.2103(a) (1), section 207(b) (A) of the Clean Air Act. Subsection (a) reiterates the language of section 207(c) (3) of the Act for maintenance instructions, with the clarifying provision that such instructions be likely to be performed on in-use vehicles. The additional language is included to set out what the Agency considers to be a basic element of the Act's requirement that such instructions be "reasonable."

Subsection (b) requires all maintenance instructions to be set out such that a person who regularly engages in the business of servicing automobiles will be able to satisfactorily comply with them. This is a further elaboration of the "reasonable" requirement of section 207(c) (3) of the Act. Recognizing the fact that many vehicles will be serviced at independent, non-dealer facilities, this provision can be viewed as simply part of the standard of "likely to be performed in-use." Further, it supports the prohibition of § 85.2105 against the tying of warranty coverage to dealer service.

Subsection (c) proposes a partial solution to the problem of owner maintenance. Given that many owners maintain their own vehicles, the question becomes how such individuals will be able to prove that the required instructions have been carried out. The proposed § 85.2107, which deals specifically with the issue of proof, expressly reserves the acknowledged right of an owner to perform all of the required maintenance. However, the standard of proof under such circumstances necessarily places a higher burden on the owner than he would have if he had taken his vehicle to a dealer or an independent service facility. This is due to the fact that not all owners will have the instruments and skills necessary to adequately maintain the emission control systems and devices in use today. Thus, an owner who claims the ability to totally maintain his vehicle needs to establish, essentially, that he is capable of doing so.

However, there are a substantial number of maintenance instructions which are capable of being performed by most owners (e.g., oil and filter changes, spark plug replacements, etc.). The Agency believes that these maintenance items should not be removed from the purview of owners out of their concern that they will risk loss of warranty protection by performing the instruction. One way to approach this problem would be for the Agency to define those instructions capable of owner completion, and to specify minimum requirements for proof of such. The different technologies among vehicle manufacturers would greatly complicate the effort, but the sustaining of owner's rights in this area is considered to be a necessary aspect of the regulations.

Subsection (c) proposes an alternative approach. Since a vehicle manufacturer

AR_0033355

is in the best position to determine which maintenance instructions for his product are capable of being performed by an owner, the manufacturer is encouraged to specify such items, along with whatever evidence he would be willing to accept as proof of compliance. It is expected that manufacturers who do this will be able to gain from advertising that their vehicles are "owner serviceable", while at the same time reducing the potential for future disagreements with owners regarding proper maintenance. The approach also puts control of the question of proof in the hands of the manufacturer while protecting owners since, once specified, the manufacturer will be bound to accept the evidence called for. The Agency hopes that the owner's burden will be set at a minimal level such as, for example, retention of receipts or old parts. But, the most important factor is that advance notice will be given as to the required evidence, whatever it may be.

The Agency particularly requests comments on this proposed approach to the problem under the Emissions Performance Warranty of maintenance performed by owners. Manufacturers are encouraged to provide examples of what maintenance they would consider designating as "owner maintenance", and the evidence which would be accepted as proof of compliance.

Subsection (d) reiterates the criteria of section 207(c) (3) of the Clean Air Act for inclusion of operation instructions under § 85.2103(a)(1) of the proposal. Additional language is added to provide that all such instructions "be consistent with the normal use for which the vehicle is sold." As discussed above for subsection (a), this is again intended to elaborate on the Agency's view of how the term "reasonable" is to be interpreted in this specific context so as to give adequate notice to manufacturers regarding the standard for operation instructions required under the Emissions Performance Warranty.

### C. SECTION 85.2105 PROHIBITION AGAINST BRAND NAME REQUIREMENTS

This section contains the proposal's basic prohibition against tying of the maintenance and operation condition of § 85.2103(a)(1) to the use of only parts and service provided by the vehicle manufacturer. It contains essentially the same restriction as that of section 102(c) of the Magnuson-Moss Warranty Act, 15 U.S.C. 2302(c) (1975).

Section 207(b) (2) (A) of the Clean Air Act explicitly conditions manufacturer liability under the Performance Warranty on a vehicle being "maintained and operated in accordance with instructions issued under (207) (c) (3)." Since the passage of the Clean Air Act Amendments of 1970, this condition has been the focus of much attention from EPA and from Congress itself. No one disputes the basic concept involved; that is, that a car owner is responsible for reasonable and necessary periodic maintenance of his vehicle. However, some segments of the automotive industry

have expressed concern that the provision is potentially anticompetitive in that it may shift maintenance work away from independent facilities and towards manufacturer authorized dealerships.

The actual danger of such a shift is difficult to evaluate given the present lack of experience with any similar type warranty. On December 18, 1974, the Subcommittee on Environmental Problems Affecting Small Business of the Permanent Select Committee on Small Business of the House of Representatives filed a report entitled "Monopolistic Tendencies of Auto Emission Warranty Provisions" (House Report No. 93–1628, 93d Congress, 2d Session). That report concluded that the Emissions Performance Warranty could prove to be anticompetitive in that car owners might feel compelled to use only dealer service and original equipment parts in order to ensure continued protection for the full 5 years/50,000 mile period. Accordingly, the Committee recommended, among other things, that EPA pursue all administrative remedies to minimize such an effect.

The proposal contains three sections aimed directly at this potential problem. Section 85.2105, as stated, represents the basic restriction. Sections 85.2106 and 85.2107 deal respectively with the issue as related to parts and service under the Emissions Performance Warranty, and are discussed in detail below.

### D. SECTION 85.2106 REPLACEMENT PARTS

With regard to the replacement parts industry, the potential for anticompetitive effects from the Emissions Performance Warranty rests in the concern that owners will use only original equipment parts so as to ensure continued protection for the full 5 year/50,000 mile period, and that service facilities will also react in the same manner. Thus, the provisions of the proposal which address the issue of performance of maintenance at independent facilities do not encompass the parts issue. Section 85.2106 is intended to fill this gap.

The basic position of § 85.2106 is twofold. First, subsection (a) provides that unless a vehicle manufacturer affirmatively indicates otherwise, he must allow use of any part identified by its manufacturer as a replacement part for a specific vehicle in question. Second, subsection (b) provides that a manufacturer who desires to avoid subsection (a) may do so by providing information sufficient to determine whether a given part meets the standards which are required. In essence, a manufacturer may set up any standard of acceptability, consistent with section 85.2105, related to the emissions performance of parts required to be replaced under the warranty. For example, he may require that all replacements be "equivalent" to the original part, as most do under general warranties today. However, if this approach is taken, then the owner's manual must set out whatever specifications are needed to judge that equivalency. In other words, the owner must be provided

with the information necessary to be able to distinguish between those parts which are, and those which are not equivalent. Without this information, an "equivalency" requirement becomes virtually identical to a specification of use of only original equipment parts.

In short, the proposal allows inclusion of a "standard" for acceptability of replacement parts only if that standard may actually be applied in practice against the numerous available aftermarket parts. Otherwise, use of any part sold as a replacement will be acceptable. This is not to say that the vehicle manufacturer will be held liable for the failure of a non original equipment part. Subsection (d) specifically reserves the ability of a manufacturer to deny a warranty claim if he can show that the vehicle's failure of a short test was due to such a part.

Subsection (c) is included in anticipation of the possibility of a future EPA program for certification of aftermarket automotive parts. No such program is presently in operation, although the Agency has published an advance notice of a voluntary program (39 FR 40192, Thursday, November 14, 1974), and Congress has debated making such an effort mandatory (Congressional Record, September 30, 1976, p. H11977). The basic thrust of such a certification will be to qualify a part for use in maintenance under the Emissions Performance Warranty. The provisions of subsection (c) will remain inoperative until such a program is established.

Subsection (e) deals with another parts issue; specifically, the question of warranty coverage for parts without a definite replacement interval. Current practice today illustrates that many parts are subjected in maintenance instructions to a check or inspection, with replacement only if the part is found defective. Such an instruction is not necessarily undesirable since it can lead to the discovery and correction of component failures. However, the instruction raises the question as to whether the part is warranted beyond its first check point, or whether protection ends there with any extra life of the part being simply a benefit to the owner. The regulations specify that, for purposes of the Emissions Performance Warranty, such a part is covered for the full 5 year/50,000 mile period. In other words, the manufacturer shall be liable for replacement of any part that does not have a definite replacement interval and which becomes the basis of a claim under the Emissions Performance Warranty.

The Agency realizes that this approach may cause the routine replacement of some parts which might otherwise, depending on the circumstances of the vehicle's usage, render adequate service for a substantially longer period of time. However, this approach might also cause the design of longer lived parts. In any event, to allow such an instruction to insulate a manufacturer from liability for a part failure could render the warranty totally ineffective since a manufacturer could provide such an instruc-

AR_0033356

tion for every part which could possibly fail. Further, this type of instruction is clearly aimed at correcting a failure after it has occurred, which is a warranty question, and not prevention of the failure, which in the Agency's view is the purpose of required maintenance.

In conjunction with these requirements, the proposal also requires that a manufacturer submit to EPA an estimate of the typical cost of each item to be replaced during maintenance required under the Emissions Performance Warranty, and the labor charge to replace it. EPA intends to make this information available to the public to enable vehicle purchasers to make some minimal comparisons among manufacturers as to the cost of the maintenance required pursuant to the Emissions Performance Warranty.

## 2. SECTION 85.2107 PROOF OF MAINTENANCE AND PROPER OPERATION

Section 85.2107 proposes detailed requirements as to the amount and types of proof that may be required from an owner to show compliance with the § 85.2103(a)(1) conditions to recovery under the Emissions Performance Warranty. Two major purposes are intended to be served here. First, such provisions are considered necessary to ensure a high degree of consistency with respect to interpretation of the "proper maintenance and operation" phrase. Without them, variations could be expected due to differing interpretations among those dealers and other agents of the manufacturer who are authorized to handle warranty claims, with little recourse for owners due to lack of bargaining power on their part. Some inconsistencies will still be inevitable, but the presence of detailed guidance in the owner's manual should considerably reduce the problem. Second, the provisions are intended to help reduce the anticompetitive potential of the warranty. Section 85.2105, as described, contains the basic prohibition of the proposal against tying of the warranty to "dealer service." However, in operation, problems related to the use of independent service facilities will most likely arise at the point at which proof of maintenance is required. Thus, the Agency believes that specific provisions on this issue are required.

The proposal is aimed, in essence, at preserving a car owner's present ability to have his vehicle maintained at any service facility, or to maintain it himself. This is sought to be balanced, however, against the ability of the manufacturer to avoid liability if the maintenance has not been correctly performed. Resolution of this conflict depends to a large extent on the interpretation given to the maintenance condition of the warranty.

One possible interpretation is that the Act requires the owner to be able to prove that each maintenance instruction was performed at the proper time and done correctly. This would place a large burden on those owners who have their vehicles serviced at independent facilities. The typical owner, in such an instance, is rarely in a position to

make such a showing. He simply tenders his car to the shop, and returns when the work is completed. Thus, a question as to compliance with the maintenance condition would in all likelihood be resolved against him. The consequence of this interpretation is therefore to heavily favor protection of the manufacturer against improper maintenance, while discouraging use of independent facilities.

Another interpretation could be that the Act requires only that the owner make good faith efforts to obtain the requisite maintenance, with the manufacturer subsequently being held strictly liable for the emissions performance of the vehicle. In other words, the manufacturer would not be able to defend against a claim on the grounds that maintenance was not correctly performed. The requirement would be satisfied simply by tender of a vehicle to someone who held himself out as capable of following the manufacturer's instructions. The Agency believes that such an interpretation, although stringent, may be correct given the goals of the Act. Under it, manufacturers could be expected to react by reducing the amount and complexity of required maintenance, a procedure which could be expected to result in vehicles with lower emissions throughout their useful life and beyond.

A third alternative, and the one proposed in this notice, is to interpret the maintenance condition to require some initial showing by the owner, after which he will be presumed to have complied with the condition. The showing consists of evidence which the Agency believes will in most cases indicate that the work was correctly performed. However, the presumption is not made conclusive. The manufacturer may, with some exceptions, rebut the presumption by showing that the maintenance instructions have not been properly complied with. The burden of proof in this regard will be on the manufacturer, but, in most instances, he will be the party in the best position to meet such a burden. On the other hand, owners will be able to continue to have their vehicles maintained at competent independent facilities, rather than at dealerships, without risking loss of protection under the Emissions Performance Warranty simply because of that choice. The Agency believes that this approach best satisfies the intent behind the maintenance requirement of the Emission Performance Warranty; however, since this is a critical issue in the warranty, specific comments are requested. The actual provisions of the proposal are discussed below.

The basic element of the proposal is the subsection (a) provision that compliance with the maintenance requirement shall be presumed upon either of two showings, or a combination thereof, by an owner. First, presentation of a properly validated maintenance logbook shall be sufficient to raise the presumption. Second, a showing by the owner that he has submitted the vehicle to one who regularly engages in the business of

servicing automobiles, and directed that person to perform the required maintenance in accordance with the manufacturer's published instructions, shall be sufficient to raise the presumption. The Agency hopes that the use of logbooks will eventually become the preferred method for proof of maintenance, and that it will result in a recognized, uniform procedure across the country for establishing compliance with the maintenance condition. However, a business receipt which contains the same information as would appear in the logbook shall be acceptable in lieu of a logbook entry. In either case, subsection (b) allows the manufacturer (with some exceptions discussed below) to rebut by proving that the required maintenance was not, in fact, correctly performed.

Subsection (c) preserves the right of an owner to establish, by means other than those of subsection (a), that his vehicle has been properly maintained; the distinction being the absence of any presumption here. Thus, an owner may have a more difficult task showing proper compliance with the maintenance condition under this subsection. For example, he may have to establish his own expertise to perform maintenance which is not specified as owner's maintenance by the manufacturer. The proposed standard is simply that of reasonable evidence. By its nature, this is something that will have to be determined on a case by case basis. Clearly, fair operation of the provision will require good faith on the part of owners, manufacturers, and dealers.

Subsection (d) proposes that a signed statement be accepted as proof of proper operation under the Emissions Performance Warranty. Due to the nature of the requirement of proper operation, the Agency believes that such a statement is all that can reasonably be demanded. No owner could disprove the negative, i.e., that he had not improperly operated his vehicle. The statement is not made conclusive since, if a vehicle exhibits obvious indications of improper operation, then a claim may be denied on that basis. However, in the absence of such a showing by the manufacturer, it is all that may be required. Subsection (e) establishes four exceptions to the ability of a manufacturer to escape liability on the basis of improper maintenance. The first is in the case of work performed by a dealer or other authorized agent of the manufacturer. Under general principles of Agency, the manufacturer must accept responsibility for such work.

The second exception is in the case of work performed on the vehicle to keep it in a safe operating condition. This is intended to allow for those instances where a vehicle will not function properly without adjustment causing it to exceed emission standards. The agency believes that such an adjustment may not affect protection under the Emissions Performance Warranty.

The third exception is intended to reach those instances where the manufacturer should have foreseen that the vehicle would not be properly main-

AR_0033357

tained. This could be due to a number of reasons. For example, equipment necessary to adjust the engine may not be readily available in the field. The design of some emission related component may be such that it is too sensitive to be properly serviced by most mechanics. Instructions in the service manual may be incomplete, or too vague to ensure correct maintenance in most instances. If any of these conditions can be shown, or others which establish that the manufacturer should have foreseen that improper maintenance would result, then such improper maintenance may not be raised in defense of an Emissions Performance Warranty claim.

The fourth exception relates to maintenance and operation instructions not relevant to the particular failure of a vehicle to meet emission standards, and is intended to protect vehicle owners from unduly harsh application of the § 85.2103 (a)(1) conditions. If a vehicle fails due to a clearly defective component in one emission control system, the absence of maintenance to an unrelated component, or the existence of unrelated improper operation of the vehicle, should not relieve the manufacturer from liability.

Subsection (f) explicitly reserves the right of an owner to maintain his own vehicle. With regard to proof, such a person will have to, in general, meet the reasonable evidence criteria of subsection (c). An exception to this exists for those instructions listed as owner's maintenance under § 85.2104(c) of the proposal. For such maintenance, the manufacturer must set out the evidence which is desired as proof of compliance, presentation of which will then enable the owner to obtain the rebuttable presumption of subsection (a). The issue of owner maintenance is discussed in more detail in section IV.B. above.

Subsection (g) specifies requirements for proper validation of the maintenance logbook so as to satisfy subsection (a)(1). In general, this consists of the signature of the same individual who would otherwise sign a receipt sufficient to make the subsection (a)(2) showing. In the case of owner's maintenance, the owner himself shall be authorized to validate the logbook.

**F. SECTION 85.2108 WARRANTY CLAIMS**

A necessary element of effective operation of the Emissions Performance Warranty will be the existence of expeditious claim procedures. Section 85.2108, to this end, requires each manufacturer to establish such procedures. Given the typical manufacturer organization currently in effect, it is expected that they will involve a determination by a dealer, and perhaps subsequently by a zone representative, of the manufacturer. However, although it is expected that the vast majority of claims will be settled at these levels, the proposal does not contain any requirements related to them, except that the owner obtain an immediate decision at the point of first presentation of his vehicle for repair. The Agency is of the

opinion that such details are best left to the discretion of each manufacturer.

The proposal does require that all procedures contain a designated final level of review, and that an owner be provided with a final decision on his claim within ten days of its receipt at that final level. This is deemed necessary to assure that owners whose vehicles do not pass a short test may obtain an expeditious determination as to the validity of their Emissions Performance Warranty. Owners facing sanctions due to a failed vehicle have a need to know, within a short period of time, whether a warranty claim will be honored, or whether they should seek repair at their own expense. In the case of a denied claim, an owner must also determine whether to pursue legal action against the manufacturer, and, for this reason, the proposal requires that a denial be accompanied by a written explanation.

The provision requiring review within ten days is supported by a proposal that the manufacturer be held liable for the cost of any repair work actually performed on a vehicle subsequent to the lapse of the notification period. An owner facing a penalty or sanction will be at an extreme disadvantage with regard to any time delay in the processing of his claim. This proposal, however, will ensure a fixed waiting time after which the owner will either know that his claim has been denied, or that his vehicle may be repaired at the manufacturer's expense. Hopefully, State and local jurisdictions will establish any inspection program deadlines in accordance with the warranty notification period.

A final question with regard to warranty claims is at what point in time a claim may be raised. Section 85.2108(a) specifically deals with this issue. Essentially, a cause of action under the Emissions Performance Warranty will exist upon satisfaction of all of the requirements of § 85.2103(a), subsection (3) of which states that an owner must bear a penalty or sanction as a result of a short test failure. Operation of this provision may be complicated by the fact that jurisdictions are not expected to impose any penalty at the first failure of an emissions test. Rather, the owner of a failed vehicle will probably simply be required to have the vehicle serviced, and then undergo a retest within a specified period of time. Even in the case of repeated failures, penalties or sanctions may not be imposed beyond a requirement that the owner demonstrate that a certain amount of corrective maintenance has been performed on the vehicle. Use of fines or suspensions in some jurisdictions is expected to be limited to those situations where the owner either refuses to undergo a test at all, or refuses to have corrective maintenance or repair performed on his vehicle after it fails a test.

The § 85.2103(a)(3) condition could be held to require an owner to either violate State or local law so as to incur a fine, or at the least be without the use of his vehicle, before an Emissions Per-

formance Warranty claim could be raised. However, such an interpretation could hardly be ascribed to Congress in passing this provision (section 207(b)(2) (C) of the Act). The Agency believes that the purpose of this condition is simply to limit the warranty to those situations in which repair of the vehicle is mandatory. Consequently, the proposal specifically holds that a warranty cause of action arises immediately upon failure of a short test if the owner is required to take any corrective action as a result of that failure. The owner need not ignore a given grace period, and actually incur a penalty or sanction before the warranty becomes operational.

**G. SECTION 85.2109 WARRANTY REMEDY**

As stated in § 85.2103(a), the manufacturer's obligation under the Emissions Performance Warranty is to "remedy the nonconformity at no cost to the owner." The Agency's interpretation of this requirement is set out in § 85.2109. Subsection (a) deals with the precise remedy involved. It is, in essence, to place the vehicle in a conforming condition. A temporary fix, sufficient only to enable the vehicle to pass an emissions retest is unacceptable. Further, this liability is specifically clarified as being independent of any State or local limitation on the penalty or sanction required to trigger warranty protection under § 85.2103(a)(3). EPA anticipates that many jurisdictions will set a limit on repair expense after which an owner will be required to take no more action despite the fact that his vehicle continues to fail to conform to emission standards. Alternatively, owners may simply be fined if their vehicles fail I/M inspections. However, the Agency believes that such provisions should not act to limit protection under the Emissions Performance Warranty. The "penalty or sanction" paragraph of section 207(b) does restrict the applicability of the warranty to those areas with mandatory inspections, and most likely will further restrict the potential frequency of claims in those areas to annual or semi-annual periods. But, given a mandatory test with some penalty or sanction attached, the Act is clear that the warranty remedy, if obtainable, is for the manufacturer to "remedy the nonconformity". The decision by a State or locality to fix a maximum penalty or sanction for its citizens cannot affect this potential Federal liability of a manufacturer under the warranty.

Subsection (b) speaks to the cost of repair, and emphasizes the requirement that a manufacturer bear the entire cost regardless of a failed vehicle's proximity to its next scheduled maintenance point. Thus, for example, if the required remedy for a failed vehicle is a new set of spark plugs, the manufacturer must provide them without cost even though the vehicle would have been scheduled to receive a new set, at the owner's expense, within a short period of time. In sum, the cost of a repair may not be split pro rata based on the vehicle's position within the required maintenance schedule, or on any other criteria.

AR_0033358

Under this provision, an owner may thus obtain a free tune-up when he would not have received one had his vehicle failed a week later at the maintenance interval. The Agency believes that this approach, although strict, is required by the Act. No problem arises if a vehicle fails due to a defect in a non-maintenance item since the time of such a failure is irrelevant to responsibility for repair. However, the Agency anticipates that many failures will be correctable simply by performance of routine maintenance, albeit at an earlier stage than that scheduled. In these cases, the time of failure will be determinative of responsibility, and, under the Emissions Performance Warranty, this can mean only complete responsibility. The purpose of the warranty is to ensure that a properly maintained and operated vehicle will perform within emissions standards at all times during its useful life. Although the need for routine maintenance implies that a vehicle will naturally vary in its emissions as maintenance items deteriorate, at no time should emissions exceed standards. Thus, failure of a short test indicates a problem outside of normal parameters. This, by the very nature of the warranty, must be corrected at the manufacturer's expense regardless of the point in time at which it is discovered.

Subsection (c) deals with a secondary problem related to the performance of routine maintenance as a repair under the Emissions Performance Warranty; that is, the fact that such work will affect the maintenance schedule. Clearly, parts replaced within a short time of their scheduled replacement need not be replaced again at the scheduled point, as it would only result in the needless waste of many parts. The proposal thus requires that a manufacturer adjust the maintenance schedule under these circumstances, and inform the owner of the new periods at the time of the warranty repair.

The issue of the effect of unscheduled maintenance, whether performed under the warranty or at an owner's request, is of general importance to this proposal. Experience shows that few vehicles can be expected to rigidly adhere to any maintenance schedule throughout a 5 year/50,000 mile period. Thus, particularly at later periods in a car's useful life, the question of compliance with the maintenance condition of § 85.2103(a)(1) may involve analysis of a record quite different from that envisioned by the applicable schedule. The Agency is concerned that this variable may confuse the determination of entitlement to protection under the Emissions Performance Warranty, especially in cases where the remedy is strictly maintenance oriented. Comments are particularly desired as to how this problem should be approached in any final regulations.

**H. SECTION 85.2110 INCLUSION OF WARRANTY PROVISIONS IN OWNER'S MANUALS**

The key to obtaining effective implementation of any warranty lies in full disclosure of its provisions to the warrantee. Accordingly, the proposal contains specific requirements intended to ensure that complete information regarding the Emissions Performance Warranty is supplied to vehicle owners. Section 85.2110 contains all of these requirements. Most are felt to be self explanatory, and are thus not discussed below.

In general, disclosure must be made in the vehicle owner's manual, which is intentionally defined broadly to allow flexibility in the presentation of the warranty information. Many manufacturers have separate warranty and/or maintenance booklets today for their own warranty or the Clean Air Act Section 207(a) warranty. This approach is at least equivalent to if not better than inclusion in the owner's manual proper, and the Agency hopes that similar type presentations will be adopted for the Emissions Performance Warranty.

The owner's manual need only contain a brief listing of the maintenance schedule, as is current practice today; provided that full descriptions of all procedures are set out in the service manual, those manuals are available, and the owner can obtain a copy of those procedures related to the Emissions Performance Warranty by mail, at nominal cost. This compromise to requiring that complete procedures be in all owner's manuals is proposed recognizing that few owners have a need for detailed instructions, and that presentation in the service manual is the established practice today. With regard to any maintenance designated as "owner's maintenance", this rationale may not be applicable, and the regulations thus require complete detailed instructions in the owner's manual for these procedures.

The owner's manual is also required to contain a logbook for the purpose of verifying compliance with the maintenance condition of the warranty. The Agency believes that this is a preferred approach to requiring that owners retain receipts for all maintenance services, although, as previously discussed, business receipts are acceptable under the proposal.

**I. REVIEW OF MANUALS AND DISAPPROVAL OF MAINTENANCE AND OPERATION INSTRUCTIONS**

Section 85.2111 of the proposal requires that all owner's and service manuals be submitted to the Agency for review pursuant to this subpart. In the case of maintenance and operation instructions which are determined to be out of compliance, either on their face or in actual practice, § 85.2112 provides for disapproval of such with the consequence being that they subsequently cease to be part of § 85.2103(a)(1) condition to recovery under the warranty.

No disapproval may be effected without notice to the manufacturer, an opportunity for him to present his views and evidence at an Agency hearing on the record, and publication in the FEDERAL REGISTER. Once an instruction is disapproved, however, the manufacturer will be required to send notification by mail to all owners, and the disapproval will be included in a compilation by the Agency for distribution to all interested parties.

Specific comments are requested as to the desired scope of any hearing held with regard to disapproval of a maintenance or operation instruction, including limits, if any, to be placed on discovery, intervention, cross-examination, and appeal.

**V. COST OF IMPLEMENTATION**

The major Agency cost involved in the implementation of the Emissions Performance Warranty will stem from whatever yearly testing is required in order to set cut-points (pass/fail points) for the various short tests identified in the subsection 207(b)(1) proposal being published today. Manufacturer costs will relate to administration of the warranty, and loss of sales due to price increases made to cover expected repair costs. An economic analysis of these factors has been prepared by the Agency and is available for inspection and copying at the U.S. Environmental protection Agency, Public Information Reference Unit, Room 2922 (EPA Library), 401 "M" Street, S.W., Washington, D.C. 20460. Single copies may be obtained by writing to: Environmental Protection Agency, Mobile Source Enforcement Division, Warranty Project (EN–340), 401 "M" Street, S.W., Washington, D.C. 20460.

The Agency is particularly interested in obtaining information related to the potential economic impacts of the Emissions Performance Warranty, and specifically requests comments on this topic with supporting data if available.

**VI. ENVIRONMENTAL IMPACT**

No adverse environmental impacts are anticipated by these regulations. As previously discussed, the warranty is basically only a cost-shifting mechanism. It will indirectly lead to some air quality benefits to the extent that it encourages implementation of State and local "Inspection/Maintenance" programs in areas which would otherwise not have them, causes more stringent standards to be enforced, induces owners to devote more attention to properly maintaining their vehicles, and influences manufacturers to build more durable emission control systems. However, the warranty itself does not contain any such impact.

No voluntary environmental impact statement has been prepared pursuant to EPA guidelines set forth in 39 FR 37419. The Emissions Performance Warranty is primarily directed at light duty vehicles, whose emission standards are specificallly exempted from the EIS requirements.

**VII. COMMENTS**

Interested persons are encouraged to participate in this rulemaking proceeding by submitting written comments (ten copies are requested) to: Director, Mobile Source Enforcement Division (EN–340), Room 3220 (WSM), Environmental Protection Agency, 401 "M" Street, S.W., Washington, D.C. 20460.

All comments received before the close of business on the comment closing date

AR_0033359

**PROPOSED RULES**

will be considered. All comments will be available for inspection and copying at the U.S. Environmental Protection Agency, Public Information Reference Unit, Room 2922 (EPA Library), 401 "M" Street, S.W., Washington, D.C. 20460.

Final regulations, modified as the Administrator deems appropriate after consideration of comments, will be promulgated as soon as practicable after such consideration and will be applicable to model year 1979 and later light duty vehicles and light duty trucks.

This notice of rulemaking is issued under authority of the following sections of the Clean Air Act as amended: 207 (42 U.S.C. 1857f–5(a)), 208 (42 U.S.C. 1857f–6) and 301(a) (42 U.S.C. 1857g). The regulations would implement section 207(b) of the Clean Air Act of 1970.

NOTE.—The Environmental Protection Agency has determined that this document does not contain a major proposal requiring preparation of an Inflation Impact Statement under Executive Order 11821 and OMB Circular A–107.

Dated: May 6, 1977.

DOUGLAS M. COSTLE,
*Administrator.*

Accordingly, notice is hereby given that Part 85 of Title 40 of the Code of Federal Regulations is proposed to be revised by the addition of a new Subpart V as set forth below.

**Subpart V—Emissions Control System Performance Warranty Regulations**

Sec.
85.2101  General applicability.
85.2102  Definitions.
85.2103  Warranty.
85.2104  Instructions for maintenance and proper operation.
85.2105  Prohibition against brand name requirements.
85.2106  Replacement parts.
85.2107  Proof of maintenance and proper operation.
85.2108  Warranty claims.
85.2109  Warranty remedy.
85.2110  Inclusion of warranty provisions in owner's manuals.
85.2111  Review of warranty statement, maintenance and operation instructions.
85.2112  Maintenance and operation instruction disapproval.

**Subpart V—Emissions Control System Performance Warranty Regulations**

**§ 85.2101  General applicability.**

The provisions of this subpart are applicable to all 1979 and later model year light duty vehicles and light duty trucks.

**§ 85.2102  Definitions.**

(a) As used in this subpart, all terms not defined herein shall have the meaning given them in the Act:

(1) "Act" means Part A of Title II of the Clean Air Act, 42 U.S.C. 1857 (f)–1 through (f)–7, as amended by Pub. L. 91–604 and 93–319.

(2) "Administrator" means the Administrator of the Environmental Protection Agency or his authorized representative.

(3) "Emission control device or system" means any system, assembly, device, or component thereof which can affect emissions.

(4) "Emissions Performance Warranty" means that warranty given pursuant to this subpart.

(5) "EPA-approved emission tests" means a test prescribed under 40 CFR 85.2201 et seq.

(6) "Light duty truck" means any motor vehicle related at 8,500 pounds GVWR or less with a vehicle curb weight of 6,000 pounds or less, and a basic vehicle frontal area of 46 square feet or less, which is:

(i) Designed primarily for purposes of transportation of property or is a derivation of such a vehicle, or

(ii) Designed primarily for transportation of persons, and having a capacity of more than 12 persons, or

(iii) Available with special features enabling off-street or off-highway operation and use.

(7) "Light duty vehicle" means a passenger car or passenger car derivative capable of seating 12 passengers or less.

(8) "Model year" means the manufacturer's annual production period (as determined by the Administrator) which includes January 1 of such calendar year; however, if the manufacturer has no annual production period, the term "model year" shall mean the calendar year.

(9) "Owner" means the ultimate purchaser or any subsequent purchaser of a vehicle.

(10) "Owner's Manual" means the instruction booklet normally provided to the purchased of a vehicle, and any other written information pertaining to the operation, maintenance, specifications, description or warranty of the vehicle provided with that booklet.

(11) "Service Manual" means that book provided by the manufacturer for use by vehicle service personnel in maintaining and repairing vehicles.

(12) "Useful Life" means a period of use of 5 years or 50,000 miles, whichever first occurs.

**§ 85.2103  Warranty.**

(a) The manufacturer of each vehicle to which this subpart applies shall warrant the emission control device or system of the vehicle such that if:

(1) The vehicle is maintained and operated in accordance with the manufacturer's instructions under the Emissions Performance Warranty, as set out in the owner's manual, and

(2) It fails to conform, for a period of 5 years or 50,000 miles, whichever first occurs, to the applicable emissions standards of the U.S. Environmental Protection Agency, as judged by an EPA-approved emission test, and

(3) Such nonconformity results or will result in the owner of the vehicle having to bear any penalty or other sanction (including the denial of the right to use the vehicle) under State or Federal law, then the manufacturer shall remedy the nonconformity at no cost to the owner.

(b) The warranty period shall begin on the date the vehicle is delivered to its ultimate purchaser, or if the vehicle is first placed in service as a demonstrator

or company car prior to such delivery, on the date it is first placed in such service.

**§ 85.2104  Instructions for maintenance and proper operation.**

(a) Maintenance required under the Emissions Performance Warranty must be reasonable and necessary to assure the proper functioning of the emission control device or system of the vehicle, including that it will be likely to be performed on in-use vehicles. Instructions shall be specific as to the exact procedures required, and the intervals at which they are to be performed.

(b) Maintenance instructions shall be set out such that one who regularly engages in the business of servicing automobiles will be able to satisfactorily comply with them.

(c) A manufacturer may specify those maintenance instructions which, in his opinion, are capable of being performed by a vehicle owner. Each instruction shall contain the complete procedure to be followed, and the documentation necessary to establish that it has been performed so as to qualify the owner to validate the maintenance logbook under § 85.2107(g)(2).

(d) Operation instructions applicable to the Emissions Performance Warranty must be reasonable and necessary to assure the proper functioning of the emission control devices or systems of the vehicle, including that they be consistent with the normal use for which the vehicle is sold.

**§ 85.2105  Prohibition against brand name requirements.**

(a) No maintenance or operation instruction issued pursuant to the Emissions Performance Warranty may include any condition on the use of any component or service (other than a component or service provided without charge under the terms of the purchase agreement) which is identified by brand, trade, or corporate name; or directly or indirectly distinguish between service performed by the franchised dealers of the manufacturer or any other service establishments with which the manufacturer has a commercial relationship, and service performed by independent automotive repair facilities with which the manufacturer has no commercial relationship, except that the prohibition of this section may be waived by the Administration if:

(1) The manufacturer satisfies the Administrator that the vehicle will function properly only if the component or service so identified is used in connection with the vehicle, and

(2) The Administrator finds that such a waiver is in the public interest.

**§ 85.2106  Replacement parts.**

(a) Unless specified otherwise by the vehicle manufacturer, compliance with instructions to replace parts during maintenance under the Emissions Performance Warranty shall require only the use of parts identified by their manufacturer as replacement parts for the specific vehicle in question.

AR_0033360

(b) A vehicle manufacturer may specify that all parts replaced during maintenance under the Emissions Performance Warranty be equivalent, from an emissions standpoint, to the original equipment parts of the vehicle, or set out some other criteria for acceptability (from an emissions standpoint) not in conflict with § 85.2105; *Provided*, that the owner's manual contains information necessary to determine whether a given part is so equivalent or meets the acceptability criteria.

(c) In all cases, a part certified, in accordance with criteria and procedures sanctioned by the Administrator, to be an equivalent replacement part for a specific vehicle in question shall be acceptable for use during maintenance under the Emissions Performance Warranty.

(d) Notwithstanding the above, a manufacturer may avoid liability under the Emissions Performance Warranty if he can show that a particular failure of an Agency-approved emission test is caused by a non-original equipment replacement part. For purposes of this section, any part authorized by the vehicle manufacturer to be sold as a replacement part for a vehicle in question shall be considered an original equipment replacement part.

(e) A part not required to be replaced at a definite interval shall be considered as warranted for the full term of the Emissions Performance Warranty. Diagnostic maintenance instructions, that is, instructions to replace a component only if checked and found to be operating below specification, shall have no bearing on warranty coverage. The manufacturer shall be liable for any such part which becomes the basis of a claim under the Emissions Performance Warranty.

§ 85.2107  Proof of maintenance and proper operation.

(a) Upon presentation of a vehicle for repair under the Emissions Performance Warranty, an owner shall be entitled to a rebuttable presumption that the requirement of § 85.2103(a)(1) that a vehicle be maintained in accordance with the manufacturer's instructions has been met upon:

(1) Presentation of a properly validated maintenance logbook for that vehicle, or

(2) A showing that he has submitted the vehicle, at the specified intervals, to someone who regularly engages in the business of servicing automobiles, and directed that person to perform the specified maintenance in accordance with the manufacturer's instructions for that vehicle, or

(3) Any combination of the above, which, taken together, covers all of the required maintenance for the vehicle.

(b) A manufacturer may rebut the presumption of paragraph (a) of this section by showing that the maintenance required under the Emissions Performance Warranty have not been properly complied with.

(c) In the absence of a showing as set out in paragraph (a) of this section, a manufacturer shall nevertheless con-

sider the § 85.2103(a)(1) maintenance condition satisfied upon receipt of reasonable evidence that the required maintenance was performed at the proper intervals and likely to have been done correctly, unless the manufacturer can show that such is not the case.

(d) The requirement of § 85.2103(a)(1) that a vehicle be operated in accordance with the manufacturer's instructions shall be considered satisfied upon receipt of a signed statement by the owner that he has properly operated the vehicle, unless the manufacturer can show that such is not the case.

(e) Despite inability of an owner to meet any of the above requirements, a manufacturer may in no case deny a warranty claim on the basis of:

(1) Work improperly performed by a dealer or other authorized service agent of the manufacturer,

(2) Work performed on the vehicle to rectify an unsafe condition, including a driveability condition that is unsafe, attributable to the manufacturers.

(3) Work improperly performed or not performed due to the design of the vehicle, an impractical maintenance procedure, unavailability of necessary tools or instruments, or other cause which the manufacturer should have foreseen would result in such improper maintenance or lack of maintenance, or

(4) Noncompliance with any maintenance or operation instruction which the owner can show is not relevant to his vehicle's particular failure of an EPA-approved emission test.

(f) Nothing in this subpart shall be construed to prevent an owner from personally performing all of the required maintenance for his vehicle under the Emissions Performance Warranty.

(g) Proper validation of the maintenance logbook, as specified in paragraph (a)(1) of this section, shall consist of completed entries for only those items required by § 85.2110(b)(2), and the signature of either:

(1) Someone who regularly engages in the business of servicing automobiles, or

(2) The owner, in the case of items classified as owner's maintenance pursuant to § 85.2104(c) and for which the owner possesses the required documentation under that paragraph .

§ 85.2108  Warranty claims.

(a) A claim under the Emissions Performance Warranty may be raised immediately upon failure of an EPA-approved emission test if, as a result of that failure, an owner is required to take action of any kind in order to avoid imposition of a penalty or sanction. An owner need not suffer the loss of the right to use his vehicle, be fined, incur repair expenses, or actually bear any such penalty or sanction to satisfy the requirement of § 85.2103(a)(3). That requirement shall be met if a test failure sets a procedure in motion under which the owner will bear such a penalty or sanction if his vehicle is not brought into conformity, or repaired to some specified extent.

(b) Each manufacturer shall establish procedures as to the manner in which a claim under the Emissions Performance Warranty may be raised. The procedures shall require an immediate decision by the dealer, or other person to whom a vehicle is initially presented for repair, as to the validity of the claim, and shall designate a final person or office to which vehicle owners may appeal a refusal by a dealer or other agent of the manufacturer to honor a claim.

(c) Within 10 days of the receipt of an appeal by such person or office, the manufacturer shall either honor the claim or provide the owner, in writing, an explanation of the basis upon which the claim is being denied. Failure to so notify shall result in the manufacturer being liable for the cost of any subsequent work actually performed on the vehicle in order to bring it into compliance with applicable emission standards.

§ 85.2109  Warranty remedy.

(a) The manufacturer's obligation under the Emissions Performance Warranty shall be to make such adjustments or repairs as are necessary to assure that the vehicle complies with applicable emission standards of the U.S. Environmental Protection Agency, that it will continue to comply for the remainder of its useful life (if proper maintenance and operation is continued), and that it will operate in a safe manner. State or local limitations as to the extent of the penalty or sanction imposed upon an owner of a failed vehicle shall have no bearing on this liability.

(b) Under the Emissions Performance Warranty, the manufacturer shall be liable for the total cost of the remedy of any vehicle validly presented for repair, to any authorized service facility of the manufacturer.

(c) If, in the course of remedying a nonconformity under the Emissions Performance Warranty, parts are replaced or work is performed which would otherwise have been scheduled at some future time under the maintenance instructions, then the manufacturer must adjust those instructions to reflect new periods for the particular vehicle in question based on the time of the warranty repair. The owner shall be informed of the new schedule at the time of the repair under the Emissions Performance Warranty.

§ 85.2110  Inclusion of warranty provisions in owner's manuals.

The owner's manual for each vehicle to which the regulations of this subpart are applicable shall contain, at a minimum, the following information:

(a) *Warranty statement.* A basic statement of the coverage of the Emissions Performance Warranty as set out in § 85.2103. This shall be separated from any other warranty given by the manufacturer, and be prefaced by the title "Emissions Performance Warranty" set in bold face type.

(b) *Maintenance and operation instructions.* All maintenance and operation instructions intended by the manufacturer to be included in the § 85.2103

AR_0033361

(a) (1) condition to recovery under the Emissions Performance Warranty.

(1) Maintenance instructions shall be separated from any general maintenance requirements or suggestions of the manufacturer, and shall be prefaced by the title "Required Instructions for Maintenance Under the Emissions Performance Warranty" set in bold face type. This requirement may be satisfied by a short statement of services to be performed if:

(i) The service manual for the vehicle contains a full description of all required maintenance,

(ii) Such manuals are readily available to the general public at the beginning of the model year for the vehicle, and

(iii) The ultimate purchaser of the vehicle is provided with an opportunity to obtain a copy of those instructions relevant to the warranty, by mail, at a nominal cost.

(2) In all cases, the owner's manual shall contain a "maintenance logbook" consisting of an abbreviated listing of the required maintenance in a format to facilitate the collection and storage of all information pertaining to the question of compliance with the maintenance condition. This shall include space for recording of the date and vehicle mileage at which point each instruction or group of instructions is performed, and the signature of the individual performing such, certifying that the manufacturer's procedures have been followed. In the case of maintenance pursuant to § 85.2104(c), space shall also be provided for the owner to certify that he can meet all of the documentation requirements of the manufacturer for such maintenance.

(3) Operation instructions shall be set out in full, separated from any general operation requirements or suggestions of the manufacturer, and shall be prefaced by the title "Required Instructions For Operation Under the Emissions Performance Warranty" set in bold face type.

(c) *Owner's maintenance.* Maintenance instructions, if any, provided pursuant to § 85.2104(c). All such instructions, with required documentation, shall be set out, in full, and shall be prefaced by the title "Owner's Maintenance" set in bold face type. Any procedures listed under this heading must also appear in the maintenance listing required under § 85.2110(b) (1).

(d) *Proof of compliance with required maintenance and operation instructions.* The provisions of § 85.2107 shall be set out under the heading "Proof of Compliance With Required Instructions Under

the Emissions Performance Warranty" set in bold face type.

(e) *Replacement parts statement.* A statement as to acceptability of replacement parts for use in maintenance under the Emissions Performance Warranty which comports with the requirements of § 85.2106. The statement shall appear under the title "Replacement Parts for Maintenance Under the Emissions Performance Warranty" set in bold face type, and shall contain:

(1) An explanation of the manufacturer's criteria for choice of acceptable replacement parts along with complete specifications sufficient to determine their acceptability for any given part, or

(2) In lieu of paragraph (e) (1) of this section, a statement that use of any part identified by its manufacturer as a replacement part for the specific vehicle in question will be acceptable, and

(3) In all cases, a statement that use of any part certified under the authority of the U.S. Environmental Protection Agency to be an equivalent replacement part for the specific vehicle in question will be acceptable.

(f) *Warranty claims.* Complete instructions as to when and how an owner may bring a claim under the Emissions Performance Warranty, as governed by § 85.2108. Instructions shall appear under the title "Emissions Performance Warranty Claims" set in bold face type, and shall include:

(1) An explanation of the point in time at which a claim may be raised,

(2) Step-by-step procedures as to the manner in which a claim may be raised,

(3) A clear designation and address of the final claim review person or office of the manufacturer, and

(4) The provision regarding failure of the manufacturer to respond within 10 days of an appeal to that person or office.

§ 85.2111   Review of warranty statement, maintenance and operation instructions.

(a) EPA will review owner's manuals and service manuals to ensure that the Emissions Performance Warranty and its accompanying maintenance and operation instructions have been included in accordance with the requirements of this subpart.

(b) For purposes of such review, the manufacturer of each vehicle to which this subpart applies shall submit two copies to EPA of the owner's manual and service manual for each such vehicle, in the final printed format in which they are to be distributed. The manuals

should be received by EPA prior to the introduction of the vehicle for sale.

(c) At the same time, the manufacturer shall submit an estimate of the cost of each item to be replaced during maintenance required under the Emissions Performance Warranty, and the labor charge to replace it, for each vehicle to which this subpart applies. Such submission need not be made to the extent that it would duplicate information already being provided to EPA pursuant to existing regulations or guidelines.

(d) All materials should be sent to: Director, Mobile Source Enforcement Division (EN–340), Environmental Protection Agency, 401 "M" Street SW., Washington, D.C. 20460.

§ 85.2112   Maintenance and operation instruction disapproval.

(a) Any maintenance or operation instruction may be disapproved upon a determination by EPA that it does not, in practice, satisfy the criteria set out in § 85.2104 for inclusion of such instructions.

(b) No disapproval shall be effected without affording the manufacturer reasonable notice in writing, and an opportunity to present his views or evidence at an Agency hearing on the record.

(c) A disapproval shall become effective upon publication of such in the FEDERAL REGISTER.

(d) Upon disapproval, an instruction shall cease to be a condition to manufacture liability under § 85.2103(a)(1). No warranty claim may be denied on the basis of non-compliance with such an instruction, or on the basis of emissions degradation due to attempts to comply.

(e) The manufacturer shall be required to mail notification of any disapproval to the owners of all affected vehicles, with an explanation of the implication of such with regard to protection under the Emissions Performance Warranty. Manufacturers shall ascertain the current addresses of owners in a manner to be approved by the Administrator.

(f) EPA may periodically publish a list of all disapproved instructions for distribution to emissions inspection facilities, and any other interested persons. Copies may be obtained by writing to: Public Information Office, Environmental Protection Agency, 401 "M" Street SW., Washington, D.C. 20460.

(g) Failure of EPA to disapprove any intruction shall have no bearing on the propriety of such instruction when considered in light of § 85.2107(e) (3).

[FR Doc.77–14619 Filed 5–24–77;8:45 am]

AR_0033362

**federal register**

## WEDNESDAY, MAY 25, 1977
### PART III



# INTERSTATE
# COMMERCE
# COMMISSION

# VARIOUS RAILROAD
# COMPANIES

### System Diagram Maps

## INTERSTATE COMMERCE COMMISSION
### [AB 88 (SDM)]
### BESSEMER & LAKE ERIE RAILROAD CO.
#### System Diagram Map

Notice is hereby given that, pursuant to the requirements contained in Title 49 of the Code of Federal Regulations, § 1121.22, that the Bessemer & Lake Erie Railroad Company, has filed with the Commission its color-coded system diagram map in docket No. AB 88 (SDM). The maps reproduced here in black and white are reasonable reproductions of that system map.

Color-coded copies of the map have been served on the Governor of each state in which the railroad operates and the Public Service Commission or similar agency and the State designated agency. Copies of the map may also be requested from the railroad at a nominal charge. The maps also may be examined at the office of the Commission, Section of Dockets, by requesting docket No. AB 88 (SDM).

ROBERT L. OSWALD,
*Secretary.*



[FR Doc.77-14611 Filed 5-24-77; 8:45 am]

**NOTICES**

26771

[AB 192 (SDM)]

### BIRMINGHAM SOUTHERN RAILROAD CO.

#### System Diagram Map

Notice is hereby given that, pursuant to the requirements contained in Title 49 of the Code of Federal Regulations, § 1121.22, that the Birmingham Southern Railroad Company, has filed with the Commission its color-coded system diagram map in docket No. AB 192 (SDM). The maps reproduced here in black and white are reasonable reproductions of that system map.

Color-coded copies of the map have been served on the Governor of each State in which the railroad operates and the Public Service Commission or similar agency and the State designated agency. Copies of the map may also be requested from the railroad at a nominal charge. The maps also may be examined at the office of the Commission, Section of Dockets, by requesting docket No. AB 192 (SDM).

ROBERT L. OSWALD,
*Secretary.*



**— Category 5**

## BIRMINGHAM SOUTHERN RAILROAD COMPANY

| | |
|---|---|
| SCALE  1" = 3 MILES | BIRMINGHAM , ALABAMA |
| S.M.S.A. - 1000 | DATE  FEBRUARY , 1977 |
| OFFICE OF CHIEF ENGINEER<br>GREENVILLE , PENNA. | AB 192 (SDM) |

[FR Doc.77-14599 Filed 5-24-77; 8:45 am]

AR_0033365

NOTICES

[AB 190 (SDM)]

## CARBON COUNTY RAILWAY CO.

### System Diagram Map

Notice is hereby given that, pursuant to the requirements contained in Title 49 of the Code of Federal Regulations, § 1121.23, that the Carbon County Railway Company, has filed with the Commission its color-coded system diagram map in docket No. AB 190 (SDM). The maps reproduced here in black and white are reasonable reproductions of that system map.

Color-coded copies of the map have been served on the Governor of each state in which the railroad operates and the Public Service Commission or similar agency and the State designated agency. Copies of the map may also be requested from the railroad at a nominal charge. The maps also may be examined at the office of the Commission, Section of Dockets, by requesting docket No. AB 190 (SDM).

ROBERT L. OSWALD,
*Secretary.*



[FR Doc.77-14598 Filed 5-24-77; 8:45 am]

## [AB 1 (SDM) [1]]

### CHICAGO AND NORTH WESTERN TRANSPORTATION CO.

#### System Diagram Map

Notice is hereby given that, pursuant to the requirements contained in Title 49 of the Code of Federal Regulations, 1121.22, that the Chicago and North Western Transportation Company, has filed with the Commission its color-coded system diagram map in docket No. AB–1 (SDM). The maps reproduced here in black and white are reasonable reproductions of that system map and the Commission on April 22, 1977, received a certificate of publication as required by said regulation which is considered the effective date on which the system diagram map was filed.

Color-coded copies of the map have been served on the Governor of each state in which the railroad operates and the Public Service Commission or similar agency and the State designated agency. Copies of the map may also be requested from the railroad at a nominal charge. The maps also may be examined at the office of the Commission, Section of Dockets, by requesting docket No. AB–1 (SDM).

ROBERT L. OSWALD,
*Secretary.*

CHICAGO AND NORTH WESTERN
TRANSPORTATION COMPANY

AB–1

Description of all lines or portions of lines identified on the Chicago and North Western Transportation Company System Diagram Map as falling within Categories 1 thru 3. 49 CFR 1121.21.

CATEGORY

All lines or portions of lines which the Chicago and North Western Transportation Company anticipates will be the subject of an abandonment or discontinuance application to be filed within the 3-year period following the date upon which the diagram, or any amended diagram, is filed with the Interstate Commerce Commission. 49 CFR 1121.20(b) (1).

ILLINOIS

(a) Rockford to Winnebago (Westerly 6.9 miles of Belvidere Subdivision).
(b) Entire segment is located in Illinois.
(c) Entire segment is located in Winnebago County.
(d) M.P. 93.5 to M.P. 100.4.
(e) No agency station located on this segment. Closed station of Winnebago served by central agency at Rockford.
Comment: Proposal does not include any industries located at Rockford.
(a) Sycamore to Byron (Westerly 30.8 miles of Ingalton Subdivision and portion of former C.G.W. Ry. Chicago to Omaha Line).
(b) Entire segment is located in State of Illinois.
(c) Entire segment is located in DeKalb and Ogle Counties.
(d) M.P. 57.5 to M.P. 88.3.
(e) Central agent at Byron responsible for associate station of Esmond and closed stations of Clare, Lindenwood, and Holcomb.

[1] AB 1 (SDM) includes Des Moines and Central Iowa Railway Company and Central Iowa Railway Company and Fort Dodge, Des Moines & Southern Railway Company.

Central agent at Sycamore (unaffected) served closed station at Five Points.
Comment: Proposal does not include industries located at Sycamore.
(a) Ringwood, Illinois to Lake Geneva, Wisconsin (Westerly 17.4 miles of Lake Geneva Subdivision).
(b) Segment is located in the States of Illinois and Wisconsin.
(c) The entire segment is located in McHenry County, Illinois and Walworth County, Wisconsin.
(d) M.P. 69.2 to M.P. 86.6.
(e) Agents located at Lake Geneva and Genoa City. Agent at Lake Geneva served closed station of Pell Lake. Agent at McHenry (unaffected) is responsible for associate station of Richmond.
Comment: Proposal does not include industries located at Ringwood.
(a) Elgin to Dundee (3.0 mile portion of Dundee Subdivision).
(b) Entire segment is located in State of Illinois.
(c) Entire segment is located in Kane County.
(d) M.P. 43.6 to M.P. 46.6
(e) None.
Comment: Proposal does not include industries located at Elgin and Dundee.

IOWA

(a) Lake View to Holstein (Westerly 41.1 miles of Holstein Subdivision).
(b) Entire segment is located in the State of Iowa.
(c) Entire segment is located in Sac and Ida Counties.
(d) M.P. 4.5 to M.P. 45.6
(e) Central agent at Wall Lake (unaffected) is responsible for associate stations of Sac City, Early, Schaller, Galva, and Holstein.
Comment: Proposal does not include industries located at Lake View.
(a) Minerva Junction to Zearing (Easterly 19.1 miles of Roland Subdivision).
(b) Entire segment is located in the State of Iowa.
(c) Entire segment is located in Marshall and Story Counties.
(d) M.P. 240.0 to M.P. 259.1
(e) Central agent at Clemons Grove is responsible for closed stations of St. Anthony, Zearing, and Minerva. Central agent at Marshalltown (unaffected) is responsible for closed station of Keller.
(a) Ellsworth to Lawn Hill (Easterly 21.0 miles of Ellsworth Subdivision).
(b) Entire segment is located in the State of Iowa.
(c) Entire segment is located in Hamilton and Hardin Counties.
(d) M.P. 65.4 to M.P. 44.4
(e) Central agent at Jewell (unaffected) is responsible for associate stations to Radcliffe and Hubbard. Central agent at Eldora (unaffected) is responsible for associate station of Lawn Hill.
Comment: Proposal does not include industries located at Ellsworth.
(a) Hicks to Buckingham (Southern 9.3 miles of Parkersburg Subdivision).
(b) Entire segment is located in the State of Iowa.
(c) Entire segment is located in Blackhawk and Tama Counties.
(d) M.P. 38.1 to M.P. 28.8
(e) Central agent at Reinbeck (unaffected) is responsible for associate station of Buckingham and closed station of Voorhies.
Comment: Proposal does not include industries located at Hicks.
(a) Garwin to Gladbrook (6.4 mile portion of Alden Subdivision).
(b) Entire segment is located in the State of Iowa.

(c) Entire segment is located in Tama County.
(d) M.P. 12.1 to M.P. 18.5
(e) None.
Comment: Proposal does not include industries located at Garwin or Gladbrook.
(a) Marathon to Alton (59.2 mile portion of Sioux Rapids Subdivision).
(b) Entire segment is located in the State of Iowa.
(c) Entire segment is located in Buena Vista, Clay, O'Brien and Sioux Counties.
(d) M.P. 157.3 to M.P. 216.5
(e) Central agent at Sioux Rapids is responsible for associate stations of Linn Grove and Peterson. Central agent at Alton (unaffected) is responsible for associate stations of Sutherland, Paullina, and Granville.
Comment: Proposal does not include industries located at Marathon or Alton.
(a) Humboldt to LuVerne (13.7 mile portion of Forest City Subdivision).
(b) Entire segment is located in the State of Iowa.
(c) Entire segment is located in Humboldt County.
(d) M.P. 201.5 to M.P. 187.8
(e) Central agent at LuVerne (unaffected) is responsible for associate station of Livermore and closed station of Arnold.
Comment: Proposal does not include industries at Humboldt or LuVerne.
(a) Corwith to Lake Mills (Northerly 38.7 miles of Forest City Subdivision).
(b) Entire segment is located in the State of Iowa.
(c) Entire segment is located in Hancock and Winnebago Counties.
(d) M.P. 178.0 to M.P. 139.3.
(e) Central agent at Forest City is responsible for associate station of Leland. Central agent located at Britt.
Comment: Proposal does not include industries located at Corwith and Lake Mills.
(a) Olewein to Dubuque (69.3 mile portion of Dubuque Subdivision).
(b) Entire segment is located in the State of Iowa.
(c) Entire segment is located in Fayette, Buchanan, Delaware and Dubuque Counties.
(d) M.P. 245.0 to M.P. 175.7
(e) Central agent at Dubuque (unaffected) is responsible for associate station of Dyersville and closed stations of Durango, Graf, Farley, Petersburg, and Almoral. Central agent at Oelwein (unaffected) is responsible for associate station of Aurora and closed stations of Thorpe, Dundee, Lamont, and Stanley.
Comment: Proposal is contingent on agreement with C.M.St.P.&P. RR. for trackage rights between Clinton, Iowa and Dubuque. Proposal does not include industries located at Dubuque or Oelwein.
(a) Grand Junction to Minburn (Northerly 21.6 miles of Perry Subdivision).
(b) Entire segment is located in the State of Iowa.
(c) Entire segment is located in Greene, Boone and Dallas Counties.
(d) M.P. 260.8 to M.P. 282.4
(e) Central agency at Grand Junction (unaffected) is responsible for associate stations of Rippey and Perry and closed station of Angus.
Comments: Proposal does not include industries at Grand Junction or Minburn. Proposal is contingent on C.R.I.&P. RR. abandoning operations over this trackage.
(a) Ayrshire to Terril (Northerly 34.0 miles of Tara subdivision).
(b) Entire segment is located in the State of Iowa.
(c) Entire segment is located in Palo Alto, Clay, and Dickinson Counties.
(d) M.P. 217.3 to M.P. 182.5

AR_0033367

(e) Central agent at Spencer is responsible for associate station of Terril and closed stations of Ruthven and Langdon.

Comment: Proposal does not include industries located at Ayrshire.

(a) Gypsum to Flugstad (Westerly 11.9 miles of Flugstad Subdivision).

(b) Entire segment is located in the State of Iowa.

(c) Entire segment is located in Webster and Hamilton Counties.

(d) M.P. 1.8 to M.P. 13.7

(e) Central agent at Ford Dodge (unaffected) is responsible for closed stations of Evanston, Brushy, and Flugstad.

Comment: Proposal does not include industries at Gypsum.

(a) Jewell to Stratford (Easterly 14.6 miles of Dayton Subdivision).

(b) Entire segment is located in the State of Iowa.

(c) Entire segment is located in Hamilton and Webster Counties.

(d) M.P. 69.4 to M.P. 84.0

(e) Central agent at Gowrie (unaffected) is responsible for associate stations of Stanhope and Stratford.

Comment: Proposal does not include industries located at Jewell.

(a) Harcourt to Dayton (Westerly 5.1 miles of Dayton Subdivision).

(b) Entire segment is located in the State of Iowa.

(c) Entire segment is located in Webster County.

(d) M.P. 98.0 to M.P. 92.9

(e) Central agent at Gowrie (unaffected) is responsible for associate station of Dayton.

Comment: Proposal does not include industries at Harcourt.

(a) Trimount, Minnesota to Estherville, Iowa (southerly 26.5 miles of Estherville Subdivision).

(b) Entire segment is located in the States of Minnesota and Iowa.

(c) Entire segment is located in Martin County, Minnesota and Emmet County, Iowa.

(d) M.P. 142.4 to M.P. 168.9

(e) Central agent at Spencer (unaffected) is responsible for associate stations of Dunnell, Estherville and closed station of Huntington. Central Agent at St. James (unaffected) is responsible for associate station of Sherburn.

Comment: Proposal does not include industries located at Trimount.

(a) Camp Dodge to Granger (northerly 7.2 miles of Des Moines and Central Iowa Railway).

(b) Entire segment is located in the State of Iowa.

(c) Entire segment is located in Dallas and Polk Counties.

(d) M.P. 11.4 to M.P. 18.6.

(e) Central agent at Des Moines (unaffected) is responsible for associate stations of Granger and Herrold.

Comment: Proposal does not include industries at Camp Dodge.

### MICHIGAN

(a) Ishpeming to Martin's Landing (Westerly 15.1 miles of Martin's Landing Spur).

(b) Entire segment is located in the State of Michigan.

(c) Entire segment is located in Marquette County.

(d) M.P. 74.5 (L.S.&I. RR.) to M.P. 196.6.

(e) Central agent at Ishpeming (unaffected) is responsible for closed stations of Clowry, Martin's Landing, and Blueberry Mine.

Comments: Proposal does not include industries located at Ishpeming Proposal is for discontinuance of operations only.

### MINNESOTA

(a) Lake Crystal to Winnebago (24.6 miles—entire Winnebago Subdivision).

(b) Entire segment is located in the State of Minnesota.

(c) Entire segment is located in Blue Earth and Faribault Counties.

(d) M.P. 0.0 to M.P. 24.6

(e) Central agent at Mankato (unaffected) is responsible for associate stations of Garden City, Vernon Center, Amboy, and Winnebago.

Comment: Proposal does not include industries located at Lake Crystal.

(a) Heron Lake to Lake Wilson (36.6 miles—entire Slayton Subdivision).

(b) Entire segment is located in the State of Minnesota.

(c) Entire segment is located in Jackson, Nobles, and Murray Counties.

(d) M.P. 0.0 to M.P. 36.6

(e) Central agent at Worthington (unaffected) is responsible for associate stations of Dundee, Lime Creek, Avoca, Slayton, Hadley, and Lake Wilson.

Comment: Proposal does not include industries located at Heron Lake.

(a) Bingham Lake to Currie (33.3 miles—entire Currie Subdivision).

(b) Entire segment located in the State of Minnesota.

(c) Entire segment located in Cottonwood and Murray Counties.

(d) M.P. 0.0 to M.P. 38.3.

(e) Central agent at Windom (unaffected) is responsible for associate stations of Delft, Jeffers, Storden, Westbrook, Dovray, and Currie.

Comment: Proposal does not include industries located at Bingham Lake.

(a) St. James to Hanska (Northerly 13.4 miles of Hanska Spur).

(b) Entire segment is located in the State of Minnesota.

(c) Entire segment is located in Watonwan and Brown Counties.

(d) M.P. 125.2 to M.P. 111.8.

(e) Central agent at St. James (unaffected) is responsible for associate stations of LaSalle and Hanska.

Comment: Proposal does not include industries located at St. James.

(a) Trimount to Ormsby (Northerly 4.7 miles of Estherville Subdivision).

(b) Entire segment is located in the State of Minnesota.

(c) Entire segment is located in Martin and Watonwan Counties.

(d) M.P. 140.7 to M.P. 136.0.

(e) Central agent at St. James (unaffected) is responsible for associate station of Ormsby.

Comment: Proposal does not include industries located at Trimount.

(a) Trimount, Minnesota to Estherville, Iowa. Line description as on Page 11 (Iowa).

(a) Rochester to Stewartville (12.6 mile portion of Rochester Subdivision).

(b) Entire segment is located in the State of Minnesota.

(c) Entire segment is located in Olmsted County.

(d) M.P. 146.0 to M.P. 158.6.

(e) Central agent at Rochester (unaffected) is responsible for associate stations of Simpson and Stewartville.

Comment: Proposal does not include industries located at Rochester.

(a) Hopkins to Norwood (Easterly 31.4 miles of Morton Subdivision).

(b) Entire segment is located in the State of Minnesota.

(c) Entire segment is located in Hennepin and Carver Counties.

(d) M.P. 19.6 to M.P. 51.3.

(e) Central agent at Hopkins (unaffected) is responsible for associate stations of Deep-

haven, Excelsior, Manitou, Victoria, Waconia, and Young America.

Comments: Proposal does not include industries located at Hopkins or Norwood. Proposal is contingent on agreement with C.M.St.P.&P. RR. for trackage rights between Minneapolis and Norwood.

(a) Northfield to Faribault (12.3 mile portion of Red Wing Subdivision).

(b) Entire segment is located in the State of Minnesota.

(c) Entire segment is located in Rice County.

(d) M.P. 58.1 to M.P. 45.8

(e) Central agent at Randolph (unaffected) is responsible for associate station of Dundas and closed station of Bridgewater.

Comments: Proposal does not include industries located at Northfield or Faribault. Proposal is contingent on agreement with C.M.St.P.&P. RR. for trackage rights between Northfield to Faribault.

### NEBRASKA

(a) Blair to Tekamah (Southerly 17.4 miles of Lyons Subdivision).

(b) Entire segment is located in the State of Nebraska.

(c) Entire segment is located in Washington and Burt Counties.

(d) M.P. 98.1 to M.P. 80.7.

(e) Central agent at Blair (unaffected) is responsible for associate stations of Herman and Tekamah, and closed station of Ranch Spur.

Comment: Proposal does not include industries located at Blair.

(a) Fremont to Lincoln (48.3 mile portion of Lincoln Subdivision).

(b) Entire segment is located in the State of Nebraska.

(c) Entire segment is located in Dodge, Saunders, and Lancaster Counties.

(d) M.P. 39.2 (UP RR) to M.P. 48.5

(e) Central agent at Fremont (unaffected) is responsible for associate station of Cedar Bluffs. Central agent at Lincoln (unaffected) is responsible for associate stations of Wahoo and Coresco, and closed stations of Colon and Davey.

Comments: Proposal is contingent on agreements with U.P. RR. and M.P. RR. for trackage rights between Fremont and Lincoln. Proposal does not include industries located at Fremont or Lincoln.

(a) Elkhorn Jct. to Blair (22.4 mile portion of Sioux City Subdivision).

(b) Entire segment is located in the State of Nebraska.

(c) Entire segment is located in Douglas and Washington Counties.

(d) M.P. 121.6 to M.P. 99.2

(e) Central agent at Omaha (unaffected) is responsible for associate station of Florence and closed station of Ft. Calhoun.

Comment: Proposal does not include industries located at Blair or Omaha (Elkhorn Jct. is a junction point in Omaha).

### SOUTH DAKOTA

(a) Jolly to Jolly Dump (3.7 miles—entire Jolly Dump Spur).

(b) Entire segment is located in the State of South Dakota.

(c) Entire segment is located in Butte County.

(d) M.P. 0.0 to M.P. 3.7.

(e) Central agent at Belle Fourche (unaffected) is responsible for associate station of Jolly Dump.

(a) Redfield to Frankfort (Easterly 9.7 miles of Frankfort Spur).

(b) Entire segment is located in the State of South Dakota.

(c) Entire segment is located in Spink County.

(d) M.P. 386.9 to M.P. 379.2.

AR_0033368

(e) Central agent at Redfield (unaffected) is responsible for associate station of Frankfort.

Comment: Proposal does not include industries located at Redfield.

(a) James Valley Jct. to Redfield (Easterly 33.8 miles of Oakes Subdivision).

(b) Entire segment is located in the State of South Dakota.

(c) Entire segment is located in Beadle and Spink Counties.

(d) M.P. 4.0 to M.P. 37.8

(e) Central agent at Huron (unaffected) is responsible for associate station of Hitchcock.

Comment: Proposal is contingent on agreement with C.M.St.P.&P.RR. for trackage rights between Wolsey, South Dakota and Redfield. Proposal does not include industries located at James Valley Junction or Redfield.

### WISCONSIN

(a) Ripon to Bancroft (Westerly 58.9 miles of Marshline Subdivision).

(b) Entire segment is located in the State of Wisconsin.

(c) Entire segment is located in Fond du Lac, Green Lake, Marquette, Waushara and Portage Counties.

(d) M.P. 20.5 to M.P. 136.4

(e) Central agent at Ripon (unaffected) is responsible for associate stations of Green Lake, Chier St. Marie Sand Co. Pit, Princeton, and Neshkoro. Central agent at Almond is responsible for associate stations of Bannerman, Wautoma, Wild Rose and closed station of Bancroft.

Comment: Proposal does not include industries located at Ripon.

(a) Merrillan to Marshfield (Westerly 37.5 miles of Merrillan Subdivision).

(b) Entire segment is located in the State of Wisconsin.

(c) Entire segment is located in Jackson, Clark, and Wood Counties.

(d) M.P. 0.0 to M.P. 37.5

(e) Central agent at Merrillan (unaffected) is responsible for associate stations of Neillsville, Granton, Chili, and closed station of Kurth.

Comment: Proposal does not include industries located at Merrillan or Marshfield.

(a) Edgar to Marshfield (22.0 mile portion of Marshfield Subdivision).

(b) Entire segment is located in the State of Wisconsin.

(c) Entire segment is located in Marathon and Wood Counties.

(d) M.P. 40.8 to M.P. 62.8

(e) Central agent at Wausau (unaffected) is responsible for associate stations of Stratford and closed stations of Fenwood and Opal.

Comment: Proposal does not include industries located at Edgar or Marshfield.

(a) Conover to Phelps (9.2 miles entire Phelps Spur).

(b) Entire segment is located in the State of Wisconsin.

(c) Entire segment is located in Villas County.

(d) M.P. 0.0 to M.P. 9.2.

(e) Central agent at Watersmeet (unaffected) is responsibble for associate station of Phelps.

Comment: Proposal does not include industries located at Conover.

(a) Beloit to Evansville (23.0 miles portion of Beloit and Footville Subdivisions).

(b) Entire segment is located in the State of Wisconsin.

(c) Entire segment is located in Rock County.

(d) M.P. 92.5 to M.P. 115.5.

(e) Central agent at Beloit (unaffected) is responsible for closed station of Afton. Central agent at Madison (unaffected) is re-

sponsible for associate station of Footville and closed station of Magnolia.

Comment: Proposal does not include industries located at Beloit or Evansville.

(a) Ringwood, Illinois to Lake Geneva, Wisconsin. Line description is on Pages 2 and 3 (Illinois).

(a) Medary Jct. to Galesville (23.2 miles—a portion of the Adams Subdivision and the entire Galesville Spur).

(b) Entire segment is located in the State of Wisconsin.

(c) Entire segment is located in LaCrosse and Trempealeau Counties.

(d) M.P. 268.3 to M.P. 284.5 and M.P. 284.0 to M.P. 2910.

(e) Central agent at LaCrosse (unaffected) is responsible for associate stations of Onalaska, Midway, Trempealeau, Galesville and closed station of Lytles.

Comment: Proposal does not include industries located at Medary.

(a) Shawano to Eland (Westerly 29.3 miles of Shawano Subdivision).

(b) Entire segment is located in the State of Wisconsin.

(c) Entire segment is located in Shawano County.

(d) M.P. 38.7 to M.P. 68.0.

(e) Central agent at Shawano (unaffected) is responsible for associate station of Bowler and closed station of Thornton.

Comment: Proposal does not include industries located at Shawano or Eland.

### CATEGORY 2

All lines or portions of lines potentially subject to abandonment which the Chicago and North Western Transportation Company has under study and believes may be the subject of a future abandonment application because of either anticipated operating losses or excessive rehabilitation costs, as compared to potential revenues. 49 CFR 1121.20 (b)(2).

### IOWA

(a) Burt to Bancroft (3.0 mile portion of Burt Subdivision).

(b) Entire segment is located in the State of Iowa.

(c) Entire segment is located in Kossuth County.

(d) M.P. 145.5 to M.P. 148.5.

(e) Central agent at Burt (unaffected) is responsible for associate station of Bancroft.

Comment: Proposal does not include industries located at Burt.

(a) LuVerne to Corwith (8.6 mile portion of Forest City Subdivision).

(b) Entire segment is located in the State of Iowa.

(c) Entire segment is located in Kossuth and Hancock Counties.

(d) M.P. 186.6 to M.P. 178.0

(e) Central agent at Britt (unaffected) is responsible for associate station of Corwith and closed station of Hanna.

Comment: Proposal does not include industries located at LuVerne.

(a) Rolfe to Ayrshire (22.2 mile portion of Tara Subdivision).

(b) Entire segment is located in the State of Iowa.

(c) Entire segment is located in Pocahontas and Palo Alto Counties.

(d) M.P. 239.5 to M.P. 217.3.

(e) Central agent at Rolfe (unaffected) is responsible for associate stations of Curlew and Ayrshire, and closed stations of Plover and Mallard.

Comment: Proposal does not involve industries located at Rolfe.

(a) Carroll to Harlan (Southerly 40.2 miles of Harland Subdivision).

(b) Entire segment is located in the State of Iowa.

(c) Entire segment is located in Carroll, Crawford, and Shelby Counties.

(d) M.P. 421.7 to M.P. 461.9

(e) Agent located at Harlan and central agent located at Carroll (unaffected) is responsible for associate stations of Manning and Irwin, and closed station of Halbur.

Comment: Proposal does not include industries located at Carroll.

(a) Belmond to Alexander (Easterly 7.7 miles of Belmond Subdivision).

(b) Entire segment is located in the State of Iowa.

(c) Entire segment is located in Wright and Franklin Counties.

(d) M.P. 206.3 to M.P. 198.6

(e) Central agent at Belmond (unaffected) is responsible for associate station of Alexander.

Comment: Proposal does not include industries located at Belmond.

(a) Mason City to Kesley (Northerly 34.8 miles of Parkersburg Subdivision).

(b) Entire segment is located in the State of Iowa.

(c) Entire segment is located in Cerro Gordo, Franklin, and Butler Counties.

(d) M.P. 104.3 to M.P. 68.7 excluding M.P. 75.9 to M.P. 75.1 at Dumont.

(e) Central agent at Mason City (unaffected) is responsible for associate stations of Dougherty and Aredale and closed stations of Cartersville and Kesley.

Comment: Proposal does not include industries located at Mason City or Dumont.

(a) Manly, Iowa to Austin, Minnesota (30.5 mile portion of Mason City Subdivision).

(b) Entire segment is located in the States of Iowa and Minnesota.

(c) Entire segment is located in Worth and Mitchell Counties, Iowa and Mower County, Minnesota.

(d) M.P. 48.0 to M.P. 17.5.

(e) Central agent at Austin (unaffected) is responsible for associate station of Lyle and closed stations of Rolan and Meltonville.

Comment: Proposal is contingent on agreement with C.M.St.P.&P. RR. for trackage rights between Mason City, Iowa and Austin, Minnesota. Proposal does not include industries located at Manly or Austin.

### MINNESOTA

(a) Tracy, Minnesota to Gary, South Dakota (Northerly 57.3 miles of Marshall Subdivision).

(b) Entire segment is located in the States of Minnesota and South Dakota.

(c) Entire segment is located in Lyon, Lincoln, and Yellow Medicine Counties, Minnesota and Deuel County, South Dakota.

(d) M.P. 227.6 to M.P. 284.9

(e) Central agent at Marshall is responsible for associate stations of Amiret, Ghent, Minnesota, Taunton, Porter, Camby, Burr and Gary.

Comment: Proposal does not include industries located at Tracy.

(a) Cannon Falls to Red Wing (16.8 mile portion of Red Wing Subdivision).

(b) Entire segment is located in the State of Minnesota.

(c) Entire segment is located in Goodhue County.

(d) M.P. 74.3 to M.P. 91.1

(e) Agent at Red Wing (unaffected) is responsible for closed Station of Welch.

Comments: Proposal is contingent on agreements with C.M.St.P.&P. RR. and B.N. for trackage rights between St. Paul, Minnesota and Red Wing, Minnesota. Proposal does not include industries located at Cannon Falls or Red Wing.

(a) Manly, Iowa to Austin, Minnesota. Line description is on Pages 28 and 29 (Iowa).

### NEBRASKA

(a) Oakdale to Elgin (10.4 miles entire Elgin Spur).

AR_0033369

(b) Entire segment is located in the State of Nebraska.

(c) Entire segment is located in Antelope County.

(d) M.P. 115.0 to M.P. 104.6.

(e) Central agent at Neligh (unaffected) is responsible for associate station of Elgin.

Comment: Proposal does not include industries located at Oakdale.

#### SOUTH DAKOTA

(a) Ellis to Mitchell (Westerly 65.2 miles of Sioux Falls Subdivision).

(b) Entire segment is located in the State of South Dakota.

(c) Entire segment is located in Minnehaha, McCook, Hanson and Davison Counties.

(d) M.P. 65.5 to M.P. 130.7.

(e) Central agent at Salem is responsible for associate stations of Hartford, Humboldt, Montrose, Spencer, and Farmer. Central agent at Mitchell is responsible for associate station of Fulton and closed station of Riverside.

Comment: Proposal does not include industries located at Ellis.

(a) Tracy, Minnesota to Gary, South Dakota. Line description is on Page 29 (Minnesota).

#### WISCONSIN

(a) Pulaski to Gillett (Easterly 16.2 miles of Laona Subdivision).

(b) Entire segment is located in the State of Wisconsin.

(c) Entire segment is located in Oconto and Shawano Counties.

(d) M.P. 17.1 to M.P. 33.3.

(e) Central agent at Green Bay (unaffected) is responsible for closed station of Krakow. Central agent at Oconto Falls (unaffected) is responsible for associate stations of Green Valley and Gillett.

Comment: Proposal does not include industries located at Pulaski.

#### CATEGORY 3

All lines or portions of lines for which an abandonment or discontinuance application is pending before the Interstate Commerce Commission on the date upon which the diagram, or any amended diagram, is filed with the Interstate Commerce Commission. 49 CFR Section 1121.20(b)(3).

#### IOWA

(a) Zearing to Roland (Westerly 10.5 miles of Roland Subdivision).

(b) Entire segment is located in the State of Iowa.

(c) Entire segment is located in Story County.

(d) M.P. 259.1 to M.P. 269.6.

(e) Central agent at Clemons Grove (unaffected) is responsible for associate station of Roland and closed station of McCallsburg.

Comment: Docket Number AB–1 (Sub. No. 45). Proposal does not include industries located at Zearing.

(a) Somers to Carroll (30.9 mile portion of Harlem Subdivision).

(b) Entire segment is located in the State of Iowa.

(c) Entire segment is located in Calhoun and Carroll Counties.

(d) M.P. 389.1 to M.P. 420.0.

(e) Central agent at Somers (unaffected) is responsible for associate station of Lanesboro and closed stations of Rinard, Lohrville, Wightman and Lidderdale.

Comments: Docket AB–1 (Sub. No. 27). Proposal does not include industries located at Somers or Carroll.

(a) Bancroft to Ledyard (Northerly 9.4 miles of Burt Subdivision).

(b) Entire segment is located in the State of Iowa.

(c) Entire segment is located in Kossuth County.

(d) M.P. 146.5 to M.P. 157.9

(e) Central agent at Burt (unaffected) is responsible for associate station for Ledyard.

Comments: Docket Number AB–1 (Sub. No. 51). Proposal does not include industries located at Bancroft.

(a) Wren, Iowa to Iroquois, South Dakota (155.7 miles of Hawarden Subdivision).

(b) Entire segment is located in the States of Iowa and South Dakota.

(c) Entire segment is located in Plymouth and Sioux Counties, Iowa and Union, Lincoln, Turner, McCook, Miner and Kingsbury Counties, South Dakota.

(d) M.P. 0.0 to M.P. 126.0.

(e) Central agent at Sioux City (unaffected) is responsible for associate station of Craig and closed stations of Merrill and Brunsville. Agent at Hawarden is responsible for closed station of McNally. Central agent at Beresford is responsible for associate stations of Alcester, Centerville, Hurley, Parker, and Monroe. Central agent at Salem (unaffected) is responsible for associate stations of Canistota and Canova, and closed station of Unityville. Central agent at Huron (unaffected) is responsible for associate stations of Carthage and closed stations of Vilas, Argonne and Esmond.

Comments: Docket Number AB–1 (Sub. No. 9). Proposal does not include industries located at Wren, Salem or Iroquois.

(a) Stewartville, Minnesota to McIntire, Iowa (33.7 mile portion of Rochester Subdivision).

(b) Entire segment is located in the States of Minnesota and Iowa.

(c) Entire segment is located in Olmsted, Mower and Fillmore Counties, Minnesota and Howard and Mitchell Counties, Iowa.

(d) M.P. 158.6 to M.P. 192.3.

(e) Central agent at Rochester (unaffected) is responsible for associate stations of Racine, Spring Valley, Ostrander, and LeRoy.

Comments: Docket Number AB–1 (Sub. No. 19). Proposal does not include industries located at Stewartville or McIntire.

(a) Stratfort to Dayton (8.9 miles of Dayton Subdivision).

(b) Entire segment is located in the State of Iowa.

(c) Entire segment is located in Webster County.

(d) M.P. 84.0 to M.P. 92.9.

(e) None.

Comments: Docket Number AB–1 (Sub. No. 46). Proposal does not include industries located at Stratford or Dayton.

#### MICHIGAN

(a) Gillett, Wisconsin to Scott Lake, Michigan (Westerly 89.4 miles of Laona Subdivision).

(b) Entire segment is located in the States of Wisconsin and Michigan.

(c) Entire segment is located in Oconto, Forest and Florence Counties, Wisconsin and Iron County, Michigan.

(d) M.P. 33.3 to M.P. 122.7.

(e) Central agent at Oconto Falls (unaffected) is responsible for associate station of Suring. Central agent at Laona is responsible for associate stations of Wabeno and Newald, and closed stations of Breed, Mountain, Lakewood, Townsend, Long Lake, and Tipler.

Comments: Docket Number AB–1 (Sub. No. 40). Proposal does not include industries located at Gillett or Scott Lake.

#### MINNESOTA

(a) Sanborn to Wanda (Westerly 8.2 miles of Wanda Spur.

(b) Entire segment is located in the State of Minnesota.

(c) Entire segment is located in Redwood County.

(d) M.P. 0.6 to M.P. 8.8.

(e) Central agent at Tracy (unaffected) is responsible for closed station of Wanda.

Comments: Docket Number AB–1 (Sub. No. 48). Proposal does not include industries located at Sanborn.

(a) Sleepy Eye to Redwood Falls (24.8 miles—entire Redwood Falls Subdivision).

(b) Entire segment is located in the State of Minnesota.

(c) Entire segment is located in Brown and Redwood Counties.

(d) M.P. 1.4 to M.P. 26.2.

(e) Central agent at Sleepy Eye (unaffected) is responsible for associate stations of Evan, Morgan, Gilfillan, and Redwood Falls.

Comments: Docket Number AB–1 (Sub. No. 50). Proposal does not include industries located at Sleepy Eye.

(a) Marshall Jct. to Wabasso and Wabasso to Vesta (37.3 miles—entire Wabasso Subdivision).

(b) Entire segment is located in the State of Minnesota.

(c) Entire segment is located in Lyon and Redwood Counties.

(d) M.P. 54.2 to M.P. 28.8 and M.P. 14.5 to M.P. 26.4.

(e) Central agent at Marshall (unaffected) is responsible for associate stations of Dudley, Milroy, Lucan, Wabasso, Seaforth, and Vesta.

Comment: Docket AB–1 (Sub. No. 58).

(a) Stewartville, Minnesota to McIntire, Iowa. Line description is on Pages 35 and 36 (Iowa).

(a) Tunnel City, Wisconsin to Medary Jct., Wisconsin and Trempealeau, Wisconsin to Winona, Minnesota (41.3 mile portion of Adams Subdivision).

(b) Entire segment is located in the States of Wisconsin and Minnesota.

(c) Entire segment is located in Monroe, LaCrosse and Trempealeau Counties, Wisconsin and Winona County, Minnesota.

(d) M.P. 163.2 to M.P. 267.8 (excluding M.P. 168.0 to 169.5 at Camp McCoy, M.P. 176.0 to M.P. 248.0 at Sparta and M.P. 260.0 to M.P. 261.9 at West Salem) and M.P. 284.5 to M.P. 296.6

(e) Central agent at LaCrosse (unaffected) is responsible for associate station of Bangor and closed stations of Rockland and Pine Creek.

Comments: Docket Number AB–1 (Sub. No. 54). Proposal does not include industries located at Tunnel City, Camp McCoy, Sparta, West Salem, Medary, Trempealeau and Winona.

#### NEBRASKA

(a) Norfolk, Nebraska to Winner, South Dakota (Westerly 172.4 miles of Winner Subdivision).

(b) Entire segment is located in the States of Nebraska and South Dakota.

(c) Entire segment is located in Madison, Pierce, Antelope, Knox and Boyd Counties, Nebraska and Gregory, Tripp, and Mellette Counties, South Dakota.

(d) M.P. 2.9 to M.P. 175.3.

(e) Central agent at Norfolk (unaffected) is responsible for closed station of Hadar. Central agent at Creighton is responsible for associate stations of Pierce, Foster, Plainview, Winnetoon, Verdigre, Niobrara, Lynch, Bristow, Spencer, Anoka, and closed stations of Verdel and Monowi. Central agent at Winner is responsible for associate stations of Fairfax, Bonesteel, Herrick, Burke, Gregory, Dallas, Colome, and closed station of St. Charles.

Comments: Docket Number AB–1 (Sub. No. 34). Proposal does not include industries located at Norfolk.

AR_0033370

(a) Elkhorn Jct. to Irvington (5.3 mile portion of Omaha Subdivision).

(b) Entire segment is located in the State of Nebraska.

(c) Entire segment is located in Douglas County.

(d) M.P. 1.7 to M.P. 7.0.

(e) None.

Comment: Docket Number AB-1 (Sub. No. 49).

## SOUTH DAKOTA

(a) Watertown to Stratford (Northerly 71.4 miles of Stratford Subdivision).

(b) Entire segment is located in the State of South Dakota.

(c) Entire segment is located in Codington, Clark, Day, Spink, and Brown Counties.

(d) M.P. 234.9 to M.P. 306.3.

(e) Central agent at Watertown (unaffected) is responsible for associate stations of Florence, Wallace, Bradley, and closed station of Crocker. Central agent at Aberdeen (unaffected) is responsible for associate stations of Conde and Stratford, and closed stations of Crandall and Randolph.

Comments: Docket Number AB-1 (Sub. No. 33). Proposal does not include industries located at Watertown.

(a) Watertown to Doland (Westerly 48.2 miles of Watertown Subdivision).

(b) Entire segment is located in the State of South Dakota.

(c) Entire segment is located in Codington, Clark and Spink Counties.

(d) M.P. 321.5 to M.P. 369.7.

(e) Central agent at Watertown (unaffected) is responsible for associate stations of Henry and Clark, and closed stations of Kampeska and Elrod. Central agent at Redfield (unaffected) is responsible for associate stations of Raymond and Doland.

Comments: Docket Number AB-1 (Sub. No. 32). Proposal does not include industries located at Watertown.

(a) Wren, Iowa to Iroquois, South Dakota. Line description is on Pages 34 and 35 (Iowa).

(a) Norfolk, Nebraska to Winner, South Dakota. Line description is on Pages 40 and 41 (Nebraska).

## WISCONSIN

(a) Gillett, Wisconsin to Scott Lake, Michigan. Line description is on page 37 (Michigan).

(a) Tunnel City, Wisconsin to Medary Jct., Wisconsin and Trempealeau, Wisconsin to Winona, Minnesota. Line description is on Pages 39 and 40 (Minnesota).

(a) Hortonville to Larsen (10.1 miles entire Larsen spur).

(b) Entire segment is located in the State of Wisconsin.

(c) Entire segment is located in Outagamie and Winnebago Counties.

(d) M.P. 0.2 to M.P. 10.3

(e) Central agent at New London (unaffected) is responsible for associate station of Larsen and closed station of Medina.

Comments: Docket Number AB-1 (Sub No. 21). Proposal does not include industries located at Hortonville.

(a) Rosemere to Forest Junction (Westerly 26.3 miles of Brillion Subdivision).

(b) Entire segment is located in the State of Wisconsin.

(c) Entire segment is located in Manitowoc and Calumet Counties.

(d) M.P. 78.9 to M.P. 105.2.

(e) Central agent at Manitowoc (unaffected) is responsible for associate stations of Reedsville, Brillion, Forest Junction, and closed stations of Branch, Whitelaw, and Cato.

Comments: Docket Number AB-1 (Sub No. 52). Proposal does not include industries located at Manitowoc (Rosemere is a junction point near the station of Manitowoc).

(a) Klevenville to Fennimore including Lancaster Jct. to Lancaster, Montfort Jct. to Cuba City and Ipswich to Platteville

(101.2 miles—Westerly portion of Lancaster Subdivision including the Fennimore Spur and entire Platteville Subdivision including the Platteville Spur).

(b) Entire segment is located in the State of Wisconsin.

(c) Entire segment is located in Dane, Iowa, Grant and Lafayette Counties.

(d) M.P. 101.5 to M.P. 158.4 including M.P. 155.8 to M.P. 167.8, M.P. 145.0 to M.P. 173.5 and M.P. 165.9 to M.P. 169.7.

(e) Central agent at Madison (unaffected) is responsible for associate station of Mt. Horeb and closed station of Blue Mounds. Central agent at Dodgeville is responsible for associate stations of Barneveld, Ridgeway, Cobb, Montfort, Fennimore, Stitzer, Lancaster, Livingston, Platteville, Cuba City and closed stations of Edmund, Preston, Liberty, Rewey, and Ipswich.

Comments: Docket Number AB-1 (Sub. No. 41). Proposal does not include industries located at Klevenville.

(a) Hayward to Bayfield and Ashland Jct. to Ashland (Westerly 77.3 miles of Ashland Subdivision including Westerly portion of Ashland Spur).

(b) Entire segment is located in the State of Wisconsin.

(c) Entire segment is located in Sawyer, Bayfield, and Ashland Counties.

(d) M.P. 104.0 to M.P. 178.3 and M.P. 0.0 to M.P. 3.0.

(e) Central agent at Hayward (unaffected) is responsible for closed station of Seeley. Central agent at Cable is responsible for associate stations of Drummond, Grandview, Mason and closed station of Benoit. Agent at Ashland (unaffected) is responsible for closed station of Ashland Jct. Central agent at Washburn is responsible for associate station of Bayfield and closed stations of Barksdale, Sioux, and Pureair.

Comments: Docket Number AB-1 (Sub. No. 29). Proposal does not include industries located at Hayward or Ashland.

AR_0033371

# CHICAGO AND NORTH WESTERN TRANSPORTATION COMPANY

## AB-I
## SYSTEM DIAGRAM MAP
### 49-CFR SEC. 1121.20

DATE  APRIL 6, 1977

## STANDARD METROPOLITAN STATISTICAL AREAS

1. CHICAGO
2. DAVENPORT-ROCK ISLAND
3. PEORIA
4. SPRINGFIELD
5. ST. LOUIS
6. ROCKFORD
7. KENOSHA
8. RACINE
9. MILWAUKEE
10. MADISON
11. LA CROSSE
12. GREEN BAY
13. APPLETON
14. EAU CLAIRE
15. DULUTH-SUPERIOR
16. MINNEAPOLIS-ST. PAUL
17. ROCHESTER
18. SIOUX FALLS
19. DUBUQUE
20. WATERLOO-CEDAR FALLS
21. CEDAR RAPIDS
22. SIOUX CITY
23. LINCOLN
24. OMAHA
25. DES MOINES
26. ST. JOSEPH
27. KANSAS CITY

## LEGEND

RED — CATEGORY 1. ANTICIPATED SUBJECT OF ABANDONMENT APPLICATION WITHIN 3 YEARS. 49 CFR SEC. 1121.20 (b)(1)

GREEN — CATEGORY 2. POTENTIALLY SUBJECT TO ABANDONMENT. 49 CFR SEC. 1121.20 (b)(2)

YELLOW —X—X— CATEGORY 3. APPLICATION PRESENTLY PENDING BEFORE COMMISSION. 49 CFR SEC. 1121.20 (b)(3)

BROWN — — — CATEGORY 4. OPERATED UNDER SUBSIDY 49 USC SEC. 1a (6)(a) 49 CFR SEC. 1121.20 (b)(4)

BLACK ———— CATEGORY 5. OTHER LINES OWNED OPERATED. 49 CFR SEC. 1121.20 (b)(5)

BLACK —••— STATE BOUNDARY LINES

BLACK —•—•— COUNTY BOUNDARY LINES

BLACK ∿∿∿ SMSA BOUNDARY LINES

AR_0033372



AR_0033373





AR_0033375



AR_0033376



AR_0033377



AR_0033378



AR_0033379



[FR Doc.77-14608 Filed 5-24-77; 8:45 am]

AR_0033380

[AB 117 (SDM)]

## ELGIN, JOLIET AND EASTERN RAILWAY CO.

### System Diagram Map

Notice is hereby given that, pursuant to the requirements contained in Title 49 of the Code of Federal Regulations, § 1121.22, that the Elgin, Joliet and Eastern Railway Company, has filed with the Commission its color-coded system diagram map in docket No. AB 117 (SDM). The maps reproduced here in black and white are reasonable reproductions of that system map.

Color-coded copies of the map have been served on the Governor of each State in which the railroad operates and the Public Service Commission or similar agency and the State designated agency. Copies of the map may also be requested from the railroad at a nominal charge. The maps also may be examined at the office of the Commission, Section of Dockets, by requesting docket No. AB 117 (SDM).

ROBERT L. OSWALD,
*Secretary.*



AR_0033381

[AB 119 (SDM)]

### FORT WORTH & DENVER RAILWAY CO.

#### System Diagram Map

Notice is hereby given that, pursuant to the requirements contained in Title 49 of the Code of Federal Regulations, § 1121.22, that the Fort Worth & Denver Railway Company, has filed with the Commission its color-coded system diagram map in docket No. AB 119 (SDM). The maps reproduced here in black and white are reasonable reproductions of that system map and the Commission on May 5, 1977, received a certificate of publication as required by said regulation which is considered the effective date on which the system diagram map was filed.

Color-coded copies of the map have been served on the Governor of each state in which the railroad operates and the Public Service Commission or similar agency and the State designated agency. Copies of the map may also be requested from the railroad at a nominal charge. The maps also may be examined at the office of the Commission, Section of Dockets, by requesting docket No. AB 119 (SDM).

ROBERT L. OSWALD,
*Secretary.*



AR_0033382

FORT WORTH AND DENVER RAILWAY COMPANY
LINE DESCRIPTION
AB 119


Interstate Commerce Commisssion
Ex Parte 274 (Sub-No. 2)
Section 1121.20 (b) (3)


Silverton Line


A 19.71 mile line in Texas, extending through Floyd

and Briscoe Counties from Sterley, Texas, Milepost

306.4, to Silverton, Texas, Milepost 326.11.

[FR Doc.77-14600 Filed 5-24-77; 8:45 am]

AR_0033383

NOTICES

[AB 188 (SDM)]

## JOHNSTOWN & STONY CREEK RAILROAD CO.

### System Diagram Map

Notice is hereby given that, pursuant to the requirements contained in Title 49 of the Code of Federal Regulations, § 1121.22, that the Johnstown & Stony Creek Railroad Company, has filed with the Commission its color-coded system diagram map in docket No. AB 188 (SDM). The maps reproduced here in black and white are reasonable reproductions of that system map.

Color-coded copies of the map have been served on the Governor of each state in which the railroad operates and the Public Service Commission or similar agency and the State designated agency. Copies of the map may also be requested from the railroad at a nominal charge. The maps also may be examined at the office of the Commission, Section of Dockets, by requesting docket No. AB 188 (SDM).

ROBERT L. OSWALD,
*Secretary.*



JOHNSTOWN & STONY CREEK R.R.
CAMBRIA COUNTY, PA. S.M.S.A. 3680
SCALE 1"= 1500'            MARCH 1977
AB 188 (SDM)

AR_0033384

NOTICES

[AB 185 (SDM)]

## LAKE TERMINAL RAILROAD CO.

### System Diagram Map

Notice is hereby given that, pursuant to the requirements contained in Title 49 of the Code of Federal Regulations, § 1121.22, that the Lake Terminal Railroad Company, has filed with the Commission its color-coded system diagram map in docket No. AB 185 (SDM). The maps reproduced here in black and white are reasonable reproductions of that system map.

Color-coded copies of the map have been served on the Governor of each state in which the railroad operates and the Public Service Commission or similar agency and the State designated agency. Copies of the map may also be requested from the railroad at a nominal charge. The maps also may be examined at the office of the Commission, Section of Dockets, by requesting docket No. AB 185 (SDM).

ROBERT L. OSWALD,
*Secretary.*



Category 5

LAKE TERMINAL RAILROAD COMPANY

SCALE 1" = 3000'          LORAIN, OHIO

S.M.S.A. - 4440       DATE  FEBRUARY, 1977

OFFICE OF CHIEF ENGINEER
GREENVILLE, PENNA.        AB 185 (SDM)

AR_0033385

NOTICES

[AB 35(SDM)]

## LOS ANGELES & SALT LAKE RAILROAD CO.

### System Diagram Map

Notice is hereby given that, pursuant to the requirements contained in Title 49 of the Code of Federal Regulations, § 1121.22, that the Los Angeles & Salt Lake Railroad Company, has filed with the Commission its color-coded system diagram map in docket No. AB 35 (SDM). The maps reproduced here in black and white are reasonable reproductions of that system map and the Commission on April 29, 1977, received a certificate of publication as required by said regulation which is considered the effective date on which the system diagram map was filed.

Color-coded copies of the map have been served on the Governor of each state in which the railroad operates and the Public Service Commission or similar agency and the State designated agency. Copies of the map may also be requested from the railroad at a nominal charge. The maps also may be examined at the office of the Commission, Section of Dockets, by requesting docket No. AB 35 (SDM).

ROBERT L. OSWALD,
*Secretary.*

SYSTEM DIAGRAM MAP of the LOS ANGELES & SALT LAKE RAILROAD CO. AB No. 35 prepared in conjunction with I.C.C. Order Ex Parte No. 274 (Sub-No. 2) and Title 49 of the code of Federal Regulation 1121.

**\* L E G E N D \***

Lines or portions of lines anticipated to be the subject of an abandonment or discontinuance application within three years shown_____ (1)

Lines or portions of lines potentially subject to abandonment which are under study and which may be the subject of a future abandonment application because of either anticipated operating losses or excessive rehabilitation costs, as compared to potential revenues shown__ (2)

Lines or portions of lines for which an abandonment or discontinuance application is pending before the Interstate Commerce Commission shown_____ (3)

Lines or portions of lines which are being operated under rail service continuance provisions shown _____ (4)

All other Los Angeles and Salt Lake Railroad Co. lines shown __

0        50        100
SCALE IN MILES

Standard Metropolitan Statistical Area (SMSA) shown____

City outside of an (SMSA) with a population of 5,000 or more persons according to 1970 U.S. Census reports shown _____

State boundaries shown_____

Boundaries of counties in which proposed abandonments are located shown_____ | County |

AR_0033386



AR_0033387



AR_0033388



LOS ANGELES & VICINITY

AR_0033389

LOS ANGELES & SALT LAKE
RAILROAD COMPANY
SYSTEM DIAGRAM (AB-35)

## Description of Lines

Pursuant to the regulations of the Interstate
Commerce Commission (49 C.F.R. 1121.21), following is a
description of lines of Los Angeles & Salt Lake Railroad
Company as shown on the System Diagram Map.

Category 1 - Lines anticipated to be the subject of abandon-
ment applications within three years.

### California

(a)  Designation of line:  Crestmore Branch
(b)  States in which located:  California
(c)  Counties in which located:  Riverside and
San Bernadino, Counties
(d)  Milepost locations:  M.P. 3.00 at Crestmore, to
M.P. 4.24.
(e)  There are no agency or terminal stations located
on this line.

### Utah

(a)  Designation of line:  Cedar City Branch
(b)  States in which located:  Utah
(c)  Counties in which located:  Iron
(d)  Milepost locations:  M.P. 31.83 near Cedar City,
to M.P. 33.17 near Cedar City
(e)  Cedar City at M.P. 32.52 is an agency station
located on this line.

(a)  Designation of line:  Ironton Branch
(b)  States in which located:  Utah
(c)  Counties in which located:  Utah
(d)  Milepost locations:  M.P. 0.00 at Ironton, to
M.P. 1.87.
(e)  There are no agency or terminal stations located
on this line.

Category 2 - Lines which are potentially subject to abandon-
ment and which the carrier has under study and
believes may be the subject of a future abandonment

AR_0033390

application because of either anticipated operating losses or excessive rehabilitation costs, as compared to potential revenues.

## California

(a) Designation of line: Crestmore Branch
(b) States in which located: California
(c) Counties in which located: Riverside
(d) Milepost locations: M.P. 0.00 near Riverside Junction, to M.P. 0.86.
(e) There are no agency or terminal stations located on this line.

## Nevada

(a) Designation of line: Boulder City Branch
(b) States in which located: Nevada
(c) Counties in which located: Clark
(d) Milepost locations: M.P. 9.8 near Henderson, to M.P. 22.67 near Boulder City
(e) Henderson at M.P. 9.87 is an agency station located on this line.

(a) Designation of line: Pioche Branch
(b) States in which located: Nevada
(c) Counties in which located: Lincoln
(d) Milepost locations: M.P. 14.78 near Panaca, to M.P. 32.96 near Pioche
(e) There are no agency or terminal stations located on this line.

(a) Designation of line: Prince Branch
(b) States in which located: Nevada
(c) Counties in which located: Lincoln
(d) Milepost locations: M.P. 0.10 near Prince Junction, to M.P. 8.81 near Prince.
(e) There are no agency or terminal stations located on this line.

## Utah

(a) Designation of line: Silver City Branch
(b) States in which located: Utah
(c) Counties in which located: Juab
(d) Milepost locations: M.P. 0.48 near Silver City, to M.P. 2.42.
(e) There are no agency or terminal stations located on this line.

[FR Doc.77-14591 Filed 5-24-77; 8:45 am]

AR_0033391

[AB 186 (SDM)]

## McKEESPORT CONNECTING RAILROAD CO.

### System Diagram Map

Notice is hereby given that, pursuant to the requirements contained in Title 49 of the Code of Federal Regulations, § 1121.22, that the McKeesport Connecting Railroad Company, has filed with the Commission its color-coded system diagram map in docket No. AB 186 (SDM). The maps reproduced here in black and white are reasonable reproductions of that system map.

Color-coded copies of the map have been served on the Governor of each State in which the railroad operates and the Public Service Commission or similar agency and the State designated agency. Copies of the map may also be requested from the railroad at a nominal charge. The maps also may be examined at the office of the Commission, Section of Dockets, by requesting docket No. AB 186 (SDM).

ROBERT L. OSWALD,
*Secretary.*



LEGEND
━━━ CATEGORY 5 TRACK

McKEESPORT CONNECTING RAILROAD COMPANY
ALLEGHENY COUNTY, PA.   S.M.S.A. 6280
SCALE : 1"= 1500                    MARCH 1977

*AB 186 (SDM)*

[FR Doc.77-14607 Filed 5-24-77;8:45 am]

AR_0033392

NOTICES                                                                    26799

[AB 153 (SDM)]

## MOUNT HOOD RAILROAD CO.
### System Diagram Map

Notice is hereby given that, pursuant to the requirements contained in Title 49 of the Code of Federal Regulations, § 1121.22, that the Mount Hood Railroad Company, has filed with the Commission its color-coded system diagram map in docket No. AB 153 (SDM). The maps reproduced here in black and white are reasonable reproductions of that system map and the Commission on April 29, 1977, received a certificate of publication as required by said regulation which is considered the effective date on which the system diagram map was filed.

Color-coded copies of the map have been served on the Governor of each State in which the railroad operates and the Public Service Commission or similar agency and the State designated agency. Copies of the map may also be requested from the railroad at a nominal charge. The maps also may be examined at the office of the Commission, Section of Dockets, by requesting docket No. AB 153 (SDM).

ROBERT L. OSWALD,
*Secretary.*

---

SYSTEM DIAGRAM MAP of the MOUNT HOOD RAILROAD AB No. 153 prepared in conjunction with I.C.C. Order Ex Parte No. 274 (Sub-No. 2) and Title 49 of the code of Federal Regulation 1121.

\* L E G E N D \*

Lines or portions of lines anticipated to be the subject of an abandonment or discontinuance application within three years shown_____ ①

Lines or portions of lines potentially subject to abandonment which are under study and which may be the subject of a future abandonment application because of either anticipated operating losses or excessive rehabilitation costs, as compared to potential revenues shown__ ②

Lines or portions of lines for which an abandonment or discontinuance application is pending before the Interstate Commerce Commission shown_____ ③

Lines or portions of lines which are being operated under rail service continuance provisions shown_____ ④

All other Mount Hood Railroad lines shown_____

Standard Metropolitan Statistical Area (SMSA) shown____

City outside of an (SMSA) with a population of 5,000 or more persons according to 1970 U.S. Census reports shown_____

State boundaries shown_____

Boundaries of counties in which proposed abandonments are located shown_____ County

---

AR_0033393



[FR Doc.77-14588 Filed 5-24-77;8:45 am]

AR_0033394

[AB 184 (SDM)]

## NEWBURGH & SOUTH SHORE RAILWAY CO.

### System Diagram Map

Notice is hereby given that, pursuant to the requirements contained in Title 49 of the Code of Federal Regulations, § 1121.22, that the Newburgh & South Shore Railway Company, has filed with the Commission its color-coded system diagram map in docket No. AB 184 (SDM). The maps reproduced here in black and white are reasonable reproductions of that system map.

Color-coded copies of the map have been served on the Governor of each state in which the railroad operates and the Public Service Commission or similar agency and the State designated agency. Copies of the map may also be requested from the railroad at a nominal charge. The maps also may be examined at the office of the Commission, Section of Dockets, by requesting docket No. AB 184 (SDM).

ROBERT L. OSWALD,
*Secretary.*



[FR Doc.77-14605 Filed 5-24-77;8:45 am]

AR_0033395

**NOTICES**

[AB 10 (SDM)]

### NORFOLK AND WESTERN RAILWAY CO.

#### System Diagram Map

Notice is hereby given that, pursuant to the requirements contained in Title 49 of the Code of Federal Regulations, § 1121.22, that the Norfolk and Western Railway Company, has filed with the Commission its color-coded system diagram map in docket No. AB 10 (SDM). The maps reproduced here in black and white are reasonable reproductions of that system map and the Commission on April 29, 1977, received a certificate of publication as required by said regulation which is considered the effective date on which the system diagram map was filed.

Color-coded copies of the map have been served on the Governor of each State in which the railroad operates and the Public Service Commission or similar agency and the State designated agency. Copies of the map may also be requested from the railroad at a nominal charge. The maps also may be examined at the office of the Commission, Section of Dockets, by requesting docket No. AB 10 (SDM).

ROBERT L. OSWALD,
*Secretary.*

## SYSTEM DIAGRAM MAP
## NORFOLK AND WESTERN RAILWAY COMPANY

including the following lines:

Akron, Canton and Youngstown Railroad Company
Chesapeake Western Railway Company
Lake Erie and Fort Wayne Railroad Company
Lorain and West Virginia Railway Company
New Jersey, Indiana and Illinois Railroad Company
Norfolk, Franklin and Danville Railway Company
Pittsburgh and West Virginia Railway Company
Wabash Railroad Company
Wheeling and Lake Erie Railway Company

Scale of Miles
0   10   20   30   40   50   60

AR_0033396

## LEGEND

(1) Lines anticipated will be subject of abandonment application within 3 years.

(2) Lines potentially subject to abandonment.

(3) Abandonment applications pending before Commission.

(4) Lines which are being operated under the Rail Service continuation provisions of Section 1a(6) (a) of the Act or of Section 304(c) (2) of the Regional Rail Reorganization Act of 1973.

(5) All other lines or portions of lines which the carrier owns, and operates, directly or indirectly.

(6) Trackage Rights.

(7) STANDARD METROPOLITAN STATISTICAL AREAS

| | | | |
|---|---|---|---|
| 1 | Norfolk, Virginia Beach, Portsmouth, VA-NC | 22 | Cincinnati, OH-KY-IN |
| 2 | Petersburg, Colonial Heights, Hopewell, VA | 23 | Hamilton-Middleton, OH |
| | | 24 | Muncie, IN |
| 3 | Lynchburg, VA | 25 | Fort Wayne, IN |
| 4 | Roanoke, VA | 26 | Indianapolis, IN |
| 5 | Raleigh, Durham, NC | 27 | Anderson, IN |
| 6 | Greensboro, Winston-Salem, High Point, NC | 28 | Lafayette-West Lafayette, IN |
| 7 | Kingsport, Bristol, TN-VA | 29 | South Bend, IN |
| 8 | Huntington-Ashland, WV-KY-OH | 30 | Chicago, IL |
| 9 | Pittsburgh, PA | 31 | Gary-Hammond-East Chicago, IN |
| 10 | Wheeling, WV-OH | 32 | Champaign-Urbana-Rantoul, IL |
| 11 | Steubenville-Weirton, OH-WV | | |
| 12 | Buffalo, NY | 33 | Decatur, IL |
| 13 | Erie, PA | 34 | Bloomington-Normal, IL |
| 14 | Cleveland, OH | 35 | Peoria, IL |
| 15 | Canton, OH | 36 | Springfield, IL |
| 16 | Akron, OH | 37 | St. Louis, MO-IL |
| 17 | Lorain-Elyria, OH | 38 | Columbia, MO |
| 18 | Columbus, OH | 39 | Kansas City, MO-KS |
| 19 | Toledo, OH-MI | 40 | Des Moines, IA |
| 20 | Detroit, MI | 41 | Omaha, NB-IA |
| 21 | Lima, OH | | |

Note 1    Numbers designating SMSA's on maps enclosed in hexagon.

AR_0033397

Numerical identification of lines in Categories 1 thru 4 (in accordance with 49 CFR 1121.20(b)) on NW system diagram map, interrelated state maps, and as listed and described on separate statement accompanying the maps and marked for identification as Appendix A.

CATEGORY 1

1-1  Lorain & West Virginia Railway Company
1-2  Connersville Branch
1-3  Rushville Branch
1-4  Easterly Portion of Gary District
1-5  Westerly Portion of Gary District
1-6  Carey to Delphos (AC&Y)
1-7  Kokomo to Frankfort
1-8  Ottumwa Branch
1-9  Pittsfield Branch
1-10 Portion of Champaign Branch
1-11 Portion of Steubenville Branch

CATEGORY 2

NW has none in this category.

CATEGORY 3

3-2  Sullivan District
3-3  Keokuk Branch
3-4  Streator Branch
3-5  Radford Branch
3-6  Portion of Jarratt District

CATEGORY 4

NW has none in this category.

AR_0033398



MAP SEGMENT NO. 1
Virginia, North Carolina and
Maryland

AR_0033399



MAP SEGMENT NO. 2
North Carolina, Virginia, West Virginia and Kentucky
ZANESVILLE
Pleasant
Cumberland
Moundsvill
New Martinsville
Morgantown
Westernport
Fairmont
Kingwood
Marietta
Lathrop
Athens
Grafton
Rowlesburg
Lumberport
Clarksburg
Parkersburg
Dundas
Pomeroy
Century
Petersburg
Ravenswood
Millwood
Ripley
Spencer
Elkins
Harton
WEST VIRGINIA
Pickens
Bartow
Webster Sps
Bridgewater
Blue Cr
Dundon
Tioga
Barboursville
CHARLESTON
Hilop
Richwood
Lynn
DEEPWATER BRIDGE
Seth
Lexington
Raineile
Clifton Forge
Whitcomb
Meadow Cr.
Covington
Beckley
White Sulphur Spr.
Glasgow
Bueno Vista
Gilbert
Mullens
Elmore
PRINCETON
Kellysville
Forest
LYNCHBU
Salem
Blacksburg
ROANOKE
BLUEFIELD
Altovista
WALTON
Christiansburg
Cedar Bluff
Pulaski
Rocky Mount
Saltville
Marion
Abingdon
Glade Spr.
Fries
Koehler
S. Boston
Galax
Danville
BRISTOL
Mt. Airy
Stokesland
Madison
Obrien
WEST JEFFERSON
Walnut Cove
Rural Hall
N. Wilkesboro
WINSTON-SALEM
Glen
Greensboro
Scale of Miles
0 10 20 30 40 50 60
Chapel Hill



MAP SEGMENT NO. 3
Virginia, Kentucky, West Virginia,
Ohio and Indiana

AR_0033401



AR_0033402



MAP SEGMENT NO. 5
Michigan, Ohio and Indiana

AR_0033403



AR_0033404



MAP SEGMENT NO. 7
Illinois, Missouri and Iowa
Scale of Miles
0 10 20 30 40 50 60
Cedar Rapids
Belle Plaine
Grinnell
Montezuma
Iowa City
Wilton Jc.
Davenport
Tipton
Standwood
Oxford Jc.
Clinton
Dewitt
Sterling
Dixon
Forreston
Rochelle
Rock Island
Washington
Sigourney
Hedrick
Columbus Jc
Winfield
Morning Sun
Mediapolis
Fairfield
OTTUMWA
New Boston
Keithsburg
Preemption
Alpha
Monmouth
Galesburg
Burlington
Houghton
Ft Madison
Farmington
MOULTON
Medill
KEOKUK
Alexandria
CARTHAGE
La Harpe
Bushnell
Canton
Cuba
Lewistown
PEORIA
BLOOMINGTON
Vermont
Rushville
Golden
QUINCY
VERSAILLES
Meredosia
SPRINGFIELD
HANNIBAL
E. Hannibal
BLUFFS
PITTSFIELD
TAYLORVILLE
Louisiana
Roodhouse
Whitehall
MOBERLY
CENTRALIA
MEXICO
Wellsville
Jerseyville
Litchfield
Grafton
COLUMBIA
Fulton
St. Charles
Edwardsville
JEFFERSON CITY
ST. LOUIS
EAST ST. LOUIS
Nashville
Coulterville
Bagnell
RIVER
ILLINOIS
MISSOURI
KANSAS CITY
QUINCY
1-8
3-3
1-9
35
36
37
38

AR_0033405



MAP SEGMENT NO. 8
Missouri, Iowa,
Kansas and Nebraska

AR_0033406

[AB 57 (SDM)]

## NORTHAMPTON & BATH RAILROAD CO.

### System Diagram Map

Notice is hereby given that, pursuant to the requirements contained in Title 49 of the Code of Federal Regulations, § 1121.22, that the Northampton & Bath Railroad Company, has filed with the Commission its color-coded system diagram map in docket No. AB 187 (SDM). The maps reproduced here in black and white are reasonable reproductions of that system map and the Commission on April 29, 1977, received a certificate of publication as required by said regulation which is considered the effective date on which the system diagram map was filed.

Color-coded copies of the map have been served on the Governor of each State in which the railroad operates and the Public Service Commission or similar agency and the State designated agency. Copies of the map may also be requested from the railroad at a nominal charge. The maps also may be examined at the office of the Commission, Section of Dockets, by requesting docket No. AB 187 (SDM).

ROBERT L. OSWALD,
*Secretary.*



AR_0033407

AB ____ (SDM)

## Northampton and Bath Railroad Company

Description of Lines to Accompany the System Diagram Map

Category 1 - All lines or portions of lines which the carrier anticipates will be the subject of an abandonment or discontinuance application to be filed within the three-year period following the date upon which the diagram, or any amended diagram, is filed with the Commission.

(a)  Carrier's designation for each line.

Entire line of Northampton and Bath Railroad Company.

(b)  State or states in which each line is located.

Pennsylvania.

(c)  County or counties in which each line is located.

Northampton County.

(d)  Mileposts delineating each line or portion of line.

MP 0.00 to MP 7.28

(e)  Agency or terminal stations located on each line or portion of line with milepost designations.

| Stations | Milepost Designations |
| --- | --- |
| Northampton | 0.00 |
| Navarro | 0.66 |
| Weaversville | 2.68 |
| Lerch's | 4.57 |
| Jacksonville | 5.20 |
| Bath | 6.56 |
| Bath Jct. | 7.28 |

AR_0033408

Category 2 - All lines or portions of lines potentially subject to abandonment which the carrier has under study and believes may be the subject of a future abandonment application because of either anticipated operating losses or excessive rehabilitation costs, as compared to potential revenues.

None.

Category 3 - All lines or portions of lines for which an abandonment or discontinuance application is pending before the Commission on the date upon which the diagram, or any amended diagram, is filed with the Commission.

None.

[FR Doc.77-14597 Filed 5-24-77;8:45 am]

FEDERAL REGISTER, VOL. 42, NO. 101—WEDNESDAY, MAY 25, 1977

NOTICES

[AB 36 (SDM)]

## OREGON SHORT LINE RAILROAD CO.

### System Diagram Map

Notice is hereby given that, pursuant to the requirements contained in Title 49 of the Code of Federal Regulations, § 1121.22, that the Oregon Short Line Railroad Company, has filed with the Commission its color-coded system diagram map in docket No. AB 36 (SDM). The maps reproduced here in black and white are reasonable reproductions of that system map and the Commission on April 29, 1977, received a certificate of publication as required by said regulation which is considered the effective date on which the system diagram map was filed.

Color-coded copies of the map have been served on the Governor of each state in which the railroad operates and the Public Service Commission or similar agency and the State designated agency. Copies of the map may also be requested from the railroad at a nominal charge. The maps also may be examined at the office of the Commission, Section of Dockets, by requesting docket No. AB 36 (SDM).

ROBERT L. OSWALD,
*Secretary.*

SYSTEM DIAGRAM MAP of the OREGON SHORT LINE RAILROAD CO. AB No. 36 prepared in conjunction with I.C.C. Order Ex Parte No. 274 (Sub-No. 2) and Title 49 of the code of Federal Regulation 1121.

* L E G E N D *

Lines or portions of lines anticipated to be the subject of an abandonment or discontinuance application within three years shown_____ ①

Lines or portions of lines potentially subject to abandonment which are under study and which may be the subject of a future abandonment application because of either anticipated operating losses or excessive rehabilitation costs, as compared to potential revenues shown__ ②

Lines or portions of lines for which an abandonment or discontinuance application is pending before the Interstate Commerce Commission shown_____ ③

Lines or portions of lines which are being operated under rail service continuance provisions shown_____ ④

All other Oregon Short Line Railroad Co. lines shown —

SCALE IN MILES

Standard Metropolitan Statistical Area (SMSA) shown____

City outside of an (SMSA) with a population of 5,000 or more persons according to 1970 U.S. Census reports shown_____

State boundaries shown_____

Boundaries of counties in which proposed abandonments are located shown_____ County

AR_0033410