They may also adopt another Federal agency's EIS (§ 1506.3).

viii. *Consistent terminology.* The regulations provide uniform terminology for the implementation of NEPA (§ 1508.1). For instance, the CEQ term "environmental assessment" will replace the following (nonexhaustive) list of comparable existing agency procedures: "survey" (Corps of Engineers), "environmental analysis" (Forest Service), "normal or special clearance" (HUD), "environmental analysis report" (Interior), and "marginal impact statement" (HEW) (§ 1508.9).

ix. *Incorporation by reference.* Agencies are encouraged to incorporate material by reference into the environmental impact statement when the material is not of central importance and when it is readily available for public inspection (§ 1502.21).

x. *Specific comments.* The regulations require that comments on environmental impact statements be as specific as possible to facilitate a timely and informative exchange of views among the lead agency and other agencies and the public (§ 1503.3).

xi. *Simplified procedures for making minor changes in environmental impact statements.* If comments on a draft environmental impact statement require only minor changes or factual corrections, an agency may circulate the comments, responses thereto, and the changes from language in the draft statement, rather than rewriting and circulating the entire document as a final environmental impact statement (§ 1506.4).

xii. *Combining documents.* Agencies may combine environmental impact statements and other environmental documents with any other document used in agency planning and decisionmaking (§ 1506.4).

xiii. *Reducing paperwork involved in reporting requirements.* The regulations will reduce the paperwork involved in reporting requirements as summarized below. In comparing the requirements under the existing Guidelines and the new CEQ regulations, it should be kept in mind that the regulations cover Sections 102(2)(A) through (I) of NEPA, while the Guidelines cover only Section 102(2)(C) (environmental impact statements). CEQ's new regulations will also replace more than 70 different existing sets of individual agency regulations. (Under the new regulations each agency will only issue implementing procedures to explain how the regulations apply to its particular policies and programs (§ 1507.3).)

| Existing requirements (Applicable guidelines sections are noted) | New requirements (Applicable regulations sections are noted) |
|---|---|
| *Assessment* (optional under Guidelines on a case-by-case basis, currently required, however, by most major agencies in practice or in procedures) Sec. 1500.6. | *Assessment* (limited requirement; not required where there would not be environmental effects or where an EIS will be required) Secs. 1501.3, 4. |
| *Notice of intent* to prepare impact statement Sec. 1500.6. | *Notice of intent* to prepare EIS and commence scoping process Sec. 1501.7. |
| *Quarterly list* of notices of intent Sec. 1500.6. | Requirement abolished. |
| *Negative determination* (decision not to prepare impact statement) Sec. 1500.6. | *Finding of no significant impact* Sec. 1501.4. |
| *Quarterly list* of negative determinations Sec. 1500.6. | Requirement abolished. |
| *Draft EIS* Sec. 1500.7 ...... | *Draft EIS* Sec. 1502.9. |
| *Final EIS* Sec. 1500.6, .10 | *Final EIS* Sec. 1502.9. |
| *EISs* on non-agency legislative reports ("agency reports on legislation initiated elsewhere") Sec. 1500.5(a)(1). | Requirment abolished. |
| *Agency report* to CEQ on implementation experience Sec. 1500.14(b). | Requirement abolished. |
| *Agency report* to CEQ on substantive guidance Secs. 1500.6(c), 14. | Requirement abolished. |
| *Record of decision* (no Guideline provision but required by many agencies' own procedures and in a wide range of cases generally under the Administrative Procedure Act and OMB Circular A-95, Part I, Sec. 6(c) and (d), Part II, Sec. 5(b)(4)). | *Record of decision* (brief explanation of decision based in part on EIS that was prepared; no circulation requirement) Sec. 1505.2. |

### B. REDUCING DELAY

The measures to reduce delay are listed below.

i. *Time limits on the NEPA process.* The regulations encourage lead agencies to set time limits on the NEPA process and require that time limits be set when requested by an applicant (§§ 1501.7(b)(2), 1501.8).

ii. *Integrating EIS requirements with other environmental review requirements.* Often the NEPA process and the requirements of other laws proceed separately, causing delay. The regulations provide for all agencies with jurisdiction over a proposal to cooperate so that all reviews may be conducted simultaneously (§§ 1501.7, 1502.25).

iii. *Integrating the NEPA process into early planning.* If environmental review is tacked on to the end of the planning process, then the process is prolonged, or else the EIS is written to justify a decision that has already been made and genuine consideration may not be given to environmental factors. The regulations require agencies to integrate the NEPA process with other planning at the earliest possible time (§ 1501.2).

iv. *Emphasizing interagency cooperation before the EIS is drafted.* The regulations emphasize that other agencies should begin cooperating with the lead agency before the EIS is prepared in order to encourage early resolution of differences (§ 1501.6). We hope that early cooperation among affected agencies in preparing a draft EIS will produce a better draft and will reduce delays caused by unnecessarily late criticism.

v. *Swift and fair resolution of lead agency disputes.* When agencies differ as to who shall take the lead in preparing an EIS, or when none is willing to take the lead, the regulations provide a means for prompt resolution of the dispute (§ 1501.5).

vi. *Preparing EISs on programs and not repeating the same material in project specific EISs.* Material common to many actions may be covered in a broad EIS, and then through "tiering" may be summarized and incorporated by reference rather than reiterated in each subsequent EIS (§§ 1502.4, 1502.20, 1502.21, 1508.28).

vii. *Legal delays.* The regulations provide that litigation, if any, should come at the end rather than in the middle of the process (§ 1500.3).

viii. *Accelerated procedures for legislative proposals.* The regulations provide accelerated, simplified procedures for environmental analysis of legislative proposals, to fit better with Congressional schedules (§ 1506.8).

ix. *Categorical exclusions.* Under the regulations, categories of actions which do not individually or cumulatively have a significant effect on the human environment may be excluded from environmental review requirements (§ 1508.4).

x. *Finding of no significant impact.* If an action has not been categorically excluded from environmental review under § 1508.4, but nevertheless will not significantly affect the quality of the human environment, the agency will issue a finding of no significant impact as a basis for not preparing an EIS (§ 1508.13).

### C. BETTER DECISIONS

Most of the features described above will help to improve decisionmaking. This, of course, is the fundamental purpose of the NEPA process: the end to which the EIS is a means. Section 101 of NEPA sets forth the substantive requirements of the Act, the policy to be implemented by the "action-forcing" procedures of Section 102. These procedures must be tied to their intended purpose, otherwise they are indeed useless paperwork and wasted time.

i. *Recording in the decision how the EIS was used.* The new regulations re-

AR_0042697

quire agencies to produce a concise public record, indicating how the EIS was used in arriving at the decision (§ 1505.2). This record of decision must indicate which alternative (or alternatives) considered in the EIS is preferable on environmental grounds. Agencies may also discuss preferences among alternatives based on relevant factors including economic and technical considerations and agency statutory missions. Agencies should identify those "essential considerations of national policy", including factors not related to environmental quality, which were balanced in making the decision.

ii. *Insure follow-up of agency decisions.* When an agency requires environmentally protective mitigation measures in its decisions, the regulations provide for means to ensure that these measures are implemented and monitored (§ 1505.3).

iii. *Securing more accurate, professional documents.* The regulations require accurate documents as the basis for sound decisions. As provided by Section 102(2)(A) of NEPA, the documents must draw upon all the appropriate disciplines from the natural and social sciences, plus the environmental design arts (§ 1502.6). The lead agency is responsible for the professional integrity of environmental documents and requirements are established to ensure this result, such as special provisions regarding the use of data provided by an applicant (§ 1506.5). A list of people who helped prepare documents, and their professional qualifications, shall be included in the EIS to encourage professional responsibility and ensure that an interdisciplinary approach was followed (§ 1502.17).

The regulations establish a streamlined process, and one which has a broader purpose than the Guidelines they replace. The Guidelines emphasized a single document, the EIS, while the regulations emphasize the entire NEPA process, from early planning through assessment and EIS preparation through decisions and provisions for follow-up. They are designed to gear means to ends—to ensure that the action-forcing procedures of Section 102(2) of NEPA are used by agencies to fulfill the requirements of the Congressionally mandated policy set out in Section 101 of the Act. Furthermore, the regulations are uniform, applying in the same way to all Federal agencies, although each agency will develop its own procedures for implementing the regulations. With these new regulations we seek to carry out as faithfully as possible the original intent of Congress in enacting NEPA.

### 3. BACKGROUND

The Council was greatly assisted by the hundreds of people who responded to our call for suggestions on how to

make the NEPA process work better. In all, the Council sought the views of almost 12,000 private organizations, individuals, State and local agencies, and Federal agencies. In public hearings which we held in June 1977, we invited testimony from a broad array of public officials, organizations, and private citizens, affirmatively involving NEPA's critics as well as its friends.

Among those represented were the U.S. Chamber of Commerce, which coordinated testimony from business; the Building and Construction Trades Department of the AFL-CIO, which did so for labor; the National Conference of State Legislatures, for State and local governments; and the Natural Resources Defense Council, for environmental groups. Scientists, scholars, and the general public were also represented.

There was broad consensus among these diverse witnesses. All, without exception, expressed the view that NEPA benefited the public. Equally widely shared was the view that the process had become needlessly cumbersome and should be streamlined. Witness after witness said that the length and detail of EISs made it difficult to distinguish the important from the trivial. The degree of unanimity about the good and bad points of the NEPA process was such that at one point an official spokesperson for the oil industry rose to say that he adopted in its entirety the presentation of the President of the Sierra Club.

After the hearings we culled the record to organize both the problems and the solutions proposed by witnesses into a 38-page "NEPA Hearing Questionnaire." The questionnaire was sent to all witnesses, every State governor, all Federal agencies, and everyone who responded to an invitation in the FEDERAL REGISTER. We received more than 300 replies, from a broad cross section of groups and individuals. By the comments we received from respondents we gauged our success in faithfully presenting the results of the public hearings. One commenter, an electric utility official, said that for the first time in his life he knew the government was listening to him, because all the suggestions made at the hearing turned up in the questionnaire. We then collated all the responses for use in drafting the regulations.

We also met with every agency of the Federal government to discuss what should be in the regulations. Guided by these extensive interactions with government agencies and the public, we prepared draft regulations which were circulated for comment to all Federal agencies in December, 1977. We then studied agency comments in detail, and consulted numerous Federal officials with special expe-

rience in implementing the Act. Informal redrafts were circulated to the agencies with greatest experience in preparing environmental impact statements.

At the same time that Federal agencies were reviewing the early draft, we continued to meet with, listen to, and brief members of the public, including representatives of business, labor, State and local governments, environmental groups, and others. Their views were considered during this early stage of the rulemaking. We also considered seriously and proposed in our regulations virtually every major recommendation made by the Commission on Federal Paperwork and the General Accounting Office in their recent studies on the environmental impact statement process. The studies by these two independent bodies were among the most detailed and informed reviews of the paperwork abuses in the impact statement process. In many cases, such as streamlining intergovernmental coordination, the proposed regulations go further than their recommendations.

On June 9, 1978 the regulations were proposed in draft form (43 FR at pages 25230–25247) and the Council announced that the period for public review of and comment on the draft regulations would extend for two months until August 11, 1978. During this period, the Council received almost 500 written comments on the draft regulations, most of which contained specific and detailed suggestions for improving them. These comments were again broadly representative of the various interests which are involved in the NEPA process.

The Council carefully reevaluated the regulations in light of the comments we received. The Council's staff read and analyzed each of the comments and developed recommendations for responding to them. A clear majority of the comments were favorable and expressed strong support for the draft regulations as a major improvement over the existing Guidelines. Some comments suggested further improvements through changes in the wording of specific provisions. A smaller number expressed more general concerns about the approach and direction taken by the regulations. In continuing efforts to resolve issues raised during the review, staff members conducted numerous meetings with individuals and groups who had offered comments and with representatives of affected Federal agencies. This process continued until most concerns with the proposals were alleviated or satisfied.

When, after discussions and review the Council determined that the comments raised valid concerns, we altered the regulations accordingly. When we

AR_0042698

decided that reasons supporting the regulations were stronger than those for challenging them, we left the regulations unchanged. Part 4 of the Preamble describes section by section the more significant comments we received, and how we responded to them.

#### 4. COMMENTS AND THE COUNCIL'S RESPONSE

##### PART 1500—PURPOSE, POLICY AND MANDATE

*Comments on § 1500.3: Mandate.* Section 1500.3 of the draft regulations stated that it is the Council's intention that judicial review of agency compliance with the regulations not occur before an agency has filed the final environmental impact statement, causes irreparable injury, or has made a finding of no significant impact. Some comments expressed concern that court action might be commenced under this provision following a finding of no significant impact which was only tentative and did not represent a final determination that an environmental impact statement would not be prepared.

The Council made two changes in response to this concern: First, the word "final" was inserted before the phrase "finding of no significant impact." Thus, the Council eliminated the possibility of interpreting this phrase to mean a preliminary or tentative determination. Second, a clarification was added to this provision to indicate the Council's intention that judicial review would be appropriate only where the finding of no significant impact would lead to action affecting the environment.

Several comments on § 1500.3 expressed concern that agency action could be invalidated in court proceedings as the result of trivial departures from the requirements established by the Council's regulations. This is not the Council's intention. Accordingly, a sentence was added to indicate the Council's intention that a trivial departure from the regulations not give rise to an independent cause of action under law.

##### PART 1501—NEPA AND AGENCY PLANNING

*Comments on § 1501.2: Apply NEPA early in process.* Section (d)(1) of § 1501.2 stated that Federal agencies should take steps to ensure that private parties and State and local entities initiate environmental studies as soon as Federal involvement in their proposals can be foreseen. Several commenters raised questions concerning the authority of a Federal agency to require that environmental studies be initiated by private parties, for example, even before that agency had become officially involved in the review of the proposal.

The Council's intention in this provision is to ensure that environmental factors are considered at an early stage in the planning process. The Council recognizes that the authority of Federal agencies may be limited before their duty to review proposals initiated by parties outside the Federal government officially begins. Accordingly, the Council altered subsection (d)(1) of § 1501.2 to require that in such cases Federal agencies must ensure that "[p]olicies or designated staff are available to advise potential applicants of studies or other information foreseeably required by later Federal action." The purpose of the amended provision is to assure the full cooperation and support of Federal agencies for efforts by private parties and State and local entities in making an early start on studies for proposals that will eventually be reviewed by the agencies.

*Comments on § 1501.3: When to prepare an environmental assessment.* One commenter asked whether an environmental assessment would be required where an agency had already decided to prepare an environmental impact statement. This is not the Council's intention. To clarify this point, the Council added a sentence to this provision stating that an assessment is not necessary if the agency has decided to prepare an environmental impact statement.

*Comments on § 1501.5: Lead agencies.* The Council's proposal was designed to insure the swift and fair resolution of lead agency disputes. Section 1501.5 of the draft regulations established procedures for resolving disagreements among agencies over which of them must take the lead in preparing an environmental impact statement. Under subsection (d) of this section, persons and governmental entities substantially affected by the failure of Federal agencies to resolve this question in writing may request to designate a lead agency forthwith. If this request has not been met "within a reasonable period of time," subsection (e) authorizes such persons and governmental entities to petition the Council for a resolution of this issue.

Several comments objected to the phrase "within a reasonable time" because it was vague, and left it uncertain when concerned parties could file a request with the Council. The comments urged that a precise time period be fixed instead. The Council adopted this suggestion and substituted 45 days for the phrase "within a reasonable period of time." With this change, the regulations require that a lead agency be designated, if necessary by the Council, within a fixed period following a request from concerned parties that this be done.

Several commenters suggested that the Council take responsibility for designating lead agencies in every case to reduce delay. These commenters recommended that all preliminary steps be dropped in favor of immediate Council action whenever the lead agency issue arose.

The Council determined, however, that individual agencies are in the best position to decide these questions and should be given the opportunity to do so. In view of its limited resources, the Council does not have the capability to make lead agency designations for all proposals. As a result of these factors, the Council determined not to alter this provision.

Several commenters opposed the concept of joint lead agencies authorized by subsection (b) of this section, particularly where two or more of the agencies are Federal. These commenters expressed doubt that Federal agencies could cooperate in such circumstances and stated their view that the environmental review process will only work where one agency is given primary responsibility for conducting it.

In the Council's judgment, however, the designation of joint lead agencies may be the most efficient way to approach the NEPA process where more than one agency plays a significant role in reviewing proposed actions. The Council believes that Federal agencies should have the option to become joint lead agencies in such cases.

*Comments on § 1501.6: Cooperating agencies.* The Council developed proposals to emphasize interagency cooperation before the environmental impact statement was prepared rather than comments on a completed document. Section 1501.6 stated that agencies with jurisdiction by law over a proposal would be required to become "cooperating agencies" in the preparation of an EIS should the lead agency request that they do so. Under subsection (b) of this provision, "cooperating agencies" could be required to assume responsibility for developing information and analysis within their special competence and to make staff support available to enhance the interdisciplinary capability of the lead agency.

Several comments pointed out that principal authority for environmental matters resides in a small number of agencies in the Federal government. Concern was expressed that these few agencies could be inundated with requests for cooperation in the preparation of EISs and, if required to meet these requests in every case, drained of resources required to fulfill other statutory mandates.

The Council determined that this was a valid concern. Accordingly, it added a new subsection (c) to this sec-

AR_0042699

**RULES AND REGULATIONS**

tion which authorizes a cooperating agency to decline to participate or otherwise limit its involvement in the preparation of an EIS where existing program commitments preclude more extensive cooperation.

Subsection (b)(5) of this section provided that a lead agency shall finance the major activities or analyses it requests from cooperating agencies to the extent available funds permit. Several commenters expressed opposition to this provision on grounds that a lead agency should conserve its funds for the fulfillment of its own statutory mandate rather than disburse funds for analyses prepared by other agencies.

The same considerations apply, however, to cooperating agencies. All Federal agencies are subject to the mandate of the National Environmental Policy Act. This provision of the regulations allows a lead agency to facilitate compliance with this statute by funding analyses prepared by cooperating agencies "to the extent available funds permit." In the Council's view, this section will enhance the ability of a lead agency to meet all of its obligations under law.

*Section 1501.7: Scoping.* The new concept of "scoping" was intended by the Council and perceived by the great preponderance of the commenters as a means for early identification of what are and what are not the important issues deserving of study in the EIS. Section 1501.7 of the draft regulations established a formal mechanism for agencies, in consultation with affected parties, to identify the significant issues which must be discussed in detail in an EIS, to identify the issues that do not require detailed study, and to allocate responsibilities for preparation of the document. The section provided that a scoping meeting must be held when practicable. One purpose of scoping is to encourage affected parties to identify the crucial issues raised by a proposal before an environmental impact statement is prepared in order to reduce the possibility that matters of importance will be overlooked in the early stages of a NEPA review. Scoping is also designed to ensure that agency resources will not be spent on analysis of issues which none concerned believe are significant. Finally, since scoping requires the lead agency to allocate responsibility for preparing the EIS among affected agencies and to identify other environmental review and consultation requirements applicable to the project, it will set the stage for a more timely, coordinated, and efficient Federal review of the proposal.

The concept of scoping was one of the innovations in the proposed regulations most uniformly praised by members of the public ranging from

business to environmentalists. There was considerable discussion of the details of implementing the concept. Some commenters objected to the formality of the scoping process, expressing the view that compliance with this provision in every case would be time-consuming, would lead to legal challenges by citizens and private organizations with objections to the agency's way of conducting the process, and would lead to paperwork since every issue raised during the process would have to be addressed to some extent in the environmental impact statement. These commenters stated further that Federal agencies themselves were in the best position to determine matters of scope, and that public participation in these decisions was unnecessary because any scoping errors that were made by such agencies could be commented upon when the draft EIS was issued (as was done in the past) and corrected in the final document. These commenters urged that scoping at least be more open-ended and flexible and that agencies be merely encouraged rather than required to undertake the process.

Other commenters said that the Council had not gone for enough in imposing uniform requirements. These commenters urged the Council to require that a scoping meeting be held in every case, rather than only when practicable; that a scoping document be issued which reflected the decisions reached during the process; and that formal procedures be established for the resolution of disagreements over scope that arise during the scoping process. These commenters felt that more stringent requirements were necessary to ensure that agencies did not avoid the process.

In developing § 1501.7, the Council sought to ensure that the benefits of scoping would be widely realized in Federal decisionmaking, but without significant disruptions for existing procedures. The Council made the process itself mandatory to guarantee that early cooperation among affected parties would be initiated in every case. However, § 1501.7 left important elements of scoping to agency discretion. After reviewing the recommendations for more flexibility on the one hand, and more formality on the other, and while making several specific changes in response to specific comments, the Council determined that the proper balance had been struck in Section 1501.7 and did not change the basic outline of this provision. The Council did accept amendments to make clear that scoping meetings are permissive and that an agency might make provision for combining its scoping process with its environmental assessment process.

*Comments on § 1501.8: Time limits.* Reducing delay and uncertainty by the use of time limits is one of the Council's principal changes. Section 1501.8 of the draft regulations established criteria for setting time limits for completion of the entire NEPA process or any part of the process. These criteria include the size of the proposal and its potential for environmental harm, the state of the art, the number of agencies involved, the availability of relevant information and the time required to obtain it. Under this section, if a private applicant requests a lead agency to set time limits for an EIS review, the agency must do so provided that the time limits are consistent with the purposes of NEPA and other essential considerations of national policy. If a Federal agency is the sponsor of a proposal for major action, the lead agency is encouraged to set a timetable for the EIS review.

Several commenters objected to the concept of time limits for the NEPA process. In their opinion, the uncertainties involved in an EIS review and competing demands for limited Federal resources could make it difficult for agencies to predict how much time will be required to complete environmental impact statements on major proposals. These commenters were concerned that time limits could prompt agencies to forego necessary analysis in order to meet deadlines. In their view, the concept of time limits should be dropped from the regulations in favor of more flexible "targets" or "goals" which would be set only after consultation with all concerned parties.

On the other side of the question, the Council received several comments that the provision for time limits was not strict enough. These comments expressed concern that the criteria contained in the draft regulations were vague and would not serve effectively to encourage tight timetables for rapid completion of environmental reviews. The Council was urged to strengthen this section by including definite time limits for the completion of the EIS process in every case or by providing that CEQ itself set such limits for every environmental review, and by setting time limits for the establishment of time limits.

A primary goal of the Council's regulations is to reduce delays in the EIS process. The Council recognizes the difficulties of evaluating in advance the time required to complete environmental reviews. Nevertheless, the Council believes that a provision for time limits is necessary to concentrate agencies' attention on the timely completion of environmental impact statements and to provide private applicants with reasonable certainty as to how long the NEPA process will take. Section 1501.7(c) of the regulations

AR_0042700

allows revision of time limits if significant new circumstances (including information) arise which bear on the proposal or its impacts.

At the same time, the Council believes that precise time limits to apply uniformly across government would be unrealistic. The factors which determine the time needed to complete an environmental review are various, including the state of the art, the size and complexity of the proposal, the number of Federal agencies involved, and the presence of sensitive ecological conditions. These factors may differ substantially from one proposal to the next. The same law that applies to a Trans-Alaska pipeline may also apply to a modest federally funded building in a historic district. In the Council's judgment, individual agencies are in the best position to perform this function. The Council does not have the resources to weigh these factors for each proposal. Accordingly, the Council determined not to change these provisions of § 1501.8 of the regulations.

### PART 1502—ENVIRONMENTAL IMPACT STATEMENT

*Comments on Section 1502.5: Timing.* Several commenters noted that it has become common practice in informal rulemaking for Federal agencies to issue required draft environmental impact statements at the same time that rules are issued in proposed form. These commenters expressed the view that this procedure was convenient, time-saving and consistent with NEPA, and urged that the regulations provide for it. The Council added a new subsection (d) to § 1502.5 on informal rulemaking stating that this procedure shall normally be followed.

*Comments on section 1502.7: Page limits.* A principal purpose of these regulations is to turn bulky, often unused EISs into short, usable documents which are in fact used. Section 1502.7 of the draft regulations provided that final environmental impact statements shall normally be less than 150 pages long and, for proposals of unusual scope or complexity, shall normally be less than 300 pages. Numerous commenters expressed strong support for the Council's decision to establish page limits for environmental impact statements.

Several commenters objected to the concept of page limits for environmental impact statements on grounds that it could constrain the thoroughness of environmental reviews. Some said that the limits were too short and would preclude essential analysis; others contended that they were too long and would encourage the inclusion of unnecessary detail. One commenter proposed a "sliding scale" for page limits;

another suggested that a limitation on the number of words would be more effective than a limitation on the number of pages. A number of commenters urged that page limits be simply recommended rather than established as standards that should normally be met.

The usefulness of the NEPA process to decisionmakers and the public has been jeopardized in recent years by the length and complexity of environmental impact statements. In accordance with the President's directive, a primary objective of the regulations is to insure that these documents are clear, concise, and to the point. Numerous provisions in the regulations underscore the importance of focusing on the major issues and real choices facing Federal decisionmakers and excluding less important matters from detailed study. Other sections in the regulations provide that certain technical and background materials developed during the environmental review process may be appended but need not be presented in the body of an EIS.

The Council recognizes the tension between the requirement of a thorough review of environmental issues and a limitation on the number of pages that may be devoted to the analysis. The Council believes that the limits set in the regulations are realistic and will help to achieve the goal of more succinct and useful environmental documents. The Council also determined that a limitation on the number of words in an EIS was not required for accomplishing the objective of this provision. The inclusion of the term "normally" in this provision accords Federal agencies latitude if abnormal circumstances exist.

Others suggested that page limits might result in conflict with judicial precedents on adequacy of EISs, that the proverbial kitchen sink may have to be included to insure an adequate document, whatever the length. The Council trusts and intends that this not be the case. Based on its day-to-day experience in overseeing the administration of NEPA throughout the Federal government, the Council is acutely aware that in many cases bulky EISs are not read and are not used by decisionmakers. An unread and unused document quite simply cannot achieve the purpose Congress set for it. The only way to give greater assurance that EISs will be used is to make them usable and that means making them shorter. By way of analogy, judicial opinions are themselves often models of compact treatment of complex subjects. Departmental option documents often provide brief coverage of complicated decisions. Without sacrifice of analytical rigor, we see no reason why the material to be covered in an EIS cannot normally

be covered in 150 pages (or 300 pages in extraordinary circumstances).

*Comments on § 1502.10: Recommended format.* Section 1502.10 stated that agencies shall normally use a standard format for environmental impact statements. This provision received broad support from those commenting on the draft regulations.

As part of the recommended format, environmental impact statements would be required to describe the environmental consequences of a proposed action before they described the environmental consequences of the environment that would be affected. Many commenters felt that these elements of the EIS should be reversed so that a description of the environmental consequences of a proposal would follow rather than precede a description of the affected environment. The commenters stated their view that it would be easier for the reader to appreciate the nature and significance of environmental consequences if a description of the affected environment was presented first. The Council concurs in this view and adopted the suggested change.

*Comments on § 1502.13: Purpose and need.* This section of the draft regulations provided that agencies shall briefly specify—normally in one page or less—the underlying purpose and need to which the agency is responding in proposing alternatives for action. Many commenters stated that in some cases this analysis would require more than one page. The Council responded to these comments by deleting the one page limitation.

*Comments on § 1502.14: Alternatives including the proposed action.* Subsection (a) of this section of the draft regulations provided, among other things, that agencies shall rigorously explore and objectively evaluate all reasonable alternatives. This provision was strongly supported by a majority of those who commented on the provision.

A number of commenters objected to the phrase "all reasonable alternatives" on the grounds that it was unduly broad. The commenters suggested a variety of ways to narrow this requirement and to place limits on the range and type of alternatives that would have to be considered in an EIS.

The phrase "all reasonable alternatives" is firmly established in the case law interpreting NEPA. The phrase has not been interpreted to require that an infinite or unreasonable number of alternatives be analyzed. Accordingly, the Council determined not to alter this subsection of the regulations.

Subsection (c) requires Federal agencies to consider reasonable alternatives not within the jurisdiction of the lead agency. Subsection (d) requires consideration of the no action alternative. A

AR_0042701

55984                **RULES AND REGULATIONS**

few commenters inquired into the basis for these provisions. Subsections (c) and (d) are declaratory of existing law.

Subsection (e) of this section required Federal agencies to designate the "environmentally preferable alternative (or alternatives, if two or more are equally preferable)" and the reasons for identifying it. While the purpose of NEPA is better environmental decisionmaking, the process itself has not always successfully focused attention on this central goal. The objective of this requirement is to ensure that Federal agencies consider which course of action available to them will most effectively promote national environmental policies and goals. This provision was strongly supported in many comments on the regulations.

Some commenters noted that a wide variety of decisionmaking procedures are employed by agencies which are subject to NEPA and recommended flexibility to accommodate these diverse agency practices. In particular, the commenters recommended that agencies be given latitude to determine at what stage in the NEPA process—from the draft EIS to the record of decision—the environmentally preferable alternative would be designated.

The Council adopted this recommendation and deleted this requirement from the EIS portion of the regulations (§ 1502.14), while leaving it in § 1505.2 regarding the record of decision. Nothing in these regulations would preclude Federal agencies from choosing to identify the environmentally preferable alternative or alternatives in the environmental impact statement.

*Comments on § 1502.15: Environmental consequences.* Subsection (e) of this section requires an environmental impact statement to discuss energy requirements and conservation potential of various alternatives and mitigation measures. One commenter asked whether the subsection would require agencies to analyze total energy costs, including possible hidden or indirect costs, and total energy benefits of proposed actions. The Council intends that the subsection be interpreted in this way.

Several commenters suggested that the regulations expressly mention the quality of the urban environment as an environmental consequence to be discussed in an environmental impact statement. The Council responded by adding a new subsection (g) to this section requiring that EISs include a discussion of urban quality, historic and cultural resources, and the design of the built environment, including the reuse and conservation potential of various alternatives and mitigation

measures. Section 1502.15 has been renumbered as § 1502.16.

*Comments on § 1502.17: List of preparers.* Section 1502.17 provided that environmental impact statements shall identify and describe the qualifications and professional disciplines of those persons who were primarily involved in preparing the document and background analyses. This section has three principal purposes: First, Section 102(2)(A) of NEPA requires Federal agencies to "utilize a systematic, interdisciplinary approach which will insure the integrated use of the natural and social sciences and the environmental design arts in planning and decisionmaking which may have an impact on man's environment." The list of preparers will provide a basis for evaluating whether such a "systematic interdisciplinary approach" was used in preparing the EIS. Second, publication of a list of preparers increases accountability for the analyses appearing in the EIS and thus tends to encourage professional competence among those preparing them. Finally, publication of the list will enhance the professional standing of the preparers by giving proper attribution to their contributions, and making them a recognized part of the literature of their disciplines. This provision received broad support from those commenting on the regulations.

Some commenters felt that a list of preparers would be used as a list of witnesses by those challenging the adequacy of an EIS in court proceedings. However, this information would ordinarily be available anyway through normal discovery proceedings.

Section 1502.17 was also criticized for failing expressly to mention expertise and experience as "qualifications" for preparing environmental impact statements. The Council added these two terms to this section to insure that the term "qualifications" would be interpreted in this way.

Some commenters suggested that the list of preparers should also specify the amount of time that was spent on the EIS by each person identified. These commenters felt that such information was required as a basis for accurately evaluating whether an interdisciplinary approach had been employed. While the Council felt there was much to be said for this suggestion, it determined that the incremental benefits gained from this information did not justify the additional agency efforts that would be required to provide it.

*Comments on § 1502.19: Circulation of the environmental impact statement.* If an EIS is unusually long, Section 1502.19 provided, with certain exceptions, that a summary can be circulated in lieu of the entire document. Several commenters suggested that

private applicants sponsoring a proposal should receive the entire environmental impact statement in every case in view of their interest and probable involvement in the NEPA process. The Council concurs and altered this provision accordingly.

*Comments on § 1502.20: Tiering.* Section 1502.20 encouraged agencies to tier their environmental impact statements to eliminate repetitive discussions and to focus on the actual issues ripe for decision at each level of environmental review. Some commenters objected to tiering on grounds that it was not required by NEPA and would add an additional unauthorized layer to the environmental review process.

Section 1502.20 authorizes tiering of EISs; it does not require that it be done. In addition, the purpose of tiering is to simplify the EIS process by providing that environmental analysis completed at a broad program level not be duplicated for site-specific project reviews. Many agencies have already used tiering successfully in their decisionmaking. In view of these and other considerations, the Council determined not to alter this provision.

*Comments on § 1502.22: Incomplete or unavailable information.* Section 1502.22 provided, among other things, that agencies prepare a worst case analysis of the risk and severity of possible adverse environmental impacts when it proceeds with a proposal in the face of uncertainty. This provision received strong support from many commenters.

Several commenters expressed concern that this requirement would place undue emphasis on the possible occurence of adverse environmental consequences regardless of how remote the possibility might be. In response, the Council added a phrase designed to ensure that the improbability as well as the probability of adverse environmental consequences would be discussed in worst case analyses prepared under this section.

Section 1502.22 stated that if information is essential to a reasoned choice among alternatives and is not known and the costs of obtaining it are not exorbitant, the agency shall include the information in the environmental impact statement. Some commenters inquired into the meaning of the term "costs." The Council intends for this word to be interpreted as including financial and other costs and adopted the phrase "overall costs" to convey this meaning.

PART 1503—COMMENTING

*Comments on § 1503.1: Inviting comments.* Section 1503.1 set forth the responsibility of Federal agencies to solicit comments on environmental impact statements. Several commenters observed that may Federal

AR_0042702

agencies solicit comments from State and local environmental agencies through procedures established by Office of Management and Budget Circular A-95 and suggested that the Council confirm this approach in the regulations. The Council adopted this suggestion by adding an appropriate paragraph to the section.

*Comments on § 1503.2: Duty to comment.* Section 1503.2 set forth the responsibilities of Federal agencies to comment on environmental impact statements. Several commenters suggested reinforcing the requirement that Federal agencies are subject to the same time limits as those outside the Federal government in order to avoid delays. The Council concurred in this suggestion and amended the provision accordingly. The Council was constrained from further changes by the requirement of Section 102(2)(C) of NEPA that agencies "consult with and obtain" comments of specified other agencies.

*Comments on § 1503.3: Specificity of comments.* Section 1503.3 of the draft regulations elaborated upon the responsibilities of Federal agencies to comment specifically upon draft environmental impact statements prepared by other agencies. Several commenters suggested that cooperating agencies should assume a particular obligation in this regard. They noted that cooperating agencies which are themselves required independently to evaluate and/or approve the proposal at some later stage in the Federal review process are uniquely qualified to advise the lead agency of what additional steps may be required to facilitate these actions. In the opinion of these commenters, cooperating agencies should be required to provide this information to lead agencies when they comment on draft EISs so that the final EIS can be prepared with further Federal involvement in mind.

The Council adopted this suggestion and amended § 1503.3 through the addition of new subsections (c) and (d). The new subsections require cooperating agencies, in their comments on draft EISs, to specify what additional information, if any, is required for them to fulfill other applicable environmental review and consultation requirements, and to comment adequately on the site-specific effects to be expected from issuance of subsequent Federal approvals for the proposal. In addition, if a cooperating agency criticizes the proposed action, this section now requires that it specify the mitigation measures which would be necessary in order for it to approve the proposal under its independent statutory authority.

*Comments on § 1504.3: Procedure for referrals and response.* Several commenters noted that § 1504.3 did not establish a role for members of the public or applicants in the referral process. The Council determined that such persons and organizations were entitled to a role and that their views would be helpful in reaching a proper decision on the referral. Accordingly, the Council added subsection (e) to this section, authorizing interested persons including the applicant to submit their views on the referral, and any response to the referral, in writing to the Council.

Subsection (d) of this section provided that the Council may take one of several actions within 25 days after the referral and agency responses to the referral, if any, are received. Several commenters observed, however, that this subsection did not establish a deadline for final action by the Council in cases where additional discussions, public meetings, or negotiations were deemed appropriate. These commenters expressed concern that the absence of a deadline could lead to delays in concluding the referral process. The Council concurred. Accordingly, the Council added subsection (g) to this section which requires that specified actions be completed within 60 days.

Several commenters noted that the procedures established by Section 1504.3 may be inappropriate for referrals which involve agency determinations required by statute to be made on the record after opportunity for public hearing. The Council agrees. The Council added subsection (h) to this section requiring referrals in such cases to be conducted in a manner consistent with 5 U.S.C. 557(d). Thus, communications to agency officials who made the decision which is the subject of the referral must be made on the public record and after notice to all parties to the referral proceeding. In other words, ex parte contacts with agency decisionmakers in such cases are prohibited.

### PART 1505—NEPA AND AGENCY DECISIONMAKING

*Comments on Section 1501.1: Agency decisionmaking procedures.* Some commenters asked whether this or other sections of the regulations would allow Federal agencies to place responsibility for compliance with NEPA in the hands of those with decisionmaking authority at the field level. Nothing in the regulations would prevent this arrangement. By delegating authority in this way, agencies can avoid multiple approvals of environmental documents and enhance the role of those most directly involved in their preparation and use. For policy oversight and quality control, an environmental quality review office at the national level can, among other things, establish general procedures and guidance for NEPA compliance, monitor agency performance through periodic review of selected environmental documents, and facilitate coordination among agency subunits involved in the NEPA process.

*Comments on § 1505.2: Record of decision in those cases requiring environmental impact statements.* Section 1505.2 provided that in cases where an environmental statement was prepared, the agency shall prepare a concise public record stating what its final decision was. If an environmentally preferable alternative was not selected, § 1505.2 required the record of decision to state why other specific considerations of national policy overrode those alternatives.

This requirement was the single provision most strongly supported by individuals and organizations commenting on the regulations. These commenters stated, among things, that the requirement for a record of decision would be the most significant improvement over the existing process, would procedurally link NEPA's documentation to NEPA's policy, would relate the EIS process to agency decisionmaking, would ensure that EISs are actually considered by Federal decisionmakers, and was required as sound administrative practice.

As noted above, the Council decided that agencies shall identify the environmentally preferable alternative and the reasons for identifying it in the record of decision. *See* Comments on § 1502.14. The Council's decision does not involve the preparation of additional analysis in the EIS process; it simply affects where the analysis will be presented.

Some commenters objected to the concept of a public record of decision on actions subject to NEPA review. In the Council's opinion, however, a public record of decision is essential for the effective implementation of NEPA. As previously noted, environmental impact statement preparation has too often become an end in itself with no necessary role in agency decisionmaking. One serious problem with the administration of NEPA has been the separation between an agency's NEPA process and its decisionmaking process. In too many cases bulky EISs have been prepared and transmitted but not used by the decisionmaker. The primary purpose of requiring that a decisionmaker concisely record his or her decision in those cases where an EIS has been prepared is to tie means to ends, to see that the decisionmaker considers and pays attention to what the NEPA process has shown to be an environmentally sensitive way of doing things. Other factors may, on balance, lead the decisionmaker to decide that other policies outweigh the environmental ones, but at least

AR_0042703

the record of decision will have achieved the original Congressional purpose of ensuring that environmental factors are integrated into the agency's decisionmaking.

Some commenters expressed the opinion that it could be difficult for Federal agencies to identify the environmentally preferable alternative or alternatives because of the multitude of factors that would have to be weighed in any such determination and the subjective nature of the balancing process. By way of illustration, commenters asked: Is clean water preferable to clean air, or the preservation of prime farmland in one region preferable to the preservation of wildlife habitat in another?

In response, the Council has amended the regulations to permit agencies to identify more than one environmentally preferable alternative, regardless of whether they are "equally" preferable, as originally proposed. Moreover, the "environmentally preferable alternative" will be that alternative which best promotes the national environmental policy as expressed in Section 101 of NEPA and most specifically in Section 101(b). Section 101(a) stresses that the policy is concerned with man and nature, to see that they exist in productive harmony and that the social, economic, and other requirements of present and future generations of Americans are fulfilled. Section 101(c) recognizes the need for a healthy environment and each person's responsibility to contribute to it. Section 101(b) contemplates Federal actions which will enable the Nation to fulfill the responsibilities of each generation as trustee for the environment for succeeding generations; to attain the widest range of beneficial uses of the environment; to preserve important historic, cultural and natural aspects of our national heritage; and to accomplish other important goals. The Council recognizes that the identification of the environmentally preferable alternative or alternatives may involve difficult assessments in some cases. The Council determined that the benefits of ensuring that decisionmakers consider and take account of environmental factors outweigh these difficulties. To assist agencies in developing and determining environmentally preferable alternatives, commenters on impact statements may choose to provide agencies with their views on this matter.

Several commenters expressed concern that the regulations did not authorize Federal agencies to express preferences based on factors other than environmental quality. In the opinion of these commenters, this emphasis on environmental considerations was misplaced and not consistent with the factors that agencies are expected to consider in decisionmaking.

The Council responded to these comments by reference to the statute, recognizing that Title II of NEPA and especially Section 101 clearly contemplate balancing of essential considerations of national policy. We provided that agencies may discuss preferences they have among alternatives based on relevant factors, including economic and technical considerations and agency statutory mission. Agencies should identify those considerations, including factors not related to environmental quality, which were balanced in making the decision. Nothing in the final regulations precludes Federal agencies from choosing to discuss these preferences and identifying these factors in the environmental impact statement.

Some commenters objected to the word "overrode" in this provision. The language of the Act and its legislative history make clear that Federal agencies must act in an environmentally responsible fashion and not merely consider environmental factors. NEPA requires that each Federal agency use "all practicable means and measures" to protect and improve the environment "consistent with other essential considerations of national policy." Section 101(b). The Council determined to tie this provision of the regulations to NEPA's statutory provision in place of the "overrode" language.

Several commenters expressed concern that the phrase "national policy" would not allow agencies to refer to state and local policies in the record of decision. "National policy" is the phrase used by Congress in NEPA. However, in many cases specific statutory provisions require that Federal agencies adhere to or pay heed to State and local policies.

Finally, some commenters expressed concern that the requirement for a concise record of decision would involve additional agency efforts. The intention is not to require new efforts, but to see that environmental considerations are built into existing processes. Preparing such decision records is recognized as good administrative practice and the benefits of this requirement outweigh the difficulties of building environmental considerations into the decisionmaking process.

Subsection (c) of § 1505.2 states that for any mitigation adopted a monitoring and enforcement program where applicable shall be adopted and summarized in the record of decision. One commenter asked what the term "summarized" was intended to mean in this context. The Council intends this word to be interpreted as requiring a brief and concise statement describing the monitoring and enforcement program which has been adopted.

*Comments on § 1505.3: Implementing the decision.* Section 1505.3 provides for mitigation of adverse environmental effects. Several commenters expressed concern that this provision would grant broad authority to the lead agency for mandating that other agencies undertake and monitor mitigation measures without their consent. This is not the Council's intention and the language of the provision does not support this interpretation.

## PART 1506—OTHER REQUIREMENTS OF NEPA

*Comments on §1506.1: Limitations on actions during NEPA process.* Section 1506.1 placed limitations on actions which can be taken before completion of the environmental review process because of the possibility of prejudicing or foreclosing important choices. Some commenters expressed concern that these limitations would impair the ability of those outside the Federal government to develop proposals for agency review and approval. Accordingly, the Council added a new paragraph (d) to this section which authorizes certain limited activities before completion of the environmental review process.

*Comments on § 1506.2: Elimination of duplication with State and local procedures.* This section received strong support from many commenters. Several commenters sought clarification of the procedures established by this section. It provides for coordination among Federal, State and local agencies in several distinct situations. First, subsection (a) of this section simply confirms that Federal agencies funding State programs have been authorized by Section 102(2)(D) of NEPA to cooperate with certain State agencies with statewide jurisdiction in conducting environmental reviews. Second, subsection (b) provides generally for Federal cooperation with all States in environmental reviews such as joint planning processes, joint research, joint public hearings, and joint environmental assessments. Third, subsection (c) specifically provides for Federal cooperation with those States and localities which administer "little NEPA's." The Federal agencies are directed to the fullest extent possible to reduce duplication between NEPA and comparable State and local requirements. Approximately half the states now have some sort of environmental impact statement requirement either legislatively adopted or administratively promulgated. In these circumstances, Federal agencies are required to cooperate in fulfilling these requirements as well as those of Federal laws so that one document will comply with all applicable laws. Finally, subsection (d) provides that Federal agencies generally shall in en-

AR_0042704

**RULES AND REGULATIONS**

vironmental impact statements discuss any inconsistency between a proposed action and any approved State or local plan or laws, regardless of whether the latter are Federally sanctioned.

*Comments on § 1506.3: Adoption.* Section 1506.3 authorized one Federal agency to adopt an environmental impact statement prepared by another in prescribed circumstances, provided that the statement is circulated for public comment in the same fashion as a draft EIS. Several commenters stated their view that recirculation was unnecessary if the actions contemplated by both agencies were substantially the same. The Council concurs and added a new paragraph (b) which provides that recirculation is not required in these circumstances.

*Comments on § 1506.4: Combining documents.* Section 1506.4 provided for the combination of environmental documents with other agency documents. Some commenters expressed the view that this section should enumerate the types of agency documents which could be combined under this provision. The Council concluded that such a list was not necessary and that such matters were better left to agency discretion. Thus, agencies may choose to combine a regulatory analysis review document, an urban impact analysis, and final decision or option documents with environmental impact statements.

*Comments on § 1506.5: Agency responsibility.* NEPA is a law which imposes obligations on Federal agencies. This provision is designed to insure that those agencies meet those obligations and to minimize the conflict of interest inherent in the situation of those outside the government coming to the government for money, leases or permits while attempting impartially to analyze the environmental consequences of their getting it. § 1506.5 set forth the responsibility of Federal agencies for preparing environmental documents, and addressed the role of those outside the Federal government. As proposed, subsection (b) of this section provided that environmental impact statements shall be prepared either by Federal agencies or by parties under contract to and chosen solely by Federal agencies. The purpose of this provision is to ensure the objectivity of the environmental review process.

Some commenters expressed the view that requiring Federal agencies to be a formal party to every contract for the preparation of an environmental impact statement was not necessary to ensure objectivity so long as the contractor was chosen solely by Federal agencies. These commenters contended that a requirement for formal Federal involvement in all such contracts could cause delay. The

Council concurs and deleted the phrase "under contract" from this provision.

Several commenters noted that the existing procedures for a few Federal programs are not consistent with § 1506.5. The Council recognizes that this provision will in a few cases require additional agency efforts where, for example, agencies have relied on applicants for the preparation of environmental impact statements. The Council determined that such efforts were justified by the goal of this provision.

Several commenters expressed concern that environmental information provided by private applicants would not be adequately evaluated by Federal agencies before it was used in environmental documents. Other commenters wanted to insure that applicants were free to submit information to the agencies. Accordingly, the Council amended subsection (a) to allow receipt of such information while requiring Federal agencies to independently evaluate the information submitted and to be responsible for its accuracy. In cases where the information is used in an environmental impact statement, the persons responsible for that evaluation must be identified in the list of preparers required by § 1502.17.

Several commenters expressed the view that applicants should be allowed to prepare environmental assessments. These commenters noted that the number of assessments prepared each year is far greater than the number of environmental impact statements; that such authority was necessary to ensure environmental sensitivity was built into actions, which while ultimately Federal were planned outside the Federal government; that assessments are much shorter and less complex than EISs; and that it would be considerably less difficult for Federal agencies independently to evaluate the information submitted for an environmental assessment than for an environmental impact statement.

The Council concurs and has added a new subsection (b) to this section which authorizes the preparation of environmental assessments by applicants. The Council intends that this provision enable private and State and local applicants to build the environment into their own planning processes, while the Federal agency retains the obligation for the ultimate EIS. The Council emphasizes, however, that Federal agencies must independently evaluate the information submitted for environmental assessments and assume responsibility for its accuracy; make their own evaluation of environmental issues; and take responsibility for the scope and content of environmental assessments.

*Comments on § 1506.6: Public involvement.* Subsection (b)(3) of this section listed several means by which Federal agencies might provide notice of actions which have effects primarily of local concern. Several commenters urged that such notices be made mandatory, rather than permissive; other commenters felt these methods of public notice should not be listed at all. Some commenters suggested that additional methods be included in this subsection; others urged that one or more methods be deleted.

Subsection (b) of this section required agencies to provide public notice by means calculated to inform those persons and agencies who may be interested or affected. Paragraph 3 of the subsection merely identified alternative techniques that might be used for this purpose at the local level. Paragraph 3 is not intended to provide an exhaustive list of the means of providing adequate public notice. Nor are the measures it lists mandatory in nature. On the basis of these considerations, the Council determined not to alter this provision.

As proposed, subsection (f) of this section required Federal agencies to make comments on environmental impact statements available to the public. This subsection repeated the existing language on the subject that has been in the Guidelines since 1973 (40 CFR 1500.11(d)) relative to the public availability of comments. On the basis of comments received, the Council altered this provision to state that intra-agency documents need not be made available when the Freedom of Information Act allows them to be withheld.

Several commenters observed that subsection (f) did not establish limitations on charges for environmental impact statements as the Council's Guidelines had. Accordingly, the Council incorporated the standard of the Guidelines into this subsection. The standard provides that such documents shall be provided to the public without charge to the extent practicable, or at a fee which is not more than the actual costs incurred.

*Comments on § 1506.8: Proposals for legislation.* Section 1506.8 established modified procedures for the preparation of environmental impact statements on legislative proposals. Except in prescribed circumstances, this section provided for the transmittal of a single legislative EIS to the Congress and to Federal, State and local agencies and the public for review and comment. No revised EIS is required in such cases.

A few commenters objected to these procedures and urged that draft and final environmental impact statements be required for all legislative proposals. These commenters said that the

AR_0042705

**RULES AND REGULATIONS**

conventional final environmental impact statement, including an agency's response to comments, was no less important in this context than in a purely administrative setting.

However, the Council views legislative proposals as different from proposed actions to be undertaken by agencies, in several important respects. Unlike administrative proposals, the timing of critical steps (hearings, votes) is not under the control of the administrative agency. Congress will hold its hearings or take its votes when it chooses, and if an EIS is to influence those actions, it must be there in time. Congress may request Federal agencies to provide any additional environmental information it needs following receipt of a legislative EIS. Administration proposals are considered alongside other proposals introduced by members of Congress and the final product, if any, may be substantially different from the proposal transmitted by the Federal agency. Congress may hold hearings on legislative proposals and invite testimony on all aspects of proposed legislation including its environmental impacts. On the basis of these considerations, the Council determined that it would be overly burdensome and unproductive to require draft and final legislative environmental impact statements for all legislation, wherever it originates.

Several commenters also expressed concern about the requirement that the legislative environmental impact statement actually accompany legislative proposals when they are transmitted to Congress. These commenters noted that such proposals are often transmitted on an urgent basis without advance warning. Accordingly, the Council amended this section to provide for a period of thirty days for transmittal of legislative environmental impact statements, except that agencies must always transmit such EISs before the Congress begins formal deliberations on the proposal.

*Comments on § 1506.10: Timing of agency action.* Subsection (c) of this section provided that agencies shall allow not less than 45 days for comments on draft environmental impact statements. Several commenters felt that this period was too long; others thought it too short.

The Council recognizes that a balance must be struck between an adequate period for public comment on draft EIS's and timely completion of the environmental review process. In the Council's judgment, 45 days has proven to be the proper balance. This period for public comment was established by the Guidelines in 1973, and the Council determined not to alter it. Subsection (e) of this section authorizes the Environmental Protection Agency to reduce time periods for

agency action for compelling reasons of national policy.

*Comments on § 1506.11: Emergencies.* Section 1506.11 provided for agency action in emergency circumstances without observing the requirements of the regulations. The section required the Federal agency "proposing to take the action" to consult with the Council about alternative arrangements.

Several commenters expressed concern that use of the phrase "proposing to take the action" would be interpreted to mean that agencies consult with the Council before emergency action was taken. In the view of these commenters, such a requirement might be impractical in emergency circumstances and could defeat the purpose of the section. The Council concurs and substituted the phrase "taking the action" for "proposing to take the action." Similarly, the Council amended the section to provide for consultation "as soon as feasible" and not necessarily before emergency action.

PART 1507—AGENCY COMPLIANCE

*Comments on § 1507.2: Agency capability to comply.* Section 1507.2 provided, among other things, that a Federal agency shall itself have "sufficient capability" to evaluate any analysis prepared for it by others. Several commenters expressed concern that this could be interpreted to mean that each agency must employ the full range of professionals including geologists, biologists, chemists, botanists and others to gain sufficient capability for evaluating work prepared by others. This is not the Council's intention. Agency staffing requirements will vary with the agency's mission and needs including the number of EIS's for which they are responsible.

*Comments on § 1507.3: Agency procedures.* Subsection (a) of § 1507.3 provided that agencies shall adopt procedures for implementation of the regulations within eight months after the regulations are published in the FEDERAL REGISTER. Several commenters noted that State and local agencies participating in the NEPA process under certain statutory highway and community development programs would also require implementing procedures but could not finally begin to develop them until the relevant Federal agencies had completed this task. Accordingly, the Council amended this provision to allow such state and local agencies an additional four months for the adoption of implementing procedures.

Several commenters suggested that agencies with similar programs should establish similar procedures, especially for the submission of information by applicants. The Council concurs and added a new sentence to subsection (a)

stating that agencies with similar programs should consult with each other and the Council to coordinate their procedures, especially for programs requesting similar information from applicants.

Several commenters suggested that a committee be established to review agency compliance with these regulations. Under subsection (a), the Council will review agency implementing procedures for conformity with the Act and the regulations. Moreover, the Council regularly consults with Federal agencies regarding their implementation of NEPA and conducts periodic reviews on how the process is working. On the basis of these considerations, the Council determined that a committee for the review of agency compliance with NEPA should not be established.

PART 1508—TERMINOLOGY AND INDEX

*Comments on § 1508.8: Effects.* Several commenters urged that the term "effects" expressly include aesthetic, historic and cultural impacts. The Council adopted this suggestion and altered this provision accordingly.

*Comments on § 1508.12: Federal agency.* Several commenters urged that States and units of general local government assuming NEPA responsibilities under Section 104(h) of the Housing and Community Development Act of 1974 be expressly recognized as Federal agencies for purposes of these regulations. The Council adopted this suggestion and amended this provision accordingly.

*Comments on § 1508.14: Human environment.* In its proposed form, § 1508.14 stated that the term "human environment" shall be interpreted comprehensively to include the natural and physical environment and the interaction of people with that environment. A few commenters expressed concern that this definition could be interpreted as being limited to the natural and physical aspects of the environment. This is not the Council's intention. *See* § 1508.8 (relating to effects) and our discussion of the environment in the portion of this Preamble relating to § 1505.2. The full scope of the environment is set out in Section 101 of NEPA. Human beings are central to that concept. In § 1508.14 the Council replaced the work "interaction" with the work "relationship" to ensure that the definition is interpreted as being inclusive of the human environment.

The only line we draw is one drawn by the cases. Section 1508.14 stated that economic or social effects are not intended by themselves to require preparation of an environmental impact statement. A few commenters sought further explanation of this provision. This provision reflects the

AR_0042706

Council's determination, which accords with the case law, that NEPA was not intended to require an environmental impact statement where the closing of a military base, for example, only affects such things as the composition of the population or the level of personal income in a region.

*Comments on § 1508.16: Legislation.* Section 1508.16 defined legislation to exclude requests for appropriations. Some commenters felt that this exclusion was inappropriate. Others noted that environmental reviews for requests for appropriations had not been conducted in the eight years since NEPA was enacted. On the basis of traditional concepts relating to appropriations and the budget cycle, considerations of timing and confidentiality, and other factors, the Council decided not to alter the scope of this provision. The Council is aware that this is the one instance in the regulations where we assert a position opposed to that in the predecessor Guidelines. Quite simply, the Council in its experience found that preparation of EISs is ill-suited to the budget preparation process. Nothing in the Council's determination, however, relieves agencies of responsibility to prepare statements when otherwise required on the underlying program or other actions. (We note that a petition for certiorari on this issue is now pending before the Supreme Court.) This section was renumbered as § 1508.17.

*Comments on § 1508.17: Major Federal action.* Section 1508.17 of the draft regulations addressed the issue of NEPA's application to Federal programs which are delegated or otherwise transferred to State and local government. Some commenters said that the application of NEPA in such circumstances is a highly complicated issue; that its proper resolution depends on a variety of factors that may differ significantly from one program to the next and should be weighed on a case-by-case basis; and that agencies themselves should be accorded latitude in resolving this issue, subject to judicial review. The Council concurs and determined not to address this issue in this context at the present time. This determination should not be interpreted as a decision one way or the other on the merits of the issue.

Section 1508.17 also stated that the term "major" reinforces but does not have a meaning independent of the term "significantly" in NEPA's phrase "major Federal action significantly affecting the quality of the human environment." A few commenters noted that courts have differed over whether these terms should have independent meaning under NEPA. The Council determined that any Federal action which significantly affects the quality of the human environment is "major"

for purposes of NEPA. The Council's view is in accord with *Minnesota PIRG v. Butz,* 498 F. 2d 1314 (8th Cir., 1974).

Section 1508.17 was renumbered as § 1508.18.

*Comments on § 1508.22: Proposal.* Section 1508.22 stated that a proposal exists when an agency is "actively considering" alternatives and certain other factors are present. Several commenters expressed the view that this phrase could be interpreted to mean that a proposal exists too early in planning and decisionmaking, before there is any likelihood that the agency will be making a decision on the matter. In response to this concern, and to emphasize the link between EISs and actual agency decisions, the Council deleted the phrase "actively considering" and replaced it with the phrase "actively proposing to make a decision on" alternatives. The Council does not intend the change to detract from the importance of integrating NEPA with agency planning as provided in § 1501.2 of the regulations.

This section was renumbered as § 1508.23.

## OTHER COMMENTS

*Comments on the application of NEPA abroad.* Several commenters urged that the question of whether NEPA applies abroad be resolved by these regulations. However, the President has publicly announced his intention to address this issue in an Executive Order. The Executive Order, when issued, will represent the position of the Administration on that issue.

*Comments on the role of Indian tribes in the NEPA process.* Several commenters stated that the regulations should clarify the role of Indian Tribes in the NEPA process. Accordingly, the Council expressly identified Indian Tribes as participants in the NEPA process in §§ 1501.2(d)(2), 1501.7(a)(1), 1502.15(c) and 1503.1(a)(2)(ii).

*Comments on the Council's special environmental assessment for the NEPA regulations.* The Council prepared a special environmental assessment for these regulations and announced in the preamble to the draft regulations that the document was available to the public upon request. Some commenters expressed the view that it did not contain an adequate evaluation of the effects of the regulations. For the reasons set out in the assessment, and the preamble to the proposed regulations, the Council confirmed its earlier determination that the special environmental assessment did provide an adequate evaluation for these procedural regulations.

*Comments on the President's authority to issue Executive Order 11991 and the Council's authority to issue regula-*

*tions.* A few commenters questioned the authority of the President to issue Executive Order 11991, and the authority of the Council to issue the regulations. The President is empowered to issue regulations implementing the procedural provisions of NEPA by virtue of the authority vested in him as President of the United States under Article II, Section 3 of the Constitution and other provisions of the Constitution and laws of the United States. The President is empowered to delegate responsibility for performing this function to the Council on Environmental Quality under Section 301 of Title 3 of the United States Code and other laws of the United States.

*Comments on the responsibilities of Federal agencies in the NEPA process.* Agency responsibilities under the regulations often depend upon whether they have "jurisdiction by law" or "special expertise" with respect to a particular proposal. Several commenters noted that these terms were not defined in the regulations and could be subject to varying interpretations. Accordingly, the Council added definitions for these terms in §§ 1508.15 and 1508.26.

*Comments on the role of State and areawide clearinghouses.* At the request of several States, the Council recognized the role of state and areawide clearinghouses in distributing Federal documents to appropriate recipients. See e.g. §§ 1501.4(e)(2), 1503.1(2)(iii), and 1506.6(b)(3)(i).

*Comments on the concept of a national data bank.* When the Council issued the proposed regulations, it invited comment on the concept of a national data bank. The purpose of a data bank would be to provide for the storage and recall of information developed in one EIS for use in subsequent EISs. Most commenters expressed reservations about the idea on grounds of cost and practicality. The Council, while still intrigued by the concept did not change its initial conclusion that the financial and other resources that would be required are beyond the benefits that might be achieved.

*Comments on Federal funding of public comments on EISs.* The Council also invited comment on a proposal for encouraging Federal agencies to fund public comments on EISs when an important viewpoint would otherwise not be presented. Several commenters supported this proposal on grounds that it would broaden the range and improve the quality of public comments on EISs. Others doubted that the expenditure of Federal funds for this purpose would be worthwhile. Some felt that Congress should decide the question. The Council determined not to address the issue of Federal funding for public comments on EISs in the regu-

AR_0042707

lations, but to leave the matter to individual agencies' discretion.

## 5. REGULATORY ANALYSES

The final regulations implement the policy and other requirements of Executive Order 12044 to the fullest extent possible. We intend agencies in implementing these regulations to minimize burdens on the public. The determinations required by Section 2(d) of the Order have been made by the Council and are available on request.

It is our intention that a Regulatory Analysis required by Section 3 of the Order be undertaken concurrently with and, where appropriate, integrated with an environmental impact statement required by NEPA and these regulations.

## 6. CONCLUSION

We could not, of course, adopt every suggestion that was made on the regulations. We have tried to respond to the major concerns that were expressed. In the process, we have changed 74 of the 92 sections, making a total of 340 amendments to the regulations. We are confident that any issues which arise in the future can be resolved through a variety of mechanisms that exists for improving the NEPA process.

We appreciate the efforts of the many people who participated in developing the regulations and look forward to their cooperation as the regulations are implemented by individual agencies.

CHARLES WARREN,
*Chairman.*

## TABLE OF CONTENTS

PART 1500—PURPOSE, POLICY, AND MANDATE

Sec.
1500.1  Purpose.
1500.2  Policy.
1500.3  Mandate.
1500.4  Reducing paperwork.
1500.5  Reducing delay.
1500.6  Agency authority.

PART 1501—NEPA AND AGENCY PLANNING

1501.1  Purpose.
1501.2  Apply NEPA early in the process.
1501.3  When to prepare an environmental assessment.
1501.4  Whether to prepare an environmental impact statement.
1501.5  Lead agencies.
1501.6  Cooperating agencies.
1501.7  Scoping.
1501.8  Time limits.

PART 1502—ENVIRONMENTAL IMPACT STATEMENT

1502.1  Purpose.
1502.2  Implementation.
1502.3  Statutory requirements for statements.

Sec.
1502.4  Major Federal actions requiring the preparation of environmental impact statements.
1502.5  Timing.
1502.6  Interdisciplinary preparation.
1502.7  Page limits.
1502.8  Writing.
1502.9  Draft, final, and supplemental statements.
1502.10  Recommended format.
1502.11  Cover sheet.
1502.12  Summary.
1502.13  Purpose and need.
1502.14  Alternatives including the proposed action.
1502.15  Affected environment.
1502.16  Environmental consequences.
1502.17  List of preparers.
1502.18  Appendix.
1502.19  Circulation of the environmental impact statement.
1502.20  Tiering.
1502.21  Incorporation by reference.
1502.22  Incomplete or unavailable information.
1502.23  Cost-benefit analysis.
1502.24  Methodology and scientific accuracy.
1502.25  Environmental review and consultation requirements.

PART 1503—COMMENTING

1503.1  Inviting comments.
1503.2  Duty to comment.
1503.3  Specificity of comments.
1503.4  Response to comments.

PART 1504—PREDECISION REFERRALS TO THE COUNCIL OF PROPOSED FEDERAL ACTIONS DETERMINED TO BE ENVIRONMENTALLY UNSATISFACTORY

1504.1  Purpose.
1504.2  Criteria for referral.
1504.3  Procedure for referrals and response.

PART 1505—NEPA AND AGENCY DECISIONMAKING

1505.1  Agency decisionmaking procedures.
1505.2  Record of decision in cases requiring environmental impact statements.
1505.3  Implementing the decision.

PART 1506—OTHER REQUIREMENTS OF NEPA

1506.1  Limitations on actions during NEPA process.
1506.2  Elimination of duplication with State and local procedures.
1506.3  Adoption.
1506.4  Combining documents.
1506.5  Agency responsibility.
1506.6  Public involvement.
1506.7  Further guidance.
1506.8  Proposals for legislation.
1506.9  Filing requirements.
1506.10  Timing of agency action.
1506.11  Emergencies.
1506.12  Effective date.

PART 1507—AGENCY COMPLIANCE

1507.1  Compliance.
1507.2  Agency capability to comply.
1507.3  Agency procedures.

PART 1508—TERMINOLOGY AND INDEX

1508.1  Terminology.
1508.2  Act.
1508.3  Affecting.

Sec.
1508.4  Categorical exclusion.
1508.5  Cooperating agency.
1508.6  Council.
1508.7  Cumulative impact.
1508.8  Effects.
1508.9  Environmental assessment.
1508.10  Environmental document.
1508.11  Environmental impact statement.
1508.12  Federal agency.
1508.13  Finding of no significant impact.
1508.14  Human environment.
1508.15  Jurisdiction by law.
1508.16  Lead agency.
1508.17  Legislation.
1508.18  Major Federal action.
1508.19  Matter.
1508.20  Mitigation.
1508.21  NEPA process.
1508.22  Notice of intent.
1508.23  Proposal.
1508.24  Referring agency.
1508.25  Scope.
1508.26  Special expertise.
1508.27  Significantly.
1508.28  Tiering.
Index.

## PART 1500—PURPOSE, POLICY, AND MANDATE

Sec.
1500.1  Purpose.
1500.2  Policy.
1500.3  Mandate.
1500.4  Reducing paperwork.
1500.5  Reducing delay.
1500.6  Agency authority.

AUTHORITY: NEPA, the Environmental Quality Improvement Act of 1970, as amended (42 U.S.C. 4371 et seq.), section 309 of the Clean Air Act, as amended (42 U.S.C. 7609) and Executive Order 11514, Protection and Enhancement of Environmental Quality (March 5, 1970 as amended by Executive Order 11991, May 24, 1977).

§ 1500.1  Purpose.

(a) The National Environmental Policy Act (NEPA) is our basic national charter for protection of the environment. It establishes policy, sets goals (section 101) and provides means (section 102) for carrying out the policy. Section 102(2) contains "action-forcing" provisions to make sure that federal agencies act according to the letter and spirit of the Act. The regulations that follow implement Section 102(2). Their purpose is to tell federal agencies what they must do to comply with the procedures and achieve the goals of the Act. The President, the federal agencies, and the courts share responsibility for enforcing the Act so as to achieve the substantive requirements of section 101.

(b) NEPA procedures must insure that environmental information is available to public officials and citizens before decisions are made and before actions are taken. The information must be of high quality. Accurate scientific analysis, expert agency comments, and public scrutiny are essential to implementing NEPA. Most important, NEPA documents must con-

AR_0042708

centrate on the issues that are truly significant to the action in question, rather than amassing needless detail.

(e) Ultimately, of course, it is not better documents but better decisions that count. NEPA's purpose is not to generate paperwork—even excellent paperwork—but to foster excellent action. The NEPA process is intended to help public officials make decisions that are based on understanding of environmental consequences, and take actions that protect, restore, and enhance the environment. These regulations provide the direction to achieve this purpose.

### § 1500.2 Policy.

Federal agencies shall to the fullest extent possible:

(a) Interpret and administer the policies, regulations, and public laws of the United States in accordance with the policies set forth in the Act and in these regulations.

(b) Implement procedures to make the NEPA process more useful to decisionmakers and the public; to reduce paperwork and the accumulation of extraneous background data; and to emphasize real environmental issues and alternatives. Environmental impact statements shall be concise, clear, and to the point, and shall be supported by evidence that agencies have made the necessary environmental analyses.

(c) Integrate the requirements of NEPA with other planning and environmental review procedures required by law or by agency practice so that all such procedures run concurrently rather than consecutively.

(d) Encourage and facilitate public involvement in decisions which affect the quality of the human environment.

(e) Use the NEPA process to identify and assess the reasonable alternatives to proposed actions that will avoid or minimize adverse effects of these actions upon the quality of the human environment.

(f) Use all practicable means, consistent with the requirements of the Act and other essential considerations of national policy, to restore and enhance the quality of the human environment and avoid or minimize any possible adverse effects of their actions upon the quality of the human environment.

### § 1500.3 Mandate.

Parts 1500–1508 of this Title provide regulations applicable to and binding on all Federal agencies for implementing the procedural provisions of the National Environmental Policy Act of 1969, as amended (Pub. L. 91–190, 42 U.S.C. 4321 et seq.) (NEPA or the Act) except where compliance would be inconsistent with other statutory re-

quirements. These regulations are issued pursuant to NEPA, the Environmental Quality Improvement Act of 1970, as amended (42 U.S.C. 4371 et seq.) Section 309 of the Clean Air Act, as amended (42 U.S.C. 7609) and Executive Order 11514, Protection and Enhancement of Environmental Quality (March 5, 1970, as amended by Executive Order 11991, May 24, 1977). These regulations, unlike the predecessor guidelines, are not confined to Sec. 102(2)(C) (environmental impact statements). The regulations apply to the whole of section 102(2). The provisions of the Act and of these regulations must be read together as a whole in order to comply with the spirit and letter of the law. It is the Council's intention that judicial review of agency compliance with these regulations not occur before an agency has filed the final environmental impact statement, or has made a final finding of no significant impact (when such a finding will result in action affecting the environment), or takes action that will result in irreparable injury. Furthermore, it is the Council's intention that any trivial violation of these regulations not give rise to any independent cause of action.

### § 1500.4 Reducing paperwork.

Agencies shall reduce excessive paperwork by:

(a) Reducing the length of environmental impact statements (§ 1502.2(c)), by means such as setting appropriate page limits (§§ 1501.7(b)(1) and 1502.7).

(b) Preparing analytic rather than encyclopedic environmental impact statements (§ 1502.2(a)).

(c) Discussing only briefly issues other than significant ones (§ 1502.2(b)).

(d) Writing environmental impact statements in plain language (§ 1502.8).

(e) Following a clear format for environmental impact statements (§ 1502.10).

(f) Emphasizing the portions of the environmental impact statement that are useful to decisionmakers and the public (§§ 1502.14 and 1502.15) and reducing emphasis on background material (§ 1502.16).

(g) Using the scoping process, not only to identify significant environmental issues deserving of study, but also to deemphasize insignificant issues, narrowing the scope of the environmental impact statement process accordingly (§ 1501.7).

(h) Summarizing the environmental impact statement (§ 1502.12) and circulating the summary instead of the entire environmental impact statement if the latter is unusually long (§ 1502.19).

(i) Using programs, policy, or plan environmental impact statements and

tiering from statements of broad scope to those of narrower scope, to eliminate repetitive discussions of the same issues (§§ 1502.4 and 1502.20).

(j) Incorporating by reference (§ 1502.21).

(k) Integrating NEPA requirements with other environmental review and consultation requirements (§ 1502.25).

(l) Requiring comments to be as specific as possible (§ 1503.3).

(m) Attaching and circulating only changes to the draft environmental impact statement, rather than rewriting and circulating the entire statement when changes are minor (§ 1503.4(c)).

(n) Eliminating duplication with State and local procedures, by providing for joint preparation (§ 1506.2), and with other Federal procedures, by providing that an agency may adopt appropriate environmental documents prepared by another agency (§ 1506.3).

(o) Combining environmental documents with other documents (§ 1506.4).

(p) Using categorical exclusions to define categories of actions which do not individually or cumulatively have a significant effect on the human environment and which are therefore exempt from requirements to prepare an environmental impact statement (§ 1508.4).

(q) Using a finding of no significant impact when an action not otherwise excluded will not have a significant effect on the human environment and is therefore exempt from requirements to prepare an environmental impact statement (§ 1508.13).

### § 1500.5 Reducing delay.

Agencies shall reduce delay by:

(a) Integrating the NEPA process into early planning (§ 1501.2).

(b) Emphasizing interagency cooperation before the environmental impact statement is prepared, rather than submission of adversary comments on a completed document (§ 1501.6).

(c) Insuring the swift and fair resolution of lead agency disputes (§ 1501.5).

(d) Using the scoping process for an early identification of what are and what are not the real issues (§ 1501.7).

(e) Establishing appropriate time limits for the environmental impact statement process (§§ 1501.7(b)(2) and 1501.8).

(f) Preparing environmental impact statements early in the process (§ 1502.5).

(g) Integrating NEPA requirements with other environmental review and consultation requirements (§ 1502.25).

(h) Eliminating duplication with State and local procedures by providing for joint preparation (§ 1506.2) and with other Federal procedures by providing that an agency may adopt ap-

AR_0042709

propriate environmental documents prepared by another agency (§ 1506.3).

(i) Combining environmental documents with other documents (§ 1506.4).

(j) Using accelerated procedures for proposals for legislation (§ 1506.8).

(k) Using categorical exclusions to define categories of actions which do not individually or cumulatively have a significant effect on the human environment (§ 1508.4) and which are therefore exempt from requirements to prepare an environmental impact statement.

(1) Using a finding of no significant impact when an action not otherwise excluded will not have a significant effect on the human environment (§ 1508.13) and is therefore exempt from requirements to prepare an environmental impact statement.

### § 1500.6    Agency authority.

Each agency shall interpret the provisions of the Act as a supplement to its existing authority and as a mandate to view traditional policies and missions in the light of the Act's national environmental objectives. Agencies shall review their policies, procedures, and regulations accordingly and revise them as necessary to insure full compliance with the purposes and provisions of the Act. The phrase "to the fullest extent possible" in section 102 means that each agency of the Federal Government shall comply with that section unless existing law applicable to the agency's operations expressly prohibits or makes compliance impossible.

## PART 1501—NEPA AND AGENCY PLANNING

Sec.
1501.1    Purpose.
1501.2    Apply NEPA early in the process.
1501.3    When to prepare an environmental assessment.
1501.4    Whether to prepare an environmental impact statement.
1501.5    Lead agencies.
1501.6    Cooperating agencies.
1501.7    Scoping.
1501.8    Time limits.

AUTHORITY: NEPA, the Environmental Quality Improvement Act of 1970, as amended (42 U.S.C. 4371 et seq.), Section 309 of the Clean Air Act, as amended (42 U.S.C. 7609, and Executive Order 11514, Protection and Enhancement of Environmental Quality (March 5, 1970, as amended by Executive Order 11991, May, 24 1977).

### § 1501.1    Purpose.

The purposes of this part include:

(a) Integrating the NEPA process into early planning to insure appropriate consideration of NEPA's policies and to eliminate delay.

(b) Emphasizing cooperative consultation among agencies before the environmental impact statement is prepared rather than submission of adversary comments on a completed document.

(c) Providing for the swift and fair resolution of lead agency disputes.

(d) Identifying at an early stage the significant environmental issues deserving of study and deemphasizing insignificant issues, narrowing the scope of the environmental impact statement accordingly.

(e) Providing a mechanism for putting appropriate time limits on the environmental impact statement process.

### § 1501.2    Apply NEPA early in the process.

Agencies shall integrate the NEPA process with other planning at the earliest possible time to insure that planning and decisions reflect environmental values, to avoid delays later in the process, and to head off potential conflicts. Each agency shall:

(a) Comply with the mandate of section 102(2)(A) to "utilize a systematic, interdisciplinary approach which will insure the integrated use of the natural and social sciences and the environmental design arts in planning and in decisionmaking which may have an impact on man's environment," as specified by § 1507.2.

(b) Identify environmental effects and values in adequate detail so they can be compared to economic and technical analyses. Environmental documents and appropriate analyses shall be circulated and reviewed at the same time as other planning documents.

(c) Study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources as provided by section 102(2)(E) of the Act.

(d) Provide for cases where actions are planned by private applicants or other non-Federal entities before Federal involvement so that:

(1) Policies or designated staff are available to advise potential applicants of studies or other information foreseeably required for later Federal action.

(2) The Federal agency consults early with appropriate State and local agencies and Indian tribes and with interested private persons and organizations when its own involvement is reasonably foreseeable.

(3) The Federal agency commences its NEPA process at the earliest possible time.

### § 1501.3    When to prepare an environmental assessment.

(a) Agencies shall prepare an environmental assessment (§ 1508.9) when necessary under the procedures adopted by individual agencies to supplement these regulations as described in § 1507.3. An assessment is not necessary if the agency has decided to prepare an environmental impact statement.

(b) Agencies may prepare an environmental assessment on any action at any time in order to assist agency planning and decisionmaking.

### § 1501.4    Whether to prepare an environmental impact statement.

In determining whether to prepare an environmental impact statement the Federal agency shall:

(a) Determine under its procedures supplementing these regulations (described in § 1507.3) whether the proposal is one which:

(1) Normally requires an environmental impact statement, or

(2) Normally does not require either an environmental impact statement or an environmental assessment (categorical exclusion).

(b) If the proposed action is not covered by paragraph (a) of this section, prepare an environmental assessment (§ 1508.9). The agency shall involve environmental agencies, applicants, and the public, to the extent practicable, in preparing assessments required by § 1508.9(a)(1).

(c) Based on the environmental assessment make its determination whether to prepare an environmental impact statement.

(d) Commence the scoping process (§ 1501.7), if the agency will prepare an environmental impact statement.

(e) Prepare a finding of no significant impact (§ 1508.13), if the agency determines on the basis of the environmental assessment not to prepare a statement.

(1) The agency shall make the finding of no significant impact available to the affected public as specified in § 1506.6.

(2) In certain limited circumstances, which the agency may cover in its procedures under § 1507.3, the agency shall make the finding of no significant impact available for public review (including State and areawide clearinghouses) for 30 days before the agency makes its final determination whether to prepare an environmental impact statement and before the action may begin. The circumstances are:

(i) The proposed action is, or is closely similar to, one which normally requires the preparation of an environmental impact statement under the procedures adopted by the agency pursuant to § 1507.3, or

(ii) The nature of the proposed action is one without precedent.

### § 1501.5    Lead agencies.

(a) A lead agency shall supervise the preparation of an environmental

AR_0042710

impact statement if more than one Federal agency either:

(1) Proposes or is involved in the same action; or

(2) Is involved in a group of actions directly related to each other because of their functional interdependence or geographical proximity.

(b) Federal, State, or local agencies, including at least one Federal agency, may act as joint lead agencies to prepare an environmental impact statement (§ 1506.2).

(c) If an action falls within the provisions of paragraph (a) of this section the potential lead agencies shall determine by letter or memorandum which agency shall be the lead agency and which shall be cooperating agencies. The agencies shall resolve the lead agency question so as not to cause delay. If there is disagreement among the agencies, the following factors (which are listed in order of descending importance) shall determine lead agency designation:

(1) Magnitude of agency's involvement.

(2) Project approval/disapproval authority.

(3) Expertise concerning the action's environmental effects.

(4) Duration of agency's involvement.

(5) Sequence of agency's involvement.

(d) Any Federal agency, or any State or local agency or private person substantially affected by the absence of lead agency designation, may make a written request to the potential lead agencies that a lead agency be designated.

(e) If Federal agencies are unable to agree on which agency will be the lead agency or if the procedure described in paragraph (c) of this section has not resulted within 45 days in a lead agency designation, any of the agencies or persons concerned may file a request with the Council asking it to determine which Federal agency shall be the lead agency.

A copy of the request shall be transmitted to each potential lead agency. The request shall consist of:

(1) A precise description of the nature and extent of the proposed action;

(2) A detailed statement of why each potential lead agency should or should not be the lead agency under the criteria specified above in paragraph (c) of this section.

(f) A response may be filed by any potential lead agency concerned within 20 days after a request is filed with the Council. The Council shall determine as soon as possible but not later than 20 days after receiving the request and all responses to it which Federal agency shall be the lead

agency and which other Federal agencies shall be cooperating agencies.

§ 1501.6 Cooperating agencies.

The purpose of this section is to emphasize agency cooperation early in the NEPA process. Upon request of the lead agency, any other Federal agency which has jurisdiction by law shall be a cooperating agency. In addition any other Federal agency which has special expertise with respect to any environmental issue, which should be addressed in the statement may be a cooperating agency upon request of the lead agency. An agency may request the lead agency to designate it a cooperating agency.

(a) The lead agency shall:

(1) Request the participation of each cooperating agency in the NEPA process at the earliest possible time.

(2) Use the environmental analysis and proposals of cooperating agencies with jurisdiction by law or special expertise, to the maximum extent possible consistent with its responsibility as lead agency.

(3) Meet with a cooperating agency at the latter's request.

(b) Each cooperating agency shall:

(1) Participate in the NEPA process at the earliest possible time.

(2) Participate in the scoping process (described below in § 1501.7).

(3) Assume on request of the lead agency responsibility for developing information and preparing environmental analyses including portions of the environmental impact statement concerning which the cooperating agency has special expertise.

(4) Make available staff support at the lead agency's request to enhance the latter's interdisciplinary capability.

(5) Normally use its own funds. The lead agency shall, to the extent available funds permit, fund those major activities or analyses it requests from cooperating agencies. Potential lead agencies shall include such funding requirements in their budget requests.

(c) A cooperating agency may in response to a lead agency's request for assistance in preparing the environmental impact statement (described in paragraph (b) (3), (4), or (5) of this section) reply that other program commitments preclude any involvement or the degree of involvement requested in the action that is the subject of the environmental impact statement. A copy of this reply shall be submitted to the Council.

§ 1501.7 Scoping.

There shall be an early and open process for determining the scope of issues to be addressed and for identifying the significant issues related to a proposed action. This process shall be termed scoping. As soon as practicable

after its decision to prepare an environmental impact statement and before the scoping process the lead agency shall publish a notice of intent (§ 1508.22) in the FEDERAL REGISTER except as provided in § 1507.3(e).

(a) As part of the scoping process the lead agency shall:

(1) Invite the participation of affected Federal, State, and local agencies, any affected Indian tribe, the proponent of the action, and other interested persons (including those who might not be in accord with the action on environmental grounds), unless there is a limited exception under § 1507.3(c). An agency may give notice in accordance with § 1506.6.

(2) Determine the scope (§ 1508.25) and the significant issues to be analyzed in depth in the environmental impact statement.

(3) Identify and eliminate from detailed study the issues which are not significant or which have been covered by prior environmental review (§ 1506.3), narrowing the discussion of these issues in the statement to a brief presentation of why they will not have a significant effect on the human environment or providing a reference to their coverage elsewhere.

(4) Allocate assignments for preparation of the environmental impact statement among the lead and cooperating agencies, with the lead agency retaining responsibility for the statement.

(5) Indicate any public environmental assessments and other environmental impact statements which are being or will be prepared that are related to but are not part of the scope of the impact statement under consideration.

(6) Identify other environmental review and consultation requirements so the lead and cooperating agencies may prepare other required analyses and studies concurrently with, and integrated with, the environmental impact statement as provided in § 1502.25.

(7) Indicate the relationship between the timing of the preparation of environmental analyses and the agency's tentative planning and decisionmaking schedule.

(b) As part of the scoping process the lead agency may:

(1) Set page limits on environmental documents (§ 1502.7).

(2) Set time limits (§ 1501.8).

(3) Adopt procedures under § 1507.3 to combine its environmental assessment process with its scoping process.

(4) Hold an early scoping meeting or meetings which may be integrated with any other early planning meeting the agency has. Such a scoping meeting will often be appropriate when the impacts of a particular action are confined to specific sites.

AR_0042711

Case 1:24-cv-00089-DMT-CRH    Document 113-19    Filed 10/31/24    Page 16 of 121

(c) An agency shall revise the determinations made under paragraphs (a) and (b) of this section if substantial changes are made later in the proposed action, or if significant new circumstances or information arise which bear on the proposal or its impacts.

§ 1501.8   Time limits.

Although the Council has decided that prescribed universal time limits for the entire NEPA process are too inflexible, Federal agencies are encouraged to set time limits appropriate to individual actions (consistent with the time intervals required by § 1506.10). When multiple agencies are involved the reference to agency below means lead agency.

(a) The agency shall set time limits if an applicant for the proposed action requests them: *Provided,* That the limits are consistent with the purposes of NEPA and other essential considerations of national policy.

(b) The agency may:

(1) Consider the following factors in determining time limits:

(i) Potential for environmental harm.

(ii) Size of the proposed action.

(iii) State of the art of analytic techniques.

(iv) Degree of public need for the proposed action, including the consequences of delay.

(v) Number of persons and agencies affected.

(vi) Degree to which relevant information is known and if not known the time required for obtaining it.

(vii) Degree to which the action is controversial.

(viii) Other time limits imposed on the agency by law, regulations, or executive order.

(2) Set overall time limits or limits for each constituent part of the NEPA process which may include:

(i) Decision on whether to prepare an environmental impact statement (if not already decided).

(ii) Determination of the scope of the environmental impact statement.

(iii) Preparation of the draft environmental impact statement.

(iv) Review of any comments on the draft environmental impact statement from the public and agencies.

(v) Preparation of the final environmental impact statement.

(vi) Review of any comments on the final environmental impact statement.

(vii) Decision on the action based in part on the environmental impact statement.

(3) Designate a person (such as the project manager or a person in the agency's office with NEPA responsibilities) to expedite the NEPA process.

(c) State or local agencies or members of the public may request a Federal Agency to set time limits.

---

# PART 1502—ENVIRONMENTAL IMPACT STATEMENT

Sec.
1502.1   Purpose.
1502.2   Implementation.
1502.3   Statutory Requirements for Statements.
1502.4   Major Federal Actions Requiring the Preparation of Environmental Impact Statements.
1502.5   Timing.
1502.6   Interdisciplinary Preparation.
1502.7   Page Limits.
1502.8   Writing.
1502.9   Draft, Final, and Supplemental Statements.
1502.10  Recommended Format.
1502.11  Cover Sheet.
1502.12  Summary.
1502.13  Purpose and Need.
1502.14  Alternatives Including the Proposed Action.
1502.15  Affected Environment.
1502.16  Environmental Consequences.
1502.17  List of Preparers.
1502.18  Appendix.
1502.19  Circulation of the Environmental Impact Statement.
1502.20  Tiering.
1502.21  Incorporation by Reference.
1502.22  Incomplete or Unavailable Information.
1502.23  Cost-Benefit Analysis.
1502.24  Methodolgy and Scientific Accuracy.
1502.25  Environmental Review and Consultation Requirements.

AUTHORITY: NEPA, the Environmental Quality Improvement Act of 1970, as amended (42 U.S.C. 4371 et seq.), Section 309 of the Clean Air Act, as amended (42 U.S.C. 7609), and Executive Order 11514, Protection and Enhancement of Environmental Quality (March 5, 1970, as amended by Executive Order 11991, May 24, 1977).

§ 1502.1   Purpose.

The primary purpose of an environmental impact statement is to serve as an action-forcing device to insure that the policies and goals defined in the Act are infused into the ongoing programs and actions of the Federal Government. It shall provide full and fair discussion of significant environmental impacts and shall inform decisionmakers and the public of the reasonable alternatives which would avoid or minimize adverse impacts or enhance the quality of the human environment. Agencies shall focus on significant environmental issues and alternatives and shall reduce paperwork and the accumulation of extraneous background data. Statements shall be concise, clear, and to the point, and shall be supported by evidence that the agency has made the necessary environmental analyses. An environmental impact statement is more than a disclosure document. It shall be used by Federal officials in conjunction with

other relevant material to plan actions and make decisions.

§ 1502.2   Implementation.

To achieve the purposes set forth in § 1502.1 agencies shall prepare environmental impact statements in the following manner:

(a) Environmental impact statements shall be analytic rather than encyclopedic.

(b) Impacts shall be discussed in proportion to their significance. There shall be only brief discussion of other than significant issues. As in a finding of no significant impact, there should be only enough discussion to show why more study is not warranted.

(c) Environmental impact statements shall be kept concise and shall be no longer than absolutely necessary to comply with NEPA and with these regulations. Length should vary first with potential environmental problems and then with project size.

(d) Environmental impact statements shall state how alternatives considered in it and decisions based on it will or will not achieve the requirements of sections 101 and 102(1) of the Act and other environmental laws and policies.

(e) The range of alternatives discussed in environmental impact statements shall encompass those to be considered by the ultimate agency decisionmaker.

(f) Agencies shall not commit resources prejudicing selection of alternatives before making a final decision (§ 1506.1).

(g) Environmental impact statements shall serve as the means of assessing the environmental impact of proposed agency actions, rather than justifying decisions already made.

§ 1502.3   Statutory requirements for statements.

As required by sec. 102(2)(C) of NEPA environmental impact statements (§ 1508.11) are to be included in every recommendation or report. On proposals (§ 1508.23). For legislation and (§ 1508.17). Other major Federal actions (§ 1508.18). Significantly (§ 1508.27). Affecting (§§ 1508.3, 1508.8). The quality of the human environment (§ 1508.14).

§ 1502.4   Major Federal actions requiring the preparation of environmental impact statements.

(a) Agencies shall make sure the proposal which is the subject of an environmental impact statement is properly defined. Agencies shall use the criteria for scope (§ 1508.25) to determine which proposal(s) shall be the subject of a particular statement. Proposals or parts or proposals which are related to each other closely enough to be, in effect, a single course of action shall

AR_0042712

be evaluated in a single impact statement.

(b) Environmental impact statements may be prepared, and are sometimes required, for broad Federal actions such as the adoption of new agency programs or regulations (§ 1508.18). Agencies shall prepare statements on broad actions so that they are relevant to policy and are timed to coincide with meaningful points in agency planning and decisionmaking.

(c) When preparing statements on broad actions (including proposals by more than one agency), agencies may find it useful to evaluate the proposal(s) in one of the following ways:

(1) Geographically, including actions occurring in the same general location, such as body of water, region, or metropolitan area.

(2) Generically, including actions which have relevant similarities, such as common timing, impacts, alternatives, methods of implementation, media, or subject matter.

(3) By stage of technological development including federal or federally assisted research, development or demonstration programs for new technologies which, if applied, could significantly affect the quality of the human environment. Statements shall be prepared on such programs and shall be available before the program has reached a stage of investment or commitment to implementation likely to determine subsequent development or restrict later alternatives.

(d) Agencies shall as appropriate employ scoping (§ 1501.7), tiering (§ 1502.20), and other methods listed in §§ 1500.4 and 1500.5 to relate broad and narrow actions and to avoid duplication and delay.

§ 1502.5 Timing.

An agency shall commence preparation of an environmental impact statement as close as possible to the time the agency is developing or is presented with a proposal (§ 1508.23) so that preparation can be completed in time for the final statement to be included in any recommendation or report on the proposal. The statement shall be prepared early enough so that it can serve practically as an important contribution to the decisionmaking process and will not be used to rationalize or justify decisions already made (§§ 1500.2(c), 1501.2, and 1502.2). For instance:

(a) For projects directly undertaken by Federal agencies the environmental impact statement shall be prepared at the feasibility analysis (go-no go) stage and may be supplemented at a later stage if necessary.

(b) For applications to the agency appropriate environmental assessments or statements shall be commenced no later than immediately after the application is received. Federal agencies are encouraged to begin preparation of such assessments or statements earlier, preferably jointly with applicable State or local agencies.

(c) For adjudication, the final environmental impact statement shall normally precede the final staff recommendation and that portion of the public hearing related to the impact study. In appropriate circumstances the statement may follow preliminary hearings designed to gather information for use in the statements.

(d) For informal rulemaking the draft environmental impact statement shall normally accompany the proposed rule.

§ 1502.6 Interdisciplinary preparation.

Environmental impact statements shall be prepared using an inter-disciplinary approach which will insure the integrated use of the natural and social sciences and the environmental design arts (section 102(2)(A) of the Act). The disciplines of the preparers shall be appropriate to the scope and issues identified in the scoping process (§ 1501.7).

§ 1502.7 Page limits.

The text of final environmental impact statements (e.g., paragraphs (d) through (g) of § 1502.10) shall normally be less than 150 pages and for proposals of unusual scope or complexity shall normally be less than 300 pages.

§ 1502.8 Writing.

Environmental impact statements shall be written in plain language and may use appropriate graphics so that decisionmakers and the public can readily understand them. Agencies should employ writers of clear prose or editors to write, review, or edit statements, which will be based upon the analysis and supporting data from the natural and social sciences and the environmental design arts.

§ 1502.9 Draft, final, and supplemental statements.

Except for proposals for legislation as provided in § 1506.8 environmental impact statements shall be prepared in two stages and may be supplemented.

(a) Draft environmental impact statements shall be prepared in accordance with the scope decided upon in the scoping process. The lead agency shall work with the cooperating agencies and shall obtain comments as required in Part 1503 of this chapter. The draft statement must fulfill and satisfy to the fullest extent possible the requirements established for final statements in section 102(2)(C) of the Act. If a draft statement is so inadequate as to preclude meaningful analysis, the agency shall prepare and circulate a revised draft of the appropriate portion. The agency shall make every effort to disclose and discuss at appropriate points in the draft statement all major points of view on the environmental impacts of the alternatives including the proposed action.

(b) Final environmental impact statements shall respond to comments as required in Part 1503 of this chapter. The agency shall discuss at appropriate points in the final statement any responsible opposing view which was not adequately discussed in the draft statement and shall indicate the agency's response to the issues raised.

(c) Agencies:

(1) Shall prepare supplements to either draft or final environmental impact statements if:

(i) The agency makes substantial changes in the proposed action that are relevant to environmental concerns; or

(ii) There are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts.

(2) May also prepare supplements when the agency determines that the purposes of the Act will be furthered by doing so.

(3) Shall adopt procedures for introducing a supplement into its formal administrative record, if such a record exists.

(4) Shall prepare, circulate, and file a supplement to a statement in the same fashion (exclusive of scoping) as a draft and final statement unless alternative procedures are approved by the Council.

§ 1502.10 Recommended format.

Agencies shall use a format for environmental impact statements which will encourage good analysis and clear presentation of the alternatives including the proposed action. The following standard format for environmental impact statements should be followed unless the agency determines that there is a compelling reason to do otherwise:

(a) Cover sheet.

(b) Summary.

(c) Table of Contents.

(d) Purpose of and Need for Action.

(e) Alternatives Including Proposed Action (secs. 102(2)(C)(iii) and 102(2)(E) of the Act).

(f) Affected Environment.

(g) Environmental Consequences (especially sections 102(2)(C) (i), (ii), (iv), and (v) of the Act.

(h) List of Preparers.

(i) List of Agencies, Organizations, and Persons to Whom Copies of the Statement Are Sent.

(j) Index.

AR_0042713

**RULES AND REGULATIONS**

(k) Appendices (if any).

If a different format is used, it shall include paragraphs (a), (b), (c), (h), (i), and (j), of this section and shall include the substance of paragraphs (d), (e), (f), (g), and (k) of this section, as further described in §§ 1502.11–1502.18, in any appropriate format.

§ 1502.11  Cover sheet.

The cover sheet shall not exceed one page. It shall include:

(a) A list of the responsible agencies including the lead agency and any cooperating agencies.

(b) The title of the proposed action that is the subject of the statement (and if appropriate the titles of related cooperating agency actions), together with the State(s) and county(ies) (or other jurisdiction if applicable) where the action is located.

(c) The name, address, and telephone number of the person at the agency who can supply further information.

(d) A designation of the statement as a draft, final, or draft or final supplement.

(e) A one paragraph abstract of the statement.

(f) The date by which comments must be received (computed in cooperation with EPA under § 1506.10).

The information required by this section may be entered on Standard Form 424 (in items 4, 6, 7, 10, and 18).

§ 1502.12  Summary.

Each environmental impact statement shall contain a summary which adequately and accurately summarizes the statement. The summary shall stress the major conclusions, areas of controversy (including issues raised by agencies and the public), and the issues to be resolved (including the choice among alternatives). The summary will normally not exceed 15 pages.

§ 1502.13  Purpose and need.

The statement shall briefly specify the underlying purpose and need to which the agency is responding in proposing the alternatives including the proposed action.

§ 1502.14  Alternatives including the proposed action.

This section is the heart of the environmental impact statement. Based on the information and analysis presented in the sections on the Affected Environment (§ 1502.15) and the Environmental Consequences (§ 1502.16), it should present the environmental impacts of the proposal and the alternatives in comparative form, thus sharply defining the issues and providing a clear basis for choice among options

by the decisionmaker and the public. In this section agencies shall:

(a) Rigorously explore and objectively evaluate all reasonable alternatives, and for alternatives which were eliminated from detailed study, briefly discuss the reasons for their having been eliminated.

(b) Devote substantial treatment to each alternative considered in detail including the proposed action so that reviewers may evaluate their comparative merits.

(c) Include reasonable alternatives not within the jurisdiction of the lead agency.

(d) Include the alternative of no action.

(e) Identify the agency's preferred alternative or alternatives, if one or more exists, in the draft statement and identify such alternative in the final statement unless another law prohibits the expression of such a preference.

(f) Include appropriate mitigation measures not already included in the proposed action or alternatives.

§ 1502.15  Affected environment.

The environmental impact statement shall succinctly describe the environment of the area(s) to be affected or created by the alternatives under consideration. The descriptions shall be no longer than is necessary to understand the effects of the alternatives. Data and analyses in a statement shall be commensurate with the importance of the impact, with less important material summarized, consolidated, or simply referenced. Agencies shall avoid useless bulk in statements and shall concentrate effort and attention on important issues. Verbose descriptions of the affected environment are themselves no measure of the adequacy of an environmental impact statement.

§ 1502.16  Environmental consequences.

This section forms the scientific and analytic basis for the comparisons under § 1502.14. It shall consolidate the discussions of those elements required by secs. 102(2)(C) (i), (ii), (iv), and (v) of NEPA which are within the scope of the statement and as much of sec. 102(2)(C)(iii) as is necessary to support the comparisons. The discussion will include the environmental impacts of the alternatives including the proposed action, any adverse environmental effects which cannot be avoided should the proposal be implemented, the relationship between short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and any irreversible or irretrievable commitments of resources which would be involved in the proposal should it be implemented. This section should not

duplicate discussions in § 1502.14. It shall include discussions of:

(a) Direct effects and their significance (§ 1508.18).

(b) Indirect effects and their significance (§ 1508.8).

(c) Possible conflicts between the proposed action and the objectives of Federal, regional, State, and local (and in the case of a reservation, Indian tribe) land use plans, policies and controls for the area concerned. (See § 1506.2(c).)

(d) The environmental effects of alternatives including the proposed action. The comparisons under § 1502.14 will be based on this discussion.

(e) Energy requirements and conservation potential of various alternatives and mitigation measures.

(f) Natural or depletable resource requirements and conservation potential of various alternatives and mitigation measures.

(g) Urban quality, historic and cultural resources, and the design of the built environment, including the reuse and conservation potential of various alternatives and mitigation measures.

(h) Means to mitigate adverse environmental impacts (if not fully covered under § 1502.14(f)).

§ 1502.17  List of preparers.

The environmental impact statement shall list the names, together with their qualifications (expertise, experience, professional disciplines), of the persons who were primarily responsible for preparing the environmental impact statement or significant background papers, including basic components of the statement (§§ 1502.6 and 1502.8). Where possible the persons who are responsible for a particular analysis, including analyses in background papers, shall be identified. Normally the list will not exceed two pages.

§ 1502.18  Appendix.

If an agency prepares an appendix to an environmental impact statement the appendix shall:

(a) Consist of material prepared in connection with an environmental impact statement (as distinct from material which is not so prepared and which is incorporated by reference (§ 1502.21)).

(b) Normally consist of material which substantiates any analysis fundamental to the impact statement.

(c) Normally be analytic and relevant to the decision to be made.

(d) Be circulated with the environmental impact statement or be readily available on request.

AR_0042714

## § 1502.19   Circulation of the environmental impact statement.

Agencies shall circulate the entire draft and final environmental impact statements except for certain appendices as provided in § 1502.18(d) and unchanged statements as provided in § 1503.4(c). However, if the statement is unusually long, the agency may circulate the summary instead, except that the entire statement shall be furnished to:

(a) Any Federal agency which has jurisdiction by law or special expertise with respect to any environmental impact involved and any appropriate Federal, State or local agency authorized to develop and enforce environmental standards.

(b) The applicant, if any.

(c) Any person, organization, or agency requesting the entire environmental impact statement.

(d) In the case of a final environmental impact statement any person, organization, or agency which submitted substantive comments on the draft.

If the agency circulates the summary and thereafter receives a timely request for the entire statement and for additional time to comment, the time for that requestor only shall be extended by at least 15 days beyond the minimum period.

## § 1502.20   Tiering.

Agencies are encouraged to tier their environmental impact statements to eliminate repetitive discussions of the same issues and to focus on the actual issues ripe for decision at each level of environmental review (§ 1508.28) Whenever a broad environmental impact statement has been prepared (such as a program or policy statement) and a subsequent statement or environmental assessment is then prepared on an action included within the entire program or policy (such as a site specific action) the subsequent statement or environmental assessment need only summarize the issues discussed in the broader statement and incorporate discussions from the broader statement by reference and shall concentrate on the issues specific to the subsequent action. The subsequent document shall state where the earlier document is available. Tiering may also be appropriate for different stages of actions. (Sec. 1508.28).

## § 1502.21   Incorporation by reference.

Agencies shall incorporate material into an environmental impact statement by reference when the effect will be to cut down on bulk without impeding agency and public review of the action. The incorporated material shall be cited in the statement and its content briefly described. No material may be incorporated by reference

unless it is reasonably available for inspection by potentially interested persons within the time allowed for comment. Material based on proprietary data which is itself not available for review and comment shall not be incorporated by reference.

## § 1502.22   Incomplete or unavailable information.

When an agency is evaluating significant adverse effects on the human environment in an environmental impact statement and there are gaps in relevant information or scientific uncertainty, the agency shall always make clear that such information is lacking or that uncertainty exists.

(a) If the information relevant to adverse impacts is essential to a reasoned choice among alternatives and is not known and the overall costs of obtaining it are not exorbitant, the agency shall include the information in the environmental impact statement.

(b) If (1) the information relevant to adverse impacts is essential to a reasoned choice among alternatives and is not known and the overall costs of obtaining it are exorbitant or (2) the information relevant to adverse impacts is important to the decision and the means to obtain it are not known (e.g., the means for obtaining it are beyond the state of the art) the agency shall weigh the need for the action against the risk and severity of possible adverse impacts were the action to proceed in the face of uncertainty. If the agency proceeds, it shall include a worst case analysis and an indication of the probability or improbability of its occurrence.

## § 1502.23   Cost-benefit analysis.

If a cost-benefit analysis relevant to the choice among environmentally different alternatives is being considered for the proposed action, it shall be incorporated by reference or appended to the statement as an aid in evaluating the environmental consequences. To assess the adequacy of compliance with sec. 102(2)(B) of the Act the statement shall, when a cost-benefit analysis is prepared, discuss the relationship between that analysis and any analyses of unquantified environmental impacts, values, and amenities. For purposes of complying with the Act, the weighing of the merits and drawbacks of the various alternatives need not be displayed in a monetary cost-benefit analysis and should not be when there are important qualitative considerations. In any event, an environmental impact statement should at least indicate those considerations, including factors not related to environmental quality, which are likely to be relevant and important to a decision.

## § 1502.24   Methodology and scientific accuracy.

Agencies shall insure the professional integrity, including scientific integrity, of the discussions and analyses in environmental impact statements. They shall identify any methodologies used and shall make explicit reference by footnote to the scientific and other sources relied upon for conclusions in the statement. An agency may place discussion of methodology in an appendix.

## § 1502.25   Environmental review and consultation requirements.

(a) To the fullest extent possible, agencies shall prepare draft environmental impact statements concurrently with and integrated with environmental impact analyses and related surveys and studies required by the Fish and Wildlife Coordination Act (16 U.S.C. Sec. 661 et seq.) the National Historic Preservation Act of 1966 (16 U.S.C. Sec. 470 et seq.), the Endangered Species Act of 1973 (16 U.S.C. Sec. 1531 et seq.), and other environmental review laws and executive orders.

(b) The draft environmental impact statement shall list all Federal permits, licenses, and other entitlements which must be obtained in implementing the proposal. If it is uncertain whether a Federal permit, license, or other entitlement is necessary, the draft environmental impact statement shall so indicate.

## PART 1503—COMMENTING

Sec.
1503.1   Inviting Comments.
1503.2   Duty to Comment.
1503.3   Specificity of Comments.
1503.4   Response to Comments.

AUTHORITY: NEPA, the Environmental Quality Improvement Act of 1970, as amended (42 U.S.C. 4371 et seq.), Section 309 of the Clean Air Act, as amended (42 U.S.C. 7609), and Executive Order 11514, Protection and Enhancement of Environmental Quality (March 5, 1970, as amended by Executive Order 11991, May 24, 1977).

## § 1503.1   Inviting comments.

(a) After preparing a draft environmental impact statement and before preparing a final environmental impact statement the agency shall:

(1) Obtain the comments of any Federal agency which has jurisdiction by law or special expertise with respect to any environmental impact involved or which is authorized to develop and enforce environmental standards.

(2) Request the comments of:

(i) Appropriate State and local agencies which are authorized to develop and enforce environmental standards;

(ii) Indian tribes, when the effects may be on a reservation; and

AR_0042715

**RULES AND REGULATIONS**

(iii) Any agency which has requested that it receive statements on actions of the kind proposed.

Office of Management and Budget Circular A-95 (Revised), through its system of clearinghouses, provides a means of securing the views of State and local environmental agencies. The clearinghouses may be used, by mutual agreement of the lead agency and the clearinghouse, for securing State and local reviews of the draft environmental impact statements.

(3) Request comments from the applicant, if any.

(4) Request comments from the public, affirmatively soliciting comments from those persons or organizations who may be interested or affected.

(b) An agency may request comments on a final environmental impact statement before the decision is finally made. In any case other agencies or persons may make comments before the final decision unless a different time is provided under § 1506.10

§ 1503.2  Duty to comment.

Federal agencies with jurisdiction by law or special expertise with respect to any environmental impact involved and agencies which are authorized to develop and enforce environmental standards shall comment on statements within their jurisdiction, expertise, or authority. Agencies shall comment within the time period specified for comment in § 1506.10. A Federal agency may reply that it has no comment. If a cooperating agency is satisfied that its views are adequately reflected in the environmental impact statement, it should reply that it has no comment.

§ 1503.3  Specificity of comments.

(a) Comments on an environmental impact statement or on a proposed action shall be as specific as possible and may address either the adequacy of the statement or the merits of the alternatives discussed or both.

(b) When a commenting agency criticizes a lead agency's predictive methodology, the commenting agency should describe the alternative methodology which it prefers and why.

(c) A cooperating agency shall specify in its comments whether it needs additional information to fulfill other applicable environmental reviews or consultation requirements and what information it needs. In particular, it shall specify any additional information it needs to comment adequately on the draft statement's analysis of significant site-specific effects associated with the granting or approving by that cooperating agency of necessary Federal permits, licenses, or entitlements.

(d) When a cooperating agency with jurisdiction by law objects to or expresses reservations about the proposal on grounds of environmental impacts, the agency expressing the objection or reservation shall specify the mitigation measures it considers necessary to allow the agency to grant or approve applicable permit, license, or related requirements or concurrences.

§ 1503.4  Response to comments.

(a) An agency preparing a final environmental impact statement shall assess and consider comments both individually and collectively, and shall respond by one or more of the means listed below, stating its response in the final statement. Possible responses are to:

(1) Modify alternatives including the proposed action.

(2) Develop and evaluate alternatives not previously given serious consideration by the agency.

(3) Supplement, improve, or modify its analyses.

(4) Make factual corrections.

(5) Explain why the comments do not warrant further agency response, citing the sources, authorities, or reasons which support the agency's position and, if appropriate, indicate those circumstances which would trigger agency reappraisal or further response.

(b) All substantive comments received on the draft statement (or summaries thereof where the response has been exceptionally voluminous), should be attached to the final statement whether or not the comment is thought to merit individual discussion by the agency in the text of the statement.

(c) If changes in response to comments are minor and are confined to the responses described in paragraphs (a) (4) and (5) of this section, agencies may write them on errata sheets and attach them to the statement instead of rewriting the draft statement. In such cases only the comments, the responses, and the changes and not the final statement need be circulated (§ 1502.19). The entire document with a new cover sheet shall be filed as the final statement (§ 1506.9).

## PART 1504—PREDECISION REFERRALS TO THE COUNCIL OF PROPOSED FEDERAL ACTIONS DETERMINED TO BE ENVIRONMENTALLY UNSATISFACTORY

Sec.
1504.1  Purpose.
1504.2  Criteria for Referral.
1504.3  Procedure for Referrals and Response.

AUTHORITY: NEPA, the Environmental Quality Improvement Act of 1970, as amended (42 U.S.C. 4371 et seq.), Section 309 of the Clean Air Act, as amended (42 U.S.C. 7609), and Executive Order 11514, Protection and Enhancement of Environmental Quality (March 5, 1970, as amended by Executive Order 11991, May 24, 1977).

§ 1504.1  Purpose.

(a) This part establishes procedures for referring to the Council Federal interagency disagreements concerning proposed major Federal actions that might cause unsatisfactory environmental effects. It provides means for early resolution of such disagreements.

(b) Under section 309 of the Clean Air Act (42 U.S.C. 7609), the Administrator of the Environmental Protection Agency is directed to review and comment publicly on the environmental impacts of Federal activities, including actions for which environmental impact statements are prepared. If after this review the Administrator determines that the matter is "unsatisfactory from the standpoint of public health or welfare or environmental quality," section 309 directs that the matter be referred to the Council (hereafter "environmental referrals").

(c) Under section 102(2)(C) of the Act other Federal agencies may make similar reviews of environmental impact statements, including judgments on the acceptability of anticipated environmental impacts. These reviews must be made available to the President, the Council and the public.

§ 1504.2  Criteria for referral.

Environmental referrals should be made to the Council only after concerted, timely (as early as possible in the process), but unsuccessful attempts to resolve differences with the lead agency. In determining what environmental objections to the matter are appropriate to refer to the Council, an agency should weigh potential adverse environmental impacts, considering:

(a) Possible violation of national environmental standards or policies.

(b) Severity.

(c) Geographical scope.

(d) Duration.

(e) Importance as precedents.

(f) Availability of environmentally preferable alternatives.

§ 1504.3  Procedure for referrals and response.

(a) A Federal agency making the referral to the Council shall:

(1) Advise the lead agency at the earliest possible time that it intends to refer a matter to the Council unless a satisfactory agreement is reached.

(2) Include such advice in the referring agency's comments on the draft environmental impact statement, except when the statement does not

AR_0042716

contain adequate information to permit an assessment of the matter's environmental acceptability.

(3) Identify any essential information that is lacking and request that it be made available at the earliest possible time.

(4) Send copies of such advice to the Council.

(b) The referring agency shall deliver its referral to the Council not later than twenty-five (25) days after the final environmental impact statement has been made available to the Environmental Protection Agency, commenting agencies, and the public. Except when an extension of this period has been granted by the lead agency, the Council will not accept a referral after that date.

(c) The referral shall consist of:

(1) A copy of the letter signed by the head of the referring agency and delivered to the lead agency informing the lead agency of the referral and the reasons for it, and requesting that no action be taken to implement the matter until the Council acts upon the referral. The letter shall include a copy of the statement referred to in (c)(2) below.

(2) A statement supported by factual evidence leading to the conclusion that the matter is unsatisfactory from the standpoint of public health or welfare or environmental quality. The statement shall:

(i) Identify any material facts in controversy and incorporate (by reference if appropriate) agreed upon facts,

(ii) Identify any existing environmental requirements or policies which would be violated by the matter,

(iii) Present the reasons why the referring agency believes the matter is environmentally unsatisfactory,

(iv) Contain a finding by the agency whether the issue raised is of national importance because of the threat to national environmental resources or policies or for some other reason,

(v) Review the steps taken by the referring agency to bring its concerns to the attention of the lead agency at the earliest possible time, and

(vi) Give the referring agency's recommendations as to what mitigation alternative, further study, or other course of action (including abandonment of the matter) are necessary to remedy the situation.

(d) Not later than twenty-five (25) days after the referral to the Council the lead agency may deliver a response to the Council, and the referring agency. If the lead agency requests more time and gives assurance that the matter will not go forward in the interim, the Council may grant an extension. The response shall:

(1) Address fully the issues raised in the referral.

(2) Be supported by evidence.

(3) Give the lead agency's response to the referring agency's recommendations.

(e) Interested persons (including the applicant) may deliver their views in writing to the Council. Views in support of the referral should be delivered not later than the referral. Views in support of the response shall be delivered not later than the response.

(f) Not later than twenty-five (25) days after receipt of both the referral and any response or upon being informed that there will be no response (unless the lead agency agrees to a longer time), the Council may take one or more of the following actions:

(1) Conclude that the process of referral and response has successfully resolved the problem.

(2) Initiate discussions with the agencies with the objective of mediation with referring and lead agencies.

(3) Hold public meetings or hearings to obtain additional views and information.

(4) Determine that the issue is not one of national importance and request the referring and lead agencies to pursue their decision process.

(5) Determine that the issue should be further negotiated by the referring and lead agencies and is not appropriate for Council consideration until one or more heads of agencies report to the Council that the agencies' disagreements are irreconcilable.

(6) Publish its findings and recommendations (including where appropriate a finding that the submitted evidence does not support the position of an agency).

(7) When appropriate, submit the referral and the response together with the Council's recommendation to the President for action.

(g) The Council shall take no longer than 60 days to complete the actions specified in paragraph (f) (2), (3), or (5) of this section.

(h) When the referral involves an action required by statute to be determined on the record after opportunity for agency hearing, the referral shall be conducted in a manner consistent with 5 U.S.C. 557(d) (Administrative Procedures Act).

## PART 1505—NEPA AND AGENCY DECISIONMAKING

Sec.
1505.1  Agency decisionmaking procedures.
1505.2  Record of decision in cases requiring environmental impact statements.
1505.3  Implementing the decision.

AUTHORITY: NEPA, the Environmental Quality Improvement Act of 1970, as amended (42 U.S.C. 4371 et seq.), Section 309 of the Clean Air Act, as amended (42 U.S.C. 7609), and Executive Order 11514, Protection and Enhancement of Environmental Quality (March 5, 1970, as amended by Executive Order 11991, May 24, 1977).

§ 1505.1  Agency decisionmaking procedures.

Agencies shall adopt procedures (§ 1507.3) to ensure that decisions are made in accordance with the policies and purposes of the Act. Such procedures shall include but not be limited to:

(a) Implementing procedures under section 102(2) to achieve the requirements of sections 101 and 102(1).

(b) Designating the major decision points for the agency's principal programs likely to have a significant effect on the human environment and assuring that the NEPA process corresponds with them.

(c) Requiring that relevant environmental documents, comments, and responses be part of the record in formal rulemaking or adjudicatory proceedings.

(d) Requiring that relevant environmental documents, comments, and responses accompany the proposal through existing agency review processes so that agency officials use the statement in making decisions.

(e) Requiring that the alternatives considered by the decisionmaker are encompassed by the range of alternatives discussed in the relevant environmental documents and that the decisionmaker consider the alternatives described in the environmental impact statement. If another decision document accompanies the relevant environmental documents to the decisionmaker, agencies are encouraged to make available to the public before the decision is made any part of that document that relates to the comparison of alternatives.

§ 1505.2  Record of decision in cases requiring environmental impact statements.

At the time of its decision (§ 1506.10) or, if appropriate, its recommendation to Congress, each agency shall prepare a concise public record of decision. The record, which may be integrated into any other record prepared by the agency, including that required by OMB Circular A-95 (Revised), part I, sections 6 (c) and (d), and part II, section 5(b)(4), shall:

(a) State what the decision was.

(b) Identify all alternatives considered by the agency in reaching its decision, specifying the alternative or alternatives which were considered to be environmentally preferable. An agency may discuss preferences among alternatives based on relevant factors including economic and technical considerations and agency statutory missions. An agency shall identify and discuss all such factors including any essential considerations of national policy which were balanced by the agency in making its decision and

AR_0042717

Case 1:24-cv-00089-DMT-CRH    Document 113-19    Filed 10/31/24    Page 22 of 121

state how those considerations entered into its decision.

(c) State whether all practicable means to avoid or minimize environmental harm from the alternative selected have been adopted, and if not, why they were not. A monitoring and enforcement program shall be adopted and summarized where applicable for any mitigation.

§ 1505.3 Implementing the decision.

Agencies may provide for monitoring to assure that their decisions are carried out and should do so in important cases. Mitigation (§ 1505.2(c)) and other conditions established in the environmental impact statement or during its review and committed as part of the decision shall be implemented by the lead agency or other appropriate consenting agency. The lead agency shall:

(a) Include appropriate conditions in grants, permits or other approvals.

(b) Condition funding of actions on mitigation.

(c) Upon request, inform cooperating or commenting agencies on progress in carrying out mitigation measures which they have proposed and which were adopted by the agency making the decision.

(d) Upon request, make available to the public the results of relevant monitoring.

## PART 1506—OTHER REQUIREMENTS OF NEPA

Sec.
1506.1 Limitations on actions during NEPA process.
1506.2 Elimination of duplication with State and local procedures.
1506.3 Adoption.
1506.4 Combining documents.
1506.5 Agency responsibility.
1506.6 Public involvement.
1506.7 Further guidance.
1506.8 Proposals for legislation.
1506.9 Filing requirements.
1506.10 Timing of agency action.
1506.11 Emergencies.
1506.12 Effective date.

AUTHORITY: NEPA, the Environmental Quality Improvement Act of 1970, as amended (42 U.S.C. 4371 et seq.), Section 309 of the Clean Air Act, as amended (42 U.S.C. 7609), and Executive Order 11514, Protection and Enhancement of Environmental Quality (March 5, 1970, as amended by Executive Order 11991, May 24, 1977).

§ 1506.1 Limitations on actions during NEPA process.

(a) Until an agency issues a record of decision as provided in § 1505.2 (except as provided in paragraph (c) of this section), no action concerning the proposal shall be taken which would:

(1) Have an adverse environmental impact; or

(2) Limit the choice of reasonable alternatives.

(b) If any agency is considering an application from a non-Federal entity, and is aware that the applicant is about to take an action within the agency's jurisdiction that would meet either of the criteria in paragraph (a) of this section, then the agency shall promptly notify the applicant that the agency will take appropriate action to insure that the objectives and procedures of NEPA are achieved.

(c) While work on a required program environmental impact statement is in progress and the action is not covered by an existing program statement, agencies shall not undertake in the interim any major Federal action covered by the program which may significantly affect the quality of the human environment unless such action:

(1) Is justified independently of the program;

(2) Is itself accompanied by an adequate environmental impact statement; and

(3) Will not prejudice the ultimate decision on the program. Interim action prejudices the ultimate decision on the program when it tends to determine subsequent development or limit alternatives.

(d) This section does not preclude development by applicants of plans or designs or performance of other work necessary to support an application for Federal, State or local permits or assistance. Nothing in this section shall preclude Rural Electrification Administration approval of minimal expenditures not affecting the environment (e.g. long leadtime equipment and purchase options) made by non-governmental entities seeking loan guarantees from the Administration.

§ 1506.2 Elimination of duplication with State and local procedures.

(a) Agencies authorized by law to co-operate with State agencies of statewide jurisdiction pursuant to section 102(2)(D) of the Act may do so.

(b) Agencies shall cooperate with State and local agencies to the fullest extent possible to reduce duplication between NEPA and State and local requirements, unless the agencies are specifically barred from doing so by some other law. Except for cases covered by paragraph (a) of this section, such cooperation shall to the fullest extent possible include:

(1) Joint planning processes.

(2) Joint environmental research and studies.

(3) Joint public hearings (except where otherwise provided by statute).

(4) Joint environmental assessments.

(c) Agencies shall cooperate with State and local agencies to the fullest extent possible to reduce duplication between NEPA and comparable State and local requirements, unless the agencies are specifically barred from doing so by some other law. Except for cases covered by paragraph (a) of this section, such cooperation shall to the fullest extent possible include joint environmental impact statements. In such cases one or more Federal agencies and one or more State or local agencies shall be joint lead agencies. Where State laws or local ordinances have environmental impact statement requirements in addition to but not in conflict with those in NEPA, Federal agencies shall cooperate in fulfilling these requirements as well as those of Federal laws so that one document will comply with all applicable laws.

(d) To better integrate environmental impact statements into State or local planning processes, statements shall discuss any inconsistency of a proposed action with any approved State or local plan and laws (whether or not federally sanctioned). Where an inconsistency exists, the statement should describe the extent to which the agency would reconcile its proposed action with the plan or law.

§ 1506.3 Adoption.

(a) An agency may adopt a Federal draft or final environmental impact statement or portion thereof provided that the statement or portion thereof meets the standards for an adequate statement under these regulations.

(b) If the actions covered by the original environmental impact statement and the proposed action are substantially the same, the agency adopting another agency's statement is not required to recirculate it except as a final statement. Otherwise the adopting agency shall treat the statement as a draft and recirculate it (except as provided in paragraph (c) of this section).

(c) A cooperating agency may adopt without recirculating the environmental impact statement of a lead agency when, after an independent review of the statement, the cooperating agency concludes that its comments and suggestions have been satisfied.

(d) When an agency adopts a statement which is not final within the agency that prepared it, or when the action it assesses is the subject of a referral under part 1504, or when the statement's adequacy is the subject of a judicial action which is not final, the agency shall so specify.

§ 1506.4 Combining documents.

Any environmental document in compliance with NEPA may be combined with any other agency document to reduce duplication and paperwork.

AR_0042718

**RULES AND REGULATIONS**

§ 1506.5  Agency responsibility.

(a) *Information.* If an agency requires an applicant to submit environmental information for possible use by the agency in preparing an environmental impact statement, then the agency should assist the applicant by outlining the types of information required. The agency shall independently evaluate the information submitted and shall be responsible for its accuracy. If the agency chooses to use the information submitted by the applicant in the environmental impact statement, either directly or by reference, then the names of the persons responsible for the independent evaluation shall be included in the list of preparers (§ 1502.17). It is the intent of this subparagraph that acceptable work not be redone, but that it be verified by the agency.

(b) *Environmental assessments.* If an agency permits an applicant to prepare an environmental assessment, the agency, besides fulfilling the requirements of paragraph (a) of this section, shall make its own evaluation of the environmental issues and take responsibility for the scope and content of the environmental assessment.

(c) *Environmental impact statements.* Except as provided in §§ 1506.2 and 1506.3 any environmental impact statement prepared pursuant to the requirements of NEPA shall be prepared directly by or by a contractor selected by the lead agency or where appropriate under § 1501.6(b), a cooperating agency. It is the intent of these regulations that the contractor be chosen solely by the lead agency, or by the lead agency in cooperation with cooperating agencies, or where appropriate by a cooperating agency to avoid any conflict of interest. Contractors shall execute a disclosure statement prepared by the lead agency, or where appropriate the cooperating agency, specifying that they have no financial or other interest in the outcome of the project. If the document is prepared by contract, the responsible Federal official shall furnish guidance and participate in the preparation and shall independently evaluate the statement prior to its approval and take responsibility for its scope and contents. Nothing in this section is intended to prohibit any agency from requesting any person to submit information to it or to prohibit any person from submitting information to any agency.

§ 1506.6  Public involvement.

Agencies shall: (a) Make diligent efforts to involve the public in preparing and implementing their NEPA procedures.

(b) Provide public notice of NEPA-related hearings, public meetings, and the availability of environmental docu-

ments so as to inform those persons and agencies who may be interested or affected.

(1) In all cases the agency shall mail notice to those who have requested it on an individual action.

(2) In the case of an action with effects of national concern notice shall include publication in the FEDERAL REGISTER and notice by mail to national organizations reasonably expected to be interested in the matter and may include listing in the *102 Monitor.* An agency engaged in rulemaking may provide notice by mail to national organizations who have requested that notice regularly be provided. Agencies shall maintain a list of such organizations.

(3) In the case of an action with effects primarily of local concern the notice may include:

(i) Notice to State and areawide clearinghouses pursuant to OMB Circular A-95 (Revised).

(ii) Notice to Indian tribes when effects may occur on reservations.

(iii) Following the affected State's public notice procedures for comparable actions.

(iv) Publication in local newspapers (in papers of general circulation rather than legal papers).

(v) Notice through other local media.

(vi) Notice to potentially interested community organizations including small business associations.

(vii) Publication in newsletters that may be expected to reach potentially interested persons.

(viii) Direct mailing to owners and occupants of nearby or affected property.

(ix) Posting of notice on and off site in the area where the action is to be located.

(c) Hold or sponsor public hearings or public meetings whenever appropriate or in accordance with statutory requirements applicable to the agency. Criteria shall include whether there is:

(1) Substantial environmental controversy concerning the proposed action or substantial interest in holding the hearing.

(2) A request for a hearing by another agency with jurisdiction over the action supported by reasons why a hearing will be helpful. If a draft environmental impact statement is to be considered at a public hearing, the agency should make the statement available to the public at least 15 days in advance unless the purpose of the hearing is to provide information for the draft environmental impact statement).

(d) Solicit appropriate information from the public.

(e) Explain in its procedures where interested persons can get information or status reports on environmental

impact statements and other elements of the NEPA process.

(f) make environmental impact statements, the comments received, and any underlying documents available to the public pursuant to the provisions of the Freedom of Information Act (5 U.S.C. 552), without regard to the exclusion for interagency memoranda where such memoranda transmit comments of Federal agencies on the environmental impact of the proposed action. Materials to be made available to the public shall be provided to the public without charge to the extent practicable, or at a fee which is not more than the actual costs of reproducing copies required to be sent to other Federal agencies, including the Council.

§ 1506.7  Further guidance.

The Council may provide further guidance concerning NEPA and its procedures including:

(a) A handbook which the Council may supplement from time to time, which shall in plain language provide guidance and instructions concerning the application of NEPA and these regulations.

(b) Publication of the Council's Memoranda to Heads of Agencies.

(c) In conjunction with the Environmental Protection Agency and the publication of the 102 Monitor, notice of:

(1) Research activities;

(2) Meetings and conferences related to NEPA; and

(3) Successful and innovative procedures used by agencies to implement NEPA.

§ 1506.8  Proposals for legislation.

(a) The NEPA process for proposals for legislation (§ 1508.17) significantly affecting the quality of the human environment shall be integrated with the legislative process of the Congress. A legislative environmental impact statement is the detailed statement required by law to be included in a recommendation or report on a legislative proposal to Congress. A legislative environmental impact statement shall be considered part of the formal transmittal of a legislative proposal to Congress; however, it may be transmitted to Congress up to 30 days later in order to allow time for completion of an accurate statement which can serve as the basis for public and Congressional debate. The statement must be available in time for Congressional hearings and deliberations.

(b) Preparation of a legislative environmental impact statement shall conform to the requirements of these regulations except as follows:

(1) There need not be a scoping process.

AR_0042719

(2) The legislative statement shall be prepared in the same manner as a draft statement, but shall be considered the "detailed statement" required by statute; *Provided*, That when any of the following conditions exist both the draft and final environmental impact statement on the legislative proposal shall be prepared and circulated as provided by §§ 1503.1 and 1506.10.

(i) A Congressional Committee with jurisdiction over the proposal has a rule requiring both draft and final environmental impact statements.

(ii) The proposal results from a study process required by statute (such as those required by the Wild and Scenic Rivers Act (16 U.S.C. 1271 et seq.) and the Wilderness Act (16 U.S.C. 1131 et seq.)

(iii) Legislative approval is sought for Federal or federally assisted construction or other projects which the agency recommends be located at specific geographic locations. For proposals requiring an environmental impact statement for the acquisition of space by the General Services Administration a draft statement shall accompany the Prospectus or the 11(b) Report of Building Project Surveys to the Congress, and a final statement shall be completed before site acquisition.

(iv) The agency decides to prepare draft and final statements.

(c) Comments on the legislative statement shall be given to the lead agency which shall forward them along with its own responses to the Congressional committees with jurisdiction.

### § 1506.9 Filing requirements.

Environmental impact statements together with comments and responses shall be filed with the Environmental Protection Agency, attention Office of Federal Activities (A-104), 401 M Street SW., Washington, D.C. 20460. Statements shall be filed with EPA no earlier than they are also transmitted to commenting agencies and made available to the public. EPA shall deliver one copy of each statement to the Council, which shall satisfy the requirement of availability to the President. EPA may issue guidelines to agencies to implement its responsibilities under this section and § 1506.10 below.

### § 1506.10 Timing of agency action.

(a) The Environmental Protection Agency shall publish a notice in the FEDERAL REGISTER each week of the environmental impact statements filed during the preceding week. The minimum time periods set forth in this section section shall be calculated from the date of publication of this notice.

(b) No decision on the proposed action shall be made or recorded under § 1505.2 by a Federal agency until the later of the following dates:

(1) Ninety (90) days after publication of the notice described above in paragraph (a) of this section for a draft environmental impact statement.

(2) Thirty (30) days after publication of the notice described above in paragraph (a) of this section for a final environmental impact statement. An exception to the rules on timing may be made in the case of an agency decision which is subject to a formal internal appeal. Some agencies have a formally established appeal process which allows other agencies or the public to take appeals on a decision and make their views known, after publication of the final environmental impact statement. In such cases, where a real opportunity exists to alter the decision, the decision may be made and recorded at the same time the environmental impact statement is published. This means that the period for appeal of the decision and the 30-day period prescribed in paragraph (b)(2) of this section may run concurrently. In such cases the environmental impact statement shall explain the timing and the public's right of appeal. An agency engaged in rulemaking under the Administrative Procedures Act or other statute for the purpose of protecting the public health or safety, may waive the time period in paragraph (b)(2) of this section and publish a decision on the final rule simultaneously with publication of the notice of the availability of the final environmental impact statement as described in paragraph (a) of this section.

(c) If the final environmental impact statement is filed within ninety (90) days after a draft environmental impact statement is filed with the Environmental Protection Agency, the minimum thirty (30) day period and the minimum ninety (90) day period may run concurrently. However, subject to paragraph (d) of this section agencies may allow not less than 45 days for comments on draft statements.

(d) The lead agency may extend prescribed periods. The Environmental Protection Agency may upon a showing by the lead agency of compelling reasons of national policy reduce the prescribed periods and may upon a showing by any other Federal agency of compelling reasons of national policy also extend prescribed periods, but only after consultation with the lead agency. (Also see § 1507.3(d).) Failure to file timely comments shall not be a sufficient reason for extending a period. If the lead agency does not concur with the extension of time, EPA may not extend it for more than 30 days. When the Environmental Protection Agency reduces or extends any period of time it shall notify the Council.

### § 1506.11 Emergencies.

Where emergency circumstances make it necessary to take an action with significant environmental impact without observing the provisions of these regulations, the Federal agency taking the action should consult with the Council about alternative arrangements. Agencies and the Council will limit such arrangements to actions necessary to control the immediate impacts of the emergency. Other actions remain subject to NEPA review.

### § 1506.12 Effective date.

The effective date of these regulations is July 30, 1979, except that for agencies that administer programs that qualify under sec. 102(2)(D) of the Act or under sec. 104(h) of the Housing and Community Development Act of 1974 an additional four months shall be allowed for the State or local agencies to adopt their implementing procedures.

(a) These regulations shall apply to the fullest extent practicable to ongoing activities and environmental documents begun before the effective date. These regulations do not apply to an environmental impact statement or supplement if the draft statement was filed before the effective date of these regulations. No completed environmental documents need be redone by reasons of these regulations. Until these regulations are applicable, the Council's guidelines published in the FEDERAL REGISTER of August 1, 1973, shall continue to be applicable. In cases where these regulations are applicable the guidelines are superseded. However, nothing shall prevent an agency from proceeding under these regulations at an earlier time.

(b) NEPA shall continue to be applicable to actions begun before January 1, 1970, to the fullest extent possible.

## PART 1507—AGENCY COMPLIANCE

Sec.
1507.1   Compliance.
1507.2   Agency Capability to Comply.
1507.3   Agency Procedures.

AUTHORITY: NEPA, the Environmental Quality Improvement Act of 1970, as amended (42 U.S.C. 4371 et seq.), Section 309 of the Clean Air Act, as amended (42 U.S.C. 7609), and Executive Order 11514, Protection and Enhancement of Environmental Quality (March 5, 1970, as amended by Executive Order 11991, May 24, 1977).

### § 1507.1 Compliance.

All agencies of the Federal Government shall comply with these regulations. It is the intent of these regulations to allow each agency flexibility in adapting its implementing proce-

AR_0042720

dures authorized by § 1507.3 to the requirements of other applicable laws.

### § 1507.2 Agency capability to comply.

Each agency shall be capable (in terms of personnel and other resources) of complying with the requirements enumerated below. Such compliance may include use of other's resources, but the using agency shall itself have sufficient capability to evaluate what others do for it. Agencies shall:

(a) Fulfill the requirements of Sec. 102(2)(A) of the Act to utilize a systematic, interdisciplinary approach which will insure the integrated use of the natural and social sciences and the environmental design arts in planning and in decisionmaking which may have an impact on the human environment. Agencies shall designate a person to be responsible for overall review of agency NEPA compliance.

(b) Identify methods and procedures required by Sec. 102(2)(B) to insure that presently unquantified environmental amenities and values may be given appropriate consideration.

(c) Prepare adequate environmental impact statements pursuant to Sec. 102(2)(C) and comment on statements in the areas where the agency has jurisdiction by law or special expertise or is authorized to develop and enforce environmental standards.

(d) Study, develop, and describe alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources. This requirement of Sec. 102(2)(E) extends to all such proposals, not just the more limited scope of Sec. 102(2)(C)(iii) where the discussion of alternatives is confined to impact statements.

(e) Comply with the requirements of Sec. 102(2)(H) that the agency initiate and utilize ecological information in the planning and development of resource-oriented projects.

(f) Fulfill the requirements of sections 102(2)(F), 102(2)(G), and 102(2)(I), of the Act and of Executive Order 11514, Protection and Enhancement of Environmental Quality, Sec. 2.

### § 1507.3 Agency procedures.

(a) Not later than eight months after publication of these regulations as finally adopted in the FEDERAL REGISTER, or five months after the establishment of an agency, whichever shall come later, each agency shall as necessary adopt procedures to supplement these regulations. When the agency is a department, major subunits are encouraged (with the consent of the department) to adopt their own procedures. Such procedures shall not paraphrase these regulations. They shall

confine themselves to implementing procedures. Each agency shall consult with the Council while developing its procedures and before publishing them in the FEDERAL REGISTER for comment. Agencies with similar programs should consult with each other and the Council to coordinate their procedures, especially for programs requesting similar information from applicants. The procedures shall be adopted only after an opportunity for public review and after review by the Council for conformity with the Act and these regulations. The Council shall complete its review within 30 days. Once in effect they shall be filed with the Council and made readily available to the public. Agencies are encouraged to publish explanatory guidance for these regulations and their own procedures. Agencies shall continue to review their policies and procedures and in consultation with the Council to revise them as necessary to ensure full compliance with the purposes and provisions of the Act.

(b) Agency procedures shall comply with these regulations except where compliance would be inconsistent with statutory requirements and shall include:

(1) Those procedures required by §§ 1501.2(d), 1502.9(c)(3), 1505.1, 1506.6(e), and 1508.4.

(2) Specific criteria for and identification of those typical classes of action:

(i) Which normally do require environmental impact statements.

(ii) Which normally do not require either an environmental impact statement or an environmental assessment (categorical exclusions (§ 1508.4)).

(iii) Which normally require environmental assessments but not necessarily environmental impact statements.

(c) Agency procedures may include specific criteria for providing limited exceptions to the provisions of these regulations for classified proposals. They are proposed actions which are specifically authorized under criteria established by an Executive Order or statute to be kept secret in the interest of national defense or foreign policy and are in fact properly classified pursuant to such Executive Order or statute. Environmental assessments and environmental impact statements which address classified proposals may be safeguarded and restricted from public dissemination in accordance with agencies' own regulations applicable to classified information. These documents may be organized so that classified portions can be included as annexes, in order that the unclassified portions can be made available to the public.

(d) Agency procedures may provide for periods of time other than those presented in § 1506.10 when necessary to comply with other specific statutory requirements.

(e) Agency procedures may provide that where there is a lengthy period between the agency's decision to prepare an environmental impact statement and the time of actual preparation, the notice of intent required by § 1501.7 may be published at a reasonable time in advance of preparation of the draft statement.

---

## PART 1508—TERMINOLOGY AND INDEX

Sec.
1508.1  Terminology.
1508.2  Act.
1508.3  Affecting.
1508.4  Categorical Exclusion.
1508.5  Cooperating Agency.
1508.6  Council.
1508.7  Cumulative Impact.
1508.8  Effects.
1508.9  Environmental Assessment.
1508.10  Environmental Document.
1508.11  Environmental Impact Statement.
1508.12  Federal Agency.
1508.13  Finding of No Significant Impact.
1508.14  Human Environment.
1508.15  Jurisdiction By Law.
1508.16  Lead Agency.
1508.17  Legislation.
1508.18  Major Federal Action.
1508.19  Matter.
1508.20  Mitigation.
1508.21  NEPA Process.
1508.22  Notice of Intent.
1508.23  Proposal.
1508.24  Referring Agency.
1508.25  Scope.
1508.26  Special Expertise.
1508.27  Significantly.
1508.28  Tiering.

AUTHORITY: NEPA, the Environmental Quality Improvement Act of 1970, as amended (42 U.S.C. 4371 et seq.), Section 309 of the Clean Air Act, as amended (42 U.S.C. 7609), and Executive Order 11514, Protection and Enhancement of Environmental Quality (March 5, 1970, as amended by Executive Order 11991, May 24, 1977).

### § 1508.1 Terminology.

The terminology of this part shall be uniform throughout the Federal Government.

### § 1508.2 Act.

"Act" means the National Environmental Policy Act, as amended (42 U.S.C. 4321, et seq.) which is also referred to as "NEPA."

### § 1508.3 Affecting.

"Affecting" means will or may have an effect on.

### § 1508.4 Categorical exclusion.

"Categorical Exclusion" means a category of actions which do not individually or cumulatively have a significant effect on the human environment

AR_0042721

**RULES AND REGULATIONS**

and which have been found to have no such effect in procedures adopted by a Federal agency in implementation of these regulations (§1507.3) and for which, therefore, neither an environmental assessment nor an environmental impact statement is required. An agency may decide in its procedures or otherwise, to prepare environmental assessments for the reasons stated in §1508.9 even though it is not required to do so. Any procedures under this section shall provide for extraordinary circumstances in which a normally excluded action may have a significant environmental effect.

§1508.5   Cooperating agency.

"Cooperating Agency" means any Federal agency other than a lead agency which has jurisdiction by law or special expertise with respect to any environmental impact involved in a proposal (or a reasonable alternative) for legislation or other major Federal action significantly affecting the quality of the human environment. The selection and responsibilities of a cooperating agency are described in §1501.6. A State or local agency of similar qualifications or, when the effects are on a reservation, an Indian Tribe, may by agreement with the lead agency become a cooperating agency.

§1508.6   Council.

"Council" means the Council on Environmental Quality established by Title II of the Act.

§1508.7   Cumulative impact.

"Cumulative impact" is the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions. Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time.

§1508.8   Effects.

"Effects" include:
(a) Direct effects, which are caused by the action and occur at the same time and place.
(b) Indirect effects, which are caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable. Indirect effects may include growth inducing effects and other effects related to induced changes in the pattern of land use, population density or growth rate, and related effects on air and water and other natural systems, including ecosystems.

Effects and impacts as used in these regulations are synonymous. Effects includes ecological (such as the effects on natural resources and on the components, structures, and functioning of affected ecosystems), aesthetic, historic, cultural, economic, social, or health, whether direct, indirect, or cumulative. Effects may also include those resulting from actions which may have both beneficial and detrimental effects, even if on balance the agency believes that the effect will be beneficial.

§1508.9   Environmental assessment.

"Environmental Assessment":
(a) Means a concise public document for which a Federal agency is responsible that serves to:
(1) Briefly provide sufficient evidence and analysis for determining whether to prepare an environmental impact statement or a finding of no significant impact.
(2) Aid an agency's compliance with the Act when no environmental impact statement is necessary.
(3) Facilitate preparation of a statement when one is necessary.
(b) Shall include brief discussions of the need for the proposal, of alternatives as required by sec. 102(2)(E), of the environmental impacts of the proposed action and alternatives, and a listing of agencies and persons consulted.

§1508.10   Environmental document.

"Environmental document" includes the documents specified in §1508.9 (environmental assessment), §1508.11 (environmental impact statement), §1508.13 (finding of no significant impact), and §1508.22 (notice of intent).

§1508.11   Environmental impact statement.

"Environmental Impact Statement" means a detailed written statement as required by Sec. 102(2)(C) of the Act.

§1508.12   Federal agency.

"Federal agency" means all agencies of the Federal Government. It does not mean the Congress, the Judiciary, or the President, including the performance of staff functions for the President in his Executive Office. It also includes for purposes of these regulations States and units of general local government and Indian tribes assuming NEPA responsibilities under section 104(h) of the Housing and Community Development Act of 1974.

§1508.13   Finding of no significant impact.

"Finding of No Significant Impact" means a document by a Federal agency briefly presenting the reasons why an action, not otherwise excluded (§1508.4), will not have a significant effect on the human environment and for which an environmental impact statement therefore will not be prepared. It shall include the environmental assessment or a summary of it and shall note any other environmental documents related to it (§1501.7(a)(5)). If the assessment is included, the finding need not repeat any of the discussion in the assessment but may incorporate it by reference.

§1508.14   Human Environment.

"Human Environment" shall be interpreted comprehensively to include the natural and physical environment and the relationship of people with that environment. (See the definition of "effects" (§1508.8).) This means that economic or social effects are not intended by themselves to require preparation of an environmental impact statement. When an environmental impact statement is prepared and economic or social and natural or physical environmental effects are interrelated, then the environmental impact statement will discuss all of these effects on the human environment.

§1508.15   Jurisdiction By Law.

"Jurisdiction by law" means agency authority to approve, veto, or finance all or part of the proposal.

§1508.16   Lead agency.

"Lead Agency" means the agency or agencies preparing or having taken primary responsibility for preparing the environmental impact statement.

§1508.17   Legislation.

"Legislation" includes a bill or legislative proposal to Congress developed by or with the significant cooperation and support of a Federal agency, but does not include requests for appropriations. The test for significant cooperation is whether the proposal is in fact predominantly that of the agency rather than another source. Drafting does not by itself constitute significant cooperation. Proposals for legislation include requests for ratification of treaties. Only the agency which has primary responsibility for the subject matter involved will prepare a legislative environmental impact statement.

§1508.18   Major Federal action.

"Major Federal action" includes actions with effects that may be major and which are potentially subject to Federal control and responsibility. Major reinforces but does not have a meaning independent of significantly (§1508.27). Actions include the circumstance where the responsible officials fail to act and that failure to act is reviewable by courts or administrative tribunals under the Administrative Procedure Act or other applicable law as agency action.

AR_0042722

(a) Actions include new and continuing activities, including projects and programs entirely or partly financed, assisted, conducted, regulated, or approved by federal agencies; new or revised agency rules, regulations, plans, policies, or procedures; and legislative proposals (§§ 1506.8, 1508.17). Actions do not include funding assistance solely in the form of general revenue sharing funds, distributed under the State and Local Fiscal Assistance Act of 1972, 31 U.S.C. 1221 et seq., with no Federal agency control over the subsequent use of such funds. Actions do not include bringing judicial or administrative civil or criminal enforcement actions.

(b) Federal actions tend to fall within one of the following categories:

(1) Adoption of official policy, such as rules, regulations, and interpretations adopted pursuant to the Administrative Procedure Act, 5 U.S.C. 551 et seq.; treaties and international conventions or agreements; formal documents establishing an agency's policies which will result in or substantially alter agency programs.

(2) Adoption of formal plans, such as official documents prepared or approved by federal agencies which guide or prescribe alternative uses of federal resources, upon which future agency actions will be based.

(3) Adoption of programs, such as a group of concerted actions to implement a specific policy or plan; systematic and connected agency decisions allocating agency resources to implement a specific statutory program or executive directive.

(4) Approval of specific projects, such as construction or management activities located in a defined geographic area. Projects include actions approved by permit or other regulatory decision as well as federal and federally assisted activities.

§ 1508.19  Matter.

"Matter" includes for purposes of Part 1504:

(a) With respect to the Environmental Protection Agency, any proposed legislation, project, action or regulation as those terms are used in Section 309(a) of the Clean Air Act (42 U.S.C. 7609).

(b) With respect to all other agencies, any proposed major federal action to which section 102(2)(C) of NEPA applies.

§ 1508.20  Mitigation.

"Mitigation" includes:

(a) Avoiding the impact altogether by not taking a certain action or parts of an action.

(b) Minimizing impacts by limiting the degree or magnitude of the action and its implementation.

(c) Rectifying the impact by repairing, rehabilitating, or restoring the affected environment.

(d) Reducing or eliminating the impact over time by preservation and maintenance operations during the life of the action.

(e) Compensating for the impact by replacing or providing substitute resources or environments.

§ 1508.21  NEPA process.

"NEPA process" means all measures necessary for compliance with the requirements of Section 2 and Title I of NEPA.

§ 1508.22  Notice of intent.

"Notice of Intent" means a notice that an environmental impact statement will be prepared and considered. The notice shall briefly:

(a) Describe the proposed action and possible alternatives.

(b) Describe the agency's proposed scoping process including whether, when, and where any scoping meeting will be held.

(c) State the name and address of a person within the agency who can answer questions about the proposed action and the environmental impact statement.

§ 1508.23  Proposal.

"Proposal" exists at that stage in the development of an action when an agency subject to the Act has a goal and is actively preparing to make a decision on one or more alternative means of accomplishing that goal and the effects can be meaningfully evaluated. Preparation of an environmental impact statement on a proposal should be timed (§ 1502.5) so that the final statement may be completed in time for the statement to be included in any recommendation or report on the proposal. A proposal may exist in fact as well as by agency declaration that one exists.

§ 1508.24  Referring agency.

"Referring agency" means the federal agency which has referred any matter to the Council after a determination that the matter is unsatisfactory from the standpoint of public health or welfare or environmental quality.

§ 1508.25  Scope.

Scope consists of the range of actions, alternatives, and impacts to be considered in an environmental impact statement. The scope of an individual statement may depend on its relationships to other statements (§§1502.20 and 1508.28). To determine the scope of environmental impact statements, agencies shall consider 3 types of actions, 3 types of alternatives, and 3 types of impacts. They include:

(a) Actions (other than unconnected single actions) which may be:

(1) Connected actions, which means that they are closely related and therefore should be discussed in the same impact statement. Actions are connected if they:

(i) Automatically trigger other actions which may require environmental impact statements.

(ii) Cannot or will not proceed unless other actions are taken previously or simultaneously.

(iii) Are interdependent parts of a larger action and depend on the larger action for their justification.

(2) Cumulative actions, which when viewed with other proposed actions have cumulatively significant impacts and should therefore be discussed in the same impact statement.

(3) Similar actions, which when viewed with other reasonably foreseeable or proposed agency actions, have similarities that provide a basis for evaluating their environmental consequencies together, such as common timing or geography. An agency may wish to analyze these actions in the same impact statement. It should do so when the best way to assess adequately the combined impacts of similar actions or reasonable alternatives to such actions is to treat them in a single impact statement.

(b) Alternatives, which include: (1) No action alternative. (2) Other reasonable courses of actions. (3) Mitigation measures (not in the proposed action).

(c) Impacts, which may be: (1) Direct. (2) Indirect. (3) Cumulative.

§ 1508.26  Special expertise.

"Special expertise" means statutory responsibility, agency mission, or related program experience.

§ 1508.27  Significantly.

"Significantly" as used in NEPA requires considerations of both context and intensity:

(a) *Context.* This means that the significance of an action must be analyzed in several contexts such as society as a whole (human, national), the affected region, the affected interests, and the locality. Significant varies with the setting of the proposed action. For instance, in the case of a site-specific action, significance would usually depend upon the effects in the locale rather than in the world as a whole. Both short- and long-term effects are relevant.

(b) *Intensity.* This refers to the severity of impact. Responsible officials must bear in mind that more than one agency may make decisions about partial aspects of a major action. The following should be considered in evaluating intensity:

(1) Impacts that may be both beneficial and adverse. A significant effect

AR_0042723

56006

**RULES AND REGULATIONS**

may exist even if the Federal agency believes that on balance the effect will be beneficial.

(2) The degree to which the proposed action affects public health or safety.

(3) Unique characteristics of the geographic area such as proximity to historic or cultural resources, park lands, prime farmlands, wetlands, wild and scenic rivers, or ecologically critical areas.

(4) The degree to which the effects on the quality of the human environment are likely to be highly controversial.

(5) The degree to which the possible effects on the human environment are highly uncertain or involve unique or unknown risks.

(6) The degree to which the action may establish a precedent for future actions with significant effects or represents a decision in principle about a future consideration.

(7) Whether the action is related to other actions with individually insignificant but cumulatively significant impacts. Significance exists if it is reasonable to anticipate a cumulatively significant impact on the environment. Significance cannot be avoided by terming an action temporary or by breaking it down into small component parts.

(8) The degree to which the action may adversely affect districts, sites, highways, structures, or objects listed in or eligible for listing in the National Register of Historic Places or may cause loss or destruction of significant scientific, cultural, or historical resources.

(9) The degree to which the action may adversely affect an endangered or threatened species or its habitat that has been determined to be critical under the Endangered Species Act of 1973.

(10) Whether the action threatens a violation of Federal, State, or local law or requirements imposed for the protection of the environment.

§ 1508.28 Tiering.

"Tiering" refers to the coverage of general matters in broader environmental impact statements (such as national program or policy statements) with subsequent narrower statements or environmental analyses (such as regional or basinwide program statements or ultimately site-specific statements) incorporating by reference the general discussions and concentrating solely on the issues specific to the statement subsequently prepared. Tiering is appropriate when the sequence of statements or analyses is:

(a) From a program, plan, or policy environmental impact statement to a program, plan, or policy statement or analysis of lesser scope or to a site-specific statement or analysis.

(b) From an environmental impact statement on a specific action at an early stage (such as need and site selection) to a supplement (which is preferred) or a subsequent statement or analysis at a later stage (such as environmental mitigation). Tiering in such cases is appropriate when it helps the lead agency to focus on the issues which are ripe for decision and exclude from consideration issues already decided or not yet ripe.

INDEX

| | |
|---|---|
| Act | 1508.2 |
| Action | 1508.18, 1506.25 |
| Action-forcing | 1500.1, 1502.1 |
| Adoption | 1500.4(n), 1500.5(h), 1506.3 |
| Affected Environment | 1502.10(f), 1502.15 |
| Affecting | 1502.3, 1508.3 |
| Agency Authority | 1500.6 |
| Agency Capability | 1501.2(a), 1507.2 |
| Agency Compliance | 1507.1 |
| Agency Procedures | 1505.1, 1507.3 |
| Agency Responsibility | 1506.5 |
| Alternatives | 1501.2(c), 1502.2, 1502.10(e), 1502.14, 1505.1(e), 1505.2, 1507.2(d), 1508.25(b) |
| Appendices | 1502.10(c), 1502.18, 1502.24 |
| Applicant | 1501.2(d)(1), 1501.4(b), 1501.8(a), 1502.19(b), 1503.1(a)(3), 1504.3(c), 1506.1(d), 1506.5(a), 1506.5(b) |
| Apply NEPA Early in the Process. | 1501.2 |
| Categorical Exclusion | 1500.4(p), 1500.5(k), 1501.4(a), 1507.3(b), 1508.4 |
| Circulating of Environmental Impact Statement. | 1502.19, 1506.3 |
| Classified Information | 1507.3(c) |
| Clean Air Act | 1504.1, 1508.19(a) |
| Combining Documents | 1500.4(o), 1500.5(i), 1506.4 |
| Commenting | 1502.19, 1503.1, 1503.2, 1503.3, 1503.4, 1506.6(f) |
| Consultation Requirement. | 1500.4(k), 1500.5(g), 1501.7(a)(6), 1502.25 |
| Context | 1508.27(a) |
| Cooperating Agency | 1500.5(b), 1501.1(b), 1501.5(c), 1501.5(f), 1501.6, 1503.1(a)(1), 1503.2, 1503.3, 1506.3(c), 1506.5(a), 1508.5 |
| Cost-Benefit | 1502.23 |
| Council on Environmental Quality. | 1500.3, 1501.5(e), 1501.5(f), 1501.6(c), 1502.9(c)(4), 1504.1, 1504.2, 1504.3, 1506.6(f), 1506.9, 1506.10(e), 1506.11, 1507.3, 1508.6, 1508.24 |
| Cover Sheet | 1502.10(a), 1502.11 |
| Cumulative Impact | 1508.7, 1508.25(a), 1508.25(c) |
| Decisionmaking | 1505.1, 1506.1 |
| Decision points | 1505.1(b) |
| Dependent | 1508.25(a) |
| Draft Environmental Impact Statement. | 1502.9(a) |
| Early Application of NEPA. | 1501.2 |
| Economic Effects | 1508.8 |
| Effective Date | 1506.12 |
| Effects | 1502.16, 1508.8 |
| Emergencies | 1506.11 |
| Endangered Species Act | 1502.25, 1508.27(b)(9) |
| Energy | 1502.16(e) |
| Environmental Assessment. | 1501.3, 1501.4(b), 1501.4(c), 1501.7(b)(3), 1506.2(b)(4), 1506.5(b), 1508.4, 1508.9, 1508.10, 1508.13 |
| Environmental Consequences. | 1502.10(g), 1502.16 |
| Environmental Consultation Requirements. | 1500.4(k), 1500.5(g), 1501.7(a)(6), 1502.25, 1503.3(c) |
| Environmental Documents. | 1508.10 |
| Environmental Impact Statement. | 1500.4, 1501.4(c), 1501.7, 1501.3, 1502.1, 1502.2, 1502.3, 1502.4, 1502.5, 1502.6, 1502.7, 1502.8, 1502.9, 1502.10, 1502.11, 1502.12, 1502.13, 1502.14, 1502.15, 1502.16, 1502.17, 1502.18, 1502.19, 1502.20, 1502.21, 1502.22, 1502.23, 1502.24, 1502.25, 1506.2(b)(4), 1506.3, 1506.8, 1508.11 |
| Environmental Protection Agency. | 1502.11(f), 1504.1, 1504.3, 1506.10, 1508.19(a) |
| Environmental Review Requirements. | 1500.4(k), 1500.5(g), 1501.7(a)(6), 1502.25, 1503.3(c) |
| Expediter | 1503.8(b)(2) |
| Federal Agency | 1508.12 |
| Filing | 1506.9 |
| Final Environmental Impact Statement. | 1502.9(b), 1503.1, 1503.4(b) |
| Finding of No Significant Impact. | 1500.3, 1500.4(q), 1500.5(l), 1501.4(e), 1508.13 |
| Fish and Wildlife Coordination Act. | 1502.25 |
| Format for Environmental Impact Statement. | 1502.10 |
| Freedom of Information Act. | 1506.6(f) |
| Further Guidance | 1506.7 |
| Generic | 1502.4(c)(2) |
| General Services Administration. | 1506.8(b)(5) |
| Geographic | 1502.4(c)(1) |
| Graphics | 1502.8 |
| Handbook | 1506.7(a) |
| Housing and Community Development Act. | 1506.12, 1508.12 |
| Human Environment | 1502.3, 1502.22, 1508.14 |
| Impacts | 1508.8, 1508.25(c) |
| Implementing the Decision. | 1505.3 |
| Incomplete or Unavailable Information. | 1502.22 |
| Incorporation by Reference. | 1500.4(j), 1502.21 |
| Index | 1502.10(j) |
| Indian Tribes | 1501.2(d)(2), 1501.7(a)(1), 1502.15(c), 1503.1(a)(2)(ii), 1506.6(b)(3)(ii), 1508.5, 1508.12 |
| Intensity | 1508.27(b) |
| Interdisciplinary Preparation. | 1502.6, 1502.17 |
| Interim Actions | 1506.1 |
| Joint Lead Agency | 1501.5(b), 1506.2 |
| Judicial Review | 1500.3 |
| Jurisdiction by Law | 1508.15 |
| Lead Agency | 1500.5(c), 1501.1(c), 1501.5, 1501.6, 1501.7, 1501.8, 1504.3, 1506.2(b)(4), 1500.8(a), 1508.16(c), 1508.16 |
| Legislation | 1500.5(j), 1502.3, 1506.8, 1508.17, 1508.18(a) |
| Limitation on Action During NEPA Process. | 1506.1 |
| List of Preparers | 1502.10(h), 1502.17 |
| Local or State | 1500.4(n), 1500.5(h), 1501.2(d)(2), 1501.5(b), 1501.5(d), 1501.7(a)(1), 1501.8(e), 1502.16(c), 1503.1(a)(2), 1506.2(b), 1506.6(b)(3), 1508.5, 1508.12, 1508.18 |
| Major Federal Action | 1502.3, 1508.18 |
| Mandate | 1500.3 |
| Matter | 1504.1, 1504.2, 1504.3, 1508.19 |

AR_0042724

## INDEX—Continued

| | |
|---|---|
| Methodology | 1502.24 |
| Mitigation | 1502.14(h), 1502.16(h), 1503.3(d), 1505.2(c), 1505.3, 1508.20 |
| Monitoring | 1505.2(c), 1505.3 |
| National Historic Preservation Act. | 1502.25 |
| National Register of Historical Places. | 1508.27(b)(8) |
| Natural or Depletable Resource Requirements. | 1502.16(f) |
| Need for Action | 1502.10(d), 1502.13 |
| NEPA Process | 1508.21 |
| Non-Federal Sponsor | 1501.2(d) |
| Notice of Intent | 1501.7, 1507.3(e), 1508.22 |
| OMB Circular A-95 | 1503.1(a)(2)(iii), 1505.2, 1506.6(b)(3)(i) |
| 102 Monitor | 1506.6(b)(2), 1506.7(c) |
| Ongoing Activities | 1506.12 |
| Page Limits | 1500.4(a), 1501.7(b), 1502.7 |
| Planning | 1500.5(a), 1501.2(b), 1502.4(a), 1508.18 |
| Policy | 1500.2, 1502.4(b), 1508.18(a) |
| Program Environmental Impact Statement. | 1500.4(i), 1502.4, 1502.20, 1508.18 |
| Programs | 1502.4, 1508.18(b) |
| Projects | 1508.18 |
| Proposal | 1502.4, 1502.5, 1506.8, 1508.23 |
| Proposed Action | 1502.10(e), 1502.14, 1506.2(c) |
| Public Health and Welfare. | 1504.1 |
| Public Involvement | 1501.4(e), 1503.1(a)(3), 1506.6 |
| Purpose | 1500.1, 1501.1, 1502.1, 1504.1 |
| Purpose of Action | 1502.10(d), 1502.13 |
| Record of Decision | 1505.2, 1506.1 |
| Referrals | 1504.1, 1504.2, 1504.3, 1506.3(d) |
| Referring Agency | 1504.1, 1504.2, 1504.3 |
| Response to Comments | 1503.4 |
| Rural Electrification Administration. | 1506.1(d) |

| | |
|---|---|
| Scientific Accuracy | 1502.24 |
| Scope | 1502.4(a), 1502.9(a), 1508.25 |
| Scoping | 1500.4(b), 1501.1(d), 1501.4(d), 1501.7, 1502.9(a), 1506.8(a) |
| Significantly | 1502.3; 1508.27 |
| Similar | 1508.25 |
| Small Business Associations. | 1506.6(b)(3)(vi) |
| Social Effects | 1508.8 |
| Special Expertise | 1508.26 |
| Specificity of Comments. | 1500.4(1), 1503.3 |
| State and Areawide Clearinghouses. | 1501.4(e)(2), 1503.1(a)(2)(iii), 1506.6(b)(3)(i) |
| State and Local | 1500.4(b), 1500.5(h), 1501.2(d)(2), 1501.5(b), 1501.5(d), 1501.7(a)(1), 1501.8(c), 1502.16(c), 1503.1(a)(2), 1506.2(b), 1506.6(b)(3), 1508.5, 1508.12, 1508.18 |
| State and Local Fiscal Assistance Act. | 1508.18(a) |
| Summary | 1500.4(h), 1502.10(b), 1502.12 |
| Supplements to Environmental Impact Statements. | 1502.9(c) |
| Table of Contents | 1502.10(c) |
| Technological Development. | 1502.4(c)(3) |
| Terminology | 1508.1 |
| Tiering | 1500.4(i), 1502.4(d), 1502.20, 1508.28 |
| Time Limits | 1500.5(e), 1501.1(e), 1501.7(b)(2), 1501.8 |
| Timing | 1502.4, 1502.5, 1506.10 |
| Treaties | 1508.17 |
| When to Prepare an Environmental Impact Statement. | 1501.3 |
| Wild and Scenic Rivers Act. | 1506.8(b)(ii) |
| Wilderness Act | 1506.8(b)(ii) |
| Writing | 1502.8 |

[FR Doc. 78-33362 Filed 11-27-78; 8:45 am]

AR_0042725

lations, but to leave the matter to individual agencies' discretion.

## 5. REGULATORY ANALYSES

The final regulations implement the policy and other requirements of Executive Order 12044 to the fullest extent possible. We intend agencies in implementing these regulations to minimize burdens on the public. The determinations required by Section 2(d) of the Order have been made by the Council and are available on request.

It is our intention that a Regulatory Analysis required by Section 3 of the Order be undertaken concurrently with and, where appropriate, integrated with an environmental impact statement required by NEPA and these regulations.

## 6. CONCLUSION

We could not, of course, adopt every suggestion that was made on the regulations. We have tried to respond to the major concerns that were expressed. In the process, we have changed 74 of the 92 sections, making a total of 340 amendments to the regulations. We are confident that any issues which arise in the future can be resolved through a variety of mechanisms that exists for improving the NEPA process.

We appreciate the efforts of the many people who participated in developing the regulations and look forward to their cooperation as the regulations are implemented by individual agencies.

CHARLES WARREN,
*Chairman.*

## TABLE OF CONTENTS

### PART 1500—PURPOSE, POLICY, AND MANDATE

Sec.
1500.1  Purpose.
1500.2  Policy.
1500.3  Mandate.
1500.4  Reducing paperwork.
1500.5  Reducing delay.
1500.6  Agency authority.

### PART 1501—NEPA AND AGENCY PLANNING

1501.1  Purpose.
1501.2  Apply NEPA early in the process.
1501.3  When to prepare an environmental assessment.
1501.4  Whether to prepare an environmental impact statement.
1501.5  Lead agencies.
1501.6  Cooperating agencies.
1501.7  Scoping.
1501.8  Time limits.

### PART 1502—ENVIRONMENTAL IMPACT STATEMENT

1502.1  Purpose.
1502.2  Implementation.
1502.3  Statutory requirements for statements.

Sec.
1502.4  Major Federal actions requiring the preparation of environmental impact statements.
1502.5  Timing.
1502.6  Interdisciplinary preparation.
1502.7  Page limits.
1502.8  Writing.
1502.9  Draft, final, and supplemental statements.
1502.10  Recommended format.
1502.11  Cover sheet.
1502.12  Summary.
1502.13  Purpose and need.
1502.14  Alternatives including the proposed action.
1502.15  Affected environment.
1502.16  Environmental consequences.
1502.17  List of preparers.
1502.18  Appendix.
1502.19  Circulation of the environmental impact statement.
1502.20  Tiering.
1502.21  Incorporation by reference.
1502.22  Incomplete or unavailable information.
1502.23  Cost-benefit analysis.
1502.24  Methodology and scientific accuracy.
1502.25  Environmental review and consultation requirements.

### PART 1503—COMMENTING

1503.1  Inviting comments.
1503.2  Duty to comment.
1503.3  Specificity of comments.
1503.4  Response to comments.

### PART 1504—PREDECISION REFERRALS TO THE COUNCIL OF PROPOSED FEDERAL ACTIONS DETERMINED TO BE ENVIRONMENTALLY UNSATISFACTORY

1504.1  Purpose.
1504.2  Criteria for referral.
1504.3  Procedure for referrals and response.

### PART 1505—NEPA AND AGENCY DECISIONMAKING

1505.1  Agency decisionmaking procedures.
1505.2  Record of decision in cases requiring environmental impact statements.
1505.3  Implementing the decision.

### PART 1506—OTHER REQUIREMENTS OF NEPA

1506.1  Limitations on actions during NEPA process.
1506.2  Elimination of duplication with State and local procedures.
1506.3  Adoption.
1506.4  Combining documents.
1506.5  Agency responsibility.
1506.6  Public involvement.
1506.7  Further guidance.
1506.8  Proposals for legislation.
1506.9  Filing requirements.
1506.10  Timing of agency action.
1506.11  Emergencies.
1506.12  Effective date.

### PART 1507—AGENCY COMPLIANCE

1507.1  Compliance.
1507.2  Agency capability to comply.
1507.3  Agency procedures.

### PART 1508—TERMINOLOGY AND INDEX

1508.1  Terminology.
1508.2  Act.
1508.3  Affecting.

Sec.
1508.4  Categorical exclusion.
1508.5  Cooperating agency.
1508.6  Council.
1508.7  Cumulative impact.
1508.8  Effects.
1508.9  Environmental assessment.
1508.10  Environmental document.
1508.11  Environmental impact statement.
1508.12  Federal agency.
1508.13  Finding of no significant impact.
1508.14  Human environment.
1508.15  Jurisdiction by law.
1508.16  Lead agency.
1508.17  Legislation.
1508.18  Major Federal action.
1508.19  Matter.
1508.20  Mitigation.
1508.21  NEPA process.
1508.22  Notice of intent.
1508.23  Proposal.
1508.24  Referring agency.
1508.25  Scope.
1508.26  Special expertise.
1508.27  Significantly.
1508.28  Tiering.
Index.

## PART 1500—PURPOSE, POLICY, AND MANDATE

Sec.
1500.1  Purpose.
1500.2  Policy.
1500.3  Mandate.
1500.4  Reducing paperwork.
1500.5  Reducing delay.
1500.6  Agency authority.

AUTHORITY: NEPA, the Environmental Quality Improvement Act of 1970, as amended (42 U.S.C. 4371 et seq.), section 309 of the Clean Air Act, as amended (42 U.S.C. 7609) and Executive Order 11514, Protection and Enhancement of Environmental Quality (March 5, 1970 as amended by Executive Order 11991, May 24, 1977).

### § 1500.1  Purpose.

(a)  The National Environmental Policy Act (NEPA) is our basic national charter for protection of the environment. It establishes policy, sets goals (section 101) and provides means (section 102) for carrying out the policy. Section 102(2) contains "action-forcing" provisions to make sure that federal agencies act according to the letter and spirit of the Act. The regulations that implement Section 102(2). Their purpose is to tell federal agencies what they must do to comply with the procedures and achieve the goals of the Act. The President, the federal agencies, and the courts share responsibility for enforcing the Act so as to achieve the substantive requirements of section 101.

(b)  NEPA procedures must insure that environmental information is available to public officials and citizens before decisions are made and before actions are taken. The information must be of high quality. Accurate scientific analysis, expert agency comments, and public scrutiny are essential to implementing NEPA. Most important, NEPA documents must con-

AR_0042708

**RULES AND REGULATIONS**

## § 1506.5 Agency responsibility.

(a) *Information.* If an agency requires an applicant to submit environmental information for possible use by the agency in preparing an environmental impact statement, then the agency should assist the applicant by outlining the types of information required. The agency shall independently evaluate the information submitted and shall be responsible for its accuracy. If the agency chooses to use the information submitted by the applicant in the environmental impact statement, either directly or by reference, then the names of the persons responsible for the independent evaluation shall be included in the list of preparers (§ 1502.17). It is the intent of this subparagraph that acceptable work not be redone, but that it be verified by the agency.

(b) *Environmental assessments.* If an agency permits an applicant to prepare an environmental assessment, the agency, besides fulfilling the requirements of paragraph (a) of this section, shall make its own evaluation of the environmental issues and take responsibility for the scope and content of the environmental assessment.

(c) *Environmental impact statements.* Except as provided in §§ 1506.2 and 1506.3 any environmental impact statement prepared pursuant to the requirements of NEPA shall be prepared directly by or by a contractor selected by the lead agency or where appropriate under § 1501.6(b), a cooperating agency. It is the intent of these regulations that the contractor be chosen solely by the lead agency, or by the lead agency in cooperation with cooperating agencies, or where appropriate by a cooperating agency to avoid any conflict of interest. Contractors shall execute a disclosure statement prepared by the lead agency, or where appropriate the cooperating agency, specifying that they have no financial or other interest in the outcome of the project. If the document is prepared by contract, the responsible Federal official shall furnish guidance and participate in the preparation and shall independently evaluate the statement prior to its approval and take responsibility for its scope and contents. Nothing in this section is intended to prohibit any agency from requesting any person to submit information to it or to prohibit any person from submitting information to any agency.

## § 1506.6 Public involvement.

Agencies shall: (a) Make diligent efforts to involve the public in preparing and implementing their NEPA procedures.

(b) Provide public notice of NEPA-related hearings, public meetings, and the availability of environmental docu-

ments so as to inform those persons and agencies who may be interested or affected.

(1) In all cases the agency shall mail notice to those who have requested it on an individual action.

(2) In the case of an action with effects of national concern notice shall include publication in the FEDERAL REGISTER and notice by mail to national organizations reasonably expected to be interested in the matter and may include listing in the *102 Monitor.* An agency engaged in rulemaking may provide notice by mail to national organizations who have requested that notice regularly be provided. Agencies shall maintain a list of such organizations.

(3) In the case of an action with effects primarily of local concern the notice may include:

(i) Notice to State and areawide clearinghouses pursuant to OMB Circular A-95 (Revised).

(ii) Notice to Indian tribes when effects may occur on reservations.

(iii) Following the affected State's public notice procedures for comparable actions.

(iv) Publication in local newspapers (in papers of general circulation rather than legal papers).

(v) Notice through other local media.

(vi) Notice to potentially interested community organizations including small business associations.

(vii) Publication in newsletters that may be expected to reach potentially interested persons.

(viii) Direct mailing to owners and occupants of nearby or affected property.

(ix) Posting of notice on and off site in the area where the action is to be located.

(c) Hold or sponsor public hearings or public meetings whenever appropriate or in accordance with statutory requirements applicable to the agency. Criteria shall include whether there is:

(1) Substantial environmental controversy concerning the proposed action or substantial interest in holding the hearing.

(2) A request for a hearing by another agency with jurisdiction over the action supported by reasons why a hearing will be helpful. If a draft environmental impact statement is to be considered at a public hearing, the agency should make the statement available to the public at least 15 days in advance unless the purpose of the hearing is to provide information for the draft environmental impact statement).

(d) Solicit appropriate information from the public.

(e) Explain in its procedures where interested persons can get information or status reports on environmental

impact statements and other elements of the NEPA process.

(f) make environmental impact statements, the comments received, and any underlying documents available to the public pursuant to the provisions of the Freedom of Information Act (5 U.S.C. 552), without regard to the exclusion for interagency memoranda where such memoranda transmit comments of Federal agencies on the environmental impact of the proposed action. Materials to be made available to the public shall be provided to the public without charge to the extent practicable, or at a fee which is not more than the actual costs of reproducing copies required to be sent to other Federal agencies, including the Council.

## § 1506.7 Further guidance.

The Council may provide further guidance concerning NEPA and its procedures including:

(a) A handbook which the Council may supplement from time to time, which shall in plain language provide guidance and instructions concerning the application of NEPA and these regulations.

(b) Publication of the Council's Memoranda to Heads of Agencies.

(c) In conjunction with the Environmental Protection Agency and the publication of the 102 Monitor, notice of:

(1) Research activities;

(2) Meetings and conferences related to NEPA; and

(3) Successful and innovative procedures used by agencies to implement NEPA.

## § 1506.8 Proposals for legislation.

(a) The NEPA process for proposals for legislation (§ 1508.17) significantly affecting the quality of the human environment shall be integrated with the legislative process of the Congress. A legislative environmental impact statement is the detailed statement required by law to be included in a recommendation or report on a legislative proposal to Congress. A legislative environmental impact statement shall be considered part of the formal transmittal of a legislative proposal to Congress; however, it may be transmitted to Congress up to 30 days later in order to allow time for completion of an accurate statement which can serve as the basis for public and Congressional debate. The statement must be available in time for Congressional hearings and deliberations.

(b) Preparation of a legislative environmental impact statement shall conform to the requirements of these regulations except as follows:

(1) There need not be a scoping process.

AR_0042719

## 6. What is Tribal and Native Hawaiian Consultation?

Grounded in the government-to-government relationship,[21] Tribal and Native Hawaiian consultation is a process for communication between the federal government and Tribes and the Native Hawaiian Community. Tribes and the Native Hawaiian Community are not merely part of the public, and consultation is distinct from public participation. Effective Tribal and Native Hawaiian consultation involves the free flow of information and ideas that emphasizes trust, respect, and shared responsibility. Such exchanges of information are intended to ensure meaningful and timely input by Tribes and NHOs in the development of federal policies having Tribal or Native Hawaiian implications, including regulations, legislation, and policy statements or actions that may have substantial direct effects on Tribes and NHOs.[22] As discussed more thoroughly below, there are specific legal requirements for Tribal consultation under the National Historic Preservation Act (NHPA) and other federal authorities such as:

- Executive Order 13175 on Consultation and Coordination with Indian Tribal Governments

- Executive Order 13007 on Indian Sacred Sites

- The Presidential Memorandum on Uniform Standards for Tribal Consultation

- Executive Order 14096 on Revitalizing Our Nation's Commitment to Environmental Justice for All

Agencies also consult with Tribes in conjunction with fulfilling their obligations under the National Environmental Policy Act (NEPA) as discussed further below.

## 7. What is Indigenous Knowledge?

Indigenous Knowledge refers to those bodies of observations, oral and written knowledge, innovations, practices, and beliefs developed by Indigenous peoples through their interaction and experience with the environment and passed on across generations that is applied to phenomena across biological, physical, social, cultural, and spiritual systems.[23] Deeply rooted in Indigenous communities having distinct cultures, geographies, and societies, Indigenous Knowledge is heterogeneous and can be expressed in different ways.

Indigenous Knowledge has much in common with scientific methodologies. Both, for example:

- Seek systematic ways of understanding and explaining ways of knowing;

- Use empirical approaches to conduct practical, curiosity-driven investigations;

- Use standard practices, such as systematic observation, innovation, and verification;

- Derive from directly engaging with the environment; and

- Evolve and adapt to new observations.



---

[21] Or when consulting with the Native Hawaiian Community, the government-to-sovereign relationship.

[22] While this Guide focuses on Tribes (including federally recognized Alaska Native Tribes) and NHOs, federal agencies are also required to "consult with Alaska Native corporations on the same basis as Indian tribes under Executive Order No. 13175." Consolidated Appropriations Act, 2004, Pub. L. No. 108-199, Div. H § 161, 118 Stat. 3, 452 (2004), as amended by Consolidated Appropriations Act, 2005, Pub. L. No. 108-447, Div. H, Title V § 518, 118 Stat. 2809, 3267 (2004).

[23] Indigenous Knowledge may also be referred to as "Native Science," "traditional ecological knowledge," or "Indigenous traditional ecological knowledge."

AR_0042912

period, and successive reports shall be due annually on the same date thereafter. Without limitation, Peloton acknowledges and agrees that failure to make such timely and accurate reports as required by this Agreement and Order may constitute a violation of Section 19(a)(3) of the CPSA and may subject the Firm to enforcement under section 22 of the CPSA.

36. Notwithstanding and in addition to the above, Peloton shall promptly provide written documentation of any changes or modifications to its compliance program or internal controls and procedures, including the effective dates of the changes or modifications thereto. Peloton shall cooperate fully and truthfully with staff and shall make available all non-privileged information and materials and personnel deemed necessary by staff to evaluate Peloton's compliance with the terms of the Agreement.

37. The parties acknowledge and agree that the Commission may publicize the terms of the Agreement and the Order.

38. Peloton represents that the Agreement:

(i) is entered into freely and voluntarily, without any degree of duress or compulsion whatsoever;

(ii) has been duly authorized; and

(iii) constitutes the valid and binding obligation of Peloton, enforceable against Peloton in accordance with its terms. The individuals signing the Agreement on behalf of Peloton represent and warrant that they are duly authorized by Peloton to execute the Agreement.

39. The signatories represent that they are authorized to execute this Agreement.

40. The Agreement is governed by the laws of the United States.

41. The Agreement and the Order shall apply to, and be binding upon, Peloton and each of its parents, successors, transferees, and assigns; and a violation of the Agreement or Order may subject Peloton, and each of its parents, successors, transferees, and assigns, to appropriate legal action.

42. The Agreement, any attachments, and the Order constitute the complete agreement between the parties on the subject matter contained therein.

43. The Agreement may be used in interpreting the Order. Understandings, agreements, representations, or interpretations apart from those contained in the Agreement and the Order may not be used to vary or contradict their terms. For purposes of construction, the Agreement shall be deemed to have been drafted by both of the parties and shall not, therefore, be construed against any party, for that reason, in any subsequent dispute.

44. The Agreement may not be waived, amended, modified, or otherwise altered, except as in accordance with the provisions of 16 CFR 1118.20(h). The Agreement may be executed in counterparts.

45. If any provision of the Agreement or the Order is held to be illegal, invalid, or unenforceable under present or future laws effective during the terms of the Agreement and the Order, such provision shall be fully severable. The balance of the Agreement and the Order shall remain in full force and effect, unless the Commission and Peloton agree in writing that severing the provision materially affects the purpose of the Agreement and the Order.

(Signatures on next page)
PELOTON INTERACTIVE, INC.
Dated: 12/8/22
By: /s/Barry McCarthy
Barry McCarthy, Peloton Interactive, Inc., CEO & President

Dated: 12/9/2022
By: /s/Erin M. Bosman
Erin M. Bosman, Morrison Foerster LLP, Counsel to Peloton Interactive, Inc.

U.S. CONSUMER PRODUCT SAFETY COMMISSION
Mary B. Murphy, Director
Leah Ippolito, Supervisory Attorney
Michael J. Rogal, Trial Attorney
Dated: 12/14/22
By: /s/Michael J. Rogal
Michael J. Rogal, Trial Attorney, Division of Enforcement and Litigation, Office of Compliance and Field Operations

**United States of America Consumer Product Safety Commission**

*In the Matter of:* PELOTON INTERACTIVE, INC.

CPSC Docket No.: 23–C0001

**Order**

Upon consideration of the Settlement Agreement entered into between Peloton Interactive, Inc. ("Peloton"), and the U.S. Consumer Product Safety Commission ("Commission" or "CPSC"), and the Commission having jurisdiction over the subject matter and over Peloton, and it appearing that the Settlement Agreement and the Order are in the public interest, the Settlement Agreement is incorporated by reference and it is:

Provisionally accepted and provisional Order issued on the 28th day of December, 2022.

By Order of the Commission.
/s/Alberta Mills
Alberta E. Mills,

*Secretary, U.S. Consumer Product Safety Commission.*

[FR Doc. 2023–00146 Filed 1–6–23; 8:45 am]
**BILLING CODE 6355–01–P**

---

**COUNCIL ON ENVIRONMENTAL QUALITY**

[CEQ–2022–0005]

RIN 0331–AA06

**National Environmental Policy Act Guidance on Consideration of Greenhouse Gas Emissions and Climate Change**

**AGENCY:** Council on Environmental Quality.

**ACTION:** Notice of interim guidance; request for comments.

**SUMMARY:** The Council on Environmental Quality (CEQ) is issuing this interim guidance to assist agencies in analyzing greenhouse gas (GHG) and climate change effects of their proposed actions under the National Environmental Policy Act (NEPA). CEQ is issuing this guidance as interim guidance so that agencies may make use of it immediately while CEQ seeks public comment on the guidance. CEQ intends to either revise the guidance in response to public comments or finalize the interim guidance.

**DATES:** This interim guidance is effective immediately. CEQ invites interested persons to submit comments on or before March 10, 2023.

**ADDRESSES:** You may submit comments, identified by docket number CEQ–2022–0005, by any of the following methods:

• *Federal eRulemaking Portal:* https://www.regulations.gov. Follow the instructions for submitting comments.

• *Fax:* 202–456–6546.

• *Mail:* Council on Environmental Quality, 730 Jackson Place NW, Washington, DC 20503.

All submissions received must include the agency name, "Council on Environmental Quality," and the docket number, CEQ–2022–0005. All comments received will be posted without change to https://www.regulations.gov, including any personal information provided. Do not submit electronically any information you consider to be private, Confidential Business Information (CBI), or other information, the disclosure of which is restricted by statute.

**FOR FURTHER INFORMATION CONTACT:** Jomar Maldonado, Director for NEPA, 202–395–5750 or *Jomar.MaldonadoVazquez@ceq.eop.gov.*

AR_0043046

The Council on Environmental Quality (CEQ) provides this redline for the convenience of reviewing the changes to its regulations. While CEQ has taken steps to ensure the accuracy of this redline, it is not an official version of the proposed rule. Please refer to the official final rule, available at https://regulations.gov in Docket No. CEQ–2023–0003.

**Title 40 Code of Federal Regulations**
**Chapter V—Council on Environmental Quality**
**Subchapter A—National Environmental Policy Act Implementing Regulations**

**PART 1500—PURPOSE AND POLICY**

Sec.
1500.1 Purpose ~~and policy~~.
1500.2 Policy.~~[Reserved]~~
1500.3 NEPA compliance.
1500.4 Concise and informative environmental documents~~Reducing paperwork~~.
1500.5 Efficient process~~Reducing delay~~.
1500.6 Agency authority.

**Authority**: 42 U.S.C. 4321–4347; 42 U.S.C. 4371–4375; 42 U.S.C. 7609; and E.O. 11514, 35 FR 4247, 3 CFR, 1966–1970, Comp., p. 902, as amended by E.O. 11991, 42 FR 26967, 3 CFR, 1977 Comp., p. 123~~; and E.O. 13807, 82 FR 40463, 3 CFR, 2017, Comp., p. 369~~.

**§ 1500.1 Purpose ~~and policy~~.**

(a) The National Environmental Policy Act (NEPA) is ~~a procedural statute intended to ensure Federal agencies consider the environmental impacts~~the basic national charter for protection of ~~their actions in~~ the environment~~decision-making process~~. It establishes policy, sets goals, and provides direction for carrying out the policy.

(1) Section 101(a) of NEPA establishes the national environmental policy of the Federal Government to use all practicable means and measures to foster and promote the general welfare, create and maintain conditions under which ~~man~~humans and nature can exist in productive harmony, and fulfill the social, economic, and other requirements of present and future generations of Americans. Section 101(b) of NEPA establishes the continuing responsibility of the Federal Government to use all practicable means, consistent with other essential considerations of national policy, to:

(i) Help each generation serve as a trustee of the environment for succeeding generations;

(ii) Assure for all people safe, healthful, productive, and aesthetically and culturally pleasing surroundings;

(iii) Attain the widest range of beneficial uses of the environment without degradation, risk to health or safety, or other undesirable and unintended consequences;

(iv) Preserve important historic, cultural, and natural aspects of our national heritage, and maintain, wherever possible, an environment which supports diversity and variety of individual choice;

Original/black text = Current regulations
Redline = proposed rule (green text reflects moved language; red reflects new language; strikethrough means deleted language)

AR_0043436

(v) Achieve a balance between population and resource use which will permit high standards of living and a wide sharing of life's amenities; and

(vi) Enhance the quality of renewable resources and approach the maximum attainable recycling of depletable resources.

(2) Section 102(2) of NEPA establishes ~~the~~ procedural requirements to carry out the policy and responsibilities established~~stated~~ in section 101 of NEPA and contains "action-forcing" procedural provisions to ensure Federal agencies implement the letter and spirit of the Act. The purpose of the regulations in this subchapter is to set forth what Federal agencies must and should do to comply with the procedures and achieve the goals of the Act. The President, the Federal agencies, and the courts share responsibility for enforcing the Act so as to achieve the policy goals of section 101. ~~In particular, it requires Federal agencies to provide a detailed statement on proposals for major Federal actions significantly affecting the quality of the human environment. The purpose and function of NEPA is satisfied if Federal agencies have considered relevant environmental information, and the public has been informed regarding the decision-making process. NEPA does not mandate particular results or substantive outcomes. NEPA's purpose is not to generate paperwork or litigation, but to provide for informed decision making and foster excellent action.~~

(b) The regulations in this subchapter implement ~~section 102(2)~~the requirements of NEPA and. ~~They provide direction to Federal agencies to determine what actions are subject to NEPA's procedural requirements and the level of NEPA review where applicable. The regulations in this subchapter are intended to~~ ensure that agencies identify, consider, and disclose to the public relevant environmental information ~~is identified and considered~~ early in the process before decisions are made and before actions are taken ~~in order to ensure informed decision making by Federal agencies~~. The information shall be of high quality. Accurate scientific analysis, expert agency comments, and public scrutiny are essential to implementing NEPA. Most importantly, environmental documents must concentrate on the issues that are truly relevant to the action in question, rather than amassing needless detail. The regulations in this subchapter ~~are~~ also are intended to ensure that Federal agencies conduct environmental reviews in a coordinated, consistent, predictable and timely manner, and to reduce unnecessary burdens and delays. Finally, the regulations in this subchapter promote concurrent environmental reviews to ensure timely and efficient decision making.

(c) Ultimately, of course, it is not better documents but better decisions that count. NEPA's purpose is not to generate paperwork—even excellent paperwork— ~~or litigation,~~ but to ~~provide for informed decision making and~~ foster excellent action. The NEPA process is intended to help public officials make decisions that are based on an understanding of environmental consequences, and take actions that protect, restore, and enhance the environment. The regulations in this subchapter provide the direction to achieve this purpose.

Original/black text = Current regulations
Redline = Final rule (green text reflects moved language; red reflects new language; strikethrough means deleted language)

2

**§ 1500.2 Policy.[Reserved]**

Federal agencies shall to the fullest extent possible:

(a) Interpret and administer the policies, regulations, and public laws of the United States in accordance with the policies set forth in the Act and in these regulations.

(b) Implement procedures to make the NEPA process more useful to decision makers and the public; to reduce paperwork and the accumulation of extraneous background data; and to emphasize important environmental issues and alternatives. Environmental documents shall be concise, clear, and supported by evidence that agencies have conducted the necessary environmental analyses.

(c) Integrate the requirements of NEPA with other planning and environmental review procedures required by law or by agency practice so that such procedures run concurrently rather than consecutively where doing so promotes efficiency.

(d) Encourage and facilitate public engagement in decisions that affect the quality of the human environment, including meaningful engagement with communities such as those with environmental justice concerns.

(e) Use the NEPA process to identify and assess the reasonable alternatives to proposed actions that will avoid or minimize adverse effects of these actions upon the quality of the human environment, such as alternatives that will reduce climate change-related effects or address adverse health and environmental effects that disproportionately affect communities with environmental justice concerns.

(f) Use all practicable means, consistent with the requirements of the Act and other essential considerations of national policy, to restore and enhance the quality of the human environment and avoid or minimize any possible adverse effects of their actions upon the quality of the human environment.

**§ 1500.3 NEPA compliance.**

(a) *Mandate*. This subchapter is applicable to and binding on all Federal agencies for implementing the procedural provisions of the National Environmental Policy Act of 1969, as amended (Pub. L. 91–190, 42 U.S.C. 4321 *et seq.*) (NEPA or the Act), except where compliance would be inconsistent with other statutory requirements. The regulations in this subchapter are issued pursuant to NEPA; the Environmental Quality Improvement Act of 1970, as amended (Pub. L. 91–224, 42 U.S.C. 4371 *et seq.*); section 309 of the Clean Air Act, as amended (42 U.S.C. 7609);and Executive Order 11514, Protection and Enhancement of Environmental Quality (March 5, 1970), as amended by Executive Order 11991, Relating to the Protection and Enhancement of Environmental Quality (May 24, 1977); and Executive Order 13807, Establishing Discipline and Accountability in the Environmental Review and Permitting Process for Infrastructure Projects (August 15, 2017). The regulations in this subchapter apply to the

Original/black text = Current regulations
Redline = Final rule (green text reflects moved language; red reflects new language; strikethrough means deleted language)

AR_0043438

therefore should be considered discussed in the same impact statement. Actions are connected if theyNEPA review that:

(1i) Automatically trigger other actions that may require environmental impact statementsNEPA review;

(2ii) Cannot or will not proceed unless other actions are taken previously or simultaneously; or

(3iii) Are interdependent parts of a larger action and depend on the larger action for their justification.

(2) Alternatives, which include the no action alternative; other reasonable courses of action; and mitigation measures (not in the proposed action).

(3) Impacts.

(c) *Levels of NEPA review.* In assessing the appropriate level of NEPA review, agencies may make use of any reliable data source and are not required to undertake new scientific or technical research unless it is essential to a reasoned choice among alternatives, and the overall costs and timeframe of obtaining it are not unreasonable. Federal aAgencies should determine whether the proposed action:

(1) Is appropriatelyNormally does not have significant effects and is categorically excluded (§ 1501.4);

(2) Is not likely to have significant effects or the significance of the effects is unknown and is therefore appropriate for an environmental assessment (§ 1501.5); or

(3) Is likely to have significant effects and is therefore appropriate for an environmental impact statement (part 1502 of this subchapter).

(db) *Significance determination—context and intensity.* In considering whether the an adverse effects of the proposed action isare significant, agencies shall analyze the potentially affected environment and degree of the effectsexamine both the context of the action and the intensity of the effect. Agencies should consider connected actions consistent with § 1501.9(e)(1). In assessing context and intensity, agencies should consider the duration of the effect. Agencies may also consider the extent to which an effect is adverse at some points in time and beneficial in others (for example, in assessing the significance of a habitat restoration action's effect on a species, an agency may consider both any short-term harm to the species during implementation of the action and any benefit to the same species once the action is complete). However, agencies shall not offset an action's adverse effects with other beneficial effects to determine significance (for example, an agency may not offset an action's adverse effect on one species with its beneficial effect on another species).

Original/black text = Current regulations
Redline = Final rule (green text reflects moved language; red reflects new language; strikethrough means deleted language)

AR_0043446

(1) Agencies shall analyze the significance of an action in several contexts. Agencies should consider the characteristics of the geographic area, such as proximity to unique or sensitive resources or communities with environmental justice concerns. Depending on the scope of the action, agencies should consider the potential global, national, regional, and local contexts as well as the duration, including short-and long-term effects. In considering the potentially affected environment, agencies should consider, as appropriate to the specific action, the affected area (national, regional, or local) and its resources, such as listed species and designated critical habitat under the Endangered Species Act. Significance varies with the setting of the proposed action. For instance, in the case of a site-specific action, significance would usually depend only upon the effects in the local area.

(2) Agencies shall analyze the intensity of effects considering the following factors, as applicable to the proposed action and in relationship to one another: In considering the degree of the effects, agencies should consider the following, as appropriate to the specific action:

(i) Both short- and long-term effects.

(ii) Both beneficial and adverse effects.

(iii) The degree to which the action may adversely Eaffects on public health and safety.

(ii) The degree to which the action may adversely affect unique characteristics of the geographic area such as historic or cultural resources, parks, Tribal sacred sites, prime farmlands, wetlands, wild and scenic rivers, or ecologically critical areas.

(iiiv) Effects thatWhether the action wouldmay violate relevant Federal, State, Tribal, or local laws or other requirements or be inconsistent with Federal, State, Tribal, or local policies designed for the protectioning of the environment.

(iv) The degree to which the potential effects on the human environment are highly uncertain.

(v) The degree to which the action may adversely affect resources listed or eligible for listing in the National Register of Historic Places.

(vi) The degree to which the action may adversely affect an endangered or threatened species or its habitat, including habitat that has been determined to be critical under the Endangered Species Act of 1973.

(vii) The degree to which the action may adversely affect communities with environmental justice concerns.

(viii) The degree to which the action may adversely affect rights of Tribal Nations that have been reserved through treaties, statutes, or Executive Orders.

Original/black text = Current regulations
Redline = Final rule (green text reflects moved language; red reflects new language; strikethrough means deleted language)

12

1502.15 Affected environment.
1502.16 Environmental consequences.
1502.17 Summary of scoping information~~submitted alternatives, information, and analyses~~.
1502.18 List of preparers.
1502.19 Appendix.
1502.20 Publication of the environmental impact statement.
1502.21 Incomplete or unavailable information.
1502.22 Cost-benefit analysis.
1502.23 ~~Methodology and scientific accuracy.~~ [Reserved]
1502.24 Environmental review and consultation requirements.

**Authority**: 42 U.S.C. 4321–4347; 42 U.S.C. 4371–4375; 42 U.S.C. 7609; and E.O. 11514, 35 FR 4247, 3 CFR, 1966–1970, Comp., p. 902, as amended by E.O. 11991, 42 FR 26967, 3 CFR, 1977 Comp., p. 123.

### § 1502.1 Purpose of environmental impact statement.

(a) The primary purpose of an environmental impact statement prepared pursuant to section 102(2)(C) of NEPA is to ~~ensure~~ serve as an action-forcing device by ensuring agencies consider the environmental effects~~impacts~~ of their action~~s~~ in decision making, so that the policies and goals defined in the Act are infused into the ongoing programs and actions of the Federal Government.

(b) Environmental impact statements~~It~~ shall provide full and fair discussion of significant ~~environmental impacts~~effects and shall inform decision makers and the public of reasonable alternatives that would avoid or minimize adverse ~~impacts~~effects or enhance the quality of the human environment. Agencies shall focus on ~~significant~~important environmental issues and reasonable alternatives and shall reduce paperwork and the accumulation of extraneous background data.

(c) Environmental impact Ss~~tatements~~ shall be concise, clear, and to the point, and shall be supported by evidence that the agency has made the necessary environmental analyses. An environmental impact statement is more than a disclosure document ~~that informs Federal agency decision making and the public~~. Federal agencies shall use environmental impact statements in conjunction with other relevant material to plan actions, involve the public, and make decisions.

### § 1502.2 Implementation.

To achieve the purposes set forth in § 1502.1, agencies shall prepare environmental impact statements in the following manner:

(a) Environmental impact statements shall not be encyclopedic.

(b) Environmental impact statements shall discuss ~~impacts~~effects in proportion to their significance. There shall be only brief discussion of other than ~~significant~~important issues. As in

Original/black text = Current regulations
Redline = Final rule (green text reflects moved language; red reflects new language; strikethrough means deleted language)

31

AR_0043466

## § 1502.13 Purpose and need.

The ~~environmental impact~~ statement shall ~~include a statement that~~ briefly ~~specify~~summarizes the underlying purpose and need ~~to which the agency is responding in proposing the alternatives including~~for the proposed ~~agency~~ action.

## § 1502.14 Alternatives including the proposed action.

The alternatives section is the heart of the environmental impact statement. The alternatives section should ~~present~~identify the reasonably foreseeable environmental ~~impacts~~effects of the proposed action and the alternatives in comparative form based on the information and analysis presented in the sections on the affected environment (§ 1502.15) and the environmental consequences (§ 1502.16). In doing so, the analysis should sharply define the issues for the decision maker and the public and provide a clear basis for choice among options. In this section, agencies shall:

(a) Rigorously explore and objectively Eevaluate reasonable alternatives to the proposed action, and, for alternatives that the agency eliminated from detailed study, briefly discuss the reasons for their elimination. The agency need not consider every conceivable alternative to a proposed action; rather, it shall consider a reasonable range of alternatives that will foster informed decision making. Agencies also may include reasonable alternatives not within the jurisdiction of the lead agency.

(b) Discuss each alternative considered in detail, including the proposed action, so that reviewers may evaluate their comparative merits.

(c) Include the no action alternative.

(d) Identify the agency's preferred alternative or alternatives, if one or more exists, in the draft statement and identify such alternative in the final statement unless another law prohibits the expression of such a preference.

(e) Include appropriate mitigation measures not already included in the proposed action or alternatives.

(f) ~~Limit their consideration to a reasonable number of alternatives.~~Identify the environmentally preferable alternative or alternatives amongst the alternatives considered in the environmental impact statement. The environmentally preferable alternative will best promote the national environmental policy expressed in section 101 of NEPA by maximizing environmental benefits, such as addressing climate change-related effects or disproportionate and adverse effects on communities with environmental justice concerns; protecting, preserving, or enhancing historic, cultural, Tribal, and natural resources, including rights of Tribal Nations that have been reserved through treaties, statutes, or Executive Orders; or causing the least damage to the biological and physical environment. The environmentally preferable alternative may be the proposed action, the no action alternative, or a reasonable alternative.

Original/black text = Current regulations
Redline = Final rule (green text reflects moved language; red reflects new language; strikethrough means deleted language)

AR_0043474

of shared databases or application programming interfaces, in their implementation of NEPA and related authorities.

## PART 1508—DEFINITIONS

Sec.
1508.1 Definitions.
1508.2 [Reserved]

**Authority**: 42 U.S.C. 4321–4347; 42 U.S.C. 4371–4375; 42 U.S.C. 7609; and E.O. 11514, 35 FR 4247, 3 CFR, 1966–1970, Comp., p. 902, as amended by E.O. 11991, 42 FR 26967, 3 CFR, 1977 Comp., p. 123.

## § 1508.1 Definitions.

The following definitions apply to the regulations in this subchapter. Federal agencies shall use these terms uniformly throughout the Federal Government.

(a) *Act* or *NEPA* means the National Environmental Policy Act, as amended (42 U.S.C. 4321, *et seq.*).

(b) *Affecting* means will or may have an effect on.

(c) *Applicant* means a non-Federal entity, including a project sponsor, that seeks an action by a Federal agency such as granting a permit, license, or financial assistance.

(de) *Authorization* means any license, permit, approval, finding, determination, or other administrative decision issued by an agency that is required or authorized under Federal law in order to implement a proposed action.

(ed) *Categorical exclusion* means a category of actions that thean agency has determined, in its agency NEPA procedures (§ 1507.3 of this subchapter) or pursuant to § 1501.4(c) of this subchapter, normally does not have a significant effect on the human environment.

(f) *Communities with environmental justice concerns* means those communities that may not experience environmental justice as defined in paragraph (m) of this section. To assist in identifying communities with environmental justice concerns, agencies may use available screening tools, such as the Climate and Economic Justice Screening Tool and the EJScreen Tool, as appropriate to their activities and programs. Agencies also may develop procedures for the identification of such communities in their agency NEPA procedures.

(ge) *Cooperating agency* means any Federal, agency (and a State, Tribal, or local agency with agreement of the lead agency) other than a lead agency that has jurisdiction by law or special expertise with respect to any environmental impact involved in a proposal that has been designated by the lead agency(or a reasonable alternative) for legislation or other major Federal action that may significantly affect the quality of the human environment.

Original/black text = Current regulations
Redline = Final rule (green text reflects moved language; red reflects new language; strikethrough means deleted language)

71

AR_0043506

(h̶f̶) *Council* means the Council on Environmental Quality established by title II of the Act.

(i̶g̶) *Effects* or *impacts* means changes to the human environment from the proposed action or alternatives that are reasonably foreseeable and include the following:

(1) Direct effects, which are caused by the action and occur at the same time and place.

(2) Indirect effects, which are caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable. Indirect effects may include growth-̶inducing effects and other effects related to induced changes in the pattern of land use, population density or growth rate, and related effects on air and water and other natural systems, including ecosystems.

(3) Cumulative effects, which are effects on the environment that result from the incremental effects of the action when added to the effects of other past, present, and reasonably foreseeable actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions. Cumulative effects can result from actions with individually minor but collectively significant actionseffects taking place over a period of time.

(4) Effects include ecological (such as the effects on natural resources and on the components, structures, and functioning of affected ecosystems), aesthetic, historic, cultural, economic, social, or health, whether direct, indirect, or cumulative.such as disproportionate and adverse effects on communities with environmental justice concerns, whether direct, indirect, or cumulative. Effects also include effects on Tribal resources and climate change-related effects, including the contribution of a proposed action and its alternatives to climate change, and the reasonably foreseeable effects of climate change on the proposed action and its alternatives. Effects may also include those resulting from actions which may have both beneficial and detrimental adverse effects, even if on balance the agency believes that the effects will be beneficial.

(j̶h̶) *Environmental assessment* means a concise public document prepared by, for which a Federal agency to aidis responsible, for an agency's compliance with action that is not likely to have a significant effect or for which the Act and significance of the effects is unknown (§ 1501.5 of this subchapter), that is used to support itsan agency's determination of whether to prepare an environmental impact statement (part 1502 of this subchapter) or a finding of no significant impact, as provided in (§ 1501.6 of this subchapter).

(k̶i̶) *Environmental document* means an environmental assessment, environmental impact statement, documented categorical exclusion determination, finding of no significant impact, record of decision, or notice of intent.

(l̶j̶) *Environmental impact statement* means a detailed written statement asthat is required by section 102(2)(C) of NEPA.

(m̶k̶) *Environmental justice* means the just treatment and meaningful involvement of all people, regardless of income, race, color, national origin, Tribal affiliation, or disability, in

Original/black text = Current regulations
Redline = Final rule (green text reflects moved language; red reflects new language; strikethrough means deleted language)

AR_0043507

agency decision making and other Federal activities that affect human health and the environment so that people:

(1) Are fully protected from disproportionate and adverse human health and environmental effects (including risks) and hazards, including those related to climate change, the cumulative impacts of environmental and other burdens, and the legacy of racism or other structural or systemic barriers; and

(2) Have equitable access to a healthy, sustainable, and resilient environment in which to live, play, work, learn, grow, worship, and engage in cultural and subsistence practices.

(n*l*) *Environmentally preferable alternative* means the alternative or alternatives that will best promote the national environmental policy as expressed in section 101 of NEPA.

(o*m*) *Extraordinary circumstances* means factors or circumstances that indicate a normally categorically excluded action may have a significant effect. Examples of extraordinary circumstances include potential substantial effects on sensitive environmental resources, potential substantial disproportionate and adverse effects on communities with environmental justice concerns, potential substantial effects associated with climate change, and potential substantial effects on historic properties or cultural resources.

(p*k*) *Federal agency* means all agencies of the Federal Government. It does not mean the Congress, the Judiciary, or the President, including the performance of staff functions for the President in his Executive Office. For the purposes of the regulations in this subchapter, Federal agency also includes States, units of general local government, and Tribal governments assuming NEPA responsibilities from a Federal agency pursuant to statute.

(q*l*) *Finding of no significant impact* means a document by a Federal agency briefly presenting the agency's determination that and reasons why an action, not otherwise categorically excluded (§ 1501.4 of this subchapter), will not have a significant effect on the human environment and for which an environmental impact statement therefore will not be prepared.

(r*m*) *Human environment or environment* means comprehensively the natural and physical environment and the relationship of present and future generations of Americans with that environment. (*See also* the definition of "effects" in paragraph (i*g*) of this section.)

(s) *Joint lead agency* means a Federal, State, Tribal, or local agency designated pursuant to § 1501.7(c) that shares the responsibilities of the lead agency for preparing the environmental impact statement or environmental assessment.

(t*n*) *Jurisdiction by law* means agency authority to approve, veto, or finance all or part of the proposal.

(u*o*) *Lead agency* means the Federal agency or agencies, inthat proposes the case of joint lead agencies,agency action or is designated pursuant to § 1501.7(c) for preparing or having taken

Original/black text = Current regulations
Redline = Final rule (green text reflects moved language; red reflects new language; strikethrough means deleted language)

AR_0043508

of decision and that have a ~~nexus~~connection to those adverse effects. ~~While NEPA requires consideration of mitigation, it does not mandate the form or adoption of any mitigation.~~ Mitigation includes, in general order of priority:

(1) Avoiding the ~~impact~~adverse effect altogether by not taking a certain action or parts of an action.

(2) Minimizing ~~impacts~~the adverse effect by limiting the degree or magnitude of the action and its implementation.

(3) Rectifying the ~~impact~~adverse effect by repairing, rehabilitating, or restoring the affected environment.

(4) Reducing or eliminating the ~~impact~~adverse effect over time by preservation and maintenance operations during the life of the action.

(5) Compensating for the ~~impact~~adverse effect by replacing or providing substitute resources or environments.

(z~~t~~) *NEPA process* means all measures necessary for compliance with the requirements of section 2 and title I of NEPA.

(aa~~u~~) *Notice of intent* means a public notice that an agency will prepare and consider an environmental impact statement or, as applicable, an environmental assessment.

(bb~~v~~) *Page* means 500 words and does not include citations, explanatory maps, diagrams, graphs, tables, and other means of graphically displaying quantitative or geospatial information.

(cc~~w~~) *Participating agency* means a Federal, State, Tribal, or local agency participating in an environmental review or authorization of an action.

(dd) *Participating Federal agency* means a Federal agency participating in an environmental review or authorization of an action.

(ee) *Programmatic environmental document* means an environmental impact statement or environmental assessment analyzing all or some of the environmental effects of a policy, program, plan, or group of related actions.

(ff~~x~~) *Proposal* means a proposed action at a stage when an agency has a goal, is actively preparing to make a decision on one or more alternative means of accomplishing that goal, and can meaningfully evaluate its effects. A proposal may exist in fact as well as by agency declaration that one exists.

(gg~~y~~) *Publish* and *publication* mean methods found by the agency to efficiently and effectively make environmental documents and information available for review by interested

Original/black text = Current regulations
Redline = Final rule (green text reflects moved language; red reflects new language; strikethrough means deleted language)

AR_0043512

**15618**        Federal Register / Vol. 51, No. 80 / Friday, April 25, 1986 / Rules and Regulations

comments, USEPA published a second notice of proposed rulemaking March 1, 1985 (50 FR 8346), to approve the OCC proposed revision request.

During the public comments period for the March 1, 1985, notice, USEPA received one comment from OCC. OCC noted that the potassium phosphate salt production line tons per year current SIP limit was an error and that there is no current independent SIP limit for this salt production line. USEPA disagrees with OCC. Because the potassium phosphate salt line was not explicitly included in the Clark County, Appendix to Indiana's nonattainment TSP regulations, 325 IAC 6–1, it is governed by the general emission limitations in 325 IAC 6–1, Section 2(a) of this regulation, that limits the potassium phosphate salt line to 0.03 grains per dry standard cubic foot (gr/dscf).

This action is not affected by the PSD regulations because the revision does not result in an increase in actual emissions. Thus, the action does not qualify as a major modification and does not consume PSD increment.

Based on the proposal, USEPA has determined that the emission limits contained in the operating permits can be approved as a site-specific SIP revision. The current and proposed limits are:

| Source | Current SIP limits | | Proposed SIP limits | |
|---|---|---|---|---|
| | gr/dscf | T/yr | gr/dscf | T/yr |
| Thermal Process (Acid Line) | 0.023 | 8.7 | ¹ 0.122 | 40 |
| Sodium Phosphate Salt Production Line | 0.028 | 85.2 | ¹ 0.037 | 40.9 |
| Potassium Phosphate Salt Production Line | 0.03 | | ¹ 0.109 | 13 |
| Total | | 93.9 | | 93.9 |

¹ Based on actual stack test data.
Note: T/yr = Tons per year.

The Office of Management and Budget has exempted this rule from the requirements of section 3 of Executive Order 12291.

Under section 307(b)(1) of the Act, petitions for judicial review of this action must be filed in the United States Court of Appeals for the appropriate circuit by May 27, 1986. This action may not be challenged later in proceedings to enforce its requirements. (See 307(b)(2).)

List of Subjects in 40 CFR Part 52

Air pollution control, Incorporation by reference, Particulate matter, Intergovernmental relations.

Note.—Incorporation by reference of the State Implementation Plan for the State of Indiana was approved by the Director of the Federal Register on July 1, 1982.

Dated: April 12, 1986.

**Lee M. Thomas,**
*Administrator.*

PART 52—APPROVAL AND PROMULGATION OF IMPLEMENTATION PLANS

Title 40 of the Code of Federal Regulations, Chapter I, Part 52, is amended as follows:

1. The authority citation for Part 52 continues to read as follows:

**Authority:** 42 U.S.C. 7401–7642.

2. Section 52.770 is amended by adding new paragraph (c)(56) as follows:

§ 52.770    Identification of Plan.

*    *    *    *    *

(c) * * *

(56) On September 2, 1983, the Indiana Air Pollution Control Board (Board) submitted revised emission limitations for Occidental Chemical Corporation (OCC), located in Clark County, Indiana. Amendments to these operating permits were submitted by the State on December 21, 1983. These emission limits replace those approved for OCC (under its former name, Hooker Chemical) at (c)(34).

(i) Incorporation by reference.

(A) Indiana Air Pollution Control Board Operation Permits:

(1) Control Number 16113, date issued December 27, 1982.

(2) Control Number 16114, date issued December 27, 1982.

(3) Control Number 16115, date issued December 27, 1982.

(ii) Additional material.

(A) OCC corrected emissions dated September 13, 1984.

(B) OCC's new modeled data, dated November 6, 1984.

(C) State's modeling for OCC and surrounding area, dated July 2, 1984 and August 7, 1984.

[FR Doc. 86–9292 Filed 4–24–86; 8:45 am]

**BILLING CODE 6560-50-M**

COUNCIL ON ENVIRONMENTAL QUALITY

40 CFR Part 1502

National Environmental Policy Act Regulations; Incomplete or Unavailable Information

**AGENCY:** Council on Environmental Quality, Executive Office of the President.

**ACTION:** Final rule.

**SUMMARY:** The Council on Environmental Quality (CEQ) promulgates regulations, binding on all federal agencies, to implement the procedural provisions of the National Environmental Policy Act (NEPA). The regulations address the administration of the NEPA process, including preparation of environmental impact statements for major federal actions which significantly affect the quality of the human environment. On August 9, 1985, CEQ published a proposed amendment to one of these regulations (40 CFR 1502.22), which addresses incomplete or unavailable information in an environmental impact statement (EIS). 50 FR 32234. After reviewing the comments received in response to that proposal, the CEQ now issues the final amendment to that regulation. The final amendment requires all federal agencies to disclose the fact of incomplete or unavailable information when evaluating reasonably foreseeable significant adverse impacts on the human environment in an EIS, and to obtain that information if the overall costs of doing so are not exorbitant. If the agency is unable to obtain the information because overall costs are exorbitant or because the means to obtain it are not known, the agency must (1) affirmatively disclose the fact that such information is unavailable; (2) explain the relevance of the unavailable information; (3) summarize the existing credible scientific evidence which is relevant to the agency's evaluation of significant adverse impacts on the human environment; and (4) evaluate the impacts based upon theoretical approaches or research methods generally accepted in the scientific community. The amendment also specifies that impacts which have a low probability of occurrence but catastrophic consequences if they do occur, should be evaluated if the analysis is supported by credible scientific evidence and is not based on pure conjecture, and is within the rule of reason. The requirement to prepare a "worst case analysis" is rescinded.

The existing guidance regarding 40 CFR 1502.22, found in Question 20 of *Forty Most Asked Questions Concerning CEQ's National Environmental Policy Act Regulations,* 46 FR 18032 (1981), is hereby withdrawn. Guidance relevant to the amended regulation will be published after the regulation becomes effective.

**EFFECTIVE DATE:** May 27, 1986.

**FOR FURTHER INFORMATION CONTACT:** Dinah Bear, General Counsel, Council on Environmental Quality, 722 Jackson Place NW., Washington, DC 20006. (202) 395–5754.

AR_0043514

systems do not track certain categories of CEs considered "routine" activities, such as emergency preparedness planning. For example, DOE officials stated that the department has two types of CEs, those that (1) are routine (e.g., administrative, financial, and personnel actions; information gathering, analysis, and dissemination) and are not tracked and (2) are documented as required by DOE regulations.

## Governmentwide Data Are Available on EISs

EPA publishes and maintains governmentwide information on EISs, updated when Notices of Availability for draft and final EISs are published in the Federal Register. CEQ and NAEP publish publicly available reports on EISs using EPA data.[18] As shown in table 1, the three compilations of EIS data produce different totals.

**Table 1: Number of Environmental Impact Statements from EPA, CEQ, and NAEP, 2008 through 2012**

| Calendar year | Environmental Protection Agency (EPA) | | | Council on Environmental Quality (CEQ) | | | National Association of Environmental Professionals (NAEP) | | |
|---|---|---|---|---|---|---|---|---|---|
| | Draft | Final | Total | Draft | Final | Total | Draft | Final | Total |
| 2008 | 270 | 277 | **547** | 270 | 277 | **547**[a] | 272 | 276 | **548**[b] |
| 2009 | 252 | 203 | **455** | 252 | 203 | **455**[c] | 277 | 222 | **499** |
| 2010 | 242 | 240 | **482** | 241 | 246 | **487** | 243 | 231 | **474** |
| 2011 | 235 | 201 | **436** | 234 | 201 | **435** | 234 | 204 | **438** |
| 2012 | 200 | 197 | **397** | 199 | 198 | **397** | 194 | 210 | **404** |
| **Total** | **1,199** | **1,118** | **2,317** | **1,196** | **1,125** | **2,321** | **1,220** | **1,143** | **2,363** |

Sources: GAO analysis of EPA data, and CEQ and NAEP reports.

Notes:

NEPA calls for federal agencies to circulate a draft Environmental Impact Statement (EIS) for public review and comment. When the public comment period is finished, the agency analyzes comments, conducts further analysis as necessary, and prepares the final EIS. The final EIS is circulated for review and may be made available for public review and comment.

The differences in EIS numbers are likely due to different assumptions used to count the number of EISs and minor inconsistencies in the EPA data compiled for the CEQ and NAEP reports and GAO's

---

[18]NAEP's annual NEPA reports generally include two sets of EIS data. The first set, presented in tables 1 and 2, reflects NAEP's analysis of the number of draft and final EIS announcements published in the *Federal Register*. The second set of EIS data are used by NAEP to analyze the time frames associated with completing EISs. The two sets of EIS data within NAEP reports generally do not match, in part because the sample of EISs used to evaluate time frames excludes certain projects, such as "adoptions" or EISs that were subsequently supplemented.

AR_0043535

analysis of EPA's database. EPA officials told us that the data it provides to others may differ because EPA periodically corrects the manually entered data in their EIS database.

[a]In 2008, two different CEQ documents listed 543 and 547 total EISs, respectively. We used the 547 value in this table because it matched the sum of the draft and final EIS reported by CEQ in 2008 and also because it matched the total number we derived from the information supplied by EPA.

[b]One section of NAEP's Annual NEPA Report 2008 identified a total of 548 EISs for 2008, while another section of the report identified a total of 547. We use 548 for this table to remain consistent with NAEP's summary of EIS data for 2008.

[c]For 2009, the CEQ source document shows 450 for the total number of EISs, but this is a computation error because the total from adding the "draft" and "final" entries is 455.

According to CEQ and EPA officials, the differences in EIS numbers shown in table 1 are likely due to different assumptions used to count the number of EISs and minor inconsistencies in the EPA data compiled for the CEQ and NAEP reports and for our analysis of EPA's data. CEQ obtains the EIS data it reports based on summary totals provided by EPA. Occasionally, CEQ also gathers some CE, EA, and EIS data through its "data call" process, by which it aggregates information submitted by agencies that use different data collection mechanisms of varying quality. According to a January 2011 CRS report on NEPA, agencies track the total draft, final, and supplemental EISs filed,[19] not the total number of individual federal actions requiring an EIS.[19] In other words, agency data generally reflect the number of EIS documents associated with a project, not the number of projects.

Four agencies—the Forest Service, BLM, FHWA, and the U.S. Army Corps of Engineers within the Department of Defense (DOD)—are generally the most frequent producers of EISs, accounting for 60 percent of the EISs in 2012, according to data in NAEP's April 2013 report.[20] As shown in table 2, these agencies account for over half of total draft and final EISs from 2008 through 2012, according to NAEP data.

---

[19]CRS, *The National Environmental Policy Act (NEPA): Background and Implementation,* RL33152 (Washington, D.C.: Jan. 10, 2011).

[20]NAEP, *Annual NEPA Report 2012 of the National Environmental Policy Act (NEPA) Practice* (April 2013).

AR_0043536

**Table 2: Number of Environmental Impact Statements by Agency as Reported by National Association of Environmental Professionals (NAEP), 2008 through 2012**

| Calendar year | Forest Service | | Bureau of Land Management[a] | | Federal Highway Administration | | Army Corps of Engineers | | All other agencies[b] | | Total |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | Number | Percentage of total | Number | Percentage of total | Number | Percentage of total | Number | Percentage of total | Number | Percentage of total | |
| 2008 | 123 | 22 | 49 | 9 | 65 | 12 | 43 | 8 | 268 | 49 | 548[c] |
| 2009 | 134 | 27 | 28 | 6 | 58 | 12 | 41 | 8 | 238 | 48 | 499 |
| 2010 | 104 | 22 | 55 | 12 | 56 | 12 | 39 | 8 | 220 | 46 | 474 |
| 2011 | 109 | 25 | 42 | 10 | 49 | 11 | 33 | 8 | 205 | 47 | 438 |
| 2012 | 102 | 25 | 56 | 14 | 44 | 11 | 41 | 10 | 161 | 40 | 404 |
| Total | 572 | 24 | 230 | 10 | 272 | 12 | 197 | 8 | 1,092 | 46 | 2,363 |

Source: GAO analysis of NAEP data.

Note: The National Environmental Policy Act (NEPA) calls for federal agencies to solicit input by submitting a draft Environmental Impact Statement (EIS) for public comment. When the public comment period is finished, the agency analyzes comments, conducts further analysis as necessary, and prepares the final EIS.

[a]According to BLM officials, BLM completed 53 NEPA analyses in 2010, 44 in 2011, and 20 in 2012. We present NAEP's analysis of EPA data in this table.

[b]In 2012, 31 other agencies completed at least 1 draft or final EIS. Five of them prepared 10 or more, including the National Park Service (21 draft and final EISs) and the Fish and Wildlife Service (19), both within the Department of the Interior; the National Oceanic and Atmospheric Administration within the Department of Commerce (17); the Navy within the Department of Defense (14); and the Federal Transit Administration within the Department of Transportation (10). The list of agencies varied somewhat for each of the other fiscal years presented (2008 through 2011).

[c]One section of NAEP's Annual NEPA Report 2008 identified a total of 548 EISs for 2008, while another section of the report identified a total of 547. We use 548 for this table to remain consistent with NAEP's summary of EIS data for 2008.

# Little Information Exists on the Costs and Benefits of Completing NEPA Analyses

Little information exists at the agencies we reviewed on the costs and benefits of completing NEPA analyses. We found that, with few exceptions, the agencies did not routinely track data on the cost of completing NEPA analyses, and that the cost associated with conducting an EIS or EA can vary considerably, depending on the complexity and scope of the project. Information on the benefits of completing NEPA analyses is largely qualitative. Complicating matters, agency activities under NEPA are hard to separate from other environmental review tasks under federal laws, such as the Clean Water Act and the Endangered Species Act; executive orders; agency guidance; and state and local laws.

AR_0043537

# The National Environmental Policy Act of 1969, as amended

(Pub. L. 91-190, 42 U.S.C. 4321-4347, January 1, 1970, as amended by Pub. L. 94-52, July 3, 1975, Pub. L. 94-83, August 9, 1975, and Pub. L. 97-258, § 4(b), Sept. 13, 1982)

An Act to establish a national policy for the environment, to provide for the establishment of a Council on Environmental Quality, and for other purposes.

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That this Act may be cited as the "National Environmental Policy Act of 1969."

## Purpose

**Sec. 2 [42 USC § 4321].** The purposes of this Act are: To declare a national policy which will encourage productive and enjoyable harmony between man and his environment; to promote efforts which will prevent or eliminate damage to the environment and biosphere and stimulate the health and welfare of man; to enrich the understanding of the ecological systems and natural resources important to the Nation; and to establish a Council on Environmental Quality.

## TITLE I

## CONGRESSIONAL DECLARATION OF NATIONAL ENVIRONMENTAL POLICY

**Sec. 101 [42 USC § 4331].**

(a) The Congress, recognizing the profound impact of man's activity on the interrelations of all components of the natural environment, particularly the profound influences of population growth, high-density urbanization, industrial expansion, resource exploitation, and new and expanding technological advances and recognizing further the critical importance of restoring and maintaining environmental quality to the overall welfare and development of man, declares that it is the continuing policy of the Federal Government, in cooperation with State and local governments, and other concerned public and private organizations, to use all practicable means and measures, including financial and technical assistance, in a manner calculated to foster and promote the general welfare, to create and maintain conditions under which man and nature can exist in productive harmony, and fulfill the social, economic, and other requirements of present and future generations of Americans.

(b) In order to carry out the policy set forth in this Act, it is the continuing responsibility of the Federal Government to use all practicable means, consist with other essential

AR_0043565

TABLE I—§ 36.2.—CIVIL MONETARY PENALTY INFLATION ADJUSTMENTS—Continued

| Statute | Description | New maximum (and minimum, if applicable) penalty amount |
|---|---|---|
| 31 U.S.C. 1352(c)(1) and (c)(2)(A) ........... | Provides for a civil penalty, as set by Congress in 1989, of $10,000 to $100,000 for recipients of Government grants, contracts, etc. that improperly lobby Congress or the Executive Branch with respect to the award of Government grants and contracts. | 22,021 to 220,213 |
| 31 U.S.C. 3802(a)(1) and (a)(2) ............... | Provides for a civil penalty, as set by Congress in 1986, of up to $5,000 for false claims and statements made to the Government. | 12,537 |

\* \* \* \* \*

## PART 668—STUDENT ASSISTANCE GENERAL PROVISIONS

■ 3. The general authority citation for part 668 continues to read as follows:

**Authority:** 20 U.S.C. 1001–1003, 1070a, 1070g, 1085, 1087b, 1087d, 1087e, 1088, 1091, 1092, 1094, 1099c, 1099c–1, 1221e–3, and 3474; Pub. L. 111–256, 124 Stat. 2643; unless otherwise noted.

\* \* \* \* \*

### § 668.84   [Amended]

■ 4. In § 668.84 amend paragraph (a)(1) introductory text by removing the number "$59,017" and adding, in its place, the number "$62,689".

[FR Doc. 2022–08222 Filed 4–19–22; 8:45 am]

BILLING CODE 4000–01–P

---

## COUNCIL ON ENVIRONMENTAL QUALITY

**40 CFR Parts 1502, 1507, and 1508**

[CEQ–2021–0002]

RIN 0331–AA05

### National Environmental Policy Act Implementing Regulations Revisions

**AGENCY:** Council on Environmental Quality.

**ACTION:** Final rule.

**SUMMARY:** The Council on Environmental Quality (CEQ) issues this final rule to amend certain provisions of its regulations for implementing the National Environmental Policy Act (NEPA), addressing the purpose and need of a proposed action, agency NEPA procedures for implementing CEQ's NEPA regulations, and the definition of "effects." The amendments generally restore provisions that were in effect for decades before being modified in 2020.

**DATES:** This rule is effective May 20, 2022.

**ADDRESSES:** CEQ established a docket for this action under docket number

CEQ–2021–0002. All documents in the docket are listed in the docket at *www.regulations.gov.*

**FOR FURTHER INFORMATION CONTACT:**
Amy B. Coyle, Deputy General Counsel, 202–395–5750, *Amy.B.Coyle@ ceq.eop.gov.*

**SUPPLEMENTARY INFORMATION:** CEQ is issuing this final rule to amend three provisions of its regulations implementing the National Environmental Policy Act of 1969 (NEPA), 42 U.S.C. 4321 *et seq.,* which are set forth in 40 CFR parts 1500 through 1508 ("NEPA regulations" or "CEQ regulations"). First, CEQ is revising 40 CFR 1502.13 on the requirement for a purpose and need statement in an environmental impact statement. The revision clarifies that agencies have discretion to consider a variety of factors when assessing an application for an authorization, removing the requirement that an agency base the purpose and need on the goals of an applicant and the agency's statutory authority. The final rule also makes a conforming edit to the definition of "reasonable alternatives" in 40 CFR 1508.1(z). Second, CEQ is revising 40 CFR 1507.3 to remove language that could be construed to limit agencies' flexibility to develop or revise procedures to implement NEPA specific to their programs and functions that may go beyond the CEQ regulatory requirements. Third, CEQ is revising the definition of "effects" in paragraph (g) of 40 CFR 1508.1 to include direct, indirect, and cumulative effects. CEQ is making these changes in order to better align the provisions with CEQ's extensive experience implementing NEPA and unique perspective on how NEPA can best inform agency decision making, as well as longstanding Federal agency experience and practice, NEPA's statutory text and purpose to protect and enhance the quality of the human environment, including making decisions informed by science, and case law interpreting NEPA's requirements.

## I. Background

### A. NEPA Statute

Congress enacted NEPA in 1969 by a unanimous vote in the Senate and a nearly unanimous vote in the House[1] to declare an ambitious and visionary national policy to promote environmental protection for present and future generations. President Nixon signed NEPA into law on January 1, 1970. NEPA seeks to "encourage productive and enjoyable harmony" between humans and the environment, recognizing the "profound impact" of human activity and the "critical importance of restoring and maintaining environmental quality" to the overall welfare of humankind. Furthermore, NEPA seeks to promote efforts that will prevent or eliminate damage to the environment and biosphere and stimulate the health and welfare of people, making it the continuing policy of the Federal Government to use all practicable means and measures to create and maintain conditions under which humans and nature can exist in productive harmony and fulfill the social, economic, and other requirements of present and future generations of Americans. It also recognizes that each person should have the opportunity to enjoy a healthy environment and has a responsibility to contribute to the preservation and enhancement of the environment. 42 U.S.C. 4321, 4331.

NEPA requires Federal agencies to interpret and administer Federal policies, regulations, and laws in accordance with NEPA's policies and to give appropriate consideration to environmental values in their decision making. To that end, section 102(2)(C) of NEPA requires Federal agencies to prepare "detailed statements," referred to as environmental impact statements (EISs), for "every recommendation or

---

[1] *See* Linda Luther, Cong. Rsch. Serv., RL33152, The National Environmental Policy Act: Background and Implementation (2008), *https:// crsreports.congress.gov/product/ details?prodcode=RL33152.*

TABLE I—§ 36.2.—CIVIL MONETARY PENALTY INFLATION ADJUSTMENTS—Continued

| Statute | Description | New maximum (and minimum, if applicable) penalty amount |
|---|---|---|
| 31 U.S.C. 1352(c)(1) and (c)(2)(A) ........... | Provides for a civil penalty, as set by Congress in 1989, of $10,000 to $100,000 for recipients of Government grants, contracts, etc. that improperly lobby Congress or the Executive Branch with respect to the award of Government grants and contracts. | 22,021 to 220,213 |
| 31 U.S.C. 3802(a)(1) and (a)(2) ............... | Provides for a civil penalty, as set by Congress in 1986, of up to $5,000 for false claims and statements made to the Government. | 12,537 |

\*　\*　\*　\*　\*

## PART 668—STUDENT ASSISTANCE GENERAL PROVISIONS

■ 3. The general authority citation for part 668 continues to read as follows:

**Authority:** 20 U.S.C. 1001–1003, 1070a, 1070g, 1085, 1087b, 1087d, 1087e, 1088, 1091, 1092, 1094, 1099c, 1099c–1, 1221e–3, and 3474; Pub. L. 111–256, 124 Stat. 2643; unless otherwise noted.

\*　\*　\*　\*　\*

### § 668.84　[Amended]

■ 4. In § 668.84 amend paragraph (a)(1) introductory text by removing the number "$59,017" and adding, in its place, the number "$62,689".

[FR Doc. 2022–08222 Filed 4–19–22; 8:45 am]

BILLING CODE 4000–01–P

---

## COUNCIL ON ENVIRONMENTAL QUALITY

**40 CFR Parts 1502, 1507, and 1508**

[CEQ–2021–0002]

RIN 0331–AA05

### National Environmental Policy Act Implementing Regulations Revisions

**AGENCY:** Council on Environmental Quality.

**ACTION:** Final rule.

**SUMMARY:** The Council on Environmental Quality (CEQ) issues this final rule to amend certain provisions of its regulations for implementing the National Environmental Policy Act (NEPA), addressing the purpose and need of a proposed action, agency NEPA procedures for implementing CEQ's NEPA regulations, and the definition of "effects." The amendments generally restore provisions that were in effect for decades before being modified in 2020.

**DATES:** This rule is effective May 20, 2022.

**ADDRESSES:** CEQ established a docket for this action under docket number CEQ–2021–0002. All documents in the docket are listed on *www.regulations.gov*.

**FOR FURTHER INFORMATION CONTACT:** Amy B. Coyle, Deputy General Counsel, 202–395–5750, *Amy.B.Coyle@ceq.eop.gov*.

**SUPPLEMENTARY INFORMATION:** CEQ is issuing this final rule to amend three provisions of its regulations implementing the National Environmental Policy Act of 1969 (NEPA), 42 U.S.C. 4321 *et seq.*, which are set forth in 40 CFR parts 1500 through 1508 ("NEPA regulations" or "CEQ regulations"). First, CEQ is revising 40 CFR 1502.13 on the requirement for a purpose and need statement in an environmental impact statement. The revision clarifies that agencies have discretion to consider a variety of factors when assessing an application for an authorization, removing the requirement that an agency base the purpose and need on the goals of an applicant and the agency's statutory authority. The final rule also makes a conforming edit to the definition of "reasonable alternatives" in 40 CFR 1508.1(z). Second, CEQ is revising 40 CFR 1507.3 to remove language that could be construed to limit agencies' flexibility to develop or revise procedures to implement NEPA specific to their programs and functions that may go beyond the CEQ regulatory requirements. Third, CEQ is revising the definition of "effects" in paragraph (g) of 40 CFR 1508.1 to include direct, indirect, and cumulative effects. CEQ is making these changes in order to better align the provisions with CEQ's extensive experience implementing NEPA and unique perspective on how NEPA can best inform agency decision making, as well as longstanding Federal agency experience and practice, NEPA's statutory text and purpose to protect and enhance the quality of the human environment, including making decisions informed by science, and case law interpreting NEPA's requirements.

## I. Background

### A. NEPA Statute

Congress enacted NEPA in 1969 by a unanimous vote in the Senate and a nearly unanimous vote in the House[1] to declare an ambitious and visionary national policy to promote environmental protection for present and future generations. President Nixon signed NEPA into law on January 1, 1970. NEPA seeks to "encourage productive and enjoyable harmony" between humans and the environment, recognizing the "profound impact" of human activity and the "critical importance of restoring and maintaining environmental quality" to the overall welfare of humankind. Furthermore, NEPA seeks to promote efforts that will prevent or eliminate damage to the environment and biosphere and stimulate the health and welfare of people, making it the continuing policy of the Federal Government to use all practicable means and measures to create and maintain conditions under which humans and nature can exist in productive harmony and fulfill the social, economic, and other requirements of present and future generations of Americans. It also recognizes that each person should have the opportunity to enjoy a healthy environment and has a responsibility to contribute to the preservation and enhancement of the environment. 42 U.S.C. 4321, 4331.

NEPA requires Federal agencies to interpret and administer Federal policies, regulations, and laws in accordance with NEPA's policies and to give appropriate consideration to environmental values in their decision making. To that end, section 102(2)(C) of NEPA requires Federal agencies to prepare "detailed statements," referred to as environmental impact statements (EISs), for "every recommendation or

[1] *See* Linda Luther, Cong. Rsch. Serv., RL33152, The National Environmental Policy Act: Background and Implementation (2008), *https://crsreports.congress.gov/product/details?prodcode=RL33152*.

report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment'' and, in doing so, provide opportunities for public participation to help inform agency decision making. 42 U.S.C. 4332(2)(C). The EIS process embodies the understanding that informed decisions are better decisions, and that environmental conditions will improve when decision makers understand and consider environmental impacts. The EIS process also serves to enrich the understanding of the ecological systems and natural resources important to the Nation and helps guide sound decision making, including development, in line with the best available science and data. NEPA also established the Council on Environmental Quality (CEQ) in the Executive Office of the President, which advises the President on environmental policy matters and oversees Federal agencies' implementation of NEPA. 42 U.S.C. 4342.

In many respects, NEPA was a statute ahead of its time, and it remains relevant and vital today. It codifies the common-sense and fundamental idea of ''look before you leap'' to guide agency decision making, particularly in complex and consequential areas, because conducting sound environmental analysis before actions are taken reduces conflict and waste in the long run by avoiding unnecessary harms and uninformed decisions. It establishes a framework for agencies to ground decisions in sound science and recognizes that the public may have important ideas and information on how Federal actions can occur in a manner that reduces potential harms and enhances ecological, social, and economic well-being. *See, e.g.,* 42 U.S.C. 4331, 4332(2)(A).

*B. Regulatory Implementation of NEPA 1970–2020*

In 1970, President Nixon issued Executive Order (E.O.) 11514, *Protection and Enhancement of Environmental Quality,* directing CEQ to issue guidelines for implementation of section 102(2)(C) of NEPA.[2] In response, CEQ issued interim guidelines in April 1970, and revised the guidelines in 1971 and 1973.[3] In 1977, President Carter issued E.O. 11991, *Relating to Protection and Enhancement of Environmental Quality,* amending E.O. 11514 and directing CEQ to issue regulations for implementation

of section 102(2)(C) of NEPA and requiring that Federal agencies comply with those regulations.[4] CEQ promulgated its NEPA regulations in 1978.[5] Issued 8 years after NEPA's enactment, the NEPA regulations reflected CEQ's interpretation of the statutory text and Congressional intent, expertise developed through issuing and revising the CEQ guidelines and advising Federal agencies on their implementation of NEPA, initial interpretations of the courts, and Federal agency experience implementing NEPA. The 1978 regulations reflected the fundamental principles of informed and science-based decision making, transparency, and public engagement Congress established in NEPA. They directed Federal agencies to issue and update periodically agency-specific implementing procedures to supplement CEQ's procedures and integrate the NEPA process into the agencies' specific programs and processes. Consistent with 42 U.S.C. 4332(2)(B), the regulations also required agencies to consult with CEQ in the development or update of these agency-specific procedures to ensure consistency with CEQ's regulations.

In 1981, CEQ issued the ''Forty Most Asked Questions Concerning CEQ's National Environmental Policy Act Regulations,''[6] one of numerous guidance documents CEQ has issued. The ''Forty Questions'' reflected CEQ's contemporaneous interpretation of the 1978 regulations and grew out of meetings CEQ held in ten Federal regions to discuss implementation of the CEQ regulations with Federal, state, and local government officials, which identified common questions. The Forty Questions guidance is the most comprehensive guidance CEQ has issued on the 1978 regulations, addressing a broad set of topics from alternatives to tiering. Since its issuance, CEQ has routinely identified the Forty Questions guidance as an invaluable tool for Federal, state, Tribal, and local governments and officials, and members of the public, who have questions about NEPA implementation. Since 1981, CEQ has issued more than 30 additional guidance documents on a range of topics including efficient and coordinated environmental reviews,

mitigation and monitoring, and effects analyses.[7]

CEQ made technical amendments to the 1978 implementing regulations in 1979[8] and amended one provision in 1986 (referred to collectively as 1978 regulations).[9] Otherwise, the regulations were left unchanged for over 40 years. As a result, CEQ and Federal agencies developed extensive experience implementing the 1978 regulations, and a large body of agency practice and case law developed based on them.

*C. 2020 Amendments to the CEQ Regulations*

On August 15, 2017, President Trump issued E.O. 13807, *Establishing Discipline and Accountability in the Environmental Review and Permitting Process for Infrastructure Projects,*[10] directing, in part, CEQ to establish and lead an interagency working group to identify and propose changes to the NEPA regulations.[11] In response, CEQ issued an advanced notice of proposed rulemaking (ANPRM) on June 20, 2018, requesting comment on potential revisions to ''update and clarify'' the CEQ regulations and including a list of questions on specific aspects of the regulations.[12] CEQ received approximately 12,500 comments.[13]

On January 10, 2020, CEQ published a notice of proposed rulemaking (NPRM) proposing broad revisions to the 1978 NEPA regulations.[14] A wide range of stakeholders submitted more than 1.1 million comments on the proposed rule,[15] including state and local governments, Tribes, environmental advocacy organizations, professional and industry associations, other advocacy or non-profit organizations, businesses, and private citizens. Many commenters provided detailed feedback on the legality, policy wisdom, and potential consequences of the proposed amendments. In keeping with the proposed rule, the final rule, promulgated on July 16, 2020 (''2020 regulations'' or ''2020 rule''), made

---

[2] 35 FR 4247 (Mar. 7, 1970), sec. 3(h).

[3] *See* 35 FR 7390 (May 12, 1970) (interim guidelines); 36 FR 7724 (Apr. 23, 1971) (final guidelines); 38 FR 10856 (May 2, 1973) (proposed revisions to the guidelines); 38 FR 20550 (Aug. 1, 1973) (revised guidelines).

[4] 42 FR 26967 (May 25, 1977).

[5] 43 FR 55978 (Nov. 23, 1978).

[6] 46 FR 18026 (Mar. 23, 1981) (''Forty Questions''), *https://www.energy.gov/nepa/downloads/forty-most-asked-questions-concerning-ceqs-national-environmental-policy-act.*

[7] *See https://www.energy.gov/nepa/ceq-guidance-documents* for a list of current CEQ guidance documents.

[8] 44 FR 873 (Jan. 3, 1979).

[9] 51 FR 15618 (Apr. 25, 1986) (amending 40 CFR 1502.22).

[10] 82 FR 40463 (Aug. 24, 2017).

[11] *Id.,* sec. 5(e)(iii).

[12] 83 FR 28591 (June 20, 2018).

[13] The comments are available on *www.regulations.gov* under Docket No. CEQ–2018–0001.

[14] 85 FR 1684 (Jan. 10, 2020).

[15] *See* Docket No. CEQ–2019–0003, *https://www.regulations.gov/document/CEQ-2019-0003-0001.*

AR_0043864

wholesale revisions to the regulations; it took effect on September 14, 2020.[16]

In the months that followed the issuance of the 2020 regulations, five lawsuits were filed challenging the 2020 rule.[17] These cases challenge the 2020 rule on a variety of grounds, including under the Administrative Procedure Act (APA), NEPA, and the Endangered Species Act, contending that the rule exceeded CEQ's authority and that the related rulemaking process was procedurally and substantively defective. In response to CEQ and joint motions, the district courts have issued temporary stays in each of these cases, except for *Wild Virginia* v. *Council on Environmental Quality*, which the district court dismissed without prejudice on June 21, 2021,[18] and is currently on appeal to the U.S. Court of Appeals for the Fourth Circuit.

### D. CEQ's Comprehensive Review of the 2020 Regulations

On January 20, 2021, President Biden issued E.O. 13990, *Protecting Public Health and the Environment and Restoring Science to Tackle the Climate Crisis,*[19] to establish an Administration policy to listen to the science; improve public health and protect our environment; ensure access to clean air and water; limit exposure to dangerous chemicals and pesticides; hold polluters accountable, including those who disproportionately harm communities of color and low-income communities; reduce greenhouse gas emissions; bolster resilience to the impacts of climate change; restore and expand the Nation's treasures and monuments; and prioritize both environmental justice and the creation of well-paying union jobs necessary to achieve these goals.[20] The E.O. calls for Federal agencies to review existing regulations issued between January 20, 2017, and January 20, 2021, for consistency with the policy it articulates and to take appropriate action. The E.O. also revokes E.O. 13807

and directs agencies to promptly take steps to rescind any rules or regulations implementing it. An accompanying White House fact sheet, published on January 20, 2021, specifically directs CEQ to review the 2020 regulations for consistency with E.O. 13990's policy.[21]

On January 27, 2021, the President signed E.O. 14008, *Tackling the Climate Crisis at Home and Abroad,* to establish a government-wide approach to the climate crisis by reducing greenhouse gas emissions and an Administration policy to increase climate resilience, transition to a clean-energy economy, address environmental justice and invest in disadvantaged communities, and spur well-paying union jobs and economic growth.[22] E.O. 14008 also requires the Chair of CEQ and the Director of the Office of Management and Budget (OMB) to ensure that Federal permitting decisions consider the effects of greenhouse gas emissions and climate change.[23]

Consistent with E.O. 13990 and E.O. 14008, CEQ is engaged in a comprehensive review of the 2020 regulations to ensure that they provide for sound and efficient environmental review of Federal actions, including those actions integral to tackling the climate crisis, in a manner that enables meaningful public participation, advances environmental justice, respects Tribal sovereignty, protects our Nation's resources, and promotes better environmental and community outcomes. CEQ is taking a phased approach to its comprehensive review, which includes this Phase 1 rulemaking and a planned, more comprehensive Phase 2 rulemaking. Additionally, as a preliminary matter, CEQ issued an interim final rule on June 29, 2021, amending the requirement in 40 CFR 1507.3(b) for agencies to propose changes to existing agency-specific NEPA procedures by September 14,

2021, to make those procedures consistent with the 2020 regulations.[24] CEQ extended the date by 2 years to avoid agencies proposing changes to agency-specific implementing procedures on a tight deadline to conform to regulations that are undergoing extensive review and will likely change in the near future. CEQ requested comments on the interim final rule and received approximately 20 written submissions; summaries and responses to those comments are included in the response to comments document posted to the docket for this rulemaking.

As a next step in the phased approach, CEQ published a proposed rule[25] for the Phase 1 rulemaking on October 7, 2021. In the Phase 1 proposed rule, CEQ identified a discrete set of provisions that pose significant near-term interpretation or implementation challenges for Federal agencies; would have the most impact to agencies' NEPA processes during the interim period before a "Phase 2" rulemaking is complete and make sense to revert to the 1978 regulatory approach. In proposing to revert to language conforming to the approach in the 1978 regulations, the proposed rule addressed issues similar or identical to those the public and Federal agencies recently had the opportunity to consider and comment on during the rulemaking for the 2020 rule.

Publication of the proposed rule initiated a 45-day public comment period that concluded on November 22, 2021. CEQ received approximately 94,458 written comments in response to the proposed rule. Seventy-six comments were shared with CEQ during two virtual public meetings CEQ hosted on the proposed rule on October 19, 2021, and October 21, 2021. In total, CEQ received 94,534 comments on the proposed rule, which CEQ considered in the development of this final rule. A majority of the comments (approximately 93,893) were campaign form letters sent in response to an organized initiative and identical or very similar in form and content. CEQ received approximately 573 unique public comments, of which 362 were substantive comments raising a variety of issues related to the rulemaking approach and contents of the proposed rule. The vast majority of the unique comments expressed some level of support for the proposed rule. Many supportive comments included suggestions for Phase 2 or expressed general support for Phase 1 while also

---

[16] 85 FR 43304 (July 16, 2020).

[17] *Wild Va.* v. *Council on Env't Quality,* No. 3:20cv45 (W.D. Va. 2020); *Env't Justice Health All.* v. *Council on Env't Quality,* No. 1:20cv06143 (S.D.N.Y. 2020); *Alaska Cmty. Action on Toxics* v. *Council on Env't Quality,* No. 3:20cv5199 (N.D. Cal. 2020); *California* v. *Council on Env't Quality,* No. 3:20cv06057 (N.D. Cal. 2020); *Iowa Citizens for Cmty. Improvement* v. *Council on Env't Quality,* No. 1:20cv02715 (D.D.C. 2020). Additionally, in *The Clinch Coalition* v. *U.S. Forest Service,* No. 2:21cv00003 (W.D. Va. 2020), plaintiffs challenged the U.S. Forest Service's NEPA implementing procedures, which established new categorical exclusions, and, relatedly, the 2020 rule's provisions on categorical exclusions.

[18] *Wild Va.* v. *Council on Env't Quality,* 544 F. Supp.3d 620 (W.D. Va. 2021) (appeal pending).

[19] 86 FR 7037 (Jan. 25, 2021).

[20] *Id.,* sec. 1.

[21] White House Fact Sheet: List of Agency Actions for Review (Jan. 20, 2021), *https://www.whitehouse.gov/briefing-room/statements-releases/2021/01/20/fact-sheet-list-of-agency-actions-for-review/.*

[22] E.O. 14008, 86 FR 7619 (Feb. 1, 2021). E.O. 14008's direction to advance environmental justice reinforces and reflects the policy established in E.O. 13985, *Advancing Racial Equity and Support for Underserved Communities Through the Federal Government,* that the Federal Government "pursue a comprehensive approach to advancing equity for all, including people of color and others who have been historically underserved, marginalized, and adversely affected by persistent poverty and inequality." 86 FR 7009 (Jan. 20, 2021).

[23] *Id.,* sec. 213(a); *see also* sec. 219 directing agencies to make achieving environmental justice part of their missions by developing programs, policies, and activities to address the disproportionately high and adverse human health, environmental, climate-related and other cumulative impacts on disadvantaged communities.

[24] 86 FR 34154 (June 29, 2021).

[25] 86 FR 55757 (Oct. 7, 2021).

indicating that the commenters would have preferred for CEQ to have proposed more comprehensive changes in Phase 1. CEQ provides a summary of the comments received on the proposed rule and responses to those comment summaries in the document, "National Environmental Policy Act Implementing Regulations Revision Phase 1 Response to Comments" (Phase 1 Response to Comments) and provides below brief summaries of comments and responses related to the provisions in the final rule.

Separately, CEQ is developing a Phase 2 rulemaking to propose comprehensive revisions to the 2020 regulations and intends to issue a second proposed rule for notice and public comment. Both the Phase 1 and Phase 2 rulemakings are intended to ensure that the NEPA process provides for efficient and effective environmental reviews that are guided by science and are consistent with the statute's text and purpose; enhance clarity and certainty for Federal agencies, project proponents, and the public; inform the public about the potential environmental effects of Federal Government actions and enable full and fair public participation; and ultimately promote better informed Federal decisions that protect and enhance the quality of the human environment and advance environmental, climate change mitigation and resilience, and environmental justice objectives.

*E. Public Comments on the Phased Approach*

CEQ received multiple comments related to the phased approach that it has selected to organize its review of the 2020 regulations. Numerous commenters suggested that CEQ set aside the 2020 regulations entirely and reissue the 1978 regulations to serve as a baseline for consideration of further regulatory reforms. These commenters expressed overall support for the content of the Phase 1 proposed rule, but contended that other provisions in the 2020 regulations also pose near-term challenges and should be revised to revert to the 1978 text. Some of these commenters expressed the view that a full repeal of the 2020 regulations is needed to prevent conflicts between existing agency NEPA procedures and the CEQ regulations. Some commenters also requested that CEQ reissue the 1978 regulations and not pursue additional revisions. CEQ also received many comments expressing support for the Phase 1 rulemaking and encouraging CEQ to quickly initiate and complete a Phase 2 rulemaking. Some of these commenters also identified additional

provisions that the commenters contended Phase 1 should address or provided recommendations for consideration in Phase 2.

Other commenters requested that CEQ pursue one overall rulemaking, rather than a phased approach. These commenters expressed views that one rulemaking has advantages, including enabling stakeholders and the public to understand and comment on the full scope of changes at one time, rather than in two phases. Some of these commenters also expressed concern that the phased approach could result in confusion and inefficiency.

CEQ appreciates the views expressed by commenters on the phased approach and acknowledges that a single rulemaking process would have entailed different tradeoffs and conferred different benefits. However, CEQ considers the phased approach for its review of the 2020 regulations to strike the appropriate balance between the need to act quickly to address critical issues and the need to conduct a thorough review of the 2020 regulations. As explained above, CEQ determined that the phased approach will address important near-term implementation challenges while allowing sufficient time to conduct a thorough review of the 2020 regulations to determine what other changes, including additional reversions to the 1978 regulations and new revisions, may be necessary or appropriate. CEQ decided against proposing a full reversion to the 1978 regulations in Phase 1 to focus time and resources on the most pressing issues and avoid the administrative burdens associated with analyzing each provision in the 2020 regulations, considering whether to revert each provision to the 1978 language and the reasoning for doing so, and responding to comments on the large number of regulatory provisions that would be affected. CEQ is a small agency with limited resources and had concerns about undertaking two large rulemakings—one to revert to the 1978 regulations and a second to propose new updates.

With this final rule, CEQ is concluding Phase 1 and will continue its work on Phase 2. In Phase 2, CEQ will consider the NEPA regulations comprehensively and assess whether to revise additional provisions to revert to the language of the 1978 regulations or to propose other revisions based on its expertise, NEPA's policies and requirements, relevant case law, and feedback from Federal agencies and the public. Further information on the phased approach can be found in the Phase 1 Response to Comments.

## III. Summary of and Rationale for Final Rule

This section summarizes and identifies CEQ's rationale for the regulatory changes included in the final rule. This section also briefly summarizes and responds to the comments CEQ received in response to the NPRM. CEQ has provided more detailed summaries and responses in the Phase 1 Response to Comments document,[26] which CEQ incorporates by reference and has made available in the docket for this rulemaking.

Many commenters expressed general support for CEQ's proposal and the general return to the language from the 1978 regulations for the provisions on purpose and need; agency NEPA procedures; and the definition of effects. These commenters stated that the 2020 rule weakened NEPA and that parts of the 2020 regulations were misguided and reflected a bias in favor of project proponents to the possible detriment of environmental values or the public interest. Several of these commenters indicated that the proposed revisions are important for providing clarity, certainty, and consistency.

Commenters who expressed general opposition to the proposed rule were generally supportive of the 2020 regulations. These commenters expressed disappointment about CEQ rescinding portions of the 2020 rule and expressed concerns that the proposed rule would slow down efforts to improve the nation's infrastructure or harm certain economic sectors. Some of these commenters agreed with the goals that CEQ identified as guiding this rulemaking, but stated that the 2020 rule advanced those goals.

CEQ acknowledges that there is both support for and opposition to the changes outlined in the NPRM, and that there are many additional provisions that commenters suggested CEQ should change in either the Phase 1 rulemaking or in future rulemakings. CEQ is considering these comments as it develops its proposed Phase 2 rule.

This Phase 1 final rule is guided by the extensive experience of CEQ and Federal agencies implementing NEPA for the last 50 years. CEQ is charged with overseeing NEPA implementation across the Federal Government and reviews every agency's proposed new or

---

[26] The National Environmental Policy Act Implementing Regulations Revision Phase 1 Response to Comments is available under "Supporting & Related Materials" in the docket on *www.regulations.gov* under docket ID CEQ–2021–0002, available at *https://www.regulations.gov/docket/CEQ-2021-0002/document?documentTypes=Supporting%20%26%20Related%20Material.*

updated NEPA implementing procedures. Through this iterative process, CEQ engages with agencies to understand their specific authorities and programs to ensure they integrate consideration of environmental impacts into their decision-making processes. Additionally, CEQ frequently consults with agencies on the efficacy and effectiveness of NEPA implementation. Where necessary or appropriate, CEQ engages with agencies on NEPA reviews for specific projects or project types to provide advice and identify any emerging or cross-cutting issues that would benefit from CEQ issuing formal guidance or assisting with coordination. For example, CEQ has convened interagency working groups to promote efficient and effective environmental reviews for transportation and broadband projects. CEQ also has extensive experience providing written guidance to Federal agencies on a wide range of NEPA-related issues, including environmental justice, emergency actions, climate change, and more.[27] In addition, CEQ meets regularly with external stakeholders to understand their perspectives on the NEPA process. Finally, CEQ coordinates with other Federal agencies and components of the White House on a wide array of environmental issues, such as endangered species consultation or impacts to Federal lands and waters from federally authorized activities.

CEQ relied on this body of experience and expertise in developing this final rule. As discussed in detail in the following sections, CEQ is generally reverting to the approach in the 1978 regulations for these three provisions with non-substantive changes to the 1978 regulatory text to accommodate the current structure of the CEQ regulations. In doing so, CEQ intends for the Phase 1 final rule provisions to have the same meaning as the corresponding provisions in the regulations in effect from 1978 to September 2020.

*A. Purpose and Need (§ 1502.13)*

i. Regulatory History and Proposed Changes

The purpose and need section of an EIS identifies the agency's purpose for the proposed action and the need it serves. Developing a statement of the purpose and need is a vital early step in the NEPA process that is foundational to other elements of an EIS. For example, the purpose and need statement informs the range of reasonable alternatives that the agency analyzes and considers.

The 1978 regulations required that each EIS briefly state the underlying purpose and need to which the agency is responding in proposing the alternatives, including the proposed action. 40 CFR 1502.13 (2019). The 2020 regulations modified this requirement by adding specific language to address circumstances in which an agency's "statutory duty" is to consider an application for authorization, such as applications for permits or licenses. In those circumstances, the 2020 regulations require agencies to base the purpose and need on the goals of an applicant and the agency's authority. The 2020 rule added conforming language to a new definition of "reasonable alternatives" in § 1508.1(z). Specifically, the 2020 regulations define "reasonable alternatives" to mean "a reasonable range of alternatives that are technically and economically feasible, meet the purpose and need for the proposed action, and, where applicable, meet the goals of the applicant."[28] In the NPRM for this rulemaking, CEQ proposed to revert to the language of the 1978 regulations in § 1502.13 and make a conforming edit to the definition of "reasonable alternatives" in § 1508.1(z) by deleting the reference to the goals of the applicant from the definition.

ii. Summary of NPRM Comments on Purpose and Need

CEQ received comments that both supported and opposed the proposed changes in the NPRM to §§ 1502.13 and 1508.1(z). Some commenters supported the changes in the proposed rule, expressing the view that the changes would result in better decisions because agencies would consider a full range of alternatives and their effects without any arbitrary limitations tied to a project applicant or specific agency authorities. Commenters also expressed the view that the 2020 rule could be interpreted to allow or encourage agencies to prioritize an applicant's goals over the needs and goals of the public or the agency's own goals, and that the proposed rule would remedy these problems. Some commenters also specifically supported the retention of

"technically and economically feasible" in the definition of "reasonable alternatives," stating this is in alignment with previous CEQ guidance on the 1978 regulations. Many commenters agreed with CEQ's statements in the NPRM that the purpose and need statement should reflect understanding of an agency's statutory authority, the public interest, and an applicant's goals but that these should be framed in the context of the general goal of an action and not through an evaluation of whether an applicant can reach its specific goals. Some comments also indicated that the reference to agency authority is redundant and supported the proposed removal of this reference to avoid unnecessary confusion.

Other commenters opposed the proposed changes to §§ 1502.13 and 1508.1(z), contending that the language adopted in the 2020 rule provides clarity that agencies must base the purpose and need on the applicant's goals and agency's statutory authority. Commenters also expressed the view that the 1978 regulation resulted in some Federal agencies prioritizing agency goals over the goals of the applicant, and therefore, that the proposed rule would have the same effect. They further argued that analyses considering alternatives that do not meet an applicant's goals or that cannot be implemented by the applicant or agency are wasteful of both the applicant's and the agency's resources. Commenters also expressed the view that the proposed changes to purpose and need are not required by NEPA. For example, some commenters stated that there is no requirement to consider the public interest when developing a purpose and need statement for a non-Federal project. These commenters also objected to CEQ's statements in the NPRM that the 2020 regulations could be interpreted to require that an applicant's goals be the sole or primary factor for articulating purpose and need. These commenters contended that the 2020 rule's requirement that agencies consider alternatives that the applicant is capable of implementing does not foreclose consideration of potential environmental impacts or public interests. Further, these commenters stated that basing alternatives on the needs of an applicant does not unreasonably narrow the range of alternatives that an agency must consider because agencies still must consider the "no action alternative" and other reasonable alternatives that align with the goals of the applicant. Some commenters who supported retaining the reference to agency statutory

---

[27] *See https://www.energy.gov/nepa/ceq-guidance-documents* for a list of current CEQ guidance documents.

[28] As noted in the 2020 rule, the definition of "reasonable alternatives" was based in part on CEQ's longstanding guidance, the "Forty Most Asked Questions Concerning CEQ's National Environmental Policy Act Regulations," 46 FR 18026 (Mar. 23, 1981), as amended, 1986, *https://www.energy.gov/sites/default/files/2018/06/f53/G-CEQ-40Questions.pdf*. Specifically, the guidance states in response to Question 2A, "Reasonable alternatives include those that are practical or feasible from the technical and economic standpoint and using common sense, rather than simply desirable from the standpoint of the applicant."

authority agreed with CEQ that the language is confusing, but contended that CEQ should clarify it and that deleting the reference also will create confusion.

The inconsistent interpretations of the language in 40 CFR 1502.13 (2020) expressed by commenters to the NPRM, as well as commenters on the 2020 rule, demonstrate the ambiguity of the language and underscore the need for clarification. Some commenters read the language in the 2020 rule to make the applicant's goals and the agency's statutory authority the sole factors an agency can consider in formulating a purpose and need statement when considering an application for authorization. Other commenters read the language as allowing agencies to consider other, unenumerated factors. These comments demonstrate the ambiguity of the 2020 text, which CEQ is clarifying in this final rule.

CEQ specifically requested comment on the potential effects of the proposed changes to §§ 1502.13 and 1501.8(z) to the environmental review process, including timeframes for environmental review. In response, some commenters indicated they do not believe the proposed changes will affect the average timeline for the environmental review process. Other commenters stated that CEQ's proposed revisions to purpose and need will lead to unnecessarily time-consuming and costly expansions of the consideration of alternatives by agencies with little focus on the project's stated purpose. Some commenters expressed concern that the change to purpose and need would result in additional EISs as opposed to more efficient environmental assessments. CEQ did not receive any specific data or evidence from commenters that would address whether or not the proposed change would have an effect on the environmental review process, including timelines.

### iii. Rationale for Final Rule

In the final rule, CEQ makes the changes as proposed. Specifically, the final rule amends the first sentence in § 1502.13 to require an EIS to state the purpose and need to which the agency is responding in proposing alternatives, including the proposed action. The rule removes the second sentence requiring agencies base the purpose and need on the goals of the applicant and the agency's authority when the agency is reviewing an application for authorization. Finally, the final rule removes the reference to the goals of the applicant from the definition of "reasonable alternatives" in § 1508.1(z).

CEQ makes these changes to address the ambiguity created by the 2020 rule language and ensure agencies have the flexibility to consider a variety of factors in developing the purpose and need statement and are not unnecessarily restricted by misconstruing this language to require agencies to prioritize an applicant's goals over other potentially relevant factors, including effectively carrying out the agency's policies and programs or the public interest. While CEQ does not interpret the 2020 rule language to require agencies to prioritize an applicant's goals above or to the exclusion of other relevant factors, CEQ finds that removing the language on applications for authorization and restoring the 1978 regulatory text is appropriate. The language of the 2020 rule could be misconstrued to inappropriately constrain the discretion of agencies in formulating a purpose and need statement, which would be inconsistent with fully informed decision making and sound environmental analysis. And even if interpreted to merely direct agencies to consider the applicant's goals and the agency's statutory authority alongside other relevant factors, CEQ deems it appropriate to strike the text because it is unnecessary and confusing.

Consistent with longstanding practice and to ensure informed decision making, agencies should have discretion to base the purpose and need for their actions on a variety of factors, which include the goals of the applicant, but not to the exclusion of other factors. Agencies have long considered myriad factors in developing a purpose and need statement. These include the agency's mission and the specifics of the agency decision, including statutory and regulatory requirements. Factors also may include national, agency, or other policy objectives applicable to a proposed action, such as a discretionary grant program targeted to achieve certain policy goals; desired conditions on the landscape or other environmental outcomes; local needs; and an applicant's goals. Additionally, when considering a project sponsored by an outside party, there may be actions by multiple Federal agencies for which the lead agency, in consultation with cooperating agencies, will need to craft the purpose and need statement in a manner to address all of the Federal agency actions (*e.g.*, funding and permits) covered by the NEPA document.

Finally, the goals of the applicant are important, but not determinative, factor in developing a purpose and need statement for a variety of reasons,

including helping to identify reasonable alternatives that are technically and economically feasible. Both the development of purpose and need statements and the identification of alternatives are governed by a rule of reason; the range of alternatives should be reasonable, practical, and not boundless. This approach is consistent with CEQ's longstanding position as set forth in the Forty Questions issued shortly after the promulgation of the 1978 regulations, where CEQ acknowledged that agencies must consider practicality and feasibility, without relying solely on the applicant's preference for identifying what alternatives are reasonable.[29] Additionally, removing this language does not foreclose an agency from considering the goals of the applicant.

The final rule also removes the reference to the agency's statutory authority from § 1502.13 because it is confusing and unnecessary. Federal agency discussions with CEQ and public comments, as reflected in both the 2020 Rule Response to Comments and the Phase 1 Response to Comments, demonstrate that some interpret this language to limit agencies' discretion in developing the purpose and need statement. The implication that an agency's authority is only relevant when the proposed action is for an authorization, such as a permit or license, is incorrect because an agency's statutory authority for its action is always a relevant consideration for developing a purpose and need statement irrespective of whether the proposed action is an authorization. The 2020 rule's addition of the text also is confusing because it suggested that a change in practice was intended. In fact, agencies have always considered their statutory authority and the scope of the agency decision when developing purpose and need statements. In CEQ's experience implementing the 1978 regulations, there has been little or no confusion among the agencies regarding these issues; therefore, the additional language is unnecessary. Furthermore,

---

[29] *See* Forty Questions, 2A, *supra* note 28 ("In determining the scope of alternatives to be considered, the emphasis is on what is 'reasonable' rather than on whether the proponent or applicant likes or is itself capable of carrying out a particular alternative. Reasonable alternatives include those that are practical or feasible from the technical and economic standpoint and using common sense, rather than simply desirable from the standpoint of the applicant."). *See also* Simmons v. *U.S. Army Corps of Engineers,* 120 F.3d 664, 669 (7th Cir. 1997) ("An agency cannot restrict its analysis to those 'alternative means by which a particular applicant can reach his goals'. . . . The Corps has the 'duty under NEPA to exercise a degree of skepticism in dealing with self-serving statements from a prime beneficiary of the project.'").

AR_0043868

for projects involving multiple agency actions under different statutory authorities, the lead agency should have flexibility in crafting a purpose and need statement to address multiple agency decisions both for efficiency and effective decision making.

CEQ also makes these changes in the final rule because the language added by the 2020 rule may be interpreted in a manner that does not lay the appropriate groundwork for environmentally sound decision making when an agency considers a request for an authorization or reflect the best reading of the NEPA statute or case law. A properly drafted purpose and need statement should lead to consideration of the reasonable alternatives to the proposed action, consistent with NEPA's requirements. *See* 42 U.S.C. 4332(2)(C), 4332(2)(E). CEQ disagrees with commenters assertions that consideration of alternatives that do not meet an applicant's goals or cannot be implemented by the applicant will always waste applicant or agency resources or result in delays. There may be times when an agency identifies a reasonable range of alternatives that includes alternatives—other than the no action alternative—that are beyond the goals of the applicant or outside the agency's jurisdiction because the agency concludes that they are useful for the agency decision maker and the public to make an informed decision. Always tailoring the purpose and need to an applicant's goals when considering a request for an authorization could prevent an agency from considering alternatives that do not meet an applicant's stated goals, but better meet the policies and requirements set forth in NEPA and the agency's statutory authority and goals. The rule of reason continues to guide decision making in such contexts.

CEQ's concern that the 2020 regulation's change to § 1502.13 may be interpreted to unduly constrain the discretion of agencies leading to the development of unreasonably narrow purpose and need statements is consistent with a similar concern raised by the courts in reviewing agencies' purpose and need statements under the 1978 regulations. It is contrary to NEPA for agencies to "contrive a purpose so slender as to define competing 'reasonable alternatives' out of consideration (and even out of existence)." *Simmons* v. *U.S. Army Corps of Engineers*, 120 F.3d 664, 666 (7th Cir. 1997) (citing 42 U.S.C. 4332(2)(E)). Constricting the definition of the project's purpose could exclude "truly" reasonable alternatives, making an EIS incompatible with NEPA's

requirements. *Id. See also, e.g., Nat'l Parks & Conservation Ass'n* v. *Bureau of Land Mgmt.*, 606 F.3d 1058, 1070 (9th Cir. 2010) ("Agencies enjoy 'considerable discretion' to define the purpose and need of a project. However, 'an agency cannot define its objectives in unreasonably narrow terms.'" (internal citations omitted)).

Other court decisions have deferred to agencies' purpose and need statements developed under the 1978 regulation that put weight on multiple factors rather than just an applicant's goals, recognizing those factors as appropriately within the scope of the agency's consideration. *Citizens Against Burlington, Inc.* v. *Busey*, 938 F.2d 190 (D.C. Cir. 1991), which the 2020 final rule relied upon as the justification for language added to the purpose and need provision, is consistent with the language in the 1978 regulations that CEQ is restoring, and, in fact, interpreted and applied that language. In that case, in applying the traditional "rule of reason," the court held that the agency's consideration of the applicant's goals to develop the purpose and need of the action was reasonable. *Id.* at 196–99. However, the court did not require all agencies to make the applicant's goals the sole (or even primary) factor in the formulation of the purpose and need in all factual and legal contexts. *See id.* Returning to the 1978 framework is consistent with case law affirming agency discretion to formulate purpose and need statements based on a variety of relevant factors.

Removing the language regarding an applicant's goals from § 1502.13 does not mean that an agency should consider a boundless set of alternatives. This final rule does not amend language in 40 CFR 1502.14 directing agencies to "[e]valuate reasonable alternatives to the proposed action," and § 1508.1(z), as amended in this final rule, continues to define "reasonable alternatives" as "a reasonable range of alternatives that are technically and economically feasible and meet the purpose and need for the proposed action." The principle that the range of alternatives should be reasonably related to the purpose and need is well-settled. *See Westlaws Water Dist.* v. *U.S. Dep't of the Interior*, 376 F.3d 853, 868 (9th Cir. 2004); *Process Gas Consumers Grp.* v. *U.S. Dep't of Agric.*, 694 F.2d 728, 769 (D.C. Cir. 1981).

The final rule will reduce confusing and unnecessary text and align the regulations more closely to the purposes underlying NEPA. These changes reaffirm agency discretion to identify and consider the factors relevant to formulating statements of purpose and

need in view of the specific circumstances before the agency and the agency's responsibilities, including effectively carrying out agency policies and programs and considering the public interest and the goals of an applicant. CEQ disagrees with the assertions that returning or reaffirming agency discretion to consider multiple factors even where a private applicant is involved will result in significant additional burdens or negatively affect timelines. Agencies have significant experience under the 1978 regulations in considering a variety of factors when crafting purpose and need statements, including an applicant's goals. Furthermore, CEQ did not receive any data, but only general and speculative statements, in response to its specific request for comment on potential effects of the proposed changes to §§ 1502.13 and 1501.8(z) on the environmental review process, including timeframes for environmental review. CEQ notes that it is ultimately for the agency to determine what alternatives are needed to inform its decision making. Exploring and evaluating reasonable alternatives helps decision makers and the public examine other ways to meet the purpose and need of an action, including options with different environmental consequences or mitigation measures, and demonstrate to the public that the agency made an informed decision because it has explored such tradeoffs. CEQ also disagrees with the assertion that the changes to purpose and need in the final rule will directly result in an increase in the number of certain types of environmental review documents like EISs. Development of a purpose and need statement is separate from the assessment of whether a potential effect is significant, and therefore, whether an EIS is required. The changes made in the final rule will ensure agencies can make these determinations based on all relevant factors.

### B. Agency NEPA Procedures (§ 1507.3)

#### i. Regulatory History and Proposed Changes

The 1978 regulations required Federal agencies to develop NEPA procedures through a notice and comment process to integrate NEPA reviews into their decision-making processes. Over the 40-year period that the 1978 regulations were in place, approximately 85 agencies issued procedures to facilitate agency compliance with NEPA.[30]

---

[30] A list of agency NEPA procedures is available at *https://ceq.doe.gov/laws-regulations/agency_implementing_procedures.html*. No agency has updated its procedures to implement the 2020

Continued

Agencies have taken a wide range of approaches to their agency-specific NEPA procedures. Some have essentially incorporated the CEQ regulations by reference without much additional detail; others have issued procedures that tailor the NEPA process to the contexts in which they operate and integrate NEPA compliance with the agency's other statutory responsibilities or environmental requirements.[31] Consistent with 42 U.S.C. 4332(2)(B) and 40 CFR 1507.3 (2019), agencies consulted with CEQ in developing agency-specific procedures and CEQ determined that the procedures conformed with NEPA and the CEQ regulations before the agencies issued final procedures.

The 2020 rule amended 40 CFR 1507.3 to include "ceiling provisions" that made the CEQ regulations the maximum requirements agencies could include in their agency NEPA procedures. In adopting the ceiling provisions, the 2020 rule asserted that the ceiling provisions were intended to eliminate inconsistencies among agency-specific procedures and between agency procedures and the CEQ regulations by requiring that the 2020 regulations apply where existing agency NEPA procedures are inconsistent with the CEQ regulations absent a clear and fundamental conflict with another statutory requirement. The 2020 rule also required agencies to propose new or revised procedures within 12 months to eliminate any inconsistencies and prohibited agencies from imposing procedures or requirements additional to the CEQ regulations unless those additional procedures promote agency efficiency or are required by law.

In the Phase 1 NPRM, CEQ proposed to revise § 1507.3(a) and (b) to delete the ceiling provisions to provide that while agency NEPA procedures need to be consistent with the CEQ regulations, agencies have discretion and flexibility to develop procedures beyond the CEQ regulatory requirements, enabling agencies to address their specific programs, statutory mandates, and the contexts in which they operate. Specifically, the NPRM proposed to remove language in § 1507.3(a) stating that where existing agency NEPA procedures are "inconsistent" with the CEQ regulations, the CEQ regulations apply "unless there is a clear and fundamental conflict with the

requirements of another statute." The NPRM did not propose to amend the determination made in the 2020 rule in § 1507.3(a) that categorical exclusions established in agency NEPA procedures as of September 14, 2020, are consistent with the CEQ regulations. The NPRM also proposed to remove from § 1507.3(b) the language requiring agencies "to eliminate any inconsistencies" with the CEQ regulations and the prohibition on agencies imposing additional procedures or requirements beyond the CEQ regulations unless those additional procedures promoted agency efficiency or were required by law. The NPRM did not propose to further amend the requirement for agencies to propose new or revised NEPA procedures within 36 months, by September 14, 2023, as revised in the interim final rule,[32] as well as the encouragement for major subunits of departments to adopt their own procedures with the consent of the department.

ii. Summary of NPRM Comments on Agency NEPA Procedures

Many commenters supported the proposed changes to § 1507.3, stating that the 2020 ceiling provisions were unnecessary and unhelpful because agencies should have flexibility to add additional requirements or detail to their NEPA procedures tailored to their unique needs and missions. Commenters also noted that the proposed change would assist agencies during the transition period before the completion of a Phase 2 rulemaking because it clarifies that agencies can and should continue to apply their existing NEPA procedures while CEQ finishes its review of the 2020 rule. They noted that without this change, agencies might be in the position of developing agency procedures that either conflict with NEPA or the 2020 regulations. Many commenters stated that the proposal would restore the ability of Federal agencies to develop agency-specific NEPA procedures to implement NEPA to the "fullest extent possible" consistent with 42 U.S.C. 4332. Some commenters who supported removing the ceiling provision noted that removing the provision may reduce, but will not eliminate, all of the harms of the 2020 rule because the 2020 rule is not being repealed.

Other commenters opposed the proposed changes to § 1507.3 as unnecessary because the 2020

regulations contain language allowing flexibility for agencies to tailor their NEPA procedures to improve efficiency. Some commenters also suggested that CEQ's proposed changes invite agencies to disregard the 2020 rule. Commenters indicated that the NPRM's proposed changes would result in inconsistencies and conflicts among agencies' NEPA procedures, increased litigation, costs, delays, and paperwork, and impede the Administration's goals. Commenters also requested that CEQ provide additional rationale and examples of agency confusion about the 2020 regulations.

Some commenters suggested additional changes CEQ should consider to § 1507.3, including to develop a framework for CEQ review of agency NEPA procedures to ensure agency discretion is not boundless; require agencies to affirm their procedures were reviewed for consistency by CEQ; and require that Federal agencies make revisions to their procedures only with public notice and comment. While such changes are beyond the scope of this rulemaking, CEQ notes that agencies cannot make changes to their NEPA procedures without consulting with CEQ, providing notice and comment, and receiving a determination from CEQ that the proposed changes are consistent with NEPA and the CEQ regulations. See 40 CFR 1507.3(b)(1)–(2). CEQ will consider the ideas included in these comments in the development of its Phase 2 rulemaking.

iii. Rationale for Final Rule

The 2020 final rule did not include a detailed rationale for adoption of the "ceiling" provisions, although the 2020 proposed rule stated that they were intended to "prevent agencies from designing additional procedures that will result in increased costs or delays." (85 FR 1693). The 2020 Final Rule Response to Comments document also stated that "it is important that agencies do not revise their procedures in a way that will impede integration" with other environmental review requirements or "otherwise result in heightened costs or delays." [33] CEQ also asserted in the 2020 Final Rule Response to Comments that it had the authority to place limits on agency procedures pursuant to 42 U.S.C. 4344(3) and E.O. 11991.[34]

CEQ has reexamined the rationales provided for the 2020 rule and the

---

regulations and, as discussed above, CEQ promulgated an interim final rule to extend the deadline for agencies to propose updates.

[31] *Compare* the U.S. Department of Agriculture's procedures, 7 CFR part 1b, with NOAA Administrative Order 216–6A and Companion Manual, *https://www.noaa.gov/nepa.*

[32] As noted in part I of the preamble, CEQ revised this time period from 12 months to 36 months in its interim final rule. *See* 86 FR 34154 (June 29, 2021).

[33] CEQ, Update to the Regulations Implementing the Procedural Provisions of the National Environmental Policy Act Final Rule Response to Comments, p. 436 (June 30, 2020), *https://www.regulations.gov/document/CEQ-2019-0003-720629.*

[34] *Id.*

comments received on the Phase 1 NPRM and determined that finalizing the changes as proposed in the Phase 1 NPRM is appropriate. Doing so clarifies that agencies can and should continue to apply their existing NEPA procedures, consistent with the CEQ regulations in effect, while CEQ completes its review of and revisions to the 2020 regulations in its Phase 2 rulemaking. The final rule makes clear that agencies have this discretion by removing the ceiling provisions. The removal of the ceiling provisions allows agencies to exercise their discretion to develop and implement procedures beyond the CEQ regulatory requirements; however, agency procedures cannot conflict with current CEQ regulations. More generally and as discussed further below, these changes to § 1507.3 will promote better decisions, improve environmental and community outcomes, and spur innovation that advances NEPA's goals by giving agencies the flexibility to follow their existing procedures or develop new or revised NEPA procedures that best meet the agencies' statutory missions and enable integration of environmental considerations in their decision making in a flexible manner. Giving agencies the flexibility to innovate should increase the likelihood that agencies identify process improvements and efficiencies that benefit Federal agencies as well as project sponsors and other stakeholders, including the public. CEQ disagrees with the 2020 rule's assertions and some NPRM commenters' contentions that this change will result in increased costs and delays due to conflicts among agency NEPA procedures or between agency NEPA procedures and the CEQ regulations. A primary purpose of the longstanding process by which CEQ engages with agencies in the development of their NEPA procedures is to identify and resolve potential conflicts and ensure that agency-specific procedures conform with the CEQ regulations. Furthermore, the public has an opportunity to provide public comments on proposed agency NEPA procedures before they are finalized. These processes facilitate identification of potential conflicts, costs, or delays and give agencies opportunities to balance various policy and process considerations before establishing or changing their procedures.

The final rule's changes to § 1507.3 also will better achieve NEPA's objectives and statutory requirements. First, while CEQ is responsible for interpreting and overseeing NEPA

implementation, all agencies are charged with administering the statute's requirements. *See* 42 U.S.C. 4332. NEPA expressly instructs agencies to develop methods and procedures in consultation with CEQ to ensure consideration of "environmental amenities and values" in decision making. *See* 42 U.S.C. 4332(2)(B). NEPA and the CEQ regulations, *see* 40 CFR 1507.3, call for agencies to take responsibility for their own procedures, even while consulting with CEQ. Agencies should be allowed to pursue the environmental aims of the statute, including by adopting and carrying out procedures that require additional or more specific environmental analysis than called for by the CEQ regulations. Furthermore, CEQ plays a critical role in reviewing and determining that an agency's NEPA procedures comply with NEPA and the CEQ regulations, which ensures that agency procedures integrate the NEPA process with agency decision making so that the public and decision makers are informed of the environmental consequences of agency decisions. *See* 40 CFR 1507.3(b), (e).

Second, removing these ceiling provisions improves alignment of the NEPA regulations with NEPA's statutory text, which directs agencies to pursue the statute's goals "to the fullest extent possible." 42 U.S.C. 4332. The legislative history of NEPA indicates that the intent behind this statement was to ensure that all Federal agencies comply with NEPA as well as their statutory authorities and that "no agency shall utilize an excessively narrow construction of its existing statutory authorizations to avoid compliance." [35] This final rule provides agencies the flexibility to comply with NEPA, including by allowing agencies to adopt agency-specific NEPA procedures that align with their unique missions, circumstances, and statutory mandates.

Agencies may more fully pursue NEPA's twin aims to consider environmental effects and inform the public by establishing procedures that provide for additional environmental review and public participation or evaluation of certain issues such as air and water quality impacts, environmental justice considerations, or habitat effects. *See* 42 U.S.C. 4332. Agency procedures could include more specific requirements for the development of environmental assessments to facilitate the decision-making process, such as requiring multiple alternatives or documentation of alternatives considered but

dismissed. For example, the National Oceanic and Atmospheric Administration (NOAA), which, among other things, is responsible for the stewardship of the Nation's ocean resources and their habitat, might adopt agency-specific procedures on the analysis of impacts to species or habitats protected by the Endangered Species Act, the Marine Mammal Protection Act, or the Magnuson-Stevens Fishery Conservation and Management Act, as well as other vulnerable marine and coastal ecosystems. Removing the ceiling provision allows agencies to include such specificity, which can help lead to more effective reviews and provide efficiencies by fostering better integration of NEPA with other statutory requirements.

Third, upon further consideration, CEQ no longer agrees with the assertions in the 2020 Final Rule Response to Comments that setting the CEQ regulations as the ceiling puts agencies in the best position to reduce costs and delays in NEPA implementation, or that doing so will promote integration of NEPA and compliance with other environmental review requirements. The 2020 rule did not provide any support for the assertion that these changes would achieve those goals. It also did not explain why the process laid out in § 1507.3—requiring agencies to collaborate with CEQ on the development of their NEPA procedures, seek public comment on proposed procedures, and obtain CEQ conformity determinations—does not sufficiently advance the goal of ensuring an efficient and effective NEPA review. CEQ has reconsidered the ceiling provisions in light of this longstanding process, CEQ's experience implementing it, and the comments CEQ received on the proposed rule, and determined that the ceiling provisions create unnecessary rigidity in light of other mechanisms to promote consistency and coordination, and reduce costs and delays. CEQ also finds that the processes included in the 1978 regulations effectively promoted the integration of NEPA and other environmental reviews. *See* 40 CFR 1502.25 (2019). CEQ's review of agency procedures allows CEQ and the agency to discuss the rationale for any new or additional procedures or requirements proposed by agencies, and allows CEQ to promote consistency across the Federal Government, as appropriate, without limiting agencies' flexibility to do more than the CEQ regulations describe or otherwise inhibit innovation, including innovation and

---

[35] H. Rep. No. 91–765, at 9–10 (1969).

**23462**    **Federal Register** / Vol. 87, No. 76 / Wednesday, April 20, 2022 / Rules and Regulations

flexibilities that can improve agency efficiency.

### iv. Deadline Extension

As explained in section I.D, CEQ issued an interim final rule in June 2021 that extended by 2 years—to September 14, 2023—the deadline in 40 CFR 1507.3(b) for agencies to propose changes to their existing agency-specific NEPA procedures to make them consistent with the current CEQ regulations. The interim final rule explained that the extension would avoid agencies having to propose changes to their implementing procedures on a tight deadline to conform to regulations that are undergoing extensive review and will likely change in the near future.

The Administrative Procedure Act did not require CEQ to provide notice and an opportunity for public comment prior to extending the deadline. *See, e.g.,* 86 FR 34156. Nevertheless, CEQ requested comments on the interim final rule and received approximately 20 written submissions. CEQ has provided summaries and responses to these comments in the response to comments document posted to the docket for this rulemaking. For the reasons set forth in the interim final rule and the response to comment document, and having now considered public comments, CEQ is finalizing in this rule the deadline extension originally made effective in the interim final rule.

### C. Definition of "Effects" or "Impacts" (§ 1508.1(g))

#### i. Regulatory History and Proposed Changes

NEPA requires Federal agencies to examine the environmental effects of their proposed actions and alternatives and any adverse environmental effects that cannot be avoided if the proposed action is implemented. 42 U.S.C. 4332(2)(C). The 1978 regulations defined "effects" to include "direct effects" and "indirect effects" and separately defined "cumulative impact." *See* 40 CFR 1508.7, 1508.8 (2019). Section 1508.8(a) of the 1978 regulations defined "direct effects" as effects "caused by the action and occur at the same time and place." Section 1508.8(b) of the 1978 regulations defined "indirect effects" as effects "caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable." Section 1508.8 of the 1978 regulations also provided examples of indirect effects and effects generally, and noted that the terms "effects" and "impacts" as used in the regulations were synonymous.

The 1978 regulations defined "cumulative impact" as "the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions." *Id.* § 1508.7. The definition also stated that cumulative impacts "can result from individually minor but collectively significant actions taking place over a period of time." *Id.*

The 2020 rule made several major changes to these definitions. The 2020 rule provided a single definition for "effects" or "impacts," deleting the subcategorization of "direct" and "indirect" effects and the definition of "cumulative impacts." The definition includes introductory text followed by three paragraphs designated (g)(1) through (3). The first clause of the introductory text provides that "[e]*ffects* or *impacts* means changes to the human environment from the proposed action or alternatives that are reasonably foreseeable and have a reasonably close causal relationship to the proposed action or alternatives." The second clause provides that the definition of "effects" or "impacts" includes "those effects that occur at the same time and place as the proposed action or alternatives and may include effects that are later in time or farther removed in distance from the proposed action or alternatives." The phrase "those effects that occur at the same time and place as the proposed action or alternatives," is drawn verbatim from the description of direct effects in the 1978 regulations' definition of effects. The clause "*may include* effects that are later in time or farther removed in distance," is a modified version of the language describing indirect effects in the 1978 regulations' definition of effects; the 2020 rule qualified this implemented definition by adding "may include." 40 CFR 1508.1(g) (2020) (emphasis added).

Following the introductory text, paragraph (g)(1) includes language identifying examples of effects, which is modified from the last paragraph of the 1978 definition of "effects." Paragraph (g)(2) includes new text providing that a "'but for' causal relationship is insufficient to make an agency responsible for a particular effect under NEPA" and that agencies generally should not consider effects "if they are remote in time, geographically remote, or the product of a lengthy causal chain." This paragraph also implicitly excludes "effects that the agency has no ability to prevent due to its limited statutory authority or would occur

regardless of the proposed action." Paragraph (g)(3) requires an agency's analysis of effects to be consistent with the definition of "effects" and explicitly repeals the definition of cumulative impact.

In the NPRM, CEQ proposed to revise the definition of "effects" or "impacts" in § 1508.1(g) to restore the substance of the definitions of "effects" and "cumulative impact" contained in the 1978 regulations. The NPRM also proposed to continue to provide one combined definition for the two terms, rather than reinstating separate definitions for "effects" and "cumulative impacts" as existed in the 1978 regulations, because separate definitions are unnecessary as reflected in the 1978 regulation's statement that the terms "impacts" and "effects" were synonymous.

The NPRM proposed the following specific amendments to § 1508.1(g). First the NPRM proposed to revise the introductory paragraph in § 1508.1(g) to define "effects" or "impacts" as "changes to the human environment from the proposed action or alternatives" that include "direct effects," "indirect effects," and "cumulative effects" as described in § 1508.1(g)(1) through (3), and remove the phrase "that are reasonably foreseeable and have a reasonably close causal relationship."

Second, the NPRM proposed to revise each of the paragraphs (g)(1) through (3) and add a fourth paragraph (g)(4). Proposed paragraphs (g)(1) through (3) describe "direct effects," "indirect effects," and "cumulative effects," and proposed paragraph (g)(4) provides a list of examples of effects similar to paragraph (g)(1) of the 2020 regulation. The NPRM proposed to move text included in the introductory paragraph of the 2020 regulations, but which originated in the 1978 regulations, into the relevant paragraphs. Specifically, the phrase "effects that occur at the same time and place" would be moved to the description of direct effects in paragraph (g)(1), and the phrase "effects that are later in time or farther removed in distance" would be moved to the description of indirect effects in paragraph (g)(2). The definition of cumulative effects in paragraph (g)(3) is made up of the language defining "cumulative impact" in the 1978 regulations with non-substantive edits for consistency with the current regulations. Paragraph (g)(4) includes proposed amended text from paragraph (g)(1) of the 2020 regulation providing a list of examples of effects. In paragraph (g)(4), the NPRM proposed to restore the language of the 1978 regulations and

AR_0043872

delete minor and non-substantive modifications made in the 2020 rule. Following the proposed amendments, the text in paragraph (g)(4) would be identical to the final sentence of the effects definition in the 1978 regulation.

Third, the NPRM proposed to delete in its entirety the text included in paragraph (g)(2) of the 2020 regulations, which states that a "but for" causal relationship is insufficient to make an agency responsible for a particular effect under NEPA; generally excludes from the definition of "effects" those that are remote in time, geographically remote, or the product of a lengthy causal chain; and fully excludes effects that the agency has no ability to prevent due to its limited statutory authority or that would occur regardless of the proposed action.

Fourth, the NPRM proposed to delete in its entirety the text included in paragraph (g)(3) of the 2020 regulations, which requires agencies to analyze effects consistent with the definition of "effects" and explicitly repeals the definition of "cumulative impact" from the 1978 regulations.

Finally, CEQ notes that the NPRM did not propose to include in the definition of "effects" or "impacts" the statement in the 1978 regulations' definition of "effects" that "[e]ffects and impacts as used in these regulations are synonymous." *See* 40 CFR 1508.8(b) (2019). Because the NPRM proposed to continue to provide a single definition for "effects" or "impacts," including that statement would be unnecessary and redundant.

ii. Summary of NPRM Comments on the Definition of "Effects"

General Comments

CEQ received numerous comments on the proposed changes to § 1508.1(g), both expressing support for and opposition to the proposed changes. Many commenters supported the proposed revisions and restoring the concepts of direct, indirect, and cumulative effects or impacts to the regulations. Commenters expressed support for the proposed changes for a variety of reasons, including because the proposed changes better reflect NEPA principles and case law; help ensure the proper scope of analysis that NEPA requires, including analysis of effects on climate change, communities with environmental justice concerns, and wildlife; and provide clarity and consistency for the environmental review process. Many of these commenters identified the changes to the definitions of effects and impacts as the most damaging changes put in place

by the 2020 rule. Some commenters specifically pointed to the importance of considering indirect and cumulative effects for addressing environmental justice concerns and climate change in environmental reviews, consistent with E.O. 13990 and the Administration's priority to assess and mitigate climate pollution. Commenters also contended that central to an agency considering whether an action will cause or contribute to undue burdens to a community is a review of cumulative impacts resulting from past, present, and reasonably foreseeable future actions and effects in a project area, including the impacts of climate change. Other commenters raised concerns about the 2020 rule's removal of language on direct, indirect, and cumulative effects and impacts and emphasized the importance of considering these categories of effects on wildlife and other natural resources. Some commenters agreed with the NPRM that the proposed changes will provide clarity to agencies, practitioners, and the public by helping agencies and the public evaluate and understand the full scope of reasonably foreseeable effects in NEPA reviews.

CEQ also received multiple comments expressing overall opposition to the proposed changes. Some commenters raised concerns that restoring the approach to impacts and effects in the 1978 regulations would lead to wider and more complex analysis in the NEPA process, require evaluation of impacts that are outside the scope of the decision, and go beyond the intent of the statute. These commenters stated that the proposed changes to the definition of effects will not improve NEPA compliance or agency certainty. Some commenters expressed the view that the proposed changes will result in undue burden on agencies, increased costs and litigation, and lengthier review times. Some commenters indicated that if CEQ restores the definition of effects in the final rule then the definition should include sideboards or other bounding criteria to prevent misuse, unnecessary delays, and increased costs. These commenters contended that requiring agencies to expend time and resources on analyzing and disclosing speculative effects adds time and cost to the NEPA process without providing value to decision makers or the public. Some commenters expressed concern specifically about the proposed rule's potential to delay critical infrastructure projects.

As discussed further in section II.C.iii and in the Phase 1 Response to Comments, CEQ has considered the comments in support of and opposed to

the changes to the definition of "effects" in the proposed rule. With respect to the potential impacts to NEPA review timelines, CEQ is not aware of—and commenters did not provide—data supporting the claim that evaluation of direct, indirect, and cumulative effects necessarily leads to longer timelines, especially given the long history of agency and practitioner experience with analyzing these categories of impacts and effects under the 1978 regulations, as well as modern techniques leveraging science and technology to make environmental reviews comprehensive yet efficient.[36] CEQ considers the importance of clear and robust analysis of effects to informed agency decision making to outweigh the speculative potential for shorter NEPA documents or timeframes.

Furthermore, the deletion of the definition of "cumulative impacts" in the 2020 rule did not absolve agencies from evaluating reasonably foreseeable cumulative effects, and therefore, it is unclear that the deletion would narrow the scope of effects analyzed by agencies. Numerous commenters on the NPRM noted that the 2020 rule's changes to the definition of "effects" created uncertainty and confusion in agencies implementing NEPA. CEQ expects that substantively restoring these definitions, which were in place and in use for decades, will better clarify the effects agencies need to consider in their NEPA analyses and could help avoid delays or deficiencies in NEPA reviews caused by agency uncertainty over the proper scope of effects analysis. Furthermore, conducting a robust consideration of all reasonably foreseeable effects of a proposed action is not a delay; rather, doing so constitutes sound decision making and fulfills NEPA's statutory mandate. *See* 42 U.S.C. 4332. Therefore, based on CEQ's experience and expertise, this final rule strikes the proper balance of promoting informed decision making and completing environmental reviews expeditiously.

CEQ also considered comments regarding the potential for increased litigation. Both commenters in favor of and opposed to the NPRM's proposal to restore language from the 1978 regulations on direct, indirect, and

---

[36] For example, CEQ's NEPA.gov website provides a list of greenhouse gas (GHG) accounting tools, *https://ceq.doe.gov/guidance/ghg-accounting-tools.html*, and the Environmental Protection Agency's (EPA's) NEPAssist tool, *https://www.epa.gov/nepa/nepassist*, a web-based application that draws environmental data dynamically from EPA's Geographic Information System databases and web services and provides immediate screening of environmental assessment indicators for a user-defined area of interest.

cumulative effects raised concerns over increased litigation. CEQ considers the effect of the proposed changes on litigation to be difficult to predict, and therefore not a useful factor in determining the approach for this final rule.

## Consistency With the NEPA Statute

Some commenters stated that Federal agencies have a statutory obligation to assess all of the relevant environmental effects of their proposed actions and argue that restoring the 1978 definition of "effects" would align the regulations with longstanding agency practice and judicial precedent. Commenters expressed the view that NEPA's plain language requires Federal agencies to address impacts to future as well as present generations, that this statutory mandate cannot be met without analyzing cumulative and indirect effects, and that courts have consistently affirmed this legal obligation. Other commenters stated that the changes to the definition of effects and impacts made by the 2020 rule are at odds with the statute's plain language, clear congressional intent, and decades of legal precedent and have created confusion and uncertainty.

Other commenters objected to the proposed rule contending that because NEPA does not include the terms "direct," "indirect," or "cumulative" effects, including those terms in the regulations is contrary to the plain language of the statute. Commenters also contended that the 2020 rule's elimination of those terms and replacement with a simplified definition of "effects" focused on reasonable foreseeability is in better alignment with NEPA's statutory language, the goals of the statute, and case law.

The restoration of direct, indirect, and cumulative effects as part of the definition of "effects" better reflects NEPA's statutory purpose, policy, and intent and is more consistent with the case law interpreting NEPA's requirements. NEPA sets forth a policy to encourage productive and enjoyable harmony between humans and their environment; to promote efforts that will prevent or eliminate damage to the environment and biosphere, and stimulate the health and welfare of people; and to enrich the understanding of the ecological systems and natural resources important to the Nation. 42 U.S.C. 4321. Accordingly, the U.S. Supreme Court has stated that NEPA promotes a "sweeping commitment to 'prevent or eliminate damage to the environment and biosphere' by focusing Government and public attention on the environmental effects of proposed

agency action." *Marsh* v. *Oregon Natural Resources Council,* 490 U.S. 360, 371 (1989) (citing 42 U.S.C. 4321). The Court explained that NEPA requires agencies to take a "hard look" at the environmental effects of their planned actions, including indirect effects relevant to the dam project at issue in the case, such as potential changes in downstream water temperature that could reduce species survival. *Id.* at 374, 385.

Similarly, courts have long applied the concept of cumulative impacts or effects as identified in the 1978 regulations to NEPA analysis. *See, e.g., NRDC* v. *Hodel,* 865 F.2d 288, 297–98 (D.C. Cir. 1988) (stating, "NEPA, as interpreted by the courts, and CEQ regulations both require agencies to consider the cumulative impacts of proposed actions," and holding that NEPA required the Secretary of the Interior to consider the cumulative impacts of offshore development in different areas of the Outer Continental Shelf). Even before CEQ issued regulations defining "effects" to include cumulative effects, the U.S. Supreme Court had interpreted NEPA to require consideration of "cumulative or synergistic environmental impact." *Kleppe* v. *Sierra Club,* 427 U.S. 390, 410 (1976). Although this case focuses on programmatic review, the Court recognized the importance of considering the collective environmental effects of agency actions to inform the decision-making process. *Id.* ("Only through comprehensive consideration of pending proposals can the agency evaluate different courses of action.").[37]

## Comments on Department of Transportation v. Public Citizen

Some commenters agreed with CEQ's statements in the NPRM about *Department of Transportation* v. *Public Citizen,* 541 U.S. 752 (2004), contending that the 2020 rule's interpretation of the decision to justify limits on effects analysis was incorrect and that the changes in the Phase 1 proposed rule align with the Supreme Court's decision. Commenters also expressed the view that the 2020 rule's reliance on or interpretation of *Public Citizen* to impose a categorical limitation on the scope of effects that agencies may

permissibly analyze was fundamentally misguided because the decision identified the effects that an agency *must* consider, but did not limit the effects that an agency *may* consider. Commenters also expressed the view that the holding in *Public Citizen* is limited to the narrow circumstance in which an agency has no discretion to alter the activity that causes the effects in question. Additional commenters contended that if the Court intended to exclude cumulative effects or impacts from environmental review, the Court would have clearly said so. Based on these interpretations of *Public Citizen,* these commenters generally supported the NPRM's proposed definition of effects and requested that CEQ clarify that the case applies only in limited circumstances.

Commenters who disagreed with the NPRM's interpretation of *Public Citizen* contended that the Court stated clearly that NEPA requires a reasonably close causal relationship between the environmental effect and alleged cause and that a "but for" causal relationship is insufficient to make an agency responsible for a particular effect under NEPA. Commenters also argued that the 2020 rule aligned with *Public Citizen,* because the Court held that consideration of actions beyond an agency's statutory authority serves no purpose and fails to satisfy NEPA's rule of reason. Commenters also asserted that the NPRM did not adequately explain CEQ's change in interpretation of *Public Citizen* in light of the 2020 rule's heavy reliance upon it.

CEQ has reexamined its interpretation of and reliance on the *Public Citizen* decision in the 2020 rule. The 2020 rule relied upon the decision to provide a broadly applicable statement on effects analysis that is not compelled by the opinion itself and that does not comport with CEQ's view of the proper scope of effects analysis in line with NEPA's informational purpose and longstanding agency practice and discretion. At issue in *Public Citizen* was whether the Federal Motor Carrier Safety Administration (FMCSA) had appropriately excluded from its NEPA analysis effects from Mexican trucks entering the United States that would occur if the President followed through on his intention to lift a moratorium on those trucks following FMCSA promulgating vehicle safety regulations. The Supreme Court explained that NEPA and the 1978 regulations are governed by a "rule of reason." *Id.* at 767. FMCSA had no ability to deny certification if trucks met minimum requirements, and as a result, the Supreme Court held that FMCSA had

---

[37] *See also* CEQ's 1970 interim guidelines, interpreting the requirement in section 102(2)(C)(iv) to mean that "[t]he relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity . . . requires the agency to assess the action for *cumulative and long-term effects* from the perspective that each generation is trustee of the environment for succeeding generations." 35 FR 7390, 7392 (May 12, 1970) (emphasis added).

lawfully defined the scope of its analysis, and that it was not arbitrary and capricious for FMCSA to exclude from its NEPA analysis effects that would occur if the President lifted the moratorium. *Id.* at 758–59.

In reaching that conclusion, the Court rejected application of "a particularly unyielding variation of 'but for' causation, where an agency's action is considered a cause of an environmental effect even when the agency has no authority to prevent the effect." *Id.* at 767. The Court stated that "NEPA requires 'a reasonably close causal relationship' between the environmental effect and the alleged cause." *Id.* And then it explained that "inherent in NEPA and its implementing regulations is a 'rule of reason,' which ensures that agencies determine whether and to what extent to prepare an EIS based on the usefulness of any new potential information to the decisionmaking process." *Id.* It further explained that "it would . . . not satisfy NEPA's 'rule of reason' to require an agency to prepare a full EIS due to the environmental impact of an action it could not refuse to perform. Put another way, the legally relevant cause of the entry of the Mexican trucks is not FMCSA's action, but instead the actions of the President in lifting the moratorium and those of Congress in granting the President this authority while simultaneously limiting FMCSA's discretion." *Id.* at 769.

The 2020 rule quoted the Court's statement on "but for" causation as a categorical limitation on effects analysis without recognizing the factual and legal context in which the statement was made, including the statements that immediately surrounded it. In fact, the Court tied its analysis of "but for" causation to a "critical feature" of the case—that FMCSA had no statutory authority to stop the process by which the trucks would operate. The Court explained that requiring FMCSA to consider the environmental impacts of those operations as effects of its action would violate the "rule of reason," because the consideration would not fulfill NEPA's purpose of informing the decision maker. *See id.* at 768–69. Moreover, the Court affirmed FMCSA's consideration of effects under the 1978 regulations. *See id.* at 770. The Court did not hold that agencies *may not* consider a broader range of effects in other circumstances. The Court's focus was on situations "where an agency has no ability to prevent a certain effect due to its limited statutory authority." *Id.* The 2020 rule could be read to apply universally the proximate causation principle of tort law when determining the scope of their NEPA analyses. This

result is not compelled by the *Public Citizen* decision and is in significant tension with the Supreme Court's recognition that tort law and NEPA are governed by different principles that serve different policy objectives. *See Metro. Edison Co.* v. *People Against Nuclear Energy,* 460 U.S. 766, 775, FN 7 (1983). Instead, the Court held that FMCSA's effects analysis in the specific factual and legal context of its proposed action was reasonable and not arbitrary and capricious.

For these reasons, CEQ has reconsidered its reasoning and approach taken in the 2020 rule and does not deem it useful to include the "reasonably close causal relationship" and "but for" language drawn from *Public Citizen,* which dealt with a unique context in which an agency had no authority to direct or alter an outcome, in the broadly applicable NEPA regulations. Doing so inappropriately transforms a Court holding affirming an agency's exercise of discretion in a particular factual and legal context into a rule that could be read to limit agency discretion. Instead, as further discussed below, agencies are better guided by the longstanding principle of reasonable foreseeability and the rule of reason in implementing NEPA's directives.

Comments on Reasonably Foreseeable and Reasonably Close Causal Relationship

Some commenters supported the removal of the 2020 language contending that it limits effects analysis to effects that are "reasonably foreseeable and have a reasonably close causal relationship" and because consequential reasonably foreseeable environmental effects may occur remote in time or place from the original action or be the product of a causal chain; for example, toxic releases into air or water and greenhouse gas emissions that contribute to climate change often occur remote in time or place from the original action or are a product of a causal chain. As such, these commenters stated that restoring the definition of effects to the 1978 regulations would provide for more sound decision making. Commenters also stated that the 2020 regulations' definition of "effects" requiring a close causal relationship potentially narrowed and improperly limited the scope of effects agencies would consider for proposed Federal actions. Commenters specifically pointed to the "but for" language in the 2020 regulations as adding uncertainty and noted that, under the 1978 regulations, agencies shared an understanding of how to assess the

effects of a proposed action based on agency procedures and case law.

On the other hand, commenters opposing changes to the 2020 rule's definition of "effects" argued that limiting the NEPA analysis to those effects that are reasonably foreseeable and have a reasonably close causal relationship to the proposed action is in line with common sense and jurisprudence. Others emphasized that the 2020 definition reasonably limits the scope of potential effects analysis and prevents reviews from considering impacts that bear little or no relationship to the proposed action, and therefore improves clarity and relevance of NEPA documents. These commenters asserted that the 2020 rule's addition of "reasonably foreseeable and reasonably close causal relationship" made a practical clarification that may reduce unnecessary analysis and inefficiencies. Other commenters suggested that, if CEQ reintroduces direct, indirect, and cumulative effects, the rule should clarify that these effects are limited to those that are "reasonably foreseeable."

CEQ has reexamined the phrase "reasonably close causal relationship," which the 2020 rule added to the definition of "effects" in part on the basis that consideration of effects should be limited by proximate cause principles from tort law.[38] CEQ now considers this phrase unnecessary and unhelpful because an agency's ability to exclude effects too attenuated from its actions is adequately addressed by the longstanding principle of reasonable foreseeability that has guided NEPA analysis for decades. *See Robertson* v. *Methow Valley Citizens Council,* 490 U.S. 332, 356 (1989). *See also Sierra Club* v. *FERC,* 867 F.3d 1357, 1371 (D.C. Cir. 2017) (citing *EarthReports, Inc.* v. *FERC,* 828 F.3d 949, 955 (D.C. Cir. 2016)). Furthermore, CEQ no longer deems it necessary to import principles of tort law into the NEPA regulations. Environmental review under NEPA serves different purposes, such as guiding sound agency decision making and future planning, that may reasonably entail a different scope of effects analysis than the distinct tort law context. *See Metro. Edison Co.,* 460 U.S. at 775, FN 7 (1983) ("[W]e do not mean to suggest that any cause-effect relation too attenuated to merit damages in a tort suit would also be too attenuated to merit notice in an EIS; nor do we mean to suggest the converse. In the context of both tort law and NEPA, courts must look to the underlying policies or legislative intent in order to draw a manageable line between those causal

---

[38] 85 FR 43304 (July 16, 2020).

changes that may make an actor responsible for an effect and those that do not."). Keeping the 2020 limitation also would suggest that agency NEPA practitioners are required to apply a tort law legal standard where they would still have to exercise professional judgement in determining the scope of the effects analysis. CEQ is removing the phrase "reasonably close causal relationship" from the definition of "effects"; the definition will continue to include the phrase "reasonably foreseeable" consistent with longstanding interpretation to allow agencies the flexibility to conduct appropriate effects analysis in line with their discretion and NEPA's requirements.

**Comments on Potential Phase 2 Changes**

CEQ also requested public comments on whether a Phase 2 rulemaking should provide more specificity about the manner in which agencies should analyze certain categories of effects. In response, some commenters suggested that the Phase 2 rulemaking should address how agencies address impacts from climate change and provide more specificity about how agencies analyze environmental justice impacts. Others emphasized that a Phase 2 rule should make the effects analysis more objective and less speculative or provide additional clarification to the definition of effects to produce more effective and focused environmental reviews. Some commenters requested CEQ issue guidance on analysis of effects, and some indicated that guidance might be more efficient than updating the regulations further in a Phase 2 rule. CEQ is considering these comments in the development of its Phase 2 rulemaking and its guidance on assessing greenhouse gas emissions and climate change in environmental reviews.

**iii. Rationale for Final Rule**

The final rule makes the changes proposed in the NPRM with minor modification. The final rule revises the introductory paragraph of § 1508.1(g) defining "effects" and "impacts" as "changes to the human environment from the proposed action or alternatives *that are reasonably foreseeable.*" The NPRM did not include the clause "that are reasonably foreseeable," but the final rule retains this clause in response to comments. Doing so is consistent with the preamble to the NPRM, which consistently states that direct, indirect, and cumulative effects must be reasonably foreseeable. 86 FR 55765–67. While the NPRM proposed to remove the clause from the definition because

reasonable foreseeability has always been central to defining the scope of effects, after considering comments, CEQ agrees that this clause enhances clarity in line with longstanding agency practice and NEPA case law. Therefore, CEQ has determined to retain this phrase in the final rule.

The final rule otherwise makes the changes as proposed in the NPRM. CEQ is including direct, indirect, and cumulative effects as part of the definition of "effects" or "impacts" to avoid disruption and uncertainty caused by the 2020 rule and clarify that agencies should continue to engage in the context-specific inquiry that have undertaken for more than 40 years to identify reasonably foreseeable effects of a proposed action and its alternatives, providing for sound decision making. The restoration of "cumulative impacts" from the 1978 regulations to include cumulative effects as a component of the definition of "effects" is a non-substantive change, as the 1978 regulations specifically provided that the terms "impacts" and "effects" are synonymous. Agencies should treat cumulative effects under the final rule in the same fashion as they treated cumulative impacts under the 1978 regulations.

As discussed in responding to comments above, restoring language on direct, indirect, and cumulative effects better promotes NEPA's statutory purposes and is more consistent with the extensive NEPA case law. *See* 42 U.S.C. 4321–4332. Restoring these phrases to the regulations also is consistent with this Administration's policies to be guided by science and to address environmental protection, climate change, and environmental justice. *See, e.g.,* E.O. 13990[39] and E.O. 14008.[40] Returning to the approach in the 1978 regulations provides regulatory consistency and stability for Federal agencies, affected stakeholders, and the public. CEQ is not returning to these definitions because this is what has always been done, but because longstanding CEQ and Federal agency experience and practice has demonstrated that these interpretations promote the aims of the NEPA statute and are practical to implement. These interpretations also reasonably reflect the plain meaning of the statutory phrase "environmental impact," and explicitly capture the indirect and cumulative nature of many environmental impacts.

CEQ is including direct, indirect, and cumulative effects as part of the

definition of "effects" or "impacts" because they have long provided an understandable and effective framework for agencies to consider the effects of their proposed actions in a manner that is understandable to NEPA practitioners and the public. CEQ considers this approach to result in a more practical and easily implementable definition than the 2020 rule's definition of "effects" that explicitly captures the indirect and cumulative nature of many environmental effects, such as greenhouse gas emissions or habitat fragmentation. Upon further evaluation of the rationale for the 2020 rule and the comments CEQ received on the NPRM, CEQ does not consider the tort law standards of "close causal relationship" and "but for" causation to be ones that provide more clarity or predictability for NEPA practitioners, agency decision makers, or the public. Furthermore, as discussed in this section, CEQ does not consider the existing case law interpreting the 1978 definition of "effects" to require that the NEPA regulations limit agency discretion to identify reasonably foreseeable effects under such a standard. CEQ also is removing the potential limitations on consideration of temporally or geographically removed environmental effects, effects that are a product of a lengthy causal chain, and "effects that the agency has no ability to prevent due to its limited statutory authority or would occur regardless of the proposed action." These qualifications may unduly limit agency discretion and stating them as categorical rules that limit effects analyses is in tension with NEPA's directives to produce a detailed statement on the "environmental impact of [a] proposed action," "any adverse environmental effects which cannot be avoided," and "the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity." 42 U.S.C. 4332(2)(C). Furthermore, this language could lead Federal agencies to omit from analysis or disclosure critical categories of reasonably foreseeable effects that are temporally or geographically removed, such as climate effects, frustrating NEPA's core purpose and Congressional intent.

Although the 2020 rule preamble suggested that agencies could continue to consider indirect and cumulative effects,[41] an agency could

---

[39] *Supra* note 19.
[40] *Supra* note 22.

[41] In responding to comments about potential effects on threatened and endangered species, the preamble to the 2020 rule explained that "the final rule does not ignore cumulative effects on listed species." 85 FR 43304 (July 16, 2020). Similarly, the 2020 Final Rule Response to Comments stated that

misunderstand the language of the rule to prohibit considering indirect or cumulative effects of their proposed actions given the language in 40 CFR 1508.1(g)(3): "An agency's analysis of effects shall be consistent with this [definition of effects]." Additionally, the definition included inconsistent directions to agencies—the introductory paragraph stated that effects "may include effects that are later in time or farther removed in distance" but paragraph (g)(2) stated that agencies generally should not consider effects if they are remote in time or geographically remote. CEQ considers the clarification that indirect and cumulative effects are included in the definition of effects critical to ensuring that agency decision makers have a complete view of reasonably foreseeable effects of their proposed actions.[42]

Defining "effects" to include direct, indirect, and cumulative effects will not result in consideration of a limitless universe of effects. The consideration of effects has always been bounded by a reasonableness standard, and, as discussed above, the final rule will retain language on reasonable foreseeability. While CEQ understands the importance of predictability, it is also critical that analyses are complete and scientifically accurate to ensure that decision makers and the public are fully informed.

Including direct and indirect effects in the definition of "effects" ensures that NEPA analyses disclose both adverse and beneficial effects over various timeframes, providing important information to decision makers. For example, a utility-scale solar facility could have short-term direct effects, such as adverse construction and land impacts. The facility also could have long-term indirect beneficial effects, such as reductions in air pollution, including greenhouse gas emissions, from the renewable energy generated by the solar facility that displaces more greenhouse gas-intensive energy sources (such as coal or natural gas) as an electricity source for years or decades into the future. As another example, air pollution, including greenhouse gas

emissions, released by fossil fuel combustion is often a reasonably foreseeable indirect effect of proposed fossil fuel extraction that agencies should evaluate in the NEPA process, even if the pollution is remote in time or geographically remote from a proposed action. An agency decision maker can make a more informed decision about how a proposed action aligns with the agency's statutory authorities and policies when she has information on the comparative potential air pollution effects and greenhouse gas emissions of the proposed action and alternatives, including the no action alternative. The final rule's definition of "effects" provides clarity and ensures that agencies disclose such indirect effects.

CEQ also has reevaluated its position on cumulative effects and disagrees with the assertions in the 2020 rule that cumulative effects analyses divert agency resources from analyzing the most significant effects to effects that are irrelevant or inconsequential. Rather, consideration of reasonably foreseeable cumulative effects allows agencies and the public to understand the full scope of potential impacts from a proposed action, including how the incremental impacts of a proposed action contribute to cumulative environmental problems such as air pollution, water pollution, climate change, environmental injustice, and biodiversity loss. Science confirms that cumulative environmental harms, including repeated or frequent exposure to toxic air or water pollution, threaten human and environmental health and pose undue burdens on historically marginalized communities.[43] CEQ does not consider such harms to be inconsequential or irrelevant, but rather critical to sound agency decision making. By restoring the phrase "cumulative effects," this final rule will make clear that agencies must fully analyze reasonably foreseeable cumulative effects before Federal decisions are made.

CEQ continues to have the goal that environmental reviews should be efficient and effective and will continue to evaluate the NEPA process for opportunities to improve timeliness consistent with NEPA's purposes. However, CEQ disagrees with the assertion in the 2020 rule that requiring

analysis of reasonably foreseeable cumulative effects causes unacceptably long NEPA processes. CEQ considers the disclosure of all reasonably foreseeable direct, indirect, and cumulative effects to be critical to the informed decision-making process required by NEPA, *see, e.g.*, 42 U.S.C. 4332, such that the benefits of any such disclosure outweigh any potential for shorter NEPA documents or timeframes. Moreover, nothing in this final rule suggests that a well-drafted NEPA document cannot be both concise and supported by thorough analysis. CEQ also disagrees with the 2020 rule's assertion that deleting reference to direct, indirect, and cumulative effects is necessary because agencies have devoted substantial resources categorizing effects as direct, indirect, or cumulative. 85 FR 43343. Nothing in the CEQ regulations requires agencies to categorize effects separately in this manner; instead, well-organized NEPA documents address the direct, indirect, and cumulative effects of particular resources in a cohesive and comprehensive manner. Agencies may discuss holistically all reasonably foreseeable direct, indirect, and cumulative effects, rather than delineating the categories in separate sections of a NEPA document, to facilitate the decision maker and the public's comprehensive understanding of the effects of the proposed actions and alternatives.

## IV. Rulemaking Analyses and Notices

### A. Executive Order 12866, Regulatory Planning and Review

E.O. 12866 provides that the Office of Information and Regulatory Affairs (OIRA) will review all significant rules.[44] E.O. 13563 reaffirms the principles of E.O. 12866, calling for improvements in the Federal Government's regulatory system to promote predictability, reduce uncertainty, and use the best, most innovative, and least burdensome tools for achieving regulatory objectives.[45] Because this final rule applies to all Federal agencies, it is a significant regulatory action that CEQ submitted to OMB for review. The changes will remove uncertainty created by the 2020 rule to benefit agencies and the public. These changes do not obligate agencies to undertake longer, more complicated analyses. Furthermore, an effective NEPA process can save time and reduce overall project costs by identifying and avoiding problems, including potential

---

the 2020 rule did not automatically exclude from analysis effects falling within the deleted definition of "cumulative impact[s]." CEQ, Update to the Regulations Implementing the Procedural Provisions of the National Environmental Policy Act Final Rule Response to Comments 467 (June 30, 2020), *https://www.regulations.gov/document/CEQ-2019-0003-720629.*

[42] CEQ's longstanding position has been that cumulative effects analysis is "critical" for the purposes of evaluating project alternatives and developing appropriate mitigation strategies. See CEQ GHG guidance at *https://ceq.doe.gov/guidance/ceq_guidance_nepa-ghg.html.*

[43] *See, e.g.,* Mercedes A. Bravo et al., *Racial Isolation and Exposure to Airborne Particulate Matter and Ozone in Understudied U.S. Populations: Environmental Justice Applications of Downscaled Numerical Model Output,* 92–93 Env't Int'l 247 (2016) (finding that long-term exposure to particulate matter is associated with racial segregation, with more highly segregated areas suffering higher levels of exposure).

[44] 58 FR 51735 (Oct. 4, 1993).
[45] 76 FR 3821 (Jan. 21, 2011).

significant effects, that may occur in later stages of project development.[46] Additionally, if agencies choose to consider additional alternatives and conduct clearer or more robust analyses, such analyses should improve societal outcomes by improving agency decision making. Because individual cases will vary, the magnitude of potential costs and benefits resulting from these proposed changes are difficult to anticipate. Therefore, CEQ has not quantified them. CEQ received a number of comments requesting that it revisit the regulatory impact analysis from the 2020 rule. Because this final rule mainly clarifies provisions,[47] CEQ considers Phase 2 to be the more appropriate rulemaking for any reconsideration of the regulatory impact analysis to the extent Phase 2 proposes substantive changes.

*B. Regulatory Flexibility Act and Executive Order 13272, Proper Consideration of Small Entities in Agency Rulemaking*

The Regulatory Flexibility Act (RFA), as amended, 5 U.S.C. 601 *et seq.,* and E.O. 13272[48] require agencies to assess the impacts of proposed and final rules on small entities. Under the RFA, small entities include small businesses, small organizations, and small governmental jurisdictions. An agency must prepare a Regulatory Flexibility Analysis at the proposed and final rule stages unless it determines and certifies that the rule, if promulgated, would not have a significant economic impact on a substantial number of small entities. 5 U.S.C. 605(b). An agency need not perform an analysis of small entity impacts when a rule does not directly regulate small entities. *See Mid-Tex Electric Coop., Inc.* v. *FERC,* 773 F.2d 327 (D.C. Cir. 1985). This final rule does not directly regulate small entities. Rather, it applies to Federal agencies and sets forth the process for their compliance with NEPA. Accordingly, CEQ hereby certifies that the rule will not have a significant economic impact on a substantial number of small entities.

*C. National Environmental Policy Act*

Under the CEQ regulations, major Federal actions may include regulations. When CEQ issued regulations in 1978, it prepared a "special environmental assessment" for illustrative purposes pursuant to E.O. 11991.[49] The NPRM for the 1978 rule stated "the impacts of procedural regulations of this kind are not susceptible to detailed analysis beyond that set out in the assessment." [50] Similarly, in 1986, while CEQ stated in the final rule amending its regulations that there were "substantial legal questions as to whether entities within the Executive Office of the President are required to prepare environmental assessments," it also prepared a special environmental assessment.[51] The special environmental assessment issued in 1986 made a finding of no significant impact, and there was no finding made for the assessment of the 1978 final rule.

CEQ continues to take the position that a NEPA analysis is not required for establishing or updating NEPA procedures. *See Heartwood* v. *U.S. Forest Serv.,* 230 F.3d 947, 954–55 (7th Cir. 2000) (finding that neither NEPA or the CEQ regulations required the Forest Service to conduct an environmental assessment or an EIS prior to the promulgation of its procedures creating a categorical exclusion). Nevertheless, based on past practice, CEQ developed a special environmental assessment, posted it in the docket, and invited comments. CEQ did not receive any comments, but made minor changes to the special environmental assessment, which CEQ has posted in the docket.

*D. Executive Order 13132, Federalism*

E.O. 13132 requires agencies to develop an accountable process to ensure meaningful and timely input by state and local officials in the development of regulatory policies that have federalism implications.[52] Policies that have federalism implications include regulations that have substantial direct effects on the states, on the relationship between the National Government and the states, or on the distribution of power and responsibilities among the various levels of government. This rule does not have federalism implications because it applies to Federal agencies, not states. However, CEQ notes that States may elect to assume NEPA responsibilities under Federal statutes. CEQ received comments in response to the NPRM from a number of States, including those that have assumed NEPA responsibilities, and considered these comments in development of the final rule.

*E. Executive Order 13175, Consultation and Coordination With Indian Tribal Governments*

CEQ acknowledges that it shares a government-to-government relationship with Tribes that differs from its relationship to the general public. E.O. 13175 requires agencies to have a process to ensure meaningful and timely input by Tribal officials in the development of policies that have Tribal implications.[53] Such policies include regulations that have substantial direct effects on one or more Indian Tribes, on the relationship between the Federal Government and Indian Tribes, or on the distribution of power and responsibilities between the Federal Government and Indian Tribes. CEQ has assessed the impact of this final rule on Indian Tribal governments and has determined that the final rule would not significantly or uniquely affect these communities. However, CEQ recognizes the important role Tribes play in the NEPA process and held a government-to-government consultation on the NEPA regulations generally on September 30, 2021. CEQ also held a consultation specifically on the Phase 1 proposed rule on November 12, 2021. CEQ also invited Tribes and Alaska Native Corporations to provide early input on the Phase 2 rulemaking as well as CEQ's guidance on considering greenhouse gas emissions and climate change in NEPA reviews. In addition to the feedback provided during these consultation sessions, CEQ considered written comments that Tribes submitted during and after the consultations, as well as Tribal comments submitted during the public comment period. CEQ plans to continue to engage in additional government-to-government consultation with federally recognized Tribes and Alaska Native Corporations on its NEPA regulations. During consultation and in written comments, CEQ has received input on areas of importance to Tribes, many of which are around provisions that were not addressed in this Phase 1 rule. CEQ will consider this input for the Phase 2 rulemaking.

---

[46] *See* Linda Luther, Cong. Rsch. Serv., R42479, The Role of the Environmental Review Process in Federally Funded Highway Projects: Background and Issues for Congress (2012), *https://crsreports. congress.gov/product/pdf/R/R42479.*

[47] While the changes to § 1507.3 are more than clarifying edits, agencies have not revised their NEPA procedures to address changes to the CEQ regulations made by the 2020 rule. Therefore, this change does not have costs and benefits for CEQ to consider.

[48] 67 FR 53461 (Aug. 16, 2002).

[49] 43 FR 25230 (June 9, 1978).

[50] *Id.* at 25232.

[51] 51 FR 15618, 15619 (Apr. 25, 1986).

[52] 64 FR 43255 (Aug. 10, 1999).

[53] 65 FR 67249 (Nov. 9, 2000).

*F. Executive Order 12898, Federal Actions To Address Environmental Justice in Minority Populations and Low-Income Populations*

E.O. 12898 requires agencies to make achieving environmental justice part of their missions by identifying and addressing, as appropriate, disproportionately high and adverse human health or environmental effects of their programs, policies, and activities on minority populations and low-income populations.[54] CEQ has analyzed this final rule and determined that it will not cause disproportionately high and adverse human health or environmental effects on minority populations and low-income populations. This rule sets forth implementing regulations for NEPA for Federal agencies; it is in the agency implementation of NEPA when conducting reviews of proposed agency actions where consideration of environmental justice effects occurs.

*G. Executive Order 13211, Actions Concerning Regulations That Significantly Affect Energy Supply, Distribution, or Use*

Agencies must prepare a Statement of Energy Effects for significant energy actions under E.O. 13211.[55] CEQ has determined that this rulemaking is not a "significant energy action" because it is not likely to have a significant adverse effect on the supply, distribution, or use of energy.

*H. Executive Order 12988, Civil Justice Reform*

Under section 3(a) of E.O. 12988,[56] agencies must review their proposed regulations to eliminate drafting errors and ambiguities, draft them to minimize litigation, and provide a clear legal standard for affected conduct. Section 3(b) provides a list of specific issues for review to conduct the review required by section 3(a). CEQ has conducted this review and determined that this final rule complies with the requirements of E.O. 12988.

*I. Unfunded Mandate Reform Act*

Section 201 of the Unfunded Mandates Reform Act of 1995, 2 U.S.C. 1531, requires Federal agencies to assess the effects of their regulatory actions on state, Tribal, and local governments, and the private sector to the extent that such regulations incorporate requirements specifically set forth in law. Before promulgating a rule that may result in the expenditure by a state, Tribal, or

local government, in the aggregate, or by the private sector of $100 million, adjusted annually for inflation, in any 1 year, an agency must prepare a written statement that assesses the effects on state, Tribal, and local governments and the private sector. 2 U.S.C. 1532. This final rule applies to Federal agencies and will not result in expenditures of $100 million or more for state, Tribal, and local governments, in the aggregate, or the private sector in any 1 year. This action also will not impose any enforceable duty, contain any unfunded mandate, or otherwise have any effect on small governments subject to the requirements of 2 U.S.C. 1531–1538.

*J. Paperwork Reduction Act*

This final rule will not impose any new information collection burden that requires additional review or approval by OMB under the Paperwork Reduction Act (PRA), 44 U.S.C. 3501 *et seq.*

**List of Subjects in 40 CFR Parts 1502, 1507, and 1508**

Administrative practice and procedure; Environmental impact statements; Environmental protection; Natural resources.

**Brenda Mallory,**
*Chair.*

For the reasons discussed in the preamble, the Council on Environmental Quality amends parts 1502, 1507, and 1508 in title 40 of the Code of Federal Regulations as follows:

**PART 1502—ENVIRONMENTAL IMPACT STATEMENT**

■ 1. Revise the authority citation for part 1502 to read as follows:

**Authority:** 42 U.S.C. 4321–4347; 42 U.S.C. 4371–4375; 42 U.S.C. 7609; and E.O. 11514, 35 FR 4247, 3 CFR, 1966–1970, Comp., p. 902, as amended by E.O. 11991, 42 FR 26967, 3 CFR, 1977 Comp., p. 123.

■ 2. Revise § 1502.13 to read as follows:

**§ 1502.13  Purpose and need.**

The statement shall briefly specify the underlying purpose and need to which the agency is responding in proposing the alternatives including the proposed action.

**PART 1507—AGENCY COMPLIANCE**

■ 3. Revise the authority citation for part 1507 to read as follows:

**Authority:** 42 U.S.C. 4321–4347; 42 U.S.C. 4371–4375; 42 U.S.C. 7609; and E.O. 11514, 35 FR 4247, 3 CFR, 1966–1970, Comp., p. 902, as amended by E.O. 11991, 42 FR 26967, 3 CFR, 1977 Comp., p. 123.

■ 4. Amend § 1507.3 by revising paragraph (a) and the introductory text of paragraph (b) to read as follows:

**§ 1507.3  Agency NEPA procedures.**

(a) The Council has determined that the categorical exclusions contained in agency NEPA procedures as of September 14, 2020, are consistent with this subchapter.

(b) No more than 36 months after September 14, 2020, or 9 months after the establishment of an agency, whichever comes later, each agency shall develop or revise, as necessary, proposed procedures to implement the regulations in this subchapter. When the agency is a department, it may be efficient for major subunits (with the consent of the department) to adopt their own procedures.

\* \* \* \* \*

**PART 1508—DEFINITIONS**

■ 5. Revise the authority citation for part 1508 to read as follows:

**Authority:** 42 U.S.C. 4321–4347; 42 U.S.C. 4371–4375; 42 U.S.C. 7609; and E.O. 11514, 35 FR 4247, 3 CFR, 1966–1970, Comp., p. 902, as amended by E.O. 11991, 42 FR 26967, 3 CFR, 1977 Comp., p. 123.

■ 6. Amend § 1508.1 by revising paragraphs (g) and (z) to read as follows:

**§ 1508.1  Definitions.**

\* \* \* \* \*

(g) *Effects* or *impacts* means changes to the human environment from the proposed action or alternatives that are reasonably foreseeable and include the following:

(1) Direct effects, which are caused by the action and occur at the same time and place.

(2) Indirect effects, which are caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable. Indirect effects may include growth inducing effects and other effects related to induced changes in the pattern of land use, population density or growth rate, and related effects on air and water and other natural systems, including ecosystems.

(3) Cumulative effects, which are effects on the environment that result from the incremental effects of the action when added to the effects of other past, present, and reasonably foreseeable actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions. Cumulative effects can result from individually minor but collectively significant actions taking place over a period of time.

[54] 59 FR 7629 (Feb. 16, 1994).
[55] 66 FR 28355 (May 22, 2001).
[56] 61 FR 4729 (Feb. 7, 1996).

(4) Effects include ecological (such as the effects on natural resources and on the components, structures, and functioning of affected ecosystems), aesthetic, historic, cultural, economic, social, or health, whether direct, indirect, or cumulative. Effects may also include those resulting from actions which may have both beneficial and detrimental effects, even if on balance the agency believes that the effects will be beneficial.

\*    \*    \*    \*    \*

(z) *Reasonable alternatives* means a reasonable range of alternatives that are technically and economically feasible, and meet the purpose and need for the proposed action.

\*    \*    \*    \*    \*

[FR Doc. 2022–08288 Filed 4–19–22; 8:45 am]

**BILLING CODE 3325–F2–P**

# DEPARTMENT OF THE INTERIOR

## Fish and Wildlife Service

[Docket No. FWS–HQ–ES–2015–0126; FXHC11220900000–156–FF09E33000]

## U.S. Fish and Wildlife Service Mitigation Policy

**AGENCY:** Fish and Wildlife Service, Interior.

**ACTION:** Notice of final policy.

**SUMMARY:** We, the U.S. Fish and Wildlife Service (Service), announce revisions to our Mitigation Policy, which has guided Service recommendations on mitigating the adverse impacts of land and water developments on fish, wildlife, plants, and their habitats since 1981. The revisions are motivated by changes in conservation challenges and practices since 1981, including accelerating loss of habitats, effects of climate change, and advances in conservation science. The revised Policy provides a framework for applying a landscape-scale approach to achieve, through application of the mitigation hierarchy, a net gain in conservation outcomes, or at a minimum, no net loss of resources and their values, services, and functions resulting from proposed actions. The primary intent of the Policy is to apply mitigation in a strategic manner that ensures an effective linkage with conservation strategies at appropriate landscape scales.

**DATES:** This Policy is effective on November 21, 2016.

**ADDRESSES:** Comments and materials received, as well as supporting documentation used in the preparation of this Policy, including an environmental assessment, are available on the Internet at *http://www.regulations.gov* at Docket Number FWS–HQ–ES–2015–0126.

**FOR FURTHER INFORMATION CONTACT:** Craig Aubrey, U.S. Fish and Wildlife Service, Division of Environmental Review, 5275 Leesburg Pike, Falls Church, VA 22041–3803, telephone 703–358–2442.

**SUPPLEMENTARY INFORMATION:** The revised Policy integrates all authorities that allow the Service either to recommend or to require mitigation of impacts to Federal trust fish and wildlife resources, and other resources identified in statute, during development processes. It is intended to serve as a single umbrella policy under which the Service may issue more detailed policies or guidance documents covering specific activities in the future. Citations for the many statutes and other authorities referenced in this document are in Appendix A.

### Background

The primary intent of revising the 1981 Mitigation Policy (1981 Policy) is to apply mitigation in a strategic manner that ensures an effective linkage with conservation strategies at appropriate landscape scales, consistent with the Presidential Memorandum on Mitigating Impacts on Natural Resources from Development and Encouraging Related Private Investment (November 3, 2015), the Secretary of the Interior's Order 3330 entitled "Improving Mitigation Policies and Practices of the Department of the Interior" (October 31, 2013), and the Departmental Manual Chapter (600 DM 6) on Implementing Mitigation at the Landscape-scale (October 23, 2015). Within this context, our revisions of the 1981 Policy: (a) Clarify that this Policy addresses all resources for which the Service has authorities to recommend mitigation for impacts to resources; and (b) provide an updated framework for applying mitigation measures that will maximize their effectiveness at multiple geographic scales.

By memorandum, the President directed all Federal agencies that manage natural resources to avoid and minimize damage to natural resources and to effectively offset remaining impacts, consistent with the principles declared in the memorandum and existing statutory authority. Under the memorandum, all Federal mitigation policies shall clearly set a net benefit goal or, at minimum, a no net loss goal for natural resources, wherever doing so is allowed by existing statutory authority and is consistent with agency mission and established natural resource objectives. This Policy implements the President's directions for the Service.

Secretarial Order 3330 established a Department-wide mitigation strategy to ensure consistency and efficiency in the review and permitting of infrastructure development projects and in conserving natural and cultural resources. The Order charged the Department's Energy and Climate Change Task Force with developing a report that addresses how to best implement consistent, Department-wide mitigation practices and strategies. The report of the Task Force, "A Strategy for Improving the Mitigation Policies and Practices of the Department of the Interior" (April 2014), describes guiding principles for mitigation to improve process efficiency, including the use of landscape-scale approaches rather than project-by-project or single-resource mitigation approaches. This revision of the Service's Mitigation Policy complies with a deliverable identified in the Strategy that seeks to implement the guiding principles set forth in the Secretary's Order, the corresponding Strategy, and subsequent 600 DM 6.

In 600 DM 6, the Department of the Interior established policy intended to improve permitting processes and help achieve beneficial outcomes for project proponents, affected communities, and the environment. By implementing this Manual Chapter, the Department will:

(a) Effectively mitigate impacts to Department-managed resources and their values, services, and functions;

(b) provide project developers with added predictability and efficient and timely environmental reviews;

(c) improve the resilience of resources in the face of climate change;

(d) encourage strategic conservation investments in lands and other resources; increase compensatory mitigation effectiveness, durability, transparency, and consistency; and

(e) better utilize mitigation measures to help achieve Departmental goals.

The final Policy implements the Department's directions for the Service. As with the 1981 Policy, the Service intends, with this revision, to conserve, protect, and enhance fish, wildlife, plants, and their habitats for future generations. Effective mitigation is a powerful tool for furthering this mission.

### Changes From the Draft Policy

This final Policy differs from the proposed revised Policy in a few substantive respects, which we list below, and contains many editorial changes in response to comments we received that requested greater clarity of expression regarding various aspects of the Policy purpose, authorities, scope, general principles, framework for formulating mitigation measures, and definitions. The most common editorial change to the final Policy addresses the concern that the proposed revised Policy was unclear regarding the Service's authorities to either recommend or require mitigation. The proposed revised Policy frequently used the phrase "recommend or require" as a general descriptor for Service-formulated mitigation measures, because we have authority to require mitigation in some contexts, but not in others. The final Policy adds new text to the Authority section that identifies those circumstances under which we have specific authority to require, consistent with other applicable laws and regulations, one or more forms of

AR_0044664

mitigation for impacts to fish and wildlife resources.

This Policy provides a common framework for the Service to apply when identifying mitigation measures across the full range of our authorities, including those for which we may require mitigation, but the Policy cannot and does not alter or substitute for the regulations implementing any of our authorities. We summarize below the few substantive changes to the proposed revised Policy, listed by section.

In section 4 of the Policy, General Policy and Principles, we added a principle to emphasize the importance of the avoidance tier of the mitigation hierarchy. This new principle reinforces existing direction in the proposed revised Policy that Service staff will recommend avoidance of all impacts to high-value habitats as the only effective means of mitigating impacts at these locations.

In section 5.5, Habitat Valuation, we clarify that habitats of "high-value" to an evaluation species are scarce and of high suitability and high importance. As with the proposed revised Policy, the final Policy directs Service personnel to seek avoidance of all impacts to high-value habitats.

In section 5.6.3, Compensation, we added a paragraph that describes onsite compensation and distinguishes it from rectifying impacts. We added another paragraph that indicates how third parties may assume the responsibilities for implementing proponent-responsible compensation. Other revisions to this section are editorial in nature, intended to better communicate Service intentions about the use of compensation in mitigating impacts to species. These revisions include reorganizing material into new subsections at 5.6.3.1, Equivalent Standards, and at 5.6.3.2, Research and Education.

In section 6, Definitions, we added definitions for "baseline" and "habitat credit exchange" and modified the definition of "practicable."

In Appendix A, Authorities and Direction for Service Mitigation Recommendations, we updated the listed authorities, regulations, and guidance documents where necessary. To better reflect their relationship with this Policy and to respond to comments received, we have modified the discussions of the Bald and Golden Eagle Protection Act, Clean Water Act, Fish and Wildlife Conservation Act, Marine Mammal Protection Act, Migratory Bird Treaty Act, and Natural Resource Damage Assessment and Restoration processes.

We made clarifying edits and additions to Appendix C, Compensatory Mitigation in Financial Assistance Awards Approved or Administered by the U.S. Fish and Wildlife Service. We added a sentence in the first paragraph recognizing that the regulations at 50 CFR part 84 authorize the use of Natural Resource Damage Assessment funds as a match in the National Coastal Wetlands Conservation Program. In part B, we added "the proposed use of mitigation funds on land acquired with Federal financial assistance" as a common issue related to mitigation in financial assistance. In part G, we clarified the circumstances under which the Service can approve financial assistance to satisfy mitigation requirements of State, tribal, or local governments. In part H, we revised the topic question from "Can a mitigation proposal be located on land acquired under a Service financial assistance award?" to "Can a project on land already designated for the conservation of natural resources generate credits for compensatory mitigation?" and revised the answer accordingly. We added a topic to those included in the proposed revised Policy at part I: "Does the Service's Mitigation Policy affect financial assistance programs and awards managed by other Federal entities?" This addition describes the various circumstances in which this question is relevant.

**Discussion**

The Service's motivations for revising the 1981 Policy include:

• Accelerating loss, including degradation and fragmentation, of habitats and subsequent loss of ecosystem function since 1981;

• Threats that were not fully evident in 1981, such as effects of climate change, the spread of invasive species, and outbreaks of epizootic diseases, are now challenging the Service's conservation mission;

• The science of fish and wildlife conservation has substantially advanced in the past three decades;

• The Federal statutory, regulatory, and policy context of fish and wildlife conservation has substantially changed since the 1981 Policy; and

• A need to clarify the Service's definition and usage of mitigation in various contexts, including the conservation of species listed as threatened or endangered under the Endangered Species Act of 1973, as amended (ESA), which was expressly excluded from the 1981 Policy.

*Mitigation Defined*

In the context of impacts to environmental resources (including their values, services, and functions) resulting from proposed actions, "mitigation" is a general label for measures that a proponent takes to avoid, minimize, and compensate for such impacts. The 1981 Policy adopted the definition of mitigation in the Council on Environmental Quality (CEQ) National Environmental Policy Act (NEPA) regulations (40 CFR 1508.20). The CEQ mitigation definition remains unchanged since codification in 1978 and states that "Mitigation includes:

• Avoiding the impact altogether by not taking a certain action or parts of an action;

• minimizing impacts by limiting the degree or magnitude of the action and its implementation;

• rectifying the impact by repairing, rehabilitating, or restoring the affected environment;

• reducing or eliminating the impact over time by preservation and maintenance operations during the life of the action; and

• compensating for the impact by replacing or providing substitute resources or environments."

This definition is adopted in this Policy, and the use of its components in various contexts is clarified. In 600 DM 6, the Department of the Interior states that mitigation, as enumerated by CEQ, is compatible with Departmental policy; however, as a practical matter, the mitigation elements are categorized into three general types that form a sequence: Avoidance, minimization, and compensatory mitigation for remaining unavoidable (also known as residual) impacts. The 1981 Policy further stated that the Service considers the sequence of the CEQ mitigation definition elements to represent the desirable sequence of steps in the mitigation planning process. The Service generally affirms this hierarchical approach in this Policy. We advocate first avoiding and then minimizing impacts that critically impair our ability to achieve conservation objectives for affected resources. We also provide guidance that recognizes how action- and resource-specific circumstances may warrant departures from the preferred mitigation sequence; for example, when impacts to a species may occur at a location that is not critical to achieving the conservation objectives for that species, or when current conditions are likely to change substantially due to the effects of a changing climate. In such

circumstances, relying more on compensating for the impacts at another location may more effectively serve the conservation objectives for the affected resources. This Policy provides a logical framework for the Service to consistently make such choices.

*Scope of the Revised Mitigation Policy*

The Service's mission is to conserve, protect, and enhance fish, wildlife, and plants, and their habitats for the continuing benefit of the American people. This mission includes a responsibility to make mitigation recommendations or to specify mitigation requirements during the review of actions based on numerous authorities related to specific plant and animal species, habitats, and broader ecological functions. Our authorities to engage actions that may affect these resources extends to all U.S. States and territories, on public and on private property. This unique standing necessitates that we clarify our integrated interests and expectations when seeking mitigation for impacts to fish, wildlife, plants, and their habitats.

This Policy serves as overarching Service guidance applicable to all actions for which the Service has specific authority to recommend or require the mitigation of impacts to fish, wildlife, plants, and their habitats. In most cases, applications of this Policy are advisory. Service recommendations provided under the guidance of this Policy are intended to help action proponents incorporate appropriate means and measures into their actions that will most effectively conserve resources affected by those actions. As necessary and as budgetary resources permit, we intend to adapt or develop Service program-specific policies, handbooks, and guidance documents, consistent with the applicable statutes, to integrate the spirit and intent of this Policy.

*New Threats and New Science*

Since the publication of the Service's 1981 Policy, land use changes in the United States have reduced the habitats available to fish and wildlife. By 1982, approximately 72 million acres of the lower 48 States had already been developed. Between 1982 and 2012, the American people developed an additional 44 million acres for a total of 114 million acres developed. Of all historic land development in the United States, excluding Alaska, over 37 percent has occurred since 1982. Much of this newly developed land had been existing habitats, including 17 million acres converted from forests.

A projection that the U.S. population will increase from 310 million to 439 million between 2010 and 2050 suggests that land conversion trends like these will continue. In that period, development in the residential housing sector alone may add 52 million (42 percent more) units, plus 37 million replacement units. By 2060, a loss of up to 38 million acres (an area the size of Florida) of forest habitat alone is possible. Attendant pressures on remaining habitats will also increase fragmentation, isolation, and degradation through myriad indirect effects. The loss of ecological function will radiate beyond the extent of direct habitat losses. Given these projections, the near-future challenges for conserving species and habitats are daunting. As more lands and waters are developed for human uses, it is incumbent on the Service to help project proponents successfully and strategically mitigate impacts to fish and wildlife and prevent systemic losses of ecological function.

Accelerating climate change is resulting in impacts that pose a significant challenge to conserving species, habitat, and ecosystem functions. Climatic changes can have direct and indirect effects on species abundance and distribution, and may exacerbate the effects of other stressors, such as habitat fragmentation and diseases. The conservation of habitats within ecologically functioning landscapes is essential to sustaining fish, wildlife, and plant populations and improving their resilience in the face of climate change impacts, new diseases, invasive species, habitat loss, and other threats. Therefore, this Policy emphasizes the integration of mitigation planning with a landscape approach to conservation.

Over the past 30 years, the concepts of adaptive management (resource management decisionmaking when outcomes are uncertain) have gained general acceptance as the preferred science-based approach to conservation. Adaptive management is an iterative process that involves: (a) Formulating alternative actions to meet measurable objectives; (b) predicting the outcomes of alternatives based on current knowledge; (c) conducting research that tests the assumptions underlying those predictions; (d) implementing alternatives; (e) monitoring the results; and (f) using the research and monitoring results to improve knowledge and adjust actions and objectives accordingly. Adaptive management further serves the need of most natural resources managers and policy makers to provide accountability

for the outcomes of their efforts, *i.e.,* progress toward achieving defensible and transparent objectives.

Working with many partners, the Service is increasingly applying the principles of adaptive management in a landscape approach to conservation. Mitigating the impacts of actions for which the Service has advisory or regulatory authorities continues to play a significant role in accomplishing our conservation mission under this approach. Our aim with this Policy is to align mitigation with conservation strategies at appropriate landscape scales so that mitigation most effectively contributes to achieving the conservation objectives we are pursuing with our partners, and to align mitigation recommendations and requirements with Secretarial Order 3330 and 600 DM.

*A Focus on Habitat Conservation*

Although many Service authorities pertain to specific taxa or groups of species, most specifically recognize that these resources rely on functional ecosystems to survive and persist for the continuing benefit of the American people. Mitigation is a powerful tool for sustaining species and the habitats upon which they depend; therefore, the Service's Mitigation Policy must effectively deal with impacts to the ecosystem functions, properties, and components that sustain fish, wildlife, plants, and their habitats. The 1981 Policy focused on habitat: "the area which provides direct support for a given species, population, or community." It defined criteria for assigning the habitats of project-specific evaluation species to one of four resource categories, using a two-factor framework based on the relative scarcity of the affected habitat type and its suitability for the evaluation species, with mitigation guidelines for each category. We maintain a focus on habitats in this Policy by using evaluation species and a valuation framework for their affected habitats, because habitat conservation is still generally the best means of achieving conservation objectives for species. However, our revisions of the evaluation species and habitat valuation concepts are intended to address more explicitly the landscape context of species and habitat conservation to improve mitigation effectiveness and efficiency. In addition, we recognize that some situations warrant measures that are not habitat based to address certain species-specific impacts.

AR_0044666

*Applicability to the Endangered Species Act*

The 1981 Policy did not apply to the conservation of species listed as threatened or endangered under the ESA. Excluding listed species from the 1981 Policy was based on: (a) A recognition that all Federal actions that could affect listed species and designated critical habitats must comply with the consultation provisions of section 7 of the ESA; and (b) a position that "the traditional concept of mitigation" did not apply to such actions. This Policy supersedes this exclusion for the Service. Mitigation, which we define in this Policy as measures to avoid, minimize, and compensate for impacts, is an essential means of achieving the overarching purpose of the ESA, which is to conserve listed species and the ecosystems upon which they depend.

Effective mitigation prevents or reduces further declines in populations and/or habitat resources that would otherwise slow or impede recovery of listed species. It is fully consistent with the purposes of the ESA for the Service to identify measures that mitigate the impacts of proposed actions to listed species and designated critical habitat. Although this Policy is intended, in part, to clarify the role of mitigation in endangered species conservation, nothing herein replaces, supersedes, or substitutes for the ESA or its implementing regulations.

Under ESA section 7, the Service has consistently recognized or applied mitigation in the form of:

(a) Measures that are voluntarily included as part of a proposed Federal action that avoid, minimize, rectify, reduce over time, or compensate for unavoidable (also known as residual) impacts to a listed species;

(b) components of reasonable and prudent alternatives (RPAs) to avoid jeopardizing the continued existence of listed species or destroying or adversely modifying designated critical habitat; and

(c) reasonable and prudent measures (RPMs) within an incidental take statement to minimize the impacts of anticipated incidental taking on the affected listed species.

As another example, the 1982 amendments to the ESA created incidental take permitting provisions (section 10(a)(1)(B)) with specific requirements (sections 10(a)(2)(A)(ii) and 10(a)(2)(B)(ii)) for applicants to minimize and mitigate impacts to listed species to the maximum extent practicable.

**Summary of Comments and Responses**

The March 8, 2016, notice announcing our proposed revisions to the U.S. Fish and Wildlife Service (Service) Mitigation Policy (Policy) (81 FR 12380) requested written comments, information, and recommendations from governmental agencies, tribes, the scientific community, industry groups, environmental interest groups, and any other interested members of the public.

That notice established a 60-day comment period ending May 9, 2016. Several commenters requested an extension of time to provide their comments, asked the Service to revise and recirculate the Policy for comment, or asked the Service to withdraw the Policy to allow interested parties additional time to comment. We subsequently published a notice on May 12, 2016 (81 FR 29574), reopening the comment period for an additional 30 days, through June 13, 2016.

During the comment period, we received approximately 189 comments from Federal, State, and local government entities, industry, trade associations, conservation organizations, nongovernmental organizations, private citizens, and others. The range of comments varied from those that provided general statements of support or opposition to the draft Policy, to those that provided extensive comments and information supporting or opposing the draft Policy or specific aspects thereof. The majority of comments submitted included detailed suggestions for revisions addressing major concepts as well as editorial suggestions for specific wording or line edits.

All comments submitted during the comment period have been fully considered in preparing the final Policy. All substantive information provided has been incorporated, where appropriate, directly into this final Policy or is addressed below. The comments we received were grouped into general issues specifically relating to the draft Policy, and are presented below along with the Service's responses to these substantive comments.

*A. Clarify How the Policy Guides Formulation of Service Mitigation Recommendations vs. Requirements*

*Comment (1):* Many commenters indicated that the proposed Policy was unclear regarding the Service's authorities to require mitigation, and requested clarification to distinguish between requirements and recommendations. Several of these commenters noted that various

authorities cited for the Policy, such as the ESA, Fish and Wildlife Coordination Act (FWCA), and NEPA, do not require actions to maintain or improve the status of affected resources, or to apply a landscape approach to their conservation, which are features of the Policy.

*Response:* We agree with comments that the proposed Policy provided an unclear distinction between circumstances under which the Policy would guide the Service's formulation of: (a) Mitigation requirements, *i.e.,* measures that the Service may impose upon an action proponent as conditions of Service funding, approval, or regulatory decision; vs. (b) mitigation recommendations, *i.e.,* measures that we advise an action proponent to adopt for conservation purposes. We used the phrase "recommend or require" because the Service has authority to require mitigation in some contexts, but not in others, and our aim with this Policy is to provide a common framework for the Service to implement across the full range of our authorities. However, we recognize the need to clearly distinguish these two general contexts, and have revised the final Policy accordingly.

Circumstances under which the Service currently has specific authority to *require,* consistent with applicable laws and regulations, one or more forms of mitigation for impacts to fish and wildlife resources include the following:

1. Actions that the Service carries out, *i.e.,* the Service is the action proponent;
2. Actions that the Service funds;
3. Actions to restore damages to fish and wildlife resources caused by oil spills and other hazardous substance releases, under the Oil Pollution Act (OPA) and the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA);
4. Actions of other Federal agencies that require an incidental take statement under section 7 of the ESA (measures to minimize the impacts of incidental taking on the species);
5. Actions that require an incidental take permit under section 10 of the ESA (measures to minimize and mitigate the impacts of the taking on the species to the maximum extent practicable);
6. Fishway prescriptions under section 18 of the Federal Power Act (FPA), which minimize, rectify, or reduce over time through management, the impacts of non-Federal hydropower facilities on fish passage;
7. License conditions under section 4(e) of the FPA for non-Federal hydropower facilities affecting Service properties (*e.g.,* a National Wildlife Refuge) for the protection and

utilization of the Federal reservation consistent with the purpose for which such reservation was created or acquired;

8. Actions that require a Letter of Authorization or Incidental Harassment Authorization under the Marine Mammal Protection Act (MMPA); and

9. Actions that require a permit for non-purposeful (incidental) take of eagles under the Bald and Golden Eagle Protection Act (BGEPA).

The circumstances cited above under which the Service currently has specific authority to *require,* consistent with applicable laws and regulations, one or more forms of mitigation for impacts to fish and wildlife resources are further clarified in subsequent responses to comments, the Policy, and its appendices.

In all other circumstances not listed above, the Policy will guide the Service's formulation of recommendations, not requirements, to proponents of actions that cause impacts to fish and wildlife resources and which are within the defined scope (section 3) of the Policy.

*B. Policy Is Based on Existing Authority*

*Comment (2):* Several commenters stated that the draft Policy attempted to inappropriately create new authority for the Service to engage in mitigation processes, circumventing appropriate legislative or rulemaking processes. They stated that the Policy could not be used to expand Service authority to take actions beyond those authorized by Congress, noting that the Policy itself is not an independent grant of authority and the imposition of any mitigation measures advocated by it would be constrained by authority provided by the applicable statute. The commenters requested we clarify that the Policy does not expand existing Service authorities.

*Response:* The commenters are correct that the Policy cannot create or assume new authority for making mitigation recommendations. This Policy does not exceed existing statutory or regulatory authority to engage in mitigation processes for the purpose of making mitigation recommendations, and in limited cases, specifying mitigation requirements. Processes established by applicable statutes and regulations remain in effect and are not superseded by this Policy. In implementing this Policy and carrying out our broader mission, the Service recognizes these authorities and processes, and their limitations.

*C. Scope of the Policy*

*Comment (3):* One commenter stated their concerns that the scope of the Policy appeared to limit the discretion of an action agency, potentially holding the action agency or applicant responsible for mitigation beyond an action agency's own authority, mission, and responsibilities.

*Response:* The Service recognizes that the authorities and processes of different agencies may limit or provide discretion regarding the level of mitigation for a project. This Policy is not controlling upon other agencies. There may be limitations (*e.g.,* agency-specific authorities and 600 DM 6) on the implementation of measures that would achieve the Policy's goal of net conservation gain or a minimum of no net loss, when the costs of such mitigation are reimbursable by project beneficiaries under laws and regulations controlling agencies' activities (*e.g.,* Bureau of Reclamation).

*Comment (4):* Two commenters stated their belief that the Policy inappropriately expands Service authority to lands beyond National Wildlife Refuges or other Service-managed lands, and beyond the authorities of the ESA.

Several commenters wanted the Policy to contain explicit guidance on the function of the Service's mitigation authorities under each statute and on implementation of the new Policy in relation to those authorities. Two commenters were concerned about the way the Service will coordinate its responsibilities with similar duties carried out by other agencies and how the Policy applies in situations when more than one statute applies to a particular action.

*Response:* The Service's authorities to recommend mitigation are described in section 2 and in Appendix A. The Policy's overall coverage is described in the Scope, section 3. The commenters are correct that the Policy's coverage is dictated by the underlying statutory authorities. If a relevant statute provides the Service with authority to make mitigation recommendations, the Service may provide recommendations that cover the resources that are described in that statute. The Policy cannot create or assume new authority for making mitigation recommendations or exceed existing statutory or regulatory authority, and it does not extend the geographic or taxonomic extent of coverage beyond existing Service practice. Authorities for making mitigation recommendations may be applicable, regardless of the location of the action, and whether the action has an effect on a species listed under the ESA. For example, the Service routinely reviews projects to provide mitigation recommendations for inter-jurisdictional fish under NEPA, FWCA, FPA, and the Clean Water Act (CWA) for projects that are planned on lands and waters not owned or managed by the Service.

This Policy covers engagement under all of the Service's mitigation authorities, and does not replace interagency procedure established in another document. The Policy was developed in accordance with the Presidential Memorandum on Mitigating Impacts on Natural Resources from Development and Encouraging Related Private Investment (November 3, 2015), and the Secretary of the Interior's Order 3330 entitled "Improving Mitigation Policies and Practices of the Department of the Interior" (October 31, 2013). Having multiple agency mitigation policies using common principles, terms, and approaches provides greater consistency and predictability for the public.

*Comment (5):* Two commenters stated that the Service cannot prioritize fish, wildlife, plants, and their habitats above all other resources. One said that the Policy must incorporate the Mining and Minerals Policy Act of 1970 (30 U.S.C. 21a) that states that it is the policy of the Federal Government in the national interest to foster and encourage private enterprise in the development of economically sound and stable domestic mining, minerals, metal and mineral reclamation industries, and to promote the orderly and economic development of domestic mineral resources and reserves. They also stated the Policy must incorporate the National Materials and Minerals Policy, Research and Development Act, (30 U.S.C. 1601 *et seq.*), which states it is the continuing policy of the United States to promote an adequate and stable supply of materials necessary to maintain national security, economic well-being, and industrial production, with appropriate attention to a long-term balance between resource production, energy use, a healthy environment, natural resources conservation, and social needs. The commenter noted that the Service ignored these statutes and proposed requirements that restrict and discourage mineral development in violation of these laws. They added that any mitigation must be balanced against Congress' policy of encouraging mineral development.

*Response:* The Service recognizes the national importance of resource development referenced by the commenter, along with many other types of economic development and activities. Statutes that encourage such development are not modified by this Policy. By enacting the various statutes

that provide for natural resource mitigation authority across multiple Federal agencies, Congress has recognized that fish and wildlife resources provide commercial, recreational, social, and ecological value to the American people. These statutes providing mitigation authority do not supersede statutes encouraging economic development. Conversely, statutes encouraging economic development do not supersede those providing mitigation authorities. Mitigation is a process by which agencies, proponents, and partners can facilitate sustainable development while simultaneously addressing the long-term conservation of native plants, animals, and ecosystems.

*Comment (6):* One commenter stated there were constitutional limits on requiring mitigation, referencing the *Koontz* v. *St. Johns River Water Management District* case decided by the U.S. Supreme Court 570 US 2588 (2013). This commenter noted that any compensatory mitigation measures must have an essential nexus with the proposed impacts and be roughly proportional, or have a reasonable relationship between the permit conditions required and the impacts of the proposed development being addressed by those permit conditions.

*Response:* Like all agencies, the Service has responsibility to implement its authorities consistent with any applicable case law. The Service will implement the Policy in a manner that is consistent with the *Koontz* case and any other relevant court decisions. We have included the following language in the Policy in section 5.6, Means and Measures: All appropriate mitigation measures have a clear connection with the anticipated effects of the action and are commensurate with the scale and nature of those effects.

### D. Trust Resources

*Comment (7):* Several commenters addressed the concept of Federal trust fish and wildlife resources. They noted that in section 3.2, the Policy states that it applies to Service trust resources, but gives Service staff discretion to engage in mitigation processes on an expanded basis under appropriate authorities. They were unclear what authorities were being referenced and recommended that they be clarified, especially if they were expanding the Service's efforts. They asked that we clarify what the term "expanded basis" means.

Commenters stated that the Service's authority is limited to migratory birds, threatened or endangered species, eagles, and certain marine mammals.

They said that States have authority for all other species. They also requested acknowledgement that States have sole authority for resource management and that the Service should restrict the Policy to only federally protected species.

*Response:* This Policy applies to all resources listed or described within the Service's various mitigation authorities. The language used within those authorities to describe the covered resources determines the scope of Service recommendations made under each authority. Some authorities apply to resources defined very broadly. The types of resources for which the Service is authorized to recommend mitigation include those that contribute broadly to ecological functions that sustain species. For example, the definitions of the terms "wildlife" and "wildlife resources" in the Fish and Wildlife Coordination Act include birds, fishes, mammals, and all other classes of wild animals, and all types of aquatic and land vegetation upon which wildlife is dependent. The purpose of the National Environmental Policy Act (NEPA) also establishes an expansive focus in promoting efforts that will prevent or eliminate damage to the environment, including fish and wildlife resources, while stimulating human health and welfare. In NEPA, Congress recognized the profound impact of human activity on the natural environment, particularly through population growth, urbanization, industrial expansion, resource exploitation, and new technologies. NEPA further recognized the critical importance of restoring and maintaining environmental quality, and declared a Federal policy of using all practicable means and measures to create and maintain conditions under which humans and nature can exist in productive harmony. These statutes address systemic concerns and provide authority for protecting habitats and landscapes.

In this Policy, we note that the Service has traditionally described its trust resources as migratory birds, federally listed endangered and threatened species, certain marine mammals, and inter-jurisdictional fish. Our engagement in mitigation processes is likely to focus on those trust resources, but under certain authorities, the Service's recommendations are not strictly limited to covering only trust resources. This Policy does not establish new authority. We respect the role of States and State authorities. We have revised section 3.2 to replace the term "expanded basis" to avoid the perception that the Policy is expanding authorities.

### E. Applicability to Endangered and Threatened Species

*Comment (8):* Several commenters recommended excluding species that are listed as endangered or threatened under the ESA as resources to which the Policy would apply, and several others supported such applicability. Reasons cited by the commenters for excluding listed species included: (a) The Service does not explain the circumstances that have changed and warrant reversing the listed-species exclusion of the 1981 Policy; (b) the Policy cannot substitute for ESA-specific requirements; (c) the ESA does not provide authority to require mitigation; and (d) Policy concepts such as "net conservation gain," "high-value habitat," and a "landscape approach" to conservation are inconsistent with ESA statutory authority and regulatory requirements.

*Response:* The Policy addresses all fish and wildlife resources for which the Service has authority to recommend or require mitigation, including ESA-listed species, because of our need to more strategically provide such recommendations. The primary purpose of the ESA is to provide a means for conserving the ecosystems upon which listed species depend. Avoiding, minimizing, and compensating for impacts is as important, if not more so, to the conservation of listed species as it is to any other resource of conservation concern (*e.g.*, wetlands), because listed species are in danger of extinction or are likely to become so in the foreseeable future. The Service can and should advise others about how they may help conserve listed species when their proposed actions would cause impacts to their populations, because conserving listed species is part of our agency's mission. Identifying those means and measures that would, at minimum, result in no net loss to the status of affected listed species will inform action proponents about what they can do, consistent with their authorities and abilities, to prevent further status declines or contribute to their recovery. As mentioned earlier, the 1982 amendments to the ESA are another example of the changed circumstances since the 1981 Policy, and changes in knowledge, conservation, and management of listed species support this Policy's concepts.

*Comment (9):* In ESA section 7(a)(2) consultations, several commenters noted that reasonable and prudent alternatives (RPAs) to actions that jeopardize listed species or destroy or adversely modify designated critical habitat are not required to meet the no-net-loss or net gain goal of the Policy.

*Response:* When an agency has proposed an action that the Service has determined in a biological opinion is likely to jeopardize listed species or destroy or adversely modify designated critical habitat, we agree that RPA(s) to that action are not required to meet the no-net loss/net gain goal of the Policy. The definition of RPAs at 50 CFR 402.02 applies to the formulation of RPAs, not this Policy. In discussions with both the action agency and any applicant involved, the Service is required to suggest RPAs, if available, to the action agency and to rely on the expertise of both in identifying RPAs.

The ESA does not prohibit impacts to critical habitat, but section 7(a)(2) does prohibit Federal actions from destroying or adversely modifying critical habitat, without special exemption under section 7(h). We do not anticipate conflicts between the advisory recommendations under this Policy provided in advance of the initiation of consultation and subsequent review of actions under section 7(a)(2) relative to critical habitat. However, we have added language in the Policy that specifically cautions Service personnel about providing compensation recommendations in the context of actions that may affect designated critical habitat. Recommendations for measures that mitigate impacts (all fish types) to the listed species *within* critical habitat will receive preference over compensation *outside* critical habitat to avoid the possibility that adverse effects to the physical and biological features of critical habitat could appreciably diminish its conservation value.

*Comment (10):* In ESA section 7(a)(2) consultations, several commenters requested that the Service clarify whether the reasonable and prudent measures (RPMs) and the accompanying nondiscretionary terms and conditions that the Service includes in incidental take statements may require compensating for the impacts of take on the species. Most stated that RPMs are limited to actions that minimize take, and may not include requirements to compensate for taking impacts. In support of such comments, some quoted the Services' 1998 Consultation Handbook language at page 4–50, which states in a section about RPMs: "Section 7 requires minimization of the level of take. It is not appropriate to require mitigation for the impacts of incidental take."

*Response:* The Service's authority to require or recommend mitigation, including all forms of mitigation covered by the CEQ's definition of mitigation, are governed by the ESA and the regulations addressing consultations at 50 CFR part 402. While this Policy addresses ESA compensatory mitigation to a limited extent, further detail regarding the role of compensatory mitigation in implementing the ESA will be provided through authority-specific step-down policy (see proposed Endangered Species Act—Compensatory Mitigation Policy at 81 FR 61032–61065, September 2, 2016).

*Comment (11):* Two commenters asked that we clarify this sentence in the Discussion material on Applicability to the Endangered Species Act: "This Policy encourages the Service to utilize a broader definition of mitigation where allowed by law."

*Response:* We removed the sentence from the Discussion material in this final Policy.

### F. Policy Addresses Multiple Authorities

*Comment (12):* Several commenters addressed aspects of the Service's authority under the Bald and Golden Eagle Protection Act (BGEPA). One commenter supported the acknowledgement that compensatory mitigation for bald and golden eagles may include preservation of those species' habitats and enhancing their prey base. They noted that existing regulations establishing a permit program for the non-purposeful take of bald and golden eagles recognize these options but that these options have not been used. One commenter stated the Service was incorrect in stating in the proposed Policy: "the statute and implementing regulations allow the Service to require habitat preservation and/or enhancement as compensatory mitigation for eagle take." They said that Congress has not exercised jurisdiction over the habitats of eagles, meaning the Service lacks authority to require mitigation for impacts to eagle habitats. One commenter suggested the Policy should articulate whether compensatory mitigation would be in addition to current requirements of a 1-for-1 take offset.

*Response:* The Service has revised the BGEPA material in Appendix A section (A)(1) to address the concepts raised by the commenters. Although BGEPA does not directly protect eagle habitat beyond nest structures, nothing in the statute precludes the use of habitat restoration, enhancement, and protection as compensatory mitigation. Because golden eagle populations are currently constrained by a high level of unauthorized human-caused mortality rather than habitat loss, permits for golden eagle take require mitigation to be in the form of a reduction to a human-caused source of mortality.

However, habitat restoration and enhancement could potentially offset permitted take in some situations, once standards and metrics are developed to ensure the habitat-based mitigation provided will adequately compensate for the detrimental impacts of the permit.

As we developed this Policy, the Service is simultaneously in the process of developing revised regulations that will establish the specific mitigation ratio (prior to being adjusted to account for uncertainties and risks in the mitigation method) for eagle permits.

*Comment (13):* Three commenters stated that section 404(m) of the CWA does not provide the Service with any substantive authority to "secure mitigation" as stated in Appendix A (A)(2). They suggested the Service's role is limited to commenting upon section 404 permits and providing recommendations to the U.S. Army Corps of Engineers (Corps) and that final decisionmaking rests with that agency.

*Response:* We have edited Appendix A to remove the word "secure," replacing it with "recommend." This change better reflects the Service's authority, provided in the CWA, to provide mitigation recommendations during permitting processes. The Service makes such recommendations with the intention that they be considered and adopted by the Corps as their permit conditions or requirements, but the commenters are correct that the Service's recommendations themselves are advisory.

*Comment (14):* Two commenters were concerned that the language in the Policy provides an inappropriate method of requiring mitigation measures on projects permitted under CWA section 404 where the Service could not do so under its own authority, by asking the Corps to impose them.

*Response:* The language regarding the CWA in Appendix A (A)(2) does not introduce any new authority or process. It describes the existing means by which the Service, under statutory authority in the CWA, provides recommendations to the Corps. The Service uses those recommendations to advise the Corps on the effects of proposed permitting actions on aquatic habitats and wildlife and how to mitigate those effects. The Corps then decides whether to adopt the Service's advice in making their CWA permitting decision.

*Comment (15):* One commenter was concerned that the Policy could be applied to activities authorized under CWA section 404 Nationwide Permits (NWP) that have only minimal environmental impacts. They said that the Service should expressly exclude

activities authorized by NWPs from the Policy because such activities have only minimal environmental impacts and any current mitigation requirements are unwarranted.

*Response:* Mitigation does apply to the NWP program. The Corps addresses mitigation for NWP-authorized activities in General Condition 23 (77 FR 10285, February 21, 2012). Activities authorized by NWPs are not excluded from this Policy. Also see the agency coordination provisions of General Condition 31, Pre-construction Notification, in the NWPs issued by the Corps on February 21, 2012 (77 FR 10286). For the listed NWPs and in the circumstances described in General Condition 31, the Service is afforded a review opportunity, after which the U.S. Army Corps District Engineer will consider any comments from Federal and State agencies concerning the proposed activity's compliance with the terms and conditions of the NWPs and the need for mitigation to reduce the project's adverse environmental effects to a minimal level.

*Comment (16):* One commenter suggested clarifying the application of the Policy to the Service's role in CWA section 404 permits and mitigation by adding the following sentence to Section 3.4, Applicability to Service Actions: This Policy applies to the Service's review of all CWA permits, both in coordination and consultation roles.

*Response:* We agree with the commenter that the Policy applies to the Service's review of CWA section 404 permits. We did not add the suggested sentence but address the Service's application of our statutory authority to make recommendations that mitigate the impacts of these permitted actions on aquatic environments in Appendix A (A)(2).

*Comment (17):* Two commenters addressed the Service's authority under the Fish and Wildlife Coordination Act. One commenter said the Policy should acknowledge that the FWCA is advisory in nature. Another commenter said that the Policy should acknowledge that the FWCA provides a basis for recommending mitigation of impacts to ecological functions.

*Response:* Mitigation recommendations the Service makes under the FWCA to Federal agencies planning water resource development projects are advisory. Section 2(a) of the FWCA requires agencies to consult with the Service whenever the waters of any stream or other body of water are proposed or authorized to be impounded, diverted, channelized, controlled, or modified for any purpose

whatever, with a view to the conservation and development of fish and wildlife resources. Section 2(b) of the FWCA requires that Service reports and recommendations be given full consideration and included in project reports to Congress or to any other relevant agency or person for authorization or approval. These aspects of FWCA compliance are required. Adoption of Service recommendations by the Federal water resource construction agency is not required.

The FWCA applies to those resources described in section 8 of the statute, where the terms "wildlife" and "wildlife resources" are defined to include birds, fishes, mammals, and all other classes of wild animals, and all types of aquatic and land vegetation upon which wildlife is dependent. In practice, Service recommendations made under FWCA are likely to focus on linkages of effects to trust resources, as prioritized by Service field and regional offices, but recommendations can cover resources as the statute defines. Because of the breadth of this coverage, we agree with the commenter that Service recommendations under the FWCA can include measures intended to address systemic ecological functions and agree that the purposes of the statute envision this application.

*Comment (18):* Several commenters addressed the Service's authority under the Migratory Bird Treaty Act (MBTA). One commenter said the Service was incorrect in describing implied authority to permit incidental take of migratory birds under the MBTA and noted that the Service has no authority to require compensatory mitigation for incidental take of migratory birds. Several commenters said that mitigation for migratory birds exceeds MBTA authority and that the Policy should exclude potential incidental impacts to migratory birds under the MBTA until the Service establishes statutory or regulatory authority to require landowners to obtain incidental take authorization prior to undertaking otherwise lawful activities. They added that the MBTA does not directly address mitigation or habitat impacts.

One commenter said the Service was incorrect in writing that the Fish and Wildlife Conservation Act implicitly provided for mitigation of impacts to migratory birds. They said that the language does not authorize the Service to engage in any management activities associated with migratory birds, particularly over private parties, only directing the Service to monitor and assess population trends and species status of migratory nongame birds.

*Response:* The Service has consistently interpreted the MBTA to apply to the incidental take of migratory birds. Currently, there is no express authority to permit the incidental take of migratory birds under the MBTA. Thus, the Service uses an enforcement discretion approach whereby the Service provides technical assistance to project proponents with strategies to avoid or minimize project-related take of migratory birds that is not the purpose of the otherwise legal action. Under this approach, the Service recommends voluntary measures that can mitigate the direct take of migratory birds and works with project proponents to address impacts to migratory bird habitat, including voluntary compensation for loss of migratory bird habitat. In May 2015, the Service published a notice of intent to conduct a National Environmental Policy Act review of a proposed rule that would establish the authority to permit incidental take as provided by the Act itself. An environmental impact statement will evaluate multiple alternatives for authorizing the incidental take of migratory birds. Subsequently, the Service will develop a regulation that provides the clear authority to permit incidental take and require mitigation measures to avoid and minimize incidental take, and compensation for unavoidable take. Until the regulation is finalized, the Service will continue working with project proponents and industries to manage impacts to migratory birds and their habitats.

The Service does not have specific statutory authority pursuant to the MBTA to *require* Federal action agencies and/or their permittees to provide compensatory mitigation for unavoidable impacts to (loss of) migratory bird habitat resulting from federally conducted or approved, authorized, or funded projects or activities. However, many Federal agency-specific authorities, as well as procedural authorities such as NEPA and the FWCA, require consultation with the Service, State natural resource agencies, and others, and evaluation of environmental effects of proposed actions, which may include considering impacts to migratory bird habitat. Through these authorities, the Service may recommend compensatory mitigation for unavoidable impacts to migratory bird habitat. Federal action agencies may include terms and conditions in permits, licenses, and certificates that mitigate a full range of adverse environmental effects, such as recommendations to compensate for

unavoidable impacts to migratory bird habitat, if they determine they have authority, consistent with their statutes and regulations, to require such compensatory mitigation.

In addition, Executive Order (E.O.) 13186 directs Federal agencies "taking actions that have, or are likely to have, a measurable negative effect on migratory bird populations" to sign a Memorandum of Understanding (MOU) with the Service "that shall promote the conservation of migratory bird populations."

In Appendix A, we have modified the text of section (A)(7) to clarify the requirements of the Fish and Wildlife Conservation Act and have made minor clarifying edits to the MBTA text of section (A)(10).

*Comment (19):* Four commenters addressed the Marine Mammal Protection Act (MMPA) discussion in Appendix A (A)(9). One commenter suggested that the Service provide more clarification on existing authorities under the MMPA. These included specifying that this section of Appendix A only discusses incidental take authorizations for non-commercial fishing activities; clarifying requirements as they apply to military readiness activities; providing additional information on other means of affecting the least practicable adverse impact; and clarifying that the permissible methods of taking and the mitigation and reporting are required measures as provided under Incidental Take Regulations (ITRs) and Incidental Harassment Authorizations (IHAs).

*Response:* Although the MMPA section of Appendix A was intended to provide a general overview for part of this Act, we agree that Appendix A of the Mitigation Policy could benefit from these additional clarifications. We have revised Appendix A to address these points as appropriate.

*Comment (20):* Commenters stated that the Policy is incompatible with the MMPA in that it adopts a new position inconsistent with the existing regulations or otherwise effects a substantive change in the MMPA.

*Response:* This Policy does not alter or amend any existing regulation, law, or policy other than the 1981 Policy itself. Instead, where mitigation measures are compatible with the standards of other statutes, *e.g.,* the MMPA, the Service would recommend their use. On the other hand, there are mitigation measures that may be required under statutes besides the MMPA regardless of this Mitigation Policy, *e.g.,* mitigation measures to ensure the least practicable adverse impact on a marine mammal species or

stock and its habitat, and on their availability for subsistence use.

*Comment (21):* Commenters stated that the draft mitigation Policy is incompatible with the MMPA in that it indicates that recipients of incidental take authorizations would be required to take actions to achieve a net conservation gain or no net loss to the affected marine mammal species or stock. They commented that the Service does not have such authority under the MMPA.

*Response:* The MMPA states that species and population stocks should not be permitted to diminish beyond the point at which they cease to be a significant functioning element in the ecosystem of which they are a part, and, consistent with this major objective, they should not be permitted to diminish below their optimum sustainable population. In this manner, the mitigation Policy is compatible with the MMPA in that it implies there should be no conservation loss. However, the Service agrees that the MMPA does not require recipients to achieve a net conservation gain or no net loss to marine mammals. It was not the intent of this Policy to make such a requirement. Instead, should the Service make the required findings under section 101(a)(5) of the MMPA and authorize incidental take, it would prescribe the permissible methods of taking and other means of ensuring the least practicable adverse impact on the marine mammal species or stock and its habitat, and on the availability for subsistence use as a part of that authorization. We have revised Appendix A of the Policy to clarify this point.

*Comment (22):* One commenter suggested that the Policy should include language to ensure that review and consultation under Section 106 of the National Historic Preservation Act of 1996 (NHPA) (16 U.S.C 470 *et seq.*), as amended in 1992, takes place at the early planning stage of the action and not wait until mitigation is being considered.

*Response:* We have revised section 3.4 of the Policy to state that the Service's responsibilities begin "during early planning for design of the action." In addition, we have added the following language: "Consistent with the NEPA, and the NEPA and NHPA Section 106 Handbook, these reviews will be integrated into the decisionmaking process at the earliest possible point in planning for the action rather than wait until mitigation is considered."

*Comment (23):* One commenter said that in Appendix B, to help meet its overarching Tribal Trust Doctrine

responsibilities under the NHPA, the Service should initiate Section 106 consultation with Indian tribes early within the time of mitigation planning for the FWS proposed action (instead of after the preferred mitigation approach is selected).

*Response:* We have revised Appendix B accordingly. The Service will initiate Section 106 consultation with Indian tribes during early planning for Service-proposed actions, to ensure their rights and concerns are incorporated into project design. Consultation will continue throughout all stages of the process, including during consideration of mitigation, and will follow the Service's Tribal Consultation Handbook and the Service's Native American Policy.

*Comment (24):* One commenter specifically questioned the treatment of Natural Resource Damage Assessment actions conducted under CERCLA, OPA, and the CWA, stating that the Presidential Memorandum on Mitigating Impacts on Natural Resources from Development and Encouraging Related Private Investment, dated November 3, 2015, requires that separate guidance be developed for when restoration banking or advance restoration would be appropriate.

*Response:* When a release of hazardous materials or an oil spill injures natural resources under the jurisdiction of State, tribal, or Federal agencies, the type of restoration conducted depends on the resources injured by the release and, by nature of the action, must happen after impacts occur. Thus, this Policy's preference for compensatory mitigation measures that are implemented and earn credits in advance of project impacts cannot apply. However, pending promulgation of further DOI guidance, the tools provided in section 5 maintain flexibility useful in implementing restoration to restore injured resources under the jurisdiction of multiple governments, by providing support for weighing or modifying project elements to reach Service goals. Therefore, in agreement with the commenter, we have made edits to section 5.6 and to Appendix A to clarify the relationship of this Policy with Natural Resource Damage Assessment and the Presidential Memorandum on Mitigation.

*Comment (25):* Two commenters said that combining the fish and wildlife resources provisions of the Stream Protection Rule under the Surface Mining Control and Reclamation Act (SMCRA) with the language of the proposed Mitigation Policy could result in the Service inserting mitigation

AR_0044672

requirements not otherwise called for in a SMCRA permit.

*Response:* At the time this Policy was completed, the proposed Stream Protection Rule, published July 27, 2015 (80 FR 44436), was not yet finalized. The statutory language of SMCRA and its implementing regulations, including the Stream Protection Rule when finalized, will determine the scope of resources covered by Service recommendations under that statute. This Policy does not exceed existing statutory or regulatory authority to engage in mitigation processes for the purpose of making mitigation recommendations, and in limited cases, specifying mitigation requirements. Processes established by applicable statutes and regulations are not superseded by this Policy.

*G. Exemptions*

*Comment (26):* Several commenters provided observations regarding exemptions from the Policy. One commenter said that the Policy should further identify those activities and projects that are exempt, adding that the Policy should make clear that any new procedural or other requirements apply only to new project applications or proposals. Several commenters said that the Policy should not apply to actions for which a complete application is already submitted. They stated that the Policy should apply neither to actions already under review nor to actions where coordination was initiated prior to publication of the final Policy.

*Response:* In section 3.3, Exclusions, we describe the circumstances when the Policy does not apply, but we do not specifically exempt any category of action. The Policy applies when one or more of our authorities apply to the review of a particular action for purposes of making mitigation recommendations. It is the language of those authorities that specifies their coverage of particular actions and resources. In section 3.3, we establish that the Policy does not apply when the Service has already agreed to a mitigation plan for pending actions, except in the specified circumstances. Complete applications that are submitted prior to the finalization of this Policy, but that are not yet under review, do not satisfy those circumstances. If an action is under active review as of the date of final publication of this Policy, Service personnel may elect to apply this Policy to that action. For actions where coordination was initiated prior to the final Policy, Service personnel would determine whether that coordination constitutes active review.

*Comment (27):* Two commenters said the Policy should exempt landowners who have participated or are currently participating in voluntary programs designed to conserve endangered species.

*Response:* We do not specifically exempt any category of action in section 3.3. This Policy, as an umbrella policy, integrates all of the Service's authorities for engaging in mitigation. We cannot legally exempt the landowners referenced by the commenters on the basis of their status pursuant to an agreement entered into under a single authority, because their future actions may trigger applicability of one or more other authorities. The Policy does not, however, override or modify any such agreements or substitute for the regulations governing those agreements.

*Comment (28):* Four commenters stated that the Policy should explicitly exempt activities with *de minimis* impacts. They said that projects with small and/or temporary impacts should not be burdened by mitigation measures.

*Response:* We do not specifically exempt any category of action and do not exempt actions on the basis of the size of activities planned or on the size of their impacts. The Policy provides a framework to guide Service personnel in their review of actions, including their application of the mitigation hierarchy and their recommendations for mitigation. Application of this guidance will assist Service personnel in determining whether to engage actions in mitigation planning and then in the formulation of mitigation recommendations. Application of this guidance could result, in appropriate circumstances, in a decision not to engage in mitigation planning for actions with *de minimus* impacts, but we do not specifically exempt actions based on the scale of anticipated impacts.

*Comment (29):* One commenter stated the Policy should include an exemption for conservation projects sponsored by local, State, or Federal resource agencies that seek beneficial restoration and implement conservation objectives.

*Response:* We do not specifically exempt any category of action and do not exempt actions on the basis of their primary purpose. We acknowledge that actions designed to restore or create habitats are generally less likely to require, for example, compensatory mitigation, and support their role in fulfilling the Service's larger mission. The Policy does not establish new or increased scrutiny of conservation or restoration actions than under existing statutes and regulations. The Service

may apply this Policy in review of a conservation action that is intended to benefit one resource, but may adversely affect others for which the Service is authorized to provide mitigation recommendations and/or mitigation requirements.

*Comment (30):* Two commenters stated that this Policy should not apply to military testing, training, or readiness activities. They stated that such an exclusion is necessary to be consistent with the Presidential Memorandum on Mitigating Impacts on Natural Resources from Development and Encouraging Related Private Investment (November 3, 2015).

*Response:* The Service interprets the Presidential Memorandum, which instructs agencies to develop or update their mitigation policies, to exempt agencies that conduct military testing, training, and readiness activities from the requirement to update or create policies for those activities. The Presidential Memorandum cannot exempt any particular activity from the applicability of existing statutory authority that provides for mitigation.

*Comment (31):* One commenter stated the Policy should define or describe "habitat" and recommended that the Service exclude dredge material placement sites, and other such manmade areas, from mitigation planning processes.

*Response:* Habitat develops on sites with a history of human manipulation, including levees, reclaimed mine sites, timber harvest sites, agricultural areas, and dredged material placement sites. The commenter does not reference a particular timeframe over which their proposed exemption would be valid. We note that sites with a history of human manipulation may have been disturbed or modified hundreds of years prior, with multiple episodes of habitat recovery and re-disturbance in the intervening years. The Policy does not exclude areas solely because they are manmade or disturbed habitats. Mitigation requirements and recommendations will be informed by the framework established in this Policy, including section 5.5, Valuation.

*H. Net Conservation Gain/No Net Loss*

*Comment (32):* Many commenters addressed the Policy's mitigation planning goal to improve (*i.e.*, a net gain) or, at minimum, to maintain (*i.e.*, no net loss) the current status of affected resources. A number of commenters supported the goal while a number of commenters opposed the inclusion of a net conservation gain. Many commenters stated that the Service lacks the statutory authority to implement the

net gain goal for mitigation planning. Several commenters suggested that a net gain goal imposes a new standard for mitigation and that mitigation requirements should be commensurate with the level of impacts. Others expressed concern about the costs associated with achieving a net gain.

*Response:* The Policy applies to those resources identified in statutes and regulations that provide the Service with the authority to make mitigation recommendations or specify mitigation requirements and are described in section 2 and in Appendix A. The purpose of the net conservation goal in mitigation planning is to improve conservation outcomes to affected resources, but the Policy does not require project proponents to achieve those outcomes. The Policy provides a framework for Service recommendations to conserve fish, wildlife, plants, and their habitats that are negatively affected by proposed actions. The identification of those means and measures that would result in a net conservation gain to the affected resources will not only help prevent further declines but contribute to a net improvement in the status of affected species and their habitats. The Service will seek a net gain in conservation outcomes in developing mitigation measures consistent with our mission to identify and promote opportunities to decrease the gap between the current and desired status of a resource.

*Comment (33):* Several commenters questioned the ability to achieve the net conservation gain and how it would be measured. Other commenters stated that the Policy should provide the methodology to assess or measure the net conservation gain.

*Response:* It is beyond the scope of the Policy to provide specific quantifiable measures to achieve the net conservation gain goal. The Service's mitigation goal is to achieve a net conservation gain or, at a minimum, no net loss of the affected resources. The Policy provides the framework for assessing the effects of an action and formulating mitigation measures (sections 5.1 through 5.9) to achieve this goal, which will be specific to the conservation objectives of the affected resources.

*Comment (34):* Several commenters stated that neither no net loss, nor net conservation gain, are compatible with the standards of the ESA sections 7 and 10. One commenter asked that we clarify that the net conservation gain goal does not modify or expand proponents' obligations under ESA sections 7 or 10 permitting programs. One commenter stated that the Policy's

goal would have limited relevance to section 10 decisions other than serving as an aspiration or goal for negotiating conservation measures. One commenter asked that we specify how the Policy's goal will be applied to processing incidental take permit applications under section 10(a)(2)(B)(ii), especially for projects predicted to directly kill listed species. This commenter added that neither no net loss nor net gain is an appropriate goal under section 10 if the goal implies that impacts at the individual level will not be minimized to the maximum extent practicable.

*Response:* This Policy is intended to guide mitigation for impacts to listed species. It does not expand the Service's authorities for recommending or requiring mitigation under the ESA. As an administrator of the ESA, the Service has an obligation to work with others to recover listed species and preclude the need to list species, including guiding compensatory mitigation to offset the adverse impacts of actions to threatened and endangered species. The Service anticipates further defining the mitigation goal in relation to compensatory mitigation for impacts to listed species and designated critical habitat in the forthcoming Endangered Species Act Compensatory Mitigation Policy.

*Comment (35):* One commenter recommended the use of regional conservation goals and objectives in developing landscape-scale mitigation where the conservation goals and objectives are clear, explicit, and defensible. The commenter recommended that the Policy define a conservation goal as a ''formal statement describing the future status of a species or habitat.''

*Response:* We acknowledge that there may be variability in conservation plans developed by different entities, and agree that the commenter's descriptions are among the possibilities. This Policy describes an overall goal of a net conservation gain. The Service's mitigation planning goal is to improve (*i.e.,* a net gain) or, at minimum, to maintain (*i.e.,* no net loss) the current status of affected resources, as allowed by applicable statutory authority and consistent with the responsibilities of action proponents under such authority, primarily for important, scarce, or sensitive resources, or as required or appropriate. Service mitigation recommendations or requirements will specify the means and measures that achieve this goal, as informed by established conservation objectives and strategies. This Policy defines conservation objectives as a measurable expression of a desired outcome for a

species or its habitat resources. Population objectives are expressed in terms of abundance, trend, vital rates, or other measurable indices of population status. Habitat objectives are expressed in terms of the quantity, quality, and spatial distribution of habitats required to attain population objectives, as informed by knowledge and assumptions about factors influencing the ability of the landscape to sustain species.

*I. Landscape-Scale Approach*

*Comment (36):* Two commenters stated the Policy should include nearshore, estuarine, and marine habitats in describing landscapes. They asked that we clarify that the concept is inclusive of ecologically connected areas of the aquatic environment, such as watersheds.

*Response:* We concur with the commenters that the definition of and concept of landscape and a landscape approach must include aquatic environments. The concept does include ecologically connected areas of the aquatic environment such as watersheds. The existing definition of landscape in section 6 accommodates this inclusion.

*Comment (37):* Three commenters suggested providing more clarity regarding what it means to take a landscape approach to mitigation in the absence of an existing conservation plan. They said that a landscape approach in the absence of an appropriate plan will necessitate an analytical process and the Policy should identify the information that should be used in such a process. They suggested adopting language from the rule on Compensatory Mitigation for Losses of Aquatic Resources, 33 CFR parts 325 and 332 (Corps) and 40 CFR part 230 (Environmental Protection Agency (EPA)), 33 U.S.C. 1344, that describes the Corps and EPA watershed approach in the absence of appropriate plans.

*Response:* The availability of plans will be variable, and the Policy's instruction to Service staff to take a landscape approach when conservation plans are not available is sound. The diversity in the habitats, species, project impacts, and mitigation in the implementation of the Service's suite of mitigation authorities make detailed specification of landscape approach instructions beyond the scope of this umbrella policy. In concurrence with the commenters, we have added text to the end of section 5.1, Integrating Mitigation with Conservation Planning.

*Comment (38):* Multiple commenters expressed concerns regarding how the landscape approach will be

implemented, suggesting that clarity be provided through specific criteria, guidance on process, and how data will be used or appropriateness of data, for consistent application.

*Response:* The Service has written the national Policy in a manner that facilitates further clarification on a regional scale. As with many of the decisions made in impact analysis, determination of appropriate assessment methodologies including landscape scale must occur on a project-by-project basis, under the authority at hand, with information most appropriate for the site or region of impact. Section 5.3.3 allows the Service flexibility in methodology to meet this need by allowing use of any methodology that allows comparison of present to predicted conditions, measures beneficial and adverse impacts by a common metric, and predicts effects over time. We look forward to using existing means of engagement at the local and State level, when working with the States, tribes, and other partners through existing authorities while developing programs and additional guidance to seek mutual goals and avoid inconsistency.

*J. Advance Mitigation Planning at Larger Scales*

*Comment (39):* Two commenters stated that the term "Advance Mitigation Planning at Larger Scales" in section 5.1, Integrating Mitigation with Conservation Planning, might be confused with the Policy's preference for Advance Mitigation in section 5.7.1, Preferences.

*Response:* We agree and have changed the term within section 5.1 to read "Proactive Mitigation Planning at Larger Scales."

*K. Climate Change*

*Comment (40):* Many commenters addressed the Policy's inclusion of climate change in assessing the effects of a proposed action and mitigation. One commenter stated the Policy should make it a requirement that climate change be assessed, while others urged the Service to refrain from using climate change projections to govern mitigation efforts. Several commenters stated that climate change predictions and the effects to species and their habitats are uncertain and that the current state of climate projections are not of a scale sufficient to assess project-related impacts or mitigation. Several commenters suggested the Policy include guidance on how the effects of climate change should be determined. One commenter stated the Service should ensure that the temporal scope

of the analyses is well defined and supported by data and that the impacts to species and their habitats can be assessed with reliable predictability.

*Response:* Consistent with the Departmental Manual Chapter (600 DM 6), this Policy recommends that climate change be considered when evaluating the effects of an action and developing appropriate mitigation measures. The Service recognizes that the science of climate change is advancing and assessment methodologies are continually being refined to address the effects of climate change to specific resources and at differing scales. Because of the broad scope of resources covered by this Policy and the evolving state of climate change science and assessment methodologies, including specific information on these topics is beyond the scope of the Policy. Therefore, the Policy is written with language to ensure that it does not become quickly outdated as methodologies evolve. As stated in section 5.3, Assessment, the Service will use the best available information and methodologies when considering the effects of climate change to the resources covered by this Policy and in designing mitigation measures.

*Comment (41):* One commenter provided an in-depth discussion of the broad-scale consequences of greenhouse gas emissions, climate change, and carbon sequestration.

*Response:* The Service shares the commenter's emphasis of the importance of climate change as a systemic challenge that must be a focus of integrated natural resource management. That is why it is written in the Policy to inform the scale, nature, and location of mitigation measures when employing the Policy's fundamental principle of using the landscape approach (section 4.c). It is not possible to provide exhaustive details for addressing climate change in this umbrella policy. Our mitigation authorities give us ability to recommend mitigation for impacts to species and habitats, but we do not have explicit authorities to recommend offsets for carbon emissions. In the course of integrating mitigation with conservation planning (section 5.1), assessing project impacts and formulating mitigation measures (section 5.3), and recommending siting of compensatory mitigation (section 5.7.1), this Policy directs Service staff to integrate consideration of climate change.

*L. Collaboration and Coordination*

*Comment (42):* Several commenters supported the Policy's clear desire for collaboration and coordination with

stakeholders. However, other commenters were concerned with the lack of detail in regard to coordination with State, tribal, or other local conservation partners during various steps in the process, and the extent to which data, analyses, and expertise of these entities will be used, and conflict with existing planning efforts avoided. Multiple comments indicated the importance of early coordination with State, tribal, and Federal organizations, local conservation partners, and private landowners, especially to avoid delay in the process. Some commenters requested minimum standards for plans or data, and indicated multiple types of plans or data that would be useful (*e.g.*, ESA Recovery Plans, State Wildlife Action Plans, watershed plans, State natural heritage data, and plans associated with State or metropolitan transportation planning processes). One commenter in particular pointed to the importance of collaborating to avoid conflicts and "negative externalities" for Alaska and its citizens. Multiple commenters requested we specifically list State and local entities in section 5.2.

*Response:* State and local conservation partners often have data or planning documents important to project mitigation scenarios. Thus, we acknowledge the benefits of collaboration and coordination in the early planning and design of mitigation in section 5.2. We look forward to using existing means of engagement at the local and State level, when working with the States, tribes, and other partners through existing authorities while developing programs to seek mutual goals and avoid inconsistency. Therefore, we revised the text in sections 4(c) and 5.2(a) and (d) to better reference local government entities.

*Comment (43):* One commenter requested reaffirmation that States can, with guidance and participation of the Service, develop and implement mitigation programs to achieve Service mitigation goals, while aligning with local conservation plans and multiple use objectives. Several commenters requested identification of specific Service representatives to engage in these planning efforts, and clarification on process, especially to avoid disputes related to inconsistency. One commenter requested the Service require State concurrence with recommendations when related to resources under State authority; others were specifically concerned with the Policy's interface with current mitigation systems.

*Response:* We agree that alignment with local mitigation efforts mutually

benefits conservation agencies, and this Policy formally recognizes the shared responsibility with State, local, and tribal governments, and other Federal agencies and stakeholders. We look forward to using existing means of engagement at the local and State level, when working with the States, tribes, and other partners through existing authorities while developing programs to seek common goals and avoid inconsistency.

*Comment (44):* Several commenters requested more information specifically on how conflicts between agencies or regulations, plans, or mitigation or permitting requirements would be handled.

*Response:* Conflicts between agencies are handled through direct engagement and through existing mechanisms that will be unchanged by this Policy. For example, in NEPA, regulations at 40 CFR part 1504 establish procedures for referring Federal interagency disagreements concerning proposed major Federal actions that might cause unsatisfactory environmental effects to the Council on Environmental Quality. The same regulations provide means for early resolution of such disagreements. In CWA permitting processes, disagreements over issuance of specific permits or on policy issues between the Service and the Corps or between EPA and the Corps are resolved following procedures established at section 404(q) of that act and detailed within a Memorandum of Agreement between the agencies. The Corps/EPA joint 2008 Compensatory Mitigation Rule also features a dispute resolution process for agencies to resolve disagreements concerning the approval of mitigation banks or in-lieu-fee programs. We will continue to use existing processes.

*Comment (45):* One commenter requested that the Service include requirements that all mitigation data, including data associated with amount and type of mitigation, ecological outcomes, landscape scale and conservation plans used in mitigation planning, and monitoring be made public in an easily accessible manner, such as being submitted electronically to publicly available databases.

*Response:* We agree that data should be made broadly available to facilitate future conservation at a landscape level, dependent on the relevant regulations under which the mitigation is required. If there is the potential for disclosure of personal, private, or proprietary information, there are limitations on the Service's or other agencies' ability to require public availability. While most of the Service's mitigation authorities allow for recommendations, the ability

to disclose monitoring data may be at the discretion of another agency. A blanket requirement to post all monitoring data to public databases would, therefore, be beyond the scope of this Policy.

*M. Assessment*

*Comment (46):* One commenter stated that indirect effects from some actions are greater than the direct effects and should, therefore, be made more prominent in the Policy.

*Response:* We added indirect and cumulative impacts to section 5.3 of the Policy.

*Comment (47):* Several commenters expressed concern regarding the use of best professional judgment during and as subjective predictions of impact, as described in section 5.3.4. Some commenters seemed particularly concerned about coincidental changes in magnitude of probable impacts caused by indirect sources, or those falling outside Service jurisdiction, such as climate change.

*Response:* The Service, in section 5.3, allows use of "best professional judgment" using information described in the remainder of that section (recognition of and adjustment for uncertainty, use of information provided by the action proponent, and best available methodologies to predict impact). Thus, even where predictions may be uncertain, the Service will support decisions on the best available scientific information. As with many of the decisions made in impact analysis, prediction of impacts through time must occur on a project-by-project basis, under the authority at hand, with information most appropriate for the site or region of impact. We look forward to using existing means of engagement at the local and State level, when working with the States, tribes, and other partners through existing authorities while developing programs and additional guidance to seek mutual goals and avoid inconsistency.

*Comment (48):* Multiple commenters stated that assessment methodologies should be designed to ensure predictable mitigation credits, measure both beneficial and adverse effects, and be based on biological and/or habitat conditions that are accurate, sensitive, repeatable, and transparent. Two commenters were concerned that the Service should provide additional guidance to Federal and State agencies to avoid inefficiencies, and provide clarification in methodologies.

*Response:* As with many of the decisions made in impact analysis, determination of appropriate assessment methodologies must occur on a project-

by-project basis, under the authority at hand, with information most appropriate for the site or region of impact. Section 5.3.3 allows the Service flexibility in methodology to meet this need by allowing use of any methodology that compares present to predicted conditions, measures beneficial and adverse impacts by a common metric, and predicts effects over time. We look forward to using existing means of engagement with the States, tribes, and other partners through existing authorities while developing programs and additional guidance to seek mutual goals and avoid inconsistency.

*Comment (49):* One commenter suggested that "key ecological attributes" (KEA) be used as a landscape-scale mitigation framework to guide impact assessment and ensure "like for like" benefits. The commenter categorized KEAs as: (1) Size (measure of a resource's area of occurrence or population abundance); (2) condition (measure of the biological composition, structure, and biotic interactions that characterize the space in which the resource occurs); and (3) landscape context (assessment of the resource's environment including the ecological processes and regimes that maintain it, and connectivity that allows species to access habitats and resources or allows them to respond to environmental change through dispersal or migration).

*Response:* While use of the assessment approach involving application of KEAs would be consistent with the assessment principles and attributes of the best available effect assessment methodologies that we describe in section 5.3, we do not specify use of specific methodologies because the Policy's breadth of geographical, ecological, and authority coverage warrant flexibility.

*Comment (50):* One commenter stated the Policy should provide science quality standards while another commenter stated that science provided by a project proponent to support a mitigation action should be evaluated fairly.

*Response:* As stated in the Policy, the Service will use the best available science in formulating and monitoring the long-term effectiveness of its mitigation recommendations and decisions, consistent with all applicable Service science policy. This will include an objective evaluation of science-based information provided by the project proponent.

AR_0044676

### N. Evaluation Species

*Comment (51):* Numerous commenters expressed opinions and concerns on how the evaluation species should be selected. Suggestions focused on coordination with States and other parties and on selecting species identified in local government plans that have met appropriate standards or in State Wildlife Action Plans.

*Response:* The Policy is not meant to be exhaustive in identifying the resources or characteristics of evaluation species. The Service recognizes that there may be existing plans (*e.g.,* local government plans, State Wildlife Action plans) other than those identified in the Policy as well as other characteristics that may be useful in mitigation planning depending on the specific action and the affected resources. We agree that the use of existing plans such as State Wildlife Action plans or other sources that have established species conservation objectives will be useful in selecting evaluation species within the affected area. The Service will work with project proponents and other stakeholders in reviewing existing plans and identifying evaluation species for a specific action following the guidance outlined in section 5.4, Evaluation Species.

*Comment (52):* One commenter stated that section 5.4, Evaluation Species should be expanded to focus beyond evaluation species to species and their habitats for use in impact assessments and mitigation planning.

*Response:* Section 5.4 in the Policy adequately addresses the identification and characteristics of evaluation species, and does not need to be expanded. The purpose of selecting evaluation species is part of the Policy's framework to evaluate affected habitats and make mitigation recommendations based on their scarcity, suitability, and importance to achieving conservation objectives as discussed in section 5.5, Habitat Valuation.

*Comment (53):* A number of commenters suggested that the Policy's approach to evaluation species will expand the Service's jurisdiction to all wildlife and that mitigation will be required for species (and habitats) for which there is no direct statutory or regulatory obligation.

*Response:* Evaluation species are a utility used by agencies in mitigation planning. The Service defines them as the fish, wildlife, and plant resources in the affected area that are selected for effects analysis and mitigation planning. We need evaluation species because we cannot exhaustively assess all impacts and formulate mitigation for all resources affected by a proposed action. The purpose of Service mitigation planning is to develop a set of recommendations that, if implemented with the proposed action as a package, would achieve conservation objectives for the affected resources. Accordingly, the Service would select evaluation species for which conservation objectives have the greatest overlap with the effects of a proposed action. The Service will select others to represent the suite of fish and wildlife impacts caused by an action. The Policy provides guidance for selecting evaluation species and is not a means of expanding our jurisdiction. Evaluation species are, in effect, a planning tool and were a major feature of the 1981 Policy.

*Comment (54):* A number of commenters addressed the selection of evaluation species in those instances identified in the Policy where an evaluation species does not need to occur within the affected habitat: Species identified in an approved plan that includes the affected area, or the species is likely to occur in the affected area during the reasonably foreseeable future with or without the proposed action due to natural species succession. One commenter stated that the Policy places clear and defined limits on what constitutes both the "reasonably foreseeable future" and "natural species succession" when selecting evaluation species so mitigation actions are not overly expansive. Some commenters questioned the Service's authority to expand the scope of analysis to species that do not occur in the affected area but could occur at some point in the foreseeable future due to natural species succession.

*Response:* The selection of evaluation species that is not currently present in the affected area was a component of the Service's 1981 Policy. Under this Policy, the Service retains the ability to consider such selections, as authorities permit. Such selections will be subject to the conditions described in section 5.4 and are not a means of expanding the Service's authorities.

*Comment (55):* A few commenters stated that there is no basis for evaluating other non-listed species when assessing actions under the ESA, while another commenter expressed concern that the consultation and permitting for specific species will be complicated by the addition of evaluation species resulting in additional analysis and costs.

*Response:* Nothing in this Policy supersedes statutes and regulations governing treatment of federally listed species. Section 5.4, Evaluation Species, provides guidance on the selection of evaluation species that the Service will recommend in the assessment of affected resources and mitigation planning. The Service will recommend the smallest set of evaluation species necessary to relate the effects of an action to the full suite of affected resources. In instances where the Service is required to issue a biological opinion, permit, or regulatory determination for a specific species, that species will be, at a minimum, identified as an evaluation species. The recommendation to use additional evaluation species will depend on the specific project and affected resources. Use of evaluation species beyond federally listed species will improve conservation outcomes for other resources affected by an action, but the Policy does not require such usage.

*Comment (56):* One commenter stated that the Policy creates a new category of species by using evaluation species.

*Response:* Evaluation species is not a new term and has been brought forth from the Service's 1981 Policy. Section 5.4, of the Policy, Evaluation Species, provides additional guidance on the selection and use of evaluation species to assess impacts and develop mitigation strategies.

### O. Habitat Valuation

*Comment (57):* Several commenters requested the Service provide additional details on habitat valuation in section 5.5 of the Policy. To avoid the potential for "lengthy disputes" between the Service and other stakeholders in mitigation planning, some recommended including measurable/repeatable metrics in the Policy for quantifying habitat scarcity, suitability, and importance. Others wanted a very clear standard for identifying "habitats of high-value," for which the Policy guidance is to avoid all impacts.

*Response:* The scope of the Policy covers all authorities that give the Service a role in mitigating the impacts of actions to fish and wildlife resources, which encompasses a broad range of action types and species. The types and quality of available information vary widely across this range; therefore, highly prescriptive methods of habitat valuation are not advisable. Scarcity, suitability, and importance are the characteristics most relevant to our purpose for habitat valuation, which is to inform the relative emphasis we place on avoiding, minimizing, and compensating for impacts to the conservation of evaluation species. Our definitions of these parameters are sufficiently clear to provide useful guidance to Service personnel in

formulating mitigation recommendations to action proponents. However, we have revised the Policy to clarify that "habitats of high-value" are those that are rare and both highly suitable for, and important to, the conservation of the evaluation species.

Our authority to require specific mitigation actions of action proponents is limited, and is governed by the regulations of the statute that confers such authority, not this Policy. Our goal with this Policy is to provide a common framework for the Service to apply when identifying mitigation measures across the full range of our authorities to promote better conservation outcomes for species. Service personnel are obligated to explain mitigation recommendations, including our valuation of the affected habitats. Action proponents may adopt or reject Service recommendations about how they may maintain or improve the status of species as part of their proposed actions. Therefore, we do not anticipate "lengthy disputes" between the Service and action proponents over habitat valuations.

*Comment (58):* Several commenters recommended that the Service use habitat valuation as the basis for variable mitigation standards or goals, similar to the 1981 Policy.

*Response:* This Policy adopts a minimum goal of no-net-loss for mitigating impacts to evaluation species, regardless of the value of the affected habitat, which is a fundamental change relative to the 1981 Policy. Instead of determining variable objectives that apply to affected habitats, variable habitat value informs the priority we assign to avoid, minimize, and compensate for impacts to evaluation species. Our rationale for this change is that all occupied habitats contribute to the current status of an evaluation species. Discounting the contribution of lower value habitat would increase the difficulty of achieving conservation objectives for evaluation species. However, we recognize that to maintain or improve a species' status, it is more efficient to avoid and minimize impacts to higher value habitats, and to minimize and strategically compensate for impacts to lower value habitats. The Service will engage action proponents in mitigation planning only when we have authority to do so and when an action may adversely affect resources of conservation interest to a degree that warrants application of the Policy.

*Comment (59):* Two commenters recommended the Service retain the four Resource Categories of the 1981 Policy.

*Response:* In the 1981 Policy, the Resource Categories established variable mitigation objectives based on habitat value, which was a function of scarcity and suitability. Under this Policy, the objective is a minimum of no net loss, regardless of habitat value. Instead, habitat value informs the priority we assign to avoid, minimize, and compensate for impacts. By adding habitat "importance" to the scarcity and suitability parameters of the 1981 Policy, the revised Policy more explicitly integrates mitigation recommendations with conservation strategies applicable to the evaluation species. Our valuation considers all three parameters, and we will seek to avoid and minimize impacts to habitats of higher value, and to minimize and compensate for impacts to habitats of lower value. We considered prescribing a prioritization of mitigation types through a revised resource category system but determined that it added little practical value beyond stating that we should recommend avoiding impacts to rare habitats that are of both high suitability and importance (the equivalent of Resource Category 1 in the 1981 Policy) and give greater emphasis to compensating for impacts to low-value habitats.

*Comment (60):* Three commenters expressed specific concerns about the three habitat-valuation parameters, each recommending possible revisions/substitutions. One stated that our definition of importance was mostly a function of scarcity and/or suitability, and suggested substituting "irreplaceability" and "landscape position" as more independent parameters. Another suggested that "unique and irreplaceable" was the criterion for recommending avoiding all impacts to a habitat, as opposed to high-value assessed by all three valuation parameters. The third urged the Service to use "vulnerability" as an additional parameter.

*Response:* Our definitions of the three habitat-valuation parameters are distinct and do not overlap, but we recognize potential correlations between the parameters (*e.g.*, rare habitats of high suitability are very likely also of high importance). Our definition of importance captures the significance of a location in the conservation of a species, regardless of its scarcity or suitability, and we disagree that importance is mostly a function of scarcity and suitability. The definition of importance refers to both the ability to replace the affected habitat and its role in the conservation of the evaluation species as a core habitat, a linkage between habitats, or its

provision of a species-relevant ecological function. Therefore, "irreplaceability" and "landscape position" are already considered in the importance parameter.

A "unique" habitat is the rarest valuation possible on the scarcity parameter, and an "irreplaceable" habitat rates high on the importance parameter. The third parameter, suitability, is defined as "the relative ability of the affected habitat to support one or more elements of the evaluation species' life history compared to other similar habitats in the landscape context." A unique habitat would have no other similar habitats in the relevant landscape context for comparative purposes; therefore, its suitability is not assessable. In practice, if a unique and irreplaceable habitat is supporting an evaluation species, we will consider it as a "high-value" habitat under this Policy.

Our view of "vulnerability" as a habitat-valuation parameter is that it is difficult to define and assess consistently. A workable definition would likely overlap substantially with the scarcity parameter, which is more readily evaluated given data about the spatial distribution of a habitat type in the relevant landscape context, and also with the replicability concept under the importance parameter. Regardless whether a non-overlapping definition is possible, adding vulnerability as a fourth habitat-valuation parameter would then dilute the influence of the other three. Scarcity and suitability, which were features of the 1981 Policy, and importance, which is applicable to interpreting how conservation plans describe the significance of particular areas, are each amenable to reasonably consistent assessment by Service personnel. These three parameters sufficiently serve the purpose of habitat valuation under this Policy, which is to prioritize the type of mitigation we recommend.

*Comment (61):* One commenter suggested that when more than one evaluation species uses an affected habitat, some situations may warrant not using the highest valuation to govern the Service's mitigation recommendations, contrary to the Policy's guidance in section 5.6.3. The commenter offered the following example of such a situation. An affected habitat is used by two evaluation species; but regulatory requirements (*e.g.*, ESA compliance) apply to the species associated with the lower habitat valuation, and conservation bank credits are available to compensate for impacts to this species. Two other commenters requested clarification of

the Service's methodology for valuation of a habitat used by multiple evaluation species.

*Response:* Because the goal of the Policy is to improve, or at minimum, maintain the current status of evaluation species, the Policy's guidance to assign the highest valuation among evaluation species associated with an affected habitat most efficiently achieves this goal for all evaluation species. Avoiding or minimizing impacts to the higher value habitat reduces the level of compensation necessary to achieve the Policy goal for both species. The availability of conservation bank credits, while advantageous, should not dictate Service recommendations for achieving the Policy goal.

Although species to which regulatory requirements apply, such as species listed under the ESA, are automatic evaluation species under the Policy, the Policy does not assign priorities among evaluation species. Accordingly, our habitat-valuation methodology is the same whether one or multiple evaluation species use an affected habitat. The scarcity parameter is not species-specific; however, the suitability and importance parameters are. A particular affected habitat is not necessarily of the same suitability for and importance to different evaluation species and may, therefore, receive different valuations. The highest valuation informs the relative priority for avoiding, minimizing, and compensating for impacts.

*P. Mitigation Hierarchy*

*Comment (62):* We received comments from many entities related to our use of the mitigation hierarchy concept in the Policy. Most expressed support for strict adherence to the avoid-minimize-compensate sequence of the hierarchy and concern that the Policy's recognition of circumstances warranting a departure from this preferred sequence provides Service personnel an inappropriate amount of discretion. Others supported such departures and requested greater specificity in defining the circumstances that would justify greater emphasis on compensation.

*Response:* The first three general principles listed in section 4 will guide the Service's application of the mitigation hierarchy: (a) The goal is to improve or, at minimum, to maintain the current status of affected resources; (b) observe an appropriate mitigation sequence; and (c) integrate mitigation into a broader ecological context with applicable landscape-level conservation plans. Action- and resource-specific application of these principles under

the framework of section 5 will determine the relative emphasis that Service mitigation recommendations afford to measures that avoid, minimize, and compensate for impacts.

We are clarifying Service determinations of "high-value habitat," for which the Service recommendation is to avoid all impacts. Consistent with our commitment to the mitigation hierarchy under Principle "b" of section 4, the Service will not recommend compensation as the sole means of mitigating impacts when practicable options for avoiding or minimizing impacts are available. However, to achieve the Policy's goal of maintaining or improving the status of evaluation species, all Service mitigation recommendations will necessarily include some degree of compensation, unless it is the rare circumstance where it is possible to avoid all impacts while still accomplishing the purpose of the action or we are compelled to recommend the no-action alternative. Our habitat-valuation guidance (section 5.5) informs the relative emphasis we place on the mitigation types in the hierarchy. Higher valued habitats warrant primarily avoidance and minimization measures, in that order, to the maximum extent practicable. Compensation is likely, but not necessarily, a more effective means of maintaining or improving the status of species affected in lower valued habitats. Applicable conservation plans for the evaluation species (Principle "c" of section 4) will inform Service personnel whether compensation should receive greater emphasis. Service personnel are obligated to explain recommendations per the guidance of section 5.8, Documentation.

*Comment (63):* One commenter stated the Policy should include a mechanism to credit a project proponent for implementing avoidance or minimization measures.

*Response:* Avoidance and minimization are components of the mitigation hierarchy. Impacts that are avoided will negate the need for further mitigation measures. Impacts that are minimized will lessen the need to reduce, rectify, and compensate for residual impacts.

*Comment (64):* One commenter requested the Policy clarify how mitigation credits will be calculated at banking sites and that the Policy should provide for the ability to "stack" credits. Another commenter suggested the Policy include the definition of the term "credit."

*Response:* This is not a compensatory mitigation policy. It is beyond the scope of this Policy to provide detailed

procedural or operational information. Based on the applicable authority, such implementation detail for compensatory mitigation processes is provided in other regulatory or policy documents. For example, details for CWA processes is provided through regulation (Compensatory Mitigation for Losses of Aquatic Resources, 33 CFR parts 325 and 332 (USACE) and 40 CFR part 230 (EPA), 33 U.S.C. 1344). For ESA processes, the Service expects to finalize such guidance through policy (see proposed ESA Compensatory Mitigation Policy at (81 FR 61032–61065, September 2, 2016)).

*Q. Avoidance*

*Comment (65):* Several commenters strongly supported the Policy's statements on avoidance, or said the Policy should increase the emphasis on avoidance generally, and especially with respect to the most highly valued resources. They suggested the Policy more strongly acknowledge that some habitats are unique and irreplaceable, making the "no action" alternative the only way of achieving conservation goals for species that depend on those habitats. They added that ensuring the long-term protection of high-value habitat is especially critical for imperiled species.

Some commenters said the Policy should not require avoidance of all impacts to high-value habitats, as strict adherence to this measure has the potential to stop crucial infrastructure projects. They said requiring avoidance of high-value habitats and imposing limitations on timing, location, and operation of the project will result in added project costs. They proposed that avoidance recommendations be made or implemented on a case-by-case basis. Some commenters suggested the Policy clarify the Service's authority for recommending a "no action" alternative. One commenter said the Service cannot recommend avoidance of all impacts when such a position would deny a property owner any beneficial use of their property. Otherwise, a regulatory taking would result. Commenters said that because the Service has no basis to deny an action, the Policy should expressly state it does not allow for the Service to veto proposed projects on which it consults.

*Response:* We agree the proposed Policy's existing statements regarding recommendation of avoidance of impacts to high-value habitats are important themes, as they were in the 1981 Policy. For clarity, we have edited section 4, General Policy and Principles, to add a principle highlighting the

Service's policy of recommending avoidance of high-value habitats.

This Policy provides a common framework for identifying mitigation measures. It does not create authorities for requiring mitigation measures to be implemented. The authorities for reviewing projects and providing mitigation recommendations or requirements derive from the underlying statutes and regulations. On a case-by-case basis, as noted in the Policy at section 5.7, Recommendations, we may recommend the "no action" alternative when appropriate and practicable means of avoiding significant impacts to high-value habitats and associated species are not available. These recommendations will be linked to avoiding impacts to high-value habitats. Depending on the spatial configuration and location of habitats relative to project elements, recommending avoidance of all impacts to high-value habitats will not always equate to recommending no action.

Also, we note that the Policy does not indicate avoidance of all high-value habitats is required. The Policy provides guidance to Service staff for making a recommendation to avoid all high-value habitats or to adopt a "no action" alternative in certain circumstances. If we provide such materials to an action agency for consideration in their authorization process, a regulatory taking would not result from making recommendations. This Policy will not effectively compel a property owner to suffer a physical invasion of property and will not deny all economically beneficial or productive use of the land or aquatic resources. This Policy provides a common framework for the Service to apply when identifying mitigation measures across the full range of our authorities, including those for which we may require mitigation. This broad program direction for the Service's application of its various authorities does not itself result in any particular action concerning a specific property. In addition, this Policy substantially advances a legitimate government interest (conservation of species and their habitat) and does not present a barrier to all reasonable and expected beneficial use of private property.

*Comment (66):* Three commenters said identifying and requiring avoidance of all high-value habitat conflicts with the statutory and regulatory requirements of the ESA. They pointed out that regulations at 50 CFR 402.14(i)(2) state reasonable and prudent measures cannot alter basic design, location, scope, duration, or timing of an action. They said the

Service would prohibit any activity impacting areas determined to be high-value habitat and that no such parallel requiring complete avoidance exists under the ESA. They said the Service has no authority to mandate the complete avoidance of designated critical habitat or require all impacts to critical habitat be offset with mitigation measures that achieve a net gain or no net loss.

*Response:* The Policy does not prohibit any activity impacting areas determined to be high-value habitat. The Policy provides guidance to Service staff for making a recommendation to avoid all high-value habitats or to adopt a "no action" alternative in certain circumstances. Through the Policy, we are neither requiring nor mandating the complete avoidance of designated critical habitat. Regulations and procedures that implement the ESA are not superseded. The Policy does apply to all species and their habitats for which the Service has authorities to recommend mitigation on a particular action, including listed species and critical habitat. Although the Policy is intended, in part, to clarify the role of mitigation in endangered species conservation, nothing in it replaces, supersedes, or substitutes for the ESA implementing regulations. In early stages of interagency consultation under the ESA, we routinely provide advice to action agencies on avoiding impacts to listed species and designated critical habitats that may be reflected in subsequent project descriptions or in action agency permits or authorizations. The provision of that advice is consistent with the Policy's guidance to Service staff on recommending avoidance of all high-value habitats.

*Comment (67):* One commenter said requiring onsite avoidance can lead to piecemeal mitigation and undermines the goal of supporting regional mitigation planning. They suggested removing the preference for onsite avoidance over compensatory mitigation to better support regional mitigation planning goals.

*Response:* The Service agrees that defaulting to avoidance can, in some cases, result in a less desirable outcome than pursuing compensatory mitigation elsewhere that better serves broader landscape-level conservation goals. However, in the Policy, we note that those cases involve impacts to lower value habitats. Even then, the Service will consider avoidance, consistent with the mitigation hierarchy. For the most highly valued habitats, the Policy guides Service staff to recommend avoidance. If adopted, recommendations to avoid impacts to high-value habitats directly

support regional mitigation planning by ensuring the scarcest, most suitable, and most important habitats within a landscape remain unaffected.

*Comment (68):* Three commenters discussed whether avoidance of all impacts to high-value habitats is always necessary or desirable. They asked what the Service's response would be when an action is likely to be implemented despite recommendations to avoid high-value habitats. They suggested the Policy recognize that avoidance of all impacts to high-value habitats is not always necessary or practicable, and that unavoidable impacts to those resources will sometimes be authorized.

*Response:* Through this Policy, we provide guidance to Service staff that recommendations should seek to avoid all impacts to habitats they determine to be of high-value. Therefore, our policy is that it is always desirable to avoid impacts to high-value habitats. We recognize circumstances will vary, and in section 5.7, Recommendations, we note that when appropriate and practicable means of avoiding significant impacts to high-value habitats and associated species are not available, the Service may recommend the "no action" alternative. We further recognize that our recommendations, either to avoid all impacts to high-value habitats or to adopt the no action alternative if necessary, will not be adopted or implemented by action agencies in all cases.

### R. Compensatory Mitigation

*Comment (69):* Several commenters said they strongly supported application of equivalent standards for compensatory mitigation mechanisms as advocated by the Policy. One commenter said that, without equivalency, mitigation programs with lower standards will have competitive pricing advantages that create a "race to the bottom" as developers seek the lowest cost compliance option, producing lower conservation outcomes and undermining chances of species recovery. Several said the Policy should give greater emphasis to the sentence: "The Service will ensure the application of equivalent ecological, procedural, and administrative standards for all compensatory mitigation mechanisms." These commenters felt that, while the Policy's intent to support equivalent standards is clear, the statement is not easily located within a paragraph in section 5.6.3. They suggested creating a new paragraph with this sentence as the lead, or creating a new subsection titled "Equivalent Standards" under the existing section 5.6. Two commenters said equivalent standards should be

AR_0044680

required by the Policy. One commenter said a monitoring and verification process should be required of all mitigation.

*Response:* We agree with the commenters that equivalent standards must be applied to ensure compensatory mitigation is successfully implemented regardless of the mechanism used to provide the mitigation. A level playing field allows for more transparency, fairness, and a greater likelihood of successful mitigation. In this Policy, we do not state that equivalent standards are required because of the breadth of authorities and processes it covers. In many cases, our authority is advisory, with the permitting authority resting with another agency. In such cases, requiring equivalent standards is another agency's provision to implement or enforce. This Policy covers multiple authorities, so it would be inaccurate to state that it can require equivalent standards in all cases. However, the Policy's statement of support for application of equivalent standards is accurate in all cases. Similarly, we support the monitoring and verification processes suggested by one commenter, but cannot provide a blanket requirement for such processes through this Policy. We agree with the commenters who suggested that our support for equivalent standards is not well highlighted or located within the Policy. We have now placed the information under a header for a new section 5.6.3.1, Equivalent Standards.

*Comment (70):* One commenter supported the Policy's definition of "additionality," while two commenters expressed concern for the use of the term "baseline" in defining additionality and suggested the Policy distinguish between baseline and pre-project or pre-existing conditions.

*Response:* For purposes of the Policy, the baseline is the existing condition that will be used as the starting point by which to compare the adverse or beneficial effects of an action. In assessing compensatory mitigation, the Service will evaluate if the proposed mitigation measures are demonstrably new and would not have occurred without the compensatory mitigation measure and if they provide a conservation benefit above the baseline condition (*i.e.,* additionality). We have included the definition of baseline in section 6.

*Comment (71):* Several commenters requested the Service recognize in the Policy the ability of proponents to transfer responsibility for compensatory mitigation actions they initiate to a third party.

*Response:* We have revised the Policy to recognize that third parties may assume responsibility for implementing proponent-responsible compensation. This Policy advocates equivalent ecological, procedural, and administrative performance standards among all compensatory mitigation mechanisms. Therefore, conversion of a proponent-responsible plan to one administered by a third party is inconsequential relative to the Policy's goals. The third party accepting responsibility for the compensatory actions would assume all of the proponent's obligations to ensure success and durability.

*Comment (72):* One commenter suggested the Policy indicate that Service-approved conservation banks for aquatic and aquatic-dependent species may also serve the purpose of compensating for impacts to waters regulated under the CWA, but that the Corps has discretion to use a conservation bank for those purposes.

*Response:* We agree that a wetland protected and managed as a conservation bank to compensate for impacts to species may also serve as a wetland mitigation bank, provided the Corps has approved the bank for that purpose. Because the Policy addresses mitigation for impacts to fish and wildlife species and not impacts to regulated wetlands, per se, the comment exceeds the scope of this Policy and does not warrant a specific revision. However, we intend to address operational considerations for compensatory mitigation mechanisms in step-down policies, such as the proposed ESA Compensatory Mitigation Policy (81 FR 61032–61065, September 2, 2016).

*Comment (73):* One commenter questioned whether measures that are considered "onsite compensation" in the context of permitting processes under the CWA (*i.e.,* restoring, enhancing, and/or preserving wetlands on or adjacent to the impact site) are considered a form of minimization under the Policy. The commenter noted section 5.6.3 indicates that compensation occurs "generally in an area outside the action's affected area," but also refers to compensation sites that are either "within or adjacent to the impact site."

*Response:* The Policy adopts the five mitigation types defined in the NEPA regulations. We include "rectifying the impact by repairing, rehabilitating, or restoring the affected environment" (rectify) and "reducing or eliminating the impact over time by preservation and maintenance operations during the life of the action" (reduce) under the

"minimizing" label, but have not discarded these definitions, which have specific utility for species conservation. Our purpose for consolidating the five NEPA mitigation types into three was to align the general language of this Policy with that of the existing three-tiered DOI and CWA mitigation policies (avoid, minimize, and compensate). We group "rectify" and "reduce" with "minimization" to recognize the priority of these types of measures over compensation in the mitigation hierarchy, because such measures are, by definition, onsite measures focused specifically on the action-affected resources. We recognize that, unlike proactive minimization measures, measures to rectify and reduce impacts over time occur after impacts and are, therefore, more similar to compensation measures. Compensation replaces, or provides substitute resources or environments for, the affected resources, not necessarily within the affected area. Replacing or providing an onsite substitute for an affected resource meets the definition of rectify, but in the three-tier scheme of mitigation under CWA processes, is typically called onsite compensation. Because this Policy addresses species and not waters of the United States, some differences in terminology with mitigation under the CWA are unavoidable.

Under this Policy, which has not discarded the definition of rectify, "onsite compensation" has a narrower meaning. Onsite compensation involves provision of a habitat resource within the action area that was *not* adversely affected by the action, but would effectively address the action's effect on the conservation of the evaluation species. For example, an action reduces food resources for an evaluation species, but water availability in dry years is a more limiting factor to the species' status in the affected area. Increasing the reliability of water resources onsite may represent a practicable measure that will more effectively maintain or improve the species' status over some degree of rectifying the loss of food resources alone, even though the action did not affect water availability. This Policy would identify measures to restore food resources as rectification and measures to increase water availability as onsite compensation.

*Comment (74):* Five commenters addressed the Policy's reference to habitat credit exchanges among available compensatory mitigation mechanisms. Two commenters expressed support for the inclusion of habitat credit exchanges, but one commenter said that they should be excluded because there are no existing

examples that demonstrate the viability of the concept. Three commenters said the Policy should emphasize that equivalent standards apply to habitat credit exchanges as well as all other compensatory mitigation mechanisms. Two commenters said the Policy should further define habitat credit exchanges.

*Response:* We agree with the majority of the commenters that defining and clarifying the role of habitat credit exchanges as a potential compensatory mechanism is prudent. In section 6, we have added the definition of habitat credit exchange. We confirm that all compensatory mitigation mechanisms, including habitat credit exchanges, must meet equivalent standards. Habitat credit exchanges in concept are not new. They are the species equivalent to the environmental market mechanisms established for carbon and water quality trading. Exchanges are emerging where wide-ranging species cross multiple natural and geo-political boundaries and a mechanism to engage vast numbers of participants is desired. At its core, a habitat credit exchange is a trading platform and, therefore, may encompass other compensatory mitigation mechanisms such as conservation banks.

*Comment (75):* One commenter expressed concern that "performance standards" are included among the 12 considerations for compensatory mitigation mechanisms in section 5.6.3, but are not mentioned in section 5.8 about documenting final Service recommendations. The commenter recommended the Service require performance standards in mitigation plans that address the full range of measures adopted (avoidance, minimization, and compensation), not just compensatory measures.

*Response:* We agree mitigation plans should include performance standards that address the effectiveness (degree to which objectives are achieved) of any mitigation means and measures (avoid, minimize, compensate) for which the outcome is relatively uncertain. Although such uncertainty is generally greatest for compensatory measures involving future habitat improvements to offset unavoidable impacts, the success of planned avoidance and minimization measures is not always assured and may require monitoring. To handle uncertainty, section 5.8 indicates that Service-recommended/approved mitigation plans should specify measurable objectives, associated effectiveness monitoring, and additional adaptive management (*i.e.,* corrective) actions as indicated by monitoring results. These final plans address the full range of mitigation means and

measures that are reasonable and appropriate to ensure the proposed action improves or, at minimum, maintains the current status of affected species and their habitats. We did not use the phrase "performance standards" in section 5.8 as we did in section 5.6.3, and it is not necessary to do so. A compensatory mitigation plan that is prepared independently of a general mitigation plan for an impact-causing action (*e.g.,* the instrument for operating a conservation bank or in-lieu fee program) will serve the compensation needs of one or more such actions, and both types of plans require objectives and appropriate effectiveness monitoring (*i.e.,* performance standards).

*Comment (76):* One commenter recommended the Policy explicitly require an equivalent assessment of impacts and offsets (*i.e.,* the amount of compensation necessary to, at minimum, maintain the current status of the affected species after applying avoidance and minimization measures).

*Response:* Section 5.3, Assessment, provides general guidance for estimating impacts and benefits. This guidance applies to assessing the effects of actions both with and without mitigation options. Section 5.3 directs Service staff to use best available effects-assessment methodologies that meet various criteria, including the ability to estimate adverse and beneficial effects using "common" (*i.e.,* shared or equivalent) metrics. We have revised this language to clarify that "common" means "equivalent," and have added an example to illustrate the concept. The example involves assessing effects to a species' food resource. The metric is the density or spatial extent of the food resource. Predicted decreases and increases in this metric represent adverse and beneficial effects, respectively.

*Comment (77):* One commenter stated that the Service should not require the use of a mitigation or conservation bank over other mitigation mechanisms, and that the Service lacks authority to require financial assurances of action proponents.

*Response:* We are clarifying the circumstances under which the Service may require the implementation of mitigation under the guidance of this Policy. Such circumstances are limited, and we expect our application of the Policy will most often occur in an advisory capacity to action proponents. The Policy expresses a preference for compensatory mitigation in advance of impacts, but the use of conservation banks or other compensation in advance of impacts is not a firm requirement,

even when the Service is funding, approving, or carrying out the proposed action. To the same extent that the Service cannot require mitigation under all of the authorities that apply to a particular action, the Service cannot require financial assurances of action proponents in all cases (*e.g.,* outside the ESA Habitat Conservation Plan context). Nevertheless, we are retaining the reference to financial assurances throughout the Policy as a prudent component of mitigation plans. Such assurances are a reasonable and practicable underpinning for reducing the uncertainty about achieving the objectives associated with mitigation plans, especially with compensatory activities intended to secure future benefits to the affected species.

*Comment (78):* One commenter believed the Policy preference to compensate for impacts in advance of actions causing impacts would discourage voluntary actions to conserve species in order to avoid the need to list them as endangered or threatened under the ESA. The commenter suggested Service listing decisions would discount any habitat improvements that are identified, or could serve as advance compensation, presumably because the proponents of future actions causing impacts to the species would seek to claim such improvements as compensatory offsets. Over time, advance compensation improves the status of the species only to the extent that its benefits exceed the impacts of those future actions relying upon it; therefore, advance compensation does not necessarily preclude the need to list a species.

*Response:* This Policy does not address listing decisions under the ESA. This comment addresses the purposes of the Service's proposed "Policy Regarding Voluntary Prelisting Conservation Actions" (79 FR 42525–42532, July 22, 2014), which is not yet finalized. The proposed Voluntary Prelisting Conservation Actions policy describes the Service's proposal to give credit to such actions in the event of a subsequent listing of the species. In the context of both section 7 and section 10 of the ESA, the Service proposes to recognize a proponent's previous conservation actions as offsets to the adverse effects of a proposed action within the framework of an established conservation plan for the species in States that participate in the prelisting conservation program. Regardless how the Service finalizes the Voluntary Prelisting Conservation Actions policy, this Policy expresses Service support for compensation in advance of impacts to species, and the Service will account for

AR_0044682

advance compensation actions in its formulation of mitigation recommendations.

*Comment (79):* Several commenters recommended the Policy address preferences for "in-kind" vs. "out-of-kind" compensatory measures. Some urged the Service to explicitly endorse out-of-kind measures, while others advised us to express a strong preference for in-kind measures as in the 2008 Mitigation Policy for CWA section 404 permitting.

*Response:* We do not use the terminology of "in-kind" vs. "out-of-kind" compensation in this Policy. Unlike the Mitigation Policy for CWA section 404 permitting, where the subject resources are waters of the United States, the subject resources of this Policy are species. All compensatory mitigation recommended by the Service under this Policy is "in-kind" for the affected evaluation species (*i.e.*, it must offset an action's unavoidable impacts to the same species). We do not express a preference for implementing compensatory measures in the same type of habitat(s) affected by the action. Based on a species' conservation needs and applicable plans/strategies to address those needs, Service personnel will determine whether in-kind or out-of-kind habitat compensation will provide the most practicable means of ensuring a proposed action improves or, at minimum, maintains the current status of the affected evaluation species.

*Comment (80):* Two commenters recommended that the Policy recognize an action proponent's authorities/abilities to implement all mitigation measures onsite only, or to implement compensatory measures only within a particular jurisdiction.

*Response:* The Service should not provide recommendations that others have no discretion to consider, and this Policy does not direct Service personnel to do so. Measures that avoid and minimize impacts apply within the area affected by the action, and proponents should generally have sufficient discretion to adopt and implement all such measures. The Service will respect the jurisdictional limitations of proponents to implement compensatory measures outside the affected area.

*Comment (81):* A few commenters expressed concern that early or voluntary mitigation actions would not be recognized or given the appropriate crediting.

*Response:* The Service supports early and voluntary mitigation actions and is committed to collaborating and coordinating with project proponents to

assess the accrual of additional conservation benefits from such actions.

*Comment (82):* A number of commenters addressed the concept of duration in relation to the durability of mitigation measures. Several commenters questioned the standard to maintain the intended purpose of the mitigation measure "for as long as the impacts of the action persist on the landscape." These commenters suggested the duration of the mitigation site be correlated to the monitoring and maintenance period after which the mitigation sites should be allowed to evolve through natural successional processes rather than be required to maintain a specific condition. Another commenter recommended more objective or established timeframes such as length of the "planning horizon" or "in perpetuity" to characterize the duration of the mitigation. One commenter suggested the burden of proof be on the project proponent to demonstrate that impacts of a temporary duration have been removed before being released from a mitigation obligation.

*Response:* The Service will recommend or require that mitigation measures be durable, and at minimum, maintain their intended purpose for as long as impacts of the action persist on the landscape. The Service acknowledges site-specific conditions may need to evolve through natural processes. For example, we expect riverine systems to scour and revegetate in cycles, causing species composition to vary at any one point in time but supporting targeted resources in the long term. In other circumstances, active management (*e.g.*, controlled burning, grazing) may be needed to retain the intended purpose of the mitigation site for affected resources. Mitigation measures for permanent impacts will rely on permanent mitigation. When it can be demonstrated that impacts to affected resources are temporary, durability accounts for the time the effects of the action persist.

*Comment (83):* One commenter noted the definition of "durability" only includes the concept of duration and not the implementation assurances needed to ensure the mitigation is durable, while another commenter suggested that reference be made to the elements "a. thru i." as set forth in 81 FR 12380 at 12391 (March 8, 2016) as essential to the definition.

*Response:* Durability is one of the fundamental principles that will guide Service mitigation recommendations to ensure mitigation measures maintain their intended purpose for affected resources for as long as impacts persist

on the landscape. We agree with the commenters that implementation assurances are needed to ensure mitigation is durable. Section 5.6.3 identifies those elements intended to ensure successful implementation and durability of compensatory mitigation measures, including site-protection mechanisms, performance standards, monitoring, long-term and adaptive management, and provisions for financial assurances.

*Comment (84):* Several commenters supported the approach described in the Policy regarding the limits on use of research or education as compensatory mitigation. Three commenters suggested that use of research/education as compensatory mitigation should be expanded. One commenter suggested we add additional implementation detail. For clarity, one commenter suggested moving the research/education material under a new header or section.

*Response:* We agree with the commenters who said compensatory mitigation should provide tangible benefits and that research/education should be included in a mitigation package only in those limited circumstances described in the Policy. Exhaustive implementation detail on this topic is beyond the scope of this umbrella policy, which covers all Service mitigation authorities wherever they are carried out. Such detail may be contained in future step-down guidance or will be determined on a case-by-case basis by Service staff. We have reorganized the material into a new section 5.6.3.2.

### S. Adaptive Management

*Comment (85):* In general, commenters appeared to agree with the concept of adaptive management, as discussed in the Background section and other areas of the Policy. Several commenters suggested refinements to the Policy to increase certainty for project proponents. One commenter was concerned with regard to adaptive management's nexus with protections for federally listed species.

*Response:* We agree the iterative process used during adaptive management serves to facilitate progress toward achieving defensible and transparent objectives. As this Policy is meant to guide the overall approach to mitigation planning while allowing the greatest flexibility for Service program needs, we expect further guidance will document specific requirements on specific elements included in documentation, including those related to adaptive management. Nothing in this Policy supersedes statutes and

regulations governing treatment of federally listed species.

*T. Documentation*

*Comment (86):* Commenters asked that final recommendations include, in writing, all steps and clearly identify party responsibilities regarding implementation and performance of mitigation measures. One commenter requested more consistency between the 12 elements identified in section 5.6.3 and the section on final recommendations. Another commenter requested clarification of whether information provided by the Service through the Policy is a requirement or considered technical assistance.

*Response:* The Policy indicates that documentation should be commensurate in scope and level of detail with the significance of the potential impacts to resources, in addition to providing an explanation of the basis for Service recommendations. As this Policy is meant to guide the overall approach to mitigation planning while allowing the greatest flexibility for Service program needs, we expect further guidance will document specific requirements on specific elements included in documentation. Section 5.6.3 describes the use of compensatory mitigation, one of the five general types of impact mitigation described under section 5.6, Means and Measures. Section 5.6.3 includes several measures meant to ensure successful implementation and durability, specific to instances where compensatory mitigation is employed. The text in section 5.8, Documentation, has been modified to include the phrase: "Where compensation is used to address impacts, additional information outlined in section 5.6.3 may be necessary."

*U. Monitoring*

*Comment (87):* Many commenters were concerned how this Policy would add predictability, efficiency, and timeliness. Some were particularly concerned about potentially variable interpretation among Service field offices. One recommended actual Policy implementation elements be separated due to complexity and provided as guidance, while two others stated the Policy was not specific enough to evaluate and ensure consistency. Several commenters requested a standardized process or system, with clear guidelines and methods for implementation, be established to determine effectiveness, monitor durability, and track performance to ensure compliance and deliver conservation benefits. One commenter

was concerned that wildlife and habitat assessments envisioned by the Policy could entail complex analyses, while others said mitigation should be based on biological conditions and reliable, repeatable, and quantitative science-based methods to measure benefits and outcomes and inform adaptive management. Others suggested use of key ecological attributes (KEAs) to measure outcomes. Some were concerned that there was no requirement for monitoring, while others supported standardized self-reporting. One commenter noted the monitoring requirement may conflict within the Policy itself (Appendix B, section C) with regard to the responsibility of the Service to monitor compliance.

*Response:* The Service, being national in scope of operations, has written the proposed Policy in a manner that allows for further clarification on a regional scale. Regarding the request that a "standardized process" or "system" be established, where such (a) system(s) would be of benefit, it would be more practicable to establish it at a regional or programmatic scale, and would be handled through step-down guidance. The principle articulated in paragraph (f) of section 4 specifically states: "The Service will use the best available science in formulating and monitoring the long-term effectiveness of its mitigation recommendations and decisions, consistent with all applicable Service science policy." The principle articulated in paragraph (f) states "The Service will recommend or require that mitigation measures are durable, and at a minimum, maintain their intended purpose for as long as impacts of the action persist on the landscape." Thus, where appropriate, a process using KEAs may be applied. Regarding requirements for monitoring, the Policy states the Service's final mitigation recommendations should communicate in writing "c. effectiveness monitoring; d. additional adaptive management actions as may be indicated by monitoring results; and e. reporting requirements." Regarding the statement indicating the need or inability to "require" monitoring, this Policy serves as an overarching guidance applicable to all actions for which the Service has specific authority to recommend or require the mitigation of impacts to fish, wildlife, plants, and their habitats. The text in the Policy was modified to clarify its intent with regard to monitoring compliance. This includes Appendix B, which now clarifies Service responsibilities for applying the Policy when formulating our own

proposed actions under the NEPA decisionmaking process, versus being used as guidance for providing mitigation recommendations when reviewing the proposed actions of other Federal agencies under NEPA.

*V. Recommendations and Preferences*

*Comment (88):* One commenter was concerned that certain language in the Policy appeared to devalue proponent-responsible compensatory mitigation and cautioned against conflating preferences with standards. This commenter pointed to the Department of the Interior's Departmental Manual Chapter (600 DM 6) on Implementing Mitigation at the Landscape-scale (October 23, 2015), that lists the high and equivalent standards to which all mechanisms for compensatory mitigation should be held in section 6.7. They noted preferences are not included in that list, so while the ideas of "equivalent standards" and a policy's "preferences" are both principles, a preference is not an equivalent standard. They said each mitigation measure does not need to adhere to each preference, only to each equivalent standard. They suggested that the following statement be removed from section 5.6.3 of the Policy, as it seemingly asserts all mitigation measures must achieve the preferences: "As outlined by DM 6.6 C, this means that compensatory mitigation measures will. . .implement and earn credits in advance of impacts . . . ."

*Response:* We do not intend to devalue proponent-responsible mitigation, and we recognize it is a vital compensatory-mitigation mechanism, whether implemented by private project developers, agencies, or third-party mitigation implementers. We acknowledge flexibility is warranted in recommendations for the compensatory mitigation measures and mechanisms most likely to achieve the Policy's goal, and we established a preference for advance mitigation because it is the compensatory mitigation timing most likely to achieve that goal. We recognize either concurrent mitigation or mitigation occurring after impacts may be necessary in some cases, and may represent the best ecological outcome in others. The Policy does not establish an explicit preference for conservation or mitigation banks or other compensatory mitigation mechanisms. Conservation or mitigation banks do typically secure resource benefits before impacts occur, and may be more likely to satisfy this preference, but any other compensatory mitigation mechanism that does so is also consistent with the Service's preference. We agree with the

AR_0044684

suggestion to remove reference of our preference for advance mitigation from the language that precedes the list of equivalent standards, located in the new section 5.6.3.1, Equivalent Standards, and have made that targeted edit to avoid further confusion between preferences and equivalent standards.

*Comment (89):* One commenter asked for clarification of the following statement on advance compensatory mitigation within section 5.7.1, Preferences: The extent of the compensatory measures that are not completed until after action impacts occur will account for the interim loss of resources consistent with the assessment principles (section 5.3).

*Response:* The sentence the commenter mentions addresses temporal loss. Temporal loss is the delay between the loss of resource functions caused by an impact and the replacement of resource functions at a compensatory mitigation site. Additional compensatory mitigation may be required to compensate for temporal loss. When the compensatory mitigation project is initiated prior to, or concurrent with, the impacts, additional compensation for temporal loss may not be necessary, unless the resource has a long development time. We have added an additional sentence to clarify the statement.

*Comment (90):* One commenter said the Policy should use a priority and preference, similar to the Corps' and EPA's joint rule on Compensatory Mitigation for Losses of Aquatic Resources, 33 CFR parts 325 and 332, and 40 CFR part 230 (EPA), 33 U.S.C. 1344. In that regulation, the agencies establish an explicit preference for mitigation banking, followed by in-lieu fee programs, and finally, proponent-responsible mitigation.

*Response:* This Policy is an umbrella policy that integrates all of the Service's authorities for engaging in mitigation processes. One reason we have not pursued an outright preference for banks or other mechanisms is that our authorities to recommend mitigation extend beyond the current track record for banks, which is limited to aquatic habitats and listed species. Instead of following the regulatory model from the CWA practice of stating an explicit, hierarchical preference that begins with banks, we establish a preference for advanced mitigation. While conservation or mitigation banks do typically secure resource benefits before impacts occur, and may be more likely to satisfy this preference, any compensatory mitigation mechanism that secures resource benefits before

impacts occur may also be consistent with the Service's preference.

We expect additional detail regarding compensatory mitigation mechanisms will be included in future step-down policies that are specific to compensatory mitigation. In this Policy, we use terminology that supports and accommodates future Service policies rather than pre-determines their content. For example, we do not yet know what compensatory mitigation mechanisms will be preferred in future Bald and Golden Eagle Protection Act regulations, so it would be inappropriate to state firm preferences here.

*Comment (91):* One commenter suggested we revise section 5.7, Recommendations, to indicate that compensatory mitigation should encourage more sustainable contributions of the goods and services provided to the public. This commenter said mitigation can have larger public benefits and services and that the Service should encourage mitigation actions that have additional natural, cultural, historical, or recreational values and benefits.

*Response:* We agree mitigation actions can provide the benefits the commenter describes. In section 5.1, we describe our support of the development of mitigation plans that identify high-priority resources prior to specific proposed actions. The most effective early mitigation planning is integrated with conservation planning and planning for human infrastructure, including transportation; water and energy development; as well as working lands, recreation, and cultural values. Although such integration is not a requirement of a process under any particular mitigation authority, the Service recognizes the potential power of plans that simultaneously addresses multiple ecological and human needs from broad stakeholder perspectives.

*W. Advance Mitigation*

*Comment (92):* Several commenters addressed the Policy's inclusion of a preference for advance mitigation. Several said they strongly endorsed statements throughout the Policy that recognize the value of compensatory mitigation completed in advance of impacts. Others said the preference should be removed or altered, but their reasoning differed. Some opposed a categorical requirement that mitigation be implemented prior to impacts, while others suggested the Policy go further than a preference and make advance mitigation a requirement. Some commenters said a preference was appropriate, but suggested the Policy

use consistent language in referring to a preference.

*Response:* Section 5.7.1 describes a preference for advance mitigation. It is not a requirement. As policy, we prefer that compensatory mitigation be implemented before the impacts of an action occur, making affected resources less vulnerable to temporal impacts and a net loss. Advance mitigation reduces risk and uncertainty. Demonstrating that mitigation is successfully implemented in advance of impacts provides ecological and regulatory certainty that is rarely matched by a proposal of mitigation to be accomplished concurrent with, or following, the impacts of an action. Most of the Service's mitigation authorities provide the ability to specify mitigation recommendations rather than requirements, and the Service would not be able to create a requirement for advance mitigation through policy. Accordingly, when providing mitigation recommendations to another action agency for consideration in their permitting or project decision, this Policy's guidance to Service staff is that they indicate their preference for advance mitigation. We have made minor edits to more consistently refer to this preference.

*Comment (93):* Several commenters said the Policy's preference for advance mitigation is incompatible with project-planning realities, is not feasible or appropriate for some projects, and is not always possible. They suggested we revise the Policy to allow mitigation to occur concurrent with, and in some circumstances following, impacts to be consistent with the Corps' mitigation framework. Some commenters suggested simultaneous construction of the project and mitigation remain an option.

Other commenters expressed the need for flexibility regarding the preference for conservation reasons. One commenter said overemphasizing the timing of mitigation could limit the Policy's goal of net conservation gain. They suggested the Policy de-emphasize mitigation timing in favor of tailored mitigation that addresses the needs of unique species and habitats. They were also concerned that a preference for advance mitigation would give priority to for-profit conservation/mitigation banks, and may not adequately tailor mitigation for the impacted resources. Another commenter noted that some initial flexibility may be necessary as new mitigation programs are created at the State and local levels.

*Response:* Because advance mitigation is the Service's preference and not a requirement, the Policy is compatible with circumstances where

compensatory mitigation is concurrent with or after project impacts. It is our preference that compensatory mitigation be implemented prior to project impacts, but we recognize that authorities and project planning circumstances might prevent implementation of advance mitigation in some cases. While concurrent mitigation is an option when circumstances allow, proponents may expect advance mitigation to remain the Service's preference in most cases.

We agree that flexibility is necessary in recommendations for compensatory mitigation measures and mechanisms that are most likely to successfully secure resources. Advance mitigation is the Service's preference, as it is the compensatory mitigation timing that is most likely to achieve success in regard to procuring funding. We recognize that concurrent mitigation or mitigation occurring after impacts may be necessary in some cases or may represent the best ecological outcome in others. The Policy does not establish an explicit preference for conservation or mitigation banking or other compensatory mitigation mechanisms. Conservation or mitigation banking typically secures resources before impacts occur, but any compensatory mitigation mechanism that does so may also be considered consistent with the Service's preference.

*Comment (94):* One commenter wrote that it is possible for in-lieu fee programs to implement advanced mitigation, although they have not done so historically. This commenter also said a preference for advanced mitigation applied to in-lieu fee programs would increase their likelihood of success.

*Response:* The Policy's preference for advance mitigation applies to all compensatory mitigation mechanisms. Although conservation or mitigation banking secures resources before impacts occur, any compensatory mitigation mechanism implemented before impacts occur may also satisfy this preference. In-lieu fee programs can implement a "jump-start" that establishes and maintains a supply of credits that offer mitigation in advance of impacts.

## X. Public and Private Lands

*Comment (95):* Several commenters focused on the way the Policy addresses siting of compensatory mitigation relative to land ownership status in section 5.7.2, Recommendations for Locating Mitigation on Public or Private Lands. Several expressed support for the Policy's statement that mitigation will generally be required on lands with the

same ownership classification as those where impacts occur. Some commenters believe the Policy should establish even stronger controls on public land mitigation, saying that impacts on private lands should not be mitigated on public lands. These commenters reasoned that mitigation on public lands has limited value and should not be allowed. One commenter said the Policy should recognize that when any compensatory mitigation is sited on Federal lands, unless a full-cost compensation is made for the fair market value (at a minimum) of the land utilized, then the public is subsidizing the development that caused the resource impacts. One commenter said no policy should create unfair competition with private industry, or create a disincentive to private investment in compensatory mitigation. They felt this could occur if there were no restrictions on siting compensatory mitigation for private-land impacts on public land locations. One commenter noted that some land managers would like to use compensatory mitigation funds to resolve preexisting problems on public lands, usually unrelated to the action and resources under active analysis. The commenter said this view is understandable but contrary to the mitigation hierarchy.

Several commenters suggested fewer barriers or checks on mitigating private-land impacts on public lands, and the removal of the statement that compensatory mitigation should generally occur on lands with the same ownership classification as at the location of impacts. These commenters said requiring mitigation on lands with the same ownership classification is unnecessarily restrictive, adding that, when implemented, the standards for compensatory mitigation will force a positive result regardless of land ownership. One commenter said public land managers do not and will not have the funding necessary to stabilize and recover some resources, and it is, therefore, imperative that private conservation investments, including mitigation for adverse activities, be applied on public lands if it will provide maximum conservation benefit for the affected resource.

*Response:* Compensatory mitigation can occur on public lands, and in some cases, such siting may lead to the best ecological outcome. Compensatory mitigation for impacts on public lands can be sited on both public and private lands. Also, compensatory mitigation for impacts on private lands can be located on public lands, but it is that combination, or that particular change in ownership classification, where

Service staff should be attentive to additional considerations before confidently making such a recommendation. Section 5.7.2 describes factors Service staff should consider. This cautious approach is warranted within the Policy's instruction to Service staff, for the reasons described below.

We recognize that funds to properly manage or restore public lands are often insufficiently available today, absent infusion of mitigation dollars. This argument may have merit in some cases, but we remain concerned about consequences. It is possible that funding availability is reduced and opportunities to restore or protect at-risk habitats on private lands are precluded when compensatory mitigation is sited on public lands. If passed, those opportunities on private lands are often permanently gone. Given the irregular footprint of public lands across much of the United States, we are also concerned about strategic conservation of wildlife if the aggregation of mitigation onto public lands is further streamlined without articulating at least some test or application of criteria prior to making such recommendations. If we remove all checks on locating compensatory mitigation for private land impacts on public lands, we may risk making the "export" of habitats from private to public lands a routine practice, as it may often be the lower cost option. This outcome would counter the Service's intent that the Policy be applied using a landscape-level approach.

We agree with the commenters who said there is potential for the public to subsidize the development that causes resource impacts if access to public lands for compensatory mitigation is streamlined to an inappropriate extent. This could potentially facilitate impacts or de-incentivize avoidance on private lands by artificially reducing the costs of compensatory mitigation for project proponents.

We are also concerned about the unintended consequence of reducing private conservation investment. Streamlined access to public lands for proponents needing to provide mitigation for impacts on private lands could undermine private conservation investment and banking opportunities, or weaken the economic conditions necessary for bank establishment by artificially reducing proponents' mitigation costs (*e.g.*, land acquisition costs might not be fully incorporated).

*Comment (96):* Several commenters discussed conditions or means for ensuring compensatory mitigation on public lands is durable and held to the

same standards as when conducted on private lands.

One commenter said the Policy should require the public land agency include the compensatory mitigation requirements as specific conditions in the special use permit or other required authorizations. This commenter also said a long-term management plan should be included in the use authorization, permit, or other legally binding document. They said that in order to ensure long-term management plans are binding, they should be established through a contractual agreement between the public land management agency and a third party with a conservation mission.

One commenter said compensatory mitigation on Federal lands for impacts on private lands must include full-cost compensation for the use of public lands, either through monetary compensation or implementation of additional projects to further the purposes of the Federal lands.

One commenter said land managers must demonstrate that actions taken in already-protected areas meet mitigation objectives and are not used solely for the benefit of existing protected area management goals. They added that when compensatory mitigation is sited within protected areas, land managers must uphold accountability by maintaining a ledger of mitigation actions undertaken and completed in addition to existing conservation obligations.

One commenter said the Policy, at minimum, should give preference to private lands with high conservation potential yet currently lacking conservation assurances (*i.e.*, legal and financial assurances in place to achieve protection in perpetuity) before considering the use of public lands for mitigation.

Two commenters said the Policy should require public land managers commit to long-term protection and management, and that they implement and fully fund alternative compensatory mitigation in the event of a change in law that allows incompatible uses to occur on mitigation lands. They said this would provide better certainty to project proponents when mitigating on public lands.

*Response:* We agree that the identification of mechanisms for ensuring the durability and additionality of compensatory mitigation on public lands is both important and challenging. As an umbrella policy, this Policy integrates all of the Service's authorities for engaging in all aspects of mitigation, and is not specifically a compensatory

mitigation policy. It is beyond the scope of the Policy to provide detailed procedural information for all compensatory mitigation scenarios. Also, as many of our mitigation authorities are advisory, it would be inappropriate to present detailed compensatory mitigation procedures in this Policy for such advisory authorities, when that information may already be presented in the existing regulations or guidance of other agencies. We agree that compensatory mitigation on Federal lands for impacts occurring on private lands must incorporate accounting for the difference between the cost of using public lands compared to private lands. Otherwise, agencies will not be able to maintain a level playing field for both public and private lands and for all types of compensatory mitigation mechanisms. Detailed specification of measures to ensure such accounting is beyond the scope of this Policy.

Public lands that are proposed for siting compensatory mitigation may include Federal, State, county, and municipal lands. The existence and nature of mechanisms to ensure durability and additionality varies widely across land management agencies. Given this variation, it is prudent for this Policy to provide general guidelines for Service staff to examine before recommending mitigation of private land impacts on public lands. As described in section 5.7.2, these include additionality, durability, legal consistency, and whether the proposal would lead to the best possible conservation outcome.

*Comment (97):* One commenter addressed the Service's Final Policy on the National Wildlife Refuge System and Compensatory Mitigation under the Section 10/404 Program (64 FR 49229–49234, September 10, 1999). They said siting compensatory mitigation for impacts permitted under the CWA on National Wildlife Refuge System lands is not appropriate and that those lands were not established for fulfilling private wetland impact mitigation requirements. They added that the Service must fulfill its responsibility for fully functioning Federal lands and should in no instances lower its standards when contemplating compensatory mitigation; to do otherwise would subsidize private mitigation. This commenter was concerned that section 5.7.2 undermined the 1999 Policy.

*Response:* We appreciate the commenter's observations and share their concerns regarding compensatory wetland mitigation on National Wildlife Refuge System lands. Those concerns led to, and were addressed by the 1999

Policy. Section 5.7.2 does not undermine the 1999 Policy. Regardless of the content of section 5.7.2, when the public land proposed for siting compensatory mitigation for permitted impacts under the CWA is a National Wildlife Refuge, that proposal is specifically covered by, and must comply with, the 1999 Policy. Our revisions of the 1981 Policy do not modify or supersede the 1999 Policy.

*Y. Implementation*

*Comment (98):* One commenter recommended an economic analysis because they believed there would be additional burdens and cost of implementing the Policy.

*Response:* We understand that confusion regarding whether the Service's comments are requirements or merely recommendations may have led some to believe the scope of the Policy has been substantially expanded. The burdens and costs associated with this Policy will remain largely the same as under the 1981 Policy and under existing agency practice.

*Comment (99):* Commenters requested the Service articulate a clear timeline in which the Policy will be implemented across the agency. A 2-year timeline was recommended, as it would allow enough time to sufficiently (a) adopt the Policy, (b) train and educate staff, and (c) apply the Policy in the field. Others questioned the undue burden to staff and availability of funding to implement the Policy. Similarly, commenters requested information on how the Service plans to implement the Policy, given staffing and budget constraints.

*Response:* The Service, being national in scope of operations, has written the proposed Policy in a manner that allows for further clarification on a regional scale. Regarding the request that a "standardized process" or "system" be established, where such a system(s) would be of benefit, it would be more practicable to establish it at a regional or programmatic scale, and would be handled through step-down guidance. During development of such guidance, the Service will facilitate discussions and training with staff to ensure consistency and reduce workload.

*Comment (100):* Many expressed concern with how the Policy may be inconsistent or conflict with regulations or policies from States, and other Federal agencies responding to the Presidential Memorandum on Mitigation (National Marine Fisheries Service, Corps, National Atmospheric and Oceanic Administration, Federal Energy Regulatory Commission, etc.), given the need to promulgate joint regulations. Some urged the Service to

coordinate this Policy internally, particularly with policies promulgated under the Endangered Species Act and CERCLA, OPA, and the CWA during natural resource damage assessment. One commenter requested clarity where more than one statute applies, others suggested the Service provide training internally and externally to other agencies, and some recommended examples and templates be constructed.

*Response:* The Policy is consistent with the Presidential Memorandum on Mitigation. The guidance development referenced in the Presidential Memorandum on Mitigation is under consideration within the Department of Interior at the time this Policy is being finalized and the Service will continue to seek consistency in future guidance. We have made edits to Appendix A to clarify the relationship of this Policy with natural resource damage assessment and the Presidential Memorandum on Mitigation.

*Comment (101):* One commenter questioned the use of "reasonably foreseeable," requesting clarification of what impacts would be considered such and what criteria would be applied to make that determination.

*Response:* The Service will implement use of the phrase "reasonably foreseeable," similar to that used in NEPA. Under this scenario, actions that are likely to occur or are probable, rather than those that are merely possible, would be considered reasonably foreseeable. See CEQ guidance at 46 FR 18026 (March 23, 1981).

*Comment (102):* Several commenters were concerned that the Policy lacks clear mitigation protocol, resulting in moving targets for land users interested in developing and executing projects in good faith. Some commenters stated that the Policy will substantially increase uncertainty, without providing additional environmental benefits, especially given the broad range of regulatory protections already in place.

*Response:* The Service, being national in scope of operations, has written the proposed Policy in a manner that allows for further clarification on a regional scale. Thus, site differences could be considered during impact evaluation, for example, circumstances such as differences in productivity of habitat prior to the project, expected duration and severity of impact, or other local conditions. A less flexible policy could cause rigid adherence to a protocol, which may be more suitable in one region than another.

*Comment (103):* One commenter suggested the Service did not comply with procedural requirements to finalize the Policy, in particular the Administrative Procedure Act (APA) and the Regulatory Flexibility Act (RFA).

*Response:* The Service complied with all necessary regulatory requirements in publishing the final Policy. The Policy does not require compliance with the APA or the RFA because it is not regulatory. The Policy simply revises and replaces the 1981 Policy that guided the Service's mitigation recommendations for 35 years. This Policy is advisory in nature and outlines the Service's recommended approach to addressing accelerating loss of habitats, effects of climate change, and a strategic approach to conservation at appropriate landscape scales. It addresses all resources for which the Service has legal authorities to recommend mitigation for impacts to resources and provides an updated framework for mitigation measures that will maximize their effectiveness at multiple geographic scales.

*Comment (104):* Several commenters suggested we allow the public to comment on a complete portfolio of policies, handbooks, and guidance documents that implement the Policy at one time.

*Response:* Many of the Service's guidance products are completed, while others are either in development or have yet to be drafted, making it logistically impossible to complete such a filing. This Policy is intended to be an umbrella policy under which more detailed policies or guidance documents covering specific activities may be developed in the future.

## Z. Editorial and Organizational Comments

*Comment (105):* Many commenters provided specific technical, editorial, and organizational suggestions or corrections, including suggestions for new or modified definitions.

*Response:* We have addressed technical, editorial, and organizational suggestions and corrections as appropriate throughout the document.

*Comment (106):* Many commenters questioned the specifics of multiple definitions, requested clarification or refinement, or mentioned the need for additional or narrowed definitions (*e.g.,* baseline, additionality, equivalent standards, preferences and credits, emerging mechanisms, conservation objective, net conservation gain, impacts or effects, landscape, ecologically relevant scales, broad ecological functions, ecologically functioning landscapes).

*Response:* With regard to refining the definitions, the Service is consistent with the Departmental Manual and Presidential Memorandum. As with many of the decisions made during analyses of impacts, definitions of many terms may take on the nuances of the project and/or authority under which the mitigation is being discussed. We have preserved the flexibility and look forward to using existing means of engagement at the local and State level, when working with the States, tribes, and other partners through existing authorities while developing programs and additional guidance to seek mutual goals and avoid inconsistency, including newly emerging mechanisms for analyses, mitigation, and monitoring.

*Comment (107):* One commenter was concerned the definition of "compensatory mitigation" insinuates there will always be "remaining unavoidable impacts" that must be compensated, and suggests revisions. The same commenter states that the definition of mitigation hierarchy should include where departure from the sequential approach may achieve a better conservation income.

*Response:* If there are no residual impacts after "all appropriate and practicable avoidance and minimization measures have been applied," no compensatory mitigation would be required. Departure from the mitigation hierarchy is detailed in section 5.5, where we describe how relative emphasis will be given to mitigation types within the mitigation hierarchy depending on the landscape context and action-specific circumstances that influence the effectiveness of available mitigation. No change was made to these definitions.

## AA. Appendix C. Compensatory Mitigation in Financial Assistance Awards Approved or Administered by the U.S. Fish and Wildlife Service

*Comment (108):* Five commenters suggested or requested clarifications regarding Appendix C, which addresses the limited role that specific types of mitigation can play in financial assistance programs. Two commenters said they supported limiting the use of public conservation funds to meet regulatory mitigation requirements, as the use of such funding to also generate credits undermines the effectiveness of both conservation and mitigation programs. They said that funding from any public entity that is specifically dedicated to conservation should not be used to generate credits, and suggested those funds be used to achieve baseline conditions. They suggested the Policy clarify that public conservation funds can be used to meet baseline.

*Response:* The commenters propose that, if funds from a public entity are specifically dedicated to conservation, they could be used to achieve baseline conditions, which they define as "the level of resource function above which mitigation credits may be sold." However, even if baseline were defined as recommended, the achievement of baseline would still be an essential part of the process leading to the generation of mitigation credits.

This Policy prohibits the use of the Federal share or the required minimum match of a financial assistance project to satisfy Federal mitigation requirements, except in exceptional situations described in the Policy. This prohibition is consistent with the basic principles of the regulations implementing the compensatory mitigation requirements of the CWA, which is the authority for most funds spent on mitigation. The regulations were published in the **Federal Register** on April 10, 2008 (73 FR 19594), by: (a) The Department of Defense, resulting in regulations at 33 CFR parts 325 and 332; and (b) the EPA, resulting in regulations at 40 CFR part 230. Sections 332.3(j)(2) and 230.93(j)(2) state that, except for projects undertaken by Federal agencies, or where Federal funding is specifically authorized to provide compensatory mitigation, federally funded aquatic resource restoration or conservation projects undertaken for purposes other than compensatory mitigation, such as the Wetlands Reserve Program, Conservation Reserve Program, and Partners for Wildlife Program activities, *cannot be used for the purpose of generating compensatory mitigation credits* for activities authorized by [Department of the Army] permits. *However, compensatory mitigation credits may be generated by activities undertaken in conjunction with, but supplemental to, such programs* in order to maximize the overall ecological benefits of the restoration or conservation project. [*Emphasis added.*]

The preamble of the final rule for these regulations clarifies the intent of §§ 230.93(j)(2) and 332.3(j)(2) by stating that, for example, if a Federal program has a 50 percent landowner match requirement, neither the federally funded portion of the project, nor the landowner's 50 percent match, which is part of the requirements for obtaining Federal funding, may be used for compensatory mitigation credits. However, if the landowner provides a greater than 50 percent match, any improvements provided by the landowner over and above those required for Federal funding could be

used as compensatory mitigation credits.

The Policy acknowledges these regulations for mitigation required by the CWA (Dept. of the Army permits). It also adopts the underlying principles of these regulations as the foundation of the Policy for mitigation required by authorities other than the CWA. Restricting the role of financial assistance funds for mitigation purposes is a reasonable requirement to avoid the equivalent of a Federal subsidy to those who are legally obligated to compensate for the environmental impacts of their proposed projects.

*Comment (109):* Two commenters said limiting the use of funds counted as matching funds toward Federal grants as mitigation is inconsistent with several existing State and Federal policy statements. They noted that in 2008, seven agencies including the Service, other Federal agencies, and several Oregon State agencies issued joint recommendations limiting the use of public conservation dollars to generate credits for mitigation. The recommendations state, "The agencies believe that funds from programs identified as Public Resource Protection and Restoration Programs should not be used to finance mitigation projects undertaken to satisfy regulatory requirements. To do so would be inconsistent with the mandated and/or intended purposes and limitations of these programs." The recommendations further state ". . . multisource funded projects should include accounting that is detailed and transparent enough to accurately measure the relative habitat and conservation values derived through each funding source." They also stated that Metropolitan Regional Governments and other sources of public conservation funds have consistently limited the use of public conservation funds to support mitigation, but allow mitigation funds to be used as match.

*Response:* The Policy allows matching funds to be used to generate credits only if: (a) The match used for the credits is over and above the required minimum; (b) funding for the award has been statutorily authorized and/or appropriated for use as compensatory mitigation for specific projects or categories of projects; or (c) the project funded by the Federal financial assistance award requires mitigation as a condition of a permit. These restrictions are based on the premise that neither Federal funds nor any required contribution for obtaining Federal funds should subsidize those who are legally obligated to compensate for the environmental impacts of the

projects they propose. This was an underlying principle in the regulations that implement the compensatory mitigation requirements of the CWA, which is the authority for most funds spent on compensatory mitigation.

The regulations on compensatory mitigation under the CWA were published jointly in the **Federal Register** on April 10, 2008 (73 FR 19594), by: (a) The Department of Defense, resulting in regulations at 33 CFR parts 325 and 332; and (b) the Environmental Protection Agency, resulting in regulations at 40 CFR part 230. For excerpts from these regulations that are relevant to this comment, please see our response to comment #108 above.

Consistent with the DOD and EPA regulations, the Appendix C, section (C)(1)(a) of the Policy allows the match in a Federal financially assisted project to be used to generate mitigation credits if: The mitigation credits are solely the result of any match over and above the required minimum. This surplus match must supplement what will be accomplished by the Federal funds and the required minimum match to maximize the overall ecological benefits of the restoration or conservation project.

*Comment (110):* Five commenters said they want to encourage collective action to achieve conservation outcomes, and leveraging multiple funding sources will lead to bigger projects with greater environmental benefits. They said the Policy seems to support a scenario where the EPA could fund $1 million of a project, a city could fund $2 million, but the city could not take any mitigation credits if it claimed those funds as match for the Federal grant. The commenters said this scenario could limit opportunities to create greater conservation or environmental benefit at a landscape scale.

*Response:* Under the commenters' scenario, if a city provided match above the required minimum, the Policy would not present a barrier for this "surplus" match to generate mitigation credits as long as the program's establishing authority(ies) or regulations do not prohibit it. However, if a program requires a minimum match, that required minimum has effectively already been dedicated to conservation by the rules of the program. In those programs where a minimum match is required, the Federal funds and the minimum match are essential components of the financial assistance. The award would not be possible without that minimum match, so the Policy does not allow either of these

essential components to generate mitigation credits.

This was a basic principle in the regulations that implement the compensatory mitigation requirements of the CWA, which is the authority for most funds spent on compensatory mitigation. The Service's revised Policy is based on the same principle. If we were to allow the match required as a prerequisite for an award to generate mitigation credits, it would effectively subsidize those who are legally obligated to compensate for the environmental impacts of their proposed projects.

*Comment (111):* Two commenters suggested the following text to reflect the importance of leveraging multiple funding sources in achieving landscape-scale outcomes: Public conservation funds cannot be used to meet regulatory compliance obligations. Where multiple sources of funding are used in conjunction with credit-generating activities, it is the permittee's responsibility to demonstrate compliance with this requirement. Public conservation funds can be used to meet baseline conditions.

*Response:* The Policy authorizes the use of specific funding sources that are, or could be interpreted as "public conservation funds." The references to such funding in the Policy are:

(a) Federal funding statutorily authorized and/or appropriated for use as compensatory mitigation for specific projects or categories of projects (Appendix C, section E(1)(b)).

(b) Federal funds needed to mitigate environmental damage caused by a federally funded project (Appendix C, section E(1)(c)).

(c) Revenue from a Natural Resource Damage Assessment and Restoration Fund settlement as long as the financial assistance program does not prohibit its use (Appendix C, section F).

The Policy also affirms that States, tribes, and local governments are free to use Federal financial assistance (*i.e.,* public conservation funds) to satisfy the mitigation requirements of State laws or regulations as long as that use is not contrary to any law, regulation, or policy of the State, tribal, or local government (Appendix C, section G(2)).

We did not accept the commenter's recommended language because it could lead to incorrect interpretations of the Policy.

The commenter also recommended "public conservation funds" be used to meet baseline conditions under the commenter's definition of "baseline." We addressed this issue in a previous response.

*Comment (112):* One commenter said it is not workable to prohibit a site that has received Federal funds to generate credits. They suggested the Policy encourage the pooling of resources and the investment of mitigation dollars in the most valuable sites regardless of whether Federal funds have been invested on the site, especially for those uses not directly related to restoring greater sage-grouse habitat. The commenter said they believe thoughtful discussions and pertinent accounting will ensure Federal funds are not used to generate credits to offset the impacts of the private sector or create a conflict with the rules of additionality.

*Response:* The authority for most funds spent on mitigation is the CWA. The regulations that implement the CWA's compensatory mitigation requirements were published jointly in the **Federal Register** on April 10, 2008 (73 FR 19594), by: (a) The Department of Defense, resulting in regulations at 33 CFR parts 325 and 332; and (b) the Environmental Protection Agency, resulting in regulations at 40 CFR part 230. Sections 332.3(a)(3) and 230.93(a)(3) indicate that compensatory mitigation projects may be sited on public or private lands. Credits for compensatory mitigation projects on public land must be based solely on aquatic resource functions provided by the compensatory mitigation project, *over and above* those provided by public programs already in place. [*Emphasis added.*]

Sections 332.3(j)(2) and 230.93(j)(2) of 40 CFR part 230 state that, except for projects undertaken by Federal agencies, or where Federal funding is specifically authorized to provide compensatory mitigation, federally funded aquatic resource restoration or conservation projects undertaken for purposes other than compensatory mitigation, such as the Wetlands Reserve Program, Conservation Reserve Program, and Partners for Wildlife Program activities, cannot be used for the purpose of generating compensatory mitigation credits for activities authorized by [Department of the Army] permits. However, compensatory mitigation credits may be generated by activities undertaken in conjunction with, *but supplemental to,* such programs in order to maximize the overall ecological benefits of the restoration or conservation project. [*Emphasis added.*]

The CWA may have a limited effect on the habitat of the greater sage-grouse, but the underlying principles of its regulations are reasonable and appropriate for applicability to other statutory authorities for mitigation. Limiting any credits from projects on public lands to those based on resource functions provided *over and above* those already in place, avoids a government subsidy to those already legally obligated to compensate for impacts of their projects. The Policy adopts the basic principles of the CWA's compensatory mitigation regulations as the foundation for all sources of compensatory mitigation.

*Comment (113):* One commenter noted Appendix C includes information on the use of Service funds relative to the need to obtain permits from the Corps' regulatory program. To avoid confusing these requirements with the Corps' Civil Works requirements, they suggested adding a statement that Appendix C does not affect policies on cost-sharing or non-Federal contributions for the Corps' Civil Works Program.

*Response:* The Policy directly affects only those Federal financial assistance programs and awards in which the Service has the authority to approve or disapprove applications. It also affects real property or equipment either acquired or improved with a Service-administered financial assistance award where the recipient must continue to manage the real property or equipment for its originally authorized purpose as long as it is needed for that purpose. The Policy has no effect on other Federal agencies' policies on match or cost share as long as those policies do not affect: (a) Restrictions in this Policy on the use of Service-administered financial assistance awards for generating compensatory mitigation credits, and (b) the Service's responsibilities as identified in Federal statutes or their implementing regulations. The Policy does not take precedence over the requirements of any Federal statute or regulation, whether that statute or regulation applies to a Service program or a program of another Federal agency. We added a new section I to Appendix C to clarify these issues.

*Comment (114):* One commenter said the Service's proposed revised Policy is inconsistent with in-lieu fee mitigation in the context of financial assistance programs. They sought further explanation of the rationale of allowing Federal funds to satisfy mitigation requirements of State, tribal, or local governments.

*Response:* The revised Policy prohibits the use of proceeds from the purchase of credits in an in-lieu fee program as match unless both of the following apply:

(a) The proceeds are over and above the required minimum match. This surplus match must supplement what will be accomplished by the Federal

funds and the required minimum match to maximize the overall ecological benefits of the project.

(b) The statutory authority(ies) for the financial-assistance program and program-specific regulations (if any) do not prohibit the use of match or program funds for mitigation.

This prohibition is consistent with the underlying principles of the regulations implementing the compensatory mitigation requirements of the CWA, which is the authority for most funds spent on mitigation. Please see relevant excerpts from the regulations published jointly by The Department of Defense and the EPA within our response to comment #108 above.

The Service's revised Policy defers to these regulations for mitigation required by the CWA (Dept. of the Army permits). It also adopts the underlying principles of these regulations as the foundation for mitigation required by authorities other than the CWA. Restricting the ability of financial assistance programs to generate compensatory mitigation credits is a reasonable requirement to avoid the equivalent of a Federal subsidy to those who are legally obligated to compensate for the environmental impacts of their proposed projects.

The rationale of allowing the use of Federal funds to satisfy mitigation requirements of State, tribal, or local governments is based on 33 CFR 332.3(j)(1) and 40 CFR 230.93(j)(1), which have the force and effect of law only for the compensatory mitigation requirements of the CWA. However, the basic approach of these regulations is reasonable and appropriate for use as the foundation of a Service policy on mitigation in the context of financial assistance when the authority for mitigation is in a statute other than the CWA.

The regulations at 33 CFR 332.3(j)(1) and 40 CFR 230.93(j)(1) read:

(j) *Relationship to other Federal, State, tribal, and local programs.* (1) Compensatory mitigation projects for DA [Department of the Army] permits may also be used to satisfy the environmental requirements of other programs, such as State, tribal, or local wetlands regulatory programs, other Federal programs such as the Surface Mining Control and Reclamation Act, Corps civil works projects, and Department of Defense military construction projects, consistent with the terms and requirements of these programs and subject to the following considerations: (i) The compensatory mitigation project must include appropriate compensation required by the DA permit for unavoidable impacts

to aquatic resources authorized by that permit. (ii) Under no circumstances may the same credits be used to provide mitigation for more than one permitted activity. However, where appropriate, compensatory mitigation projects including mitigation banks and in-lieu fee projects, may be designed to holistically address requirements under multiple programs and authorities for the same activity.

The wording of Appendix C, section G may have led the commenter to incorrectly conclude that Service-administered financial assistance may be awarded explicitly for the purpose of satisfying the mitigation requirements of a State, tribal, or local government. We changed the wording of section G to avoid any misunderstanding on this issue.

*Comment (115):* One commenter asked what, if any, impacts might be considered for administration of the Service's Wildlife and Sport Fish Restoration Program (WSFR) and State fish and wildlife agency obligations related to that program. They requested potential programmatic impacts be noted in the Policy, and the existing Joint Federal/State Task Force on Federal Assistance Policy (JTF) be engaged. This commenter appreciated the Policy's emphasis on collaboration and coordination, but suggested we also cite 43 CFR part 24, *Department of the Interior Fish and Wildlife Policy: State-Federal Relationships.* They also said the Service should consult with the States and other affected governments before selecting plans to guide mitigation, and that great deference should be given to State-prepared plans.

*Response:* It is difficult to assess the impact of the Policy on WSFR because the Service has never had any comprehensive national policy on the role of mitigation in its financial assistance programs. The CWA is the authority for most funds spent on mitigation, and it is the only Federal statutory authority for mitigation that addresses mitigation in the context of financial assistance. The Policy does not (and cannot) change the CWA regulations on compensatory mitigation, which have been in effect since 2008. The Policy will give grants managers in the Service and in recipient agencies a better awareness and understanding of these regulations.

In addition to the 2008 CWA regulations, an element of continuity in this Policy is its treatment of the Natural Resource Damage Assessment and Restoration Fund. This Policy incorporates the findings of a 1999 Solicitor's Opinion determining that

revenue from this fund was eligible as match.

As for the commenter's recommendation that we consult with the States and other affected governments before selecting plans to guide mitigation, on March 8, 2016, we published the proposed revised Policy in the **Federal Register**, and invited all interested parties to comment during a 60-day comment period. On May 12, 2016, we extended the comment period for an additional 30 days. We are pleased to have received the recommendations of the Association of Fish and Wildlife Agencies, which represents State fish and wildlife agencies.

As for the comment that we engage the Joint Federal/State Task Force on Federal Assistance Policy on the potential impacts to the WSFR program, we welcome any JTF engagement on the implementation of Appendix C. We are also open to future input that: (a) Clearly improves implementation of Appendix C; (b) fully complies with existing statutes and regulations; (c) carries out the general policy and principles stated in section 4 of the Policy, with special attention to the goal of a net conservation gain; (d) maintains a consistent approach in satisfying the requirements of all statutory authorities for mitigation to the extent possible; (e) ensures *additionality* (see section 6) for any proposed change in locating compensatory mitigation on public or private lands already designated for the conservation of natural resources; and (f) does not subsidize those who are legally obligated to compensate for the environmental impacts of their proposed projects.

Section G of Appendix C of the revised Policy may be of special interest to the Association of Fish and Wildlife Agencies, as it affirms the rights of States, tribes, and local governments to structure the mitigation requirements of their own laws and regulations however they choose. The Service's revised Policy does not affect mitigation required by State, tribal, or local law.

We added the 43 CFR part 24 reference to Appendix A, section C per the comment.

To address the comment that we give great deference to State-prepared plans that guide mitigation, we will convert the existing section H in Appendix C to section I, and add the following to the new section H: When evaluating existing plans under sections H.2.a or b, the Service must defer to State and tribal plans to determine which additional benefits to count toward achieving the mitigation planning goal

as long as the plans are consistent with Federal law, regulation, and this Policy.

*Comment (116):* One commenter noted that the way financial assistance programs addressed in Appendix A are described in section 3.5 may become outdated. The number of financial assistance programs recently increased to 61. Instead of using a number that will change frequently, they suggested revising the first sentence to read:

The Service has more than 60 financial assistance programs, which collectively disburse. . . .

*Response:* We made the suggested revision.

*Comment (117):* One commenter addressed the interaction between the Service's financial assistance programs described in Appendix A with section 4, General Policy and Principles. The commenter was concerned that the following concept in paragraph (g) would be applied inconsistently unless additional guidance was provided: "The Service will recommend or require that compensatory mitigation be . . . additional to any *existing or foreseeably expected* conservation efforts planned for the future." The commenter said the following scenarios need clarification:

(1) A master plan for a land-management unit has an objective that calls for a specific conservation action to be accomplished in the next 15 years. If funding has not yet been appropriated or allocated to accomplish the conservation action, would the master-plan objective qualify as a "foreseeably expected" conservation effort planned for the future?

(2) The establishing statutory authority of a land-management agency makes that agency responsible for specific management actions, but the agency does not have enough funds to carry out these management actions. Would those management actions for which the agency is statutorily responsible qualify as an "existing or foreseeably expected" conservation effort?

(3) The partners in a grant-funded land-acquisition project have committed to use non-Federal and non-match funds to complete specific types of restoration or enhancement on the project area. These commitments contributed to the project being recommended for funding by the grant program's ranking panel. Would these commitments qualify as an "existing or foreseeably expected" conservation effort?

*Response:* The regulations implementing the compensatory mitigation requirements of the CWA at 33 CFR 332.7(a) and 40 CFR 230.97(a) state that:

Long-term protection may be provided through real estate instruments such as conservation easements held by entities such as Federal, State, tribal, or local resource agencies, nonprofit conservation organizations, or private land manager; the transfer of title to such entities; or by restrictive covenants. For government property, long-term protection may be provided through Federal facility management plans or integrated natural resources management plans.

These regulations regard facility-management plans and integrated natural-resources management plans as providing long-term protection. We used this as part of the basis for clarifying what would qualify as "existing or foreseeably expected conservation efforts planned for the future." We addressed the issues and scenarios raised by the commenter in Appendix C, section H.

*Comment (118):* One commenter addressed the interaction between the Service's financial assistance programs described in Appendix C and provisions of section 5.7.2, Recommendations for Locating Mitigation on Public or Private Lands. They asked for clarification on whether the following would be considered public land:

(a) Real property owned by "instrumentalities" of government, such as a regional water management district?

(b) An interest in real property that is less than full fee title, such as a conservation easement or a leasehold estate?

(c) Real property owned by tribal governments?

(d) Real property held by nongovernmental entities, but acquired with Federal financial assistance. In such cases, the Federal awarding agency does not have an ownership interest in the property, but it does have the following legal rights defined in regulation:

(1) Approving encumbrances to the title,

(2) Approving or giving instructions for disposition of real property no longer needed for its originally authorized purpose, and

(3) Receiving a share of the proceeds resulting from disposition of real property when the Federal awarding agency authorizes sale on the open market or transfer to the grant recipient.

*Response:* Examples (a), (b), and (c) would be public land for purposes of the Policy. However, if the government or public agency owns a fee with exceptions to title as in example (b), the Policy applies only to the interest owned by a government or public

agency. It has no effect on interests not owned by a government or public agency. Example (d) would be considered public land only if the interest in real property is owned by the Federal Government; a State, tribal, or local government; or an agency or instrumentality of one of these governments. We have provided clarification in Appendix C, section H.

*Comment (119):* One commenter said terms in section 5.7.2, Recommendations for Locating Mitigation on Public or Private Lands, had implications for the material in Appendix C and were unclear. Specifically, they asked for an explanation of the difference between the proposed language of this Policy in section 5.7.2: "measures the public agency is foreseeably expected to implement absent the mitigation" and the language of the regulations jointly issued by the EPA at 40 CFR 230.93(a)(3) and the Corps at 33 CFR 332.3(a)(3): "Credits for compensatory mitigation projects on *public* land must be based solely on aquatic resource functions provided by the compensatory mitigation project, over and above *those provided by public programs already planned or in place.*"

*Response:* The language in section 5.7.2 and in the EPA/Corps regulation has different purposes, but both are applications of the principle of *additionality*, which this Policy defines as: A compensatory mitigation measure is additional when the benefits of a compensatory mitigation measure improve upon the baseline conditions of the impacted resources and their values, services, and functions in a manner that is demonstrably new and would not have occurred without the compensatory mitigation measure.

The measures described in section 5.7.2 are effectively those described in the regulatory language as: Those provided by public programs already planned.

Appendix C, section H explains how to determine what qualifies as "baseline conditions . . . that a public land management agency is foreseeably expected to implement absent the mitigation."

*Comment (120):* One commenter addressed Appendix C, section H, Can a mitigation proposal be located on land acquired under a Federal financial assistance award? They said despite this section title, section 5.7.2, Recommendations for Locating Mitigation on Public or Private Lands, seems to apply to everything covered by the Policy, including financial assistance awards. They suggested that if section 5.7.2 applies to financial

assistance awards, we clarify that Appendix C, section H supplements section 5.7.2.

*Response:* Most lands acquired under Service-approved or administered financial assistance awards are dedicated to conservation, but not all are public land. We have revised section H to acknowledge the applicability of section 5.7.2 to land already designated for conservation.

*Comment (121):* One commenter said the Authorities and Direction for Service Mitigation Recommendations listed in Appendix A needed additional references related to the financial assistance programs described in Appendix C. They suggested the following authorities for the two Service grant programs that have an authorizing statute or regulation prohibiting the use mitigation in the program be added to Appendix A:

North American Wetlands Conservation Act, 16 U.S.C. 4401 *et seq.*
National Coastal Wetlands Conservation Grants, 16 U.S.C. 3954, 50 CFR part 84.

*Response:* We added the North American Wetlands Conservation Act, 16 U.S.C. 4401 *et seq.* to Appendix A, section B, Additional Legislative Authorities. We added the National Coastal Wetlands Conservation Grants, 16 U.S.C. 3954, 50 CFR part 84 to Appendix A, section C, Implementing Regulations.

*Comment (122):* One commenter addressed the ineligibility of the use of mitigation in the National Coastal Wetlands Conservation program. They suggested that inserting the following as the ninth sentence in the introductory paragraph would avoid any potential misunderstandings: Consistent with the Service's Mitigation Policy, the regulations at 50 CFR part 84 authorize the use of Natural Resource Damage Assessment funds as match in the National Coastal Wetlands Conservation Program.

*Response:* We added the sentence as recommended.

*Comment (123):* For further clarity, one commenter recommended editing in Appendix C, section B, Where do most mitigation issues occur in financial assistance? Specifically, they suggested the first sentence in the answer to Question B be replaced with: Most mitigation issues in financial assistance relate to: (a) The proposed use of mitigation funds on land acquired with Federal financial assistance, and (b) the use as match of mitigation funds and in-kind contributions derived from mitigation funds.

*Response:* We replaced the first sentence as recommended by the commenter.

*Comment (124):* One commenter noted that in a recent mitigation project proposed for siting on land acquired with Federal financial assistance, the landowner asserted that the mitigation project should be acceptable to the Service because it was acceptable to the Corps. To address such implementation questions, the commenter suggested adding a new section that examines the responsibilities of the Corps and the Service for approving specific decisions related to the limited role of mitigation in financial assistance programs. They said, where appropriate, the new section would give the legal basis of their respective roles.

*Response:* The District Engineer of the Corps has the authority to impose conditions on a Department of the Army (DA) permit under the CWA, including conditions on the type and location of compensatory mitigation. However, no mitigation project, whether it is under the authority of the CWA or any other Federal statute, can interfere with the purposes of a financially assisted project. If the conditions in a DA permit will affect a financially assisted project for which the Service is responsible, those conditions must be acceptable to the Service before the permitted activity is initiated.

Even if a mitigation project under the CWA will not affect one of its financially assisted projects, the Service may be a member of the Interagency Review Team that reviews documentation for the establishment of mitigation banks and in-lieu fee programs. The respective roles of the Corps and the Service in carrying out the compensatory mitigation requirements of the CWA are described in more detail in 33 CFR parts 325 and 332, and 40 CFR part 230.

For mitigation projects that will affect a financially assisted project in a program where it approves or administers awards, the Service is responsible for the following decisions:

*(a) Can real property and equipment acquired under a Service-administered financial assistance award be used for purposes of compensatory mitigation?*

The Service makes this decision based on 2 CFR 200.311(b) and 2 CFR 200.313(a–c), which addresses real property and equipment (respectively), with special reference to the Service's authority to approve encumbrances and its right to receive a share of proceeds from a disposition when property is no longer needed for the purposes of the original award. 50 CFR 80.132–135 also apply to real property acquired under

the Wildlife Restoration program, Sport Fish Restoration program, and Enhanced Hunter Education and Safety programs, and will guide mitigation in financial assistance programs.

*(b) Can real property that includes a capital improvement funded by a Service-administered financial assistance award be used for purposes of compensatory mitigation during the useful life of the capital improvement?*

The Service makes this decision based on 2 CFR 200.311(b). Regulations at 50 CFR 80.132–135 may also be applicable to a capital improvement funded by an award from the Wildlife Restoration program, Sport Fish Restoration program, and Enhanced Hunter Education and Safety programs. "Capital improvement" means (a) a structure that costs at least $25,000 to build; or (b) the alteration, renovation, or repair of a structure that increases the structure's useful life by at least 10 years or its market value by at least $25,000. A financial assistance program may have its own definitions of capital improvement for purposes of compensatory mitigation as long as it includes all capital improvements as defined here.

*(c) Can real property managed, maintained, or operated with funding from a Service-administered financial assistance award be used for purposes of compensatory mitigation?*

The Service makes this decision based on 2 CFR 200.300.311(a) and (b). Regulations at 50 CFR 80.134 also apply to real property managed, maintained, or operated by an award from the Wildlife Restoration program, Sport Fish Restoration program, and Enhanced Hunter Education and Safety programs.

*(d) Are funds or in-kind contributions that have been used or will be used to satisfy compensatory-mitigation requirements eligible as match in a Service-administered financial assistance program?*

The Service makes this decision based on 2 CFR 200.300; 2 CFR 200.403(a); and 2 CFR 200.404(a), (b), and (d). For compensatory mitigation required by the CWA, the Service makes this decision in compliance with 33 CFR 332.3(j)(2) and 40 CFR 230.93(j)(2). The final rule for these regulations was published in the **Federal Register** on April 10, 2008 (73 FR 19594). Its preamble clarifies the intent of §§ 332.3(j)(2) and 230.93(j)(2) in the following example: . . . if a Federal program has a 50 percent landowner match requirement, neither the federally funded portion of the project, nor the landowner's 50 percent match, which is part of the requirements for obtaining

Federal funding, may be used for compensatory mitigation credits. However, if the landowner provides a greater than 50 percent match, any improvements provided by the landowner over and above those required for federal funding could be used as compensatory mitigation credits.

## National Environmental Policy Act (NEPA)

We have analyzed this Policy in accordance with the criteria of the National Environmental Policy Act, as amended (NEPA) (42 U.S.C. 4332(c)), the Council on Environmental Quality's Regulations for Implementing the Procedural Provisions of NEPA (40 CFR parts 1500–1508), and the Department of the Interior's NEPA procedures (516 DM 2 and 8; 43 CFR part 46). Issuance of policies, directives, regulations, and guidelines are actions that may generally be categorically excluded under NEPA (43 CFR 46.210(i)). Based on comments received, we determined that a categorical exclusion can apply to this Policy, but nevertheless, the Service chose to prepare an environmental assessment (EA) to inform decision makers and the public regarding the possible effects of the policy revisions. We announced our intent to prepare an EA pursuant to NEPA when we published the proposed revised policy. We requested comments on the scope of the NEPA review, information regarding important environmental issues that should be addressed, the alternatives to be analyzed, and issues that should be addressed at the programmatic stage in order to inform the site-specific stage during the comment period on the proposed revised policy. Comments from the public were considered in the drafting of the final EA. The final EA is available on the Internet at *http://www.regulations.gov* at Docket Number FWS–HQ–ES–2015–0126.

## Authority

The multiple authorities for this action include the: Endangered Species Act of 1973, as amended (16 U.S.C. 1531 *et seq.*); Fish and Wildlife Coordination Act, as amended, (16 U.S.C. 661–667(e)); National Environmental Policy Act (42 U.S.C. 4371 *et seq.*); and others identified in section 2 and Appendix A of this Policy.

## Mitigation Policy of the U.S. Fish and Wildlife Service

### 1. Purpose

This Policy applies to all actions for which the U.S. Fish and Wildlife Service (Service) has specific authority

to either recommend or to require the mitigation of impacts to fish, wildlife, plants, and their habitats. Most applications of this Policy are advisory. The purpose of this Policy is to provide guidance to Service personnel in formulating and delivering recommendations and requirements to action agencies and project proponents so that they may avoid, minimize, and compensate for action-caused impacts to species and their habitats.

The guidance of this Policy:

• Provides a framework for formulating measures to maintain or improve the status of affected species through an application of the mitigation hierarchy informed by a valuation of their affected habitats;

• will help align Service-recommended mitigation with conservation objectives for affected resources and the strategies for achieving those objectives at ecologically relevant scales;

• will allow action agencies and proponents to anticipate Service recommendations and plan for mitigation measures early, thus avoiding delays and assuring equal consideration of fish and wildlife conservation with other action purposes; and

• allows for variations appropriate to action- and resource-specific circumstances.

This Policy supersedes the Fish and Wildlife Service Mitigation Policy (46 FR 7644–7663) published in the **Federal Register** on January 23, 1981. Definitions for terms used throughout this Policy are provided in section 6.

### 2. Authority

The Service has jurisdiction over a broad range of fish and wildlife resources. Service authorities are codified under multiple statutes that address management and conservation of natural resources from many perspectives, including, but not limited to, the effects of land, water, and energy development on fish, wildlife, plants, and their habitats. We list below the statutes that provide the Service, directly or indirectly through delegation from the Secretary of the Interior, specific authority for conservation of these resources and that give the Service a role in mitigation planning for actions affecting them. We further discuss the Service's mitigation planning role under each statute and list additional authorities in Appendix A.

• Bald and Golden Eagle Protection Act, 16 U.S.C. 668 *et seq.* (Eagle Act)
• Endangered Species Act of 1973, as amended, 16 U.S.C. 1531 *et seq.* (ESA)
• Federal Land and Policy Management Act, 43 U.S.C. 1701 *et seq.* (FLPMA)

• Federal Power Act, 16 U.S.C. 791–828c (FPA)
• Federal Water Pollution Control Act (Clean Water Act), 33 U.S.C. 1251 *et seq.* (CWA)
• Fish and Wildlife Conservation Act, 16 U.S.C. 2901–2912
• Fish and Wildlife Coordination Act, as amended, 16 U.S.C 661–667(e) (FWCA)
• Marine Mammal Protection Act of 1972, as amended, 16 U.S.C. 1361 *et seq.* (MMPA)
• Migratory Bird Treaty Act, 16 U.S.C. 703–712 (MBTA)
• National Environmental Policy Act, 42 U.S.C. 4371 *et seq.* (NEPA)
• National Wildlife Refuge System Administration Act, 16 U.S.C. 668dd *et seq.*

While all of the statutes listed above give the Service an advisory role in fish and wildlife mitigation, not all of them give the Service authority to require others to implement the mitigation measures we identify. Circumstances under which the Service has specific authority to require, consistent with applicable laws and regulations, one or more forms of mitigation for impacts to fish and wildlife resources include:

• Actions that the Service carries out, *i.e.*, the Service is the action proponent;
• actions that the Service funds;
• actions to restore damages to fish and wildlife resources caused by spills of oil and other hazardous materials under the Oil Pollution Act and the Comprehensive Environmental Response, Compensation, and Liability Act;
• actions of other Federal agencies that require an incidental take statement under section 7 of the ESA (measures to minimize the impact of the incidental taking on the species);
• actions of non-Federal entities that require an incidental take permit under section 10 of the ESA (measures to minimize and mitigate the impacts of the taking on the species to the maximum extent practicable);
• fishway prescriptions under section 18 of the FPA, which minimize, rectify, or reduce over time through management, the impacts of non-Federal hydropower facilities on fish passage;
• license conditions under section 4(e) of the FPA for non-Federal hydropower facilities affecting Service properties (*e.g.*, a National Wildlife Refuge) for the protection and utilization of the Federal reservation consistent with the purpose for which such reservation was created or acquired;
• actions that require a ''Letter of Authorization'' or ''Incidental

AR_0044694

Harassment Authorization'' under the MMPA; and

• actions that require a permit for non-purposeful (incidental) take of eagles under the Eagle Act.

Our aim with this Policy is to provide a common framework for Service discretion across the full range of our authorities, including those listed above for which the Service may require mitigation, but the Policy does not alter or substitute for the regulations implementing any of these authorities.

*3. Scope*

3.1. Actions

This Policy applies to all Service activities related to evaluating the effects of proposed actions and subsequent recommendations or requirements to mitigate impacts to resources, defined in section 3.2. For purposes of this Policy, actions include: (a) Activities conducted, authorized, licensed, or funded by Federal agencies (including Service-proposed activities); (b) non-Federal activities to which one or more of the Service's statutory authorities apply to make mitigation recommendations or specify mitigation requirements; and (c) the Service's provision of technical assistance to partners in collaborative mitigation planning processes that occur outside of individual action review.

3.2. Resources

This Policy may apply to specific resources based on any Federal authority or combination of authorities, such as treaties, statutes, regulations, or Executive Orders, that empower the Federal Government to manage, control, or protect fish, wildlife, plants, and their habitats that are affected by proposed actions. Such Federal authority need not be exclusive, comprehensive, or primary, and in many cases, may overlap with that of States or tribes or both.

This Policy applies to those resources identified in statute or implementing regulations that provide the Service authority to make mitigation recommendations or specify mitigation requirements for the actions described in section 3.1. The scope of resources addressed by this Policy is inclusive of, but not limited to, the Federal trust fish and wildlife resources concept.

The Service has traditionally described its trust resources as migratory birds, federally listed endangered and threatened species, certain marine mammals, and inter-jurisdictional fish. Some authorities narrowly define or specifically identify covered taxa, such as threatened and endangered species, marine mammals, or the species protected by the Migratory Bird Treaty Act. This Policy applies to trust resources; however, Service Regions and field stations retain discretion to recommend mitigation for other resources under appropriate authorities.

The types of resources for which the Service is authorized to recommend mitigation also include those that contribute broadly to ecological functions that sustain species. The definitions of the terms ''wildlife'' and ''wildlife resources'' in the Fish and Wildlife Coordination Act include birds, fishes, mammals, and all other classes of wild animals, and all types of aquatic and land vegetation upon which wildlife is dependent. Section 404 of the Clean Water Act (33 CFR 320.4) codifies the significance of wetlands and other waters of the United States as important public resources for their habitat value, among other functions.

The Endangered Species Act envisions a broad consideration when describing its purposes as providing a means whereby the ecosystems upon which endangered and threatened species depend may be conserved and when directing Federal agencies at section 7(a)(1) to utilize their authorities in furtherance of the purposes of the ESA by carrying out programs for the conservation of listed species. The purpose of the National Environmental Policy Act (NEPA) also establishes an expansive focus in promoting efforts that will prevent or eliminate damage to the environment while stimulating human health and welfare. In NEPA, Congress recognized the profound impact of human activity on the natural environment, particularly through population growth, urbanization, industrial expansion, resource exploitation, and new technologies. NEPA further recognized the critical importance of restoring and maintaining environmental quality, and declared a Federal policy of using all practicable means and measures to create and maintain conditions under which humans and nature can exist in productive harmony. These statutes address systemic concerns and provide authority for protecting habitats and landscapes.

3.3. Exclusions

This Policy does not apply retroactively to completed actions or to actions specifically exempted under statute from Service review. It does not apply where the Service has already agreed to a mitigation plan for pending actions, except where: (a) New activities or changes in current activities would result in new impacts; (b) a law enforcement action occurs after the Service agrees to a mitigation plan; (c) an after-the-fact permit is issued; or (d) where new authorities or failure to implement agreed-upon recommendations, warrant new mitigation planning. Service personnel may elect to apply this Policy to actions that are under review as of the date of its final publication.

3.4. Applicability to Service Actions

This Policy applies to actions that the Service proposes, including those for which the Service is the lead or co-lead Federal agency for compliance with NEPA. However, it applies only to the mitigation of impacts to fish, wildlife, plants, and their habitats that are reasonably foreseeable from such proposed actions. When it is the Service that proposes an action, the Service acknowledges its responsibility, during early planning for design of the action, to consult with Tribes, and to consider the effects to, and mitigation for, impacts to resources besides fish, wildlife, plants, and their habitats (*e.g.,* cultural and historic resources, traditional practices, environmental justice, public health, recreation, other socio-economic resources, etc.). Consistent with NEPA (42 U.S.C. 4332(A)) (40 CFR 1500.2 and 1501.2) and the CEQ and the Advisory Council on Historic Preservation (ACHP), *NEPA NHPA Section 106 Handbook,* these reviews will be integrated into the decisionmaking process at the earliest possible point in planning for the action. This Policy neither provides guidance nor supersedes existing guidance for mitigating impacts to resources besides those defined in section 3.2, Resources.

NEPA requires the action agency to evaluate the environmental effects of alternative proposals for agency action, including the environmental effects of proposed mitigation (*e.g.,* effects on historic properties resulting from habitat restoration). Considering impacts to resources besides fish and wildlife requires the Service to coordinate with entities having jurisdiction by law, special expertise, or other applicable authority. Appendix B further discusses the Service's consultation responsibilities with tribes related to fish and wildlife impact mitigation, *e.g.,* statutes that commonly compel the Service to address the possible environmental impacts of mitigation activities for fish and wildlife resources. It also supplements existing Service NEPA guidance by describing how this Policy integrates with the Service's decisionmaking process under NEPA.

AR_0044695

3.5. Financial Assistance Programs and Mitigation

The Service has more than 60 financial assistance programs, which collectively disburse more than $1 billion annually to non-Federal recipients through grants and cooperative agreements. Most programs leverage Federal funds by requiring or encouraging the commitment of matching cash or in-kind contributions. Recipients have acquired approximately 10 million acres in fee title, conservation easements, or leases through these programs. To foster consistent application of financial assistance programs with respect to mitigation processes, Appendix C addresses the limited role that specific types of mitigation can play in financial assistance programs.

*4. General Policy and Principles*

The mission of the Service is working with others to conserve, protect, and enhance fish, wildlife, plants, and their habitats for the continuing benefit of the American people. In furtherance of this mission, the Service has a responsibility to ensure that impacts to fish, wildlife, plants, and their habitats in the United States, its territories, and possessions are considered when actions are planned, and that such impacts are mitigated so that these resources may provide a continuing benefit to the American people. Consistent with Congressional direction through the statutes listed in the "Authority" section of this Policy, the Service will provide timely and effective recommendations to conserve, protect, and enhance fish, wildlife, plants, and their habitats when proposed actions may reduce the benefits thereof to the public.

Fish and wildlife and their habitats are resources that provide commercial, recreational, social, and ecological value to the Nation. For Tribal Nations, specific fish and wildlife resources and associated landscapes have traditional cultural and religious significance. Fish and wildlife are conserved and managed for the people by State, Federal, and tribal governments. If reasonably foreseeable impacts of proposed actions are likely to reduce or eliminate the public benefits that are provided by such resources, these governments have shared responsibility or interest in recommending means and measures to mitigate such losses. Accordingly, in the interest of serving the public, it is the policy of the U.S. Fish and Wildlife Service to seek to mitigate losses of fish, wildlife, plants, their habitats, and uses thereof resulting from proposed actions.

The following fundamental principles will guide Service-recommended mitigation, as defined in this Policy, across all Service programs.

a. *The goal is a net conservation gain.* The Service's mitigation planning goal is to improve (*i.e.*, a net gain) or, at minimum, to maintain (*i.e.*, no net loss) the current status of affected resources, as allowed by applicable statutory authority and consistent with the responsibilities of action proponents under such authority. As informed by established conservation objectives and strategies, Service mitigation recommendations will focus primarily on important, scarce, or sensitive resources, and will specify the means and measures that achieve the planning goal.

b. *Observe an appropriate mitigation sequence.* The Service recognizes it is generally preferable to take all appropriate and practicable measures to avoid and minimize adverse effects to resources, in that order, before compensating for remaining impacts. However, to achieve the best possible conservation outcomes, the Service recognizes that some limited circumstances may warrant a departure from this preferred sequence. The Service will prioritize the applicable mitigation types based on a valuation of the affected resources as described in this Policy in a landscape conservation context.

c. *Avoid high-value habitats.* The Service will seek avoidance of all impacts to high-value habitats. High-value habitats make an exceptional contribution to the conservation of species. Preventing impacts to these habitats is the most effective means of maintaining the current status of a species, which is the minimum goal of this Policy.

d. *A landscape approach will inform mitigation.* The Service will integrate mitigation into a broader ecological context with applicable landscape-level conservation plans, where available, when developing, approving, and implementing plans, and by steering mitigation efforts in a manner that will best contribute to achieving conservation objectives. The Service will consider climate change and other stressors that may affect ecosystem integrity and the resilience of fish and wildlife populations, which will inform the scale, nature, and location of mitigation measures necessary to achieve the best possible conservation outcome. The Service will foster partnerships with Federal and State partners, tribes, local governments, and other stakeholders to design mitigation strategies that will prevent fragmented

landscapes and restore core areas and connectivity necessary to sustain species.

e. *Ensure consistency and transparency.* The Service will use timely and transparent processes that provide predictability and uniformity through the consistent application of standards and protocols as may be developed to achieve effective mitigation.

f. *Science-based mitigation.* The Service will use the best available science in formulating and monitoring the long-term effectiveness of its mitigation recommendations and decisions, consistent with all applicable Service science policy.

g. *Durability.* The Service will recommend or require that mitigation measures are durable, and at a minimum, maintain their intended purpose for as long as impacts of the action persist on the landscape. The Service will recommend or require that action proponents provide assurances of durability, including financial assurances, to support the development, maintenance, and long-term effectiveness of the mitigation measures.

h. *Effective compensatory mitigation.* The Service will recommend implementing compensatory mitigation before the impacts of an action occur. The Service will recommend compensatory mitigation that provides benefits to the affected species that are additional to the benefits of existing conservation efforts or those planned for the reasonably foreseeable future. To ensure consistent implementation of compensatory mitigation, the Service will support the application of equivalent standards, regardless of the mechanism used to provide compensatory mitigation.

*5. Mitigation Framework*

This section of the Policy provides the conceptual framework and guidance for implementing the general policy and principles declared in section 4 in an action- and landscape-specific mitigation context. Implementation of the general policy and principles as well as the direction provided in 600 DM 6 occurs by integrating landscape scale decisionmaking within the Service's existing process for assessing effects of an action and formulating mitigation measures. The key terms used in describing this framework are defined in section 6, Definitions.

The Service recommends or requires mitigation under one or more Federal authorities (section 2) when necessary and appropriate to avoid, minimize, and/or compensate for impacts to resources (section 3.2) resulting from

proposed actions (section 3.1). Our goal for mitigation is to achieve a net conservation gain or, at minimum, no net loss of the affected resources (section 4). Sections 5.1 through 5.9, summarized below, provide an overview of the mitigation framework and describe how the Service will engage actions as part of its process of assessing the effects of an action and formulating mitigation measures that would achieve this goal. Variations appropriate to action-specific circumstances are permitted; however, the Service will provide action proponents with the reasons for such variations.

Synopsis of the Service Mitigation Framework

*5.1. Integrating Mitigation Planning with Conservation Planning.* The Service will utilize landscape-scale approaches and landscape conservation planning to inform mitigation, including identifying areas for mitigation that are most important for avoiding and minimizing impacts, improving habitat suitability, and compensating for unavoidable impacts to species. Proactive mitigation plans can achieve efficiencies for attaining conservation objectives while streamlining the planning and regulatory processes for specific landscapes and/or classes of actions within a landscape.

*5.2. Collaboration and Coordination.* At both the action and landscape scales, the Service will collaborate and coordinate with action proponents and with our State, Federal, and tribal conservation partners in mitigation.

*5.3. Assessment.* Assessing the effects of proposed actions and proposed mitigation measures is the basis for formulating a plan to meet the mitigation policy goal. This Policy does not endorse specific methodologies, but does describe several principles of effects assessment and general characteristics of methodologies that the Service will use in implementing this Policy.

*5.4. Evaluation Species.* The Service will identify the species evaluated for mitigation purposes. The Service should select the smallest set of evaluation species necessary, but include all species for which the Service is required to issue biological opinions, permits, or regulatory determinations. When actions would affect multiple resources of conservation interest, evaluation species should serve to best represent other affected species or aspects of the environment. This section describes characteristics of evaluation species that are useful in planning mitigation.

*5.5. Habitat Valuation.* The Service will assess the value of affected habitats to evaluation species based on their scarcity, suitability, and importance to achieving conservation objectives. This valuation will determine the relative emphasis the Service will place on avoiding, minimizing, and compensating for impacts to habitats of evaluation species.

*5.6. Means and Measures.* The means and measures that the Service recommends for achieving the mitigation policy goal are action- and resource-specific applications of the three general types of impact mitigation (avoid, minimize, and compensate). This section provides an expanded definition of each type, explains its place in this Policy, and lists generalized examples of its intended use in Service mitigation recommendations and requirements.

*5.7. Recommendations.* This section describes general standards for Service recommendations, and declares specific preferences for various characteristics of compensatory mitigation measures, *e.g.,* timing, location.

*5.8. Documentation.* Service involvement in planning and implementing mitigation requires documentation that is commensurate in scope and level of detail with the significance of the potential impacts to resources. This section provides an outline of documentation elements that are applicable at three different stages of the mitigation planning process: Early planning, effects assessment, and final recommendations.

*5.9. Followup.* Determining whether Service mitigation recommendations were adopted and effective requires monitoring, and when necessary, corrective action.

5.1. Integrating Mitigation With Conservation Planning

The Service's mitigation goal is to improve or, at minimum, maintain the current status of affected resources, as allowed by applicable statutory authority and consistent with the responsibilities of action proponents under such authority (see section 4). This Policy provides a framework for formulating mitigation means and measures (see section 5.6) intended to efficiently achieve the mitigation planning goal based upon best available science. This framework seeks to integrate mitigation recommendations and requirements into conservation planning to better protect or enhance populations and those features on a landscape that are necessary for the long-term persistence of biodiversity and ecological functions. Functional

ecosystems enhance the resilience of fish and wildlife populations challenged by the widespread stressors of climate change, invasive species, and the continuing degradation and loss of habitat through human alteration of the landscape. Achieving the mitigation goal of this Policy involves:

• Avoiding and minimizing those impacts that most seriously compromise resource sustainability;

• rectifying and reducing over time those impacts where restoring or maintaining conditions in the affected area most efficiently contributes to resource sustainability; and

• strategically compensating for impacts so that actions result in an improvement in the affected resources, or at a minimum, result in a no net loss of those resources.

The Service recognizes that we will engage in mitigation planning for actions affecting resources in landscapes for which conservation objectives and strategies to achieve those objectives are not yet available, well developed, or formally adopted. The landscape-level approach to resource decisionmaking described in this Policy and in the Departmental Manual (600 DM 6.6D) applies in contexts with or without established conservation plans, but it will achieve its greatest effectiveness when integrated with such planning.

When appropriate, the Service will seek a net gain in the conservation outcome of actions we engage for purposes of this Policy. It is consistent with the Service's mission to identify and promote opportunities for resource enhancement during action planning, *i.e.,* to decrease the gap between the current and desired status of a resource. Mitigation planning often presents practicable opportunities to implement mitigation measures in a manner that outweighs impacts to affected resources. When resource enhancement is also consistent with the mission, authorities, and/or responsibilities of action proponents, the Service will encourage proponents to develop measures that result in a net gain toward achieving conservation objectives for the resources affected by their actions. Such proponents include, but are not limited to, Federal agencies when responsibilities such as the following apply to their actions:

• Carry out programs for the conservation of endangered and threatened species (Endangered Species Act, section 7(a)(1));

• consult with the Service regarding both mitigation and enhancement in water resources development (Fish and Wildlife Coordination Act, section 2);

• enhance the quality of renewable resources (National Environmental Policy Act, section 101(b)(6)); and/or

• restore and enhance bird habitat (Executive Order 13186, section 3(e)(2)).

To serve the public interest in fish and wildlife resources, the Service works under various authorities (see section 2) with partners to establish conservation objectives for species, and to develop and implement plans for achieving such objectives in various landscapes. We define a landscape as an area encompassing an interacting mosaic of ecosystems and human systems that is characterized by common management concerns (see section 6, Definitions). Relative to this Policy, such management concerns relate to conserving species. The geographic scale of a landscape is variable, depending on the interacting elements that are meaningful to particular conservation objectives and may range in size from large regions to a single watershed or habitat type. When proposed actions may affect species in a landscape addressed in one or more established conservation plans, such plans will provide the basis for Service recommendations to avoid and minimize particular impacts, rectify and reduce over time others, and compensate for others. The criteria in this Policy for selecting evaluation species (section 5.4) and assessing the value of their affected habitats (section 5.5) are designed to place mitigation planning in a landscape conservation context by applying the various types of mitigation where they are most effective at achieving the mitigation policy goal.

The Service recognizes the inefficiency of automatically applying under all circumstances each mitigation type in the traditional mitigation sequence. As DM 6 also recognizes, in limited situations, specific circumstances may exist that warrant an alternative from this sequence, such as when seeking to achieve the maximum benefit to affected resources and their values, services, and functions. For example, the cost and effort involved in avoiding impacts to a habitat that is likely to become isolated or otherwise unsuitable for evaluation species in the foreseeable future may result in less conservation when compared to actions that achieve a greater conservation benefit if used to implement offsite compensatory mitigation in area(s) that are more important in the long term to achieving conservation objectives for the affected resource(s). Conversely, onsite avoidance is the priority where impacts would substantially impair progress toward achieving conservation objectives.

The Service will rely upon existing conservation plans that are based upon the best available scientific information, consider climate-change adaptation, and contain specific objectives aimed at the biological needs of the affected resources. Where existing conservation plans are not available that incorporate all of these elements or are not updated with the best available scientific information, Service personnel will otherwise incorporate the best available science into mitigation decisions and recommendations and continually seek better information in areas of greatest uncertainty. Service personnel will use a landscape approach based on analysis of information regarding resource needs, including priorities for impact avoidance and potential compensatory mitigation sites. Such information includes development trends and projected habitat loss or conversion, cumulative impacts of past development activities, the presence and needs of species, and restoration potential. Service personnel may access this information in existing mapping products, survey data, reports, studies, or other sources.

Proactive Mitigation Planning at Larger Scales

The Service supports the planning and implementation of proactive mitigation plans in a landscape conservation context, *i.e.,* mitigation developed before actions are proposed, particularly in areas where multiple similar actions are expected to adversely affect a similar suite of species. Proactive mitigation plans should complement or tier from existing conservation plans relevant to the affected resources (*e.g.,* recovery plans, habitat conservation plans, or nongovernmental plans). Effective and efficient proactive mitigation identifies high-priority resources and areas on a regional or landscape scale, prior to and without regard to specific proposed actions, in which to focus: (a) Resource protection for avoiding impacts; (b) resource enhancement or protection for compensating unavoidable impacts; and (c) measures to improve the resilience of resources in the face of climate change or otherwise increase the ability to adapt to climate and other landscape change factors. In many cases, the Service can take advantage of available Federal, State, tribal, local, or nongovernmental plans that identify such priorities.

Developing proactive mitigation should involve stakeholders in a transparent process for defining objectives and the means to achieving those objectives. Planning for proactive

mitigation should establish standards for determining the appropriate scale, type, and location of mitigation for impacts to specific resources within a specified area. Adopted plans that incorporate these features are likely to substantially shorten the time needed for regulatory review and approval as actions are subsequently proposed. Proactive mitigation plans, not limited to those developed under a programmatic NEPA decisionmaking process or a Habitat Conservation Plan process, will provide efficiencies for project-level Federal actions and will also better address potential cumulative impacts.

Procedurally, proactive mitigation should draw upon existing land-use plans and databases associated with human infrastructure, including transportation, and water and energy development, as well as ecological data and conservation plans for floodplains, water quality, high-value habitats, and key species. Stakeholders and Service personnel process these inputs to design a conservation network that considers needed community infrastructure and clearly prioritizes the role of mitigation in conserving natural features that are necessary for long-term maintenance of ecological functions on the landscape. As development actions are proposed, an effective proactive regional mitigation plan will provide a transparent process for identifying appropriate mitigation opportunities within the regional framework and selecting the mitigation projects with the greatest aggregated conservation benefits.

5.2. Collaboration and Coordination

The Service shares responsibility for conserving fish and wildlife with State, local, and tribal governments and other Federal agencies and stakeholders. Our role in mitigation may involve Service biological opinions, permits, or other regulatory determinations as well as providing technical assistance. The Service must work in collaboration and coordination with other governments, agencies, organizations, and action proponents to implement this Policy. Whenever appropriate, the Service will:

a. Coordinate activities with the appropriate Federal, State, tribal, and local agencies and other stakeholders who have responsibilities for fish and wildlife resources when developing mitigation recommendations for resources of concern to those entities;

b. consider resources and plans made available by State, local, and tribal governments and other Federal agencies;

c. seek to apply compatible approaches and avoid duplication of efforts with those same entities;

d. collaborate with Federal and State agencies, tribes, local agencies and other stakeholders in the formulation of landscape-level mitigation plans; and

e. cooperate with partners to develop, maintain, and disseminate tools and conduct training in mitigation methodologies and technologies.

The Service should engage agencies and applicants during the early planning and design stage of actions. The Service is encouraged to engage in early coordination during the NEPA Federal decisionmaking process to resolve issues in a timely manner (516 DM 8.3). Coordination during early planning, including participation as a cooperating agency or on interdisciplinary teams, can lead to better conservation outcomes. For example, the Federal Highway Administration (FHWA) is most likely to adopt alternatives that avoid or minimize impacts when the Service provides early comments under section 4(f) of the Transportation Act of 1966 relative to impacts to refuges or other Service-supported properties. When we identify potential impacts to tribal interests, the Service, in coordination with affected tribes, may recommend mitigation measures to address those impacts. Recommendations will carry more weight when the Service and tribe have overlapping authority for the resources in question and when coordinated through government-to-government consultation.

Coordination and collaboration with stakeholders allows the Service to confirm that the persons conducting mitigation activities, including contractors and other non-Federal persons, have the appropriate experience and training in mitigation best practices, and where appropriate, include measures in employee performance appraisal plans or other personnel or contract documents, as necessary. This allows for the development of rigorous, clear, and consistent guidance, suitable for field staff to implement mitigation or to deny authorizations when impacts to resources and their values, services, and functions are not acceptable. Collaboratively working across Department of the Interior bureaus and offices allows the Service to conduct periodic reviews of the execution of mitigation activities to confirm consistent implementation of the principles of this Policy.

When collaborating with stakeholders, Service staff should utilize the principles and recommendations set forth in the Council on Environmental Quality handbook, *Collaboration in NEPA—a Handbook for NEPA Practitioners* (2007).

### 5.3. Assessment

Effects are changes in environmental conditions caused by an action that are relevant to the resources (fish, wildlife, plants, and their habitats) covered by this Policy. This Policy addresses mitigation for impacts to these resources. We define impacts as adverse effects relative to the affected resources. Impacts may be direct, indirect, or cumulative. Indirect effects are often major drivers in ecological systems. Because indirect impacts from an action occur later in time or farther removed in distance, they may have landscape-scale implications. Mitigation is the general label for all measures implemented to avoid, minimize, and/or compensate for its predicted impacts.

The Service should design mitigation measures to achieve the mitigation goal, when appropriate, of net gain, or a minimum of no net loss for affected resources. This design should take into account the degree of risk and uncertainty associated with both predicted project effects and predicted outcomes of the mitigation measures. The following principles shall guide the Service's assessment of anticipated effects and the expected effectiveness of mitigation measures.

1. The Service will consider action effects and mitigation outcomes within planning horizons commensurate with the expected duration of the action's impacts. In predicting whether mitigation measures will achieve the mitigation policy goal for the affected resources during the planning horizon, the Service will recognize that predictions about the more-distant future are more uncertain and adjust the mitigation recommendations accordingly.

2. Action proponents should provide reasonable predictions about environmental conditions relevant to the affected area both with and without the action over the course of the planning horizon (*i.e.,* baseline condition). If such predictions are not provided, the Service will assess the effects of a proposed action over the planning horizon considering: (a) The full spatial and temporal extent of resource-relevant direct and indirect effects caused by the action, including resource losses that will occur during the period between implementation of the action and the mitigation measures; and (b) any cumulative effects to the affected resources resulting from existing concurrent or reasonably foreseeable future activities in the landscape context. When assessing the affected area without the action, the Service will also evaluate: (a) Expected natural species succession; (b) implementation of approved restoration/improvement plans; and (c) reasonably foreseeable conditions resulting directly or indirectly from any other factors that may affect the evaluation of the project including, but not limited to, climate change.

3. The Service will use the best available effect assessment methodologies that:

a. Display assessment results in a manner that allows decisionmakers, action proponents, and the public to compare present and predicted future conditions for affected resources;

b. measure adverse and beneficial effects using equivalent metrics to determine mitigation measures necessary to achieve the mitigation policy goal for the affected resources (*e.g.,* measure both adverse and beneficial effects to a species' food resources via changes to the density or spatial extent of the food resource);

c. predict effects over time, including changes to affected resources that would occur with and without the action, changes induced by climate change, and changes resulting from reasonably foreseeable actions;

d. are practical, cost-effective, and commensurate with the scope and scale of impacts to affected resources;

e. are sufficiently sensitive to estimate the type and relative magnitude of effects across the full spectrum of anticipated beneficial and adverse effects;

f. may integrate predicted effects with data from other disciplines such as cost or socioeconomic analysis; and

g. allow for incorporation of new data or knowledge as action planning progresses.

4. Where appropriate effects assessment methods or technologies useful in valuation of mitigation are not available, Service employees will apply best professional judgment supported by best available science to assess impacts and to develop mitigation recommendations.

### 5.4. Evaluation Species

Section 3.2 identifies the resources to which this Policy applies. Depending on the authorities under which the Service is engaging an action for mitigation purposes, these resources may include: Particular species; fish, wildlife, and plants more generally; and their habitats, including those contributing to ecological functions that sustain species. However, one or more species

of conservation interest to the Service is always necessary to initiate mitigation planning, and under this Policy, the Service will explicitly identify evaluation species for mitigation purposes. In instances where the Service is required to issue a biological opinion, permit, or regulatory determination for specific species, the Service will identify such species, at minimum, as evaluation species.

Selecting evaluation species in addition to those for which the Service must provide a regulatory determination varies according to action-specific circumstances. In practice, an initial examination of the habitats affected and review of typically associated species of conservation interest are usually the first steps in identifying evaluation species. The purpose of Service mitigation planning is to develop a set of recommendations that would improve or, at minimum, maintain the current status of the affected resources. When available, conservation planning objectives (*i.e.,* the desired status of the affected resources) will inform mitigation planning (see section 5.1). Therefore, following those species for which we must provide a regulatory determination, species for which action effects would cause the greatest increase in the gap between their current and desired status are the principal choices for selection as evaluation species.

An evaluation species must occur within the affected area for at least one stage of its life history, but as other authorities permit, the Service may consider evaluation species that are not currently present in the affected area if the species is:

a. Identified in approved State or Federal fish and wildlife conservation, restoration, or improvement plans that include the affected area; or

b. likely to occur in the affected area during the reasonably foreseeable future with or without the proposed action due to natural species succession.

Evaluation species may or may not occupy the affected area year-round or when direct effects of the action would occur.

The Service should select the smallest set of evaluation species necessary to relate the effects of an action to the full suite of affected resources and applicable authorities, including all species for which the Service is required to issue opinions, permits, or regulatory determinations. When an action affects multiple resources, evaluation species should represent other affected species or aspects of the environment so that the mitigation measures formulated for the evaluation species will mitigate impacts to other similarly affected resources to

the greatest extent possible. Characteristics of evaluation species that are useful in mitigation planning may include, but are not limited to, the following:

a. Species that are addressed in conservation plans relevant to the affected area and for which habitat objectives are articulated;

b. species strongly associated with an affected habitat type;

c. species for which habitat limiting factors are well understood;

d. species that perform a key role in ecological processes (*e.g.,* nutrient cycling, pollination, seed dispersal, predator-prey relations), which may, therefore, serve as indicators of ecosystem health;

e. species that require large areas of contiguous habitat, connectivity between disjunct habitats, or a distribution of suitable habitats along migration/movement corridors, which may, therefore, serve as indicators of ecosystem functions;

f. species that belong to a group of species (a guild) that uses a common environmental resource;

g. species for which sensitivity to one or more anticipated effects of the proposed action is documented;

h. species with special status (*e.g.,* species of concern in E.O. 13186, Birds of Conservation Concern);

i. species of cultural or religious significance to tribes;

j. species that provide monetary and non-monetary benefits to people from consumptive and non-consumptive uses including, but not limited to, fishing, hunting, bird watching, and educational, aesthetic, scientific, or subsistence uses;

k. species with characteristics such as those above that are also easily monitored to evaluate the effectiveness of mitigation actions; and/or

l. species that would be subject to direct mortality as a result of an action (*e.g.,* wind turbine).

## 5.5. Habitat Valuation

Species conservation relies on functional ecosystems, and habitat conservation is generally the best means of achieving species population objectives. Section 5.4 provides the guidance for selecting evaluation species to represent these habitat resources. The value of specific habitats to evaluation species varies widely, such that the loss or degradation of higher value habitats has a greater impact on achieving conservation objectives than the loss or degradation of an equivalent area of lower value habitats. To maintain landscape capacity to support species, our

mitigation policy goal (Section 4) applies to all affected habitats of evaluation species, regardless of their value in a conservation context. However, the Service will recognize variable habitat value in formulating appropriate means and measures to mitigate the impacts of proposed actions, as described in this section. The primary purpose of habitat valuation is to determine the relative emphasis the Service will place on avoiding, minimizing, and compensating for impacts to habitats of evaluation species.

The Service will assess the overall value of affected habitats by considering their: (a) Scarcity; (b) suitability for evaluation species; and (c) importance to the conservation of evaluation species.

• *Scarcity* is the relative spatial extent (*e.g.,* rare, common, or abundant) of the habitat type in the landscape context.

• *Suitability* is the relative ability of the affected habitat to support one or more elements of the evaluation species' life history (reproduction, rearing, feeding, dispersal, migration, hibernation, or resting protected from disturbance, etc.) compared to other similar habitats in the landscape context. A habitat's ability to support an evaluation species may vary over time.

• *Importance* is the relative significance of the affected habitat, compared to other similar habitats in the landscape context, to achieving conservation objectives for the evaluation species. Habitats of high importance are irreplaceable or difficult to replace, or are critical to evaluation species by virtue of their role in achieving conservation objectives within the landscape (*e.g.,* sustain core habitat areas, linkages, ecological functions). Areas containing habitats of high importance are generally, but not always, identified in conservation plans addressing resources under Service authorities (*e.g.,* in recovery plans) or when appropriate, under authorities of partnering entities (*e.g.,* in State wildlife action plans, Landscape Conservation Cooperative conservation "blueprints," etc.).

The Service has flexibility in applying appropriate methodologies and best available science when assessing the overall value of affected habitats, but also has a responsibility to communicate the rationale applied, as described in section 5.8 (Documentation Standards). These three parameters are the considerations that will inform Service determinations of the relative value of an affected habitat that will then be used to guide application of the mitigation hierarchy under this Policy.

AR_0044700

For all habitats, the Service will apply appropriate and practicable measures to avoid and minimize impacts over time, generally in that order, before applying compensation as mitigation for remaining impacts. For habitats we determine to be of high-value (*i.e.*, scarce and of high suitability and high importance) however, the Service will seek avoidance of all impacts. For habitats the Service determines to be of lower value, we will consider whether compensation is more effective than other components of the mitigation hierarchy to maintain the current status of evaluation species, and if so, may seek compensation for most or all such impacts.

The relative emphasis given to mitigation types within the mitigation hierarchy depends on the landscape context and action-specific circumstances that influence the efficacy and efficiency of available mitigation means and measures. For example, it is generally more effective and efficient to achieve the mitigation policy goal by maximizing avoidance and minimization of impacts to habitats that are either rare, of high suitability, or of high importance, than to rely on other measures, because these qualities are typically not easily repaired, enhanced through onsite management, or replaced through compensatory actions. Similarly, compensatory measures may receive greater emphasis when strategic application of such measures (*i.e.*, to further the objectives of relevant conservation plans) would more effectively and efficiently achieve the policy goal for mitigating impacts to habitats that are either abundant, of low suitability, or of low importance.

When more than one evaluation species uses an affected habitat, the highest valuation will govern the Service's mitigation recommendations or requirements. Regardless of the habitat valuation, Service mitigation recommendations or requirements will represent our best judgment as to the most practicable means of ensuring that a proposed action improves or, at minimum, maintains the current status of the affected resources.

5.6. Means and Measures

The means and measures that the Service recommends for achieving the goal of this Policy (see section 4) are action- and resource-specific applications of the five general types of impact mitigation: Avoid, minimize, rectify, reduce over time, and compensate. The third and fourth mitigation types, rectify and reduce over time, are combined under the minimization label (*e.g.*, in mitigation

planning for permitting actions under the Clean Water Act, in the Presidential Memorandum on Mitigating Impacts on Natural Resources from Development and Encouraging Related Private Investment, and in 600 DM 6.4), which we adopt for this Policy and for the structure of this section, while also providing specific examples for rectify and reduce. When carrying out its responsibilities under NEPA, the Service will apply the mitigation meanings and sequence in the NEPA regulations (40 CFR 1508.20). In particular, the Service will retain the ability to distinguish, as needed, between minimizing, rectifying, and reducing or eliminating the impact over time, as described in Appendix B: Service Mitigation Policy and NEPA.

The emphasis that the Service gives to each mitigation type depends on the evaluation species selected (section 5.4) and the value of their affected habitats (section 5.5). Habitat valuation aligns mitigation with conservation planning for the evaluation species by identifying where it is critical to avoid habitat impacts altogether and where compensation measures may more effectively advance conservation objectives. All appropriate mitigation measures have a clear connection with the anticipated effects of the action and are commensurate with the scale and nature of those effects.

Nothing in this Policy supersedes the statutes and regulations governing prohibited "take" of wildlife (*e.g.*, ESA-listed species, migratory birds, eagles); however, the Policy applies to mitigating the impacts to habitats and ecological functions that support populations of evaluation species, including federally protected species. Attaining the goal of improving or, at a minimum, maintaining the current status of evaluation species will often involve applying a combination of mitigation types. For each of the mitigation types, the following subsections begin with a quote of the regulatory language at 40 CFR 1508.20, then provides an expanded definition, explains its place in this Policy, and lists generalized examples of its intended use in Service mitigation recommendations. Ensuring that Service-recommended mitigation measures are implemented and effective is addressed in sections 5.8, Documentation, and 5.9, Followup.

5.6.1. Avoid—Avoid the impact altogether by not taking a certain action or parts of an action.

Avoiding impacts is the first tier of the mitigation hierarchy. Avoidance ensures that an action or a portion of the action has no direct or indirect effects

during the planning horizon on fish, wildlife, plants, and their habitats. Actions may avoid direct effects to a resource (*e.g.*, by shifting the location of the construction footprint), but unless the action also avoids indirect effects caused by the action (*e.g.*, loss of habitat suitability through isolation from other habitats, accelerated invasive species colonization, degraded water quality, etc.), the Service will not consider that impacts to a resource are fully avoided. In some cases, indirect effects may cumulatively result in population and habitat losses that negate any conservation benefit from avoiding direct effects. An impact is unavoidable when an appropriate and practicable alternative to the proposed action that would not cause the impact is unavailable. The Service will recommend avoiding all impacts to high-value habitats. Generalized examples follow:

a. Design the timing, location, and/or operations of the action so that specific resource impacts would not occur.

b. Add structural features to the action, where such action is sustainable (*e.g.*, fish and wildlife passage structures, water treatment facilities, erosion control measures) that would eliminate specific losses to affected resources.

c. Adopt a non-structural alternative to the action that is sustainable and that would not cause resource losses (*e.g.*, stream channel restoration with appropriate grading and vegetation in lieu of rip-rap).

d. Adopt the no-action alternative.

5.6.2. Minimize (includes Rectify and Reduce Over Time)—Minimize the impact by limiting the degree or magnitude of the action and its implementation.

Minimizing impacts, together with rectifying and reducing over time, is the second tier of the mitigation hierarchy. Minimizing is reducing the intensity of the impact (*e.g.*, population loss, habitat loss, reduced habitat suitability, reduced habitat connectivity, etc.) to the maximum extent appropriate and practicable. Generalized examples of types of measures to minimize impacts follow:

a. Reduce the overall spatial extent and/or duration of the action.

b. Adjust the daily or seasonal timing of the action.

c. Retain key habitat features within the affected area that would continue to support life-history processes for the evaluation species.

d. Adjust the spatial configuration of the action to retain corridors for species movement between functional habitats.

e. Apply best management practices to reduce water quality degradation.

f. Adjust the magnitude, timing, frequency, duration, and/or rate-of-change of water flow diversions and flow releases to minimize the alteration of flow regime features that support life-history processes of evaluation species.

g. Install screens and other measures necessary to reduce aquatic life entrainment/impingement at water intake structures.

h. Install fences, signs, markers, and other measures necessary to protect resources from impacts (*e.g.,* fencing riparian areas to exclude livestock, marking a heavy-equipment exclusion zone around burrows, nest trees, and other sensitive areas).

*Rectify* — This subset of the second tier of the mitigation hierarchy involves "repairing, rehabilitating, or restoring the affected environment."

Rectifying impacts may possibly improve, relative to no-action conditions, a loss in habitat availability and/or suitability for evaluation species within the affected area and contribute to a net conservation gain. Rectifying impacts may also involve directly restoring a loss in populations through stocking. Generalized examples follow:

a. Repair physical alterations of the affected areas to restore pre-action conditions or improve habitat suitability for the evaluation species (*e.g.,* re-grade staging areas to appropriate contours, loosen compacted soils, restore altered stream channels to stable dimensions).

b. Plant and ensure the survival of appropriate vegetation where necessary in the affected areas to restore or improve habitat conditions (quantity and suitability) for the evaluation species and to stabilize soils and stream channels.

c. Provide for fish and wildlife passage through or around action-imposed barriers to movement.

d. Consistent with all applicable laws, regulations, policies, and conservation plans, stock species that experienced losses in affected areas when habitat conditions are able to support them in affected areas.

*Reduce Over Time*—This subset of the second tier of the mitigation hierarchy is to "reduce or eliminate the impact over time by preservation and maintenance operations during the life of the action."

Reducing impacts over time is preserving, enhancing, and maintaining the populations, habitats, and ecological functions that remain in an affected area following the impacts of the action, including areas that are successfully restored or improved through rectifying mitigation measures. Preservation,

enhancement, and maintenance operations may improve upon conditions that would occur without the action and contribute to a net conservation gain (*e.g.,* when such operations would prevent habitat degradation expected through lack of management needed for an evaluation species). Reducing impacts over time is an appropriate means to achieving the mitigation goal after applying all appropriate and practicable avoidance, minimization, and rectification measures. Generalized examples follow:

a. Control land uses and limit disturbances to portions of the affected area that may continue to support the evaluation species.

b. Control invasive species in the affected areas.

c. Manage fire-adapted habitats in the affected areas with an appropriate timing and frequency of prescribed fire, consistent with applicable laws, regulations, policies, and conservation plans.

d. Maintain or replace equipment and structures in affected areas to prevent losses of fish and wildlife resources due to equipment failure (*e.g.,* cleaning and replacing trash racks and water intake screens, maintaining fences that limit access to environmentally sensitive areas).

e. Ensure proper training of personnel in operations necessary to preserve existing or restored fish and wildlife resources in the affected area.

*5.6.3. Compensate*—Compensate for the impact by replacing or providing substitute resources or environments.

Compensating for impacts is the third and final tier of the mitigation hierarchy. Compensation is protecting, maintaining, enhancing, and/or restoring habitats and ecological functions for an evaluation species, generally in an area outside the action's affected area. Mitigating some percentage of unavoidable impacts through measures that minimize, rectify, and reduce losses over time is often appropriate and practicable, but the costs or difficulties of mitigation may rise rapidly thereafter to achieve the mitigation planning goal entirely within the action's affected area. In such cases, a lesser or equivalent effort applied in another area may achieve greater benefits for the evaluation species. Likewise, the effort necessary to mitigate the impacts to a habitat of low suitability and low importance of a type that is relatively abundant in the landscape context (low-value habitat) will more likely achieve sustainable benefits for an evaluation species if invested in enhancing a habitat of moderate suitability and high

importance. This Policy is designed to apply the various types of mitigation where they may achieve the greatest efficiency toward accomplishing the mitigation planning goal.

Onsite restoration of an affected resource meets the definition of rectify and is not considered compensation under this Policy. Although compensation is usually accomplished outside the affected area, onsite compensation under the definitions of this Policy involves provision of a habitat resource within the affected area that was not adversely affected by the action, but that would effectively address the action's effect on the conservation of the evaluation species. For example, an action reduces food resources for an evaluation species, but in dry years, water availability is a more limiting factor to the species' status in the affected area. Increasing the reliability of water resources onsite may represent a practicable measure that will more effectively maintain or improve the species' status than some degree of rectifying the loss of food resources alone, even though the action did not affect water availability. In this example, measures to restore food resources are rectification, and measures to increase water availability are onsite compensation.

Multiple mechanisms may accomplish compensatory mitigation, including habitat credit exchanges and other emerging mechanisms. Proponent-responsible mitigation, mitigation/conservation banks, and in-lieu fee funds are the three most common mechanisms. Descriptions of their general characteristics follow:

a. *Proponent-Responsible Mitigation.* A proponent-responsible mitigation site provides ecological functions and services in accordance with Service-defined or approved standards to offset the habitat impacts of a proposed action on particular species. As its name implies, the action proponent is solely responsible for ensuring that the compensatory mitigation activities are completed and successful. Proponent-responsible mitigation may occur onsite or offsite relative to action impacts. Like all compensatory mitigation measures, proponent-responsible mitigation should: (a) Maximize the benefit to impacted resources and their values, services, and functions; (b) implement and earn credits in advance of project impacts; and (c) reduce risk to achieving effectiveness.

b. *Mitigation/Conservation Banks.* A conservation bank is a site or suite of sites that provides ecological functions and services expressed as credits that are conserved and managed in

perpetuity for particular species and are used expressly to offset impacts occurring elsewhere to the same species. A mitigation bank is established to offset impacts to wetland habitats under section 404 of the Clean Water Act. Some mitigation banks may also serve the species-specific purposes of a conservation bank. Mitigation and conservation banks are typically for-profit enterprises that apply habitat restoration, creation, enhancement, and/or preservation techniques to generate credits on their banking properties. The establishment, operation, and use of a conservation bank requires a conservation bank agreement between the Service and the bank sponsor, and aquatic resource mitigation banks require a banking instrument approved by the U.S. Army Corps of Engineers. Responsibility for ensuring that compensatory mitigation activities are successfully completed is transferred from the action proponent to the bank sponsor at the time of the sale/transfer of credits. Mitigation and conservation banks generally provide mitigation in advance of impacts.

c. *In-Lieu Fee.* An in-lieu fee site provides ecological functions and services expressed as credits that are conserved and managed for particular species or habitats, and are used expressly to offset impacts occurring elsewhere to the same species or habitats. In-lieu fee programs are sponsored by governmental or nonprofit entities that collect funds used to establish in-lieu fee sites. In-lieu fee program operators apply habitat restoration, creation, enhancement, and/or preservation techniques to generate credits on in-lieu fee sites. The establishment, operation, and use of an in-lieu fee program may require an agreement between regulatory agencies of applicable authority, including the Service, and the in-lieu fee program operator. Responsibility for ensuring that compensatory mitigation activities are successfully completed is transferred from the action proponent to the in-lieu fee program operator at the time of sale/transfer of credits. Unlike mitigation or conservation banks, in-lieu fee programs generally provide compensatory mitigation after impacts have occurred. See section 5.7.1 for discussion of the Service's preference for compensatory mitigation that occurs prior to impacts.

The Service's preference is that proponents offset unavoidable resource losses in advance of their actions. Further, the Service considers the banking of habitat value for the express purpose of compensating for future unavoidable losses to be a legitimate

form of mitigation, provided that withdrawals from a mitigation/conservation bank are commensurate with losses of habitat value (considering suitability and importance) for the evaluation species and not based solely upon the affected habitat acreage or the cost of land purchase and management. Resource losses compensated through purchase of conservation or mitigation bank credits may include, but are not limited to, habitat impacts to species covered by one or more Service authorities.

5.6.3.1  Equivalent Standards

The mechanisms for delivering compensatory mitigation differ according to: (1) Who is ultimately responsible for the success of the mitigation (the action proponent or a third party); (2) whether the mitigation site is within or adjacent to the impact site (onsite) or at another location that provides either equivalent or additional resource value (offsite); and (3) when resource benefits are secured (before or after resource impacts occur).

Regardless of the delivery mechanism, species conservation strategies and other landscape-level conservation plans that are based on the best scientific information available are expected to provide the basis for establishing and operating compensatory mitigation sites and programs. Such strategies and plans should also inform the assessment of species-specific impacts and benefits within a defined geography.

Service recommendations or requirements will apply equivalent ecological, procedural, and administrative standards for all compensatory mitigation mechanisms. Departmental guidance at DM 6.6 C declares a preference for compensatory mitigation measures that will maximize the benefit to affected resources, reduce risk to achieving effectiveness, and use transparent methodologies. Mitigation that the Service recommends or approves through any compensatory mitigation mechanism should incorporate, address, or identify the following that are intended to ensure successful implementation and durability:

a. Type of resource(s) and/or its value(s), service(s), and function(s), and amount(s) of such resources to be provided (usually expressed in acres or some other physical measure), the method of compensation (restoration, establishment, preservation, etc.), and the manner in which a landscape-scale approach has been considered;

b. factors considered during the site selection process;

c. site protection instruments to ensure the durability of the measure;

d. baseline information;

e. the mitigation value of such resources (usually expressed as a number of credits or other units of value), including a rationale for such a determination;

f. a mitigation work plan including the geographic boundaries of the measure, construction methods, timing, and other considerations;

g. a maintenance plan;

h. performance standards to determine whether the measure has achieved its intended outcome;

i. monitoring requirements;

j. long-term management commitments;

k. adaptive management commitments; and

l. financial assurance provisions that are sufficient to ensure, with a high degree of confidence, that the measure will achieve and maintain its intended outcome, in accordance with the measure's performance standards.

Third parties may assume the responsibilities for implementing proponent-responsible compensation. The third party accepting responsibility for the compensatory actions would assume all of the proponent's obligations for ensuring their success and durability.

5.6.3.2  Research and Education

Research and education, although important to the conservation of many resources, are not typically considered compensatory mitigation, because they do not directly offset adverse effects to species or their habitats. In rare circumstances, research or education that is directly linked to reducing threats, or that provides a quantifiable benefit to the species, may be included as part of a mitigation package. These circumstances may exist when: (a) The major threat to a resource is something other than habitat loss; (b) the Service can reasonably expect the outcome of research or education to more than offset the impacts; (c) the proponent commits to using the results/recommendations of the research to mitigate action impacts; or (d) no other reasonable options for mitigation are available.

5.7. Recommendations

Consistent with applicable authorities, the Policy's fundamental principles, and the mitigation planning principles described herein, the Service will provide recommendations to mitigate the impacts of proposed actions at the earliest practicable stage of planning to ensure maximum

AR_0044703

consideration. The Service will develop mitigation recommendations in cooperation with the action proponent and/or the applicable authorizing agency, considering the cost estimates and other information that the proponent/agency provides about the action and its effects, and relying on the best scientific information available. Service recommendations will represent our best judgment as to the most practicable means of ensuring that a proposed action improves or, at minimum maintains, the current status of the affected resources. The Service will provide mitigation recommendations under an explicit expectation that the action proponent or the applicable authorizing agency is fully responsible for implementing or enforcing the recommendations.

The Service will strive to provide mitigation recommendations, including reasonable alternatives to the proposed action, which, if fully and properly implemented, would achieve the best possible outcome for affected resources while also achieving the stated purpose of the proposed action. However, on a case-by-case basis, the Service may recommend the "no action" alternative. For example, when appropriate and practicable means of avoiding significant impacts to high-value habitats and associated species are not available, the Service may recommend the "no action" alternative.

5.7.1. Preferences for Compensatory Mitigation

Unless action-specific circumstances warrant otherwise, the Service will observe the following preferences in providing compensatory mitigation recommendations:

*Advance compensatory mitigation.* When compensatory mitigation is necessary, the Service prefers compensatory mitigation measures that are implemented and earn credits in advance of project impacts. Even though compensatory mitigation may be initiated in advance of project impacts, there may still be temporal losses that need to be addressed. The extent of the compensatory measures that are not completed until after action impacts occur will account for the interim loss of resources consistent with the assessment principles (section 5.3).

*Compensatory mitigation in relation to landscape strategies and plans.* The preferred location for Service-recommended or required compensatory mitigation measures is within the boundaries of an existing strategically planned, interconnected conservation network that serves the conservation objectives for the affected resources in the relevant landscape context. Compensatory measures should enhance habitat connectivity or contiguity, or strategically improve targeted ecological functions important to the affected resources (*e.g.,* enhance the resilience of fish and wildlife populations challenged by the widespread stressors of climate change).

Similarly, Service-recommended or required mitigation should emphasize avoiding impacts to habitats located within a planned conservation network, consistent with the Habitat Valuation guidance (section 5.5).

Where existing conservation networks or landscape conservation plans are not available for the affected resources, Service personnel should develop mitigation recommendations based on best available scientific information and professional judgment that would maximize the effectiveness of the mitigation measures for the affected resources, consistent with this Policy's guidance on Integrating Mitigation Planning with Conservation Planning (section 5.1).

5.7.2. Recommendations for Locating Compensatory Mitigation on Public or Private Lands

When appropriate as specified in this Policy, the Service may recommend establishing compensatory mitigation at locations on private, public, or tribal lands that provide the maximum conservation benefit for the affected resources. The Service will generally, but not always, recommend compensatory mitigation on lands with the same ownership classification as the lands where impacts occurred, *e.g.,* impacts to evaluation species on private lands are generally mitigated on private lands and impacts to evaluation species on public lands are generally mitigated on public lands. However, most private lands are not permanently dedicated to conservation purposes, and are generally the most vulnerable to impacts resulting from land and water resources development actions; therefore, mitigating impacts to any type of land ownership on private lands is usually acceptable as long as they are durable. Locating compensatory mitigation on public lands for impacts to evaluation species on private lands is also possible, and in some circumstances may best serve the conservation objectives for evaluation species. Such compensatory mitigation options require careful consideration and justification relative to the Service's mitigation planning goal, as described below.

The Service generally only supports locating compensatory mitigation on (public or private) lands that are already designated for the conservation of natural resources if additionality (see section 6, Definitions) is clearly demonstrated and is legally attainable. In particular, the Service usually does not support offsetting impacts to private lands by locating compensatory mitigation on public lands designated for conservation purposes because this practice risks a long-term net loss in landscape capacity to sustain species by relying increasingly on public lands to serve conservation purposes. However, the Service acknowledges that public ownership does not automatically confer long-term protection and/or management for evaluation species in all cases, which may justify locating compensatory mitigation measures on public lands, including compensation for impacts to evaluation species on public or private lands. The Service may recommend compensating for private-land impacts to evaluation species on public lands (whether designated for conservation of natural resources or not) when:

a. Compensation is an appropriate means of achieving the mitigation planning goal, as specified in this Policy;

b. the compensatory mitigation would provide additional conservation benefits above and beyond measures the public agency is foreseeably expected to implement absent the mitigation (only such additional benefits are counted towards achieving the mitigation planning goal);

c. the additional conservation benefits are durable, *i.e.,* lasting as long as the impacts that prompted the compensatory mitigation;

d. consistent with and not otherwise prohibited by all relevant statutes, regulations, and policies; and

e. the public land location would provide the best possible conservation outcome, such as when private lands suitable for compensatory mitigation are unavailable or are available but do not provide an equivalent or greater contribution towards offsetting the impacts to meet the mitigation planning goal for the evaluation species.

Ensuring the durability of compensatory mitigation on public lands may require multiple tools beyond land use plan designations, including right-of-way grants, withdrawals, disposal or lease of land for conservation, conservation easements, cooperative agreements, and agreements with third parties. Mechanisms to ensure durability of land protection for compensatory mitigation on public and private lands vary among agencies, but should preclude conflicting uses and ensure that protection and management

of the mitigation land is commensurate with the magnitude and duration of impacts.

When the public lands under consideration for use as compensatory mitigation for impacts on private lands are National Wildlife Refuge System (NWRS) lands, additional considerations covered in the Service's Final Policy on the NWRS and Compensatory Mitigation Under the Section 10/404 Program (64 FR 49229–49234, September 10, 1999) may apply. Under that policy, the Regional Director will recommend the mitigation plan proposing to site compensatory mitigation on NWRS lands to the Director for approval.

5.7.3. Recommendations Related to Recreation

*Mitigation for impacts to recreational uses of wildlife and habitat.* The Service will generally not recommend measures intended to increase recreational value as mitigation for habitat losses. The Service may address impacts to recreational uses that are not otherwise addressed through habitat mitigation, but will do so with separate and distinct recreational use mitigation recommendations.

*Recreational use of mitigation lands.* Consistent with applicable statutes, the Service supports those recreational uses on mitigation lands that are compatible with the conservation goals of those mitigation lands. If certain uses are incompatible with the conservation goals for the mitigation lands, for example, off-road vehicle use in an area conserved for wildlife intolerant to disturbance, the Service will recommend against such uses.

5.8. Documentation

The Service should advise action proponents and decisionmaking agencies at timely stages of the planning process. To ensure effective consideration of Service recommendations, it is generally possible to communicate key concerns that will inform our recommendations early in the mitigation planning process, communicate additional components during and following an initial assessment of effects, and provide final written recommendations toward the end of the process, but in advance of a final decision for the action. The following outline lists the components applicable to these three planning stages. Because actions vary substantially in scope and complexity, these stages may extend over a period of years or occur almost simultaneously, which may necessitate consolidating some of the components listed below.

For all actions, the level of the Service's analysis and documentation should be commensurate with the scope and severity of the potential impacts to resources. Where compensation is used to address impacts, additional information outlined in section 5.6.3 may be necessary.

A. Early Planning

1. Inform the proponent of the Service's goal to improve or, at minimum, maintain the status of affected resources, and that the Service will identify opportunities for a net conservation gain if appropriate.

2. Coordinate key data collection and planning decisions with the proponent, relevant tribes, and Federal and State resource agencies; including, but not limited to:

a. Delineate the affected area;

b. define the planning horizon;

c. identify species that may occur in the affected area that the Service is likely to consider as evaluation species for mitigation planning;

d. identify landscape-scale strategies and conservation plans and objectives that pertain to these species and the affected area;

e. define surveys, studies, and preferred methods necessary to inform effects analyses; and

f. as necessary, identify reasonable alternatives to the proposed action that may achieve the proponent's purpose and the Service's no-net-loss goal for mitigation.

3. As early as possible, inform the proponent of the presence of probable high-value habitats in the affected area (see section 5.5), and advise the proponent of Service policy to avoid all impacts to such habitats.

B. Effects Assessment

1. Coordinate selection of evaluation species with relevant tribes, Federal and State resource agencies, and action proponents.

2. Communicate the Service's assessment of the value of affected habitats to evaluation species.

3. If high-value habitats are affected, advise the proponent of the Service's policy to avoid all impacts to such habitats.

4. Assess action effects to evaluation species and their habitats.

5. Formulate mitigation options that would achieve the mitigation policy goal (an appropriate net conservation gain or, at minimum, no net loss) in coordination with the proponent and relevant tribes, and Federal and State resource agencies.

C. Final Recommendations

The Service's final mitigation recommendations should communicate in writing the following:

1. The authorities under which the Service is providing the mitigation recommendations consistent with this Policy.

2. A description of all mitigation measures that are reasonable and appropriate to ensure that the proposed action improves or, at minimum, maintains the current status of affected fish, wildlife, plants, and their habitats.

3. The following elements should be specified within a mitigation plan or equivalent by either the Service, action proponents, or in collaboration:

a. Measurable objectives;

b. implementation assurances, including financial, as applicable;

c. effectiveness monitoring;

d. additional adaptive management actions as may be indicated by monitoring results; and

e. reporting requirements.

4. An explanation of the basis for the Service recommendations, including, but not limited to:

a. Evaluation species used for mitigation planning;

b. the assessed value of affected habitats to evaluation species;

c. predicted adverse and beneficial effects of the proposed action;

d. predicted adverse and beneficial effects of the recommended mitigation measures; and

e. the rationale for our determination that the proposed action, if implemented with Service recommendations, would achieve the mitigation policy goal.

5. The Service's expectations of the proponent's responsibility to implement the recommendations.

5.9. Followup

The Service encourages, supports, and will initiate, whenever practicable and within our authority, post-action monitoring studies and evaluations to determine the effectiveness of recommendations in achieving the mitigation planning goal. In those instances where Service personnel determine that action proponents have not carried out those agreed-upon mitigation means and measures, the Service will request that the parties responsible for regulating the action initiate corrective measures, or will initiate access to available assurance measures. These provisions also apply when the Service is the action proponent.

### 6. Definitions

Definitions in this section apply to the implementation of this Policy and were developed to provide clarity and consistency within the policy itself, and to ensure broad, general applicability to all mitigation processes in which the Service engages. Some Service authorities define some of the terms in this section differently or more specifically, and the definitions herein do not substitute for statutory or regulatory definitions in the exercise of those authorities.

*Action.* An activity or program implemented, authorized, or funded by Federal agencies; or a non-Federal activity or program for which one or more of the Service's authorities apply to make mitigation recommendations, specify mitigation requirements, or provide technical assistance for mitigation planning.

*Additionality.* A compensatory mitigation measure is additional when the benefits of a compensatory mitigation measure improve upon the baseline conditions of the impacted resources and their values, services, and functions in a manner that is demonstrably new and would not have occurred without the compensatory mitigation measure.

*Affected area.* The spatial extent of all effects, direct and indirect, of a proposed action to fish, wildlife, plants, and their habitats.

*Affected resources.* Those resources, as defined by this Policy, that are subject to the adverse effects of an action.

*Baseline.* Current and future environmental conditions (relevant to the resources covered by this Policy) that are expected without implementation of the proposed action under review. Predictions about future environmental conditions without the action should account for natural species succession, implementation of approved land and resource management plans, and any other reasonably foreseeable factors that influence these conditions.

*Compensatory mitigation.* Compensatory mitigation means to compensate for remaining unavoidable impacts after all appropriate and practicable avoidance and minimization measures have been applied, by replacing or providing substitute resources or environments (see 40 CFR 1508.20.) through the restoration, establishment, enhancement, or preservation of resources and their values, services, and functions. Impacts are authorized pursuant to a regulatory or resource management program that issues permits, licenses, or otherwise approves activities. In this Policy, "mitigation" is a deliberate expression of the full mitigation hierarchy, and "compensatory mitigation" describes only the last phase of that sequence.

*Conservation.* In the context of this Policy, the noun "conservation" is a general label for the collective practices, plans, policies, and science that are used to protect and manage species and their habitats to achieve desired outcomes.

*Conservation objective.* A measurable expression of a desired outcome for a species or its habitat resources. Population objectives are expressed in terms of abundance, trend, vital rates, or other measurable indices of population status. Habitat objectives are expressed in terms of the quantity, quality, and spatial distribution of habitats required to attain population objectives, as informed by knowledge and assumptions about factors influencing the ability of the landscape to sustain species.

*Conservation planning.* The identification of strategies for achieving conservation objectives. Conservation plans include, but are not limited to, recovery plans, habitat conservation plans, watershed plans, green infrastructure plans, and others developed by Federal, State, tribal or local government agencies or non-governmental organizations. This Policy emphasizes the use of landscape-scale approaches to conservation planning.

*Durability.* A mitigation measure is durable when the effectiveness of the measure is sustained for the duration of the associated impacts of the action, including direct and indirect impacts.

*Effects.* Changes in environmental conditions that are relevant to the resources covered by this Policy.

*Direct effects* are caused by the action and occur at the same time and place.

*Indirect effects* are caused by the action, but occur at a later time and/or another place.

*Cumulative effects* are caused by other actions and processes, but may refer also to the collective effects on a resource, including direct and indirect effects of the action. The causal agents and spatial/temporal extent for considering cumulative effects varies according to the authority(ies) under which the Service is engaged in mitigation planning (*e.g.,* refer to the definitions of cumulative effects and cumulative impacts in ESA regulations and NEPA, respectively), and the Service will apply statute-specific definitions in the application of this Policy.

*Evaluation species.* Fish, wildlife, and plant resources in the affected area that are selected for effects analysis and mitigation planning.

*Habitat.* An area with spatially identifiable physical, chemical, and biological attributes that supports one or more life-history processes for evaluation species. Mitigation planning should delineate habitat types in the affected area using a classification system that is applicable to both the region(s) of the affected area and the selected evaluation species in order to facilitate determinations of habitat scarcity, suitability, and importance.

*Habitat Credit Exchange.* An environmental market that operates as a clearinghouse in which an exchange administrator, operating as a mitigation sponsor, manages credit transactions between compensatory mitigation providers and project permittees. This is in contrast to the direct transactions between compensatory mitigation providers and permittees that generally occur through conservation banking and in-lieu fee programs. Exchanges provide ecological functions and services expressed as credits that are permanently conserved and managed for specified species and are used to compensate for adverse impacts occurring elsewhere to the same species.

*Habitat value.* An assessment of an affected habitat with respect to an evaluation species based on three attributes—scarcity, suitability, and importance—which define its conservation value to the evaluation species in the context of this Policy. The three parameters are assessed independently but are sometimes correlated. For example, rare or unique habitat types of high suitability for evaluation species are also very likely of high importance in achieving conservation objectives.

*Impacts.* In the context of this Policy, impacts are adverse effects relative to the affected resources.

*Importance.* The relative significance of the affected habitat, compared to other examples of a similar habitat type in the landscape context, to achieving conservation objectives for the evaluation species. Habitats of high importance are irreplaceable or difficult to replace, or are critical to evaluation species by virtue of their role in achieving conservation objectives within the landscape (*e.g.,* sustain core habitat areas, linkages, ecological functions). Areas containing habitats of high importance are generally, but not always, identified in conservation plans addressing resources under Service authorities (*e.g.,* in recovery plans) or when appropriate, under authorities of

AR_0044706

partnering entities (*e.g.,* in State wildlife action plans, Landscape Conservation Cooperative conservation "blueprints," etc.).

*Landscape.* An area encompassing an interacting mosaic of ecosystems and human systems that is characterized by a set of common management concerns. The most relevant concerns to the Service and this Policy are those associated with the conservation of species and their habitats. The landscape is not defined by the size of the area, but rather the interacting elements that are meaningful to the conservation objectives for the resources under consideration.

*Landscape-scale approach.* For the purposes of this Policy, the landscape-scale approach applies the mitigation hierarchy for impacts to resources and their values, services, and functions at the relevant scale, however narrow or broad, necessary to sustain, or otherwise achieve, established goals for those resources and their values, services, and functions. A landscape-scale approach should be used when developing and approving strategies or plans, reviewing projects, or issuing permits. The approach identifies the needs and baseline conditions of targeted resources and their values, services, and functions, reasonably foreseeable impacts, cumulative impacts of past and likely projected disturbance to those resources, and future disturbance trends. The approach then uses such information to identify priorities for avoidance, minimization, and compensatory mitigation measures across that relevant area to provide the maximum benefit to the impacted resources and their values, services, and functions, with full consideration of the conditions of additionality and durability.

*Landscape-scale strategies and plans.* For the purposes of this Policy, landscape-scale strategies and plans identify clear management objectives for targeted resources and their values, services, and functions at landscape-scales, as necessary, including across administrative boundaries, and employ the landscape-scale approach to identify, evaluate, and communicate how mitigation can best achieve those management objectives. Strategies serve to assist project applicants, stakeholders, and land managers in pre-planning as well as to inform NEPA analysis and decisionmaking, including decisions to develop and approve plans, review projects, and issue permits. Land use planning processes provide opportunities for identifying, evaluating, and communicating mitigation in advance of anticipated

land use activities. Consistent with their statutory authorities, land management agencies may develop landscape-scale strategies through the land use planning process, or incorporate relevant aspects of applicable and existing landscape-scale strategies into land use plans through the land use planning process.

*Mitigation.* In the context of this Policy, the noun "mitigation" is a label for all types of measures (see Mitigation Types) that a proponent would implement toward achieving the Service's mitigation goal.

*Mitigation hierarchy.* The elements of mitigation, summarized as avoidance, minimization, and compensation, provide a sequenced approach to addressing the foreseeable impacts to resources and their values, services, and functions. First, impacts should be avoided by altering project design and/or location or declining to authorize the project; then minimized through project modifications and permit conditions; and, generally, only then compensated for remaining unavoidable impacts after all appropriate and practicable avoidance and minimization measures have been applied.

*Mitigation planning.* The process of assessing the effects of an action and formulating mitigation measures that would achieve the mitigation planning goal.

*Mitigation goal.* The Service's goal for mitigation is to improve or, at minimum, maintain the current status of affected resources, as allowed by applicable statutory authority and consistent with the responsibilities of action proponents under such authority.

*Mitigation types.* General classes of methods for mitigating the impacts of an action (Council on Environmental Quality, 40 CFR 1508.20(a–e)), including:

(a) Avoid the impact altogether by not taking the action or parts of the action;

(b) minimize the impact by limiting the degree or magnitude of the action and its implementation;

(c) rectify the impact by repairing, rehabilitating, or restoring the affected environment;

(d) reduce or eliminate the impact over time by preservation and maintenance operations during the life of the action; and

(e) compensate for the impact by replacing or providing substitute resources or environments.

These five mitigation types, as enumerated by CEQ, are compatible with this Policy; however, as a practical matter, the mitigation elements are categorized into three general types that form a sequence: Avoidance,

minimization, and compensation for remaining unavoidable (also known as residual) impacts. Section 5.6 (Mitigation Means and Measures) of this Policy provides expanded definitions and examples for each of the mitigation types.

*Practicable.* Available and capable of being done after taking into consideration existing technology, logistics, and cost in light of a mitigation measure's beneficial value and a land use activity's overall purpose, scope, and scale.

*Proponent.* The agency(ies) proposing an action, and if applicable, any applicant(s) for agency funding or authorization to implement a proposed action.

*Resources.* Fish, wildlife, plants, and their habitats for which the Service has authority to recommend or require the mitigation of impacts resulting from proposed actions.

*Scarcity.* The relative spatial extent (*e.g.,* rare, common, or abundant) of the habitat type in the landscape context.

*Suitability.* The relative ability of the affected habitat to support one or more elements of the evaluation species' life history (reproduction, rearing, feeding, dispersal, migration, hibernation, or resting protected from disturbance, etc.) compared to other similar habitats in the landscape context. A habitat's ability to support an evaluation species may vary over time.

*Unavoidable.* An impact is unavoidable when an appropriate and practicable alternative to the proposed action that would not cause the impact is not available.

**Appendix A. Authorities and Direction for Service Mitigation Recommendations**

*A. Relationship of Service Mitigation Policy to Other Policies, Regulations*

This section is intended to describe the interaction of existing policies and regulations with this Policy in agency processes. Descriptions regarding the application of mitigation concepts generally, and elements of this Policy specifically, for each of the listed authorities follow:

1. The Bald and Golden Eagle Protection Act (16 U.S.C. 668–668d) (Eagle Act)

The Eagle Act prohibits take of bald eagles and golden eagles except pursuant to Federal regulations. The Eagle Act regulations at title 50, part 22 of the Code of Federal Regulations (CFR), define the "take" of an eagle to include the following actions: "pursue, shoot, shoot at, poison, wound, kill, capture, trap, collect, destroy, molest, or disturb" (§ 22.3).

Except for protecting eagle nests, the Eagle Act does not directly protect eagle habitat. However, because disturbing eagles is a violation of the Act, some activities within

eagle habitat, including some habitat modification, can result in illegal take in the form of disturbance. "Disturb" is defined as "to agitate or bother a bald or golden eagle to a degree that causes, or is likely to cause, based on the best scientific information available, (1) injury to an eagle, (2) a decrease in its productivity, by substantially interfering with normal breeding, feeding, or sheltering behavior, or (3) nest abandonment, by substantially interfering with normal breeding, feeding, or sheltering behavior."

The Eagle Act allows the Secretary of the Interior to authorize certain otherwise prohibited activities through regulations. The Service is authorized to prescribe regulations permitting the taking, possession, and transportation of bald and golden eagles provided such permits are "compatible with the preservation of the bald eagle or the golden eagle" (16 U.S.C. 668a). Permits are issued for scientific and exhibition purposes; religious purposes of Native American tribes; falconry (golden eagles only); depredation; protection of health and safety; golden eagle nest take for resource development and recovery; nonpurposeful (incidental) take; and removal or destruction of eagle nests.

The Eagle Act provides for mitigation in the form of avoidance and minimization by restricting permitted take to circumstances where take is "necessary." While not expressly addressed, compensatory mitigation can also be used as a tool for ensuring that authorized take is consistent with the preservation standard of the Eagle Act. The regulations for eagle nest take permits and eagle non-purposeful incidental take permits explicitly provide for compensatory mitigation. Although eagle habitat (beyond nest structures) is not directly protected by the Eagle Act, the statute and implementing regulations do not preclude the use of habitat restoration, enhancement, and protection as compensatory mitigation.

At the time of development of this Appendix A, the threshold for authorized take of golden eagles is set at zero throughout the United States because golden eagle populations appear to be stable and potentially declining, and may not be able to absorb additional take while still maintaining current numbers of breeding pairs over time. Accordingly, all permits for golden eagle take must incorporate compensatory mitigation. Because golden eagle populations are currently primarily constrained by a high level of unauthorized human-caused mortality, rather than habitat loss, permits for golden eagle take require mitigation to be in the form of a reduction of a source of mortality; however, habitat restoration and enhancement could potentially offset permitted take in some situations, once reliable standards and metrics are developed to support the application of habitat-based mitigation to offset permitted take.

2. Clean Water Act (33 U.S.C. 1251 *et seq.*)

Several locations within the statute under section 404 describe the responsibilities and roles of the Service. The authority at section 404(m) is most directly relevant to the Service's engagement of Clean Water Act permitting processes to recommend mitigation for impacts to aquatic resources

nationwide and is routinely used by Ecological Services Field Offices. At section 404(m), the Secretary of the Army is required to notify the Secretary of the Interior, through the Service Director, that an individual permit application has been received or that the Secretary proposes to issue a general permit. The Service will submit any comments in writing to the Secretary of the Army (Corps of Engineers) within 90 days. The Service has the opportunity to engage several thousand Corps permit actions affecting aquatic habitats and wildlife annually and to assist the Corps of Engineers in developing permit terms that avoid, minimize, or compensate for permitted impacts. The Department of the Army has also entered into a Memorandum of Agreement with the Department of the Interior under section 404(q) of the Clean Water Act. The current Memorandum of Agreement, signed in 1992, provides procedures for elevating national or regional issues relating to resources, policy, procedures, or regulation interpretation.

3. Endangered Species Act of 1973, as Amended (16 U.S.C. 1531 *et seq.*)

A primary purpose of the Endangered Species Act (ESA) of 1973 as amended (16 U.S.C. 1531 *et seq.*) is to conserve the ecosystems upon which species listed as endangered and threatened depend. Conserving listed species involves the use of all methods and procedures that are necessary for their recovery, which includes mitigating the impacts of actions to listed species and their habitats. All actions must comply with the applicable prohibitions against taking endangered animal species under ESA section 9 and taking threatened animal species under regulations promulgated through ESA section 4(d). Under ESA section 7(a)(2), Federal agencies must consult with the Service(s) to ensure that any actions they fund, authorize, or carry out are not likely to jeopardize the continued existence of listed species or adversely modify designated critical habitat. Federal agencies, and any permit or license applicants, may be exempted from the prohibitions against incidental taking for actions that are not likely to jeopardize the continued existence of the species or result in the destruction or adverse modification of designated critical habitat, if the terms and conditions of the incidental take statement are implemented.

The Service may permit incidental taking resulting from a non-Federal action under ESA section 10(a)(1)(B) after approving the proponent's habitat conservation plan (HCP) under section 10(a)(2)(A). The HCP must specify the steps the permit applicant will take to minimize and mitigate such impacts, and the funding that will be available to implement such steps. The basis for issuing a section 10 permit includes a finding that the applicant will, to the maximum extent practicable, minimize and mitigate the impacts of incidental taking, and a finding that the taking will not appreciably reduce the likelihood of the survival and recovery of the species in the wild.

This Policy applies to all actions that may affect ESA-protected resources except for conservation/recovery permits under section

10(a)(1)(A). The Service will recommend mitigation for impacts to listed species, designated critical habitat, and other species for which the Service has authorized mitigation responsibilities consistent with the guidance of this Policy, which proponents may adopt as conservation measures to be added to the project descriptions of proposed actions. Such adoption may ensure that actions are not likely to jeopardize species or adversely modify designated critical habitat; however, such adoption alone does not constitute compliance with the ESA. Federal agencies must complete consultation per the requirements of section 7 to receive Service concurrence with "may affect, not likely to adversely affect" determinations, biological opinions for "likely to adversely affect" determinations, and incidental take statement terms and conditions. Proponents of actions that do not require Federal authorization or funding must complete the requirements under section 10(a)(2) to receive an incidental take permit. Mitigation planning under this Policy applies to all species and their habitats for which the Service has authorities to recommend mitigation on a particular action, including listed species and critical habitat. Although this Policy is intended, in part, to clarify the role of mitigation in endangered species conservation, nothing herein replaces, supersedes, or substitutes for the ESA implementing regulations.

All forms of mitigation are potential conservation measures of a proposed Federal action in the context of section 7 consultation and are factored into Service analyses of the effects of the action, including any voluntary mitigation measures proposed by a project proponent that are above and beyond those required by an action agency. Service regulations at 50 CFR 402.14(g)(8) affirm the need to consider "any beneficial actions" in formulating a biological opinion, including those "taken prior to the initiation of consultation." Because jeopardy and adverse modification analyses weigh effects in the action area relative to the status of the species throughout its listed range and to the status of all designated critical habitat units, respectively, "beneficial actions" may also include proposed conservation measures for the affected species within its range but outside of the area of adverse effects (*e.g.*, compensation).

Mitigation measures included in proposed actions that avoid and minimize the likelihood of adverse effects and incidental take are also relevant to the Service's concurrence with "may affect, not likely to adversely affect" determinations through informal consultation. All mitigation measures included in proposed actions that benefit listed species and/or designated critical habitat, including compensatory measures, are relevant to jeopardy and adverse modification conclusions in Service biological opinions.

Likewise, the Service may apply all forms of mitigation, consistent with the guidance of this Policy, in formulating a reasonable and prudent alternative that would avoid jeopardy/adverse modification, provided that it is also consistent with the regulatory

AR_0044708

definition of a reasonable and prudent alternative at 50 CFR 402.02. It is preferable to avoid or minimize impacts to listed species or critical habitat before rectifying, reducing over time, or compensating for such impacts. Under some limited circumstances, however, the latter forms of mitigation may provide all or part of the means to achieving the best possible conservation outcome for listed species consistent with the purpose, authority, and feasibility requirements of a reasonable and prudent alternative.

For Federal actions that are not likely to jeopardize the continued existence of listed species or result in the destruction or adverse modification of habitat, the Service may provide a statement specifying those reasonable and prudent measures that are necessary or appropriate to minimize the impacts of taking incidental to such actions on the affected listed species. That incidental take statement must comply with all applicable regulations. No proposed mitigation measures relieve an action proponent of the obligation to obtain incidental take exemption through an incidental take statement (Federal actions) or authorization through an incidental take permit (non-Federal actions), as appropriate, for unavoidable incidental take that may result from a proposed action.

**4. Executive Order 13186 (E.O. 13186), Responsibilities of Federal Agencies To Protect Migratory Birds**

E.O. 13186 directs Federal departments and agencies to avoid or minimize adverse impacts on "migratory bird resources," defined as "migratory birds and the habitats upon which they depend." These acts of avian protection and conservation are implemented under the auspices of the MBTA, the Eagle Act, the Fish and Wildlife Coordination Act (16 U.S.C. 661–666c), the ESA, the National Environmental Policy Act, and "other established environmental review process" (section 3(e)(6)). Additionally, E.O. 13186 directs Federal agencies whose activities will likely result in measurable negative effects on migratory bird populations to collaboratively develop and implement an MOU with the Service that promotes the conservation of migratory bird populations. These MOUs can clarify how an agency can mitigate the effects of impacts and monitor implemented conservation measures. MOUs can also define how appropriate corrective measures can be implemented when needed, as well as what proactive conservation actions or partnerships can be formed to advance bird conservation, given the agency's existing mission and mandate.

The Service policy regarding its responsibility to E.O. 13186 (720 FW 2) states "all Service employees should: A. Implement their mission-related activities and responsibilities in a way that furthers the conservation of migratory birds and minimizes and avoids the potential adverse effects of migratory bird take, with the goal of eliminating take" (2.2 A). The policy also stipulates that the Service will support the conservation intent of the migratory bird conventions by integrating migratory bird conservation measures into our activities, including measures to avoid or minimize adverse impacts on migratory bird resources; restoring and enhancing the habitat of migratory birds; and preventing or abating the pollution or detrimental alteration of the environment for the benefit of migratory birds.

**5. Executive Order 13653 (E.O. 13653), Preparing the United States for the Impacts of Climate Change**

E.O. 13653 directs Federal agencies to improve the Nation's preparedness and resilience to climate change impacts. The agencies are to promote: (1) Engaged and strong partnerships and information sharing at all levels of government; (2) risk-informed decisionmaking and the tools to facilitate it; (3) adaptive learning, in which experiences serve as opportunities to inform and adjust future actions; and (4) preparedness planning.

Among the provisions under section 3, *Managing Lands and Waters for Climate Preparedness and Resilience,* is this: "agencies shall, where possible, focus on program and policy adjustments that promote the dual goals of greater climate resilience and carbon sequestration, or other reductions to the sources of climate change . . . [a]gencies shall build on efforts already completed or underway . . . as well as recent interagency climate adaptation strategies." Section 5 specifies that agencies shall develop or continue to develop, implement, and update comprehensive plans that integrate consideration of climate change into agency operations and overall mission objectives.

The *Priority Agenda: Enhancing The Climate Resilience of America's Natural Resources* (October 2014), called for in E.O. 13653, includes provisions to develop and provide decision support tools for "climate-smart natural resource management" that will improve the ability of agencies and landowners to manage for resilience to climate change impacts.

The Service policy on climate change adaptation (056 FW 1) states that the Service will "effectively and efficiently incorporate and implement climate change adaptation measures into the Service's mission, programs, and operations." This includes using the best available science to coordinate an appropriate adaptive response to impacts on fish, wildlife, plants, and their habitats. The policy also specifically calls for delivering landscape conservation actions that build resilience or support the ability of fish, wildlife, and plants to adapt to climate change.

**6. Federal Power Act (16 U.S.C. 791–828c) (FPA)**

The Federal Energy Regulatory Commission (FERC) authorizes non-Federal hydropower projects pursuant to the FPA. The Service's roles in hydropower project review are primarily defined by the FPA, as amended in 1986 by the Electric Consumers Protection Act, which explicitly ascribes those roles to the Service. The Service has mandatory conditioning authority for projects on National Wildlife Refuge System lands under section 4(e) and to prescribe fish passage to enhance and protect native fish runs under section 18. Under section 10(j),

FERC is required to include license conditions that are based on recommendations made pursuant to the Fish and Wildlife Coordination Act by States, NOAA, and the Service for the adequate and equitable protection, mitigation, and enhancement of fish, wildlife, and their habitats.

**7. Fish and Wildlife Conservation Act (16 U.S.C. 2901–2912)**

Specifically, Federal Conservation of Migratory Nongame Birds (16 U.S.C. 2912) requires the Service to "identify the effects of environmental changes and human activities on species, subspecies, and populations of all migratory nongame birds" (section 2912(2)); "identify conservation actions to assure that species, subspecies, and populations of migratory nongame birds . . . do not reach the point at which the measures provided pursuant to the Endangered Species Act of 1973, as amended (16 U.S.C. 1531–1543), become necessary" (section 2912(4)); and "identify lands and waters in the United States and other nations in the Western Hemisphere whose protection, management, or acquisition will foster the conservation of species, subspecies, and populations of migratory nongame birds. . . ." (section 2912(5)).

**8. Fish and Wildlife Coordination Act (16 U.S.C. 661–667e) (FWCA)**

The FWCA requires Federal agencies developing water-related projects to consult with the Service, NOAA, and the States regarding fish and wildlife impacts. The FWCA establishes fish and wildlife conservation as a coequal objective of all federally funded, permitted, or licensed water-related development projects. Federal action agencies are to include justifiable means and measures for fish and wildlife, and the Service's mitigation and enhancement recommendations are to be given full and equal consideration with other project purposes. The Service's mitigation recommendations may include measures addressing a broad set of habitats beyond the aquatic impacts triggering the FWCA and taxa beyond those covered by other resource laws. Action agencies are not bound by the FWCA to implement Service conservation recommendations in their entirety.

**9. Marine Mammal Protection Act of 1972, as Amended (16 U.S.C. 1361 *et seq.*) (MMPA)**

The MMPA prohibits the take (*i.e.,* hunting, killing, capture, and/or harassment) of marine mammals and enacts a moratorium on the import, export, and sale of marine mammal parts and products. There are exemptions and exceptions to the prohibitions. For example, under section 101(b), Alaskan Natives may hunt marine mammals for subsistence purposes and may possess, transport, and sell marine mammal parts and products. However, this section focuses on incidental take authorizations for non-commercial fishing activities.

Section 101(a)(5) allows for the authorization of incidental, but not intentional, take of small numbers of marine mammals by U.S. citizens while engaged in a specified activity (other than commercial fishing) within a specified geographical

region, provided certain findings are made. Specifically, the Service must make a finding that the total of such taking will have a negligible impact on the marine mammal species and will not have an unmitigable adverse impact on the availability of these species for subsistence uses. Negligible impact is defined at 50 CFR 18.27(c) as "an impact resulting from the specified activity that cannot be reasonably expected to, and is not reasonably likely to, adversely affect the species or stock through effects on annual rates of recruitment or survival." Unmitigable adverse impact, which is also defined at 50 CFR 18.27(c), means "an impact resulting from the specified activity that is likely to reduce the availability of the species to a level insufficient for a harvest to meet subsistence needs by (i) causing the marine mammals to abandon or avoid hunting areas, (ii) directly displacing subsistence users, or (iii) placing physical barriers between the marine mammals and the subsistence hunters; and (2) cannot be sufficiently mitigated by other measures to increase the availability of marine mammals to allow subsistence needs to be met."

Section 101(a)(5)(A) of the MMPA provides for the promulgation of Incidental Take Regulations (ITRs), which can be issued for a period of up to 5 years. The ITRs set forth permissible methods of taking pursuant to the activity and other means of effecting the least practicable adverse impact on the species or stock and its habitat, paying particular attention to rookeries, mating grounds, and areas of similar significance, and on the availability of such species or stock for subsistence uses. In addition, ITRs include requirements pertaining to the monitoring and reporting of such taking.

Under the ITRs, a U.S. citizen may request a Letter of Authorization (LOA) for activities proposed in accordance with the ITRs. The Service evaluates each LOA request based on the specific activity and geographic location, and determines whether the level of taking is consistent with the findings made for the total taking allowable under the applicable ITRs. If so, the Service may issue an LOA for the project and will specify the period of validity and any additional terms and conditions appropriate to the request, including mitigation measures designed to minimize interactions with, and impacts to, marine mammals. The LOA will also specify monitoring and reporting requirements to evaluate the level and impact of any taking. Depending on the nature, location, and timing of a proposed activity, the Service may require applicants to consult with potentially affected subsistence communities in Alaska and develop additional mitigation measures to address potential impacts to subsistence users. Regulations specific to LOAs are codified at 50 CFR 18.27(f).

Section 101(a)(5)(D) established an expedited process to request authorization for the incidental, but not intentional, take of small numbers of marine mammals for a period of not more than one year if the taking will be limited to harassment, *i.e.*, Incidental Harassment Authorizations (IHAs). Harassment is defined in section 3 of the MMPA (16 U.S.C. 1362). For activities other than military readiness activities or scientific

research conducted by or on behalf of the Federal Government, harassment means "any act of pursuit, torment, or annoyance which (i) has the potential to injure a marine mammal or marine mammal stock in the wild" (the MMPA calls this Level A harassment) "or (ii) has the potential to disturb a marine mammal or marine mammal stock in the wild by causing disruption of behavioral patterns, including, but not limited to migration, breathing, nursing, breeding, feeding, or sheltering" (the MMPA calls this Level B harassment). There is a separate definition of harassment applied in the case of a military readiness activity or a scientific research activity conducted by or on behalf of the Federal Government. In addition, "small numbers" and "specified geographical region" requirements do not apply to military readiness activities.

The IHA prescribes permissible methods of taking by harassment and includes other means of effecting the least practicable impact on marine mammal species or stocks and their habitats, paying particular attention to rookeries, mating grounds, and areas of similar significance. In addition, as appropriate, the IHA will include measures that are necessary to ensure no unmitigable adverse impact on the availability of the species or stock for subsistence purposes in Alaska. IHAs also specify monitoring and reporting requirements pertaining to the taking by harassment.

ITRs and IHAs can provide considerable conservation and management benefits to covered marine mammals. The Service shall recommend mitigation for impacts to species covered by the MMPA that are under its jurisdiction consistent with the guidance of this Policy and to the extent compatible with the authorities of the MMPA. Proponents may adopt these recommendations as components of proposed actions. However, such adoption itself does not constitute compliance with the MMPA. In addition, IHAs or LOAs issued under ITRs specify the permissible methods of taking and other means of effecting the least practicable adverse impact on the species or stock and its habitat, and on the availability for subsistence purposes. Those authorizations also outline required monitoring and reporting of takes.

10. Migratory Bird Treaty Act (16 U.S.C. 703–712) (MBTA)

The MBTA does not allow the take of migratory birds without a permit or other regulatory authorization (*e.g.*, rule, depredation order). The Service has express authority to issue permits for purposeful take and currently issues several types of permits for purposeful take of individuals (*e.g.*, hunting, depredation, scientific collection). Hunting permits do not require the mitigation hierarchy be enacted; rather, the Service sets annual regulations that limit harvest to ensure levels harvested do not diminish waterfowl breeding populations. For purposeful take permits that are not covered in these annual regulations (*e.g.*, depredation, scientific collection), there is an expectation that take be avoided and minimized to the maximum extent practicable as a condition of the take authorization process. Compensation and

offsets are not required under these purposeful take permits, but can be accepted.

The Service has implied authority to permit incidental take of migratory birds, though incidental take has only been authorized in limited situations (*e.g.*, Department of Defense Readiness Rule and the NOAA Fisheries Special Purpose Permit). In all situations, permitted or unpermitted, there is an expectation that take be avoided and minimized to the maximum extent practicable, and voluntary offsets can be employed to this end. However, the Service cannot legally require or accept compensatory mitigation for unpermitted, and thus illegal, take of individuals. While action proponents are expected to reduce impacts to migratory bird habitat, such impacts are not regulated under the MBTA. As a result, action proponents are allowed to use the full mitigation hierarchy to manage impacts to their habitats, regardless of whether or not a permit for take of individuals is in place. Assessments of action effects should examine direct, indirect, and cumulative impacts to migratory bird habitats, as habitat losses have been identified as a critical factor in the decline of many migratory bird species.

11. National Environmental Policy Act (42 U.S.C. 4321 *et seq.*) (NEPA)

NEPA requires Federal agencies to integrate environmental values into decisionmaking processes by considering impacts of their proposed actions and reasonable alternatives. Agencies disclose findings through an environmental assessment or a detailed environmental impact statement and are required to identify and include all relevant and reasonable mitigation measures that could improve the action. The Council on Environmental Quality's implementing regulations under NEPA define mitigation as a sequence, where mitigation begins with avoidance of impacts; followed by minimization of the degree or magnitude of impacts; rectification of impacts through repair, restoration, or rehabilitation; reducing impacts over time during the life of the action; and lastly, compensation for impacts by providing replacement resources. Effective mitigation through this ordered approach starts at the beginning of the NEPA process, not at the end. Implementing regulations require that the Service be notified of all major Federal actions affecting fish and wildlife and our recommendations solicited. Engaging this process allows the Service to provide comments and recommendations for mitigation of fish and wildlife impacts.

12. National Wildlife Refuge Mitigation Policy (64 FR 49229–49234, September 10, 1999) (Refuge Mitigation Policy)

The Service's Final Policy on the National Wildlife Refuge System and Compensatory Mitigation under the section 10/404 Program establishes guidelines for the use of Refuge lands for siting compensatory mitigation for impacts permitted through section 404 of the Clean Water Act (CWA) and section 10 of the Rivers and Harbors Act (RHA). The Refuge Mitigation Policy clarifies that siting mitigation for off-Refuge impacts on Refuge lands is appropriate only in limited and

AR_0044710

exceptional circumstances. Mitigation banks may not be sited on Refuge lands, but the Service may add closed banks to the Refuge system if specific criteria are met. The Refuge Mitigation Policy, which explicitly addresses only compensatory mitigation under the CWA and RHA, remains in effect and is unaltered by this Policy. However, the Service will evaluate all proposals for using Refuge lands as sites for other compensatory mitigation purposes using the criteria and procedures established for aquatic resources in the Refuge Mitigation Policy (*e.g.*, to locate compensatory mitigation on Refuge property for off-Refuge impacts to endangered or threatened species).

13. Natural Resource Damage Assessment and Restoration (NRDAR)

Under the Oil Pollution Act (33 U.S.C. 2701 *et seq.*) (OPA) and the Comprehensive Environmental Response, Compensation and Liability Act (42 U.S.C. 9601) (CERCLA), as amended by Public Law 99–499, when a release of hazardous materials or an oil spill injures natural resources under the jurisdiction of State, tribal, and Federal agencies, these governments quantify injuries to determine appropriate restoration necessary to compensate the public for losses of those resources or their services. Nothing in this Policy supersedes the statutes and regulations governing the natural resource damage provisions of CERCLA, OPA, and the CWA.

The Service is often a participating bureau, supporting the Department of the Interior, during NRDAR. A restoration settlement, in the form of damages provided through a settlement document, is usually determined by quantifying the type and amount of restoration necessary to offset the injury caused by the spill or release. The type of restoration conducted depends on the resources injured by the release (*e.g.*, marine habitats, ground water, or biological resources (fish, birds)).

In the *Presidential Memorandum on Mitigating Impacts on Natural Resources from Development and Encouraging Related Private Investment* (November 3, 2015), DOI is charged with developing guidance describing considerations for evaluating whether, where, and when tools and techniques used in mitigation—including restoration banking or advance restoration projects—would be appropriate as components of a restoration plan resolving natural resource damage claims. Pending promulgation of that guidance, the tools provided in section 5 maintain the flexibility to implement the appropriate restoration to restore injured resources under the jurisdiction of multiple governments, by providing support for weighing or modifying project elements to reach Service goals.

*B. Additional Legislative Authorities*

1. Clean Air Act; 42 U.S.C. 7401 *et seq.*, as amended (See *http://www.fws.gov/refuges/airquality/permits.html*)
2. Marine Protection, Research, and Sanctuaries Act; 16 U.S.C. 1431 *et seq.* and 33 U.S.C. 1401 *et seq.*
3. Resource Conservation and Recovery Act; 42 U.S.C. 6901 *et seq.*
4. Shore Protection Act; 33 U.S.C. 2601 *et seq.*
5. Coastal Zone Management Act; 16 U.S.C. 1451 *et seq.*
6. Coastal Barrier Resources Act; 16 U.S.C. 3501
7. Surface Mining Control and Reclamation Act; 30 U.S.C. 1201 *et seq.*
8. National Wildlife Refuge System Administration Act; 16 U.S.C. 668dd, as amended
9. National Historic Preservation Act; 16 U.S.C. 470f
10. North American Wetlands Conservation Act, 16 U.S.C. 4401 *et seq.*
11. Pittman-Roberts Wildlife Restoration Act; 16. U.S.C. 669–669k
12. Dingell-Johnson Sport Fish Restoration Act; 16 U.S.C. 777–777n, except 777e–1 and g–1
13. Federal Land and Policy Management Act, 43 U.S.C. 1701 *et seq.*

*C. Implementing Regulations*

1. National Environmental Policy Act (NEPA), 40 CFR part 1508, 42 U.S.C. 55
2. Marine Mammal Protection Act (MMPA), 50 CFR part 18, 16 U.S.C. 1361 *et seq.*
3. Migratory Bird Treaty Act (MBTA), 50 CFR part 21, 16 U.S.C. 703 *et seq.*
4. Bald and Golden Eagle Protection Act (Eagle Act), 50 CFR part 22, 16 U.S.C. 668 *et seq.*
5. Guidelines for Wetlands Protection, 33 CFR parts 320 and 332, 40 CFR part 230
6. Compensatory Mitigation for Losses of Aquatic Resources, 33 CFR parts 325 and 332 (USACE) and 40 CFR part 230 (EPA), 33 U.S.C. 1344
7. National Coastal Wetlands Conservation Grants, 16 U.S.C. 3954, 50 CFR part 84
8. Natural Resource Damage Assessments (OPA), 15 CFR part 990, 33 U.S.C. 2701 *et seq.*
9. Natural Resource Damage Assessments (CERCLA), 43 CFR part 11, 42 U.S.C. 9601
10. Endangered Species Act of 1973, as amended; 50 CFR parts 13, 17 (specifically §§ 17.22, 17.32, 17.50), part 402; 16 U.S.C. 1531 *et seq.*
11. Powers of the Secretary (43 U.S.C. 1201), 43 CFR part 24

*D. Executive Orders*

1. Executive Order 13186, Responsibilities of Federal Agencies to Protect Migratory Birds, January 10, 2001
2. Executive Order 12114, Environmental Effects Abroad of Major Federal Actions, January 4, 1979
3. Executive Order 11988, Floodplain Management, May 24, 1977
4. Executive Order 11990, Protection of Wetlands, May 24, 1977
5. Executive Order 12898, Federal Actions To Address Environmental Justice in Minority and Low-Income Populations, February 11, 1994
6. Executive Order 13514, Federal Leadership in Environmental, Energy, and Economic Performance, October 5, 2009
7. Executive Order 13604, Improving Performance of Federal Permitting and Review of Infrastructure Projects, March 22, 2012

*E. Council on Environmental Quality (CEQ) Policy and Guidance*

1. Guidance Regarding NEPA Regulations (48 FR 34236, July 28, 1983)
2. Designation of Non-Federal Agencies to be Cooperating Agencies in Implementing the Procedural Requirements of the National Environmental Policy Act (40 CFR 1508.5, July 28, 1999)
3. Cooperating Agencies in Implementing the Procedural Requirements of the National Environmental Policy Act (January 30, 2002)
4. Collaboration in NEPA, a Handbook for NEPA Practitioners (October 2007)
5. Memorandum, "Appropriate Use of Mitigation and Monitoring and Clarifying the Appropriate Use of Mitigated Findings of No Significant Impact" (January 14, 2011)
6. "Memorandum on Environmental Collaboration and Conflict Resolution" (September 6, 2012)
7. NEPA and NHPA, a Handbook for Integrating NEPA and Section 106 (March 2013)
8. Memorandum for Heads of Federal Departments and Agencies, "Effective Use of Programmatic NEPA Reviews" (December 18, 2014)
9. Memorandum: "Final Guidance for Federal Departments and Agencies on Consideration of Greenhouse Gas Emissions and the Effects of Climate Change in National Environmental Policy Act Reviews" (August 1, 2016)

*F. Department of the Interior Policy and Guidance*

1. Department of the Interior National Environmental Policy Act Procedures, 516 DM 1–7
2. Secretarial Order 3330, Improving Mitigation Policies and Practices of the Department of the Interior (October 31, 2013)
3. Secretarial Order 3206, American Indian Tribal Rights, Federal-Tribal Trust Responsibilities, and the Endangered Species Act (June 5, 1997)
4. Department of the Interior Climate Change Adaptation Policy, 523 DM 1

*G. U.S. Fish and Wildlife Service (USFWS) Policy and Guidance:*

1. Service Responsibilities to Protect Migratory Birds, 720 FW 2
2. Final Policy on the National Wildlife Refuge System and Compensatory Mitigation under the Section 10/404 Program, 64 FR 49229–49234, September 10, 1999
3. Habitat Conservation Planning and Incidental Take Permit Processing Handbook, 61 FR 63854, 1996
4. USFWS National Environmental Policy Act Reference Handbook, 505 FW 1.7 and 550 FW 1
5. Endangered Species Act Habitat Conservation Planning Handbook (with NMFS), 1996
6. Endangered Species Act Consultation Handbook (with NMFS), 1998
7. Inter-agency Memorandum of Agreement Regarding Oil Spill Planning and Response Activities Under the Federal

Water Pollution Control Act's National Oil and Hazardous Substances Pollution Contingency Plan and the Endangered Species Act, 2002

8. Guidance for the Establishment, Use, and Operation of Conservation Banking, 2003

9. Endangered and Threatened Wildlife and Plants; Recovery Crediting Guidance, 2008

10. USFWS Tribal Consultation Handbook, 2011

11. Service Climate Change Adaptation Policy, 056 FW 1

12. USFWS Native American Policy, 510 FW 1

*H. Other Agency Policy, Guidance, and Actions Relevant to Service Activities*

1. Memorandum of Agreement Between the Department of the Army and the Environmental Protection Agency, The Determination of Mitigation Under the Clean Water Act Section 404(b)(1) Guidelines, 1990

2. Federal Highway Administration, Consideration of Wetlands in the Planning of Federal Aid Highways, 1990

3. Clean Water Act Section 404(q) Memorandum of Agreement Between the Department of the Interior and the Department of the Army, 1992

4. Interagency Agreement between the National Park Service, Fish and Wildlife Service, Bureau of Land Management, and the Federal Aviation Administration Regarding Low-Level Flying Aircraft Over Natural Resource Areas, 1993

5. USFWS Memorandum from Acting Director to Regional Directors, Regarding "Partners for Fish and Wildlife Program and NEPA Compliance," 2002

6. Agreement between the U.S. Fish and Wildlife Service and the U.S. Army Corps of Engineers for Conducting Fish and Wildlife Coordination Act Activities, 2003

7. Memorandum of Agreement Between the U.S. Fish and Wildlife Service and the U.S. Army Corps of Engineers, 2003

8. Partnership Agreement between the U.S. Army Corps of Engineers and the U.S. Fish and Wildlife Service for Water Resources and Fish and Wildlife, 2003

9. Memoranda of understanding with nine Federal agencies, under E.O. 13186, Responsibilities of Federal Agencies to Protect Migratory Birds (*http://www.fws.gov/migratorybirds/PartnershipsAndIniatives.html*)

**Appendix B. Service Mitigation Policy and NEPA**

This appendix addresses Service responsibilities for applying this Policy when we are formulating our own proposed actions under the NEPA decision making process. Service personnel may also use this appendix as guidance for providing mitigation recommendations when reviewing the proposed actions of other Federal agencies under NEPA. However, comments that we provide are advisory to other Federal agencies in the NEPA context as an agency with special expertise regarding mitigating impacts to fish and wildlife resources. Consistent with their authorities, action

agencies choose whether to adopt, in whole or in part, mitigation recommendations received from other agencies and the public, including the Service. Any requirements of other Federal agencies to mitigate impacts to fish and wildlife resources are governed by applicable statutes and regulations.

*A. Mitigation in Environmental Review Processes*

NEPA was enacted to promote efforts to prevent or eliminate damage to the environment and biosphere (42 U.S.C. 4321). The NEPA process is intended to help officials make decisions based on an understanding of environmental consequences and take actions that protect, restore, and enhance the environment (40 CFR part 1501). At the earliest stage possible in the planning process, and prior to making any detailed environmental review, the Service will "consult with and obtain the comments of any Federal agency which has jurisdiction by law or special expertise with respect to any environmental impact involved." (42 U.S.C. 4332(C)) Early coordination avoids delays, reduces potential conflicts, and helps ensure compliance with other statutes and regulations. When scoping the issues for the review, the Service will "invite the participation of affected Federal, State, and local agencies, any affected Indian tribe, the proponent of the action, and other interested persons (including those who might not be in accord with the action on environmental grounds)." (40 CFR 1501.7(a)(1))

NEPA requires consideration of the impacts from connected, cumulative, and similar actions, and their relationship to the maintenance and enhancement of long-term productivity (42 U.S.C. 4332). Mitigation measures should be developed that effectively and efficiently address the predicted and actual impacts, relative to the ability to maintain and enhance long-term productivity. The consideration of mitigation (type, timing, degree, etc.) should be consistent with and based upon the evaluation of direct, indirect, and cumulative impacts. The Service should also consider and encourage public involvement in development of mitigation planning, including components such as compliance and effectiveness monitoring, and adaptive management processes.

Consistent with the January 14, 2011, CEQ Memorandum: Appropriate Use of Mitigation and Monitoring and Clarifying the Appropriate Use of Mitigated Findings of No Significant Impacts, Service-proposed actions should incorporate measures to avoid, minimize, rectify, reduce, and compensate for impacts into initial proposal designs and described as part of the action. Measures to achieve net gain or no-net-loss outcomes have the greatest potential to achieve environmentally preferred outcomes that are encouraged by the memorandum, and measures to achieve net gain outcomes have the greatest potential to enhance long-term productivity. We should analyze mitigation measures considered, but not incorporated into the proposed action, as one or more alternatives. For illustrative purposes, our NEPA documents may address mitigation

alternatives or consider mitigation measures that the Service does not have legal authority to implement. However, the Service should not commit to mitigation alternatives or measures considered or analyzed without sufficient legal authorities or sufficient resources to perform or ensure the effectiveness of the mitigation (CEQ 2011). The Service should monitor the compliance and effectiveness of our mitigation commitments. For applicant-driven actions, some or most of the responsibility for mitigation monitoring may lie with the applicant; however, the Service retains the ultimate responsibility to ensure that monitoring is occurring when needed and that the results of monitoring are properly considered in an adaptive management framework.

When carrying out its responsibilities under NEPA, the Service will apply the mitigation meanings and sequence in the NEPA regulations (40 CFR 1508.20). In particular, the Service will retain the ability to distinguish between:

• Minimizing impacts by limiting the degree or magnitude of the action and its implementation;

• rectifying the impact by repairing, rehabilitating, or restoring the affected environment; and

• reducing or eliminating the impact over time by preservation and maintenance operations during the life of the action. Minimizing impacts under NEPA is commonly applied at the planning design stage, prior to the action (and impacts) occurring. Rectification and reduction over time are measures applied after the action is implemented (even though they may be included in the plan). Therefore, under NEPA, there are often very different temporal scopes between minimization measures and those for rectification and reduction over time. These temporal differences can be important for developing and evaluating alternatives, analyzing indirect and cumulative impacts, and for designing and implementing effectiveness and compliance monitoring. Therefore, the Service will retain the ability to distinguish between these three mitigation types when doing so will improve the ability to take the requisite NEPA "hard look" at potential environmental impacts and reasonable alternatives to proposed actions.

Other statutes besides NEPA that compel the Service to address the possible environmental impacts of mitigation activities for fish and wildlife resources commonly include the National Historic Preservation Act of 1996 (NHPA) (16 U.S.C 470 *et seq.*), as amended in 1992, the Federal Water Pollution Control Act (Clean Water Act) (33 U.S.C. 1251–1376), Fish and Wildlife Coordination Act (16 U.S.C 661–667(e)), as amended (FWCA), and the Clean Air Act (42 U.S.C. 7401–7661). Service mitigation decisions should also comply with all applicable Executive Orders, including E.O. 13514, Federal Leadership in Environmental, Energy, and Economic Performance (October 5, 2009); E.O. 13653, Preparing the United States for the Impacts of Climate Change (November 1, 2013); and E.O. 12898, Federal Actions To Address Environmental Justice in Minority

Populations and Low-Income Populations. DOI Environmental Compliance Memorandum (ECM) 95–3 provides additional direction regarding responsibilities for addressing environmental justice under NEPA, including the equity of benefits and risks distribution.

*B. Efficient Mitigation Planning*

The CEQ Regulations Implementing NEPA include provisions to reduce paperwork (§ 1500.4), delay (§ 1505.5), and duplication with State and local procedures (§ 1506.2) and combine documents in compliance with NEPA. A key component of the provisions to reduce paperwork directs Federal agencies to use environmental impact statements for programs, policies, or plans, and to tier from statements of broad scope to those of narrower scope, in order to eliminate repetitive discussions of the same issues (§§ 1501.1(i), 1502.4, and 1502.20). To the fullest extent possible, the Service should coordinate with State, tribal, local, and other Federal entities to conduct joint mitigation planning, research, and environmental review processes. Mitigation planning can also provide efficiencies when it is used to reduce the impacts of a proposed project to the degree it eliminates significant impacts and avoids the need for an environmental impact statement. When using this approach, employing a mitigated Finding of No Significant Impact (FONSI), the Service should ensure consistency with the aforementioned January 14, 2011, CEQ memorandum.

Use of this Policy will help focus our NEPA discussion on issues for fish, wildlife, plants, and their habitats, and will avoid unnecessarily lengthy background information. When appropriate, the Service should use the process for establishing evaluation species and resource categories to concentrate our environmental analyses on relevant and significant issues.

Programmatic NEPA reviews can establish standards for consideration and implementation of mitigation, and can more effectively address cumulative impacts. The programmatic NEPA reviews can facilitate decisions on agency actions that precede site- or project-specific decisions and actions, such as mitigation alternatives or commitments for subsequent actions, or narrowing of future alternatives. To ensure that landscape-scale mitigation planning is effectively implemented and meets conservation goals, as appropriate, the Service should seek and consider collaborative opportunities to conduct programmatic NEPA decisionmaking processes on Service actions that are similar in timing, impacts, alternatives, resources, and mitigation. The Service should consider developing standard mitigation protocols or objectives in a programmatic NEPA review in order to provide a framework and scope for the subsequent tiered analysis of environmental impacts. Existing landscape-scale conservation and mitigation plans that have already undergone a NEPA process will provide efficiencies for Federal actions taken on a project-specific basis and will also better address potential cumulative impacts. However, the Service may incorporate plans

or components of plans by reference (40 CFR 1502.21), while addressing impacts from plans or components within the NEPA process on the Service action. When considering programmatic NEPA reviews, the Service should adopt approaches consistent with the December 18, 2014, CEQ Memorandum: Effective Use of Programmatic NEPA Reviews.

Appropriate treatment of climate change in NEPA reviews is essential to development of meaningful mitigation. The Service approach should be consistent with the August 1, 2016, CEQ Memorandum: Final Guidance for Federal Departments and Agencies on Consideration of Greenhouse Gas Emissions and the Effects of Climate Change in National Environmental Policy Act Reviews, which guides the consideration of reasonable alternatives and recommends agencies consider the short- and long-term effects and benefits in the alternatives and mitigation analysis.

*C. Collaboration*

Collaboration is an important component of mitigation planning, especially at the landscape or programmatic level. A collaborative NEPA process can offer the Service many benefits regarding development and implementation of mitigation, including, but not limited to: Better information regarding mitigation options by accessing relevant scientific and technical expertise and knowledge relating to local resources; a fairer process by involving most or all interests involved in determining mitigation; conflict prevention by dealing with issues related to mitigation as they arise; and easier implementation because all the stakeholders feel vested in the implementation of mitigation. Therefore, when considering and engaging in collaboration, the Service should, to the extent applicable, utilize the principles and recommendations set forth in the Office of Management and Budget and CEQ Memorandum on Environmental Collaboration and Conflict Resolution (2012) and the CEQ handbook, *Collaboration in NEPA–a Handbook for NEPA Practitioners* (2007).

*D. NEPA and Tribal Trust Responsibilities*

NEPA also provides a process through which all Tribal Trust responsibilities can be addressed simultaneous to consultation, but care should be taken to ensure that culturally sensitive information is not disclosed. Resources that may be impacted by Service actions or mitigation measures include culturally significant or sacred landscapes, species associated with those landscapes, or species that are separately considered culturally significant or sacred. The Service should coordinate or consult with affected tribes to develop methods for evaluating impacts, significance criteria, and meaningful mitigation to sacred or culturally significant species and their locales. Because climate change has been identified as an Environmental Justice (EJ) issue for tribes, adverse climate change-related effects to culturally significant or sacred landscapes or species may be cumulatively greater, and may indicate the need for a separate EJ analysis. Affected tribes can be those for

which the locale of the action or landscape mitigation planning lies within traditional homelands and can include traditional migration areas. The final determination of whether a tribe is affected is made by the tribe, and should be ascertained during consultation or a coordination process. When government-to-government consultation takes place, the consultation process will be guided by the Service Tribal Consultation Handbook.

The Service has overarching Tribal Trust Doctrine responsibilities under the Eagle Act, the National Historic Preservation Act (NHPA), the American Indian Religious Freedom Act (AIRFA) (42 U.S.C. 1996), Religious Freedom Restoration Act of 1993 (RFRA) (42 U.S.C. 2000bb *et seq.*), Secretarial Order 3206, American Indian Tribal Rights, Federal-Tribal Trust Responsibilities, the Endangered Species Act (June 5, 1997), Executive Order 13007, Indian Sacred Sites (61 FR 26771, May 29, 1996), and the USFWS Native American Policy. Government-wide statutes with requirements to consult with tribes include the Archeological Resources Protection Act of 1979 (ARPA) (16 U.S.C. 470aa–mm), the Native American Graves Protection and Repatriation Act (NAGPRA) (25 U.S.C. 3001 *et. seq.*), and AIRFA. Regulations with requirements to consult include NAGPRA, NHPA, and NEPA. As required, the Service will initiate Section 106 consultation with Indian tribes during early planning for FWS proposed actions, to ensure their rights and concerns are incorporated into project design. Consultation will continue throughout all stages of the process, including during consideration of mitigation.

*E. Integrating the Mitigation Policy Into the NEPA Process*

When the Service is the lead or co-lead Federal agency for NEPA compliance, this Policy may inform several components of the NEPA process and make it more effective and more efficient in conserving the affected Federal trust resources. This section discusses the role of this Policy in Service decisionmaking under NEPA.

Scoping

The Service should use internal and external scoping to help identify appropriate evaluation species, obtain information about the relative scarcity, suitability, and importance of affected habitats for resource category assignments, identify issues associated with these species and habitats, and identify issues associated with other affected resources. Climate change vulnerability assessments can be a valuable tool for identifying or screening new evaluation species. The Service should coordinate external scoping with agencies having special expertise or jurisdiction by law for the affected resources.

Purpose and Need

The purpose and need statement of the NEPA document should incorporate relevant conservation objectives for evaluation species and their habitats, and the need to ensure either a net gain or no-net-loss. Because the statement of purpose and need frames the development of the proposed action and

alternatives, including conservation objectives from the beginning, it steers action proposals away from impacts that may otherwise necessitate mitigation. Addressing conservation objectives in the purpose statement initiates a planning process in which the proposed action and all reasonable alternatives evaluated necessarily include appropriate conservation measures, differing in type or degree, and avoids presenting decisionmakers with a choice between a "conservation alternative" and a "no conservation alternative."

Alternatives

The alternatives should include, as appropriate, an alternative that includes design components or mitigation measures to achieve a net benefit for affected resources and an alternative that includes design components or mitigation measures to achieve no-net-loss of affected resources. Alternatives that include provisions for mitigation based upon different climate change projections will help guide the development of appropriate responses, and will facilitate the ability to change mitigation responses more quickly to ones already analyzed but not previously adopted.

Affected Environment

The affected environment discussion should focus on significant environmental issues associated with evaluation species and their habitats and highlight resource vulnerabilities that may require mitigation features in the project design. This section should document the relative scarcity, suitability, and importance of affected habitats, along with the sensitivity and status of the species and habitats. It should identify relevant temporal and spatial scales for each resource and the appropriate indicators of effects and units of measurement for evaluating mitigation features. This section should also identify habitats for evaluation species that are currently degraded but have a moderate to high potential for restoration or improvement.

Significance Criteria

Explicit significance criteria provide the benchmarks or standards for evaluating effects under NEPA. Potentially significant impacts to resources require decisionmaking supported by an environmental impact statement. Determining significance considers both the context and intensity of effects. For resources covered by this Policy, the sensitivity and status of affected species, and the relative scarcity, suitability, and importance of affected habitats, provide the context component of significance criteria. Measures of the severity of effects (degree, duration, spatial extent, etc.) provide the intensity component of significance criteria. Significance criteria may help identify appropriate levels and types of mitigation; however, the Service should consider mitigation for impacts that do not exceed thresholds for significance as well as those that do.

Analysis of Environmental Consequences

The analysis of environmental consequences should address the relationship of effects to the maintenance and enhancement of long-term productivity (40

CFR 1502.16), and include the timing and duration of direct, indirect, and cumulative effects to resources, short-term versus long-term effects (adverse and beneficial), and how the timing and duration of mitigation would influence net effects over time. The Service's net gain goal for fish and wildlife resources under this Policy applies to the full planning horizon of a proposed action. Guidance under section V.B.3 (Assessment Principles) of this Policy supplements existing Service, Department, and government-wide guidance for the Service's environmental consequences analyses for affected fish and wildlife resources under NEPA.

Cumulative Effects Analyses

The long-term benefits of mitigation measures, whether onsite or offsite relative to the proposed action, often depend on their placement in the landscape relative to other environmental resources and stressors. Therefore, cumulative effects analyses, including the effects of climate change, are especially important to consider in designing mitigation measures for fish and wildlife resources. Cumulative effects analyses should include consideration of direct and indirect effects of climate change and should incorporate mitigation measures to address altered conditions. Cumulative effects are doubly important in actions affecting species in decline, such as ESA-listed or candidate species, marine mammals, and Birds of Conservation Concern, for which the Service should design mitigation that will improve upon existing conditions and offset as much as practicable reasonably foreseeable adverse cumulative effects. Also, to the extent practicable, cumulative effects analyses should address the synergistic effects of multiple foreseeable resource stressors. For example, in parts of some western States, the combination of climate change, invasive grasses, and nitrogen deposition may substantially increase fire frequency and intensity, adversely affecting some resources to a greater degree than the sum of these stressors considered independently.

Analysis of Climate Change

The analyses of climate change effects should address effects to and changes for the evaluation species, resource categories, mitigation measures, and the potential for changes in the effects of mitigation measures. Anticipated changes may result in the need to choose different or additional evaluation species and habitat, at different points in time.

Decision Documents

Mitigation measures should be included as commitments within a Record of Decision (ROD) for an EIS, and within a mitigated FONSI. The decision documents should clearly identify: (a) Measures to achieve outcomes of no net loss or net gain; (b) the types of mitigation measures adopted for each evaluation species or suite of species; (c) the spatial and temporal application and duration of the measures; (d) compliance and effectiveness monitoring; (e) criteria for remedial action; and (f) unmitigated residual effects.

**Appendix C. Compensatory Mitigation in Financial Assistance Awards Approved or Administered by the U.S. Fish and Wildlife Service**

The basic authority for Federal financial assistance is in the Federal Grant and Cooperative Agreement Act of 1977 (31 U.S.C. 6301 *et seq.*). It distinguishes financial assistance from procurement, and explains when to use a grant or a cooperative agreement as an instrument of financial assistance. Regulations at 2 CFR part 200 provide Government-wide rules for managing financial assistance awards. Each of the Service's financial assistance programs has at least one statutory authority, which are listed in the Catalog of Federal Domestic Assistance at *http://www.cfda.gov/*. These statutory authorities and their program-specific regulations may supplement or create exceptions to the Government-wide regulations. The authorities and regulations for the vast majority of financial assistance programs do not address mitigation, but there are at least two exceptions. The statutory authority for the North American Wetlands Conservation Fund program (16 U.S.C. 4401 *et seq.*) prohibits the use of program funds for specific types of mitigation. Regulations implementing the National Coastal Wetlands Conservation Grant program (50 CFR part 84) include among the activities ineligible for funding the acquisition, restoration, enhancement, or management of lands to mitigate recent or pending habitat losses. Consistent with this Policy, the regulations at 50 CFR part 84 authorize the use of Natural Resource Damage Assessment funds as match in the National Coastal Wetlands Conservation Program. To foster consistent application of financial assistance programs with respect to mitigation processes, the following provisions describe appropriate circumstances as well as prohibitions for use of financial assistance in developing compensatory mitigation.

*A. What is Federal financial assistance?*

Federal financial assistance is the transfer of cash or anything of value from a Federal agency to a non-Federal entity to carry out a public purpose authorized by a U.S. law. If the Federal Government will be substantially involved in carrying out the project, the instrument for transfer must be a cooperative agreement. Otherwise, it must be a grant agreement. We use the term *award* interchangeably for a grant or cooperative agreement. This Policy applies only to awards approved or administered by the Service in one of its financial assistance programs. If the Service shares responsibility for approving or administering an award with another entity, this Policy applies only to those decisions that the Service has the authority to make under the terms of the shared responsibility.

*B. Where do most mitigation issues occur in financial assistance?*

Most mitigation issues in financial assistance relate to: (a) The proposed use of mitigation funds on land acquired with Federal financial assistance, and (b) using either mitigation funds or in-kind

AR_0044714

contributions derived from mitigation, as match. Match is the share of project costs not paid by Federal funds, unless otherwise authorized by Federal statute. Most Service-approved or -administered financial assistance programs require or encourage applicants to provide match to leverage the Federal funds.

*C. Can the Federal or matching share in a financially assisted project be used to generate mitigation credits for activities authorized by Department of the Army (DA) permits?*

1. Neither the Federal nor matching share in financially assisted aquatic-resource-restoration projects or aquatic resource conservation projects can be used to generate mitigation credits for DA-authorized activities except as authorized by 33 CFR 332.3(j)(2) and 40 CFR 230.93(j)(2). These exceptional situations are any of the following:

a. The mitigation credits are solely the result of any match over and above the required minimum. This surplus match must supplement what will be accomplished by the Federal funds and the required-minimum match to maximize the overall ecological benefits of the restoration or conservation project.

b. The Federal funding for the award is statutorily authorized and/or appropriated for the purpose of mitigation.

c. The work funded by the financial assistance award is subject to a DA permit that requires mitigation as a condition of the permit. An example is an award that funds a boat ramp that will adversely affect adjacent wetlands and the impact must be mitigated. The recipient may pay the cost of the mitigation with either the Federal funds or the non-Federal match.

2. Match cannot be used to generate mitigation credits under the exceptional situations described in section C(1)(a–c) if the financial assistance program's statutory authority or program-specific regulations prohibit the use of match or program funds for compensatory mitigation.

*D. Can the Service approve a proposal to use the proceeds from the purchase of credits in an in-lieu-fee program or a mitigation bank as match?*

1. In-lieu-fee programs and mitigation banks are mechanisms authorized in 33 CFR part 332 and 40 CFR part 230 to provide mitigation for activities authorized by a DA permit. The Service must not approve a proposal to use proceeds from the purchase of credits in an in-lieu-fee program or mitigation bank as match unless both of the following apply:

a. The proceeds are over and above the required minimum match. This surplus match must supplement what will be accomplished by the Federal funds and the required-minimum match to maximize the overall ecological benefits of the project.

b. The statutory authority for the financial assistance program and program-specific regulations (if any) do not prohibit the use of match or program funds for mitigation.

2. The reasons that the Service cannot approve a proposal to use proceeds from the purchase of credits in an in-lieu-fee program or mitigation bank as match except as described in section D(1)(a–b) are:

a. Proceeds from the purchase of credits are legally required compensation for resources or resource functions impacted elsewhere. The sponsor of the in-lieu-fee program or mitigation bank uses these proceeds for the restoration, establishment, enhancement, and/or preservation of the resources impacted. The purchase price of the credits is based on the full cost of providing the compensatory mitigation.

b. When credits are purchased from an in-lieu-fee program sponsor or a mitigation bank to compensate for impacts authorized by a DA permit, the responsibility for providing the compensatory mitigation transfers to the sponsor of the in-lieu-fee program or mitigation bank. The process is not complete until the sponsor provides the compensatory mitigation according to the terms of the in-lieu-fee program instrument or mitigation-banking instrument approved by the District Engineer of the U.S. Army Corps of Engineers.

*E. Can the Federal share or matching share in a financially assisted project be used to satisfy a mitigation requirement of a permit or legal authority other than a DA permit?*

The limitations on the use of mitigation in a Federal financially assisted project are generally the same regardless of the source of the mitigation requirement, but only the limitations regarding mitigation required by a DA permit are currently established in regulation. Limitations for a permit or authority other than a DA permit are established in this Policy. They are:

1. Neither the Federal nor matching share in a financially assisted project can be used to satisfy Federal mitigation requirements except in any of the following situations:

a. The mitigation credits are solely the result of any match over and above the required minimum. This surplus match must supplement what will be accomplished by the Federal funds and the required minimum match to maximize the overall ecological benefits of the project.

b. The Federal funding for the award is statutorily authorized and/or appropriated for use as compensatory mitigation for specific projects or categories of projects.

c. The project funded by the Federal financial assistance award is subject to a permit or authority that requires mitigation as a condition of the permit. An example is an award that funds a boat ramp that will adversely affect adjacent wetlands and the impact must be mitigated. The recipient may pay the cost of the mitigation with either the Federal funds or the non-Federal match.

2. Match cannot be used to satisfy Federal mitigation requirements under the exceptional situations described in section E(1)(a–c) if the financial assistance program's statutory authority or program-specific regulations prohibit the use of match or program funds for mitigation.

3. If any regulations govern the specific type of mitigation, and if these regulations address the role of mitigation in a Federal financially assisted project, the regulations will prevail in any conflict between those regulations and section E of Appendix C.

*F. Can the Service approve a proposal to use revenue from a Natural Resource Damage Assessment and Restoration (NRDAR) Fund settlement as match in a financial assistance award?*

1. The Service can approve such a proposal as long as the financial assistance program does not prohibit the use of match or program funds for compensatory mitigation. In certain cases, this revenue qualifies as match because:

a. Federal and non-Federal entities jointly recover the fees, fines, and/or penalties and deposit the fees, fines, and/or penalties as joint and indivisible recoveries into a fiduciary fund for this purpose.

b. The governing body of the NRDAR Fund may include Federal and non-Federal trustees, who must unanimously approve the transfer to a non-Federal trustee for use as non-Federal match.

c. The project is consistent with a negotiated settlement agreement and will carry out the provisions of the Comprehensive Environmental Response Compensation and Liability Act, as amended, Federal Water Pollution Control Act of 1972, and the Oil Pollution Act of 1990 for damage assessment activities.

d. The use of the funds by the non-Federal trustee is subject to binding controls.

*G. Can the Service approve financial assistance to satisfy mitigation requirements of State, tribal, or local governments?*

1. The Service may approve an award that satisfies a compensatory mitigation requirement of a State, tribal, or local government, if satisfying the mitigation requirement is incidental to a project purpose consistent with the purposes(s) of the program. It is solely the responsibility of the State, tribal, or local government to determine that its mitigation requirement has been satisfied and to submit any required certifications to that effect.

2. Satisfying a State, tribal, or local government mitigation requirement with Federal financial assistance or contributing match originating from such a requirement to a Federal award must not be contrary to any law, regulation, or policy of the State, tribal, or local government, as applicable.

*H. Can a project on land already designated for the conservation of natural resources generate credits for compensatory mitigation?*

1. A project on public, private, or federally recognized tribal lands already designated for conservation of natural resources can generate credits for compensatory mitigation if it meets the requirements of section 5.7.2. One of these requirements is that the benefits of the mitigation measures must be additional. If the authority for the compensatory mitigation is the Clean Water Act and if public land is proposed as the site of the project, it must also comply with 33 CFR 332.3(a)(3) and 40 CFR 230.93(a)(3), both of which read:

. . . Credits for compensatory mitigation projects on public land must be based solely on aquatic resource functions provided by the compensatory mitigation project, over and above those provided by public programs already planned or in place. . . .

AR_0044715

Public land includes only those real property interests owned or held by Federal, State, and local governments, and instrumentalities of any of these governments.

To be either "additional" or "over and above," the benefits must improve upon the baseline conditions of the impacted resources and their values, services, and functions in a manner that is demonstrably new and would not have occurred without the compensatory mitigation measure. Baseline conditions are: (a) Those that exist, and (b) those that a public land-management agency is foreseeably expected to implement absent the mitigation.

2. Examples of baseline conditions that a land-management agency or organization is foreseeably expected to implement are:

a. Management outcomes or environmental benefits required for a land-management unit by a statute, regulation, covenant in a deed, facility-management plan, or an integrated natural resources management plan, *e.g.*, (a) huntable populations of big game, (b) Class A wild trout populations at Class A densities, and (c) habitat diversity. When evaluating existing plans under sections H.2.a or b, the Service must defer to State and tribal plans to determine which additional benefits to count toward achieving the mitigation planning goal as long as the plans are consistent with Federal law and regulation and this Policy.

b. Management responsibilities assigned to an agency by statute, regulation, facility management plan, or integrated natural resources management plan, *e.g.*, (a) resource protection, (b) habitat management, and (c) fire management.

c. Commitments made under a financial-assistance award by the recipient, a subrecipient, or a partner to achieve certain management outcomes or environmental

benefits for a land-management unit. The source of the funding to carry out these commitments may be the awarding agency, a match provider, and/or other contributors.

3. Projects that are not part of annual operations and maintenance are not baseline conditions if they are unfunded and have little prospect of funding, even if these projects are authorized in a statute or called for in a plan. Examples of projects that may be authorized in a statute or called for in a plan, but may have little prospect for funding are: (a) Construction of a high-volume pump station, (b) demolition of a dam, (c) reforestation of 1,000 acres of former agricultural land, and (d) acquisition of real property.

4. If it is unclear whether the proposed mitigation would provide additional conservation benefits after considering the above guidance, financial assistance managers must use judgment in making a decision. The overarching principles in making this decision should be: (a) Consistency with regulations, and (b) avoidance of an unauthorized subsidy to anyone who has a legal obligation to compensate for the environmental impacts of a project.

5. Service staff must be involved in the decision to locate mitigation on real property acquired under a Service-approved or administered financial assistance award for one or both of the following reasons:

a. The Service has a responsibility to ensure that real property acquired under one of its financial assistance awards is used for its authorized purpose as long as it is needed for that purpose.

b. If the proposed legal arrangements or the site-protection instrument to use the land for mitigation would encumber the title, the recipient of the award that funded the acquisition of the real property must obtain

the Service's approval. If the proposed legal arrangements would dispose of any real-property rights, the recipient must request disposition instructions from the Service.

*I. Does the Service's Mitigation Policy affect financial assistance programs and awards managed by other Federal entities?*

1. This Policy affects only those Federal financial assistance programs and awards in which the Service has the authority to approve or disapprove applications for financial assistance or changes in the terms and conditions of an award. It also affects real property or equipment acquired or improved with a Service-administered financial assistance award where the recipient must continue to manage the real property or equipment for its originally authorized purpose as long as it is needed for those purposes.

2. The Policy has no effect on other Federal agencies' policies on match or cost share as long as those policies do not affect:

a. Restrictions in the Policy on the use of Service-approved or administered financial assistance awards for generating compensatory mitigation credits, and

b. the Service's responsibilities as identified in Federal statutes or their implementing regulations.

3. This Policy does not take precedence over the requirements of any Federal statute or regulation whether that statute or regulation applies to a Service program or a program of another Federal agency.

Dated: November 9, 2016.

**Daniel M. Ashe,**

*Director, U.S. Fish and Wildlife Service.*

[FR Doc. 2016–27751 Filed 11–18–16; 8:45 am]

**BILLING CODE 4333–15–P**

AR_0044716