**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA**

| | |
|---|---|
| State of Iowa et al.,<br><br>Plaintiffs,<br><br>vs.<br><br>Council on Environmental Quality and Brenda Mallory, in her official capacity as Chair,<br><br>Defendants,<br><br>and<br><br>Alaska Community Action on Toxics et al.,<br><br>Intervenor-Defendants,<br><br>and<br><br>State of California et al.,<br><br>Intervenor-Defendants. | Case No. 1:24-cv-00089 |

---

**ORDER REGARDING ALL MOTIONS FOR
SUMMARY JUDGMENT AND PARTIAL SUMMARY JUDGMENT**

---

[¶ 1]    THIS MATTER comes before the Court on three Motions for Summary Judgment and one Motion for Partial Summary Judgment. This case has two sets of Intervenor-Defendants. For purposes of this Order, the Court will refer to Alaska Community Action on Toxics et al. as the

"Organization Intervenors"[1] and to California et al. as the "State Intervenors."[2] The Court will refer to the Council on Environmental Quality and Brenda Mallory collectively as "CEQ."

[¶ 2]    The Plaintiff States[3] filed a Motion for Summary Judgment on August 2, 2024. Doc. No. 64. CEQ, Organization Intervenors, and State Intervenors responded on August 30, 2024. Doc. Nos. 85–86, 90–92. Plaintiff States replied on September 20, 2024. Doc. No. 98.

[¶ 3]    CEQ and the Organization Intervenors each filed Cross-Motions for Summary Judgment on August 30, 2024. Doc. Nos. 84, 87. State Intervenors filed a Cross-Motion for Partial Summary Judgment for Counts I, II, and IV of the Amended Complaint on August 30, 2024. Doc. No. 83. Plaintiff States responded to all three motions on September 20, 2024. Doc. No. 101. On October 11, 2024, CEQ, Organization Intervenors, and State Intervenors filed their Replies. Doc. Nos. 105–07.

[¶ 4]    For the reasons explained below, Plaintiff States' Motion for Summary Judgment is **GRANTED**, CEQ's Motion for Summary Judgment is **DENIED**, Organization Intervenors' Motion for Summary Judgment is **DENIED**, and State Intervenors' Motion for Partial Summary Judgment is **DENIED**.

---

[1] The Organization Intervenors include Alaska Community Action on Toxics, Center for Biological Diversity, Center for Environmental Health, Center for Food Safety, Environmental Law and Policy Center, Environmental Protection Information Center, Food & Water Watch, Fort Berthold Power, Friends of the Earth, Green Latinos, Labor Council on Latin American Advancement, Malama Makua, National Parks Conservation Association, National Wildlife Federation, Ocean Conservancy, People's Collective for Environmental Justice, Rio Grande International Study Center, Southern Utah Wilderness Alliance, We Act for Environmental Justice, The Wilderness Society, and Winter Wildlands Alliance. Doc. No. 60.

[2] The State Intervenors include the States of California, Colorado, Illinois, Maine, Maryland, New Jersey, New Mexico, New York, Oregon, Washington, Wisconsin, the Commonwealth of Massachusetts, the People of Michigan, the District of Columbia, and the City of New York. Doc. No. 82.

[3] The Plaintiff States include the States of Iowa, North Dakota, Alaska, Arkansas, Florida, Georgia, Idaho, Kansas, Louisiana, Missouri, Montana, Nebraska, South Carolina, South Dakota, Tennessee, Texas, Utah, Virginia, West Virginia, Wyoming, and the Commonwealth of Kentucky.

## BACKGROUND

[¶ 5]     Congress enacted the National Environmental Policy Act of 1969 ("NEPA") on Jan. 1, 1970. Pub. L. No. 91-190, 83 Stat. 852. NEPA requires all federal agencies to analyze the effects of federal action on the environment through a "detailed statement." 42 U.S.C. § 4332(C). NEPA established the Council on Environmental Quality and authorized the agency "make recommendations to the President" and "develop and recommend to the President national policies to foster and promote the improvement of environmental quality." 42 U.S.C. § 4344(3)-(4).

[¶ 6]     In 1970, President Nixon instructed CEQ to issue "guidelines" to federal agencies. Exec. Order No. 11,514, 35 Fed. Reg. 4247–48 (Mar. 7, 1970). The prevailing judicial view at the time held that CEQ's guidelines were advisory and non-binding suggestions. See Nat'l Helium Corp. v. Morton, 455 F.2d 650, 656 (10 Cir. 1971) ("[T]he apparent purpose of the Council is to review federal programs and activities so as to keep the President informed on the extent to which these activities may affect the policies set forth in [NEPA]. The Council's function is in no way regulatory. Its purpose is to take information and to coordinate the reporting of governmental activities so as to aid the policy makers."); Greene Cnty. Planning Bd. v. Red. Power Comm'n, 455 F.2d 412, 421 (2d Cir. 1972) (describing in an introductory clause that "the Guidelines are merely advisory and the Council on Environmental Quality has no authority to prescribe regulations governing compliance with NEPA"); Hiram Clarke Civic Club, Inc. v. Lynn, 476 F.2d 421, 424 (5th Cir. 1973) ("These CEQ guidelines are merely advisory, because the CEQ does not have the authority to prescribe regulations governing compliance with NEPA."); Env't Def. Fund, Inc. v. Corps Of Engineers of U.S. Army, 492 F.2d 1123, 1128 (5th Cir. 1974) (describing CEQ as "an environmental group created by NEPA to act as consultants to the President"); Warm Springs Dam Task Force v. Gribble, 565 F.2d 549, 552 (9th Cir. 1977) (stating the CEQ is "charged

with review of environmental impact statements for the executive branch"); <u>Aertsen v. Landrieu</u>, 637 F.2d 12, 17 (1st Cir. 1980) (describing CEQ as "an advisory body . . . which has authority to promulgate guidelines to aid 'responsible officials' to develop their own procedures").

[¶ 7]    In 1975, the D.C. Circuit held the guidelines were "entitled to great respect" and noted CEQ interpretation was "entitled to deference" because it was charged with appraising agency compliance with NEPA. <u>Sierra Club v. Morton</u>, 514 F.2d 856, 873, 873 n.24 (D.C. Cir. 1975). The administrative interpretation of NEPA was adopted soon after enactment. <u>Id.</u> However, the circuit court also stated, "[T]he Guidelines are intended to guide agency planners in the need for impact statements." <u>Id.</u> at 875. When that case reached the Supreme Court under a new name, the Solicitor General advised the Court the guidelines "were not mandatory" and "do not bind agencies of the Executive branch." <u>Marin Audubon Soc'y v. FAA</u>, 121 F.4th 902, 910 (quoting Brief for the Petitioners at 31 n.24, <u>Kleppe v. Sierra Club</u>, 427 U.S. 390 (1976)).

[¶ 8]    In 1977, after <u>Kleppe v. Sierra Club</u>, President Carter amended President Nixon's Executive Order, directing CEQ to "[i]ssue regulations to Federal agencies for the implementation of the procedural provisions of the Act" and directing agencies to "comply with the regulations issued by the Council." Exec. Order No. 11,991, 42 Fed. Reg. 26967 (May 24, 1977). In response, CEQ promulgated the 1978 Rule, which included "uniform standards applicable throughout the Federal government" and were "binding on all Federal agencies." NEPA–Regulations, 43 Fed. Reg. 55978, 55978-79 (Nov. 29. 1978) (codified at 40 C.F.R. pts. 1500–08). The 1978 Rule replaced individual agency regulations. <u>Id.</u> To support its authority for the 1978 Rule, CEQ listed President Carter's Executive Order and "the President's Constitutional and statutory authority." <u>Id.</u> The regulations stated that (1) if no significant impact is anticipated, the agency can use a categorical exclusion ("CE") to approve the project without paperwork, <u>Id.</u> at 55992; (2) if impact

is uncertain or unlikely to be significant, the project required an Environmental Assessment ("EA"), which "briefly provides sufficient evidence and analysis for determining" if more detailed analysis is required, Id. at 56004; and (3) if significant effects are likely, then the project required an Environmental Impact Statement ("EIS"), a more in-depth analysis. Id. at 55994. The 1978 Rule was seen by the courts, the government, and the CEQ as legally binding on not only federal agencies, but also third parties seeking judicial review of agency compliance. See Dept. of Transp. v. Public Citizen, 541 U.S. 752 (2004) (CEQ was "established by NEPA with authority to issue regulations interpreting it.").

[¶ 9]     NEPA was left largely undisturbed for almost forty years until 2017 when President Trump directed CEQ to propose a new process. Exec. Order 13,807, 82 Fed. Reg. 40463 (Aug. 15, 2017). CEQ then promulgated a new Rule in 2020. Update to the Regulations Implementing the Procedural Provisions of NEPA, 85 Fed. Reg. 43304 (July 16, 2020) (to be codified in 40 C.F.R. pts. 1500–08, 1515–18). In 2021, President Biden directed CEQ to reconsider the 2020 Rule. See Exec. Order 13,990, 86 Fed. Reg. 7037 (Jan. 20, 2021). In 2022, CEQ amended its regulations "generally restor[ing] provisions that were in effect for decades before being modified in 2020." NEPA Implementing Regulations Revisions, 87 Fed. Reg. 23453, 23453 (Apr. 20, 2022) (to be codified at 40 C.F.R. §§ 1502, 1507–08). The 2022 Rule also stated agencies had discretion to include various factors when determining the purpose and need for a project, removed some language that would limit agencies' ability to implement procedures greater than CEQ's requirements, and the term "effects" "include[s] direct, indirect, and cumulative effects." Id.

[¶ 10]  In 2023, Congress enacted the Fiscal Responsibility Act ("FRA") that also amended NEPA. Pub. L. No. 118-5, 137 Stat. 10 (2023). The FRA changed the requirements of the EIS and added several new provisions detailing: differences between EAs and EISs, what to consider when

deciding if an EA or an EIS is required, when CEs can apply, types of information that can be considered, page and time limits for documentation, and statutory definitions. Id.

[¶ 11]   On May 1, 2024, CEQ promulgated the 2024 Rule with the stated intent to: (1) implement FRA amendments, (2) enhance consistency and clarity, (3) improve the efficiency and effectiveness of the review process, (4) revert to and revise certain language from the 1978 rules, and (5) remove additional parts of the 2020 Rule "that CEQ considers imprudent or legally unsettled, or that create ambiguity that could reduce efficiency or increase the risk of litigation." National Environmental Policy Act Implementing Regulations Revisions Phase 2, 89 Fed. Reg. 35442, 35447–48.

[¶ 12]   On May 21, 2024, Plaintiff States filed the present action challenging the 2024 Rule. Doc. No. 1.[4] Plaintiff States allege four claims for relief, namely that the 2024 Rule violates: (1) NEPA and the Administrative Procedure Act ("APA") by exceeding the agency's authority and making changes inconsistent with the authorizing act, (2) the APA because it is arbitrary and capricious, (3) NEPA because Congress did not authorize the agency create a document that avoids a full NEPA analysis of projects that have significant impacts, and (4) the major questions doctrine by exceeding CEQ's authority and affecting topics that have major economic significance. Doc. No. 39, pp. 24–39. Organization Intervenors' Motion to Intervene was granted on July 31, 2024, and State Intervenors' Motion to Intervene was granted on August 30, 2024. Doc. Nos. 60, 82.

[¶ 13]   On October 18, 2024, CEQ moved to hold a hearing on its Motion for Summary Judgment. Doc. No. 111. The Court granted the Motion on October 21, 2024, and set the hearing for November 20, 2024. Doc. No. 112. On November 13, 2024, Plaintiff States requested leave to file

---

[4] Plaintiff States filed an Amended Complaint on June 4, 2024. Doc. No. 39.

supplemental authority[5] concerning the D.C. Circuit decision in <u>Marin Audubon</u>, which found CEQ had no rulemaking authority under NEPA. Doc. Nos. 114.

[¶ 14]   <u>Marin Audubon</u> concerned a challenge to an Air Tour Management Plan set by the Federal Aviation Administration ("FAA") and the National Park Service. 121 F.4th 902, 905 (D.C. Cir. 2024). The National Parks Act requires FAA approval for flights over national parks, but the FAA cannot approve applications without an approved Air Tour Management Plan ("Plan") that assesses environmental impact and complies with NEPA. <u>Id.</u> at 905–07. The FAA decided a particular project qualified as an exclusion; therefore, a Plan wasn't needed. <u>Id.</u> at 908. The D.C. Circuit reviewed the FAA's decision and held that even though parties did not challenge CEQ's authority, the court would review it sua sponte. <u>Id.</u> at 909.

[¶ 15]   Writing for the court, Judge A. Raymond Randolph noted that for CEQ regulations to be binding, there must be "some delegation of the requisite legislative authority by Congress." <u>Id.</u> at 912 (quoting <u>Chrysler Corp. v. Brown</u>, 441 U.S. 281, 304 (1979)). Further, the Supreme Court has been clear that agencies are "creatures of statute." <u>Id.</u> at 914 (quoting <u>Nat'l Fed'n of Indep. Bus. v. OSHA</u>, 595 U.S. 109, 117 (2022)). "The Constitution does not permit the President to seize for himself the law-making power of Congress by issuing an order that, like a statute, authorizes a government official to promulgate rules and regulations." <u>Id.</u> (cleaned up) (quoting <u>Youngstown Sheet & Tube Co. v. Sawyer</u>, 343 U.S. 579, 588 (1952)). Therefore, the D.C. Circuit held that CEQ "had no lawful authority to promulgate these regulations." <u>Id.</u>

[¶ 16]   After review of <u>Marin Audubon</u>, this Court ordered additional briefing on the issue of CEQ authority. Doc. No. 117. A hearing was held on November 20, 2024, concerning all motions before the Court. Doc. No. 123. The Court allowed for additional supplemental briefing after the hearing,

---

[5] The Court granted the Motion on November 14, 2024. Doc. No. 115.

extending the deadline until after CEQ's oral arguments in <u>Seven County Infrastructure Coalition</u> <u>v. Eagle County</u>, No. 23-975 (argued Dec. 10, 2024). Doc. No. 124. CEQ, Organization Intervenors, and State Intervenors filed supplemental briefs on December 13, 2024. Doc. Nos. 134–36. Plaintiff States filed their Reply on December 20, 2024. Doc. No. 137.

## STANDING

[¶ 17]   CEQ argues the Plaintiff States do not have standing. Doc. No. 86, p. 25. Standing requires a concrete injury, caused by the defendant, that can be remedied by the Court. <u>Lujan v. Defs. of</u> <u>Wildlife</u>, 504 U.S. 555, 560–61 (1992).[6] The presence of one party with standing is sufficient for jurisdiction. <u>Rumsfeld v. Forum for Acad. & Inst. Rights, Inc.</u>, 547 U.S. 47, 52 n.2 (2006).

### I.    Injury

[¶ 18]   CEQ presents several arguments against standing: (1) states are not regulated parties, (2) the injury is hypothetical, (3) the direct impact of the 2024 Rule (as opposed to NEPA itself) is not proven, (4) special solicitude does not apply in this case, and (5) the injuries of several Plaintiffs are self-inflicted.[7] Doc. No. 86, pp. 25–33. Plaintiff States argue (1) CEQ ignores States' role in preparing NEPA documents and applying CEQ's regulations regarding NEPA, (2) "[n]o speculation is needed to discern that agencies will alter their NEPA reviews due to the Final Rule,"

---

[6] The parties do not dispute causation and redressability, and those elements will not be discussed. Doc. No. 86.

[7] Of the fifty states in our democratic republic, thirty-four are a party to this lawsuit, plus the District of Columbia and the City of New York. <u>See</u> Doc. Nos. 39, 82. None of the parties addressed State Intervenor standing in the briefing, except State Intervenors themselves. <u>See</u> Doc. No. 85, p. 22. While an intervenor's burden for standing is different than a party's, it is not lower. In the Eighth Circuit, an intervenor must still establish Article III standing. <u>United States v. Metro.</u> <u>St. Louis Sewer Dist.</u>, 569 F.3d 829, 833 (8th Cir. 2009). Intervenor-defendants have an injury for standing purposes if the court's remedy would cause imminent injury. <u>See id.</u> at 836. When State Intervenors moved to join this case, none of the parties objected, and when Magistrate Judge Clare Hochhalter granted State Intervenors' motion, no one appealed that decision. <u>See</u> Doc. Nos. 63– 82.

(3) CEQ concedes the Final Rule applies to every review and all federal agencies and therefore it is the Final Rule (and not NEPA) that will cause injury, (4) the Rule also effects the quasi-sovereign interest of the health and well-being of their populaces, and (5) States were assigned the responsibility of implementing NEPA before the 2024 Rule's enactment. Doc. No. 98, pp. 11–13.

[¶ 19]  First, for unregulated parties to have standing, courts must ask: "Is it likely that the government's regulation or lack of regulation of someone else will cause a concrete and particularized injury in fact to the unregulated plaintiff?" FDA v. All. For Hippocratic Med., 602 U.S. 367, 385 n.2 (2024). Plaintiff States have supplied ample evidence that essential projects will be delayed by the 2024 Rule. See Doc. Nos. 65-1–65-16. The 2024 Rule requires agencies, and by implication States, to reevaluate the environmental impact for projects that rely on documents older than five years. 89 Fed. Reg. at 35562. Therefore, whether or not the project has an EIS already, all projects are subject to the 2024 Rule requirements.

[¶ 20]  Second, state projects will be delayed under the 2024 Rule. All agencies will have to propose new implementation procedures by July 1, 2025. Id. at 35573. Even if the States play no part in this stage of the process, the agencies will likely have to delay work on other projects to comply with this tight timeline. See id. at 35532 (Commenters to the proposed rule questioned the ability to comply with the timeline at all, given the nature of formal rulemaking.). After these new implementing procedures are complete, the States will have to comply, inevitably taking extra time and expense to implement state projects.

[¶ 21]  Further, some states have delegated authority to implement and enforce environmental programs. See e.g., Doc. No. 65-16, pp. 3–5 (Wyoming has delegated primacy to enforce and implement environmental programs that comply with federal regulations.). The trickle-down obligations from the 2024 Rule are sure to cause delay. Like in West Virginia v. EPA, where states

had standing to challenge an EPA rule before enforcement, "[t]here is not a mere possibility the new regulations will impact States – it is a given." 669 F. Supp. 3d 781, 798 (D.N.D. 2023), <u>appeal dismissed</u>, No. 23-2411, 2023 WL 8643059 (8th Cir. Oct. 10, 2023). Therefore, the injury they allege is concrete and particularized.

[¶ 22]  Third, the Eighth Circuit has held states "still must satisfy the basic requirements of Article III standing." <u>Missouri v. Biden</u>, 52 F.4th 362, 369 (8th Cir. 2022). The Court finds traditional Article III standing is satisfied in this case and does not reach the issue of whether the States' quasi-sovereign interests are implicated.

[¶ 23]  Fourth, the injuries to the States with delegated enforcement authority are not self-inflicted. In <u>Clapper v. Amnesty Intern. USA</u>, standing was denied for economic harm stemming from actions taken "based on a fear of" an effect a law might have. 568 U.S. 398, 416 (2013). The States charged with implementing NEPA are not acting out of fear and this assumption of responsibility was taken long before the 2024 Rule was enacted. <u>See</u> Doc. No. 98, p. 13.

[¶ 24]  For the above stated reasons, this Court finds the Plaintiff States have a concrete and particularized injury. Therefore, this Court finds the Plaintiff States have met the elements of standing.

## II.    Ripeness

[¶ 25]  CEQ also argues the claims are unripe without specific applications of the challenged rule. Doc. No. 86, p. 33. Plaintiff States argue the 2024 Rule fails as a matter of law and further factual application will not change this failure. Doc. No. 98, p. 16.

[¶ 26]  When considering ripeness, courts assess how fit the issues are for judicial decision and if withholding review causes hardship to the parties. <u>Parrish v. Dayton</u>, 761 F.3d 873, 875 (8th Cir.

2014). An issue is ripe for adjudication if it is not hypothetical or contingent. Id. Injuries that are certainly impending are sufficient. Id. Hardship can include financial risk or forced behavior. Id.

[¶ 27]  CEQ argues this case is similar to Wild Virginia v. CEQ, where a group of organizations sued CEQ challenging the 2022 Rule. 56 F.4th 281, 287 (4th Cir. 2022). In that case, the claims were unripe because the organizations did not have specific projects subject to NEPA and instead relied on allegations of general future harm. Id. at 303. The Court does not find Wild Virginia applicable here as the Plaintiff States and State Intervenors have identified specific injuries that do not rely on alleged general harm. See Doc. Nos. 65-1–65-16, 85-1–85-5.

[¶ 28]  CEQ further argues States will have opportunity later to challenge the 2024 Rule through a petition process. Doc. No. 86, p. 35. The court petition process for agency delay was discussed at the hearing. See 42 U.S.C. § 4336a(g)(3). Project sponsors like the States can petition the court when the agency fails to act within a certain timeline, which is not triggered until certain events occur. Id. § 4336a(g)(1). This limited review does not address the issues outside of delay and only gives the remedy of setting a schedule for agency action. See id. § 4336a(g). States would still be required to wait for a final agency before being able to challenge them judicially.

[¶ 29]  The Court does not need to wait for facts relating to direct application of the 2024 Rule. The effects of the Rule are already being felt by the States as agencies use resources to make compliance procedures instead of assessing State projects already in process.

[¶ 30]  These injuries are sufficient and would cause increased hardship to the States if the Court denied review. Therefore, the Court finds the issues are ripe for adjudication.

### III.    Conclusion

[¶ 31]  Plaintiff States have an imminent and concrete injury in the delay and financial expense associated with compliance to the 2024 Rule. This injury is caused by the CEQ. A decision by this

Court to vacate portions of the 2024 Rule would remedy this injury. The issues are ripe, and hardship would occur if the Court withheld review. Therefore, the Plaintiff States have standing, and these issues are ripe for adjudication.

## EXCEEDING AUTHORITY

[¶ 32]  Final federal administrative agency action is reviewed by courts under the authority of the APA. 5 U.S.C. § 706. Agency action may be set aside if it is "arbitrary, capricious," or "in excess of statutory . . . authority." Id. § 706(2)(A), (C).

### I.    Scope of CEQ Authority

[¶ 33]  Plaintiff States argue CEQ exceeded the authority given to it by Congress by changing NEPA from a procedural statute to forcing substantive action. Doc. No. 65, pp. 28–29. CEQ and State Intervenors argue that CEQ acted within its authority afforded by Congress and recognized by the Supreme Court in Andrus v. Sierra Club. Doc. No. 85, p. 30; 86, pp. 37–39.

[¶ 34]  When reviewing agency actions done under delegated discretionary authority, courts are "to independently interpret the statute," recognize the boundaries of Congressional delegations, and "ensur[e] the agency has engaged in 'reasoned decisionmaking' within those boundaries." Loper Bright Enters. v. Raimondo, 603 U.S. 369, 395 (citations omitted).[8]

---

[8] CEQ, Organization Intervenors, and State Intervenors argue the Court should not reach the issue of CEQ authority for multiple reasons. Doc. Nos. 134–36. The Court finds none of them persuasive. Plaintiff States have claimed the 2024 Rule exceeds CEQ authority. This necessarily means the Court must determine what CEQ's authority is to analyze if CEQ exceeded it. This process is a step in the Court's required analysis and not an issue that needs to be presented or forfeited. See Loper Bright, 603 U.S. at 395. Similarly, the pending en banc appeal of Marin Audubon does not influence this case. The Court is not bound by the D.C. Circuit and no decision in that case would affect this Order. Also, the Complaint need not be amended because all parties were aware of the broader issue of CEQ authority with the citation to Food & Water Watch v. U.S. Dep't of Agric. in Plaintiff States' opening brief. See Doc. No. 65, p. 49. The issue of CEQ authority has been fully briefed, orally argued, and all parties had opportunity to be heard. Lastly, "[w]hen an issue or claim is properly before the court, the court is not limited to the particular legal

[¶ 35]  The plain text of NEPA authorizes CEQ to "make recommendations to the President" and "develop and recommend to the President national policies." 42 U.S.C. § 4344(3)-(4). President Nixon directed the agency to issue guidelines in 1970, Exec. Order 11,514, which courts interpreted to be advisory. See e.g., Nat'l Helium Corp., 455 F.2d at 656 ("The Council's function is in no way regulatory."). Without referencing judicial interpretation, President Carter, relying on "authority vested in [him] by the Constitution and statutes of the United States of America," amended Nixon's order and directed CEQ to issue "regulations" by formal rulemaking procedures including notice and comment. Exec. Order 11,991, 42 Fed. Reg. 26967 (May 24, 1977). President Carter also required federal agencies to comply with CEQ regulations "except where such compliance would be inconsistent with statutory requirements." Id.

[¶ 36]  NEPA is not ambiguous. The plain text of the statute does not give CEQ authority to issue binding regulations. NEPA only authorizes CEQ to make recommendations to the President. Therefore, the Court finds that CEQ does not have authority under NEPA to issue regulations.

### a.  Precedent

[¶ 37]  CEQ, State Intervenors, and Organization Intervenors argue CEQ has authority to issue regulations because courts have "consistently recognized" CEQ authority, which binds this Court's decision. Doc. Nos. 135, pp. 12–13; 133, pp. 12–13; 134, pp. 22–28. Plaintiff States argue the Supreme Court and Eighth Circuit have not fully analyzed the issue. Doc. No. 137, pp. 5–9.

[¶ 38]  The Supreme Court has mentioned the source of CEQ authority only a handful of times. In Andrus v. Sierra Club, the Supreme Court explicitly noted President Carter's Executive Order that changed advisory guidelines into mandatory regulations. 442 U.S. 347, 356–57 (1979). The

---

theories advanced by the parties, but rather retains the independent power to identify and apply the proper construction of governing law." Kamen v. Kemper Fin. Servs., Inc., 500 U.S. 90, 99 (1991).

Supreme Court did not analyze CEQ authority specifically and instead went on to give CEQ a version of pre-Chevron agency deference. Id. at 358. In Robertson v. Methow Valley Citizens Council, the Supreme Court merely stated President Carter directed CEQ to issue regulations and CEQ did so based on his executive order. 490 U.S. 332, 354 (1989). That same year, in Marsh v. Oregon Nat. Res. Council, the Supreme Court stated CEQ regulations are entitled to deference under Andrus and impose a duty on agencies, citing to the regulations themselves. 490 U.S. 360, 372 (1989). In Dep't of Transp. v. Public Citizen the Supreme Court stated in an introductory clause that CEQ was "established by NEPA with authority to issue regulations interpreting it." 541 U.S. 752, 757 (2004). The Supreme Court did not engage in any analysis of CEQ's authority as it was not a direct issue. However, even there the Supreme Court states that regulations "guide federal agencies." Id.

[¶ 39]  These cases have one thing in common: no direct analysis of CEQ authority. See Food & Water Watch v. U.S. Dep't of Agric., 1 F.4th 1112, 1118 (D.C. 2021) (Randolph, J., concurring). These statements are more akin to dicta than reasoned analysis. See Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 91 (1998) ("[D]rive-by jurisdictional rulings . . . have no precedential effect."). See also Marin Audubon, 121 F.4th at 913 ("The Supreme Court's pronouncements in this area cannot rescue CEQ's regulations."). In the Eighth Circuit, "we give Supreme Court dicta more weight than other judicial dicta . . . [but] it is not binding." Dahle v. Kijakazi, 62 F.4th 424, 428 (8th Cir. 2023).

[¶ 40]  The Eighth Circuit itself has been equally sparse with analysis of CEQ authority. In Goos v. ICC, a footnote mentions in one sentence that CEQ regulations are binding on federal agencies. 911 F.2d 1283, 1286 n.2 (8th Cir. 1990). The authority cited for this sentence is a law journal article, id., which states: "Initially envisioned as only having the power to issue guidelines for

agency compliance with NEPA, CEQ soon gained powerful authority over administration of the statute within the Executive Branch" through Carter's executive order, which made the regulations "binding on the various federal agencies." Charles H. Montange, <u>NEPA in an Era of Economic Deregulation: A Case Study of Environmental Avoidance at the Interstate Commerce Commission</u>, 9 Va. Env't L.J. 1, 4 (1989) (footnotes omitted). The article in turn cites NEPA, President Carter's Executive Order, <u>Andrus</u>, and an additional Ninth Circuit case. <u>Id.</u> at 4 nn.25–29.

[¶ 41]  As far as this Court's research could find, no binding court has clearly analyzed the issue of CEQ authority before <u>Food & Water Watch</u>. In the treatise American Jurisprudence, the citation for CEQ authority includes a Tenth Circuit case that does not directly address CEQ authority but merely upholds its Rules, and a D.C. District Court case from 2017 that in turn cites <u>Public Citizen</u>. 61B Am. Jur. 2d Pollution Control § 84; <u>see also</u> <u>Coalition of Concerned Citizens to Make Art Smart v. FTA of U.S. Dep't of Trans</u>, 843 F.3d 886 (10th Cir. 2013); <u>Ctr. for Biological Diversity v. Zinke</u>, 260 F. Supp. 3d 11 (D.D.C. 2017). In an article on the history of NEPA and the U.S. Forest Service, Professor Courtney A. Schultz goes so far as to say, "[A]lthough the Act did not originally authorize CEQ to promulgate regulations, it was always assumed to be CEQ's role to interpret aspects of the Act and coordinate activities across federal agencies." <u>History of the Cumulative Effects Analysis Requirement Under NEPA and Its Interpretation in U.S. Forest Service Case Law</u>, 27 J. Env't. L. & Litig. 125, 130 (2012). This Court agrees. For forty years CEQ's authority has been assumed, but these assumptions by the courts and others do not constitute binding precedent.

### b. Presidential Sub-delegation

[¶ 42]  CEQ, State Intervenors, and Organization Intervenors argue NEPA authorizes the President to issue regulations, and the Executive Order simply sub-delegates that authority to CEQ. Doc. Nos. 135, pp. 12–13; 133, pp. 12–13; 134, pp. 22–28. Plaintiff States argue CEQ's presidential delegation violates the separation of powers doctrine. Doc. No. 137, pp. 5–9.

[¶ 43]  CEQ held the same stance when promulgating the 1978 Rule. See 43 Fed. Reg. 55978, 55989 (Nov. 29, 1978). Several commenters questioned the authority of President Carter to issue the executive order and questioned CEQ's authority to issue regulations. Id. CEQ rebutted this argument, saying President Carter had authority vested in him from the Constitution and through NEPA. Id.

[¶ 44]  The U.S. Constitution entrusts the President with ensuring the laws Congress passes are "faithfully executed." U.S. Const. art. II, § 3. Justice Robert Jackson famously outlined the Venn diagram of presidential and congressional power in Youngstown Sheet Tube Co. v. Sawyer: (1) A president has the most authority when acting with "an express or implied authorization of Congress," (2) "there is a zone of twilight in which [the President] and Congress may have concurrent authority," and (3) presidential power is at its lowest when acting against "the expressed or implied will of Congress." 343 U.S. 579, 635–37 (1952) (Jackson, J., concurring). Presidential power "must be scrutinized with caution, for what is at stake is the equilibrium established by our constitutional system." Id. at 638.

[¶ 45]  The separation of powers doctrine "is undoubtably carved into the Constitution's text by its three articles separating powers" between the three branches of government. Trump v. United States, 603 U.S. 593, 638 (2024). "In the framework of the Constitution, the President's power to see that the laws are faithfully executed refutes the idea that he is to be a lawmaker. The

Constitution limits [the President's] functions in the lawmaking process . . . . And the Constitution is neither silent nor equivocal about who shall make laws which the President is to execute." Youngstown Sheet, 343 U.S. at 587. Legislative power lies with Congress. U.S. Const. art. I, § 1.

[¶ 46]  Administrative agencies can be given statutory power to issue regulations from Congress. Loper Bright, 603 U.S. at 394–95. It is the court's role to fix the boundaries of agency authority. Id. at 395.

> No matter how important, conspicuous, and controversial the issue . . . an administrative agency's power to regulate in the public interest must always be grounded in a valid grant of authority from Congress. And in our anxiety to effectuate the congressional purpose of protecting the public, **we must take care not to extend the scope of the statute beyond the point where Congress indicated it would stop.**

FDA v. Brown & Williamson Tobacco Corp., 529 U.S. 120, 161 (2000) (emphasis added) (cleaned up) (quoting United States v. Article of Drug . . . Bacto-Unidisk . . ., 394 U.S. 784, 800 (1969)). "Agencies are free to grant additional procedural rights in the exercise of their discretion but reviewing courts are generally not free to impose them." Vermont Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc., 435 U.S. 519, 524 (1978).

[¶ 47]  Agencies can also receive authority from the President. The Constitution tells the President to "take Care" when executing the laws. U.S. Const. art. II, § 3. The Take Care Clause has been codified by Congress in Section 301 and allows the President to delegate duties to agencies of any function "vested in the President by law" or duties that are subject to presidential approval. 3 U.S.C. § 301.

[¶ 48]  Regulations issued pursuant to an executive order must have "a nexus between the regulations and some delegation of the requisite legislative authority by Congress." Chrysler Corp. v. Brown, 441 U.S. 281, 304 (1979). An agency "literally has no power to act" under its own regulations without valid congressional delegation. Fed. Election Comm'n v. Cruz, 596 U.S. 289,

301 (2022) (quoting <u>La. Pub. Serv. Comm'n v. FCC</u>, 476 U.S. 355, 374 (1986)). Executive orders can be challenged if they have the "force or effect of law." <u>See</u> <u>Chrysler Corp</u>, 441 U.S. at 302–03. An administrative rule has the "force and effect of law" if: (1) it "affect[s] individual rights and obligations" and (2) the agency's authority to issue the rule is "rooted in a grant of [legislative authority] by the Congress and subject to limitations which that body imposes." <u>Id.</u> at 301–02.

[¶ 49]   In <u>Chrysler</u>, Chrysler Corp. had multiple contracts with the government and was required to follow several executive orders to provide equal employment opportunities. <u>Id.</u> at 286. Pursuant to these executive orders, the Office of Federal Contract Compliance Programs required the corporation to disclose certain information. <u>Id.</u> at 287. After a Freedom of Information Act request, Chrysler sued to keep the information confidential. <u>Id.</u> at 287–89. The regulations at issue were promulgated under executive orders, which allowed additional regulations beyond what Congress enacted. <u>Id.</u> at 303–04. The Supreme Court stated: "The pertinent inquiry is whether under any of the arguable *statutory* grants of authority the regulations . . . are reasonably within the contemplation of that grant of authority." <u>Id.</u> at 306. In that case, it was "simply not possible to find in these statutes a delegation of the disclosure authority." <u>Id.</u>

[¶ 50]   Congress was clear when it enacted NEPA. CEQ was to "assist and advise the President," gather information to submit to the President, review programs and make recommendations to the President, develop and recommend policies to the President, and report to the President the condition of the environment after investigation and documentation. 42 U.S.C. § 4344. These duties are reiterated in the section detailing the qualifications of members of CEQ. 42 U.S.C. § 4342.

[¶ 51]   Under "the authority vested in [him] as President of the United States and in furtherance of the purpose and policy of" NEPA, President Nixon directed CEQ to fulfill its duties including

issuing guidelines "as required by section 102(2)(C) of the Act" and issue instructions to agencies "as may be required to carry out the Council's responsibilities under the Act." Exec. Order No. 11,514, 35 Fed. Reg. 4247–48 (Mar. 7, 1970). Most Circuit Courts of Appeal agreed these guidelines were non-binding and advisory. See Nat'l Helium Corp, 455 F.2d at 656 (10th Circuit); Greene Cnty. Planning Bd., 455 F.2d at 421 (2nd Circuit); Hiram Clarke Civic Club, 476 F.2d at 424 (5th Circuit); Warm Springs Dam, 565 F.2d at 552 (9th Circuit); Aertsen, 637 F.2d at 17 (1st Circuit); Brief for the Petitioners at 31 n.24, Kleppe, 427 U.S. 390 (admission by United States before the Supreme Court that guidelines do not bind agencies).

[¶ 52]  President Carter, relying on "authority vested in [him] by the Constitution and statutes of the United States of America," amended Nixon's order and directed CEQ to issue "regulations" by formal rulemaking procedures including notice and comment. Exec. Order 11,991, 42 Fed. Reg. 26967 (May 24, 1977). President Carter also required federal agencies to comply with CEQ regulations "except where such compliance would be inconsistent with statutory requirements." Id.

[¶ 53]  If this Court is to take seriously the command from the Supreme Court to "take care not to extend the scope of the statute beyond the point where Congress indicated it would stop," then there seems little choice in the matter. Brown & Williamson Tobacco, 529 U.S. at 161. Congress is clear in NEPA that CEQ is to report to the President and make recommendations. 42 U.S.C. § 4344. Administrative agencies were not a new invention in 1969. Congress had vested power in other agencies to make regulations. See Bruce Wyman, The Rise of the Interstate Commerce Commission, 24 Yale L.J. 529 (1915) (detailing the history of the Commission's authority, specifically Congressional amendments enacted because of judicial interpretation). There is no nexus this Court can find between the delegation from Congress and President Carter's executive

order to issue regulations. See Chrysler Corp., 441 U.S. at 304. The President's authority to delegate under the Take Care Clause pertains to the internal management of the executive branch. See California v. EPA, 72 F.4th 308, 318 (D.C. Cir. 2023). CEQ regulations go far beyond that management.

[¶ 54]   There is also no need to look for implied authorization from Congress because Congress was explicit. CEQ was to advise the President and make recommendations; it was not to make regulations. 42 U.S.C. § 4344. If this was an oversight, then Congress has a long history of making amendments to circumvent judicial interpretation. See e.g., U.S. Const. Amend. XIII, XIV (responding to Dred Scott v. Sandford, 60 U.S. 393 (1857)); Religious Freedom Restoration Act of 1993, 42 U.S.C. § 2000bb (responding to Employment Division v. Smith, 494 U.S. 872 (1990)). That is Congress's job as the law-making body of government, not the Court or the President. Therefore, this Court holds Executive Order 11,991 was not a valid exercise of the President's power under the Take Care clause.

### c.   Congressional Ratification

[¶ 55]   CEQ and State Intervenors argue that in the many years since the 1978 Rule, Congress has relied on and implicitly ratified CEQ regulations. Doc. Nos. 134, pp. 27–28; 135, pp. 19–22. Plaintiff States argue Congress's lack of codification of CEQ authority is telling, and Congress cannot cure a separation of powers issue simply by agreement. Doc. No. 137, pp. 6–7.

[¶ 56]   In United States v. Alaska, the Supreme Court held Congress can ratify Presidential action taken without authority. See 521 U.S. 1 (1997). At that time, the Pickett Act allowed the President to reserve land in the then District of Alaska for public use; however, the Act did not mention submerged land specifically. Id. at 43–44. An executive order created a petroleum reserve, and years later Alaska argued that the land should belong to the state, not the federal government. Id.

The Supreme Court found that if Congress wanted to keep the land separate, it would have done so when it inducted Alaska into the Union. Id. When "Congress acknowledged the United States' ownership of and jurisdiction over the Reserve . . . Congress ratified the inclusion of submerged lands within the Reserve, whether or not it had intended the President's reservation authority under the Pickett Act to extend to such lands." Id. at 45. Many of the other examples come from the 1940s or earlier. See Erica Newland, Note, Executive Orders in Court, 124 Yale L.J. 2026, 2056 n.108 (2015). In United States v. Midwest Oil Co. from 1915, the Supreme Court held the government could give consent by its silence. 236 U.S. 459, 475 (1915). Midwest Oil again applied to lands for the public domain. Id. Presidential orders taking land for public use "were known to Congress . . . and in not a single instance was the act . . . disapproved." Id. The meaningful distinction, according to the court, was "the fact that its exercise was not only useful to the public, but did not interfere with any vested right of the citizen." Id. It most often happens in areas that are explicitly under the President's control, such as national security or foreign affairs. See Propper v. Clark, 337 U.S. 472, 475 (1949) (discussing executive order freezing Austrian property); Fleming v. Mohawk Wrecking & Lumber Co., 331 U.S. 111, 114 (1947) (discussing executive order "effectuating the transition from war to peace"); Rose v. McNamara, 375 F.2d 924, 926 (D.C. Cir. 1967) (discussing executive order issued pursuant to a treaty).

[¶ 57]  The practice of finding Congressional acquiescence equivalent to explicit delegation of authority is not without problems. Justice Scalia discusses the problems with taking inaction as approval.

> This assumption, which frequently haunts our opinions, should be put to rest. It is based, to begin with, on the patently false premise that the correctness of statutory construction is to be measured by what the current Congress desires, rather than by what the law as enacted meant. To make matters worse, it assays the current Congress' desires *with respect to the particular provision in isolation,* rather than the way the provision was originally enacted) as part of a total legislative

package . . . . But even accepting the flawed premise that the intent of the current Congress, with respect to the provision in isolation, is determinative, one must ignore rudimentary principles of political science to draw any conclusions regarding that intent from the *failure* to enact legislation. The "complicated check on legislation," erected by our Constitution creates an inertia that makes it impossible to assert with any degree of assurance that congressional failure to act represents (1) approval of the status quo, as opposed to (2) inability to agree upon how to alter the status quo, (3) unawareness of the status quo, (4) indifference to the status quo, or even (5) political cowardice. . . . I think we should admit that vindication by congressional inaction is a canard.

Johnson v. Transp. Agency, 480 U.S. 616, 671–72 (1987) (Scalia, J., dissenting).

[¶ 58] The Supreme Court has also held that congressional inaction is insufficient when "administrative action has raised serious constitutional problems." Greene v. McElroy, 360 U.S. 474, 507 (1959) (discussing due process). Decisions that implicate constitutional powers "cannot be assumed by acquiescence or nonaction" and "must be made explicitly not only to assure that individuals are not deprived of cherished rights under procedures not actually authorized, but also because explicit action, especially in areas of doubtful constitutionality, requires careful and purposeful consideration by those responsible for enacting and implementing our laws." Id. at 507 (citations omitted). "Without explicit action by lawmakers, decisions of great constitutional import and effect would be relegated by default to administrators who, under our system of government, are not endowed with authority to decide them." Id. In Greene, the unconstitutional programs were created by directives from the Secretary of Defense, Army, Navy, or Air Force, not the President. Id. at 495. It is possible the outcome may have been different had the programs been instituted under an executive order since direction of the military is squarely under the President's power. The key point here, though, is the importance the Supreme Court places on separation of power issues that implicate rights of citizens.

[¶ 59] The case before this Court does not involve an issue given to the President by the Constitution. Congress gave the President the authority to set national policy concerning the

environment and explicitly gave CEQ the authority to advise the President. See 42 U.S.C. § 4344. The courts at the time correctly interpreted NEPA and held CEQ to be an advisory body. See Nat'l Helium Corp, 455 F.2d at 656 (10th Circuit); Greene Cnty. Planning Bd., 455 F.2d at 421 (2nd Circuit); Hiram Clarke Civic Club, 476 F.2d at 424 (5th Circuit); Warm Springs Dam, 565 F.2d at 552 (9th Circuit); Aertsen, 637 F.2d at 17 (1st Circuit); Brief for the Petitioners at 31 n.24, Kleppe, 427 U.S. 390 (admission by United States before the Supreme Court that guidelines do not bind agencies). President Carter proceeded to grant CEQ power to create binding regulations, affecting not only federal agencies but all the third parties that are also subject to NEPA. See Exec. Order No. 11,991, 42 Fed. Reg. 26,967 (May 24, 1977). This bestowal of authority implicates the exact separation of power issues that the judicial system is bound to uphold and protect. Agency power comes from statutes explicitly issued by Congress and not from Congressional inaction or continuation of the status quo. See Johnson, 480 U.S. at 671–72 (Scalia, J., dissenting). For the foregoing reasons, the Court finds CEQ does not have authority from Congressional ratification.

### d.  Conclusion

[¶ 60]    "No matter how rational or consistent with congressional intent a particular decision might be," agency action cannot be inconsistent with governing law. Morton v. Ruiz, 415 U.S. 199, 232 (1974). "If Congress wishes to re-strike the balance between [the President and CEQ] it is free to do so . . . . Until Congress does so, however, we must apply [NEPA] according to its terms." Rattigan v. Holder, 689 F.3d 764, 776 (D.C. Cir. 2012) (Kavanaugh, J., dissenting). The issue of CEQ authority is clear: NEPA gives CEQ authority to promulgate non-binding guidelines, but CEQ may not issue rules that have the force and effect of law. Coming to any other conclusion "leaves the court open to the criticism that it is denying th2489

[¶ 61]  e obvious until an objective observer cries out that 'the emperor has no clothes.'" <u>Moore v. City of Harriman</u>, 272 F.3d 769, 775 (6th Cir. 2001) (Gilman, J., concurring).

## II.    Reasoned Decisionmaking

[¶ 62]  Based on this Court's finding of no CEQ authority, the issue of whether CEQ exceeded its authority by promulgating the 2024 Rule is simple: CEQ had no authority to issue a binding rule, therefore the entire 2024 Rule exceeded its authority. However, the Court will also analyze the remaining arguments in the event another court decides CEQ has valid rule-making authority to "[i]ssue regulations to Federal agencies for the implementation of the procedural provisions" in NEPA. 42 Fed. Reg. 26967.

[¶ 63]  After "fixing the boundaries of the delegated authority," courts are to "ensur[e CEQ] has engaged in 'reasoned decisionmaking' within those boundaries." <u>Loper Bright</u>, 603 U.S. at 395 (cleaned up) (citations omitted).

### a.  Deference

[¶ 64]  CEQ argues its interpretation of NEPA should receive deference, as the Supreme Court indicated in <u>Andrus</u>. Doc. No. 86, pp. 37–39. Plaintiff States argue no deference is awarded under <u>Loper Bright</u>. Doc. No. 98, p. 16.

[¶ 65]  "[E]very statute's meaning is fixed at the time of enactment." <u>Loper Bright</u>, 603 U.S. at 400 (quoting <u>Wis. Ctr. Ltd. v. United States</u>, 585 U.S. 274 (2018)). The "best reading" of a statute is "one the court, after applying all relevant interpretive tools, concludes is best." <u>Id.</u> "When the best reading of a statute is that it delegates discretionary authority to an agency, the role of the reviewing court under the APA is, as always, to independently interpret the statute and effectuate the will of Congress subject to constitutional limits." <u>Id.</u> at 395.

[¶ 66]  Under the APA, an agency decision or interpretation does not have to be the best decision, only the product of reasoned decisionmaking. See id. When reviewing regulations made by agencies with discretionary authority, "courts must exercise independent judgment in determining the meaning of statutory provisions," but may "seek aid from the interpretations of those responsible for implementing particular statutes." Id. at 394. "[I]nterpretations issued contemporaneously with the statue at issue, and which have remained consistent over time, may be especially useful in determining the statute's meaning." Id.

[¶ 67]  Andrus was decided in 1979, just a year after the initial regulations in 1978, and before the Supreme Court formalized the Chevron doctrine in 1984. See Andrus, 442 U.S. at 347. In Andrus, three organizations wanted the Fish and Wildlife Service to prepare an EIS for their proposed budget cuts, which would affect more than 30 million acres. Id. at 352. A district court relied on pre-1978 CEQ guidelines and found that appropriation requests fell under NEPA and required EIS preparation. Id. at 354. The Court of Appeals reversed, saying that only appropriations with proposals for new action would require EISs. Id. at 355. The Supreme Court stated that Congress was silent on the issue both in statute and legislative history; therefore, CEQ's interpretation of NEPA was entitled to "substantial deference" because the Council was created by NEPA, and this interpretation was "consistent with the traditional distinction which Congress has drawn." Id. at 356–60.

[¶ 68]  Andrus was a precursor to Chevron and followed much of the same process and reasoning. Whatever deference the Supreme Court assigned to CEQ in Andrus is subject to the same standard of review outlined in Loper Bright. The Court is not required to give deference to CEQ interpretations. Furthermore, compliance with the APA is not a topic committed to CEQ's discretion. Iowa League of Cities v. EPA, 711 F.3d 844, 872 (8th Cir. 2013) ("In other words,

whether and when an agency must follow the law is not an area uniquely falling within its own expertise, and thus the agency's decision is less servicing deference."); see also Reno-Sparks Indian Colony v. EPA, 336 F.3d 899, 909 n.11 (9th Cir. 2003) ("The agency is not entitled to deference because complying with the notice and comment provisions when required by the APA 'is not a matter of agency choice.'" (quoting Powderly v. Schweiker, 704 F.2d 1092, 1098 (9th Cir. 1983))). But even if it were, agencies given discretionary authority are subject to independent judicial review. Iowa League of Cities, 711 F.3d at 876–77. The only "deference" given to agencies under the APA concerns the arbitrary and capricious standard, which requires the decision be upheld if it is objectively reasonable. See Loper Bright, 603 U.S. at 395.

[¶ 69] Therefore, CEQ's decisions will not be given deference under Andrus. Under the exceeding authority standard, the Court will ensure it engaged in reasoned decisionmaking with the limits of its Congressionally-given authority. Id.

### b. Removing language in NEPA's purpose statement

[¶ 70] Plaintiff States argue the 2024 Rule exceeds CEQ authority by removing regulatory language and changing the stated purpose of NEPA. Doc. No. 65, pp. 28–30. CEQ, Organization Intervenors, and State Intervenors argue the changes accurately reflect both the legislative history of NEPA and have been endorsed by the Supreme Court. Doc. Nos. 85, pp. 29–32; 86, pp. 39–40; 88, pp. 14–17.

[¶ 71] The 2024 Rule reverts the regulatory language to the wording from the 1978 Rule, removing amendments made in 2020. 43 Fed. Reg. at 55990–91. The 2020 Rule made these changes to reflect the Supreme Court's interpretation of NEPA in Methow Valley and Public Citizen. 85 Fed. Reg. at 43316. The 2020 Rule also stated the words "action-forcing" were vague and added more specific references "to the consideration of environmental impacts of" agency

decisions. Id. CEQ states that calling NEPA "purely procedural" is "an inappropriately narrow view." See 85 Fed. Reg. at 35449. However, this "inappropriately narrow view" is endorsed by the Supreme Court that highlights the difference between "procedural mechanisms–as opposed to substantive, result-based standards." See Methow Valley, 490 U.S. at 353. CEQ states "Congress established the NEPA process for the purpose of promoting informed decision making and improved environmental outcomes" but fails to state that Congress decided to accomplish these goals through a procedural, not substantive, process. 85 Fed. Reg. at 35449.

[¶ 72]  The intent of Congress is clear from the plain language of NEPA: it was concerned about the environment and wanted procedures for agencies to consider how their actions affected the environment. The "action" NEPA forces is consideration through procedure. See Methow Valley, 490 U.S. at 353. Removal of this language arguably expands NEPA into something Congress did not intend. Therefore, CEQ exceeded its authority in making changes to NEPA's purpose section.

### c.  Mandated policy priorities

[¶ 73] Plaintiff States argue mandating policy priorities—including consideration of environmental justice, climate change, indigenous knowledge, and worldwide effects—inappropriately relies on executive orders and not direction from Congress. Doc. No. 65, pp. 30–31. CEQ, Organization Intervenors, and State Intervenors argue because the statute was meant to keep all Americans safe, these factors are not outside NEPA's scope and argue they are examples of many factors that agencies are able, but not required, to consider. Doc. Nos. 85, pp. 33; 86, p. 42; 88, p. 19.

[¶ 74]  Executive Order 12,898 and 14,096 both rely on the authority vested in the President by the Constitution and the law to promote and advance environmental justice. 59 Fed. Reg. 7629 (Feb. 16, 1994); 88 Fed. Reg. 25251 (April 21, 2023). NEPA vested the federal government and

the President with the authority to use "all practicable means and measures . . . to foster and promote the general welfare." 42 U.S.C. § 4331. As discussed, the President is responsible for enforcing the laws. U.S. Const. art. II. The Take Care Clause allows the President to direct his agencies. Id. The Executive Orders directing federal agencies to emphasize environmental justice, climate change, and indigenous knowledge are within this zone of authority. CEQ is an administrative agency subject to Presidential direction. Therefore, reliance on Executive Orders for the 2024 Rule is appropriate to highlight consideration of these areas.

[¶ 75]   However, CEQ suggests agencies "should" consider global effects in Section 1501.3(d)(1), dependent on "scope of the [agency] action." 85 Fed. Reg. at 35557. NEPA was enacted for the needs of citizens of the United States, not the world. See id. at 35554. The 1978 Rule does not include global consideration. See 43 Fed. Reg. at 56005. There may be instances where national considerations outweigh local concerns, but NEPA does not authorize agencies to put global effects over domestic interests. Therefore, the inclusion of global effects as a factor for agency consideration is not within CEQ's authority.

### d.  Environmentally preferable alternative

[¶ 76]   Plaintiff States argue the requirement to identify an environmentally preferable alternative will force agencies to identify what fits best with policy, not objective outcomes. Doc. No. 65, p. 35. CEQ, Organization Intervenors, and State Intervenors argue the alternative has always been required and the only change is the timing of identification. Doc. Nos. 85, p. 44; 86, p. 46; 88, p. 29.

[¶ 77]   The 2024 Rule defines "environmentally preferable alternative" as "the alternative . . . that will best promote the national environmental policy as expressed in section 101 of NEPA." 89 Fed. Reg. at 35575. The 2020 Rule also required identification of this alternative. Id. at 35504.

The 2024 Rule states requiring identification earlier in the process increases transparency and allows the public to comment on the alternative before the agency makes a decision. Id. Changing the timing of identification of this alternative is within CEQ's authority to regulate the implementation of NEPA procedure. See 42 Fed. Reg. at 26967. Increasing transparency and allowing for public comment reasonably serve the purpose of NEPA. Therefore, the Court finds this change is within CEQ's authority.

### e. Mitigation

[¶ 78]  Plaintiff States argue the removal of mitigation language contradicts Methow Valley. Doc. No. 65, pp. 36–38. CEQ, Organization Intervenors, and State Intervenors argue the mitigation provision is substantively identical to both the 2020 Rule and the 1978 Rule. Doc. Nos. 85, p. 46; 86, p. 51; 88, p. 31.

[¶ 79]  The 2024 Rule removes from the definition of "mitigation" the clause stating NEPA "does not mandate the form or adoption of any mitigation." 89 Fed. Reg. at 35548–49. The Rule states this language could be misleading because agencies themselves can require mitigation. Id. The 2024 Rule states the language does not contradict Methow Valley because it puts no binding requirements on agencies but instead "encourage[s] agencies to commit to mitigation." Id. at 35518.

[¶ 80]  The Supreme Court held in Methow Valley:

> There is a fundamental distinction . . . between a requirement that mitigation be discussed . . . and a substantive requirement that a complete mitigation plan be actually formulated and adopted. . . . [I]t would be inconsistent with NEPA's reliance on procedural mechanisms–as opposed to substantive, result-based standards–to demand the presence of a fully developed plan that will mitigate environmental harm before an agency can act.

490 U.S. at 352–53. The Court is not persuaded that removing the text clears confusion. In fact, the removal may add confusion as it arguably changes the limitations Congress placed on NEPA

regarding mitigation. The language says NEPA does not mandate mitigation, which is true. Agencies who commit or are otherwise required to mitigate will know of those requirements and agencies that have not will understand that no requirement can come from NEPA itself. Therefore, the Court finds removing this language is not the product of reasoned decisionmaking and CEQ exceeded its authority.

[¶ 81]  Plaintiff States also argue the additional requirement of a monitoring plan for mitigation forces agencies to act. Doc. No. 65, pp. 36–38. CEQ, Organization Intervenors, and State Intervenors argue the monitoring plan only concerns action agencies have already committed to taking. Doc. Nos. 85, pp. 46–47; 86, p. 51; 88, p. 32.

[¶ 82]  The 2024 Rule allows an agency to find "no significant impact" due to mitigation. 89 Fed. Reg. at 35558. When an agency does so, it must state what the mitigation is and how it will be enforced, including a monitoring and compliance plan. Id. at 35558–59.

[¶ 83]  The requirement to have a plan is one of the agency's choosing and is not mandated by CEQ. The result of no impact is based on the agency's mitigation efforts. If the agency does not take those mitigation measures, then the outcome changes and triggers a different process under NEPA. Monitoring agency-chosen mitigation is directly related to the detailed statement CEQ is directed to regulate. Therefore, requiring such a monitoring plan is within CEQ's authority.

### f.  CE usage

[¶ 84]  Plaintiff States argue the 2024 Rule inhibits CE usage on several fronts: (1) additional extraordinary circumstances can be used as a ban of CEs for projects disfavored by special interest groups, (2) additional conditions on the use of another agency's CE contradicts FRA, and (3) ten-year review obligations have no statutory basis. Doc. No. 65, pp. 39–40. CEQ, Organization Intervenors, and State Intervenors argue (1) the change allows for agency discretion, (2) the

conditions only lay out a procedure for adoption, and (3) CEQ has encouraged regular review since 2010, and the procedure does not contradict FRA. Doc. Nos. 85, pp. 48–51; 86, pp. 53–56; 88, pp. 34–37.

[¶ 85]  First, the 2024 Rule adds environmental justice and climate change concerns as examples of possible extraordinary circumstances "that indicate a normally categorically excluded action may have a significant effect." 89 Fed. Reg. at 35575. "This list of examples is not exclusive, and agencies continue to have the discretion to identify extraordinary circumstances in their NEPA implementing procedures . . . ." Id. at 35541. CEQ does not mandate agencies include this in their agency-specific procedures. CEQ is responsible for setting policy objectives. Therefore, the Court does not find this additional consideration outside of CEQ authority.

[¶ 86]  Second, FRA allowed agencies to adopt CEs from other agencies. See 42 U.S.C. § 4336c. Section 4336c requires the agency to identify the CE, consult with the other agency, tell the public the planned use, and document the process. Id. The 2024 Rule requires agencies to identify the CE, consult with the other agency, provide public notice, evaluate if any extraordinary circumstances apply, and publish the decision. 89 Fed. Reg. at 35558. The only added requirement is an evaluation of extraordinary circumstances, which can reasonably fall under Congress's mandate to ensure adoption is appropriate. See 42 U.S.C. § 4336c(2). Therefore, this addition does not contradict Congress's mandate.

[¶ 87]  Third, the 2024 Rule adds a requirement that all CEs must be reviewed at least every ten years. 89 Fed. Reg. at 35574. NEPA is silent on the issue of periodic review. See 42 U.S.C. § 4321. CEQ "has encouraged agencies to review CEs since the 2010 guidance," 89 Fed. Reg. at 35534. However, guidance is different than regulation. NEPA's stated purpose for CEQ is to develop guidance for agencies "designed to make the environmental impact statement process more useful

to decisionmakers and the public; and to reduce paperwork . . . to focus on real environmental issues." 42 U.S.C. § 4321. It is logical that periodic review would "ensure the underlying analysis and conclusions remain valid," 89 Fed. Reg. at 35534. However, Congress did not tell CEQ to be hall monitors constantly requiring agencies to prove they have considered the environment. Congress told them to give agencies a process that would reduce paperwork, not make it emerge from hibernation every decade like a swarm of cicadas. Mandatory re-evaluation is outside of CEQ authority.

### III.    Conclusion

[¶ 88]  Removing language from NEPA's purpose section and definition of mitigation confuses, if not outright contradicts, Supreme Court interpretation. Inclusion of consideration of global effects is not a valid consideration for a statute concerned with the health and welfare of Americans and under the jurisdiction of the United States. Lastly, requiring re-evaluation of CE-usage every ten years conflicts with Congress's mandate to reduce paperwork. Therefore, the Court finds the 2024 Rule exceeded CEQ authority.

<u>**ARBITRARY AND CAPRICIOUS**</u>

[¶ 89]  Plaintiff States also argue the 2024 Rule is arbitrary and capricious. Doc. No. 65, p. 41. CEQ, Organization Intervenors, and State Intervenors argue the changes and clarifications to the 2024 Rule are adequately explained and reasonable. Doc. Nos. 85, p. 51; 86, p. 56; 88, p. 37.

[¶ 90]  "Arbitrary and capricious review, at its core, measures if an agency action was irrational." <u>Mandan, Hidatsa & Arikara Nation v. U.S. Dep't of the Interior</u>, 95 F.4th 573, 579 (8th Cir. 2024). Agency action can be arbitrary and capricious if it "fails to consider relevant factors" by either considering factors Congress didn't intend, entirely missed an important aspect, its explanation is not supported by the evidence, or "so implausible that it could not be ascribed to a difference in

view." Id. at 580 (quoting Missouri ex rel. Bailey v. U.S. Dep't of Interior, Bureau of Reclamation, 73 F.4th 570, 577–78 (8th Cir. 2023)). Failure to consider can be due to misunderstanding "the full scope of [the agency's] discretion." Id. (quoting Red River Valley Sugarbeet Growers Ass'n v. Regan, 85 F.4th 881, 887 (8th Cir. 2023)).

[¶ 91]  Given the Court has found CEQ lacked rulemaking authority, the 2024 Rule automatically fails the arbitrary and capricious standard. However, the Court will also analyze these arguments as if CEQ had valid authority. See 42 Fed. Reg. at 26967.

## I.    NEPA's Purpose and Public Comment

[¶ 92]  Plaintiff States argue the 2024 Rule provides no meaningful analysis for reversing the 2020 Rule's changes to NEPA's purpose section or removal of public comment specificity. Doc. No. 65, p. 42. CEQ, Organization Intervenors, and State Intervenors argue the Rule states the changes were needed because the original purpose language was "inappropriately narrow," NEPA is not a check-the-box exercise, and the commenting requirement was unnecessarily burdensome. Doc. Nos. 85, p. 53; 86, p. 57; 88, p. 38.

[¶ 93]  Agencies may make changes to their policies if they provide reasoned explanations. Encino Motorcars, LLC v. Navarro, 579 U.S. 211, 222 (2016). Failure to explain is reason to hold the change as arbitrary and capricious. Id. An agency must "display awareness that it *is* changing position," "the new policy is permissible under the statute," and the "agency *believes* it to be better." F.C.C. v. Fox Television Stations, Inc., 556 U.S. 502, 515–16 (2009). While more justification is not demanded, "a reasoned explanation is needed for disregarding facts and circumstances that underlay or were engendered by the prior policy." Id.

### a. Meaningful analysis

[¶ 94]  The 2024 Rule states calling NEPA a "national charter" better reflects Sections 2 and 101 of NEPA. 89 Fed. Reg. at 35449. To emphasize the procedural nature of the statute may suggest NEPA is nothing more than rote paperwork. Id. These sections state the purpose of NEPA is to "declare national policy which will encourage productive and enjoyable harmony between man and his environment," promote efforts to "prevent or eliminate damage to the environment . . . and stimulate the health and welfare of man," to enrich the understanding of the environment, and establish the CEQ. 42 U.S.C. §§ 4321, 4331. The Supreme Court acknowledged in Andrus that NEPA is action-forcing to the extent that it requires agencies to address and acknowledge environmental concerns in their planning. Andrus, 442 U.S. at 350–51. However, the procedural nature of NEPA was addressed ten years later and highlighted NEPA's "procedural mechanisms–as opposed to substantive, result-based standards." Methow Valley, 490 U.S. at 353.

[¶ 95]  The concern that NEPA be associated with rote paperwork is without merit since approval of NEPA paperwork requires agencies to substantively assess environmental issues. The change in language does in fact distance NEPA from this procedural nature, giving the impression that it has more authority than it really does. What CEQ seems to insinuate is agencies should make certain changes based on the environmental analysis, not just be informed about it. That outcome is outside the scope of NEPA. See id. This procedural language has been in NEPA since 1978 and CEQ gives no reason why suddenly in 2024 there was a need to change the language.

### b. Comment Specificity

[¶ 96]  The 2024 Rule removes language that the 2020 Rule added, which required public comments be "as detailed 'as necessary to meaningfully participate and fully inform the agency of the commenter's position.'" 89 Fed. Reg. at 35512. Before the 2020 Rule, comments were only

required to be "as specific as possible." <u>Id.</u> In support for the 2020 change, the 2020 Rule cited <u>Vermont Yankee</u>: "[W]hile it is true that NEPA places upon an agency the obligation to consider every significant aspect of the environmental impact of a proposed action, it is still incumbent upon [parties] who wish to participate to structure their participation so that it is meaningful, so that it alerts the agency to the [parties'] position and contentions. . . . 'Comments must be significant enough to step over a threshold requirement of materiality before any lack of agency response or consideration becomes of concern.'" 85 Fed. Reg. at 43333; <u>see also</u> 435 U.S. at 553 (quoting <u>Portland Cement Ass'n v. Ruckelshaus</u>, 486 F.2d 375, 394 (1973). The 2020 Rule stated the changes should not "be construed to limit public comment to those . . . with scientific or technical expertise, and agencies should continue to solicit comment from all interested and affected members of the public." 85 Fed. Reg. at 43333. "CEQ includes these changes in the final rule to ensure that agencies are alerted to all interested and affect parties' concerns . . . ." <u>Id.</u>

[¶ 97]   CEQ knew it was changing policy and put many explanations in the 2024 Rule as to why it thought changing the language was a better course of action. In the 2024 Rule, CEQ states the 2020 Rule requirement could result in "unnecessarily long comments that will impede efficiency." 89 Fed. Reg. at 35512. CEQ found the previous requirement to be "as specific as possible" was sufficient. <u>Id.</u> CEQ also stated several ways the 2020 Rule could be misunderstood: requiring information that is not pertinent but is the most specific; require detailed explanations of moral objections; commenters must be an expert; and require collection of information not available to commenters. <u>Id.</u> Finally, CEQ said it was vague and burdensome for the commenter to anticipate appropriate level of detail to meet the standard. <u>Id.</u> at 35513. Therefore, the reversion to the previous standard for specificity of comments is the product of reasoned decisionmaking and did not exceed CEQ authority.

### c.  Conclusion

[¶ 98]  The Court finds the changes to NEPA's purpose statement does not have a reasoned explanation that shows the changes were the product of reasonable decisionmaking. Therefore, CEQ exceeded its authority when promulgating that change.

## II.    Reliance Interests

[¶ 99]  Plaintiff States argue the 2024 Rule changes fundamental aspects of NEPA that Plaintiff States have relied on for decades pertaining to mitigation measures, greenhouse gas emission quantification, environmental justice considerations, and restriction of project proponent and third-party preparation of NEPA documents. Doc. No. 65, p. 43. CEQ, Organization Intervenors, and State Intervenors argue CEQ's guidance has advised agencies to consider greenhouse gas emissions, environmental justice, and mitigation since 2010; third party preparation only began in 2020; and FRA implements third-party preparation amendments outside of the APA's review. Doc. Nos. 85, p. 55–56; 86, pp. 11–12, 60–61; 88, pp. 38–39.

[¶ 100] When agencies change policy, reliance interests for long-held policies should be considered. Fox Television, 556 U.S. at 515. If the reliance interests are "serious," then an agency "must" give "a more detailed justification." Id.

[¶ 101] Mitigation compliance measures and environmental justice have been discussed previously. The Court does not see serious reliance interests here because mitigation compliance is only after agency adoption of mitigation measures and environmental justice is an optional consideration. See Section II.e. Greenhouse gas emissions fall under the same analysis. In Section 1502.16(a)(6) of the 2024 Rule, agencies "shall include analysis of . . . where applicable, climate change-related effects, including, where feasible, quantification of greenhouse gas emissions." When projects do not affect climate change, this calculation need not be done. If projects do have

climate change-related effects, calculation is done only when it is feasible to do so. Therefore, the Court does not find a change in policy or a serious reliance issue.

[¶ 102] Third-party preparation of documents has been allowed under NEPA since the 1978 Rule when the "contractor" had no interest in the project. 43 Fed. Reg. at 56001. The 2020 Rule allowed preparation by "applicants." 85 Fed. Reg. at 43371. The 2024 Rule also allows applicants to submit documentation if the agency has procedures that follow Section 1507.3(c)(12). 89 Fed. Reg. at 35571, 35574. This is not a long-held policy, and a pathway exists under the 2024 Rule if procedures are in place. Therefore, the Court does not find a serious reliance interest here. However, the procedures themselves do not pass the arbitrary and capricious standard.

[¶ 103] The procedures must include "a prohibition on the preparation of a finding of no significant impact or record of decision by applicants." Id. at 35574. In contrast, the 2020 Rule only specified that agency procedures identify "specific criteria for and identification of" events that do not require EIS, EA, or have a significant impact." 85 Fed. Reg. at 43374. Agencies have been and are required to independently verify the information submitted by applicants. 89 Fed. Reg. at 35571.

[¶ 104] A prohibition on finding a specific outcome of analysis is not objective, unbiased, or reasonable. If an applicant finds no significant impact, they cannot file the report. This provision does not make any sense and wastes agency and applicant time. The Court finds this provision arbitrary and capricious. See Mandan, Hidatsa & Arikara Nation, 95 F.4th at 579 (stating arbitrary and capricious standard).

### III.    Increased Litigation Risk

[¶ 105] Plaintiff States argue the 2024 Rule adds uncertainty and increases risk of litigation by removing the provision that states nonspecific objections are waived. Doc. No. 65, pp. 43–44. CEQ, Organization Intervenors, and State Intervenors argue the changes will increase certainty

and specificity could burden the public if commenters believe they must be experts or explain a moral objection. Doc. Nos. 85, p. 56; 86, p. 58; 88, p. 39.

[¶ 106] The 2020 Rule added that comments must be as detailed "as necessary to meaningfully participate and fully inform the agency of the commenter's position." 89 Fed. Reg. at 35512. The 2024 Rule restores previous language requiring comments to be "as specific as possible." Id. While all necessary things must be possible, all possible things are not always necessary. Based on this simple logic, a rule requiring something to be "as specific as possible" is more demanding than a rule that requires a comment to be as specific "as necessary." The Court finds the removal of the 2020 Rule language to be arbitrary and capricious.

## IV.    Indigenous Knowledge

[¶ 107] Plaintiff States argue the Rule is arbitrary and capricious because it mandates use of indigenous knowledge but admits there is no workable definition. Doc. No. 65, pp. 44–45. CEQ, Organization Intervenors, and State Intervenors argue CEQ adequately explained a definition was impracticable because indigenous knowledge is inherently heterogenous. Doc. Nos. 85, pp. 56–57; 86, p. 45 n.27; 88, p. 37. See also Doc. No. 113-18, p. 8 (CEQ memo directing agencies to a broad definition of indigenous knowledge.).

[¶ 108] "Indigenous knowledge" is not defined by the 2024 Rule but is given as an example of a kind of special expertise. See id. at 35559. In Sections 1502.15 and 1506.6, the rule states "[a]gencies shall use high-quality information, including . . . indigenous knowledge to describe reasonably foreseeable environmental treads . . . and when such information is incomplete or unavailable, provide relevant information consistent with § 1502.21." Id. at 35565. Section 1502.21 states that if costs are reasonable and the information is essential, the agency is required to obtain it. Id. at 35566. If the cost is unreasonable, then another statement is required to explain

the lack of information. Id. However, the procedure for missing information does not remove the burden of seeking out the information in the first place. Considering the care CEQ used with "environmental justice" and "climate change," if CEQ wanted to make indigenous knowledge optional, it would have use words like "such as" or the conjunction "or" instead of "and."

[¶ 109] The Court concludes CEQ intended the consideration of indigenous knowledge to be mandatory. Indigenous knowledge may be valuable to some projects, but it is not applicable to all projects. The Court finds mandatory inclusion of indigenous knowledge consideration in Sections 1502.15 and 1506.6 is arbitrary and capricious.

## V.    Timeline

[¶ 110] Plaintiff States argue the 2024 Rule sets an unrealistic timeline of twelve months for agencies to submit proposed implementation procedures and limits the engagement of the public in the process. Doc. No. 65, p. 45. CEQ, Organization Intervenors, and State Intervenors argue the 2020 Rule had the same timeline. Doc. Nos. 85, pp. 57–58; 86, pp. 59–61; 88, p. 40. The 2024 Rule states that the timeline will not be changed because the requirement is only to submit proposed procedures and not final procedures. 89 Fed. Reg. at 35532. Since the requirement is only for proposed procedures, input from the States and public is not required and will be able to occur before the final procedures are in place. Therefore, the Court finds the timeline to be reasonable.

## VI.    Conclusion

[¶ 111] The arbitrary and capricious standard asks if agency action was rational. See Mandan, Hidatsa & Arikara Nation, 95 F.4th at 579. The Court finds the 2024 Rule irrational on several fronts. The CEQ did not engage in reasoned decisionmaking when it changed the language in NEPA's purpose section, removing wording that is supported by current Supreme Court

interpretation. The 2024 Rule is irrational to allow applicants to submit environmental analysis but prohibit them from finding no significant impact. And finally, CEQ did not engage in reasoned decisionmaking by drafting Sections 1502.15 and 1506.6 to require evaluation of indigenous knowledge for all projects. Therefore, the Court finds the 2024 Rule is arbitrary and capricious.[9]

## REMEDY

[¶ 112] The Court has found the 2024 Rule exceeds CEQ authority and, additionally, to be arbitrary and capricious. Plaintiff States request the Court vacate the 2024 Rule and remand to the agency. Doc. No. 65, p. 50. CEQ, Organization Intervenors, and State Intervenors argue the 2024 Rule has a severability clause and requests supplemental briefing on the issue of remedies. Doc. Nos. 85, pp. 62–63; 86, p. 65; 88, p. 43–44.

### I.    Severability

[¶ 113] The 2024 Rule states, "The sections of this subchapter are separate and severable from one another. If any section or portion therein is stayed or determined to be invalid . . . it is the Council's intention that the validity of the remainder of those parts shall not be affected, with the remaining sections to continue in effect." 89 Fed. Reg. at 35555. Regulations may be severed if (1) severance does "not impair the function of the statute as a whole," and (2) no evidence indicates "the regulation would not have been passed but for" inclusion of the severed provisions. K Mart Corp. v. Cartier, Inc., 486 U.S. 281, 294 (1988).

[¶ 114] The Court found CEQ did not have authority to issue any regulation. No further briefing is needed concerning the status of the remaining provisions because all provisions of the 2024 Rule are necessarily without authority and void.

---

[9] Plaintiff States raise additional claims concerning violations of NEPA and the Major Questions Doctrine. Doc. No. 65, pp. 46–48. The Court declines to reach these issues.

[¶ 115] Assuming CEQ had authority, the Court also found CEQ exceeded its authority and additionally that the 2024 Rule is arbitrary and capricious. Severance is permitted when the severed provisions do not inhibit the function of the statute. K Mart, 486 U.S. at 294. CEQ exceeded authority by changing NEPA's purpose section and the definition of mitigation, including consideration of global effects, and requiring CE categorization every ten years. The Court finds these provisions/changes could be severed from the 2024 Rule without hindering the statute as a whole. The Court also found the Rule arbitrary and capricious. Removing the change to NEPA's purpose section and consideration of global effects is likely severable. However, if the Court were to remove the provision concerning applicant preparation, agencies and applicants would be uncertain as to their ability to create procedures or allow for applicant preparation. Further, removal of indigenous knowledge would introduce ambiguity as to how agencies are to rely on and use high-quality information. The Court declines to rule on the interpretation of revised provisions. Therefore, even assuming authority, the 2024 Rule cannot function after severance.

[¶ 116] Other issues regarding remedies have been fully briefed and discussed. See Doc. Nos. 65, 86, 98, 119–20, 122, 128, 133–37. Therefore, the Court denies the request for supplemental briefing and finds the severability provision inapplicable.

## II. Vacatur

[¶ 117] Section 706 of the APA states, "The reviewing court shall . . . hold unlawful and set aside agency action . . . found to be . . . arbitrary, capricious," or "in excess of statutory . . . authority." 5 U.S.C. § 706(2)(A), (C).

### a. Availability

[¶ 118] CEQ argues the APA does not consider vacatur as a remedy. Doc. No. 86, pp. 65–66. Plaintiff States argue vacatur is the standard remedy. Doc. No. 98, p. 37–38.

[¶ 119] The Court recognizes the meaning of "set aside" is a topic of interest at the Supreme Court. Compare Corner Post, Inc. v. Bd. of Governors of Fed. Reserve System, 603 U.S. 799, 826–843 (2024) (Kavanaugh, J., concurring) (detailing the evidence and arguments in favor of vacatur as a remedy under the APA); with United States v. Texas, 599 U.S. 670, 688–704 (2023) (Gorsuch, J., concurring) (detailing the evidence and arguments in opposition of vacatur as a remedy under the APA). However, the Supreme Court has not issued guidance in this area as of this Order. Therefore, the Court is bound by Eighth Circuit precedent which states Section 706 "authorizes courts to strike down as ultra vires agency rules promulgated without valid statutory authority." Iowa League of Cities, 711 F.3d at 876 (vacating an EPA rule as exceeding agency authority).

### b. Analysis

[¶ 120] CEQ, Organization Intervenors, and State Intervenors argue vacatur would be too disruptive. Doc. Nos. 85, pp. 62–63; 86, p. 66; 88, pp. 43–44. Plaintiff States argue retaining the 2024 Rule would be more disruptive. Doc. No. 98, p. 40.

[¶ 121] "The ordinary practice is to vacate unlawful agency action." United Steel v. Mine Safety & Health Admin., 925 F.3d 1279, 1287 (D.C. Cir. 2019). Vacatur is considered a less severe remedy compared to an injunction. Monsanto Co. Geertson Seed Farms, 561 U.S. 139, 165 (2010) (reversing an injunction and affirming vacatur). The D.C. Circuit has held that vacatur is discretionary. Sugar Cane Growers Co-op. v. Veneman, 289 F.3d 89, 98 (D.C. Cir. 2002). Courts should balance "the seriousness of the order's deficiencies (and thus the extent of doubt whether the agency chose correctly) and the disruptive consequences of an interim change that may itself be changed." Id. (quoting Allied-Signal, Inc. v. U.S. Nuclear Reg. Comm'n, 988 F.2d 146, 150–51 (D.C. Cir. 1993)).

[¶ 122] The D.C. Circuit has held the "exceptional remedy" of remand without vacatur should be used "when an agency cannot easily unravel a past transaction" or "vacatur would disrupt settled transactions." Am. Great Lakes Ports Assoc. v. Schultz, 962 F.3d 510, 519 (D.C. Cir. 2020) (declining to vacate a rule when the outcome was to reinvoice and redistribute funds for all transactions four years earlier); EME Homer City Generation, L.P. v. EPA, 795 F.3d 118, 132 (D.C. Cir. 2015) (remanding without vacatur to avoid possible "substantial disruption to the trading markets . . . developed around the 2014 emissions budgets).

[¶ 123] In this case, the Court cannot think of a more serious deficiency than an agency acting without Congressional authority. Even if another court finds there is authority, the pervasive errors the Court has found through its analysis under the purported authority is equally disconcerting. The problems with the 2024 Rule are not limited to one or two provisions. The changes aggregate to seemingly reflect a motive to change NEPA into something it is not. NEPA may be "action-forcing" but it is not "outcome-forcing."

[¶ 124] The 2024 Rule has required deadlines for agencies to propose implementing procedures. Vacating the rule will stop those clocks. This is far less disruptive than requiring agencies to figure out how to navigate an invalid rule while on remand. No transaction would be unraveled, and no markets are at stake here. This Court will follow the ordinary practice and vacate the 2024 Rule.

### c. Scope

[¶ 125] CEQ argues vacatur should be limited to the Plaintiff States that have shown an injury. Doc. No. 86, p. 66. However, Justice Blackmun's dissent in Defenders of Wildlife states:

> In some cases the "agency action" will consist of a rule of broad applicability; and if the plaintiff prevails, the result is that the rule is invalidated, not simply that the court forbids its application to a particular individual. Under these circumstances a single plaintiff, so long as he is injured by the rule, may obtain "programmatic" relief that affects the rights of parties not before the court.

497 U.S. 871, 913 (1990) (J. Blackmun, dissenting); <u>see also</u> <u>Nat'l Min. Ass'n v. U.S. Army Corps</u> <u>of Engineers</u>, 145 F.3d 1399, 1409 (D.C. Cir. 1998).

[¶ 126] This Court is not issuing an injunction against enforcing the 2024 Rule against certain parties; the Court is vacating the rule entirely. The particular circumstances of these plaintiffs are not what makes the rule invalid. The natural consequence of invalidating a rule is that it is unenforceable against everyone. CEQ acted without authority and the 2024 Rule is invalid and vacated.

### d. Status Quo

[¶ 127] CEQ, Organization Intervenors, and State Intervenors argue vacatur would conflict with the amendments passed in the FRA. Doc. Nos. 85, p. 62; 86, p. 66; 88, p. 44. Plaintiff States argue FRA only codified aspects of the 2020 Rule and limited CEQ from making other changes. Doc. No. 98, p. 39.

[¶ 128] The APA states, "To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret" the law, and define terms of an agency action. 5 U.S.C. § 706. Based on those decisions, the reviewing court can either "compel agency action" or "hold unlawful and set aside agency action." <u>Id.</u> The "effect of invalidating an agency rule is to reinstate the rule previously in force." <u>Paulsen v. Daniels</u>, 413 F.3d 999, 1008 (9th Cir. 2005). The Fifth Circuit has recently held, "[A] vacatur does nothing but re-establish the status quo absent the unlawful agency action." <u>Texas v. United States</u>, 40 F.4th 205, 220 (5th Cir. 2022).

[¶ 129] In <u>Marin Audubon</u>, the FAA decided the Bay Area Parks Plan would have no environmental impact and did not need an EIS. 121 F.4th at 908. The FAA did not rely on its own procedures, but instead relied on CEQ's regulations. <u>Id.</u> at 911. The D.C. Circuit held CEQ did not have rulemaking authority, and therefore FAA's reliance on their regulations was in error. <u>Id.</u> at

914. The court held the FAA action was arbitrary and capricious and vacated the Plan. Id. at 918–19. The court did not vacate CEQ regulations, even though it found CEQ did not have authority. See id. at 919.

[¶ 130] The question before this Court is the validity of the 2024 Rule. The Court has found CEQ has no rulemaking authority and therefore, the 2024 Rule is invalid. The APA requires this Court to set aside and vacate invalid agency actions. See 5 U.S.C. § 706. All parties agree if the 2024 Rule is vacate, the status quo is the version of NEPA in place on June 30, 2024, the day before the rule took effect. See Doc. Nos. 135, p. 23; 137, pp. 9–10; see also 89 Fed. Reg. at 35442.

[¶ 131] It is very likely that if the CEQ has no authority to promulgate the 2024 Rule, it had no authority for the 2020 Rule or the 1978 Rule and the last valid guidelines from CEQ were those set out under President Nixon. However, vacating a rule does not mean the Court decides the appropriate replacement. The law states that vacating simply reinstates the previous rule. See Paulsen, 413 F.3d at 1008. The validity of the 2020 Rule is not before this Court. Whether or not the 2020 Rule conflicts with the FRA does not affect this Court's ruling and is not relevant to this decision. The Court holds CEQ has no rulemaking authority and therefore, the 2024 Rule is invalid and vacated as a matter of law.

**<u>CONCLUSION</u>**

[¶ 132] The first step to fixing a problem is admitting you have one. The truth is that for the past forty years all three branches of government operated under the erroneous assumption that CEQ had authority. But now everyone knows the state of the emperor's clothing and it is something we cannot unsee.

[¶ 133] The problem lies not only with CEQ and NEPA, but with the disheveled hodgepodge of law surrounding administrative agencies and executive orders generally. Presidents rely on the

Constitution and the laws of the United States, then leave it to the courts to decide which ones give them power. The Constitution separated the powers of government for very good reasons. The separation of powers doctrine is not an esoteric point of procedure that academics make a fuss about to get tenure. After centuries, we as Americans do not understand what it was like to live under a monarchy without checks and balances. People fought to separate these powers in a new form a government. People died for this new government because they saw what happened when all the power was held in one hand. Power can be taken by force, given, or lost inch by inch. It is the job of Congress to enact the law. It is the job of the President to enforce the law. It is the job of the Judiciary to determine the boundaries of the law. If Congress wants CEQ to issue regulations, it needs to go through the formal process and grant CEQ the authority to do so.

[¶ 134] For the reasons set forth above, the Plaintiff States' Motion for Summary Judgment (Doc. No. 64) is **GRANTED**. CEQ's Motion for Summary Judgment (Doc. No. 84), Organization Intervenors' Motion for Summary Judgment (Doc. No. 87) and State Intervenors' Partial Summary Judgment (Doc. No. 83) are **DENIED**.

[¶ 135] **IT IS SO ORDERED**.

DATED February 3, 2025.

Daniel M. Traynor, District Judge
United States District Court